**Robert E. Franz, Jr.**      OSB #730915
E-Mail:  rfranz@franzlaw.comcastbiz.net
**Sarah R. Henderson**      OSB #153474
E-Mail:  shenderson@franzlaw.comcastbiz.net
LAW OFFICE OF ROBERT E. FRANZ, JR.
P.O. Box 62
Springfield, OR 97477
Telephone: (541) 741-8220
  Attorneys for Mark Dannels, Pat Downing, Kris Karcher, Shelly McInnes,
  Raymond McNeely, Kip Oswald, Michael Reeves, Sean Sanborn,
  Eric Schwenninger, Chris Webley, Anthony Wetmore, Craig Zanni,
  David Zavala, City of Coquille, City of Coos Bay, Coos County, Oregon,
  and the Estate of David Hall

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| Nicholas James McGuffin,<br>as an individual and as guardian<br>*ad litem*, on behalf of S.M., a minor, | Case No. 6:20-cv-01163-MK |
| Plaintiffs, | |
| v. | **Objections to Magistrate's** |
| Mark Dannels, Pat Downing, Susan<br>Hormann, Mary Krings, Kris Karcher,<br>Shelly McInnes, Raymond Mcneely,<br>Kip Oswald, Michael Reaves, John<br>Riddle, Sean Sanborn, Eric<br>Schwenninger, Richard Walter,<br>Chris Webley, Anthony Wetmore,<br>Kathy Wilcox, Craig Zanni, David<br>Zavala, Estate of Dave Hall,<br>Vidocq Society, City of Coquille,<br>City of Coos Bay, Coos County,<br>and Oregon State Police, | **Findings and Recommendation**<br>by Defendants Dannels, Downing,<br>Karcher, McInes, McNeely, Oswald,<br>Reeves, Sanborn, Schwenninger,<br>Webley, Wetmore, Zanni, Zavala,<br>City of Coquille, City of Coos Bay,<br>and Coos County, and the Estate of<br>David E. Hall |
| Defendants. | |

Page 1 of 13 – Objections to Findings and Recommendation.

COME NOW Defendants Mark Dannels, Pat Downing, Kris Karcher, Shelly McInnes, Raymond McNeely, Kip Oswald, Michael Reeves, Sean Sanborn, Eric Schwenninger, Chris Webley, Anthony Wetmore, Craig Zanni, David Zavala, City of Coquille, City of Coos Bay, and Coos County, Oregon, and the Estate of David Hall by and through their attorneys, the Law Office of Robert E. Franz, Jr., and pursuant to Fed. R. Civ. P. 12(b)(6), and hereby offer the following Objections to Magistrate Kasubhai's Findings and Recommendation on Defendants' Motions to Dismiss Plaintiffs' Complaint, dated July 27, 2021.

## I.  Lack of Factual Specificity to State a Claim Under 42 U.S.C. § 1983.

Magistrate Kasubhai's findings are correct as to Defendant McInnes, and she should properly be dismissed from this action.  In addition, the same reasoning that applied to Defendant McInnes also applies to Defendants Karcher, Wetmore, Sanborn, Schwenninger, Webley, Zanni, Zavala.  Like McInnes, there are no specific allegations made against any of these named Defendants, who have been sued in their individual capacity.  Personal liability under § 1983 demands that a plaintiff plead "that each [g]overnment-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676; *see also Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988) [pleading standards governing § 1983 claims necessarily compel the plaintiff to "set forth specific facts as to each individual defendant's" contributory role in the resulting constitutional injury.]  As is the situation with Defendant McInnes, Plaintiffs have not alleged what specific wrongful conduct was committed: by whom, when, and where; and how that conduct violated the Constitution and damaged the Plaintiffs.  Instead, Plaintiffs have offered broad allegations of wrongdoing and attributed them to undifferentiated groups of defendants.  This approach does not satisfy pleading requirements and does not put each individual Defendant on notice of what he or she is alleged to have done wrong.

This case does not present a situation where undifferentiated allegations against all or a large group of defendants is warranted. As Magistrate Kasubhai correctly states, there are two circumstances under which allegations against a collection of undifferentiated defendants is permissible. The first is "where collective allegations are used to describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct." *United States ex rel. Silingo v. Wellpoint, Inc.*, 904 F.3d 667, 681 (9th Cir. 2018). As noted in Magistrate Kasubhai's Findings and Recommendation, Plaintiff's Complaint "does not allege that each Defendant engaged in precisely the same conduct." (Doc. No. 83 at 9) As such, the *Silingo* exception does not apply.

The second noted exception is where "the claimant does not possess the necessary information" to be more specific. *See Roberts v. Cty. of Riverside*, 2020 WL 3965027, at 3-4 (C.D. Cal. June 5, 2020). This exception also does not apply in the instant case. As these Defendants have discussed in prior briefing, Plaintiffs cannot contend that they lack the personal knowledge to individually identify which officers are responsible for the alleged harm. The Plaintiffs' attorneys have been working on this case since at least 2016 and have been given access to nearly every piece of discovery that exists. Plaintiffs have audio, video, and transcripts of two grand jury proceedings – the first grand jury convened in 2000, and the 2010 grand jury that indicted Plaintiff McGuffin. They have full transcripts of the 2011 jury trial. They have copies of the entire District Attorney's file, as well as all files from the law enforcement agencies involved in investigating the Freeman homicide. There is no legitimate reason why the Plaintiffs should not be required to allege specific wrongdoing on the part of each Defendant they have sued in their individual capacity. That is, Plaintiffs should be required to plead something more specific than "the Defendants fabricated evidence." This allegation, like most of

Plaintiffs' allegations, are nothing but 'naked assertion[s] devoid of 'further factual enhancement.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007).

Magistrate Kasubhai's Findings and Recommendation also improperly accepts as true unsubstantiated legal conclusions, that are not well-pled factual allegations. For example, in its analysis of the sufficiency of Plaintiff's allegations under Count One of their First Claim for Relief, the Magistrate accepts as true Plaintiffs' allegations that "Defendants deprived McGuffin of his constitutional right to due process and his right to a fair trial." (Compl. ¶ 183.) (Doc. No. 83 at 9) This is not a well-pled factual allegation, and it is not entitled to a presumption of truth at this stage. *Twombly*, 550 U.S. at 555 ("legal conclusions couched as factual allegations are not accepted as true").

Remember, the Plaintiffs are asking for substantial damages, and have made allegations of deplorable conduct on the part of each Defendant. There are hundreds of pieces of physical and documentary evidence. Surely, each Defendant is entitled to know what they did in more specific terms then they fabricated evidence. This Court, a jury, and the Defendants are given no clue in the Complaint as to what so-called "evidence" the Plaintiffs are talking about. What evidence, when, where and how did the fabrication of this unpled and unspecified evidence cause the Plaintiff to be wrongfully convicted? Defendants' Motions to Dismiss for failure to allege specific facts to support Plaintiffs' claims must be granted, as the specific facts wanting are necessary to put each Defendant on notice of what allegations are being made against each of them and allow them a meaningful opportunity to gather specific evidence to defend themselves.

## II. Negligence Claims are Barred by the Statute of Ultimate Repose.

Magistrate Kasubhai's Findings and Recommendation is flawed in its analysis of the applicability of Oregon's statute of ultimate repose. He accepts Plaintiffs' argument that the statute applies only to *physical* injuries to person or

Page 4 of 13 – Objections to Findings and Recommendation.

property.  This is incorrect.  To reach this conclusion, Plaintiffs and the Court
relied on a statutory construction argument that is fundamentally flawed.

First, the plain language of the statute simply states, "negligent injuries to
person or property."  ORS 12.115 (1).  It does not state "negligent *physical* injury
to person or property.  If the legislature intended to apply the statute of ultimate
repose to only physical injuries, it would have so stated.  There is no ambiguity in
the terms of the statute, therefore there is no justification to read in limitations that
are not indicated by the plain language, and no reason to engage in statutory
construction at all.  The statute simply applies to <u>any</u> negligent injury to person or
property.

Second, Plaintiff's argument as to why the statute of ultimate repose is
limited to physical injury relies on the interpretation of the terms of ORS 12.110.
Aside from the fact that engaging in statutory construction is not appropriate here,
it is also improper for two other reasons.  The primary reason is that ORS 12.110
<u>does not apply to public bodies</u>.  Unlike the statute of ultimate repose, ORS 12.110
has not been incorporated into the Oregon Tort Claims Act.  The statute of
limitations that applies to Plaintiff's tort claims against the Municipal Defendants
is ORS 30.275(9), which provides:

> "Except as provided in ORS 12.120, 12.135 and 659A.875, but
> <u>notwithstanding any other provision of ORS chapter 12</u> or other
> statute providing a limitation on the commencement of an action, an
> action arising from any act or omission of a public body or an officer,
> employee or agent of a public body within the scope of ORS 30.260 to
> 30.300 shall be commenced within two years after the alleged loss or
> injury."

The language of ORS 30.275(9) is clear.  It incorporates ORS 12.120, 12.135 and
659A.875, and *no other* provisions.  Thus, anything to do with ORS 12.110 is
irrelevant as to statute of ultimate repose as it applies to the municipal Defendants.

Page 5 of 13 – Objections to Findings and Recommendation.

 On the other hand, the statute of ultimate repose set forth in ORS 12.115(1), was incorporated into the Oregon Tort Claims Act in 1991 and is properly applicable to public bodies and public employees. *O'Brien v. State*, 312 Or. 672 (1992) ("the legislature amended ORS 30.265(3)(d) to provide that public bodies are immune from liability for "[a]ny claim which is limited or barred by the provisions of any other statute, including but not limited to any statute of ultimate repose." Or. Laws 1991, ch. 861, § 1).

Even if we were to accept Plaintiffs' approach and utilize ORS 12.110 in construing the statute of ultimate repose, the outcome would be the same. Plaintiffs' position is that legislature draws a clear line distinction between physical injury to the person, and injury to the rights of the person, because they are enumerated separately in ORS 12.110.  ORS 12.110 states, in relevant part:

> (1) An action for assault, battery, false imprisonment, or for any injury to the person or rights of another, not arising on contract, and not especially enumerated in this chapter, shall be commenced within two years; …

Pursuing Plaintiffs' approach to its logical conclusion, the following must be true: assault is separately enumerated, so it is not an injury to the person; battery is separately enumerated, so it is not an injury to the person; false imprisonment is separately enumerated, so it is neither an injury to the person or to the rights of another.  That leaves the question: if assault, battery, and false imprisonment are not injuries to the person, what is?  The answer is simple.  Assault, battery, false imprisonment, damage to reputation, emotional distress, *et cetera* are all injuries to the person, and ORS 12.110(1) is of no relevance to the application of the statute of ultimate repose.

In addition, construction of ORS 12.115(1) with ORS 12.110 is improper because ORS 12.110 is a statute of limitations—a fundamentally different

Page 6 of 13 – Objections to Findings and Recommendation.

mechanism than a statute of ultimate repose.  The way a statute of ultimate repose functions does not correspond with how a statute of limitations functions, because they are concerned with different things: the statute of limitations defines the period of time from a claim's accrual during which a claimant may file suit.  The statute of ultimate repose is not concerned with accrual of claims at all; rather, the applicability of ORS 12.115 is based on when the act or omission occurred, not when or what kind of injury might result.  *See Sealey v. Hicks*, 309 Or. 387, 394 n. 7, 788 P.2d 435 (1990) (ORS 12.115 "provides a deadline for the initiation of an action whether or not the injury has been discovered or has even occurred").  It sets a maximum amount of time from an alleged act or omission, after which a claim cannot be asserted, irrespective whether that claim has even accrued.  The construction of ORS 12.115(1) with a statute of limitations simply does not harmonize with logic.

Plaintiff's argument, which is adopted by Magistrate Kasubhai in his Findings and Recommendation, is also contradicted by case law both parties cite, *Cannon v. Oregon Dep't of Just.*, 288 Or. App. 793, 798–801, 407 P.3d 883, 888–89 (2017).  Plaintiffs argue that the Court of Appeals in *Cannon* "assumed that the statute of ultimate repose would apply to another exoneree's claims against state actors for negligent conduct, but the court never addressed—and was not asked to address—the plain language of the statute."  This contention is simply not correct.  The Court's decision on application of the statute of ultimate repose in *Cannon* was not an assumption of any kind—it was the principal issue decided in the case.

Philip Cannon filed suit against various departments of the State of Oregon on February 26, 2010.  Attached hereto as Exhibit A is a copy of the actual complaint filed by Mr. Cannon, which is a public record maintained by the Judicial Department of the State of Oregon.

Mr. Cannon's lawsuit included claims for negligence, abuse of process, legal malpractice, and *false imprisonment*, and alleged that Mr. Cannon had sustained "economic damages in the form of lost income while incarcerated, lost income continuing into the future after incarceration, attorneys fees, costs, and expenses incurred prior to the filing of this action related to Plaintiff's criminal cases" as well as "non-economic damages in the form of *emotional distress*, pain, suffering, anguish, *diminishment of reputation*, *loss of society and companionship* to his children, *loss of opportunity to restore reputation*, and all emotional responses associated with continuous unlawful confinement."  The Court of Appeals' analysis of the application of ORS 12.115(1) in *Cannon* (a case on all fours with the instant case in relevant part) is squarely applicable here:

> As the Supreme Court explained in *Shasta View Irrigation Dist. v. Amoco Chemicals*, 329 Or. 151, 162, 986 P.2d 536 (1999), a statute of limitations may be tolled in certain circumstances but, with few  **888 exceptions, a statute of ultimate repose may not be tolled. The statute of ultimate repose establishes a maximum time to file a claim, regardless of the date of discovery of an injury or other circumstances that may affect the expiration of the statute of limitations. It "provides a deadline for the initiation of an action whether or not the injury has  *799 been discovered or has even occurred." *Sealey v. Hicks*, 309 Or. 387, 394 n. 7, 788 P.2d 435 (1990); *Urbick v. Suburban Medical Clinic, Inc.*, 141 Or. App. 452, 457, 918 P.2d 453 (1996) (" 'It matters not when the claim has accrued, or even *if* it has accrued.' " (Quoting *Lesch v. DeWitt*, 118 Or. App. 397, 399-400, 847 P.2d 888, *vac'd on other grounds*, 317 Or. 585, 858 P.2d 872 (1993) (Emphasis in original.))). Unless otherwise provided by statute, an ultimate repose period " 'cannot be extended regardless of unfairness to the plaintiff.' " *Shasta View Irrigation Dist.*, 329 Or. at 162, 986 P.2d 536 (quoting *DeLay v. Marathon LeTourneau Sales*, 291 Or. 310, 315, 630 P.2d 836 (1981)). When the ultimate repose period has expired, the claim is extinguished and no legally cognizable injury exists. *Sealey*, 309 Or. at 392, 788 P.2d 435.

Here, the statute of ultimate repose required plaintiff to bring an action within "10 years from the date of the act or omission complained of." ORS 12.115(1). Thus, in considering whether plaintiff's claims against DOJ, OSP, and OSU are barred, the question is when the acts or omissions complained of in those claims *occurred*. The question of when plaintiff's claims "accrued" is a statute-of-limitations question that is irrelevant to the statute-of-repose inquiry; therefore, *Stevens* and other cases pertinent to the tolling of a statute of limitations do not bear on the analysis.

The record on summary judgment requires the conclusion that the acts or omissions complained of by DOJ, OSP, and OSU all occurred before and during plaintiff's trial, which concluded on February 25, 2000, more than 10 years before plaintiff filed his complaint. Indeed, plaintiff makes no argument to the contrary.[5] We therefore reject *800 plaintiff's contention that the period of ultimate repose had not expired.

We further reject plaintiff's contention that the period of ultimate repose was tolled until his release from prison under an exception for a plaintiff who is in a relationship of trust and confidence with the defendant. The Supreme Court acknowledged in *Josephs*, 260 Or. at 501-02, 491 P.2d 203, and *Cavan v. General Motors*, 280 Or. 455, 458, 571 P.2d 1249 (1977), that a period of ultimate repose might be tolled during a time when the plaintiff had an active and continuing "relationship of trust and confidence with the defendant and in which continued treatment or other ongoing resort to the skills of the defendant is required. The classic example is the physician-patient relationship." *Cavan*, 280 Or. at 458, 571 P.2d 1249. Plaintiff asserts that he had a continuous and ongoing relationship with defendants during the period of prosecution and incarceration. It is true that plaintiff had an adversarial relationship with the state defendants for various periods during his prosecution and imprisonment, but it was not one of "trust and confidence" such that DOJ, OSP, and OSU had a duty to act in plaintiff's interest in the way required to toll the period of ultimate repose.

Finally, with respect to plaintiff's constitutional argument, the Supreme Court has previously considered and rejected the contention that application of a statutory period of ultimate repose before a claim

becomes actionable violates the remedy clause of Article I, section
10.  **889 *Josephs*, 260 Or. at 502, 491 P.2d 203 (holding that "a
statute which purports to extinguish a remedy before the legally
protected right becomes actionable" does not violate Article I, section
10);[6] *see also Horton v. OHSU*, 359 Or. 168, 193, 376 P.3d 998
(2016) ("[W]ithin constitutional limits, the legislature has
authority  *801 to alter a common-law duty or condition the
procedural means of recovering for a common-law injury."
(citing *Josephs*)). <u>For the foregoing reasons, we conclude that the trial
court did not err in dismissing plaintiff's claims against DOJ, OSP,
and OSU based on the statute of ultimate repose.</u>

*Cannon v. Oregon Dep't of Just.*, 288 Or. App. 793, 798–801, 407 P.3d 883, 888–

89 (2017).  Plaintiffs' argument, as adopted by Magistrate Kasubhai, is clearly

incorrect.  In order to find that the ORS 12.115(1) does not apply in the instant

case, this Court would be required to disregard the authority found in *Cannon*, and

effectively overrule a decision by the Oregon Court of Appeals.  This Court should

not, and indeed cannot, do so pursuant to the *Rooker-Feldman* jurisdictional

doctrine, *inter alia*.  Rather, this Court should defer to the Oregon Court of

Appeals in its interpretation and application of Oregon law, and properly apply

ORS 12.115(1) to Plaintiffs' state law negligence claims.

## III.  Any Malicious Prosecution Claim Fails on Favorable Termination.

Magistrate Kasubhai's Findings and Recommendation correctly analyzes the

favorable termination requirement for a state law malicious prosecution claim.

Plaintiff's criminal case indeed was not terminated in a manner that indicated his

innocence, and this claim fails as a matter of law.  However, the Findings and

Recommendation goes on to state that Plaintiffs' federal malicious prosecution

claim does not suffer the same defect.  This conclusion is incorrect, as the

Plaintiffs' federal malicious prosecution likewise was not terminated in a manner

that indicated the innocence of Mr. McGuffin.

Page 10 of 13 – Objections to Findings and Recommendation.

As an initial matter, these Defendants dispute whether Plaintiffs have indeed pled a federal malicious prosecution claim. However, it makes little difference because a federal malicious prosecution claim fails on the favorable termination element just like Plaintiffs' state law claim does.

To prevail on a state law malicious prosecution claim, the Plaintiff must prove: "(1) the institution or continuation of criminal proceedings; (2) by or at the insistence of the defendant; (3) termination of such proceedings in the plaintiff's favor; (4) malice in instituting the proceedings; (5) lack of probable cause for the proceedings; and (6) injury or damage because of the prosecution." *Rose (Betty) v. Whitbeck*, 277 Or. 791, 795, *mod*., 278 Or. 463 (1977); *Miller v. Columbia County*, 282 Or. App. 348, 360 (2016).

Federal courts rely on state common law for the elements of state law malicious prosecution. *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004). So, in the context of a claim under § 1983 for malicious prosecution, the Plaintiff must prove: (1) the elements of the state law tort, and (2) the intent to deprive the plaintiff of a constitutional right. *Westwood v. City of Hermiston*, 787 F. Supp.2d 1175, 1205 (D. Or. 2011); *Pusateri v. Klamath Cty. Cmty. Dev.*, No. 1:18-CV-00058-MC, 2018 WL 468300, at 2 (D. Or. Jan. 18, 2018); *Mata-Gonzalez v. Monico*, No. 3:11-cv-00260, 2013 WL 5476952, at *8 (D. Or. Sep. 27, 2013). Because the elements of the state law tort are incorporated into a federal claim for malicious prosecution under 42 U.S.C. § 1983, if the state law claim fails on one of its elements, the federal claim likewise fails.

The case law Magistrate Kasubhai relies on for proposition that the federal malicious prosecution action does not require favorable termination is addressing when a federal malicious prosecution claim *accrues*, rather than defining its elements. Favorable termination—that is, termination of prior proceedings in such a manner as to indicate a claimant's innocence, is a necessary element of a federal

Page 11 of 13 – Objections to Findings and Recommendation.

malicious prosecution claim. *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1068 (9th Cir. 2004). Plaintiffs' malicious prosecution claim arising under 42 U.S.C. § 1983 fails for the same reasons as the state law malicious prosecution claim both in general and as an incorporated element of the Oregon state law tort.

## IV. Statute of Limitations and Tort Claim Notice Requirements.

All of Plaintiffs' state law claims that accrued prior to the date the conviction was set aside, and therefore were not barred by his conviction under *Heck*, must be dismissed as untimely and for failure to comply with tort claim notice requirements. Plaintiffs' position is that none of their claims for relief accrued until the conviction was set aside. Clearly this is not true. Under *Heck*, the only claims that would accrue when the conviction was set aside are claims for malicious prosecution, which fail as a matter of law on other grounds. Any claims that do not require favorable termination as an element of the cause of action accrue when the alleged injury first occurs, and Plaintiff has a complete cause of action. For Plaintiff's false imprisonment claim, on the date of the arrest—August 23, 2010. For his defamation and false light claims, on the date of publication, whether Mr. McGuffin was incarcerated or not. For his intentional infliction of emotional distress claim, on the date of the act alleged to have caused emotional distress, whether Mr. McGuffin was incarcerated or not. It is undisputed that Plaintiff did not provide tort claim notice to any defendant prior to May of 2020. The time allowed to provide tort claim notice had expired nearly ten years before at the least, and in some instances nearly twenty years before. Magistrate Kasubhai's recommendation to dismiss Plaintiffs' Fourth and Fifth claims for relief as time-barred is correct, and the same analysis applies to the Second and Eighth claims for relief.

## V.  Conclusion.

These Defendants ask that this Court adopt the portions of Magistrate Kasubhai's Findings and Recommendation proposing dismissal of Plaintiffs' claims against Defendant McInnes entirely, dismissal of Plaintiffs' state and federal conspiracy claims, and state law malicious prosecution, false light, defamation *per se*, and indemnification.

In addition, for the reasons stated herein, as well as those briefed and argued previously, these Defendants ask the Court to dismiss Plaintiffs' state law claims for false imprisonment, negligent training and supervision, intentional infliction of emotional distress, and the remaining counts of Plaintiffs' 14th Amendment claim against all of the City and County Defendants.

DATED:  Tuesday, August 24, 2021.

Respectfully submitted,

/s/ Sarah R. Henderson
LAW OFFICE OF ROBERT E. FRANZ, JR.
**Sarah R. Henderson**
OSB #153474
(541) 741-8220
**Of Attorneys for Defendants Mark Dannels,
Pat Downing, Kris Karcher, Shelly McInnes,
Raymond McNeely, Kip Oswald,
Michael Reeves, Sean Sanborn,
Eric Schwenninger, Chris Webley,
Anthony Wetmore, Craig Zanni, David Zavala,
City of Coquille, City of Coos Bay,
Coos County, Oregon, and the Estate
of David E. Hall**

Verified Correct Copy of Original 1.22.2015.

STATE OF OREGON
Marion County Circuit Courts
FEB 2 6 2010
ENTERED

STATE OF OREGON
Marion County Circuit Courts
FEB 2 6 2010
FILED

IN THE CIRCUIT COURT FOR THE STATE OF OREGON

FOR THE COUNTY OF MARION

PHILIP SCOTT CANNON,            )
                                )   Case No. ____10C12260____
        Plaintiff,              )
                                )   COMPLAINT – NEGLIGENCE,
    v.                          )   ABUSE OF PROCESS, LEGAL
                                )   MALPRACTICE, FALSE
OREGON DEPARTMENT OF JUSTICE,   )   IMPRISONMENT
OREGON STATE POLICE,            )
OREGON STATE UNIVERSITY,        )
OREGON PUBLIC DEFENSE           )
SERVICES COMMISSION, AND        )
ROBIN A. JONES                  )   (JURY TRIAL REQUESTED; NOT
                                )   SUBJECT TO MANDATORY
        Defendants              )   ARBITRATION)
                                )
                                )   (Demand Range: Greater than 1,000,000)

Plaintiff alleges:

## JURISDICTION AND VENUE

1.

Plaintiff is a resident of Marion County, Oregon.

2.

Defendant Oregon State Police ("OSP") is an agency of the state of Oregon. Defendant

Oregon State University ("OSU") is an agency affiliated with the Department of Higher Education

which is headquartered in Marion County, Oregon. Defendant Oregon Department of Justice

("DOJ") is an agency of the state of Oregon. Oregon Public Defense Services Commission

("OPDSC") is the public defender's office providing indigent defense to people convicted of crimes

and is an agency of the state of Oregon. OSP, DOJ, and OPDSC are headquartered in Marion

PAGE 1 – COMPLAINT

10C12260
CM
Complaint
1920957




Exhibit A at 1

Verified Correct Copy of Original 1 22 2015.

1    County. Defendant Robin Jones ("Jones") is an attorney licensed to practice law in the State of

2    Oregon and represented Plaintiff on Plaintiff's direct appeal to the Oregon Court of Appeals and

3    Supreme Court, and whose office is primarily located in Marion County. During the events

4    described in this Complaint, Jones was acting in the course and scope of her employment for

5    OPDSC.

6                                    **FACTUAL ALLEGATIONS**

7                                                3.

8         On November 23, 1998, Jason Kinser ("Kinser"), Suzan Osborne ("Osborne"), and Celesta

9    Graves ("Graves") were murdered at 5909 Orchard Heights Road. On November 24, 1998, Plaintiff

10   was detained and interrogated. On November 25, 1998, Plaintiff was arrested and charged by

11   information with the aggravated murder of Kinser, Osborne, and Graves.

12                                               4.

13        On December 3, 1998, Plaintiff was indicted for the aggravated murder of Kinser, Osborne,

14   and Graves. Plaintiff entered a not guilty plea to all charges on December 3, 1998. Morrow became

15   defense counsel on January 11, 1999. Trial began on January 24, 2000 and continued through

16   February 25, 2000. Plaintiff was found guilty by jury verdict on February 28, 2000. On March 16,

17   2000, Judgment of Conviction was entered. Plaintiff appealed his conviction to the Oregon Court

18   of Appeals; his conviction was affirmed without opinion on July 31, 2002. Plaintiff petitioned for

19   review to the Oregon Supreme Court; that petition was denied on January 22, 2003. Plaintiff filed

20   a Petition for Post-Conviction Relief in Marion County Circuit Court on January 12, 2004. On

21   September 2, 2009, a Stipulated Judgment granting Post-Conviction relief was entered in Marion

22   County Circuit Court setting aside Plaintiff's convictions for aggravated murder. On December 18,

23   2009, all charges against Plaintiff were dismissed without prejudice. Plaintiff was continuously

24   incarcerated from November 24, 1998 to December 18, 2009. On January 12, 2010, a judgment

25   vacating Plaintiff's sentence was entered in Polk County Circuit Court.

26   ///

27

28   PAGE 2 – COMPLAINT

Exhibit A at 2

Verified Correct Copy of Original 1 22 2015.

5.

Plaintiff is not guilty of the aggravated murder charges against him and has maintained his innocence throughout these proceedings.

6.

Throughout the investigation of the murders of Graves, Osborne, and Kinser, Polk Sheriff, Krauger, Woods, and Holsapple mishandled evidence. In a deposition in June 2009, Krauger, the person responsible for securing, labeling and tracking the movements of all of the evidence acknowledged that there were "problems" with the evidence handling in this case. These problems include, but are not limited to, the loss of several pieces of evidence from a secure storage locker, cross-contamination of evidence from another case, mislabeled evidence and gaps in the chain of custody. Finally, on June 7-July 20, 2005, Polk DA/Fisher destroyed exhibits relevant to Plaintiff's case.

7.

On November 23, 1998, Kinser, Osborne, and Graves were shot to death in a mobile home in rural Polk County that was owned by Charles ("Charles") and Bimla Boyd ("Bimla"). Kinser was a drug dealer, methamphetamine producer, and police informant whose close associate had recently tried to assist authorities with a controlled drug purchase that had resulted in retaliation from some drug dealers. Kinser was also reportedly involved in a variety of other criminal actions, thefts, and strong-arm debt collections. Kinser had angered several people in Oregon's criminal underworld and it had been reported that more than one "hit" had been planned in order to kill him. At least one of these "hits" was connected to drug dealers. Osborne was Kinser's girlfriend and Graves was their close friend.

8.

Prior to moving into the mobile home on the Boyds' property, Kinser and Osborne were living in the Boyds' residence. Graves was a frequent visitor and overnight guest to the mobile home. Apparently, all victims were killed at the location where their bodies were found. All of the

PAGE 3 – COMPLAINT

LAFKY & LAFKY
ATTORNEYS AT LAW
429 COURT ST. NE, SALEM, OR 97301
TELEPHONE (503) 585-2450 - FAX (503) 585-0205 - Email Info@lafky.com

Exhibit A at 3

Verified Correct Copy of Original 1.22.2015.

victims were shot in the head; Kinser and Osborne were each shot once and Graves was shot twice, for a total of four gunshot wounds.  Kinser was found inside the kitchen area of the residence; Osborne and Graves were found lying together beneath the mobile home.

9.

Bimla was the person who initially reported the crime.  Bimla stated that she was on her way to pick up her children from the school bus stop when she noticed smoke coming out of the front door of the mobile home.  She stopped to investigate, opened the door, and discovered a fire burning atop the hearth in front of a wood burning stove.  After putting out the fire and allowing the dense smoke to clear, she reportedly noticed Kinser lying on the floor in a pool of blood, gasping for breath and trying to speak.  Bimla then stated that she exited the mobile home and called 911 at 3:57pm to report the situation and seek medical assistance for Kinser, whom she believed to be still alive.  Twenty minutes later, Bimla reportedly called 911 again to report that nobody had arrived and if someone did not get there soon, Kinser would be dead.

10.

From November 24-December 31, 1998, Steele was the elected Sheriff of Polk County.  From January 1, 1999 to present, Wolfe has been the elected Sheriff of Polk County and is responsible for the actions of the employees of Polk Sheriff.  When the police, including agents and employees of Polk Sheriff and Dallas PD arrived, they determined Kinser was dead and that he had been shot.  Subsequently, Holsapple was assigned as lead detective in this investigation until January 1999.  In January 1999, Krauger and Taylor assumed the role of co-lead detectives.  As such, Holsapple's responsibilities included, but were not limited to, assigning the gathering, documenting, and storage of all evidence and determining initial suspects.  Holsapple assigned the responsibility of gathering, documenting, and storage of all evidence to Krauger.  Holsapple assigned Box to take the initial interviews with the surrounding neighbors.  At the crime scene, Holsapple assigned Woods to shoot a video.  This video was never given or shown to Plaintiff's trial counsel.  Just prior to Plaintiff's trial, Holsapple took this video out of evidence storage to Spirit Mountain Casino

PAGE 4 – COMPLAINT

Exhibit A at 4

Verified Correct Copy of Original 1 22 2015.

1  reportedly for editing for presentation to the jury. Numerous requests were made to view the video

2  throughout the post-conviction relief case, and agents of Polk DA, Polk Sheriff, and DOJ made

3  knowingly false representations as to its existence. Polk Sheriff has "lost" the original video of the

4  crime scene.

5                                          11.

6      Polk Sheriff/Dallas PD ran checks into Kinser's background and determined that he had been

7  recently arrested, along with Thomas McMahon, for trafficking methamphetamine. At that time,

8  McMahon (whom the police describe as Hispanic) was considered a suspect in the homicides, and

9  a photo line-up containing his picture was constructed for future use. The police questioned Bimla

10  about her discovery and called for additional assistance from Polk Sheriff/Dallas PD/OSP and the

11  county medical examiner. Over two hours later, the bodies of Osborne and Graves were discovered.

12  Graves's body was partially under the mobile home, with her legs protruding from beneath a piece

13  of lumber, and Osborne's body was completely under the perimeter of the mobile home. The

14  medical examiner pronounced them to be dead from gunshot wounds to the head, (it was later

15  determined that all victims had been killed with a .22 caliber gun of unknown make and model).

16  Due to the lack of daylight and weather conditions, police officers determined that the crime scene

17  should be "secured" and the investigation postponed. Charles was allowed to enter the crime scene

18  and retrieve his dog, which was apparently underneath the mobile home. The following day, two

19  .22 caliber shell casings were found underneath the mobile home in close proximity to the bodies.

20  To date, the other two casings have not been found. Krauger/Polk Sheriff also took into evidence

21  a red, BIC lighter that the fire marshal believed was a possible source of ignition for the fire and that

22  he felt should be tested for finger prints. The lighter was subsequently "lost" while in the custody

23  of Krauger/Polk Sheriff before ever being tested. Also "lost" by Polk Sheriff was a section of the

24  outside wall of the residence containing a possible fifth bullet hole that Polk Sheriff Woods had

25  removed with a pair of tin snips.

26  ///

27

28  PAGE 5 – COMPLAINT

LAFKY & LAFKY
ATTORNEYS AT LAW
429 COURT ST. NE, SALEM, OR 97301
TELEPHONE (503) 585-2450/FAX (503) 585-0205/ Email info@lafky.com

Verified Correct Copy of Original 1 22 2015.

12.

Upon questioning Bimla, the police began to learn of the events that had supposedly occurred prior to her finding Kinser. Bimla told them that the water line to the trailer had been broken by Kinser's dog a few days earlier and that the victims had been trying to get the water line repaired. Kinser and Charles had attempted to fix the problem the previous night, but were unable to make the necessary repairs. It was decided that the problem was beyond their ability, and that professional help was needed. A local plumbing contractor, Robert's Plumbing, was contacted, who estimated the cost of the repair at $1,000. Graves suggested that she had a friend who was a handyman who could probably repair the problem for much less. Plaintiff was that handyman. Plaintiff arrived at the mobile home sometime after the men from Robert's Plumbing had left. Bimla observed Plaintiff's maroon colored mini van parked in front of the mobile home.

13.

At about 3:15 pm, Bimla had reportedly prematurely driven down her driveway to pick up her children from their school bus stop, so she decided to return home and wait until the correct time. According to Bimla, this was the second time that day that she had made a needless trip down her 0.6 mile, gravel driveway for reasons she could not explain to police. On her way back to her house, she reportedly encountered a small tree or limb which had fallen across her driveway. Bimla reportedly attempted to call Osborne at least twice for assistance with removing the obstruction, but could not get through.

14.

While stopped in the driveway, a small pickup truck reportedly pulled up behind Bimla. Two men, Jeremy Douglas Olsen ("Olsen") and Larry Weaver ("Weaver") were in that pickup and were there to allegedly deliver a gallon of water to the mobile home. Olsen got out of the pickup and approached Bimla's vehicle, observing the blockage in the road as he did so. Olsen borrowed Bimla's cell phone to call Osborne and have Kinser bring his chainsaw. Olsen was reportedly able to reach Osborne on her cell phone at 3:28pm, and he could hear Kinser in the background. The

PAGE 6 – COMPLAINT

LAFKY & LAFKY
ATTORNEYS AT LAW
429 COURT ST. NE, SALEM, OR 97301
TELEPHONE (503) 585-2450/FAX (503) 585-0205/ Email Info@lafky.com

Exhibit A at 6

exchange between Olsen and the people in the mobile home was described by Bimla as being vulgar and angry.  According to cell phone records, the conversation ended at 3:30pm.  After they decided that Kinser was not going to assist, Olsen and Weaver moved the log on their own and drove the approximate 100 yards to the trailer.

15.

Bimla then reportedly proceeded on to her home while Olsen and Weaver turned off at the trailer.  During the next fifteen minutes, Bimla's attention was reportedly focused upon working on a quilt and using the bathroom.  At some point during this time, the power also went out.  Bimla claims she did not see the pickup leave, nor was she sure when Plaintiff left.  According to Bimla, she left her home at 3:45pm and noticed smoke coming from the front door of the mobile home.  When she approached the home to investigate, Bimla found the front door ajar and Kinser's dog in an agitated state.  It was at this time that she claimed the mobile home was fully engulfed in thick smoke and that there was a box of papers next to the wood stove that was on fire, which she subsequently extinguished.  After putting out the fire, Bimla stated that she attempted to remove Kinser's dog, but that the dog would not leave.  Bimla claimed the smoke cleared enough for her to see Kinser lying on the kitchen floor with his head in a pool of blood.  At this time, Bimla believed that Kinser was alive and tried to communicate with him.  Bimla told police that she then left the mobile home and called 911, then drove to the bottom of her driveway and waited for the fire and rescue personnel to arrive.  During the initial 911 call, Bimla told the operator that she thought that the whole thing was a "set-up" and that she had seen the victim's girlfriend (Osborne) leave in a car.  Bimla also told the police that she had "run into someone" prior to finding the fire.  After speaking with Bimla, an "all points bulletin" (APB) was put out for the two men in the yellow pick-up.

16.

The next day, after reading about the murders in a newspaper and observing a strange look on the face of Olsen, Teresa Monahan ("Monahan") contacted Polk Sheriff to see if the people in the article were her friends.  The police declined to disclose the names of the victims, but said they

PAGE 7 – COMPLAINT

Exhibit A at 7

Verified Correct Copy of Original 1.22.2015.

Verified Correct Copy of Original 1 22 2015.

1 would contact her and Olsen. Later that day, November 24, 1998, Monahan, Olsen, Weaver, and

2 Jamison "Bubba" Ennis ("Ennis"), along with Ennis' girlfriend, Nichole York, and another

3 individual all went to the victims' mobile home. Upon arrival (in two separate vehicles– Weaver's

4 yellow pickup and Ennis' red Volkswagon Jetta) the police determined that Olsen and Weaver were

5 the two men for whom they had the APB on. The police also recognized Ennis as someone whom

6 they had dealt with on previous occasions. Everyone but Ennis was asked to make statements at the

7 Polk Sheriff's office. After speaking with Olsen and Weaver, who explained that they were at the

8 trailer the previous day to deliver a gallon of water to Kinser and that Plaintiff had been at the crime

9 scene when they left, Polk Sheriff, Dallas PD, and Polk DA/DOJ decided to focus their attention on

10 Plaintiff. At approximately 8:00pm that evening, Plaintiff was arrested at his home in Marion

11 County.

12                                          17.

13      During his interrogation, Plaintiff cooperated with Polk Sheriff, Polk DA/DOJ, Dallas PD,

14 and OSP, detailing his actions over the previous 48 hours. Plaintiff admitted to being a recreational

15 drug user, owning an illegal short barreled shot gun and several other weapons, and to having at one

16 time been in possession of money that belonged to Graves's boyfriend. Plaintiff explained that he

17 was no longer in possession of that money due to the fact that Graves had told too many people about

18 it and that Graves was now telling people that the money was in a safe deposit box. Plaintiff also

19 described, in detail, the problems that he had encountered with the plumbing at the trailer (these

20 problems were the same that the plumber from Robert's Plumbing would later describe at trial) and

21 gave a description of a man who appeared to be Hispanic who was at the trailer whom he believed

22 to be having some sort of conflict with Kinser when Plaintiff left. The interrogation was conducted

23 by Wallace of Dallas PD and Oja of OSP. During the interrogation, Plaintiff complained that

24 Wallace and Oja were misquoting him and that he would like them to play back the recording. The

25 tape recorder that was present in the room was thrown against the wall and broken by Wallace and

26 the tape of the conversation was never produced. In pretrial testimony by Wallace and trial

27

28 PAGE 8 – COMPLAINT

Exhibit A at 8

Verified Correct Copy of Original 1 22 2015.

1   testimony by Oja, both officers claimed that there never was a tape in the recorder, that they had been

2   advised to "save money" by not using tapes, and that the only reason the pocket sized recorder was

3   on the table in front of Plaintiff was that there was nowhere else to "store it." Plaintiff requested an

4   attorney. Subsequently, Plaintiff was charged with the murders of Kinser, Osborne, and Graves.

5   After searching Plaintiff's home on two separate occasions, agents of OSP, Polk Sheriff, and Dallas

6   PD found hundreds of spent shell casings of various caliber, including many .22 caliber shell casings

7   and several boxes of live .22 caliber ammunition.

8                                                          18.

9           Over the course of the next several months, agents of OSP, Polk Sheriff, Polk DA, DOJ, and

10  Dallas PD interviewed dozens of witnesses and generated over 6,000 pages of reports in which many

11  facts came to light which would cause a reasonable person to question the theory that Plaintiff had

12  committed these crimes.   Morrow refused to provide Plaintiff with copies of these reports,

13  preventing Plaintiff from being able to reasonably aid and assist in his own defense. In the reports,

14  it was learned that one of Bimla's neighbors, a former police officer named Larry Wacken, had

15  reported to Polk Sheriff that, on the day of the murders, Wacken had heard a series of gunshots and

16  a woman scream at about 4:05pm. Many of Bimla's neighbors also reported that there had been

17  substantial suspicious activity at the residence for several weeks prior to the murders. Although it

18  was later apparently "sanitized" from the official Master Index of Police Reports, report C-10, which

19  was a photo line-up of a Hispanic looking man named Thomas McMahon, was initially generated

20  on the day of the murders. Also, several months after Plaintiff was arrested, a "confidential" memo

21  by Krauger was authored that listed Ennis as a suspect. In addition, several people associated with

22  the local illegal drug culture told police that there was a "hit" out on Kinser prior to his death. Many

23  acquaintances of Plaintiff were also interviewed; all of them acknowledged that Plaintiff had

24  possessed firearms for a substantial time period prior to the murders. Krauger either authored a note

25  or received written instruction that stated: "clear Bim Boyd of shooting."

26  ///

27

28  PAGE 9 – COMPLAINT

LAFKY & LAFKY
ATTORNEYS AT LAW
429 COURT ST. NE, SALEM, OR 97301
TELEPHONE (503) 585-2450/FAX (503) 585-0205/ Email Info@lafky.com

Exhibit A at 9

19.

A few days after Plaintiff was arrested, an unidentified person attempted to bribe the night watchman at a Salem towing company to gain access to a vehicle that had recently been impounded by the Salem police department. This person reportedly told the night watchman that he needed to get some items from the vehicle that could implicate his friends in a murder. The watchman did not comply, instead contacting Salem police, who in turn contacted Polk Sheriff, who then took possession of the vehicle (a brown, triumph sports car owned by Patrick Murphy ("Murphy")), and proceeded to confiscate several items from it, including jewelry and three blue colored coin collector books. The items were later returned to the Salem Police Department. Polk Sheriff and Polk DA failed to inform Plaintiff and his attorneys of these facts. Several days after that, acting on a call from a concerned neighbor, Salem authorities discovered the body of Murphy in his Salem residence. It appeared that he had been killed several weeks prior (approximately 3 and a half weeks prior to the murders for which Plaintiff was charged). Eventually, Ennis and two others, Michael Benson and Brian Hudson, were arrested and later convicted of killing Murphy with a .22 caliber gun. Almost one year after the murders of Osborne, Kinser, and Graves, while awaiting trial for the Murphy murder charge, Ennis confessed to police that Olsen and Weaver were at Bimla's the day of the murders, at his direction, to deliver drugs. This is a fact that both Olsen and Weaver failed to mention to Polk Sheriff, Polk DA, DOJ, OSP, and Dallas PD until after they were made aware that Ennis had alerted the police to their true reason for being at the Boyd property. As described in paragraph 25 below, coin collection books similar to those seized from Murphy's vehicle were at the murder scene.

20.

After the bodies of Graves, Kinser, and Osborne had been examined, evidence of wounds other than gunshots were noted, and it was also determined that each of the victims would have died immediately from the gunshots. During trial, testimony from the state medical examiners indicated that if Bimla had heard Kinser gasping, she would have had to have found him within one minute

PAGE 10 – COMPLAINT

LAFKY & LAFKY
ATTORNEYS AT LAW
429 COURT ST NE, SALEM, OR 97301
TELEPHONE (503) 585-2450/FAX (503) 585-0205/ Email Info@lafky.com

Exhibit A at 10

Verified Correct Copy of Original l 22 2015.

of Kinser being shot. Kinser had in fact gasped after being shot, due to the presence of inhaled blood found in his lungs. The closest time of death by reasoning would be 3:57 pm, the time that Bimla called 911 and reported that Kinser was gasping and trying to speak. *This time is in conflict with* the time that Plaintiff arrived home (4:02pm) according to his fiancee, Sarah Miller ("Miller"). Miller's initial statements were that she was unsure of when Plaintiff arrived home, but she recalled that she was just finishing a phone call to the power company at that time; phone records later revealed that the time of the call was from 3:58pm to 4:02pm. The travel time between the crime scene and Plaintiff's home was a minimum of 26 minutes according to the police. It was the Polk DA/DOJ's theory that all victims were killed between the time that Olsen's cell phone conversation with the victims ended (3:30pm) and the time that Olsen and Weaver claimed that they arrived at the mobile home (approximately 3 to 4 minutes later).

21.

Facing charges of unlawful use of a motor vehicle and possession of a modified firearm, Timothy Canini ("Canini") approached Polk Sheriff/Polk DA/DOJ with a proposal to testify that he had purchased several silenced .22 caliber guns from Plaintiff prior to the murders and that Plaintiff was a drug addict, in exchange for his being released from the Marion County Jail. Canini was released immediately after speaking with Krauger, allegedly due to "emergency overcrowding." At Plaintiff's trial, Canini also disclosed that he knew Ennis and that he had given one of the .22 caliber weapons that he had obtained from Plaintiff to Ennis, and that the last place Canini was aware of the location of that weapon was in the attic of Murphy, the victim in Ennis's murder case. Upon his release, Canini promptly absconded and was unavailable for questioning by Plaintiff's attorneys until he was picked up during a "random" traffic stop and used by the state as a rebuttal prosecution witness– two days before the end of Plaintiff's trial. Canini denied getting any special favors from Polk Sheriff/Polk DA in exchange for his testimony, but he did say that he and Krauger were "good friends."

///

PAGE 11 – COMPLAINT

LAFKY & LAFKY
ATTORNEYS AT LAW
429 COURT ST NE, SALEM, OR 97301
TELEPHONE (503) 585-2450/FAX (503) 585-0205/ Email Info@lafky.com

Exhibit A at 11

Verified Correct Copy of Original 1 22 2015.

Verified Correct Copy of Original | 22 2015.

22.

In early June 1999, Fisher chose to resubmit Plaintiff's clothing to the OSP crime lab for DNA testing. The first time that the same clothes were examined, there was reportedly no DNA or other forensic evidence found. During this retesting, OSP allegedly found three spots of blood on the Plaintiff's boots. After further testing, it was shown that the DNA was human male blood that did not match any of the victims and all of the samples were "consumed" in order to conduct the analysis. During the second examination it was never asked, nor was it ever disclosed, why Polk DA/DOJ believed there was a need to conduct further laboratory testing. The "discovery" of the blood was used as a reason to deny Plaintiff bail, and it was several months after the bail hearing that the blood was found not to match any of the victims. Upon his arrest, approximately 25 hours after the last body was discovered, Plaintiff was thoroughly examined by Polk Sheriff, Dallas PD, and OSP and was found to have no injuries.

23.

During the summer of 1999, Salem attorney Michael McDonough ("McDonough") contacted Polk Sheriff/Polk DA/DOJ stating that he had reason to believe that Bimla was planning on fleeing the country in order to avoid testifying at Plaintiff's trial. McDonough reported that Bimla had approached him for advice regarding what kind of trouble she would get in if she went to Mexico to "hide out" during Plaintiff's trial. A pretrial hearing was held, and Bimla denied making the statements, instead telling the court that she suffered from numerous medical problems, including panic and anxiety disorders, memory problems, difficulty walking and cancer, and that she needed to go to Mexico for treatment that was not available in the United States. The court asked her to supply the names of her local doctors in order to verify her claims. Nobody, either from the defense or prosecution, ever checked the names that she supplied. The only names Bimla provided were that of a psychologist and a chiropractor. In light of this disclosure, Morrow failed to follow up with questioning Bimla either during pretrial or trial regarding the types of medications she was using or how these medications could have affected her memory.

PAGE 12 – COMPLAINT

LAFKY & LAFKY
ATTORNEYS AT LAW
429 COURT ST. NE, SALEM, OR 97301
TELEPHONE (503) 585-2450/FAX (503) 585-0205/ Email Info@lafky.com

Exhibit A at 12

24.

During the summer of 1999, Plaintiff's attorneys were having much difficulty obtaining discovery from Polk DA/DOJ. During a pretrial hearing in mid August 1999, Judge Luukinen admonished Polk DA/DOJ for "playing games with a man's life." Polk DA/DOJ at that time was denying that it had access to or possession of any of the discovery from the Ennis case in neighboring Marion County. The District Attorney from Marion County, Dale Penn, wrote Judge Luukinen to state that he that was familiar with both cases and claimed that they were not related. Polk DA/DOJ claimed that they were not in possession of any discovery material from the Ennis case. Judge Luukinen subsequently ordered Polk DA/DOJ to comply with Plaintiff's request for discovery. A few days later, Krauger turned over a massive file containing discovery from the Ennis case, claiming in a sworn affidavit that he had apparently over-looked it for several months. In addition, Oja turned in as evidence a live .22 caliber bullet that he had claimed he had "accidentally" put in his pocket during his search of Plaintiff's home the previous year. Oja was purportedly uncertain how or when the bullet got into his pocket, but he stated that it could only have happened during his search of Plaintiff's residence. Although the bullet in question was never used as evidence in Plaintiff's trial. Oja was at the crime scene prior to searching Plaintiff's home.

25.

During opening statements at Plaintiff's trial, Morrow informed the jury that one of the victims, Osborne, was a coin collector who had several collections stored in blue colored collection books and that her mother would be able to testify about them, and that the same type of books had been found in the car involved in the Ennis case. Morrow was unaware that Osborne's mother had died between the time she had been interviewed by the defense and the time that the trial had began. Morrow failed to reconfirm with witnesses prior to trial that they would appear at trial. After disclosure of the connection between the two cases, Polk Sheriff/Dallas PD/OSP/Polk DA/ DOJ apparently discussed the content of the trial amongst themselves and Woods recalled similar coin collections at the Kinser/Osborne/Graves crime scene that were never photographed or mentioned

PAGE 13 – COMPLAINT

Exhibit A at 13

Verified Correct Copy of Original 1.22.2015.

Verified Correct Copy of Original 1 22 2015.

1    in any reports. Polk DA/DOJ presented testimony from Woods at trial, who claimed to be an

2    amateur coin collector who remembered seeing the coin collections at the crime scene and the coin

3    collections from the Ennis case and that, although the collections were of the same denomination and

4    type of collector books, they were of different quantity and quality. When asked why he never made

5    any record of seeing these items prior to testifying about them, he stated that he "just hadn't."

6    Krauger attended trial throughout the proceedings, and discussed trial testimony with Woods prior

7    to Woods' testimony.

8                   26.

9        At trial, Bimla made conflicting statements about her actions on the day of the murders, she

10   disclosed that she suffered from numerous physical and mental ailments that could effect her

11   memory, and subsequently claimed to have memory problems 39 times during cross-examination.

12   She did not claim any memory problems while answering the 300 questions of the prosecution.

13                   27.

14        Through the use of Neutron Activation Analysis (NAA), Polk DA/DOJ alleged that all of the

15   bullets retrieved from the victims were of Remington brand. Polk DA/DOJ presented the theory of

16   Comparative Bullet Lead Analysis (CBLA) to the jury, a forensic technique used primarily by the

17   FBI's crime labs to compare fired bullet lead from crimes to live ammunition in possession of a

18   suspect. Nyhus and Fisher attempted to have OSP crime lab perform the CBLA analysis and were

19   advised by Kenn Meneely at OSP that bullet lead analysis was of questionable forensic value and

20   OSP would not perform this test. At the time of Plaintiff's trial, the only facilities in the United

21   States doing CBLA were the FBI crime lab and OSU's laboratory supervised by Conrady. Conrady

22   inaccurately determined that Plaintiff possessed ammunition in his residence that was "analytically

23   indistinguishable" from the lead found in the bodies of the victims. Conrady's testimony was

24   inaccurate, lacking in sufficient scientific basis, lacking in adequate peer review, and conducted in

25   facilities that lacked adequate quality control and supervision. Polk DA/DOJ used this testimony

26   to argue that the bullets found in the victims and the ammunition from Plaintiff's home must have

27

28   PAGE 14 – COMPLAINT

LAFKY & LAFKY
ATTORNEYS AT LAW
429 COURT ST NE, SALEM, OR 97301
TELEPHONE (503) 585-2450/FAX (503) 585-0205/ Email Info@lafky.com

Exhibit A at 14

Verified Correct Copy of Original 1/22/2015.

come from the same "batches" and that the chances of that occurring by coincidence were 1 in 64,000,000. This statistic was presented to the jury by Nyhus during closing rebuttal arguments, and no evidence to support this statistic had ever been generated during the trial, nor has any scientific study ever been conducted that supports this conclusion. The methodology employed by Conrady, and his resultant testimony at Plaintiff's trial, was a substantial factor in Plaintiff's conviction, and has since been demonstrated to have been scientifically and factually flawed. Morrow, Polk DA, DOJ, Nyhus, Fisher, and Conrady knew, or should have known, that the CBLA testimony presented by Conrady was scientifically flawed, and would have a substantial impact on the jury. Morrow, Nyhus, and Fisher knew, or should have known, that Nyhus's claim of the chance of a matched bullet occurring by coincidence was 1 in 64,000,000 was statistically flawed, untruthful, and would have a substantial impact on the jury.

28.

Rutter and Klocko, criminalists employed by OSP, testified that the two shell casings from the crime scene matched some shell casings found at the Plaintiff's home. At trial, Rutter and Klocko only presented magnified photographs of .38 caliber shell casings that were found in a training manual, and a single, Polaroid photo (defense exhibit 131) described what they claimed as a match. Detailed bench notes from their examinations were never generated and neither Rutter nor Klocko could provide the jury with an accurate description of the number or type of conditions that needed to be present for them to make a conclusion of a shell casings "match." Rutter testified: "take my word for it." The testimony presented by Rutter and Klocko to the jury was factually and scientifically flawed, and departed from the standard in firearm and toolmark analysis. Morrow, Polk DA, DOJ, Nyhus, Fisher, Rutter, and Klocko knew, or should have known, that the firearm and toolmark analysis testimony presented by Rutter and Klocko was scientifically flawed, and would have a substantial impact on the jury.

29.

At Plaintiff's trial, Polk DA/DOJ presented expert testimony from Birch. Birch was a retired

PAGE 15 – COMPLAINT

LAFKY & LAFKY
ATTORNEYS AT LAW
429 COURT ST. NE, SALEM, OR 97301
TELEPHONE (503) 585-2450/FAX (503) 585-0205/ Email Info@lafky.com

Exhibit A at 15

Verified Correct Copy of Original 1 22 2015.

1  engineer from Remington Ammunition.  Birch testified about bullet distribution and the smelting

2  of lead used in the manufacture of .22 caliber bullets.  Birch's testimony about the bullet lead found

3  in Plaintiff's garage being unique was inaccurate, because he did not realize until trial that the bullets

4  in Plaintiff's garage were mispackaged by Remington.  Morrow, Polk DA, DOJ, Nyhus, Fisher, and

5  Birch knew, or should have known, that the testimony presented by Birch was inaccurate,

6  scientifically flawed, not supported by substantial evidence, and would have a substantial impact on

7  the jury.

8                                                           30.

9          At Plaintiff's trial, Polk DA/DOJ presented expert testimony from Birch. Birch was a retired

10  engineer from Remington Ammunition.  Birch testified about bullet distribution and the smelting

11  of lead used in the manufacture of .22 caliber bullets.  Birch's testimony about the bullet lead found

12  in Plaintiff's garage being unique was inaccurate, because he did not realize until trial that the bullets

13  in Plaintiff's garage were mispackaged by Remington.  Morrow, Polk DA, DOJ, Nyhus, Fisher, and

14  Birch knew, or should have known, that the testimony presented by Birch was inaccurate,

15  scientifically flawed, not supported by substantial evidence, and would have a substantial impact on

16  the jury.

17                                                           31.

18          Plaintiff presented testimony from criminalist Kay Sweeney, who disputed the shell casings

19  match citing chamber face marks (these marks are unique to rim fire casings, found exclusively on

20  .22 caliber or other rim fire ammunition) on the casings from the crime scene as being inconsistent

21  with all of the casings found at Plaintiff's home (documenting his work with numerous magnified

22  photos), and the lack of a suspect weapon to generate and compare casings with. In addition, by

23  analyzing the type and quantity of crimp and knurling rings on the slugs removed from the victims,

24  Sweeney determined that the bullets in question were from two different manufacturers-Winchester

25  made the bullet that killed Kinser and Remington made the bullets that killed Osborne and Graves.

26  These crimp and knurling rings clearly refuted Conrady's conclusions and testimony about the bullet

27

28  PAGE 16 – COMPLAINT

LAFKY & LAFKY
ATTORNEYS AT LAW
429 COURT ST. NE, SALEM, OR 97301
TELEPHONE (503) 585-2450/FAX (503) 585-0205/ Email Info@lafky.com

Exhibit A at 16

Verified Correct Copy of Original | 22 2015.

1   lead having come from one batch, or manufacturer, but Morrow failed to understand the importance
2   of that fact. Instead, Morrow argued that Rutter was less than diligent in his analysis by failing to
3   note the rings. Rutter acknowledged that he did not check the chamber face marks on any of the slugs
4   that he examined. Morrow provided no expert defense to the CBLA evidence, despite the fact that,
5   at the time of Plaintiff's trial, there existed significant and substantial expert opinion that such
6   analysis was scientifically flawed. The FBI, faced with numerous credible studies that have
7   concluded that CBLA analysis is scientifically flawed has, subsequent to Plaintiff's trial, abandoned
8   the analytical technique. Even after the FBI stopped using CBLA analysis and had concluded that
9   it was scientifically unsupported, OSU and Conrady continued to perform it. In addition, new
10  findings published by the National Academies of Science regarding both CBLA and shell casings
11  identification have seriously drawn into question the reliability and relevance of the forensic
12  evidence in this case.

13                                              32.

14      In February 2002, Bimla's ex-husband, Charles was found dead by Robert Daniel Spencer
15  ("Spencer") at 5909 Orchard Heights Road. Charles died under suspicious circumstances that were
16  later ruled non-suspicious, largely due to Bimla's statements to police that Charles was "depressed."
17  In September 2002, Bimla was arrested and charged with murder for shooting Spencer. In October
18  2002, Bimla and Charles's son, James, went public with his concerns about his father having been
19  killed and alleged that Polk County authorities were ignoring evidence of "foul play." He was
20  quoted as saying "I know she [Bimla Boyd] killed my father." A few months after initially charging
21  Bimla with murder, Polk DA/Fisher, agreed to provide her with a plea bargain to the reduced charge
22  of manslaughter in the second degree and she was sentenced to seventy-five months in prison, and
23  was released from prison before Plaintiff.

24                                              33.

25      After Charles' death was officially ruled non-suspicious, Bimla produced a copy of a home-
26  made will that she allegedly found among her ex-husband's personal belongings. The will was dated

27

28  PAGE 17 – COMPLAINT

LAFKY & LAFKY
ATTORNEYS AT LAW
429 COURT ST. NE, SALEM, OR 97301
TELEPHONE (503) 585-2450/FAX (503) 585-0205/ Email Info@lafky.com

Exhibit A at 17

a few weeks prior to Charles' death, and Bimla proceeded to probate the document in Marion County Circuit Court. The will essentially left all of Charles' belongings to his ex-wife, an estate valued at several hundred thousand dollars. The will was a fake, and one of the two witnesses who signed it acknowledged that he signed it inappropriately. The other witness was Spencer, the man who was killed by Bimla. Bimla was purportedly fraudulently obtaining housing assistance payments from Polk County after testifying against Plaintiff and she has never been charged for that alleged crime or for filing the false will in court.

34.

Plaintiff appealed his convictions and was represented by Jones, who was an attorney licensed to practice law in the State of Oregon and was employed by the Oregon Public Defender's Office. Plaintiff communicated with Jones several times about claims that needed to be addressed in his appellate brief. Jones failed to address the majority of Plaintiff's requested claims. After the Court of Appeals affirmed without opinion, Jones authored an e-mail to Gerber, where she admitted to failing to include viable claims in Plaintiff's appeal.

35.

After exhausting direct appeal, Plaintiff filed a Petition for Post-Conviction Relief in 2004. Mark Geiger was appointed to represent Plaintiff and Gerber was assigned to represent Oregon State Penitentiary. For the next five and one-half years, Gerber delayed the judicial process including, but not limited to, engaging in delay tactics, numerous postponements, and failing to disclose the loss and/or destruction of evidence. In discussions with Plaintiff regarding Plaintiff's claims of innocence and request for post-conviction relief, Gerber attempted to force Plaintiff to waive his right to sue and ability to obtain damages regarding Plaintiff's unlawful incarceration. Gerber's demand that Plaintiff give up his civil remedies caused Plaintiff to be incarcerated for a period of time longer than if such demand had not been made. Gerber's insistence that Plaintiff give up his civil remedies was a violation of his due process, abuse of process, and the Fourteenth Amendment to the US Constitution.

PAGE 18 – COMPLAINT

Exhibit A at 18

Verified Correct Copy of Original 1.22 2015.

Verified Correct Copy of Original 1 22 2015.

36.

As a result of the actions of Defendants described in this complaint, Plaintiff has sustained economic damages in the form of lost income while incarcerated, lost income continuing into the future after incarceration, attorneys fees, costs, and expenses incurred prior to the filing of this action related to Plaintiff's criminal cases.  Plaintiff has sustained non-economic damages in the form of emotional distress, pain, suffering, anguish, diminishment of reputation, loss of society and companionship to his children, loss of opportunity to restore reputation, and all emotional responses associated with continuous unlawful confinement.  Plaintiff gives notice of his intent to request punitive damages where allowable by law.  Plaintiff requests compensatory damages for all claims that provide for such damages in this Complaint.

**FIRST CLAIM FOR RELIEF AGAINST DEFENDANTS OSP AND DOJ –**

**NEGLIGENCE**

37.

Plaintiff realleges paragraphs 1 through 36.  OSP and DOJ employed individuals and agents, who acted in the course and scope of their employment for the various entities for which they were employed.  OSP and DOJ were negligent in failing to use a methodology that was accepted by the standards in the field to analyze CBLA and firearms and toolmark identification.  OSP and DOJ acted negligently included, but not limited to the following: failing to preserve and maintain evidence, failing to investigate exculpatory evidence, and failing to provide evidence, and failing to reexamine the guilty verdict in the trial proceedings in light of newly discovered evidence suggesting the innocence of Plaintiff, and presented forensic testimony lacking in adequate quality control, proficiency testing, technical review, and scientific documentation. OSP and DOJ were negligent in employing a methodology that deviated from the standards in the field for CBLA and firearms and toolmark identification.  OSP and DOJ's negligence as described above caused Plaintiff's conviction and subsequent incarceration.  The acts of the agents and employees of OSP and DOJ as described above constituted a deviation from the standard of care for law enforcement

PAGE 19 – COMPLAINT

LAFKY & LAFKY
ATTORNEYS AT LAW
429 COURT ST  NE, SALEM, OR 97301
TELEPHONE (503) 585-2450/FAX (503) 585-0205/ Email Info@lafky.com

Exhibit A at 19

Verified Correct Copy of Original 1 22 2015.

1  and prosecutorial actors engaged in similar matters.

2  38

3  As a result of OSP's and DOJ's negligent conduct, Plaintiff has suffered economic damages

4  to be determined at trial and non-economic damages in the amount of $1,500,000.

5  **SECOND CLAIM FOR RELIEF AGAINST DEFENDANT OSU – NEGLIGENCE**

6  39.

7  Plaintiff realleges paragraphs 1 through 38.  Conrady was acting in the course and scope of

8  his employment when he performed the services described above on behalf of the prosecution of

9  Plaintiff.  OSU had a duty to properly analyze and use scientifically accepted methods to analyze

10  evidence pertaining to criminal cases but negligently failed to do so.  OSU was negligent in failing

11  to use a scientifically accepted method for bullet lead analysis.  OSU's negligence in failing to use

12  a scientifically accepted method for bullet lead analysis caused Plaintiff's conviction and subsequent

13  incarceration. The acts of the agents and employees of OSU DOJ as described above constituted a

14  deviation from the standard of care for scientific and forensic method engaged in similar matters.

15  40.

16  As a result of OSU's negligent conduct, Plaintiff has suffered economic damages to be

17  determined at trial and non-economic damages in the amount of $1,500,000.

18  **THIRD CLAIM FOR RELIEF AGAINST DEFENDANTS DOJ, OSP, AND OSU– ABUSE**

19  **OF PROCESS**

20  41.

21  Plaintiff realleges paragraphs 1 through 40.  DOJ, OSP, and OSU are liable for the acts of

22  their employees and agents as described above.  DOJ, OSP, and OSU prosecuted Plaintiff with the

23  alterior purpose of convicting Plaintiff without lawful and sufficient evidence.

24  42.

25  DOJ, OSP, and OSU committed a willful act in using the prosecution of Plaintiff that is not

26  proper in the regular conduct of such proceedings. Plaintiff suffered incarceration.

27

28  PAGE 20 – COMPLAINT

LAFKY & LAFKY
ATTORNEYS AT LAW
429 COURT ST. NE, SALEM, OR 97301
TELEPHONE (503) 585-2450/FAX (503) 585-0205/ Email Info@lafky.com

Exhibit A at 20

Verified Correct Copy of Original 1 22 2015.

43.

As a result, Plaintiff suffered economic in an amount to be determined at trial and noneconomic damages in the amount of $1,500,000.

**FOURTH CLAIM FOR RELIEF AGAINST DEFENDANT OPDSC AND JONES –**

**LEGAL NEGLIGENCE**

44.

Plaintiff realleges paragraphs 1 through 43. Jones and OPDSC had a duty to competently represent Plaintiff in his appeal.

45.

Jones and OPDSC  failed to competently represent Plaintiff by failing to include viable claims that Plaintiff requested be included in his appeal. This failure resulted in Plaintiff's continued incarceration.

46.

As a result of Jones' legal negligence, Plaintiff has suffered economic damages in an amount to be determined at trial and noneconomic damages in the amount of $1,500,000.

**FIFTH CLAIM FOR RELIEF AGAINST DEFENDANT DOJ – FALSE**

**IMPRISONMENT**

47.

Plaintiff realleges paragraphs 1 through 46. From September 1, 2009 to December 18, 2009, DOJ intentionally confined Plaintiff; that confinement was unlawful.

48.

As a result DOJ's unlawful confinement, Plaintiff has suffered economic damages in an amount to be determined at trial and noneconomic damages in the amount of $1,500,000.

///

///

///

PAGE 21 – COMPLAINT

LAFKY & LAFKY
ATTORNEYS AT LAW
429 COURT ST  NE, SALEM, OR 97301
TELEPHONE (503) 585-2450/FAX (503) 585-0205/ Email Info@lafky.com

Exhibit A at 21

Verified Correct Copy of Original 1 22 2015.

1  WHEREFORE, Plaintiff demands the following for his claims for relief:

2  1.    Plaintiff's First Claim for Relief Against Defendants OSP and DOJ: Economic damages

3        in an amount to be determined at trial and noneconomic damages in the amount of

4        $1,500,000.

5  2.    Plaintiff's Second Claim for Relief Against Defendant OSU:  Economic damages in an

6        amount to be determined at trial and noneconomic damages in the amount of $1,500,000.

7  3.    Plaintiff's Third Claim for Relief Against Defendants DOJ, OSU, and OSP: Economic

8        damages in an amount to be determined at trial and noneconomic damages in the amount

9        of $1,500,000.

10 4.    Plaintiff's Fourth Claim for Relief Against Defendants OPDSC and Jones: Economic

11       damages in an amount to be determined at trial and noneconomic damages in the amount

12       of $1,500,000.

13 5.    Plaintiff's Fifth Claim for Relief Against Defendant DOJ: Economic damages in an

14       amount to be determined at trial and noneconomic damages in the amount of $1,500,000.

15       DATED this 24th day of February, 2010.

16

17

18       Kevin T. Lafky                OSB#85263
         Eric Wilson,                  OSB#04455
19       Haley Percell,                OSB#05345
         Leslie Gomez                  OSB#08340
20       Of Attorneys for Plaintiff

21

22

23

24

25

26

27

28 PAGE 22 – COMPLAINT

LAFKY & LAFKY
ATTORNEYS AT LAW
429 COURT ST. NE, SALEM, OR 97301
TELEPHONE (503) 585-2450/FAX (503) 585-0205/ Email Info@lafky.com

Exhibit A at 22