# R. Paul Frasier
## District Attorney for Coos County

**Office of the District Attorney**
Coos County Courthouse
250 N. Baxter St.
Coquille, OR 97423
Phone: 541-396-7550   Fax: 541-396-1015
TDD: 1-800-735-2900



August 10, 2016

Mr. Paul E. Reim
Oregon Department of Justice
Trial Division
1162 Court St NE
Salem, Oregon  97301

Re: McGuffin v. Nooth 15CV1030

Dear Paul:

Here is my third installment on the McGuffin matter. I am jumping ahead to the allegations of regarding Brady violations and misconduct. I will get back to the alleged shortcomings of trial counsel in future letters.

This may become important in the future but I have been informed that Kristen Steinhoff died last week as a result of a drug overdose.

First of all, I want to make it abundantly clear that I deny for myself and law enforcement any allegation that we engaged in any form of misconduct in this case. We worked very hard to make sure this case was investigated properly and to make sure our conduct was above reproach. We wanted the right person to be held accountable for the death of Leah Freeman and the evidence lead us to the person responsible. We investigated several potential suspects in this case. We eliminated all but one, that being Nick McGuffin.

As to paragraph/count 11, with the substance of the allegation being on page 20, I have the following comments:

As to point 1: All reports in this case were given to the defense. I have an open file policy and allowed the defense to examine all of my trial binders well in advance of trial. If there were reports that were missing in discovery, the defense had access to them prior to trial. In addition, I kept a discovery list of all materials sent to them which were Bates numbered. An example of the list, which was current as of June 30, 2011, (which was just before trial in July of 2011) is

1

attached. The defense claims there were reports of witness interviews of witnesses John Lundgren, David Breakfield and Kristen Steinhoff that were not given in discovery. I do not know what reports they are referring to;

As to point 2: It has been my practice, and my understanding, that I am not under any obligation to supply the bench notes for lab personnel unless the defense requests it. We did obtain all bench notes for the DNA testing;

As to point 3: I gave to the defense all records of lab work done that I had in my possession. We had lab work done by several different entities. The majority of the lab work was done by the Oregon State Police. However, we did seek outside lab work. A couple of years after Leah's body was found, my predecessor as District Attorney, Mr. Paul Burgett, arranged for the additional DNA testing and examination of Leah's clothes be done by a lab in England. My understanding is that the lab had some connection to Scotland Yard. I was not involved in that decision to send the clothes to England, but it is my understating that at the time this lab was the only lab in the world that was doing certain types of DNA testing. No usable results were obtained (one of the problems in this case was that because Leah's body and clothing had been exposed to the elements so long was the fact that most, if not all, of the DNA contained in any bodily fluids found on the clothes on the body had degraded and was simply not usable to obtain DNA). Because of a persistent rumor that Leah had been hit by a car, we also sent her outer clothing to a lab in Chicago to be examined to see if there was any evidence of paint transfer on the clothing. Again, the results were negative. The reports we had from England and Chicago were given to the defense prior to trial;

As to point 4: Generally police officer notes are not discoverable unless they contain material not contained within a police report. As a courtesy we did give the defense copies of the notebooks for Officers Brenden, Nichols and Zavala;

As to point 5: We gave to the defense copies of all recordings of interviews in this case. I do not know what the defense is referring to when they claim we did not do so;

As to point 6: We gave to the defense all of the materials for chain of custody of all of the evidence in the case. For example, we gave the defense the evidence accountability sheets (Discovery pages #6678 – 6710), the evidence log (Discovery pages 6711-6716), the forensic evidence request forms (Discovery pages 6717 – 6725), the Lab Submission Forms (Discovery pages 6726 – 6779) and the records for the shipping of evidence back from England (Discovery pages 6675 – 6677). I do not know what records the defense is referring to when they claim we did not do so;

2

As to point 7: I gave to the defense all records I had pertaining to all examinations of evidence. Again, I do not know what records the defense is referring to when they claim otherwise;

As to point 8: I am not sure what crime scene the defense is referring to. There are multiple locations in this case that could be considered crime scenes. For example, the locations of the shoes, the McGuffin home and vehicles, Leah's home, and where the body was found could be considered crime scenes. Any video we had of the various scenes was given to the defense. Again, I am unaware of any video the defense claims was not disclosed;

As to point 9: Notes from briefings of the major crime team. Our major crime team does not have a person designated to keep "notes" of the meetings of the team. A "to do list" with assignments may be established, but generally it is not kept as record. I am not sure what the defense is referring to in this allegation. Further, I do not see how this would have affected the case eventually developed against Mr. McGuffin;

As to point 10: I gave to the defense the death certificate I had in my possession. No request was made of the "original" or the "affidavit" amending it. If the dense wanted it they could have requested it or obtained it from the Department of Vital Statistics. Again, I do not see how the original would have changed the result in this case.

As follow-up to this point, I will make note of the following. Dr. Olsen from the beginning had classified the manner of death of Leah as homicide. I was present at the autopsy of Leah and Dr. Olsen told me that day after he had completed his work that he believed the manner of death was homicide but that the actual cause of the death was some sort of undetermined homicidal violence. As an investigative tactic we did not want anyone outside of the investigation to know that the exact cause of death had not been determined. That included Leah's mother as early on in the investigation she maintained close ties to Mr. McGuffin and his family and we were concerned if we shared with her information about the case that it would go straight back to the McGuffins. Thus the first death certificate listed the manner and cause of death as "pending investigation". By 2004, we had no compelling reason to keep this secret so the death certificate was amended to read that the immediate cause of death was homicidal violence of undetermined type, that the manner of death was homicide that occurred on June 28, 2000, that the time of injury was unknown, that it was undetermined how the injury occurred, that the place of injury was a road embank and that the location was milepost 1.5 of Lee Valley Road, Coquille, Oregon. The amended death certificate was offered at trial and the jury was able to see all of the listings where is the cause of death and injury was undetermined. Had this become an issue, we would have explained why this occurred. It was not done for any nefarious reason; it was done to maintain as best we could some investigative secrets about the case in the early stages of the investigation. In my opinion, any

3

difference between the original and ultimate certificate would have had no impact on the verdict in this case;

As to point 11: Any recordings we had of Kristen Steinhoff were given to the defense. I do not know what recordings the defense is referring to in this allegation;

As to point 12: All materials we had regarding the Vidocq Society were given to the defense. I do not know what other records pertaining to the Society the defense is referring to.

As a follow-up to this point, I need to explain the Vidocq Society involvement in this case. It is my recollection that sometime after we had re-opened the case, Coquille Police were approached by the Society about the case. I do not know how we came to their attention. Chief Dannels brought their request to my attention. I had never heard of them before and asked from some background on who they were. Chief Dannels reported back that he has checked them out and found out that the Society was a group of law enforcement officials, mostly retired, but some who were still active, who were renowned specialists in multiple aspects of homicide investigation. These included forensic scientists, polygraph examiners, investigators, psychologists, profilers and so forth. According to Chief Dannels, this group came highly recommended. The Society's purpose was to help police agencies and prosecutors from across the country in solving particularly difficult cases. Most of the time these cases are sometimes referred to as "cold" cases as a lot of them, like ours, had gone unsolved for years. It was explained to me that the Society met once a month in Philadelphia, Pennsylvania. It was a "lunch" meeting where we would present the case and the society would then critique the case and give us any ideas how to work the case. They assured us that anything we told them would be kept in confidence. At the time we were willing to take any help we could get on the case, so we accepted their offer. The Society had done this for numerous other cases from across the United States as a free service.

The Society paid for me and Chief Dannels to go to the meeting. We thought it best that we also take along Sheriff Zanni, who had spent a lot of time on the case and knew the case just as well as anyone and the analyst from the Oregon Department of Justice who had developed time lines, charts and so forth. The City of Coquille paid for those two to attend.

We did not go to the first date set for the meeting as the night before we left we had an incident where a husband had shot his wife at short distance with .30-06 rifle. It was a miracle she survived. The husband fled the scene in Coos Bay and then drove to his grandparent's home in Myrtle Point. Chief Dannels spotted the defendant as he was driving by Coquille and was the lone officer in pursuit of the suspect. He followed the suspect to the grandparent's home where the defendant exited his vehicle with the rifle. When the defendant refused to put down the gun

4

and pointed the gun at Chief Dannels, the chief fired at the defendant several times. The Chief did hit the defendant with one of his shots. The defendant then went around a corner of the house and committed suicide. We decided we needed to stay and wrap up this investigation rather than travel to Philadelphia. We eventually went a couple of months later.

The four of us arrived at the meeting location about an hour early. We were met almost immediately by an individual who was one of the founding fathers of the Vidocq Society, Mr. Richard Walter. Mr. Walter claimed to be psychologist and explained he had extensive background in interviewing and working with violent criminals. He presented me with an article he had recently written and claimed to have been published where he indicated that the person who had killed Leah fit a particular profile. The article was somewhat lengthy and I did not have time to review that day. However, Mr. Walter explained to us at length his theory/profile of the person who would have killed Leah, which just happened to fit Mr. McGuffin perfectly. Naturally we were very interested in what he had to say.

We made our presentation to the Society at lunch. After our presentation, the critique we received back was interesting. The Society did not have any specifics for us to do. Their input was basically that we were on the right track, that we were doing the right things, and that we really had a better case than we thought we had.

After the presentation, we decided we wanted to hear more what Mr. Walter had to say. We invited him to spend the afternoon with us and to have dinner with us. Again, his theory or profile of the killer of Leah was spot on as to Mr. McGuffin.

Upon our return from Philadelphia, I read the article given to me by Mr. Walter. I was disappointed in reading the article as it dealt with the profile of a serial killer. I had no evidence to suggest that Mr. McGuffin was serial killer (in fact I do not believe he is). I was having trouble in seeing how this article was on point to Leah's death. I was considering using Mr. Walter as a witness in the case, but I was concerned about the article he had given me and how it helped our case.

Several months after the Vidocq Society presentation, the show 20/20 came to Coquille to work on a show for the ABC network. They brought Mr. Walter out to do a segment. I met with Mr. Walter one afternoon at Coquille PD. Mr. Walter asked if I had read the article he had given me. I told him I had read it and was having problems with its relevancy to this case as it dealt with a serial killer. Mr. Walter agreed that could a problem. He then produced another article he claimed to have written. This one he claimed had not yet been published. He assured the article me was directly on point to the case. I did not read it at that time but put it aside to look at later.

That night Sheriff Zanni, myself, Chief Dannels and a couple of other people went to dinner with Mr. Walter. During dinner, Mr. Walter made some comments

5

about other cases he had been involved in and in particular he made comments about his involvement and findings he had made at the behest of Scotland Yard pertaining to Jack the Ripper. I rode with Sheriff Zanni on the way home from dinner. Sheriff Zanni had told me that he thought there were issues with the credibility of Mr. Walter. I asked him to explain. It turned out that Sheriff Zanni was a "history buff" as to the Jack the Ripper case and he told me that some of the things Mr. Walter had to say about the case were not true. I told Sheriff Zanni that we had not "vetted" Mr. Walter and that if we were to use him as a witness we needed to do so. I asked Sheriff Zanni to then check out Mr. Walter. The next morning Sheriff Zanni was in my office with some results. Sheriff Zanni had found a federal appeals court case called Drake v. Portuondo from the federal second circuit. There are several opinions in the case, but what we found was that Mr. Walter had testified in the case and had expressed a profile that fit the defendant perfectly in that case. The Court found that Walter had misled, if not lied, about his background and credentials. He was not a psychologist and did not even have a master's degree. The court found that Mr. Walter learned the facts of that particular case and then had built a profile that fit the defendant. Basically the court found him to be a fraud.

I realized at that point that the profile built by Mr. Walter was simply not reliable. It appeared to me that he had done the same thing he had done in the second circuit case in that once he knew the facts of our case, in that it appeared he had created a profile that fit Nick McGuffin. Given the second circuit findings, I knew there was no way I could or should use Mr. Walter or his information. I notified Chief Dannels of what we had found out and I also told the producer for 20/20 what had been discovered and even gave the producer a copy of the case Sheriff Zanni had found. I warned 20/20 that it appeared that Mr. Walter was a fraud and that in my opinion they should not rely upon him. I also directed as to our case that we would not use anything given to us by Mr. Walter and that were going to distance ourselves as far as we could from him, and if need be, from the Vidocq Society given he was a founding member and still on their Board of Directors.

Long story short: I did not use anything we learned from Mr. Walter or the Vidocq Society and certainly did not use it a trial. It had no effect on the verdict in this case; and

As to Point 13: I gave any material I had in my possession and control about 20/20 to the defense, which frankly wasn't much if anything.

I should also make some follow-up comments about 20/20. I do not know exactly how this case came to the attention of 20/20 and why they were interested in the case. I knew that they had become involved, but I was under the impression, and I frankly admit that impression was wrong, that there was an agreement that anything 20/20 learned would not be broadcast until after a verdict had been reached in the case. I remember I was asked about them being involved in the case and I did give permission for them to do so, but again, it was under my

6

mistaken impression that nothing would be broadcast until after a verdict had been returned. I learned that was not the agreement when 20/20 came to town to tape segments for the show that would air before trial. At that point I refused to personally cooperate with the show to the extent they wanted. For example, Mr. Avila did interview me, but I would not answer questions he put to me about the case that I felt would be in violation of the rules pertaining to pretrial publicity. My interview with Mr. Avila was not used at all in the show that was broadcast prior to trial.

I have to say after the initial broadcast that I was not happy with what 20/20 had done. They had a whole segment on Mr. Walter, even though I had shown to them that he was likely a fraud. (In retrospect, I remember how in the show that Mr. Walter explained his profile and even went as far to explain how the person with this psychological background would actually use his fist to strike someone so as to explain the blood evidence found in the case. When I look at that now, I realize just how ludicrous Mr. Walter's opinion actually was.)

I was also upset that the show broadcast a motive that Mr. McGuffin killed Leah because he was having sex with her and that to do so would be a criminal act. The theory proffered by 20/20 was that Nick killed Leah to prevent him being prosecuted for having sex with her. That was obviously wrong. First off, Nick and Leah were just barely within three years of age, so having consensual sex between the two would not be criminal. Secondly, it seemed everyone knew they were having sex. In fact, Mom had set up an appointment for Leah to get birth control. Sex was not the motive. It was not used at trial.

To make matters worse, at least for me, concerned a photo of Leah's body that was used on the show. 20/20 had asked me for permission to use a photo of Leah's body at the scene. I refused. Somehow they obtained a photo and used that in the show.

The following Monday I took action I had never done before. I issued a directive to all law enforcement that no one was allowed to talk with the press about the case from that day forward except me. I told them I did not care what arrangements may have been made with the press about future participation in the case. I made it clear that if anyone from the day forward talked to the press without my permission I would seek a gag order and I would not hesitate to prosecute anyone who violated that order. 20/20 was not happy I cut them off. I told them I did not care because they used a fraud in the show, used a photo I told them not to use and put forward a false motive. No one was going to have anything to say to them until after a verdict was reached.

I will point out that the show had no bearing on the verdict. The defense had an opinion poll of likely jurors in Coos County that was done after the 20/20 show was aired. The purpose of the poll was to determine if the defendant could get a fair trial in Coos County and had the poll showed that getting a fair trial would be

7

problematic, I am sure the results of the poll would have been used in support of a motion for a change of venue. Based upon representations of defendant counsel in pre-trial hearings, the poll apparently showed that the defendant could get a fair trial. (As an aside I would think you would want to explore what the poll results were. I suspect they had a question about whether the people of the county thought the defendant was guilty and that the results of the poll were favorable to the defense.) Voir dire showed that if any of the jurors had been exposed to pre-trial publicity that they still could be fair and impartial to all sides. 20/20 had no effect on this verdict.

These are my comments as to paragraph/count 11. I will have further comments as to the petition in the near future.

Sincerely,

R. Paul Frasier

8