IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| NICHOLAS JAMES MCGUFFIN, as<br>an individual and as guardian<br>ad litem, on behalf of S.M., a<br>minor,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>MARK DANNELS, PAT DOWNING,<br>SUSAN HORMANN, MARY KRINGS,<br>KRIS KARCHER, SHELLY MCINNES,<br>RAYMOND MCNEELY, KIP OSWALD,<br>MICHAEL REAVES, JOHN RIDDLE,<br>SEAN SANBORN, ERIC<br>SCHWENNINGER, RICHARD WALTER,<br>CHRIS WEBLEY, ANTHONY WETMORE,<br>KATHY WILCOX, CRAIG ZANNI,<br>DAVID ZAVALA, JOEL D. SHAPIRO<br>AS ADMINISTRATOR OF THE ESTATE<br>OF DAVID E. HALL, VIDOCQ<br>SOCIETY, CITY OF COQUILLE,<br>CITY OF COOS BAY, and COOS<br>COUNTY,<br><br>　　　　Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) No. 6:20-cv-01163-MK<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

REMOTE DEPOSITION OF RICHARD WALTER

Taken on behalf of the Plaintiffs

June 30, 2022

Page 2

BE IT REMEMBERED THAT, pursuant to the Oregon Rules of Civil Procedure, the deposition of RICHARD WALTER was taken by Aaron M. Thomas, Certified Shorthand Reporter and Registered Professional Reporter for Oregon, on June 30, 2022, commencing at the hour of 8:03 a.m., via Zoom.

APPEARANCES:

MALONEY LAUERSDORF REINER PC
Counsel for Plaintiffs
1111 East Burnside Street, Suite 300
Portland, OR 97214
acl@mlrlegalteam.com
jpuracal@forensicjusticeproject.org
    By MR. ANDREW C. LAUERSDORF
        MS. JANIS C. PURACAL

LAW OFFICE OF ROBERT E. FRANZ, JR.
Counsel for Defendants: City of Coquille, City of Coos Bay, Coos County, Craig Zanni, Chris Webley, Eric Schwenninger, Sean Sanborn, Ray McNeely, Kris Karcher, Pat Downing, Mark Dannels, Kip Oswald, Michael Reaves, David Zavala, Anthony Wetmore, Shelly McInnes
PO Box 62
Springfield, Oregon 97477
rfranz@franzlaw.comcastbiz.net
BY: MR. ROBERT E. FRANZ, JR.

OREGON DEPARTMENT OF JUSTICE
Counsel for Defendants: Oregon State Police, John Riddle, Susan Hormann, Mary Krings, Kathy Wilcox
100 SW Market Street
Portland, OR 97201
jesse.b.davis@doj.state.or.us
BY: MR. JESSE B. DAVIS

/////

AARON THOMAS COURT REPORTING - 503-961-5740

--oOo--

WOOD SMITH HENNING & BERMAN LLP
Counsel for Defendants: Vidocq Society and Richard
Walter
12755 Southwest 69th Avenue
Suite 100
Portland, Oregon 97223
kschaffer@wshblaw.com
BY: KARIN L. SCHAFFER


ALSO PRESENT:  Mr. Nicholas J. McGuffin

Page 58

A.    Meaning that it was government work that is privileged.

Q.    How so?

A.    By the nature of the request for my services.

Q.    Do you have any type of government security clearance?

A.    Nope.

Q.    Any type of NSA clearance, CIA, FBI, any agency clearance?

A.    Nope.  I gave a lecture -- as an aside, I gave a lecture in Orlando in the '90s, I think it was, and FBI, CIA, everybody else was there, and after the lecture -- this was for the American Academy of Forensic Sciences, then within 15 minutes, the FBI had me aside and had invited me then to Quantico, so from that point on, then, I would periodically go and give lectures at Quantico and hear other people there while I was there, and so then that increased my visibility, and so then the other people around would reach out to me and ask me to help them on their cases or whatever was going on.

Q.    That was an AAFS speaking engagement in Orlando, Florida?

Page 59

A.    Right.

Q.    What was the date of that engagement?

A.    Again, you can get the exact date when you get my resume.

Q.    Okay.  What was the name of the program?

A.    It was in the -- this one was under the -- there are eight different sections of the academy, but I gave this one in psychiatry.  I belonged to the general section.  I didn't like the behavioral science unit category, but I've forgotten exactly the title of the speech that I gave.  I gave a discussion of the learning curve for sadistic behavior.

Q.    Did you present any papers or anything with that discussion?

A.    No.  It's -- one of the problems in speaking on such issues is that the bad people are the very first people who will want the papers or that will show up at the lectures if they can get in, so I am very careful about how much education we give the bad people to avoid apprehension.

Q.    Those are bad people that show up at the American Association of Forensic Scientist lectures?

A.    Right, and they'd show up at other lectures.  When I was in Wichita, Kansas, years ago,

Page 69

Q.   It does have a comprehensive listing of your speaking agreements?

A.   Yes.

Q.   How do you identify on there the engagements that are privileged due to some kind of --

A.   Those are not included there.  I'm not going to list them.

Q.   So it's not a comprehensive listing, then?

A.   No, and I never will give one.

Q.   Have you ever -- this is at Quantico when you said you've given presentations.

Does the FBI provide you with any forms, guidelines, any kind of manuals for speaking at Quantico?

A.   No.

Q.   Any kind of security restrictions, written policies, anything that you had to sign?

A.   No.

Q.   Did you have to complete an application or a background check before speaking at Quantico?

A.   No.  They knew of me.

Q.   So how did they know of you?

A.   Well, I'm old and I've been around since Christ wore tennis shoes, so -- and they've been at

the American Academy of Forensic Science meetings and I've been going there for over 40 years, and so you get known.

Q.   Do these -- so by the time this person pulled you aside and asked you to come speak at Quantico, you had been in the AAFS for 40 years?

A.   Not -- well, in those days, it was probably 25 or 30, 25 or 30 years.

Q.   Okay.  When did you first join the American Association of Forensic Scientists?

A.   I was in the very early '70s.

Q.   And where were you working at the time?

A.   At the Los Angeles County Medical Examiner's Office.

Q.   Why did you join the AAFS at that time?

A.   Because it sounded interesting and people I was working with were involved with it at the coroner's office, and I then found out that I could go, and did.  I gave a small little lecture and they were nice to me, so I thought, well, next year I'll go, too, and it didn't take long and then I became a member.

You have to -- it's a graduated kind of membership which is a credential, and so you have to give papers, you have to participate in the

Page 71

organization, et cetera, which I did, and I became a fellow and I've been a fellow probably for 30 years, and I like it.  I have a lot of friends there and some enemies, which is fine, and it suits me.

Q.    Are you a current fellow or a retired fellow?

A.    I'm a retired fellow now.

Q.    What's the difference between a fellow and a retired fellow?

A.    I don't have to pay for the meetings.

Q.    And you were in the general section, you said?

A.    Yeah.

Q.    You also mentioned earlier the psychiatry section.

Can members be in something like the psychiatry section without actually being a psychiatrist?

A.    Well, you can present there, okay?  But you -- you can only belong to one of the divisions and I chose to stay with general, because I thought that -- and still believe, that they're a little more authentic than some of the behavioral people. I found them shallow, quite frankly.

Q.    The behavioral people you found shallow?

Page 72

A.    Yep.

Q.    And would your resume also include a comprehensive list of your published works?

A.    Some.

Q.    Is there anything else listed on there besides education, employment history, speaking engagements and published works?

A.    I think that's too much already.

Q.    Do you remember what you were speaking of specifically at the Orlando engagement where the FBI agent pulled you aside?

A.    I was speaking about the learning curve of the sadist.

Q.    That's right.

      Okay.  And who was the FBI agent?

A.    Robert Ressler, who's now dead.

Q.    When did he pass?

A.    About three years ago.  Parkinson's disease.

Q.    Okay.  Ressler is not the gentleman that you wrote -- that you wrote Profiling Killers with.

      Is that right?

A.    Yep.

Q.    Okay.  Did you ever coauthor anything with Ressler?

Page 114

And so then with all that, the Vidocq Society and the American Academy got involved and they both were vigorous in their investigation, which I am pleased for, and from that, then, the -- three different people wrote to the American Academy of Forensic Sciences, the ethics committee, and had me taken out of the academy, however their investigation of it was that I was truthful and that I had not committed any violation.

In part, the violation at large was that I used no psychological and no legitimate terminologies, for instance, with the idea of what piquerism was, where the multiple stabbing, et cetera, and from that, then, everybody believed in this paid gun, in my opinion, but psychologists that testified there wasn't such a thing.

Well, when in fact, the first legal entry where piquerism was used was in 1923 and there's a whole register now of other cases where piquerism is used, and whether the person who advised the court was crooked or just stupid, the -- nobody ever challenged the opinions of the court, so the court ruled, then, that I had misquoted, et cetera, and used nonprofessional language, when in fact, it's part of the lexicon, it's just that he was too damn

Page 115

dumb to figure it out, not that I'd be critical.

Q.    Who were the three different people that complained to AAFS?

A.    AAFS generally and specifically does not reveal that.

Q.    So you don't know the identity of --

A.    I suspect two, but do I have proof of it? No.  Does AAFS have it?  Yes, but then Karin here has a copy, then, of a letter from AAFS that exonerates me three times for what they claim and deducted for claims for what they considered to be a wrongful accusation.

Q.    Who are the two people you suspect?

A.    A guy by the name of Weller and -- who's a psychologist in New York.

Q.    W-E-L-L-E-R?

A.    Yes, and I suspect, then, another -- I can't think of his name.  I will in a minute.

Q.    Do you know Mr. Weller's first name?

A.    No.  It may be Michael, but I'm not sure. I've never met him that I know of.

Q.    As far as I can tell, at least in Drake v. Portuondo, you weren't personally sued?

A.    Okay.  Fair enough.

Q.    So getting back to the original question,

Q.    Okay.  So you did two or three cases in Hong Kong.

How many cases in Australia?

A.    A lot.  A major case in Wollongong.

Q.    Can you spell that for me?

A.    W-O-L-L-O-N-G-O-N-G.

Q.    What kind of case was that?

A.    A murder of a female, head cut off and thrown down a bank.

Q.    The head cut off and thrown down the bank or the head cut off and the body thrown down the bank?

A.    Both.

Q.    Who was your contact on that work?

A.    Pat Ryan and her husband was also a pathologist who's now dead, Ray Ryan.

Q.    R-Y-A-N?

A.    Yes.

Q.    And Pat is short for what?

A.    Patricia.

Q.    And do you have contact information for Patricia?

A.    I probably do at home.

Q.    What agency was Patricia with?

A.    She was out of -- outside of -- outside

Page 162

of -- between Sydney and Wollongong in some little town.

Q.   A local police agency or something?

A.   Well, yeah, but they were both international forensic pathologists, so they were called in on the case who then contacted me.

Q.   Who were they called in by?

A.   Pardon?

Q.   Who were they called in by?

A.   I have no idea.

Q.   What agency?

A.   I have no idea.

Q.   Where did your work on the case take place?

A.   Here.

Q.   In the U.S.?

A.   Yeah, they brought all the information over and they came over to the American Academy and I reviewed it and that was that.

Q.   How many cases have you worked on or consulted on actually in Australia?

A.   I really don't know a number.  I don't remember any of the people that I worked with, but they -- well, I did work with Sydney P.D. on a child molestation ring that was going on that included the

Page 192

G-A-U-G-A-N.

Are these two different people or the same person?

A.   It sounds like the same person.  The first one is the correct spelling.

Q.   Okay.  These people we've talked about, okay.

Okay.  What is the Sherry Black Foundation?

A.   The Sherry Black Foundation was created by Sherry Black's daughter who is Heidi Miller of the Miller Foundation out of Salt Lake City.  She was viciously murdered and they reached out to Vidocq and asked for help and we tried and tried and went out and this and that, and eventually my old friend/expert and I had been going out and educating the original police department on the case and they were absolutely incompetent, and so then we went and lectured again and told them that the killer would probably be around the age of 19 and that he would be within two or three city blocks from the residence and whatever else.  There was much more to the case, but aside from that, that's the significant bit.

More time went by, and eventually, then,

Page 193

thanks to -- what's the DNA, you know, where they --

oh, Ancestry.com, they then found a relative,

eventually they found the guy.

Heidi Miller called me and said --

actually about last year, called me and said

"Richard, guess what?" and I said "What?" and she

said "They caught him!" and I said "Really?"  I said

"Great."  I said, "I just have to ask, how old was

he at the time?"

"He was 19," said she, and I said "Where

did he live?" and she said "Two blocks away," and

so -- but in the meantime, they then decided -- and

they're an extremely wealthy family, they decided to

underwrite programs for law enforcement where they

would come and have a three-day presentation by

Patrick Zirpoli and myself, and then an extra day to

bring their cases and we would help them with their

cases, and it was very successful until the

pandemic, and then everything went flat, so now

they're just starting to get going again, but in the

meantime, we probably educated not only in Utah, but

in Tennessee and other places, we've educated

probably 2,000 cops or more, and the Miller

Foundation have funded that to make it easier.

I think it costs something like $50 to

$100 for three days of lecture that other people were charging, you know, outrageous amounts.  It has resulted in at least, maybe more, but I know of at least four murderers being caught that would not have been.

So they're providing a real community service and I think very well of them and they pay us and they pay us well at $1,000 a day, and from that, we're now in contact again and we're getting ready to start up and do more teaching almost pro bono for the agencies.

Q.   Let me slow you down for a second.

It wasn't clear from your answer who was actually murdered, was it Sherry Black?

A.   Yes.

Q.   And Heidi Miller is Sherry Black's daughter?

A.   Yes.

Q.   And Heidi Miller set up the Sherry Black Foundation?

A.   Yes.

Q.   And that is funded by a foundation called the Miller Foundation?

A.   Yes, and she's a Miller, she and her husband.

Q.   Okay.   What is the Templar Group?

A.   That was a short-lived group started by a mutual friend of Zirpoli's and mine, a private investigative agency, and so talked us into doing it, but then realized it was not my cup of tea or Zirpoli's, so it fell apart quickly.

Q.   Is that around the time that you changed your private investigator's license?

A.   Yes.  I was very disappointed and disgusted by the whole venture.

Q.   Were you still a member of the Vidocq Society at the time?

A.   Yes.

Q.   Who started up the Templar Group?

A.   A guy by the name of Steve Stoud.

Q.   Steve Stoud, S-T-O-U-D?

A.   Yes, who was a former Pennsylvania State Police who preceded Zirpoli as the head of the crime unit.

Q.   I have the same Robert Stoud associated with --

A.   Same.

Q.   Is that the same guy?

A.   Yeah.  Yeah.

Q.   Okay.  And the purpose was it was supposed

Page 202

to be a private investigator agency?

A.    Right.

Q.    Who is Anthony Manetta?

A.    He is -- I don't know if he's still there, but he was -- last I learned, I think he was a lieutenant with the Pennsylvania State Police.

Q.    What's his approximate age?

A.    He should be around 40 right now.

Q.    When's the last time that you had any contact with Mr. Manetta?

A.    It's been a long time.

Q.    How about James C. Ford, who's that?

A.    It's one of Steve's friends that I don't know that I've met.  Maybe I have, but I wouldn't know him if I saw him.

Q.    Okay.  What is Steve Stoud's approximate age?

A.    Probably pushing 50.

Q.    And when's the last time that you talked to him?

A.    Well, he stopped by my house and I was busy with something else and I just told him that I couldn't see him at that time, and so he left, and I heard he was trying to get ahold of me and I don't care if I do.

Q.   Okay.  Why is that?

A.   I think he's a user of people.

Q.   Okay.  Do you feel that he used you?

A.   Yes.

Q.   How so?

A.   He asked me what I thought and he'd go back and pretend it was his.

Q.   How was the Templar Group funded?

A.   By -- we each put in -- I can't remember how much we each put in.  We each put in a lot of money and it was worth it to get out.

Q.   So did you have to forfeit your contribution?

A.   Yep.

Q.   Were you compensated at all?  Did you make any money off the Templar Group?

A.   Not a dime.

Q.   What was your role, just a private investigator?

A.   Yeah.  I'm not a gumshoe running out up and down streets.  I'm an old man.

Q.   What is located at 1879 Chenango Street in Montrose, Pennsylvania?

A.   I own a house there.

Q.   And what is located at 148 Spruce Swamp

Page 204

Road in Milanville, Pennsylvania?

A.   That's where Patrick Zirpoli lives.

Q.   Do you know why the business was set up with all of the members' addresses listed as your address?

A.   Pardon?

Q.   Do you know why the business was set up with all of the partners' addresses listed as your address?

A.   No, I was not aware of that.

Q.   How many cases did you work on as a partner in the Templar Group?

A.   None.

Q.   What is the Omega Crime Assessment Group?

A.   It's a group that I started years and years and years ago as an independent, and then it went by the wayside.

Q.   Who set that up, you?

A.   Yes.

Q.   Why was it set up?  What was it for?

A.   I thought it might be a way to make contact with others and I found out that it was more of a nuisance than a blessing.

Q.   How so?

A.   Well, if you haven't figured it out by

now, in my world, it can be extremely competitive and a lot of people will cut your throat at the easiest point that they can, and so I was getting a lot of unnecessary garbage that I didn't want to put up with, so I stopped all that.

Q.   Who is Barbara Dunn?

A.   Barbara Dunn is the stepmother of Scott Dunn and wife of Jim Dunn, and Scott Dunn was murdered in Texas, I'm trying to think of the name of the town.  It's cloudy.

Eventually, then, and you may or may not have seen the case of Scott Dunn, the murder of Scott Dunn on television, they often show it on 48 Hours or Forensic Files.  It's where eventually his girlfriend was jealous over another girlfriend and murdered him and they couldn't find the body, couldn't find the body, and it was one of the first cases around that a conviction was done with no body, no weapon, but a conviction was gathered.

She now is out of prison.  She put a hit on the father of the victim.  She put a hit on the judge.  Well, on the prosecutor, who then became a judge, and he died in a motorcycle accident by a drunk, and she put a hit on everybody else other than myself, which I found interesting, but --

Page 206

Q.   Is that the case where they sprayed Luminol all over the apartment and found blood?

A.   Yep.  Yep.

Q.   And I think I read somewhere that your role in that case was to convince the prosecutor that they had enough evidence to convict?

A.   Yes.  Yes.

Q.   Just based on the quantity of blood?

A.   Well, I argued that the blood was tissue, therefore part of the body.

Q.   And did the prosecutor adopt that argument?

A.   Yes.

Q.   And did they present that argument at trial?

A.   Yes, and it prevailed.

Q.   It prevailed.

How was Omega Crime Assessment Group funded?

A.   Me.  It was -- it never turned out to be a money making operation.

Q.   Okay.  What was Barbara Dunn's role?

A.   I don't -- I don't see the connection between -- I don't know of any connection between Omega and Barbara Dunn.

Q.   She's listed on the corporate records for Omega Crime Assessment Group.

A.   Really.

Q.   With the Pennsylvania Secretary of States's office.

A.   News to me.

Q.   Did you earn any money with Omega Crime Assessment Group?

A.   Nope.

Q.   And what's located at 32 Sutphin Pines in Yardley, Pennsylvania?

A.   That's where the Dunns lived before they moved to Georgia or North Carolina, wherever it is.

Q.   How many cases did you work out on as a representative of Omega Crime Assessment Group?

A.   I don't know that I did any actually.

Q.   Are you currently a member of any other private, professional organizations other than the Sherry Black Foundation?

A.   No.

Q.   Were you previously a member of any other private, professional organizations other than Vidocq Society, Sherry Black Foundation or the others that we've talked about?

A.   Not that I can think of.

Page 216

that he'd been injured somehow.  Again, it was just to get money.

Q.   Were you testifying as a fact witness or an expert witness?

A.   As -- I testified for the department.

Q.   Right, as to facts that you observed?

A.   Right.  Right.  Yeah.

Q.   So not as an expert witness?

A.   Right.  Right.

Q.   Have you testified in any other cases in the state of Michigan other than that one?

A.   I don't think so.  I don't think so. Thanks to the Drake decision, I then decided that I wasn't going to go that direction.  I would aid and assist and sometimes I would then educate or the other psychologists or whatever else would call me and ask me for advice to send them to do whatever the testimony was, but I decided it was not good until I could get my name cleared and it took a long time.

With that said, with the American Academy of Forensic Sciences and the others, I feel, and I didn't do wrong, I feel now if I went to court, I would let the chips fall where they may, tell the truth and there you are.

Page 242

having a pre-conference with me.

Q.   Okay.  Is that something that he talked to you at some point, how impressed he was with Vidocq and you in particular?

A.   If he did, I didn't choose to hear him.

Q.   Okay.  Do you recall having any conversations with him about your prior work?

A.   No, not really.

Q.   Okay.  Then it shows "They took the case with Richard Walter as the point man."

Would having you as the point man be something that happened after they presented, or could you have been preassigned by -- what's us name?

MS. SCHAFFER:  I'm going to object that this lacks foundation.  This is a periodical article.  This doesn't actually reflect anything that's designated.  I don't think it's relevant and it lacks foundation.

Q.   Go ahead and answer the question, if you can.

MS. SCHAFFER:  Yeah, you can go ahead and answer the question, if you can.

A.   What was the question?

Q.   This idea of you as the point man, and let

Page 243

me ask you, were you considered the point man on Vidocq's participation in the Freeman investigation?

A.   After the presentation at Vidocq.

Q.   Okay.  So that would have been something that occurred after the presentation?

A.   Right.

Q.   Okay.  So they came to present, and do you recall when they came to present?

A.   No.

Q.   Who was present when they came to present?

A.   All the regular people.

Q.   Do you know how many?

A.   I have no idea.

Q.   Do you recall who came out from Oregon?

A.   Dannels and the prosecutor and a police officer.  There may have been one -- it seems to me like there were five people that came.

Q.   Okay.  And do you recall the name of the prosecutor?

A.   Yeah.

Q.   Is that Mr. Frasier?

A.   Yeah.

Q.   Okay.  And do you recall the name of the police officer?

A.   No.

Q.   Okay.  When they came out, did they already have a theory developed about what had happened with Ms. Freeman and who was responsible?

A.   They may have.  It wasn't explicit, but they may have.

Q.   Okay.  And when they came out, what specifically did they tell you about the case up to that point?

A.   They just ran through some of the evidence, not all of it, but some of the evidence that they had, and it sounded like they had a good idea of who they thought was the bad guy, but that would not have influenced me.

(Exhibit No. 3 marked.)

Q.   Okay.  So let me show you another exhibit here.  I'll show you what's been marked as Exhb. 3. This is an article called Murder on the Menu from November 19, 2012.  It's by something called The Crime Report, and what this guy is talking about, and you can read the whole article if you want to, but I'll just summarize it for you and you can let me know if you need to hear more.

A.   Right.

Q.   This guy is an author who was apparently allowed to come along to a Vidocq meeting with a

Page 245

couple of detectives, Bryan Hargett and Sergeant Mickey Williams, who were investigating the murder of a woman named Jodine Serrin in Carlsbad, California, and he's recording on just generally what happened at this meeting, so I wanted to go through it just a little bit and see if this is consistent with your understanding of what generally happened at one of these presentations.

He says "He talks about Fred Bornhofen there, who you've mentioned, and he said that he acts as Vidocq's case management director, and I think that's correct, right, we've already talked about?

A.    Right.

Q.    And then on the next page, he says "Often the Vidocq Society covers the investigators' airfare and hotel expenses."

Do you know if Vidocq covered the expenses for Chief Dannels and Mr. Frasier and their entourage?

A.    That's a great mystery of this case, because they asked me, I then have no record of it, I then called Vidocq, talk to the treasurer, and he has no record of it.  I haven't talked to Dannels and I don't know if they have a record of it or not.

Page 246

I know that I didn't pay for it, and so the question who paid the expenses, I also called the travel agency that Vidocq used and they don't have evidence for it, and so I'm at a loss to explain it.

Q.   Okay.  But you're certain that they came out there?

A.   Yeah.

Q.   Okay.  And then it says here in this particular case, the -- let me get the name right, the Serrin case.  In this case, Bornhofen handed out copies of a brief about the case and said as a rule, he makes sure to collect all copies when lunch is over.

Do you recall that Bornhofen handed out copies of the brief on the Freeman investigation prior to the investigation?

A.   I don't know that he did on that one.

Q.   Okay.  Was that his routine practice or his habit?

A.   Often was the case.

Q.   Okay.  And then he says "'I burn them in my incinerator, so they don't get out to the public,' Bornhofen explained."

A.   Right.

Q.   Is that your understanding of what

Bornhofen's practice was?

A.   Yes.

Q.   Okay.  And was that something that was a Vidocq policy?

A.   It was a protective policy that I think went by the wayside.

Q.   Since you left, since the time you left?

A.   Yes.

Q.   Okay.  And then it says down here, he talks about how the meeting goes on, and he says "The detectives poured through details of the case, pointing out clues, missed opportunities, and possible leads.  On the projector screen, they wove a tale of a case that they had clearly put their heart into."

So that suggests to me that they were presenting some sort of a PowerPoint or a video or something that they produced?

A.   A PowerPoint.

Q.   Is that pretty typical of the people that come to present?

A.   A PowerPoint, yes.

Q.   Okay.  Do you recall if Chief Dannels had a PowerPoint presentation for you when they came out?

Page 248

A.   I don't recall.

Q.   Okay.  And then he says here "The audience studied the photos of the crime scene."

Would that be part of the PowerPoint or do people typically bring out glossies and eight-by-tens and actual photos to pass around?

A.   Very rarely did that happen.

Q.   Okay.  And then he basically says that after that, that the questions came out rapid fire, and then they tried to answer the questions.

Down here on page 3 of 4, they say "Sometimes the club's real hard-nosed sleuthing comes after the formal presentation of the case, when Vidocq members who think they can offer help or advice line up to discuss their thoughts with detectives."

Is that the same thing that you were talking about earlier when you said you sometimes take folks out to dinner and talk about the case?

A.   Let me read that line again.

Yes.

Q.   Okay.  So is this -- what he's talking about here, is this something that happened inside the presentation, and then at some point the presentation ended and then you take them out to

dinner?

A.   The presentation ends, they don't know they're going to be invited out or not.

Q.   Oh, okay.

A.   Okay.  And then if they do a good job and look like they're interested or whatever else, then I, as well as -- we'd ask them to stay over an extra night and then we would take them out to different restaurants or whatever else for -- to be congenial as well as give them an opportunity to loosen up and ask questions.

Q.   Okay.

A.   Because the room where they generally present and the hall that they present can be relatively intimidating.

Q.   Okay.  And then he mentions down here that there were a couple people that came up and asked some questions, but when Richard Walter, the famed forensic psychologist, began to explain his thoughts on the murder, a small crowd gathered.  It says Bornhofen describes you as the backbone of the organization, so I'm wondering, I don't want to trigger any modesty or anything, but it sounds like you're really the draw here, that this is you as opposed to the bigger organization.

Page 250

Is that fair or no?

A.   I think many people believe that.

Q.   Okay.

A.   Not necessarily myself.

Q.   Okay.  So when you tendered your resignation, was there any -- did anybody say "Hey, please don't go.  That's not okay"?

A.   Yes.

Q.   And who said that?

A.   A number of people that -- I wouldn't say a number, but a few that couldn't believe it and they saw my absence as a loss.  Whether true or not, that was their expression.

(Exhibit No. 4 marked.)

Q.   Okay.  So then I'll stop sharing this, and then I want to show something else here.  I'll show you what's been marked as Exhb. 4.

Do you see that PowerPoint presentation on your screen?

A.   Yes.

Q.   That's titled "Homicidal Death of Leah Nicole Freeman," and my understanding is it was created on January 14th, 2010, which should have been about a week before Chief Dannels came out and presented this to the Vidocq Society.

Page 255

███████████████████████████████████████████

██    ████████████████████████

██    █████    ████████████████████

██████████████████████████████████████████████

██████████████████████████████████ what's your

recollection of what happened with -- after the

presentation was given, what happened next on the

Freeman case?

    A.    I think there was speculation that they

didn't have enough to move forward in the room.

    Q.    Were there small group discussions of any

kind?

    A.    No.  I think there were probably -- you

asked me earlier, I did respond.  I think there were

probably -- generally you'll find about 50 people

there at the case presentation.

    Q.    Okay.  After the presentation, did half of

them get up and leave?  Did all of them get up and

leave or stick around and --

    A.    Yeah, they stuck around and chatted for a

while.  They all had their opinions about this, that

and whatever else.  I think that even Dannels and

the police officer and everybody but the prosecutor

thought that they needed more development and that

Page 256

they couldn't move forward with the prosecution.

However, then, we went to dinner, and it was at dinner, I believe -- it could have happened at the meeting, but I think it was at dinner, then, that the prosecutor then said that he thought it had legs and that he always wanted to try a circumstantial case and this -- he wanted to move forward on this, and I think Dannels and the other police officer weren't gobsmacked pleased, but gobsmacked by it all, okay?

Q.   Did you get the impression that the prosecutor was not convinced before coming to Vidocq?

A.   I don't know.

Q.   Okay.  I'm just kind of wondering why you got the sense that Dannels and the other police officer were gobsmacked.  It seems to me that if the prosecutor was already convinced that he could go forward, there wouldn't be much reason to come up to present at Vidocq Society.

A.   Well, how about this reaction, I'll imitate it, "Really?"

Q.   Okay.  So do you recall -- you went out to dinner, who all went to dinner with you?

A.   Just them and myself.

Page 257

Q.   Anyone else from Vidocq decide to go with you?

A.   No.

Q.   What was discussed at the dinner?

A.   The case.

Q.   What specifically was discussed about the case?

A.   Well, I think that they were still quite loose, very, very loose in their understanding of the collection of material that they had.  I then -- I think I offered the suggestion that from my understanding that it was a PA case, that I would have some more evidence and to affirm that and I'd like to see more crime scene photos and all that, kind of stuff, okay?

Q.   So at that point, was there a decision made that you would come back to Coquille with them at some point?

A.   They asked me if I would, and I think I said it would depend on whether Vidocq agrees with it.

Q.   And apparently Vidocq agreed with you.

A.   Yes.

Q.   Because you went back.

Do you recall during the presentation, did

Page 258

you take any notes?

A.   No.

Q.   Did you see anyone else at Vidocq taking any notes while they were reviewing the case?

A.   I would disapprove.

Q.   How about at the dinner, any notes taken at the dinner by anyone that you recall?

A.   I can't affirm positively.  I think the investigator did.

Q.   Okay.  And then after you had the dinner and talked a little bit, what happened next?  How did the dinner end?

A.   I went home.  I went back to my hotel room.  I can't remember -- it had to be Vidocq called me, or Fred, and said that they had contacted and wanted me to come out and I said "What does the Vidocq Society think about that?" and he said "It's your decision," and apparently it was okay and now the whole issue of payment and stuff is a mystery, but anyway, I got there.

Q.   And did Mr. Bornhofen say who had contacted him?

A.   No.

Q.   So we don't know if it was Dannels or Frasier or who?

Page 259

A.   Right.

Q.   Okay.  And when you say the question of payment is a mystery, what do you mean?

A.   We never could figure out who paid for the airfare and all that kind of stuff.

Q.   Okay.  Was it another one of those things where you tried to look at Vidocq's records, talked to the travel agents and that sort of thing?

A.   Yeah.  Yeah.

Q.   And there's no record of Vidocq paying for it?

A.   Well, they didn't -- they changed Frasier and all this kind of stuff, but I talked to the most recent treasurer and he looked and they only have six years back, they don't have ten years back.

Q.   So the decision was made that you would travel to Coquille and that Vidocq would participate.

What was the plan for Vidocq Society's involvement in the pre-investigation?

A.   Me going out and getting ideas and giving them suggestions and giving them a sense of perspective and letting them make up their own mind. That's how they wanted to proceed.  I did not say "Go get him," okay?  It's their choice.  I was there

Page 260

only as an interested pro bono person.  It's their case, not mine.  I wasn't the investigator.  I didn't do the cross checking of their facts, that sort of thing.  It was just a -- it was a thought stimulated -- hopefully a thought stimulating exercise for them so they could understand their case.

What they do with that case is their problem or their benefit, not mine.

Q.   Was the involvement with any other Vidocq Society members contemplated?

A.   Not that I know of.

Q.   Who is Mark McClish?

A.   I don't know.

Q.   Do you know what his involvement was?

A.   I don't know who he is.

(Exhibit No. 5 marked.)

Q.   Okay.  Let me show you what's been marked as Exhb. 5.

I'll represent to you that this is a blog post from a blog that's maintained or a website maintained by somebody named Mark McClish, and this was from September 23, 2011, and it's about Leah Freeman, the investigation, and he says down here, "In November of 2009, the Vidocq Society asked me to

STATE OF OREGON        )

County of Multnomah    )

I, Aaron M. Thomas, Certified Shorthand Reporter, Registered Professional Reporter, and Notary Public for the State of Oregon, do hereby certify that ROBERT WALTER personally appeared before me at the time and place mentioned in the caption herein; that the witness was by me first duly sworn on oath and examined upon oral interrogatories propounded by counsel; that said examination, together with the testimony of said witness, was taken down by me in stenotype and transcribed through computer-aided transcription; and that the foregoing transcript constitutes a full, true and accurate record of said examination of and testimony given by said witness, and of all other oral proceedings had during the taking of said deposition, and of the whole thereof.

Witness my hand and Notarial Seal at Portland, Oregon, this 9th day of July, 2022.

_____

Aaron M. Thomas
Oregon CSR 04-0388