# R. Paul Frasier
## District Attorney for Coos County

**Office of the District Attorney**
Coos County Courthouse
250 N. Baxter St.
Coquille, OR 97423
Phone: 541-396-7550  Fax: 541-396-1015
TDD: 1-800-735-2900



May 31, 2016

Mr. Paul E. Reim
Oregon Department of Justice
Trial Division
1162 Court St NE
Salem, Oregon 97301

Re: McGuffin v. Nooth 15CV1030

Dear Paul:

Consider this the first installment of what I suspect will be several missives dealing with the McGuffin PCR case referenced above. This case was part of my life for over 10 years and thus far I consider it to be the highlight case of my career. I will do anything I can to assist you in defending this matter.

Before I start going through the petition, I think some background is necessary about the case. This letter will serve as the background of the case. In subsequent letters I will address the petition.

Leah Freeman was a 15 year old girl who had just completed her freshman year at Coquille High School. (If you look at the yearbook for that year, in the freshman picture section, my oldest daughter's picture is next to Leah's.) Somewhere around the middle of the school year, Mr. McGuffin and Leah became boyfriend/girlfriend. Cory Courtright, the mother of Leah, was against the relationship primarily due to the age difference. In addition, the defendant became very possessive of Leah during the time they were together. Leah had been active in sports such as volleyball and basketball. Once she was in a relationship with Nick, her participation in sports stopped. She did not spend any time with friends her own age as the defendant monopolized her time. The relationship was rocky. As shown at trial there were incidents where the two would argue and yell at each other in very loud voices. Leah's friends were counseling her to get out of the relationship. Leah's mother was concerned they were sexually active and had made arrangements for Leah to be seen at the Public Health Department for the Friday after Leah disappeared so she could get on birth control. (This was prearranged before Leah disappeared.)

1

The day she disappeared was a Wednesday at the end of June 2000. She had been with Nick all day, including a barbeque with other individuals. At 7 PM, Nick dropped her off at the home of Sherrie Mitchell. Ms. Mitchell was a friend of Leah. Nick was to pick her up at 9 PM. While at the Mitchell home, Sherrie once again counseled Leah that she needed to get out of the relationship with Nick. Leah, while Ms. Mitchell was not watching, wrote a letter to Ms. Mitchell. See attached Exhibit 1. Just before 9 PM, Leah became angry with Ms. Mitchell and her mother and left the home on foot. She was subsequently seen by other persons at the McKay's Market, what was then the credit union in Coquille and then near Coquille High School. She was not seen after that. See Attached Exhibit 2 that will give you some reference.

Nick showed up at the Mitchell home around 9 PM. He was informed that Leah had just left. He was driving a blue Mustang. He then drove around town looking for her. He claimed he never found her.

Nick came back to the Mitchell home around 10 PM. Mrs. Mitchell had Nick call Leah's mom to see if she was home. Nick was told she was not home. Nick then went looking for her again. He claimed he did not find her. At some point he drove by Leah's home and claims he saw a light on in Leah's bedroom window. As it was a second story home, he tried to get her attention by throwing rocks at the window. Leah did not come to the window. According to Nick, he assumed she was home and he then drove home.

Leah's mother woke up in the middle of the night and saw that Leah was not home. She thought that Nick had found her and that they were still out together. Mom was not happy with Leah not being home and was determined to discuss this with Leah when she came home. Mom woke up at around 7AM Thursday. Leah was not home. Mom then called Nick who claimed he was surprised she was not home. Leah's family then began to look for her with no success.

Later that morning Leah's mother reported to the police that Leah was missing. This began a series of mistakes by the Coquille Police Department. The then chief, Mike Reeves, decided she must be a run away and did very little except to look around town to see if she was around. Leah made no contact with home and was not seen by anyone.

The Coos County Sheriff's Office heard that there was a missing girl in Coquille and offered the services of two experienced detectives to help. Chief Reeves turned that offer down.

On Friday Leah still had not shown up. Again, the Sherriff's Office offered to help, but that help was refused by the Coquille Police.

At that time I was a deputy DA in Coos County with Paul Burgett being the elected DA. I was called wither late Thursday or early Friday by then Det. Sgt. Craig Zanni of the Sheriff's Office and was told about the missing girl. It is my recollection that

2

as Chief Reeves was declining assistance, my then boss did not want to push the issue about us getting involved.

Over the weekend Chief Reeves decided that something must have happened to Leah. He then called the FBI and asked for their help. (He did not ask for help from local law enforcement.) The FBI did come to Coquille and started an investigation. However, by Tuesday of the following week, with Leah not having been found, the FBI began to question Chief Reeves why other local law enforcement was not involved. Finally, one week after she disappeared, the Coos County Major Crime Team and I were asked by Chief Reeves to get involved. The Major Crime Team involves personnel from every police agency in the county who lend a hand when a major crime such as a murder occurs.

The state of the investigation at that point was not very good. We were one week behind as it were and we were getting some difficulties. For example, at one point a local person with DHS had been telling kids that might no something to not talk with the police and get a lawyer.

Nick was interviewed a couple of times by the Coquille PD after Leah disappeared. Frankly his story just did not make any sense. For one thing, he claimed to have been driving up and down Central Avenue in Coquille looking for her and claiming he never saw her, but at the same time there were reports of her being seen walking by the Market, a restaurant, the credit union and the high school. A week and a half after Leah disappeared, Nick came in for an interview with experienced detectives. Nick agreed to take a polygraph test and flunked it. When the officers started to question him, especially about his failure of the polygraph test, Nick became very anger and invoked his right to counsel. A couple of days later I became aware that Nick's family had retained Bob and Shaun McCrea to represent him.

The investigation went into sort of a stall at that point. Because some of the kids would not talk to us, I empanelled an investigatory grand jury to find out what these people had to say. It was video recorded. We learned one important thing from that grand jury and that was Nick had switched cars that evening. To start the evening he was driving a blue mustang. At some point he then switched to driving a maroon colored sedan (his mother's car I believe). Later he switched back to the Mustang. We obtained search warrant for both cars and the McGuffin home. (This brought up another point that bothered me when I later found out about it. I was not informed at that time what was found in that search. I will discuss that later below.) Nothing of significance was found. However, we noted that the Mustang appeared to have been cleaned out. The trunk was missing its liner and there was not jack or spare tire.

The Fourth of July weekend brought forth some interesting developments. An individual named Tony Messerle came forward with a shoe he had found. Mr. Messerle at the time worked for the county in the road department shop. We worked a swing shift at the county maintaining and repairing road department equipment. He got off work around 11:00 PM. He rode his motorcycle home which took him on the road next to gas

3

station (which is across the street from the high school) where Leah was last seen. A short distance to the east where Leah was last seen he found a tennis shoe in the middle of the road. At first he thought it might be the shoe of one of his children and he picked up and took it home. He later learned that his children had not lost any of their shoes. He held on to it for a couple of days and eventually brought it to the police after hearing that one of the last places Leah had been seen was near where he had found the shoe. The shoe was identified by Leah's sister as being one of Leah's shoes. We had it tested and DNA tests confirmed it was in fact Leah's shoe. Of interest was blood found on the bottom of the shoe in small pin point drops that I have always been told would be high velocity blood spatter. The blood was determined to be by DNA as that of Leah.

Around the same time a Sheriff's deputy named Kip Oswald had gone to a place where sometimes kids in Coquille go to hang out and have parties and drink etc. He went there to see if he could locate Leah or any evidence that might explain what had happened to her. It is located on Hudson Ridge, which would be about 15 miles from Coquille. As he was driving on a dirt road leading to the party location he found in the middle of the road a tennis shoe. The deputy picked up the shoe and put it in his truck. He later found out about the shoe Mr. Messerle had found and he turned it over to Coquille PD. It matched the other shoe we had found and completed the pair. It was tested for DNA and it was shown to be Leah's shoe. There was no blood on the shoe.

We developed the theory that the shoe found by Mr. Messerle was lost by Leah at the time she disappeared. With her blood on the shoe, especially on the bottom of the shoe, it was apparent that something had happened to her that had caused her to bleed at the time she disappeared. The location of the second shoe was obviously planted where it was so that if it was discovered it would throw us off the track of what happened to Leah.

We worked the case for several weeks with no luck. About five weeks after she disappeared, her body was found by the police in a location that was an obvious dump site. The location was about 10 miles from Coquille. The second shoe was found about five miles as the crow flies further to the east from where her body was found. She was found in a wooded area at the side of the road but was not really visible from the road. She was found at the bottom of a steep embankment about five yards from the road. She was dressed in the same clothes she was last observed in. However, because this was summer and she had been out in the open her body was badly decomposed. All of her organs and most of her skin had basically rotted away. There was some tissue on the lower part of one her legs but basically everything else was gone but her bones and hair.

The clothing had rotted to some degree and there has been some obvious animal activity causing some holes on the clothes. A couple of things for sure were determined from the clothes. There were no bullet holes or holes caused by a knife. The skeleton was checked for any sharp force injuries and none were found. There were no broken bones. The hyoid bone was found and it was in a couple of pieces. However,

4

because of her age (apparently the hyoid bone does not generally fuse into one piece until a person becomes an adult) and animal activity, we could not definitely say she had been strangled. At the same time we could not rule out strangulation. All of the other neck organs normally used to determine strangulation had long since rotted away.

Dr. Olsen declared her death to be a homicide and listed such on the death certificate. We did not list on the original certificate the cause of death for a couple of reasons. First of all, at the time of the autopsy, Leah's mother was very close with Nick McGuffin and his family. We discovered that things we told her about what had happened to her daughter were getting reported back to our only suspect. In addition, even after she broke off being close to the McGuffin family, we found she could not keep anything secret. While we suspected strangulation as the cause of death, we had no definitive proof of that being the case. We did not want it to be public information that we did not know the cause of her death. The death certificate was later amended by Dr. Olsen.

The case then stalled. It was worked for several weeks after her body was found and then went cold.

I should mention that Nick McGuffin was not the only person we looked at for this crime. For example, there was one individual who had lived in an apartment whose back window was just a few feet from where Leah's shoe with the blood on it was found. We became interested in him as he simply up and left town within a day or two of Leah disappearing and left behind all of his belongings in the apartment. We spent a lot of time tracking him down and sent officers to various locations in the country until we found him in Colorado. He was interviewed and eventually eliminated as a suspect.

As each new person came to light, they were eventually eliminated. We never could eliminate Nick McGuffin as the person responsible for Leah's death.

Over the years I tried to get Chief Reeves to open the case back up. I even wrote him a letter detailing the reports I had and said why don't we get together and compare notes and see what I have and see what you have. He never responded to my requests. I later found out that he had told his staff that in his opinion the case was never going to be solved so he had determined that he was not going to have any more time or resources of the department spent on the case.

A couple of years after Leah disappeared, our deputy medical examiner became aware that there was a new type of DNA test that might be of assistance in the case. However, the only lab in the world that was doing this type of test was a lab in England that to my understanding was associated with Scotland Yard. My then boss authorized all of Leah's clothing to be sent to this lab for the additional DNA testing. Their inspection of the clothing did not find any bullet or knife holes. Also no DNA was found that could be identified to anyone. Apparently Leah's bodily fluids had leaked into her clothes as she degraded and subsequently all of the fluids degraded to the point that no DNA could be extracted from the clothes for further testing.

5

The case then goes on to the back burner for years. During that time several rumors starting running through town. One rumor was she had been run over by a car and killed, with the person responsible (names varied but one that came to light the most was Tom Stemmerman) then taking her body and dumping it where it was eventually found. Another rumor was that she had been kidnapped and held in a cabin a short distance from where her body was found where she had been raped and murdered. Another rumor had her being kidnapped and murdered at Tom Stemmerman's place and then being buried on the property to be subsequently dug up and dumped where her body was found. Another rumor involved a person named Alisha Michaud who supposedly in one story had heard someone confess to killing Leah to another story she had been present when Leah was killed to another story she had killed Leah. We tried the best we could to investigate these rumors but we never found anything of substance to confirm any of those rumors.

On January 1, 2008 I became the DA for Coos County. In 2008 Chief Reeves retired. I was involved with the City of Coquille (I was on the interview committee) to find a new chief. There were five finalists for the job. I approached each one and obtained a commitment from them to take a look at this case. Unlike Chief Reeves, I felt the case could be solved if we worked it right. Mark Dannels from Arizona was named the new chief.

Chief Dannels took his commitment to re-open the case to heart. Within about three months of his becoming chief, we had formed a cold case team of retired homicide detectives from Coos County law enforcement and who had been involved to some degree in the case. We started meeting once a week toward the end of 2008. We kept what we were doing secret.

The first task we had was determining what sort of reports had been generated. Here was one of the first issues I encountered. There were numerous reports and duplicate copies that had been thrown into several banana boxes. They were not organized in any fashion. It took several weeks to organize those reports. We then had to compare what Coquille PD had with what I had been given. There were numerous reports that had been generated or given to Coquille PD but had not been given to me. I had reports that had not been given to Coquille PD. As the Coos County Major Crime had been involved, we also requested that each agency that had worked on the case to go through their archives and send us a copy they had on the investigation. Again we found reports that had not been sent to either me or Coquille PD.

Once we came up with I call a master copy of the reports (Coquille had one copy; I had another), we then needed to look at the physical evidence. Again, I found we had issues. I soon discovered that there had been evidence seized in the original investigation that I had not been told about it. For example, there was yearbook found in Nick's room that had pictures of Leah circled and comments by Nick written nearby. I found that we had the journals of Leah that had been seized when she disappeared which contained statements about the state of her relationship with Nick. When the case

6

was originally investigated law enforcement here did not have digital cameras and were using 35 mm cameras for photos. We found several rolls of film that had never been developed. Of most concern was the fact Leah's clothes and shoes were not in the Coquille evidence locker. We found out they had never been returned from England. Fortunately they still had them and we arranged for them to be returned to Coquille.

Once we had all of the reports and evidence in hand, I spent a great deal of time going through the reports and the evidence. I had developed a list of things I wanted to have done or clarified.

We reached a point where we decided to go public. This was in late 2009. We determined to go back and re-interview all of the witnesses and any new ones developed. Before we announced to the public what we were going to do, we informed the McGuffin family that we were re-opening the case. Initially we had thought about doing a tap on the McGuffin's phones to see if we could gather any worthwhile evidence after we told them the case was being re-investigated. I even prepared a wire tap application and order. We eventually decided not to apply for the order.

Chief Dannels and Sgt Smith contacted the McGuffins and informed them what was going to happen. Nick showed up and made some spontaneous statements that we used at trial. The McGuffins claimed that they had written documentation as to who killed Leah. We asked them to share it. They declined to give it to us. We eventually obtained a warrant to search their property for the documents which we did find. They were a repeat of the rumors we had been hearing for years and had no substance to it.

I also directed the police to tell the McGuffins if they had anyone they wanted us to talk to give us their names and we would talk to them.

After we went public with a press release, we called out the major crime Team and set out to re-interview everyone. Eventually we reached the point of presenting the case to grand jury. I asked that a special panel be empanelled for period of 90 days starting in late spring 2010. During that time the grand jury met several times. I eventually called about 115 persons to the grand jury and several others that appeared by report. The grand jury was both audio and video recorded with court permission.

I called everyone that had anything to say about the case. I ran down every rumor. Of note the people who said they had heard such and such a rumor could never tell us exactly who the original source of the information was. In the end, each of the rumors that were being batted around that did not involved Nick McGuffin were found to be without substance.

The grand jury returned an indictment in August 2010 and Mr. McGuffin was arrested. The case went to trial in 2011 and he was found guilty of Manslaughter in the First Degree.

7

ATTACHMENT B, Page 9 of 73
Case No. 15CV1030
AG_000284
Exhibit 10, Page 7 of 8

My ultimate theory of the case was that I did not believe this was a premeditated crime. I did not think that Nick McGuffin woke up the morning Leah disappeared with the idea he was going to kill Leah that day. I think what happened was that their relationship was volatile to begin with; that Leah decided to breakup; that she told Nick that night they were done; Nick became very angry at her decision; that he grabbed her by the neck; in the process she lost the one shoe; that in the process he slapped or hit her in the face resulting in the blood spatter on the bottom of the shoe; and that he eventually strangled her to death. I still argued he intended to kill her as strangulation takes some time and effort (more than what you see on TV) just that there was no premeditation.

If need be I will come to Salem and sit down with you and go over the case in detail as we go through this process.

Sincerely,

R. Paul Frasier

8