IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


NICHOLAS JAMES MCGUFFIN, as      )
an individual and as guardian    )
ad litem, on behalf of S.M., a   )
minor,                           )
                                 )
          Plaintiffs,            )
                                 )
  v.                             ) No. 6:20-cv-01163-MK
                                 )
MARK DANNELS, PAT DOWNING,       )
SUSAN HORMANN, MARY KRINGS,      )
KRIS KARCHER, SHELLY MCINNES,    )
RAYMOND MCNEELY, KIP OSWALD,     )
MICHAEL REAVES, JOHN RIDDLE,     )
SEAN SANBORN, ERIC               )
SCHWENNINGER, RICHARD WALTER,    )
CHRIS WEBLEY, ANTHONY WETMORE,   )
KATHY WILCOX, CRAIG ZANNI,       )
DAVID ZAVALA, JOEL D. SHAPIRO    )
AS ADMINISTRATOR OF THE ESTATE   )
OF DAVID E. HALL, VIDOCQ         )
SOCIETY, CITY OF COQUILLE,       )
CITY OF COOS BAY, and COOS       )
COUNTY,                          )
                                 )
          Defendants             )
                                 )

REMOTE DEPOSITION OF RICHARD WALTER

Taken on behalf of the Plaintiffs

June 30, 2022

BE IT REMEMBERED THAT, pursuant to the Oregon Rules of Civil Procedure, the deposition of RICHARD WALTER was taken by Aaron M. Thomas, Certified Shorthand Reporter and Registered Professional Reporter for Oregon, on June 30, 2022, commencing at the hour of 8:03 a.m., via Zoom.

APPEARANCES:

MALONEY LAUERSDORF REINER PC
Counsel for Plaintiffs
1111 East Burnside Street, Suite 300
Portland, OR 97214
acl@mlrlegalteam.com
jpuracal@forensicjusticeproject.org
     By MR. ANDREW C. LAUERSDORF
        MS. JANIS C. PURACAL

LAW OFFICE OF ROBERT E. FRANZ, JR.
Counsel for Defendants: City of Coquille, City of
Coos Bay, Coos County, Craig Zanni, Chris Webley,
Eric Schwenninger, Sean Sanborn, Ray McNeely,
Kris Karcher, Pat Downing, Mark Dannels, Kip Oswald,
Michael Reaves, David Zavala, Anthony Wetmore,
Shelly McInnes
PO Box 62
Springfield, Oregon 97477
rfranz@franzlaw.comcastbiz.net
BY: MR. ROBERT E. FRANZ, JR.

OREGON DEPARTMENT OF JUSTICE
Counsel for Defendants: Oregon State Police, John
Riddle, Susan Hormann, Mary Krings, Kathy Wilcox
100 SW Market Street
Portland, OR 97201
jesse.b.davis@doj.state.or.us
BY: MR. JESSE B. DAVIS

/////

EXHIBIT G
Page 2 of 23

--oOo--

WOOD SMITH HENNING & BERMAN LLP
Counsel for Defendants: Vidocq Society and Richard Walter
12755 Southwest 69th Avenue
Suite 100
Portland, Oregon 97223
kschaffer@wshblaw.com
BY: KARIN L. SCHAFFER

ALSO PRESENT:  Mr. Nicholas J. McGuffin

AARON THOMAS COURT REPORTING - 503-961-5740

Page 57

What all information does your information have on it?  What are the categories?

A.    A lot of murder, a lot about sex crimes, a lot about violent crime.  I specialize in violent crime as a profession, therefore I have not only here in the United States, but also, then, internationally lectured and whatever else in everything from England and the Home Office, Scotland Yard, to China to Istanbul to Hungary and all over.

Q.    Let me back you up.

As far as the categories go, does it list all of your education?

A.    Yes.

Q.    And does it list all of your employment history?

A.    Yes.  You could get absolute accurate information.

Q.    Does it include a list of all your speaking engagements?

A.    Not exclusive.  There are some privileged ones that I did not list.

Q.    Why is that?

A.    Because they're government protected.

Q.    What does that mean?

Page 58

A.   Meaning that it was government work that is privileged.

Q.   How so?

A.   By the nature of the request for my services.

Q.   Do you have any type of government security clearance?

A.   Nope.

Q.   Any type of NSA clearance, CIA, FBI, any agency clearance?

A.   Nope.  I gave a lecture -- as an aside, I gave a lecture in Orlando in the '90s, I think it was, and FBI, CIA, everybody else was there, and after the lecture -- this was for the American Academy of Forensic Sciences, then within 15 minutes, the FBI had me aside and had invited me then to Quantico, so from that point on, then, I would periodically go and give lectures at Quantico and hear other people there while I was there, and so then that increased my visibility, and so then the other people around would reach out to me and ask me to help them on their cases or whatever was going on.

Q.   That was an AAFS speaking engagement in Orlando, Florida?

Page 140

like to fly?

A. No.

Q. Other than the case that you referred to as the cannibal case, what other cases did you work on with the Metropolitan Police?

A. The others are privileged and I choose not to discuss them.

Q. Who would be able to verify your work on those cases without disclosing privilege?

A. No one.

Q. Who did you report to for your work on these cases?

A. You're exhausting me with an unanswerable question.

Q. Well, who was your contact for those cases?

A. I'm not going to discuss it. I'm not going to, no.

Q. Okay. I just want to be clear, you're refusing to answer?

A. Yes.

Q. Where did any of those cases take place? I understand you may be refusing to answer, but I just need to have you say that for the record.

A. I refuse to answer.

Page 141

MS. SCHAFFER: I'm also going to object. I believe that's been asked and answered.

MR. LAUERSDORF: I asked him about where the cannibalism case took place and he didn't know the answer to that. Now I'm asking where were any of the other cases that he worked on for the Metropolitan Police took place.

Q. My understanding is that you're refusing to answer.

Is that correct, Mr. Walter?

A. That's correct.

Q. So is my understanding correct that other than the cannibal case that we've already talked about, you're refusing to answer any questions about casework or consulting work that you did with the Metropolitan Police?

A. Correct.

Q. And the metropolitan police was in some part of London, England?

A. Right. Yes.

Q. Okay. And then you said you did work for Home Office?

A. Yes.

Q. How many cases have you worked on for Home Office?

Page 142

A.    Same answer.  I'm not going to respond.

Q.    And just so my understanding is correct, my understanding is that you're refusing to answer any questions with regard to casework or consulting work that you did with Home Office in -- somewhere in England?

A.    Yes.

Q.    And then Scotland Yard, how many cases have you worked on for Scotland Yard?

A.    I refuse to respond.

Q.    Even with regard to just the number of cases?

A.    Yep.

MS. SCHAFFER:  Let me just state an objection to all the line of questioning with regard to Metro Police, Home Office and Scotland Yard.  The question is not relevant to the subject matter of this litigation.  I'll just state my objection for the record.

Q.    Just so my understanding is correct, Mr. Walter, you're refusing to answer any questions with regard to casework or consulting work that you performed with or for Scotland Yard in England.

Is that right?

A.    That's right.  Right.

Q.    Okay.  Other than Home Office, Metropolitan Police and Scotland Yard, did you do any other side work or consulting work while you were employed by Michigan DOC?

A.    I'm refusing to answer any further questions about employment.

Q.    About your employment?

A.    Yep.  Yep.

Q.    Okay.  How about during your time with the Los Angeles County Medical Examiner's Office, did you do any consulting or side work while you were employed by the Los Angeles County Medical Examiner's Office?

A.    Again, I'm refusing all discussion on outside work.

Q.    Okay.  So let me make sure that I understand what you're saying just so I can avoid a bunch of unnecessary questions.

If my understanding is correct, you're refusing to answer any questions regarding work or employment outside of the history of employment that we have already discussed.

Is that correct?

A.    That's correct.

MS. SCHAFFER:  Andy, is this a good time

Page 144

to break for lunch if we're going to move on to a different topic?

MR. LAUERSDORF:  Yeah, let me ask one more question, and I understand he's going to refuse to answer, but I have to ask anyway.

Q.   How were you employed in 2010?

MS. SCHAFFER:  I'm sorry, can you repeat the question.

Q.   Yeah, how were you employed in 2010, the year 2010?

MS. SCHAFFER:  Lacks foundation; assumes facts not in evidence.

You can answer if you can.

A.   I'm not going to respond.

Q.   Well, were you employed by anyone in 2010? Were you on anyone's payroll?

A.   To be quite frank, I don't remember, but I'm going to assume not.

MR. LAUERSDORF:  Okay.  Sounds like a good place to take a break.

THE WITNESS:  Okay.  Great.

MS. SCHAFFER:  So how about a half an hour, does that work for everyone?

MR. LAUERSDORF:  Sounds good for me.

(Lunch recess taken:  11:52 - 12:30 p.m.)

BY MR. LAUERSDORF:  (Continuing)

Q.  Okay.  Let's see, we were talking about the metropolitan police, and other than the case that you referred to as the cannibal case, what are the other cases that you worked on or consulted on for the Metropolitan Police?

A.  I can't remember the name of the case per se.  In a park in Central London, a female victim was murdered and stabbed 60 some times, et cetera.  There was a great deal of controversy over the whole issue.  Her -- she was brutally murdered and all kinds of theories had popped up.

Then I was asked to review it.  One did and one had great discussions about it.  Again, I wish I could remember the name, but I can't.  From that, then, they realized that the primary suspect at the time finally realized that he didn't do it and it took them another year or so and they then on their own discovered, thanks to DNA, the person who actually did it who's now in jail serving time, so that was a huge case in London.  This was probably ten years ago now.

Q.  Who asked you to review it?

A.  The Yard did, and I don't remember the

name of the detective.

Q.   Scotland Yard did?

A.   Yes.

Q.   They asked you to review a case for Metropolitan Police?

A.   Yeah, and so I did, and Bob Wessler from FBI also reviewed it and several other people.  It looked like a different person, however, then, there was some deviltry in the police service that then tried to manipulate and whatever else the primary suspect at the time and we basically told him that he was wrong.

Q.   Who was that, who did you tell that he was wrong?

A.   The investigators who were working on the case.  I believe it was a particular individual who was very suspicious.

Q.   What was the investigator's name?

A.   I don't know.  I just mentioned that.

With that, then, eventually a year later, they found out through DNA that the primary suspect that they had had didn't match and then they found out that somebody already in prison for another murder had committed the crime, so it was a big deal and people were punished over it who were craving a

Page 147

boondoggle, so that's that case.

However, that said, you also asked me about cases, other cases through the various agencies, and I've been to London at least 20, 30 times.

Q.   Okay.  Lets break that down a little bit.

So on this last case that you're talking about with the woman with the 60 stab wounds, you don't know who the investigator was at Scotland Yard that asked to you review it?

A.   Right.

Q.   But where did your work take place on the case?

A.   At the Metropolitan Police.

Q.   At what location?

A.   Right Downtown London.

Q.   And who did you work with there?

A.   I just told you, I don't remember.

Q.   Well, I asked you before who asked you to review it and you didn't remember.

A.   Right.

Q.   And I asked you who you worked with on the case rather than who asked you to review it.

A.   Right.

Q.   You don't remember?

Page 148

A.    It's been a long time and I just don't remember.

Q.    What are the names of the folks you've worked with at Scotland Yard in the past who have asked you to review cases?

A.    I'm trying to think.  John -- I always block on his name.  He was the head of the investigative unit there on homicides.  We had long conversations about it and the skullduggery that went on about it.

Q.    About what, the homicide unit or a particular case?

A.    The skullduggery on this particular case that took place.  They got a psychologist who then set up a honey trap to entice him to -- for an admission and the whole thing was framed and he was convinced that that was the guy, so he thought it was in his best interest to lie and misrepresent before he got caught.

Q.    What was the name of the psychologist? What was the name -- oh, sorry.

A.    I hear you.

Q.    Okay.

A.    I'm blocking on it.  He didn't like me and I didn't like him.  He was afraid to meet me, so I

Page 149

never got to meet him face to face, but he -- I know he charged the Yard I think over 400,000 pounds for his immoral and illegal work and -- Ron somebody. At one time, he was relatively famous in England for his work.

Q.   Lon, L-O-N?

A.   Ron, R-O-N.

Q.   Oh, R-O-N.

Okay.  And then you said John was the head of homicide investigation?

A.   Yeah, John.  Yeah.

Q.   And you don't recall his last name?

A.   No.

Q.   This was ten years ago, so around 2011?

A.   At least, or maybe before, but I think then.

Q.   Other than John, who else have you worked with at Scotland Yard?

A.   A number of them.  I work cases and I don't -- at the time, I knew their names, but at the time, I didn't care.  Well, I cared, but it's gone the way of -- into a pit.  I just can't recall.

Q.   So you don't recall the names of anyone that you worked with at Scotland Yard other than John?

Page 150

A.   Right.  Right.

Q.   Okay.  How about Metropolitan Police, what are the names of the folks that you worked with at Metropolitan Police over the years?

A.   Well, a number of various agencies there. They hold these plaques and all that kind of crap, but I really can't remember their names.  I'm not being obstructive, I just don't remember their names.  It's been a couple of years since I've seen any of them.

Q.   How about Home Office, how about anybody that you worked with at Home Office?

A.   I would if I heard their name, but at the time the Home Office called me and asked me if -- they were the ones that asked me if I would look at cannibal case and I said yes, so then I worked on that, but I can't remember the guy who called me. It's been a long time.

Q.   Okay.  Other than the -- other than the cannibal case and the 60-stab-wound case what's another case that you worked on for somebody at Scotland Yard or Metropolitan Police or --

A.   Outside of those agencies also are the various counties, whatever you call them, a serial rapist that we helped take down.

Page 151

Q.    Where was that?

A.    Up in mid England.  I don't remember exactly.  It's been a long time.  I had no idea I'd be asked these questions, so otherwise I would have had the names or reviewed.

Q.    Are they all on your resume?

A.    No.

Q.    But you're able to retrieve the names if you had the opportunity?

A.    I think I could maybe.  I'm not sure.  I won't promise.  I will promise that I will try.

Q.    Okay.  Do you have any records that you worked on any cases for Scotland Yard?

A.    No.

Q.    Do you have records of any of your work on cases with Metropolitan Police?

A.    No.

Q.    Do you have any records of any of your work on cases with Home Office?

A.    No.  I don't keep records.

Q.    Does that mean you had records at some point and you destroyed them or you just don't keep any records?

A.    I don't keep any records.

Q.    On any of your cases?

Page 152

A.    Rarely.  Once in a while, I will.

Q.    Did you make any records on the Freeman investigation?

A.    No.

Q.    Okay.  Other than what we talked about with the Metropolitan Police, Scotland Yard and the Home Office, did you do any other work for other employers, side work, freelancing, while you were employed with the Michigan Department of Corrections?

A.    Yes, often.

Q.    With who?

A.    Again, in Istanbul, Turkey, which was problematic, but aside from that.

Q.    Who did you work with in Turkey?

A.    The Turkish-- the Istanbul Police.  I gave a lecture that was translated into Russian as well as Turkish and I gave it in English.

Q.    Who was your contact at the Istanbul Police?

A.    Oh, God.  I'll never remember their names. They're difficult to pronounce.  I developed a bad habit of not remembering names when I was working, because I always knew -- I was interested in what they were saying rather than their names per se and

Page 153

I always had officers around me that could tell me who they were after the fact if I forgot, but -- so I'm not good at name recall.  It's a bad habit and -- that's it.

Q.    When was the last time that you renewed your passport?

A.    Maybe a couple years ago.

Q.    Do you have any of your old passports?

A.    Yep.

Q.    Those would show your travel to Istanbul or England to work on these cases, right, so we'd be able to put dates on things from there?

A.    I can go back and look.

Q.    Okay.  I'd ask that you do that, and if you have the passports, we'd ask for copies of that and we'll send a request for production on that.

Other than Istanbul, Turkey, and the case -- well, what kind of case did you consult on in Istanbul?

(REQUEST FOR PRODUCTION)

A.    Well, I lectured, and then I was approached and told that on one side of the Bosporus which runs through Istanbul, that a group of men and women had been slaughtered and that parts, then, were taken from the men and put on the women and

Page 195

Q.    And who runs the Sherry Black Foundation? Who's responsible for the day-to-day operation?

A.    They have a manager, but I think that's going to be changing very soon.  The last one did well, but we want more action from that and Heidi and her daughter and whoever else are paying close attention to it and they're keen on getting back and giving back to the community, the kind of law enforcement teaching and investigation that they need and not just rely on DNA.

Q.    When was that foundation set up?

MS. SCHAFFER:  Calls for speculation.

You can answer if you know.

A.    I don't know the exact date, the exact year.  I think it was about '17.

Q.    When did you join?

A.    Right at the beginning.

Q.    And where is it located, in Utah?

A.    Yeah, Salt Lake City.

Q.    And what's your role with the foundation?

A.    My buddy Patrick Zirpoli and I teach crime assessment, lots of illustrations, lots of questions, all that kind of stuff, and it's proven to be successful.

Q.    And does it take on cases the same way

Page 196

Vidocq does?

A.    Vidocq is much freer.    Vidocq is pro bono.

Q.    Okay.    Like how does the Sherry Black Foundation -- so does the Sherry Black Foundation take on cold cases?

A.    Oh, yeah.

Q.    And how does it screen those cases?

MS. SCHAFFER:    Objection; calls for speculation.

You can answer if you know.

A.    They screen through us and ask us in terms of are the cases for their -- we really want to educate the whole crowd, but for the cold cases that want attention, then we screen them for efficiency and productivity and success and all that kind of stuff and then we get back and let them know and then they bring their cases -- those people bring their cases for us to help on the fourth day.

Q.    So the same process that Vidocq used?

A.    Exactly.

Q.    Okay.    And who is Patrick Zirpoli?

A.    He was the head of the Pennsylvania State Police Crime Unit.

Q.    How long have you known him?

A.    Years.

Page 262

Q.   Do you recall Mr. McClish appearing on that show?

A.   No.

Q.   Okay.  Do you recall him being a member of the Vidocq Society?

A.   Absolutely not.

Q.   Okay.  And then -- okay.  So assuming that the Vidocq Society did not ask Mr. McClish to get involved, do you know if they asked anyone other than Mr. McClish to get involved?

A.   I do not know.

Q.   What's that?

A.   I do not know.

Q.   Okay.  And what was the plan for your involvement in the investigation?

     MS. SCHAFFER:  I'll object; that's asked and answered, I believe.

Q.   Okay.  That was when you said earlier that you were just going out there to be a pro bono resource?

A.   Yep.

Q.   Where did you get your training in investigating crime?

A.   A wide range of services, mostly applied training, though I did attend a couple classes while

Freeman investigation.

Is that right?

MS. SCHAFFER:  Objection; misstates the witness' testimony.  I don't believe he ever testified that he formed an opinion.

Q.   I thought you testified that you thought this was a power assertive.

A.   I didn't testify.  Oh, I testified -- I think it is, was a power-assertive case, but -- I forgot what started the argument.

Q.   I'm sorry, I didn't mean it to be an argument.  I was just asking if -- I was just asking if it was correct that you had developed a theory or an opinion of the typology of the perpetrator and the crime scene in this case.

A.   I developed my own opinion, but I didn't necessarily share that.  I shared with them what their evidence showed.  They can draw the conclusion, then, whether it fits or doesn't fit and whether he's the guy.  He did -- I mean, they did make that judgment and they thought it was then the -- McGuffin, whatever his name is.

Q.   Okay.  And that was based on their understanding of your theory about power assertive versus power reassurance versus anger retaliation