Janis C. Puracal, OSB #132288
E-mail: jcp@mlrlegalteam.com
Andrew C. Lauersdorf, OSB #980739
E-mail: acl@mlrlegalteam.com
MALONEY LAUERSDORF REINER, PC
1111 E. Burnside Street, Ste. 300
Portland, OR  97214
Telephone: (503) 245-1518
Facsimile: (503) 245-1417

David B. Owens, WSBA #53856, *pro hac vice*
E-mail: david@loevy.com
LOEVY & LOEVY
100 S. King Street, Ste. 100
Seattle, WA  98104-2885
Telephone: (312) 590-5449

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| NICHOLAS JAMES MCGUFFIN, as an individual and as guardian *ad litem*, on behalf of S.M., a minor,<br><br>Plaintiffs,<br><br>v.<br><br>MARK DANNELS, PAT DOWNING, SUSAN HORMANN, MARY KRINGS, KRIS KARCHER, SHELLY MCINNES, RAYMOND MCNEELY, KIP OSWALD, MICHAEL REAVES, JOHN RIDDLE, SEAN SANBORN, ERIC SCHWENNINGER, RICHARD WALTER, CHRIS WEBLEY, ANTHONY WETMORE, KATHY WILCOX, CRAIG ZANNI, DAVID ZAVALA, JOEL D. SHAPIRO AS ADMINISTRATOR OF THE ESTATE OF DAVID E. HALL, VIDOCQ SOCIETY, CITY OF COQUILLE, CITY OF COOS BAY, and COOS COUNTY,<br><br>Defendants. | Civil No. 6:20-cv-01163-MK<br><br>SECOND AMENDED COMPLAINT FOR DAMAGES<br><br>***DEMAND FOR JURY TRIAL*** |

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

COMES NOW Plaintiffs Nicholas James McGuffin and S.M., by and through their attorneys, Maloney Lauersdorf Reiner PC and Loevy & Loevy, and allege and claim as follows:

## I.  INTRODUCTION

1.      Nicholas McGuffin spent nine years in prison for a crime that he did not commit—the murder of Leah Freeman.

2.      McGuffin was wrongfully convicted because Defendants fabricated and suppressed evidence and otherwise violated McGuffin's rights under the United States constitution, the Oregon constitution, and the law.

3.      After fighting for his innocence for nearly two decades, McGuffin was exonerated when his conviction was vacated and the Coos County District Attorney's Office unilaterally dismissed all charges against him.

4.      Though nothing can bring back that time, McGuffin and his daughter, S.M., now bring this action to redress the devastating injuries that Defendants caused them.

## II.  PARTIES

5.      Plaintiff Nicholas James McGuffin is, and was at all times material and relevant to this action, an individual and resident of the state of Oregon.

6.      Plaintiff S.M. is, and was at all times material and relevant to this action, a minor individual and resident of the state of Oregon.  S.M. appears in this lawsuit through her father, Nicholas McGuffin, as her guardian *ad litem*.

7.      Defendants Mark Dannels, Dave Hall, Shelly McInnes (formerly Grant), Raymond McNeely, Michael Reaves, Sean Sanborn, Chris Webley, and David Zavala are, or were at times material and relevant to this action, police officers of Defendant City of Coquille acting under color of law and within the scope of their employment by and for Defendant City of Coquille.  They are sued in their individual capacity.

8.      Defendants Reaves and Dannels were, at times material and relevant to this action, the Chief of Police of Defendant City of Coquille.  Defendants Reaves and Dannels were

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

final policymakers, or had been delegated such authority by and for Defendant City of Coquille. Defendants Reaves and Dannels are sued in both their individual and official capacities.

9.      Defendant Richard Walter is, or was at all times material and relevant to this action, an individual employed by the Vidocq Society and an agent of Defendant City of Coquille acting under color of law and within the scope of his agency for Defendant City of Coquille.

10.      The Vidocq Society is a Pennsylvania corporation and is, or was at all times material and relevant to this action, the employer of Defendant Walter.  At all times material and relevant to this action, Defendant Vidocq Society acted as an agent of Defendant City of Coquille and was acting under color of law and within the scope of its agency for Defendant City of Coquille.

11.      Defendant City of Coquille, which includes the City of Coquille Police Department and its officers, employees, and reserves, is an Oregon municipal corporation and is, or was at times material and relevant to this action, the employer of Defendants Dannels, Hall, McInnes, McNeely, Reaves, Sanborn, Webley, and Zavala.  Defendant City of Coquille is liable for the acts of these individuals while acting within the scope of their employment and/or agency for Defendant City of Coquille.  Defendant City of Coquille is liable for the acts of Defendant Walter and the Vidocq Society while acting within the scope of their employment and/or agency for the City of Coquille.  In addition, Defendant City of Coquille is responsible for the policies, practices, and customs of Defendant City of Coquille, including the City of Coquille Police Department.

12.      Defendants Pat Downing, Kris Karcher, Kip Oswald, and Craig Zanni are, or were at times material and relevant to this action, officers or employees of the Coos County Sheriff's Office or the Coos County Medical Examiner, and acting within the scope of their employment for Coos County.  They are sued in their individual capacity.

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

13.     Defendant Zanni was, at times material and relevant to this action, the Sheriff of Defendant Coos County.  Defendant Zanni was a final policymaker, or had been delegated such authority by and for Defendant Coos County.  Defendant Zanni is sued in both his individual and official capacities.

14.     Defendant Coos County, which includes the Coos County Sheriff's Office and the Coos County Medical Examiner, and their respective officers, employees, and reserves, is an Oregon municipal corporation and is, or was at times material and relevant to this action, the employer of Defendants Downing, Karcher, Oswald, and Zanni.  Defendant Coos County is liable for the acts of these individuals while acting within the scope of their employment by and for Defendant Coos County.  In addition, Defendant Coos County is responsible for the policies, practices, and customs of Defendant Coos County, including the Coos County Sheriff's Office and the Coos County Medical Examiner.

15.     Defendants Susan Hormann, Mary Krings, John Riddle, and Kathy Wilcox are, or were at times material and relevant to this action, employees or officers of the Oregon State Police acting under color of law and within the scope of their employment by and for the Oregon State Police.  They are sued in their individual capacity.

16.     Defendants Eric Schwenninger and Anthony Wetmore are, or were at times material and relevant to this action, police officers of Defendant City of Coos Bay acting under color of law and within the scope of their employment by and for Defendant City of Coos Bay. They are sued in their individual capacity.

17.     Defendant City of Coos Bay, which includes the City of Coos Bay Police Department and its officers, employees, and reserves, is an Oregon municipal corporation and is, or was at times material and relevant to this action, the employer of Defendants Schwenninger and Wetmore.  Defendant City of Coos Bay is liable for the acts of these Defendants while acting within the scope of their employment by and for Defendant City of Coos Bay.  In addition, Defendant City of Coos Bay is responsible for the policies, practices, and customs of Defendant

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

City of Coos Bay, including the City of Coos Bay Police Department.

## III.  JURISDICTION AND VENUE

18.    This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C §§ 1331 and 1343.

19.    This Court has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

20.    Venue in this court is proper under 28 U.S.C. § 1391(b)(1)-(2) and LR 3-2(b) because the majority of Defendants reside or were incorporated in this judicial district, and the acts, events, and omissions giving rise to the claims asserted herein occurred primarily within this district.

## IV.  FACTUAL ALLEGATIONS

**A.    Background**

21.    McGuffin grew up in Coquille, Oregon and attended Coquille High School, where he and Freeman met and began dating in 1999.

22.    On the night of June 28, 2000, while walking alone after leaving her friend Cherie Mitchell's house, Freeman was abducted and murdered.

23.    In August of 2010, after nearly ten years of being intimidated and harassed by Defendants, McGuffin was arrested without probable cause and then prosecuted for Freeman's murder.

24.    McGuffin was convicted by 10-2 verdict of manslaughter, and sentenced to 10 years in prison, plus three years of post-prison supervision.

25.    In December of 2019, all charges against McGuffin were dismissed, and McGuffin was released, free and fully exonerated, from South Fork Forest Prison Camp, in Tillamook, Oregon.

26.    McGuffin was continuously confined in either jail or prison from the time of his arrest until his exoneration in December of 2019.

Page 5– SECOND AMENDED COMPLAINT FOR DAMAGES

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

27.     McGuffin had absolutely nothing to do with the abduction or murder of Leah Freeman.

**B.     Freeman's Abduction and Murder**

28.     On the evening of June 28, 2000, McGuffin drove Freeman in his blue Ford Mustang to the home of Freeman's friend, Cherie Mitchell.

29.     McGuffin dropped Freeman off at the Mitchell residence at approximately 7:00 p.m. on June 28, 2000.  McGuffin did not see, speak with, or otherwise interact with Freeman ever again after dropping her off at the Mitchell residence.

30.     McGuffin was scheduled to return to the Mitchell residence to pick up Freeman around 9:00 p.m. for a double date with McGuffin and their friends, Brent Bartley, and Bartley's girlfriend, Nicole Price.

31.     Sometime before 9:00 p.m., Freeman and Mitchell argued, Freeman grew angry with Mitchell, and Freeman left the Mitchell residence alone on foot.

32.     Mitchell followed Freeman out of the house and watched Freeman walk by herself in the direction of North Central Boulevard.

33.     Multiple other witnesses saw Freeman walking alone on North Central Boulevard in the direction of Coquille High School.

34.     Witnesses also saw Freeman standing outside the high school, and then across the street from the high school on the corner of West Central Boulevard and North Elm Street.

35.     The last witness known to have seen Freeman alive reported seeing her standing on the corner of West Central Boulevard and North Elm Street, in between the cemetery and the gas station, between 9:15 p.m. and 9:30 p.m. on June 28, 2000.

36.     Freeman's right Nike tennis shoe was reportedly found around 11:30 p.m. that evening on North Elm Street, near the cemetery and the gas station.

37.     On July 5, 2000, Coos County Sheriff's Deputy Kip Oswald presented Freeman's left Nike tennis shoe to the Coquille Police Department and reported that he had found the shoe

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

on Hudson Ridge, a remote forested area approximately ten miles from the location where Freeman was last seen alive.

38.     Deputy Oswald knew the shoe was connected to Freeman's abduction, but did not photograph it, its condition, position, or location, and did not conduct any other steps to preserve evidence from the area around where he purportedly found the left shoe.

39.     On August 3, 2000, Freeman's body was found deep in the woods on an embankment of the Coquille River, approximately eight miles from the location where she had last been seen alive.

## C.     Evidence of McGuffin's Innocence and Search for Freeman

40.     Shortly after 9:00 p.m. on the night that Freeman was abducted, McGuffin arrived at the Mitchell residence in his Ford Mustang to pick up Freeman.

41.     There, McGuffin learned from Mitchell that Freeman had left and started walking toward town.

42.     McGuffin began to search for Freeman.

43.     McGuffin spent more than five hours searching for Freeman, and more than 20 witnesses saw and interacted with McGuffin during that time, including Freeman's mother, sister, and friends, McGuffin's family and friends, and at least two City of Coquille Police Department police officers, including Officer Danny Lee and Defendant Zavala, each of whom pulled McGuffin over at different times while he was driving his Ford Mustang.

44.     Other records available to law enforcement also confirmed McGuffin's whereabouts and activities while searching for Freeman, including telephone records and card-lock gas station records.

45.     The next morning, McGuffin continued his search for Freeman with Freeman's sister, Denise.  McGuffin, Denise, and Freeman's mother together reported Freeman missing to the City of Coquille Police Department (CPD).

///

Page 7– SECOND AMENDED COMPLAINT FOR DAMAGES

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

46.    The CPD, with knowledge and direction of the then-Chief of Police Defendant Reaves, refused to investigate or even search for Freeman.

47.    Unable to get assistance from local police, McGuffin enlisted Freeman's sister and his own family and friends, and they continued to search for Freeman throughout Coquille, the surrounding counties, and all the way into California.

**D.    The Faulty and Reckless Initial Investigation into Freeman's Murder**

48.    Acting pursuant to the policies, practices, and customs of the City of Coquille, then-Chief of Police Defendant Reaves and City of Coquille police officers and investigators initially refused to investigate Freeman's abduction.

49.    In a departure from established practices and procedures, the City of Coquille even rejected assistance from other investigating law enforcement agencies.

50.    Eventually, the CPD and Defendant City of Coquille decided to actually conduct an investigation.  Defendant City of Coquille, by and through Defendant Reaves, appointed an inexperienced police officer, Defendant Hall, to lead the investigation into Freeman's abduction, despite the fact that Defendant Hall had no major case experience and had never worked a major crime, let alone a murder investigation.  Defendant City of Coquille, by and through Defendant Reaves, also appointed a second inexperienced police officer, Defendant McInnes, to work with Hall, despite the fact that Defendant McInnes had less than one year of experience as a police officer.

51.    Defendants Reaves, Hall, McInnes, and Zavala, of the City of Coquille Police Department as well as Defendants Downing, Oswald, and Zanni of the Coos County Sheriff's Office, and Defendant Wetmore of the City of Coos Bay Police Department, and Defendant Karcher of the Office of the Coos County Medical Examiner (collectively, the "Original Investigating Officers") participated in the investigation.

52.    There was no physical evidence or evidence of motive connecting McGuffin to Freeman's abduction or murder.

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

53.     In fact, evidence available to law enforcement at the time—including witness statements, physical evidence, and CPDs own contact with McGuffin—made it obvious that McGuffin was innocent.

54.      Despite his innocence, the Original Investigating Officers decided to pursue McGuffin as a suspect, agreed to violate his constitutional rights in order to implicate him in Freeman's abduction and murder, and began to deliberately fabricate evidence against McGuffin.

55.     Acting pursuant to the policies, practices, and customs of the City of Coquille, the City of Coos Bay, and Coos County, including inadequate training and procedural safeguards, the Original Investigating Officers fabricated evidence in order to implicate McGuffin in the abduction and murder of Freeman.

56.     The Original Investigating Officers fabrication of evidence included attempts to coerce false confessions by convincing McGuffin and his friend, Brent Bartley, to participate in polygraph examinations, even though the Original Investigating Officers had already decided that, no matter the actual results, they would manipulate McGuffin by withholding the actual results and telling him that he had failed the test.

57.     The Original Investigating Officers, in reports and warrant applications falsely reported that McGuffin failed the polygraph examination when, in fact, McGuffin had passed the examination.

58.     The Original Investigating Officers also reported the fabricated results of the McGuffin polygraph examination to the public, through media outlets, in an effort to manipulate public opinion and implicate McGuffin in the abduction and murder of Freeman despite his innocence.

59.     The Original Investigating Officers also pressured Bartley to participate in multiple polygraph examinations, so that they could falsely claim he was being "deceptive" and had "failed" the examinations.

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

60.     These efforts were not only intended to fabricate direct evidence against McGuffin, but also to intimidate and dissuade Bartley from providing exculpatory testimony on McGuffin's behalf.

61.     The Original Investigating Officers presented the fabricated polygraph evidence in two search warrants for McGuffin's property.

62.     The Original Investigating Officers fabricated additional evidence in an effort to undermine the fact that there was substantial evidence establishing McGuffin's whereabouts on the night of Freeman's disappearance, and that he could not have committed the crime, including Defendant Zavala's deliberate fabrication of information included in his report of a traffic stop with McGuffin the night of Freeman's abduction and murder, which was written in a manner intended to falsely implicate McGuffin in Freeman's abduction and murder.

63.     Acting pursuant to the policies, practices, and customs of the City of Coquille, the City of Coos Bay, and Coos County, including inadequate training and procedural safeguards, the Original Investigating Officers suppressed, tampered with, and/or destroyed evidence, including photographs and video recordings of the crime scene.

64.     The Original Investigating Officers also suppressed evidence confirming McGuffin's innocence, including documents related to Nick Backman, who saw Freeman after she left the Mitchell residence while he was using an ATM.

65.     Defendant Zanni reviewed the ATM records from the credit union, but did not write an official report, log the records into evidence, or preserve those records that confirm McGuffin's innocence.

66.     The Original Investigating Officers also suppressed evidence of their own misconduct.  In addition to actions described above, and others still unknown to Plaintiffs, the Original Investigating Officers suppressed their attempts to persuade witness Kristen Steinhoff to falsely implicate McGuffin in the abduction and murder of Freeman.

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

67.     The destroyed evidence also included a videotape from the US Bank on North Central Boulevard, which would have recorded, with time stamps, McGuffin driving along North Central Boulevard during his search for Freeman on the night of June 28, 2000.

68.     The destroyed evidence further included a videotape of the original crime scene where Freeman's body was found, which Defendant Karcher removed from the evidence locker and which has never been seen since.

69.     Acting pursuant to the policies, practices, and customs of the City of Coquille, the City of Coos Bay, and Coos County, including inadequate training and procedural safeguards, the Original Investigating Officers worked in concert with other law enforcement agencies and individuals who agreed to assist Defendant City of Coquille police officers in their efforts to falsely implicate McGuffin in the abduction and murder of Freeman despite his innocence.

70.     These other agencies and individuals included, among others, the Oregon State Police Forensic Services Division (the "OSP Lab") and Defendants Krings, Hormann, and Wilcox (the "OSP Lab Defendants") of the OSP Lab.

71.     Suppression, tampering with, and/or destruction of evidence also occurred at these other agencies, or with the help of these individuals.

72.     In July 2000, employees of the OSP Lab examined Freeman's right Nike tennis shoe that was reportedly found on North Elm Street next to the cemetery on the night that Freeman was abducted.

73.     No blood was found on the right Nike tennis shoe.

74.     Employees of the OSP Lab also tested the right Nike tennis shoe for DNA, and found the DNA of Freeman and an unidentified male on the right Nike tennis shoe.

75.     The male DNA on the right Nike tennis shoe did not match McGuffin.

76.     The presence of DNA of an unidentified male on the right Nike tennis shoe was obviously of value, both for purposes of solving the crime, and as exculpatory evidence of McGuffin's innocence.

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

77.     Despite the nature and obvious importance of the DNA evidence found on the right Nike tennis shoe, this exculpatory evidence was suppressed by the Original Investigating Officers and OSP Lab Defendants.

78.     The OSP Lab Defendants also fabricated evidence by issuing a report falsely indicating that only Freeman's DNA was found on the right Nike tennis shoe to support the false narrative that all other suspects besides McGuffin had been eliminated.

79.     The OSP Lab Defendants knew that the report was false and deliberately suppressed this fact with the intent that the report would be used as evidence to indict and convict McGuffin for the abduction and murder of Freeman.

80.     Employees of the OSP Lab examined the left Nike tennis shoe that was reportedly found on Hudson Ridge approximately one week after Freeman disappeared.

81.     Blood was found on the left Nike tennis shoe.

82.     The OSP Lab also tested the left Nike tennis shoe for DNA, and found the DNA of Freeman and an unidentified male on the left Nike tennis shoe.

83.     Though they knew the male DNA from the left shoe did not belong to Defendant Oswald, the OSP Lab Defendants and Original Investigating Officers falsely suggested that this DNA was Oswald's in a report in order to support the false narrative that all other suspects besides McGuffin had been eliminated.

84.     The OSP Lab Defendants knew that the report was false and deliberately suppressed this fact to use the report as evidence to indict and convict McGuffin for the abduction and murder of Freeman.

85.     Defendants also suppressed evidence that would have shown the male DNA on the left shoe did not belong to Defendant Oswald and, instead, confirmed the presence of DNA of an unidentified male on the victim's bloodstained left shoe.

86.     Despite extensive evidence of McGuffin's innocence, and the lack of evidence implicating McGuffin in the abduction and murder of Freeman, the Original Investigating

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Officers continued to target and harass McGuffin for years for the purpose of intimidating and provoking him in an effort to fabricate additional evidence that might be used against McGuffin.

87.    This harassment and misconduct included officers routinely following McGuffin, interfering in McGuffin's personal relationships, including his long-term relationship with the girlfriend who would become the mother of his daughter, S.M., and repeatedly arresting McGuffin when he would visit this girlfriend.

88.    This harassment and misconduct also included officers confronting McGuffin at his place of employment, Bandon Dunes Golf Resort, and accusing McGuffin of kidnapping and murdering another young girl, Brooke Wilberger, in Corvallis, Oregon, and attempting to ask him about Freeman's murder.

89.    Defendants knew at the time of the accusation that McGuffin was represented by an attorney, and that they were not permitted to question him about Freeman's murder, but they did so anyway.

**E.    The Faulty and Reckless Investigation into the "Cold" Case**

90.    At the same time that the Original Investigating Officers were pursuing their campaign of harassment and intimidation, public pressure to solve the case with a conviction was intensifying, due in part to the seriousness of the crimes at issue, but also in large part to the fact that the Original Investigating Officers were very publicly targeting McGuffin and repeatedly reported to the media that McGuffin was implicated in Freeman's abduction and murder despite his innocence.

91.    Defendant Reaves resigned from his position as CPD Police Chief in 2008.

92.    Defendant City of Coquille coordinated with the District Attorney on the selection of a new chief, and the City and the District Attorney required the new Chief to commit to "closing" the Freeman case by securing a conviction.

93.    Defendant Dannels made such a commitment and was hired as the new Chief of Police for Defendant City of Coquille in 2008.

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

94.     Once he became Chief of Police, Defendant Dannels suggested that the Freeman investigation was a "cold" case even though officers had never stopped pursuing McGuffin, and he assembled a team of police officers and other investigators, including several members of the Original Investigating Officers, charged with closing the Freeman murder investigation with a conviction (the "Cold Case Investigation"). Defendant Dannels and his team referred to the Freeman investigation as a "cold case," so, for pleading purposes, Plaintiffs will refer to Defendant Dannels' team collectively as the "Cold Case Investigators," and their investigation as the "Cold Case Investigation."

95.     The Cold Case Investigators included Defendants Dannels, McNeely, Sanborn, and Webley of the City of Coquille Police Department; Defendants Karcher and Zanni of Coos County; Defendant Schwenninger of the City of Coos Bay Police Department; Defendants Hormann and Wilcox of the OSP Lab; and Defendant Riddle of the Oregon State Police.

96.     The Cold Case Investigators picked up and proceeded with the original investigation, employing similar tactics and building upon the efforts of the Original Investigating Officers and the OSP Lab Defendants, and focusing their efforts exclusively on implicating McGuffin in Freeman's murder through the fabrication, suppression, and/or destruction, of evidence.

97.     Intense public pressure and increased media attention, much of which was at the invitation of the Cold Case Investigators, exacerbated the sense of urgency among the Defendants to obtain a conviction for Freeman's abduction and murder.

98.     As Defendant McNeely explained to a national news outlet in 2010, the Freeman case was the "black sheep of Coquille" and most people thought it "could have got solved back in 2000," a reference to the targeting of McGuffin by the Original Investigating Officers and the OSP Lab Defendants.

99.     The original investigation suffered from problems that were known to the Cold Case Investigators, including that:

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

a.  Defendants Hall and McInnes had never investigated a murder or other major crime;

b.  Police reports were destroyed or thrown into banana boxes in no particular order or organization;

c.  Photographs were degraded, not preserved, or never developed;

d.  Defendant McInnes had collected evidence, such as a suspicious poem by an unknown man that was delivered to the funeral home before Freeman's funeral, but did not write a report, did not submit the evidence for forensic testing, and did not interview any witnesses, effectively destroying any evidence of the alternate suspect;

e.  A laboratory in England had reviewed the police reports and concluded that the information written by the Original Investigating Officers "appears to be unreliable, being a mixture of mistaken recollection, hearsay, speculation, repetition or rumour, and some of it may possibly be based on unsubstantiated or incorrect assumptions";

f.  Defendant Hall had been investigated for stealing evidence from Defendant City of Coquille's police evidence storage locker, had removed evidence related to the Freeman case without the knowledge of the evidence control officer, and was reported to have an alcohol problem and been intoxicated while on duty as a police officer with the Black Butte Ranch Police Department;

g.  At least two of the Original Investigating Officers—Defendants Oswald and Zavala—were suspected of misconduct or involvement in the crimes at issue and ordered to participate in polygraph examinations regarding their involvement in the Freeman case;

h.  Defendant Zavala had been suspected of misconduct with witness Kristen Steinhoff;

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

i.   The Original Investigating Officers relied on witnesses who were known drug users and dealers;

j.   A CPD officer was convicted of stealing evidence from Defendant City of Coquille's police evidence locker in 2008; and

k.   A 2008 audit of Defendant City of Coquille police evidence locker confirmed that some evidence was missing, some evidence was placed in the wrong location, some evidence had not been recorded, some evidence was left in an unlocked locker, and the evidence log had been altered.

100.   The Cold Case Investigators also knew that the Original Investigating Officers and the OSP Lab Defendants crafted a false narrative of McGuffin's guilt based on junk science, including a "statement analysis," fabricated polygraph results, and other fabricated evidence as alleged above.

101.   The Cold Case Investigators also knew of the exculpatory evidence establishing McGuffin's innocence, which they attempted to undermine by fabricating additional evidence, and knew of the exculpatory DNA evidence, which they suppressed through McGuffin's trial and for years thereafter.

102.   Despite their knowledge of the misconduct, lack of credibility, unreliable and unconstitutional methods, and violations of McGuffin's rights by the Original Investigating Officers and the OSP Lab Defendants, the Cold Case Investigators involved many of the Original Investigating Officers and the OSP Lab Defendants in the renewed investigation, relied upon their prior investigation, and built-upon that investigation using unconstitutional tactics of their own in furtherance of the same goal:  arresting and prosecuting McGuffin for a crime that he did not commit.

**F.   The Cold Case Investigators' Fabrication and Suppression of Evidence**

103.   By 2010, the Cold Case Investigators were focused exclusively on arresting and convicting McGuffin, and were not conducting any meaningful investigation into other leads or

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

suspects.

104.     The Cold Case Investigators faced several hurdles in their quest to convict McGuffin, however, including McGuffin's obvious innocence.

105.     In order to overcome these hurdles and reach their ultimate goal, the Cold Case Investigators fabricated additional evidence falsely implicating McGuffin in Freeman's abduction and murder, and suppressed other evidence, including DNA evidence and evidence of the misconduct of the Original Investigating Officers, the OSP Lab Defendants, and themselves.

106.     The Cold Case Investigators' efforts to fabricate evidence implicating McGuffin included the City of Coquille hiring Defendant Vidocq Society, an unlicensed private "investigation" firm, and Defendant Walter, a "profiler" and agent of Defendant Vidocq Society.

107.     Defendants Vidocq Society and Walter acted as agents of Defendant City of Coquille during their participation in the Freeman investigation.

108.     The Cold Case Investigators provided Defendant Walter with access to the Freeman case file, including the previously fabricated reports, and agreed to have Defendant Walter generate a false "profile" that would purportedly implicate McGuffin in the abduction and murder of Freeman.

109.     Defendant City of Coquille and the Cold Case Investigators agreed to utilize Defendant Vidocq Society and Defendant Walter because they knew they would be willing to claim they developed a "profile" that would falsely purport to link McGuffin to the crime, even though he was innocent.

110.     At the time they agreed to involve Defendant Walter as an agent in the investigation, the City of Coquille, the Cold Case Investigators, and the Vidocq Society knew that Defendant Walter had developed a false profile in another case in which a federal appellate court concluded in a published opinion that Defendant Walter had "grossly exaggerated most of his qualifications and outright lied about some of them," and had conjured up a "profile" of the alleged murderer in that case by learning facts about the case from law enforcement and then

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

simply creating a "profile" to fit the suspect under investigation.  The appellate court in that case found that Defendant Walter had "weav[ed] the complicated facts of the case into a seemingly coherent narrative" and even adapted his profile "to remedy any potential weaknesses in the prosecution's theory of [the defendant's] motive."

111.    Defendants Walter and Vidocq Society offered the same service to the City of Coquille and the Cold Case Investigators who needed to fabricate a motive and corresponding narrative to overcome the obvious weaknesses in the case against McGuffin, including the fact of his innocence.

112.     The Cold Case Investigators and Defendant Walter also deliberately fabricated evidence for the purpose of crafting a theory of how Freeman was murdered by falsely reporting that blood had been found on Freeman's right Nike tennis shoe when it had not.

113.    Defendant CPD Police Chief Dannels falsely reported, and repeated on the nationally televised ABC network news program "20/20," while standing near the cemetery, that Freeman's shoe was found on the road right there with blood on it.

114.    The Cold Case Investigators and Defendant Walter all knew that Freeman's right Nike tennis shoe had been carefully examined and no blood whatsoever was found on the shoe. Nonetheless, they falsely reported that blood was found on Freeman's right Nike tennis shoe in an effort to explain how her abduction and murder occurred, and to implicate McGuffin in those crimes, despite his innocence.

115.    The Cold Case Investigators and Defendant Walter fabricated additional evidence by falsely reporting, and repeating on "20/20," that  blood on the right tennis shoe indicated that Freeman was "smashed in the face" and forcibly taken from the location where the right tennis shoe was reportedly found, falsely suggesting that they had evidence to prove how the crime occurred.

116.    The Cold Case Investigators and Defendant Walter also deliberately fabricated evidence of potential motives by falsely reporting that Freeman may have been pregnant at the

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

time of her murder, and that McGuffin may have been afraid that he would be charged with statutory rape due to the age difference between them if the pregnancy was discovered.

117.    Defendant McNeely falsely repeated this fabricated evidence of an alleged motive on the nationally televised ABC network news program "20/20."

118.    At the time that the Cold Case Investigators fabricated this evidence, and Defendant McNeely repeated it on national television, they all knew Freeman was not pregnant when she was abducted and killed.

119.    At the time that the Cold Case Investigators fabricated this evidence, and Defendant McNeely repeated it on national television, they knew that consensual sex between McGuffin and Freeman was not "statutory rape" as a matter of Oregon law.

120.    Defendant Walter bolstered this fabricated motive with his own false "profile" of Freeman's murderer by reporting, and repeating on "20/20," that based upon his determination of how the murder happened, he concluded that Freeman's murderer wanted to get Freeman out of the way, suggesting that the killer was not a stranger, but someone very close to Freeman, or to whom Freeman's continued existence posed a substantial threat.

121.    At the time that Defendant Walter conjured up his false "profile" and reported his conclusions regarding the murderer's motives, Defendant Walter had no knowledge of how the murder actually happened and simply fabricated a false "profile" and motive based upon the agreement he had made with the Cold Case Investigators and City of Coquille in an effort to effect the arrest, indictment, and conviction of McGuffin for a crime he did not commit.

122.    The Cold Case Investigators also fabricated evidence for the purpose of undermining the exculpatory evidence of McGuffin's whereabouts on the night of Freeman's disappearance, including fabricating false testimony placing McGuffin and Freeman together at Cherie Mitchell's house after 9:00 p.m. on the night Freeman was abducted.

123.    This fabricated evidence included the false testimony of witnesses Scott Hamilton, Richard Bryant, and John Lindegren, which was used against McGuffin to secure his

Page 19– SECOND AMENDED COMPLAINT FOR DAMAGES

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

indictment and conviction.

124.    Lindegren had seen Cherie Mitchell and her boyfriend outside of her home the night Freeman was abducted, but the Cold Case Investigators manipulated Lindegren into saying that the people he saw were Freeman and McGuffin, even though the Cold Case Investigators knew that this was false.  The Cold Case Investigators further documented this false "identification" in police reports, and provided this fabricated evidence to the District Attorney for presentation at grand jury and trial, despite knowing that Lindegren had not seen McGuffin and Freeman together on the night of Freeman's disappearance.

125.    Defendants also suppressed evidence related to Lindegren's purported identification, including their own manipulation of Lindegren and the fact that the Original Investigating Officers knew and had conclusively determined that Lindegren had seen Mitchell and her boyfriend, not McGuffin and Freeman, on the night of Freeman's disappearance.

126.    The Cold Case Investigators further falsely reported, and Defendant Dannels repeated on the nationally televised ABC network news program "20/20," that several witnesses actually placed McGuffin with Freeman after 9:00, despite knowing that this statement was untrue.

127.    The Cold Case Investigators similarly and deliberately fabricated evidence by coercing witness Scott Hamilton to falsely allege that McGuffin had admitted picking Freeman up after 9:00 p.m. on June 28, 2000, and dropping her off by the McKay's Market on North Central Boulevard.

128.    The Cold Case Investigators knew that Hamilton's coerced testimony was false, and deliberately suppressed this fact.

129.    The Cold Case Investigators also knew that they had fabricated Hamilton's false testimony by using investigative techniques with Hamilton that were so coercive and abusive that they knew or should have known the use of the techniques would lead to false evidence. These techniques included threatening Hamilton, falsely telling Hamilton that McGuffin had

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

implicated Hamilton in Freeman's abduction and murder, falsely suggesting or promising

Hamilton that he could save himself from criminal prosecution by implicating McGuffin, and by

coaching Hamilton or expressly telling Hamilton what they wanted him to say.

130.    Defendant Hall also similarly and deliberately fabricated evidence by

manipulating his stepson, Richard Bryant, into falsely testifying that McGuffin had made a

statement amounting to a "jailhouse confession" about Freeman's death.

131.    McGuffin never made any confession whatsoever, and the Cold Case

Investigators knew that Bryant's connection to Defendant Hall, who had previously fabricated

evidence in an attempt to secure McGuffin's arrest and conviction, was the reason that Bryant

made the statement.

132.    The Cold Case Investigators suppressed the corrupt origins of Bryant's claims in

order to use them as evidence to indict and convict McGuffin for the abduction and murder of

Freeman.

133.    The Cold Case Investigators similarly and deliberately fabricated evidence by

coercing witness Steinhoff to testify falsely that McGuffin threatened Steinhoff not to speak to

the police.

134.    The Cold Case Investigators deliberately fabricated this false evidence by using

investigative techniques with Steinhoff that were so coercive and abusive that the Cold Case

Investigators knew or should have known that use of the techniques would lead to false evidence.

135.    The techniques that Cold Case Investigators used to coerce Steinhoff into

providing false testimony included repeatedly subjecting her to intense interrogation by

Defendants Dannels and Riddle; scaring her children; telling Steinhoff that she had failed a

polygraph examination and they knew she was withholding information about Freeman's

abduction and murder; telling Steinhoff that other witnesses had reported that Steinhoff took part

in Freeman's abduction and murder; suggesting that Steinhoff would be arrested if she did not

implicate McGuffin in Freeman's abduction and murder, and that she should think about what

Page 21– SECOND AMENDED COMPLAINT FOR DAMAGES

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

would happen to her four children if she was arrested; threatening Steinhoff to the point of her breaking down in tears; and not allowing Steinhoff to leave or end the interrogation despite her requests and repeated pleas that she did not have any information to provide.

136.     The Cold Case Investigators ultimately succeeded in fabricating false evidence from Steinhoff—that McGuffin had threatened her when, in fact, he had not—through their tactics.

137.     Beaten down and frightened, Steinhoff adopted Defendants' misrepresentations as her own and repeated them back to Defendants Dannels and Riddle, even though Steinhoff and the Cold Case Investigators knew that McGuffin had never said any such thing or otherwise threatened Steinhoff.

138.     The Cold Case Investigators, along with the Original Investigating Officers, also fabricated evidence for the purpose of creating the false inference that McGuffin had used his Ford Mustang to transport Freeman's body after she was abducted and murdered, including falsely reporting, and repeating on "20/20," that the Ford Mustang had been "wiped clean" shortly after Freeman's abduction and murder, when that claim was untrue and Defendants knew there was nothing to suggest McGuffin's car had been cleaned or "wiped" in any way at all.

139.     The Cold Case Investigators also deliberately suppressed, tampered with, and/or destroyed relevant and material impeachment evidence that undermined the credibility of key prosecution witnesses, including evidence of their own misconduct and violations of McGuffin's rights described herein.

**G.     The Arrest and Defamation of McGuffin for a Crime He Did Not Commit**

140.     On August 23, 2010, based upon evidence fabricated by Defendants and without any probable cause, McGuffin was arrested and charged with Freeman's murder.

141.     To add further insult, the Cold Case Investigators invited producers from the nationally televised ABC network program "20/20" to have what the show called "exclusive access" to the investigation.

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

142.    The Cold Case Investigators fed the "20/20" producers false information to claim McGuffin had murdered Freeman, despite McGuffin's innocence.

143.    The "20/20" cameras were invited to film the arrest, and the Cold Case Investigators made a dramatic, unlawful arrest for the cameras by stopping McGuffin along the side of the road and accosting him as he was driving home from work.

144.    Along the way, Cold Case Investigators made false and inflammatory statements about McGuffin, including that everyone should assume that McGuffin was carrying a gun.

145.    Cold Case Investigators even attempted to use the media to question McGuffin on-camera about the Freeman case, despite the fact that they knew McGuffin was represented by counsel and they were not permitted to speak with him.

146.    In the show, Cold Case Investigators and Defendant Walter made knowingly false statements on the air concerning McGuffin, including false statements that: (1) there was blood found on Freeman's right shoe; (2) the fabricated blood evidence proved that Freeman had been "smashed in the face" and forcibly taken from that location; (3) McGuffin could have wanted to kill freeman either because Freeman was pregnant or McGuffin was afraid of getting in trouble for statutory rape; (4) McGuffin's car had been "wiped" clean when they searched it; and (5) several witnesses placed McGuffin with Freeman after 9:00 p.m. the night she was abducted.

147.    At the time of these statements, the defendants knew or should have known that they were false.

148.    The "20/20" television show was broadcast to the public, including the jury pool in Coos County, before McGuffin's criminal trial.

149.    The "20/20" television show was also published on the internet for the public, including the jury pool in Coos County, before McGuffin's criminal trial.

150.    The "20/20" television show was broadcast to the public in 2010, before jury selection in McGuffin's criminal trial, and included information that would have been inadmissible at trial.  This inadmissible evidence was deliberately provided to "20/20" by

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Defendants to sway public opinion before the trial and ensure the conviction.

**H.    McGuffin's Wrongful Conviction**

151.    Between the date of his arrest and trial, McGuffin was continuously confined and deprived of his liberty.

152.    In July 2011, McGuffin was tried for Murder in the First Degree.

153.    McGuffin was acquitted of murder and convicted of the lesser-included offense of manslaughter by a non-unanimous jury.

154.    McGuffin was sentenced to 10 years in prison, plus three years of post-prison supervision.

155.    The basis for McGuffin's arrest, indictment, and conviction was evidence that was fabricated by the Defendants, including, for example, as described above.

156.    At grand jury and trial, Defendants continued to suppress exculpatory evidence, including the DNA results, their own misconduct, and other exculpatory and material evidence, including, but not limited to, the evidence described above.

157.    Without the Defendants' fabrication and suppression of evidence, McGuffin would not have been convicted.

158.    No direct, tangible, or objective evidence linked McGuffin to the abduction and murder of Leah Freeman, and no reasonable jury could have convicted McGuffin in the absence of the evidence fabricated by Defendants, or if presented with the evidence suppressed by Defendants.

159.    McGuffin appealed his conviction to the Oregon Court of Appeals, and the judgment of conviction was affirmed without opinion in December 2013.

160.    McGuffin's petition for review was denied by the Oregon Supreme Court in 2014.

**I.    McGuffin's Exoneration**

161.    McGuffin filed a petition for post-conviction relief.

162.    The post-conviction court found that McGuffin's constitutional rights were

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

violated by, among other reasons, the suppression of the exculpatory DNA evidence.

163.    The post-conviction court vacated McGuffin's conviction.

164.    In December 2019, the District Attorney unilaterally moved the court to dismiss all charges against McGuffin.

165.    The dismissal was not the product of any agreement between the parties.  Indeed, the District Attorney pursued an *ex parte* order of dismissal within hours after filing his motion to dismiss, without waiting for any response to the motion.  He earlier told a reporter that "There is unknown male DNA on those shoes.  Does it exonerate McGuffin?  Maybe, but I don't know."

166.    Based upon information and belief, the District Attorney recognized that, if pursued, the action would result in a decision in favor of McGuffin due to the lack of inculpatory evidence, as well as the exculpatory evidence and government misconduct discovered during the post-conviction case.

167.    On December 17, 2019, the court dismissed the Criminal Case and McGuffin was released from custody.

168.    By the time McGuffin was released from custody he had served over nine years in jail and prison for a crime that he did not commit.

**J.    McGuffin's Damages**

169.    Even before his wrongful arrest, prosecution, and conviction, McGuffin spent years being intimidated, harassed, and tormented by police officers at the hands of the Defendants.  Defendants even enlisted the help of other police officers and law enforcement agencies to follow McGuffin around and harass him.  The police admitted their campaign of harassment to the public and producers of "20/20."

170.    The Defendants also provided photographs of McGuffin's mother, father, and brother—none of whom had been implicated in any crime—to various news media and those photographs were published and disseminated publicly before trial.

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

171.    Defendants' open and very public targeting of McGuffin and his family, and Defendants' deliberate dissemination of fabricated and false information to the news media, resulted in McGuffin and his family members, including his young daughter, S.M., being subjected to public humiliation, harassment, and even death threats.

172.    McGuffin spent over nine years incarcerated in jail and then prison for a crime that he did not commit.

173.    McGuffin was wrongfully convicted when his daughter, S.M., was only three years old, and incarcerated hundreds of miles from his family, including S.M., causing him to miss out on birthdays, holidays, first days of school, and every other highlight of parenting a young child, such as teaching her how to swim and ride a bike.

174.    During his incarceration, McGuffin's only option for maintaining a relationship with his daughter was to have his parents bring her to the prison to visit him.  S.M. spent her formative years missing her dad, and being exposed to prison life in order to have any kind of relationship with him.

175.    During his incarceration, McGuffin was further deprived of the ability to interact freely with his loved ones; to be present for holidays, births, deaths, and other life events; to pursue his passions and interests; to engage in meaningful labor and pursue his chosen career in the culinary field; and to live freely as an autonomous being.

176.    As a result of his wrongful incarceration, McGuffin was forced to leave his lucrative position as an Executive Banquet Chef at one of the most highly regarded restaurants in Coos County and abandon the training and skills he had developed through culinary school and his time as a chef.

177.    In addition to causing the severe trauma of McGuffin's wrongful imprisonment and loss of liberty, Defendants' misconduct caused and continues to cause McGuffin extreme physical and psychological pain and suffering, humiliation, constant fear, anxiety, deep depression, despair, rage, and other physical and psychological effects.

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

178.     The Defendants' misconduct further caused and continues to cause McGuffin's loss of reputation in his community and loss of employment options in his chosen vocation.

179.     The Defendants' misconduct further caused and continues to cause S.M. the loss of care, comfort, consortium, love, and emotional and financial support from her father.

## V.  CONSPIRACY AMONG AND BETWEEN THE DEFENDANTS

180.     The Defendants conspired within their own subgroups and between each of those subgroups to convict McGuffin of a crime that he did not commit.

181.     The circumstances suggest that there was a meeting of the minds within and between each subgroup of Defendants.  Each subgroup worked as a team, sharing information and collaborating on next steps.  The acts described above, including fabricating reports, withholding exculpatory evidence, and coercing witnesses, are unlikely to have been undertaken without an agreement because multiple individuals on each team and across teams were involved in those acts of misconduct.

182.     The circumstances also suggest that there was a meeting of the minds between all of the Defendants.  The acts described above are unlikely to have been undertaken without an agreement because at least five of the individual Defendants overlapped between the original investigation and the cold case investigation, and each of the overlapping individuals knew about exculpatory evidence that had been suppressed and evidence that had been fabricated to falsely suggest McGuffin's guilt.  For example:

   a.   Defendant Hormann participated in the DNA testing that produced exculpatory DNA evidence in the original investigation, and Hormann then participated in the cold case investigation, wherein that evidence was suppressed.

   b.   Defendant Zanni participated in an exculpatory interview with witness Nick Backman and obtained exculpatory ATM records that confirmed Backman's information in the original investigation, and Zanni then participated in the cold

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

case investigation and at trial, wherein that evidence was suppressed.

c. Defendants Wilcox, Hormann, and Karcher participated in examining Freeman's shoes during the original investigation, and these individuals then participated in the cold case investigation, wherein the Defendants fabricated blood evidence on Freeman's right shoe that did not exist.

d. Defendants Wilcox and Karcher participated in examining McGuffin's car during the original investigation, and these individuals then participated in the cold case investigation and at trial, wherein the Defendants fabricated evidence that the car had been wiped clean when it had not.

e. Defendant Karcher participated in the autopsy on Freeman's body during the original investigation, and Karcher then participated in the cold case investigation, wherein the Defendants fabricated evidence of a possible pregnancy and fear of statutory rape charges.

f. Defendant Hall led the original investigation and then participated behind-the-scenes in the cold case investigation, wherein the Defendants fabricated evidence of a jailhouse confession through Hall's stepson, Richard Bryant.

183. The Original Investigating Officers and the OSP Lab Defendants fabricated evidence, and suppressed exculpatory evidence, for the purpose of exerting influence to initiate, continue, and perpetuate judicial proceedings against McGuffin. These individuals handed those efforts over to the Cold Case Investigators and Walter to continue the same campaign.

184. The other Defendants fabricated additional evidence and suppressed additional exculpatory evidence, suggesting that the meeting of the minds began during the original investigation, carried over to the cold case investigation through the overlapping individuals, and continued throughout that cold case investigation.

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

## VI. POLICIES AND PRACTICES THAT WERE THE MOVING FORCE BEHIND THE CONSTITUTIONAL VIOLATIONS

185.    The violation of McGuffin's constitutional rights and resulting wrongful conviction were not mere accidents or anomalies but, instead, were caused by the policies, practices, and/or customs of the City of Coquille, Coos County, and the City of Coos Bay (the "Municipal Defendants"), as well as the Vidocq Society.

### A.    The Municipal Defendants

186.    The constitutional violations that were the proximate cause of McGuffin's wrongful conviction further arose out of the Municipal Defendants' failure to train and supervise the individual Defendants in a manner that amounts to deliberate indifference.

187.    In addition, the Municipal Defendants failed to adopt adequate procedural safeguards concerning the suppression of material evidence; the fabrication of evidence; the prosecution of individuals in the absence of probable cause; the interview, interrogation, and coercion of witnesses; and other law enforcement functions that violated McGuffin's constitutional rights.

188.    The Municipal Defendants withheld material exculpatory and/or impeachment evidence as alleged above, and did so pursuant to the municipalities' policies, practices, and/or customs that permit the suppression of such evidence, even where it would obviously be exculpatory and/or impeaching, as it was here.

189.    The violations of McGuffin's constitutional rights by the Original Investigating Officers and the Cold Case Investigators were approved of and ratified by the Municipal Defendants and/or by the final policymaker for the respective Municipal Defendant such that the actions of the individual Defendants constitute the official policy, practices, and/or customs of the respective Municipal Defendant.

190.    In addition, the Original Investigating Officers and the Cold Case Investigators knowingly gave false statements and provided false information to the media in order to

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

influence potential fact finders in the small community of Coos County as alleged above.

191.    These acts were committed, or ratified, by officials whose acts fairly represent official policy such that the challenged action constituted official policy.

192.    These unlawful acts were, furthermore, the result of longstanding policies, practices, or customs that constitute the standard operating procedure of the Municipal Defendants.

193.    The unlawful acts of the Original Investigating Officers before the involvement of the Cold Case Investigators were known to, accepted by, and built upon by the Cold Case Investigators, including Defendant Dannels, who was the official policymaker at the time he approved of, accepted, and ratified these acts.

194.    The Municipal Defendants recognized the need for adequate training of their employees and were deliberately indifferent to the necessity of training regarding *Brady* obligations and evidence collection, handling, and preservation.

195.    The Municipal Defendants knew very well that their training, supervision, procedures, practices, and customs to prevent due process violations related to the suppression and/or fabrication of evidence were inadequate, but refused to implement adequate training and supervision or other programs to prevent violations of due process, exhibiting deliberate indifference to such violations.

## B.    Vidocq Society

196.    The constitutional violations that were the proximate cause of McGuffin's wrongful conviction further arose out of the Vidocq Society's failure to train and supervise Walter in a manner that amounts to deliberate indifference.

197.    The Vidocq Society failed to adopt adequate procedural safeguards concerning the suppression of material evidence, the fabrication of evidence, and the prosecution of individuals in the absence of probable cause.

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

198.     The Vidocq Society withheld material exculpatory and/or impeachment evidence as alleged above, and did so pursuant to the Vidocq Society's policies, practices, and/or customs that permit the suppression of such evidence, even where it would obviously be exculpatory and/or impeaching, as it was here.

199.     The Vidocq Society specifically instructs its employees and agents to withhold information about its investigation, including the very fact of the Vidocq Society's participation in an investigation.

200.     The Vidocq Society further instructs its employees and agents to avoid documenting their investigation and/or opinions and/or destroy documentation during and after participation in an investigation.

201.     The violations of McGuffin's constitutional rights by Walter were approved of and ratified by the Vidocq Society and/or the final policymaker for the Vidocq Society such that Walter's actions constitute the official policies, practices, and/or customs of the Vidocq Society.

202.     In addition, Walter knowingly gave false statements and provided false information to the media in order to influence potential fact finders in the small community of Coos County as alleged above.

203.     These acts were committed, or ratified, by officials—including Walter himself who was an official policymaker for the Vidocq Society—whose acts fairly represent official policy such that the challenged action constituted official policy.

204.     These unlawful acts were, furthermore, the result of longstanding policies, practices, or customs that constitute the standard operating procedure of the Vidocq Society.

205.     Walter's unlawful acts were known to and accepted by the Vidocq Society, and the acts were specifically approved of, accepted, and ratified in an internal memo written by policymakers at the Vidocq Society during Walter's participation in the Freeman investigation.

206.     As discussed in paragraph 110 above, the Vidocq Society had actual and/or constructive notice that its failure to train and supervise Walter, or its omission of adequate

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

policies and procedures, would result in constitutional violations, and still the Vidocq Society was deliberately indifferent to the necessity of training, supervision, and policymaking.

207.    The Vidocq Society knew very well that its training, supervision, procedures, practices, and customs to prevent due process violations related to the suppression and/or fabrication of evidence were inadequate, but refused to implement adequate training and supervision or other programs to prevent violations of due process, exhibiting deliberate indifference to such violations.

### VII.  FIRST CLAIM FOR RELIEF: 42 U.S.C. §1983

### (Count 1 – Violation of Fourteenth Amendment)

208.    McGuffin incorporates by reference herein the allegations set forth above in paragraphs 1 through 207 in their entirety.

209.    As alleged above, Defendants, while acting individually, jointly, and/or in conspiracy with each other, as well as under color of law and within the scope of their employment, deprived McGuffin of his constitutional right to due process and his right to a fair trial.

210.    In the manner described more fully above, Defendants deliberately withheld exculpatory and impeachment evidence from McGuffin, his attorneys, and prosecutors, among others, thereby misleading and misdirecting McGuffin's criminal prosecution.

211.    In addition, as described more fully above, Defendants fabricated and solicited false evidence, including statements and testimony they knew to be false, fabricated police reports and other evidence falsely implicating McGuffin, obtained charges against McGuffin, obtained his conviction using that false evidence, and failed to correct fabricated evidence they knew to be false when it was used against McGuffin in grand jury proceedings and during his criminal trial.

212.    In addition, Defendants extracted and/or concocted fabricated statements from witnesses by using coercive means and/or despite knowledge of McGuffin's innocence, which

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Defendants used to incriminate McGuffin before and during his criminal proceedings and to secure his conviction.

213.    In addition, based on information and belief, Defendants concealed and fabricated additional evidence that is not yet known to McGuffin.

214.    Defendants' misconduct described in this count resulted in McGuffin's unjust and wrongful criminal prosecution and conviction, deprived him of his liberty, caused witnesses to provide false and involuntary statements that were used to incriminate him, and denied him his constitutional right to a fair trial guaranteed by the Fourteenth Amendment.  Absent this misconduct, McGuffin's prosecution could not, and would not, have been pursued.

215.    The misconduct described in this count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and with total disregard for the truth and McGuffin's clear innocence.

216.    As a result of Defendants' misconduct described in this count, McGuffin suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

217.    Defendants' misconduct described in this count was undertaken pursuant to the policies, practices, and customs of the Municipal Defendants and the Vidocq Society as more fully described below.

**(Count 2 – Malicious Prosecution)**

218.    McGuffin incorporates by reference herein the allegations set forth above in paragraphs 1 through 217 in their entirety.

219.    In the manner described more fully above, Defendants, individually, jointly, and in conspiracy with each other, as well as under color of law and within the scope of their employment, accused McGuffin of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against McGuffin without any probable cause for doing so and in spite of the fact that they knew McGuffin was innocent, in violation of his rights secured

Page 33– SECOND AMENDED COMPLAINT FOR DAMAGES

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

by the Fourth and Fourteenth Amendments.

220.    In so doing, Defendants caused McGuffin to be deprived of his liberty, detained without probable cause, and improperly subjected to judicial proceedings for which there was no probable cause.

221.    The misconduct described in this count was objectively unreasonable and was undertaken intentionally and with malice.

222.    As a result of Defendants' misconduct described in this count, McGuffin suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

223.    Defendants' misconduct described in this count was undertaken pursuant to the policies, practices, and customs of the Municipal Defendants and the Vidocq Society as more fully described below.

**(Count 3 – Illegal Pretrial Detention Following the Issuance of Legal Process)**

224.    McGuffin incorporates by reference herein the allegations set forth above in paragraphs 1 through 223 in their entirety.

225.    In the manner described more fully above, Defendants, individually, jointly, and in conspiracy with each other, as well as under color of law and within the scope of their employment, caused McGuffin to be subjected to illegal pretrial detention following the issuance of legal process, in spite of the fact that they knew McGuffin was innocent, in violation of his rights secured by the Fourth Amendment and incorporated by the Fourteenth Amendment.

226.    In so doing, Defendants caused McGuffin to be deprived of his liberty, detained without probable cause, and improperly subjected to judicial proceedings for which there was no probable cause.

227.    The misconduct described in this count was objectively unreasonable and was undertaken intentionally and with malice.

///

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

228.    As a result of Defendants' misconduct described in this count, McGuffin suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

229.    Defendants' misconduct described in this count was undertaken pursuant to the policies, practices, and customs of the Municipal Defendants and the Vidocq Society as more fully described below.

**(Count 4 – Failure to Disclose Exculpatory Information)**

230.    McGuffin incorporates by reference herein the allegations set forth above in paragraphs 1 through 229 in their entirety.

231.    Defendants failed to disclose exculpatory evidence leading to McGuffin's detention in violation of his right to due process.

232.    As alleged above, Defendants failed to disclose, among other things, material evidence, including, but not limited to: evidence of their own misconduct and other credibility/impeachment evidence; exculpatory DNA evidence; evidence of the victim's whereabouts and actions (*e.g.*, the Backman documents, US Bank videos); and the fact that they had fabricated police reports and witness statements.

233.    Defendants knew there was no credible evidence tying McGuffin to Freeman's abduction and murder.  Had they disclosed this exculpatory evidence, the evidence would have proven McGuffin's innocence, cast doubt on the entire police investigation and prosecution, and led to the end of McGuffin's detention and prosecution.

234.    Defendants performed the above-described acts under color of state law, deliberately, intentionally, with malice or reckless disregard for the truth and McGuffin's rights, and with deliberate indifference to McGuffin's clearly established constitutional rights.

235.    As a result of Defendants' misconduct described in this count, McGuffin suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

236.    Defendants' misconduct described in this count was undertaken pursuant to the policies, practices, and customs of the Municipal Defendants and the Vidocq Society as more fully described below.

**(Count 5 – Failure to Intervene)**

237.    McGuffin incorporates by reference herein the allegations set forth above in paragraphs 1 through 236 in their entirety.

238.    In the manner described above, and during the constitutional violations described above, one or more Defendants stood by without intervening to prevent the violation of McGuffin's constitutional rights, even though they had the duty and the opportunity to do so.

239.    These Defendants had a duty and reasonable opportunity to prevent this harm to McGuffin, but they failed to do so.

240.    The misconduct described in this count was objectively unreasonable and was undertaken intentionally with willful indifference to McGuffin's constitutional rights.

241.    As a result of Defendants' failure to intervene to prevent the violation of McGuffin's constitutional rights, McGuffin suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

242.    Defendants' misconduct described in this count was undertaken pursuant to the policies, practices, and customs of the Municipal Defendants and the Vidocq Society as more fully described below.

**(Count 6 – Conspiracy)**

243.    McGuffin incorporates by reference herein the allegations set forth above in paragraphs 1 through 242 in their entirety.

244.    Defendants reached an agreement between and among themselves to frame McGuffin for Freeman's abduction and murder, and thereby to deprive McGuffin of his constitutional rights, as alleged above.  This agreement was first reached when the Original

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Investigating Officers began implicating McGuffin, continued throughout the actions of the OSP

Lab Defendants, the Cold Case Investigators, and Walter, all prior to the arrest of McGuffin, and

remained in place throughout all periods of his detention, prosecution, and incarceration.

245.    In addition, Defendants conspired before McGuffin's conviction, and continued to

conspire after his conviction, to deprive McGuffin of exculpatory material to which he is entitled

and that would have led to his earlier exoneration.

246.    In this manner, Defendants, acting in concert with each other and with other co-

conspirators, known and unknown, conspired by concerted action to accomplish an unlawful

purpose and/or a lawful purpose by unlawful means.

247.    In furtherance of the conspiracy, each co-conspirator committed overt acts and

was an otherwise willful participant in joint activity.

248.    As a result of this illicit prior agreement, McGuffin suffered loss of liberty, great

mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other

grievous and continuing injuries and damages as set forth above.

249.    The misconduct described in this count was objectively unreasonable and was

undertaken intentionally and with willful indifference to McGuffin's constitutional rights.

250.    Defendants' misconduct described in this count was undertaken pursuant to the

policies, practices, and customs of the Municipal Defendants and the Vidocq Society as more

fully described below.

### (Count 7 – Destruction of Exculpatory Evidence)

251.    McGuffin incorporates by reference herein the allegations set forth above in

paragraphs 1 through 250 in their entirety.

252.    The Original Investigating Officers, the OSP Lab Defendants, the Cold Case

Investigators, and Walter suppressed, destroyed, and/or caused to be destroyed exculpatory and

materially-favorable evidence, including, but not limited to, police reports, notes,

communications, audio/visual recordings, evidence that McGuffin could not have committed the

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

crime, crime scene evidence, and evidence bearing upon the credibility of the Freeman homicide investigation and its investigators.

253.    As a result of these violations, McGuffin was deprived of his right to a fair trial and was wrongly convicted of a crime of which he is innocent.

254.    These Defendants were acting under color of law and within the scope of employment when they took these acts.

255.    Defendants' misconduct described in this count was undertaken pursuant to the policies, practices, and customs of the Municipal Defendants and the Vidocq Society as more fully described below.

### (Count 8 – Unconstitutional Policies, Practices, and Customs of the Municipal Defendants and the Vidocq Society)

256.    McGuffin incorporates by reference herein the allegations set forth above in paragraphs 1 through 255 in their entirety.

257.    McGuffin's injuries were caused by the policies, practices, and customs of the Municipal Defendants and the Vidocq Society, as well as by the actions of policy-making officials for the Municipal Defendants and the Vidocq Society.

258.    At all times relevant and material to this action, and for a period of time before and after, the Municipal Defendants failed to promulgate proper or adequate rules, regulations, policies, and procedures governing the conduct of interviews, interrogations, questioning of criminal suspects and witnesses, and obtaining statements and testimony from witnesses.

259.    At all times relevant and material to this action, and for a period of time before and after, the Municipal Defendants and the Vidocq Society failed to promulgate proper or adequate rules, regulations, policies, and procedures governing the collection, documentation, preservation, testing, and disclosure of evidence, including physical evidence; writing of reports and taking of investigative notes; and the maintenance of investigative files and disclosure of those files in criminal proceedings by officers and agents of the Municipal Defendants and the

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Vidocq Society.

260.    In addition or alternatively, the Municipal Defendants failed to promulgate proper and adequate rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Municipal Defendants with respect to the conduct of interviews and interrogations and techniques to be used when questioning criminal suspects and witnesses, as well as obtaining statements and testimony from witnesses.

261.    In addition or alternatively, the Municipal Defendants and the Vidocq Society failed to promulgate proper and adequate rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Municipal Defendants with respect to the collection, documentation, preservation, testing, and disclosure of evidence, including physical evidence; writing of reports and taking of investigative notes; and the maintenance of investigative files and disclosure of those files in criminal proceedings

262.    Officers and agents of the Municipal Defendants and the Vidocq Society committed these failures to promulgate proper or adequate rules, regulations, policies, and procedures.

263.    Had officers and agents of the Municipal Defendants and the Vidocq Society promulgated appropriate rules, regulations, policies, and procedures, then the violation of McGuffin's constitutional rights would have been prevented.

264.    In addition, at all times relevant and material to this action, and for a period of time before, the Municipal Defendants and the Vidocq Society had notice of practices and customs by their respective officers, employees, and agents pursuant to which individuals suspected of criminal activity, like McGuffin, were routinely deprived of exculpatory evidence, falsely charged, defamed and insulted in the media, subjected to the fabrication of evidence, and prosecuted with false evidence.

265.    In addition, at all times relevant and material to this action, and for a period of time before, the Municipal Defendants had notice of practices and customs of their officers and

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

agents that included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, and/or did not disclose investigative materials to criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers fabricated false evidence implicating criminal defendants in criminal conduct; (4) officers failed to maintain and/or preserve evidence and/or destroyed evidence, including physical evidence; and/or (5) officers pursued and secured wrongful convictions through profoundly flawed investigations.

266.    In addition, at all times relevant and material to this action, and for a period of time before, the Vidocq Society had notice of practices and customs of its employees and agents, including Walter, that included one or more of the following: (1) employees and agents did not record investigative information in reports, did not maintain proper investigative files, and/or did not disclose investigative materials to criminal defendants; (2) employees and agents fabricated evidence implicating criminal defendants in criminal conduct; (3) employees and agents failed to maintain and/or preserve evidence and/or destroyed evidence; (4) employees and agents falsified their credentials to create the appearance of expertise; and/or (5) employees and agents pursued and secured wrongful convictions through profoundly flawed investigations.

267.    These practices and customs, individually and/or together, were allowed to flourish because the leaders, supervisors, and policymakers of the Municipal Defendants and the Vidocq Society directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses like those affecting McGuffin.

268.    The above practices and customs, so well settled as to constitute *de facto* policies of the Municipal Defendants and the Vidocq Society were able to exist and thrive, individually and/or together, because policymakers with authority over the same exhibited deliberate

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

indifference to the problem, thereby effectively ratifying it.

269.    In addition, the misconduct described in this count was undertaken pursuant to the policies and practices of the Municipal Defendants and the Vidocq Society in that the constitutional violations committed against McGuffin were committed with the knowledge or approval of persons with final policymaking authority for the Municipal Defendants and the Vidocq Society, or were actually committed by persons with such final policymaking authority.

270.    McGuffin's injuries were directly and proximately caused by officers, agents, and employees of the Municipal Defendants and the Vidocq Society, including but not limited to Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this count.

### (Count 9 – Violation of S.M.'s Fourteenth Amendment Rights)

271.    Plaintiffs incorporate by reference herein the allegations set forth above in paragraphs 1 through 270 in their entirety.

272.    As alleged above, the Defendants, while acting individually, jointly, and/or in conspiracy with each other, as well as under color of law and within the scope of their employment, deprived McGuffin of his constitutional right to due process and his right to a fair trial by fabricating evidence and suppressing exculpatory evidence.

273.    At the time of their misconduct, the Defendants knew or should have known that S.M. had a constitutionally protected liberty interest under the Fourteenth Amendment in the companionship, society, and comfort between herself and her father, McGuffin.

274.    As a result of the Defendants' misconduct, McGuffin suffered loss of liberty for over nine years, depriving S.M. of the care, comfort, consortium, love, and emotional and financial support from her father during and after the period of time while he was imprisoned.

275.    As a result of the Defendants' misconduct, S.M. suffered great mental anguish, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

## VIII.  SECOND CLAIM FOR RELIEF

### (State Law – False Imprisonment)

276.    Plaintiffs incorporate by reference herein the allegations set forth above in paragraphs 1 through 275 in their entirety.

277.    By letters dated May 8, 12, and 27, 2020, Plaintiffs provided notice to the Defendants of their state law claims as required by ORS 30.275.

278.    McGuffin was incarcerated beginning on August 23, 2010.

279.    The incarceration was not lawful.  The indictment against McGuffin was made without probable cause because it was based on fabricated evidence as alleged above, and was made without regard to exculpatory evidence that had been deliberately suppressed as alleged above.

280.    The Defendants violated McGuffin's rights by incarcerating him without probable cause.

281.    The Municipal Defendants and the Vidocq Society are responsible for the misconduct of their respective agents and employees who acted as alleged above under a theory of vicarious liability and/or respondeat superior.

282.    As a result of the misconduct of the Defendants, McGuffin suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

283.    As a result of the misconduct of the Defendants, S.M. suffered a loss of consortium as set forth above.

## IX.  THIRD CLAIM FOR RELIEF

### (State Law – Malicious Prosecution)

284.    Plaintiffs incorporate by reference herein the allegations set forth above in paragraphs 1 through 283 in their entirety.

///

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

285. Based on the misconduct alleged above, the Defendants caused McGuffin to be unreasonably seized and further caused McGuffin to be improperly subjected to judicial proceedings for which there was no legitimate probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury, and all such proceedings were ultimately terminated in McGuffin's favor in a manner indicative of his innocence.

286. As alleged above, the Defendants accused McGuffin of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors and grand jurors with the intent of exerting influence to institute and continue judicial proceedings against McGuffin.

287. The proceedings lacked probable cause because they were based on fabricated evidence as alleged above, and were made without regard to exculpatory evidence that had been deliberately withheld and suppressed as alleged above.

288. The Defendants' statements about McGuffin's alleged culpability were made with knowledge that the statements were false and perjured.

289. The misconduct alleged above was undertaken with malice, willfulness, and/or reckless indifference.

290. The Municipal Defendants and the Vidocq Society are responsible for the misconduct of their respective agents and employees who acted as alleged above under a theory of vicarious liability and/or respondeat superior.

291. As a result of the misconduct of the Defendants, McGuffin suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

292. As a result of the misconduct of the Defendants, S.M. suffered a loss of consortium as set forth above.

///

///

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

## X.  FOURTH CLAIM FOR RELIEF

## (State Law – Civil Conspiracy)

293.    Plaintiffs incorporate by reference herein the allegations set forth above in paragraphs 1 through 292 in their entirety.

294.    The Defendants and other co-conspirators, known and not yet known to Plaintiffs, reached an agreement amongst themselves to "close" the Freeman case by arresting and indicting McGuffin with the intent that he would be convicted.

295.    The Defendants had a meeting of the minds as alleged above.

296.    The Defendants took one or more unlawful overt steps in furtherance of the conspiracy by fabricating evidence as alleged above; suppressing, tampering with, or destroying material exculpatory and impeachment evidence as alleged above; manipulating witnesses as alleged above; and concealing their misconduct, all in violation of McGuffin's constitutional rights, including, for example, as alleged above.

297.    The misconduct alleged above was objectively unreasonable and was undertaken intentionally with willful indifference to McGuffin's constitutional rights.

298.    As a result of the misconduct alleged above, McGuffin was indicted and ultimately wrongly convicted.

299.    The Municipal Defendants and the Vidocq Society are responsible for the misconduct of their respective agents and employees who acted as alleged above under a theory of vicarious liability and/or respondeat superior.

300.    As a result of the misconduct of the Defendants, McGuffin suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

301.    As a result of the misconduct of the Defendants, S.M. suffered a loss of consortium as set forth above.

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

## XI.  FIFTH CLAIM FOR RELIEF
### (State Law – Negligent Training and Supervision Against the Municipal Defendants and the Vidocq Society)

302.    Plaintiffs incorporate by reference herein the allegations set forth above in paragraphs 1 through 301 in their entirety.

303.    The Municipal Defendants and the Vidocq Society each had a duty to properly train and supervise their respective agents and employees.

304.    The Municipal Defendants and the Vidocq Society breached their duty to train and supervise their respective agents and employees by creating policies, practices, and customs to prohibit the misconduct alleged above.

305.    The Municipal Defendants and the Vidocq Society also breached their duty to train and supervise their respective agents and employees by failing to institute policies, practices, and customs that would prohibit the misconduct alleged above.

306.    As a result of the negligence of the Municipal Defendants and the Vidocq Society, the individual Defendants violated McGuffin's constitutional rights by committing the misconduct alleged above.

307.    As a result of the negligent training and supervision by the Municipal Defendants and the Vidocq Society, McGuffin suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

308.    As a result of the negligent training and supervision by the Municipal Defendants and the Vidocq Society, S.M. suffered a loss of consortium as set forth above.

## XII.  SIXTH CLAIM FOR RELIEF

### (State Law – Intentional Infliction of Emotional Distress)

309.    Plaintiffs incorporate by reference herein the allegations set forth above in paragraphs 1 through 308 in their entirety.



MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

310.    The acts and misconduct of the Defendants as alleged above were extreme and outrageous.  The actions were rooted in an abuse of power or authority, and they were undertaken with intent to cause, or were in reckless disregard of the probability that their actions would cause, severe emotional distress to McGuffin and S.M. as alleged above.

311.    As a direct and proximate result of the actions by the Defendants, McGuffin has suffered and continues to suffer physical sickness and severe emotional distress.

312.    As a result of the misconduct by the Defendants, McGuffin suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

313.    As a result of the misconduct by the Defendants, S.M. suffered a loss of consortium as set forth above.

## XIII.  SEVENTH CLAIM FOR RELIEF

### (State Law – Negligent and/or Intentional Spoliation of Evidence)

314.    Plaintiffs incorporate by reference herein the allegations set forth above in paragraphs 1 through 313 in their entirety.

315.    The Defendants had a duty to preserve evidence.

316.    The Defendants breached their duty to preserve evidence by negligently and/or intentionally suppressing, tampering with, and/or destroying evidence that was exculpatory and materially favorable to McGuffin.

   a.    Defendants Vidocq Society and Walter destroyed all evidence of their involvement and misconduct in the criminal case against McGuffin, except a single two-page internal memorandum documenting certain fabricated evidence.

   b.    Defendants Hormann, Krings, and Wilcox destroyed evidence in their possession, including their communications about exculpatory evidentiary examinations, evidence of any file review in 2010, and evidence of their own misconduct.

   c.    The remaining Defendants destroyed evidence in their possession, including the

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

original crime scene videotape, a bank video documenting that McGuffin could not have committed the crime, ATM records from witness Nick Backman, certain police reports, results of a polygraph of Defendant Oswald, and evidence of their own misconduct.

317.    Defendants knew or should have known that the information, physical items, and records that were suppressed, tampered with, and/or destroyed would be required as evidence.

318.    As a direct and proximate result of the actions by the Defendants, the value of Plaintiffs' claims in this lawsuit were diminished.

319.    As a result of the misconduct by Defendants, Plaintiffs are entitled to any diminished value of their claims.

## XIV.   EIGHTH CLAIM FOR RELIEF

## (Attorney Fees Pursuant to 42 U.S.C. § 1988(b))

320.    Plaintiffs incorporate by reference herein the allegations set forth above in paragraphs 1 through 319 in their entirety.

321.    Pursuant to 42 U.S.C. § 1988(b), Plaintiffs are entitled to their attorney fees incurred in this action.

## XV.  JURY DEMAND

Plaintiffs request a trial by jury of twelve.

## XVI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for the following relief:

1.    Judgment against Defendants and in favor of Plaintiffs on all claims for relief stated herein;

2.    An award of Plaintiffs' economic and non-economic damages;

3.    An award of punitive damages;

4.    An award of Plaintiffs' costs and attorney fees in this action pursuant to 42 U.S.C. § 1988(b); and

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

5. Such other relief as the Court finds just and equitable.

DATED:  January 27, 2023

| MALONEY LAUERSDORF REINER PC | LOEVY & LOEVY |
|---|---|
| By /s/Janis C. Puracal<br> Janis C. Puracal, OSB #132288<br> E-Mail:  jcp@mlrlegalteam.com<br> Andrew C. Lauersdorf, OSB #980739<br> E-Mail:  acl@mlrlegalteam.com | By /s/David B. Owens<br> David B. Owens, WSBA #53856<br> E-Mail:  david@loevy.com<br> *Pro hac vice* |

MALONEY | LAUERSDORF | REINER ᴘᴄ
ᴀᴛᴛᴏʀɴᴇʏs ᴀᴛ ʟᴀᴡ
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

## CERTIFICATE OF SERVICE

I hereby certify that on January 27, 2023, the foregoing SECOND AMENDED

COMPLAINT FOR DAMAGES was served on the following parties at the following address by

sending to them a true copy thereof via the method indicated below:

| | |
|---|---|
| Robert E. Franz, Jr.<br>Sarah R. Henderson<br>Law Office of Robert E. Franz, Jr.<br>PO Box 62<br>Springfield, OR 97477<br>rfranz@franzlaw.comcastbiz.net<br>shenderson@franzlaw.comcastbiz.net<br>    *Attorneys for Defendants*<br>    *City of Coquille, City of Coos Bay,*<br>    *Coos County, Craig Zanni, Chris*<br>    *Webley, Eric Schwenninger, Sean*<br>    *Sanborn, Ray McNeely, Kris Karcher,*<br>    *Pat Downing, Mark Dannels, Kip*<br>    *Oswald, Michael Reaves, David Zavala,*<br>    *Anthony Wetmore, and Shelly McInnes* | Jesse B. Davis<br>Todd Marshall<br>Oregon Department of Justice<br>100 SW Market Street<br>Portland, OR 97201<br>todd.marshall@doj.state.or.us<br>jesse.b.davis@doj.state.or.us<br>    *Attorneys for Defendants John*<br>    *Riddle, Susan Hormann, Mary*<br>    *Krings, and Kathy Wilcox* |
| Graham B. Miller<br>Karin L. Schaffer<br>Amanda Rockett<br>Wood Smith Henning & Berman LLP<br>12755 SW 69th Ave., Ste. 100<br>Portland, OR 97223<br>gmiller@wshblaw.com<br>kschaffer@wshblaw.com<br>arockett@wshblaw.com<br>    *Attorneys for Defendants Vidocq*<br>    *Society and Richard Walters* | |

☒ by electronic means through the Court's ECF System on the date set forth above.

☐ by mailing a full, true and correct copy thereof in a sealed, first-class postage paid envelope, addressed to the attorneys as shown above, and deposited with the United States Postal Office at Portland, Oregon on the date set forth above.

☐ by emailing to each of the foregoing a copy thereof to the email address above.

MALONEY LAUERSDORF REINER PC


By  /s/Janis C. Puracal
      Janis C. Puracal, OSB #132288
      E-Mail:  jcp@mlrlegalteam.com

Attorneys for Plaintiffs

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417