**Robert E. Franz, Jr.**      OSB #730915
E-Mail:  rfranz@franzlaw.comcastbiz.net
**Sarah R. Henderson**      OSB #153474
E-Mail:  shenderson@franzlaw.comcastbiz.net
FRANZ & HENDERSON
P.O. Box 62
Springfield, OR 97477
Telephone:  (541) 741-8220
  Attorneys for Mark Dannels, Pat Downing, Kris Karcher, Shelly McInnes,
  Raymond McNeely, Kip Oswald, Michael Reeves, Sean Sanborn,
  Eric Schwenninger, Chris Webley, Anthony Wetmore, Craig Zanni,
  David Zavala, City of Coquille, City of Coos Bay, Coos County, Oregon,
  and the Estate of David E. Hall

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| Nicholas James McGuffin, as an individual and as guardian *ad litem*, on behalf of S.M., a minor, | Case No. 6:20-cv-01163-MK |
| Plaintiffs, | **FRCP 56 Motion for Summary Judgment** by Municipal Defendants |
| v. | **ORAL ARGUMENT REQUESTED** |
| Mark Dannels, Pat Downing, Susan Hormann, Mary Krings, Kris Karcher, Shelly McInnes, Raymond McNeely, Kip Oswald, Michael Reaves, John Riddle, Sean Sanborn, Eric Schwenninger, Richard Walter, Chris Webley, Anthony Wetmore, Kathy Wilcox, Craig Zanni, David Zavala, Joel D. Shapiro as Administrator of the Estate of David E. Hall, Vidocq Society, City of Coquille, City of Coos Bay, and Coos County, | |
| Defendants. | |

## TABLE OF CONTENTS

Page

**CERTIFICATIONS OF COUNSEL** ..................................................................2

**MOTION** ..................................................................................................2

**LEGAL MEMORANDUM** ..........................................................................6

**I.    Introduction** ....................................................................................5

**II.   Statement of Facts** .........................................................................7

**III.  Argument** .....................................................................................22

    *A. Plaintiffs' First Claim for Relief – Count 1: 14th Amendment Due Process.* ...............22

        1. <u>No Withholding of Exculpatory Evidence.</u> .......................................................23

        2. <u>No Fabrication of Evidence.</u> ..........................................................................24

    *B. Plaintiffs' First Claim for Relief – Count 2: Malicious Prosecution.* ..........................28

        1. <u>The Municipal Defendants Did Not Initiate the Prosecution</u> ...............28

        2. <u>Probable Cause Existed as a Matter of Law.</u> .........................................29

    *C. Plaintiffs' Second Claim for Relief – Count 3: Illegal Pretrial Detention.* ..................30

    *D. Plaintiffs' First Claim for Relief – Count 4: Brady/Youngblood.* ................................31

    *E. Plaintiffs' First Claim for Relief – Count 5: Failure to Intervene.* ..............................33

    *F. Plaintiffs' First Claim for Relief – Count 6: Conspiracy.* ............................................34

    *G. Plaintiffs' First Claim for Relief – Count 7: Destruction of Evidence.* .......................37

    *H. Plaintiffs' First Claim for Relief – Count 8: Monell.* ..................................................39

    *I. Plaintiffs' First Claim for Relief – Count 9: Plaintiff S.M.* ..........................................41

    *J. Qualified Immunity.* ....................................................................................................42

    *K. Plaintiffs' Second Claim for Relief – State Law False Imprisonment.* .........................44

*L. Plaintiffs' Third Claim for Relief –State Law Malicious Prosecution.* ........................46

*M. Plaintiffs' Fourth Claim for Relief –Civil Conspiracy.* ................................................47

*N. Plaintiffs' Fifth Claim for Relief – Negligent Training & Supervision.* ........................47

*O. Plaintiffs' Sixth Claim for Relief – I.I.E.D.* ..................................................................48

*P. Plaintiffs' Seventh Claim for Relief – State Law Spoliation of Evidence.* ....................50

*Q. Plaintiffs' Eighth Claim for Relief – Attorney Fees.* .....................................................50

**CONCLUSION** ...................................................................................................................50

# TABLE OF AUTHORITIES

## **Cases**

Page

*Aragonez v. County of San Bernardino,* 2008 WL 4948410 (C.D.Cal.2008). ............................34

*Arizona v. Youngblood*, 488 U.S. 51 (1988)..........................................................................32, 37

*Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) ...................................................................42, 43

*Avery v. City of Milwaukee*, 847 F.3d 433 (7th Cir. 2017) ...........................................................26

*Baker v. McCollan*, 443 U.S. 137 (1979) ...................................................................................30

*Becker v. Russek,* 518 F.Supp. 1040 (W.D.Va.1981) ................................................................35

*Bradford v. Davis*, 923 F.3d 599 (9th Cir. 2019).......................................................................23

*Bradford v. Scherschligt*, 803 F.3d 382 (9th Cir. 2015) ............................................................25

*Brady v. Maryland*, 373 U.S. 83 (1963) ..............................................6, 23-25, 31-32,38

*Briscoe v. LaHue*, 460 U.S. 325 (1983)...............................................................................26-27

*Brosseau v. Haugen,* 543 U.S. 194 (2004) ................................................................................43

*Buckley v. Fitzsimmons,* 509 U.S. 259 (1993) ..........................................................................27

*California v. Trombetta*, 467 U.S. 479 (1984)............................................................................37

*Cardenas v. Cnty. of Tehama*, 476 F. Supp. 3d 1055 (E.D. Cal. 2020)........................................35

*Catt v. Dept. of Human Services*, 284 P.3d 532 (2012) ..............................................................47

*Ctr. for Legal Stud., Inc. v. Lindley*, 64 F. Supp. 2d 970 (D. Or. 1999) ......................................35

*Checkley v. Boyd,* 107 P.3d 651 (2005) ......................................................................................48

*Christofferson v. Church of Scientology,* 644 P.2d 577 (1982). .............................................48-49

*Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101 (9th Cir. 2009) ...............................25

*Cunningham v. Gates,* 229 F.3d 1271 (9th Cir.2000).............................................................33-34

*Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001) ..............................................................24-25

*Dombrowki v. Dowling,* 459 F.2d 190 (7th Cir.1972) ...................................................35

*Dykes v. Hosemann,* 776 F.2d 942 (C.A.11 1985) .......................................................27

*Easley v. City of Riverside*, 890 F.3d 851 (9th Cir. 2018) ...........................................43

*Eggleston v. Prince Edward Volunteer Rescue Squad, Inc.,*
569 F.Supp. 1344 (E.D.Va.1983) ................................................................................35

*Felarca v. Birgeneau*, 891 F.3d 809 (9th Cir. 2018) ...................................................44

*Fields v. Wharrie*, 740 F.3d 1107, 1110 (7th Cir. 2014) .............................................26

*Galbraith v. City of Santa Clara*, 207 F.3d 1119 (9th Cir. 2002).................................25

*Gausvik v. Perez*, 345 F.3d 813 (9th Cir. 2003) .........................................................25

*Gerstein v. Pugh*, 420 U.S. 103 (1975)........................................................................29

*Gray v. Dep't of Justice*, 275 F. App'x 679 (9th Cir. 2008) ........................................31

*Green v. City & Cnty. of San Francisco*, 751 F.3d. 1039 (9th Cir 2014).....................42

*Highbaugh v. Caitham*, 2021 WL 3141215 (N.D. Cal. July 26, 2021) ................... 24-26

*Hryciuk v. Robinson*, 326 P.2d 424 (1958) ..................................................................30

*Hobbs v. City of Long Beach*, 534 F. App'x. 648 (9th Cir. 2013)........................... 29-30

*James v. Dallas Police Dep't*, 2013 WL 5873291 (N.D. Tex. 2013) ...........................30

*Josephs v. Burns & Bear*, 491 P.2d 203 (1971).........................................................47

*Keates v. Koile*, 883 F.3d 1228 (9th Cir. 2018) ..........................................................41

*Kirkpatrick v. County of Washoe*, 843 F.3d 784 (9th Cir. 2016)..................................41

*Legal Aid Society v. Ass'n. of Legal Aid Attorneys,* 554 F.Supp. 758 (S.D.N.Y. 1982).......... 35-36

*Libby v. City of Medford*, 2017 WL 2219995 (D. Or. Mar. 17, 2017) ..........................30

*Malley v. Briggs,* 475 U.S. 335 (1986) ........................................................................43

*Manuel v. City of Joliet, Ill.*, 580 U.S. 357 (2017)........................................................30

*Marsh v. County of San Diego*, 680 F.3d 1148 (9th Cir. 2012)......................................44

*Marshall v. PricewaterhouseCoopers, LLP*, 539 P.3d 766 (2023).........................47, 48

*Martinez v. Colon,* 54 F.3d 980 (1st Cir.1995)............................................................34

*McDade v. West*, 223 F.3d 1135 (9th Cir. 2000) ..........................................................40

*McGanty v. Staudenraus,* 901 P.2d 841 (1995) ...........................................................48

*Mendocino Envtl. Ctr. v. Mendocino County,*192 F.3d 1283, (9th Cir.1999) ..............34

*Monteilh v. Cnty. of Los Angeles*, 820 F. Supp. 2d 1081 (C.D. Cal. 2011) ............. 33-34

*Monell v. Dep't of Soc. Serv. of N.Y.*, 436 U.S. 658 (1978)...................................... 39-40

*Morales v. Fry*, 873 F.3d 817 (9th Cir. 2017).................................................................43

*Mullenix v. Luna*, 136 S. Ct. 305 (2015).......................................................................43

*Napier v. Sheridan*, 24 Or. App. 761 (1976) .................................................................45

*NelsonRadio & Supply Co. v. Motorola, Inc.,* 200 F.2d 911 (5th Cir. 1952) ................35

*Nemitz v. Conrad*, 22 Or. 164 (1892)............................................................................45

*N. Carolina Dep't of Transp. v. Crest St. Cmty. Council, Inc.*, 479 US 6 (1986).........50

*Oester v. Datan*, 2014 WL 4446062 (D. Or. Sept. 9, 2014) ..........................................30

*O'Doan v. Sanford*, 991 F.3d 1027 (9th Cir. 2021) .......................................................25

*Patton v. J.C. Penney Co.,* 719 P.2d 854 (1986) ...........................................................48

*Pearson v. Callahan*, 555 US 223 (2009).....................................................................43

*Perry v. Rein*, 215 Or. App. 113 (2007).........................................................................46

*Ramirez v. Butte–Silver Bow County,* 298 F.3d 1022 (9th Cir.2002)...........................34

*Reichle v. Howards,* 132 S. Ct. 2088 (2012) ................................................................42

*Rehberg v. Paulk*, 132 S. Ct. 1497 (2012) ............................................................... 27-28

*Rochin v. California*, 342 U.S. 165 (1952) ...................................................................41

*Saucier v. Katz,* 533 U.S. 194 (2001) ................................................................42, 43

*Sheets v. Knight,* 779 P.2d 1000 (1989)................................................................48

*Shoemaker v. Selnes*, 220 Or. 573 (1960)........................................................30, 46

*Simmons v. Navajo Cty., Ariz.,* 609 F.3d 1011 (9th Cir. 2010) ....................................39

*Singh v. McLaughlin*, 255 Or. App. 340 (2013) .......................................................44

*Smothers v. Gresham Transfer, Inc.*, 23 P.3d 333 (2001) ...........................................47

*Spencer v. Peters*, 857 F.3d 789 (9th Cir. 2017)....................................................24, 25

*State v. Chilson*, 219 Or. App. 136 (2008).................................................................29

*State v. Foster*, 350 Or. 161 (2011) ..........................................................................29

*State v. Greenough*, 142 Or. App. 506 (1996) ..........................................................29

*State v. Prince*, 93 Or. App. 106 (1988) ...................................................................29

*State v. Soldahl*, 331 Or. 420 (2000).........................................................................29

*State v. Vasquez-Villagomez*, 346 Or. 12 (2009) ......................................................29

*Strickler v. Greene*, 527 U.S. 263 (1999) .................................................................23

*Tennison v. City & County of San Francisco*, 570 F.3d 1078 (9th Cir. 2009) ..............31

*United States v. Drake*, 543 F.3d 1080 (9th Cir. 2008) ..........................................33, 38

*United States v. Koon,* 34 F.3d 1416 (9th Cir.1994)................................................. 33-34

*United Steelworkers of Am. v. Phelps Dodge Corp.,* 865 F.2d 1539 (9th Cir. 1989)............... 34-35

*Walker v. City of Portland*, 71 Or. App. 693 (1985) ...................................................44

*Westwood v. City of Hermiston*, 787 F. Supp. 2d 1174 (D. Or. 2011) ...........................28

*Woodrum v. Woodward Cty., Okl.*, 866 F.2d 1121 (9th Cir. 1989)................................41

**Statutes & Rules**

42 U.S.C. § 1983 ........................................... 24, 27, 28, 30, 31, 33, 34, 35, 39, 40-42, 46

42 U.S.C. § 1988 .......................................................................................................50

ORS 30.260 ...............................................................................................................45

ORS 30.265 ...............................................................................................................45

ORS 30.285 ...............................................................................................................45

ORS 30.287 ...............................................................................................................45

ORS 131.005 .............................................................................................................29

**Secondary Sources**

*Black's Law Dictionary* 924 (4th ed 1951) ...............................................................47

*Restatement (Second) of Torts*, § 46 (1965) .......................................................... 47-48

*Restatement (Second) of Torts* § 122 (1965) ............................................................45

*Webster's Third New Int'l Dictionary* 1164 (unabridged ed 2002) ...............................48

**Robert E. Franz, Jr.**     OSB #730915
E-Mail:  rfranz@franzlaw.comcastbiz.net
**Sarah R. Henderson**     OSB #153474
E-Mail:  shenderson@franzlaw.comcastbiz.net
FRANZ & HENDERSON
P.O. Box 62
Springfield, OR 97477
Telephone:  (541) 741-8220
  Attorneys for Mark Dannels, Pat Downing, Kris Karcher, Shelly McInnes,
  Raymond McNeely, Kip Oswald, Michael Reeves, Sean Sanborn,
  Eric Schwenninger, Chris Webley, Anthony Wetmore, Craig Zanni,
  David Zavala, City of Coquille, City of Coos Bay, Coos County, Oregon,
  and the Estate of David E. Hall

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| Nicholas James McGuffin, as an individual and as guardian *ad litem*, on behalf of S.M., a minor, | Case No. 6:20-cv-01163-MK (Lead Case) |
| Plaintiffs, | **FRCP 56 Motion for Summary Judgment** by Municipal Defendants |
| v. | |
| Mark Dannels, Pat Downing, Susan Hormann, Mary Krings, Kris Karcher, Shelly McInnes, Raymond McNeely, Kip Oswald, Michael Reaves, John Riddle, Sean Sanborn, Eric Schwenninger, Richard Walter, Chris Webley, Anthony Wetmore, Kathy Wilcox, Craig Zanni, David Zavala, Joel D. Shapiro as Administrator of the Estate of David E. Hall, Vidocq Society, City of Coquille, City of Coos Bay, and Coos County, | **ORAL ARGUMENT REQUESTED** |
| Defendants. | |

Nicholas James McGuffin, as an
Individual and as guardian ad litem,
on behalf of S.M., a minor,

    Plaintiffs,

  v.

Oregon State Police,

    Defendant.

Case No. 3:21-cv-01719-MK
(Trailing Case)

## LR 7-1 CERTIFICATION

PURSUANT TO LOCAL RULE 7-1, the undersigned hereby certify that
these moving Defendants have conferred with the Plaintiffs, by and through their
attorneys of record in this matter, and that the parties made a good faith effort to
resolve the dispute but have been unable to do so; therefore, this Motion for
Summary Judgment is necessary.

## LR 7-2 CERTIFICATION

The undersigned hereby certify that the following Motion for Summary
Judgment complies with LR 7-2(a) because it does not exceed 50 pages including
headings, footnotes, and quotations, but excluding the caption, table of contents,
table of cases and authorities, signature block, exhibits, and any certificates of
counsel, consistent with this Court's Order dated November 27, 2024.

## MOTION

COME NOW Defendants Mark Dannels, Kris Karcher, Raymond McNeely,
Kip Oswald, Michael Reeves, Sean Sanborn, Eric Schwenninger, Chris Webley,
Craig Zanni, David Zavala, City of Coquille, Coos County, Oregon, and the Estate
of David E. Hall (hereinafter, the "Municipal Defendants"), by and through their
attorneys, Franz & Henderson, and pursuant to FRCP 56, hereby move this Court
for Summary Judgment in their favor and against the Plaintiffs upon the grounds
and for the reason that there is no genuine issue of material fact on any of the
claims of the Plaintiffs; therefore, these moving Defendants are entitled to

judgment as a matter of law on all of Plaintiffs' claims and counts as set forth in their Second Amended Complaint on file herein.

THIS MOTION is made in good faith, not for the purpose of delay, and in the opinion of counsel is well founded in law. This Motion is based upon FRCP 56; the following Legal Memorandum of Law; and the Declarations of Mark Dannels, Kris Karcher, Raymond McNeely, Michael Reaves, Sean Sanborn, Eric Schwenninger, Chris Webley, Craig Zanni, and David Zavala, together with and the following Exhibits:

| Exhibit | Description |
| --- | --- |
| Exhibit 5001 | McGuffin Criminal Trial Transcript |
| Exhibit 5002 | 2010 Grand Jury Transcripts |
| Exhibit 5003 | 2000 Grand Jury Video |
| Exhibit 5004 | Mark Kirn 2000 Grand Jury Transcript |
| Exhibit 5005 | David Jenkins 2000 Grand Jury Transcript |
| Exhibit 5006 | Josh Emler 2000 Grand Jury Transcript |
| Exhibit 5007 | Jason Rice 2000 Grand Jury Transcript |
| Exhibit 5008 | Kristen Steinhoff 2000 Grand Jury Transcript |
| Exhibit 5009 | Michael McAdams 2000 Grand Jury Transcript |
| Exhibit 5010 | Lyndee Kindred 2000 Grand Jury Transcript |
| Exhibit 5011 | Raymond Lewis 2000 Grand Jury Transcript |
| Exhibit 5012 | Brent Bartley 2000 Grand Jury Transcript |
| Exhibit 5013 | Kristy Christofferson 2000 Grand Jury Transcript |
| Exhibit 5014 | Scott Hamilton 2000 Grand Jury Transcript |
| Exhibit 5015 | Cherie Mitchell 2000 Grand Jury Transcript |
| Exhibit 5016 | Ashley Hutchinson 2000 Grand Jury Transcript |
| Exhibit 5017 | Margaret Mitchell 2000 Grand Jury Transcript |
| Exhibit 5018 | Sharon Nelson 2000 Grand Jury Transcript |
| Exhibit 5019 | Nicole Price 2000 Grand Jury Transcript |

| | |
|---|---|
| Exhibit 5020 | Aaron West 2000 Grand Jury Transcript |
| Exhibit 5021 | 6/29/00 Missing Person Report by Reaves |
| Exhibit 5022 | 7/1/00 Supplemental Missing Person Report |
| Exhibit 5023 | 7/6/00 Search Warrant Affidavit by Hall |
| Exhibit 5024 | 7/27/00 Search Warrant Affidavit by Hall |
| Exhibit 5025 | 7/28/00 Search Warrant Affidavit by Hall |
| Exhibit 5026 | City of Coquille Case Binders |
| Exhibit 5027 | Young Incident Report 7/5/00 |
| Exhibit 5028 | State Dismissal of Case |
| Exhibit 5029 | Ulmer Report June 29, 2000 |
| Exhibit 5030 | Audio of Steinhoff Interview by Lee 9/12/00 |
| Exhibit 5031 | Transcript of Steinhoff Interview by Lee 9/12/00 |
| Exhibit 5032 | Steinhoff Handwritten Statement 6/27/10 |
| Exhibit 5033 | Transcript of Steinhoff Interview by Davis 2/14/02 |
| Exhibit 5034 | Audio of Steinhoff Interview by Davis 2/14/02 |
| Exhibit 5035 | Photos of Nick McGuffin and Kristen Steinhoff |
| Exhibit 5036 | Steinhoff Interview by Tabor 6/26/10 |
| Exhibit 5037 | Audio of McGuffin Interview 6/30/00 |
| Exhibit 5038 | Court Reporter Transcript of McGuffin Interview 6/30/00 |
| Exhibit 5038A | Transcript of McGuffin Interview 6/30/00 |
| Exhibit 5039 | McGuffin Handwritten Timeline 7/5/00 |
| Exhibit 5040 | McGuffin Polygraph Report by Ranger |
| Exhibit 5041 | Frasier Letter to McCrea 7/31/00 |
| Exhibit 5042 | Nick Backman Report |
| Exhibit 5043 | McAdams & Jenkins Polygraph Reports |
| Exhibit 5044 | Downing Incident Reports |
| Exhibit 5045 | Street View West Coquille Turnoff |
| Exhibit 5046 | Webley Report - Hamilton |

| Exhibit 5047 | Crook Interview by Looney |
| Exhibit 5048 | Crook Polygraph Report |
| Exhibit 5049 | Looney Incident Reports |
| Exhibit 5050 | Emler, Jenkins, West, Sero Polygraph Reports |
| Exhibit 5051 | Route Right Shoe to Left Shoe |
| Exhibit 5052 | Route Right Shoe to Body |
| Exhibit 5053 | McMullen Statement |
| Exhibit 5054 | Map to Haga (Bartley's Grandparents) House |
| Exhibit 5055 | Map of Leah's Route |
| Exhibit 5056 | Overview Maps |
| Exhibit 5057 | Bartley Polygraph Report |
| Exhibit 5058 | McGuffin Indictment & Arrest Warrant |
| Exhibit 5059 | McGuffin Signed Statement – Not Testifying |
| Exhibit 5060 | Portions of State's Criminal Trial Exhibits |
| Exhibit 5061 | Steinhoff Polygraph Report |
| Exhibit 5062 | Reaves Supplemental Report |
| Exhibit 5063 | Hall Report 7/5/00 |
| Exhibit 5064 | Zavala DPSST Transcript |
| Exhibit 5065 | Zavala Report Traffic Stop |
| Exhibit 5066 | Card-Lock Gas Records |
| Exhibit 5067 | McGuffin Phone Records |
| Exhibit 5068 | Zanni DPSST Transcript |
| Exhibit 5069 | Zanni DA Investigator Appointment |
| Exhibit 5070 | Accountability Record |
| Exhibit 5071 | Lab Submission Sheet |

/

/

/

## Legal Memorandum

### I. Introduction.

This case arises out of the setting aside of the criminal conviction of Nicholas James McGuffin, who, on July 19, 2011, was convicted by a Coos County Circuit Court Jury for Manslaughter in the First Degree for the death of his former girlfriend, Leah Freeman. Freeman disappeared from Coquille, Oregon, on June 28, 2000, and her badly decomposed body was found on August 3, 2000, in a rural area adjacent to the North Fork of the Coquille River, approximately nine miles from where she was last seen alive. At the time of her death, Leah Freeman was 15 years old, and Nick McGuffin was 18 years old.

In August of 2019, a bench trial was held on a Petition for Post-Conviction Relief filed by Plaintiff Nick McGuffin in the Circuit Court for Malheur County, before Circuit Court Judge Patricia Sullivan. On November 26, 2019, Judge Sullivan issued her decision, setting aside McGuffin's 2011 conviction and granting him a new trial based upon ineffective assistance of his trial counsel, and supposed *Brady* violation by the Oregon State Police Lab. The grounds for setting aside the conviction were completely unrelated to any conduct of these moving Defendants. McGuffin's claim for actual innocence was denied, Judge Sullivan having found that there was sufficient evidence in the record that "reasonable juror could have found petitioner guilty beyond a reasonable doubt."

District Attorney Paul Frasier agreed with Judge Sullivan "that there was sufficient evidence in the record from which a jury could find this defendant guilty;" but he declined to retry McGuffin because it has been 19 years since the death of Freeman; at least two people who testified at the trial have died; the passage of time makes it unknown if witnesses can be located and subpoenaed for trial; by the time a new trial would be over, Mr. McGuffin would have served his original sentence; and the mother of Leah Freeman did not want to go through the

pain and stress of a new trial. (Exhibit 5028 at 3-5) The charges were dismissed on December 17, 2019.

The Plaintiffs' Complaint contains the following claims for relief: (1) a 42 U.S.C. § 1893 claim containing nine separate Counts (14th Amendment Due Process, Malicious Prosecution, Illegal Pretrial Detention Following the Issuance of Legal Process, Failure to Disclose Exculpatory Information, Failure to Intervene, Conspiracy, Destruction of Exculpatory Evidence, Unconstitutional Policies, Practices, and Customs, and 14th Amendment Rights of Plaintiff S.M.); (2) a state law claim for False Imprisonment; (3) a state law claim for Malicious prosecution; (4) a state law claim for civil conspiracy; (5) a state law claim for negligent training and supervision; (6) a state law claim for intentional infliction of emotional distress; (7) a state law claim for negligent and/or intentional spoliation of evidence; and (8) a claim for attorney fees under 42 U.S.C. § 1988(b).

As discussed in the legal memorandum that follows, each of Plaintiffs' claims against these moving Defendants fail as a matter of law and these moving Defendants are entitled to judgment in their favor on each of the claims brought against them.

## II.  Statement of Facts.

On the morning of Thursday, June 29, 2000, around 10:25 AM, Cory Courtright, the mother of fifteen-year-old Leah Freeman, came to the Coquille Police Department and reported that her daughter, Leah Freeman, had not returned home the previous evening. At that time, a Missing Person Report was filed. (See Exhibit 5021)

Later that day, Ms. Courtright came back to the Police Department to provide more information. (See Exhibit 5022) A missing person investigation was then started by Coquille Chief of Police Michael Reaves with the help of other officers as described in Exhibit 5022. After learning that Nick McGuffin was with

Leah Freeman on the evening of June 28, 2000, Chief Reaves and Officer David Hall interviewed Nick McGuffin at 1:30 PM on June 30, 2000. His interview was recorded so a person can hear exactly what Mr. McGuffin reported. McGuffin's mother was with him during the interview, and one can hear her speak on occasion. The recorded interview is marked as Exhibit 5037. Transcripts of the interview are marked as Exhibit 5038 and 5038 A.

      It is undisputed that some of the information given by Mr. McGuffin to Chief Reaves and Officer Hall on June 30, 2000, was false and misleading. And, the false statements were intentional as they were not due to a lack of memory, since the interview took place within 48 hours of McGuffin's contact with Freeman. For example, McGuffin told the officers that between the time he dropped Freeman off at Cheri Mitchell's house around 7 PM and the time he went back to pick her up around 9 PM, he left Brent Bartley and Nicole Price at Brent's grandmother's house and "I went to Fast Mart, hung out there for a while, drove around, I talked to a couple of people, I talked to Aaron West, and I talked to, uh, I think Ricky Crook and a couple people after that, and I don't know I just drove around until I had to go pick her back up." (Exhibit 5038 at 3-6; Exhibit 5037) The truth of the matter is that between 7 PM and 9 PM McGuffin went to Johnson Mill Pond and smoked marijuana with Aaron West, Josh Emler, and David Jenkins for "a good hour – maybe two. We were out there for quite a while." (Exhibit 5002 at 235-239)

      Another example of false information provided to the police on June 30, 2000, is that McGuffin told Reaves that from "about 9:00" and for the next "four hours" (from 9 PM to 1 AM):

> I went back. I, I drove -- I either took a left by -- to go by Fast Mart, or I took -- went straight to go by McKay's. I can't remember which street I went on, but I ended up taking a left to go back up Central to go back to see if she was walking home. I didn't see her. I came back.

I came through -- back through Central; didn't see her. I think I went up by the park. I checked at the park. I checked -- checked at the cruising place. I checked at the Nazarene church. I checked at West Coquille turnoff. I checked at Sturdivant. I drove the loop. I basically drove everywhere for that four hours looking for her, and I didn't see her once. (Exhibit 5037; 5038 at 6-7)

McGuffin's story that he did not see Freeman or catch up to her would be impossible since between 9 PM and 10 PM on the evening of June 28th at least twelve people saw Freeman walking on the sidewalk along Central Avenue between McKay's and the high school, and none of these people were specifically looking for Freeman. Thus, anyone specifically looking for Freeman walking along Central between 9 PM and 10 PM would have seen her.

The following people reported that they saw Leah Freeman between 9 PM and 10 PM on June 28, 2000, walking or standing along Central between McKay's and the Coquille High School:

(1) Ashley Hutchinson (now Patton) testified that she saw Freeman around 9 PM "walking by the pay phone in front of McKay's;" that Freeman "looked really mad;" "she had her arms crossed;" and "she had a frown on her face like she was upset about something." (Exhibit 5001 at 675-676) Freeman was walking on "the sidewalk" towards the high school. (Exhibit 5001 at 676)

(2) Mark Kirn testified that he saw Freeman around 9:10 walking along Central towards the high school while eating at Hunters. (Exhibit 5004 at 4-7)

(3) Michael McAdams testified that he saw Freeman between 9 and 9:30 walking along Central towards the high school while eating at Hunters with Mark Kirn. (Exhibit 5001 at 692-693) (Exhibit 5009 at 3-4)

(4) Thomas Bounds testified that he saw Freeman two times on the evening of June 28, 2000. (Exhibit 5001 at 773-775). The first time was daylight when he was heading west out of town on Central, and he saw her standing in front of the

high school on Central like she was waiting for someone; he waived at her, and she waved back. (Exhibit at 5001 at 773-775)

The second time just as it was starting to get dark and he was heading back into town to his apartment, which was located next to the Chevron gas station, he saw her at the phone booth located behind the Chevron station which is located on Central; "she was standing there. Again, like she was waiting for somebody." (Exhibit 5001 at 774-777). It appeared that she was on the phone. (Exhibit 5001 at 778)

(5) Alicia Hyatt testified that when it was dark out, she saw Freeman walking past the high school. (Exhibit 5002 at 144-146)

(6) Cynthia Jones testified that around 9:30 PM when it was still light outside, she was heading home on Central away from town when she saw Freeman in the phone booth located at the Chevron gas station. (Exhibit 5001 at 395-398)

(7) Nick Backman told Nick McGuffin that Backman saw Leah in the parking lot of the Smoke Shop at about 9 PM and again a few minutes later near the credit union on Central which was just down the street from the Smoke Shop. (Exhibit 5042 at 2). The police report containing this information was in the possession of the investigator hired by Attorney McCrea. (See Bates stamp "Bonk 000350" Exhibit 5042 at 2). McGuffin also told his mother that Nick Backman saw Freeman that evening. (Exhibit 5042 at 3). This information was and is in the files of Attorney McCrea and stamped by the District Attorney-004243. (Exhibit 5042 at 3) The Backman police report confirmed what Backman told McGuffin and is Bates stamped by the District Attorney's Office with number 003247. (Exhibit 5042 at 4)

(8) Heather Reid testified that around 9 PM she saw Freeman walking by Hunter's Eatery with her arms crossed walking towards the high school, and she did not look happy. (Exhibit 5001 at 707-709). Reid was driving down North

Central taking a friend home. (Exhibit 5002 at 258-260). After taking her friend home, and on her way back down Central, Reid saw McGuffin parked in his mother's T-bird at Fast Mart; McGuffin was just "staring at his steering wheel." (Exhibit 5002 at 261-262)

(9) <u>Raymond Lewis</u> testified that around 9:15-9:45 PM he saw Freeman walking along Central between Security Bank and Fast Mart, walking towards the high school. (Exhibit 5011 at 3-5) (Exhibit 5001 at 731-732)

(10) <u>Heidi Crook</u> testified that around 9 PM she saw Freeman walking on Central between the motel and Hunter's restaurant towards the middle school with arms crossed across her chest. (Exhibit 5001 at 701-703)

(11) <u>Georgia Grisham</u> testified that when she was returning to Coquille from playing Bingo in Coos Bay around 10 PM, after she turned her van onto West Central from Highway 42, near the Maytag store, she saw Freeman "staggered right out across there in front of me . . . I almost hit her. . . . But I wheeled over to the left side of the road, because she came right off of that post there, that says 'Welcome to Coquille Oregon." (Exhibit 5002 at 1175-1178) (See Exhibit 5045 for Google photo of the area) Freeman "wasn't walking normal. . . . Walking or running normal . . . It wasn't normal." (Exhibit 5002 at 1191)

(12) <u>Dennis Briggs</u> reported to police that he was driving south on West Central toward McKay's Market, and he saw Freeman at the West Central, Fairview Road junction. (Exhibit 5029 at 16)

In addition, Lyndee Kindred testified that she talked to McGuffin in person around 9:30 PM two houses away from Freeman's house when he was in his blue Mustang. (Exhibit 5010 at 3-4) "I talked to Nick between 9:30, 9:45-ish, up by where she was living on Knott Street." (Exhibit 5001 at 1547). It should be noted that to drive a car to Freeman's house from McKay's, a person has to drive down Central, past Fast Mart, past Hunters, past the credit union, past the Chevron

station, past the high school, past the Nazarene Church, and then turn left onto

Knott Street. (See Exhibit 5056 at 2, 5055)

> Further, Scott Hamilton testified at the jury trial that McGuffin told him:

> A. That she was supposed to be going to a friend's house. And I think they may have gotten in an argument over it and what not. And at some point or another that they met up again in a store. Nick found her. And they were arguing. And she got out of the car somewhere around McKay's. Nick said he drove around the loop and went back to go find her, but never could find her.

> Q. Now, he told you that he picked her up and then dropped her at McKay's?
> A. Yes.

(Exhibit 5001 at 853) This is same information Hamilton passed on to Officer

Chris Webley:

> Hamilton said McGuffin told him he was supposed to pick up Freeman at Cherie Mitchell's house but had been late and Freeman had already left. Hamilton said McGuffin told him that he found Freeman walking and picked her up in his car, then began arguing with her. According to Hamilton, McGuffin said that Freeman wanted out of the car and he let her out near McKay's Market.

> Hamilton said McGuffin told him he then drove around the loop before coming back through town. At this time McGuffin told Hamilton he was unable to find Freeman. Hamilton said McGuffin told him they were fighting because she was supposed to be at Sherie's house and wasn't.

(Exhibit 5046 at 3) And, when McGuffin talked to Kristen Steinhoff at the parking

lot of the Maytag store area around 10 PM, he told Steinhoff: "He said that they

had got in an argument, and she took off walking and he couldn't find her."

(Exhibit 5002 at 855) According to Steinhoff, she saw McGuffin there at Maytag

without a car "walking in circles around Maytag" between 9-10 PM. (Exhibit

5030; 5031 at 3)

Furthermore, McGuffin was not driving around town for four hours between 9 PM and 1 AM looking for 15-year-old Leah Freeman, the girl he was going to marry, because a little after midnight he was on the bed in the bedroom of 18-year-old Kristen Steinhoff smoking Meth with her, exposing himself to her, fondling her breasts, kissing her, and trying to get her pants down so he could have intercourse with her, a minor fact McGuffin did not tell Chief Reaves. As testified by Steinhoff at the jury trial:

> Q. Okay. Did something happen while he was at your house?
> A. We did drugs.
>
> Q. When you say drugs, what type of drugs?
> A. Meth.
>
> Q. So you're saying that the Defendant did Methamphetamine as well?
> A. Uh huh.
>
> Q. That's a yes?
> A. Yes.
>
> * * *
>
> A. He just touched my chest and tried to kiss me and stuff.
>
> Q. When you're saying touched your chest, you're referring to your chest or to your breast?
> A. Yeah, to my breast.
>
> Q. Was that above the clothes or under the clothes?
> A. Above the clothes.
>
> Q. Where were you when that was happening?
> A. On my bed.
>
> Q. Where was he when that was happening?
> A. On my bed.
>
> Q. Were you sitting up or lying down?

A. I can't remember.

Q. When you say he kissed you, are you talking about on the lips?
A. Uh huh. Yes.

Q. Did he do anything else to you?
A. He tried to unbutton my pants.

                               * * *

Q. Do you remember telling Grand Jurors that he exposed his penis to you?
A. Yes.

Q. Did that happen?
A. Yes.

Q. Do you remember him trying to take off his pants?
A. Yes.

Q. Do you remember him attempting to touch your crotch area on the top of your pants?
A. Yes.

                               * * *

Q. Do you remember telling the Grand Jury that you stopped it because it was weird that Leah was missing?
A. Yes.

(Exhibit 5001 at 816-818)

Also, that early morning when McGuffin came over to Steinhoff's house and tried to have sex with her, McGuffin told Steinhoff that Freeman and McGuffin were "fighting." (Exhibit 5033 at 7; Exhibit 5034)  Steinhoff also told OSP detective Jim Davis that at that time, McGuffin was acting weird: "I've never seen somebody act like the way he acted that night. . . . He was acting weird like she was never coming back." (Exhibit 5033 at 8; Exhibit 5034)  As Steinhoff further elaborated:

"Because, it was like he was trying to hide something. There was something else going on. She wasn't just - - it was like they weren't just in a fight; there was something else going on, and I could tell."

(Exhibit 5036 at 16)

With regards to the various cars involved in this matter and relating to Nick McGuffin, as explained below, it should be noted that between 9 PM on June 28, 2000, and 3 AM on June 29, 2000, Nick McGuffin was observed driving two different cars at different times; namely, his mother's Thunderbird and his blue Mustang. He also was driving or riding in a purple Kia between approximately 12 midnight to 3 AM with Kristen Steinhoff.

Mark Kirn (Exhibit 5004 at 8-9; Exhibit 5003), Aaron West (Exhibit 5002 at 243), David Jenkins (Exhibit 5005 at 6; Exhibit 5043 at 9), Joshua Emler (Exhibit 5006 at 9-10), Jason Rice (Exhibit 5007 at 3), Michael McAdams (Exhibit 5001 at 694, 696), Heather Reid (Exhibit 5001 at 711) all saw Mr. McGuffin in his mom's Thunderbird at various times after 9 PM on June 28, 2000, always while driving back and forth along Central Blvd. past Fast Mart.

In addition, Aaron West also was with Nick when Nick was driving his blue Mustang when they went to Johnson Mill Pond and smoked marijuana for at least an hour prior to 9 PM. (Exhibit 5002 at 239), and West testified that just after 9 PM he again saw Nick at Fast Mart at which time Nick was still driving his blue Mustang. (Exhibit 5002 at 241) However, later that evening Nick switched cars and one of the last two times West saw McGuffin he was driving his Mom's T-bird: "He came back a couple hours after that time too, but either that time or the next time is when he had switched cars to a T-bird." (Exhibit 5002 at 243) David Jenkins also saw Nick driving the Mustang before Nick switched to driving the T-bird. (Exhibit 5005 at 6; Exhibit 5043 at 9) Joshua Emler also saw Nick driving the Mustang before Nick switched to driving the T-bird. (Exhibit 5006 at 7, 9-10)

Ashley Patton saw McGuffin's car that day at Fast Mart: "Once I saw the Mustang. And another time I saw the maroon Thunderbird." (Exhibit 5001 at 677) Kristen Steinhoff told OSP detective Jim Davis that she saw McGuffin drive both the Mustang and T-bird the evening of June 28th through the early morning of the 29th. (Exhibit 5033 at 4; Exhibit 5034) Brent Bartley testified that he was 30% to 50% sure that McGuffin "switched rigs" that night: "He drove - - dropped us off in the Mustang, and I think he picked us up in the T-bird." (Exhibit 5002 at 483)

As to the purple Kia, Kristin Steinhoff testified that her and Nick used a purple Kia to search for Leah when McGuffin came over to her house the early morning hours of June 29, 2000. (Exhibit 5008 at 14) The Kia belonged to Zach Elderkin. (Exhibit 5002 at 798) They looked for Leah for about half an hour. (Exhibit 5002 at 804) McGuffin told her that Leah and McGuffin "had got in an argument and she took off walking and he couldn't find her." (Exhibit 5002 at 855-856) She was with McGuffin for about an hour and a half. (Exhibit 5008 at 11) When she saw him at her house, he was wearing different clothes then when she saw him earlier in the evening at Maytag. (Exhibit 5002 at 803-804) As Steinhoff further elaborated:

> "when I seen him walking in the Econo Rooter parking lot or Roto-Rooter, whatever it's called, he was wearing something. And then when I seen him again after I got back into town, he was wearing something different." (Exhibit 5036 at 42)

When they got back in town, they drove to the place you use the gas card to get gas to put in the KIA; at which time Steinhoff gave Nick McGuffin five dollars to get some gas. (Exhibit 5008 at 15) The card lock record shows the time was 2:21 AM. (Exhibit 5066).

We also know that not only were Steinhoff and McGuffin using the KIA that morning in dealing with Leah Freeman, but Ricky Crook was also with them. As stated by Heather McMullen, the mother of Steinhoff: "McMullen said she recalls

Kristin coming home in Elderkin's car at 'the crack of dawn' with Nick McGuffin and Ricky Crook." (Exhibit 5053) The three of them then sat on the front porch to house and talked.  (Exhibit 5002 at 756-762)

After the interview of McGuffin, the Coquille Police continued with the investigation. Over the weekend of July 1 and 2, 2000, the investigation turned into an endangered missing person investigation because Freeman had not been located. The FBI then joined in the investigation providing expertise and manpower for searches and witness interviews. Then, after Freeman still had not been located, Deputy District Attorney Paul Frasier was assigned the case, and he took over as the head and lead of the investigation. The Coos County Team was then activated to help with the investigation. (Reaves Declaration at 4)

On July 3, 2000, Tony Messerle reported to the Coquille Police that on the evening of June 28, 2000, around 11:30 PM, while driving home from work on his motorcycle, he found a Nike shoe on Elm Street, about 100 yards north of the Chevron gas station. (Exhibit 5002 at 390-394) The shoe was later identified as the right shoe of Freeman.

On July 5, 2000, Deputy Kip Oswald of the Coos County Sheriff's Office found a Nike shoe on a dirt road at Hudson Ridge. (Exhibit 5001 at 933-934, 937) The shoe was later identified as the left shoe of Freeman. Hudson Ridge is a place where high school kids would hang out and party. (Exhibit 5001 at 733)

Because it soon became very apparent from the interviews of various people that Nick McGuffin had not been truthful in his interview with Chief Reaves, a polygraph examination of Mr. McGuffin took place on Wednesday, July 5, 2000, by Mark Ranger of the Oregon State Police. (Exhibit 5040 at 4) McGuffin agreed to submit to a polygraph examination at the request of Officer David Hall. During the pre-test interview, McGuffin told Ranger that Freeman was not pregnant; that he expected to marry Freeman; and that "I used to call her Angel." (Exhibit 5001 at

91-92) We also know that according to Brent Bartley, McGuffin's friend, on July 5, 2000, McGuffin was "nervous as hell and scared shitless." (Exhibit 5057 at 3)

Mr. McGuffin failed the polygraph examination as to the following questions:

#1 Did you physically do something to Leah that resulted in her death?
No.

#2 Do you have any direct involvement in Leah's disappearance?
No.

#3 Have you talked to Leah since last Wednesday night after 9:00PM?
No.

(Exhibit 5040 at 4)

Of interest is the fact that Ricky Crook told Steinhoff a week before June 28, 2000, that Freeman was pregnant (Exhibit 5032 at 1), and McGuffin told Steinhoff in the early morning of June 29, 2000, when McGuffin was trying to have sex with her, that Freeman thought she was pregnant. (Exhibit 5033 at 7; Exhibit 5034) And it is undisputed that Ricky Crook and McGuffin were "close" friends; and in fact, McGuffin stayed at the home of Ricky Crook for two months just prior to the disappearance of Freeman because McGuffin was having "family problems." (Exhibit 5002 at 571, 579) Further, Ricky Crook was also a close friend of Steinhoff. And we know that Steinhoff was a close friend of Nick and were together doing drugs even when Leah was dating Nick. (Photo of McGuffin and Steinhoff-Exhibit 5035 at 3) Also, all three, Crook (Exhibit 5048 at 3 – "Did you participate in any way in Leah's death?"); McGuffin (Exhibit 5040 at 4 – "Did you physically do something to Leah that resulted in her death?"); and Steinhoff

(Exhibit 5061 at 5-"Did you participate in the death of Leah?") failed a polygraph examination.

Prior to his polygraph test being administered, and before Freeman's body was found along the Coquille River, McGuffin told North Bend Police Officer Buddy Young that Leah may have been walking near the river and stumbled and hit her head on a rock and fallen into the river. (Exhibit 5027 at 5)  And, after McGuffin failed his polygraph, he became confrontational and told Ranger "[t]he polygraph is not evidence. You don't have shit!" (Exhibit 5023 at 8) Later that afternoon, McGuffin and his parents went to the Freeman residence. Cory Courtright told police that they pulled into the driveway, and it was clear McGuffin had been crying. McGuffin exited the car, walked past Leah's sister, Denise, on the porch to the backyard, and threw up. Courtright reported that Bruce McGuffin told her that Nick had just finished taking the polygraph and had passed with flying colors. Almost immediately thereafter, McGuffin retained Shaun McCrea as his attorney. Paul Frasier gave Mr. McGuffin the opportunity to take another polygraph to clear him as a suspect, and that opportunity was refused. (See Exhibit 5041)

After Paul Frasier took over the investigation, he set up a grand jury in order to interview and obtain the sworn testimony of several witnesses. The grand jury investigation was conducted by Frasier and took place on July 20, 2000, and July 27, 2000. A good outline of the investigation up to that point in time can be found in the affidavits of Officer Hall as contained in Exhibits 5023, 5024, and 5025.

The body of Leah Freeman was discovered on August 3, 2000, on a bank along the Coquille River. Once the body was found, Paul Frasier took over the lead in the investigation as the case had turned into a homicide. From that point forward, Paul Frasier was the person ultimately responsible for the investigation. Reaves' involvement then became one of a facilitator for Paul Frasier. On August

17, 2000, Frasier had Brent Bartley appear before the grand jury on August 17, 2000. The first grand jury did not result in any charges being filed related to the death of Leah Freeman. Nick McGuffin did not testify at the first grand jury. Over the next several weeks, there was no significant developments in the investigation into Leah Freeman's death and the case went cold. (Reaves Declaration at 4)

However, in 2008, Paul Frasier, who up until that time had been Chief Deputy District Attorney under Paul Burgett, took office as the new District Attorney. In July of 2008, Mike Reaves also retired as Chief of Police for the City of Coquille. (Reaves Declaration at 5) Mark Dannels was hired as the new Chief of Police and made a commitment to taking a fresh look at the case at the request of Paul Frasier and in response to community pleas. (Dannels Declaration at 2)

Chief Dannels facilitated the reopening of the case in the early stages by assembling a cold case team of retired homicide detectives, including Craig Zanni, that had been involved in the original investigation. These investigators, like Zanni, were appointed by Frasier as investigators for the Coos County District Attorney's Office, and worked under the direction and control of Frasier. (See Exhibit 5069)

The team, led by Paul Frasier, began meeting weekly beginning in late 2008. Because Paul Frasier was the one leading the investigation and making the decisions about if and when to submit the case to grand jury, he was allowed access to the entirety of the case file. Chief Dannels directed Officer Sanborn, with the help of the cold case team, to organize and index the entire contents of the case file so that information about any person involved or mentioned could be located in a matter of moments. This organization and indexing work were done in the months preceding the public reopening of the investigation, and the product became what was a series of binders. (See Exhibit 5026) These indexed Notebooks, in electronic format, appear at Exhibit 5026. Chief Dannels also

charged Pat Smith, evidence custodian, with ensuring that all physical evidence was accounted for and made available to the District Attorney's Office. (Dannels Declaration at 3)

In October of 2009, Chief Dannels and Lieutenant Pat Smith met with McGuffin's parents, Bruce and Kathy McGuffin, at their request. During that meeting, Bruce McGuffin told Chief Dannels that he wanted Chief Dannels to "prove his son's innocence." Chief Dannels advised the McGuffins that his job was to prove who murdered Leah Freeman, whoever that person was. The McGuffins also told Chief Dannels that they had in their possession 300 pages of documents that prove Nick McGuffin's innocence. However, they refused to share the documents with the police. (See Exhibit 5002 at 1292-1293)

In January of 2010, once the team had a handle on the investigation as it stood, and all reports and physical evidence were accounted for, a press conference was held to publicly announce that the investigation was being reopened. At that point, Paul Frasier assembled the Coos County Major Crime Team to assist in an active investigation. A complete but succinct overview of what the investigation entailed from there can be found in the grand jury testimony of Chief Dannels, appearing at Exhibit 5002, beginning at page 1285.

During the summer of 2010, after months of investigation, Paul Frasier decided to submit the case to a grand jury. Several of the named defendants were called to testify on various matters before the grand jury. Each of them testified truthfully. (See various Declarations of Defendants) Over 100 people testified before the grand jury, including both parents of Nick McGuffin and anyone who claimed that they had relevant information about who caused the death of Leah Freeman, whether that be Nick McGuffin or anyone else. (See Exhibit 5002) Nick McGuffin did not testify at the grand jury.

Eventually, after the grand jury reconvened several times, on August 23, 2010, the grand jury returned a true bill indicting McGuffin for the murder of Leah Freeman. Pursuant to that indictment, and a motion by the District Attorney's Office, Coos County Circuit Court Judge Martin Stone issued a warrant for McGuffin's arrest that same day, and McGuffin was taken into custody without incident.

In the lead up to the criminal trial, Paul Frasier asked Chief Dannels for two officers to be assigned to him full time. Coquille Officers Webley and McNeely were assigned to Frasier and were under the direction and control of Paul Frasier from that point forward. Mr. McGuffin's criminal trial began on July 5, 2011.

Several of the Municipal Defendants were called to testify during the trial. Each of them testified truthfully. (See various Declarations of Defendants) Nick McGuffin elected "not to testify" at his criminal trial. (Exhibit 5059) On Monday, July 18, 2011, the case went to the jury for deliberations. (Exhibit 5001 at 1763) The following day, July 19, 2011, the jury returned its verdict. It found McGuffin not guilty of Murder; but guilty of the lesser included charge of Manslaughter. (Exhibit 5001 at 1768) None of the Municipal Defendants had any further involvement in the matter, and did not take any action or have any contact with McGuffin after that date.

## III. Argument.

### A. Plaintiffs' First Claim for Relief – Count 1: 14th Amendment Due Process.

Count 1 of Plaintiffs' First Claim for Relief involves an alleged violation of Plaintiff McGuffin's right to a fair trial under the Due Process Clause of the 14th Amendment. Plaintiffs' allegations in support of this claim are largely duplicative of multiple other of their claims and counts. They involve alleged withholding of exculpatory evidence, fabrication and solicited false evidence, and "extraction" or concoction" of fabricated witness statements.

1. <u>No Withholding of Exculpatory Evidence</u>.

To succeed on a claim based upon withholding of exculpatory evidence under *Brady*, a plaintiff must show that (1) the evidence is favorable to him, (2) the state suppressed the evidence, and (3) prejudice ensued. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999); *see also Bradford v. Davis*, 923 F.3d 599, 614 (9th Cir. 2019). In other words, there must have been a "'reasonable probability' that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." *Id*. at 289.

Plaintiffs allege the following items were *Brady* material that was withheld by the Defendants.

(1) The results of a polygraph of Defendant Oswald. There is zero evidence that these results were intentionally withheld by the Municipal Defendants. The polygraph was administered by an Oregon State Police polygrapher, and Defendant Oswald was informed that he passed. There is no evidence that a report of results of that polygraph was ever in the possession of the Municipal Defendants.

(2) An email between the OSP Lab Defendants and the other Defendants documenting their attempts to avoid developing evidence that would exonerate McGuffin. The email in question is from Susan Hormann, an analyst with the OSP Lab, to Lt. Pat Smith of Coquille PD. It is not exculpatory evidence for the simple reason that it contains no evidence—no results of testing, no witness statements, absolutely nothing.

(3) Various notes from the Major Crime Team. These notes are not *Brady* material. They do not contain evidence. They do not contain witness statements that are otherwise not included in reports that were disclosed. To the extent any did contain discoverable information, there is no evidence that they were withheld. They were made available to the District Attorney, along with the entirety of the rest of the case file. The determination of what to disclose to the defense in

discovery is a legal question made by the prosecutor, outside of the domain of law enforcement.

(4) The fact "that the Defendants knew" various things. This is not *Brady* material for the simple reason that it is not a thing. For example: "that the Defendants knew McGuffin passed a polygraph." This is baseless. The Municipal Defendants knew that McGuffin was administered a polygraph by OSP Detective Mark Ranger, and Ranger reported that McGuffin failed the polygraph. None of the Defendants are polygraphers, and none had any reason or ability to question what Ranger reported.

The remainder of Plaintiffs' allegations are likewise meritless or do not involve the Municipal Defendants in any way. For the foregoing reasons, as well as those discussed in Subsection D addressing Count 4 of Plaintiff's First Claim for Relief, Plaintiffs claims based upon alleged withholding of evidence in violation of *Brady* fail as a matter of law and should be dismissed.

2. <u>No Fabrication of Evidence</u>.

"To prevail on a [Section] 1983 claim of deliberate fabrication, a plaintiff must prove that (1) the defendant official deliberately fabricated evidence and (2) the deliberate fabrication caused the plaintiff's deprivation of liberty." *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017). Showing deliberate fabrication of evidence requires the plaintiff to "at a minimum, point to evidence that supports at least one of the following two propositions: (1) [d]efendants continued their investigation of [the plaintiff] despite the fact that they knew or should have known that he was innocent; or (2) [d]efendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information." *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). It bears pointing out that the first prong of *Devereaux*'s standard

requires *innocence*. A not guilty verdict isn't enough to prove actual innocence. *Highbaugh v. Caitham*, 2021 WL 3141215, at *9 (N.D. Cal. July 26, 2021).

Where a plaintiff raises a deliberate fabrication of evidence claim, he must identify the "evidence he contends the government deliberately fabricated," then show (1) the defendant acted deliberately in falsifying evidence, and (2) the intentional fabrication was the proximate and but-for cause of the plaintiff's deprivation of liberty. *Bradford v. Scherschligt*, 803 F.3d 382, 386 (9th Cir. 2015); *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017); *Galbraith v. City of Santa Clara*, 207 F.3d 1119, 1126 (9th Cir.) Deliberately fabricating evidence is not equivalent to instances where an officer "carelessly handled the facts and the investigation." *Gausvik v. Perez*, 345 F.3d 813, 817 (9th Cir. 2003) (careless inaccuracy by officer in probable cause affidavit inadequate under stringent standard for deliberate fabrication claim). Mistakes of "tone," or "characterization" are insufficient, rather Plaintiff must show actual misrepresentations. *Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1113 (9th Cir. 2009).

Relatedly, an investigator's statements of their subjective opinions about an element of a criminal investigation cannot constitute "fabrication," nor is doing so abusive or coercive such that it would lead to false information. Statements that are merely careless or inaccurate do not suffice. *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017), *citing Gausvik v. Perez*, 345 F.3d 813, 817 (9th Cir. 2003). And, withholding of evidence, even if intentional, "cannot in itself support a deliberate-fabrication-of-evidence claim," as "deliberate fabrication...must mean something more than a mere omission." *O'Doan v. Sanford*, 991 F.3d 1027, 1045 (9th Cir. 2021), *citing* 263 F.3d at 1079. That is, "a *Brady* violation cannot in itself support a deliberate-fabrication-of-evidence claim." *Devereaux v. Abbey*, 263 F.3d 1070, 1079 (9th Cir. 2001).

Finally, while a plaintiff has a right not to be held in violation of his due process rights on the basis of fabricated evidence, no constitutional right exists to a flawless investigation. Law enforcement have leeway to make reasonable mistakes or reasonably misinterpret evidence. *Highbaugh v. Caitham*, No. C 20-03911 WHA, 2021 WL 3141215, at *13 (N.D. Cal. July 26, 2021).

Despite the multitude of formulaic and conclusory allegations contained in Plaintiffs' Second Amended Complaint, there exists no evidence of deliberate fabrication. Rather, most of the allegations of "fabrication" are actually allegations of coercion. Coercion and fabrication are not synonyms, and allegations of coercion cannot support a fabrication of evidence claim. *Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017). Even more specifically, there is a difference between coerced testimony—"testimony that a witness is forced by improper means to give... [it] may be true or false"—and fabricated testimony—which is "invariably false." *Fields v. Wharrie*, 740 F.3d 1107, 1110 (7th Cir. 2014). Only the latter can support a due process claim, and even then, only if the record shows that the officers "created evidence they knew to be false." *Avery*, 847 F.3d at 439. Here, Plaintiffs cannot show either. There is no evidence that any testimony was improperly coerced. Interrogation of witnesses is, by its very nature, designed to elicit information that a witness or suspect may be reluctant to share. However, it is not coercive in the sense that it is forcing testimony by some improper means. And, even if the Municipal Defendants had engaged in coercion, there is zero evidence that they knew any testimony they elicited was false. This claim, to the extent is construed as a coercion claim, fails as a matter of law.

The remainder of Plaintiffs' allegations of fabrication, which involve alleged false testimony, also fail. First, the Municipal Defendants' testimony was truthful. Second, even if there was any evidence that testimony was false, witnesses are absolutely immune from liability for their testimony in judicial proceedings.

*Briscoe v. LaHue*, 460 U.S. 325 (1983). This absolute immunity extends to governmental witnesses, such as police officers, to prevent undermining their contributions to the judicial process and their other public duties. *Id.* This absolute immunity applies in § 1983 cases just as it does at common law, and the same absolute immunity that applies for trial witnesses applies to witnesses called to testify before a grand jury. In the United States Supreme Court case of *Rehberg v. Paulk*, 132 S. Ct. 1497 (2012), Charles Rehberg, a certified public accountant, brought a Section 1983 claim against an investigator for a district attorney's office, contending that the investigator conspired to present and did present false testimony against Rehberg in the investigator's grand jury testimony which resulted in Rehberg's criminal indictment. In holding that the investigator, the sole and only witness before the grand jury, had absolute immunity from any type of claim based upon 42 U.S.C. § 1983, the Supreme Court of the United States stated as follows:

> For these reasons, we conclude that grand jury witnesses should enjoy the same immunity as witnesses at trial. This means that a grand jury witness has **absolute immunity from any § 1983 claim based on the witness' testimony**. In addition, as the Court of Appeals held, **this rule may not be circumvented** by claiming that a grand jury witness conspired to present false testimony or by using evidence of the witness' testimony to support any other § 1983 claim concerning the initiation or maintenance of a prosecution. Were it otherwise, "a criminal defendant turned civil plaintiff could simply reframe a claim to attack the preparation instead of the absolutely immune actions themselves." *Buckley v. Fitzsimmons,* 509 U.S. 259, 283, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993) (KENNEDY, J., concurring in part and dissenting in part); see also *Dykes v. Hosemann,* 776 F.2d 942, 946 (C.A.11 1985) *(per curiam)* ("[J]udges, on mere allegations of conspiracy or prior agreement, could be hauled into court and made to defend their judicial acts, the precise result judicial immunity was designed to avoid").  In the vast majority of cases involving a claim against a grand jury witness, the witness and the prosecutor conducting the investigation engage in preparatory activity, such as a

> preliminary discussion in which the witness relates the substance of
> his intended testimony.  We decline to endorse a rule of absolute
> immunity that is so easily frustrated.

*Rehberg v. Paulk*, 132 S. C. at 1506-07 (2012) (Bold emphasis supplied). Thus,
because the Plaintiffs cannot assert any claim against any of the Defendants based
upon alleged false testimony, all the Municipal Defendants are entitled to summary
judgment on this count.

Finally, even if Plaintiffs could produce evidence of fabrication, this claim
fails on the causation element. There is no evidence that any of the alleged
instances of wrongdoing influenced the District Attorney's decision to submit the
case to grand jury, the grand jury's decision to return a true bill, or the trial jury's
decision to return a guilty verdict.

### B. Plaintiffs' First Claim for Relief – Count 2: Malicious Prosecution.

Plaintiffs' Count 2 alleges malicious prosecution under federal law. A
malicious prosecution claim under § 1983 arises under the Fourth Amendment. To
prevail on this claim, Plaintiffs must show that (1) the defendants initiated or
procured the criminal charges against the plaintiff in a wrongful manner and
without probable cause, (2) the defendants acted with malice, meaning the
prosecution was initiated with a wrongful motive, such as intent to violate
plaintiff's constitutional rights, (3) he obtained a *favorable termination* of the
underlying criminal prosecution, indicating his innocence, and (4) the prosecution
resulted in a seizure of the Plaintiff in violation of his Fourth Amendment Rights.
*Thompson v. Clark*, 596 U.S. 36 (2022); *Westwood v. City of Hermiston*, 787 F.
Supp. 2d. 1174 (D. Or. 2011), *aff'd*, 496 Fed. Appx. 728 (9th Cir 2012).

1. The Municipal Defendants Did Not Initiate the Prosecution.

Put simply, the Municipal Defendants cannot be held liable for McGuffin's
prosecution, malicious or not, because they did not initiate the prosecution of

McGuffin. (See various Declarations of Defendants) As discussed elsewhere herein, the prosecution was initiated by a grand jury indictment. The seizure of the McGuffin occurred only after that indictment, not as a result of the Municipal Defendants' actions.

    2. <u>Probable Cause Existed as a Matter of Law</u>.

    Plaintiffs' claim for malicious prosecution fails because probable cause for the prosecution existed as a matter of law. Under Oregon Law, probable cause exists when a law enforcement officer reasonably believes that, more likely than not, the suspect has committed an offense, and that subjective belief is objectively reasonable.  ORS 131.005(11) (defining probable cause); *State v. Greenough*, 142 Or. App. 506, 509, 923 P2d 646 (1996) (articulating objective and subjective components of probable cause). Probable cause may be based on personal observations, collective knowledge of law enforcement, or by named informants. *State v. Soldahl*, 331 Or. 420 (2000) (probable cause was valid based on officer's collective knowledge); *State v. Prince*, 93 Or. App. 106, 111 (1988) ("Cross-corroboration among informants is a well-accepted method of demonstrating the validity of the information given"). Because the test for probable cause is the totality of the circumstances, isolated inconsistencies will not single-handedly eliminate probable cause. *State v. Vasquez-Villagomez*, 346 Or. 12, 25-27 (2009). Probable cause does not require absolute certainty, nor is an officer required to consider and eliminate all other possible explanations. *State v. Foster*, 350 Or. 161, 173 (2011). "The potential existence of a defense or exemption is not relevant" to whether or not probable cause to believe a crime has occurred. *State v. Chilson*, 219 Or. App. 136, 141 (2008).

    In this case, it is undisputed that Plaintiff was indicted by a grand jury. (See Exhibit 5058) The United States Supreme Court has held that a grand jury indictment conclusively determines the existence of probable cause. *Gerstein v.*

*Pugh*, 420 U.S. 103, 118 (1975). "A grand jury indictment is prima facie evidence of probable cause." *Hobbs v. City of Long Beach*, 534 F. App'x. 648, 649 (9th Cir. 2013); *Shoemaker v. Selnes*, 220 Or. 573, 581 (1960); *see also Libby v. City of Medford*, No. 1:15-CV-00298-CL, 2017 WL 2219995, at *5 (D. Or. Mar. 17, 2017), *report and recommendation adopted*, No. 1:15-CV-00298-CL, 2017 WL 2219980 (D. Or. May 19, 2017) (same); *Oester v. Datan*, No. 6:12–CV–0152–TC, 2014 WL 4446062, at *3 (D. Or. Sept. 9, 2014) (same, citing *James v. Dallas Police Dep't*, No. 3:12–cv–457–N, 2013 WL 5873291 (N.D. Tex. 2013)) (holding that the independent finding, and proceeding indictment, by a grand jury "conclusively establish[es] the existence of probable cause" and thus bars a Plaintiff's § 1983 claim). "'[A]nd unless the prima facie evidence is overcome by proof that the [indictment] was obtained by false testimony or other improper means, it becomes binding' and prevents the plaintiff from recovering." *Libby*, 2017 WL 2219995, at *5 (D. Or. Mar. 17, 2017) (quoting *Hryciuk v. Robinson*, 213 Or. 542, 550, 326 P.2d 424 (1958)). As discussed above, Plaintiff cannot prove the indictment was procured wrongfully, and as a result there was probable cause as a matter of law. Relatedly, as discussed elsewhere herein, there is no evidence that the Municipal Defendants had any improper purpose such that they could be found to have acted with malice. Plaintiff's claim for malicious prosecution fails.

  *C. Plaintiffs' First Claim for Relief – Count 3: Illegal Pretrial Detention.*

        Plaintiffs' Count 3 alleges Illegal Pretrial Detention Following the Issuance of Legal Process in violation of the Fourth Amendment. To maintain this claim, Plaintiffs must demonstrate (1) a deprivation of liberty through detention, (2) the detention was without probable cause, (3) that the detention was carried out under color of state law, and (4) causation; that is, that the defendants' actions were the legal cause of the deprivation of liberty. *Manuel v. City of Joliet, Ill.*, 580 U.S. 357 (2017); *Baker v. McCollan*, 443 U.S. 137 (1979).

This count fails for many of the same reasons as the prior. First, probable cause existed as a matter of law, so this claim fails on that element. Second, and related, it fails on the causation element. Plaintiff McGuffin's detention was a result of an arrest warrant issued by a Circuit Court judge, fair and valid on its face. This warrant was issued on the motion of the District Attorney following a lawfully obtained grand jury indictment, procured after the District Attorney, not the Municipal Defendants, decided to submit the case to grand jury. As a result, Plaintiffs cannot demonstrate that the actions of the Municipal Defendants were the cause of McGuffin's detention following the issuance of legal process.

*D. Plaintiffs' First Claim for Relief – Count 4: Brady/Youngblood.*

Police officers and prosecutors alike share an obligation to disclose exculpatory evidence under *Brady*. However, those obligations are different depending on their role. Since *Brady* was decided, the Ninth Circuit has "clarified the application of Brady to law enforcement officers, holding that once the officer turns the evidence over to the prosecutor, [the officer's] duty is complete and due process satisfied." *Gray v. Dep't of Justice*, 275 F. App'x 679, 681 (9th Cir. 2008). "[A] § 1983 plaintiff must show that police officers acted with deliberate indifference to or reckless disregard for an accused's rights or for the truth in withholding evidence from prosecutors." *Tennison v. City & County of San Francisco*, 570 F.3d 1078, 1088 (9th Cir. 2009).

For all of the reasons previously discussed, Plaintiffs' claims with regard to *Brady* fail. The alleged material was either not *Brady* material at all, not "material" at all, or not withheld. One example is the information about the witness Nick Backman. While Plaintiffs allege the existence of this witness was withheld, the real facts are as follows. First, Nicholas McGuffin was the source of the tip from Nick Backman. Backman told McGuffin that he had seen Leah on the night of June 28, 2000, in the parking lot of the smoke shop, and then shortly after that near

the Credit Union on Central Blvd. McGuffin shared this information with his mother, who documented it in her writings. Second, those documents, which the McGuffins claimed proved Nick's innocence (they did not), were not shared with police despite their requests, and investigators finally had to obtain a search warrant to access them. However, these documents *were* included in the criminal discovery. Third, the report documenting Backman's statement to police was included in the criminal discovery. (Exhibit 5042) The name was mistakenly misspelled as "Nick Beckman", but the date and contents of the statement make it clear who the report is referring to. This report was also in the files of Joyce Bonk, the investigator working with McGuffin's defense attorney, Shaun McCrea. Fourth, the original tip sheet regarding Backman, completed by then Detective Sergeant Zanni, was located in District Attorney Paul Frasier's files and was Bates stamped by him. Plaintiffs allege that this document was withheld because they cannot locate it in the files of Shaun McCrea, but this argument is futile as to the Municipal Defendants. Once any documents are provided or made available to the prosecutor, law enforcement's obligation under *Brady* is complete. In sum, it is indisputable that every single document relating to Nick Backman was properly disclosed by the Municipal Defendants. And, as discussed *supra*, the same is true of every other document in the case file. The entire case file was made available to the District Attorney, nothing was withheld, and the Municipal Defendants' obligations under *Brady* were fulfilled.

As to the allegations of failure to preserve evidence, the exculpatory value of the lost evidence must be "apparent" to police as measured at the time the evidence was allegedly destroyed. *Arizona v. Youngblood*, 488 U.S. 51, 56 n.*, 109 S. Ct. 333, 336 (1988) ("The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or

destroyed."). The exculpatory value of an item of evidence is not "apparent" when the evidence merely "*could have*" exculpated the defendant if preserved and tested. *United States v. Drake*, 543 F.3d 1080, 1090 (9th Cir. 2008) citing *Youngblood,* 488 U.S. at 56.

The primary allegation in this category one is what is referred to as the "US Bank Tape." The real story of this tape makes it clear it does not support Plaintiffs' claims. The tape, which purportedly contained surveillance footage, was originally provided to Coquille Police Officer Dan Brenden by US Bank manager Charles King on July 12, 2000. Mr. King told Officer Brenden that he needed the tape back as soon as possible. Of note, the US Bank is located at 209 N. Central Blvd., further south than Leah Freeman was ever seen on the night of June 28, 2000. Reports show that the tape was reviewed, it was determined that it contained nothing of value to the investigation, and it was returned to Mr. King.

Far from having known exculpatory value, there is no evidence that the tape had evidentiary value at all. At the very most, it could have shown McGuffin's car passing by while he was driving the "loop" around Coquille. Even if this were the case, that is not exculpatory in any manner. It is undisputed that Mr. McGuffin was seen driving up and down Central Blvd. by multiple witnesses. Finally, Coquille Police Officers did not destroy or otherwise fail to preserve the tape as alleged. They simply returned it to its owner at his request, after it was determined to be of no evidentiary value. This does not come close to supporting a constitutional violation

E. *Plaintiffs' First Claim for Relief – Count 5: Failure to Intervene.*

The contours of a § 1983 claim based on an alleged failure to intervene are discussed by a court in this Circuit in *Monteilh v. Cnty. of Los Angeles*:

The parties agree that "[p]olice officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or

other citizen." *Cunningham v. Gates,* 229 F.3d 1271, 1289 (9th Cir.2000)(quoting *United States v. Koon,* 34 F.3d 1416, 1447 n. 25 (9th Cir.1994) *rev'd on other grounds* ) (internal quotations omitted). "Importantly, however, officers can be held liable for failing to intercede only if they had an opportunity to intercede." *Id.* An officer's duty to intercede arises only when a fellow officer is acting under the color of state law, but not when the fellow officer is engaged in private violence. *Martinez v. Colon,* 54 F.3d 980 (1st Cir.1995), *cert. denied,* 516 U.S. 987, 116 S.Ct. 515, 133 L.Ed.2d 423 (1995). Furthermore, bystander officers only have a duty to stop a violation when they know or have reason to know of the constitutional violation. *Ramirez v. Butte–Silver Bow County,* 298 F.3d 1022, 1029–30 (9th Cir.2002) (holding that bystander officer could not be liable for failure to intercede in unlawful search by fellow officers because he had no reason to know that the search warrant was defective); *Ting v. U.S.,* 927 F.2d 1504, 1511 (9th Cir.1991); *Aragonez v. County of San Bernardino,* No. EDCV 07–00992–VAP (Opx) 2008 WL 4948410 at *6 (C.D.Cal.2008) ("Bystander officers only have a duty to stop a violation, though, where they know or have reason to know of the constitutional violation.").

820 F. Supp. 2d 1081, 1092–93 (C.D. Cal. 2011). In this case, this claim fails on the merits for two reasons. First, for all of the reasons discussed herein, there was no constitutional violation by the Municipal Defendants. Second, and inextricably related, none of the Municipal Defendants ever witnessed or otherwise had reason to believe a constitutional violation occurred such that they would have had an opportunity to intervene.

 *F. Plaintiffs' First Claim for Relief – Count 6: Conspiracy.*

 The First Claim for relief alleges that the Defendants engaged in a conspiracy under 42 U.S.C. § 1983. To establish liability for a conspiracy in a § 1983 case, a plaintiff must "demonstrate the existence of an agreement or meeting of the minds" to violate constitutional rights. *Mendocino Envtl. Ctr. v. Mendocino County,*192 F.3d 1283, 1301 (9th Cir.1999) (internal quotation marks omitted). "To be liable, each participant in the conspiracy need not know the exact details of

the plan, but each participant must at least share the common objective of the conspiracy." *United Steelworkers of Am. v. Phelps Dodge Corp.,* 865 F.2d 1539, 1541 (9th Cir. 1989) (en banc). "Each member of the conspiracy 'must have knowledge of the nature and scope of the agreement.'" *Ctr. for Legal Stud., Inc. v. Lindley*, 64 F. Supp. 2d 970, 979 (D. Or. 1999), *aff'd*, 1 F. App'x 662 (9th Cir. 2001) (citation omitted). "A mere allegation of conspiracy without factual specificity is insufficient." *Cardenas v. Cnty. of Tehama*, 476 F. Supp. 3d 1055, 1069 (E.D. Cal. 2020) (citation omitted).

Allegations of conspiracy amongst individual officers employed by the same agency fail on their face because, legally, constituted a single entity. The intracorporate conspiracy doctrine, as it is known in American law, grew out of the decision in *NelsonRadio & Supply Co. v. Motorola, Inc.,* 200 F.2d 911 (5th Cir. 1952), *cert. denied,* 345 U.S. 925 (1953), an anti-trust case based on an alleged conspiracy between the defendant corporation and its officers, employees and agents. In that case, the Court dismissed the action, saying:

> It is basic in the law of conspiracy that <u>you must have two persons or entities to have a conspiracy</u>. A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that <u>the acts of the agent are the acts of the corporation</u>. 200F.2d at 914.

This doctrine applies in the civil rights area. *Dombrowski v. Dowling,* 459 F.2d 190, 196 (7th Cir.1972) (Stevens, J.); *Herrmann v. Moore,* 576 F.2d 453 (2d Cir.), *cert. denied,* 439 U.S. 1003 (1978); *Becker v. Russek,* 518 F.Supp. 1040, 1045 (W.D.Va.1981), *aff'd without opinion* 679 F.2d 876 (4th Cir.1982);  *Eggleston v. Prince Edward Volunteer Rescue Squad, Inc.,* 569 F.Supp. 1344, 1352 (E.D.Va.1983), *aff'd without opinion,* 742 F.2d 1448 (4th Cir.1984), involving "officials of a public body who act within the scope of their

employment"); *Legal Aid Society v. Ass'n. of Legal Aid Attorneys,* 554 F.Supp. 758, 766 (S.D.N.Y. 1982) (involving a union and its officers).

Plaintiffs allege a conspiracy amongst the Municipal Defendants, as well as between the Municipal Defendants and the State Defendants, Vidocq Society, and Richard Walter. As an initial matter, pursuant to the intracorporate conspiracy doctrine above, Plaintiffs cannot rely on allegations of conspiracy between employees of the same entity—in this case, between Coquille Police Officers, or between Coos County Sheriff's Office employees. In any event, Plaintiffs cannot otherwise prevail on this claim for multiple reasons.

First, this claim fails because, as discussed herein, Plaintiffs can prove no underlying constitutional violation. Without a violation of Plaintiffs' constitutional rights, no claim for conspiracy to violate those rights lies.

Second, the Plaintiffs' allegations styled as acts in furtherance of a conspiracy are actually simple collaboration, information sharing, and reasonable reliance on other members of the investigation, many of whom had specialized training or expertise. For example, an OSP Detective who is a trained polygrapher performs an examination and reports the results of that examination with Coquille Police Department. No one employed by Coquille Police Department is trained in polygraphy. Coquille Police have every right to rely on the reported results of the polygraph by the expert in polygraphy. This does not point to a conspiracy to do anything. For another example, Coquille Police send physical evidence for DNA and other forensic testing to the OSP Crime Lab, and the specially trained lab personnel perform the testing and send a report back to Coquille Police with the results of the tests. No one at Coquille Police Department is trained in DNA testing. Coquille Police again have every right—and every reason—to rely on the reported results of the DNA testing by the experts in DNA testing. This, again,

does not point to a conspiracy to do anything. It is a reality of criminal investigative work.

Finally, this claim fails because there is no evidence of an improper purpose. Rather, the evidence shows that the purpose of each and every one of the Municipal Defendants was not to "frame" anyone for the murder of Leah Freeman. Their purpose was to investigate the circumstances of Freeman's death and see if they could solve the case. When it came down to it, it was not up to the Municipal Defendants to prosecute McGuffin for the murder. That decision was ultimately made by a grand jury, after Paul Frasier decided to submit the case to grand jury. And, as discussed herein and in the declarations of the Municipal Defendants, each and every one of them testified truthfully. There can be no liability for conspiracy where the alleged conspirators only goal was to solve a crime and hold the person or persons who committed the crime responsible.

Because no conspiracy existed, for the reasons set forth above, Plaintiffs' claims based upon this alleged conspiracy fail as a matter of law.

*G. Plaintiffs' First Claim for Relief – Count 7: Destruction of Evidence.*

Due process requires the government to preserve evidence which possesses "exculpatory value that was apparent before the evidence was destroyed" and is "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489, 104 S. Ct. 2528, 2534 (1984). The exculpatory value of the lost evidence must be "apparent" to police as measured at the time the evidence was allegedly destroyed. *Arizona v. Youngblood*, 488 U.S. 51, 56 n.*, 109 S. Ct. 333, 336 (1988) ("The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed."). The exculpatory value of an item of evidence is not "apparent" when the evidence merely "*could have*"

exculpated the defendant if preserved and tested. *United States v. Drake*, 543 F.3d 1080, 1090 (9th Cir. 2008) citing *Youngblood,* 488 U.S. at 56.

This claim fails for the same reasons articulated previously under *Brady* and *Youngblood*. There is simply no evidence that any of the Municipal Defendants willfully destroyed any evidence. The only item not previously addressed is the "Crime Scene Video" that cannot be located. And again, contrary to Plaintiffs' conspiratorial and baselessly accusatory version of events, the real facts paint a picture that is both innocuous and immaterial.

On August 3, 2000, the day Leah Freeman's badly decomposed body was found on an embankment several miles outside of Coquille, OSP Lt. James Pex was called to the area, and he took control of the scene. His report states that he was going to obtain video of the scene. Pex does not include in the report whether this was in fact done; however, on August 7, 2000, an item of evidence described as a "Video Tape of Crime Scene" is delivered to Coquille Police Department by Det. Sgt. Zanni and logged into evidence by Officer Hall. (Exhibit 5070) There is no evidence that this tape was accessed until several months later. In March of 2001, Deputy ME Kris Karcher and Coos Bay Police Detective Cal Mitts were preparing to travel to the England to hand deliver items of evidence to the UK National Forensic Science Service laboratory in Chorley. (Exhibit 5001 at 1299) Karcher had recently learned from a speaker at a training she attended that the NFS lab was performing DNA testing that was more sensitive than any that could be performed locally. (Id.) The primary items examined by the FSS Lab were Leah Freeman's clothes and shoes. However, the FSS also requested other items for review including reports and "[s]cene photographs and <u>video</u>." (See Exhibit 5026 – 04 Scientific Evidence – England DNA Materials at 21 and generally) On March 22, 2001, Deputy ME Karcher checked out Coquille Police evidence Item No. 223 "Video Tape Crime Scene." (Exhibit 5071)

As it turns out, at some point after the cold case team began working on reopening the case in 2008, it was discovered that the materials that had been delivered to the FSS Chorley lab were still in England. (See Exhibit 5026 – 04 Scientific Evidence – England DNA Materials at 3) Only after Paul Frasier got involved did the FSS lab finally mail back the clothes and shoes of Freeman. The video, however, was never logged back into evidence and there is no evidence it was ever returned to Oregon. The UK Forensic Science Service, as of 2012, no longer exists. *See UK Parliament Science and Technology Committee – Seventh Report: The Forensic Science Service*, https://publications.parliament.uk/pa/ cm201012/cmselect/cmsctech/855/85502.htm (last accessed Jan. 6. 2025).

The only reasonable explanation for what happened to Item No. 224 is that it was delivered to the FSS Lab in England and never returned. There exists zero evidence of Plaintiffs' purported version of events, wherein they allege that the video was intentionally withheld or destroyed by Deputy ME Karcher due to some obvious exculpatory content.

*H. Plaintiffs' First Claim for Relief – Count 8: Monell.*

Defendants Coos County and City of Coquille are entitled to summary judgment on all of the Plaintiff's Section 1983 claims. First, because none of the individual Defendants have violated the constitutional rights of the Plaintiffs, Defendant Clackamas County is entitled to summary judgment as a matter of law. *Simmons v. Navajo Cty., Ariz.,* 609 F.3d 1011, 1021 (9th Cir. 2010) ("Because we hold that there was no underlying constitutional violation, the Simmonses [plaintiffs] cannot maintain a claim for municipal liability).

Second, a municipality cannot "be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Serv. of N.Y.*, 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L.Ed.2d 611 (1978). Liability may attach to a municipality only where the municipality itself causes the constitutional violation through the "execution of

a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell,* 436 U.S. at 694, 98 S. Ct. 2018. And, liability only attaches where a municipality's policy or customs show a "deliberate indifference" to the constitutional rights and are the "moving force behind the constitutional violation."  As he Ninth Circuit has held that:

> "Local government entities "can be sued directly under § 1983 ... where ... the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that [entity's] officers." *Monell,* 436 U.S. at 690, 98 S.Ct. 2018. However, liability attaches only where the entity's policies evince a "deliberate indifference" to the constitutional right and are the "moving force behind the constitutional violation." *Levine v. City of Alameda,* 525 F.3d 903, 907 (9th Cir.2008) (internal quotation marks and citation omitted)." *Edgerly v. City & Cnty. of San Francisco*, 599 F.3d 946, 960 (9th Cir. 2010)

Furthermore, a "plaintiff cannot demonstrate the existence of a municipal policy or custom based solely on a single occurrence of unconstitutional action by a nonpolicymaking employee." *McDade v. West*, 223 F.3d 1135, 1141 (9th Cir. 2000).

In the case at bar, as set forth in the various declarations of the Defendants, neither Coos County or the City of Coquille had a policy, practice, or custom of having its law enforcement officers violate the provisions of the Fourth Amendment or the Fourteenth Amendment to the Constitution of the United States. In fact, it has always been the policy, practice, and custom of Coos County and the City of Coquille to have its law enforcement officers follow and obey the provisions of the Fourth Amendment and the Fourteenth Amendment to the United States Constitution. This is consistent with Oregon law and the Fourth

Amendment. It is Plaintiffs' burden to prove a constitutional violation *and* prove that a custom or policy is what caused that violation. They can prove neither.

I. *Plaintiffs' First Claim for Relief – Count 9: Plaintiff S.M.*

In this Count, Plaintiffs allege that Plaintiff S.M. "had a constitutionally protected liberty interest under the Fourteenth Amendment in the companionship, society, and comfort between herself and her father, McGuffin." (Doc. No. 143) As an initial matter, this claim fails because Plaintiff S.M. has no such Fourteenth Amendment right. For parents, the right to familial association is generally grounded in the Fourteenth Amendment's Due Process Clause, while claims brought by children arise under the Fourth Amendment right to be free from unreasonable seizures. *See Kirkpatrick v. County of Washoe*, 843 F.3d 784, 788–89 & n.2 (9th Cir. 2016) (en banc).

Second, even if the Court construes this claim as a Fourth Amendment claim, it fails as a matter of law. The same legal standard applies in evaluating Fourth and Fourteenth Amendment claims for the removal of children." *Keates v. Koile*, 883 F.3d 1228, 1236 (9th Cir. 2018) (quoting *Wallis*, 202 F.3d at 1137 n.8). In order to constitute a Fourteenth Amendment violation, the state interference must "shock [ ] the conscience" or "offend the community's sense of fair play and decency." *Rochin v. California*, 342 U.S. 165, 172-73, 72 S. Ct. 205, 96 L.Ed. 183 (1952). "Mere negligence or lack of due care by state officials in the conduct of their duties does not trigger the substantive due process protections of the Fourteenth Amendment and therefore does not state a claim under section 1983." *Woodrum v. Woodward Cty., Okl.*, 866 F.2d 1121, 1126 (9th Cir. 1989).

This claim fails because none of the conduct of the Municipal Defendants as supported by the factual record "shocks the conscience" as required to support this claim. Further, the individual defendants are entitled to qualified immunity on this count because there is certainly no clearly established right of a child to have their

parent be free from lawful imprisonment, even where damage to their relationship does occur.

*J. Qualified Immunity.*

As discussed above, each of Plaintiffs' federal claims fails on its merits. Alternatively, each of the Municipal Defendants are entitled to qualified immunity. In an action based upon 42 U.S.C. § 1983, an individual defendant is not liable if he is entitled to qualified immunity. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards,* 132 S. Ct. 2088, 2093, 182 L.Ed.2d 985 (2012). "When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

Assessing whether an official is entitled to immunity is a two-prong inquiry. Under the first prong the court asks whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional, right?" *Saucier v. Katz,* 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L.Ed.2d 272 (2001). Under the second prong the court examines whether the right was clearly established. *Id.* The "'clearly established' standard protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can reasonably anticipate when their conduct may give rise to liability for damages." *Reichle v. Howards,* 132 S. Ct. 2088, 2093, 182 L.Ed.2d 985 (2012).

> The second prong requires us to analyze two discrete sub-elements: "whether the law governing the conduct at issue was clearly established" and "whether the facts as alleged could support a reasonable belief that the conduct in question conformed to the established law." *Green*, 751 F.3d at 1052.
> * * *

> Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id*. at 236; *see Morales*, 873 F.3d at 822. If the second prong is dispositive, courts need not analyze the first. *Pearson*, 555 U.S. at 236–37, 129 S.Ct. 808.

*Easley v. City of Riverside*, 890 F.3d 851, 856 (9th Cir. 2018). If a reasonably competent officer would have concluded his behavior was appropriate; and if officers of reasonable competence could disagree on the issue, then immunity should be recognized. *Saucier v. Katz*, 533 U.S. 194, 202, 121 S. Ct. 2151, 2156, 150 L.Ed.2d 272 (2001); *Malley v. Briggs,* 475 U.S. 335, 341, 106 S. Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd,* 563 U.S. 731, 741, 131 S. Ct. 2074, 179 L.Ed.2d 1149 (2011). Put simply, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L.Ed.2d 271 (1986).

As stated in *Mullenix v. Luna*, 136 S. Ct. 305, 308, 193 L.Ed.2d 255 (2015):

> "We have repeatedly told courts ... not to define clearly established law at a high level of generality." *al–Kidd, supra,* at 742, 131 S.Ct. 2074. The dispositive question is "whether the violative nature of *particular* conduct is clearly established." *Ibid.* (emphasis added). This inquiry " 'must be undertaken in light of the specific context of the case, not as a broad general proposition.' " *Brosseau v. Haugen,* 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (*per curiam* ) (quoting *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that "[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." 533 U.S., at 205, 121 S.Ct. 2151.

In addition, a "plaintiff must prove both steps of the inquiry to establish the officials are not entitled to immunity from the action." *Felarca v. Birgeneau*, 891 F.3d 809, 815–16 (9th Cir. 2018) (*citing Marsh v. County of San Diego*, 680 F.3d 1148, 1152 (9th Cir. 2012)).

First, the officers are entitled to qualified immunity under the first prong of the doctrine of qualified immunity because "[t]aken in the light most favorable to the party asserting the injury" the facts and evidence presented in this motion show that the conduct of the officers as set forth above did not violate a constitutional right of the Plaintiffs protected by the Fourth or Fourteenth Amendment as alleged.

Second, the officers are entitled to qualified immunity under the second prong of the doctrine of qualified immunity, because there was no clearly established law protecting Plaintiff for the kinds of harm plausibly alleged in the Second Amended Complaint.

Finally, the immunity of the individually named Municipal Defendants results in a dismissal of the City of Coquille and Coos County, because neither entity can be held liable for the conduct of their employees where that employee is immune from liability.

### K. Plaintiffs' Second Claim for Relief – State Law False Imprisonment.

Under Oregon law, the elements of false arrest are: "(1) the tortfeasor must confine the plaintiff; (2) the tortfeasor must intend the act that causes the confinement; (3) the plaintiff must be aware of the confinement; and (4) the confinement must be unlawful." *Singh v. McLaughlin*, 255 Or. App. 340, 348 (2013). "The gravamen of the claim is 'the unlawful imposition of restraint on another's freedom of movement." *Id.* Initially lawful confinement may become unlawful if the confinement continues after "officers exhaust[] their authority to detain" a person. *Walker v. City of Portland*, 71 Or. App. 693, 699 (1985).

This claim fails for a few simple reasons. First, none of the named defendants arrested McGuffin. Second, even if one of them had arrested McGuffin, the arrest was not unlawful. It was executed pursuant to a facially valid warrant resulting from a grand jury indictment that established probable cause as a matter of law. Plaintiffs do not so much as allege that the warrant was invalid. And, the Municipal Defendants did not secure the arrest warrant, so there is no evidence that it was secured by them by improper means. A police officer cannot be held liable for executing a valid arrest warrant. *Restatement (Second) of Torts* § 122 (1965); *see generally Nemitz v. Conrad*, 22 Or. 164, 165, 29 P. 548 (1892); *Napier v. Sheridan*, 24 Or. App. 761, 765, 547 P.2d 1399 (1976) (supporting the general proposition, the fact that an arrest is made pursuant to a warrant defeats a claim of unlawful imprisonment, because the warrant provides a form of privilege or justification to interfere with a plaintiff's liberty).

In addition, none of the individual Municipal Defendants can be held liable to the Plaintiff for the tort of false arrest, since Plaintiff's exclusive remedy is limited to an action against their public body employer. As stated in ORS 30.265:

> (1) Subject to the limitations of ORS 30.260 to 30.300, every public body is subject to action or suit for its torts and those of its officers, employees and agents acting within the scope of their employment or duties, whether arising out of a governmental or proprietary function or while operating a motor vehicle in a ridesharing arrangement authorized under ORS 276.598. **The sole cause of action for any tort** of officers, employees or agents of a public body acting within the scope of their employment or duties and eligible for representation and indemnification under ORS 30.285 or 30.287 **shall be an action against the public body only.** The remedy provided by ORS 30.260 to 30.300 is exclusive of any other action or suit against any such officer, employee or agent of a public body whose act or omission within the scope of the officer's, employee's or agent's employment or duties gives rise to the action or suit. No other form of civil action or suit shall be permitted. If an action or suit is filed against an officer, employee or agent of a public body, on appropriate motion the public

body shall be substituted as the only defendant. Substitution of the
public body as the defendant does not exempt the public body from
making any report required under ORS 742.400.  (emphasis supplied)

Plaintiff McGuffin's claim for false arrest fails as a matter of law and must be
dismissed.

*L. Plaintiffs' Third Claim for Relief –State Law Malicious Prosecution.*

To prevail on a state law claim for malicious prosecution requires a plaintiff
to show: (1) the defendant initiated or prosecuted a judicial proceeding against the
plaintiff; (2) the proceeding terminated in the plaintiff's favor; (3) the defendant
lacked probable cause to prosecute the action; (4) the defendant acted with malice
or with the "primary purpose other than that of securing an adjudication of the
claim"; and (5) the plaintiff suffered damages. *Perry v. Rein*, 215 Or. App. 113,
125, 168 P.3d 1163 (2007). Under Oregon law, dismissal of the claims must also
"reflect adversely on the merits of the action." *Perry v. Rein*, 215 Or. App. 113,
130 (2007). That is, the charges must be dismissed in a manner that is indicative of
the criminal defendant's innocence of the underlying crime. Of note, in order for
someone aside from a prosecutor who initiates criminal proceedings against
another who is not guilty of the offense charged is liable to him for the harm done
thereby if: (1) the proceedings were initiated without probable cause; *and* (2)
primarily because of a purpose other than that of bringing the offender to justice.
*Shoemaker v. Selnes*, 220 Or. 573 (1960) (Emphasis supplied).

This claim fails for the same reasons as Plaintiffs' federal malicious
prosecution claim under § 1983. In addition, this claim fails for the additional
reason that under Oregon state law, a malicious prosecution plaintiff has to prove
the underlying criminal action was terminated in a manner that indicated the
plaintiff's innocence. As previously noted, the grounds for Plaintiff McGuffin
being granted a new trial did not reflect his innocence of the underlying crime, and

the charges were not dismissed by Paul Frasier based on a belief that he was innocent. Rather, both Judge Sullivan and Paul Frasier rejected McGuffin's claim of innocence and believed that there was sufficient evidence for a jury to convict him of the crime.

*M. Plaintiffs' Fourth Claim for Relief –Civil Conspiracy.*

State law civil conspiracy is not a tort recognized by Oregon courts. Thus, this claim must be dismissed. And, even if it was recognized, it would fail for the same reasons as Plaintiffs' claim for conspiracy under federal law.

*N. Plaintiffs' Fifth Claim for Relief – Negligent Training & Supervision.*

This negligence claim fails because it is barred by the statute of ultimate repose, ORS 112.115(1). Under Oregon case law, the period of ultimate repose runs from the date of the act or omission complained of, regardless of when the damage resulted or when the act or omission was discovered. *See Josephs v. Burns & Bear*, 260 Or. 493, 501-02, 491 P.2d 203 (1971), overruled on other grounds by *Smothers v. Gresham Transfer, Inc.*, 332 Or. 83, 23 P.3d 333 (2001); *Catt v. Dept. of Human Services*, 251 Or. App. 488, 508, 284 P.3d 532 (2012).

The Supreme Court of Oregon recently confirmed the applicability of the statute in this context. In *Marshall v. PricewaterhouseCoopers, LLP,* the parties disputed what types of negligence claims the legislature intended to describe with the phrase "negligent injury to person or property" in ORS 12.115(1). 371 Or. 536, 540, 539 P.3d 766, 769 (2023). The Court explained that the legislature likely intended the terms to mean what they were understood to mean in the legal field at the time the statute was passed in 1967, and further reasoned:

> In 1967, "injury" had an established legal meaning of **"[a]ny wrong or damage done to another, either in his person, rights, reputation, or property."** *Black's Law Dictionary* 924 (4th ed 1951). And the phrase "[i]njuries to person or property" was associated with the broad concept of "civil injury," which was defined as "[i]njuries to

person or property, resulting from a breach of contract, delict, or criminal offense, which may be redressed by means of a civil action." *Id.*; *see also Webster's Third New Int'l Dictionary* 1164 (unabridged ed 2002) (specifying that "injury," when used as a legal term, means "a violation of another's rights for which the law allows an action to recover damages or specific property or both"; the term is "comprehensive," and it includes "an act or result involving an **impairment or destruction of right**, health, **freedom**, soundness, or loss of something of value").

371 Or. 536, 542, 539 P.3d 766, 770 (2023) (Emphasis supplied). As a result, the statute of ultimate repose applied to the purely economic harm alleged by the plaintiffs in *Marshall*. Similarly, the statute clearly applies to the harm to reputation and rights alleged by Plaintiffs in the instant case. As a result, this claim fails as a matter of law and must be dismissed.

*O. Plaintiffs' Sixth Claim for Relief – I.I.E.D.*

A claim for IIED is made up of three elements: "(1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the cause of the plaintiff's severe emotional distress, and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct." *Sheets v. Knight,* 308 Or. 220, 236, 779 P.2d 1000 (1989). Conduct giving rise to the "extraordinary transgression" must be more than merely "rude, boorish, tyrannical, churlish and mean." *Patton v. J.C. Penney Co.,* 301 Or. 117, 124, 719 P.2d 854 (1986), abrogated on other grounds by *McGanty v. Staudenraus,* 321 Or. 532, 901 P.2d 841. Rather, the "distress must be so severe that no reasonable person could be expected to endure it." *Checkley v. Boyd,* 198 Or. App. 110, 131, 107 P.3d 651 (2005) (citing RESTATEMENT (SECOND) OF TORTS, § 46 cmt. i (1965)). Put another way, the conduct must be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Christofferson v. Church of*

*Scientology,* 57 Or. App. 203, 211 n. 7, 644 P.2d 577 (1982), rev. den. 293 Or. 456, 650 P.2d 928, (1982), cert. den. 459 U.S. 1206, 103 S. Ct. 1196, 75 L.Ed.2d 439 (1983) (citing Restatement (Second) of Torts, § 46, comment d (1965)).

This claim is barred by the 2-year statute of limitations and failure to serve timely tort claim notice. Under the Oregon Tort Claims Act, O.R.S. 30.275(9), there is a two-year statute of limitations for tort claims and a 180-day notice provision. An IIED claim accrues when the plaintiff suffers severe emotional distress as a result of the defendant's conduct *Amadi v. ConAgra Foods*, Inc., 881 F.Supp.2d 1227 (2012).

This lawsuit was filed on July 20, 2020. So, any alleged act that took place prior to July 20, 2020, is barred by the statute of limitations; and, each and every instance of injury alleged by the Plaintiffs that occurred before January 2, 2020, is barred for failure to provide notice of the claim. The Complaint does not allege a single wrongful act or omission on behalf of any of the Municipal Defendants within the period allowed by the statute of limitations and tort claim notice requirements. This, of course, makes sense. Plaintiff McGuffin's last interaction with any of the Municipal Defendants was during the summer of 2011. No allegations or evidence exists to the contrary. No Defendant took, or could have taken, any action to intentionally inflict emotional distress on McGuffin after that time. And, of course, it must be noted that the conduct of the Municipal Defendants as supported by the evidence does not come close to reaching the extremity described in *Christofferson*, *supra*. Despite Plaintiffs' rote and hollow allegation that the Defendants' conduct was "extreme and outrageous" is utterly unsupported by the true facts of this case.

As to Plaintiff S.M., this claim fails for all of the same reasons. In addition, here is zero evidence that any of the Defendants took any action, outrageous or

otherwise, with an intent to inflict emotional distress on S.M. The fact that McGuffin even had a child is a fact hardly even acknowledged in the investigation.

*P. Plaintiffs' Seventh Claim for Relief – State Law Spoliation of Evidence.*

In this claim, Plaintiffs allege negligent and/or intentional spoliation of evidence. To the extent this claim relies on allegations of negligent conduct, it is barred by the statute of ultimate repose for the same reasons as Plaintiffs' Fifth Claim for Relief. As to intentional spoliation of evidence, no such tort exists in Oregon law. As a result, this claim fails as a matter of law.

*Q. Plaintiffs' Eighth Claim for Relief – Attorney Fees.*

Plaintiff's Eighth Claim for Relief is improper. Any potential entitlement to attorney fees under 42 U.S.C. § 1988 does not constitute a separate, independent claim for relief. Whether attorney fees can be recovered is contingent on the outcome of the primary action and the discretion of the Court. *See N. Carolina Dep't of Transp. v. Crest St. Cmty. Council, Inc.*, 479 US 6 (1986); 42 U.S.C. § 1988 ("the court, in its discretion, may allow the prevailing party.") As a result, this claim is meritless and should be dismissed.

**IV. Conclusion.**

For all of the foregoing reasons, Defendants are entitled to Summary Judgment and a dismissal of all of the Plaintiffs' claims with prejudice.

DATED:  Tuesday, January 7, 2025.

Respectfully submitted,

By:  /s/ Robert E. Franz, Jr.
      FRANZ & HENDERSON
      **Robert E. Franz, Jr.**
      OSB #730915
      (541) 741-8220
       **Of Attorneys for Municipal Defendants**

/s/ Sarah R. Henderson
FRANZ & HENDERSON
**Sarah R. Henderson**
OSB #153474
(541) 741-8220
 **Of Attorneys for Municipal Defendants**