**Robert E. Franz, Jr.**    OSB #730915
E-Mail:  rfranz@franzlaw.comcastbiz.net
**Sarah R. Henderson**    OSB #153474
E-Mail:  shenderson@franzlaw.comcastbiz.net
Franz & Henderson
P.O. Box 62
Springfield, OR 97477
Telephone:  (541) 741-8220
Attorneys for Mark Dannels, Pat Downing, Kris Karcher, Shelly McInnes,
Raymond McNeely, Kip Oswald, Michael Reeves, Sean Sanborn,
Eric Schwenninger, Chris Webley, Anthony Wetmore, Craig Zanni,
David Zavala, Estate of David E. Hall, City of Coquille, City of Coos Bay,
and Coos County, Oregon

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| Nicholas James McGuffin,<br>as an individual and as guardian<br>*ad litem*, on behalf of S.M., a minor,<br><br>       Plaintiffs,<br>    v. | Case No. 6:20-cv-01163-MK<br>(Lead Case) |
| Mark Dannels, Pat Downing, Susan<br>Hormann, Mary Krings, Kris Karcher,<br>Shelly McInnes, Raymond McNeely,<br>Kip Oswald, Michael Reaves, John<br>Riddle, Sean Sanborn, Eric<br>Schwenninger, Richard Walter,<br>Chris Webley, Anthony Wetmore,<br>Kathy Wilcox, Craig Zanni, David<br>Zavala, Estate of Dave Hall,<br>Vidocq Society, City of Coquille,<br>City of Coos Bay, Coos County,<br>and Oregon State Police,<br><br>       Defendants. | **Declaration of Michael Reaves** |

I, Michael Wayne Reaves, hereby declare under penalty of perjury as follows:

I am currently 73 years of age.  I make this declaration based on my personal knowledge of the facts contained herein.

I am one of the named Defendants in the above-entitled matter.  I retired from the Coquille, Oregon, Police Department in July of 2008.  I was the Chief of Police for the City of Coquille from approximately July 1996 to July 2008.

I graduated from John Carroll High School in 1970.  It is located in Fort Peerce, Florida. In 1972, I obtained an associate's degree in criminal justice from Columbus Junior College.  I then spent the next six years in the United States Air Force before I received an honorable discharge.  I have taken classes at Palm Beach Junior College; at Green River Community College; at Florida State University; and at Southern Oregon University.

I started my law enforcement career in 1979, as a Deputy Sheriff for the St. Lucy County Sheriff's Department, where I worked for 11 years.  I also worked for the Sanford Police Department for three years.  I then became a police officer for the City of Oakridge, Oregon, for three years.  Then, I became the Chief of Police for the City of Coquille.

On Thursday, June 29, 2000, around 10:25 a.m., Cory Courtright, the mother of fifteen-year-old Leah Freeman, came to the Coquille Police Department and reported that her daughter, Leah Freeman, had not returned home the previous evening.  At that time, a Missing Person Report was filed.  (See Exhibit 5021)

Later that day, Ms. Courtright came back to the Police Department to give us more information.  On July 2, 2000, I submitted a Supplemental Report.  (See Exhibit 5022)

After receiving the missing person's report and additional information, on June 29, 2000, myself, Officer David Hall, Officer Randy Ulmer, and Officer

Page 2 of 15 – Declaration of Michael Reaves

Dave Zavala immediately started looking for Leah Freeman, and we started interviewing people and obtaining information as set forth in Exhibit 5022.

On Friday, June 30, 2000, we continued to interview people, obtain information, and search various areas of Coquille as outlined in Exhibit 5022, staring around 7 a.m. Because we learned that Nick McGuffin was with Leah Freeman on the evening of June 28, 2000, we made arrangements to interview Nick McGuffin at 1:30 p.m. that day. His interview was recorded, so a person can hear exactly what Mr. McGuffin reported to us. McGuffin's mother was with him during the interview, and one can hear her speak on occasion. The recorded interview is marked as Exhibit 5037. A transcript of the interview is marked as Exhibit 5038.

At the time of the interview of Nick McGuffin, he was shown a photograph of Leah Freeman that we had obtained from Coquille High School. Mr. McGuffin reacted very strongly at seeing the picture--he became choked up, teary eyed, and had difficulty catching his breath. Based upon my experience in interviewing people, this was an over-reaction by Mr. McGuffin, unless he knew Freeman was already dead, because at this point, we were just trying to find her and there was no evidence of foul play, much less that she was dead and never coming back. Yet Nick McGuffin acted as if she was gone forever. After the interview with McGuffin, the officers of the Police Department continued with our investigation, and I worked until 10 p.m. the rest of the day.

Over the weekend of July 1 and 2, 2000, the investigation continued as outlined in my report. Newspapers were contacted as well as other agencies. The investigation then turned into an endangered missing person investigation because Freeman had not been located. On July 3, 2000, I requested that the FBI help us with the investigation because the FBI at the time was tasked with missing juvenile investigations, and I wanted them involved. The FBI sent four

Page 3 of 15 – Declaration of Michael Reaves

investigators to Coquille to assist in the investigation by providing manpower for searches and witness interviews. We met with the FBI agents the afternoon of July 3, 2000, and the investigation continued. (See Exhibit 5062)

Then, within a week after the initial missing person's report, after Ms. Freeman still had not been located and after discussing the situation with the FBI, I asked the District Attorneys' Office, through Paul Frasier, to assist us with the investigation because I felt we needed more people. Paul Frasier then involved his office and the Coos County Major Crime Team to assist us with the investigation. Thereafter, both Paul Frasier and the Major Crime Team, together with the City of Coquille Police Department worked on the investigation. The Major Crime Team included police officers from every police agency in Coos County.

Paul Frasier then took over a lead role in the investigation. He directed the officers on what he wanted done, and set up a grand jury in order for Frasier and the jurors to interview and obtain the sworn testimony of several witnesses. The grand jury investigation was conducted by Frasier and took place on July 20, 2000, and July 27, 2000. A good outline of the investigation up to that point in time can be found in the affidavits of Officer Hall as contained in Exhibits 5023, 5024, and 5025, and from the supplement report, marked as Exhibit 5062.

The body of Leah Freeman was discovered on August 3, 2000. Once the body was found, Paul Frasier took over the lead in the investigation as we now were dealing with a homicide. From that point forward, Paul Frasier was the person ultimately responsible for the investigation. My involvement then became one of a facilitatory for Paul Frasier.

In his role as the head of the investigation, Paul Frasier had Brent Bartley appear before the Grand Jury on August 17, 2000. Thereafter, no charges were filed by Paul Frasier or the Grand Jury against anyone. I then went back to my

Page 4 of 15 – Declaration of Michael Reaves

normal duties and helped when needed.  I acted as a supervisor when necessary and did not do any further investigation myself.

Over the following years, I had no further significant involvement with Mr. McGuffin or the investigation of the death of Leah Freeman up to the date I retired in July of 2008.  On occasion, Paul Frasier would ask for documents, which we provided.  Paul Frasier was never denied any documents he asked for.  There never was a prosecution of anyone related to the murder of Leah Freeman while I was the Chief of Police for Coquille.  No one was ever arrested for anything dealing with Leah Freeman while I was the Chief of Police for Coquille.  Although, the investigation had been taken over by Paul Frasier, I continued to cooperate with Paul Frasier, the FBI, and the Coos County Major Crime Team.  At no time did I ever request the matter be referred to any grand jury, including the first grand jury; nor did I request the matter be referred to a second grand jury.  And at no time, before or after I left the City of Coquille, did I ask that the case be presented to the District Attorney's Office for the prosecution of anyone.

After I retired, my only involvement with the Leah Freeman matter was when I testified at the Omnibus Hearing on April 14, 2011, before the Coos County Circuit Court, and when I testified at the jury trial of Mr. McGuffin on July 12, 2011.  I was retired at the time of my testimony in both matters, and I was not employed as a police officer by any police department at the time of my testimony.

My testimony at the Omnibus Hearing was about the fact that I was with David Hall when we took the recorded interview of Mr. McGuffin on June 30, 2000, and at that time neither myself nor Mr. Hall made any threats towards Mr. McGuffin, nor did we promise him anything, nor did we coerce him in any way. Further, I confirmed the fact that Mr. McGuffin was free to go at any time during his interview.

Page 5 of 15 – Declaration of Michael Reaves

My testimony at the Jury Trial was about the fact that Cory Courtright filed a missing person's report; that Officer David Hall was assigned to the case; and that we took the recorded interview of Mr. McGuffin on June 30, 2000. I also identified the recording and a transcript of the recording, and I identified the woman present with Mr. McGuffin at the time of his interview was his mother, Kathy McGuffin. I never testified at any grand jury in this matter.

During the time I was Chief of Police for Coquille, during a criminal investigation, we provided copies of all the reports we had to the prosecutor on the case when he or she asked for the reports that we had done. In this case, when Paul Frasier requested copies of the reports that we had done on the Leah Freeman case, copies of those reports were provided to him, since he was the one leading the investigation and making the decisions on who was to be testifying at the grand jury that was supervised by him in July and August of 2000.

At no time did I ever withhold any reports from Paul Frasier or fail to provide to him reports or copies of reports upon his request. Paul Frasier had full access to all of our reports and all evidence in the possession of the Coquille Police Department; and at any time, he could have come to the Coquille Police Department and inspected any evidence or police reports and documents related to the investigation. His office was located in the City of Coquille. I do not know of any reports that he was denied access so that he could review or make copies.

I have never arrested Mr. McGuffin for any crime, violation, or matter relating to Leah Freeman; and I never made any decisions related to the arrest of Nick McGuffin relating to Leah Freeman. Mr. McGuffin was never arrested for any matter dealing with Leah Freeman when I was the Chief of Police of the City of Coquille.

I have never prosecuted Mr. McGuffin for any crime, violation, or matter relating to Leah Freeman; I have never initiated any prosecution of Mr. McGuffin

Page 6 of 15 – Declaration of Michael Reaves

for any crime, violation, or matter relating to Leah Freeman; I have never continued any prosecution of Mr. McGuffin for any crime, violation, or matter relating to Leah Freeman; I have never insisted on the institution or continuation of any criminal proceedings relating to Leah Freeman against Nick McGuffin; and I have never made any decisions relating to the prosecution, initiation, or continuation of the prosecution of Mr. McGuffin for any crime, violation, or matter relating to Leah Freeman.  I played absolutely no role in the criminal prosecution of Mr. McGuffin.  I was not even employed as a police officer in Oregon at the time of the commencement of the prosecution against Mr. McGuffin.  And, while I was the Chief of Police for the City of Coquille, Mr. McGuffin was never prosecuted for any crime, violation, or matter relating to Leah Freeman.

I have never given any false testimony or false information in any matter relating to Leah Freeman or Mr. McGuffin.  I have never tried to have any person give false testimony or false information in any matter relating to Leah Freeman or Mr. McGuffin.

I have never fabricated any evidence in any proceeding, investigation, or prosecution involving Mr. McGuffin and/or Leah Freeman. I have never tried to get any person to fabricate any evidence in any proceeding, investigation, or prosecution involving Mr. McGuffin and/or Leah Freeman.

I have never destroyed any evidence in any proceeding, investigation, or prosecution involving Mr. McGuffin and/or Leah Freeman. I have never tried to get any person to destroy any evidence in any proceeding, investigation, or prosecution involving Mr. McGuffin and/or Leah Freeman.

I never made any attempts to coerce a false confession from anyone, including Mr. McGuffin; I never falsely reported that McGuffin failed a polygraph to anyone; nor did I fabricate the results of the polygraph examination provided to Mr. McGuffin. On July 5, 2000, a polygraph examination of Mr. McGuffin was

Page 7 of 15 – Declaration of Michael Reaves

conducted by Mark Ranger of the Oregon State Police. (Exhibit 5040 at 1) McGuffin agreed to submit to the polygraph examination. (Exhibit 5040 at 2) At no time did I pressure McGuffin to participate in a polygraph examination for any purpose. Mr. McGuffin did not pass the polygraph. (Exhibit 5040 at 4)

After the polygraph was given to Mr. McGuffin, I was told by Mark Ranger that Mr. McGuffin failed the polygraph. Thus, if asked, I would have stated that Mr. McGuffin failed his polygraph examination. Such a statement was true. See Exhibit 5040 at 4.

At no time did I pressure anyone else to participate in any polygraph examination for any purpose, including Brent Bartley. A polygraph examination of Bartley took place on July 5, 2000. I was advised by Mark Ranger that Brent Bartley passed this polygraph examination. From a reading of the report of Ranger it is clear that he agreed to that polygraph examination and voluntarily showed up for the examination. See Exhibit 5057 at 2-4.

As to Bartley's second polygraph examination, which was taken on July 27, 2000, I was not involved in setting up that polygraph nor did I request that the polygraph examination take place. It did not take place at the Coquille Police Department. Thus, I never pressured Bartley in taking a second polygraph. Nevertheless, in looking at the report from Ranger, it is apparent that Brent Bartley had his attorney present throughout the entire polygraph procedure, so it is clear that both Mr. Bartley and his attorney had agreed to the second polygraph examination, and that Mr. Bartley voluntarily showed up for the examination. (Exhibit 5057 at 6) I did nothing in the investigation of the murder of Leah Freeman to dissuade or prohibit Mr. Bartley from testifying and giving evidence about his knowledge of the facts relating to Mr. McGuffin and/or Leah Freeman. None of the information about the polygraph results of McGuffin and the two

polygraphs of Bartley were fabricated or falsely reported to anyone for any purpose as is illustrated by Exhibits 5057 and 5040.

At no time did I fabricate police reports of my interactions or the interactions of anyone else with McGuffin; nor did I suppress, tamper with, or destroy any evidence relating to the murder of Leah Freeman; nor did I suppress evidence of any misconduct by any law enforcement officers on any topic; nor did I destroy a videotape from the US Bank on North Central; nor did I suppress DNA evidence found on Freeman's shoes.

I never fabricated any evidence relating to the criminal case and proceedings involving Nick McGuffin, and I never attempted to fabricate any evidence relating to the criminal case and proceedings involving Nick McGuffin.  I never destroyed any evidence relating to the criminal case and proceedings involving Nick McGuffin, and I never attempted to destroy any evidence relating to the criminal case and proceedings involving Nick McGuffin.  I never tampered with any evidence relating to the criminal case and proceedings involving Nick McGuffin, and I never attempted to tamper with any evidence relating to the criminal case and proceedings involving Nick McGuffin.  I never coerced any witnesses into giving false testimony for or against Nick McGuffin relating to the criminal case and proceedings involving Nick McGuffin; and I never attempted to coerce any witnesses into giving false testimony for or against Nick McGuffin relating to the criminal case and proceedings involving Nick McGuffin.  I never suppressed any evidence relating to the criminal case and proceedings involving Nick McGuffin, and I never attempted to suppress any evidence relating to the criminal case and proceedings involving Nick McGuffin.

At no time did I ever fail to disclose any exculpatory information related to the investigation and/or prosecution of Nick McGuffin to Paul Frasier.  I did not hide, conceal, destroy, withhold, or fail to disclose any exculpatory information or

Page 9 of 15 – Declaration of Michael Reaves

evidence to Paul Frasier, nor did I suppress any exculpatory evidence or information at any time. Paul Frasier had full access to all of the documents, information, reports, notes, and evidence in the custody of the Coquille Police Department to read or copy at any time beginning on June 29, 2000.

Nor did I ever destroy any exculpatory information or evidence related to the investigation and prosecution of Nick McGuffin.  At no time did I ever see any violations of the constitutional rights of Nick McGuffin; thus, there was never a need for me to intervene in order to prevent any constitutional violations of the rights of Nick McGuffin.  And, at no time have I ever participated in any type of a conspiracy against Nick McGuffin for any purpose on any matter.

I was not employed as a police officer in Oregon when Mr. McGuffin was indicted by the Grand Jury of the County of Coos Bay, State of Oregon, in August 2010, as set forth in Exhibit 5058.  I had no involvement in any decision to submit this matter to the Grand Jury and I had no involvement in making the decision of the Grand Jury to return a true bill.  I did not testify at the Grand Jury proceeding.

I never arrested Mr. McGuffin at any time with regards to the warrant issued for his arrest relating to the murder of Leah Freeman; and I have never served any warrants on Mr. McGuffin at any time.  I had no involvement in the decision to issue the arrest warrant for Nicholas McGuffin as set forth in Exhibit 5058 at 5.  The warrant was issued by a circuit court judge for Coos County, and I never appeared before that Judge for the purpose of obtaining a warrant for the arrest of Nicholas McGuffin.

At no time have I ever confined or imprisoned Mr. McGuffin, nor have I ever participated in any confinement or imprisonment of Mr. McGuffin with regards to the Leah Freeman matter.  A no time have I ever seized Mr. McGuffin, nor have I ever participated in any seizure of Mr. McGuffin with regards to the Leah Freeman matter.  I was not employed in Oregon as a police officer when Mr.

Page 10 of 15 – Declaration of Michael Reaves

McGuffin was arrested pursuant to the arrest warrant, and I did not serve the arrest warrant on Mr. McGuffin; nor did I participate in the service of the arrest warrant on Mr. McGuffin.  Mr. McGuffin was commanded to be arrested by a Coos County Circuit Court Judge, not by me.

As to Plaintiff S.M., I have never talked to S.M., and I have never done anything to interfere in the relationship between S.M. and Mr. McGuffin.  I have never taken custody of S.M.  In fact, during the period of time that I was employed as the Chief of Police for the City of Coquille, I did not even know that Mr. McGuffin had a child.  I have never talked to any child of Mr. McGuffin; nor have I ever had any type of contact with any child of Mr. McGuffin.  Further, I have never done anything to interfere with any relationship that Mr. McGuffin had or has with any of his children.

As the Chief of Police for Coquille, I had policy-making authority to make policies for the Police Department relating to police activities.  During my term as the Chief, the officers that worked for the City were trained on the City's policies and procedures.

I have and had personal knowledge of the policies, practices, and customs governing the Coquille Police Department during my employment with the City of Coquille.  When I first got to the City of Coquille, the City had written policies.  I reviewed the policies, and then I made changes to them as I saw fit.  Each officer was provided a copy of those policies.

The City of Coquille then switched to the Lexipol system, giving the officers access to the policies on their computers.  Lexipol is a private company that provides examples of policies to public safety departments throughout the United States.  Each police agency can adopt and/or customize the policies.  Lexipol also provides on-line training to police officers.  The City also had various training manuals that were kept in the squad room for the officers to review and use.

Page 11 of 15 – Declaration of Michael Reaves

When I was the Chief of Police for the City of Coquille there was never a policy, practice or custom of the Coquille Police Department for its police officers and employees performing their duties to exercise a deliberate indifference and/or callous disregard for the rights, safety, and welfare of anyone. It was always the policy, practice, and custom of the Coquille Police Department for its officers and employees to follow the requirements of the laws of the State of Oregon and the requirements of the Constitution of the United States when they are performing their duties for the City of Coquille, and when they were carrying out their responsibilities as police officers.

When I was the Chief of Police for the City of Coquille, there was never a policy, practice or custom of the Coquille Police Department of failing to follow the statutes of the State of Oregon, which prescribe a certain amount of training for police officers employed by police departments in the State of Oregon. In fact, it was the policy, practice, and custom of the Coquille Police Department that all of its police officers complete the amount of training required by the statutes and administrative rules of the State of Oregon, and the requirements of the Department of Public Safety Standards and Training of the State of Oregon. Each of the officers involved in the investigation of the Leah Freeman matter were properly trained and their training complied with the proper standard of care for a police department in the State of Oregon. There was never a policy of inadequate training when I was the Chief of Police for the City of Coquille.

When I was the Chief of Police for the City of Coquille, there was never a policy, practice or custom of the Coquille Police Department of fabricating evidence of any kind for any purpose, or to suppress, tamper with, and/or destroy evidence of any kind for any purpose. In fact, it was the policy, practice, and custom of the Coquille Police Department that all of its police officers were never

to fabricate evidence and/or suppress, tamper with, and/or destroy evidence of any kind for any purpose.

The City of Coquille and myself never encouraged, condoned, or acquiesced in any unconstitutional conduct of the police officers employed by the City, and it was the policy and practice of the City that unconstitutional conduct of its police officers was prohibited and would result in discipline up to and including termination.

Neither the City of Coquille nor myself ever encouraged or acquiesced to unlawful behavior by its officers. To the contrary, the City of Coquille had a policy of reviewing complaints of unlawful behavior made against its police officers through an internal affairs process, and to impose discipline on police officers when the circumstances warrant the imposition of discipline under the City's policies.

During my time as a Police Officer in the State of Oregon including my time with the City of Coquille, I had received excellent training and none of this training was inadequate. While I was the Chief of Police, each officer was trained in accordance with the standards and practices of the State of Oregon.

At no time did I ever agree with anyone to violate the connotational rights of Nick McGuffin for any reason, much less in order to implicate him in the murder of Leah Freeman; and I do not know of any police officer that agreed to violate the constitutional rights of Nick McGuffin. Mr. McGuffin agreed to an interview with me and Officer Hall, as did his mother; and he agreed to his polygraph examination.

As to David Hall, he is no longer living. He was with the City of Coquille as a police officer when I became the Chief. He left the City of Coquille in April of 2002. When he was working on the Freeman case, he did a very good job. He first worked with me when the matter was first reported to us by Ms. Courtright on

the morning of June 29, 2000.  Then, when the FBI was called in, Officer Hall fully cooperated with the FBI, and he fully cooperated with the Coos County Major Crime Team when it became involved with the investigation.  Then once Paul Frasier took over the investigation, David Hall fully cooperated with Paul Frasier and followed the directions of Paul Frasier, including the directions to obtain search warrants and to file affidavits for search warrants as set forth in Exhibits 5023, 5024, 5025.  In fact, it was my understanding that all those affidavits for search warrants were prepared and reviewed by Paul Frasier and/or his staff, and approved by Paul Frasier and/or his staff for legal and factual accuracy, and that is why the documents are on the legal pleading paper of the Office of the District Attorney.  The City of Coquille did not use pleading paper.

The investigation done by myself, Officer Hall, and the other police officers from the City of Coquille was not negligent or reckless.  It was very good.  And this included the time before the FBI became involved, and the time after the FBI became involved; and the time after Paul Frasier took over the investigation.

The allegations made in this lawsuit in the complaints filed in this Court against the City of Coquille and its police officers are false and not true, including each and every allegation made against me.

The allegations made in this lawsuit in the complaints filed in this Court against the City of Coquille and its police officers that the City of Coquille and its officers somehow persuaded witnesses to testify falsely or that there was an attempt to falsely implicate McGuffin can be heard to be untrue just by listening to the recordings of the various witnesses who were interviewed by the City of Coquille Police Officers; and by listening and viewing the video recording of the witnesses who testified at all of the Grand Jury proceedings; and by listening to the trial testimony of the witnesses that testified.  A review of all the proceedings and exhibits will illustrate what a good investigation was conducted by the City of

Page 14 of 15 – Declaration of Michael Reaves

Coquille and its officers in this case.  Further, Mr. McGuffin could have testified at either Grand Jury and/or he could have testified at his own criminal trial to deny any of the statements made by any witness, including any statements made by any police officer, but he did not.  See Exhibits 5059, 5001, 5002, 5003.

PURSUANT TO 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct.

Michael W Reaves
_____
Michael Wayne Reaves

Tuesday, January 7, 2025