**Robert E. Franz, Jr.**   OSB #730915
E-Mail:  rfranz@franzlaw.comcastbiz.net
**Sarah R. Henderson**   OSB #153474
E-Mail:  shenderson@franzlaw.comcastbiz.net
Franz & Henderson
P.O. Box 62
Springfield, OR 97477
Telephone:  (541) 741-8220
Attorneys for Mark Dannels, Pat Downing, Kris Karcher, Shelly McInnes,
Raymond McNeely, Kip Oswald, Michael Reeves, Sean Sanborn, Eric
Schwenninger, Chris Webley, Anthony Wetmore, Craig Zanni, David Zavala, City
of Coquille, City of Coos Bay, and Coos County, Oregon

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| Nicholas James McGuffin,<br>as an individual and as guardian<br>*ad litem*, on behalf of S.M., a minor,<br><br>            Plaintiffs,<br>     v.<br><br>Mark Dannels, Pat Downing, Susan<br>Hormann, Mary Krings, Kris Karcher,<br>Shelly McInnes, Raymond Mcneely,<br>Kip Oswald, Michael Reaves, John<br>Riddle, Sean Sanborn, Eric<br>Schwenninger, Richard Walter,<br>Chris Webley, Anthony Wetmore,<br>Kathy Wilcox, Craig Zanni, David<br>Zavala, Estate of Dave Hall,<br>Vidocq Society, City of Coquille,<br>City of Coos Bay, Coos County,<br>and Oregon State Police,<br><br>            Defendants. | Case No. 6:20-cv-01163-MK<br><br><br><br>**Declaration of Mark Dannels** |

I, Mark Joseph Dannels, hereby declare under penalty of perjury as follows:

I am currently 61 years of age. I make this declaration based on my personal knowledge of the facts contained herein.

I am one of the named Defendants in the above-entitled matter. I was the Chief of Police for the City of Coquille from August of 2008, through May of 2011.

I started my law enforcement career in May of 1984 with the City of Bisbee, Arizona, after serving a tour of duty in the U.S. Army. In January of 1986, I left to join the Cochise County Sheriff's Office in Arizona. I progressed through the ranks to Deputy Commander before retiring in 2008. At that point I accepted the position of Chief of Police for the City of Coquille and moved up to Oregon. Prior to coming to Oregon, I had never heard of Leah Freeman. To the best of my recollection, I first heard of the Leah Freeman case from a community member during a meet and greet at the Coquille Community Center when I was in Coquille for the testing and interview process prior to being hired. I did not make any commitment to "closing" the Freeman case as a condition of my hiring. However, I was aware that there was community desire to give the case a fresh look and I did commit to District Attorney Paul Frasier that I would help facilitate that in coordination with and at the direction of Paul Frasier.

After beginning my tenure as Chief of Police in Coquille, I assembled a cold case team of retired homicide detectives, including Craig Zanni, that had been involved in the original investigation. The team, led by Paul Frasier, began meeting weekly beginning in late 2008.

During the time I was Chief of Police for Coquille, during a criminal investigation, we provided copies of all the reports we generated to the District Attorney's office because they would ultimately be the ones deciding whether to initiate a prosecution. For the Leah Freeman case, because Paul Frasier was the one

Page 2 of 11 – Declaration of Mark Dannels

leading the investigation and making the decisions about if and when to submit the case to grand jury, he had access to the entirety of the case file. One of the main goals of my department at the time was ensuring that Paul Frasier had copies of or access to every piece of paper and item of evidence that we did. One of the main things I directed was to have the entire contents of the case file organized and indexed so that information about any person involved or mentioned could be located in a matter of moments. This organization and indexing work was done by Officer Sanborn, with the assistance of the cold case team, in the months preceding the public reopening of the investigation, and the product became what we called "Trial Notebooks." I also charged Pat Smith, CPS's evidence custodian, with ensuring that all physical evidence was accounted for and made available to the District Attorney's office.

In January of 2010, once we had a handle on the investigation as it stood, we held a press conference to publicly announce that we were reopening the investigation. The hope, at the time, was that individuals who may have information and were not forthcoming with police during the original investigation would, due to the passage of time, being older, many having families of their own, would be more willing to share any information they had. I also hoped to instill confidence in the community that we were committed to trying to solve the case.

Not long after the press conference, I was contacted by a producer from ABC News 20/20, who indicated that they wanted to come to Coquille to film coverage of the investigation. I told the producer that he would have to clear that with Paul Frasier. Paul Frasier subsequently spoke to them and agreed to allow 20/20 to come. I did not have any editorial control over what 20/20 produced, but there was an agreement that 20/20 would not air anything prior to the trial, or without the go-ahead from Paul Frasier. I did not seek out ABC News 20/20 in order to publish information about the case, much less before trial. I simply

Page 3 of 11 – Declaration of Mark Dannels

allowed them access to film, with reasonable limitations, and with the approval of Paul Frasier. My understanding is that the airing of the 20/20 episode "What Happened to Leah Freeman" in 2010 was in direct violation of an agreement with Paul Frasier not to air anything until he gave the go-ahead.

I was interviewed and filmed on several occasions by 20/20. The information I shared was all accurate to the best of my knowledge. I did not intentionally make any false statements or fabricate any evidence. In any event, none of my statements to 20/20 were presented to either the grand jury or the criminal trial jury, as they were not evidence.

At no time did I ever withhold any reports from Paul Frasier or fail to provide to him reports or copies of reports. Paul Frasier had full access to all our reports and all evidence in the possession of the Coquille Police Department; and at any time, he could have come to the Coquille Police Department and inspected any evidence or police reports and documents related to the investigation. His office was located in the City of Coquille, and he participated in numerous meetings of the investigative team at the Coquille Police Department.

I have never prosecuted Mr. McGuffin for any crime, violation, or matter relating to Leah Freeman; I have never initiated any prosecution of Mr. McGuffin for any crime, violation, or matter relating to Leah Freeman; I have never continued any prosecution of Mr. McGuffin for any crime, violation, or matter relating to Leah Freeman; and, I have never insisted on the institution or continuation of any criminal proceedings relating to Leah Freeman against Nick McGuffin. As mentioned above, I agreed to facilitate the reopening of the investigation into the murder of Leah Freeman along with Paul Frasier. I was the public facing "lead" of the investigation for Coquille Police Department because I was the Chief. However, the bulk of the investigatory work was done by the Major Crimes Team, directed by Paul Frasier. The decision to submit the Leah Freeman

Page 4 of 11 – Declaration of Mark Dannels

homicide to grand jury was made by Paul Frasier. The eventual indictment of Mr. McGuffin was based upon a grand jury's returning of a true bill. After the indictment of Mr. McGuffin, my involvement in the case diminished. Paul Frasier asked me to assign him two of my officers to be with him all the way through trial. I assigned Officer McNeely and Officer Webley. From then on out, McNeely and Webley were under the direction of the District Attorney's office full-time. I worked long hours and night shifts, and brought in a part-time officer to ensure patrol shifts were staffed and that Frasier had the manpower he needed to prepare everything for trial.

My last involvement in the case was when I testified at the Omnibus hearing on April 14, 2011, before the Coos County Circuit Court. My testimony at the Omnibus Hearing was about the contacts I had with Mr. McGuffin and his parents in the lead up to publicly reopening the Freeman investigation. I explained that my visits to Bruce and Kathy McGuffin were at their request, and that Nick McGuffin showed up during one of them and volunteered information without being asked any questions. I also clarified that my visit with Pat Smith to Nick McGuffin's residence was simply a courtesy to notify him that we were reopening the investigation, and that we were not there to question him about the case. Prior to making this visit, I cleared it with District Attorney Paul Frasier because I knew Nick McGuffin was represented by an attorney.

I have never given any false testimony or false information in any matter relating to Leah Freeman or Mr. McGuffin. I have never tried to have any person give false testimony or false information in any matter relating to Leah Freeman or Mr. McGuffin. I testified before the 2010 grand jury, and my testimony was truthful. I did not testify at Mr. McGuffin's criminal trial in 2011. Just weeks after the Omnibus hearing, I ended my term as Chief of Police for the City of Coquille and moved back to Arizona to run for Sheriff of Cochise County.

Page 5 of 11 – Declaration of Mark Dannels

I have never fabricated any evidence in any proceeding, investigation, or prosecution involving Mr. McGuffin and/or Leah Freeman. I have never tried to get any person to fabricate any evidence in any proceeding, investigation, or prosecution involving Mr. McGuffin and/or Leah Freeman.

I have never destroyed any evidence in any proceeding, investigation, or prosecution involving Mr. McGuffin and/or Leah Freeman. I have never tried to get any person to destroy any evidence in any proceeding, investigation, or prosecution involving Mr. McGuffin and/or Leah Freeman.

I never made any attempts to coerce a false confession from anyone, including Mr. McGuffin; I never falsely reported that McGuffin failed a polygraph to anyone; nor did I fabricate the results of polygraph examination provided to Mr. McGuffin.

At no time did I pressure anyone to participate in any polygraph examinations for any purpose, including Kristin Steinhoff. I was present at the Oregon State Police office in Coos Bay when a polygraph examination of Kristin Steinhoff took place on June 17, 2010. I was advised by Detective Mike Tabor that Steinhoff failed this polygraph examination. From a reading of Detective Tabor's report, it is clear that she agreed to that Polygraph Examination and voluntarily showed up for the examination. See Exhibit 5061. Following the examination, I spoke with Kristin about the results and encouraged her to be forthcoming about anything she knew. At no point did I suggest or encourage her to lie or provide false testimony. My sole goal, having learned that she showed deception in the polygraph examination, was to find out the truth. As I recall, as a result of my questioning Steinhoff after the polygraph, she did not tell police anything she had not already shared in previous interviews.

At no time did I fabricate police reports of my interactions or the interactions of anyone else with McGuffin; nor did I suppress, tamper with, or

Page 6 of 11 – Declaration of Mark Dannels

destroy any evidence relating to the murder of Leah Freeman; nor did I suppress evidence of any misconduct by any law enforcement officers on any topic; nor did I suppress DNA evidence found on Freeman's shoes.

I never fabricated any evidence relating to the criminal case and proceedings involving Nick McGuffin, and I never attempted to fabricate any evidence relating to the criminal case and proceedings involving Nick McGuffin. I never destroyed any evidence relating to the criminal case and proceedings involving Nick McGuffin, and I never attempted to destroy any evidence relating to the criminal case and proceedings involving Nick McGuffin. I never tampered with any evidence relating to the criminal case and proceedings involving Nick McGuffin, and I never attempted to tamper with any evidence relating to the criminal case and proceedings involving Nick McGuffin.  I never coerced any witnesses into giving false testimony for or against Nick McGuffin relating to the criminal case and proceedings involving Nick McGuffin; and I never attempted to coerce any witnesses into giving false testimony for or against Nick McGuffin relating to the criminal case and proceedings involving Nick McGuffin. I never suppressed any evidence relating to the criminal case and proceedings involving Nick McGuffin, and I never attempted to suppress any evidence relating to the criminal case and proceedings involving Nick McGuffin.

At no time did I ever fail to disclose any exculpatory information related to the investigation and/or prosecution of Nick McGuffin to Paul Frasier. I did not hide, conceal, destroy, withhold, or fail to disclose any exculpatory information or evidence to Paul Frasier, nor did I suppress any exculpatory evidence or information at any time. I never destroyed any exculpatory information or evidence related to the investigation and prosecution of Nick McGuffin. At no time did I ever witness any violations of the constitutional rights of Nick McGuffin; thus, there was never either a need or an opportunity for me to intervene in order to

Page 7 of 11 – Declaration of Mark Dannels

prevent any constitutional violations of the rights of Nick McGuffin. And, at no time have I ever participated in any type of a conspiracy against Nick McGuffin for any purpose on any matter.

I have never arrested Mr. McGuffin for any crime, violation, or matter relating to Leah Freeman. Mr. McGuffin was arrested only after an arrest warrant was issued pursuant to the grand jury indictment. I was not involved in securing the warrant. The warrant was issued by a circuit court judge for Coos County, and I never appeared before that judge for the purpose of obtaining a warrant for the arrest of Nicholas McGuffin.

At no time have I ever confined or imprisoned Mr. McGuffin, nor have I ever participated in any confinement or imprisonment of Mr. McGuffin with regards to the Leah Freeman matter. A no time have I ever seized Mr. McGuffin, nor have I ever participated in any seizure of Mr. McGuffin with regards to the Leah Freeman matter. Mr. McGuffin was commanded to be arrested by a Coos County Circuit Court judge, not by me.

As to Plaintiff S.M., I have never talked to S.M., and I have never done anything to interfere in the relationship between S.M. and Mr. McGuffin. I have never taken custody of S.M. Further, I have never done anything to interfere with any relationship that Mr. McGuffin had or has with any of his children.

As the Chief of Police for Coquille, I had policy-making authority to make policies for the Police Department relating to police activities. During my term as the Chief, the officers that worked for the City were trained on the City's policies and procedures.

I have and had personal knowledge of the policies, practices, and customs governing the Coquille Police Department during my employment with the City of Coquille. When I first got to the City of Coquille, the City had already begun using the Lexipol system, which allows the officers access to the policies on their

Page 8 of 11 – Declaration of Mark Dannels

computers. Lexipol is a private company that provides examples of policies to public safety departments throughout the United States. Each police agency can adopt and/or customize the policies. Lexipol also provides on-line training to police officers. The City also had various training manuals that were kept in the squad room for the officers to review and use.

When I was the Chief of Police for the City of Coquille there was never a policy, practice or custom of the Coquille Police Department for its police officers and employees performing their duties to exercise a deliberate indifference and/or callous disregard for the rights, safety, and welfare of anyone. It was always the policy, practice, and custom of the Coquille Police Department for its officers and employees to follow the requirements of the laws of the State of Oregon and the requirements of the Constitution of the United States when they are performing their duties for the City of Coquille, and when they were carrying out their responsibilities as police officers.

When I was the Chief of Police for the City of Coquille, there was never a policy, practice or custom of the Coquille Police Department of failing to follow the statutes of the State of Oregon, which prescribe a certain amount of training for police officers employed by police departments in the State of Oregon. In fact, it was the policy, practice, and custom of the Coquille Police Department that all its police officers complete the amount of training required by the statutes and administrative rules of the State of Oregon, and the requirements of the Department of Public Safety Standards and Training of the State of Oregon. Each of the officers involved in the investigation of the Leah Freeman matter were properly trained and their training complied with the proper standard of care for a police department in the State of Oregon. There was never a policy of inadequate training when I was the Chief of Police for the City of Coquille.

Page 9 of 11 – Declaration of Mark Dannels

When I was the Chief of Police for the City of Coquille, there was never a policy, practice or custom of the Coquille Police Department of fabricating evidence of any kind for any purpose, or to suppress, tamper with, and/or destroy evidence of any kind for any purpose. In fact, it was the policy, practice, and custom of the Coquille Police Department that all its police officers were never to fabricate evidence and/or suppress, tamper with, and/or destroy evidence of any kind for any purpose.

The City of Coquille and myself never encouraged, condoned, or acquiesced in any unconstitutional conduct of the police officers employed by the City, and it was the policy and practice of the City that unconstitutional conduct of its police officers was prohibited and would result in discipline up to and including termination.

Neither the City of Coquille nor myself ever encouraged or acquiesced to unlawful behavior by its officers. To the contrary, the City of Coquille had a policy of reviewing complaints of unlawful behavior made against its police officers through an internal affairs process, and to impose discipline on police officers when the circumstances warrant the imposition of discipline under the City's policies.

During my time as a Police Officer in the State of Oregon including my time with the City of Coquille, I had received excellent training and none of this training was inadequate. While I was the Chief of Police, each officer was trained in accordance with the standards and practices of the State of Oregon.

At no time did I ever agree with anyone to violate the constitutional rights of Nick McGuffin for any reason, much less to implicate him in the murder of Leah Freeman; and I do not know of any police officer that agreed to violate the constitutional rights of Nick McGuffin. As mentioned above, my contacts with Mr. McGuffin were either the result of him approaching me and offering information

Page 10 of 11 – Declaration of Mark Dannels

without being asked, or simply courtesy notifications about the status of the investigation into Leah Freeman's death. Every voluntary interaction I had with Mr. McGuffin was cleared with Paul Frasier, and at no point did I question Mr. McGuffin without his attorney present.

The allegations made in this lawsuit in the complaints filed in this Court against the City of Coquille and its police officers are false and not true, including each and every allegation made against me.

The allegations made in this lawsuit in the complaints filed in this Court against the City of Coquille and its police officers that the City of Coquille and its officers somehow persuaded witnesses to testify falsify or that there was an attempt to falsely implicate McGuffin can be heard to be untrue just by listening to the recordings of the various witnesses who were interviewed by the City of Coquille Police Officers; and by listening and viewing the video recording of the witnesses who testified at all of the grand jury proceedings; and by listening to the trial testimony of the witnesses that testified. A review of all the proceedings and exhibits will illustrate the thorough investigation was conducted by the City of Coquille and its officers in this case. Further, Mr. McGuffin could have testified at his own criminal trial to deny any of the statements made by any witness, including any statements made by any police officer, but he did not. See Exhibits 5059, 5001, 5002, 5003.

PURSUANT TO 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct.

/s/ Mark J. Dannels                                    January 7, 2025
Mark Joseph Dannels                                 Date

Page 11 of 11 – Declaration of Mark Dannels