**Robert E. Franz, Jr.**     OSB #730915
E-Mail:  rfranz@franzlaw.comcastbiz.net
**Sarah R. Henderson**     OSB #153474
E-Mail:  shenderson@franzlaw.comcastbiz.net
FRANZ & HENDERSON
P.O. Box 62
Springfield, OR 97477
Telephone:  (541) 741-8220
Attorneys for Mark Dannels, Pat Downing, Kris Karcher, Shelly McInnes, Raymond McNeely, Kip Oswald, Michael Reeves, Sean Sanborn, Eric Schwenninger, Chris Webley, Anthony Wetmore, Craig Zanni, David Zavala, City of Coquille, City of Coos Bay, and Coos County, Oregon

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| Nicholas James McGuffin, as an individual and as guardian *ad litem*, on behalf of S.M., a minor, | Case No. 6:20-cv-01163-MK |
| Plaintiffs, | |
| v. | |
| Mark Dannels, Pat Downing, Susan Hormann, Mary Krings, Kris Karcher, Shelly Mcinnes, Raymond Mcneely, Kip Oswald, Michael Reaves, John Riddle, Sean Sanborn, Eric Schwenninger, Richard Walter, Chris Webley, Anthony Wetmore, Kathy Wilcox, Craig Zanni, David Zavala, Estate of Dave Hall, Vidocq Society, City of Coquille, City of Coos Bay, Coos County, and Oregon State Police, | **Exhibit 5001 – 2011 Criminal Trial Transcript** |
| Defendants. | |

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

| | |
|---|---|
| STATE OF OREGON, )<br>)<br>         Plaintiff, )<br>)<br>)<br>    vs. )<br>)<br> NICHOLAS JAMES McGUFFIN, )<br>)<br>         Defendant. )<br>_____ ) | CASE NO. 10CR0782<br><br>PLEA HEARING |

TRANSCRIPT OF PROCEEDINGS

Volume 1, Pages 2-7

BE IT REMEMBERED That, the above-entitled cause came on regularly for hearing beginning at 1:03 p.m., Tuesday, August 24, 2010 in the Circuit Courtroom of the Coos County Courthouse in the City of Coquille, County of Coos, State of Oregon, before the Honorable Michael J. Gillespie.

APPEARANCES

R. Paul Frasier, District Attorney for Coos County, representing the Plaintiff.

Shaun McCrea, Attorney at Law, representing the Defendant.

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 1

index    i

INDEX OF PROCEEDINGS

Volume 1, Pages 2-182

**(Please refer to index li for explanation of Page Numbering.)**

PLEA HEARING, August 24, 2010                                    2

Motions Due September 24, 2010                                  4

Status Hearing Set for October 11, 2010                        5


PRETRIAL HEARING, October 14, 2010                             8

Motions Due December 15, 2011                                  8

Omnibus Hearing Set for April 14th and 15th of 2011          8

Jury Trial Set for May 10th through 20th of 2011              8


OMNIBUS HEARING, April 14, 2011                                10

Motion for Change of Venue Withdrawn by Defendant             11

Motion to Admit Statements by Plaintiff                       11

Motion to Exclude Witnesses by Defendant                      12

    Motion Granted by the Court                               12


Plaintiff's Witnesses:

    Danny P. Lee                                               12

        Direct Examination by Mr. Frasier                     13

        Cross Examination by Ms. McCrea                       15

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 2

index   ii

INDEX (Continued)

Volume 1, Pages 2-182 (Continued)

OMNIBUS HEARING, April 14, 2011 (Continued)

Plaintiff's Witnesses (Continued):

David Hall                                                16

    Direct Examination by Mr. Frasier                     17

    Cross Examination by Ms. McCrea                        24

Michael W. Reaves                                         31

    Direct Examination by Mr. Frasier                     32

    Cross Examination by Ms. McCrea                        33

Mark Ranger                                               34

    Direct Examination by Mr. Frasier                     35

    Cross Examination by Ms. McCrea                        40

    Redirect Examination by Mr. Frasier                   48

Everett "Buddy" Young                                     49

    Direct Examination by Mr. Frasier                     49

    Cross Examination by Ms. McCrea                        58

Dean Perske                                               66

    Direct Examination by Mr. Frasier                     66

    Cross Examination by Ms. McCrea                        76

Craig Zanni                                               88

    Direct Examination by Mr. Frasier                     88

    Cross Examination by Ms. McCrea                        91

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 3

index   iii


INDEX (Continued)

Volume 1, Pages 2-182 (Continued)

OMNIBUS HEARING, April 14, 2011 (Continued)

Plaintiff's Witnesses (Continued):

Mark Joseph Dannels ........................................ 91

    Direct Examination by Mr. Frasier ........ 92

    Cross Examination by Ms. McCrea .......... 97

    Redirect Examination by Mr. Frasier ..... 106

    Recross Examination by Ms. McCrea ....... 107

David Zavala .............................................. 108

    Direct Examination by Mr. Frasier ........ 108

    Cross Examination by Ms. McCrea .......... 113


Defendant's Motion to Exclude ............................. 116

    Argument on Behalf of Defendant .......... 116

    Motion Denied by the Court ............... 118


Plaintiff's Motion to Admit Statements (Continued) ....... 123

Plaintiff's Witnesses:

Sherry Ann Mitchell ....................................... 123

    Direct Examination by Mr. Frasier ........ 124

    Cross Examination by Ms. McCrea .......... 131

Plaintiff Rests On Motion to Admit Statements ............ 142

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 4

index    iv

INDEX (Continued)

Volume 1, Pages 2-182 (Continued)

OMNIBUS HEARING, April 14, 2011 (Continued)

Plaintiff's Motion to Admit Statements (Continued)

    Argument on Behalf of Defendant                      145


Plaintiff's Motion in Limine 2                             146

    Argument on Behalf of Defendant                      146

    Argument on Behalf of Plaintiff                      149

    Motion Denied by the Court                           151


Plaintiff's Request for a Jury View                       152

    Argument on Behalf of Defendant Against              152

    Argument on Behalf of Plaintiff                      154

    Jury View Granted by the Court                       155


Plaintiff's Motion for Discovery                          155

    Argument on Behalf of Defendant                      155

    Discovery Deadline April 20, 2011                    156


Defendant's Request for Telephonic Witnesses             157

    Request Granted by the Court                         158


Memos Due April 18, 2011                                  158

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 5

index   v

INDEX (Continued)

Volume 1, Pages 2-182 (Continued)

OMNIBUS HEARING, April 14, 2011 (Continued)

Responses Due April 20, 2011                                   159


Motions, Objections, Rulings of the Court

    10, 11, 12, 116, 118, 143, 148, 153.



PRETRIAL HEARING, May 5, 2011                                  165

Defendant's Request for Postponement                           165

Jury Trial Reset for July 5th Through 22nd                     165

Defendant Agrees to Possibility of Mr. McCrea                  167
    Not Being Available


Plaintiff's Motion for Discovery                               170

    Discovery Due by May 27th, 2011                           171



PRETRIAL HEARING, June 21, 2011                                174

Plaintiff's Motion for Discovery                               174

    Argument on Behalf of Plaintiff                           174

    Argument on Behalf of Defendant                           175

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 6

index   vi

INDEX (Continued)

Volume 2, Pages D1 2 to D1 32


JURY TRIAL, DAY 1, July 5, 2011                        D1 2

PRETRIAL MATTERS, July 5, 2011                         D1 2

Plaintiff's Motion to Admit Statements                D1 3

      Plaintiff Withdraws Motion for the Present Time  D1 3

Defendant's Motion in Limine                          D1 3

      Court Discusses Lay Opinion                     D1 4

      Court Discusses Testimony of Different Witnesses  D1 6


JURY TRIAL, DAY 1, July 5, 2011                       D1 16

Introduction to the Case                             D1 16

Voir Dire Begins, but Not Transcribed                D1 28

                  (END OF DAY ONE)


        Volume 2, Pages D2 2-D2 37

JURY TRIAL, DAY 2, July 6, 2011                       D2 2

Defendant Requests No Reaction Instruction            D2 8

      Request Granted by the Court                    D2 9


Plaintiff's Motion to Exclude Witnesses               D2 9

      Motion Granted by the Court                     D2 9


Discussion of Unanimous Verdict versus 11-1           D2 9

      Verdict Will Need to be Unanimous               D2 10

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 7

index   vii

INDEX (Continued)

Volume 2, Pages D2 2 to D2 37 (Continued)

JURY TRIAL, DAY 2, July 6, 2011 (Continued)

Request for No Reaction Instruction Withdrawn        D2 14

Jury of Fourteen Sworn                              D2 23

Precautionary Instructions                         D2 24

Jury View                                          D2 35

(END OF DAY TWO)

Volume 3, Pages D3 2 to D3 111

JURY TRIAL, DAY 3, July 7, 2011                     D3 2

Opening Statement on Behalf of Plaintiff            D3 3

Opening Statement on Behalf of Defendant            D3 18

Plaintiff's Witnesses:

    Raymond Lee McNeely                             D3 32

        Direct Examination by Mr. Frasier          D3 32

    Cross Examination by Mr. McCrea                 D3 34

    Jeff Walker                                     D3 37

        Direct Examination by Mr. Frasier          D3 37

        Cross Examination by Ms. McCrea            D3 39

    Cory Courtright                                 D3 41

        Direct Examination by Mr. Frasier          D3 41

        Cross Examination by Ms. McCrea            D3 70

        Redirect Examination by Mr. Frasier        D3 83

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 8

index   viii

INDEX (Continued)

Volume 3, Pages D3 2 to D3 111 (Continued

JURY TRIAL, DAY 3, July 7, 2011 (Continued)

Defendant's Request to Read Exhibit 215          D3 84

    Request Granted by the Court                 D3 84


Plaintiff's Witnesses (Continued):

    Cynthia Ann Jones                             D3 87

        Direct Examination by Ms. Soublet         D3 88

        Cross Examination by Ms. McCrea           D3 91

    Matthew Phillip Carney                        D3 95

        Direct Examination by Mr. Frasier         D3 95

        Cross Examination by Mr. McCrea           D3 99

        Redirect Examination by Mr. Frasier       D3 109


Volume 4, Pages D3 112-D3 222

    Denise Bertrand                               D3 112

        Direct Examination by Ms. Soublet         D3 112

        Cross Examination by Ms. McCrea           D3 133

        Redirect Examination by Ms. Soublet       D3 141

    Stacy Lyons Crutchfield                       D3 141

        Direct Examination by Ms. Soublet         D3 142

        Cross Examination by Ms. McCrea           D3 147

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 9

index   ix

INDEX (Continued)

Volume 4, Pages D3 112 to D3 222 (Continued)

JURY TRIAL, DAY 3, July 7, 2011 (Continued)

Defendant's Motion to Dismiss Witness                 D3 149

    Court Request Foundation From Plaintiff          D3 150

    Plaintiff's Witness (Out of the Presence of the Jury):

        Donna Dennis                                 D3 150

            Direct Examination by Ms. Soublet        D3 151

    Court Rules Lack of Foundation                   D3 153

    Argument on Behalf of Plaintiff                  D3 154

    Court Grants Motion to Dismiss Witness           D3 154

Plaintiff's Witnesses (Continued):

    Craig Zanni                                      D3 155

        Direct Examination by Mr. Fraiser            D3 155

        Cross Examination by Mr. McCrea              D3 160

    Anthony S. Wetmore                               D3 161

        Direct Examination by Ms. Soublet            D3 162

        Cross Examination by Ms. McCrea              D3 169

    David Leo Main                                   D3 171

        Direct Examination by Mr. Frasier            D3 171

        Cross Examination by Mr. McCrea              D3 175

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 10

index   x

INDEX (Continued)

Volume 4, Pages D3 112 to D3 222 (Continued)

JURY TRIAL, DAY 3, July 7, 2011 (Continued)

Plaintiff's Witnesses:

| | |
|---|---|
| Adam J. Shinar Brewer | D3 176 |
| Direct Examination by Mr. Frasier | D3 177 |
| Cross Examination by Ms. McCrea | D3 180 |
| Redirect Examination by Mr. Frasier | D3 187 |
| Patrick Dexter Smith | D3 188 |
| Direct Examination by Ms. Soublet | D3 188 |
| Cross Examination by Mr. McCrea | D3 216 |

(END OF DAY THREE)

Volume 5, Pages D4 2 to D4 168

| | |
|---|---|
| JURY TRIAL, DAY FOUR, July 11, 2011 | D4 2 |

Plaintiff's Witnesses:

| | |
|---|---|
| Austin Fisher | D4 2 |
| Direct Examination by Mr. Frasier | D4 2 |
| Cross Examination by Ms. McCrea | D4 5 |
| Redirect Examination by Mr. Frasier | D4 8 |
| Brent Bartley | D4 8 |
| Direct Examination by Ms. Soublet | D4 9 |
| Cross Examination by Ms. McCrea | D4 21 |
| Redirect Examination by Ms. Soublet | D4 33 |

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 11

index   xi

INDEX (Continued)

Volume 5, Pages D4 2 to D4 168 (Continued)

JURY TRIAL, DAY 4, July 11, 2011 (Continued)

Plaintiff's Witnesses:

Melissa Smith                                              D4 34

    Direct Examination by Ms. Soublet              D4 34

    Cross Examination by Mr. McCrea                D4 42

    Redirect Examination by Ms. Soublet            D4 52

Sherry Mitchell                                           D4 53

    Direct Examination by Mr. Frasier              D4 54

    Cross Examination by Ms. McCrea                D4 77

    Redirect Examination by Mr. Frasier            D4 86

Margaret (Peggy) Mitchell                                 D4 87

    Direct Examination by Mr. Frasier              D4 88

    Cross Examination by Ms. McCrea                D4 94

    Direct Examination, Cont'd by Mr. Frasier      D4 97

Corey Bryant                                              D4 98

    Direct Examination by Mr. Frasier              D4 98

    Cross Examination by Mr. McCrea                D4 103

    Redirect Examination by Mr. Frasier            D4 108

Joshua Emler                                              D4 109

    Direct Examination by Ms. Soublet              D4 109

    Cross Examination by Mr. McCrea                D4 114

    Redirect Examination by Ms. Soublet            D4 117

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 12

index   xii

## INDEX (Continued)

### Volume 5, Pages D4 2 to D4 168 (Continued)

JURY TRIAL, DAY 4, July 11, 2011 (Continued)

Plaintiff's Witnesses:

| | |
|---|---|
| Aaron West | D4 119 |
|    Direct Examination by Ms. Soublet | D4 119 |
|    Cross Examination by Mr. McCrea | D4 125 |
|    Redirect Examination by Ms. Soublet | D4 128 |
| John Lindegren | D4 130 |
|    Direct Examination by Mr. Frasier | D4 130 |
|    Cross Examination by Ms. McCrea | D4 136 |
| Ashley Patton | D4 142 |
|    Direct Examination by Ms. Soublet | D4 143 |
|    Cross Examination by Ms. McCrea | D4 147 |
| Mark Kirn | D4 150 |
|    Direct Examination by Mr. Frasier | D4 150 |
|    Cross Examination by Ms. McCrea | D4 155 |
| Mike McAdams | D4 159 |
|    Direct Examination by Mr. Frasier | D4 159 |
|    Cross Examination by Ms. McCrea | D4 165 |

### Volume 6, Pages 169-261

| | |
|---|---|
| Heidi Crook | D4 169 |
|    Direct Examination by Ms. Soublet | D4 169 |
|    Cross Examination by Ms. McCrea | D4 172 |

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 13

index   x

INDEX (Continued)

Volume 6, Pages D4 169 to D4 261 (Continued)

JURY TRIAL, DAY 4, July 11, 2011 (Continued)

Plaintiff's Witnesses:

Heather Reid                                          D4 174
    Direct Examination by Ms. Soublet            D4 174
    Cross Examination by Ms. McCrea              D4 181
Ray McNeely                                          D4 184
    Direct Examination by Mr. Frasier            D4 185
    Cross Examination by Mr. McCrea              D4 189
Raymond Lewis                                        D4 198
    Direct Examination by Mr. Frasier            D4 199
    Cross Examination by Ms. McCrea              D4 204
    Redirect Examination by Mr. Frasier          D4 224
Alicia Hyatt                                         D4 226
    Direct Examination by Mr. Frasier            D4 227
    Cross Examination by Mr. McCrea              D4 233
Thomas Bounds                                        D4 241
    Direct Examination by Ms. Soublet            D4 241
    Cross Examination by Ms. McCrea              D4 245
Dan Lee                                              D4 248
    Direct Examination by Mr. Frasier            D4 248
    Cross Examination by Ms. McCrea              D4 253
    Redirect Examination by Mr. Frasier          D4 259

(END OF DAY FOUR)

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 14

index   xiv

INDEX (Continued)Volume 7, Pages D5 2 - D5 137


JURY TRIAL, DAY 5, July 12, 2011                          D5 2

Motion by Defendant for Co-Counsel Objections            D5 2

Court's Ruling                                           D5 6

Plaintiff's Witnesses, Continued:

     Brett Mauro                                         D5 7

          Direct Examination by Mr. Frasier             D5 7

          Cross Examination by Ms. McCrea               D5 12

     Kristen Steinhoff-Ramsey                           D5 18

          Direct Examination by Ms. Soublet             D5 18

          Cross Examination by Ms. McCrea               D5 29

          Redirect Examination by Ms. Soublet           D5 45

     Tina Mims                                           D5 47

          Direct Examination by Mr. Frasier             D5 48

          Cross Examination by Ms. McCrea               D5 51

          Redirect Examination by Mr. Frasier           D5 54

     Scott Hamilton                                      D5 55

          Direct Examination by Mr. Frasier             D5 55

          Cross Examination by Mr. McCrea               D5 63

Motion by Defendant that Grand Jury Tape be
     Offered for Impeachment                            D5 98

     Motion Denied by the Court                          D5 99

          Cross Examination, Cont'd by Mr. McCrea        D5 99


Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

index   xv

Exhibit 5001 at 15

INDEX (Continued)

Volume 7, Pages D5 2 - D5 137 (Continued)

JURY TRIAL, DAY 5, July 12, 2011 (Continued)

    David Zavala                                          D5 107

        Direct Examination by Mr. Frasier          D5 107

        Cross Examination by Ms. McCrea            D5 114

Defendant's Witness (Out of order):

    David Zavala                                          D5 120

        Direct Examination by Ms. McCrea           D5 120

        Cross Examination by Mr. Frasier           D5 121

        Redirect Examination by Ms. McCrea         D5 122

Plaintiff's Witnesses, Continued:

    Tony Messerle                                        D5 125

        Direct Examination by Mr. Frasier          D5 125

        Cross Examination by Mr. McCrea            D5 132

    Kip Oswald                                           D5 137

       Volume 8, Pages D5 138-D5 280

        Direct Examination by Mr. Frasier          D5 138

        Cross Examination by Mr. McCrea            D5 147

        Redirect Examination by Mr. Frasier        D5 157

    Randy Ulmer                                          D5 159

        Direct Examination by Mr. Frasier          D5 159

        Cross Examination by Ms. McCrea            D5 162

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

index    xvi

Exhibit 5001 at 16

INDEX (Continued)

Volume 8, Pages D5 138-D5 280 (Continued)

JURY TRIAL, DAY 5, July 12, 2011 (Continued)

| | |
|---|---|
| Jennifer Lee Storts | D5 164 |
| Direct Examination by Ms. Soublet | D5 165 |
| Cross Examination by Mr. McCrea | D5 176 |
| Redirect Examination by Ms. Soublet | D5 182 |
| Zack Elderkin | D5 182 |
| Direct Examination by Ms. Soublet | D5 183 |
| Cross Examination by Ms. McCrea | D5 187 |
| Michael Reaves | D5 189 |
| Direct Examination by Mr. Frasier | D5 190 |
| Cross Examination by Ms. McCrea | D5 198 |
| David Hall | D5 200 |
| Direct Examination by Mr. Frasier | D5 200 |
| Cross Examination by Mr. McCrea | D5 220 |
| Mark Ranger | D5 227 |
| Direct Examination by Mr. Frasier | D5 227 |
| Cross Examination by Mr. McCrea | D5 230 |
| Dean Perske | D5 232 |
| Direct Examination by Ms. Soublet | D5 232 |
| Cross Examination by Mr. McCrea | D5 241 |
| Redirect Examination by Ms. Soublet | D5 251 |

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

index    xvii

Exhibit 5001 at 17

INDEX (Continued)

Volume 8, Pages D5 138-D5 280 (Continued)


JURY TRIAL, DAY 5, July 12, 2011 (Continued)

    Everett John Young                                    D5 251

        Direct Examination by Ms. Soublet          D5 252

        Cross Examination by Ms. McCrea            D5 257

    Juliana Curran                                        D5 266

        Direct Examination by Mr. Frasier          D5 267

        Cross Examination by Ms. McCrea            D5 270

        Redirect examination by Mr. Frasier        D5 273

Plaintiff Witness Outside the Presence of the Jury:

    Christy Diane Cagley-Young                             D5 274

        Direct Examination by Mr. Frasier          D5 275

        Cross Examination by Ms. McCrea            D5 277

        Clarifying Examination by the Court        D5 279

(END OF DAY FIVE)



Volume 9, Pages D6 2-D6 112

JURY TRIAL, DAY 6, July 13, 2011                          D6 2

Motion by Defendant to Exclude Witness                    D6 2

Motion Denied by the Court                                D6 11

Plaintiff's Witnesses:

    Scott Hamilton                                        D6 16

        Excused as Witness                         D6 17

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 18

INDEX (Continued)

Volume 9, Pages D6 2-D6 112 (Continued)

JURY TRIAL, DAY 6, July 13, 2011 (Continued)

 Michael Dennis           D6 19

   Direct Examination by Ms. Soublet  D6 19

   Cross Examination by Ms. McCrea  D6 23

 Donna Dennis            D6 25

   Direct Examination by Ms. Soublet  D6 25

   Cross Examination by Mr. McCrea  D6 28

   Redirect Examination by Ms. Soublet  D6 30

 Kimberly Pugmire         D6 30

   Direct Examination by Mr. Frasier  D6 31

   Cross Examination by Ms. McCrea  D6 35

   Redirect examination by Mr. Frasier  D6 37

 Megan Rae Davidson        D6 38

   Direct Examination by Ms. Soublet  D6 38

   Cross Examination by Ms. McCrea  D6 45

   Redirect Examination by Ms. Soublet  D6 50


Defendant's Witness (Out of order):

 Megan Rae Davidson        D6 52

   Direct Examination by Ms. McCrea  D6 52

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

index   xix

Exhibit 5001 at 19

INDEX (Continued)

Volume 9, Pages D6 2-D6 112 (Continued)

JURY TRIAL, DAY 6, July 13, 2011 (Continued)

Plaintiff's Witnesses, Continued:

Christy Diane Young (Cagley)                       D6 53

    Direct Examination by Mr. Frasier            D6 54

    Cross Examination by Ms. McCrea             D6 57

    Redirect Examination by Mr. Frasier         D6 61

Richard Bryant                                    D6 62

    Direct Examination by Mr. Frasier            D6 62

    Cross Examination by Ms. McCrea             D6 66

Darius Mede                                       D6 70

    Direct Examination by Mr. Frasier            D6 70

Kathy Wilcox                                      D6 73

    Direct Examination by Mr. Frasier            D6 73

Volume 10, Pages D6 113 to D6 253

    Direct Examination by Mr. Frasier, Cont'd   D6 113

    Cross Examination by Ms. McCrea             D6 123

    Redirect Examination by Mr. Frasier         D6 169

David Breakfield                                  D6 176

    Direct Examination by Ms. Soublet           D6 177

    Cross Examination by Mr. McCrea             D6 182

    Redirect Examination by Ms. Soublet         D6 190

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

index    xx

Exhibit 5001 at 20

INDEX (Continued)

Volume 10, Pages D6 113 to D6 253 (Continued)

JURY TRIAL, DAY 6, July 13, 2011 (Continued)

    Scot Rogers                                          D6 194

        Direct Examination by Mr. Frasier          D6 194

    Tony Wetmore                                         D6 198

        Direct Examination by Ms. Soublet          D6 198

        Cross Examination by Ms. McCrea            D6 209

        Redirect Examination by Ms. Soublet        D6 211

    Kris Karcher                                         D6 211

        Direct Examination by Ms. Soublet          D6 212

        Cross Examination by Ms. McCrea            D6 233

        Redirect Examination by Ms. Soublet        D6 241

    Melissa Beebe                                        D6 243

        Direct Examination by Mr. Frasier          D6 244

        Cross Examination by Ms. McCrea            D6 246

Judicial Notice of Defendant's Case 03CR1566         D6 248

(END OF DAY SIX)

Volume 11, Pages D7 2-D7 193

JURY TRIAL, Day 7, July 14, 2011                     D7 2

Plaintiff's Witnesses:

    James Pex                                            D7 3

        Direct Examination by Mr. Frasier          D7 4

        Cross Examination by Ms. McCrea            D7 27

        Redirect Examination by Mr. Frasier        D7 47

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

index   xxi

Exhibit 5001 at 21

INDEX (Continued)

Volume 11, Pages D7 2-D7 193 (Continued)

JURY TRIAL, Day 7, July 14, 2011 (Continued)

Plaintiff's Witnesses:

| | |
|---|---|
| Kris Karcher | D7 51 |
| Direct Examination by Ms. Soublet | D7 51 |
| Cross Examination by Ms. McCrea | D7 52 |
| Redirect Examination by Ms. Soublet | D7 53 |
| Ray McNeely | D7 53 |
| Direct Examination by Mr. Frasier | D7 54 |
| Cross Examination by Ms. McCrea | D7 58 |
| James Norman Olson | D7 62 |
| Direct Examination by Mr. Frasier | D7 62 |
| Examination In Aid of Objection by Mr. McCrea | D7 70 |
| Direct Examination by Mr. Frasier (Cont.) | D7 71 |
| Examination In Aid of Objection by Mr. McCrea | D7 86 |
| Direct Examination by Mr. Frasier (Cont.) by Mr. Frasier | D7 87 |
| Cross Examination by Mr. McCrea | D7 89 |
| Redirect Examination by Mr. Frasier | D7 102 |
| Recross Examination by Mr. McCrea | D7 107 |
| Redirect Examination by Mr. Frasier | D7 107 |
| Plaintiff Rests | D7 109 |

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 22

INDEX (Continued)

Volume 11, Pages D7 2-D7 193 (Continued)

JURY TRIAL, Day 7, July 14, 2011 (Continued)

Defendant's Motion for Judgment of Acquittal          D7 109

    Motion Denied by the Court                       D7 111

Defendant's Objection to Exhibit 84                   D7 111

    Objection Sustained by the Court                 D7 115


Plaintiff Rests                                       D7 115


Defendant's Witnesses:

    Quinn Leslie Marie Myers                         D7 115

        Direct Examination by Ms. McCrea             D7 115

        Defense Offer of Proof Out of the            D7 124
        Presence of the Jury

        Cross Examination by Ms. Soublet             D7 126

    Kenn Meneely                                     D7 127

        Direct Examination by Ms. McCrea             D7 127

        Examination in Aid of Objection              D7 142
        By Mr. Frasier

        Direct Examination (Continued) by            D7 143
        Ms. McCrea

        Cross Examination by Mr. Frasier             D7 165

        Redirect Examination by Ms. McCrea           D7 182

(END OF DAY SEVEN)


Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 23

INDEX (Continued)

Volume 12, Pages D8 2-D8 79

JURY TRIAL, Day 8, July 15, 2011                          D8 2

Defendant's Witnesses:

    David Main                                            D8 3

        Direct Examination by Ms. McCrea              D8 4

    Dale Oester                                           D8 7

        Direct Examination by Ms. McCrea              D8 7

        Cross Examination by Mr. Frasier              D8 13

    Mark Perry                                            D8 15

        Direct Examination by Ms. McCrea              D8 16

        Cross Examination by Mr. Frasier              D8 19

    Ellen Marie Richardson                                D8 21

        Direct Examination by Ms. McCrea              D8 21

        Cross Examination by Ms. Soublet              D8 24

    Lyndee Stidham                                        D8 25

        Direct Examination by Ms. McCrea              D8 25

        Cross Examination by Ms. Soublet              D8 30

        Redirect Examination by Ms. McCrea            D8 31

    Steve Quackenbush                                     D8 32

        Direct Examination by Ms. McCrea              D8 32

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 24

INDEX (Continued)

Volume 12, Pages D8 2-D8 79

JURY TRIAL, Day 8, July 15, 2011                            D8 2

Defendant's Witnesses:

    Margaret Elizabeth Buehner                             D8 34

        Direct Examination by Ms. McCrea               D8 36

        Cross Examination by Mr. Frasier               D8 45

        Redirect Examination by Ms. McCrea             D8 49

        Recross Examination by Mr. Frasier             D8 51

    Kenn Meneely                                           D8 55

        Direct Examination by Ms. McCrea               D8 56

        Cross Examination by Mr. Frasier               D8 63

        Redirect Examination by Ms. McCrea             D8 66


Plaintiff Stipulates to Defendant's Map                    D8 68

(END OF DAY EIGHT)


Volume 13, Pages D9 2-D9 165

JURY TRIAL, Day 9, July 18, 2011                           D9 2

Discussion with Juror No. 75, Mr. Welch regarding          D9 2
    Communication Outside of Court

Juror Welch will be Excused                                D9 8

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664


index    xxv

Exhibit 5001 at 25

<u>INDEX (Continued)</u>

<u>Volume 13, Pages D9 2-D9 165 (Continued)</u>

JURY TRIAL, Day 9, July 18, 2011 (Continued)

Defendant's Witnesses:

    Haley Greenway                                             D9 12

        Direct Examination by Ms. McCrea                 D9 13

        Cross Examination by Ms. Soublet                 D9 18

    Barbara Ladawn Carr                                        D9 19

        Direct Examination by Ms. McCrea                 D9 19

        Cross Examination by Ms. Soublet                 D9 34

Defendant Rests


Plaintiff's Rebuttal Witnesses:

    Kathy Wilcox                                               D9 35

        Direct Examination by Mr. Frasier                D9 35

        Cross Examination by Mr. McCrea                  D9 37

        Redirect Examination by Mr. Frasier              D9 46

    Craig Zanni                                                D9 49

        Direct Examination by Mr. Frasier                D9 49

Plaintiff Rests on Rebuttal                                    D9 50

Defendant Waives Presentation of Rebuttal Evidence            D9 50

Defendant's Renewal of Motion for Judgment of                 D9 51
    Acquittal

    Motion Denied by the Court                             D9 51

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

index   xxvi

<u>INDEX (Continued)</u>

Exhibit 5001 at 26

Volume 13, Pages D9 2-D9 165 (Continued)

JURY TRIAL, Day 9, July 18, 2011 (Continued)

Jury Charge                                                D9 54

Closing Argument on Behalf of Plaintiff                   D9 64

Closing Argument on Behalf of Defendant                   D9 96

Final Argument on Behalf of Plaintiff                     D9 132

Final Jury Charge                                         D9 157

Exceptions to Instructions by Plaintiff Waived            D9 161

Exception to Instructions by Defendant                    D9 162

Jury Deliberates                                          D9 162

Jury Instructed to Come Back Tomorrow                     D9 163

                     (END OF DAY NINE)

              Volume 13, Pages D10 2-D10 7

JURY TRIAL, Day 10, July 19, 2011                         D10 2

Jury Verdict                                              D10 2

Court Sends Jury Back to Fix Verdict                      D10 3

Jury Verdict                                              D10 4

Polling of the Jury                                       D10 5

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

index   xxvii

Exhibit 5001 at 27

INDEX (Continued)

Volume 13, Pages D10 2-D10 7 (Continued)


JURY TRIAL, Day 9, July 18, 2011 (Continued)

Verdict Received by the Court                                    D10 6

Sentencing Set for August 1, 2011                               D10 7

                        (END OF DAY TEN)


SPECIFIED PAGES:

Objections, Motions, Rulings of the Court

      D3 25, D3 103, D3 104, D3 109, D3 110, D3 149,

          D3 155, D3 174, D3 219.

      D4 39, D4 53, D4 117, D4 118, D4 185, D4 186,

          D4 187.

      D5 2, D5 6, D5 16, D5 38, D5 46, D5 68, D5 76,

          D5 84, D5 85, D5 86, D5 87, D5 88, D5 89,

          D5 98, D5 99, D5 102, D5 102, D5 141,

          D5 142, D5 192, D5 196, D5 231, D5 240,

          D5 244, D5 245, D5 262, D5 263, D5 277,

          D5 278, D5 280.

     D6 2, D6 11, D6 12, D6 13, D6 22, D6 63,

          D6 27, D6 28, D6 45, D6 48, D6 49, D6 178,

          D6 184, D6 185, D6 189, D6 190, D6 191,

          D6 192, D6 192, D6 193, D6 196, D6 197,

          D6 242, D6 243.

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664


                                        index    xxviii

Exhibit 5001 at 28

INDEX (Continued)


SPECIFIED PAGES (Continued):

Objections, Motions, Rulings of the Court (Continued)

      D7 109, D7 110, D7 115, D7 119, D7 120, D7 122,

          D7 124, D7 126, D7 143, D7 168, D7 192.

      D8 10, D8 13, D8 28, D8 29, D8 41, D8 44,

          D8 45, D8 49, D8 50, D8 51, D8 58, D8 62,

          D8 63, D8 64, D8 65, D8 66.

      D9 23, D9 32, D9 33, D9 36, D9 40, D9 41, D9 46,

          D9 48, D9 54, D9 116, D9 136, D9 143, D9 144,

          D9 150.

Instructions to the Jury

      D2 24, D2 36.

      D3 61, D3 182, D3 220.

      D4 83, D4 87, D4 129, D4 129, D4 187, D4 226, D4 260.

      D5 6, D5 68, D5 95, D5 97, D5 102, D5 112, D5 123,

          D5 142, D5 193, D5 194, D5 196, D5 245, D5 273.

      D6 16, D6 18, D6 18, D6 28, D6 72, D6 112, D6 194,

          D6 207, D6 220, D6 249, D6 249.

      D7 62, D7 69, D7 108, D7 120, D7 123,  D7 125,

          D7 186, D7 193.

      D8 6, D8 12, D8 15, D8 52, D8 68, D8 72.

      D9 52, D9 54, D9 92, D9 94, D9 112, D9 143,

          D9 149, D9 150, D9 157, D9 163.

      D10 6.


Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 29

index   xxix


INDEX (Continued)


SPECIFIED PAGES (Continued):

Proceedings Out of the Presence of the Jury

    D2 31, D2 36.

    D3 62, D3 150, D3 182, D3 222.

    D4 87, D4 129, D4 226, D4 260.

    D5 2, D5 95, D5 112, D5 123, D5 124, D5 194, D5 273.

    D6 2, D6 72, D6 91, D6 92, D6 101, D6 230 D6 112,

      D6 194, D6 249.

    D7 62, D7 108, D7 109, D7 114, D7 123, D7 186,

      D7 193.

    D8 2, D8 52, D8 68, D8 73, D8 78.

    D9 2, D9 52, D9 93, D9 95, D9 112, D9 144, D9 149,

      D9 161, D9 162, D9 164.

    D10 2, D10 3, D10 4, D10 6.

Stipulations

    D4 83, D4 129, D6 91, D6 92, D6 101, D6 230, D8 68.


Volume 14, Pages 183-257

POST-TRIAL MOTIONS, August 1, 2011    1713

Defendant's Motions to Continue and Allow Contact    1714

    Argument on Behalf of Defendant    1714

    Argument on Behalf of Plaintiff    1718

    Motion to Continue Denied by the Court    1719

    Motion to Allow Contact Denied by the Court    1723

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 30

index    xxx

INDEX (Continued)

Volume 14, Pages 183-257 (Continued)

POST-TRIAL MOTIONS, August 1, 2011 (Continued)

Ballot Measure 11 Motion                                  1723

    Argument on Behalf of Defendant                  1723

    Argument on Behalf of Plaintiff                  1732

    Motion Denied by the Court                       1736


SENTENCING, August 1, 2011                                1736

Statement on Behalf of Defendant                         1736

Statement on Behalf of Plaintiff Waived                  1738

Statement by Defendant Waived                            1738

Judgment of the Court                                    1742



MOTION FOR NEW TRIAL, September 9, 2011                   1744

    Argument on Behalf of Defendant                  1746

    Statement on Behalf of Plaintiff                 1777



MOTION FOR JUDGMENT OF ACQUITTAL, September 9, 2011       1777

    Argument on Behalf of Defendant                  1777

    Motion Denied by the Court                       1786


CERTIFICATE OF TRANSCRIBER                               1789

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 31

index   xxxi

INDEX OF WITNESSES

PLAINTIFF'S WITNESSES:                     PAGE TESTIMONY BEGINS

Omnibus Hearing, April 14, 2011:

Danny P. Lee                                        13

David Hall                                          17

Michael W. Reaves                                   32

Mark Ranger                                         35

Everett "Buddy" Young                               49

Dean Perske                                         66

Craig Zanni                                         88

Mark Joseph Dannels                                 92

David Zavala                                       108

Sherry Ann Mitchell                               124


Jury Trial, July 7, 2011:

Raymond McNealy                                  D3 32

Jeff Walker                                      D3 37

Cory Courtright                                  D3 41

Cynthia Ann Jones                                D3 88

Matthew Phillip Carney                           D3 95

Denise Bertrand                                  D3 112

Stacy Lyons Crutchfield                          D3 142

Donna Dennis (Out of Jury's Presence)            D3 151

Craig Zanni                                       D3 155

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 32

index    xxii


INDEX OF WITNESSES


PLAINTIFF'S WITNESSES:                    PAGE TESTIMONY BEGINS

July 7, 2011 (Continued):

Anthony S. Wetmore                              D3 162

David Leo Main                                  D3 171

Adam J. Shinar Brewer                           D3 177

Patrick Dexter Smith                            D3 188


July 11, 2011:

Austin Fisher                                    D4 2

Brent Bartley                                    D4 9

Melissa Smith                                   D4 34

Sherry Mitchell                                 D4 54

Margaret (Peggy) Mitchell                       D4 88

Corey Bryant                                    D4 98

Joshua Emler                                    D4 109

Aaron West                                      D4 119

John Lindegren                                  D4 130

Ashley Patton (Hutchinson)                      D4 143

Mark Kirn                                        D4 150

Mike McAdams                                    D4 159

Heidi Crook                                     D4 169

Heather Reid                                    D4 174


Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 33

index   xxxiii


INDEX OF WITNESSES


PLAINTIFF'S WITNESSES:                    PAGE TESTIMONY BEGINS

July 11, 2011 (Continued):

Ray McNeely                                    D4 185

Raymond Lewis                                  D4 199

Alicia Hyatt (Hartwell)                        D4 227

Thomas Bounds                                  D4 241

Dan Lee                                        D4 248


July 12, 2011:

Brett Mauro                                     D5 7

Kristin Steinhoff-Ramsey                        D5 18

Tina Marie Mims                                 D5 48

Dennis Scott Hamilton                           D5 55

Tony Messerle                                   D5 125

Kip Oswald                                      D5 138

Randy Ulmer                                     D5 159

Jennifer Storts                                 D5 165

Zack Elderkin                                   D5 183

Mike Reaves                                      D5 189

David Hall                                       D5 200

Mark Ranger                                      D5 227

Dean Perske                                      D5 232


Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 34

index   xxxiv


INDEX OF WITNESSES


PLAINTIFF'S WITNESSES:                    PAGE TESTIMONY BEGINS

July 12, 2011 (Continued):

Everett (Buddy) Young                              D5 252

Juliana Curran (Reab)                             D5 267

Christy Diane Young (Cagley)                       D5 275
    (Outside of Jury Presence)


July 13, 2011:

Dennis Scott Hamilton                              D6 16
    (Recalled and Released Without Testimony)

Michael Dennis                                    D6 19

Donna Dennis                                      D6 25

Kimberly Courtright Pugmire                        D6 31

Megan Rae Davidson                                D6 38

Christy Diane Young (Cagley)                       D6 54

Richard Bryant                                    D6 62

Darius Mede                                       D6 70

Kathy Wilcox                                      D6 73

David Breakfield                                  D6 177

Scot Rogers                                       D6 194

Tony Wetmore                                      D6 198

Kris Karcher                                      D6 212

Melissa Beebe                                     D6 244


Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 35

index   xxxv


INDEX OF WITNESSES


PLAINTIFF'S WITNESSES:                    PAGE TESTIMONY BEGINS

July 14, 2011:

James Pex                                         D7 4

Kris Karcher                                      D7 51

Ray NcNeely                                       D7 54

James Olson                                       D7 62


DEFENDANT'S WITNESSES:                    PAGE TESTIMONY BEGINS

July 12, 2011:

David Zavala                                      D5 120


July 13, 2011:

Megan Rae Davidson                                D6 52


July 14, 2011:

Quinn Myers                                       D7 115

Kenn Meneely                                      D7 127


July 15, 2011:

Dale Oester                                       D8 7

Mark Perry                                        D8 16

Ellen Richardson                                  D8 21


Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 36

index   xxxvi


INDEX OF WITNESSES


DEFENDANT'S WITNESSES:                    PAGE TESTIMONY BEGINS

July 15, 2011:

Lyndee Stidham                                        D8 25

Steve Quackenbush                                     D8 32

Margaret Buehner                                      D8 36

Kenn Meneely                                          D8 56


July 18, 2011:

Haley Greenway                                        D9 13

Barbara Ladawn Carr                                   D9 19


PLAINTIFF'S REBUTTAL WITNESSES:           PAGE TESTIMONY BEGINS

July 18, 2011:

Kathy Wilcox                                          D3 35

Craig Zanni                                           D9 49


Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 37

index    xxxvii

INDEX OF EXHIBITS

| PLAINTIFF | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| Omnibus Hearing, April 14, 2011: | | | |
| 1 | Search Warrant Packet, 1/24/2010 | 121 | 122 |
| 2 | Victim's Letter to Sherry Mitchell | 130 | 130 |
| 3 | Letter from Victim to Defendant | 142 | 143 |
| 4 | Letter from Victim to Defendant | 142 | 143 |
| 5 | Letter from Victim to Defendant | 142 | 143 |
| 6 | Letter from Victim to Defendant | 142 | 143 |
| 7 | Document, Victim's Diary | 142 | 143 |
| 8 | Document - Poem | 142 | 143 |
| 9 | Document, Poem "Thoughts" | 142 | W/D |
| 10 | Audio Interview with Defendant | 20 | 20 |
| 11 | Statement of Defendant, 7-5-00 | 22 | 22 |
| 12 | Miranda Form | 36 | 36 |

| DEFENDANT | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| Motion for New Trial, September 9, 2011 | | | |
| 301 | Mr. Webley's Report | 220 | — |
| 302 | State's Closing Argument | 221 | — |

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 38

index   xxxviii

INDEX OF EXHIBITS (Continued)

| PLAINTIFF | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| Jury Trial, July 5-19, 2011: | | | |
| 1 | Photograph, Leah Freeman Before Her Death | D3 43 | D3 43 |
| 2 | Google Map of Area Where Victim was Found | D7 57 | D7 57 |
| 3 | Google Map of Area Where Victim was Found | D7 57 | D7 57 |
| 4 | Google Map of Area Where Victim was Found | D7 57 | D7 57 |
| 5 | Google Map of Area Where Victim was Found | D7 57 | D7 57 |
| 6 | Google Map of Area Where Victim was Found | D7 57 | D7 57 |
| 7 | Victim, Day of Incident | D3 54 | D3 54 |
| 8 | Victim, Day of Incident | D3 54 | D3 54 |
| 9 | Photograph, Front of Home | D3 50 | D3 51 |
| 10 | Photograph, West Side of Home | D3 50 | D3 51 |
| 11 | Photograph, West Side of Home | D3 50 | D3 51 |
| 12 | Photograph, East Side of Home | D3 50 | D3 51 |
| 13 | Photograph, East Side of Home | D3 50 | D3 51 |
| 14 | Photograph, Back of Home | D3 50 | D3 51 |
| 15 | Photograph of Mitchell Home | D4 55 | D4 55 |
| 16 | Photograph, Front of Mustang | D3 121 | D3 121 |
| 17 | Photograph of Mustang | D6 77 | D6 77 |

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 39

index    xxxix

INDEX OF EXHIBITS (Continued)

| PLAINTIFF | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 18 | Photograph of Mustang | D6 77 | D6 77 |
| 19 | Photograph of Mustang | D6 77 | D6 77 |
| 20 | Photograph of Mustang | D6 77 | D6 77 |
| 21 | Photograph of Mustang | D6 77 | D6 77 |
| 22 | Photograph of Mustang | D6 77 | D6 77 |
| 23 | Photograph of Mustang | D6 77 | D6 77 |
| 24 | Photograph of Mustang | D6 77 | D6 77 |
| 25 | Photograph, Front of Thunderbird | D3 121 | D3 121 |
| 26 | Photographs of Thunderbird | D6 95 | D6 95 |
| 27 | Photographs of Thunderbird | D6 95 | D6 95 |
| 28 | Photographs of Thunderbird | D6 95 | D6 95 |
| 29 | Photograph of Shoe | D3 132 Withdrawn D6 85 | D6 85 |
| 30 | Photograph of Shoe | D6 85 | D6 85 |
| 31 | Photograph of Swab Locations and Close-up of Blood | D6 85 | D6 85 |
| 32 | Photograph of Swab Locations and Close-up of Blood | D3 174 D6 85 | D3 174 D6 85 |
| 33 | Photograph, Yearbook Where it was Found | D3 174 | D3 174 (Conditionally) |
| 34 | Photograph, Lee Valley Road | D6 201 | D6 201 |
| 35 | Photograph, Lee Valley Road | D6 201 | D6 201 |
| 36 | Photograph, Lee Valley Road | D6 201 | D6 201 |

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 40

index   xl

INDEX OF EXHIBITS (Continued)

| PLAINTIFF | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|

Trial, July 5-19, 2011 (Continued):

| PLAINTIFF | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 37 | Photograph, Lee Valley Road | D6 201 | D6 201 |
| 38 | Photograph, Lee Valley Road | D6 201 | D6 201 |
| 39 | Photograph of Body from Road | D6 221 | D6 221 |
| 40 | Photograph of Body | D6 221 | D6 221 |
| 41 | Photograph of Body | D6 201 | D6 201 |
| 42 | Photograph of Body | D6 221 | D6 221 |
| 43 | Photograph of Body | D6 221 | D6 221 |
| 44 | Photograph of Body | D6 221 | D6 221 |
| 45 | Photograph of Body | D7 70 | D7 70 |
| 46 | Photograph of Victim's Pants | D6 108 | D6 108 |
| 47 | Photograph of Victim's Pants | D6 108 | D6 108 |
| 48 | Photograph of Victim's Pants | D6 108 | D6 108 |
| 49 | Photograph of Victim's Pants | D6 108 | D6 108 |
| 50 | Photograph of Victim's Pants | D6 108 | D6 108 |
| 51 | Photograph of Victim's Shirt | D6 113 | D6 113 |
| 52 | Photograph of Victim's Shirt | D6 113 | D6 113 |
| 53 | Photograph of Victim's Shirt | D6 113 | D6 113 |
| 54 | Photograph of Victim's Shirt | D6 113 | D6 113 |
| 55 | Photograph of Victim's Shirt | D6 113 | D6 113 |
| 56 | Photograph of Victim's Bra | D6 118 | D6 118 |

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 41

index   xli

INDEX OF EXHIBITS (Continued)

| PLAINTIFF | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| Trial, July 5-19, 2011 (Continued): | | | |
| 57 | Photograph of Victim's Bra | D6 118 | D6 118 |
| 58 | Photograph of Victim's Bra | D6 118 | D6 118 |
| 59 | Photograph of Victim's Sock | D6 120 | D6 120 |
| 60 | Photograph of Victim's Sock | D6 120 | D6 120 |
| 61 | Photograph of Victim's Sock | D6 120 | D6 120 |
| 62 | Photograph Taken by English Lab of Victim's Clothing | D6 226 | D6 226 |
| 63 | Photograph Taken by English Lab of Victim's Clothing | D6 226 | D6 226 |
| 64 | Photograph Taken by English Lab of Victim's Clothing | D6 226 | D6 226 |
| 65 | Photograph Taken by English Lab of Victim's Clothing | D6 226 | D6 226 |
| 66 | Photograph Taken by English Lab of Victim's Clothing | D6 226 | D6 226 |
| 67 | Photograph Taken by English Lab of Victim's Clothing | D6 226 | D6 226 |
| 68 | Photograph Taken by English Lab of Victim's Clothing | D6 226 | D6 226 |
| 69 | Photograph Taken by English Lab of Victim's Clothing | D6 226 | D6 226 |
| 70 | Photograph Taken by English Lab of Victim's Clothing | D6 226 | D6 226 |
| 71 | Photograph Taken by English Lab of Victim's Clothing | D6 226 | D6 226 |

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 42

index    xlii

INDEX OF EXHIBITS (Continued)

| PLAINTIFF | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| Trial, July 5-19, 2011 (Continued): | | | |
| 72 | Photograph Taken by English Lab of Victim's Clothing | D6 226 | D6 226 |
| 73 | Lindegren Identified Location | D4 135 | D4 135 |
| 74 | Lindegren Identified Location | D4 135 | D4 135 |
| 75 | Map of Coquille | D3 33 | D3 33 |
| 76 | Map of Coos County | D3 33 | D3 33 |
| 77 | Diagram of Leah's Home Upstairs | D3 38 | D3 38 |
| 78 | Copy of Mustang Registration | D4 188 | D4 189 |
| 79 | Copy of Thunderbird Registration | D4 188 | D4 189 |
| 80 | Letter from Sherry Mitchell to Defendant | D4 58 | D4 59 |
| 81 | Response of Defendant to Sherry Mitchell | D4 62 | D4 62 |
| 82 | Note from Victim to Sherry Mitchell | D4 67 | D4 67 |
| 83 | Defendant's Time Line | D5 210 | D5 211 |
| 84 | Brent Bartley Time Line (Received for Record Only, Not to Jury) | D5 219 | - - |
| 85 | Victim's Letter to Nick, Asshole | D3 218 | D3 218 |
| 86 | Victim's Letter to Nick, 1/7/00 | D3 218 | D3 218 |

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 43

index   xliii

INDEX OF EXHIBITS (Continued)

| PLAINTIFF | DESCRIPTION | OFFERED | RECEIVED |
|-----------|-------------|---------|----------|
| Trial, July 5-19, 2011 (Continued): | | | |
| 87 | Victim's Letter to Nick, Chicken Shit | D3 218 | D3 218 |
| 88 | Victim's Note, Thoughts | D3 218 | D3 218 |
| 89 | Victim's Poem, He Picked Me Up | D3 218 | D3 218 |
| 90 | Victim's Diary | D3 218 | D3 218 |
| 91 | Nick's Note to Victim, Trust Me | D3 218 | D3 218 |
| 92 | Victim's Note to Nick, Hey Babe | D3 218 | D3 218 |
| 93 | Yearbook Pages | D3 219<br>D4 129 | —<br>D4 130 |
| 95 | Defendant Recorded Interview with Reaves and Hall | D5 192 | D5 192 |
| 96 | Victim's Right Shoe | D7 2 | D7 2 |
| 97 | Victim's Left Shoe | D7 2 | D7 2 |
| 98 | Victim's Pants | D7 2 | D7 2 |
| 99 | Victim's Shirt | D7 2 | D7 2 |
| 100 | Victim's Bra | D7 2 | D7 2 |
| 201 | Victim's Sock | D7 2 | D7 2 |
| 202 | Victim's Hairbrush | D3 219 | D3 220 |
| 203 | Victim's Toothbrush | D7 2 | D7 2 |
| 204 | DNA Standards, C. Courtright | D7 2 | D7 2 |

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 44

index   xliv

INDEX OF EXHIBITS (Continued)

| PLAINTIFF | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| Trial, July 5-19, 2011 (Continued): | | | |
| 205 | DNA Standards, D. Freeman | D7 2 | D7 2 |
| 206 | DNA Standards, Defendant | D7 2 | D7 2 |
| 207 | OSP Lab Report, 8/27/00 | D6 91 | D6 91 |
| 208 | OSP Lab Report, 9/6/00 | D6 101 | D6 101 |
| 210 | OSP Lab Report, 1/21/01 | D6 92 | D6 92 |
| 211 | Lab Report from England | D6 230 | D6 230 |
| 212 | Microtrace Report, 3/15/11 | D6 230 | D6 230 |
| 213 | Microtrace Report, 4/6/11 | D6 230 | D6 230 |
| 214 | Victim's Medical Records | D3 64 | D3 65 |
| 215 | Defendant's Medical Records | D3 68 | D3 68 |
| 216 | Defendant's Timeline Seized   Withdrawn | D6 196 D6 250 | — |
| 218 | Transcript of Defendant's Interview (Received for Record Only) | D5 192 | D5 197 |
| 221 | Photograph, Coquille HS, Bus Gate | D4 229 | D4 230 |
| 222 | Photo, North Elm & Central | D5 130 | D5 130 |
| 223 | Photograph, North Elm & Central | D5 130 | D5 130 |
| 224 | Photograph, North Elm | D5 130 | D5 130 |
| 225 | Photograph, North Elm | D5 130 | D5 130 |
| 226 | Photograph, North Elm | D5 130 | D5 130 |

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 45

index   xlv

INDEX OF EXHIBITS (Continued)

| PLAINTIFF | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| Trial, July 5-19, 2011 (Continued): | | | |
| 227 | CD Video of Hudson Ridge Shoe | D5 142 | D5 142 |
| 232 | Photograph, Hwy 42/42S Junction, Eastbound | D5 110 | D5 110 |
| 233 | Photograph, Hwy 42/42S Junction, Westbound | D5 110 | D5 110 |
| 234 | Photograph, Hwy 42/42S Junction | D5 110 | D5 110 |
| 235 | Photograph, DFN Card Lock | D5 110 | D5 110 |
| 236 | Western Auto Receipt, | D5 147 | D5 147 |
| 237 | Letter, Victim to Defendant | D7 3 | D7 3 |
| 238 | Letter, Victim to Defendant | D7 3 | D7 3 |
| 239 | Letter, Victim to Defendant | D7 3 | D7 3 |
| 240 | Time Log Sheet, Jennifer Storts | D5 168 | D5 168 |
| 241 | CD of Grand Jury Testimony | D7 62 | D7 62 |
| 242 | CD Recording of Phone Call, Scott Hamilton to Defendant | D6 13 | D6 13 |
| 243 | CD of Grand Jury Testimony | D6 13 | D6 13 |
| 244 | Victim's Death Certificate | D7 86 | D7 87 |

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 46

index   xlvi

INDEX OF EXHIBITS (Continued)

| DEFENDANT | DESCRIPTION | OFFERED | RECEIVED |
|-----------|-------------|---------|----------|
| Trial, July 5-19, 2011 (Continued): | | | |
| 101 | Photograph of Gas Station | D3 94 | D3 94 |
| 102 | Photograph, Mustang Back Seat | D4 24 | D4 24 |
| 103 | Photograph, Close-up of Speaker | D4 24 | D4 24 |
| 104 | Letter from Victim to Defendant | D7 187 | D7 187 |
| 105 | Letter from Victim to Defendant | D7 187 | D7 187 |
| 106 | Letter from Victim to Defendant | D7 187 | D7 187 |
| 107 | Letter from Victim to Defendant | D7 187 | D7 187 |
| 108 | Letter from Victim to Defendant | D7 187 | D7 187 |
| 109 | Letter from Victim to Defendant | D7 187 | D7 187 |
| 110 | Letter from Victim to Defendant | D7 187 | D7 187 |
| 111 | Letter from Victim to Defendant | D7 187 | D7 187 |
| 112 | Letter from Victim to Defendant | D7 187 | D7 187 |
| 113 | Victim's Note | D7 187 | D7 187 |
| 113A | Victim's Note | D7 187 | D7 187 |
| 114 | Note from Victim to Defendant | D7 187 | D7 187 |

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 47

index    xlvii


INDEX OF EXHIBITS (Continued)


PLAINTIFF          DESCRIPTION                    OFFERED    RECEIVED

Trial, July 5-19, 2011 (Continued):

| 115 | Chris' Note to Victim | D4 80 | D4 80 |
|-----|------------------------|-------|-------|
| 116 | Chris' Note to Victim | D4 80 | D4 80 |
| 117 | Chris' Note to Victim | D4 80 | D4 80 |
| 118 | Chris' Note to Victim | D4 80 | D4 80 |
| 119 | Chris' Note to Victim | D4 80 | D4 80 |
| 120 | Chris' Note to Victim | D4 80 | D4 80 |
| 121 | Sun and Moon Data, 6/28/00 | D7 190 | D7 190 |
| 123 | Victim's Letter to Mr. Hall | D4 83 | D4 83 |
| 124 | Google Map, Johnson Mill | D7 59 | D7 60 |
| 126 | Reward Poster | D9 11 | D9 11 |
| 127 | Photograph of Thunderbird | D6 140 | D6 140 |
| 128 | Summary | D9 11 | D9 11 |
| 129 | Summary | D9 11 | D9 11 |
| 130 | Summary | D9 11 | D9 11 |
| 131 | Summary | D9 11 | D9 11 |
| 132 | Summary | D9 11 | D9 11 |
| 133 | Summary | D9 11 | D9 11 |
| 134 | Summary | D9 11 | D9 11 |
| 135 | Photo - Victim's Right Shoe | D7 140 | D7 140 |
| 136 | Photo - Victim's Left Shoe | D7 140 | D7 140 |


Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 48

index   xlviii

INDEX OF EXHIBITS (Continued)

| PLAINTIFF | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| Trial, July 5-19, 2011 (Continued): | | | |
| 137 | Inner Fold Inside Evidence Bag From Victim's Shoe | D7 143 | D7 143 |
| 138 | Two Brown/Blonde Hairs | D7 143 | D7 143 |
| 139 | Photograph, Left Shoe | D7 144 | D7 144 |
| 140 | Photograph, Left Shoe | D7 144 | D7 144 |
| 141 | Photograph, Left Shoe | D7 144 | D7 144 |
| 142 | Photograph, Tank Top | D7 146 | D7 146 |
| 143 | Photograph, Tank Top | D7 146 | D7 146 |
| 144 | Photograph, Close-up of Tank Top | D7 148 | D7 148 |
| 145 | Photograph, Close-up of Tank Top | D7 148 | D7 148 |
| 146 | Photograph, Sports Bra | D7 151 | D7 151 |
| 147 | Photograph, Demonstrative | D7 154 | D7 154 |
| 148 | Photograph, Demonstrative | D7 154 | D7 154 |
| 149 | Photograph, Tank Top | D7 155 | D7 155 |
| 150 | Photograph, Tank Top | D7 155 | D7 155 |
| 151 | Photograph, Tank Top | D7 155 | D7 155 |
| 152 | Photograph, Sports Bra | D7 155 | D7 155 |
| 153 | Vehicle Registration | D8 20 | D8 21 |
| 154 | Meneely Report (For Record Only) | D8 58 D8 62 | — — |

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 49

index    xlix

INDEX OF EXHIBITS (Continued)

| PLAINTIFF | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| Trial, July 5-19, 2011 (Continued): | | | |
| 155 | Map | D9 11 | D9 12 |
| 157 | Demonstrative Vehicle Photographs(For Record Only) | D9 33 | D9 33 |
| 158 | Demonstrative Vehicle Photographs(For Record Only) | D9 33 | D9 33 |
| 159 | Photographs Demonstrative Vehicle(For Record Only) | D9 33 | D9 33 |
| 160 | Demonstrative Vehicle Photographs(For Record Only) | D9 33 | D9 33 |
| 161 | Demonstrative Vehicle Photographs(For Record Only) | D9 33 | D9 33 |
| 162 | Photograph of Mustang | D9 25 | D9 26 |
| 163 | Photograph of Mustang | D9 25 | D9 26 |
| 164 | Photograph of Mustang Interior | D9 32 | D9 32 |
| 166 | Photograph of Mustang Interior | D9 32 | D9 32 |
| 171 | Photograph of Mustang Trunk | D9 29 | D9 29 |
| 172 | Photograph of Mustang Trunk | D9 29 | D9 29 |
| 173 | Check for Purchase of Vehicle | D9 31 | D9 31 |
| 174 | Vehicle Title, Defendant | D9 33 | D9 33 |
| 175 | Vehicle Title, William Huff | D9 32 | D9 32 |

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 50

index   1

INDEX OF EXHIBITS (Continued)

Motion for New Trial, September 9, 2011:

| DEFENDANT | DESCRIPTION | OFFERED | RECEIVED |
|-----------|-------------|---------|----------|
| 301 | Police Report and Emails | — | — |
| 302 | Document, Transcription | 257 | 257 |

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 51

Z                                                          index   li


INDEX OF VOLUMES

AND EXPLANATION OF PAGE NUMBERING

VOLUME                                                      Pages

   1   PRETRIAL PROCEEDINGS                                 2-182

            Plea Hearing, August 24, 2010                   2-7

            Pretrial Hearing, October 14, 2010              8-9

            Omnibus Hearing, April 14, 2011                 10-164

            Pretrial Hearing, May 5, 2011                   165-173

            Pretrial Hearing, June 21, 2011                 174-182

**The following are Trial Days numbered with a "D" signifying**

**the day of the Trial, then the page number of that day.**

**This is done for simplification in finding something.  The**

**actual page numbers would be 183-1712.**

   2   Jury Trial, Day One, July 5, 2011      D1 1 2-D1 32

       Jury Trial, Day Two, July 6, 2011       D2 2-D2 37

   3   Jury Trial, Day Three, July 7, 2011    D3 2-D3 111

   4   Jury Trial, Day Three, Continued     D3 112-D3 222

   5   Jury Trial, Day Four, July 11, 2011    D4 2-D4 168

   6   Jury Trial, Day Four, Continued      D4 169-D4 261

   7   Jury Trial, Day Five, July 12, 2011    D5 2-D5 137

   8   Jury Trial, Day Five, Continued      D5 138-D5 280

   9   Jury Trial, Day Six, July 13, 2001     D6 2-D6 112

  10   Jury Trial, Day Six, Continued       D6 113-D6 253

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 52

index    li

INDEX OF VOLUMES (Continued)

AND EXPLANATION OF PAGE NUMBERING

VOLUME                                                    Pages

  11   Jury Trial, Day Seven, July 14, 2011    D7 2-D7 193

  12   Jury Trial, Day Eight, July 15, 2011     D8 2-D8 79

  13   Jury Trial, Day Nine, July 18, 2011      D9 2-D9 165

       Jury Trial, Day Ten, July 19, 2011      D10 2-D10 7

**The following are page numbers after the completion of the Trial (1530 pages plus Pre-Trial of 182) beginning with Page 1713, and continuing with what those page numbers were be had the Trial been numbered consecutively.**

  14    POST-TRIAL PROCEEDINGS                      1713-1736

            Post-Trial Motions, August 1, 2011   1713-1736

            Sentencing, August 1, 2011           1736-1743

            Motion for New Trial, Sept. 9, 2011  1744-1777

            Motion for Judgment of Acquittal,    1777-1788
            September 9, 2011

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 53

2

\*                                   \*                                   \*

JUDICIAL ASSISTANT:    All rise.  Circuit Court is in session, Judge Gillespie presiding.

THE COURT:    Be seated.

Good afternoon.

This is the time set for an Arraignment, 10CR0782.

Sir, confirm your name for me.  Nicholas James McGuffin, N-I-C-H-O-L-A-S; James, common spelling; McGuffin, M-c-G-U-F-F-I-N?

DEFENDANT:    That's correct, Your Honor.

THE COURT:    In this particular instance, I need to confirm your date of birth, April 25 of 1982?

DEFENDANT:    Yes, that's correct.

THE COURT:    In this case, you've been indicted by the Coos County Grand Jury on a charge of Murder. The charge alleges that you on or about June 28, 2000, in Coos County, Oregon, unlawfully and intentionally caused the death of Leah Freeman, another human being.

Do you understand what you are accused of?

DEFENDANT:    Yes, I do.

THE COURT:    The maximum penalty is life imprisonment.

Mr. Frasier, frankly, I forgot to look.  Ten years ago, the minimum was still 25?

Exhibit 5001 at 54

3                                    Plea Hearing

MR. FRASIER:    It's still 25, Your Honor.

THE COURT:    The minimum period of incarceration, if you are convicted of this offense, is 25 years.

Do you understand?

DEFENDANT:    Yes, I do.

THE COURT:    You have a right to a jury trial, the right to confront witnesses, and remain silent at that trial.  Also, the right to the assistance of a lawyer, court appointed if you could not afford to hire one.

Do you understand your rights?

DEFENDANT:    Yes, I do.

THE COURT:    Appearing with Ms. Shaun McCrea.

My understanding, Ms. McCrea, is you've been retained, and your firm will be representing him?

MS. McCREA:    That's correct, Your Honor.

THE COURT:    Thank you.

Would you acknowledge a copy — receipt of a copy of the Indictment?  I'd be willing to waiver further arraignment.

MS. McCREA:    Yes, Your Honor.  He's prepared to enter a plea of not guilty.

THE COURT:    Okay.

Would you like a time period, which would be necessary to file any Motions against the Indictment due at

Exhibit 5001 at 55

Plea Hearing                  4

Arraignment?

MS. McCREA:    We would ask for thirty days, Your Honor.

THE COURT:    Thirty days.

Mr. Frasier, any objection?

MR. FRASIER:    That's fine, Your Honor.

THE COURT:    Thirty days is allowed.

Any Motions due at Arraignment would be due timely — Friday, 24 September, by the close of business.

MS. McCREA:    Very good, Your Honor.

THE COURT:    In this particular instance, I would set security in accordance with the general order.  Let me just double check.  That's the amount set on the warrant, $2,000,000.

Ms. McCrea, you are requesting a Release Hearing?

MS. McCREA:    Yes, Your Honor.

THE COURT:    My understanding is the parties have agreed to September 2 at 1:00 p.m. to consider reduction in security or release?

Mr. Frasier?

MR. FRASIER:    That's correct.

THE COURT:    Ms. McCrea?

MS. McCREA:    Yes, Your Honor.

THE COURT:    And, it is my understanding that

Exhibit 5001 at 56

5                                Plea Hearing

you've agreed, Ms. McCrea, that the Court's Release Officer can interview your client?

MS. McCREA:    That is correct.

THE COURT:    Okay.

Her name is Donna Buckles.  She will be in contact with you.  Okay?  Do you understand?

DEFENDANT:    Yes, I do.

THE COURT:    In this particular instance — uh, would you like me to set a Change of Plea Proceeding or a — or, a Status Hearing?

MS. McCREA:    A Status Hearing.

MR. FRASIER:    Status Hearing.

THE COURT:    Okay.

MR. FRASIER:    Thirty days, Your Honor.

THE COURT:    Thirty days would come up on the 24th.

Why — because Motions may be filed, wouldn't it be better to give a period of time after the 24th of September?

MR. FRASIER:    That's fine.

THE COURT:    Okay.

How about October 11 at, uh, 1:30 p.m. in the family courtroom.

MS. McCREA:    That's fine, Your Honor.

THE COURT:    Is that agreeable?

MR. FRASIER:    (Simultaneously) Okay.

Exhibit 5001 at 57

Plea Hearing                6

MS. McCREA:    Yes.

MR. FRASIER:    That's fine.

THE COURT:    Okay.

We'll set that as a status appearance.

Mr. McGuffin, you've been arraigned on the charge.  I've advised you of your rights.  We've set a Release Hearing to consider reduction of security or release on other circumstances.  I set a Status Hearing with your lawyers, here representing you.

Do you have any questions you would like to ask the Court?

DEFENDANT:    (Inaudible response.)

THE COURT:    Are you satisfied just to - - -

DEFENDANT:    (Interposing) Just, thank you for trying to get the — for letting us try to get the bail reduced.  That's - - -

THE COURT:    (Interposing) Okay.

DEFENDANT:    - - - all.  I'm not a flight risk.  I'm just a family man and I work hard.

THE COURT:    Okay, Mr. McGuffin.  That will be taken up on the 2nd at 1:00 p.m.

Thank you for your appearance this afternoon.

Thank you for driving down on such short notice, Ms. McCrea.  We appreciate the courtesy of your appearing.

Exhibit 5001 at 58

7                              Plea Hearing

Mr. Frasier, thank you.

Deputies, you can remove Mr. McGuffin.

Thank you.

For the benefit of those remaining in the courtroom, it's apparent that there is some conflict between persons here.  It would be best if the person supporting Mr. McGuffin would leave at this time, and then I'll invite the people who are supporting the Freeman family to leave.

Thank you.

You can go off the record.

\*                              \*                              \*

Exhibit 5001 at 59

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

STATE OF OREGON,                  )

            Plaintiff,       )    CASE NO. 10CR0782

                      )    PRETRIAL HEARING

     vs.               )

NICHOLAS JAMES McGUFFIN,   )

        Defendant.      )

TRANSCRIPT OF PROCEEDINGS

Volume 1, Pages 8-9

BE IT REMEMBERED That, the above-entitled cause came on regularly for hearing beginning at 1:04 p.m., Thursday, October 14, 2010 in the Circuit Courtroom of the Coos County Courthouse in the City of Coquille, County of Coos, State of Oregon, before the Honorable Richard L. Barron.

APPEARANCES

R. Paul Frasier, District Attorney for Coos County, representing the Plaintiff.

Shaun McCrea, Attorney at Law, representing the Defendant.

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 60

8

\*                                        \*                                        \*

THE COURT:    Time set for State vs. McGuffin.

The Court had a brief conference with the attorneys about different dates in this matter.  And, I believe, that the Court told counsel that if they had to file any Motions they want to file in this case by December 15th. That any pretrial matters will be heard on the dates of April 14th and 15th of next year.

And the Trial will take place May 10th, 11th, 12th, 13th and then the 16th through the 20th of the next week. Parties have told the Court they believe the Trial would be completed by that time.

Now, any other matters, uh, - - -

Nine o'clock for the Omni on the 14th and 15th. And 5:00 by — on December 15th, obviously.

And the Trials, generally, we'll start at 9:30 each day.  They may start earlier in the morning, but we will talk about that at the time.

Any — any other matter you wish to bring up, Mr. Frasier?

MR. FRASIER:    I don't have anything further, Your Honor.

THE COURT:    Okay.

Ms. McCrea, anything else for Mr. McGuffin?

MS. McCREA:    No, Your Honor.

Exhibit 5001 at 61

9

THE COURT:    Those will be the dates set.
Parties have been given notice in Court.

We'll be in recess.


*                              *                              *

Exhibit 5001 at 62

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS


STATE OF OREGON,                         )
                                         )
                Plaintiff,               )     CASE NO. 10CR0782
                                         )
                                         )     OMNIBUS HEARING
        vs.                              )
                                         )
 NICHOLAS JAMES McGUFFIN,                )
                                         )
                Defendant.               )
_____)


TRANSCRIPT OF PROCEEDINGS

Volume 1, Pages 10-164

        BE IT REMEMBERED That, the above-entitled cause

came on regularly for hearing beginning at 9:11 p.m., Thursday,

April 14, 2011 in the Circuit Courtroom of the Coos County

Courthouse in the City of Coquille, County of Coos, State of

Oregon, before the Honorable Richard L. Barron.

APPEARANCES

R. Paul Frasier, District Attorney for Coos County,
representing the Plaintiff.


Shaun McCrea, Attorney at Law, representing the Defendant.


        Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 63

10

*                          *                          *

JUDICIAL ASSISTANT:    All rise.  Circuit Court in the State of Oregon, in Coos County, is now in session.

THE COURT:    Be seated, please.

This is the time set for the Omnibus Hearing in State vs. Nicholas McGuffin.

And, Mr. Frasier, are you ready?

MR. FRASIER:    Yes, Your Honor.

THE COURT:    Ms. McCrea, are you ready?

MS. McCREA:    Yes, Your Honor.

THE COURT:    Okay.

I did want to make sure all the people in the audience know that as members of the public you are welcome to be present.  I do want you to understand, though, that there is to be no, uh, demonstration of agreement or disagreement. Or, I don't want you talking.  Or, certainly don't address other people in the audience, uh, whether you are friends or otherwise.  I don't want any problems in here, but you are welcome to stay here and listen.

Okay.  There are several issues before the Court.  The one issue that I understand will not be before the Court now is the Motion for Change of Venue.  I was notified yesterday, uh, by Ms. McCrea, who also notified Mr. Frasier that, on behalf of the defense, that Motion was being withdrawn.

Exhibit 5001 at 64

11                                    Motions

And, Ms. McCrea is that still correct?

MS. McCREA:    That — that is correct, Your Honor.  The expert did conduct the public opinion poll, and the good people of Coos County can be fair.  So, we are withdrawing that Motion.

THE COURT:    Mr. McGuffin, that was discussed with you and you are in agreement with that?

DEFENDANT:    Yes — yes, I am.

THE COURT:    Okay.

Then, Mr. Frasier, we have your Motion to Admit Statements.  Uh, and then, we — we have some other Motion to Suppress, some other Motions in Limine, and the Court has some questions.

Did you want to take the testimony on the Motion to Admit Statements first?

MR. FRASIER:    Um, it doesn't matter to me how we proceed, Your Honor.  I do — one of the witnesses, Officer Zavala, on the Motion for Statements, won't be here until about 11:00.  He's driving down from Salem this morning.

THE COURT:    Okay.

MR. FRASIER:    But, I can proceed with the other witnesses on that.

THE COURT:    Okay.  The other legal matters I think we can take up at some — some later time.  Just get your — if you have officers, just get them on and off (not

Exhibit 5001 at 65

Motions        12

understandable) - - -

MR. FRASIER:    (Interposing) That's fine.

THE COURT:    - - - work.

Okay.

Any objection with that — starting with that?

MS. McCREA:    No, Your Honor.

And the defense would move to exclude witnesses on that Motion.

THE COURT:    Okay.

Anybody - - -

MS. McCREA:    (Interposing) I think Mr. - - -

THE COURT:    - - - who has been a witness — is going to be a witness for either side, on any of these matters — whether they are they have been subpoenaed or not — will have to wait outside until they are called.

Okay.  Call your first witness.

MR. FRASIER:    We'll call Officer — or, former Officer Dan Lee.

THE COURT:    Raise your right hand, please.

DANNY P. LEE

was thereupon produced as a witness on behalf of Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat up here, please.

Exhibit 5001 at 66

13                                                    Lee   D

Go ahead.

MR. FRASIER:    Thank you.

DIRECT EXAMINATION

BY MR. FRASIER:

Q.    Could you state your name please, sir, and spell your last name for the record?

A.    Yes.  My name is Danny P. Lee, L-E-E.

Q.    And, were you formerly — well, have you been employed in the past as a Police Officer for the City of Coquille?

A.    Yes, I was.

Q.    How long were you a Police Officer for the City?

A.    Approximately, eighteen years.

Q.    And, you are retired at this point?

A.    Yes, I am.

Q.    When did you retire?

A.    I believe, uh, around May — or, not May — March of '05.

Q.    I would like to direct your attention, sir, to the evening of June 28th, early morning hours of June 29th of 2000. Were you on duty as a police officer for the City of Coquille that day?

A.    Yes, I was.

Q.    And at approximately 12:03 a.m., did you have contact with the Defendant in this case, Mr. McGuffin?

Exhibit 5001 at 67

Lee  D        14

A.    I did.

Q.    And, could you tell us where you were when this contact occurred?

A.    Yes.  I was in a patrol car, and I was headed westbound on, uh, East Twelfth Street, near Collier.

Q.    And how did you come into contact with the Defendant?

A.    When I came up to the stop sign there, across on Collier, coming the other direction — or, not Collier, excuse me, on, uh, East Twelfth, coming the other direction, was a Mustang with a headlight out.  I pulled across the intersection, stopped.  Mr. McGuffin was operating the vehicle.  We had a slight discussion, window-to-window.  Uh, he informed that, uh, Leah was in the area walking around.  He was concerned about her well being, not being able to find her.  Asked me if I would keep an eye out for her, and I told him I would, and we went our ways.

Q.    And, did you notice a demeanor of the Defendant?

A.    He seemed to be genuinely upset that he couldn't find her.

Q.    Okay.  Now, in regards to this contact, did you threaten him in any way to get him to talk to you?

A.    No, not to the best of my knowledge.

Q.    Promise him anything?

A.    No.

Exhibit 5001 at 68

15                                                    Lee   X

Q.   Coerce him in any way?

A.   No.

Q.   And, I take it since he's in his car and you are in his (sic) car — had you done anything to stop him or anything like that?

A.   No.  We just made contact there.

Q.   Did you turn on your overhead lights?

A.   No, I did not.  I did not.

Q.   Thank you.

MR. FRASIER:   That's all the questions I have.

THE COURT:   And cross?

CROSS EXAMINATION

BY MS. McCREA:

Q.   Mr. Lee, did you also have contact with Mr. McGuffin after this period of time, that night — same night we'll call it — at Fast Mart, along with Officer Zavala?

A.   Uh, I don't recall that, but it's very possible.  We used to stop in there at Fast Mart and talk to a lot of the high school kids on late night shifts.

Q.   You indicated, in terms of Mr. McGuffin's demeanor, that he appeared to be genuinely upset?

A.   Yes.  I was - - -

Q.   (Interposing) Did you notice anything else about his demeanor?

Exhibit 5001 at 69

Lee    X      16

A.   No, not off the top of my head.

Q.   So, this wasn't a traffic stop?  You didn't pull him over because he only had one headlight?

A.   No.  It was a casual contact.

Q.   Casual contact.  Okay.

That's fine.

MS. McCREA:   Nothing further, Your Honor.

THE COURT:   What's the date again?

MR. FRASIER:   It would have been, uh, June 29th at 2:03 (sic) a.m.

THE COURT:   Okay.  Thank you.

MR. FRASIER:   That's all the questions I have.

MS. McCREA:   I'm sorry.  Was it 2:03?  I wrote down 12:03.

MR. FRASIER:   I mean 12:03.

MS. McCREA:   Okay.

MR. FRASIER:   Excuse me.

12:03 (not understandable).

Thank you.

THE COURT:   You are free to leave.

MR. FRASIER:   I'll call Dave Hall.

DAVID HALL

was thereupon produced as a witness on behalf of Plaintiff and, having first been duly sworn to tell the truth, the whole

Exhibit 5001 at 70

17                                                    Hall   D

truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat here, please.

DIRECT EXAMINATION

BY MR. FRASIER:

Q.    Could you state your name, please, sir, and spell your last name for the record?

A.    David Hall, H-A-L-L.

Q.    And in the year 2000, how were you employed?

A.    I was employed as a Police Officer for the City of Coquille.

Q.    How long did you work for the City of Coquille?

A.    Approximately nine years.

Q.    As — while you were working for the City of Coquille, have — were you assigned to be, in essence, the lead officer in the investigation of the disappearance and death of Leah Freeman?

A.    Yes, I was.

Q.    I would like to direct your attention to June 29th of 2000.  Did you have contact with the Defendant that day at the home of Cory Courtright?

A.    Yes, I did.

Q.    Could you tell the Court, please, approximately what time it was and what occurred?

A.    I can't remember exactly what time it was.  But, we

Exhibit 5001 at 71

Hall  D      18

were over there at Cory's house to ask her some questions in regard to Leah.  And, uh, Nicky McGuffin was there.  And I asked him to briefly give me a time in which he had saw Leah.

Q.   And what did the Defendant tell you?

A.   Mr. McGuffin told me he had dropped off Leah at approximately 7:00 p.m. the night before at Sherry Mitchell's home, and that he was supposed to return her up at approximately 9:00 p.m.  But, when he arrived she had already left.

Q.   Did he indicate if he looked for her?

A.   Yes, he did.  He said that he drove around until approximately 2:30 a.m. Friday morning looking for her, and then finally went home because he thought that Leah had went to a friend's house and — to stay there, and that she was possibly mad at him for being late to pick her up.

Q.   Did he indicate where he had driven to — to look for

- - -

A.   (Interposing) Uh, - - -

Q.   - - - Leah Freeman.

A.   - - - at that time, he said he had driven up and down Central.

Q.   Now, at the time that you spoke with him on June 29th of 2000, did you promise the Defendant anything to get him to talk with you?

A.   No, I did not.

Exhibit 5001 at 72

19                                                Hall   D

Q.   Coerce him in any way?

A.   No, sir.

Q.   Threaten him in any way?

A.   No, sir.

Q.   Did you do anything to impede his movement?

A.   No, sir.

Q.   Did you put handcuffs on him, anything like that?

A.   No, sir.

Q.   Did it appear to you that this was a voluntary statement on his part to you?

A.   Yes, sir.

Q.   Now, let's move to the next day, June 30, 2000.  Did you and Chief Reaves of the Police Department, have contact with the Defendant?

A.   Yes, we did.

Q.   And where did that contact occur?

A.   At the Police Department.

Q.   And how did that contact come to be?

A.   Um, we had had both him and Nick Bartley (sic), uh, come to the police station that day to get an interview from him.

Q.   All right.  And did you interview with Chief Reaves, the Defendant?

A.   Yes, sir, we did.

Q.   And was that recorded?

Exhibit 5001 at 73

Hall   D        20

A.    Yes, sir.

Q.    Earlier today — I'll show you what's marked as State's Exhibit 10.  Earlier today, did you listen to the recording that's on that - - -

A.    (Interposing) Yes, sir.

Q.    - - - tape?

And is that a recording of the interview that you participated in?

A.    Yes, sir.

Q.    And does it accurately portray the conversation you had with the Defendant on June 30th?

A.    Yes, sir.

MR. FRASIER:    Your Honor, for purposes of this Hearing, we'd offer State's Exhibit 10.  It's the recording.

MS. McCREA:    Assuming it's the same recording I've received in Discovery, there is no objection, Your Honor.

THE COURT:    Received.

(Whereupon Plaintiff's Exhibit No. 10 was received into evidence.)

MR. FRASIER:    Does the Court wish to listen to this later?

THE COURT:    How long is it?

MR. FRASIER:    Uh, fifteen, twenty minutes.

THE COURT:    I think it's easier if I do that,

Exhibit 5001 at 74

21                                                    Hall  D

rather then hold up all the proceedings just to have it — to — to — just to listen to it now.  So, I can listen to it later.

There is objection to that?

MS. McCREA:    No, Your Honor.

Q.    Officer Hall, in regards to the June 30, 2000 interview, the one that's on the recording, again, was Mr. McGuffin — the Defendant — threatened in any way to get him to talk to you?

A.    No, sir.

Q.    Promised anything?

A.    No, sir.

Q.    Coerced in any way?

A.    No, sir.

Q.    Was he — had he been restrained in any way while he was there talking to you?

A.    No, sir.

Q.    After the interview was completed, did the Defendant leave the police station?

A.    Yes, he did.

Q.    Now, I would like to go to the 5th of July of 2000. Did you have contact with the Defendant again?

A.    Yes, we did.

Q.    And was he, again, asked to come back to the Coquille Police Department?

A.    Yes, he was.

Exhibit 5001 at 75

Hall D     22

Q.   As part of that, did you ask the Defendant to write out a handwritten timeline as to the events of that evening?

A.   Yes, we did.

Q.   I have here what's marked as State's Exhibit No. 11, and ask if you will review that?

A.   Uh huh.

Q.   Is that a duplicate of the handwritten statement that the Defendant gave you on July the 5th of 2000?

A.   Yes, it is.

MR. FRASIER:    And, Your Honor, we'd offer State's Exhibit 11.

MS. McCREA:    There is no objection, Your Honor.

THE COURT:    Received.

(Whereupon Plaintiff's Exhibit No. 11 was received into evidence.)

Q.   After the handwritten statement was taken, was the Defendant interviewed, then, by Detective Mark Ranger, of the Oregon State Police?

A.   Yes, he was.

Q.   And after he had been spoken to by Detective Ranger, did you and Detective Ranger have additional contact with the Defendant?

A.   Yes, we did.

Q.   What was his demeanor like, at that point?

Exhibit 5001 at 76

23                                              Hall  D

A.   Uh, he was very defensive and agitated.

Q.   Did you tell the Defendant anything about a witness seeing Leah?

A.   Um — refer to my notes.

Yes, I told Mr. McGuffin that we had a witness that saw Leah in McGuffin's car after 10:00 p.m. on the night that she disappeared.

Q.   How did the Defendant react to that statement?

A.   He gasped.  Um, he began looking up at ceiling and looking all around, as if he was, uh, searching for an answer. He never once said that it was impossible, or called it a lie. But, he only replied that he didn't know how that was possible.

Q.   And did the Defendant, at that point, terminate the interview and leave the room?

A.   Yes, he did.

Q.   Again, in this contact, were there any threats made to the Defendant?

A.   No.

Q.   Promises made?

A.   No.

Q.   Any coercion involved?

A.   No.

Q.   He was allowed to come and go as he wished?

A.   Yes, he was.

Exhibit 5001 at 77

Hall  X        24

Q.    Thank you.

MR. FRASIER:    I believe those are the questions I have, Your Honor.

THE COURT:    Ms. McCrea?

CROSS EXAMINATION

BY MS. McCREA:

Q.    Mr. Hall, let's talk about the context of the July 5, 2000 statements to Mr. McGuffin.  In terms of the context, when you told Mr. McGuffin — or, let me — let me rephrase that.

When you indicate to us that Mr. McGuffin was defensive after talking to Mark Ranger, this was after you, yourself, had had a conversation with Mark Ranger?  Is that right?

A.    Yes.

Q.    And the conversation that you had had with Mark Ranger was Mark Ranger had administered a polygraph examination to Mr. McGuffin, and Mr. Ranger had indicated to you that it was his belief that that polygraph showed a significant amount of deception on three key questions?  Is that right?

A.    That's correct.

Q.    And those specific questions were, One, "Did you physical do something that resulted in Leah's death?"  Right?

A.    Correct.

Exhibit 5001 at 78

25                                          Hall   X

Q.    Two, "Did you have any direct involvement in Leah's disappearance?"  Correct?

A.    Correct.

Q.    And Three, "Have you talked to Leah since last Wednesday night after 9:00 p.m.?"  That was the third question?

A.    Yes, ma'am.

Q.    And after you had discussed this with Mr. Ranger, the two of you, Mr. Ranger and yourself, decided that you would then confront Mr. McGuffin with the result of this polygraph?  Correct?

A.    We were going to interview him a little bit more. Yes, ma'am.

Q.    Well, did you let him know that it was your belief that he had not passed the polygraph?

A.    I don't believe so, ma'am.

Q.    What about Mr. Ranger?

A.    In regards to what, ma'am?

Q.    Didn't one of you, or both of you, indicate to Mr. McGuffin that he had not passed the polygraph?

A.    I don't recall that, ma'am.

Q.    Okay.  So, you are not saying it didn't happen, you are saying you don't remember?

A.    I don't remember, ma'am.

Q.    Okay.  But — and you've been testifying from the

Exhibit 5001 at 79

Hall  X      26

report that you made in this case back in the year 2000?  Is that fair?

A.    That is correct.

Q.    And one of the things that you indicated in your report was when you and Mr. Ranger decided you would interview Mr. — Mr. McGuffin again, that was to, quote, ". . . try to determine if he was hiding something", unquote?

A.    That's correct, ma'am.

Q.    Is that right?

All right.  So, you were trying to get him to admit to something - - -

A.    (Interposing) We - - -

Q.    - - - when you questioned him a second time?

A.    We felt that he was hiding something.  We were trying to bring it out.

Q.    All right.  And your questions, then, would reflect a tone similar to what you were trying to do?  Is that fair?

A.    I would believe that would be fair, ma'am.

Q.    Okay.  So, if Mr. McGuffin was defensive, he could be reacting to the tone of your questioning?

A.    It's possible.

Q.    All right.  How long did this interview — the second interview, with you and Mr. Ranger, and Mr. McGuffin, last?

A.    Not a very long time, ma'am.

Q.    Well, can you give me an estimate, Mr. Hall?  Five

Exhibit 5001 at 80

27                                          Hall   X

minutes?  Two minutes?

A.   I'm trying to recollect, ma'am, and I want to believe it was approximately ten to fifteen minutes.

Q.   Ten to fifteen minutes.  And that was not recorded, except for what is in your report?  Is that right?

A.   Yes, ma'am.

Q.   Now, you weren't present when Mark Ranger was administering the polygraph?  Is that correct?

A.   Yes.  I was not present.

Q.   He — and the statement that Mr. — Mr. McGuffin gave you on June 29, 2000, at Cory Courtright's house — you had asked Mr. McGuffin to give you just a brief — to briefly give you a time in which he saw Leah?

A.   Yes, ma'am.

Q.   Okay.  So, at that time, you didn't ask him for a lot of specific details?  Is that fair?

A.   That's fair, ma'am.

Q.   And, he was responsive to your request?

A.   Yes, ma'am.

Q.   And he — he answered every question that you asked of him?  I don't know.  Did you ask him any questions, other then that?

A.   I was trying to ascertain, at that time, you know, approximate times when he dropped her off — the last time he had seen her.

Exhibit 5001 at 81

Hall   X      28

Q.    Now, your testimony, Mr. Hall, was that Mr. McGuffin had said he was supposed to pick up Leah at approximately 9:00?  That was - - -

A.    (Interposing) Yes.

Q.    - - - what you said here today?

A.    Yes, ma'am.

Q.    Now, your report says he was supposed to return and pick up Leah at 9:00?

A.    Yes, ma'am.

Q.    Okay.  Um, - - -

Then, when you asked Mr. McGuffin to come down to the police station on June 30, 2000, he did so?  Is that right?

A.    That is correct, ma'am.

Q.    And he was cooperative at that time?

A.    Yes, ma'am, he was.

Q.    And, likewise, when — you asked him to come down to the police station, then, on July 5, 2000?

A.    Yes, ma'am.

Q.    And to give you the handwritten statement?

A.    Yes, ma'am.

Q.    And he did that willingly?

A.    Yes, ma'am.

Q.    Now, the — the statement that you made to him, Mr. Hall, on July 5th — when you told him that you had a

Exhibit 5001 at 82

29                                          Hall   X

witness that saw Leah in Mr. McGuffin's car after 10:00 p.m.,

- - -

A.   (Interposing) Yes, ma'am.

Q.   - - - who was that witness you were referring to?

A.   I can't recall at this time, ma'am.

Q.   Was there a witness, or were you just telling him that?

A.   I believe we had a witness, at that point, that had said that they had seen Leah in his — with Nick that — after 10:00.

Q.   Now, Mr. Hall, at this point, you were the lead investigator on this case?

A.   I was assigned that at that time, yes, - - -

Q.   (Interposing) What - - -

A.   - - - ma'am.

Q.   What does that mean, to be the lead investigator?

A.   I don't understand your question, ma'am.

Q.   Well, what are the responsibilities of the lead investigator?

A.   Well, at that time, it was all new to me.  Uh, I was compiling all witness statements and leads, and running down leads at that time, until such time that other people were brought in to help.

Q.   So, did the other officers in the case report to you?

Exhibit 5001 at 83

Hall   X      30

A.    Uh, yes, ma'am.

Q.    So, were you compiling all of the information that they provided?

A.    At that time, yes, ma'am.

Q.    So, would that include if, in fact, there was a witness who claimed to have seen Leah in Mr. McGuffin's car after 10:00 p.m.?

A.    Yes, ma'am.

Q.    And when you made this report back in July of 2000, you didn't name any witness - - -

A.    (Interposing) Huh uh.  No, ma'am.

Q.    - - - in your report?  Is that right?

A.    That's correct, ma'am.

Q.    And at this point, you don't — you can't tell us if, in fact, there was such a witness, or if you were just telling Mr. McGuffin that?  Is that right?

A.    I — I just don't know at this time, ma'am.

Q.    And Mr. McGuffin indicated to you he didn't know how that was possible?

A.    Yes, ma'am.

Q.    And the other things that you said, in terms of him never once calling it impossible, was how maybe you thought he should have reacted?

A.    Excuse me, ma'am?

Q.    Well, you testified, Mr. Hall, that he never once

Exhibit 5001 at 84

31                                          Hall   X

said that was impossible - - -

A.    (Interposing) That's correct.

Q.    - - - or called it a lie?

A.    That's correct.

Q.    But, he did respond to your statement?  Is that fair?

A.    Yes, ma'am.

Q.    And he told you he didn't know how that was possible?

A.    That's correct, ma'am.

Q.    Thank you.

MS. McCREA:    That's all I have, Your Honor.

THE COURT:    Redirect?

MR. FRASIER:    I have no further questions, Your Honor.

THE COURT:    (Not understandable), you are free to leave.

Call your next witness.

MR. FRASIER:    Thank you, Your Honor.

We call Mike Reaves.

THE COURT:    Step forward, please.

Raise your right hand.

MICHAEL W. REAVES

was thereupon produced as a witness on behalf of Plaintiff and, having first been duly sworn to tell the truth, the whole

Exhibit 5001 at 85

Reaves   D       32

truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat here, please.

DIRECT EXAMINATION

BY MR. FRASIER:

Q.    Could you state your name, please, sir, and spell your last name for the record?

A.    Michael W. Reaves, R-E-A-V-E-S.

Q.    And, sir, you are the retired Police Chief for the City of Coquille?

A.    Yes, I am.

Q.    And, were you the Police Chief in the year 2000?

A.    Yes, I was.

Q.    I would like to direct your attention, sir, to June 30th of the year 2000.  Did you have contact with the Defendant in this case, Mr. McGuffin?

A.    I did.

Q.    And in conjunction with Officer Hall — or, Mr. Hall, did you conduct an interview of the Defendant, that was recorded?

A.    I did.

Q.    And that interview, you've listened to previously today?

A.    Yes, I did.

Q.    And that was on a CD marked State's Exhibit 10?

Exhibit 5001 at 86

33                                              Reaves   X

A.   I assume so.

I just saw a laptop computer with the thing on it. I didn't see a CD (not understandable).

Q.   In regards to that statement, sir, did the Defendant — did you or any officer in your presence threaten the Defendant in any way to get him to talk to you?

A.   No.

Q.   Promise him anything?

A.   No.

Q.   Uh, coerce him in any way?

A.   No, we did not.

Q.   And was he free to go at any time?

A.   Yes, he was.

Q.   Thank you.

MR. FRASIER:   That's all the questions I have, Your Honor.

THE COURT:   Ms. McCrea?

CROSS EXAMINATION

BY MS. McCREA:

Q.   Mr. Reaves, was there any questioning of Mr. McGuffin that was not included on the tape recorded conversation?

A.   Yes, ma'am.

Q.   And how extensive was that — how long?

A.   It was, um, maybe five or ten minutes before we

Exhibit 5001 at 87

Reaves    X        34

recorded it.  It was essentially going over the same thing that was on the recording.

Q.   Did you make any notes before you started the recorder?

A.   I don't remember.  If I did, they are included in my report.

Q.   So, in terms of your testimony, there is no material difference between the questions and answers that were on the tape recording, that we have as Exhibit 10 versus what was not recorded?

A.   That's right.

Q.   Thank you.

MS. McCREA:    Nothing further, Your Honor.

MR. FRASIER:    Nothing further, Your Honor.

I'd ask the witness to be excused.

THE COURT:    You are free to leave.

WITNESS:    Thank you, sir.

THE COURT:    Call your next witness.

MR. FRASIER:    I'll call Mark Ranger.

THE COURT:    Raise your right hand, please.

MARK RANGER

was thereupon produced as a witness on behalf of Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

Exhibit 5001 at 88

35                                                    Ranger   D

THE COURT:   Sit here, please.

DIRECT EXAMINATION

BY MR. FRASIER:

Q.   Could you state your name, please, sir, and spell your last name for the record?

A.   My name is Mark Ranger, R-A-N-G-E-R.

Q.   And, are you retired as a Detective from the Oregon State Police?

A.   Yes.  Retired just a little over five years ago.

Q.   How long were you with the State Police, sir?

A.   Twenty-seven years.

Q.   I would like to direct your attention to the year 2000.  Were you working as a detective for the State Police at that time?

A.   Yes.

Q.   And were you asked to assist in the investigation of the disappearance and death of Leah Freeman?

A.   Yes.

Q.   On July the 5th of 2000, did you have contact with the Defendant in this case, Mr. McGuffin?

A.   Yes.

Q.   And as part of that contact, did you have an interview with the Defendant, uh, at the Coquille Police Department?

A.   Yes.

Exhibit 5001 at 89

Ranger   D        36

Q.    Prior to, or as part of that interview, did you advise the Defendant of his constitutional rights, per the Miranda decision?

A.    Yes.

Q.    And was that recorded in any way?

A.    Yes.

Q.    How was it recorded?

A.    On a form — Miranda form.

Q.    I'll show you what's marked as State's Exhibit No. 12, and ask if you can identify that?

A.    Yes.  This is — this — this is a copy of the form — uh, Miranda form that I read to Mr. McGuffin.

Q.    Did he sign it in your presence?

A.    Yes.

Q.    And did he indicate to you that he understood his rights?

A.    Yes.

Q.    State's Exhibit 12, is that a duplicate of the original?

A.    Yes.

Q.    Thank you.

          MR. FRASIER:    We'd offer State's Exhibit 12.

          MS. McCREA:    There is no objection to Exhibit 12, for the purpose of this Hearing, Your Honor.

          THE COURT:    Received.

Exhibit 5001 at 90

37                                                    Ranger   D

(Whereupon Plaintiff's Exhibit No. 12 was received into evidence.)

Q.    (9:41:13) Sir, after the — the Advice of Rights was given to the Defendant, did you then interview him?

A.    Yes.

Q.    And was there anyone else in the room with you when you did that — that interview?

A.    At the very end of the interview, Officer — at the time, Detective Dave Hall, joined me for a very brief time.

Q.    All right.  At the beginning of the interview, after the Advice of Rights, what did you discuss with the Defendant?

A.    Uh, his whereabouts on the day, uh, and his activity on the, uh — on the day that Leah Freeman disappeared.

Q.    And what did the Defendant tell you about his relationship, or how long he had known Leah Freeman, and so forth?

A.    He told me that Leah was his girlfriend, at the time, and they had been together for about ten months.

Q.    Did he say anything about whether she was pregnant or not?

A.    He told me that he did not, uh — as far as he knew, that she was not pregnant.

Q.    Did he indicate that he had any plans for the future between the two of them?

A.    He told me that he expected to marry — marry her in

Exhibit 5001 at 91

Ranger    D        38

the future.

Q.    Did he have a name that he used to call her?

A.    He said, uh — he said, "I used to call her Angel."

Q.    Did you ask him what he thought might have happened to her?

A.    Yes.

Q.    And what did the Defendant tell you?

A.    He told me that, uh, he suspected — he suspected that someone had kidnapped Leah.  He, uh — he hoped that she had just run — ran away.  He also speculated that Leah, uh, wouldn't knowingly take drugs, but maybe somebody gave her some acid and she OD'd.  He also said that maybe she fell down somewhere and hit her head.

Q.    And just to back up, "acid" is a street name for LSD?

A.    LSD, yes.

Q.    And "OD'd" is a - - -

A.    Overdose.

Q.    Now, did you further speak with the Defendant when — the last time he saw Ms. Freeman?

A.    Yes.

Q.    What did he tell you?

A.    He said the last time he saw Leah Freeman was when he and his friend, Brett Bartley, dropped her off at a friend's house around 7:00 to 7:05 p.m.

Exhibit 5001 at 92

39                                    Ranger   D

Q.   Did he indicate what he did after that?

A.   Yeah.  From there they picked up Nicki Price, who was Brett's girlfriend, and they went out to Brett's grandparents' home.

They arrived at the grandparents' home around 7:20 to 7:30.  He didn't stay long and left around 7:30.  From there he stopped at the Fast Mart and then drove out — and hung out at the Mill Pond.  He left the Mill Pond around 9:00, uh, to come into town to pick up Leah, but she had already left her friend's house.

He drove around looking for her and couldn't find her.  He did not check Leah's home because he knew that she wouldn't go home until after 11:00 p.m., if she was around town.

Q.   Did the Defendant deny any involvement in her disappearance?

A.   Yes.

Q.   Now, at some point in time, Officer Hall joined the interview?

A.   Yes.

Q.   And at some point, the Defendant decided to terminate the interview and leave?

A.   Yes.

Q.   During the contact that you had with him that evening, did you promise the Defendant anything to get him to

Exhibit 5001 at 93

Ranger  X      40

speak with you?

A.   No.

Q.   Coerce him in any way?

A.   No.

Q.   Threaten him in any way?

A.   No.

Q.   Did it appear his statement was voluntary on his part?

A.   Yes.

Q.   And he was free to go at any time?

A.   Yes.

Q.   Thank you.

MR. FRASIER:   That's all the questions I have, Your Honor.

THE COURT:   Ms. McCrea?

CROSS EXAMINATION

BY MS. McCREA:

Q.   Mr. Ranger, you indicated that Mr. McGuffin said he didn't check Leah's house because he knew she wouldn't go home until after 11:00 p.m. if she was around town?  Was that - - -

A.   (Interposing) Right.

Q.   - - - your testimony?

A.   Yes.

Q.   Did he tell you why he believed that, or knew that?

A.   No.  I don't recall.

Exhibit 5001 at 94

41                                                    Ranger   X

Q.   So, all you can say is that's what he told you?

A.   Yes.

Q.   Now, the context of this meeting with Mr. McGuffin, Mr. Ranger, was that he came in to have you administer a polygraph to him?  Is that right?

A.   Yes.

Q.   And that was on July 5, 2000?

A.   Yes.

Q.   And he came voluntarily to the Coquille Police Department?

A.   Yes.

Q.   And that was at 1:30 p.m. in the afternoon?

A.   Yes.

Q.   Now, part of the consideration, in administering a polygraph to someone, is it's important to know that person's physical condition?  Would that be fair?

A.   Yes.

Q.   So, for example, isn't it important whether or not the person slept the night before?

A.   It can be, yes.

Q.   And in this case, didn't Mr. McGuffin tell you that he had not had very much sleep the night before?

A.   He said he slept about four to five hours.

Q.   Did he say that he had been out, trying to run down a lead regarding Leah?

Exhibit 5001 at 95

Ranger  X        42

A.   I don't recall that.

Q.   Do you have anything else in your notes about what he told you, concerning his sleep?

A.   He said he was tired.  I asked him if he was tired. He said, "Yes."

Q.   Did he tell you that he had been coming back from Lincoln City?

A.   I don't recall that.

Q.   Nothing in your notes?

A.   No.

Q.   Did he tell you anything else concerning his physical condition, that would be a consideration for you, in administering the polygraph?

A.   No.

Q.   Were you under any time pressure in conducting this polygraph, Mr. Ranger?

A.   No.

Q.   And based on — well, you administered the polygraph, and then what you get are a bunch of graphs or charts from that examination?  Is that right?

A.   Yes.

Q.   And then you, as the examiner, need to put a numerical score on those?

A.   Yes.

Q.   And you did that in this case?

Exhibit 5001 at 96

43                                                    Ranger  X

A.   Yes.

Q.   And it was your opinion that Mr. McGuffin was being deceptive?  Is that right?

A.   Yes.

Q.   And did you make that known to Officer Hall?

A.   Yes.

Q.   Did the two of you, then, make that known to Mr. McGuffin?

A.   Yes.

MR. McCREA:   May I have just a moment, Your Honor.

THE COURT:   Yes.

MR. McCREA:   I'm sorry.

MS. McCREA:   It's (not understandable) - - -

MR. McCREA:   (Interposing) I don't hear - - -

MS. McCREA:   - - - two counts - - -

THE COURT:   (Interposing) Okay.

MR. McCREA:   I don't hear as well I wish and — so, it takes me a little while.

THE COURT:   All right.  Go ahead.

Q.   So, Mr. Ranger, when Mr. McGuffin came in to take the polygraph, would it be fair to say that he was — he was cooperative with you?

A.   Yes.

Q.   He was pleasant?

Exhibit 5001 at 97

Ranger   X       44

A.    Up until the very end.

Q.    Okay.  So, he had a — his demeanor toward you was — I don't know, friendly or cooperative?  And — and would it be fair to say his demeanor changed once you told him that he failed the polygraph?

A.    Yes.

Q.    And his — and his demeanor changed from being friendly to being, shall we say, defensive?

A.    Angry.

Q.    Angry?  Okay.  Would defensive apply, as well?

A.    He was angry.

Q.    All right.  How long did you and Officer Hall, then, talk to him after you'd told him that he failed the polygraph?

A.    Just a short time, a few minutes.

Q.    A few minutes like three minutes?  Five minutes?

A.    Maybe — maybe fifteen minutes.

Q.    Fifteen minutes?  Okay.

And during that period of time — well, let me ask you this.  Who told him that he had not passed the polygraph?

A.    I did.

Q.    You did?

A.    Yeah.

Q.    And then, was it you or Officer Hall, or both of you, asking Mr. McGuffin more questions?

A.    I don't recall Officer Hall asking any questions.

Exhibit 5001 at 98

45                                                        Ranger  X

Q.   All right.  So, were you asking questions?

A.   Yes.

Q.   And were you asking those questions based on your belief that Mr. McGuffin had not been truthful on the polygraph?

A.   Yes.

Q.   And so, would it be fair to say you were being accusatory toward - - -

A.   (Interposing) Yes.

Q.   - - - him?

All right.  And the — are you aware, Mr. Ranger, that your polygraph charts had been subject to peer review by Steve Hebner?

A.   No.

Q.   So — and you are not aware that Mr. Hebner finds that your charts are not accurate?

A.   No.  I've never been told that until just now.

Q.   Okay.  Now, would — do you remember Officer Hall making a statement to Mr. McGuffin, in this final contact, that there was supposedly a witness who had seen — who had been — who had seen Leah Freeman in Mr. McGuffin's car after 10:00 p.m.?

A.   I don't recall that.

Q.   Okay.  Just a couple more questions, Mr. Ranger.

So, during the entire time that you worked — you

Exhibit 5001 at 99

Ranger  X      46

worked for Oregon State Police, did you do so as a Polygraph Examiner?

A.   No.  I was an Examiner for about, uh, fourteen years - - -

Q.   (Interposing) Okay.  So, - - -

A.   - - - for the State Police.

Q.   So, would that be the last fourteen years up until you retired?

A.   Yes.  Yes.

Q.   And, is it a common, standard practice of the Oregon State Police to request - - -

A.   (Interposing) Hang on.  It's twelve years.  I'm sorry.

Q.   Okay.  That's — I wasn't going to - - -

A.   (Interposing) Okay.

Q.   I wasn't going to ding you - - -

A.   (Interposing) Oh, I know.

Q.   - - - for the - - -

A.   I just wanted to make sure - - -

Q.   - - - the two years.

A.   - - - I had — I - - -

Q.   (Interposing) Okay.

A.   - - - I'm a - - -

Q.   (Interposing) I appreciate that.

A.   - - - little fuzzy there, okay?

Exhibit 5001 at 100

47                                                              Ranger   X

Q.   All right.

And in — in terms of administering a polygraph examination to someone, is it a standard procedure of the Oregon State Police that when you do a polygraph examination, you — you do what you might term a "pre-test", which is to get some information from the individual?

A.   Yes.

Q.   Okay.  And you did that here?  Right?

A.   Yes.

Q.   And then, you set up what are termed the "relevant questions" — the questions that you want to score, to see whether or not you, as the Examiner, believe the person is telling the truth?  Right?

A.   Yes.

Q.   You administer the exam?  Right?

A.   Yes.

Q.   And then, you decide, based on certain criteria, whether or not you think the person passed?

A.   Yes.

Q.   And if the person did not pass, isn't it a standard practice to then confront the individual with the fact that he or she did not pass the test, to try to get them to make admissions in that instance?

A.   Yes.

Q.   And — and is that what you did here?

Exhibit 5001 at 101

Ranger   ReD    48

A.   Yes.

Q.   And you didn't get any admissions from Mr. McGuffin? Is that right?

A.   Correct.

Q.   Okay.  And he did get defensive, and he did leave?

A.   Yes.

Q.   But he did — he did listen to what you and — and Officer Hall had to say?

A.   Yes.

Q.   But, there were admissions made?

A.   Correct.

Q.   Okay.  Thank you.

        MS. McCREA:    Nothing further, Your Honor.

        THE COURT:    Mr. Frasier?

                REDIRECT EXAMINATION

BY MR. FRASIER:

Q.   Just so we are clear, the interview that you have testified to here, today, was prior to the administration of the polygraph test?

A.   Yes.

Q.   Thank you.

        MR. FRASIER:    That's all I have.

        MS. McCREA:    Nothing further, Your Honor.

        THE COURT:    You may step down.  You are free to leave.

Exhibit 5001 at 102

49                                              Young   D

MR. FRASIER:    Call Buddy Young.

THE COURT:    All right.

EVERETT "BUDDY" YOUNG

was thereupon produced as a witness on behalf of Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat here, please.

Go ahead.

DIRECT EXAMINATION

BY MR. FRASIER:

Q.    Could you state your name, please, sir, and spell your last name for the record?

A.    My first name is Everett, E-V-E-R-E-T-T, but I go by Buddy.  Last name Young, Y-O-U-N-G.

Q.    And your occupation, sir?

A.    I'm a Police Sergeant with the City of North Bend.

Q.    And how long have you been with the City of North Bend?

A.    Thirty-three years.

Q.    I'd like to direct your attention, sir, to the year 2000.  Were you asked to assist in the investigation of the disappearance and death of Leah Freeman?

A.    Okay.

Q.    And, I'd like to direct your attention to July the

Exhibit 5001 at 103

Young  D     50

5th of 2000.  Did you have contact with the Defendant that day?

A.    I did.

Q.    And, where did you have contact with him?

A.    At the Coquille Police Department, in the downstairs area.

Q.    And you were aware the Defendant had agreed to take a polygraph examination?

A.    I was aware of that, yes.

Q.    And he took the examination, as far as you knew?

A.    As far as I knew.

Q.    While that test was being scored, did you have contact with the Defendant?

A.    I did.

Q.    And to the best of your knowledge, had he been told anything about the results of the test when you had contact with him?

A.    No.  As far as I knew, he had not been told anything at that time.

Q.    Could you tell us about this contact?  What the demeanor of the Defendant was like?  What he said?

A.    Well, we first started just talking about cars because he had a '67 Mustang, which I also had when I was a kid.  So, I just started talking to him about his Mustang.

Then he started talking about his polygraph exam. He was exhibiting some anxiety about the possible results of

Exhibit 5001 at 104

51                                        Young  D

the test, stating that he had hoped that the results were favorable, but that he had doubts because he was mentally distracted during the exam.  And his thoughts were kind of scattered and erratic.

Q.   Did you have a discussion about Leah Freeman?

A.   Uh, we did.

Q.   What did he say?

A.   He was, uh — we talked about Leah Freeman and her being at the house that she was supposed to have been at when he went looking for her.  And I ask him why he had not driven directly to Leah's house after he could not initially find her at Sherry Mitchell's house.  Uh, maybe she had walked home.  He stated that he knew absolutely that she would not be there, at her house.  She hated to be there, and would not have gone home until she absolutely had to go home.

Um, I asked him if she would ever take a ride with a stranger.  Nick was emphatic that, uh, she — there was no way she would ever take a ride with a stranger.  Then he paused for a minute and continued to state that she might take a ride with a stranger under very unusual circumstances, such as if she was extremely depressed and feeling like nobody loved or cared for her.

Nick then stated that Leah was feeling this way on the night that she disappeared because she had just had a confrontation with her friend Sherry Mitchell, at Sherry

Exhibit 5001 at 105

Young   D       52

Mitchell's house, with Sherry's mother, Peggy Mitchell.  And expressed her opinion that Leah was not a good influence on her daughter.  Leah was apparently upset by this.

Q.   Um, did the Defendant begin to express some frustrations about Ms. Freeman being gone or disappeared?

A.   Yes.  He, uh — he did.  He, um, said she would never run away without — without either taking him along with her or letting him know at least what she was doing.

Uh, he then started saying that, um — he started talking about a weird phone call that he got at his house, that he thought was kind of strange.  I believe that was — he said it was on June 28th. About 4:00 in the morning, he received a phone at the residence, that nobody knew who it was that called.

I found the statement rather bazaar.  I asked him how he could have had knowledge that the phone call was for him if nobody knew who it was.  He said he knows it was for him because nobody else would call the house at that hour unless it was for him.  He stated that had he answered the phone, instead of his mother answering the phone, the caller would not have hung up.

Uh, he did start talking about the possible current status of Leah, speculating that she might have been walking near the river and stumbled and hit her head, or on a rock or something, or fallen into the river.  And that seemed like a

Exhibit 5001 at 106

53                                            Young  D

bazaar, off-the-wall, statement to me at the time, especially considering all the other potential possibilities of what could have happened to Leah — why he would come up with that one.

I asked Nick if he truly believed that Leah, who was a good looking blonde, female — had a nice physique — if she would be stupid enough to go walking along a dark, secluded river bank, wearing a tight fitting white tank-top, giving no thought to the possibility of an encounter down there, where she could have been harmed.  Nick then said that, nah, he didn't believe Leah would be that stupid.

I — I then asked him why he even brought the scenario up in the first place, then.  He said that his mind was racing of all the possible things that might have happened to her.  Still,  I found it a little bazaar that he would come up with that scenario.

Q.   Okay.  Now, at that point, did you break contact with the Defendant?

A.   Yes.

Q.   Now, during the time you were with him, did you promise him anything to get him to talk to you?

A.   No, sir.

Q.   Coerce him in any way?

A.   No, sir.

Q.   Threaten him in any way?

Exhibit 5001 at 107

Young  D    54

A.  No, sir.

Q.  Did you do anything to impede where he was at or if he could go or not?

A.  No, sir.

Q.  As far as you are concerned, was he free to leave?

A.  Yeah.  I didn't need him to hang around.

Q.  And did it appear to you that his statement to you was voluntary on his part?

A.  Oh, yes.

Q.  Now, I'd like to direct your attention to August the 5th of 2000.  Did you have contact with the Defendant on that date?

A.  Yes, I did.

Q.  And where did you have contact with the Defendant?

A.  Out at his parents' residence.

Q.  And how did this contact come to be?

A.  Uh, myself and Trooper Perske, from the State Police, were running out there to retrieve a sweatshirt that belonged to a Bill Sero (phonetic).  We had had prior contact with Bill Sero, and he asked us if we could retrieve the sweatshirt for him.  And we told him that we would try to do that.

Q.  And when you got there was the Defendant there?

A.  He was.

Q.  Now, did the Defendant say anything to you?

Exhibit 5001 at 108

55                                        Young   D

A.    Yes.  We were, basically, there talking to his father, Bruce, out on the front porch.  Nick was — just happened to be standing there on the front porch, too.  Then he went and tried to find Bill's — I'll wait until the whistle stops.  He went and tried to find Bill Sero's sweatshirt.  Couldn't find it.  And then, he started to talk to us about all the parties that have been allegedly happening during the time of Leah's disappearance.

He told us there had been parties all week long at the residence of a subject named Matt Sinnott.  We had heard of only one party there, on or about the 20th of June, but Nick laughed and said that there were parties there all week.

He said that Matt Sinnott, the son of Dr. James Sinnott, labeled all the expensive furniture and other items in the house with little sticky labels, and numbers on them, and then stuck corresponding numbers on the respective resting places where those items were removed.  Um, he then put them in a safe location where they couldn't be harmed by people there at the party, and then these items were replaced after the party was over.  I still don't know why he told us that, but he saw fit to tell us that.

Nick asked if someone had checked at the Chevron gas station near Central and Elm Streets, to see who was working on the 28th.  Nick said the attendant's name is Matt, and that he drives a light blue pickup truck.  That had already been

Exhibit 5001 at 109

Young   D      56

done by the members of the team.

Nick also mentioned that a Kristin Steinhoff was driving a small purple car on the night of the 28th, and that the car belongs to some guy in Green Acres.

Nick continued to say that Scott Hamilton was acting weird on the night of the 28th. Nick said that he was with Kristin Steinhoff, at her residence, at about 1:00 in the morning, after he had dropped off Brent Bartley. Nick said that he felt like somebody was watching him and Kristin, at this residence. And when he left Kristin's house, that Scott Hamilton came running toward him from a bushy area where he had been hiding, and was anxiously asking Nick, "What's going on? What's going?"

Nick said that a person named Whit Mauro (phonetic) made a comment — third-hand information comment — at a party that he was attending, stating that he wished he could bring Leah back, but that he's not God. But he wished he could bring her back.

Nick said that this comment was overheard by a Megan Pinkley (phonetic), Ron Osborne, and a Mike Pisola (phonetic). He had no further info on those people.

Nick said that a person name Tanya Johnson worked at the Bachelor's Inn, which is a local strip club, was reportedly talking to two guys out of the Portland area, who were admonished by her about their tactics being used to try

Exhibit 5001 at 110

57                                          Young  D

and pick up women in the area, whatever those tactics were. And advising them, "That this is not Portland and behavior like that is not acceptable in Coos County."

Nick said that this Tanya, supposedly, has a VHS tape from the bar's security cameras with these two guys on it. Nick said that she has a boyfriend that works at Tower Ford Motor Company, and that she lives with this guy on the road that runs along the Coos River, uh, from the Sumner — from the Sumner Road turn off, when you head — when you head toward Sumner from the Eastside.

Two guys from Portland were allegedly driving a blue van with red or yellow writing on both sides.

And the last thing he told us was that there was also a subject name Cliff Derous, who was scheduled to go into the Marine Corp. He was held back for a Court trial because of some criminal mischief that he did to the McGuffin's vehicle. Nick filed charges against Derous, and Derous made threats — ambiguous threats — to "get" Nick and Leah. Nick said that Derous was in the Coquille area either the day before or the day after Leah disappeared.

Q.   Did you have any more contact with the Defendant that day?

A.   No.

Q.   During this contact with him, were you actually questioning him at any time?

Exhibit 5001 at 111

Young  X      58

A.    No.  He was standing there smoking cigarettes and just kind of rattling this stuff off.  So, - - -

Q.    At any time, again, did you promise him anything to get him to talk to you?

A.    No.

Q.    Coerce him in any way?

A.    No.

Q.    Threaten him in any way?

A.    No, sir.

Q.    Did it appear to you to be a voluntary statement on his part?

A.    Yes, sir.

Q.    And again, he was free to go at any time?

A.    Yes.  He was at his house.

Q.    Thank you.

MR. FRASIER:    That's all the questions I have of the witness, Your Honor.

THE COURT:    Ms. McCrea.

CROSS EXAMINATION

BY MS. McCREA:

Q.    Sergeant Young, when you had the contact with Mr. McGuffin on August 5, 2000, that would have been after the body of Leah Freeman had been found?  Is that right?

A.    Correct.

Q.    And, Mr. — you said that you didn't know why

Exhibit 5001 at 112

59                                          Young  X

Mr. McGuffin was telling you about the parties at Matt Sinnott's house, but you did record that in your report, right?

A.    Right.

Q.    And basically, wouldn't it be fair to say what he was doing was giving you leads for things that the police could check out, concerning Leah Freeman's disappearance?

A.    Absolutely.

Q.    Okay.  And so, you had already checked out the thing about Matt, the attendant at the gas station, right?  Meaning, you, the police?

A.    I — yeah — I didn't.

Q.    Maybe not you personally?

A.    Right.

Q.    All right.  But, I thought you had said that, "We had already done that"?

A.    Yes.

Q.    And Kristin Steinhoff was interviewed a number of times?  Correct?

A.    By other members, yes.

Q.    And the police interviewed Scott Hamilton?

A.    They may have.  I — I - - -

Q.    (Interposing) Okay.

A.    - - - don't know.

Q.    And are you aware that Whit Mauro was contacted

Exhibit 5001 at 113

Young  X       60

about his statement that he wished he could bring Leah back?

A.   Yes.

Q.   And — and the person who had talked to the guys from Portland, she was contacted by police and interviewed, as well?  Right?

A.   She probably was.  I was the one that contacted Whit, so I know about Whit being - - -

Q.   (Interposing) Okay.

A.   - - - contacted.

Q.   Okay.  All right.  But, all of these things that you've related to us was information that Mr. McGuffin was trying to give you, as a member of law enforcement, so you could follow up on Leah Freeman's disappearance?

A.   That was my — my perception, yes.

Q.   Okay.  And — and he knew you were a police officer, right, - - -

A.   (Interposing) Yeah.

Q.   - - - when you went out there?

Now, the sole reason that you and the other officer went to the McGuffin residence was to retrieve a sweatshirt for Bill Sero?

A.   That was it.

Q.   Okay.  Did you ever get that sweatshirt?

A.   It wasn't — it wasn't there at the residence.

Q.   All right.

Exhibit 5001 at 114

61                                          Young  X

A.    I don't - - -

Q.    (Interposing) Was one of the reasons that you wanted the sweatshirt because Bill Sero was a suspect concerning the disappearance of Leah Freeman?

A.    Yeah.  Bill — Bill had been talked to and questioned.  And so, we wanted to get it just to — also, have a look at.  Two — two-fold — return it to Bill if there was nothing wrong with it, but if there was something there to hold onto it.

Q.    And was another — another basis for going out to get that sweatshirt, that you were hoping to get statements from Nick McGuffin?

A.    No.  In fact, I wasn't going to talk to him at all, because prior to this contact — when I had been at the residence once before, his dad was asleep and I talked to his mom.  And his mom said, uh — she brought Nick out to talk to us, and Nick said, "I'm not talking anybody anymore unless I have my attorney with me."  So, at that point, it was "game off" for me.  I wasn't going to talk to him anymore.

And when we went out there that day, we had no intention on talking to Nick.  We were talking to his dad.  Nick was standing there on the porch and — which he had the right to do it's his porch, but he's the one that started telling us this stuff.

Q.    Okay.  And — and everything that he related to you

Exhibit 5001 at 115

Young  X      62

had to do with either going into the house to try to find Mr. Sero's sweatshirt, or information on leads for Leah's disappearance?

A.    That's correct.

Q.    Back — during the contact of July 5, 2000 — now, you knew that Mr. McGuffin had submitted himself to a polygraph exam?  Correct?

A.    Yes, ma'am.

Q.    And, while that was being scored is when you had the contact with Mr. McGuffin?

A.    Yes, ma'am.

Q.    And that was — as I thought I understood you say, was downstairs in the Coquille Police Department?

A.    Yes, ma'am.

Q.    Did I have that right?

A.    Yes.

Q.    Now, you, at the time — did Mr. McGuffin walk up to you or did you walk up to him?

A.    I think we were sitting at a table there.  It's not a real big place.  Um, it was kind of their quasi-squad room. And we were just kind of sitting there hanging out, waiting — I was probably waiting for the team members to get back and get another assignment.  Nick just happened to be there.

Q.    So, you were on duty at the time?

A.    Yes.

Exhibit 5001 at 116

63                                          Young  X

And so, I — the initial conversation — and the only thing, really, I was talking to him about — or cared to talk to him about at that time — was his Mustang, because I had had one.

Q.   I'm sorry, because - - -

A.   I had had a Mustang just like it, so I just was talking to him about his car.

Q.   Okay.  Was it the same year?

A.   Yeah, '67.

Q.   Same color?

A.   I don't think it was the same color, no.

Q.   Okay.

A.   Mine — mine was blue.

Q.   Well, his was blue.

A.   Not — yeah.  A different color, though.

Q.   Okay.  A different color blue?  You don't want be associated with that Mustang.  I know.

All right.  So, was Mr. McGuffin sent down to the area where were you, to your knowledge, by one of the other officers?

A.   I don't know that.

Q.   All right.

A.   I don't know who - - -

Q.   (Interposing) He just - - -

A.   - - - sent him there.

Exhibit 5001 at 117

Young  X      64

Q.   He just showed up there?

A.   I'm assuming he was hanging around waiting for his results.

Q.   All right.

A.   So, - - -

Q.   So, the two of you talked about the Mustang, and then there was some discussion about Leah Freeman?  Right?

A.   Right.

Q.   And, would it be fair to say that Mr. McGuffin's demeanor, when he was talking to you about Leah Freeman and her disappearance, is he appeared to be very concerned?

A.   He appeared to be pretty anxious.

Q.   Okay.  He was anxious about the fact that — that, um, she was still gone?  Is that fair?

A.   Uh, his — I think that — I think that bothered him, but a lot of his anxiety — my perception was his anxiety, the greater part of it, was over the outcome of the polygraph. Because of his — in his own words, that he was mentally distracted; and his thoughts were scattered and erratic; his mind was racing concerning his friends and Leah, and what might have happened to her.

Several times, he expressed concern that his state of mind may have had a negative affect on the outcome of the test.  I mean, that was — that seemed to be his focal point for his anxiety.

Exhibit 5001 at 118

65                                                      Young   X

Q.   Okay.  He didn't want to fail the polygraph?  Is that fair?

A.   That was my take.

Q.   All right.  Now, I had understood that — you — you talked about the Mustang.  He talked about the polygraph.  And then he spent a — a long time, basically, talking to you about Leah Freeman?

A.   Right.

Q.   And when he talked about Leah Freeman, did he display the same anxious demeanor, or did he display a different kind of demeanor?

A.   It was different.  It was not — it was not anxiety, like he was displaying when he was talking about the polygraph.  It was more of a inquisitive state of, "I just . . ." — you know, "I just wonder what happened.  I just wonder what happened," kind of thing.

Q.   Okay.  So, - - -

A.   (Interposing) But not so much anxiety.

Q.   All right.  Trying to figure it out?

A.   Right.

Q.   Like he was rolling all this stuff around his head, trying to figure out where she had gone and what happened?

A.   Right.

Q.   Okay.  Thank you.

          MS. McCREA:   Nothing further, Your Honor.

Exhibit 5001 at 119

Perske   D      66

THE COURT:    Redirect?

MR. FRASIER:    Nothing further, Your Honor.

THE COURT:    You may step down.  You are free to leave.

Call your next witness.

MR. FRASIER:    Thank you.

We call Dean Perske.

THE COURT:    Raise your right hand, please.

DEAN PERSKE

was thereupon produced as a witness on behalf of Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat here, please.

Go ahead.

MR. FRASIER:    Thank you.

DIRECT EXAMINATION

BY MR. FRASIER:

Q.   Could you state your name, please, sir, and spell your last name for the record?

A.   Dean Perske, P-E-R-S-K-E.

Q.   And, you are a retired Police Officer with the Oregon State Police?

A.   Yes.

Q.   And how long were you employed by the State Police?

Exhibit 5001 at 120

67                                             Perske   D

A.    Twenty-six years.

Q.    What type of things did you do for the State Police?

A.    Uh, I worked for Albany PD before that — the Police Department.  And started with the State Police, in the Patrol Division, for about — just short of four years at Cottage Grove, then made Detective.  I was a Detective for about fifteen years working major crimes, crimes against children, narcotics for awhile, until I transferred into Fish and Wildlife for about a year.  Then I was promoted to Sergeant for the last six years.

Q.    And, during the year 2000, were you working as a Detective for the State Police?

A.    Yes.

Q.    And were you asked, at that time, to assist in the investigation of the disappearance and death of Leah Freeman?

A.    Yes.

Q.    On July 28th of 2000, were you asked to help in the execution of a search warrant at the home of the Defendant?

A.    Yes.

Q.    And as your assignment that day, were you asked to interview the Defendant?

A.    Yes, I did.

Q.    And did you — where did you conduct the interview of the Defendant?

A.    At the Coquille Police Department.

Exhibit 5001 at 121

Perske   D        68

Q.   And before starting the interview, did you advise the Defendant of his Constitutional rights per the Miranda decision?

A.   Yes.

Q.   Did you read the Search Warrant Affidavit to him?

A.   Yes, I did.

Q.   Did the Defendant indicate to you he understood his rights?

A.   Yes.

Q.   And, did he indicate to you that he wanted to cooperate and give a statement?

A.   Yes, he did.

Q.   Now, as part of that there, he was asked to give hair and saliva samples?  Is that correct?

A.   Yes.

Q.   And photographs were taken of his body to see if he had any injuries or anything along that line?

A.   Yes.

Q.   Now, after you had completed obtaining the samples and so forth, did you then interview the Defendant?

A.   Yes.

Q.   What did the Defendant tell you?

A.   We — we were sitting at an open table, myself and another detective.  We asked if he would go over, briefly, his whereabouts that night of what occurred.  Went over it again.

Exhibit 5001 at 122

69                                          Perske   D

It was, basically, consistent with what I had been told he had told other officers that had talked to him prior on this.

Um, gave an account of where he kind of drove around town, some of the people he ran into.  Uh, - - -

Q.   All right.  Did he tell you that he had, uh, stopped by Sherry Mitchell's home to pick up Leah sometime between 9:00 and 10:00 p.m.?

A.   Yes.

Q.   And, did he tell you that she had already left?

A.   Yes.

Q.   Did he tell you where he went looking for her, at that point?

A.   Yes.  He indicated that he drove up Central Street and Knott Street, and back up Fifth near the park, and around up Central by the Fast Mart.  He said that during this time that's when he saw different friends that he knew, and asked if they had seen Leah.

Q.   Indicate that he talked to friends and had them looking for Leah, too?

A.   Yes.

Q.   Did he indicate if he saw anybody at the Fast Mart, that he knew?

A.   Brent Mauro — a subject name Brent Mauro.

Q.   And, did he talk about someone that he saw near Farr's?

Exhibit 5001 at 123

Perske    D        70

A.    Yes.  A Mark Kirns (sic) there.  And - - -

Q.    (Interposing) And did he — did he indicate he had went to the house of Brent Bartley?

A.    Yes.

Q.    And did he see anyone there?

A.    A Daniel Lapine and a Quinton Can — Quinn Cannon.

Q.    Now, did he tell you anything about getting gas for his car?

A.    Yes.  He indicated that there is a card lock here in town that he had stopped by and put — three times — and put four to seven gallons from the — using the card lock at the — by the Caboose coffee place in Coquille.  He said their family had a fuel card, and that's what he was using to buy the gas with it — to get the gas with.

Q.    Did he indicate if he had called his mother?

A.    Yes.  He said that they had an 800 number that he could call her on.  It's at no charge.  And, he had called her on that.

Q.    Did he indicate what time or what the purpose of the call was?

A.    Approximately 10:30 p.m.

Q.    And did he ask — did he tell you what he asked in that call?

A.    Asked if the mother had heard from Leah — if they had heard from Leah.

Exhibit 5001 at 124

71                                              Perske   D

Q.   Did you then question him — or, did the Defendant tell you about what his relationship with Leah Freeman was like?

A.   Yes.  He indicated that this was the first true — true-love relationship that he had had.

Q.   Did he describe their relationship, how it was going?

A.   Yes.  He said that it had been tough at times.  Um, they had argued at times in the relationship, but apparently worked a few things out, as far as rules on how they were — could get through the issues they were having.  And that since they had developed these rules, that things were now going okay.

Q.   Did you ask him if he knew what had happened to Leah Freeman?

A.   Yes, at that (not understandable).

Q.   And what did he say?

A.   He said, no, he didn't.

Q.   Did he then give you a situation, or recall an instance, where Leah had fallen, or something?

A.   Yes.  He then told us about an incident where — exactly that — that they had been walking along the river, and she had fallen on some rocks.  I wondered how that was relevant, and asked him about it.  And he thought that maybe if anything would have happened to her, it might have been

Exhibit 5001 at 125

Perske   D       72

that.  That she may have been walking along the river, fallen and hit her head, and then fell into the water.  And that's what could have happened.

Q.   Was suicide brought up?

A.   Yes.

Q.   And what did the Defendant say about that?

A.   He felt that if — that it — one of the other possibilities may be suicide if she had heard that he was maybe seeing another woman.  And he denied that he was.

Q.   Did the Defendant, again, deny any knowledge as to knowledge as to what happened to the — to Leah Freeman?

A.   Yes.

Q.   Did he get — deny any knowledge of who might have done anything to her?

A.   Yes.

Q.   Did he say anything about, uh — well, did he say he could not live with himself if he had done something to Leah?

A.   Yes.  He said he wasn't that kind of a person.

Q.   Now, I'd like — well, during this contact that you had with him on July 28th of 2000, did you threaten him in any way to get him to talk to you?

A.   No.  It was very casual contact.

Q.   Promise him anything?

A.   No.

Q.   Coerce him in any way?

Exhibit 5001 at 126

73                                                    Perske   D

A.    No.

Q.    Now, let us move to August the 4th, 2000.  Did you have contact with the Defendant at his home, at that time?

THE COURT:    This is August 4th, you said?

MR. FRASIER:    August 4th.

THE COURT:    Okay.

A.    Yes.

Q.    And what was the purpose of you going out to the home on August the 4th?

A.    Uh, the body of Leah had been discovered the day before.  There — so, myself, along with Lieutenant Buddy Young, from North Bend Police Department, then went to let Mr. McGuffin know that her body had been found.

Q.    And what happened when you got there?  And what did the defendant tell you?

A.    Uh, he had — he had already heard the information. He — he knew that.  We were standing on his front porch there. He (not understandable) — he indicated to us that he had already heard that information.

Q.    What was his demeanor like?

A.    Uh, very nervous.  Um, he was chain smoking, one at a time.  You could visibly see his hands shaking.  Uh, some — we were talking — his dad, as I recall, was also there.  We were kind of talking to him, and he — any answers that he was kind of giving us were just yes and no's, as opposed to —

Exhibit 5001 at 127

Perske   D      74

before when we had talked to him, he was talkative and open —
more open.  This time very short answers.  Again, very
nervous.  Uh, - - -

Q.   (Interposing) Okay.

A.   I mean, very noticeable.

Q.   Uh, again, in this contact, did you threaten him in
any way to get him to talk to you?

A.   No.

Q.   Promise him anything?

A.   No.

Q.   Coerce him in any way?

A.   No.

Q.   And he was free to go at any time?

A.   Yeah.  In fact, we left.

Q.   Now, directing yourself, uh, to August the 8th, 2000.
Did you have contact with the Defendant at that time?

A.   Yes.

Q.   And where did that occur?

A.   At the Johnson Planing Mill over in Coos Bay.

Q.   And, could you tell us how that contact occurred?

A.   Uh, we had learned that he was working at that
location.  So, we drove there and he was standing outside this
— kind of a mill yard type thing.  And, myself and another
Detective from the State Police just pulled up, and he
recognized us, and walked over and chatted with him.

Exhibit 5001 at 128

75                                                    Perske   D

Q.   And, what did you talk about with the Defendant that day?

A.   We were specifically asking him if, uh, he had sexual relations, or intercourse, with Leah Freeman recently, prior to her disappearance.

Q.   And what did he tell you?

A.   Indicated, yes, that he had.  That one or two days before, that they did have sexual intercourse.

Q.   And did he indicate anything about the use of birth control?

A.   Yes.  He said that they did not use it on a regular basis.

Q.   Again, in this contact, did you threaten him in any way to get him to talk to you?

A.   No.

Q.   Promise him any way (sic) - - -

A.   (Interposing) No.

Q.   - - - anything?

A.   No.

Q.   Coerce him in any way?

A.   No.

Q.   Was he free to go at any time?

A.   Unless work kept him there.  We — we left.  He stayed at work.  We didn't - - -

Q.   (Interposing) All right.

Exhibit 5001 at 129

Perske   X      76

A.   He — yes, he could walk back to the job.

Q.   All right.  Thank you.

MR. FRASIER:   That's all the questions I have at this time.

MS. McCREA:   So, did - - -

I'm sorry.

THE COURT:   That's all right.

CROSS EXAMINATION

BY MS. McCREA:

Q.   Detective Perske, the officer who went with you on August 8, 2000 was Detective Oester?

A.   Correct.  Yes.

Q.   Now, you go to Mr. McGuffin's place of business.  Presumably, you weren't asking these personal questions out in public with everyone around?  Would that be fair?

A.   No.  This was — as I recall, it's kind of a little one or two-man mill yard with lumber and a — kind of a small mill.  His brother was there.

Q.   His brother, Wayne, was there?

A.   Yes.

Q.   Okay.

A.   We spoke briefly to him.

Q.   So, the two of you came up, you made it — he knew who you were, Nick did?

A.   (Inaudible response.)

Exhibit 5001 at 130

77                                           Perske  X

Q.  And — you are nodding "yes"?

A.  Yes.

Q.  Okay.  And the two of you — you and Detective
Oester, it was clear you were on duty?

A.  Yes.

Q.  And you — you said, "Hey, Nick,. . ." — I'm — I'm
paraphrasing for you.  You tell me how it was.  But, "We just
have a couple more questions.  Would you mind answering a
couple more questions?"  That sort of thing?

A.  Yes.

Q.  And he — and Mr. McGuffin was cooperative with you?
Is that fair?

A.  Yes.

Q.  So, you ask him these questions concerning Leah
Freeman and sexual contact?

A.  Yes.

Q.  And he responded?

A.  Yes.

Q.  Didn't refuse to answer your questions?

A.  No.

Q.  And then the two of you left?

A.  Yes.

Q.  And that was the extent of the contact on August 8th?
Is that right?

A.  Yes.

Exhibit 5001 at 131

Perske   X      78

Q.   Okay.  Now, on August 4th, when you went out to the McGuffin residence with Sergeant Young, were you also looking for Bill Sero's sweatshirt?

A.   I don't recall us looking.  I remember our point of the main contact was to let him know that her body had been found.

Q.   To let Mr. McGuffin know that?

A.   Yes.

Q.   Okay.  And I — the reason I'm asking, Detective Perske, is we had some testimony from Lieutenant Young, and I'm not — I'm going to have to go back and figure out if this was a different contact or — or the same contact.

So, when you had the contact on August 4th, - - -

MR. FRASIER:    (Interposing) I can straighten that out.  The contact for the Bill Sero, was August the 5th. It was the next day.

MS. McCREA:    Okay.  It was - - -

WITNESS:    (Interposing) The next day - - -

MS. McCREA:    - - - a separate - - -

WITNESS:    - - - we talked to Bill Sero.

MS. McCREA:    Okay.

THE COURT:    That's what my notes (not understandable).

WITNESS:    Right.

MS. McCREA:    Well, I had the — I had the

Exhibit 5001 at 132

79                                              Perske  X

different dates, but I wasn't — I wanted to clarify.

WITNESS:    I think we talked to Bill Sero.

Q.    Okay.  So, you went to the McGuffin residence on August 4th with Lieutenant Buddy Young, specially to make it known to Nick McGuffin that Leah Freeman's body had been found the day before?

A.    Yes.

Q.    All right.  And, when you get to the residence, is Mr. McGuffin outside the residence, or do you make contact with the door of the residence?  In other words, do you have to knock on the door?

A.    I - - -

Q.    (Interposing) Do you remember?

A.    I don't recall if they came out and met us as we drove up, or what — but, I remember talking — we talked on the front porch area.

Q.    Okay.  And it was you and Lieutenant Buddy Young?

A.    Yes.

Q.    Were you in a marked patrol car?

A.    Probably not.

Q.    In uniform?

A.    Plain clothes.

Q.    Okay.  But, they knew that you were a Police Officer?

A.    Yes.

Exhibit 5001 at 133

Perske   X        80

Q.   And who was Mr. McGuffin?

A.   I recall his dad being there.  Uh, maybe the — I don't know if there were other — other people there.  I want to think his brother did — but, I don't — I didn't make any further notes on that contact.  Lieutenant Young kind of wrote the report about that interview.

Q.   Okay.  So, how long was the contact with Mr. McGuffin on August 4th?

A.   I didn't list a time of contact in my report.  I — I — it wasn't — I would say less than a half hour.  Twenty minutes maybe.  I don't know — he — if he — in his report, he made a document of the time arrived and left.

Q.   So, your recollection, Detective Perske, is that the contact with Mr. McGuffin, at the porch of his home, was about twenty minutes?

A.   Ball park.  And I just — like I said, if Lieutenant Young had a time that he quoted you, that — that would have been it.  I didn't make a note in my report.

Q.   He didn't — he didn't talk about this.  So, I'm not trying to - - -

A.   (Interposing) Oh.

Q.   I'm not trying to trip you, - - -

A.   (Interposing) I — I - - -

Q.   - - - here.  I just want your best recollection.

A.   Okay.

Exhibit 5001 at 134

81                                                      Perske   X

Q.   If that makes it - - -

A.   (Interposing) That's - - -

Q.   - - - easier?

A.   That's — yeah.  That's my best recollection, - - -

Q.   (Interposing) Okay.

A.   - - - was a half hour.

Q.   That - - -

A.   (Interposing) Yes.

Q.   - - - makes it a little easier.  Because I'm not — I'm not trying to, - - -

A.   (Interposing) Okay.

Q.   - - - like I said, trick you here.  Okay?  I'm just — I'm trying to get information.  Honest.

All right.  Now, would it be correct that you or Lieutenant Young are asking Mr. McGuffin questions?

A.   Yes.  But, I — as I recall, once we had advised him of the — the death, he had already heard about that.

Q.   Uh huh.

A.   And then his dad was kind of interjecting — started talking.  He was kind of interjecting little bits and pieces here.  Again, what specifically was stated in that interview, I — we talked — and Lieutenant Young was going to write the report regarding it.

Q.   Okay.  Well, the reason I ask you that question is because your report, and what your testimony was here today —

Exhibit 5001 at 135

Perske   X       82

referring to Mr. McGuffin, were that his answers were very short?

A.    Yes.

Q.    Mainly just yes or no.  And if he's giving answers, it seems like it would be in response to questions that you or the other officer were asking.

A.    Then there some in — like I say, some — he was kind of injecting as we were talking to the dad and him, and then he would also respond.  But, I'm sure, then, we would follow up with a question if he elicited a response of some kind.

Q.    Now, you've indicated that Mr. McGuffin appeared very nervous, that he was chain smoking cigarettes one after another, and his hands were shaking at times?

A.    (Inaudible response.)

Q.    Now, this is the day after Leah Freeman's body has been found?

A.    Yes.

Q.    And, she was missing for approximately five weeks?

A.    Yes.

Q.    Other than the fact that Mr. McGuffin was chain smoking — and you've indicated his hands were shaking at times — what else did you notice that led you to believe he was nervous?

A.    Those — those things.  Like I stated, that was in direct contrast.  Usually, when we do a search warrant on

Exhibit 5001 at 136

83                                              Perske  X

people, and we are pulling samples of things off that, that's when they are really amped up or excited.  It wasn't that at all when were talking to him in the cellar of a Police Department asking specific questions about this.

Here is a contact on his front porch.  I mean, like I say, he was burning Marlboros as fast he could light them, and his hands were shaking.  A direct contrast to that other contact with him.  Those are the two times I've had met the guy.

Q.   Uh huh.  Okay.  Well, the first - - -

A.   (Interposing) It was noticeable.

Q.   Okay.  So, the first time you met, Leah was still missing?  And the second time you met him, she — her body had been discovered?

A.   Yes.

Q.   And he was — had been her boyfriend?

A.   Yes.

Q.   So, it makes sense that that would have — the discovery of her body would have some impact on him?

A.   Yes.

Q.   Okay.  Now, going back to July 28, 2000.  In terms of the photographs of Mr. McGuffin, to see if there injuries — any injuries on his body, there were no injuries on his body?  Is that right?

A.   I don't — I don't recall any.

Exhibit 5001 at 137

Perske    X      84

Q.    And he was totally cooperative in giving you the samples of his head hair, of the saliva, all — all of those things?  Right?

A.    Yes.

Q.    And in order to do that, you or another officer had him get in a police vehicle, and transported him to the Police Station?

A.    Yes.

Q.    And then he was returned home after those samples were taken and he was interviewed?  Right?

A.    Yes.

Q.    Now, how many police officers were present when Mr. McGuffin was interviewed on July 28th?

A.    Two.

Q.    And that would be you and who else?

A.    And Jim Davis, a retired Detective for the State Police.

Q.    From Klammath Falls?

A.    Yes.

Q.    And how long did that interview last?

A.    I want to say at least an hour.

Q.    And that was not tape recorded or memorialized in any way but the — your report?

A.    Correct.

Q.    Mr. McGuffin didn't refuse to answer any of your

Exhibit 5001 at 138

85                                                    Perske   X

questions, did he?

A.   No.

Q.   Now, when — I want to clarify, when he indicated to you that he stopped by Sherry Mitchell's to pick Leah up, wasn't that between 9:00 and 9:10 p.m.?

A.   Yes.

Q.   Okay.  Not 9:00 and 10:00 p.m., but 9:00 and 9:10, like ten minutes after 9:00?

A.   Yes.  That's - - -

Q.   (Interposing) Okay.

A.   - - - what I thought we heard.

Q.   All right.  Well, I — maybe - - -

A.   (Interposing) Okay.

Q.   - - - I just got confused.  That's why I want to - - -

A.   (Interposing) That's what - - -

Q.   - - - to clarify, - - -

A.   - - - I have documented in my report.  That's (not understandable) - - -

Q.   - - - to make sure that I've got it right.

And, in terms of Mr. McGuffin stopping to get gas three times that evening — and putting four to seven gallons in each time — didn't he tell you that the reason for that was because he had a gas leak in his gas tank?

A.   No.  I don't recall that.  It — it — I — I don't

Exhibit 5001 at 139

Perske   X      86

recall him saying that.

Q.   Do you remember him telling you that the family fuel card could be checked for records?  It would show the time he purchased the gas?

A.   Yes.

Q.   And did you do that?

A.   I didn't specifically.  I wasn't assigned to do that, no.

Q.   Mr. McGuffin did tell you that he was driving his Mustang all that day and that night?

A.   Yes.

Q.   And in terms of his relationship with Leah Freeman, what he told you, in terms of establishing the rules, is that as far as getting along, things had been going pretty good recently?  Correct?

A.   Correct.

Q.   And when he told — Mr. McGuffin told you about Leah walking along the river, on some rocks, and falling down, didn't he tell you that they had been up swimming at Powers the day before she disappeared, or close in time?

A.   That could have been where it was.  I — I didn't document where he said.  He just indicated it was along a river where she could have fallen.

Q.   What about the time?  Did he tell you that they had been swimming recently and she had fallen?

Exhibit 5001 at 140

87                                          Zanni   D

A.   I — I didn't — I didn't document any of that, if he did.

Q.   Okay.  And everything you have would be in your report?  You don't have any notes anymore?

A.   No.  That's what I have.

Q.   So, the topics of conversation were — during this meeting on July 28th — were said by you or Detective Davis?  Is that fair?

A.   Yes.

Q.   So, it was a question and answer situation, not Mr. McGuffin simply giving you a narrative?

A.   Correct.

Q.   And you had — did — well, let me ask you this.  Did you have the statement or reports of what Mr. McGuffin had previously told other officers?

A.   Whether I had it on my direct person, at that time, I don't recall.  But I — I had read it and was kind of briefed.  That's why I summized, earlier in the report, that he gave a statement that was consistent with what we had told officers before.

Q.   Okay.  Thank you.

        MS. McCREA:   That's all I have, Your Honor.

        THE COURT:   Redirect?

        MR. FRASIER:   I have nothing further, Your Honor.

Exhibit 5001 at 141

Zanni  D      88

THE COURT:    You may step down.  You are free to leave.

WITNESS:    Thank you.

THE COURT:    Call your next witness.

MR. FRASIER:    Uh, Sheriff Zanni.

CRAIG ZANNI

was thereupon produced as a witness on behalf of Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat here.

Go ahead.

MR. FRASIER:    Thank you.

DIRECT EXAMINATION

BY MR. FRASIER:

    Q.    Could you state your name, please, sir, and spell your last name for the record?

    A.    Excuse me.  My name is Craig Zanni, Z-A-N-N-I.

    Q.    And what is your current occupation, sir?

    A.    I'm the Sheriff for Coos County.

    Q.    And in the year 2000, were you employed by the Sheriff's Office?

    A.    Yes, I was.

    Q.    And what was your occupation — or, your assignment at that time?

Exhibit 5001 at 142

89                                                    Zanni    D

A.    I was the Detective Sergeant for the Coos County Sheriff's Office.  I was head of the Criminal Investigation Section.

Q.    And in the year 2000, were you asked to assist in the investigation of the disappearance and death of Leah Freeman?

A.    Yes, I was.

Q.    Directing your attention, sir, to July 28th of 2000, did you assist in the execution of a search warrant at the Defendant's home?

A.    Yes.

Q.    And while you were there, did you have brief contact with the Defendant in this case, Mr. McGuffin?

A.    Yes, I did.

Q.    Could you tell the Court, please, about the contact and what was said?

A.    I asked him if he would voluntarily submit to a DNA test and a hair sample?

Q.    And what did the Defendant say?

A.    He said that was fine.  He had no reason — nothing to hide.  He had nothing to do with the disappearance of his girlfriend.  And, uh, he was hoping and praying that she would be all right, and he would get her back.

Q.    And at some point in time, did the Defendant's father become involved in this conversation?

Exhibit 5001 at 143

Zanni    D        90

A.    Yes.

Q.    And what occurred then?

A.    He began to tell me how, uh, Nick McGuffin, his son, had been teaching the missing girl, Leah Freeman, how to defend herself if she should be attacked or try to be abducted, by forcefully kneeing somebody in the groin, or striking them in the groin area.

Q.    And was the Defendant standing there while this was said to you?

A.    Yes.

Q.    And how did he react to it?

A.    He shook his head up and down, as indicating an affirmative response to what — his dad's statement.

Q.    During this contact you had with him, did you promise him anything to get him to talk to you?

A.    No.

Q.    Coerce him in any way?

A.    No.

Q.    Promise him any way (sic)?

A.    No.

Q.    Anything?

       Was he free to walk away from you at any time?

A.    Yes.

Q.    Thank you.

       MR. FRASIER:    That's all I have.

Exhibit 5001 at 144

91                                                  Dannels  X

CROSS EXAMINATION

BY MS. McCREA:

Q.   So, that was the extent of the statement that Bruce McGuffin said, "Nick had taught Leah how to defend herself", and Mr. — Nick McGuffin agreed?

A.   He was trying to — was trying to teach her — I believe it was more not that he had, but that he was trying to teach her how to defend herself.

Q.   Okay.  And — and that was — that's the whole statement?  That's it?

A.   More or less, yes.

Q.   Okay.  Thanks.

MS. McCREA:   I have nothing further, Your Honor.

THE COURT:   You may step down and you are free to leave.

WITNESS:   Thank you, Your Honor.

MR. FRASIER:   Call Chief Dannels.

THE COURT:   Raise your right hand.

MARK JOSEPH DANNELS

was thereupon produced as a witness on behalf of Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:   Have a seat here, please.

Exhibit 5001 at 145

Dannels   D        92

DIRECT EXAMINATION

BY MR. FRASIER:

Q.   Could you state your name, please, sir, and spell your last name for the record?

A.   Mark Joseph Dannels, D-A-N-N-E-L-S.

Q.   And what is your occupation, sir?

A.   I work for the City of Coquille.  My current title is Police Chief.

Q.   And how long have you been the Police Chief, sir?

A.   Since August of 2008.

Q.   Now, directing your attention, sir, to October 15, 2009.  Did you have contact — or, did you go to the home of the parents of the Defendant in this case, Nick McGuffin?

A.   Yes, I did.

Q.   And did you go, at that time, with another officer of your department, Pat Smith?

A.   Yes.

Q.   And Officer — or, Sergeant Smith — or, whatever — he's on vacation right now — today?

A.   That is correct.  He's on a cruise.

Q.   All right.

Now, when you went out to the — why did you go out to the residence?

A.   On the 15th or the 19th — or, 18th?

Q.   Uh, well - - -

Exhibit 5001 at 146

93                                            Dannels   D

A.    To be specific with you.

Q.    What — what day was it that you went out there?

A.    We actually went out there on three occasions.  The first one was on the 15th.  Uh, we went out there based on a (sic) inquiry from the family, to talk to us about, uh, the Leah Freeman investigation.

Q.    And what occurred while you were there, of the first contact?

A.    We set up to come back on October 18th of 2009 to discuss the case further.

Q.    And, did you and Officer Smith go out there on the 18th of October?

A.    Yes, sir.

Q.    And while you were there, did the Defendant in this case, Mr. McGuffin, arrive on the scene?

A.    Yes, he did.

Q.    Did you have contact with him there?

A.    Yes, I did.

Q.    And was there a conversation back and forth between you and Mr. McGuffin, the Defendant?

A.    Yes.

Q.    Could you tell the Court, please, what the Defendant told you on October the 18th?

A.    Yes.  He commented about having paperwork that would prove his innocence, in reference to the Leah Freeman

Exhibit 5001 at 147

Dannels   D       94

investigation — had — due to the fact that he been accused of the crime during the investigation — initial — preliminary investigation on this.  He also stated that, uh, it showed the identity of the person who actually killed Leah.

Q.   And, did he indicate to you that he knew who had killed Leah Freeman?

A.   Um, he — he stated that we should looking at several names.  Yes.

Q.   Chief, do you have your report in front of you there?

A.   Yes, I do.

Q.   And there is a page — well, this is a report that was written by Officer Smith?

A.   Correct.

Q.   Um, I don't have page (not understandable).  Might I look at the report there?

A.   Yes.

Q.   In the second paragraph, and what's marked with a handwritten nine there, in the last sentence of that, does that refresh your memory?

A.   Yes.

Q.   What did the Defendant tell you?

A.   Nick stated he knew who did it, but declined to tell us who.

Q.   Now, at the beginning of the conversation, the

Exhibit 5001 at 148

95                                         Dannels   D

Defendant told you about having retained an attorney?

A.    Correct.

Q.    And he had been advised to remain — be silent?

A.    Correct.

Q.    But he went ahead and told you this stuff anyway?

A.    Yes.  Without questions posed to him.

Q.    All right.  Now, did you have contact with the Defendant, again, on January 24th?

A.    Yes, I did.

Q.    And how did that occur?

A.    Lieutenant Pat Smith and myself had gone to his residence off Access Road, which is located off Highway 42, in regards to do a courtesy visit to him to let him know that the following day there was going to be a press conference.  That we, uh, were reopening the Leah Freeman investigation.

Q.    And what happened when you made contact with him?

A.    Knocked on the door.  He came to the door.  It was approximately 10:00 in the morning.  Uh, he asked if we could give him a minute to dress himself.  He had been sleeping, it appeared to be.  He came back to the door.  Uh, was very nervous.  Very agitated with our presence, to the point of even sweating from his brow area.

Um, a couple times I just — told him several times, "Just relax."  You know, "We are not here to interview.  We are here to let you know that we are reopening the case."  And

Exhibit 5001 at 149

Dannels   D        96

as a courtesy that I gave to him, based on the visit on the 18th of October.

Q.   Now, did you question the Defendant in any way that day?

A.   No.

Q.   How did he react to you telling him that you were reopening the investigation?

A.   He — he got very — again, very agitated, very nervous, again, the sweating.  Uh, he was spouting stuff — wasn't making a lot of sense.  Uh, just — not normal.

Q.   Did he accuse you of harassing him?

A.   Yes.  He stated a phone call would have sufficed instead of the visit.

Q.   Did you leave at that point?

A.   Yes.

Q.   During the two contacts that you had with the Defendant that we've described here today, did you threaten the Defendant in any way to get him to talk to you?

A.   No, I did not.

Q.   Promise him anything?

A.   No.

Q.   Coerce him in any way?

A.   No.

Q.   Thank you.

            MR. FRASIER:    Those are the questions I have,

Exhibit 5001 at 150

97                                                    Dannels  X

Your Honor.

THE COURT:    Go ahead.

CROSS EXAMINATION

BY MS. McCREA:

Q.    Chief Dannels, when did you become the Police Chief here?

A.    August 25, 2008.

Q.    August 25, 2008.

And you replaced Mike Reaves?  Is that right?

A.    Yes, ma'am.

Q.    And one of the things you wanted to work on, once you were sworn in, was the case involving Leah Freeman?  Is that right?

A.    Can you clarify that by - - -

Q.    (Interposing) Well, I'm looking at the Affidavit, as part of the Search Warrant Request from January 24, 2010, of Eric Schweshing (phonetic) — Schweshinger (phonetic).  Am I saying it right?

A.    Schwenninger.

Q.    Schwenninger.  Thank you.

And, he specifically says, "Chief Dannels has informed me that one of the things he wanted to work, once he was sworn in, was the case involving Leah Freeman."  Is that accurate?

A.    I can't recall the specifics.  Um, and the reason I

Exhibit 5001 at 151

Dannels   X      98

asked you to clarify that was, I — I didn't know what you were referencing to.  If I can elaborate on that?

One of the concerns that was brought to me when I took over as Police Chief, was this case.  So, that — that is true in that aspect.

Q.   And with the assistance of the District Attorney, you set up a, quote, "Cold Case Team"?  Is that right?

A.   Yes, ma'am.

Q.   And that began working on the case and correlating materials?

A.   Yes.

Q.   So — and in — part of working on that case, and preparing to set up the Cold Case Team, I'm sure you had briefings and conversations with the District Attorney?  Would that be fair?

A.   Yes.

Q.   And you had access to the files and documents, and other things involving the case?

A.   Correct.

Q.   And you were aware, at the time — well, were you aware at the time that you came on as Police Chief, that Mr. Nick McGuffin was represented by attorneys?

A.   When I came on as Police Chief?  I don't know.  I don't think I knew that then.

Q.   Okay.  After you came on as Police Chief, were you

Exhibit 5001 at 152

99                                    Dannels   X

apprised of that?

A.   At one point, I was.  I don't recall specific — what part of the — the part about briefings that was brought up. But, yes, I was aware of that.

Q.   Okay.  And, in fact, didn't Mr. Frasier, at some point, indicate to you that he had written a letter to Robert McCrea, the attorney then representing Mr. McGuffin, on August 17, 2004, asking for the McGuffins to provide the document information that they claimed to have concerning the killer of Leah Freeman?

A.   I don't know if I recall the specifics of that.

Q.   Well, you made arrangements to go out, at the request of Bruce and Kathy McGuffin, to talk to them about information that they had.  Is that right?

A.   That is correct.

Q.   And, presumably, given your training and experience, before doing that you conferred with the District Attorney?

A.   Yes.  He knew I was going.

Q.   And the District Attorney, if you had not known before, made you aware that Nick McGuffin was represented by counsel?

A.   I believe so.  I — our purpose — I guess, there might be some confusion a little bit.  Our purpose to go out there that day was not something that I had solicited, but something the parents had solicited.  So, our purpose was to

Exhibit 5001 at 153

Dannels   X   100

go out to hear what they had say.  It was not an interview type situation or visit.

Q.   You went out to the McGuffin home on October 15th — was it 2009 — and then went back again on October 18th?  Correct?

A.   Yes, ma'am.

Q.   And the intention on going out there on the 18th was to talk to Bruce and Kathleen McGuffin?

A.   Yes.

Q.   Mr. Nicholas McGuffin then arrived while you were there having contact with Kathleen and Bruce McGuffin?

A.   Yes.

Q.   And Nick McGuffin was accompanied by his then girlfriend, Megan Edgerton (phonetic)?  Is that right?

A.   That is correct.

Q.   And, at that point, Nick McGuffin offered little information, saying he had retained an attorney and had been advised to remain silent?

A.   Correct.

Q.   So, you are saying you didn't ask him any questions?  Nick made some spontaneous statements to you?

A.   Yes.

Q.   Okay.  And that included Nick saying that he had been driving the Mustang all night and had not been driving the Thunderbird?

Exhibit 5001 at 154

101                                        Dannels   X

A.   Yes.  He made a comment to that matter.

Q.   All right.  And Kathleen confirmed that by saying Nick had been grounded from driving the Thunderbird at the time?

A.   I believe both Nick and — or, Bruce and Kathy had made that comment to us.

Q.   Okay.  And you testified, Chief Dannels, that Nick stated he knew who did it, but declined to tell us who? Right?

A.   Correct.

Q.   Now, before that statement, Nick advised you that you should be looking at Bill Sero, Tom Stemmerman (phonetic), and Alisa Mashad (phonetic), as they were all involved with drugs?

A.   That is correct.

Q.   And during this meeting, Nick professed his innocence to you?

A.   Yes.

Q.   Now, on January 24, 2010, when you and Pat Smith went to Nick McGuffin's residence, this was different than where you had gone on October 18th?  Right?

A.   That is correct.

Q.   On October 18th you had gone to Nick McGuffin's parents' residence, Kathleen and Bruce McGuffin?

A.   Yes.

Exhibit 5001 at 155

Dannels   X     102

Q.   On January 24, 2010, you went to Nick McGuffin's own residence?

A.   That is correct.

Q.   And you — he wasn't expecting you?  Is that fair?

A.   That is fair.

Q.   And you knocked on the front door several times before he opened the door?

A.   I don't recall how many times we knocked.

Q.   Okay.  If you could look at the report?  It's on Page 7, first paragraph under "January 24th".

A.   Okay.

Q.   "Chief Dannels knocked on the front door several times?"

A.   That is correct.

Q.   And you specifically asked Nick if the two of you could come inside?

A.   Yes.

Q.   And he said, "Sure", and asked you to wait so he could get dressed?

A.   Yes.

Q.   Now, the whole purpose of coming to see Nick McGuffin was what you've termed a "courtesy visit"?

A.   Yes.

Q.   And is it correct that you didn't make courtesy visits to anyone other than Nick McGuffin on that day, about

Exhibit 5001 at 156

103                                    Dannels  X

this matter?

A.   No.  I made a courtesy visit to his parents' house, also.

Q.   Okay.  So, the only courtesy visits, to alert people about the reopening of the investigation, and the press conference, were to Nick McGuffin and to his parents, Kathleen and Bruce McGuffin?

A.   Yeah.  Those are the two I went to, yes.

Q.   I'm sorry?

A.   Yes.  Those are two I went to.

Q.   And when you got inside the house, you told Nick McGuffin that you were reopening the Leah Freeman investigation?  Right?

A.   Yes.

Q.   And you specifically asked him if he had anything to help prove his innocence?

A.   If he had anything to — yeah.  If he had anything to help prove his innocence — yes.

Q.   Okay.  And then — and only in — after you had made that statement to him, did he start becoming agitated and, as you put it, nervous?

A.   Correct.

Q.   And that is when he became irrate about you coming to the home and not calling?

A.   I can't say what specifically triggered him to be

Exhibit 5001 at 157

Dannels  X    104

that way.  I took it more of our presence than anything.

Q.   Okay.  Well, he — well, he had — you had asked if you could come in and he said, "Sure"?

A.   Yes.

Q.   And he let you in?  Right?

A.   That is correct.

Q.   And then, it was at the point that you asked him if he had anything to help prove his innocence that he became reactive?

A.   I can't say what made him reactive.  I made the statement - - -

Q.   (Interposing) I know.  I'm just talking about in terms of chronology.

A.   Okay.  Chronology, you are correct.  Yes.

Q.   And at that point, you should be talking with his attorney instead?

A.   Correct.

Q.   And you responded that you weren't going to do that?  And, the purpose of your contact was simply to provide a courtesy visit to inform him about the reopening of the case?

A.   That is correct.

          MS. McCREA:    If I may have just a moment, Your Honor?

          THE COURT:    Yes.

Q.   Chief Dannels, when you were having this contact

Exhibit 5001 at 158

105                                                    Dannels   X

with Nick McGuffin, did you tell Nick that someone is going down for Leah's murder?

A.   I do not recall that statement.

Q.   Chief Dannels, as — I mean, as the Police Chief, and the one who reopened the investigation in this case, I'm presuming — and you correct me if I'm wrong — that you have gone through everything involved in this case?  Would that be fair?

A.   I have gone through — and you say "everything", that means a lot.  I have gone through a lot of the material, correct.

Q.   Okay.  And — and, probably over a substantial period of time?

A.   Yes.

Q.   All right.  And, my question to you is this.  In the course of your examination and review of the matters in this case, and talking to the various police officers, have you ever come across anything which supports the contention that was made to Mr. McGuffin, that someone saw Leah Freeman in his car after 10:00 p.m. the night she disappeared?

A.   Can you repeat that one more time?  I want to make sure I understand you exactly on what you are asking me.

Q.   Okay.  My question is, based on your examination — based on your review of everything, and talking to other police officers — everything you've done in relation to this

Exhibit 5001 at 159

Dannels   ReD    106

case, have you ever come across any witness who claims — any witness in this case, who claims to have seen Leah Freeman in Mr. McGuffin's car after 10:00 p.m. on the night that she disappeared?

A.   No, not that I can recall at this time.

Q.   I'm sorry?

A.   No, not that I recall at this time.

Q.   Okay.  Thank you.

MS. McCREA:    Nothing further, Your Honor.

THE COURT:    Redirect?

MR. FRASIER:    Thank you.

REDIRECT EXAMINATION

BY MR. FRASIER:

Q.   Uh, Chief Dannels, in addition to the McGuffin's side of this case, when you announced that the case was being reopened, did you make contact with other individuals, as a courtesy, to inform them that the case was being reopened?

A.   Yes.

Q.   And who was that?

A.   That was Brent Bartley.

Q.   And did you also contact members of the Freeman family?

A.   Yes.

Q.   And who were they?

A.   Cory Courtright and, um, I'm not sure if her sister

Exhibit 5001 at 160

107                                                Dannels ReX

was there.  I believe her sister might have been there.

Q.  Thank you.

MR. FRASIER:  That's the only questions I have now.

MS. McCREA:  May I just follow up one - - -

THE COURT:  (Interposing) Go ahead.

MS. McCREA:  Thank you.

RECROSS EXAMINATION

BY MS. McCREA:

Q.  And the other people that you contacted, Brent Bartley and the Freeman's, concerning the courtesy call, did you also ask them if they had anything to prove their innocence?

A.  I wasn't there for the Brent Bartley one, so I can't answer that one.  Uh, when it came to Leah's parents — mom and family — no, I did not.

Q.  Okay.

MS. McCREA:  Nothing further, Your Honor.

THE COURT:  You may step down.  You are free to leave.

WITNESS:  Thank you, Your Honor.

THE COURT:  We'll recess for about fifteen minutes.

(RECESS)

JUDICIAL ASSISTANT:  All rise.

Exhibit 5001 at 161

Zavala    D      108

THE COURT:    Be seated please.

Call your next witness.

MR. FRASIER:    Thank you, Your Honor.

We call Officer Zavala.

THE COURT:    Step forward, please.  Raise your right — right hand.

DAVID ZAVALA

was thereupon produced as a witness on behalf of Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat up here, please.

DIRECT EXAMINATION

BY MR. FRASIER:

Q.    Could you state your name, please, sir, and spell your last name for the record?

A.    First name — first name is David.  Last name is Zavala, Z as in Zebra-A-V as in Victor-A-L-A.

Q.    And what is your occupation, sir?

A.    I am Police Officer for the City of Keiser.

Q.    And prior to working for the City of Keiser, did you work as a Police Officer for the City of Coquille?

A.    Yes, I did.

Q.    And were you working in that capacity in the year 2000?

Exhibit 5001 at 162

109                                                    Zavala   D

A.   Yes, I was.

Q.   Directing your attention to June 28th of 2000.  Were you on duty that day?

A.   Yes, I was.

Q.   And were you working what's sometimes referred to as the swing shift, there — thereabout?

A.   Yes.

Q.   And at approximately 10:30 p.m., did you have contact with the Defendant in this case, Mr. McGuffin?

A.   Yes, I did.

Q.   Could you tell the Court, please, how you came into contact with Mr. McGuffin?

A.   That evening, I was driving a marked patrol car.  I was in uniform, displaying a badge.  And I was driving, um, westbound on Highway 42.  And as I was going — driving westbound, I saw a vehicle coming towards me, that was traveling eastbound, with only one headlight.

And so, as the vehicle had passed me, I turned around in the middle of the highway.  And the vehicle, once it passed me, I recognized it as Nick McGuffin's vehicle, from previous contacts.  It was a blue Mustang.  Then the vehicle turned off onto Highway 42 South, and pulled over at, uh — like the shoulder of the road there, just prior to the entrance of the, uh — the park.

Q.   That would be Sturdevant Park?

Exhibit 5001 at 163

Zavala   D     110

A.   I'm sorry?

Q.   Sturdevant Park?

A.   Yes.

Q.   And, by pulling over, did you initiate a traffic stop, turn over — turning on your overhead lights, that type of thing?

A.   Yes, I did.

Q.   And the purpose was to discuss this out — this headlight that was out?

A.   That is correct.

Q.   And this is — what time of the day was it again?

A.   This was in the evening, uh, approximately 10:30 p.m.

Q.   And the conditions, it was dark?

A.   Yes, it was — it was dark.  Um, I believe it was dry.  I — it was a few years ago, but, yes.

Q.   All right.  The point is, cars would have to have had their headlights on?

A.   Correct.  Yes.

Q.   All right.  Now, what happened when you stopped this car?  What did you do?

A.   Well, as I approached the vehicle, I saw Nick light up a cigarette.  When I spoke to him and asked him — I asked him why he was driving without a headlight on — or, without a headlight.  And he told me, in substance, that he was out

Exhibit 5001 at 164

111                                              Zavala   D

looking for his girlfriend.

And then, he had asked me if I had seen her. I told him that I hadn't, and I said that I would. We discussed a time and let him know that — that the night shift — the graveyard shift was coming on and suggested that, uh, he should, basically, end his search or get his headlight fixed because of the fact that graveyards was coming on. And, basically — as I — in substance, I said, you know, "You know how they are."

Um, and Nick told me that he would make it quick.

Q. All right. Now, you — you did not issue a citation for the headlight?

A. No, I did not.

Q. And when you say, "You know how they are in the graveyard", why — why did you say that?

A. Well, I was implying the fact that I knew, at the time, the officers were coming on duty and if they would have seen the vehicle out, they probably would have cited him for — for driving without a — the — the proper headlights.

Q. And during your contact with him, uh, what was the demeanor of the Defendant like?

A. Uh, based on my — my report here, in my notes, he — he appeared a little nervous throughout the contact. Again, he did light up a cigarette when I approached him. Um, he didn't seem to be upset. Uh, I documented, also, he — it did

Exhibit 5001 at 165

Zavala  D    112

not appear that he had been crying.  And he didn't have anybody else in the vehicle with him.

Q.  Did you break contact at that point?

A.  Yes, I did.

Q.  And did you see which direction the vehicle went?

A.  I did.  They, uh — the vehicle ended up driving south on Highway 42 South, across the bridge — crossing the river.  Which I found odd because of the fact that he said he was looking for his girlfriend, who I assumed was in town somewhere, and he was heading out of town.

Q.  Now, you are familiar with the address of the Defendant, at that time?

A.  At that time, I recall — if I recall correctly, the address — his residence is — is in that area, out that direction.

Q.  And so, the direction he was driving was consistent with — headed in the direction of his home?

A.  Yes.

Q.  And away from the City of Coquille?

A.  Yes.

Q.  During your contact with him, did you threaten him in any way to talk to you?

A.  No.

Q.  Make any promises to him?

A.  No.

Exhibit 5001 at 166

113                                          Zavala  X

Q.   Coerce him in any way?

A.   No.

Q.   Did it appear to you that his statements he made to you were voluntary on his part?

A.   Yes.

Q.   Outside of turning your overhead lights on to pull the car over, did you do anything to impede his movement?

A.   No.

Q.   Did you put handcuffs on him at any time, or anything like that?

A.   No.

Q.   Thank you.

        MR. FRASIER:    That's all the questions I have.

        THE COURT:    Cross?

                CROSS EXAMINATION

BY MS. McCREA:

Q.   Sir, did the overhead lights remain on until Mr. McGuffin was allowed to drive away?

A.   I would — I would assume that they do.  Yes, a routine traffic stop.

Q.   You indicated that you recognized Mr. McGuffin's vehicle from prior contacts.  Can you tell me what those prior contacts were?

A.   Well, from the time that I started working here for

Exhibit 5001 at 167

Zavala   X      114

the City of Coquille, he, along with a lot of the other teenagers in the city, I became to know.  And — and I just knew him from just driving through town, making previous contacts.  On — uh, I remember talking to him several times over at the market that's - - -

Q.   (Interposing) Fast Mart?

A.   I believe so.

Q.   Okay.

A.   Uh, - - -

Q.   (Interposing) Or, used to be Fast Mart?

A.   Right.

Q.   Yeah.

A.   So, I — I just knew that that was his vehicle, and I knew when I — when he passed me that that was him driving it.

Q.   Do you also remember encountering Mr. McGuffin later that night, at Fast Mart, with Officer Lee?  A and Mr. McGuffin asking you again if you had seen Leah Freeman, his girlfriend?

A.   To be honest with you, no, I don't recall that.

Q.   Okay.  When Nick told you that he was looking for his girlfriend, did he give you her name?

A.   No.

Q.   Just his girlfriend?

A.   Yes.

Q.   Okay.  How long did this entire stop last, to your

Exhibit 5001 at 168

115                                                    Zavala   X

recollection?

A.    Five minutes, approximately.

Q.    Now, when he — when Mr. McGuffin went south on Highway 42, crossing the river, was that also towards the entrance to the park?

A.    Well, he had passed the entrance to the park to cross the bridge.

Q.    Okay.  And other than what you've described in terms of his demeanor, you didn't notice — notice anything else?

A.    No.

Q.    And, Officer Zavala, the way that Nick McGuffin going — was going, was that also consistent with going to the, um — the little gas station to buy gas?  The card lock station?

(Defendant and counsel conversing.)

Never mind.  Let me — let me retract that question.

In the previous contacts that you had had with Mr. McGuffin, had you noticed him smoking?

A.    Yes.

Q.    Okay.

MS. McCREA:    Nothing further.  Thank you.

MR. FRASIER:    I have no further questions, Your Honor.

THE COURT:    You're — you may step down.  You are free to leave.

Exhibit 5001 at 169

Motion          116

MR. FRASIER:    That's all the witnesses I have on the Motion to Admit Statements, Your Honor.

THE COURT:    Do you have any witnesses on that part of this, Ms. McCrea?

MS. McCREA:    No, Your Honor.

THE COURT:    Okay.  There is — this next one is the search warrant.  And I think, generally, it appears to be an argument about the four corners of it.  Except that — she — there is some allegation it went beyond the scope.  That they — they seized items beyond the scope of the search warrant.  I don't know whether that's an issue still or not?

Uh, - - -

MR. FRASIER:    (Interposing) I don't know either because I — I don't know what they claimed was seized that was outside the scope.

THE COURT:    Is that — what — what is it, I guess — because I'm not too sure he has the witness here.  But at least I read two things.  One, you were — you were saying the search warrant itself wasn't sufficient.  And Two, there was something that was seized beyond the scope of the search warrant, which would be Mr. Frasier's burden.  The other one would be your burden.

MS. McCREA:    The issue concerning the search warrant, Your Honor, and — and I — is, I guess, primarily, whether Mr. Frasier intends to introduce any of the documents

Exhibit 5001 at 170

117                                        Motion

that were seized from the McGuffin's residence.  And, the
focus is on the warrant executed on January 24, 2010.

The concern that the defense has is the
documents were taken wholesale.  And this included documents
that were privileged under attorney — attorney-client
privilege, which were communications back and forth between
our office and Nick McGuffin.

And, it may be that it's a non-issue if
Mr. Frasier isn't intending to try to introduce anything along
that line, but that is a primary concern in terms of the scope
of the document seized.

The basis for the search warrant was
essentially — this is the second part of the — of the
situation.  The basis for the search warrant, at Page 5 of the
Search Warrant Affidavit, which is 1-A — I'm looking at
Mr. Frasier's Memorandum in Opposition — is essentially that
we have an informant, Bruce McGuffin, who indicated that he
had approximately three hundred pages of documents indicating
that Nick McGuffin was innocent regarding the death of Leah
Freeman.  That Nick McGuffin indicated that the documents also
identified who the killer of Leah Freeman was.  And that
neither Bruce nor Nick McGuffin were going to give these
documents until they had consulted with a lawyer.

And then they did not contact the police.  And
so, based on the statements of Mr. McGuffin, as the informant,

Exhibit 5001 at 171

Ruling          118

there was an allegation that there is probable cause to believe that evidence of the crimes of Murder and Manslaughter in the First Degree, including, but not limited to documents in the custody and control of Bruce McGuffin, numbering approximately three hundred pages, are in the location which was to be searched and — and which was searched.

So, to the extent that there is — you know, a question of probable cause, I submit that there wasn't enough for — based on Bruce McGuffin's statement that he had these documents, for the search warrant to issue — for there to be a claim of probable cause for evidence of crimes of Murder and Manslaughter in the First Degree for the police to get the search warrant, and to conduct the searches.

THE COURT:    Okay.  I understand your point. But I — I don't agree with it, but I think I would deny it on that basis.

And, of course, I have no idea what the three hundred pages are.  If there were things that were seized between Mr. McGuffin and Mr. McCrea, or Ms. McCrea, one — one of the two, I'm assuming you don't plan to use that?

MR. FRASIER:    No.  I don't plan on using any of those documents, Your Honor.  In fact, uh, there is only two or three, or four, documents in there that I'm even interested in.  And, a majority of those would probably be more in line of being used in cross examination, rather than

Exhibit 5001 at 172

119                                        Ruling

offering up in my case-in-chief.  There is one document that I am considering offering in case-in-chief, but the rest would be — basically, contains material that I would want to use in cross examination.

THE COURT:   Okay.  So, I understand that — and do you agree there were correspondence that was between Mr. McGuffin and his attorneys that were seized?

MR. FRASIER:   My recollection — I don't specifically recall anything that was addressed specifically to Nick McGuffin.  I do recall letters that were addressed to his parents, uh, from the attorneys.  And - - -

THE COURT:   (Interposing) Those you don't intend to use?

MR. FRASIER:   No.  I don't intend to use those.

Right off the top — I'm not saying there weren't any that were addressed to Mr. McGuffin, the Defendant, it's just right off the top of my head, I don't recall any.

THE COURT:   Okay.  Well, I guess it — it would somewhat depend, uh — he doesn't plan to use them anyway, but — but I would — but, if — if Mr. McGuffin — if they were — if there are documents that were in Mr. Nick McGuffin's possession, that were addressed to his parents, and you could show they were Nick — in Nick McGuffin's presence —

Exhibit 5001 at 173

Ruling        120

I mean, he would have — they would have waived any attorney-client privilege because his parents would have shared it with him.  So, there wouldn't be an attorney-client privilege.

So — but that would have to be somewhat shown, because it would be strange that — that Mr. Nick McGuffin would have his parents' attorney-client because they would have waived it, then, by sharing it with somebody else.

Uh, but you are not going to use any of those documents?  I - - -

MR. FRASIER:    (Interposing) That's correct.

THE COURT:    - - - just want to make sure we are not going to get into that argument.

Then, those aren't being used.  You need to let probably Ms. McCrea know what one document you are thinking about, or intend to introduce.  Although, she has copies of those, but just so the parties can prepare in certain ways.

The other documents, you are just intending to use in cross, which still means they are available.  I think the documents under that search warrant were legally seized. And the only thing she's complaining about that was outside the scope of it, were these — as I understand it, the letters related — that relate to correspondence between attorneys — between attorneys and clients.  And, you don't intend to use any of the those things, so I don't — there is nothing for the Court to really rule on, in that case.

Exhibit 5001 at 174

121                                    Ruling

So, unless there is some other argument somebody wants to make about the scope — about the search warrant's validity, I'll - - -

MR. FRASIER:    (Interposing) Well, for the record, so the record is clear, I'd offer a certified — a Certified Copy of the Search Warrant Packet, marked State's Exhibit 1.

THE COURT:    And I — and I had read that when I was reading the Memo — preparing it — so, I've read it.  It — it's — so, if it sounds like I'm ruling pretty quickly, I've already read the documents.

Any other argument?

MS. McCREA:    No, Your Honor.

THE COURT:    Okay.  Motion to Suppress is denied.

Mr. Frasier, at this point, unless he brings something up later, can't use any documents that were addressed to and from your office.

I'm assuming we are talking about your office and the McGuffin's, mainly because they don't appear to be relevant.  As I said, it appears to me, if they can prove that some of those documents were in Nick McGuffin's possession, that his — that his parents would have waived their attorney-client privilege.

MR. FRASIER:    And is Exhibit 1 received,

Exhibit 5001 at 175

Ruling          122

Your Honor?

THE COURT:    Yes.

(Whereupon Plaintiff's Exhibit No. 1 was received into evidence.)

MR. FRASIER:    All right.

Um, I have another witness to call on our Motion to Admit Statements of the victim, who is on the phone. And we can put her on now, if you wish.

THE COURT:    Okay.  And I - - -

MR. FRASIER:    (Interposing) That would be the last - - -

THE COURT:    And Ms. McCrea's response was she would be looking at that.  And, I'm assuming you are opposing that?  If not, then we don't need to go through that.

MS. McCREA:    Oh, no.  I'm opposing it, yes.

THE COURT:    Call your witness.

MR. FRASIER:    Okay.

Would you call Extension 425?  They'll transfer the call to you.

JUDICIAL ASSISTANT:    (Not understandable.)

MR. FRASIER:    Oh, excuse me, 465.

I assume we can release Detective Schwenninger, at this point?

THE COURT:    Uh, I'm - - -

MR. FRASIER:    (Interposing) Okay.  Yes.

Exhibit 5001 at 176

123                              Ruling

THE COURT:    If this Motion to Suppress is done, you can.

MS. McCREA:    That's fine.

THE COURT:    This on Motion in Limine 1?

MR. FRASIER:    No. 1, I believe, yes.

THE COURT:    Who am I speaking to?

MR. FRASIER:    (Inaudible response.)

THE COURT:    Who is this?

MR. FRASIER:    Sherry Mitchell.

THE COURT:    Ms. Mitchell, can you hear me?

JUDICIAL ASSISTANT:    I don't have her.

THE COURT:    Oh, okay.  Well, then she can't hear me.

(Whereupon telephonic communication was established with the witness.)

THE COURT:    Uh, Ms. Mitchell, this Judge Barron.  You are on a speaker phone in the courtroom.  Can you hear me?

WITNESS:    I can hear you.  Can you hear me?

THE COURT:    Yes.  Thank you.

WITNESS:    Oh, good.

SHERRY ANN MITCHELL

was thereupon produced as a witness on behalf of Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as

Exhibit 5001 at 177

Mitchell   D      124

follows:

THE COURT:    Okay.

Mr. Frasier will be questioning you.  And then Ms. McCrea will be questioning you.

And I — I might say — although, I don't think it probably will happen — if you could just pause for a couple seconds after you are asked a question, just in case there is an objection.  Because once you start talking, if somebody objects, it's hard for me to interject and stop you.

WITNESS:    Okay.

THE COURT:    Okay?

Mr. Frasier.

MR. FRASIER:    Thank you.

DIRECT EXAMINATION

BY MR. FRASIER:

Q.   Can you hear me all right, Ms. Mitchell?

A.   I can hear you.

Q.   All right.

Could you, first of all, tell us your full name and spell your last name for the record?

A.   Uh huh.  My name is Sherry Ann Mitchell.  And my last name M-I-T-C-H-E-L-L.

Q.   And could tell us what city you currently reside in?

A.   I'm currently living in Oregon City.

Q.   And did you, at some point in time in your life,

Exhibit 5001 at 178

125                                    Mitchell  D

live in Coquille, Oregon?

A.   I did.

Q.   And when — when was it that you lived in Coquille?

A.   Pretty much all through school.  Growing up, I went to elementary, middle, and high school there.

Q.   And did you live in the City of Coquille in the year 2000?

A.   I did.

Q.   And, do you recall your address that you lived at when you were here in the — in the year 2000?

A.   Uh, I do.  It was 444½ North Elm Street.

Q.   During the time — well, in the year 2000, and prior to that, were you familiar with a young lady named Leah Freeman?

A.   Yes, I was.

Q.   And how did you know Ms. Freeman?

A.   We were really good friends.

Q.   Were you about the same age?

A.   We were.  We were in the same grade.

Q.   And in the year 2000, what grade were you in?

A.   Our freshman year.  We were in 9th Grade.

Q.   Did you finish your freshman year the Spring of 2000?

A.   Yes.

Q.   And you were looking forward to the sophomore in the

Exhibit 5001 at 179

Mitchell   D     126

Fall of 2000?

A.    Exactly.

Q.    How do you describe you relationship with Ms. Freeman?

A.    Uh, we had been friends for a few years — really good friends.  We spent most of our time together outside of school, during 7th and 8th Grade, and a lot of the beginning of 9th Grade.

Q.    I want to direct your attention to June 28, 2000. Did you have contact with Ms. Freeman that day?

A.    Uh, yes, I did.

Q.    Now, early in the morning, did you try to get a hold of her by phone?

A.    I don't remember.  Probably.  It was a good chance.

Q.    At some point in time during the day, uh, was arrangements made — or, was a plan made that Leah would come over to your home about 7:00 p.m.?

A.    Yes.

Q.    And did she come over to your house, on Elm Street, at around 7:00 p.m.?

A.    She did.

Q.    Now, were you aware of any relationship that Ms. Freeman was in at that time?

A.    I was.  She was dating Nick McGuffin.

Q.    And in regards to, um — well, let me ask you this.

Exhibit 5001 at 180

127                                    Mitchell   D

Uh, how did Leah Freeman arrive at your place?

A.    Nick McGuffin dropped her off.

Q.    And what happened when she got there?

A.    She, uh — she came inside.  I think that he had wanted to come in with her, and they — they were maybe kind of like scuffling — not really fighting.  Um, but just — you know, a little bicker about it, but then he left and she came inside.

Q.    And was there a discussion about going someplace with her the next day, or the day after?

A.    Uh, there was.

Q.    What was that about?

A.    I — to be honest, I — I'm not a hundred — like, I don't remember a hundred percent.  I'm pretty sure that it was — she had an appointment at the health department, and I know that I was going with her.  I can't remember if that appointment was the next day or not.  But I — I think that that's what is being referenced.

Q.    All right.  There was an appointment to go to the Health Department to get birth control?

A.    Yes.

Q.    What happened, uh — well, how long was Leah at your home?

A.    Um, she was there for a little less than two hours.

Q.    And what happened during that two hours between you

Exhibit 5001 at 181

Mitchell   D      128

and her?

A.    Well, we kind of just hung out in my bedroom.  And then, um, we were going to go for a run together.  It was something that we did often together.  Um, and we were going to go running.  And so, I went downstairs to ask my mom if I could go.  And she had just gotten home from work, and didn't want me to go because there have been times that me and Leah had gone running together, and somewhere in the middle of our run, Nick would drive by and stop, and he would end up picking her up.  She would get in the car with him, and I would end up running back home alone.

And so, since it was almost 9:00, my mom didn't want me to go because she knew that Nick at some point was probably going to drive by and pick her up.  And so, she didn't want me out after dark by myself.  So, I wasn't allowed to go.

Q.    Um, did it appear to you that Ms. Freeman had overheard your mother saying, "No.  You can't go on this run?"

A.    I'm sure she did.  It was a pretty small house.

Q.    And how did Ms. Freeman react to your mother's refusal to let you go for a jog?

A.    Uh, she got — she took it really personally.  It really hurt her feelings.  And she, um, you know, stormed down the stairs and went outside.

Q.    And did you follow her outside?

A.    I did.

Exhibit 5001 at 182

129                                    Mitchell   D

Q.   What did she say about your mother, that you could recall?

A.   She — I remember her saying that she thought my mom hated her.  Um, and, of course, I — you know, I told her that that, of course, what — what she was upset about.  She just didn't want me running after dark by myself.  And she knew that, you know, in the past Nick had picked her up before.

Q.   Did she apologize to you for anything?

A.   Uh, yes.  She apologized for not being good enough for me.

Q.   How did you respond to that?

A.   I — well, of course, I said that that's — you know, I said that that wasn't the case, or anything, but she — right after that, she walked away.  So, - - -

Q.   What was her demeanor like when she walked away?

A.   She was upset.  She had her arms crossed.  And — you know, I don't — I can't — she was probably crying.  But, I know that she was mad.  So, - - -

Q.   Did you ever see Leah Freeman again after that?

A.   I did not.

Q.   Did you see which direction she — when she left, which direction did she go?

A.   She was going, uh, down towards McKay's, off of — I think it was Fourth Street.  But she — she left Elm Street and was going down — walking towards McKay's.

Exhibit 5001 at 183

Mitchell  D    130

Q.   All right.  Now, at some point in time, did you discover in your room a note that had been written to you by Ms. Freeman?

A.   Yeah, I did.  I actually — I — I think I knew that she was writing it.  She — that was also — we always use to write each letters.  You know, just stupid little letters.  And so, she — she was writing that - - -

Q.   (Interposing) And she left that behind for you there in your room?

A.   Yes, she did.

Q.   Did you, uh — did you turn that over to the police, eventually?

A.   Um, I did.

MR. FRASIER:   Your Honor, for purposes of this Hearing, I have marked as State's Exhibit No. 2 the letter that was left for her.

We'd offer it.

THE COURT:   Any objection, for this Hearing?

MS. McCREA:    No.

For the purpose of the Hearing, subject to, of course, foundation.

THE COURT:   No. 2 is received.

(Whereupon Plaintiff's Exhibit No. 2 was received into evidence.)

Q.   Thank you.

Exhibit 5001 at 184

131                                    Mitchell  X

MR. FRASIER:    I don't have any further questions of this witness, at this time, on this issue.

CROSS EXAMINATION

BY MS. McCREA:

Q.    Ms. Mitchell, so, your bedroom was in the upstairs of the house on the Elm Street?  Is that right?

A.    Yes, it is.

Q.    And you and — and Leah Freeman were upstairs listening to music and hanging out together?

A.    Yeah.

Q.    After — excuse me — after Leah Freeman started dating Nick McGuffin, is it fair to say that you and Leah Freeman weren't hanging out as much as you had been?

A.    Yes, it is.

Q.    And — was that sometimes, uh — a — as we would say, a bone of contention between you?

A.    Um, I think it was — I mean — you know, I had a boyfriend at the time, too.  And him and Nick weren't exactly friends.  Um, and I — you know, Nick's friends are a lot older.  Um, and I — I was just kind of — I was kind of scared of them all.  And, the last — the couple times that we did hang out it was just kind of awkward.  So — I mean, I don't think it was — it was more just that — I mean, I didn't really know — I don't know.  It was just uncomfortable, I guess.

Q.    Was your boyfriend, Corey Bryant?

Exhibit 5001 at 185

Mitchell   X     132

A.   Yes, it was.

Q.   And on June 28, 2000, after Leah Freeman left your house, walking away towards Safeway (sic), did Corey Bryant arrive at your house?

A.   He did.

Q.   Were you still outside the house, or were you inside the house at that point?

A.   I — I don't remember.  I mean, I know that he said was still outside.  But I — I don't remember that.  I don't remember whether I was or not.

Q.   Now, in terms of the interaction with Leah on June 28, 2000, she was upset about your mom not wanting you to go running with her.  And she left the house, and you followed her outside?  Is that right?

A.   Yes.

Q.   And then, in addition to that, the whole conversation shifted to you talking to her about Nick McGuffin, didn't it?

A.   Uh, well, it didn't really shift, since it was kind of the same conversation.  I mean, Leah pretty much thought that we hated her because of Nick.  And, I just tried to tell her it wasn't because of Nick that we hated her.  We just didn't really like the choices she was making.

Q.   So, you didn't approve of Nick McGuffin?

A.   Um — hmm, I didn't approve of — no, I guess not.  I

Exhibit 5001 at 186

133                                    Mitchell  X

mean, it wasn't that I didn't approve of him, I just didn't think that they — I thought that he did a lot of things that she wasn't old enough to do, and they fought a lot.  I mean, every time I was around them they were arguing.  So, it didn't make a lot of sense to me.

Q.   So, you didn't see Leah Freeman and Nick McGuffin as a good combination for a dating relationship?

A.   No.  I thought that they kind of brought out the worst in each other.

Q.   And your mom had the same opinion?  Is that fair?

A.   Uh, I don't know if she had that much of an opinion. I think she was actually just really tired that day, to be honest.  Um, but, I think — the only thing that she knew was probably, you know, what maybe I told her, or what she had see from time to time.  But, you know, she may have had that opinion.  I — I'm not a hundred percent sure.

Q.   On - - -

A.   (Interposing) She didn't want me in the dark by myself.

Q.   Right.

On June 28, 2000, you did have some discussion with Leah Freeman, as she was leaving the house, concerning Nick McGuffin?  Is that right?

A.   Yes.

Q.   And you made it known to her that you didn't think

Exhibit 5001 at 187

Mitchell  X    134

that it was a good fit, the two of them dating?

A.    Probably.  That's — yeah.  I mean, I guess that's a fair way to say it.

Q.    And, do you remember how long this part of the conversation lasted?

A.    I mean, it — it couldn't have been more than a couple minutes.  I — I can't give you a — a number, but I know it wasn't long.

Q.    And, it was in response to your statements about Nick McGuffin, that Leah Freeman said, "Well, I'm sorry I'm not good enough for you?"

A.    Um, yeah.  I mean, it was — I think it was also along the lines of like me just telling her that I — you know, that — with the whole running thing, like feeling like that maybe she was going to, you know, get picked up.  She felt like I was saying I was being ditched or something.  I don't know.

Q.    I'm sorry.  I couldn't — I couldn't catch the last part, Ms. Mitchell.

A.    Oh, I was just saying that maybe she felt like, uh — or, I — I got the feeling that she was saying that she — like that I was ditching her or something.  And she was saying that she was sorry.  I don't know.  Never mind.

Q.    Were there times when you and Leah Freeman disagreed, that you went running together to work out your

Exhibit 5001 at 188

135                                      Mitchell   X

issues?

A.    Um, not that I remember.  I mean, we went running together because we both liked to run.  We didn't, honestly, disagree a lot.  So, this was kind of — that was kind of the big one.

Q.    Do you — yeah.

Do you remember a time when you and Leah Freeman, and somebody named Austin, went bowling?

A.    Nope.  But, I'm sure it happened.

Q.    Okay.  I know it's been a long time.

A.    Yeah.  I — I'm sure it happened — but — you know, more than once.  I've gone bowling with him a lot.  So, - - -

But, I don't remember the certain time that you are speaking of.

Q.    Bare with me just a second.

A.    Yep.  No problem.

Q.    Do you remember what time Leah Freeman left your house?

A.    Um, it was a little bit before 9:00, because it wasn't long before Nick was supposed to be there.

Q.    Do you remember what time Nick arrived?

A.    He arrived like right around 9:00.  He was on time.

Q.    Now, did he arrive before Corey Bryant or after Corey Bryant?

A.    I don't remember.

Exhibit 5001 at 189

Mitchell  X    136

Q.   Okay.  I'm looking at a document that has been attributed to Leah Freeman, where she talks about, "Yesterday I went bowling with Sherry and Austin for about two hours."

A.   Uh huh.

Q.   And then she talks about — Austin, basically, was screwing everything up.  "He was going to be (not understandable) with us, and I really didn't want him to.  So, we ended up going running.  Got in an argument about how I never talk to her anymore and ran it off."

Does that refresh your recollection?

A.   (Inaudible response.)

Q.   And then you said — stayed the night with Leah?

A.   I'm — I'm sorry, it doesn't.

Q.   Okay.

A.   Sorry.

Q.   But, how often would the two of you go running your freshman year?

A.   Uh, I don't know so much about our freshman year.  I mean, we went running a lot our 7th and 8th Grade year.  Um, you know, I can't — there is not a number I can give you our freshman year.  I — you know — kind of — I mean, in the beginning, probably quite a bit.  I mean, not so much near the end, you know.

Q.   So, when you said you "go running quite a lot", would that a — a number of days a week?

Exhibit 5001 at 190

137                                        Mitchell  X

A.   I — I honestly don't know.  I mean, there were — I guess, probably.  I mean, I can't — I really can't give you a number.  I just don't remember.

Q.   Okay.  And when you went running, like how far would the two of you run?

A.   We would run like to — you know, like from my house to the high school.  Or, when she lived over on Knott Street, we would usually run and meet in the middle, and then, you know, turn around and just kind of run like the loop, you know.  Or, we would walk/run the loop.  Um, you know, maybe up by high school.  I mean, we just kind of run around.  There wasn't really any other — a specific amount of time or place we would run.  We just — you know, ran around.

Q.   Okay.  And, in terms of the running, you said "walk/run".  Would the two — would you characterize what you did as walk/running, as jogging, as full out sprinting, or would it be a combination?

A.   Yeah.  All I meant was that if we would run the loop, it was — I mean, the loop was three miles long.  I don't know if we were in shape enough to run the entire time.  So, we would probably slow to a walk.  But, most of the time we were jogging.  We weren't sprinting or anything.  We would just be jogging.

Q.   Okay.  When Nick McGuffin showed up at your house, um, did he — he indicated to you he was there to pick up Leah?

Exhibit 5001 at 191

Mitchell  X      138

A.    Yeah.

Q.    And what did you tell him?

A.    I just told him that we got in a fight and she walked off mad.  I said that he could — you know, he could probably catch her.  She probably wasn't very far.

Q.    And did you tell him anything about what the fight was about?

A.    Uh, I don't remember.  I mean, if — if he asked, I'm sure I did.  But, I don't — I can't remember if he asked or not.  I — I think he just went and got her.  Or, went to get back in his car.  I'm not sure, though.  I can't remember.

Q.    And, when did you find the note in your room?

A.    Uh, I — I mean, probably just when I went back up in — in my room.  I mean, I think I knew she was writing it.  You know, I was sitting by her while she was writing it.  I can't — you know, I don't remember, but I think I probably just went back up and saw it there.

Q.    Okay.  And was it folded it or was it laid out flat?

A.    I think it was still in the notebook that she wrote it in.

Q.    Was that your notebook or her notebook?

A.    My notebook.

Q.    And where was the notebook in your room?

A.    Hmm, I have no idea.

Q.    Okay.  Like you don't remember if it was on the bed

Exhibit 5001 at 192

139                                    Mitchell   X

or the desk?

A.   No.  I don't remember.  I don't think I had a desk.  So, it was probably on the bed.

Q.   Okay.  Now, Leah had asked you if you would go to her appointment at the Health Department?  Is that right?

A.   Yes.

Q.   And part of what her note says is, "I hope you can come?"

A.   Uh huh.

Q.   And had you made any agreement or promise to her that you would go with her?

A.   Um, honestly, I don't — I don't remember a conversation that we had, necessarily, about it.  But, I'm sure that I was just going to go.  Like I'm — I mean I'm sure there was no reason why I wouldn't have gone.  So, - - -

You know — I mean, I'm assuming I had already told her that I would go with her, but I — I can't remember exactly.

Q.   And — and, she references the music that you are listening to, ". . .is really giving me the heaby jeebies (phonetic)."  Do you remember what the music was?  And then she said - - -

A.   (Interposing) It was — it was probably like Destiny's Child or some — some hip hoppy music because she — she was into — I don't know.  Or, maybe I was listening to

Exhibit 5001 at 193

Mitchell X    140

country or something.  She wasn't, you know, into that.  She liked — I don't know.  I remember her listening to like Puff Daddy and stuff like that, I guess.

Q.    When Nick McGuffin came to pick Leah Freeman up and you told him, "We got in a fight and she left", what was his — his reaction?  Was there anything other than he just said, "Okay," and went to try to go find her?

A.    I don't remember.

Q.    Okay.

Give me just a second, please, Ms. Mitchell.

Ms. Mitchell, regarding the note that we are talking about, from your room, did Leah write all of this note — you know, as best as you know — while you were down arguing with your mom, or was she writing some of it while you were in the room with her?

A.    I think she wrote it all while I was in the room with her, or at least most of it.

Q.    Were you looking - - -

A.    (Interposing) It was like when I was fiddling with the music.

Q.    I'm sorry.  While you - - -

A.    (Interposing) It — it - - -

Q.    - - - were fiddling with the music?

A.    Yeah.  Because in it she says, "Oh, now you are changing it."  I mean, it wasn't — I know it seems weird, but

Exhibit 5001 at 194

141                                              Mitchell  X

it wasn't uncommon for us to write notes to each other even though we were sitting right next to each other.

Q.   You guys were just ahead of the texting craze?

A.   Yeah.  Exactly.  That — it was just — I mean, every time we got out of class, in the hall, we had a stupid little note for each other that really didn't say anything at all, but that's just what we did.

Q.   Okay.  So, this wasn't unusual for her to write a note like this to you?

A.   Not at all.

Q.   Or, to write it while you are in the room with her?

A.   I'm — no.  I mean, it wasn't unusual.  I know it sounds stupid, but it's not unusual — or, it wouldn't have been.

Q.   Alrighty.  Thank you.

        MS. McCREA:    That's all the questions I have.

        WITNESS:    Okay.

        THE COURT:    Mr. Frasier?

        MR. FRASIER:    I don't have any further questions, Your Honor.

        THE COURT:    Thank you, ma'am.  We'll terminate the call.

        WITNESS:    All right.  Thank you.

        (Whereupon telephonic communication was terminated with the witness.)

Exhibit 5001 at 195

142

THE COURT:    Okay.  Anything else on that, Mr. Frasier?

MR. FRASIER:    That's all the live testimony I have on the Motion to Admit Statements from the victim.

I do have the documents referred to in my Memorandum, marked as individual exhibits.  Again, just for purposes of these Hearings, I would offer those documents.

I realize that at Trial we will have to establish foundation and so forth for them.  But, for purposes of this Hearing, we'd offer State's 3, 4, 5, 6, 7, 8, and 9, which are letters addressed to Mr. McGuffin, and her diary, plus two documents.  One appears to be a poem, and another she entitled, "Thoughts".

THE COURT:    I'm sorry.  The numbers again?

MR. FRASIER:    No. 3 through 9.

MS. McCREA:    May I — I've got to correlate them to what — what I have in the State's Exhibits.

Well, are — are these the ones that were attached to your - - -

MR. FRASIER:    (Interposing) Yes.

MS. McCREA:    Okay.  Because I've got down — well, I'm sorry, Your Honor.  If I could just a moment because - - -

THE COURT:    (Interposing) Yes.

MS. McCREA:    - - - these are not in the same

Exhibit 5001 at 196

143

order, apparently, as they were in the State's Exhibits.

MR. FRASIER:    Oh, I'll — I'll withdraw No. 9.

THE COURT:    Okay.

MS. McCREA:    For the — the purpose of the Court considering them for this Hearing, there is no objection to them being received.  There is an objection to them, in terms of their admissibility, which we are going to be arguing about.

THE COURT:    Okay.  They are - - -

MS. McCREA:    (Interposing) And - - -

THE COURT:    - - - received.  They are received for the purpose of this Hearing.

(Whereupon Plaintiff's Exhibit Nos. 3, 4, 5, 6, 7, and 8 were received into evidence.)

MS. McCREA:    Oh.  In other words, Mr. Frasier, is there going to be any evidence concerning the foundation with the — the timeframe of any of these documents, other than the Sherry Mitchell document?

MR. FRASIER:    In terms of - - -

MS. McCREA:    (Interposing) And the - - -

MR. FRASIER:    - - - when they were found or - - -

MS. McCREA:    Well, when they were found or when they were made.

MR. FRASIER:    Well, we'll be offering as a

Exhibit 5001 at 197

144

(sic) evidence, uh, when they were found.  We'll be offering the evidence of their — most of the documents have a date on it.  The diary documents, uh, have dates except for the latter entries, which occur after dates in the, uh — earlier dates in the diary.  So, - - -

MS. McCREA:    So, are you offering evidence on when they were found?

MR. FRASIER:    For this Hearing?

MS. McCREA:    Yeah.

MR. FRASIER:    No.  I'll be doing that at Trial.

MS. McCREA:    Okay.

THE COURT:    They are received for this Hearing.

Did you have any testimony on this Motion in Limine 1, Ms. McCrea?

MS. McCREA:    No, Your Honor.

THE COURT:    Okay.

Uh, we have Motion - - -

MS. McCREA:    (Interposing) I'm - - -

THE COURT:    - - - in Limine 2.

MS. McCREA:    (Not understandable)?

THE COURT:    You may.

MS. McCREA:    Your Honor, if we could back to the, um — the State's Motion to Offer the Defendant's

Exhibit 5001 at 198

145

Statements?

THE COURT:    Yes.

MS. McCREA:    The Defendant would make the request to offer, as evidence on that Motion, the Affidavit in addition to, on the Defendant's Reply to the Plaintiff's Motion No. 2 — to offer into evidence the Affidavit of Steve Hebner, concerning the polygraph examination done of Mr. McGuffin for consideration concerning the admissibility of Mr. McGuffin's statements.

So, we would — we would ask that that be considered as part of the evidence.  And I can make a separate copy of that and have it marked for the Court.

THE COURT:    Well, it's attached to the Memo that you gave the Court his morning.  Uh, I'll get it here.

And that, uh, hasn't been file stamped yet because the Court just received it.  But, the Affidavit of Mr. Hebner is attached thereto.  And, I don't see the necessity, unless you want it marked as a separate exhibit, for you to do that.  I mean, it — it's attached to your Memo.  And if you want me to consider it in relation to the State's Motion to Admit, I'll do that.

MS. McCREA:    Yes, please.

THE COURT:    Okay.

MS. McCREA:    Thank you.

THE COURT:    Yep.

Exhibit 5001 at 199

Motion in Limine 2          146

Okay.  The next one, Motion in Limine 2, to keep evidence that Ms. Freeman may been hit and killed by a car driven by another person.  I assume there is no testimony on that.  That's just legal argument?

MR. FRASIER:    That would be my position, Your Honor.

THE COURT:    I — I don't know whether you had any evidence on that?  Any testimony or evidence you wanted to present on that issue?

MS. McCREA:    Well, the — the evidence we would present on that issue are the Attachments, A, B, and C, which is the Grand Jury testimony of Doctor Olsen, Chief Deputy Medical Examiner Kris Karcher, and then the Affidavit of Mr. Hebner.

THE COURT:    Okay.  That — and I haven't had a chance to read the testimony.  I read the Motion, and I read Mr. Hebner's Affidavit.  But, I just got those transcripts.  They are too long that I — I couldn't read those before the Hearing.

I'm assuming those are offered just to show that the State can't prove the exact method of how Ms. Freeman died.

MS. McCREA:    The State cannot prove the manner nor the cause of her death, Your Honor.

THE COURT:    Okay.  And, clearly, that would

Exhibit 5001 at 200

147                                Motion in Limine 2

be one issue that the Court — or, one thing that the Court would look at in determining whether or not you could present evidence of - - -

I guess, you could present, possibly, evidence that she could have been killed some other way.  Whether you could present evidence a specific person might have been involved, I think you have to show more than the fact that she, uh — they just can't prove how she was killed.

And I — you know, I've had this issue before. I think I had it in the last case — murder case you tried here.  Uh, - - -

MS. McCREA:    (Interposing) Mr. McCrea - - -

THE COURT:    - - - and - - -

MS. McCREA:    - - - was just saying that, Your Honor.

THE COURT:    Right.  And, I let — I let some evidence in, as to one person being a possible perpetrator, and kept evidence out that another person who was a possible perpetrator.

But, I think there has to be something — and in that case, there was, I think, certainly, enough evidence to get it in there — but, I think there has to be something that points to these people other than — I think even more than they happen to own a car, or had their drivers license.

So, I — I don't know what else you're — you're

Exhibit 5001 at 201

Motion in Limine 2          148

offering, other than the fact that the State possibly can't show exactly how she died.

On that, I'm — I'm saying you want that evidence in?

MS. McCREA:    Well, I'm not necessarily saying I want in the evidence that she was killed by a car that was driven by William — known as Bill Sero, and/or Thomas Stemmerman, and/or Rowdy Howard, and/or Lisa Mashad, or Matt Mendell, or Stacy Napier.

THE COURT:    Right.

MS. McCREA:    What — what I am — what I am objecting to is the State restricting the defense's ability to bring forward evidence concerning issues related to Ms. Freeman's disappearance and death, both in terms of cross examination and if there are specific facts which point to someone other than Mr. McGuffin.

And, it is really a two-fold issue.  Because, it's interesting that the State's Motion — their Motion in Limine is limited to prohibiting the introduction of evidence at Trial that she was killed by a car, as opposed to whether she was hit by a car.

So, it — it's a — I simply — I submit that the State simply cannot prohibit the defense from bringing in particular instances, or information.  And, it's not something that, I submit, the Court can make a blanket grant of State's

Exhibit 5001 at 202

149                                Motion in Limine 2

Motion in Limine.  But, it's something that we are going to

have to take up at the time of Trial, depending on how the

evidence comes out.

THE COURT:    That — that may be.  But, if —

if, in fact, the State — and I haven't heard from Mr. Frasier

— if the State is going to put on evidence that says, "We

don't know how she was killed", that, in effect, opens it up

even to argument to the jury just to say, "Well, they don't

how she could have been killed.  She was walking on the

street.  She could have been killed by a car."  I — I don't

know, uh, that their Motion in Limine would prevent an

argument.

Where you're presenting exact evidence, it

might — that — that points to a person.  And, you've said now

you are not sure that's what you want to do.  But, just their

— their statement, if — if, in fact, that's true, "We can't

prove how she was killed, or the method how she was killed, or

how she died," uh, I'm not too sure that you couldn't just

argue that she could have been killed on a sidewalk, - - -

MS. McCREA:    (Interposing) Yeah.

THE COURT:    - - - walking down the street.

So, his Motion in Limine was to present —

prevent you from presenting evidence, but I'm not too sure

that would prevent argument.

MR. FRASIER:    My — my concern in this case,

Exhibit 5001 at 203

Motion in Limine 2        150

Your Honor, has been there have been these rumors floating around town that — "Well, she was run over by a car driven by . . ." — and there is — you name five, six different people who were driving the car.  And there is also rumors indicating the Defendant was driving the car that ran her over.  Or, that he was in the car that — when it occurred, and what have you.

Every time we go and talk to these people that say, "I heard so and so say this," we keep getting, "Well, that's what I heard.  I never heard Person A. . ." such as Sero, ". . .say that.  I never Stemmerman say that.  I never heard Mashad say that."  It's always, "That's what I heard on the street."

THE COURT:    Right.

MR. FRASIER:    And that's what I'm trying to keep out, is unless there is something that says, "I heard this person say that," I don't think we ought to go there.

THE COURT:    Well — okay.  I think Ms. McCrea is right in one — one regard.  I'm going to have to hear Trial testimony.  Based on what I'm hearing now, generally, we are not going to — we are not going to have rumors coming in unless there is something to back the rumor.

And, I think that's what — in the prior case — prior murder cases I've tried here, that's what I tended to rule on, because there was evidence that connected the one person and really not the other one.  Although, that wasn't a

Exhibit 5001 at 204

151                              Motion in Limine 2

rumor.  But, I don't think rumors can come in.  I don't think it prevents her from arguing it.  We don't know how she was killed.  And it could have been anything.  I mean, she was out on - - -

MR. FRASIER:    (Interposing) (Not understandable) - - -

THE COURT:    - - - the street at — after dark.

MR. FRASIER:    I — and I don't disagree with that.

THE COURT:    Okay.  Well, I guess, if it comes to the point where you think you should be able to bring up and say, "Well, didn't you hear that Mr. Sero, or somebody else, might have been — might have hit her with a car, then I'll — I'll make a ruling at that point in time.

Right now — I mean, I'm not — I tend to think that wouldn't be coming in, but I don't know the circumstances.

Okay?

MS. McCREA:    Yes.

THE COURT:    All right.

MS. McCREA:    Is the Court going to want us to do a — um, a short Memorandum on the issue of the Defendant's Statements and the documents?

THE COURT:    Well, you can do a Memorandum if you want to.  I'm not asking for one.  I — I just as soon hear

Exhibit 5001 at 205

Jury View          152

your argument on — on — if you have an argument against the Motion to Admit Statements, which I assumed you did — but, if you want to do a Memo instead of that, that's fine with me.

MS. McCREA:    Okay.

THE COURT:    You want to do a Memo?

MS. McCREA:    I would.

THE COURT:    Okay.

And, you could also do a Memo on Motion in Limine 1, because I don't think you did one.  If you are going to do one, I'll give you a short period of time to get it in.  Okay?  Because the - - -

MS. McCREA:    (Interposing) Yes.

THE COURT:    - - - Trial is next month.

MS. McCREA:    Yes.

THE COURT:    We have a couple other things.

The State wants a Jury View.

Do you have any argument one way or the other on that?

MS. McCREA:    The — I talked to Mr. Frasier about the Jury View.  And, one of the questions I had for him was who was going to be the individual in the bus, pointing out the locations to the jury.  And he opined he thought it would be you, Your Honor.

THE COURT:    At jury views before, I've gone along.  I don't especially relish the tour guide, - - -

Exhibit 5001 at 206

153                                          Jury View

MS. McCREA:    (Interposing) I - - -

THE COURT:    - - - but, uh, - - -

MS. McCREA:    (Interposing) Well, that was - - -

THE COURT:    - - - it could be - - -

I don't — I — I don't know there is any other way, unless — and I've had both — both counsel and the Defendant, at the same time there, because I think the Defendant's entitled to be present during those matters.  But I — if people want me to say, "Look at this and look at that," I'm happy to do that.  I also don't care if both counsel are there, if counsel wants to do it.  As long as it's just, "This is what we want you to look at."

But I — I do think — I'm not too sure whether I've — whether I've not gone on views before.  I think, generally, I have just because I think it's necessary the jury is there.

MS. McCREA:    Yes.  That — that makes sense.

THE COURT:    Okay.

MS. McCREA:    So, the only issue of the proposed Jury View that I have is the view of Mr. McGuffin's — it's actually Mr. McGuffin's parents' residence, the McGuffin home in 2000, which is No. 8 on the list.  And I object to that concerning a relevance aspect.

I — otherwise, I am okay with the proposed Jury

Exhibit 5001 at 207

Jury View         154

View.  I understand that there would be a jury instruction given to the jury that it's not evidence.  And, I would also ask for — and I will take a stab a drafting — a jury instruction to apprise the jury that the time taken to get from one point to another with the Jury View, should not be taken as any evidence of the time anyone else would take to get from one point to another.

THE COURT:    Okay.

Mr. Frasier, do you have any — I'm not too sure I've had an objection about the relevancy of a particular part of a Jury View before — but, do you have any — what is - - -

MR. FRASIER:    (Interposing) Well, - - -

THE COURT:    What is the relevance?  Because that — that may be important if we are just driving around to drive.  I don't - - -

MR. FRASIER:    (Interposing) I — I believe we are going to have evidence, Your Honor, that some point during the time — I realize the Defendant's family denies this — but, we've had some indication of the witnesses, and I believe there will be testimony at Trial, that some time during the evening the Defendant switched cars.  And that some time during the evening the Defendant changed his clothes.  So, there would be a necessary — in our view, it's necessary to show that he must have gone home at some point in time.

We heard from Officer Zavala, who just

Exhibit 5001 at 208

155                          Motion for Discovery

testified that he was headed in the general direction of home.

So, I think in that regard, the location of home in regards to

everything else in this case has become, uh, and issue.

THE COURT:    Okay.

You can have your Jury View.

Did you want any — any other things visited,

Ms. McCrea?

MS. McCREA:    I don't think so, Your Honor.

THE COURT:    Okay.

All right.  No.  We'll, go to the places there.

Uh, the last issue is the Motion for Discovery

that the State's filed.

Has that occurred to your satisfaction or is

that an argument - - -

MR. FRASIER:    I have not received any

Discovery from the defense, Your Honor.

MS. McCREA:    And I — I will be providing him

Discovery.  I just received the State's issued subpoenas, with

approximately a hundred and thirty-five names.  So, now I can

see who the State is really going be calling as witnesses, and

I will be getting Mr. Frasier Discovery.

I'm still receiving Discovery from them, and

I'm still responding to that in terms of our own

investigation.  So, as we obtain things which are

discoverable, I will provide those.

Exhibit 5001 at 209

Motion for Discovery          156

THE COURT:    Okay.

I guess — and — what I don't want to do is get into this argument, uh, at — at — closer to Trial.  And that is that if you have witnesses you intend to call — and I'm not too sure exactly what to do — is if you have witnesses that they are going to call and you have material or statements that you intend to use in cross, uh, my general feeling is that — even though you are not specifically calling — may be — may be discoverable.  Although, certainly, if not discoverable, would have to be turned over to the State at the time of cross examination.  Because if — if you are using that in cross, they would have — they would be able to see that.

But, at this point in time, my feeling would be if you have statements from witnesses who you are going to call, then there is absolutely no reason why they shouldn't have been turned over by now, and should — and should be given to the State.  And I will set next Wednesday as the deadline for doing that.

Uh, we're — we're — what are we?  About a month — we are less than a month from Trial.

MS. McCREA:    And that's fine, Your Honor.

Um, in addition, I would indicate to the Court that Mr. Frasier and I have a reached an agreement, that given the number of people the State has already subpoenaed, that the State will let the defense know before releasing any of

Exhibit 5001 at 210

157                          Motion for Discovery

their subpoenaed witnesses, to give the defense an opportunity to subpoena those people.  So, we don't have to run out and subpoena all the same people ahead of time.

THE COURT:    And I think that's fair.  And that's good.  And that's — this is kind of the issue I was talking, though.  If they say, "We are going to release them." And you say, "Okay.  I want them to be here.  They are now my witness."

"Okay."  "Here is my — here is — here is the statement from them."

That, uh — I'm not too sure that it directly violates the discovery rule, but it comes close.  So, I just — if you have witnesses that you intend to call — if they release them from the subpoena, or let them go, then I think those are probably statements that should be turned over.

MS. McCREA:    I understand.

THE COURT:    Okay.

MS. McCREA:    The — another issue is I'd like to ask the Court for permission, if necessary to conduct telephone testimony at Trial.  And there is an — a DNA examiner in England that the State utilized to examine Ms. Freeman's clothes in this case.  We are trying to reach him, and we may want him in the defense case.  But, the cost to transport him to Oregon would be prohibited.  It - - -

THE COURT:    I have not — I have not cared one

Exhibit 5001 at 211

Motion for Discovery          158

way or the other about telephone testimony unless there is an objection.  If — if both sides agree it can be by telephone, I don't — I don't care.

MS. McCREA:    Very good.  Then I will — I will confirm with Mr. Frasier, Your Honor.

THE COURT:    Okay.

And at this point, you are getting more reports in.  I think at this point as soon as you get a report in, if it's from a witness that's going be there, you need to turn it over immediately, unless of course you are not going to use that witness at all.  But, I mean — but — just so — any — anything is coming in — and I — Mr. Frasier would be under the same obligation, but, as I said, Wednesday of next week is the deadline for getting that stuff in.  Unless a statement comes in after that, then you've got to it as soon as you get it after that.

Is that satisfactory, Mr. Frasier?

MR. FRASIER:    That's fine, Your Honor.

THE COURT:    Okay.

Now, the only other — uh, I think that decides all the issues that I had written down as being issues here.  I had a couple things of my own, but is there something else either party has?

MS. McCREA:    When does the Court want my Memos?  By Monday?

Exhibit 5001 at 212

159

THE COURT:    Uh, that would be fine.

MS. McCREA:    Thank you.

MR. FRASIER:    And any Response by me by Wednesday?

THE COURT:    That would be fine.

MR. FRASIER:    All right.

THE COURT:    Okay.

Now, that the Motion to Change Venue has been withdrawn, uh, I'm assuming voir dire — well, it may or — may be shorter.

And so, I'm not too sure — because you — you withdrew it, I — I don't know what your expert concluded one way or the other, but are you thinking of any type of short questionnaire that relates to the publicity that this case has that you want the jury to fill out?  Or, is that just kind of not really an issue any more?

MS. McCREA:    I submit it is still an issue. And a short questionnaire would be appropriate.

THE COURT:    Okay.

MS. McCREA:    And - - -

THE COURT:    (Interposing) I will draft up one.  And when the jurors come in — it's not going to be really more than, "What have you heard about this case?  Have you . . ."  You know, "Have you read, seen on TV, or listened to the reports?  Have you done any internet searches about

Exhibit 5001 at 213

160

this?  Have you formed a specific opinion about whether Mr. McGuffin is guilty or not?  Has anybody else expressed an opinion?  Has people — have people told you about that?"  And, that would be, basically, it.

And, uh, this case was originally set — I think — for nine days?

MR. FRASIER:    (Inaudible response.)

THE COURT:    And so, you have a hundred and thirty-five witnesses?

MR. FRASIER:    We issued a hundred and thirty-five.  I anticipate that in our case-in-chief we will call at least seventy witnesses — case-in-chief.

THE COURT:    You might have sixty-five for rebuttal?

MR. FRASIER:    Well, it depends on where we go with this issue of — you know, did this person drive a car?  If that starts coming in, those extra witnesses will be pertaining to that issue.

THE COURT:    Okay.

MR. FRASIER:    So, um, - - -

THE COURT:    (Interposing) So, assuming we're limited to your seventy - - -

And, how many witnesses do you think you might have, Ms. McCrea?

MS. McCREA:    I really don't know.  Let's make

Exhibit 5001 at 214

161

a wild guess and say twenty.

THE COURT:    Okay.

So, do we think that — I assume most of those are not long witnesses?

MR. FRASIER:    I — I don't think so, Your Honor.  But, I've been thinking about this and — and talking with, uh — Ms. Soublet will be trying the case with me.  We — we think it's more realistic that it will take longer than nine trial days, or longer than ten trial days.  We think it will go into a third week.

THE COURT:    Okay.

MR. FRASIER:    And so, I would want to tell the Court that.

The other thing I probably should tell the Court, I hope it doesn't go into a fourth week.  I really don't think it will.  But, I'm going to tell the Court, at this, point that — if we get into the week of, uh, Memorial Day weekend, that Monday — Memorial Day and — and the rest of that week, I'm out of town for my daughter's wedding.  So, um, - - -

THE COURT:    (Interposing) We'll try and move it - - -

MR. FRASIER:    - - - I hope we don't get there.

THE COURT:    We'll try to move it along.

Exhibit 5001 at 215

162

Right?

MR. FRASIER:    Or, if I'm not out of town for my daughter's wedding, I hope — there'll be another homicide in Coos County, - - -

(Laughter.)

- - - and we don't need that.

THE COURT:    Not now.

Uh, well, we'll — we'll try to move it along quickly.

I generally don't — I mean, this is not a case in which the death penalty is, and so I — I don't recall, trying the murder cases that I've tried, having individual voir dire for a murder case.

And I'm not too sure — if we have that short questionnaire — I mean, usually jurors are pretty good. Because I usually say, "Don't say what you know, I just want to know what the effect of it is on you." And you can question about that. You know, there is always a possibility of somebody blurting something out. But, uh, I don't see a reason to do an individual voir dire in this case.

(No audible response.)

Hearing no objection, we won't do one.

Uh, - - -

MS. McCREA:    (Interposing) Individual voir dire? Well — yeah. When the — when the Court's - - -

Exhibit 5001 at 216

163

THE COURT:    (Interposing) I didn't hear an objection, though.  Good.

MS. McCREA:    Well, I guess — when I — when the Court says "individual voir dire", I mean — I assume you meaning we take the jurors one at a time, outside the presence of all the other jurors?

THE COURT:    Right.

MS. McCREA:    And at this point, I don't see a need to do that one on one.  But, of course, if we get particular responses on the juror questionnaire, it may become important to do so.  Which - - -

THE COURT:    (Interposing) If — if it becomes important to question a juror individually about something, I will be happy to take them back into my office, with everybody present, and we'll do it that way.

MS. McCREA:    Which is what I anticipated, which is why I didn't raise an objection when the Court brought it up.

THE COURT:    Okay.

Uh, anything else?

MR. FRASIER:    I have nothing further, Your Honor.

THE COURT:    Okay.  Then I will, uh, wait for your Memo on Monday.

And your reply on Wednesday.

Exhibit 5001 at 217

164

MS. McCREA:    Wednesday.

THE COURT:    Okay.

We'll be in recess then.

\*                            \*                            \*

Exhibit 5001 at 218

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

STATE OF OREGON,               )
                               )
            Plaintiff,         )      CASE NO. 10CR0782
                               )
                               )      PRETRIAL HEARING
      vs.                      )
                               )
 NICHOLAS JAMES McGUFFIN,      )
                               )
            Defendant.         )
_____    )

TRANSCRIPT OF PROCEEDINGS

Volume 2, Pages 165-173

BE IT REMEMBERED That, the above-entitled cause

came on regularly for hearing beginning at 1:15 p.m., Thursday,

May 5, 2011 in the Circuit Courtroom of the Coos County

Courthouse in the City of Coquille, County of Coos, State of

Oregon, before the Honorable Richard L. Barron.

APPEARANCES

Erika Soublet, Assistant District Attorney for Coos County,
representing the Plaintiff.

Shaun McCrea, Attorney at Law, representing the Defendant.

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 219

165

*                             *                                    *

JUDICIAL ASSISTANT:    All rise.

THE COURT:    Be seated, please.

This is the time set for a Hearing on some Motions filed in State vs. McGuffin, Case No. 10CR0782.

Mr. McGuffin, I think as you aware from talking to your counsel, that Ms. McCrea filed a Motion to continue the Trial date because her — her co-counsel, Mr. McCrea, has some health problems that have to be taken care of and — including a surgery next week.  And so, she has asked that the case be postponed in light of that.

And my first question to you, do you understand why she asked the case be postponed?

DEFENDANT:    Yes, I do.

THE COURT:    And you are in agreement with that?

DEFENDANT:    Yes, I am.

THE COURT:    Okay.

The second thing that I need to talk to you about is a trial date.  And, tentatively — I talked with counsel in chambers briefly beforehand.  And we are looking at a date beginning July 5th for — and that would take the — July 5th through the 8th, the 11th through the 15th, and the 18th through the 22nd.  Now, we may not need all that time, but that's about three weeks.

Exhibit 5001 at 220

166

DEFENDANT:    Okay.

THE COURT:    Now, we, unfortunately, do not know what the surgery will show, or what it will necessitate from Mr. McCrea.  We all hope the best, obviously.  But, it may mean that, uh, if we set it in July that Mr. McCrea not — may not be able — be available to assist Ms. McCrea.  I don't know that.  We hope, obviously, that will happen, but with health you can't always tell.

If we don't set it in July, we are probably looking at November.

DEFENDANT:    (Not understandable.)

THE COURT:    So, the second question that I have for you is that if Mr. McCrea is not able to participate in the Trial, do you wish to go ahead and proceed in July?

DEFENDANT:    Yes, I do.

THE COURT:    Okay.  That would mean that there can't be any complaint later, by you, that, "Okay.  Mr. McCrea wasn't there.  I wanted him there."  Because — and again, hopefully everything is fine and he'll be there.  But, if he's not, Ms. McCrea will proceeding alone with you, and she's trying — Ms. McCrea is extremely capable of trying, but obviously it helps to have Mr. McCrea, who is also very competent.  But, he may or may not be able to be there.

DEFENDANT:    I understand.

THE COURT:    So, you are willing to proceed

Exhibit 5001 at 221

167

without his presence, if that becomes necessary?

DEFENDANT:     Yes, I am.

THE COURT:     Or, maybe even his partial presence at times?

DEFENDANT:     Yes.

THE COURT:     Okay.  You would prefer that, rather than waiting until probably November?

DEFENDANT:     Yeah.  I would prefer it be in July.

THE COURT:     Okay.

And you understand you are giving up the right to have his — his presence here all the time, or even part of the time?

DEFENDANT:     Yes.

THE COURT:     That — that could happen.

DEFENDANT:     That's — that's all right.

THE COURT:     Okay.

Uh, okay.  Then the Trial will be set beginning May 5th — or, excuse me, July 5th through July 22nd.

Now, the other thing, that I'm sure Ms. McCrea talked to you, that we talked about briefly, is that because this case was scheduled in May there — we made sure there were no conflicts with witnesses — all that.

The State is — is agreeing to this trial date, although, it's fitting in — and with a number of other cases

Exhibit 5001 at 222

168

that we have pending, it's getting harder to fit these cases in there, longer cases — is that there may be witnesses — mainly police witnesses — who, because of previous vacations, other time off, whatever it is scheduled, are not going to be able to be here in person.

And, I said would postpone this but only upon the agreement of the defense saying, "Okay. If there is a witness that can't be here, One, we may have to do it by telephone, or Two, it may have to be done by written report."

DEFENDANT:   Okay.

THE COURT:   And that would mean, of course, by telephone, neither you nor your counsel gets to see somebody face to face, because we may not be able to do it by video. So, you may not be able to see them face to face. And that can affect cross examination, the right to confront witnesses, because they are not here personally.

And, obviously, if it's done by report, there is no cross examination and no confrontation because the witness isn't even here. They are introducing a report, or the State is merely standing up and telling the jury what this person would testify to if they are here. So, there is no chance to cross examine that, to confront the witness, to do anything other then have read a report, state orally what the witness said, or have the witness on the telephone and possibly by video.

Exhibit 5001 at 223

169

But again, that would be giving up your right to confront that witness, and cross examine that witness in some instances, entirely during the Trial.

Now, are you agreeable to that happening?

DEFENDANT:    Yes, I am.

THE COURT:    Now, I don't know what (sic) the witnesses are.  It sounded as if — when I had this brief conference with counsel, it was merely going to be witnesses who, uh, maybe see some evidence, uh, probably not too controversial.

DEFENDANT:    Uh huh.

THE COURT:    But, if Mr. Frasier for some reason — and he — he looked quickly, because I don't think counsel had originally thought of June or July.  They were thinking (not understandable), so he had to go back over. But, if there is another witness that all of a sudden Ms. McCrea objects to doing that way, then this Trial is going to have to be reset until the fall.

Now, I'm not saying she shouldn't object or you shouldn't object to it, but the condition of me doing this was the State possibly had some witnesses who couldn't be here for various reasons and had other plans to do that.

So, you are not giving up your right to a object to a witness not being here, but you are giving up — by agreeing to this July date — that if, in fact, you do object

Exhibit 5001 at 224

170                                    Discovery Motion

to a witness not being here, we are resetting this case until the fall.  Do you understand that?

DEFENDANT:    Yes, I do.

THE COURT:    You are agreeable to that?

DEFENDANT:    Yes, I am.

THE COURT:    Okay.  Do you have any questions about any of the things we covered so far?

DEFENDANT:    No, I do not.

THE COURT:    Okay.  And now we have a Discovery Motion, which in light of this reset, I'm hoping can be resolved with counsel.  I mean, I — I can go ahead and hear your arguments and — and read it.  I — my general feeling is that the defense and State has — have the same obligation under the statute.  They've got to give — provide the same information, and they have to do it as soon as practical.

Uh, and if you are not going to call a witness, and I don't care whether the statement is made is or not, because it's, you know — unless, obviously, the State has an obligation to produce exculpatory evidence.  But, other than that, if you are not using a witness, you don't have to provide things.

But, I do think stuff should be done, uh, in a timely manner.  And, I would say generally that I wouldn't expect this material not to be available by the 27th of May.  And, what I can do is hear your arguments and — and, uh, take

Exhibit 5001 at 225

Discovery Motion        171

it under advisement.  And then, on the 27th advise me whether I need to make a ruling on it.

Is that agreeable?

MS. SOUBLET:    That's agreeable to the State.

MS. McCREA:    Yes — yes, Your Honor.

THE COURT:    Okay.

Mr. — Mr. McGuffin, what I'm telling the counsel is that each side has an obligation under the statute to share what witnesses they are calling, what statements, to provide any other material that they are going to get — have.

And, I did notice there was something that said Ms. McCrea might offer some things that she got from the State.

I'm assuming you are not arguing that you need discovery of that?

MS. SOUBLET:    No.

THE COURT:    Okay.

MS. SOUBLET:    I'm not, Your Honor.

THE COURT:    Well, uh — so, we are talking about having it done then.  Both counsel have assured me that they are going to get whatever they have — or, if possibly something that comes up at the last minute — they will get all of this material to them.

And again, I would say, that even if it's a witness who you think just might be called, that has to be

Exhibit 5001 at 226

172                          Discovery Motion

provided, even if you make a later decision not to do it. So, that — that also has to be done.

Do you understand that?

DEFENDANT:    Yes, I do.

THE COURT:    Do you have any questions?

DEFENDANT:    No, I don't.

THE COURT:    Okay.

Is there anything else, counsel, either of you want to bring up?

MS. SOUBLET:    Nothing from the State.

THE COURT:    Ms. McCrea?

MS. McCREA:    No, Your Honor.  Thank you.

THE COURT:    All right.  That will be the new, uh, Trial date.  And, uh, hopefully that will be when we can do it.

I hope Mr. McCrea gets better.

MS. McCREA:    Thank you, Your Honor.

THE COURT:    Discovery is to be done by May 27th.

Okay.  And I — I know Ms. Freeman's family, I believe, is here.  And — and, uh, this was necessitated and I know a reset is — is uncomfortable to you as the other side. But, this was necessitated, and I tried to get it set as quickly as I could.  Uh, and so, July was the — was the first date.

Exhibit 5001 at 227

Discovery Motion          173

VOICE:    Thank you, Your Honor.  Yes, thank you.

THE COURT:    Okay?

*                      *                      *

Exhibit 5001 at 228

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

STATE OF OREGON,                 )
                                 )
          Plaintiff,        )     CASE NO. 10CR0782
                                 )
                               )     PRETRIAL HEARING
     vs.                 )
                               )
NICHOLAS JAMES McGUFFIN,   )
                               )
          Defendant.        )
_____)

TRANSCRIPT OF PROCEEDINGS

Volume 1, Pages 174-182

BE IT REMEMBERED That, the above-entitled cause came on regularly for hearing beginning at 1:27 p.m., Tuesday, June 21, 2011 in the Circuit Courtroom of the Coos County Courthouse in the City of Coquille, County of Coos, State of Oregon, before the Honorable Richard L. Barron.

APPEARANCES

R. Paul Frasier, District Attorney for Coos County, representing the Plaintiff.

Erika Soublet, Assistant District Attorney for Coos County, representing the Plaintiff.

Shaun McCrea, Attorney at Law, representing the Defendant.

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 229

174

*                                    *                                    *

JUDICIAL ASSISTANT:    All rise.

THE COURT:    Be seated please.

Cathy, I didn't grab the file.  I thought it was out here.

Uh, Mr. Frasier, this is your Motion.  And as I read Ms. McCrea's Response, it appears to me that two of the three might be resolved.  And the last one is the Grand Jury, or is there something else?

MR. FRASIER:    Um, I have received the written statements, and I have received recorded — the recordings pertaining, I believe.  I don't know if there is other recordings out there that I haven't received yet, because there — they list 42 witnesses.  And, obviously, I don't have 42 recordings.  But, I do have recordings.  And if they are representing that that's all there is, then that's fine.  I'll accept their word at that.

The only issue I had is, I don't — still at this point, do not know if they are going to call any experts.  We have not received any notice of that.  They have looked at the clothing in the case, and so forth.  I know they have Mr. Meneely on board here, but I have not received any word.  And I wanted to know where we were at on that, and at least have a deadline set if they are going to call an expert, to get me a report and things along that line.

Exhibit 5001 at 230

175                          Motion of Discovery

THE COURT:    Right.

MR. FRASIER:    And the — the — the last is the Grand Jury transcripts.

THE COURT:    Okay.

Uh, Ms. McCrea, I'm assuming that — uh, putting aside the expert and the Grand Jury stuff for a moment — that he has all the reports and/or recordings of witnesses that you intend to call, that are available?

MS. McCREA:    I believe so, Your Honor.  And I was — I was going through our list this morning.  I sent Mr. Frasier a — by email, a Defendant's Amended Witness List.  That's where he's coming up with the number of 41 witnesses.  And some of those are people on his witness list.  And so, we would only intend to call them if the State did not call them.

And by each one of the names, I've indicated to him, if there is a statement provided, tape provided.  And I will double check.

And I sent him some more information this morning.  So, it is the defense attempt to provide him everything that we have concerning our witnesses.

THE COURT:    What you are telling me, is that if they don't call a particular witness, you may call them.  But you are not relying on anything other than police reports that you've gotten on those witnesses?

MS. McCREA:    Correct.

Exhibit 5001 at 231

Motion of Discovery          176

THE COURT:    And there is no other — there is no other additional interviews that your investigators have done?

MS. McCREA:    Correct.

For example, No. 17 on our list is D — D — sorry — David Zavala, who is a Police Officer.  And I have in parenthesis "No defense statement", - - -

THE COURT:    (Interposing) Okay.

MS. McCREA:    - - - because we haven't interviewed him.

I can also — I — I did bring the original of the Defendant's Reply, which I understand the Court has seen, but there it is.

THE COURT:    I — I read the — the email with the Attachment that you submitted.

MS. McCREA:    And I have, in my hands, the x-rays that Mr. Frasier loaned to me.  And I am, in the Court's presence, returning those to him intact.

THE COURT:    Okay.  Now, that takes care of the witnesses, as far as you know.  And I would think that you could easily get that taken care of by tomorrow, double - - -

MS. McCREA:    (Interposing) Yes.

THE COURT:    - - - checking?

MS. McCREA:    Yes.

THE COURT:    Now, as far as the expert goes, I

Exhibit 5001 at 232

177                          Motion of Discovery

understood your Reply is that Mr. — Mr. Meneely has not

written a report?

MS. McCREA:    That is - - -

THE COURT:    (Interposing) But - - -

MS. McCREA:    - - - correct.  Mr. Meneely

- - -

THE COURT:    - - - do you intend to call him,

though?

MS. McCREA:    Yes.  Mr. Meneely is - - -

THE COURT:    (Simultaneously) Okay.  I - - -

I expect him to get a report this week.

MS. McCREA:    Yes, Your Honor.

And, I have listed him as No. 34 on our list.

I have the photos that he took of the clothing on CD, which I

received yesterday afternoon, and alerted Mr. Frasier that I

had received those.  And I am tendering to him a copy of the

CD of the clothing.  I have been in contact with Mr. Meneely.

He is preparing a report for me so I can tender that to

Mr. Frasier.  And we will have that to Mr. Frasier this week.

THE COURT:    Okay.

Now, the last thing is the Grand Jury notes.

And my reading of what you're  — what you are saying, is — I —

I don't know that I disagree with what you are saying,

Ms. McCrea.  Because — I mean, Mr. Frasier supplied you with

things that I don't think he is required to supply you with.

Exhibit 5001 at 233

Motion of Discovery          178

Uh, and so, that was a courtesy.  And I think, from my dealing with these cases over the years, that you guys have been very cooperative with each other.

And my — my concern is that I wouldn't want to see that jeopardized in any way.  And if you've transcribed things — although, I don't think — I think you are correct.  And the impeachment of anybody would be done by the recording, as opposed to your trancriptionist.  It might save time during the Trial for somebody to actually have that, though.

I don't disagree with your legal position.  I think, uh — and I think it's correct.  Uh, but it's a matter of — of possibly making the Trial go along easier — it might able to have — they might be able — rather than — if you have that and you are using something in examination, for them to have the same thing, as opposed to going back and trying to search through all the tapes.  But, I'm not going to order you to produce it.

MS. McCREA:    I understand.

THE COURT:    Okay.

MS. McCREA:    There — there is one other issue, Your Honor.  And I — I need clarification from Mr. Frasier.

And, um, Mr. Frasier had indicated that absent the defense turning over any transcriptions that we have made, that the prosecution would not stipulate to any telephone

Exhibit 5001 at 234

179                              Motion of Discovery

testimony.  And, I just want to confirm that because I will need to make other arrangements for the witnesses.

THE COURT:   Okay.  Uh, I — I thought this Trial we talked about some telephone testimony at some time. Maybe it was in another case that I had.  But, - - -

MS. McCREA:   There — well, there was discussion between the parties at the time that the case was postponed from the May date, - - -

THE COURT:   (Interposing) Right.

MS. McCREA:   - - - involving any State Police Officer witnesses who would be - - -

THE COURT:   (Interposing) Was that — was that — okay.

MS. McCREA:   - - - unable to attend - - -

THE COURT:   (Interposing) Now I recall it, yeah.

MS. McCREA:   - - - on that basis.  And the defense agreed that we would not be objecting to their telephone testimony because we were the ones asking for the postponement.  But, this is with regard to the issue of defense witnesses.

THE COURT:   Okay.

Well, you don't have to stipulate.  I wouldn't order you to stipulate.  So, if you are not agreeable to them telephoning — I guess she is just saying, "Are you not

Exhibit 5001 at 235

Motion of Discovery          180

agreeable to that?"

MR. FRASIER:    Well, I think my position my position I set forth in my letter was — is — to counsel was — you know, I've been very cooperative in this case.  I've given them stuff that they were not — that I didn't have to give them.  And I — you know, frankly, I'm surprised a little bit that I'm, you know, not being afforded the courtesy of — of having the transcripts that they have prepared, but that's their decision.

In some respects — you know, I have given them stuff they were not entitled to, out of cooperation.  Now, they are asking me for a favor.

THE COURT:    I — I made - - -

MR. FRASIER:    (Interposing) And I'm not so sure - - -

THE COURT:    (Interposing) I - - -

MR. FRASIER:    - - - I want to go there.

THE COURT:    I made my position clear right now.

MR. FRASIER:    Yeah.

THE COURT:    I think she is legally correct.  I've also made my position on what I think possibly should happen.  I can't order you to stipulate.  I'm not going to order you to stipulate.  If you - - -

MR. FRASIER:    (Interposing) Okay.

Exhibit 5001 at 236

181                              Motion of Discovery

THE COURT:    If you don't feel that you should, then don't.

MR. FRASIER:    I mean, if — if they want my cooperation, I'm asking for a favor.

THE COURT:    I understand that.

MR. FRASIER:    Okay.

THE COURT:    So, I guess the answer is, possibly.

MS. McCREA:    Very good.

THE COURT:    Okay.

Anything else?

MS. McCREA:    Not for the defense, Your Honor.

MR. FRASIER:    I have nothing further, Your Honor.

THE COURT:    Okay.  I just need to talk to counsel, briefly, about a scheduling matter on this.  So, that — that doesn't have to be on the record.

MR. FRASIER:    Yeah.

THE COURT:    Okay?

It won't — it won't change the Trial date.  I'm not talking about that.  Just that — there is just one - - -

(Laughter.)

Uh, it's not going to to — I just have to ask about one thing, though, - - -

MS. McCREA:    (Interposing) Okay.

Exhibit 5001 at 237

Motion of Discovery          182

THE COURT:    - - - that's come up since then. It may affect one day of the Trial.  But, I just want to see what affect that might have.

Okay?

MR. FRASIER:    (Inaudible response.)

MS. McCREA:    (Inaudible response.)

All right.

And just for the record, Mr. McCrea, it is nice to see you.  I'm glad you have recovered.

Okay.  You want to come around, - - -

MS. McCREA:    (Interposing) Okay.

THE COURT:    - - - please?

*                    *                    *

Exhibit 5001 at 238

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

STATE OF OREGON, )
)
         Plaintiff, )    CASE NO. 10CR0782
)
)    JURY TRIAL
    vs. )
)
NICHOLAS JAMES McGUFFIN, )
)
     Defendant. )
_____)

TRANSCRIPT OF PROCEEDINGS

Volume 2, Day 1, Pages D1 2-D1 32

BE IT REMEMBERED That, the above-entitled cause came on regularly for hearing beginning at 9:19 a.m., Tuesday, July 5, 2011 in the Circuit Courtroom of the Coos County Courthouse in the City of Coquille, County of Coos, State of Oregon, before the Honorable Richard L. Barron.

APPEARANCES

R. Paul Frasier, District Attorney for Coos County, representing the Plaintiff.

Erika Soublet, Assistant District Attorney for Coos County, representing the Plaintiff.

Robert McCrea, Attorney at Law, representing the Defendant.

Shaun McCrea, Attorney at Law, representing the Defendant.

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 239

D1 2

*                              *                                    *

(Jury panel out.)

JUDICIAL ASSISTANT:    All rise.

THE COURT:    Be seated, please.

First of all, this is State vs. McGuffin.  It's a pretrial matter.  The jury is not in the jury room (sic).

There was one juror, Ms. Dungee.  She's on about the fourth page, like the 98th juror.  And, staff informed me that when she came in, she kind of cowered in the corner and didn't even get in line.  And she was visibly shaking and upset.  Told staff she can't be around people.  Didn't let us know before.  Didn't send her questionnaire in until today, and didn't have a doctor's excuse.  But, they said she was visibly shaking and upset, and I just allowed them to excuse her.

I just — I wasn't going to put — they — they felt it wasn't — she wasn't making it up.  It looked very real.  So, I didn't think — and we have over a hundred and five jurors.  But, I let them go ahead and excuse her rather than make somebody suffer.

Okay?

MR. FRASIER:    (Inaudible response.)

MS. McCREA:    (Inaudible response.)

THE COURT:    Uh, I had two quick matters.  As soon as we know the jury has been oriented and ready, I'm

Exhibit 5001 at 240

D1 3                                    Motions

going to stop this procedure because we take it up after selection.

There was a Motion to Admit Statements by the State in relation to a — a recent decision, State vs. Davis. In a — in a conference in my chambers, off the record, between counsel, Mr. Frasier informed me that he wasn't pursuing that at the present time.  He may pursue it in rebuttal possibly, and he would let me know.  So, any Hearing we would have to have would be then.

The other matter, then, left pending, is Ms. McCrea's Motion in Limine.  And Mr. Frasier filed a Response.  And the Court has reviewed those matters.

So, uh, let's see.  Did you bring down the original of that, Ms. McCrea?

MS. McCREA:    (Inaudible response.)

THE COURT:    If you didn't, we just need it sometime.  I — I have a copy.  But, - - -

MS. McCREA:    Yes.  I intended to bring it down, Your Honor.  And I think my staff mailed it to you.  I do — I do have another physical copy, - - -

THE COURT:    (Interposing) Oh, that's fine.

MS. McCREA:    - - - but - - -

THE COURT:    I've got a — I've got a copy.  I just — I was just wanting the — wanting the - - -

MS. McCREA:    (Interposing) Yes, - - -

Exhibit 5001 at 241

Motions        D1 4

THE COURT:    - - - a record to be - - -

MS. McCREA:    - - - it would make total sense to bring the original, but I think it was already mailed to the Court.

THE COURT:    That's fine.

Okay.  Uh, Mr. Frasier, raised the timeliness of the Motion.  And, of course, I don't — that may be correct.

My problem, uh, Mr. Frasier, is that, uh — and I would prefer to have these because what — if — one prejudice that you possibly suffer is a ruling that you would want to appeal when they come this late.  Uh, and if I rule something out and you wanted to appeal it, that puts us in a — in a tight situation.  Other than that, I guess Ms. McCrea could even wait until the Trial and — and object.  Then the Court would have to rule on it.

So, uh, I would rather have these matters brought up early so we can do the Pretrial beforehand.  But, in this case, I'm not — I wouldn't not hear those based on timeliness.

MR. FRASIER:    Very well.

THE COURT:    Okay.  Uh, some of this stuff I can look at.  I mean, I'll — I'll hear argument.  The fact that there is a lay opinion — as long as there is there a basis for a lay opinion, it's allowable.  And I — that's the problem with not hearing it.  I think in some of these cases,

Exhibit 5001 at 242

D1 5                                        Lay Opinion

I'm going to have wait until we actually are in Trial to make a ruling.  But, generally, a lay opinion that has some basis for it — a foundation — is allowable, just as the same as any other one.  So, that in and of itself is not grounds for excluding something.

Okay.  Now, the first one relates to, uh, drug use.  Let me get this.

Uh, I — I guess, my feeling, generally — especially if Mr. McGuffin is going to testify and he's on the — on the list — is if, in fact, he was using drugs or people are going to testify he was using drugs, that goes to his recollection.  And that would generally, at least for no other purpose, it would be relating — it would — it would come in for that basis, as a part of his, uh — whether he could recollect things.  So, it would come in on that.

Uh, as I understand, the other theory is that — of Mr. — of the State's offering it, is that, uh — based on what they perceived as the defense strategy, which is that Mr. McGuffin was very concerned about, uh, his — Ms. Freeman. And that instead of out looking, he's out taking drugs and, uh — a related matter, attempting to have intercourse with somebody.

Now, the defense may — may say none of that is true, but if they have witnesses who have testify to it, generally, it would appear to be, uh, somewhat relevant.  So —

Exhibit 5001 at 243

Preliminary Matters        D1 6

and relevancy isn't a high standard.

I'm going to kind of give you my feeling on these things, and if you have something you want to put on the record, go ahead and put it on the record, either of you? Okay?

MR. FRASIER:    (No audible response.)

MS. McCREA:    (No audible response.)

THE COURT:    Uh, Donna Dennis — again, that's kind of a — a foundation matter.  Uh, it — it appears that there is some way that she thinks she recognizes Ms. Freeman and Mr. McGuffin, uh, and — uh, there might have to be some time element in there.  But generally, if she can relate it to him that would again have a relationship because that could go to — that could go to motive.  That could go to a lot of things.  So, that would generally be admissible.

Mr. Breakfield, uh, if he's — I'm assuming that this statement that he — that is allegedly attributed to Mr. McGuffin, came after Ms. Freeman was missing or — or, her body was discovered.

MR. FRASIER:    That's correct.

THE COURT:    Okay.  And I think that statement of — that, "I strangled the bitch and can do so to you", would be admissible after — if it's after the death of Ms. Freeman. I mean, that could be construed as an admission.

Uh, I don't want to go into a lot of details

Exhibit 5001 at 244

D1 7                          Preliminary Matters

that — that he's all of a sudden, uh — to — to show jealousy,

because as I recall Mr. Breakfield dated Ms. Edgerton, who had

some relationship with Mr. McGuffin, it's alleged.  And, I'm

not too sure that his jealousy — alleged jealousy, as related

to one person, necessarily relates to this case.  So, I

wouldn't want a lot of background.  You could say that, "He

confronted me.  We both at one time dated somebody."  But, I

don't want a lot of stuff on that — on that issue.

MR. FRASIER:    We can do that, Your Honor.

THE COURT:    Mr. Bryant, uh — it would appear

that that would be relevant.  And we could — Mr. Bryant's — is

he — he the one in custody?

MR. FRASIER:    No.

THE COURT:    Mr. - - -

MR. FRASIER:    (Interposing) Uh, yes, he is in

custody at the time.

THE COURT:    Mr. — Mr. Bryant was in custody

with Mr. McGuffin?

MR. FRASIER:    That's correct.

THE COURT:    Okay.  Uh, but he was in on — and

I can certainly give a limiting instruction as to — you know,

that's irrelevant on this case what he was in custody for, but

I think the custody, the fact they were in jail together,

would have — that surrounds the statement.  And it would be

too hard to say what it was, but I can certainly give a

Exhibit 5001 at 245

Preliminary Matters        D1 8

limiting instruction, if requested, to say that that has nothing to do with this charge, and they can't consider for any purpose.  The only purpose it was offered is to show under the circumstances in which the statement was made.

Dustin Graham, you are not calling as a witness, but may call — call in rebuttal.  So, if that — if you are going to call him in rebuttal, bring that up so we can — I can rule on that.

MR. FRASIER:    We'll do that.

THE COURT:    And Melissa Beebe, it would seem to me to be admissible as a possible admission.

Uh, it came out of - - -

MS. McCREA:    (Interposing) Excuse me, Your Honor.  I — maybe I can — maybe I can help a little bit.

In — in going through the — the evidence and the State's Response, it appears to me that the State's rendition is so different than what the defense anticipates the evidence to be, that in most of these instances, I now believe - - -

And my — and my effort was — let me digress for just a moment.  My effort in filing the Motion was to try to bring these matters before the Court and to put Mr. Frasier on notice, without having to do this piece meal during the time of the Trial.

THE COURT:    Right.

Exhibit 5001 at 246

D1 9                        Preliminary Matters

MS. McCREA:    Because then we have to keep sending the jury out and dealing with these issues.

But, in terms of Mr. Frasier's Response, it appears — and Melissa Beebe is an example of that — that we are so far apart on what we anticipate the witness is going to say, that we may just have to do that in some of these instances.  Because, with Ms. Beebe, the — it is the defense position, prosecution rendition leaves out a crucial statement that she made according to the Discovery.

And that is that before Mr. McGuffin made any statement back to her — the context of it was that she saw him at the Courthouse.  That she said to him, "How did Court go for you?"  And he said, "Very well."  Or, "Fine." Or, something.

And then she said, "It's a lot better than it should have been for you."  And his statement back to her was only in response to that.  So, that part gets left out by the prosecution.

So, I'm just saying it's going to depend on the how the witness testifies at the Trial.

And the same for Donna Dennis.  The same for Mr. Breakfield, Austin Fisher, Richard Bryant.  And with Richard Bryant, the State's position is that the defense may contend that these statements were not made.  I doubt that we are going to take that position.  However, I anticipate that

Exhibit 5001 at 247

Preliminary Matters        D1 10

Mr. Bryant's testimony, based on the Discovery, is going to be different then the characterization of the prosecution that Mr. McGuffin was remembering things.  But rather it was — it will be our position — was musing about things.

The same with Tina Mims and, um — and Adam Shiner.

Now, the — the situation with Kimberly Peak is different because she is being called to testify - - -

THE COURT:    (Interposing) I don't — Kimberly Peak is one — I don't — I don't consider that an adoptive admission.  So, I — I — that one, I generally wouldn't allow, because I - - -

MS. McCREA:    (Interposing) And — and the statement to David Jenkins would be — the statement that David Jenkins allegedly made, that he denies making, is hearsay.

THE COURT:    Well, we don't — Ms. Peak — Ms. Peak — I don't consider that an adoptive admission.  So — you know, it generally wouldn't be coming in, unless you could show me something else.  The circumstances I don't think — it's just silence.  And — and I don't think that, in and of itself — at least looking at Kirkpatrick and reading some of the — reading the Oregon case and a — and a couple Federal cases, I just don't think that it makes — that it goes over the hump to get — get that in.  So, that one generally would not be coming, in unless something else is shown to me, of

Exhibit 5001 at 248

D1 11                          Preliminary Matters

course.

MS. McCREA:    Okay.

THE COURT:    And the thing — I do want to mention, of course, there may circumstances, such as Ms. Beebe, when you say there is other circumstances.  That may be true and she may testify that.  It still might be admissible because the jury can infer something else from that — a — a broader thing than — than what it is.

Mr. — Mr. Frasier was not going into what the crime was related to Ms. Beebe's statement.  That may be something that you want to bring out because it shows what it was.  But it — and the whole statement.  But it still may be admissible just because it's a — it's a statement of — it's surprising — or, "Surprising what you can get away with in Coos County," it may still be something that the jury, with all things, would want to consider.

So — I mean, I'll listen to it.  But, generally, what you are saying is the facts may be a little different than what he's brought out.  And that may true.  And that, in some case, may lead to me saying it's not admissible. But other cases, generally, I think it probably is going to be admissible.

MS. McCREA:    And — and I understand the Court's position.  And — and, my intent in bringing these things before the Court was to raise these issues as soon as

Exhibit 5001 at 249

Preliminary Matters        D1 12

reasonably practicable.

THE COURT:    Right.

MS. McCREA:    And also, to put the State on notice that there may be issues with these matters because — of course, the State's going to — I know that Mr. Frasier is a worthy adversary and he's going to make a strong and (sic) opening statement as he can.  But I certainly would like to avoid, through the — through the course of the Trial, having to request a Motion for Mistrial because of issues that I didn't bring up at — in the very beginning.  And many of these things, as the Court notes, are things we are going to have to deal with as they come out through the course of the witnesses in the Trial.

THE COURT:    Okay.  Uh, let me — that generally covers most of these with, one — let me look at the — it's the Reaves — let me look at my note here.

Uh, the — the statement in relation to the — the Reaves, about — that Mr. McGuffin allegedly made here about, uh — when he reminded her of the statement about, "She's been hitting me," and that sort of thing.  Uh, and then he said, "I wish. . ." — supposedly — ". . .I had something to bitch about now."  I — that sounds to me more as if it's a statement relating to if she were alive.  Uh, I mean, "I wish she were alive, so I — so I could bitch about something like that," as opposed to it being a negative comment.  But, I

Exhibit 5001 at 250

D1 13                          Preliminary Matters

don't really think that's necessarily admissible.

Uh, the rest of it about the relationship, and the hitting that — you said the hitting would probably — generally, be — show the relationship was bad, so that generally would be coming in.

Uh, the rest of them, I think, generally, are what I've said before, with the exception of Austin Fisher. Let me look at a note there. Uh, and Austin Fisher was a — was a boy that — isn't that the boy who dated — who dated Ms. Freeman earlier?

MR. FRASIER:    Yes.

THE COURT:    That one I'm — about, "I'll beat you up," could show possessiveness in relation to Ms. Freeman. As I said, the other possessiveness related to Ms. Edgerton, I don't think is necessarily probative of anything.  In relationship with Ms. Freeman, it probably is.

So, generally, except for the things that I've specifically mentioned, I think, with possible exception coming up here in Trial, would generally be admissible.

MS. McCREA:    There was also — regarding the Reaves, Your Honor, there was the issue of the alleged contact where Ricky Crook was present, and making statements.  And Mr. McGuffin was supposed to be make — doing hand gestures trying to get him - - -

THE COURT:    (Interposing) I don't - - -

Exhibit 5001 at 251

Preliminary Matters      D1 14

MS. McCREA:    - - - to stop.

THE COURT:    - - - generally think that's probably admissible.  Because I don't know that she doesn't — that — that's broad interpretation.  So, generally, I don't think that is admissible.

MS. McCREA:    Okay.  Thank you.

THE COURT:    Okay.

The jury ready yet?

JUDICIAL ASSISTANT:    (Inaudible response.)

THE COURT:    Are these people that are crossed out on this list the ones that aren't here?

JUDICIAL ASSISTANT:    (Inaudible response.)

THE COURT:    Do they have a copy of this?

JUDICIAL ASSISTANT:    (Inaudible response.)

THE COURT:    Okay.  You have a copy of — of — a copy of people who have been crossed out.  So, you can take out, uh, - - -

Oh, this — this is fourteen?

JUDICIAL ASSISTANT:    (Inaudible response.)

THE COURT:    Yeah.  That would be helpful.

Okay.  Tell — tell Kay to let us know.

JUDICIAL ASSISTANT:    (Not understandable.)

THE COURT:    I — I would question — counsel, I would — I would caution, when — to be able to feed this to the other courtrooms so they can hear it, I'm — I'm pressing

Exhibit 5001 at 252

D1 15                           Preliminary Matters

the panic button that we usually have so we can go through that audio system. If we don't do that, then we have to go through another audio system that has about a ten-second delay between what I say and what they hear down there, which is too long. I mean, we've — we've had that. So, it's going to be through this audio system. But, this audio system in here is extremely sensitive. So, anybody who moves a pencil is going to be heard.

I am going to ask the jurors to be as quiet as possible. You know, so you shuffle papers, they are going to hear shuffling papers and not voices. So, please — please be as careful as possible with that. I mean I can't cram a hundred people into this courtroom. We are going to get about seventy of them in here. I'll tell you that now, and I'll tell the jury that, also.

Okay?

MR. FRASIER:    (No audible response.)

MS. McCREA:    (No audible response.)

THE COURT:    As soon as the jury is ready, we'll bring them out.

(RECESS)

(Jury panel out.)

THE COURT:    My understanding is that you'll have no problem because the jurors are going to be sitting in here filling out things.

Exhibit 5001 at 253

Introduction        D1 16

You'll have no problem, Mr. McGuffin, going out and around?

Is that correct?

(No audible response.)

We were told that - - -

JUDICIAL ASSISTANT:    (Interposing) I spoke with this — the deputy, to go (not understandable).

So, Mr. McGuffin, when — when you leave the courtroom, you go out that way with — Ms. McCrea will walk out with you.

DEFENDANT:    Okay.

THE COURT:    And, obviously, there will be deputies around there, but — rather than have you back through there.

JUDICIAL ASSISTANT:    (Not understandable.)

THE COURT:    Okay.

(RECESS)

(Jury panel in.)

JUDICIAL ASSISTANT:    All rise.  Circuit Court of the State of Oregon, the County of Coos, is now in session.

THE COURT:    Be seated please.

Okay.  Ladies and gentlemen, this is case of State of Oregon vs. Nicholas McGuffin.

Mr. Frasier, are you ready for the State?

MR. FRASIER:    The State is ready, Your Honor.

Exhibit 5001 at 254

D1 17                                    Introduction

THE COURT:    Ms. McCrea, are you ready for Mr. McGuffin?

MS. McCREA:    The defense is prepared, Your Honor.

THE COURT:    If all jurors in the room, and in the adjoining courtroom, would please stand and raise your right hand, and answer "I will" at the end of the oath.

(Whereupon the jury panel was sworn by the Bailiff to truthfully answer all questions regarding their qualifications.)

THE COURT:    Have a seat, please.

I would mention a couple things.  We have an audio and a video feed going into the next courtroom so jurors there can hear that.  The microphones that are being used are extremely sensitive in this courtroom.  So, I would ask people to not talk and to try to keep the squirming to a minimum because the other courtroom, uh, that hears this is going to pick up any paper shuffling, or any — any movement at all, and it may mask what we are — we are hearing.

This is the best audio system we can use.  If this does not work as well, we have another audio system that can set up, but it is not as good because there is about a ten- second delay between my speaking and the other courtroom hearing what I'm saying.  And that's too long a delay so we are trying this system to make sure it works.

Exhibit 5001 at 255

Introduction        D1 18

I would ask that everybody listen carefully as possible because that will speed up this process as we are going through here.

I want to, first of all, introduce parties. Seated closest to you at counsel table is Mr. Paul Frasier, who is the District Attorney for Coos County.  To Mr. Frasier's right is Ms. Erika Soublet, who is the Chief Deputy District Attorney for Coos County.

To Ms. Soublet's right is Mr. Robert McCrea, and he is one of the attorneys representing Mr. McGuffin.  And seated to Mr. McCrea's right is Ms. Shaun McCrea, who is also an attorney representing Mr. McGuffin.

And then, Mr. Nicholas McGuffin is at the end of counsel table.  He is the Defendant in this case.

Mr. McGuffin has been charged with the crime of Murder.  The charge reads that he did, on June 28, 2000, in Coos County, Oregon, did unlawfully and intentionally cause the death of Leah — Leah Freeman, another human being.

Mr. McGuffin has plead not guilty.  That means he denies these allegations.  He is presumed to be innocent. And that presumption stays with him until such time, if it is reached, that you are convinced beyond a reasonable doubt of his guilt.

The fact that he has been charged with this crime cannot be considered by you as indicating that he is

Exhibit 5001 at 256

D1 19                                      Introduction

guilty of the crime.  That is merely the formal process of bringing a charge before the jury.  The jury determines whether he is guilty or not guilty of the crime.

The State has the burden of proving his guilt beyond a reasonable doubt.  He has no burden of proving or disproving anything in the case.

Uh, this courtroom will get warm.  There is an air conditioning system, but the air conditioning system — if we turn it on — would mask everything that I say.  So, it's not going be on and the courtroom will get warm.  During the recesses, we will have it on to try to make sure it gets as cool as possible.  But, I just want to advise you that it — that it will get warm in this matter.

You were all given clipboards with a questionnaire.  And you were asked not to look at that questionnaire until you were told to, and that will be at the end of this process.  And I want to make sure that you understand that that questionnaire is being filled out under oath, just as your questioning would be when we ask you a question.  So, please look at it carefully, read it carefully, and answer it as truthfully as you can.

Once we get to that process of you filling out the questionnaire, then when you fill it out, we will release you for a short period of time.  Probably until about 12:45, so we can copy those, get them collated, and give them to the

Exhibit 5001 at 257

Introduction        D1 20

attorneys and the parties so they have a chance to review those before we start the process.  We will be trying to start — restart the process after the questionnaire is done at 1:00. So, if you leave the courtroom, you'll have to be back here about 12:45.  And we will try to get started at 1:00 and start questioning jurors.

I will point out to you that the Constitution, and our law, requires that we have a fair cross section of the community.  And that means people who are older, people who are younger, people who are employed, people who are unemployed, people with children, and people without children. All factors.

I will take into account your — try to take into account, as best I can, your personal circumstances and what hardships it may or may not cause you.  I cannot guarantee that you will be released because of a particular circumstance in your life.  There are some cases that just take a longer time to try.  This case has had some publicity in it, so it's going to take a longer process to go through this procedure and get it done.

We are as anxious to have a jury picked as you are, but it will take some time.  And I will try to excuse people that I feel really have to — that really have to be excused.  But, I cannot guarantee that.  So, again, it relates — we have to have a section whether you are employed, or

Exhibit 5001 at 258

D1 21                                    Introduction

unemployed, children or not, older or younger, I'll take it into account the best I can.

Uh, I envision the picking of the jury to take, obviously, today and tomorrow, and possibly into Thursday. I can't tell you how long it will take. It just depends on how we will go. What we are going to do, though, is — is somewhat a little different. We've — we've got fourteen in the jury box. We will question fourteen, myself and the attorneys. And as soon as we have those fourteen chosen that we think, at that point, uh, there is no particular reason to excuse them, we will excuse those fourteen people with directions that they will be called back at a certain point in time.

We will then put another fourteen in the box and go through the same procedure, excuse those people to come back, and then we'll put another fourteen in the box to go through that a third time. And then, we may have a few other jurors in there.

The reason for that is that the parties are also entitled to exercise what are called peremptory challenges. And that means they don't have to give a specific reason, but there up to twenty-six peremptory challenges in this type of case. So, that's why we need to select that many jurors, to make sure we have enough jurors to fill the jury box and for peremptory challenges.

Now, there are other times where jurors are

Exhibit 5001 at 259

Introduction        D1 22

excused for what's "cause" — that is, a particular reason. And those don't count in that twenty-six.

Uh, I do want to stress that you need to be as patient as possible.  We are trying to move this on as quickly as we can.  And again, if you listen carefully, that will help.

I would point out the staff cannot change the procedures, or change anything that's in here.  So, uh — we all sometimes are in situations we don't especially appreciate and we would prefer to be somewhere else; but complaining to the staff, or asking them to change something, is not going to work and it's not going to be very helpful because they can't change it without directions from me.  So, if you want to say something to them it's fine.  They are just not going to be able change, or probably accommodate your request.

I would also stress, specifically — and the questionnaire says this — don't ask people for help on your — on your questionnaire, and don't tell people what you wrote on your questionnaire.  And if you are excused, and you are still a member of the jury — that is if the first — we pick the first fourteen and we say, "Okay.  You can home for awhile," — and this applies to all jurors, not just the fourteen — do not discuss this case with anybody — your husbands, children, friends, neighbors, no one.

And do not go out and do any independent

Exhibit 5001 at 260

D1 23                              Introduction

research — go to the Internet, go — go look at past news articles, do any of that.  All of that is completely improper.  And I'm mentioning it because jurors have done it time after time.  I've had people go on — after they have been told this, go on the Internet and do searches of people and then come out — and it's found out.  That type of conduct can jeopardize an entire case.

And so, I want to stress specifically, do not, under any circumstances, talk to anybody about it, or do any — any independent research, including looking up definitions of words.  Anything.  Don't bring anything into the courtroom — newspaper articles, anything.

And again, I — I trust people to do this.  I think in most cases, most jurors follow these rules exactly.  But, I've had in cases — and usually every case that is lengthy or — or has more notoriety, I've had people go ahead and violate it.  So, please do not violate what I've told you to do.  That is basically a Court Order not to do it.

Uh, you will note when you fill out the questionnaire, that there are about a 160 witnesses scheduled to testify.  This Trial is supposed to take three weeks, give or take.  I can't ever guarantee how long, exactly, a Trial will make (sic).  Sometimes they move faster.  And even though they mention about 160 witnesses, some witnesses are extremely short.  Some witnesses may be longer.  So, it may move quicker

Exhibit 5001 at 261

Introduction        D1 24

than — than you think.  But, right now it's scheduled to — to be a three-week Trial.

Uh, there is room for you to add anything. There are — there are about five pages of witnesses.  You are asked, if you know any of these witnesses, to fill out — just to put down who you know, and how you know them, and how long. And there is room for you to answer each of the questions. Try to read it carefully.  And when it says, "If you've read or heard anything about this story," please don't just put, "I read — I read about this story."  If you remember specific details, write down the specific details you remember, uh, just so we are aware of what you do remember on this case, if you remember anything.

At this time, then, what I'm going to do — unless counsel has anything else — is that we are going to recess.  We are going to leave you in the courtroom — and we'll probably turn the air conditioning on while you are on (sic) there — to fill out the questionnaire.  When you are done filling out the questionnaire, you can give it to Ms. Cress or - - -

Is Ms. Marino in the other room?

JUDICIAL ASSISTANT:    (Inaudible response.)

THE COURT:    - - - or Ms. Marino, who is in the other courtroom.  Fill it out, sign it, put your juror number on.  Make sure your juror number is on the pages.  And

Exhibit 5001 at 262

D1 25                                    Introduction

then you will be free to leave, to come back at about — I

would want everybody back here at 12:45.

Are the jurors in the courtroom in the order

they are going to be called?

JUDICIAL ASSISTANT:    (Inaudible response.)

THE COURT:    Okay.  Uh, I - - -

JUDICIAL ASSISTANT:    (Interposing) (Not

understandable.)

THE COURT:    - - - want the fourteen here,

that are seating the jury box, to remember where your seats

are, uh, because when we bring you back, you'll — you fourteen

will be seated in this position.

We may, then, ask the other jurors, and get

them in order, and put you in the order that you'll actually

be called — we already know that order — so we don't have

people have — having to walk over each other.

I would ask that you keep your juror buttons

on, so people know.  We have a lot of people that are

associated with this case.  So, you keep them on.  If anybody

attempts to approach you about the case, tell them you cannot

talk about it and to leave you alone, and report that to

Court personal and we will try to deal with that as quickly as

possible.  But, keep your juror button on even when you are in

the community, so people will know that you are a juror.  And

hopefully most people will know not to approach you and talk

Exhibit 5001 at 263

Introduction       D1 26

to you about the case.

Okay.  Does counsel have anything else before we recess for them to fill out the questionnaire?

MR. FRASIER:   Nothing from the State, Your Honor.

MS. McCREA:   No, Your Honor.

THE COURT:   Okay.  Does any juror in this room have a question about any of the procedures before I — before I take a break and allow you to start filling out your questionnaires?

JUROR:   (Inaudible response.)

THE COURT:   Yes, sir?

JUROR:   You stated that we weren't supposed to look up the meaning of any words we don't understand?

THE COURT:   If you have a question about that during the process, sir, I will try to explain it.  I — I want it — I want to explain.  Most legal terms mean the same thing they do in everyday life.  There are some specific definitions.  For instance, the word "intentional" is defined in the questionnaire.  So, that has a specific legal meaning. But most words in the law mean exactly what they mean in everyday life.  So, there is really not a lot of complication about that.  Okay?

JUROR:   Thank you.

THE COURT:   Anything else?

Exhibit 5001 at 264

D1 27                                    Introduction

JUROR:    (No audible response.)

THE COURT:    Okay.  Then the parties will take a — a recess.

As I said, fill out the questionnaire.  Just be back in the jury assembly room by 12:45.  And we will try to get started.  When I ask about patience, I'm even talking about that.  Just getting all — getting over a hundred people organized is not the easiest process in the world.

Okay?

We will be in recess then.  Fill out the questionnaires and be back at 12:45.

Okay.  We'll be in recess.

(RECESS)

(Jury in.)

JUDICIAL ASSISTANT:    All rise.

THE COURT:    Be seated, please.

First of all, I want to thank all of the jurors for cooperating with this process.  And — you've made it quite easy.  And the staff has been able to collate and get this together.  So, I want to thank all of you very much for your efforts and your cooperativeness with the Court.

Uh, we are going to start.  Just to explain, I will ask the jurors — the fourteen jurors, here as a group, some questions and then the attorneys will each have a chance to ask you some questions.

Exhibit 5001 at 265

Introduction        D1 28

First of all, we are going to pass out a — just a list of questions that I'm going to ask generally.  And when I ask them — I'll read them to you — I want you to circle the ones that may apply to you.  We'll pass those out now.

While she's doing that, also, I would ask that everybody in the courtroom, kind of remember where your seat is.  Because we've got it lined up that if somebody has to come up here they are kind of in order so people don't have to crawl over each other to get out.  So, try to remember where you are — where — where you are sitting so we can keep that order.

And if you — I'll just kind of wait and then I'll read the questions, and you can circle the ones that apply to you.

You have to leave the window closed, ma'am.

JUROR:    (Not understandable.)

JUDICIAL ASSISTANT:    You have to leave the window closed.

(Whereupon voir dire was conducted by the Court, the State and the Defense.)

THE COURT:    And you come back at 1:00, you fourteen, the rest of you be back here at 8:45.  Have a good evening and drive carefully, please.

Thank you.

Did you get a new panel sheet for us here?

Exhibit 5001 at 266

D1 29                                    Introduction

MR. FRASIER:    I think this for you.

THE COURT:    You've got a third panel sheet?

MR. FRASIER:    (Not understandable) the expert jurors that they had it on (not understandable.)

THE COURT:    This is the third one — Panel Three.  Okay.

Yeah, I've got mine, too.

Okay.  Yeah.  Uh, save those and I'll — I'll use yours when I get to the end.  Okay.

Thanks.

Uh, sir, if you want wait just at, uh, my office door — just outside my office door.  She'll get to you then.

JUROR:    Okay.  Right down the - - -

THE COURT:    (Interposing) Yeah.

JUROR:    - - - hallway?

THE COURT:    It's just around the corner.  It's the first - - -

JUROR:    (Not understandable) - - -

THE COURT:    When you go around the corner, it's right there.

JUROR:    First door on the right, there?

THE COURT:    First door on your right.  Correct.

JUROR:    All right.  Thank you.

Exhibit 5001 at 267

Introduction          D1 30

THE COURT:    You bet.

Okay.  Ms. Cress is going to talk to him.  I don't know that I'm going to wait to go over it with you or make you wait to — to do that.

Uh, I appreciate the questioning.  We got through two panels.  We'll do one tomorrow.  I plan to probably just — after we get through another fourteen, have a — maybe another six people just to make sure we have plenty in case people change their mind.  So, that will give us a total of 48 jurors for peremptories, and, uh, I think that would be — that will be plenty.

Uh, I didn't ask — do people want the Jury View before or after opening statements?  I — I think, generally, it's before, but — so, you can give an opening statement and talk about what they've seen.

MR. FRASIER:    I — I agree with the Court.  I think before is — is preferable.

I do need to say — about the scheduling issue — I've got two witnesses who I've got to put on Thursday or they are unavailable.  So, - - -

THE COURT:    (Interposing) I — I don't see a problem because I think we are going to have - - -

MR. FRASIER:    (Interposing) Okay.

THE COURT:    I think we are going have, probably, enough jurors by noon.  And if it goes similar to

Exhibit 5001 at 268

D1 31                                    Introduction

what this is — and most of these questionnaires — I haven't looked through the rest of them — have been people who haven't — don't know about this case.  They don't have an opinion.

Now, we may get a load of — a load of these — on these, where all of a sudden that's changed.  But I'm — hopefully, we can get all the jurors passed for cause by noon through the selection, have the fourteen, and have the bus.  And then, we've got Thursday for opening statements and your witnesses.

MR. FRASIER:    All right.  That's fine.

THE COURT:    Possibly, even one opening statement tomorrow.  So, - - -

Okay?

Anything else?

(No audible response.)

JUDICIAL ASSISTANT:    (Not understandable.)

THE COURT:    The juror who wants to be released, his girlfriend just had a baby four weeks ago.  He's — he's the sole support of the family.  If he doesn't work, they don't get paid — he doesn't get paid.

JUDICIAL ASSISTANT:    (Not understandable.)

THE COURT:    Why is he in the courtroom?

Oh, one — Juror 169?

MS. McCREA:    Kevin Jones?

JUDICIAL ASSISTANT:    Yes.

Exhibit 5001 at 269

Introduction        D1 32

THE COURT:    Mr. Jones.

MR. FRASIER:    I have no objection to him being released.

MS. McCREA:    I don't object either.

THE COURT:    Tell Mr. Jones he doesn't need to come back.

JUDICIAL ASSISTANT:    Right.  But he needs to call in for (not understandable)?

THE COURT:    He needs to call in for other cases, yes.

Anything else?

MR. FRASIER:    No.

MS. McCREA:    (Inaudible response.)

THE COURT:    Okay.  We'll try to get started at 9:00.

Thank you.

(END OF DAY ONE)

*                    *                    *

Exhibit 5001 at 270

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

STATE OF OREGON,                  )
                                  )
            Plaintiff,            )    CASE NO. 10CR0782
                                  )
                                  )    JURY TRIAL
      vs.                         )     DAY 2
                                  )
 NICHOLAS JAMES McGUFFIN,         )
                                  )
            Defendant.            )
 _____ )


TRANSCRIPT OF PROCEEDINGS

Volume 2, Day 2, Pages D2 2 to D2 37

BE IT REMEMBERED That, the above-entitled cause came on regularly for hearing beginning at 9:21 a.m., Wednesday, July 6, 2011 in the Circuit Courtroom of the Coos County Courthouse in the City of Coquille, County of Coos, State of Oregon, before the Honorable Richard L. Barron.

APPEARANCES

R. Paul Frasier, District Attorney for Coos County, representing the Plaintiff.

Erika Soublet, Assistant District Attorney for Coos County, representing the Plaintiff.


Robert McCrea, Attorney at Law, representing the Defendant.

Shaun McCrea, Attorney at Law, representing the Defendant.


Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 271

D2 2

*                              *                                    *

JUDICIAL ASSISTANT:   All rise.  Circuit Court in the State of Oregon, in Coos County, is in session.

THE COURT:   Be seated, please.

Good morning.

Good morning, to those in the room.

I forgot to press a button when I said "good morning" the first time.  So, now I'm welcoming you, also.

Uh, we'll start then, uh, with Ms. Carocci?

(Whereupon voir dire was continued by the Court, the State and the Defense.)

THE COURT:   Okay.  This is a real convenient breaking point.

I guess, the bad news may be that I've done this long enough that I get paranoid and worried about what's going to happen when we start selecting these jurors because I've had some jurors — when we've gone through this process — find something where we have had to excuse them.  So, I am going to want all of you to come back at 1:00.

The good news is that I don't think that's going to happen.  And we'll — we'll go through this process and pick a jury and then you'll all be released.  But, if we pick six more than we — than I think we are going to need to go through the entire process - - -

But as I've said, I've had this — we've got to

Exhibit 5001 at 272

D2 3

this point where then I've had to excuse people, and we need more people. And I don't want to let all the jurors go and then — and then have to figure out where — where we are going to get jurors. Because I've had to send police officers out on the street and actually grab people off the street to serve as jurors, and I don't want to have to do that. They don't appreciate that.

So, uh, what I will do is just release all of you for lunch. And, if all of you — we will probably make arrangements for — we'll make arrangements for the 46 people to come back to the jury room. The remainder of you will be in that jury assembly room. And as soon as we get the jury picked, then we will release you. If for some reason we need another juror to come down here, we'll let you know. And we'll try to do that as quickly as possible because I have all the other jurors coming back at 1:00, and we should be able to go through the process very quickly.

I appreciate your patience in being here. You've been courteous. I really appreciate your help in doing this.

So, everybody is excused until 1:00. And if you would just come back, we'll — as I said, we'll — we'll sort out the 46 people, bring them down here. The other people will remain. Just be back at 1:00.

We can do this two different ways. We can just

Exhibit 5001 at 273

D2 4

— I can have all 46 jurors in here.  We can sit 14 and just excuse them as we normally do, so you get a chance to look at them.  Or, we can just go down the list if you don't need to see the jurors again, and just start exercising the peremptories.  I don't — I don't care which way.

Seat 14, start excusing people.  You each have 13 peremptories.  The last two names would be the alternates, unless you two agree on something else.  Or, we can not call them in and just start excusing them.  I don't care which way.

MS. McCREA:    I'm — I'm thinking about it, Your Honor.

THE COURT:    I — I - - -

MS. McCREA:    (Interposing) I — it's - - -

THE COURT:    - - - understand.

MS. McCREA:    It's one of those things where I — I'm thinking we can do it from the list, but I just don't want to put myself in a position where, um, - - -

THE COURT:    (Interposing) My only thought is that — you know, you can see the people doing it.  I don't care which way because, obviously, if we do it without them being here it can even be quicker because we don't have to call people up to sit down.  And I'm all for quicker.  But I also want to make sure that you know who you are excusing and — and remember that.

So, again, uh — I guess, if — if you can't

Exhibit 5001 at 274

D2 5

agree on it, we are going to have the people in the courtroom and excuse them.  So, we are going to do it the normal — that's the normal way.  If you can agree on the other procedure, then it's fine.  So, there is a default position is what I'm telling you.

MR. FRASIER:   Well, I — I think from my perspective, Your Honor, I would rather see them in the box, for me.

THE COURT:   Okay.

MS. McCREA:   That makes it easy.

And I had an experience in Jackson County where I excused the wrong juror because I didn't see them.  So, it makes me reticent.

And — and, Your Honor, at some point, may I confer with Mr. McGuffin about our peremptories before we actually — either now or - - -

THE COURT:   (Interposing) Oh, yeah.

MS. McCREA:    - - - ten minutes ahead of - - -

THE COURT:   (Interposing) That's - - -

MS. McCREA:    - - - time?

THE COURT:   That's not a problem.

I'd like to — I'd like to do it at 1:00.  It's just because I've held about - - -

MS. McCREA:   (Interposing) Yes.

THE COURT:    - - - forty-some jurors here that

Exhibit 5001 at 275

D2 6

I'm going to have to release.  But, yeah, that's not a problem.  The deputies will allow you to do that — to confer with that.

We are going to go, two, two, two, two, two, and then at the end it will be — you are each entitled to one extra, I believe, with the — yeah, one extra with the two alternates.  So, then it will go — once we exercise — well, we just exercise — it will go two, two, two, until the last, and then it will be one and one.  So, - - -

Okay?

MS. McCREA:    Yes.

MR. FRASIER:    Your Honor, in regards to the alternates, I don't have a problem with the last two being the alternates, but I would prefer that they not be told they are the alternates until the end of the - - -

THE COURT:    (Interposing) I don't plan - - -

MR. FRASIER:    - - - Trial.

THE COURT:    - - - to tell them.  I think that's the smart — I would prefer that just because they don't know, at the point in time, uh, and I think that makes it easier for them to have to listen to the case and that sort of thing.

So, as long it — that's agreeable with you, Ms. McCrea?

MS. McCREA:    Yes, Your Honor.

Exhibit 5001 at 276

D2 7

THE COURT:   Okay.  And we'll have the View then — your bus is ready when?

MR. FRASIER:   Well, I can — I had told him to be — I had told him yesterday 1:30.  Then I — because we were going slower, I told him 2:00.  But, I guess I can get him here at 1:30.

THE COURT:   And I think by the time we get done with the peremptories here, it will be, uh — I — I think 2:00 is probably a good idea because I've got to advise them of what — and all I'm going to do is tell Ms. Cress to point out — she's got a script of the what the View is — of what the trip will be.  She's just going to say, you know, "Take notice of McKay's," or the other landmarks, and not say anything else.

Uh, on our off-the-record discussion, Ms. McCrea and Mr. McGuffin are going to be on the bus with the deputies.

And, Mr. Frasier, you said you would prefer to be in the lead car.  I — I'm not going to be there.  I have a little concern about one side being on the bus and not the other side.  I don't care whether you miss — you or Ms. Soublet go, but I think one of you ought to be on the bus.

MR. FRASIER:   All right.  That's fine.  I'll ride on the bus, then.

THE COURT:   Okay.

Exhibit 5001 at 277

D2 8

I just — I just think it's better to have that. Uh, and everybody's agreed that I don't have to go so I'm not going to.

Okay?

MS. McCREA:    I have one other request, Your Honor.

After the jury is sworn, I request that the Court give an instruction consistent with the Uniform Trial Court rule.  And I don't — I didn't bring that with me.  I apologize.  But, there is - - -

THE COURT:    (Interposing) The — the precautionary one?

MS. McCREA:    Well, there is a rule about that the — the parties and no one is supposed to have a reaction in the courtroom.  And, it is a concern because often there is — there is a reaction by the jurors, or by the media, that the parties are not — you know, not showing a reaction.  And the reason for that is because the Court instructs us not to.

THE COURT:    Okay.  Let me get to the part - - -

Well, there is one that's about four pages.  I think that's after the jury is selected.  And what you want me to do is, basically, go over that?

MS. McCREA:    Yes.

THE COURT:    Okay.  And I will look at that.

Exhibit 5001 at 278

D2 9                         Motion to Exclude Witnesses

Some of the — I'm not going to repeat what I've repeated — what I've already said.  But, I will generally look at it.  I normally don't give that, but the — the request is reasonable, so I'll certainly look at it and try to give it.

Anything else?

MS. McCREA:    No, Your Honor.

MR. FRASIER:    Uh, for the record, we would Move to Exclude Witnesses.

And I believe we've agreed that Ms. Bonk can be in the courtroom for the defense.  And Officer McNeely can be in the courtroom for the State.

THE COURT:    Okay.

MS. McCREA:    That's correct.

THE COURT:    And the Statute says this case is 11 to 1.  That's what we are instructing the jury on?  Okay?

MR. FRASIER:    On - - -

THE COURT:    The Murder Statute — Statute.

You want it unanimous?

MR. FRASIER:    I thought it was unanimous.

MS. McCREA:    Yeah.

THE COURT:    No. 136.  Unless there is something done recently that I'm not aware of.

MR. FRASIER:    (Not understandable.)

THE COURT:    I just looked at again this morning.  That always worries me when somebody looks at me

Exhibit 5001 at 279

D2 10

like, "What are you talking about?"

No. 136.450(2), "Except when the State requests unanimous verdict, the verdict of guilty for Murder or Aggravated Murder, shall be by concurrence of at least eleven of twelve."

MR. FRASIER:   No. 136 what?

MS. McCREA:   No. 136.450.

THE COURT:   Subsection 2.

It would still be 10 to 2 to find somebody not guilty.

MR. FRASIER:   Can I get back to the Court on that?  Um, I think there has been some advice that we've been given by the Attorney General not to follow that Statute.  And I want to - - -

THE COURT:   (Interposing) I have — I had some problems myself with it because I'm not too sure why it — only the State gets to request unanimous verdict.  I — I've always questioned that, but I wanted to make sure that the issue — I'm assuming you may have because my — my initial reaction was, "Well, why only one side gets to request that?"

MR. FRASIER:   Right. And I - - -

THE COURT:   (Interposing) So, if that's — if it's unanimous, it's fine with me.  It always has been.  It's just that that Statute is in existence.

MR. FRASIER:   Let me double check on that,

Exhibit 5001 at 280

D2 11

Your Honor, but I think I'm going to want unanimous.

THE COURT:   Well, and I'm — I know the defense would want unanimous.  I — I just wanted to point out the Statute because it's there, and I don't want that to become a problem later.

So, unanimous it's fine.  It's always been that way.  And I'm not too sure the reasoning behind that Statute.  I'm not too sure the reasoning behind giving the State to request it.  It always seemed — when I read that Statute a long time ago, it always seemed to be — be unfair, and, uh, something about just allowing one side.

So, I will take it, unless I'm told otherwise, that it's going to be a unanimous verdict.

Okay?

MR. FRASIER:   All right.

MS. McCREA:   Yes.

THE COURT:   All right.

Anything else?

MS. McCREA:   No, Your Honor.

MR. FRASIER:   (Inaudible response.)

THE COURT:   Okay.

(Whereupon voir dire continued.)

THE COURT:   Okay.  That brings us down to 44 jurors, which is still enough.

What I do plan to do — I'll let you know ahead

Exhibit 5001 at 281

D2 12

of time — is call the entire jury in.  And I may or may not say that some idiot was outside the courtroom, in which I've told you on an off-record discussion, photographing jurors and may have their cars.  And that — I would probably even tell them that that — the only thing that went on U-Tube was the little confrontation with the police outside.  And that he's been instructed he cannot do that any further.  And then, if that happened — if something like that happened, he may be prosecuted for Contempt.

But, I want to know whether that effects anybody sitting on the jury, whether that would affect them, or at all effect how they would look at — look (sic) or decide this, so I can get a feel for the entire panel.  I don't want to question each individual juror that way.  But, I do want to get an idea of — if anybody — and I will ask, you know, "Is anybody real concerned about this?  Or would it affect them?  Something like that, and see of there is a raise of hands.

If there is an objection to that procedure, you want me to do something else, let me know.

MR. FRASIER:   I don't have problem with that procedure, Your Honor.

MS. McCREA:   It's fine, Your Honor.

THE COURT:   Okay.

Ms. Greeley and Ms. Farr can be told they are excused.  Bring the other, I guess, 26 people down here.  Seat

Exhibit 5001 at 282

D2 13

them down here.  And bring the 14 into the jury box and then we will - - -

JUDICIAL ASSISTANT:    (Interposing) (Not understandable.)

THE COURT:    (Not understandable).  Yeah, for other cases.

And you might remind them, specifically, that — that admonition about not talking to people in other cases applies all the time — and so, not to do it.

And for the record, the precautionary instruction that Ms. McCrea was talking about, uh, I have planned giving a version — a very short version of that because there is some things in there I think the jury should take.  But, there wasn't anything about the reaction.  And I think what somebody may be talking about is I always say before I receive a verdict, "There is to be no reaction to the verdict."

So, I don't — uh, there is no specific instruction that covers, you know, people may not — people aren't supposed to react, so don't watch them or something. And I — I don't know how I would ever phrase that because I think jurors, especially, need to watch witnesses.  They watch the Defendant.  They watch everybody during the Trial.

I would be a little leery about questioning it. But as I understand, Ms. McCrea, since that's not in an

Exhibit 5001 at 283

D2 14

instruction anywhere, you didn't particularly care about the instruction being given now?

MS. McCREA:   I — I looked up the instruction in the Uniform Trial Court Rules.  It's in the Court Decorum and it is limited to taking the verdict.  So, that is fine, Your Honor.

THE COURT:   Okay.  And I did have her Xerox the precautionary instruction that talks about objections and those things.  So, I think I will give that.  I cut out all the part about doing research and stuff because I've pretty well covered that already.

Okay.

JUDICIAL ASSISTANT:   (Not understandable.)

THE COURT:   Okay.

Cathy, make sure all the other jurors remain until we are done with the (not understandable).

JUDICIAL ASSISTANT:   Right.

THE COURT:   If you could remove your hats, please?  If you could remove your hats, please?

Thank you.

Good afternoon.

Thanks for your patience.  We've had a few things that we've — we've been working.  We haven't been sitting.  We've been — having a few things we had to do.

Got two things.  The first thing is I've

Exhibit 5001 at 284

D2 15

already had to excuse two of the jurors who were selected for not following the Court's instructions.

I realize that we put jurors in a — in a new position and an uncomfortable position about don't speak to people, don't do this, but I am serious about those instructions.  They can affect an entire Trial.  And it is not fair to the parties.  And both jurors have violated those rules.  So, they are excused.

Now, I — I don't totally get upset with people because, as I said, this is a new experience for you.  But, it is very important.  I mean, these — all these cases are important that we try.  People are entitled to a fair trial.  And I think anybody in a situation being here, one party or the other, would want them to be treated fairly.  And so, I expect that to be done.  And I don't expect to have to tell people this admonition time after time after time.  I expect them to listen to it and follow it.  Okay?

Secondly, my understanding is at the noon hour, at least, there was some gentleman out there that — I probably shouldn't use the word "gentleman" — who was photographing jurors and possibly juror cars.  Okay.  Uh, he — he has now been told that if it occurs again, he very — may very well be arrested for Contempt and prosecuted for Contempt.

Uh, we don't expect people to do that.  So — and I can't enter — enter a general Order to the community

Exhibit 5001 at 285

D2 16

that says, "Don't take pictures of jurors," so there was no specific Order to anybody. But, he has now been informed of what may happen if he does it again.

Uh, I believe he is about seventy years old. He did — the police did go out and talk to him. As soon as we found out, I sent some officers down there. They did talk to him. And he has put on U-Tube his confrontation with the police officers, not any jurors.

So, the media allows — I mean, we have all these multi things, and people put them on. And — and, uh, I have no control over people who do stupid things, unless they do them within the courtroom, or violate an Order that I have, then I — then I can do something about it. But, generally, I can't deal with stupidity on that basis.

My question to you, though, is there any juror who, because of that, feels that now they cannot be a fair and impartial juror in this case? And — and I — if — if it — if you have a concern about it, I need you to raise your hand and talk about it now because I don't want it to become an issue later because that creates a problem.

And, I understood that he might have been rude to people, rude to some jurors on that matter. But, I do need to know if anybody has a problem, a concern, or a question about it, please raise your hand and we'll deal with it now.

JUROR:  I know he took my picture. Is this —

Exhibit 5001 at 286

D2 17

like, I'm wondering if I should be concerned about it.  What concerns are possible, or - - -

THE COURT:    You know, I — I don't — from my experience over the years, most people who do things are — you know, are completely harmless.  They do stupid things.  They don't think.  They don't care — they don't seem to think about other people or other feelings.  And why they do it, I have no idea.  I can't do anything about that now.  But, I — you know, I — I have no idea.  So, I — I — that's just from experience.  I can't tell you what somebody's going to do.  If they put it on U-Tube, there is not a lot that can be done about it.

But, uh, I — I can only do what I've done.  And I don't know that — I can't tell you there is a specific concern.  My — my knowledge is the man doesn't have any — there is no criminal record or anything that we are aware of (Not understandable).  So, - - -

VOICE:    Your Honor, if — anybody who came out between 12:00 and 12:20 had their photograph taken.  Anybody who wore a juror button.

THE COURT:    Okay.

Well, again, that's a twenty-minute period.  And I think within about — within five minutes of me learning of it — even closer than that — there were deputies that went out — out there.  Uh, and he left at that point in time.  And, as I said, the only thing he's put on U-Tube is the fact that

Exhibit 5001 at 287

D2 18

he recorded the little confrontation he had with the deputies.

But, again, if anybody is concerned about that, wants to raise an issue about that, this is the time to do it because we are now going to be selecting the fourteen people who are going to be sitting on this case.

Okay?

Yes, sir.

JUROR:    At this point, you have no idea what his motive or his goal is?

THE COURT:    I — I wouldn't even — I wouldn't even venture a guess.  He — I — my understanding is he lives in Myrtle Point.  So, he's in this general area.  I don't know what his interest is.

JUROR:    I was — I was sitting there.  I spoke with him.  Uh, it didn't seem as if he was doing anything wrong.  In his mind, he was very clearly within his rights. And, was quite offended that he was being asked to leave.  Did not want to wait around to see you.  He just said, you — you know, "Either arrest me or I'm leaving."  And there was no — no ability to arrest him, so he left.

I didn't think much of it, probably still won't.  But, I would — was, in hindsight, curious what his motive was.

THE COURT:    And — and I'm not too sure whether he would say anything other than fact — my only

Exhibit 5001 at 288

D2 19

understanding is he said, "Well, it's in the public and I can do what I want."  And - - -

JUROR:    (Interposing) That's exactly - - -

THE COURT:    And, actually, - - -

JUROR:    - - - what he said - - -

THE COURT:    And, generally, - - -

JUROR:    - - - three times.

THE COURT:    Generally, people can do what they want.  There might not being crime about it, but the Court's authority does extend — uh, and there is a specific rule that says jurors should not be photographed anywhere, on — on a case in which they are sitting.

So, there is a Court rule that relates to that. He may or may have not have known about that.  There is nothing that I'm going to do about his past conduct.  If — if he violates something in the future, there may be something done at that point in time.  Because then he is aware that there is a Court rule.

But again, I — I can't talk to anybody's motivation.  The only thing I can do is ask the jurors if they are going to be affected by this in any way because then that's not fair to the parties.

Yes, sir?

JUROR:    I'm, uh — I'm not concerned about it all, you know.  But, um, someone else came up with an idea in

Exhibit 5001 at 289

D2 20

there.  Would it a bad idea to take our badges off until we came to this room?  Or, is that not allowed?

THE COURT:    No, you can do that.  My — I — I prefer it, obviously, that they are — they are worn during the — if you are selected as a juror, during the Trial because you are going to go out to lunch, and — and there is — there are a lot — there is 160 witnesses.  So, people are going to be out to lunch, and I'd prefer that somebody know that you are a juror just so they stop talking around that when you are on the case, when you are in the courthouse.  When you go home, obviously, you are out — out in the community, I don't think it's necessary.  But, during a Trial it has been helpful because it's — had people not be around you.

JUROR:    Okay.

THE COURT:    Okay?

Yes, sir.

JUROR:    Your Honor, I — I had just like the opposite thing happen yesterday.  On our break we went to lunch and, uh, people saw the button, and it instantly made them want to come up and talk to you about it (not understandable).

THE COURT:    Well, and that's the risk you run.  But, it also - - -

JUROR:    (Interposing) Yeah.

THE COURT:    - - - the right to say, "Hey, I'm

Exhibit 5001 at 290

D2 21

a juror, don't talk to me."  So, I mean it does that as opposed - - -

JUROR:    (Interposing) It kind of draws — it seemed like it was drawing attention.

THE COURT:    Well, it — it may, but it — they may come up if you are here, anyway, and ask you, or - - -

JUROR:    (Interposing) Yeah.

THE COURT:    - - - they may just start — if you are standing somewhere, start talking around — talking around that.  If they see the button, you can easily say, "I'm a juror, don't talk to me - - -

JUROR:    (Interposing) Okay.

THE COURT:    - - - about it.  Don't do this sort of thing."

So — you know, there is pros and cons of it, but I've just found that it's better — it gives you some protection to say, "I'm a juror, don't talk to me."

Okay.  Anybody else?

(No audible response.)

Okay.  Then, we are going to start the process of whittling every — whittling this down to where we get fourteen people.  Uh, but again, I don't want anybody to be afraid to raise their hand or say something.

Okay?

JURORS:    (No audible response.)

Exhibit 5001 at 291

D2 22

(Whereupon voir dire was continued by the Court, the State and the Defense.)

THE COURT:    Well, if I'm correct after all this, the parties have indicated they are now satisfied with the fourteen jurors seated.

Before I swear you fourteen in, I always go over this again — once more.  Once you are sworn — once you are sworn in as a jury, you are it; and you cannot get off because you decide that it's inconvenient, or some other purpose.  You can't get off.  And if something came up where you actually had a reason to get off, then depending on the number we had left, we might have to start the whole process again.  So, I want everybody to take just a second or two and think bout it.

Is there anybody that has any questions, concerns, or anything about being on this jury and serving before we swear you in?  And I have — I have other jurors here and other jurors down there.  Does anybody have any questions, concerns, or anything they want to raise before you are sworn in?

JURORS:    (No audible response.)

Okay.  It's called a fair notice and fair warning.

If the fourteen of you would please stand and raise your right hand.

Exhibit 5001 at 292

D2 23

(Whereupon a jury of fourteen were duly empaneled and sworn to try the above entitled case.)

THE COURT:   Have a seat, please.

The other jurors in the room are excused.  You can leave your jury buttons, uh, here and you are free to leave.  We will excuse the other jurors, also.

I do wish to thank you very much.  It's — you are a very important part of the process even if you don't end up serving.  We call in a great number of people.  As you saw, we excuse a lot.  I can never tell exactly how many jurors we need for specific cases.  Sometimes I think people wonder why we call in so many.  I think you see that the process sometimes excludes people, and so we have to have to have as many people as we can.  That we make sure we have a fair cross section of the community.  I think we've, obviously, done that at this point in time.  But, I do thank you for your service.

Please call in as directed.  You are free to leave.

(Remainder of Jury Panel exits.)

THE COURT:   Do you want to pass that out to the jurors?

I'm going to give you a precautionary instruction at this point in time.  And then I'll give you another instruction that's not written down, about a Jury View that will be taken this afternoon.

Exhibit 5001 at 293

Precautionary Instructions       D2 24

JUROR:    (Not understandable.)

THE COURT:    The Jury View.

JUROR:    View?

THE COURT:    View.

JUROR:    Do you want us to read this now?

THE COURT:    I'll read it to you.  Read along with me if you would, please.  Okay?

Members of the jury, the law that applies to this case will be given to in part in these precautionary instructions.

After you've heard the evidence, and before the arguments from the lawyers, I will give you further instruction regarding the legal rules you must follow in deciding this case.

Your duty is to decide the facts from the evidence.  You and you alone are the judges of the facts.  You will hear the evidence, decide the facts, and then apply those facts to the law I will give you.  That is how you will reach a verdict.  In doing so, you must follow the law whether you agree with it or not.

To be an effective juror, you must also not be influenced to any degree by personal feelings, sympathy for, or prejudice against, any party, witness, or lawyer, or any other participant in the case.

The evidence you are to consider in this case

Exhibit 5001 at 294

D2 25                    Precautionary Instructions

consists of testimony of witnesses and exhibits received in evidence.

Exhibits are physical things, such as letters, photographs, charts, or physical objects.  You will be able to examine the exhibits while you deliberate.

You may draw any reasonable inferences from the evidence, but you must not engage in guesswork or speculation.

From time to time, a lawyer may make an objection.  I will decide whether or not it is proper under the law for you to consider such evidence.  Do not speculate about why the objection was made or about why I ruled as I did.

If I overrule on objection, the question may be answered or the exhibit received.  If I sustain an objection, the question cannot be answered or the exhibit cannot be received.  Whenever I sustain an object — an objection to a question, ignore the question and do not guess what the answer would have been.

Sometimes I may order that evidence be stricken from the record, and that you are to disregard it or ignore the evidence.  When you are deciding the case, you must not consider the evidence that I told you to disregard.

The opening statements and the closing arguments of the lawyers are intended to help you understand the evidence.  Although, their statements and arguments are

Exhibit 5001 at 295

Precautionary Instructions        D2 26

not part of the evidence.

You must not interpret — interpret any statement, ruling or remark I make during this Trial as any indication that I have formed any opinion about the facts or outcome of this case.  You and you alone are to decide the facts.  You must decide how believable that evidence is, and what weight or value you will give the evidence.

You may take notes if you wish during the trial.  However, please keep in mind that each party is entitled to the considered decision of each juror.  Therefore, during deliberations you should not give undue weight to other jurors notes if those notes conflict with your recollection of the evidence.

Do not allow your note-taking to interfere with your ability to observe, evaluate testimony.

Whenever you leave the courtroom, your notes should be left in the jury room.

Do not discuss this case during the trial with anyone, including any of the lawyers, parties, witnesses, your friends, or members of your family.  Do not discuss this case with any — any other jurors until you begin your deliberations and — at the end of the case.

Do not attempt to decide this case until you begin your deliberations.

Do not communicate with anyone, by any means,

Exhibit 5001 at 296

D2 27                    Precautionary Instructions

concerning what you see or hear in the courtroom.  Do not try to find out more about this case, by any means, other than what you learn in the courtroom.

Ignore any attempted improper communication. If any person tries to communicate with you about this case, tell that person you cannot discuss the case because you are a juror.  If the person persists, simply walk away and report the incident to the Court.

After you have rendered your verdict, or have been otherwise discharged by me, you will be free to do any research you choose, or to share you experiences either directly, or through your favorite electronic means.

Remember that all phones, PDA's, laptops, or other electronic devices must be turned off while you are in Court and while you are deliberations.

We will now hear opening statements — they will be delayed probably until tomorrow — in which the lawyers will outline the evidence that they expect it to be.  After opening statements, the evidence will be presented.  At the conclusion of the evidence, I will instruct you about the law that applies to this case.

The lawyers will make their closing arguments to you and you will begin your deliberations.  At the end of the trial, you will have to make a decision based on what you recall of the evidence.  You will not have a written

Exhibit 5001 at 297

Precautionary Instructions        D2 28

transcript to consult, and it is difficult to play back recorded testimony.  So — so, that's not typically done.  I urge you to play close attention to the testimony as it is given.

I will be talking to the attorneys about the timing of the opening statements.  But, before that is done you are going to have a Jury View.

The Court has arranged for a Jury View in this case.  This is an opportunity for members of the jury to look at some particular location or locations.  The Jury View itself is not evidence, but is taken simply to enable each of you to better understand and evaluate the evidence that will be presented in the courtroom.

While on the Jury View, please stay together as a group.  Either the Court or the Bailiff may point our certain features for you to observe.  Do not allow any person to talk to you about the case.  Do not ask any person any questions about the case during the Jury View.  The law specifically prohibits any person other than the Judge or the Bailiff, and that's Ms. Cress, from speaking with the jury on any subject connected to the Trial.

You will be placed on a bus and they will drive around different locations in Coquille and maybe outside of Coquille.  That is going to take about an hour or two.  So, we'll take a brief recess before you — before you go on that.

Exhibit 5001 at 298

D2 29                    Precautionary Instructions

JUROR:    Is that today?

THE COURT:    Today.

JUROR:    Okay.

THE COURT:    This afternoon.

Ms. Cress will point out certain things, except don't ask her questions.  She's not allowed to answer any anyway.  And she'll just point out things and say, "Take note of this.  Take note of that."  And then you can - - -

When you come back, my guess is that it will be closer to 5:00, so I don't think opening statements will be done.  I'm going to talk to the attorneys about that briefly while we take a recess.

Please remember the admonition that we've gone over time and time again about talking to people.  It is really important for you to assert yourself.  If somebody comes up, tell them to stop and walk away.  Don't allow them to talk to you or - - -

Yes, ma'am.

JUROR:    Just so I'm clear, I understand that talking about the case — do people know that we are on this case, or (not understandable)?

THE COURT:    I would — I would not even mention it because that's the type of thing — somebody mentioned the buttons seem to encourage people.  There is a reason for the buttons.  But, I wouldn't — I — you could say

Exhibit 5001 at 299

D2 30

you are a juror.  And if they say, "What case?", say, "It doesn't matter I can't talk about it."  That's what I would prefer.

So, it does require a certain amount of assertion that we normally don't necessarily do in our life.  We don't tell people to shut up and quit talking to us.  But, basically, that's what I'm telling you to do.

Okay?

JUROR:    (Inaudible response.)

THE COURT:    Uh, the restroom is in there.  This is a non-smoking building.  I don't know if there is any smokers left on the jury, but at this point in time we don't have the personnel, really, to divide smokers from non-smokers.  You can smoke on other breaks when you are outside.  Not on the bus and probably not on the Jury View.  So, at this point, you — you are probably prohibited smoking.

I will have you use the jury room.  That — there is two restrooms in there.  That's where you will be going.  When you report in the mornings from now on you'll be in there.

If — uh, you will probably come back to the courthouse — be coming to the courtroom.  I'll be — if we don't hear opening statements, and I don't think we are going to, I will then excuse you for tomorrow morning to come in and start the opening statements, and then we'll start hearing

Exhibit 5001 at 300

D2 31

evidence tomorrow.

So, if all of you would step into the jury room at this point in time.

Yes, ma'am?

JUROR:   (Not understandable) tablets so we can take notes?

THE COURT:   There will be tablets and pens and pencils for you to take notes if you wish to do that, yes.

JUROR:   And this is our order how we sit?

VOICE:   (Simultaneously) (Not understandable) - - -

THE COURT:   This is where you - - -

VOICE:   (Interposing) (Not understandable.)

THE COURT:   Yeah, this is where you are supposed to — just to help me keep track of things.

Thanks.

(Jury out.)

Mr. Frasier, are you going to have somebody sit up at the table with you?

MR. FRASIER:   (Interposing) Um, - - -

THE COURT:   A representative?

MR. FRASIER:   No.  I wasn't really going to designate him as a representative.  I just wanted him to be able to come and go as — as we need him.  And he was going to sit back here.

Exhibit 5001 at 301

D2 32

THE COURT:    Who is that?

MR. FRASIER:    Officer McNeely.

THE COURT:    Okay.  Officer — Officer McNealy will be the designated representative for the State.  And he can come in and go out, even though witnesses are excluded and he may be one.  But, the State has the right to designate somebody who is a representative.  He will be it.

Okay.  I don't think we have time for opening statements today.

How long are — you said you had two witnesses that had to be on what — tomorrow?

MR. FRASIER:    Right.

THE COURT:    I assume we'll have time.

MR. FRASIER:    I think we will tomorrow.  That shouldn't be a problem.

THE COURT:    Okay.  I'm hoping to start at 9:00 tomorrow.  But, tomorrow I think Judge Stone has something, so he can't take all of them.  I took some morning matters this morning.

JUDICIAL ASSISTANT:    (Not understandable.)

THE COURT:    Okay.  So, he has stuff going. And I'll have to take my 8:30 stuff.  I don't think it's too extensive.  And I'll try to get started at 9:00 tomorrow.

But, we'll go on to the Jury View.

Is — is your bus out here?

Exhibit 5001 at 302

D2 33

MR. FRASIER:    I'm assuming so.

THE COURT:    Okay.  And I do — just give them a few minutes to go to the restroom and then they'll go.

Uh, - - -

MR. FRASIER:    (Interposing) The plan is for Mr. McGuffin to be taken out first to the bus.  Then once he's on the bus, then we can — we'll give the high sign for the jury.

THE COURT:    And, uh, Mr. McGuffin, just — you've been very polite and courteous.  And make sure you understand that the deputies have to be there.  And I know you won't do anything, but just keep in mind that these are the fourteen people who are going to be judging whether you are guilty or not guilty.  So, act accordingly.  And I know Ms. McCrea has already talked to you about that.  But, the deputies have to be there, and they are going to treat you with courtesy, as the — I believe they have.  Uh, so — just so there is no problem.  Okay?

DEFENDANT:    Is it okay that I bring a — a notepad?  (Not understandable.)

THE COURT:    I'm not going interfere with the — I — I think Ms. McCrea is going to tell you just to sit there and listen.  I don't know what taking notes would do one way or the other.  I — I really don't specifically care. But, I would make sure no one knows what you are writing down,

Exhibit 5001 at 303

D2 34

other than your counsel.  Because if people see things, that's going to be a problem you've created yourself.

DEFENDANT:    Yes, Your Honor.

THE COURT:    Okay.

MS. McCREA:    Your Honor, is it a definite we are not doing openings today?

THE COURT:    We are not going to give opening - - -

MS. McCREA:    (Interposing) Okay.

THE COURT:    - - - today - - -

MS. McCREA:    (Interposing) Thank you.

THE COURT:    - - - because by the time you get back it will be too late.

Anything else?

MS. McCREA:    Just — I hope the counsel can have a short recess before we get on the bus?

THE COURT:    Yes.  We - - -

MS. McCREA:    (Interposing) Because - - -

THE COURT:    - - - will do that.  I think, probably, - - -

(Laughter.)

THE COURT:    - - - we'll take - - -

VOICE:    (Not understandable.

MS. McCREA:    You're not.

THE COURT:    (Interposing) I always wanted to

Exhibit 5001 at 304

D2 35

sing my grandchildren - - -

MS. McCREA:   Mr. Frasier and I are.

THE COURT:   - - - songs — "The Wheels on the Bus Go Around and Around".   But, I won't do that.

Uh, I will — let's try to shoot for 2:45 that you get on the bus.

MS. McCREA:   Yes.  Thank you, Your Honor.

THE COURT:   Okay.

Oh, I — I am going to have Ms. Cress tell the jury that Mr. McGuffin, you, Mr. Frasier, and she will be on the bus and that I will not be on the bus.

MS. McCREA:   Very good, Your Honor.

THE COURT:   Okay.

Cathy, you can tell them that.

(Chatter among parties in the courtroom.)

(RECESS)

(Jury in.)

JUDICIAL ASSISTANT:   All rise.

THE COURT:   Be seated, please.

I would like to have you here by 9:00 tomorrow morning.  And we will get started with - - -

And, in fact, Cathy, am I going to be able to be done with my 8:30 stuff?

JUDICIAL ASSISTANT:   (Inaudible response.)

THE COURT:   Why don't you get here about ten

Exhibit 5001 at 305

D2 36

to 9:00 — 8:50?  And then, I have some matters in the morning I'm going to have to take.  Hopefully they will be over so we can get started at 9:00 with the opening statements.

Ms. Gauvin, I hope you are feeling better.

VOICE:    She's a trooper.

THE COURT:    Good.

JUROR:    (Not understandable.)

THE COURT:    Uh, when you come in, just come directly into the courtroom.  And, if we have proceedings here, you can go behind the chairs and go directly into the courtroom (sic), if you would at that point.

Remember the admonition that I've given you about not discussing, or doing research, or having anybody approach you about this.

I appreciate all that you've done so far.  And, uh, have a pleasant evening.  Be back at 8:50 tomorrow morning.  Okay?

JUROR:    Thank you.

JUROR:    Yep.

JUROR:    Have a good night.

THE COURT:    Thank you.

(Jury out.)

THE COURT:    Anything else today?

MS. McCREA:    No, Your Honor.

MR. FRASIER:    No.

Exhibit 5001 at 306

D2 37

THE COURT:   Okay.  Thank you.  See you tomorrow morning.  Thanks a lot for your work on the case.  I appreciate it.

*                              *                              *

Exhibit 5001 at 307

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

STATE OF OREGON,                    )
                                    )
          Plaintiff,                )     CASE NO. 10CR0782
                                    )
                                    )     JURY TRIAL
     vs.                            )      DAY 3
                                    )
NICHOLAS JAMES McGUFFIN,            )
                                    )
          Defendant.                )
_____     )


TRANSCRIPT OF PROCEEDINGS

Volume 3, Day 3, Pages D3 2 to D3 111

BE IT REMEMBERED That, the above-entitled cause
came on regularly for hearing beginning at 9:07 a.m., Thursday,
July 7, 2011 in the Circuit Courtroom of the Coos County
Courthouse in the City of Coquille, County of Coos, State of
Oregon, before the Honorable Richard L. Barron, and a jury.

APPEARANCES

R. Paul Frasier, District Attorney for Coos County,
representing the Plaintiff.

Erika Soublet, Assistant District Attorney for Coos County,
representing the Plaintiff.


Robert McCrea, Attorney at Law, representing the Defendant.

Shaun McCrea, Attorney at Law, representing the Defendant.


Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 308

D3 2

*                              *                              *

(Jury in.)

JUDICIAL ASSISTANT:    All rise.  Circuit Court in the State of Oregon, in Coos County, is now in session.

THE COURT:    Be seated, please.

Good morning.

VOICE:    Good morning.

THE COURT:    We'll try it for now.

I'm going to try to leave the air conditioner on so we can — it will be reasonably cool.  If it gets to the point where somebody can't hear, including me, I'll have it turned off.  But, we are going to try to operate with that at this point in time.

Uh, I welcome all people who are attending this Trial.  It is a public Trial and you are welcome in the courtroom.  What you are not welcome to do is show any reaction to what anybody says or done.  If I see anybody shaking or nodding their head, or talking too loudly, or making any gestures showing approval or disapproval or something, I'll have them removed from the courtroom and they will not be allowed back.  So, your — you have a certain right to be here.  And I'm glad you are here, but you have the right only to listen.

Okay.  Mr. Frasier, you may give the State's opening statement.

Exhibit 5001 at 309

D3 3                                    Statements

Ms. Soublet, you may give - - -

MS. SOUBLET:      (Interposing) Thank you, Your Honor.

THE COURT:    - - - the State's opening statement.

MS. SOUBLET:    Counsel.  Members of the jury.

On June 28, 2000, fifteen year old Leah Freeman went up to her mother, Cory Courtright, kissed her on the cheek, told her she loved her, she'd see her later, and then got into the passenger side of the Defendant's blue 1967 Mustang and drove away.  And that was last time Cory Courtright saw her daughter.

Leah Freeman, as the evidence will show, as she grew up, was a happy-go-lucky child.  Was very into sports. Despite her petite size, was a pretty good basketball player. Had a circle of friends that she hung out with, which included Sherry Ann Mitchell and Stacy Lyons Crutchfield.  And even in the eighth grade, had a boyfriend, Austin Fisher.

But, when Leah started highschool in the fall of 1999 and met the Defendant, Nicholas James McGuffin, a seventeen year old senior, the evidence will show that she started to change.  It was a relationship that she kept secret from her mother, Cory Courtright, and older sister, Denise Bertrand, despite the fact they'll tell that she had had a good relationship with both her mother and her sister.

Exhibit 5001 at 310

Statements        D3 4

It was a relationship — the evidence will show in the testimony from Stacy Lyons Crutchfield and Sherry Ann Mitchell — that was toxic at times, troubled at best. And that as that school year progressed, the relationship was troubled with more than just the normal teenage — teenage angst.

But, you'll hear in Leah's own words, from entries made in her diary; from letters that she wrote to friends, Sherry Ann Mitchell; from letters that she wrote to the Defendant that were found after her death and disappearance; that that relationship was troubled with both jealousy and anger issues. Was troubled with trust issues.

You'll hear from Austin Fisher how the Defendant threatened to kick his butt at one time for spending time with Leah.

You'll hear in the Defendant's own words how he referred to Leah as being "his girl" now and not Sherry Mitchell's anymore.

You'll hear about arguments that they had. At one point, in April of 2000, got into an argument in the parking lot of McKay's, where the Defendant was so mad that he threw his keys across the parking lot.

Got into arguments at school, on the school premises, witnessed by people at the school.

And you'll hear how, as the school year

Exhibit 5001 at 311

D3 5                                      Statements

progressed, after all those things that one would expect his senior — prom and graduation — the Defendant was still living out at his parent's residence on Baker Road.  Still had access to two automobiles, his blue 1967 Mustang and his parent's maroon Thunderbird.

And on June 28, 2000, he was at the Courtright residence , which was then at 1173 North Knott Street, spending time with Leah, having her help him wash off the grease paint that was on his car from graduation.  And that as Leah was getting ready to leave the residence, told Ms. Courtright what her plans were for the day, that she was going to spend time with Sherry Mitchell.  Taking her mother's advice, spend more time with her friends, not so much time with the Defendant.

And after leaving the Mitchell (sic) residence, they went to the Defendant's house, where this picture was taken on June 28, 2000.  And whatever good mood that they had had, as they were at the Courtright residence at 1173 North Knott, was gone by the time they got to the McGuffin residence.

And you'll know this because Melissa Smith, a friend of the Defendant's and a friend of Leah Freeman's, called Leah and spoke to her at the McGuffin residence.  And she'll tell you that she could hear the Defendant in the background yelling at Leah, calling her a bitch.  Could tell

Exhibit 5001 at 312

Statements        D3 6

that Leah was upset and didn't want to talk right then.  And indicated that she talked to Melissa later.

And at some point after this photograph was taken on June 28, 2000, the Defendant and Leah left his parent's residence.  They went and picked up Brent Bartley and went out to his grandparent's residence, the Haga Ranch.  And hung out there for part of the afternoon — watching a movie, maybe having something to eat — before the Defendant took Leah, in his blue 1967 Mustang, to Sherry Ann Mitchell's house, located at 44½ North Elm Street.  And dropped off Leah to spend time with Sherry Ann Mitchell, as planned.

And Sherry Ann Mitchell will tell you, in that two hours, between 7:00 and 9:00 on June 28, 2000, she and Leah spent time much as you would expect teenage girls to spend their time — up in her room talking, listening to music, discussing their plans for the summer.

You'll hear how Sherry Ann Mitchell found a letter that Leah wrote and left in the room for her, which she'll tell you wasn't unusual for her to do.  But, as one would expect from a conversation with two teenage girls, it eventually turned to boys.  Specifically, to the relationship with the Defendant.  And that conversation ended in tears, both on Sherry Ann Mitchell's part and on Leah Freeman's part.

And Sherry Ann Mitchell and her mother, Peggy Mitchell, will tell you Leah ran from the house upset,

Exhibit 5001 at 313

D3 7                                    Statements

indicating that she was sorry she wasn't good enough for them anymore. And Sherry Ann Mitchell will tell you that she attempted to calm Leah down, to tell her that it wasn't Leah, it was the relationship with the Defendant that needed to end.

And shortly after, Leah goes storming off in the direction she would need to walk if she was going home, the Defendant pulls up at 44½ North Elm Street, in his blue 1967 Mustang, looking for Leah. And was told, by Sherry Ann Mitchell, who is still crying at that time, that they got into a fight and Leah walked off to go home. The Defendant, you'll hear, drove away from  44½ North Elm Street.

And the evidence will show, from John Lindegren, who was at his sister's house watching TV, walking his dog (not understandable) — the Defendant actually caught up with Leah Freeman after she left Sherry Ann Mitchell's house.  Was seen in an argument outside on Elm Street, near Sherry Ann Mitchell's house, sometime after 9:00 on June 28, 2000.

And you'll hear from Scott Hamilton, a friend of the Defendant's, how the Defendant told him he picked up Leah after she left Sherry Ann Mitchell's house. They got into an argument and she got out of the car at McKay's. And it's at McKay's where actually Patty Hutchinson (phonetic) will tell you she saw Leah Freeman. Could tell that she was upset by the look on her face.

Exhibit 5001 at 314

Statements       D3 8

And Heidi Crook and Mark Kirn will tell you they saw Leah walking along Central Avenue by Hunter's Restaurant that evening.  That Heather Reid, who was with Heidi Crook, will tell you that she's known Leah since she was three years old, and could tell by the look on her face that she was upset.  And Heather Reid was so concerned about Leah walking Central alone, that time of night and that upset, that after she dropped off Heidi Crook, she went back looking for Leah to give her a ride home.  And will tell you that she made it all the way to the Fairview Road turn off on Central and didn't see her again.

But Ray Lewis will tell you he saw Leah walking by the Credit Union.  And Alicia Hartwell will tell you that she saw Leah at the high school, in the parking lot, walking towards the Defendant's car after 9:00 on June 28th of 2000.

Cynthia Jones will tell you that she saw Leah at a gas station across the street — which is now the Shell, use to be the Chevron — in the phone booth looking at two guys across the street in the high school parking who were having an argument.

And Thomas Bounds, a distant relative of Leah Freeman's, will tell you that he lived in the apartments behind the gas station on North Elm.  And that he was driving pass the highschool earlier, saw Leah there in the parking lot, noticed the top that she was wearing.  As he went into

Exhibit 5001 at 315

```
D3 9                          Statements
```

town and came back about twenty minutes later, didn't see her again.  And went back to his residence at those apartment complexes, and will tell you that he heard a scream sometime later, which he could tell was a young child.  Didn't know what it was.  And didn't hear anything else after that, so went about his business.

And the evidence will show that while all these people are seeing Leah walking along West Central Avenue, the Defendant is seen, himself.  He is seen by Kristin Steinhoff at the Econo Rooter, right there where Central meets the bypass for Highway 42.  It's there, Kristin Steinhoff will tell you, she saw the Defendant in the parking lot, by the Econo Rooter store, by himself — with no cars around — standing and looking at the ground.

And Kristin Steinhoff will tell you she asked the Defendant what he was doing.  Made a joke about stealing flowers.  The Defendant, who was upset, told her that Leah was missing and he couldn't find her.  Kristin Steinhoff will tell you she told the Defendant to come by her house later if he still couldn't find Leah and she would help him look for her.

The Defendant, the evidence will show, went to Denny's Pizza, and spoke to Denise Bertrand, Leah's older sister, asking her if she had seen Leah.  And Ms. Bertrand will tell you the Defendant was visibly upset at that time. She didn't think it was that big of a deal.  This was shortly

Exhibit 5001 at 316

Statements        D3 10

after 10:00 in the evening on June 28th.

The Defendant — the evidence will show — went up to the Haga Ranch and asked Brent Bartley if he had seen Leah, if she had been back up there.

The evidence will show, from Officer David Zavala — then of the Coquille Police Department, now the Keiser Police Department — that he stopped the Defendant for that blue 1967 Mustang with only one headlight. And that upon contacting the Defendant, informing him he needed to get that headlight taken care of before the graveyard shift came on, the Defendant asked him if he had seen Leah. He couldn't find her, and asked Officer Zavala to keep a look out for her.

And Officer Zavala will tell you that he told the Defendant he would do that. And then he watched as the Defendant continued to drive on Highway 42, and made that turn to go over the bridge and out to Baker Road, as if going back to his parent's house.

And the evidence will show that the Defendant came back in to Coquille later that evening, now in the early morning hours of June 29, 2000. Went to Brent Bartley's house and picked up him. And drove around looking for Leah.

And Brent Bartley will tell you how they went to Sanford Heights Park, and he stayed in the car, the Defendant got out, walking in the park calling Leah's name. How they went to the high school. And Brent Bartley stayed in

Exhibit 5001 at 317

D3 11                                Statements

the car but the Defendant got out, went looking for Leah and calling her name.  And then when they got back to 1173 North Knott Street, Brent Bartley will tell you the Defendant didn't get out of the car.  Just indicated that the house was dark, she must be home and mad at him, and drove off.

It's after that the Defendant goes to Kristin Steinhoff's house, ostensibly  to take her up on her offer of help in looking for Leah.  But, Kristin Steinhoff will tell you that once at her residence she noted two different things about the Defendant.  One was that he had changed clothes from what he had been wearing earlier in the evening, when she saw him by the Econo Rooter store.  And the other, that he was driving a different car — his parent's maroon Thunderbird — different from the car that she had seen him in earlier in the day.

And at Kristin Steinhoff's house, at a time when the Defendant has indicated to multiple people that he's upset and looking for Leah, he takes the unusual step in deciding to do two things with Kristin Steinhoff.  One, was use a controlled substance, methamphetamine.  And the other, was to try to have sex with her.  Going so far as to get her on the bed, attempting to take her clothes off, and exposing his penis to her before Kristin Steinhoff stopped it.  And after that incident happened, he went back out driving around Coquille looking for Leah.

Exhibit 5001 at 318

Statements        D3 12

Multiple people will tell you, other than just Kristin Steinhoff, they saw the Defendant in his parent's maroon Thunderbird on June 29, 2000.  Specifically, Aaron West, Heather Reid, and Brent Bartley, all remember the Defendant driving his parent's maroon Thunderbird on June 29, 2000.

And at some point, the Defendant went home to his parent's house out on Baker Road, which is where he was when Cory Courtright called on June 29, 2000, shortly before 8:00 a.m., looking for her daughter.  And she'll tell you that the Defendant asked — when asked where Leah was, his response was, "You mean she didn't come home last night?"

And you'll actually hear from Ms. Courtright how earlier on June 28, 2000, the Defendant called her when he went back to Sherry Ann Mitchell's house about 10:15, looking for Leah.  And told Cory Courtright not to worry, that he would bring Leah home that night.  Yet, on June 29, 2000 he's home asleep and Leah isn't home.

And the evidence will show he came into town, went with Cory Courtright and Denise Bertrand to the Police Department and helped them file a missing police — Missing Person's Report.  And you'll hear that that report wasn't taken very seriously, at that time, by the Police Department. But, despite the fact that Cory Courtright, Denise Bertrand, and the Defendant, himself, were saying, "Leah would never run

Exhibit 5001 at 319

D3 13                                    Statements

away", it was treated, basically, as a "runaway".

And it's not until June 30th, the very next day, that Officer David Hall and then Chief Mike Reaves, with the Coquille Police Department, talked to the Defendant about what happened on June 28th. And you'll hear, in the Defendant's own words, what he told them. How he described Leah as being the love of his life, and what happened on June 28, denying that he ever saw her again after she left Sherry — after he dropped her off at Sherry Ann Mitchell's at 7:00.

Doesn't mention going to Kristin Steinhoff's house and attempting to have sex with her and doing drugs with her. Doesn't mention picking Leah up, getting into an argument with her, and having her get out of the car at McKay's.

And in the days and the weeks that follow, as family and friends looked for Leah, as an investigation continued, additional resources were brought in, and evidence was recovered. Specifically, a tennis shoe down the street from that gas station where Leah was seen by Cynthia Jones on June 28th, and the area near Thomas Bounds' residence where he heard the scream on June 28th. The tennis shoe that was identified as belonging to Leah Freeman. A tennis shoe that had Leah Freeman's blood on the sole of that shoe. And you'll hear, in the course of the investigation, that the second shoe that matches that was found out on Hudson Ridge road sometime

Exhibit 5001 at 320

later.

And as the search continued, with officers attempting to find Leah Freeman's body, you are going to hear how on August 3, 2000, Detective Tony Wetmore was working with Detective Cal Mitts, Detective Kurt Bennett was working with newly-appointed Deputy Medical Examiner Kris Karcher, went out on that day to check three specific places where they thought they might find Leah Freeman's remains. And the last place that they were going to check was Lee Valley Road.

And Detective Wetmore will tell you how it was a fluke that he didn't bring his hip waders with him so he couldn't walk in the river with Detective Mitts as originally planned. And wound up having to walk along the river bank, down by Lee Valley Road. And Detective Whitmore will tell you that he stepped onto a slight hill — mound of earth — and caught a whiff of something, which he immediately recognized as a smell of decomposing flesh. And he attempted to catch that whiff again. Couldn't figure out where it came from. Stepped off the mound and started to look, and found what was later to be identified as the badly decomposed remains of Leah Freeman.

You'll here how the Major Crimes Team was activated. The Oregon State Police Crime Laboratory came out and were able to determine that Leah's body had been there for quite some time. And an autopsy was performed by

Exhibit 5001 at 321

D3 15                              Statements

Dr. James Olson, of the State Medical Examiner's Office.  That despite the badly decomposed nature of her remains, was unable to find any evidence that she had suffered a gunshot wound.  Was unable to find any evidence that she had been stabbed.  Was unable to find any evidence that she had suffered any sort of blunt force trauma, or had been badly beaten.  But, that despite those lack of findings, despite her badly decomposed status, was able to determine that the manner of her death was homicide of a unspecified trauma.

And you'll hear how after that, the investigation went somewhat cold.  With officers contacting the Defendant the next day, on August 4th — or, August 5, 2000 to tell him that Leah's remains had been found.  He'll be able to tell you about the change in his demeanor.  How earlier on in the investigation he had been calm, and not nervous.  But, on that day after Leah's body was found, was chain smoking cigarettes as fast as he could light them and was short in his answers with them.

And during the years between August of 2000 and January of 2010, the investigation remained cold.  But, in October of 2009, Officer Pat Smith, of the Coquille Police Department, went to the McGuffin residence out on Baker Road, at their invitation, to talk about the status of the investigation.  And during that contact, the Defendant showed up and told Officer Smith that he knew who killed Leah

Exhibit 5001 at 322

Statements        D3 16

Freeman, but declined to give a name.

And in January of 2010 when the investigation went public, officers interviewed everybody who was still alive — who had been interviewed in 2000 — and tracked down new leads. Specifically, Jennifer Storts, who will tell you that she was coming home from her shift at Coquille Valley Hospital the early morning hours of June 29, 2000 — going out Fairview Road to her house — and as she came around a corner, where you wouldn't expect to find people walking, found two guys walking with a blonde hair girl in between them, as if holding him (sic) and supporting him (sic). It startled her so much, she wasn't sure what she had seen. And just as she's deciding whether or not she needs to stop and offer them a ride, sees a vehicle on the side of the road and figures that everything is okay.

You'll hear from Richard Bryant how the Defendant told him, sometime after Leah Freeman's body was found, that he kept seeing her laying there. That he couldn't do anything about it. And how he couldn't believe that he let bad things happen to Leah.

And you'll hear from David Breakfield, who dated the Defendant's later girlfriend, Megan (not understandable) — Megan Edgerton, at some point prior to 2000. And how the Defendant didn't like that really. Didn't like that fact that Mr. Breakfield was dating is on-again, off-

Exhibit 5001 at 323

D3 17                                    Statements

again girlfriend; to the point where he threatened Mr. Breakfield.  Telling him specifically, "I strangled that bitch and I can do the same to you."  "I killed before and I can kill again."

The evidence will show that as leads were followed up on, the conclusion the police arrived at — the conclusion supported by the evidence — was that on June 28, 2000, the Defendant met up with Leah Freeman at a time when he was upset that she wasn't spending time with him that night — chose to spend time with her friends.  At a time when was upset that she was losing friends, and realizing the toxic nature of the relationship needed to end.  And that volatile mix of those two individuals came to a violent end, with Leah Freeman's life being taken, the actions of the Defendant, and her body dumped off the side of Lee Valley Road in an effort to cover things up.

At the end of the State's case, after you hear the defense case, after all the evidence is presented, the State is confident that you will weigh the evidence carefully and impartially, and will reach the same conclusion that the person responsible for intentionally causing the death of Leah Nicole Freeman is Nicholas James McGuffin.  I'm confident that you will find a verdict of guilty, convict him of the charge for which he was indicted by the Coos County Jury, find him guilty of Murder because the State will have proven it's case

Exhibit 5001 at 324

Statements      D3 18

beyond a reasonable doubt.

Thank you.

THE COURT:   Ms. McCrea, you may give Mr. McGuffin's opening statement.

MS. McCREA:   May it please the Court. Mr. McGuffin.  Counsel for the prosecution.  Members of the jury.

Nick McGuffin and Leah Freeman were young and they were in love.  And that includes all of the kind of teenage things that go along with that kind of love.  They did have arguments.  They would verbally fight and then they would make up.  And it was very public.  It would happen at school. It would happen in town.  It was a thing like a passing thundershower.

Now, when Nick and Leah started dating in the fall of 1999, Leah's mom, Cory, did not approve of Nick McGuffin because there was an age difference between the two of them — because Leah was fifteen and Nick was seventeen, would turn eighteen in April of 2000 — figured that he would graduate.  And Cory discouraged the relationship.  And eventually, she told Leah, "You cannot date Nick McGuffin." And she forbid Leah to see him during the months of December 1999 and January of 2000.

Well, a couple of things happened because of that.  One is, Leah and Nick were sneaking around behind her

Exhibit 5001 at 325

D3 19                                        Statements

back.  And the second thing is it caused a strain between the mother and daughter, in terms of their relationship.  And eventually, Cory relented and said, "Okay.  You guys can date," and had allowed Nick to come over to the house in March of 2000.

Now, at that point, the — they were then the Freeman's — Denise, the older sister, Leah, and Cory Freeman were all living with Cory's friend — or, boyfriend, Jimmy Murphy, in a particular area of town.  And Mr. Murphy did not approve of the relationship between Leah and Nick.  And would not allow Nick to come over to the house or to call after 9:30.

Eventually, Mr. Murphy and Leah — Leah's mom, Cory Freeman, had a parting of the ways.  And the girls and their mother moved into Leah's grandparent's place, Cory Freeman's parent's house on Knott Street, which is where we went yesterday for the Jury View.  So, that's where they were residing.

Now, Cory Freeman's — now Courtright — father was — was an old school kind of guy.  And he didn't much approve of this older guy-younger girl relationship either.  And he wouldn't allow Nick up on the second floor where Leah's bedroom was.  And he had some pretty strong ideas about how a couple should act.  So, that's where we start in terms of the context.

Exhibit 5001 at 326

Statements      D3 20

We expect the witnesses will testify that yes, indeed, there were arguments, but that overall they had a happy relationship.  Yes, they did spend a lot of time together, and that was at the expense of some of Leah's relationships with her girlfriends.

In early June — the last day of school in 2000 was June 14th.  In early June, there was a graduation party at Nick McGuffin's parents home, Kathy and Nick (sic) McGuffin, out on Baker Road, which is one of the other places that we saw on the Jury View yesterday.  And Leah's mom, Cory Courtright went so far as to allow Leah to spend the night out there, the night of the graduation party, with Nick and his family.  And she went out and participated for a period of time.  So, things were proceeding pretty much the way they would with a couple of kids.

On June 28th, which is the fateful day — and let me say, everyone — I'm sure everyone in this room feels nothing but incredible sympathy and sorrow for the Courtright family and for the loss of Leah Freeman.  That they're — the — just got to — just got to make sure that that's out there.

So, on the 28th of June, Nick and Leah are at Cory Courtright's house and they are, as counsel says, washing the car because it was graduation, there were white letterings on the side of the windows of his 1967 Mustang.  They were having a great time.  They were spraying water at each other.

Exhibit 5001 at 327

D3 21                                    Statements

They were laughing.  And we expect that Cory Courtright will tell you that Leah was in a — in a exceptionally great mood.

Leah tells her, "I'm going to go over to Sherry's for a couple of hours then Nick is going to pick me up at 9:00.  We are going to go back to the Haga's and have a barbeque, watch a movie."  And she sees her off.

So, they — Nick and Leah go and pick up their friend Brent Bartley.  Go up to the grandparent's place, the Haga's — where the bus had a time turning around yesterday — and hang out for awhile.  And then, it gets to be almost 7:00.  This rendevous with Sherry Mitchell, Leah's friend, has been pre-arranged.  Nick takes her down to Sherry's home.  Brent is with them.  And on the way, Nick says to Leah, you know, "Are you sure you want to do this.  Do you want me to come with you because I know there is going to be trouble?"  Kind of like, "I know Sherry doesn't like me or approve of me."  And Leah says, "No.  No.  I want to go spend time with Sherry."

So, he drops her off.  Nick and Brent then go pick up Brent's girlfriend, Nicki Price.  And the three of them go back to the Haga residence.  But, Nick doesn't want to be a third wheel.  He wants to give them some privacy, so he leaves, goes down to Fast Mart, which is on Central — the place that was closed when we went by it yesterday — and hangs out for awhile.  Sees some guys he knows, and they end up going out to the Johnson Mill Ponds.  Only not the parking

Exhibit 5001 at 328

Statements        D3 22

area that we saw yesterday, but way down at the other end — almost a mile.

And, yeah, they were doing stuff we'd rather they weren't doing. They smoked some marijuana together. And then, Nick realizes what time it is, and says, "I got to go pick up Leah," because it's almost 9:00. He gets to Sherry Mitchell's after 9:00. Between, probably, 9:05 and 9:10. He comes up Central, turns down Fourth by McKay's, comes up to Sherry's house, and does not see Leah. But, then when he gets there, he sees Sherry standing in the yard with her boyfriend Cory Bryant, and she, Sherry, is crying. Nick says, "What happened?" And Sherry explains that they had a fight. They had an argument, and that Leah left.

Now, the arrangement between Leah and Nick was that he was going to pick her up at 9:00. This argument occurred substantially before that, the evidence will show, because the argument was initially about Sherry wanting to go jogging — what's called the loop — the area around Central, with Leah. And Leah's mom — I'm — yeah, and Leah — and Sherry's Mom, Peg Mitchell, saying, "No." And she told Sherry she didn't want her to because, apparently, there had been times in the past when Leah and Sherry had gone jogging, Nick had come by and picked up Leah, and then Sherry had gone home by herself. And Peg Mitchell didn't want Sherry coming home in the dark by herself, and was very disapproving.

Exhibit 5001 at 329

D3 23                                    Statements

Leah overheard this and came downstairs and left the house.  Sherry went after her.  And this conversation — or, confrontation, if you will, ensued to the point that Sherry is saying to Leah, "You need to break up with Nick — he's not good for you; you shouldn't be around him — which upsets Leah.  She says, "I'm sorry I'm not good enough for you," and she stormed off.

Two things, you can infer from the evidence, were going through her mind.  One, she was angry with her friend and her friend's mom.  And Two, she's angry with Nick because he was right, because he told her there were going to be problems when she went over there.  So, she leaves.

Now, when she left is going to be a critical issue in this case because the testimony — there — and there is going to be going a lot of testimony for a lot of people. And you, as the jurors, are going to have to decide which of that testimony fits and is consistent with what occurred on June 28th.

Because the evidence will be that they were going to go jogging.  Nick was supposed to pick Leah up at 9:00.  So, it would be sometime before the 9:00 time, and time to come back from the jogging trip, before Nick would pick her up.

So, Leah takes off walking.  And we submit, that the evidence will show that Mr. Lindegren is mistaken if

Exhibit 5001 at 330

Statements        D3 24

he says that he saw the two of them, Leah and Nick together. Because Nick comes looking for Leah. She's not a Sherry's Mitchell — Sherry Mitchell's house. He then goes looking for her down Central. Stops at Fast Mart. Runs into some of the guys that he had been out at the Johnson Mill Ponds with, and says to them, "Have you seen Leah?" And they say, "No", which we submit, the evidence will show, means she was already past Fast Mart by the time Nick got there.

Other people do see her along the way — along Central. And later on, other people see Nick. But, we submit the evidence will show that no one saw Nick catch up with Leah at any time along the road on Central.

But, Nick goes looking for her. He goes to Fast Mart. He drives the loop. He goes to Brent Bartley's house on Dean Street looking for her. He goes to, um — he goes to the pizza place and talks to the sister, Denise. He goes up to Haga's. He goes a number of places. And you are going to hear the testimony about the different places he went and who he saw. He does not go home to his parent's house.

At 10:15, he does go back to Sherry's, again looking for Leah. And at that point, asks if he can call Cory Courtright — Cory Freeman — Leah's mom, to see if she has come home. He calls and she's not there. So, he continues looking. He goes back to Fast Mart at some point and he calls his mother to see if, for some reason, Leah would be out at

Exhibit 5001 at 331

D3 25                              Statements

his house on Baker Road.  She is not there.

Now, you have to understand something about this 1967 Mustang.  This car had been damaged in an accident, and had a leaky gas tank.  So, Nick would only fill it up with a little bit of gas at a time.  And, in terms of Officer Zavala seeing him cross 42, as if he were going home, where he was actually going was to — let me see if I can get this right — the CN — CNF — or, CF — CNP card lock pumps, because that's where he would gas up his car.

So, he did get stopped by Officer Zavala.  He did tell him he was looking for Leah.  He told everybody that night he was looking for Leah.  He bought more gas and he kept looking for her.  He was stopped again about midnight, 12:03, by Officer Danny Lee.  Same issue, his headlight was — was dim.  And he told Officer Lee, again, he was looking for Leah.

Nick does go over to Kristin Steinhoff's house. He talks to her.  And you've got to remember we are dealing with a guy who is barely eighteen.  In Nick's mind, he's very, very concerned.  He's panicking - - -

MS. SOUBLET:    (Interposing) Objection. Argumentative.  Argumentative.

THE COURT:    Overruled.

MS. McCREA:    He's panicking because he doesn't believe that Leah would run away.  He is worried that something has happened to her.

Exhibit 5001 at 332

Statements        D3 26

On the other hand, we submit the evidence will show, his mind is also concerned that maybe she was angry, and maybe she went off to a party, and maybe she's hanging out with some other guy.

And Kristin Steinhoff, the evidence will show, doesn't do anything to dissuade him of this.  But, in fact, that's what she tells him — she, Kristin Steinhoff, thinks is going on.

So, they have this little interlude, which Nick is the one who cut off and said, "No.  I can't do this."  And, it was going to be payback.  And, he realizes he doesn't know what's going on, and it's not okay.

So, at that point, Kristin Steinhoff offers to drive him out to where there had been a party the night before.  And this is at a doctor's house.  The doctor is named Stinnott (sic).  And the house is a little ways out Fairview — just maybe a mile out Fairview, from where the Jury View — were we started from Central yesterday.

And so, Ms. Steinhoff has a Kia vehicle that she's borrowed from her mother's friend.  They go in the Kia because, at that point, Nick McGuffin doesn't have much gas in his car, and he's also concerned about getting stopped for a third time with the dim headlight and getting a ticket for that.  So, they drive out to Stinnott's (sic).  They go up and the — the house dark.  There had been a party the night

Exhibit 5001 at 333

D3 27                                   Statements

before, but there is no party that night.  They come back to town and Nick leaves Kristin Steinhoff's house.

From there, he goes — and — and he's gone a — he's gone a number of places, and — and you are going to hear all the evidence of that.  He goes back over by Leah's house and he stands outside her window, which is kind of on the side, and he looks up and he doesn't exactly see a light on, but he sees some flickering that could be a reflection from the television in her room.  And he — there is a gravel driveway next to the Freeman house — next — and next to her window.  So, he picks up a couple of little stones and tosses them at the window to see if she'll respond.  She doesn't, but he figures, "Well, the TV is on.  She's mad at me.  I'm — I'm going to go home."  So, he goes home.

The next morning, when he gets the call from Cory Courtright, he immediately goes over to her house.  Nick and Denise, Leah's sister, go out looking for Leah, as does her mom.  Eventually, they are so concerned — and, um, Leah's grandfather is so concerned and upset — that they all, Nick and Cory, go down to the Police Department and make a Missing Persons Report.  And then things go into play at that point.

Now, at some point, the police ask Nick if they can do an examination on his Mustang, and he agrees to that.  So, the police take possession of his Mustang, and they do — I submit the evidence will show — a very thorough examination

Exhibit 5001 at 334

Statements        D3 28

inside and out, cracks and crevices, looking for everything and anything that would connect Nick to Leah's disappearance. They don't find anything. And that's in the year 2000.

Nick cooperates with them and makes statements, which as counsel says, you will hear. The investigation proceeds. There was the shoe found on — by the cemetery. There was, then, the shoe found by Hudson Ridge, as well as some other items — a receipt with someone's name on it other than Mr. McGuffin's name. And then, eventually, as counsel says — and I don't mean to repeat everything, but you are going to hear the evidence — Ms. Freeman's body is located.

Now, an autopsy is done and no cause or manner of death can be determined. The State continues to investigate. They take Ms. Freeman's clothing, and the shoes, and they send them to a laboratory in England, whom they believe have a more advanced system of DNA analysis. And, DNA has determined that, in fact, these are Leah Freeman's shoes, and it is Leah Freeman's blood on the shoe.

And, the analysis by the Oregon State Crime Lab Individual is that the blood on the shoe was what is called medium to high velocity blood spatter. Which means that — we submit the evidence will show, that there is going to be blood in the air around where the spatter was. And so, there should be some transfer of that blood onto other objects. So, for example, the evidence will show, if Ms. Freeman — if Leah was

Exhibit 5001 at 335

D3 29                                Statements

transported, there should be some trace evidence of that blood

in the vehicle where she was taken, or on the perpetrator's

clothing, or somewhere.

So, the State Crime Lab and the prosecution are

looking for some connections with that evidence.  So, they

send the — the clothing and the shoes to England for analysis.

And England does an analysis.  And interestingly enough, the

evidence will show that there are — there is a hole — or, a

cut mark in the sports bra and the shirt, which may have been

made at the same time.  So, the English lab cannot rule out

stabbing in this case.

What is significant in terms of what the

evidence will show for us is that the DNA does not show any

connection between Mr. McGuffin and Leah Freeman's death.  The

analysis by the lab in England does not show any connection

between Leah Freeman's death and Nick McGuffin.  And the State

continues to do their investigation and analysis.  And, in the

year 2000, eventually the Grand Jury is closed and nothing

more occurs.  And Nick McGuffin tries to live his life,

knowing that he is under the shadow of suspicion in this

community.

And in 2009, 2010, a new police chief comes on,

the case is reopened, and a new Grand Jury is convened, and

people are talked to.  And you are going to hear what they

have to say.

Exhibit 5001 at 336

Statements    D3 30

But, also, of interest to you and important, is that the State kept investigating forensically. The — the blue Mustang had been sold to somebody else. The State went to the owner of that car — the blue Mustang — Mr. — Mr. McGuffin's Mustang and said, "May we search it again? May we take custody of it and analyze it again?" And she allowed them to so. And they took it away and they looked at to their heart's content. They took paint samples. They did whatever they — they did.

The State also went and found the Kia, the little vehicle that Kristin Steinhoff and Mr. McGuffin had been in the night of June 28th. And they did an examination of that vehicle, as well. And in that vehicle they did find evidence of semen and some evidence of blood. Those were not connected to Leah Freeman.

So, they sent — going back to the Mustang, they sent what they found to a special lab in — near Chicago, called Micro Trace (phonetic). And Micro Trace came up with hair and fibers, and they — a bunch of things. And they found a paint chip — a little tiny paint chip on the tank top that Leah Freeman had been wearing, on the clothing that had been saved. And this lab, Micro Trace, did an examination, a comparison of that chip to see if it matched the paint on the Mustang or the paint on the Kia, and there was no connection.

And lest I forget, there was also a search of

Exhibit 5001 at 337

D3 31                                    Statements

the Thunderbird, and that didn't turn anything up.

And it is also of interest, for your consideration in evaluating the testimony of the witnesses, that on January 26, 2010, when the case was reactivated — I'm not sure if it's trooper or detective — John Riddle of the Oregon State Police went out with another officer and posted reward posters throughout Coquille and Coos Bay for the arrest and conviction of whoever killed Leah Freeman — in the amount of $10,000.

So, you are going to hear evidence about all of these things.

Now, what have I forgotten to tell you?

We all feel for the Courtright family. It is a tragedy what happened to Leah Freeman. But when you, the jurors, hear all of the evidence in this case, we expect that based on that evidence, there was not a timeframe when Nicholas McGuffin could have caught up with, or did catch up with Leah Freeman and do anything to her. On the contrary, he was looking for her.

And we expect that the evidence — the forensic evidence — and there is going to be a lot of it — that you are going to be looking at, is going to have no connection whatsoever to Nicholas McGuffin. So, you will be voting not guilty because he's an innocent man.

Thank you.

Exhibit 5001 at 338

McNeely   D     D3 32

THE COURT:   Call your first witness.

MR. FRASIER:   Thank you, Your Honor.

We'd call Officer McNeely.

RAYMOND LEE McNEELY

was thereupon produced as a witness on behalf of Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:   Have a seat up here, please.

If you would bring the microphone closer to you.  Thank you.

Go ahead, Mr. Frasier.

MR. FRASIER:   Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. FRASIER:

Q.   Could you state your name, please, sir, and spell your last name for the record?

A.   Raymond Lee McNeely, M-c-N-E-E-L-Y.

Q.   And what is your occupation, sir?

A.   I'm a Police Officer for the City of Coquille.

Q.   How long have you been with the Police Department in Coquille?

A.   Five and a half years.

Q.   And at the request of your administration — at least at one time Chief Dannels — were you asked be, basically, in

Exhibit 5001 at 339

D3 33                                              McNeely  D

charge of the reopening of the investigation in the death of

Leah Freeman?

A.   Yes, I was.

Q.   Now, I want to show to you a couple of exhibits

here.  They've been marked as State's Exhibits 75 and 76.  And

I ask if you can identify these (not understandable)?

A.   Yes, I can.

Uh, sorry, Your Honor.

Q.   State's — uh, are these, uh, diagrams or maps of the

area of Coquille and also of the Coos County area?

A.   Yes, they are.

Q.   And do they accurately portray the areas as they

would have been on June 28th of 2000?

A.   Yes, they do.

MR. FRASIER:   Your Honor, we would offer

State's Exhibit 75 and 76.

MR. McCREA:   There is no objection to 75 and

76, Your Honor.

THE COURT:   They are received.  Thank you.

(Whereupon Plaintiff's Exhibit Nos. 75 and 76

were received into evidence.)

THE COURT:   Thank you.

Q.   Officer, I'm going to ask you — I'm just going to

hold up State's Exhibit 75.  Can you describe that to the

jury, please?

Exhibit 5001 at 340

McNeely  D    D3 34

A.    The — that's the streets of Coquille.  Shows the — Central Avenue, and the bypass, and the river, and - - -

Q.    Okay.  And State's Exhibit 76, describe that, please.

A.    It's a map of the outlining area of Coquille. Again, that's the City of Coquille there on the left.  Then that shows the road out Fairview, the road to Lee Valley Road where Leah's body was discovered, and then Hudson Ridge, where the other shoe was found.

Q.    Thank you.

MR. FRASIER:    Your Honor, that's all the questions I have right at the moment for Officer McNeely.  I will recall him later as we go through this proceeding.

THE COURT:    Any cross examination?

MR. McCREA:    I — may I look at them?

THE COURT:    You may.

MR. McCREA:    It takes me awhile, Your Honor. I - - -

THE COURT:    (Interposing) That's all right. Go ahead.

MR. McCREA:    (Not understandable.)

CROSS EXAMINATION

BY MR. McCREA:

Q.    Officer McNeely, as I understand it, you weren't part of the original investigation, then, back in 2000?

Exhibit 5001 at 341

D3 35                                                        McNeely  X

A.   No, I was not.

Q.   And so, when did you start working on the investigation?

A.   I started working on the investigation of January of 2010, actively.

Q.   And as part of that, you reviewed all of the — all of the investigation that had gone before?

A.   It was divided up between three officers in the department, in sections.

Q.   Well, did you eventually, yourself, review all of the investigation that had been done?

A.   Not personally, every single page.  We divided up into three sections with two other officers and they briefed me on what they had had.  And I had gone through stuff, but to say "every single page", I would not testify to that.

Q.   All right.  When — when you made up the map, what did you use as your source material to make up the map?

A.   That was at the assistance of DOJ.

Q.   I'm - - -

A.   (Interposing) Department - - -

Q.   - - - sorry?

A.   - - - Of Justice.

Q.   Oh, the Department of Justice?

A.   Yes.

Q.   All right.  By — by source of material, I was — I

Exhibit 5001 at 342

McNeely  X    D3 36

was referring to — as — as far as, where the dark lines are indicated.

A.    (No audible response.)

Q.    The dark lines are significant on the map?  Is that correct?

A.    Yeah.  They trace significant routes — or, where - - -

Q.    (Interposing) Oh.

A.    Like, the one goes out to Lee Valley, where the body was found.  And - - -

Q.    And the — and the — the lines are placed there to indicate the locations, then, that were significant in the original investigation?

A.    Correct.

Q.    All right.  Thank you.

MR. McCREA:    That's all the questions I have.

THE COURT:    You may step down.

You are needed for further attendance, so you are not excused.

Call your - - -

WITNESS:    (Interposing) Thank you, Your Honor.

THE COURT:    - - - second witness.

MR. FRASIER:    Thank you, Your Honor.

We call Trooper Walker.

Exhibit 5001 at 343

D3 37                                                    Walker  D

JEFF WALKER

was thereupon produced as a witness on behalf of Plaintiff

and, having first been duly sworn to tell the truth, the whole

truth and nothing but the truth, was examined and testified as

follows:

THE COURT:    Have a seat up here, please.

DIRECT EXAMINATION

BY MR. FRASIER:

Q.   Can you state you name, please, sir, and spell your

last name for the record?

A.   My name is Jeff Walker, W-A-L-K-E-R.

Q.   And what is your occupation, sir?

A.   I'm a Senior Trooper with the Oregon State Police.

Q.   And where are you stationed?

A.   Uh, currently, I'm actually stationed out of the

Center Point Area Command, which is near Medford.

Q.   Have you been stationed elsewhere?

A.   I was stationed here in Coos Bay, uh, for about

seven years, uh, a couple years prior to today.

Q.   And as part of your duties at the State Police, are

you sometimes called upon to do diagrams?

A.   Yes, I am.  I'm an ACTAR (phonetic) accredited

Collision Reconstructionist, which allows me to do the crime

scenes and crashes, and stuff of that nature.

Q.   And at the request of my office, did you on — well,

Exhibit 5001 at 344

Walker   D    D3 38

in — as part of this investigation, go to the residence of 1173 Knott Street, here in - - -

A.   (Interposing) Yes, I did.

Q.   - - - Coquille?

A.   Yes, I did.

Q.   And did you prepare a diagram of the upstairs of portion of this particular residence?

A.   Yes, I did.

Q.   I'll show you what's marked as State's Exhibit No. 77.  And, do you recognize this, sir?

A.   That is the — an enlargement of the scaled diagram that I produced for this case.

Q.   Uh, and was it scaled, as I understand it?

A.   Yes, it was.

Q.   Does this accurately portray what you saw — the diagram?

A.   Yes, it is.

MR. FRASIER:   Your Honor, we would offer State's Exhibit 77.

MS. McCREA:   This, to me, is identical to what I have here.

There is no objection — there is no objection, Your Honor.

THE COURT:   Received.

(Whereupon Plaintiff's Exhibit No. 77 was

Exhibit 5001 at 345

D3 39                                              Walker  X

received into evidence.)

Q.    Thank you.

MR. FRASIER:    That's all the questions I have of this witness.

THE COURT:    Ms. McCrea.

MS. McCREA:    I have just a couple of questions.

CROSS EXAMINATION

BY MS. McCREA:

Q.    Hi Trooper.

A.    Hi.

Q.    So, (not understandable) — on — on your diagram, - - -

MS. McCREA:    Sorry, Judge — (not understandable).

Q.    On your diagram, these little kind of — are these doors?

A.    Those are doors.

Q.    Okay.

A.    And they also show the — the swing of the door.  So, in other words, the hinge of the door is on this side, showing that the door opens that way.

Q.    So, we are — when we are looking at the diagram — and I'm — I'm referring to — it says "Attic Access Panel" on the left, and there is like a — (not understandable) this

Exhibit 5001 at 346

Walker   X    D3 40

triangle that kind of swings down — those are going to be doors?

A.    Yes.

Q.    Okay.

A.    Yeah.

Q.    And likewise, where it says "Ceiling Light", the things on the two sides would also be doors?

A.    Yeah.  Anywhere you see one of these, there is a door.

Q.    Okay.  So, they look kind of like chart notes?  I'm — I'm trying to get this so we have it in the record so - - -

A.    (Interposing) Correct.

Q.    Okay.  All right.

And the ones that are sort of like triangular, are those doors, or is that something else?

A.    Those are what are called "bifold doors" that are commonly found in closet areas.

Q.    All right.  Thank you.

THE COURT:    Anything else?

MS. McCREA:    No, Your Honor.

THE COURT:    Mr. Frasier?

MR. FRASIER:    I have no further questions.  I ask that the witness be excused.

THE COURT:    Any objection?

MS. McCREA:    No, Your Honor.

Exhibit 5001 at 347

D3 41                                              Courtright  D

THE COURT:    You are excused from further attendance.

Call your next witness.

MR. FRASIER:    Thank you, Your Honor.

We call Cory Courtright.

THE COURT:    Raise your right hand, please, ma'am.

CORY COURTRIGHT

was thereupon produced as a witness on behalf of Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat up here, please.

If you could lean forward and make sure the microphone is about that distance is fine.

WITNESS:    Okay.

THE COURT:    Go ahead, Mr. Frasier.

MR. FRASIER:    Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. FRASIER:

Q.   Could you tell us your name, please, ma'am, and spell your last name for the record?

A.   Cory Courtright, C-O-U-R-T-R-I-G-H-T.

Q.   Where do you live, ma'am?

A.   Right now, I live at 351 West Fifth Street in

Exhibit 5001 at 348

Courtright  D    D3 42

Coquille.

Q.   Have you lived in Coquille for a period of time?

A.   Oh, yes.  Most — most of my life.

Q.   Have you been married, ma'am?

A.   Yes.

Q.   And were you married at one time to an individual named Denny Freeman?

A.   Yes, I was.

Q.   And Mr. Freeman — Denny Freeman — did he have business here in town?

A.   Yes, he did.

Q.   And what was that?

A.   Denny's Pizza.

Q.   Okay.  Did you work there?

A.   Yeah.  Off and on for several years — many years.

Q.   Mr. Freeman and you, did you divorce?

A.   We did.

Q.   In - - -

A.   Um, in '88, I believe.

Q.   Mr. Freeman still with us?

A.   No.

Q.   Passed away?

A.   Yeah.  He passed away.

Q.   Do you have any children with Mr. Freeman?

A.   Yes.  I had two.

Exhibit 5001 at 349

D3 43                                    Courtright  D

Q.   And who are they?

A.   Denise Marie Bertrand, now, and — and Leah Nicole Freeman.

Q.   And when was Leah born?

A.   Leah was born October 29, 1984.

Q.   I'm going to show a picture to you here.  It's marked as State's Exhibit No. 1.  Do you recognize that picture?

A.   Yes, I do.

Q.   And is that a picture of your daughter?

A.   Yes, it is.

Q.   And, does it show she looked when — shortly before she disappeared?

A.   Yes, it does.

MR. FRASIER:    We would offer State's Exhibit No. 1, Your Honor.

MS. McCREA:    There is no objection, Your Honor.

THE COURT:    Received.

(Whereupon Plaintiff's Exhibit No. 1 was received into evidence.)

Q.   I want to go back, uh, to the years 1999 and the year 2000.

A.   Okay.

Q.   What — what year of school was Leah in 1999/2000?

Exhibit 5001 at 350

Courtright   D    D3 44

A.    She was a freshman in high school.

Q.    And where did she go to school?

A.    Here in Coquille High School.

Q.    And at — at the time that school started, where were you living at that time?

A.    Um, we were living at 351 West Fifth Street.

Q.    Was that with, uh, an (not understandable) - - -

A.    (Interposing) With Jim Murphy.

Q.    Was he your boyfriend at that time?

A.    At that time, yes.

Q.    And during the course of the school year, did Leah develop a relationship with anyone?

A.    Yes.

Q.    Did she have a boyfriend?

A.    Yes.

Q.    And who was that?

A.    Nick McGuffin.

Q.    Do you see him here in the courtroom?

A.    Yes, I do.

Q.    Point him out for us, please.

A.    It's the Defendant.

Q.    Um, what types of things did Leah do in school her freshman year?

A.    Um, she was into volleyball, basketball, and she did some track.

Exhibit 5001 at 351

D3 45                                        Courtright  D

Q.   How did she do as an athlete?

A.   She — very well.

Q.   How about her school work?

A.   It was average.  Um, C's, B's, I would say.

Q.   What was her health like?

A.   She was in great health.

Q.   Did she have any health problems?

A.   No.

Q.   Did she have any issues like heart murmur or anything like that?

A.   Oh, no.

Q.   Diabetes?

A.   No.

Q.   Uh, did you have a family doctor in Coquille?

A.   Um, yeah.  Her doctor was Brazier, I believe, at the time.

Q.   As part of going — being involved in sports, did she have to have a physical every year?

A.   Yes.

Q.   Any — any problems as a result of that?

A.   No.

Q.   Um, did she have problems with her teeth?

A.   Yeah.  She had braces.

Q.   How long did she have braces?

A.   Oh.  Um — gosh.  I — I don't know that I can answer

Exhibit 5001 at 352

Courtright  D    D3 46

that.  Shoot.  Maybe a year.  Or — or, under — maybe even under a year.

Q.  How would you describe your relationship with your daughter Leah?

A.  We had a good relationship.  We were - - -

Q.  (Interposing) (Not understandable) - - -

A.  - - - close.  Um, I thought we talked about a lot of things.  I — I always thought she was pretty honest with me.

Q.  Now, um, when you became aware that she was involved with the Defendant, Mr. McGuffin, how did you feel about that?

A.  I didn't like the idea because he was seventeen and she was only fifteen.  Um, but he brought her home from school a couple of times and came to the door and — you know, when he brought her home.  And, um, at first I said, "No."  But, I could see that she was interested in him and he seemed like a nice kid, and so I — I let them go out.

Q.  Was there a period of time you actually said, "No", you didn't want them dating?

A.  Yes.

Q.  Did you find out they were actually seeing each other behind your back?

A.  Yes, I did.

Q.  How did you react to that?

A.  I was angry.  And — and I — I told them that they could no longer see each other.  Um, Leah began to cry a lot

Exhibit 5001 at 353

D3 47                                        Courtright   D

when he would — after they would hang up from the phone.  And, um, I was hearing of, um, some fighting between the two of them at school.  And, um, I told them they had to quit seeing each other.

Q.   But they continued to see each other?

A.   Nick — yes.  And her sister, Denise, finally told me about it — that they were sneaking around.  Leah would tell me she was going jog- — it wasn't just at school.  Leah would tell me she was going jogging and, in fact, a few times she was actually going to meet Nick.

Q.   Did you eventually relent and let your daughter be with Mr. McGuffin?

A.   Yes.

Q.   Why did you do that?

A.   Because I didn't — I figured I couldn't stop it.  And I didn't want to have a relation — I didn't — I wanted our relationship to remain honest and truthful.  And I didn't want her to sneak around.  And I didn't really think I had a whole lot of control over whether she saw him, if she was going to be sneaking around.

Q.   Now, after you relented, did you have a discussion with both your daughter and Mr. McGuffin about sex?

A.   Yes, I did.

Q.   And what was this discussion?

A.   I told her to have him come to the house.  And I

Exhibit 5001 at 354

Courtright   D      D3 48

told them both that I realized that I couldn't stop them from seeing one another, and that they were going to continue to do it.  But, if they were going to continue to do it — I knew that they were having sex — or, I had heard this and — that she was going to have to get on some form of birth control pills.

Q.   Did you talk with them about parenthood and things like that?

A.   Yes, I did.

Q.   What did you tell them?

A.   I told them that neither one of them were anywhere near ready to be parents.  And I wasn't ready to be a grandparent.  Uh, and so — I also told them that I was going to make an appointment for Leah to get on birth control.

Q.   And was that through the Coos County Public Health Department?

A.   Yes.

Q.   Now, during the — the school year — uh, around the time of prom, did Leah go to the prom?

A.   Yes, she did.

Q.   Who did she go with?

A.   She went with Nick and, um, two other friends of theirs, Scott Hamilton and Melissa Smith.

Q.   At some point in time did you move from the residence of Mr. Murphy?

Exhibit 5001 at 355

D3 49                                      Courtright  D

A.   Yes.

Q.   And approximately when was that?

A.   Um, I believe it was the end of May.

Q.   What year?

A.   Uh, 2000.

Q.   And where did you move to?

A.   We moved to my parent's house on Knott Street.

Q.   And that address was - - -

A.   1173 North Knott.

Q.   And was there a part of the house that you and your daughters moved into?

A.   Yeah.  We all had our own separate rooms upstairs.

Q.   Now, I previously showed you, I believe, State's Exhibit 77.  Do you recognize this?

A.   Yes.

Q.   Okay.  I'm going to - - -

Okay.  This is a laser pointer.  That dot there, push on the red — you see the red dot?

A.   Yeah.

Q.   Okay.  Using that laser pointer - - -

THE COURT:    (Interposing) Excuse me.

Ms. Freeman — Ms. Courtright, I'm sorry, could you move the microphone around so it's still in front of your mouth?

WITNESS:    Oh.

Exhibit 5001 at 356

Courtright   D      D3 50

THE COURT:   Reasonably close to you.   Thank you, ma'am.

Go ahead.

Q.   Using that, uh, pointer, could you point out where your room was?

A.   My room would be here.

Q.   Okay.  And where was Denise's bedroom?

A.   Denise's bedroom was over here.

Q.   And Leah's bedroom?

A.   Right across from mine.

Q.   Was there a restroom upstairs?

A.   No.

Q.   It was downstairs?

A.   Right.

Q.   Now, I want to show to you what I've previously marked as State's Exhibits 9, 10, 11, 12, 13, and 14.  If you would look at those briefly?
Do you recognize those pictures?

A.   Yes.

Q.   And are — are these pictures of 1173 Knott Street?

A.   Yes, sir.

Q.   Now, these were pictures were taken earlier this year.  Is the house layout the same as it was in the year 2000?

A.   Yes.

Exhibit 5001 at 357

D3 51                                    Courtright  D

MR. FRASIER:    We'd offer State's Exhibits 9 through 14.

MS. McCREA:    There is no objection, Your Honor.

THE COURT:    No. 9 through 14 are received.

(Whereupon Plaintiff's Exhibit Nos. 9, 10, 11, 12, 13, and 14 were received into evidence.)

Q.    I put up on the screen here State's Exhibit 9. Could you describe that for us, please?  What is this a picture of?

A.    It's a picture of my parent's house, where we lived.

Q.    And is that the front part of the house?

A.    Yes, it is.

Q.    This is State's Exhibit 10.  Do you recognize that, too?

A.    Yes.

Q.    And what is this a picture of?

A.    That's the side of the house.

Q.    And this is State's Exhibit 11.  Do you recognize that?

A.    Yes.  That's also the side of the house.

Q.    Now, where was Leah's bedroom in relation to this side of the house?

A.    It's up at the top up there.

Q.    Using that laser pointer that I gave you, the —

Exhibit 5001 at 358

Courtright   D     D3 52

could you point out — is there a window to her bedroom in this picture?

A.    Yes.

Q.    Point that out, please.

A.    Right there.

Q.    This is State's Exhibit 12.  Do you recognize that?

A.    It's kind of — um, yes.

Q.    And is, again, that 1173 Knott Street?

A.    Yes, it is.

Q.    And is — is that a different part of the house?

A.    Yes.  That's the other side of the house.

Q.    State's Exhibit 13?

A.    That's the same side of the house.

Q.    All right.  And finally, State's Exhibit 14?

A.    That's the back.

Q.    When you moved in with your parents, was there still property of yours and your daughter's at the residence of Mr. Murphy?

A.    Yes.

Q.    Why is that stuff still there?

A.    We left in a hurry that morning.  Mr. Murphy and I had had a — had had a disagreement, and I told the girls to just grab some clothes and — as did I — and we left.  And we went to my parent's house.

Q.    Was it your intent to abandon that stuff there at

Exhibit 5001 at 359

D3 53                                    Courtright  D

Mr. Murphy's house?

A.   Oh, no.  No.  We planned to come back and get it at some point.  I just didn't know when.

Q.   I want to direct your attention now to June 28, 2000.  Earlier in the day — well, do you recall that day, ma'am?

A.   No.

Q.   Okay.

A.   I mean, I — I — not the early afternoon or the morning — what — I don't know if I worked that day, or if I had been shopping or something that day, but I remember coming home around 4:00.

Q.   Now, what happened when you came home?

A.   When I came home, Nick's car was in the driveway. And him and Leah were cleaning off the window.  The, um, seniors write on the windows, and they were cleaning that off of his window.

Q.   And how were they behaving?

A.   They were laughing and having fun.

Q.   How long were they there?

A.   They left shortly after I got there.  Um, I would guess maybe even ten or fifteen minutes after I got there.

Q.   Do you remember what your daughter was wearing?

A.   Um, blue jeans and a white tank top.

Q.   I want to show to you what's marked as State's

Exhibit 5001 at 360

Courtright   D     D3 54

Exhibits No. 7 and State's Exhibit 8.  Are those pictures of your daughter?

A.   Yeah.  Yes.

Q.   And are those pictures as she appeared on June 28th of 2000?

A.   Yes.

MR. FRASIER:   We would offer State's Exhibits No. 7 and 8.

MS. McCREA:   (10:23:21) No objection, Your Honor.

THE COURT:   Received.

(Whereupon Plaintiff's Exhibit Nos. 7 and 8 were received into evidence.)

Q.   The tank top she's wearing, had she had that for a period of time?

A.   I'm not sure.

Q.   And this — we are looking at State's Exhibit 7. We'll now go to State's Exhibit 8.

Her hair color — what was her hair color?

A.   Blonde.

Q.   Before Leah left, did she say anything to you?

A.   (Witness crying.)  I'm sorry.

Q.   Do you need a break?

A.   I'll be okay.

She said something about that she was going to take

Exhibit 5001 at 361

D3 55                                    Courtright  D

my advice, because I had told her she needed to spend more time with her friends — not so much time with Nick.  And shortly after I had gotten home from wherever I had been that day, she said, "I've decided to take your advice, mom.  I'm gonna, um — I'm gonna go see Sherry.  Nick's going to take me there, but first we are going out to Nick's house."  Something about movies and that Nick was going to take her to Sherry's at 7:00.  And that maybe they would go to the Bartley's — or, excuse me, the Haga's to watch the movies, I think was how it went.  And, um — and I said, "Good.  I'm glad to hear that, Leah.  That you are spending — going to spend time with your friends instead."

        And she was just getting ready to leave, and she jumped up and kissed me on the cheek and said, "I love you, mommy."

        I never saw her again.

   Q.   What time were you expecting Leah back that night?

   A.   I can't remember if it was 11:00 or 12:00.  Um, it almost seems like it might have been 12:00 because it was going to be later.  You know, she — they were — she was going to go see Sherry, and then I figured to watch a movie, you know, it would take a few hours.  And so, I'm not positive if I told her to be home at a 11:00 or 12:00.

   Q.   Later on in the evening, did you get a phone call from the Defendant, Mr. McGuffin?

Exhibit 5001 at 362

Courtright   D    D3 56

A.    Yes.

Q.    Do you recall about what time that was?

A.    Um, like about five minutes after 10:00.

Q.    And what did the Defendant say to you in that telephone conversation?

A.    He said, "Hey, Cory, is Leah there?"  And I said, "No.  Why?"

And he said, "Well, I can't find her."  I said, "What?"

He said, "Oh, don't worry."  He goes, "I — I'll — I'm going right now.  I'll go look for her.  I'll — I'll bring her home."

Q.    Now, did you ever hear from the Defendant again that night?

A.    No.

Q.    Did he ever come to the door — knock on the door, asking if Leah was home?

A.    No.

Q.    Did he ever call you again to say, "I haven't found her ?"

A.    No.

Q.    At some point in time, do you go to sleep on the evening of June 28th?

A.    Yeah.  I, uh — I fell asleep shortly after that phone call.

Exhibit 5001 at 363

D3 57                                    Courtright   D

Q.   Did you wake up in the middle of the night?

A.   I woke — I woke up at 3:30.  I had to go to the bathroom.  And I looked in her room.

Q.   Who's room?

A.   Leah's room.

Q.   What did you see?

A.   Her bed was empty.  She wasn't there.

Q.   Any lights on in her room?

A.   No.  I turned the light on.

Q.   Was there a television in the room?

A.   I — I don't recall right now.

Q.   Do you recall any type of light from any type of source being on in that room?

A.   No.

Q.   When you saw your daughter wasn't home, what did you think?

A.   Well, I just thought, "My God."  I was shocked because she hadn't ever done anything like that.  Never not come home.  I — I thought, "She must be with Nick.  She's — she's got to be with Nick.  He said he was going to find her."

Q.   Back up a little bit.

Had you ever allowed Leah to spend the night with the Defendant?

A.   Um, yes.

Q.   Could you tell us about that?

Exhibit 5001 at 364

Courtright   D     D3 58

A.   Um, at Nick's graduation that year, which was — I'm not positive of the date.  It was either — I think it was June 11th or the 13th.  She kept asking me if she could go out there and spend the night because Bruce and Kathy were going to be there — his parents were going to be there.  And they were going to have a party because of his graduation.  And she really wanted to go.  And she told me that other friends of hers were being allowed to go.  And I said, "Yes."  Well, it took awhile, but I said, "Yes."  And I said, "But, when I get off work I'm going to come out there and meet his parents," because I had never met them.

Q.   Did you do that?

A.   Yes, I did.  I went out there.  Um, I think I got off work a little bit early that night.  And I think I got out there around 11:00 — 10:30 or 11:00.

Q.   Now, going back to you checked her room she's not there, you eventually go back to bed?

A.   Yes.

Q.   And do you get up — what time did you get up?

A.   Well, I went back to bed.  And I think I might have even dozed off, um, for a little bit.  But, um, my mother — my mother always had a special time that she got up.  She always got up at 6:30 in the morning.  And I heard her get up and so I ran down there.  And I was scared because — well, not just because Leah wasn't there, but my dad had health issues.  And,

Exhibit 5001 at 365

D3 59                                    Courtright   D

um, I was scared for him to find out that his granddaughter wasn't there and I didn't know where she was.

And — so anyway, I got up at 6:30 when I heard my mom. And I told my mom — I said, "Mom, Leah's not home." She said, "Where is she?" And I said, "I don't know. She's got to be out at the McGuffin's. Where else could she be?"

She goes, "Well, should you call out there this early? And — it's kind of early." "I know Kathy goes to work, I think, around 8:00." So, I waited until about ten to 8:00 and called out there.

Q.    And did you talk with the Defendant over the phone?

A.    Yes.

Q.    And what did you talk about?

A.    I just asked him if — I said, "Is Leah out there?" And he said, "No."

And I said, "Well, where is she?" He said, "She didn't come home last night?"

And I said, "No. Where is she?" He goes, "I don't know, but I'll be right in. I'll be right in town."

Q.    Did he come to your residence?

A.    He — he did come right away, yes.

Q.    And did you talk with him when he got to your house?

A.    Yes.

I was asking him — you know, I was like, "Was there parties last night? Could she have gone to a party?" He

Exhibit 5001 at 366

Courtright  D    D3 60

claimed there wasn't any parties that night.

Q.   Did he tell you when the last time he saw her?

A.   When he took her to Sherry's at 7:00.

Q.   Did he say anything about coming by your house?

A.   I don't believe so.

Q.   Did you eventually go to the Coquille Police Department?

A.   Yes.

Q.   And who went with you?

A.   Pardon me?

Q.   Who went with you?

A.   Um, Nick and my daughter, Denise, and I went.

Q.   Um, what happened?

A.   (No audible response.)

Q.   Well, first of all, who did you speak with?

A.   Um, at that time, it was Chief of Police, um, Mike Reaves.  And he just — he wasn't very nice.

I started — he was asking what she wearing, and I was — I was in a little bit of a panic mode and, uh — and I couldn't quite remember, and so I was asking Denise and Nick. I was — you know, "God, I can't remember.  What was she wearing?"  And then, they said she was wearing the blue jeans and a — what they called a "wife beater" — a "wife beater" tee shirt — or, tank top.

And so, I said that to him.  And he proceeded to

Exhibit 5001 at 367

D3 61                                    Courtright  D

yell at me for using that word, "wife beater".  And, um, he just, uh, gave me papers from — what is that organization?  The National Exploited — I can't remember - - -

Q.    (Interposing) The Center for Missing and Exploited - - -

A.    (Interposing) Yes.

Q.    - - - Children?

A.    Thank you.  That was — I filled out the — went home, filled out papers for that.

Q.    Did you take it back to him?

A.    Yes.

Q.    Anything happen that day?

A.    Anything happen that day?

Q.    Did the police come to your house?  Did they do anything?

A.    Yeah.  They — they came by a couple times.  I remember, um, Dave Hall coming by a few times.

Q.    And Dave Hall was who?

A.    He was an officer at the Coquille Police Department.  I don't know what rank.

MR. FRASIER:    Your Honor, can counsel and I approach?

THE COURT:    Yes.

(Bench conference.)

THE COURT:    We'll take the morning recess.

Exhibit 5001 at 368

Courtright  D    D3 62

Everybody in the audience, remain seated until the jury has a chance to go to the jury room.  You take your notes with you and be in the jury room.  It will probably take about — take about fifteen minutes.  Remember the admonition not to discuss the case.

(Jury out.)

THE COURT:    I do want to take this opportunity to remind people in the audience that they are not, specifically, to go to any witness who's schedule to be here and talk to them about what witnesses have testified in Court.

And I expect counsel to tell their witnesses that they are not to talk to people in — if they are scheduled to be a witness, they are not to talk to other people about the testimony that's here.  Okay?

THE COURT:    We'll be in recess until, uh, five to.

You may step down.

WITNESS:    All right.

(RECESS)

(Jury in.)

JUDICIAL ASSISTANT:    All rise.

THE COURT:    Be seated, please.

Uh, Ms. Courtright, if you would retake the stand, please.

Exhibit 5001 at 369

D3 63                                              Courtright  D

You are still under oath.

Go ahead.

DIRECT EXAMINATION (Continued)

BY MR. FRASIER:

Q.   Over the years, were you familiar with your daughter's handwriting?

A.   Yes.

Q.   Had you seen it on multiple occasions?

A.   Yes.

Q.   And do you believe if you looked at a particular document, you could identify it — whether it's her handwriting or not?

A.   Yes.

Q.   I'm going to show to you what's been previously marked as State's Exhibits No. 85, 86, and 87.  If you would look at those, please?  Do you recognize the handwriting in those particular documents?

A.   Yes.

Q.   And do — who do you identify that handwriting as being?

A.   Leah's.

Q.   I'll show you what's marked as State's Exhibit No. 82, and ask if you can identify the handwriting?

A.   Yes.

Q.   And who's handwriting is that?

Exhibit 5001 at 370

Courtright   D     D3 64

A.   Leah's.

Q.   Did your daughter keep a diary?

A.   Yes, she did.

Q.   And when she wrote in her diary, did she address the entries to a particular person or - - -

A.   Yes.  I'm trying to remember who she — I believe, it was "Patty".

Q.   I'll show you now what's marked as State's Exhibit No. 90.  If you would look through that?  Do you recognize that?

A.   Yes.

Q.   Do you recognize the handwriting in there?

A.   Yes, I do.

Q.   And who's handwriting is it?

A.   It's Leah's.

Q.   I also have what's marked as State's Exhibits 88, 89 and 92.  Do you recognize the handwriting on those particular documents?

A.   Yes.  It's Leah's.

Q.   I think I asked you before, your daughter was in good health, as far as you knew?

A.   Yes.

        MR. FRASIER:   Your Honor, I have here what's marked as State's Exhibit 214, which is the medical records of (not understandable) Ms. Freeman (not understandable).

Exhibit 5001 at 371

D3 65                                    Courtright  D

MS. McCREA:   (Not understandable.)

There is no objection, Your Honor.

THE COURT:   Received.

(Whereupon Plaintiff's Exhibit No. 214 was received into evidence.)

Q.   You indicated that the last time you saw your daughter was in the afternoon of June 28, 2000?

A.   Yes.

Q.   In the days following, did you have contact with the Defendant during that time period?

A.   I'm sorry.  Could you repeat that?

Q.   Did the — in the days following your — your daughter's disappearance, did the Defendant ever have contact with you?

A.   Yes.

Q.   Uh, were you supportive of him?

A.   Yes, I was.

Q.   Did he help in this — in looking for your daughter?

A.   Yes.

Q.   Did you have posters made up for her?

A.   Yes.

Q.   Did he help place those posters?

A.   Yes.

Q.   Uh, are you related, in some manner, to Howard Leatherman?

Exhibit 5001 at 372

Courtright   D    D3 66

A.   Yes, I am.

Q.   How are you related to Mr. Leatherman?

A.   He's my mother's cousin.

Q.   And just for the record, Mr. Leatherman is the creator of the Leatherman Tool?

A.   Yes, he is.

Q.   And he's somewhat wealthy?

A.   Yes, he is.

Q.   Did he offer money as a reward to help find Leah?

A.   Yes, he did.

Q.   And back in the year 2000, how much money did he offer in terms of the reward?

A.   He offered $5,000.

Q.   When the case was reopened in 2010, thereabouts, did he offer additional funds to - - -

A.   (Interposing) Yes, he did.

Q.   And how much total was the reward, uh, when it was put out again in the year 2000 — or, - - -

A.   (Interposing) He - - -

Q.   - - - 2010?

A.   He added another $5,000, making it $10,000.

Q.   To your knowledge, has anyone ever been given any of that money?

A.   No.

Q.   Now, going back to the year 2000, the early part of

Exhibit 5001 at 373

D3 67                                    Courtright  D

July — so, the 2ⁿᵈ, 3ʳᵈ, thereabouts — was there a time where the Defendant came over to your house with his parents?

A.    The — yes.

Q.    Okay.  And was there an incidence where he threw up?

A.    Yes.

Q.    Could you tell us about that, please?

A.    Well, his — him and his parents pulled up in the driveway.  And myself and my sister and — I don't know — maybe even a few other family members, were just kind of pacing around out in the driveway.  And they pulled up — the McGuffin's pulled up with Nick.

He got out of the car.  I started talking to his parents.  And the next thing I knew, my daughter, Denise, came running from the backyard and said, "Oh my gosh, mom, there is something wrong with Nick."  And I said, "What do you mean there is something wrong with Nick."  She said, "He's in the back.  He's throwing up."

Q.    And did Mr. And Mrs. McGuffin take the Defendant from there?

A.    Yes.

Q.    Is — to your knowledge did they — well, - - -

Let me ask this question.  Was it your understanding that Mr. McGuffin had just come from an interview with the police?

A.    Yes.

Exhibit 5001 at 374

Courtright　D　　D3 68

(Discussion between counsel.)

MR. FRASIER:　Your Honor, I have here what's marked as State's Exhibit No. 215.　They are records pertaining to that (not understandable) for the Defendant. And we would offer them.

MS. McCREA:　I'm — I'm sorry, what's the purpose of offering the records?

MR. FRASIER:　To show his anxiety attack on that day.

MS. McCREA:　If I could have just a moment, Your Honor?

THE COURT:　Yes.

MS. McCREA:　There is no objection.

THE COURT:　Received.

(Whereupon Plaintiff's Exhibit No. 215 was received into evidence.)

Q.　Your father has since passed away?

A.　Yes.

Q.　And what type of a individual was your father?

A.　He was a good guy.　My dad was a — he was a good father.

Q.　Kind of — using the vernacular — straight laced?

A.　Pardon me?

Q.　Kind of straight laced?

A.　Yes.

Exhibit 5001 at 375

D3 69                                    Courtright  X

Q.   How did he feel — well, would he allow Nick to go upstairs to Leah's bedroom?

A.   No.

Q.   After Leah disappeared, prior to her body being found, did your father have an argument with either the Defendant or his father?

A.   Um, I'm sorry, I don't understand that question.

Q.   Did your father have a argument with the Defendant, or with the Defendant's father after Leah disappeared?

A.   Yes.

Q.   Were you present for that?

A.   Um, I was upstairs asleep, and the argument woke me up.

Q.   And who was there?

A.   It was Bruce McGuffin.

Q.   After that argument — we cannot get into what was said, but after that argument, what was your relationship like with Nick McGuffin from then on?

A.   I don't think I saw him after that.  I don't think I saw Nick after that.

Q.   Now, I want to back up just a bit — prior to your daughter's disappearance.  Did the Defendant ever come to you and discuss an issue that was bothering him in his relationship with Leah?

A.   Yes.  I vaguely remember one afternoon.  She was in

Exhibit 5001 at 376

Courtright  X    D3 70

school and he had come over and — saying something about Leah was hitting him — being mean and hitting him, and he claimed that it hurt.

Q.   And what did you advise him?

A.   I said, "Well, then maybe you two should stop seeing each other."  And — and then I spoke to Leah about it.

Q.   Did you talk to Leah about that?

A.   Yes, I did.

MR. FRASIER:   I believe that's all the questions I have of Ms. Courtright at this time, Your Honor.

THE COURT:   Ms. McCrea?

CROSS EXAMINATION

BY MS. McCREA:

Q.   Ms. Courtright, you indicated that Leah was a pretty good athlete?

A.   Yes.

Q.   She played volleyball, and track, and — and I think there was another sport?

A.   Basketball.

Q.   Basketball.

And I'm — I'm sorry, I'm going to have to ask you to speak up.  It's really hard to hear on this side of the room.

Thank you.

A.   Okay.

Q.   Perfect.

Exhibit 5001 at 377

D3 71                                                    Courtright  X

Thanks so much.

A.    Uh huh.

Q.    And she also — you indicated that during the period of time when you told her that she could not see Nick McGuffin, that she would tell you that she was going jogging, and she would go see Nick instead.  Is that right?

A.    Yes.

Q.    But did Leah like to jog, also?

A.    Yes.

Q.    And was she a fast walker?

A.    Um, I don't know if I would say "fast walker".  I don't - - -

Q.    (Interposing) Okay.  Well part of — part of athletics, in terms of, um, track is the person has to be able to run?  Right?

A.    Correct.

Q.    Okay.  And was she a fast runner?

A.    Track wasn't actually one of her favorite sports.  Um, Track was probably on the bottom of that list of sports that I gave you.

Q.    Okay.  So, you don't think she was a fast runner?

A.    I can't really answer that because I don't know how to define that.

Q.    Did - - -

A.    (Interposing) I'm sorry.

Exhibit 5001 at 378

Courtright X    D3 72

Q. Let me ask you a different question. Did she enjoy running?

A. Yes.

Q. And did she like to run with Sherry Mitchell?

A. Yes, she did.

Q. Did she run with some other friends?

A. Um, Sherry is the only I remember off of the top of my head right now.

Q. In terms of Leah's wardrobe, did she have any tops — if — do you know what I mean by the term "peasant blouse"?

A. (No audible response.)

Q. That doesn't — that doesn't strike a chord?

A. No.

Q. Okay. Then, let me ask this. Did she have any tops that were kind of flowy, either in the shoulders or down at the bottom, that you remember?

A. Actually, yes, I do remember one.

Q. Okay. Can you describe it for us? I know it's been a long time.

A. Um, I — I'm remembering one outfit that I bought her, that I have never seen. Last I had heard it was at the McGuffin's home. Um, it was a pair of cropped off short — shorter pants. Not shorts, but in between your ankles and your knee.

Q. Uh huh.

Exhibit 5001 at 379

D3 73                                    Courtright  X

A.    They were white.  And a — it's a summer top, and it just kind of has spaghetti straps and it flowed out at the bottom, - - -

Q.    (Interposing) Okay.

A.    - - - from here on out.  I don't know if you can see that or not, but - - -

Q.    (Interposing) Do you remember what color it was?

A.    I remember it being light in color.  And it might of had some kind of a little pattern running through it.

Q.    But, that was different than what you saw her wearing when she left your house on June 28th?

A.    Yes.

Q.    Okay.  Now, on June 28th, when Nick and Leah were washing his Mustang, I think you indicated that they were laughing together?

A.    Yes.

Q.    And they were spraying each other with the hose?

A.    Yes.

Q.    And joking around?

A.    Yes.

Q.    And that — that day Leah was in — Leah was in an exceptionally great mood?

A.    She was.

Q.    Okay.  So, they left your house — would it be around 4:00?

Exhibit 5001 at 380

Courtright X    D3 74

A.    Yes.  Shortly after 4:00, I believe.  Yeah.

Q.    Now, Ms. Courtright, you — at the time we are talking about, June 28, 2000, you had a television in your bedroom?

A.    Yes.

Q.    And Leah had a television in her bedroom?

A.    Yes.  I believe she did.

Q.    Okay.  And is it fair to say that you often fall asleep watching television?

A.    Yes.

Q.    And the night of June 28th, you went upstairs to watch TV and fell asleep?

A.    Correct.

Q.    Do you recall — Mr. Frasier asked you about whether Nick McGuffin said anything to you about coming by the house. Do you recall talking to Chief Reaves on June 29, 2000, and telling him that Nick told you he came by at 2:00 a.m. and thought he saw a TV light on in Leah's room?  He was unable to get anyone's attention, called to you, and threw rocks at Leah's window, so then he went home.

A.    And — and your question is what?

Q.    My question is — well, you — you talked to Chief Reaves on a number of occasions?  Right?

A.    Yeah.

Q.    Okay.

Exhibit 5001 at 381

D3 75                                             Courtright  X

A.    Yes.

Q.    And you talked to him — I'm looking at his report from June 29, 2000.  And this is what he indicates you told him, so I'm wondering if this refreshes your recollection of Nick telling you that he came by at 2:00 a.m. and thought he saw a TV light on in Leah's room, threw rocks at the window, didn't get a response, and then went home?

A.    I — I think he might have told me that.

Q.    Okay.  Now, when you got up at 3:30 and went into Leah's room, you did turn the light on at that time?  Is that right?

A.    Oh.  Yes.

Q.    Okay.  And you are not sure, when you checked in Leah's room, whether her door was open or shut?

A.    I believe I pushed the door open to — yes.

Q.    Okay.  But, when you pushed the door open, you weren't sure whether it was all the way closed?  Is that fair?

A.    I didn't have to turn the knob - - -

Q.    (Interposing) Okay.

A.    - - - to open the door.

Q.    All right.  The — the photographs of Leah that we have in evidence — I think they are Exhibits 1 and 2.  I'm sorry.  They — they are 7 and 8.  Those photographs were taken by Mr. McGuffin?

A.    I — I don't know what photographs you are talking

Exhibit 5001 at 382

Courtright  X    D3 76

about.

MS. McCREA:    Where are they?  May I have 7 and 8, please?

Q.   I'm sorry, Ms. Courtright.

A.   Oh.

Q.   Those photographs, yeah, (not understandable).

A.   I'm sorry.  Okay.  Yeah.

Q.   Okay.  So — and were those — do you know — were those photographs taken that day by Nick McGuffin?

A.   Um, he said they were.

Q.   Okay.

A.   So, I'm — I'm assuming they were.

Q.   Well, they weren't taken by you?

A.   No.

Q.   Okay.

A.   No.  Huh uh.

Q.   And is that Mr. McGuffin's house?  Do you know?

A.   I believe this is their house.

Q.   It — because you were out at the house at least once - - -

A.   (Interposing) Yes.

Q.   - - - for the graduation party?

A.   Right.

Q.   And then after Leah went missing, you went out to the house on a number of occasions?  Is that right?

Exhibit 5001 at 383

D3 77                                              Courtright   X

A.   Yes.

Q.   Okay.  And, um, do — do you know who the person is who is partly in the picture?

A.   No.

Q.   Does that appear to be Nick's Mustang in the - - -

A.   It does.  It appear — it appears to be.

Q.   And do you remember when Leah was scheduled to get her braces off?

A.   Hmm, I think — ugh, probably sometime in August.  It wasn't too long after she was found.

Q.   The relationship between Nick and Leah, began in about October of 1999?  Is that right?

A.   Yes.

Q.   And you've indicated that you didn't approve initially because of the age difference?

A.   Yes.

Q.   And — now, my understanding is that it was between December of '99 and January of 2000 that Leah was not allowed to date Nick?  Is that your recollection?

A.   Approximately.  I — I — I can't - - -

Q.   (Interposing) That's fair.

A.   Yeah.

Q.   That's — that's perfectly fine, Ms. Courtright.  That's - - -

And there was a time in — in about — was it

Exhibit 5001 at 384

Courtright    X    D3 78

approximately about March, then, that you — you relented, as you put it, and allowed them to get back together?

A.    Yes.

Q.    Okay.  And once — once they were back to together, and you had a chance to observe them, they spent a lot of time together?  Is that fair?

A.    Yes.

Q.    And they did things like watching movies together?

A.    Yes.

Q.    Hanging out in Nick's car?

A.    Uh, I — uh, possibly.

Q.    Okay.  Well, when you lived at the house on Fifth Street with Mr. Murphy, Mr. Murphy did not approve of Nick McGuffin?

A.    Correct.

Q.    And Mr. McGuffin was not allowed to telephone or come by after 9:30?  Is that right?

A.    Correct.

Q.    Okay.  And, um — and it was a — is it fair to say it was a pretty — it was a pretty bad breakup with Mr. Murphy when you and the girls left that house?

A.    The — the morning we left, yes.

Q.    Yeah.  And was part of that an altercation between Leah and Jim Murphy?

A.    No.  The altercation was between Denise and Jim

Exhibit 5001 at 385

D3 79                                              Courtright   X

Murphy.

Q.   Okay.  It was between Denise and Jim Murphy?

A.   Yes.

Q.   And did — and Leah called Nick to come get her?  She packed a backpack and had him come get her?

A.   Yes.

Q.   Now, when you moved, then, to your parents' place, your — your dad's been characterized as being straight-laced — what I might call "old school"?

A.   Yes.

Q.   And he was very particular about when Nick should be there with Leah?  Would that be fair?

A.   Yes.

Q.   Okay.  And did Nick and Leah talk on the phone a lot?

A.   Um, by "a lot" you mean — I - - -

Q.   (Interposing) Well, they are teenagers.  I mean - - -

A.   Yeah.  They did, - - -

Q.   (Interposing) Okay.

A.   - - - I guess.

Q.   And — and Nick gave Leah rides to and from school, didn't he?

A.   Some of the times.

Q.   Some of the times he would be late and she would go

Exhibit 5001 at 386

Courtright  X    D3 80

off to school without him?

A.    He was pretty much there to pick her up.

Q.    Okay.  When Nick came over to help you go look for Leah the — the next morning, on the 29th, he appeared to be extremely concerned?  Would that be fair to say?

A.    You know, I — I don't feel comfortable answering that because I wasn't concentrating on him.

Q.    Okay.

A.    My concentrations were on, "Where is Leah?"

Q.    Because you were particularly concerned?

A.    Yes.

Q.    But, in terms of the speed in Nick McGuffin responding to your phone call, he came right in — came right - - -

A.    (Interposing) Yes.

Q.    - - - over?

A.    Yes, that's - - -

Q.    (Interposing) Okay.

A.    - - - true.

Q.    And he made himself available to assist you in any way, in trying to find Leah?

A.    Yes.

Q.    And he and Denise drove around in his Mustang for a period of time?  And you drove around in a separate car?

A.    Yes.

Exhibit 5001 at 387

D3 81                                        Courtright   X

Q.   And then he went with you to the Police Station to make the Missing Persons Report?

A.   Yes.  I caught up with him at the gas — I caught up with them at the gas station.  And I began to panic and I said, "We got to. . ." — I was worried about my dad and his health, for one thing, along with Leah.  Um, I said that we needed to contact the police.  Let's go back to my mom and dad's.  And we all did.  We then informed my dad that Leah hadn't come home.

Q.   Now, was — was Nick McGuffin present when you talked to your dad?

A.   Uh, I believe so.

Q.   Did your dad have any reaction toward Mr. McGuffin?

A.   I don't recall.

Q.   Well, — and part of your concern on the 29th, with Leah missing, is she was not the type to run away?  Is that right?

A.   Correct.

Q.   Do you remember when, approximately, it was when Nick McGuffin came over to talk to you about his concerns with Leah hitting him?

A.   Somewhere near the end of the school year.

Q.   And was this a long discussion or a short discussion?

A.   It — it was real short, actually.  He - - -

Exhibit 5001 at 388

Courtright  X    D3 82

Q.    (Interposing) Okay.

A.    - - - was - - -

Q.    (Interposing) Give me just one moment.

MS. McCREA:    May I approach, Your Honor?

Q.    Ms. Courtright, I'm not going to be asking you about — oh, I — I'm sorry.

MS. McCREA:    I've approached the witness, now, so I'm so sorry.

Q.    I'm not going to be asking you about an exhibit and not let you see it.

MS. McCREA:    I don't have this marked.  I just want to see if this helps.

Q.    Is this a picture of the reward poster that came out in 2010?

A.    Yes.

Q.    And, um — and the reward is for $10,000?

A.    Yes.

Q.    And the requirement is that it's for the arrest and successful prosecution for the murder of Leah Freeman?

A.    That's what it says.

Q.    Okay.  And did you see these posters around the area?

A.    Yes.

Q.    Thank you.

A.    Uh huh.

Exhibit 5001 at 389

D3 83                                    Courtright  ReD

MS. McCREA:   That's all the questions I have of Ms. Courtright.

THE COURT:   Redirect?

MR. FRASIER:   Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. FRASIER:

Q.   Ma'am, did your daughter Leah ever run away from home?

A.   No, never.

Q.   And in your contacts with the — the Defendant, him taking your daughter out and so forth, what kind of car did he have?

A.   What kind of car did the Defendant have?

Q.   Yes.

A.   Um, a Mustang.

Q.   Do you recall what color it was?

A.   Blue.

Q.   Was there any other car he might have driven?

A.   Sometimes he drove his parent's, um — was it a Thunderbird?  Or — I think it was a Thunderbird.

Q.   And do you recall what the color was?

A.   I believe it's like maroon color.

Q.   And, uh, State's Exhibit 7 — you did identify this for counsel, but do you see the — the Mustang in the background of that picture?

Exhibit 5001 at 390

D3 84

A.   Yes.

Q.   And looking over in State's Exhibit 7, to the other side of another window, do you see another vehicle?

A.   I can't tell that it's a vehicle.

Q.   Okay.  (Not understandable) - - -

A.   (Interposing) Okay.

MR. FRASIER:    That's all the questions I have.

THE COURT:    You may step down, ma'am.  You are not excused.  Uh, you may remain, obviously, in the courtroom.

Call your next witness.

MR. FRASIER:    I apologize, Your Honor, but I don't have anybody here until 1:00.  We — we went faster than what I thought we would.

MS. McCREA:    Can — I would request permission to read into the record Exhibit 215, which is very short.  It was the medical record concerning Mr. McGuffin, and it has been received.

THE COURT:    I don't care.  That's fine.

MS. McCREA:    Omitting the Affidavit and the Emergency Room Record Face Sheet, this is an Emergency Room Note of July 2, 2000:

"Nicholas McGuffin: Chief — chief complaint anxiety.'

Exhibit 5001 at 391

D3 85

"Present illness: This young man is suffering some severe anxiety and mental anguish apparently after his girlfriend went missing with no clues, and she has been gone for several days now.  The police are searching.  They are afraid she may have been abducted.  They apparently were quite close. He has very restless nights sleep, maybe four to five hours last night.  He's in a great deal of anguish.  He is vomiting, driving around, crying, and needs some relief from his mental distress if possible."

"He was brought in by his parents.  He has been somewhat suicidal.  They have been watching him closely.  They have control of his medications.  He is not driving, no means, et cetera.  There is no prior history of mental disorder."

"O, for Opinion:  The patient is basically incommunicado.  He is writhing around. . ."

"I'm sorry, Observations: The patient is basically incommunicado.  He is writhing around, lying face down.  Initially, he was hyperventilating.  We gave him a brown bag and then he stopped breathing, holding breath for awhile, then resumed breathing."

"Otherwise, this HE — and that's what it says —

Exhibit 5001 at 392

D3 86

neurological status is in tact.  He is somewhat flushed.  He is weeping and obviously quite depressed."

"A: Acute situational stress depression, actually grief reaction."

"S: Because of his nausea and emisis, we gave him Phenergan 100 IM.  He is to wait in the ER until things are settled down.  And then, Xanax 1 mg four to six hours prn anxiety and sleep, No. 6 dispensed."

"The parents will keep control over all medications.  His return to see Dr. Sinnott, if needed."

"Signed John C. Counts, M.D."

Thank you, Your Honor.

THE COURT:   We'll be in recess until 1:00.

Everybody else in the courtroom remain seated until the jury has a chance to leave the courtroom for lunch.

Be back at 1:00, please.  Put your name on your notes and leave in the jury room, please.

(Jury out.)

THE COURT:   I'd also like to remind people in the courtroom, do not approach the jurors at all or attempt to talk to them.

Okay.  We'll be in recess until 1:00.

Exhibit 5001 at 393

D3 87                                                    Jones  D

                         (LUNCHEON RECESS)

                    (Jury in.)

                    JUDICIAL ASSISTANT:    All rise.

                    THE COURT:    Be seated, please.

                    Call your next witness.

                    MS. SOUBLET:    The State calls Cynthia Jones.

                    THE COURT:    Ms. Jones, if you would raise
your right hand, please.

                    Ms. Jones, - - -

                    WITNESS:    (Interposing) Yes.

                    THE COURT:    - - - raise your right hand,
please.

                         CYNTHIA ANN JONES

was thereupon produced as a witness on behalf of Plaintiff

and, having first been duly sworn to tell the truth, the whole

truth and nothing but the truth, was examined and testified as

follows:

                    THE COURT:    Have a seat up here, please.

                    You — make sure you are close to the

microphone.  That's close enough.  And make sure you keep your

voice up.  We have an air conditioning system on and you are

going to have to project your voice.

                    WITNESS:    All right.

                    THE COURT:    Okay.

                    Go ahead.

Exhibit 5001 at 394

Jones  D    D3 88

MS. SOUBLET:    Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. SOUBLET:

Q.    Ms. Jones, can you state your full name and spell your last for the record?

A.    It's Cynthia Ann Jones.  You spell Jones, J-O-N-E-S.

Q.    And, Ms. Jones, how long have you lived in Coquille?

A.    I'd say since the 9th grade.  So, - - -

Q.    (Interposing) A long time?

A.    - - - twenty - - -

Yes, a long time.

Q.    And do you know — or, did you know the victim, Leah Freeman?

A.    Yes, I did.

Q.    Can you tell the jury how you knew her?

A.    Well, she was raised with my niece.  Well, my niece was in her same class, and then we coached her for a year in basketball.

Q.    And when was that, that you coached her in basketball?

A.    She was in like the 2nd or 3rd grade.

Q.    I want to turn your attention to June 28th of 2000. Do you remember that night?

A.    Yes.

Q.    Okay.  Where were you around 9:30 p.m. on that day?

Exhibit 5001 at 395

```
D3 89                                          Jones  D
```

A.   I was driving towards my house.

Q.   And where was your house located?

A.   It's on North First Street.  You turn to go by the Shell station.

Q.   Okay.  And at that time, did you see Leah Freeman?

A.   Yes, I did.

Q.   And where was she when you saw her?

A.   She was in the phone booth.

Q.   Okay.  Where was the phone booth located?

A.   As I turned to my right, the phone booth was just like fifteen feet away, if — if that much.  It's just right next to the road.

Q.   And what were the lighting conditions like there, at that phone booth?

A.   It was still light outside.

Q.   Did you notice anything about Leah that night?

A.   No.  She — I looked at her and she just went - - -, like that, and she seemed fine.

Q.   Did you notice what she was wearing?

A.   Yeah.  She did have on a white tank top.

Q.   Did you notice anyone else in the area at that time?

A.   Yes.  The reason I remember it is there was two men over — across the street just screaming violently.  One was just screaming violently at the other one.  And, um, I looked at them first as I was turning, and then I looked at her.  She

Exhibit 5001 at 396

Jones   D    D3 90

— she seemed to be fine and — and I just went on.

Q.   Do you remember where — you say "across the street", what's across the street from the gas station in that intersection?

A.   Um, it was right in front of the high school.

Q.   Do you remember anything other than the fact that they were screaming at each other — about the two gentlemen?

A.   No.  I really don't.  I really don't.

Q.   Do you remember seeing any cars in the area, obviously other than the one that you were in?

A.   No.  I — I really didn't.  I think there might have been one in the parking lot, but I — I didn't really remember it.

Q.   Do you remember what the car in the parking lot looked like?

A.   It's just been so long, that I — I have to even say — I don't really know.  I'm sorry.  I don't know.  I was thinking it was maroon or — I don't know.  I can't remember.

Q.   Did you make a - - -

A.   (Interposing) Sorry.

Q.   - - - connection between the gentlemen in front of the high school and Leah?

A.   No.  I — I knew something was going on, but she seemed to be fine.  You know, she didn't seem to - - -

Q.   (Interposing) And when you say - - -

Exhibit 5001 at 397

D3 91                                                      Jones   X

A.    - - - be afraid.

Q.    When you say, "one was screaming at the other", how would you describe that screaming?

A.    Oh.  It was — it was violent.  He was very, very upset.

Q.    Thank you.

          MS. SOUBLET:     Nothing further.

          THE COURT:    Ms. McCrea?

                    CROSS EXAMINATION

BY MS. McCREA:

Q.    Ms. Jones, I understand you were — you were heading home?

A.    Yes.

Q.    So, is it correct you were traveling west on Central?

A.    I'm not good with that west stuff.

Q.    Okay.

A.    I'm sorry.

Q.    Okay.

A.    I was heading from town.

Q.    From town?

A.    Yes.

Q.    And then you turned right at the gas station?

A.    Yes.

Q.    And that would have you going up the road past the

Exhibit 5001 at 398

Jones    X      D3 92

cemetery on your left?

A.    Yes.

Q.    Okay.  I just wanted to make sure I got the — I got the connections right.

MS. McCREA:    Okay.  With counsel's permission — I'm sorry I didn't get the chance to print this.

Q.    I'm going to show you a photograph.  We are going to — we are just going to call this, for the sake of identification, Defense Exhibit 101.

Do you recognize this location?

A.    Yes.

Q.    And what is it?

A.    Well, it's the shell station and the phone booth is not there anymore, as you can see.

Q.    Right.  And would the phone booth be where that slab of cement was?

A.    Yes.

Q.    Okay.

A.    (Not understandable) - - -

Q.    (Simultaneously) And does - - -

Does that look like how it looks now?

A.    Yes.

Q.    Okay.  And this slab of cement would have been where the phone booth was where you saw Leah Freeman?

A.    Yes.

Exhibit 5001 at 399

D3 93                                           Jones  X

Q.   And was it actually - - -

THE COURT:    (Interposing) Just a minute.

Ma'am, - - -

WITNESS:    (Interposing) Yes.  I'm not - - -

THE COURT:    - - - when — when she's that close, you are not talking to her.  You are still talking to everybody - - -

WITNESS:    (Interposing) Okay.

THE COURT:    - - - in the jury.

MS. McCREA:    I'm sorry.

THE COURT:    You are going to have to move the microphone over, closer to the front of you.  When she moves over there and you starting talking to her - - -

WITNESS:    (Interposing) Uh huh.

THE COURT:    Because the mike isn't picking it up.  Okay?

WITNESS:    Okay.

THE COURT:    Okay.

Q.   Sorry.

A.   That's okay.

Q.   So, was it actually the typical, old, glass phone booth?

A.   Yes.

Q.   Okay.  Not like a (not understandable) stand at the — stand at a little stand?

Exhibit 5001 at 400

Jones   X    D3 94

A.    No.

Q.    And — and you saw — and this would be — okay.  You answered — you answered that.

MS. McCREA:    Okay.  Your Honor, with the Court's permission, and if counsel doesn't object, I'd move to — I would offer Defense Exhibit 101, and I will replace this with a printed copy on Monday.  And I will send a copy to Mr. Frasier.

MR. FRASIER:    No objection.

THE COURT:    Okay.  No. 101 is — will be received.

(Whereupon Defendant's Exhibit No. 101 was received into evidence.)

You'll get a copy to us on Monday.

And you — yes?

MS. McCREA:    Yes.  Thank you.

Q.    And — and, Ms. Jones, you indicated that it was very light out?  Is that correct?

A.    Yes.  It hadn't gotten dark yet.

Q.    Thank you.

MS. McCREA:    That's all the questions I have, Your Honor.

THE COURT:    Any redirect?

MS. SOUBLET:    None, Your Honor.

THE COURT:    You are free to step down and you

Exhibit 5001 at 401

D3 95                                                        Carney  D

are free to leave.

WITNESS:    Thank you.

THE COURT:    Excused.

Call your next witness.

MR. FRASIER:    Thank you, Your Honor.

We call Matthew Carney.

THE COURT:    Well, you are going to have to wait for a few minutes.

Step forward, please, sir.

Raise your right hand.

MATTHEW PHILLIP CARNEY

was thereupon produced as a witness on behalf of Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat here, please.

DIRECT EXAMINATION

BY MR. FRASIER:

Q.    Could you state your name, please, sir, and spell your last name for the record?

A.    Yeah.  Matthew Phillip Carney, spelled C-A-R-N-E-Y.

Q.    And where do you reside, sir?

A.    Pendleton, Oregon.

Q.    Um, do you have an occupation, sir?

A.    I do.  I work for a sporting goods store.

Exhibit 5001 at 402

Carney   D    D3 96

Q.   And are you also in the Military?

A.   I am, yes.

Q.   I was intending to call you next week after we called some other witnesses, but you have an obligation next week?

A.   I do.  I'm getting ready to deploy to Afghanistan.

Q.   And when do you leave for Afghanistan?

A.   I have to attend a school in — the 10th of August — or, uh, 10th of July for, uh, a Personal Security Detail School.  And then I deploy August 29th.

Q.   You'll be leaving the area when?

A.   I'll be leaving the area 10 July.

Q.   Mr. Carney, have you lived in the Coquille area?

A.   Yes.

Q.   And when did you move here?

A.   Moved here in 1990 and moved 2002.

Q.   And how old were you when you moved her in 1990?

A.   First grade — six.

Q.   And — so, you would have been what when you left in 2002?

A.   Just graduated from high school — uh, eighteen.

Q.   While you were here in Coquille, were you familiar with an individual named Raymond Lewis?

A.   Yes, absolutely.

Q.   And how did you know Mr. Lewis?

Exhibit 5001 at 403

D3 97                                           Carney   D

A.   Grew up together since little kids.  Always been very close.

Q.   How often would you see each other?

A.   Every single day.

Q.   Now, when did you graduate, sir?

A.   2002.

Q.   Now, were still at — you were at Coquille High School?

A.   Uh, yes.

Q.   And you were familiar with the Leah Freeman disappearance?

A.   Yeah, absolutely.

Q.   You were aware of roughly when she disappeared and so forth?

A.   Uh, yeah.

Q.   Were you friends with Mr. Lewis at that time?

A.   Yes.

Q.   Now, directing your attention to, uh, the timeframe that Leah Freeman disappeared, did you have contact with Mr. Lewis?

A.   Yes.  Uh huh.

Q.   And could you describe for us?

A.   Uh, together pretty much every day.  I mean, we were pretty much best friends growing up.  So, - - -

Q.   And, in particular, the evening of June 28, 2000, do

Exhibit 5001 at 404

Carney    D    D3 98

you remember being with Mr. Lewis?

A.   Um, no, not specifically being with him.  But, I do recall us talking about that later on after, um — after, I guess, the investigation went on throughout the years.  I think shortly after, he was told, um — or, he came to somebody and told them that he had seen her walking home that night, on his way to my house.  But, I don't particularly remember — I mean, it was probably a couple years when - - -

Q.   (Interposing) When - - -

A.   - - - we started talking - - -

Q.   - - - Mr. Lewis came over and visited you, what time of the day would he come over to your house?

A.   Oh, that was in the summer time, so I'm sure we were together — I guess I can't specifically — that day?  Is that what you are - - -

Q.   (Interposing) Well, - - -

A.   - - - asking?

Q.   - - - during that week, what time would he come over?

A.   We were probably together all day every day.

Q.   Evening?  After, - - -

A.   (Interposing) Sure.

Q.   - - - 9:00?

A.   Yeah.  We were together.

Q.   Do you recall a time period where he did not come

Exhibit 5001 at 405

D3 99                                                    Carney   X

over and see you?

     A.   No.

     Q.   Thank you.

          MR. FRASIER:    That's all the questions I have
for Mr. Carney.

          THE COURT:    Ms. — Mr. McCrea?

                    CROSS EXAMINATION

BY MR. McCREA:

     Q.   Mr. Carney, you indicated that you had been friends
for how long?

     A.   Probably since we were seven, eight years old.

     Q.   All right.  So, you knew Mr. — Mr. Carney (sic)
really well?

     A.   Uh, Mr. Lewis, yes, sir.

     Q.   I'm sorry.  You are Mr. Carney?

     A.   Yes, sir.

     Q.   You knew — you knew Mr. Lewis really well?

     A.   Yes.

     Q.   And you did things together?

     A.   Absolutely.

     Q.   And would you say you were really, really close
friends?

     A.   Yes.

     Q.   And you still are?

     A.   Yes.

Exhibit 5001 at 406

Carney   X   D3 100

Q.   And, did you go hunting together?

A.   Uh, yes.  Uh, in high school, no, we didn't hunt together.  We didn't really hunt much, I guess you could say.

Q.   But, Mr. Lewis went hunting at that time, didn't he?

A.   Yes.

Q.   And he had a 4x4 pickup?

A.   Yep.  I believe he did.

Q.   And did he have a lift kit on that?

A.   Uh huh.

Q.   And that would have been at the time we are talking about, on the 28th of June of 2000?

A.   Uh, yeah.

Q.   And it was common for him to go up on Hudson Ridge, wasn't it?

A.   Oh, yes.  Everybody was always up there.

Q.   Okay.  But — but, particularly, Mr. — Mr. Lewis was very familiar Hudson Ridge, right?

A.   Was, yes.

Q.   And to get to Hudson Ridge, that we are talking about, is you take off from — on Fairview, off Central, and just keep following it out to Four Corners and then turn right?

A.   Right.  If you were going to - - -

Q.   (Interposing) All right.

A.   - - - to Middle Creek, sure.

Exhibit 5001 at 407

D3 101                                              Carney   X

Q.   And did — uh, in your experience and acquaintance with Mr. Lewis, did he keep hunting equipment in his pickup sometimes?

A.   Uh, no.  I wouldn't think hunting equipment.  As far as rifles, you mean?  Or binoculars?  Or, - - -

Q.   Pardon?

A.   Uh, rifles or binoculars?  Is that what you are referring to?

Q.   Rifles or binoculars — he did or did not?

A.   Um, no.

Q.   What about hunting knives?

A.   No.  I wouldn't think so.  Not in his - - -

Q.   (Interposing) Did - - -

A.   - - - pickup.

Q.   Did he have a hunting knife?

A.   I'm sure he did, but I couldn't say for sure.

Q.   You say he probably did?

A.   Probably did.  Yeah.

Q.   Yeah.  Okay.

A.   Uh huh.

Q.   And, as far as the — as the night of the 28th, you don't have a specific recollection of his coming over?  Isn't that correct?

A.   Not specifically, no.  The — the first time I was asked about it, I guess, was just a few days ago.  So, ten

Exhibit 5001 at 408

Carney   X    D3 102

years ago I can't — I - - -

Q.    (Interposing) Right.

A.    I don't have a specific recollection.

Q.    It — it came up a few days ago - - -

A.    (Interposing) Right.

Q.    - - - when an investigator contacted you?  And that was one of the law enforcement people - - -

A.    (Interposing) Right.

Q.    - - - here?

A.    Uh, Officer Webley, I believe.

Q.    But, going back to the — the time when he would come over, how long would he usually spend if he did come over in the evening?

A.    Oh.  In the summer time, we would be out probably until it was our curfew, I guess you could say.  So, we would probably be out — I know I couldn't be out running around until 2:00 or 3:00 in the morning, or anything crazy like that.  So, - - -

Q.    (Interposing) I'm sorry.  You talk really fast and I'm really old.  So, - - -

A.    (Interposing) Yes, sir.

Q.    - - - we — we need to make an adjustment.

A.    Sure.

Uh, I know I wasn't allowed to be out - - -

Q.    (Interposing) Beyond - - -

Exhibit 5001 at 409

D3 103                                    Carney   X

A.   - - - till, - - -

Q.   - - - what?  I didn't - - -

A.   - - - you know, - - -

Q.   - - - catch that.

A.   - - - 2:00 or 3:00 in the morning, I was not allowed to be out.  So, maybe midnight I would say I would definitely have to be - - -

Q.   (Interposing) All right.

A.   - - - home in - - -

Q.   (Interposing) Midnight?

A.   - - - the summertime.  Yes.

Q.   So, he'd come over around 9:00, and you — he'd either stay or you would do things together until around midnight?

A.   Sure.  I'm sure he had to be - - -

Q.   (Interposing) All right.

A.   - - - home, also.

Q.   So, we have — we are in a situation where he was out — just assume this be the situation — he was out driving around between 9:00 and 9:45, and — and then, uh, a situation where he was hurrying to get home by — at a time around 10:45; that would — that would indicate it was probably not a night he came over to your house, would it not?

MR. FRASIER:    I think that - - -

A.   (Interposing) Uh, - - -

Exhibit 5001 at 410

Carney   X   D3 104

MR. FRASIER:   - - - calls for speculation, Your Honor.  I would object to the question.

THE COURT:   Sustained.

MR. McCREA:   Well this — this witness is called out of order.  And so, I don't have a chance to lay the foundation that would go with as normal, Your Honor.  And it puts — he's not - - -

THE COURT:   (Interposing) So, you are telling me - - -

MR. McCREA:   - - - going to be - - -

THE COURT:   - - - you will lay a foundation?

MR. McCREA:   Pardon?

THE COURT:   You are telling me you will lay a foundation for - - -

MR. McCREA:   (Interposing) Yes.

THE COURT:   - - - this?

MR. McCREA:   I — I — in fact, I will here and now indicate, specifically, the foundation therefore.  By that I mean, in the question to the witness.

THE COURT:   All right.  Go ahead.

MR. McCREA:   All right.

Q.   I want you to assume, Mr. Carney, that on the 20th of July in 2000, that Mr. Lewis testified before the Coos County Grand Jury.  And he testified at that time that he was driving around and made three separate passes through the area on

Exhibit 5001 at 411

D3 105                                        Carney  X

Central where McKay's and — and — the Hunter Room, and where, more specifically, fast food he was located.  That's what I'm trying to get out.

A.   Yeah.

Q.   And — then, uh, he was hurrying to get home at ten — between 10:30 — or, 10:30 to 10:45 to get — to get home.  Now, assuming that that's what he testified to the Grand Jury at that time, in — wouldn't that indicate to you that that was not a night he came over to your house?

A.   Um, that's possible.

Q.   All right.

A.   Yes.  Yeah.

Q.   And more specifically, if he — so, if we are looking at 9:45 to 10:30, that's only 45 minutes?  Correct?

A.   Uh huh.

THE COURT:   Your — your answer was - - -

WITNESS:   Yes.

Q.   All right.  How far is it from the area of — where the fast food market is located to your house?

A.   Hmm, a minute and a half, two minutes if you were driving, probably.

Q.   Okay.  How long does it take to drive that far?

A.   From — from let's say, uh, Fast Mart to my house?

Q.   Yes.

A.   Yeah.  Probably two minutes tops.

Exhibit 5001 at 412

Carney  X   D3 106

Q.   Okay.  Just a couple of minutes?

A.   A couple of minutes, yes.

Q.   But, uh — now, at the time you — you spent together, you were friends with him, - - -

A.   (Interposing) Uh huh.

Q.   Uh, you were — you were, at that time, what, sixteen years old?

A.   Fifteen or sixteen, yes.  Uh, let's - - -

Q.   (Interposing) And - - -

A.   - - - see - - -

Q.   (Interposing) And Mr. Lewis was sixteen years old?

A.   Right.

Q.   And you — you talked about things as friends will?

A.   Uh huh.

Q.   Did you talk about girls?

A.   Uh, not so much probably when we were younger like that.  But, yeah, I'm sure we did.  Yeah.

Q.   All right.  Now, did you have — as part of your acquaintance and friendship with Mr. Lewis, did you have classes with him?

A.   Yes.

Q.   And did you have a Home Ec class that year?

A.   Oh, I don't even — I don't recall.  I don't remember.

Q.   All right.  Let me ask it this way.  Did you and he

Exhibit 5001 at 413

D3 107                                          Carney  X

have a class together where Leah Freeman was in that class?

A.    Uh, I don't remember having a class with her.  No.

Q.    Do — now, you knew where Mr. Lewis lived?  Correct?

A.    Oh, yes.

Q.    And you knew that — that Leah Freeman lived just up the street, on the — on the 28th of June, from where Mr. Lewis lived?

A.    Um, I don't know where she lived, but I knew that she lived in Sanford Heights.

Q.    All right.  And that — and, uh, did — during your friendship discussions with Mr. Lewis, did he ever talk about Leah Freeman?

A.    No.  Not to me, no.

Q.    Uh, you knew who she was?

A.    I knew who she was, yes.

Q.    Did you think she was cute?

A.    She was attractive, yes.

Q.    Attractive?

A.    Yeah.

Q.    Okay.  Now, the first time that Mr. Lewis caught up to you, that — he was at your house the night that she disappeared, - - -

A.    (Interposing) Uh huh.

Q.    - - - was some days later than the date she disappeared?  Isn't that correct?

Exhibit 5001 at 414

Carney  X    D3 108

A.    Yes.  As — as far as I can remember us ever talking about that night, and him saying that he had seen her on the way to my house, I would say — I don't remember ever talking about that until maybe a year or years later.

Q.    Okay.  When — when he brought it up, he said an investigator to talk to him?

A.    Right.

Q.    And he said to you that he was over at your house?

A.    Uh, yeah, on his way over to my house, yes.

Q.    He was on his way over to your house?

A.    Yes.

Q.    That you and he had been together that night?

A.    Right.

Q.    All right.  And so, then as time went by, when the two of you would talk about it, he would always make it out that he had been over at your house that night when she disappeared?  Right?

A.    Right.  Right.

Q.    Okay.

A.    As I remember, yeah.

        MR. McCREA:    Can I have just a moment, Your Honor?

        THE COURT:    Uh huh.

Q.    Okay.  And — and — we'll go back to — (not understandable) I clearly understand.  You don't have a

Exhibit 5001 at 415

D3 109                                                    Carney  ReD

recollection here, today, whether he was at your house that night or not?  Correct?

A.   No, I don't.

Q.   All right.  Thank you very much.

A.   Uh huh.

THE COURT:   Redirect?

REDIRECT EXAMINATION

BY MR. FRASIER:

Q.   Mr. Carney, - - -

A.   (Interposing) Uh huh.

Q.   - - - how long have you known Mr. Lewis?

A.   From today?  Probably, uh — oh, probably close to twenty years — eighteen years probably.

Q.   And even though you live in Pendleton, do you have contact with him?

A.   Yeah.  Not as much.  I'm pretty busy out there. But, yeah, I still have contact with him.  Yeah.

Q.   Just in your contact with Mr. Lewis, do you have a personal opinion as to his character for trustworthiness?

A.   Uh, Yeah.

MR. McCREA:   Wait a minute.  That's outside the scope of any cross examination, Your Honor.

THE COURT:   No.  I think it's within the scope.

MR. McCREA:   All right.

Exhibit 5001 at 416

Carney   ReD  D3 110

THE COURT:    Go ahead.

Q.    Do you have an opinion as to his character for being trustworthy?

A.    Yes.

Q.    And what is that opinion?

A.    That he is trustworthy.  Uh huh.

Q.    Mr. Lewis ever told that he was involved in any way, shape or form with the disappearance of Leah Freeman?

A.    No.

Q.    Now, in regards to Hudson Ridge, you indicated Mr. Lewis has been up there a lot?

A.    Oh, yeah.  We've been up there, sure.

Q.    Have you been up there?

A.    Oh, yes.  Uh huh.

Q.    Hudson Ridge, this area, what is — as the kids here in Coquille — you are one of them — or, you were here - - -

A.    (Interposing) Right.

Q.    - - - in high school, - - -

A.    (Interposing) Sure.

Q.    - - - what was Hudson Ridge like for high school kids?

A.    It was like a playground if you had a truck, I guess you could say.  There was mud and there was open space to be a kid, shoot guns and - - -

Q.    Were there parties up there?

Exhibit 5001 at 417

D3 111                                    Carney   ReD

A.    Uh, yeah, I think there was.

Q.    Drinking?

A.    Sure.

Q.    Uh, bonfires?

A.    Sure.

Q.    Thank you.

          MR. FRASIER:    I believe that's all the questions I have, Your Honor.

          THE COURT:    You may step down.  You are free to leave.

          WITNESS:    Okay.

          THE COURT:    I have a responsibility to orient a jury.  So, I'm going to have to take a recess.  I'm sorry about this break.  And it was — I wanted to get started and I wasn't sure exactly when I had to do it, but everybody is there so I have to go do it now.

          So, we are going to take a brief recess so I can do that, and then we'll come back and restart with the next witness.  Okay?

          Everybody else remain seated until the jury has a chance to go to the jury room.

          (Jury out.)

          THE COURT:    About fifteen minutes.

          MR. McCREA:    What did he say?

          MS. McCREA:    Fifteen minutes.

Exhibit 5001 at 418

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

STATE OF OREGON,                 )
                                 )
            Plaintiff,           )    CASE NO. 10CR0782
                                 )
                                 )    JURY TRIAL
      vs.                        )     DAY 3 - Continued
                                 )
  NICHOLAS JAMES McGUFFIN,        )
                                 )
            Defendant.           )
_____  )

TRANSCRIPT OF PROCEEDINGS

Volume 4, Day 3, Pages D3 112 to D3 222

BE IT REMEMBERED That, the above-entitled cause
came on regularly for hearing beginning at 9:07 a.m., Thursday,
July 7, 2011 in the Circuit Courtroom of the Coos County
Courthouse in the City of Coquille, County of Coos, State of
Oregon, before the Honorable Richard L. Barron, and a jury.

APPEARANCES

R. Paul Frasier, District Attorney for Coos County,
representing the Plaintiff.

Erika Soublet, Assistant District Attorney for Coos County,
representing the Plaintiff.


Robert McCrea, Attorney at Law, representing the Defendant.

Shaun McCrea, Attorney at Law, representing the Defendant.


Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 419

                                                        D    D3 112

                              (RECESS)

                  (Jury in.)

                  JUDICIAL ASSISTANT:    All rise.

                  THE COURT:    Be seated, please.

                  Sorry about that.

                  Call your next witness.

                  MS. SOUBLET:    The State calls Denise
Bertrand.

                  JUDICIAL ASSISTANT:    Step on in and stand in
the middle, and raise your right hand.

                  THE COURT:    Raise your right hand, please.

                              DENISE BERTRAND
was thereupon produced as a witness on behalf of Plaintiff
and, having first been duly sworn to tell the truth, the whole
truth and nothing but the truth, was examined and testified as
follows:

                  THE COURT:    Have a seat up here, please.

                  If you would get closer to the microphone,
please, and keep your voice up.

                  All right.  Go ahead.

                  MS. SOUBLET:    Thank you, Your Honor.

                              DIRECT EXAMINATION
BY MS. SOUBLET:

     Q.   Ms. Bertrand, can you state your full name and spell
your last for the record?

Exhibit 5001 at 420

D3 113                                    Bertrand  D

A.    Denise Bertrand, B-E-R-T-R-A-N-D.

Q.    Ms. Bertrand, how long have you lived in Coos County?

A.    My whole life.

Q.    Where do you live right now?

A.    Myrtle Point.

Q.    Do you have family in the area?

A.    I do.

Q.    Who?

A.    I have four children, and my husband, and his large family, and my mother still lives here in Coquille.  I have a couple aunts in the area.  An uncle in the area.  And they are married ones, and their children — my cousins — several.

Q.    And your mother would be Ms. Cory Courtright?

A.    Yes, it is.

Q.    And where were you living in the school year 1999/2000?

A.    Um, my mother and I both were living at, um, her parents', my grandma and grandpa's house on Knott Street, here in Coquille.

Q.    Was there a time where you were living someplace other than on Knott Street that school year?

A.    Uh, we were also — um, it's up behind McKay's on Fifth Street — during part of the year — a friend of my mother's owns a house there.

Exhibit 5001 at 421

Bertrand  D   D3 114

Q.   Somebody else living with you then?

A.   My sister, Leah.

Q.   Leah?

A.   Yes.

Q.   And how much younger than you was Leah?

A.   Two years, one month, and one day.

Q.   How would you describe Leah growing up?  What type of person was she?

A.   She was incredible.  She was energetic.  She was gorgeous.  She was funny.

Q.   Did you have a good relationship with your sister?

A.   A great one.

Q.   How about her relationship with your mother?

A.   Pretty good.  Pretty good relationship with my mom. We — they were pretty good about being pretty open and honest with each other.

Q.   Was there anything that Leah liked to do, particularly at school?

A.   Sports.  She loved sports.  She loved hanging with her friends, playing with her friends, socializing, occasionally studying.  But, mostly — mostly her sports.  And, um, the most of her last year of school revolved around, uh — around hanging out with her boyfriend.

Q.   And who was her boyfriend her last year of school?

A.   Uh, Nick.

Exhibit 5001 at 422

D3 115                                              Bertrand  D

Q.   Is that Nicholas McGuffin?

A.   Yes, it is.

Q.   Do you see that person in the courtroom today?

A.   I sure do.

Q.   Can you point him out for me and tell me what he's wearing?

A.   He is wearing a black tie with a printed — or, a black shirt with a printed blue and white tie.

Q.   And how long have you known the Defendant?

A.   Um, my freshman year him and I shared a biology class, which would have been two years prior to Leah's freshman year.

Q.   Were you in the same class with the Defendant?

A.   No.  He's — he's a grade ahead of me.

Q.   And how did you become — actually, let me back up. You said Leah was very into sports.  Was there any sport in particular that she excelled at?

A.   Basketball and volleyball both, but basketball.

Q.   How tall was your sister?

A.   Not very.  She was one of the shorter members of the team.  She was — probably barely hit five foot.  Maybe an inch under five — somewhere in that area, right around five foot.

Q.   Would that have been her freshman year?

A.   Yes.

Q.   Her height?

Exhibit 5001 at 423

Bertrand    D    D3 116

(Not understandable) petite?

A.    She was very petite.

Q.    And you mentioned that Leah had a circle of friends that she liked to hang out with.  Do you remember who those were?

A.    Sherry Mitchell was her best friend in the whole wide world.  She also had — she was very close with Stacy Urler (phonetic), Stacy Lyons, Melissa Brugnoli.  Those were the most frequent.

Q.    And when the school year started, how — did you notice a change in Leah?

A.    At the beginning of the year was — it wasn't that big — you know, towards — a little bit more into the year she, um — she didn't seem to have her friends in her life as much as before.  It was mostly revolved around her boyfriend.

Q.    And how did you find out that she was dating the Defendant?

A.    A friend of hers actually told me.  Sherry told me.

Q.    Do you remember when that was?

A.    Hmm, not very long into the school year.  I — maybe — maybe two months into the school year.

Q.    And what did you do when you found out that your sister was dating a senior?

A.    I — again, you know, Leah and I got along very well. I was surprised that she didn't tell me first.  But, she knew

Exhibit 5001 at 424

D3 117                                        Bertrand  D

that I would not be happy.  I was very overprotective of her, watching out for her.  And, I'm also not an idiot and wasn't a fan of — and there is not usually a good reason, in my opinion, for a senior boy to be dating a freshman girl.  And that bothered me.  And she probably knew that would bother me, and so she didn't tell me.  So, I was surprised at that — that she didn't tell me, but I could see why at the same time.

Q.    And did you tell your mother at that time?

A.    Um, yes.  Yes, I did.

Q.    And what was her reaction?

A.    She was none too thrilled either.

Q.    Was there a time when you ever had concerns about Leah being in that relationship with the Defendant?

A.    Several times.  I, um — I told her when I found out that I was not a fan of it.  And she knew at that point, after mom talked to her, that she wasn't a fan of it, as well.  And, um, my mom actually told them that they were not allowed to date.  "You are not going to see him anymore."

And so, they stopped.  And I went over to Sherry's house from the house on Fifth Street, up behind McKay's — Sherry's house was also up behind McKay's — and — to ask her something, and to my surprise they were sitting together on the couch at Sherry's house — Nick and - - -

Q.    (Interposing) When you say - - -

A.    - - - Leah.

Exhibit 5001 at 425

Bertrand  D    D3 118

Q.   - - - "they" you are referring Leah and - - -

A.   (Interposing) Nick and - - -

Q.   - - - Nick?

A.   - - - Leah.  Yeah.

And I looked at her, I'm like, "What are you doing?" And Sherry's mom made the comment that she thought it would be better if they were going to see each other behind people — that they were still being supervised if they were going to hide it.

So, - - -

Q.   (Interposing) Did you tell your mother about that - - -

A.   I sure - - -

Q.   - - - discovery?

A.   I did.  I told her — I told Leah that I wouldn't tell her, but I did tell her because I felt she should know. And she waited awhile before she said anything, hoping Leah would be honest about it.  And I kept encouraging Leah to tell her.

Q.   Did that - - -

A.   (Interposing) (Not understandable) - - -

Q.   - - - eventually happen?

A.   Yes.

Q.   How long after you discovered the two of them were still seeing each other outside of school was it before Leah

Exhibit 5001 at 426

D3 119                                        Bertrand  D

told your mom?

A.    It was a few weeks.  It was a couple weeks.

Q.    Did you ever have an occasion to see Leah after she'd been out on a date or spent time with the Defendant?

A.    Yeah.  Several times.  Uh, sometimes they were awfully short.  She would come in like she was upset, which was unusual because we were pretty good about talking prior about everything together.  You know, "How was your day?  What did you do?  Oh, that would of ticked me off.  Did that tick you off?"  You know, general, throughout the day, how our feelings were.

And there were times where when she would come in it was mostly a storm off to her room.  And I would try to follow her and she'd — "I'm just really tired and. . .", like she — obviously, something negative had happened that she didn't want to discuss with me, which again was unusual for the relationship that we had.

Q.    Did you ever have an opportunity to find her crying in her room?

A.    More than once.

Q.    And what had she been doing prior to your finding her crying in her room?

A.    She had either gotten back from getting dropped off by her boyfriend or had a phone call with her boyfriend, or been at a friend's house and had her boyfriend stop by there.

Exhibit 5001 at 427

Bertrand  D    D3 120

Q.   And how would you describe the relationship between the Defendant and Leah?  Were they equals?

A.   No.

Q.   Who was in control?

A.   I would by far say that Nick was in control of their relationship.

Q.   Are you aware of whether or not he — where he was living that school year?

A.   Where Nick was living?

Q.   Yes.

A.   Yes.

Q.   And where was that?

A.   It's out Baker Road.  Out, uh — if you go over the dike on 42 South, and cut on a sharp left back on Fat Elk Road.  A couple miles out there there is a gravel road that turns off to the right, called Baker Road.

Q.   And are you aware whether or not he had a car?

A.   Yes.  He had a car.  His parents had a couple cars that he'd borrow.

Q.   And I'm going to hand you what's been marked, for identification purposes as State's Exhibit 16, and and ask you if you recognize that?

A.   That is his — that is Nick's blue Mustang.

Q.   Okay.  And State's Exhibit 25?

A.   That is Nick's parents' maroon Thunderbird.

Exhibit 5001 at 428

D3 121                                    Bertrand  D

MS. SOUBLET:    I would offer State's Exhibit 16 and 25.

MS. McCREA:    No objection, Your Honor.

THE COURT:    Received.

(Whereupon Plaintiff's Exhibit Nos. 16 and 25 were received into evidence.)

Q.    Ms. Bertrand, I'm going to hand you State's Exhibits 9, 10, and 11, and ask you to look at those and tell me if you recognize them?

A.    Yeah.  The first one is my grandparents' house on Knott Street.

Q.    (Not understandable.)

A.    As are the other two, yes.

Q.    Okay.  And in Exhibit 11, is there — what part of the house does that show?

A.    No. 9, 10, 11 — so, the back one.

Uh, this is the, um, left side of the house if you are facing the house from the street.

Q.    And is Leah's bedroom window depicted in that?

A.    Yes, it is.

Q.    And where is it depicted?

A.    It is on the second floor, above the tall skinny window, which was my grandparents' bedrooms below.

Q.    I want to take you to the summer of 2000.  Were you working?

Exhibit 5001 at 429

Bertrand   D    D3 122

A.    I was working two jobs.

Q.    And where were those jobs?

A.    I would work part time at the pizza parlor and I would work part time at Hunter's Eatery and Creamery, which was prior to that the Dairy Queen on the main drag.

Q.    And by the "pizza parlor", you are referring to your dad's - - -

A.    (Interposing) Denny's - - -

Q.    - - - restaurant?

A.    - - - Pizza.  Yes.

Q.    What was your job at Denny's?

A.    I was a cook/oven watcher.  And occasionally would help on the front counter, as well.  And, um, as with everybody, you are part of the clean up crew at the end of the night.

Q.    Do you remember what the hours for Denny's Pizza were in the summer of 2000?

A.    Yeah.  We always closed at 11:00, no matter what night of week it was.

Q.    And on June 27, 2000, did you work that day — or, that night?

A.    Yes, I did.

Q.    Do you remember where you were working?

A.    I was working at Denny's.

Q.    Do you remember what time you got home that day —

Exhibit 5001 at 430

D3 123                                    Bertrand  D

or, that night?

A.   Oh, it was — I would say somewhere in the vicinity of 11:45 — 11:30, 11:45.

Q.   Were you scheduled to work the next day on June 28th?

A.   Yes.  Yes, I was.

Q.   Did you remember an occasion when you were woken sometime during the day on June 28th and you didn't want to be?

A.   Yes.

Q.   Can you tell the jury about that?

A.   Um, working, you know, that late you — me at least, you know, wanting a certain amount of hours of sleep to be able to function the next day.  I, um, was awakened somewhere — I would say it was about 8:00 or 9:00 in the morning.  I was still very tired.  I may have been a little earlier than that, so I would say 8:00-ish.

And, um, my window was on the other side of the house, upstairs, which is the right side of the house if you are looking at it and — which is right above the driveway. Nick had come in his blue Mustang that he had the senior writings all over, and they were washing the car in the driveway.  And being loud and playful while doing so, which is normal.  Um, but I was trying to sleep and it woke me up.  And I peeked out and saw that they were cleaning it and goofing off while they were cleaning the car.  And tried to lay back down.

Exhibit 5001 at 431

Bertrand   D     D3 124

Leah, a few minutes later, came upstairs and asked if I wanted to help them.  And the last thing I ever got to say to her was, "No.  I want to sleep."

Q.   How did she react to that?

A.   She seemed — she was like, "Okay.  I'll talk to you later."  And she went back down the stairs and they finished cleaning the car, and then they ended up leaving.

Q.   And did you have an opportunity to see the Defendant that night on June 28th?

A.   Yes.  I, uh, was working at the pizza parlor.  And he came into the pizza parlor a few times, briefly.  He practically ran in and asked if I had seen Leah or heard from Leah, and I told him, "No.  I thought she was with you or at Sherry's house."  And he's like, "Well, I went there to get her and she wasn't there, and I can't seem to find her."  And I didn't think much of it at the time.

Q.   Backing up right there.  Do you remember what time that was?

A.   Hmm, there was more than one time that he came in. I — I would say the first time was somewhere around 8:30, 9:00, 9:30.  Somewhere between 8:30 and 9:30.

Q.   Were you looking at your watch at that time and making note of it?

A.   No.  It was — you know, the routine is typically around 9:00-ish is when we start doing all the — wipe down all

Exhibit 5001 at 432

D3 125                                    Bertrand  D

the tables, filling salt shakers and pepper shakers, and things, and that's what I was out doing when he came in the first time.

Q.   And what did you notice, if anything, about his demeanor that first time?

A.   He was very short of breath and shaking, and anxious, and I found it odd, but didn't think really anything of it, of course, at the time.

Q.   Was there a time when he came back in, too, or you saw him again that night?

A.   Yeah.  He came back in later before we closed.  I think that the time was somewhere closer to the 10:00 mark. Um, it had been — if I remember right, I'm pretty sure, that there hadn't been very people in that night and so we were pretty much all done with our cleanup.  It was just re-cleaning up whatever we had made a mess of if somebody else came in to order a pizza or anything.

Um, and he was of the same demeanor; practically running in, anxious, frantic.  My — and I told him both times, "If I see her, I'll — you know, I'll have her try and call you, you know, and let you know that — where she's at if you are that worried."

Q.   And what was his response to that?

A.   "Oh, okay."  And like ran out the door in mid-sentence and - - -

Exhibit 5001 at 433

Bertrand  D    D3 126

Q. Did you see him again that night?

A. I — you know, I — I know he came in at least twice. I don't recall if it was three times or not.

Q. Did you eventually go back home to the house on Knott Street that night?

A. Yeah. I got home like — you know, somewhere around 11:45-ish.

And, uh, I found it odd that — that he was so worried and didn't know where she was. And I thought she was supposed to be spending the night at her friend Sherry's house. But, I know a lot of times when she goes to a friend's houses, that he would come over and hang out with her there. Or, they would leave for awhile and then he'd bring her back and she finished the night at her friend's house.

So, I peaked in her room. When you go up the stairs, my door was immediately to the left. If you walk around the banister to the right, there is two doors over there. The one on the left was my mom's and the one on the right was Leah's. I peaked in her room and she wasn't in there. There was nothing on in there. And I went back to my bed and lied down thinking, "Yeah. She's at Sherry's house. What's he — what's he so worried about?"

Q. When you say, "There was nothing on in there," are you referring to lights?

A. There was no light on. There was no — a lot of

Exhibit 5001 at 434

D3 127                                    Bertrand  D

times she liked to watch the late night Bob Vila Do It Yourself shows and — which I always thought was hilarious — and then she would watch a lot of the, um — the beauty makeover shows to get tips for her make-up and, you know, things like that.  And there was nothing on.  There was no light on.  There was no TV on.  There was no — there was nothing.  She wasn't in there.

Q.   So, how did you find out that Leah hadn't come home that night?

A.   Well, I — like I said, peaking in the room.  And then I went to bed.  And my mom woke me up to tell me that Leah still wasn't home, and she's not at Sherry's house, and they — she can't find her, and Nick can't find her.  And Nick had come over and the three of us — being my mother, me and Nick — went to the Police Station to file a Missing Persons because we couldn't find her anywhere.

Q.   And that would have been the Coquille Police Department?

A.   Yes.

Q.   And how did that go?

A.   Very horribly.  She — they informed us that they could not report her as a missing person because she was a minor, and typically that they are not actually missing.  That they would have to put her in as a runaway.  And, I, very honestly, told them, "You are crazy.  She is not a runaway.

Exhibit 5001 at 435

Bertrand    D    D3 128

She has nothing to run away from. Everything that she has, wants, and could want is right here. You know, who is she going to run away with? Her boyfriend? He's right here. Who's she going to run away from? You know, we were so close. All of her friends are here. None of her friends know where she's at. What is she running away from?"

They didn't care. They insisted that we put it in as a runaway because that's the typical thing that happens at her age.

Q. Did you have an opportunity on that day — on June 29th — to ask the Defendant what had happened the night before?

A. There was several times that, you know, we tried talking to him — my mother and I both. And he just — he insisted that he went — he dropped her off at Sherry's house. And when he went to pick her up that she wasn't there. That he hadn't seen her and that he had been looking all over for her.

Q. Do you remember if he told you where he looked for your sister?

A. I — I — specifically, no. I know that he — you know, he was rant — rambled on. "I drove all over. I looked at this." But, I remember he had stated he looked at people's houses and on streets in between, but I — what specific houses he said at that time, no, I can't quote you on.

Exhibit 5001 at 436

D3 129                                    Bertrand  D

Q.   Did you ever ask him or did he ever tell you whether or not he came by your house?

A.   He said he had come by.  In fact, I think he said he talked to my grandpa even one time when he knocked on the door, and said that he hadn't seen her come home.

Q.   Did you ever have an opportunity to — did he ever mention doing anything to get Leah's attention at her window?

A.   Yeah.  At one point, he had stated that he had thrown rocks at her window — this picture you handed me here.

Q.   Is that State's Exhibit 11?

A.   Yes.

MS. SOUBLET:    And it's up on the big screen for the jury to see.

Q.   Were there rocks underneath that window?

A.   No.  Between the chimney that you see there and the wall that comes out where the skinny, tall window is, which is where my grandparent's room is, there is a little area there that my grandpa would always plant his tomatoes in.  Every year he planted — he had a garden up on the separate section that he did strawberries in, and green beans, and everything else in, but his tomatoes he always did in that section right there.

Q.   I'm going to interrupt you right there.  Hand you a laser pointer — that little green button right there.  I ask you to point to the jury so they see on Exhibit 11 where you

Exhibit 5001 at 437

Bertrand  D    D3 130

are talking about.

A.    It was in between this brick fireplace that goes into the living room.  And this far window with the wall here, this was my grandparents' bedroom.  There is an opening right here in between the — if you come down this way, this is the green grass walk through that goes clear through to the backyard.  But, this narrow opening right here is where he always planted his tomatoes every year.

Q.    And can you point so the jury can see what you're talking about where Leah's bedroom window was?

A.    Right there.

Q.    Thank you.

A.    Yep.

Q.    After you left Coquille Police Department, did you have an opportunity to drive around with the Defendant looking for Leah?

A.    Many times.  Many, many, many times.

Q.    And how would you describe his demeanor or actions during those times?

A.    He did a lot of talking, but it was mostly about him.  "This my fault.  I can't believe I can't find her.  I shouldn't have — I should have been there.  I should have been there on time.  I should have picked her up earlier.  I should have done this.  I should have done that.  Where — why didn't I come to here and why didn't I look at this place before.

Exhibit 5001 at 438

D3 131                                    Bertrand  D

And why didn't I this."  And it wasn't, uh, "I hope she's okay."  It was all about him and how he should have done this and he would have done that.

Q.   As the investigation into your sister's disappearance continued, were you initially supportive of the Defendant?

A.   Yes.

Q.   Was there a time in the beginning of July when he came to your house after having been interviewed by the police?

A.   Yes.

Q.   And do remember what, if anything, he did while at your house?

A.   He was extremely pale.  And he had both of his parents with him.  And apparently it had gone very negatively, or difficult for him, and he looked ill — like I said, pale.  And the next thing I know he was throwing up in the driveway.  Actually, it was right to the edge of the driveway, which was partially on the neighbors property.

Q.   Did you notice a change in the Defendant after Leah's memorial service?

A.   He was far more distant.  He wasn't, you know, checking in anymore.  He wasn't — there didn't seem to be any sense of support whether him wanting our support, or him — you know, wanting us to give him support.  There wasn't any — it

Exhibit 5001 at 439

Bertrand   D    D3 132

was, "Wow.  We are on our own now.  She's not here.  She's gone and I don't really need to socialize with you guys anymore."

Q.    Did you ever have an opportunity — were you ever asked to identify articles of Leah's clothing, particularly shoes?

A.    Yes.

Q.    And I'm going to show you what's been marked for identification purposes, as State's Exhibit 29, and ask you if you recognize that?

A.    Yes, I do.

Q.    What do you recognize it to be a photograph of?

A.    One of Leah's pairs of Nike tennis shoes.

MS. SOUBLET:     I would offer - - -

A.    (Interposing) Half of the pairs of Leah's Nike tennis shoes.

MS. SOUBLET:     I would offer State's Exhibit 29.

MS. McCREA:     Can — can we confer for just a second?

THE COURT:     (No audible response.)

MS. SOUBLET:     I'll withdraw that request.

And I have no further questions.

THE COURT:     Okay.

Cross?

Exhibit 5001 at 440

D3 133                                    Bertrand  X

CROSS EXAMINATION

BY MS. McCREA:

Q.   Ms. Bertrand, when you were out looking for Leah, the day after she didn't come home with Mr. McGuffin, you were concerned about her whereabouts?  Is that a fair statement?

A.   Absolutely.

Q.   And Mr. McGuffin was concerned about her whereabouts?  Is that a fair statement?

A.   He appeared to be.

Q.   Okay.  When he came to Denny's the night before, on more than one occasion, you've described him as being breathless and — would — would worried be a fair adjective for how he seemed?

A.   Anxious is a better word.

Q.   Anxious.  Okay.  Now, you were working so you couldn't take a lot of time to chat with him.  Is that right?

A.   That's true.

Q.   Because you were cleaning the tables, doing sort of the shutdown of the restaurant?

A.   Correct.

Q.   So, did Nick have an opportunity to tell you that Sherry and Leah had been in a — in an argument?

A.   No.  He told me — no, he didn't tell me.  Sherry told me later.

Q.   Okay.  And at some point, did you or your mom call

Exhibit 5001 at 441

Bertrand  X   D3 134

over to Sherry Mitchell's asking if Leah was over there?

A.   My mom called over there the next morning before waking me up.

Q.   Okay.  And did you find out, then, that next morning that Sherry and Leah had been in an argument?

A.   It wasn't in the morning when I talked to Sherry.  I believe it was actually in the afternoon, Sherry had told me, yes.

Q.   All right.  So — so that same day?

A.   Yes.

Q.   Did you have any discussion with Nick McGuffin about the argument that Sherry and Leah had had?

A.   I don't believe so.

Q.   How long were you and Nick McGuffin driving around looking for Leah?

A.   There was several different occasions.  I — I think — I drove around without him several times, as well.  But with him, there was probably about three to five times, and each time was probably between a half hour to an hour.

Q.   Now, in terms of Nick saying that he had been looking all over for Leah the night of June 28th, he did come into Denny's Pizza at least twice?

A.   Yes.

Q.   And that was over a period of, what, the time separated by maybe an hour, in your recollection?

Exhibit 5001 at 442

D3 135                                    Bertrand  X

A.   Hour to an hour and a half, somewhere in there, yes.

Q.   And in terms of how he was acting, the fact that he would be anxious, would not be unusual given the relationship between Nick McGuffin and your sister Leah, would it?

A.   I'm not — I'm not sure what you are asking there.

Q.   Okay.  Well, didn't Nick McGuffin see himself as Leah's guardian?

A.   I can't say I would use the word "guardian".

Q.   Okay.  Well, I'm looking at a report — an interview with you from July 3, 2000 with William Soul (phonetic) of, I believe, the Federal Bureau of Investigation.  And you were asked why McGuffin would have seemed worried at that point that he did not know where Leah was, and you replied that "McGuffin sees himself as Leah's guardian and he is totally in love with her."  Do you remember - - -

A.   (Interposing) Well, at - - -

Q.   - - - saying that?

A.   - - - point, as I answered her question towards the beginning, I was a supporter of Nick.  And back then, in that time, yes, I probably used — would have used that word.

Q.   Okay.  So, that's what you — you agree that's what you said back on July 3, 2000?

A.   If it's in there, then I probably did, yes.

Q.   Okay.  They did spend a lot of time together, right?

A.   Oh, yes.

Exhibit 5001 at 443

Bertrand  X    D3 136

Q.   And — and some of the time was bad.  You've described how Leah would come home and sometimes be crying.  But some of the time was good, wasn't it?

A.   Yes.

Q.   And they went to the prom together?

A.   Yes, they did.

Q.   And the — the last morning that you saw her, as you've described, they were outside washing the car, and laughing and playing?

A.   Yep.

Q.   And she was happy and in a good mood?

A.   Yes.

Q.   And would it be fair to say that she was devoted to Nick McGuffin?

A.   Very so.

Q.   And he appeared to be devoted to her?

A.   I don't know about that.  There were several times where — when they were hanging or driving around together — spending time together — and they would go where there was a group of his friends at; she was very okay to sit in the car and wait for him to be done socializing with his friends.  And sometimes that was hours, but she could just wait in the car until he was done.  But, if she wanted to go visit with a friend, he certainly didn't wait for her.  It was more of a, "I'll just drop you off and I'll check back and see if you are

Exhibit 5001 at 444

D3 137                                              Bertrand  X

ready later."

        I don't know if I'd call that devotion.

    Q.    All right.  Well, you've also indicated when she would be at a friend's house he would show up to see her?

    A.    Yeah.  Yes, he would.

    Q.    He telephoned her at the house?

    A.    At our house or at the - - -

    Q.    (Interposing) Yeah.

    A.    Yes.

    Q.    And she — would she telephone him?

    A.    Yes.

    Q.    Now, Ms. Bertrand, you indicated that they arrived and you were awakened on June 28th really early, like around 8:00 or 9:00 in the morning?  Is that correct?

    A.    Yes.

    Q.    And how long did they stay at the house, to your recollection?

    A.    Cleaning the car?  They — they probably continued to clean the car for a half hour or so.

    Q.    Okay.  So, you think that they left in the morning around 9:30 or 10:00?

    A.    Best recollection, yes.

    Q.    Did you go to work that day, on the 28th?

    A.    (No audible response.)

    Q.    I should say, what time did you go to work?  Because

Exhibit 5001 at 445

Bertrand  X    D3 138

of course you went to work because Nick came into Denny's.

A.    My shift started at, um, either 4:00 or 5:00.  I was supposed to be there at 5:00, but they kind of had it worked out with me where they would call me if they were getting busy earlier so I could come in earlier to help.

MS. McCREA:    Now, if I could have Prosecution Exhibit 10, please?

Q.    And, Ms. Bertrand, is what's been admitted into evidence as prosecution Exhibit 10.  Is that your grandparents' house on Knott Street?

A.    Yes, it is.

Q.    Is it the same one that we've been talking about?

A.    Yep.

Q.    Does that photograph show the side of the house with Leah's bedroom window?

A.    Yes, it does.

Q.    Okay.  And that is sort of here onto the left side of that?

A.    Yep.

Q.    Okay.  The house next door has a gravel driveway that we can just see in the photograph, right?

A.    Yep.

Q.    And it had that driveway back in 2000?

A.    Yep.

Q.    So, there would have been stones, which Mr. McGuffin

Exhibit 5001 at 446

D3 139                                        Bertrand  X

could have picked up from that driveway and thrown at the window?

    A.   Yes.

        But I — that doesn't — just because there was stones there that he could have thrown, there wasn't any under the window.

    Q.   I understand that.

    A.   Okay.

    Q.   I understand that.  But there were stones close by, - - -

    A.   (Interposing) Yes.

    Q.   - - - just over the fence in the other driveway?

        Now, at the time that Leah was dating Nick, after your mom had approved the relationship — because there was a time when your mom said, "No.  You can't — you can't see Nick"?

    A.   That's right.

    Q.   And they were sneaking around behind her back?

    A.   That's right.

    Q.   And then she relented and said, "Okay.  I — you know, I'm going to let you guys see each other," right?

    A.   That's right.

    Q.   And at that point, were you then — I'm talking about back then, not how you feel now — back then, were you supportive of the relationship?

Exhibit 5001 at 447

Bertrand   X   D3 140

A.   I was leery, but I wanted her to be happy.

Q.   Okay.

A.   So, I didn't fight her on it.

MS. McCREA:   If I can have just a moment, Your Honor?

THE COURT:   You may.

Q.   Ms. Bertrand, just one last question.

On the night of June 28th, the last time that Mr. McGuffin came to see you at Denny's, do you remember him asking you to come out with him to help search for Leah?

A.   No.

Q.   Do you remember that you were going to meet someone else and you said that you couldn't go out with Nick?  That you were meeting a coworker?

A.   After work, that's why I didn't get home until 11:45, is I had gone with a friend because we were done cleaning up at about ten — 11:15 or so.  And so, I was with a friend for a little bit and then got home at a 11:45.  I don't recall telling him that, but I guess I may have.

Q.   Okay.  Thank you.

MS. McCREA:   I have nothing further, Your Honor.

THE COURT:   Redirect?

MS. SOUBLET:   Just briefly.  Thank you, Your Honor.

Exhibit 5001 at 448

D3 141                                    Bertrand  ReD

REDIRECT EXAMINATION

BY MS. SOUBLET:

Q.   Ms. Bertrand, prior to June 28, 2000, had there ever been an opportunity when your sister, Leah, didn't come home and didn't let her mother know where she was?

A.   Absolutely not.

Q.   Thank you.

MS. SOUBLET:    Nothing further.

THE COURT:   You may step down.

Do you want this witness to remain available?

MS. SOUBLET:    No, Your Honor.  Thank you. She may be released.

THE COURT:   Without objection, you are released.

WITNESS:   Thank you.

THE COURT:   Call your next witness.

MS. SOUBLET:    The State calls Stacy Lyons.

JUDICIAL ASSISTANT:   Step into the middle and raise your right hand.

STACY LYONS CRUTCHFIELD

was thereupon produced as a witness on behalf of Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:   Have a seat up here, please.

Exhibit 5001 at 449

Crutchfield  D    D3 142

Go ahead.

MS. SOUBLET:    Thank you.

DIRECT EXAMINATION

BY MS. SOUBLET:

Q.    Ms. Crutchfield, can you state your full name and spell your last for the record?

A.    Yes.   It's Stacy Crutchfield, C-R-U-T-C-H-F-I-E-L-D.

Q.    Ms. Crutchfield, I'm going to ask you to scoot a little bit closer to the microphone, and try and keep your voice up so we can hear you, - - -

A.    (Interposing) Okay.

Q.    - - - and don't have to turn off the AC.

But, your name used to — is your maiden name Lyons?

A.    Yes.

Q.    And how long have you lived in Coos County?

A.    Um, well, I've lived here most of life.  I — I lived here for the first eighteen years and then moved away, and I've been back about three now.

Q.    Okay.  And when you lived here, did you live in Coquille?

A.    Yes.

Q.    Okay.  What schools did you go?

A.    Elementary, I actually started out in Fairview and then I came — I moved into town and came to both Jefferson, Lincoln, the Coquille Middle School, and then Coquille High

Exhibit 5001 at 450

D3 143                                    Crutchfield  D

School.

Q.   And did you know Leah Freeman?

A.   Yes.

Q.   How long had you known Leah Freeman?

A.   Um, we had went to school together since approximately fourth grade.

Q.   And in freshman year of high school, how would you describe your relationship with Leah?

A.   Um, we were friends.  We had classes together and played sports together.  We shared lockers that year and the year before.

Q.   I'm sorry.  You dropped off there at the end.  You shared - - -

A.   (Interposing) Sorry.

Q.   - - - lockers?

A.   Um, yeah.  We shared lockers that year and the year before.

Q.   And the year before you would have been at the middle school?

A.   Yes.

Q.   You say you played sports.  What sports did you play with Leah?

A.   Um, well, in middle school we played basketball together and volleyball.  And I don't — I don't recall in high school playing together.  I'm not sure.

Exhibit 5001 at 451

Crutchfield  D    D3 144

Q.    Did Leah have another — any other circle of friends that she hung out with?

A.    During high school or prior?

Q.    (No audible response.)

A.    Um, during — not for the most part, not until her and Nick got together, and then she hung out with that group of people, as well.

Q.    Okay.  When you say "Nick" are you referring to the Defendant, Nicholas McGuffin?

A.    Yes.

Q.    And how long have you known the Defendant?

A.    I met him eleven years ago when they got together, when I went to high school with them.

Q.    Had you hung out with him or hung out in the circle of people that he hung out with prior to Leah dating him?

A.    Not really.  We were just acquaintances from school.

Q.    And do you know how much older than you he was?

A.    Three years.

Q.    Do you remember when it was that Leah and the Defendant started dating?

A.    It was around October of our freshman year.

Q.    That would have been the school year 1999/2000?

A.    Yes.

Q.    How would you describe, uh, their relationship? Happy?

Exhibit 5001 at 452

D3 145                                    Crutchfield  D

A.   Um, well, at times.  There — she really cared about him a lot.  And you could tell that she really — she really loved him and she was really serious about him pretty quick. Um, but their relationship was also pretty emotional at times. They argued and, um, their arguments could get pretty heated. And, um — so, it seemed like when they were — they were happy, they are happy.  But when they are not, they — they really weren't.

Q.   And prior to Leah dating the Defendant in October of 1999, what had her personality been like?

A.   She was pretty spunky.  She was, um, just kind of fun loving and goofy.  Goofy is always the word I used to describe her because she was kind of silly and — and, um, you know, just — just kind of a happy-go-lucky person.

Q.   And did you notice a change in her after she started dating the Defendant?

A.   Yes.

Q.   And what was that change?

A.   I had never seen her be, um, quite as, I guess, aggressive as — as I did in that relationship.  She would get upset if, um — she — she would get jealous if she thought that he was flirting with other girls.  And, um, she would get really angry about it.  And I had never really seen — I had never really seen her be angry before.  She wasn't really much of an angry person.

Exhibit 5001 at 453

Crutchfield   D    D3 146

Q.    And when you say "angry" what do you mean?

A.    Um, I mean that she would — she would get mad at him because she thought he was flirting with other girls.

Q.    Was there an incident in May of 2000 on the track at the high school?

A.    Yes.  I don't remember what the circumstances were surrounding it, but for some reason she was upset with him. And, um, it was during our PE class.  We were walking around the track together, her and I.  And he had came out on the track because he wanted to talk to her because she was upset with him.  And she started pushing him, and she was yelling at him.  And she kept pushing him, pushing him, and — and me and a couple of the other people were trying to break it up, at that point.  And, um, he — he kind of was just trying to back off and — and kind of hold her back from hitting him.

Q.    Had you ever seen, prior to her dating the Defendant, Leah acting that way?

A.    No.

Q.    Is that a "no"?

A.    No.  Sorry.

Q.    How much — what was the height difference between the two?

A.    Pretty significant.  I would have to say — I mean, her — her head probably went to about his chin.  It was pretty significant height difference.

Exhibit 5001 at 454

D3 147                                      Crutchfield  D

Q.   Do you remember — uh, when was the last time you saw Leah?

A.   It was about a week before she went missing.

Q.   And where were you?

A.   I was living across from her at the time.  And I was at my house and I was getting ready to leave for the summer, and, um, she actually came over to my house to tell me goodbye.  And we talked for a little while, just out on — in front of my place.  And then, Nick pulled up to her grandparents' house, where her and her mom were staying at the time.  And so, we walked over there and talked over there for awhile until I left.

Q.   And did Leah seem surprised to see the Defendant?

A.   Um, I don't — I don't really recall.  I know she wasn't expecting him to be coming.  I mean, she didn't say that she was expecting him to be coming over, but I don't know that I would say she was surprised.

Q.   Thank you.

        MS. SOUBLET:    I have - - -

A.   Uh huh.

        MS. SOUBLET:     - - - nothing further.

                    CROSS EXAMINATION

BY MS. McCREA:

Q.   Do you remember, did she seem pleased to see him?

A.   Um, as I recall, it was more just — just kind of

Exhibit 5001 at 455

Crutchfield  X    D3 148

like, "Oh, there is Nick.  Let's go talk to him."

Q.    All right.  And these — these arguments, like the — the one on the track, Ms. Crutchfield, that — this was not an effort where the two of them tried to go away somewhere private to have a tiff?  Is that right?

A.    They — they did try to walk away from the group of us.  There was — I was walking with Leah and there was a few other people because it was during a class.  And they kind of walked away to talk.  But then when we saw that it was getting heated, then we walked back over there.

Q.    Okay.  So, how many people were in the class?

A.    Oh.  Um, I would — I would have to guess maybe ten or fifteen.  I — I don't know for sure.

Q.    Was it coed or all girls?

A.    Coed.

Q.    Coed.  So, Nick and Leah walk a little ways away and she starts yelling at him?

A.    Uh huh.

Q.    And — and then, she starts pushing him?

A.    Uh huh.

Q.    And he didn't push back, he was just trying to hold her off?  Is that right?

A.    He — yeah.  He had his hands up like he was trying to hold her back from — from pushing.

Q.    And is it fair to say that Nick McGuffin was Leah

Exhibit 5001 at 456

D3 149　　　　　　　　　　　　　　　　Crutchfield  X

Freeman's first real boyfriend?

A.　Um, first serious boyfriend, yes.

Q.　(Not understandable) — that's — that's the word I wanted — first - - -

A.　(Interposing) Uh huh.

Q.　- - - "serious boyfriend".

Okay.  Thanks.

MS. McCREA:　That's all the questions I have, Your Honor.

THE COURT:　Anything else?

MS. SOUBLET:　No, Your Honor.  Thank you.

THE COURT:　You may step down.  You are free leave.

WITNESS:　Thank you.

THE COURT:　Call your next witness.

MS. SOUBLET:　The State calls Donna Dennis.

MR. McCREA:　Your Honor, we do have a matter for the Court in connection with this witness.

There has been a motion regarding the testimony.

THE COURT:　Uh, this — this was the most recent Motion you filed?

MR. McCREA:　Pardon?

THE COURT:　This was the most recent Motion, or the one prior that we heard?

Exhibit 5001 at 457

Dennis        D3 150

MR. McCREA:    I think it's the most recent Motion.

THE COURT:    Let me look at it.  Just a minute.

Well, I think my problem, Mr. McCrea — and I said this at the earlier Hearing — was that the State is going to have to lay a foundation.  And I'm not too sure — are you asking to have that laid out of the presence of the jury?

MR. McCREA:    Yes — yes, Your Honor.

THE COURT:    Okay.

Ladies and gentlemen, I'll ask you to step into the jury room.  Occasionally there are witnesses or evidence that I'm going to have to hear some legal argument before I determine whether you can hear it or not, and it's hard to do that when you are sitting here.  So, I'll ask you to step into the jury room.

(Jury out.)

THE COURT:    Step forward, please, ma'am. Raise your right hand.

DONNA DENNIS

was thereupon produced as a witness on behalf of Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat up here, please.

Exhibit 5001 at 458

D3 151                                              Dennis  D

Go ahead, please.

MS. SOUBLET:    Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. SOUBLET:

Q.   Ms. Dennis, can you state your name and spell your last for the record?

A.   Donna Dennis, D-E-N-N-I-S.

Q.   And how long have you lived in Coos County?

A.   Oh, uh, thirty-eight years.

Q.   You were living here in the school year 1999/2000?

A.   Correct.

Q.   Okay.  And did you have family living with you at that time?

A.   Yes.

Q.   And who was that?

A.   Our grandson.  We raised him.

Q.   Okay.  And what's his name?

A.   Michael.

Q.   What school did Michael go to?

A.   Coquille High School.

Q.   (Not understandable) occasion in the spring of 2000 when you picked him up from high school?

A.   Yes.

Q.   Was that a routine of yours to pick him up?

A.   Yes.  Most generally, yes.

Exhibit 5001 at 459

Dennis  D    D3 152

Q.   And is there an incident that sticks in your memory that happened in the parking lot of the high school?

A.   Yes.

Q.   And can you tell the Judge what that incident was?

A.   Well, I, uh, was sitting in the car waiting for Michael and — teenager watching, which is about the only thing you can do — and I happened to notice a couple coming from the far end of the high school, walking across the parking lot towards the hurricane fenced area where the kids park.  And they were — appeared to be bickering.  And, uh — and I was kind of watching.

And, uh, they got over to the car.  And when they got to the car is — he grabbed her arm and threw her up against the car — or, pushed her up against the car.  I wouldn't say "threw".  Forced her up against the car.

Q.   Do you remember what he looked like?

A.   Not really.

Q.   Do you remember what she looked like?

A.   Lightish-colored hair, medium height.  I was probably halfway across the parking lot, so I didn't — wasn't up close and personal.

Q.   Do you remember, uh, what kind of car?

A.   Uh, it was a sporty number.  I would say either a Camaro, Mustang, something like that.  I'm not a real car expert.  So, - - -

Exhibit 5001 at 460

D3 153                                                      Dennis  D

Q.   Ms. Dennis, I'm going to hand you State's Exhibits 1, 7, and 8 and ask you to look at those, and tell me if you recognize the person in those.

A.   Yes, I do.

Q.   And who do you recognize?

A.   That's Leah Freeman.

Q.   Do you recognize her as being the same person you saw in the parking lot of the high school?

A.   I could not say that.

Q.   Does she appear to match the description of the person you saw in the parking lot?

A.   Yes.

Q.   And prior to the incident in the parking lot at the high school, had you seen or known her before?

A.   Uh, the kids all went to school together, so you knew them as smaller children.  I hadn't seen her in years, so I did not - - -

Q.   (Interposing) I'm showing you what - - -

A.   - - - wouldn't have recognized her.

Q.   I'm showing you what's been received as State's Exhibit 16 and asking you if you recognize that?

A.   I — I, honestly, could not tell you.  It was from the back of the car and I don't remember the color.

MS. SOUBLET:    For purposes of foundation, I have no further questions.

Exhibit 5001 at 461

Dennis   D    D3 154

THE COURT:    That doesn't appear to be enough.

MR. McCREA:    I didn't hear what the Court said.

THE COURT:    I — I said that doesn't appear to be enough.

MR. McCREA:    I agree.

THE COURT:    I — I thought you would, but I — I have to hear from the State.

MR. McCREA:    I'm sorry, Your Honor.

MS. SOUBLET:    Well, Your Honor, I think Ms. Dennis' testimony about Ms. Freeman — recognizing from the pictures, that she matched the general description of the individual in question is sufficient for her to testify about the incident in the parking lot.

THE COURT:    A light-haired teenage girl does not seem to me to be too unusual.

MS. SOUBLET:    Your Honor, she also indicated she was of medium height, which the testimony from both Ms. Bertrand and Ms. - - -

THE COURT:    (Interposing) I think the - - -

MS. SOUBLET:    - - - Crutchfield - - -

THE COURT:    The testimony, as I recall, was that Leah was short, under five foot, which I don't consider medium height.

Unless you have something else, the testimony

Exhibit 5001 at 462

D3 155                                                Zanni   D

won't come in.

                    MS. SOUBLET:     I have nothing further.

                    THE COURT:    You may step down, ma'am.  You

are free to leave.

                    Bring the jury in, please.

                    (Jury in.)

                    THE COURT:    Okay.

                    I've ruled that the testimony of that witness

will not be heard by the jury.

                    Call your next witness.

                    MR. FRASIER:     Thank you, Your Honor.

                    We call Sheriff Zanni.

                          CRAIG ZANNI

was thereupon produced as a witness on behalf of Plaintiff

and, having first been duly sworn to tell the truth, the whole

truth and nothing but the truth, was examined and testified as

follows:

                    THE COURT:    Have a seat here, please.

                    DIRECT EXAMINATION

BY MR. FRASIER:

    Q.   Can you state your name, please, sir, and spell your

last name for the record?

    A.   Craig Zanni, Z-A-N-N-I.

    Q.   And what is your occupation, sir?

    A.   I work for the Coos County Sheriff's Office and the

Exhibit 5001 at 463

Zanni    D    D3 156

citizens of Coos County.

Q.    In what capacity?

A.    I'm the Sheriff and the former Dog Handler and Dog Trainer.

Q.    How long have you been the Sheriff?

A.    Since January 1st of this year.

Q.    Prior to that, sir, were you with the Sheriff's Office?

A.    Yes.  Since 1977.

Q.    Could you tell the jury, please, what you did while you worked at the Sheriff's Office prior to being elected Sheriff?

A.    Uh, prior to being elected Sheriff, uh, my last thirteen years with the Coos County Sheriff's Office, I was the Chief of Investigations.  In 2004 I left and became the Director at the South Coast Interagency Narcotics Team.  I retired from there in 2007 and then became a Special Investigator for the District Attorney's Office in the Coos County Sheriff's Office, and did background investigations for local agencies.

Q.    At some point in time you retired?

A.    I think I did.  I'm not sure at this point.

Q.    And — and — then you came back as the Sheriff?

A.    Yes.

Q.    All right.  Now, I would like to direct your

Exhibit 5001 at 464

D3 157                                                    Zanni   D

attention, sir, to the year 2000.  Where were you assigned at that time?

A.   I was a Chief Investigator for the Coos County Sheriff's Office, a Detective Sergeant.

Q.   And did you become aware, at some point in time, that there was a missing girl here in the Coquille area named Leah Freeman?

A.   Yes.

Q.   And at some point in time did you become involved in this investigation?

A.   Yes.

Q.   And have you been involved in that investigation off and on since that — that time?

A.   Yes, I have.

Q.   Now, directing your attention, sir, to July the 7th of the year 2000, um, were you asked to go to the home of an individual named Jimmy Murphy?

A.   Yes.

Q.   And were you asked to, uh, look into a bedroom that had been associated with Leah Freeman?

A.   Yes, I was.

Q.   And what was your purpose in going there, sir?

A.   To see if there were any items that Leah Freeman had there, or had left there that were of any evidentiary value or might be of evidentiary value.

Exhibit 5001 at 465

Zanni   D    D3 158

Q.   And in the course of looking in this bedroom, did you find what you believed to be property of Ms. Freeman?

A.   Yes, I did.

Q.   I'll show you, first of all, a metal tin box, and ask if you can identify this?

A.   Yes.

Q.   And did you find that box when you were searching this room?

A.   Yes, I did.

Q.   Did you examine the contents inside this box?

A.   Yes.

Q.   Now, I'm going to open the box for you, sir.  Was there inside what appeared to be a diary?

A.   Yes.

Q.   I'll show what's been marked as State's Exhibit 90. Does that appear to be the diary that you saw that was in there?

A.   Yes.

Q.   And were there other notes in there that, uh, appeared to have handwriting on them?

A.   Yes.

Q.   I'll show you what's marked as State's Exhibits — excuse me — 88, 89 and 92.  Were those — appear to be documents that were inside there?

A.   No. 88, yes; 89, yes; 92, yes.

Exhibit 5001 at 466

D3 159                                      Zanni   D

Q.   And State's Exhibit 91, was that also found inside the box?

A.   Yes.

Q.   What did you do with this box after you seized it - - -

A.   (Interposing) Seized it - - -

Q.   - - - (not understandable)?

A.   - - - and they were turned over to the Coquille Police Department.

Q.   And for what reason were they given to the Coquille Police Department?

A.   For review for potential evidentiary value.

Q.   Now, were you also asked to go to 1173 Knott Street?

A.   Yes.

Q.   And what was the reason for you to go there?

A.   To obtain any samples that we could that may contain DNA or information related to the victim that might aid in the search for the victim.

Q.   What type of things, based on your training and experience, would you look for that would have, uh, DNA on it that you could identify, say, for the victim in this case, Leah Freeman?

A.   Uh, bedding, clothing, toothbrush, hairbrush, personal items.  Uh, that the person either handled or would have carried or had on their person.

Exhibit 5001 at 467

Zanni   X    D3 160

Q.   I'll show you now what's marked as State's Exhibit No. 202.  Do you recognize that item?

A.   Yes.

Q.   And did you seize something from the — the bathroom or bedroom of Ms. Freeman?

A.   Yes.

Q.   And what was it that you seized?

A.   Her hair brush.

Q.   And is State's Exhibit 202 the hair brush that you seized?

A.   Yes.

Q.   What did you do with that?

A.   Turned it over to Coquille Police Department.

Q.   Thank you.

        MR. FRASIER:    That's all the questions I have at this time, Your Honor.

        THE COURT:    Cross?

                CROSS EXAMINATION

BY MR. McCREA:

Q.   Sheriff Zanni, just one thing.  You were asked a question — did — about did you believe that this might be Leah — or, did you believe this was Leah Freeman's property — some question of that nature?

A.   Yes.

Q.   Did anyone accompany you on this - - -

Exhibit 5001 at 468

D3 161                                          Zanni   X

A.    (Interposing) Yes.

Q.    - - - destination?

A.    Yes.  There were - - -

Q.    (Interposing) And - - -

A.    - - - family — there were family members present on both occasions.

Q.    You had some family members present?

A.    Yes.

Q.    So, what you did — are you saying what you did was you relied on what they said as to whose property it was?

A.    Yes.

Q.    Okay.  Thank you.

MR. McCREA:    That's all the questions I have.

THE COURT:    Any redirect?

MR. FRASIER:    No, Your Honor.  Ask the witness to be excused.

THE COURT:    Without objection, Sheriff, you are excused from further attendance.

WITNESS:    Thank you, Your Honor.

THE COURT:    Call your next witness.

MS. SOUBLET:    The State calls Officer Tony Wetmore.

ANTHONY S. WETMORE

was thereupon produced as a witness on behalf of Plaintiff and, having first been duly sworn to tell the truth, the whole

Exhibit 5001 at 469

Wetmore   D   D3 162

truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat here, please.

Go ahead, please.

MS. SOUBLET:    Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. SOUBLET:

Q.    Officer Wetmore, can you state your full name and spell your last for the record?

A.    Anthony S. Wetmore.  It's W-E-T-M-O-R-E.

Q.    Officer Wetmore, I'm going to ask you to scoot closer to the microphone and keep your voice up so we don't have to turn the AC off.

A.    Okay.

Q.    And can you tell the Grand — tell the jurors how you are employed?

A.    Uh, with the City of Coos Bay Police Department as a — currently, as a Patrol Officer.

Q.    And how long have you been with Coos Bay PD?

A.    I've been with the Department eighteen years, fifteen as, uh, either a Patrol Officer or an Investigator.

Q.    And in the year 2000, what was your assignment with the Police Department?

A.    I was assigned to the Investigations Unit as a Detective at that time.

Exhibit 5001 at 470

D3 163                                    Wetmore   D

Q.   Okay.  And what is being assigned as a Detective mean?

A.   Uh, our department — as opposed to some that do it like a promotion where you go to investigations until you are promoted upwards, our department, as well as a lot of smaller departments, uh, it's — it's basically a rotation.  You apply, are selected.  Still have to have certain qualifications.  And after a set amount of time — or, usually a set amount of time — typically three years, four years — you'll rotate back to Patrol and somebody else will — will rotate over.

Q.   And in 2000, how long had been in on that rotation of Detectives?

A.   Uh, I had been on the road as a sworn Officer for approximately four to five years at that time.  And I believe I had been in Investigations for maybe a year to two years — maybe a year.

Q.   I'm sorry.  I'm going to have to ask you to speak up.  Was that a year to two years in Investigation, - - -

A.   (Interposing) I — I believe - - -

Q.   - - - at that - - -

A.   - - - so.

Q.   - - - time?

And when were you assigned to assist in the search for Leah Freeman?

A.   Uh, it would have been around the beginning of July,

Exhibit 5001 at 471

Wetmore   D   D3 164

I believe, initially.  On the first of July we were requested.

Q.   Okay.  And on July 28th of 2000 did you have an opportunity to assist the service of a Search Warrant?

A.   Yes, I did.

Q.   And what house were you searching?

A.   Uh, it was the residence where Nick McGuffin lived, as well as his parents, and I believe possibly his brother.

Q.   And where is that residence located?

A.   Uh, it's in Coos County.  It's 56246 Baker Road.

Q.   And who all assisted in the service of the Search Warrant that day?

A.   Uh, there were a number of people.  I couldn't name everybody, obviously.  From our department, Detective Dave Main, Detective Cal Mitts, and myself from Coos Bay.  There were a lot of officers I don't recall from, uh, other members of our Homicide Team, Oregon State Police, Coquille, probably North Bend.  I couldn't tell you everybody that was there, though.

Q.   Were you assigned to work with a particular partner?

A.   Yes, I was.

Q.   And who was that?

A.   Detective Cal Mitts from our department.

Q.   And were you assigned to search a particular area of the residence?

A.   Yes, I was.

Exhibit 5001 at 472

D3 165                                        Wetmore  D

Q.   And where was that?

A.   We were assigned to go through the bedroom of the Nick McGuffin.

Q.   And in going through the Defendant's bedroom, did you have an opportunity to seize items of evidentiary value?

A.   Yes, I did.

Q.   And when you seized those items, what would you do with them?

A.   Uh, place them in a bag to be turned over to the person that was logging the evidence.

Q.   Okay.  And how would you identify those items as having been something that you found?

A.   Uh, typically, if it's an item that I've sealed, I would tape it, would initial it, would date it, and would log it in.  Typically, on a larger case where you've got items of evidence coming in from multiple people they would be turned over to the person logging the evidence — show them what it is — who would fill out the form and the various paperwork that goes with it.

Q.   And did you have a particular way of identifying by numbers or letters items that you found?

A.   Yes.  I — although I — I don't recall on that date if that was an item — if the items that were seized, if I actually was the one to literally close the bag or — it would have been identified by my evidence numbers, which are ASW

Exhibit 5001 at 473

Wetmore   D   D3 166

followed by a sequential number.

Q.   Okay.  Such as 001?

A.   Yes, ma'am.

Q.   Officer Wetmore, I'm going to hand you that, ask you to look inside at the items and tell me if you recognize the items inside that bag?

A.   Yes, I do.

Q.   And what do you recognize those items inside that bag to be?

A.   This is a — this a collection of various notes, letters, things that appear to be to or from Mr. McGuffin.

Q.   And to or — when you say "to or from" they are obviously written by somebody else?

A.   Somebody other than me, yes.

Q.   Okay.  And do you — did you have an opportunity to look at those items and see who they were written by?

A.   Very briefly.

Q.   And who was that?

A.   Some of them were from Nick McGuffin.

MS. McCREA:   I'm sorry.  I — I'm really having trouble hearing you, sir.  Some of those were from where?

WITNESS:   Some of the items appeared to be from Mr. McGuffin - - -

MS. McCREA:   (Interposing) From - - -

Exhibit 5001 at 474

D3 167                                          Wetmore   D

WITNESS:     - - - or - - -

MS. McCREA:     - - - Mr. McGuffin?

WITNESS:    Or, to Mr. McGuffin.

MS. McCREA:     Or, to Mr. McGuffin?   Okay.

WITNESS:    Yes, ma'am.

Q.    Those items that were to Mr. McGuffin, who did they appear to have been written by?

A.    Various people.  No particular person that I recall.  There was just various documents.  Some — there were some notes that were, I believed, signed by Ms. Freeman — by Leah — by the girlfriend.

MS. McCREA:    I'm sorry.  By who?

WITNESS:    By Leah.

MS. McCREA:    Okay.

A.    But I — I don't recall those being the only items that were seized.  I'm sure there were some notes from other people, as well.

Q.    And when you, uh, completed your search of the Defendant's bedroom, did you put those items in the bag as you just previously described?

A.    Yes, I did.

Q.    And labeled them with what evidence number?

A.    ASW-001.

Q.    Thank you.

MS. SOUBLET:    I have no further questions of

Exhibit 5001 at 475

Wetmore    D    D3 168

the witness at this time.

THE COURT:    What was the exhibit number of the bag, or did you have that - - -

MS. SOUBLET:    (Interposing) There isn't an exhibit number of the bag.

THE COURT:    Okay.

Go ahead.

MR. FRASIER:    There are several documents marked as State's Exhibits inside.

THE COURT:    Okay.  That's fine.

Uh, Ms. McCrea?

MR. McCREA:    Could we take just a moment, Your Honor?

THE COURT:    Yes.

MR. McCREA:    Your Honor, we don't — (not understandable).  (Not understandable) items — it's at a time that the Court might be considering a recess anyway — to give us a chance to look at what — what it is - - -

THE COURT:    (Interposing) I'm not considering - - -

MR. McCREA:    - - - inside the bag.

THE COURT:    - - - right now.

Uh, do you know — is there a number — numbers on the reports that you — that you got from the District Attorney?

Exhibit 5001 at 476

D3 169                                          Wetmore   X

Mr. Frasier, Do you know where — where it is?

MR. FRASIER:    To be honest with you, I'll have to double check, but I'm not sure Detective Wetmore wrote a report about the seizure of this.

THE COURT:    Did you write a report?

WITNESS:    I don't believe, so, sir.

THE COURT:    Okay.

MS. McCREA:    That's why we don't have one.

THE COURT:    That's correct.  It doesn't sound like anybody has one.

MS. McCREA:    Okay.

THE COURT:    Do you have - - -

MS. McCREA:    (Interposing) Let me - - -

THE COURT:    - - - any cross?

MS. McCREA:    I have just a couple of questions, Your Honor.

THE COURT:    Okay.

                    CROSS EXAMINATION

BY MS. McCREA:

    Q.   Officer — is it Officer Wetmore?

    A.   Yes, ma'am.

    Q.   Okay.  Officer Wetmore, when you and the other officers executed the search warrant at Mr. McGuffin's residence, was he there?

    A.   I don't recall.  He — he may have been.  I don't

Exhibit 5001 at 477

Wetmore    X    D3 170

recall, specifically, Nick McGuffin.  I do recall, uh, the mother, father — I believe the brother's name was Wayne.  I recall those three being there.  Mr. McGuffin may have arrived during the Search Warrant.  I don't recall him being there when we arrived, though.

Q.   Does it refresh your recollection that Mr. McGuffin actually opened the door for you, that his parents were working?

A.   I don't know that I was there when the door was opened.  I couldn't say who — who answered - - -

Q.   (Interposing) (Not understandable) - - -

A.   - - - it.  But, - - -

Q.   Then, Officer, we won't belabor it any further.

A.   Okay.

Q.   Thank you.

MS. McCREA:    Nothing further, Your Honor.

MS. SOUBLET:    Subject to being recalled later, but I have no further questions for him at this time.

THE COURT:    You may step down.  You are not excused.  You may be called later.

WITNESS:    Yes, sir.

THE COURT:    Okay.

Call your next witness.

MR. FRASIER:    Call Dave Main.

MR. WETMORE:    Your Honor, should I - - -

Exhibit 5001 at 478

D3 171                                    Main  D

THE COURT:    (Interposing) Uh, just give that to Mr. Frasier.

Thank you.

Raise your right hand, please.

DAVID LEO MAIN

was thereupon produced as a witness on behalf of Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat here, please.

DIRECT EXAMINATION

BY MR. FRASIER:

Q.    Could you state your name, please, sir, and spell your last name for the record?

A.    David Leo Main, M-A-I-N.

Q.    And your occupation — what is your occupation at this time, sir?

A.    I drive truck for Main Rock.

Q.    And how long have you been doing that?

A.    Five years, sir.

Q.    Prior to that what was your occupation?

A.    I was a Police Officer for the City of Coos Bay.

Q.    For how long?

A.    Thirty one years, two months.

Q.    And why did you leave?

Exhibit 5001 at 479

Main  D   D3 172

A.   PERS.   They were doing away with the money (not understandable) so I decided it was a good time to leave.

Q.   So you retired?

A.   Yes, sir.

Q.   Now, what type of position did you have with — with the Coos Bay Police Department?

A.   I — upon my retirement, I was Sergeant in charge of Investigations.

Q.   And how long have you been working in Investigations?

A.   Five years.

Q.   Were you working in Investigations in the year 2000?

A.   Yes, sir, I was.

Q.   Now, at some point in time did you and other officers in your department become involved in the investigation of the disappearance of Leah Freeman?

A.   Yes, sir, we did.

Q.   And in particular, did you assist in the execution of a Search Warrant at the home of the Defendant, off of Baker Road, on July 25, 2000?

A.   July 25th?

Q.   Well what — do you recall what day it was?

A.   July 28th of 2000, sir.

Q.   Okay.  I can't read my own writing.  All right.

A.   Yes, sir.

Exhibit 5001 at 480

D3 173                                              Main   D

Q.    July 28th?

A.    Yes, sir, I did.

Q.    And in particular, did you seize any evidence there?

A.    Yes, sir, I did.

Q.    I'm going to show to you this particular bag here. And, actually, I'm going to ask you to open it up, if you will, and ask if you can identify the contents inside there?

There is a book, marked State's Exhibit — I believe it's 93.

A.    State's Exhibit 93?

Q.    Do you recognize that, sir?

A.    Yes, sir, I do.

Q.    And did you seize that particular book?

A.    Yes, sir, I did.

Q.    Where did you find it, to the best of your recollection?

A.    In the residence there was a counter between the kitchen and the living room. And it was lying there on the counter - - -

Q.    (Interposing) (Not understandable) - - -

A.    - - - on the living room side.

Q.    I'll show State's Exhibit No. 33, and ask if you can identify that?

A.    Yes, sir, this is where I located this annual from Coquille High School.

Exhibit 5001 at 481

Main  D    D3 174

Q.   And does State's Exhibit 33 accurately portray how you found this book?

A.   Yes, sir.

MR. FRASIER:    I'd offer State's Exhibit 33.

MR. McCREA:    Your Honor, at this point, there doesn't appear to be any — any relevancy to the issues in this case of being developed by Exhibit 33.  Therefore, we object to it.

THE COURT:    Uh, Mr. Frasier, that's a picture of the annual?

MR. FRASIER:    A picture of where the annual was found.

THE COURT:    Okay.  You are going to introduce the annual?

MR. FRASIER:    I'll be - - -

THE COURT:    (Interposing) Okay.

MR. FRASIER:    - - - introducing annual.  We'll be drawing the jury's attention to specific portions of the annual.

THE COURT:    Okay.  Right now I'll conditionally receive it, in that its being tied up because I think they want to show where it was found, One.  And Two, if the — if the annual is then received in evidence that would be relevant to it.  So, I'll receive it conditionally to it being tied up.

Exhibit 5001 at 482

D3 175                                          Main   X

(Whereupon Plaintiff's Exhibit No. 33 was conditionally received into evidence.)

MR. FRASIER:    All right.

MR. McCREA:    Nothing more, Your Honor.  Thank you.

Q.   Now, in regards to what is marked as State's Exhibit 93, the annual, did you, uh — you seized that?

A.   Yes, sir, I did.

Q.   And you put it into a bag marked with an exhibit number?

A.   Yes, sir.

Q.   And then, what did you do with the item once you had seized it?

A.   It was turned over to the property officer at Coquille Police Department.

Q.   Thank you.

MR. FRASIER:    That's all the questions I have for (not understandable).

THE COURT:    Cross?

CROSS EXAMINATION

BY MR. McCREA:

Q.   Mr. — I guess it's now Mr. Main, formerly Officer Main?

A.   Yes, sir.

Q.   Did you write any report on this search?

Exhibit 5001 at 483

Shinar   D    D3 176

A.   No, sir, I did not.

Q.   All right.

MR. McCREA:    That's all the questions I have.

THE COURT:    Uh, he's released then?

MR. FRASIER:    Yes, please, Your Honor.

THE COURT:    You are free to leave.

WITNESS:    Thank you, Your Honor.

THE COURT:    Call your next witness.

MR. FRASIER:    Thank you, Your Honor.

We'd call Mr. Shinar.

THE COURT:    Sir, if you would step forward, please, right up to the table there and raise your right hand.

ADAM J. BREWER SHINAR

was thereupon produced as a witness on behalf of Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat here, please.

Make sure you remain pretty close to that microphone.

Keep your voice up when you are answering questions.

WITNESS:    Thank you.

THE COURT:    And — and you can move it down.

Go ahead.

Exhibit 5001 at 484

D3 177                                          Shinar  D

MR. FRASIER:    Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. FRASIER:

Q.   Could you state your name, please, sir, and spell your last name for the record?

A.   Adam J. Brewer, B-R-E-W-E-R.

Q.   And do you also go by the last name — a different last name?

A.   Oh, Shinar.  That is my current last name as of the marriage.

Q.   You chose, when you got married, to take your wife's name?

A.   Correct.

Q.   And, sir, where do you reside?

A.   I reside in North Bend.

Q.   How long have you lived in the Coos County area?

A.   Oh, about twenty-two years.

Q.   Did you used to reside in the Coquille area?

A.   Correct.

Q.   And approximately when did you reside in Coquille?

A.   From nine — about '96 to about 2003.

Q.   During the timeframe that you lived in the Coquille area, did you become acquainted with the Defendant in this case, Nicholas McGuffin?

A.   I know of him but we are not friends or anything

Exhibit 5001 at 485

Shinar   D    D3 178

like that.

Q.    How did you know of him?

A.    I knew him through Leah Freeman.

Q.    And did — how did you know Leah Freeman?

A.    I met her through working at Denny's Pizza, which — which was her father, um, Dennis Freeman.  And I met her one day with Mr. McGuffin, also, at the restaurant.  And that's how knew him through her.

Q.    You were aware that they were boyfriend/girlfriend?

A.    Correct.

Q.    Now, directing your attention to April of 2000, did you have an occasion to be at what sometimes referred to as the Fast Mart - - -

A.    (Interposing) Yes, I - - -

Q.    - - - here in Coquille?

A.    Yes, I was.

Q.    And did you see Leah Freeman and the Defendant at the Fast Mart?

A.    Yes, I did.

Q.    Could you describe for the jury, please, what you saw?

A.    At the time, I was returning from an evening function at a church, and I had come up to my car at Fast Mart.  I put my stuff in the vehicle.  And at the time, my wife to be was there working.  And I was approaching the

Exhibit 5001 at 486

D3 179                                    Shinar   D

entrance, and I had noticed Mr. McGuffin — side profile — another gentleman beside him, and somebody they were holding against the ice machine.  And, um, at that time, I just kind of went inside.  Um, as I was passing the door, there was a little bit of conversation going on between two people in that group.  Um, just — just, um, "You need to leave me alone." Things like that.

I don't know really what's going on I'm just there to see my girlfriend at the time, and she was getting ready to get off work.  And so, I wait inside.  We were there talking for a few minutes.  And at the time — after we talked for just a couples minutes, there was a big slam/bang outside.  And me and her went to the door, and there was somebody running off, one person throwing keys through the air, and some screaming going on.

Um, so people have already been dispersed.  And all I's (sic) could see was the back of Leah Freeman's sweatshirt, which was from — her basketball sweatshirt for the school. And that's about all that I do remember of that moment and that evening.

Q.   All right.  So, you saw Ms. Freeman where — where — did you see her prior to you going in the store?

A.   I thought at the time that there was — I know there was three people there.  I did not see exactly who was the third person being pushed against the ice machine.

Exhibit 5001 at 487

Shinar    X    D3 180

Q.    But, after the bang, you did see Leah Freeman?

A.    Yes.  Because her — the back of her jersey — or, her sweatshirt, I should say, says "Freeman" on the back of it, and the letters which was for the Red Devil's basketball, that I remember from when she was in school.

Q.    Did you see the Defendant at that time?

A.    Yes, I did.  He was throwing his keys in the air, um, hollering something.  I don't really remember.  Just some screaming, some things like that.

Q.    Thank you.

MR. FRASIER:    That's all the questions I have of Mr. - - -

THE COURT:    Ms. McCrea?

CROSS EXAMINATION

BY MS. McCREA:

Q.    This was — this was what month — I'm sorry — Mr. — it's Mr. Brewer now, right?

A.    Actually, Shinar.  But, - - -

Q.    (Interposing) I'm sorry.  Mr. Shinar.  I want to get — I want to get the — names are important, Mr. Shinar.

So, this was — I think you said April - - -

A.    (Interposing) Correct.

Q.    - - - of 2000?

A.    Correct.

Q.    Okay.  And you were interviewed by the Coquille

Exhibit 5001 at 488

D3 181                                         Shinar  X

Police Department back in August of 2000?  Do you remember that?

A.   Yes, I do.

Q.   And at that time you didn't say anything to Officer Davis about somebody being pushed up against an ice machine, did you?

A.   No, I did not.

Q.   And what you did say was that you saw keys being thrown across the parking lot?

A.   Correct.

Q.   Now, you testified, also, before the Coos County Grand Jury in August of 2010?  Do you remember that?

A.   Yes, I do.

Q.   And when you testified before the Grand Jury in August of 2010, and you were asked about whether you would recognize Mr. McGuffin, you indicated that you have only seen him from a distance.

A.   No.  It was not the question pertaining to that. That was do I know him?  And I said, "from a distance," which I clearly said already.

Q.   I think the question was, "Did you ever meet him?" And the answer was, "I've only seen him from a distance."

A.   No.  That — that was question wasn't answered that way.  I said, "I know him from a distance."

Q.   "I know him from a distance"?

Exhibit 5001 at 489

Shinar    X    D3 182

A.    Uh huh.

Q.    (Simultaneously) Okay.

Do you recall also testifying that you had never really seen Leah Freeman and Nick McGuffin together?  The only time you had seen her was like when you were on shift at Denny's Pizza?

A.    No.  That's not correct.

Q.    That's not what you said?

A.    No.

Q.    Okay.

MS. McCREA:    Your Honor, I — I need to — I need to pull the Grand Jury testimony.  And I believe this is the State's last witness for the day.  So, if we could take our afternoon recess, I will pull that.

THE COURT:    Okay.  We'll take a recess hopefully for no more than fifteen minutes.

If you would step into the jury room, please.

(Jury out.)

You can step down for the moment, sir.  Don't leave.

WITNESS:    Back in the hall?

THE COURT:    Yeah.  You'll be called back.

Is this going to be your last witness today?

MR. FRASIER:    We have one more that we can call.

Exhibit 5001 at 490

D3 183                                           Shinar  X

THE COURT:   Okay.  I want — I want it called. So, we — I realize it's hard to schedule these people sometime, but I would hope that we could have full days.

MR. FRASIER:   Well, - - -

THE COURT:   (Interposing) Okay.

MR. FRASIER:    - - - so do we.

THE COURT:   Okay.  Uh, we'll be in recess for about fifteen minutes.

(RECESS)

(Jury in.)

JUDICIAL ASSISTANT:   All rise.

THE COURT:   Be seated, please.

Go ahead, Ms. McCrea.

MS. McCREA:   Thank you, Your Honor.

CROSS EXAMINATION (CONTINUED)

BY MS. McCREA:

Q.   Okay.  Mr. Shinar, you — do you recall testifying before the Coos County Grand Jury on August 4th of last year, 2010?

A.   Yes, I do.

Q.   And that was the Grand Jury looking into the disappearance and death of Leah Freeman?

A.   Correct.

Q.   And you were placed under an oath just like you were today?

Exhibit 5001 at 491

Shinar   X    D3 184

A.    Yes, I was.

Q.    You were sworn to tell the truth?

A.    (No audible response.)

Q.    Yes?

A.    Yes.  Correct.

Q.    And you were asked questions by Mr. Frasier at that time, during the Grand jury — the same prosecutor who is here with us today?

A.    Correct.

Q.    At the same time you were also asked some questions by Grand Jurors in that proceeding?  Is that right?

A.    I don't remember being asked by too many Grand Jurors during that proceeding at all.

Q.    And I'm going to ask you again.  Do you remember being asked the question, "Would you have recognized Nick if you saw him at that time?  Did you ever meet him?"  And you answering, "I've only seen him from a distance.  So, that's all I know there.  I never really seen them together.  The only time I've seen her was like when I was on shift at Denny's Pizza."

A.    Yeah, that — part of that is correct, yes.  But not a hundred percent.

Q.    Okay.  Mr. Shinar, I have the tape recording - - -

A.    (Interposing) Uh huh.

Q.    - - - of that Grand Jury Proceeding with that

Exhibit 5001 at 492

D3 185                                        Shinar  X

question and that answer.  And I'm hoping you are going to be able to hear it.

Here we go.

(Whereupon a portion the audio recording of the Grand Jury Proceeding is played for the witness as follows:)

"I never really seen them together.  The only time I've seen her was like when I was on shift at Denny's Pizza."

A.   Oh, I remember that part of the conversation, yeah. But, it's not hundred percent of what you asked me a moment ago — when I was here a minute ago.  You asked me if I - - -

Q.   (Interposing) (Not understandable) - - -

A.   - - - ever or not have meet — met him.  And that — that was not clearly anything said there.  It was all jarble.

Q.   You did not understand this?

A.   No.  I remember — I could hear half of it.  But, the first part was like — the (not understandable) part was like all just jumbled.

Q.   Could you hear your answer, - - -

A.   (Interposing) Yes, - - -

Q.   - - - Mr. Shinar?

A.   - - - I could hear my answer, - - -

Q.   (Interposing) And what did - - -

A.   - - - as what I replied to.

Q.   All right.  And was your answer the same as what I

Exhibit 5001 at 493

Shinar   ReD  D3 186

just quoted to you a moment ago?

Would you like me to read it to you again?

A.   You can read it to me again.  I can try to see what you want me to answer to.

Q.   My question is were you asked the question and did you give the answer that you just heard on this tape recording?

A.   Yes, that is correct to that particular part of the question.  But, you asked a two-part question earlier.

Q.   Okay.  I'm not dealing with earlier.  I'm dealing with since Court has reconvened.

A.   Okay.  Great.

Q.   So, are we on the page since - - -

A.   (Interposing) I hope so.  Because I didn't say everything you said earlier.

Q.   Okay.  Mr. Shinar, let me withdraw what I asked you earlier.

A.   Uh huh.

Q.   Let's just deal with what we've talked about since Court reconvened.

A.   Uh huh.

Q.   Did you — were you asked the question and did you give the answer that you had only seen Nick from a distance and what was played on the tape here?

A.   Yes.  That is correct.

Exhibit 5001 at 494

D3 187                                                  Shinar   ReD

Q.   Okay.  Thank you very much.

MS. McCREA:    No further questions for this witness, Your Honor.

THE COURT:    Redirect?

REDIRECT EXAMINATION

BY MR. FRASIER:

Q.   Mr. Shinar, when you testified at the Grand Jury last August, did I also ask you about seeing Ms. McGuffin — Ms. Freeman and Mr. McGuffin at Denny's Pizza?

A.   Yes.  Correct.

Q.   Did I ask you if you had seen them be in an argument there at the pizza place?

A.   Correct.

Q.   Did you describe a — recalling something occurring around the video games?

A.   Correct.  Um, as you go to Denny's Pizza, there is a video game.  It's in the middle.  And there is a corridor that leads up there.  At the time that I was there — it wasn't that I was working there at that time at all.  This was just shortly before April that I had seen the two arguing in the hallway.  Her arms went up and then she ran after him.  But, that's the only thing I seen there.

Q.   Thank you.

MR. FRASIER:    That's all I have.

THE COURT:    You may step - - -

Exhibit 5001 at 495

Smith   D    D3 188

MS. McCREA:    (Interposing) (Not understandable) - - -

THE COURT:    - - - step down.  You are - - -

WITNESS:    (Interposing) Okay.

THE COURT:    - - - released from further attendance.

WITNESS:    Alrighty.  Thank you.

THE COURT:    Call your next witness.

MS. SOUBLET:    The State call Officer Pat Smith.

THE COURT:    Raise your right hand, please.

PATRICK DEXTER SMITH

was thereupon produced as a witness on behalf of Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat up here, please.

WITNESS:    Thank you, sir.

DIRECT EXAMINATION

BY MS. SOUBLET:

    Q.   Officer Smith, can you state your name and spell your last for the record?

    A.   Patrick Dexter Smith, S-M-I-T-H.

    Q.   And how are you employed?

    A.   I'm a Police Officer with City of Coquille Police

Exhibit 5001 at 496

D3 189                                              Smith  D

Department.

Q.    How long have you been with Coquille PD?

A.    Since March 2005.

Q.    Okay.  Do you have any prior law enforcement experience?

A.    I do.

Q.    And where was that?

A.    In the City of Coburg, in the City of Oakridge, and in California.

Q.    Okay.  So, how many total years law enforcement experience?

A.    Somewhere in the neighborhood of a little over fifteen years.

Q.    I'm sorry.  Did you say fifteen?

A.    Fifteen.

Q.    And what's your current assignment at Coquille Police Department?

A.    I'm a Patrol Officer.

Q.    Okay.  Do you have any other special duties that you do for the Police Department?

A.    I'm a Evidence Custodian.

Q.    Can you tell the — the jurors what an Evidence Custodian does?

A.    It's my task to make sure that the evidence that's logged in is what the officer says is prop — it's properly

Exhibit 5001 at 497

Smith   D    D3 190

packaged in some type of integrity packaging.  And then, depending on what the officer requests, whether it be shipped off to the lab for further testing, some other facilities for additional testing, or lodged into evidence and then held for Court.  And then, I release property from the evidence room for — for Court purposes or other purposes.

Q.    And do you keep, in the normal course of Police Department business, any records or logs of items that come into evidence and when they leave (not understandable)?

A.    I do.

Q.    How long have you been the Evidence Custodian?

A.    Uh, since December 2008.

Q.    And at that time was the Coquille Police Department located in the same building it's located in now?

A.    Uh, since December 2 — yes, it was.  Since the — since the time I've been the Evidence Custodian.

Q.    And prior to that, when you started in March of 2005, was it located someplace different?

A.    It was.

Q.    Was there a time when you moved?

A.    We did.

Q.    And when do you — when was that?

A.    That was around August 2007, September 2007, somewhere in that time period.

Q.    And during that move — do you remember what day of

Exhibit 5001 at 498

D3 191                                          Smith   D

the week the move occurred on?

A.   Uh, we finalized moving — the evidence room was the last thing that we moved from the old City Hall, which was on a Friday.  Uh, sometime during that time period.

Q.   And where is the evidence room located at the new location — the credit union building?

A.   Um, it's in kind of a basement area underneath the City Manager's Office.

Q.   And how does one access that — that room?

A.   There is a single-door entrance just outside the drive-thru area of the City Hall.

Q.   And did you notice anything or have any concerns about that evidence room when you did the move from the old City Hall to the credit union building.

A.   Well, there were a couple things.  Number One, when we moved in there, there wasn't any electrical supply outlets for inside the room.  Um, and then there was — the exterior door that was on the evidence room had the hinges on the outside of the door, which would make it easy for anyone to be able to come through and pop the hinges out, remove the door, and gain access.

Q.   Did you do anything to rectify that problem with the door?

A.   I did.

Q.   And what was that?

Exhibit 5001 at 499

Smith   D    D3 192

A.   I went to the Coquille Supply and purchased a door — a metal door, and installed it on the inside of that same door jamb so there would be a door with an inside swing with a deadbolt on it, and then the door on the outside.  So, there is actually two doors on one door jamb.

Q.   And do you remember how — you indicated you had a dead bolt?  Is that correct?

A.   Yes.  There is a dead bolt.

Q.   And who had keys to the evidence room over that weekend?

A.   Myself and Officer Randy Ulmer.

Q.   And were you, prior to finishing up your work week that week, able to move all the evidence from the old location to the new location?

A.   Yes.  We did it all in one day.

Q.   And as part of that move, was there any sort of refrigeration source?

A.   There was.

Q.   Okay.  And what's kept in the refrigerator?

A.   Uh, generally, evidence from biohazardous type materials.

Q.   And where was that item placed?

A.   That was placed inside the evidence room.

Q.   Was there ever an opp — ever a time during that move, from the old location to the new location, that that

Exhibit 5001 at 500

D3 193                                        Smith  D

refrigerator was left outside, unattended, and unsecured?

A.    No.

Q.    And how long was it before you were able to get an electrical socket in that room?

A.    We'll we moved in on that Friday.  I worked in the evidence room most of that weekend securing that new door. And it was that Friday when I realized there wasn't electrical outlets, so I talked with the Director of Public Works.  And he got a hold of an electric company and they were there the following Monday.

Q.    And when you returned to work on Monday, did you have an opportunity to observe the refrigerator?

A.    I did.

Q.    Was it still secured?

A.    It was still secured.

Q.    Was there anything else you noticed about it?

A.    I noticed some drainage coming from the refrigerator.

Q.    And who was the Evidence Custodian at that time?

A.    Randy Ulmer.

Q.    Was there ever an opportunity after you moved from the old location to the new location for there to be an audit conducted of the evidence?

A.    There was.

Q.    And when was that?

Exhibit 5001 at 501

Smith   D    D3 194

A.    That was sometime during the January — or, December/January — well, December 2008, January 2009, somewhere in that area.

Q.    Now, as a result of that audit, are you aware of any problems with evidence related to the Leah Freeman case being missing?

A.    Everything was accounted for.

Q.    When you started at the Coquille Police Department back in March of 2005, were you aware of or assigned to the Leah Freeman case at that time?

A.    No.

Q.    Okay.  When did you become assigned to it?

A.    Well, I don't think we — really anyone was specifically assigned to it until after Chief Mark Dannels arrived here in Coquille.  Um, we specifically had material and documents, and things of that nature, that I would put together periodically.  Uh, but not until after Chief Dannels arrived did we actually, specifically, start the investigation again.

Q.    When you say "materials and documents" are you referring to police reports or evidence?

A.    Police reports.

Q.    And when you say "put them together" what do you mean?

A.    Well, when we first — when I first arrived here in

Exhibit 5001 at 502

D3 195                                        Smith   D

March of 2009, a variety of officers had come and gone through the Coquille Police Department.  So there was a variety of documents, police reports, follow-up sheets, notes, things of that nature were placed in different offices and things of that nature in the Police Department.

Q.   I'm sorry, Officer Smith, did you say when you arrived in March 2009 or 2005?

A.   I'm sorry.  March of 2005.

Q.   So, when you say you started gathering reports, how long did it take you to put those reports together in one place?

A.   Off and on through the course of a couple years.

Q.   Was this the only case that you were working on at that time?

A.   No.

Q.   Was there — this the only case that anyone in the department was working on at that time?

A.   No.

MS. McCREA:    May I have Exhibit 82?

Q.   Officer Smith, I'm going to hand you what's been marked as Exhibit 82.  I believe it's your Evidence Item No. 159.  And ask if you can tell me when that item was lodged into evidence at the Coquille Police Department?

A.   It was lodged into evidence on July 1, 2000.

Q.   And do you show in your records that item ever

Exhibit 5001 at 503

Smith   D    D3 196

having been released?

A.   No, ma'am.

Q.   And how can you verify or assure that it's the same exhibit?

A.   Uh, the evidence tape was placed on the evidence — top of the envelope.  And this is a specialized integrity tape.  You can't break the seal — you can't open the envelope without breaking the seal.

Q.   And did you have an opportunity to open Item No. 159, in preparation for this Trial?

A.   Yes, ma'am.

Q.   And inside that is there an exhibit sticker on the item inside?

A.   There is.

Q.   And what's that exhibit sticker number?

A.   State's Exhibit 82.

Q.   Thank you.

        MS. McCREA:    Put that back, please.

Q.   Mr. Smith, I'm going to hand you what's been marked as State's Exhibit — I believe it's your Evidence Item   No. 160 — and ask if you can tell me when that item came into evidence at Coquille Police?

A.   On July 4, 2000.

        THE COURT:    I'm sorry.  The exhibit number, again?

Exhibit 5001 at 504

D3 197                                          Smith  D

WITNESS:    Exhibit No. is — Exhibit No. 96.

THE COURT:    Thank you.

Sorry.

Q.   Your Evidence Item No. is - - -

A.   No. 160.

Q.   Okay.  And do you show that item as ever having been released or returned to the Police Department?

A.   I do, on several occasions.

Q.   Okay.  Can you tell the jury when that was?

A.   It was released and sent to the Crime Lab, to Oregon State Police, on March 10, 2000.  It was returned from the lab on September 29, 2000.  It was released and shipped to the United Kingdom on March 25, 2001.  It was returned to Coquille Police Department on March 25, 2010.  It was shipped to Micro Trace on May 19, 2010.  Returned on April 8, 2011.  Released for forensic examination by — to Kenn Meneely on — on May 28, 2011.  And returned it back to evidence on June 8, 2011.

Q.   And again, as with the previous item, how can you assure or verify that this exhibit is in the same condition — same item - - -

A.   (Interposing) It has the original packaging — um, the original tag, and it would have been sealed with integrity tape on multiple occasions.

Q.   Officer Smith, in reference to Exhibit 96, can you

Exhibit 5001 at 505

Smith   D    D3 198

tell me when the first day was you show it leaving Coquille Police Department?

A.    On March 10, 2000.

Q.    Okay.  Officer Smith, do you have copies of the documents you prepared for Trial today?

A.    I do, here.

Q.    Okay.  I'm asking you — we are looking at Evidence Item No. 160.  And can you tell me when the first time that item came in to Coquille Police Department?

A.    It came into Coquille Police — I'm sorry — on July 4, 2000.

Q.    Okay.  And when was the first time it was released from the Coquille Police Department?

A.    July 10, 2011.

Q.    Okay.  I'm going to show you what's been marked, for identification purposes, State's Exhibit 97.  I believe it's your Evidence Item No. 170.  And as you if you can tell me when that item came into evidence?

A.    That item came into evidence, lodged on July 5, 2000.

Q.    And do you — when do you show that item having been released from Coquille Police Department?

A.    July 10th of 2000.

Q.    And when was it returned?

A.    September 29, 2000.

Exhibit 5001 at 506

D3 199                                          Smith   D

Q.   Can you go through the other times that item was released and returned to the Coquille Police Department?

A.   Released on March 25, 2001.  Returned on March 15, 2010.  Released on May 19, 2010.  Returned on April 8, 2011.  Released on May 28, 2011.  And returned on June 8, 2011.

Q.   And, Officer Smith, those times, you are talking about Exhibit No. 97, your Evidence Item No. 170, being released.  Where was it released to?

A.   The first time the evidence was released was to the Oregon State Crime Lab.  The second time it was released, was sent to United Kingdom.  The third time it was released it went to Micro Trace.  And the final time it was released it went out to Kenn Meneely for forensic examination.

Q.   And how can you verify or assure that that a — Exhibit No. 96, your Evidence Item No. 170, is the same item?

A.   It has the original packaging material, it has the original tag from the evidence, and it's been sealed every time with evidence tape.

Q.   Officer Smith, I'm showing you what's been marked, for identification purposes, State's Exhibit 202, your Evidence Item No. 168.  And ask me (sic) if you can tell me when that item was lodged into evidence at Coquille Police Department?

A.   Item No. 168 was lodged into the Coquille Police

Exhibit 5001 at 507

Smith    D    D3 200

Department on July 5, 2000.

Q.    And do you show this having been released to anyone?

A.    It was released to the Oregon State Crime Lab on July 10, 2000.

Q.    And when was it returned?

A.    It was returned on October 13, 2000.

Q.    And when was the next time that item was released?

A.    It was released to the United Kingdom on March 25, 2001.

Q.    And when was it returned?

A.    It was returned to the Coquille Police Department on March 15, 2010.

Q.    And how can you assure that that Exhibit 202, your Evidence Item No. 160, is in the same condition?

A.    They have the same original packaging material and it's been secured with evidence tape — has the original tag still on it.

Q.    Officer Smith, I'm handing you what's been marked, for identification purposes, State's Exhibit 203, your Evidence Item No. 171.  Asking you if you can identify that for me?

A.    Item 171 is one toothbrush from the victim.

Q.    And when do you show that item as having been lodged into Coquille Police Department evidence?

A.    It showed being lodged in on July 11, 2000.

Exhibit 5001 at 508

D3 201                                          Smith   D

Q.   And do you show that item as having been released to anyone?

A.   I do.  I show it was, um, released to the Crime Lab in, uh, — July 10, 2000.  It was returned from the crime lab on September 29, 2000.  It was again released to United Kingdom on March 25, 2001.  And returned to the Coquille Police on March 15, 2010.

Q.   And how can you assure that your Item No. 171 is in the same condition?

A.   It's in the original packaging.  And it still has the originally evidence tape and tag on it.

Q.   Officer Smith, I'm handing you what's been marked, for identification purposes, as State's Exhibits 204 and 205 — your Evidence Items No.'s 182 and 183 — and ask you if you can tell me when those items came into the Coquille Police Department?

A.   Item No. 182 was lodged in on July 19, 2000.  And our Item No. 183 was lodged into evidence on July 24, 2000.

Q.   And when was Evidence Item No. 182 released?

A.   It was released to the Oregon State Crime Lab on July 24, 2000 and returned on September 29, 2000.

Q.   What about Evidence Item No. 183, Exhibit 205?

A.   It was also released to the Crime Lab on July 24, 2000 and returned on September 29, 2000.

Q.   And what is Exhibit No. 204, your Evidence Item

Exhibit 5001 at 509

Smith    D    D3 202

No. 182?

A.    No. 182 is, uh, from Cory Freeman, and it is a DNA sample.

Q.    And what is Exhibit 205, your Evidence Item No. 183?

A.    It's also a DNA sample from Dennis Freeman.

Q.    And how can you assure that those two exhibits are the same exhibits?

A.    It's in the original packaging and it's still secured with evidence tape.

Q.    Officer Smith, I'm handing you what's been marked, for identification purposes, as State's Exhibit 206, your Evidence Item No. 190.  Asking you, first, to identify that for me and tell me what it is.

A.    No. 190 it's a mouth swabs and pubic head standards.

Q.    From?

A.    From, uh, Mr. Nick McGuffin.

Q.    And when was Evidence Item No. 190, Exhibit 206, lodged in the Coquille Police Department?

A.    It was lodged on July 28, 2000.

Q.    And when was it released to the crime lab?

A.    It was released to the Oregon State Crime Lab on March 28, 2000.  Returned on September 19, 2000.

Q.    Officer Smith, I'm going to back you up there - - -

A.    (Interposing) I'm sorry.

Q.    - - - and ask you to look at your documents again

Exhibit 5001 at 510

D3 203                                              Smith  D

and tell me when it was released to the Crime Lab?

A.   Again, my records — my note says, "Crime Lab Oregon State Police on July 28, 2000."

Q.   Okay.  And when was it returned from the Crime Lab?

A.   September 19, 2000.

Q.   And when was it released to the United Kingdom?

A.   On March 25, 2001.

Q.   And when was it returned?

A.   On March 15, 2010.

Q.   Officer Smith, I'm going to hand you your Evidence Item No. 192.  And ask you to tell me when that item was lodged into evidence at Coquille Police Department?

A.   On July 29, 2000.

Q.   Okay.  And do you ever show records of that item having been released to anyone?

A.   No.

Q.   I'm going to ask you to look inside exhibit — your Evidence Item No. 192 and tell me if there are documents in there with exhibit stickers on them?

A.   There are.

Q.   Okay.  And can you read what those exhibit stickers are?

A.   State's Exhibit No. 80, 85, 86, 87, and 228.

Q.   And Officer Smith, how do you know that your Item No. 192 is in the same condition as it was when it was

Exhibit 5001 at 511

Smith  D    D3 204

received?

A.    It's in the same packaging in there that has evidence tape on it.

Q.    Okay.  And did you have an opportunity to open up that bag in preparation for this Trial?

A.    I did.

Q.    And are the contents in similar — the same condition as when you opened them last week?

A.    Yes.

Q.    I'm handing you your Item No. 199, Exhibit No. 93, and ask me — if you can tell me when that item came into evidence at Coquille Police Department?

A.    Lodged into evidence on July 29, 2000.

Q.    And inside that bag is there a item with an exhibit sticker on it?

A.    There is.

Q.    What's that exhibit sticker?

A.    State's Exhibit No. 93.

Q.    Did you ever show that item having been released from Coquille Police Department?

A.    I do not.

Q.    How do you know it's the same exhibit as it was when it was lodged?

A.    It has the same packaging material is in here as it was before.

Exhibit 5001 at 512

D3 205                                              Smith   D

Q.   Officer Smith, I'm going to hand you what's been marked, for identification purposes as State's Exhibit 98, your Evidence Item No. 212.  And ask you if you can tell me when that item was lodged into evidence?

A.   This was item was lodged into evidence on August 4, 2000.

Q.   And what is your Evidence No. 212, State Exhibit 98?

A.   Blue jean pants.

Q.   Okay.  And when were those items (sic) released from your custody?

A.   Was sent to the Oregon State Crime Lab on August 9, 2000.

Q.   And when — were they returned?

A.   They were not returned.  They were released subsequently from that location on March 25, 2001 to United Kingdom.

Q.   And when were they returned from the United Kingdom?

A.   On March 15, 2010.

Q.   And when were they shipped to Micro Trace?

A.   On May 19, 2010.

Q.   And when were they returned?

A.   On April 8, 2011.

Q.   And were they sent anywhere else after that?

A.   They were sent to Kenn Meneely for forensic examination on May 28, 2011 and returned on June 28, 2011.

Exhibit 5001 at 513

Smith   D    D3 206

Q.    And how can you be sure that that exhibit is the same exhibit - - -

A.    (Interposing) I'm sorry.  Just to clarify that.  I read the wrong date on this.  They were returned to Coquille Police on June 8, 2011.

Q.    Thanks for that clarification.

And how can you be sure that that Evidence Item No. 212, Exhibit 98, is in the same condition?

A.    It's in the — has the original packaging material with it, and still secured with evidence tape.

Q.    Officer Smith, I'm handing you what's been marked, for identification purposes, as State's Exhibit 99, your Evidence Item No. 213.  And ask if you can first tell me — identify what that is?

A.    This is a tank top.

Q.    Okay.  And when was that item lodged into Coquille Police Department custody?

A.    On August 4, 2000.

Q.    And when was it sent to the Crime Lab?

A.    Sent to the Crime Lab on August 9, 2000.

Q.    And when was it released from there to the United Kingdom?

A.    On March 25, 2001.

Q.    And when was it returned from the United Kingdom?

A.    On March 15, 2010.

Exhibit 5001 at 514

D3 207                                                    Smith   D

Q.   And when was it shipped to Micro Trace?

A.   On May 19, 2010.

Q.   And when was it returned from Micro Trace?

A.   On April 8, 2011.

Q.   And when was it sent to Mr. Meneely and returned to from Mr. Meneely?

A.   It was picked up by Mr. Meneely on May 28, 2011 and returned on June 8, 2011.

Q.   And how can you be sure that Evidence Item No. 213, Exhibit 99, is the same exhibit?

A.   It has the originally packaging and still has evidence tape secured.

Q.   Officer Smith, I'm going to hand you what's been marked, for identification purposes, as State's Exhibit 100, your Evidence Item No. 213.  And ask you, first, if you could tell me what that is?

A.   This is a sports bra.

Q.   And when was that item received first into Coquille Police Department custody?

A.   On August 4, 2000.

Q.   And when was it sent to the Crime Lab?

A.   On August 9, 2000.

Q.   And when was it released and returned to and from the UK?

A.   It was released on March 25, 2001 and returned on

Exhibit 5001 at 515

Smith   D    D3 208

March 15, 2010.

Q.   And when was it shipped to and returned from Micro Trace?

A.   It was released on May 19, 2010 and returned on April 8, 2011.

Q.   And when was it sent to Mr. Meneely and returned from Mr. Meneely?

A.   It was picked up on May 28, 2011 and returned on June 8, 2011.

Q.   And how can you be sure that Item No. 214, Exhibit 100, is the same?

A.   It has the original packaging material and it's still secured with evidence tape.

Q.   Officer Smith, I'm handing you what's been marked, for identification purposes, as State's Exhibit 201, your Evidence Item No. 215.  Asking you, first, to identify that for me.

A.   Item 215 is a left sock.

Q.   And when was that item lodged into Coquille Police Department evidence?

A.   On August 4, 2000.

Q.   And when was it released to the Crime Lab?

A.   On August 9, 2000.

Q.   And when was it sent to and returned from the UK?

A.   Released on March 25, 2001.  And returned on

Exhibit 5001 at 516

D3 209                                                Smith  D

March 15, 2010.

Q.    And how can you be sure that that item is Exhibit No. 201, your Evidence Item No. 215, is the same?

A.    It's still in the original packaging material and still secured with evidence tape.

Q.    Officer Smith, I'm handing what's — your Evidence Item No. 167.  Asking you, first, if you can identify what that is?

A.    It's a metal box containing the victim's diary.

Q.    And when was that item lodged into evidence?

A.    It was lodged on July 7, 2000.

Q.    And do you ever show that item being released?

A.    It was released to the Case Officer on March 15, 2001.  And it was returned back to the evidence room on March 16, 2001.

Q.    And how can you be sure that, uh, exhibit — your Evidence Item No. 167, Exhibit 90, is the same?

A.    It still has the — the original tag and still secured with evidence tape.

Q.    Officer Smith, I'm going to ask you to pull out the tin, open it up — the inside of it — and tell me if there are items in there with exhibit numbers on them.

A.    State's Exhibit 9-0, State's Exhibit 88, State's Exhibit 89, State's Exhibit 92, and State's Exhibit 91.

Q.    And how can you be sure that those exhibits, your

Exhibit 5001 at 517

Smith    D    D3 210

Evidence Item No. 167, are in the same condition?

A.    They are in the original packaging with, uh — secured with evidence tape.

Q.    Officer Smith, I'm going to hand you your Evidence Item No. 3873.  Ask you if you can open that up and tell me, are there documents inside with exhibit stickers on them?

A.    You ask that I open this up?

Q.    Yes.  Are there documents inside with exhibit stickers on them?

A.    There are.

Q.    And what are those exhibit stickers?

A.    State's Exhibit 83 and State's Exhibit 84.

Q.    And when were those documents lodged into Coquille Police Department evidence?

A.    On April 6, 2011.

Q.    And how can you be sure that those items are in the same condition?

A.    It's in the packaging when it was packaged for evidence and secured with tape.

Q.    Officer Smith, I'm going to hand you what's been marked as your Exhibit No. 3 — your Evidence Item No. 3206.  Ask you to look at that and tell me are there documents inside with exhibit stickers on them?

A.    There is.

Q.    Okay.  And what's that exhibit sticker?

Exhibit 5001 at 518

D3 211                                                Smith  D

A.    No. 81.

Q.    When was that item lodged into evidence?

A.    It was lodged into evidence on January 28, 2010.

Q.    And how can you be sure that that item is in the same condition as it was?

A.    It's in the original packaging with evidence tape.

Q.    Officer Smith, I'm handing you your Evidence Item No. 3197.  Asking you to open that and tell me are there items inside with exhibit stickers on them?

A.    There is.

Q.    Okay.  And what are the exhibit stickers?

A.    It's State's Exhibit 230.

Q.    Okay.  And when was that item lodged into Coquille Police Department?

A.    It was lodged on July 25, 2010.

Q.    Okay.  And do you show that item ever having been released?

A.    It was released to Grand Jury on July 20, 2010.

Q.    And returned on when?

A.    On the same day.

Q.    And how can you be sure that that evidence item number is in the same condition?

A.    It's in the — the same packaging and evidence tape.

Q.    Officer Smith, I'm handing you what's been identified as your Evidence Item No. 3201, and asking you if

Exhibit 5001 at 519

Smith   D    D3 212

you can tell me when that item came into evidence?

A.   This was lodged into evidence on July — or, I'm sorry, January 25, 2010.

Q.   Officer Smith, I'm going to ask you to open up that evidence bag — item, and tell me are there documents inside with State's exhibits stickers on them?

A.   There is.

Q.   And what's the exhibit number?

A.   No. 216.

Q.   And when was that item lodged into evidence?

A.   On January 25, 2010.

Q.   Do you ever show that item having been released from evidence?

A.   No, ma'am.

Q.   How can you be sure it's the same exhibit?

A.   It's in the same original packaging secured with evidence tape.

Q.   And finally, your Evidence Item No. 3203.  Asking you to tell me when that item came into Coquille Police Department custody.

A.   On January 25, 2010.

Q.   Can you open it up and tell me are there documents inside with State's exhibit stickers on them?

A.   There is.

Q.   And what's that exhibit number?

Exhibit 5001 at 520

D3 213                                          Smith   D

A.   Exhibit No. 229.

Q.   Do you ever show that evidence item number being released from Coquille Police Department custody?

A.   It was released to Grand Jury on July 20, 2010, returned that same day.

Q.   And how can you be sure it's the same exhibit?

A.   It's still secured with evidence tape and in the original packaging.

Q.   Officer Smith, I want to shift gears and talk about your involvement in the Leah Freeman investigation.

Actually, Officer Smith, before we start talking about your investigation — your role in the Leah Freeman investigation, why did you do an audit of the evidence room in December of 2008?

A.   There was an indiscretion from the Evidence Custodian prior to that time.  And when it came to light we secured the evidence room.  And based on an investigation from an outside agency, it was recommended that a complete audit be made.

Q.   And by indiscretion, you mean Officer Randy Ulmer stole money from the evidence room?

A.   Yes, ma'am.

Q.   Now, turning your attention to your role in the Leah Freeman investigation.  On October 18, 2009, were you working that day?

Exhibit 5001 at 521

Smith   D    D3 214

A.   I was.

Q.   Did you have an opportunity to go to the McGuffin residence?

A.   I did.

Q.   And where is that located?

A.   56246 Baker Road.

Q.   And what was your understanding of the reason for going there?

A.   Uh, Chief Dannels had had a couple prior contacts with Bruce and Kathleen McGuffin, in connections to their wanting to discuss the case with Chief Dannels.

Q.   So, were you invited there?

A.   We were.

Q.   And how long were you at the residence that day?

A.   Probably under two hours.

Q.   And how would you describe the tone of the conversation that day?

A.   Oh, it was very good.

Q.   And at some point during the two hours you were there at the McGuffin residence, did the Defendant arrive?

A.   He did.

Q.   And during that time there, did he ever make statements to you about knowing the identity of who killed Leah Freeman?

A.   He did.

Exhibit 5001 at 522

D3 215                                              Smith  D

Q.   Did he give you a name?

A.   He did not.

Q.   Did he ever make statements about documents which would clear is — prove him innocent?

A.   He did.

Q.   Did he provide those documents to you?

A.   He did not.

Q.   And on January 2010, did you participate in a Search Warrant at the McGuffin residence?

A.   I did.

Q.   And what was your role there?

A.   Pretty much just kind of overseeing everything. Doing logistics, getting packaging material for the officers that were conducting searches.

Q.   Acting as an Evidence Custodian?

A.   Um, I was assisting with making sure they had everything necessary for it, and that it lodged into evidence properly.

Q.   Thank you.

          MS. SOUBLET:    I have nothing further.

          THE COURT:    Ms. McCrea?  Or, is it Mr. McCrea?

          MR. McCREA:    (No audible response.)

                    CROSS EXAMINATION

BY MR. McCREA:

Exhibit 5001 at 523

Smith   X   D3 216

Q. When you served the Search Warrant, uh, that was to find the documents that talked about who killed Leah Freeman?

A. Yes, sir.

Q. And, there — there were letters and so forth told about people that supposedly did this?  Isn't that correct?

A. Yes, sir.

Q. And these were — these were then used as the basis for further investigation?

A. Yes, sir.

Q. But, none of those documents indicated that this had been done by Mr. McGuffin?  Isn't that correct?

A. Not to my knowledge.  I didn't read the documents.

Q. All right.  (Not understandable) - - -

In conjunction with the exhibits, and for easy reference, the — the shoes that were put into evidence, let's call them Leah's shoes just for easy reference.  Okay?

A. Yes, sir.

Q. All right.  Um, one shoe reportedly came from up by the cemetery?  Correct?

A. Yes, sir.

Q. And which one is that, Detective?  Is that the right shoe or the left?

A. All I have listed on my information is Item No. 160.

Q. Okay.  So, you don't indicate which?

A. No, sir.

Exhibit 5001 at 524

D3 217                                          Smith   X

Q.    Then, do your records show whether it was the right or left shoe that was found up at Hudson Ridge?

A.    That would be Item No. 170.  And, no, sir, my — my documents don't show that.

Q.    Okay.  They're — that's one of the things you identified here?

A.    Yes, sir.

MR. McCREA:    May we — may we see 96 and 97?

MR. FRASIER:    I can answer the question if you wish.

MS. McCREA:    Okay.

MR. FRASIER:    No. 160, or Exhibit 96, is the right shoe from the cemetery.  Exhibit 97, Item No. 170, the left shoe from Hudson Ridge.

MS. McCREA:    Okay.  Got it.

Thank you.

Q.    Thank you very much.

MR. McCREA:    That's all.

A.    Your welcome, sir.

THE COURT:    Any redirect?

MS. SOUBLET:    No, Your Honor.

THE COURT:    Do you want this witness to remain available?

MS. SOUBLET:    He — Your Honor, yes.  Subject to recall, but he may be released at this time.

Exhibit 5001 at 525

D3 218

THE COURT:    You — you may leave at this point, but you are still subject to recall.

WITNESS:    Yes, sir.  Thank you.

THE COURT:    And I take it that's it for the day?

MR. FRASIER:    I — I would like to do at this time, Your Honor, based on the testimony that we have heard so far, offer certain exhibits.

We would offer State's Exhibits 85, 86, and 87.

THE COURT:    Any objection to those?

MS. McCREA:    May we see them?

THE COURT:    (No audible response.)

MR. McCREA:    We have no further objections other than what I've already been litigating,   Your Honor.

THE COURT:    Okay.  Those — they are received.

(Whereupon Plaintiff's Exhibit Nos. 85, 86, and 87 were received into evidence.)

MR. FRASIER:    Thank you, Your Honor.

And then, in regards to Sergeant Zanni's — or, Sheriff Zanni's testimony, we would offer State's Exhibits 88, 89, 90, 91, and 92.

MR. McCREA:    Your Honor, we have no further objection beyond what we've - - -

THE COURT:    (Interposing) They are - - -

MR. McCREA:    - - - already - - -

Exhibit 5001 at 526

D3 219

THE COURT:    - - - received.

MR. McCREA:    - - - litigated.

THE COURT:    Thank you.

(Whereupon Plaintiff's Exhibit Nos. 88, 89, 90, 91, and 92 were received into evidence.)

MR. FRASIER:    And finally, we would offer 202, the hair brush, and State's Exhibit 93, the annual.

THE COURT:    I'm sorry.  The exhibit numbers, again, were?

MR. FRASIER:    No. 93 and 202.

MS. McCREA:    (Simultaneously) 202.

THE COURT:    Thank you.

MS. McCREA:    I don't - - -

MR. McCREA:    Your Honor, as to 93, we object on the grounds of relevance.  And it — it's — there may be some inference that the State feels can be drawn from this. But, if we are going to — we are going to have to be enlightened regarding what that is, because it isn't readily apparent on the face of it, as to the issues in this case.

THE COURT:    Is there a particular page?

MR. McCREA:    And — pardon?

MR. FRASIER:    There is several photographs in there of Ms. Freeman that are circled — or, with hearts. There is a picture in one part where it's not clear, but the handwriting on the side identifies it as Leah.  And then there

Exhibit 5001 at 527

D3 220

is some comments about "my girl", something to that effect.  I can point these out to counsel.  Or, - - -

THE COURT:    (Interposing) Okay.

MR. FRASIER:    - - - at — at a later - - -

THE COURT:    (Interposing) What about 202? Are you going to object to 202?

MR. FRASIER:    In fact, what I can do is I'll - - -

MR. McCREA:    (Interposing) No.

MR. FRASIER:    I will scan out the pictures I think are relevant.

THE COURT:    Okay.

MR. McCREA:    Oh.

THE COURT:    No. 202 is received.

(Whereupon Plaintiff's Exhibit No. 202 was received into evidence.)

MR. McCREA:    Yeah.

THE COURT:    Uh, and that's the last time — uh, things you are going to offer?

MR. FRASIER:    Yes.

THE COURT:    Okay.  So, I can let the jury go? Correct?

MR. FRASIER:    Yes.

THE COURT:    Okay.  There is no more witnesses today.  We are not working tomorrow, as I indicated to you.

Exhibit 5001 at 528

D3 221

So, we'll come back Friday.  And if you get here at 9:00.

I have stuff Monday morning.

JUDICIAL ASSISTANT:    (Not understandable.)

THE COURT:    Monday.  Did I say Friday?

JURORS:    Yes.

(Laughter.)

THE COURT:    I really — we all know you are listening.

(Laughter.)

So, Monday — I have stuff Monday.  And, uh, it depends on how it goes, whether I'll get it done.  So, just be here at 9:00.  We'll try to get started as soon thereafter as we can.

Remember the admonition — leave your notes here.  Specifically, remember your admonition — this is three days.  Don't allow anybody to talk to you.  Don't talk about the case.  Don't do anything in relation to investigating, looking up things, going online, reading papers, doing anything about the case at all.  Keep that in mind.

Everybody else in the courtroom remain seated until the jury has a chance to leave.

And you can probably leave your buttons here if you want.  You can get them Monday morning, so you don't forget them.

THE COURT:    Is that it, Cathy?  One more —

Exhibit 5001 at 529

D3 222

two more.  Okay.  There they go.

(Jury out.)

THE COURT:    (Interposing) Okay.  Mr. Frasier, as I understand it, you are going to specifically point out to the defense what pages you are interested in — or, scan the ones you are looking at?

MR. FRASIER:    Yes.  I can do that.  I'll either do it tonight or first thing in the morning and I can email it to counsel.

THE COURT:    Okay.  So, I'll hold ruling on — on 93 until you have a chance.

And then, you may or may not renew the objection.

And at least, uh — then Monday morning we can take that up.

MR. FRASIER:    Right.

THE COURT:    Okay.

We will be in recess, then, until Monday at 9:00.

(END OF DAY THREE)

*                              *                              *

Exhibit 5001 at 530

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS


STATE OF OREGON,                      )
                                      )
            Plaintiff,                )      CASE NO. 10CR0782
                                      )
      vs.                             )      JURY TRIAL
                                      )       DAY FOUR
NICHOLAS JAMES MCGUFFIN,              )
                                      )
            Defendant.                )
_____       )

TRANSCRIPT OF PROCEEDINGS

Volume 5, Pages D4 2 to D4 168

BE IT REMEMBERED That, the above-entitled cause

came on regularly for hearing beginning at 9:04 a.m., Monday,

July 11, 2011, in the Circuit Courtroom of the Coos County

Courthouse in the City of Coquille, County of Coos, State of

Oregon, before the Honorable Richard L. Barron and a jury.


APPEARANCES

R. Paul Frasier, District Attorney for Coos County,
representing the Plaintiff.

Erica Soublet, Assistant District Attorney for Coos County,
representing the Plaintiff.

Shaun McCrea, Attorney at Law, representing the Defendant.

Robert McCrea, Attorney at Law, representing the Defendant.


S. Jean Sprouse, Court Transcriber, XV Judicial District, 503-325-5254

Exhibit 5001 at 531

Fisher   D       D4 2

(Jury In.)

JUDICIAL ASSISTANT:    All rise.

The Circuit Court of State of Oregon, County of Coos is now in session.

THE COURT:    Be seated.

Good morning.  Did you have a good weekend?

Mr. Frasier, call your next witness.

MR. FRASIER:    Thanks, Your Honor.

We would call Austin Fisher.

AUSTIN FISHER

was thereupon produced as a witness on behalf of the Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat up here, please.

DIRECT EXAMINATION

BY MR. FRASIER:

    Q.   Could you state your name please, sir, and spell your last name for the record?

    A.   Austin Fisher, F-I-S-H-E-R.

    Q.   Where do you live, sir?

    A.   Coquille.

    Q.   How long have you lived in Coquille?

    A.   All my life pretty much.

    Q.   Did you go to school here?

Exhibit 5001 at 532

Fisher    D        D4 3

A.    Yes.

Q.    Did you graduate from Coquille High School?

A.    Yes.

Q.    Did you attend the, what's sometimes referred to as the middle school here in Coquille?

A.    Yes.

Q.    While you were attending the middle school did you become acquainted with an individual named Leah Freeman?

A.    Yes.

Q.    How did you know her?

A.    We were really good friends.

Q.    When did you get to know her?

A.    Seventh grade.

Q.    And at some point of time were you, for lack of better terms, boyfriend/girlfriend?

A.    Kinda, yeah.

Q.    When was that?

A.    Eighth grade — end of eighth grade — for the summer.

Q.    And your freshman year, were you two still together?

A.    No.  We — just at the beginning, but not very long.

Q.    Now, did you personally observe Leah have a new boyfriend after you?

A.    Yes.

Q.    And who was that?

A.    Nick McGuffin.

Exhibit 5001 at 533

Fisher    D        D4 4

Q.    The Defendant in this case?

A.    Yes.

Q.    Now, after the Defendant began being with Leah Freeman, did you have a conversation with him regarding contact with Leah Freeman?

A.    Yes.

Q.    And what did the Defendant tell you in that conversation?

A.    He told me that if I talked to her or went around her then he was going to beat me up.

Q.    Did you have an opportunity yourself to personally observe Leah Freeman and the Defendant together?

A.    Yes.

Q.    What were they like when they were together?

A.    I saw them arguing a lot, but I — that's about it. I didn't see them a lot.

Q.    Okay.  When you say arguing, did they raise their voices?

A.    Yes.

Q.    And where did you see this?

A.    At school.

Q.    Thank you.

        MR. FRASIER:    That's all the questions I have of the witness at this time, Your Honor.

        THE COURT:    Ms. McCrea.

Exhibit 5001 at 534

Fisher   X      D4 5

MS. McCREA:    Thank you.

CROSS EXAMINATION

BY MS. MCCREA:

Q.    Mr. Fisher, you indicated that you and Leah Freeman were really good friends?

A.    Yes.

Q.    You're nodding yes.  Sorry, you have to answer out loud.

A.    Yes.

Q.    Okay.  And when you were kinda boyfriend and girlfriend, you really liked her.  Is that fair to say?

A.    Yes.

Q.    She broke up with you after the freshman school year started?

A.    Yeah.  It was kind of a mutual thing.

Q.    Even after the two of you parted ways, you still really like her.  Right?

A.    We were friends.

Q.    And there was an occasion when you and Leah and Sherry Mitchell and maybe somebody else went bowling together?

A.    Maybe, probably.

Q.    I realize it's been a long time ago.

A.    Yeah.

Q.    Now, when Leah Freeman started going out with Nick McGuffin, you and Leah were freshman and Nick McGuffin was a

Exhibit 5001 at 535

Fisher   X     D4 6

senior.  Is that right?

A.   Yes.

Q.   So, he was an upper classman and you guys were just beginning high school?

A.   Yeah.

Q.   And Nick — would it be fair to say that Nick was pretty popular at school?

A.   Yeah, probably.

Q.   And he had played football for Coquille High School?

A.   Yeah.

Q.   He didn't play in the year of — the fall of 1999 though because he had broken his neck.  Do you remember that?

A.   Yes, yeah.

Q.   So, you would see Leah and Nick around school occasionally.  Now, the conversation with Nick McGuffin when he said if you talked to Leah he would beat you up, didn't that happen after you and some other kids, specifically Casey and Josh, were teasing Leah after New Years insinuating that she and Nick McGuffin had had sex?

A.   I don't remember that.

Q.   Okay.  Well, I'm - - -

MS. McCREA:   If I might approach, Your Honor.

THE COURT:   You may.

Q.   Mr. Fisher, I'm going to show you a copy of a page out of Exhibit No. 90 which is Leah Freeman's diary.  And I'm

Exhibit 5001 at 536

```
                                  Fisher    X      D4 7
```

going to ask you to take a look at this:

"All day Austin, Casey and Josh were asking me if I had a good time on New Years and asinine crap like that. I don't really care that they think I had sex with him even though I didn't."

Does that refresh your recollection about teasing her?

A.    No.  But if she said it, then it's probably true.

Q.    Okay.  Do you remember - - -

Well, let me get back to the microphone.

Mr. Fisher, after you and Lea Freeman were no longer boyfriend and girlfriend, you still had contact and you would still telephone her from time to time.  Is that right?

A.    Yeah.

Q.    Did you have hopes of getting back together with her?

A.    No.

Q.    Just friendly terms?

A.    Yeah, just friends.

Q.    And back in 2000 you had relatives living in the Fairview Area near Hudson Ridge.  Is that right?

A.    Yes.

Q.    Did you have a pickup at that time?

A.    I think so.

Q.    Now, you turned sixteen on June 23rd, 2000.  Did you

Exhibit 5001 at 537

```
                                   Fisher   ReD    D4 8
```

get your driver's license right away?

A.   No.

Q.   In terms of your family up near Hudson Ridge, that would have been your uncle?

A.   My grandparents.

Q.   Your grandparents.  Okay.

Thank you.

MS. McCREA:    That's all the questions I have.

THE COURT:    Any redirect?

### REDIRECT EXAMINATION

BY MR. FRASIER:

Q.   Mr. Fisher, did you have anything to do with the disappearance of Leah Freeman?

A.   No, sir.

Q.   Thank you.

MR. FRASIER:    That's all I have.

THE COURT:    You may step down and you're free to leave.

Call your next witness.

MS. SOUBLET:    State calls Brent Bartley.

THE COURT:    I'm sorry.  Did you say Brent or Frank?

MS. SOUBLET:    Brent.

MR. FRASIER:    Brent.

THE COURT:    Thank you.

Exhibit 5001 at 538

Bartley   D     D4 9

BRENT BARTLEY

was thereupon produced as a witness on behalf of the Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat up here, please.

DIRECT EXAMINATION

BY MS. SOUBLET:

Q.    Mr. Bartley, can you state your full name and spell your last for the record?

A.    Brent William Bartley, B-A-R-T-L-E-Y.

Q.    Mr. Bartley, how old are you?

A.    Thirty-one.

Q.    Where do you live?

A.    275 North Broadway, Apartment 301, Coos Bay, Oregon, 97420.

Q.    Did you used to live here in Coquille?

A.    Yes.

Q.    When was that?

A.    About three or four years ago I think.  It's been that - - -

Q.    (Interposing) Did you grow up here in Coquille?

A.    Yes.  Born and raised.

Q.    What high school did you go to?

A.    Coquille.

Exhibit 5001 at 539

Bartley  D    D4 10

Q.   How do you — do you know the Defendant, Mr. McGuffin?

A.   Went to school with him.

Q.   Okay.  Were you in the same grade?

A.   No.  He was younger than me.

Q.   So, how did you meet him?

A.   His brother was in my grade.

Q.   Did you ever have an opportunity to hang out with him?

A.   Yes.

Q.   When was that?

A.   Can you be more specific?

Q.   Did you hang out with him in high school, after you graduated from high school?

A.   Both.

Q.   Were you aware of whether or not the Defendant had any cars?

A.   Yes.

Q.   What were those?

A.   A Mustang and a T-bird.

Q.   I'm showing you what's been received as State's Exhibit No. 16 and asking you if you recognize that?

A.   Yes.

Q.   What is that?

A.   A Ford Mustang.

Exhibit 5001 at 540

Bartley    D      D4 11

Q.   Is that the Defendant's Mustang?

A.   Yes.

Q.   And Exhibit No. 25, do you recognize the car in that?

A.   Which one?

Q.   The maroon one?

A.   Yes.

Q.   Okay.  And what is that?

A.   A Ford T-bird.

Q.   Is that the same car you saw the Defendant sometimes drive?

A.   Yes.

Q.   In the summer of 2000 were you working?

A.   Yes.

Q.   A long time ago, difficult to remember?

A.   Yes.

Q.   Are you aware of whether or not the Defendant had a girlfriend then?

A.   Yes.

Q.   Who was that?

A.   Leah Freeman.

Q.   How — did you know Ms. Freeman other than her association with the Defendant?

A.   What do you - - -

Q.   (Interposing) Did you know her before?

Exhibit 5001 at 541

Bartley  D    D4 12

A.    No.

Q.    Did you have an opportunity to ever see them together?

A.    Yes.

Q.    When was that?

A.    All the time.

Q.    Was there a time, like, where you would see her specifically?

A.    What do you mean?

Q.    Did you see her other than seeing her with the Defendant?

A.    No.

Q.    Did you have a chance to see them together on more than one occasion?

A.    Yes.

Q.    Okay.  And what was their relationship like?

A.    Good.

Q.    Do you remember saying that they would fight and makeup?

A.    I've never seen them fight.

Q.    Where were you living in the summer of 2000?

A.    I don't know the exact address.  I can't even remember the exact address.  But, over by Dean Street in Coquille.

Q.    Was that a house, an apartment?

Exhibit 5001 at 542

Bartley   D    D4 13

A.   A house.

Q.   Who else lived there?

A.   Daniel LaPine.

Q.   Were you yourself dating anyone in the summer of 2000?

A.   Yes.

Q.   Who was that?

A.   Nicole Price.

Q.   Is her name now Nelson?

A.   Yeah.

Q.   Did you ever have a chance to see the inside of the Defendant's Mustang?

A.   Yes.

Q.   What was the inside of that car like?

A.   Clean.

Q.   What about the trunk?

A.   Dirty, because that's where he would throw all the stuff, usually.  Then after it was clean.

Q.   I'm sorry?  You said then what?

A.   It was clean.

Q.   When was that?

A.   After this all happened.

Q.   By this all happening, you mean after Ms. Freeman went missing?

A.   Yes.

Exhibit 5001 at 543

Bartley   D    D4 14

Q.   I want to turn your attention to June 28th, 2000.  Do you remember that day?

A.   Kinda, yes.

Q.   Why kinda?

A.   Because it's been eleven years ago.

Q.   Were you drinking that day?

A.   Yes.

Q.   Were you asked by the police to do a timeline of events?

A.   Yes.

Q.   Do you remember when that was?

A.   When I wrote it down?  No, I don't remember the day. I did it.

Q.   Was it after June 28th?

A.   Yeah.

Q.   Mr. Bartley, I'm going to hand you what's been marked for identification purposes as State's Exhibit No. 84 and ask you if you recognize that?

A.   Yes.

Q.   What do you recognize it to be?

A.   My written statement.

Q.   That's the timeline that we're talking about?

A.   Yes.

Q.   Did you have plans to hang out with anyone that day on June 28th, 2000?

Exhibit 5001 at 544

Bartley  D    D4 15

A.   Yes.

Q.   Who was that?

A.   Nick and Leah.

Q.   Anyone else?

A.   And Nicky.

Q.   Where were you going to spend the day?

A.   At my grandparent's house.

Q.   Okay.  And where is that?

A.   I don't know the address.  I'm bad with that.
Sorry.

Q.   Is it called the Haga Ranch or residence?

A.   It's the Haga's — yeah, my grandparent's house.

Q.   Is that in town or out of town?

A.   Out of town.

Q.   Do you remember how you got to that residence?

A.   Yeah.

Q.   How was that?

A.   Ms. McGuffin.

Q.   In what car?

A.   His Mustang.

Q.   Was anyone else with you at that time?

A.   Yeah.

Q.   Who was that?

A.   Leah.

Q.   Do you remember when you got to your grandparent's

Exhibit 5001 at 545

Bartley  D    D4 16

house?

A.    This says four, but I can't remember exactly times.

Q.    Was it in the morning or in the afternoon?

A.    Afternoon.

Q.    Late in the afternoon or early in the afternoon?

A.    Early.

Q.    Was Ms. Nelson with you at that time?

A.    No.

Q.    Were you supposed to be at the — at your grandparent's house?

A.    No.

Q.    Do you remember what your plans were once you got to your grandparent's house?

A.    Yes.

Q.    What was that?

A.    Watch movies and hang out.

Q.    So, did you do that?

A.    No.

Q.    Why not?

A.    We — because we went and dropped off Leah and then we picked up Nicky.  And then - - -

Q.    (Interposing) Do you remember — I'm sorry.

A.    Oh, no.  Go for it.

Q.    Do you remember what time you went and dropped off Ms. Freeman?

Exhibit 5001 at 546

Bartley   D      D4 17

A.   No.  I - - -

Q.   I'm going to ask you to look at Exhibit No. 84 and tell me if that refreshes your recollection about what time you dropped off Ms. Freeman?

A.   About six or seven I guess.

Q.   Where did you drop her off?

A.   At a friend's house — I can't even — Mitchell is her last name.  I can't remember her first name.

Q.   How did you get there from your grandparent's house to the Mitchell Residence?

A.   McGuffin.

Q.   In what car?

A.   The Mustang.

Q.   What did you do after that?

A.   Went and picked up Nicky.

Q.   Okay.  And what after that?

A.   Went back to my grandparent's house.

Q.   When you say we, you're talking about everybody?

A.   No.  Me, Nick and Nicky.

Q.   Okay.  Was there a time when the Defendant left your grandparent's residence again?

A.   Yeah.

Q.   When was that?

A.   About fifteen, twenty minutes after all three of us got back there.

Exhibit 5001 at 547

Bartley  D    D4 18

Q.   Okay.  Did he tell you where he was going?

A.   No.

Q.   Did he tell you whether or not he was coming back?

A.   Yeah.  He was our ride.

Q.   Did you see him again that night after he left your grandparent's house?

A.   Yeah.

Q.   When was that?

A.   About nine I think.  He came back and asked if we seen her.  And we said, "No."  Then he left again.  And I can't remember if he came back another time and asked us or if he came back the third time and just picked us up.

Q.   Okay.  When you say seen her, you're referring to Ms. Freeman?

A.   Yes.

Q.   Were you expecting to see Ms. Freeman back out at the house?

A.   He was supposed to go pick her up.  I was expecting them both to come back, yeah.

Q.   Were you expecting to see her by herself back at your house?

A.   No.

Q.   Were you expecting to hear a phone call from her?

A.   No.  I wasn't answering the phone.  I wasn't supposed to be out there.

Exhibit 5001 at 548

Bartley   D    D4 19

Q.   So, when the Defendant came back from — came back and asked you if you'd seen Ms. Freeman, what did you do?

A.   I said, "No."

Q.   Did you notice anything about his demeanor at that time, the way he was acting?

A.   No.  Just kinda worried that he couldn't find her.

Q.   Do you remember what time you left your grandparent's residence for good that night?

A.   Ten, eleven, somewhere in there.

Q.   How did you get home from your grandparent's residence?

A.   McGuffin.

Q.   The Defendant?

A.   Yes.

Q.   Where did he drop you off?

A.   Right below the middle school in Coquille.

Q.   Did you come straight from your grandparent's house to below the middle school?

A.   No.  We went and dropped off Nicky.  And then me and him — he was still worried.  He couldn't find her.  So, we went to the high school.  And he stopped and got out and looked.  And then we went by her house and the light wasn't on so we didn't stop.  And then we stopped at Sanford Heights and he got out and went and checked the park.  And then drove me back — we went back towards town.  And that's when I seen

Exhibit 5001 at 549

Bartley    D      D4 20

Richard Bryant and got out.

Q.    When you say he got out at the park, are you referring to the Defendant?

A.    Yeah.

Q.    Okay.  Did you get out of the car?

A.    No.

Q.    Why not?

A.    I had a knee brace on and I was gimped up.

Q.    Do you remember him saying anything to you when you went past Ms. Freeman's Residence?

A.    Just the light wasn't on, so we didn't stop.

Q.    Do you remember going to Denny's Pizza at some point that night?

A.    No, not really.  I heard I was there, but I — I was drinking.

Q.    Did you ever have a chance to see the Defendant driving a car other than the Mustang on June 28th, June 29th, 2000?

A.    No, not that I can recall.

Q.    Do you remember speaking to officers in July of 2010?

A.    Probably.

Q.    Talking to Detective - - -

A.    (Interposing) Yeah.

Q.    - - - McNeely - - -

Exhibit 5001 at 550

Bartley    X    D4 21

A.    (Interposing) Oh, yeah.

Q.    - - - and Officer Webley?

A.    Yes.

Q.    At that time you indicated that you saw the Defendant in the Thunderbird later that night?

A.    See, that's what I was — maybe I thought it.  But I said in my statement that you've got in your hand that says I was sixty percent.  I don't know if it was a different rig or not.  And I said I was about sixty percent sure that it could have been a different rig.  But I didn't know.  I can't recall.

Q.    Did you have an opportunity to see the inside of the Defendant's trunk after June 28th, 2000?

A.    Yes.

Q.    What was different about it?

A.    It was clean, cleaned out.

Q.    Thank you.

        MS. SOUBLET:    Nothing further.

        THE COURT:    Ms. - - -

                    CROSS EXAMINATION

BY MS. MCCREA:

Q.    (Interposing) Mr. Bartley, I'm — this is not intended to embarrass you.  But, back in June of 2000 you would — you have characterized yourself back then as a drinker.  Is that fair?

Exhibit 5001 at 551

Bartley   X    D4 22

A.   Yes.

Q.   And that you would drink to get drunk?

A.   Yes.

Q.   And you drank a lot of alcohol back then?

A.   Yes.

Q.   And you smoked marijuana?

A.   Yes.

Q.   You were intoxicated the evening of June 28th, 2000?

A.   Yes.

Q.   So, that is part of why you have some memory issues concerning specific times?

A.   Yes.

Q.   Now, the idea to go to your grandparent's house was, you were going to go with your girlfriend Nicky Price.  And Nick McGuffin was going to go with his girlfriend Leah Freeman.  Right?

A.   Yes.

Q.   And the idea was to have a quiet place where you could have a barbecue and watch some movies away from the house you shared with Daniel LaPine because it was, forgive me, kind of a party house?

A.   Yes.

Q.   And not — and there were a lot of guys who would hang out there.  And the idea was for the two couples to have some time together?

Exhibit 5001 at 552

Bartley   X    D4 23

A.   Yes.

Q.   So, that night, Nick McGuffin was in the Mustang. And that was, to your understanding, his car. But occasionally he would drive his parent's T-bird?

A.   Yes.

Q.   Were you aware that he had been grounded from driving the T-bird on June 26th?

A.   No.

Q.   Were you aware that Nick had been in sort of a little race with Daniel LaPine in his Mustang previously and had put a hole in the gas tank of the Mustang?

A.   Yeah.

Q.   You were aware of that?

A.   Yeah.  I think it happened out Fairview.

Q.   Out Fairview.  Okay.

Were you present when that happened or you just heard about it?

A.   No.  Just heard about it.

Q.   Now, the inside of the Mustang - - -

MS. McCREA:   If I could approach, Your Honor. And I'm going to show Mr. Bartley what's been marked for identification as Defense Exhibits Nos. 102 and 103.

This is No. 102.  And then the close up is No. 103.  Thank you.

Q.   So, Mr. Bartley, I'm showing you what's been marked

Exhibit 5001 at 553

Bartley    X    D4 24

for identification as Defense Exhibits Nos. 102 and 103.  Do you recognize that back seat of that vehicle?

A.    Yes.

Q.    And is that Nick McGuffin's Mustang from back in 2000?

A.    Yes.

Q.    Does it fairly and accurately portray how that back seat looked with the stereo speaker?

A.    Yeah.

MS. McCREA:    We'd offer Exhibits Nos. 102 and 103, Your Honor.

MS. SOUBLET:    No objection.

THE COURT:    Received.

(Whereupon Exhibits Nos. 102 and 103 were then received into evidence.)

Q.    So, Mr. Bartley, this was a pretty good speaker that took up the whole — one whole passenger side of the back seat. Is that fair?

A.    Yes.

Q.    And when you and Mr. McGuffin took Leah Freeman over to her friend's house, you were sitting in the front seat and Leah was in the back seat?

A.    I can't recall.  I imagine.  See, I just can't recall if I was or not.

Q.    I understand.  But you did have on a knee brace?

Exhibit 5001 at 554

Bartley    X      D4 25

A.    Yes.

Q.    Because you had hurt your knee, I think, jumping off a bridge?

A.    Yes.

Q.    The place that you dropped Leah Freeman off was behind McKay's Market.  Do you remember that?

A.    Yes.

Q.    And when you - - -

Well, let me back up.

So, is this the correct chronology, you and Nick and Leah went out to your grandparent's, the Haga property?

A.    (No audible response.)

Q.    You're nodding yes?

A.    Yes.

Q.    We've got to get it on the record.

And to get to the Haga property you would walk up on — well, if you were walking.  Or if you were driving the most direct route would be to drive up Elm, past the cemetery and keep on going up?

A.    Yes.

Q.    And it's a — it is a little ways out from — from let's say the high school?

A.    It's a mile.

Q.    It's a mile.  Okay.

So, the three of you go up to your grandparent's.

Exhibit 5001 at 555

Bartley   X    D4 26

And then at some point do the three of you go out to Nick McGuffin's parent's home to get some videos?

A.   I think we did it earlier.  I can't remember.

Q.   Got the videos earlier?

A.   Yeah.

Q.   Okay.

A.   I can't remember a hundred percent.

Q.   And Leah Freeman was with you at the time?

A.   Yeah.

            MS. McCREA:   And may I have Exhibits Nos. 7 and 8, please?

            Thank you.

Q.   Mr. Bartley I'm going to show you what's been introduced into evidence as Exhibits Nos. 7 and 8.  And do you recognize Leah Freeman?

A.   Yes.  I think that's me, probably.

Q.   That was going to be my next question.  Okay, this is State's Exhibit No. 7.  And there is a shirt and an arm on part of the photograph.  And you think that was you?

A.   Yes.

Q.   Do you remember photographs being taken out at Nick's house on that day?

A.   No.

Q.   Had you been drinking before that time?

A.   Probably.

Exhibit 5001 at 556

Bartley   X   D4 27

Q.   Had you been smoking marijuana?

A.   Yes.

Q.   Okay.  So, in your recollection is this how Leah was out at Nick McGuffin's parent's house on June 28th when you all were there?

A.   Yeah.

Q.   So, you got the videos.  You went to your grandparent's house.  And then Leah had plans to go see her friend?

A.   Yes.

Q.   So, you went with Nick to drop her off at her Sherry Mitchell's house?

A.   Yes.

Q.   Then Nick was supposed to pick her up after a couple of hours?

A.   Yeah, that's what my understanding was.

Q.   Now, did you and Nick also go to McKay's and get some steaks to cook?

A.   Yeah.  And O.J.

Q.   And some O.J.

A.   For the mixed drinks.

Q.   Okay.  To make mixed drinks.

So, after you left Sherry Mitchell's then you and Nick McGuffin went over and picked up your girlfriend Nicky Price?

Exhibit 5001 at 557

Bartley   X      D4 28

A.    Yes.

Q.    Now, Nicky Price, you had a relationship with her from, what, 2000 to about 2003?

A.    Yeah.

Q.    Do the two of you have a child together?

A.    Yes.

Q.    Did you part amiably or less than amiably?

A.    Less.

Q.    Less than amiably.

Are you on good terms now?

A.    Yeah, getting better.

Q.    When you got back to the Haga's it was just the three of you, Nick McGuffin, your girlfriend Nicky Price, and you?

A.    Yes.

Q.    So, after about fifteen minutes Nick left.  Did he say anything about not wanting to be a third wheel?

A.    Yes.

Q.    So, he left.  And then he — you knew he was going to come back to pick you guys up and give you a ride home?

A.    Yes.

Q.    Now, you talked about when he came back.  And when he came back he was in the Mustang?

A.    Yes.  It's starting to get fuzzy.  I'm pretty sure though.

Exhibit 5001 at 558

Bartley    X    D4 29

Q.    Because you had been drinking during the period of time after you picked up Nicky Price and you were at your grandparent's?

A.    Yes.

Q.    In terms of Nick McGuffin's demeanor, is it fair to say he looked kind of worried?

A.    Yes.

Q.    And that didn't surprise you because it wasn't like Leah to disappear?

A.    No.

Q.    No, it was not - - -

A.    (Interposing) Yeah, it wasn't like it.

Q.    And so once you took Nicky Price home, then you went with Nick McGuffin looking for Leah Freeman?

A.    Yes.

Q.    And the two of you went to the high school because Nick said that Leah liked to go there to get away, just to go out to the football field and sit in the stadium and — or the grandstands — and think?

A.    Yes.

Q.    So, Nick went and looked there?

A.    Yes.

Q.    And he didn't see her.

A.    Yeah, correct.

Q.    Did you go with him or did you wait in the car?

Exhibit 5001 at 559

Bartley   X     D4 30

A.   I waited in the car.

Q.   And then you drove to Sanford Heights where Leah had been living with her mom and her grandmother?

A.   Yes.

Q.   And you knew where Leah's house was?

A.   Yes.

Q.   So, as you went by the house you've indicated that Nick said, "She's not there.  There's no light on?"

A.   Yes.

Q.   And did you slow down to look?

A.   Yes.

Q.   And then up from the house on Knott Street at Sanford Heights, there is a little park.  Right?

A.   Yes.

Q.   And Nick went down to the park to check to see if Leah was there?

A.   Yes.

Q.   And you stayed in the car?

A.   Yes.

Q.   So, when Nick came back he didn't give you any indication that he'd seen Leah?

A.   No.

Q.   And you were with Nick McGuffin that night looking for Leah probably between thirty minutes to an hour?

A.   Yeah.

Exhibit 5001 at 560

Bartley    X      D4 31

Q.    To the best of your recollection?

A.    Yeah.

Q.    And then you saw Richard Bryant.  And Richard Bryant had marijuana?

A.    Correct.

Q.    Okay.  And so you got out so you could go smoke marijuana with Richard Bryant?

A.    Correct.

Q.    And Nick didn't go with you.  He kept — he said he was going to keep looking for Leah?

A.    Correct.

Q.    Now, the next day, on June 29th, 2000, you had a party at your grandparent's place?

A.    Yes.

Q.    And basically your mom busted you for that later on.

A.    Yes.

Q.    Is that right?

A.    Yes.

Q.    And there was a white sort of tank top, what we might call a wife beater at that location?

A.    Yes.

Q.    And that didn't belong to Leah Freeman, did it?

A.    No.

Q.    It belonged to a guy named Myah (phonetic) Stokes?

A.    Yes.  And it was there because we spilled beer and

Exhibit 5001 at 561

Bartley   X    D4 32

he used it to clean it up.

Q.   Used his shirt to clean it up?

A.   Yeah.  It's Myah.

Q.   Now, Mr. Bartley, the Prosecution has indicated that someone matching your description was with another male and a blonde female on Fairview Mountain around midnight on June 28th, 2000.  Were you on Fairview Mountain that night?

A.   No.

Q.   Were you anywhere near Fairview Mountain around midnight on June 28th?

A.   No.

Q.   Early morning hours of June 29th, 2000?

A.   No.

Q.   Thank you.

        MS. McCREA:   That's all the questions I - - - I'm sorry, Your Honor.  Just a moment.

        THE COURT:   Okay.

Q.   Mr. Bartley, if you remember, when you went with Nick McGuffin to drop off Leah Freeman behind McKay's at Sherry Mitchell's house, do you remember Nick saying anything to Leah Freeman about Leah going over to Sherry's wasn't a good idea, that Leah and Sherry were going to have a fight? Anything like that?

A.   Not that I can recall, no.

Q.   Okay.

Exhibit 5001 at 562

Bartley   ReD   D4 33

Thank you.

MS. McCREA:    That's all I have, Your Honor.

THE COURT:    Any redirect?

MS. SOUBLET:    Just briefly.

Thank you, Your Honor.

REDIRECT EXAMINATION

BY MS. SOUBLET:

Q.    Mr. Bartley, were you the only one drinking that day?

A.    Yes.

Q.    Did you ever see the Defendant drink that day?

A.    No.

Q.    In your — you indicated you went to get steaks and orange juice from McKay's?

A.    Correct.

Q.    Was that before or after you dropped off Ms. Freeman?

A.    No.  She was still at my grandparent's house.  It was just me and Nick.  We left her there and went to the store and then came back.

Q.    Thank you.

MS. SOUBLET:    Nothing further.

THE COURT:    You may step down and you're free to leave.

WITNESS:    Okay.  What do I do with this, Your

Exhibit 5001 at 563

Smith   D    D4 34

Honor?

THE COURT:    Just leave it there, please.

WITNESS:    Okay.

MS. SOUBLET:    The State calls Melissa Smith.

THE COURT:    You can get that exhibit if you want, Cathy.

MELISSA SMITH

was thereupon produced as a witness on behalf of the Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat up here, please.

Go ahead.

MS. SOUBLET:    Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. SOUBLET:

Q.   Ms. Smith, can you state your full name and spell your last for the record?

A.   Melissa Marie Smith.

Q.   And the last name?

A.   Smith.

Q.   How do you spell it?

A.   S-M-I-T-H.

Q.   Ms. Smith, did you grow up here in Coquille?

A.   For the most part.

Exhibit 5001 at 564

Smith    D      D4 35

Q.   Which high school did you go to?

A.   Coquille Valley High School - - -

Q.   (Interposing) Can - - -

A.   Oops.

Q.   I'm sorry?

A.   Until my senior year.  And then I went to Marshfield.

Q.   And did you know Leah Freeman?

A.   Yes.

Q.   How did you know her?

A.   We were friends, like, the last eight months that she was alive.

Q.   That would have been the school year 1999-2000?

A.   Correct.

Q.   How do you know the Defendant?

A.   We were also friends.

Q.   Were you friends with anyone else through him?

A.   I was dating Scott Hamilton at the time, which was friends with Nick.

THE COURT:   I'm sorry, the name you were dating?

WITNESS:   Scott Hamilton.

THE COURT:   Thank you.

Q.   Did you — how would you — did you have an opportunity to see the Defendant and Leah Freeman together?

Exhibit 5001 at 565

Smith   D    D4 36

A.   How did I what?  I'm sorry.

Q.   Did you have a chance to see the Defendant and Leah Freeman together?

A.   Yeah.

Q.   How would you describe their relationship?

A.   Basically like any other teenage, high school relationship.  It was, um - - -

Q.   (Interposing) Would they fight and makeup?

A.   Yeah.

Q.   Do you know where the Defendant was living in the summer of 2000?

A.   Yes, at his parent's house.

Q.   Do you know whether or not he had access to any cars?

A.   Yes.

Q.   And what were those cars?

A.   He had his car and his parent's car.

Q.   And what was his car?

A.   A Mustang.

Q.   What was his parent's car?

A.   A Thunderbird I believe.

Q.   I want to turn your attention to June 27th, 2000.  Do you remember that day?

A.   Yes.

Q.   Okay.  And what did you do that day?

Exhibit 5001 at 566

Smith   D     D4 37

A.    The four of us had drove up to the river, out towards Powers, and went swimming out there.

Q.    When you say the four of us, you're referring to yourself, Scott Hamilton, the Defendant and Ms. Freeman?

A.    Correct.  Yes, sorry.

Q.    How did you get out there?

A.    In — I believe Nick drove his parent's Thunderbird that day.

Q.    And on June 28th, 2000, do you remember that day?

A.    Yes.

Q.    Did you have a chance to speak to Ms. Freeman that day?

A.    I did talk to her on the phone just for a couple minutes that day.

Q.    Do you remember when?

A.    I can't remember the exact time, no.

Q.    Why were you calling her?

A.    I had called her to let her know that I was just going home that night.  And I wasn't going to have any plans or anything to do anything.

Q.    And did you hear anyone else in the background while you were on the phone with Ms. Freeman?

A.    I had heard Nick.  But I don't know who he was talking to.

Q.    Do you remember telling the police that you could

Exhibit 5001 at 567

Smith   D      D4 38

hear him yelling at Ms. Freeman to get off the phone and calling her a bitch?

A.   Not at her.  I heard him saying that, but it wasn't at — I don't — I can't — I don't know if it was at her or not. She didn't say anything.

Q.   And you — do you remember how Ms. Freeman sounded on the phone?

A.   Yeah.  She sounded a little — just a little upset. And I had asked her what was wrong.  And she said that she would tell me later.  And I never — that was the last time I got to talk to her.

Q.   So, on June 29th, 2000, do you remember that day?

A.   Yes.  Yeah.

Q.   Why do you remember that day?

A.   Because that day my step mom had called me at seven in the morning to ask me if I had seen Leah because her mom had called my step mom to see if we had seen her.  And I hadn't.  And so then we had gotten up and tried looking for her.

Q.   When you say - - -

A.   (Interposing) Driving around looking for her.

Q.   Where did you go looking for her?

A.   We just drove around, all around Coquille.  I was staying at Myrtle Point — in Myrtle Point at a friend's house. I ended up staying the night there.  And so, we went with — I

Exhibit 5001 at 568

Smith   D    D4 39

think my sister came and picked us up.  And we had just drove back to Coquille and looked all over, driving around.

Q.   Did you see the Defendant during that time?

A.   I believe I did see him that day, yes.

Q.   Okay.  And how would you describe his demeanor?

A.   Nervous and trying to find — well, not nervous. Just anxious trying to find her.

Q.   Do you remember saying that he was very distraught and overly dramatic?

MR. McCREA:   Object to leading the witness, Your Honor.

THE COURT:   Overruled.

A.   Oh - - -

THE COURT:   You can answer.

A.   Oh, sorry.  He was — he was upset.  She was missing. So, he was upset.

Q.   Did you have a chance to ask him what happened?

A.   No.

Q.   You didn't speak to him about what happened or he tell you what happened with Ms. Freeman the night before?

A.   No, no.

Q.   Do you remember anything else about the Defendant's demeanor in the days or weeks after Ms. Freeman disappeared and before her body was found?

A.   Just that he was upset that she was missing.

Exhibit 5001 at 569

Smith   D      D4 40

Q.   Do you remember whether or not he would have referred to Ms. Freeman in the past tense?

A.   I can't really remember exactly.  I don't want to say.  It was a long time ago.

Q.   Do you remember telling police officers back in 2000 that the Defendant kept referring to Ms. Freeman in the past tense?

A.   I can't — I don't really remember that.  I think that — I think one time it had.  And I corrected him and said that she was going to come home.

Q.   And this was prior to - - -

A.   (Interposing) I can't remember the exact date that that was or when that was.

Q.   And this was prior to her body being found?

A.   Correct, yes.

Q.   Did you have a chance to see the Defendant after her body was found?

A.   Yes.

Q.   What happened on that occasion?

A.   I seen him quite a bit after.  I don't know which — when you — what day you're talking about.

Q.   I'm talking about the opportunity or the time when you and Mr. McGuffin had sex?

A.   That happened.

Q.   So, after — at some point shortly after

Exhibit 5001 at 570

Smith   D     D4 41

Ms. Freeman's body was found you slept with the Defendant?

A.   After her — awhile after her memorial service, yes.

Q.   How did that occur?

A.   I was drinking and it happened one time.  And after it happened it never happened again.  And it was a mistake. It was just — I was emotional and vulnerable and it just happened.

Q.   Do you remember what if anything the Defendant said to you during that?

A.   Just that — um - - -

We were reading.  I had like letters and stuff.  And we were just looking at pictures and stuff.  And he had said that he knows that if he was with anybody that Leah would want it to be with one of her good friends.

Q.   Do you remember talking to detectives back in 2000 about this case and being asked to describe the relationship between the Defendant and Ms. Freeman?

A.   I'm sure, yeah.

Q.   Okay.  And do you remember telling the detectives what percentage you would place on how in love Ms. Freeman was with the Defendant?

A.   That — I don't recall that and I was going to read — I don't recall anything about a percentage.  When I was asked about that a couple weeks ago, I don't remember anything about that.  And it doesn't sound familiar to me.  So, no I don't

Exhibit 5001 at 571

Smith   X    D4 42

know that.  I did want to see it.

Q.    The last paragraph.

A.    Okay.  Yeah, still reading that, it still doesn't sound familiar to me at all, actually.

Q.    So, you don't remember telling detectives that she only loved him seventy-five percent?

A.    Yeah, I don't.  I don't remember that at all, actually.

Q.    Thank you.

A.    Everything else I remember saying.  But the percent thing just doesn't ring a bell in my mind at all.

Q.    Thank you.

MS. SOUBLET:    Nothing further.

WITNESS:    Yeah, okay.

THE COURT:    Mr. McCrea.

CROSS EXAMINATION

BY MR. MCCREA:

Q.    Ms. Smith - - -

A.    Uh huh.

Q.    I'm Robert McCrea.  I'm here on behalf of Nick McGuffin.  You've never talked to me before, right?

A.    No.  No, I haven't.

Q.    You've never even seen me before have you?

A.    No, I have not.

Q.    And I you as it were.

Exhibit 5001 at 572

Smith   X    D4 43

And you were questioned.  You were questioned by the FBI back in July of 2000?

A.    Correct.

Q.    And that was an Agent Sole or Soley or Souley, something like that?

A.    I can't even remember the name.

Q.    Okay.  But he was an FBI agent, anyway?

A.    I remember that.

Q.    Were you fairly well impressed being questioned by an FBI agent?

A.    Impressed?

Q.    Oh, it just — the FBI is sort of — has a larger stature you might say, than other types of law enforcement in your mind.  Is that fair to say?

A.    I'm sure, yeah.

Q.    Okay.  And at that — at the time that you were talking with him that was in July of 2000, before Leah's body had been found?

A.    Before, yes.

Q.    And you — she'd — you'd gotten to be pretty good friends with her?

A.    Uh huh.

Q.    And the way this came about was, at that time Scott Hamilton was friends with the Defendant, Mr. McGuffin.  And you were going with, as the expression is used — at least back

Exhibit 5001 at 573

Smith   X     D4 44

in my day the expression was used - - -

A.    (Interposing) Uh huh.

Q.    - - - with Scott?

A.    Yes.

Q.    And Leah and Nick McGuffin were going together?

A.    Correct.

Q.    And that's how you got acquainted?

A.    Correct, yeah.

Q.    And then you guys did things together?

A.    Uh huh.

Q.    All right.

So, after doing that for a number of months you became really pretty good friends with Leah?

A.    Correct.

Q.    You liked her?

A.    Yes.

Q.    Was she cute?

A.    Yeah.

Q.    By cute I mean physically attractive?

A.    Yeah, she was — yeah.

Q.    Again, forgive some of my expressions.  They may be out of date.

Anyway, when you talked to the FBI agent, you were interested in helping as much as you possibly could?

A.    Uh huh.

Exhibit 5001 at 574

Smith   X   D4 45

Q.   To see if you had information that would help find her.  Correct?

A.   If I — yeah.  Yeah.

Q.   Right.  And at that time, you advised the FBI agent that Nick McGuffin and Leah Freeman argued like any regular couple?

A.   Yeah.

Q.   Okay.

A.   That's what - - -

Q.   (Interposing)  But you went on to tell him that Nick and Leah loved each other more than anything?

A.   They were happy when they were happy.  And they — it was just like a regular high school relationship.  It - - -

Q.   (Interposing) All right.

A.   Everybody — I mean, I didn't see any perfect relationship in high school.

Q.   Well, what I'm getting at specifically, did you make the statement to him that they loved each other more than anything?

A.   I can't remember what exactly I said.

Q.   Do you recall saying they had planned a future together?

A.   I don't know if I said those exact words.  I can't remember honestly.

Q.   Okay.

Exhibit 5001 at 575

Smith    X    D4 46

A.    That was a long time ago.  I don't - - -

Q.    What about the statement — this statement that they wanted three children and had selected names for them?

A.    Well, I remember Leah and I were talking about baby names.  I don't remember — I don't remember three, but I could've said that.  But I remember talking about names.

Q.    Okay.  And - - -

A.    (Interposing) We had home ec together and we had those — those babies that you had to take care of.  And that was that year.  So we — well, I had one.  And I remember us talking about baby names.

Q.    And you've indicated that if they did have arguments that Leah Freeman yelled much more during the arguments than Mr. McGuffin did.  Right?

A.    She was pretty feisty.  They both were.

Q.    Okay.  But it's fair to say Leah had a pretty sharp tongue?

A.    She spoke her mind when she — yeah.

Q.    All right.  I'm not trying to say anything bad.  I'm just - - -

A.    (Interposing) Oh, no.

Q.    And, you said in observing the relationship between them, you had known Leah Freeman to strike Mr. McGuffin, but you'd never known him to strike her?

A.    Yeah, I don't remember saying that either.

Exhibit 5001 at 576

Smith    X    D4 47

Q.   You don't recall that?  Is that accurate as to how it was between them, though?

A.   I had seen them argue.  I don't recall seeing anybody hit anybody.

Q.   Okay.  You don't recall it being a physical difficulty between them is what you're saying?

A.   No, I don't recall that at all.  I know there was arguing.  But I don't remember any physical violence.

Q.   And, on the day before the 28th of June, 2000, the four of your had gone swimming together?

A.   Correct, yes.

Q.   And you had a really good time?

A.   Yes.  It was — yeah.

Q.   And you felt so good about it that that's why you wanted to get together the next day?

A.   Correct.

Q.   And then you broke up with your boyfriend, Scott the next day?

A.   Correct.

Q.   So, you didn't get together?

A.   No.

Q.   And - - -

MR. McCREA:   Excuse me, Your Honor.  Let me have just a moment please?

THE COURT:   Yes.

Exhibit 5001 at 577

Smith   X    D4 48

Q.    In terms of what went on after the 28th, you saw Mr. McGuffin a number of times when you and other people were looking, trying to find Leah?

A.    Correct.

Q.    And he was very upset?

A.    Correct.

Q.    Distraught as it were?

A.    Uh huh.

Q.    Is that fair?

A.    Yes.

Q.    And then after the time that the body was found and the memorial service had been held, you and Mr. McGuffin got together and were going over reminisces.  Is that correct?

A.    Yes.

Q.    And this was probably at least a couple weeks or more after - - -

A.    (Interposing) After the service, correct.

Q.    - - - after the services.  All right.

And you were having something to drink at that time?

A.    Yeah.

Q.    Both of you?

A.    Uh huh.

Q.    And you got very sentimental?

A.    I would say, yeah.

Q.    I don't mean to make this maudlin at all, but both

Exhibit 5001 at 578

Smith    X    D4 49

of you got very sentimental?

A.    (No audible response.)

Q.    And you got very emotional?

A.    (No audible response.)

THE COURT:    Please, ma'am, you can't hear. You're going to have to answer out loud.

A.    Oh, sorry.  Yes.  Yes.

THE COURT:    You have to make sure the microphone's in front of you.

A.    Yes.  Sorry.  Okay.  I'm trying to see him, too.

Q.    I can - - -

THE COURT:    (Interposing) Move the microphone over then.

WITNESS:    Oh, okay.

Q.    I can see you nod your head, but the recorder can't.

A.    Sorry.  Sorry.

Q.    That's fine.

Anyway, you got very sentimental, the two of you?

A.    Correct.

Q.    And you began to feel very close, one to the other?

A.    Yeah.

Q.    Well, it led into one of the more emotional experiences between individuals, and that is — that's when you had sex together.  Is that correct?

A.    Correct, yeah.

Exhibit 5001 at 579

Smith   X     D4 50

Q.   And it was just the one time incident?

A.   Just one time, yeah.

Q.   Excuse me.

One thing, going back to the swimming.  And I don't mean to bounce around out of order, swimming on the 27th of June, did Leah have kind of an accident and jump off a rock and hit her head or get her head off a rock while you were out there swimming?

A.   I — not that I recall.

Q.   Pardon?

A.   Not that I recall.

Q.   Okay.

A.   She was jumping off the rocks.  But I can't remember if she had an accident of some sort.

Q.   She was jumping off a rock?

A.   Uh huh.

Q.   Did - - -

A.   (Interposing) Into the water.

Q.   Did — pardon?

A.   Into the water, yeah.

Q.   Into the water?

A.   Uh huh.

Q.   Was there some interchange with Mr. McGuffin — between Mr. McGuffin, that is to say Nick McGuffin, and Leah Freeman about her jumping off the rock where he was saying she

Exhibit 5001 at 580

Smith    X    D4 51

should be careful.  He was concerned she might hurt herself?

A.   Um — I can't remember exact words.  But I know I didn't — I didn't want to.  And I thought they were crazy for jumping off the rocks.

Q.   What about — she seemed okay?

A.   Yeah.

Q.   In any event, the overall thing was you had a really good time?

A.   Yeah, yeah.  We had a really good day.  It was a really good day.

Q.   One last thing.

A.   Okay.

Q.   Even though you had broken up with Scott Hamilton did he happen to hear you talking on the phone about the fact that you and Nick had had sex?

A.   Yes.

Q.   And he had got really upset about it?

A.   Yes, he did.

Q.   Really angry with you?

A.   Uh huh.

Q.   Really angry with you guys, both of you?

A.   Yes.

Q.   I said that was the last thing, but I guess one other thing.  It may come up here.  Without having to get you back here.  You guys went to the prom together; you guys in my

Exhibit 5001 at 581

Smith   ReD   D4 52

terminology being you and Leah and Nick and Scott - - -

A.   (Interposing) Right.

Q.   - - - all went to the prom together?

A.   Yes, we did.

Q.   And Leah was wearing a white dress?

A.   Uh huh.

Q.   And this was in the latter part of May that you had the prom?

A.   Yeah.  I can't remember the exact date, but I think it was in the end, towards the end.

Q.   And she started her menstrual period at that time?

A.   Correct, yeah, that night.

Q.   Was concerned about the white dress, etcetera?

A.   Yeah.

Q.   All right.  But, you do have a recollection of that happening?

A.   Yes.

          MR. McCREA:   Those are all the questions I have of this witness, Your Honor.

          THE COURT:   Redirect.

          MS. SOUBLET:   Thank you, Your Honor.

          REDIRECT EXAMINATION

BY MS. SOUBLET:

Q.   Ms. Smith, how old were you in the summer of 2000?

A.   I had just turned sixteen on June 22nd.

Exhibit 5001 at 582

Smith   ReD   D4 53

Q.   How old was the Defendant?

A.   Eighteen, I believe — eighteen.

Q.   Where did the alcohol come from on the night when you guys had sex?

A.   I can't remember.  I don't remember how I got it.

Q.   Do you remember telling officers that you felt like you — you felt like Defendant took advantage of you?

MR. McCREA:   I'll object, irrelevant, what she felt like in that regard.  And besides it's a 404 issue, Your Honor.

THE COURT:   I don't know about the — I'm not too sure.

I'll sustain the objection to that question.

MS. SOUBLET:   Nothing further.

THE COURT:   You may step down.  You're free to leave.

WITNESS:   Thank you.

THE COURT:   Call your next witness.

MR. FRASIER:   Call Sherry Mitchell.

SHERRY MITCHELL

was thereupon produced as a witness on behalf of the Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:   Have a seat up here, please.

Exhibit 5001 at 583

Mitchell   D    D4 54

DIRECT EXAMINATION

BY MR. FRASIER:

Q.   Could you state your name please, ma'am, and spell your last name for the record?

A.   Sherry Mitchell.  It's M-I-T-C-H-E-L-L.

MR. FRASIER:   Would you pull that microphone up and scoot up to it a little bit that would help.

WITNESS:   Is that better?

MR. FRASIER:   Yes.

Q.   Could you tell us where you live?

A.   I currently live in North Bend, Oregon.

Q.   Have you lived in the City of Coquille in the past?

A.   I have.

Q.   When was that?

A.   From my seventh grade year until a little after graduation, so 2003.

Q.   When you lived here in Coquille did you live at a particular location?

A.   I did.  I lived up behind McKay's on North Elm Street, at forty-four — four, four, four and a half.

Q.   All right.

I'm going to show you what's marked as State's Exhibit No. 15.  Do you recognize what's portrayed in that photograph?

A.   I do.  That was my house.

Exhibit 5001 at 584

Mitchell    D    D4 55

Q.   And does it accurately portray where your house was and so forth?

A.   Yes.

MR. FRASIER:    Your Honor, we'd offer State's Exhibit No. 15.

MS. McCREA:    No objection, Your Honor.

THE COURT:    Received.

(Whereupon Exhibit No. 15 was then received into evidence.)

Q.   Ma'am, I'm going to put this up on the screen here. There's a — or should be — a laser pointer there.  And the red triangle, push it.  Okay?

A.   Okay.

Q.   Could you describe this property where you lived at, please?

A.   Yeah.  I lived — my mom actually owned both houses. And I lived in the one in the back there down that little driveway.

Q.   There's actually two houses there?

A.   There's two houses.  There's this one up in the front.  And then down this driveway there's a second house.

Q.   And is that one - - -

A.   (Interposing) And that's the one I lived in.

Q.   Who lived there with you?

A.   My mom.

Exhibit 5001 at 585

Mitchell   D    D4 56

Q.   Anyone else?

A.   My older brother — one of my older brothers lived there for awhile.  And I'm not sure at what point he moved into the front house.  So, sorry.

Q.   Okay.  The house in the back where you were living, where's the door to get into it?

A.   It's right where this — sorry — where this is.  It's just a little bit to the left of that.

Q.   Now, in the — well, did you know an individual named Leah Freeman?

A.   Yes, I did.

Q.   How did you know Leah?

A.   She was a really good friend of mine.

Q.   When did you become acquainted with her?

A.   Seventh grade volleyball.

Q.   Did you go to school with her?

A.   I did.

Q.   Where?

A.   Coquille High School and well, in middle school.

Q.   Middle school.

And, how long were you friends?

A.   For about three years.

Q.   How would you describe your relationship with Ms. Freeman?

A.   She was the person that I was closest to at the

Exhibit 5001 at 586

Mitchell   D    D4 57

time.  She was my best friend.

Q.   When you started to know her when you were in middle school, what was she like?

A.   She was hilarious.  She was so funny and she was fun and she was goofy and like this little ball of energy that nobody could keep up with.  She was just — everybody wanted to be around her.  Like she was just friends with everybody.  I mean, she was just — I don't know — she was awesome.

Q.   In the fall of 1999 — well, let me back up.

Were you in the same grade with her?

A.   I was.

Q.   In the fall of 1999 did you start high school together?

A.   We did.

Q.   What type of activities did she participate in?

A.   We played volleyball.  She played volleyball her freshman year.  I don't think that she played basketball that year.  She was a basketball player, but I don't think that she played that year.  If she did I don't remember it.  I remember her playing volleyball.

Q.   During the course of her freshman year did — of your own personal knowledge — did you observe whether or not she had a boyfriend?

A.   She did.  She was dating Nick McGuffin.

Q.   And when did that start?

Exhibit 5001 at 587

Mitchell   D   D4 58

A.   During volleyball.

Q.   Did you have some concerns?

A.   I did.

Q.   What were your concerns?

A.   When they first got together my concerns were just that he was just kind of a known — he was known to be a druggy.  So, I was just concerned because I felt like Leah was pretty young to be dating somebody older who was a druggy.

Q.   Did you actually write a letter to Mr. McGuffin?

A.   I did.

Q.   I'm going to show you now what's been previously marked as State's Exhibit No. 80 and I believe previously identified by Officer Wetmore.  Do you recognize that letter?

A.   I do.

Q.   And did you write that to the Defendant?

A.   I did, with the help of Leah.

Q.   With the help of Leah?

A.   Yes.

Q.   Was it intended to be serious, a joke, what?

A.   Well, the part about — I didn't want him to hurt her.  And I think that she had concerns, too, because he was kind of a flirt.  And so she wanted to know what his response would be as well.  But, it was mostly a joke.

MR. FRASIER:   I'd offer State's Exhibit No. 80.

Exhibit 5001 at 588

Mitchell   D    D4 59

MS. McCREA:   There's no objection.

THE COURT:   I'm sorry?

MS. McCREA:   There's no objection, Your Honor.

THE COURT:   The exhibit number again?

WITNESS:   Eighty.

THE COURT:   Mister - - -

MS. SOUBLET:   No. 80.

THE COURT:   No. 80 is received.

(Whereupon Exhibit No. 80 was then received into evidence.)

Q.   Would you read that for the jury, please?

A.   Me?

Q.   Sure.

A.   Oh, um - - -

Q.   (Interposing) Can you read it from there?

A.   I think so.  It says:

"Mr. McGuffin, okay, here's the deal.  I'm writing you this letter for one reason only. The reason is Leah.  First of all, if you have any bad intentions towards her then I'll be forced to kick your ass.  Second, if you get her started on drugs . . ."

My handwriting was terrible.

Q.   Okay.  Perhaps if I just - - -

Exhibit 5001 at 589

Mitchell    D    D4 60

A.    Yeah, I'm sorry.

Q.    Let me just go ahead and have you - - -

A.    (Interposing) Okay.  I'm sure.  Okay.

Q.    Why don't you go ahead and just read it?

A.    Okay.

"Second, if you get her started on drugs be the
other half of her losing her virginity or
anything like that, I'll be so pissed.  Also,
you're not to be alone with her when you're
drunk or high.  And if you break her heart I'll
gut your balls like a fish and use your dick as
a fishing pole.  If you think I sound bossy
just remember that she is my girl and I'm
loaning her to you.  So be thankful.  Anyway,
have a fun relationship.  Love always, Sherry
Ann."

Q.    Now, you mentioned in there that Leah was my girl?

A.    Uh huh.  It was a joke.  We had t-shirts made.

Q.    What type of t-shirts?

A.    Her t-shirt said Sherry's girl; and my t-shirt said
Leah's girl.

Q.    Did you receive a response back from the Defendant
in writing to that letter?

A.    I did.

Q.    I'm going to show you now what's been marked as

Exhibit 5001 at 590

Mitchell   D    D4 61

State's Exhibit No. 81.  Do you recognize that?

A.   I do.

Q.   Is that the letter you received back from the Defendant?

A.   Yes.

Q.   Now, you kept that in your personal possessions for several years?

A.   I did.  I don't think I really knew it was there to be honest.  I kept it with a box of letters from high school. But, yeah, I did.

Q.   And last year when the case was reopened were you asked to go through your personal papers?

A.   Uh huh.  And that's when I found it in here and handed it over.

Q.   And is that letter in the same condition is was when you first received it?

A.   Well, the paper is a little browner, but yes.

Q.   Has there been any changes to the writing or anything - - -

A.   (Interposing) No.

Q.   - - - along that line?

A.   No.

Q.   You turned it over to the police then?

A.   (No audible response.)

          THE COURT:   Your answer is yes?

Exhibit 5001 at 591

Mitchell   D    D4 62

WITNESS:   Yes.

MR. FRASIER:   We'd offer State's Exhibit No. 81.

MS. McCREA:   There's no objection.

THE COURT:   Received.

(Whereupon Exhibit No. 81 was then received into evidence.)

Q.   Would you read that for the jury, please?

A.   Yes.  It says:

"Sherry Ann:  First of all I like Leah a lot and there's no bad intentions towards her.  I wouldn't hurt Leah.  I couldn't hurt Leah.  I like her too much.  If anyone is going to hurt somebody it would have to be her hurting me, just because it doesn't seem like she likes me that much.  I just hope she doesn't stop liking me, because I like her too much for that.  Oh, yeah, and I wasn't planning on getting Leah started on any bad habits.  I'm not like that. I don't want her to start anyways.  And another thing, if you used my thing as a fishing pole and gutted my balls I would have to seriously hurt you.  After I got out of the hospital, anyways.  So, anyway Leah does like me or what? Because sometimes she doesn't act like it.  And

Exhibit 5001 at 592

Mitchell   D     D4 63

I'm not going to stop trying, but I just need to know.  Well, I've got to go.  Your friend, Nicholas James.

P.S.  She's my girl, not yours.  Just kidding."

Q.   During the course of the school year as the Defendant and Leah were together did you observe anything different about Leah?

A.   I did.

Q.   What did you see?

A.   Well, she started using drugs.  She stopped being like bubbly and happy and fun to be around.  And kinda became like serious and dramatic.  And she was really jealous which I didn't remember her being before.

Q.   Did you have an opportunity to observe her with the Defendant?

A.   On occasion.  Mostly just at school.  I didn't really — I hung out with them only once that I can really remember.

Q.   How would you describe what their relationship was?

A.   Dramatic.

Q.   What do you mean by that?

A.   They were both pretty jealous.  And they were both also kind of flirty.  So they would flirt with other people and get really jealous.  And they would, like, fight in the parking lot of the high school in front of everybody.  And it

Exhibit 5001 at 593

Mitchell   D    D4 64

was just dramatic.

Q. Did they fight (not understandable)?

A. I don't remember what the fights were about. I just remember on one or two occasions them fighting in the parking lot with people around. And I remember Leah slapped him. And it was just — it wasn't really like her to be so public like that.

Q. Did you ever see the Defendant strike her?

A. I didn't.

Q. The only thing you saw was her striking him?

A. Uh huh. I saw him strike a wall, but not her.

Q. Was that after an argument with her or during an argument with her?

A. I don't — again, I don't know what they were fighting about. But it was something. And it was at the school, down by our cafeteria.

Q. And you saw the Defendant hit a wall?

A. Twice.

Q. And was there any damage to the wall?

A. Yeah. He put holes in them.

Q. I want to direct your attention now to June 28th, 2000. Do you remember that day?

A. I do.

Q. And was there some arrangements made for Ms. Freeman to come over to your place?

Exhibit 5001 at 594

Mitchell   D     D4 65

A.   Uh huh, there was.

Q.   And what were the arrangements as best as you can recall?

A.   I can't remember who called who, but I know it was a phone call.  And we had agreed that she would come over to my house around seven.

Q.   And did she come over to your house at seven?

A.   She did.

Q.   And did you observe her arriving?

A.   Kind of.  I mean, I opened the door and you know, I saw her get out.

Q.   Get out of?

A.   Of the car.

Q.   Which car?

A.   I don't remember.

Q.   All right.  And who's car?  Who was driving?

A.   I know Nick was — Nick dropped her off.

Q.   And what happened when Ms. Freeman got out of the car?

A.   They weren't like fighting or anything.  They were just kind of, maybe like a little tension.  And then she just came inside.

Q.   And what did the Defendant do when she came inside?

A.   I think he left.

Q.   Now, once Leah came inside what did you — what did

Exhibit 5001 at 595

Mitchell   D    D4 66

you two do?

A.    We just hung out.  We went in my room and listened to music and hung out.  She wrote me a letter while I was sitting there and made fun of my music.  And - - -

Q.    (Interposing) You mentioned she wrote you a letter?

A.    She did.

Q.    When did you — did you see her writing this letter?

A.    I saw her writing.  I don't think I knew she was writing me a letter.  It wasn't uncommon for her to do that, though.  I mean, she just wrote letters all the time.  So, I saw her writing.  I don't think that I actually found it until after she left.  Like, I realized it was a letter that she was writing to me.

Q.    And it was after she left that you found it?

A.    I think so.

Q.    Let me show you what's been marked as State's Exhibit No. 82 and ask if you can identify that?

A.    Yes.  That's the letter she wrote me.

Q.    And is it in the same condition as when you found it?

A.    Yes.

Q.    The writing hasn't been changed or anything like that?

A.    No.

Q.    And you turned that over the police back in the year

Exhibit 5001 at 596

Mitchell   D    D4 67

2000?

A.   Yes.

THE COURT:    Your answer was yes?

WITNESS:    Yes.  Sorry.

MR. FRASIER:    Your Honor, we'd offer State's Exhibit No. 82.

MS. McCREA:    There's no objection, Your Honor.

THE COURT:    Received.

(Whereupon Exhibit No. 82 was then received into evidence.)

Q.   Would you read that for the jury, please?

A.   Yes.  It says:

"6/28 of 2000.  Sherry Ann Mitchell.  Hey girl, how are you?  I hope you can come.  It would make me feel better.  Not that I know if you'll even read this by then.  Anyways, how's life?  All here I guess.  Nick and I have been getting along a lot better.  I wasn't really mad at Nick when I got out to come over to the house.  I just didn't feel like being around him anymore tonight.  I love him to death, but that boy gets an attitude sometimes.  And that was one of them.  Anyways, this music you're listening to is really giving me the heebie

Exhibit 5001 at 597

Mitchell   D   D4 68

jeebies.  Just kidding.  I don't really mind.
Oh, good, now you're changing it.  Well, I'm
going to go now.  I love you.  Love, Leah
Nicole."

Q.   Now, when Ms. Freeman came over that evening, what were your plans?

A.   I don't — we were just going to hang out.  I don't think we made plans.

Q.   Was there a point in time where a discussion was had about going jogging?

A.   Uh huh.  Yeah, while she was there we decided that we were going to go jogging together.

Q.   And how much time had elapsed from the time she arrived until you started having this discussion about jogging?

A.   Probably like an hour, hour and a half.  I mean it was eight or eight thirty.

Q.   Had you gone jogging with her before?

A.   Yeah.  We went jogging together a lot.

Q.   When you went jogging where would you go?

A.   Just around Coquille.  Sometimes we would run the loop.  Sometimes we would jog down to Fifth Street Park.  I mean, we didn't have a particular path.  We would just jog.

Q.   How long would these jogs take?

A.   I mean it would depend on where we went.  You know,

Exhibit 5001 at 598

Mitchell   D    D4 69

sometimes they would just be — I mean, it wasn't like an exercise thing.  It was like a leisure thing.  So, I mean, they would sometimes turn into a walk that would take a few hours.  I mean - - -

Q.   Now, when you said the loop, just so we're clear. What's the loop?

A.   The new highway around Coquille and like through, by the high school.

Q.   You would run down Central, out on the bypass and then back - - -

A.   (Interposing) Yes.

Q.   - - - back to your house?

A.   Yes, yes.

Q.   Now, did Ms. Freeman come with jogging clothes?

A.   No.  We didn't plan on going jogging before she got there.

Q.   And was there — how would — well, if you were to have gone jogging, what type of clothing would she have used?

A.   She would have just borrowed some of my shorts.  And I think she — I mean, she had on a tank top she could have jogged in.  And she had on her shoes that she could have jogged in.  She would have just borrowed shorts.

Q.   Did you go and talk to your mom about going jogging?

A.   I did.

Q.   And where was your mom when you had that discussion?

Exhibit 5001 at 599

Mitchell   D     D4 70

A.   I think she was just downstairs.

Q.   Did Leah come downstairs with you?

A.   Not in the beginning.  I think she was changing.

Q.   What happened when you went downstairs and talked to your mom?

A.   Well, I went down to ask her if I could go jogging. And she said, "No."  She asked — well, she asked if Leah was going to jog the whole way with me.

And I said I didn't know because it was close to the time when Nick was going to come get her.  And so, in the past he had — sometimes when we were jogging he would pick her up somewhere in the middle of our jog and I would run home alone. And my mom would get mad that I was in the dark by myself.

And so, when she asked me that I said I didn't know because I didn't.  And so she said she didn't want me to go. And so I got in a fight with her because I wanted to go jogging.

Q.   What time was it that you understood the Defendant was coming to pick up Ms. Freeman?

A.   Nine.

Q.   Was there a concern that you would have enough time to go jogging and still be back in time for - - -

A.   (Interposing) I don't remember ever really thinking about it, to be honest.  I mean, I think that I kind of assumed that somewhere during our jog he would pick her up.

Exhibit 5001 at 600

Mitchell   D     D4  71

And that was fine with me.  It just wasn't fine with my mom.

Q.    So, you indicated you got into a fight with your mom about not going?

A.    Uh huh.

Q.    Was it verbal?

A.    Yeah.

Q.    Loud?

A.    Probably.

Q.    Okay.  Did you go back upstairs to where Leah was?

A.    I think she came — she came down while we were fighting.  My mom and I were fighting.  Because I was trying to get her to let me go.  And Leah came down.

Q.    How was Leah dressed at that time?

A.    I think she was back in her jeans.  I don't know if she ever actually changed or not.  I went downstairs.  And I assumed she was changing, but - - -

Q.    Do you recall what she was wearing that night?

A.    Yeah.  She was wearing a white men's wife beater, but it wasn't a men's because it had elastic straps on it.  And I think she was wearing light colored jeans and like running shoes.

Q.    I'll show you State's Exhibits Nos. 7 and 8.  Does that appear to be what she was wearing that day?

A.    Yes.

Q.    What happened when Ms. Freeman came down the stairs?

Exhibit 5001 at 601

Mitchell    D    D4 72

A.    She just walked straight outside.

Q.    Try to stop her?

A.    Well, I followed her.

Q.    What happened?

A.    She said, "Oh," you know, she said, "Your mom hates me."

And I said, "She doesn't, you know, she doesn't hate you.  She just doesn't want me running by myself in the dark."

And I said, you know, "It's happened a few times."

And I said, "She doesn't hate you."

Q.    How did she respond?

A.    Well, I think I had told her, you know, it wasn't about her.  You know, of course that we loved her.  That it was just maybe about some of the decisions that she'd been making lately that made my mom, you know, just not sure if — if I should go running with her or not.  And then of course we started talking about her doing drugs and Nick.

Q.    What did you tell her?

A.    I just — just that I didn't think she should be doing drugs.  I thought she was better than that.  I mean, it wasn't honestly about Nick.  It was about — you know, what she was doing.

Q.    Did you discuss her relationship with Nick?

A.    Uh huh.  Yeah.  Yes.

Q.    What was said?

Exhibit 5001 at 602

Mitchell   D     D4  73

A.   Just that he — I mean, I didn't think they were very good together.  They were — they didn't bring out the best in each other; they brought out the worst in each other.  And, you know, it wasn't something that I had really told her before.  And so I was just honest and just told her I didn't think they were a great couple.

Q.   How did she respond?

A.   She said, "I'm sorry I'm not good enough for you." And she walked away.

Q.   Which way did she walk?

A.   She walked from Elm down Fourth towards McKay's.

Q.   Did you follow her?

A.   No.  I stood there and watched her for a little bit. I think I thought she was going to come back.  I thought she would turn around.  But I didn't follow her.

Q.   Where was she the last time you saw her?

A.   Walking on Fourth, just probably like in between my road and where the road goes down.

Q.   Do you recall roughly about what time it was when she left?

A.   It was almost nine.  It was like maybe eight forty-five, eight fifty.  It was really close to nine.

Q.   After she left what did you do?

A.   I went back inside and — I was crying.  So, I just went home.

Exhibit 5001 at 603

Mitchell  D    D4 74

Q.   Did the Defendant eventually show up?

A.   He did, just like minutes after.

Q.   When you say minutes, can you give us an approximate amount of time?

A.   It wasn't long.  I remember he — when he showed up, I said, "You had to have just missed her."

I said, you know, "I'm sure, you know, she's not far."

And I told him, "She's . . ." you know, I said, "She's probably walking home.  You'll catch her."

Q.   Now, you had walked to her house with her from your house?

A.   Yeah.

Q.   Multiple times?

A.   Yes.

Q.   Was there a particular route that she took?

A.   We wouldn't usually go all the way down to McKay's. I don't know what route she took that night.  But normally we would have gone left on — I don't know the name of the road. But it would take you left and you would come down by Fast — the old Fast Mart.  And then we would hit the — Central.

Q.   And this road would — if you're talking about turn off, this is off of Fourth?

A.   Yes.

Q.   That would be before you get to McKay's?

Exhibit 5001 at 604

Mitchell   D    D4 75

A.   Yes.  There's two roads.  And it would have been the first one if you left my house.  Sorry, I don't know the name of it.

Q.   Now, when the Defendant came to your house what did you tell him?

A.   I told him, "We got in a fight.  She just left.  I'm sure you can catch her."

Q.   When you said you into a fight, did you describe what the fight was about or anything like that?

A.   I — I — not that I remember him.  As far as I remember he didn't ask.  I didn't tell him.  He got in the car and left.

Q.   After the Defendant left — well, let me ask you this.  What type of car was he in when he came, do you recall?

A.   I don't remember.  I know he had two cars.  And I don't remember what he was ever driving.  So, sorry.

Q.   That's okay.

After the Defendant left, what did you do?

A.   I don't remember.  I probably went upstairs, probably went up to my room.

Q.   Did you leave your house?

A.   No.  I stayed there.

Q.   At some point in time did the Defendant return?

A.   Yeah, he came back.  It was about an hour later.  It was about ten o'clock.

Exhibit 5001 at 605

Mitchell   D   D4 76

Q.   What happened when he came back to your house?

A.   He came back, asked if Leah was there.  I said, "No. You didn't find her?"

And he said, "No."

I said, "Well, she probably walked home.  You know, did you call her mom?"

And he said, "No."

I said, you know, "Well, call her mom."  And I gave him the phone and dialed it for him.  And he called Cory and Leah wasn't there.  And then he left again.

Q.   Did you see him again that night?

A.   No.

Q.   Did you do anything after he had come to your house and said that he couldn't find Leah.  Did you do anything after that?

A.   Yeah.  I had my older brother drive me down to Fifth Street, just because it was a place that me and Leah went often with each other.  And I thought, well, you know, Nick wouldn't probably drive there and think she was there.  I thought maybe she's down there on the swings or something. And so I just had my brother drive me to Fifth Street.  And she wasn't there.  And so then I just went back home.

Q.   Thanks.

MR. FRASIER:   Your Honor, that's all the questions I have at this time.

Exhibit 5001 at 606

Mitchell   X    D4 77

THE COURT:    Ms. McCrea.

CROSS EXAMINATION

BY MS. MCCREA:

Q.   Ms. Mitchell, after Leah Freeman left — well, let me back up.

You were dating a guy named Corey Bryant back on June 28th of 2000.  Is that correct?

A.   Yes.

Q.   And after Leah Freeman left, after the fight between the two of you, your boyfriend Corey Bryant showed up at your house?

A.   Yes.  I honestly — that wasn't something that I even remembered.  But I ran into him a few months back and he told me about that.  I'm sure he did.  It wouldn't have been something that stuck in my head because he came by a lot.

Q.   And at this point, on June 28th, you've indicated that you've said some things to Leah that you had never said to her before?

A.   (No audible response.)

Q.   You're nodding yes?

A.   Yes.

Q.   And she became extremely upset in response.  Is that fair?

A.   Yes.

Q.   And that made you be extremely upset as well?

Exhibit 5001 at 607

Mitchell   X   D4 78

A.   Yes.

Q.   And I think you said that you started crying?

A.   Yes.

Q.   Do you know if Leah was crying when she left?

A.   Yes, she was.

Q.   She was crying.  Okay.

When she came over at around seven o'clock, was your mom home at that time?

A.   I don't remember if my mom was home or if she got home at some point while Leah was there.

Q.   But the two of you, you and Leah, were upstairs in your room as you say, hanging out?

A.   Uh huh.

Q.   Uh huh, yes?

A.   Yes.

Q.   Sorry.  We've just got to get it on the record.

A.   Yes.

Q.   Okay.  Now, prior to this rendezvous, on June 28th, would it be fair to say that you and Leah had not been spending as much time together as you had been in the past?

A.   Yes, it would be fair.

Q.   When — the two of you would do a lot of stuff.  But when Leah started dating Nick McGuffin, she was spending most of her time with him.  Is that correct?

A.   Yes.

Exhibit 5001 at 608

Mitchell   X    D4 79

Q.   The two of you would write notes back and forth?

A.   Yes.

Q.   And I want to, if I might, show you some notes.

MS. McCREA:   Let me show Counsel first.

It's kind of hard to navigate back here.

Q.   Ms. Mitchell, I'm going to show you what's been marked for identification as Defendant's Exhibits Nos. 115, 116, 117, 118 — let me try not to drop them on the floor — 119, and 120.  Would you just take a second and take a look at those?

A.   Yeah.

Q.   So, do you recognize each of those exhibits as notes that you sent to Leah or gave to Leah Freeman?

A.   Are you asking me if I remember them all or if I recognize them?

Q.   Well, do you — okay.  Let me ask you this.  Can you not remember them.  The first one which would be Exhibit — is that No. 116?

A.   No. 115.

Q.   No. 115.  That is a typed document.  The rest of them are handwritten?

A.   Yes.

Q.   So, is the typed document signed by you?

A.   Yes.

Q.   And you remember writing that to her?

Exhibit 5001 at 609

Mitchell    X    D4 80

A.    Yes.

Q.    Okay.  The other ones, do you recognize your handwriting?

A.    Yes.

Q.    And do you believe that these are documents that you gave or sent to Leah?

A.    Yes, I do.

Q.    And do they — obviously they're copies of the originals.  Do they appear to be what you gave to her?

A.    Yes.

MS. McCREA:    With Mr. Frasier's permission since the originals are in the custody of the Prosecution we would offer Nos. 115, 116, 117, 118, 119, and 120, Your Honor.

MR. FRASIER:    I have no objection.

THE COURT:    Received.

(Whereupon Exhibits Nos. 115 116, 117, 118, 119, and 120 were then received into evidence.)

Q.    So, Ms. Mitchell, I'm not going to ask you to read all of those out loud.  But the tenor of those notes is, you and Leah had the kind of relationship where the note that she wrote to you the night of June 28th, she started out, "Hey Girl?"

A.    Uh huh.

Q.    Yes?

A.    Yes.

Exhibit 5001 at 610

Mitchell   X    D4 81

Q.   Okay.  Sorry.

And you would start out some of your notes that way.
And some of them you would start out saying, "Hey my girl,"
kind of thing.  Right?

A.   Um-m-m.  Okay.  Yes, "Hey, how's my girl."  Right.

Q.   And some of them, it was, "Hey sexy girl?"

A.   Uh huh.

Q.   Or, "Hey sexy lady," that sort of thing?

A.   Uh huh.  Yes.

Q.   Okay.  And then I want to show you what's been
marked for identification as Defendant's Exhibit No. 123.  Do
you recognize that document?

A.   No.

Q.   The document is addressed to a Mr. Hall.  And do you
recognize the handwriting in the document?

A.   Yes, it's Leah's.

Q.   It's Leah's handwriting.  And were you interested in
a boy at school at that — in 2000 by the name of Robert Hall?

A.   Yeah.  We went to homecoming or something together.

Q.   Okay.

A.   That was about the extent of our relationship
though.

Q.   And in this letter, in Leah's letter, in her
handwriting, to Mr. Hall, she references the same type of
language to him as you wrote to Nick McGuffin about not

Exhibit 5001 at 611

Mitchell   X   D4 82

breaking her heart and the language about, "I'll gut your balls like a fish and use your dick as a fishing pole?"

A.   Uh huh.

Q.   So, do you know, was she writing that at the same time that you're writing the letter to Mr. McGuffin?

A.   It sure looks like it.

Q.   Do you - - -

A.   (Interposing) I don't remember it, but I know that Leah was with me when I wrote the letter to Nick.  And it looks like — I don't remember this.  But we obviously wrote one to him as well.

Q.   And it was in the tenor of sort of a joke or a fun kind of thing?

A.   Uh huh.  I'm sure I wanted to know what his response would be, the same way she wanted to know what Nick's was going to be.

Q.   And that was Exhibit No. 123.

          MS. McCREA:   We'd offer No. 123, Your Honor.

          MR. FRASIER:   Your Honor, I don't have an objection to No. 123, but I think we need to lay the foundation of where it was found.  And I don't have a problem stipulating to it.  But my understanding is, No. 123 was found in Ms. Freeman's property.

          Correct?

          MS. McCREA:   I received it from you in

Exhibit 5001 at 612

Mitchell   X    D4 83

discovery.  So, I believe it was found in her property, yes.

THE COURT:   Okay.  He just wants to stipulate.  And you're saying you believe.  Is that a stipulation or not?  I don't care whether you do.  I just need to know.

MR. FRASIER:   My point is it didn't come from Mr. Hall.  It came from - - -

MS. McCREA:   (Interposing) It was — yes, the parties can stipulate, Your Honor, that this document, Exhibit No. 123, was found in Ms. Freeman's possessions when the search was done either at the premises of Mr. Murphy or at the house on Knott Street.  And it has been in the Prosecution's possession ever since.

MR. FRASIER:   That's fine.

THE COURT:   Okay.

You can take that stipulation as a fact in the case, Ladies and Gentlemen.

MR. FRASIER:   With that I don't object to the exhibit.

THE COURT:   It's received.

(Whereupon Exhibit No. 123 was then received into evidence.)

Q.   Ms. Mitchell, just a couple more questions.  So, Leah's — Leah Freeman started dating Nick McGuffin in the fall of 1999?

Exhibit 5001 at 613

Mitchell    X    D4 84

A.    Yes.

Q.    And there was a time when Leah's mother, Cory Courtright, said to Leah, "You're not going to see Nick anymore?"  Do you remember that?

A.    Vaguely.

Q.    And Leah was upset about that.  Wasn't she?

A.    Well, yeah.

Q.    And then eventually her mom said that she could see Nick again?

A.    Yeah, I think she kind of gave in, because what else was there to do?  She wanted to be able to communicate with her daughter.  And she knew Leah was going to hide it from her.

Q.    Okay.  So, during the period of time when Leah was dating Nick the two of you would exchange notes and that sort of thing, but you weren't doing as much together as friends as you had been?

A.    Correct.

Q.    And based on the concerns that you've expressed, and you tell me if I'm right or wrong, and the fact that Nick McGuffin was significantly older than Leah Freeman, would it be fair to say that you did not approve of their dating relationship?

A.    Absolutely.

Q.    But the first time you actually made that known to

Exhibit 5001 at 614

Mitchell   X    D4 85

Leah was the night she came over on June 28th?

A.    It wasn't the first time I made it known.  It was the first time that I made it known maybe as strongly as I did.  It was the first time that I was just blatantly honest with her.  It's — Leah never thought that I thought her and Nick were a great couple.  But it was the first time that I just told her exactly how I felt.

MS. McCREA:    If I might just have a moment, Your Honor.

THE COURT:    Yes.

Q.    So, Ms. Mitchell, is it fair to say that Leah was not mad at Nick McGuffin when she arrived at your house?

A.    When I asked her, because like I said there had been some tension.  I noticed some tension.  I asked her if they were okay?  And she said that they weren't really fighting, buy that Nick hadn't wanted her to come by herself.  Like he had wanted to come in with her.  And she wouldn't let him.  And so there had been some tension there because of that.

Q.    Okay.  But that - - -

A.    (Interposing) But I don't think they were fighting, fighting.

Q.    Okay.  And she wasn't mad at Nick.  Nothing had changed concerning him when she left your house?

A.    Not that I knew of.

Q.    Okay.  Thank you.

Exhibit 5001 at 615

Mitchell   ReD   D4 86

MS. McCREA:    Nothing - - -

A.   She didn't say, "I'm going to break up with him or anything."

Q.   Yeah.  Her reaction was more to the contrary.  She was mad at you for bringing it up?

A.   Yes.

Q.   Okay.

MS. McCREA:    Nothing further, Your Honor.

THE COURT:    Redirect.

MR. FRASIER:    Thank you.

REDIRECT EXAMINATION

BY MR. FRASIER:

Q.   Ms. Mitchell, you indicated I think in response to Counsel's questions that you didn't think it was a good idea for these two to be together because of their age difference.  Was there other reasons?

A.   It wasn't as much their age difference as it was the drug factor.  You know, the factor that Nick was kind of a known flirt.  And he was definitely a know druggy.  But then as time went on I didn't think they were good together.  They fought a lot.  They were, you know, Leah had changed a lot.  She went from being really happy and funny to just kind of upset a lot.  And she — I had never seen her be angry and slap somebody or be overly dramatic or overly jealous.  I'd never seen those things from her.  And I felt like maybe they — he

Exhibit 5001 at 616

Mitchell  ReD  D4 87

brought that out in her.

Q.    And you expressed that to her before she left?

A.    Yes.

Q.    Thank you.

MR. FRASIER:    That's all I have, Your Honor.

THE COURT:    You may step down, ma'am.  You are free to leave.

WITNESS:    Thank you.

THE COURT:    We will take a recess until about eleven.

Everybody else remain seated until the jury has a chance to go to the jury room.

(Jury Out.)

THE COURT:    We'll be in recess until eleven.

(RECESS.)

(Jury In.)

JUDICIAL ASSISTANT:    All rise.

THE COURT:    Be seated please.

Call your next witness.

MR. FRASIER:    Thank you, Your Honor.

We call Peggy Mitchell.

MARGARET (Peggy) MITCHELL

was thereupon produced as a witness on behalf of the Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as

Exhibit 5001 at 617

M. Mitchell   D     D4 88

follows:

THE COURT:    Have a seat up here, please.

DIRECT EXAMINATION

BY MR. FRASIER:

Q.   Could you state your name please, sir, and spell your last name for the record?

A.   Margaret Mitchell.  Do you want my real name?

Q.   Sure.

A.   Margaret Mitchell.  Last name, M-I-T-C-H-E-L-L.

Q.   Do you have a nickname?

A.   Peggy.

Q.   Where do you live, ma'am?

A.   I live in North Bend, Oregon.

Q.   Are you familiar with Sherry Mitchell?

A.   Yes.  That's my daughter.

Q.   In the summer of 2000, could you tell us where you were living?

A.   Four forty-four and half North Elm Street in Coquille.

Q.   How long had you lived there?

A.   That's a good question.  A few years.

Q.   Are you familiar with an individual named Leah Freeman?

A.   Yes.

Q.   How do you know Ms. Freeman?

Exhibit 5001 at 618

M. Mitchell   D     D4 89

A.   Leah and my daughter were very good friends for a few years.

Q.   When did they first get to know each other?

A.   I don't exactly know.  Middle school maybe.

Q.   How often would you see Leah?

A.   In the past, often.  Sometimes she spent two or three days in a row at our house.  And — are you talking about in the past or when I last saw her?

Q.   Well, okay.  Let me - - -

A.   (Interposing) It changed.  It changed.  In the past she spent a lot of time with my daughter.

Q.   And this would be while they were in middle school?

A.   Yes.

Q.   Did they play sports together?

A.   They did.

Q.   What type of sports?

A.   Track and volleyball.

Q.   Were they in the same grade?

A.   Yes.

Q.   Now, in the fall of 1999, your daughter became a freshman at Coquille High School?

A.   Uh huh.  Yes.

Q.   And that would have been at the same time that Leah Freeman became a freshman?

A.   Yes.

Exhibit 5001 at 619

M. Mitchell   D    D4 90

Q.   Now, you indicated that she spent a lot of time at your house, but then that changed?

A.   Right.  Yes.

Q.   When did that occur that she stopped coming over so much?

A.   Roughly about the time she started dating Nick.

Q.   You became aware that she was dating the Defendant Nicholas McGuffin?

A.   Yes.

Q.   Did you have an opportunity to observe these two together?

A.   No.

Q.   I want to go now to June 28th of 2000.  Do you remember that day, ma'am?

A.   Yes.

Q.   Had you been working that day?

A.   Yes.  I — yes.

Q.   About what time was it when you got home?

A.   About seven p.m.

Q.   And who was there when you got there?

A.   Leah.  My daughter was there and Leah was there.

Q.   She had gotten there before you did?

A.   Either just before or just after.  I didn't go right in the house.

Q.   And what did the two girls do when they got — while

Exhibit 5001 at 620

M. Mitchell   D     D4 91

you were there?

A.   They were upstairs in Sherry's room doing what girls do.

Q.   What were you doing?

A.   I was — actually I was out in my yard in a lawn chair just trying to relax.

Q.   Now, how long — well, let me ask you this.

Did you have any idea how long Leah was supposed to be there that night?

A.   I understood Nick was to pick her up around nine.

Q.   Now, did your daughter, Sherry, come to you and ask if she could go jogging?

A.   Yes, she did.

Q.   Do you recall roughly when in the evening that was?

A.   Roughly nine-ish.

Q.   And what happened when your daughter came and asked you?

A.   I was a mom.  We got in an argument.  I told her no, she couldn't go running.  And, you know, we got in a little argument about that.

Q.   Where was Leah during this?

A.   Leah, at the time — I'm not sure if Leah was still upstairs or downstairs.  But we were right at the base of the staircase.

Q.   And did Leah come downstairs shortly after this

Exhibit 5001 at 621

M. Mitchell    D    D4 92

argument?

A.    Yes.

Q.    And how was she behaving when she came downstairs?

A.    She seemed upset, went out the door kind of quickly.

Q.    Did you follow her?

A.    I did not.

Q.    Stay in the house?

A.    I did.

Q.    Do you recall what she was wearing that night?

A.    I don't.  But when both girls came downstairs and wanted to go running, they both had shorts on.

Q.    I'm going to show you what's marked as State's Exhibits Nos. 7 and 8.  I believe it's been represented were taken of Leah that day.  Do they — does that help your memory any?

A.    She often wore a tank top.  I — it doesn't.

Q.    What happened after Leah went out the door?

A.    My daughter followed her.

Q.    Did you see or hear what happened?

A.    I didn't.

Q.    Did your daughter eventually come back in the house?

A.    She did.  She came back a few minutes later, very upset because Leah had been crying.

Q.    Did your daughter have a boyfriend at that time?

A.    She did.

Exhibit 5001 at 622

M. Mitchell   D     D4 93

Q.   Do you recall his name?

A.   His name was Corey.

Q.   Did Corey show up at any time?

A.   I don't remember.  He was there often, but I don't remember.

Q.   Now, did the Defendant show up at your home?

A.   That would be Nick?

Q.   Yes.

A.   Yes, he did.

Q.   About what time was that?

A.   Roughly ten or fifteen minutes after nine.

Q.   Let me back up.  We've heard testimony that the Defendant showed up shortly after Leah left.  Did you see him at that time?

A.   I'm not sure.  I think so.  I think — I remember being with Sherry at the time.  And both of us — either I heard him right next to the door.  Sherry said, "You should have just passed him," or, "Just passed her because she just left."  That's all I remember.

Q.   Now, you recall him coming back at around ten?

A.   Yes.

Q.   Can you describe what happened when he came to your house at ten o'clock?

A.   I think I had just locked the door.  We were just getting ready to go to bed.  And he sounded pretty frantic

Exhibit 5001 at 623

M. Mitchell  X    D4 94

behind the door.  So, I let Sherry open it.  And said he hadn't found Leah still.  And so we were both very surprised. And Sherry asked him if he had talked to Cory, to Leah's mom. And Nick hadn't.  And so she dialed the phone and handed him the phone so he could call her.

Q.  Did you let him in your house?

A.  No.

Q.  How long did he talk on the phone?

A.  Not long.  Just long enough to ask if she'd seen Leah yet.

Q.  What happened when the phone call was done?

A.  Nick left.  We closed the door.  I went to bed. Shortly thereafter Sherry's brother — one of her brothers took her to the park to go and see if Leah was where Sherry might be.  And Sherry came back home.

Q.  Did you see Leah Freeman again after the time you saw her at your house?

A.  No.

Q.  Thank you.

MR. FRASIER:   That's all the questions I have at this time.

THE COURT:   Ms. McCrea.

CROSS EXAMINATION

BY MS. MCCREA:

Q.  Ms. Mitchell, the house on Elm where you were living

Exhibit 5001 at 624

M. Mitchell  X    D4 95

with your daughter in June of 2000 was a pretty small house, wasn't it?

A.   Yes.

Q.   And Sherry's room was upstairs?

A.   Yes.

Q.   So, when you and Sherry were arguing at the base of the stairs, the volume — well, let me put it this way.  Did the volume of the argument increase?

A.   I don't remember.

Q.   Was it the kind of situation where she said, "Can Leah and I go jogging?"

And you said, "No."  And she continued to persist in trying to get you to change your mind?

A.   Yes.

Q.   Okay.  So, she's saying, "Come on, mom, let us go."

And you're saying, "No?"

A.   That's right, yes.

Q.   All right.  And the two of you were talking in voices that would have carried upstairs?

A.   Yes.

Q.   Okay.  How long did the argument last, as best you can recall?  How many times — let me rephrase it this way.  How many times do you think you had to say no?

A.   Typically it would have been three or four.  So, I'm going to say it two to three minutes at the very most.

Exhibit 5001 at 625

M. Mitchell  X    D4 96

Q.   During the time that you were telling Sherry no, didn't you also indicate to her that you didn't want her to have to come back in the dark if Nick came by and picked up Leah?

A.   Yes.

Q.   And that was the concern that you had?

A.   Yes.

Q.   So, were the two of you still arguing when Leah came downstairs?

A.   I don't remember.

Q.   So, Leah comes downstairs.  And did she say anything before she walked out the door?

A.   Not to me, no.

Q.   She appeared to be upset?

A.   Yes.

Q.   And then Sherry went out after her and you did not hear that conversation?

A.   No.  That's right.

Q.   When Nick McGuffin came back to the house around ten o'clock, did you see what car he was driving?

A.   No.

Q.   When once he spoke with Cory, with Cory that is Leah's mom, he indicated to you that he was going to continue looking for Leah?

A.   I don't remember.  I just remember that's what we

Exhibit 5001 at 626

M. Mitchell   X    D4 97

expected.

Q. And he didn't say anything to the contrary?

A. No.

Q. Thank you.

MS. McCREA:   That's all the questions I have.

THE COURT:   Any redirect?

MR. FRASIER:   I have one matter I didn't bring up in my direct that I remember.

THE COURT:   Okay.

DIRECT EXAMINATION, Continued

BY MR. FRASIER:

Q. Ma'am, a few days before June 28th, do you ever recall being at the Fast Mart store and talking to Leah Freeman about her relationship with Nick McGuffin?

A. I don't remember.

Q. Do you ever recall telling Leah at any time that you were upset with her behavior and what she was doing and places she was hanging out?

A. No.

Q. Okay.

MR. FRASIER:   That's all I have.

THE COURT:   Any cross on that point?

MS. McCREA:   No, Your Honor.

THE COURT:   You may step down, ma'am. You are free to leave.

Exhibit 5001 at 627

Bryant   D    D4 98

Call your next witness.

MR. FRASIER:    Call Corey Bryant.

<u>COREY BRYANT</u>

was thereupon produced as a witness on behalf of the Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat up here, please.

Make sure you sit closer please and make sure the microphone's in front of you there and keep your voice up, please.

Go ahead.

MR. FRASIER:    Thank you.

<u>DIRECT EXAMINATION</u>

BY MR. FRASIER:

Q.   Could you state your name please, sir, and spell your last name for the record?

A.   Corey Bryant, B-R-Y-A-N-T.

Q.   Where do you live, sir?

A.   Right now I'm residing in Redmond, Oregon.

Q.   Have you lived in the City of Coquille before?

A.   Yes.

Q.   When did you live here in Coquille?

A.   From 1999 to 2001.

Q.   Did you go to school here while you were here?

Exhibit 5001 at 628

Bryant   D     D4 99

A.   Yes.

Q.   What school did you go to?

A.   Coquille High School.

Q.   And when you went to school here what grades were you in?

A.   Sophomore to senior.

Q.   Did you graduate?

A.   Yes, sir.

Q.   Now, are you familiar with an individual named Sherry Mitchell?

A.   Yes.

Q.   And how do you know Sherry?

A.   Sherry and I were good friends in high school and then we dated for awhile.

Q.   Do you recall when you dated?

A.   It would be my junior year.  So, 2000.

Q.   Now, when you lived here in Coquille, where did you live?

A.   I lived with my Aunt Beth out on Green Acres.

Q.   Did you have a job?

A.   Yeah.  I worked at McKay's grocery store.

Q.   Were you working there the summer of 2000?

A.   Yes.

Q.   What type of work did you do at McKay's?

A.   Courtesy clerk, stocked shelves, just about anything

Exhibit 5001 at 629

Bryant   D   D4 100

they needed around the store.

Q.   Was that back when the McKay's here in Coquille was open twenty-four hours a day?

A.   It wasn't open twenty-four.  It was still closing at nine o'clock at night.

Q.   I want to direct your attention now to June 28th, 2000.  Do you remember that day?

A.   Yeah.

Q.   Did you go over to the home of Sherry Mitchell?

A.   I did.

Q.   Do you recall roughly what time it was when you went over there?

A.   It was about eight thirty.

Q.   What time did you — did you have to work that night?

A.   Yeah.  I had to work at nine.

Q.   What happened when you got there?

A.   Sherry and Leah had just had some little dispute or something, nothing major, and Leah had just walked home and Sherry was kind of upset.

Q.   Was Sherry crying?

A.   A little bit, not really.

Q.   Had you seen Leah Freeman?

A.   Not that night.

Q.   Now, while you were there with Sherry did the Defendant show up?

Exhibit 5001 at 630

Bryant  D    D4 101

A.    Nick?

Q.    McGuffin.

A.    Yes.

Q.    What happened when the Defendant showed up?

A.    He was there to pick up Leah and she wasn't there. Sherry told him that she had just left.  And he kind of rolled his eyes and left.

Q.    Did you see Mr. McGuffin again that night?

A.    No.

Q.    Did you see Leah Freeman at all that night?

A.    No.

Q.    Now, I want to back up a little bit to the school year, 1999/2000.  Were you aware that Leah Freeman and Nick McGuffin were boyfriend/girlfriend?

A.    Yes.

Q.    How did you get to know Leah Freeman?

A.    She was one of Sherry's best friends.

Q.    And did you become acquainted with the Defendant Nick McGuffin?

A.    Yes.

Q.    How did you become acquainted with him?

A.    Through school and through Leah.

Q.    Did you ever see an incident in the parking lot at the high school involving Leah Freeman and the Defendant?

A.    Yes.

Exhibit 5001 at 631

Bryant   D   D4 102

Q.   Could you tell the jury please what you saw?

A.   Yeah, they had just got some couples pictures together.  And she accidentally dropped a couple of them on the ground.  And Nick got mad and was like, "Why did you throw those on the ground?"  He was mad at Leah.  And she was apologizing.  But she didn't do it on purpose.

Q.   What was the Defendant's voice like as he's talking to her?

A.   He was agitated; wasn't very pleased at all.

Q.   Was he loud?

A.   Yeah.

Q.   Did you have an opportunity to see these two together?

A.   In which way?

Q.   Well, did you ever see Leah and Nick together at school?

A.   Oh, yeah.

Q.   What was their relationship like?

A.   It had its ups and downs.  Lots of times they weren't — they were not getting along and not talking or mad at each other.

Q.   And other times they were good?

A.   Of course.

Q.   Thank you.

MR. FRASIER:   That's all the questions I have

Exhibit 5001 at 632

Bryant   X    D4 103

at this time.

THE COURT:    Mr. McCrea.

CROSS EXAMINATION

BY MR. MCCREA:

Q.    Mr. Bryant, before coming here and going back to the year 2000 you talked to an Officer Wetmore about what you had seen the night of the 28th of June of 2000.  Is that correct?

A.    I believe so, yes.

Q.    And at that time did you indicate to him that you had gone down to the Mitchell's that evening.  Correct?

A.    Yes.

Q.    And that you knocked on the door?

A.    No.  I met Sherry in the yard that evening.

Q.    Well, all right.  Do you recall what you told him?

A.    The officer?

Q.    Yes.  Did you tell him you knocked on the door?

A.    I might have.

Q.    All right.  And did you tell him that Sherry had been crying in the bathroom?

A.    I didn't think she was crying in the bathroom, no.

Q.    My question is, did you tell the officer that?

A.    I'm not sure.  I've not read my original statement.

Q.    Did he make notes as you were talking to him?

A.    Yeah.

MR. McCREA:    May I approach the witness, Your

Exhibit 5001 at 633

Bryant   X   D4 104

Honor?

THE COURT:   You may.

Q.   I'm going to hand you a copy of some handwritten notes, a portion of which is underlined up at the top.  Would you take a moment to read that please?

A.   Out loud?

Q.   Does that refresh your recollection of what you told Officer Wetmore?

A.   Yeah.

Q.   It does?

A.   Yeah, I - - -

Q.   (Interposing) All right.

So — and I don't mean to turn my back on you, but let me go back.

So you — and you talked to him something like a week or so after Leah had disappeared.  Correct?

A.   Yeah.

Q.   All right.  And at that time you did tell him that you had knocked on the door.  Right?

A.   Yeah.

Q.   And that Sherry had been crying in the bathroom?

A.   Yeah.

Q.   And then that it was some ten minutes later before Mr. McGuffin arrived?

A.   Uh huh.

Exhibit 5001 at 634

Bryant  X   D4 105

Q. Now, you had driven down — what would it be, Fourth Street to get to Elm?

A. I believe so. The one that goes up next to McKay's. I'm not familiar with the exact number.

Q. All right. Well, you had driven down the street that comes from McKay's down to Elm where the Mitchell's live. Correct?

A. Uh huh.

Q. And then you had driven in on Elm Street where the Mitchell's home is?

A. Correct.

Q. And McKay's sits up on Central?

A. Uh huh.

Q. And when you drove down there to get to the Mitchell's home, you didn't see Leah Freeman walking along Fourth Street. Correct?

A. Correct.

Q. And you didn't see her on Elm as you drove in?

A. Correct.

Q. And so then, after you were there it was still some ten minutes or so before Mr. McGuffin arrived?

A. Yeah, correct.

Q. And you testified before the Grand Jury here back in July of 2010, at that time did you even estimate that it might have been fifteen minutes after you arrived before he showed

Exhibit 5001 at 635

Bryant   X   D4 106

up?

A.   Yeah.

Q.   Okay.  So, would it be fair to say there was an appreciable amount of time from the time you showed up at the Mitchell's until Mr. McGuffin got there?

A.   Yeah, ten, fifteen minutes.

Q.   Okay.  And when he did show up, were you present when there was a conversation between Sherry Mitchell and Mr. McGuffin about what had gone on regarding Leah Freeman?

A.   Yes.

Q.   And didn't she spend the time to tell him that there had been a fight between her mother and herself and that this had caused Ms. Freeman to become upset?

A.   Yes.

Q.   Okay.  So, there was this conversation went on in which this whole thing was discussed with Mr. McGuffin?

A.   Uh huh.

Q.   And it was after this conversation then before Mr. McGuffin when to see if he could find Leah Freeman. Correct?

A.   Correct.

Q.   Now — well — then you indicated that you went back — yeah, you went back up Fourth Street up — or whatever street it is, Fourth if it is — to McKay's and went to work that night?

Exhibit 5001 at 636

Bryant   X    D4 107

A.   Correct.

Q.   And you didn't see anything of Leah Freeman as you went back up to McKay's?

A.   No.

Q.   You talked about the relationship between Mr. McGuffin and Ms. Freeman.  He became angry when she dropped a whole bunch of something.  I didn't quite catch what it was.

A.   They were photos.

Q.   A whole bunch of photos on the ground?

A.   Correct.

Q.   And they sort of spread out all over the place?

A.   Correct.

Q.   One of those frustrating type things?

A.   Yeah, but he seemed a little more mad about it, like that she had meant to do it and she hadn't.  She — it was an accident.

Q.   Okay.  So — but there was nothing physical went on?

A.   Besides him raising his voice and being very agitated with her, no.

Q.   He raised his voice?

A.   Yeah.

Q.   All right.  But the answer is no, there was nothing physical?

A.   No.

Exhibit 5001 at 637

Bryant  ReD  D4  108

Q.   You never saw anything physical regarding Mr. McGuffin and Ms. Freeman.  Isn't that correct?

A.   Correct.  I - --

Q.   (Interposing) All right.  Thank you.

MR. McCREA:    That's all the questions I have.

THE COURT:    Redirect.

MR. FRASIER:    Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. FRASIER:

Q.   Mr. Bryant, Counsel asked you about what Sherry Mitchell had told Mr. McGuffin when he arrived at the Mitchell home.  And Sherry Mitchell told Mr. McGuffin that there had been an argument?

A.   Uh huh.

Q.   Is that correct?

A.   Correct.

Q.   Do you recall what she talked about?

A.   Just that Peggy and Sherry and Leah had had some type of dispute.  I wasn't standing right there listening word for word.

Q.   Did you hear anything about Sherry Mitchell saying to Mr. McGuffin that she had told Leah that she felt that the relationship between the two was bad, things like that?

A.   Not that evening, but I had heard that before.

Q.   Did you ever hear Sherry that night say anything to

Exhibit 5001 at 638

Emler   D    D4 109

Mr. McGuffin about that?

A.   No.

Q.   Thank you.

MR. FRASIER:   That's all I have.

THE COURT:   You may step down and you are free to leave.

WITNESS:   Okay.

THE COURT:   Call your next witness.

MS. SOUBLET:   The State calls Josh Emler.

JOSH EMLER

was thereupon produced as a witness on behalf of the Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:   Have a seat up here, please.

Scoot closer to the microphone please.  And keep your voice up, please.

Go ahead.

MS. SOUBLET:   Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. SOUBLET:

Q.   Mr. Emler, can you state your full name and spell your last for the record?

A.   It's Joshua D. Emler, David Emler, E-M-L-E-R.

Q.   Mr. Emler, did you used to live here in Coquille?

Exhibit 5001 at 639

Emler    D    D4 110

A.    Yes, I did.

Q.    Okay.  And what high school did you go to?

A.    Coquille.

Q.    Do you know the Defendant, Mr. McGuffin?

A.    Yeah, I know who he is.

Q.    How do you know him?

A.    Mostly from school, just know him from being around. Kind of know everybody I that went to school with him.

Q.    Are you the same age?

A.    I don't know.  Probably roughly the same age.  I don't know if he's — I might be a little bit younger than him.

Q.    What year did you graduate from high school?

A.    I never graduated from school.

Q.    What year did you attend Coquille High School?

A.    To my junior year.  I think was until '98, '99.

Q.    In the summer of 2000 were you still living in Coquille?

A.    Yes.

Q.    Do you remember June 28th, 2000?

A.    I don't remember specific dates, but yeah I know what date we're talking about here.

Q.    Had you been hanging out with anybody that day?

A.    Yeah, Aaron, David and me.  And we went out — went to the Mill Pond with him, come back into town and got to Fast Mart.

Exhibit 5001 at 640

Emler    D    D4 111

Q.    Let me back you up there.

A.    Okay.

Q.    By Aaron, you mean Aaron West?

A.    Yes.

Q.    And David, you mean David Jenkins?

A.    Yes.

Q.    And by him your referring to the Defendant?

A.    Yes.

Q.    Where had you and Mr. West and Mr. Jenkins been prior to seeing the Defendant?

A.    I think we were at Fast Gas if I remember right.

Q.    Fast Gas or Fast Mart?

A.    Fast Mart, sorry.

Q.    Do you remember what time you saw the Defendant?

A.    No, I don't remember what time it was.

Q.    Do you remember how he got to Fast Mart?

A.    In his car through his driving.

Q.    What car was that?

A.    The blue Mustang.

Q.    Once the Defendant came to Fast Mart what happened?

A.    I don't really remember.  We ended up going out to the Mill Pond one way or another.  I was riding with Aaron.

Q.    Is that Johnson Mill Pond?

A.    Yes.

Q.    What was the reason for going out to Johnson - - -

Exhibit 5001 at 641

Emler   D    D4 112

A.    (Interposing) We went out to smoke pot.

Q.    By pot you mean marijuana?

A.    Yes.

Q.    Do you remember how long you were out at Johnson Mill Pond?

A.    Not really.

Q.    Do you remember who all smoked marijuana?

A.    Yeah.  All the four of us, David, me, Aaron and Nick.

Q.    That's the Defendant?

A.    Yes.

Q.    And what happened after you were done smoking marijuana out at Johnson Mill Pond?

A.    We headed back into town.

Q.    Do you remember the Defendant saying anything about Ms. Freeman while out at Johnson Mill Pond?

A.    No.  I don't really remember much of, you know, the day.  I don't know, I've had this much time just, you know, like you say it's been a long time ago.  It's not something that I really remember a whole bunch about.  I just know I was out there because you guys came to me and asked me before.  Or excuse me, these guys came to me and asked me before, you know, a bunch of questions and asked me where I was and what I did.  And I came in here and you know, I cooperated.  I went in and did everything they asked me to do.  I just — you guys

Exhibit 5001 at 642

Emler    D    D4 113

have it all on videotape.  I know that I went to the DA and told them what I knew then.  I'm sure that that's more reliable than what I remember now.  You know, it's been a long time ago.

Q.   And would one of those times have been back in 2000, shortly after Ms. Freeman's disappearance?

A.   Yes.

Q.   Do you remember speaking with police officers then?

A.   Yeah.  I remember — I remember having — it was you know — there was a lot of different people coming and talking to me.  And they asked us to come down.  I had to go down and take a lie detector test.  I had to go to the DA's office.  I remember, you know, doing that stuff.

Q.   Mr. Emler, I'm show you your statement and ask you to read it to yourself and tell me if you — tell me when you're done.

A.   Okay.

Q.   You're done?

A.   Yeah, I'm done.

Q.   After you were at Johnson Mill Pond did you have an opportunity to come back in town?

A.   Did I have an opportunity to come back into town?  By that you mean?

Q.   Well, did you stay out at Johnson Mill Pond all night or did you go home?

Exhibit 5001 at 643

Emler   X    D4 114

A.    No.  We went back into town.

Q.    Okay.  And where did you go when you back into town?

A.    We went back into Fast Mart.

Q.    Did you see the Defendant later that night?

A.    Yeah.

Q.    Okay.  Do you remember what car he was driving when you saw him later that night?

A.    I don't really remember exactly.  I said there that he was driving the other car.  I don't remember that specifically.  I honestly don't.

Q.    The other car would be the Thunderbird?

A.    Yeah.

Q.    Did the Defendant say anything to you when he came back to Fast Mart?

A.    I don't remember.

        MS. SOUBLET:    Nothing further.

        THE COURT:    Cross.

                CROSS EXAMINATION

BY MR. MCCREA:

Q.    Is it correct it was a little after nine that you left the Johnson Mill Pond?

A.    I — sir, I don't remember.  I just — you know, timelines.  Like I said it's been a long time ago.  I really - - -

Q.    (Interposing) That's fine.  If you don't remember

Exhibit 5001 at 644

Emler   X    D4 115

you can just tell me you don't remember, Mr. Emler.

A.   Yeah, I just don't remember.

Q.   I don't mean to beleaguer you about it.  You understand?

A.   Yeah, I understand.

Q.   Now — but you went — you went — you left and Mr. McGuffin left.  Correct?

A.   Yes, as far as I know.

Q.   And you went to Fast Mart?

A.   Yeah.

Q.   And Fast Mart was a young people hang — a young people's — possessive form — hangout - - -

A.   (Interposing) Yeah.

Q.   - - - back at that time?

A.   Yes.

Q.   So, it's the sort of place where young people would congregate in the evening?

A.   Yeah.

Q.   And, after you had been there for awhile, then Mr. McGuffin showed up?

A.   See that's — I know he showed back up, but I — you know, like I said I know I said all this and a lot of I don't really remember.  It's been a long time ago, man.  It's not — you know, just - - -

Q.   (Interposing) That's fine.  But you do remember he

Exhibit 5001 at 645

Emler   X    D4 116

showed up?

A.   Yeah, I remember seeing him again that evening.  I do remember that.  I don't remember what he was driving, what was said - - -

Q.   (Interposing) All right.

A.   - - - what time it was, but - - -

Q.   (Interposing) Wait.

But let me take it sort of a step at a time, for both of us.  Okay?

A.   Okay.

Q.   He showed up?

A.   Yeah.

Q.   All right.  And did you have a memory of how long you had been at Fast Mart when Mr. McGuffin showed up?

A.   That I don't really remember.  I know we had been there for a few though.

Q.   All right.  That's fine.  If you don't — and you don't have to, you know, make any excuses for it.  It's fine.

A.   Yeah.

Q.   And as I understand it, at this time you don't remember what car he was driving when he showed up?

A.   No, sir, I don't.

Q.   All right.  And then do you remember whether or not you saw him drive by or — well, drive by Fast Mart some more times later that evening?

Exhibit 5001 at 646

Emler  ReD  D4 117

A.   I don't remember seeing him drive by later that evening.  As far as I know I — I know I seen him drive by.  I remember that part, but I don't remember what he was driving.  I - - -

Q.   (Interposing)  Okay.  Did he look — did it appear as though he was looking for someone?

A.   I couldn't tell you.

Q.   All right.  That's fine, Mr. Emler.

Thank you.

MR. McCREA:   We have no other questions.

THE COURT:   Any redirect?

MS. SOUBLET:   Just briefly.

Thank you, Your Honor.

REDIRECT EXAMINATION

BY MS. SOUBLET:

Q.   So, Mr. Emler, you're saying you don't remember telling the police that the Defendant was driving the Mustang at the Mill Pond and the Thunderbird later?

A.   I don't remember saying that on there.  I remember — you know, like I said, from what I've read.  When I came into the DA this last time, they let me read through it again.  And I'd seen what I said there.

Q.   What you told the police in 2000 would be correct?

A.   What I'd seen on there seemed kind of - - -

MR. McCREA:   (Interposing) Excuse me, Your

Exhibit 5001 at 647

Emler   ReD  D4 118

Honor.  I object to the form.  A question gets asked and then the witness is going on at considerable length, well beyond the scope of the question, number one.

Number two, then I object to Counsel leading the witness - - -

THE COURT:    (Interposing)  Those objections - - -

MR. McCREA:    - - - on the most recent question.

THE COURT:    Both of those objections are overruled.

Go ahead and ask your question again.

Q.   What you told the police in 2000 was correct?

A.   On the statement right there?

Q.   Yes.

A.   There's some of that is something I don't think I said.  I don't remember saying that.  And what's on that statement there did not seem to me like something I would say. It seemed kind of corny.

Q.   Would it be safe to say that your memory in 2000 about the events that happened in 2000, is better than your memory here today?

A.   Yeah.  It would be.

Q.   And what your testimony at Grand Jury in 2000 would be better than your memory here today?

Exhibit 5001 at 648

West    D    D4 119

A.    Yeah, absolutely.

Q.    Thank you.

MS. SOUBLET:    Nothing further.

THE COURT:    You may step down and you're free to leave.

Call your next witness.

MS. SOUBLET:    The State calls Aaron West.

AARON WEST

was thereupon produced as a witness on behalf of the Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat here, please.

Go ahead.

MS. SOUBLET:    Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. SOUBLET:

Q.    Mr. West, can you state your full name and spell your last for the record?

A.    Aaron David West, W-E-S-T.

Q.    Mr. West, did you go to or did you grow up in Coquille?

A.    Yes, I did.

Q.    What high school did you go to?

A.    Coquille High School.

Exhibit 5001 at 649

West    D    D4 120

Q. And how do you know the Defendant, Mr. McGuffin?

A. I grew up with his family.

Q. Okay. Would that be his brother, Wayne McGuffin?

A. Yeah, his older brother, Wayne.

Q. Did you know Leah Freeman?

A. Just through Nick, yes.

Q. And when you say through Nick what do you mean?

A. I — the first time I met her was when I — he brought her over to a friend's house.

Q. Were you aware of whether or not they were dating?

A. Yeah. He said they were.

Q. When was that?

A. It would be two or three, maybe four weeks before she came up missing.

Q. How often would you say you saw Ms. Freeman prior to her disappearance?

A. After I met her, almost a daily — almost a daily. Every time I saw Nick.

Q. I want to turn your attention to June 28th, 2000. Do you remember that day?

A. A little bit. I've been refreshed about it, yeah.

Q. Were you hanging out with anyone in particular that day?

A. Josh Emler and David Jenkins and Nick, off and on that day.

Exhibit 5001 at 650

West   D   D4 121

Q.   Okay.  Where were you guys hanging out?

A.   Fast Mart mainly.

Q.   When you're at Fast Mart who's with you?

A.   David and Josh Emler were with me.  And then Nick would show up off and on in his car.  There was a whole bunch of people there.

Q.   Do you remember what car he was driving?

A.   His blue Mustang.

Q.   On that day was there a time when he came to Fast Mart and stayed with you?

A.   Yeah.  He hung out for awhile.  I'm not sure about how long.  And we visited and stuff.  And then we decided to go for a drive.  And we went out to Johnson Mill Pond.

Q.   What was the reason for going out to Johnson Mill Pond?

A.   We went out to go get high on marijuana.

Q.   Do you remember what time that was?

A.   It was late afternoon, seven, eight o'clock probably.

Q.   At that time was Ms. Freeman with the Defendant?

A.   No.  He said that he had dropped her off at a friend's house.

Q.   Once out — how did you get out to Johnson Mill Pond?

A.   I drove my car and he followed in his.

Q.   What car was that?

Exhibit 5001 at 651

West   D   D4 122

A.    The blue Mustang.  And I have — had a Plymouth at that period in time.

Q.    And once out at Johnson Mill Pond, where did you guys go?

A.    Towards the end of it, just parked alongside the pond.

Q.    Okay.  And what did you do while out there?

A.    Just hung out, visited, smoked some marijuana.

Q.    Did you have a chance — when you say smoked some marijuana, who was smoking marijuana?

A.    All four of us were that were out there.

Q.    Did you have a chance to talk to the Defendant while you were out at Johnson Mill Pond?

A.    Yeah.  He pulled up beside my car and we were just visiting about, just normal things.  He was talking about this and that being he was a little upset because him and — I think him and Leah had an argument or something earlier in the day.  Or I'm not quite sure what it was about.  But he was talking about having to pick her up at a specific time and not wanting to be late to pick her up.

Q.    Do you remember how long you were out at Johnson Mill Pond?

A.    A good hour or so probably, an hour and a half maybe.  I wasn't really keeping too much track of the time except for he was supposed to be back I think around nine or

Exhibit 5001 at 652

West   D   D4 123

something to pick her up.  I know it was getting pretty close to that time.

Q.   Was there a time when the Defendant wanted to leave but you all didn't?

A.   Yes.  Yeah, it was pretty close to nine.  He was wanting to go.  And I don't know about Josh or David, but I told him that, you know, it's — don't worry about it.  You know, I kinda persuaded him to stay and finish what we were doing.

Q.   And then what happened?

A.   After we were done he took off first.  And I followed him.  And we went back into town.  And he - - -

Q.   (Interposing) Did you see where he went?

A.   Yeah, he turned — he turned at a street past me, I think up by the post office maybe.  I turned right there by Safeway.  And we were going to meet back at Fast Mart.  And I seen him turn up Fourth Street by McKay's.  And I continued to Fast Mart.

Q.   Did you see him again later that night?

A.   Yes.  It was maybe ten, fifteen minutes after that he came to Fast Mart and asked if anybody had seen Leah walking by or anything or knew if any of us had seen her or anything because she wasn't where she was supposed to be.

Q.   Do you remember what his demeanor was like?

A.   He was maybe upset, kinda.  He could have just — he

Exhibit 5001 at 653

West   D    D4 124

could have just been stoned.  Or, he wasn't his normal, you know, happy-go-lucky as he was before we left.

Q.    Did he tell you what he was going to do?

A.    No.  He said he was going to go look for her, drive — I think he was going to drive to her house, hers and her mom's house to see if she had made it home yet.  And then he took off driving towards the high school.

Q.    Was there a time when you saw him later again that night?

A.    Yeah.  I saw him several times that night.  He drove by a few times, Fast Mart, while I was there.  He stopped a few times just to ask if anybody had seen her yet, because he said he still hadn't found her.

Q.    Was there a time when you saw him drive in a car other than the Mustang?

A.    Yeah.  Later that night he pulled in and he was driving a red Thunderbird.  Said he had either — I can't remember exactly why he had parked the car.  It was either — he was either getting low on gas or it was a mechanical problem.  But he said that he had to take it out to his parent's house and switch cars.

Q.    Did you ever see him in the Mustang again that night?

A.    No.

Q.    Finally, Mr. West, you have a conviction in 2002 for

Exhibit 5001 at 654

West    X    D4 125

forgery.  Is that correct?

A.    Yes.

Q.    And a conviction in 1998 for Theft Third.  Is that correct?

A.    1997 or 1998, something like that.

Q.    Thank you.

MS. SOUBLET:    Nothing further.

THE COURT:    Any cross?

CROSS EXAMINATION

BY MR. MCCREA:

Q.    Mr. West, it wasn't unusual in your past experience with Mr. McGuffin for him to drive his parent's car, the Thunderbird.  Is that correct?

A.    Yeah.  He drove it quite often.  And he - - -

Q.    (Interposing) Okay.  And when you're attempting to recall something, do you tend to form — do you try to form a mental picture in your mind about what it was happened?

A.    Yes.  It's how I usually do it.

Q.    How long was it after the 28th of June before the police talked to you about what you had seen the evening of the 28th?

A.    At least two or three weeks if - - -

Q.    (Interposing) Probably about a week?

A.    At least two weeks, three weeks.

Q.    About a week?

Exhibit 5001 at 655

West   X   D4 126

A.   Two, at least - - -

Q.   (Interposing) Two weeks?

A.   At least two weeks after.  It was quite awhile afterwards.

Q.   It was quite awhile after?

A.   Yes.

Q.   Okay.  So, it was — it's fair to say that it was quite awhile after the 28th of June before you were trying to bring up in your memory what you had seen that night.  Right?

A.   Yes.

Q.   And you had been smoking marijuana?

A.   Yes.

Q.   And in — you had a discussion about this with Officer Buddy Young at one time, didn't you?

A.   I'm not sure of the officer's name, but there was several officers that discussed things with me.

Q.   Did you indicate to him that you'd been — you'd been pretty screwed up with having smoked the marijuana?

A.   Oh, yeah.  I smoked a lot of marijuana at that point in time of my life.

Q.   Now — so — but as best you could bring up your memory — well, strike that.  Let's go to - - -

Mr. McGuffin came to Fast Mart after you guys went back to town from Johnson Mill Pond.  And he asked if you'd seen Leah, right?

Exhibit 5001 at 656

West   X   D4 127

A.   Yes.

Q.   And indicated he was looking for her?

A.   Yes.

Q.   And then that continued through — on through the night.  Isn't that correct?

A.   Yes, it did.

Q.   He went by maybe six, seven times?

A.   It could've been that many, yes.

Q.   And sometimes he'd stop and ask if anybody had seen Leah yet?

A.   Yes.

Q.   And did he appear as he would stop by later on to be getting upset and concerned about not finding her?

A.   He seemed to be more upset or his demeanor changed throughout the night.

Q.   And in terms of when you finally left Fast Mart, do you have a time frame as to when you finally left Fast Mart and went home?

A.   Probably between eleven p.m. and midnight I would guess.

Q.   Eleven and midnight?

A.   Yes.

Q.   All right.  And this process of Mr. McGuffin going by, stopping in, looking, went on right up to the time that you left and went home?

Exhibit 5001 at 657

West   ReD  D4 128

A.   Yes.

Q.   Is that fair?

MR. McCREA:   I think that's all the questions I have of this witness, Your Honor.

THE COURT:   Any redirect?

REDIRECT EXAMINATION

BY MS. SOUBLET:

Q.   Mr. West, do you remember speaking to Officer Zavala on July 7th, 2000?

A.   Might have been that day.  I do remember kinda talking to him.

Q.   Would it be safe to say that your memory of what happened in 2000 was better in 2000 than it is today?

A.   Yes.

Q.   Would it be safe to say that your testimony at Grand Jury would be better than what it is today?

A.   Yes.

Q.   Thank you.

MS. SOUBLET:   Nothing further.

THE COURT:   You may step down.

Call your next witness.

MR. FRASIER:   Your Honor, we are — don't have any more witnesses before lunch.

THE COURT:   Okay.

Everybody else remain seated until the jury has

Exhibit 5001 at 658

West   ReD   D4 129

a chance to leave.

Remember the admonitions.  Leave your notes in the jury room.  Be back at 1:00 please.

(Jury Out.)

THE COURT:    One o'clock.

(LUNCH RECESS)

(Jury In.)

JUDICIAL ASSISTANT:    All rise.

THE COURT:    Be seated please.

Call your next witness.

MR. FRASIER:    Thank you, Your Honor.

First we have a stipulation, Your Honor.

THE COURT:    Okay.

MR. FRASIER:    In regards to Mr. Fisher the parties would stipulate that he first obtained his driver's license on October 23rd, 2000.

THE COURT:    Okay.

Ladies and Gentlemen, you may consider that as a fact in the case.  The parties have stipulated to it.

MR. FRASIER:    And while I'm standing here, we have reached an agreement on what pages from the annual, State's Exhibit No. 93.  And I would offer that at this time.

THE COURT:    Okay.

MR. FRASIER:    (Not understandable) Counsel previously.

Exhibit 5001 at 659

Lindegren   D    D4 130

MS. McCREA:    Yes.

THE COURT:    That's exhibit number?

MR. FRASIER:    No. 93.

THE COURT:    No. 93 is received.

(Whereupon Exhibit No. 93 was then received into evidence.)

MR. FRASIER:    Call John Lindegren.

JOHN LINDEGREN

was thereupon produced as a witness on behalf of the Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat up here, please.

Make sure you get close to the microphone. Thank you.

Go ahead.

DIRECT EXAMINATION

BY MR. FRASIER:

Q.   Could you state your name please, sir, and spell your last name for the record?

A.   John Lindegren, L-I-N-D-E-G-R-E-N.

MR. FRASIER:    Why don't you pull the microphone a little closer to you.  Thank you.

Q.   First of all, could you tell us where you live, sir?

A.   115 Ash, Myrtle Point, Oregon.

Exhibit 5001 at 660

Lindegren   D    D4 131

Q.    How long have you lived there?

A.    Two years.

Q.    Have you lived in the City of Coquille?

A.    Yes, I have, sir.

Q.    How long and when did you live in Coquille?

A.    Off and on all my life, sir.  I've lived in only a couple other places.

Q.    Do you have relatives in the area?

A.    Yeah.  Yes, I do, my sister.

Q.    What's your sister's name?

A.    hJordis, H-J-O-R-D-I-S.

Q.    And does she have a nickname?

A.    Jordie.

Q.    Does she work?

A.    She does.  Coquille library.

Q.    Now, I want to direct your attention, sir, to the summer of 2000, the year 2000.  Did you live here in the Coquille area?

A.    I did, sir.

Q.    And did your sister live here in the Coquille area then?

A.    Yes, sir.

Q.    Where did she live?

A.    551 West Fourth Place.

Q.    Where is that at in relation to the McKay's Market

Exhibit 5001 at 661

Lindegren    D    D4 132

in Coquille?

A.    You go up Fourth and then you turn onto Fourth Place I believe and you go around a little — a little alleyway deal.

Q.    Are you familiar with the North Elm Street in that area?

A.    Yes (not understandable) yes.

Q.    Now, you're aware that an individual, a young girl named Leah Freeman disappeared in June of 2000?

A.    Yes, sir, I am.

Q.    Directing your attention to June 28th, 2000, do you recall that day?

A.    Yes, I do.

Q.    Had you been over at your sister's house?

A.    Yes, I had.

Q.    What were you doing there?

A.    I went over there — I had a dog.  I just got out of a ten year relationship and I didn't have any place to take my dog.  So she was taking care of my dog.  So I'd come up there and play with the dog and watch TV up there and — and I was up there at the time.

Q.    In particular do you recall what you were watching that night?

A.    Survivor.

Q.    When the show was over, what did you do, sir?

A.    I went outside and messed with the dog a couple few

Exhibit 5001 at 662

Lindegren   D    D4 133

minutes.  And then I left.

Q.    Where were you going?

A.    I was walking down to — I had rented an apartment in town.  And I was walking home.

Q.    Did you walk on North Elm?

A.    Yes, sir, I did.

Q.    Are you familiar with the Defendant in this case, Mr. McGuffin?

A.    Yes, I am.

Q.    How do you know him?

A.    I've met him around.  You know, I grew up around here.

Q.    And Leah Freeman, were you familiar with who she was?

A.    Yes.

Q.    How did you know her?

A.    I know some of her family and I grew up around here.

Q.    Now, after you had watched Survivor — well, first of all do you recall what time Survivor came on at night?

A.    I think it came on about eight o'clock.

Q.    And how long of a show was it?

A.    A one hour show.

Q.    So, it ended somewhere around nine?

A.    Yes, sir, I believe it did.

Q.    And after the show, that's when you went out and

Exhibit 5001 at 663

Lindegren   D   D4 134

played with your dog a little bit?

A.   Yeah.

Q.   And then you started to walk home?

A.   Yes, sir, I did.

Q.   Again you were walking on North Elm?

A.   I was, sir.

Q.   Did you see Leah Freeman that night?

A.   I did, sir.

Q.   Did you see Nicholas McGuffin that night?

A.   Yes, I did, sir.

Q.   See them together?

A.   I did.

Q.   Where?

A.   At — once you walk down on North Elm — I don't know what the address is.  There's a house and then a gravel road and a house behind it.  I'm not familiar with the address or anything.

Q.   Now, did the police interview you about this?

A.   Yes, they did.

Q.   And did they actually take you to this location that you described?

A.   They did, sir.

Q.   Did you point out where you saw these individuals?

A.   I did, sir.

Q.   I'm going to show you what's marked as State's

Exhibit 5001 at 664

Lindegren    D    D4 135

Exhibit No. 73 and 74.  Do you recognize that?

A.    Yeah, I do.

Q.    Do those pictures portray the area where you saw Leah Freeman and Nicholas McGuffin?

A.    Yes, sir, it does.

Q.    And this was after nine o'clock?

A.    Yes.

Q.    Do these picture accurately portray what you saw?

A.    Yes.

Q.    Now there's some orange cones in there.  What do they represent?

A.    That's where I saw these people.

MR. FRASIER:    At this time, Your Honor, we'd offer State's Exhibits Nos. 73 and 74.

MS. McCREA:    There's no objection, Your Honor.

THE COURT:    Received.

(Whereupon Exhibits Nos. 73 and 74 were then received into evidence.)

Q.    I'm going to put up on the screen here, sir, what's marked as State's Exhibit No. 73.  Can you see that from where you're at?

A.    I do, sir.

Q.    Do you see those two cones, orange cones?

A.    Uh huh.

Exhibit 5001 at 665

Lindegren    X    D4 136

Q.    Who was standing where?

A.    I don't know, sir.  I remember seeing them there.  I don't know who was standing.  Leah was there.  I saw her.  And I saw Mr. McGuffin.

Q.    Could you tell if they were talking or anything like that?

A.    Yeah, they were talking.

Q.    When you — did you walk by them or what happened?

A.    Uh huh.

Q.    What happened?

A.    I was just walking by.  There was a pickup that was parked there in the road.  So, I walked around it.  And I was walking down to Fourth.  And I just said, "Hello."  And just proceeded on walking.

Q.    Did you see them again after that?

A.    I did not, sir.

Q.    Thank you.

        MR. FRASIER:    That's the questions I have, Your Honor

                CROSS EXAMINATION

BY MS. MCCREA :

Q.    Mr. Lindegren, you didn't see a blue Mustang in that area that night did you?

A.    No, ma'am, I did not.

Q.    And the guy that you saw was about medium height?

Exhibit 5001 at 666

Lindegren   X   D4 137

A.   I don't know, six foot.

Q.   And the girl that you saw had her hair pulled back from her head?

A.   I believe so.

Q.   Now, this was — your dog — her name was what, Oca?

A.   Yes, ma'am.

Q.   And she was a chow mix?

A.   Yes, ma'am.

Q.   Do you still have her?

A.   No.

Q.   Okay.  And so basically you had visitation rights with her at your sister's house?

A.   I guess you could put it that way.

Q.   Okay.  Because you didn't — like you said you didn't have any place to keep her back in June of 2000?

A.   You're correct, ma'am.

Q.   So, would it be fair to say that you and your sister had a ritual where you would come over and have dinner, watch some TV, walk Oca and then go home?

A.   Yes.

Q.   Okay.  And the night that we're talking about, June 28th, 2000, you came over and you had dinner, had something to eat, watched Survivor, took the dog for a walk and then went home?

A.   I believe I went over and walked the dog and I ate,

Exhibit 5001 at 667

Lindegren   X    D4 138

I watched some TV, and then I played with the dog a little more, and then left.

Q.   How big was this dog, Mr. Lindegren?

A.   About ninety-five pounds.

Q.   Ninety-five pounds.  Okay.  And at this time, in June of 2000, how old was she?

A.   Oh, I don't know, two or three.

Q.   Okay.  So, she had quite a bit of energy?

A.   Yeah.

Q.   She wasn't an old dog who was content to just hang out on the carpet?

A.   No.  I don't believe so, ma'am.

Q.   Okay.  And typically when you went to visit your sister you would take Oca your dog for a walk?

A.   Yes, ma'am.

Q.   And didn't you take Oca for a walk on June 28th, 2000?

A.   I believe so.

Q.   Okay.  And didn't you typically take Oca for a walk after you watched Survivor?

A.   Sometimes I did; sometimes I didn't.

Q.   Okay.  And is it possible you took her for a walk after Survivor on June 28th?

A.   No, ma'am, I don't believe so.

Q.   So, if your sister said that you did take the dog

Exhibit 5001 at 668

Lindegren   X    D4 139

for a walk you would disagree with that?

A.   All I can testify is what I remember as being a truth, you know.  And I think I went over there about five in the afternoon.  And I do believe I run the dog before that.

Q.   When you would — when you say run the dog, would you typically put her on a leash and walk her through the neighborhood?

A.   No.  I'd let her walk beside me.

Q.   Okay.  So, she was a well trained dog that didn't need a leash?

A.   You got it.

Q.   And the two of you would make, say, for lack of a better term, a loop around the neighborhood?

A.   Yeah.  I'd go down the road.  And I go up Cedar and go down where the old county barns were and then come back around.

Q.   So, typically your walks with Oca would go anywhere from ten minutes to forty-five minutes?

A.   Yeah.  Yeah.

Q.   How long do you think you played with Oca the night of June 28th?

A.   Oh, I don't know, ten minutes maybe.  After I had went out.  Yeah.

Q.   I'm sorry.  After you went out?

A.   Of her house.

Exhibit 5001 at 669

Lindegren   X    D4 140

Q.    Okay.  So, you think you played with Oca after Survivor was over?

A.    Yeah.

Q.    Because it was your dog and you were - - -

A.    (Interposing) Yeah.

Q.    - - - I'm guessing pretty attached to her?

A.    Yeah, I was, ma'am.

Q.    So, Survivor's over and then you go out and play with Oca.  And then you start walking home?

A.    I did, ma'am.

Q.    Okay.  And that's when you see the male and the female in front of the Mitchell's home where we saw the orange cones - - -

A.    (Interposing) Yeah - - -

Q.    - - - in the photograph?

A.    - - - where you saw the cones.

Q.    Now, Mr. Lindegren, the first time that you spoke to the police was on July 16th, 2000?

A.    Yes, ma'am.

Q.    And the pickup you saw was parked partially in the road.  Is that correct?

A.    It was, ma'am.

Q.    So you had to walk around it - - -

A.    (Interposing) I did, ma'am.

Q.    - - - to get past?

Exhibit 5001 at 670

Lindegren    X    D4 141

Now, at this point when you're walking around the pickup and you see the couple, you didn't have the dog with you?

A.    No, ma'am.

Q.    Thank you, Mr. Lindegren.

MS. McCREA:    That's all the questions I have of you.

THE COURT:    Any redirect?

MR. FRASIER:    Nothing at this time, Your Honor.

THE COURT:    Does that mean you want him to remain available?

MR. FRASIER:    We may need him to remain available, but he can go and go about his business.  We'll get a hold of him if we need him.

THE COURT:    Mr. Lindegren, you are — you are free to leave now, but you're still under subpoena.  You're not released from that.  And they may want to call you back later.  This trial is scheduled to be this week and into next week.  So, you'll have to make yourself available.  If you want to go anywhere let the DA's office know where they can always contact you to call you back.

WITNESS:    Okay, sir.  Do I get any hours?  You know, do I get — you know, they — do I get any time?

MR. FRASIER:    We'll give him as much headway

Exhibit 5001 at 671

Lindegren   X   D4 142

as we can.

WITNESS:   Yeah, that's what I meant.

THE COURT:   You'll get some time, yeah.

WITNESS:   Okay.

THE COURT:   Just make sure they know where you are.

WITNESS:   Okay.  Because I may — I'm a concrete finisher and - - -

THE COURT:   (Interposing) That's fine.

WITNESS:   Okay.

THE COURT:   All right.

Call your next witness.

MS. SOUBLET:   State calls Ashley Patton.

ASHLEY PATTON

was thereupon produced as a witness on behalf of the Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:   Have a seat up here, please.

If you would scoot way forward, please, right next to the microphone.  And you can bend it down so it's right even with your mouth.

Okay.  Thank you.

Go ahead.

MS. SOUBLET:   Thank you, Your Honor.

Exhibit 5001 at 672

Patton    D    D4 143

DIRECT EXAMINATION

BY MS. SOUBLET:

Q.    Ms. Patton, can you state your name and spell your last name for the record?

A.    Ashley Patton, P-A-T-T-O-N.

Q.    I'm going to ask you to - - -

THE COURT:    No.  If you could raise your volume, please.  Speak louder.

WITNESS:    Do I need to say it again?

MS. McCREA:    We'll have them turn off the air conditioner.

WITNESS:    Okay.

Q.    Ms. Patton, is your last name — did your maiden name used to be Hutchinson?

A.    Yes.

Q.    Have you lived in Coquille before?

A.    Yes.

Q.    Were you living in Coquille the summer of 2000?

A.    Yes.

Q.    Were you still in school at that time?

A.    Yes.

Q.    Okay.  What school were you going to?

A.    Coquille High School.

Q.    What — in the school year '99/2000 what year were you?

Exhibit 5001 at 673

Patton   D   D4 144

A.   A sophomore.

Q.   Do you know Leah Freeman, or did you know Leah Freeman?

A.   Yes.

Q.   How long had you known Leah Freeman?

A.   Since we were little kids.  I couldn't — probably ten years.

THE COURT:   Ma'am, I'm sitting right next to you and I can hardly hear you.  You're going to have to really supply some volume.

WITNESS:   Okay.

A.   Probably about ten years or longer.

Q.   Do you know the Defendant, Mr. McGuffin?

A.   Yes.

Q.   How do you know him?

A.   From school, when we were kids.

Q.   Did you see him and Ms. Freeman in the school year 1999/2000?

A.   Yes.

Q.   What did you know about their relationship?

A.   Basically that they were together.

Q.   By together you mean boyfriend/girlfriend?

A.   Right.

Q.   Did you have an opportunity to see them interact with each other?

Exhibit 5001 at 674

Patton   D    D4 145

A.   Yeah on different various occasions in the hallway at school and maybe sometimes at Fast Mart or something like that.

Q.   How would you describe their relationship?

A.   Pretty much like any other high school relationship. It seemed like sometimes they were mad at each other; sometimes they were getting along.  Just depended on the day. Nothing unusual I noticed though.

Q.   I want to turn your attention to June 28th, 2000, do you remember that day?

A.   Yes.

Q.   Had you been working some place that summer?

A.   I worked at Hunter's Eatery and Creamery.

Q.   Were you working on June 28th?

A.   I don't think I was working.  I think I was just visiting friends there.

Q.   Did you have an occasion to see Ms. Freeman on June 28th?

A.   Yes.

Q.   What time was that?

A.   It was a few minutes before nine o'clock at night.

Q.   Where were you?

A.   I was driving my car down Central Avenue by McKay's.

Q.   Where was Ms. Freeman?

A.   She was walking by the pay phone in front of

Exhibit 5001 at 675

Patton    D    D4 146

McKay's.

Q.    Did you notice what she was wearing?

A.    She was wearing a men's white tank top and I think khaki shorts and tennis shoes.

Q.    I'm showing you what's been received as State's Exhibit No. 8 and asking you if you recognize that?

A.    Yeah.

Q.    What is that?

A.    A men's white tank top.

Q.    Is that a photo of Ms. Freeman as you saw her on — with that top on June 28th?

A.    Oh, yes.

Q.    Did you notice anything about her?

A.    She looked really mad.  She was walking really fast.  And she had her arms crossed.  And she was looking down.  And she had a frown on her face like she was upset about something.

Q.    Do you remember where she was walking?

A.    In front of the pay phone in front of McKay's, on the sidewalk.

Q.    Headed what direction?

A.    Towards Hunter's and the Credit Union and — I don't know what direction that is.  Sorry.

Q.    Towards the high school?

A.    Yeah.

Exhibit 5001 at 676

Patton    X    D4 147

Q.   Did you see the Defendant that night?

A.   I think I saw his car at Fast Mart on occasion when I drove by a few times.  But I didn't actually physically see him.

Q.   What car?

A.   Once I saw the Mustang.  And another time I saw the maroon Thunderbird.

Q.   Thank you.

MS. SOUBLET:    I have nothing further.

THE COURT:    Cross.

CROSS EXAMINATION

BY MS. MCCREA:

Q.   Ms. Hutchinson, you were — I'm sorry.

What's your current name?

A.   Patton.

Q.   Patton.  Thank you.

Ms. Patton, you would see Nick McGuffin in town from time to time.  Is that fair?

A.   Yes.

Q.   And occasionally you would see him driving a blue Mustang?

A.   Yes.

Q.   And other times you would see him driving a maroon Thunderbird?

A.   Right.

Exhibit 5001 at 677

Patton   X   D4 148

Q.   And it just depended on what day and what time he might be driving which car?

A.   Yes.

Q.   Okay.  Now, on June 28th, 2000 when you saw Leah Freeman, you've indicated that she was walking fast on North Central heading toward the high school?

A.   Yes.

Q.   And is it correct that you didn't recall seeing anybody else in the area around her?

A.   Yes.

Q.   And you certainly didn't see Nick McGuffin anywhere near her at that point?

A.   No.

Q.   Now, you were heading the opposite direction that she was going?

A.   Yes.

Q.   Okay.  But as long as you could see her, you didn't see any contact between her and Mr. McGuffin?

A.   No.

Q.   And you didn't stop and have any conversation with Leah Freeman?

A.   No.

Q.   Did you see her at all later on that night?

A.   No.  I think I stayed home the rest of the night.

Q.   So, in terms of your observations of Mr. McGuffin

Exhibit 5001 at 678

Patton   X    D4 149

the rest of the night, you were heading into town when you saw Leah Freeman.  Did you then go back to Fast Mart for a period of time?

A.   No.

Q.   So, your observations of Mr. McGuffin might have been a night different than June 28th?

A.   No.  It was like earlier in the night - - -

Q.   (Interposing) It was - - -

A.   - - - or throughout the day.  It was that day.  It wasn't any time after I saw Leah.  It was some time that day before I saw Leah.  I have no idea approximately when.

Q.   I understand.  It's been a long time.  So, if you saw Mr. McGuffin in the Mustang or in the Thunderbird, it would have been before you saw Leah Freeman - - -

A.   (Interposing)  Yes.

Q.   - - - walking?

A.   Yes.

Q.   Okay.  That's great.  Thank you.

          MS. McCREA:   Nothing further, Your Honor.

          THE COURT:   Ms. - - -

          MS. SOUBLET:   (Interposing) No redirect.

          THE COURT:   You may step down and you're free to leave.

          MR. FRASIER:   Call Mark Kirn.

Exhibit 5001 at 679

Kirn    D    D4 150

MARK KIRN

was thereupon produced as a witness on behalf of the Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat up here, please.

Move closer to the microphone, please, right up there.  Okay.  And keep your voice up, please.

Go ahead.

MR. FRASIER:    Thanks, Your Honor.

DIRECT EXAMINATION

BY MR. FRASIER:

Q.    Could you state your name please, sir, and spell your last name for the record?

A.    Mark Kirn, K-I-R-N.

Q.    Where do you live, sir?

A.    I live in Myrtle Point.

Q.    Have you lived in Coquille?

A.    Yes.  I lived in Coquille my whole life until three months ago.

Q.    Go to school here?

A.    Yes, sir.

Q.    Go to Coquille High School?

A.    Yes, sir.

Q.    What year did you graduate?

Exhibit 5001 at 680

Kirn    D    D4 151

A.    2001.

Q.    While you were attending Coquille High School did you become acquainted with or at least recognize or were familiar with the Defendant in this case, Nicholas McGuffin?

A.    Yes, sir.

Q.    How well would you say you knew him?

A.    I knew him pretty well.

Q.    And did you ever go out to his house, that type of thing?

A.    Yes, sir.

Q.    Did you know Leah Freeman?

A.    Yes, sir.

Q.    How did you know Ms. Freeman?

A.    Just from school and from Nick.

Q.    And when you say from Nick, what do you mean?

A.    Just that he was dating her.

Q.    That would have been what year, do you recall?

A.    Oh, '98, '99, somewhere in there.  I don't — I don't remember.

Q.    Now, do you know an individual named Mike McAdams?

A.    Yes, sir.

Q.    How do you know Mr. McAdams?

A.    From school and — from school.

Q.    Now I want to talk about the summer of the year 2000, in particular June 28th, 2000.  Do you remember that day,

Exhibit 5001 at 681

Kirn    D    D4 152

sir?

A.    Not really, no.

Q.    Do you remember a day where allegedly Ms. Freeman disappeared?

A.    Yes.  Yeah.

Q.    Do you recall where you were that evening?

A.    I was at Hunter's Eatery and Creamery I guess is what it was called.

MR. FRASIER:    You'll have to speak up.

A.    I was at Hunter's, the old Dairy Queen.

Q.    And what's it currently called?

A.    Colleen's.

Q.    Why were you there?

A.    I was eating.

Q.    With who?

A.    Mike McAdams.

Q.    Do you recall about what time of the evening it was you were there?

A.    No, sir, I don't.  It was — it was later in the evening but I can't tell you an exact time.

Q.    Do you recall talking to the police back in the year 2000?

A.    Yes.

Q.    And do you recall testifying at the Grand Jury in the year of 2000?

Exhibit 5001 at 682

Kirn   D   D4 153

A.   Yes.

Q.   Do you recall telling the Grand Jury and also the police officers that it was around nine o'clock?

A.   Yes.  That sounds about right.

Q.   Now, while you were eating there at the restaurant, at Hunter's, did you see Leah Freeman?

A.   Yes.

Q.   And where was she when you saw her?

A.   She was walking from, like the Les Schwab side of town towards the high school on - - -

Q.   (Interposing) Do you recall what she was wearing?

A.   A white t-shirt I think.  I'm pretty sure.  A white t-shirt.

Q.   Okay.  This is State's Exhibit No. 7.  Does that refresh your memory any?

A.   Yes.  That looks like the shirt she was wearing that night.

Q.   Okay.

MR. FRASIER:   Can you speak up so the jury can hear you?

A.   Yeah, that looks like the shirt she was wearing that night.

Q.   Could you tell anything about her demeanor when she was walking up the street?

A.   No, sir.  It's been so long, I couldn't.

Exhibit 5001 at 683

Kirn    D    D4 154

Q.    Did you see which direction she was headed?

A.    She was headed towards the high school, that direction.

Q.    Now, did you see her again that evening?

A.    No, sir.

Q.    After you finished eating at the restaurant, where did you go?

A.    To Fast Mart.

Q.    And did — who went with you to Fast Mart?

A.    I think Mike McAdams was probably with me.  And that was where everybody used to hang out when we were in school so there was quite a few people there.  I can't recall who exactly.

Q.    While you were there did you see the Defendant, Mr. McGuffin?

A.    Yes, sir.

Q.    Do you recall what car he was driving?

A.    I think it was the Thunderbird, but I'm not a hundred percent sure.  It's been so long I can't tell you exactly.

Q.    Did you see him later in the evening?

A.    No, sir.

Q.    Just saw him that once?

A.    I — yeah, just that one time.

Q.    And how much time had passed from the time you

Exhibit 5001 at 684

Kirn   X   D4 155

finished eating until you saw the Defendant?

A.   I don't remember.

Q.   Short period of time; longer period of time?

A.   It could've been.  I really don't remember that far back that good.

Q.   Would your memory about what you told the police officers and the Grand Jury back in the year of 2000 be better than today?

A.   Yes, sir.  Yeah.

Q.   Thank you.

MR. FRASIER:   That's all I have, Your Honor.

CROSS EXAMINATION

BY MS. MCCREA:

Q.   Mr. Kirn, when you saw Nick McGuffin that night on June 28th, 2000 he was with Leah Freeman's sister?

A.   I don't remember.  There was someone with him, but I can't recall who it was.

Q.   Do you remember it was a female?

A.   No, I don't remember.

Q.   Okay.  Do you remember telling the police that you stopped to talk to Nick.  And that you believe you saw Leah's sister in the Thunderbird with Nick looking for Leah?

A.   If that's what I told them back then, that's probably what happened.  I really can't tell you now for sure. It's been a long time.

Exhibit 5001 at 685

Kirn   X   D4 156

Q.   I understand.  I understand.

So, on June 28th, 2000, as best as you can remember, you and Mr. McAdams were going to go get a movie and watch a movie later?

A.   Yeah, possibly.

Q.   Okay.  And you decided to go to Hunter's to get something to eat - - -

A.   (Interposing)  Yes.

Q.   - - - before that?

A.   Yes.

Q.   And at that time Hunter's closed at nine o'clock, didn't it?

A.   I don't know.

Q.   So the two of you had to go to get something to eat before it closed?

A.   Well, yeah, I imagine.

Q.   When you saw Leah Freeman, is it correct that Mr. McAdams was facing the window and you were sitting with your back to the window?

A.   No.  I don't know if that's correct or not.

Q.   Okay.

A.   I think we were sitting both sideways to the window.

Q.   Okay.  Did Mr. McAdams ask you who Leah Freeman was as she walked by the window?

A.   I — yeah, I think so.

Exhibit 5001 at 686

Kirn   X   D4 157

Q.   And you indicated that's Leah Freeman, or that's Nick McGuffin's girlfriend?

A.   Yeah I think — yeah, I think that's what happened.

Q.   And Leah Freeman was walking right by the window of Hunter's.  Is that correct?

A.   I — I don't know.

Q.   And she had her arms wrapped around her like she was cold?

A.   Maybe.  I - - -

Q.   (Interposing) Okay.  If that's what you told Officer Downing back in 2000, that would have been your recollection then?

A.   Yes.

Q.   Okay.  And she was walking fast?

A.   I can't — I couldn't tell you.

Q.   So, again, if that's what you told the officer when he interviewed her (sic) that would have been your recollection at the time?

A.   Yes.

Q.   Okay.  Now, you've indicated you only saw Nick McGuffin one time the night of June 28th, 2000.  Did I get that right?  As best as you — I'm not trying to trick you here Mr. Kirn, I just want to - - -

A.   (Interposing) No.  As best as I can remember, but I've — I could've seen him more than that.  I just can't

Exhibit 5001 at 687

Kirn    X    D4 158

remember.

Q.    Okay.  And your recollection is that you saw Nick McGuffin at Fast Mart?

A.    Yes.

Q.    And at that time do you remember telling him that you had seen Leah Freeman walk past Hunter's?

A.    Yes.

Q.    But you don't remember what time that was?

A.    No.

Q.    And in terms of Fast Mart, you indicated that that's quite — that was quite a hang out back in the year 2000?

A.    Yes.

Q.    I mean it looks kind of lonely now.  It's all shut down?

A.    Yeah.

Q.    But on a typical summer night, like June 28th, 2000, would there have been a lot of kids hanging out?

A.    Yes.

Q.    People coming and going?

A.    Yes.

Q.    Would it be pretty unusual on a summer evening for the parking lot at Fast Mart to be empty?

A.    Yes.

Q.    Thank you.

            MS. McCREA:    That's all the questions I have,

Exhibit 5001 at 688

McAdams    D    D4 159

Your Honor.

THE COURT:    Redirect.

MR. FRASIER:    No further questions, Your Honor.

THE COURT:    You may step down.  You're free to leave.

Call your next witness.

MR. FRASIER:    Call Mike McAdams.

MIKE MCADAMS

was thereupon produced as a witness on behalf of the Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat up here, please.

Scoot a little closer, please and keep your voice up.

Go ahead.

DIRECT EXAMINATION

BY MR. FRASIER:

Q.    Could you state your name please, sir, and spell your last name for the record?

A.    Michael Joseph McAdams, M-C, capital A-D-A-M-S.

Q.    Where do you live, sir?

A.    I live in Brownsville, Oregon.

Q.    Have you lived in Coquille?

Exhibit 5001 at 689

McAdams    D    D4  160

A.   Yes, sir.

Q.   When have you lived in Coquille?

A.   A large part of my life.  I just recently moved to Brownsville two months ago.

Q.   Did you go to school here?

A.   Yes, sir.

Q.   Go to Coquille High School?

A.   Yep.

Q.   Did you graduate?

A.   Yep.

Q.   What year?

A.   '98.

Q.   Are you familiar with the Defendant in this case, Mr. McGuffin?

A.   Yes, sir.

Q.   How do you know him?

A.   He's one of my good friends.

Q.   And were you familiar with an individual named Leah Freeman?

A.   As an acquaintance through — it was his girlfriend.

Q.   When you say his, you're referring to Mr. McGuffin?

A.   Yes, sir.

Q.   Now, do you know an individual named Mark Kirn?

A.   Yep.

Q.   How do you know Mr. Kirn?

Exhibit 5001 at 690

McAdams   D   D4 161

A.   He used to be one of my friends, too.

Q.   I want to direct your attention, sir, to the summer of 2000, in particular June 28th of 2000.  Were you with Mr. Kirn that day?

A.   Yep.

Q.   Did you go anywhere with him?

A.   Yep.

Q.   Where did you go?

A.   We went to Hunter's Eatery and Creamery.

Q.   And that's a restaurant here in Coquille?

A.   Yep.

Q.   On what street, do you recall?

A.   It's right next to the new City Hall, Main Street. I don't know.  Is that Main Street?

Q.   Central?

A.   Central, there you go.

Q.   And has that restaurant changed names since then?

A.   Yeah, two or three times.

Q.   Do you know what it's currently called?

A.   Colleen's.

Q.   Do you recall about what time of the evening it was when you got there?

A.   I'm going to say right before closing, right at dusk.  So, I'm going to say right around eight o'clock maybe.

Q.   Do you recall talking with the police back in 2000?

Exhibit 5001 at 691

McAdams    D    D4 162

A.    Vaguely.

Q.    And do you recall telling them it was around nine o'clock?

A.    Yeah.  I mean, depending on the hours, you know, summer and daylight savings time.  Around nine o'clock.

Q.    Now, while you were there with Mr. Kirn, did you get something to eat?

A.    Yeah.

Q.    Was this during the process of the restaurant closing up?

A.    No.  It was just towards the end of the night.  Not a whole lot of people there.

Q.    While you were eating there did you see Leah Freeman?

A.    Yes, sir.

Q.    Where did you see her?

A.    On the far side of the street, walking uphill towards the stop light.

Q.    Walking in that direction what landmarks would you go to, coming up?

A.    There used to be a sign there saying that there's a stop light.

Q.    What I'm getting at is what direction was she going?

A.    North.

Q.    And that would be towards the high school?

Exhibit 5001 at 692

McAdams   D    D4 163

A.    Yes, sir.

Q.    Could you tell what she was wearing?

A.    I'm pretty sure she was wearing shorts and a white shirt.  But I've thought about it so many times that, like, the color can change in my head just by thinking about it. So, I'm going to say a white shirt and shorts.

Q.    Let me show you State's Exhibit No. 7.  Does that refresh your memory, sir?

A.    Yeah.

Q.    And does that look like at least the top she was wearing?

A.    Yes, sir.

Q.    Could you tell what her demeanor was like?

A.    She was like a speed — like walking uphill faster than, you know, nonchalant.  Just kind of going up the hill trying to keep pace.

Q.    Did you see her again after that?

A.    No, sir.

Q.    Did you see the Defendant that night?

A.    Yeah, later down at the store.  That's the meeting spot where we'd all hang out.  And if there was something going on, we'd diverse from there.

Q.    And do you recall the name of this store?

A.    Fast Mart.

Q.    Okay.  Do you recall how much time had elapsed from

Exhibit 5001 at 693

McAdams   D    D4 164

the time you finished eating until the time you went to Fast Mart?

A.    Directly.  About twenty minutes, half an hour maybe.

Q.    And how long was it from the time you finished eating until you saw the Defendant?

A.    I'm going to say forty-five minutes maybe.  He just pulled up, you know, right as we're all hanging out there.  He just pulled up like normal.

Q.    Do you recall what kind of vehicles the Defendant drove during that time period?

A.    When he pulled up to the store that night I believe he was in the Thunderbird.  He had a Mustang and a truck.

Q.    Okay.  On the evening that Leah Freeman disappeared, June 28th, did you see the Defendant driving the blue Mustang?

A.    I don't — I mean, I don't believe so.  I think he was driving the Thunderbird.

Q.    Did you talk with the Defendant while he was at Fast Mart?

A.    I would have greeted him and said, "How's it going?" And just talked, you know, like a normal day.

Q.    Did the Defendant ever tell you anything or ask you anything about Ms. Freeman being missing or anything like that?

A.    No.

Q.    Thank you.

Exhibit 5001 at 694

McAdams   X   D4 165

MR. FRASIER:    That's all the questions I have at this time.

THE COURT:    Go ahead.

CROSS EXAMINATION

BY MS. MCCREA:

Q.   Mr. McAdams, I'm looking at a report that you gave to Officer Perske back on July 26, 2000.  And does it refresh your recollection that after you and Mr. Kirn ate, that you were tired and dropped Mr. Kirns back off at the video store and went home to bed because you had to be at work at five o'clock?

A.   I mean, if that's the report I gave, that's the best of my recollection of 2000.  You know, it's 2012.  I done my share of cannabis in my time and my recollections aren't very good twelve years later, but I did have to work at five in the morning.  And all the time I would stay up and hang out with my friends, you know, because I was young and - - -

Q.   (Interposing) And it's easier to do when you're young, huh?

A.   Yeah, quite definitely.

Q.   Yeah.  Look, I'm not trying to give you a hard time, Mr. McAdams.

A.   I see.

Q.   So, when you were relaying to us the meeting with Nick McGuffin at Fast Mart, the way that you're phrasing it,

Exhibit 5001 at 695

McAdams   X    D4 166

"I would have greeted him and just talked about the usual stuff."  Is it that you don't have a specific recollection of actually - - -

A.    (Interposing) Yeah.  I can't think of exact words that I would have said.  Anything we would have specifically talked about, it was — I don't know.

Q.    And you would typically run into Nick McGuffin at Fast Mart.  Is that fair?

A.    That's — yeah.

Q.    So on what, a daily basis maybe?

A.    Yeah.  We hung out a lot.

Q.    Okay.  And you would see Nick McGuffin driving the blue Mustang on some occasions?

A.    Yeah.

Q.    And other times you would see him in the maroon Thunderbird?

A.    Yeah.

Q.    And it wasn't a significant thing if he was in one car or the other?

A.    No.

Q.    And going back eleven years to 2000, you don't have a specific recollection as to what car he was driving that night, if you saw him?

A.    I don't have a hundred percent accurate.  But in my mind it sticks out that he was driving the Thunderbird.

Exhibit 5001 at 696

McAdams    X    D4 167

Q.   Now, on June 28th you and Mr. Kirn were going to get a movie.  And you decided to go to Hunter's to get a bite to eat first?

A.   I don't know if we were going to get a movie.  But I know that I was definitely in to get something to eat.

Q.   Okay.  I'm looking at a report of a statement you gave to Officer Perske where it says, "They decided to get a movie and go to Hunter's for a bite to eat."

A.   Okay.

Q.   So, that could be you just don't have a recollection of - - -

A.   (Interposing) Yeah.

Q.   - - - the movie part of it right now?

A.   Yeah.

Q.   Did you guys — to your recollection, did you get a movie that night?

A.   I don't believe so, because I would have been going home after that, or you know, hang out a little bit.  And that's not — we didn't watch movies.  That wasn't hanging out.  You know what I mean?  We'd go drive or do something, be active, not really sit around and watch movies.

Q.   And back on June 28th, 2000, Hunter's would close at nine o'clock?

A.   I'm pretty sure.

Q.   And that's why you guys wanted to get there, to get

Exhibit 5001 at 697

McAdams    X    D4 168

something to eat before it closed?

A.    Yeah.

Q.    Okay.  And the two of you were sitting there.  And you were facing the window and Mr. Kirn was facing toward you?

A.    Yeah.

Q.    And then Leah Freeman walks by.  And did — and so you saw her?

A.    Yeah, I looked up.  And I was eating hamburger.  And I said, "Isn't that Nick's girlfriend?"

Mark turned around and looked and said, "Yeah."

And we just went back to eating.

Q.    Okay.  And what you noticed was she was walking at a fairly quick pace?

A.    Yeah.  She was — I mean she's going uphill.  So, when you're walking uphill you tend to lean forward and have a continual stride to keep your momentum forward.

Q.    And you would characterize it more as a power walk than just moseying up the hill?

A.    Yes.

Q.    Okay.

Thank you.

MS. McCREA:    That's all the questions I have.

THE COURT:    Redirect.

MR. FRASIER:    I have nothing further, Your Honor.

Exhibit 5001 at 698

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

STATE OF OREGON,                    )
                                    )
            Plaintiff,              )      CASE NO. 10CR0782
                                    )
      vs.                           )      JURY TRIAL
                                    ) DAY FOUR, Continued
NICHOLAS JAMES MCGUFFIN,            )
                                    )
            Defendant.              )
_____)

TRANSCRIPT OF PROCEEDINGS

Volume 6, Pages D4 169 to D4 261

        BE IT REMEMBERED That, the above-entitled cause

came on regularly for hearing beginning at 9:04 a.m., Monday,

July 11, 2011, in the Circuit Courtroom of the Coos County

Courthouse in the City of Coquille, County of Coos, State of

Oregon, before the Honorable Richard L. Barron and a jury.


APPEARANCES

R. Paul Frasier, District Attorney for Coos County,
representing the Plaintiff.

Erica Soublet, Assistant District Attorney for Coos County,
representing the Plaintiff.

Shaun McCrea, Attorney at Law, representing the Defendant.

Robert McCrea, Attorney at Law, representing the Defendant.


  S. Jean Sprouse, Court Transcriber, XV Judicial District, 503-325-5254

Exhibit 5001 at 699

Crook    D    D4 169

THE COURT:    You may step down.  You're free to leave.

WITNESS:    Thank you.

THE COURT:    Call your next witness.

MS. SOUBLET:    The State calls Heidi Crook.

<u>HEIDI CROOK</u>

was thereupon produced as a witness on behalf of the Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat up here, please.

Scoot close to the microphone, please.  Move it down.  You can move it further down than that if you want. The whole thing moves.  And then so it's there.  And then speak up, please.

Go ahead.

MS. SOUBLET:    Thank you, Your Honor.

<u>DIRECT EXAMINATION</u>

<u>BY MS. SOUBLET</u>:

    Q.   Mrs. Crook, can you state your full name and spell your last for the record?

    A.   Heidi Crook, C-R-O-O-K.

    Q.   I'm going to ask you to speak up loud enough so everybody can hear you.  We don't have to turn the air conditioner off.

Exhibit 5001 at 700

Crook   D   D4 170

Mrs. Crook, have you lived in Coquille all your life?

A.   Yes.

Q.   Were you living here in 2000?

A.   Yes.

Q.   Do you know the Defendant Nicholas McGuffin?

A.   Yes.

Q.   How do you know him?

A.   He was my brother's friend and I went to school with him.

Q.   Were you the same age?

A.   No.

Q.   Older or younger?

A.   Older.

Q.   By how many years?

A.   Three.

Q.   Did you know Leah Freeman?

A.   I knew her sister.

Q.   Did you know whether or not she and Defendant were dating in the school year '99-2000?

A.   I think so.

Q.   I want to turn your attention to June 28, 2000.  Do you remember that night?

A.   Yes.

Q.   Who were you with?

Exhibit 5001 at 701

Crook   D   D4 171

A.   Heather Reid.

Q.   Do you remember where you were headed?

A.   Yes.

Q.   Where was that?

A.   To my house on Elliott Street.

Q.   How were you getting there?

A.   Heather was driving.

Q.   Do you remember what time that was?

A.   A little before nine p.m.

Q.   Driving — how do you — going which way?

A.   Towards the stop light on Central.

Q.   Did you see Leah Freeman that night?

A.   Yes.

Q.   Where was she?

A.   In between the motel and Hunter's Restaurant.

Q.   Do you remember what side of the street she was on?

A.   The same side as the motel.

Q.   Do you remember what she was wearing?

A.   A white tank top.

Q.   I'm going to show you State's Exhibit No. 7 and ask you if you recognize that?

A.   Yeah.  Yes.

Q.   What's Exhibit No. 7 a photo of?

A.   A picture of Leah wearing jeans and a white tank top.

Exhibit 5001 at 702

Crook    X    D4 172

Q.    Is that same tank top you saw her in on June 28th, 2000?

A.    Yes.

Q.    Did you notice anything about Ms. Freeman?

A.    She looked like she was cold.  Her arms were crossed across her chest.

Q.    Did you see her again that night?

A.    No.

Q.    Thank you.

MS. SOUBLET:    Nothing further.

CROSS EXAMINATION

BY MS. MCCREA:

Q.    So, Ms. Crook, when you say that you were coming to the stop light.  You and Ms. Reid were heading into town?

A.    We were heading towards the middle school.

Q.    You were heading towards the middle school.  Were you on Central?

A.    Yes.

Q.    Okay.  So, were you going the same direction or the opposite direction as Ms. Freeman?

A.    The same.

Q.    Okay.  So you were going the same direction.  And she was close to Hunter's Restaurant?

A.    Yes.

Q.    And so you came up behind Leah and passed her.  Is

Exhibit 5001 at 703

Crook    X    D4 173

that right?

A.    Yes.

Q.    And she was on the Fast Mart side of the road?

A.    Yes.

Q.    And she was walking fast?

A.    I'm not sure.

Q.    But you saw that she had her arms crossed over her chest?

A.    Yes.

Q.    When — during the time that the two of you observed her, you didn't see her stop, did you?

A.    No.

Q.    And you didn't see Mr. McGuffin come up and meet up with her?

A.    No.

Q.    Nobody else was with her during the time that you observed her?

A.    No.

Q.    Okay.  And June 28th, 2000, I realize it's been a long time, but it was a pretty nice evening?

A.    It was almost dark.

Q.    Okay.  But up until the point — until that point it had been a nice day?

A.    Yes.

Q.    Okay.  All right.  I know I'm asking you to remember

Exhibit 5001 at 704

Reid    D    D4 174

a long time ago.

Thank you.

MS. McCREA:    That's all the questions I have.

THE COURT:    Any redirect?

MS. SOUBLET:    No, Your Honor.

THE COURT:    You may step down and you're free to leave.

Call your next witness.

MS. SOUBLET:    The State calls Heather Reid.

HEATHER REID

was thereupon produced as a witness on behalf of the Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat up here, please.

And if you'd scoot up close to the microphone. You can bend it down so it's equal with your mouth.  And then keep your voice up, please.

Go ahead.

MS. SOUBLET:    Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. SOUBLET:

Q.    Ms. Reid, can you state your name and spell your last for the record?

A.    Heather Lynn Reid, R-E-I-D.

Exhibit 5001 at 705

Reid    D    D4 175

Q.    Ms. Reid, did you grow up in Coquille?

A.    No, I did not.  I grew up in North Bend.

Q.    In the summer of 2000 were you living in Coquille?

A.    Yes, I was.

Q.    Where were you living?

A.    I was living up at Shelley Road Apartments.

Q.    Do you know the Defendant?

A.    Yes, I do.

Q.    How do you know him?

A.    Just a friend.

Q.    Did you go — what high school did you go to?

A.    North Bend High School.

Q.    Did you know Leah Freeman?

A.    Yes, I did.

Q.    How did you know Leah?

A.    Just from being here in Coquille and being friends with her sister.

Q.    Her sister Denise?

A.    Denise.

Q.    How long had you known Ms. Freeman?

A.    I've known them for years.  My mom used to date their dad years and years ago when Leah was two.

Q.    Would you say you grew up with Ms. Freeman?

A.    Yeah.

Q.    And are you the same age as her sister Denise or

Exhibit 5001 at 706

Reid    D    D4 176

older or younger?

A.   I'm older.

Q.   How older?

A.   I'm not sure.  A couple year.  I'm thirty-one, so I'm not sure how old she is.

Q.   In the school year 1999-2000, did you ever see the Defendant and Ms. Freeman together?

A.   Yes, I did.

Q.   Were you aware of what the relationship was?

A.   Boyfriend/girlfriend.

Q.   Did you know what their relationship was like?

A.   No, I don't.

Q.   Did you have an opportunity to see them in an argument?

A.   No.

Q.   Do you remember telling the police back in 2000 that you saw them in a verbal argument at Fast Mart?

A.   I don't remember.

Q.   If you said that back in 2000 would your memory be better then than it is today?

A.   Probably.

Q.   Ms. Reid, I want to turn your attention to June 28th, 2000.  Do you remember that day, that night?

A.   I'll try.

Q.   Did you have an opportunity to see Ms. Freeman that

Exhibit 5001 at 707

Reid   D    D4 177

night?

A.    I did.  I saw her walking right there by the Hunter's Eatery on the left hand side of North Central, walking down the road.

Q.    Okay.  Was there anyone else with you?

A.    Heidi Crook was with me.

Q.    Where were you going?

A.    I was taking Heidi Crook home to her mother's house.

Q.    Do you remember what Ms. Freeman was wearing?

A.    Yes, I do.

Q.    What was that?

A.    She was wearing a white tank top.  It had four or five criss crosses across the back.  And she was wearing — I don't remember if she was wearing shorts or if she was wearing pants.  But I remember the tank top.

Q.    I'm going to show you Exhibit No. 7 and ask you if you recognize that?

A.    No.

Q.    When you saw — do you remember what time it was when you saw Ms. Freeman?

A.    It was right — right before nine o'clock.  Just a few minutes to nine.

Q.    And where was she?

A.    She was on — going down North Central towards the high school way.  She was on the left hand side, right there —

Exhibit 5001 at 708

Reid    D    D4 178

by I believe it's Colleen's Restaurant now.  She was just right about there walking down the road with her arms crossed.

Q.    Did you notice anything else about her at that time?

A.    She just looked very cold.

Q.    Do you remember telling the police that she looked mad?

A.    She either looked mad or she looked cold.  But she didn't look happy.

Q.    Sorry?

A.    She just didn't look happy.  She was either mad or she was cold.  I wasn't sure.  She had her arms criss crossed.

Q.    Where did you go after seeing Ms. Freeman?

A.    I went to the stop light there at the middle school and took a right and went up Tenth Street and took Heidi home. Went around the block and came back down to see if she was still walking because I was going to give her a ride.  And she wasn't there.

Q.    Why were you going to give her a ride?

A.    Because she looked cold.

Q.    Do you know how far you drove on Central looking for her?

A.    I just came down to the gas station.  I guess it was the old BP gas station and went down to the stop light again. And she wasn't in the range of being able to see.

Q.    So, is that before or after the Fairview turnoff?

Exhibit 5001 at 709

Reid   D    D4 179

A.    Before.

Q.    Did you see the Defendant that night?

A.    I don't remember if it was that night or if it was the next day.

Q.    By the next day, are you talking early morning hours of June 29th?

A.    It was in the middle of the daytime.  I just remember it being a nice sunny day.

Q.    Where was he then?

A.    Fast Mart.

Q.    Do you remember telling the police back in 2000 that you saw him at Fast Mart that same night?

A.    I just don't remember if it was that same night. I'm assuming it was the next day or earlier — previously that day.  Because it was sun shiny.  It was a nice day.  And when I had seen Leah it was almost dusk.

Q.    Do you remember testifying at Grand Jury?

A.    Yes, I do.

Q.    You testified back in 2000 and 2010?

A.    Yes.

Q.    Is it fair to say that your memory in 2000 was better than your memory here today?

A.    It's hard to say.  When I get in front of a crowd of people I get scared.  And I kind of blank out.  And so I don't remember.

Exhibit 5001 at 710

Reid    D    D4 180

Q.    Were you with a crowd of people when you were speaking with police officers back in 2000?

A.    No.

Q.    If I show you your statement from 2000 and ask you to read that to yourself and tell me when you're done.

MS. McCREA:    May we know which statement this is, Counsel, what officer?

MS. SOUBLET:    I don't, but it's Page No. 3890.

MS. McCREA:    Thank you.

Q.    Are you done?

A.    Yes, I am.

Q.    Does that refresh your recollection about telling the officers that you saw the Defendant at Fast Mart in the Thunderbird that night?

A.    Yes.

Q.    You did say that?

A.    Yes, I did.

Q.    Do you remember having a conversation with the Defendant about seeing him that night in the Thunderbird?

A.    I do.  I just — I was thinking it was the day after the fact.  But I guess it wasn't.  I'm not sure.  I just don't remember.  I can't be positive.

Q.    What was Defendant's reaction to your telling him you saw him in the Thunderbird on June 29th when you told

Exhibit 5001 at 711

Reid   X    D4 181

police that?

A.    Everything's just kind of confusing because he was driving both cars, his car and his mother's car.  And I remember seeing him at one point in his mom's Thunderbird sitting at Fast Mart by himself.  And he was just sitting, staring at the steering wheel.  But I drove by for just a couple seconds.  And just saw the side of him.  So I don't — I don't remember anything past that.

Q.    And you had an opportunity to tell the Defendant that you told the FBI that.  Correct?

A.    Yes.

Q.    That was after Ms. Freeman's disappearance?

A.    Yes.  He asked me if I had gone and talked to them and reported everything that I knew?

Q.    And what was his reaction when you told him that you told the police you saw him in the Thunderbird?

A.    I don't remember what his reaction was.

Q.    So, you don't remember saying that he told you you were mistaken and getting upset.  And him calling you a liar?

A.    No, I do not remember that at this point.

                MS. SOUBLET:    Nothing further.

                    CROSS EXAMINATION

BY MS. MCCREA:

Q.    Ms. Reid, in terms of you telling Mr. McGuffin that you saw him at Fast Mart in the Thunderbird, his reaction was

Exhibit 5001 at 712

Reid   X   D4 182

— I'm sorry.  Telling him that you saw him at Fast Mart, his reaction was, he specifically asked you what — "Wait, what car was I in?"

A.   Yes.

Q.   And then when you told him he was in the Thunderbird his reaction was, he was not in the Thunderbird.  Is that right?

A.   Yes, that he was in his own car.

Q.   And as you've said, he drove both cars, maybe not interchangeably, but quite often?

A.   Yes.

Q.   So it's hard to remember now back eleven years what car he was driving then.  And probably it would also be true back in 2000 trying to remember on a specific day looking back, what car he was in?

A.   That's correct.

Q.   So, when you were taking Ms. Crook home, you were coming — you were going in the same direction as Leah Freeman?

A.   Yes.

Q.   And you passed her.  And then you went up to Tenth. Is that where the stop light is?

A.   Yes.

Q.   And you took a right?

A.   Yes.

Q.   And as near as you can tell Leah Freeman continued

Exhibit 5001 at 713

Reid   X    D4 183

on?

A.    Yes.

Q.    So, from Tenth you then went up to Elliott?

A.    That's correct.

Q.    Is that right?

A.    That's correct.

Q.    And then — and how far was it to Elliott from where you turned at Tenth?

A.    Down to — what is it?  Two blocks.

Q.    Two blocks?

A.    Two blocks past — down Elliott.  And then to the right again down to the BP gas station out there.  Right where you come out at Fast Mart.

Q.    Where you come out at Fast Mart?

A.    Yeah.

Q.    Okay.  And then you dropped off Ms. Crook.  And took a right on — if this is right.  I'm looking at your statement from back in 2000.  A right on Dean to Tenth and then back to Central?

A.    That's correct.

Q.    And then you stopped at the light.  And you did not see Leah Freeman anywhere?

A.    I did not.

Q.    And at that point you did not see Nick McGuffin anywhere either?

Exhibit 5001 at 714

Reid   X   D4 184

A.   No.   And then I went home to my grandmother's.

Q.   And then you went home?

A.   Yes.

Q.   So, when you saw Leah walking I think you indicated that she looked cold and she could have been mad.   Her facial — you nodded yes.

A.   Yes.

Q.   I'm sorry.   We have to get it on the record.

And her facial expression was that she was not happy?

A.   Yes.

Q.   And she was walking fast?

A.   She was walking fast, yes.

Q.   Thank you.

MS. McCREA:   That's all the questions I have, Your Honor.

THE COURT:   Redirect.

MS. SOUBLET:   No, Your Honor.

THE COURT:   You may step down and you're free to leave.

Call your next witness.

MR. FRASIER:   We'll call Officer McNeely briefly, Your Honor.

You're still under oath.

THE COURT:   You're still under oath.   You've

Exhibit 5001 at 715

McNeely    D    D4 185

testified.

RAY MCNEELY

was thereupon produced again as a witness on behalf of the Plaintiff and, having previously been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. FRASIER:

Q.    Officer McNeely, previously today we heard from a witness named Melissa Smith.  Did you have an opportunity to interview her previously?

A.    Yes, I did.

Q.    When did you interview her?

A.    On April 22nd, 2011 at approximately 12:30 in the afternoon.

Q.    And did you have a conversation with her about her overhearing — well, her having a phone call or a phone call discussion with Leah Freeman the day she disappeared?

A.    Yes, I did.

Q.    And did she relate to you that she had heard the Defendant say something - - -

A.    (Interposing) Yes, she - - -

Q.    _- - - while she was on the phone?

A.    Yes, she did.

Q.    Could you tell us what - - -

Exhibit 5001 at 716

McNeely   D   D4 186

MR. McCREA:    Your Honor, I'll object.

THE COURT:    As?

MR. McCREA:    Well, there wasn't any foundation laid for this to be introduced, Your Honor.

THE COURT:    Well, I think he's offering it for impeachment.  And I think the witness was asked that.

MR. McCREA:    Pardon?

THE COURT:    I think the witness was asked the question about this conversation.

And it's being offered for impeachment I assume, Mr. Frasier?

MR. FRASIER:    That's correct.

THE COURT:    Okay.

MR. McCREA:    Then we ask for limiting instruction.

THE COURT:    I will give one.

MR. McCREA:    But I continue the objection on the basis that there was no foundation laid specifically where the witness was asked if she made this statement to the officer so she could explain this statement.

THE COURT:    Well, she was certainly asked about it.  I know that.  And I think she was asked about whether she talked to the police.  I don't know specifically about this officer.  With that I think you might be right.  But she was asked if she made it and told the police that, as

Exhibit 5001 at 717

McNeely   D   D4 187

I recall.

Mr. Frasier.

MR. FRASIER:   Our recollection is she was asked specifically, "Did she speak with either Officer McNeely or Officer Webley?"

THE COURT:   Okay.

The objection is overruled.

Ladies and Gentlemen, when a witness testifies to something or says, "I don't remember," or says, "I didn't say that," and is given the statement and said, "Did you say this to so and so or the police?"

And they deny it.  You can — the party offering it can then call a witness who then says — who in effect says, "Yes, she did tell me that."

You can accept that and hear that testimony only for your determination of whether — in this case Ms. Smith — was telling the truth or not.  You cannot accept it as direct evidence that she actually said it.  Just that you can take it as whether or not she was telling the truth or not when she was testifying as a witness.

Okay.  Go ahead.

DIRECT EXAMINATION, Continued

BY MR. FRASIER:

Q.   What did Ms. Smith tell you regarding what she overheard the Defendant say?

Exhibit 5001 at 718

McNeely   D    D4 188

A.    She told myself and Officer Webley that on the day that Leah disappeared, that she had called Leah.  And she remembers that Leah and Nick were fighting.  She said that while she was on the phone she could hear Nick in the background yelling at Leah, calling her a bitch.

Smith said she asked Leah if she wanted to talk, but Leah was upset and said she would just talk to her later about it.

Q.    Now, I'm going to show to you what's marked and been previously received as State's Exhibit No. 16 which is identified as being the blue Mustang.  Do you recognize that?

A.    Yes, I do.

Q.    And can you see the license number there?

A.    Yes, I can.

Q.    And can you read that license number for us?

A.    Yes.  PBA840.

Q.    Now, I'll show you what's marked as State's Exhibit No. 25.  Does that show the maroon Mustang (sic) that we've been discussing?

A.    The maroon Thunderbird.

Q.    Thunderbird?

A.    Yes.

Q.    And can you at least read part of that number?

A.    SM, I believe it's Q, 836.

MR. FRASIER:    Your Honor, I have here what's

Exhibit 5001 at 719

McNeely    X    D4 189

marked as State's Exhibits Nos. 78 and 79 which are certified

copies of registrations for those two particular vehicles.

And we would ask that they be admitted at this time.

MS. McCREA:    There is no objection to No. 78

and 79, Your Honor.

THE COURT:    They are received.

(Whereupon Exhibits Nos. 78 and 79 were then

received into evidence.)

MR. FRASIER:    I have nothing further to ask

Officer McNeely at this time.  I'll probably recall him later.

THE COURT:    Okay.

Mr. McCrea.

CROSS EXAMINATION

BY MR. MCCREA:

Q.    Detective McNeely, the conversation to which you

made reference with Melissa Smith occurred the 22nd of April,

2011?

A.    Correct.  April 22nd, 2011.

Q.    And at that time you had — you didn't make any kind

of recording of this conversation.  Is that correct?

A.    We did not record the conversation, no.

Q.    So, you had the conversation, and then you went

somewhere and typed up a report?

A.    Officer Webley typed up the report, yes.

Q.    So, you didn't even do the report?

Exhibit 5001 at 720

McNeely   X    D4 190

A.   After he wrote the report I reviewed it for accuracy, agreed with it, and then - - -

Q.    (Interposing) And now you have — you have reviewed other — well, strike that.

Let's approach it this way.

So, what you did was you reviewed the report and then relied upon your recollection of what you thought Ms. Smith had said at this interview.  Correct?

A.   Officer Webley and I interviewed Ms. Smith, he wrote up the report.

Q.   My question's simple.  You read the — when you reviewed the report you looked at it and checked it against your memory of what the interview had been.  Is that correct?

A.   Yes, that's correct.

Q.   Because you had nothing else that — to which you could go and determine exactly what she'd said.  Correct?

A.   Correct. (Not understandable.)

Q.   All right.  And - - -

MR. McCREA:    All right.  That's all the questions I have.

THE COURT:    Any redirect?

MR. FRASIER:    No, Your Honor.

THE COURT:    You may step down.  You're still needed as a witness.  So, you're not excused.

WITNESS:    Thank you, Your Honor.

Exhibit 5001 at 721

D4 191

THE COURT:    Call your next witness.

MR. FRASIER:    Your Honor, we're still waiting for some witnesses to get here, but I do have some things we could do to fill in some time.

THE COURT:    Okay.

MR. FRASIER:    I'd like to read into the record several of State's Exhibits that have been previously received.

THE COURT:    You may.

MR. FRASIER:    The first is State's Exhibit No. 86 which is a letter previously identified in a handwriting of Leah Freeman to the Defendant.  It is dated 1/7/00.  It reads:

"Nicholas, I can't believe I miss you as much as I do and it's only Friday.  I'm gonna be crying all day Sunday.  Well, then you call me and asked me if I wanted to stay at her house tonight, but I told her it wouldn't be very much fun because I'm in such a ass mood.  I'm sad and very irritable."  Parentheses, "(PMS)" close parentheses.

"Everybody was pissing me off today, especially Heidi, Casey, Richard, and Catherine.  Rio . . ."  I think it's Rio.  ". . . decided she's gonna have me stay

Exhibit 5001 at 722

D4 192

at her house and have Grant and Kyle stay at his/her house.  And there we'll be.  All in accordance, of course."

Then she writes, spelling parenthesis pointing to the word:

"Stacey gave me this jacket thing and it smelled so gross.  It was flat out disgusting. Sherry asked if she could wear it just to walk home because it was really cold and she didn't have a sweater.  She put it on as I was walking away to talk to Sherry and Rio.  When I went back she was wearing Melissa's sweater. So I asked her if she was too good for it or something.  So she made me smell it.  And she was definitely too good for it.  Like I said it was disgusting."

"Guess what?  Right.  I'm listening to Faith.  One of the few songs that reminds me of you.  No offense but I really don't want to be reminded of you right now.  It makes me really sad.  Almost to the point of crying, which I don't want to do because I know I'm going to be doing that pretty soon, which is why I'm not wearing any makeup.  I look like such a grungy

Exhibit 5001 at 723

D4 193

loser today.  I wore no makeup.  I got toothpaste all over my sweater, and I had my hair up with my hairs falling all over the place."

"Next, I washed dishes and got water all over my sweater.  It was just a really bad day.  But it didn't really matter because I didn't see you anyway.  Did you notice I am way more comfortable around you than I used to be?  Think about it.  I wouldn't eat in front of you.  I didn't want to say anything too personal or sincere.  I was always so worried that you would get mad at me, so I wouldn't do or say a lot of things.  Things have changed so much.  I think they've changed for the better.  Do you ever wonder why I don't tell you I love you when you tell me?  Do you want to know?  Well, as stupid as it's going to sound, it's because I just don't want to get old.  I don't want it to get old.  A lot of my problems are because of my dad.  I think this is one of them because I used to tell him I loved him all the time, like ten, fifteen times a day.  And I haven't told him that.  He hasn't told me that in like four to five years.  I just don't want

Exhibit 5001 at 724

D4 194

that to happen to us.  Do you really think we'll end up together?  I hope so because I can't see myself with anybody else.  And I definitely don't want to have to."

"But our opinions are so different.  I don't want to live in a big town.  You do.  I don't want harsh drugs in my life.  You probably do.  And you're probably going to want me to work before and while.  You know what, it doesn't really matter for now."

"Well, baby, I'm going to go.  I'll help —
I hope you're having fun in Seattle.  Love you, Leah Nichole McGuffin."

This is State's Exhibit No. 85.  It is dated 1-19-00.

"Nick, okay, I don't understand how you can be such an asshole to me.  You claim that you're pissed off because everything in your life sucks, yet you only take your anger out on me.  And I didn't do a damn thing.  I'll admit I didn't tell you about Luke . . ." parentesis, "(slightly)" close parenthesis, ". . . putting the moves on me.  But I didn't think that was a big deal.  Besides, you were pissed before

Exhibit 5001 at 725

D4 195

that.  And Sherry said you weren't even mad about that.  But you know what?  You have no reason to be mad at me.  The only reason for you being mad at me that I can think of, would be because of the Luke thing.  But you shouldn't be because it's not like I lied to you or anything.  I mean, that was never the question.  You asked me — you asked if we did anything.  You asked if we kissed, held hands, and that kind of thing.  But, yes, I can honestly say I did none of the above.  Just because he tried, doesn't mean we actually did anything.  He didn't even try to kiss me.  It was like just stupid little flirty things.  I'm sorry, but if you're mad about that, you need to just get over it."

"You know what's sad?  I really don't think, quote, "we" end quote, are going to last very long.  Well, not as long as I thought and hoped.  I was thinking more along the lines of forever.  But from the way things are looking I don't see that happening.  Don't get me wrong, I still love you to death.  But you can't keep treating me . . ."

Excuse me.

Exhibit 5001 at 726

D4 196

"But you can't keep treating me like I'm just your bitch because I can't and won't put up with that.  I've been putting up with it for a long time and I am so sick of it.  I depress all of my friends.  Not that I'm ever really with my friends.  But when I am I depress them because you depress me.  And what I don't understand is how you can smile and be just peachy fucking keen when you're with your friends.  But when you're just with me, life sucks.  I don't understand it.  Aren't I supposed to make you happy?  Apparently I'm not doing a very good job.  Maybe you should just fire me.  That's not at all what I want, but if we can't make each other happy, maybe something's wrong with our relationship.  Maybe we're wrong for each other.  Maybe we were never right for each other.  I mean, we don't have anything in common.  We argue all the time.  And I don't say anything without pissing you off.  And I really think that me being a freshman really bothers you.  I tell you the truth, I don't know why I'm with you.  I love you.  It's just that I don't know why I love you."

Exhibit 5001 at 727

D4 197

"With all these problems we have you'd think we would have broken up a long time ago. Love you, Leah."

"P.S.  I will never ride in the back of your car again no matter what."

And, I'll read State's Exhibit No. 87, Your Honor.  It's undated.  It reads:

"Nicholas James, I know you think this is chicken shit of me, but for me this is the best way of getting through to you.  I can't talk to you because I will cry.  And you don't seem to approve of me crying.  And telling you how I feel without you interrupting me makes it a lot easier also.  Anyways, the reason I'm writing this is because changes have to be made.  Baby, I'm sorry but I cannot keep arguing with you about everything we do.  It's wearing me out and breaking my heart."

"I don't understand how we got so bad. How can two people that love each other and care about each other so much treat each other like we do?  Hitting you and us talking to each other like we do.  I don't understand it and I don't think I ever will.  Everyone knows how

Exhibit 5001 at 728

Lewis   D   D4 198

much we have — how much we love each other.

And I'm pretty sure that no one can explain it

either."

"Well, what I think is that we've been

with each other so much that we've forgotten

how much we need each other.  So, my question

for you is, would time apart help?  Maybe we

need to for once miss each other.  We just need

to miss the way we need each other because we

do need each other.  We just need to miss that.

Love you, Leah Nicole, aka baby doll."

We have a witness that's here now, Your Honor.
We call Raymond Lewis.

THE COURT:   Okay.

RAYMOND LEWIS

was thereupon produced as a witness on behalf of the Plaintiff

and, having first been duly sworn to tell the truth, the whole

truth and nothing but the truth, was examined and testified as

follows:

THE COURT:   Have a seat up here, please.

DIRECT EXAMINATION

BY MR. FRASIER:

Q.   Could you state your name please, sir, and spell

your last name for the record?

Exhibit 5001 at 729

Lewis   D    D4 199

A.    Raymond Lewis, L-E-W-I-S.

Q.    Mr. Lewis, could you scoot up by the microphone and pull it up there by you.  We need everybody to speak up.

A.    Raymond Lewis, L-E-W-I-S.

Q.    Now, Mr. Lewis, could you tell us where you live?

A.    Coquille, Oregon.

Q.    Have you lived in Coquille — how long have you lived in Coquille?

A.    Twenty-seven years.

Q.    Are you familiar with an individual named Leah Freeman?

A.    Yes, I know who she is.

Q.    How did you know Ms. Freeman?

A.    She was an underclassman at Coquille High School.

Q.    You went to Coquille High School?

A.    Yes.

Q.    What grades did you go through there?

A.    Freshman through senior year.

Q.    Did you graduate?

A.    Yes, I did.

Q.    When you were in high school did you know Leah Freeman from high school?

A.    I knew who she was.

Q.    What grade were you in when she was at the high school?

Exhibit 5001 at 730

Lewis   D    D4 200

A.    I was a sophomore.

Q.    Do you know the Defendant in this case, Nicholas McGuffin?

A.    Yes, I do.

Q.    How do you know Mr. McGuffin?

A.    He also went to school there.

Q.    Mr. Lewis, I'd like to direct your attention, sir, to June 28th, 2000.  This was the day that Leah Freeman allegedly disappeared.  Do you recall that day, sir?

A.    Yes, sir.

Q.    And in the evening hours that night did you have an opportunity to see Leah Freeman?

A.    I did.

Q.    Where did you see Ms. Freeman?

A.    I saw her walking on the corner — or, walking on the street by Fast Mart.

Q.    Which direction were you headed?

A.    I was headed into town, into downtown from the high school area.

Q.    So, you would have been headed towards the south?

A.    Yes, south.

Q.    And you would have been headed in the direction of McKay's and so forth?

A.    Yes, McKay's.

Q.    Now, did you — where did you see Ms. Freeman?

Exhibit 5001 at 731

Lewis   D   D4 201

A.   She was walking by Fast Mart.

Q.   Do you recall what her demeanor was like?

A.   No, I don't.

Q.   What direction was she going?

A.   She was going north, towards the high school.

Q.   Do you recall what side of the street she was on?

A.   She was on the right hand side as I was going down towards McKay's.

Q.   So that would have been on the same side of the street as what businesses?

A.   Fast Mart — I don't know what the building next to it would have been at the time.

Q.   Do you recall what she was wearing?

A.   A white shirt.

Q.   I'll show you what's marked as State's Exhibit No. 7.  Do you recognize that?

A.   I — yeah, it looks like a white shirt.

Q.   Does it look like the shirt she was wearing that night?

A.   I don't recall.

Q.   What was her demeanor like?

A.   I didn't pay any attention.  I just happened to glance over.  And I was driving through town.

Q.   Where were you headed?

A.   I was headed to a friend's house.

Exhibit 5001 at 732

Lewis   D   D4 202

Q.   Who was that?

A.   Matthew Carney.

Q.   Now, how well did you know Leah Freeman?

A.   No, I didn't know Leah very well.

Q.   Did you have any classes with her?

A.   Not that I can recall.

Q.   Would you say that Ms. Freeman was a cute, good looking girl?

A.   Yeah.

Q.   Did you have any interest in the girl?

A.   No.

Q.   I bring this up, Mr. Lewis, because we're going to hear testimony later on about a place called Hudson Ridge. Are you familiar with that?

A.   Very familiar.

Q.   How do you know Hudson Ridge?

A.   Hunt, go play in the mud, go shoot guns up there regularly, used to party up there a lot.

Q.   When you say used to party up there, was there other kids that would go up there an party?

A.   Oh, yeah.

Q.   And how often would you say you went up to Hudson Ridge Road Area?

A.   Two, three times a month.

Q.   At the time that we're talking about here, the

Exhibit 5001 at 733

Lewis    D    D4 203

summer of 2000, what type of vehicle did you have?

A.    I had a 1988 Chevy four wheel drive pickup.

Q.    This pickup, how long did you have it?

A.    Two years.

Q.    At the time you were in high school, did you ever go out with Ms. Freeman?

A.    No.

Q.    Did she ever ride in your truck?

A.    No.

Q.    Ever go anywhere with you?

A.    No.

Q.    Now, I believe we're going to hear testimony later on that a shoe of Ms. Freeman was found up on Hudson Ridge, but we're also going to hear some testimony that a receipt was found — we'll have the officer testify.  Kind of far away, but do you recognize this receipt?

A.    Yes.

Q.    And, that receipt is that made out to you?

A.    Yes, it is.

Q.    And we've marked it as State's Exhibit No. 236.  Do you know how this receipt got up on Hudson Ridge?

A.    I don't have any idea.  It could've fell out of my truck.

Q.    Now your truck, what type of a truck was it?

A.    '88 Chevy pickup.

Exhibit 5001 at 734

Lewis   X   D4 204

Q.   Did you do any modifications to it?

A.   I did.

Q.   What type of modifications?

A.   Lift and tires, bigger tires.

Q.   This receipt here, what is that for?

A.   It is for the three inch body lift.

Q.   Where did you keep this receipt?

A.   I don't know.  It was probably on the floor board.

Q.   Of your truck?

A.   Yeah.

Q.   Mr. Lewis, did you have anything to do with the disappearance or death of Leah Freeman?

A.   No.

Q.   Thank you.

        MR. FRASIER:   That's all I have, Your Honor.

        THE COURT:   Mr. McRea.

                    CROSS EXAMINATION

BY MR. MCCREA:

Q.   Mr. Lewis, you're good friends with Matthew Carney. Right?

A.   Correct.

Q.   And, when the police talked to you — at least when they talked to you in the year 2011 — you said you were going over to his house that night.  Is that correct?

A.   Yes.

Exhibit 5001 at 735

Lewis    X    D4 205

Q. And as a matter of fact you said that you went over there and that you spent time together that night. Correct?

A. I don't recall.

Q. Well, does this — I'm looking at a report that was made in a discussion with Officer Webley stating:

"He definitely remembers going to Carney's house and that Carney was home when he got there. But he did not know if he stayed the night or went home later."

Is that the statement you made to the police?

A. Yes. That is the same one I made.

Q. All right. With regard to Mr. Carney, have you seen Mr. Carney since last Thursday?

A. No, sir.

Q. Pardon?

A. No.

Q. So, you've not discussed what his testimony was here?

A. He told me he — I talked to him on the phone.

Q. All right. You didn't see him, but you talked to him on the phone?

A. And — when he had left.

Q. So, he discussed with you what his testimony was?

A. He — a little bit, yes.

Q. What do you mean by a little bit? How long did you

Exhibit 5001 at 736

Lewis    X    D4 206

talk?

A.    Five minutes maybe.

Q.    Okay.  So, he described to you the questions he'd been asked about you?

A.    No.  He asked — he talked to me about just partying up on Hudson Ridge.

Q.    He talked to you about what?

A.    Partying up Hudson Ridge and shooting up - - -

Q.    (Interposing) Partying up Hudson Ridge?

A.    - - - and going shooting up Hudson Ridge.

Q.    And — well, I'm sorry.  Did he talk to you about going up on Hudson Ridge as such or about his testimony in that regard?

A.    Just going up Hudson Ridge.

Q.    All right.  But my question had been to you, did he talk to you about what his testimony had been?

A.    No, sir.

Q.    No?

A.    No.

Q.    All right.  Now — excuse me.

You live out on what's called Stanton Heights?

MR. McCREA:    May I approach, Your Honor?

THE COURT:    Yes.

Q.    You live out in the general area of what's known as Stanton Heights?

Exhibit 5001 at 737

Lewis   X   D4 207

A.   Sanford Heights.

Q.   Pardon?

A.   Sanford Heights.

Q.   Okay.  Here's a map.  This is a map that's in evidence as State's Exhibit No. 3.

Can you see that all right, Mr. Lewis?

A.   It's very vague.

Q.   Very vague?

A.   Yes.

Q.   Can you see it now?

A.   Yes, sir.

Q.   All right.  I'm going along a dark line here on this map which I understand is Central.  Does that orient you as to what's on the map?

A.   I can't really tell, but — sorry.

THE COURT:   You're going to have to — when you turn that way, and you have to see the map, but would you move the microphone - - -

WITNESS:   (Interposing) Yes.

THE COURT:   - - - over in front of you and then keep your voice up.  Even though Mr. McCrea is close the jury still has to hear you.

WITNESS:   Yes, sir.

THE COURT:   Thank you.

Q.   Can you tell now?

Exhibit 5001 at 738

Lewis    X    D4 208

A.    Yes.  It looks to be Central.

Q.    And here's Knott - - -

THE COURT:    (Interposing) I'm sorry.  Did you say it looked like Central?

WITNESS:    Yes.

Q.    I'm now pointing at Knott Street where the dark blue line comes down Central and then makes the turn down on the map?

A.    Yes, sir.

Q.    All right.  And down here where I'm pointing there's a little square?

A.    Yes, sir.

Q.    All right.  Now, if that's where Leah Freeman was living at that time, where on this map would you have been living?

A.    Do you want me to point it out?

Q.    Yes, sir.

A.    I (not understandable).

Q.    You pointed to a place on the map that's down a short — there's a short distance to an intersection and then down at the next intersection?

A.    Yes.

Q.    All right.  So, at that time you and - - -

Forgive me for turning my back, but I can't walk any other way.

Exhibit 5001 at 739

Lewis    X    D4 209

You and Leah Freeman were neighbors in the sense that you lived on — both lived up there on Knott Street?

A. Yes.

Q. Is that correct?

A. Yes. Sorry.

Q. And you knew she lived up there?

A. Yes.

Q. And you had probably seen her around her grandparent's house there. Correct?

A. Correct.

Q. Now, in addition, let's go to this matter of high school and classes. The year 2000, didn't you get into a Home Ec class?

A. I don't know what year I would have taken it.

Q. Well, a cooking class?

A. I don't remember a cooking class.

Q. Let's go at it another way.

I want you to think really hard. Didn't you and Leah Freeman have a class together?

A. I can't remember, sir.

Q. Excuse me?

A. I can't remember.

Q. Well, in terms of your — of your acquaintance with her, at least you knew who she was?

A. Yes.

Exhibit 5001 at 740

Lewis    X    D4 210

Q.    You thought she was good looking?

A.    Yeah.

Q.    Attractive as it were?

A.    Right.

Q.    Okay.  And you knew that she and Nick McGuffin were girlfriend/boyfriend?

A.    Correct.

Q.    But you'd never seen any arguments or fights between them.  Is that correct?

A.    Correct.

Q.    But you had some acquaintance with Nick McGuffin, didn't you?

A.    Yes, I did.

Q.    You had enough acquaintance with him to tease him some, didn't you?

A.    I don't recall.

Q.    Well, let me ask you more specifically.  Didn't you have occasion to overhear Ms. Freeman from confiding in one of her friends about what her sexual activity was with Mr. McGuffin?

A.    I don't recall that.

Q.    Do you recall going and teasing Mr. McGuffin about what his sexual activity was with Ms. Freeman?

A.    I do not.

Q.    Now, are you saying that that flat didn't happen, or

Exhibit 5001 at 741

Lewis     X     D4 211

you just don't remember?

A.   I don't remember, sir.

Q.   Just — pardon?

A.   I don't remember.

Q.   You just don't remember?

A.   Right.

Q.   You're not saying it didn't happen?

A.   Correct.

Q.   In any event, at that time you had a pickup?

A.   Yes.

Q.   An '88 Chevy?

A.   Yes.

Q.   And you got this lift kit for it?

A.   Right.

Q.   And when you got the lift kit you put it on layaway to start with?

A.   Yes.

Q.   And that's what the receipt was written for?

A.   Yes.

Q.   And that receipt's dated the 30th of May?

A.   Yeah.  I didn't see the date on it.

Q.   Well, Counsel.  I don't know what the number is.

     MR. FRASIER:    It does say May 30th, 2000.

Q.   All right.  I have here State's Exhibit for identification as No. 236.  So, that's the receipt for the

Exhibit 5001 at 742

Lewis    X    D4 212

layaway of the lift kit?

A.    Yes, it is.

Q.    All right.  And this was in your pickup, was it?

A.    Yes, it was.

Q.    And so, somehow it got from your pickup into being out on Hudson Ridge?

A.    Yes, it did.

Q.    And that had to occur sometime then between the 30th of May and when it was found up there?

A.    Yes, sir.

Q.    Now, you would go up there to hunt?

A.    Yes.

Q.    What would you hunt?

A.    Deer and elk.

Q.    Pardon?

A.    Deer and elk.

Q.    All right.  Between the 30th of May and let's say the 5th or 6th of July of 2000 there wasn't any deer season open, was there?

A.    No, sir, there wasn't.

Q.    Wasn't any elk season open?

A.    No, sir.

Q.    So, you didn't have reason to go up there to be hunting deer or elk?

A.    Correct.

Exhibit 5001 at 743

Lewis    X    D4 213

Q. And you'd hunt them with a high powered rifle?

A. Yes, sir.

Q. Did you keep the rifle in your pickup?

A. No, sir.

Q. Some people have the things on their back — on the back window. You didn't have one of those, a gun rack?

A. No, sir. No.

Q. What model pickup was this? By that I mean, did it just have the one set of seats or was it a so called extra cab type?

A. It was a regular cab long bed with a bench seat.

Q. Pardon?

A. It was a regular cab with a bench seat.

Q. I'm missing part of what you're saying. It was?

A. A regular cab pickup, single cab.

Q. Single cab?

A. With a bench seat.

Q. Did it have a canopy on it?

A. No, sir.

Q. What color was it?

A. Maroon.

Q. Dark maroon or light maroon?

A. Light.

Q. Light?

A. Yes.

Exhibit 5001 at 744

Lewis   X   D4 214

Q.   And the — okay.

When you hunted deer and elk you'd have to dress them out when you get them?

A.   Correct.

Q.   And you'd need a hunting knife, right?

A.   Correct.

Q.   So, you had a hunting knife?

A.   I owned one, yes, sir.

Q.   Pardon?

A.   Yes, sir.

Q.   Did you have a twenty-two also, besides a high powered rifle?

A.   Yes, sir.

Q.   Pardon?

A.   Yes, sir.

Q.   A pistol or a rifle or both?

A.   Rifle.

Q.   Rifle?

A.   Rifle.

Q.   That's a regular twenty-two rim fire?

A.   Yes, sir.

Q.   And so, going back to the time that you saw Leah Freeman.  Now, what time did you see her?

A.   I don't know the specific time, but it was close to dusk.  I believe that it was getting — starting to get dark.

Exhibit 5001 at 745

Lewis    X    D4 215

Q.    It was what?

A.    Starting to get dark.

Q.    Starting to get dark?

A.    Yes.

Q.    In addition to testifying here, you testified before the 2000 Grand Jury on the 20th of July of 2000.  Is that correct?

A.    Correct.

Q.    At that time did you indicate that you had seen her between nine fifteen and nine forty-five?

A.    I believe so, sir.

Q.    All right.  And then you were asked, "Why the half hour spread between nine fifteen and nine forty-five?"  Do you remember you were asked why such a spread?

A.    I don't recall that.

Q.    Okay.  Do you remember saying that in the course of seeing her that you had come around there twice or two or three times.  And you don't remember which time you saw her?

A.    No, I don't.

Q.    You don't recall?

A.    I don't recall that.

Q.    Now, like with the other, are you saying that's not what was said, or you just don't remember what was said?

A.    I don't remember, sir.

Q.    In any event, is it correct that you didn't just go

Exhibit 5001 at 746

by her once, but you drove around a few more times?

A. I don't recall that, sir.

Q. Well, excuse me.

MR. McCREA: May we set up - - -

MS. SOUBLET: The (not understandable) or the video?

MR. McCREA: The video, whichever one you've go on.

MS. SOUBLET: Do you want that exact place?

MR. McCREA: With the court's permission, the — my electronic skill is little or none. But we have a relatively short disk of the Grand Jury presentation. And I'm asking that co-counsel be allowed to display that to the witness to see if it refreshes his recollection, Your Honor.

THE COURT: That's fine.

MR. McCREA: Pardon?

THE COURT: That's fine.

MR. McCREA: Fine. Thank you.

MS. McCREA: I confess my technological skills are not - - -

THE COURT: (Interposing) Okay.

(Whereby a short video tape was played for the witness. Not transcribed.)

Q. Now, Mr. Lewis, through the courtesy and the efforts of the co-counsel, you have had the opportunity of seeing and

Lewis    X    D4 217

hearing your testimony before the Grand Jury back in 2000, on the date of the 20th of July, 2000.  Does that refresh your memory as to what happened that night?

A.    No, sir, it doesn't.

Q.    Pardon?

A.    I don't recall what happened that night.

Q.    Well, would your memory have been accurate as to what happened on the night of June 28th, 2000 when you testified on July 20th of 2000?

A.    Yes, sir.

Q.    And did you see that at that time that you testified that you came around there twice or two or three times at the time you saw Ms. Freeman walking?

A.    Yes, sir.

Q.    Pardon?

A.    Yes, sir.

Q.    And Mr. Frasier asked you whether you saw the first time or the third time.  You saw that?

A.    Yes, sir.

Q.    That would have been accurate as to what happened?

A.    Yes, sir.

Q.    You said you couldn't remember which time it was?

A.    Correct.

Q.    And that you had said that it could've been that you saw her from nine fifteen to nine forty-five.  Is that

Exhibit 5001 at 748

Lewis   X   D4 218

correct?

A.   Correct.

Q.   So — and that would have been accurate.  You could've seen her as late as nine forty-five?

A.   Yes, sir.

Q.   And then you indicated that you saw Mr. McGuffin that night, also?

A.   That's correct.

Q.   Do you remember seeing Mr. McGuffin?

A.   I do not recall that.

Q.   But you saw on that Grand Jury testimony that you did say that you saw Mr. McGuffin?

A.   Yes, sir.

Q.   And he was driving his Mustang?

A.   Yes, sir.

Q.   And that's the Mustang that was blue with a white — one fender that's the white primer color?

A.   I don't remember if it was white or gray, but, yes sir.

Q.   Gray?

A.   Right.  Yes, sir.

Q.   I stand corrected.  You're probably accurate.  More accurate than I am.

A.   Yes.

Q.   All right.  And that you indicated that you saw him

Exhibit 5001 at 749

Lewis    X    D4 219

at ten, ten thirty, ten forty-five, something like that?

A.    Correct.

Q.    And that would have been accurate as to when you saw him?

A.    Uh - - -

Q.    What's on the Grand Jury testimony would have been accurate at that time as to what you saw?

A.    Yes, sir.

Q.    And the time you saw it?

A.    Yes, sir.

Q.    Okay.  And you indicated that you were trying to get home in a hurry at that time?

A.    Yes, sir.

Q.    Do you remember that, that you were trying to get home in a hurry?

A.    I don't remember trying to get home in a hurry, no.

Q.    Now, in terms of going up to Hudson Ridge, we've got it pinned down that there wasn't any deer or elk season open. Did you go up there to go mudding?

A.    Yes, sir.

Q.    But this was — this was dry then in that summer, wasn't it?

A.    Correct.

Q.    So, there wasn't any mud to go running around in up there?

Exhibit 5001 at 750

Lewis    X    D4 220

A.    There was on one road.  There was on one road, sir.

Q.    All right.  Do you remember going up there between the 30th of May and let's say the 5th of July?

A.    I do not recall.

Q.    And so you can't tell us any people who were with you when you went up there that period of time?

A.    No, sir.

Q.    And you said you went up there a whole lot?

A.    Yes.

Q.    You've never seen Mr. McGuffin up there, though, isn't that correct?

A.    That is correct.

Q.    You've never heard him talk about going to Hudson Ridge, have you?

A.    Correct.

Q.    And, in terms of Hudson Ridge, let's deal with this in a sense.  This is another map.  It's in evidence as State's Exhibit No. 5.  Are you able to orient yourself on this map?

A.    Can't really read it.

        THE COURT:    Mr. Lewis, I don't care if you get down and look at it closely.  I just don't want you to start to talking until you get back on the stand and the microphone is there.

        WITNESS:    Okay.

A.    I don't recognize all the roads or anything like

Exhibit 5001 at 751

Lewis   X    D4 221

that, but it is Fairview Road.  Yes, sir.

Q.  All right.  I'm pointing over on the left side of the map at a short purple line running down on the map which is labeled Knott Street.  Are you able to pick up on that?

A.  Yes, sir.

Q.  And that's where Leah Freeman lived?

A.  Correct.

Q.  And that's also where you lived?

A.  Correct.

Q.  And then I have moved over to the light somewhat, to a long line that goes straight and then does some jagged or rather wiggly lines to the north.  And, you recognize that where this starts is at Central?

A.  Yes, sir.

Q.  Where that line goes up is about where the cemetery is?  Is that correct?

A.  Yes, sir.

Q.  Then, from the area where the cemetery is, the next main street, moving my finger over more to the light on the map and the heavy purple line, this would be Fairview Road going out?

A.  Correct.

Q.  And it's correct is it not that if you go from this cemetery area down to Central you can then go onto Fairview Road.  And that would proceed to take you all the way out?

Exhibit 5001 at 752

Lewis   X   D4 222

I'm now bringing my finger across — completely across — to the right side of the map where Hudson Ridge Road takes off?

A.   Correct.

Q.   And off Fairview Road also, I'm now putting my finger toward a line running down from the very long purple line running a shorter distance down the map.  This is Lee Valley Road.  Correct?

A.   I believe so, yes.

Q.   All right.  Now, did anyone in law enforcement, including the Grand Jury, did they — did anyone talk to you back in 2000 about how it was that your receipt was up on Hudson Ridge Road Area?

A.   I was just called in.

Q.   Pardon?

A.   I was just called in by them to look at the receipt.

Q.   You were what?

A.   I was called in when they had found the receipt, to look at it.

Q.   I'm sorry?

THE COURT:   He said he was called in to look at the receipt.

Q.   Okay.  They called you in to look at the receipt?

A.   Correct.

Q.   And you identified it as yours?

Exhibit 5001 at 753

Lewis    X    D4 223

A.    Yes, sir.

Q.    Did they ask you how it came to be up there?

A.    I don't recall, sir.

Q.    All right.  Did they ask you to have a look in your pickup at that time?

A.    I don't believe so.

Q.    And they didn't look at your pickup at that time, did they?

A.    No, sir.

Q.    In fact, your pickup has never been processed by the crime lab or any agency like that, isn't that correct?

A.    Correct.

Q.    They never — they never searched your home?

A.    Correct.

Q.    So, nothing has been done by law enforcement up to and including this moment to try to establish whether or not — in our pickup or at your home — there's something that establishes a connection between you and the disappearance of Leah Freeman.  Is that correct?

A.    Correct.

Q.    When you saw her she was walking, right?

A.    Yes, sir.

Q.    And she was alone?

A.    Yes, sir.

Q.    And she looked like, at least the direction she was

Exhibit 5001 at 754

Lewis   ReD   D4  224

walking, was toward where she lived?

A.   Correct.

Q.   And toward where you lived?

A.   Correct.

Q.   And did you — did you consider offering her a ride home?

A.   I — no, sir.

Q.   Pardon?

A.   No, sir.

Q.   No?  I see.

And it's your testimony then that you never saw her again after that?

A.   Correct, sir.

Q.   Thank you.

MR. McCREA:   That's all the question I have.

THE COURT:   Redirect.

MR. FRASIER:   Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. FRASIER:

Q.   Sir, Counsel asked you about a twenty-two rifle or pistol that you had.

A.   Rifle, sir.  Yes.

Q.   And what was it again?

A.   It was a twenty-two Ruger, ten twenty-two.

Q.   A rifle?

Exhibit 5001 at 755

Lewis   ReD  D4 225

A.   Yes, sir.

Q.   And where did you keep that?

A.   At home.

Q.   Keep it in your truck?

A.   Not unless I was shooting it, sir.

Q.   And your hunting knife, where did you keep that?

A.   At home as well.

Q.   Did you ever keep it in your truck?

A.   Sometimes it was in there.

Q.   For what reason would it be in your truck?

A.   If I left it in there.

Q.   Now, was Leah Freeman ever in your truck?

A.   No, sir.

Q.   Was Leah Freeman ever at your house?

A.   No, sir.

Q.   Would there have been any reason to look at your truck?

A.   No, sir.

Q.   Again, did you have anything to do with the death of Leah Freeman?

A.   No, sir.

Q.   Thank you.

MR. FRASIER:   That's all I have, Your Honor.

THE COURT:   You may step down.  You're free to leave.

Exhibit 5001 at 756

Lewis  ReD  D4 226

WITNESS:    Thanks.

THE COURT:    We'll take a recess.

WITNESS:    Should I move this?

THE COURT:    Yes.  To get it out of the way, yes.

Everybody else remain seated until the jury has a chance to go to the jury room.

Take your notes.  Remember the admonition. We'll take around twenty minutes.

(Jury Out.)

THE COURT:    About three twenty.

(RECESS)

(Jury In.)

JUDICIAL ASSISTANT:    All rise.

THE COURT:    Be seated please.

Call your next witness.

MR. FRASIER:    Thanks, Your Honor.

We call Alicia Hartwell — Alicia Hyatt.

AUSTIN FISHER

was thereupon produced as a witness on behalf of the Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat up here, please.

Exhibit 5001 at 757

Hyatt   D    D4 227

DIRECT EXAMINATION

BY MR. FRASIER:

    Q.   Could you state your name please and spell your last name for the record?

    A.   It's Alicia Hyatt, H-Y-A-T-T.  It was Hartwell, but I recently got married.

              MR. FRASIER:    You need to scoot up to the microphone, please.

              WITNESS:    Sorry.

              MR. FRASIER:    And you need to speak up.

              WITNESS:    I was a little quiet there.  Sorry.

              MR. FRASIER:    If you don't speak up we have to shut the air conditioning off.

              WITNESS:    No, don't do that.

    Q.   You indicated now your married name is Hyatt?

    A.   Yes.

    Q.   And your maiden name was?

    A.   Hartwell.

    Q.   Would you spell that for us, please?

    A.   H-A-R-T-W-E-L-L.

    Q.   And, where do you live now?

    A.   Right now I'm living in Coos Bay.

    Q.   Had you lived in the Myrtle Point Area?

    A.   Yes.

    Q.   When did you live in Myrtle Point?

Exhibit 5001 at 758

Hyatt    D    D4 228

A.    Pretty much from the time I was in the sixth grade until I graduated high school.

Q.    Did you attend church functions, that type of things over here in Coquille?

A.    Yeah, at the Four Square Church over here in Coquille over by the high school.

Q.    I'm going to direct you now to the summer of the year 2000.  How old were you then?

A.    About eleven.  I was almost twelve.

Q.    Did you know Leah Freeman?

A.    Yeah.  When I was younger my mom used to babysit her.  And she worked at Denny's Pizza.  I knew Leah and Denise very well.

Q.    In the summer of 2000, June of 2000 — well, to get right to it, June 28th of 2000, that would have been the day she allegedly disappeared?

A.    Yeah.

Q.    Did you happen to be in the Coquille area that day?

A.    Yes.  I was attending a church practice for our summer Christmas program — or, our summer play program. Excuse me.

Q.    What time of the day was this practice?

A.    It was in the evening.  I'm not exactly sure what time we left.  But I know we got there at about five in the afternoon.

Exhibit 5001 at 759

Hyatt    D    D4 229

Q.    When you were leaving, do you recall what time of the day it was when you left?

A.    It was late in the night.  I'm not exactly sure what time.  I was eleven.  I really didn't care what time it was at the time.  I was out past curfew, so.

Q.    Was it still daylight?

A.    No.  It was very dark out.

Q.    Now, did you see Leah Freeman that night?

A.    I did.  In a van, I was with a friend of mine and her grandmother.  We were coming home.  And as we drove past the high school she had been walking past.  And I had spotted her but I didn't say anything else.  I went back to talking with my friend.

Q.    And where did you see her in relation to the high school?

A.    It was about halfway between the main gate entrance where everyone parks and down below where the bus barn area is.

Q.    I'll show you now what's marked as State's Exhibit No. 221.  Do you recognize that?

A.    Yes.  That's about where I seen her, right about here, walking.

Q.    And does that show you the area where you saw her?

A.    Yes.

                MR. FRASIER:    We'd offer State's Exhibit

Exhibit 5001 at 760

Hyatt   D   D4 230

No. 221.

MR. McCREA:    No objection, Your Honor.

THE COURT:    Received.

(Whereupon Exhibit No. 221 was then received into evidence.)

Q.    While I'm getting the projector warmed up here, could you describe — do you recall what Leah Freeman was wearing when you saw her?

A.    It was a white tank top.  And it was either jeans shorts or a pair of blue jean pants.  I couldn't quite tell. It was pretty dark.

Q.    I'll show you what's marked as State's Exhibit No. 7.  Do you recognize - - -

A.    (Interposing) Yes.  That's about what she was wearing that evening.

Q.    Could you tell if — well, could you tell what her demeanor was like when you saw her?

A.    I really didn't pay attention too much.  It seemed she might have been a little upset or so.  She was walking quite fast.

Q.    As you were driving by, did you see any other vehicles?

A.    As we pulled out from the church, about where Coquille Vision Center is I noticed a car that was coming, followed us and about stopped right about where we're seen

Exhibit 5001 at 761

Hyatt   D    D4 231

her.  It was just shortly after that that the car behind us stopped.

Q.    What did — was there anything that drew your attention to this car?

A.    One of the headlights looked a little dimmer than the other one.  And I didn't really pay attention much to it, but it did look a little bit dimmer than the other one.  And I noticed that.

Q.    Do you recall what the shape of the headlights were?

A.    They were really round as in, like, an older car. The glass bulbs.

Q.    Now, your family, do they do work with cars?

A.    My dad's a mechanic.  My mom and my dad have always been really into cars.  I've been around them all my life.

Q.    And, this one headlight that was dim, why did that cause you concern?

A.    I figured the bulb was about to go out or it seemed that way.  It was kinda funny.  I don't know why.  It's always been something that I've noticed.  Ever since I was little, with me and my brothers, we always played in the car, you know, Pedittle or Popeye, you know, one's dimmer; one's out. So, it was kind of a game.  I've just always noticed things like that.

Q.    Okay.  On the screen now is State's Exhibit No. 221. And this is a laser pointer.  And it's got a little red button

Exhibit 5001 at 762

Hyatt   D    D4 232

on top.

A.    Okay.

Q.    Could you, using that laser pointer, point out on the screen where you saw Leah Freeman?

A.    When I first spotted her she was right about through here.  And then the car stopped right along up here, in this area.  When I first noticed that it was slowing down or stopping was right about there.

Q.    What else could you tell us about this car that you saw?

A.    I'm not sure whether it was one or two people in the car, but I did notice that they did stop and the passenger door had opened.  And she'd stopped to talk to them.  But by the time that I really, you know, had seen anything else we were too far around the corner to see much after that.

Q.    Could you describe this car for us?

A.    I know it was an older model car.  It looked about like a front end of a Mustang is what I was assuming.  My mom's always been really into later Mustangs.  A '69 is her favorite car.  So, I've been looking at them for years.

Q.    This has been marked as State's Exhibit No. 16. Does that look familiar?

A.    Yes, that does.  It looks about like the front end. It was a darker colored car I noticed, and it was an older — it seemed.  It was pretty dark, so I couldn't tell you exactly

Exhibit 5001 at 763

Hyatt   X    D4 233

what color it was.

Q.   Did you see how many people were in the car?

A.   Not for sure.  It looked at least one.  There may have been a second person, but I am not a hundred percent sure on that.  It seemed like there was two, but it may have just been the way the shadow from the light hit them.

Q.   Did you see Ms. Freeman approach the car?

A.   Yes.  She stopped and spoke to someone in the car.  It appeared that she had known who it was.

Q.   Then you went on home?

A.   Yeah.

Q.   Thank you.

MR. FRASIER:   That's all the questions I have of the witness.

THE COURT:   Mr. McCrea.

CROSS EXAMINATION

BY MR. MCCREA:

Q.   Ms. Hyatt, I want to put this in total context.  You were riding in a van with some other young folks.  Is that correct?

A.   One other girl.

Q.   Pardon?  One other?

A.   It was just one other girl.  And her grandmother was driving.

Q.   And the driver of the van was Mary Fuller?

Exhibit 5001 at 764

Hyatt  X  D4 234

A.  Yes, that's correct.

Q.  And you were — and forgive me because I couldn't hear a lot of what you said on direct examination.

A.  Sorry.

Q.  You were twelve or so at the time?

A.  It was just before my twelfth birthday.

Q.  So, you were still eleven?

A.  Yes.

Q.  You were eleven years old.  And when this happened you were in the process of bickering with this other person over a shirt.  Isn't that right?

A.  That's correct.

Q.  Okay.  So, the bickering with the other person was taking the main part of your attention.  Is that fair?

A.  No.  I was actually trying to stop.  I was - - -

Q.  (Interposing)  It wasn't?

A.  No, it wasn't.  We were bickering over it and I had just stopped talking to her on the way home, because I did not want to deal with it any farther.

Q.  Okay.  I'm not hearing what you're saying.  Speak up, please.

A.  Sorry.  No.  I stopped arguing with her about that point because I just, I didn't want to argue with her any longer over it.  I had stopped talking to her and starting paying attention out the window.  That's when I noticed Leah.

Exhibit 5001 at 765

Hyatt   X    D4 235

Q.   Well, the first time that you were contacted regarding this would have been along about in July or the first part of August of 2000.  Is that correct?

A.   Yes.

Q.   And so at that time what happened would have happened something just over a month before.  Correct?

A.   Correct.

Q.   And that was Officer Downing with whom you spoke?

A.   Yes.  He came to my parent's house.

Q.   And at that time, is this what you told him?  That you were riding with Ms. Fuller and some other kids in Ms. Fuller's car and does remember seeing a girl that appeared to be the same as the girl in the pictures?  And you advised that you remembered seeing this girl walking right near the high school and that the girl was a blonde haired female wearing a white top and blue jeans.

And then you went on to say that you don't — you did not know Leah personally, but your parents do.  But you did remember that the girl you saw was very similar to the girl in the photographs around town.

Is that what you told him?

A.   If that's what it says, then yes.  I don't exactly remember what I said.  I was eleven.

Q.   Would you like to see the report?

A.   No.  I believe what - - -

Exhibit 5001 at 766

Hyatt   X    D4 236

Q.   (Interposing)  Okay.

So, that's what you actually reported as to what you'd seen?

A.   Yes.  The officer really didn't ask me too many questions.

Q.   I can't hear you.

A.   The officer really didn't ask me too many questions when he came to the house.  And he really didn't listen to much of what I had to say.  He asked me a couple questions.  And before I finished with what I was trying to say he turned around and walked off of our porch and got in his car and left.  I didn't even tell him everything that I had seen that night.

Q.   And in terms of what you saw, you said the person was walking fast.  Right?

A.   Yes.

Q.   And it was getting dark?

A.   It was pretty dark out and it seemed to be getting darker, yes.

Q.   Pretty dark out at that time.  So, what you were seeing was, you were seeing in pretty dark conditions.  Right?

A.   Yes.

Q.   All right.  And you did testify before the Coos County Grand Jury the 21st of July of 2010.  Is that correct?

A.   Yes.

Exhibit 5001 at 767

Hyatt   X    D4 237

Q.   All right.  And at that time you talked about the car that had stopped.  You said the car that stopped, it was a darker colored car?  Is that what you testified?

A.   Yes.

Q.   And that it was a little compact car, like maybe a Honda or Nissan or something?

A.   No.  I do not remember saying - - -

Q.   (Interposing) You (not understandable)?

A.   No.  I said it was a car.  I didn't know what form. It looked like an older model's car.  But it didn't look like a compact car.

Q.   Actually, didn't you say twice or more that it was a darker, little compact car?

A.   It was a darker smaller car.  It didn't look too compact.  If I said that, then I mis-spoke.  I apologize for that.

Q.   Excuse me.  Pardon?

A.   I said it was a darker smaller car, but I don't remember calling it a compact car.  If I said that in the report then I mis-spoke it.  But I know it was a darker colored older small car.

Q.   If you said that before the Grand Jury, that would have been your best recollection at that time.  Is that correct?

A.   Yes.

Exhibit 5001 at 768

Hyatt   X    D4 238

Q.   As a matter of fact if you said a third time, "I know it was a darker colored car."

Mr. Frasier says, "Okay."

And then you say, "And it was a little compact car."

Does that sound — does that refresh your memory of what you testified to?

A.   Not really.  I was kind of under a lot of stress at that point.  I do remember saying a lot of it, but I didn't remember calling it a compact car.  I know it was a smaller car.

Q.   Okay.  In any event, it had two headlights?

A.   Yes.

Q.   And one was just a little dimmer than the other?

A.   Yeah.  It seemed like it was going out or they'd had the brights on and one wasn't working correctly or something.

Q.   And in terms of — well — you didn't — if I understand what you're saying correctly, you couldn't tell if there were one or two people in the car?

A.   No.  I could not tell if there was two or not.

Q.   And in terms of anyone that — anyone that had any contact with Ms. Freeman, you couldn't tell if that person was a male or a female.  Is that right?

A.   No.  It was a dark figure in the car.

Q.   Pardon?

A.   No.  It was just a dark figure to me.  I couldn't

Exhibit 5001 at 769

Hyatt    X    D4 239

tell whether it was male or female.

        MR. McCREA:    May I see Exhibit No. 15?

Q.    Is it correct that your testimony — that you said the car could be black?

A.    I said it was darker.  It seemed like a black or a dark green or maybe a dark blue.  I wasn't quite sure.

Q.    You said it could be black or blue or dark gray?

A.    Yeah.  It was darker colored.  I wasn't quite sure of the color.

Q.    And I'm not clear.  You're not identifying this car pictured in No. 15 (not understandable).  Is that correct?

A.    No.  I said it seemed similar to the car.  I'm not saying that was the exact car.

Q.    But, if you indicated — forgive my glasses here — in your Grand Jury testimony that it could have been a Honda or a Nissan, that would be accurate as to your recollection.  Is that correct?

A.    I don't remember saying that.  But if it's in there, then I probably did say that.  I don't - - -

Q.    (Interposing) I'm sorry?

A.    The more I thought about that evening, the more it couldn't have been a smaller compact car like a Nissan or a Honda or something like that.  It was an older model's car because the headlight was different.  And it was round, not square.

Exhibit 5001 at 770

Hyatt   X   D4 240

Q.   I'm sorry.  My question was pretty short.  It was just — if you indicated to Grand Jury it could have been a Honda or a Nissan would that have been accurate of your recollection at the time?

A.   At the time that's what I said, then that is what I said.  But I do not remember saying that.

Q.   (Not understandable.) Okay.

Now, Mary Fuller was operating the van.  You said that before?

A.   Yes.

Q.   And did you say anything at the time to her so that she would take a look at the car?

A.   No.

Q.   Did you say anything out loud?

A.   Other than that I noticed the girl on the side of the road and said - - -

Q.   I'm sorry?

A.   No.  Not about the car at all.

Q.   Well, or — okay.  Okay.

Excuse me.

MR. McCREA:   I think that's all the questions I have of this witness.

THE COURT:   Redirect.

MR. FRASIER:   No further questions, Your Honor.

Exhibit 5001 at 771

Bounds    D    D4 241

THE COURT:    You may step down and you're free to leave.

Call your next witness.

MS. SOUBLET:    The State calls Thomas Bounds.

<u>THOMAS BOUNDS</u>

was thereupon produced as a witness on behalf of the Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat up here, please.

MS. SOUBLET:    Mr. Bounds, I'm going to ask you to scoot up close to the microphone and make sure we can hear you over the AC so we don't have to turn it off.

WITNESS:    Testing.

<u>DIRECT EXAMINATION</u>

<u>BY MS. SOUBLET</u>:

Q.    can you state your name and spell your last name for the record?

A.    Thomas Bounds, B-O-U-N-D-S.

Q.    Mr. Bounds, have you lived in Coquille all your life?

A.    No, I have not.

Q.    In the summer of 2000 were you living in Coquille?

A.    Yes, I was.

Q.    Where were you living?

Exhibit 5001 at 772

Bounds   D   D4 242

A.   I was living at 382 West Central Boulevard, Apartment No. 2.

Q.   Where is that in relation to the high school?

A.   That is across from the high school, caddy corner somewhat.  Slightly to the east of the gas station.

Q.   That's a Shell station now - - -

A.   (Interposing)  Yes.

Q.    - - - was a Chevron station in 2000?

A.   That is correct.

Q.   Did you know Leah Freeman?

A.   Yes, I did.

Q.   How did you know her?

A.   She is my second cousin by marriage.

Q.   I want to turn your attention to June 28th, 2000.  Do you remember that evening?

A.   Yes, I do.

Q.   Okay.  Was there a time where you were driving past the high school that night?

A.   Yes, there was.  Actually it wasn't during the night.  It was still daylight.  I don't know what time it was, but my wife and I were going over to our mother-in-law's house.  And as we drove past the high school Leah Freeman was there in front of the high school standing like she was waiting for someone.

Q.   Did you notice anything about her at that time?

Exhibit 5001 at 773

Bounds   D    D4 243

A.    Other than I thought her attire was a little bit risque.  That's the only reason I really remembered, because I commented to my wife that I was wondering if her mother knew that she was wearing that kind of a top.  She was wearing somewhat of a — I believe it was a strapless top, but I'm not sure.  I don't remember that well.

Q.    You didn't approve of the top?

A.    No.  But I'm kind of conservative anyway.

Q.    Do you remember which direction you were headed?

A.    Yes.  I was heading out of town towards 42nd.

Q.    Did you do anything or — to catch Ms. Freeman's attention at that time?

A.    Oh, my wife and I waved at her.  We know her.  And she waved back.

Q.    How long was it before you returned home?

A.    That I couldn't say honestly.  I do know it was daylight when we went over there.  And it was just starting to get a little dark when we headed home.

Q.    Did you have an opportunity to see Ms. Freeman at that time?

A.    Yes.  At that time as we were turning into the Chevron Station going to our drive, we saw Leah at the pay phone behind the gas station.

Q.    Was she doing anything?

A.    No.  She was standing there.  Again, like she was

Exhibit 5001 at 774

Bounds   D    D4 244

waiting for somebody.

Q.   What did you do?

A.   We went home.  Got out of the car and went into the house.  Got my bathrobe on.  Wife turned on the TV.  And about that time I thought I heard a scream from outside.

Q.   Can you describe the scream?

A.   Kind of high pitched.  Sounded like from a young person.  I didn't hear it quite all that well.  The metal storage units that are between us and where the pay phone is has a tendency to misdirect sound a little bit, so I was not sure if — exactly where the sound came from.  But I did step outside to listen further.  And I didn't hear nothing else.

Q.   How long was it after you saw Ms. Freeman standing at the phone booth was it until you heard the scream?

A.   I would guess fifteen to twenty minutes.  But then I'm not exactly sure on that either.

Q.   When you stepped outside did you see or hear anyone else?

A.   No, I did not.

Q.   When you say it was a high pitched scream, how would you further describe that?

A.   Young female.  It sounded like a kid.  And of course the property next to us, where the phone booth is at, the Courtney Property, they do have children there also.  So, at that point I wasn't sure if it was just a kid squealing or if

Exhibit 5001 at 775

Bounds    X    D4 245

it was one of the high school kids screaming at each other as they drive by like they do sometimes.  I — but I didn't hear anything after I had stepped out.

Q.    Thank you.

MS. SOUBLET:    Nothing further.

CROSS EXAMINATION

BY MS. MCCREA:

Q.    Mr. Bounds, can you describe to us in a little more detail where in relation to the high school that you saw Leah Freeman?  In other words, was she — was she inside the fence?  Was she outside the fence?

A.    She was outside the fence.  I would say twenty to thirty yards from the entranceway.

Q.    And which entranceway, the bus entranceway or the - - -

A.    (Interposing) Oh, no.  The regular school entranceway.

Q.    Okay.

A.    And she was on the town side.

Q.    And she was on the town side?

I'm sorry.  It's really hard to hear back here.  So, that's why - - -

A.    (Interposing) It was on the town side.

Q.    Thank you.  Okay.

And as you passed by where she was, she was by

Exhibit 5001 at 776

Bounds    X    D4 246

herself?

A.    Yes, ma'am, she was.

Q.    And she didn't appear to be in distress in any way?

A.    No.  But she did look like she was waiting for somebody.

Q.    Like, she was just hanging out?

A.    Yeah.  She had that look like she was, you know, waiting for somebody.

Q.    Okay.  And as you and your wife passed by, you gave like a friendly wave to her acknowledging that you recognized her?

A.    Yes, ma'am, we did.

Q.    And she gave you the same kind of a wave back?

A.    Yes, that's correct.

Q.    It wasn't like a, "Hey, come here.  Help me."  It was just a, "Hey, how you doing?"

A.    No.  No, it was not.  And that was during the daytime.

Q.    Okay.  Now, when you came back and you saw her at the phone booth?

A.    Uh huh.

Q.    This would be the phone booth that no longer exists by the service station?

A.    That is correct.

Q.    What was then a Chevron Station and is now a Shell

Exhibit 5001 at 777

Bounds   X    D4 247

Station?

    A.   Yes, ma'am.

    Q.   And when you came back and you saw her at the — she was at the pay phone.  Right?

    A.   Yes, ma'am, she was.

    Q.   And is it correct that she appeared to be on the phone as you passed by?

    A.   Yes, it did.

    Q.   When you hear the scream, Mr. Bounds, you stepped outside to see if you could hear anything else?

    A.   Yes, ma'am, I did.

    Q.   I'm sorry.  I didn't mean to cut you off.

    A.   Yes, ma'am, I did.

    Q.   And you didn't hear anything after that.  Is that right?

    A.   That's correct.

    Q.   Thank you.

        MS. McCREA:   I have nothing further, Your Honor.

        THE COURT:   Redirect?

        MS. SOUBLET:   No, Your Honor.  Thank you.

        THE COURT:   You may step down, sir.  You're free to leave.

        Call Dan Lee.  Call your next witness.  I'm going by your schedule.

Exhibit 5001 at 778

Lee    D    D4 248

MR. FRASIER:   Call Dan Lee.

THE COURT:   Okay.

DAN LEE

was thereupon produced as a witness on behalf of the Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:   Have a seat here, please.

DIRECT EXAMINATION

BY MR. FRASIER:

Q.   Could you state your name please, sir, and spell your last name for the record?

A.   Yes.  Danny Paul Lee, L-E-E.

MR. FRASIER:   Mr. Lee, could you pull that microphone down there, pull it up close to you, so (not understandable) and speak loudly if you will.  Otherwise we have to turn the air conditioning off.

WITNESS:   Okay.

Can you hear that?

MR. FRASIER:   Thank you.

Q.   Sir, in the past have you been employed as a police officer for the City of Coquille?

A.   Yes, I have been.

Q.   And how long did you work for the City of Coquille?

A.   Approximately eighteen years.

Exhibit 5001 at 779

Lee    D    D4 249

Q.   Do you have other experience in law enforcement?

A.   I had a brief stint with the Sheriff's Office for about nine months as a reserve deputy.

Q.   How long did — what time period did you work for the Coquille Police Department?

A.   Oh, from April of '86 until approximately January of '05.

Q.   And in 2005 did you retire?

A.   Yes, I did.

Q.   Still retired?

A.   I am.

Q.   Now, I want to direct your attention, sir, to June 28th, 2000.  Were you working as a police officer that day?

A.   Yes, I was.

Q.   Could you recall the shift you were working, sir?

A.   I believe it was graveyard.

Q.   And a graveyard shift, what hours did that cover?

A.   I believe we started our graveyards at eleven o'clock at that time, p.m., and then we ran to — in the morning, like, seven.

Q.   So, you would have started your shift at eleven p.m. June 28th, then finished sometime in the morning on June 29th?

A.   Yes.  That's correct.  Yes.

Q.   Now, while you were on duty that evening, and in particular around midnight, did you have contact with the

Exhibit 5001 at 780

Lee   D   D4 250

Defendant in this case, Nicholas McGuffin?

A.   Yes, I did.

Q.   Where were you when this contact occurred?

A.   I was in a patrol car and I was west bound on East Twelfth Street, just about where Collier crosses there.  It's a stop sign on Twelfth.  Collier is through traffic.

Mr. McGuffin was headed eastbound on Twelfth, on the other side of North Collier Street.  And I noticed there was a headlight out on the vehicle.  I didn't know it was McGuffin at the time.  And I came across the intersection and stopped in the road.  And we spoke from car to car.  And I let him know that he had an equipment problem at that point.

Q.   Did you actually turn — stop his car?

A.   Yes.  I don't believe we turned the cars off.  But we were stopped in the road.

Q.   Did you turn your overhead lights on to - - -

A.   (Interposing) No.  There was no stop.  It was a casual contact.

Q.   So, you're like in the middle of the intersection or?

A.   No.  I believe it was on the Twelfth Street itself.

Q.   And when you pulled up what did you say to the Defendant?

A.   I let him know that he had a headlight out.  And that was basically what I had to say.  I mean, you know, he

Exhibit 5001 at 781

Lee    D    D4 251

told me a couple of things during the contact.

Q.   What did he tell you?

A.   He told me that he couldn't find Leah, his girlfriend.  And that she was apparently out walking around in that area.  And he wanted to know if I would keep my eye open for him (sic) and — or for her.  Excuse me.   And if I did see her maybe I could give her a ride home.

Q.   Did you agree to do that?

A.   Yes, I did.

Q.   How did the Defendant appear to be — well, how was he behaving when he was talking to you?

A.    Well, he seemed upset that he couldn't find Leah. He had been looking for her, apparently, and he couldn't find her.  And then in turn asked me if I would keep an eye out for her.  He seemed genuinely upset that he couldn't locate her.

Q.   Did you notice anything about his physical appearance?

A.   His eyes may have been a little glassy, a little watery, a little glassy.

Q.   The car he was driving, you indicated a headlight was out?

A.   That's correct.

Q.   Could you describe the car further for us?

A.   It was a sixties model Mustang.

Q.   Was there anything distinctive about the Mustang?

Exhibit 5001 at 782

Lee    D    D4 252

A.    Not that I can recall off the top of my head.

Q.    I'll show you what's been previously received as State's Exhibit No. 16 and ask if you can identify that?

A.    It would appear to be the vehicle that Mr. McGuffin had been driving that evening and in the past he drives that car.

Q.    Have you seen him drive any other type car?

A.    On occasion I — I've seen him to drive — I believe his parents had like a red Thunderbird.

Q.    How many times did you see Mr. McGuffin that evening?

A.    As far as I can recollect I had only seen him the one time during the course of the evening.

Q.    And during the course of that evening, you're on patrol.  Is that correct?

A.    That's correct.

Q.    Did you ever, like, go into the police station for a couple hours to write reports or things like that?

A.    That's a good possibility, but I don't recall. That's been way too long ago.

Q.    Did you ever see Leah Freeman that night?

A.    I did not see her that evening, no.

Q.    Thank you.

        MR. FRASIER:    That's all the questions I have.

Exhibit 5001 at 783

Lee    X    D4 253

THE COURT:    Ms. McCrea.

MS. McCREA:    Thank you, Your Honor.

Mr. Lee, bear with me.  I want to (not understandable) down.

MR. McCREA:    Excuse me, Your Honor.  Not to interrupt Ms. McCrea, but it's been pointed out to me that when I used the map with the witness Mr. Lewis, that I erroneously referred to them as Exhibits Nos. 3 and 5.  And in fact Exhibit No. 3 that I — in other words the exhibit that I termed Exhibit No. 3 is Exhibit No. 75.  And the exhibit that I termed Exhibit No. 5 is really Exhibit No. 76.

THE COURT:    Thank you.

MR. McCREA:    Let the record show that correction and my error.

THE COURT:    Okay.

MR. McCREA:    I guess it's on the back and I was looking at something on the front.

THE COURT:    Okay.  Thank you.

CROSS EXAMINATION

BY MS. MCCREA:

Q.  So, Mr. Lee, I have — I have on the easel what has been entered into evidence as Exhibit No. 75.

A.    Okay.

Q.   And it's kind of hard to see, so if you want to come down here and take a look at it, please feel free to do so.

Exhibit 5001 at 784

Lee   X   D4 254

And then we'll get you back over here.

A.   Okay.

WITNESS:   So - - -

(LAUGHTER)

MS. McCREA:   (Interposing) Sorry.

WITNESS:   That's not a problem.

MS. McCREA:   I didn't mean to put you in that position.

WITNESS:   It's okay.

MS. McCREA:   So, I just want you to get oriented.

We'll let you get over by the microphone and see if you can help us with this.

WITNESS:   Okay.

Q.   So, all right.  So, it was actually after midnight. I mean, so technically we're to June 29th, 2000, when you had the contact with Mr. McGuffin.  Is that right?

A.   That is correct.

Q.   And before you had the contact with Mr. McGuffin, you actually had contact with Scott Hamilton.  Is that right?

A.   That's a possibility.

Q.   Okay.  Well, I've got your report here.  Would you like to take a look at it?

A.   Sure.

Q.   I'm just going to make you put your glasses on

Exhibit 5001 at 785

Lee   X   D4 255

again.

A.   That's not a problem for me.

Q.   If you'd look at that top highlighted paragraph.

A.   I can do that.

Okay.

Q.   So, at midnight you had a contact with Scott Hamilton.  Is that right?

A.   According to my report, yes I did.

Q.   Okay.  And since you have your report and I don't, where did that contact take place?

A.   That was in the one thousand block of North Dean Street.

Q.   Of North Dean Street.  So, what would be the closest cross street?

A.   Well, it would probably be Twelfth or Eleventh.  I'm assuming it would probably be closer to Twelfth.

Q.   So, that would be in this area?

A.   Well, I can't see the map.  I - - -

Q.   (Interposing) Okay.  Eleventh and Twelfth and Dean Street?

A.   Yes.  Dean Street parallels Collier.  And Twelfth Street is a short block, about two blocks long that crosses Collier from Dean.  So, if I seen him on — in the — or in the one thousand block of Dean, I would be approaching the twelve hundred block or the Twelfth Street that went across Collier.

Exhibit 5001 at 786

Lee    X    D4 256

Q.    Do you - - -

A.    (Interposing) So, earlier in the evening.  Yes, in there.

Q.    At midnight?

A.    Yes, at midnight.

Q.    According to your report?

A.    Yeah.

Q.    And Scott Hamilton was operating, as you put in your report, a primer gray El Camino.  Is that right?

A.    Correct.  That's the vehicle he usually drove.

Q.    And primer gray is sort of that preparatory stuff when the car is not painted?

A.    Yeah.  Yes, it's a light gray.

Q.    Okay.  Do you remember why you had contact with Scott Hamilton at that time?

A.    I do not.

Q.    It's not in your report?

A.    No.

Q.    And then, three minutes later, at 12:03, in other words at three minutes after midnight is when you had the contact with Mr. McGuffin?

A.    Yes.

Q.    And can you go through for me again, Mr. Lee, where you were and where Nick McGuffin was coming from?

A.    Sure.

Exhibit 5001 at 787

Lee    X    D4 257

THE COURT:    If you step over there, make sure you keep your voice up, please.

A.    Okay.  I've got to orient myself again, because I got away from the map.  All right.

So, which location do you want to know?

Q.    I want to know where you had the — where you were coming from when you first saw Nick McGuffin?

A.    Come off of Dean, come onto Twelfth.  And Mr. McGuffin's car was coming this direction on Twelfth.  And I was heading this direction.

Q.    So you were heading west; he was heading east?

A.    Exactly.

Q.    Okay.  And — okay.

I'll let you — I want to make sure we get you on the record.

You've indicated that this was not where you turned on your overhead lights and affected a traffic stop.  The two of you just met.  Both cars stopped.  And you rolled down your windows and talked?

A.    Exactly.

Q.    Okay.  And at that point the reason that you made contact with Mr. McGuffin was because you noticed that his blue Mustang had a headlight out?

A.    Right.

Q.    Do you remember if it was the right or the left?

Exhibit 5001 at 788

Lee    X    D4 258

A.    I have no idea at this time.

Q.    But the headlight was out.  It wasn't a situation where it was dim.  It was out?

A.    It was not functioning.

Q.    It was not functioning.  Okay.

And that's when he had the conversation with you about looking for Leah.  And the whole conversation lasted, what, maybe five minutes at the maximum?

A.    I would — if that.  Yeah, a very brief contact.

Q.    All right.

A.    Headlight was exchanged.  He gave me the information about looking for Leah.  And we went on our way.

Q.    And he did appear to be genuinely concerned to try to find her.  Is that right?

A.    That is correct.

Q.    Okay.  Now, do you have any recollection of seeing Mr. McGuffin later that night?  In other words, the early morning hours of the 29th at Fast Mart when you were there with Officer Zavala?

A.    I don't recall.  I don't even recall being at Fast Mart with Officer Zavala.  We used to stop in at Fast Mart on a very frequent occasions.  It's where the kids hung out.  And we would stop in there and chat with the kids and see what was going on; see how they were doing.  You know, sometimes you pick up a suspended driver there; sometimes you could get a

Exhibit 5001 at 789

Lee   ReD  D4 259

DUII driving into the store.

Q.   Okay.  So, you could have stopped there that night, but you don't have a specific recollection?

A.   Exactly.

Q.   All right.  I'll take that from you.

Thank you very much.

A.   You're welcome.

MS. McCREA:   No further questions, Your Honor.

THE COURT:   Redirect?

MR. FRASIER:   Just briefly.

REDIRECT EXAMINATION

BY MR. FRASIER:

Q.   Are you familiar with Kristin Steinhoff?

A.   I know who that person is, yes.

Q.   And did you know where she was living at the time that we're talking about here, June 28th?

A.   I believe she was living on Dean Street.  I believe the address there was a corner house, the first house back on the right when you turned onto Dean.  And I believe the address was like 1026, something like that.

Q.   Where is that in relation to where you had contact with Mr. McGuffin?

A.   Within probably half a block or a block of that area.  It's on the same street that I was traveling before I

Exhibit 5001 at 790

Lee  ReD  D4 260

turned onto Twelfth Street.

Q.    Thank you.

MR. FRASIER:    That's all I have.

THE COURT:    You may step down.

Mr. Frasier.

MR. FRASIER:    We've tried to get some other witnesses in because we were ahead of schedule, and we weren't successful, Your Honor.  We went faster than I really thought we would today.

THE COURT:    Okay.

We will be in recess then.

Everybody else remain seated until the jury has a chance to leave.

Remember the admonition.  Leave your notes in the jury room.  Nine o'clock.

JUROR:    Are we done for the day?

THE COURT:    Done for the day.

(Jury Out.)

THE COURT:    Nine o'clock.

If the air conditioning system is really preventing you from hearing, I can turn it off.  I don't want to — I mean, it's nice to be cooler, but it's better to hear. So, you guys let me know tomorrow.  This morning it wasn't on. This afternoon it was.  And so I just need to know in the morning whether it's going to be a problem or not.

Exhibit 5001 at 791

D4 261

MS. McCREA:    When the witnesses speak up, it's not a problem.

THE COURT:    And I try to do that, but at a certain point in time it doesn't do any good to repeat it five or six times because they answer me in the same level of voice they answered me before.  And without getting nasty, which I prefer not to do, I - - -

MS. McCREA:    (Interposing) I understand, Your Honor.

THE COURT:    Okay.  Just let me know.

MS. McCREA:    Okay.

THE COURT:    We'll be in recess until nine.

(END OF DAY FOUR.)

Exhibit 5001 at 792

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

STATE OF OREGON,                        )
                                        )
            Plaintiff,                  )      CASE NO. 10CR0782
                                        )
      vs.                               )      JURY TRIAL
                                        )       DAY FIVE
NICHOLAS JAMES MCGUFFIN,                )
                                        )
            Defendant.                  )
_____        )

TRANSCRIPT OF PROCEEDINGS

Volume 7, Pages D5 2 to D5 137

      BE IT REMEMBERED That, the above-entitled cause came on regularly for hearing beginning at 9:19 a.m., Tuesday, July 12, 2011, in the Circuit Courtroom of the Coos County Courthouse in the City of Coquille, County of Coos, State of Oregon, before the Honorable Richard L. Barron and a jury.

APPEARANCES

R. Paul Frasier, District Attorney for Coos County, representing the Plaintiff.

Erica Soublet, Assistant District Attorney for Coos County, representing the Plaintiff.

Shaun McCrea, Attorney at Law, representing the Defendant.

Robert McCrea, Attorney at Law, representing the Defendant.

    S. Jean Sprouse, Court Transcriber, XV Judicial District, 503-325-5254

Exhibit 5001 at 793

D5 2

(Jury out.)

JUDICIAL ASSISTANT:    All rise.

The Circuit Court of State of Oregon, County of Coos is now in session.

THE COURT:    Be seated please.

Mr. McCrea.

MR. McCREA:    Your Honor, I have this matter for the Court.

Pursuant to Uniform Trial Court Rule 6.100, and the practice of the Court.  Except for good cause shown, any witness is to be examined by only one Counsel per party.  And we have been abiding by that.  And I don't intend that we should change that as far as examining a witness in terms of asking a witness questions.

But as an example, in the case of Ms. Hyatt yesterday, the combination of my less than perfect hearing coupled with the air conditioning created a situation where I would ask her a question and she would go on at extreme length in a somewhat soft voice.  And I found myself in a situation where I wasn't able to hear hardly a word she was saying.  And as a consequence I was unable to tell if she was answering the question or if she was providing observations and dissertations that were prejudicial and objectionable.  And that was very troubling.  And due to the fact of the application of the Rule 6.100, I was the one that was

Exhibit 5001 at 794

D5 3

obligated to make the objection.

Now, I know the Court doesn't have any solution for my hearing. And I know that the Court has only what might be termed limited assistance concerning the air conditioning. But what I'm asking the Court to do — what I'm moving the court to do is, for good cause shown, to enlarge the privilege to object the testimony to the co-Counsel in this case so that even though I'm examining the witness, Ms. McCrea would have the option and opportunity to interpose an objection if same were necessary.

And I have discussed this problem with the Defendant personally so that he is aware, number one, that the problem exists on my part. And I feel that the problem could, under some circumstances, amount to inadequate assistance of Counsel. And as I said this has been very troubling to me in reflection.

And it would appear that by doing so, by the Court allowing such a motion and allowing Ms. McCrea to interpose an objection or a Motion to Strike if that was appropriate, as well as my doing so, that it would resolve the problem. And the Defendant has indicated that would be satisfactory to him to continue as we are with that additional provision.

THE COURT:    And I'm sorry. The name of the witness you said?

Exhibit 5001 at 795

D5 4

MR. McCREA:    Oh, Ms. Hyatt, the young woman who was eleven years old when she was on the van.

THE COURT:    Okay.  I'm just trying to locate her.

MS. McCREA:    Lisa Hartwell.

MR. McCREA:    Lisa — pardon me.  Alicia Hartwell, now Hyatt.

THE COURT:    Right.

MR. McCREA:    Is the witness, Your Honor.

THE COURT:    I'm just trying to locate - - -

MR. McCREA:    (Interposing) So the record is clear, I have also discussed the situation that occurred — the situation as it occurred with that witness with the Defendant, Mr. McGuffin.  And he does not raise any objections or proceedings based on what occurred though I have made it clear to him I could not hear what she was saying and could not make objections.

THE COURT:    Well, you know, I have noticed that.  The problem that it creates sometimes is that — and I was going to mention it — is that there is some overlapping, which I assume is partly due to your hearing in that you're speaking and the witness is speaking.  And you're tying to get her to say, to at least speak up so you can hear it.  And that requires — and then all the sudden we're overlapping on the record.  And that's a bit of a problem.

Exhibit 5001 at 796

D5 5

I mean, my first solution, before I go to start having Counsel do that is just not have the air conditioning on.

MR. McCREA:    Is what?

THE COURT:    Not have the air conditioning on.

MR. McCREA:    Well, today that may not pose that much of a problem, that's true, Your Honor.

THE COURT:    So, I would prefer to try — to try it that way at first, just because that rule is one — it's a long standing rule.  I mean, it proceeded the Uniform Trial Court Rules.  And I'll see if that works first of all, because I didn't notice the problem in the morning yesterday when the air conditioning wasn't on.  So, I would prefer to handle it that way at this point.

If it gets too uncomfortable in this courtroom, whether it shows rain out there or not, it can get uncomfortably warm.  And if not, then I'll consider the other matter.

I don't know whether the State has any objection one way or the other, but I prefer at least to handle it way I'm going to handle it right now.

MR. McCREA:    I — excuse me.

THE COURT:    Mr. Frasier.

MR. FRASIER:    That's fine, Your Honor.  And you know, if it gets to the point where we have to turn the

Exhibit 5001 at 797

D5 6

air conditioning on, I don't have a problem with what he's proposing.

THE COURT:    Okay.

We'll try it the first way, just not having the air conditioning on.

Okay?

MR. McCREA:    Very well.

THE COURT:    Bring the jury in.

(Jury In.)

THE COURT:    Good morning.

I noted yesterday in the morning we didn't have the air conditioning system on, and there didn't seem to be a problem. And yesterday when the air conditioning was on even some jurors were having some problems. We're going to try it without the air conditioning because my alternative frankly is I ask people to speak up, and this is an unusual setting for most people. And they revert to what they normally do. And that is they say, "Okay, I understand."

And then they use the same voice they've always used. And my alternative is to start yelling at them which I don't like to do. Because then it becomes a battle between me and the witness. And that's not a good thing.

So, we'll try it without the air conditioning. And if it gets too warm and too uncomfortable, just let me know and I will try to politely — politely as I can — urge the

Exhibit 5001 at 798

Mauro    D      D5 7

witnesses to speak up.

I mean, the microphone does provide some amplification, but not a lot.  Most of it has to come from their own voice.  And it's — and if I interrupt all the time telling them to speak up, then everybody loses track of what anybody's saying except for me saying, "Speak up."  And that's not a good thing.  So, we'll try it without the air conditioning.

Call your next witness, please.

MR. FRASIER:    Thanks, Your Honor.

We call Brett Mauro.

BRETT MAURO

was thereupon produced as a witness on behalf of the Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat here, please.

DIRECT EXAMINATION

BY MR. FRASIER:

Q.   Could you state your name please, sir, and spell your last name for the record?

A.   Brett Mauro, M-A-U-R-O.

THE COURT:    Would you scoot closer, please, to the microphone?

MR. FRASIER:    Just going to ask you to scoot

Exhibit 5001 at 799

Mauro    D      D5 8

up closer to the microphone.

Q.   Can you tell us where you live, sir?

A.   94795 Vista Lane.

Q.   What city?

A.   Coquille?

Q.   How long have you lived in the Coquille Area?

A.   All my life.

Q.   I would assume you were living here in the year 2000?

A.   Yes

Q.   Did you go to school here?

A.   Yes, sir.

Q.   And what year did you — did you go to high school?

A.   Yeah.

Q.   Did you graduate?

A.   '97.

Q.   Are you familiar with the Defendant in this case, Nicholas McGuffin?

A.   Yes, sir.

Q.   How do you know Mr. McGuffin?

A.   We all grew up together.

Q.   Were you acquainted with an individual named Leah Freeman?

A.   Yes, sir.

Q.   How did you know Leah?

Exhibit 5001 at 800

Mauro   D      D5 9

A.   Grew up together all out lives.

Q.   Did you — were you aware that at some point in time the Defendant and Ms. Freeman were boyfriend/girlfriend?

A.   Yes, sir.

Q.   And did you have an opportunity to observe them together?

A.   Oh, yes, sir.

Q.   What could you tell us about their relationship based on what you saw?

A.   Off again, on again, real rocky.

Q.   Were there times it was good?

A.   Times it was good; times it was bad.

Q.   Did you ever see them argue?

A.   Yeah, a few times.

Q.   Did you ever see any physical altercations - - -

A.   (Interposing) No, sir.

Q.   Now, I want to direct your attention, sir, to June 28th of the year 2000.  That is the day allegedly that Ms. Freeman disappeared.  Do you recall that day, sir?

A.   I do.

Q.   Did you see the Defendant that day?

A.   Yes, I did.

Q.   Where did you see him?

A.   Fast Mart.

Q.   Do you recall about what time of the day it was?

Exhibit 5001 at 801

Mauro   D   D5 10

A.   Nine forty-ish, roughly.

Q.   And did you have contact with the Defendant?

A.   Yes, sir.

Q.   Do you recall what kind of — was he in a vehicle?

A.   Yes, sir.

Q.   Do you recall what kind of vehicle?

A.   He was in his Mustang.

Q.   Could you tell the jury please what happened when you had contact with the Defendant?

A.   I asked the Defendant to go somewhere with me and he said, no, his girlfriend was gone.

     And I said, "She can't be gone.  She has to be somewhere."

     And he said, "No.  She's gone."

Q.   And did he repeat that she was gone?

A.   Four or five, six times.

Q.   How was he acting when he said, "She's gone?"

A.   He was a little different.

Q.   Did you see him later in the evening?

A.   Fifteen, twenty minutes later.

Q.   And do you recall what kind of vehicle he was in at that time?

A.   I cannot recall.  I don't remember that.

Q.   And how was he behaving at that time?

A.   Same as the prior conversation.

Exhibit 5001 at 802

Mauro    D    D5 11

Q.   What was he saying?

A.   He said, "Come on.  Let's go.  My girlfriend's gone."

Q.   Did you ever go for a ride with him?

A.   Yeah, I got in the vehicle.

Q.   Where did you go?

A.   I can't really remember where our exact place we went.  I think we went down River Road.  But, it's been so long ago, I might not remember that correctly.

Q.   How long were you with him?

A.   Fifteen, twenty minutes.  Maybe half an hour tops, you know.  Not very long at all.

Q.   Did you go someplace and park?

A.   Yeah.

Q.   What did you do?

A.   We got stoned.

Q.   When you say you got stoned, what do you mean?

A.   We smoked marijuana.

Q.   Both of you?

A.   Yes, we did.

Q.   While you were parked smoking marijuana, what does the Defendant say?

A.   We don't really talk.  The conversation I really don't remember.  It was not much of a conversation, I don't believe.  I don't remember the exact conversation.

Exhibit 5001 at 803

Mauro    X    D5 12

Q.    Was he saying anything about Ms. Freeman?

A.    I don't believe at that time, after we had gone for a ride he said anything about Ms. Freeman?

Q.    Excuse me.  I didn't hear.

A.    I don't think he talked about Leah at all during the car ride or the conversation.

Q.    Was there a time in — a couple days later that you went for a ride with him to Roseburg?

A.    No, sir.

Q.    All right.

            MR. FRASIER:    Those are the questions I have.

            Thank you, Your Honor.

            THE COURT:    Ms. McCrea.

                    CROSS EXAMINATION

BY MS. MCCREA:

Q.    So, Mr. Mauro, what you've described here today concerning your conversation with Mr. McGuffin is what you told Officer Webley back in March of 2010.  Is that right?

A.    Correct.

Q.    And you talked to other police officers or authorities back in the year 2000 closer in time to June 28th, 2000.  Isn't that right?

A.    Yes, ma'am.

Q.    In fact you talked to somebody in the FBI?

A.    Yes, ma'am.

Exhibit 5001 at 804

Mauro   X    D5 13

Q.   And that would have been Officer Ferrera

A.   Sure.  I — I can't remember the name.

Q.   But somebody from the FBI?

A.   Yeah, it was a brief conversation.

Q.   Okay.  And that was on July 5th, 2000?

A.   I don't remember the exact date, ma'am.

Q.   Was it close in time to June 28th, 2000?

A.   Sure.  I don't — I mean, I don't remember the exact dates.

Q.   That's fine.

And when you talked to Special Agent Ferrera, at that point you told him you saw Nick McGuffin at 9:15 and Nick was in his blue Mustang, didn't you?

A.   I don't remember that conversation.

Q.   Mr. Mauro, would you like to look at the report to see if this refreshes your recollection?

A.   Sure.  I don't remember any of that.

Q.   Are you saying it didn't happen or are you saying you don't - - -

A.   (Interposing) No, I'm not saying it didn't happen. I don't remember that at all.

Q.   You remember talking to the FBI?

A.   Yeah.  But I don't remember the conversation. That's really - - -

Q.   (Interposing) I'm sorry do you - - -

Exhibit 5001 at 805

Mauro    X     D5 14

A.    (Interposing) No.  I just don't remember it at all. I don't remember.

Q.    Now, Mr. Mauro, when you talked to Officer Webley on March 5th, 2010, did anybody give you a - - -

A.    (Interposing) No, ma'am.

Q.    I'm sorry.  I appreciate you anticipating, but let me finish the question.  Okay?

A.    Sorry.

Q.    So, no one gave you a copy of Agent Ferrera's report that I just showed you here today?

A.    No, ma'am.

Q.    And nobody gave you a report of Lieutenant Buddy Young concerning the statements that you made to him on July 10th, 2000?

A.    Was he part of the homicide investigation team?

Q.    Yes.

A.    I do remember talking to him.  Yeah, I remember that one.

Q.    Let's deal with Buddy Young for a minute.  When you talked to Buddy Young you didn't tell him anything about going and smoking marijuana with Nick McGuffin the night of June 28th, did you?

A.    By - - -

Q.    (Interposing) Here's the whole part.  I'm not trying to - - -

Exhibit 5001 at 806

Mauro    X    D5 15

A.    (Interposing) If I didn't — if I didn't I just didn't say it.  I mean, I believe you.

Q.    So — and you talked to Lieutenant Buddy Young on or about July 10th, 2000?

A.    Okay.

Q.    So — well?

A.    Yeah, yeah, somewhere in there.

Q.    Okay.

A.    I don't remember dates.

Q.    All right.  And he talked to you about — one of the things he talked to you about was drug parties going on that night.  Right?

A.    Yes, ma'am.

Q.    And he talked to you about use of illegal drugs?

A.    Yes, ma'am.

Q.    And you didn't mention anything to him about having gone and smoked marijuana with Nick McGuffin that night?

A.    I didn't.  But it just wasn't, you know, a big deal I didn't think.

Q.    You knew Leah Freeman was missing?

A.    Yeah.

Q.    And you testified here today that Mr. McGuffin made a statement that she was gone?

A.    Uh huh.

Q.    And so, but that wasn't a big deal to you?

Exhibit 5001 at 807

Mauro   X   D5 16

A.   Oh, it was.

Q.   But you didn't mention it?

A.   I — I didn't I guess.

Q.   And when — and so the first time you mentioned it was in this interview with Mr. Webley on March 5, 2010?

A.   Okay.

Q.   And in terms of — now, do you have any recollection of having talked with Special Agent Ferrera back in early July?

A.   I don't.

Q.   You don't remember talking to him at all?

A.   I mean, I remember him standing there, and a conversation.  But I don't remember any of the conversation.

Q.   You don't remember telling him that Mr. McGuffin said that - - -

MR. FRASIER:   (Interposing)  Your Honor, I'm going to object.  He already says he doesn't remember.  So I think - - -

THE COURT:   (Interposing) Well, she can ask him again.  If he says he can't remember again, then she can go on to something else.

Go ahead.  Ask him.

Q.   You don't remember that Mr. McGuffin said to you that Leah Freeman had got — just got into an argument with her best friend?

Exhibit 5001 at 808

Mauro    X    D5 17

A.    I don't remember saying that.

Q.    And you don't remember saying that you observed Mr. McGuffin driving up and down Central Street?

A.    I don't remember the conversation to that officer at all.

Q.    Do you remember seeing Mr. McGuffin driving up and down Central?

A.    Yeah.

Q.    And when you went with Mr. McGuffin as you testified, to go smoke marijuana, you left with him from Fast Mart.

A.    Yes, ma'am.

Q.    Is that right?

A.    Yes, ma'am.

Q.    And who else was around at that point?

A.    I couldn't even tell you.  I have no idea.  I don't remember who was there.

Q.    Thank you, Mr. Mauro.

          MS. McCREA:    Nothing further, Your Honor.

          THE COURT:    Redirect.

          MR. FRASIER:    No further questions, Your Honor.

          THE COURT:    You may step down.  You're free to leave.

          Call your next witness.

Exhibit 5001 at 809

Steinhoff   D    D5 18

MS. SOUBLET:    The State calls Kristen Steinhoff.

KRISTEN STEINHOFF-RAMSEY

was thereupon produced as a witness on behalf of the Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat up here, please.

DIRECT EXAMINATION

BY MS. SOUBLET:

Q.   Ms. Steinhoff, can you state your name and spell your last name for the record?

A.   Kristen Steinhoff-Ramsey, S-T-E-I-N-H-O-F-F dash R-A-M-S-E-Y.

MS. SOUBLET:    I'm going to ask you to scoot a little closer to the microphone and make sure you speak up so we can hear you.

Q.   Ms. Steinhoff-Ramsey, how long have you lived in Coos County?

A.   Most of my life.

Q.   Were you living here in 2000?

A.   Yeah.

Q.   Do you know the Defendant, Nicholas McGuffin?

A.   Yes.

Q.   How do you know him?

Exhibit 5001 at 810

Steinhoff   D     D5 19

A.   Because I lived in Coquille for a long time.   We just — I don't know.

Q.   So, you know him from being around in Coquille?

A.   Yeah.

Q.   How long have you known him?

A.   Probably since 1999.

Q.   Did you know the victim, Leah Freeman?

A.   No.

Q.   Where were you living in the summer of 2000?

A.   At my grandma's house.

Q.   Where was your grandmother's house located?

A.   On North Dean.

Q.   Is that here in Coquille?

A.   Uh huh.

Q.   Do you remember the exact address?

A.   1026.

Q.   Was there anybody else living there at the house besides you and your grandmother?

A.   My mom.

Q.   What's your mother's name?

A.   Heather McMullen.

Q.   Did you have a car?

A.   Yes.

Q.   What was that car?

A.   A Honda Elantra.

Exhibit 5001 at 811

Steinhoff   D    D5 20

Q.   How long had you had it?

A.   Since I was sixteen.

Q.   How old were you in the summer of 2000?

A.   Seventeen.

Q.   Was that car reliable?

A.   No.

Q.   What was wrong with it?

A.   The transmission kept going out and the starter.

Q.   Do you know what type of car the Defendant had?

A.   A Mustang.

Q.   Do you know whether or not he had access to any other cars?

A.   The Thunderbird.

Q.   I want to turn your attention to June 28th, 2000.  Do you remember that day?

A.   Some of it.

Q.   Were you doing drugs that day?

A.   Yes.

Q.   What kind of drugs?

A.   Meth.

Q.   That's Methamphetamine?

A.   Uh huh.

Q.   Were you doing any other drugs that day?

A.   No.

Q.   Were you driving your car that day?

Exhibit 5001 at 812

Steinhoff   D     D5 21

A.    I was driving Zach's car.

Q.    Okay.  Is that Zachary Elderkin?

A.    Yeah.

Q.    And why were you driving Mr. Elderkin's car and not yours?

A.    Because my car, it wouldn't start.  There was something wrong with it.

Q.    What type of car was Mr. Elderkin's car?

A.    A Kia.

Q.    Do you remember where you were when you got the car from Mr. Elderkin?

A.    I was at my grandma's house.  And I took him home.

Q.    When you say you took him home, where was home, where did you drive him to?

A.    Access Road.

Q.    Where is that?

A.    It's on the highway, on your way to Coos Bay.

Q.    Is that near Green Acres?

A.    Uh huh.

Q.    Is that a yes?

A.    Yes.

Q.    Was there a time when you were supposed to have the car back?

A.    Yeah, like six in the morning, before six because he had to go to work.

Exhibit 5001 at 813

Steinhoff  D    D5 22

Q.   When you drove out to Green Acres, did you see anyone on the way?

A.   Nick.

Q.   Where was Mr. McGuffin?

A.   In that Econo Rooter parking lot, that little pull out.

Q.   Do you remember what time that was?

A.   No.

Q.   Was it daylight, dusk?

A.   No, it was dark.

Q.   Do you remember what he was doing?

A.   Walking.

Q.   When you say walking, what do you mean?

A.   He was walking and said he couldn't find Leah.

Q.   So, you're indicating he said he could find Leah, that must mean you stopped?

A.   Yeah, I stopped to see what he was doing.  Because there was no cars there.  It was just him.

Q.   And he told you he could find Leah?

A.   Yeah.

Q.   And who did you know Leah to be?

A.   His girlfriend.

Q.   Did he tell you anything else at that time?

A.   No.  I told him that if he didn't find her by the time I got back that I would help him look for her.

Exhibit 5001 at 814

Steinhoff  D    D5 23

Q.   So, what did you do after having that conversation?

A.   I took Zack home and then came back into town.

Q.   Do you remember how long that took you?

A.   No.

Q.   When you got back into town did you see the Defendant still by the Maytag or Econo Rooter place?

A.   No.

Q.   What did you do when you got back to town?

A.   I can't remember if I went to my grandma's house or — I think I went straight back to my grandma's house.

Q.   Was there a time when the Defendant showed up at your grandmother's house that night?

A.   Yeah.  Yes.

Q.   Do you remember what he was wearing at that time?

A.   No.

Q.   Was it the same thing that he had on when you saw him at the Maytag store?

A.   I'm not sure.

Q.   Do you remember testifying before Grand Jury in 2000?

A.   Not really.  A little bit.

Q.   Is it safe to say that your memory then would be stronger than it is today?

A.   Yes.

Q.   Do you know Scott Hamilton?

Exhibit 5001 at 815

Steinhoff   D     D5 24

A.    Yes.

Q.    Do you remember seeing him that night?

A.    And if you told the Grand Jury back in 2010 that Mr. Hamilton — you saw Mr. Hamilton that night, that would be a better recollection than today?

A.    Yes.

Q.    And if you told the Grand Jury back in 2010 that the Defendant was wearing different clothes when he showed up at your house than when you saw him earlier, that would be a better recollection than today?

A.    Yes.

Q.    How long was the Defendant at your house that night?

A.    I'm not sure — awhile.

Q.    Okay.  Did something happen while he was at your house?

A.    We did drugs.

Q.    When you say drugs, what type of drugs?

A.    Meth.

Q.    So you're saying that the Defendant did Methamphetamine as well?

A.    Uh huh.

Q.    That's a yes?

A.    Yes.

Q.    Did anything else happen while he was at your house that night?

Exhibit 5001 at 816

Steinhoff   D     D5 25

A.    Yes.

Q.    What's that?

A.    He just touched my chest and tried to kiss me and stuff.

Q.    When you're saying touched your chest, you're referring to your chest or to your breast?

A.    Yeah, to my breast.

Q.    Was that above the clothes or under the clothes?

A.    Above the clothes.

Q.    Where were you when that was happening?

A.    On my bed.

Q.    Where was he when that was happening?

A.    On my bed.

Q.    Were you sitting up or lying down?

A.    I can't remember.

Q.    When you say he kissed you, are you talking about on the lips?

A.    Uh huh.  Yes.

Q.    Did he do anything else to you?

A.    He tried to unbutton my pants.

Q.    Okay.  Did he do anything else?

A.    No.

Q.    Do you remember telling Grand Jurors that he exposed his penis to you?

A.    Yes.

Exhibit 5001 at 817

Steinhoff   D     D5 26

Q.   Did that happen?

A.   Yes.

Q.   Do you remember him trying to take off his pants?

A.   Yes.

Q.   Do you remember him attempting to touch your crotch area on the top of your pants?

A.   Yes.

Q.   Whose idea was it for that to happen?

A.   I don't know.

Q.   Did you stop it?

A.   Yeah, we both stopped.

Q.   Why did you stop it?

A.   Because we were just friends.

Q.   Do you remember telling the Grand Jury that you stopped it because it was weird that Leah was missing?

A.   Yes.

Q.   Was there a time that evening when you drove the Defendant around looking for Ms. Freeman?

A.   Yes.

Q.   Was that before or after he attempted to have sex with you?

A.   I can't remember.

Q.   Whose car were you in?

A.   In Zack's — in the Kia.

Q.   In the Kia?

Exhibit 5001 at 818

Steinhoff  D     D5 27

A.    Uh huh.

Q.    Where did you go?

A.    We just drove around town looking for her and out past that Scolari's Farm and turned around in the Sinnott's driveway.

Q.    Okay.  That's Doctor Sinnott's house?

A.    Yes.

Q.    How long did that take?

A.    I'm not sure.

Q.    After doing that did you go back to your house?

A.    Yes.

Q.    Okay.  Did you see the Defendant again that night?

A.    I seen him at Fast Gas.

Q.    Okay.  And where is Fast Gas?

A.    It's on the highway.

Q.    What was he doing?

A.    I can't remember.

Q.    Fast Gas, is that the same thing as Fast Mart?

A.    Yes — no.  It's the one on the highway, like if you're going towards Studevant Park.

Q.    I'm sorry?

A.    If you're going towards Sturdevant Park it's that Fast Gas right there by the car wash.

Q.    Okay.  Do you remember seeing the Defendant in a different car that day?

Exhibit 5001 at 819

Steinhoff   D     D5 28

A.   Yes.

Q.   What car was that?

A.   The Thunderbird.

Q.   After Ms. Freeman went missing did you speak to the police?

A.   Yes.

Q.   And did you tell the Defendant that you'd spoken tot he police?

A.   Yes.

Q.   Was there a time when the Defendant talked to you about that?

A.   Yes.

Q.   Where did that happen?

A.   At the church parking lot across from the middle school.

Q.   What happened at that time?

A.   He just told me to keep my mouth shut.

Q.   Did he tell you anything else?

A.   No.

Q.   Do you somebody by the name of Tina Leeman or Tina Mims?

A.   Yes.

Q.   Okay.  Was there a time in 2000 when she was at your house?

A.   Yes.

Exhibit 5001 at 820

Steinhoff    X      D5 29

Q.   Did the Defendant show up at your house at that time?

A.   Yes.

Q.   Did you have a conversation with him about your talking to the police?

A.   Not that I can remember.

Q.   Do you remember telling the Grand Jury that the Defendant threatened you and told you to keep your mouth shut or you'd end up like Leah?

A.   I don't remember.

Q.   You don't remember telling the Grand Jury that?

A.   No.

Q.   But if that was your testimony in 2010 your memory then would be better then than it was today?

A.   Yes.

Q.   Thank you.

        MS. SOUBLET:    I have nothing further.

        THE COURT:    Ms. McCrea.

                CROSS EXAMINATION

BY MS. MCCREA:

Q.   Ms. Steinhoff-Ramsey, since June 28th of 2000 you've talked to the police a number of times?

A.   Yes.

Q.   A whole bunch of times.  Is that fair?

A.   Yes.

Exhibit 5001 at 821

Steinhoff   X    D5 30

Q.   You've got to speak up so we can hear you.

A.   Yes.

Q.   Okay.  And you talked to different police officers. Is that correct?

A.   Yes.

Q.   And you've talked to the District Attorney?

A.   Yes.

Q.   And you've testified before the Grand Jury twice?

A.   Yes.

Q.   And you've never withheld the fact that you have had these contacts with law enforcement from Mr. McGuffin, have you?

A.   No.

Q.   You haven't gone out of your way to make sure that Nick knew you had spoken with the police.  But when it came up, you would let him know?

A.   Yes.

Q.   Okay.  Now, in terms of him supposedly threatening you at the church parking lot, that was a time when you and Scott Hamilton were at the church and you'd been drinking?

A.   I don't remember me drinking.  I hardly ever drank then.

Q.   Well, okay.  Back in 2000 you made a statement to Officer Zavala on July 10th, 2000.  Do you remember that?  You may not remember the exact date, but close in time to when

Exhibit 5001 at 822

Steinhoff   X    D5 31

Leah Freeman disappeared?

A.   Yes.

Q.   Okay.  And then on September 12th, 2000, which would be maybe what, eight to ten weeks after Leah Freeman disappeared, you sat down with Officer Danny Lee and made a statement to him.  Right?

A.   (No audible response.)

Q.   At Sturdevant Park?

A.   Oh, yes.

Q.   And Josh Felker was there?  Or Joe Felker?

A.   Joe.

Q.   Okay.  Was Joe Felker a friend of yours?

A.   Yes.

Q.   And Joe Felker was present when you had the conversation with Danny Lee?

A.   I don't remember if he was there.

Q.   Do you remember having the conversation with Danny Lee at Sturdevant Park?

A.   Yes.

Q.   And the reason that you got hold of Danny Lee to talk to him was because you wanted to make sure everyone knew that you didn't have anything to do with Leah Freeman's disappearance?

A.   Yes.  Because there was a bunch of rumors going around.

Exhibit 5001 at 823

Steinhoff   X     D5 32

Q.    There were rumors going around?

A.    Yes.

Q.    And Danny Lee tape recorded that conversation, didn't he?

A.    I can't remember.

Q.    So, when you talked to Danny Lee on September 12th, 2000.  And this would be after Leah Freeman's body was found.  Is that right?

A.    Yes.

Q.    When you talked to Danny Lee on September 12th, you told him that you had been drinking the night of June 28th, didn't you?

A.    I can't remember that.  I don't remember.

Q.    And you told Danny Lee that when you were at the church parking lot that you and Scott Hamilton had been drinking?

A.    I don't remember that.

Q.    I have a transcript of the conversation.  And I'm going to show you this portion of it.

        MS. McCREA:    It's Page No. 8, Counsel.

Q.    To see if this refreshes your recollection.  So, if you'd take a look at this, ma'am, down to here.

        I'm not trying to keep you from looking at anything else, but that's what's pertinent.

A.    I don't remember being drunk.  I might have been.

Exhibit 5001 at 824

Steinhoff   X    D5 33

Q.   You might have been.

A.   Yeah, I don't remember, though.

Q.   All right.  And in terms of what this says, is, it says that you talked to Nick once.  And that was the night before.

And Mr. Lee says, (not understandable).

And you say, "I was all drunk at the church.  Me and Hamilton were."

Is that what the transcript says?

A.   Yes.

Q.   And you're not saying this isn't what you said, you're just saying you don't remember it?

A.   Yes.

Q.   And what you remember is that you might have been drinking?

A.   Yes.

Q.   All right.  Now, when you saw Mr. McGuffin on June 28th, 2000 at the Econo Rooter or what's now the Maytag Store, you indicated it was dark?

A.   Yes.

MS. McCREA:   I'm going to move back over here so you can face the microphone.  And we really need you to speak up.  Okay?

WITNESS:   Okay.

MS. McCREA:   I'm sorry.  I know it's hard,

Exhibit 5001 at 825

Steinhoff   X     D5 34

but we (not understandable).

Q.   Okay.  So, when you saw Mr. McGuffin at the Maytag Store, you've testified that it was dark?

A.   Yes.

Q.   And it wasn't just dusk, it was dark?

A.   Yes.

Q.   Right?

A.   Yes.

Q.   And in fact you told the Grand Jury that the only light there was, was from a street light on the highway?

A.   Yes.

Q.   And you indicated that Mr. McGuffin was there and you got out of the car and teased him and asked him if he was stealing flowers?

A.   Yes.

Q.   And at that time he told you he was looking for Leah and he couldn't find her?

A.   Yes.

Q.   And it's correct he was not on the phone at that time, isn't it?

A.   He wasn't on the phone?

Q.   Was not on the phone?

A.   No.

Q.   He wasn't talking on a phone?

A.   No.

Exhibit 5001 at 826

Steinhoff   X    D5 35

Q.   Okay.  And you told him that if he still couldn't find Leah to come over to your house later and you would help him look for her?

A.   Yes.

Q.   Okay.  And then at some point he did come over to your house?

A.   Yes.

Q.   And he came in the blue Mustang?

A.   Yes.

Q.   And when he came in, what he said to you was, quote, "I hope she did not do something stupid." unquote?

A.   Yes.

Q.   And he kept saying that during the time that he was with you?

A.   Yes.

Q.   And he was really concerned about where Leah was?

A.   Yes.

Q.   And he also told you, and this is a quote, "When all my other girlfriends have done this in the past, they have been out cheating on me?"

A.   Yes.

Q.   And he was worried that she was with another guy?

A.   Yes.

Q.   And he was worried she might be at a party somewhere?

Exhibit 5001 at 827

Steinhoff   X     D5 36

A.   Yes.

Q.   And he was also worried that maybe something else had happened to her?

A.   Yes.

Q.   And you — you liked Nick McGuffin, didn't you, Ms. Steinhoff-Ramsey?

A.   Yeah, we were friends.

Q.   Well, he was also an attractive guy?

A.   Yeah, but I didn't like him like that.

Q.   Okay.  Well, and the two of you did smoke some Methamphetamine together?

A.   Yes.

Q.   And at some point the two of you did get kind of, as you said, kissing and a little involved?

A.   Yes.

Q.   And it was like Nick was concerned that Leah was out with somebody else and it was going to be payback?

A.   I don't know.

Q.   Well, the bottom line is the two of you didn't have sex that night, did you?

A.   No.

Q.   And you've never had sex with Nick McGuffin?

A.   No.

Q.   And you offered to drive him in the Kia out to Sinnott's property because there had been talk of a party

Exhibit 5001 at 828

Steinhoff   X     D5 37

being out there.  Is that right?

A.   Yes.

Q.   And Sinnott's is out Fairview, but not very far out Fairview.  Is that correct?

A.   Yes.

Q.   So you took the Kia.  Now, do you remember that Nick had a headlight out that night on the Mustang?

A.   No.

Q.   Did he tell you anything about having been stopped by the police twice for having a headlight out?

A.   I can't remember if he did.

Q.   But you took the Kia and you drove?

A.   Yes.

Q.   And the two of you went out to Sinnott's and there was no party there?

A.   Yeah.

Q.   The place was dark?

A.   Yes.

Q.   Okay.  You've got to speak up for me just a little bit.  I'm sorry.

A.   Yes.

Q.   Thank you.

And there were no cars around?

A.   No.

Q.   So the two of you came back to town?

Exhibit 5001 at 829

Steinhoff   X    D5 38

A.    Yes.

Q.    And when you came back to town you went over to — I'm blanking on the name of it — the card lock place.  And Nick put some gas in your car.  Do you remember that?

A.    No.

Q.    Okay.  But you went back to your house.  And at that point Nick left.  Is that right?

A.    Yes.

Q.    And then you went — you went over to Hernan Cortez's house?

MS. SOUBLET:    Objection.  Beyond the scope of direct.

THE COURT:    Are you asking that in relation with Mr. McGuffin?

MS. McCREA:    Well, my next question was going to be Mr. McGuffin was not with her?

THE COURT:    Then I'll sustain the objection.

Q.    Once Mr. McGuffin left, you didn't see him again that night.  Is that right?

A.    I think I'd seen him once at the Fast Gas.

Q.    You saw him at Fast Gas after he left your house?

A.    I think so.  I think I seen him once there.

Q.    All right.  And in terms of you driving around with him, and looking for Leah and driving out to Sinnott's, that would have been — might have been later than midnight?

Exhibit 5001 at 830

Steinhoff   X    D5 39

A.   I'm not sure.

Q.   Okay.  I'm going to show you a transcript of your conversation with Danny Lee and see if this helps you remember.  This is - - -

MS. McCREA:    Should be Page No. 6, Counsel.

Q.   Take a look at that?

A.   This whole page?

Q.   Well, just the highlighted part.  Don't mean to make you read all of it.

A.   Yes.

Q.   Does that refresh your recollection?

A.   Yes.

Q.   That it may have been later than midnight?

A.   Yes.

Q.   And then in terms of — as long as I'm up here.  In terms of drinking the night of June 28th, 2000, would you take a look at Page No. 3.  And just take a look at this and see if that refreshes your recollection?

A.   Yes.

Q.   You were drinking the night of June 28th?

A.   I might have been.  I don't really remember, but - - -

Q.   But that's what you told Danny Lee on - - -

A.   (Interposing) Yeah.

Q.   - - - September 12th.  The transcript says I was

Exhibit 5001 at 831

Steinhoff   X    D5 40

drinking that night, too?

A.   (No audible response.)

Q.   You're nodding yes?

A.   Yes.

Q.   I don't mean to give you a hard time, we just have to make sure we get it into the record.

A.   Okay, yes.

Q.   Now, when you talked to Danny Lee — well, scratch that.

Now, when — okay.  When you talked to Danny Lee, you talked to him about there was a time when Nick McGuffin came over to your grandmother's house.  And then Tina Mims came there and Nick started crying and talking to Tina Mims about Leah having disappeared?

A.   Yes.

Q.   And that was about — I don't know what day September 12th, 2000 was, but the day that this occurred, the conversation between Nick and Tina Mims, was the Monday prior. Do you remember that?

A.   No.

Q.   It was a few days prior?

A.   (No audible response.)

Q.   And Nick McGuffin was talking to Tina Mims about who Nick thought had killed her?

A.   I don't remember.

Exhibit 5001 at 832

Steinhoff    X    D5 41

Q.    And Ricky Crook was there.  And Ricky wanted to leave.  So, you and Ricky went around the corner and got Nick McGuffin's T-bird and brought it back to your house.  Do you remember that?

A.    No.

Q.    Now, when you talked to — when you talked to Officer Zavala, you didn't tell him anything about Nick having changed his clothes.  Did you?

A.    I don't remember.

Q.    Ms. Steinhoff-Ramsey, I'm going to show you — this is Officer Zavala's report from July 10, 2000.  And I want you to take a minute and read through that and see if there's anything in there about Mr. McGuffin changing his clothes.

       Okay?

       Does that refresh your recollection?

A.    Yeah.

Q.    There's nothing in there about you telling him that Nick McGuffin had changed his clothes, was there?

A.    No.

Q.    Now, I'm going to ask you to take a look at Page No. 10 of the transcript of your interview with Dan Lee and see if that refreshes your recollection about Nick McGuffin coming over when Tina Mims was there.

       Does that refresh your recollection?

A.    A little bit.

Exhibit 5001 at 833

Steinhoff    X    D5 42

Q.    Okay.  In the sense that the time that Tina Mims was at your house and Nick McGuffin came over to your house when Tina Mims was there, that Nick was talking to Tina Mims about what had happened to Leah, in other words her disappearance?

A.    Yes.

Q.    And that night Nick McGuffin did not take you in the bathroom and make any threats to you, did he?

A.    No.

Q.    And in fact, any other time that Tina Mims was there, he didn't make any threats to you?

A.    Um — him and Ricky drove me out to Poe Lane.

Q.    Okay.  He and Ricky drove you out to Poe Lane.  And that was the night when Tina Mims was there?

A.    Yes.

Q.    And she wanted to do Methamphetamine, and you guys didn't want to do meth with her.  Is that right?

A.    I don't remember.

Q.    And so you drove out to Poe Lane to take a little time for her to leave so you could come back and do drugs and not share them with her?

A.    No.  There was a shotgun in the back seat.

Q.    Whose car was it?

A.    Nick's.

Q.    Okay.  There was a shotgun in the back seat.  Nick didn't threaten you with the shotgun in any way, did he?

Exhibit 5001 at 834

Steinhoff   X    D5 43

A.   No.

Q.   And you guys went out to Poe Lane.  You sat there for a few minutes.  And then you came back?

A.   Yes.

Q.   Okay.  And no threats were made to you in any way, shape or form?

A.   No.

Q.   Okay.  He didn't say anything threatening to you?

A.   No.

Q.   He didn't take any threatening action towards you?

A.   No.

Q.   And neither did — who else was in the car?

A.   Ricky Crook.

Q.   Ricky Crook.  And Ricky Crook didn't either, did he?

A.   No.

Q.   Okay.  All right.

        MS. McCREA:   If I could have just a moment, Your Honor.

        THE COURT:   Yes.

Q.   And you've indicated you didn't remember Scott Hamilton being at your house?

A.   Yes.

Q.   On June 28th.  Wasn't Scott — you were dating Scott Hamilton at that time, weren't you?

A.   Yes.

Exhibit 5001 at 835

Steinhoff    X    D5 44

Q.   And wasn't Scott coming to your house — came a number of times.  And you kept telling him to come back?

A.   Yes.

Q.   So, you saw him a number of times at the time that — around the time Nick McGuffin was at your house that night?

A.   I don't remember how many times I seen him.

Q.   But it was more than once?

A.   It could've been.

Q.   But Scott Hamilton - - -

A.   (Interposing) I know that it was at least once.

Q.   At least once.  Okay.  So, Scott Hamilton did not go out to Sinnott's to see if there was a party with you and Nick?

A.   No.

Q.   Did he follow the two of you out there in his own car?

A.   Not that I know of.

Q.   Okay.  He wouldn't have been invited if he had?

A.   No.

Q.   And the car that you borrowed from Zack Elderkin, that was a purple Kia?

A.   Yes.

Q.   And do you know whether — well, let me phrase it this way.  That car was later seized by the police and examined.  Is that right?

Exhibit 5001 at 836

Steinhoff   ReD   D5 45

A.   Yes.

Q.   And it was processed to see if there was any evidence in it?

A.   Yes.

Q.   And to your knowledge there wasn't any evidence?

A.   Yes.

Q.   Now, Ms. Steinhoff-Ramsey, during the times that you have had contact with various officers of law enforcement, the District Attorney, and the Grand Juries, you have consistently and always told them that you don't know anything about the disappearance of Leah Freeman.  Is that right?

A.   Yes.

Q.   And it is true that you don't know anything?

A.   Yes.

Q.   And you didn't have anything to do with her disappearance?

A.   Yes.

Q.   Thank you.

MS. McCREA:   That's all the questions I have, Your Honor.

THE COURT:   Redirect.

MS. SOUBLET:   Briefly.

Thank you, Your Honor.

REDIRECT EXAMINATION

BY MS. SOUBLET:

Exhibit 5001 at 837

Steinhoff   ReD   D5 46

Q.   Ms. Steinhoff-Ramsey, do you remember telling Tina Mims to talk to Officer Lee back in 2000?

A.   No.

Q.   Do you remember testifying before the Grand Jury in 2010 that when you went out to Poe Lane you thought you — you were scared of the Defendant and Ricky Crook?

A.   Yes.

Q.   Do you remember telling the Grand Jurors that you thought if there hadn't been people at your house you wouldn't have come back?

A.   Yes.

MS. McCREA:   Excuse me.  I object to all the leading, Your Honor.

THE COURT:   Overruled.

Go ahead.

Q.   That's a yes, you remember making that statement?

A.   Yes.

Q.   Do you remember doing a handwritten statement last year for the police?

A.   No.

Q.   Okay.  Look at that and tell me if you recognize the handwriting?  Look at both pages.

Are you done looking at it?

A.   Yes.

Q.   And do you recognize it?

Exhibit 5001 at 838

Steinhoff   ReD   D5 47

A.   Yes.

Q.   Whose handwriting is that?

A.   It's mine.

Q.   What's the date on it?

A.   June 27, 2010.

Q.   Do you remember making that statement?

A.   Yes.

Q.   In that statement you indicated the Defendant told you to keep your mouth shut and stop talking to the police?

A.   Yes.

Q.   Thank you.

MS. SOUBLET:   I have nothing further.

THE COURT:   You may step down.  And you're excused without objection from further attendance.

Call your next witness.

MR. FRASIER:   Thank you, Your Honor.

We call Tina Mims.

TINA MIMS

was thereupon produced as a witness on behalf of the Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:   Have a seat up here, please.

Exhibit 5001 at 839

Mims    D      D5 48

DIRECT EXAMINATION

BY MR. FRASIER:

Q.   Could you state your name please, ma'am, and spell your last name for the record?

A.   Tina Marie Mims, M-I-M-S.

Q.   Where do you live, ma'am?

A.   Coos Bay, Oregon.

Q.   Have you — are you acquainted with the Coquille Area?

A.   I grew up in Coquille.

Q.   Are you familiar with the Defendant in this case, Mr. McGuffin?

A.   Breifly.

Q.   And are you also familiar with an individual named Kristen Steinhoff?

A.   I've known her her whole life.

Q.   Are you familiar with her family?

A.   Yes, sir.

Q.   Now, in the year 2000 do you recall where you were living at that time?

A.   In Coquille at my grandmother's house.

Q.   Where was that?

A.   On East Fifth Street.

Q.   Now, do you know where Kristen Steinhoff was living in the summer of the year 2000?

Exhibit 5001 at 840

Mims   D     D5 49

A.   At her grandmother's house, one block from the Tenth Street Market.

Q.   When was the first time you met the Defendant in this case?

A.   An evening at her home.

Q.   And was that during the summer of 2000?

A.   Yes, sir, it was.

Q.   Do you recall in relation to the disappearance of Leah Freeman, was it before or after?

A.   It was after the disappearance of Leah.

Q.   Do you know, when you first met her, had the body of Ms. Freeman been found?

A.   I do not believe so at that time.

Q.   Was Ms. Steinhoff at the house while you were there that evening?

A.   Yes, sir.

Q.   Could you describe to the jury, please, what happened when the Defendant came over?

A.   There was approximately four of us sitting in the living room of Ms. Steinhoff's grandmother's home.  The Defendant entered the home with an elderly gentleman.  And directed Kristen to go to the restroom and speak with him. The other gentleman said nothing.  They went to the restroom.

Q.   When you say they, you're referring to?

A.   Nick McGuffin and the gentleman that was with him.

Exhibit 5001 at 841

Mims    D      D5 50

Q.   What happened then?

A.   Then I proceeded back shortly after, because I needed to use the restroom.  And I overheard a conversation that wasn't very pleasant.

Q.   What did you hear the Defendant say?

A.   Basically Kristen was being threatened by Nick; being told that she needed to keep her mouth quiet.  I heard also somewhat of a conversation about — I don't know if it was trunk or a back of a vehicle being cleaned up or cleaned out.

Q.   What did you do when you heard this?

A.   I opened the door and asked what was going on.

Q.   Did you go inside the bathroom?

A.   Yes, sir, I did.

Q.   What happened after you entered the bathroom?

A.   The elderly gentleman exited.  Nick engaged in a conversation with me.

Q.   What did the Defendant tell you?

A.   He relayed to me that he was not threatening Kristen, that he was Leah Freeman's boyfriend at that time.  And actually tried to engage in a calm conversation with me.

Q.   Do you recall what he was talking about?

A.   Not specifically.  It's been a long time.

Q.   And after you had this conversation, what did the Defendant do?

A.   He stayed for a short while and then left her

Exhibit 5001 at 842

Mims    X    D5 51

residence.

Q.    Thank you.

MR. FRASIER:    That's all the questions I have at this time, Your Honor.

THE COURT:    Ms. McCrea.

CROSS EXAMINATION

BY MS. MCCREA:

Q.    Ms. Mims, you only met Nick McGuffin one time. Right?

A.    At that time, yes.

Q.    Well, you told the Grand Jury that you know him from basically one meeting approximately ten years ago?

A.    Yes, ma'am.

Q.    And this was the meeting that you've described here today?

A.    Yes, ma'am.

Q.    And as a result of what you tell us had occurred, you suggested to Kristen Steinhoff that she should talk to Danny Lee.  Is that right?

A.    Yes, ma'am, I did.

Q.    And she did that?

A.    Yes, ma'am, she did.

Q.    Now, you didn't talk to Danny Lee about this, did you?

A.    No, ma'am.

Exhibit 5001 at 843

Mims    X    D5 52

Q.    And after Kristen Steinhoff did a recorded interview with Danny Lee and later you found out that she didn't mention any of what you told us to him, you didn't contact him at that time?

A.    No, ma'am, I did not.

Q.    And you didn't talk to anybody in law enforcement about what you testified to here today until June 29th of last year?

A.    I felt approaching Danny Lee should be sufficient enough.  He was an officer for Coquille Police.  He was supposed to handle the situation.  Obviously, he did not.

Q.    Okay, ma'am.  My question was, up until June 29th, 2010, you didn't contact or talk to anyone in law enforcement about what you testified to here today?

A.    No, ma'am.

Q.    No, you didn't.  Is that a confirmation?

A.    No.

Q.    Sorry?

A.    No, ma'am.

Q.    Okay.  So, the first time that this information came up was when you talked to Officer Webley on June 28th, 2010?

A.    I don't remember the exact date, but yes, it was Officer - - -

Q.    (Interposing) So, about a year ago?

A.    Yes, ma'am.

Exhibit 5001 at 844

Mims    X    D5 53

Q.    Now, you are friends with Kristen Steinhoff's family.  Is that right?

A.    Not at this time, but yes, at one time I was.

Q.    And you know Leah Freeman's mother Cory?

A.    Yes, I do.

Q.    And you know Leah Freeman's sister, Denise?

A.    Yes, ma'am, I do.

Q.    And at the time that you made the observations that you've testified to here today, Ms. Mims, at Kristen Steinhoff's grandmother's house, you and the other people at the house were partying.  Is that a fair statement?

A.    Yes, ma'am.

Q.    And you had been using Methamphetamine that night?

A.    Yes, ma'am.

Q.    Had you been using any other drugs?

A.    No, ma'am.

Q.    Any alcohol?

A.    Possibly.  I can't recall.

Q.    And at that time you were using on a regular basis, Methamphetamine and alcohol?

A.    No, ma'am.  Alcohol was my drug of choice.

Q.    All right.  So, Methamphetamine was something that you used occasionally?

A.    Yes, ma'am.

Q.    And on the night in question you had been using

Exhibit 5001 at 845

Mims    ReD    D5 54

Methamphetamine?

A.    Yes, ma'am.

Q.    And you didn't make any notes of this conversation after it supposedly happened, did you, Ms. Mims?

A.    No, ma'am, I did not.

Q.    Thank you.

MS. McCREA:    Nothing further, Your Honor.

THE COURT:    Redirect.

REDIRECT EXAMINATION

BY MR. FRASIER:

Q.    Ma'am, Counsel asked you that the first time you told somebody about this was in June of last year.  Why did you wait so long?

A.    I came forth to the Coquille Police Department and I put forth an effort to do what was right then.  With no help. I was on felony probation at that time.  Could not get anyone to listen as far as the Coquille Police Department.  Danny Lee was my neighbor.  I spoke with him in confidence and I felt I could confide in him and talk to him and something would come out; something would be done about it.  It didn't happen.  I didn't feel that at that time there were other officers on the police force that I could confide in them and trust them.  And that's my honest opinion.

I don't know why I never said anything after all the years since this.  I have no idea why.  I do not have an

Exhibit 5001 at 846

Hamilton   D     D5 55

answer for that.  For that I am ashamed.  But, then I tried to do that right thing and no one would listen.

Q.   Thank you.

MR. FRASIER:   That's all I have, Your Honor.

THE COURT:   You may step down and you're free to leave.

Call your next witness.

MR. FRASIER:   Call Scott Hamilton.

SCOTT HAMILTON

was thereupon produced as a witness on behalf of the Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:   Have a seat up here, please.

DIRECT EXAMINATION

BY MR. FRASIER:

Q.   Could you state your name please, sir, and spell your last name for the record?

A.   My name is Dennis Scott Hamilton.  And, it's H-A-M-I-L-T-O-N.

Q.   Where do you live, sir?

A.   I live in Myrtle Point, Oregon now.

Q.   You lived in Coquille?

A.   Yes, I have.

Q.   Did you go to Coquille High School?

Exhibit 5001 at 847

Hamilton    D    D5 56

A.    Yes, I did.

Q.    What year did you graduate?

A.    2000.

Q.    What do you do for work?

A.    I'm a construction worker.

Q.    Did you come from the job today?

A.    More or less.

Q.    Are you familiar with the Defendant in this case, Mr. McGuffin?

A.    Yes, I am.

Q.    How do you know him?

A.    We've known each other for a long time.

Q.    When you say a long time, can you give us an idea?

A.    Since the third grade.

Q.    Were you familiar with somebody by the name of Leah Freeman?

A.    Yes, I was.

Q.    How did you know Ms. Freeman?

A.    I knew Leah through Nick.

Q.    When you say you knew Leah through Nick, what do you mean by that?

A.    When Leah and Nick dated, then Nick was my friend of course through school, that's how I met her.

Q.    Were you and Mr. McGuffin, the Defendant, in the same grade?

Exhibit 5001 at 848

Hamilton   D     D5 57

A.    Yes, we were.

Q.    Graduated at the same time?

A.    Yes, we did.

Q.    And your senior year, did you go to the prom?

A.    Yes, I did.

Q.    And who'd you go to the prom with?

A.    I went with Melissa Smith.

Q.    Was it a double date?

A.    Yes.

Q.    And who was else?

A.    Nick and Leah went with us.

Q.    Now, how long did you date Melissa Smith?

A.    Two and a half, three years I think.

Q.    Do you recall when you broke up?

A.    Yeah, it was the later part of my senior year or right out of school.

Q.    Why was that?

A.    Oh, because I was a bad kid back then.  And I thought it was a good idea to be able to cheat on her.

Q.    Who were you cheating with?

A.    Kristen Steinhoff.

Q.    Now, I want to direct your attention, sir, to the evening — late evening — of June 28th, 2000 or early morning hours of June 29th, 2000.  This is the night Leah Freeman disappeared.  Do you recall that evening?

Exhibit 5001 at 849

Hamilton   D      D5 58

A.    Yeah.

Q.    And do you recall being at Kristen Steinhoff's Residence?

A.    Yes, I do.

Q.    Do you recall roughly what time it was while you were there?

A.    Nine thirty, ten.

Q.    Did you go by that house several times?

A.    I used to go over there quite often during that period of time, yes.

Q.    When you went over to see Ms. Steinhoff, how would you go into the house?

A.    I'd go through her bedroom window.

Q.    Why would you go through the bedroom window?

A.    It was just the way I went.

Q.    Were you afraid of getting caught there?

A.    Probably.

Q.    When you were at Ms. Steinhoff's Residence, did you see the Defendant there?

A.    Yeah.

Q.    And again, do you recall roughly what time this was?

A.    I'd say it was around nine thirty, ten — nine to ten.

Q.    Where were you?

A.    I was at her back window to her bedroom.

Exhibit 5001 at 850

Hamilton    D      D5 59

Q.   Did you hear anything?

A.   Yeah, I heard — they were in there talking.

Q.   Did you hear the Defendant say anything?

A.   Yes, I did.

Q.   What did the Defendant say?

A.   The only thing I heard him say was that he didn't know what to do and he needed help.

Q.   Now, did you see the Defendant and Ms. Steinhoff leave?

A.   I watched them leave her room, but I didn't leave until after they left.

Q.   Was there a time that you ran out of the bushes and asked what was going on?

A.   I don't remember asking what was going on that evening, no.  Later on I asked.

Q.   Okay.  Now, about a week after Ms. Freeman disappeared, did you go for a ride with the Defendant?

A.   Yes.

Q.   Where did you go?

A.   He drove us out Fairview, out to Lee Valley Road.

Q.   What happened — when you say we, who was there?

A.   Just Nick and I.

Q.   And you said you went to Lee Valley Road?

A.   Yes.

Q.   And did you stop anywhere?

Exhibit 5001 at 851

Hamilton   D     D5 60

A.   Yeah, we stopped a little ways past the big gravel pit down there.

Q.   When you say past the gravel pit, you're coming from Fairview Road?

A.   Yeah, coming from Fairview turning onto Lee Valley.

Q.   Right.

A.   And the gravel pit's on your left.  And it was just maybe fifty yards past that.

Q.   And you stopped?

A.   Yeah.

Q.   Did you get out of the car?

A.   Yes, we did.

Q.   What happened when you got out of the car?

A.   Nick kept looking down over the bank and talking about how, it's like he could see her laying down there by some rock or stump.

Q.   Did you see anything?

A.   I seen a rock or a stump down there, but other than bushes and sticks, no.

Q.   Now, did you talk with the Defendant about what had happened the night that Ms. Freeman had disappeared?

A.   We talked a little bit about it, but you could never get a whole lot out of Nick about it.

Q.   To the best of your recollection, what has the Defendant told you about the night that Leah Freeman

Exhibit 5001 at 852

Hamilton   D    D5 61

disappeared?

A.    That she was supposed to be going to a friend's house.  And I think they may have gotten in an argument over it and what not.  And at some point or another that they met up again in a store.  Nick found her.  And they were arguing.  And she got out of the car somewhere around McKay's.  Nick said he drove around the loop and went back to go find her, but never could find her.

Q.    Now, he told you that he picked her up and then dropped her at McKay's?

A.    Yes.

Q.    Now, when was the first time you told the police about that?

A.    Just this new stuff here.

Q.    When the case was reopened?

A.    Yeah.

Q.    And you told Officer Webley or Officer McNeely that?

A.    Yes, I did.

Q.    Now, I brought you to the Grand Jury last year.  Do you recall that?

A.    Yes, I do.

Q.    And I asked you about that, didn't I?

A.    Uh huh.

Q.    And what — and you didn't remember — you didn't tell the Grand Jury about Nick telling you this, did you?

Exhibit 5001 at 853

Hamilton   D    D5 62

A.   No.

Q.   Why didn't you tell the Grand Jury?

A.   I was nervous and I just didn't think about it I suppose.  I mean, this is kind of big thing and I got kind of nervous about it all.  So, it just didn't cross my mind at the time.

Q.   When the police brought you to see me?

A.   Yes.

Q.   I played for you your Grand Jury testimony?

A.   Yes, you did.

Q.   Do you recall that?

A.   Yeah, I recall that.

Q.   What did you tell the officers and me when I played that for you?

A.   That I was shocked of what I said because it didn't even make any sense to me.

Q.   Why was that?

A.   Because it's not what I remember.

Q.   And you remember Mr. McGuffin telling you that he had picked up Leah and dropped her at McKay's?

A.   Yes, I do.

Q.   Is there any doubt in your mind on that?

A.   No.

Q.   Have you had any trouble with the law in the last few years?

Exhibit 5001 at 854

Hamilton   X     D5 63

A.    Other than driving.  That's my big downfall.

Q.    Driving while suspended?

A.    That and tickets.  I was kind of a rebel with no cause.

Q.    All right.

Thank you.

MR. FRASIER:    That's all the questions I have.

CROSS EXAMINATION

BY MR. MCCREA:

Q.    Mr. Hamilton, you and — you and your — when she was your girlfriend, Melissa Smith, did things with Mr. McGuffin and Ms. Freeman a number of times.  Is that correct?

A.    No.

Q.    No?

A.    We went to prom together.

Q.    Well, you went swimming together the day before she disappeared, didn't you?

A.    No.  Not to my knowledge.  I do not remember that.

Q.    Mr.  Hamilton, do you have some memory difficulties?

A.    No.  I have a good memory, actually.

Q.    Do you have comprehension difficulties?

A.    No.

Q.    Understanding difficulties?

A.    No.

Exhibit 5001 at 855

Hamilton   X   D5 64

Q.   Did the four of you go out to what's known as Letterman's Pool out by Powers and spend the whole day and have a really good time?

A.   No, not to my knowledge, no.  I do not remember that at all.

Q.   Well, altogether — maybe this isn't altogether, but you've talked — you talked to Officer Main in 2000.  Right?

A.   Yeah, if that's his name.

Q.   Pardon?

A.   I don't — it's hard to remember a lot of the officers names back then, but yeah.

Q.   Okay.  Well, you talked to Officer Main in 2000, Detective Oester in 2000, Detective Perske in 2000, Detective Oester again in September of 2000, and then you — let's see here — talked to the Officers Weber and McNeely in January of 2010?  Went to the Grand Jury in August of 2010.  Does that all sound correct?

A.   Yes.  That sounds right.

Q.   And then Weber and McNeely got you back again in April of '11.  Does that sound like the times you talked to the police?

A.   Yes, it does.

MR. FRASIER:   Your Honor, just so the record's clear, it's Officer Webley, not Weber.

THE COURT:   Okay.

Exhibit 5001 at 856

Hamilton   X   D5 65

MR. McCREA:   Sorry.  What is it?

MR. FRASIER:   Webley.

THE COURT:   Webley, all right.  Webley.

Q.   Now, let's start out.  You did have some occasion to see what the relationship was like between the Defendant and Ms. Freeman.  Correct?

A.   Yes.  We all went to school together.

Q.   Pardon?

A.   Yes.  We all went to school together.

Q.   Okay.  And it was your testimony in the Grand Jury they got along pretty well?

A.   For the most part, but they'd argue just like anybody else.

Q.   Okay.  And in terms of what you've testified here, you've testified here that you broke up with Ms. Smith because you were cheating on her with Kristen Steinhoff.  Right?

A.   Yes.

Q.   And you were going over there and having sex with her?

A.   Yes, I was.

Q.   And what happened was, you picked up a disease from her and infected Ms. Smith.  Right?

A.   Yeah.

Q.   And she confronted you about that?

A.   Yes, she did.

Exhibit 5001 at 857

Hamilton   X     D5 66

Q.   And she dropped you because of having done that?

A.   She — we broke up because I cheated on her, yes. That was after the fact.

Q.   So then at that point your girlfriend was Kristen Steinhoff?

A.   Yeah.

Q.   And so you went over there then the night of the 28th and Nick McGuffin was there?

A.   Yes, he was.

Q.   So, now you'd lost Ms. Smith as your girlfriend and your girlfriend is Steinhoff, but Nick McGuffin's over there. Does that bother you?

A.   No.

Q.   So, it's your testimony that you sneaked up to the back bedroom window.  Right?

A.   Yes.

Q.   Okay.  And that was your — that was the way you and — you did your visiting with Ms. Steinhoff, was you'd go in the back bedroom window?

A.   Yes, I would.

Q.   And you sneaked up there because — it's your testimony — because you saw Mr. — is it your testimony — because you saw Mr. McGuffin's Mustang was parked out there?

A.   Yeah.  I seen his car parked out there.

Q.   Okay.  But you didn't let them know you were there?

Exhibit 5001 at 858

Hamilton   X   D5 67

A.   No.  Because I always walk up to the window like I did every time.

Q.   Well, but you didn't say, "Hey, you guys I'm here at the back window?"

A.   Well, no.

Q.   Did you do anything to attract their attention?

A.   No, I didn't.

Q.   Did you have any contact with them whatsoever?

A.   That evening, no.

Q.   Pardon?

A.   That evening, no.

Q.   Okay.  This is the evening of the 28th?

A.   Yes.

Q.   Now — and then they went off together in the Mustang?

A.   Yes.

Q.   On July 1oth you were contacted by an officer.  And at that time you said that you'd been at Kristen Steinhoff's house until after midnight; that you had shown up at Kristen Steinhoff's between nine and ten — no.  Excuse me.  Until after midnight.  And that Nick has shown up at Kristen Steinhoff's between nine and ten and he was in the Mustang. And you told that officer that was pissed off and acted confused.  And Nick told Hamilton and Steinhoff that he had been late to pickup Leah at Sherry's.  He was supposed to pick

Exhibit 5001 at 859

Hamilton   X    D5 68

her up at nine p.m. and he got there at nine o-five p.m.  Nick told them he looked for her but couldn't find her.

And Hamilton said that Nick had told him of rumors in Port Orford that - - -

MR. FRASIER:   (Interposing) Objection.  Your Honor, is there a question here?  I mean, he's reading a report.

MR. McCREA:   I'm going to ask him if - - -

MR. FRASIER:   If this is to refresh his memory, show it to him.

MR. McCREA:   I'm not trying to refresh his memory, I'm doing impeachment as they do it.

THE COURT:   Well, I'm not too sure that's impeachment that you're asking, because he's here, yeah.  I mean, I guess you can ask him if he said that.  I don't have a problem with you asking him a question after you read that.  I'm not too sure you're impeaching him right now.  So - - -

Mr. Frasier, he can ask the question and read that.

Ladies and Gentlemen, I want to make it clear to you, when somebody asks a question and somebody says they don't remember it, that's — you can't take the question as a fact.  But whether he — whether they ask it or the State asks it.  The question is the question.  The answer is what's important in relation to the question.

Exhibit 5001 at 860

Hamilton   X   D5 69

So, go ahead and ask your question.  I don't have a problem with you reading it and asking him a question about it.

MR. McCREA:    Thank you.

Q.   Let's break it into — into two parts.

Did you hear what — what I had read to you from the report so far, Mr. Hamilton?

A.   Yeah.

Q.   And isn't that what you said to Officer Main on the 10th of July, 2000?

A.   No, I don't believe so.  Because I don't remember talking to Nick or Kristen either that night.  So, that — Port Orford and all that, that is nothing to my memory.

Q.   All right.  The second part is, didn't you go on to tell Officer Main that Nick had told you of rumors in Port Orford that Leah was seen with an unknown girlfriend going to California?  And that you also mentioned an argument that the two had at Letterman's Rock?  "They were fighting, but mostly yelling at each other three weeks ago."  Then stated this happened about a week before her disappearance you thought.

A.   I don't remember any of that.  I don't remember nothing about Port Orford, California.  And we didn't go swimming with them at Letterman's.  So - - -

Q.   (Interposing) Are you denying that you said these things?

Exhibit 5001 at 861

Hamilton    X    D5 70

A.    I'm denying that I said those, because I didn't say those to my memory.

Q.    This doesn't refresh your memory at all?

A.    No, it doesn't ring no bells.

Q.    On — then did you have contact with another — with an officer — let me back up and be sure I get something pinned down.

Do you even remember having contact with an officer in July of 2000?

A.    Yeah.  I remember them talking to me, yeah.  They took swabs — they took saliva samples from me and everything because somebody said I did it.

Q.    Excuse me?

A.    They took saliva samples from me and everything back in 2000.

Q.    The point is that you do remember you were contacted by the police and you gave them a statement in 2000, July?

A.    Yes.  And I told them the same thing that I told them when they reopened this.

Q.    In other words you're saying that you told them in July the same thing that you told them in January?

A.    Other than Nick taking me out Lee Valley Road, yes.

Q.    In dealing with that, this matter of going out to Lee Valley Road, that was — that was about a week after the body was found.  Right?

Exhibit 5001 at 862

Hamilton    X    D5 71

A.    Somewhere around that time.  I couldn't remember for sure.

Q.    Okay.  But the body had been found?

A.    I'm not sure.  I can't remember.  It's ten years ago.

Q.    All right.  Anyway, police had contact with you in August of 2000.  Isn't that correct also?

A.    When?

Q.    August of 2000?

A.    I think they only talked to me the one time.

Q.    Well, didn't an Officer — Detective Oester contact you and you told him that your girlfriend was Kristen Steinhoff.  And your ex-girlfriend was Melissa Smith.  And on June 28th you were at Melissa's until about eight o'clock.  And then you went home.  And at nine to nine thirty you went over to Kristen Steinhoff's house and Nick was there sitting in his Mustang.  And Kristen was on the porch.

And Nick asked him if he had seen Leah.  And he told Nick that he had not seen Leah.  And Nick said that he saw Leah and she was with another guy, to beat the hell out of the guy and take Leah home.  In his opinion Nick seemed genuinely concerned.  Isn't that what you told Oester as to what had happened?

MR. FRASIER:    For the record, Your Honor, it's Detective Ester (phonetic), not Oster (phonetic).

Exhibit 5001 at 863

THE COURT:    Okay.

MR. McCREA:    I'm sorry.  Auster (phonetic)?

A.   I can't say I remember.  I can't remember saying that.

Q.   Pardon?

A.   I can't remember that.

Q.   Let me get it clear again.  And, are you saying it didn't happen or just you don't have any memory of it?

A.   I don't remember what you just read, no.

Q.   Did it happen?

A.   Who's to know?  I don't remember.

Q.   Okay.  Did you go on to tell him that Nick and Kristen were going to put gas in a purple Kia.  So he waited at Kristen's house.  They left about ten thirty and were gone about fifteen to twenty minutes before they came back.  When they got back they said they had gone to Sinnott's — that would be the doctor's place — to see if Leah was there.  But she wasn't.  Did you make that statement?

A.   I don't remember saying anything about that.

Q.   Did you go on to say, in that same conversation, that Nick left Kristen's at midnight, possibly a little after. You stayed another fifteen to twenty minutes before Kristen left to take the purple Kia back to the guy that owned it near Green Acres.  Then you left and went home and got home about ten o'clcok.  Did you make that statement to the detectives?

Exhibit 5001 at 864

Hamilton   X   D5 73

A.   Not that I remember.  No, I don't - - -

Q.   Detective Oester as I've been corrected?

A.   But that's what I'm saying, this is ten years ago. It's hard to remember some of it.  I remember the stuff that's stuck in mind that seemed funny.  But other than that, I don't remember all that other stuff.

Q.   All right.  Did you make this statement at that same conversation?  Excuse me.

A.   Well, if it's the same conversation I'm pretty sure I probably won't remember it.

Q.   The same conversation with Detective Oester.

"On the night of June 28th he never saw
Nick and Kristen Steinhoff in her bedroom.
When he got to Kristen's that night he turned
down his CD player when he pulled in and saw
that it was nine and Nick was there just
getting out of his car and walking up to the
door.  It wasn't dark yet but it was close
enough that he had his headlights on.  Nick was
very calm and didn't act like anything was
happening."

Did you make that statement to Detective Oester?

A.   I don't remember hardly talking to the detectives back then, years ago.

Q.   Speaking of your headlights, you had round

Exhibit 5001 at 865

Hamilton    X    D5 74

headlights on your car?

A.    Indeed.

Q.    Also in August, you had — did you have contact with another officer, Perske who interviewed you?

A.    I don't remember the name.

Q.    Well, you got interviewed by another officer on — in August, right?

A.    Of 2000?

Q.    Correct.

A.    I got talked to once by the detectives to my memory.

Q.    Well, didn't you get talked to another time and said — you said the following?  You said that you were McGuffin's best friend and that you knew Leah well.  And the day before Freeman came up missing — in other words 6/27/2000 — Hamilton, Nick McGuffin, Freeman and Melissa Smith, Hamilton's girlfriend at the time, all went swimming out at the Letterman's Hole by Powers?

A.    No, I wouldn't have said that because it never happened.

Q.    Never happened?

A.    It never happened.

Q.            "They were there until around five or five thirty and McGuffin dropped him back off at Smith's house?  Hamilton went home and then drove over to Kristen Steinhoff's who was

Exhibit 5001 at 866

Hamilton   X     D5 75

sleeping."

You didn't make that statement?

A.   Not to my memory, no.

Q.        "Hamilton said he went back home and worked on his car and watched some TV until eight thirty or nine when he went back to Steinhoff's."

Did you say that?

A.   Again, no, not to my memory, no.

Q.        "When Hamilton got there McGuffin was already there talking to Kristen.  Kristen and McGuffin left in her Kia and got gas, supposedly at the Fast Gas in Coquille and were back in about twenty minutes.  When they got back McGuffin told Hamilton that they had gotten the gas and then went by a party at — quote — "doc's" — end quotes, house looking for Leah.  And then returned to Steinhoff's."

          "Hamilton said that this was getting around dusk, but was not really sure of the exact time."

Did you make that statement?

A.   No.  And you already read all this to me.

Q.   Pardon?

A.   You already asked me these questions.  I can only

Exhibit 5001 at 867

Hamilton    X    D5 76

say no so many times.

Q.    "Hamilton said . . ."  Excuse me.

A.    I can only say no so many time, sir.

Q.    Pardon?

A.    I can only say no so many times, sir.  You're asking me the same questions.

Q.    Well, these are different statements.

A.    Well, if I don't remember it, I don't remember it.

Q.    Well that's what we wanted to know is how good your memory is, among other things.

          MR. FRASIER:    Your Honor, I'm going to object to the commentary.

          THE COURT:    Sustained.

          MR. McCREA:    I withdraw it, Your Honor.

          THE COURT:    All right.

          MR. McCREA:    Withdraw it.

          THE COURT:    Okay.  Don't do it, please.

          MR. McCREA:    Apologize to the Court.

          THE COURT:    All right.

Q.          "Hamilton said they sat around and talked
            for a few minutes and McGuffin then left.
            Hamilton said he stayed there for another
            fifteen or twenty minutes before going home.
            Hamilton thought that he got home about one
            a.m."

Exhibit 5001 at 868

Hamilton    X    D5 77

Q.    Did you make that statement?

A.    Again, no.

Q.    In September of 2000, you talked to a police officer.  This would be Detective Oester again.  Do you remember that?

A.    No.

Q.    Didn't you at that time indicate that about a week after Leah's body was found that you were going to Chris — I guess it's Miller or Mueller's — place above Fairview with Nick McGuffin.  It was about eight p.m. in the evening.  And Nick asked him if he wanted to see where Leah's body had been found?

A.    I have no memory of that.

Q.    Well, when you went out there to see where Leah's body had been found, that was the time that you were on your way out to Chris's place, were you not?

A.    I don't remember stopping by Chris's place because Nick just drove out to Lee Valley Road.  And then I wanted to go back to town after awhile.  We never went out there.

Q.    Okay.  But you had been going to go to Chris's place?

A.    I don't remember anything about going out to Chris's place, no.

Q.    All right.  Anyway, did you make the statement as I just read to you?

Exhibit 5001 at 869

Hamilton    X    D5 78

A.    No, I - - -

Q.    (Interposing) Did you make that statement?

A.    - - - couldn't have, because I don't remember going out to Chris's house or anything.

Q.    Well, let me ask you if you made the statement that you went out there about a week after Leah's body was found?

A.    Nick took me out to the Lee Valley Road sometime around that time, but - - -

Q.    (Interposing) Okay.  Actually, there were markers out there, weren't there?

A.    No.

Q.    There was a cross and some flowers?

A.    I don't remember seeing any markers or anything.

Q.    Well, all right.

Going on with the statement in conversation:

"Hamilton stated that he told Nick that he didn't, but as they were driving to Fairview, Nick turned onto Lee Valley Road and drove out past the rock pit.  Nick was looking to the left, driving slow and pointed out where the grass was mashed down.  He said, 'That's where her body was found.'"

"Nick drove about twenty feet past this spot and stopped the car and then got out.  And Nick walked back to where the grass was mashed

Exhibit 5001 at 870

Hamilton    X    D5 79

down and went down over the river bank toward the river."

A.    He looked down over the hill and was talking about that spot that I was talking about.

Q.    Okay.  All right.

And so — and then Nick pointed out to you the spot where Leah had been found?

A.    He just said it looks like he could see her laying down there.  That's all he said.

Q.    Well, all right.  He said - - -

Well, actually, what you told — didn't you make the statement to Detective Oester there in September, you said:

"You were really uncomfortable at this point and wanted to leave.  But Nick came back up the bank.  And he had a picture of Leah in his hand.  And he was crying and looking at the picture.  And then walked up to him . . ."

That's you.

". . . and hugged him.  And Nick was saying that he could picture Leah lying down there with her head on a rock."

Did you make that statement?

A.    I may have made a statement similar to that.  But I don't remember giving him a hug or nothing.  I told him it would be all right, because I was still trying to be there for

Exhibit 5001 at 871

Hamilton   X   D5 80

him.

Q.   And you'd try to be there for him?

A.   I tried to be there for him.

Q.   Okay.  So, the hugging would have been consistent with that.  Right?

A.   Yeah, I don't remember hugging him, though.

Q.   And so then you started walking together.  And you walked back to the car.  And then you got in the car and drove on to Chris's.  Isn't that what you said?

A.   No.  We went back to town after we left there.

Q.   Well, in any event, in any of the statement you made to the police in 2000, you never indicated that Mr. McGuffin said that after he had gone by Sherry's to pick up Ms. Freeman, to pick up Leah, that he found her and picked her up and then they argued and he dropped her off at McKay's. you never told any officers that back in 2000.  Isn't that correct?

A.   Correct.  And the reason because is Nick didn't say anything to me about it until I was fixing his Stratus.

Q.   All right.  But, let's get this pinned down.  You never said anything about it to any police officers until January of 2010.  Correct?

A.   When they reopened the case, yes.

Q.   Okay.

Now, you're saying something to the effect that he

Exhibit 5001 at 872

Hamilton    X     D5 81

didn't say anything about it until you asked him about it?

A.   More or less.

Q.   When and where did you ask him about it?

A.   At his house — his mom and dad's house — when I was fixing his car.

Q.   Pardon?

A.   At his mom and dad's house when I was fixing his car.

Q.   When you were fixing his car?

A.   Yeah, his '95 Dodge Stratus.  The tranny went out. I replaced it for him.

Q.   Didn't you say at Grand Jury that you'd never helped him work on his car?

A.   On his Mustang, yes.

Q.   On his Mustang yes what?

A.   I've never worked on his Mustang.

Q.   I see.  All right.  Let's - - -

So, you asked him at the house, but when?  What year was this?

A.  It was probably four or five years ago.  Four years ago.  I don't know what time it was.  I don't keep track of when I work on people's cars.

Q.   Well, it was a lot of years ago if you asked him this supposedly, right?

A.   Three, three and a half, four years ago.  That's

Exhibit 5001 at 873

Hamilton    X    D5 82

about what it was, yeah.

Q.   In any event, the first time you told the — any police — about it, that would have been Officer Webley.

MR. McCREA:    Did I get it right?

MS. SOUBLET:    Yes.

Q.   Webely and Officer Meneely — McNeely?

A.   Yes.  That's when I first got brought back up.

Q.   Okay.  So, you talked to them in January of 2010?

A.   Yeah.

Q.   And at that time isn't that also the first time that you — that you told this narrative about going over to Steinhoff's house and you were going to go in through the bedroom window.  And that instead you saw Nick's Mustang.  And then you stopped and listened at the window and heard this whispered conversation.  Right?

A.   No.  I told them ten years ago about that.

Q.   You told them ten years ago?

A.   When they first — when this all happened.  I told them that I came up to the window and all that.  I told them all about that.

Q.   You told them just that way, not what I read you, but what - - -

A.   (Interposing) To my knowledge, yes.  That's what I said to them.

Q.   All right.

Exhibit 5001 at 874

Hamilton   X   D5 83

And at that time, in January, didn't you also tell them that two weeks prior to the body being found you recalled Mr. McGuffin saying that Bill Sero, S-E-R-O, was responsible for her disappearance?

A.   I remember Nick saying something about Bill, yeah.

Q.   But, what I want to know is, you told the officer that in January?

A.   That Nick had said something about Bill doing it, yeah.

Q.   Okay.  And you said that it seemed like he was just throwing it out there because everyone was looking at him?

A.   It kinda seemed that way, yeah.

Q.   Yeah, okay.

Now, Mr. — well, you indicated that you were asked the question and indicated that you talked to Mr. McGuffin about the — what had happened.  And you've indicated that what he told you is this thing about picking her up and dropping her at McKay's.  Actually, after the conversation at the — with the police in January they wanted you to try to get Mr. McGuffin to admit that to you, didn't they?

A.   In 2010?

Q.   Pardon?

A.   2010?

Q.   No — in 2010, yes.

A.   They wanted — repeat your question.

Exhibit 5001 at 875

Hamilton   X     D5 84

Q.    They wanted you to try to get Mr. McGuffin to admit that he had told you that he picked Ms. Freeman up after Sherry Mitchell's and then dropped her off at McKay's.  Right?

A.    They — I don't remember them wanting me to get him to admit anything, but yeah I did call him.  Make a phone call.

Q.    Well, they didn't want you to get him to admit anything, huh?

A.    I don't remember what.  I remember calling him to see what he would say.  They wanted him to say something, but the only thing they said is, told me to tell them not to tell them about him taking me out there.

Q.    Well, then he said — as a matter of fact, you then also said — if you'll pardon the words — "Fuck it.  Go ahead and tell them whatever you want to."  Isn't that what he said?

A.    He said that.  Then I asked him about him taking me out there.  And he told me not to tell them about that.

Q.    But that's when he said, well, you can go ahead and tell them whatever you want.  But, let's - - -

A.    (Interposing) Let's bounce around.

Q.    But, well okay we'll deal with that to some extent.

            MR. FRASIER:    Just so we're clear, with this line of questioning I take it, the Defense is waiving any objection to that action?

            THE COURT:    To?

Exhibit 5001 at 876

Hamilton   X     D5 85

MR. FRASIER:   Well, Your Honor, that this was a situation where a pretext phone call was attempted.

THE COURT:   I understand.

MR. FRASIER:   I just want to make - - -

THE COURT:   (Interposing) I'm not too sure about what you said whether it waives or not, but he's going into it, so you can go into it, obviously.

MR. FRASIER:   All right.

Q.   Well, as a matter of fact, they coached you before this phone call, didn't they?

A.   No.

Q.   Pardon?

A.   No.

Q.   Didn't coach you?

A.   There was no coaching.

Q.   They didn't indicate to you what they wanted you to ask him and what they wanted you to try to get him to say?

A.   They didn't say anything about trying to get him to say anything.  They just wanted me to call and ask him and tell him, "Hey, what do you want me to do?"

Q.   All right.  So, you called him?

A.   Yep.

Q.   And, when you called him, one of the first things you told him was you're going to talk to the detectives, be talking to them tomorrow?

Exhibit 5001 at 877

Hamilton    X    D5 86

A.    Yeah.

Q.    And he said, "Um, you can say really whatever you want.  I mean, as far as that part I mean."

Didn't he say that?

A.    He did say that.  But then I said, "Well, do you want me to tell them, what about you taking me out there?"

And Nick's like, "Oh, I kind of forgot about that.  Well, if you would, don't tell them about that."

Q.    Well, he was embarrassed about that, wasn't he?

A.    I don't know - - -

MR. FRASIER:    (Interposing) I'll object to the question.  I don't know how the witness can say he was embarrassed.

THE COURT:    Sustained.

Q.    In any event — okay, but let's deal with this conversation about — at McKay's.  You said — let's see here — in the conversation - - -

You asked him this, you said, "Well, about when, when you were telling me about you know, the night when all that shit happened, that you and Leah got in a fight and you dropped her off at McKay's or what not.  Do you remember — you remember telling me that, right?"

And Mr. McGuffin said, "No.  Because I dropped her off at Sherry's."

Isn't that what he said?

Exhibit 5001 at 878

Hamilton    X    D5 87

A.    No.  I don't think he said that.

Q.    You don't think he said that?

A.    No.  That's when he just kinda said, "Tell them whatever you want."  And then I asked him about him taking me out there.

Q.    No.  I'm talking about dropping her off at McKay's.  Did you hear what I just read you?

A.    Yes.  I'm not deaf.

Q.    All right.  And he said, "No, because I dropped her off at Sherry's."

A.    You're talking about the phone call I made?

Q.    I'm talking about the phone call.

A.    Yeah.  I don't remember him saying anything about dropping her off at Sherry's.  When I asked him about that, he went to, "Well, you can tell them whatever you want."

Q.    Yeah, okay.

A.    And then I asked him, "Do you want me to say anything about you taking me out there?"

And Nick said, "Well, I kinda forgot about that.  If you would don't tell them about that."

Q.    Well - - -

A.    (Interposing) For the second time.

Q.    Actually, he said — he said — he didn't say he forgot about it.  He said - - -

MR. FRASIER:    (Interposing) Your Honor - - -

Exhibit 5001 at 879

Hamilton   X     D5 88

MR. McCREA:    Excuse me.

MR. FRASIER:    Just play the tape.

MR. McCREA:    Isn't this - - -

WITNESS:    Play the tape.

THE COURT:    Okay.

MR. McCREA:    We may do that.

THE COURT:    Okay.  He can ask the question.

Q.   Let's deal with dropping her off at McKay's that you testified here.  And what he said was — you said:

"Well, that's the story.  Okay.  I thought you told me that you — I remember you telling me that you guys were fighting or something. And I thought she just got out of the car by McKay's or something?"

And he said, "No."

You said, "Well, that's ten years ago, though, so."

And he said, "Well, yeah.  So I dropped her off at Sherry's because fucking she said she was going to go in there for a couple of hours.  And then she was going to come back with Brent and Nicky Price.  And that's who I was with that night."

And you said, "Oh."

And he said, "Fucking, she was.  And see,

Exhibit 5001 at 880

Hamilton   X    D5 89

we were having a barbecue and she was going to come back and we were going to eat.  But, no, I mean, we got into a little bit of a tizzy but it wasn't really a fight, because what it was, is Sherry was giving her a guilt trip because she hadn't been hanging out with her.  And Leah really didn't want to hang out with her because Sherry and her weren't getting along."

And you said, "Yeah."

And he said, "Fucking Sherry's been talking shit about her.  And I don't even — me and her got into it really.  It wasn't even an argument, it was just fucking me telling her that she needs to realize who her fucking true friends were."

I was like, "You know, Sherry's just fucking was talking shit about her constantly. And I kept on hearing about it.  And you know, me . . ."

MR. FRASIER:    (Interposing) Your Honor, is there a question here?

Q.   Isn't that what he said?

THE COURT:    That's the question.

MR. FRASIER:    All right.

A.   I don't remember anything about a barbecue or

Exhibit 5001 at 881

Hamilton   X    D5 90

anything.  What I remember is, when I asked him about it, he kinda shoved it off and told me I could tell them whatever I want.  And again, like I said, I asked him if he wanted me to tell them about going out Lee Valley.  And he asked me not to.

Q.   Well, in any event, when you talked to him on the phone he indicated that all he'd done was dropped her off at Sherry's and then tried to pick her up there.  And she wasn't there.  Right?

A.   I don't remember him saying anything about dropping Leah off at Sherry's, no.

Q.   So, you don't remember that?

A.   I don't remember him saying that, no.

Q.   Okay.  Now, Mr. Frasier has talked to you about — about your testimony in Grand Jury in, I believe it would have been August 11th of 2010.  And he asked you questions about what Mr. McGuffin had told you.  Right?

A.   Yes.

Q.   And at that time — let's see.  Dealing with this matter of dropping her off at McKay's.

Oh, all right.

Mr. Frasier asked you if he had made a statement like that, about dropping her off at McKay's didn't he?

A.   Yeah, he did.

Q.   And you indicated that you didn't remember any statement like that?

Exhibit 5001 at 882

Hamilton   X    D5 91

A.    Yes, I did.

Q.    Okay.  And then Mr. Frasier said that he was going to read to you what the police put in their report so you could jog your memory.  And so, he read to you the police report as follows:

> "Hamilton said once when he began wondering if McGuffin might have had something to do with Freeman's disappearance, Hamilton said he came out and asked McGuffin to his face if he had anything to do with it.  According to Hamilton, McGuffin denied anything and offered a brief explanation."

> "Hamilton said McGuffin told him that he was supposed to pick up Freeman at Sherry Mitchell's house but had been late, and Freeman had already left.  Hamilton said McGuffin told him that he found Freeman walking and picked her up in his car and began arguing with her, according to Hamilton.  McGuffin said that Freeman wanted out of the car.  And he let her out near McKay's."

And then he asked you:

> "Do you recall telling the police that?"

Didn't he ask you that in that form in Grand Jury?

A.    I don't — he didn't — I don't remember him asking me

Exhibit 5001 at 883

Hamilton    X    D5 92

that in Grand Jury.

Q.    You don't remember that.  And then after he had read you that report and asked you that question, do you recall telling the police that your answer was:

"I don't remember saying that, anything about Nick picking her up there because I thought it was the other way around.  I thought Nick was supposed to be dropping her off there and he didn't want to."

A.    Yeah, I do remember that.  But like I told Frasier, I was nervous - - -

Q.    (Interposing) No.  My question is, you do remember that now?

A.    Yes.  I never said I didn't remember that.

Q.    And so, at that time — and then he went on to ask you about a question about:

"Did you ever hear from Nick that Bill Sero was the one that killed Leah?"

"And you said, 'No, I never heard Nick say anything like that.  You know, to be honest Nick didn't really say anything about it.'"

Do you remember that question and that answer?

A.    No.  Because I wouldn't have said no, because I've heard Nick say something about Bill Sero a dozen times.

Exhibit 5001 at 884

Hamilton     X     D5 93

Q.   My question is, do you remember his asking that question and you gave that answer?

A.   No, I don't remember — I remember telling him that I've heard say something about Bill Sero, yes.  But I never remember saying no, I didn't hear Nick say something about that.

Q.   Well, he asked you at that time, he said as follows:

"Question: Well, I'm having a little problem here Scott.  Because I'm looking at the report.  It says here, 'Hamilton told me that approximately two weeks prior to Freeman's body being found, he recalls McGuffin saying that Bill Sero was responsible for her disappearance.'

And your answer was:

"Well, I didn't say that.  So . . ."

Do you recall that question and that answer?

A.   I remember saying that I — Nick has talked about Bill Sero doing it, yes.  I remember saying that.

Q.   You remember saying what?

A.   Nick saying something about Bill Sero doing it.

Q.   No, my question was, do you recall when he asked - - -

A.   (Interposing) Then no.  I don't recall.

Q.   All right.

Exhibit 5001 at 885

Hamilton   X    D5 94

A.   The one I say is what I know.

Q.   You don't recall what he said in Grand Jury.  Do you recall that he then said:

"How did you say . . ."

And you kind of interrupted him and said:

"I'm sure I remember."

And he went on to say, to quote:

"Hamilton said that it seemed like he was throwing it out there because everyone was looking at him.  Hamilton did not recall McGuffin giving any details, just mentioning it."

That finished his question.  And then your answer was:

"I don't remember Nick ever saying anything about Bill, ever."

A.   Well, that would be a lie because I've obviously remembered that.

Q.   Wait, wait.  What's a lie?

A.   Me saying that Nick's never said anything about Bill doing it because I've known — I've heard him say it.  He said it to me before.

Q.   Well, you're saying that what you said in Grand Jury was a lie?

A.   I may have been nervous and said the wrong thing.

Exhibit 5001 at 886

Hamilton    X    D5 95

But - - -

Q.    Well, when — are you saying that when you said, "I don't remember Nick ever saying anything about Bill ever." That that was a lie on your part?

A.    I wouldn't call it a lie.

Q.    Well.

A.    Because I've told them before that I've heard Bill — him say something about Bill doing it.    So - - -

Q.    All right.

My question is, is that what you said in Grand Jury?

A.    I don't believe so, because it wouldn't make sense for me to say that.

Q.    Now, after you had testified in Grand Jury - - -

THE COURT:    (Interposing) You're going to go to a different topic.  How much longer are you going to be? We've been going about two hours.  I'm trying to get — allow you to finish this, but we've been going a couple hours.

MR. McCREA:    Oh, okay.  Well, I'm probably going to take another fifteen minutes at least, Your Honor.

THE COURT:    Then we'll take a recess at this point in time.

Everybody else remain seated until the jury has a chance to go to the jury room.

Please remember the admonition.

(Jury Out.)

Exhibit 5001 at 887

Hamilton   X    D5 96

THE COURT:    You can step down.  You'll have to come back.  But you can step down.  You can take a recess and then just come back.

We'll take about fifteen minutes; maybe between ten and fifteen after.

If anybody plans to play any tape recordings or anything, have that ready to go when we come back, either one.

Okay?

We'll be in recess until about ten after — twelve after.

(RECESS)

(Jury In.)

JUDICIAL ASSISTANT:    All rise.

THE COURT:    Be seated please.

Go ahead, Mr. McCrea.

Proceed, please.

MR. McCREA:    Okay.  Thank you, Your Honor.

CROSS EXAMINATION, Continued

BY MR. MCCREA:

Q.   Mr. Hamilton, one sort of housekeeping matter, the automobile that you were driving around in that night was a primer gray El Camino.  Is that right, on the 28th of June, 2000?

A.   Yes.

Q.   Okay.

Exhibit 5001 at 888

MR. McCREA: Now, we have the pertinent portion of the Grand Jury testimony keyed up, Your Honor. I'd ask through the assistance of Counsel, be played for the witness to see if it refreshes his recollection.

THE COURT: That's fine.

And when you start it, I'm just going to pause the tape so it doesn't pick it up.

And then again, this is just for refreshing his memory.

(Whereupon Grand Jury tape was played for the jury off the record. Not transcribed.)

THE COURT: I don't particularly care. I told the jury this is just to refresh his memory. They're not taking anything — taking notes about this, correct, until there's questions asked. Unless you have some objection I don't have a problem with this going into the Court, it's just for his refreshing of his memory. But, there's no way I can have him punch the button. There's a (not understandable).

Go ahead.

(Whereupon Grand Jury tape was played for the jury off the record. Not transcribed.)

MR. McCREA: I may have mis-spoke in part. Actually, it's our position that this testimony on this — before the Grand Jury — it both is a matter of refreshing his recollection, but also it may be offered and the jury may hear

Hamilton   X    D5 98

it as impeachment of his testimony that is contrary to that. And enough foundation has been laid, I submit at that point, that it is improper impeachment to offer this testimony. Because it's been referenced to him and he has - - -

Well, pursuant to Rule 613 I think it is - - -

THE COURT:    (Interposing) Okay.  You're wanting to offer the playing of that for the jury for impeachment purposes?

MR. McCREA:    Yes.  As well as to refresh his recollection if it does.

THE COURT:    Any objection?

MR. FRASIER:    Your Honor, I think there are parts of this testimony that would not be otherwise be admissible.  I don't think the whole is admissible. Therefore, I would like an opportunity — and I don't have a problem with Counsel and I working together to come up with something that we believe is presentable.  And I don't have a problem doing that later in this trial.

But I do object at this point because I do believe there are parts that are not proper impeachment, nor are they admissible.

THE COURT:    Okay.

He's not objecting to you offering it for impeachment on those particular points you've raised with him, but there are other parts that haven't.  So, playing the whole

Exhibit 5001 at 890

Hamilton   X    D5 99

tape could lead to the admission of evidence that's not admissible.  And I won't allow that.  I don't know what the objections are, first.  But in the sense you're only offering it as to certain parts, and those are the only parts that should be played.

Obviously, that will have to be done between you and counsel.  And if you can't do it then I'm going to have to listen to it - - -

MR. McCREA:    (Interposing) All right.

THE COURT:    - - - and make a ruling on it. So, we'll stop the playing of this now until you can — and I'll make sure Mr. Hamilton's available.  Until you can work out something.  And if you haven't worked out something, then — and then, at least until I have a chance to review and make a ruling on what the objections are.

Okay?

MR. McCREA:    That's fair.

Thank you, Your Honor.

THE COURT:    Yep.

Now, do you have anything else of Mr. Hamilton?

MR. McCREA:    Yes.

THE COURT:    Go ahead.

CROSS EXAMINATION, Continued

BY MR. MCCREA:

Q.   Now, Mr. Hamilton, after you'd appeared at the Grand

Exhibit 5001 at 891

Hamilton    X    D5 100

Jury and testified, then the Officers Webley and McNeely, they got you back into the police station.  Isn't the correct?

A.    Down at the DA's office?

Q.    Pardon?

A.    They came and talked to me again after I talked at the Grand Jury?

Q.    Yeah, they talked to you again?

A.    Yeah, they did.

Q.    All right.  And at that time, they said that — they told you that the trial was coming up and they wanted to get this — get this thing correct about what Mr. McGuffin had told you.  Is that right?

A.    They wanted to talk to me about what I said.

Q.    Right.  And they indicated that there had been a problem regarding what you'd said in Grand Jury?

A.    Yeah.

Q.    And they said that this part about the picking up and dropping off at McKay's was really important to them?

A.    They just were asking me why I would change what I said.  The only thing that I had was I was nervous in front of all of them, just like today.  And I messed up what I said.

Q.    Well - - -

A.    (Interposing)  Because when they told me — when they replayed what I said, it bewildered me, because I didn't understand why I would have even said that.  Because I know

Exhibit 5001 at 892

Hamilton    X    D5 101

what I knew in my head that was opposite from what I said.

Q.    Well, they — so, they went — they talked to you about what had happened - - -

A.    (Interposing) They asked me why — why it changed. They asked me why it changed.

Q.    Why you changed in Grand Jury?

A.    Yeah.

Q.    All right.  And in the course of talking about it, they indicated that this was really important to them.  Right?

A.    They didn't indicate nothing.  They were just wanting to know why I would change what I said.  And like I told you just a second ago, that I was nervous in front of all of them and I just mixed up my own words.

Q.    Well, didn't they say the following?

          "Some of this stuff that's really important
           is right there at the last you said?"

     Referring to their report:

          "Where here you asked Nick about a kind of
           explanation.  You became suspicious.  You said
           that he told you he was supposed to pick up her
           at Sherry's house.  He'd been late.  And he
           told you that he found her walking and picked
           her up.  And they started — they started
           arguing and he told you that he had dumped her
           out at McKay's; that she went out.  He let her

Exhibit 5001 at 893

Hamilton    X    D5 102

out near McKay's.  That's obviously an important thing to us.  That evidently that didn't come across."

Did they say that to you?

A.  I can't remember those exact words - - -

Q.  (Interposing)  Well, did they — excuse me.

A.  - - - that they said that to me.

Not to my knowledge, no, I can't say they said it was important.  I could see how it probably was important.

Q.  All right.  So, in substance they said that to you?

A.  They never came out and said that this is very important and you need to fix what you did.  They just asked me why I would change my story in front of Grand Jury.  And like I told them, I was nervous in front of all of them just like anybody else would be.  And I mixed my own words up.

Q.  All right.  Before you testified - - -

A.  (Interposing) I'll take a polygraph on that.

Q.  Pardon?

A.  They even had me take a polygraph about that.

MR. McCREA:    I object, Your Honor.

THE COURT:    Sustained.

MR. McCREA:    Move to strike.

THE COURT:    The jury is to disregard the last remark.

Q.  Mr. Hamilton, did anyone talk to you again just

Exhibit 5001 at 894

D5 103

before you testified?  When's the last time you talked to law enforcement, let me put it that way?

A.   A month and a half, two months ago.  It's been awhile now.

Q.   Pardon?

A.   It's been awhile now.  I couldn't tell you for sure time.

Q.   Well?

A.   It's been a month and a half or so at the least.

Q.   During a recess did anybody talk to you?

A.   No.

Q.   The — all right.  A few more questions.

So, after the officers went over with you your statement and said in words or substance it was important, then you said, "Yes, that's right.  That's what was said." Correct?

A.   No, what I said was, is, "I can't believe I said that.  It doesn't make any sense why I would have said that, because it goes against what I know."

Q.   Well, anyway - - -

MR. McCREA:   I believe that's all the questions I have until we're able to get this matter resolved.

I'm sorry, Your Honor.

THE COURT:   That's all right.

MR. McCREA:   All the questions I have until

Exhibit 5001 at 895

D5 104

we get it resolved regarding the Grand Jury testimony.

THE COURT:    Mr. Frasier, do you want to reserve your redirect until this other matter is straightened out and he's finished cross?  Or do you want to redirect on some of it now?

MR. FRASIER:    Actually, Your Honor, I have no redirect.  So, at this point I don't have a problem with him stepping down from the stand.  And if he keeps us apprized of where he's at we'll get him back.

THE COURT:    Okay.

And I don't envision this problem being solved, like, over the noon hour.  If you can it's fine.  But I'm not going to delay other witnesses waiting for that.  So it may be that you have to resolve it in the evening as opposed to there.  And I'll order him to be available.

But if you can resolve it over the noon hour, fine.  But I don't want to sit and delay and delay witnesses while we're waiting for that matter to be resolved.

MR. FRASIER:    Right.

MR. McCREA:    Well, probably we can.  I don't think it's that difficult.  But we'll see.

THE COURT:    Okay.

MR. McCREA:    The other thing, as long as — while this witness is still on the stand, so there's no doubt in Counsel's mind, we're prepared — as a matter of fact, we'd

Exhibit 5001 at 896

D5 105

be prepared to offer the pretext telephone tape or disk, whatever it is.

MR. FRASIER:    That's fine.

THE COURT:    Okay.

If you have it, offer it and I'll receive it.

MR. McCREA:    Well, we needed — we were doing the Grand Jury so we could only key up one thing.

THE COURT:    Okay.

So, you want — it's a tape recording?

MR. FRASIER:    It's a digital recording.  It can be played on a computer.  I have no problem doing that at a later time.  The witness does not need to be on the stand for that.  I mean, we can play it anytime we get the exhibit ready.

THE COURT:    Is that agreeable?

MS. McCREA:    Yes.  I can — I can cue it up right now, Your Honor.

MR. FRASIER:    Well, if we're going to have it as an exhibit, I would prefer it to be on a CD ready to go. And - - -

THE COURT:    (Interposing) So, then it's in evidence.

MR. FRASIER:    Then it's in evidence.

THE COURT:    Right now it's not — you don't have a CD right now?

Exhibit 5001 at 897

D5 106

MS. McCREA:    I do not have it here with me, no.  I didn't anticipate I was going to need it this morning.

THE COURT:    Okay.  I understand that.  Well, get it on a CD so when it's offered — then when it's done it can be given to the — Ms. Cress to keep.

MS. McCREA:    Yes.

THE COURT:    Okay.

Mr. Hamilton, I'm going to ask you to be back at one o'clock.  And if they've got this one thing straightened out, then you'll be back on the stand.  If not, then I will probably release you for the rest of that day to come back tomorrow at, like, nine o'clock and we'll restart.

MR. FRASIER:    Your Honor, I would suggest it will be tomorrow morning.  Because by the time they tell me what they want and we go through and excise out, it's probably going to be tonight before I - - -

THE COURT:    (Interposing) That's fine because Mr. McCrea thought it could be done over the lunch hour. You're telling me it can't.

So, just be back here at nine o'clock in the morning.

WITNESS:    All right.

THE COURT:    Okay, you're released until tomorrow at nine.

Call your next witness.

Exhibit 5001 at 898

Zavala    D    D5 107

MR. FRASIER:    Thank you.

We call Officer Zavala.

DAVID ZAVALA

was thereupon produced as a witness on behalf of the Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat up here, please.

DIRECT EXAMINATION

BY MR. FRASIER:

Q.    Could you state your name please, sir, and spell your last name for the record?

A.    First name is David.

Last name is Z as in Zebra-A-V as in Victor-A-L-A.

Q.    And what is your occupation, sir?

A.    I'm a police officer for the City of Kaiser.

Q.    How long have you worked for the City of Kaiser?

A.    It's been about almost eleven years.

Q.    Prior to that, sir, were you employed as a police officer in another location?

A.    Yes, here in the City of Coquille.

Q.    How long had you worked in the City of Coquille?

A.    Just about over a year.

Q.    I'd like to direct your attention, sir, to June 28th of 2000.  Were you on duty that day?

Exhibit 5001 at 899

Zavala    D    D5 108

A.    Yes, I was.

Q.    And I want to direct your attention now to about ten thirty p.m. in the evening.  Did you have contact with the Defendant in this case, Mr. McGuffin?

A.    Yes, I did.

Q.    Where did you have contact with him?

A.    I was — like I said I was on duty.  I was driving on Highway 42.  I was driving eastbound.  And I saw Mr. McGuffin's blue Mustang.  At the time I didn't know it was his until after he had passed me.  He was driving westbound.  I noticed that the headlight was out.  So, I turned around on the vehicle and pulled it over off of, I believe it's Highway 42 south, going into Sturdevant Park there.

Q.    And this — when you're talking about Highway 42, you're talking about the bypass around the City of Coquille?

A.    Yes.

Q.    Why did you stop the car again?

A.    There was a headlight out.

Q.    Did you approach the car?

A.    I did.

Q.    And how many people were in the car?

A.    There was only one individual.  And that was the driver, Mr. McGuffin.

Q.    Tell us what happened when you got out of the car and approached the car?

Exhibit 5001 at 900

Zavala    D    D5 109

A.    Well, as I approached the car, I spoke with Mr. McGuffin and let him know the reason for the stop there. And I asked him what he was doing out at that time of the night with — driving around with only one headlight on.  And he told me that he was out looking for his girlfriend.  And he had asked me if I had seen her.  I told - - -

Q.    (Interposing)  Did you who his girlfriend was?

A.    Yes.

Q.    Who was that?

A.    Leah Freeman.

Q.    Okay.  Go ahead.

A.    So I told that I hadn't seen her, but I told him I'd keep an eye out for her.  My shift was ending in about twenty minutes.  And so then I told him that he should probably get home because of the fact that grave robbers coming out and he shouldn't be driving without a headlight out.

Q.    How did he respond to that?

A.    He said he knew that and he would make it quick. And after that he ended up leaving.  And he ended up going across the bridge there, past — over the river.

Q.    Did you know where the Defendant lived?

A.    I believe it was that area.  I believe his family lived in that general direction.

Q.    Now, how was the Defendant's demeanor when you had contact with him?

Exhibit 5001 at 901

Zavala   D   D5 110

A.   Well, based on my report here he did appear a little nervous.  He did light a cigarette when I approached him.  But he didn't show any signs of being upset or any signs of — that he'd been crying.

Q.   I want to show you a series of pictures here marked State's Exhibits Nos. 232, 233, 234, and 235 and ask if you could look at those for a minute.

A.   Okay.

Q.   Do you recognize the area as portrayed in those photographs?

A.   Yes, I do.

Q.   And is this the area that we're talking about where the stop occurred?

A.   Yes.

Q.   And do these pictures portray the area as you remember it on the evening of June 28th, 2000?

A.   Yes.

MR. FRASIER:   We'd offer, Your Honor, State's Exhibits Nos. 232 through 235 inclusive.

MS. McCREA:   There's no objection, Your Honor.

THE COURT:   Received.

(Whereupon Exhibits Nos. 232, 233, 234, and 235 were then received into evidence.)

Q.   This is State's Exhibit No. 232.  Can you see that

Exhibit 5001 at 902

Zavala    D    D5 111

on the screen, sir?

MR. FRASIER:    I'm going to dim the lights.

A.    Yes, I can see it.

Q.    Could you describe this photograph for us, please?

A.    The — that's Highway 42.  And then where that speed sign there — where it says speed limit of forty miles an hour — that is — I believe is that Highway 42 South towards the park and over the river.

Q.    This is State's Exhibit No. 233.  Do you recognize that?

A.    Yes.  That's just a different — same location, just a different viewpoint.

Q.    Can you see the area where you pulled the car over?

A.    Yes, just past the speed limit sign there on the right.

Q.    There's a laser pointer there — the red - - -

A.    (Interposing) Right about there.

Q.    And Sturdevant Park, where's that at?

A.    Just further down the road.

Q.    Now, backing up.  I'm going to back up to No. 232. You mentioned you saw the Defendant drive across a bridge?

A.    Yes.

Q.    Do you see the bridge in that photograph?

A.    Yes.  The bridge is right there.

Q.    And the car went over the bridge?

Exhibit 5001 at 903

Zavala   D    D5 112

THE COURT:    Just a minute.

Ma'am, are you all right?

JUROR:    Yes.

THE COURT:    You have water?

JUROR:    Yes, I have.

THE COURT:    Do you want a recess?

JUROR:    (Not understandable.)

THE COURT:    Yes, certainly.

THE COURT:    We will take a recess, if all of you would step into the jury room, please.

Are you all right.  Do you need help getting back there?

JUROR:    (No audible response.)

THE COURT:    Okay.

(Jury Out.)

THE COURT:    Just let me know when she's ready.  We'll start back when the juror's ready.

You can step down for the moment.

(RECESS)

(Jury In.)

JUDICIAL ASSISTANT:    All rise.

THE COURT:    Be seated please.

Are you all right?

JUROR:    Sorry.

THE COURT:    No problem.  Glad you're better.

Exhibit 5001 at 904

Zavala    D    D5 113

Mr. Frasier, go ahead.

MR. FRASIER:    Thank you, Your Honor.

DIRECT EXAMINATION, Continued

BY MR. FRASIER:

Q.    Officer Zavala, before I forget, what type of vehicle was this that you stopped?

A.    It was a blue Mustang.

Q.    Now, going back to State's Exhibit No. 232.  I'm now going to go to State's Exhibit No. 234.  Is there some sort of a card lock or a gas station, CFN, near this intersection?

A.    If I recall correctly there is.  I believe it's behind that building there.

Q.    All right.  And let's look at State's Exhibit No. 235.  Does that help you there?

A.    Yes.  Right in there.

Q.    Where is that in relation to Highway 42 South?

A.    To be honest with you, I'd have to look back at the pictures again to - - -

Q.    Okay.  Let's go back here to No. 234.

A.    If I recall correctly, that's the turn off right there to the right.

Q.    Okay.

A.    Tough angle here, but we'd be looking at right in there.

Q.    All right.  Now, did you see this blue Mustang go

Exhibit 5001 at 905

Zavala   X   D5 114

into the CFN or the card lock station?

A.   No.  It continued over the bridge.

Q.   Thank you.

MR. FRASIER:   Those are the questions I have, Your Honor.

THE COURT:   Ms. McCrea.

MS. McCREA:   Thank you, Your Honor.

CROSS EXAMINATION

BY MS. MCCREA:

Q.   Is it detective?

A.   Officer.

Q.   Officer, okay.

Officer Zavala, you've indicated that you were in uniform on the night of June 28th, 2000.  Right?

A.   Yes.

Q.   And you were operating a marked patrol vehicle?

A.   Excuse me.  Yes.

MS. McCREA:   Need water?

WITNESS:   No.  I've had a cough for about a week and a half now.

MS. McCREA:   All right.

WITNESS:   Thank you, though.

MS. McCREA:   I just didn't want you to be uncomfortable.

Q.   When you made contact with Mr. McGuffin, I think you

Exhibit 5001 at 906

Zavala   X   D5 115

said you were traveling eastbound.  But actually you were traveling westbound, weren't you?

A.   That is correct.

Q.   And Mr. McGuffin was traveling eastbound?

A.   Correct.  Yes.

Q.   Now, you indicated in your report that you stopped him about twenty-two thirty hours which would be ten thirty?

A.   Yes.

Q.   And it could've been a little earlier than that, couldn't it?

A.   I guess it could've been.

Q.   Well, this report was made on July 12th, 2000.  Correct?  Is that right?

A.   Yes.

Q.   And your contact with Mr. McGuffin was on June 28th, 2000.  So that's a period of approximately two weeks.  Right?

A.   Yes.

Q.   Now do you have your notebook from June 28th with you today, sir?

A.   No, I do not.

Q.   Okay.  I have a copy of your notebook which I have received courtesy of the Prosecution.

A.   Okay.

Q.   Could you take a look and see if that looks to be a copy of your notebook - - -

Exhibit 5001 at 907

Zavala   X   D5 116

A.    (Interposing)  Yes.

Q.    - - - from that time?

A.    Uh huh.

Q.    Okay.  And then I'm turning to a page that's got referenced, No. 62800.  That would be June 28th, 2000?

A.    Yes.

Q.    Does this appear — this is a copy of your notebook?

A.    Yes.

Q.    Okay.  And that's your handwriting?

A.    Yes.

Q.    And typically what you do is you make notations in your notebook as things happen during your shift?

A.    Yes.

Q.    And on June 28, 2000, as you've indicated, you were working until eleven o'clock that night?

A.    Yes.

Q.    So, you made notations in your notebook concerning the contact you had with various individuals?

A.    Yes.

Q.    When you had the contact with Mr. McGuffin, did you turn on your overhead lights to affect a traffic stop?

A.    That I do not recall if I did exactly.  But I would assume that I did.  Especially on that evening with the traffic being there.  It's more of a safety concern at a minimum.  But to pull them over, yes.

Exhibit 5001 at 908

Zavala   X   D5 117

Q.    Sure.   And the car that he was driving, you've indicated was a blue Mustang.   And it was an older vehicle. Did you recognize it as a '67 Mustang?

A.    Not great with cars.   It was a blue Mustang; older vehicle, yes.

Q.    Okay.   And in terms of Mr. McGuffin's reaction to your overhead lights, pulled up and stopped in a reasonable time?

A.    Yes.

Q.    And had the contact with you as you've described?

A.    Yes.

Q.    Now, you don't know what kind of a mechanical condition Mr. McGuffin's car was in that night when you contacted him on June 28th.   Is that right?

A.    No.

Q.    And you've indicated, according to the State's photographs that we now have in evidence, that the stop occurred close to the entrance of Sturdevant Park.   Is that right?

A.    Prior to the entrance, yes.   There's that little gravel area there.

Q.    And typically, in the evening there is a gate that is placed across the entrance to the park?

A.    If I recall correctly, yes.

Q.    Okay.   Do you have any recollection whether the gate

Exhibit 5001 at 909

Zavala    X    D5 118

was there that night or not?

A.    No, I do not.

Q.    So, in terms of Mr. McGuffin driving over the bridge, you've indicated you saw him drive over the bridge. And you didn't wait to see whether he came back over the bridge or not?

A.    No.

Q.    So, you don't know if he did come back over the bridge?

A.    That is correct.

Q.    On the far side of the bridge, to the right side, isn't there a place called the Fishtrap where one can turn around.  It's kind of a circle area?

A.    To be honest with you, I don't remember.

Q.    So, there could be.  You just don't - - -

A.    (Interposing)  Right.

Q.    You're up in Kaiser now.  You're not down here anymore?

A.    It's been a couple years, yes.

Q.    All right.  I just want to go back to your notebook for just a minute.  And I want you to take a look, beginning at June 28th, 2000 through the course of your shift.  And in terms of what's in your notebook, there is nothing written in your notebook contemporaneously with your contact with Mr. McGuffin on June 38th, 2000.  Is that right?

Exhibit 5001 at 910

Zavala    X    D5 119

A.    It doesn't appear so.  Correct.

Q.    And I'm — take your time.  So, what you put in your report, written on July 12, 2000, was what you reconstructed from your memory after the fact?

A.    Yes.

Q.    Okay.  Thank you.

A.    Uh huh.

Q.    And Officer Zavala, it is correct that the gas station card lock area is fairly close to where you had the contact with Mr. McGuffin?

A.    Yes.

MS. McCREA:    If I can just have a moment, Your Honor.

THE COURT:    Okay.

MS. McCREA:    Nothing further.

THE COURT:    Mr. Frasier.

MR. FRASIER:    I have nothing further.

THE COURT:    You may step down.  And you're free to leave.

MR. FRASIER:    Your Honor, he was subpoenaed by the Defense.  Is he released from that also?

THE COURT:    Okay.

Do you need Officer Zavala back?  If it's something you can take care of now, out of order, that would be fine.  If not, then I'll order him back.

Exhibit 5001 at 911

Zavala   D    D5 120

MS. McCREA:   Just very briefly, if I can take care of it now.

### DAVID ZAVALA

was thereupon produced as a witness on behalf of the Defendant and, having previously been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

### DIRECT EXAMINATION

BY MS. MCCREA:

Q.   Officer Zavala, back in July of 2000 you interviewed Kristen Steinhoff-Ramsey.  Is that right?

A.   I'd have to look back at some of my other reports here to verify that.

Q.   Would it help if I showed you the report?  Or do you have reports with you?

A.   I have some here, yes.

Q.   Okay.

A.   On what date was that?

Q.   July 10, 2000.

A.   Okay.  I have the report here.

Q.   During the time when you interviewed Ms. Steinhoff-Ramsey, she indicated to you that Mr. McGuffin kept saying to her, the night of June 28th, when he was at her house, that, quote, "I hope she did not do something stupid." unquote?

A.   Okay.

Exhibit 5001 at 912

Zavala    X    D5 121

Q.   Was that in your report?

A.   Yes.

Q.   Is that what Ms. Steinhoff-Ramsey told you?

A.   That's what — again, this was several years ago.  If I indicated that in my report, especially if I put it in quotation notes, yes, I would assume that's what she told me.

Q.   Okay.  And likewise that Ms. Steinhoff-Ramsey told you that when Nick McGuffin was at her house on June 28th, that he told her, quote, "When all my other girlfriends had done this in the past they've been out cheating on me." unquote?

A.   Yes.

Q.   Thank you.

          MS. McCREA:    That's all the questions I have.

          THE COURT:    Mr. Frasier.

          MR. FRASIER:    Thank you, Your Honor.

                    CROSS EXAMINATION

BY MR. FRASIER:

Q.   In your interview with Ms. Steinhoff, she also told you, did she not, that she had seen Mr. McGuffin at the Maytag store?

A.   Yes.

Q.   And she had asked him jokingly if he was stealing flowers?

A.   Correct.

Q.   And she also told you that the Defendant said he was

Exhibit 5001 at 913

Zavala   ReD  D5 122

looking for Leah?

A.    Yes.

Q.    Did she also tell you she didn't notice a car in the area of the Maytag Store?

A.    Yes.

Q.    Thank you.

MR. FRASIER:    That's all I have.

MS. McCREA:    And I'm sorry, Your Honor, I neglected to address one area if I might just briefly.

THE COURT:    Go ahead and address it.

REDIRECT EXAMINATION

BY MS. MCCREA:

Q.    Officer Zavala, Ms. Steinhoff-Ramsey also — her name was Steinhoff then — also told you when you interviewed her on July 10, 2000, that when she went home that Scott Hamilton was there waiting?

A.    Yes.

Q.    Okay.

MS. McCREA:    That's all, Your Honor.

THE COURT:    Anything on that, Mr. Frasier?

MR. FRASIER:    No, Your Honor.

THE COURT:    Now you are free to leave.  Go back to Kaiser and won't have to come back here.

We will take our recess at this time, lunch recess.

Exhibit 5001 at 914

Zavala   ReD  D5 123

Everybody else remain seated until the jury has a chance to leave the courtroom.

Leave your notes in the jury room.  Remember the admonition.

JUROR:    What time?

THE COURT:    One o'clock.

(JURY OUT.)

THE COURT:    Okay.  Maybe five after.

(LUNCH RECESS)

(JURY OUT.)

JUDICIAL ASSISTANT:    All rise.

THE COURT:    Be seated please.

Somebody has a matter I was told.

Ms. McCrea.

MS. McCREA:    Your Honor, I understand the court does not have control over the people in the audience.  But it is a concern that it was reported to me by the Defense investigator that there are persons out in the hallway who are discussing the testimony of witnesses.  And our efforts are — on both sides are being made not to taint witnesses who are excluded.

THE COURT:    Right.

MS. McCREA:    And so if the Court could just give, perhaps a gentle admonition.

THE COURT:    I've done that once already.  I

Exhibit 5001 at 915

Zavala   ReD  D5 124

can do it again, but then it — and I'll be happy to do it at all times.  But it only kind of gets to the people who are in the courtroom.  And so — and that's why when I first did it, I said, "I expect Counsel to tell their witnesses that, because that way it could get there."

But I will certainly do it again.  Do you prefer me to do that with the jury present or not present?

Not present.  You're shaking your head not present.  Everybody else is kind of silent.  So - - -

MS. McCREA:    (Interposing) That's fine.

THE COURT:    Okay.

You need to come in or stay out.  Don't stand with the door open.

I do want to remind people that are in the courtroom that they are not allowed to go out and talk about the case where other witnesses might hear.  There are witnesses out in the hall.  And if you want to talk about it, go home and talk about it, not out in the hallway.  It's improper to talk to any witnesses or be around any witnesses when you're talking about the case or what people testified to.

So, do not talk about witness's testimony when you're out in the hallway.

Okay.

Bring the jury in.

Exhibit 5001 at 916

Messerle   D   D5 125

(Jury In.)

THE COURT:    Mr. Frasier.

MR. FRASIER:    Thank you, Your Honor.

We call Tony Messerle.

TONY MESSERLE

was thereupon produced as a witness on behalf of the Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat up here, please.

DIRECT EXAMINATION

BY MR. FRASIER:

Q.    Could you state your name please, sir, and spell your last name for the record?

A.    Tony Messerle, M-E-S-S-E-R-L-E.

MR. FRASIER:    Could you scoot forward a little bit so you're close to that microphone there?

Thank you.

Q.    Mr. Messerle, where do you currently live?

A.    Springfield, Oregon.

Q.    Prior to that have you lived in Coquille?

A.    I have.

Q.    Are you related to the Messerle family noted here in Coquille?

A.    I am.

Exhibit 5001 at 917

Messerle    D    D5 126

Q.   Who's your dad?

A.   Ken Messerle.

Q.   Former State Senator?

A.   That would be the same person.

Q.   There's a Messerle that just was appointed County Commissioner?

A.   Yes, there was.

Q.   And who's that?

A.   He's my dad's brother, my uncle.

Q.   When you lived here in Coquille, where did you live, sir?

A.   I lived on 536 West Eighteenth Street.

Q.   Do you have children?

A.   I do.

Q.   How many?

A.   Three.

Q.   Do you have boys, girls?

A.   I have two boys and a girl.

Q.   And ages?

A.   Twenty-four, twenty-one, and twenty.

Q.   Now, directing your attention to the year 2000, were you living in Coquille at that time?

A.   I was.

Q.   At that same residence we discussed?

A.   I was.

Exhibit 5001 at 918

Messerle  D    D5 127

Q.    Were you children living there or staying with you on occasion?

A.    Every other weekend, visitation.

Q.    You're divorced?

A.    Yes.

Q.    And where were you working at the time, sir?

A.    Coos County Road Department.

Q.    What did you do at the road department?

A.    I worked swing shift in the shop, service department in the road department shop.

Q.    And did you have a particular shift in the year 2000 that you were working?

A.    Yes.  I was working swing shift.

Q.    And what hours was that, sir?

A.    I believe it was three to eleven thirty.

Q.    Now, I want to direct your attention to the day that allegedly Leah Freeman disappeared, June 28th of the year 2000. Were you working that day?

A.    I did, yes.

Q.    Did you work a full shift?

A.    Yes.

Q.    You would have gotten off work at about what time?

A.    Eleven thirty.

Q.    And how would you have — well, how did you drive to get home?

Exhibit 5001 at 919

Messerle   D    D5 128

A.    I had a motorcycle at the time.

Q.    How did you — what route did you take to get home?

A.    I left the shop on Central and came straight up Central and turned on Elm Street at the gas station, went straight to my home which is straight up that street.

Q.    As you're traveling up Elm Street, did you notice something in the road?

A.    I did.

Q.    What did you see?

A.    I saw something glint at me.  And I stopped.  It was a tennis shoe.

Q.    Did you pick this tennis shoe up?

A.    I did.

Q.    Why did you pick this tennis shoe up?

A.    I had just got my kids for the weekend.  And I hadn't seen them yet.  They were deposited at my house.  And the first thing that went through my mind is it could have been one of my kids' shoes.

Q.    So, you picked it up?

A.    Yes.  It was in proximity to where I live.

Q.    What did you do with this shoe?

A.    I took the shoe home and put it on the kitchen floor.

Q.    Now at some point in time — well, did you figure out it wasn't one of your kids' shoes?

Exhibit 5001 at 920

Messerle   D    D5 129

A.    The next morning, yes.

Q.    At some point in time did you become aware that there was a missing girl in Coquille?

A.    The following Sunday.  Like I said my kids were with me for the weekend.  We went with my parents to Lakeside.  On our way back home to Coquille from Lakeside, we heard all the stuff on the radio of this missing girl.

Q.    And did you connect this shoe to some — to the case to some degree?

A.    Not really.  My daughter suggest, you know, "Gee, dad, we should call."  Because I had this shoe and it wasn't theirs.  And so when I got home I did.  I called the Coquille PD.  They had a number at the time.

Q.    Did an officer come and see you?

A.    Yes.

Q.    Was that Officer Randy Ulmer?

A.    I do not recall the officer's name.

Q.    Did you give the shoe to that particular officer?

A.    I did.

Q.    I'm going to show you what's been marked as State's Exhibit No. 96.  And it's kind of hard to see, but does that kind of look like the shoe you gave to the officer?

A.    I remember the shoe being a light tennis shoe.

Q.    Now, I want to show you a series of photographs here, sir, State's Exhibits — marked State's Exhibits

Exhibit 5001 at 921

Messerle    D    D5 130

Nos. 222, 223, 224, 225, and 226 and ask if you can look at those photographs. And if you recognize the area portrayed in them?

A. I do.

Q. And does this show the area where you were driving that day and where you saw and found this shoe?

A. Yes. It's really my route home.

Q. I'll take those back.

MR. FRASIER: We would offer State's Exhibits Nos. 222 through 226 inclusive.

MR. McCREA: There's no objection, Your Honor.

THE COURT: They're received.

(Whereupon Exhibits Nos. 222, 223, 224, 225, and 226 were then received into evidence.)

Q. Mr. Messerle, I'm going to put up here on the screen, this is State's Exhibit No. 222. Can you see that over there?

A. I can.

Q. Now, this portrays a Shell gas station?

A. Yes.

Q. At the time, in 2000 was it a Shell gas station there?

A. It could've been a Chevron. I don't know when it changed. But it was a Chevron Station.

Exhibit 5001 at 922

Messerle   D    D5 131

Q.   And does it portray North Elm Street?

A.   If you were to turn up that street to your left.

Q.   And is that the route you went is up, turning left?

A.   Yes.

Q.   State's Exhibit No. 223.  Do you recognize that?

A.   I do.

Q.   What is this a picture of?

A.   It would be the opposite side of the street.  The gas station would now be to our — behind us — and you would turn right to go up Elm Street.

Q.   And would this show the way you were coming from the county shops?

A.   Yes.

Q.   You would have been driving on the — well, in this picture it would be the left side of the road?

A.   Yes.

Q.   Coming toward Elm Street?

A.   Yes.

Q.   This is State's Exhibit No. 224.  Can you describe that for us, please?

A.   That is looking straight up Elm Street from Central.

Q.   How far up Elm Street were you when you saw this shoe?

A.   The best I can tell you from that picture there, I think it would be about the second little shadow in the

Exhibit 5001 at 923

Messerle   X    D5 132

street.

Q.   This is State's Exhibit No. 225.  See if I can darken it some more.  Do you recognize that area?

A.   That would be about where I just stated.

Q.   All right.  And there's a laser pointer in front of you, sir.  A black object that's got a red diamond or triangle on top.  And that's the button to — no.

Would you point out where you found the shoe?

A.   Right about there.

Q.   Was it — where in the road was it?

A.   As I was coming up the road it's a narrow street. There's not really a right or left side.  And I was coming up more to the right of course.  And it would have been right in front of me.  So, it was to the right of the centerline.

Q.   This is State's Exhibit No. 226.  Could you point out again where you saw the shoe?

A.   There.

MR. FRASIER:   That's all the questions I have of the witness at this time, Your Honor.

THE COURT:   Mr. McCrea or Ms. McCrea?

MR. McCREA:   Oh, I'm sorry, Your Honor.

                    CROSS EXAMINATION

BY MR. MCCREA:

Q.   Mr. Messerle, when you pointed the laser, it appeared that you were pointing into what might be termed

Exhibit 5001 at 924

Messerle   X    D5 133

about halfway in between the centerline and the edge of the road on the right side.  Is that where you meant it to be?

A.   Yes.

Q.   And you were on a motorcycle, but you haven't given us much description what kind of motorcycle?

A.   It was a Honda Nighthawk, not a large bike.

Q.   Not a large bike.  Did it have a windshield?

A.   No.

Q.   Okay.  So you were out where you had a good view of whatever was on the road?

A.   Once I drove up to it, yes.

Q.   I beg your pardon?

A.   Once I drove up to it, yes.

Q.   Okay.  The shoe wasn't itself all that visible.  Is that a fair statement?

A.   When I picked it up I knew it was a shoe.

Q.   I didn't mean it that way.  I meant as you're driving down the road.  You saw something reflective?

A.   Yes.

Q.   Okay.  And it was a reflection rather than seeing a shoe that first caught your eye?

A.   Yes.  It was in my line of travel.

Q.   And that caused you to stop to see what it is is reflecting?

A.   Yes.

Exhibit 5001 at 925

Messerle   X   D5 134

Q.   And at that point you backed your bike up a bit to get to where the shoe was?

A.   I did not back up.

Q.   Oh, okay.  You stopped where the shoe was?

A.   Yes.

Q.   And I know it's been eleven years ago, but I — I need to ask this question.  Do you recall what position the shoe was in on the road?

A.   Whether the shoe was lying on its side or sitting straight up or — at all — I honestly do not recall.

Q.   All right.  That's what I meant.  That's what I'm driving at.

And do you recall whether the laces were tied or untied?

A.   I do not.

Q.   Now, in terms of how you dealt with the shoe, you just picked it up with your hands?

A.   Yes.

Q.   Now, you were riding a motorcycle, were you wearing gloves?

A.   I don't believe I was.

Q.   In any event, let's deal with how you dealt with the shoe further.  You took it — in terms of your taking it home. You took it home and the first thing you did was just put it on the kitchen floor?

Exhibit 5001 at 926

Messerle   X    D5 135

A.    Yes.

Q.    And did you do anything to alter or change it as you put it on the kitchen floor?

A.    My kids were in bed and I went straight to bed.

Q.    Did the shoe as you casually — well maybe.  Did the shoe as you observed it appear to be in good condition?

A.    Yes.

Q.    Did you notice any damage or, what I'm trying to say, smudges or anything on it?

A.    No.

Q.    All right.  Now, when was the next time you had occasion to take a look at the shoe?

A.    The next morning I asked my kids, before I left for work, if it was any of their shoes?  And they said, "No."

Q.    In the process of asking the kids about the shoe, was the shoe handled or just left where it was?

A.    I honestly don't know.  I don't know if any one of us picked up the shoe or just looked at it where it was on the floor.  If meant nothing at the time.

Q.    But, nobody tried to wear the shoe?

A.    No.

Q.    And then once — well, maybe I should go step-by-step.

None of your kids indicated it was their shoe?

A.    Correct.

Exhibit 5001 at 927

Messerle   X   D5 136

Q.   So, from that point until the time a police officer came, did the shoe just stay in one place?

A.   Yes.

Q.   Okay.  And you didn't do anything to change its condition?

A.   Nothing.

Q.   So, let's talk about the tied or untied.  As far as the tied or untied part, whatever it was, it was still the same as it had been when you turned it over to a police officer?

A.   Yes.

Q.   And as far as its condition, having to do with damage or smudges or anything like that, that remained the same as well?

A.   Yes.

Q.   Okay.  To the best of your knowledge and ability, then, you turned it over in the — the same condition you found it?

A.   Yes.

Q.   And, you got off work you think around eleven thirty?

A.   Yes.

Q.   I've seen in reports that you estimate that you found the shoe between eleven thirty-five and eleven forty. Does that seem about right?

Exhibit 5001 at 928

Messerle   X   D5 137

A.   I remember saying eleven thirty-three because I went straight home every night.  Shift work is the same every night.

Q.   I'm sorry I'm a poor — I have - - -

A.   I believe I said eleven thirty-three.  That's what comes to my mind.  And I don't remember anything other than that.

Q.   Eleven thirty-two?

A.   Eleven thirty-three.

Q.   Oh, eleven thirty-three.  Okay.  It didn't take you long to get from the shop - - -

A.   (Interposing) No.

Q.   - - - to where the shoe was?

A.   Exactly.

Q.   Okay.  But in any event, would it be fair to say that in your recollection you would have found the shoe, no question about it, by eleven forty-five?

A.   Yes.

MR. McCREA:   That's all the questions I have, Your Honor.

THE COURT:   Any redirect?

MR. FRASIER:   No, I have no redirect.

THE COURT:   You may step down, sir.  And you're free to leave.

MR. FRASIER:   Call Officer Oswald.

Exhibit 5001 at 929

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

STATE OF OREGON,                      )
                                      )
            Plaintiff,                )       CASE NO. 10CR0782
                                      )
      vs.                             )       JURY TRIAL
                                      ) DAY FIVE, Continued
NICHOLAS JAMES MCGUFFIN,              )
                                      )
            Defendant.                )
_____       )

TRANSCRIPT OF PROCEEDINGS

Volume 8, Pages D5 138 to D5 280

BE IT REMEMBERED That, the above-entitled cause came on regularly for hearing beginning at 9:19 a.m., Tuesday, July 12, 2011, in the Circuit Courtroom of the Coos County Courthouse in the City of Coquille, County of Coos, State of Oregon, before the Honorable Richard L. Barron and a jury.

APPEARANCES

R. Paul Frasier, District Attorney for Coos County, representing the Plaintiff.

Erica Soublet, Assistant District Attorney for Coos County, representing the Plaintiff.

Shaun McCrea, Attorney at Law, representing the Defendant.

Robert McCrea, Attorney at Law, representing the Defendant.

S. Jean Sprouse, Court Transcriber, XV Judicial District, 503-325-5254

Exhibit 5001 at 930

Oswald   D    D5 138

KIP OSWALD

was thereupon produced as a witness on behalf of the Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat here, please.

DIRECT EXAMINATION

BY MR. FRASIER:

Q.   Could you state your name please, sir, and spell your last name for the record?

A.   Kip Darwen Oswald, O-S-W-A-L-D.

Q.   What is your occupation, sir?

A.   I'm a police officer.

Q.   Who do you work for?

A.   I currently work for North Bend Police Department.

Q.   How long have you worked for the North Bend Police Department?

A.   Almost five years.

Q.   Prior to that did you work for another police agency?

A.   I worked for Hillsboro Agency for three and a half years and Coos County Sheriff's Office for twenty-three and a half years.

Q.   When did you work for the Sheriff's Office?

A.   Between '83 and 2006.

Exhibit 5001 at 931

Oswald   D    D5 139

Q.    Why did you leave the Sheriff's Office and then end up at North Bend Police Department?

A.    I retired but I had to go back to work because I couldn't afford the insurance.

Q.    In the summer of 2000 were you — who were you working for in the summer of 2000?

A.    Coos County Sheriff's Office.

Q.    In the month of July of 2000 had you become aware that there was a missing girl in the Coquille Area named Leah Freeman?

A.    Yes.  I found out the day of this occurrence.  And she had apparently gone missing the week prior.

Q.    Now, as part of that did you decide on your own to go and look at certain locations in the county to see if you could find her?

A.    Yes, I did.

Q.    Was there a particular location that you went to out towards the Fairview Area?

A.    Yes.

Q.    Where was that?

A.    I went out onto Lone Pine Lane and started checking roads off to the sides.  Ended up on Hudson Ridge.

Q.    Are you familiar with the Hudson Ridge Road Area?

A.    Yes, I am.

Q.    In your capacity as a Deputy Sheriff, have you gone

Exhibit 5001 at 932

Oswald   D    D5 140

out there a lot?

A.    Many times.

Q.    Why is that an area you patrol frequently?

A.    I did, because I've often found places where there have been parties and stuff at the particular location that I went to where there'd been fires.  And you'd often see a lot of evidence of drinking and drugs going on there.

Q.    Had you also seen areas where there had been illegal garbage dumping?

A.    Yes.

Q.    Now, directing your attention, I believe it's to July the 5th of the year 2000.  Is that the day that you went up Hudson Ridge?

A.    Yes.

Q.    And could you describe where you went up the Hudson Ridge Road?

A.    I turned off Lone Pine Lane and went up.  It's approximately three hundred, four hundred yards up to a road that goes off to the left which is an access road to the power lines.  And it drives up, oh I guess it's probably seventy-five yards, and goes underneath the power lines.

Q.    As you're driving up this road did you see anything that your attention was drawn to?

A.    Yes.  I got up to where there's a ninety degree turn in the road.  And it's just prior to the top of that road.

Exhibit 5001 at 933

Oswald   D   D5 141

And there was a shoe lying the road.

Q.   Now, is this before you get to the power lines or after the power lines?

A.   It's just before you go under the power lines, yes.

Q.   I'm going to — can you describe this shoe that you saw, sir?

A.   It was a white Nike tennis shoe, women's.  I believe it was size six.

Q.   Let me just show you what's been marked - - -

A.   (Interposing) Yes.

Q.   - - - as State's Exhibit No. 97.  Does that look like the shoe you found?

A.   All I can see is that little bit in there of the shoe, but it's been awhile.  I think it is, yes.

Q.   Now, let's talk about where you found the shoe. Prior to coming into court today, this CD I have here is marked State's Exhibit No. 227.  Did you watch this particular CD?

A.   Yes, I did.

Q.   And is this a video showing going up Hudson Ridge Road to where you found the shoe?

A.   That's correct.

Q.   And does it accurately portray what you saw that day or the area at least?

A.   Yes.

Exhibit 5001 at 934

Oswald   D   D5 142

MR. FRASIER:   Your Honor, at this time we'd offer State's Exhibit No. 227, video only.  There's no audio with this.

MR. McCREA:   We do object to No. 227.  It's a re-enactment as I understand it, Your Honor.  And it's the Defendant's position that it is not in a very real sense a natural display of precisely how the area appears and how the finding occurred.

THE COURT:   When was the tape taken?

MR. FRASIER:   When did we?

WITNESS:   The tape was made approximately two and a half weeks ago.

THE COURT:   You might ask him if there's — what differences if any there are.

Q.   Is there any differences in the conditions of the road or the area where the shoe was found?

A.   There has been a little bit of logging near the top where some trees have been fallen.  The road itself appears to be the same other than, at the time that I was going up there, there was some garbage dumped off to the left hand side that's not there in the pictures.

THE COURT:   The Objection's overruled.  The exhibit will be received.

(Whereupon Exhibit No. 227 was then received into evidence.)

Exhibit 5001 at 935

Oswald   D    D5 143

THE COURT:   Just keep in mind that it was taken two and half weeks ago.  And it's just to show you the area that he is talking about.

Will you be questioning the witness during the showing of this?

MR. FRASIER:   I was going to ask him to describe what is - - -

THE COURT:   (Interposing) That's fine.

I just wanted to make sure we kept the recording going.

Go ahead.

Q.   Officer, as this is playing could you describe it for us, please?

A.   This is looking at Lone Pine Lane.  And these two access roads to the right and the left of this car are actually Hudson Ridge, the access also off of Lone Pine.

This is starting up Hudson Ridge.

What this is going to do is going to show you from Lone Pine all the way up to the point where I located the shoe.

Where we turn off to go onto the access road up underneath the power lines.  I actually get out and walk and he follows me up there.

Now you see the start of the logging road there and the access road to the left there.  Those trees and stuff over

Exhibit 5001 at 936

Oswald    D    D5 144

there were not logged at the time that this occurred.

This corner, in 2000 there was garbage along that corner and back into the trees a little bit.

When I came around this corner right here, I saw the show laying in the road. And I'll point to where the shoe is here — it was — in a minute.

Q. Are you standing there? Is that where the shoe was?

A. That's where I was pointing on that — the right side, the middle of the road.

What he's doing here is just showing the area. It's pretty much the same except right at the very top of the picture you can see that there were some trees that were there.

Q. What did you do with the shoe that you found?

A. I picked it up and I took it back to Coquille. At the time that I came into town the FBI in Coquille were running a road block where they were checking cars that had come through on that same day the week prior to ask them if they had seen anything. And I asked them if they knew what size that she wore.

They weren't sure at that time. And I showed them the shoe. They said that it appears to match another one that they had and asked me to put it into evidence.

Q. And so you turned it over to the Coquille Police Department?

Exhibit 5001 at 937

Oswald    D    D5 145

A.    No.  I turned it into evidence at Coos County Sheriff's Office.

Q.    And to the best of your knowledge was it then turned over to the Coquille Police Department at a later time?

A.    It was later turned over to them, yes.

Q.    Now, when you found the shoe, do you recall what its position was on the road?

A.    It was laying sideways.  I remember being able to see that it was white when I pulled up there.  So it had to have been laying on its left side.

Q.    And do you recall the condition of the laces, anything along that line?

A.    I believe it was — they were untied.

Q.    Now, when you picked the shoe up, did you pick it up with your bare hands or did you put some gloves on?

A.    I picked it up with my bare hands.

Q.    Later on it was determined there was some male DNA on that shoe?

A.    And it was mine, yes.

Q.    And you gave a sample and they determined it was your DNA?

A.    That's correct.

Q.    Now, did you go back up?  After you turned the shoe in, did you go back up there a couple days later to look around to see if you could find any more evidence up there?

Exhibit 5001 at 938

Oswald    D    D5 146

A.    I did.

Q.    And in particular did you go up there on July — I believe the 7th of 2000?

A.    Yes, I did.

Q.    I'm going to show to you what's marked as State's Exhibit No. 236 which has previously been identified as a receipt in the name of Raymond Lewis.  Do you recognize that, sir?

A.    Yes, I do.

Q.    Did you find that receipt on July the 7th?

A.    Yes, I did.

Q.    Where did you find that receipt?

A.    In the photographs when I said that we'd be turning onto the road that was the access road off of Hudson Ridge Road and I was pointing out where the trees were that were cut.  If you go straight there and you go about a hundred yards to a hundred and fifty yards there's a road that takes off to the left.  And there had been a vehicle that had — vehicle tire track that had spun out there.  And it looked like somebody had turned around there.  And I saw this laying in the road.  And since somebody had appeared to have gotten out of a vehicle at that location and had spun out I picked up the receipt and then checked the area to make sure that there wasn't something else there.

Q.    And how far away was this receipt from where you had

Exhibit 5001 at 939

Oswald   X   D5 147

found the shoe?

A.   Hundred to hundred and fifty yards.

Q.   Is that a straight line as the crow would fly?

A.   It would be down — it would be down over the hill from the top of the hill underneath the power lines down to that other road.

MR. FRASIER:   Your Honor, we'd offer State's Exhibit No. 236.

MR. McCREA:   No objection.

THE COURT:   No. 236 is received.

(Whereupon Exhibit No. 236 was then received into evidence.)

MR. FRASIER:   I don't believe I have any further questions for the witness at this time.

THE COURT:   Cross.

CROSS EXAMINATION

BY MR. MCCREA:

Q.   It's Officer Oswald now.  Is that correct?

A.   Yes.

Q.   I tried to listen carefully, but forgive me if I'm redundant of some of what you said.

You went up this access road.  And this goes up to the power line itself.  Is that correct?

A.   Yes.  It goes up underneath the power lines and then drives — actually, if you go to the left, drives out a little

Exhibit 5001 at 940

Oswald   X    D5 148

bit farther underneath there.

Q.   And in the video you're walking up there.  But the road is a road that you could drive a vehicle up there.  Is that correct?

A.   That's correct.

Q.   Pardon?

A.   That's correct.

Q.   Okay.  And you walked up the road for the video in order to get the best display you could of what the road was like?

A.   Yes, sir.

Q.   All right.  Now, dealing with the receipt which is now in evidence as No. 236, if you don't go up this access road, the road goes — Hudson Ridge Road — goes on — I don't know, it seems to me like it's east.  But it may be some other direction for a ways to where you found the receipt.  Is that correct?

A.   That's correct.

Q.   And you found the receipt where there's a branch in the road?

A.   There's a road that takes off to the left.  And it was just probably ten to fifteen feet this side of that road.

Q.   Of where the branch takes off to the left?

A.   Yes.

Q.   Okay.  Was there anything else around the receipt?

Exhibit 5001 at 941

Oswald   X   D5 149

A.   Just the evidence of somebody backing up to the edge of the road and then where their tires spun out.

Q.   And that's — did you talk about that before that I just wasn't able to hear?

A.   Yes.  I think I explain it just a little different, but I did, yes.

Q.   Somebody had back up, tires had spun, and then - - -

But, aside from this disturbance on the road, were there any other items that looked like they may have fallen out there?

A.   No.

Q.   Now, going back to the access road.  Did you then later go back to the access road where you found the shoe and make a further examination?

A.   Yes, I did.

Q.   And at that time did you find two spent — that is to say fired — twenty-two cartridge cases?

A.   I think I did.  Are you referring to one of my reports?

Q.   Yes, yes.

A.   Which one are you referring to?

Q.   I'm not — let me - - -

MR. McCREA:   May I approach?

THE COURT:   You may.

Q.   This is what I was looking at.

Exhibit 5001 at 942

Oswald   X    D5 150

A.    Okay.  So we're on the — is it this?  Yeah, I think this is just the — I have the observations.  I don't have that part.  Yes, sir.

Q.    Does that bring back a memory?

A.    Yes, it does.

MR. McCREA:    So, forgive me.  I'll go back.

Q.    Without having to go to the trouble of prevailing of Mr. Frasier to put the video back up, were the twenty-two — spent twenty-two cartridges found in the general area where you have indicated on the video you found the shoe?

A.    Yes.  All of these items were.  And that's why I picked them up, just in case they may of some evidentiary value.

Q.    And, in that same area did you also find some items that you describe as being three napkins or towelettes?

A.    Yes, I did.

Q.    With regard to the napkins or towelettes, did you make a note of the fact that they had been there when you had found the shoe previously, there in this same area?

A.    I didn't know that.  Just the age of them appeared that they could have been and that's why I picked them up.  I didn't notice whether they were or not at the time.

Q.    Well, I — would you please look at Page 2 of your report under observations.  And look at the third paragraph there please?

Exhibit 5001 at 943

Oswald   X    D5 151

A.    I don't remember that in my memory, but I did put down there I noted that they were at that location when I found the shoe.

Q.    Okay.  And I don't mean to belabor the issue, but that's part of being a police officer, is to make reports?

A.    Absolutely.

Q.    And the reason that you do it is to get it down accurately at the time that it's known to you as to what happened?

A.    That's correct.

Q.    Okay.  And so is it fair to say that you put it in the report that those were there when you found the shoe, that's that the fact, that they were there when you found the shoe?

A.    Yes.

Q.    Okay.  So, you seized those.  Is that right?

A.    Yes, I did.

Q.    And in addition — well, I don't know about in addition.  But in conjunction with seizing those napkins or towelettes, they had some residue on them according to your report?

A.    Yes.  There's an unknown residue.

Q.    I'm sorry, what kind of residue?

A.    Yes.  It was an unknown residue.

Q.    Okay.  You didn't know what it was?

Exhibit 5001 at 944

Oswald    X    D5 152

A.    No.

Q.    And it's not your job to do analysis to try to find out what it is?  I mean, that's not part of your patrolman job?

A.    No.  It's just my job to send it to the lab to find out what it is if that's - - -

Q.    (Interposing) Okay.  How did you handle these items? By that I mean you had picked up the shoe with your hands, but how did you go about processing the napkins or towelettes with the residue?

A.    I don't remember.

Q.    Excuse me?

A.    I don't remember.

Q.    Okay.  What about the cartridges?  Do you remember how you handled them?

A.    I don't.

Q.    Well, let me ask you this.  Do you have a standard procedure as to how you — well, strike that.  Let me back up.

By the time you found the napkins or towelettes with the residue, had you become aware that this shoe you found was probably the shoe from the missing Leah Freeman?

A.    Yes, I had.

Q.    Okay.  So, it's fair to say that things that were to be found in this area you now knew were important?

A.    They could be, yes.

Exhibit 5001 at 945

Oswald   X    D5 153

Q.   Okay, that's fair.  It could be important.  So, would it have been a standard police procedure to try to handle these items — by these items I'm referring to the spent twenty-two cartridges and the three napkins or towelettes with residue — in a way that would preserve the sanctity of their nature?

A.   It should be.  But the only thing I'm saying is, I don't remember.

Q.   Pardon?

A.   The only thing I'm saying is I don't remember exactly how - - -

Q.   (Interposing) Oh, I understand that.

A.   - - - I picked them up.

Q.   I'm just asking you - - -

A.   (Interposing) I don't know if I picked them up with a pen or whether I had gloves on or — I just don't remember that part right now.

Q.   That would have been proper police procedure.  Right?

A.   Yes.

Q.   Okay.  And that's normally what's used when you're trying to keep — when you know that evidence could be important?

A.   That's correct.

Q.   Okay.  Now, what did you do with these items after

Exhibit 5001 at 946

Oswald     X     D5 154

you seized them?

A.    I took them to the Coos County Sheriff's Office and they were placed into evidence.

Q.    Now, when you place them in evidence they are registered in, in some manner?  Is that correct?

A.    Yeah.  They're placed on a card.  You put what Item No. 1 is; Item No. 2.  And then you mark them on the bags and make sure everything is marked so it coincides with the card so they know what's in evidence with that case.  It's got the case number on it.  And it's placed into evidence in the box.

Q.    You — and then they're preserved in a sealed bag?

A.    They're in a bag where there's tape put on the outside of the bags or staples and/or.  And then they're placed into a locked box.

Q.    Okay.  And that's done to preserve them?

A.    Yes.

Q.    Now, do you know what was done to process those items to see what if anything could be derived from them?

A.    I do not.  I was not privy to any of the things that were sent in or what was examined.

Q.    Have you seen them here today?

A.    I saw the shoe.  And I don't know what else was in the bag.

Q.    No, I'm — the twenty-two cartridges and the napkins or towelettes?

Exhibit 5001 at 947

Oswald   X   D5 155

A.   No.  I haven't seen those.

Q.   Not seen those.  After you checked them into evidence did you ever see them again?

A.   No.

Q.   And did anyone ever interview you and talk to you about where you had obtained those and what the — you know, and their circumstances, such as the fact that they had been there when you found the shoe?

A.   I - - -

Q.   (Interposing) By anyone, I mean law enforcement person?

A.   I don't remember a conversation of that.

Q.   The video we saw here, it probably was said, but I didn't catch it.  When was that made?

A.   About two and half weeks ago.

Q.   Two and a half weeks ago?

A.   Yes, sir.

Q.   When you were up there, it was in July of 2000.  Correct?

A.   That is correct.

Q.   And it was — it was dry that summer, was it not?

A.   I remember that evening as being very warm.

Q.   Excuse me?

A.   I remember that evening being very warm.  I don't know how the whole summer was, but it was dry that day, yes.

Exhibit 5001 at 948

Oswald   X    D5 156

Q.   Well, let me get at it this way, to get to the point.  The road was dry up there?

A.   Yes, it was.

Q.   You didn't have any traction problems?

A.   No, I did not.

Q.   You didn't see any mud?

A.   No.

Q.   And that includes down where the receipt was found.  You didn't see any mud down there?

A.   No, I don't believe so.

Q.   And there was some dampness showing on the video.  That's what's there now or at least when it was made.  So, it's not quite the same as when you made it.  Right?  I mean, as when you were there?

A.   Yeah.  If it was damp, it wasn't damp then.  No.

Q.   Pardon?

A.   It wasn't damp then, no.

Q.   Okay.  That's all I'm trying to get at.

Then, was the - - -

MR. McCREA:   May I have just a moment, Your Honor?

THE COURT:   Go ahead.

Q.   Oh.  In the property list I'm looking at it indicates there were some photographs made of the evidence.  Is that correct?

Exhibit 5001 at 949

Oswald   ReD  D5 157

A.   That is correct.

Q.   Did you do that?

A.   Yes, I did.

Q.   And the photographs you made, did they give a good representation as to what the evidence looked like?

A.   Yes.

Q.   Have you seen the photographs here today?

A.   No.

Q.   Thank you Officer Oswald.  Thank you very much.

THE COURT:   Redirect.

REDIRECT EXAMINATION

BY MR. FRASIER:

Q.   Officer Oswald, Hudson Ridge Area, is that known as an area where people go to party?

A.   Yes.

Q.   Is there locations up there where people go what's sometimes referred to as mudding?

A.   Yes.  In fact, right up at the top of that hill there's a hill that goes down to the Hudson Ridge Road that's been used a lot for mudding, in particular.

Q.   Is there a particular location where actually there's a stream or a river that runs across the road?

A.   There is down below where it goes back onto Middle Creek.  There's a portion of road that cuts back and goes back down to Middle Creek.

Exhibit 5001 at 950

Oswald  ReD  D5 158

Q. And is that wet or muddy year round?

A. Yes, it is.

Q. Now, in regards to these twenty-two shells, where were they found?  How far were they away from where you found the shoe?

A. In the general proximity.  There's — if I were to estimate, probably ten feet each side of — maybe fifteen feet each side of where I found the shoe, I located these items.

Q. And, these towelettes, where were they in relation to the shoe?

A. Same general area.

Q. Were they with the twenty-two shells or - - -

A. They were just items that were in the area that were — they were kind of spread around that I picked up that were there.  I thought maybe could be evidential value.

Q. Now, in your experience as a deputy up there, have you seen people target shoot and things like that up there?

A. Yes.  There's quite often shell casings and garbage there.

Q. And you indicated earlier that there was actually a pile of garbage?

A. Yes.  It was pretty common to go up there on that particular corner that I was pointing out.  And there would be actually truckloads of garbage there.  And at that time there was garbage.

Exhibit 5001 at 951

Ulmer    D    D5 159

Q.    How far away was the garbage from where you found these towelettes and stuff like that?

A.    Probably twenty-five feet.  It would have been right behind where I was standing and I was — well, it would have been to my right when I was standing pointing down at the ground.

Q.    Thank you.

            MR. FRASIER:    That's all I have.

            THE COURT:    You may step down and you're free to leave.

            WITNESS:    Thank you.

            THE COURT:    Call your next witness.

            MR. FRASIER:    Call Randy Ulmer.

                        RANDY ULMER

was thereupon produced as a witness on behalf of the Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

            THE COURT:    Have a seat here, please.

                    DIRECT EXAMINATION

BY MR. FRASIER:

Q.    Could you state your name please, sir, and spell your last name for the record?

A.    Randy Ulmer, U-L-M-E-R.

Q.    Mr. Ulmer, what is your current occupation?

Exhibit 5001 at 952

Ulmer    D    D5 160

A.    Currently I work at a hardware store.

Q.    Previously you were employed by the Coquille Police Department?

A.    That's correct.

Q.    How long were you with the police department?

A.    Approximately ten years.

Q.    I don't mean to be embarrassing to you, but there's a couple things I need to ask.  While you were working for the police department did you have a gambling problem?

A.    Yes, I did.

Q.    And it got out of control?

A.    Yes, it did.

Q.    While you worked for the police department were you in charge of the evidence locker?

A.    Yes, I was.

Q.    And as part of your gambling problem did you remove some money from the - - -

A.    (Interposing) Yes, I did.

Q.    And you were subsequently prosecuted for Theft in the First Degree?

A.    I was.

Q.    You plead guilty to that?

A.    Yes, I did.

Q.    Resigned your position with the police department?

A.    Yes, I did.

Exhibit 5001 at 953

Ulmer   D    D5 161

Q.   Now, I want to go back to the year 2000.  Were you working as a police officer then?

A.   Yes, I was.

Q.   And you became aware in the late June, early July that there was a missing girl here in Coquille?

A.   That's correct.

Q.   And that would have been Leah Freeman?

A.   Yes.

Q.   Now, are you familiar with Tony Messerle?

A.   Yes, I am.

Q.   How do you know Mr. Messerle?

A.   Well, I met Mr. Messerle a few times in my life. One particular occasion I — he had called in and found an item on North Elm Street which was a shoe, which was possibly Leah Freeman's shoe.

Q.   Did you go to his residence?

A.   Yes, I did.

Q.   Did you recover that shoe?

A.   I did.

Q.   I'm going to show to you what's marked as State's Exhibit No. 96.  And looking at the tags there and so forth can you identify that shoe?

A.   That appears to be the correct one.

Q.   And you took that from Mr. Messerle at that time?

A.   Yes.

Exhibit 5001 at 954

Ulmer   X   D5 162

Q.   And you placed it at the Coquille Police Department?

A.   Yes, I - - -

Q.   (Interposing) In the evidence locker?

A.   Yes.

Q.   Did you have contact with Deputy Kip Oswald?

A.   Um, I believe I did.

Q.   Did Deputy Oswald discuss with you about having found a shoe up on Hudson Ridge?

A.   I honestly don't recall.

Q.   All right.

MR. FRASIER:   I don't believe I have any further questions for Officer or Mr. Ulmer, Your Honor.

THE COURT:   Ms. McCrea.

CROSS EXAMINATION

BY MS. MCCREA:

Q.   Mr. Ulmer, when did you receive the shoe, Exhibit No. 96 from Mr. Messerle, what day?

A.   If I can refer to my reports?

Q.   Of course.

A.   I don't believe I have a copy of that one.

Q.   Well, I can show you what I have, but it may not be helpful in terms of the date.

A.   I believe it was June 28th, 2000.

Q.   Okay, so — June 28th?  That's the day that Ms. Freeman went missing.

Exhibit 5001 at 955

Ulmer    X    D5 163

A. Okay.

MS. McCREA: Mr. Frasier, are you prepared to assist?

MR. FRASIER: Yes. July the 4th, 2000 is the date on the tag.

A. That would be the correct date, then.

Q. Thank you.

A. Thank you.

Q. And to obtain the shoe you had received information from dispatch that there was a shoe that you needed to go pick up or an item you needed to pick up?

A. Correct.

Q. So, you went to Mr. Messerle's residence. Is that right?

A. That is correct.

Q. Made contact with him and he gave you the shoe?

A. That's correct.

Q. At the time that you first saw the shoe was it sitting on his kitchen floor?

A. I believe he met me outside with the shoe.

Q. So, he carried it out and handed it to you?

A. I believe.

Q. And did he have it in his bare hands?

A. I don't recall how he was handling it at the time.

Q. I understand. It's been a long time ago.

Exhibit 5001 at 956

Ulmer    X    D5 164

A.    Quite awhile.

Q.    When you took possession of it were you wearing gloves or were you bare handed?

A.    I was wearing gloves at the time.

Q.    You were wearing gloves.  And then you put it in a bag?

A.    Yes.

Q.    Okay.  And to your knowledge that was then logged into evidence and submitted for analysis?

A.    Correct.

Q.    And there was no indication as far as you know that Mr. Messerle's DNA was found on that shoe?

A.    Not that I know of, no.

Q.    Thank you.

MS. McCREA:    Nothing further, Your Honor.

THE COURT:    Any redirect?

MR. FRASIER:    I have no further questions, Your Honor.

THE COURT:    You may step down.  You're excused; free to leave.

WITNESS:    Thank you, Your Honor.

THE COURT:    Call your next witness.

MS. SOUBLET:    State calls Jennifer Storts.

MS. McCREA:    Excuse me, Your Honor.

Actually Mr. Ulmer is under Defense subpoena,

Exhibit 5001 at 957

Storts   D   D5 165

but he doesn't need to be — remain here now.

THE COURT:    Do you want him back, though?

MS. McCREA:    I want him back at some point, but we'll make arrangements with him.

THE COURT:    Okay.

Mr. Ulmer, you're not excused from the case. So, make sure that Ms. McCrea or a representative of her office is aware of how they can get a hold of you. I don't think it's like fifteen minutes notice, but it will be half a day or some type of notice like that.

MS. MITCHELL:    Yes.

WITNESS:    (Not understandable.)

THE COURT:    Okay. That's fine.

Step forward, please, Ms. Storts.

JENNIFER STORTS

was thereupon produced as a witness on behalf of the Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat up here, please.

DIRECT EXAMINATION

BY MS. SOUBLET:

Q.    Ms. Storts, can you state your full name and spell your last for the record?

A.    It's Jennifer Lee Storts, S-T-O-R-T-S.

Exhibit 5001 at 958

Storts    D    D5 166

MS. SOUBLET:    You can actually pull that microphone down.

THE COURT:    (Not understandable.)

WITNESS:    Okay.  Perfect.  There we go.

MS. SOUBLET:    I'm going to ask you to keep your voice up to make sure that everybody can hear you.

WITNESS:    Okay.  Not a problem.

Q.    Ms. Storts, how are you employed?

A.    I'm the lab manager at Coquille Valley Hospital.

Q.    How long have you been at Coquille Valley?

A.    At least eleven years.

Q.    Were you working there in the summer of 2000?

A.    Yes, I was.

Q.    And what was your position at that time?

A.    At that time I was just a generalist.

Q.    Okay.  Working in the lab?

A.    Working in the laboratory, yes.  I was an MT.

Q.    Do you know Kathy McGuffin?

A.    Yes, I do.

Q.    How do you know her?

A.    She also works with me in the radiology department.

Q.    Are you aware or do you know what type of car Ms. McGuffin drove in the summer of 2000?

A.    Yes, I believe so.

Q.    And what was that?

Exhibit 5001 at 959

Storts   D    D5 167

A.    She drove like a step-side truck.

Q.    A pickup?

A.    Pickup, yes.  I'm sorry.  A pickup with a step-side.

Q.    Ms. Storts, I want to turn your attention to June 28th, June 29th, 2000.  Were you working that day?

A.    I was working that evening, yes — that day and evening.

Q.    Okay.  Were you working a regular shift or an on-call shift?

A.    An on call shift.

Q.    Which means what?

A.    Which means basically you work so many hours.  And then if somebody comes into the ER or an in-patient needs some lab work, they call us back into the hospital.  And we do thing then and then we go back home afterwards.

Q.    Are you required to keep some sort of track of your hours when you're called in on on-call hours?

A.    Yes, we are.

Q.    How do you do that?

A.    Basically when we enter the hospital we write down the time that we were there, the patient that we drew, and then we also — when we go to leave — we write down that time that we leave the hospital again.

Q.    And are those records kept in the normal course of Coquille Valley Hospital business?

Exhibit 5001 at 960

Storts   D   D5 168

A.   Yes, they are.

Q.   Ms. Storts, I'm going to hand you what's been marked for identification purposes as State's Exhibit No. 240 and ask you if you recognize that?

A.   Yes.  That's my call log sheet for June of 2000.

Q.   How do you recognize that as being yours?

A.   Well, first off my maiden name is Jennifer DeBord. And that's my handwriting.  And my name's at the top.

MS. SOUBLET:   We'd offer State's Exhibit No. 240.

MR. McCREA:   There's no objection.

THE COURT:   Received.

(Whereupon Exhibit No. 240 was then received into evidence.)

Q.   Ms. Storts, in looking at Exhibit No. 240, can you tell me what time you got off at Coquille Valley Hospital on June 28th?

A.   Five minutes after midnight.

Q.   And where were you living at that time?

A.   I was - - -

MR. McCREA:   (Interposing) Excuse me.  I couldn't - - -

I'm sorry, Your Honor, this witness is speaking very quickly.  And I'm having difficulty hearing what she's saying.  I didn't catch the time.

Exhibit 5001 at 961

Storts   D    D5 169

WITNESS:    I'm sorry, sir.

Five minutes after midnight.

MR. McCREA:    Thank you very much.

Q.    Where were you living at that time?

A.    I was living exactly at the eight mile marker out Fairview.

Q.    So, when you got off shift from Coquille Valley, how did you go home?

A.    I actually take, like, the back road that will take you out onto Fairview Road, right by Milky Way Feed and Pack. And then I drive Fairview Mountain home.

Q.    And while driving out on Fairview Mountain after midnight on, which would now be June 29th, 2000, did you see someone?

A.    I came around the corner as I was going up Fairview Mountain.  And it startled me because I was exhausted and driving home.  And I came around the corner and saw two males and a short female.  The males were on each side of her walking up Fairview Mountain.

Q.    Do you remember where on Fairview Mountain Road that was?

A.    Approximately, yes.  We took some pictures of the spot.  There had been some changes because the road had sluffed off since 2000.  And they'd had to do some reconstruction of the road.  But, yes.

Exhibit 5001 at 962

                                    Storts   D    D5 170

Q.   And what mile marker is it closest to?

A.   I couldn't tell that off the top of my head.  Sorry.

Q.   Do you remember talking to detectives last year when this case was reopened?

A.   Yes.

Q.   Do you remember possibly telling them that it was closer to mile marker four?

A.   Well, it was — what I had told them is it was where Carol Major used to live.  That's how I had told them, and they came up with mile marker four, because I know where her driveway was.

Q.   And I take it you'd been out there with somebody and took pictures?

A.   Yes.

Q.   And when was that?

A.   Some time last year.

Q.   That was near mile marker four?

A.   Yes.

Q.   And what was the road like in 2000?

A.   You mean — well, there was an actual — a little bit of an shoulder where somebody could walk along that side of the road.  If that's what you mean.  I'm a little confused by your questions.

Q.   That is what I meant.

A.   Okay.

Exhibit 5001 at 963

Storts   D   D5 171

Q.   Whether or not there was a shoulder?

A.   There was a shoulder at that time.

Q.   Where were the people when you saw them?

A.   They were on the side of the road walking up Fairview Mountain.

Q.   So, on the same side as you're driving?

A.   Absolutely, yes.

Q.   And did you notice anything about — well, first of all how could you tell they were two men and a woman?

A.   I would just say by basically what they were wearing.  They were wearing dark hoodies.  They both had their hoods up.  Basically body structure would be the only way that I could definitively tell you if they were men or not.  That would be it.

Q.   If I understand correctly, you consider somebody who watches people.  Is that right?

A.   I — well, yes, I'm in the — you know, I see people everyday.  And I see a lot of people, yes.

Q.   What if anything did you notice about the girl?

A.   The girl was shorter than the two guys, had very distinct, very blonde hair.

Q.   Did you notice anything else about her?

A.   That would be about it.

Q.   Do you remember telling Detective Asmus (phonetic) and Detective Andrews that she was skinny and appeared to be

Exhibit 5001 at 964

Storts   D    D5 172

slouched down?

A.   Yes, yes.

Q.   You know Brent Bartley?

A.   I do know Brent Bartley.

Q.   How long have you known Brent Bartley?

A.   I basically can't remember not knowing him because I've been very good friends with his sister for most of my life.

Q.   So, in 2000 you would have known him for a period of time?

A.   Yes.

Q.   How often would you think you'd seen Brent Bartley?

A.   I don't know.  In the last year or in my lifetime?

Q.   In 2000?

A.   In 2000?

Q.   Quite a bit?

A.   Well, I can't really tell you I saw him a lot in 2000.  I can't remember that many years ago.  I'm sorry, but — I mean, I've seen, but I couldn't tell you how many times.

Q.   Do you remember telling Detective Andrews and Detective Asmus that the stature of one of the two men and the way the person was walking appeared to be Brent Bartley?

A.   Yes.  I said I could not rule him out.

Q.   What about the other guy?

A.   Approximately the same height.  That's all I can

Exhibit 5001 at 965

Storts   D    D5 173

tell you.  Same type of stature.

Q.    After seeing those three people on — off of the road, what did you do?

A.    Well, at first — like I had originally said, they startled me.  And so then when I kinda got my wits back about me, I thought to myself, "Well, maybe I need to turn around and find out if they need help," because you don't usually see somebody walking on Fairview Mountain at that time.  And as I came around the next corner that's when I saw a vehicle.  And that's when I determined that they had a vehicle, therefore I didn't need to stop and see if they needed help.

Q.    And when you came around the corner, how far away was the vehicle from where you saw the people?

A.    I — you know what — a hundred yards, a hundred fifty yards, something like that.

Q.    What type of vehicle was it?

A.    All I could tell the detectives was that it was a pickup truck.  And it was not normal as far — it was not a normal large pickup truck.  It was not a little pickup truck.  It was — all that sticks out in my mind is that it was unusual.  And that is all I can tell you.

Q.    Did you — when did you become aware that Leah Freeman was missing?

A.    It was in the papers.  I mean, whenever it was in the papers and the radio.  The next day, the day after.  I

Exhibit 5001 at 966

Storts   D   D5 174

don't know.

Q. And did you attempt to relay what you saw to Coquille Police?

A. Yes, I did.

Q. Who did you tell?

A. I told Chief Reaves.

Q. How was Chief Reaves' reaction to your information?

A. He — he didn't — he basically made me feel like an idiot for coming forward. He wanted to know what this piece of paper was and asked me — flat out asked me, "Well, why are you giving this to me?"

And I said to him, "I'm giving this to you to prove what time I left the hospital. And nothing else was ever done."

Q. Was there a time when — was there a time when you told the police again?

A. Yes.

Q. When was that?

A. I also at the time — well, when the case was reopened, worked with Nicky Daniels. And when it came out on the news that they were reopening the case and that they had re-interviewed witnesses, I asked Nicky, I said, "Well, do they need to see me?"

And she said, "Well, what for?"

And that's when I told her about the night that I

Exhibit 5001 at 967

Storts   D    D5 175

was on call.

And she said, "They know nothing about that."

Q.   And you were interviewed the next day?

A.   And I believe it was the next day, yes.

Q.   Do you know what the relationship of Kathy McGuffin is to the Defendant?

A.   I do now, yes.

Q.   What is that?

A.   That Kathy is Nick's mother.

Q.   And sometime after you saw the people on Fairview Road back in June — June 29th, 2000, did you have an opportunity to observe Ms. McGuffin in a pickup in the parking lot of the hospital?

A.   Yes.

Q.   And did you notice anything different about her tires?

A.   That — I am not comfortable answering that question.

Q.   Do you remember telling Detective Asmus and Detective Andrews - - -

A.   (Interposing) I told them that there were rumors - - -

Q.   (Interposing)  I'm not asking — let me interrupt you.  I'm not asking about rumors.  I'm asking you if you observed Ms. McGuffin's tires?

A.   Yes.

Exhibit 5001 at 968

Storts   X   D5 176

Q.   Did those tires appear to be new?

A.   Yes, they did.

Q.   Thank you.

MS. SOUBLET:   I have nothing further.

THE COURT:   Mr. McCrea.

MR. McCREA:   Well, yeah.  (Not understandable.)

CROSS EXAMINATION

BY MR. MCCREA:

Q.   You looked at Ms. McGuffin's pickup since that time, as I understand what you're saying to Counsel.  Is that correct?

A.   Since what time, sir?

Q.   Since the time that you saw the matter of the people and the pickup out on Fairview Mountain?

A.   Uh huh.  That next week, yes.

Q.   And you never — you never told or identified the pickup as Mrs. McGuffin's pickup.  Isn't that true?

A.   That's correct.

Q.   Okay.  And you don't identify it as her pickup now?

A.   I cannot tell you that for sure, no.  That was eleven years ago and - - -

Q.   (Interposing) Okay.  And it was a small pickup as the same type as Mrs. McGuffin has?

Exhibit 5001 at 969

Storts   X    D5 177

A.   I can't even tell you that for positive.  What I can tell you is that it was an unusual pickup; and it was not a normal small pickup; and it was not a normal large pickup.

Q.   It was - - -

A.   (Interposing) It just sticks — it just sticks out my brain as being unusual.  That's the only thing my brain will tell me now at this point, is that it was unusual.

Q.   Well, as I understand what you're saying, you don't tie it together as being Mrs. McGuffin's pickup at this point?

A.   I cannot tell you for positive that it was, no.

Q.   All right.  Now, as far as the person.  Two people had hooded sweatshirts on?

A.   Correct.

Q.   And they had the hoods up on the hooded sweatshirts?

A.   Correct.

Q.   And you saw no faces of either of those people?

A.   I saw no faces.

Q.   And they were about the same height, both of them?

A.   Approximately, yes.

Q.   Okay.  And the — so, those persons could have been females also with hoods up on the sweatshirt?

A.   It is possible.  I did not see faces.

Q.   Yeah, right.  Okay.  And then the person in the center, you thought was a female because the person had long hair?

Exhibit 5001 at 970

Storts    X    D5 178

A.    I did not say that she had long hair.  The only thing that sticks out to me is that it was very blonde hair.

Q.    Oh, blonde.  I misunderstood.  Beg your pardon.

The person had blonde hair?

A.    Yes.

Q.    Was it long or short?

A.    I can't tell you that.

Q.    All right, so it could have been - - -

A.    (Interposing) Let's put it this way.  It was not short spiky hair.  It was definitely in a style that went this way.  But I couldn't tell you if it was shoulder length or if it was long.  That I cannot tell you.

Q.    A lot of male in this area at the time wore their hair long.  Is that correct?

A.    I can't tell you because I didn't — I don't know.  I guess if guys wear their hair long; they wear their hair long. I'm not sure that that's a relevant question.

Q.    Let me phrase it this way.  And I don't mean to badger you at all.  Could this have been — the person in the center — could it have been a small skinny male that had long blonde hair?

A.    I can't tell you that it wasn't.

Q.    Yeah, that's what I'm getting at.

A.    That's what I'm — yeah.

Q.    All right.  And, the — and in terms of the one

Exhibit 5001 at 971

Storts   X   D5 179

person and the relationship if any toward Brent Bartley, again, it's a place where you can't say it wasn't Brent Bartley?

A.   Correct.  That's what I told them.  I cannot say that it was not Brent.

Q.   Right.

A.   But I can also not tell you that it was.

Q.   Yeah, so - - -

Now, I didn't hear you talk about this, but I need to ask you because I saw something in the report.  Did you get some impression regarding the person in the center that they might be intoxicated or something?

A.   You know, yes.  They — originally I was asked if that person was alive.  My impression is that that person in the middle was still alive, but that the person needed help walking.

Q.   Okay.  So, they could have been intoxicated or drug overdosed, something like that?

A.   As long as they could halfway be up on their feet, yes.

Q.   Well, but they appeared - - -

A.   (Interposing) There was a person on each side holding - - -

Q.   I'm sorry.

A.   I'm sorry, sir.  Go ahead.

Exhibit 5001 at 972

Storts   X   D5 180

Q.   Well, I think I interrupted you.  And I apologize.

They appeared to be on their own feet and motivating with assistance.  Is that a fair characterization?

A.   Correct.  That's a good way — yes.  There was a person on each side obviously helping.  But the person was on their own feet yet.

Q.   Now, I didn't quite catch where you live out there?

A.   I lived exactly at the eight mile marker at that time.

Q.   Is that — is that still on Fairview Mountain?

A.   It's actually on the other side of Lee Valley Road. It's more out Fairview.

Q.   Okay.

A.   Toward — it's not at Four Corners.  It's actually between Lee Valley Road and Four Corners.

Q.   Well, how — about what mile marker is Lee Valley Road?

A.   Lee Valley Road is right before the seven mile marker.

Q.   Just before the seven mile?

A.   Correct.

Q.   Okay.  So, where you saw these people was still three miles before you get to Lee Valley Road?

A.   Yes.  It was not — I had not crested the mountain at that time.

Exhibit 5001 at 973

Storts    X    D5 181

Q.    Okay.  And just a couple other things, Ms. Stort.  I don't mean to keep you unduly long.  You got off at 12:05, you checked out.  Correct?

A.    Correct.

Q.    You'd been on duty for seventy-two hours?

A.    Yes, round about.  I'd been on for a very long period of time.

Q.    And you wanted to go home?

A.    Very much so.

Q.    So you got out of there just as quickly as you could?

A.    Absolutely.

Q.    Okay.  And you went directly from the hospital out to where you saw the people?

A.    Correct.

Q.    So, would it be fair to say that you got to where the people were within about ten minutes of the time you left?

A.    Correct.

Q.    So, we're placing what you saw as happening roughly around twelve fifteen a.m.?

A.    Yeah, give or take a few minutes, yes.

Q.    That's all — excuse me.  That would be what you said.

Thank you.

MR. McCREA:    That's all the questions I have,

Exhibit 5001 at 974

Storts   ReD   D5 182

Your Honor.

> THE COURT:    Redirect.

> MS. SOUBLET:    Just briefly.

> Thank you, Your Honor.

<u>REDIRECT EXAMINATION</u>

<u>BY MS. SOUBLET</u>:

> Q.    Ms. Storts, what were you driving?

> A.    Let's see.  In 2000, um.  I was probably driving my green Geo Metro in 2000 — a teal green Geo Metro.

> Q.    And did either one — did any one of the three people that you saw walking on Fairview Mountain turn around or turn their heads?

> A.    No.  Nobody turned around, but they kinda turned like this as I drove by.

> Q.    In your direction or away from you?

> A.    In my direction.

> Q.    Thank you.

> MS. SOUBLET:    Nothing further.

> THE COURT:    You may step down.  You're free to leave.

> WITNESS:    Does somebody want this exhibit?

> THE COURT:    Just leave it there, please.

> WITNESS:    Okay.

> MS. SOUBLET:    The State calls Zack Elderkin.

Exhibit 5001 at 975

Elderkin    D    D5 183

ZACK ELDERKIN

was thereupon produced as a witness on behalf of the Plaintiff

and, having first been duly sworn to tell the truth, the whole

truth and nothing but the truth, was examined and testified as

follows:

THE COURT:    Have a seat up here, please.

Go ahead.

MS. SOUBLET:    Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. SOUBLET:

Q.    Mr. Elderkin, can you state your full name and spell your last for the record?

A.    Zachary David Elderkin.  And it's E-L-D-E-R-K-I-N.

Q.    Mr. Elderkin, where were you living in 2000?

A.    I was living with my brother a few miles out of Coquille headed toward Coos Bay.

Q.    Is that near Green Acres?

A.    I'm not sure.

Q.    Had you lived here long?

A.    No.  I probably been there six months.

Q.    Did you know someone by the name of Heather McMullen back in the summer of 2000?

A.    Yes.

Q.    Do you know someone named Kristen Steinhoff-Ramsey?

Exhibit 5001 at 976

Elderkin   D    D5 184

A.   Yes.

Q.   Who is she in relation to Heather McMullen?

A.   She is Heather's daughter.

Q.   Do you know where they were living in the summer of 2000?

A.   They were living here in Coquille.

Q.   Do you remember where?

A.   No.

Q.   Was there an occasion - - -

Did you have a vehicle in the summer of 2000?

A.   I did.

Q.   What was that?

A.   It was a '99 Kia Sophia.

Q.   Okay.  And what color was it?

A.   Kind of a purplish blue.

Q.   Was there an occasion where you lent that car to Kristen Steinhoff?

A.   Yes.

Q.   Do you remember what day that was?

A.   I think it was Thursday.

Q.   Would that be June 28th, 2000?  Does that sound familiar?

A.   I have no idea.

Q.   Why did you lend Kristen your car?

A.   She said she was having car problems.  And I was

Exhibit 5001 at 977

Elderkin   D    D5 185

dating her mother.  And that was her daughter, so I lent her the car.

Q.    Where were you when you gave her the car?

A.    At her house.

Q.    At Ms. Steinhoff's house?

A.    Yeah.

Q.    Here in Coquille?

A.    Yes.

Q.    Were there any restrictions on when you had to have the car back?

A.    Yes.

Q.    When was that?

A.    She was supposed to have it back at one a.m. in the morning because I needed to go to work in Eugene at six a.m.

Q.    Okay.  Did you have to be in Eugene at six a.m., or you had to leave at six a.m.?

A.    I had to be there at six a.m.

Q.    How would you get from outside of Coos Bay to Eugene?

A.    I would drive that car.

Q.    I meant what route would you take?

A.    Usually I went through Drain.

Q.    When you gave Ms. Steinhoff the car, what happened?

A.    I don't understand.  What do you mean what happened?

Q.    Well, did you spend the night at Ms. McMullen's

Exhibit 5001 at 978

Elderkin   D   D5 186

house or did you go home?

A.   No.  She took me and my daughter back to my brother's house where I was staying.

Q.   Okay.  And did something happen on that drive home?

A.   Yeah.  She stopped and talked to some guy on the corner right by the highway.  Some guy that I don't know who it was.  And when she got back in the car she said the guy couldn't find their girlfriend.

Q.   Okay.  When you say stopped by the highway, are you talking about where Central meets the bypass?

A.   I have no idea.

Q.   Okay.  Was there a store near there?

A.   Not that I'm aware of.

Q.   Was there anyone else in the area?

A.   Like how do you mean?

Q.   Any other people standing near him?

A.   No.

Q.   Do you remember what time that was?

A.   Daylight.

Q.   Well, there's different types of daylight.  Bright daylight, nearer to dusk?

A.   I have no idea.

Q.   After Ms. Steinhoff got back into the car, what happened?

A.   She took me and my daughter back to my brother's

Exhibit 5001 at 979

Elderkin    X    D5 187

house.

Q.    Did you get your car back?

A.    Eventually.  She was late with it.

Q.    Did you ever let Ms. Steinhoff borrow your car again?

A.    Never.

Q.    Thank you.

MS. SOUBLET:    I have nothing further.

CROSS EXAMINATION

BY MS. MCCREA:

Q.    Mr. Elderkin, the guy you saw at the place on the highway, he was — he was near a Jeep Wagoneer.  Is that right?

A.    That's what I remember.

Q.    Okay.  And you remember that because you're kind of an fashionato of Jeep Wagoneers?

A.    No.  I just like automobiles.  A bit of a gear head.

Q.    Okay.  And it was a Jeep Wagoneer.  And it was a dark color.  Is that right?

A.    That's correct.

Q.    Do you remember what color it was?

A.    Just a dark color.

Q.    Okay.  And if it had been a bright orange or that kind of color you would have remembered it?

A.    Maybe.

Q.    Okay.  Well, you testified at the Grand Jury, right?

Exhibit 5001 at 980

Elderkin   X   D5 188

A.   Yes, I did.

Q.   And that was on July 30th, 2010?

A.   If you say so.

Q.   Okay.  And at that point you were asked if you could tell what color the Jeep Wagoneer was.  And you responded,

"Dark.  It was just a darker one.  I mean, if it would have been bright orange I would have remembered that."

Does that sound like what you were asked and what you answered?

A.   Yeah.  That would have been an answer I said.

Q.   Okay.  That sounds like something you'd say?

A.   Yes.

Q.   Okay. Now, at some point, Mr. Elderkin, when you still had the car, did the police take possession of it and search it?

A.   No, they did not.

Q.   At some point did you become aware that the police had gotten the car and were processing it for evidence?

A.   Just a matter of a few months ago.

Q.   A few months ago they did that?

A.   Yeah.

Q.   And there was no indication in terms of police contact with you after they processed that vehicle, that they needed to talk to you about anything more concerning the car.

Exhibit 5001 at 981

Elderkin   X   D5 189

Is that fair?

A.    That's correct.  I'm unaware if they had already processed it or if they were still processing it.

Q.    But in terms of, since the time that you became aware that that car that you used to own, the Kia, was processed, there hasn't been anything more in terms - - -

A.    (Interposing) No.  There has not.

Q.    Okay.  Mr. Elderkin, just one other question.  The man that you saw near the Jeep Wagoneer, was he trying to call on a cell phone?

A.    Yes, he was.  And he was pacing back and forth in front of the van - - -

Q.    (Interposing) Okay.

A.    - - - like he was agitated.

Q.    All right.  Thank you.

MS. McCREA:    I have no further questions.

MS. SOUBLET:    No redirect.

THE COURT:    You may step down and you're free to leave.

Call your next witness.

MR. FRASIER:    Thank you.

We call Mike Reaves.

MICHAEL REAVES

was thereupon produced as a witness on behalf of the Plaintiff and, having first been duly sworn to tell the truth, the whole

Exhibit 5001 at 982

Reaves    D    D5 190

truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat up here, please.

DIRECT EXAMINATION

BY MR. FRASIER:

Q.    Could you state your name please, sir, and spell your last name for the record?

A.    Michael W. Reaves, R-E-A-V-E-S.

Q.    Your current occupation, sir?

A.    I'm retired.

Q.    And prior to retiring, what were you?

A.    I was the chief of police of Coquille.

Q.    How long were you the chief of police in Coquille?

A.    About twelve years.

Q.    Were you a police officer prior to that, also?

A.    Yes.

Q.    How long were you in law enforcement and where did you work?

A.    I was chief of police in Coquille; I was the chief of police for three years in Oakridge; I worked for the (not understandable) County Sheriff's Department for a total of — in Florida — for a total of twelve years.  I worked for the (not understandable) Police Department in Florida for a total of three years.  And I was a security policeman in the United States Air Force for six years.

Exhibit 5001 at 983

Reaves    D    D5 191

Q.    Directing your attention, sir, to the summer of the year 2000, were you working as a police chief at that time here in the City of Coquille?

A.    Yes, I was.

Q.    Directing your attention to June 29th of 2000, were you contacted by Cory Courtright and informed that her daughter Leah Freeman was missing?

A.    The report was made to the police department, yes.

Q.    You became aware of that report?

A.    Yes, I did.

Q.    And as time progressed you assigned an officer to be in charge of the investigation, if you will?

A.    Yes, I did.

Q.    And who was that?

A.    Dave Hall.

Q.    Now, after — well, as part of this you learned that the Defendant in this case, Mr. McGuffin, was the boyfriend of Leah Freeman at the time she disappeared?

A.    Yes.

Q.    Did you or Officer Hall make arrangement for an interview to be conducted of the Defendant?

A.    Yes, I did.

Q.    And was that interview conducted on June 30th of 2000?

A.    Yes, it was.

Exhibit 5001 at 984

Reaves   D   D5 192

Q.   And was it recorded?

A.   Yes, it was.

Q.   I'll show you what's been previously marked as State's Exhibit No. 95.  Have you listened to that CD prior to your testimony today?

A.   Yes.

Q.   And is that a recording of that interview that you had with the Defendant?

A.   It's a copy of the recording that I made, yes.

Q.   And does the recording or the copy accurately portray the conversation that you had with the Defendant?

A.   Yes.

Q.   And State's Exhibit No. 218, is that a transcript of the interview?

A.   Yes.

Q.   And does the transcript accurately portray the interview?

A.   Yes.

        MR. FRASIER:   Your Honor, at this time we'd move for the admission of State's Exhibit No. 95 and State's Exhibit No. 218.

        MS. McCREA:   There's no objection to State's Exhibit No. 95, Your Honor.

        THE COURT:   No. 95 is received.

        (Whereupon Exhibit No. 95 was then received

Exhibit 5001 at 985

Reaves    D    D5 193

into evidence.)

MS. McCREA:    Your Honor, at this time we'd object to No. 218.  I'd like an opportunity to compare it since I — I want to make sure that it's an exact representation and the evidence is actually the Defendant's statements which are on the CD and not the transcript itself.

THE COURT:    Well, I realize that.  I'll give you a chance to do it.

I think the only thing that those exhibits are helpful to is some — and to me sometimes they're more helpful when they're listening to the tape if we all, including the jury has a copy of that so they can follow it.  Understand that the tape is — it's an aid to the jury.  I understand your point.

But I'll certainly give you the time before I decide whether to receive it or not to look it over. And we'll have the tape played.  So I guess you could be looking it over while the tape's being played and find out whether it's accurate or not.

So, I'll reserve my ruling on that for now. You have a copy to pass to the jury, is that what the hold up is?

MR. FRASIER:    Yes, I do.

THE COURT:    Well, have you listened — you've listened to the tape I'm quite sure, Ms. McCrea?

Exhibit 5001 at 986

Reaves    D    D5 194

MS. McCREA:    I have, Your Honor.

THE COURT:    Okay.  I just have found that it's an aid to the jury.

And if I allow you to do this, Ladies and Gentlemen, the tape is what's important.  If there's something on the tape that's not on the transcript, then obviously you have to listen to the tape and not the transcript.  Because that's somebody's best effort to transcribe what's there.  It's just an aid to them to assist it.

If you want a little time to consider it before I probably will allow the jury to see it, I will give you that time.

Do you have some other areas you can go on it?

MR. FRASIER:    Actually, this is all I was going to cover with the chief.  It takes about fifteen minutes, Your Honor, fifteen, twenty minutes.

If the Court wants to take a break now, we could - - -

THE COURT:    (Interposing) Okay.  I can take that now.

We'll take a fifteen minute break.

If you would step into the jury room.

Everybody else remain seated until the jury has a chance to go in the room.  And we'll take that.  That will give Ms. McCrea a chance to review that.

Exhibit 5001 at 987

Reaves    D    D5 195

(Jury Out.)

THE COURT:    I might add that if I allow this to go to the jury I would receive the transcript itself merely for the purpose of the record and not to go to the jury, because the tape is the best evidence of that.  But I do think it's of assistance to the jury in these cases to be able to follow that along.  I would then, if I do that, just put No. 218 into the record for any appellate purposes, but it wouldn't be sent back to the jury room.

MR. McCREA:    Oh.

THE COURT:    Okay?

MS. McCREA:    With that understanding, Your Honor, I'm fine with it then.

I'm sorry.

I understood that it was being — Counsel was offering it as - - -

THE COURT:    (Interposing) Well, he may have. But that would be my ruling.

MS. McCREA:    Well, and I — and with what the Court's ruling would be is acceptable.

THE COURT:    Good.

I should quit while I'm ahead, then.

Let's take a recess.  Fifteen minutes.

You may step down.

(RECESS)

Exhibit 5001 at 988

Reaves    D    D5 196

(Jury In.)

JUDICIAL ASSISTANT:    All rise.

THE COURT:    Be seated please.

MS. McCREA:    Your Honor, with regard to State's Exhibit No. 218 the Defense agrees it is appropriate for the jury to have the transcripts during the time that Exhibit No. 95, the tape is played, but that the Exhibit No. 218 will not be entered into evidence, but will be of assistance here in the courtroom for the jury.

THE COURT:    Okay.

What is indicated is that you will receive this transcript so you can follow along with the tape recording. Make sure  when you're reading along that you're listening, because the tape, obviously, is what was actually was said. And then when the case goes to the jury to deliberate you will have the tape recording but not the transcript at that time, because it's just an aid for you.  And it's going to be an aid for you while you're listening to it but not at a later time.

Okay?

Pass them out, please.

And you may go ahead and — when the jury gets that.  And you're not going to be asking the witness any questions about it while the tape's being played?

MR. FRASIER:    No, I'm not.

THE COURT:    Okay.  So you can put it on - - -

Exhibit 5001 at 989

As soon as the tape starts being played you can pause the FTR.

MS. McCREA: Excuse me, Counsel. We have an issue.

MR. FRASIER: Your Honor, on Page — well, it's marked four in the corner, I — there appears to be some handwritten comments on the transcript that should have been whited out. They're not whited out.

THE COURT: Okay.

So, they all have — don't read the stuff on it.

Okay. Cathy, can you get those back, white out - - -

Is it a lot?

MR. FRASIER: No. It's just two words and an asterisk.

THE COURT: Okay.

Just white out the two words and the asterisk then give it back to the jury.

Don't rush. I don't want you to fall.

THE COURT: Okay, go ahead.

And you can pause it when he starts the tape.

(State's Exhibit No. 95, the audio tape was played for the jury. Not transcribed.)

THE COURT: Then the transcript No. 218 is received for the record, not for the jury.

Reaves   X   D5 198

(Whereupon Exhibit No. 218 was then received for the record only, not for the jury.)

THE COURT:   Go ahead.

MR. FRASIER:   Thank you, Your Honor.

I have no further questions of Chief Reaves.

THE COURT:   Ms. McCrea.

MS. McCREA:   Thank you, Your Honor.

CROSS EXAMINATION

BY MS. MCCREA:

Q.   Chief Reaves, the statement of Mr. McGuffin we just heard was on June 30th, 2000.  Is that right?

A.   I believe so.

Q.   Mr. McGuffin came in with Cory Courtright to make the missing persons report on June 29th, the day before?

A.   I don't know that.

Q.   Did you make a request of Mr. McGuffin to come in and give a statement on June 30th?

A.   I asked him — either myself of Hall asked him to come in, yes.

Q.   Okay.  And he was happy to do that?

A.   He was there voluntarily, yes, ma'am.

Q.   Yeah.  And you set an appointment time because we heard on the tape he said he didn't want to be late?

A.   I think so.

Q.   Was there other conversation before you turned on

Exhibit 5001 at 991

Reaves    X    D5 199

the tape recorder?

A.    Yes.

Q.    And was it different than what we have here in evidence?

A.    No.

Q.    And the other person who was there — well, there was Deputy Hall was present.  Is that right?

A.    Yes.

Q.    And the - - -

A.    Officer Hall.

Q.    I'm sorry.  Officer Hall.  Sorry.

Officer Hall.  And then the woman who was present was Mr. McGuffin's mother, Kathy McGuffin?

A.    Kathy McGuffin was there, yes.

Q.    And where was the statement taken?

A.    It was taken in the upper office of the Coquille Police Department.

Q.    And that's why we hear some other extraneous noise on the tape?

A.    Well, that's the first time I've heard that extraneous noise.  I think this is a copy of a copy of a copy. I don't believe it's on the original tape.

Q.    All right.  Thank you.

MS. McCREA:    That's all the question I have.

THE COURT:    Any redirect?

Exhibit 5001 at 992

Hall   D   D5 200

MR. FRASIER:   No, Your Honor.  That's all I have.

THE COURT:   You may step down.  You're free to leave.

Call your next witness.

MR. FRASIER:   Call Dave Hall.

DAVID HALL

was thereupon produced as a witness on behalf of the Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:   Have a seat up here, please.

DIRECT EXAMINATION

BY MR. FRASIER:

Q.   Could you state your name please, sir, and spell your last name for the record?

A.   David Hall.  Last name spelling H-A-L-L.

Q.   Where do you live at this time, sir?

A.   Paisley, Oregon.

Q.   Lake County?

A.   Yes, sir.

Q.   In the summer of 2000 how were you employed?

A.   I was employed as a police officer for the City of Coquille.

Q.   How long had you worked for the City of Coquille as

Exhibit 5001 at 993

Hall   D   D5 201

a police officer?

A.   I think it was a total of ten years.

Q.   And in June of 2000, were you working for the City of Coquille at that time as a police officer?

A.   Yes, I was.

Q.   In particular June 29th of 2000, were you asked by then Chief Reaves to lead an investigation into the disappearance of Leah Freeman?

A.   Yes, I did.

Q.   At the time you were on light duty with the police department?

A.   Yes, I was.

Q.   You had an injury or something?

A.   I had knee surgery.  I had had two knee surgeries and I was on light duty.  And they put me on day shift while I was healing up.

Q.   And because you're on light duty you could — it was easier for you to be a detective type individual?

A.   That's correct.

Q.   Had you ever investigated a case like this before?

A.   Never.

Q.   Since then?

A.   Never.

Q.   On the — well, did you have contact with the Defendant on June 29th, 2000?

Exhibit 5001 at 994

Hall   D    D5 202

A.    Yes.

Q.    Where did you have contact with him?

A.    At Leah Freeman's home.

Q.    Why had you gone by there?  Why did you go to Leah Freeman's home?

A.    I was requested by Chief Reaves to go by and talk to Cory in the disappearance of Leah Freeman, that she hadn't returned home the night before.  And I had went over there to ascertain names of friends, acquaintances, and what have you from Cory so I could start checking out some leads of, you know, possibly where she went.  If she was a run away or what.

Q.    What time of the day was this, do you recall?

A.    I believe it was in the afternoon.

Q.    And the Defendant was there when you arrived?

A.    I believe he showed up after I arrived, if I remember correctly.

Q.    Did you speak with him?

A.    Yes, I did.

Q.    And what did you talk with him about?

A.    I asked him when was the last time he had seen Leah. And what he had done with her the previous day.

Q.    Did you ask him to give you like a brief time line?

A.    Yes, I did.

Q.    What did the Defendant tell you?

A.    I'll just refer to my notes.

Exhibit 5001 at 995

Hall    D    D5 203

"He had dropped Leah off at seven p.m. the night before at Sherry Mitchell's house.  And then he was supposed to return and pick her up at about nine p.m. that same evening.  And when he arrived she had already left.  And then he stated that he drove up and down Central looking for her until about two thirty in the morning at what time he went home."

Q.   Did he say where he thought Leah was, when he went home at two thirty?

A.   He thought that she was possibly staying at a friend's house because she may have been upset with him because he was late picking her up at Sherry Mitchell's house.

Q.   Now, in an attempt to locate Ms. Freeman, was there some sort of teletype or attempt to locate issued?

A.   I don't recall.  I don't believe so at that point.

Q.   At some point in time you had learned that she had been out at the residence of Brent Bartley's grandparents?

A.   That's correct.

Q.   Had you gone out there to look around?

A.   Yes, we did.

Q.   And when you went out there — how many times did you go out there?

A.   Chief Reaves and I both went out there one time.  And then I believe we went out the next day also.

Exhibit 5001 at 996

Hall   D    D5 204

Q.    Now, the first time you went out there, that would have been Thursday — or, June 29th?

A.    That's correct.

Q.    And what if anything did you note out there?

Well, first of all the grandparents' place is out at the end of what road?

A.    I believe it's at the end of Fir.

Q.    And what if anything did you note when you were out there that day?

A.    When Chief Reaves and I arrived we noticed some of the (not understandable) and the back yard, that there was a lot of empty beer cans.  There was a funnel with a hose on it that I ascertained at the time that was a beer bong.  There was a white tank top shirt like a men's tank top shirt that Chief Reaves, when he picked it up he said it smelled of beer.

Q.    Did you collect any evidence or anything at that time?

A.    No, sir.

Q.    Now, on June the 30th you were present while the Defendant was interviewed?

A.    Yes, sir.

Q.    And that was on — that was recorded?

A.    Yes, sir.

Q.    And during that interview you learned that she — Ms. Freeman — had been wearing a white tank top?

Exhibit 5001 at 997

```
                                      Hall   D    D5 205
```

A.    That's correct, sir.

Q.    Based on that information what did you guys do then?

A.    We went back out to the Haga Residence to look for that item.

Q.    What happened when you got out there?

A.    When we arrived everything — we noticed everything had been cleaned up.  All the beer cans were gone.  And the place was essentially cleaned up.

Q.    Now, Leah Freeman wasn't located during that first week?

A.    No, sir.

Q.    At some point in time the FBI was invited to help with the investigation?

A.    Yes, sir.

Q.    July the 5th the major crime team for Coos County was asked to be involved?

A.    Yes, sir.

Q.    And there were police officers from Roseburg and Klamath Falls that came to help?

A.    Yes, sir.

Q.    Other agencies in the county such as Coos Bay Police, North Bend Police, and the crime lab?

A.    Yes, sir.

Q.    At the time there was a crime lab in Coos County?

A.    That's correct, sir.

Exhibit 5001 at 998

Hall   D   D5 206

Q.    Where was that?

A.    Excuse me, sir?

Q.    Where was the crime lab at that time?

A.    At that time it was in Coos Bay.

Q.    There were numerous witnesses interviewed?

A.    Yes, sir.

Q.    One week to the day after Leah disappeared was there a road block set up?

A.    Yes, sir.

Q.    And could you tell us why it was set up one week to the day after she disappeared and so forth?

A.    Well, in essence when we had the FBI agents come over and we briefed them on the information we had at that time, and it was their — from their experience they decided they wanted to set up a road block at that particular time of the evening because people are essentially creatures of habit. They either walk the same direction to and from their home, to say, to go to the store or someone else's home. And that by having the road block at that particular time of the night when Leah went — disappeared — we thought it may — somebody would come up with some more information or recall something from the week prior.

Q.    Now, during that first week did you become aware of a set of tennis shoes that had been found?

A.    Yes, I did.

Exhibit 5001 at 999

Hall   D   D5 207

Q. One having been found near the Chevron gas station?

A. Yes.

Q. By the cemetery?

A. Yes, sir.

Q. And another that had been found on Hudson Ridge?

A. Yes, sir.

Q. Based on that were you asked to obtain an item from Leah Freeman's personal possessions where her DNA could be obtained?

A. Yes, sir.

Q. And were you also asked to get DNA samples from her parents, Cory Courtright and Denny Freeman?

A. Yes, we were.

Q. I'll show you what's been marked as State's Exhibits Nos. 204 and 205. Do you recognize the tags on those bags and so forth?

A. Yes, I do, sir.

Q. What are those two items?

A. The one item are swabs from Corliss Courtright; and the other one is swabs from Denny Freeman.

Q. And you obtained those swabs?

A. Yes, sir.

Q. How do you get these swabs? What do you do?

A. You have a tube with a couple of swabs in them. And we put on — we glove up. And then take the swabs and go

Exhibit 5001 at 1000

Hall   D   D5 208

inside the cheeks of the mouth and just swab the mouth, place them back in the container, seal them and enter them into evidence.

Q.   Now did you actually go to where Leah Freeman was living at that time off of Knott Street?

A.   To?

Q.   Leah Freeman's home where she had been living?

A.   Yes.

Q.   Off of Knott Street?

A.   Correct.

Q.   And did you obtain the toothbrush that was identified to you as being Leah Freeman's toothbrush?

A.   I don't recall exactly if I did at that point.  I can't remember.

Q.   Let me show you what's marked as State's Exhibit No. 203.

A.   Okay.  That's a toothbrush.  Yes.  But it's not on my handwriting on the evidence tag.

Q.   Right.  But the evidence tag indicates you seized it?

A.   Yes.

Q.   These items would have been placed into evidence at the Coquille Police Department?

A.   That is correct, sir.

Q.   And would they have then subsequently been sent to

Exhibit 5001 at 1001

Hall   D    D5 209

the crime lab for analysis?

A.    That's correct, sir.

Q.    Did you also at some point in time get a swab or a DNA sample from the Defendant?

A.    Yes, we did.

Q.    I'll show you what's marked as State's Exhibit No. 206.  Do those appear to be the swabs that were obtained from the Defendant?

A.    I don't see — all I see is McGuffin's name up here. But I don't see a tag on who collected the evidence.

Q.    Okay.  We'll come back to that.

A.    Okay.

Q.    You do recall though that there was a DNA sample obtained from the Defendant?

A.    Yes, sir.

Q.    And that was to conduct further investigation as the case went on?

A.    Exactly.

Q.    Now, the shoes in the case, those were subsequently sent to the crime lab for analysis?

A.    That's correct, sir.

Q.    And prior to the body of Leah Freeman being discovered were you made aware of certain results of DNA that had come off those shoes?

A.    That's correct.

Exhibit 5001 at 1002

Hall   D   D5 210

Q.   And were you made aware that the shoes had been identified as having DNA of Leah Freeman?

A.   That's correct.

Q.   Now, was the Defendant asked to come into the Coquille Police Department I believe on the 5th of July of 2000?

A.   Yes, he was.

Q.   And as part of that coming in and being interviewed, did you ask him to do a time line of the events of the day that Leah Freeman disappeared?

A.   Yes, we did.

Q.   And did you ask him to write that out on a pad of paper?

A.   Yes, I did.

Q.   I'm going to show you what's marked as State's Exhibit No. 83 and ask if you can identify that?

A.   Yes.  This is the Defendant's written statement and time line that he wrote out for us that day.

Q.   And if you'll just briefly look through it, does that document appear to be in the same condition as it was when you received it from the Defendant, Mr. McGuffin?

A.   Yes, sir, it is.

MR. FRASIER:   Your Honor, at this time we'd offer State's Exhibit No. 83.

MR. McCREA:   No objection, Your Honor.

Exhibit 5001 at 1003

Hall   D    D5 211

THE COURT:    Received.

(Whereupon Exhibit No. 83 was then received into evidence.)

Q.   Officer, if you would please or Mr. Hall, if you would please, would you read the document to the jury?

A.   Starting at the beginning, sir?

Q.   Yes.

A.   Okay.

"2:00 to 4:00 - Left Leah's house. And then he's got 4:00 - went to Brent Bartley's house.

5:00 - Me, Leah, and Brent went out to my house to get a couple of movies.

5:45 - Went to Brent's grandparent's house.  Brent had a couple of drinks.  I had one mixed drink.  I don't know if Leah had any.

6:50 - Left to take Leah to Sherry Mitchell's house.  Leah told me to come back in two hours, which is about nine o'clock.

7:00 - Brent and I went and picked up Nicky Price and I took them both up to Brent's grandparent's house.

7:30 to 9:00 - I hung out at Fast Mart until about eight o'clock.

8:00 - Drove around, went out to Mill

Exhibit 5001 at 1004

Hall   D    D5 212

Pond, came back into town.

9:05 - Went up to Sherry's house.  When I got there Sherry was crying and said Leah and Sherry's mom got into an argument.  Also said Leah had just left.

9:15 - Drove up Central looking for Leah. Drove back down Central, took a left at Stamper's, then another left at the next stop sign.  Came back across from Fast Mart by hair place and drove back up Central.  Went to west Coquille turnoff and turned around.

9:45 - Drove by Fast Mart again and I think Brett Mauro yelled at me, but I just kept driving because I was looking for Leah.  A bunch of people hanging out at Fast Mart.

10:00 - I might have seen Tim Woosley walking around.

10:15 - Went back to Sherry's.  She said that Leah didn't come back.  And she said maybe she walked out to your house.  Called Leah's mom, asked if Leah was home.  And she said, "No."

10:30 - Called my mom from Fast Mart to see if Leah had called, but she didn't.

10:40 - Talked to Mark Kirn.  He said that

Exhibit 5001 at 1005

Hall   D    D5 213

him and Mike McAdams seen her walking by Hunter's between . . ."

Then he's got writing - - -

". . . between ten and ten forty — Went up to Brent's grandparent's house, but Leah wasn't there.

10:50 - Zavala pulled me over for one headlight and I told him that I was looking for Leah and asked him to help find her.

10:55 - Went to Denny's Pizza and asked Denise, Leah's sister, if she stopped by. And she said, "No."

11:05 - Seen Richard Bryant walking and he said he hadn't seen her either.

Between 10:40 and 11:00 - Went to high school and seen two people walking the track and asked them if they had seen a girl walking around in a tank top. They also said, "No." The couple were driving a maroon Arrowstar van.

11:30 - I went back up to Brent's house to pick him and Nicky up.

11:40 - Dropped Nicky off and me and Brent went looking for Leah for about another forty-five minutes.

11:50 - Went by Leah's house and I didn't

Exhibit 5001 at 1006

Hall   D   D5 214

think she was home so we kept looking.  Also, I talked to two girls at the Sanford Heights playground.  And they also didn't see her.

Midnight - Seen Danny Lee and asked him to look for her because I couldn't find her.  He kinda ignored me and didn't pay attention.

After midnight - Saw Richard Bryant again.  Brent got out of the car.  And him and Richard went up to Brent's house by Dean Street.

12:30 - Went back by Leah's house.  Still didn't think she was home.

1:00 - Talked to Kristen Steinhoff for about forty-five minutes to an hour at her house to see if she had seen her.

2:00 - Went back by Leah's and seen a glare in her window which I thought was the TV in her bedroom.  So, I went and threw a couple of rocks at her window to see if she was there, but she didn't answer.  I thought she was sleeping.

2:00 to 2:30 - Looked around town just in case she wasn't home and I didn't see her.  I decided to head home about 2:30 or 3:00 in the morning.

3:00 a.m. - Went to bed.

Exhibit 5001 at 1007

Hall    D    D5 215

4:00 a.m. - Got a phone call.  My mom answered but the person hung up.

7:30 in the morning - Leah's mom calls and said that she didn't come home and that her TV was probably the glare in Leah's room.

I don't know who called at four in the morning, but I think it might have been Leah trying to contact me."

And it's signed by Nicholas James McGuffin.

Q.   I want to jump ahead to August the 3rd of 2000.  Do you recall what happened that day?

A.   Yes I do.

Q.   And what happened on August the 3rd of 2000?

A.   At approximately three thirty in the command post I was contacted by Officer Kurt Bennett of the North Bend Police Department.

Q.   Were you informed that a body had been found?

A.   Yes, he did.

Q.   Did you respond out to the scene?

A.   I personally did not respond.  I made contact with Lieutenant Pex of the Oregon State Police and advised him of where her body was found and to get his crime team together to meet other people out there at the scene.

Q.   This body was eventually recovered that day?

Exhibit 5001 at 1008

Hall   D   D5 216

A.    Yes, sir.

Q.    And the next day, on August 4th was there an autopsy performed on the body?

A.    That is correct, sir.

Q.    And was it your understanding based on that autopsy that this body had been identified as that of Leah Freeman?

A.    That's correct, sir.

Q.    Did you attend the autopsy?

A.    Yes, sir, I did.

Q.    And at the time that the autopsy was conducted was the body still wearing clothing?

A.    Yes, it was.

Q.    Do you recall what was on the body?

A.    She was wearing a white tank top, like a men's tank top shirt and — I can't vividly remember what she was wearing. I thought it was pants.  But I'm not sure, sir.

Q.    Were you directed or did you seize the clothing as it was removed from the body?

A.    I did, sir.

Q.    Was there a sock on the body?

A.    Excuse me, sir?

Q.    Sock?

A.    I believe so, but I can't remember, sir.

Q.    I'll show you what's marked as State's Exhibit No. 201.  It's marked as DEH004.  D-E-H, would those be your

Exhibit 5001 at 1009

Hall   D   D5 217

initials?

A.    That's correct, sir.

Q.    And when you seized an item you would mark it with your initials and then there would be a number after those initials?

A.    That's correct, sir.

Q.    And the number would be the number of exhibits you had received up to that point?

A.    That's correct, sir.

Q.    And in this situation this was marked as DEH004, and is identified as a sock?

A.    That's correct, sir.

THE COURT:    Sorry.  The State's Exhibit number is?

MR. FRASIER:    No. 201.

THE COURT:    Thank you.

Q.    This is marked as State's Exhibit No. 99.  You indicated that the body had a top on it.  I know it's hard to see with all of this, but - - -

A.    (Interposing) Yes, that's correct.  That's my handwriting.

Q.    And you seized this at that time?

A.    Yes, sir.

Q.    Do you recall if the body had a bra on?

A.    I don't recall, sir, no.

Exhibit 5001 at 1010

Hall   D   D5 218

Q.    I'm going to show you what's marked as State's Exhibit No. 100.  It's hard to see, but can you identify any of it?

A.    That looks like it, sir.

Q.    And you would have seized that, also?

A.    That's correct.

Q.    Were there pants on the body?

A.    I believe there was, yes, sir.

Q.    This is State's Exhibit No. 98.  Do you recognize that?

A.    Yes, it is.  That's my handwriting.  And those were blue pants.

Q.    Those were seized by you?

A.    Yes, sir.

Q.    These items that we've been referring to here, State's — these four items of clothing — the pants, the bra, the top, the sock, you delivered those to the evidence room at the Coquille Police Department?

A.    Well, at first, because of the condition of the clothing, we rented a secure storage facility and hung the garments up and put, like, white paper underneath of them. And then we hooked up a fan inside the secure room and let the fan try to air out the garments for several days before we packaged them up and placed them into evidence.

Q.    Just so we're clear, what was the condition of the

Exhibit 5001 at 1011

Hall    D    D5 219

body?

A.    You want a - - -

Q.    (Interposing) Well, when you were at the autopsy, this is a — well - - -

A.    (Interposing)  It was — it was severely decomposed.

Q.    And the clothing, were — was it still moist, wet?

A.    Very.  Very, very moist.

Q.    I want to back up a little bit.  On July the 5th, when you interviewed the Defendant and he did that handwritten time line for you?

A.    Yes, sir.

Q.    Was Brent Bartley also asked to come in that night?

A.    That day.  Yes, sir, he was.

Q.    Did you ask him to do a time line?

A.    Yes, sir, I did.

Q.    And this has been marked as State's Exhibit No. 84. Is that the time line that Mr. Bartley prepared for you?

A.    Yes, it is.

Q.    Again, is it in the same condition?  It hasn't been changed or anything like that?

A.    No, sir.

          MR. FRASIER:    Your Honor, we'd offer State's Exhibit No. 84.

          MR. McCREA:    It's hearsay, Your Honor.  I don't think - - -

Exhibit 5001 at 1012

Hall   X   D5 220

It's hearsay.  I don't understand what - - -

THE COURT:    (Interposing) Sustained.

MR. McCREA:    All right.

MR. FRASIER:    That's all we have, Your Honor.

THE COURT:    You — if you're not withdrawing that, we need to give it to Ms. Cress.  You've offered it.  I sustained the objection to it.  It goes into evidence, but not to the jury.

MR. FRASIER:    All right.  Thank you.

THE COURT:    Cross.

CROSS EXAMINATION

BY MR. MCCREA:

Q.   If — I'm not totally clear.  Is it Officer Hall now?

A.   No, sir.  I'm retired.

Q.   Retired?

A.   Yes, sir.

Q.   When you're retired do you go from an officer to a mister, then?

A.   Yes, sir.

Q.   All right.  So, Mr. Hall, as I understand what you're saying, you became the lead investigator on the Leah Freeman case.  Is that correct?

A.   I was appointed by Chief Reaves.

Q.   Is that kind of like being drafted?

A.   Yes, sir.

Exhibit 5001 at 1013

Hall    X    D5 221

Q.    Is that sort of the way you felt, that you were drafted there?

A.    Yes, sir.

Q.    In any event, you're pretty much familiar then with how the investigation proceeded?

A.    Yes, sir.

Q.    And you have indicated to us that you had joining in, a number of agencies.  And that included the FBI. Correct?

A.    That's correct.

Q.    And that included the Oregon State Crime Lab?

A.    Yes, sir.

Q.    And that included — it also included the Oregon State Police?

A.    Yes, sir.

Q.    Coquille Police Department?

A.    Yes, sir.

Q.    And I believe you mentioned some other — oh, the Sheriff's Office?

A.    Sheriff's Office, North Bend Police Department - - -

Q.    (Interposing)  Coos County Sheriff's Office?

A.    Yes, sir.

Q.    Now, in terms of what you've testified to regarding your dealings with Mr. McGuffin, Mr. McGuffin — let's see. Your first contact with him was on the 29th?

Exhibit 5001 at 1014

Hall   X   D5 222

A.   Yes, sir.

Q.   And when you talked with him on the 29th, he talked with you freely and cooperatively?

A.   Yes, sir.

Q.   And then when you talked to him — let's see.  Well you had him prepare a time line.  Isn't that correct?

A.   Excuse me, sir?

Q.   Oh, you had him prepare a time line.  Oh, okay, here we go.  And he was cooperative about doing the time line?

A.   Yes, sir, he was.

Q.   One thing I didn't hear mentioned, did you ask him for permission to search his Mustang?

A.   Yes, sir, I did.

Q.   And did he give you that permission?

A.   Yes, sir, he did.

Q.   In writing?

A.   Yes, sir.

Q.   And did you search the mustang then?

A.   At that particular time we had — I had sent Lieutenant Bunny Young from North Bend Police Department and Mast Brother's Towing.  And went out and picked up the Mustang at his parent's house.

Q.   Okay.  You picked it up, took it into custody?

A.   Yes, sir.

Q.   And then did you request or direct or whatever the

Exhibit 5001 at 1015

Hall    X    D5 223

right term is, for it to be processed by the crime lab?

A.   Yes, sir.

Q.   And was that done?

A.   To my knowledge, yes sir.

Q.   All right.  I guess the thing I didn't mention, is you got a swab, a DNA swab from Mr. McGuffin?

A.   Yes, sir.

Q.   Was he fully cooperative doing that?

A.   Yes, sir.

Q.   All right.  There was reference to the body having a sock.  There was just one sock, is that correct?

A.   That I can remember, sir.

Q.   I don't mean to beleaguer you with things like that. There were no shoes on the body?

A.   No, sir, not that I recall.

Q.   And you indicated that, based on what information you had received, the shoes that had been found had been identified as hers?

A.   Yes, sir.

Q.   Now, with regard to those shoes, have they been sent to the crime lab for processing?

A.   Yes, sir, they were.

Q.   And that would have been the right shoe as you understand it, was the first shoe found.  But then the left shoe was the second shoe found?

Exhibit 5001 at 1016

Hall   X    D5 224

A.    That I don't recall the order in which — which was found, sir.  But both of them were sent to the crime lab.

Q.    They both went for processing?

A.    Yes, sir.

Q.    And you indicated that the clothing was put in storage and then you had a fan — well, do it — blowing on it?

A.    To help - - -

Q.    (Interposing) Was the clothing processed at all? Did you — was any residue removed from it or anything like that - - -

A.    (Interposing)  No, sir.

Q.    - - - before you started this process?

A.    No, sir.

Q.    And the — with regard to the tank top, white top that you'd seen up at the — that would have been at the Haga's Residence?

A.    Yes, sir.

Q.    Okay.  Do you have any recollection what size that was?

A.    No, sir, I don't.

Q.    Did you examine it at all?

A.    I didn't.  I didn't touch it.

Q.    All right.  Did any law enforcement person examine it as far as you know?

A.    That day that Chief Reaves and I went up, he had

Exhibit 5001 at 1017

Hall   X   D5 225

reached down and I can't recall if he grabbed it or not, but he said it said it had — it was soaked.  And it had an odor of beer.

Q.   Odor of beer?

A.   Yes.

Q.   Okay.  Well, you saw it.  And then you saw the one that was on the body.  Wasn't the one on the body a different kind of tank top than the one you'd seen up at Haga's?

A.   No, sir.  In my recollection, they both appeared to be the same style.

Q.   The same style?

A.   Yes, sir.

Q.   And that's the man's undershirt type style?

A.   Yes, sir.

Q.   But beyond that, you can't whether they were the same size, for example?

A.   No, sir.

MR. McCREA:    It will be one moment, Your Honor.

Q.   Did you conduct a search of the McGuffin's home?

A.   Yes, sir, we did.

Q.   And were they cooperative about that?

A.   At what — I don't understand when you say conducted.

Q.   Well, you — did you conduct — did you conduct a search back in 2000 in the — well, let's say in the July,

Exhibit 5001 at 1018

Hall   X    D5 226

August time frame?

A.    Yes, sir, we did.

Q.    So — well, you obtained a search warrant?

A.    Exactly, sir.

Q.    I didn't mean to get it confused.  And with the search warrant you went out and conducted the search and seized whatever you thought was appropriate to seize to be processed.  Correct?

A.    At the time that the search warrant was conducted at the McGuffin residence, Sheriff Zanni and a team went out there.  And they were the one that conducted that.

Q.    Okay.  Well, it wasn't a case where you had asked for permission to search and been refused and then got a search warrant?

A.    No, sir.

Q.    Okay.  You chose to use the search warrant process?

A.    Yes, sir.

Q.    Thank you very much Mr. Hall.

WITNESS:    Thank you, sir.

THE COURT:    Redirect.

MR. FRASIER:    I don't have any further questions, Your Honor.

THE COURT:    You may step down and you're free to leave.

WITNESS:    I'm free to go, Your Honor.  Thank

Exhibit 5001 at 1019

Ranger    D    D5 227

you.

THE COURT:    Call your next witness.

MR. FRASIER:    Thank you, Your Honor.

We call Mark Ranger.

MARK RANGER

was thereupon produced as a witness on behalf of the Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat up here, please.

DIRECT EXAMINATION

BY MR. FRASIER:

Q.    Could you state your name please, sir, and spell your last name for the record?

A.    My name is Mark Ranger, R-A-N-G-E-R.

Q.    You're currently retired.  Is that correct?

A.    Yes.  I was with the State Police for twenty-seven years and I retired about five years ago.

Q.    Where were you stationed?

A.    Primarily in Roseburg.

Q.    I'd like to direct your attention, sir, to the summer of the year 2000.  Were you working for the State Police at that time?

A.    Yes.

Q.    In the month of July of the year 2000, were you

Exhibit 5001 at 1020

Ranger    D    D5 228

asked to come over to Coquille and assist in the investigation of the disappearance of Leah Freeman?

A.    Yes.

Q.    In particular I'd like to direct your attention to July the 5th of 2000.  Were you over here in Coquille that day working this investigation?

A.    Yes.

Q.    Did you have an opportunity that day to meet with the Defendant in this case, Nicholas McGuffin?

A.    Yes.  I met with him over at the Coquille Police Department at about one thirty in the afternoon on the 5th of July.

Q.    When you sat down and talked with him, was there anybody else there with you when you were speaking with him?

A.    No.

Q.    And did you ask him to give — well, to tell you what that he and — what had happened to Leah Freeman?

A.    Yes.

Q.    Could you tell us, well, what did the Defendant have to say?

A.    Well, I asked about his relationship with Leah.  And he told me that he had been going with Leah for about ten — the past ten months.  And as far as he knew she wasn't pregnant.  And that he expected to marry her in the future.

Q.    Did he have a nickname for her?

Exhibit 5001 at 1021

Ranger  D   D5 229

A.   Yeah.  He stated to me at one point, he said, quote, "Mark, I used to call her Angel."

Q.   Now, the word use or used, was that past tense?

A.   Yes.

Q.   Did he — well, how did the interview go from there?

A.   Well, from then — at that point I asked him what he thought — what did he think happened to Leah?

And he told me that he suspected that maybe someone had kidnapped her.  He said maybe she had ran away.  He thought that possibly, although she wouldn't knowingly take drugs, that maybe somebody gave her some acid and she O.D.'d.

And then he also mentioned that possibly she fell down somewhere and hit her head.

Q.   Now, acid.  Is that a street name for a particular drug?

A.   LSD.

Q.   Now, did you talk with the Defendant more during the day?

A.   Yeah, I wanted to go over his time line that evening and when was the last time he saw Leah on the night of June 28th.

He told me the last time he saw Leah was when he and his friend Brent Bartley dropped her off at her friend's house around seven to seven o-five p.m.  From there they went and picked up Nicky Price who was Brent's girlfriend.  And then

Exhibit 5001 at 1022

Ranger    X    D5 230

they went over to Brent's grandparent's home.  They arrived at the grandparent's home around seven twenty to seven thirty p.m.

He said he didn't stay long and left around seven thirty p.m.  From there he stopped at the Fast Mart and then went out and hung out at the Mill Pond.  He said he left the Mill Pond around nine p.m. to pick up Leah.  But when he went by she had already left.

He drove around looking for her, and could not find her.  He did not go to Leah's house because he knew she wouldn't go home until after eleven if she was around town.

He denied any involvement in Leah's disappearance.

Q.   Thank you.

MR. FRASIER:   That's all the questions I have.

THE COURT:   Ms. McCrea.

Mr. McCrea.

CROSS EXAMINATION

BY MR. MCCREA:

Q.   Oh, just one thing about — used to call her Angel? She was missing at this time, right?

A.   Yes.

Q.   You can't very well call her anything if she's missing.  Right?

A.   I'm not tracking that.

Exhibit 5001 at 1023

Ranger   X    D5 231

Q. Well, let me — you said he used to call her Angel?

A. Right.

Q. Okay. And you're talking to him on the 5th of July?

A. Correct.

Q. And she's been missing since the 28th of June. Right?

A. Right. Missing for about a week.

Q. Pardon?

A. She'd been missing for about a week.

Q. Yeah, been missing for about a week. And so he was referring to how he used to call her before she was missing. Right?

MR. FRASIER:   Well, Your Honor, that calls for A) speculation; and he's also asking this witness - - -

THE COURT:   (Interposing) Sustained.

MR. McCREA:   All right.

Q. Well, at the time that you were talking to him Ms. Freeman wasn't there for him to call her any particular name. Isn't that correct?

A. Correct.

Q. And he was cooperative with you through what you talked about?

A. Yes.

MR. McCREA:   I don't have any other questions.

Exhibit 5001 at 1024

Perske   D   D5 232

THE COURT:    Anything further?

MR. FRASIER:    No, Your Honor.  And ask the witness be excused.

THE COURT:    You are excused from further attendance.

Call your next witness.

MS. SOUBLET:    State calls Dean Perske.

DEAN PERSKE

was thereupon produced as a witness on behalf of the Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat up here, please.

Go ahead.

MS. SOUBLET:    Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. SOUBLET:

   Q.   Mr. Perske, can you state your full name and spell your last for the record?

   A.   Dean Perske, P-E-R-S-K-E.

MS. SOUBLET:    I'm going to ask you to pull the microphone a little bit closer to you and speak up so everybody can hear you.

   Q.   How are you — how are you employed now?

   A.   I'm not.  I'm currently retired as of six months

Exhibit 5001 at 1025

Perske   D    D5 233

ago.

Q.   What are you retired from?

A.   Oregon State Police.

Q.   How long were you with the State Police?

A.   The State Police, twenty-seven years.

Q.   And in July of — June or July of 2000, what was your assignment with the State Police?

A.   I was a detective assigned to the criminal division.

Q.   Working out of what office?

A.   The Roseburg.

Q.   On July 20th, 2000, were you asked to assist Coquille Police Department in the investigation of Leah Freeman's disappearance?

A.   Yes, I was.

Q.   Why were you asked to become involved?

A.   They were looking for additional help from other detectives from outside the area to help follow up on the investigation that had already been ongoing.

Q.   And on July 28th of 2000 were you working that day?

A.   Yes.

Q.   And on that day did you have contact with a person later identified as the Defendant, Mr. McGuffin?

A.   Yes.

Q.   Page 24 of your report if you can get there.

A.   Yes, got it.

Exhibit 5001 at 1026

Perske    D    D5 234

Q.    What was your reason for contacting the Defendant on that day?

A.    On that day we were executing a search warrant on a vehicle at his house and on the Defendant there himself.

Q.    And when you say we, were you working with a partner?

A.    Yes.  I was assigned with an Officer Jim Davis who was another State Police officer on that day.  There were other officers from several agencies involved in this investigation that did the other part of the search warrant.

Q.    What was the reason for serving the search warrant on the Defendant?  What were you getting from him?

A.    We were collecting hair and saliva samples and taking body photographs.

Q.    What was the reason for collecting saliva samples?

A.    For possible comparison with further evidence that was found, or evidence that was found.

Q.    Mr. Perske, I'm going to hand you what's been marked for identification purposes as State's Exhibit No. 206 and ask you if you recognize that?

A.    Let's see.  It says oral swabs and with an identification number on it.  I — looks like our evidence — standard evidence packaging.

Q.    When you say oral swabs, can you tell the jurors, how did you take that sample, a saliva sample from someone?

Exhibit 5001 at 1027

Perske   D    D5 235

A.   We take a — the crime lab provides us with these — they're sterile cotton swabs on — it looks like glorified Q-tip.  You rub the inside of the mouth and on the cheek.  You stand them up.  You let them dry before they're sealed in any packages.  We take usually four of those.  And, like I say, they're dried for a period.  Right there and then they're put in some packaging and sent to the crime lab.

Q.   Is there an agency case number associated with Exhibit No. 206?

A.   I see the coding number on the top of it.  Oh yes, 00 — I don't have my glasses.  I see a case number, Oregon case number down at the bottom.  And I can't read it.  I don't have my glasses on.

Q.   Did you have an opportunity to speak with the Defendant after taking those samples from him?

A.   Yes.  Officer Davis and I spoke with him after that.

Q.   How would you describe his demeanor?

A.   Very casual, very open.  Talked to us freely.  He was read a copy of the search warrant, advised of his Miranda Rights, and then asked if he would waive those and talk with us.  And he said, "Sure."

Q.   Where did this take place?

A.   Basement of the Coquille Police Department.

Q.   Did you have an opportunity to ask him what had happened on June 28th?

Exhibit 5001 at 1028

Perske   D    D5 236

A.   Yes.   We — after collecting those samples, we went over and asked — he agreed to talk to us.   So, I said, "Hey, can we go over again with what you did that day," what went on.   So, he went over with a statement, giving us his whereabouts for what he'd done.

Q.   And what did he tell you had happened on June 28th?

A.   That he had gone to pick up his girlfriend Leah.   He had gone over to Sherry Mitchell's to pick her up between nine and nine ten.   And she had already left by the time he'd got there.

He then drove up Central Street and Knott Street then back down Fifth Street near the park.   And up around Central by the Fast Mart.

He repeated that he drove around town looking for Ms. Freeman for quite a while.

I asked him if he remembered running into anybody?

He did recall running into a subject named Brett Mauro by the fast Mart, a subject named Mark Kirn over by Farr's at about ten thirty p.m. and two other subjects, a Glen Cannon and a Daniel Lapine in the front yard of the Brack Shack or Brent Bartley's house.

And he said nobody had claimed to see Leah Freeman that he spoke to that evening.

Q.   Did you have an opportunity to ask him about his relationship with Ms. Freeman?

Exhibit 5001 at 1029

Perske   D    D5 237

A.    Yes.

Q.    What if anything did he tell you about her?

A.    That that was the first girl that he had ever truly loved out of several girlfriends.  They had gone through tough times like anybody else does in a young relationship, but that they had kind of worked some of their main problems out.  And things were going good at that time.

Q.    Did he ever mention any rules that he had with Ms. Freeman?

A.    He talked about that they had some rules.  I noted I mentioned that in the report, but I didn't make specific things.  And I don't recall them being anything of significance.

Q.    Did you ask the Defendant whether or not he contacted anybody else that night looking for Ms. Freeman?

A.    He indicated that he had gone to the — when we were trying to pin down some closer times and stuff about where he might have gone around town — he did indicate that he had gone to the card lock by the Caboose over in Coquille and that he'd got a few gallons each time.  And that thing would log the time when you enter a card lock or something.  It tracks the time.  So, he said I could — that could vouch for when I was driving around town.

And then he said he also made a phone call at home to his mom.  They have an eight hundred number that would also

Exhibit 5001 at 1030

Perske   D    D5 238

— it spits apparently a record out showing them, you know, when a call comes in and stuff.  So they could track a time from that.

Q.    Did you have an opportunity to ask the Defendant what he thought had happened to Ms. Freeman?

A.    Yes.

Q.    What was his response?

A.    One of the snares that he gave out was that she may have been walking, possibly along a river and fallen and hit her head and done that.

Or, that she may have — if she found out or thought that he was seeing another girl, that he — that she may have committed suicide.

Q.    I want to turn your attention to August 4th, 2000. Did you see the Defendant on that day?

A.    Yes.

Q.    Who was with you?

A.    Lieutenant Buddy Young.

Q.    What was the reason for contacting the Defendant August 4th, 2000?

A.    That was — Ms. Freeman's body had been discovered the day before.  So we were sent out to go out and contact Mr. McGuffin and advise him of the find of her body.

Q.    Were you able to do so?

A.    Yes.

Exhibit 5001 at 1031

Perske    D    D5 239

Q.    How would you describe his demeanor on that day?

A.    This was a — when we contacted him at his house, he was already aware of what had been found.  At this time he was very obviously nervous, to the point of shaking, smoked — chain smoking cigarettes, one after the other.  And just — I mean, very, very nervous, very — somewhat agitated appearing.

Q.    Mr. Perske, in the course of helping out on this investigation did you have an opportunity to speak to Melissa Smith?

A.    Yes.  She was one of several people I spoke with.  Yes.  On August 18th.

Q.    I'm sorry.  Was that August 18th of 2000?

A.    Yes.  At about one p.m. I spoke with her.

Q.    During the course of the interview with Ms. Smith, did you have an opportunity to ask her about Ms. Freeman and Mr. McGuffin's relationship?

A.    Yes, that was one of the things we discussed.

Q.    During that conversation did Ms. Smith indicate she noticed a change in their relationship?

A.    Yes.

Q.    Can you tell the jurors what Ms. Smith told you?

A.    Ms. Smith said when they were first going out they always talked like a lot of young people do, how much we love each other, and I love you a hundred percent, and comments like that back and forth.  But a couple days prior to

Exhibit 5001 at 1032

Perske    D    D5 240

Ms. Freeman turning up missing, she noticed it was a noticeable different to her between the attitude - - -

MR. McCREA:    (Interposing) Excuse me, Your Honor.  I don't recall there being any foundation for this particular testimony with Ms. Smith.  And I object therefore. What I'm referring to, of course, is the requirement she be given an opportunity - - -

THE COURT:    (Interposing) Right.

MR. McCREA:    - - - to explain or deny.

THE COURT:    Right.

MS. SOUBLET:    And I did cover that with Ms. Smith.

THE COURT:    With — did you mention Officer Perske?

MS. SOUBLET:    I did.

THE COURT:    Yeah.  Okay.

Overruled.

Q.    You can continue.

A.    What she indicated is, like I say, they went from I love you very much, I love you a hundred percent, the playful banter back and forth, to I only love you — the last couple days prior was — she was only making that comment, I only love you seventy-five percent now.  And it was a noticeable, again, difference to her from what she had exhibited them between each other prior to that, the two days prior.

Exhibit 5001 at 1033

Perske   X   D5 241

Q.    Thank you.

MS. SOUBLET:    I have nothing further.

THE COURT:    Mr. McCrea.

MR. McCREA:    Thank you.

CROSS EXAMINATION

BY MR. MCCREA:

Q.    Mr. Perske, I know — did you say you didn't bring your reading glasses?  Is that?

A.    No, I did not.

Q.    Okay.  So, you're having to read reports as best you can, so to speak?

A.    The reports are text I can read fairly well.  It was the fine print on this evidence thing - - -

Q.    (Interposing) Oh, okay.

A.    - - - that I couldn't quite bring into focus.

Q.    Great.  That's fine.

Now, did you conduct some of the interviews with Detective Easter (phonetic) of the Oregon State Police?

MR. FRASIER:    Ester (phonetic).

THE COURT:    I think it's Ester.

A.    Detective Oester, yes.

MR. McCREA:    I keep trying to get that right, Your Honor.

THE COURT:    That's fine.  I just wanted to make that they know.

Exhibit 5001 at 1034

Perske   X    D5 242

Q.   With Detective Oester of the Oregon State Police?

A.   Yes, I did.

Q.   And I want to deal with a couple things here.  When Mr. McGuffin is talking with you, and this refers to I believe it's the 28th of July, and he — this is when he — this is when he's very open, very casual, very cooperative, right?

A.   Yes.

Q.   And at that point Ms. Freeman's body had not been found.  Correct?

A.   Correct.

Q.   And did you talk to him about whether or not he cared for her, whether he had feelings for her?

A.   Yes.  That's — as I stated before, he talked about that this was the first girl that I really truly loved.

Q.   Okay.  So, the information you had was that he felt very deeply for her.  Correct?

A.   That was his statement, yes.

Q.   And regarding that same conversation for a moment, away from the — when he talked about getting gas a number of times, did he explain that he had a leak in the gas tank on the Mustang?

A.   Not that I recall or noted in my report if he - - -

Q.   (Interposing) Didn't you — weren't you curious why he would get small quantities?

A.   Well, I'm — at the time I - - -

Exhibit 5001 at 1035

Perske   X   D5 243

Q.    (Interposing) If you don't recall - - -

A.    - - - don't think.  No.  Maybe there was a reason.
Maybe his folks said, "Hey, you can't put more than five
gallons in,"  so you bump it up.

Q.    Okay.

A.    I — I — it wasn't something that brought up a — any
red flag in my opinion.

Q.    In any event, on August 4th when you saw him, then he
was — you said very nervous?

A.    Yes.

Q.    He was upset.  Isn't that correct?

A.    Yes.  He was noticeably agitated.

Q.    All right.  So, now the body has just been recovered
the day before, or that is to day discovered the day before,
August 3rd, correct?

A.    Yes.

Q.    So, you're talking to Mr. McGuffin the very next day
after the body has been found.  Right?

A.    Yes.

Q.    And so you're talking to a person that indicated he
cared very deeply about the person that has now been
determined to be dead.  Right?

A.    Yes, that was his statement.

Q.    Okay.  And so, — well, let's put it this way.  In
your experience people get upset when somebody they care about

Exhibit 5001 at 1036

Perske   X    D5 244

very deeply is dead — dies as it were?

A.   Yes.  I've seen that, yes.

Q.   All right.   Now, I want to talk about a different matter.

MR. McCREA:   And, Your Honor, this is a matter of efficiency actually, maybe.  Because one of the persons about whom I asked regarding statements of Mr. Hamilton this morning is Mr. Penske (sic) — Mr. Penske when he was an officer of the State Police.  And I would, rather than call him back in our case, which we would do if we have to, but - - -

THE COURT:   (Interposing) If the DA doesn't object, I have no problem with it.

MS. SOUBLET:   I have no objection.

MR. FRASIER:   It's Officer Perske, not Penske.

MR. McCREA:   Perske.  Okay.

You have no objection?

MS. SOUBLET:   No.

MR. McCREA:   Okay.

May I approach the witness, Your Honor?

THE COURT:   You may.

Q.   I believe I have in my hand the same report that you've been utilizing.  Is that correct?

A.   Thirty-one pages?

Exhibit 5001 at 1037

Perske   X    D5 245

Q.   Let me look.  Yes.

A.   Yes, that's - - -

Q.   (Interposing)  All right.  I'd ask you to turn to Page 29 of the 31.

A.   Yes.

Q.   And the last paragraph on that page, do you see that?

A.   Regarding the August 15th at 3:15 or 3:35 interviewed Dennis Scott Hamilton?

Q.   Yes.

MS. SOUBLET:   Your Honor, sorry to interrupt, but before Counsel goes any further.  If this is for impeachment purposes I would request a limiting instruction.

THE COURT:   This is for impeachment purposes as I understand it.  Correct, Mr. McCrea?

MR. McCREA:   I'm sorry I didn't hear.

THE COURT:   This is for impeachment purposes?

MR. McCREA:   Yes.

THE COURT:   Okay.

Ladies and Gentlemen, as I instructed you before, when a witness is asked about statements and denies them or doesn't recall and they call another witness to testify about those statements, you can consider that only for its bearing on the credibility of the witness who previously testified, not for whether it's true or not.  Just on the

Exhibit 5001 at 1038

Perske   X    D5 246

credibility of that witness.

So, this relates to Mr. Hamilton.  You can use this testimony in assessing his credibility as a witness.

Go ahead.

CROSS EXAMINATION, Continued

BY MR. MCCREA:

Q.   I'd ask you then, Mr. Perske, to refer to that interview and the question is, did you question Mr. Hamilton regarding this case?

A.   Yes.

Q.   And would you be willing — would you please read your report as to what you discussed and what Mr. Hamilton told you?

A.   Start from August 15th?

Q.   Yes.

A.          "On August 15th, 2000 at approximately 3:35 p.m. I interviewed Dennis Scott Hamilton regarding this case.  Hamilton had been identified as a friend of McGuffin who had been with him the day before and on the day of the disappearance."

"Hamilton said that he was McGuffin's best friend and that he knew Leah well.  The day before Freeman came missing — and I have in parenthesis (on 6/27/2000) Hamilton, Nick

Exhibit 5001 at 1039

Perske   X   D5 247

McGuffin, Freeman and Melissa Smith — and I have in parenthesis (Hamilton's girlfriend at the time) end of parenthesis — all went swimming out at the Leatherman's Hole by Powers.  They were there until around five or five thirty and McGuffin dropped them back off at Smith's house."

"Hamilton went home and then drove over to Kristen Steinhoff's who was sleeping.  Hamilton said he went back home and worked on his car and watched TV until about eight thirty or nine when he went back to Steinhoff's.  When Hamilton got there, McGuffin was already there talking to Kristen.  Kristen and McGuffin left in her Kia and got out supposedly at the Fast Gas in Coquille and were back about twenty minutes."

"When they got back McGuffin told Hamilton they had gotten the gas and then went by a party at — in quotation's "Doc's house" — looking for Leah.  And then returned to Steinhoff's."

Q.   Now, would you stop there for just a moment.  The first part of what you read referred to the swimming at the Leatherman's Hole on 6/27.  Did you at some point talk with

Exhibit 5001 at 1040

Perske   X   D5 248

him or begin talking with him about what he had done on the 28th of June?

A.   You mean further in that statement?

Q.   Yes.

A.   Did you want me just to continue reading what he told me or - - -

Q.   (Interposing) Well, what I want to get sorted out is whether or not he told you that they went out looking for Leah in the Kia on the 27th or whether he was telling you they went looking for Leah in the Kia on the 28th of June.

A.   Well, he — as he started his statement this — what he was describing to me, the way I took it was that it was the day before Leah came up missing.  And that was on 6/27.  So, I assume this is the 26th.

Q.   I'm sorry?

A.   The statement I just read is what he described — it started out was:

"Hamilton said that he was with McGuffin — he was McGuffin's best friend.  That he knew Leah well.  The day before Freeman came up missing . . ."

Which was on the 27th.

Q.   Yeah, right.

A.   Then, blah, blah, blah, the statement I just read. So, I'm assuming that what I just read and told everybody was

Exhibit 5001 at 1041

Perske    X    D5 249

on the 26th, based on his deal.

Q.    Well - - -

A.    Not the day she came up missing.

Q.    She came up missing on the 28th, did she not?

A.    I have in parentheses the 27th.

Q.    Well, Ms. Freeman came up missing on the 28th. That's been the testimony here.

A.    28th?  "The day before came up . . ."  Oh.  The day before — yeah.  She came up missing on the — he came up on the 27th, the day before.  If she was missing on the 28th, the 27th then is what this occurred on.

Q.    All right.  So, they went looking for — I mean, they went swimming on the 27th, the day before?

A.    Yes.  This is the day before.  All this is - - -

Q.    (Interposing) Okay.  Now, what's confusing.  And I don't mean to criticize your report or your report writing, is he then describes Kristen Steinhoff — you, in your report have him describing Kristen Steinhoff and McGuffin leaving in the Kia.  And when they came back, he said they had gotten gas and went by a party at "Doc's house" looking for Leah.  And then returned to Steinhoff's house.

And what I'm trying to ascertain is, what day did he tell you that was taking place?  If you can tell?

A.    Well, like I say from the way it's written in this context isn't it the day before she came up missing these are

Exhibit 5001 at 1042

Perske    X    D5 250

the events that occurred.  So that would be on the 27th, the day before this came up missing, that's when they went and got this gas and stuff.  If it was another day I would hopefully have broken it into another paragraph and started with that.

Q.    Well, all right.

Did you talk to him about what he had done on the evening of the 28th of June, 2000?

A.    I asked him some general questions and as he said he had no knowledge of who was responsible for Freeman's disappearance.

Q.    Okay.  But, like my question is, did — beyond that did you talk to him — talk to Mr. Hamilton about what he, Mr. Hamilton, had done on the 28th of June, 2000?

A.    Well, I guess — if you're referring to the part he said he got home about one a.m. the following morning which would have been the day that she disappeared, I guess so.  For an hour of time, that's when he said he got home on the day she actually disappeared.

Q.    I'm sorry.  I - - -

A.    His last thing says that he stayed around there for twenty minutes after they get back — they get back from the thing.  And then he was there until about — he got home about one a.m. that following morning.  So, yes, he — I guess I did talk to him a little bit about what he did on the 28th.  Then he gave the generic statement that he didn't have any more

Exhibit 5001 at 1043

Perske   ReD  D5 251

information regarding her disappearance.

    Q.   All right.

         MR. McCREA:    I don't have any other questions of this witness.

         THE COURT:    Redirect.

         MS. SOUBLET:    Just briefly.

         Thank you, Your Honor.

         REDIRECT EXAMINATION

BY MS. SOUBLET:

    Q.   Mr. Perske, when you were interviewing the Defendant the first time on July 28th, 2000, while Ms. Freeman's body was still missing, did he appear to be upset?

    A.   No.  Very low key.

    Q.   The only change occurred after Ms. Freeman's body was found?

    A.   Correct.

    Q.   Thank you.

         MS. SOUBLET:    Nothing further.

         THE COURT:    You may step down.  You're free to leave.

         WITNESS:    Thank you.

         Call your next witness.

         MS. SOUBLET:    The State calls Sergeant Buddy Young.

Exhibit 5001 at 1044

Young    D    D5 252

EVERETT JOHN YOUNG

was thereupon produced as a witness on behalf of the Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat up here, please.

Go ahead.

MS. SOUBLET:    Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. SOUBLET:

Q.    Sergeant Young, can you state your full name and spell your last for the record?

A.    Everett John Young, Y-O-U-N-G.

Q.    How are you employed?

A.    The City of North Bend Police Department.

Q.    How long have you been with North Bend Police Department?

A.    Thirty-three years.

Q.    In the summer of 2000 what was your assignment at North Bend Police Department?

A.    I was working — I was a lieutenant at the time, but I was pretty much in management.  But it was also working with the major crimes team.

Q.    And on — as part of working with the major crimes team, were you asked to assist the Coquille Police Department

Exhibit 5001 at 1045

Young   D   D5 253

into the investigation of Leah Freeman's disappearance?

A.   I was.

Q.   On July 5th, that day, did you have contact with the Defendant?

A.   I did.

Q.   Where did that take place?

A.   At the Coquille Police Department in the squad room area.

Q.   Actually prior to that had you been asked to seize any evidence?

A.   Yes.  Myself and I believe it was Detective Pat Downing, went up to the residence of Nick McGuffin and seized the Mustang that was up there.

Q.   What type of Mustang was it?

A.   It was a Ford Mustang.  I believe it was a '67, if I remember correctly.

Q.   Is that a car that you're familiar with?

A.   Yes.

Q.   How are you familiar with it?

A.   I had a '67 Mustang myself when I was in high school.

Q.   Once at the Coquille Police Department and you had an opportunity to talk with the Defendant, did you get talking about the Mustang?

A.   We did, yes.

Exhibit 5001 at 1046

Young   D    D5 254

Q.   And after doing that the Defendant started talking to you about Ms. Freeman?

A.   Yes.

Q.   Did you have an opportunity to ask him what had happened on June 28th, 2000?

A.   Well, yes.  And we were talking a little bit about her circumstances and disappearing stuff.  And I asked him, when he was looking for her, why he didn't drive directly to her residence when he couldn't find her at her friend's house — Mitchell's house — or anywhere along the route.  Why didn't he just go to see if she went home?

Q.   And what was his response?

A.   He stated that he knew absolutely that she would not have gone home.  Said that she hated to be there.  And that she just wouldn't have gone home.  So, he didn't bother to go there to look for her.

Q.   Did you have an opportunity to ask him whether or not Ms. Freeman would have taken a ride from a stranger?

A.   I did.

Q.   And what was his response?

A.   His response was pretty emphatic.  He said that there was no way that Leah would ever take a ride with a stranger.  He then paused a bit and continued stating that she might take a ride with a stranger under very unusual circumstances, such as if she was extremely depressed and

Exhibit 5001 at 1047

Young  D   D5 255

feeling like nobody loved or cared for her.

He then stated that Leah was feeling this way on that night that she disappeared because she had just had a confrontation with her friend, a friend at Sherry Mitchell's house. With Sherry's mother I believe it was, Peggy Mitchell, who expressed her opinion that Leah was not a good influence on her daughter and said she was pretty saddened and upset by that.

Q.   When you say she, meaning?

A.   Meaning Leah.

Q.   Did you have an opportunity to ask him whether or not he thought Leah would have run away?

A.   Excuse me?

Q.   Did you ask him whether or not Ms. Freeman would have run away?

A.   I did. If he thought she'd run away. And he said he didn't think she would run away, at least not without talking to him and letting him know in case he wanted to go with her.

Q.   Was there ever a discussion about a phone call at his parent's house?

A.   Yes. In that same conversation about her running away, he mentioned that on the morning of June 28th about four o'clock in the morning, he received a phone call at his residence, but that nobody knows who it was. I found the

Exhibit 5001 at 1048

Young   D   D5 256

statement kind of strange.  I asked him how he could have had knowledge that the phone call was for him if he doesn't know who it was.

He said that he knows it was for him because nobody would call his house at that hour unless it was for him.  He stated that he — had he answered the phone instead of his mother the caller would not have hung up.  He didn't give any consideration to the fact that it could have been a wrong number or somebody realized after the first few rings and hung up or if they heard an unfamiliar voice they might have hung up.  He was convinced somebody was trying to call him, but he would not elaborate as to who he thought it might have been or for what purpose they might be calling him.

Q.   Sergeant Young, let me interrupt you there.  You said at four a.m. on June 28th.  Do you mean four a.m. on June 29th?

A.   Well, that would have been — he said on the morning of June 28th at about four o'clock.  That's what I have in my report.  So, that's what he told me.

Q.   After that discussion about the four a.m. phone call, did the Defendant start speculating about what could have happened to Ms. Freeman?

A.   He did.  He started talking about how she might have been walking along the river and stumbled and hit her head on a rock and fallen into the river.  It seemed kind of like a

Exhibit 5001 at 1049

Young   X   D5 257

strange off the wall statement to me, especially considering all the other possibilities that could have happened.

I asked him if he truly believed that Leah, who was a good looking female, nice physique, would have been stupid enough to walk along a dark, secluded river bank wearing a tight fitted, you know, wife beater shirt like she had on; taken the chance that, you know, somebody might have seen her down there and taken advantage of her?

He then said he did not believe she would be that stupid.

Q.   Thank you.

MS. SOUBLET:   I have nothing further.

THE COURT:   Ms. McCrea.

CROSS EXAMINATION

BY MS. MCCREA:

Q.   So, it's — I'm sorry — Lieutenant Young?

A.   No, ma'am.  It's sergeant.

Q.   Sergeant.  Sorry.

A.   That's okay.

Q.   So, Sergeant Young, the conversation that you were having with Mr. McGuffin at this point, and this was what, July 5th, 2000?

A.   Right.

Q.   Part of it was, Mr. McGuffin would make a statement and, for example, Mr. McGuffin saying, "If she would ever take

Exhibit 5001 at 1050

Young   X   D5 258

a ride with a stranger."

And then you would sort of say to him, "Why do you think that?"  Or you would challenge his response.  Is that fair?

A.   Yeah.  I don't think I'd challenge it, but I was curious as to why he was saying some of those things or thinking the way he was thinking.  Because it just — some of it just seemed a little bit odd to me.

Q.   Well, and you knew the he had been talked to by a number of other officers before your conversation with him?

A.   I would assume somebody talked to him.  I couldn't tell you how many people had talked to him.  I wouldn't know that.

Q.   Okay.  Well, for example, when Nick McGuffin told you that she — that Leah may have been walking near the river and stumbled and hit her head on a rock and fallen into the river, you did challenge him, didn't you?

A.   Yes.  It just seemed odd to me.  And I asked him, you know, why he would have thought that, being just the way she was dressed and everything.  Did he really think she would go walking along a river in the dark?

Q.   Okay.  And at that point you were not aware that Leah and Nick and Melissa Smith and Scott Hamilton had gone swimming up at Leatherman's pool up Powers the day before Leah Freeman disappeared?

Exhibit 5001 at 1051

Young   X   D5 259

A.    I was not aware of that, ma'am, no.

Q.    And I assume Mr. McGuffin didn't tell you anything about that during his conversation with you?

A.    No, ma'am.

Q.    But you asked him to speculate on what might have happened to Leah Freeman.  Is that right?

A.    No.  He was — he was talking about her walking along the river.  And he was just espousing upon that.  And I thought of all of the other possibilities, why was he doing that?

Q.    Okay.  My question is, you were asking him what he thought may have happened to her?

A.    Okay.

Q.    Is that right?

A.    Probably, yeah.

Q.    And so he was telling you different things that may have happened?

A.    You could look at it that way, yeah.

Q.    He was speculating?

A.    Yeah.

Q.    Okay.  And this was on July 5th, 2000?

A.    Uh huh.

Q.    Leah disappeared on June 28th, 2000?

A.    Correct.

Q.    So, at this point it's been about a week?

Exhibit 5001 at 1052

Young   X   D5 260

A.   Correct.

Q.   There hasn't been any word from her; she hasn't turned up anywhere.  Is that fair?

A.   Yes.

Q.   And Mr. McGuffin at the time that he had this conversation with you, voiced aloud his frustration over her disappearance, didn't he?

A.   Yes.

Q.   And he was concerned that she hadn't come back?

A.   That's what he was conveying.

Q.   Okay.  And in fact, when he talked about the possibility of her running away, he indicated she would never have run away without him or at least telling him that she was leaving in case he wanted to go with her?

A.   Correct.

Q.   That's what he said?

A.   Yes.

Q.   Okay.  Now, the — the major — what is the major crime team?  Or what was it back in 2000?

A.   It was a team comprised of investigators from all the different agencies in the area, because we're small down here.  If my agency had a major crime, we wouldn't expect one or two of our guys to handle it.  So, the team would get called out.  And there was a commitment that all these officers belong to you for at least a week to help you gather

Exhibit 5001 at 1053

Young   X   D5 261

up the evidence and get statements and what not and try and solve the crime.

It was kinda like you scratch my back, I'll scratch yours.  Then, when it's your turn, we'll all come to your house.  So, it was just a team of experienced guys that got together to help each other.

Q.   And as part of being on this investigation you indicated that you seized Mr. McGuffin's 1967 blue Mustang. Right?

A.   Yes, ma'am.

Q.   And this was done pursuant to a written consent that he provided?

A.   That's — yes.

Q.   And the Mustang was not served at his residence, but in fact you called a tow company and towed it to a secure facility so that you or sort of the generic you, the major crime team, could go through the Mustang at their leisure.  Is that right?

A.   Correct.

Q.   And there was no time limit on how long the crime team could keep the Mustang in order to go through it?

A.   I'm not aware of any time limit.

Q.   Okay.  Well, you went to get it?

A.   Right.

Q.   And did you have contact with Mr. McGuffin when you

Exhibit 5001 at 1054

Young   X   D5 262

went to get the Mustang?

A.   I believe we did, and his dad.

Q.   Okay.  And they didn't say, "Okay.  You got to have it back here within twenty-four hours?"

A.   Not to us, no.

Q.   To anybody?

A.   I don't know if they said it to anybody else.  They didn't say it to us.  We just went to observe it getting onto the tow truck and then taking it to the State Police headquarters where we secured it.

Q.   Okay.  And it wasn't returned within twenty-four hours.  Right?

A.   I don't believe so, no.

Q.   It was — in fact the crime lab had it for a long period of time and went through it very, very carefully.  Is that fair?

A.   Yes.  I would say that's fair.

Q.   And it was what we would call totally processed?

A.   I would say so.

        MS. McCREA:   Give me just a moment, please.

Q.   Sergeant Young, did you just talk to Mr. McGuffin this one time on July 5th, 2000?

A.   No.  There was another time - - -

        MS. SOUBLET:   (Interposing) Objection.  Beyond the scope of direct.

Exhibit 5001 at 1055

Young   X   D5 263

THE COURT:    Well, we're talking about him taking statements.  So, I'll allow it.

Go ahead.

A.    There was another time when myself and Detective Perske who I believe was already in here, we went out to retrieve a sweatshirt out at the McGuffin's residence.

Q.    That's fine.  We don't - - -

MS. SOUBLET:    (Interposing) Your Honor, I would also object on grounds of hearsay.

MS. McCREA:    Well, we don't — that's fine.  I didn't — we don't need to get into it.  I don't want to — I'm happy to assist Counsel in this.

Q.    My question then is directed at the July 5th, 2000 conversation with Mr. McGuffin.

A.    Okay.

Q.    And although it doesn't indicate it in your report, do you remember when you had the conversation about Leah hitting her head, or Mr. McGuffin saying — I'm sorry.  Of Leah hitting her head on a rock and falling into the river.  That in fact Mr. McGuffin told you that when they had gone swimming at Leatherman's pool that she had fallen and hit her head on a rock?

A.    I don't remember that, but in that type of a case if that was told to me, I would have put that down.  I'd have documented that.

Exhibit 5001 at 1056

Young   X   D5 264

Q.   So, you don't have any recollection of that.  And you're saying it's not in your report.  So, it didn't happen.

A.   No.  It's not in my report because I don't have — if it was told to me, I would have put it in there.  And if it's not there, then I'm going to say that it wasn't told to me.

Q.   So, now the phone call that Nick indicated that he received at four in the morning?

A.   Okay.

Q.   He was positive that that phone call was for him?

A.   That's what he said.

Q.   Okay.  And didn't he indicate to you that he believed that phone call had either been from Leah or from someone who knew something about where she was?

A.   I don't remember that.  In fact, I thought it was weird because he's — he just said he didn't know who it was, but was sure that it was for him.

Q.   Right.

A.   So, I thought that rather odd.

Q.   And, okay.  He said that he was sure it was for him.  And that came — well it would actually be the night of June 28th or the early morning technically of June 29th?

A.   Okay.

Q.   And it was after nine o'clock when Mr. McGuffin, on June 28th went to find Leah Freeman and she was not at Sherry Mitchell's.  Right?

Exhibit 5001 at 1057

Young   X   D5 265

A.    Yes.

Q.    Okay.  So, this call at four in the morning is close in time to Leah Freeman's disappearance?

A.    Okay.

Q.    And Mr. McGuffin had expressed to you his concern about her location and about finding her?

A.    Yes.

Q.    Is that all true?

A.    Yeah.  He was concerned about where she was.

Q.    And so the phone call at four a.m. — well, I don't mean to make you speculate although you've done some of that about your opinion concerning the phone call - - -

MS. SOUBLET:    (Interposing)  I'm going to object to the argumentative nature - - -

THE COURT:    (Interposing) Sustained.

Q.    Well, let's deal with this just for a minute.  So, the fact that Nick was sure that he received — that the phone call would have been for him, was rather bizarre to you because he didn't know who was calling?

A.    Correct.

Q.    But it would be consistent of him believing it was for him if he believed that the call was from Leah Freeman. Right?

MS. SOUBLET:    Objection.  Speculative.

THE COURT:    Sustained.

Exhibit 5001 at 1058

Young   X    D5 266

MS. McCREA:    I have nothing further, Your Honor.

THE COURT:    Redirect.

MS. SOUBLET:    No.  Thank you.

THE COURT:    You may step down.  And you're free to leave.

WITNESS:    Thank you, sir.

MS. McCREA:    Actually, I believe - - -

THE COURT:    (Interposing) Is he under your subpoena?

MS. McCREA:    I believe so, yes.

WITNESS:    Okay.

THE COURT:    And you need him back.  Is that correct?

MS. McCREA:    Yes.

THE COURT:    Okay.

Just be available to come back.

Do you have another witness now, or - - -

MR. FRASIER:    I have one short witness I think we can get done before five.

THE COURT:    Fine.

MR. FRASIER:    Call Juliana Curran.

MS. McCREA:    I'm sorry, Counsel, who was the witness?

MR. FRASIER:    Juliana Curran, used to be

Exhibit 5001 at 1059

Curran   D   D5 267

Reab.

MS. McCREA:    Thank you.

JULIANA CURRAN

was thereupon produced as a witness on behalf of the Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat up here, please.

Go ahead please.

MR. FRASIER:    Thank you.

DIRECT EXAMINATION

BY MR. FRASIER:

Q.    Could you state your name please, ma'am, and spell your last name for the record?

A.    Juliana Danielle Curran, C-U-R-R-A-N.

MR. FRASIER:    Could you pull that microphone a little bit closer to you?

WITNESS:    Okay.

MR. FRASIER:    And you're going to need to speak up.

WITNESS:    Again?

MR. FRASIER:    Yes.

Q.    Would you do it over again?

A.    I'm Juliana Danielle Curran, C-U-R-R-A-N.

Q.    And you're married at this time?

Exhibit 5001 at 1060

Curran   D   D5 268

A.    I am.

Q.    And your maiden name was?

A.    Reab, R-E-A-B.

Q.    Have you — or do you live in the Coquille Area?

A.    I do.

Q.    How long have you lived here?

A.    I was born in Coquille.  I've never left.

Q.    Go to high school here?

A.    I did.  I graduated.

Q.    What year did you graduate?

A.    2001.

Q.    Are you familiar with the Defendant in this case, Nick McGuffin?

A.    I am.

Q.    How do you know Mr. McGuffin?

A.    I've know him since — before I started school.  I had first grade.  I went to school with him since the beginning.

Q.    And were you familiar with Leah Freeman?

A.    I was.

Q.    How did you know her?

A.    My mom and Cory have gone back years.  My mom used to work at Denny's Pizza and I grew up playing with Denise and Leah.

Q.    Were you the same year high school that the

Exhibit 5001 at 1061

Curran    D    D5 269

Defendant was?

A.    Originally.  I was held back.  So, I was supposed to originally graduate in 2000.  But because I have medical concerns, they held me back.

Q.    So, you graduated a year later?

A.    Uh huh, due to my stomach.

Q.    Now, I want to direct your attention to the latter part of the school year of 1999-2000.

A.    Okay.

Q.    Was there a day that the Defendant offered you a ride home or you asked the Defendant for a ride home?

A.    Yes.

Q.    And, were you aware that the Defendant and Leah Freeman were boyfriend/girlfriend?

A.    I was.

Q.    In this ride home from school did the Defendant tell you anything about his relationship with Ms. Freeman?

A.    He did.  He said that he needed to get back right away to pick up Leah from school.  He said there was abuse in the relationship, that she had hit him.  And that he didn't — he didn't want a fight, so he needed to get right back and pick her up from school.  I told Nick that he needed to tell Cory that Leah was hitting him.  And that maybe she needed some counseling or something.

Q.    Thank you.

Exhibit 5001 at 1062

Curran    X    D5 270

MR. FRASIER:    That's all the question I have, Your Honor.

THE COURT:    Any cross?

CROSS EXAMINATION

BY MS. MCCREA:

Q.    Ms. Reab, this was the last day of school - - -

A.    (Interposing) I believe - - -

Q.    - - - in June of 2000?

A.    Yes.

Q.    Do you remember what day of the month that was?

A.    Uh - - -

Q.    I know it's been a long time.

A.    I'd have to look at a calendar.

Q.    Okay.  Was it like maybe around the first part of June?

A.    I do believe so, yeah.

Q.    And actually, you asked Nick for a ride home, didn't you?

A.    I did.

Q.    Okay.  And he was happy to give you a ride?

A.    Oh, for sure, yeah.  I used to walk on the highway. And it was a heavy backpack and — why not?

Q.    It was nice to have a ride for a change?

A.    You bet.

Q.    So, he expressed some concern to you about the way

Exhibit 5001 at 1063

Curran   X   D5 271

that Leah was treating him?

A.   Yes.

Q.   And he asked for your advice?

A.   Yeah.  I mean he was more — he was telling me that there was abuse in the relationship.  He needed to get back and go pick up Leah so there wouldn't be a fight.  She wouldn't basically physically attack him, smack him, hit him, whatever, slap — a fight.  I mean, it sounded like she would get physical.

Q.   Okay.  So, he was doing you a favor and this came up in the context of he needed to get back and not be late in picking up Leah?

A.   Right.  Because that could start a fight where she might physically attack him.

Q.   All right, all right.  I got it.  Okay.

A.   Yeah.

Q.   And you grew up with Leah and with her sister, Denise?

A.   Uh huh.  And I actually - - -

Q.   (Interposing) And your family's been friends - - -

Okay.  Let's wait.  I'm going to ask you a question.  And then you can answer it.  Okay?  Otherwise we're both talking on the record.  Okay.

So, you grew up with Leah and Denise Freeman?

A.   Uh huh.

Exhibit 5001 at 1064

Curran   X   D5 272

Q.    Your mom worked at Denny's Pizza.  Is that right?

A.    When I was really, really little, yes.

Q.    And so you've known the Freeman family for a long time?

A.    Uh huh.

Q.    Okay.  And how long did it take for Nick to give you a ride home?

A.    Oh, it was just instant.  I mean, it was really — it was a quick thing.  It didn't take any time at all.  I just live at the (not understandable) at the end of town.

Q.    So, in terms of him asking for your advice, you told him that he should talk to somebody?

A.    Cory, Leah's mom.

Q.    Talk to Leah's mom.  And he thanked you for your advice?

A.    Yeah.  It sounded like that, you know, he thought that was a good thing to maybe tell Cory that it was getting physical.  And maybe she needed some counseling or, you know, that it needed to be talked about.

Q.    Okay.  Very good.

      Thank you.

            MS. McCREA:    Nothing further, Your Honor.

            THE COURT:    Redirect.

            MR. FRASIER:    Just one question.

Exhibit 5001 at 1065

Curran   ReD  D5 273

<u>REDIRECT EXAMINATION</u>

<u>BY MR. FRASIER</u>:

Q.   Based on your acquaintanceship with Leah Freeman, had you known her to be aggressive?

A.   No.  No.  She's never attacked anybody as far as I'd seen, you know.

Q.   Thank you.

MR. FRASIER:   That's all I have.

THE COURT:   You are free to leave.  You may step down.

WITNESS:   Thank you.

THE COURT:   We'll take the evening recess at this time.

Nine o'clock.  Everybody else remain seated until the jury has a chance to leave.

Remember the admonition.  Leave your notes in the jury room, please.

(Jury Out.)

THE COURT:   If I'm reading your list right, do you plan to rest tomorrow?

MR. FRASIER:   I'm hoping so, yes.

THE COURT:   Okay.

Just so — and if I read this correctly, it's probably some time in mid afternoon?

MR. FRASIER:   I hope so, yes.

Exhibit 5001 at 1066

D5 274

THE COURT:    Okay.

So, the Defense will have some witnesses available?

MS. McCREA:    Like Mr. Frasier says, I hope so.

THE COURT:    Okay.

MR. FRASIER:    Your Honor, before we adjourn for the evening, I do have a witness that I intend to call tomorrow, but it might be a good idea that the court hear it outside the presence of the jury, because I - - -

THE COURT:    (Interposing)  Okay.

MR. FRASIER:    And I'm prepared to do that now.

THE COURT:    All right.

Go ahead.

MR. FRASIER:    And that would be Ms. Cagley, Christy Diane Cagley.

THE COURT:    Okay.  That's fine.  Let's go.

CHRISTY DIANE CAGLEY (YOUNG)
was thereupon produced as a witness on behalf of the Plaintiff outside the presence of the jury, and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat up here, please.

Go ahead.

Exhibit 5001 at 1067

Young   D   D5 275

DIRECT EXAMINATION

BY MR. FRASIER:

Q.    Could you state your name please, ma'am, and spell your last name for the record?

A.    Christy Diane Cagley, C-A-G-L-E-Y.

Q.    Have you been previously name as Young, by the last name of Young?

A.    Yes.

Q.    Now, Ms. Young, we called you in here today because we want to ask you some questions to determine the admissibility of your testimony.  Okay?

A.    Okay.

Q.    Now, the questions that I have for you, are you familiar with an individual named Polly Parks?

A.    Yes, I am.

Q.    And how do you know Polly Parks?

A.    She's been a good friend of mine for about eleven years now.

Q.    Was there a period of time that you lived with Ms. Parks?

A.    Yes.

Q.    When was that?

A.    Been about ten years now.

Q.    Do you recall in relation to the disappearance of Leah Freeman, when — taking that into account — when you lived

Exhibit 5001 at 1068

Young   D   D5 276

with Ms. Parks?

A.   Two weeks, two and a half weeks right after Leah disappeared I moved in with Polly.

Q.   Do you recall an occasion after Leah Freeman disappeared and after you moved into the home of Polly Parks where the Defendant and his brother Wayne McGuffin were at Ms. Parks' home?

A.   Yes, I do.

Q.   Do you recall a television set being on?

A.   Yes, I do.

Q.   Do you recall a report on the television that a shoe had been found on Hudson Ridge?

A.   I do.

Q.   In the presence of the Defendant do you recall what Wayne McGuffin said?

A.   He looked at his brother.  And he said, "Ah, they won't find anything from that shoe."

And Mr. McGuffin himself over there laughed about it.  And it was kinda brushed under the rug.

Q.   Do you recall telling the police that — and I believe you also testified at the Grand Jury — that the shoe had been put there to put the police off?

A.   Yes.  It was put there deliberately to make them think that she'd been out there.

Q.   How did the Defendant react to that statement by

Exhibit 5001 at 1069

Young   X   D5 277

Wayne McGuffin?

A.   He thought it was kind of humorous.  It didn't really concern him much.  He found it to be humorous, like kind of - - -

Q.   (Interposing) Did he laugh?

A.   He kinda just snickered about it and was, like, "Yeah.  I know what you're talking about."  You know.

Q.   Thank you.

WITNESS:   You're welcome.

MR. FRASIER:   That's the proposed testimony I intend to offer tomorrow.

THE COURT:   Any examination of this?  Or any objection now?  You can examine and make your objection or make an objection, Counsel.

MS. McCREA:   Well, I object to it.  I mean, it's hearsay.  It's a statement of Wayne McGuffin.

I guess, yeah.  Let ask her a couple questions.

CROSS EXAMINATION

BY MS. MCCREA:

Q.   So, I'm sorry.  Is it Ms. Cagley now?

A.   No.  It's Young.

Q.   It's Young.  Because I've got both your names on this report.

So, Ms. Young, the first time that you spoke to anyone in law enforcement about what you've testified here

Exhibit 5001 at 1070

Young   X   D5 278

today was July 20th, 2010.  Is that right?

A.   Yes.

Q.   And you spoke to Officer McNeely of the — Officer McNeely and Officer Webley?

A.   Yes.

Q.   And you hadn't told anybody what you've told us here today prior — in terms of law enforcement — prior to that time?

A.   No.

Q.   And the statement that was made was solely a statement of Wayne McGuffin, not of Nick McGuffin?

A.   Yes.

MS. McCREA:   Your Honor, our position is it's hearsay.  It is — the Defense is put in a position where it's very difficult to cross examine because the statement didn't come up until 2010.  And it is more prejudicial than it is probative.

THE COURT:   Uh - - -

MR. McCREA:   (Not understandable.)

MS. McCREA:   And, I'm sorry.

And what?

MR. McCREA:   (Not understandable.)

MS. McCREA:   Yes.  And Mr. McGuffin did not adopt the statement of Wayne McGuffin.

THE COURT:   Ms. Cagley, just let me go over

Exhibit 5001 at 1071

Young    CourtD5 279

this again.

CLARIFYING EXAMINATION

BY THE COURT:

Q.    When the report came on about the shoe and Mr. Wayne McGuffin, you say, said, "They won't find much from that."

What was Mr. Nick McGuffin's reaction?

A.    He was looking right at his brother, having a conversation with him and agreeing with him.  And he thought it was funny.

Q.    He was agreeing — looking at him and saying in effect — whether he said the words — nodding his head or something to show he agreed with him?

A.    Uh huh.

Q.    Okay.  And the next statement, Mr. Wayne McGuffin you say made, was, "Somebody planted it to throw people off." And at that point the Defendant laughed?

A.    Yes.  He snickered about it.

Q.    Okay.

THE COURT:    The first part, from what she's testified would clearly indicate that the Defendant adopted it, the circumstances.

The second part, would not indicate that. Although in the context — and I looked at this in relation to — I think the other witness testified but I ruled out.

I just want to look at it a little closer,

Exhibit 5001 at 1072

because the context of the whole conversation actually may indicate from what's she's testified to, that even the laugh at the second part may be part of the overall circumstance. And you don't need somebody saying, "I agree with that statement." for it to be an adoptive admission.

So, I will look at it and let you know tomorrow morning whether she will be allowed to testify.

Okay?

But I think at least the first part she would be, clearly.

MR. FRASIER:    All right.

THE COURT:    Okay.

Ma'am, you'll have to be back at nine tomorrow.

MR. FRASIER:    That's fine.

WITNESS:    Okay.  Thank you.

THE COURT:    We'll be in recess.

(END OF DAY FIVE)

*                          *                          *

Exhibit 5001 at 1073

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

STATE OF OREGON,                    )
                                    )
            Plaintiff,              )      CASE NO. 10CR0782
                                    )
     vs.                            )      JURY TRIAL
                                    )       DAY SIX
NICHOLAS JAMES MCGUFFIN,            )
                                    )
            Defendant.              )
_____ )

<u>TRANSCRIPT OF PROCEEDINGS</u>

<u>Volume 9, Pages D6 2 to D6 112</u>

BE IT REMEMBERED That, the above-entitled cause came on regularly for hearing beginning at 8:59 a.m., Wednesday, July 13, 2011, in the Circuit Courtroom of the Coos County Courthouse in the City of Coquille, County of Coos, State of Oregon, before the Honorable Richard L. Barron and a jury.

<u>APPEARANCES</u>

R. Paul Frasier, District Attorney for Coos County, representing the Plaintiff.

Erica Soublet, Assistant District Attorney for Coos County, representing the Plaintiff.

Shaun McCrea, Attorney at Law, representing the Defendant.

Robert McCrea, Attorney at Law, representing the Defendant.

S. Jean Sprouse, Court Transcriber, XV Judicial District, 503-325-5254

Exhibit 5001 at 1074

D6 2

(Jury out.)

JUDICIAL ASSISTANT:    All rise.

THE COURT:    Be seated please.

Ms. McCrea.

MS. McCREA:    Your Honor, I would request to be heard further concerning the witness Christy Young-Cagley - - -

THE COURT:    (Interposing)  Go ahead, please.

MS. McCREA:    - - - and that matter.

We had her short testimony yesterday.  I just received her CCH from the State this morning.  She does not have any impeachable felony convictions, but she does have some arrests.  The State has indicated to me that she has not been offered anything nor has she been promised anything in exchange for her testimony.

But my additional concern is in looking at the discovery.  The Court had ruled that this was an adoptive admission based on Oregon Rule of Evidence 801.4(b))(B), that - - -

THE COURT:    (Interposing) You're talking about what I said yesterday?

MS. McCREA:    Yes.

THE COURT:    And it's not something in the past (not understandable)?

MS. McCREA:    No, no, what the court said at

Exhibit 5001 at 1075

D6 3

the end of the day yesterday.  And I confess this was — I appreciated that Mr. Frasier brought it up so we all had a chance to look at it, but it was unexpected at the moment, so I did need a little bit of time to think about it.  And my concern, Your Honor, is that based on the report of the interview of Officer McNeely and Officer Webley of Ms. Young-Cagley on July 20th, 2010, the report says she stated in 2000 she lived with Nicole Lindsey in Fairview above the Halfway Tavern a ways.

"Young said about two days after Leah went missing she moved in with Pauline Parks.  And then she talked about Nick and Wayne McGuffin nonchalantly talking at Parks' house about Leah's disappearance and the shoe being found up on Hudson Ridge.  Young said Wayne said, quote 'Ha.  That was put there to throw them off.  It was meant to be thrown there.  They won't find anything there.' unquote."

And then, in the Grand Jury testimony when Ms. Cagley-Young testified before the Grand Jury on July 30th, 2010, ten days later, she was asked by Mr. Frasier a question:
"Was there ever a discussion when, with, let's say Wayne, when it was announced publicly that a shoe belonging to Leah had been found on

Exhibit 5001 at 1076

D6 4

Hudson Ridge?"

Answer:   "Uh huh or um huh."

Question: "Do you recall Wayne McGuffin saying —
what do you recall Wayne McGuffin saying at
that point?"

Answer:   "I remember Wayne kind of snickering and
saying, 'They won't find anything from that.
That's been thrown there to put them off the
trail."

Question: "Did he further explain what he meant by
that?"

Answer:   "No.  And I didn't care to elaborate with
him on it."

Question: "He didn't want to know any more?"

And then they go onto other matters.  So, in both the Grand Jury testimony and the interview with the police officers, there was no indication by the witness of any supposed reaction of Mr. McGuffin where it could be an adoptive admission.  And the question was specifically put to her at Grand Jury, "Was there ever a discussion?"

And the only thing she testified to, under oath, was what Mr. Wayne McGuffin said; not anything regarding Nicholas McGuffin.

So, it is our position that it is not an adoptive admission, and that it should go to the

Exhibit 5001 at 1077

D6 5

admissibility, not simply the weight of the evidence because under 403 it is so prejudicial and inflammatory.  And further, it implicates an issue which we've not brought up in the case to date because we've been trying to make everything work.  But I feel compelled to bring up at this moment, Your Honor.

It implicates in addition, an issue of Mr. McGuffin's right to a speedy trial concerning pre-indictment delay, because Ms. Freeman disappeared back on June 28th, 2000.  There was a Grand Jury in the year 2000.  There was a Grand Jury in 2010.  And Mr. McGuffin was discharged in August of 2010.  And now we have witnesses and information coming up in such a manner that it is difficult if not impossible for the Defense to effectively investigate, confront and challenge this type of witness in this type of situation.

And I submit that under Article 1 section 10, that violates Mr. McGuffin's right to a speedy trial; Article 1 section 10 is the equivalent of Mr. McGuffin's rights under the Sixth Amendment; under Barker versus Wingo; 407 United States 514 from 1972.  And as I know the Court well knows, the requirements under Barker versus Wingo are the length of delay, and under the federal standard whether Defendant asserted his right which he doesn't need to do under the State standard.  The  - - -

THE COURT:    (Interposing) Let me just ask

Exhibit 5001 at 1078

D6 6

something.  It's been a while since I read Barker, but is that — I don't recall that necessary being a pre-indictment delay case as opposed to a post-indictment delay case?

MS. McCREA:    No.  But that does set out the standard.

THE COURT:    It sets out the standard for post-indictment delay?

MS. McCREA:    Yes.

THE COURT:    But not pre-indictment delay?

MS. McCREA:    Right.

THE COURT:    There's a difference.

MS. McCREA:    There is a difference, Your Honor.

THE COURT:    Okay.

Go ahead.

MS. McCREA:    Yeah, no, but I'm - - -

THE COURT:    (Interposing) I just wanted to make sure I was correct on Barker.

MS. McCREA:    Yes.  You're tracking.

My contention is that the problem we've had here is the pre-indictment delay.

THE COURT:    I understand that.

MS. McCREA:    Okay.

THE COURT:    But Barker — when you quote Barker, that's as I recall a post-indictment delay case.  And

Exhibit 5001 at 1079

D6 7

the standards are different.

MS. McCREA:    Well, and I - - -

THE COURT:    (Interposing) You finish your argument, but - - -

MS. McCREA:    Well, my position would be that the standards are not so significantly different that the result would be different according to what I'm saying.  And that is that there was a significant delay here.  And that the reasons for the delay are not such that it's justifiable.  And that there's this admitting this witness's testimony specifically would be prejudicial to Mr. McGuffin in this case.  And therefore, that's an additional reason for this witness to be excluded.

THE COURT:    Okay.

Well, you are raising the issue of pre-indictment delay.  Are you making a motion to dismiss this case because of pre-indictment delay based on this?  Because I'm not getting that necessarily.  You said it raises an issue.  But you haven't — you're not — you're not telling me you're moving to dismiss it on that grounds.  And if you're not, I'm not going to rule on it.

MS. McCREA:    I'm moving to exclude this witness on that ground.

THE COURT:    Okay.  All right.

Well, it appears to me, and I want you to

Exhibit 5001 at 1080

D6 8

correct me if I'm wrong.  The basis of your motion is that this witness has come up somewhat late.  And that in two statements she didn't specifically mention a response by Mr. McGuffin.  Where in her testimony yesterday she mentioned specifically a response by Mr. McGuffin.  And that response in effect is what the Court said would allow the testimony.

And if at least one of the basis, the main basis, is that her two statements are inconsistent with her statement on the stand, that could possibly be said to apply to every witness here.  And you would be asking me to say that evidence is inadmissible because there's contradictions.  And that has always been a jury function; and not a court function if they're there.

Now there may be some point — some point in a case where it is so clear and so obvious that the court might have to rule that something is inadmissible as opposed to it is admissible and it's up to the jury to decide the credibility and that through listening and through listening to arguments where Counsel can certainly bring up all the inconsistencies they wish to bring up, because we've gone through that with several witnesses.

But generally that is a function of the jury and not the Court and it doesn't effect the admissibility.  It may effect the weight the jury give to it through argument. Now, specifically in this case — and I wanted to make sure I

Exhibit 5001 at 1081

D6 9

heard the witness correct.  When I questioned her, I said, "Tell me again what happened when the first statement came up when Mr. Wayne McGuffin allegedly said, 'Well, they won't find anything from that.'"

And Ms. Cagley indicated that Mr. McGuffin nodded his head, laughed.  And then the second statement was that somebody planted it there.  And Mr. McGuffin again, allegedly laughed.

That would indicate in her testimony, at least here, and Mr. Frasier that's the only reason I would allow it, because of the nod.  Because it showed agreement.  And in fact there is a case, United States versus Tocco, T-O-C-C-O, 135 Federal third, 116, a 1998 case in which a witness said that one co-defendant confessed to committing arson with another co-defendant.  The witness then went to the co-defendant and described — said this other person has confessed to me that he committed the crime along with you on behalf of his brother. And the witness nodded.  And the Court upheld the admissibility of that as acquiescence.

It wasn't silence, it was acquiescence.  So, there is case law that would indicate that the nod of a head certainly shows acquiescence.  And in that case to me it was much more ambiguous than this case.  Because in this case there were direct statements.  In that case I guess you could even say ambiguity was that he was just nodding his head while

Exhibit 5001 at 1082

D6 10

the witness was talking.  But the Court allowed it and certainly said ambiguity doesn't stop admissibility.

So I think the statement would be admissible again.  And the witness specifically said Mr. McGuffin nodded. If it was merely somebody who chuckled at some remark, it wouldn't be —  I wouldn't allow it.  But with the nod I would allow it.  And then the chuckle then would be consistent with what Ms. Cagley described as a further kind of laughing at the second statement.  So, I think both statements would come in.

The pre-indictment delay, I think as Counsel is very aware there are very few if any cases — I mean, I'm sure there are cases where pre-indictment delay has led to a dismissal or in this case you're not moving for a dismissal. But you're saying that in effect should lead me to exclude the witness.  There have been other witnesses who will testify — who have testified and may testify in the future who have come forward at a later time.

And those cases are — in that sense those witnesses are no different than this witness.  And pre-indictment delay has to show actual prejudice before a Court would ever dismiss something based on pre-indictment delay as opposed to post-indictment delay where there has to be not only some — possibly some prejudice, but a lengthy delay for no reason.  This case was indicted in 2010.  And I had the issue before, but the issue clearly wouldn't — the pre-

Exhibit 5001 at 1083

D6 11

indictment delay in this case was based on investigation. And there's nothing to show that the State delayed ten years to do this for any advantage. And the witness is here in person and can be cross examined. And so there's no prejudice based on this witness coming in because you have the right to cross examine the witness.

So, I will deny your motion.

MS. McCREA: And the Court is also denying it on the 403 basis?

THE COURT: Yeah. I — you know, both sides introduce evidence that's prejudicial to the other side. I mean, that's the nature of the evidence. The State introduces evidence that tries to show Mr. McGuffin is guilty; you introduce evidence to try to show he's not guilty. And I guess in that sense all evidence that's introduced is prejudicial.

But I don't see that the prejudice — this case, based on the witness coming forward in 2010 or whatever it is, is any different than any other witness. And I don't see that this — that the prejudice of this is so inflammatory or different than any other prejudice — and other statements. I think witnesses who testified, for instance, that Mr. McGuffin threatened to strangle them or kill them, similarly to Ms. Freeman was obviously prejudicial. And would be, if it's inflammatory, might even be more inflammatory than this. But

Exhibit 5001 at 1084

D6 12

I don't find either of those statements so inflammatory that it would lead to me not admitting the evidence.

So, your motion's denied.

Bring the jury in.

(Jury In.)

THE COURT:     Counsel approach, Ms. McCrea and Mr. Frasier.

(SIDEBAR)

THE COURT:     Call your next witness, please.

MS. SOUBLET:     State calls Michael Dennis.

MR. McCREA:     Excuse me, Counsel and Your Honor, I thought we were going to go on with Mr. Hamilton this morning.

THE COURT:     We certainly — did — was there some sort of agreement reached or - - -

MR. McCREA:     Uh - - -

THE COURT:     (Interposing) If there was that's fine.  And I think it would be better to finish Mr. Hamilton before going to another witness as long as there is some agreement reached on what was going to be - - -

MR. McCREA:     (Interposing) The State found what we had intended to offer satisfactory and was kind enough to make a copy of that portion of the Grand Jury testimony, which is as I understand it, Exhibit No. 243, Your Honor.

THE COURT:     Okay.

Exhibit 5001 at 1085

D6 13

MR. FRASIER:    What I've done, Your Honor, is I have the phone call.  And it's marked as State's Exhibit No. 242.  And then I have the Grand Jury testimony that's marked as State's Exhibit No. 243.  We're prepared to offer those as exhibits.

THE COURT:    Okay.

MR. McCREA:    And yeah, we were going to offer them anyway.  So, they're doubly offered, I guess you could say, Your Honor.

THE COURT:    I'm just going to rule once.

How many — No. 243 and what?

MR. FRASIER:    No. 242.

THE COURT:    Okay.  Nos. 242 and 243 are received.

(Whereupon Exhibits Nos. 242 and 243 were then received into evidence.)

MR. FRASIER:    I also have, Your Honor, what I've marked as No. 241 which is an excerpt of the Grand Jury testimony of Ms. Reid.  I previously provided that excerpt to Counsel yesterday.  We would offer No. 241 also.

MR. McCREA:    I defer to co-Counsel.

THE COURT:    Any objection to that?

MS. McCREA:    Yes.  I'm sorry I didn't realize it was an exhibit.  He just handed me a CD and I haven't listened to it.  So, if we could - - -

Exhibit 5001 at 1086

D6 14

THE COURT:    (Interposing) All right.  I'll allow - - -

MS. McCREA:    - - - defer that.

THE COURT:    I'll withhold ruling on that for now.

MS. McCREA:    Thank you.

MR. FRASIER:    With the admission of the exhibits, Your Honor, I do not see a reason to put Mr. Hamilton back up there.  We can play these at any time for the jury.

THE COURT:    I don't know whether Mr. McCrea had finished his cross examination.  If all you wanted to do was play that, I don't see the necessity either.

But if you wanted him on the stand for some reason, I'll call him back.

MR. McCREA:    I want him on the stand for very good reasons, Your Honor.

THE COURT:    Okay.

Then let's get Mr. Hamilton back in.

And you want those played.  And then you'll question him.  Correct?

MR. McCREA:    Well, actually what I want to do is, I want to establish some more foundation concerning the so called pretext phone call so it's understood the circumstances under which this is made.

Exhibit 5001 at 1087

D6 15

THE COURT:     Okay.

Do you wish to do that before these tapes are played or after?

MR. McCREA:     It doesn't have to be before the Grand Jury tape, but it needs to be before the phone call tape.

THE COURT:     Okay.

I just want to make sure that we do that, because the — when we play the tape I'm not going to have the FTR on to record the tape because it's already in evidence. So, I just want to make sure that you're not going to be asking questions during that time so we don't have to — the reporter doesn't have to be going back and forth.

So, whatever order you want to do it.  I just want to make sure of the order.

MR. McCREA:     Yes, Your Honor.  It's very simple.  I just hadn't discussed my process — intended process and procedure with Mr. Frasier.  We intend to play the Grand Jury testimony which we were in the process of doing before; and to complete that.

THE COURT:     And that was for impeachment purposes?

MR. McCREA:      Yes, that's correct.

THE COURT:     Okay.

Go ahead.

Exhibit 5001 at 1088

D6 16

MR. McCREA:   And then we have — and then I have some questions of Mr. Hamilton about and concerning the phone call.

THE COURT:   Okay.

MR. McCREA:   And then we would play the phone call.  And that - - -

THE COURT:   (Interposing) Okay, that's fine.

MR. McCREA:   - - - would be the end of my questioning of Mr. Hamilton.

THE COURT:   Okay.

Call Mr. Hamilton back in.

Mr. Hamilton, if you'd have a seat back here.

You're still under oath.

Just to explain the procedure, they're going to play the Grand Jury — your Grand Jury testimony.  They won't be asking you any questions.  So, you can just sit and listen and not say anything.  Then, when that's done they will be asking you some questions.  And then they'll play another tape about some phone calls.

The first tape, the one on the Grand Jury testimony is for impeachment.  That is you can use it to assess Mr. Hamilton's credibility, but for no other purpose.  In other words, again, it's not offered for the truth of what was said, it's just whether it effects his credibility or not.

Okay.

Exhibit 5001 at 1089

D6 17

Then, go ahead and play the Grand Jury tape, please.

And you don't have to — you can pause the FTR during the playing of that Grand Jury tape.

THE COURT:    Go ahead.

MR. McCREA:    Well, I don't like to make this trial any longer than necessary nor does anyone else.  And if I — if what Counsel is proposing is that we don't Mr. Hamilton any further and that we just play the tapes, and we excuse Mr. Hamilton, that would be fine with the Defense that we do it that way.

THE COURT:    Okay.

So, you don't need him as a witness any longer?

And Mr. Frasier, you don't need - - -

Okay.  Now, you don't need him as a witness any longer, Mr. Frasier, either?

MR. FRASIER:    No.

THE COURT:    Okay.

Then he's excused.

MR. McCREA:    Right.  We just excused him.

THE COURT:    Mr. Hamilton, you may step down. And you're free to go.

Okay.  It sounds like you can now play it.

MR. FRASIER:    Okay.

THE COURT:    And again, when it starts you can

Exhibit 5001 at 1090

pause FTR.

FTR is For the Record, that's what they call that recording system. Just so you know what that stands for.

(State's Exhibit No. 243, the audio tape was played for the jury. Not transcribed.)

MR. FRASIER: Does Counsel wish the phone call to be played now?

MR. McCREA: Yes.

THE COURT: And I understood this was being offered for more than impeachment, the phone call, as opposed to just impeachment. It was being offered for other purposes or just impeachment again?

MR. FRASIER: I would submit that this should be received as substantive evidence.

THE COURT: The phone calls?

MR. FRASIER: Yes.

THE COURT: Yes, that's what I thought it was being offered. I just wanted to make sure.

Okay, that's fine.

Play the phone calls.

You can consider this tape for any purpose.

(State's Exhibit No. 242, the audio tape was played for the jury. Not transcribed.)

THE COURT: Go ahead and call your next witness.

Dennis   D    D6 19

MS. SOUBLET:    The State calls Michael Dennis.

MICHAEL DENNIS

was thereupon produced as a witness on behalf of the Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat here, please.

Go ahead, please.

MS. SOUBLET:    Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. SOUBLET:

Q.    Mr. Dennis, can you state your full name and spell your last for the record?

A.    Michael Dennis, D-E-N-N-I-S.

Q.    Mr. Dennis, have you grown up in Coquille?

A.    Yes.

Q.    Lived here all your life?

A.    Yes.

Q.    Did you go to Coquille High School?

A.    Yes, I did.

Q.    What grade were you in the school year 1999-2000?

A.    In 1999-2000 I believe I was a sophomore.

Q.    Did you know the Defendant, Nicholas McGuffin?

A.    Yes, I did.

Q.    How do you know him?

Exhibit 5001 at 1092

Dennis   D    D6 20

A.   Mostly through passing in school.  Never really hung out much or anything.  Pretty much said, "Hi," here and there. That was about it.

Q.   Did you know the victim, Leah Freeman?

A.   Yes.

Q.   How did you know her?

A.   Pretty much the same relation.

Q.   Were you aware whether of not she and the Defendant were involved in a relationship?

A.   Yes.

Q.   Okay.  And what did you know that relationship to be?

A.   Fairly troubled relationship.  I mean, they fought, from what I'd see every once in awhile.  I never witnessed anything severe, you know, real physical or anything.  A little bit of pushing and shoving was about the most that I'd ever seen.

Q.   Who were you living with in 2000?

A.   My grandma and grandpa.

Q.   What's your grandmother's name?

A.   Donna Dennis.

Q.   Was there an opportunity near the end of the school year when your grandmother came to pick you up after school?

A.   Yes.

Q.   And at that time were you asked to identify some

Exhibit 5001 at 1093

Dennis    D       D6 21

people for her?

A.    Yes, I was.

Q.    Who were the people you were identifying?

A.    Nick McGuffin and Leah Freeman.

Q.    Where were they when you made that identification?

A.    I'm not sure of the directional facing, but if you're facing the road outside of the high school it would be towards the left hand corner there.

Q.    Okay.  Is that in the parking lot?

A.    Yes.

Q.    Were they next to something?

A.    More or less, kind of away from the fence in the middle of the parking lot there.  There wasn't really anything around that I could remember except for their vehicle.

Q.    What vehicle was that?

A.    The blue Mustang.

MS. SOUBLET:   Can I see Exhibit (not understandable)?

Q.    Mr. Dennis, I'm showing you what's been received as Exhibit No. 16 and asking you if you recognize that?

A.    Yes.  I recognize the license plate.

Q.    What is it a picture of?

A.    A blue Mustang.

Q.    Whose blue Mustang?

A.    Nicholas McGuffin's.

Exhibit 5001 at 1094

Dennis  D    D6 22

Q.   Was there an opportunity after that incident in the parking lot when the incident came up again between you and your grandmother?

A.   Came up again?

MS. McCREA:   Excuse me.  It sounds like actually we're getting into back door hearsay, Your Honor. And I object.

THE COURT:   I'm not sure yet.  Because that question just — I think in essence did they discuss it again and she — and the witness didn't answer.  But that question wouldn't be objectionable.

But be careful if you're going to ask him what grandma said.

MS. SOUBLET:   I'm not going to ask him what his grandmother said.

THE COURT:   All right.

Then go ahead.

Q.   Was there a time when that incident — you discussed that incident again with your grandmother?

A.   The same incident, I believe we discussed it a little bit on the way home, for the most part.  And that was about it.

Q.   Was there a time after Leah Freeman's disappearance where that incident came up again?

A.   I honestly can't remember.  She may have asked me

Exhibit 5001 at 1095

Dennis    X    D6 23

about it at one time, you know, asked if maybe I felt there was anything.

MS. McCREA:    Well, wait a minute.

THE COURT:    Sustained.

You can't testify to what your grandmother said.

WITNESS:    Okay.

Q.    Thank you.

MS. SOUBLET:    Nothing further.

THE COURT:    Ms. McCrea.

CROSS EXAMINATION

BY MS. MCCREA:

Q.    Mr. Dennis, so you were in high school with Leah Freeman and Nick McGuffin?

A.    Yes.

Q.    And you're giving us your impressions now eleven years later of their relationship.  Right?

A.    Yes.

Q.    And you'd see them in the hallways at school or as you said out in the parking lot?

A.    Yes.

Q.    And would it be fair to characterize the relationship as passionate?

A.    I'd say that they cared for each other.

Q.    Okay.  And you indicated that there would be

Exhibit 5001 at 1096

Dennis    X    D6 24

arguments and this sort of thing.  Would there also be times when you would see them displaying public affection?

A.    Yes.

Q.    And they were together a lot?

A.    As far as I can remember they were together quite often, yes.

Q.    Okay.  And the times that they had arguments, that was very public, wasn't it?

A.    Yes.

Q.    All right.  So, they didn't really care who heard them or who saw them, they were going to do what they were going to do with each other?

A.    Yeah.  It seemed like it, yeah.

Q.    Okay.  And this time in question when you saw them, Leah Freeman and Nick McGuffin in the parking lot.  What you remember is seeing them standing by Mr. McGuffin's blue Ford Mustang?

A.    Yes.

Q.    Thank you.

        MS. McCREA:    That's all the questions I have, Your Honor.

        MS. SOUBLET:    No redirect.

        THE COURT:    You may step down and you're free to leave.

        WITNESS:    All righty.

Exhibit 5001 at 1097

D. Dennis  D    D6 25

THE COURT:    State calls Donna Dennis.

DONNA DENNIS

was thereupon produced as a witness on behalf of the Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat here, please.

DIRECT EXAMINATION

BY MS. SOUBLET:

Q.    Ms. Dennis, can you state your full name and spell your last for the record?

A.    Donna Dennis, D-E-N-N-I-S.

Q.    Mrs. Dennis, do you live here in Coquille?

A.    Yes.

Q.    Were you living here in the school year 2000?

A.    Yes.

Q.    Did you have anyone living with you at that time?

A.    My grandson Michael.

Q.    Was there an occasion when you picked your grandson up from school?

A.    Yes.

Q.    When — do you remember when in the school year that was?

A.    Not precisely, no.

Q.    Near the first half of the school year, which would

Exhibit 5001 at 1098

D. Dennis  D    D6 26

be in 1999 or - - -

A.    Oh, what part of the school year.  I'm sorry.  I thought you asked which year.  It would have been towards the end of the school year.

Q.    While you were picking your grandson up from high school, did you have an opportunity to witness people in the parking lot?

A.    Yes.

Q.    Was there any people in particular that drew you attention?

A.    There was a couple that were having words as they were walking across the parking lot.

Q.    Okay.  When you say having words, what do you mean?

A.    Arguing.  It looked like arguing.

Q.    So, what did you do?

A.    I was just watching.

Q.    And was there a point where the argument — where you became concerned about the argument?

A.    Yes.  It — when they got to a car it accelerated into more of a physical.

Q.    Okay.  Let me back you up.  When you say couple are you talking boy/girl, girl/girl?

A.    Boy/girl.

Q.    And when they got to the car what happened?

A.    He grabbed her by the arm and slammed her up against

Exhibit 5001 at 1099

D. Dennis   D     D6 27

the car.

Q.    What happened after that?

A.    She — her posture changed.  And she lowered her head and folded her arms and which bothered me, the posture. Then - - -

Q.    (Interposing) Did you take — I'm sorry.

A.    I'm sorry.  Then Michael got in the car.

Q.    And at that point, without telling me what he said, did you have an opportunity to ask him who the couple was?

A.    Yes, I did.

Q.    Was he — without again, without telling me what he said — was he able to identify the couple?

A.    Yes, he was.

Q.    Were you concerned about that incident?

MR. McCREA:    Object.  It's irrelevant whether she was concerned about it or not.  It doesn't go to any issue here.  It tends to be a 403 also, Your Honor.

THE COURT:    Well, a 403, I'm not too sure.

Is there a question after this?

MS. SOUBLET:    There is.

THE COURT:    Go ahead.

I'll overrule it.

Q.    Were you concerned about the incident?

A.    Yes.

Q.    Did you report that incident?

Exhibit 5001 at 1100

D. Dennis   X    D6 28

A.   Yes.

MR. McCREA:   Object.  I object; move to strike.

THE COURT:   If it's - - -

MR. McCREA:   (Interposing) On the same basis.

THE COURT:   Right.

I'm not too sure what that goes to.  She's testified about the incident and what happened.  What happened thereafter, unless there's some specific thing that — other than the reporting it's not particularly relevant to any issue.

MS. SOUBLET:   Your Honor, I think it's relevant that she reported it to the high school.

MR. McCREA:   Well, I object.

THE COURT:   No.  If that's it I'll sustain the objection and strike.

MS. SOUBLET:   Then I have nothing further.

THE COURT:   Okay.

The last answer is stricken.  And the other one before that about whether she was concerned and reported it that's stricken.  Don't consider it.

Go ahead, Mr. Frasier — I mean Mr. McCrea.

CROSS EXAMINATION

BY MR. MCCREA:

Q.   Ms. Dennis, this argument between these two people

Exhibit 5001 at 1101

D. Dennis   X    D6 29

proceeded across the parking lot for some distance.  Right?

A.   Correct.

Q.   And you were watching it from — watching it and being kind of amused originally.  Right?

A.   Yeah, pretty much.

Q.   And you couldn't — you couldn't hear what the argument was about?

A.   No.

Q.   And therefore — well, never mind the therefore.

As a matter of fact you never did hear what they'd been arguing about?

A.   Oh, no.  Huh uh.

Q.   All you saw was got to the car.  Correct?

A.   Correct.

Q.   And then he physically got her in the car.  Is that correct?

A.   Eventually, yes.

Q.   And while this was happening, Michael your grandson came up.  Correct?

A.   Correct.

Q.   And Michael saw them at the car, also.

A.   Correct.

Q.   And he saw them at the car before they got in the car.  Correct?

A.   Correct.

Exhibit 5001 at 1102

D. Dennis  ReD  D6 30

Q.   All right.  So, Michael saw what happened as far as their getting the car, also.  Correct?

A.   Correct.

Q.   All right.

MR. McCREA:   That's all the question I have.

THE COURT:   Any redirect?

REDIRECT EXAMINATION

BY MS. SOUBLET:

Q.   Ms. Dennis, when you saw the gentleman push the woman, was it into the car or across the car?

A.   Originally, up against the car then into the car.

Q.   Thank you.

MS. SOUBLET:   Nothing further.

THE COURT:   You may step down and you're free to leave.

WITNESS:   Thank you.

MR. FRASIER:   Call Kim Pugmire.

KIM PUGMIRE

was thereupon produced as a witness on behalf of the Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:   Have a seat up here, please.

Go ahead.

MR. FRASIER:   Thank you, Your Honor.

Exhibit 5001 at 1103

Pugmire   D    D6 31

DIRECT EXAMINATION

BY MR. FRASIER:

Q.   Could you state your name please, sir, and spell your last name for the record?

A.   Sure.  Kimberly Pugmire, P-U-G-M-I-R-E.

Q.   And you're currently married?

A.   Yes.

Q.   Your maiden name?

A.   Courtright.

Q.   Are you familiar or were you familiar with an individual named Leah Freeman?

A.   Yes.

Q.   How did you know her?

A.   She's my cousin.

Q.   Are you familiar with the Defendant in this case, Mr. McGuffin?

A.   Yes.

Q.   How do you know him?

A.   We went to school together.

Q.   Where were you in relation to him in terms of school year?

A.   We were pretty decent friends.  We would walk through the halls together.  Hang out a little bit.

Q.   All right.  Were you older than him, younger?

A.   Older by two years.

Exhibit 5001 at 1104

Pugmire   D    D6 32

Q.   Now, did you become aware at some point in time that the Defendant was dating your cousin, Leah Freeman?

A.   Yes, I did.

Q.   Did you have an opportunity to observe these two together?

A.   Not so much.

Q.   Now, you're aware that your cousin disappeared on the evening of June 28th of 2000?

A.   Yes.

Q.   A few days after she disappeared did you have a conversation with the Defendant about Ms. Freeman being gone?

A.   I did.

Q.   Do you recall how many days after it had been reported she was missing that you discussed this with him?

A.   It was somewhere around three or four days.

Q.   And what happened?  What did the Defendant tell you?

A.   I had pulled into a parking lot, used to be Seven Eleven.  And he approached me and we had not seen each other before she had been missing.  And he came up to me and said, "Kim, you know, I have nothing to do with this.  You know, I have nothing to do with this."

And I said, "I know that.  You don't have to tell me twice."

Q.   And what time of the day was this?

A.   It was evening.  It was dark.

Exhibit 5001 at 1105

Pugmire   D    D6 33

Q.   Who were you with?

A.   I was with an ex-boyfriend at the time and one of his friends.

Q.   And what type of vehicle were you in?

A.   It was a green Ford pickup.

Q.   What did you do after you had this conversation with Mr. McGuffin?

A.   We proceeded to head out Fairview.

Q.   Where were you headed?

A.   We were taking the back roads to Myrtle Point.

Q.   So, when you went over Fairview Mountain or Hungry Mountain or whatever they call it, where did you go from there?

A.   Could you repeat that?

Q.   Well, did you end up on Lee Valley Road?

A.   Yes, correct.

Q.   And — well, as you're headed out towards Lee Valley Road, do you see the Defendant again?

A.   I do.

Q.   Where do you see him?

A.   At that gravel pull off right off Lee Valley Road.

Q.   What vehicle was he in?

A.   A red vehicle that I saw him in at the parking lot of Seven Eleven.

Q.   Now, was he with anybody?

Exhibit 5001 at 1106

Pugmire   D    D6 34

A.   Yes.  I believe he was with the two guys that he was with at the store.

Q.   When you left the store, who left first, you - - -

A.   (Interposing) We did.

Q.   Okay.  And as you're going out to Lee Valley Road were you passed by this car?

A.   Correct.

Q.   Could you tell us about that, please?

A.   Right as we were heading out I did notice that that red car that they were in had passed us.  I would say within the first couple minutes of leaving.

Q.   Now, when you get out on Lee Valley Road, you see the car again?

A.   Correct.  As we pull over.

Q.   And where were you pulling over?

A.   To that gravel pull off, the very first gravel pull off on Lee Valley Road.

Q.   Is it a large area?

A.   Yes.  Correct.

Q.   Why did you pull over?

A.   Because the two gentlemen that I was with needed to use the restroom.

Q.   Now, did you see the Defendant there?

A.   I did.

Q.   What happened when you saw him?

Exhibit 5001 at 1107

Pugmire    X    D6 35

A.    I felt that I did not want to stop at that time. And we continued to go on.  I had them get back in the car and go.

Q.    And where did you go from there?

A.    We continued on the gravel road.  And I pulled over about a mile away for them to go to the bathroom.

Q.    Thank you.

MR. FRASIER:    That's all the questions I have, Your Honor.

THE COURT:    Ms. McCrea.

CROSS EXAMINATION

BY MS. MCCREA:

Q.    Ms. Pugmire, you did know Nick McGuffin fairly well in high school.  Right?

A.    Yes.  Correct.

Q.    And the two of you would make small talk?

A.    Uh huh.

Q.    And in fact you — and you were good friends.  Is that a fair statement?

A.    Yes.

Q.    And in fact the two of you — he would walk you to class and you'd walk to class arm in arm on occasion?

A.    Correct.

Q.    Okay.  You knew that he was dating your cousin Leah?

A.    Yes.

Exhibit 5001 at 1108

Pugmire   X     D6 36

Q.    And at one point you said to him, "You take care of my cousin . . ."

A.    (Interposing) Uh huh.

Q.    " . . . because you know she means a lot?"

A.    Right.

Q.    So you kind of charged him to be her guardian?

A.    Right.

Q.    Okay.  Now, the night that you saw him at Seven Eleven in the red car, it wasn't a Thunderbird, was it?

A.    No.

Q.    It was a smaller car than that?

A.    Yes.  Correct.

Q.    Do you remember, was Nick driving or was somebody else driving?

A.    You know, I wasn't paying attention as to was driving.

Q.    Okay.

A.    Because they left after us as well.

Q.    And when you got to the area of the gravel pit, Nick and the other guys were out of the car?

A.    Correct.

Q.    Just standing there?

A.    Right.

Q.    Okay.  And as you started to pull in or slow down, he didn't make any gestures to you or anything did he?

Exhibit 5001 at 1109

Pugmire   ReD   D6 37

A.   No, huh uh.

Q.   Didn't yell at you or say anything?

A.   No.

Q.   Okay.  And when you saw him at Seven Eleven, there wasn't anything unusual about the way he looked that caught your attention, was there?

A.   No, huh uh.

Q.   And what time of day was this?

A.   It was nighttime.  I believe it would be right around ten o'clock.

Q.   Thank you.

        MS. McCREA:    Nothing further, Your Honor.

        THE COURT:    Any redirect?

        MR. FRASIER:    Yes, just briefly.

                REDIRECT EXAMINATION

BY MR. FRASIER:

Q.   Just so we're clear, the old Seven Eleven eventually turned into what's called the - - -

A.   (Interposing) Fast Mart, correct.

Q.   All right.  Thank you.

        MR. FRASIER:    That's all I have, Your Honor.

        THE COURT:    You may step down, ma'am.  You're free to go.

        WITNESS:    Thank you.

        THE COURT:    Call your next witness.

Exhibit 5001 at 1110

Davidson    D    D6 38

MS. SOUBLET:    The State calls Megan Davidson.

MEGAN DAVIDSON

was thereupon produced as a witness on behalf of the Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat here, please.

I think it would be - - -

MS. SOUBLET:    Your Honor, I don't believe she can make it up to the witness stand.

THE COURT:    No, she cannot.  I agree with you.  I think it would be — if she gets — positions herself in front of one of the microphones on the jury rail — that one or that one — that would be fine.

MR. FRASIER:    Is this okay?

THE COURT:    That's fine.

And whoever's going to cross examine her, if you wish to go around so you can see her testify, that would be fine.

DIRECT EXAMINATION

BY MS. SOUBLET:

    Q.    Ms. Davidson, can you state your full name and spell your last for the record?

    A.    Megan Rae Davidson, D-A-V-I-D-S-O-N.

    Q.    Is Davidson your married name or - - -

Exhibit 5001 at 1111

Davidson    D    D6 39

A.    Yes.

Q.    Was your maiden name Hinkley?

A.    Yes.

Q.    Do — did you grow up in Coos County?

A.    Yes.

Q.    In Coquille?

A.    Yes.

Q.    How do you know the Defendant?

A.    We went to school together.

THE COURT:    Ms. Davidson, I would ask you to raise your voice a little, please.

A.    We went to school together.

THE COURT:    Thank you.

Q.    And that would include high school?

A.    Yes.

Q.    Okay.  And did you know Leah Freeman?

A.    Yes.

Q.    How did you know Ms. Freeman?

A.    Just from school.

Q.    Did you know whether or not she was involved in a relationship with the Defendant?

A.    Yeah.

Q.    Were you involved in a relationship with the Defendant?

A.    A relationship?  No.

Exhibit 5001 at 1112

Davidson   D    D6 40

Q.    Okay.  Did you occasionally have sex with the Defendant?

A.    Yeah.

Q.    Is that a yes?

A.    Yeah.

Q.    And that's during the time when he was dating - - -

THE COURT:    (Interposing) Excuse me, ma'am. I'm sorry.  I don't - - -

WITNESS:    (Interposing) Yes.

THE COURT:    Thank you.

WITNESS:    Sorry.

THE COURT:    That's all right.

Q.    Was that during the time when he was dating Ms. Freeman?

A.    Yeah.

Q.    I want to turn your attention to June 29th, 2000.  Do you remember that day?

A.    No, not really.

Q.    Do you remember speaking to the Defendant that day?

A.    I think in the morning.

Q.    Okay.  And do you remember what the conversation was about?

A.    Are you talking about when he called my house?

Q.    Yes.

A.    He called and wondered if I had seen Leah.

Exhibit 5001 at 1113

Davidson    D    D6 41

Q.   What did you tell him?

A.   I said, "No."

Q.   Did you — were you — did you consider yourself to be friends with Ms. Freeman?

A.   Not — no.  I mean, no.

Q.   You were friends with the Defendant?

A.   Yes.

Q.   After you got out of school that year had you seen Ms. Freeman between then and when the Defendant called you early in the morning asking about it?

A.   I'm sorry.  What?

Q.   After you got out of school that year, had you been spending time with Ms. Freeman?

A.   No.

Q.   After the Defendant asked you if you'd seen Ms. Freeman, what did you say?

A.   I said, "No."

Q.   Did you ask him why you would have seen her?  Why he was calling you?

A.   I think I recall saying, "No.  Why would I know?" Because me and Leah weren't like that.  But I think he was just frantic calling anybody and everybody he could.

Q.   Was there a time after Ms. Freeman's disappearance when the Defendant moved into your house?

A.   Yeah.  When he stayed there.  He didn't like move

Exhibit 5001 at 1114

Davidson   D   D6 42

in.  But, yeah, he stayed there.

Q.   Okay.  And by staying there, you mean staying overnight?

A.   (No audible response.)

Q.   That's a yes?

A.   Yeah.

Q.   Wasn't living with his parents at that time?

A.   No.  I don't know.

Q.   And during that time, did you have an occasion to have sex with the Defendant?

A.   I don't remember.

Q.   Do you remember talking with Officer McNeely and Officer Webley last May, 2010?

A.   Yeah.

Q.   And at that time you told them that you'd had sex with the Defendant after Ms. Freeman went missing and prior to her body being found?

A.   Right.  But you just asked me if I'd done it many a time?

Q.   No.  I just asked if you'd had sex with the Defendant?

A.   Well, I already answered that, yes.

Q.   And I'm now asking specifically about the time between Ms. Freeman's disappearance and before her body was found?

Exhibit 5001 at 1115

Davidson   D    D6 43

A.    I think so, yes.

Q.    You actually told the officers that the Defendant — you asked the Defendant whether or not he was ready.  Is that right?

A.    I don't remember.

Q.    You don't remember telling Officer Webley and Officer McNeely that you asked the Defendant, "Are you sure you're ready?"

A.    No.

Q.    I'm going to hand you your statement and ask you to read - - -

A.    (Interposing) This is the statement that they took from me.  This — they twisted my words - - -

Q.    (Interposing) Ma'am, I'm asking you to read that statement, the paragraph I've pointed out.  Right here.  To yourself and tell me when you're done.

A.        "According to Megan, she asked him, "Are you sure you're ready?"

Q.    Ms. Davidson, I asked you to read it to yourself.

A.    Oh.  Okay.

Q.    Are you finished reading that paragraph?

A.    Yes.

Q.    Okay.  And you're saying you don't remember telling Officer McNeely and Officer Webley - - -

A.    (Interposing) No.

Exhibit 5001 at 1116

Davidson    D    D6  44

Q.   - - - that you asked the Defendant is he was ready?

A.   No.

Q.   Do you remember telling the — Officer McNeely and Officer Webley — that the Defendant indicated that, yes, he was ready.

A.   No, I don't remember that.

Q.   Do you remember testifying at Grand Jury that the Defendant had said he hadn't had sex in three weeks?

A.   No.

Q.   It would be safe to say that at the time you testified at Grand Jury and the time you made these statements to Officer McNeely and Officer Webley, that your memory was better than it is today?

A.   My memory sucks.  I don't know what you're asking.

Q.   Well, I'm asking if your memory sucked less back in 2010 when you made that statement?

A.   It probably sucks the same.

MS. SOUBLET:   Nothing further.

THE COURT:   Ms. McCrea.

Just a minute, ma'am.

MS. SOUBLET:   You have to wait.

MS. McCREA:   It's like an obstacle course in here.

THE COURT:   Right.

Exhibit 5001 at 1117

Davidson   X     D6 45

CROSS EXAMINATION

BY MS. MCCREA:

Q.   I know, now you've got to deal with another lawyer. Sorry.

A.   Okay.

Q.   So — okay.  Ms. Davidson, I understand you're saying you're having a hard time with your memory?

A.   Yes.

Q.   The night before Mr. McGuffin called you.  You'd said that — Counsel asked you if he'd called you about looking for Leah.  Do you remember if you had gone to a party the night before?

MS. SOUBLET:   Objection.  Beyond the scope of direct.

MS. McCREA:   Well, it goes to - - -

THE COURT:   No, no, no.

I'll overrule that.

Go ahead.

Q.   Do you remember if you'd gone to a party the night before?

A.   Yes.

Q.   That's a yes?

A.   Uh huh.

Q.   Okay.  And did Nick ask you anything about if — well, that's the point.  You went to a party the night before.

Exhibit 5001 at 1118

Davidson    X    D6 46

That's fine.

A.    Uh huh.

Q.    Now, in terms of Nick staying at your house, was — do you remember when that was?

A.    I don't remember specific dates, no.

Q.    Okay.  And you were friends with Nick McGuffin?

A.    (No audible response.)

Q.    You're nodding yes?

A.    Yes.

Q.    Sorry, I'm trying - - -

A.    Sorry, yes.

Q.    I know.  I know.  I'll just keep reminding you.

And you weren't that close to Leah Freeman?

A.    No.

Q.    And in terms of Nick and Leah's relationship, you observed that they had a good relationship?

A.    Yes.

Q.    Okay.  And Counsel had brought out that you had sex with Nick McGuffin while he was dating Leah Freeman.  I'm sorry and that's — I don't mean to embarrass you.  And was it — it was a situation where despite that it appeared to you Nick McGuffin was devoted to Leah Freeman?

A.    Yes.

Q.    And did they spend a lot of time together?

A.    Yes.

Exhibit 5001 at 1119

Davidson   X    D6 47

Q. And occasionally did you see them have arguments?

A. I've seen them have a argument one time. But other than that we didn't really hang out together as a group.

Q. And the argument that you saw them have was up at Powers?

A. Uh huh.

Q. And that — you're — yes?

A. Yes. Sorry, yes.

Q. Thank you. That's okay.

And during that argument Leah got mad at Nick and he put her over his shoulder and took her to the tent?

A. Yes.

Q. Okay.

A. Or actually I think to the car.

Q. To the car?

A. To put her to bed.

Q. Okay. To put her to bed. And Mr. McGuffin typically drove a blue Mustang?

A. Typically yes.

Q. Okay. He also would sometimes drive his parent's T-bird?

A. (No audible response.)

Q. You're answering yes.

A. Yes. Sorry.

Q. Thank you. Okay.

Exhibit 5001 at 1120

Davidson   X    D6 48

And you had occasion to ride in that Mustang?

A.    Yes.

Q.    And is it correct that there was a gas leak in the —
from the trunk?

A.    Yes.

Q.    There was a gas leak in that car?

A.    Yes.

Q.    Okay.  And you knew that because when you're riding
in the car it smelled like gas?

A.    Yes.

Q.    Okay.  And you had occasion to look in the trunk
during the period of time before Leah - - -

MS. SOUBLET:    (Interposing) Objection.
Beyond the scope.

A.    Um - - -

THE COURT:    (Interposing) Just a minute,
ma'am.

A.    No, I don't think I ever - - -

THE COURT:    (Interposing) No, ma'am.  Just a
minute.

Do you have her subpoenaed also?  Because this
is beyond the scope.

MS. McCREA:    My investigator is nodding yes.
I thought we had her subpoenaed.

THE COURT:    Okay.  Then she is beyond — that

Exhibit 5001 at 1121

Davidson   X    D6 49

is beyond the scope.

So, I'll sustain the objection to that.

If you wish to — are you done with your cross?

MS. McCREA:   If I could just ask a couple more questions on cross.

THE COURT:   That's fine.  And then rather than have Ms. Davidson come back, I would allow you to call her as your witness now.

MS. McCREA:   Okay.

THE COURT:   Okay.

Go ahead and finish your cross.

CROSS EXAMINATION, Continued

BY MS. MCCREA:

Q.   Now, Ms. Davidson, you started to respond to a question by the Prosecution Counsel that — concerning your statement that your words had been twisted.  And you were cut off.  What did you want to tell us?

A.   Well, I just feel like they took some things that I said and completely switched them around.  They used words that I've never even used before.  That's just what I mean.  I mean, I just — it's definitely not word for word for what I said.  And — okay.

Q.   All right.

MS. McCREA:   So, now what I'm going to do, is I'm going to ask you - - -

Exhibit 5001 at 1122

Davidson   ReD   D6 50

THE COURT:   (Interposing) Before you do that- - -

Is there any redirect on this — on her cross?

MS. SOUBLET:    There is, Your Honor.

THE COURT:    Go ahead and ask your questions.

REDIRECT EXAMINATION

BY MS. SOUBLET:

Q.   Ms. Davidson, you had an opportunity to talk with Officer McNeely and Officer Webley in May of this year, didn't you?

A.   Yeah.

Q.   Okay.  And on that occasion they gave you an opportunity to look at your police statement — your statement from 2010, the one I just showed you.  Is that right?

A.   Yeah.

Q.   And then they gave you the opportunity to make corrections to that?

A.   No.

Q.   So, you're saying you don't remember talking with Officers - - -

A.   (Interposing) Did not give me any — he said he was going to.  And then he didn't.  He asked me questions.  And that was it.

Q.   And in those questions that he asked you, that was to clear up any questions or concerns you had about how your

Exhibit 5001 at 1123

Davidson   ReD   D6 51

earlier statement had been written?

A.   I guess.

Q.   You're still friends with Mr. McGuffin, aren't you?

A.   I would say yes.

Q.   And you don't want him to be convicted, do you?

A.   If he did, then yes.  But if he didn't, no.

Q.   Thank you.

MS. SOUBLET:   I have nothing further on that.

THE COURT:   Okay.

Now, Ms. McCrea you may call her as your own witness.  And we will have you examine her.

MS. McCREA:   Okay.

So, I'm calling the Defense witness (not understandable).

I promise we're going to have you out of here in a couple of minutes.

WITNESS:   Okay.

THE COURT:   This beats you having to come back a second time.

All right?

WITNESS:   Okay.  No, that's fine.

THE COURT:   All right.

Now, just listen to the questions and answer them, please.

WITNESS:   Okay.

Exhibit 5001 at 1124

Anderson    D    D6 52

MEGAN DAVIDSON

was thereupon produced as a witness on behalf of the Defendant and, having previously been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. MCCREA:

Q.   So, I just want to talk to you a little bit about the Mustang.

A.   Okay.

Q.   And you testified already that there were occasions when you rode in the Mustang.  And you had testified that you knew that there was a leak in the gas tank because you could smell it in the car?

A.   Yes.

Q.   Now, do you remember there being a trunk liner in the Mustang?

A.   I don't recall ever even looking in the trunk.  So, I can't say.

Q.   All right.  I'm going to see if I can refresh your recollection.  You testified before the Grand Jury for Coos County on August 11th, 2010, so last year.  And at that time you were asked a question by a Grand Juror:

            "So, there wasn't a bed liner or a trunk

            liner or anything?"

Exhibit 5001 at 1125

Anderson   D    D6 53

And you answered:

> "No, I don't.  I never remember there
> being a trunk liner in there.  But honestly I
> never really paid that much attention."

A.   Yeah.  I didn't pay any attention to if there was a trunk liner.  And I — I don't recall seeing the trunk very often.  We rode in the car.

Q.   Do you remember there being a big speaker in the back seat?

A.   I'm sure there was, but no I don't.

Q.   All right.

Thank you, Ms. Davison.

MS. McCREA:   That's all the questions I have, Your Honor.

THE COURT:   Do you have any cross?

MS. SOUBLET:   No.  Thank you.

THE COURT:   Ma'am, you are free to leave.  If somebody would assist her in backing up, please.

Call your next witness.

MR. FRASIER:   Call Christy Young.

<u>CHRISTY YOUNG</u>

was thereupon produced as a witness on behalf of the Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

Exhibit 5001 at 1126

Young   D    D6 54

THE COURT:    Have a seat here, please.

Go ahead.

MR. FRASIER:    Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. FRASIER:

Q.   Could you state your name please, ma'am, and spell your last name for the record?

A.   Christy Diane Cagley, C-A-G-L-E-Y.

Q.   Are you also known as Young?

A.   Yes, I am.

Q.   Are you married?

A.   Yes, I am.

Q.   What's your married name?

A.   Young.

Q.   And Cagley's your - - -

A.   (Interposing) Maiden.

Q.   How long you been married?

A.   Three years.

Q.   Where do you live at this time?

A.   I live in Bandon.

Q.   Ma'am, I'd like to — well, let me ask you this question.  Are you familiar with an individual named Polly Parks?

A.   Yes, I am.

Q.   How do you know Ms. Parks?

Exhibit 5001 at 1127

Young   D     D6 55

A.    Polly and I have been friends for ten, eleven years.

Q.    Are you familiar with an individual named Leah Freeman?

A.    I know her name.  I never met her personally.

Q.    Are you familiar with the Defendant in this case, Mr. McGuffin?

A.    Yes, I am.

Q.    Are you familiar with his older brother, Wayne?

A.    Yes, I am.

Q.    How do you know those two?

A.    Acquaintances through Polly, hanging out, things like that.

Q.    Now, in the year 2000 were you actually living with Ms. Parks?

A.    Yes, I was.

Q.    And approximately — well, let me ask you this.  Are you aware when Leah Freeman disappeared?

A.    Yes.

Q.    In relation to the time she disappeared, when did you move in with Ms. Parks?

A.    About two and a half weeks later.

Q.    Now, while you are staying with Ms. Parks, was there ever an occasion after you moved in that the Defendant and his brother Wayne were at Ms. Parks' residence?

A.    Yes.

Exhibit 5001 at 1128

Young   D    D6 56

Q.    And do you recall is this was before or after the body of Ms. Freeman had been discovered?

A.    Before.

Q.    Was there a television news program, something on while these two individuals were there?

A.    Yes.

Q.    Was there something about a shoe being found on Hudson Ridge?

A.    Yes.

Q.    Was the Defendant present when this came out over the television?

A.    Yes, he was.

Q.    And was Wayne McGuffin present?

A.    Yes, he was.

Q.    In the presence of the Defendant what did Wayne McGuffin say?

A.    Wayne looked at his brother and addressed him and the room that, "Oh, they won't find anything from that shoe. It was put there to make them think she was up there."

Q.    How did the Defendant respond to that comment?

A.    Not as — he nodded his head in agreement, acknowledged his statement, and laughed about it.

Q.    Was there a further comment made about the shoe being put there to throw the police off?

A.    Yes.

Exhibit 5001 at 1129

Young  X    D6 57

Q.   Who made that comment?

A.   Wayne.

Q.   How did the Defendant respond to that comment?

A.   He thought it was funny.

Q.   Thanks.

MR. FRASIER:    Your Honor, those are the questions I have.

THE COURT:    Ms. McCrea.

CROSS EXAMINATION

BY MS. MCCREA:

Q.   Ms. Young, are you related to Raymond Cagley?

A.   Yes, I am.  He's my cousin.

Q.   He's your cousin.  And in June of 2000, he lived over by what is now the Shell gas station?

A.   Yes, he did.

Q.   Near — in one of those apartment?

A.   Yes.

Q.   And that's near Elm where the other Leah Freeman shoe was found?

A.   Yes.

Q.   So, when you moved in with Polly Parks in the year 2000, you were what, seventeen?

A.   Eighteen.

Q.   Eighteen.  And you stayed there for how long?

A.   I would say three, three and a half months.

Exhibit 5001 at 1130

Young   X    D6 58

Q.    During the summer of 2000, after Leah Freeman disappeared and the investigation was proceeding, there was a lot of stuff on television as things developed.  Right?

A.    Yes.

Q.    So, for example, the shoe being found on Hudson Ridge was a topic of conversation?

A.    On the television, yes.

Q.    Okay.  Well, you're talking at Polly Parks.  And it apparently was the topic of conversation there as well?

A.    No, ma'am.

Q.    Well, didn't you just testify that Wayne McGuffin made a statement about it?

A.    I testified that he made a statement.  I or Polly never did.

Q.    Okay.  There were other people present when Wayne McGuffin made his statement?

A.    Uh huh.

Q.    Is that a yes?

A.    Yes.

Q.    And you've indicated at that point Leah Freeman's body had not been discovered?

A.    No, ma'am.

Q.    So, nobody knew where she was?

A.    Not to my knowledge.

Q.    Nobody knew in the sense of what had happened?

Exhibit 5001 at 1131

Young   X    D6 59

A.    No.

Q.    Okay.  And so it was — it was at that point a mystery?

A.    Somewhat, yes.

Q.    And around town, if you know, was it a topic of conversation?

A.    Yes.

Q.    Now, Ms. Young, you were interviewed by Officer McNeely and Officer Webley on July 20th of 2010.  Do you remember that?

A.    Yes, I do.

Q.    And at that point you told them that Wayne said, "Ha.  That was put there to throw them off.  It was meant to be thrown there.  They won't find anything there."  Is that what you told them?

A.    Yes, ma'am.

Q.    And at that time you didn't tell them anything about Nick McGuffin nodding his head, did you?

A.    Yes, I did.  I said that he thought it was funny and I found it very odd that he found it funny.  And he agreed with him.

THE COURT:    Could you scoot closer to the microphone?

WITNESS:    Yes, I can.

Q.    Ms. Young, I'm going to show you a copy of Officer

Exhibit 5001 at 1132

Young   X    D6 60

Webley's report.  And just take your time and take a look and see if there's anything in there that indicates that you told them that he thought it was funny.

A.    Nope.

Q.    There's nothing in there about Nick McGuffin nodding in response, is there?

A.    No.

Q.    And the first time, Ms. Young, that you talked to law enforcement about this was on July 20th, 2010.  Right?

A.    Yes.

Q.    Then you testified before the Coos County Grand Jury on July 30th, 2010.  Do you remember that?

A.    Yes, I do.

Q.    And at that point you were asked a question as to, was there ever a discussion when let's say, Wayne, when it was announced publicly that a shoe belonging to Leah had been found on Hudson Ridge.  And you responded, "Uh huh."

And then you were asked, "What do you recall Wayne McGuffin saying at that point?"

And you responded, "I remember Wayne kind of snickering and saying, 'They won't find anything from that. That's been thrown there to put them off the trail."

A.    Yes.

Q.    Is that what you said?

A.    Talking to his brother, yes.

Exhibit 5001 at 1133

Young   ReD   D6  61

Q.   And then the next question was, "Did he further explain what he meant by that?"

And you responded, "No.  And I didn't care to elaborate with him on it."

A.   That's true.

Q.   And during the Grand Jury you didn't say anything at all about Mr. McGuffin laughing or nodding in agreement or thinking it was funny?

A.   Yes.

Q.   You did not say that?

A.   No.

Q.   Thank you.

MS. McCREA:   That's all the questions I have.

THE COURT:   Redirect.

REDIRECT EXAMINATION

BY MR. FRASIER:

Q.   Ma'am, when you testified at the Grand Jury was I the person that asked you the questions?

A.   Yes, you were.

Q.   Did I ask you how the Defendant reacted?

A.   No, you did not.

Q.   Thank you.

MR. FRASIER:   That's all I have, Your Honor.

THE COURT:   You may step down, ma'am.  You are free to leave.

Exhibit 5001 at 1134

Bryant   D    D6 62

WITNESS:    Thank you.

THE COURT:    Call your next witness.

MR. FRASIER:    Call Richard Bryant.

RICHARD BRYANT

was thereupon produced as a witness on behalf of the Plaintiff

and, having first been duly sworn to tell the truth, the whole

truth and nothing but the truth, was examined and testified as

follows:

THE COURT:    Have a seat up here, please.

DIRECT EXAMINATION

BY MR. FRASIER:

Q.   Could you state your name please, sir, and spell

your last name for the record?

A.   My name is Richard Bryant, B-R-Y-A-N-T.

Q.   Where do you currently live, sir?

A.   John Day, Oregon.

Q.   How long have you lived in John Day?

A.   Since 2007.

Q.   Have you previously lived here in the Coos County

Area?

A.   Yeah.  I was born and raised here.

Q.   Go to high school here?

A.   Yeah.

Q.   Do you know the Defendant in this case, Nicholas

McGuffin?

Exhibit 5001 at 1135

Bryant  D    D6 63

A.    Yes, sir, I do.

Q.    How do you know him?

A.    We went to school probably about six years or so together.  I mean, we weren't like hang out buddies and stuff like that but we knew each other at the first, you know, five or six years of school.

Q.    Were you in the same grade?

A.    Yeah.

Q.    Now, Mr. Bryant, you've had some problems with the law?

A.    Oh, yeah.

Q.    And you've been convicted of some felonies in the past?

A.    Yeah.  I have one felony on my record from - - -

Q.    (Interposing) What is that?

A.    Possession of a Controlled Substance.

Q.    Now, Mr. Bryant, you — well, were you familiar with Leah Freeman?

A.    Yeah.

Q.    How did you know Ms. Freeman?

A.    I knew her mainly from being Nick's girlfriend.  I knew other parts of her family vaguely, but they were like step-brother or something like that.

Q.    All right.  Now, did you have an opportunity to see Mr. McGuffin and Ms. Freeman together?

Exhibit 5001 at 1136

Bryant   D    D6 64

A.    Yeah.

Q.    Could you describe what you saw?

A.    You know, your general couple.  They would have their moments where they didn't get along.  You know, most of the time you'd just see them, you know, driving by in their car and — the majority of the time.

Q.    All right.  Now, you're aware that Ms. Freeman disappeared the evening of June 28th, 2000?

A.    Yes.

Q.    The following morning does the Defendant show up at your house?

A.    He did.

Q.    Do you recall what time of the day it was?

A.    I would have to say between seven thirty — six thirty, seven thirty in the morning.  It was pretty early in the morning.

Q.    Were you still asleep?

A.    Yeah.

Q.    And what happened when the Defendant came to your house?

A.    Well, I got a knock on the door.  I opened the door and Nick was standing there.  And he was telling me that Leah was missing and something had happened.  She was gone.  And he had a picture of her.  And, you know, I was like, "What do you mean she's gone?  Maybe she's at a friend's house.  Maybe she,

Exhibit 5001 at 1137

Bryant   D    D6 65

you know, went with someone."

But he was pretty adamant that she was missing and something bad had happened.  And he wanted me to help her — help him find her.

Q.  Now, I want to direct your attention to — it would actually be the year of 2002.  And actually September of 2002. Had you been incarcerated in the Coos County Jail?

A.  Probably.  I couldn't exactly say that date, but probably.

Q.  When you were incarcerated at the Coos County Jail did you at times have a cell mate?

A.  I did.

Q.  And in that time frame did you have the Defendant as a cell mate?

A.  I did.  I can't remember for the period amount of time we were cell mates, but yeah.

Q.  And during that time frame that you're together, did the Defendant talk with you about Leah Freeman?

A.  It was a very short discussion, but yeah.

Q.  What did he tell you?

A.  He was a little emotional at the time, you know, he was crying and telling me that, you know, he can picture her laying there and her head sitting on a rock and there was nothing he could do about.  And there was nothing he could do.

Q.  Thank you.

Exhibit 5001 at 1138

Bryant    X    D6 66

MR. FRASIER:    That's all I have of the witness, Your Honor.

THE COURT:    Ms. McCrea.

CROSS EXAMINATION

BY MS. MCCREA:

Q.    Mr. Bryant, you testified before the Coos County Grand Jury about this matter on August 4th of last year, didn't you?

A.    Yes.

Q.    And at that time what you told them Mr. McGuffin said was, "I can just — I can see her laying there.  And I couldn't do anything to help her.  And I can't do anything about it."  Isn't that what you said?

A.    Yes.

Q.    You didn't say anything about her head laying on a rock?

A.    I think I remember saying something about that.

Q.    Would you like to — would you like to hear your testimony, hear the tape?

A.    I think I just did.

Q.    Okay.  So, are you saying that you remember now you didn't say the rock part?

A.    I thought I did, but apparently I didn't.  But that's what I remember the conversation being in the jail.

Q.    Okay.  And Mr. McGuffin, even in 2002, was very

Exhibit 5001 at 1139

Bryant   X    D6 67

emotional about Leah Freeman?

A.    (No audible response.)

Q.    You have to answer out loud.  Sorry.

A.    Yeah, yeah.

Q.    And he was still upset about her disappearance?

A.    Yeah.

Q.    Is that fair?

A.    Yeah.

Q.    And he indicated to you that he didn't have anything to do with her disappearance, didn't he?

A.    We didn't really talk that much into detail.  I had mentioned something to him about how the - - -

Q.    (Interposing) Okay, wait.  Let's not get into that.  Just - - -

A.    (Interposing) Yeah.

Q.    Did he tell you — yes or no did he tell you he didn't have anything to do with her disappearance?

A.    Yes, he did say that.

Q.    Okay.  When he came to your house with the photograph of Leah, could it have been a day later than June 29th?

A.    No, I don't believe so.

Q.    Okay.  But he had a photograph of Leah with him?

A.    Yeah.

Q.    And you're saying he came between approximately

Exhibit 5001 at 1140

Bryant   X    D6 68

what, six thirty and seven thirty in the morning?

A.    Yeah.  It was pretty early in the morning.  It — I might have to say between six thirty and eight thirty in the morning.  It was pretty early in the morning for me.

Q.    Well, I understand.  The reason I'm asking about whether it could be a different day is because we've had testimony in the case that Cory Freeman called Mr. McGuffin at his parent's home at about seven forty-five, eight o'clock. And he immediately went over to her house from his parent's house.

A.    I don't know anything about that.

Q.    Okay.  But to your recollection it would have been the morning of the 29th?

A.    Yeah.

Q.    In any event, when Nick McGuffin came to your house he was extremely concerned that Leah had not — could not be found?

A.    Yes.

Q.    And he was upset?

A.    Yeah.

Q.    And he was asking for your help in — or, you know, wanted to know if you had seen her?

A.    Yeah.

Q.    Now, the night before, had you been to a party?

A.    No, I don't think so.

Exhibit 5001 at 1141

Bryant   X    D6 69

Q.   Okay.

MS. McCREA:   May I have a moment?

Q.   And in your observations, Mr. Bryant, of the relationship between Mr. McGuffin and Ms. Freeman, they had some arguments but it looked like they got along really well?

A.   I would say yeah for the most part.  I mean, it just seemed like a general couple.  I mean, every — to me I think everybody has their moments where they argue and fight.  I mean, it just seemed kinda normal.  I mean, they actually did seem relatively happy.

Q.   Okay.  For teenagers?

A.   Yeah.

Q.   Yeah.  Okay.  And when they would have an argument, wouldn't it be like, she would take off walking or he — and then he would go his way.  And the next thing you know it would be like nothing happened?

A.   Yeah, I would say so.  You know, it would be a — I think there was maybe an instance I can remember where she would take off walking and you know, they would probably be heated.  And, you know, the next thing you know they'd be in the car together.  And like you said it was like nothing happened.

Q.   Okay.  Public displays of affection?

A.   Yeah, I would say so.

Q.   Okay.

Exhibit 5001 at 1142

Mede    D    D6 70

MS. McCREA:    That's all the questions I have.

Thank you.

THE COURT:    Redirect.

MR. FRASIER:    Nothing further.  I ask that the witness be excused.

THE COURT:    You are free to leave.

WITNESS:    Thank you.

THE COURT:    Call your next witness.

MR. FRASIER:    Call Darius Mede.

DARIUS MEDE

was thereupon produced as a witness on behalf of the Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat up here, please.

DIRECT EXAMINATION

BY MR. FRASIER:

    Q.    Could you state your name please, sir, and spell your last name for the record?

    A.    Darius Mede, M-E-D-E.

    Q.    And what is your occupation, sir?

    A.    I work for the Coos County Sheriff's Office in the jail right now.

    Q.    And what are your responsibilities in the jail?

    A.    I'm in charge of administration of the jail.

Exhibit 5001 at 1143

Mede   D    D6 71

Q.   As part of being in charge of the administration are you also in charge of the records that are kept at the Coos County Jail?

A.   I am.

Q.   Are there records kept in the normal course of business with the jail?

A.   There are all kinds of records.

Q.   And in particular is there a record kept of when a particular individual may have been in jail and if they had been in jail where they were held, particular inside the jail?

A.   Yes.  We keep a record of everybody's housing assignment.

Q.   I'm going to show what's marked as State's Exhibit No. 94.  Do you recognize this document, sir?

A.   I do.  It's a housing assignment out of our computer system.

Q.   And this is something that's, again, kept in the normal course of business?

A.   It is.

Q.   And the first page, is that housing record for who?

A.   Richard Ernest Bryant.

Q.   And the second page is for who?

A.   Nicholas James McGuffin.

Q.   Do the records indicate that Mr. Bryant and Mr. McGuffin shared a cell from September 16th of 2002 to

Exhibit 5001 at 1144

Mede    D      D6  72

September 24th of 2002?

    A.    They do.

    Q.    Thank you.

          MR. FRASIER:    That's all the questions of this witness.

          THE COURT:    Cross.

          MS. McCREA:    No questions, Your Honor.

          THE COURT:    You may step down.  You are free to leave.

          Call your next witness.

          MR. FRASIER:    Your Honor, my next witness will be rather lengthy.  So, if you want to take a morning break.

          THE COURT:    That's fine.

          If the jury would step into the jury room.  Take your notebooks.  Remember the admonition.

          Everybody else remain seated until the jury has a chance to go to the jury room.

          (Jury Out.)

          THE COURT:    Okay.

          About five to.

          (RECESS)

          (Jury In.)

          JUDICIAL ASSISTANT:    All rise.

          THE COURT:    Be seated please.

Exhibit 5001 at 1145

Wilcox   D    D6 73

Call your next witness.

MR. FRASIER:    Thank you.

We call Kathy Wilcox.

KATHY WILCOX

was thereupon produced as a witness on behalf of the Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat here, please.

Go ahead, please.

MR. FRASIER:    Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. FRASIER:

Q.   Could you state your name please, ma'am, and spell your last name for the record?

A.   It's Kathy S. Wilcox, W-I-L-C-O-X.

Q.   Your current occupation is?

A.   I'm retired from Oregon State Police.

Q.   And what did you do for the Oregon State Police?

A.   I was a criminalist for the State Police and then a detective for two years.

Q.   When you say you were a criminalist, what does that mean?

A.   I was a criminalist for fifteen years.  That's what I was hired for.  A criminalist is a forensic scientist who is

Exhibit 5001 at 1146

Wilcox   D    D6 74

a sworn officer.  And so we're in charge of the crime scenes, the analyzing of evidence, drug cases, firearms, tool marks, all of the CSI stuff.

Q.   Could you tell us a little bit about your training and background experience?

A.    Yes.  I have a Bachelor of Science degree from Oregon State University.  It was awarded in 1980.  I went to work for the Lane Memorial blood bank.  My degree was in microbiology.  So, I worked in blood banking for two years. We then moved to Washington and worked at Fred Hutchinson Cancer Research Center which was — I was an HLA technologist which is DNA typing for bone marrow and kidney transplants.

And it might not seem that long ago, but that's when DNA for forensics was just really getting started.

So, we moved back to Oregon.  All our family is here.  And I worked for two years at North Bend Medical Center as a medical technologist primarily in hematology, blood studies and urinalysis — some chemistry.

And then I was hired by the Oregon State Police as a criminalist to work in the crime labs.  A lot on the different lab experiences I had and the DNA experiences.

Q.   When did you start working for the State Police?

A.    1987.

Q.   Where were you assigned to work?

A.    I was assigned to the Coos Bay lab.

Exhibit 5001 at 1147

Wilcox   D    D6 75

Q.   There actually was a State Police Crime Lab in Coos Bay?

A.   Yes.  Oregon State Police Crime Lab in Coos Bay, Oregon.

Q.   Does it currently exist?

A.   No.  I was closed in 2002.

Q.   And is that when you left the crime laboratory system?

A.   Yes.  And I went to detectives for two years before I retired.

Q.   Now, as part of your work as a criminalist or a forensic scientist, were you at times called upon to process vehicles for forensic evidence?

A.   Yes, I was.

Q.   Could you describe for the jury please when you process a car, what type of things are you looking for; what types of things did you do?

A.   A car processing, of course you'd usually just do — you'd know a little bit about the case.  You might not know everything.  Sometimes I kinda like didn't want to know everything.  But, so it depends on what you were looking for, blood spatter or weapons or other kinds of fluids or residues.

But it always starts with a bright light examination.  And there is actually nothing better than doing it outside in the sunlight.

Exhibit 5001 at 1148

Wilcox    D    D6 76

Then we usually take it to a vehicle bay.  You use alternate light sources which give you different wave length of light.  And it improves contrast.  So, if you have, like, black residue on a black sweatshirt, by using different wave lengths sometimes the residue will appear white or pink.  So, you find stains, often body fluids.  Like urine will show up.  Sometimes it almost fluoresces, when otherwise you might not be able to see it.  Same with semen and blood which might be dark red, might appear to be black.  And then the fabric might turn out to be gray.  It just depends on the different things.

We use Luminal for finding blood residue that is not visible to the naked eye.  And to do that you have to have a room totally dark.  So we always do that in a vehicle bay.  And we usually tarp everything also.  And photography.  And then of course, just going through it with the vacuum sweeping and taping of the seats if they're fabric.  If you just run a big piece of strapping tape over it you can pick up fibers and hairs you might not otherwise see.

Just a thorough examination.

Q.    And over the course of the time you worked with the crime lab, could you estimate how many cars you might process?

A.    Oh, a hundred.

Q.    I'm going to direct your attention now, ma'am, to July the 6th of 2000.  Were you asked to examine a 1967 Mustang with the Oregon license numbers PEA640 — or, excuse me — 840?

Exhibit 5001 at 1149

Wilcox   D    D6 77

A.   Yes, I was.

Q.   First of all what I'm going to do is show you a series of photographs.

MR. FRASIER:    May I have State's Exhibits Nos. 16 through 24?

Q.   I'm going to show you what's marked as State's Exhibits Nos. 16 through 24.  Can you identify the vehicle that's portrayed in this series of photographs?

A.   This is the 1967 Mustang.  And it has that Oregon license plate PEA840.

Q.   And State's Exhibits Nos. 17 through I believe it's No. 24, are these pictures that were taken during the examination of the (not understandable)?

A.   Yes, they are.

Q.   And do they accurately portray what you saw as you processed this vehicle?

A.   Yes, they do.

MR. FRASIER:    Your Honor, we'd offer State's Exhibits Nos. 17 through 24.

MS. McCREA:    There's no objection, Your Honor.

THE COURT:    Received.

(Whereupon Exhibits Nos. 17, 18, 19, 20, 21, 22, 23 and 24 were then received into evidence.)

Q.   Now, I'm going to — there's a laser pointer there

Exhibit 5001 at 1150

Wilcox   D     D6  78

and it has a red dot on it right here.

A.    Okay.

Q.    And I'm going to be putting the pictures up on the screen here.

MR. FRASIER:    Could we dim the lights please.

Q.    This is State's Exhibit No. 16.  Could you describe this for us, please?

A.    This is the Mustang that we were just talking about.

Q.    Now, did you process the Mustang where it was found or was it taken to a particular location?

A.    The crime lab had a vehicle bay behind it.  And that's where it was taken.

Q.    This is State's Exhibit No. 17.  Is this the vehicle in the bay?

A.    Yes, it is.

Q.    While I'm thinking about it, was there a problem with the gas tank?

A.    Yes, it leaked.

Q.    Did you do anything to recover the gas that might have - - -

A.    (Interposing) Well, I think I put some kitty litter down later.

Q.    Now, this picture here, State's Exhibit No. 17, what does it show?

A.    That is the Ford Mustang.

Exhibit 5001 at 1151

Wilcox   D     D6 79

Q.   And from what prospect?

A.   Oh, that is the rear of it.

Q.   This is State's Exhibit No. 18?

A.   Yes.

Q.   Could you describe that for us, please.

A.   That is the Mustang once again.  And that would be the passenger side.

Q.   This is State's Exhibit No. 19.

A.   The passenger side looking from the back corner.

Q.   State's Exhibit No. 20.

A.   That would be the driver's side.  And it was primed on the back corner with white paint.

Q.   State's Exhibit No. 21.

A.   That again is the back corner where the primer is. And I probably was also trying to get a picture of the wheel.

Q.   State's Exhibit No. 22.

A.   That is the trunk.

Q.   When you examined the trunk, was there anything inside the trunk?

A.   Not a thing.  Nothing.

Q.   Spare tire?

A.   No spare tire.  No trunk liner.  I remember when I opened it, I was going, like, "Wow."  There was just nothing.

Q.   State's Exhibit No. 23.

A.   I believe that's a closeup of the trunk, the inner

Exhibit 5001 at 1152

Wilcox   D    D6 80

part of the trunk.  Yes.

Q.    And State's Exhibit No. 24.

A.    That is another closeup.  I was probably sectioning it off and getting the different corners of it.

Q.    Could you tell us what you did with this car?

A.    I can.  I generated a report.

"I first examined and photographed the outside of the vehicle.  There was a moderate amount of road dust on the vehicle and some minor damage to the front fender below the bumper.  This damage did not appear to be recent.  The left rear side fender was primed with white paint.  The car had dripped a small amount of gasoline.  The vehicle condition was consistent with its age."

"The interior of the vehicle was examined and photographed.  The interior surface did not appear to have been recently wiped clean.  A locksmith was called to open the trunk.  The trunk compartment was empty.  There was no spare tire or any type of trunk liner."

"The engine compartment was examined and nothing of any apparent significance was noted.  The exterior, interior and trunk area of the car were further examined using special

Exhibit 5001 at 1153

Wilcox   D    D6 81

alternate lighting techniques.  These areas were also chemically tested for blood.  No blood was found."

"The interior floor was vacuumed.  And the chemical testing was Luminal."

Which you see on TV all the time when you turn out the lights and light up things.  Only I must say they don't do it correctly, but it's TV.

Q.   Did you do — or did you think about doing tape lifts?

A.   I did.  I did.  I — if I recall I didn't do tape lifts because it was vinyl seating.  And it was clean.  I mean, it was wiped clean.  There wasn't anything visibly there.  You usually do tape lifts on fabric when you want to, like, lift dog hair or whatever hairs you want to lift or trace evidence.

I didn't do a microscopic examination of like the vacuum sweepings, but I looked them over.  And since I'd done cars before where people have been abducted, the things I was looking for is, like, maybe glitter off of somebody's t-shirt, or hair that's been pulled out of their head.  If you look at hair it's very different if it's been pulled out or if it just falls out.  There's a different look to it.

There was no wads of hair.  There was nothing really remarkable about anything that I saw in there.

Exhibit 5001 at 1154

Wilcox   D    D6 82

Q.   When you examined the trunk, did you look like at the trunk lid on the inside of the trunk lid.  Did you look at that, too?

A.   Yes, I did.

Q.   See anything of significance there?

A.   No, I did not.

Q.   How long would you say you worked on this car?

A.   I can say exactly.  These are the notebooks we keep for what we do during the day.  And so I can go to - - -

I worked on it all day.  I put field investigation on the car eight hours.

Q.   Now, I want to go to the tenth of July.  Had you been made aware that a pair of shoes had been found with one shoe found in a different location than another here in Coos County?

A.   Yes, I had.

Q.   And that they were believed to be the shoes of Ms. Freeman?

A.   Yes.

Q.   And did you do an examination of both shoes?

A.   Yes, I did.

Q.   I'm going to show to you what's previously been marked as State's Exhibits Nos. 96 and 97.  Do you recognize the shoes or your markings?

A.   Yes.  This is my Exhibit No. 1, KW.  That's my — and

Exhibit 5001 at 1155

Wilcox   D    D6 83

our case number 00N481 — that's the lab's case number.

Q.   And State's Exhibit No. 96, your Exhibit No. 1, that would be the — what shoe would that be?

A.   Right.  Exhibit No. 1 is the right shoe.

Q.   And I believe we've had testimony that Exhibit No. 97, the right shoe — or excuse me — No. 96 - - -

A.   (Interposing)  No. 96 is the right shoe, yes.

Q.   - - - was found on Elm Street?

A.   Okay.

Q.   Exhibit No. 97, do you recognize that?

A.   This is the left shoe that was submitted at the same time.

Q.   I believe we've had testimony that that was found on Hudson Ridge?

A.   Okay.

Q.   Now, did you examine both of these shoes?

A.   Yes, I did.

Q.   What type of — when you examine shoes like this in a forensic setting, what are you doing?

A.   Okay.  Well, on my worksheet I first — of course, first you just examine them using good lighting.  The big secret with the crime lab is we have excellent lighting and we have different kinds of lighting which makes us very popular at crime scenes, because we can bring it with us, too.

But — so, I examined it with good lighting, bright

Exhibit 5001 at 1156

Wilcox   D    D6 84

light examination; special light examination is what it's under.  So, I do regular light examination, bright light examination, a low powered microscopic examination, and I tested three spots on the right shoe with a presumptive test for blood.  And it was negative.

And I tested — I had — I don't remember how many I tested.  I think I tested six.  And I had four presumptive tests for blood on the left shoe.  I further tested one of those and it was human blood.

Q.   Now, in the course of examining the left shoe, the one from Hudson Ridge, did you take photographs of that particular shoe?

A.   Yes, I did.

Q.   I'm going to show you now what's been previously marked as State's Exhibits Nos. 29 through 32 and ask if you can identify those photographs?

A.   Yes.  These are photos that I took in the lab.  I have the same ones in my lab notes.

Q.   And do they accurately portray what you saw?

A.   Yes, they do.

MR. FRASIER:   We would offer State's Exhibits Nos. 29 through 32.

MS. McCREA:   There's no objection, Your Honor.

THE COURT:   Received.

Exhibit 5001 at 1157

Wilcox   D    D6 85

(Whereupon Exhibits Nos. 29, 30, 31 and 32 were then received into evidence.)

Q.   This is - - -

MR. FRASIER:   Can you dim the lights please.

Q.   - - - State's Exhibit No. 29.  Could you describe this for us a little bit, please?

A.   This is just the shoe sitting on the lab bench.  I think I put it on a piece of white paper which I would usually do in case any trace evidence came off of it.  And I just took a photo straight down at it.

Q.   In looking at the top of the shoe, is there anything of significance that you noticed?

A.   I'm not sure what you mean.  I think there was a couple of stains on the shoelaces, but they were not tested at that time.

Q.   I notice that the shoe appears to be untied.  Was that how the shoe arrived in the jail — or, in the lab?

A.   Yes.

Q.   This is State's Exhibit No. 30.  Could you describe this for us, please?

A.   This is a photograph of the sole of the shoe, just straight down at it, looking at it straight down.

Q.   When you examined the sole of the shoe what if anything did you note?

A.   Well, I had noticed that there were a couple of

Exhibit 5001 at 1158

Wilcox   D    D6 86

small blood spatter droplets on it.  And you could pretty much see them with the — almost with the naked eye.  And then with the low powered microscope they were quite clear.

Q.    This is State's Exhibit No. 31.

A.    That is a closeup of the ball of the foot on the shoe on the sole.  And I was trying to capture the small little blood spatters that were on that.

Q.    I notice there's some circles drawn on this photograph?

A.    Yes.  I'm circling the blood spatter, since it's pretty hard to see on that black sole.

Q.    Using the laser pointer could you point out the areas that you saw this blood spatter?  On the top there's a red - - -

A.    (Interposing) I don't want to put anybody's eye out.  Okay.

There was a spot right — right about there.  I think I've got it.  There was one on top of the tread.  I think I described them each.

"Right shoe, looking down towards front to the back."

I might be able to describe them better if I look at my notes.  Okay.  One, two — now, I can't find it.  Anyway, there was one there.  Oh, okay.  There's one down here.  And I think there were a couple of smears on the top.  You might be

Exhibit 5001 at 1159

Wilcox  D    D6 87

able to see that right there.  One up there.  I think I had like four of them.

Q.    This is State's Exhibit No. 32.  Is that a further closeup?

A.    Yes.  There we go.

Q.    And in this photograph there's a square marked?

A.    Oh, okay, yes.  Because I think that was — the sole of the shoe had the little traction knobs on it.  And that one was a little bit to the side of the traction knob, which to me — you know, it's not a stepped in blood.  It's spattered on there.  And that's what I think I was trying to capture. Right on the edge over right about there.

Q.    Okay.  Let's talk a little bit about blood spatter. You know, you indicated that this wasn't stepped in blood. Could you talk — tell us about blood drops, spatter, what is this?

A.    Well, we actually do quite a bit of study on it. And I've taken like week long classes on it where you — if you think about it, you know, if you have like a cut on your finger or anywhere and it drips, when it — depending on the surface it hits, it makes a big drip.  It's going to be at least a dime to a nickel size from just a drop of blood. There's that much volume in it.  Depending on what it falls on and how it falls.

And then you have blood that is smeared.  You know,

Exhibit 5001 at 1160

Wilcox   D    D6 88

if there's wet blood and you smear it.  And if you smear it with a shoe, it might leave a shoe print.  If you smear it with hair, you've got hair in it.

You have — oh, and TV is great at showing this, you know, pulsated blood.  If someone dies of a — or is wounded terribly like with a vein, you'll actually have these little arcs of blood coming out of them and dripping down the wall.

So, you have — you know, unless you really think about it, you don't realize how many different kinds of blood spatter there are.

When you have droplets this small, we call that spatter.  And it — it has force behind it.  You don't get this kind of blood spatter just by, you know, flicking a drippy finger.  It has to be — some force has to be involved, like a sneeze or a blow to something.  Usually something that's already bloody has to be hit to cause small droplets to come off.  You might even think of it as, if you were painting and you're doing a painting technique where you pull back the brush and let the paint fly.  You get smaller ones the harder you do it.  And they have to be fairly close, because they also can dry pretty fast.

Q.   Now, in looking at the bottom of the left shoe where you found these, did you sample this blood in some way?

A.   I did.  I took a moistened cotton swab and touched it to them and then we do a presumptive test called a

Exhibit 5001 at 1161

Wilcox   D    D6 89

Phenolphthalein test.  And it turns a bright orange in the presence of blood.  You put a — you take a little tiny bit of sample, just — you can't even see it microscopic.  And you put a few drops of solution on it.  And it turns a bright pink for — that's just a presumptive test for blood.

Then I further took some of that and ran a antigen antibody card that reacts specifically for human blood.  And that pretty much all I did because I could see I didn't have much sample.  And I didn't want to consume too much evidence.

Q.   Now, in regards to the two shoes, what efforts were made forensically to determine if there was any scientific evidence to show whose shoes they belonged to or who had been wearing them?

A.   Well, as soon as we — actually I asked them — I had heard about the shoes to submit them to the lab because they were wondering if they were Leah's for sure — Leah Freeman's. and I said, "Well, just submit them.  And we'll send them for DNA analysis."  Because we had, at that point, collected some of Leah Freeman's items and the Portland lab would do the final DNA analysis on those.

Q.   And in particular there had been a DNA sample from Cory Courtright, the mother of Leah Freeman?

A.   Well, that is, you know, how you could establish paternity or fraternity is to do the parents.  And then I think we also had Leah's toothbrush, I think is what they used

Exhibit 5001 at 1162

Wilcox   D     D6 90

to get her DNA.

Q.   Now, in conjunction with this case were the shoes, the samples from Cory Courtright, Denny Freeman, and the toothbrush of Leah Freeman, were they sent to — for further forensic examination?

A.   Yes.  They were sent to the Oregon State Police Forensic Lab in Portland.

Q.   Why were they sent to Portland?

A.   Portland did all the DNA analysis.  It's — it takes a lot of resources and training to do DNA.  So, it's all centralized.  All the crime labs in Oregon except for a couple Defense crime labs are all State run.  So, we're all tied in together.  We're all basically the same — the same lab.  We're just in different, you know, physical locations.

Q.   And one lab may have a specific thing they specialize in?

A.   Oh, yes.  Portland was the largest lab.  And they had a whole DNA unit, which you know, requires a PhD and people specially trained and special equipment.

Q.   Now, was there a report returned from the Portland Crime Lab regarding the analysis of the two shoes, the blood spatter and so forth?

A.   Yes, there was.

MR. FRASIER:   Your Honor, by stipulation, I think we've agreed that State's Exhibit No. 207 is — we would

Exhibit 5001 at 1163

Wilcox   D    D6 91

offer that report in lieu of calling the forensic scientist that did those tests.

MS. McCREA:    It is so stipulated, Your Honor.

THE COURT:    Thank you.

It's received them.

(Whereupon Exhibit No. 207 was then received into evidence.)

Q.    In regards to the shoes and the DNA testing that was done, can you tell the jury please, were these shoes identified as belonging to or having been worn by a particular individual?

A.    The tennis shoes and the blood on the shoes matched Leah Freeman.

Q.    Now, in examining the left shoe, the one with the blood on it, did the crime lab also find a DNA profile for another individual?

A.    Okay.  Let's see, I think they found — they did find another individual.  They found a minor profile.

Q.    And that was for a male?

A.    Yes.

Q.    And subsequently there was a DNA standard obtained from Deputy Oswald?

A.    Yes, there was.

Q.    Was that sent to the lab, up to Portland to compare with what was found?

Exhibit 5001 at 1164

Wilcox   D    D6 92

A.   Yes, it was.

MR. FRASIER:   Again, by stipulation, Your Honor, I have State's Exhibit No. 208 which is the report of that test.

MS. McCREA:   There's no objection.  We have stipulated to it, Your Honor.

THE COURT:   It's received.

(Whereupon Exhibit No. 208 was then received into evidence.)

Q.   I'm handing you No. 208.  What did the crime lab find in regards to this minor profile belonging to a male?

A.   Let's see.  Where is that?

Q.   Oh, excuse me.  I gave you the wrong report.

A.   Right.  This is the report on something else, socks.

Q.   I'm sorry.

MR. FRASIER:   I withdraw No. 208, Your Honor.

THE COURT:   Okay.

MR. FRASIER:   No. 210 is the right - - -

MS. McCREA:   (Interposing) You'd better look at it this time.

THE COURT:   No. 210 is received then.

(Whereupon Exhibit No. 210 was then received into evidence.)

THE COURT:   Assuming that's stipulated to?

MS. McCREA:   Yes, it's stipulated to, Your

Exhibit 5001 at 1165

Wilcox    D    D6 93

Honor.

THE COURT:    Okay.

It's received.

Q.    And again, did they identify — was it identified who the minor profile, male profile came out to?

A.    Yes.

"The DNA profile of Kip Oswald is consistent with the minor profile in the previously analyzed exhibit."

They call it two point three left to Nike shoe.

Q.    Now, let's go back to the original report, the first report, and the right shoe, the one that's been identified as being found on Elm Street.  Was there any other DNA associated with any other individual found on that shoe, other than Leah Freeman?

A.    No.  They only found Leah Freeman's on the right shoe.

Q.    Now, after you had examined the shoes — well, were you working closely with the investigators in terms of the missing Leah Freeman?

A.    Yes, I was.

Q.    And did you at times go out and help them in searches of a variety of different areas?

A.    Yes, I did.

Q.    Was there a time that you had gone out with

Exhibit 5001 at 1166

Wilcox    D    D6 94

investigators and had gone to the cemetery or near the gas station where the right shoe was found on Elm Street?

A.    Yes, I did.

Q.    Could you tell the jury please what you did, what you found, what happened?

A.    Okay.  That was July 20th of 2000.  And I took the crime lab pickup and we searched the cemetery.  I think we did a line search where everybody sort of lines up and just walks slowly at the same pace.  I only collected three or four items.  The cemetery was well kept and neat and tidy.  There was a little bit of trash around.  But it either didn't fit the time frame or didn't have any evidentiary value at that time.  So, we collected some things.  And didn't do much else with it.

Q.    Did you look at these items later on at the lab or - - -

A.    (Interposing) I don't think so.

Q.    Wasn't anything that, as you looked at it, that jumped out?

A.    That is correct.

Q.    Now, eventually a search warrant was obtained to search the residence of the Defendant at that time and also the maroon Thunderbird?

A.    Yes.

Q.    Did you participate — did you go out to the scene?

Exhibit 5001 at 1167

Wilcox    D    D6 95

A.    Yes, I did.

Q.    And that would have been on July 28th of 2000?

A.    Yes, it is.

Q.    First of all, let's talk about the Thunderbird.  Did you process the Thunderbird?

A.    I did.

Q.    I'm going to show to you what's previously been marked as State's Exhibits Nos. 25 through 28.  Do you recognize the vehicle portrayed in those photographs?

A.    Yes.  This is the Thunderbird here.  I was going to find its license plate number.  Oh, search warrant came first.  It's this one right here.  It's SMQ836.  This one right here.

Q.    And some of these photographs, at least No. 27 and No. 28, are these pictures that you took of the vehicle?

A.    Yes.  You can see it's in the evidence bay at that point.

Q.    And these pictures all accurately portray what you saw?

A.    Yes, they did.

            MR. FRASIER:    State's Exhibit No. 25 has previously been received.  We would offer State's Exhibits Nos. 26 through 28.

            MS. McCREA:    No objection, Your Honor.

            THE COURT:    Received.

            (Whereupon Exhibits Nos. 26, 27 and 28 were

Exhibit 5001 at 1168

Wilcox   D     D6 96

then received into evidence.)

Q.   I'm going to put on the screen now these particular photographs.  This is State's Exhibit No. 25.  The Thunderbird we're talking about is this vehicle here.  Is that correct?

A.   Yes, it is.

Q.   This is State's Exhibit No. 26.  Would that be the rear of the vehicle?

A.   I — yes.  It's way small there.

Q.   This is State's Exhibit No. 27.  Would this — does this show the vehicle in the evidence bay?

A.   Yes, it is.

Q.   I see what looks like some kitty litter there.  Is that what you spread on the floor because of the gas leak from the Mustang?

A.   I think that was what it was for.

Q.   And this is State's Exhibit No. 28.

A.   Yes.

Q.   Could you tell the jury please what you did with this particular vehicle?

A.        "I first photographed the outside of the vehicle.  The vehicle appeared to be in good condition with a few minor dings and dents in it.  It was covered with a light coating of road dust."

When I — when I say things like that, what I'm also

Exhibit 5001 at 1169

Wilcox   D    D6 97

saying is that it hadn't recently been detailed or cleaned. It was consistent with having been driven time past, you know, nothing unusual as far as one area wasn't clean and one wasn't.  So are kind of my key words to myself.

"Examination of the exterior of the car failed to reveal any recent damage, blood or anything of apparent scientific significance."

"I next photographed and examined the interior of the car.  The interior was cluttered with empty cigarette containers, soda bottles, CD's and miscellaneous items.  No blood was detected."

"A note written on tissue paper was seized from the center console of the car.  Leah had apparently written this note to Nick.  No other items were seized during the search."

"Examination of the trunk revealed a few clothing items, two tool boxes, and a few miscellaneous items.  The spare tire and the tire iron were also in the trunk.  No blood or any items of apparent scientific significance were noted."

And I ended the search of the car at approximately four thirty p.m.

Q.   When you indicate that you didn't find any blood,

Exhibit 5001 at 1170

Wilcox  D    D6 98

what type of testing did you do to look to see if there was any blood or anything like that in the car?

A.   Well, I — to tell you the truth I don't have my original lab notes from that.  I just have the reports.  But what I would usually do is the same thing.  I would do bright light examination with — we actually had halogen lights we could set up around there.  Flash — a good flashlight even helps.  And alternate light source.  I don't think I Luminal'd that car because there was no indication it had been cleaned and there was no blood detected.

If I see anything that might even remotely be blood, I usually run the presumptive test, the Phenolphthalein test because it's quick and easy and you can just do it and toss the swab away if it's negative.  It's not — unless there's some reason to make note of that, it's not a big test.  It's not a big thing that we make a big deal out of.  It's just a quick and easy test.

And just a thorough examination.  That was pretty much it.

Q.   How much time do you think you spent on this vehicle?

A.   I think I only spent a couple hours on this vehicle. I wasn't really getting anything that indicated any kind of crime scene there.

Q.   Now, let's go back to the search of the residence of

Exhibit 5001 at 1171

Wilcox   D    D6 99

the Defendant off of Baker Road at that time.  Did you actually go out there?

A.   I did.  I did go.

Q.   And while you were there were you asked to look at some items?

A.   Yes, I was.

Q.   What type of things were you asked to look at?

A.   I think my part of the search was apparently the suspect's bedroom.  I did a couple other bedrooms.  I don't really remember doing his bedroom.  And they also brought me some guns that previously had been removed from the house to look at.

Q.   And when you examined the guns, what if anything did you notice?

A.   They — I made a note of which guns they were.  And, let's see if I've got that.  And I examined them for use and any blood spatter that might have blown back on it, like if someone is — either handles a gun that's got blood on it or it's been near somebody who's bleeding.  Or if they're even close when they shoot.  Sometimes they get high velocity blood spatter on the gun itself.  And it can be very small.

And I didn't find any of that.  When the crime scene — it had been quite awhile.  And the guns had left the residence and were brought back by family members.  I found no blood.  I didn't think they were very good evidence, to tell

Exhibit 5001 at 1172

Wilcox   D   D6 100

you the truth.

Q.   Is there — was there some bats or anything like that you were looking at?

A.   Oh, yes.  Let me look at my report real quick.  Well, the three firearms were brought to me.  And I remember there was an aluminum bat brought to me also.  I can't remember if it came from the residence or if someone brought them to me — one of the family members.  But it was tested for blood and it was negative, also.

Q.   Now, during the course of the search of the Defendant's bedroom, was there a white Adidas sock that appeared to have some blood on it that was found?

A.   Yes, there was.

Q.   And was that eventually submitted to your lab for analysis?

A.   Well, it was a white sock.  I can't — to don't think that was an Adidas sock.  It was a white sock that was submitted.

Q.   And this sock, was there actually another sock too that was - - -

A.   (Interposing) Okay.  We've got to the get the sock straight.

Q.   Yeah.  Do you show — I believe it's Exhibits Nos. 11 and 12.  Do you show those two types of socks being - - -

A.   (Interposing) Okay.  Exhibit No. 11 was a sock.  It

Exhibit 5001 at 1173

Wilcox    D    D6 101

had — it was not like Leah's sock. And she had one sock on her when they eventually found her body. And it was an Adidas sock. So, the white sock found at the residence I don't think was an anklet sock. It was just a white crew sock. It had a single little, small drop of blood on it.

Q. And eventually there was another sock, and Adidas sock that was found hanging on the fence at Coquille High School?

A. Yes. And that sock — it was given and exhibit number. I don't think it ever actually even came to the lab. It was sent directly from Coquille PD to Portland.

Q. Now, I have here at this time — hopefully I have the right one — Exhibit No. 208. This is the DNA report as to those two socks.

MR. FRASIER:    We'd offer that pursuant to the stipulation.

MS. McCREA:    It's so stipulated, Your Honor.

THE COURT:    It's received.

(Whereupon Exhibit No. 208 was then received into evidence.)

Q. The — what did the lab find in regards to the — well, first of all let's talk about the sock that came out of the Defendant's bedroom that had a little bit of blood on it. What was the result of that?

A. Nick McGuffin's DNA profile does not match the DNA

Exhibit 5001 at 1174

Wilcox   D    D6 102

profile previously obtained from the white Adidas — oops, wrong sock.  Shoot.

Okay.  Exhibit — the lab Exhibit No. 11 was the white sock taken from the suspect's bedroom.  Nick McGuffin could not be eliminated as a source of the mixture previously obtained from Exhibit No. 11, the white sock.

Q.   And the other sock, they couldn't find any DNA at least of people related to this case?

A.   That is correct.

Q.   Now, during the course of this investigation, was there a variety of things submitted to you to look at?

A.   There were many items submitted to the lab to look at.

Q.   Do you have those submission reports there with you?

A.   I do.  I think I printed them out.  They gave me a CD.  These are just the submission slips.

Q.   Let's - - -

A.   (Interposing) There's lots.

Q.   What types of things were submitted?

A.   Well, the — since we had a lot of officers looking for evidence for this case, they would submit things they found from beside the road that looked suspicious, pieces of rope, you know, scraps of cloth that looked like they had a red stain on them.  One was — I think I had a piece of nylon rope, a knife and a blood stained cloth which sounds awful,

Exhibit 5001 at 1175

Wilcox   D   D6 103

but it was something from a logging truck.  It wasn't a stained cloth, it was a logging flag.  It wasn't even unusual. And it was some sort of knife that was used to cut — you know, a utility knife.  Wrappers, beer cans that they thought might be found or associated with the scene from near Leah's route or where items that were known to be hers were found.  Since it was scattered about the county.  There were lots of things they could pick up, just in case.

Q.   Did they send you a box with a dead cat in it?

A.   They did.

Q.   And where — do you recall where that came from?

A.   Well, I think it — there was — I'm actually — live in north county, but there's a dump area out in Coquille by Fairview or some place.  And people dump their animal bones and their dead cats and items that they don't know what to do with over the bank.  And they thought that this sweatshirt that was wrapped around a dead cat might have something to do with the crime scene.

So, I looked at all that, photographed it, tested it.  There was a big piece of pelvic bone with it.  It was probably an elk or a cow.  It was very large.  But they were not associated with the disappearance and death of Leah Freeman.

Q.   These items, there was like beer cans and things like that?

Exhibit 5001 at 1176

Wilcox   D    D6 104

A.   Yes.   There was quite a bit of — everybody was looking really hard.   So, they were thinking anything that might help.

Q.   And in all these things that you looked at, did you find anything that connected these items in any way to the disappearance of Leah Freeman?

A.   No, I did not.

Q.   Now, Ms. Freeman's body was located August 3rd of 2000?

A.   Okay.

Q.   Were you involved in the recovery of her body?

A.   No.   My Lieutenant Pex went to that crime scene.

Q.   Were you asked at a later time to examine the clothing that had been removed from the person of Leah Freeman at the autopsy?

A.   Yes, I was.

Q.   Could you tell us, please — well, first of all let's back up a little bit here.   Once the body had been located was there — one of the focuses of the investigation was to try to determine how Ms. Freeman had actually died?

A.   That is correct.

Q.   And when you examined the clothing, what were you looking for?

A.   We were looking for any signs of violence.   Sexual assault was big of course.   Blood.   Stabs, tears in the

Exhibit 5001 at 1177

Wilcox   D    D6 105

clothing, anything that might indicate the manner or cause of her death.

Q.   If a person is, let's say been shot with a firearm through their clothing, what type of holes — what would you be looking for?

A.   Well, of course a bullet would make a hole.  And depending on the caliber, it might be small or large.  Usually bullets are very hot when they hit clothing.  So, depending on the type of clothing of course, it can make a very neat hole, considering that it might leave a very horrible wound.  So, we're looking for tiny holes even.  Because a twenty-two can leave a very small hole that's easy to overlook.  But it can still be there.  So, we're looking at the holes.

Of course, any stipling or gun shot residue from a close firearm contact would actually result maybe from burning of the fabric or even gun powder being deposited on fabric.  And of course associated blood with that.

Knifings of course would give a cut.  And tearing or a sexual assault might result in tearing or cutting if a knife is used.

Q.   And are the hole sometimes — well, in a body that's been laying outside let's say for several weeks — would there be holes left say by animal predation and things like that?

A.   Yes, there would.

Q.   And are they going to be different that, say, a

Exhibit 5001 at 1178

Wilcox   D   D6 106

bullet hole or a knife hole?

A.   Yes, they will.

Q.   In what way would they be different?

A.   Well, animals of course are chewing and tearing at fabric and they fray the edges.  They also might go for certain areas.  And even insect of course activity can cause some of these things.

And Leah Freeman's clothes were in very bad condition.  They had been out there.  And it had been in the middle of summer.

Q.   When you say bad condition, what do you mean?

A.   They were — she had laid out for over a month in Coquille in the middle of summer.  And she had basically melted in her clothes.  So, there was a lot of body fluids.  You have the adipose tissue had sort of melted.  You had insect activity.  And you had animal activity.

Q.   Now, the clothing was submitted to your lab and you began your examination when?

A.   It was — it wasn't quite some time later.  I think it was actually in October.

Q.   Okay.

A.   Here we go.  No.  It was August 9th.  I'm sorry.

Q.   And as part of your examination what would you do with the clothing when it arrived?  Or what would you do to examine the clothing?

Exhibit 5001 at 1179

Wilcox    D    D6 107

A.    Once again, you use — with clothing and well, any smaller item — you always spread out butcher paper under it so as you examine it, if any trace evidence falls off, you have a nice clean white surface.  So, it was laid out on butcher paper.  It was really deteriorated.  So, I did it mostly — I had a very large fume hood to do it under because it was really smelly.

And I checked the pockets.  I made note of their condition.  I examined — examination of debris failed to reveal any trace evidence.  No significant fibers or trace evidence was noted.  No blood was noted.  And that was — I was looking at the jeans then.

One thing about her clothes which is important in other crime scenes is, her clothes were very usual clothes.  She had blue jeans on, a white t-shirt, a white cotton sports bra.  There wasn't any unusual fabric or unusual fibers or anything brightly colored, anything that would be of a more unique nature that might tie her in with a crime scene or a place, like carpet fibers or you know, a fur coat or something.

Q.    And as part of your examination did you photograph the items as you examined them?

A.    Yes, I did.

Q.    I'll show you now what's marked as State's Exhibits Nos. 46 through 50 and ask if you can identify those pictures?

Exhibit 5001 at 1180

Wilcox   D   D6 108

A.   Well, these are the front of the victim's jeans. And they're laid out.

Q.   Are those pictures you took?

A.   Yes, they are.  I have them in my lab notes.

Q.   Are they pictures of the pants of Ms. Freeman?

A.   Yes, they are.

Q.   Do those pictures accurately portray what you saw?

A.   Yes, they do.

MR. FRASIER:   We would offer State's Exhibits Nos. 46 through 50.

MS. McCREA:   There's no objection, Your Honor.

THE COURT:   Received.

(Whereupon Exhibits Nos. 46, 47, 48, 49 and 50 were then received into evidence.)

THE COURT:   I'm sorry.  The number again?

MR. FRASIER:   Nos. 46 - - -

WITNESS:   (Interposing) Nos. 46 through 50.

THE COURT:   Thank you.

Q.   Ma'am - - -

MR. FRASIER:   Can we dim the lights please.

Q.   - - - I'm going to put up here State's Exhibit No. 46.  Could you describe this for the jury, please?

A.   Those are the pants that were submitted as Leah Freeman's pants.  And they were just blue jeans I believe.

Exhibit 5001 at 1181

Wilcox   D    D6 109

And they are as I described them before.  They were in very bad condition and I checked for fibers, trace evidence.  The pockets were empty, blood.  And of course semen and any body fluids — any trace evidence.

Q.   I notice down there on the bottom, "Examination of debris failed to reveal AASS."  What does that mean?

A.   Anything of apparent scientific significance.

Q.   Now, I noted — you say no blood was noted?

A.   That is true.

Q.   Now, Ms. Freeman had decomposed significantly?

A.   Yes.

Q.   Would there be a difference if she had been bleeding versus decomposing in looking at the pants or any piece of clothing?

A.   Well, I would think if there had been a significant wound you would still have the blood stain on there, even though you had — the adipose tissue when it decomposes is very — it's greasy.  So, it was very kind of greasy and of course dark.  I mean, these started out blue and now they're kind of brown.  So, I would be still looking if there had been a large blood stain for the red or the brownish stain that would indicate a wound.

Q.   And you didn't see any of that on the pants?

A.   That is correct.

Q.   And this is State's Exhibit No. 47.  Could you

Exhibit 5001 at 1182

Wilcox   D   D6 110

describe this for us, please?

A.   I think that is just another view of the pants, especially of the top area.  Since of course we would be concerned with a sexual assault.  So I spent a lot of time looking for any trace that there might have been any left — any kind of a semen trace.

Q.   And how would you look for, say, semen in this situation?

A.   Well, there's alternate light sources which improve contrast.  So, like if you can turn out the lights and put different wave lengths of lights on there.  Semen often times almost fluoresces.  That's a good way to find things.  And then there was chemical testing.  And I know I did a lot of that because that was a big concern with this case.  So, I took little samples from, you know, the crotch area and other places looking for — a chemical test on something maybe I couldn't see.  All the chemical tests, all my visuals were negative.

Q.   This is State's Exhibit No. 48.  Could you describe that for us, please?

A.   I think that is a back view of the jeans.

Q.   Were there any holes that you recall in the pants?

A.   Yes, there were some animal holes in the pants.

Q.   This is State's Exhibit No. 49.

A.   That is the bottom seat area of the victim's jeans.

Exhibit 5001 at 1183

Wilcox   D    D6 111

And I took a couple of pictures.  And I — it was reported to me or I remember seeing a picture that she was found on her back.  So, it would kind of make sense that the bottom part of her jeans would be more disintegrated.

Q.    Why is that?

A.    Just more pooling of the body fluids and animal activity and insect activity.

Q.    These holes that we see in State's Exhibit No. 49, would they be — well, let me ask you this.  Are they consistent with being like, say, a bullet hole or a knife hole?

A.    No, they are not.

Q.    Why is that?

A.    Well, they're fairly large for a bullet hole.  The larger one is — my scale is in inch increments on one side closest to the hole and centimeters on the other side.  So, that large hole is way big for a bullet hole.  And also they're frayed around the edges.  They're frayed and they're gnawed on looking, if that's a scientific term.  They're not clean in any way.

Q.    And this is State's Exhibit No. 50.  The other hole, you measured that, too?

A.    Yes.

Q.    And again, did that have any consistency with say a knife wound or being shot or something like that?

Exhibit 5001 at 1184

Wilcox   D    D6 112

A.    No.

Q.    And again, why?

A.    The frayed — frayed edges are a big part of it.  The size and the shape.

MR. FRASIER:    Your Honor, this is a good place to break if you wish.

THE COURT:    Okay.

We'll break for the lunch hour.

Everybody else remain seated until the jury has a chance to leave.

Leave your notebooks in the room.  Remember the admonition.  Be back at one o'clock.

(Jury Out.)

THE COURT:    You may step down.

Okay, 1:00.

(LUNCH RECESS)

(Jury In.)

JUDICIAL ASSISTANT:    All rise.

THE COURT:    Be seated, please.

Mr. Frasier, you may continue.

MR. FRASIER:    Thank you, Your Honor.

Exhibit 5001 at 1185

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

STATE OF OREGON,                        )
                                        )
            Plaintiff,                  )      CASE NO. 10CR0782
                                        )
       vs.                              )      JURY TRIAL
                                        ) DAY SIX, Continued
NICHOLAS JAMES MCGUFFIN,                )
                                        )
            Defendant.                  )
_____ )

TRANSCRIPT OF PROCEEDINGS

Volume 10, Pages D6 113 to D6 253

        BE IT REMEMBERED That, the above-entitled cause

came on regularly for hearing beginning at 8:59 a.m.,

Wednesday, July 13, 2011, in the Circuit Courtroom of the Coos

County Courthouse in the City of Coquille, County of Coos,

State of Oregon, before the Honorable Richard L. Barron and a

jury.

APPEARANCES

R. Paul Frasier, District Attorney for Coos County,
representing the Plaintiff.

Erica Soublet, Assistant District Attorney for Coos County,
representing the Plaintiff.

Shaun McCrea, Attorney at Law, representing the Defendant.

Robert McCrea, Attorney at Law, representing the Defendant.

S. Jean Sprouse, Court Transcriber, XV Judicial District, 503-325-5254

Exhibit 5001 at 1186

Wilcox   D    D6 113

DIRECT EXAMINATION, Continued

BY MR. FRASIER:

    Q.   Ms. Wilcox, as part of your examination did you also do a detailed examination of the tank top shirt that was found on the body of Ms. Freeman?

    A.   Yes.

    Q.   I'm going to — did you take photographs of that during your examination, also?

    A.   Yes, I did.

    Q.   I'll show you what I've marked as State's Exhibits Nos. 51 through 55 and ask if you can identify those photographs?

    A.   These are the photographs I took in the lab.

    Q.   Do they accurately portray what you saw?

    A.   Yes, they do.

        MR. FRASIER:   We would offer State's Exhibits Nos. 51 through 55.

        MS. McCREA:   There's no objection, Your Honor.

        THE COURT:   Received.

        (Whereupon Exhibits Nos. 51, 52, 53, 54, and 55 were then received into evidence.)

    Q.   I'm going to put up on the screen here now what would be State's Exhibit No. 51.

        MR. FRASIER:   Could you dim the lights for us

Exhibit 5001 at 1187

Wilcox   D   D6 114

again please?

Q.   Could you describe the — what the shirt looked like and what you found?

A.   The shirt was in very poor condition.  It's I think originally a white — a white men's sleeveless t-shirt.  And it had some animal or insect — probably animal — holes in it.  And a lot of forest debris and insect casings and shells and stuff.

Q.   Again, in your examination are you looking for things like a bullet hole or a knife hole or something along that line?

A.   Yes.

Q.   And how did you examine this?  What did you do to examine this shirt?

A.   I think I used the same methods of bright light, alternate light source, took maybe some samples to test if I thought they looked like anything that might even remotely possibly have a body fluid on it like semen or blood.

Q.   Did you find any hole in this shirt that you could associate with having been caused say by a bullet?

A.   No.  None was apparent.

Q.   Now, when you're looking for something that's caused let's say by a knife or a sharp instrument, what type of things are you looking for in that type of situation?

A.   Well, usually people don't stand still if they're

Exhibit 5001 at 1188

Wilcox   D   D6 115

being stabbed.  So, often it will be a slashing cut or, you know, it can just be a stabbing mark.  A lot of times it's — if it's a cut along the seam that usually — you know, through the seam — that's a knife usually because that's a tougher material.  And of course associated blood, concentrated blood around a hole.

Q.   Now, again, you're looking for blood staining?

A.   Yes, around a hole.

Q.   Well, in particular on this shirt were you looking for any blood staining on the shirt as a whole?

A.   Well, some.  However, once again she had sort of melted in her clothing.  So, a presumptive test for blood might not be definitive.  I was looking for a — if a wound had bled there would still be a darker stain in that area.

Q.   Now, did you find any holes in this shirt that you would associate with having been caused by a sharp instrument?

A.   No.

Q.   Did you find any staining that would be, say, consistent with blood having drained from a stab wound?

A.   No.

Q.   Now, looking at — let's go to State's Exhibit No. 52 here.  These are close ups of the holes that you did find?

A.   Yes.

Q.   These are in the upper left front of the shirt?

A.   Yes.

Exhibit 5001 at 1189

Wilcox    D    D6 116

Q.    Now, when you found a hole in the shirt or other pieces of clothing, was there something you did to highlight them for photograph purposes?

A.    Well, I like to put a white piece of paper behind these items since they were stained dark brown.  And that made the holes show up better.

Q.    Now, I want to clarify something.  This here in the upper — or excuse me — the lower right hand corner.  That's actually a hole made when the photograph was punched to put it in the binder?

A.    Maybe — well, oh.  Let's look.  Yes, that is the hole punch.

Q.    This wasn't actually a hole that you found in the shirt?

A.    No, I didn't remember that hole.

Q.    These holes here in the middle of the photograph, what did you associate these with?

A.    Just animal activity.

Q.    This is State's Exhibit No. 53.  There seems to be some differentiation in color here.  Could you — from the top part of the shirt or whatever to the bottom.  Can you describe why that would be?

A.    I just remember seeing actually one photograph of the body at the scene.  And she was lying on her back.  So, all I can think of is maybe how the garments fell against her

Exhibit 5001 at 1190

Wilcox   D    D6 117

body or — I'm not sure, actually.

Q.   All right.   Again, in the top part of the picture there's a kind of round hole.   Again, is that a hole punch for the binder?

A.   Yep.   Yes, that is.

Q.   These holes that we see here, what did you determine in examining them?

A.   That they were animal or insect activity.

Q.   This is State's Exhibit No. 54.   Can you describe that for us?

A.   That is the back of the t-shirt.

Q.   And again, this is State's Exhibit No. 55.

A.   Okay.

Q.   And did you find a hole in the back of the shirt?

A.   Let me find this.   Yes, I did.

Q.   And is this the hole that we're looking at here?

A.   Yes.

Q.   And again, did you ascribe this to any particular cause?

A.   No.   Just it was a frayed hole.   Animal activity, general disintegration.

Q.   Now, there was also a bra, a sports bra that she was wearing?

A.   Yes.

Q.   And did you examine that?

Exhibit 5001 at 1191

Wilcox   D   D6 118

A.    Yes, I did.

Q.    And did you photograph that also?

A.    Yes.

Q.    I'll show you how what's been marked as State's Exhibits Nos. 56 through 58 and ask if you can identify these photographs?

A.    These are the photographs I took of the sports bra in the lab.

Q.    And do they accurately portray what you saw?

A.    Yes, they do.

MR. FRASIER:    We'd offer State's Exhibits Nos. 56 through 58.

MS. McCREA:    There's no objection, Your Honor.

THE COURT:    Received.

(Whereupon Exhibits Nos. 56, 57, and 58 were then received into evidence.)

Q.    This is State's Exhibit No. 56.  Could you describe this for us, please?

A.    This was I believe originally a white lady's sports bra.

Q.    And what did you do to examine this particular item of clothing?

A.    Once again put it on some white butcher paper, photographed it, looked at it under a bright light and

Exhibit 5001 at 1192

Wilcox   D   D6 119

examined it for any blood, semen, but marks, hole marks.

Q.   And in examining the bra did you find any holes or anything like that that you associated with, say, being shot or having been made by some sort of sharp object?

A.   No, I did not.

Q.   This is State's Exhibit No. 57?

A.   Yes.

Q.   Could you describe this for us, please?

A.   That is the back — a photograph of the back of the sports bra.

Q.   And what was the condition of the back of the bra?

A.   Very bad, extremely — I think I wrote in my notes it was in extremely poor condition.

Q.   Now, this is State's Exhibit No. 58.  Did you do something to help show the photograph or show the holes that were in the back there?

A.   I slipped a piece of white paper into the sports bra so that the tearing and the holes in the back would be more noticeable.

Q.   Again the holes that you saw in the sports bra, did you see anything again that you would associate with, say, having been caused by a bullet or some sort of sharp object?

A.   No.

Q.   Now, there was one other item of clothing you examined?

Exhibit 5001 at 1193

Wilcox   D    D6 120

A.   Yes.  I had one sock.

Q.   I'll show you now what's marked as State's Exhibits Nos. 59, 60 and 61 and ask if you can identify those?

A.   These are pictures of the sock I took while examining them in the lab.

Q.   That was one sock?

A.   Yes.

Q.   And again these pictures accurately portray what you saw?

A.   Yes.

MR. FRASIER:   We would offer State's Exhibits Nos. 59, 60 and 61.

MS. McCREA:   Is this Exhibit No. 11 or 12?

MR. FRASIER:   This is off the body.

MS. McCREA:   Off the body, okay.

There's no objection, Your Honor.

THE COURT:   Received.

(Whereupon Exhibits Nos. 59, 60 and 61 were then received into evidence.)

Q.   This is State's Exhibit No. 59.  Could you describe that for us, please?

A.   This is a sock.  And I don't remember now, but I called it an Adidas sock.  So, that little black mark at the top must be the Adidas symbol.  I assume I looked it up at the time.

Exhibit 5001 at 1194

Wilcox   D    D6 121

Q.    And in examining the sock, did you go through the same routine as you did with the other pieces of clothing?

A.    Yes, I did.

Q.    This is State's Exhibit No. 60.  Was there holes found in the sock?

A.    Yes, there were.

Q.    And did you look at those holes to determine their origin and things along that line?

A.    Yes, I did.

Q.    What did you find?

A.    The sock was in the same condition as the other clothing.  I did not note anything of — that was remarkable forensically.

Q.    Again, did you find anything associated — that you could see — associated to a bullet hole or something having been caused with a sharp object?

A.    No.

Q.    And finally, this is State's Exhibit No. 61.  Again, could you describe this for us, please?

A.    That is the top of the sock.  And I think I was taking a closeup of the symbol.  And you can see there is some animal — some insect casings and things on there to show the condition of the sock and the type of sock it was.

Q.    Now, you retired from the crime lab.  What year was it that you retired?

Exhibit 5001 at 1195

Wilcox   D   D6 122

A.    I retired from the crime lab in 2002.  They actually closed the crime lab.  And I became an Oregon State Police Tribal gaming detective for two years before I actually retired.

Q.    So, after 2002 did you do any additional forensic work in this case?

A.    No.

Q.    Now, were you made aware prior to trial that the clothing in this case had been released to a Defense expert to look at them, Mr. Kenn Meneely?

A.    I just found out a couple days ago.

Q.    And were you given a copy of Mr. Meneely's report?

A.    Yes, I was.

Q.    And are you aware that Mr. Meneely claims to have found some holes in at least the shirt and the bra that he associates with being made with some sort of sharp object?

A.    Yes.

Q.    Did you look at that report?

A.    Yes, I did.

Q.    And did you review your photographs and your findings from the — your examination that you did in the year 2000?

A.    Yes, I did.

Q.    In the areas where Mr. Meneely claims there's holes, did you find similar items that he claims to see today?

Exhibit 5001 at 1196

Wilcox    X    D6 123

A.   Well, he did make a note that in the upper left front of the shirt that there were holes.  And there are.  But he further goes to say I think that one of the holes associated with it looked like it had been cut.

And I — I don't know what he's referring to.

Q.   Did you see any hole in that shirt at that time that would - - -

A.   (Interposing) No.

Q.   - - - reflect that?

A.   No.

Q.   And in the bra there's a similar hole that he refers to or a slice or a cut.  Again, did you, in your examination of the bra, did you find anything like that in the year 2000?

A.   No, I did not.

Q.   Thank you.

MR. FRASIER:    That's all the questions I have at this time.

THE COURT:    Cross.

CROSS EXAMINATION

BY MS. MCCREA:

Q.   Ms. Wilcox, let's deal with that last part first.  So, the photographs that we have here in evidence today are based on the examination that you did in the year 2000?

A.   That is correct.

Q.   So, the exhibit, Exhibit No. 61, the closeup of the

Exhibit 5001 at 1197

Wilcox    X    D6 124

sock.  We were looking for the Adidas symbol?

A.    Yeah.

Q.    You don't need to get it out.  I'm just going to ask you - - -

A.    (Interposing) Okay.

Q.    So, that was a closeup.  The other ones that you took were from your perspective in the examination.  Right?  In other words that's the only closeup photo we have?

A.    Of the sock?

Q.    No.  Of all of these items - - -

A.    (Interposing) No.

Q.    - - - of clothing?

A.    No.  If you look at the photos, I have a broad photo of the whole thing.  Close up of areas of interest, like the front crotch area of the pants.  And then closer items with the gray ruler in there.

Q.    Right.

A.    That — those are closeups of the holes, the different holes.

Q.    Okay.  And those closeups are as close as you got.  Would that be fair to say?

A.    Yes.

Q.    Okay.  Now, let's come back to that.  But, you talked about a lot of things.  And I'd like to kind of break them down a little bit if we can.  My poor seat mates are

Exhibit 5001 at 1198

Wilcox   X    D6 125

getting pushed out with all of my stuff.

So, you used the term trace evidence a number of times during your testimony.  Right?

A.    That's correct.

Q.    And that's a term of art for a forensic scientist?

A.    Yes.

Q.    And it actually — well, I'm going to read you a quotation and see if you recognize this:

"Wherever he steps, wherever he touches, whatever he leaves even unconsciously, will serve as a silent witness against him.  Not only his fingerprints or his footprints, but his hair, the fibers from his clothes, the glass he breaks, the tool mark he leaves, the paint he scratches, the blood or semen he deposits or collects."

" All of these and more bear mute witness against him.  This is evidence that does not forget.  It does not confuse by the excitement of the moment.  It is not absent because human witnesses are.  It is factual evidence. Physical evidence cannot be wrong.  It cannot perjure itself.  It cannot be wholly absent. Only human failure to find it, study, and understand it can diminish its value."

Exhibit 5001 at 1199

Wilcox   X   D6 126

Are you familiar with that statement?

A.   Yes, I am.

Q.   And was that made by — is that made by Professor Edmond Locard?

A.   Yes, it is.

Q.   And is that considered to be the Locard Exchange Principle?

A.   I hadn't heard it used that way, but yes, it's similar.

Q.   Okay.  Well, what's it mean to you?  What have you heard it called?

A.   Let's see, what did they call that?  What's the title of that, I can't remember?

Q.   Well, it's from the — it was first published in a book by Professor Paul Kirk.

A.   It's just the fact that wherever someone's been they should leave traces of themselves or take a trace of their environment with them.

Q.   Okay.  And the — let me try this again.

Professor Locard was considered to be like the father of modern forensic science.  Is that fair?

A.   Yes.

Q.   Okay.  So, in terms of trace evidence — and you talked a lot about it Ms. Wilcox.  I just want to kinda organize it a little.  In other words, you're going to have —

Exhibit 5001 at 1200

Wilcox   X   D6 127

trace evidence could be fairly described — and you correct me if my words aren't right.  But could fairly be described as small objects that as you say, are either taken or left, that may not be readily visible to the naked eye, for example?

A.   That would be correct.

Q.   Okay.  And whether it is — whether something is left is going to depend on the nature of the evidence.  Right?

A.   Yes.

Q.   Or whether something is taken is going to depend on the nature of the evidence?

A.   That is correct.

Q.   So, certain materials pick up evidence.  Like you've talked about blood spatter.  Yes?

A.   Yes.

Q.   Okay, sorry.

And things like hairs can be left?

A.   That is correct.

Q.   Okay.  And other materials or things can lose evidence.  For example, there's chemical tests for whether somebody is under the influence of alcohol, because alcohol dissipates.  Right?

A.   Yes.

Q.   Okay.  And your job as a forensic scientist in this case was to look for trace evidence, things that had been left behind, for example, on items that were provided to you in the

Exhibit 5001 at 1201

Wilcox   X    D6 128

crime lab?

A.   That is correct.

Q.   Okay.  And that's because, when a person for example touches something, they may, as we've talked about, leave something like their DNA?

A.   They could, yes.

Q.   Or their fingerprints?

A.   They could, yes.

Q.   Things like hair/

A.   Yes.

Q.   Or lipstick?

A.   Yes.

Q.   Paint chips?

A.   Yes.

Q.   Fibers?

A.   Yes.

Q.   Blood?

A.   Yes.

Q.   Okay.  Or they could take something with them.  For example, you could end up with something on a shirt such as a fiber or a paint chip that went with the individual.  Right?

A.   Right.  Or from the scene.

Q.   Exactly.  Thank you.  That's putting it better than I am.  Yeah, they take something from the scene?

A.   Yes.

Exhibit 5001 at 1202

Wilcox   X   D6 129

Q.   So, if somebody for example, drove their truck through the mud, they may have that mud on their tires when they leave the scene?

A.   Correct.

Q.   And that's what you as a forensic scientist are doing, is looking to see if any trace evidence is either left at an area or has been taken, transported, somewhere else?

A.   Yes.

Q.   Okay.  And you described for us that one of the first things that you do is you just flat look at an object or an area.  Right?

A.   That is correct.

Q.   So, in this case you talked about you looked at the blue Mustang.  First you did a visual examination?

A.   That is correct.

Q.   Okay.  And in terms of looking at a scene, you went out to the cemetery where the first shoe was found.  And you and other officers paced the scene looking for particular items that might be of interest?

A.   Correct.

Q.   Okay.  So, a visual examination.  And there's lots of ways to do that.  And you've talked a little bit about that.  First you look at, for example in ordinary light.  Right?

A.   Yes.

Exhibit 5001 at 1203

Wilcox    X    D6 130

Q.    Then you can use bright light which may even just be a flashlight?

A.    Yes.

Q.    Okay.  And then you've got some special lights that you use that can make things appear that wouldn't appear otherwise?

A.    Yes.  They — well, they improve contrast.

Q.    Okay.  Improve contrast.  Thank you.

A.    So you can see them better.

Q.    Right, so you can see them better.

So, for example, that's what you can do in terms of using Luminal in order to see if there was blood in an area. Right?

A.    That is correct.

Q.    Now, something like Luminal, is it correct that even if — let's say you were looking at a trunk of a car.  And even if somebody had hosed out the trunk of that car, is Luminal still going to pick up residue of blood in that trunk?

A.    It could.

Q.    Okay.  And are there other things that you have used that are more sensitive?

A.    The thing about Luminal is it actually works well on older blood, if any is left.  It's not real specific.  And it actually will react with things like rust and — I mean they make — I just like people to know they make it all look so

Exhibit 5001 at 1204

Wilcox   X   D6 131

simplistic on TV.  And it's a little more complicated than that.  But it's a presumptive test.

And Luminal is especially good on, say if you had a lot of blood spatter on a wall.  And someone had cleaned it up.  And, I don't know about usual people, but at crime scenes people usually don't clean up at all.  I don't know if that's in a hurry or whatever.  But, that actually can improve.  And then it ages a little bit.  It improves finding it with Luminal.  But the problem with Luminal, especially in an outdoor scene or on metal, is it can react with metal.  It can actually react with cleaning solutions.

I remember I had a car, the entire car lit up because they had cleaned it with something that reacted with the Luminal.

And it also reacts with some plant materials.  So, it's not very specific.

Q.   Okay.  It's - - -

A.   (Interposing) So, once you identify that there's something there, then you test it further.  And those further tests would narrow it down to, yes it is blood; yes, it is human blood; or, not.

Q.   Okay.

A.   So, there are things more specific than Luminal. Luminal is a tool used to find trace blood.

Q.   Got it.  So, Luminal is kind of like the digital —

Exhibit 5001 at 1205

Wilcox   X   D6 132

like a binary yes/no.  Either — because you were talking about a presumptive.  So if you find - - -

A.    (Interposing) Right.  Yes, it's a presumptive test.  Yes.

Q.    Okay.  So, when you use Luminal, you could find — it will give you — if it gives you a positive, then you go forward to see if it is blood or if it is rust or it is something else.  And do more and more sensitive tests to make a determination?

A.    That is correct.

Q.    Okay.  And if you don't get any presumptive positive from the Luminal, you don't go any further?

A.    That is correct.

Q.    Okay.  And now, and is there also — and if Luminal shows blood, can it also indicate to you blood patterns?

A.    It can, yes.

Q.    Okay.  So, like your example with the wall?

A.    Yes.

Q.    It could show you if something had been wiped?

A.    Exactly.

Q.    Okay.  And in this case, based on your examination of Mr. McGuffin's blue Mustang, there was no presumptive blood in the trunk of the car?

A.    That is correct.

Q.    There was no presumptive blood anywhere on the

Exhibit 5001 at 1206

Wilcox   X   D6 133

Mustang?

A.   That is true.

Q.   And also with the Thunderbird, same thing?

A.   That is true.

Q.   Okay.  Now, in addition to the chemical items that you used such as Luminal — and I know there is a whole bunch of different things that you can do — you can also look at things microscopically.  Right?

A.   Yes.

Q.   So, there's lots — you know, you can use your eyes as an aid.  And you can use a magnifying lens.  And there's all sorts of different kinds of microscopes, aren't there?

A.   Yes, there are.

Q.   What are some of the kinds of microscopes that you used back in 2000?

A.   Well, we had compound microscopes, stereo microscopes.  We had the — like the bullet scope.  We had two field of visions at the same time.  I used a low powered microscope on things like clothing and things like that to start off with because they're bulkier.  And you can put a larger object under there.  And with good lighting and even an eight powered magnification, I mean it just makes a world of difference on the things you can see.

Q.   Right.  The closer you get, the more you can see?

A.   The problem with being closer, like with a stereo

Exhibit 5001 at 1207

Wilcox   X    D6 134

microscope, is that you're looking at a smaller and smaller field.

Q.    Uh huh.

A.    So, you have to, like, put things on a slide.  So, like if you wanted to look at the root of a hair to see whether it had been, you know, pulled out and stretched or whether it had been — just fallen out naturally, in which case it looks more like a little light bulb because it's all rounded off and kind of done for.  You just — you'd have to put it on a slide and put it under a microscope.  But then you're looking at such a small area.

So, for things like clothes and larger items, you know, you start out with the most - - -

Q.    (Interposing) The bird's eye view?

A.    Yeah, the bird's eye view and go smaller and smaller and smaller.

Q.    Right.

A.    You find a little piece of glitter or something that might tie a place or a thing with something else.  Then you zero in more and more and more.

Q.    Okay.  And do you know how long you spent examining the clothes?

A.    Oh, I would — I would say — well, I could probably figure it out.  These were for time cards, too.  Okay.  So how long did I spend in the lab doing clothes?

Exhibit 5001 at 1208

Wilcox   X    D6 135

It was — I would think that would have taken me pretty close to a day.

Q.   Okay.

A.   Or, you know, maybe not steadily, but - - -

Q.   (Interposing) That's fine.  I'm not trying to give you a hard time.  I just wanted - - -

A.   (Interposing) Oh, okay.  Well, I just trying to think how long that would have taken.

Q.   - - - just an estimate.

A.   Say a day.

Q.   Okay.  All right.

And in this case, in this situation, you had — you were aware that one shoe had been found at what we've called Elm Street, the cemetery area that you went out and searched.  And the second shoe was found on Hudson Ridge.  And then the body was found in a different location.  Right?

A.   Yes.

Q.   So, part of what you were considering was that you had three separate crime scenes?

A.   Possible crime scenes, yes.

Q.   You were going to look at three different places or they were going to look and bring them back to you, for evidence.  Right?

A.   Yes.

Q.   And you weren't the only forensic scientist working

Exhibit 5001 at 1209

Wilcox    X    D6 136

on this case.  Right?

A.    No.    There were two forensic scientists at the Coos Bay lab.  My boss was Lieutenant Pex.  He was also a working criminalist.

Q.    And that's Jim Pex?

A.    Yes.

Q.    Yeah, okay.  Now, you were asked about the shoe, the shoes.  And I'm interested right now in the left shoe.  And I wanted to ask you, Ms. Wilcox, when we had Exhibit No. 31 up on the board, which gave us a closeup of the ball of the foot, there was some writing on the photo that labeled it as the right shoe.  Would that have been an error?

A.    Oh, yes.

Q.    Okay.

A.    That is bad.

Q.    I just wanted to make sure I was — that I was tracking with that.  Okay.

And, you've indicated that there were blood droplets on that shoe.  And you've talked about them a little bit.  And isn't it correct that your analysis was that on that shoe, there was a high velocity blood droplet on the side of the traction square?

A.    Yes.

Q.    Okay.  And you talked a little bit about blood spatter.  And blood spatter is essentially blood that's

Exhibit 5001 at 1210

Wilcox   X   D6 137

traveled through the air and lands on other surfaces?

A.   Yes.

Q.   Okay.  And you talked about this, but I'm going to just kinda organize it if you'll indulge me.

So, you've got, let's say, low impact blood spatter which may be like a bloody nose where you talked about it drips down and makes sort of a large surface?

A.   Yes.

Q.   Okay.  That wasn't stated well.  You stated it much better.

And then we could categorize it as medium velocity which would be more like when somebody gets punched in the nose?

A.   Yes.

Q.   Okay.  And then it's going to be more on the surface of the skin or the clothing?

A.   And usually a person's already bleeding, just so you know, when that happens.  Because you have — say, you have blood on your face.  And then you get smacked or hit.  Then the blood will come off in a smaller droplet - - -

Q.   (Interposing) Okay.

A.   - - - and get deposited.  It's usually closer to the person or the object that the blood is coming from because it's not as heavy.  It actually doesn't have the mass to go through the air very far, unless it's just dripping of course.

Exhibit 5001 at 1211

Wilcox    X    D6 138

But - - -

Q.    (Interposing) And that's why - - -

A.    Yeah.  But that's considered medium velocity.  It's usually — low velocity is drip blood; medium velocity is low impact; high velocity is considered — usually a gunshot wound.  Because you've got a lot of force there.  And the blood will almost aerosol.

Q.    The blood almost aerosols?

A.    Yes.

Q.    And it could be from something other than a gunshot.  Right?

A.    Right.  Those are just good examples.  But you kinda get the idea of what they mean by the force involved.

Q.    So, when you say aerosol, that means you're going to have lots of little droplets going sort of in every direction.  Would that be fair?

A.    Correct.  But also the little small droplets don't go as far.  That's another thing to keep in mind.

Q.    All right.  So, if someone is injured or if they're bleeding, if there's high velocity blood spatter, you would expect to find evidence of that — of that aerosol effect — residue of that blood at least close by in the area of where the person was?

A.    Yes.

Q.    So, if they were — if they were in a car, then you

Exhibit 5001 at 1212

Wilcox   X   D6 139

would expect to find that residue in a car?

A.   Yes.

Q.   And if they were transported from one place to another, it could be in the car, in a blanket that was wrapped around the person in the car.  It could be on the individual who intentionally inflicted the cause of the blood spatter?

A.   Right.  Well, then it would usually be transfer blood.

Q.   Okay.

A.   Blood spatter — it's huge field actually.  When you get into forensics, it involves, you know, a lot more specifics to, you know, describe it.  Transfer blood, smear blood, you know, tracked blood, whatever.

Q.   But here, given the fact that you'd found this high velocity blood spatter, the droplet on the side of the left shoe, you were looking for evidence of blood spatter in other locations.  Is that fair?

A.   Yes.

Q.   Okay.  And in terms of the evidence that you looked at, you didn't find any?

A.   Correct.

Q.   You didn't find any in Mr. McGuffin's Mustang?

A.   True.

Q.   Nothing in his house?

A.   That is true — well, the one little white sock had

Exhibit 5001 at 1213

Wilcox   X   D6 140

some blood.

Q.   Well, but that was not Leah Freeman's blood.  Right?

A.   That is correct, yes.

Q.   And nothing in the Thunderbird?

A.   That's true.

Q.   Okay.  Now - - -

Oh, speaking of the Thunderbird.

MS. McCREA:   May I approach, Your Honor?

THE COURT:   You may.

Q.   Ms. Wilcox, I'm going to show you what I've marked for identification as Defense Exhibit No. 127.  Does that appear to be another perspective on the Thunderbird that you searched?

A.   Yes, it does.

Q.   And that would be back in 2000 at Mr. McGuffin's parent's residence?

A.   Well, right now the car is in the crime lab bay, I think.

Q.   Okay.  Okay, well - - -

A.   (Interposing) But yes.

Q.   It came from - - -

A.   (Interposing) Yes.

Q.   Okay.  And is that how it looked when it was in the crime lab bay back in 2000?

A.   Yes.

Exhibit 5001 at 1214

Wilcox   X   D6 141

MS. McCREA:    We'd offer Defense Exhibit No. 127, Your Honor.

MR. FRASIER:    No objection.

THE COURT:    Received.

(Whereupon Exhibit No. 127 was then received into evidence.)

Q.   Now, what I'd like to do, Ms. Wilcox is go through some of the things that were found (not understandable).

MS. McCREA:    And forgive me.  I have to get my pen.

WITNESS:    I have to get my glasses.

MS. McCREA:    Oh, I didn't mean to make you put your glasses on.

WITNESS:    (Laughter.)

Q.   All right.  This is a summary that we've marked as Defense Exhibit No. 128.  Now, you talked about there were a whole bunch of things so you can process.  Right?

A.   Yes.

Q.   And I just want to kind of go through those with you if I could.

So, we have the Mustang car that was searched on July 6th, 2000.  Right?  You processed that?

A.   Yes.

Q.   And there was nothing of significance found on that.

A.   Correct.

Exhibit 5001 at 1215

Wilcox   X    D6 142

Q.    Okay.  So, there was nothing associated to Nick McGuffin.  Is that fair?

A.    Well, it was his car.

Q.    Okay.  But in terms of — I'm talking about forensic-wise - - -

A.    (Interposing)  Oh, forensic.

Q.    Forensic evidence?

A.    No.  I didn't find anything that looked of apparent scientific significance to this case.

Q.    Scientific significance.

A.    Thank you.

Q.    Okay, yeah.  You had that acronym?

A.    Yeah.

Q.    And likewise, there was nothing - - -

THE COURT:    (Interposing) Just a minute.

Can you move the microphone (not understandable)?

WITNESS:    Yes.

MS. McCREA:    Perfect.

Q.    And there was nothing of scientific significance associated to Leah Freeman.  Is that right?

A.    On the Mustang.

Q.    On the Mustang.  I know.

A.    Yes.

Q.    There was a note in the Thunderbird?

Exhibit 5001 at 1216

Wilcox    X    D6 143

A.    Yeah, Thunderbird.

Q.    Yes.  And then we've got the right Nike shoe.  And that was OSP Exhibit No. 1, Agency No. 160.  That was at Elm Street.  And when that analysis was done by you on July 17th there was no blood.  Right?

A.    Yes.

Q.    And then you've got the — talked to us about the DNA report.  And there was no DNA on that shoe associated to Mr. McGuffin?

A.    That is correct.

Q.    There was DNA on that shoe associated to Leah Freeman?

A.    Yes.

Q.    Now, as to Oregon State Police No. 2, Agency No. 70, that was the left Nike shoe from Hudson Ridge.  And on that shoe there was no blood associated with Mr. McGuffin?

A.    That is correct.

Q.    There was blood associated with Leah Freeman?

A.    Yes.

Q.    And there was DNA associated with Leah Freeman?

A.    Yes.

Q.    But there was not DNA associated with Mr. McGuffin?

A.    Yes.

Q.    Now, we have in evidence — I believe we have in evidence a hairbrush which was Oregon State Police No. 3168.

Exhibit 5001 at 1217

Wilcox   X   D6 144

And that was from Ms. Freeman?

A.   Yes.

Q.   And that was used as the standard for her DNA analysis?

A.   That and a toothbrush.

Q.   And a toothbrush.  Which - - -

A.   (Interposing) I actually think they would have used the toothbrush, but I'm not sure.

Q.   All right.

A.   That would have been a better thing to use.

Q.   And voila, No. 4, Agency No. 171, the toothbrush?

A.   That is correct.

Q.   So, that was associated — it was used as a standard. And it was associated with Ms. Freeman, but not connected to Mr. McGuffin?

A.   It was just a standard.  I don't think it was supposed to be connected - - -

Q.   (Not understandable.)

A.   - - - to him.

Q.   I know you do wonder, though.

A.   Yes.

Q.   And then as to five, six and seven which are M-A-F one, two and three.  Those were a yellow rope, a knife, and a red flag.  Now, you referred to those in your direct examination.  Right?

Exhibit 5001 at 1218

Wilcox   X   D6 145

A.   Yes.

Q.   Somebody had brought you a yellow rope.  They brought you a utility knife, and they brought you what looked to be kinda awful, but it turned out to just be like a logging flag?

A.   Yes.  It actually had a logging company's name on it.

Q.   Okay.  And those items did not have any association to either Mr. McGuffin nor to Ms. Freeman?

A.   That is correct.

Q.   Then we have items that you obtained when you did the grid search of the cemetery.  And that was on July 27th, 2000?

A.   Yeah.

Q.   And that would be the yellow paper, the fragment of cloth, and the condom and the wrapper?

A.   That is correct.

Q.   And you indicated that you found those things and seized them but they weren't examined?

A.   As far as I know, they never went anywhere else.

Q.   Okay.  So, for our purposes there's no scientific significance to either Ms. Freeman or Mr. McGuffin?

A.   Yes.  That is correct.

Q.   And then we have Exhibit No. 11.  And I've got (not understandable), too.  Exhibit No. 11, the white sock.  That

Exhibit 5001 at 1219

Wilcox   X   D6 146

was from Mr. McGuffin's residence?

A.    Yes.

Q.    That was seized on August 27th or was examined on —
I'm sorry.  It was examined on August 27, 2000 for blood.  And
then was examined on September 6th, 2000 for DNA?

A.    Okay, yes.

Q.    Is that right?

A.    Yes.

Q.    Okay.  And it did have blood on it?

A.    Yes.

Q.    And that blood was associated with Mr. McGuffin?

A.    Oh, he could not be excluded.

Q.    Okay.  So - - -

A.    (Interposing) Wasn't that it?

Q.    Yes.  So, he could not be excluded.  So, we can
consider it associated with him?

A.    Yes.

Q.    But it doesn't — it's not associated to Leah
Freeman?

A.    That is correct.

Q.    And then there were three firearms examined at the
McGuffin's residence?

A.    Yes.

Q.    And none of those were shotguns, were they?

A.    No.  One was a pellet gun.  I could probably tell

Exhibit 5001 at 1220

Wilcox   X    D6 147

you exactly what they were.  Okay.  Here we go.  I did not put much store by these firearms, to tell you the truth.  Because they had been out — as a criminalist you like to get your evidence - - -

Q.    (Interposing) Fresh?

A.    Fresh.  Thank you.

The three firearms were as follows:

"A Crossman air gun, Power Master 66 pellet rifle, a High Standard — the Plinker twenty-two caliber pistol, and a serial number.  And a Martin's firearm, twenty-two long rifle."

So, I had two twenty-two long rifles — well, one was a pistol; one was a long rifle; and one was a pellet gun.

Q.    And when you were doing the execution of the search warrant at the McGuffin's property, that started at — well, you met with members of the major crime team at eight a.m.  And then at approximately nine thirty you met at the residence.  And then you finished that at approximately one p.m.?

A.    That is correct.

Q.    Just trying to help you.  I didn't know if you had closed the book on your report yet.

A.    Not yet.

Q.    All right.  And one of the other things that you can do in your analyses is to have items tested to see if there's

Exhibit 5001 at 1221

Wilcox   X   D6 148

any latent prints.  Right?

A.    That is correct.

Q.    And that was done on some items in this case, wasn't it?

A.    I believe so.

Q.    So, that was — we talked about the firearms.  Those had no scientific association to Mr. McGuffin or Ms. Freeman.  Correct?

A.    That is correct.

Q.    Okay.  And then Exhibit No. 12 which was Agency No. 226, was the Adidas anklet sock that was found on a fence.  And DNA cuttings were taken on August 27th, 2000.  And it was analyzed.  And that did not have any association with Mr. McGuffin.  Is that right?

A.    Yes.

Q.    And likewise it didn't have any association with Leah Freeman?

A.    Yes.

Q.    And were you involved in the fibers being removed from that sock on November 3rd, 2000?

A.    I don't think so.  I think that was the sock that went directly from Coquille PD to the Portland lab.

Q.    Okay.  So, that would be part of the DNA work?

A.    Yes.  We gave it a exhibit number I think just to keep everything in order.  But, I don't think it even — I even

Exhibit 5001 at 1222

Wilcox   X   D6 149

examined it.

Q.    Okay.  So that would be part of the DNA report you testified about, no scientific significance regarding either Ms. Freeman or Mr. McGuffin?

A.    That is correct.

Q.    And likewise we talked about the Thunderbird car. Nothing of scientific significance concerning Mr. McGuffin. And we had a note apparently from Ms. Freeman to Mr. McGuffin?

A.    That is correct.

Q.    There was nothing of scientific significance, DNA, latent prints?

A.    That is correct.  Well, I didn't do latent prints on the car.  We knew he had driven it.  You know, we knew people had been in it.

Q.    So, I can write no on both of these?

A.    Yes.

Q.    All right.  And then in addition, there was a lot of work done here.  Right?

A.    Yes.

Q.    Okay.  So, Oregon State Police Officer (sic) No. 14, Agency No. 1 were some swabs that were taken from the wall of an abandoned house and examined on September 11th, 2000?

A.    Okay.

Q.    Do you have that report?

A.    I might.  But I think Lieutenant Pex did those —

Exhibit 5001 at 1223

Wilcox   X    D6 150

that.

Q.    Okay.  Are you sure?

A.    So you might have to ask him about that.

Q.    I might have to ask him.  That's fair.  That's more than fair.

A.    Because he did some of the crime scenes.  It kinda went over a long period of time.  We might have had other call outs, too.

Q.    I understand.

A.    Yes.  I made a note that Pex did our Exhibit No. 14 and 15.

Q.    Okay.  Then we will leave that one for the moment.

We will go onto what's been marked for identification as Defense Exhibit No. 130.  And we have Oregon State Police Office No. 18, Agency No. 88 — 188.  And I'm going to go on with No. 189.  And then there was not a number on the other one.  So, Nos. 18, 19 and 20 for the OSP numbers, agency numbers, and that was a sheep skin rug, a quilt - - -

Well, let's deal with the sheep skin rug and the quilt.  Those were both from a garage on First Street?

A.    Yes.  I remember them being submitted.

Q.    Okay.  Do you want to look at your report?

A.    Did I write that, where they were from?  Yes.  Well, I didn't write down where they were from, but I remember them being submitted.

Exhibit 5001 at 1224

Wilcox   X   D6 151

Q.    Okay, it thought — oh, here.

A.    I did?

Q.    Yeah.

A.    Okay, I guess I do need to review.  Okay.
Yes, there it is.

Q.    Okay.

A.    From the garage on First Street, Coquille.  Okay.

Q.    And there was no blood detected on either the sheep skin rug or the quilt.  Right?

A.    That is correct.

Q.    And so those items were not associated with either Mr. McGuffin or Ms. Freeman?

A.    That is correct.

Q.    And then there was OSP No. 20 which didn't have an agency number was a tire iron which had been purportedly seized at Hudson Ridge.  And that was examined on September 18th, 2000.  And there was no blood and no hair?

A.    That is correct.

Q.    Okay.  So, that wasn't associated with Mr. McGuffin or Ms. Freeman in terms of scientific evidence?

A.    That is correct.

Q.    Now, then we have three items that you talked about.  And that was OSP Nos. 21, 22, and 23.  And those are Agency Nos. ASW000 — ASW010, ASW20, ASW30 being for No. 10 the blue sweatshirt and animal bone that you talked about?

Exhibit 5001 at 1225

Wilcox   X   D6 152

A.   Yes.

Q.   Okay.  And that was wrapped around a cat carcass?

A.   Yes.

Q.   Okay, which was near the body.

ASW20 was the cat itself, the cat carcass.  And ASW30 was a box containing the cat and the sweatshirt?

A.   That is correct.

Q.   And those were brought in because they were found near the body, right?

A.   Yes.

Q.   Okay.  And those were examined on September 28th, 2000 in terms of blood.  And you did determine it was cat blood?

A.   Yes.

Q.   Okay.  And obviously that isn't related to either Ms. Freeman or Mr. McGuffin?

A.   That is true.

Q.   No other blood but the cat blood, right?

A.   That is correct.

Q.   And the box that the cat had been in was examined for latent prints and no prints were found?

A.   You know, I don't remember seeing the report.  Did — I don't know if you have the latent print report?

Q.   You know, I'm not sure that I do.  I guess - - -

A.   (Interposing) We were — I think we were going to

Exhibit 5001 at 1226

Wilcox   X   D6 153

send it for prints.  I'm not sure it ever got done.  And the reason being is, it was not a good piece — I mean, it was already eliminated.  Once again, you don't do more when you've already eliminated.

They found — this is what I'm remembering.  It was reported to me they found the man who had thrown the cat over the bank.  It was big orange tom and he didn't like it I think.  He had done away with it and thrown it over there.  They traced him down somehow.

I think that saying there were no prints is maybe not correct because I don't think latent prints were ever actually performed.

Q.   Okay.  Would it be fair to say there were no prints — there was no positive evidence of prints associated with Mr. McGuffin or Ms. Freeman?

A.   Yes.

Q.   Okay.  Then if we do it this way.

Then, there were some tape lifts done.  Well, what are tape lifts?  Can you explain those to us?

A.   Tape lifts is — what was that of?  Well, you just take — you can just use strapping tape.  Of course you can get fancy forensic tape, too.  You just get a big piece of clear tape.  And like say if you wanted to take hairs off an upholstered car seats (not understandable).  You know, you just make a big loop of tape with the sticky side out and then

Exhibit 5001 at 1227

Wilcox    X    D6 154

just run it over there.  And it picks up surface hairs.  I mean, you don't necessary want every piece of sand that's ever been ground in there.  You want the things that are associated, hopefully, with your recent crime scene, hairs, fibers, from maybe somebody sitting there and shedding hairs or things off of their clothing.  And a tape lift is a way to kind of concentrate.  You know, you could do the whole back seat of a car, just - - -

Q.    (Interposing) Right.

A.    Depending on how dirty it was or just the head rest.  And then you lay it out.  You can even stick it to a piece of paper and examine it under a microscope quickly and easily.  And if you get, you know, something interesting you can pull it out and do further work with it.

Q.    So, what would be something interesting?

A.    Well, I'm just thinking of different cases where people have found things.  Hairs are always good.  I'm thinking right now of cars.  If you have hairs that are pulled out as opposed to falling out.

Q.    Okay.

A.    Especially if you have a wad.  But then of course you might see them.  There have been cases done on trace evidence.  When I mentioned the glitter.  Wonderful forensic case where a little girl was wearing a glittery shirt.  And the glitter actually, when you put it under a high powered

Exhibit 5001 at 1228

Wilcox   X   D6 155

microscope, actually was a certain shape that was associated with her t-shirt, to show she'd been in the car.

Q.   Right.

A.   So, that's kind of trace evidence.  But it's not actually — going trace evidence on a crime scene is tough.  That's why these are well studied and important.  But you always try for the trace evidence.

Q.   Well, because stuff gets left or stuff gets taken?

A.   Exactly.

Q.   All right.  And so you have to look to see if you can find it.

So, you did tape lifts — no, this was Mr. Pex.

A.   I'm not sure.

Q.   I think that's Mr. Pex?

A.   Yes.

Q.   Okay.

A.   I'm not sure what shirt you're talking about.

Q.   Leah Freeman's shirt.  Sorry LF, yeah.

A.   Oh, okay.

Q.   So, we'll talk to him about that.

Okay.  Now we get to the — sort of what you were talking about, the general stuff.  So, there were a bunch of beer bottles and beer cans and bottle caps and those kinds of things that were brought in from various locations for you to examine.  Is that right?

Exhibit 5001 at 1229

Wilcox   X   D6 156

A.   Yes.

Q.   Okay.  So, we have OSP No. 28, Agency No. JP3, a beer can and a glass.  And those were examined in — on September 29th, 2000.  I think that was when you did your analysis.  And there was nothing of scientific significance found related to Mr. McGuffin or Ms. Freeman?

A.   That is correct.

Q.   I'm trying to figure out a way - - -

A.   (Interposing) The only thing I might say is you say no prints or no DNA sampled.  So, they probably weren't good candidates for those things.  So, they probably weren't done is what I'm saying.

Q.   Yeah.  (Not understandable.)

A.   Okay.

Q.   (Not understandable.)

A.   Okay.

Q.   I'm trying to figure out a way to cut this (not understandable).  But I don't know if then you're going to be able to see it, Ms. Wilcox.  So, Exhibit No. 131.

Let's see if we can do it this way.  Can — you can't see that, can you?

A.   Yes, I can see it.

Q.   Can you?  Okay.

So, OSP Nos. 29 through 37 which are Agency Nos. JP4 through JP12.  And those are respectively a bottle cap, a blue

Exhibit 5001 at 1230

Wilcox   X    D6 157

rag, beer can, beer can, beer can, pop can, beer can, beer can, and then No. 12 is blood on cardboard.

So, in terms of — let's deal with No. 29 through 33, those were all items that were found by — either by the side of the road or it's not clear, that you did an analysis on, on at least September 29th, 2000.  Is that right?

A.   Yes.

Q.   Okay.  And we have nothing in terms of those exhibits of any scientific significance related to Mr. McGuffin or Ms. Freeman?

A.   That is correct.

Q.   Then there were additional beer cans — I'm sorry — a pop can, a beer can, and a beer can which are JP8, 9, — sorry — JP9, 10 and 11, that were brought to you for examination because they were found near the body?

A.   That is correct.

Q.   And you examined those as well on September 29, 2000?

A.   Yes.

Q.   And again, nothing of scientific significance related to Mr. McGuffin or Ms. Freeman?

A.   Yes.

Q.   And then as to OSP No. 37, Agency No. JP12, the blood on the cardboard, this was near a deer which was in the — near the location of the body?

Exhibit 5001 at 1231

Wilcox   X    D6 158

A.    Yes.

Q.    And you examined that on September 29th, 2000, and it was animal blood?

A.    Yes.

Q.    Okay.  So again, no - - -

A.    (Interposing) Yes.  I think I just said not human.

Q.    Okay.

A.    So, I probably did presumptive for blood and not human blood.

Q.    All right.  But — so in other words if there had been something you were concerned about you would have gone further?

A.    Yes.  It might not — probably was — but it might not even have been blood.  I'm not sure.  Wasn't concerned.

Q.    Okay.  I mean, there was a lot of stuff being analyzed for this case, wasn't there?

A.    Yes.

Q.    Okay.  Then we get to the things that you testified to on direct examination which is OSP No. 39 which is DEH1-212, the jeans that Ms. Freeman was wearing that were on her body.  And No. 40 which was the shirt that you testified about which was on Ms. Freeman.  And the bra, No. 41 which was on Ms. Freeman.  And likewise, No. 42 which was the Adidas white sock that was on Ms. Freeman.

And in terms of the jeans, the shirt, and the bra,

Exhibit 5001 at 1232

Wilcox   X   D6 159

you did an analysis on October 11th, 2000.  And there — in terms of the forensic results there was nothing of scientific significance associated with Mr. McGuffin?

A.   That is correct.

Q.   Was there anything of scientific significance associated with Ms. Freeman?

A.   They came from the medical examiner's office, so I knew they were her clothes.

Q.   Okay.  And then in terms of the Adidas white sock, hairs were found on that?

A.   They were hairs, but they turned out to be her own.  And they were post mortem.  In other words they were from her body after she had died.

Q.   And nothing connected to Mr. McGuffin?

A.   That is correct.

Q.   Now, in looking at — when you're examining clothes like this and you have something like the sports bra and the tank top.  And if we assume that she was wearing the sports bra with the tank top over it?

A.   Yes.

Q.   One of the things that you would look for would be whether you had two cuts that were of identical or two holes that were of identical size?

A.   Yes.  Or you mean, like went through?  Well, clothes being items?

Exhibit 5001 at 1233

Wilcox   X   D6 160

Q.   Yes — that — yes.

A.   Yes.

Q.   And that was my next question.  Is did you find something?

And they wouldn't necessarily — if you had two holes of the same size, they wouldn't necessarily be in exactly the same location.  Isn't that right?

A.   Well, I didn't see the body.  So, I got the clothes already.

Q.   Right.

A.   So, I'm not sure how her clothes were arranged on her as far as, if something was pulled up or down.  I mean, I'm assuming the bra was where it should be, you know, if her t-shirt got pulled up or those kind of things.

Q.   Oh, sure.  Okay, let's assume - - -

A.   (Interposing) Is that what you're - - -

Q.   (Interposing) Yeah.  On a — yeah, but on a — let's assume on a generalized basis.

A.   Okay.

Q.   If you have a situation where a person is wearing a sports bra and a shirt over it.  And the person is, let's say, stabbed.  Then there's going to be a cut.  And the stab goes through both pieces of clothing?

A.   Yes.

Q.   Then you're going to have some kind of a hole in

Exhibit 5001 at 1234

Wilcox   X   D6 161

both the sports bra and the tank top?

A.   Yes.

Q.   But they might not line up identically because of the movement of the fabric?

A.   That is correct.

Q.   Okay.  All right.  And one of the things you would look at would be a comparison of the size of the two holes to see if they were pretty similar?

A.   Yes.

Q.   Okay.  We're almost done.

Now, you had mentioned during direct examination about insects.  And — I'm sorry.  It's an unpleasant topic, but is it correct that when someone dies insect activity, depending on the environment, may start almost immediately?

A.   Yes.

Q.   Okay.  And when we're talking about insects, we're talking about flies laying eggs which create maggots?

A.   Yes.

Q.   They refer to maggots basically?

A.   Yes.

Q.   I know it's not (not understandable) but - - -

And it — once — once a — if a person is still alive then it may take more time for the insect activity.  Is that fair?

A.   Yeah.  A blow fly doesn't lay on a live person.

Exhibit 5001 at 1235

Wilcox   X   D6 162

Q.   Okay.  Thank you.

A.   And they usually don't lay at night.

Q.   Okay.  They don't lay at night.  But as soon as a person is deceased the blow flies will start - - -

A.   (Interposing) Yes.

Q.   - - - procreating?

A.   Yes.

Q.   Okay.  And they generally go toward the body orifices or any wounds.  Would that be fair?

A.   Yes.

Q.   Okay.  So, if a person — if a person were - - -

Okay, if there were a deceased person, for example, in the trunk of a vehicle, you would expect that if there was access to that trunk, if it wasn't sealed tight, the blow flies would be making their way in there?

A.   Yes.

Q.   Okay.  Immediately?

A.   Yes.

Q.   Okay.  And if you did a search later on, are you going to see evidence of that?

A.   Yes.

Q.   All right.  So, then we have OSP No. 43 which was hair from Ms. Freeman, post mortem.  And that was examined on October 11th, 2000.  Now, that was a hair standard?

A.   Yeah.  I just said head hair.  I have to look at my

Exhibit 5001 at 1236

Wilcox    X    D6 163

original report.

Okay.  Did you have a question about that one?

Q.  Well, what does that — what is it that that's - - -

Okay, let me try that again.

How is it that you characterized that as a hair standard?

A.  A hair standard is — we take a sample of her hair and just keep it.

Q.  Okay.

A.  In case it became important later in the case. Because the body was going to be disposed of it, pretty bad shape.

Q.  And the body was cremated?

A.  That's what I was told.

Q.  Okay.  All right.  So - - -

A.  (Interposing) So that would just be standard.  In any case we would take, you know - - -

Q.  (Not understandable) and not associated with Mr. McGuffin?

A.  Yes.

Q.  Okay.  And then - - -

A.  (Interposing) Associated with Leah should be yes.

Q.  I'm sorry.  Thank you.

A.  It was her standard.

Q.  Absolutely.  Thank you.

Exhibit 5001 at 1237

Wilcox   X   D6 164

A.   Be used for comparison if it was needed.

Q.   If it became relevant later on?

A.   Yes.

Q.   Sure.  Okay.  And then Oregon State Police No. 44 was a piece of cellophane that was found under her head that you examined on October 11th, 2000?

A.   Yes.  I think that just came from the crime scene. And they — it just came with the body, so - - -

Q.   And there was nothing significant about that regarding either individual?

A.   That is correct.  It was a four inch by five inch in size.  So, it was probably just a piece of trash.

Q.   And then there was some duct tape, OSP No. 49 seized from Mr. McGuffin's Mustang.  And there was also a thirty-four inch piece of duct tape, OSP No. 50 from Hudson Ridge, and you — as well as a purple glove, No. 51 from Hudson Ridge.  And you examined those three items on April 2nd, 2002?

A.   Yes.

Q.   And the duct tape in the Mustang and the duct tape, the thirty-four inch duct tape did not match?

A.   That is correct.

Q.   Okay.  So we don't have any association to either Mr. McGuffin or Ms. Freeman?

A.   I think the duct tape from the Mustang, I took the end of the duct tape — because duct tape is often involved in

Exhibit 5001 at 1238

Wilcox   X   D6 165

a kidnaping or a restraining or whatever.  So, I took it kind of like a standard.  The duct tape that was submitted by an officer.  I think he just found that beside the road, it was very aged.  It was actually starting to separate.  And duct tape is pretty sturdy stuff.  So, if it's separating it's probably a piece of trash that had been sitting by the road for quite a while, because it was very dry and the fibers were coming apart.  If anyone has used duct tape that takes awhile.

Q.   (Not understandable.)

A.   It probably was not associated with the crime at all.

Q.   I can write no?

A.   You might want yes for associated with McGuffin just because it was from his Mustang.

Q.   Thank you.

A.   Yes.

Q.   Okay.  Now, in terms of attempting to determine a cause of death or a manner of death, you mentioned both of those terms in your direct examination.   A manner of death would be how a person dies.  Right?

A.   Yes.

Q.   And the cause of death would be what killed them?

A.   Yes.

Q.   Okay.  So, if it was like a blow to the head that — would that be both — could be both the cause and the manner of

Exhibit 5001 at 1239

Wilcox   X   D6 166

death?

A. That would be a cause if they died. And a manner of death would be from the blow, the cracked skull. And manner of death would usually probably be associated with more — we're talking more evidence. Well, both of them could produce evidence, but you would have bleeding.

Q. Uh huh.

A. So, I'm talking about manner of death as in bleeding or from a forensic standpoint.

Q. Right. And in this case if you know, was there an effort made to try to examine Ms. Freeman's bones?

A. Yes. I actually talked to — I think it was Doctor Bennett that did this autopsy in Roseburg?

Q. Actually, Doctor Olson.

A. Doctor Olson. I think he was in Roseburg at the time, though. And they did — I talked to him about that because I thought perhaps, you know, they hadn't thought about getting nicks off the bones and stuff. But they had. They had cleaned off each bone. They told me that.

Q. And do you know if x-rays were made?

A. I do not know.

Q. Let me make sure I didn't forget something.

A. You didn't get the (not understandable) glove, the purple glove.

Q. Oh, thank you.

Exhibit 5001 at 1240

Wilcox   X   D6 167

A.   Well, the reason I'm — it's interesting is I found out that loggers actually use those gloves, too.  So, you find them out in the woods.

Q.   Okay.

A.   They do because their hands get so sweaty in their gloves, they put rubber gloves - - -

Q.   (Interposing) Underneath.

A.   I found that out later.  I thought it was interesting.

Q.   All right.

A.   Because you find gloves and stuff in the woods, it's not necessarily a — you know, a bad thing.

Q.   Right.  Okay.  So, that — the purple rubber glove was not associated to Mr. McGuffin or Ms. Freeman?

A.   Yes.

Q.   And the matters thereafter are after you left the crime lab?

A.   I'm sorry, what?

Q.   Well, the other matters I have on here are not associated with when you were still with the crime lab or doing the other matters.  Okay?

A.   Okay.

Q.   These right here.

MS. McCREA:   Let me just go check my notes.

Q.   All right.  I just have a couple more questions,

Exhibit 5001 at 1241

Wilcox    X    D6 168

Ms. Wilcox.

On the right shoe which — the right shoe would have been — I know Mr. Frasier will correct me if I'm wrong.  Is No. 96, the one from Elm Street.  Do you remember was that — when you received it was it tied or untied?

A.    I don't specifically remember.

Q.    And when you received Exhibit No. 97, the left shoe, do you recall that there were some hairs either in that shoe or with that shoe already packaged up?

A.    No, I do not.

Q.    Bear with me just a moment.

Ms. Wilcox, I'm just going to show you this photograph of a paper pull with an evidence number on it and see if you remember that as being with the left shoe?

MR. FRASIER:    Excuse me.  Is it the right shoe?  Weren't we talking about the left shoe?

MS. McCREA:    No.  It's the left shoe.

MR. FRASIER:    All right.

WITNESS:    It's No. 2.

Q.    If you don't remember - - -

A.    (Interposing) I don't remember.  You know, there might have been a hair in the shoe or something.

Q.    Right.

A.    Probably Leah's own, but - - -

Q.    (Interposing) Yeah.  Just checking.

Exhibit 5001 at 1242

Wilcox   ReD  D6 169

A.   No, I do not remember seeing that.

Q.   Okay.  Thank you.

All right.  I'm sorry, Ms. Wilcox, I've got one more question.

Concerning the blood spatter that you saw on the shoe, is there any way that you can express an opinion as to what direction the blood spatter would have come or gone?

A.   No.

Q.   Okay.  Thank you.

MS. McCREA:    That's all I have, Your Honor.

THE COURT:    Redirect.

MR. FRASIER:    Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. FRASIER:

Q.   Why wouldn't you be able to determine direction?

A.   For one, there was very small amount of blood spatter.  And also I don't know where the shoe was.  I mean, it's not a wall.  It's not — it's moving around itself.  So, I don't know where it was in relationship to where the blood was coming from.

Q.   All right.  Let's go back a little bit about trace evidence a little bit.  Trace evidence, is it hardy, fragile, what's it like?

A.   Well, it's very small, so it's hard to find.  And it of course can be carried away or swept away easily.

Exhibit 5001 at 1243

Wilcox   ReD  D6 170

Q.   And in terms of finding fragile or — excuse me.  In terms of finding trace evidence, the sooner you find the object or examine the object would it be safe to say that's — the sooner you do it the more probability rate arises that you'll be able to find it?

A.   That is correct.

Q.   So, if a body had been laying out for five weeks are there the chances of finding trace evidence from somebody who had committed the crime, would it be well greater when the body was first placed there; or, less when the body's finally found?

A.   It would be less.  And especially, you know, outside in warm conditions.

Q.   Why is that?

A.   Well, you saw the conditions of her clothes was very bad.  And if there had — say, there had been a small semen sample, it would have been totally overwhelmed by her own body sort of melting in her clothes.

Q.   Let's talk about trace evidence, in particular let's say hairs.  In terms of the Defendant in this case being the boyfriend of Ms. Freeman, what would be the scientific significance of finding a hair from the Defendant on her clothing?

A.   It would — it wouldn't be significant.

Q.   Why is that?

Exhibit 5001 at 1244

Wilcox   ReD  D6 171

A.   It was reported to me that Leah Freeman rode in the Mustang often, maybe every day.  So, I wasn't really concerned if I'd found one of her blonde hairs in the car.  If I'd found a giant wad of torn out hairs I might have been concerned.  But I wasn't concerned about finding his hair.  I wasn't really concerned about finding a couple of her hairs.  I think she was blonde at that time.  And, you know, another small amount of trace evidence from her didn't mean a lot.

Another thing is her clothing, like I said, was very generic, ubiquitous.  You see, you know, cotton fibers everywhere.  You see blue jean fibers everywhere.  These are not — trace evidence is a very hard way to solve a crime.  You hear about these things on TV or — and they do it, you know, in a half hour.  It's a really hard way to solve a crime.  It's unusual actually, to solve a crime with just trace evidence.

Q.   Now, Counsel asked you about — well, let's talk about Luminal a bit.  There was a question about, "Well, if you hosed out a trunk and then you were to use Luminal on the trunk would you still be able to find residue of blood in there?"

And you said — I believe your answer was you could?

A.   That is correct.

Q.   Would you always find blood, even after it's been hosed out?

Exhibit 5001 at 1245

Wilcox   ReD  D6 172

A.   No.

Q.   Why not?

A.   It would depend on anything else.  It's how well you cleaned it.  If the blood was fresh when you hosed it out, of course it would come out more easily than if it would have been dried.  Luminal actually works best on old dried blood.  It binds with the heme in the blood.  So, kind of broken down blood works better.

But it all has to do with the cleaning process.  We've had other cases where, you know, we've known that a jacket was soaked in somebody's blood.  If someone cleans it really well, you might not find it.  Usually they don't, and you can find it even after they've washed it.  But, it just depends.  A lot of — it depends on a lot of things.

Q.   Does the fact that you failed using Luminal to detect blood in the trunk of the Mustang mean there was never any blood in that trunk?

A.   No.

Q.   Now, you talked about the blood spatter found on the bottom of the shoe.  I believe you classified that as high velocity blood spatter and you mentioned that being shot would be a good example of where high velocity blood spatter comes from.  Is there other ways?

A.   Well, that is just an example.  That is a school of classifying blood.  Low blood, drip blood is low velocity.

Exhibit 5001 at 1246

Wilcox   ReD  D6 173

Medium velocity, high velocity.  This is kind of medium high velocity blood spatter.  But I was just trying to make an example of the difference.  And it's — again, there was not a lot of blood here.  But I can tell you it was not dripped blood.  It — maybe some of it was a little tiny bit of transfer blood.  It was medium to high velocity blood spatter.

Q.   What other things could cause it other than a gun shot?

A.   Well, being hit with an object.  I've seen it with tire irons.  And I've also seen it with a gun shot.  You know, you have the aerosol blood, but you also have larger droplets, too, coming off of a gunshot wound.

Usually you have — when you get medium velocity, you have something that's already bleeding.  So, the first blow will open a wound.  Say if you get smacked in the nose.  You know, there's a second when you're not going to be bleeding.  You start bleeding, you get smacked again.  Then you would get a medium to high velocity blood spatter.  There's usually quite a bit of force behind it.  It would be a forceful smack to make small droplets.

Q.   Let's say a person had a split lip and coughs.

A.   Uh huh.

Q.   And the blood is expelled by the cough, what — how would you classify that?

A.   Coughing could definitely be a medium to high

Exhibit 5001 at 1247

Wilcox   ReD  D6 174

velocity blood spatter, especially if it, like, if it was inside their mouth.

Q.    What about a sneeze?

A.    Yes.

Q.    Counsel asked you about if a dead body had been placed in the trunk of the car would the flies immediately try to get into the trunk and be with the body.  You mentioned something about flies don't lay eggs at night?

A.    Well, that's one of the ways we can usually tell if a person — say you find somebody the next day and you don't know what time of the day they died the night before.  Was it in the evening or was it when it was in the middle of the night?

Blow flies don't usually lay eggs at night.  So, if they had eggs on them, they probably died before nightfall.  It's just — it's just some examples.  There's a whole field of entomology with forensics.  And it's — you know, I would — I would have called in an expert if it was, you know, a more recent case.

Q.    Now, Counsel went through a large amount of the evidence, well probably all the evidence that was submitted to you for examination on those charts.  And I won't go through all of those again.  But, a large number of these things, you did not find anything that connected the item to Ms. Freeman or to the Defendant?

Exhibit 5001 at 1248

Wilcox  ReD  D6  175

A.   That is correct.

Q.   Did you find any evidence on any of those items that connected them to any person?

A.   No.

Q.   So, for example one of these beer cans that obviously somebody had to have handled, drank from and threw beside the road, you didn't find any trace evidence on those items that we could have used to identify anyone?

A.   That is correct.  Well, they did identify the cat situation.

Q.   Did identify who - - -

A.   (Interposing) Yes.

Q.   - - - knocked the cat off?

A.   I don't know — one of the officers traced it down.

Q.   And the last thing I'd like to talk with you about is one of the things that Counsel talked with you.  I want to put up on the screen here, this is State's Exhibit No. 8.  And maybe what I'll do is I'll go — I'm going to go to State's Exhibit No. 7.  Oops.

This is a picture allegedly taken of Ms. Freeman the day she died.  How would you describe how well that shirt fit her?

A.   It fitted her tightly.

Q.   Now, if she had been stabbed, would you expect — if she had been stabbed through the shirt and through the bra,

Exhibit 5001 at 1249

Wilcox   ReD  D6 176

would you expect the holes in a situation where she's wearing a form fitting shirt, line up at least somewhat close?

A.   Yes.

Q.   Thank you.

Finally, in your examination of the clothing of Ms. Freeman, did you find any evidence whatsoever that suggested she had either been shot or stabbed?

A.   No.

Q.   Thank you.

MR. FRASIER:   That's all I have.

THE COURT:   You may step down.  And you are free to leave - - -

Unless you want her to remain?

MR. FRASIER:   I'd ask her to come back and be present when the Defense expert testifies.  And I believe that's going to be tomorrow morning.

THE COURT:   Is that correct?

MS. McCREA:   Yes.

THE COURT:   Then you're not excused.  You need to come back tomorrow morning.

Your next witness is going to be how long?

MS. SOUBLET:   It will be short.

THE COURT:   Okay.

Call him.

MS. SOUBLET:   The State calls David

Exhibit 5001 at 1250

Breakfield  D    D6 177

Breakfield.

                    DAVID BREAKFIELD

was thereupon produced as a witness on behalf of the Plaintiff

and, having first been duly sworn to tell the truth, the whole

truth and nothing but the truth, was examined and testified as

follows:

          THE COURT:    Have a seat up here, please.

          Okay, scoot closer to the microphone.

          Go ahead.

          MS. SOUBLET:    Thank you, Your Honor.

                    DIRECT EXAMINATION

BY MS. SOUBLET:

     Q.    Can you state your full name and spell your last for

the record?

     A.    David Christopher Breakfield, B-R-E-A-K-F-I-E-L-D.

     Q.    Mr. Breakfield, how old are you?

     A.    Twenty-six.

     Q.    And do you know someone by the name of Megan

Edgerton?

     A.    Yes.

     Q.    And how do you know Ms. Edgerton?

     A.    We were friends in school.

     Q.    Would that be in high school?

     A.    Yes.

     Q.    And when was that?

Exhibit 5001 at 1251

Breakfield   D    D6 178

A.    Nine years ago.

Q.    And do you know the Defendant, Mr. McGuffin?

A.    Yes.

Q.    And how do you know him?

A.    Also through Ms. Edgerton.

Q.    Was there a time — you say you knew Ms. Edgerton. Was there a time when you were dating Ms. Edgerton?

A.    Yes.  I guess you could call it that.

Q.    How old were you at that time?

A.    Sixteen, seventeen.

Q.    Was there a time when you broke up with Ms. Edgerton?

A.    Several.

Q.    Was there a time when you were with Ms. Edgerton after she had recently broken up with the Defendant?

A.    Yeah.  According to her word, yeah.

Q.    And was there an altercation with the Defendant?

A.    Yes.

MR. McCREA:    Wait a minute.  Wait a minute. Object.  This isn't relevant to any issue here.  And they're both 403 and 404 issues, this evidence, Your Honor.  And this is outside the scope of what I thought they intended to try to introduce.  We have made objection to this evidence getting outside of the only incident that may be relevant here.

THE COURT:    I think as I recall that I felt

Exhibit 5001 at 1252

Breakfield   D    D6 179

this evidence was admissible.  I'm going to hear the question, but I — if you're — if she's going where I think she's going in this matter, then - - -

Well, hold it.

No, that was on — let me get my notes.  No.  At least my notes reflect that part of this was admissible.  And I believe I stated on the record why part of it was admissible.

So, you filed your motion in limine.  And at least the part that I found in relation to — let me get to the State's response, because I just read yours.

I think with one caveat, I had ruled that his statements would be admissible.

What year are you asking him about?

MS. SOUBLET:    I'm asking about the incident Your Honor ruled was admissible.

THE COURT:    Right.  But I'm — do you have a year?  Was it after 2000?

MS. SOUBLET:    Yes, Your Honor.  He just indicated he dated Ms. Edgerton nine or ten years ago.  It would be after 2000?

THE COURT:    Okay.

Then I had ruled that this evidence was admissible.

MR. McCREA:    Well, may we approach, Your

Exhibit 5001 at 1253

Breakfield   D    D6 180

Honor?

THE COURT:    Yes.

(SIDEBAR)

THE COURT:    We had a semantics problem and we've taken care of it.

Go ahead.

MS. SOUBLET:    Thank you, Your Honor.

Q.   Mr. Breakfield, was there a confrontation with the Defendant?

A.   Several.

Q.   I want to talk about one where he made threats to you.  Do you remember that?

A.   Yes.

Q.   And what if anything did the Defendant tell you?

A.   He said, "I strangled . . ."

Do you want me to say this?

Q.   I want you to say exactly what he told you.

A.   He said, "I strangled that bitch and I'll strangle you, too."

Q.   Did he say anything else to you?

A.   No.

Q.   Do you remember telling — talking to Officer Webley and Officer McNeely last August about this case?

A.   Yes.

Q.   Do you remember talking to them about the same

Exhibit 5001 at 1254

Breakfield   D    D6 181

confrontation that we're just talking about now?

A.   Yes.

Q.   And is it safe to say at the time you did that, that your memory of that incident is fresher now than is was then — fresher then than it was now?

A.   Fresher then than it is now?

Q.   Yes.

A.   No.

Q.   Mr. Breakfield, I'm going to show you your statement and ask you to read the last paragraph to yourself, not out loud.

Just right there.  Let me know when you're done reading that.

Are you done?

A.   Yeah.

Q.   Does that refresh your memory?

A.   Yes.

Q.   What else did the Defendant say to you during that confrontation?

A.   He would take my life as well.

Q.   What exactly did he say?

A.   "I've killed before and I'll kill again."

Q.   Did he also tell you, "I ain't afraid to kill you?"

A.   Yes.

Q.   Thank you.

Exhibit 5001 at 1255

Breakfield   X    D6 182

MS. SOUBLET:    I have nothing further.

THE COURT:    Mr. McCrea.

CROSS EXAMINATION

BY MR. MCCREA:

Q.    And the statement that Counsel showed you, you made that statement or substantially to that effect to the officer on August 5th of 2010.  Is that correct?

A.    Yes.

Q.    And it's your testimony when this purportedly happened, it was just you there and Mr. McGuffin?

A.    Yes.

Q.    And this happened back in 2002?

A.    Yes.

Q.    And so, after Mr. McGuffin said that to you, you were then aware that Mr. McGuffin had confessed to you that he had killed somebody by strangling them.  He had killed female person by strangling them.  Is that right?

A.    People say a lot of things.

Q.    Pardon?

A.    I said, people say a lot of things when they're angry.

Q.    I'm sorry?  Should I say it again?

THE COURT:    He said, "People said a lot of things when they're angry."

MR. McCREA:    Oh, people said a lot of things.

Exhibit 5001 at 1256

Breakfield   X   D6 183

Q.   Well, but you became aware of the — of Leah Freeman's disappearance death, did you not?

A.   I'd heard rumors.

Q.   Pardon?

A.   I'd heard rumors.

Q.   Okay.

A.   I was a sixteen year old boy.

Q.   And you lived here in this Coos Bay Area in nineteen — or rather in 2002.  Correct?

A.   Yes, sir.

Q.   And you lived here in 2003?

A.   Yes.

Q.   And there was publicity that came out about the fact that she was still missing during the time you're living here?

A.   Yes.

Q.   And you — did you go to the police and tell them in 2002 what Mr. McGuffin had said?

A.   No.

Q.   Did you go to the police and tell them in 2003 what he'd said?

A.   No.

Q.   Did you go to the police and tell them in 2004 what he said?

A.   No.

Q.   Well, you knew that Ms. Freeman had been his

Exhibit 5001 at 1257

Breakfield   X    D6 184

girlfriend, didn't you?

A.   I never knew Ms. Freeman.  Like I said, everything that I heard was from another party.

Q.   Well, you — but you heard the information?

A.   Yes.

Q.   And you testified at Grand Jury that you also saw things in the paper?

A.   Yes.

Q.   And you heard things on television?

A.   Yes.

Q.   Okay.  And let's go to 2005.  Did you go to the police in 2005 and tell them that Mr. McGuffin had confessed to strangling Ms. Freeman?

A.   No.

Q.   Did you go in 2006?

A.   Do you just want to skip forward to 2008, or '09 or

- - -

Q.   Pardon?

A.   No, I did not.

Q.   All right.  You knew — you had contact with the police along in this time frame, didn't you?

A.   No.

Q.   No contact at all?

            MS. SOUBLET:    I'm going to object to that question.

Exhibit 5001 at 1258

Breakfield   X   D6 185

THE COURT:    Well, depending on the question it could be rather broad.

If your question is limiting it to this type of statement, then I'll allow it.  But the question is fairly broad.

Q.   Well, my question is — let me put it this way.  You knew where to find the Coquille Police Station, did you not?

A.   Yes.

Q.   And you knew where to find the Sheriff's Office?

A.   Yes.

Q.   And you knew where to find the District Attorney's Office?

A.   Yes.

Q.   And were you aware that the number for the FBI is in the phone book?

A.   No, I was not aware of that.  Thank you, though.

Q.   All right.  But in any event — but we go clear up to 2010 before you ever told anybody that you claim this statement was made to you.  Isn't that correct?

A.   Correct.

Q.   Pardon?

A.   That's correct.

Q.   And Ms. Edgerton, Megan Edgerton, was someone that you kept trying to date, isn't the right, including up to and in 2010?

Exhibit 5001 at 1259

Breakfield   X    D6 186

A.    No.   That's not correct.

Q.    Well, didn't you ask her in 2010 to go on a — oh, come to your kid's birthday party?

A.    Yes.   That's correct.

Q.    And she said, "No?"

A.    Yeah, but it had nothing to do with physical relations or anything otherwise.

Q.    Pardon?

A.    It had nothing to do with any kind of a relationship.

Q.    Well, what — I mean, she didn't do anything with you in 2010.   Right?

A.    No.   Yeah, that's correct.

Q.    And you are now aware you are carrying this secret that Mr. McGuffin has confessed to you that he strangled, according to you, his previous girlfriend Ms. Freeman. Correct.   You're carrying this secret?

A.    Actually there was — there was never a name stated.

Q.    No.   But he — but you knew that that's girlfriend and you knew who that — that was who — that was his girlfriend and that's who became missing.   And therefore, you could form the - - -

A.    (Interposing) Yes.   I knew that, but - - -

Q.    - - - connection, couldn't you?

A.    Yes.   I knew that, but if - - -

Exhibit 5001 at 1260

Breakfield   X    D6 187

Q.   (Interposing) All right.

A.   - - - you want to be technical, he could be talking about anybody.

Q.   Pardon?

A.   You could be talking about anybody.

Q.   Well, but you didn't think he was talking about anybody, did you?  You thought he was talking about his — about Ms. Leah Freeman.  Isn't that what you thought?

A.   I'm not sure what I thought.  Like I said I was a sixteen year old boy.

Q.   Well, I'm talking about as time went by, and you got more and more information.  Didn't — weren't you — if he made that statement to you, weren't you curious enough to start talking to people about who it was he would have killed?

A.   No, sir.

Q.   You didn't care who he killed?

A.   Um, I just tried to stay as far away from the situation as I could.

Q.   No.  My question was, did you not care who he had killed?

A.   Uh — I just stayed out of the situation.

Q.   Ms. Edgerton, you considered her a friend, didn't you?

A.   Yeah.  She was a friend.

Q.   Okay.  And you consider her someone you like?

Exhibit 5001 at 1261

Breakfield    X    D6 188

A.    For a brief point in time, yeah.

Q.    Pardon?

A.    For a brief period in time, yeah.

Q.    Well, did you go warn Ms. Edgerton that Mr. McGuffin had confessed to you that he killed somebody?

A.    Oh, yeah.  She knows what me and her talked about.

Q.    The question is, did you go warn her?

A.    Yeah, me and her have talked about it.

Q.    When did you ever talk to her about it?

A.    There was several occasions.  Like I said, I think she was just playing both sides of the field.

Q.    No.  My question is when did you talk to her about it?

A.    I'd say 2004.

Q.    So — but you testified earlier that you didn't talk to anybody about it?

A.    Well, I didn't tell her the exact words, but I told her to stay away from him.

Q.    Well, you — no.  My question is — and you've answered this.  You didn't talk to anybody about the fact that he purportedly confessed to you of having killed somebody?

A.    Oh, no.

Q.    Right?

A.    No, no.

Q.    All right.  And it wasn't until you talked to these

Exhibit 5001 at 1262

Breakfield   X    D6 189

two officers August 5th of 2010, eight years after he supposedly said this, that you told anybody about it. Correct?

A.   Correct.

Q.   All right.  And at that time there had been reward posters put up around here of ten thousand dollars for information leading to the arrest and conviction of the person that was responsible for Ms. Freeman's death.  Isn't that correct?

A.   I have no knowledge of that.

Q.   You — it's your testimony you didn't know there was a reward?

MS. SOUBLET:   Objection.  Asked and answered.

A.   No, I did not.

THE COURT:   He answered it.

Go onto something else.

Q.   Also, if Mr. McGuffin was put in prison then that your opportunity to be able to do things with — to be with the — Megan Edgerton would be much simpler.  Isn't that correct?

A.   No, that's not correct.

Q.   Not true?

A.   No, that is not true at all.

Q.   All right.  So, these things just all the sudden when these officers talked to you, you remembered this and decided to tell them about it.  Is that how it happened?

Exhibit 5001 at 1263

Breakfield   ReD  D6 190

A.   As far as I know I was subpoenaed to come there. And then I was sworn in when I got there.  So - - -

Q.   (Interposing) No, I'm - - -

You weren't subpoenaed to talk to the officers on August 5th, were you?

A.   No.

Q.   All right.  So, just you're talking to the officers. They want to talk about Mr. McGuffin.  Right?

A.   Correct.

Q.   And so it's at this time that you just remember this and for the first time tell somebody, specifically these officers, that that's what he said?

MS. SOUBLET:   I'm going to object.  Asked and answered several times.

THE COURT:   Sustained.

MR. McCREA:   Well - - -

That's all the question I have.

THE COURT:   Any redirect?

MS. SOUBLET:   Just briefly.

Thank you, Your Honor.

                    REDIRECT EXAMINATION

BY MS. SOUBLET:

Q.   Mr. Breakfield, did you used to wrestle in high school?

MR. McCREA:   Object.  It's irrelevant.

Exhibit 5001 at 1264

Breakfield   ReD  D6 191

THE COURT:    Go ahead.  I'll give you some leeway as long as you tie it up.

MS. SOUBLET:    I'm going to tie it up quickly.

Q.    Did you used to wrestle in high school?

A.    Yes.

Q.    Do you consider yourself a pretty tough guy?

MR. McCREA:    Object.  It's irrelevant.

THE COURT:    I'll overrule it.

I'm expecting her to get somewhere.  If we're not getting there, I - - -

MR. McCREA:    (Interposing) Well, and I object to where she expect to go, for that matter.

THE COURT:    Well, since neither of us are totally sure of where she's going, that's a problem.

I'll strike the testimony - - -

MR. McCREA:    (Interposing) Well, may we approach?  May we approach, Your Honor?

THE COURT:    Sure, go ahead.

MR. McCREA:    Or else I'd ask you to — okay.

THE COURT:    (Interposing) Come on up.

(SIDEBAR)

Q.    Mr. Breakfield, why didn't you tell the police when it first happened?

A.    When it first happened?

Q.    Right.

Exhibit 5001 at 1265

Breakfield  ReD  D6 192

A.    I believe I've answered that already as well.

Q.    Were you scared?

A.    I was a sixteen year old kid.

Q.    So, is that a yes, you were scared?

MR. McCREA:    Wait a minute.  Object.  Leading the witness, Your Honor.

THE COURT:    Overruled.

A.    Yes, I was scared of the entire situation, which is why I took myself out of it.

Q.    And have you had a recent contact with Megan Edgerton?

A.    No.  Just I think I've gotten a couple texts from her.

Q.    Trying to keep you from coming to testify?

MR. McCREA:    Object, Your Honor.  I object to leading the witness like that and putting it before the jury.

THE COURT:    Well, I think I'll sustain that one.

You can ask another question.

Q.    Has anyone — has Ms. Edgerton had contact with you about your testimony?

MR. McCREA:    Well, wait a minute.  Unless it's connected to the Defendant it's irrelevant whether anybody's had contact - - -

THE COURT:    (Interposing) No.  I think it

Exhibit 5001 at 1266

Breakfield   ReD   D6  193

could go to bias - - -

MR. McCREA:    (Interposing) Pardon?

THE COURT:    Go to bias of a witness, possible bias of a witness.

So, I'll allow the question and the answer.

Go ahead.

Q.   Has Ms. Edgerton contacted you about your testimony?

A.   Yes.

Q.   Has she attempted to keep you from testifying?

MR. McCREA:    Object to leading Your Honor.

A.   Um - - -

THE COURT:    I think you need to rephrase the question and ask it in more general terms than that.

I'll sustain that objection.

Q.   What did she ask you to do?

A.   She didn't ask me to do anything.  She just told me that I was wrong.

MS. SOUBLET:    Nothing further.

THE COURT:    Okay.

You may step down and you're free leave.

The last piece of evidence, Ladies and Gentlemen, you can use if you choose.  It's always up to you, on whether or not Ms. Edgerton might be biased.  It can be used for no other purpose other than that.

Okay.

Exhibit 5001 at 1267

Rogers   D    D6 194

We'll take a recess for about twenty minutes.

Everybody else remain seated until the jury has a chance to leave.

Go in the jury room.  Take your notes. Remember the admonition.

(Jury Out.)

THE COURT:    Okay.  We'll be in recess until 3:00.  I mean, 3:15.

(RECESS)

(Jury In.)

JUDICIAL ASSISTANT:    All rise.

THE COURT:    Be seated please.

Call your next witness.

MR. FRASIER:    Thank you, Your Honor.

We call Scot Rogers.

SCOT ROGERS

was thereupon produced as a witness on behalf of the Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat here, please.

DIRECT EXAMINATION

BY MR. FRASIER:

Q.   Could you state your name please, sir, and spell your last name for the record?

Exhibit 5001 at 1268

Rogers   D    D6 195

A.    Scot Rogers, R-O-G-E-R-S.

Q.    What's your occupation, sir?

A.    I'm a police officer with the City of Coos Bay.

Q.    How long have you been with the City of Coos Bay?

A.    Twelve years now.

Q.    Your present assignment, sir?

A.    Patrol officer.

Q.    Prior to that did you have a different assignment?

A.    I did.  I was a detective in the investigations unit at the Coos Bay Police Department.

Q.    How long were you a detective, sir?

A.    Four years.

Q.    I want to direct your attention to January of 2010. Were you working as a detective for the Coos Bay Police Department at that time?

A.    Yes, sir.

Q.    And as part of being a detective were you assigned to work with what's sometimes referred to as major crime team?

A.    Yes, I was.

Q.    In particular I want to direct your attention to January 24th of the year 2010.  Were you asked to participate in the execution of a search warrant that was executed at the home of the Defendant's parents off of Baker Road here in Coquille?

A.    Yes, I was.

Exhibit 5001 at 1269

Rogers   D   D6 196

Q.    And during the course of that search did you seize any particular items?

A.    Yes, I did.

Q.    Now, I'm going to show to you a bag here and a piece of evidence and ask if you can identify that, please?

A.    That is a bag of paperwork that I seized from that residence.  It has my initials on it and the item number.  So, it would have been one of the first sets of documents that I recovered.

Q.    And you marked it with your initials, TSR?

A.    Yes, I did.

Q.    And 001?

A.    Yes.

Q.    And in particular here, inside this is a document that's been marked as — excuse me — State's Exhibit No. 216?

A.    Yes.

Q.    And to the best of your knowledge you seized that as part of this paperwork that's in this exhibit here?

A.    Yes, I did.

          MR. FRASIER:    Your Honor, at this time we would offer State's Exhibit No. 216.

          MS. McCREA:    Your Honor, we object based on foundation, relevance, and hearsay.

          THE COURT:    Let me see it.

          This was seized from Mr. McGuffin's house?

Exhibit 5001 at 1270

Rogers    D    D6 197

MR. FRASIER:    Parent's house.

THE COURT:    Parent's house.

Excuse me, what room was this seized in?

WITNESS:    The parent's bedroom, sir.

THE COURT:    Is that all you have of this witness?

MR. FRASIER:    Yes.

THE COURT:    Okay.

I'm going to sustain the object right now. But, I'll hear arguments and maybe tie it up later because I want to talk a little bit about this.

Anyway, do you have any cross examination?

MS. McCREA:    No, Your Honor.

THE COURT:    Okay.

MR. FRASIER:    Thank you, Your Honor.

THE COURT:    And I want to make sure that if at a later time I rule that it's admissible, are you going to want this witness back or not?

MS. McCREA:    I think the court asked the two questions I was going to ask.  So, no.

THE COURT:    Okay.

You may step down and you're free to leave.

WITNESS:    Thank you, Your Honor.

THE COURT:    You had nothing else of him, Mr. Frasier?

Exhibit 5001 at 1271

Wetmore   D   D6 198

MR. FRASIER:   No.  That's all I had, Your Honor.

THE COURT:   Call you next witness.

MS. SOUBLET:   The State recalls Officer Wetmore.

THE COURT:   You're still under oath, Officer. Retake the stand.

TONY WETMORE

was thereupon again produced as a witness on behalf of the Plaintiff and, having previously been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. SOUBLET:

     Q.   Officer Wetmore, I want to turn your attention to August 3rd, 2000.  Was that a scheduled work day for you?

     A.   Yes, it was.

     Q.   Who were you working with?

     A.   On that day I was with Detective Cal Mitts who's also with Coos Bay Police Department, Detective Bennett from North Bend Police Department, and the medical examiner Kris Karcher.

     Q.   What was your plan for the day?

     A.   We first met at Cozy Kitchen in North Bend to kind of discuss how we were going to do this.  And our plan was, we

Exhibit 5001 at 1272

Wetmore    D    D6 199

were — the four of us were coming down to Coquille to check several areas or search several areas and go from there.

Q.    What were you searching for?

A.    The body of Leah Freeman.

Q.    What were those areas that you were going to search?

A.    There were two areas.  The first area was an area on Hudson Ridge.  And the second area was on Lee Valley Road.

Q.    And after that meeting at Cozy Kitchen were you supposed to do something?

A.    Yes.  We were wearing essentially our — what we wear in investigations a lot of times, suits and ties and that sort of thing.  Our plan, obviously, being the middle of the summer, being August, it was extremely hot out.  We weren't exactly dressed to search and traipse through the woods and that sort of thing.  We were to go home, change clothes, gather needed items to go down and search.  For example, water, some snacks.  We had no idea how long we were going to be down there, in addition to changing our clothes.

The most important thing that I was supposed to gather as well as Detective Mitts was, us both being fishermen, we were going to get our waders because the area on Lee Valley Road, the plan was that we were going to walk up the creek, shallow areas of the river that we didn't believe boats would have been able to search.  And we were going to walk in our fishing waders further down.

Exhibit 5001 at 1273

Wetmore   D    D6 200

Q.   And did you remember to grab those hip waders?

A.   I did not.  The most important thing I forgot and left it home in my rush to change clothes and get water and things like that.

Q.   When you searched Hudson Ridge, did you find Ms. Freeman's remains?

A.   No.

Q.   What happened when you went to Lee Valley Road?

A.   We went to Lee Valley Road — we arrived there approximately ten minutes to three.  We parked in a large gravel pull out that was near a gate that led back down to a little — I guess I'd call it a camping area that was near the river.  We parked near there.  And the plan was, Detective Cal Mitts and myself were going to go along the river.  Detective Mitts in the river since he remembered his waders.  And the best I could do was follow alongside on the edge of the river.

Kris Karcher and Detective Bennett were going to walk the road up Lee Valley and essentially parallel us, but they were going to go the road, which rises to an area — basically a cliff — where it's above the river.

Q.   Officer Wetmore, I'm going to hand you what's been marked for identification purposes as State's Exhibits Nos. 34 through 38 and then No. 41 and ask you to look at those and tell me if you recognize those?

A.   Yes, I do.

Exhibit 5001 at 1274

Wetmore    D    D6 201

Q.    What are those photos of?

A.    In general or each one?

Q.    In general.

A.    This is the scene that I described, the area where we parked as well as the location where I located the body on Lee Valley Road.

Q.    And do those exhibits depict the scene as you remember them on August 3rd, 2000?

A.    Yes, they do.

MS. SOUBLET:    I would offer State's Exhibits Nos. 34, 35, 36, 37, 38, and 41.

MS. McCREA:    There is no objection, Your Honor.

THE COURT:    Received.

(Whereupon Exhibits Nos. 34, 35, 36, 37, 38 and 41 were then received into evidence.)

MS. SOUBLET:    I think Counselor, there's actually been a (not understandable) mistake, Nos. 34 and 36. I believe (not understandable).

Q.    Officer Wetmore, what's here is State's Exhibit — on the screen is No. 36. Can you verify with me if that's the same thing there as No. 34?

A.    Yes, ma'am.

Q.    What is the jury looking at in State's Exhibit No. 36 as it's displayed on the screen?

Exhibit 5001 at 1275

Wetmore   D    D6 202

A.    This is taken essentially standing in the middle of Lee Valley Road looking down past a gravel pull out area which you can see on the left near where the two vehicles are parked.  And that's essentially the gravel pull out that I referred to.

Q.    Then, State's Exhibit (not understandable).

THE COURT:    Excuse me.  I was reading something.  Were the exhibits — they were No. 34 through 38 and 41.  That was received.  And then you talked about an exhibit number.  Did the numbers change at all?

MR. FRASIER:    Apparently, Your Honor, when I prepared these slides, I misnumbered the slides for the screen.

THE COURT:    Okay.  But those are the exhibits that were offered.  And I've received them.  Those aren't changed?

MR. FRASIER:    No.  It's just the numbers are screwed up on the screen.

THE COURT:    All right.

Thanks.  Okay.

Go ahead.

Q.    Officer Wetmore, what's up on the screen is Exhibit No. 35.  You would agree with it's No. 37, you would agree with me is that photo there, No. 35?

A.    Correct.

Exhibit 5001 at 1276

Wetmore   D    D6 203

Q.    Can you tell me what the jury is looking at there in Exhibit No. 37?

A.    This is a gate in the — in previous photo the gravel pull out is on the left.  This is a gate with a road that leads down towards the — what I referred to as I think a camping area which is down near the river.  That gate is back in a — in one corner of that gravel pull out.

Q.    And Officer Wetmore, what's up there as Exhibit No. 38, you would agree with me is that photo there that's labeled as Exhibit No. 36?

A.    Correct.

Q.    Okay.  And can you tell the jurors what they're looking at there?

A.    This is looking down from standing on Lee Valley Road.  This is looking further down the — again, using the gravel pull out as a reference — the gravel pull out would be behind the person taking the photograph to the person's left.  And the area up ahead where the person's standing in the frame there, the area to the left there is where the body was located.

Q.    And I take it those crime scene cones and the police car weren't there when you got there?

A.    Correct.

THE COURT:    Can Counsel approach real quickly here.

Exhibit 5001 at 1277

Wetmore   D   D6 204

(SIDEBAR)

THE COURT:    Go ahead.

Q.    And Officer Wetmore, you would agree with me that what's up there as Exhibit No. 33, is actually this photo here No. 37?

A.    Correct.

Q.    Can you tell the jurors what they see there?

A.    This is taken again on Lee Valley Road.  The photo is taken looking back towards the direction of the gravel pull out, which in this case would now be on the right of the screen.  And to the right is the area where the body was located.

Q.    And Officer Wetmore, you would agree with me that what's up there as No. 34 is this same photo here, No. 38?

A.    Yes, ma'am.

Q.    Can you tell the jurors what they see there in that exhibit?

A.    This was — and I'll think how best to describe.  The body would be located — the body obviously is not visible in this location.  But it's directly through the weeds, down an embankment.  At the time this was taken when the body was located, there was no approach to the body from the road.  We actually came in from the river on the back side which is where I located her.

Exhibit 5001 at 1278

Wetmore    D    D6 205

After the scene was cordoned off, we found that there's essentially a break in the weeds as if at least one person or several people — that's unknown — but somebody or something had traveled through the brush there.  There was an obvious part and vegetation that was moved aside as if somebody had went through that area.

Q.    Officer Wetmore, when you got to Lee Valley Road, where did you and Detective Mitts walk first?

A.    We walked — the gate in the one photo that leads back towards the river.  We walked down that little road a short distance to that, or near that camping area up to the river.  Again, Detective Mitts having his waders and me not having the wader, Detective Mitts began working his way out into the water.  I essentially followed alongside, but on the edge of the river rather than actually being in the water.

Q.    Did something happen while you were walking along the river?

A.    We traveled a very short distance.  I would estimate maybe — maybe less than a hundred yards.  We had barely just arrived.  I went to step up on a large root wad that was along the edge of the water.  And as I stepped up on the root wad I caught an unmistakable but fleeting odor of decomposition. And I paused there, began looking around that root wad trying to see where that odor had come from.  But as quickly as I had sniffed the odor it was gone.  I didn't smell it again at that

Exhibit 5001 at 1279

Wetmore   D    D6 206

point.  But I was certain I had smelled something.  I didn't see anything in the immediate vicinity while I was standing on that root wad.

I called out to Detective Mitts.  My feeling was possibly like potpourri in your house and you become accustomed to it, and then you no longer smell it until you leave the house and come back in.  I thought maybe that's what's happening.  The odor's still here.  So, I called Detective Mitts over to my location and actually had him stand in the same spot and asked if he smelled anything.

He didn't.  So he returned back to the river and continued down.  However, I was certain I had smelled something and began walking away from the river trying to locate what I had smelled.

Q.   Were you able to locate that?

A.   Yes.

Q.   How did that happen?

A.   I walked — I obviously wasn't involved in any measurements that may have been taken, but I had walked essentially perpendicular from the river in a direction that would have been back towards the roadway I would estimate maybe seventy-five, maybe a hundred yards from the river.  I'm walking through vegetation, get to an area where I'm now walking through trees.  And I'm just essentially looking around.  And I'm still not smelling anything.  But I was just

Exhibit 5001 at 1280

Wetmore   D   D6 207

trying to locate what was the source of what I smelled.

And as I got nearer the road I began seeing where garbage and miscellaneous items are, you know, apparently thrown from vehicles would be my guess, and things that don't belong in the woods.  As I got closer to the roadway, at one point I saw essentially what appeared to me to be a shining red lightbulb, several feet off the ground that I saw through some brush.  And I paused, focused on that, and took a moment. Didn't understand what I was seeing.  That's what drew my attention.

Then began to see what I felt may have been clothing, which didn't seem odd before as I walking through because this area is somewhat littered with garbage and things like that.  So, this essentially red light drew my attention. And the I realized, you know, this was maybe clothing as well. And all this probably only took just a second, but it seemed like ten minutes that I was looking at this.  And I looked over a little bit to the right of the red light and looked into the face of what appeared to be Ms. Freeman.

MS. SOUBLET:   Your Honor, now would be the time for No. 41.

THE COURT:   Okay.

I just want to tell people and apprise the jury and everybody that the next photo will show the body.  And we've heard descriptions of the body.  So, it's not going to

Exhibit 5001 at 1281

Wetmore    D    D6 208

be pleasant.  But if there's any member of the audience that does not want to see this, this is the time to leave.  Because I want no reaction from anybody about this.

Okay, you're warned.

Go ahead.

Q.   Officer Wetmore, State's Exhibit No 41, can you tell the jurors what it is they see there?

A.   It's a little bit difficult for me to see the lower right of the photograph.  But in the center essentially that's one of the legs that's sticking up in the air with a foot exposed.  The red light that I referred to was actually the heel area with light coming through it is what drew my attention to that area.  But that's one of the legs sticking up.  And then from this angle appears to be the body as well.

Q.   And what did you do after finding what you believed to be Ms. Freeman's remains?

A.   I stopped right there.  At that point when I realized what I was looking at, I was approximately, maybe six feet, maybe eight feet away from her with kind of a row of vegetation, briars and that sort of thing, between myself and the body.  And I quite honestly, I was shocked at the discovery.  And I yelled out probably quite frantically for Detective Mitts who came over to my location.

Q.   And after getting Detective Mitts over to your location is that when you called out the crime team?

Exhibit 5001 at 1282

Wetmore    X    D6 209

A.    We contacted Corporal Dave Main who was our supervisor at the time.  And a call out was initiated.

Q.    Thank you.

MS. SOUBLET:    I have nothing further.

MS. McCREA:    May I see Exhibit No. 41, please.

CROSS EXAMINATION

BY MS. MCCREA:

Q.    Officer Wetmore, in Exhibit No. 41, toward the bottom right there's a black object.  Do you know, was that an old tire?

A.    Looking at this photo I can't tell.  It doesn't appear to be a tire to me.  And I — from memory I don't recall a tire being, you know, in that area as a part of the scene.

Q.    Can you identify that object at all?

A.    Not with this photograph.  I don't recall.

Q.    Do you have any recollection of what that was?

A.    No, I don't.

Q.    The photographs that we've seen show yellow evidence tape or crime tape along the road?

A.    Yes, ma'am.

Q.    And that was put up by you after the discovery of the body to make sure that the scene stayed secure?

A.    Correct.  We - - -

Q.    (Interposing)  And like — I'm sorry.

Exhibit 5001 at 1283

Wetmore   X   D6 210

A.   I was just going to say, we blocked off the roadway with our vehicles as well as strung crime scene tape.

Q.   And set up the orange cones?

A.   Possibly the cones — I don't remember.  We had it thoroughly blocked off at that point.  So there wouldn't necessarily — there wouldn't really have been a need for us to put up the cones.  Those — I don't recall for certain if those were set up by us or possibly the crime lab when they arrived. Because we — we literally blocked off the entire roadway from both directions.

Q.   And the reason that you did that was so it could be a secure perimeter so that you could — you could do the exam — you, being you the authorities — could do the examination that needed to be done, get the body moved, and then have the rest of the crime team do their forensic analysis.  Is that right?

A.   Correct.

Q.   And was — to your knowledge — once the body was moved, was the scene then thoroughly searched the next day?

A.   From the best of my recollection — I know the scene was held for some time.  I wasn't assigned to it the following day, so I don't recall what may or may not have been done.  I know the scene was held.  It wasn't released the moment we left.

Q.   And the location where you found the body was not in the water.  Right?

Exhibit 5001 at 1284

Wetmore   ReD  D6 211

A.    Correct.  It was not in the water.

Q.    All right.  Thank you.

MS. McCREA:    No further questions.

THE COURT:    Redirect.

REDIRECT EXAMINATION

BY MS. SOUBLET:

Q.    How far away from the river was Ms. Freeman's body?

A.    Like I say, I wasn't involved in any measurements if measurements were done from the river to the edge of the roadway there.  But just from my best estimation, I would guess I probably walked seventy-five yards; probably no more than a hundred yards from the stump that I had stepped up on and smelled the odor to the edge of the road.  I would guess between seventy-five yards and a hundred yards.

MS. SOUBLET:    Nothing further.

THE COURT:    You may step down.

Do you want this witness to remain?

MS. SOUBLET:    No, not the State.

THE COURT:    Without objection you're free to leave.

WITNESS:    Thank you, Your Honor.

THE COURT:    Call your next witness.

MS. SOUBLET:    The State calls Kris Karcher.

Exhibit 5001 at 1285

Karcher   D    D6 212

KRIS KARCHER

was thereupon produced as a witness on behalf of the Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat up here, please.

Go ahead.

MS. SOUBLET:    Thank you.

DIRECT EXAMINATION

BY MS. SOUBLET:

Q.    Ms. Karcher, can you state your full name and spell your last for the record?

A.    My name is Kris Karcher.  The last name is spelled K-A-R-C-H-E-R.

Q.    How are you employed?

A.    I am the Chief Deputy Medical Examiner for Coos County.

Q.    How long have you been the Chief Deputy Medical Examiner for Coos County?

A.    Since about 2000, the Chief Deputy Medical Examiner. I've been with Coos County since 1998 in the medical examiner's office.

MS. SOUBLET:    Ms. Karcher, I'm going to ask you to put the microphone a little bit closer to you so we can hear you over all the sirens outside.

Exhibit 5001 at 1286

Karcher    D    D6 213

WITNESS:    Okay.

Q.   As the — do you have some sort of medical degree?

A.   I have a Bachelor's degree in science of nursing. And my background prior to being the Chief Deputy Medical Examiner was in emergency room nursing.

Q.   How long have you had that Bachelor of science in nursing?

A.   Since 1989.

Q.   How long were you employed as an emergency room nurse?

A.   A total of about fifteen years.

Q.   And what sort of qualifications — what do you have to go through in order to become a deputy medical examiner?

A.   Well, in Oregon you need to be appointed by the District Attorney.  Here in Coos County we have some qualifications, which is a Bachelor's degree in either a medical field or in the forensic field.  And you need to be a member registered with the American Academy of Medical/Legal Death Investigators.  And that's a written national test that you need to take and pass.

Q.   And I take it you took that test and passed that test?

A.   Yes.

Q.   When was that?

A.   I believe 1997.

Exhibit 5001 at 1287

Karcher   D   D6 214

Q.   Any sort of ongoing qualifications or certifications you need in order to keep that?

A.   Yeah.  You need to have — it's a whole list of things.  Every five years you have to re-apply for registration.  You don't have to take the test again, but it's a lot of continuing education to keep the certification current.

Q.   What is forensic nursing?

A.   Forensic nursing is — it's — it combines the nursing science with forensic science and the criminal justice world.  So, it's just kind of a — if you put us — we're just a spoke of the wheel of the whole criminal justice system.

Q.   Is there a — do you have some sort of degree in forensic nursing?

A.   I have a Master's level certificate in forensic nursing that I received in 1998 from the University of Colorado in Colorado Springs.

Q.   Are there any sort of ongoing credits that you have to get in order to keep that?

A.   No.  There is none to keep the forensic nursing, huh uh.

Q.   And part of that studies in forensic nursing do you — have you received training in strangulation?

A.   Yes.

Q.   Can you tell the jurors what that consisted of?

Exhibit 5001 at 1288

Karcher   D   D6 215

A.    That was part of our class — our classroom.  I've also done a lot of separate training in strangulation, both through the State of Oregon, the Department of Human Resources, as well as through several of the different law enforcement agencies that have taught it.  It is also something that I teach on a regular basis to law enforcement, to hospital personnel, to first responders, EMT's, paramedics and such.

Q.    How many hours of instruction on strangulation do you think you've received in your career?

A.    Received?

Q.    Yes.

A.    Oh, I would say probably several hundred hours of instruction

Q.    And how many times have you taught it?

A.    Several hundred times.  Numerous times.  It's kind of an ongoing classroom.  Yeah.

Q.    And in the course of your duties as an ER nurse, how often would you see victims of strangulation?

A.    Often.

Q.    How often?

A.    Depending on which emergency department that I was working in at the time.  But you can see several a week.  Most current ER that I worked in was at Bay Area Hospital.  And I would say we probably saw someone that came in with a

Exhibit 5001 at 1289

Karcher   D    D6 216

complaint of being strangled probably three to six times a month, would be my guess.

Q.   Have you previously been qualified as an expert witness on strangulation?

A.   Yes, I have.

Q.   Can you define strangulation for the jurors?

A.   Strangulation is — it's an asphyxia which is lack of oxygen to the brain.  And you can strangle somebody either by occluding their airway or by occluding their circulatory system to your brain.  Your brain has to have oxygen.  And if you stop either the flow of blood going in or coming out, your brain will go without oxygen.

Q.   How much pressure is required to occlude an airway?

A.   Actually very little.  It takes about — the carotid arteries takes about eleven pounds of pressure to block those or to occlude the artery.  That's what's taking blood to the brain.  It's about four pounds of pressure to the jugulars which is bringing blood back out of the brain.  And about thirty-three pounds of pressure on the airway or your larynx here.

To reference that - - -

Can I just go on here?

Q.   Yes.

A.   To reference — so you have some idea of pounds of pressure.  A male — a young male, his dominant hand can make a

Exhibit 5001 at 1290

Karcher   D   D6 217

grip of about a hundred and twenty-six pounds of pressure. Between a thumb and index finger is about twenty-five pounds of pressure. So, hands around the neck can be very lethal.

Q.   How long does it take for someone to lose consciousness?

A.   When you occlude the carotid which is carrying the oxygen, it only takes about ten seconds. That's similar to like a choke hold which police will use sometimes. It takes about ten seconds. The others take about sixty seconds, but if it's not released, it's going to result in death probably within three to four minutes.

Q.   In the course of your studies in both becoming a forensic nurse and then becoming qualified to be a deputy medical examiner, have you received training in blood spatter?

A.   Yes.

Q.   Can you tell the jurors what that consisted of?

A.   That also was part of my schooling back when. It – numerous conferences where they have specialized in blood spatter I have attended. I also have years of experience and learning from masters that are on the scene as well as I am. And then I also teach it as well.

Q.   What are your — what do your job duties as Chief Deputy Medical Examiner entail?

A.   As Chief Deputy Medical Examiner I oversee all of the death investigations — medical examiner death

Exhibit 5001 at 1291

Karcher   D    D6 218

investigations in the county.  Those would include, like, homicides, accidents, suicides, some natural deaths.  I oversee the scene investigation as well as the — like an external autopsy if an autopsy is not done.  And then I arrange and assist with autopsies that are done in the county.

Q.   And when you assist in autopsies, what do you mean? What's your function there?

A.   My function is to get the body ready for our forensic pathologist to perform an autopsy.  Usually involves photographing, doing toxicology, assisting him with whatever he might need as he performs the autopsy.

Q.   And in the summer of 2000, were you the Chief Deputy Medical Examiner at that time?

A.   It was the day before.  It was right before I started as the Chief Deputy Medical Examiner.  I was just changing.

Q.   Had you been working part time as the Chief Deputy Medical Examiner?

A.   I had been working part time as the Assistant Chief Deputy Medical Examiner.

Q.   So then on August 3rd, 2000, who were you working with that day?

A.   That was a day off.  The following day was the day that I started as Chief Deputy Medical Examiner.

Q.   Did you go out and assist in the Leah Freeman

Exhibit 5001 at 1292

Karcher    D    D6 219

investigation that day?

A.    Yes, I did.

Q.    And who were you with?

A.    I was with Detective Wetmore, Detective Bennett from the North Bend Police Department, and Detective Cal Mitts from the Coos Bay Police Department.

Q.    And what areas of Coos County did you search that day?

A.    We started in the morning at — we dropped of Detective Mitts at Laverne Park up Fairview.  And it had been suggested to us different areas to look.  And he was — we dropped him off.  He was going to search the river.  And then Detective Wetmore, myself and Detective Bennett, we went up to Hudson Ridge.  And we — although we had searched that road numerous times, we went further up the road.  And we kind of split off.  And each one of us took an area of the road.  We went for about an hour and then came back, looking on both sides of the roadways.

Q.    And did you find Ms. Freeman's remains in that location?

A.    No, we didn't.  Then we continued — our last recommended area to look was on Lee Valley Road.  And at that point we dropped off — it had been suggested that we look along the creek.  And along the roadway there is an area where there's kind of a cliff and it kind of goes down.  So, you

Exhibit 5001 at 1293

Karcher   D    D6 220

could drop something off and you might not see it from the roadway.

So, our — two of us — Detective Bennett and myself walked the road.  We dropped Detective Wetmore and Detective Mitts off down below, along the creek bed.  And we located the body — Detective Wetmore located the body just at the — just off the shoulder of the road down an embankment.

Q.   Ms. Karcher, I'm going to hand you State's Exhibits Nos. 34 through 38 and ask you to look at these and tell me if you recognize them?

A.   Yes.

Q.   And what are those photos of?

A.   Those are depicting the area of Lee Valley Road where we actually stopped to let Detective Wetmore and Detective Mitts off.  And then further up the road where we actually found the body.

MS. SOUBLET:   Your Honor, may we approach?

THE COURT:   Yes.

(SIDEBAR)

THE COURT:   As I did earlier, there's going to be another set of photographs that are going to be more graphic than the other ones.  And I have not seen them, but again, we had a description of what the body looked like from Ms. Wilcox.  So, if anybody again feels that they don't want to be in the room when those are shown they need to leave

Exhibit 5001 at 1294

Karcher    D    D6 221

because I want no reaction from anybody.

And again, I just want to let the jury know that these photos will be coming.

Okay.  Go ahead.

CROSS EXAMINATION, Continued

BY MS. SOUBLET:

Q.    Ms. Karcher, I'm going to hand you what's been marked for identification purposes as State's Exhibits Nos. 39, 40, 42, 43, and 44 and ask you to look at those and tell me if you recognize those?

A.    Yes.

Q.    And what do you recognize those collectively to be?

A.    Those are pictures from looking over the bank and pictures of the body of Leah Freeman.

Q.    Do those pictures depict the scene as you remember them on August 3rd, 2000?

A.    Yes, they do.

MS. SOUBLET:    I would offer Nos. 39, 40, 42, 43, and 44.

MS. McCREA:    There's no objection.

THE COURT:    Received.

(Whereupon Exhibits Nos. 39, 40, 42, 43 and 44 were then received into evidence.)

Q.    Ms. Karcher, starting with State's Exhibit No. 39, can you tell the jurors what it is they see there?

Exhibit 5001 at 1295

Karcher    D    D6 222

A.    That's just — the roadway is right here.  And that's just the shoulder of the road and kind of an open area.  And the body is right down this embankment.

Q.    Okay.  And State's Exhibit No. 40?

A.    That's also looking down.  This is her body down here.  This actually is a leg.  And then — it's hard to see — this is a sock and then there is a leg that comes out this direction.  This is a knee of her right leg — excuse me — her left leg.  And this is kind of the knee of her right leg underneath.

Q.    And State's Exhibit No. 42?

A.    That's the body from about the neck down.  This is a foot that has no sock on it.  And it's kind of mummified.  And then this is the other leg that — the left leg crosses over the right leg.

Q.    And State's Exhibit No. 43?

A.    Also of the body.  This is the head — Leah's head. Her mouth is open, blonde hair.

Q.    And finally, State's Exhibit No. 44?

A.    That's just a closer of her head.  It also shows her left arm.  Her left arm was kind of laying over her chest. Her right arm was kind of underneath her back.

Q.    And what does that suggest to you, one arm over the chest and the other arm under the back?

A.    That she rolled down this embankment.

Exhibit 5001 at 1296

Karcher     D     D6 223

Q.    After finding Ms. Freeman's remains, what did you do at the scene?

A.    At the scene we waited for the crime lab to come. Lieutenant Pex from the crime lab came.  We took some photographs.  And then we removed the body.  And the body was transported to Ambling and Shroeder Funeral Services.

Q.    And where is that located?

A.    In Coquille.

Q.    What was the reason for — actually, backing up. Before you get there.  Could you tell by the condition of Ms. Freeman's remains whether or not she'd been at the scene for awhile?

A.    Yes.  She was badly decomposed.  The area around where she was laying was badly discolored, stained.  The foliage around her had died.  As you decompose you release gases and it will kill the plants and stuff around the body. And it appeared that she had laid there for awhile and decomposed in that spot.

Q.    And on the next day, August 4th, 2000, did you attend the autopsy?

A.    Yes, I did.

Q.    And who performed that autopsy?

A.    Doctor Olson, James Olson.  He's Coos County's forensic pathologist.

Q.    And what was your role at the autopsy?

Exhibit 5001 at 1297

Karcher   D    D6 224

A.   My role was to take photographs, assist in any way I could.  We were — the autopsy was actually done at the Douglas County Medical Examiner's Office.  And they had an autopsy assistant that also helped Doctor Olson.

Q.   You said you took photographs, what did you take photographs of?

A.   Of the body.

Q.   Were any articles of clothing recovered from the body?

A.   Yes.

Q.   What were those?

A.   Those were a — it's a men's white tank top undershirt, a sports bra, pair of jeans, and one sock I believe.

Q.   Were those seized?

A.   Those were seized.

Q.   What was the reason for seizing those?

A.   For evidentiary value.

Q.   Did you take any samples of Ms. Freeman's body and send those for testing?

A.   Yes, we did.  We took — she was badly decomposed. And so we took some muscle from one of her thighs that we did a toxicology on.  And then we also took — we cut a piece of the femur from the leg, the femur bone, your thigh bone, just in case we needed anything for DNA we would have that.

Exhibit 5001 at 1298

Karcher   D    D6 225

Q.   Do you know how Ms. Freeman's remains were identified?

A.   They were identified through a dentist.  His name escapes me, but through dental records.

Q.   You said the clothing was sent for analysis.  Who was that originally sent to?

A.   Originally the crime lab here in Coos County — in Coos Bay looked at them.

Q.   And then did you arrange for additional testing of those clothing?

A.   Right.  We — in one of those conferences that we all attended, there was a speaker there from England.  Her name was Inspector Diane Taylor.  And she spoke on the developments in DNA that were being done in England.  And so we eventually contacted her and we — Detective Mitts and myself actually hand carried all of her clothes to England where they were further tested over there.

Q.   And when did that testing occur?

A.   I believe that was in March of 2001.

Q.   Ms. Karcher, I'm going to hand you what's been marked for identification purposes as State's Exhibits Nos. 62 through 72 and ask you to look at those and tell me if you recognize them?

A.   Yes.

Q.   And what are State's Exhibits Nos. 62 through 72

Exhibit 5001 at 1299

Karcher   D    D6 226

photographs of?

A.    They're pictures of the clothes.

Q.    And where were those pictures taken?

A.    Some are taken by our crime lab in Coos Bay.  And I'm not certain if there isn't some in here from — that were taken over in England as well.

Q.    And do those pictures, Nos. 62 through 72 accurately depict Ms. Freeman's clothes as you remember them?

A.    Yes, they do.

MS. SOUBLET:    I would offer State's Exhibit Nos. 62 through 72.

MS. McCREA:    There is no objection, Your Honor.

THE COURT:    Received.

(Whereupon Exhibits Nos. 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, and 72 were then received into evidence.)

MR. FRASIER:    Your Honor, I feel compelled to clarify the witness's testimony.  All of those pictures were taken by the laboratory in London — or in England.

THE COURT:    Okay.  Thank you.

Q.    Ms. Karcher, starting with State's Exhibit No. 62, can you tell the jurors what it is?

A.    That is that man's — it actually started off as a white tank top undershirt that she was wearing.

Q.    And are we seeing the front or the back?

Exhibit 5001 at 1300

Karcher   D    D6 227

A.    You are seeing the front.

Q.    And Exhibit No. 63?

A.    In No. 63 you are seeing the front.  And I believe it's the lower right abdomen area.  And there's some holes in the — in the shirt.

Q.    And Exhibit No. 64?

A.    No. 64 is the upper right — excuse me — left chest area.

Q.    No. 65?

A.    That is the back of one of the straps.  And I believe it's on the left side where there's some damage on the back, the upper back of it.

Q.    State's Exhibit No. 66?

A.    That is the back of the shirt showing some — it's decomposition kind of damage to the back of the shirt.

Q.    Okay.  And State's Exhibit No. 67?

A.    That's also the back of the shirt.  That's up where the straps have been tied in the back.

Q.    And State's Exhibit No. 68?

A.    That is the back of a sports bra.

Q.    And is there damage noted in State's Exhibit No. 68?

A.    Yeah.  On the left there, the left back, there is a large hole.

Q.    State's Exhibit No. 69?

A.    That's just a close up of the back of the sports

Exhibit 5001 at 1301

Karcher   D    D6 228

bra.

Q.    State's Exhibit No. 70?

A.    That is I believe the back — it is the back of the sports bra.  And I believe it's on the left side.

Is that what it says up there?

Left side.

Q.    State's Exhibit No. 71?

A.    That's the jeans that she was wearing.

Q.    And is that the front of the jeans?

A.    This is the front.  There is some holes, some damage there in the crotch area and around the left pocket.

Q.    And is there a notation on that photograph about that damage?

A.    Not on my photograph, there is not.

Q.    State's Exhibit No. 72?

A.    That's the back side of the jeans with again some damage in the crotch area and the inner thigh.

Q.    And are you aware of whether or not the lab in England completed a report?

A.    Yes, they did.

Q.    I'm showing you State's Exhibit No. 211 which has been stipulated to and asking you to look at it and tell me if you recognize that?

A.    Yes, I do.

Q.    What is it?

Exhibit 5001 at 1302

Karcher    D    D6 229

A.    This is a report from the Chorley Laboratory in Chorley, England.  And it's a brief description of each of those articles that we just looked at.  And then their summary and conclusion.

Q.    What is their summary and conclusion of Ms. Freeman's clothing?

A.    That there is nothing to indicate the presence of semen on the items examined.  There was no specific pattern in blood to indicate trauma such as a stabbing assault, although such possibility cannot be discounted.  The tapings and swabbing that were — they were going to be retained.  They also lifted with tape and took swabs.

Anyway, the overall findings was that there was no additional scientific evidence to further the investigation.

Q.    After returning from England and getting the clothes back, did you arrange for additional testing of that clothing?

A.    We — yes, we did.

Q.    Okay.  And where did that testing take place?

A.    That took place in — it's called Microtrace.  And it's in Elgin, Illinois which is a suburb of Chicago I do believe.

Q.    And when were the — do you know when the clothes were sent to Microtrace?

A.    I don't — I don't remember the date right off the top of my head.  It's been within the last year or two.

Exhibit 5001 at 1303

Karcher    D    D6 230

Q.    Ms. Karcher, I'm going to hand you State's Exhibits Nos. 212 and 213 which have been stipulated to and ask you to look at those and tell me if you recognize them?

A.    Yes, I do.

Q.    What — starting with State's Exhibit No. 212, what is that?

A.    This is a report that was written to Lieutenant Smith with the Coquille Police Department.  And it's just referencing the items that were received in his — in their laboratory.  Um - - -

Q.    (Interposing) Ms. Karcher, let me interrupt you right there.

A.    I'm sorry.

MS. SOUBLET:    I would offer Nos. 211, 212 and 213.

MS. McCREA:    We did stipulate and we do stipulate to those.

THE COURT:    Those three exhibits are received.

(Whereupon Exhibits Nos. 211, 212 and 213 were then received into evidence.)

Q.    You can continue.

A.    Thank you.

Anyway, it's a summary of what — what all had been sent to their lab in Elgin, Illinois.  And then what they also

Exhibit 5001 at 1304

Karcher  D   D6 231

located on the items that were sent.

Q.   And what was the conclusion from Microtrace about the articles of clothing that were sent?

A.   They found — we initially sent two tape lifts from Leah's clothes that were actually taken on the scene when we found Leah.  We sent those.  We sent her clothes to compare any of the fibers that might have — might coexist between the two items.

In summary they were able to find a few human hairs.  And they found some paint — a paint particle on one of her items of clothing, her shirt.  And were not able to continue any further with that.

They sent the hair samples back to us.

Q.   And what about State's Exhibit No. 213?

A.   No. 213 is items that were sent from a Mustang and also a Kia.

Q.   And what's the conclusion of Microtrace in reference to those articles?

A.   Basically the same.  They were able to find some human hair, but nothing definitive that would link the car with the victim.

Q.   Did you have an opportunity to assist in the processing of vehicles associated with this case?

A.   Just the Mustang, not the Kia.

Q.   And when did that happen?

Exhibit 5001 at 1305

Karcher   D   D6 232

A.   That happened — I am not certain of the date.

Q.   What was your role in processing the vehicle?

A.   I just went and helped Mr. Pex who was processing the vehicle.  I went and helped in any way I could.  I took some photographs.

Q.   Are you aware of whether or not any items of evidentiary value were recovered?

A.   We — he used a vacuum and actually vacuumed the trunk area.  And vacuumed it in through a filter so that there was a filter catch that caught any trace evidence that might have been in there.  He also did a couple of swabs which was — he — was presumptive for blood.  Which turned out not to be blood.

He took some samples of the rug in the back of the window.  And also some — I believe there was some foam that was in the back seat area.  He collected that.

Q.   Did you have an opportunity to examine any other articles of clothing that belonged to Ms. Freeman?

A.   No.

Q.   Did you have an opportunity to examine or look at any shoes that belonged to Ms. Freeman?

A.   I saw her shoes, yes.

Q.   Now, are you aware of whether or not there was anything of evidentiary value on those shoes?

A.   There was high velocity blood spatter on the shoe.

Exhibit 5001 at 1306

Karcher   X    D6 233

It would be the show that was found at Hudson Ridge.

Q.   How can one get high velocity blood spatter?

A.   High velocity blood spatter is usually seen like with a gun shot wound or an explosion, something like that. It's more of like a mist.  But you can get it when you cough or when you sneeze.  If there's blood in your mouth or nose it will spray out of your mouth like a high velocity blood spatter would if it was a gun shot.

Q.   Would it be possible to get that from strangulation?

A.   You could get — remember when I said the blood goes up and it needs to come back.  And sometimes when it goes up, it can keep going up and it can cause like venus pressure.  I mean the veins just fill up and fill up until they might rupture.  Could rupture in the nose; in the mouth.  The other thing she could — there could have been something, a cut in her mouth.  She was wearing braces.  Anything that would have produced a little blood, either in her nose or her mouth could have caused that high velocity blood spatter.

Q.   Thank you.

MS. SOUBLET:   I have nothing further.

THE COURT:   Ms. McCrea.

CROSS EXAMINATION

BY MS. MCCREA:

Q.   So, Ms. Karcher, the reason that you and Cal Mitts took Ms. Freeman's clothes — and you also took her shoes to

Exhibit 5001 at 1307

Karcher    X    D6 234

the United Kingdom, to the UK, was because you — you, meaning the powers that be, the authorities so to speak.

A.    Uh huh.

Q.    Felt that England, the UK was maybe five to ten years ahead of the United States back in 2000 on what's known as touch DNA?

A.    Yes.

Q.    Is that right?

A.    Yes.

Q.    Okay.  And can you give us just a brief run down on what touch DNA is?

A.    Touch DNA is what they're — they're doing more routinely here in the United States.  But it's the ability to — it's kind of a low count numbered DNA.  And it has to do with how the DNA is replicated.  But they're able to — anything that you might have touched, they can swab that and get DNA.  They're doing it now more with, like, grabbing skin.  They're able to swab the skin and get DNA from an assailant.

Q.    Okay.  So — and there's different kinds of DNA.  Right?  So, you've got touch DNA, you've got mitochondrial DNA.  And I think there's another kind of DNA, also?

A.    Yeah, uh huh.

Q.    But these things went to England because they were experts and they were going to see what they could do?

A.    Yes.

Exhibit 5001 at 1308

Karcher   X    D6 235

Q.    All right.  And the report that came back indicated, in terms of their findings, that stabbing as a cause of death could not be ruled out.  Is that fair?

A.    That's what their conclusion was, yes.

Q.    Okay.  And that was back in — I'm sorry — was it 2000 or 2001?

A.    It was — I believe that we were there in March of 2001.

Q.    Okay.  Then, the situation with Microtrace — well, before anything was sent to Microtrace, the 1967 blue Mustang was — no longer belonged to Mr. McGuffin.  Is that right?  If you know.

A.    It's my understanding that it no longer belonged to Mr. McGuffin.

Q.    And through arrangements with the current owner, that Mustang was taken into police custody again in 2010 — or was that — yeah, 2010?

A.    Yes.

Q.    Okay.  So, the authorities had possession of the Mustang.  And another thorough search as you've described by Mr. Pex, was conducted.  Is that fair?

A.    That's fair.

Q.    And you were with him and taking note and taking photos and that sort of thing?

A.    Yes.

Exhibit 5001 at 1309

Karcher   X    D6 236

Q.   And so at that time the — and the Mustang was in police custody for more than twenty-four hours, wasn't it?

A.   As far as I know.  It's kind of out of my realm.

Q.   I understand.  But it wasn't like a rush situation?

A.   No.

Q.   You had plenty — you and Mr. Pex had all the time that you needed to search that Mustang as much and as completely as you wanted to?

A.   Yes.

Q.   And you did so?

A.   Yes.

Q.   And that included as you said Mr. Pex using a vacuum with a filter and using that in every crack and crevice of the Mustang?

A.   Yes.

Q.   You're nodding yes.  Okay.

And even like the — what is it?  The bolts were examined.  Right?

A.   Yes.

Q.   Okay.  It was a very thorough examination?

A.   Yes.

Q.   And you know that the Kia was also obtained and processed as well.  Is that right?

A.   Yes, uh huh.

Q.   Okay.  And then all of the things that were found as

Exhibit 5001 at 1310

Karcher   X    D6 237

a result of the processing of the Mustang were sent to this lab at Microtrace?

A.   Yes.

Q.   And in addition, what was found in the Kia was sent to the lab at Microtrace?

A.   Yes.

Q.   In addition, Leah Freeman's clothing and her shoes were sent to Microtrace for them to do an independent trace evidence analysis.  Is that fair?

A.   That's fair, yes.

Q.   Okay.  So, in terms of Microtrace doing their independent analysis, they — you said they found some hairs and some things.  The big thing that they found — and it wasn't actually literally big, but the interesting thing that they found, let's say, was a paint chip particle that you mentioned?

A.   Yes.

Q.   And that was gray in color, wasn't it?

A.   Yes, it was.

Q.   And the reason — well, scratch that.

And in addition to the other things that were sent to Microtrace, that you and Mr. Pex had obtained from processing the Mustang, paint samples of that Mustang were sent to Microtrace as well, weren't they?

A.   As far as I know, yes.

Exhibit 5001 at 1311

Karcher   X    D6 238

Q.   Well, and the intention was for Microtrace to be able to compare this gray paint chip particle that had come off Leah Freeman's tank top to see if it matched the paint on Mr. McGuffin's Mustang?

A.   Yes.

Q.   And that comparison was done, wasn't it?

A.   Yes, it was.

Q.   And there was absolutely no match between that paint particle and Mr. McGuffin's Mustang?

A.   No.

Q.   No there wasn't?

A.   No there wasn't.

Q.   Okay.  And likewise, the paint particle did not match the Kia?

A.   Correct.

Q.   Okay.  Now, when you — when you saw Ms. Freeman's body, is it correct, Ms. Karcher, that she was fully clothed?

A.   Yes, she was.

Q.   All right.  So, her jeans were completely on her body?

A.   Yes, they were.

Q.   She had the sports bra on?

A.   Yes.

Q.   And the tank top was over the sports bra?

A.   Yes, it was.

Exhibit 5001 at 1312

Karcher    X    D6 239

Q. Now, in addition to the testing and things that you've mentioned here today, there were also efforts to obtain maggot casings from under where the body had been?

A. Actually the maggot casings are a short distance from where the body. Maggots tend to migrate and then — and dig a hole in the soil. And become flies later on.

Q. Right.

A. Uh huh.

Q. Sorry.

A. Uh huh.

Q. You're absolutely right.

But there was an effort made to collect approximately a hundred of these maggot casings. And those were sent to the FBI for analysis.

A. Yes.

Q. Is that correct?

A. Yes, they were.

Q. Now, you were present for the autopsy with Doctor Olson?

A. Yes, I was.

Q. And you're familiar with what we call the hyoid bone?

A. Yes, I am.

Q. All right. That's H-Y-O-I-D and it's really hard to say?

Exhibit 5001 at 1313

Karcher   X    D6 240

A.    Uh huh.

Q.    Okay.  And the hyoid bone is in the neck.  Correct?

A.    Correct.

Q.    All right.  And a lot of times — not every time — but a lot of times, if a person has been strangled there will be a fracture to the hyoid bone.  Is that fair?

A.    Yes, that's fair.

Q.    And sometimes it will be broken?

A.    Yes.

Q.    Now, the hyoid bones comes in — in this situation it was actually in three pieces?

A.    Right.

Q.    And it doesn't fuse.  That's how it comes?

A.    You're hyoid bone fuses in early — in your early twenties.  It comes — you're born with a hyoid bone, but it comes in three pieces.  It does not fuse as one until you reach your early twenties.

Q.    Right.  And Leah Freeman's hyoid bone was still in three pieces?

A.    Yes, it was.

Q.    But it did not appear that there had been any injury to it.  Is that right?

A.    That's right.

Q.    Okay.  And based on your examination and analysis you did not find a cause of death for Ms. Freeman, did you?

Exhibit 5001 at 1314

Karcher   ReD   D6   241

A.   No, we didn't.

Q.   And you didn't find a probable slash possible cause of death either, did you?

A.   No, we didn't.

Q.   Thank you.

MS. McCREA:    That's all the questions I have, Your Honor.

THE COURT:    Any redirect?

MS. SOUBLET:    Just briefly.

Thank you, Your Honor.

REDIRECT EXAMINATION

BY MS. SOUBLET:

Q.   Ms. Karcher, is it your understanding that the reason the lab in England was unable to recover DNA was due to the condition of the clothing?

A.   Yes.  It was badly decomposed.

Q.   Where is the hyoid bone located?

A.   The hyoid bone is — it's kind a horseshoe shaped bone that's right in your — it's at the top of your larynx or your airway and holds your tongue out of the way.  It's attached to nothing other then tissue, but it's what keeps your tongue from falling down into your throat.

Q.   And in the case of strangulation, the hyoid bone would not be broken if the only thing that was cut off was the blood.  Is that correct?

Exhibit 5001 at 1315

Karcher   ReD  D6 242

A.    That's — yeah, that's why you don't always see it fractured.  Is there's numerous ways to strangle that don't affect the hyoid bone.

Q.    You had an opportunity to observe the complete autopsy of the Ms. Freeman's remains.  Is that correct?

A.    Yes.

Q.    And during that, were her bones examined?

A.    Yes, they were.

Q.    And what were they examined for?

A.    I should rephrase that.  She was x-rayed for fractures.  And then all of her ribs, vertebras were all examined for any sort of defect, like a cut from a knife, anything like that.

Q.    Did you find any defects?

A.    No, we didn't.

Q.    Did you find any fractures?

A.    No, we didn't.

Q.    And in fact didn't Doctor Olson determine her death - - -

        MS. McCREA:    (Interposing) Well, excuse me. I object to the leading nature of redirect, Your Honor.

        THE COURT:    Sustained.

Q.    Was Doctor Olson able to determine whether or not her death was accidental?

        MS. McCREA:    Well, I object.  It calls for

Exhibit 5001 at 1316

Karcher    ReD    D6    243

speculation on the part of the witness.

MS. SOUBLET:    I think Counsel opened the door with her questions.

THE COURT:    Well, Doctor Olson's going to testify, isn't he?

MR. FRASIER:    He is.

MS. SOUBLET:    He is.

THE COURT:    Okay.

Go on to something else.

MS. SOUBLET:    I have nothing further.

THE COURT:    You may step down.  You're free to leave.

MR. FRASIER:    Your Honor, could we approach?

THE COURT:    Yes.

(SIDEBAR)

THE COURT:    Call your next witness.

MR. FRASIER:    Call Melissa Beebe.

THE COURT:    We were just discussing some scheduling things.

MELISSA BEEBE

was thereupon produced as a witness on behalf of the Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat up here, please.

Exhibit 5001 at 1317

Beebe  D    D6 244

Go ahead.

MR. FRASIER:    Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. FRASIER:

Q.    Could you state your name please, ma'am, and spell your last name for the record?

A.    Melissa Beebe, B-E-E-B-E.

Q.    Where do you live?

A.    Coquille.

Q.    How long have you lived in Coquille?

A.    All my life.

Q.    Are you acquainted with an individual named Leah Freeman?

A.    Yes.  She was my cousin.

Q.    Are you acquainted with the Defendant in this case, Nicholas McGuffin?

A.    Yes.

Q.    How do you know Mr. McGuffin?

A.    Through the relationship with Leah and him had.

Q.    I take it you were aware they were boyfriend and girlfriend?

A.    Yes.

Q.    Now, I want to direct your attention, ma'am, to November the 3rd of 2003.  Do you recall where you were that day?

Exhibit 5001 at 1318

Beebe    D    D6 245

A. Yes.

Q. Where were you?

A. Coos County Courthouse.

Q. Do you recall what time of the day it was?

A. Actually I believe it was after lunch time. I'm not quite sure what time of the day it was.

Q. Did you see the Defendant that day?

A. Yes, I did.

Q. Where did you see him?

A. On the front steps out here, in front of the courthouse.

Q. And did you ask him any questions?

A. Yes, I did.

Q. What question did you ask him?

A. I asked him, "How did court go?"

Q. How did the Defendant respond?

A. He said, "Good. It went real good." I think is exactly what he said.

Q. How did you respond to that?

A. In a way I probably shouldn't have. I said, "Well, it's a lot better than it should have gone for you." Is what I said.

Q. What happens then?

A. He crossed the street over to his vehicle and turns around and said, "Yes. It's amazing what you can get away

Exhibit 5001 at 1319

Beebe   X    D6 246

with in Coos County, now, isn't it?"

Q.   Was he with anybody?

A.   Yes.  I believe it was his girlfriend.

Q.   Thank you.

MR. FRASIER:   That's all the questions I have.

CROSS EXAMINATION

BY MS. MCCREA:

Q.   Ms. Beebe, Mr. McGuffin was not here at the courthouse on anything to do with this case, was he?

A.   No, I don't believe so.

Q.   Okay.  And this was back in 2003?

A.   Correct.

Q.   And when you said how did court go?  You didn't say it in a friendly way, did you?

A.   Not exactly, no.

Q.   Okay.  You kinda said it in a way to goad him, didn't you?

A.   Probably so.

Q.   And he responded in kind?

A.   I think he responded exactly how he wanted to respond.

Q.   Well, you said sort of sarcastically, "How did court go?"

A.   "How did court go?"

Exhibit 5001 at 1320

Beebe    X    D6 247

Q.   All right.  And then responded by saying, "Good.  Real good?"

A.   Uh huh.

Q.   All right.  And that infuriated you, didn't it?

A.   It made me a little bit irritated, yeah.

Q.   Okay.  Well, you wrote down — it made you so angry you wrote down a statement in November after this happened.  Right?

A.   Yes, I did.

Q.   And the term you used was infuriated.

A.   Okay.

Q.   Do you want to see your statement?

A.   No, that's fine.

Q.   Okay.  Because I'm happy to show it to you.  I'm not trying - - -

A.   (Interposing) That's fine.

Q.   Okay.  And by the time you made the next comment to him he was across the — he had crossed Baxter Street.  Right?

A.   Correct.

Q.   And you yelled at him, "Good.  It's a lot better than you should be?"

A.   Yes, that's right.

Q.   And that's when he responded back to you about it's amazing what you can get away with in Coos County?

A.   Correct.

Exhibit 5001 at 1321

Beebe    X    D6 248

Q.    All right.  And he didn't say anything else?

A.    Nope.

Q.    You didn't say anything else?

A.    No.

Q.    That was the whole contact?

A.    That was it.

Q.    All right.

MS. McCREA:    Nothing further, Your Honor.

THE COURT:    Redirect.

MR. FRASIER:    I have nothing further, Your Honor.

THE COURT:    You may step down, ma'am.  You're free to go.

WITNESS:    Thank you.

MR. FRASIER:    Your Honor, I'd ask the Court to take Judicial Notice of its file of 03CR1566, unrelated matter involving the Defendant.  In particular I'd ask the Court to take Judicial Notice that the Defendant had an appearance in Court on November the 3rd, 2003.

MS. McCREA:    I'm sorry.  What was the case number, Counsel?

THE COURT:    03CR1566.

MS. McCREA:    1566.

THE COURT:    And without objection, the Court will take Judicial Notice that Mr. McGuffin was in court on

Exhibit 5001 at 1322

Beebe    X    D6 249

November 3rd, 2003.

MR. FRASIER:    Your Honor - - -

THE COURT:    You can consider that as a fact in this case.

MR. FRASIER:    The next witness I have would be more than what we have time for tonight.  So, I would suggest we adjourn until tomorrow.

THE COURT:    I will excuse you for the evening.  The State has indicated it may rest its case tomorrow, even in the morning.  And the Defense would start.  We will still be going into next week.  And I won't speculate on how long that is at the present time.  But just be here at 9:00 tomorrow.

It should be fine, Cathy?

JUDICIAL ASSISTANT:    (No audible response.)

THE COURT:    Okay.

Just be here at 9:00.

Remember the admonition.  Leave your notes in the jury room.

Everybody else remain seated until the jury has a chance to leave the courtroom.

(Jury Out.)

THE COURT:    Two things, Counsel.  One, there was an Exhibit No. 33 which was the picture of the annual that I conditionally received on the basis of Counsel agreeing what

Exhibit 5001 at 1323

D6 250

pages would come out of that.  And you've now agreed to it.
So, I don't see any reason not to receive a picture of that.

Does anybody have anything further on that?

MS. McCREA:   That's fine, Your Honor.

THE COURT:   No. 33 is received.

(Whereupon Exhibit No. 33 was then received
into evidence.)

THE COURT:   The next issue is Exhibit No.
216.  And - - -

MR. FRASIER:   (Interposing) Your Honor, I'll
just withdraw that to solve everybody's problems.

THE COURT:   Okay.  (Not understandable)
easier.

It's — you don't want it in evidence then?  I
mean, you don't want it as - - -

MR. FRASIER:   (Interposing) I'll just
withdraw it.

THE COURT:   Withdraw it.  Okay.

No. 216 is withdrawn.

Unless there's anything else?

MS. SOUBLET:   There is, Your Honor.  I'd like
to be heard on the issue of Exhibit No. 84, Mr. Bartley's time
line.

Your Honor sustained an objection to its
admission yesterday as hearsay.  And I would actually offer it

Exhibit 5001 at 1324

D6 251

I think as impeachment of Mr. Bartley.  I specifically questioned him from that time line for that reason.  He indicated his memory was better then than it was when he was testifying here today and actually gave answers consistent with having to be refreshed from Exhibit No. 84.

So, I think it's admissible as 613 for impeachment purposes.

MS. McCREA:   I don't agree.  And I guess what I'd ask is to be able to think about it overnight and provide the Court with a reasoned response.

THE COURT:   Okay.

I prefer those to unreasoned responses.

MS. McCREA:   Well, I might fare better with a reasoned response.

THE COURT:   Right.

MS. McCREA:   So, if we could take it up first thing in the morning?

THE COURT:   That's fine.

MS. McCREA:   Thank you.

THE COURT:   Could you give me that —
Mr. Barley's time line?

What's the exhibit number?

MS. SOUBLET:   No. 84.

THE COURT:   Okay.

Thank you.

Exhibit 5001 at 1325

D6 252

Oh, I just need to see Counsel briefly in my office.

MS. SOUBLET:    All of us?

THE COURT:    No. 241 is what?

No. 241 was the Grand Jury testimony of Ms. Reib?

MR. FRASIER:    Yes.  I haven't offered — well, we - - -

THE COURT:    (Interposing)  You haven't offered it?

MR. FRASIER:    Well, I did offer it, but they wanted time to review it.

MS. McCREA:    And the problem is I have a Macintosh computer so I can't play what they provided me.  But I know that Mr. Frasier discussed it with Mr. McCrea.  And I think there's been an agreement.  But he's — since we're - - -

THE COURT:    (Interposing) To admit it or not to admit it or - - -

MS. McCREA:    Well, to admit the — of the excerpt that Mr. Frasier wants to admit for impeachment.

THE COURT:    Okay.

MS. McCREA:    Or Ms. - - -

MS. SOUBLET:    (Interposing) Well, before we go downstairs why don't we just play it on our computer since we're done for the day?

Exhibit 5001 at 1326

D6 253

MS. McCREA:    Well, I think they've already got it set.  So, we're fine.

THE COURT:    If you want to listen to it, I'll play if for you.

THE COURT:    So, you've worked out what you're going to play?

MR. FRASIER:    Yes.

THE COURT:    Okay?

MS. McCREA:    Yes.

THE COURT:    Then No. 241 will be received as it relates to what you're going to play.

(Whereupon Exhibit No. 241 was then received into evidence.)

MR. FRASIER:    Do you want to see all four of us, you know, or just - - -

THE COURT:    (Interposing) Yeah, that would be fine.

(END OF DAY SIX.)

Exhibit 5001 at 1327

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

STATE OF OREGON,                )
                                )
                Plaintiff,      )    CASE NO. 10CR0782
                                )
                                )       JURY TRIAL
        vs.                     )         DAY 7
                                )
 NICHOLAS JAMES McGUFFIN,       )
                                )
                Defendant.      )
_____)

TRANSCRIPT OF PROCEEDINGS

Volume 11, Pages D7 2-D7 193

BE IT REMEMBERED That, the above-entitled cause
came on regularly for hearing on Day 7 of the trial, beginning
at 9:08 a.m. on Thursday, July 14, 2011, in the Circuit
Courtroom of the Coos County Courthouse in the City of
Coquille, County of Coos, State of Oregon, before the Honorable
Richard L. Barron, and a jury.

APPEARANCES

R. Paul Frasier, District Attorney for Coos County,
representing the Plaintiff.

Erika Soublet, Assistant District Attorney for Coos County,
representing the Plaintiff.


Shaun McCrea, Attorney at Law, representing the Defendant.

Robert McCrea, Attorney at Law, representing the Defendant.

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 1328

D7 2

\*                         \*                         \*

(Jury in.)

THE COURT:    Be seated.  Good morning.

Mr. Frasier?

MR. FRASIER:    Your Honor, before we start with testimony, I have a couple housecleaning things to do.

THE COURT:    Okay.

MR. FRASIER:    First of all, I don't believe I've done it yet.  But, we would offer into evidence the clothing of Ms. Freeman and her shoes, which would be State's Exhibits 96, 97, 98, 99, 100 and 201.

THE COURT:    Any objection?

MS. McCREA:    No, Your Honor.

THE COURT:    They're all received.

(Whereupon Plaintiff's Exhibit Nos. 96, 97, 98, 99, 100 and 201 were received into evidence.)

MR. FRASIER:    We would also offer State's Exhibits 203 which is the toothbrush of Ms. Freeman, 204, 205 and 206, which are the DNA standards from Cory Courtright, Danny Freeman and the Defendant.

MS. McCREA:    There's no objection.

THE COURT:    Those are received.

(Whereupon Plaintiff's Exhibit Nos. 203, 204, 205, and 206 were received into evidence.)

MR. FRASIER:    We would also offer — I believe

Exhibit 5001 at 1329

D7 3

we have an agreement that without having to recall Sheriff Zanni, that certain exhibits — I'm going to agree that certain things that they want to have that were seized by Officer Wetmore and Sergeant — or, excuse me, Sheriff Zanni, to be admitted without recalling them.

I have three exhibits, which would be State's Exhibits 237, 238 and 239.

MS. McCREA:    Yes.

THE COURT:    Those are received.

(Whereupon Plaintiff's Exhibit Nos. 237, 238 and 239 were received into evidence.)

MR. FRASIER:    With that, we would call Jim Pex.

THE COURT:    When we ended yesterday, there was an offer on State's Exhibit 84.  And I think we can take that up a little later, because there may be a couple things that I want to hear about and review.  So, we'll take that up a little later.

JAMES PEX

was thereupon produced as a witness on behalf of Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat here, please.  Thank you.

Exhibit 5001 at 1330

Pex  D    D7 4

DIRECT EXAMINATION

BY MR. FRASIER:

Q.    Could you state your name please, sir, and spell your last name for the record?

A.    My name is James Pex, P-E-X.

Q.    And what is your occupation, sir?

A.    I retired from the Oregon State Police and I now run my own businesses in forensic consulting.

Q.    When you worked for the State Police what did you do, sir?

A.    I was the Director of the State Police Crime Laboratory here in Coos Bay, and Interim Director for the Crime Laboratory in Medford.

Q.    The Crime Laboratory in Coos Bay — does it exist?

A.    Not anymore.  No.

Q.    What happened there?

A.    Budgetary cuts.

Q.    And after the Lab closed, is that when you retired?

A.    After I retired, the Lab closed.

Q.    Oh.  Okay.  In that regards?

A.    Yes.

Q.    Okay.  Well, could you tell us a little bit, sir, about your — well, your training and background in forensic science?

A.    Yes.  I have a Master of Science, primarily in

Exhibit 5001 at 1331

D7 5                                                              Pex   D

Chemistry, from Southern Oregon University.  My Bachelors Degree was from OIT in Medical Technology.  I joined the Oregon State Police in 1978 and went through a lot of different training courses, both in Oregon and at the FBI Academy in Quantico, Virginia.

I worked in the Eugene Crime Laboratory and the Medford Crime Laboratory for approximately ten years, was promoted to the Director of the Laboratory here in Coos Bay in about 1990.  I stayed there as the Director, and I also continued to work cases and crime scenes until my retirement.

Q.   Could you tell us if you have a specialty certifications?

A.   Yes, I do.  My specialty certifications — I'm a Board Certified Forensic Scientist with the American Board of Criminalistics.  Of course I'm — I was a Certified Police Officer and I have it in retired status, and a specialist certification in Clinical Chemistry with the American Society of Clinical Pathology.

Q.   What does "board certified" mean?

A.   It means you take a national exam and you have to pass the exam in order to be accepted by the association.

Q.   Do you belong to any professional societies?

A.   Yes, I do.  I belong to the American Academy of Forensic Sciences, the International Association of Blood Stain Pattern Analysts, the Association of Tool Mark and Firearm

Exhibit 5001 at 1332

Pex   D      D7 6

Examiners, the American Board of Criminalistics, and the International Association for Identification.

Q.   Could you tell us, well, about your professional experience in forensic science?

A.   As I joined the State Police in 1978, it was our practice to be general Criminalists at that time.  The training began in-house with the more experienced members of the Laboratory.  We started going out on crime scenes.  I think I went out on my first one within a couple of months of moving to Eugene.  And we continue working in general criminalistics, which means that you go out to the crime scenes.  You do the photography.  You collect your own evidence.  You bring it back to the Laboratory and you do your own examinations at that time.

If there were bullets in rifles and guns involved, we would examine them ourselves.  If it was a trace evidence examination, we would look at the hairs and fibers ourselves — and the clothing exams — and then we would write reports and testify to our findings.

As forensic science developed in the later years of my work with the State Police, they became more specialized and we would send evidence off to individuals who did nothing but a certain type of evidence examination.  So, there was a transition period later in my career to a more specialized area of forensic science.

Exhibit 5001 at 1333

D7 7                                                    Pex   D

Q.    What area was that?

A.    For me it was blood stain pattern analysis, firearms, tool marks examinations, and crime scenes.

Q.    Now, when you were the Director of the Crime Lab what were your duties there?

A.    It was to supervise the other members of the Laboratory, participate in crime scene examinations within our region, which extended from the California border as far north as Lincoln City, and in as far as Roseburg at different times.

Q.    Have you received any special awards for your work?

A.    Yes, I have.  I was recognized by the American Academy of Forensic Sciences with their Regional Award in Criminalistics in 1985.  I received an Oregon State Police Commendation Award from the Superintendent of State Police in 1991.  I received another Public Service Award from the Oregon Peace Officers Association in 1996.  I received a District Attorney's Commendation Award from Coos County District Attorney Paul Burgett in 1998.

Then I received another Oregon State Police Letter of Commendation from the Forensic Services Division in February of 1999.  I received a second Public Service Award from the Oregon Peace Officers Association in May of 2000.  And then again received an Oregon State Police Commendation Award from the Forensic Services Division of the State Police in 2001.

Q.    Outside of your work as a Criminalist, have you had

Exhibit 5001 at 1334

Pex    D       D7 8

other awards given to you?

A.    Um, I'm trying to think what comes to mind.  I participated in a lot of other things.  I sit on the — I have a Governor's Appointment to the Ocean Policy Advisory Board for the Governor of Oregon.  I also was Chairman of the Coos County Marine Reserves Committee that made decisions regarding our local ocean policy on marine reserves here over the last eighteen months.

Q.    So, you're a fisherman?

A.    Oh, yes.  Oh, yes.

Q.    Now, could you tell us, after you joined the Crime Lab system did you receive any training in how to process a crime scene?

A.    That's an integral part of what we — our responsibilities.  And, like I said, I responded to my first crime scene with more senior members of the group.  I think I was in the Laboratory probably 60 days.

And early on, of course, in your first few years with the organization you attend a lot of different training seminars and specialization training.  At that time, they did a lot of in-house, within-state training regarding crime scenes and the various aspects.  But, we also attended training at Quantico, Virginia, at the FBI Academy.  I normally went back there at least once a year.

Q.    Have you provided training to law enforcement and

Exhibit 5001 at 1335

D7 9                                                    Pex   D

other forensic scientists?

A.    That — again, in the latter years of my work with the Oregon State Police I spent a good deal of time training police officers, as well as other members of the communities, on crime scene investigations, evidence examinations, forensic photography.  I had a Federal grant to teach forensic photography related to domestic violence and taught courses in that throughout the United States.

Q.    Laboratories you've worked in — have they been accredited — nationally accredited?

A.    Yes.  All of the Crime Laboratories in Oregon were — have been accredited since 1985.

Q.    And what does that mean?

A.    That means that a — again, there's a national organization — the American Association of Crime Laboratory Directors — that sets up a — certain protocols and inspections of your laboratory.  You have to meet their standards.  And we have been meeting those standards here in Oregon since 1985.

Q.    Now, in working in the Crime Lab, is there a system set up where there's some sort of auditing or checking done on the work of the other scientists?

A.    Yes.  Part of this accreditation process means that a team comes in from out of state every five years and goes through the records and the reports in all of the Crime Laboratories in Oregon.

Exhibit 5001 at 1336

Pex  D    D7 10

Once a year, we have to do our own internal auditing. And, as a Lab Director, you are an inspector and your responsibility was to go to other laboratories and, excuse me, inspect them for the quality of work that is being done.

Q.    And while you were the Director of the Coos Bay Lab, was an audit done of your facility?

A.    Oh, yes, once a year and then once every five years.

Q.    And while you were Director of the Coos Bay Lab, who worked for you there?

A.    Kathy Wilcox.  Then we had other people that came through, worked there, transferred into other laboratories, as well.  But, related to this case, Kathy Wilcox was employed there.

Q.    And during the time that you supervised Ms. Wilcox, was there ever any issue with her work?

A.    No.

Q.    Have you been qualified as an expert and testified before?

A.    Many times.

Q.    And have you — outside of Oregon, have you testified in other states?

A.    I have.

Q.    What other states?

A.    Oregon, Washington, Idaho, California, Kentucky, North Carolina.

Exhibit 5001 at 1337

D7 11                                              Pex  D

Q.   Has the miliary taken advantages of your services?

A.   Oh, yes.  I've worked cases internationally, as well — cases that originated in Iraq, Kyrgyzstan.  I was in Iraq, in Fallujah, in February doing a crime scene processing for the military.

Q.   Now you are retired now and you have your own business?

A.   Yes.

Q.   What do you call that business?

A.   I actually own two businesses.  My primary business is Pex Forensic Consulting.  And then I have another business called International Forensic Experts that is a group of forensic experts that are subcontracted under that business.

Q.   And who do you work for?  Or, who hires you in your private practice, so to speak?

A.   Most of the time it's the defense community that hires us.  We have been hired by the prosecution, as well, on occasion.  But, primarily the work comes through the defense. They seem to be the ones that have the money to buy it — to hire us.  And also the military — the contracts that I get through the military actually come through the prosecutor's office, even though oftentimes they're for the defense.

Q.   Have you ever been — in your private practice, have you ever been appointed or asked to be like a neutral party to look at some evidence when there's a dispute between people —

Exhibit 5001 at 1338

Pex   D    D7 12

or experts?

A.    Yes, I have.

Q.    And in particular, what type of case?

A.    A couple years ago a case in San Diego.  There was a dispute over the interpretation of blood stain patterns in a homicide investigation.  The prosecution's expert came to one conclusion.  The defense's expert came to an opposing conclusion.  And the Prosecutor and defense counsel got together and decided they would go out for a third party to review the evidence independently and to see what conclusion they might reach.  And they had to have the consent of the experts in the case, as well.  And I was selected for that.

I went to San Diego, examined the evidence and reached conclusions regarding that case and the individual who was — has been in jail for two years and accused of murder was set free.

Q.    So, the prosecution accepted your - - -

A.    (Interposing) Yes.

Q.    Now, in the course of your career have you — I think you've talked about going to crime scenes.  But, let's be a little more specific.  How about homicide scenes?

A.    With — early on in our career with the State Police we responded to a variety of different scenes.  Sometimes they were sexual assaults, suicide investigations.  We worked close with the arm of the Medical Examiner's Office and any

Exhibit 5001 at 1339

D7 13                                                    Pex   D

suspicious death we would respond to.

          In the later years, we limited those responses primarily to death investigations and, of that, the majority of which were homicide investigations.

     Q.   And over the years, sir, can you give us an idea of how many homicide scenes you have been to and processed?

     A.   You know, we never kept a record on that.  But, it was a lot.  I mean, we went on a lot of investigations. Sometimes we would be at scenes and they'd be waiting for us to finish up there so we could get on to the next one.

     Q.   The Director of the Coos Bay Lab, was your work — let's say there's a homicide in Coos County.  Would you be called to go there?

     A.   Yes.

     Q.   There would be times when you would be asked to go to other parts of the state?

     A.   Yes.  Besides the region in which my Laboratory had responsibility, if there were specialized circumstances in other places in the state, they would fly me in to do processings there, as well.

     Q.   Now, Mr. Pex, I want to direct your attention now to July of the year 2000.  You were the Director of the Lab at that time?

     A.   Yes, I was.

     Q.   And during that month, was a pair of shoes that were

Exhibit 5001 at 1340

Pex  D     D7 14

subsequently identified as belonging to Leah Freeman brought in to the Lab?

A.   Yes.

Q.   And with Kathy Wilcox, did you look at these shoes?

A.   Yes.

Q.   And I believe it's the left shoe, which I believe is State's Exhibit 97 in this case — did you examine that — the sole of that shoe?

A.   Yes, I did.

Q.   With Ms. Wilcox?

A.   Yes.

Q.   What did you see?

A.   I saw impact spatter on the sole of that shoe — impact blood spatter.

Q.   Let's talk about blood spatter a little bit.  First of all, could you tell us — you indicated your specialty is — at least one of your specialities is blood spatter?

A.   That's correct.

Q.   Can you tell us how you got there and what your background is?

A.   When we talk about interpretation of blood patterns and blood stains, there are quite a variety of them.  If there's just — I'll give you an example.  If a person has a bloody nose and they're just bleeding and the blood is just dripping on the floor, historically we've called that — what's

Exhibit 5001 at 1341

D7 15                                                          Pex   D

called low velocity impact spatter.  The only influence on that blood is really gravity and it falls and the droplets are all fairly large and consistent in size.

When — let's say this person has a bloody nose and is also involved in a fist fight.  And he — he is bleeding and has blood on the surface of his skin and he gets hit again.  We're adding extra energy to that liquid.  And the droplets tend to break up and be smaller.  And they can vary in size from down to a millimeter to a centimeter in size.  It just depends.

Then the third category is that which is associated with a gunshot.  In that situation, you oftentimes get a mist of blood, kind of like you would get with a spray can — very, very tiny droplets.

There is some overlay if you're just looking at a few blood stains.  It's — oftentimes you can tell.  They're too small, for example, to be just low velocity, just dripping to the ground.  But, on the other hand, they could be from a situation there is an assault taking place, or from a shooting.  You can't really define it.

So, we refer to that as impact spatter.  Impact spatter is blood that has traveled through the air.  And if it's small in size, it could be the result of some type of a beating going on.  Blood that's dripping into blood can splash and cause small droplets.  There are a couple of different origins for small stains.

Exhibit 5001 at 1342

Pex   D    D7 16

Q.    Now, you indicated that what you saw on the shoe was impact - - -

A.    (Interposing) Yes.

Q.    - - - spatter?

And that would be consistent with what?

A.    Again, there are multiple choices when all you have is a few small blood stains.  As I go through the choices — we've talked about blood that drips into blood and splashes and creates little droplets.  You can have an assault where someone is struck and you'll get the formation of small droplets.  You can have someone who has blood in their esophagus and they cough and they can create small droplets of blood.  And, of course, in a shooting circumstance you get anywhere from a very small mist to larger droplets, as well, in combination.

So, those are the primary categories that come to mind.

Q.    Now, on August the 3rd of 2000, the body of Leah Freeman was discovered.  Did you go to that scene?

A.    Yes, I did.

Q.    Could you tell the jury, please, what you did when you went to that scene?

A.    As we do in all crime scenes, is when we arrive on scene we determine is the scene secured?  You know, what information is available at the time?  How much information — "What do I know about the scene?"  And then we — who did an

Exhibit 5001 at 1343

D7 17                                                    Pex    D

initial overview?  Someone had to look at the body and ensure that the person is dead.  And then generally they back of the scene and secure it at that point.

Then we decide what it is that we intend to do in terms of the processing.  We organize that.  Then I set up a path or a direction in which everyone who goes in or out is going to follow this path so we don't contaminate the rest of the crime scene by people just inadvertently coming and going.

And once we establish how we're going to process it, then we go forth and do that.

Q.    And what did you do in this particular case?

A.    In this particular case, I set up a place where everyone is going to come and go.  We go in first and we photograph the scene, take notes of what we see.  And then I took some initial — what we call "adhesive tape lifts" off the pants and off the upper clothing.  And I requested that someone take a piece of plywood and cut it so that it will fit inside a large body bag.  And so they did that.  We were able to — after we had searched the curtilage and carefully documented the body, we were able to slide this plywood under the deceased and put them inside the body bag and take them out completely intact for the Medical Examiner to examine.

There's more.  I guess, I - - -

Q.    (Interposing) Go ahead and tell us.

A.    Okay.  The — one of the things is that the search

Exhibit 5001 at 1344

Pex  D    D7 18

parameters — the scene size is of two-fold.  The first there is the area that's immediately around the body.  And that has to be extensively searched to see if there's anything there of evidentiary value.  It is often said in our business when people ask us what is it that we're looking for, we often respond, "We don't know, but we'll tell you when we find it." So, that is how we pursue a methodical search of the area.

Then there is also the egress into the area.  Someone had to get there and dispose of this body at this location. So, we also searched from the main highway road, down this gravel road, all the way from its junction all the way to where the body was located and beyond.  And someone walked the roads and we do what's called a line search, where people walk along in its entire length to see if there's anything of value that we pick up along the way.

Q.    Now, in your career as a forensic scientist, have you ever had cases where the homicide occurred at one location but the body ends up at the second location?

A.    Oh, sure.

Q.    And what do we — what do they commonly refer to this as?

A.    Dumped body.

Q.    In examining this scene and the position of the body and so forth, did you come to a conclusion in your opinion as to was this where Leah Freeman died, or something?

Exhibit 5001 at 1345

D7 19                                                    Pex   D

A.   That isn't always easy to establish.  The one thing that I noticed right away is that her legs were crossed.  And that is often an indication that someone has been rolled over.  Whether rolled over going down the embankment, or rolled over on the site, I don't know.  But, when you turn someone who is laying on their back, for example, or laying on their stomach and you grab them by the shoulders, the upper body, and roll them over, it causes the legs to cross.  That doesn't — that's an indication.  That's not absolute, but it's something you notice.

And based upon her position and its relationship to the road, it had the appearance of having been a dead — deposed at that site as a dumped body.  But, that's not absolute.

Q.   Now, after — well, let me ask you this question.  In searching the immediate area around the body what, if anything, did you find?

A.   There were a number of items that we collected.  Of course, there was the adhesive lifts that I took.  There were some beer cans that were located.  We took a white bottle cap.  There was a blue rag that was found, 7-Up cans.  And there was also — just west of the body there was a — I think portions of a deer carcass and some cardboard with some blood on it.  And, of course, we immediately tested that to determine if it was of human origin and it was not.  I surmise it's associated with the deer remains.

Exhibit 5001 at 1346

Pex  D    D7 20

Q.    This other evidence that you indicated, — the pop cans and what have you — to your knowledge were they subsequently looked at to see if there was anything of evidentiary value on them?

A.    Sure, they were submitted for latent print examination.

Q.    Was anything discovered?

A.    I don't recall that there was.

Q.    Now, the body was removed the same day it was found?

A.    Yes.

Q.    Did you go back out the next day?

A.    Yes, I did.

Q.    And what did you do when you went back out there?

A.    One of the things that we do is we — after the body has been removed is we — we sift the area where the body was to see if there is anything that may have soaked into the ground. For example, if a person is shot, there might be a bullet in there — in the ground. And so we'll take the soil out and we'll sift it and see if we can pick up anything of evidentiary value.

We also — there was some grass and plant materials on the hillside leading up to the road. We clipped all of that and then searched the area quite closely between the road and where the body was located, as well.

Q.    When you say "sift the earth underneath where the

Exhibit 5001 at 1347

D7 21                                                      Pex   D

body was found," what are you looking for?

A.   Again, it's a — could be buttons, could be a bullet, cartridge cases, personal items.  People leave behind the darndest things sometimes.  So, you don't know until you search and see what you can find.

Q.   And in your sifting, did you find anything of scientific or evidentiary value?

A.   Not in this case.  No.

Q.   Now, the other search — walking up the road and down and so forth — did you participate in that or did you direct that?

A.   No.  I advised the agency that this is something that needed to be done.  They got people together and did that.

Q.   And, again, to the best of your knowledge, was anything of evidentiary value to this case discovered?

A.   Other than, like I said, these items that I had mentioned earlier were collected and were available.  But, I don't know that anything of value came of them.

Q.   Now, you mentioned the tape lift that you did of the pants and the shirt.  Could you describe what you mean by "tape lifts" and what you did?

A.   What we do is you use just a really good adhesive tape and — like packaging tape, for example.  You take — you pre-examine it and make sure there isn't already a lot of contamination on it.  But, you peel it off of a roll, double it

Exhibit 5001 at 1348

Pex   D     D7 22

around, and you just apply it to the surface like that, peel it off, and then put it on a piece of clear Mylar.  And then what you're looking for is anything that might have been picked up in terms of hairs or fibers while the body was at various locations prior to where it's at now.

And so I brought those back to the Laboratory and examined them to see if there's anything of investigative value there.  Examination of hairs of and fibers is primarily a comparative technique.  You have to have something to compare it to.  And at that point, my involvement was just to see if there's a preponderance of black fibers on there.  I could see what I believed to be the color of the clothing.  But, were there other fibers that didn't match that, that might be of investigative leads.

Q.    Excuse me.  I didn't quite understand the last part. Did you see other fibers, you say?

A.     There were lots of fibers collected.  But, I didn't see anything that would be of an investigative lead.  For example, if on her blue jeans if there was a whole bunch of red fibers, then that might be of value that she was, at one point, on something that was red.

Q.    Now, these tape lifts and the stuff you're collecting, is that sometimes referred to as trace evidence?

A.    Yes.

Q.    And trace evidence — could you describe — was this

Exhibit 5001 at 1349

D7 23                                                          Pex    D

stuff hardy?  Will it stay forever?  Or, fragile?  What's it like?

A.    It's hard to say whether it will or will not.  But, for the most part, the long — the more time that goes by, the more it's going to dissipate.

Q.    So, in this case, with a body that — well, based on your training and experience, did it appear that this body had been there awhile?

A.    Yes.

Q.    And, again, based on your training and experience, would the likelihood have been — well, let's back — let me rephrase the question.

If the body had been found shortly after it was placed where it was found, would the likelihood of finding usable trace evidence be higher then, or when you eventually got to it?

A.    It would have been higher in the beginning.  Of course it depends somewhat on the clothing that you're looking at, too.  If it's a fairly smooth surface then it's not going to retain other fibers and hairs that might initially stick to that long.  I had a case in which a person had shoes that had velcro attachments on it, and of course the fibers remained in that velcro almost permanently.  So, in that situation, you know, you have something that's going to go on for a long time.

But, in this circumstance in the clothing that she

Exhibit 5001 at 1350

Pex  D     D7 24

was wearing, as time goes by the trace evidence is going to be more difficult to detect.

Q.   Now, last year you were asked to — by my office to assist in this investigation again?

A.   Yes.

Q.   And as part of that, there were two vehicles that the Coquille Police Department had obtained — a '67 Mustang and a purple Kia?

A.   Yes.

Q.   Now, did you have anything to do with searching or examining either one of those vehicles?

A.   Yes, I did.  What I did is I called a company called Microtrace back east.  They're well known throughout the country for their examinations of trace evidence.  They have a lot of specialized equipment.  I asked them if there was anything that's changed in time or anything I should know before I went forward with this processing of these vehicles. And what I did is, they gave me — said, "No, nothing has really changed."  The methods I use are still of value today.  So, I went forward and photographed these vehicles and searched them.

Q.   And did you remove anything from these vehicles?

A.   Yes.  I took some vacuum sweeps and I think some carpet standards.

Q.   Did you remove any screws or anything like that?

A.   Yeah, in the trunk.  One of the things that when

Exhibit 5001 at 1351

D7 25                                                          Pex   D

you're looking for blood stains, everything is affected by gravity.  So, to give you a hypothetical, if there was blood on the floor or blood in the trunk or something like that, it's going to continue to move downward.  And so, you know, you pull up carpets and look under the carpets inside the car and test that area.  You look in the trunk and you get down to the metal and sometimes the blood will accumulate under the screws.

In this case, there was screws that hold the gas tank in place.  And so I pulled out a number of these screws and tested underneath those, as well, to see if I could locate any blood stains.

Q.   And did you find any?

A.   No.

Q.   The evidence that you — the vacuum sweepings and things along that line — to your knowledge, was that sent to Microtrace?

A.   Yes.  I gave them to Kris Karcher, and I believe she sent those on.

Q.   And to the best of your knowledge, sir, in your examination of these vehicles, was anything of evidentiary value pertaining to this case found?

A.   That wasn't reported back to me that anything was.  So, I have not been close and involved in that.  But, no one has indicated to me that there was anything.

Q.   Going back to the — when the body was found, have you

Exhibit 5001 at 1352

Pex  D     D7 26

had cases before where you've had somebody that has laid out for awhile and decomposed to the extent we saw here?

A.   Yes.

Q.   Now — and you had an opportunity, at least that day, to examine the clothing or see the clothing of Ms. Freeman as it was on her body?

A.   Yes.

Q.   Did you see any indication of — well, in the course of your career, you've dealt with homicides where people have been stabbed?

A.   Yes.

Q.   And bled to death?

A.   Yes.

Q.   What type of things would you be looking for in those situations?

A.   We would be looking for what we would call an incised cut in the clothing, or in the body, itself.  And these are generally linear and it's — differentiating these, sometimes, from animal abuse can be difficult.  But, you know, we can surmise based upon what we see on the clothing and what is the result of the autopsy exam if the two go together or not.

And so remember that a crime scene is a place where you collect evidence.  Clothing exams, like you're discussing, is something that we do in more detail once it gets back to the Laboratory.

Exhibit 5001 at 1353

D7 27                                                        Pex   X

Q.   Did you see any indication at the scene of a large amount of blood loss?

A.   You couldn't tell in this case.  No.

Q.   And why is that?

A.   She was sufficiently decomposed that I don't think you could tell, for sure.

Q.   All right.  Thank you.

         MR. FRASIER:   I think that's all the questions I have at this — oh.

Q.   Let me ask you this.  You're not being paid to testify here today, are you?

A.   No.

Q.   Thank you.

         MR. FRASIER:   That's all I have.

         THE COURT:   Ms. McCrea?

                CROSS EXAMINATION

BY MS. McCREA:

Q.   So, Mr. Pex, you indicated that you looked at the shoes with Kathy Wilcox?

A.   Yes.

Q.   And this was in your capacity as her supervisor?

A.   Yes.

Q.   So, the two of you discussed her findings?

A.   Yes.

Q.   And then were you present when she communicated her

Exhibit 5001 at 1354

Pex   X     D7 28

findings to other police officers investigating in this case?

A.    I may or may not have been.  No.

Q.    Okay.  Were you involved in briefings with the — with the Major Crime Team?

A.    On occasion, yes.

Q.    Okay.  And you're indicating that your opinion is that this was an — or, how did you put it — impact — did you say "spatter" or "splatter"?

A.    Spatter.

Q.    Spatter, with no "L"?

A.    Right.

Q.    Okay.  An impact spatter.  And you're not saying that your opinion is inconsistent with Ms. Wilcox's opinion.  You're just saying that you have a more generalized opinion?

A.    I don't know what her — what opinion that she stated while she was here in the courtroom.  I don't know if what I'm saying is more generalized or not.  What I saw was impact spatter on the bottom of them shoes.  From an investigative standpoint, that generally means that some type of violence has occurred.

Q.    Okay.  All right.  Now — and as you've said, you've testified previously in a number of criminal cases as a forensic expert, right?

A.    Yes.

Q.    And you're very, very familiar, obviously, with the

Exhibit 5001 at 1355

D7 29                                                                  Pex   X

concept of trace evidence?

     A.   Yes.

     Q.   Yeah?

     A.   Yes.

     Q.   Okay.  Yes.  And we talked about Locard's Exchange Principle yesterday.  You're familiar with that, right?

     A.   Yes.

     Q.   And, basically, to sort of paraphrase that, it means that if someone does something — let's say if someone kills someone, that person is likely to either leave trace evidence at the scene or take something with them?

     A.   In general, yes.

     Q.   Okay.  In other words, stuff gets transferred from one place to another?

     A.   That is the hope.

     Q.   I know it wasn't eloquently put.  But, it's - - -

     A.   (Interposing) Yes.  That's the hope.

     Q.   All right.  And your job as a forensic scientist is to look for this trace evidence, maybe — you know, ideally, to solve a crime if you can.  But if not, to try to corroborate other evidence that develops.  Is that fair?

     A.   Yes.

     Q.   Okay.  And in this case — well, let's assume.  Let's assume a hypothetical.  Let's assume that we have testimony that a witness claims that the Defendant strangled the

Exhibit 5001 at 1356

Pex   X      D7 30

decedent, the person who died.

A.   Okay.

Q.   Okay?  And in that situation, it's going to be important the places that you look to try to corroborate that statement.  Right?

A.   Yes.

Q.   Okay.  And so places that you're going to look is — you've talked about looking at the body?

A.   Yes.

Q.   Looking at the clothing on the body?

A.   Yes.

Q.   Looking at the scene where the body was found?

A.   Yes.

Q.   And you're also going to be looking at things related to the suspect?

A.   Yes.

Q.   Okay.  And one of the things that would be important to do would be, if possible, to do an examination of him close in time to either the discovery of the body or the person's disappearance.  Would that be fair?

A.   Yes.

Q.   Okay.  And because you want to see if there was evidence that a struggle between the suspect and the person had taken place, right?

A.   Yes.

Exhibit 5001 at 1357

D7 31                                                  Pex   X

Q.   And there might be what we would consider trace evidence such as scratches on the person — the suspect's face, yes?

A.   Yes.

Q.   I'm sorry?

A.   Yes.  Yes.

Q.   Or his hands?

A.   Yes.

Q.   Right?  Or his torso, that kind of thing?

A.   Yes.

Q.   Okay.  Bruises?

A.   Yes.

Q.   Okay.  And then it would also be important, especially in a situation such as this, where you've indicated that it appeared to be a dumped body, - - -

A.   (Interposing) Yes.

Q.   That's such an awful term.

A.   It is.  It really is.

Q.   - - - well, that there was transfer from one place to another?

A.   Yes.

Q.   Okay.  Then assuming that we know that the distance where the body was found was out Lee Valley Road, which is a significant — well, it's a significant distance from where the first shoe was found on Elm Street, right?

Exhibit 5001 at 1358

Pex  X    D7 32

A.    Yes.

Q.    And it's also a significant distance from where the second shoe was found on Hudson Ridge?

A.    You know, I'm not familiar — quite familiar where Hudson Ridge is, because I never went out there.

Q.    Okay.  But, it was — you didn't see a sign just down the road from the entry to Lee Valley that said "Hudson Ridge," right?

A.    That said "Hudson Ridge"?  No, I didn't see that.

Q.    All right.  So, you're going to infer — I mean, as a forensic scientist, that probably the body was transported in a vehicle.  Is that fair?

A.    Yes.

Q.    And so the likely place to look for trace evidence would be in a vehicle that a suspect had been driving that was known to you, right?

A.    Correct.

Q.    Or, that the suspect had been riding in?

A.    Correct.

Q.    Okay.  So, in this case, you went back in 2010 and you were asked to process the 1967 blue Mustang that had belonged to Nick McGuffin, right?

A.    Yes.

Q.    Okay.  And you did that?

A.    Yes.

Exhibit 5001 at 1359

D7 33                                                    Pex  X

Q.   Okay.  And you talked about what you did there in terms of the vacuuming and it was a very thorough vacuuming. Is that right?

A.   Yes.  It's not complex.  But, yeah, it's as thorough as you would expect for this type of examination.

Q.   Okay.  Well, you even vacuumed the car's ceiling.  Is that correct?

A.   Yes.

Q.   Took — and you took — also took foam from the car's trunk?

A.   Yes.

Q.   Fiber from the trunk?

A.   Yes.

Q.   Carpet from the back window?

A.   Yes.

Q.   And vacuumed evidence from both the trunk and the back seat?

A.   Yes.

Q.   And then went into the car frame near the gas tank, and you've described taking out some of the screws and bolts?

A.   That's correct.

Q.   Okay.  Now, the — so, there's — really, I sort of mixed up two different things here.  One is that you were vacuuming to look for fibers or hairs or any kind of that sort of trace evidence, right?

Exhibit 5001 at 1360

Pex   X      D7 34

A.   Yes.

Q.   And then in terms of your examination of the place near the gas tank and the screws and screw holes and bolts, that was an examination for blood?

A.   Yes.

Q.   And you also did an examination of the car generally for blood?

A.   Yes.

Q.   And did you use Luminol to do that?

A.   You know, I think I did.  Let me check my records and see if I wrote it down.

I didn't write down in my notes that I Luminoled, but I remember having it with me.  But, I don't have independent recollection whether I did or did not.  Ms. Karcher was with me and perhaps she can recall.

Q.   So — and it's fair to say, isn't it, Mr. Pex, that Luminol is very sensitive to trace evidence of blood?

A.   Yes, it is.

Q.   And it can go — it can detect blood up to, what, one in ten thousand?

A.   One in one hundred thousand.

Q.   I'm sorry.  One - - -

A.   One in a hundred thousand.

Q.   One in a hundred thousand dilution?

A.   Yes.

Exhibit 5001 at 1361

D7 35                                                    Pex   X

Q.    Okay.  And isn't it true that blood evidence is something that tends to last for a long time?

A.    It depends.  Here we're talking ten years.  And there is no history in between on what transpired with the vehicle and/or they know what was evidence.  If this particular vehicle was used for the transport of Leah Freeman and there was blood in the vehicle at that time, you know, if it was preserved and nothing ever happened to it again for ten years, I would expect to find it.  But, I have no — without any interim history, there is no guarantee that even though it may have been there at one time, that even Luminol would detect it.

Q.    But, Luminol is pretty good at detecting small trace amounts?

A.    Yes, it is.

Q.    And the area in the cracks and the bolt holes was a pretty - - -

A.    (Interposing) Well, you can't Luminol that area because it's metal.

Q.    Okay.

A.    And all metals will show up with Luminol.

Q.    Is there also another dye that reacts to blood? Phenol - - -

A.    (Interposing) Phenolphthalein?

Q.    Yeah.

A.    That's the one we use when we swab for blood and I

Exhibit 5001 at 1362

Pex   X     D7 36

did do that in several areas and tested for the presence of blood.

Q.   And is it even more sensitive than Luminol?

A.   No.

Q.   Is it as sensitive as Luminol?

A.   No, it's not.  But it is, say, sensitive to one in ten thousand.

Q.   Okay.  So, you used both of those techniques on the Mustang and you didn't find any evidence of blood.  Is that right?

A.   That's correct.  I want to say the caveat — I think I Luminoled that car.  I don't remember, and I didn't for sure. And I didn't write it down.  But, I think I did.

Q.   Okay.  Well, you were — you were doing your best to determine whether there was any trace evidence of blood in that Mustang?

A.   Right.

Q.   And you didn't find any?

A.   I didn't find any.

Q.   Okay.  And the whole point of the processing was you were using your best efforts and the best techniques in order to determine if there was any trace evidence in that car, right?

A.   Yes.

Q.   Okay.  Now, we've sort of talked about — you talked

Exhibit 5001 at 1363

D7 37                                                Pex   X

about the material is important.  So, if you have — you talked about the shoes with the velcro.  The fibers are more likely to hang out there for awhile than if you have something that's like a nylon jacket?

A.   That's correct.

Q.   Okay.  So, in the situation where you've got cotton jeans or a cotton tank top, that's more likely than a nylon windbreaker - - -

A.   (Interposing) That's correct.

Q.   - - - to find — okay.  To find trace evidence?

A.   Yes.

Q.   Okay.

A.   I know where you are going.

Q.   All right.  I know.  And you've talked about that the environment is important.  So, you know, given the time that had passed from Ms. Freeman's disappearance to when the body was discovered, there had been a lot of decomposition.  So, the body wasn't in very good condition, right?

A.   That's correct.

Q.   And the clothing was not in very good condition?

A.   No.

Q.   Okay.  And so that's — so, in terms of finding stuff, you said that it's going to be more likely on the first day than down the line, but it just depends on the circumstances, right?

Exhibit 5001 at 1364

Pex   X     D7 38

A.    That's correct.

Q.    So in this case, in fact, Microtrace, the lab that you mentioned, found a gray paint chip particle on the tank top when they did the examination, didn't they?

A.    You know, I'm not — I heard that.  But, I have seen no reports.

Q.    Okay.  We have the report in evidence.

A.    Okay.

Q.    So — all right.  And part of what is also important concerning the work with trace evidence is the amount of diligence that is put in to trying to find evidence.  Is that fair?

A.    Yes.

Q.    Okay.  Because it takes a lot of time on the task, right?

A.    Yes.

Q.    I mean, a lot of time.  And you've got to look at the evidence and you've got to be looking for different kinds of trace evidence, correct?

A.    Yes.

Q.    Okay.  And isn't it true that when you worked for the State Police they didn't like you spending too much time — and I'm sort of talking about you and the other people at the Lab — they didn't like you spending too much time on cases because they had to have statistics at the end of the month and you

Exhibit 5001 at 1365

D7 39                                                          Pex   X

needed to have a certain number of cases going?

A.   That's true.

Q.   Okay.  And doing the trace evidence is time consuming?

A.   Yes.

Q.   Okay.  Now if we assume a hypothetical, Mr. Pex, if a person is placed in a car and is bleeding — let's say profusely — would you expect to find evidence of the blood in the car?

A.   It depends on how — on the circumstances.

Q.   Uh huh.

A.   If it's immediately afterwards, I would hope to.  If someone has gone through and cleaned the vehicle extensively, or it's been a long period of time, or it's been 110 degrees in that vehicle, you know, all summer long — there's a lot of factors — it had been rained on — a lot of factors to consider. But, it just depends.

Q.   Okay.  I'm glad you mentioned that, if somebody has cleaned something.  Even if somebody cleans a surface, Luminol is still going to be able to find trace evidence of blood, isn't it?

A.   Not always.

Q.   But, in most cases?

A.   You hope to.

Q.   And often you do?

A.   We do at times.  Yes.

Exhibit 5001 at 1366

Pex   X     D7 40

Q.    Okay, because - - -

A.    (Interposing) Because people don't realize, I guess, how sensitive the method is and they will, for example, clean the carpet with some detergent and you can't see it anymore, so they assume it's gone.  For us, it's not gone.  We can still find it.  So, it has applications, but it is not perfect.

Q.    And let's assume another situation.  If a person was — if two people are in a car — let's just assume — and one is struggling to get out, and struggling to the point that they get the door open and one of the shoes comes off and is left, would you expect that there's going to be some — there could potentially be some trace evidence of that struggle left in the car?

A.    There could be.  There could be.

Q.    Such as fibers?

A.    If there's blood on the shoe, then one would assume that some type of a incident occurred near the shoe.

Q.    Now, I don't know how extensive your involvement with the case was.  Were you — were you familiar with some maggot casings being collected?

A.    No.

Q.    No?  Okay.

        MS. McCREA:    May I approach, Your Honor?

        THE COURT:    You may.

Q.    So, Mr. Pex, I have on the easel what's been marked

Exhibit 5001 at 1367

D7 41                                                    Pex   X

for identification as Defense Exhibit 129.  And is it correct that you did a forensic examination of some swabs of a wall of an abandoned house on September 11, 2000, which was OSP No. 14, Agency No. 1, and also did an examination of some papers with a stain on September 11, 2000, OSP No. 15, Agency No. 2?

A.   Yes.

Q.   And there was no evidence of blood on those sites?

A.   On either one.

Q.   Okay.  So, there was nothing of forensic significance associated to either Mr. McGuffin or Ms. Freeman?

A.   (No audible response.)

THE COURT:   I'm sorry.  Did the witness answer?

WITNESS:   Yes.  I said no.

THE COURT:   Okay.  Thank you.

WITNESS:   Thank you, Your Honor.

MS. McCREA:   Oh, I'm sorry.

Q.   I've got you turned away.

THE COURT:   If you could move the microphone in front of you when you're looking that way, please.

Q.   This is marked for identification as Exhibit 130. And that — that includes reference to OSP's No. 26 and 27, Agency Nos. JP1 and JP2, which were tape lifts that were taken from Leah Freeman's shirt that you talked about today?

A.   Yes.

Exhibit 5001 at 1368

Pex   X     D7 42

Q.    Okay.  And those were sent for examination to Microtrace.  And we have the Microtrace information in evidence and there's no indication of any forensic evidence connected to Mr. McGuffin of Ms. Freeman?

A.    Okay.

Q.    Oh, I neglected to ask you.  You also did the examination of the 1999 Kia?

A.    Yeah.  I believe I did.  I know I examined the Mustang, and I think I looked at the Kia.  I believe I did.

Q.    Okay.  And in Exhibit 133 there was car evidence obtained from the Kia, OSP No. 52, and that included sperm heads on the seat and blood in the trunk liner and the rear floor board?

A.    Okay.

Q.    Do you know that?

A.    I don't recall that.

Q.    You don't recall that?  But, you did the search?

A.    You know, I don't have notes on this Kia.  I believe that I can — in my own recollection - - -

MR. FRASIER:    (Interposing) Counsel, that was processed by the Springfield Lab.

WITNESS:    Was it?

MR. FRASIER:    There's a report done.

MS. McCREA:    Oh, okay.

WITNESS:    That's why I don't have notes on it,

Exhibit 5001 at 1369

D7 43                                                      Pex  X

then.

         MS. McCREA:    All right.

         WITNESS:    I remember seeing it.  But, you know, old age is not my friend sometimes.

         MS. McCREA:    Mr. Frasier, are you willing to stipulate that there was nothing found in the Kia associated with Mr. McGuffin?

         MR. FRASIER:    I'm willing to stipulate that there was nothing found in the Kia that implicated anyone in anything in this case.

         MS. McCREA:    All right.  Well, Mr. McGuffin is the only one in the case.

         MR. FRASIER:    Well, my point is - - -

         THE COURT:    (Interposing) You're either going to stipulate or not.

         So, that's his stipulation.  If you don't accept it, fine.  There's no stipulation.  We'll go on.

         MS. McCREA:    Well, I'll accept it.

         THE COURT:    Okay.

         You can consider that as a fact.

         Go on.

         MS. McCREA:    All right.

Q.    And then you — you took the foam from the car's trunk and the fiber from the trunk, right?

A.    Yeah.  That was from the other one — the other

Exhibit 5001 at 1370

Pex   X    D7 44

vehicle.

Q.   I'm sorry.  Yes.  From the Mustang?

A.   Right.

Q.   And we have the Microtrace report and there's nothing concerning Mr. McGuffin in that.

And then, finally, in  Exhibit 134, this deals with the other things taken from the Mustang — the carpet from the back window, the tape lifts from the trunk, the vacuumed evidence from the trunk and back seat, the car's ceiling, near the gas tank of the car and screw holes and bolts?

A.   Yes.

Q.   Right?  And there was — and those were sent to Microtrace.  And so we have - - -

A.   (Interposing) I turned it all over to Ms. Karcher. And I assume they were.

Q.   Right.  And we have that in evidence and there is nothing connected to Mr. McGuffin.

And then you weren't involved in the beer cans? Ms. Wilcox testified about that.

A.   No.

Q.   Okay.  So — okay.  Thank you.  All right.

MS. McCREA:    I'm sorry.  Just a moment, Your Honor.

Q.   Mr. Pex, regarding the blood on the — the blood was on the bottom of the shoe, right?

Exhibit 5001 at 1371

D7 45                                                    Pex   X

A.   Yes.

Q.   And in terms of that being impact spatter, as you put it, if your shoe is on, it's going to be pretty hard to cough blood onto the bottom of your shoe, isn't it?

A.   Yes.

Q.   Now, in terms of the scene where the body was found, there was no indication to you that there was any evidence of gasoline — for example, gas that had leaked out of a gas tank — around that area?

A.   Well, nothing of that nature was found.  But, it might not be after that period of time.

Q.   Well, you don't know.  But, anyway, you didn't find any, right?

A.   That's correct.

Q.   And then in terms of the transport of the body, your — your best belief is that, given — well, scratch that.

That's — did the deer carcass appear to have been dumped?

A.   Yes.

Q.   And — okay.  Oh — and, Mr. Pex, in your experience you talked about being called in as a neutral third party in cases, right?

A.   Yes.

Q.   And you've also had situations where you've re-examined evidence or crime scenes after the State has done

Exhibit 5001 at 1372

Pex    X    D7 46

their examination, as an expert for the defense, and actually found something the State has missed, haven't you?

A.    Yes.

Q.    Okay.  And one case was a case down in Klamath Falls where the Oregon State Police had already — had processed a scene?

A.    I can't remember anything in Klamath Falls.  You're going to have to refresh my memory a little more on that.

Q.    Well, I thought there was a case where they had already completed their examination of the crime scene and you did an examination and caused them to - - -

A.    (Interposing) Oh.  That was out east of Klamath Falls — yeah, in Paisley.  That's correct.  It did not go well for the Oregon State Police.

Q.    Okay.  And there was at least another incident, I believe, where — I'm not sure if it was Nevada?  The State was unable to do an identification in a firearm case — a bullet comparison — and you were able to do the identification?

A.    That's correct.  The ATF did not come to the right conclusion.

Q.    All right.  Thank you, Mr. Pex.

MS. McCREA:    That's all the questions I have, Your Honor.

THE COURT:    Redirect?

MR. FRASIER:    Thank you, Your Honor.

Exhibit 5001 at 1373

D7 47                                                          Pex   ReD

REDIRECT EXAMINATION

BY MR. FRASIER:

Q.   Well, Mr. Pex, you were the forensic scientist in charge of the Lab back in 2000 when the majority of this evidence was processed?

A.   Yes.

Q.   Did you guys screw it up?

A.   I don't think we did.

Q.   Well, let's — I've got a few questions here.  If we assume the body of Leah Freeman was placed where she was found at or near June 28th of 2000, the body was found on August 3rd of 2000 — well, gasoline, does it just stay forever in a particular location?

A.   No.  It's a — they are volatile hydrocarbons and they evaporate with time, or sink into the soil and dissipate.

Q.   And so would you expect to find — if gasoline had leaked there, would — it had been five weeks — would you expect to find any sign?

A.   Not during the summer on a — on a gravel road.

Q.   Now, counsel talked with you about the pressures of the Lab trying to, "Don't spend too much time on the case because we need our stats up," and this and that and the other. Did you feel that you and Ms. Wilcox spent the amount of time that you needed to spend on this case?

A.   Yes, absolutely.  I was always in hot water over

Exhibit 5001 at 1374

Pex   ReD   D7 48

situations involving casework, because we did spend a lot of time on what we did.  And the — there was a change.  I used to do my own trace evidence exams, but they became more specialized and wanted certain individuals to just specialize in trace evidence.  So, I shipped that evidence to the Springfield Crime Laboratory and they were to do a more extensive examination there.

Q.   Now, in your course of your career — well, you've — in addition to going out to homicide scenes, you process evidence from other homicides where you didn't actually go out and see the scene?

A.   Sure.  Sure.

Q.   And how many homicides would you estimate you've been involved in processing evidence on over the years?

A.   Thousands.

Q.   In the course of your career as a forensic scientist, of the thousands of homicide cases you've worked on, can you give us a rough approximation of how many were absolutely solved because of trace evidence?

A.   Few.  But, some have been.

Q.   Some have been?

A.   That's correct.

Q.   But, the vast majority have not?

A.   The process in dealing with an investigation is if you have other evidence that's of value — for example, you have

Exhibit 5001 at 1375

D7 49                                                    Pex   ReD

a DNA match, you probably won't do the trace evidence at all. If you have a bullet from a body and you have a firearm and you match the bullet back to that firearm, you probably won't do trace.  There are steps involved in the process, those where you go on to do extensive trace examinations.  I have had success in some cases.

And a case that I was not involved in, but has made a lot of national recognition, is the Georgia child killings that occurred in the — I think it was the 1980's down there — serial killings of children.  That case was almost based entirely on trace evidence.  But, that's because there was no other evidence in the case.

Q.    All right.  Now, have you had cases where you know the body has been moved, and it's subsequently identified to you which vehicle or how the body was moved?  Have you had cases where you've gone back once that information was given to you, and you've processed this vehicle, and you failed to find any evidence?

A.    Yes.

Q.    Counsel talked with you a little bit about the — this theorem or principle about wherever a person goes, they leave something behind or they take something with them?

A.    Locard's Principle.

Q.    Yes.  Is that an absolute?

A.    No.  It is a principle.  It's not an absolute.  That

Exhibit 5001 at 1376

Pex   ReD   D7 50

is a foundation for which we do our work, but it doesn't mean —

there are certain limitations.

Q.   Now, in this case, Kathy Wilcox — when you — you supervised her, as I recall?

A.   Yes.

Q.   Did — was there a procedure with her reports that you have to approve of her reports before they were sent out?

A.   Yes.  I technically review her notes and then did she follow of the steps that she should follow.  And then we do an administrative review on, is all the paperwork that's supposed to be there, there?  So, there are two reviews, one technical and one administrative.

Q.   And you did that on all of her reports that she - - -

A.   (Interposing) Yes.

Q.   - - - did in this case?

A.   Yes.

Q.   Including the examination of the clothing of Ms. Freeman?

A.   Yes.

Q.   And did you find any problems with her work?

A.   No.

Q.   Thank you.

MR. FRASIER:   That's all I have, Your Honor.

THE COURT:   You may step down, sir.

And did you want this witness to remain, also?

Exhibit 5001 at 1377

D7 51                                          Karcher  D

MR. FRASIER:    I think he has to go Portland, Your Honor, so I'll let him go.

WITNESS:    Another crime scene.

THE COURT:    You're excused from further attendance.

WITNESS:    Thank you.

THE COURT:    Your next witness?

MR. FRASIER:    Uh, we'd like to recall Kris Karcher.

THE COURT:    Okay.

KRIS KARCHER

was thereupon again produced as a witness on behalf of Plaintiff and, having previously been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Sit here, please.

Go ahead.

MS. SOUBLET:    Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. SOUBLET:

Q.    Ms. Karcher, there was some discussion yesterday about maggot casings associated with this case?

A.    Yes, there was.

Q.    And do you know what happened with those maggot casings?

Exhibit 5001 at 1378

Karcher   X     D7 52

A.   Um, those maggot casings were collected at the scene about probably two and a half years after we found the body. And we sent those to the FBI Tox Lab.  They — initially, our hope was that they could do what's called an HCG, which is a pregnancy test.  Casings are — they're like the cocoon that the maggot, when it leaves the body and it goes, it will bury itself in the ground and then where — that's where it will become a fly and eventually emerge from the ground.

So, those casings dry out.  They're left in the ground.  But, they're a protein and they can absorb toxins from the body or the source of their food.

So, we collected the casings, sent them to the Tox Lab at the FBI, hoping that they would be able to do a pregnancy test, which they cannot do.  They still are unable to do that.  But, they did do a drug tox — a drug toxicology on those casings that came back as negative.  There was no drugs found.

Q.   Thank you.

MS. SOUBLET:   I have nothing further.

THE COURT:   Any questions?

CROSS EXAMINATION

BY MS. McCREA:

Q.   Well, the examination that they did for drugs was limited to just some certain drugs, right?

A.   Right.  It's the normal drug screen.

Exhibit 5001 at 1379

D7 53                                                Karcher  ReD

Q.   Okay.  And the reason that you use maggot casings to look for toxicological results is because maggots are blow — I guess they start out as blow flies.  Flies tend to go to the dead body, especially to the areas where — if there's any wounds, right?

A.   If there is a wound, that's usually where they'll start.  Yeah.

Q.   Okay.  And then they go to different orifices, like the mouth or other areas?

A.   Correct.

Q.   Okay.  Thank you.

          MS. McCREA:    That's all the questions I have.

          THE COURT:    Anything else?

          MS. SOUBLET:    Just briefly.  Thank you, Your Honor.

                    REDIRECT EXAMINATION
BY MS. SOUBLET:

Q.   Ms. Karcher, what's included in a normal drug screen?

A.   A normal drug screen checks for benzodiazepines, which is like the Valium, that kind of thing; cocaine; methamphetamine; heroin; and the morphines — that group.

Q.   Thank you.

          MS. McCREA:    Nothing further.

          THE COURT:    You may step down.

          MR. FRASIER:    We would recall Officer McNeely.

Exhibit 5001 at 1380

McNeely  D    D7 54

THE COURT:    You're still under oath, Officer.

RAY McNEELY

was thereupon again produced as a witness on behalf of the Plaintiff and, having previously been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. FRASIER:

Q.    Officer McNeely, there's been some discussion throughout this case of a location where Econo-Rooter is at and where a Maytag store was at.  Are you familiar with this location?

A.    Yes, I am.

Q.    Did you tell the Grand Jury in 2000 — well, first of all, where is this location we're talking about?

A.    It's right where West Central meets 42.

Q.    Is that the north end of the bypass that goes around Coquille, or the south end?

A.    It would be the north end.

Q.    Now, the Maytag business no longer is there?

A.    Correct.

Q.    And today what is the business that is there?

A.    Econo-Rooter.

Q.    Now, are you familiar with Sturdevant Park?

A.    Yes, I am.

Exhibit 5001 at 1381

D7 55                                                    McNeely  D

Q.    And there's a gate at that park?

A.    Yes, there is.

Q.    Where is this gate located?

A.    It's probably about 30 — maybe 30 yards past the entrance — 30, 40 yards.

Q.    And in your course of your work as a patrol officer for the City of Coquille, have you had the opportunity to turn around there?

A.    Yes, many times.

Q.    Is there adequate room to do it?

A.    Yes, there is.

Q.    This gate, in the course of your experience as a police officer, is it closed every night?

A.    No.  Usually, we'll notify public works if the water is getting high, and they'll close it during flood stage to keep people out of the park.

Q.    Now, I believe Ms. Steinhoff testified about a particular place she had been taken by the Defendant.  I believe it was called Coe Lane.  Do you know where that's located at?

A.    Yes, I do.

Q.    I'm going to put up here on the easel (not understandable).  This is State's Exhibit 76.  If you want to step down, Officer, and point out on the map where Coe Lane is?

A.    Approximately it would be right about here, before

Exhibit 5001 at 1382

McNeely  D    D7 56

Lee Valley Road and when you come down off of the (not understandable) Fairview Road, and it's kind of (not understandable) sort of drop down.  Between that part where you drop down where Lee Valley Road (not understandable.)

Q.   Now, for purposes of demonstrative evidence and so forth, I'm going to show you what's been marked as State's Exhibit No. 2.  Do you recognize that?

A.   Yes, I do.

Q.   And is that appear to be a Google map image that also points out various locations in this case?

A.   Yes, it does.

Q.   And does it appear to be accurate?

A.   Yes, it does.

Q.   State's Exhibit No. 3 — is it, again, similar?

A.   Yes.

Q.   And it includes areas such as where the grandparent's house of Mr. Bartley is located at?

A.   Correct.

Q.   And does that accurately portray the area?

A.   Yes, it does.

Q.   State's Exhibit 4, again a Google map area.  Does this show the location of such places as Johnson Mill Pond, the McGuffin home, where the body was found, and also Hudson Ridge?

A.   Yes, it does.

Exhibit 5001 at 1383

D7 57                                                        McNeely  D

Q.   State's Exhibit 5, does that show, again, the location where Ms. Freeman's body was found?

A.   Yes, it does.

Q.   And State's Exhibit 6, the relationship of Hudson Ridge to where the body was found?

A.   Yes.

MR. FRASIER:   Your Honor, we'd offer State's Exhibits 2 through 6.

MS. McCREA:   There's no objection, Your Honor.

THE COURT:   Received.

(Whereupon Plaintiff's Exhibit Nos. 2, 3, 4, 5 and 6 were received into evidence.)

Q.   The areas we've been talking about in this case — Hudson Ridge, Lee Valley Road, City of Coquille, the McGuffin home, Johnson Mill Pond — could you tell us all what county and state they're located in?

A.   Coos County, Oregon.

Q.   Finally, did you grow up in the Coquille area?

A.   Yes.  I've lived here for 28 years.

Q.   Are you familiar with Hudson Ridge?

A.   Yes, I am.

Q.   Graduate from high school here?

A.   Yes, I did.

Q.   And high school — did you used to go mudding?

A.   Yes, we did.

Exhibit 5001 at 1384

McNeely   X    D7 58

Q.    Where?

A.    Lots of places, but Hudson Ridge was one of the places we'd go.  It was right near my friend's house.

Q.    And were you able to go mudding there year 'round?

A.    Yes.  There's creeks and stuff up there.  In particular, on the power line roads there's one that goes down into a creek bottom where there is mud there that you can go year 'round.

MR. FRASIER:    Thank you, Your Honor.  That's all I have.

THE COURT:    Cross?

CROSS EXAMINATION

BY MS. McCREA:

Q.    Officer McNeely, when you turned around at Sturdevant Park, you haven't been driving — well, you've been driving a patrol car?

A.    Correct.

Q.    Okay.  And what year is that patrol car?

A.    I honestly couldn't tell you, ma'am.

Q.    Okay.  It has power steering?

A.    Yes, it does.

Q.    All right.  It wasn't a 1967 Mustang that you were using to try to turn around?

A.    No, it was not.

Q.    Okay.  And it would be — your patrol car, I'm

Exhibit 5001 at 1385

D7 59                                              McNeely  X

assuming, is kept in good mechanical condition?

    A.   I hope so.

    Q.   No problems with the linkages or having the gears get stuck, that kind of thing?

    A.   No, ma'am.

    Q.   And most likely it's an automatic transmission?

    A.   Yes, it is.

    Q.   Okay.  Now - - -

            MS. McCREA:    If I could approach, Your Honor?

            THE COURT:    You may.

    Q.   Since you're conveniently here, Officer McNeely, I'm going to show you what's been marked for identification as Defendant's Exhibit 124.  Is that a Google map of the Johnson Mill Pond?

    A.   Yes, it is.

    Q.   And does that appear to fairly and accurately depict that area?

    A.   Yes, it does.  Yep.

    Q.   All right.

            MS. McCREA:    We'd offer - - -

    Q.   Did you want to say something else?

    A.   No.  I just said yes.

    Q.   Okay.

            MS. McCREA:    We'd offer Defendant's Exhibit 124, Your Honor.

Exhibit 5001 at 1386

McNeely   X     D7 60

MR. FRASIER:    No objection.

THE COURT:    Received.

(Whereupon Defendant's Exhibit No. 124 was received into evidence.)

Q.   So, Officer McNeely, in this case we have — we have testimony from — I believe it's Deputy — I'm sorry if I don't get the — from Deputy Oswald that a receipt was found near the first fork up at Hudson Ridge.  Are you familiar with that?

A.   Yes, I am.

Q.   Okay.  Because I know you've been in and out during the — but, you're familiar with the case, right?

A.   Yes.  Correct.

Q.   And the testimony also was that there was evidence, or an indication when Deputy Oswald looked at that area near the receipt, that a vehicle had either spun out or turned around.  There were indications of tire tracks, okay?

A.   Okay.

Q.   Now, in terms of where one goes mudding in the summer, for example in June at Hudson Ridge, that the creek area — the muddy area is different than the location near that fork in the road that Deputy Oswald described, isn't it?

A.   It's not in the exact location.  No, ma'am.

Q.   Well, is it a ways away?

A.   No.  You can go up — do you want me to use the map?

Q.   Sure.  Go ahead.

Exhibit 5001 at 1387

D7 61                                        McNeely  X

A.    Fairview Road comes off like this, and this is where that park is where the jury view was.  Then you go up here and there is a power line road that runs along there that a lot of the kids would go on, and go just four wheeling all the time. There's a little flat spot up on top that kids will party at and stuff.

And that road that Kip is talking about is before that and it kind of comes around and links back up to this road.  And then you go down this road long enough there's a — kinda like a "U" shaped like that and the creek is in the bottom.  But, you could either access it from this road or from going from that road.

Q.    So, the receipt — would it be fair to say the receipt was closer to where the shoe was found than to where the area of water was found?

A.    Correct.

Q.    Okay.  Thank you.

MS. McCREA:    That's all the questions I have.

THE COURT:    Any redirect?

MR. FRASIER:    That's all I have, Your Honor.

THE COURT:    You may step down.

WITNESS:    Thank you, Your Honor.  Do you want me to take that down?

THE COURT:    No, that's fine.  You can leave it.

Exhibit 5001 at 1388

D7 62

MR. FRASIER:    Call Dr. Olson.

THE COURT:    How long will he be?

MR. FRASIER:    Uh, my direct will probably be fifteen, twenty minutes, Your Honor.

THE COURT:    Let's take our recess now and then we'll get it all done.

Everybody remain seated until the jury has a chance to go the jury room.

Take your notes, remember the admonition.

(Jury out.)

THE COURT:    Ten forty-five.

(RECESS)

(Jury in.)

THE COURT:    Be seated, please.

Call your next witness.

MR. FRASIER:    Your Honor, before I do that, I have State's Exhibit 241, which is an excerpt of the Grand Jury testimony of Heather Reid.  I would offer the exhibit and would then like to play that.  It's real short — a couple minutes.

THE COURT:    Okay.

Any objection?

MS. McCREA:    No, Your Honor.

THE COURT:    Received.

(Whereupon Plaintiff's Exhibit No. 241 was received into evidence.)

Exhibit 5001 at 1389

D7 63                                                    Olson  D

THE COURT:    And you can play it.

(Whereupon State Exhibit 241, the audio tape of the Grand Jury testimony was published for the jury.)

MR. FRASIER:    Now, we'll call Dr. Olson, Your Honor.

THE COURT:    Okay.

Step forward please, sir.  Raise your right hand.

JAMES NORMAN OLSON

was thereupon produced as a witness on behalf of Plaintiff and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat here, please.

DIRECT EXAMINATION

BY MR. FRASIER:

    Q.   Could you state your name please, sir, and spell your last name for the record?

    A.   Dr. James Norman Olson, O-L-S-O-N.

    Q.   And what is your occupation, sir?

    A.   I'm a physician and I specialize in hospital pathology, as well as forensic pathology.

    Q.   Could you tell us, sir, a little bit about your training and education?

    A.   After high school, four years of undergraduate work

Exhibit 5001 at 1390

Olson   D    D7 64

with a Bachelor of Science degree at the University of Washington, four years of medical school at the University of Washington, a year of internship and then — also at the University of Washington, Pathology residency at Tacoma General Hospital in Tacoma, Washington — so, basically, twelve years.

I'm Board Certified in Anatomic, clinical and Forensic Pathology and actively engage in the practice of both disciplines.

Q.    You indicated you're Board Certified in Forensic Pathology.  First of all, what does it mean to be Board Certified?

A.    Board Certification is a national examination in the various specialties in medicine and in pathology.  It includes the two primary disciplines of anatomic and clinical, which would be surgical pathology or running a laboratory — hospital pathology, essentially.  And then there are several sub-specialties, like (not understandable) Pathology or corensic Pathology, Microbiology, Blood Banking, Molecular Diagnostics.

At any rate, you take a national examination.  The first one is three days of rigorous testing.  And if you pass it, you are Board Certified in Anatomic and Clinical.  And then the sub-speciality examinations are held, I think, just once a year and they're a one-day test, testing your knowledge to see if you're, at least on a national level, judged to be competent to practice that particular branch of medicine.

Exhibit 5001 at 1391

D7 65                                                    Olson   D

Q.    And how long have you been Board Certified in Forensic Pathology?

A.    Uh, 1997.  I practiced quite a bit before that.  But, I challenged the boards on the basis of experience in 1997 and passed them.

Q.    Now, could you tell us what the sub-specialty Forensic Pathology — what is that?

A.    It's the discipline of pathology and medicine, in particular, that applies basically the knowledge and principles of medicine to resolution of medical legal issues, obviously such as we're engaged in today.

Q.    And you have done what's sometimes referred to as autopsies?

A.    Yes, I have.

Q.    How long have you been doing those, sir?

A.    I've been doing them since residency.  So, basically, almost — oh, gee, you'd be looking at since '72.  So, almost 40 years.

Q.    In regards to Coos County, do you have a position or contract with Coos County?

A.    I contract with Coos County, as well as several other counties, on an annual basis to perform the autopsies for the county and serve as the designated Medical Examiner for this county, as well as several others.

Q.    And what is your job as the Medical Examiner?

Exhibit 5001 at 1392

Olson  D    D7 66

A.    The Medical Examiner supervises the various — in my case, I supervise the various county Deputy Medical Examiners. You've already heard testimony from the Coos County Deputy — Chief Deputy Medical Examiner, Coos — Kris Karcher.  She has counterparts — excuse me, she has counterparts in other counties performing the same function.  And we discuss the cases, determine if an autopsy or toxicology is necessary. Yeah.

THE COURT:    We're getting him a glass of water.

WITNESS:    Thank you.

A.    Anyway, I can continue.

Q.    Go ahead.  Your work as the Medical Examiner — are you asked to make determinations on what — go ahead.

A.    Thank you.

Q.    Are you asked to make determinations of what the manner and cause of death are?

A.    Yes.  That's our function.

Q.    Could you tell us what "manner of death" means, and "cause of death" means?

A.    Well, cause of death precedes the manner.  Cause of death would be the actual injury or disease process that sets in place the physiologic derangements that lead to death.  And the manner of death is the — basically, five categories, which would be natural, which is the overwhelming majority of cases

Exhibit 5001 at 1393

D7 67                                              Olson  D

we see; accident, which would be probably the second most frequent category; suicide, which has also, especially now in the times we live in, become quite a frequent category, as well; homicide, obviously hands — death at the hands of another individual, or individuals; and then undetermined.

There's another category, which is a transitional category of pending investigation, which ultimately, after all avenues of investigation are exhausted the cause — or, manner of death is described either to undetermined or to another category.

Q.   And when you're doing what's referred to as a forensic autopsy, could you just briefly explain to the jury what you do in that type of an examination?

A.   In a typical forensic autopsy of — actually, most any autopsy, really — should be proceeded with careful review of the information that's available at the time preceding the autopsy up to the autopsy, itself, which would include any police briefings, in the case of a homicide or an accident — an unnatural death; review of medical records that are — that can be obtained prior to the autopsy — just generally acquiring all the information you can.

It then would proceed to the autopsy, itself.  Would be examination of the body, a careful examination externally, trying to take samples or any evidence — trace evidence that might be on the body is collected, photographed, documented

Exhibit 5001 at 1394

Olson   D     D7 68

prior to the actual removal of clothing and examination of the unclothed body.  It proceeds, depending on the type of the case — you know, if it's a completely natural death, you don't need to spend a great deal of detail on that particular part of the examination.

In a case like this, greater detail is required. But, all of the clothing, any unusual items on or about the body that are brought with it to the autopsy, are described and documented and possibly taken into evidence.

And then the body is described, it's general physical descriptors — size, age, weight, appearance of the body as you are receiving it — whether it's a death that appears to have been recent or, in this particular case, where you're dealing with badly decomposed remains.  They're described as such.

But — and then an internal examination, which typically involves a complete examination of the head, neck, chest, abdomen and extremities, where required, dissection and retention of tissues and fluid on tissue samples for other examples, such as DNA or toxicology.

Q.    Now, directing your attention, sir, to August the 4th of the year 2000, were you asked to perform a forensic autopsy on the remains of what was determined to be Leah Freeman?

A.    Yes, I was.

MR. FRASIER:    Your Honor, could we approach?

THE COURT:    Yes.

Exhibit 5001 at 1395

D7 69                                                    Olson  D

(Bench conference, not recorded.)

THE COURT:    As I did yesterday, ladies and gentlemen, there is going to be one picture of the remains of Ms. Freeman on the autopsy table.  And it probably is even a little bit more graphic than the other two.  And so what I've told other people is, if they do not to remain in the courtroom while that's being shown, this is the time to leave because I want absolutely no reaction to anything from anybody at this point in time.

So, if you're not comfortable being in here with that, then you should leave.

Q.    Dr. Olson, I'm going to show you what we've marked as State's Exhibit No. 245 and ask if you can identify this?

A.    This is a photograph taken as the body was received and removed from body bags — two of them — and the body was placed on a piece of plywood to facilitate removal.  And it shows a depiction of the individual in her state prior to anything other than just an external examination.

THE COURT:    Can everybody on the jury hear the doctor?

(Inaudible response.)

THE COURT:    You have a soft voice, and other times you talk a little rapidly, so it's hard to follow.  So, if you could keep your voice up, please.

WITNESS:    Okay.

Exhibit 5001 at 1396

Olson   InAid D7 70

And, Mr. Frasier, you were standing there. That's why I asked.

Q. And does this picture accurately portray what you saw?

A. Yes, it does.

MR. FRASIER:  We'd offer State's Exhibit 45.

MR. McCREA:  May I inquire briefly in aid of objection?

THE COURT:  Yes.

EXAMINATION IN AID OF OBJECTION

BY MR. McCREA:

Q. Doctor, does this photograph, Exhibit 45, in any way assist you in giving your opinions concerning the results of the autopsy?

A. I think it just depicts the condition of the body that we were dealing with and the limitations that will probably be discussed further on.

Q. Is that — you think it would be of assistance?

A. I would say yes.  I think so.

Q. Pardon?

A. Yes, I believe it will be of assistance.

MR. McCREA:  We have no objection.

THE COURT:  Received.

(Whereupon Plaintiff's Exhibit No. 45 was received into evidence.)

Exhibit 5001 at 1397

D7 71                                        Olson   D

DIRECT EXAMINATION (Continued)

BY MR. FRASIER:

Q.   If you'd grab that, Doctor — there's a laser pointer here with a red dot on top.

I put State's Exhibit 45 up on the screen.  Could you describe the condition of the body for us, please?

A.   The body was significantly decomposed.  We're dealing with an interval of, I think, a little over five weeks, at least.  That's the head, residual hair — blonde hair that certainly was consistent with the last photograph taken of the decedent and, I believe, used in a missing persons report or flyer.

Right side of the head, essentially, skeletonized. That would be the right lateral surface of the skull and facial structure.  It's a little dark and difficult to see that the body is fully clothed.  And, again, clothing that pretty much matches what was described as the decedent's clothing on or about the time she disappeared.

It's soaked in dark brown in multiple areas, and that's the result of fluid oozing out from the body as it decomposes.

Q.   And how you would classify the condition of this body?

A.   Well, I would say that she was probably close to almost being completely skeletonized.  No usable internal

Exhibit 5001 at 1398

Olson   D      D7 72

organs were left to evaluate for injury or disease.  And it was basically — the most intact part of the body was the right calf, which had somehow, just due to positioning, temperature, whatever, not been consumed by insects, animals or significantly decomposed.  And we were actually, as we may discus later, able to use that for toxicologic examination.  So, the right foot, ankle and calf were probably the best preserved parts of the body.

Everything else was down to skeleton and dried, mummified skin.  That, itself, was also significantly discolored, most of which being a brown to black color.  The best preserved skin and identifiable Caucasian skin was, again, on the right lower extremity.

Q.   Dr. Olson, could you describe for the jury what you did in examining this body?

A.   What I did was, basically, take it as I saw it, layer by layer, and describe the body in the position, roughly, that we received it.  The right arm was up and behind the body in kind of an unusual, awkward position.  The left was resting across the front of the body, about the abdomen, lower chest level.  I described the clothing, any — the general condition of the clothing and any holes that — of which there are numerous holes, which I was of the impression were due to post mortem animal activity, depredation of the body.

And then just removed the clothing, item by item,

Exhibit 5001 at 1399

D7 73                                    Olson   D

gave it a description and then proceeded describing the body as I saw it from head to toe, detailing the general condition, skeletonization of it, the condition of what residual tissue was left, what items — what parts of the body had decomposed and were no longer there or recognizable.  In this particular case, I would include the brain, the entire central nervous system, all of the internal organs from the neck, chest and abdomen and pelvis — none of those survived.

Q.   Now, in examining the remains, first of all, did the body still have braces on the teeth?

A.   Yes.  There were braces — upper and lower braces on the — on both — or, rather, on the teeth.

Q.   An identification was made that this was the body of Leah Freeman based on dental records?

A.   It was.  At the end of the autopsy, two dentists — I believe practicing in the Roseburg area — volunteered to examine x-rays that were provided — dental x-rays by her regular dentist or orthodontist, I guess, and confirmed that they certainly matched those x-rays and made an identification of the decedent.

Q.   And while I'm thinking about it, prior to the autopsy, were x-rays taken of the body?

A.   Yes.  A full set of x-rays were taken.  And the autopsy, itself, was performed at the Douglas County morgue in Roseburg.  And x-rays were obtained at Mercy Medical Center, a

Exhibit 5001 at 1400

Olson  D     D7 74

hospital — the hospital in Roseburg, I guess, under the supervision of the Deputy Medical Examiner for Douglas County, at that time Rick Benowait (phonetic).  And a full set of skeletal x-rays were obtained that were examined prior to the autopsy.

Q.   And did you examine those x-rays?

A.   I looked at them, yes.

Q.   And what did you find, if anything?

A.   I didn't see anything that would suggest gross trauma.  I didn't see any obvious fractures of any of the bones.  I didn't see any retained foreign objects, such as a bullet.  I didn't see skeletal trauma that would suggest possible gun shot injury.  I didn't see anything that suggested remnants of a — say a knife or other sharp force implement being in the body or a fragment of it.  In short, basically, it was a negative examination.

Q.   Now, in your examination, as part of the — after the clothing was removed — in your experience have you dealt with persons who have been stabbed?

A.   Yes.  I've had several this year and I have one to do as soon as I'm done here.

Q.   And have you, in the course of your experiences as a forensic pathologist, found on bones of a deceased individual who has been stabbed, evidence that they've been stabbed?

A.   Yes, I have.

Exhibit 5001 at 1401

D7 75                                              Olson   D

Q.   And could you describe what you would be looking for in that situation?

A.   Well, typically, if it's a stab wound to the chest, it would be difficult in most cases to miss a rib.  So, there usually is sharp incised wound, either completely through in some cases or at least partially through one or two ribs, depending on the width of the knife and its orientation when the stab wound is inflicted.

You could conceivably slice someone's throat, which is essentially a deep incised wound, and not do damage to the (not understandable) bodies.  So, I have seen that without significant skeletal trauma.

Stab wounds to the extremities, it may or may not — depending on the depth of the muscle and soft tissue — strike a long bone.  So, it varies.  But, typically a stab wound to the chest would be — it's difficult to envision the majority of those being accomplished without at least some rib injury or injury to the sternum, the breast bone.

Q.   Now, did you also visually inspect the ribs, the vertebrae, what have you, of Ms. Freeman's body?

A.   Yes, I did.

Q.   And what, if anything, did you find?

A.   I didn't find any trauma of any sort.

Q.   Did you find any evidence that she'd been stabbed?

A.   No.

Exhibit 5001 at 1402

Olson   D    D7 76

Q.    Did you find any evidence that she had been shot?

A.    No.

Q.    Her skull — what was the condition of her skull?

A.    The skull showed no fractures.  A complete examination — I removed what residual scalp and facial skin that was on the skull and examined the cranium itself, as well as the facial bones in the jaw and the cervical — or, neck, vertebrae.  I did actually examine the entire (not understandable) column.  But, I found nothing.

Near the end of the autopsy, after having examined the skull externally, I did treat it as we would a normal autopsy to remove the brain, and used a bone saw and removed the top of the — of the skull and found the brain was completely decomposed.  But, there were no obvious fractures externally or internally, and no retained objects inside the skull.

Q.    Now, you're — are you familiar with the — well, let's back up a little bit.  In regards to the rib cage, we've talked about being stabbed.  If somebody had been shot, what type of things would you be looking for there if they'd been shot in the chest area?

A.    You could — I mean — it would be difficult, again, if you're shot in the chest, most of the time there will be a perforating injury to a rib or ribs, and possibly not just the front ribs.  Say that you're shot from the front or side, but

Exhibit 5001 at 1403

D7 77                                        Olson  D

also additional ribs if the bullet itself exits.  There's also the possibility of damage to the breast bone or to the vertebral column.

Q.    And did you find any type of injury to the ribs or that type of thing indicating that Ms. Freeman had been shot?

A.    Nothing that suggested that she had been shot.  I mean, it doesn't absolutely exclude it.  But, I didn't see anything that would have pointed towards that.

Q.    Now, you indicated there was some skin that had mummified?

A.    Most of the skin that was left had become leather-like and brown to black in color.

Q.    And you examined what was left of the skin?

A.    I did.  And the intact parts on the extremities and elsewhere on the body I examined it and I couldn't find any obvious injuries.

Q.    Now, in regards to the chest area, was there any skin left from that area?

A.    Very little.

Q.    But, you were able to find some?

A.    Some, but I didn't — most of the useful skin was over the left side of the face and then over the — what was left on the forearms — some on the hands and the lower legs.

Q.    Now, as part of your examination, do you also try and do toxicological examinations?

Exhibit 5001 at 1404

Olson   D    D7 78

A.    I do.  In a case like this, if it — she were completely skeletonized, it would not have been possible under usual circumstances.  But, as I alluded to earlier, there was actually surprisingly well-preserved muscle — calf muscle in the right lower leg.

Q.    And did you excise part of that?

A.    I did.  I took 120 grams of that.

Q.    And did you cause that to be tested for the presence of controlled substances?

A.    I did.

Q.    And what were those results?

A.    The results were negative.  The tests that were performed on the muscle were negative for amphetamine; methamphetamine; cocaine and its metabolites, including a metabolite, coke-ethylene that will result if alcohol and cocaine are used simultaneously; morphine, as well as one of the metabolites that would be seen from heroin — heroin is basically a form of morphine — were tested.  And that was negative.

And then a blood organic-based screen was performed that is described as negative.  And the blood organic base would typically include common drugs that we would see therapeutically, as well as common drugs of abuse — prescription drugs such as tranquilizers, synthetic narcotics, antidepressants, antihistamines, some anesthetics, topical

Exhibit 5001 at 1405

D7 79                                             Olson   D

anesthetics.  So, that particular exam would exclude a broad category of drugs that might be abused or used.

Q.   Nothing was found?

A.   Nothing was found.  The toxicology results were negative.

Q.   Now, did you also — well, are you familiar with the concept of strangulation?

A.   Yes.  I've seen that many times.

Q.   And I think some people, when they watch TV, they think strangulation means cutting off the breath.  Is that all that's entailed?

A.   No.  Typically, strangulation can involve multiple modalities.  The biggest, most significant would be cutting off vascular supply to the brain, leading to unconsciousness.  There's also the possibility — in some individuals there's a part of the carotid artery that supplies the brain, and where it branches into the part that goes into the brain and the external branch that supplies parts of the face and jaw — there it is the carotid sinus.  And that helps in regulating blood pressure and heart rate.

And so, conceivably, if you pressed on that you could cause reflex standstill of the heart, or stoppage.  The opposite would be if you pressed below it, you could cause the heart to accelerate and possibly go in a tachycardic or rapid rate rhythm.  That's more of a physiologic event that can only

Exhibit 5001 at 1406

Olson   D    D7 80

really be surmised on the basis of circumstances and witnessed accounts.

Most commonly what you see is strangulation takes really not that much pressure.  And strangulation is typically hanging; ligature strangulation — in other words, some object — linear object like a cord, belt, whatever, wrapped around the neck; and then manual, which speaks for itself.  It's using the hands pretty much exclusively.  Implements can be used like a piece of wood or a bar, a flashlight, whatever.

And, typically, it takes very little to cut off the blood supply to the brain.  The veins that drain — the main veins that drain from the brain back to the heart through other vessels — larger ramifying with large vessels — can be blocked in about four and a half pounds of pressure, which is easily achievable with most people in this room, if not all.

The carotid arteries — the main two arteries that supply the brain — can be blocked in about eleven pounds of pressure.  The other two arteries are the vertebral arteries that run up the back and side of the spinal column and are partially protected by arches of bone.  But, they take the greatest degree of pressure, and typically would only be occluded in a hanging.  And then they take about 66 pounds.

To actually block the airway, the trachea, takes about 33 pounds of pressure to compress it to the point that air won't pass through.

Exhibit 5001 at 1407

D7 81                                                    Olson   D

Q.   And if you're examining a body for evidence of strangulation, what do you look for?

A.   Well, typically, you would look for marks on the — about the individual, assuming that they were able to put up a struggle, unless they were extremely young or old and incapable of resistance, or unconscious or nearly so for drugs, alcohol, whatever.  But, typically you would expect in a manual strangulation to see marks — fingernail marks, which can either be just, basically, an impression — kind of a curve — a linear mark from the fingernails, themselves.  And that depends upon the — how long they are.  It's conceivable that some people have very short nails and may not even make an impression.

You can get scratches, which are just linear abrasions where the skin is scratched.  You can get somewhat — marks that are sometimes called claw marks, where you dig in and pull down and it looks like a claw — sort of a "U" shaped abrasion.

You can also get the marks from the decedent, or victim, where they're trying to relieve the pressure and pull the hands off.  And their fingernails may also dig in.

You can get bruises from fingertips, the thumbs.  So, it all depends on what's used.  If it's just purely one or both hands, then those are the possibilities.

Q.   Now, in examining the remains of Ms. Freeman, were you able to do that type of an examination?

Exhibit 5001 at 1408

Olson   D     D7 82

A.    No.   That was impossible due to the level of decomposition.   I should also add that in a non-decomposed individual, typically in manual strangulation you'll get pin-point hemorrhages in the eyes over the conjunctival (phonetic) and the whites of the eyes and the membranes that surround it, over the eyelids and over the face.   And, again — and that's the vascular phenomenon due to backup and rupture of small vessels — capillary sized vessels.

In this case, that's not possible.   We don't have any — any tissue that would be of any use for that left.

Q.    Do you look for, when you do these types of examinations — when you do an internal examination of the neck, do you look for what's called the hyoid bone?

A.    Well, you look for fractures and they're most commonly seen with manual strangulation.   You have several structures that can fracture and be damaged.   The hyoid bone is an interesting bone.   It's shaped like a horseshoe.   It's positioned above the larynx.   So, if this is your voice box — top of it — it's about here.   It's "U" shaped, so it's about like this and it heads up towards the back.   And it, basically, anchors muscles to the tongue and several muscles that are used in our speech.   It doesn't articulate with any other bones directly.

You would also look at the larynx, itself — the thyroid cartilage which, in addition to forming the bulk of the

Exhibit 5001 at 1409

D7 83                                    Olson   D

voice box and having this sort of wedge or "V" shaped configuration that we can feel on ourselves, in the back has two little projections that stick up called the superior horns. And they are subject to being damaged and fractured, as well.

You could, conceivably, fracture directly the larynx, itself, the larger part of it.  And you could also fracture portions of the cricoid cartilage — a wing shaped, or actually shaped like a ring — a signet ring — that is immediately below the thyroid cartilage.  And you might, depending on where you — you might even damage tracheal cartilages.

But, that plus-muscle damage — there are multiple muscles that invest the neck.  You've got these two large ones that we can all see and feel on our side — the sternocleidomastoids.  They can show hemorrhage from pressure on them and damage to blood vessels.  It's basically bruising.

You can — and then there's an investment of very small muscles that we call the strap muscles that run up and down.  There are several of them.  And you, layer by layer, reflect those, looking for hemorrhages and injuries.

Q.   In your examination of Ms. Freeman, did you check the throat area that you've been talking about?

A.   Yes.  The only structure left was the hyoid bone. All of the other structures were decomposed and lost.

Q.   Now, the hyoid bone — is it actually one bone or is it several bones?

Exhibit 5001 at 1410

Olson   D     D7 84

A.    It depends on the age of the individual.  On a young individual like this — Leah Freeman, at age fifteen, it typically is not fused.  So, it's actually three parts.  You have a front part and then the two horns that project to the back — towards the back or posterior surface of the body.

As you age in possibly your late teens, early twenties, those can fuse.  And certainly in older people, it's not uncommon to have the entire bone fused to form one basic horseshoe shaped bone.

And in a young individual, it is possible to strangle without damage to any of the bones or structures I've discussed, because they're still largely not calcified. They're rubbery — the consistency of cartilage.  And so, typically, a young person such as this — Leah Freeman — may not show fractures of any of these structures because they are rubbery and resilient and not prone to fracture.

Q.    Now, you indicated the hyoid bone was present?

A.    I was able to identify it — all three parts of it. It was not fused.  It was in three parts.  And there was no obvious fracture of it.  If there was any hemorrhage around it, that was impossible to tell because of the state of decomposition.

Q.    Dr. Olson, we've heard testimony, at least from one witness, that claims the Defendant strangled the female.  Did you find any evidence in the course of your autopsy that would

Exhibit 5001 at 1411

D7 85                                        Olson  D

exclude strangulation as the cause of death?

A.    No.  I found nothing that would exclude it.  I didn't find anything that would make it unequivocally possible to say that she was strangled.  But, I could not exclude it.  No.

Q.    Now, during the course of your — the autopsy, you are called upon to determine cause and manner of death?

A.    Yes.

Q.    And what did you determine in this case?

A.    Well, based on the total case — the situation and everything that I knew — and bear in mind I'm doing this autopsy almost five and a half weeks after her disappearance, so a lot had been done in the interim, which I assume by now you're all aware of — based on the totality of circumstances, I — basically, I would have two options in a case like this.  One would be just to call it homicidal violence of undetermined type.  Or, the other would just be to say undetermined.  However, I chose to call it homicidal violence of undermined type because of the circumstances, notably finding other items of her apparel, one of which had blood on it.

You have, basically, a disappearance of a young, as far as all the records suggest healthy young woman, and she's — she's dumped.  There's no question that she's dumped in an area that was probably intended to, hopefully, conceal her remains, perhaps indefinitely.

As I've already said, the bloody — the blood on the

Exhibit 5001 at 1412

Olson    InAid D7 86

shoe, while not a lot of blood, certainly points to some sort of injury to this individual, especially since it could be traced as being her blood.  I felt that, while I couldn't come up with a precise type of homicide — i.e. strangulation, gunshot, beating — and blunt force trauma is not excluded in this case, either.  Just because there aren't fractures doesn't exclude significant blunt trauma to the head.

So, I chose the option of calling it homicidal violence of undetermined type.

Q.    And was the Death Certificate prepared for Ms. Freeman?

A.    Yes, it was.

Q.    I'll show you what's marked as State's Exhibit 244. Does this appear to be a copy of her Death Certificate?

A.    Yes, it is.

MR. FRASIER:    Your Honor, we'd offer State's Exhibit 244.

MR. McCREA:    Again, Your Honor, may I just inquire briefly?

THE COURT:    You may.

EXAMINATION IN AID OF OBJECTION
BY MR. McCREA:

Q.    Dr. Olson, as I understand, you indicated here homicidal violence of undetermined type, not as a medical opinion based upon your observations, but as a combination of

Exhibit 5001 at 1413

D7 87                                                    Olson  D

what you observed medically, combined with sort of a detective process of the surrounding circumstances.  Is that correct?

A.    Yes.

Q.    All right.  Thank you.

MR. McCREA:    With that understanding, there's no objection. Your Honor.

THE COURT:    Received.

(Whereupon Plaintiff's Exhibit No. 244 was received into evidence.)

DIRECT EXAMINATION (Continued)

BY MR. FRASIER:

Q.    Dr. Olson, the state of decomposition that you saw in this body — how long does it take a body that's left out in the open to get to this type of condition?

A.    Well, this is the worst season of the year you could pick, because I've seen bodies that have been dead a few days to a week, if left out, where they can be accessed by flies. And insects are the biggest factor in removing tissue.  You could conceivably, in a fresh body, have large animals — I've seen bears, dogs, coyotes, smaller things like racoons, whatever, that get involved in the process, as well.

You could — you could have — obviously, the case speaks for itself.  This only took five weeks.  But, I've seen less and I've seen — I sort of have my own — you might call it bone farm.  I have a farm in the Applegate Valley and

Exhibit 5001 at 1414

Olson   D      D7 88

periodically I lose a cow or whatever.  And I've seen cows and even sheep, when I used to do that, go down to this level in a matter of a couple weeks.

Q.   Now, in regards to the — well, let's say that, hypothetically, Ms. Freeman was stabbed in the chest.  Are you familiar with the concept of blood pooling?

A.   Yes.

Q.   Could you tell us about that?

A.   Well, if she was stabbed in the chest or any other body cavity, it depends on the position that she remains in.  If she were down and supine, it's possible that the majority of the blood would pool in the cavity before it would start to exit the body.  So, you may not have a substantial amount of blood actually exiting the body.  I mean, if she'd been upright and trying to evade her — the person assaulting her and been running around, you might have blood — quite a bit more blood on her body, as well as at the scene.

But, if — you could conceivably stab somebody in one of the major body cavities, have quite a bit of blood loss, and not have a tremendous amount exiting through the wound, itself, whether it's a gunshot or stab.  A stab is more likely to close on itself because it's a narrow wound without a lot of collateral damage to the soft tissue.  And the edges tend to re-oppose once the weapon is withdrawn.  So, it is conceivable that you could have a minimal loss of blood externally, at

Exhibit 5001 at 1415

D7 89                                              Olson  X

least for awhile.

Q.    Thank you.

MR. FRASIER:    That's all the questions I have, Your Honor.

THE COURT:    Mr. McCrea?

CROSS EXAMINATION

BY MR. McCREA:

Q.    Dr. Olson, in this case you were missing an awful lot of what you need to work with.  Is that the way it was?

A.    Yes.  I mean, basically, almost to bone.

Q.    I'm sorry?

A.    You're basically down almost to skeletonized remains.

Q.    And I do appreciate you speaking up.  As you can see

- - -

A.    (Interposing) Yeah.

Q.    And you don't have to be a doctor.

I'm kind of old and I don't hear as well as I wish I did.  So, if you would and we can get through this, I'm sure, very quickly.

And when you got her shirt off, you were actually looking sort of into the body cavity — into the torso, right?

A.    Yes.

Q.    There wasn't much of anything there except the bone?

A.    Yes.  And what was left of the tissue.

Q.    Excuse me?

Exhibit 5001 at 1416

Olson    X      D7 90

A.    And what was left of the tissue — I mean, the dried remnants of tissue.  Not much — I mean, no organs.

Q.    No organs?  And in the front, the skin had been consumed away by something?

A.    Yes.

Q.    Okay.  So, if — let's just go through this as carefully as we can as to what you had there.  In terms of toxicology, you took samplings from what was it, the thigh?

A.    No.  The back of the lower leg.

Q.    The calf?

A.    The calf.

Q.    You took muscle tissue?

A.    Yes.

Q.    And one of the problems with utilizing muscle tissue after a body has been out for awhile is that the insects and other organisms tend to extract the toxic things from the muscle tissue, don't they?

A.    Not necessarily.  In this case the muscle, as I described earlier, was surprisingly preserved and actually had kind of a pink-red color.  And it was encased in dried skin and there really was no actually maggot activity, or insect activity in the body of the muscle, itself, that I sampled.

Q.    Okay.  So, you felt this muscle tissue was probably pretty good to work with?

A.    I felt it was obviously the best chance we had to

Exhibit 5001 at 1417

D7 91                                        Olson   X

identify anything and, actually, all I'm concerned about at that point is not so much quantitation, although it could be performed, but just a yes/no answer: Are these drugs even present?  Are we dealing with anything that might point to a drug-related death?

Q.    But, one of the things you could have used instead of muscle tissue would have been to have hair samples checked for toxic substances?

A.    That's possible to do that.  You could possibly test hair samples.

Q.    There's a lot of hair samples there?

A.    Pardon?

Q.    And there was a lot of hair there?

A.    We took hair samples, but they weren't tested.  No.

Q.    But, they weren't checked for toxic substances?

A.    Well, it may not reflect the actual pre-mortem, anti-mortem levels.  They might, by themselves, also suggest yes/no, these drugs have been used.  But, it might also have suggested, depending on where you sampled in the hair, that they would have been used well — well before the death of the individual.

Q.    But, is the answer no, you didn't check them for toxic substances?

A.    No.  We checked the muscle.

Q.    And in terms of the toxic substances, you checked for the amphetamines — methamphetamine, amphetamine — the

Exhibit 5001 at 1418

Olson    X      D7 92

amphetamines, so to speak?

A.    That's correct.

Q.    You checked for it, right?

A.    Yes.

Q.    And then you checked the opiates?

A.    They were checked.  They would basically be —
morphine was checked, as well as several of its metabolites,
including one that is a breakdown from heroin to morphine.  And
then the alkaloid - - -

Q.    (Interposing) I'm not quite hearing you.  Are you
saying that the test did include heroin?

A.    Well, it included a metabolite.  Heroin is rapidly
broken down to morphine.  And the six — the one metabolite that
is tested and typically indicates the presence of it is 6-
Monoacetylmorphine.  It's the first stage in the breakdown from
heroin to morphine.

Q.    Down to morphine?

A.    Yes.

Q.    Okay.  Well, I'm not trying to take issue with you
here.  I'm just trying to get it covered what was checked.

A.    Right.

Q.    I'm looking at the Medical Examiner Toxicology
Report.  We dealt with the amphetamines.  And so as a group,
the morphine and heroin would be in the opiate group, right?

A.    They'd be part of it.  But, there — as we deal with

Exhibit 5001 at 1419

D7 93                                           Olson  X

quite frequently, there are a lot of other drugs besides

morphine and heroin now that we're dealing with.  Like

methadone is probably the biggest offender.

Q.  Did you check, generally, for opiates?

A.  The blood organic base screen should screen for

synthetic narcotics, as well as several other common drugs.

Q.  And then you checked what's set out in terms as blood

cocaine panel?

A.  That's correct.

Q.  Okay.  And that's it?

A.  That's it.  I mean, obviously, there are - - -

Q.  (Interposing) So, you didn't check for LSD?

A.  No.

Q.  And that's, what, lysergic acid diethylamide?

A.  Yes, closely.

Q.  And nothing was done to check for that?

A.  No.

Q.  What about — what's — what is the drug that is called

Ecstacy?  What is that?

A.  That's a spinoff of methamphetamine.

Q.  What about the so-called designer drugs?  What are

they?

A.  Most of those are spinoffs of the amphetamines.

Q.  You say most of them.  Are there some that are not?

A.  I'm not aware of any.  Cocaine changes.  I don't

Exhibit 5001 at 1420

Olson   X    D7 94

think any of the opiates require any sort of alteration to make them more effective or more desirable.  So, most of the designer drugs seem to be alterations of the general structure of methamphetamine.

Q.   And in any event, to the extent testing was done, you didn't find evidence of drugs, right?

A.   No.  The testing, as you described, is negative.

Q.   Now, Mr. Frasier talked with you at considerable length about strangulation.  And I just set that as a reference.  But, the fact of it is that you didn't find a single bit of evidence that strangulation had occurred, correct?

A.   No.  Nothing that would prove it occurred; nothing would disprove it as a possibility.

Q.   Well, a possibility, because you — there are a number — we'll get the possibilities.  But, there's no evidence that it occurred, right?

A.   No, not - - -

MR. FRASIER:    (Interposing) Asked and answered, Your Honor.

MR. McCREA:    Well, that's - - -

THE COURT:    (Interposing) Overruled.

Go ahead.

MR. McCREA:    Yeah.

Q.   I just want to know, yes or no, was there any

Exhibit 5001 at 1421

D7 95                                                    Olson   X

evidence at all that strangulation had occurred?

A.   No.  There was no evidence.

Q.   Thank you, Doctor.  I don't mean to make an issue.

And in this case, did you think that she probably was not shot, correct?

A.   It's not impossible to exclude it.  It's possible to get shot in parts of the body that — say the abdomen and through and through — obviously injure vital structures, bleed out, and not — and this body in this condition, where you can't examine for entrance/exit wounds, or any tissue damage, organ damage, it's basically along the lines of the strangulation.  I could not find any evidence that suggested it.  I don't think the autopsy specifically excludes it as a possibility.

Q.   If the bullet didn't hit a bone, you might not have any evidence that a bullet went into her or through her?

A.   That's correct.

Q.   And now let's deal with the stabbing.  And just to make it simple, Doctor, I'm looking at the testimony you gave in the Grand Jury.  And is it correct that she could have been stabbed?

A.   Again, it's right up there with the strangulation and the bullet.  If you stabbed her, say, in the abdomen and you didn't strike bone, we're left with nothing to be an indicator that she was stabbed.

Q.   All right.  And she could have had her throat cut?

Exhibit 5001 at 1422

Olson   X     D7 96

A.    It's possible, as well.

Q.    And you wouldn't be able to see — tell that, either?

A.    Not unless it had gone down to and damaged the vertebral column.  And I couldn't see anything in the neck vertebrae that suggested that.

Q.    You've already made it clear as far as strangulation that the hyoid bones were normal, so that didn't support strangulation?

A.    Well, it doesn't support it.  But, in a young person where, as I think I discussed earlier, everything is pretty elastic still, it is possible to strangle, manually, a younger person and not leave fractures of those bones.

Q.    I'm not taking issue with you, Doctor.  I just want to get it clear.

A.    Yes.

Q.    That didn't — now, if she had been stabbed just under the sternum — you were asked — excuse me.  Let me back up.

Mr. Frasier asked you a hypothetical regarding her being stabbed in the chest.  Do you recall that?

A.    Yes.

Q.    All right.  I want to modify that slightly and move it down to just under the sternum.  And if she were stabbed just under the sternum there would have been nothing that you were observing on her body that would show that this had happened.  Is that correct?

Exhibit 5001 at 1423

D7 97                                          Olson   X

A.    That's correct.

Q.    And so there's nothing you could observe on her body that showed this did not happen?

A.    That's correct.  I mean, you could conceivably, with an upward thrust of a knife beneath the sternum and chest cavity, strike the heart or another vital structure — large vessels and not have any marks on the bones.

Q.    But, I want you to assume in my hypothetical that we're dealing with an instrument, a knife if you will, or dagger, that is about one and a half centimeters in width, and that this stabbing takes place under the sternum.  Are you able to form an opinion, assuming that to be true, as to the internal damage — we're not talking about the bleeding; we'll get to that — but the internal damage that would do to the person?

A.    It depends on the length.  I assume that a blade of — you described it as one and a half inches?

Q.    I said one and a half centimeters.

A.    Oh, centimeters?  That's about a standard blade, maybe a little smaller.  It's three-quarters of an inch at the base of the blade, and then tapering single point — or, point, single edged.

Q.    Okay.

A.    Whatever.  Yeah, most of those — most of the knives that I see, apart from kitchen knives, steak knives, are

Exhibit 5001 at 1424

Olson   X     D7 98

folding pocket knives, typical of about four inches in length, maybe three-quarters to an inch at the base.  That would easily go up and access the heart, pulmonary vessels, aorta, and may not have any bone trauma, especially with an upward thrust if you were doing that.

Q.   So, such a thing could take place and you would not be able to see any evidence of it on the body?

A.   There, or elsewhere in the abdomen, where you may have no - - -

Q.   (Interposing) Right.

A.   - - - possible access to bones, at all.

Q.   And so — and this would be — would, or at least could, be fatal?

A.   Well, typically, in the center of the chest and an upward thrust of — as you described, it would most likely strike the heart and be fatal within a short time.

Q.   I'm sorry, Doctor.  I know that what you're saying is very clear to you.  But, I'm not hearing you.  If you could help me.

A.   Okay.  Can you restate the question then?

Q.   Oh, my question was, I guess to put it simply, would such a stabbing be fatal?

A.   Very likely.

Q.   And how quickly would it be fatal?

A.   If you strike the heart, it's just a matter of

Exhibit 5001 at 1425

D7 99                                                    Olson   X

minutes, if even that, before you would probably exsanguinate or fill the sack around the heart and compromise the heart's function.  You could strike the aorta.  You could strike — or, in combination of any of these — the long and major pulmonary vessels and bleed out.  And it could go from under a minute to perhaps several minutes, depending on what structures are damaged.

Q.   And it's correct, Doctor — and I'm just referring back to what you indicated to Mr. Frasier — that such a wound could be inflicted and it may or may not have substantial, or much of any, external bleeding?

A.   It's possible.  A lot of the wounds I see the people walk around for a bit and there is bleeding externally under their clothing and onto their shoes and onto the surface that they're standing on.  If the person went down right away, or were even stabbed in a, say, supine position on their back, it's possible that it would take longer for the blood to exit the body.  It would have to pool and then start flowing out. So, they're not absolute rules.  I mean, every case is a case unto itself.

Q.   Just as I said, it may or may not have any external bleeding?

A.   There may not be.  There may not be.

Q.   Now, with regard to blunt force trauma, is it — is it possible that the death here could have resulted from blunt

Exhibit 5001 at 1426

Olson   X    D7 100

force trauma?

A.    It could have.

Q.    And you didn't see any fracture of the skull?

A.    No.  But, you could still have substantial internal bleeding in and around the brain without skull fractures.

Q.    But, you have had personal experience with instances where there was blunt force trauma to the head that caused death without there being any evidence of the blunt force trauma on the body that you examined, right?

A.    That's correct.  I have.

Q.    Well, except inside?

A.    Except internally — hemorrhage — bleeding in or around the brain.

Q.    Yeah.  In that case, you were fortunate enough to be able to see a big blood clot on the brain?

A.    A subdural hematoma, typically, yes.

Q.    Hematoma?  Is that what you said?

A.    A subdural hematoma, typically, would be just over the surface of the brain and beneath the dense lining.

Q.    But, it was because you were fortunate enough to see this that you were able to determine that it had come from blunt force trauma to the head?

A.    Yes.

Q.    Okay.  And in this case, the brain was completely deteriorated and gone?

Exhibit 5001 at 1427

D7 101                                          Olson  X

A.    That's correct.

Q.    And you were — I'm trying to — I'm sorry, Doctor. Just give me a minute.  So, if this person had been struck by a — well, strike that.  I think we've covered that.

MR. McCREA:    May I have just a moment to review, Your Honor?

THE COURT:    Yes.

MR. McCREA:    I'm trying to be efficient here.

Q.    Oh.  One thing — you were advised there were blood spots on the sole of the shoe?

A.    Yes.  I think also near the top, as well, and perhaps on the lace.  But, yes, I was.

Q.    And you opined that that probably would be unlikely unless it came from some wound on the body?

A.    There has to be some type of injury that has broken the surface of the body and damaged vessels such that blood can be deposited on that surface in one form or another.

Q.    Okay.  And then to wrap this up, Doctor, you did the best you could with what you had, but you just can't tell us what happened to her?

A.    I can't tell you precisely what manner of injury she sustained or what caused her death precisely.  But again, as we discussed, the circumstances of this certainly militate against a consideration of a natural death.

Q.    Well, I'm not arguing with you.  I'm just — you can

Exhibit 5001 at 1428

Olson  ReD  D7 102

say she's dead, but you don't know how she came to be.  Is that a fair way to put it?

A.    Yes.

Q.    Pardon?

A.    Yes.

Q.    All right.  Thank you, Doctor.

MR. McCREA:    That's all.

THE COURT:    Redirect?

MR. FRASIER:    Thank you.

                    REDIRECT EXAMINATION

BY MR. FRASIER:

Q.    It is your opinion that she is a homicide victim?

A.    Yes, it is.

Q.    Now, counsel talked with you about checking the hair for drugs to see if there was any drugs in the hair?

A.    Yes.

Q.    Given the fact that you had taken the tissue and had that sent and analyzed, would there have been any scientific reason to check the hair?

A.    I think — I don't think so, because a lot of the hair analysis that is done — yes, there are drugs that will accumulate in the hair.  But, it's primarily a screening test that, say that you were supervising a drug recovery program for addicts, you would test the hair to see if they were being honest about being abstinent from illicit or prescription

Exhibit 5001 at 1429

D7 103                                        Olson   ReD

drugs.

And they could show up and you could, you know, say, "Well, this suggests since your last test that was performed that you've used drugs that we've told you not to use, or were trying to get you off being addicted to." So, it's kind of, in itself, a yes/no thing.

Using the muscle, which I think was a better specimen and surprisingly was fairly well preserved, given the circumstances and condition of the body elsewhere, we were able to perform a battery of tests that also — all I expected was yes or no. It might have altered the course of this. It may not have at all, had we detected any of these drugs, because it's not likely we could have adequately — I mean, you could probably perform quantitation studies, but how valid they would be would be disputable.

So, basically, the whole purpose of this testing was to say, "Yes or no? Are these drugs present? Are they a possible contributing factor, or are they even possibly the cause of death?" And we found no drugs that we could implicate as being suspicious or involved in her death, at least in the categories we tested.

We can't test for everything. I don't know how many of you have seen the Physician Desk Reference. It's this thick and in print so microscopic that even my old eyes, with glasses, have a hard time reading. But, so the number and

Exhibit 5001 at 1430

Olson   ReD   D7 104

possibility of drugs across the county is just enormous.  But, we test for what is most likely to be abused, what is most likely on the street and most common.

Q.   Now, counsel also asked you about — well, he used the hypothetical of being stabbed underneath the sternum.  In this case, there wasn't any skin left on the body to determine that?

A.   Not in that area, and there was no obvious injury to the underlying vertebral column that would suggest a stab wound where the tip might nick or strike the vertebral column or the bone.

Q.   But, in this case, she was wearing a shirt?

A.   That's correct.

Q.   And would that be an indicator?

A.   Typically it has.  And I've seen some cases, one of which is in this county, unsolved, of a fellow that went to complete skeletonization with minimal bone injuries that was stabbed multiple times and the best thing we had was his clothing, which was a coat, pants, shirt, and you could still identify obvious sharp force injury to the clothing.  It was better than having — as good as having the skin, itself.

Q.   And if the person had been shot in the chest — or if Leah Freeman had been shot in the chest or the abdomen, again, her clothing?

A.   Assuming she was clothed at the time, you would expect obvious damage to the clothing.  How much animal

Exhibit 5001 at 1431

D7 105                                          Olson   ReD

activity might alter that, because animals preferentially go to body orifices, whether natural or unnatural, and start working there — notably flies, and subsequently maggots.  But, I didn't see anything in the clothing that struck me as being the result of any type of injury, whether it's ballistic, gunshot wound, or knife.  I saw several holes which I described.  They all appeared to be the result — a lot of times the edges were frayed and the fabric was pulled outwards.  All of that, to me, suggested something I've seen multiple times, that it's just animal depredation.

Q.   Well, let me follow up with you there.  When the clothing was removed from Leah Freeman's body, did you examine it?

A.   I did.  And I described each item.

Q.   And did you see anything in the shirt or bra that caused you to believe she'd been stabbed?

A.   No.  The damage that I saw to those garments — I could not specifically implicate a gunshot wound or wounds, or stabbing.

Q.   Now, counsel also asked you — there was blood found on the bottom of one of Ms. Freeman's shoes — I believe her left shoe?

A.   That's correct.

Q.   Now, a person doesn't need to be stabbed to be bleeding, do they?

Exhibit 5001 at 1432

Olson  ReD  D7 106

A.    No.  No.  That type of bleeding could be seen from — as I said, I mean, the basic phenomenon is you've damaged the skin or a mucosal surface, like the inside of the lips, the mouth, elsewhere in the body — the lining of the hollow organs — and damaged blood vessels so the blood has escaped from the vessels themselves, and through the opening in the skin or mucosal surface.

Q.    Bloody nose?

A.    A bloody nose, bloody lip, blood in the mouth.

Q.    Thank you.

MR. FRASIER:    That's all the questions I have.

MR. McCREA:    Your Honor, may I just have one recross question?

THE COURT:    Go ahead.

MR. McCREA:    Counsel kind of enlarged a little bit.  I just want to ask - - -

THE COURT:    (Interposing) I don't think he enlarged anything.

MR. McCREA:    - - - one question.

THE COURT:    I'll allow you — so, I'll allow you to ask the question.

Mr. Frasier, if you have something, you can ask.

But, he didn't enlarge anything.

RECROSS EXAMINATION

BY MR. McCREA:

Exhibit 5001 at 1433

D7 107                                        Olson  ReX

Q.    Doctor - - -

MR. McCREA:    Thank you, Your Honor.

THE COURT:    Go ahead.

Q.    Doctor, did you make a microscopic examination of the shirt that came off of Ms. Freeman?

A.    No.  I wouldn't normally do that.

Q.    Thank you very much.

THE COURT:    Anything, Mr. Frasier?

REDIRECT EXAMINATION

BY MR. FRASIER:

Q.    Did you see a knife hole that was one and a half centimeters?  Would you have seen that?

A.    I didn't see anything that — if it had been a knife hole, initially, it had been distorted.  And it, basically, assumed an oval configuration with frayed edges.  So, it wasn't typical of what I would expect to identify on clothing in the course of a knife wound.

Q.    Thank you.

MR. FRASIER:    That's all I have.

THE COURT:    You may step down.  You are free to leave.

WITNESS:    Thank you.

THE COURT:    You don't have any of the exhibits?

WITNESS:    Where do I throw this?

Exhibit 5001 at 1434

D7 108

THE COURT:    You can just leave it right there.

WITNESS:    Okay.

THE COURT:    Mr. Frasier?

MR. FRASIER:    Your Honor, I'd like a few minutes to go over with the Clerk to make sure our exhibits are — our exhibit lists match up.  And, assuming it does, we will rest our case at that point.

THE COURT:    Okay.

Ladies and gentlemen, we will take the noon recess at this time.

Everybody else remained seated.

Leave your notes in the jury room.  Remember the admonition.  And I would say be back this time — let's say 1:30, because there may be a couple legal matters.  So, be back by 1:30.

(Jury out.)

THE COURT:    Cathy, I think that's it, but I'm not sure.  Will you check?

JUDICIAL ASSISTANT:    (Inaudible response.)

Okay.  Do you want to check now?

MR. FRASIER:    Yes.  I could check now, Your Honor.

THE COURT:    Okay.

Leave it on the record here.

This is not a time to talk in the courtroom.

Exhibit 5001 at 1435

D7 109                                    Motion

You can pause it for awhile, Dixie.  You can pause the FTR right now.

(RECESS)

(Jury out.)

MS. McCREA:    We've got, yeah, the Exhibit 84.  They can't rest yet.

THE COURT:    Well, with that exception, you're resting.

I'll either rule it in or out, so that's not going to make any difference on your motions.

MS. McCREA:    Okay.  That's fine.

THE COURT:    So, if I decide to receive it, whether you've rested or not, I'll receive it.

MR. FRASIER:    All right.

THE COURT:    So, go ahead and make any motions.

And you said you had — you might have some argument on 84.  So, I don't care if you make the argument on 84 first, or your motions first.

MS. McCREA:    Well, I'll go ahead and make my motion first, and then I'll argue on 84.

THE COURT:    Okay.

MS. McCREA:    All right.  So, pursuant to ORS 136.445, the defense moves for Judgment of Acquittal as to the charge against Mr. McGuffin, because the State's evidence does not support a verdict against Mr. McGuffin.

Exhibit 5001 at 1436

Motion       D7 110

The only direct evidence in this case was the statement of David Breakfield, claiming that Mr. McGuffin had confessed to him that Mr. McGuffin had strangled Leah Freeman. Clearly, we have no other evidence, including a cause or manner of death. We have an opinion of homicide, but no other proof that, in fact, there had been a crime, or that Mr. McGuffin was involved in it. And, thus, the state of the evidence is insufficient for any trier of fact to find the elements beyond a reasonable doubt.

In addition, under ORS 136.425(2), a confession alone is not sufficient to warrant conviction of a Defendant without some other proof a crime has been committed.

So, based on everything that has been put forward, Your Honor, the evidence is simply not sufficient and we ask the Court to grant a Judgment of Acquittal.

And, I'm sorry - - -

MR. McCREA:    (Interposing) May I?

MS. McCREA:    Mr. McCrea is pointing out to me I was generalizing Mr. Breakfield's statement, because Mr. Breakfield's statement was not that Mr. McGuffin testified that he had strangled Leah Freeman. His statement was, "I strangled that bitch," and then whatever else he said, "And I can kill you, too," or, "I can strangle you, too." The reference was intended, I submit, to reference Leah Freeman. But, of course, there is the position that that further dilutes

Exhibit 5001 at 1437

D7 111                                    Motion

the State's evidence.

THE COURT:    The Motion is denied.  Even without Mr. Breakfield's statement, I think there is sufficient other circumstances from which the jury could draw a conclusion that not only was the cause of death homicidal, but that Mr. McGuffin was the one who did it.  Whether they do that or not is up to them.  But, I think there's clearly sufficient evidence and inferences — reasonable inferences from the evidence that could be made.

So, the Motion is denied.

Now, 84?

MS. McCREA:    Concerning Exhibit — State's Exhibit 84, which is the written time line prepared by Mr. Brent Bartley, - - -

THE COURT:    (Interposing) Which is being offered for impeachment only.

MS. McCREA:    Which is being offered for impeachment only.

- - - in looking at Oregon Rule of Evidence 613, it is our position, Number One, that we don't have an adequate foundation to impeach Mr. Bartley, because my recollection of the — either the direct examination or the redirect examination by counsel was that the questions asked of him were limited to, "Is your — was your memory then. . ." — meaning back in 2000 — ". . .better than your memory now?"  And that there were no

Exhibit 5001 at 1438

Motion        D7 112

specific incidents or portions of that time line that he was questioned about specifically so that it could then be used to impeach him.

And my objection yesterday was additionally that it was hearsay.  And I continue with that objection.

And, Number Three, if in fact there is some basis — if there is some adequate foundation for impeaching him on one or more of those incidents in the time line, then it would be our position that the impeachment is limited to those things for which there was a foundation established.  That at most, counsel is entitled to then read those portions of the time line to the jury, but that it doesn't allow the State to submit the whole document into evidence.

Let me check with the senior counsel to make sure I didn't miss something.

Okay.  All right.

So, that's our position, Your Honor.

THE COURT:    Anything further?

MS. SOUBLET:    No, Your Honor.

THE COURT:    Well, I just — I haven't had time to go back over Mr. Bartley's testimony and I may do that.  And I think generally there were a lot of questions about that — the document, as a whole.  And everybody knew — and I think he was showing the document and went over — so, I think there's enough of a foundation there.  Whether I allow it, is a

Exhibit 5001 at 1439

D7 113                                    Motion

different question.  But, I will go over that.

One thing that I wanted to specifically mention to you just, as to the jury, it's generally been — I think the agreement is that the last two jurors in Seats 13 and 14 would be the alternates, unless some other — unless it was agreed on by some other party.

I merely wanted to point out that what I have noticed, although I don't think there was ever him falling asleep, Mr. Welch in Seat No. 1, at times, has come close to what I would think would be nodding.  He's been really heavy-eyed.  I've watched him a couple times.  I think I kind of coughed once and he's always opened his eyes and I never felt like he was sleeping, or I would have said something.

But, all the other jurors, I think, were extremely attentive.  And he's generally been attentive, although there's been maybe three or four occasions when I've noticed that.  But, it's not where I thought he was nodding off.

I'm merely telling counsel that now so it's not something that comes up later.  So, I don't care whether you do anything with it or not.  I had one criminal Defendant in a death penalty case told me he was happy with a juror sleeping or not.  So, I'm merely pointing it out.  And if counsel wishes to come up with some other solution, two alternates, that's fine.

Exhibit 5001 at 1440

Motion          D7 114

Okay.  1:30?

I have reserved seats.  The media seating that I've reserved, other than for the camera, I think I'm going to eliminate just because people who are not media sat there.  I think the media sat other places other than there.  So, I just — there was a lot of interest, at first, and I think that goes away.

But, the camera I will leave.  The rest of them I'm going to remove.

I will probably leave three seats for the defense.  You have two investigators.  You may have somebody else.

And three seats for the DA's Office.  You have Ms. Courtright, you have your investigator, and somebody from Victim's Assistance.  So, I'll leave three seats for each side.

The rest of it is going to be open seating, other than the one media for KCBY, because I see no need to reserve the seats anymore.

MR. FRASIER:    That's fine.

THE COURT:    And the two deputies, obviously.

MR. FRASIER:    All right.  Okay.

THE COURT:    Okay.

                (LUNCHEON RECESS)

(Jury out.)

THE COURT:    Be seated, please.

Exhibit 5001 at 1441

D7 115                                                    Myers  D

The objection to 84 will be sustained.  I don't find the basis for it to be used for impeachment, because I didn't — I listened to the testimony again and I didn't find any particular thing that was asked about that.  So, I'll sustain the objection.  It will be left not for the jury.

Okay.  Now you can bring the jury in.

(Jury in.)

THE COURT:    The State has rested.

And, Ms. McCrea, you may call your first witness.

MS. McCREA:    Thank you, Your Honor.  The defense calls Quinn Myers.

THE COURT:    Raise your right hand, please.

QUINN LESLIE MARIE MYERS

was thereupon produced as a witness on behalf of Defendant and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat up here, please.  And if you could scoot forward and move the microphone down so it's about there.  That's fine.  Great.

Go ahead, Ms. McCrea.

DIRECT EXAMINATION

BY MS. McCREA:

Q.  Would you state your full name and spell your last

Exhibit 5001 at 1442

Myers   D    D7 116

for the record, please?

A.   My name is Quinn Leslie Marie Myers, maiden name Cannon, C-A-N-N-O-N.  My now last name, M-Y-E-R-S.

Q.   And is it — do you prefer Ms. Myers?

A.   Sure.

Q.   Okay.  Ms. Myers, do you live here in town?

A.   I do.

Q.   And how long have you lived in the Coquille area?

A.   My whole life.  I grew up here.  I moved away to Eugene in 1999 to go to school for a short period of time, and then moved back.

Q.   Do you know Nick McGuffin?

A.   I do.

Q.   And how do you know him?

A.   We became friends when he was a freshman in high school and I was a sophomore in high school — became good friends.

Q.   So, he's a little bit younger than you?

A.   Uh huh.

Q.   And - - -

A.   (Interposing) A year younger.

Q.   I'm sorry?

A.   A year younger.

Q.   A year younger?  In — when the two of you were in high school, did you go to any kind of social events together?

Exhibit 5001 at 1443

D7 117                                              Myers   D

A.    I was a princess at my junior prom and I took him with me.  Yeah.

Q.    And was that a romantic situation?

A.    No.

Q.    Just friends?

A.    Yes.

Q.    Okay.  Did you know Leah Freeman?

A.    Um, I knew who she was.  I actually finished high school a year early, so I would have been a senior when she was a freshman.  But, I went to college, instead.  So, I had met her one time at Nick's house during the course of what would have been Nick's senior year when I was home to visit from college.

Q.    And did you understand that Nick and Leah were dating?

A.    Yes.

Q.    And you knew — well, did you know that there was an age difference between them?

A.    Yes.

Q.    And based on your experience in high school, was it unusual for a freshman to date a senior?

A.    No.  I did the same thing.

Q.    Okay.  Okay.  And did you have any sort of opinion about that type of relationship?

A.    Um, no.  To me, I kind of found it that when I was

Exhibit 5001 at 1444

Myers   D    D7 118

that age, the older boys had my maturity level and it was actually very common in this town — this small town that that happened.

Q.   Drawing your attention to June 28, 2000.  Do you remember where you were working that day?

A.   I worked at Claire's Boutique in the Pony Village Mall.

Q.   Do you remember what shift you were working?

A.   I worked the closing shift.  So, the store closed at 8:00, but I stayed and did paperwork until 8:30.

Q.   And then where did you go?

A.   When I got home, I drove to my boyfriend at the time, Daniel Lapine's house, on Ninth Street in Coquille.

Q.   I'm sorry?

A.   On Ninth Street in Coquille.  Daniel Lapine's house.

Q.   Okay.  Ninth Street and what, was the cross street?

A.   Um, Dean.  I mean, it was on — it actually wasn't on the corner.  It was on Ninth, but it's between Dean and Elliot.

Q.   And is that — where is that in relation to Central?

A.   Um, it's about two streets up from Central, I'm thinking.

Q.   Pretty close?

A.   Um, yeah.  I came on — when I came home, I drove past the high school to the stop light on Tenth and Central Avenue, and turned up Tenth to get to his house.

Exhibit 5001 at 1445

D7 119                                          Myers   D

Q.   And do you remember about what time you got to your boyfriend's house?

A.   Around 9:00.

Q.   I'm sorry.  Did you say who your boyfriend was?

A.   Daniel Lapine.

Q.   Okay.  Daniel Lapine.  And then at some point after you arrived there, did Nick McGuffin show up?

A.   He did.  I'm not exactly sure on the time.  I had been there probably at least twenty minutes.  I remember by what — it was dusk out.  It was the time of night where it's very hard to see, even with headlights on.  But, I could see Nick approaching as I was sitting inside.

Q.   And when you say "approaching," driving or walking up?

A.   Walking.  I didn't see the vehicle.  I saw him walking.  I was sitting where I could see out — I was about ten feet from the door, maybe, where I could see anyone who was walking onto the porch.  And I saw him as he was walking up to the porch.

Q.   And did he make contact with you?

A.   He did.  As soon as he made eye contact with me as he was walking up the steps — as he continued to walk in the house he said, "Is Leah here?"

MS. SOUBLET:   Objection. Hearsay.

THE COURT:   Sustained.

Exhibit 5001 at 1446

Myers   D    D7 120

You can't state what other people said.

WITNESS:    Okay.

Q.   So, he made contact with you.  Did he — did he stay very long?

A.   He didn't stay, at all.  As soon as I said, "No, she's not here," after he had asked, "Is she here," and I said - - -

MS. SOUBLET:    (Interposing) Objection. Hearsay.  Move to strike.

THE COURT:    Don't say what other people said. You can say what you said, but not what other people said.

WITNESS:    Okay.  I'm sorry.

MS. SOUBLET:    Your Honor, I'd move to strike and ask that the jury be instructed to disregard.

THE COURT:    As to what Mr. McGuffin supposedly said, that's stricken.  You're not to consider it.

Q.   Let me ask you this question.  Did Mr. McGuffin ask if Leah Freeman was there?

A.   Yes.

MS. SOUBLET:    Objection.  Hearsay.

Q.   What was his demeanor like?

A.   He seemed - - -

Q.   (Interposing) Wait just a second.

MR. McCREA:    (Not understandable.)

MS. McCREA:    Well, Your Honor, our position is

Exhibit 5001 at 1447

D7 121                                                    Myers  D

it's not hearsay.  It's an action on the part of Mr. McGuffin.

THE COURT:    Right.  But, you can't offer —
they can offer what he says.  You can't.

MS. McCREA:    Well, - - -

THE COURT:    (Interposing) If you have some
other — unless you have some other basis for it, it is hearsay
when you attempt to offer what your party says.  They can offer
it, because it's an adverse party, but you can't.

VOICE:    It's the state of mind.

MS. McCREA:    Yeah.  It's the — but, the
problem is, it's not being offered for the truth of it, but
going to his state of mind.

THE COURT:    Well, that can swallow the entire
rule.

MS. McCREA:    Well, let's do this.  Let me ask
her about his demeanor.

THE COURT:    That's fine.

MS. McCREA:    And then see if I'm to the point
of state of mind.

Q.    All right.  So, now — I'm sorry, Ms. Myers.  I didn't
mean to put you in this position.  What — did you notice Nick
McGuffin's demeanor when he came up to the door?

A.    He seemed worried, like he was looking for her.

Q.    Okay.  And in terms of your state of mind, it
appeared to you he was looking for someone?

Exhibit 5001 at 1448

Myers    D    D7 122

A.    Yes.

Q.    And did he say anything to you?  Just yes or no.

A.    Yes.

Q.    And was it an inquiry about the location of a person?  Just yes or no.

A.    Yes.

Q.    All right.  And the person he was looking for was not at the residence?

A.    No.

Q.    All right.  And then how long did he stay at the residence?

A.    He immediately turned around and left.

Q.    And what time — you don't remember the exact time, but what was the approximate time, to the best you know?

A.    Um — between about 9:20 and 9:45, I would say.

Q.    Okay.  Did you remember telling the defense investigator it was between 9:15 and 9:30?

A.    It could have been between that time.  It depends on what time it got dusk out at that time.

Q.    Okay.  So, you got off work at 8:30 and then went home, and then went over to Mr. Lapine's house?

A.    I didn't go home.

        MS. SOUBLET:    Objection.  Leading, and asked and answered.

        THE COURT:    I'm not — that part, I'll

Exhibit 5001 at 1449

D7 123                                                Myers   D

overrule.

Go ahead.

A.   I didn't go home.  I went straight to Mr. Lapine's house.

Q.   Okay.  How long did it take you to get from North Bend to Mr. Lapine's house?

A.   Approximately a half hour.

Q.   So, about what time do you think you arrived?

A.   Nine o'clock.

Q.   And then — well, I don't mean to keep going over the same thing.  All right.

Other than Mr. McGuffin appearing worried or — worried, did you notice anything else about his demeanor?

A.   No.

Q.   Did you see what car he was driving at that point?

A.   I did not.

MS. McCREA:   Your Honor, at this point I'd make a request to make an offer of proof concerning what Mr. McGuffin asked Ms. Myers.

THE COURT:   You may.

If you would step out, please — the jury step out for a moment.  Take your notes.  It's not going to take long.

(Jury out.)

THE COURT:   Go ahead, please.

Exhibit 5001 at 1450

Myers   D    D7 124

Q.   Ms. Myers, when Mr. McGuffin came to the house, what did he say to you?

A.   He said, "Is Leah here?"

Q.   And what did you say?

A.   I said, "No.  Why would she be here?"

Q.   And did — what was his response to you?

A.   He said, "She's not?" and turned around and left.

Q.   Did he seem surprised or just - - -

A.   (Interposing) Yes.

Q.   Okay.  And how long did that whole interaction take place?

A.   As he was walking towards me, he didn't even make it in the door.  By the time he got to the door, I had said, "Why would she be here?"  And he said, "She's not?" and turned around and left.

Q.   Okay.

          MS. McCREA:   That's the defense offer of proof, Your Honor.

          THE COURT:   Okay.  Just a minute.

          Anything else from the State?

          MS. SOUBLET:   The State would maintain its position that it's hearsay.

          THE COURT:   I think it probably qualifies coming in for his state of mind at the time.

          So, bring the jury in.

Exhibit 5001 at 1451

D7 125                                                    Myers   D

You may ask the question.

MS. McCREA:    I'm sorry?

THE COURT:    You may ask the question.

MS. McCREA:    Thank you, Your Honor.

(Jury in.)

THE COURT:    The Court will allow the questions that the Court sustained an objection to.

And, Ms. McCrea, you may ask those questions.

MS. McCREA:    Thank you, Your Honor.

Q.    Ms. Myers — Mrs. Myers, when Mr. McGuffin came to Daniel Lapine's residence on June 28, 2000, what did he say?

A.    "Is Leah here?"

Q.    And what did you say?

A.    "No.  Why would she be here?"

Q.    And what did Mr. McGuffin say, if he said anything in response?

A.    He said, "She's not?"

Q.    Did he say it in those — in that tone?

A.    He said, "She's not?"

Q.    Okay.  And what did he do?

A.    He stopped and turned around and left and didn't say anything further.

Q.    Did he even come in the house?

A.    No.  He didn't make it through the door.

Q.    Any more contact with him that night?

Exhibit 5001 at 1452

Myers    X    D7 126

A.    No.

Q.    And did you — well, at some point, did you learn that Leah Freeman was missing?

A.    The next day, around 6:00 p.m., when I was at work. Daniel Lapine, my boyfriend, had called and told me that she was missing.

Q.    Okay.  Thank you.

        MS. McCREA:    No further questions, Your Honor.

        MS. SOUBLET:    Thank you, Your Honor.

                    CROSS EXAMINATION

BY MS. SOUBLET:

Q.    Ms. Myers, do you remember talking to Officer McNeely and Officer Webley last June — last January?

A.    Yes.

Q.    You were asked to describe Ms. Freeman — asked about your observations of Ms. Freeman?

A.    Yes.

Q.    Do you remember talking about an incident you saw Ms. Freeman and the Defendant interacting at a party?

        MS. McCREA:    Well, excuse me.  It's outside the scope of direct, Your Honor.

        THE COURT:    Sustained.

        MS. SOUBLET:    Nothing further.

        MS. McCREA:    No further questions.

        THE COURT:    Do either of you want this witness

Exhibit 5001 at 1453

D7 127                                        Meneely  D

to remain available?

MS. SOUBLET:    The State does not.

MS. McCREA:    I'd ask she be excused.

THE COURT:    You may step down.  You are free to leave.

WITNESS:    Thank you.

THE COURT:    Call your next witness.

MS. McCREA:    Defense calls Kenn Meneely.

THE COURT:    Raise your right hand, please.

KENN MENEELY

was thereupon produced as a witness on behalf of Defendant and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat here, please.

Go ahead, please.

DIRECT EXAMINATION

BY MS. McCREA:

Q.   Mr. Meneely, would state your full name for the record, and spell your name?

A.   My name is Kenn Meneely, M-E-N-E-E-L-Y.

Q.   And what kind of work do you do, Mr. Meneely?

A.   I'm a private forensic consultant.

Q.   Can you give us a little bit of information about your educational background?

Exhibit 5001 at 1454

Meneely   D     D7 128

A.    I have a Bachelor's Degree in Chemistry.  I studied Organic Biochemistry, Pharmacology and Toxicology in graduate school.  I worked for four years in a medical and research facility prior to entering the State Police Crime Lab about 32 years ago.  I attended the Oregon State Police, Police Academy and received both my basic and advanced police officer certification, which I maintained throughout the course of my career.

And 32 years ago, I transferred from the Patrol Division to the Crime Lab Division, where I subsequently received additional training through the Laboratory Division, FBI, University of Texas Medical School, and University of Utah Center for Human Toxicology.

I have several publications in the area of Forensic Science.  In the last 32 years I've lectured or provided training to judges, prosecutors, defense attorneys and law enforcement in a variety of areas of forensic science to include firearms, gunshot residue analysis, gunshot proximity testing, crime scene investigation, blood spatter interpretation, trauma wounds and toxicology.

Over the last 32 years I've been involved with homicide and crime scene investigations, scene reconstructions and blood spatter analysis.  Associated with this was also the collection, preservation and analysis of evidence that was collected at the crime scenes, along with assisting the Medical

Exhibit 5001 at 1455

D7 129                                    Meneely  D

Examiner during the autopsies, collecting the evidence from the autopsy and subsequent analysis of the post-mortem samples.

Over the last 32 years, the various types of death investigations that I've been involved with include firearms or gunshot related situations, bludgeons or beatings, stabbings, strangulations or choking, infant deaths and poisonings. Analysis of these types of investigations varied from firearms comparisons, tool mark comparisons, tissue wound comparisons, analysis of damage onto fabric due to weapons, guns, knives and so on, along with trace evidence analysis, hairs and fibers, footwear comparisons and so on.

Up until my retirement from the State Police as a supervisor, I was also called an ASCLAD Inspector.  That's American Society of Crime Lab Directors Inspector.  I was responsible for going to laboratories outside of Oregon and, basically, going through every part of their lab.  And these are both forensic laboratories and medical examiner laboratories.  As inspection — looking at their staff, their training, procedures and protocol — everything that they do for their business — in an effort to accredit their entire laboratory system.

Q.   So, Mr. Meneely, you're talking about working 32 years for the State Police.  Are you talking about the Oregon State Police?

A.   Yes.

Exhibit 5001 at 1456

Meneely   D    D7 130

Q.   And were you working in the — one of the Crime Labs, much like Mr. Pex was?

A.   Mr. Pex was working in the Coos Bay Laboratory.  I was working the Springfield Laboratory.

Q.   Springfield, Oregon Laboratory?

A.   Correct.

Q.   Okay.  And have you done training of other police officers?

A.   As I testified earlier, that over the last three decades I've trained a variety of police officers, prosecutors and a variety of people in the law enforcement community.

Q.   And what about awards?  Have you received awards?

A.   I received a variety of commendations from the Oregon State Police, from the Oregon District Attorney's Association, several others to support my research work and work in some different casework.

Q.   Have you qualified as an expert witness in Court before here in Oregon?

A.   Yes.

Q.   Any idea how many times you've testified?

A.   Let's see.  One year I counted I had 900 subpoenas in one year, not that I went and testified every time.  But, I was traveling to Court multiple times every week and so I can — many, many times I've testified in Court and qualified in Court for various areas of forensics.

Exhibit 5001 at 1457

D7 131                                    Meneely  D

Q.   And what are you — what is your current business?

A.   As a private forensic consultant.

Q.   What does it mean to be a private forensic consultant?

A.   It generally means that the position — you might say it's a quality control type analysis, where in most cases I'll review documents that the State Crime Lab or other forensic laboratories have done, review them to ensure they're accurate, they're complete and that there may or not be more that can be done, potentially, in the case.  If there is any errors found, then it's my job to investigate into those errors.  Sometimes it involves a re-examination of evidence, or examination of evidence that's never been looked at.

Q.   And you were hired by the defense in this case?

A.   Correct.

Q.   And part of what you were doing was re-examining evidence in this case?

A.   Correct.

Q.   And were you also listening to and present for the testimony of Ms. Wilcox — Kathy Wilcox, Jim Pex and Dr. Olson?

A.   Correct.

Q.   Now, based on what you heard concerning some of that testimony, I want to ask you a few questions about that first. So, there was some discussion concerning Luminol.  Are you familiar with that item?

Exhibit 5001 at 1458

Meneely  D    D7 132

A.   Yes.

Q.   All right.  And I want you to tell us just a little bit about it?

A.   Well, Luminol is a chemical that — utilized by forensic scientists in a situation where a crime scene that potentially had blood in it, it's been suspected that the blood has been attempted to wipe or clean up after the fact — or, after the incident.

And this chemical is — basically you spray it on a wall and then you turn out all the lights and actually it will fluoresce a certain color in the dark.  For example, if a bloody hand print was on the wall and they had actually cleaned the wall with detergents — when sprayed with Luminol, that hand print will actually show up as a fluorescent palm print, if you will, on the wall.  And it's extremely durable, extremely sensitive.

Q.   And is blood easy or difficult to get rid of once it's on a surface?

A.   In my experience, I've had individuals clean up the entire place where literally you could not see anything.  And when we started spraying Luminol, you could see drag marks through the hallways, smears on the walls, hand prints on the walls.  And so, once again, people make an effort to clean up. They make a good effort to clean up, but still generally we can find it.

Exhibit 5001 at 1459

D7 133                                          Meneely  D

Q.   Ms. Wilcox, in her testimony, made the statement that it's unusual to solve a crime with trace evidence.  Do you agree with that statement or disagree?

A.   Well, partly I disagree in the sense that trace evidence, as you heard Mr. Pex testify, is probably the last on a forensic list that they actually spend a lot of time — mainly because since the development of DNA, DNA tends to be the most priority type of analysis that forensics go after.  If they can't find any DNA, then the next resort is to go to smaller items that may be more time consuming — maybe not as exact, but still, that's what else they turn to — and that's trace evidence.

I've had several cases where there wasn't any DNA involved, but has — for example, in one up in Toledo that I was crawling on the floor — that's what scientists do when they go through a crime scene; you get very close to the crime scene, you might say — and I found a small segment of finished wood, looked like it had been broken off.  It was buried in the carpet.  And probably a month or two months later, they found individuals out of state — they found the gun that they had with them, and there was a section of the gun that was missing that was actually a jigsaw match to the piece that I found in the carpet back to their weapon.

So, I have had cases where trace evidence was the sole piece of information that you might say made the case.

Exhibit 5001 at 1460

Meneely   D    D7 134

Q.    Okay.  And if it's — if you don't have a sole piece of trace evidence, can it also be helpful in establishing a case?

A.    Oh, yes.  Yes.

Q.    In what way?

A.    Well, in — utilized to virtually exclude circumstances, also.

Q.    Okay.  Now, Ms. Wilcox yesterday also made a statement about the clothing that she examined — the tank top and the jeans — and I think she used the adjective "ubiquitous" concerning it being rather common material, and therefore not likely to produce any trace evidence.  What is your reaction to that statement?

A.    Well, part of that is true in the sense that white cotton fibers are common.  And fibers from jeans are common.  But, it depends on where you find those fibers make it maybe good information for the particular type of investigation.  It just depends on the circumstances.  So, depending on the circumstances, those fibers or combination of fibers in the wrong location, if you will, could be important information.

Q.    There has been some testimony about the likelihood or the factors that would play into whether one would find blood on clothing or not.  And in our situation — well, let me back up.

You heard the testimony from the three individuals

Exhibit 5001 at 1461

D7 135                                    Meneely  D

and have you also reviewed all of the forensic reports provided to the defense in discovery?

A.   Yes, I have.

Q.   And based on that, what are — what are some of the factors that you would consider in whether it would be likely or not to find blood on Ms. Freeman's clothing here?

A.   Under normal situations or circumstances, one would expect to find blood.  In other words, you have blood on the shoes, so that means you have an incident that blood is being moved around, if you will.  In that case, one would most likely expect to find blood on one's clothing, also.  In this case, they didn't.

But, in this circumstance, the — because of the serious degradation of not only the body, but of the clothing — many times that can have an adverse effect on finding anything, at all, especially blood, because of its degradation in this kind of situation.

Q.   Are you talking about — what do you mean when you say "degradation?"

A.   Um, the bacteria and start — you might say eating away at the biological materials in the body and by — in essence, you might say just melting away.  And when it does that, then it's pretty difficult to maintain integrity on some biological thing such as blood on material.

Q.   Ms. Wilcox also expressed an opinion that, based on

Exhibit 5001 at 1462

Meneely  D    D7 136

the photograph of Leah Freeman in the white tank top taken the day she disappeared, June 28, 2000, that the tank top was too tight for that material to have moved.  Do you remember that testimony?

A.    Yes.

Q.    All right.  And would you agree with her assessment?

A.    I agree with the fact that it appeared to be a snug-fitting tank top, kind of a ribbed, cotton-type of material.  But, on the other side, it depends on the circumstances once again.  For example, if you're in a struggle, somebody is grabbing a tank top, you know, it is a stretchy-type material.  So, in that situation, it can move.

Q.    So, Mr. Meneely, in this case you were retained to re-examine particular evidence in this case?

A.    Yes.

Q.    And what were you asked to take a look at?

A.    I was requested to take a look at the two shoes, the jean pants, the tank top-type shirt, and the sports bra.

Q.    Of Ms. Freeman?

A.    Correct.

Q.    That had been — you didn't look at the sock, right?

A.    Correct.

Q.    Okay.  And in doing that, were you given any direction or charge?

A.    No.  The initial charge, if you will, is to go look

Exhibit 5001 at 1463

D7 137                                    Meneely   D

at the evidence — to start with to verify exactly what the other forensic findings were.

Q.   Did you go into it with any pre-conceived idea of what you were going to find?

A.   No.  It was just to examine the evidence in a very close, up front nature.

Q.   And in this case and other cases, are there times when you do an examination and what you find is actually not helpful to — well, in this case, the defense?

A.   Sometimes.

Q.   Okay.  And what did you do to obtain this evidence?

A.   I — well, through the District Attorney's Office, we made arrangements through the Coquille Police Department for me to pick up the evidence, which I picked up on May 28th.  I spent some time with the evidence and subsequently returned the evidence, which I believe is the blue box now.

Q.   So, you picked up the evidence, and where did you take it?

A.   Back to my facility where I can spread the evidence out and photograph it and examine it and take some time looking at the - - -

Q.   (Interposing) And - - -

A.   - - - material.

Q.   I'm sorry.  I didn't mean to cut you off.  And when you say your "facility," what are you talking about?  Is it

Exhibit 5001 at 1464

Meneely  D    D7 138

like in your garage or something?

A.   Well, unfortunately I've had to turn part of my house into my laboratory, too.  And so I have several rooms dedicated to a laboratory condition.  And unfortunately, in this situation, I had to turn my garage into a laboratory because of the condition, and you might say the odor of the material I was looking at.

Q.   I'm sorry.  The odor?

A.   The odor of the material — the fabric I was looking at.

Q.   What about the odor?

A.   Uh, this material was extremely, extremely degraded with biological material, maggot material and so on.  And so the odors were quite intense, so I certainly couldn't do that inside the other parts of my rooms I've turned into a laboratory.  So, I had to, basically, put down sheets of paper all over the garage floor and every place I was working for my examination.

Q.   How long did you spend looking at these various items of clothing and shoes?

A.   Three days.

Q.   Three full days?

A.   Three full days.

Q.   All right.  And what techniques did you use?

A.   I was not allowed to do any chemical analysis, only

Exhibit 5001 at 1465

D7 139                                        Meneely  D

examination either by way of microscopy, or visual or high intense.  So, in other words, I couldn't add any chemicals or potentially alter anything that was there chemically.

So, three days were spent doing both visual and microscopic examination and photographing the results of my work.

Q.   And how did your visual examination differ from the examination that Kathy Wilcox did back in 2000?

A.   Do you want to start with the shoes and work through each one?

Q.   Well, I do.  But, I wanted to get back to the odor aspect.

A.   I guess I don't understand the question.  How does my examination differ from Kathy's?

Q.   Did you use a fume hood?

A.   Oh, no.  I did not use a fume hood.

Q.   What's a fume hood?

A.   A fume hood is a box and it allows you to put real — you might say either meth labs inside this fume hood, or contaminated material that have — are real badly degraded — so the odors stay inside the fume hood and go up the vent, you might say.  Of course, the difficulty with a fume hood is that it's only so wide by so tall.  And it's designed for you to work at somewhat of a distance so that you don't have to get your face right into the contaminated material.

Exhibit 5001 at 1466

Meneely   D    D7 140

In this case, I did not have a fume hood.  But, the other side is that it allowed me to get much closer to the evidence than at a distance in looking at the contaminated material.

Q.    Now, we'll go through it.  So, you did an examination.  And as part of that, you made a report?

A.    Yes, I did.

Q.    And that was provided to the prosecution?

A.    Yes.

Q.    And you did some photographs?

A.    Correct.

Q.    Let me show you what's been marked for identification as Defendant's Exhibits 135 and 136.  Do you recognize those?

A.    Yes.  They are the right and left tennis shoes that were removed from the two different road locations, if you will.

Q.    Okay.  And those belonged to Leah Freeman?

A.    That's my understanding.

Q.    And do those fairly and accurate depict in the photographs what you saw when you were doing the examination?

A.    Yes.

MS. McCREA:    We'd offer Defendant's 135 and 136, Your Honor.

MR. FRASIER:    No objection.

THE COURT:    Received.

Exhibit 5001 at 1467

D7 141                                    Meneely  D

(Whereupon Defendant's Exhibit Nos. 135 and 136 were received into evidence.)

Q.   Tell us what you found, starting with the — it looks like the right shoe first?

A.   The right actually had very little information on it, other than the fact that it was lightly soiled, didn't have much dirt embedded into the rib patterns — or, waffle pattern on the base of it.  And that's about it on the right shoe.

Q.   Okay.  How about the left shoe?

A.   The left shoe was a little bit different in the sense, first of all, when I opened up the packaging, that — of course, the shoe laces had been removed and were just loose inside the shoes.  But, there was a paper fold — a tape-sealed paper fold that contained two blonde hairs inside this — the shoe, itself.

Q.   And is that depicted in what's been marked for identification as Defendant's Exhibit 137?

A.   Yes.  This is the paper — tape-sealed paper fold that came out of the shoe itself — inside the shoe.  It was basically stuck in there.  And I took a look at the — there were two hairs — blonde hairs — that were inside of the paper fold.

Q.   And is that in what's been marked for identification as Exhibit 138?

A.   Right.  Correct.  And these two blonde hairs, because

Exhibit 5001 at 1468

Meneely  InAidD7 142

they're loose in a paper fold, means that they may have been given kind of a gross visual observation — but, they've never been mounted on a glass - - -

MR. FRASIER:    (Interposing) Question in aid of objection.

THE COURT:    Yes.

EXAMINATION IN AID OF OBJECTION

BY MR. FRASIER:

Q.    How do you know they were never inside of a slide?

A.    Well, first of all, the slide hasn't been included. And generally the slides, when they've been microscopically examined, you have to rip the slide off, which can break the slide and so on, which would suggest that they've been - - -

Q.    (Interposing) But, you don't know if a section was taken out of that hair and put on a slide and placed elsewhere, do you?

A.    A section of the hair?

Q.    Yeah.  You don't know if this hair was sectioned — say, a piece cut off the end and then put onto a slide elsewhere, do you?

A.    There is nothing in your reports saying that.  And, you're right, the evidence as it stands - - -

Q.    (Interposing) My point would be, then, you're just speculating that it wasn't put under a slide?

A.    That's also correct.

Exhibit 5001 at 1469

D7 143                                    Meneely  D

MR. FRASIER:   Then I would object to the question, Your Honor, on that basis.

THE COURT:   Oh, I'll overrule it and allow it.

Go ahead.

DIRECT EXAMINATION (Continued)

BY MS. McMREA:

Q.   Was there anything else you wanted to say about that, Mr. Meneely?

A.   Basically, it does not appear that it's been microscopically examined, perhaps only visually, because it doesn't appear it's been mounted previously on a glass slide for microscopic examination.

Q.   And do 137 and 138 accurately depict what you saw when you were doing the examination?

A.   Yes.

MS. McCREA:   We'd offer 137 and 138.

MR. FRASIER:   No objection.

THE COURT:   Received.

(Whereupon Defendant's Exhibit Nos. 137 and 138 were received into evidence.)

Q.   And then I'm going to hand you what's been marked for identification as Defense Exhibits 139, 140 and 141, and see if you recognize these photographs?

A.   These are - - -

Q.   (Interposing) Okay.  Wait.  That's just a yes or a

Exhibit 5001 at 1470

Meneely   D    D7 144

no.

A.    Yes, I do.

Q.    All right.  And are those photographs of the left shoe?

A.    Yes.

Q.    And are those fair depictions of what you observed?

A.    Yes.

MS. McCREA:    We'll offer Exhibits 139, 140 and 141, Your Honor.

MR. FRASIER:    No objection.

THE COURT:    Received.

(Whereupon Defendant's Exhibit Nos. 139, 140 and 141 were received into evidence.)

MS. McCREA:    And we did provide these to Mr. Frasier.  That's — correct?  Well, that's — I'm stating that.

Q.    Go ahead, Mr. Meneely.  You can testify about them. Tell us what is in each one of those photographs.

A.    Once again, in State's — in Defense 139, this is a photograph of the bottom of the left shoe.  Once again, there's very little debris, a little scuffing on the shoe.  It's a little bit soiled on the side of the shoe.  But, this is a — just a general photograph of the shoe, itself.

The — Defense 140 and 141 are actually an example of microscopic photographs I've taken.  In other words, they're

Exhibit 5001 at 1471

D7 145                                    Meneely  D

microscopic down to a tenth of a millimeter.  A millimeter, you can imagine, is probably the size of the tip of your ink pen. A tenth of a millimeter is much, much smaller.  So, the point is, is that I'm looking at very, very small details that Ms. Wilcox looked at to identify these impact spatter that was testified that was found on the left shoe.

Q.   Now, when you examined the left shoe, did you find the high velocity, or medium-to-high velocity blood spatter that was documented by her?

A.   No, I did not.

Q.   And did that cause you concern?

A.   Not necessarily.

Q.   Was that surprising?

A.   Well, keeping in mind this — these shoes have been swabbed for DNA testing.  They've been handled a variety of times by many, many scientists.  And so the end sequence — the end result is that it doesn't surprise me that whatever was there at one time has probably either fallen off or been used in an analysis, because it was small evidence.

Q.   Any other observations concerning the right or left shoe?

A.   I don't believe so.

Q.   Okay.  I wasn't suggesting there was.  I'm now handing you what's been marked for identification as Defendant's Exhibits 142 and 143.  Do you recognize those

Exhibit 5001 at 1472

Meneely  D    D7 146

photographs?

A.   Yes.   These are photographs that were taken by Ms. Wilcox at the forensic laboratory when she examined the tank top — tee shirt or tank top shirt.  And these are — these are photographs that are taken from a fairly distant perspective, you might say.

Q.   And those were part of the information from the prosecution you were given to enable you to do your examination?

A.   Yes.

Q.   And so they may be duplicates of what is already in evidence.  But, that — those are two, particularly, that you looked at?

A.   Yes.

Q.   And those are copies of what you received from me concerning the discovery?

A.   Yes.

Q.   Okay.  And so they're accurate in that regard?

A.   Yes.

MS. McCREA:   We'd offer Exhibits 142 and 143, Your Honor.

MR. FRASIER:   No objection.

THE COURT:   Received.

(Whereupon Defendant's Exhibit Nos. 142 and 143 were received into evidence.)

Exhibit 5001 at 1473

D7 147                                    Meneely  D

Q.    Now, Mr. Meneely, I'm handing you what's been marked for identification as Defense Exhibits 144 and 145.  Do you recognize those photos?

A.    Yes, I do.

Q.    And are those photographs — well, what are they?

A.    These are extreme closeup photographs, is probably the best way to describe it.  One of the damaged areas in the tank top tee shirt — in other words, there were several damaged areas in this tee shirt.  And my position was to examine each one of these areas very closely under microscopic, you might say, conditions, and to determine or verify what conclusions the Crime Lab came up with.

And what this particular area is, is in the upper left-hand quadrant of the tee shirt.  There was a variety of torn and frayed edges, which was consistent with other testimony that's been described as animal damage, you might say.  However, in very close up observation and putting pieces back together and carefully unfolding the parts that have been — you might say uprooted or moved to one side or the other — that I put these pieces back together to see if there was any consistency between, in this case, the two layers of garments that I'm dealing with.

Q.    Okay.  So — and do Exhibits 144 and 145 fairly and accurately show what you saw?

A.    Yes.

Exhibit 5001 at 1474

Meneely    D    D7 148

MS. McCREA:    We'd offer 144 and 145.

MR. FRASIER:    No objection.

THE COURT:    Received.

(Whereupon Defendant's Exhibit Nos. 144 and 145 were received into evidence.)

Q.    So, now I want to ask you some additional questions, Mr. Meneely.  So, are you — when you say "damage" are you saying that this is one of the holes in the tank top?

A.    Yes.  This is the — this particular item we're discussing is the area in the upper left quadrant of the tank top shirt.

Q.    Okay.  And what was notable about it?

A.    What's notable is the specific characteristics beyond other damaged holes surrounding it, which had frayed fibers and torn, you might say.  What this does have, contrasted to other frayed and torn fibers, is a very distinct outline, very sharp lines of demarcation.

Q.    And why is that significant?

A.    It's significant because it's suggestive of a sharp instrument.  It's more than just lines of demarcation, because I look at not only that, but I look at shape and sizes and consistency to other damaged clothing areas, also.

Q.    I'm sorry.  I didn't mean to cut you off.

A.    That's fine.

Q.    Well, what's the significance of shape?

Exhibit 5001 at 1475

D7 149                                    Meneely  D

A.    The significance of shape — can I?

Q.    Absolutely.  Yeah.

A.    This is a wooden knife.  This is only to describe the characteristics of a knife.  And I believe it was about five portions of a knife that are important.  There is a handle.  There is this, you might say "T" going through there.  Some people call it the hilt, but that's not correct.  It's actually the guard.  There is the back of the knife.  There is the blade.  And then as the blade goes back into the handle, the blade actually flattens out.  And it's called the ricasso.

And when scientists are looking at different features, they're looking at elements that may be consistent to something of this nature.

For example, if you're looking at sharp instrument damage to tissue, that tissue may show a variety of different things, meaning that if you take this knife and stab into a piece of wood — if you go with the grain, it actually splits both ends of the grain.

But, if you turn the knife 90 degrees to the grain, it will actually show the outline characteristics of the knife.  It will show the flat portion of the knife.  It will show the sharp portion of the blade.  And if you go in too far, it will actually show the blunt ends on the top and bottom, meaning it's showing the actual ricasso part — the blunt end here on the edge of the knife blade, and the top part of the knife

Exhibit 5001 at 1476

Meneely   D    D7 150

blade, itself.

Similar, in the way of tissue — tissue actually has wood grain lines, but they're called Langer lines in the pathology part of it.  So, if you go into tissue with the grain, you can actually split the grain so that would be pointed on both ends.  But, if you go against the grain, you can actually show specific characteristics to the knife — the top and bottom.  And also, if it goes in too deep, it would be blunt on both the top and bottom showing that it's gone in extra deep and it's gone clear up to this blunt edge on the back end of the blade.

But, that's a little bit different than when you do test marks into fabric.  Fabric doesn't show this ricasso effect.  Fabric just generally shows the top of the blade and the actual sharp point of the blade.

So, when I look at features like this, it's not just looking at sharply defined or cut pieces of fabric.  But, I look for the blunt part of the back of the blade.  I look to see if there's actually a sharp portion of the blade.  And then I do measurements.  And these are all done under microscopic conditions.  And I measure this to get potential dimensions.  This is aside from the frayed areas that I've already excluded.

Q.   So, did you do measurements here?

A.   Yes.

Q.   And what did you determine?

Exhibit 5001 at 1477

D7 151                                          Meneely  D

A.    That the width of this damage not only has a flat portion — the top of the damage of the shirt — and actually has a pointed edge, so it's a little more difficult to see in this photograph.  But, it has a top and a bottom that the dimension of this is one and half centimeters.  One and a half centimeters is just short of about three-quarters of an inch.

MS. McCREA:    Permission to publish, Your Honor?

THE COURT:    (Inaudible response.)

Q.    And then, Mr. Meneely, that was the tank top.  Did you also do an examination of the sports bra?

A.    Yes, I did.

Q.    And I'm handing you what's been marked for identification as Defense Exhibit 146.  Is that a photograph of a close up of the sports bra?

A.    This is a very close up picture of the sports bra.

Q.    And is — does that also accurately depict how you saw it when you did the examination?

A.    Yes.

MS. McCREA:    We'd offer Defendant's Exhibit 146.

MR. FRASIER:    No objection.

THE COURT:    Received.

(Whereupon Defendant's Exhibit No. 146 was received into evidence.)

Exhibit 5001 at 1478

Meneely D    D7 152

Q.    So, what did you note about the sports bra, if anything?

A.    Once again, there was a variety of tears, because of frayed area in the sports bra.  There was two areas of concern.  One was in — there is a band at the very bottom of the sports bra that clearly had been cut out.  But, it had only been cut out over the very top layer of the band, leaving the bottom layer.  And it was a three-by-six centimeter removal.  It was like somebody cut out the label of the sports bra.

The second area, though, of concern was very closely associated with this, but still near the mid section of the sports bra, just about where the soft part of — or, the sternum ends and the soft part of the tissue begins, you might say, in that general mid section area in the abdominal area.

And this area, once again, is about two inches from the other area on the tank top that we're discussing.  In this particular area, once again, I was looking for things of consistent nature to support what I found in the tank top — things like sharp lines of demarcation or cutting, and specific size and dimensions.

Once again, the top — blunt part, bottom — sharp point, lines of demarcation or cut fabric and dimensions.  The dimensions — it — clearly you can see in the — there's a top part in this cut part.  There's a pointy part, representing the blade — consistent to the blade.  And the size of this is one

Exhibit 5001 at 1479

D7 153                                          Meneely  D

and a half centimeters, or just shy of three-quarters of an inch.

Q.    So, that was the same size as the hole you found in the tank top?

A.    Yes.

Q.    Now, you said that the two of them — the hole in the tank top and the hole in the sports bra — were about two inches apart?

A.    Yes.

Q.    Well, what does that mean?

A.    Once again, from a forensic standpoint, if there's a struggle that's happening, because this tank top is a rather — it's a ribbed fabric, stretchy, it's conceivable that this is a single event.  In other words, the — during the struggle, the tank top was grabbed, stretching over the undergarment, lining up with the sports bra damage.

Q.    And the fact that the two are the same size, to you, is significant?

A.    That's significant to me.

MS. McCREA:    Permission to publish, Your Honor?

THE COURT:    You may.

Q.    And then, Mr. Meneely, did you do a comparison for demonstrative purposes in Defense Exhibits 147 and 148, a test mark with a knife into cotton ribbed fabrics to display the top

Exhibit 5001 at 1480

Meneely   D    D7 154

flat portion of the knife and the blade area, compared to the cuts, if you will, in the tank top and the sports bra?

A.    Yes, I did.

Q.    And does — do those photographs, 147 and 148, accurately depict what your test cut was?

A.    Yes, they do.

MS. McCREA:    Offer 147 and 148, Your Honor.

MR. FRASIER:    I don't remember these photographs.  Might I see them, please?

MS. McCREA:    Of course.

MR. FRASIER:    No objection.

THE COURT:    Received.

(Whereupon Defendant's Exhibit Nos. 147 and 148 were received into evidence.)

Q.    So, what do those show?  Tell us about those.

A.    Um, Exhibit 148 is the — once again, the tank top tee shirt, the same damage that you're currently seeing now being passed around.  But, I've also added in a demonstrative section of fabric that's been — you might say stabbed with another knife, just to demonstrate the top and bottom sections of a knife.

And the same way in Defense 147 — the same piece of fabric inserted just for references to show a similarity between the top — the blunt part of the knife, and the bottom — the pointy side of the knife, if you will.

Exhibit 5001 at 1481

D7 155                                              Meneely  D

MS. McCREA:    Permission to publish, Your Honor?

THE COURT:    You may.

Q.   Mr. Meneely, now I'm going to show you what's been marked for identification as Defendant's Exhibits 149, 150, 151 and 152.  Are those photographs of — are they all the tank top where the - - -

A.   (Interposing) No.  This is a combination.

Q.   Okay.  A combination of the tank top and the sports bra?

A.   Correct.

Q.   And do those fairly and accurately depict various areas of those garments when you examined them?

A.   Yes.

MS. McCREA:    We'd offer Defense Exhibits 149 through — was it 152, Your Honor.

MR. FRASIER:    No objection.

THE COURT:    Received.

(Whereupon Defendant's Exhibits Nos. 149, 150, 151, and 152 were received into evidence.)

Q.   So, tell us about each one of those, please?

A.   These exhibits are only to demonstrate the various types of other damage that was observed.  In 149 — this is, once again, the tank top near the area that we're currently discussing.  But, it clearly shows the frayed nature as a

Exhibit 5001 at 1482

Meneely  D    D7 156

contrast to the sharply defined cut, you might say, of fibers from the picture you are currently seeing.  This shows the frayed fibers.

In 150, these are, once again, on the ribbed tank top shirt showing the frayed fibers in contrast to what you're currently seeing, also — the sharply defined fibers.

In 151, this shows, once again, the tank top.  But this is an illustration of sampling done by the Crime Lab. This is actually a cut out section.  You can see the sharply defined cut out area, which the Crime Lab will circle in black Sharpie marker an area so that they know they have actually removed this for their identification.

And 152 is a description — an area of the sports bra in that lower mid section where I identify as similar to if somebody cut out the label.  This shows you the lines of demarcation, but it's actually six by three centimeters and it only goes through the top layer and not all of the layers of the garment.

MS. McCREA:    Permission to publish, Your Honor?

THE COURT:    You may.

Q.    So, Mr. Meneely, what were all — well, let me ask you this.

Based on your examination of the sports bra and the tank top belonging to Ms. Freeman, did you form any opinion

Exhibit 5001 at 1483

D7 157                                    Meneely   D

concerning the holes in each one that you examined?

A.    The holes were consistent to a sharp instrument, for example a knife.  They had specific dimensions and both holes in both garments were, basically, exactly the same.  And because they were in such close proximity, my conclusion that they're one in the same event.

Q.    That it happened at the same time?

A.    Yes.

Q.    Okay.  Now, switching gears for a minute, there was some testimony of Mr. Pex that if there had been gasoline dripped onto the soil of the roadway at the scene where Ms. Freeman's body was found, that that would have dissipated over the period of time between her disappearance and the discovery of her body.  Do you agree with that assessment?

A.    Not completely.

Q.    Okay.

A.    And the reason I disagree is that I used to do arson analysis and even burned debris — house fires.  They can acquire material from burned debris that's in a hot environment.  We can still extract remnants of gasoline.  And in the worst case scenario — because of the way they identify gasoline is not only by the volatile compound, but they also add dyes into gasoline so they can identify gasoline from a particular station or product — like, say, Exxon gasoline — back to the dyes that are in somebody's gas tank.

Exhibit 5001 at 1484

Meneely  D     D7 158

So, there's — dyes are extremely durable, regardless of the heat, you might say.  But, once again, there's even volatile compounds still remaining even under adverse conditions like a house fire.

Q.   So.  Are you saying that they might have been able — it was possible?

A.   If — if gasoline was dripped on the surface, then because of its durability — whether it be the dyes in the gasoline or the remaining volatile materials that are there — there's still a possibility that remnants could have been, you might say, collected and analyzed.

Q.   Now, I'm going to ask for your assistance for just a second, Mr. Meneely, because I neglected to do this yesterday. Although Ms. Karcher timely testified about it for me.  And you have reviewed all of the — all of the reports from the State in this case, right?

A.   Correct.

Q.   Is that your pen?

A.   That's mine.

Q.   Okay.  All right.  So, Mr. Meneely, I just want to confirm from you — I confirmed this with Ms. Karcher yesterday — but confirm from you that I've got, on Defense Exhibit 134 — that there were four beer cans seized from the Hudson Ridge area?

A.   Correct.

Exhibit 5001 at 1485

D7 159                                                    Meneely   D

Q.    And that, based on your review of the lab reports, there was no indication that these were associated with Mr. McGuffin, as well as the plastic bottle?

A.    Correct.

Q.    Mr. Meneely, regarding the testimony concerning Dr. Olson, and utilizing the calf muscle to do an analysis for drug toxicology, do you — do you have an opinion as to whether it would be more effective to analyze — to have analyzed Ms. Freeman's hair?

A.    Actually, the — because of the degradation, even little drug metabolites that are circulating throughout the body have the ability to be destroyed, is the best probable way to describe it, by biological activity.  And so if you obtain some muscle group or some other tissue, and if you get a negative toxicology finding, it doesn't necessarily mean that there was nothing there.  It means that — one of two things.  There wasn't anything there; or, because of — bacterial degradation destroyed all of the drug metabolites in that particular tissue sample.

However, the hair samples can offer a couple different advantages.  One is that they're relatively immune from bacterial contamination.  They're kind of sealed inside their own — the cuticle of the hair.  Number Two, that you can actually analyze the hair if you segment — if you chop it up in different segments because they know how quickly hair grows in

Exhibit 5001 at 1486

Meneely   D    D7 160

a certain period of time, you can actually analyze each segment and determine when a person has started using a medication or drug, when they have stopped, and when they have restarted based upon the hair growth rate.

Q.   So — and what about the ability of a hair analysis to detect drugs other than what was discussed this morning?

A.   I guess I don't understand your question.

Q.   Okay.  The examination that was done was for some particular controlled substances, or so to speak?

A.   Correct.  They tested for a limited group, you might say, of street drugs — typically the cocaine, the methamphetamine and opiates.

Q.   All right.  And if a hair analysis had been done, could it have demonstrated whether there were other drugs in the body at one — at some point?

A.   Well, two parts to that.  Had they done a more complete analysis, they could have potentially identified more medications.  But, hair analysis — once you do a complete analysis there, you can also do a complete identification of all the drugs.  And what I mean by that is that when they test for a term that — "organic base" drugs, that's a limited variety of drugs.  And the one — they tested for cocaine, methamphetamine, and opiates.  That's extremely limited, because there is — as Dr. Olson mentioned, there is a vast number of medications still yet that aren't — that don't follow

Exhibit 5001 at 1487

D7 161                                        Meneely  D

under those three categories.

When another test was performed on the maggots, they tested for organic bases.  There is three categories of drugs.  There is acids, bases and there's neutral drugs.  For example, the basic drugs are exampled — opiates, the cocaines, methamphetamines.  The acid drugs are things like phenobarbital, the barbiturates.  Then there's a — what's called the neutral drugs, kind of in the middle.  Those are what's called benzodiazepines, like Valium and Xanax.

And so to do a total encompassing examination you have to look at each one of those drug categories.

The unfortunate thing is that that may not present the entire the picture, because some of these drugs are extremely sensitive, meaning, for example, LSD.  When we used to do urine toxicology for LSD, we asked the agencies to actually wrap the urine sample in aluminum foil, because any light that was shined down onto the urine cup, itself, would actually — because LSD metabolite is so sensitive, it would degrade it just because of light.

So, there's a variety of conditions if you don't get a positive test — for example, LSD may not even show up just because of degradation or other sensitive issues.  GHB is called the date rape drug — gamma hydroxy-butyric.  Once again, that's a specialized test.  You have to test for that.  Just the organic base test will not show that.

Exhibit 5001 at 1488

Meneely  D    D7 162

Q.    Can — okay.  And can you exclude — can you exclude drug use based on the fact that there was deterioration?

A.    No.

Q.    And what other — what other drugs could possibly — I know you've mentioned some of them — could possibly have been identified?  For example, could a more complete screen have potentially identified — I can't remember what the technical term is — the date rape drug?

A.    Yes.

Q.    What's it called?

A.    Well, the acronym is GHB.

Q.    Okay.

A.    Or, it's actually gamma hydroxy-butyric, or the date rape drug.

Q.    All right.  Thank you.  I wasn't trying to make you — okay.  And those things weren't done here, right?

A.    Correct.

Q.    So, Mr. Meneely, going back to your examination of the sports bra and the tank top, and the — basically, your opinion is you found a cut?

A.    After looking very closely, unfortunately your nose has to get right into it — nose with a mask and mentholatum over the mask to hide the odors — but, yes.

Q.    And that's what did you here?

A.    Yes.

Exhibit 5001 at 1489

D7 163                                    Meneely  D

Q.    Okay.  All right.  I understand.  And so your opinion is that this was one cut that went through two garments.  Is that correct?

A.    Yes.

Q.    And is that cut consistent with a stabbing?

A.    Yes.

Q.    And can you tell, or based on your examination, where that — well, let's assume that there's a sharp instrument — a knife — where it would have entered the body based on where the cut was?

A.    Most likely in the soft tissue area just below this breast bone, if you will, the sternum.

Q.    Can you express an opinion as to what damage that cut — the stabbing would have done?

A.    There's several vital organs, and it depends on the angle of the instrument going in.  You can actually — actually, as Dr. Olson testified that it could hit the heart or there's — like I said, there's a variety of organs there.

Q.    Was the cut that you observed consistent with anything else other than a stabbing?

A.    A sharp instrument, which I relate to a knife.

Q.    Okay.  Could it have been an animal bite?  In other words, you know, an animal gnawing on the material?

A.    Once again, I — I excluded those versus the ones that had frayed edges.  Under microscopic examination, you can see

Exhibit 5001 at 1490

Meneely  D    D7 164

frayed edges on a variety of the other components of the shirts and the sports bra.  But, these two areas actually had well-defined lines — not only just the well-defined lines of cut fabric, but you can actually see a top and a bottom, or the blunt part and the sharp part, that are typical of the knife that we discussed.

Q.   And, Mr. Meneely, in, for example, a — for lack of a better term — a casual — an observation such as during the autopsy of the sports bra and the tank top, would the cut have been detected the way that you — the way that you saw it?

A.   No.  You had to get very, very close under microscopic conditions to examine all of these frayed fibers and sharp defined cut areas.

Q.   All right.  And, given these — the circumstances that you described concerning the location of the cut under the sternum and the — and the other matters — would — would it have — would the cut to the body have been detected during an autopsy?

A.   It would have gone in through soft tissue, most likely not nicking any bones because of this specific location. Therefore, because of the degradation of the body and hitting soft tissue, it most likely would not have been detected.

Q.   Would not have been detected?

A.   Correct.

Q.   In this case?

Exhibit 5001 at 1491

D7 165                                          Meneely  X

A.    Correct.

Q.    Okay.  All right.  Thank you.

MS. McCREA:    You may inquire, counsel.

CROSS EXAMINATION

BY MR. FRASIER:

Q.    Mr. Meneely, we had a telephone conversation, didn't we, the Friday before this trial started?

A.    I don't recall the day.  But, yes, we did have a conversation.

Q.    And did I not ask you, specifically, "Is it your opinion that this woman was stabbed?"  Didn't I ask you that?

A.    I didn't record it.  But, you may have and I think my response was — I read it from my report — that it was from a sharp instrument, if I recall correctly.

Q.    Isn't it true you said, "What I'm saying is, is there's a cut made with a sharp instrument in the shirt and the bra?"

A.    Right.

Q.    You never told me, even when I asked you if she had been stabbed — when I asked your opinion, "Was she stabbed?" you never told me that, did you?

A.    I think I basically read from my report that it was consistent to a sharp object.

Q.    Well, you still haven't answered my question.  Did you tell me that she was - - -

Exhibit 5001 at 1492

Meneely  X    D7 166

A.    (Interposing) I believe that's right.  I didn't say specifically it was consistent to a knife or a stabbing.

Q.    And, in fact, you wrote a two-page report in this case, did you not?

A.    Correct.

Q.    And there is nothing in your report that says that she was stabbed, is there?

A.    No.  It — just a minute.

Q.    And when it comes to the — back to your report, in regards to the tank top, the area where you mentioned this cut is basically three lines, is it not?

A.    Correct.  Part of it says that in Area No. 1, which we described as the upper left quadrant, that I saw, as we described earlier, frayed and torn areas and then one area that we've been discussing was consistent to a sharp instrument.

Q.    Right.  You have two sentences in this report that describes the cut in the tank top, correct?

A.    Well, there was only one referencing a sharp instrument in the tank top, one referencing a sharp instrument in the sports bra.

Q.    Correct.  And, in fact, you wrote in your report regarding the tank top, "Adjacent to the same grouping of torn fabric is a hole that displays microscopic characteristics consistent to a sharp instrument."  You wrote that?

A.    Yes.

Exhibit 5001 at 1493

D7 167                                        Meneely  X

Q.   That's all you wrote about that report — about that hole, other than it was 1.5 centimeters in length?

A.   Correct.

Q.   You didn't describe it as you did here today, did you?

A.   No.

Q.   You didn't put out there that, well, it had the characteristics of a knife in this manner and this manner and this manner, did you?

A.   No.

Q.   Why didn't you go into that detail?

A.   That was my report that I published and I just didn't go into that amount of detail.

Q.   Didn't want me to know about it?

A.   I had documents, photographs — actually, you saw — I believe you saw of my work that supports my conclusions.

Q.   You just wrote this - - -

A.   (Interposing) It's not that I didn't want you to know.

Q.   But, you didn't describe it as you did here today?

A.   No.  I didn't describe the top and bottom, but I did describe the size.

Q.   And, again, looking at the sports bra, the area that you claim was made with a sharp instrument — again, all you wrote in your report regarding this hole is, basically, two

Exhibit 5001 at 1494

Meneely   X    D7 168

sentences?

      MS. McCREA:    Well, Your Honor, it's been asked and answered.

      THE COURT:    Overruled.

A.   Um, one, two — well, technically three sentences describing the areas of damage.  But, that's essentially correct — same as before.

Q.   And, again, in regards to the bra, you did not describe the — well, you didn't go into as much detail as you did here today?

A.   Correct.

Q.   Now, looking at your report, where does it say that they're about two inches apart — these two holes?

A.   It doesn't say that in the report.

Q.   Why doesn't it say that in the report?

A.   It's in my notes from my description.

Q.   Okay.  But, you didn't put it in the report that was given to me, did you?

A.   Correct.

Q.   And where is it in your report that these holes match up, or are close nearby?

A.   It's not in the report.  It's in my notes.

Q.   Why didn't that get in the report?

A.   Because I didn't put it in the report.

Q.   Why not?

Exhibit 5001 at 1495

D7 169                                    Meneely  X

A.   Because I felt it was sufficient to describe my findings as a sharp instrument.

Q.   Okay.  How much are you being paid to testify here today?

A.   I get paid through the Oregon Public Defense Services funds.

Q.   How much?

A.   And what they allow me is $150 an hour, the same as actually Mr. Pex, when he's working for the defense, also.

Q.   Okay.  And speaking of Mr. Pex, don't you work for him?

A.   I'm not so sure I'd say "work for him".  What we have is a group of several forensic — or, retired forensic scientists that if one will get a case that either they're too busy to work, then they'll essentially pass it off onto another one.  And if I have a case I can't get to, then I'll pass it off onto other scientists.  We, basically, exchange cases in that manner.  So, because he has a formed corporation, he takes a small percentage because he does some of the billing to the other clients, which I don't have to do.  And that's part of, I guess, working for him.

Q.   All right.  Now, you're — well, let me ask you these questions.  The two holes that you found in the shirt and the bra — when were they made?

A.   I have no idea.

Exhibit 5001 at 1496

Meneely    X    D7 170

Q.    Okay.  You're familiar with Kathy Wilcox, are you not?

A.    Yes, I am.

Q.    In fact, you work for the laboratory system as the same time as Ms. Wilcox, did you not?

A.    Yes.

Q.    And you are — when you worked for the Laboratory, you were familiar with her work, - - -

A.    (Interposing) Yes.

Q.    - - - were you not?

A.    Yes.

Q.    And you never had any problems with her work, did you?

A.    Actually, Mr. Pex dealt directly with her work.  I knew of what she did down in the Coos Bay Laboratory, but not more detail work.  But, I had no indication there was any problems with her work, if that's what you're asking.

Q.    Well, you have no reason of your own to doubt the validity of her work, do you?

A.    No.

Q.    All right.  Now, you've indicated that you found these two holes and they are how long, again?  One and a half centimeters?

A.    One and a half centimeters is just about three-quarters of a an inch.

Exhibit 5001 at 1497

D7 171                                    Meneely  X

Q.    And are — is it your testimony that Kathy Wilcox missed these two holes?

A.    I believe she may not have looked closely enough, given the photographs that she provided through discovery. That's the best I can tell you.

Q.    Okay.  Now, you're familiar — you were aware that the clothing was sent to another laboratory — this particular laboratory in England.  Is that right?

A.    Correct.

Q.    And they looked at the clothing?

A.    Uh huh.

Q.    Is that correct?

A.    Correct.

Q.    And you read the report, did you not?

A.    Yes, I did.

Q.    And I'm going to show to you — this is the report that's marked as State's Exhibit 211.  And there's this paragraph here, it starts on — oh, what is this?  This is Page — well, this would be the last page of the report.  It's talking about — well, it starts in this paragraph and it starts, "Damage to the back of the upper garments," and so forth?

A.    Uh huh.

Q.    There's a sentence — the last sentence of that paragraph — would you read that for us, please?

Exhibit 5001 at 1498

Meneely  X    D7 172

A.    "The possibility that Leah, the deceased, was stabbed cannot be eliminated.  However, any stab cuts are no longer recognizable due to the decay in the fabrics."

Q.    Would that also indicate to you that that laboratory — if those holes were present from the — from Leah Freeman's dying — wouldn't they have seen them?

A.    I can't tell you how closely somebody else — because it's not in their report how closely they looked at anything.

Q.    Okay.  Well, you knew that the clothing had been sent there for DNA analysis and - - -

A.    (Interposing) This clothing has been sent a variety of different places.  But, yes.

Q.    Okay.  Now, in examining the holes did you see any type of blood stain?

A.    I did not.

Q.    In your career — granted, these are fluids from Ms. Freeman's body.  She had decomposed, extensively, correct?

A.    Extensively.  Yes.

Q.    But, even with that decomposition, if Ms. Freeman had been stabbed, would you not expect to at least see some staining?

A.    Well, as Dr. Olson testified, depending on the position of the body, there may be, No. 1, very little blood.  But, No. 2, because there is such extensive degradation of biological tissue that I'm not sure that the stain would

Exhibit 5001 at 1499

D7 173                                           Meneely  X

actually be visible at this point in time.  So, it's uncertain.

Q.   All right.  Well, let's go to the first proposition you put out there.  If she didn't bleed, thus no staining, then there wouldn't be any blood to transfer to a car, would there?

A.   If that were the only bleeding area, correct.

Q.   Now, have you ever worked out of the Coos Bay Lab when it was operating?

A.   I don't believe I've worked in the Coos Bay Lab.

Q.   All right.  So, you're not familiar with the size of the fume hood that they had there?

A.   Fume hoods are somewhat standard.  But, I haven't worked in there.

Q.   Okay.  So, if I were to tell you it was big enough that you could have put a body in there, would that have surprised you?

A.   That's fine.  I mean, it's a fume hood and some are large and some are not so large.

Q.   Okay.  Let's talk about the hair analysis that you talked about in terms of toxicology.  In a homicide case, when you're trying to determine if a person had drugs in their system, you want to know if they had drugs or alcohol on board at the time of their death.  Isn't that true?

A.   Well, that's one of the desirable things that we look at.  Yes.

Q.   All right.  Now, for hair analysis to be accepted or

Exhibit 5001 at 1500

Meneely    X    D7 174

to get the results out of it, the person takes the drugs, is that right?

A.    Correct.

Q.    And then they metabolize it?

A.    Correct.

Q.    And then it gets passed through the blood system to the hair roots, correct?

A.    Correct.

Q.    And then it gets passed through the root into the shaft of the hair?

A.    Correct.

Q.    And then the hair has to grow?

A.    Also correct.

Q.    All right.  So, in order to — if you want to find out if somebody had drugs in their system at the time they died, would you be able to do that with a hair test?

A.    Well, what you're suggesting is blood is probably the best medium, which is correct because blood will tell you the most recent ingestion.  Next down the line is, perhaps, muscle or tissue, which is directly associated with the blood, which would show recent ingestion.  Next down the line of possibilities is hair, not as recent ingestion because, as you indicated, hair actually has to grow to move out from the root area.

Q.    So, in this case, if we wanted to know — let's say,

Exhibit 5001 at 1501

D7 175                                          Meneely  X

for example, if Leah Freeman died of a drug overdose, would we be able to tell that from a hair sample?

A.   Probably not, if that was the one time she utilized a large amount of drugs and didn't have time to migrate to the shaft of the hair, is a possibility.

Q.   Okay.  And in this case, if we wanted to find out what type of drugs she had in her system at the time she died, the best way to do it would have been through the tissue sample, wouldn't it?

A.   Well, the very best is the blood, which is not an option in this case.  The next one is the tissue sample, which is in the muscle, as the best case option possible, still has the potential of degradation because of biological activity. But, in essence, that's the next best try.

Q.   All right.  And in this case, that's what they did?

A.   That's what they attempted to do.

Q.   Now, you mentioned that if you talked about — well, some date rape drugs and things like that, like GSB?

A.   No.  It's GHB.

Q.   GHB, excuse me.  How long does that stay in a person's body?

A.   Actually, it only stays in the urine about twelve hours, and much less in the blood system.

Q.   In fact, isn't it true that if you have someone who thinks that they've been drugged with GHB and that they were

Exhibit 5001 at 1502

Meneely  X    D7 176

raped, you've got to get them to a hospital or to do a sample as quick as possible because if you don't, within a few hours it's gone?

A.    Correct.

Q.    And how long has GHB been around?

A.    Well, a number of years.  I guess I can't put a specific date to it.

Q.    Well, let's put it to you this way, you worked at the State Police Crime Lab until when?

A.    I retired about four years ago.

Q.    So, that would be 2007?

A.    Yes.

Q.    And wouldn't it be safe to say, or true to say, that — well, when you worked at the Lab you did a lot of toxicology work?

A.    Correct.

Q.    And you did a lot of urine tests for drugs?  You did some blood and alcohol things?  And, I believe, when we worked together, we were working on trying to do blood toxicology?

A.    Also correct.

Q.    All right.  Now, during that time frame that you were working there, isn't it true it's only been within the last five, seven years that GHB has really come on the scene?

A.    You know, I guess I'm having trouble with when you say, "Come on the scene," because I wrote up procedures for GHB

Exhibit 5001 at 1503

D7 177                                              Meneely  X

analysis for the Crime Lab Division more than five years.  So, it was on the scene.

Q.   Well, I guess my question is this.  GHB, was it a common drug being used in 2000?

A.   You know, when you say "common," it's whether or not it was recognized as a drug utilized in date rape situations and were individuals actually given samples to present to the Laboratory for analysis.  It may not have been really well recognized back then as a date rape drug.

Q.   Now, when you worked at the Laboratory and, let's say my office would say, "Hey, I'd like you to analyze this urine sample and tell me — give me a tox report," what would you look for?

A.   Generally we do an amino acid test, which would cover general classifications of drugs.  Then we would do what's called an acid base extraction to look for a broader range of drugs, hopefully to find basically everything possible in the urine.

Q.   Okay.  And you would send back a report and it would say, "Well, we found meth," or, ". . .the metabolites of methamphetamine or amphetamine or marijuana," or stuff like that.  Correct?

A.   Correct.

Q.   Did you normally test for things like GHB?

A.   Only when the circumstances dictated.  In other

Exhibit 5001 at 1504

Meneely  X    D7 178

words, if we had — through the officer's report of the incident, "This is a date rape type scenario," or other circumstances — we would have to specifically test for it.

Q.    Now, as Dr. Olson mentioned, there is the Physician Desk Reference book about yay thick that's got thousands, if not millions, of drugs in it.  Correct?

A.    It's got a lot of medications.

Q.    When you worked at the Crime Lab, would you test for everything that was in the book?

A.    Well, I think we made an effort to test for everything in the book.  That's why we did the acid base extractions to basically encompass everything.  But, I guess, can I say we absolutely tested for everything?  Probably not.

Q.    Now, in getting back to trace evidence a little bit, how many — well, let's back up.  You worked for the Laboratory for how long again?

A.    Twenty-eight years.

Q.    And during that time frame you worked on a lot of homicide cases.  Is that right?

A.    Yes.

Q.    Would you say it to be hundreds, if not thousands?

A.    Well, a lot of homicide cases.

Q.    And during that time frame, how many — can you give me a percentage of how many were solved by means of trace evidence?

Exhibit 5001 at 1505

D7 179                                          Meneely  X

A.   Actually, two that I can think of specifically.  One I mentioned in Toledo, Oregon and another one where we virtually had no other evidence, aside from the fact that as the little old lady kicked her assailant, a hair stuck in her shoe.  And I found the hair and we did some blood typing off that trace evidence.  I don't recall any others right now.

Q.   Well, let's go back again now to trace evidence.  You indicated that the lack of trace evidence can mean something.  Is that right?

A.   It may, depending on the circumstances.

Q.   And, for example, like what?

A.   For example, if I have a fuzzy red garment and I sit in this car — expectation I would leave some fuzzy red fibers in that car.  Conversely, if I have a fuzzy red garment and I didn't sit in the car, that would support the fact that I didn't sit in the car.

Q.   Okay.  Now, in this case, you went through all the lab reports that were submitted.  Is that correct?

A.   Correct.

Q.   And you are aware of what Kathy Wilcox had done in terms of analyzing or looking at the Mustang and what have you?

A.   Yes.

Q.   And you were aware that — or, were you not — that in her examination of the Mustang, she did not find any evidence of Leah Freeman being in the car, correct?

Exhibit 5001 at 1506

Meneely   X    D7 180

A.   Correct.

Q.   Now, let's back up a little bit.  You were given some of the police reports, were you not, in this case?

A.   Yes.

Q.   And were you not aware that Leah Freeman was seen inside that car — that very car — the day she disappeared?

A.   I was aware of that.

Q.   And yet we didn't find anything putting her in that car?

A.   That's what the Laboratory reports say.

Q.   As a Criminalist, what does that mean to you?

A.   Well, they didn't find anything.  That's all I can

- - -

Q.   (Interposing) That means she wasn't in the car?

A.   Not necessarily.

Q.   Well, of course, we have witnesses that put her there.  Would it be safe to say that a reasonable explanation of why nothing was found of her in that car is because it was cleaned out before it was examined by the State Police?

A.   One possibility.  Or, the possibility is that it may have been overlooked.  But, once again, the scientists are good scientists, too.  So, all I can say is that nothing was found that was associated with her.

Q.   But, something should have been found if she was in there.  If you're saying that this Locard Principle that

Exhibit 5001 at 1507

D7 181                                    Meneely  X

something gets left behind — if she was in that car, there should have been something?

A.   Once again, I believe Mr. Pex probably testified that there's no absolutes.  There's a principle, but once again there's no absolutes in this science.

Q.   The gasoline you mentioned — you are aware of the area where Ms. Freeman's body was found?

A.   Yes.

Q.   And you're aware it's a dirt road?

A.   Yes.

Q.   Would you really, realistically expect to find residue of gasoline there after five weeks on a dirt road in the summertime?

A.   Once again, if you look at the photographs of the car processing, the gas tank was dripping gas while they processed the car in the garage.  Once again, depending on how long the car was there, it was leaking gas.  If that was the car, it's leaking gas and it's going to — like I said earlier is that the volatiles are volatile materials.  They can evaporate as Mr. Pex said.  But yet, even in burning conditions, there's still remnants of it.  But still, even more durable is the dye components of gasoline.  They're durable.

Q.   Well, okay.  Let's say you have a body in your car and pull up and you dump it over the side.  Are you going to stick around for a half hour, or four or five hours, as that

Exhibit 5001 at 1508

Meneely  ReD  D7 182

car was sitting — like it was sitting in the bay?

A.    Once again, under that definition, it may not have magically dripped, if that's what you're suggesting.

Q.    Well, I guess what I'm getting at is, it's reasonable to assume that you would be able to find something after five weeks under these types of circumstances, would it?

A.    Well, first of all, the definition as how long it stayed at that particular scene and how much it dripped.  If it was only moments, then I would suggest there would be very little evidence.  If it was longer, then it would depend on how much dripped, you might say.

MR. FRASIER:    I have nothing further.

REDIRECT EXAMINATION

BY MS. McCREA:

Q.    Mr. Meneely, if Leah Freeman had been injured and were bleeding and had been in Mr. McGuffin's Mustang, based on your experience, would you expect that the forensic scientists would find some trace evidence of blood in that car?

A.    Forensic scientists are very good in looking in every crack and every crevice of everything they go after.  And I would expect if that's the case, that they would find it.

Q.    And, likewise, if she had been in the trunk?

A.    Likewise.

Q.    Now, - - -

MS. McCREA:    May I have 211, please?

Exhibit 5001 at 1509

D7 183                                        Meneely  ReD

Q.   Mr. Meneely, let's just go back briefly to State's 211, which is the results of the laboratory examinations on — from the English lab.  Can you read to us this first sentence in the second paragraph concerning what their findings were about blood staining?

A.   "No specific area of blood stain was found on the garments probably due to the extensive body tissue staining on degradation."

Q.   Okay.  And then read us what it says in that first sentence in the bottom paragraph on that page?

A.   "Damage to the back of the upper garments, while not overlapping, could be considered as have occurred whilst the garments were worn together, allowing for some movement between the layers of garments."

Q.   So, does that report talk about damage to the upper garments?

A.   Well, this isn't specific as to what I've read — talks about the blood stain couldn't be found or identified.

Q.   Right.

A.   And they talked about, in the last paragraph, damage to the back of the upper garments.

Q.   Did you find damage to the back or the front of the upper garments?

A.   The — there was frayed areas on both front and back.

Q.   Okay.  But, what about what you've described — the

Exhibit 5001 at 1510

Meneely   ReD   D7 184

cut that went through two garments?  Was that on the front or the back?

A.   Front.

Q.   Okay.  And while they talk about a different area — the damage to the back of the upper garments — do they also talk about that as being in different locations?

A.   Well, they indicate, ". . .whilst not overlapping."

Q.   I know.  I'm sorry to make you read that.  Whilst?

A.   Whilst.

Q.   Okay.  Not overlapping?  And is that the same situation that we have here of damage that is not overlapping?

A.   These are sharply defined areas of damage, that they're not overlapping, but they're in very close proximity.

Q.   Okay.  And the conclusion in the English lab report was consistent with your conclusion, that is although the — as they put it, damage — you put it "cut" — was not overlapping, but it could have occurred while they were worn together?

A.   Well, they're referencing the upper — the back of the garments, the way I read this.

Q.   Well, I understand that.

A.   Okay.

Q.   But, my question is, in terms of having damage to the two garments in the same location, does the English report say that that would have — that the damage would have happened at the same time or a different time?

Exhibit 5001 at 1511

D7 185                                        Meneely  ReD

A.    That's what they're suggesting, because the two garments can move between each other.

Q.    So, are they saying the same thing that you've said in terms of movement of the garments or something different?

A.    Same thing, essentially.

Q.    Okay.  Mr. Meneely, in terms of Kathy Wilcox's testimony, you were present for that, right?

A.    Yes, I was.

Q.    Did she say that she didn't find any evidence of Leah Freeman or Nick McGuffin, or did she say that it wouldn't be significant if she did?  Do you remember?

A.    I'm sorry.  I don't remember that.

Q.    Okay.  Now, in terms of your testimony here today, is — from what you've told us, is there anything that you have said here today that is inconsistent with the report that you wrote that was provided to the District Attorney?

A.    No.

Q.    Is there anything inconsistent with the photographs that you took during your examination?

A.    No.

Q.    Is there anything inconsistent with your testimony today and what you observed when you did the examination of the clothes and the shoes?

A.    No.

Q.    And the photographs that you took during the

Exhibit 5001 at 1512

Meneely  ReD  D7 186

examination that have been entered into evidence here today, those were provided to the District Attorney?

A.   Yes.

Q.   And the photographs that were provided to the District Attorney showed the cut that you've testified to here today concerning the tank top and the sports bra?

A.   Yes.

MS. McCREA:   Nothing further.

Q.   Thank you.

THE COURT:   You may step down, sir.  You are free to leave.

We'll take the afternoon recess at this time.

Everybody else remain seated until the jury has a chance to get into the jury room.

We'll take about 20 minutes.

(Jury out.)

THE COURT:   Three thirty.

(RECESS)

(Jury in.)

THE COURT:   Be seated, please.

Call your next witness.

MS. McCREA:   Your Honor, the defense does not have any more witnesses available today.  I do have documents to offer into evidence.

THE COURT:   Okay.

Exhibit 5001 at 1513

D7 187

MS. McCREA:    So, the defense would offer Exhibits 104 and 105.  And these are from — were seized by Sheriff Zanni at 351 West 5th, and are letters from Ms. Freeman to Mr. McGuffin.

Then we have Exhibits 106, 107, 108, 109, 110, 111, 112, 113, 113a, because the — these are the originals. The copy I had were on one document — and 114.  And those documents were seized by Officer Wetmore from Mr. McGuffin's bedroom.  And I actually received the originals courtesy of Mr. Frasier.

MR. FRASIER:    I have no objection.

THE COURT:    They are received.

(Whereupon Defendant's Exhibit Nos. 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 113a and 114 were received into evidence.)

MS. McCREA:    And I would request permission, Your Honor, to read from some of those documents to the jury at this time.

THE COURT:    You may.

MS. McCREA:    This is Exhibit 108:

"Nick, Hey, sugar, how are you?  I'm so bored. Mr. Crosby's test took me about fifteen minutes to do.  So, right now I have 55 minutes left until I get to see you.  I am so hot.  I'm stupid for wearing a big dark shirt on a bright sunny day.  Oh well, just

Exhibit 5001 at 1514

D7 188

because it's yours, that makes it okay.  I think that makes sense."

"Anyways, I'm so happy.  I have 50 minutes left of my freshman year.  Yay.  I wish you were going to be back next year and the year after that and the year after that, and then we would graduate together and then we could walk down the thing together.  But, no, you had to graduate three years before me and walk down the thing with Zack.  Shouldn't you have picked someone you would want to share your high school memories with?  You will probably never see him.  Well, never mind, you will see a lot of those people in your class.  You'll never see a lot of those people in your class except for reunions, which for you is probably a good thing, and for me, too."

"I feel like I am actually talking to someone right now because of the way I'm saying things in my head.  How weird.  I am in a weird mood.  I am all happy — giggly for awhile, and then I'm all irritable and mad."

"Now I have 44 minutes left.  I think I'm going to have to go and get another piece of paper so I'll have something else to do.  Yeah.  I'm going to write Sherry now.  I love you, Leah Nicole."

"P.S.  You'd better be done with your shit

Exhibit 5001 at 1515

D7 189

around the house."

Exhibit 109, dated May 25, 2000:

"Nick, Hey, how are you?  I hope you feel better.  You probably don't, but I sure hope you do. I walked by your class and I saw you but you didn't see me.  Yeah, you were staring at something, but I didn't know what.  Anyways, I just told Tawna (phonetic) about how you went off on Stacy.  She thought it was funny.  She is bothering Tawna, too."

"Well, everybody is wandering around so I think the bell is going to ring, so I'm going to go.  I love you, heart, yeah, Leah, a.k.a., Baby Doll."

Exhibit 111:

"Nicholas James, a.k.a. Prince Charming, Hey, baby.  How are you?  I'm so sad.  I miss you so much. Right now it's third period and I already cried.  So did Melissa, though.  We miss you guys.  School sucks without you, Baby.  So, how is your day?  I'm sorry I was being a bitch this morning.  I wish you were here to make me feel all better.  Scott is coming to get Melissa at lunch today and I don't get to see you until whenever."

"Melissa and Holly want me to stay with them tonight.  I kind of want to, but I want to see you, too, since I haven't seen you all day."

Exhibit 5001 at 1516

D7 190

"Well, I'm going to go.  I'm sure I will write you later today.  I love you.  Love always, Leah Nicole, a.k.a. Baby Doll."

Exhibit 112:

"Nick, I just talked to you, but I miss you already.  So, I was talking to Stacy about graduation.  She was talking about how cute you and Zack were when you were hugging his back.  I think you looked cute, too.  Actually, I think she was saying Zack was cute, but I'm saying I think you were good.  Anyway, Stacy wanted to take pictures of me, but I didn't want her to because I look like shit, no make up and big, baggy clothes.  That doesn't really make good pictures."

"Guess what?  Yesterday Sherry, Cory and J.D. were looking for a movie and Cory left.  I don't know where he went, but somewhere."

"Anyway, so J.D. and Sherry are there alone and J.D. kissed Sherry.  Cory and Sherry aren't officially together, but she wants to be.  So, she doesn't want to tell him.  Oh, yeah, I forgot to tell you what happened.  J.D. kissed her and she kissed back.  Poor girl.  I feel really sorry for her.  Cory was telling me awhile ago how he would never stay with a girl who cheats on him."

Exhibit 5001 at 1517

D7 191

"Anyways, I'm so sad.  I have to go to two more days of school without you and I can't wait until Thursday.  Well, I should be listening to Mrs. Lefleur (phonetic), so I'm going to go now.  I love you.  XOXO, Love, Baby Doll."

The defense also offers Defense Exhibit 121 — either by Judicial Notice, although I think Mr. Frasier is prepared to stipulate to it — which sets out from the U.S. Naval Observatory Astronomical Applications Department, the time of sunset on June 28, 2000.

MR. FRASIER:   No objection to the exhibit.

THE COURT:   Received.

(Whereupon Defendant's Exhibit No. 121 was received into evidence.)

MS. McCREA:   And that is as much as the defense can do this afternoon, Your Honor.

THE COURT:   Mr. Frasier?

MR. FRASIER:   Your Honor, with the Court's permission, I have — I could recall what would be a rebuttal witness at this time and we could take up some time this afternoon.

THE COURT:   Ms. Wilcox?

MR. FRASIER:   Yes.

THE COURT:   Okay.  I think that's - - -

MR. McCREA:   (Interposing) Well, if

Exhibit 5001 at 1518

D7 192

Mr. Frasier had let us know he wanted to do that a little sooner — we've released Mr. Meneely for the day, Your Honor. So, we don't have him here to observe the testimony and to advise us in conjunction with that testimony.  It makes it very awkward from our perspective.  And I regret it, because it would have been a handy way to do it otherwise.  But, I — we didn't know that Mr. Frasier would make this suggestion.

So, I am forced to object to following that procedure.  And I apologize to the Court we don't have further witnesses scheduled.

THE COURT:    Has Ms. Wilcox got anything — she lives in this area, correct?

MR. FRASIER:    Yes, she does.

THE COURT:    So - - -

And you have how many — how much of a day do you have tomorrow with your witnesses, do you think?

MR. McCREA:    There probably would be time enough to have her on tomorrow, based on our witnesses who — we have a number of witnesses, but they all should go fairly quickly.  And I've spent a lot of years making that prognostication and being right on.

THE COURT:    I've spent a lot of years listening to lawyers prognosticating.

MR. FRASIER:    I would prefer, Your Honor, that we be given a specific time so she doesn't have to sit here all

Exhibit 5001 at 1519

D7 193

day.

THE COURT:    How about 1:00?

I mean, it sounds like your witnesses are going to be short, generally.  If they're not, 1:00 isn't going to interfere with anything.

MS. McCREA:    Not at all, Your Honor.  That's fine.  And we can arrange with Mr. Meneely to be here.

THE COURT:    Okay.

MR. FRASIER:    All right.  That's fine.

THE COURT:    All right.

Then we'll be in recess.

Everybody else remain seated until the jury has a chance to leave.

Be back at 9:00 tomorrow.  Put your pads in the jury room and remember the admonition.  Have a pleasant evening.

(Jury out.)

THE COURT:    Okay.  We'll be in recess until 9:00.

(END OF DAY 7)

*                              *                              *

Exhibit 5001 at 1520

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

STATE OF OREGON,                      )
                                      )
              Plaintiff,              )      CASE NO. 10CR0782
                                      )
                                      )         JURY TRIAL
       vs.                            )           DAY 8
                                      )
 NICHOLAS JAMES McGUFFIN,             )
                                      )
           Defendant.                 )
_____      )

TRANSCRIPT OF PROCEEDINGS

Volume 12, Pages D8 2-D8 79

BE IT REMEMBERED That, the above-entitled cause came on regularly for hearing beginning at 9:00 a.m. on Friday, July 15, 2011, in the Circuit Courtroom of the Coos County Courthouse in the City of Coquille, County of Coos, State of Oregon, before the Honorable Richard L. Barron, and a jury.

APPEARANCES

R. Paul Frasier, District Attorney for Coos County, representing the Plaintiff.

Erika Soublet, Assistant District Attorney for Coos County, representing the Plaintiff.

Shaun McCrea, Attorney at Law, representing the Defendant.

Robert McCrea, Attorney at Law, representing the Defendant.

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 1521

D8 2

*                              *                              *

(Jury out.)

THE COURT:    Be seated, please.

Mr. McGuffin, as I do in these type of cases, your counsel has, I think, indicated that you were going to testify, which is fine.  You have the right to testify if you wish to.  If you do testify, you are subject to cross examination on what you've testified to, or any matters related thereto.

You also have the right not to testify.  And if you do not testify, the Court would give an instruction to the jury stating to the jury that you have a Constitutional right not to testify and your counsel has asked for that instruction.  So, I assume that's just in case you do not testify.

But, do you understand what I've explained to you?

DEFENDANT:    Yes, I do.

MS. McCREA:    And, Your Honor, that — just so the Court knows, he has not made a decision at this point.

THE COURT:    Oh, I assumed that.

MS. McCREA:    All right.

THE COURT:    That's why I like to go - - -

MS. McCREA:    (Interposing) Yes.  Okay.

THE COURT:    - - - over this with them and I

Exhibit 5001 at 1522

D8 3

have prepared that instruction.

And I think I've prepared the instructions that I'll have Xeroxed and given to you guys today. I think they're the instructions that both sides have asked for. So, I'll give them to you now and if there's any comments or discussion on those, we'll do that some time today.

Okay?

Cathy, you want to give them each a copy of that, please?

Bring the jury in. Oh, just a minute.

MR. FRASIER:    Your Honor, just so the Court is aware, we've decided on Ms. Wilcox — to wait until our rebuttal case, when we get there, to call her. We won't call her this afternoon.

THE COURT:    Okay. That's fine.

(Jury in.)

THE COURT:    Good morning.

Call your next witness, please.

MS. McCREA:    Defense calls David Main, Your Honor. I need to get him.

THE COURT:    I don't believe I excused you, Mr. Main. So, just have a seat. I don't have to swear you in again, because I didn't excuse you.

DAVID MAIN

was thereupon again produced as a witness on behalf of the

Exhibit 5001 at 1523

Main  D    D8 4

Defendant and, having previously been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:   Go ahead.

DIRECT EXAMINATION

BY MR. McCREA:

Q.   Mr. Main, you've been identified as David Main and you formerly were a Coos Bay Police Officer.  Is that correct?

A.   Yes, sir.  It is.

Q.   And back in July of 2000 you were involved in the investigation concerning the disappearance of Leah Freeman, correct?

A.   Yes, sir. I was.

Q.   All right.  And you're here this morning at our request, correct?

A.   Yes, sir.

Q.   And in conjunction with that request, were you asked to look for your report concerning your interview with Scott Hamilton occurring on the 10th of July of 2000?

A.   Yes, sir. I was.

Q.   And did you find that report?

A.   Yes, sir.  I did.

Q.   And did you bring it with you?

A.   Yes, sir.

Q.   And do you have it there at the witness stand with

Exhibit 5001 at 1524

D8 5                                              Main  D

you?

A.   Yes, sir.  I do.

MR. McCREA:    May I approach, Your Honor?

THE COURT:    You may.

Q.   All right.  You have the report there now?

A.   Yes, sir.  I do.

Q.   Would you look at your report, and I want to ask you a question about the interview with Scott Hamilton on the 10th of July of 2000.  Did you interview him concerning his whereabouts and those of Mr. McGuffin on the night of the 28th of July of 2000?

A.   Yes, sir.  We did.

Q.   All right.  And at that time, did he tell you as follows:

"Mr. Hamilton stated that he had been at Kristin Steinhoff's house until after midnight. Mr. Hamilton stated that Nick had shown up at Kristin's between 9:00 and 10:00 p.m.  He was in his own car, the Mustang.  Mr. Hamilton stated that Nick was pissed off and acted confused.  Nick told Hamilton and Steinhoff that he had been late to pick up Leah at Sherry's and he was supposed to pick her up at 9:00 p.m. and he got there at 9:05 p.m.  Nick told them he looked for her, but couldn't find her.

"Mr. Hamilton said that Nick had told him of

Exhibit 5001 at 1525

Main  D     D8 6

rumors in Port Orford that Leah was seen with an unknown girlfriend going to California.

Mr. Hamilton did mention an argument the two had at Leatherman's lot.  They were fighting, but mostly yelling at each other three weeks ago.  Then this happened about a week before her disappearance, he thought."

Is that what he told you?

A.   Yes, sir.  It is.

Q.   And you put that all in your report?

A.   Yes, sir.  I did.

Q.   Thank you.

MR. McCREA:    That's all the questions I have.

THE COURT:    Cross?

MR. FRASIER:    Could we have a limiting instruction, Your Honor?

THE COURT:    Yes.

Ladies and gentlemen, again, as I've told you in the past, this is merely offered for impeachment towards Mr. Hamilton, and you can use it in regards only for the purpose of determining whether Mr. Hamilton is a credible or not-credible witness, not for the substance.  Okay?

Go ahead.

MR. FRASIER:    We have no questions, Your Honor.

Exhibit 5001 at 1526

D8 7                                         Oester  D

MR. McCREA:   May the witness be excused?

THE COURT:   He may.

You are excused from further attendance.

MR. McCREA:   He's got three loads of gravel to haul, Your Honor.

THE COURT:   Good.

Don't leave it here.

MR. McCREA:   Call Dale Oester.

WITNESS:   I can deliver it at home.

THE COURT:   Don't need it there, either.

DALE OESTER

was thereupon produced as a witness on behalf of Defendant and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:   Have a seat here, please.

DIRECT EXAMINATION

BY MR. McCREA:

Q.   State your name, please?

A.   Dale Oester.

Q.   And you were formerly employed by the Oregon State Police?

A.   I was.

Q.   Were you so employed back in August of 2000?

A.   I was.

Exhibit 5001 at 1527

Oester   D    D8 8

Q.    And at that time, were you called in to assist in the investigation concerning the disappearance of Leah Freeman?

A.    I was.

Q.    As part of that investigation, did you have occasion to contact and interview a Mr. Scott Hamilton on the 15th of August of 2000?

A.    I did.

Q.    Now, you're here at the — at our request, right?

A.    I was subpoenaed by the defense.  Correct.

Q.    Okay.  That's the kind of request lawyers make.  All right.

And we asked you to review your report of that interview.  Is that also correct?

A.    Correct.

Q.    All right.  And you have that report with you?

A.    Yes, three pages of it.

Q.    Excuse me?

A.    Three pages of it.

Q.    Oh, all right.  But, specifically, do you have the report of the interview you had with Scott Hamilton on the 15th?

A.    Yes, I do.

Q.    All right.  And looking at your report, I want to ask you if he — if he told you as follows.  During this

Exhibit 5001 at 1528

D8 9                                         Oester  D

contact, the following information was obtained:

"His girlfriend was Kristin Steinhoff.  His ex-girlfriend is Melissa Smith.  On July — excuse me — on June 28th he was at Melissa's until about 8:00 and then he went home.  At 9:00 to 9:30, he went over to Kristin Steinhoff's house and Nick was there sitting in his Mustang.  Kristin was on the porch and Nick asked him if he had seen Leah.  He told him, Nick, he had not seen Leah; and Nick said that if he saw Leah and she was with another guy, to beat the hell out of the guy and take Leah home.  In his opinion, Nick seemed genuinely concerned."

"Nick and Kristin were going to go put gas in a purple Kia, so he waited at Kristin's house.  They left about 10:30 and were gone about fifteen to twenty minutes before they came back.  When they got back, they said they had gone to Sinnott's to see if Leah was there, but she wasn't.  Nick left Kristin's at midnight, possibly a little after."

"He, Hamilton, stayed another fifteen to twenty minutes before Kristin left to take the purple Kia back to the guy that owned it near Greenacres.  He left and went home and got home about 1:00 a.m."

Is that what he told you?

A.    Yes, it is.

Exhibit 5001 at 1529

Oester    D    D8 10

Q.    Now, he said:

"On June 29th he woke up at 11:00 a.m. or so. He went over to Kristin's, but she was asleep. He drove around and stopped at Hunter's to see Brian and then he went back to Kristin's at 7:00 p.m. and spent the night there. He heard that Leah. . ."

MR. FRASIER:    (Interposing) Your Honor, I'm going to object, because I don't think we went into this line of questioning with Mr. Hamilton about where he was the next day. So, this would be improper impeachment.

THE COURT:    Sustained.

MR. McCREA:    We'll skip this.

Q.    Let's go to the next paragraph.

"On the night of June 28th, he never saw Nick and Kristin Steinhoff in her bedroom. When he got to Kristin's that night, he turned down his CD player when he pulled in, and saw that it was 9:00 and Nick was there, just getting out of his car and walking up to her door. It wasn't dark yet, but it was close enough that he had his headlights on. Nick was very calm and didn't act like anything was happening."

Is that what he told you?

A.    Yes, it was.

Q.    All right. And you've reviewed your report as I

Exhibit 5001 at 1530

D8 11                                    Oester  D

read the questions?

A.    Yes, I did.  I followed along with you.

Q.    Now, did you have another occasion to interview Scott Hamilton on September 19th of 2000?

A.    I did.

Q.    And have you reviewed your report concerning that interview?

A.    I have.

Q.    And you have that report in front of you?

A.    Yes, sir.

Q.    And did he state as follows:

"He stated that about a week after Leah's body was found, he was going to Chris Miller's place above Fairview with Nick McGuffin.  It was about 8:00 p.m. in the evening and Nick asked him if he wanted to see where Leah's body had been found. Hamilton stated that he told Nick that he didn't, but as they were driving to Fairview, Nick turned onto Lee Valley Road and drove out past the rock pit.  Nick was looking to the left, driving slow, and pointed out where the grass was mashed down and said, 'That's where her body was found.'"

"Nick drove about twenty feet past this spot and stopped the car and they got out.  Nick walked back to where the grass was mashed down and he went

Exhibit 5001 at 1531

Oester   D    D8 12

over the bank towards the river.  Hamilton said he was really not comfortable with this and stayed up on the road and watched Nick.  Nick was down at the foot of the bank looking around and touching things.  Nick pointed out a spot where he said Leah had been laying.  Hamilton stated he was really uncomfortable at this point, and wanted to leave."

"Nick came back up the bank and he had a picture of Leah in his hand.  He was crying and looking at the picture, then walked up to him and hugged him — Hamilton.  Nick was saying that he could picture Leah lying down there with her head on a rock.  Hamilton stated that it really creeped him out and he started walking back toward the car.  Nick started walking with him and by the time they got the twenty feet back to the car, Nick had quit crying.  They got back in the car and Nick then drove on up to Chris'."

Is that what he told you?

A.   Yes, it is.

Q.   Thank you, very much.

MR. FRASIER:   Again, Your Honor, a limiting instruction?

THE COURT:   The same instruction I just gave you in relation to Officer Main applies to the testimony of

Exhibit 5001 at 1532

D8 13                                        Oester  X

Mr. Oester and is only for impeachment purposes only as to the credibility of Mr. Hamilton and no other purpose.

Any cross?

MR. FRASIER:   Yes.  Just a few additional questions.

CROSS EXAMINATION

BY MR. FRASIER:

Q.   Detective — or, formerly Detective Oester, you were not involved in the initial investigation?

A.   I was not.

Q.   But came in after the body had been found?

A.   I was assigned the day the body was recovered. Yes.

Q.   And did you actually go out to the site where the body was found?

A.   Not during the recovery.  I did subsequently, after the scene was processed.

Q.   Did you ever take Mr. Hamilton out there?

A.   I did.

MR. McCREA:   Wait a minute.  That's beyond the scope of the direct examination, Your Honor.

MR. FRASIER:   This goes to the asking questions about Mr. Hamilton going out to the scene.  So - - -

MR. McCREA:   (Interposing) Well, ask him about what Mr. Hamilton said about going out to the scene.

Exhibit 5001 at 1533

Oester   ReD   D8 14

THE COURT:    Right.  I know it's for impeachment purposes.  The fact that it was for impeachment purposes, I don't know that allows you to cross examine him on a substantive matter unless it relates to that impeachment or you're trying to rehabilitate Mr. Hamilton.

MR. FRASIER:    Well, that's what I'm trying to do.

THE COURT:    Right.  If you go there, then I would give the limiting instruction that it's for rehabilitation as to his credibility.  Go ahead.

Q.    Now, in your interview with Mr. Hamilton, he indicated he had been out with Mr. McGuffin to the place where the body was recovered?

A.    Yes.

Q.    And did you ask Mr. Hamilton to take you to that location?

A.    Yes, I did.

Q.    And did Mr. Hamilton take you to the location where the body had been found?

A.    He did.

MR. FRASIER:    That's all I have, Your Honor.

REDIRECT EXAMINATION

BY MR. McCREA:

Q.    Well, in that regards — but he pointed out the wrong spot, didn't he?

Exhibit 5001 at 1534

D8 15                                          Oester   ReD

A.   He pointed out the location where Nick had indicated the body was located — or her body had been found.

Q.   I'm sorry?

A.   Mr. Hamilton pointed to the spot — indicated the spot that Nick had told him where the body was found.  And that — my personal knowledge of that was — where Mr. McGuffin indicated the body was found was not where the body was found.

Q.   I'm sorry.  I didn't catch the last part.

A.   Where he — where Mr. McGuffin pointed out to Mr. Hamilton where the body had been located, it was not the location where the body had actually been located.

Q.   Okay.  Thank you.

        MR. McCREA:    That's all.

        THE COURT:    And, again, the testimony on cross examination and redirect will only go to — you can only consider all of that testimony as to Mr. Hamilton's credibility one way or the other.  Okay?

        You may step down.  You are excused.

        WITNESS:    Thank you, Your Honor.

        MS. McCREA:    Defense calls Mark Perry.

        THE COURT:    Step forward please, sir.  Stand at the table.  Raise your right hand.

                    MARK PERRY

was thereupon produced as a witness on behalf of Defendant and, having first been duly sworn to tell the truth, the whole

Exhibit 5001 at 1535

Perry  D    D8 16

truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat here, please.

Go ahead.

<u>DIRECT EXAMINATION</u>

<u>BY MS. McCREA:</u>

Q.    Would you state your full name for the record and spell your last, please?

A.    Mark Alan Perry, P-E-R-R-Y.

Q.    Mr. Perry, where do you live?

A.    Myrtle Point.

Q.    And what kind of work do you do?

A.    Electrician.

Q.    Do you know Nick McGuffin?

A.    No, I don't.

Q.    And in — at some point in past years did you own a Mustang automobile?

A.    Yes, I did.

Q.    Do you remember when that was, approximately?

A.    I'd say about fifteen years ago.

Q.    About fifteen years ago?

A.    Yeah.

MS. McCREA:    And if I may have Exhibit 16, please?

Q.    What color was it?

Exhibit 5001 at 1536

D8 17                                                    Perry  D

A.    Light powder blue.

Q.    Do you remember what the license plate was, or part of the license plate?

A.    I remember the "PEA" part.

Q.    It was - - -

A.    (Interposing) And if there was three letters, P-E-A.

Q.    Okay.  I'm showing you what's in evidence as Exhibit 16.

A.    Yeah.  That looks like it, but they painted it.

Q.    So, it's a different paint job?

A.    Yeah.

Q.    Do you recognize the license plate?

A.    I recognize the "PEA."

Q.    And when you say "PEA," you mean the P-E-A?

A.    Yeah.

Q.    Okay.  All right.  And how long did you have the car, Mr. Perry?

A.    Oh, probably about a year.

Q.    And it was a 1967?

A.    Yes.

Q.    Okay.  So, you had it for a year and when you owned the car, did it have a liner in the trunk?

A.    No, it didn't.

Q.    And can you describe the car?  Was it a fancy model, a basic model?

Exhibit 5001 at 1537

Perry  D    D8 18

A.    No.  It was a base model, very plain.

Q.    And did it have an automatic transmission?

A.    No.

Q.    Or a stick?

A.    Stick.

Q.    Standard transmission?

A.    Yeah.

Q.    And in terms of the trunk, was there anything else that you remember about the car?

A.    Yes, that the gas tank was exposed.  It was kind of strange.

Q.    Okay.  Why is that strange?

A.    Because I've always had Chevy's and Chevy's — they have a front pan and then the gas tank is under them.

Q.    And how was it in this Mustang?

A.    The gas tank was the bottom of the trunk.

Q.    Okay.  And so anything else unusual about the trunk or the gas tank?

A.    No.  It was a very nice car, very clean.

Q.    Okay.  And do you remember who you sold it to?

A.    No, I don't.

Q.    And I'm going to show you what's been marked for identification as Defendant's Exhibit 153.  Does that appear to be a copy of your Registration for the vehicle?

A.    Yeah.

Exhibit 5001 at 1538

D8 19                                                    Perry  X

MS. McCREA:    Did you want me to leave the photo up there?

MR. FRASIER:    It's up to you.

Q.    Do you remember, Mr. Perry, whether or not the 1967 Ford Mustang had power steering?

A.    That one didn't have power steering.

Q.    It did not have power steering?

A.    Manual brakes, manual steering.

Q.    Okay.  Like you said, a pretty basic model?

A.    Just a base model.  Yeah.

Q.    Okay.  Thank you.

MS. McCREA:    That's all the questions I have, Your Honor.

THE COURT:    Any cross?

MR. FRASIER:    Thank you, Your Honor.

                    CROSS EXAMINATION

BY MR. FRASIER:

Q.    When you owned the car, what did — was there anything kept in the trunk?

A.    No.  The trunk was empty when I had it.

Q.    Was there a spare tire?

A.    No.

Q.    Jack?

A.    No.

Q.    All right.  And what did you — when did you own this

Exhibit 5001 at 1539

Perry  X    D8 20

car?

A.   I'd say about fifteen years ago.  I can't be positive — fifteen, thirteen, fourteen — somewhere in there.

Q.   And was it prior to the disappearance of Leah Freeman?

A.   Yes.

Q.   All right.  Now, in regards to the car, do you have any idea what condition it was in at the time that Leah Freeman disappeared?

A.   I don't know what it looked like then.  When I had it, it was a very clean car.

Q.   Right.  But, you don't have any idea what the condition was — you have no personal knowledge of what the condition was?

A.   No.  Not at all.

Q.   All right.

A.   After I sold it, I never seen it again.

Q.   Thank you.

MR. FRASIER:   That's all the questions I have.

THE COURT:   Anything else?

MS. McCREA:   No further questions.

THE COURT:   You may step down.  You are free to leave.

WITNESS:   Okay.  Thank you.

Exhibit 5001 at 1540

D8 21                                        Richardson  D

THE COURT:    Call your next witness.

MS. McCREA:    Your Honor, we'd offer Defendant's 153.

MR. FRASIER:    No objection.

THE COURT:    Received.

(Whereupon Defendant's Exhibit No. 153 was received into evidence.)

MS. McCREA:    Ms. Bonk is checking on our next witness, Your Honor.

THE COURT:    Okay.

MS. McCREA:    Ellen Richardson.

THE COURT:    Raise your right hand, please.

ELLEN MARIE RICHARDSON

was thereupon produced as a witness on behalf of Defendant and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat here, please.

Go ahead.

DIRECT EXAMINATION

BY MS. McCREA:

    Q.    State your full name and spell your last for the record, please?

    A.    Ellen Marie Richardson, R-I-C-H-A-R-D-S-O-N.

    Q.    Ms. Richardson, where do you work?

Exhibit 5001 at 1541

Richardson  D    D8 22

A.    McKay's Market.

Q.    And which McKay's?

A.    Coquille.

Q.    I'm sorry?

A.    Coquille.

Q.    Coquille?  The one on North Central Boulevard?

A.    Correct.

Q.    And how long have you worked there?

A.    About twelve years.

Q.    Does that McKay's Market employ what are called courtesy clerks?

A.    Yes.

Q.    And what do courtesy clerks do?

A.    Fill the pop and beer, mop the floors, sack groceries, do the garbage, all kinds of the maintenance work.

Q.    All right.  And, generally, are they — do they tend to be younger people?

A.    Yes.

Q.    Okay.  Like what age range?

A.    Oh, what?  Sixteen to eighteen.

Q.    Okay.  And has it been that way during the time that you've worked at the McKay's Market?

A.    Yes.

Q.    And, typically, what work shifts do the courtesy clerks work?

Exhibit 5001 at 1542

D8 23                                    Richardson  D

A.    4:00 to 9:00 p.m.

Q.    4:00 to 9:00 p.m.?  And that has been consistent during the time that you've worked at McKay's Market?

A.    Correct.

Q.    And that would have been the shift that you observed courtesy clerks working back in the year 2000?

A.    Correct.

Q.    Do you know what time — well, you probably do since you've worked there for twelve years.  What time in — does McKay's Market close?

A.    10:00.

Q.    10:00 p.m.?

A.    Correct.

Q.    And do you know, was that true back in the year 2000?

A.    I think so.  When I first started, I don't remember if we closed at 10:00 or 10:30.

Q.    And, typically, did — well, I'm interested in the year 2000, as best you know.  But, based on your experience, do courtesy clerks work past the 9:00 p.m. — you know, the 4:00 to 9:00 shift?

A.    Maybe fifteen, twenty minutes, if they don't get things done, they will stay over just to finish up.

Q.    But, they don't - - -

A.    (Interposing) But, they're not scheduled.

Exhibit 5001 at 1543

Richardson    X    D8 24

Q.    Not scheduled?

A.    Not scheduled.

Q.    Okay.  Very good.  Thank you.

MS. McCREA:    That's all the questions I have.

THE COURT:    Any cross?

MS. SOUBLET:    Just briefly.  Thank you, Your Honor.

CROSS EXAMINATION

BY MS. SOUBLET:

Q.    Ms. Richardson, didn't the McKay's used to be open 24 hours?

A.    If it had, it was not while I was there.

Q.    And you have no specific knowledge of Corey Bryant's work schedule on June 28, 2000?

A.    No.

Q.    Thank you.

MS. SOUBLET:    Nothing further.

MS. McCREA:    No further questions, Your Honor.

THE COURT:    You may step down.  You are free to leave.

WITNESS:    Thank you.

THE COURT:    Call your next witness.

MS. McCREA:    Lyndee Stidham, Your Honor.

THE COURT:    Raise your right hand, please.

Exhibit 5001 at 1544

D8 25                                                    Stidham  D

                          LYNDEE STIDHAM

was thereupon produced as a witness on behalf of Defendant

and, having first been duly sworn to tell the truth, the whole

truth and nothing but the truth, was examined and testified as

follows:

                THE COURT:    Have a seat up here, please.

                     DIRECT EXAMINATION

BY MS. McCREA:

     Q.   Would you state your name for the record and spell

your last name, please?

     A.   Lyndee Stidham, S-T-I-D-H-A-M.  It is formerly

Lyndee Kindred.

                THE COURT:    Formerly Lyndee what?

                WITNESS:    Kindred.

                THE COURT:    Thank you.

     Q.   And, Ms. Stidham, where do you live?

     A.   Medford.

     Q.   Did you — did you ever live in Coquille?

     A.   Yes.

     Q.   Did you graduate from high school here?

     A.   Yes, in 2001.

     Q.   2001?

     A.   Uh huh.

     Q.   So, in the year 2000 how old were you?

     A.   Seventeen.

Exhibit 5001 at 1545

Stidham  D     D8 26

Q. And do you know Nick McGuffin?

A. Yes.

Q. And how do you know him?

A. We were friends.

Q. And you knew him in school?

A. Uh huh.

Q. Did you know Leah Freeman?

A. Yes.

Q. And were you friends with her, as well?

A. Not really.

Q. Okay.

A. I knew who she was, but we never hung out.

Q. So, I want to draw your attention to June 28, 2000. Were you involved in any kind of theater activity that night?

A. Yeah, Sawdusters.  I had practice.

Q. And can you tell us just a little bit about that?

A. It was from 7:00 to 9:00.  I typically left there about 9:00, 9:15-ish.

Q. Okay.  So - - -

A. (Interposing) Or a little later.

Q. So, okay.  So, you had practice from 7:00 to 9:00?

A. Uh huh.

Q. And then once practice was over, you would leave there?

A. Yeah.

Exhibit 5001 at 1546

D8 27                                              Stidham  D

Q.   And that would be located downtown here?

A.   Yes.

Q.   And where did you live at the time?

A.   Up in Sanford Heights.

Q.   And would that have been on West Ninth?

A.   Yes.

Q.   And so in order to get home, would you travel on North Central and then up Knott Street?

A.   Up Knott Street.  Correct.

Q.   Okay.  And so were you at practice that night on June 28th?

A.   Yes, I was.

Q.   And then when you left practice, did you go home?

A.   Yes.

Q.   And when you were going home, did you encounter anyone?

A.   I talked to Nick between 9:30, 9:45-ish, up by where she was living on Knott Street.

Q.   And when you say "she" you mean Leah Freeman?

A.   Yeah.

Q.   Okay.  And was he with anybody?

A.   You know, I don't have a real clear memory of that night.  I remember an encounter with him a couple days later more.

Q.   Okay.

Exhibit 5001 at 1547

Stidham  D    D8 28

A.   But, I don't remember him being with anyone.

Q.   And do you remember what car — what kind of car he was driving?

A.   I don't remember it.  But, according to my statement before, he had his Mustang.

Q.   His Mustang?

A.   Yeah.

Q.   Okay.  And do you remember his demeanor?

A.   Not from that night.  I remember saying that he just asked - - -

MS. SOUBLET:   (Interposing) Objection.

A.   I'm sure it was just a quick encounter.

MS. SOUBLET:   Objection.  Hearsay.

Q.   Are you remembering - - -

MS. McCREA:   I'll go onto another question, Your Honor.

THE COURT:   Okay.  It just depends on what she's saying.

MS. McCREA:   Well, - - -

THE COURT:   (Interposing) It may be state of mind, it may not be.

Q.   You saw him the night of June 28th?

A.   Yes.

Q.   And what was he doing?

A.   He had stopped me up by her house — up by Leah's

Exhibit 5001 at 1548

D8 29                                    Stidham  D

house and asked if I had seen her walking home.  And I told him no.

MS. SOUBLET:    Objection.  Hearsay.

MS. McCREA:    Well, - - -

THE COURT:    (Interposing) No.  That, I think, goes within the state of mind exception.  It's not really — it's offered to say what he was thinking, not the substance of it, itself, other than to say what he was thinking at the time.

So, go ahead.

MS. McCREA:    Okay.

Q.    So, he made an inquiry of you of whether you had seen Leah Freeman?

A.    He asked if I had.

Q.    Okay.  Had you seen her?

A.    No, I did not see her walking home that night.

Q.    Did you communicate that to him?

A.    I'm sure I did.  Yeah.

Q.    Okay.  I know it's been a long time.  And you indicated that you saw him again a day later, or a couple of days later?

A.    Yeah.  I'm not sure if it was the day after or a couple days later.  I remember running into him and her — and Leah's sister, Denise, at — it used to be Dairy Queen.  I think it was Hunter's at the time.

Exhibit 5001 at 1549

Stidham  X    D8 30

Q.   And is that when you noticed Nick's demeanor that you remember?

A.   That he was concerned.  Yes.

Q.   He was — and did he indicate what he was concerned about?

A.   He was just asking if I had seen her and was concerned that she was missing.

Q.   And, again, we're talking about Leah Freeman?

A.   Yes.

Q.   Okay.  All right.  Thank you.

        MS. McCREA:    That's all the questions I have.

        WITNESS:    Okay.

        THE COURT:    Cross.

        MS. SOUBLET:    Just briefly, Your Honor.

                    CROSS EXAMINATION

BY MS. SOUBLET:

Q.   Ms. Stidham, do you actually remember this, or are you basing it on reading your statement?

A.   No.  I remember talking to him at Hunter's.  I don't have a clear memory of talking to him up on Knott Street.

Q.   And, in fact, didn't you tell Ms. Bonk that your memory was foggy?

A.   Yes.

Q.   Thank you.

        MS. SOUBLET:    Nothing further.

Exhibit 5001 at 1550

D8 31                                          Stidham  ReD

MS. McCREA:    Well, let me just touch on that.

REDIRECT EXAMINATION

BY MS. McCREA:

Q.   You — you — you do remember running into Nick the night — or, do you remember running into Nick the night that Leah Freeman disappeared?

A.   I don't necessarily remember it.  I remember telling my parents that I had seen him, but I don't remember the encounter with him, necessarily.

Q.   Okay.

A.   But, I know I did have theater and left there and — I mean, I know I had practice that night.

Q.   And you made a statement back in 2000, is that right?

A.   Yes.

Q.   About this?

A.   Yeah.  And my statement would have been accurate.

Q.   Yeah.  July 7, 2000, to Sheriff Zanni?

A.   Okay.

Q.   And you've had a chance to look at that statement?

A.   Briefly.

Q.   Do you want to look at it again to see if it refreshes your recollection?

A.   I did see it.  Yeah.

Q.   Okay.  So, what you're telling us is your memory

Exhibit 5001 at 1551

Quackenbush  D    D8 32

then is better than your memory now?

A.    Yeah.  It's been eleven years.

Q.    Right.  Understandably.  Okay.

A.    And I saw him up on Sanford Heights quite a bit. So, seeing him up there again wasn't necessarily a uncommon thing.

Q.    Okay.  All right.  Thank you very much.

WITNESS:    Okay.

MS. McCREA:    May she be excused?

THE COURT:    You may step down.  You are free to leave.

MS. McCREA:    Thank you, Your Honor.

Defense calls Steve Quackenbush.

THE COURT:    Raise your right hand, please.

STEVE QUACKENBUSH

was thereupon produced as a witness on behalf of Defendant and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat here, please.

DIRECT EXAMINATION

BY MS. McCREA:

Q.    Would you state your name for the record, please?

A.    Steve Quackenbush.

Q.    Mr. Quackenbush, where do you live?

Exhibit 5001 at 1552

D8 33                                    Quackenbush  D

A.   Greenacres.

Q.   How long have you lived there?

A.   About twelve years.

Q.   And what kind of work do you do?

A.   I drive a truck for Pepsi.

Q.   For Pepsi?

A.   Yes.

Q.   Do you know someone named Corey Bryant?

A.   Yes.  He's my nephew.

Q.   He's your nephew?  Was he living with you back in June of 2000?

A.   Yes.

Q.   And where was he working?

A.   McKay's.

Q.   And that would be the McKay's Market on Central Boulevard?

A.   Yes, in Coquille.

Q.   In Coquille?  Thank you.  And what kind of a car did Corey Bryant have back in June of 2000, if he had a car?

A.   I believe it was a little Nissan pickup.

Q.   A Nissan pickup?  Do you remember what year?

A.   I do not.

Q.   Do you remember what color it was?

A.   I believe it was brown.

Q.   Brown?  Okay.  And at the time in June of 2000 Corey

Exhibit 5001 at 1553

Quackenbush  D    D8 34

Bryant was dating Sherry Mitchell?

A.   As far as I know, yes.

Q.   Okay.  And Corey was working at McKay's as a courtesy clerk?

A.   I believe so.

Q.   Do you remember what shifts he would work?

A.   I'm not sure.

Q.   You're not sure?

A.   Nuh-uh.

Q.   Okay.  All right.  Thank you.

MS. McCREA:   That's all the questions I have.

THE COURT:   Mr. Frasier, do you have any questions — cross?

MS. SOUBLET:   No, Your Honor.  Thank you.

THE COURT:   You may step down.  You are free to leave.

MS. McCREA:   Call Margaret Downs.

MR. FRASIER:   Your Honor, I haven't received any discovery from the defense on this witness.  Do they have a statement?

THE COURT:   I don't know.

MS. McCREA:   We do have a statement, and I thought that had been provided to Mr. Frasier.

THE COURT:   Well, if you have it, give it to him.  He says he doesn't have it.  I don't know whether he

Exhibit 5001 at 1554

D8 35                                          Buehner  D

does, or not.

MS. McCREA:    And I will have to obtain that from Ms. Bonk, Your Honor.

MR. FRASIER:    I was looking high and low for something last night, but I could not find anything.

MS. McCREA:    Well, I apologize, Mr. Frasier.

THE COURT:    Ms. Bonk, Mr. Frasier says he doesn't have a copy of this report, so if you have one, he needs to have it.

(Whispered conversation.)

MS. McCREA:    Thank you, counsel.  I thought I had provided a copy.

THE COURT:    Does the State have one?

MS. McCREA:    The State was given one, but they're not sure where it is.  We're going to provide them another one.

THE COURT:    Okay.

Raise your right hand please, ma'am.

MARGARET BUEHNER

was thereupon produced as a witness on behalf of Defendant and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat here, please.

Go ahead.

Exhibit 5001 at 1555

Buehner  D    D8 36

DIRECT EXAMINATION

BY MS. McCREA:

Q.  Would you state your name for the record, please?

A.  Margaret Elizabeth Buehner.

Q.  And you used to be known as Margaret Downs?

A.  Yes.

Q.  And where do you live?

A.  Um - - -

Q.  (Interposing) Currently?

A.  On 58 West Fifth Street, Coquille.

THE COURT:    Could you spell your last name?

WITNESS:    B — my last name now?

THE COURT:    Yes.

WITNESS:    B-U-E-H-N-E-R.

THE COURT:    Thank you.

Go ahead.  I'm sorry.

Q.  And so you live in Coquille at the current time. Did you grow up here?

A.  Yes.

Q.  And what kind of work do you do?

A.  Um, I am unemployed right now.  I'm actually disabled.

Q.  And what - - -

A.  (Interposing) But, previously I worked in the medical field.

Exhibit 5001 at 1556

D8 37                                    Buehner  D

Q.   And were you affiliated with the military?

A.   Yes.  I was in the Army for five years as a medic.

Q.   Now, do you know Nick McGuffin, - - -

A.   (Interposing) Yes.

Q.   - - - seated here next to me?

How do you know him?

A.   Um, from high school.

Q.   And how long have you known him?

A.   Um, at least from high school.

Q.   Okay.  Okay.  Is he somebody that you've socialized with over the, you know, the current time, or were you just friends in high school?

A.   Um, we were friends in high school and I haven't really talked to him since then.  I left for the Army.

Q.   You left for the Army after high school?

A.   Yeah, right after high school.

Q.   And what year did you graduate?

A.   In 2002.

Q.   Okay.  So, during the time that you knew Nick McGuffin in high school, did you guys hang out together?

A.   Um, not a lot.

Q.   Okay.  Now, drawing your attention — well, let me ask you this.  Did you know Leah Freeman?

A.   Yes.

Q.   And were you friends with her?

Exhibit 5001 at 1557

Buehner  D    D8 38

A.    I was really good friends with her sister.

Q.    With Denise?

A.    Denise.  Yeah.

Q.    Okay.  Now, drawing your attention to June 28, 2000, do you remember if you were working that day?

A.    I was.

Q.    And where did you work?

A.    I worked at the Mexican restaurant in Coquille.  I don't remember the name of it at the time.

Q.    Was it near the laundromat?

A.    Yes.

Q.    Okay.  And do you remember about what time you got off work that night?

A.    I believe I got off work at 9:00.

Q.    And where did you go?

A.    I — well, first I went to my house, which was where the liquor store used to be.

Q.    Okay.

A.    And my door was locked and so I walked to Fast Mart.

Q.    Walked to Fast Mart?

A.    Yes.

Q.    And when you went to Fast Mart — how long — about how long do you think you spent at Fast Mart, if you remember?

A.    Um, probably a couple of hours.

Q.    So, you were hanging out there?

Exhibit 5001 at 1558

D8 39                                                    Buehner  D

A.   Yeah.

Q.   Were you hanging out there with anybody?

A.   Um, not with anyone in particular.  There was just a group of people there.

Q.   It was kind of a local hangout at the time?

A.   Yes.

Q.   So, during the time that you were at Fast Mart, did you see Nick McGuffin?

A.   Yes.

Q.   This was on June 28th - - -

A.   (Interposing) Yes.

Q.   - - - of 2000?  Okay.

And tell us about your observations of Mr. McGuffin?

A.   Um, I saw him.  He stopped at Fast Mart one time and I didn't speak to him.  He spoke to somebody else.  And I heard through other people that were there - - -

MR. FRASIER:   (Interposing) Objection. Calls for hearsay.

THE COURT:   Sustained.

You can't testify to what other people told you.  So, don't mention what other people told you.

Go ahead.

Q.   So, you saw him stop at Fast Mart.  He was talking to other people?

A.   Yes.

Exhibit 5001 at 1559

Buehner  D    D8 40

Q.    Did you notice his demeanor when he was talking to the other people?

A.    Um, no.  He was in his car and I wasn't really close to it.

Q.    Do you remember what car he was driving?

A.    Uh, a blue Mustang.

Q.    Okay.  Did he stay at Fast Mart a long time or a short time?

A.    A short time.

Q.    Did he appear to be on an errand?

A.    Yes.

Q.    Did he appear that he was looking for someone?

A.    Yes.

Q.    Did you overhear what he was saying to anyone else?

A.    No.

Q.    Okay.  Then did you see him some other times that night?

A.    Yes.

Q.    And tell us about that?

A.    I saw him drive by in the same vehicle at least two more times.

Q.    Drive by Fast Mart?

A.    Yes.

Q.    When you saw him the first time, do you remember approximately what time it was?

Exhibit 5001 at 1560

D8 41                                                        Buehner  D

A.    No.

Q.    Okay.  And what about the other two times you saw him?

A.    I don't remember.

Q.    But, it was within this period of two hours that you were at Fast Mart that night?

A.    Yes.

Q.    Okay.  Now, when he drove by the other two times, you've indicated he was in the same car.  That would be the Mustang?

A.    Yes.

Q.    Did you ever see anyone with him?

A.    No.

Q.    Then the next day, were you involved in any contact with Mr. McGuffin?

A.    Yes.

Q.    And tell us about that?

A.    Um, actually Denise called me in the morning and told me that her - - -

MR. FRASIER:    (Interposing) Objection.  Calls for hearsay.

THE COURT:    You can't testify to what other people told you.

Q.    Denise called you and as a result of her call, did you go somewhere?

Exhibit 5001 at 1561

Buehner  D    D8 42

A.    I went to her house.

Q.    All right.  And then did you contact — did you encounter Mr. McGuffin there?

A.    Yes, I did.

Q.    And did the three of you go anywhere to do anything?

A.    Uh, yes.  The three of us went to look for Leah.

Q.    All right.  And what kinds of places did you go looking for her?

A.    Um, we went — we went everywhere.

Q.    Okay.

A.    We talked to a lot of people, asked a lot of people if they had seen her, heard from her.  I don't really know what else to say.

Q.    What was — what was Mr. McGuffin's demeanor like?

A.    He was upset.  He was distraught.

Q.    And were you in his company — this would have been June 29th.  Were you in his company after June 29th?

A.    Yes.

Q.    And was that a continuous thing?  In other words, did you stay with him, or did you see him periodically?

A.    I was with him every day and, um, sometimes overnight.

Q.    And when you say "sometimes overnight," where were you staying?

A.    At his parents' house.

Exhibit 5001 at 1562

D8 43                                                        Buehner  D

Q.   And were you staying in the same room with Mr. McGuffin?

A.   No.

Q.   And did his parents know you were there?

A.   Yes.

Q.   And why were you staying there?

A.   Um, really just for support.

Q.   Okay.  Were you concerned about Mr. McGuffin's state of mind?

A.   I was.

Q.   Was he eating?

A.   Not much.

Q.   Was he — to what you observed, was he sleeping normally?

A.   Um, I'm not sure.

Q.   Do you remember how many times or how many nights you stayed at the McGuffin residence?

A.   I don't remember.

Q.   Were there also nights when you stayed at the Freeman residence?

A.   Yes.

Q.   With your friend, Denise?

A.   Yes.

Q.   All right.  And the reason for this contact — was that because of Leah's disappearance?

Exhibit 5001 at 1563

Buehner   D    D8 44

A.   Yes.

Q.   And, as you say, for support?

A.   Yes.

Q.   Did the three of you do anything concerning putting up missing posters?

A.   Yes.

Q.   And tell us about that?

A.   Um, Denise actually went to my mom's office to make flyers and we posted flyers all over — all over Coquille in businesses, anywhere we could.

Q.   When you say "we," who are you talking about?

A.   Uh, myself and Denise and Nick.

Q.   Okay.  Now, as the days went by from June 28th, did you notice any change in Nick McGuffin's demeanor?

A.   He was just upset the whole time.  I mean, he seemed concerned about his missing girlfriend.

Q.   Did he seem to become more concerned or less concerned?

A.   More concerned.

Q.   Okay.  Anything else that you noticed?

A.   Um, not that I can think of.

Q.   I know it's been a long time.  Let me ask you this.  Do you have any recollection of Mr. McGuffin going out of town to follow up on a lead of a sighting of Leah Freeman?

MR. FRASIER:   Well, Your Honor, I'm going to

Exhibit 5001 at 1564

D8 45                                                      Buehner  X

object to that.  That's going to call for hearsay and that clearly is not state of mind.

THE COURT:   Sustained.

MS. McCREA:   That's all the questions I have.

Q.   Thank you.

THE COURT:   Cross?

MR. FRASIER:   Yes, Your Honor.

CROSS EXAMINATION

BY MR. FRASIER:

Q.   Ma'am, you indicated that you were working at the Mexican restaurant that night, June 28th?

A.   Yes.

Q.   And then you — after you got off work, you went to Fast Mart?

A.   Yes.

Q.   And why did you go to Fast Mart?

A.   Um, to find someone to buy me a pack of cigarettes.

Q.   Okay.  Were you going there to meet anybody?

A.   Um, I was just going there to meet up with people. There was a guy that I was dating at the time and he was usually there.

Q.   Okay.  And so you wanted to meet up with the guy you were dating?

A.   Yes.

Q.   And so you were looking for him more than you were

Exhibit 5001 at 1565

Buehner    X      D8 46

looking for Mr. McGuffin, right?

A.   Um, after I got there, we were all just hanging out there.

Q.   Okay.  But, were you hanging out with your boyfriend, the person you were dating with?

A.   Um, there were several people there that we were hanging out with.

Q.   Well, were you hanging out with your boyfriend?

A.   Yes.

Q.   All right.  And were you paying attention to him, weren't you?

A.   Um, I'm sure I was.

Q.   And would it be fair to say you were concentrating more on your boyfriend than you were on other people?

A.   No.

Q.   No?

A.   No.

Q.   Why not?

A.   Um, there was a lot going on and I guess that's just not really how I am.

Q.   And there was a lot going on?  Well, let me put it to you this way.  Did you go to the Fast Mart with the particular idea in mind you were going to keep track of Nick McGuffin?

A.   No.

Exhibit 5001 at 1566

D8 47                                          Buehner  X

Q.   All right.  And so that wasn't your purpose that night, was it, to keep track of Mr. McGuffin?

A.   No.

Q.   All right.  No, you indicated that you, the next day, spent some time with Mr. McGuffin.  Is that correct?

A.   Yes.

Q.   And did you go various places with him?

A.   Yes.

Q.   Did you go out to like the boat dock by one of the parks here in the Coquille area?

A.   Uh, possibly.

Q.   Do you recall meeting with Sherry Mitchell and Corey Bryant?

A.   Yes.

Q.   All right.  Do you recall going up to the Haga place?

A.   I don't know where that is.

Q.   Okay.  Do you know who Brent Bartley is?

A.   Um, yes.

Q.   And do you know where his grandparents live?

A.   No.

Q.   Do you recall going to a party on the evening of June 29th with Mr. McGuffin?

A.   No.

Q.   Okay.  Do you recall going to — let me look here.

Exhibit 5001 at 1567

Buehner   X    D8 48

Just a second.

Did you go to any type of party where there was about ten people in attendance?

A.   No.

Q.   All right.  And so you did not stay at a party with Mr. McGuffin for about 30 minutes?

A.   No.

Q.   Now, during the time frame that you were with Mr. McGuffin, it's your testimony that he was concerned about what was going on in regards to Ms. Freeman?

A.   Yes.

Q.   You indicated he was not eating well?

A.   Yes.

Q.   Was he doing any drugs in your presence?

A.   No.

Q.   Now, when you say Mr. McGuffin was concerned about Leah being missing, isn't it true you are basing that on what the Defendant told you?

A.   I'm basing that on his actions and the emotion that I saw from him.

Q.   Okay.  You saw him being emotional?

A.   Yes.

Q.   You saw him being concerned?

A.   Yes.

Q.   Would not those same emotions be present if he had

Exhibit 5001 at 1568

D8 49                                                    Buehner  ReD

killed her?

A.   Um, I don't know.

Q.   So, would it be safe to say you don't really know what he was concerned about, do you?

A.   Um, I don't know what he was concerned about.

Q.   Thank you.

MR. FRASIER:    That's all I have.

THE COURT:    Cross — redirect, excuse me.

REDIRECT EXAMINATION

BY MS. McCREA:

Q.   Did Mr. McGuffin say words that caused you to form an opinion about what he was feeling?

A.   Yes.

Q.   Did he take - - -

MR. FRASIER:    (Interposing) Well, I'm going to object.  I think that's an improper opinion.

MS. McCREA:    Well, - - -

THE COURT:    (Interposing) Well, the question was, "Did he say words?" and that wouldn't call for an opinion.  She can say whether he said words.

Now, what's your next question?

Q.   Did he take actions?  Were his actions consistent with what he was saying to you?

A.   Um, I'm not quite sure I understand.

Q.   Okay.  Let me ask you a different question.

Exhibit 5001 at 1569

Buehner   ReD   D8 50

A.   Okay.

Q.   So, you're with Mr. McGuffin for — how — how many days were you with him everyday?

A.   Um, about a week.

Q.   Okay.  About a week.  And during that period of a week, did he consistently search for Leah Freeman?

A.   Yes.

Q.   Were the things that he said to you during that time consistent with him searching for Leah Freeman?

A.   Yes.

Q.   Were the actions that he took during that time consistent with him searching for Leah Freeman?

A.   Yes.

Q.   Everything — did everything he said appear that he wanted to find her?

A.   Yes.

Q.   Did everything he said appear that he didn't know where she was?

A.   Yes.

Q.   Did he give you any indication otherwise?

A.   No.

Q.   And in terms of the things that he did and the places that he went, did he appear to be genuinely looking for her?

A.   Yes.

Exhibit 5001 at 1570

D8 51                                          Buehner  ReX

Q.   Did you have any doubt about his sincerity?

MR. FRASIER:   Well, I'll object to that. That's improper.  What her impression is, is not relevant.

THE COURT:   She's described what he was doing.  I think that's sufficient.

Sustained.

Q.   And you don't have any recollection of having gone to a party?

A.   No.

Q.   Okay.  If — that's fine, then.  That's fine.  Thank you very much.

MS. McCREA:   Nothing further, Your Honor.

THE COURT:   You may step down.

MR. FRASIER:   Your Honor, I have one follow-up question.

THE COURT:   Okay.  Go ahead.

RECROSS EXAMINATION

BY MR. FRASIER:

Q.   The actions you saw, would they also be consistent with someone trying to cover up that they murdered someone?

MS. McCREA:   Well, I object.  That calls for speculation on the part of the witness.

MR. FRASIER:   Well, - - -

THE COURT:   (Interposing) Sustained.

You can step down.  You are free to leave.

Exhibit 5001 at 1571

D8 52

WITNESS:    Thank you.

MS. McCREA:    May we approach, Your Honor?

THE COURT:    Yes.

(Bench conference, not recorded.)

THE COURT:    One witness that they have — I think they're going to call Mr. Meneely and he is not present.

He is on his way?  Do you know?

MS. McCREA:    I believe he is on his way.  Yes, Your Honor.

THE COURT:    Okay.

Then we'll take a recess until Mr. Meneely gets here.  So, you can step into the jury room.  Remember the admonition.  Take your notes.

(Jury out.)

THE COURT:    Mr. Meneely will be a witness. And, as I understand, other than two witnesses who are coming from out of state, the only witnesses that would then be left for the defense would be Mr. McGuffin, possibly, and his mother, possibly.

And Mr. Frasier has rebuttal of Ms. Wilcox.

And we had a conference here and I had indicated that I wasn't going to recess for the entire day for Monday to wait for two witnesses, and then have Mr. McGuffin decide whether he was going to testify.  And I'm not too sure he's not - - -

Exhibit 5001 at 1572

D8 53

Why are you not prepared today?  This case was set and postponed.

MS. McCREA:    Your Honor, one of the reasons we're not prepared is because we made a request to see Mr. McGuffin on Sunday and the jail would not allow us to see him.  Now, we spent significant time with him last night. We've made arrangements with Corporal Dennis to see him again this weekend.  But, the State only rested - - -

THE COURT:    (Interposing) Wait a minute.  Who denied you access to Mr. McGuffin this weekend?

MS. McCREA:    Whoever was in command at the jail on Sunday.

THE COURT:    Find out who, please.  Can you find out who did that?

Well, we have several hours today, too.  I mean, I understand preparation goes on and I'm concerned about the jail denying you access.  If I would have known that, that would not have happened.  In fact, I'm not too sure I knew they were doing that sort of thing.

MS. McCREA:    Well, Corporal Dennis has been very cooperative in assisting us with access as a result of that.

THE COURT:    Right.

MS. McCREA:    And what I'm indicating to the Court is our intention is not to necessarily delay the

Exhibit 5001 at 1573

D8 54

proceedings.  However, the State just rested yesterday.

THE COURT:    Correct.

MS. McCREA:    And we have been, I submit, proceeding with all diligence.  And the intention here is not to call extraneous witnesses to fill up the time.

THE COURT:    And I appreciate that.

MS. McCREA:    And we want to make sure we provide Mr. McGuffin with effective assistance of counsel.

THE COURT:    And I think — and I think you've been clearly doing that.  What I'm telling you is that between now and Mr. Meneely coming, and now and some time this afternoon — Mr. Meneely, I assume, isn't going to be very long?

MS. McCREA:    I would not anticipate him to be very long.

THE COURT:    Okay.  Then I think you have probably plenty of time, and I'll hear you afterwards.  But, in the meantime, I want counsel to be talking to Mr. McGuffin today to see whether or not that can be there.  Because, I don't know, you talked to him for what, two hours yesterday?

MS. McCREA:    We talked to him for almost three hours yesterday.

THE COURT:    And, as I said, the case — I'm sure you were prepared at the time we postponed it — at the time we had to postpone it.  But, I would still ask you to

Exhibit 5001 at 1574

D8 55

talk to Mr. McGuffin and start preparing him for today.

And I do want to find out who did that. That —
counsel should not be denied access, unless there's some
emergency over there.

VOICE:    Your Honor, I looked into it
yesterday and I've been unable to find the time frame that she
was there and find out who it was.

THE COURT:    Well, find it out and report it
to me, because Ms. McCrea is an officer of the Court and I'm
sure she was there trying to contact her client.

MS. McCREA:    I called from Eugene to make the
request and was told that the person I spoke with checked with
whoever was in command, and indicated that we could not come
over and have access Sunday night. So, I made arrangements to
see Mr. McGuffin at 8:00 Monday morning.

THE COURT:    In the meantime, please do what I
requested.

We'll be in recess until Mr. Meneely comes.

(RECESS)

(Jury in.)

THE COURT:    Be seated, please.

Mr. Meneely, if you'd step forward, please? I
think I excused you, so I'm going to swear you again.

KENN MENEELY

was thereupon again produced as a witness on behalf of

Exhibit 5001 at 1575

Meneely  D    D8 56

Defendant and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat here, please.

Go ahead, please.

<u>DIRECT EXAMINATION</u>

<u>BY MS. McCREA:</u>

Q.    Mr. Meneely, would you state your name again for the record, please?

A.    Kenn Meneely, M-E-N-E-E-L-Y.

Q.    You were asked yesterday about a report that you made?

A.    Correct.

Q.    And you made a report on June 23, 2011 concerning your examination of the clothing and shoes of Leah Freeman for this case?

A.    Yes.

Q.    Who was that report made for?

A.    The defense team, you might say.

Q.    That would be me and my father?

A.    Correct.

Q.    And who was the report provided to?

A.    (No response.)

Q.    It was provided to us, wasn't it?

A.    It was provided to you, basically.

Exhibit 5001 at 1576

D8 57                                          Meneely  D

Q.  And then you didn't directly provide your report to the District Attorney?

A.  No.

Q.  That was a decision made by the defense team — the counsel?

A.  I believe so.

Q.  All right.  And the report was a compilation of your observations of the clothing and the shoes?

A.  Correct.

Q.  In addition to the report, did you create a compact disk — a CD of the photographs that you took of the clothes and the shoes?

A.  Yes.

Q.  And how many — approximately how many photographs were on that CD?

A.  (No response.)

Q.  Well, there were a lot of photographs, weren't there?  Maybe 70 or so?

A.  I can only say approximately 50 to 70.  I'm just not certain.  I took a lot of photographs.

Q.  You were present when Kathy Wilcox testified?

A.  Yes.

Q.  And do you remember her saying that she had looked at your report?

A.  Yes.

Exhibit 5001 at 1577

Meneely    D      D8  58

Q.    And the only report that you made was this report on June 23, 2011?

A.    Yes.

Q.    Mr. Meneely, I'm going to show you what's been marked for identification as Defendant's Exhibit 154.  Do you recognize that?

A.    This is a copy of my report.

MS. McCREA:    We'd offer Defendant's Exhibit 154, Your Honor.

MR. FRASIER:    Your Honor, I'm not sure what the relevancy of the report is.  It would also be cumulative of his testimony.

THE COURT:    That's correct.

Sustained.

Q.    Mr. Meneely, in terms of your report, as to Item 213, the tank top shirt, in your discussion about Area 1, was your observation as set out, concerning that matter, complete?

A.    As far as my testimony goes?

Q.    Yeah.  And as far as your observation goes?

A.    I gave a complete description of Area 1, which is the upper left quadrant that we were discussing yesterday. And I described holes in that area and several were frayed.  I believe we discussed that.  And then we also further discussed the microscopic characteristics which, I believe, I included a

Exhibit 5001 at 1578

D8 59                                              Meneely  D

sharp instrument and the dimensions of that.  So, I believe that was complete.

Q.   Okay.  So, what you said was there was a hole that showed microscopic characteristics consistent to a sharp instrument?

A.   Correct.

Q.   And is sharp instrument a term of art among forensic scientists?

A.   I'm not sure what you call a "term of art".  That's a definition that forensic scientists commonly use to equate to such things as knives or perhaps even a scissor.

Q.   Okay.  And you gave a size of the hole that you were talking about as 1.5 centimeters?

A.   Correct.

Q.   And likewise, as to Item 214, the sports bra, did you reference in your report in Area 2 that there was a hole that displayed the microscopic characteristics consistent to a sharp instrument?

A.   Yes.

Q.   And, again, was that described as being 1.5 centimeters?

A.   Yes.

Q.   And so this was provided through the counsel?  This was the report that Ms. Wilcox must have seen?

A.   I - - -

Exhibit 5001 at 1579

Meneely  D    D8 60

Q.    (Interposing) There wasn't any other report that you did?

A.    Correct.

Q.    Okay.  And — all right.  Now, when you made — well, scratch that.

What you testified to yesterday, and your opinion as you stated it, before your testimony and before stating your opinion, did you have an opportunity to review Kathy Wilcox's photographs of the sports bra and the tank top?

A.    Yes.

Q.    Well, — yeah.  Okay.  Of her examination back in 2000?

A.    Yes.

Q.    And did you, in fact, look at those?

A.    Photographs?

Q.    Photographs.

A.    Yes.

Q.    Okay.  And in looking at those photographs, did you see in the same location the same hole — let's start with the sports bra — the same hole in the sports — well, the sports bra that you saw?

A.    I didn't — I don't recall seeing a specific photograph in Ms. Wilcox's notes, if you will, of that specific location.  I saw a general photograph of the sports bra from a distance, but not any more close ups of that

Exhibit 5001 at 1580

D8 61                                          Meneely  D

particular area.

Q.   Okay.  Not any more close ups.  But, in terms of location, was there one of the sports bra, or not, as you recall?

A.   Yes.

Q.   Okay.  And was there a hole consistent with the area that you looked at?

A.   Yes.

Q.   Okay.  So, did it appear to you that the hole that you now have said is a cut in the sports bra was there when Ms. Wilcox examined the item back in 2000?

A.   Yes.

Q.   And, likewise, with the tank top?  Did you look at her photographs relative to the tank top?

A.   Yes.

Q.   And did you see whether or not there was a hole in the tank top in the same area that you examined in 2011?

A.   Yes.

Q.   And was there?

A.   Yes.

Q.   And, likewise, did you look at the photographs from the United Kingdom?

A.   Yes.

Q.   And the same question, Mr. Meneely?

A.   Yes.

Exhibit 5001 at 1581

Meneely  D    D8 62

Q.   All right.  What was the difference between the photographs that Ms. Wilcox took and the photographs that you took?

A.   Well, first of all, some of those photographs were — most of them were distant photographs.  Some were a little bit out of focus, if you will.  But, the majority were what I would call distant — from a forensic standpoint, distance photographs compared to photographs I took that were probably — how do you coin the phrase? — close up and personal down to the resolution of a tenth of a millimeter.

Q.   And, likewise, the photographs from the lab in England — what was the difference between those photographs and the photographs you took?

A.   Once again, they're general distance type photographs.

Q.   And your photographs were closer?

A.   Much closer.

MS. McCREA:   Your Honor, the defense again would offer Defendant's Exhibit 154, based on the fact that there was an implication made during cross examination that Mr. Meneely's testimony was inconsistent with his report, and the report is being offered to demonstrate it's a prior consistent statement.

MR. FRASIER:   Well, I would disagree with that characterization.

Exhibit 5001 at 1582

D8 63                                          Meneely  X

THE COURT:    The objection is sustained.

We're going to probably have another recess here in a moment, so I'll probably take it up further.  But, I don't think that's correct.  So, I'll sustain the objection at this point in time.

Are you done with your examination?

MS. McCREA:    I might have a moment?

THE COURT:    Yes.

MS. McCREA:    That's all the questions I have, Your Honor.

THE COURT:    Mr. Frasier?

CROSS EXAMINATION

BY MR. FRASIER:

Q.    Mr. Meneely, let's see if I got this straight.  What you're saying is, is the holes that you've identified as cut marks are present in the photographs taken by Kathy Wilcox?

A.    Well, that area was present in the photographs I looked at.

Q.    Are you saying those particular things that you have called "cut marks" are present in Kathy Wilcox's pictures?

A.    The specific detail was not in her photographs. But, the area where those holes were, were in the photographs.

Q.    Let's — again, Mr. Meneely, the question is, do you see those cut marks in the photographs?

MS. McCREA:    Well, - - -

Exhibit 5001 at 1583

Meneely    X    D8 64

MR. FRASIER:    (Interposing) He hasn't answered the question yet.

MS. McCREA:    It's an unfair question, because the whole issue is the cut marks.

THE COURT:    Well, I — I'll overrule the objection.

A.    The specific cut marks were not displayed in Ms. Wilcox — nor the England photographs.

Q.    All right.    Now, you are aware — well, let's assume for the sake of argument that what you call cut marks were present when Ms. Wilcox did her examination.    Okay?

A.    That's an assumption.

Q.    Is it your testimony then that Ms. Wilcox did not correctly identify the cuts or the marks that you claim are cuts?

A.    First of all, I believe her testimony was that she did not see those.    But, all I can tell you is that I microscopically saw those cut marks that apparently she did not.

Q.    Are you saying that Ms. Wilcox is wrong?

A.    I'm saying that she missed it, if that equates to wrong.

Q.    Now, and you're also saying, are you not, that the English laboratory, when they looked at these garments, got it wrong, too?

Exhibit 5001 at 1584

D8 65                                                    Meneely  X

A.   First of all, based upon their documentation with their photographs, once again they did not look very closely at the garments.  But, in essence, if they're saying there was no stab marks in the clothing, then they got it wrong under your definition.

Q.   All right.  And when Dr. Olson looked at the clothing to see if he could find a cut mark so that he could see that this woman had been stabbed, are you saying that he got it wrong, too?

A.   Once again, being associated with Medical Examiners for three decades, they take the clothing and look at it during the autopsy and give a general observation.

Q.   That's not the question, Mr. Meneely.  The question is, did Dr. Olson get it wrong?

A.   Apparently he did not see stab marks.  And so that would equate to getting it wrong.

Q.   Well, all these people missed it and you're the only one that caught it?

MS. McCREA:   Well, I object to the question, Your Honor.

THE COURT:   Well, it's somewhat argumentative, Mr. Frasier.  Rephrase it.

Q.   Is it your testimony that of all the people that have looked at these two garments, you're the only person that have found these marks?

Exhibit 5001 at 1585

Meneely   ReD   D8 66

A.    Yes.

Q.    Thank you.

MR. FRASIER:    That's all I have, Your Honor.

THE COURT:    Cross?  I mean, redirect.  Excuse me.  I'm sorry.

MS. McCREA:    You're just used to me - - -

THE COURT:    (Interposing) I'm just used to certain things.  Sorry.

REDIRECT EXAMINATION

BY MS. McCREA:

Q.    Mr. Meneely, why is it that you're the only one who found these cut marks?

A.    Based on all the photographs that I reviewed in this case, I'm the only one that, as I said earlier, got close up and personal with the evidence.

MR. FRASIER:    Well, I'm going to object to the answer.  This witness has no personal knowledge as to what exactly these laboratories did.  And, therefore, I don't think he can make that comment.

THE COURT:    I'll overrule the objection.

Q.    Go ahead, Mr. Meneely.

A.    Based upon the photographs, which is documentation that supports her conclusions, is that they did distant-type examinations of the evidence, which I did not.  I did a much more in-depth examination of the evidence, down to the

Exhibit 5001 at 1586

D8 67                                         Meneely  ReD

microscopic level.

Q.    And what was the difference — well, Dr. Olson testified that he just did a visual examination of the garments.  What did you do in terms of a microscopic examination?  How close did you get?

A.    Well, generally very close.  But, part of the illustration was when we passed the photographs of the soles of the shoe was to show exactly — or, demonstrate how close I had to get to look at these damaged areas.  And it can differentiate down to a tenth of a millimeter, which is very close.

Q.    A tenth of a millimeter is about the size of a pen tip?

A.    No.  Actually, a millimeter is the size of a pen's tip.  So, we're looking at much, much closer than that.

Q.    Much, much closer?  Okay.  Is there a magnification power on the microscope that you used that you can give us as reference?

A.    Probably — I'm just — since I didn't record it, I'm just estimating it's probably 100 power — 100 times the magnification.

Q.    100 times the magnification?

A.    I'm just estimating it.

Q.    Okay.  All right.  Thank you.

          MS. McCREA:    Nothing further.

Exhibit 5001 at 1587

D8 68

THE COURT:    You may step down.

Do you want this witness to remain available?

MS. McCREA:    He will remain available.  Yeah.

THE COURT:    I'm going to ask you to step out again, ladies and gentlemen.  We have just a couple things to take care of that have to do with scheduling.

(Jury out.)

THE COURT:    And other than Ms. Greenway and Ms. Carr, who are coming from out of state, you have possibly Mr. McGuffin and possibly his mother, Mrs. McGuffin, as your remaining witnesses?

MS. McCREA:    Yes.  And also Mr. Bonk for the purpose of identifying a map, Your Honor.

THE COURT:    Do you want - - -

MR. FRASIER:    (Interposing) I would stipulate to the map coming in.  I don't have a problem with that.

MS. McCREA:    Okay.

THE COURT:    So, what you're telling me — and I am concerned about what you're telling me about the jail, because I didn't know that when we were having our sidebar — is that you don't believe you can prepare Mr. McGuffin today?

MS. McCREA:    That is correct.  And I would also indicate to the Court that at the recess, I was given new discovery from the State, which consists of a number of jail calls made by Mr. McGuffin.  And apparently there are — one,

Exhibit 5001 at 1588

D8 69

two, three, four, five of those highlighted out of a whole list of jail calls.

Each one is at least — well, the shortest one is seven minutes and fifty-nine seconds. The longest one is fifteen minutes. And I have been advised that if Mr. McGuffin testifies, the State intends to use this in rebuttal. And so I've got an obligation to sit down and listen to these matters.

THE COURT: Okay. I don't have — in light of what you said about the jail — and as I said, when we had the sidebar, I wasn't aware of that. My concern in — and I realize we scheduled this for three weeks and we're moving quicker than what everybody thought. That doesn't mean I want to go clear 'til next Friday.

But, — so the concern I have is obviously you have to prepare him, and you obviously have to listen to the tapes and are doing that to prepare him.

My problem is that what I don't want to happen on Monday is that if there's the decision that he doesn't call (sic), then Mr. Frasier, who has to prepare his — for possible cross examination, then doesn't work on closing arguments. And so we have to call the jury in again for five minutes and excuse them, because then everybody wants to prepare for closing arguments.

So, I think the decision whether to call him is

Exhibit 5001 at 1589

D8 70

different than the decision how to prepare him.  So, I would appreciate letting us know, so I don't get here Monday and then I'm told, "Well, now we want to prepare for closing argument," and we go into Tuesday.  Because it sounds like we could probably finish this case Monday.

So, can you make a decision, after talking to him — and you have — I'm assuming between now and 1:00 you could probably at least - - -

Are those tape recordings available for Ms. - - -

MR. FRASIER:   Yes.  We just gave her the CD that — we got it this morning, Your Honor.

MS. McCREA:   And I will see if I can play it on my laptop.

THE COURT:   Okay.  And make sure that she has something available.

At least let us know whether he will or will testify at that point.  So, then if — because I assume he would take awhile if he testifies?

MS. McCREA:   Yes.

THE COURT:   And rebuttal, and then that would make sense to go into Tuesday for closing arguments.  But, if he's not going to testify, then all of the sudden we've got to prepare for instructions and closing arguments and I think that's a problem.  And I would prefer not hearing, "Well, I

Exhibit 5001 at 1590

D8 71

need more time now to prepare for closing arguments."

So, I think that decision can be made whether he's going to testify, because we would then have the weekend to talk to him about what his testimony would be if he's going to testify. I don't think that's — I think that's reasonable to find that out so we know whether or not we're going to — because calling them in for an hour or two is not productive of their time.

I'll give you a recess. We'll come back at 1:00 and then you can let me know what you feel about that at that point in time. By that point, you'll have time to listen. And you can — at that time you should have access to the jail to play — because I'm assuming you're going to want Mr. McGuffin — although Mr. McGuffin was apparently a participant in that conversation, you may want to have him hear those, too.

MS. McCREA:    Yes.

THE COURT:    Okay. We'll recess until 1:00, and I'll tell the jury to be back — well, there's no need for me to have the jury back that I can see, because there isn't going to be any testimony, as I understand. So, I can excuse them. At 1:00 I will want to know whether or not — well, we can discuss this issue further at 1:00.

MS. McCREA:    I understand.

THE COURT:    Okay.

Exhibit 5001 at 1591

D8 72

Bring the jury back in.  Tell them to leave their notebooks in there.

(Jury in.)

THE COURT:   What I'm going to do is release you for the day until Monday.  I hope you appreciate the fact that when we started we had a huge number of witnesses and the parties have done a good job of paring down the witnesses so we're not going to be here clear 'til next Friday.

But, when you pare down witnesses then you obviously throw off scheduling.  And we've moved much quicker than, I think, anybody anticipated.  So, they don't have any further witnesses today that are available.  There are even a couple coming from out of state.

So, what I'll do is release you.  And at least my best information is the case may be to you either Monday or Tuesday.  Now, I don't ever guarantee all that but I think, from what I'm understanding, that Tuesday would be the latest that you would be getting the case.

So, I'll just release you now with the same admonition that I've given you all the other times.  And then just be back at 9:00 on Monday.  Have a good weekend.

VOICE:    Thank you.

THE COURT:   Everybody else remain seated until the jury has a chance to leave.

(Jury out.)

Exhibit 5001 at 1592

D8 73

THE COURT:    Okay.  1:00.

And I'm sure you will, Corporal, make sure that Mr. McCrea and Ms. McCrea have access to Mr. McGuffin?

VOICE:    Yes, sir.

THE COURT:    Between now and 1:00.  Thank you.

We'll be in recess - - -

MR. McCREA:    (Interposing) Your Honor, one last thing.

I'd like the record to show that when I represented to you yesterday that our witnesses today would be short, that I was accurate.

THE COURT:    I recognize that and I appreciate that.

MR. McCREA:    Thank you, Your Honor.

THE COURT:    The one — the one exhibit — the — Mr. Meneely's report, I don't think your characterization of what Mr. Frasier was doing is correct, because I do think he was pointing out that he didn't put it in a report.  He wasn't questioning what was in the report.  He was questioning what wasn't in the report about the length of the knife or that it was a knife or even the opinion that she was stabbed.  So, I don't think that characterization - - -

The other problem is, it appears to me that it gets close to discovery areas, which is clearly the Court. And, you know, — and then I'm ending up possibly instructing

Exhibit 5001 at 1593

D8 74

the jury on discovery law, which I don't think is appropriate, which I don't want to do.

But, I don't think the exhibits there — you know, you can do that with a lot of reports where somebody doesn't say something.  And we've gone through that with several witnesses.

So, I don't think that the exhibit is admissible.  Other than that, it may lead then, "Okay, then, we want to offer our reports."  And I think then we all of the sudden get just reports heavy, or even police reports about what people did or didn't say at particular times.  So, it's a little different, but I don't feel that is admissible.  So, that's the reason.

If you want it in the record, you should give it to her so she can put, "Not for the jury."

Okay.  1:00.

                    (RECESS)

          (Jury out.)

          THE COURT:    Be seated, please.

          Ms. McCrea?

          MS. McCREA:    Your Honor, since Court broke this morning, Mr. McCrea and I immediately went over to the jail and have been conferencing with Mr. McGuffin since that time.

          I would indicate to the Court that we still do

Exhibit 5001 at 1594

D8 75

not have a decision and our request would be to be allowed to have until 5:00 p.m. today to notify the Court and Mr. Frasier's office of Mr. McGuffin's decision.  And we could do that — we could do that informally with something - - -

THE COURT:    (Interposing) I don't have a problem with that.  I don't think it matters whether it's 1:00 or 5:00.

Do you have a - - -

MR. FRASIER:    (Interposing) No.  Just a few minutes before 5:00, because my staff is known to be right out the door at 5:00.

MS. McCREA:    And it is Friday.  I understand that.  Yes.

THE COURT:    That would be fine.  I don't have a - - -

MS. McCREA:    (Interposing) And so we can just — we could provide the Court something signed by Mr. McGuffin indicating his decision if that's - - -

THE COURT:    (Interposing) I don't care whether he signs something.  It's not — I just would like to know.  I think it's helpful both to you and the State to know what's going to happen on Monday.

MS. McCREA:    I understand.

THE COURT:    So, if you inform counsel of that, that he's not going to testify, I will take that.

Exhibit 5001 at 1595

D8 76

And, Mr. McGuffin, I'm not requiring you to sign something, but you're going to be bound by your counsel's statement.  So, if you don't want to do that, and you want the authority, which is your right because you're the client, to either say yes or no, then I would want you to sign something.

But, if you're going to be satisfied with Ms. McCrea's statement to the Court that you either will or will not, then I will leave it at that.  But, if she does make that representation to the Court, you will be stuck with the decision, in effect.

Do you understand that?

DEFENDANT:    Yes, I do.

THE COURT:    Do you have any problem with her informing the Court and the DA's Office whether you will or will not testify?

DEFENDANT:    No, I do not.

THE COURT:    And you will be bound by that decision?

DEFENDANT:    Yes, I will.

THE COURT:    Okay.

MR. FRASIER:    Your Honor, actually when I think about it, could we have 4:30, because if the decision — I need to know so we can schedule potential witnesses for Monday?

MS. McCREA:    That's fine.

Exhibit 5001 at 1596

D8 77                    Proposed Jury Instructions

THE COURT:    Okay.  That's fine.

Can you — I know you've been spending all the time talking to your client, but can we take maybe up to 30 minutes so you have a chance — the jury instructions are pretty simple.  I mean, they're straight forward.  But, maybe you could look at them for a few minutes and determine whether or not — so, we could take care of that just in case we're going to go to argument, because I instruct before arguments.

I'll take a recess so it gives you some time to look those over and determine what, if any, problems you have with them.

Just let me know when you're generally ready.

MS. McCREA:    Okay.

(RECESS)

(Jury out.)

THE COURT:    Be seated, please.

MS. McCREA:    I have had a chance to review the proposed jury instructions, Your Honor.  The only suggestion I would make is on the instruction with the definition of Murder - Intentionally, on Subsection 3, that we add in Leah Freeman's last name.

THE COURT:    Oh.  That was probably something that when I was typing I just didn't — I left it out.

MS. McCREA:    I figured that.

And the other — the other thing is the defense

Exhibit 5001 at 1597

Proposed Jury Instructions        D8 78

would like the opportunity to submit a special instruction on

— given the difference in age between Mr. McGuffin and

Ms. Freeman — that that is not a legal issue.

THE COURT:    Oh.  Okay.  In other words, to make it so the jury doesn't think that somehow there was something illegal?

MS. McCREA:    Correct.

THE COURT:    Okay.  And I will look at that.

Mr. Frasier?

MR. FRASIER:    We have no problem with the instructions as presented, Your Honor.

THE COURT:    Okay.

And I will make that one change.  I just didn't mean — I didn't mean to leave that out.  I probably thought I — because I put it in the Manslaughter one.

Okay.  I would request, Ms. McCrea, if you can, it's just that when you make the decision — because I don't know that the Court will come back into session for that. Just maybe put it in writing.  You can sign it.  I don't — he doesn't have to.

MS. McCREA:    That's fine.

THE COURT:    Just give it to Mr. Frasier and the Court whether he will or will not be - - -

MS. McCREA:    (Interposing) I will do so, Your Honor.

Exhibit 5001 at 1598

D8 79

THE COURT:     Thank you, counsel.

MS. McCREA:     Thank you.

THE COURT:     We'll be in recess.

*                              *                              *

Exhibit 5001 at 1599

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

STATE OF OREGON,           )
                          )
         Plaintiff,        )      CASE NO. 10CR0782
                          )
                          )         JURY TRIAL
    vs.                    )         DAY 9
                          )
NICHOLAS JAMES McGUFFIN,    )
                          )
         Defendant.        )
_____   )

TRANSCRIPT OF PROCEEDINGS

Volume 13, Pages D9 2-D9 165

BE IT REMEMBERED That, the above-entitled cause

came on regularly for hearing beginning at 9:07 a.m. on Monday,

July 18, 2011, in the Circuit Courtroom of the Coos County

Courthouse in the City of Coquille, County of Coos, State of

Oregon, before the Honorable Richard L. Barron, and a jury.

APPEARANCES

R. Paul Frasier, District Attorney for Coos County,
representing the Plaintiff.

Erika Soublet, Assistant District Attorney for Coos County,
representing the Plaintiff.


Shaun McCrea, Attorney at Law, representing the Defendant.

Robert McCrea, Attorney at Law, representing the Defendant.


Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 1600

D9 2

*                               *                                    *

(Jury out.)

JUDICIAL ASSISTANT:    All rise.

THE COURT:    Be seated, please.

As I briefly discussed with counsel in chambers, there was a matter with one juror that we're going to have to inquire into.  And so, I will ask you to bring Mr. Welch out.

(Juror in.)

Mr. Welch, just have a seat over there, please.

Sorry to bring you out like this, Mr. Welch, but there was some information that was brought to the Court's attention that over the weekend, some people who said that they know you — and their last name is Phillips — encountered a witness in the case, and started to question that witness about the trial.  And they said that they knew you.  And the implication was that they had talked to you.  And the witness felt that the information that they were given could only have come from the trial itself.

So, they then started questioning the witness.  And the witness didn't say anything to them.  But then, this witness got concerned, and contacted the police, who contacted the people who said they were your friends, the Phillips.  And the Phillips said they had never — they hadn't talked to you about the trial, and weren't acting on your behalf.  But - - -

Exhibit 5001 at 1601

D9 3

JUROR:    (Interposing) I — Your Honor, I said nothing — I would have (not understandable).

THE COURT:    You have not — you have not talked to them about it?

JUROR:    No.  He knows I'm on here.

THE COURT:    Right.

JUROR:    But, you know, as far as that, that's it.

THE COURT:    Right.  Well, - - -

JUROR:    (Interposing) He wants to go fishing. I won't even take him.

THE COURT:    Right.  And that's fine.  I — I just wanted to inquire.  Because, we have to inquire when they used your name, and they started talking to somebody.  They later said they weren't acting on your behalf, and had not talked to you.  That part is correct?

JUROR:    That's correct.

THE COURT:    Mr. Frasier, do you have any questions?

MR. FRASIER:    No, Your Honor.

THE COURT:    Ms. McCrea?

MS. McCREA:    (No audible response.)

THE COURT:    Obviously, you do know those people, Mr. - - -

JUROR:    (Interposing) Yeah, I know them.

Exhibit 5001 at 1602

D9 4

Yeah.

THE COURT:    Okay.  That's fine.

MS. McCREA:    We don't have any questions, Your Honor.

THE COURT:    Okay.

Mr. Welch, don't discuss this matter with the other jurors.  But I - - -

JUROR:    (Interposing) Okay.

THE COURT:    You understand why I have to inquire about it.

JUROR:    Yeah.

THE COURT:    Okay.  If you'd step into the jury room, please.

(Juror out.)

At least from the Court's standpoint, I don't disbelieve the juror, that he didn't contact the people — or, had no contact with the people.  But, I don't have any reason to doubt him, the way he answered and that sort of thing.  But I will leave it up to counsel.  I mean, we have two alternates.  The appearance of that may look — look bad.

So, I will certainly consider what counsel thinks, but - - -

MR. FRASIER:    Your Honor, I also believe this is the same juror you were referring to that was having trouble staying awake?

Exhibit 5001 at 1603

D9 5

THE COURT:    Well, I — I felt that he never fell asleep, but he had heavy eyelids on two or three occasions that I noted.  And that — I thought — I brought that to counsels' attention earlier just because I thought that was a possible concern.  I never felt he fell asleep, but I felt that his eyelids, at times, indicated that he was sleepy, and nearly came to sleep.  So, - - -

MR. FRASIER:    I think the better course of valor here, Your Honor — you know, I do agree with the Court.  I — I don't have any reason to disbelieve what the juror is staying.  But given the appearance of everything, I think, in a case like this, that he probably should be excused.

THE COURT:    Well, that's my real concern, is that the community now learns of this, is looking at whatever the verdict is — if something happened, that's not proper.

(Counsel confers with Defendant.)

MS. McCREA:    I'm sorry, Your Honor.  I'm consulting with Mr. McGuffin.

THE COURT:    That's fine.  You have a right to take your time on this.

(Counsel confers with Defendant.)

MR. McCREA:    Your Honor, one of the problems here is, we consulted with Mr. McGuffin last night when we had the email from — from Mr. Frasier, the prosecutor.  And we also had some follow up at that point.  But, the record would

Exhibit 5001 at 1604

D9 6

show that Mr. McGuffin was not present in the chambers when Mr. Frasier spoke at greater length as to what investigation was done in this regard.  And perhaps, so the record is clear, and also since we've not had a chance to confer further with Mr. McGuffin since the time we had the conference in chambers so that he could know what was done beyond the information that was originally imparted, - - -

THE COURT:    (Interposing) Sure.  I'll just have Mr. Frasier put on the record what he told us in chambers.

MR. McCREA:    Yes, that's what I'm asking, Your Honor.

THE COURT:    All right.

Mr. Frasier, go ahead.

MR. FRASIER:    Well, just so it's clear, yesterday I was contacted by telephone by Officer McNealy of the Coquille Police Department.  He indicated to me that the witness, Polly Parks, had been in contact with the Police Department and indicated that she had been contacted by two individuals named Denver Phillips and Tammer (phonetic) Phillips, and that they had questioned the witness about certain information, in particular regarding Wayne McGuffin and the statement that has previously been testified to here, I believe by Ms. Cagley.

Ms. Parks declined to answer their questions.

Exhibit 5001 at 1605

D9 7

Indicated she was a witness, and was not supposed to discuss her testimony.  She did indicate that she felt that the information that was being given to her, or questioned about, had to have come from inside the courtroom.  She did indicate - - -

The officers then, at my direction, went to investigate this more, to try to identify who these people were, and talk to them.  Basically, what we were able to learn is, Ms. Parks is at the store.  These two individuals happened to bump into her at the store.  They start asking her questions about the case, including the Wayne McGuffin situation.  They indicated they knew a juror.  They called him "Rob".  That's all they had, or at least this is what Ms. Parks revealed back, is they called the juror "Rob".

At no time did Ms. Parks say that Rob had asked them to do anything on their behalf, but she was very uncomfortable with this, and called the police and let them know.  My understanding is the police did talk to Denver and — or, Phillips and they acknowledged that they know the juror. They called him Tom Welch versus Rob Welch.  But they indicated they go fishing with him on occasion.  They denied that they were asking any questions on his behalf, that he had said anything to them about the case.  They just ran into Polly Parks and they started asking her questions about information that they had about the case.

Exhibit 5001 at 1606

D9 8

That's basically the sum and substance of everything that was reported to me.

THE COURT:    Okay.

Well, and the record should reflect that things about the case have been published in The World.  And — in the newspaper.  So, — not everything, obviously.  And the story has gone out on other media, including TV.

(Defendant confers with his attorney.)

Oh, I'm sorry.

MS. McCREA:    Your Honor, after discussing the matter briefly here at counsel table with Mr. McGuffin, he doesn't have a position.  So, he'll leave it to the Court to decide whether to release the juror, or not.

THE COURT:    Well, in that light, and what Mr. Frasier said, the Court — as I said, I don't disbelieve Mr. Welch.  But, I just think the appearance is a problem.  So, I'm going to excuse Mr. Welch.

And my — at least as I understand the statute, is that we draw as to the two alternates, 13 and 14, and choose one of them randomly.  So, I would just have Ms. Cress put numbers 13 and 14 for the seat assignments in a hat or something, and just draw one of them.  We changed seating because Ms. Tinsley had a problem.  So, actually, the Juror in Seat No. 4, Ms. Londagin, was Seat No. 14.  And she changed with Ms. Tinsley because she had some problem about hearing.

Exhibit 5001 at 1607

D9 9

And Ms. Tinsley didn't have a problem.  So, it's actually — it would be Mr. Watson and Ms. Londagin that we would draw between those two.  Okay?

So, it would be Seat — so, put No. 4 and No. 13 in a hat — or a box, or something.

JUDICIAL ASSISTANT:    (Inaudible response.)

THE COURT:    That's fine.  I don't care, the names, or whatever it is, if you've already got it.  Just put them in something and swirl them around, and then pick one.

The alternate will be Ms. Londagin.  So, I would just move Ms. Tinsley to Seat No. 1, and I would excuse Mr. Welch, and leave Ms. Londagin in Seat No. 4, if that's acceptable to everybody.

MR. FRASIER:    That's fine.

THE COURT:    Okay.

All right.  Ask Mr. Welch to come out again.

(Juror in.)

THE COURT:    Mr. Welch, in light of this — and neither I nor the parties — I mean, we all accepted your explanation.  But the appearance of this isn't — isn't good.  And this verdict has to be going out in the community.  And the community knows of it.  So, I'm going to excuse you from the case.

It's not that I disbelieve you explanation.  It's just that your — the people that you know have created a

Exhibit 5001 at 1608

D9 10

problem here, and I don't want the verdict, whichever way it is, to be tainted by something like this where people then say, "Well, something happened with a juror in this matter."

So, I'm going to excuse you from this case. I apologize for doing that, but I just don't want anybody in the community to think that something went wrong - - -

JUROR:    (Interposing) Okay.

THE COURT:    - - - in the matter. Okay?

So, you will be excused. And I appreciate your service. And I'm sorry this happened.

Okay. Then, tell Ms. Tinsley, when she comes out she's to take Seat No. 1.

(Inaudible response.)

Well, I don't care if she wears them or not, but that's the seat she's going to take. She can wear the glasses.

While we looked at it, I just researched that one instruction (not understandable), and I don't find any problems with it in the case law.

(Jury in.)

THE COURT:    I just wanted to explain. There was something that occurred over the weekend that is not Mr. Welch's fault. It's not anything that he did, but something happened in relation to some — some other people who knew him. He didn't do anything wrong, but they did. And the

Exhibit 5001 at 1609

D9 11

appearance of that was such that I didn't think it was appropriate for him to continue.  Okay?  So, that's why he is gone.  But please do not think that he did it.  And I explained that to him.

All right.  The defense rests.  Is that correct?

MS. McCREA:    No, we're not prepared to rest yet, Your Honor.

THE COURT:    Okay.

MS. McCREA:    And as a housekeeping matter, defense would offer Defense Exhibits 128, 129, 130, 131, 132, 133 and 134.  And those are the summaries.

MR. FRASIER:    No objection.

THE COURT:    Received.

(Whereupon Defendant's Exhibits Nos. 128, 129, 130, 131, 132, 133 and 134 were received into evidence.)

MS. McCLINTOCK:    We would also offer Defense Exhibit 126, which was the reward poster which was identified by Ms. Courtright.  I didn't offer it at that time because our copy had some writing on it.

MR. FRASIER:    No objection.

THE COURT:    Received.

(Whereupon Defendant's Exhibit No. 126 was received into evidence.)

MS. McCLINTOCK:    And then, by stipulation we

Exhibit 5001 at 1610

Greenway    D    D9 12

have Exhibit 155, which was the map that Mr. Frasier was prepared to stipulate to on Friday.

MR. FRASIER:    Again, no objection.

THE COURT:    Received.

(Whereupon Defendant's Exhibit No. 155 was received into evidence.)

MS. McCREA:    And at this time, Your Honor, the defense would call Haley Greenway.

THE COURT:    Did you say Halley (phonetic) or Calley (phonetic)?

MS. McCREA:    Haley, with an H.

THE COURT:    Raise your right hand, please.

                    HALEY GREENWAY

was thereupon produced as a witness on behalf of Defendant and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat here, please.

You'll have to find a place to sit.

VOICE:    Right.

THE COURT:    If you'd just move the microphone closer to you, please.  Just keep your voice up when you're answering questions.

Go ahead, please.

MS. McCREA:    Okay.

Exhibit 5001 at 1611

D9 13                                        Greenway  D

DIRECT EXAMINATION

BY MS. McCREA:

Q.   Would you state your full name for the record, and spell both your first and last for us, please?

A.   Sure.  It's Haley Nicole Greenway.  Haley, H-A-L-E-Y.  Last name Greenway, G-R-E-E-N-W-A-Y.

Q.   And Ms. Greenway, you're going to have to keep your voice up because it's really hard to hear.

A.   Oh, I'm sorry.

Q.   No, just letting you know.

A.   Okay.

Q.   And Ms. Greenway, where do you live?

A.   I live in Pearland, Texas.

Q.   And what's Pearland, Texas near?

A.   Uh, it's about ten miles southeast of Houston.

Q.   Did you used to live in Coquille?

A.   Yes.

Q.   Can you tell us when that was?

A.   I was born and raised here, and I moved — I want to say in 2003.

Q.   Did you graduate from Coquille High School?

A.   Yes.

Q.   Do you remember what year?

A.   2000.

Q.   2000.  Did you know, at the time, Nick McGuffin?

Exhibit 5001 at 1612

Greenway   D    D9 14

A.    Yes.

Q.    And how did you know him?

A.    Just, you know, a classmate.

Q.    Did you know Leah Freeman?

A.    Yes.

Q.    How did you know her?

A.    Same thing.

Q.    Did you have an occasion or opportunity to observe Leah Freeman and Nick McGuffin together in the year 2000?

A.    Yes.

Q.    What — where was that?

A.    At school.

Q.    How often would you see them?

A.    Just about every day.

Q.    Did they seem to have a romantic type relationship?

A.    Yeah, just like normal teenager relationship.

Q.    Did you ever notice any — anything that they did together?

A.    Um, I mean, go to class together, or, you know, hanging out in the halls.  And that's — that's about all I noticed.

Q.    Any public displays of affection?

A.    Oh, yeah.

Q.    Anything particular you remember?

A.    Um, you know, walking — walking her to class.  You

Exhibit 5001 at 1613

D9 15                                               Greenway  D

know, holding hands, occasional, you know, hug, or you know, just normal stuff.

Q.   Did you ever see them get into an argument?

A.   Oh, yeah.

Q.   Is — when you say "Oh, yeah", it's — was it any big deal?

A.   No.

Q.   Okay.

A.   I mean, just like everyone else, there.

Q.   All right.  "Everyone else" meaning other teenage relationships?

A.   Yes, ma'am.

Q.   Now, during the fall of 2000 — or, I don't know. Maybe it was 1999.  Anyway, the school year — that last senior year, do you remember, did — had Nick been participating in school sports?

A.   He had, yes.

Q.   And what did he play?

A.   Football.

Q.   Did he play football that last senior year?

A.   Not that I remember.

Q.   And do you remember that — anything that had happened to him to prevent him from playing football?

A.   I know at one point he had — I believe it was a broken neck.

Exhibit 5001 at 1614

Greenway  D    D9 16

Q.    And did you observe anything that he was wearing or using?

A.    He, at one point, had a neck brace on.

Q.    Do you remember how long he had the neck brace?

A.    I don't.

Q.    Now, drawing your attention to June 28, 2000, do you remember if you saw Nick McGuffin that night?

A.    I did.

Q.    And can you tell us about that?

A.    Um, I had a 10:00 curfew, and I was coming back from Fairview.  And when I came from the road from Fairview onto — I believe it's Central, at the stop sign, I saw him go by in his car.  And what kind of car was he driving?

A.    It was his Mustang.

Q.    A blue Mustang?

A.    Yes, ma'am.

Q.    Okay.  Did you have any contact with him?

A.    No.

Q.    (Not understandable.)

A.    Yes.

Q.    So, can you — you'll have to kind of (not understandable).  If you can point it out from where you are, so we can get you on the microphone, or can you get down here and sort of point to it and then tell us?

Can you show us where you were, and where you saw

Exhibit 5001 at 1615

D9 17                                           Greenway  D

Mr. McGuffin?

     A.   Let's see, now.

               THE COURT:    Could you move the microphone in front of you, ma'am?

               WITNESS:    Oh, I'm sorry.

               THE COURT:    (Not understandable) turn to the side.  That's all right.  Just get it way over there so when you speak, you're still speaking in it.

               WITNESS:    Okay.

     A.   Um, let's see.  This here is the Fairview Road.  And this here — okay, this here is Central.  So, I guess it was right here, at this intersection, here.

     Q.   It's the intersection of Central and Fairview?

     A.   Correct.

     Q.   Okay.  Did you see which way Mr. McGuffin was going?

     A.   He was going towards the high school.

     Q.   Okay.  And how — did you stop?  Did you have any conversation with him?

     A.   Well, he — he was just driving by.  And I had a 10:00 curfew.  It was just a few minutes before ten, and I had to go home.  He was, you know, just, you know, leaving.

     Q.   Okay.  Did you notice if there was anybody with him?

     A.   There wasn't.

     Q.   One moment please.

     A.   Sure.

Exhibit 5001 at 1616

Greenway   X    D9 18

Q.   Thanks.

Just to confirm, Mr. McGuffin was on Central going toward the high school when you saw him?

A.   Correct.

Q.   Okay.  Thank you.

MS. McCREA:   That's all the questions I have.

THE COURT:   Cross?

MS. SOUBLET:   Just briefly, thank you, Your Honor.

CROSS EXAMINATION

BY MS. SOUBLET:

Q.   Ms. Greenway, was he wearing a neck brace?

A.   I don't recall that time.

Q.   Did you see him wearing a neck brace in June?

A.   I don't know the months.  I don't know the time frame.

Q.   Thank you.

MS. SOUBLET:   Nothing further.

MS. McCREA:   No further questions.

THE COURT:   You may step down, ma'am, and you are free to leave.

WITNESS:   Thank you.

THE COURT:   Call your next witness.

MS. McCREA:   The defense calls Barbara Carr.

THE COURT:   If you would raise your right

Exhibit 5001 at 1617

D9 19                                                    Carr   D

hand, please, ma'am.

BARBARA LADAWN CARR

was thereupon produced as a witness on behalf of Defendant and, having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE COURT:    Have a seat here, please.

Make sure the microphone is a little closer to you, please.  And make - - -

WITNESS:    (Interposing) Like that?

THE COURT:    - - - sure you keep your voice up.

Go ahead, please.

DIRECT EXAMINATION

BY MS. McCREA:

Q.   Would you state your full name, and spell your last for the record, please?

A.   Barbara Ladawn Carr, C-A-R-R.

Q.   And Ms. Carr, where do you live?

A.   In Tucson, Arizona.

Q.   Now, I want to show you a photograph we have in evidence as State's Exhibit 16 of a Mustang vehicle.  Do you recognize that car?

A.   Yes, I do.

Q.   And how do you recognize it?

Exhibit 5001 at 1618

Carr   D    D9 20

A.   I used to own this car.

Q.   Do you remember when you owned it?

A.   It was in the summer of '99.

Q.   Summer of '99?

A.   Uh huh.

Q.   And what kind of condition was the car in when you owned it?

A.   It was in fair condition.  It was lighter in color. My husband repainted it.

Q.   And what's your husband's name?

A.   Rocky Carr.

Q.   Okay.  Now, were the two of you living in Tucson then?  Or, somewhere else?

A.   We lived in North Bend at that time.

Q.   North Bend.  Close to Coquille?

A.   Yeah.  Well, we lived out by Hauser.

Q.   Okay.  All right.  But in this area.

A.   Yes.

Q.   All right.  So, do you remember who you — and I'm assuming it was you and your husband, sort of a joint venture.

A.   Correct.

Q.   Yes.  So, do you remember who you bought the car from?

A.   It was an older gentleman that lived out in Myrtle Creek.  Not Myrtle Creek.  We were coming back from Myrtle

Exhibit 5001 at 1619

D9 21                                                    Carr   D

Creek, and we stopped at a little — a little convenience store just this side of Coquille.  There's a little convenience store out there where there's a Christmas tree farm.  And we saw it at the little store.  And we contacted the gentleman. I don't remember the gentleman's name.  But, it was an older gentleman.

Q.   And I'm going to show you what's marked for identification as Defendant's Exhibit 175, and see if that refreshes your recollection on the guy's name?

A.   Yes, it does.

Q.   And what was his name?

A.   William — we called him Grand Huff (phonetic).

Q.   Okay.  So, you bought the vehicle from Mr. Huff?

A.   Yes.

Q.   And then did you and your husband register the car, the Mustang, in your name?

A.   No, we did not.

Q.   And was there any reason for that?

A.   Because we bought it as a project.  At that time we were buying old Mustangs.  This was the second vehicle we had done that.  And we restore them, and then sell them.  Kind of a little hobby.

Q.   Okay.  So, I'm going to show you what we've got marked for identification as Defense Exhibits 157 through 161, and see if you - - -

Exhibit 5001 at 1620

Carr   D     D9 22

A.    (Interposing) Yes.

Q.    - - - recognize those photos.

A.    Yes, I do.  This particular one is the first Mustang that we did.

Q.    Okay.

THE COURT:    What's the number on that one, please?

MS. McCREA:    No. 157.

THE COURT:    Okay.

A.    And this is the same Mustang.

MS. McCREA:    That would be 158.

A.    This is a Mustang that we bought after the blue Mustang.

MS. McCREA:    That's 159.

A.    And — that we bought and a kid ran that into a telephone pole.

This was the original Mustang that we did — the red one.

MS. McCREA:    That's 160.

A.    And again, this is the original one that turned out to be red.

MS. McCREA:    And that's 161.

Q.    Okay.  So, none of those photos are photos of the Mustang that we have in Exhibit 16, but they're examples of the work that you did on other Mustangs?

Exhibit 5001 at 1621

D9 23                                        Carr   D

A.   Correct.  In one of the — in this one, you can see the - - -

MS. SOUBLET:   (Interposing) I'm going to object, Your Honor, - - -

A.   - - - Mustang (not understandable).

MS. SOUBLET:   - - - to relevancy.  She's just indicated they're not the Mustang in question.  I don't see the relevancy.

THE COURT:   I assume you're going to get to a point that you're making, here?

MS. McCREA:   Yes.

THE COURT:   Okay.  Go ahead.

Q.   So, the examples that you showed us — again, Exhibits 157 through 161 — do those indicate the type of work that you and your husband put into restoring various Mustangs?

A.   Correct.

Q.   And would that include the work you did in refurbishing or restoring the Mustang that we have in Exhibit 16?

A.   Yes, it does.

Q.   And it was not the first Mustang you did, but the second Mustang.

A.   Correct.

Q.   Now, I want to show you - - -

THE COURT:   (Interposing) Excuse me.

Exhibit 5001 at 1622

Carr  D    D9 24

Which — which was the first, and which — the red was the first one?

WITNESS:    Yes.

THE COURT:    And the blue was the second one?

WITNESS:    Yes.

THE COURT:    Okay.

MS. McCREA:    Thank you, Your Honor.

Q.    And then I'd like to show you what's been marked for identification as Defense Exhibits 162 and 163.  Do you recognize the car in those pictures?

A.    Yes.

Q.    And is that the same vehicle that is — was depicted in Exhibit 16?

A.    Yes.

Q.    It's the blue Mustang?

A.    Correct.

Q.    Okay.  It's a 1967 Ford Mustang.

A.    Yes.

Q.    All right.  And do those pictures fairly and accurately show what the Mustang looked like at the time you and your husband were working on it?

A.    Yes.  This is after we painted it.  Yeah.

Q.    Okay.

A.    Yes.

Q.    So, what — Ms. Carr, what did you and your husband

Exhibit 5001 at 1623

D9 25                                              Carr  D

do to the blue Mustang?

A.    We took all the seats out of the inside.  We — my — my father-in-law and I redid all the seats inside.  We coated them with new seat covers.  My husband put a new headliner in it.  We replaced the seal in the back window because it leaked.  And the seal that be bought didn't fit as correctly as it should.  And we repainted the trunk.  And my husband — he clear-coated this one.  And when he did that, it kind of made a swirly thing on the — and it didn't turn out very well.

Q.    So, the paint job did not turn out very well?

A.    No, it did not.

Q.    Okay.  Now, in Exhibit 162, is that your house in North Bend?  Is that where it was taken?

A.    Yes, it is.

Q.    And there appears to be a piece of plastic over the car.

A.    Correct.

Q.    And why was that?

A.    Because the back window leaked.  We couldn't — we put the window in there twice, and we couldn't get it to quit leaking into the trunk.

Q.    Okay.  All right.

            MS. McCREA:    At this point, Your Honor, we would offer Defense Exhibits 162 and 163.

            MS. SOUBLET:    And are these of this Mustang?

Exhibit 5001 at 1624

Carr   D    D9 26

MS. McCREA:    Yes.

MS. SOUBLET:    Did we get copies of these?

MS. McCREA:    Yes, I emailed them to you.

MS. SOUBLET:    I have no objection to these two exhibits.

THE COURT:    Those exhibits are received.  The numbers again?

MS. McCREA:    Nos. 162 and 163.

THE COURT:    They are received.

(Whereupon Defendant's Exhibits Nos. 162 and 163 were received into evidence.)

Q.    Now, Ms. Carr, you indicated that the back window leaked.  And — and it leaked into the trunk?

A.    Correct.

Q.    Now, when you owned this Mustang, the blue Mustang, did it have a trunk liner?

A.    No.

Q.    And why was that?

A.    Because on the coast, when you put something in a trunk right on the metal, it creates rust.  And in any of the vehicles that we did, if there was a trunk liner, we always removed it.  And some of the pictures that we had of the finished Mustangs, you can see that there was never anything in the trunk.  Like this one.

Q.    When you say "this", we've got to get those - - -

Exhibit 5001 at 1625

D9 27                                                      Carr   D

A.    (Interposing) Right.  I'm sorry.

Q.    No. 158.  Okay.

A.    Yeah, there was - - -

Q.    (Interposing) So, you're talking about the red Mustang?

A.    Right.

Q.    Okay.  Now, I'm going to show you what's been marked for identification as Defendant's Exhibit 171.  Do you recognize that photo?

A.    Yes.  That's the trunk of the Mustang in question.

Q.    Of the blue Mustang?

A.    Yes.

Q.    Okay.  And then I'm going to show you what's been marked for identification as Defendant's Exhibit 172.  Do you recognize that?

A.    Yes.

Q.    And what is it?

A.    It's rust damage, probably from the water that was leaking into the trunk.

Q.    And is that also from the blue Mustang?

A.    Yes.

Q.    Now, do both of those pictures fairly and accurately depict at least how the Mustang generally looked when you — you and your husband owned it?

A.    Right.  We — when we bought it, it looked like this.

Exhibit 5001 at 1626

Carr   D     D9 28

And then when we sold it, we had removed all the rust and sprayed it.

Q.   Okay.  So, when you say "it looked like this," you're referring to Exhibit 172?

A.   Yes.

Q.   And you're indicating that there was rust in the trunk?

A.   There was when we purchased it.

Q.   Uh huh.

A.   But, when we sold it, we had removed it all.

Q.   Okay.  You removed the rust?

A.   Yes.

Q.   Okay.

A.   But, we did tell the gentleman that bought it that it would probably happen again because as the water leaked in there, it would sit in there and create the rust.

Q.   And the water leaked in there because of the back window?

A.   Yes.

Q.   Now, when you sold the Mustang, what, if anything, had you and Mr. Carr done to the trunk?

THE COURT:   You're talking about the blue one?

MS. McCREA:   Yes.  I'm sorry.

Q.   I'm talking about the blue one.

Exhibit 5001 at 1627

D9 29                                                    Carr   D

A.   We sandblasted the trunk.  We removed the — the gas tank.  The gas tank comes out in one great big piece.  We sandblasted everything.  And we put the tank back in after we had sandblasted that.  And then we sprayed it with a gray primer paint.

Q.   Okay.  And in this exhibit, 172, can you see any of that gray primer paint?

A.   Yes.  Right along here.

Q.   (Interposing) These - - -

A.   (Interposing) Uh, right along here.

Q.   Okay.  You're talking about sort of the - - -

A.   Yeah, the — the top - - -

Q.   - - - not the very bottom?

A.   Right.  Because see, here, you can that there not any damage because the water hasn't really rested on that area.

Q.   Okay.  All right.

MS. McCREA:   We'd offer Defense Exhibits 172, and — well, let me make sure what they are.  Nos. 171 and 172, Your Honor.

MS. SOUBLET:   No objection.

THE COURT:   Received.

(Whereupon Defendant's Exhibits Nos. 171 and 172 were received into evidence.)

Q.   Who did you and Mr. Carr sell the blue Mustang to?

Exhibit 5001 at 1628

Carr   D     D9 30

A.   I don't remember his name.  Sorry.  I found out recently that it's Nick's grandfather.

Q.   Right.  Would it refresh your recollection if you took a look at the check that was written to you and Mr. Carr?

A.   Yes, it would.

Q.   I'm going to show you what's been marked for identification and Defendant's Exhibit 173.  Does that appear to be a copy of the check that you received for purchase of the Mustang?

A.   Yes.

Q.   And what's the person's name who paid you?

A.   Alvin Jensen?

Q.   Okay.

A.   Sorry.  I don't have my glasses on.

Q.   Well, I didn't mean to put you on the spot, there, either.

And then, did you do a — a Bill of Sale - - -

A.   (Interposing) Yes, I did.

Q.   - - - to someone for that blue Mustang?

A.   Yes, I did.

Q.   And who was the Bill of Sale made out to?

A.   To Bruce McGuff.

Q.   Is it McGuff or McGuffin?

A.   McGuffin, I'm sorry.

Q.   Okay.  And — and does the amount that you sold the

Exhibit 5001 at 1629

D9 31                                               Carr  D

vehicle for match the check from Mr. Jensen?

A.   Yes, it does.

Q.   And on what date did you sell the Mustang to Mr. McGuffin?

A.   It would be March 8th.

Q.   Of what year?

A.   '99.

MS. McCREA:    We'd offer Defense Exhibit 173.

MS. SOUBLET:    No objection.

THE COURT:    Received.

(Whereupon Defendant's Exhibit No. 173 was received into evidence.)

Q.   Now, Ms. Carr, you indicated that you replaced the seat covers in this Mustang?

A.   Yes, I did.

Q.   And I'm going to show you — I'll show you what's been marked for identification as Defense Exhibit 164.  Do you recognize whether those are the seat covers that you put on the vehicle?

A.   They are.

Q.   And how about in 166?

A.   Yes.

Q.   What was the condition of the seat covers before you bought the Mustang?

A.   They were cracked and torn in the seams.

Exhibit 5001 at 1630

Carr   D     D9 32

Q.   And did you replace anything else?  I think, the headliner?

A.   The headliner and the back seat.

Q.   And the back seat.  Okay.

MS. McCREA:    We'd offer 164 and 166, Your Honor.

MS. SOUBLET:    I'm sorry.  Are these before or after photos?

MS. McCREA:    These are after photos.  This is after it's replaced.

MS. SOUBLET:    No objection.

THE COURT:    Received.

(Whereupon Defendant's Exhibits Nos. 164 and 166 were received into evidence.)

Q.   Do you remember about how much time you and your husband spent refurbishing the blue Mustang?

MS. SOUBLET:    Objection.  Relevance.

THE COURT:    I'm not too sure I see the relevance of that, one way or the other.  I'll sustain the objection.

MS. McCREA:    That's fine.

We would offer Defense Exhibit 175, which is the title to Mr. Huff.

MS. SOUBLET:    No Objection.

THE COURT:    Received.

Exhibit 5001 at 1631

D9 33                                                    Carr   D

(Whereupon Defendant's Exhibit No. 175 was received into evidence.)

And we would offer Defense Exhibits 157, 158, 159, 160 and 161 as demonstrative of the work that the Carrs did, Your Honor.

MS. SOUBLET:    I would object on grounds of relevance.

THE COURT:    Sustained.

If you want those in the record, - - -

MS. McCREA:    (Interposing) I'll give those to Ms. Cress, Your Honor.

THE COURT:    Thank you.

MS. McCREA:    Thank you for reminding me.

(Whereupon Defendant's Exhibits Nos. 157, 158, 159, 160 and 161 were received into evidence for the record only.)

Q.    Bear with me for just a minute, Ms. Carr.

A.    No problem.

MS. McCREA:    We would also offer Defendant's Exhibit 174 which is the title to the blue Mustang in the name of Kathleen and Bruce McGuffin, Your Honor.  That may already be in evidence through the State, but I'm not sure that they are all the same documents.

MS. SOUBLET:    No objection.

THE COURT:    Received.

Exhibit 5001 at 1632

Carr   X    D9 34

(Whereupon Defendant's Exhibit No. 174 was received into evidence.)

Q.   Thank you, Ms. Carr.

MS. McCREA:    That's all the questions I have.

WITNESS:    Thank you.

THE COURT:    Cross?

MS. SOUBLET:    Thank you, Your Honor.

CROSS EXAMINATION

BY MS. SOUBLET:

Q.   Ms. Carr, once that Mustang — you sold that Mustang to McGuffins, you have no knowledge of what it was used for.

A.   I do not.

Q.   And you have no knowledge of its condition in June of 2000?

A.   I do not.

Q.   Thank you.

MS. SOUBLET:    Nothing further.

THE COURT:    Any redirect?

MS. McCREA:    Just briefly.

REDIRECT EXAMINATION

BY MS. McCREA:

Q.   Ms. Carr, you looked at — no, - - -

MS. McCREA:    Actually, that's fine, Your Honor.

THE COURT:    Okay.

Exhibit 5001 at 1633

D9 35                                              Wilcox  D

You may step - - -

MS. McCREA:    (Interposing) Nothing further

THE COURT:    You may step down.  You're free to leave.

WITNESS:    Thank you.

THE COURT:    Call your next witness, please.

MS. McCREA:    The defense rests, Your Honor.

THE COURT:    Thank you.

Mr. Frasier, call your first rebuttal witness.

MR. FRASIER:    Thank you, Your Honor.

We recall Kathy Wilcox.

THE COURT:    Ms. Wilcox, you're still under oath.  If you'd retake the stand, please.

KATHY WILCOX

was thereupon produced as a rebuttal witness on behalf of Plaintiff and, having previously been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. FRASIER:

    Q.    Ms. Wilcox, I'd like to go back to your examination of the shirt and the bra that were given to you by — or, that were worn by — or, that were found on the body of Ms. Freeman. Could you tell the jury, please, how closely did you examine those garments?

Exhibit 5001 at 1634

Wilcox   D    D9 36

A.   Um, well, I got right down on them, and examined them.  And you can tell from my picture, there was some low-powered magnification.

Q.   When you say you "got right down on them", what do you mean?

A.   Um, as you would physically examine anything you wanted to look at closely.  You know, you look at it closely.

Q.   And there was some sort of magnification used?

A.   Um, there must have been some low-powered magnification.

MR. McCREA:    Object to the speculation as to what must have happened.

THE COURT:    Sustained.

Q.   Well, you looked at your photographs that you took.

A.   Yes.

Q.   And do you have close-up photographs that were taken?

A.   Yes.

Q.   And do they have the ruler that you used in there?

A.   Yes, they do.

Q.   To obtain those photographs, would some sort of magnification have been used?

A.   Yes.

Q.   Now, again, in your examination, did you see anything that caused you to believe that a sharp instrument,

Exhibit 5001 at 1635

D9 37                                                      Wilcox   X

such as a knife, had cut either document — or, either garmet?

A.   No.

Q.   Thank you.

          MR. FRASIER:    That's all I have, Your Honor.

          THE COURT:    Cross?

                    CROSS EXAMINATION

BY MR. McCREA:

Q.   Ms. Wilcox, you testified previously that you had received a copy of Mr. Meneely's report.  Is that correct?

          MR. FRASIER:    Objection.  Outside the scope.

          MR. McCREA:    Well, we'll tie it up.

          THE COURT:    Just a minute.

          I'm not too sure how you're going to tie it up, but - - -

          MR. McCREA:    Well, that's — that's fine. Your Honor.

          MR. McCREA:    I'll withdraw - - -

          THE COURT:    (Interposing) Sustained.

          MR. McCREA:    - - - the question for the moment, Your Honor.

          THE COURT:    Okay.  That's fine.

          MR. McCREA:    All right.

Q.   Now, you didn't see the cuts in the fabric of the — let's take it one at a time.  You didn't see the cut in the fabric of the tank top when you examined it originally?

Exhibit 5001 at 1636

Wilcox    X    D9 38

A.    That is correct.

Q.    And the photographs you took were as much magnification — they display as much magnification as you used in the course of that examination.  Is that correct?

A.    I cannot recall exactly what magnification I used. I call it — I call it "low-powered magnification".

Q.    Excuse me?

A.    Low-powered magnification.

Q.    Low powered?

A.    Right.

Q.    Okay.  You have been present at the testimony of Mr. Meneely?

A.    Yes.

Q.    And it is correct that you never, at any time, used the kind of power magnification that he used a lot?

A.    I don't know what he used.

Q.    Well, did you hear him testify?

A.    Yes.

Q.    And you've seen the photographs?

A.    Yes.

Q.    All right.  And looking at the photographs that he took, and comparing it with the photographs you made, it demonstrates, does it not, that he used extremely greater magnification than you used?

A.    For the photographs.  I don't know what he used for

Exhibit 5001 at 1637

D9 39                                          Wilcox  X

his exam.

Q.    All right.

A.    Photographs are representative of your work.  At the time, eleven years ago, when I did this, I just used what I had at the lab at the time that seemed reasonable.

Q.    Right.

A.    I might have looked at them more closely.

Q.    Well, understand, none of my questions are intended to be accusatory.  You understand that?

A.    Yes.

Q.    You did the best you could with what you had at the time.

A.    Yes.

Q.    Okay.  And now, — and what you're saying is that using the best you had at the time, you weren't able to see the cut.

A.    I still do not see the cut.

Q.    Well, did you go and make a — you say you still do not see it.

A.    That is correct.

Q.    Have you made a re-examination of the material?

A.    No.

Q.    Pardon?

A.    No.  I have looked at the photographs.

Q.    Well, now, in conjunction with still not seeing the

Exhibit 5001 at 1638

Wilcox   X    D9 40

cut — you got a copy of Meneely's report, did you not?

A.   Yes, I did.

Q.   And - - -

MR. McCREA:   May I have Exhibit 152?

MS. McCREA:   Exhibit 154.

MR. McCREA:   I'm sorry.  I apologize, 154.

MR. McCREA:   May I approach, Your Honor.

THE COURT:   You may.

Q.   I hand you an item in evidence marked for identification as Defendant's Exhibit 154.  And I ask if you recognize that?

A.   Yes, I do.

Q.   And that's the report of Mr. Meneely that you received?

A.   Yes.

Q.   And in conjunction — or, in that report, did you look at the item regarding Area 1 of the tank top shirt?

A.   Yes, I did.

Q.   And - - -

MR. McCREA:   And by the way, Your Honor, we will offer, at this time, Exhibit 154.

MR. FRASIER:   Again, we've objected to it. The Court has sustained the objection.  We renew that objection.

THE COURT:   I'll keep with the ruling.

Exhibit 5001 at 1639

D9 41                                              Wilcox   X

MR. McCREA:    Pardon?

THE COURT:    The ruling — I previously had sustained the objection of that, and stated the reasons for that.  I think that was out of the presence of the jury.  But I have sustained the objection and explained the reasons for that.  You're re-offering it again, and - - -

MR. McCREA:    (Interposing) We're offering it again because she's testified that she still doesn't see the holes.

THE COURT:    (Interposing) Okay.  I don't think offering the report would do anything in relation to that.  So, the objection is still sustained.

MR. McCREA:    Well, may I be heard just briefly?  I don't - - -

THE COURT:    (Interposing) Yes.

MR. McCREA:    - - - mean to belabor it.

THE COURT:    No, that's fine.  Go ahead.

MR. McCREA:    The report directs a person to where the holes are, and what they — what they look like, and the direction, to assist her finding them.

THE COURT:    Well, and you can certainly question her about it.  But, it doesn't do anything other than repeat Mr. Meneely's testimony, which the jury already has.

So, the objection is sustained.

MR. McCREA:    Thank you, Your Honor.

Exhibit 5001 at 1640

Wilcox   X     D9 42

Q.   Excuse my back for a moment.

You have a copy of that same report in front of you, do you not?

A.   Yes, I do.

Q.   In other words, I'm not taking away from you what you examined — the report you examined.  You have the same thing in front of you?

A.   Yes, I do.

Q.   And referring to the tank top shirt in Area 1, it describes the — "a hole that displays microscopic characteristics consistent to a sharp instrument.  And this area is approximately 1.5 centimeters in length."  Is that correct?

A.   That is correct.

Q.   And when did you receive the report?  How long before this trial?

A.   Uh, the night before I testified, so it was about the 12th.  I — I just received it.

Q.   The night before you testified?

A.   Yes.

Q.   And you had it since that time?

A.   Yes.

Q.   And based on your training and experience as a — as a Criminalist, you don't have any trouble understanding what this report says, do you?

Exhibit 5001 at 1641

D9 43                                          Wilcox   X

A.   No, I do not.

Q.   Okay.  Now, have you ever gone to look at the tank top since you got the report to see if, in fact, there is a hole that displays microscopic characteristics consistent to a sharp instrument, and that this area is approximately 1.5 centimeters in length?

A.   I have not looked at the tank top.  I have looked at my own photographs.

Q.   My — my question is just that.

A.   Okay.  I've not physically looked at the tank top again.

Q.   Now, you — I didn't mean to keep you from explaining.  You've looked at what?  Your photograph?

A.   Yes.

Q.   All right.  And you've looked at Mr. Meneely's photograph?

A.   Yes, briefly.

Q.   And the — that cut — or that hole, I guess it's called, is displayed in Mr. Meneely's photograph?

A.   Yes, it is.

Q.   So, at least you have seen it in Mr. Meneely's photograph?

A.   Yes.

Q.   Now, dealing with the sports bra and the portion that says Area 2, in that it says, "This hole is located in

Exhibit 5001 at 1642

Wilcox   X    D9 44

the front, upper-mid section of the material.  This hole displays microscopic characteristics consistent to a sharp instrument.  This area is approximately 1.5 centimeters in length."  Correct?

A.    Correct.

Q.    And again, you had no trouble understanding that description?

A.    I have no trouble understanding that.

Q.    Okay.  And did you ever, up to this moment, re-examine this sports bra to see if, in fact, you could find that hole?

A.    No, I have not re-examined - - -

Q.    (Interposing) But, you did - - -

A.    - - - the clothing.

Q.    - - - see it in Mr. Meneely's photograph?

A.    Yes.

Q.    And in both instances, the photographs of the — of the holes, both in the tank top and the sports bra, are consistent with what his description is in the report.

A.    I would not agree that they are cut marks.  I still see the - - -

Q.    (Interposing) Wait a minute.

A.    - - - frayed edges.

Q.    My question is - - -

A.    (Interposing) But, I — you — the description

Exhibit 5001 at 1643

D9 45                                          Wilcox  X

describes them as a cut.  I'm just not seeing it.

Q.    All right.  Did you look at the photographs — had you looked at the photographs before you testified?

A.    No.

Q.    But — and, I guess — I suppose — well, just so it's clear — I make it clear, since you have examined — I mean, since you have not examined either of the items of clothing, you have not subsequently brought high magnification — microscopic examination into your view of what's there.  Is that correct?

A.    That is correct.

Q.    Okay.  Is it — is it significant that both of these holes are of exactly the same length?

A.    Well, I think he uses approximately on both of them. And there were other holes that were approximately those lengths, too.

Q.    Take out my "exactly".  Is it significant that they are the same length?

A.    It could be.

Q.    Thank you.

MR. McCREA:    That's all the questions I have.

THE COURT:    Redirect?

MR. FRASIER:    Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. FRASIER:

Exhibit 5001 at 1644

Wilcox  ReD  D9 46

Q.    Ms. Wilcox, going back to your examination back in — in the year 2000, prior to your examination you were aware that an autopsy had been performed on the body of Ms. Freeman?

A.    Yes.

Q.    And you were aware that the police and the authorities were trying to determine how she died?

A.    Yes.

Q.    You were aware that the results, because of the condition of the body were somewhat lacking?

MR. McCREA:    Excuse me.  The re-direct is going way outside the scope of cross.

MR. FRASIER:    Well, I'm going to tie it up here with my next question.

THE COURT:    Okay.  Go ahead.

Q.    When you were examining the clothes, were you looking for anything that could help you determine how Leah Freeman died?

A.    Yes.

Q.    And that would include a close examination to see if you could find a cut mark, a bullet hole, whatever?

A.    Yes.

MR. McCREA:    I'll object to leading, Your Honor.

THE COURT:    Sustained.

Q.    What were you looking for?

Exhibit 5001 at 1645

D9 47                                        Wilcox   ReD

A.   I was looking for any sign of a weapon, bullet, trace evidence — because we did not have a cause of death, at that point, and we were — that was a big part of the investigation.

Q.   Now, just so we're clear, you had looked at the photographs of these areas that Mr. Meneely is calling cut marks.

A.   Yes.

Q.   And you've looked at his photographs that have been admitted in evidence here today?

A.   Yes, I did, briefly.

Q.   And it — what is your opinion regarding those marks that you see in those photographs?

A.   Well, when I read his report, I thought it was going to be cut marks from the other lab that looked at them after me and before him — the British lab.  But I think he's taking photographs of the same things I have photographs of.  And I still don't see why he can call them cut marks, because I still see the frayed edges, and the curling of the cloth.

I — I was really thinking about it, and I'm thinking, well, it is a knit material, so if the knife wasn't very sharp, you know, that maybe it was a small knife.  But I don't see how you can say that.  I really don't.

Q.   Why is that?

A.   Um, you're supposed to be really objective as a

Exhibit 5001 at 1646

Wilcox  ReD  D9 48

Forensic Scientist.  So, I'm — I kind of have to agree with the British lab.  I do not see the cut marks.  And I don't see them in his photographs.  If they could have been made by a knife and then later frayed somehow, or because of the dullness of the knife, that maybe as a remote possibility.  But I do not see the cut marks.

Q.  But, the marks that you — that have been identified by Mr. Meneely, so we're clear, you do not believe that they're cut marks?

MR. McCREA:  Objection to leading his witness, Your Honor.

THE COURT:  I'll sustain.

You can ask her her opinion.

Q.  What is your opinion of those marks that Mr. Meneely claims are cut marks?

MR. McCREA:  Well, she's already answered that question, Your Honor.  She testified - - -

THE COURT:  (Interposing) Over — overruled.

You can answer.

A.  I did not identify those as cut marks.  I think they are — since there are similar marks like that, that are clearly animal damage, I would think that these would be animal damage, also.

Q.  Thank you.

MR. FRASIER:  That's all the questions I

Exhibit 5001 at 1647

D9 49                                                    Zanni   D

have, Your Honor.

THE COURT:    You may step down.

MR. FRASIER:    And may she be excused, please?

THE COURT:    Yes.

MR. FRASIER:    We'd recall Sheriff Zanni.

THE COURT:    And I think I told you you had to be available, so if you'd retake the stand.  You're still under oath.

CRAIG ZANNI

was thereupon produced as a rebuttal witness on behalf of Plaintiff and, having previously been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. FRASIER:

Q.    Sheriff Zanni, I believe you previously testified you became involved in this investigation in early July of 2000?

A.    Yes.

Q.    And during the course of your — your work in this case, in the month of July of 2000, did you have the opportunity to observe the Defendant in this case?

A.    On multiple occasions, yes.

Q.    At any time, did you see him wearing a neck brace?

A.    Not that I can recall.

Exhibit 5001 at 1648

Zanni    D      D9 50

Q.    Did you see anything that caused you to believe he had any physical limitations?

A.    No.

Q.    Thank you.

MR. FRASIER:    That's all I have.

THE COURT:    Cross?

MS. McCREA:    No questions, Your Honor.

THE COURT:    You may step down.

WITNESS:    Thank you, Your Honor.

THE COURT:    Call your next witness.

MR. FRASIER:    We have no further witnesses, Your Honor.

THE COURT:    Ms. McCrea, anything?

MS. McCREA:    Can I confer with counsel, Your Honor?

THE COURT:    Sure.

MS. McCREA:    Nothing further, Your Honor.

THE COURT:    Okay.

MS. McCREA:    It's — I would — I do have a matter for the Court, of course.

THE COURT:    Okay.

Ladies and gentlemen, if you want to step out, we'll take care of this matter, and then I'll come back and give you instructions, and we'll start the closing arguments.

Remember the admonition, please.  Take your

Exhibit 5001 at 1649

D9 51                                    Motion

notes with you.

                    (Jury out.)

                    THE COURT:    Go ahead.

                    MS. McCREA:    Your Honor, the defense renews the Motion for Judgment of Acquittal based on the same grounds as indicated at the close of the State's evidence.

                    THE COURT:    Okay.  And that's denied.

                    Anything else?

                    MS. McCREA:    No, Your Honor.

                    THE COURT:    Okay.  And I think the instructions we've gone over, including the new one that I gave to counsel this morning — which I understand there was no objection to.  And those will be the instructions.

                    I had the Verdict form from both the State and the defense.  The one from the defense came by email sometime, I think, this weekend.  I thought this morning, I'm going to use the one from the State because I think it follows the instructions, so we'll use that one.

                    MS. McCREA:    My — my inquiry would be, does it list Not Guilty first?

                    THE COURT:    It lists them opposite — not — not in order.  They're parallel to each other.

                    MS. McCREA:    And is Not Guilty the first option?

                    THE COURT:    No.  That's — well, there's two

Exhibit 5001 at 1650

D9 52

options — Guilty, Not Guilty.  They're on the same line.  So, I don't know that there's really a first or second option in that regard.  They're not listed on above the other.

MS. McCREA:    Right.  In the Uniform Jury Instructions, typically, Not Guilty is usually the first option because of the presumption of innocence.

THE COURT:    Uh, I guess — I've used this type of Verdict form for 31 years.  So, I've — and it's never been an issue.  So, I will use it.  I don't — I've never found that to be a factor in any case that I can recall, because the jury has returned Not Guilty verdicts and Guilty verdicts throughout the history of me being on the bench, anyway.

Okay.  We'll take about fifteen minutes.  Instruct at 10:30, and then the State will give its first argument, and I'll try to take a break between each argument — a brief break.

MS. McCREA:    Thank you, Your Honor.

THE COURT:    Depending on how long the argument is.

And you each are entitled to two hours and — unless you want me — the only thing I would suggest what I might do is that if you're within fifteen minutes of your two hours, and I — most the time I don't think that's going to happen — I can advise you of that.  Or, if you want to keep track of your own time, that's fine.

Exhibit 5001 at 1651

D9 53

Okay. We'll be in recess until 10:30.

Oh, before we go off the record, I do want to let people know that there are three reserve seats for the State, three reserve seats for the Defendant, two reserve seats for the TV camera, and two reserve seats for the Deputy Sheriffs. There are no other reserve seats, and no one can reserve a seat in this — in these matters. And neither side can reserve a seat for other people.

During the closing arguments, I don't care if you leave, but I'm not going to have people coming in and out. So, if you leave, you're not going to be coming back in, because I don't want the arguments disrupted with that door opening and closing. So, if you want to be in, come in.

That's with the exception of either the defense investigator or a State's investigator going out and doing something and (not understandable). Other than that, people need to stay in.

MR. FRASIER: Your Honor, and also, in my closing, there will be at least one picture of the deceased at the scene.

THE COURT: All right. And since Ms. Courtright is entitled to be in here under the law, I guess she would be an exception also. But, I would ask that that be kept to a minimum of going in and out. There will be a — there will be a photograph, and it's not a pleasant

Exhibit 5001 at 1652

Charge        D9 54

photograph, of Ms. Freeman.  Okay?

We'll be in recess — 10:30.

(RECESS)

JUDICIAL ASSISTANT:    All rise.

THE COURT:    Be seated, please.

Ladies and gentlemen, I will pass out the jury instructions for your use.  Please do not read ahead.

JUROR:    (Not understandable.)

THE COURT:    No, I'll read them.  Just follow — follow along with what I'm reading.

Okay.  Each instruction will have a title.  The titles themselves are not important.  They're just kind of a reference point to you.  If one of you wants to refer to an instruction, you can refer to the title.  But, the titles themselves are not really important.

We'll start with Functions of the Court and Jury.  It is your sole responsibility to make all the decisions about the facts in this case.  You must evaluate the evidence to determine how reliable or how believable that evidence is.  When you make your decision about the facts, you must then apply the legal rules to those facts and reach your verdict.

Remember, however, that your power to reach a verdict is not arbitrary.  When I tell you what the law is on a particular subject, or tell you how to evaluate certain

Exhibit 5001 at 1653

D9 55                                                Charge

evidence, you must follow these instructions.

Do not allow anything I have said or done during the course of this trial to suggest that I have formed any opinion about this case.  Keep in mind that a judge is required by law to give certain instructions in every criminal case.

When I have sustained objections to evidence or ordered that evidence be stricken or excluded from your consideration, you must follow these rulings.  Do not consider such matters during your deliberations.  Base your verdict on the evidence and these instructions.

The lawyers' statements and arguments are not evidence.  If your recollection of the evidence is different from the lawyer's recollection, you must rely on your own memory.

In deciding this case, you are to consider all the evidence you find worthy of belief.  It is your duty to weigh the evidence calmly and dispassionately and decide this case on its merits.  Do not allow bias, sympathy, or prejudice any place in your deliberations.  Do not decide this case on guesswork, conjecture, or speculation.

Do not consider what sentence might be imposed by the Court if the Defendant is found guilty.

Generally, the testimony of any witness whom you believe is sufficient to prove any fact in dispute.  You

Exhibit 5001 at 1654

Charge        D9 56

are not simply to count the witnesses, but you are to weigh the evidence.

Keep in mind that each party is entitled to the considered decision of each juror.  Therefore, you should not give undue weight to another juror's notes or memory if they conflict with your recollection of the evidence.

The Court has provided written jury instructions for your use.  When you use these instructions, do not place undue emphasis on any particular instruction, but rather view the instructions as a whole.

Direct or Circumstantial Evidence.  There are two types of evidence.  One is direct evidence, such as the testimony of an eyewitness.  The other is circumstantial evidence, the proof of a chain of circumstances pointing to the existence or non-existence of a certain fact.  You may base your verdict on direct evidence or on circumstantial evidence or on both.

Inferences.  In deciding this case, you may draw inferences and reach conclusions from the evidence, if your inferences and conclusions are reasonable and are based on your common sense and experience.

Evaluating Witness Testimony.  The term "witness" includes every person who has testified under oath in this case.  Every witness has taken an oath to tell the truth.  In evaluating each witness's testimony, however, you

Exhibit 5001 at 1655

D9 57                                        Charge

may consider such things as:

One, the manner in which the witness testifies;

Two, the nature or quality of the witness's testimony;

Three, evidence that contradicts the testimony of the witness;

Four, evidence concerning the bias, motives, or interest of the witness.

Five, evidence that the witness has been convicted of a previous crime.

Witness' Prior Conviction.  If you find that a witness has been convicted of a crime, you may consider this conviction only for its bearing, if any, on the credibility of the witness.

Witness False in Part.  A witness who lies under oath in some part of his or her testimony, is like to lie in other parts of his or her testimony.  Therefore, if you find that a witness has lied in some part of his or her testimony, then you may distrust the rest of that witness' testimony.

Sometimes witness who are not lying may give incorrect testimony.  They may forget matters, or may contradict themselves.  Also, different witnesses may observe or remember an event differently.  You will have the sole responsibility to determine what testimony or portions of

Exhibit 5001 at 1656

Charge        D9 58

testimony you will or will not rely on in reaching your verdict.

Defendant Not Testifying.  A Defendant also has an absolute Constitutional right not to testify.  Therefore a Defendant's decision not to testify cannot be considered as an indication of guilt.  It should not be commented on or in any way considered by you in your deliberations.

Defendant's Statements.  When a witness testifies about statements made by the Defendant, you should consider such testimony with caution.  In reviewing such testimony, you should consider, among other things, the following:

One, did the Defendant make the statement and if so, did the Defendant clearly express what he intended to say?

Two, did the witness correctly hear and understand what the Defendant said?

Three, did the witness correctly remember and relate what the Defendant said?

Four, did the witness intentionally or mistakenly alter some of the words used by the Defendant, thereby changing the meaning of what was actually said?

If after weighing such factors, you conclude that the Defendant said what he intended to say, and that the witness to the statement correctly understood, remembered, and

Exhibit 5001 at 1657

D9 59                                              Charge

related to you what the Defendant said, then you are authorized to consider such statements for what you've deemed them to be worth.

Expert Opinion.  An expert witness is a person with special skills or education in a particular field.  Even though expert witnesses may testify about their opinions, you are not required to accept those opinions.

To determine the value, if any, you will give to an expert's opinion you should consider such things as:

The expert's qualifications;

The expert's opportunity and ability to form the opinion;

The expert's believability; and

How the expert reached the opinion or conclusion.

Non-Expert Opinion.  Although a witness may be allowed to state his or her opinion, you are not required to accept that opinion.  To determine what value, if any, you will give to a witness' opinion, you should consider such things as:

The witness' opportunity and ability to form the opinion;

The witness' believability; and

How the witness reached the opinion or conclusion.

Exhibit 5001 at 1658

Charge    D9 60

Age.  It is not unlawful for a person who is eighteen years of age to engage in sexual conduct with a person under eighteen years of age, if the difference in their ages is less than three years.

Innocence of Defendant - Proof Beyond a Reasonable Doubt.  The Defendant is innocent unless and until the Defendant is proven guilty beyond a reasonable doubt.  The burden is on the State to prove the guilt of the Defendant beyond a reasonable doubt.

Reasonable doubt is doubt based on common sense and reason.  Reasonable doubt means an honest uncertainty as to the guilt of the Defendant.  Reasonable doubt exists when, after careful and impartial consideration of all the evidence in the case, you are not firmly convinced that the Defendant is guilty.

The charged crime against Mr. McGuffin is Murder.  Oregon law provides that a person commits the crime of Murder if that person intentionally causes the death of another human being.

In this case, to establish the crime of Murder, the State must prove beyond a reasonable doubt the following three elements:

One, the act occurred in Coos County, Oregon;

Two, the act occurred on or about June 28, 2000; and

Exhibit 5001 at 1659

D9 61                                    Charge

Three, the Defendant intentionally caused the death of Leah Freeman, another human being.

"Human being" means a person who has been born, and is alive at the time of the criminal act.  Criminal homicide includes Murder and Manslaughter in the First Degree.

Intentionally.  And you use this definition in relation to Murder.  A person acts intentionally when the person acts with a conscious objective to cause a particular result.  When used in the phrase "intentionally caused the death of Leah Freeman", intentionally means that the Defendant acted with a conscious objective to cause Leah Freeman's death.

Lesser-Included Offense.  The charged crime of Murder has, as a lesser-included offense of the crime of Manslaughter in the First Degree.  Oregon law provides that a person commits the crime of Manslaughter in the First Degree if that person recklessly causes the death of another human — of another person, excuse me, under circumstances manifesting extreme indifference to the value human life.

In this case, to establish the crime of Manslaughter in the First Degree, the State must prove beyond a reasonable doubt the following material elements:

One, the act occurred in Coos County, Oregon;

Two, the act occurred on or about June 28, 2000; and

Exhibit 5001 at 1660

Charge      D9 62

Three, the Defendant unlawfully and recklessly caused the death of Leah Freeman under circumstances manifesting an extreme indifference to the value of human life.

Recklessly.  And you use this in relation to the Manslaughter charge.  A person acts recklessly if that person is aware of and consciously disregards a substantial and unjustifiable risk that a particular result will occur. The risk must be of such nature and degree that disregarding it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation.

When used in the phrase "recklessly caused the death of Leah Freeman under circumstances manifesting an extreme indifference to the value of human life, recklessly means the Defendant was aware of and consciously disregarded — disregards a substantial and unjustifiable risk that he would cause her death, and it was under circumstances manifesting an extreme indifference to the value of human life.

The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation.

Recklessness is also established if the person acts intentionally.

Lesser-Included Offense - Explanation or

Exhibit 5001 at 1661

D9 63                                Arguments

Comparison.  The Court has instructed you about the proof

required for the charged offense of Murder, and the lesser-

included offense of Manslaughter in the First Degree.  The

difference in proof required in the charged offense as

compared to the lesser-included offense is as follows:

Murder requires the Defendant intentionally

caused the death of Leah Freeman, whereas Manslaughter in the

First Degree requires Defendant recklessly caused the death of

Leah Freeman under circumstances manifesting an extreme

indifference to the value of human life.

The last two instructions I will give to you

when the attorneys finish their arguments.

Mr. Frasier, you may give the State's first

argument.

MR. FRASIER:    Thank you, Your Honor.

May it please the Court, counsel, ladies and

gentlemen.

Today we've reached a point where a decision

has to be made.  Eleven years ago, this young woman

disappeared off the streets of Coquille.  And today, we are

coming to you to ask you to hold the Defendant accountable for

what he did to her eleven years ago.

We know that on June 28th of 2000, Leah Freeman

disappeared.  We know August the 3rd, her body was found,

dumped beside a gravel road.

Exhibit 5001 at 1662

As we think about what you've heard over the last two weeks, this is probably the question that comes to mind — what happened?

Now, I want to make something abundantly clear. The State of Oregon is not saying that Nick McGuffin, for a week or two months or a year, planned to kill his girlfriend. We are not saying that on the morning of June 28th when he woke up that day, he woke up with the idea of, "I am going to kill Leah Freeman."

The evidence, we believe, shows that a tragic set of circumstances came together on June 28th. We know these people were a devoted couple, at times. There's no question that at various points of this relationship, they expressed love and affection for each other. But, they were violent with each other, at times. We've got two people here that are kind of feisty — fiery, if you will. And it was a relationship, frankly, that under the right conditions could erupt — and did erupt — into a violent end.

What happened June 28, 2000, was the pressures, the feelings, teenage emotions, whatever you want to call it, erupted into a catastrophe that ended the life of Leah Freeman. And after that incident occurred, there's some panic. "What am I going to do?" And as you've heard, the Defendant goes about town making sure he's seen, and he's concerned about Leah. And as I go through my argument here

Exhibit 5001 at 1663

D9 65                              Arguments

today, he's showing emotion and concern about Leah.  But, he's also concerned about the tragic mistake he has made.

Now, over time, as the police did what they did back in 2000, the Defendant becomes a little bit arrogant. For eleven years he's gotten away with this.  So, as I indicated when I started, today we're here to ask you to hold him accountable for what happened.

Now, in deciding this case, there are basically two questions that need to be answered.  The first is, was Leah Freeman the victim of a homicide?  And the second question, if she was the victim of a homicide, who killed her? If the answer to the first question is no, this case is over. If you decide she wasn't the victim of a homicide, we're done. We go home.  That's it.  But, if you answer that question yes, then we move on to, did the Defendant do it?

Now, I want to talk a little bit about the first question, because it needs to be addressed.  I don't — I don't intend to spend a lot of time on it because I think, using your common sense, you'll see that she was, in fact, a homicide victim.  And that perhaps there's not even a dispute about it.  But in any event, was she murdered?

Of course, we say that, yes, she was murdered. Why do we say this?  Well, as we go through a process of elimination, if you will, we know she doesn't have any health problems.  She was not diabetic.  She didn't have a heart

Exhibit 5001 at 1664

Arguments    D9 66

murmur. She's passed the physicals that she needed to participate in sports. So, there's no natural reason for her to be dead. We know she doesn't have any drugs in her tissues, so there's no indication that this is like an accidental drug overdose, or something along that line. She doesn't have any broken bones. There's no evidence, for example, that she fell down that bank and broke her neck. You know, there's just nothing out there to indicate that this was an accident, even. She's not suicidal. And again, like I say, it's not an accident.

Well, how do we know this is a homicide? Well, I think one of the things you have to look at is the circumstances of her disappearance. Okay? First off, we know one minute she's walking home down the streets of Coquille. The next minute, she's gone. One day she looks like this. Five weeks later we find her like this.

One day we find her — she's walking through the City of Coquille here. Five weeks later we find her body — excuse me, I have to get up here a little closer — we find her body right there. And a few days after her disappearance, one of the shoes she was wearing, we find up here, off of Hudson Ridge. When you look at these circumstances, this was not an accidental death.

Well, we've got a little bit more. If she had died of natural causes, why is her body dumped out where it

Exhibit 5001 at 1665

D9 67                                    Arguments

was found?  If it's an accident, why is her body placed where it is?  If she committed suicide, why is somebody hiding the body.  These don't — this just doesn't make any sense.  If you look at these circumstances, it's clear somebody is trying to cover up the fact she was murdered.

Well, now, let's look at the autopsy.  You've heard from Dr. Olson, the Medical Examiner for Coos County, a man who's been doing this for — I think he said almost over 30 years, twenty-whatever.  And granted, there wasn't much left of her body for him to work with.  But, he listed the manner of death of homicide, and the cause of death as homicidal violence of undetermined origin.  The Medical Examiner has issued his opinion that she's the victim of a homicide.

Well, are there some things that we can also exclude from her cause of death.  Well, we do know some facts. We submit there's no evidence she was shot.  Granted, her body — there wasn't much there for the doctor to work with.  But if she'd been shot, we would have seen a bullet hole in her clothes.  No one has identified that.  If she'd been shot in the head, there would have been a hole in the skull, and there wasn't anything like that.  Her skull wasn't fractured.  She didn't have any drugs in her system.  And, as I'm thinking about it, her body was x-rayed, what was left of it.  There were no fractures in any of the bones.

One thing cannot be excluded due to the

Exhibit 5001 at 1666

condition of the body, and that is strangulation. And I realize the defense will argue that she — that, in their opinion, she was stabbed. That is, again, something we'll talk about more as the day goes on, I'm sure. But why should we consider strangulation? And the reason we should consider it is the statement that the Defendant made to Mr. Breakfield you heard last week, which was, "I strangled that bitch."

Now, even the defense, as I've indicated, seems to concede that she's a homicide victim. It's their theory that she was stabbed. But again, using your common sense and reason, a reasonable conclusion from the facts of this case is that Leah Freeman was the victim of a homicide. She died at the hands of another.

Now, I began my argument today talking about how this was a tragic set if circumstances that came together — one horrible event on June 28th. We need to talk about what those circumstances were. What was going on in this relationship? What was going on on the night of June 28th.

Let's start off with this. Well, was this relationship headed for disaster? The evidence would — well, yes, it was. It was a relationship headed for disaster. Let's look at some things that would indicate that it was.

First off, was the Defendant possessive of Leah Freeman to the exclusion of all others? We have a couple of things I'd like you to consider. One of the things you'll

Exhibit 5001 at 1667

D9 69                                    Arguments

have in evidence when you go back there is what's called State's Exhibit No. 93.  And that is a series of pages that were taken — or, scanned from the annual that was seized from the Defendant's home in July of 2000 — the yearbook for the class — or, for the year of 2000, State's Exhibit 93.

Now, I'm going to show you one page, here — I'm going to show you several pages.  But, as you can see, here's a picture of Leah Freeman there, got a heart around it.  That's no big deal.  You know, people — boyfriend/girlfriend do that all the time.  But as we go through this, you're going to see some more things.

This is another page in the yearbook.  There's a picture of the Defendant.  It says, "Don't date freshmen," and then you have the words "except for Leah Freeman" off to the side, there.

Now, we go on further.  This is a picture of the volleyball teams and what have you.  There's a picture of the volleyball team Ms. Freeman was on.  You can see her picture.  You know, she's right here.  Got the heart around it again.  And then it says, "Forever."  Again, perhaps nothing more to be read from that, perhaps.  The State - - -

We go through this again.  Here's another page again showing Ms. Freeman with her friends, again with the heart drawn around it.  On the same page, another picture of her again with the heart drawn around it.

Exhibit 5001 at 1668

Arguments        D9 70

But, here's a page we would like you to look at.  And it's going to be kind of hard to see this.  You're going to really want to look at the scanned copy when you get it back into the jury room.  But what you have here, ladies and gentlemen, is you have this green arrow, here, drawn here.  And it's pointing at the head of this individual back here.  And you can't really tell who it is.  But, it's written in pencil.  And you can't really see it here on the screen.  But you will be able to look at it — if you look at it closely.  And it says there, "My babydoll, no one else's."  "My babydoll, no one else's."

Ms. Freeman herself talks about how her time is being monopolized, to some extent, by being with the Defendant.  She wrote in what I read to you, State's Exhibit 85.  I'll just read a quote — a small portion:

"I depress all of my friends.  Not that I'm ever really with my friends, but when I am, I depress them because you depress me.  And what I don't understand is how you can smile and be just peachy fuckin' keen when you're with your friends, but when you're just with me, life sucks.  I just don't understand."

What else do we have?  Well, you heard from Cory Courtright.  She talked with you about how she was concerned about this relationship.  At first she didn't want

Exhibit 5001 at 1669

D9 71                                        Arguments

it to occur.  Then she relented.  But, one of the things she talked about was having her daughter keep seeing her friends, and things along that line.

On June 28, 2000, what was one of the last things that Leah Freeman said to her mother?  It was, "Mom, I'm taking your advice.  I'm going to go see Sherry Mitchell." There were some issues about how much — how tightly controlled this relationship was.

Sherry Mitchell.  Remember what Sherry Mitchell told you about, that she and Leah had these tee shirts?  One that Sherry wrote said "Leah's girl".  And the one that Leah wrote said "Sherry's girl", or whatever.  Remember that letter that you'll have in evidence to read that Sherry Mitchell wrote to the Defendant, you know, saying certain things she'd do to him if she (sic) mistreated Sherry — or, Leah?  She wrote at the bottom of that "My Girl".  You go back and you look at the response that the Defendant wrote to Sherry Mitchell.  The bottom of that letter he writes, "My Girl. She's my girl."  Okay?

And again, as I've indicated, Leah Freeman in a letter that I just read a portion to you, indicates that there's some issues.

Okay.  Let's go on.  Was this relationship very healthy?  Were there issues between the two?  Granted, there were times that they got along famously.  Granted, they

Exhibit 5001 at 1670

Arguments          D9 72

probably both felt that they were in love.  But there were issues.  There were arguments.

And of course, every couple argues.  But there was more than arguing going on, here.  We've got some anger involved.  You recall, the Defendant got so mad once about something Leah had done that he poked a couple holes in the sheet rock at the high school.  He went off on her — on Leah, when she accidentally dropped some pictures in the parking lot.  You heard from Ms. Dennis about her being pushed up against, or into, a car.  And you've heard testimony that Leah herself was hitting the Defendant.  These are all things that are indicative of a relationship that's got problems.

Let's take it further.  Let's look at Leah Freeman's own words regarding what she had to say about things going on in this relationship.  One of the things you have to look at when you go back there is the diary or journal of Leah Freeman.  And it's twenty, thirty pages long.  And feel free to read the whole thing.  I'm not going to read the whole thing to you.  But, I'm going to give you some excerpts that come out of that journal — things you need to keep in mind.

For the entry that is dated December 23, 1999, amongst other things, Leah Freeman wrote:

"Well, after four days of not even talking to the bad-ass wannabe, Nick finally called me today."

The entry that's dated January 1, 1999 is

Exhibit 5001 at 1671

D9 73                              Arguments

sequentially — or, in the diary after the December 1999 entries. It appears she misdated it. It should have been 2000. But in any event, in this entry of January 1, she writes about a situation where she had gone to a party. And that after the party, she went to a movie with an individual named Luke. And I believe some of the letters I read to you the other day referenced an incident with Luke.

Anyway, she had gone to a movie with Luke. And apparently the Defendant found out about it. Here's what she wrote in her diary:

"I left with Luke to go to a movie. Big mistake. I didn't do anything with him, but Nick didn't believe me. I don't think he even believes me now. I guess I can't really blame him for thinking that, but he's supposed to be able to trust me."

She goes on:

"I talked to Nick at 2:00 p.m. He made it quite clear that he was very pissed off. When he came over, he didn't look pissed. He was just really sad — like crying sad."

The entry dated for January 2, 2000, again, amongst other things she wrote:

"When Nick was here, he fell asleep on my bed. And I took the cutest picture of him. I really hope

Exhibit 5001 at 1672

Arguments        D9 74

he goes home soon, but obviously what I think doesn't really matter to him."

The entry dated January 6, 2000:

"I don't understand how I can love someone who treats me this bad.  Sometimes I just want to give him a big, huge smooch.  And sometimes I just want to kick him square in the nuts.  He can be the sweetest, most sensitive guy in the world, and then turn around and be this bad-ass prick.  In other words, his personality split really sucks.  I'm going to spend the whole weekend crying, more than likely."

She signs the entry "Leah Nicole McGuffin".

There are some entries that follow the January entries, in terms of sequence, but they're undated.  In one of the undated entries, she talks about how the Defendant had gone on some sort of trip, whether it was to Salem, or Seattle, or someplace like that.  At the end of the entry she says:

"I don't really care if he's mad at me.  I'm mad at him for going."

Again, she signs it "Leah Nicole McGuffin".

The next entry, which is undated.  She's waiting for the Defendant to call her.  And then she writes:

"I hope he's not mad at me."

Exhibit 5001 at 1673

D9 75                                    Arguments

The next entry, which is undated, amongst other things she writes:

"Nick is being such a prick.  He's sleeping.  He keeps waking up; and when he does, he's an asshole.  It's so annoying, him coming over to sleep.  Leaving me sitting here, bored to death.  It's not that I don't like being with him, but when he's being an ass like this, it's hard to tell if I can stand him, let alone love him."

The next entry, again which is undated, amongst other things she wrote:

"We got into this deep discussion about how he treats me like shit.  And I don't think he care about me.  I really don't want it to end because I care so much about him.  But when that feeling isn't returned, it really hurts.  And I can't really make any big decisions because I don't know how he feels.  All I know is I love him very much.  But not enough to put up with this kind of crap.  I've done it enough.  I'm sick of it."  Signed "Leah Nicole".

The next, and actually the last entry in the diary, again which is undated, she talks about there — apparently the Defendant had called for a period of a one-week break-up where they weren't seeing each other for a week.  She wrote, amongst other things:

Exhibit 5001 at 1674

Arguments        D9 76

"Yeah, he's calling it time off.  I'm calling it time for him to screw with other girls."

She goes on later:

"I really resent him for doing that to me.  I mean, how dare him.  I freaked on my mom so I could try to make things better with him about the whole Luke thing, which by the way never happened."

And then she goes on and talks about Luke again.

"Anyways, I risk mine and my mom's good relationship for him.  Then he breaks up with me for a week.  Now, that hurt."

She again talks about the Luke incident.  And then she writes:

"There wasn't really any coming on to me, but I'm paying the price for not telling Nick about it.  Hard situation, I know.  But I don't think it should have mattered.  If he loved me, he should have trusted me.  Oh well, his loss."

And it was signed "Leah".

We have other things that she wrote, describing this relationship.  And these are letters that she wrote to the Defendant, but were never delivered.  These are State's Exhibits 237, 238 and 239.  These exhibits were found by Sheriff Zanni when he did the search of her room in the house

Exhibit 5001 at 1675

D9 77                                   Arguments

where they lived before they moved to her grandparents' place,

the residence of Mr. Murphy over on Fifth Street.

Exhibit No. 237 starts off:

"Nick, I'm sorry I got mad at you before fourth

period.  I couldn't help but think something was

going on with that girl.  What am I supposed to

think?  You guys were late, alone, practically high.

And you had the opportunity.  I'm sorry that I

thought you would do that.  Okay?  I'm sorry."

"Besides that, you weren't being nice to me,

either.  Yeah, you come and see me between classes,

but you weren't talking.  I hate it when you lay

those guilt trips, too.  I feel bad, but I don't

want to let you know they work.  But at the same

time, I don't want you to be mad because they don't

work.  So, why were you mad, sad, whatever, before

our little argument?  Don't tell me you weren't

because you were."

"I hate arguing with you because I love you a

lot and I don't want to lose you.  I hope you're

happy.  I said it, and I meant it.  I don't know if

my thinking you would do that changed things between

us.  I don't know if you care if it means anything

to you, but it doesn't change anything for me.  I

don't care if you did anything with her or not.  I

Exhibit 5001 at 1676

Arguments        D9 78

would like to know if you did, but if you did, it still won't change the fact that I still want to be with you."

"This is weird, me pouring my heart out to you for a change.  You're always doing this to me.  You're always saying it, but I can't say it.  I freeze up in awkward situations like this.  Believe it or not, I've never been in a relationship where we argue.  Usually my relationships don't last long enough for an argument to occur.  This is the most different relationship I've been in, and the best.  Things always get awkward and boring."

"With you, that isn't even the situation.  Not at all.  I don't like the arguments because they're always about petty shit, like shoes.  I don't know if we've ever argued about shoes, but that was just an example.  But, I guess in a way they kind of make us closer.  Hopefully, we'll run out of things to argue about, and we'll just agree about everything, and be happy about everything."

She then writes a few sentences about:

"Well, now that I have that off my chest, I can talk about my chest."

And then she talks about some things along that line, but then she goes:

Exhibit 5001 at 1677

D9 79                                    Arguments

"Oh, nevermind.  It will take too long.  All right.  I'm done rambling now.  I love you.  Leah Nicole."

Exhibit 238:

"Nick, I don't know what it is, but you obviously have a problem with me.  You look at me like you're disgusted.  And I can't honestly say I like it too well.  I wish you would treat me like you care, because lately you haven't been, other than the roses, which I did appreciate.  But, when you treat me like shit, it doesn't matter if you give me 5,000 roses.  It doesn't make it okay."

"I try to settle arguments, but it just created more.  I can't say anything without you looking at me like I'm an idiot, which you know I hate because I'm sensitive about people calling me stupid and things that relate to that."

"There are a lot of things that you are sensitive about, and I respect those things.  But you don't respect my sensitivity, and that bothers me.  And it should bother you, but it doesn't.  It's kind of strange.  You can talk about marriage and having kids with me, when you treat me like you do."

"I guess you're not being as serious as I am.  In fact, you're probably not serious at all. And I

Exhibit 5001 at 1678

Arguments        D9 80

wish I wasn't.  If I were anybody else, I would have broken up with you by now.  But, I'm not anybody else.  And no matter how hard I try, I can't not love you.  Believe that.  I've tried."

"So many people have tried to get me to break up with you.  But I could never do that.  So, I guess you're stuck breaking up with me.  And by the way things are going, it seems it could happen soon."

"And if you're wondering, yes, this makes me really upset.  You don't even know how upset I am. I want you to know this, but you don't listen when I talk.  And I know I could never bring myself to giving you this letter.  I guess I'm just screwed either way.'

"I don't know why, but I don't want to stop writing.  I have nothing else to write about, but I can't talk to you because if I wake you up, you'll just bite my fucking head off again.  I wish things didn't have to be like this because I'm so unhappy. But I know that without you, I would be even more unhappy.  Love you.  Leah Nicole McGuffin."

The last, Exhibit 239:

"Nick, I don't know why I'm even trying to talk to you.  You obviously don't even care anymore. I

Exhibit 5001 at 1679

D9 81                                    Arguments

guess I figure if I follow you around long enough, you'll like me again. Well, I just want to say I'm sorry. I'm not positive as to what got you — what you got mad about. But if it's what I think it is, I didn't even mean it in a bad way, and I was just joking anyway. I just want you to know I was up all night crying about it, mostly because you'd rather talk to Jenny than your own girlfriend. Well, I hope you start talking to me soon. I love you. Leah."

The Defendant himself acknowledges that there's some issues. There's an exhibit that was again found by Sheriff Zanni. I'm going to work off a copy — the original, the Court has. It was found in the tin box with the diary. It's labeled State's Exhibit 91. It's a several-page document and taped — stapled together, that was given — or, is signed by the Defendant. He writes:

"I wish you could trust me, but if you can't, that's okay. Although, if you would I want to try to gain your trust back, but you won't let me."

Off to the side there's a notation, "Don't have any strawberries. Sorry."

"I do care. And I always will, no matter what. I'm going to keep trying and trying until I get you back. I'm going to do whatever it takes because I

Exhibit 5001 at 1680

Arguments      D9 82

love my babydoll."

And babydoll is underlined several times.

"We both care about each other so much, I hope. I wish we could just get past certain things.  Start over, or something.  I just care about you too much to let you go.  I am a fuck-up."  Underlined.  "And I would like to make it up to my babydoll."

And then there's some notations, "LOL", (not understandable), "Juice Baby", "Princess", "Prince Charming", "Nick-y-Poo".

This is a relationship, ladies and gentlemen, that's got some issues.  It's got problems.  On one hand, they really like each other — love each other.  On the other hand, they've got significant issues.

Now, let's go to June 28, 2000.  What was going on that day?  What was happening between the two on June 28, 2000?  And you'll recall that the Defendant tells the police that outside the Mitchell argument, there didn't appear to be any other issues that night.  This is an except from his statement that he gave to the police that was recorded on June 30th of 2,000:

(Whereupon an excerpt from a recording of Defendant's statement to the police was published for the jury as follows:

"Besides that argument with Sherry and her mom,

Exhibit 5001 at 1681

D9 83                                    Arguments

that couple days before Wednesday — it was like Monday — we were (not understandable).  And I was getting a pack of cigarettes and Sherry's mom pulls up.  And Leah's here, and she gets out of the car, and Leah goes over to say hi to her.  And she's all, 'So, what are you doing (not understandable), Leah?'  And she goes, 'I'm just sitting here reading.  Nick's getting a pack of cigarettes.'"

"And she all, 'Oh.  So, I'm expecting more of you.  You hang out (not understandable).  You're weird.'  That was like two or three minutes.  They pulled up like a minute after we got there.  And Leah came back to me and like was almost just crying.  She was — kind of hugged me.  Came up and put her head on my shoulder and she was like, 'I can't believe she said that.'  Because Sherry was like her best friend, and (not understandable) was like so nice to her.  And then to go and say that to her like that, that just — that would hurt me, too."

"And then they — then she ended up going to Sherry's house at — during — on Wednesday.  And then that happened.  When they got in an argument — and Sherry's mom wouldn't let Sherry go running with Leah.  Leah thought it was because Sherry's mom doesn't like Leah, and she hates her.  And she told

Exhibit 5001 at 1682

Sherry that, and Sherry tried to persuade her differently.  But she ended up leaving anyway.  And when I got there, Sherry was bawling her eyes out.  Then she said to Cory, Sherry's mom — or, Leah's mom, that it wasn't that big of an argument.  It wasn't that big of a deal.  But, you don't cry about something that's not that big of a deal."

He told the police earlier in the interview that that day Leah was the happiest he had ever seen her.

(Whereupon more of the recording was published for the jury as follows:)

"About — I was at her house about noon.  We sat there for a couple of hours.  We were cleaning out my car, and having a good time.  Probably that was the happiest I had seen her.  Everybody was getting along.  And we decided we were just going to drive around.  We wanted to do something.  So, we told Leah's mother we were going to leave.  Then we drove around for a while."

Okay.  Happiest he had ever seen her.  That wasn't true.  Leah wrote a letter that night.  She left it in the room of Sherry Mitchell.  One of the last things we know she had to say before she disappeared.  It's from State's Exhibit No. 82.  This is what's in there:

"Nick and I have been getting along a lot

Exhibit 5001 at 1683

D9 85                                    Arguments

better.  I wasn't really mad at Nick when I got up to come over here.  I just didn't feel like being around him anymore tonight.  I love him to death, but that boy gets an attitude sometimes.  And that was one of them."

Something's going on.  Something's going on before she gets out of that car and goes to see Sherry Mitchell.

Now, listen what the Defendant had to say when he talked to Scott Hamilton last year, about what was going on between him and Leah on the night in question.

(Whereupon a one and a half minute excerpt from the audio of Scott Hamilton was published for the jury, but was not understandable for transcription.)

There's something going on.  There's something going on.  Why doesn't the Defendant admit that they're having a dispute that night.  Why doesn't he tell the police about it?  Why does he lie, or admit about it — or, omit it.  Things you need to consider when you're looking at this case.

Well, let's go on.  Let's look at some of the things the Defendant did not do on the evening of June 18, 2000.  Now, he had that phone call, remember?  He calls Cory Courtright from the Mitchell home about 10:00, and he asks if Leah was home.  And Cory (not understandable), of course, she wasn't here.  "What do you need?"  And he says, "Well, don't

Exhibit 5001 at 1684

Arguments    D9 86

worry. I'll get her home safely. I'll get her home." Does he live up to that promise?

Remember, now, he's going around town as the night progressed, and he's telling people, "Do you know where Leah is at? Have you seen Leah? I'm concerned. I don't know where Leah is at." But does he ever once go up to her house and knock on the door, and say, "Hey, by the way, is Leah here?" Not once does he do that. And it's not — well, it even goes further. Not once after 10:00 p.m. does he even call up to double check. Why doesn't he call? Why doesn't he knock on the door? "Is she here?" He's so concerned about her — remember, he's telling everybody he's concerned — but he doesn't go to the one place where she should have been.

And it's not like he didn't have the opportunity. He's certainly in the area. His own witness says — put him in the area of that house. But he didn't do it. Why not check? There's something. We have multiple sightings of Leah Freeman up on Central Avenue.

Now, this next point is kind of obvious, but I'll bring it up. We know whatever happened to Leah had to have happened from the time she left the Mitchell home until Tony Messerle found that shoe at about 11:35. I think he said 11:33, 11:35, whatever. Whatever happened to her had already come and gone by the time Messerle found that shoe.

Now, during that timeframe, between nine-

Exhibit 5001 at 1685

D9 87                                    Arguments

whatever and 11:30, what do we know about Leah Freeman?  Well, we've got people that are seeing her walking by McKays.  We've got people seeing her going by the restaurant.  We've got people seeing her over by Fast Mart, the credit union.  We've got people putting her over by the high school.  We've got people putting her at the gas station.  And the Defendant admits that he's in the same area during the same timeframe.  But despite all these other people being able to see Leah Freeman, he can't.  He says he didn't see her after he dropped her off at the Mitchell home.

Now, it's his claim he didn't see Leah after he dropped her off at the Mitchell home.  And the question you have to ask yourself is, can we trust his word on that issue?  Well, according to the Defendant, Leah is the love of his life.  They're going to get married.  They're going to have kids.  But, what is he doing during that same time frame of that relationship?  Having a relationship, or sex, or whatever, with Margaret (sic) Davidson, or Pinkley, whatever her name.

Here's something — Dave Hall.  The officer that was assigned by Chief Reaves to do the initial investigation in this matter.  As you'll recall his testimony, on the day after Leah disappeared, June 29th, he goes over to the home of Cory Courtright, and he is talking with her about getting some information so they can get the teletype out, or whatever, so

Exhibit 5001 at 1686

that they can try to find Leah.  And while he's there, Nick McGuffin is there.  And he asks the Defendant, "Please give me a rendition of what happened."  And Nick gives him — the Defendant gives him a brief rendition of what had occurred the night before.

But, you'll recall what he told the officer was, before he went home — the reason he went home was because she — he thought Leah was spending the night with a friend.  Leah wasn't home because she was spending the night with a friend.  "And that's why I went home and went to bed.  I thought everything was okay.  She's off with a friend."  That's what he said on June 29th.

But, look what happens on June 30th.  The next day, he changes his story.  Remember, "I thought she was home.  I was outside.  I'm throwing rocks at the window, trying to get her attention.  I'm looking for the. . ." — you know, "I saw the light in the window."  That's different than what he told Dave Hall.  Why are we changing our story?

Here's another thing.  Details about the argument with Sherry Mitchell.  Now, you heard Sherry Mitchell testify, and you heard what she told Leah that night.  The argument started off with, well, they wanted to go jogging, and Peggy Mitchell said no.  And Leah gets upset because she doesn't think Peggy doesn't (sic) like her anymore.

So, Leah gets upset and is starting out the

Exhibit 5001 at 1687

D9 89                              Arguments

door.  Sherry follows her.  "Look, this. . ." — you know, "My mom likes you."  It goes downhill from there, because that's when Sherry says — she finally unloads on Leah and says to her, "You know, this relationship is bad.  You've changed.  You're using drugs.  You're not behaving the way you were.  This is bad."  Remember all these things?  Then I asked her, "Okay.  When the Defendant came to pick her up, what did you tell her (sic)?"  She said something about, "Well, we argued about whether she (sic) could go jogging with her.

Now, if you listen carefully to those two excerpts that I just played for you, there's a lot more than just what Sherry Mitchell testified to.  Listen to what he had to say.  For example, to Scott Hamilton he's saying, "Well, when — Peggy Mitchell was saying I shouldn't be dating her anymore, and they're giving her shit," and this and that and the other.  Okay?  He's got a lot more details about that argument than what Sherry Mitchell gave him.  How does he learn all these details?

As I indicated, at the most, Sherry Mitchell told him about, was about an argument about whether they could go jogging (not understandable).  And she gets upset and left, and was crying.  Never told — she never told the Defendant that she had said, in essence, that Nick was bad for her.  There were only two persons privy to that conversation, ladies and gentlemen — Sherry Mitchell and Leah Freeman.  Sherry

Exhibit 5001 at 1688

Arguments       D9 90

Mitchell didn't tell the Defendant about it.  That leaves Leah Freeman.  Yet the Defendant claims he didn't have any contact with her after that.  To learn what was said, he had to learn it from Leah.  Which means he had to have had some contact. Which means he had to have seen her later than what he claimed.

Why can't he tell us about that, ladies and gentlemen?  Because that's when it all blew up, and Leah ends up dead.  The Defendant is telling everybody he's concerned about Leah.  Yet, that same night, he's over at Kristin Steinhoff's house smoking meth and trying to have sex with her.  Look at his actions on the evening of June 28, 2000.  We hear from Kristin Steinhoff that, "Well, the officer said he was headed in the direction of going home."

But, let's go a little further, Kristin Steinhoff tells you he switched clothes.  She saw him at the Econo Rooter wearing a set of clothes.  And then, when he came over to her house later, he's in a different set of clothes.

He switched cars.  You heard — I don't know how many different witnesses say at sometimes he's driving the Mustang, and sometimes he's driving the — the T-Bird. Whatever — why is all this going on?

Buddy Young.  This is interesting.  Buddy Young is interviewing the Defendant and asks him, and says, "What do you think happened to your girlfriend?"  Now, instead of

Exhibit 5001 at 1689

D9 91                                    Arguments

saying, "Well, I hope she's alive and well, and maybe she ran away," or what have you, he talks about, "Maybe she's walking down by the river and fell and hit her head on a rock and died." Well, that's interesting because where do we find Leah Freeman's body. We find her by the Coquille River.

In talking with the police, what does he leave out? Well, look at State's Exhibit 83. That's his handwritten statement about the things he did that night. Nowhere in there does he talk about there being a disagreement with Leah. Nowhere in there does he mention about having — trying to have sex with Kristin Steinhoff. Nowhere in there does he mention going over there and smoking meth with her.

Then we have these things, ladies and gentlemen, for you to consider. You heard from Kristin Steinhoff that the Defendant — well, you heard from Tina Mims that the Defendant came over and threatened Kristin Steinhoff. And what did he say to her? It was after it became apparent she had been talking with the police. The Defendant threatens her. He says, "Keep your mouth shut, or you'll end up like Leah Freeman."

Then we have the incident where — at Polly Parks' house where the Defendant is agreeing with his brother, Wayne McGuffin, who said that the shoe was planted to throw the police off.

And then, of course, you have David Breakfield.

Exhibit 5001 at 1690

Arguments       D9 92

"I've killed before."  And, "I strangled that bitch."

All of these things are evidence that the Defendant in this case killed, murdered, however you want to put it, Leah Freeman.

I indicated it's time to hold the Defendant accountable.  It's been eleven years.  (Not understandable) the Defendant thinks he's above the law.  He's gotten away with it for eleven years, and thinks he can still get away with it for eleven years.  What's the evidence to support that?  The statement he made where he said, "It's amazing what you can get away with in Coos County."

Ladies and gentlemen, it's time to show the Defendant that he can't get away with this anymore.  On behalf of the State of Oregon, we ask you to consider all of the evidence, and find the Defendant guilty of that for which he is accused — causing the intentional death of Leah Freeman.

Thank you.

THE COURT:   Ms. McCrea, would you — I'm more than happy to take a recess.  Would you want one at this time?

MS. McCREA:   I would, Your Honor.  I'd like the recess.

THE COURT:   Ladies and gentlemen, I would ask that you step in the jury room.  Take your notes.  Remember the admonition not to discuss the case.

JUROR:   (Not understandable?)

Exhibit 5001 at 1691

D9 93

THE COURT:    I'm going to discuss that.

(Jury out.)

THE COURT:    Just for your information, I calculate your argument was fifty minutes.  So, - - -

I can take a lunch recess now, or I can take just a brief recess, and give you your chance to argue it. Somewhere, I'm going to have to take lunch, here.  So, - - -

MS. McCREA:    (Interposing) My preference would be we go ahead and take lunch.  We don't have rumbling tummies thinking about food as opposed to the defense argument, Your Honor.

THE COURT:    Okay.

I'm going to have the jury go with Ms. Cress and Ms. Bennett, our Trial Court Administrator.  We'll take them to lunch down at Frasiers.  There's kind of a private room there that we've arranged for them to use.  And I think it's better that they be in custody of the Court at that point in time.

So, would you step in and just - - -

How long would it take you to get ready to take them?  Are you ready to go?

JUDICIAL ASSISTANT:    (Inaudible response.)

THE COURT:    Okay.

We'll take just about five minutes for her — Ms. Cress to get Ms. Bennett together and be ready.  Then I'll

Exhibit 5001 at 1692

D9 94

have them tell the jury to leave their notes and come out.

Then tell them that they'll be in the custody of Court

personnel.  And we'll probably — by the time they get down

there and ordered — I'll have them come back about 1:00.

Okay?

So, we'll take about five minutes, and then

we're just going to - - -

When you're ready, just let me know and we'll

bring the jury back in.  Okay?

Five minutes.

(RECESS)

(Jury in.)

THE COURT:   Be seated, please.

Ladies and gentlemen, we will take a lunch

break.  You will be going — the Court will be buying your

lunch today.  You'll be going with Ms. Cress and Ms. Bennett,

who is our Trial Court Administrator.  And we even made

arrangements for — go to Frasiers.  There's a room down there.

Please follow their directions.  And please do not talk with

them about the case, or among yourselves about the case.  This

is just for lunch.

And hopefully you can get down and be back at

1:00.  So, we'll try to start with the — Ms. McCrea's closing

argument at that point in time.

So, at this point, - - -

Exhibit 5001 at 1693

D9 95

Cathy, do you just want to go — Teresa, I think, is out in the hall.

So, if you just go with Ms. Cress.

Everybody else remain seated until the jury has a chance to leave with Ms. Cress.

(Not understandable.)

Okay.  That's fine.

If you want to get — if you want - - -

MS. McCREA:    (Interposing) Oh.

THE COURT:    - - - to leave things there, that's fine.

You need to unlock it for them, for a minute.

(Jury out.)

THE COURT:    I obviously can't stop people from eating where they want to eat, but I would suggest — strongly recommend that it not be Frasiers.  Or, if it is Frasiers, that you be very careful, everybody in the audience, about what is said or done during — while you're at lunch and around the jury.

Okay.  We will be in recess until 1:00.

(LUNCHEON RECESS)

JUDICIAL ASSISTANT:    All rise.

THE COURT:    Be seated, please.

Ms. McCrea, you may give Mr. McGuffin's closing argument.

Exhibit 5001 at 1694

Arguments        D9 96

MS. McCREA:    May it please the Court, Mr. McGuffin, counsel for the prosecution, members of the jury.

This is a story — a tale of love — about two star-crossed lovers.  Prince Charming, aka Pooh, and Babydoll, aka Princess.  Nick McGuffin and Leah Freeman.

Now, the prosecution came to you in opening statement and said, "They had a toxic relationship — troubled, at best."  The prosecution is now willing to concede that they had some good times.  That they were devoted to each other.  And I suggest to you that they were very young.  They were teenagers.  And just as in the fairy tales and the stories, the course of love does not run smooth.

Now, you've heard from Mr. Frasier excerpts from things that Leah Freeman wrote in her diary back at the end of 1999 and the beginning of 2000 — back in January.  And she typically wrote things out to be able to vent her feelings.  And she didn't give those to anybody.

What she did give to Mr. McGuffin, and what you heard me read to you in evidence, and you have to read yourselves because I'm not going to make you listen to it again, are the things that Leah Freeman wrote, close in time to when she disappeared.  And that's what we care about.  What was happening at the time she disappeared between these two people.

Exhibit 5001 at 1695

D9 97                                    Arguments

So, if you look at Exhibits 109 through 114, and you read those, it's — she's talking about graduation. She's talking about how happy she is, and how things are good between them. And that's what was going on at the point in time that we care about.

No, no question they had tiffs, they had arguments. But, what you need to consider is the prosecution has brought you the best that they can bring you about the problems in this relationship. And (not understandable) members of the jury, it wasn't very (not understandable).

What we know is, on June 28, 2000, that Nick McGuffin and Leah Freeman went over to Leah's mom's, and they were washing the greasepaint off of Nick's car. They were having a great time. And Cory Courtright told you that. That Leah was really, really happy. And Denise Bertrand, her sister, told you that, that Leah was really, really happy. And even came up and woke Denise up to see if Denise wanted to come help them wash the car.

And when Leah Freeman goes to her friend Sherry Mitchell's house, and leaves a note in her bedroom, she says to Sherry Mitchell, "Nick and I are getting along better." Things are good, in other words. And things were good.

You have the photographs in evidence — Exhibits 7 and 8, of how Leah looked that last afternoon on June 28th. And she's happy. She's laughing. She's vibrant.

Exhibit 5001 at 1696

Arguments        D9 98

Now, of course, we have the issue — we have the issue of the phone call. And I submit that what the evidence shows is that when Nick and Brent Bartley and Leah Freeman went over to the McGuffins' from the Haga's — from the grandparents' place, to get the movies from the McGuffins' house, that Melissa Smith called over there to talk to Leah.

Now, at this point in time, Leah has told Nick that she's going to go over to Sherry Mitchell's house for a couple of hours that night. And it's true. Nick wasn't happy about it. But the reason Nick wasn't happy about it was because, as Denise Bertrand told you, Nick saw himself as Leah's guardian. As Kim Pugmire, the cousin who used to be a Courtright, told you, she — Kim — had told Nick, "You take care of my cousin."

And Nick took that responsibility seriously. And that's why he threatened Adam — I'm sorry, it wasn't Adam Shinar, it was Austin Fisher — because Austin Fisher and some other people were teasing Leah after New Year's Eve, accusing her of having had sex with Nick — it's in her diary entry — when she hadn't. And Nick wasn't okay with that. He was protective of her, and he was defensive of her, and the reason that he didn't want her to go over to Sherry's.

And this is the same excerpt of the tape of Nick's statement made to the authorities on June 30, 2000. You have it in evidence as State's Exhibit 218, that

Exhibit 5001 at 1697

D9 99                              Arguments

Mr. Frasier played for you.  And what Nick says there is he's saying to Chief Reaves, in response to Chief Reaves' question, "Did she have problems with anybody?" he's saying she had an argument with Sherry and her mom a couple of days before Wednesday.

Now, Wednesday was the day that Leah disappeared.  So, Leah and Nick are at Fast Mart, and Peggy Mitchell pulls in and says, "What are you doing?"  And Leah says, "Nick is just getting some cigarettes."

And Peggy Mitchell says, "Oh, I expected more of you."  And that really, really upset Leah.

So, Nick is concerned about her going over to Sherry Mitchell's because of what happened on Monday.  But more, Nick does not get along with Sherry Mitchell because he knows that Sherry Mitchell has been saying bad things about Leah.  How do we know that?  We know that from Nick's own words spoken to Scott Hamilton during the pretext phone call in January of 2010, which you have in evidence as Exhibit 242.

Now, the reason this exhibit is so important is because the things that Nick says were said without knowing he was being recorded.  He had no reason to check his words, and that's pretty obvious because he uses the "F" word over and over, and over again.  But what is important is what he says is honest, it's raw, and it's true.  And at that point, he tells Scott Hamilton that Sherry was giving her a guilt trip

Exhibit 5001 at 1698

Arguments     D9 100

because she — meaning Leah — hadn't been hanging out with her, and "fuckin' Leah" really didn't want to hang out with her because Sherry and her weren't getting along.  And he says, "Sherry has been talking shit about her, and I don't even — me and her got into — really, it wasn't even an argument.  It was just fuckin' me telling her that she needs to realize who her fuckin' true friends were.  I was like, — you know, Sherry just fuckin' was talking shit about her constantly, and I kept on hearing about it.  And you know, Leah didn't even want to believe it."

So, Nick is, even now — ten years later — is still concerned about what happened that night.  It wasn't an argument that he had with Leah, but he suggested to her that maybe she didn't want to go over to Sherry Mitchell's because Sherry wasn't a true friend.  Leah insisted that she was going to go.

And I submit to you that what happened was, when Melissa Smith called over to the McGuffins' to tell Leah that she wasn't going to be available to do anything that evening because she and Scott had broken up, even though they all had a great time at Powers swimming the day before, that either Nick was talking in the background with Brent Bartley, and was saying loudly to Brent Bartley, "Yeah, she's going to go see that bitch," referring to Sherry Mitchell; or he may have thought that Leah was on the phone with Sherry Mitchell,

Exhibit 5001 at 1699

D9 101                                    Arguments

and said the word bitch because he believed it was Sherry Mitchell on the phone.

Remember what Melissa Smith said.  She said she could hear him in the background.  He said the word "bitch", but she couldn't tell if it was directed toward Leah or if it was a conversation he was having with someone else.

The context of the situation, members of the jury, is yeah, Nick didn't want Leah to go over to Sherry Mitchell's, but she said that's what she wanted to do.  And he took her over there.  And he tells Scott Hamilton again, when he's being recorded and he doesn't know it — he doesn't have any reason to not be forthcoming — and he says, "We were having a barbeque.  She was going to come back.  We got into like a little bit of a tizzy, but it wasn't even really a fight."

So, there wasn't anything going on between Nick McGuffin and Leah Freeman that would incite him to want to kill her that night.  The evidence just isn't there.  The evidence is that he was protective of her.  He was defensive of her.  He didn't want her to go to Sherry's.  She insisted she was going to.  And so, he took her over there.  But what you see from the documentation is the relationship was good.  That she was happy.  And the photograph shows that, as well.

So, we know that Nick McGuffin took Leah Freeman over to Sherry Mitchell's house on Elm Street around

Exhibit 5001 at 1700

Arguments      D9 102

7:00.  Then he went to Fast Mart.  He meets up with Aaron West and Josh Emler and Dave Jenkins.  And they go out to Johnson Mill Pond to smoke a few bowls of marijuana.

Now, we also know that Nick was supposed to pick Leah up at 9:00.  And Aaron West testified that he, Aaron, persuaded Nick to stay a little bit longer.  I mean, remember, we're dealing with teenagers, folks.  You can just see it — Aaron saying, "Oh, come on, Nick.  Let's just finish this bowl."  Nick does that, and he's a little bit late to go pickup Leah.

Now, we all know by the time Nick went to pick up Leah, she was gone.  So, let's talk about the chronology. We know that there was a fight - - -

Oh, and the prosecution says, "Well, how did — how did Nick possibly know the details of the fight when he talks to Chief Reaves on the 30th?  And how's he going to know the things that he said about Sherry's mom not liking Leah?" Well, he knew that from what had happened on Wednesday — on Monday.  And the details of that.  But, remember, Leah disappeared on the 28th.  The Missing Person's Report was made on the 29th.  Nick's giving this testimony — this statement to the police on the 30th.  By then, you can infer there's been a lot of discussion between Nick and a lot of people, including Sherry, about what happened.

Okay.  So, we know that there was — there was

Exhibit 5001 at 1701

D9 103                              Arguments

the disagreement that Leah and Sherry wanted to go jogging, and Peg said no.  That the voices became raised.  Peg said no.  Leah came down the stairs and went out the door.  At that point, Sherry tries to get her to stop, or come back; to which Leah says, "Your mom doesn't like me," in words or substance.  And at that point, Sherry says, "You know, it's not that she doesn't like you.  It's just that you're with Nick, and Nick's not good for you, and you should get rid of him."

And this is to a young girl, a fifteen year old, who is having a blossoming relationship.  And it's about the guy she's devoted to.  And that, combined with what had happened at Fast Mart, leads Leah to say, "I'm sorry I'm not good enough for you."  And she leaves.  And she walks up Elm — that little street — to Fourth, that we saw in the jury view.  And she walks up Fourth to McKays.  And Sherry stands there crying.

And we know from Sherry's testimony that Leah went up (not understandable) about 8:45 to 8:50.  Corey Bryant, Sherry's boyfriend, arrives about 9:00.  He was a courtesy clerk at McKays.  We have the testimony from Ellen Richardson that McKays typically close at 10:00.  The courtesy clerks work until 9:00.  Now, Corey Bryant thought that he was going to work at 9:00, but that doesn't fit because courtesy clerks would typically work from 4:00 to 9:00.  So, we can infer that actually Corey Bryant was coming from McKays to the

Exhibit 5001 at 1702

Arguments      D9 104

Mitchell's house.

Now, at the point that Corey Bryant is there in the yard with Sherry Mitchell, that's when John Lindegren came by with his dog. How do we know that? We know that because of the timing. We know that because John Lindegren told us that there was a pickup parked in that little road that he had to walk around. Corey Bryant had a pickup in June of 2000. Mr. Lindegren didn't say that he saw a blue Mustang. He just saw the pickup.

He also told us that the girl had her hair pulled back. When you saw Sherry Mitchell testify in Court the other day, she had her hair pulled back. Leah's hair was so short, it would be very, very difficult for her to have her hair pulled back.

Additionally, the prosecution told you in opening statement that Mr. Lindegren would testify he saw a couple arguing. That wasn't his testimony, ladies and gentlemen. He just saw a boy and a girl in the yard. And you have the photographs in evidence as to where he saw them. He saw them directly in front of the Mitchell's house — the picture with the orange cones. It was Corey Bryant and it was Sherry Mitchell, that Mr. Lindegren saw. It was not Nick McGuffin and Leah Freeman.

Now, did — when Nick McGuffin arrived, Corey Bryant was there. There was some discussion. Nick was late.

Exhibit 5001 at 1703

D9 105                              Arguments

And Sherry told him, "You can catch her if you. . ."  "She just left.  You can catch her."  However, we know from the evidence that Corey Bryant had come from Safeway — I'm sorry, McKays, up Fourth, and he didn't see Leah.  So, you can infer from that, by the time that Corey Bryant gets to the Mitchell residence, Leah is already past McKays.

You have in evidence, members of the jury, this map, Exhibit 155, that shows you some of this stuff.  So, we've got the Sherry Mitchell residence here on Elm Street.  McKays Market is up here on Central.  So, we know by the time that Corey Bryant comes to Sherry Mitchell's residence, that Leah Freeman is already past this location.  We also know that by the time that McGuffin arrived, she's also past that location.

So, Nick comes.  She's not there.  Now, where did she go?  We know, from the testimony of Raymond Lewis, that he was coming south on Central, and saw Leah just before Fast Mart.  We know from the testimony of Mark McAdams — Mike McAdams and Mark Kirn that they saw her in front of Hunters Restaurant between 9:00 and about 9:15.

And let me say on the times, nobody was looking at their watch and setting out exact times.  Because, it's only after the fact that time became important.  But, the general outline of this is important for your consideration.

So, by 9:15, she's already up here at Hunters.

Exhibit 5001 at 1704

Arguments     D9 106

And then Heidi Crook and Heather Reid see her, and she's up toward the credit union, closer to the traffic light.  And on she goes.

We next have a sighting of here at the Coquille High School by Alicia Hartwell Hyatt.  Now, Ms. Hyatt — Ms. Hyatt would like to claim that Ms. Freeman — Leah — had contact with a car that looked like Mr. McGuffin's car.  But originally what she said was, she thought she — Alicia — saw Leah at the high school.  Then she says, "Well, I saw a car pull up and the passenger door open.  And she says it was a compact car, like maybe a Nissan.  But then, that changes when she comes to Court, and suddenly it's an older car, and it could be a Mustang.

But, there's no indication from the evidence that there was, in fact, any contact between Nick McGuffin and Leah Freeman after he dropped her off at Sherry Mitchell's house at 7:00 on June 28, 2000.  But, we have a sighting of Leah at the high school by Alicia Hartwell.

Then, we have Cynthia Jones who tells you that she saw Leah Freeman at the payphone across the street by what is now the Shell Station by the cemetery.  Leah looked at her. No big deal.  Didn't cause Cynthia Jones any concern.

Then we have the testimony of Thomas Bounds. He also saw Leah at the high school.  They waved at each other.  And then when he was coming back from visiting his

Exhibit 5001 at 1705

D9 107                                    Arguments

family, he saw Leah at the same payphone as Cynthia Jones, and Leah was on the phone. Who was she calling? I suggest to you that she was calling up to the Hagas to see when Nick was going to come pick her up. Because, he (sic) knew Nick was going to come pick her up. And he was late. So, she was trying to find out when he was going to come. Brent Bartley told you, he wasn't answering the phone, because really they weren't supposed to be there.

So, I submit when Leah doesn't get an answer to her phone call, she thinks Nick is coming to pick her up, and she starts walking up the road, up — this part of town by the cemetery. And that is when Thomas Bounds hears the scream, and somebody abducted her.

She's never sighted again after about 9:30. The shoe was found at 11:30. Somebody picked her up. Somebody took her away. But it wasn't Nick McGuffin.

Now, Nick gets to Sherry's. And again, the times are not totally clear. But, he gets to Sherry's at, say, 9:05, roughly — 9:10, 9:15. She's not there, so he goes looking for her. The first place that he goes is he stops at Fast Mart. And he sees Aaron West. And Aaron West testifies that they had followed Nick in from the Johnson Mill Pond. Saw Nick turn on Fourth, like he's going to Sherry Mitchell's house, and Aaron West and the other guys went to Fast Mart. Aaron West didn't see Leah when he got to Fast Mart. So, we

Exhibit 5001 at 1706

Arguments    D9 108

know from that, Leah is already beyond that location by the time Nick gets into town.

Nick says to Aaron, "Hey, I'm looking for Leah. Have you seen her?" Aaron says, "No, haven't seen her." Which is bewildering for Nick, because she should be heading that way, and she should be heading home, but she's not. So, he goes up Central, and then turns to go up a couple blocks to Daniel Lapine's residence — remember, the boyfriend of Quinn Myers, who is a roommate of Brent Bartley — thinking maybe Leah had gone there. He goes up to the door. Quinn Myers sees him. He says, "Is Leah here?" And she says, "No." Kind of why would she be here?

And he says, "Oh, she's not? Oh, okay." Surprised. And he just turns and leaves because he's looking for her. That's between about 9:20 and 9:30.

Nick then drives around. Goes down Knott, the street where Leah was living at that point with her grandparents. Looks for her there. Runs into Lyndee Stidham. Asks her if she's seen Leah. She hasn't. And that's roughly in the 9:00/9:30 area.

And then we have Haley Greenway, who testified this morning, who saw Nick at the intersection of Fairview and Central just before 10:00, when her curfew was. And he's driving in his blue Mustang, going toward the high school.

We also know that between about 10:00 and

Exhibit 5001 at 1707

D9 109                                    Arguments

10:15, Nick circles back around to Sherry Mitchell's to see if Leah has come back.  She hasn't, but they suggested he call Cory Courtright and see if Leah has gone home.  He does that.  She's not there.

Now, from there — and there's — there's a lot of driving around.  We had a — a statement by Kristin Steinhoff-Ramsey and Zack Elderkin that they thought they saw Nick at the Econo Rooter, or what used to be the Maytag store, around, um, probably — well, it's going to have to be before the stop by Officer Zavala.  And did they or didn't they?  It doesn't really matter.  Nick was driving around looking for Leah, that's for sure.  What we know is Zack Elderkin saw somebody who was talking on a cell phone, and Nick didn't have a cell phone in those days.  He saw somebody with a Jeep Wagoneer, and Nick wasn't driving a Jeep Wagoneer, didn't have a Jeep Wagoneer.  Kristin Steinhoff didn't see any car at all.

But, what is significant for your consideration is, there was some contact between Nick McGuffin and Kristin Steinhoff in which she communicated to her, he was looking for Leah.  And she told him, if he didn't find her, to come by later, and she — Kristin Steinhoff — would help him look for her.

So, from there, assuming that he's — he's driving the loop, this is where the Maytag place would be.  He comes back around on 42.  And he gets stopped at 42 — Deputy

Exhibit 5001 at 1708

Arguments      D9 110

Zavala testimony — here on 42 South just before the card lock gas station is.  And what is significant about Officer Zavala's testimony is he confirms that Nick is driving the blue Mustang, not any other car.  Aaron West tells you he was driving the blue Mustang.  Sherry Mitchell tells you he is driving the blue Mustang.  Brent Bartley tells you he's driving the blue Mustang.  Nick is stopped because he's got a headlight out.  Officer Zavala doesn't give him a ticket, but he says, "Graveyard shift is going to be coming on.  You'd better get home.  You'd better not be driving around with one headlight because they're not going to be as forgiving as I am."  And Nick says, "Okay."  And Zavala watches him drive over the bridge.

Okay.  He's just barely eighteen.  He's looking for his girlfriend.  He drives over the bridge, and then he turns around and he drives back, because he's looking for Leah.  He goes to the card lock and he buys gas.  And one of the things that's significant about the card lock is, in order to use it, you have to put in a card that logs the account and logs the time.  And that can be checked.  And when Nick was questioned by Officer Perske on July 5, 2000, Nick specifically told Officer Perske about this card lock, and said, "Hey, I bought gas that night.  You can check it, and you can confirm when I bought the gas."

And likewise, he told Officer Perske that his

Exhibit 5001 at 1709

```
          D9 111                            Arguments
```

parents had a 1-800 number, and that he, Nick, had called home to talk to his mom to see if Leah had made contact there, or she had somehow come out there, and told Officer Perske, "You can check that to see.  You can confirm what I'm telling you."

And you can bet, members of the jury, the prosecution checked that out as part of their investigation. And you didn't hear anything different.  So, you can infer that, in fact, Nick did buy gas at the card lock, and he did call his mom that night from Fast Mart looking for Leah.

So, once Nick leaves from buying the gas, he goes back up to Haga's - - -

And let me say, in terms of Nick on Central Boulevard, remember Aaron West testified that he saw Nick go up Central — up and down Central Boulevard at least six to seven times during the time that Aaron West was at Fast Mart until Aaron West went home between eleven and twelve that night.

So, Nick goes back up to Haga's, way up here, to get Brent Bartley and Nicki Price.  They're in the car, and the three of them go to Denny's Pizza to make contact with Denise Bertrand, Leah's sister, and ask her if she's seen Leah.  And, of course, she hasn't.  Then, about 11:30 — 11:00, 11:30 — Brent and Nick take Nicki home.  And Brent goes with Nick looking for Leah.  They drive back down onto Knott Street.  Nick slows down at Leah's house.  The lights aren't

Exhibit 5001 at 1710

Arguments      D9 112

on, so he doesn't stop.

Now, the prosecution says, "If he wanted to know if she was home, why didn't he just stop?" But, remember the background of this relationship. Cory Courtright didn't want them together in the beginning. And Jim Murphy was pretty strict about when Nick could call, and when he could come over. And Leah's granddad was pretty straight-laced, too, and he was pretty particular about when Nick should be having contact. So, when he sees there's not a light on in her room, he goes on.

He went up to the end of Knott to where the park was, and went down to check to see if she was in the park. Brent stayed in the car because he had the knee brace. They went over to the high school because Nick knew that sometimes Leah would want to just go think on the stadium seats in the grandstands, and Nick checked there and she wasn't there. Eventually Brent got tired of driving around, and when he saw Richard Bryant, he got out and went to smoke marijuana with Richard Bryant. So, Nick continues to look. We know from Brent Bartley he was in the Mustang.

Then, at 12:03, (not understandable) an area of (not understandable), right in here. Nick does get stopped a second time, this time by Officer Danny Lee. Again, it's for his headlight being out. He's in the blue Mustang. And Danny Lee says, "You know, you've got your headlight out." Nick

Exhibit 5001 at 1711

D9 113                              Arguments

says, "I know.  I'm looking for my girlfriend.  If you see her, you know, send her home."  And Danny Lee says okay.

Now, around this point, maybe give or take, Nick goes over to Kristin Steinhoff's house because she said that she would help him look for Leah.  And Scott Hamilton is there, in the area, apparently.

And much is made concerning Nick's bad character, if you will.  And if he's so concerned about Leah, how can he be smoking meth and trying to have sex with this woman, Kristin Steinhoff?  But, members of the jury, you've got to remember, we're dealing with a kid who's barely eighteen.

They've been having a great time.  They've gone to Powers swimming the day before.  They had a great time that afternoon.  And then it all went to hell in a handbasket when Leah went to see Sherry.  And from Nick's perspective, Leah is really, really upset.  She's upset at Sherry.  She's — and Sherry's mom, Peggy.  She's upset at him because he told her this was going to happen, and he was right.

And, he's looking for her — he's looking for her, Leah, not because he wants to confront her, but because he wants to comfort her.  And when he can't find her anywhere, the first thing he thinks is, "She's off with some other guy.  She's at a party, and she's off with some other guy."  And Kristin Steinhoff doesn't dispell this idea.  She, in fact,

Exhibit 5001 at 1712

encourages it.

Now, in the back of Nick's mind, he's also concerned that maybe something has happened. And Coos County is a different place, certainly, than it was back in 2000. In 2000, you didn't have fifteen year old girls being abducted. And so, Nick is being convinced that Leah is off having a good time, and she's partying. And so, his actions, while not very wise, are essentially in response to that. It's payback. It's like, "If you're out partying, then I'm going to have some fun."

So, he smoked some meth. He and Ms. Steinhoff start getting involved. But, what is very, very significant, and most important for your consideration is, he didn't have sex. They didn't. Instead, they got in the Kia, and they went out to Sinnott's a little ways out Fairview to see if there was a party. They went out to see if there was a party because Nick was afraid Leah was out there partying with somebody else.

And what did he tell Scott Hamilton at Kristin Steinhoff's house? He told Scott Hamilton, "If you see Leah with another guy, beat him up and take her home." He didn't make threats about Leah. He made threats about the guy, and he wanted Leah to get safely home. So, that was his mind set.

They go out to Sinnott's. There's no party. They come back into town. Nick takes Kristin to the card

Exhibit 5001 at 1713

D9 115                                    Arguments

lock, buys some gas for her car.  And he took — you know why they took the Kia.  Because he had been stopped twice in the Mustang with no headlight, and wasn't going to take a chance on getting stopped a third time.

And let's deal, just for a second, with the issue of him changing cars.  Now, we know he did not change cars because he tells you so in Exhibit 242, which was a pretext call to Scott Hamilton.  And again, he's saying how it is, with all the little words and swear words and all.  And what he says is, "I had the fuckin' Mustang the whole fuckin' night, and that's because my dad had the fuckin' keys.  So fuckin' — I was branded from the fuckin' T-Bird, you know, because I know from a fact that I wasn't fuckin' driving that shit."  He didn't have the T-Bird.  He had the Mustang.

Now, people say, "Oh, yeah.  Yeah.  (Not understandable) the T-Bird."  Well, remember, on July 5th, Nick signed a written consent for the police to take his Mustang, and to search it as much as they wanted.  So, he didn't have the Mustang to drive.  So, certainly at that point, people were seeing him in the T-Bird.  And he did drive the T-Bird on occasion, but he was grounded from the T-Bird on June 28th.  He was only driving the Mustang.

So, they come back into town.  Nick drops off Kristin Steinhoff.  He goes back over to Knott Street one more time.  And when he drives through this last time, he sees what

Exhibit 5001 at 1714

Arguments     D9 116

he thinks is a light on in Leah's window, or the flickering of the television.  So, he goes to the driveway next door, picks up some pebbles, and tosses them at her window.  She doesn't respond.  So, he thinks, "Well, I'm in trouble, but we'll deal with it tomorrow."  Because, as we know from the testimony, people had seen them have tiffs.  One of them would walk off, and then they would make up.  So, he goes home.

The next morning Cory Courtright calls him and says, "Leah didn't come home."  And his response is telling — because the prosecution talks about how he supposedly tells Officer Hall, "Well, she was staying overnight with a friend."  But what he says to Cory is, "What?  She didn't come home last night?"  Because, he expected her to be home.  And he thought that she was home.

In his statement — his handwritten statement to the police on July 5, 2000, indicates, "At 7:30 in the morning, Leah's mom calls and said that she didn't come home, and that her TV was probably the glare in Leah's room."  So, you know that back in July of 2000, Nick told Cory Courtright that he believed Leah had come home because he had seen the flickering — some light on in her room.  It's not something that was made up after the fact.

The prosecution also contends that Nick and Leah met up again at some point.  And the argument made to you — or, the suggestion made to you is that Nick told Scott

Exhibit 5001 at 1715

D9 117                                    Arguments

Hamilton that he actually dropped Leah off at McKays Market at some point.  But we know, from the pretext call — from Exhibit 242 — that that didn't happen because Nick tells you so.  And remember, this is being recorded by the police, and Scott Hamilton is trying to get Nick McGuffin to make admissions — to make statements.

And three times — three times, Scott Hamilton says to Nick — first time: "The night when all that shit happened that you and Leah got in a fight and you dropped her off at McKays or whatnot, you remember?  You remember telling me that, right?"  And Nick says, "No, because I dropped her off at Sherry's."

And then Hamilton says, "Well, that's ten years ago, though.  So,. . ."  And Nick says, "Well, yeah.  No.  Yeah.  I dropped her off at Sherry's because (not understandable) said she was going to go in there for a couple hours, and then she was going to come back."

And then, there's a third time where Scott Hamilton says, "I just could have swore that's what you told me about, is her getting out at McKays."  And Nick says, "Huh uh."  And then he says, "Yeah, say something that fuckin' didn't happen.  No, fuckin' no.  I didn't drop her off at McKays."  So, there was no additional contact.  Nick is flat consistent that he didn't have any contact with her.  He didn't drop her off her off at McKays.  There wasn't a fight

Exhibit 5001 at 1716

Arguments    D9 118

between them.  He talks about there was a little bit of a tizzy, and that's because of the whole situation with Sherry Mitchell, and Leah wanting to go over there.

I know it's warm in here.

So, what do we have?  We have a chronology that shows you that Nick McGuffin drops Sherry — dropped Leah Freeman off at Sherry Mitchell's at 7:00 on June 28th.  He went back to pick her up sometime after 9:00 and she was gone. Somebody abducted her, I submit, by 9:30 that night, where she was discovered at 11:30.  And it wasn't Nick McGuffin who abducted her.

He's seen place after place, time after time. And overall, what you can tell, members of the jury, is there was no time for him to make contact with Leah and to spirit her away anywhere.

Now, Mr. Frasier has — or, the prosecution has the burden of proof here.  And I'm sure that in Mr. Frasier's final argument, he's going to come up and say, "Well, Mr. McGuffin can't account all his time.  There was — you know, there could have been time where they could have met up, and he could have taken her somewhere."  If that is true, then there should have been some evidence of that in Nick McGuffin's Mustang.  You know they searched the Thunderbird, and they didn't find anything.

But, you also know they searched the Mustang.

Exhibit 5001 at 1717

D9 119                                    Arguments

And they found a lot.  They found a whole lot, members of the jury.  And throughout this whole case, they found a lot of stuff.  And you have summaries of all the stuff they found here in evidence.  You can take a look at that.  Because, it's not that they didn't find anything.  They found a lot of stuff.  But what they found did not connect with Nick McGuffin.

And these are trained and experienced people.  These are Criminalists.  These are police officers.  They did a lot of searching.  They did a lot of work.  They did a lot of comparison.  There's no DNA that connects Mr. McGuffin.  There was no blood in his car.  We know how sensitive Luminal is.  They searched the Mustang back on July 6th of 2000.  They searched it again last year.  Not one trace.  Not one iota.  Not one scintilla of blood to indicate that Leah Freeman was ever in that car.

If Mr. McGuffin snatched her and took her somewhere and killed her, he's got — he can't do it on foot.  It's got to be in the Mustang.  And there's nothing to connect that.  It's simply not there.

Well, remember, the burden is on the State in this case.  Mr. McGuffin, as he sits here, is presumed innocent.  He doesn't have to do anything or prove anything.  It's all on the State of Oregon to provide you the proof.  And they haven't done that here.  And their burden of proof is a

Exhibit 5001 at 1718

Arguments    D9 120

heavy burden. It's beyond a reasonable doubt. In civil cases, when we look at the Scales of Justice, and we have the merest feather to tip the scales, that's enough. More likely than not, probably, 51 percent — in a civil case, that's good enough.

But, this is a criminal case, and that's not good enough. So, it's not good enough for the State to say to you, "Okay. This guy cheated on his girlfriend." It's not good enough for the State to say to you, "He did drugs." It's not good enough for them to bring in a statement that he made to somebody when he was in jail, solely for the purpose of prejudicing you against him."

They have an obligation to bring you the best possible evidence — not so you think, "Okay. He may have. He might have. He could have. He probably did." It's so you know that they have proven the case — that Mr. McGuffin did, in fact, kill Leah Freeman. And it's simply not here.

And the other thing about our system of justice is it's a binary system. It's a yes, no — black or white. Is he guilty or is he not guilty. And he's not guilty unless and until they prove it to you. And they haven't done that here.

Now, like I said, they found a lot forensic evidence. And Ms. Wilcox testified that when — and this was on her direct testimony — she testified that when she examined the Mustang on July 6, 2000, it did not appear that it has

Exhibit 5001 at 1719

D9 121                                    Arguments

been wiped down.  It did not appear, in other words, members of the jury, that it had been cleaned out.  So, she looks at it, and one of the things she tells you — this was on redirect examination by the prosecution — was that in terms of looking for hair, she wasn't particular concerned if there was hair of McGuffin or hair of Ms. Freeman because she knew that Leah rode in the car maybe every day.

So, she, Ms. Wilcox, would only be concerned if she had found wads of hair, or she had found hair in the trunk.  And she didn't.  There is absolutely no evidence that Mr. McGuffin had Leah Freeman in his vehicle for any sinister purpose.

And the prosecution talks about, none of this evidence — none of the forensic evidence matches anybody.  Well, what that means is, it doesn't match anybody that they've compared it to so far.  There were people in this case to which it is not being compared.  And that's something you should also consider.

For example, Raymond Lewis.  Now, Raymond Lewis left a receipt dated May 25, 2000 up on Hudson Ridge, not very far from where Ms. Freeman's shoe with the blood was found. Raymond Lewis had a pickup with a lift kit.  Raymond Lewis was a hunter — a deer hunter, and that was out of season.  We know a deer carcass was found near the body.  Raymond Lewis had a hunting knife that he sometimes kept in his vehicle.  Raymond

Exhibit 5001 at 1720

Arguments     D9 122

Lewis said that he was going to his friend Matt Carney's house. And yet, that was never brought up to Mr. Carney until after the fact when Raymond Lewis said, "Remember, I was coming to your house the night that Leah Freeman disappeared." And Matt Carney is going, "Well, I — okay. I don't really remember specifically."

Now, I — I can't tell you who killed Leah Freeman. What I can tell you is, based on the evidence produced here today, it was not Nick McGuffin. And the prosecution has not checked out Raymond Lewis' truck. They've never checked out his (not understandable). And that's also of interest because going back to Danny Lee stopping Mr. McGuffin at 12:03 in town, what we know from that is, it was not Mr. McGuffin who was out on Fairview that Jennifer Storts saw when she was coming home from her 72-hour shift at the hospital. She said it was a pickup, and all she could tell was it looked unusual. Maybe to her a lift kit on a pickup looks unusual.

What we know, for our purposes is, there's forensic evidence that can still be checked. And it may match somebody. But, it does not match Nick McGuffin.

And we also heard about how, oh, trace evidence disappears. It doesn't stay. It's much better to get it early on. Probably all true. But, in this case we know that in 2010, the authorities had the Mustang sampled again for

Exhibit 5001 at 1721

D9 123                          Arguments

paint samples.  They had Ms. Steinhoff's Kia sampled for paint samples.  And they sent Leah Freeman's clothes to a lab in Chicago called Micro Trace.  And Micro Trace, after all this time, was able to find the tiny particle — a gray paint chip — off of Leah Freeman's shirt.

Now, that — that may turn out to match something at some point.  Because, if you remember your history, it was paint particles — paint chips that led to the apprehension of Gary Ridgeway, the Green River Killer.  And we know from Ms. Wilcox that just the smallest thing — a piece of glitter on a little girl's shirt — can be the proof needed in order to put her in a vehicle.

And I say to you, members of the jury, the significance here is we have nothing forensically, tying Nick McGuffin to the disappearance and the death of Leah Freeman.  He didn't have the time to do it.  The lack of any evidence in his car shows he didn't do it.

Now, of course we have the statement of David Breakfield.  David Breakfield, who comes into Court and says, "Nick McGuffin said to me, 'I strangled that bitch, and I'll kill you, too.'"  And the Court has instructed you about how to evaluate witness testimony.  And part of that is the manner in which the witness testifies.

Members of the jury, David Breakfield was like a poorly-prepared actor.  He got on the stand, and his first

Exhibit 5001 at 1722

Arguments    D9 124

statement was, "Do you want me to tell it now?"  So, he pops out with his line, and then prosecution counsel tries to prompt him on his next line, and he can't remember.  And she has to try to help him along with that.  That's how good a witness he was.

You also consider the nature or quality of the witness' testimony.  The quality of his testimony was (not understandable).  He claims the statement was made to him — essentially a confession — by Nick McGuffin in 2002, and he doesn't tell a living soul until 2010.  It strains the imagination to accept that.  It simply is not believable.

You also look at evidence that contradicts the testimony of the witness, and I'll get to that in just a moment.  But you look at evidence concerning the bias, motives, or interests of the witness.  And with Mr. Breakfield we have a couple of things for you to consider.

The first is that this was over Megan Edgerton. And that Mr. Breakfield wants to get back at Mr. McGuffin concerning Ms. Edgerton.

The second aspect is the timing of his statement, because there was a $10,000 reward set up in January of 2010.  And then Mr. Breakfield suddenly comes forward.  If he can successfully help with the prosecution of Mr. McGuffin, he's got 10,000 bucks in his pocket.  The way he testified, what he testified to, the timing of it, it's just

Exhibit 5001 at 1723

D9 125                                        Arguments

not believable.

Additionally, we know that despite the best efforts of the Medical Examiner, no one can say how Leah Freeman died. Dr. Olson told us, yes, it could be strangulation, but there was no damage to the hyphoid bone, which one would expect to see. It could have been blunt-force trauma. It could have been stabbing. If it was below the sternum as Mr. Meneely told you, it would — and it hit a major organ, lungs or heart, it would happen very, very quickly, and there wouldn't be any evidence on it at the autopsy.

Now again, the defense doesn't have a burden of proof, here. But we asked the Criminalist to go back and look at the clothing, and look at the shoes, so we could know if there was something else. And Mr. Meneely has told you, there is evidence of a stab wound in the area below the sternum. How does he know that? Because he looked.

And this is not to be critical of the State's experts because they did the best they could do at the time. Dr. Olson did a quick visual exam. Kathy Wilcox, as she told you, did a bright light exam. She thinks maybe now, she did maybe low-microscope exam. England did a quick exam, but their job was to look for DNA. That's what they were hired for. But even so, their report, which you have in evidence, talks about the movement of the fabric. Because, remember what Mr. Meneely told you? If there was a struggle, which one

Exhibit 5001 at 1724

Arguments     D9 126

would assume in a stabbing situation — and Ms. Wilcox talked about that, as well — you would not expect that the two pieces of fabric, the tank top and the sports bra, would be lined up identically. And that is consistent with what Mr. Meneely found. The two cuts were within two inches of each other. He found the sharp edge that indicates that it was the slashing of a knife.

And it is the size that is very important. One and a half centimeters on each of those holes. And that contradicts what Mr. Breakfield claims. So, that is evidence for you to consider. And since we don't know how Leah Freeman died, and since we can't say that it was strangulation, and we can't believe Mr. Breakfield, that another reasonable doubt.

What about Mr. McGuffin's other statements? What about his other actions? Well, it's true. It's true in the sense that he went out to look at where Leah Freeman was found, with Scott Hamilton. And when he talked to Scott Hamilton in 2010, he told Scott, "Well, you know, the police don't really need to know about that." He also said, "But tell them whatever you want." And he told him that more than once.

So, why wouldn't Mr. McGuffin want the police to know that he went out there? I submit to you that there's a couple of reasons. One is because by the time he talks to Scott Hamilton in 2010, Mr. McGuffin has been harassed, he's

Exhibit 5001 at 1725

D9 127                              Arguments

been targeted, he's been followed, and he's — he's tired of it. He doesn't want to have to deal with the police anymore. And he says to Scott Hamilton, "I wish they'd do a little more questioning of fuckin' other people instead of just trying to fuck with — fuckin' with me."

And I'm sorry about the language, but it's there.

And the other reason he didn't really want Scott Hamilton to talk about it was because it was a very private thing. And you know from testimony, that when Nick and Scott went out there, that Nick went down to where he thought the site was, which Detective — former Detective Oester told us was actually the wrong site — that Nick went down there. And when he came back up the bank, he was crying. And he had a picture of Leah. And he (not understandable) Scott. And if he had killed Leah Freeman, the last thing he's going to do is go back into that area.

Let's deal with a couple of the other statements. You've got to remember that in the beginning, there was hope. Nick hoped that maybe Leah had run away. And maybe she would be coming home. And then the first shoe was found. And still, he's hoping. And then the second shoe was found. And one still hopes against hope that things are going to work out okay. But, when you find the second shoe, it's pretty clear she didn't run away.

Exhibit 5001 at 1726

Arguments    D9 128

Now, Christy Young Cagley tells you that she was present at a place where Nick was with his brother Wayne. And then when the information about the second shoe being discovered came on the television, that Wayne made a statement to the effect of, "Oh, that was just planted there. The police aren't going to find anything." Did Wayne say that? Maybe. It's been reported to you eleven years later — okay, Ms. Cagley talked to the police back in 2010. So, it's being reported to you for the first time in 2010. And the Court - - -

And let's assume, for the sake of discussion, that Wayne McGuffin did say something like that. It wasn't with a sinister motive. It was as an armchair detective. It was meant possibly to (not understandable) or comfort his brother, because you've got one shoe in the graveyard — close to the graveyard. You've got one shoe up on Hudson Ridge. And things look really bad. So, Wayne's trying to say, "Hey, you know, it's not what it looks like." There's no indication of any knowledge of how the shoe got up there.

But, what's really important for your consideration is Ms. Cagley's claim about Nick McGuffin's reaction. And she claims that when Wayne McGuffin made this statement, that Nick laughed — that he thought it was funny. And I say to you, members of the jury, based on the evidence you've heard here today, that's not something that Nick

Exhibit 5001 at 1727

D9 129                                    Arguments

McGuffin would do.  You know from Margaret Downs — Buehner, I think her name is now — you heard her testimony that Nick was looking everywhere for Leah.  That he wasn't eating.  He wasn't sleeping.  He was chain smoking.  He was trying to find her.  He was wearing himself down physically.

And we know that to be true because on July 2nd he was taken to the Emergency Room with what was diagnosed as a grief reaction.  And you have the doctor's report in evidence as Exhibit 215.  Nick's not going to laugh about the shoe being found, because he wanted to know what had happened to Leah Freeman.

And remember Ms. Cagley's testimony.  This was not something — Nick's reaction that she told you about in Court is not something she told the police about when she told them this story.  Nor was it something she had testified to at Grand Jury.  It's something that just was provided for you in Court.  And therefore, I submit that that statement is suspect, and you should reject it.

We had some other statements.  The statement to Melissa Beebe, 2003.  Nick's at the courthouse for some proceeding.  Ms. Beebe says to him — yells at him, "How'd court go?"  And he says, "Good."

And so then she's irritated at his reaction and says, "Well, that's better than you deserve."  And it's only because of that that she's goading him.  He shouts across the

Exhibit 5001 at 1728

Arguments      D9 130

street to her, "Yeah, amazing what you can get away with in Coos County."  That doesn't mean anything.  It simply doesn't mean anything.

Over the course of all these years, and all this evidence, what we see is, there was never a time when Nick McGuffin could have caught up, or did catch up, with Leah Freeman, and abduct her or spirit her anywhere.  And if he had, it would have had to have been in the Mustang.  And there's no evidence of that.

And oh, the other thing about that little gray particle — gray paint particle is — the other thing the prosecution hasn't done is to compare it to somebody else in town who we know had a primer gray car, and that was Scott Hamilton.  That hasn't been done.

So, all of these things are reasonable doubts.  And they require you to find Mr. McGuffin not guilty.

And speaking of McGuffin, it's kind of interesting.  The great film maker, Alfred Hitchcock, had a technique that he called "the McGuffin".  And the McGuffin was where the characters in a movie would chase all over after this certain object when it really didn't have any meaning at all.  So, in the movie Casablanca, it was transit papers.  In spy movies, a lot of times it's paperwork.  In heist movies, it's a necklace.  In Pulp Fiction, it was the suitcase.

And really, members of the jury, that's what

Exhibit 5001 at 1729

D9 131                                    Arguments

we've got here, is we've got a McGuffin, and it's Nick McGuffin.  Because, you chase him all around.  You look at where he is.  You look at what he does.  You look at what he says.

Oh, and I almost forgot.  Richard Bryant.  He says to Richard Bryant, "I didn't have anything to do with it."  And I can — he's still — Nick is still haunted.  He's still haunted.  He can still see Leah laying there, because he's never going to be free of it because he feels guilty that he didn't protect her.  That he, as her guardian, did not save her.  If he'd have been on time, or he had convinced her not to go over to Sherry Mitchell's, this would not have happened.

And that brings us back around circle to his character.  And yeah, he and Melissa Smith did have a sexual encounter a couple weeks after the memorial service.  They were both drinking.  They were reminiscing about Leah.  And they sought out some solace between the two of them because they both cared so much about Leah.

But when you look at all of the evidence, Nick McGuffin is the (not understandable).

And I may have forgotten something, members of the jury, and if I have, I apologize; and I hope you rely on your notes.  Because, Mr. Frasier has the last word.  He has the burden of proof.  But the bottom line here is the State has not proven their case.  And if you, based on this

Exhibit 5001 at 1730

Arguments    D9 132

evidence, find Mr. McGuffin guilty, then the case is closed. But, what they really need to do is use this forensic evidence, and keep comparing it to people until they find out who really killed Leah Freeman.

And that's what we all really want, is justice for Leah. But, Mr. McGuffin, Nick McGuffin, is not guilty. He's not guilty. He's not guilty.

THE COURT: We'll go ahead and take about a fifteen minute recess, ladies and gentlemen. Remember the admonition. Take your notes into the jury room, and come back for final argument.

(Jury out.)

Two twenty-five.

Turn the air conditioning on.

(RECESS)

JUDICIAL ASSISTANT: All rise.

THE COURT: Be seated, please.

Mr. Frasier, you may give the State's final argument.

MR. FRASIER: Thank you, Your Honor.

Ladies and gentlemen, let's start with counsel's assertion that this was a relationship that was, in essence, good. The evidence that we have produced would indicate that that is not exactly true. Ms. Freeman clearly had issues with how she was being treated by the Defendant.

Exhibit 5001 at 1731

D9 133                                    Arguments

And, in addition to what I read to you earlier today, I would just draw your attentions to State's Exhibit 85 and 87.

For example, in 87, she starts off:

"Nick,. . ."

And these were found in the Defendant's bedroom.  These were actually delivered to him.

". . .I know you think this is chicken shit of me, but this, for me, is the best way of getting through to you."

She goes on, "Anyway, the reason I'm writing this is because changes have to be made."

State's Exhibit No. 85:

"Nick, okay, I don't understand how you can be such an asshole."

That's a healthy relationship?  Or, is this a relationship that's headed for trouble?  Is this really a good relationship?

Let's talk about the argument that the Defendant talked about in his statement with Sherry Mitchell — or, excuse me, with Chief Reaves.  Now, when he's talking to Chief Reaves, Chief Reaves asked him, "Now, does she have any problems with anybody?"  And the Defendant starts talking about the problem that night that Leah disappeared, at the Mitchell house.  But then he goes on to talk about something that happened a couple days before.  He starts talking about,

Exhibit 5001 at 1732

Arguments       D9 134

"Well, Peggy Mitchell did this," and, "Peggy Mitchell did this at the Fast Mart."  Okay?

Now, who's the source, that this occurred at Fast Mart?  It's the Defendant.  Because, you'll remember, I asked Peggy Mitchell, "Did you have a dispute with the Defendant or Leah Mitchell (sic) a couple days before at Fast Mart?"  And she says, "I don't remember that."

And again, we're back to how does the Defendant know all of this stuff that happened the night of June 28th?  Now, think about it.  Is Sherry Mitchell going to tell the Defendant, "Oh, by the way, I told Leah that you're a bad influence on her because you got her into drugs," and this, that and the other, and, "You shouldn't be around her anymore?"  Is she really going to tell him that?  No.  She's just going to say what she told you.  "We had an argument. She left."  Where is he getting all these details about this argument, unless he talked to Leah later than he's claiming.

Now, we do know that there's some sort of argument between the two that night.  But, we're not saying that it happened prior to Leah going over to Sherry Mitchell's is the sum total of what occurred.  We're not saying that. What we're saying is, there was friction.  And as I go through my final argument, here, that friction got worse and, again, exploded into this catastrophe that ended up in Leah being dead.  Things became worse.

Exhibit 5001 at 1733

D9 135                              Arguments

Now, one of the things that counsel talked about with you, "Well, we know the Defendant was telling the truth because of. . ." this, this and that.  Well, was he really being truthful with the police?  Now, one thing in particular I want to draw your attention to, Chief Reaves is asking the Defendant what happened.  And one of the things he says first, at the beginning of the tape, is, "Hey, listen.  This is a missing persons case.  We're trying to figure out what happened to Leah Freeman.  I don't care about any drinking, or anything along that line.  Tell me what's going on."

And you'll recall the Defendant said, "Hey, I don't drink and drive."  But, one of the things he leaves out on that statement on June 30th of 2000, is that he's running out to Johnson Mill Pond and smoking bowls of marijuana.  Apparently it's okay to drink — to drive after using marijuana, but he doesn't tell the police about that.

Nor does he tell them later on about him using methamphetamine that night.  And at the same time, he wants people to believe he's so concerned about where Leah Freeman is at.

Now, counsel talked about, "Well, you know, Richard Bryant must have — she must have already been past McKays when he left work."  Well, first of all, you have to accept the premise that Richard Bryant was wrong when he said,

Exhibit 5001 at 1734

Arguments       D9 136

"I was going to work," instead of coming from work which they said what he was doing.  He said he was working graveyard shift that night, and had to be there at 9:00.  "But, he must be wrong.  He must have worked four to nine, and had gotten off."

But, in any event, you'll recall I asked Sherry Mitchell if she'd ever walked home with Leah Freeman from her house.  And she said yes.  And I said, "Where did you — which route did you take?"  And it wasn't going straight down Fourth and up Central.  What she would do is take one of these cross streets back here, and come out either at Fast Mart or come out up here at Tenth Street.

Now, to say — well, first of all, Mr. Bryant had it wrong about when he went to work and when he got off.  But think about this.  If Leah walked the way she normally

- - -

MR. McCREA:    (Interposing) Excuse me, Your Honor.  That's malicious argument if it means he wouldn't have come down Fourth Street, because he testified (not understandable) came down Fourth Street.

THE COURT:    Overruled.

Go ahead.

MR. FRASIER:    If Leah (not understandable), went down part of Fourth Street and then turned onto, say, Cedar or Birch, people going down Fourth Street wouldn't have

Exhibit 5001 at 1735

D9 137                                    Arguments

seen her.

Now, here's something that's interesting. Counsel talks about Leah making a phone call to have Nick pick her up. Counsel said Leah was calling because Nick was late. Okay. How does Leah know she was — that Nick was late if she had left way before 9:00 from the Mitchell place. It doesn't add up.

Here's another question you need to ask yourself. When the Defendant goes to the Mitchell house and asks, "Hey, is Leah here?" And they say, "No, why are you asking?" "Well, I can't find her."

Who's idea was it to call Cory Courtright? It was the Mitchells'. In fact, they're the ones pushing the phone into his hand to get him to do that — to make that call. Would he have even made that phone call if he hadn't been pushed into it by the Mitchells? I submit he wouldn't.

Driving over the bridge. How do we know he turned around, as counsel suggests? Well, there's no evidence that he did. But, consider this. During the course of the trial we heard, I think either in opening statement or through questions put to the witnesses, that defense suggested he went over the bridge to turn around so he could come back into town. And the reason he did that was because the gate — he couldn't turn around at the park because the gate across the road was — was closed.

Exhibit 5001 at 1736

Arguments      D9 138

Well, when we put on the evidence that the gate is only closed when the water is high, "Oops, better change that story.  Better change that theory."

"The Defendant didn't want to go to the door of the Courtright home to tell them, 'I can't find Leah,' because he's scared of Cory Courtright — scared of her grandfather." Come on, now.  Think about it.  The Defendant wants you to believe that he's running around town trying to find Leah Freeman.  He's almost in a panic.  And do you think the fear that he might have for Cory Courtright is going to prevent him from going to her and saying, "Hey, Cory.  I'm sorry.  I lost her.  I don't know where she's at.  Is she here?"

Not once does he have the common courtesy that any young man who's taken a woman out on a date would do.  Remember the testimony that he was her guardian.  A guardian doesn't act like he acted.  A guardian goes to the responsible parent and says, "I can't find her."  The responsible thing would be to go to that door.  He didn't do it.

In the instruction that you have, the first instruction you have — it's about the Functions of the Court and Jury, things like that — part of the instructions towards the middle of it, it says, "Do not allow speculation, guesswork,. . ." and something else, ". . .to enter into your deliberations."  If you listened closely to counsel's argument, is there not speculation there — asking you to

Exhibit 5001 at 1737

D9 139                              Arguments

speculate?

For example, he tells you that the reason the Defendant was trying to fool around with Kristin Steinhoff was because he thought the — the victim was out partying. Was that not speculation about what he thought?

Or, he told Scott Hamilton not to go to the police and tell them about that incident there. And she gave you a couple of reasons. Is that not speculation? Consider that as you go through the deciding of this case.

You noticed that when Scott Hamilton says something that they like, he's telling the truth. But when he says something they don't like, he's not telling the truth? For example, you know, they say, "Well, you know he told Scott Hamilton that he wasn't driving the Thunderbird. Therefore, that must be the truth." But think about this. If he admitted to Scott Hamilton that he'd been driving the Thunderbird that night, that would be an admission that he switched cars that night. And why would he want to do that?

Let's take it a step further. If you notice carefully, everybody that has said something that hurts the Defendant in some way, must have got it wrong. For example, Dave Hall, when he said, "When I interviewed the Defendant, he said, 'I thought she was at a friend's house staying the night,' well, he must have gotten that wrong because what he really meant was that she was at home."

Exhibit 5001 at 1738

Arguments    D9 140

Or, "Sherry Mitchell must be wrong about when she said Leah left when she said it was closer to nine, and she must be wrong about what she told the Defendant."

Or, "Kathy Wilcox must have been wrong in her analysis (not understandable)."

Scott Hamilton I already mentioned when he says something they like, it's great. But when he says something they don't like, like the Defendant "telling me that he picked up. . ." — the Defendant said he picked up Leah and then dropped her off at McKays." Well, they don't like that.

Well, you know, he's having a grief attack. Well, that's true. He goes to the hospital and he's showing things of grief. But what's he grieving about? Leah Freeman is dead, and he knows it. We also know he — he did it. All these emotions he was showing are consistent with someone feeling the guilt, having taken the life of his girlfriend.

Let's talk a little bit about Mr. Meneely. If I understood Mr. Meneely correctly, he claims that he found what he believes to be a stab cut in the bra and then the shirt of Leah Freeman. They're not in the same locations. And so, he's claiming that in order for these things to match up, that the shirt had to have moved around in the course of a struggle.

Well, (not understandable) would say, "How reasonable is that proposition when you look at how well that

Exhibit 5001 at 1739

D9 141                                    Arguments

shirt fit Leah Freeman?"  If I understood it correctly, he's saying that this cut was somewhere in the left quadrant, and then it got pushed over and down so it also matches up with what he claims to be a hole in the bra that's a cut mark.

Well, let's look at this a second.  This is Defense Exhibit No. 145.  If I understood Mr. Meneely's testimony correctly, this edge here is a cut mark.  Now, what did Kathy Wilcox tell you that you look for in terms of a cut mark?  "Look for clean, straight edges.  If you see any unraveling and things along that line, it's indicative, more than likely, of something else."  How can you tell that there is a cut mark?  That's what Mr. Meneely wants you to believe.

In addition, this is Defendant's Exhibit No. 146.

And this, by the way, 145, I want to just show you, this is in the bra.  This is in the bra.  This is the mark Mr. Meneely claims, which is in the shirt, the stab mark, or whatever, in the shirt.  And Ms. Wilcox has looked at those, and talked about these raveling edges and so forth, not consistent with a stab (not understandable).  But, be that as it may - - -

Three labs looked at these clothes.  You've got the State Police looked at it in 2000.  You've got the English lab in 2001.  Micro Trace looking at in 2001/2011.  It's only Mr. Meneely that finds these things.

Exhibit 5001 at 1740

Arguments    D9 142

She examined those clothes in 2000. And you'll recall her testimony. And you'll recall the testimony of Jim Pex. Her work is double checked by him. She testified, "I did not see any marks in that shirt that were cut marks. Didn't see any holes in the shirt, or that bra, that were caused, in her opinion, by a sharp instrument (not understandable). Accordingly to Mr. Meneely, she must have missed it.

Okay. Now, the police are investigating what's happening — what happened to this young woman. We know the autopsy didn't reveal an absolute cause of death. It's extremely important for the police to find out as much as they can. Ms. Wilcox knew that. She's aware of that result. She's looking for whatever she can find to help the police. Is it reasonable to believe that she misinterpreted the marks? (Not understandable)?

Dr. Olson. Now, granted, Dr. Olson didn't take a magnifying glass or a microscope, or whatever. But he looked at those clothes, too. And here's a man who's dealt with I don't know how many different type of stabbing. And he wants to see if there's any extraneous evidence that Leah — of how Leah might have died. And there's this cut in the shirt. Now, it's one and a half centimeters. Okay? Three-quarters of an inch. You don't need a microscope to see this thing. He didn't see anything in that shirt that caused him to

Exhibit 5001 at 1741

D9 143                                    Arguments

believe that she was stabbed.  Of course, Mr. Meneely, would think that Dr. Olson missed it.

Now, stabbing or strangulation?  You know, it really doesn't matter.  In the eternal scheme of things, it doesn't matter.  Because the question still remains, who did it?  It doesn't matter.

Now, the defense says it does matter, and the reason they say it doesn't matter is because if she's stabbed, she would have bled.  And if she had bled, there should have been trace evidence of that in the car that Nick McGuffin had access to.

Now — and I guess apparently the defense believes that where Leah was found, is where her body was dumped.  So, whatever happened to her — she's stabbed, she's strangled, whatever — she's dead, and then she's transported to where she's found off of Lee Valley Road five weeks later.

Their theory is, if there's no trace evidence in the cars, then the Defendant didn't do it.

Now, the search of the Mustang.  When did that occur?  It occurred — well, if you'll recall, one of the things that Kathy Wilcox testified to, it appeared the seats had been wiped.  But - - -

MS. McCREA:    (Interposing) I object.  That was not the testimony.  She specifically - - -

THE COURT:    (Interposing) Just a minute.

Exhibit 5001 at 1742

Arguments        D9 144

I understand your (not understandable).

I'm going to sustain the objection because I don't recall that exact evidence.

Ladies and gentlemen, I — I'm sustaining the objection, but it's your recollection of the evidence.  That isn't the Court's.  But, on that point, I'll sustain the objection.

MR. FRASIER:    May we be heard outside the presence, because I do remember.

THE COURT:    Okay.

Step into the jury room, please.

(Jury out.)

THE COURT:    Just a minute.  Let me get to — I took some notes on her testimony.  I don't know what — what I recall her saying is something to the effect that that was vinyl and you couldn't get anything off of it.

MR. FRASIER:    I think she said in response to one of my questions — she was talking about looking at the seats, and that they appeared to have been wiped.

THE COURT:    I mean, — let me get to my notes.  I don't know whether I took it — I do — I recall — as I say, I recall the part where she said they were vinyl seats, and there's not much use going through those.  But, let me look.

MR. FRASIER:    The question I asked her, Your Honor, according to our notes, is we — I asked if she had done

Exhibit 5001 at 1743

D9 145                               Arguments

tape lifts of the seat, and she said, "No, because they were vinyl seats, and because it appeared they had been wiped clean."

THE COURT:   I do have the one part that says, "The car did not appear to be recently cleaned, and no blood was found.  And you do not tape lifts because it's a vinyl, and do not do a microscopic examination."  I don't have the part you have.  That doesn't mean it wasn't said.

What — do you show — Mr. Frasier has a specific recollection of what was said on that.  My notes have part of that.  And that was the part that I remember.  I don't have the other part.  Which doesn't mean I took notes on everything.

MS. McCREA:   What — what I have, Your Honor, is she was reading directly from her report from July 6th.  And she said, "The interior surfaces did not appear to have been recently wiped clean."

THE COURT:   That was more my recollection of it.  She said, "It did not appear to have recently cleaned." And I don't know that that referred to the outside, because I have a later note about the outside - - -

MS. McCREA:   (Interposing) No, it was the interior — the interior surfaces.

MR. FRASIER:   Ms. Soublet notes — she can give you a better — it's her notes I've been working off of.

Exhibit 5001 at 1744

Arguments      D9 146

MS. SOUBLET:    Your Honor, my recollection of her testimony is that she was talking about the outside of the car.  And I know that because she indicates, "There was no recent damage to the outside of car — noted recent damage to the outside of the car.  The left side was primer."  Talking about a small amount of gas leak.  Noted that the outside appeared to have been consistent with having been driven.  That there was dust on it.

But then, inside the car — Mr. Frasier was asking about tape lifts.  And I noted that she didn't do tape lifts because it was wiped clean, the vinyl seats, nothing there.

THE COURT:    Just a minute.

What date did she testify?  The 12th?

MS. SOUBLET:    The 13th, I believe?

THE COURT:    The 13th?

VOICE:    Yes.

THE COURT:    10:56?

I don't see — I don't have her starting at 10:56 on the 13th.

Let me look one more — there is it.  Okay.  All right.  Thank you.

Let me look at something.

Do you have that — Ms. Soublet, do you have that early in your notes?

Exhibit 5001 at 1745

D9 147                                    Arguments

MS. SOUBLET:    Somewhat.  It's on the second page — second full page of notes.  I didn't write down, I believe, everything when she was going over her qualifications.

THE COURT:    The only thing I can do, Mr. Frasier, is go back and listen to FTR, and I'll do that, because that's — and although there's notes taken about when a witness testifies, most of it is not that — you know, that detailed.

MR. FRASIER:    I — I understand that, Your Honor.  But that's our recollection of the testimony.

THE COURT:    Then I'll take a recess to listen to that part of the testimony.  That's the only thing I can do.

MS. McCREA:    And, Your Honor, I am also firmly convinced that Ms. Wilcox testified that the interior was — did not appear to be recently wiped clean.

THE COURT:    My notes reflect that it wasn't recently cleaned, and they don't do lifts on — on vinyl seats. But, I'll listen to the testimony.  This is a point of contention, and we have the right — we have the ability to go back and listen to it.  So, I'll go back and listen to it.

We'll be in recess until I - - -

(RECESS)

(Jury out.)

Exhibit 5001 at 1746

Arguments        D9 148

JUDICIAL ASSISTANT:    All rise.

THE COURT:    Be seated, please.

It appears from the testimony that you are both correct.  She did testify that the interior did not appear to be recently wiped clean — did not.  And then when Mr. Frasier asked her if she did a tape lift, she said, "No, it was vinyl, and it was clean.  Appeared to be wiped clean."

So, the testimony was both.  So, I'm going to overrule the objection, because it's going to be up to the jury.  But, she said two different things within a short period of time.

MS. McCREA:    Then, the problem I have is the prosecution limiting it to the one thing she said, then, as misleading.

THE COURT:    Well, the problem I have, of course, is I — you know, whenever it get these objections on what the arguments are, unless I'm positive about that, the general tendency is to overrule those because then I'm — I'm taking over what the jury is supposed to do.

And I don't know that I can limit him to say both of those.  I agree what I heard was both of them.  The first one was, "It did not appear to be recently wiped clean — did not."  And then the tape lift was, "It appeared to be clean — wiped clean."

So, I will give that — I mean, I have to

Exhibit 5001 at 1747

D9 149                              Arguments

overrule the objection because he — there's evidence in the record from which he can argue it.

The only other thing I can do is explain to the jury that she said two different things at different times. And then you can make your argument.

MS. McCREA:    I would request that, Your Honor.

THE COURT:    Mr. Frasier?

MR. FRASIER:    Leave it to the Court.

THE COURT:    Okay.

Bring the jury in.

(Jury in.)

THE COURT:    As you will recall, Mr. Frasier was making a — in his closing argument saying something about it appeared that the interior was wiped clean.  Ms. McCrea objected and said that wasn't the testimony.  In making my rulings, I can go back and listen to the testimony.  And it appears that Ms. Wilcox, at one time, said it appeared that the interior was not recently wiped clean.  She was then asked a question about lifting a print, and she said, "It was vinyl. I didn't because it appeared to be clean — wiped clean."

So, that the testimony that's before you, and I'll allow Mr. Frasier to continue with his argument to you.

Go ahead.

MR. FRASIER:    The objection is overruled?

Exhibit 5001 at 1748

Arguments        D9 150

THE COURT:    Objection is overruled, with the understanding that I just told you.

MR. FRASIER:    Well, let's move on.

Brent Bartley gave you testimony that prior to Leah disappearing that there was stuff in that trunk.  Then, unsolicited, he testified that after Leah disappeared, there was nothing in that trunk.  Okay?  The trunk was empty.

Now, trace evidence.  Let's talk about that a little bit.  Granted, trace evidence can solve cases.  But, as you heard from the experts, it's not that common event.  It rarely occurs.  And the reason is, trace evidence is fragile, easily disturbed, hard to find to begin with.  And as more time passes from the event that you're concerned about, the harder it gets to find this stuff.

Now, in this case, we know the Mustang was examined at least a week after Leah disappeared.  The Mustang — excuse me, the Thunderbird was examined almost a month later.  The chances of finding such evidence as time goes by, goes down.  Okay?

Now, does the absence of blood in either car exonerate the Defendant in this case?  And the answer is no.  Let's take it a step further.

You hear from Dr. Olson that a stab wound may not bleed significantly.  In order for there to be blood transferred into car — into the car, if she was stabbed, there

Exhibit 5001 at 1749

D9 151                              Arguments

has to be blood passing from the body.  And again, if the body is covered, there would be no blood transferred into the car itself.  So, the fact — the lack of trace evidence in this case, does not exonerate the Defendant.

Let's go a step further.  There's another problem with the stabbing theory.  And again, even though it doesn't matter, the stabbing theory doesn't explain the blood on the shoe.  Now, you heard from Jim Pex and you heard from Kathy Wilcox, about the concept of blood spatter.  And you heard that blood that falls out of a wound, or pumps out, leaves a splotch, or whatever.  But what was seen on that shoe was what was called impact spatter.  Ms. Wilcox described it between medium to high velocity.

Now, what does that mean?  If she was stabbed and the knife is pulled out, that is not going to account for the blood on the shoe because there has to be some force behind it, like a cough, or a sneeze — somewhere along that line.  All right?  So, stabbing does not explain how that blood got on the shoe.

Now, as we go through this case, you'll recall that when Mr. Fisher testified, they started asking him questions about, "Well, don't you have relatives up there by Hudson Ridge?  Don't you have a pickup truck?"  The insinuation was that Mr. Fisher had something to do with the death of Leah Freeman, until we pointed out he didn't get his

Exhibit 5001 at 1750

Arguments       D9 152

driver's license until the October after Ms. Freeman disappeared.  There's a problem.

Raymond Lewis.  Okay, here's another one. "Gee, Mr. Lewis must have done this because there's a receipt found. . ." not even on the same road.  But it's found on another secondary road about 100 yards away from where that shoe was found.  "Golly, Mr. Lewis must have done it."  But, there's a problem with Mr. Lewis doing it, because Wayne McGuffin says that shoe was planted to throw the police off. Okay?

See what's happening here?  "Oh, let's look at Raymond Lewis."  "Oh, let's look at Austin Fisher."  This is what they wanted.  Throw police off.

Well, let's talk about what other things are out there that indicates the Defendant did this to Leah Freeman.  Well, Brett Mauro.  What does he tell you?  "I seen Mr. McGuffin that night.  In fact, we both smoked some marijuana together.  And, he keeps telling me multiple times, quote, 'She's gone.'"  Gone?

Well, then we have Detective Ranger who talks to him a week later who the Defendant keeps referring — refers to Leah Freeman in the past tense.

Now, counsel talked about, "Well, of course he's going to do that because the shoe has been found."  When were the shoes turned over to the Coquille Police Department?

Exhibit 5001 at 1751

D9 153                              Arguments

You heard from Sergeant Smith.  You heard those dates.  When did this become public?  Think about that, ladies and gentlemen, because the dates — there's no way Nick McGuffin knew those shoes were in the possession of the police when he was talking to Mark Ranger.

The Defendant knew Leah wasn't coming back.  We have concern for Leah.  Sure, he's showing concern for Leah.  But, who is the ultimate source of that information about what he is concerned about?  The ultimate source there is the Defendant himself.  He's concerned about being caught.  He's concerned about being held responsible.  He's sad because his girlfriend is dead.  He couldn't just go home and hide in his room.  He had to go out and be seen in order to divert attention away from him.

Now, this is another interesting thing.  Note where he goes and who he goes with.  He never knocks on the door of her house.  When he goes someplace, he never — well, he never went farther out Fairview Road than Dr. Sinnott's place.  And he avoids the places where hard questions would be put to him about where Leah Freeman is at.  He avoids going and talking to Cory Courtright.  And where he goes, he goes to where his friends and his supporters are.  And when he goes someplace to look for her, he takes a supporter with him.

You'll recall in voir dire — and that's the questioning part when we talked with you before the trial

Exhibit 5001 at 1752

Arguments      D9 154

started — counsel asked you a question.  And that question is, "What type of evidence would you like to see in this case?"  And you all gave a variety of answers.  But, there was one answer that I was waiting to hear, but I didn't hear it.  And I didn't hear anybody say, "Admission," or, "Confession."  I think everybody would agree that an admission or a confess is pretty darned good evidence in a Murder case.

So, that brings us to Mr. Breakfield.  "Oh, he's lying.  He didn't tell anybody.  He wants the reward."  Well, you heard his testimony, ladies and gentlemen.  He didn't even know there was a reward posted.

Now, the other thing we have to remember, when this incident occurred, when he's being threatened by the Defendant, he's sixteen years old.  You looked at Mr. Breakfield.  Did he want to be sitting in that witness chair?  No, he didn't want to be here.  But, he came because he had something important to say.  He came and told you what this Defendant told him, which is, "I've killed before, and I strangled that bitch."

Here's another thing to think about.  Officer Smith had contact with the Defendant in 2009 at the home of his parents.  And the Defendant says, "I know who killed Leah Freeman."  But, he won't tell.  Golly, for a guy who has a lot of concern, who wants to see justice brought for his dead girlfriend.  Whoopee.

Exhibit 5001 at 1753

D9 155                              Arguments

What happened June 28, 2000?  Here is a reasonable explanation with the evidence you have heard in this case.  We have a relationship that, while at times is good, is in trouble.  And, as was stated in opening statement, toxic.  At times it's good, but it was bad.  And when it went bad, it was bad.

Leah is having second thoughts about this relationship.  She's got pressure from her mom.  The Defendant and Leah have a dispute about whether she should go over and see Sherry Mitchell that night.  Leah spends time with Sherry Mitchell.

An argument ensues about whether she should go jogging.  And then it ensues into, "My mom doesn't like me — your mom doesn't like me."  And then, it progresses into, "Gee, Leah, you know, you've changed.  You're doing things you shouldn't be doing.  Nick is a bad influence on you.  You ought to break up."  She unloads on her.

Leah is very upset at this point.  She leaves.  She's upset.  As she's walking away, she's thinking to herself, "Mom is right.  Sherry's right.  Maybe this is not something I should be in."

The Defendant finds her.  The argument get worse.  She walks away.  She leaves him.  Starts heading home, which would corroborate the testimony of Mr. Lindegren who saw them together; and also the testimony of Scott Hamilton, that

Exhibit 5001 at 1754

Arguments    D9 156

he dropped her off at McKays.

He gets really upset. "This is my Babydoll. This is my girl. No one else's." He finds her by the high school. He tries to get her into the car. She loses a shoe. She ends up with a bloody lip or a bloody nose. She screams, which is what was heard by Mr. Bounds. And in an effort to keep her quiet, or in anger, he strangles her.

And then it goes downhill from there. He panics, changes clothes, switches cars, body gets dumped. He has to cover for himself. Has to go around asking questions. "Where is Leah?" The pressure builds. He has guilt over what he did. He had that anxiety attack.

And then, as time goes by, we start seeing the arrogance. And then we get to the point of, "It's amazing what you can get away with in Coos County."

To close my argument, I'm going to paraphrase the words used by a prosecutor in a case back in the 1990s — a case in Mississippi. It was a 30-year old Murder case. And there had been a couple of attempts to prosecute the Defendant, and they had ended in a mistrial, hung jury. They tried again after 30 years. I'm going to paraphrase the words that were used by the prosecutor at the end, to close his argument.

On behalf of the State of Oregon, on behalf of the family of Leah Freeman, I am asking you in this case to

Exhibit 5001 at 1755

D9 157                              Final Charge

act boldly.  To hold the Defendant accountable for what he did to Leah Freeman.  Simply because it is right; it is just; and Lord knows, it's about time.  Is it ever too late to do the right thing?

The right thing, ladies and gentlemen, is to find him guilty of murdering Leah Freeman.

Thank you.

THE COURT:    If you'd turn to the last two instructions, the one starting Lesser-Include Offense - Order of Deliberation.

When you deliberate, you should first consider the charged offense of Murder.  Only if you find the Defendant not guilty of the charged offense, may you consider the lesser-included offense of Manslaughter in the First Degree.

Verdict.  When you return to the jury room, select one of your members to act as Presiding Juror.  The Presiding Juror has no greater voting weight, but is to preside over your deliberations, and be the spokesperson for the jury.  You should then deliberate and find your verdict.

On the charge of Murder, each and every juror must agree on the verdict of guilty to return a verdict of guilty of Murder.  Ten or more jurors must agree on a verdict of not guilty to return a verdict of not guilty of Murder.

For the charge of Manslaughter in the First Degree, ten or more jurors must agree on a verdict of guilty

Exhibit 5001 at 1756

Final Charge    D9 158

or not guilty to return a verdict as to Manslaughter in the First Degree.

When you arrive at a verdict, the Presiding Juror will sign the appropriate Verdict form. After you've reached the verdict, you will signal the Bailiff, and the Court will be reassembled to reach your verdict — or, receive your verdict.

You'll have one form of Verdict, and it has a place as to Count — as to Count 1, Murder, to check either Guilty or Not Guilty. And it tells you in the Verdict form what I've just explained to you. It explains the order of deliberation and the number of people that it takes to find either a verdict of guilty or not guilty. Please remember, in Murder, it has to be a unanimous verdict of guilty. It would be ten to two to find him not guilty of that. On Manslaughter, it's ten to two to find him either guilty or not guilty.

And there's, of course, a place to check either Guilty or Not Guilty of Manslaughter. If the Defendant is found guilty of Murder, then you don't go one to the Manslaughter charge. If he's found not guilty of Murder, then you do go on to the Manslaughter charge. Then you would find him guilty or not guilty.

The Presiding Juror has to sign and date this Verdict form, whether he or she agrees with the verdict or

Exhibit 5001 at 1757

D9 159                              Final Charge

not.

The instructions covering this case — the law, that is, are in the instructions I gave you. If you have a question about the instructions — that is, the law — you can have the Presiding Juror sign — write out a question and send it out. And after consulting with the attorneys, I will try to provide an answer to that as quickly as I can, because that's within my province, which is the law regarding the case.

If you have a question about the facts in the case, please do not send out a question. The facts are up to the jury. Not up to me. I can't tell you what the facts are. And if you send out a question asking me about the facts, that's the answer you would get. That's within your province, not mine.

Please don't ask to see any other evidence that wasn't admitted. I don't have the ability or the authority to bring you other evidence, because the parties have presented the evidence to you. That's it. And we don't play back the tape recording. You've all be attentive. You've all taken notes. And you can all talk — talk about this case and deliberate. But if we play one part back, we'd have to play the other part back, and basically we'd be playing the whole trial back to you.

So, you'll have in the jury room with you, the

Exhibit 5001 at 1758

Final Charge        D9 160

exhibits that were received, and the instructions, and the Verdict form.  And when you've arrived at a verdict, place it in an envelope that's provided to you.  You don't seal the envelope, but place it in there.  And do not announce your verdict when you come out.  I will be doing that by reading it in open Court.

(Bailiff sworn.)

With the exception of Mr. Watson, unless there are other — and he also may have a question — if anybody has any questions about the law, you can ask them now.  If not, you'll go back in the jury room.

And Mr. Watson, you would — you're the alternate in the case.  So, there's only twelve jurors that do that.  And I would ask, if you need to get anything, you need to leave your notes in there — or, give them to Ms. Cress, rather.  And then you would be excused and discharged from this.

I would ask that you not discuss the case with anybody until the jury has returned a verdict.  And if you wish to know the verdict, give Ms. Cress a phone number you could be reached at, and she would call you after the verdict has been returned to let you know.

In the meantime, until the case is finally decided by the jury, please do not discuss the case with anybody.  Okay?

Exhibit 5001 at 1759

D9 161                                Final Charge

Then, hearing no questions, if all of you would retire to the jury room.  Don't discuss the case while Mr. Watson is there.  He has to have a chance to leave.

You may go into the jury room.  And I would wait a couple of minutes so Ms. Cress has an opportunity to get all the exhibits in to you, and that sort of thing, before you start deliberations.

JUROR:    (Not understandable.)

THE COURT:    I don't care whether you keep those or not.  Just get your coat, and - - -

(Jury out.)

Mr. Watson, on behalf of the Court and the parties, I do wish to thank you for your service.  As you see, alternates are needed.  We had to use one alternate substitute.  And that's why we have alternates in these cases.

But, your service was very valuable.  And I — and I know I extend the thanks for the parties and myself just for being so attentive in listening to the case.

And you are discharged from this case.  Please remember my admonition.  And thank you again.

Before you go in, Cathy, I want to take the exceptions.

Mr. Frasier, does the State have any exceptions?

MR. FRASIER:    No exceptions, Your Honor.

Exhibit 5001 at 1760

Final Charge     D9 162

THE COURT:     Ms. McCrea?

MS. McCREA:     The defense takes exception to the Verdict form in that it has the first option as Guilty in contravention of the Defendant's right to the presumption of innocence, Your Honor.

THE COURT:     Okay.  You have that exception. As I said, I've — I think — I'm sure there's an exception, but in all the cases, that's generally the Verdict form I've used, and I've had people — even when I've used on similar to yours - - -

And I think in a couple cases, that has happened.  Juries have returned verdicts of guilty and not guilty, and the Verdict form has never been a factor on how they've returned verdicts.

You have that exception.

Okay.  As soon as we get all of the exhibits into the jury room, I'll release people.

(Exhibits are in jury room, and jury room door is closed.)

Okay.  You'll have to wait outside until the jury reaches a verdict.  We will be in recess at this time.

(RECESS)

(Jury out.)

THE COURT:     Just — Ms. Cress said the jury asked about time, and she said, "Don't worry.  Just take as

Exhibit 5001 at 1761

D9 163                                    Final Charge

much time as you need.  Okay?  So, I think that was

appropriate.

I might, at some poin this evening, at least by

6:00, I might send them home.  I'm not to have them deliberate

all night.  I think it's counter-productive to make people

who've worked all day, work late.  So, — but I'll let them go

for a while.  Okay?

(RECESS)

(Jury in.)

JUDICIAL ASSISTANT:    All rise.

THE COURT:    Be seated, please.

Ladies and gentlemen, I've — excuse me —

decided to stop the deliberations today and have you come back

tomorrow.  I mean, you've worked all day.  It's like making

people work overtime.  And I think it's counter-productive

after a while to make people work too late.

So, if you would come back tomorrow at 9:00 and

be here — there'll be another — there'll be another — I have a

non-jury trial starting tomorrow, but just come in.  In fact,

if you - - -

Can you — is 8:45 going to be inconvenient?

(Laughter.)

Somebody said yes?

(Laughter.)

JUROR:    (Not understandable.)

Exhibit 5001 at 1762

Final Charge        D9 164

THE COURT:    Okay.  Be here at 8:45, and then the other people — we can start the trial at 9:00.

But, this is really important to remember the admonition not to watch anything, do any research.  Don't talk about anything.

When you come back, wait until all twelve of you are present before you start talking about the case.  Don't — if two or three of you get in there, don't talk about it.  Wait until all twelve are present before there's any discussion at all.

And you make sure you're out there in the hallway — there were people out there, so that the jurors aren't talked to or anything.

Drive home.  Be back at 8:45.  And you can continue your deliberations at that time.

Do you want to stop people from coming in so the jury can go out?

Okay.  You're released for the evening.  Please drive carefully and have a pleasant evening.  Eight forty-five.

(Jury out.)

Okay, 8:45 tomorrow.

The jury has been out, I think, about two hours and fifteen minutes, and we sent them home at this point in time.  So, we'll — they'll begin — they're just going to go

Exhibit 5001 at 1763

D9 165                                    Final Charge

into the jury room.  When all twelve of them are present,

they'll start.  I'm not going to bring them out to do anything

specifically, like that.  And then I'll start my other trial.

And if we get — when we get a verdict, I will stop that and

bring everybody in.  Okay?  Just let Ms. Cress know where you

are.

MS. McCREA:    Thank you, Your Honor.

THE COURT:    Thank you.

MR. McCREA:    Thank you, Your Honor.

(END OF DAY NINE)

*                        *                        *

Exhibit 5001 at 1764

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

STATE OF OREGON,                          )
                                          )
              Plaintiff,                  )      CASE NO. 10CR0782
                                          )
                                          )          JURY TRIAL
         vs.                              )           DAY 10
                                          )
  NICHOLAS JAMES McGUFFIN,                )
                                          )
              Defendant.                  )
_____ )

TRANSCRIPT OF PROCEEDINGS

Volume 13, Pages D10 2-D10 7

        BE IT REMEMBERED That, the above-entitled cause

came on regularly for hearing beginning at 11:00 a.m. on

Tuesday, July 19, 2011, in the Circuit Courtroom of the Coos

County Courthouse in the City of Coquille, County of Coos,

State of Oregon, before the Honorable Richard L. Barron, and a

jury.

APPEARANCES

R. Paul Frasier, District Attorney for Coos County,
representing the Plaintiff.

Erika Soublet, Assistant District Attorney for Coos County,
representing the Plaintiff.

Shaun McCrea, Attorney at Law, representing the Defendant.

Robert McCrea, Attorney at Law, representing the Defendant.

        Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 1765

Verdict       D10 2

*                              *                              *

(Jury out.)

JUDICIAL ASSISTANT:    All rise.

THE COURT:    Be seated, please.

I'm informed we have a verdict that will be returned.  I want to make sure everybody in the courtroom knows there is to be absolutely no reaction by anybody at all, no matter what this verdict is.  And I will enforce that rule.  So, do not react in any way.

When the jury returns the verdict, and I've told you the verdict, the jury will then be allowed to leave.  Then the other people can orderly leave.

When you get outside the courthouse, if you want to have a reaction, it's fine.  But not in this courtroom and not in this courthouse.

Okay.  Bring the jury in.

And if you can't do it, leave now.

(Jury in.)

Ms. Hanks, you're the Presiding Juror?

PRESIDING JUROR:    Yes.

THE COURT:    Hand the verdict to Ms. Cress, please.

The jury's verdict is as follows.  In deciding whether the Defendant is — as to Count 1, Murder, we find the Defendant. . ."

Exhibit 5001 at 1766

D10 3                                    Verdict

I'm assuming, Ms. Hanks, - - -

PRESIDING JUROR:    Did I fill it out wrong?

THE COURT:    Yes.

PRESIDING JUROR:    I'm sorry.

THE COURT:    I'll have the jury go back — I'm not too sure exactly, but as to - - -

You're going to have to go back and look at it. You may have put your numbers wrong.  But, you'll have to go back and - - -

PRESIDING JUROR:    (Interposing) Okay.  Let me go (not understandable).

THE COURT:    All of you need to go back.

Cathy?

If you'd all go back into the jury room, and just stop, and — I'm going to have a copy of this made, and then I'm going to send it back — send it back with you.  Okay?

PRESIDING JUROR:    That's fine.

THE COURT:    All right.

(Jury out.)

We'll just stay on the record for a minute.

I just wanted to keep a copy of what we got originally, but I don't know — and I'll share that with you once — once we come back with the verdict, to make sure you have the right to make any exceptions, if you want, or objections.  But, I just wanted to keep a copy of this — the

Exhibit 5001 at 1767

Verdict        D10 4

original.

I'll make sure you have copies.  And before I receive the verdict, I'll make sure it's clear.  And I'll, undoubtedly, in this case, poll the jury so you'll have an opportunity, if you have an objection or exception, to make it.  But I'm not going to share it now, because it — it's something that — the jury has not returned a verdict yet.  So, I don't think it can be shared now.  But, you'll have plenty of time to do it.

Just let me know when they're ready.

(RECESS)

(Jury out.)

JUDICIAL ASSISTANT:    All rise.

THE COURT:    Be seated, please.

Okay.  Same admonition that I've given everybody.

(Jury in.)

Has the jury reached a verdict, then?

PRESIDING JUROR:    Yes.

THE COURT:    Okay.

"As to Count 1, Murder, we find the Defendant not guilty."  And that says ten to two.

"As to the Lesser-Included Offense of Manslaughter in the First Degree, we find the Defendant guilty."  And that is ten to two.

Exhibit 5001 at 1768

D10 5                                    Verdict

Now, ladies and gentlemen, I want to just poll you, just the raising of the right hand.

As to Count 1, it says, "Murder. We find the Defendant not guilty." And that is ten to two. Would the ten people who voted not guilty on the charge of Murder, raise their hand?

And that is ten to two.

As to Manslaughter in the First Degree, would the ten people who voted guilty raise their right hand?

And that is ten to two.

The original verdict that was returned as to Murder had ten guilty and two not guilty on it. And as to Manslaughter, it had ten guilty and two not guilty. So, the mistake was on — obviously they couldn't have found him guilty of Murder ten to two. That was a mistake. Those are the verdicts.

If counsel wishes to review both of these before I receive them, you may do so.

Do you wish to review those? Look at the two verdicts?

MS. McCREA:    Yes.

THE COURT:    Okay.

Ms. Cress, do you want to give that to Ms. McCrea?

Ma'am, you and you need to leave. Now.

Exhibit 5001 at 1769

Verdict        D10 6

Mr. Frasier?

If there are no objections or exceptions to the verdict — or, a request at this point in time, the verdicts will be received — the verdict will be received.

(No audible response.)

Hearing no objections, exceptions or requests, then the verdict as returned by the jury will be received.

Ladies and gentlemen, we thank you very much for your service on this case, and for your service to the community, in handling this case. You handled your responsibilities very well. You were very attentive and took notes. And you took your time on reaching your verdict in this case. And we all appreciate it.

Everybody else remained seated until the jury has a chance to leave the courtroom. Thank you.

And leave your buttons here, on the counter or wherever you are.

(Jury out.)

THE COURT:   Ms. McCrea, when did you want Sentencing set? I usually try to do those on a Monday at 1:30, but I will accommodate you if that's not working.

MS. McCREA:   Would August 22nd work for the Court, Your Honor? I have a matter in — I have a matter in Jackson County on both August 8th and August 15th.

THE COURT:   I normally don't set them out

Exhibit 5001 at 1770

D10 7                                    Verdict

that far.  Is there a reason?  I usually set it more quick than that — quicker than that.

MS. McCREA:    Well, we could set it for August 1st.

THE COURT:    That's fine.

MR. FRASIER:    That's acceptable, Your Honor.

THE COURT:    At 1:30?

MS. McCREA:    Yes.

THE COURT:    Mr. McGuffin, you're remanded back to the custody of the Sheriff.

Everybody else may leave the courtroom in an orderly and quiet manner.

(END OF DAY TEN)


*                              *                              *

Exhibit 5001 at 1771

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

STATE OF OREGON,                    )
                                    )
            Plaintiff,              )    CASE NO. 10CR0782
                                    )
                                    )    MOTION FOR NEW TRIAL
      vs.                           )
                                    )    SENTENCING
 NICHOLAS JAMES McGUFFIN,           )
                                    )
            Defendant.              )
_____    )

TRANSCRIPT OF PROCEEDINGS

Volume 14, Pages 1713-1743

            BE IT REMEMBERED That, the above-entitled cause

came on regularly for hearing beginning at 2:00 p.m., Monday,

August 1, 2011 in the Circuit Courtroom of the Coos County

Courthouse in the City of Coquille, County of Coos, State of

Oregon, before the Honorable Richard L. Barron.

APPEARANCES

R. Paul Frasier, District Attorney for Coos County,
representing the Plaintiff.

Erika Soublet, Assistant District Attorney for Coos County,
representing the Plaintiff.


Robert McCrea, Attorney at Law, representing the Defendant.

Shaun McCrea, Attorney at Law, representing the Defendant.


        Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 1772

1713

*                              *                              *

THE COURT:    State vs. McGuffin will be next.

I want to make sure, again, that people know that there is to be no reaction — nothing in this courtroom. This time it won't be merely sending somebody out of the courtroom.  You'll be going next door.

The record should reflect that I've received, uh, Ms. McCrea's — Defendant's Motion to Allow Contact and further investigation regarding prior matter, um, Mr. McGuffin's character letters in support, the Motion to Continue the Sentencing, the Motions against the Ballot Measures.  I've received the State's Response to both of those.  And I've now received a copy of a Restitution matter. And I've read everything.

So, I don't really care — the Motion to Continue — Continue the Sentencing is basically put forth based on the other matters; the Motion to Allow Contact until further investigation.

So, Ms. McCrea, anything to add to what you've already submitted?

MS. McCREA:    The State's Response, dealing with the — the Motion to Continue for Sentencing — that seems to be the preliminary issue, Your Honor — and the Motion to Allow Contact, which is essentially to provide further investigation - - -

Exhibit 5001 at 1773

1714                                    Motion

THE COURT:    (Interposing) By the way, I should indicate I received your email about you disagreeing with him of what year (phonetic) did what.  I think your recollection is correct.

MS. McCREA:    That — that was going to be the first thing I was going to say.

The — the second thing I would indicate to the Court, is the defense has ordered the CD's of the voir dire. Those are apparently ready for me downstairs.  And the request is made to have sufficient time to be able to review those, in order to determine whether there is additional information to provide to the Court, and to request a formal Hearing regarding contact with this juror.

The second aspect of the defense Motion, which we had (not understandable), in terms of a Motion to Seal, to not embarrass or cause issues for anyone involved in the case, concerns the matter of what occurred in open Court regarding the juror, Robert Welch.  And the issue in that regard is that two requests were made of the prosecution to provide us the police reports, or any notes of the Coquille Police Department, referenced in Mr. Frasier's two emails, concerning the contact with potential prosecution witness, Polly Parks (phonetic), who came forward about this contact — contact; and the investigation concerning the couple — the friends of Mr. Welch, the Phillips'.

Exhibit 5001 at 1774

Motion        1715

We have not been provided anything.  The latest Response I had from Mr. Frasier was that he did not believe that the police had prepared formal reports.  At that point, I specifically requested to at least have the names of those police officers so there could be an independent defense contact, in order to try to ascertain the circumstances here.

Now, I understand Mr. Frasier's position is the defense is now objecting to this juror having been released.  And that's actually a premature conclusion.  I fully accept the representations that Mr. Frasier made in his emails and to the Court during the time of Trial on July 18th, as an Officer of the Court.

The difficulty that I have, as the advocate for Mr. McGuffin, is Mr. Frasier's representations are based on what was told to him by someone else.  I don't have what that someone else did in terms of investigation; in other words, in this situation, the Coquille Police Department.  And of the fact that I don't even have names of any officers who took these reports, so that an independent investigation corroboration can be done, is problematic and of a concern regarding Mr. McGuffin's rights.

In addition, the defense attempted, through the defense investigator, several times to make contact with Polly Parks to discuss this matter with her.  And it appeared that she was abating having any contact with the defense.

Exhibit 5001 at 1775

1716                                    Motion

All of that raises red flags, which potentially down the line could become an issue in the event that there is an appeal or post-conviction relief. And the effort is being made now to simply be able to pin this down so there is a complete and adequate record.

So, based on those issues and the fact that we are only asking to have this matter go over to the following Monday when — I don't know the Court's schedule, but when I'm available. It is a very short question of the continuance. And it would allow us to make sure that the record is accurate and complete, Your Honor.

THE COURT:    If — if I understand what you're (not understandable) — attempting to do in relation to the Parks matter — as I recall, she didn't testify; she was a potential witness — is that — and this is somewhat conduluted (phonetic) — maybe it's condiluted because of the way I'm going to be stating it. But if I understand this correctly it's that you — after consultation with Mr. McGuffin — you specifically had time when Mr. McGuffin to talk you about Mr. Welch — indicated that you had — you had no position on whether he was excused or not. The State had a position. They thought he was excused. And I specifically stated, "Look. I think there is a bad appearance problem."

And I believe what Mr. Welch told me, that he had nothing to do with any this. And I then excused him

Exhibit 5001 at 1776

Motion       1717

because the State asked that he be excused.  And I had said that — and your — your position, along with Mr. McGuffin's position, was you didn't take a position on whether he was released or not.

So, the only basis I would think that you would be wanting to see him is to perhaps then show, "Well, we really would have wanted him because he might have been a not guilty verdict."

MS. McCREA:    Yes.

THE COURT:    Okay.

MS. McCREA:    That — that's all accurate.

And the only time - - -

THE COURT:    (Interposing) I just wanted to make sure that I understand that - - -

MS. McCREA:    (Interposing) No.

THE COURT:    - - - was the point you were - - -

MS. McCREA:    (Interposing) That's - - -

THE COURT:    - - - point you were making.

MS. McCREA:    That is exactly right.  And it is the concern of — and — and that's as nearly as we can tell because we haven't been able to obtain any of the investigation concerning the witnesses underlying Mr. Welch being called before the Court and examined — without even the names of the investigating officers.

Exhibit 5001 at 1777

1718                                          Motion

THE COURT:    Okay.

Mr. Frasier, do you have any argument on that point?

MR. FRASIER:    Well, first I would state that, uh, counsel has indicated she's asked for this information twice.  I, honestly, cannot say that I — you know, maybe she did ask a time earlier than Friday, but I can't recall one. The first I recall of this being in an email she sent Friday, which I responded to in saying, "I don't think they wrote any reports."

The officer involved was Officer Webley from the Coquille Police Department.  He's the one that interviewed Ms. Parks.  And it's my understanding that he interviewed the Phillipses, or at least one of the Phillips.

He did not write a report.  He was off this weekend.  So, I — I've had a chance today — even today — to talk to him about it.  So, in any event, that's where we are at on that.  That's all I have on that particular - - -

Well, I would add on the — regarding the other juror, in the context with Ms. Middleton — uh, Mr. Middleton — I spoke with Mr. Middleton today.  He indicates to me that he's been retired since the year 2007, and has not been actively employed, outside of basketball referring since 2008.

If I understood counsel's Motion, there was an allegation that it was a coworker of Mr. Middleton's that is a

Exhibit 5001 at 1778

Motion    1719

husband of the potential juror.  But, at this such time, he's indicating to me that he hasn't work since 2008 — outside the basketball referring.

THE COURT:    Uh, do you have anything else, Ms. McCrea?

MS. McCREA:    Well, this is news to me.  And that's another reason why I need to investigate this, Your Honor, to — to check this.  Because, of course, there has been disagreement between Mr. Middleton and Mr. McGuffin through the course of the past eleven years.

THE COURT:    Okay.  And, basically, this is all tied together.  So, do you have any other specific argument in relation — in relation to the Motion to Allow Contact.  I'm not talking about the Welch matter.  I'm talking about the new matter.

Any further argument on that?  Because that is all tied in to — excuse me — Motion to Continue Sentencing.

MS. McCREA:    No, Your Honor.

THE COURT:    Uh, the Court will deny the Motion to Continue Sentencing.  Because, basically, the first issue related to Mr. Welch — and the Court had brought to the attention of the parties that Mr. Welch, at times, appeared to be close to nodding off, and brought to the attention before anything else came up.  So, that was one matter that I brought to the parties' attention.  And then, this second matter came

Exhibit 5001 at 1779

1720                                        Motion

up.

Uh, and the basic premise here is that, "Well, I now want to go back and do an investigation to see whether, in effect, I would have objected at the time I was given the opportunity to object to his dismissal."  And, I gave, I think,the parties the time they want.  There wasn't any request for more time.  I think Ms. McCrea asked for time to consult with Mr. McGuffin.  They did that in Court.  It wasn't a lot of time.  But, there was not a request to do anything.

Mr. McGuffin was intimately involved in that conversation and in that decision to take no position of whether Mr. Welch was or was not excused.  And now, in effect, it's not timely.  It wasn't objected to.  And now, in effect, he's asking to come back and say, "Well, now I want to investigate because now I might want to raise an objection that I didn't raise when I had time to raise it."  So, that's no basis to continue his Sentence.

As far as the other matter goes, uh, even putting aside what Mr. Frasier just told me, I'm going to deny the Motion to Continue based on that Motion to Allow Contact. Because as I understand what is said, is that the juror may have — may have — knowing somebody who knew somebody — a spouse that had somebody that might have worked with somebody related to this case.

Uh, the — by the way, the Court did go back and

Exhibit 5001 at 1780

Motion        1721

listened to the entire voir dire that would have involved this juror in question.  And the main problem with that is that it's extremely hard to hear all of — all of the answers that were given.  I went back and listened to, uh, my voir dire of that particular juror, and then the general voir dire of Ms. McCrea, which I think lasted maybe forty minutes.  I'm not quite sure.  And Mr. Frasier's, which last basically one minute.  Because I think this was the third panel that we called.  She was a member of that particular panel.

And, I looked at her questionnaire, also, which indicated she didn't know anybody involved.  Hadn't talked to anybody about this case at all.

And so, there is really nothing other than pure speculation about what this is.

Now, there is — and Ms. McCrea sited the civil case involving this issue.  And in that case, the Supreme Court had reversed the Trial Court — or, the Court of Appeals, for allowing a new trial.  Basically, in that case, that juror in there had — had stated during voir dire that she knew the Defendant, but didn't disclose that she thought the Defendant — that is, it was a Civil case; I think a malpractice case — didn't disclose that this doctor, she felt, had saved the life of one of her relatives.  And in that case, the Court said, "Well, that's not sufficient to allow a Motion for a New Trial based on that."

Exhibit 5001 at 1781

1722                                        Motion

There is a case that I've found that's closer in point, State vs. Miller, which is 167 OR Appeals 72.  A 19 — a 2000 case in which a prison guard was on the jury and indicated that he did not know the Defendant.  And later during deliberations indicated that he recognized the Defendant from prior incarcerations.  And he had also said other things during deliberations.

And the Court said that wasn't sufficient.  They — they — one juror had reported this to — to defense counsel.  And defense counsel had asked for a Hearing.  And the Court gave a Hearing but didn't allow contact with the juror who might have violated conditions.  But, they did allow the contact from the — they did allow a Hearing relating to the juror who was reporting the other juror.  And they didn't allow a Motion for New Trial in that.

And they — and they — and they sited the Urseguard (phonetic) — Ernsguard Case (phonetic), which is the case sited by defense counsel.  That's Ernsguard vs. Beard, 310 OR 486, a 1990 case.

Anyway, the Miller Report specifically wrote, at Page 78, "Defendant also argues that the Court should have granted a new trial because Herring. . ." — that is the juror in question — ". . .lied by omission during voir dire, when she failed to respond to the Court's question about whether any juror knew Defendant."

Exhibit 5001 at 1782

Motion    1723

"He points out that during jury deliberations, Herring stated that she recognized Defendant from his previous incarceration.  It would probably have been better for Herring to have given that information during voir dire.  However, there is a difference between recognizing a person at a distance and knowing the person.  Herring did not claim any personal acquaintanceship with the Defendant during deliberations and incorrectly assumed that he had gang tattoos, which indicates that she had not had any direct contact with him."

"Her failure to speak up during voir dire is not a sufficient basis for the Court to grant the Motion for a New Trial based on juror misconduct."  And I think it's not even a basis for granting a Motion to Allow Contact, because this is even farther removed than that.  It's speculation that something may have happened, with nothing to show, other than the fact that possibly her husband may have known somebody that's involved with the Freeman family.  So, there is not even enough to grant that Motion.  So, those Motions will be denied.

And, now you have your arguments on Ballot Measure No. 11.  Do you have any argument on that?

MS. McCREA:    I do, Your Honor.

THE COURT:    Go ahead.

MS. McCREA:    It is our position that the

Exhibit 5001 at 1783

1724                            Ballot Measure 11

Court should apply the framework from the Rodriguez-Buck case to Mr. McGuffin's matter.  The three standards being the comparison of the severity of the penalty and the gravity of the offense, Number One.

Number Two, the specific circumstances of the Defendant's conduct that come within the statutory definition of the offense, as well as other case-specific factors, such as the characteristics of the Defendant and the victim, the harm to the victim, the relationship between the Defendant and the victim.

And Number Three, the Defendant's criminal history, including lack of criminal history.

Putting together Numbers One and Two, the comparison of the penalty and the gravity of the offense, and the specific circumstances of the Defendant's conduct, we noted at the outset — as the Court well knows — that Mr. McGuffin was acquitted of the charged count of Murder in this case.  He was found guilty of Manslaughter in the First Degree.  But, it is our position that there was no evidence to support the element of the physical act.  That is that the death was caused under circumstances manifesting extreme indifference to the value of human life.

In this case, based on the evidence, there was no cause of death.  There was no manner of death.  And this element, the element of the physical act, remains unproven.

Exhibit 5001 at 1784

Ballot Measure 11          1725

So, at best, in terms of comparison, the severity of the penalty and the gravity of the offense, and the specific circumstances here, this element is unproven. And the Court should, at best, impose a penalty of the mandatory minimum of 75 months for Manslaughter in the Second Degree, based on the mens rea of recklessly without the additional physical act and element of under circumstances manifesting extreme indifference to the value of human life.

Now, it is also the defense position that there was no proof of any mens rea in this case, concerning Mr. McGuffin.  The prosecution theory, which came up finally in rebuttal, was that Mr. McGuffin found Leah Freeman, and that she decided to break up with him.  And despite all of the happy letters she wrote to him around the time of graduation, when everything was going very well — close in time to when she disappeared — that Mr. McGuffin reacted and killed her. And it is our position that that simply does make any sense. There was simply no motive and none stated in the evidence for Mr. McGuffin to do this.

The characteristics of Mr. McGuffin and Ms. Freeman indicated that close in time to when she disappeared, their relationship was very good.

Now, in terms of the harm to the victim, there is no question that the harm was the most extreme that can be, in that Ms. Freeman was discovered approximately five weeks

Exhibit 5001 at 1785

1726                          Ballot Measure 11

later, and that she was dead.

The relationship, as I said, had — had become a good relationship.  The characteristics of the two of them were such that while Ms. Freeman, the evidence showed, would express herself physically toward Mr. McGuffin when they had arguments — that Mr. McGuffin never expressed himself physically back.  In other words, he never lifted a hand to her.

And what we know, based on the evidence in doing the comparison of both the penalty and the gravity, and the specific characteristics of the Defendant's conduct, is that Mr. McGuffin's actions on June 28th were such that if he had sought to abduct Ms. Freeman or to act violently toward her, that she was not a shrinking violet.  That she had hit Nick McGuffin before.  He had not hit her back.  She was not going to accept any kind of abduction or violation of her person without a fight.  And she would have, and probably did, fight back.  And yet, there were no defensive wounds on Mr. McGuffin.

We know from the evidence that Mr. McGuffin was stopped by Officer Zavala around 10:30 the night of June 28th.  We know that he also stopped by Officer Danny Lee at 12:03, just after midnight, on June 29th.  So, both of those officers had contact with Mr. McGuffin.  They had an opportunity to observe him.  He was not disheveled.  His clothes were not in

Exhibit 5001 at 1786

Ballot Measure 11        1727

disarray.  There were no scratches or cuts.  There was nothing they observed of him out of the ordinary.

And then we look at his actions afterward. Mr. McGuffin immediately went to Cory Courtright's when she called him on June 29th, that morning, to say that Leah had not come home.  He went with her to the police on June 29th to file the Missing Person Report.  He went to the police and made a statement to them on June 30, 2000.  And he also went back to the police on July 5, 2000 and made additional statements.

We also know, from the testimony of Officer Perske, that photographs were taken of Mr. McGuffin.  And those photographs were of his face, his hands, and his torso. And there was nothing indicative of him having been in any kind of struggle with Leah Freeman or anyone else.

In terms of specific circumstances, the Court should also consider the Mustang.  Mr. McGuffin gave his consent for the police to seize and take his Mustang, and to search it to their heart's desire.

The testimony of Mark Perry, who had previously owned the Mustang before Mr. McGuffin, was that it had never had a liner in the trunk.  There was no jack.  There was no spare tire.

And Barbara Carr, who also came in to testify, said she and her husband had done renovation and rehabilitation of that car.  That the car had gas tank leaks.

Exhibit 5001 at 1787

1728                          Ballot Measure 11

That the window in the back leaked, and that caused rust.  We had the photographs in evidence of the rust in the back of the car.  And we know from the Jury View that it was a gravel road to Mr. McGuffin's parents' house.  And thus, by fair in — inference, a person would not — meaning Mr. McGuffin — would not keep matters in the trunk because anything in the trunk would smell of gas.  It would become wet because of leaks when it rained.  And dust would come in because of that leak, as well.

Additionally, as has been harped on over and over, there was no forensic evidence to corroborate the claim that Mr. McGuffin abducted Leah Freeman.  There wasn't time for him to go to his parents' and change cars.  And if he had, it would have had been at the time that he saw Officer Zavala, and Leah would have had to be in the car at that time.  There would have been some trace evidence.  There wasn't.  It didn't happen.

Mr. McGuffin did not change his clothes.  It was stated by the prosecution that he had.  But the witness in question, Kristin Steinhoff, specifically indicated that she did not remember that happening.

So, in terms of the comparison of the severity of the penalty and the gravity of the offense, and the specific circumstances, we can't say that this was reckless. We can't say it was with manifest disregard for the value of

Exhibit 5001 at 1788

Ballot Measure 11        1729

human life.  And therefore, there is a challenge based on Rodriguez-Buck, in terms of proportionality, under Article 1 Section 16, in the US Constitution.

Further, in terms of specific circumstance, the prosecution, in its Response to the Defendant's Motion, indicates that Mr. McGuffin lied to the police.  And, yeah, that's true.  He didn't tell them that he had been using drugs earlier that night, or later that night with Kristin Steinhoff.  It was a liable omission.  Why?  Because he knew it would get him in trouble if he told them he had been using drugs.

In this case, Your Honor, the prosecution has done a masterful job of character assassination concerning Mr. McGuffin.  The evidence came before the jury that he had used drugs, that he was not faithful to Leah Freeman, and that he had been in jail.  The basis and intent was to make Mr. McGuffin out to be a bad person.  And it was very effective in terms of the accumulative effect.

But, in terms of the specific circumstances, again, on June 28, 2000, Mr. McGuffin didn't know where Leah Freeman was.  And he believed, rightly or wrongly, that she might be off with someone else, which is why she told — he told Scott Hamilton, "If you see her with another guy, beat the guy up and bring Leah home."

He hung out with Kristin Steinhoff because it

Exhibit 5001 at 1789

1730                          Ballot Measure 11

was a — a payback attempt, which he aborted and then went out looking, again, for Leah.  And at this point in time, nobody knew that anything was amiss.  Her mom didn't go looking for her.  Her sister didn't go looking for her.  Sherry Mitchell went down to the park, and then went home.  She didn't go looking for her.

All in all, we have a cumulative effect of setting up propensity evidence, but we don't have the evidence that showed what was found, in terms of the verdict — a reckless act in manifest disregard for the value of human life.

The prosecution also says in their Response, that Mr. McGuffin told Lieutenant Pat Smith that he knew who did it — who — who killed Leah.  Which comes back to the efforts that the McGuffin family was making to try to assist law enforcement.  And Mr. McGuffin provided law enforcement with a letter from Alisa Mashad, who believed that she had been in a car with Bill Sero and Tom Stemmerman, and that they had hit Leah Freeman with the car, and that Alisa Mashad had been with them when that happened.  Alisa Mashad is now in the State hospital.  She is not a credible witness for either side, but that was what Mr. McGuffin believed.

And then, finally, let's deal with the Hudson Ridge shoe.  Because the testimony was — and the specific circumstances were, that supposedly Wayne McGuffin indicated

Exhibit 5001 at 1790

that the shoe had been put on Hudson Ridge to mislead the police.  The witness, Christy Young Cagle (phonetic), came and then said — for the first time during her testimony — that Wayne McGuffin had said that, and Mr. Nick McGuffin, in response to that, had laughed or had thought it was funny.  Although, she had never said that to police before, nor had she said it to the Grand Jury.

And really, why would putting the shoe on Hudson Ridge mislead police anyway, because Ms. Freeman's body was found somewhere else?  And Wayne McGuffin never indicated that he or Mr. McGuffin, Nick — his brother — had ever been involved with anything concerning that shoe.

Nick McGuffin, in terms of specific circumstances, has been consistent in the people that he has talked to, in telling them that he is innocent, that he is not guilty of this charge.  He told that to David — he told that to — I'm sorry — Richard Bryant when he was in jail.  Told that to Pat Smith, when Pat Smith and Chief Dannels came out to his house in October of 2009.

Now, of course, we are clear that there were two people who were contrary, David Breakfield and Melissa Beebe.  But both of those instances, Mr. Breakfield's credibility was shown to be questionable and Ms. — Ms. Beebe had a — an axe to grind because Ms. Freeman is her cousin.

All in all, when we look at those two factors,

Exhibit 5001 at 1791

1732                          Ballot Measure 11

the Rodriguez-Buck factors indicate that the Court should consider this a disproportional sentence — the hundred and twenty months — to what occurred here.

And the third factor, Mr. McGuffin's criminal history, it's true.  He's got a couple of misdemeanor convictions for Trespass.  But, they are only misdemeanors. And that's all he's got.  And so, overall, in the context of everything, it is our position the Court should apply Rodriguez-Buck, should find it disproportional under the Oregon and US Constitution to Mr. McGuffin, and should impose a less onerous sentence.

THE COURT:    Ms. Soublet?

MS. SOUBLET:    Thank you.

Your Honor, I will stand on my brief.  I just want to touch on a few things that counsel said.

First, I would take exception to the argument that there is no indication as to cause of death — or, manner of death because Dr. Olson testified that the cause of death was homicidal violence of a undetermined type.  That the manner of death was homicide.  What counsel appears to be asking for is for the Court to set aside the jury's verdict of Manslaughter in the First Degree and enter a conviction for Manslaughter in the Second Degree.  And I don't believe anything out of Rodriguez-Buck allows the Court to do that.

The points counsel makes are ones she made

Exhibit 5001 at 1792

Ballot Measure 11        1733

during the Trial.  The jury chose to disregard that and to accept the State's version of the evidence as being — what they found to be true.  And I believe counsel can prove, uh, any one of the three parts of State vs. Rodriguez v. Buck three-part test.

And I would ask the Court to impose the mandatory hundred and twenty months sentence.

THE COURT:    Anything else, Ms. McCrea?

MS. McCREA:    No, Your Honor.

THE COURT:    Uh, the Court has read those matters.  And, of course, the — the jury is the one who is the finder of fact, and makes the decisions in this case, under the instructions.

Uh, and before I go on to — on to this Motion, I might indicate when I listened to the voir dire of the particular juror in question, in addition to being very difficult to hear, there was nothing that I heard on it that would have shown — thrown any light on it, on anything that could have been in relation to this Motion.  In fact, I don't recall that juror particularly saying anything.  If she did, it was something that was very hard to hear.  There was nothing in there, particularly.  And her questionnaire, as I said, indicated she knew no one.

Uh, as far as this Motion goes, the Constitutional challenge has basically already been ruled on

Exhibit 5001 at 1793

1734                              Ballot Measure 11

by the Oregon Supreme Court and this Court is bound by those decisions, and has no right to overrule what the Oregon Supreme Court says.

As far as the specific case that put out this test about whether or not the Court can, uh, determine that in a — in a particular case that a particular sentence is harsh, or would in — in a sense, shock moral conscience of all reasonable persons — I don't think they specifically said that that's what — and they — that it has to do that.  But, they've specifically said here - - -

I mean, I'm not too sure that you could ever get there when there is a human being that has been killed.  That in and of itself is the ultimate — the ultimate injury to anybody.  They are dead.  They are not here.  Uh, so that in and of itself — and this is not disproportionate in the other types offenses that we are talking about.  It's a Class A Felony.

What concerns me a little bit is some of the argument — I realize you are making it in relation to the Rodriguez matter.  But, some of it sounds close to argument to the jury or to a Motion for Judgement of Acquittal.  And I listened to that, also — both that Motion and the renewal of the Motion.  And, basically, those Motions were kind of general.  No evidence of a crime.  No evidence that Mr. McGuffin did it.  And, uh, confession alone is not

Exhibit 5001 at 1794

Ballot Measure 11          1735

sufficient to have a conviction.  And those were the only Motions.

There wasn't any specific things said about Manslaughter.  In fact, I don't recall either counsel were really arguing Manslaughter too much the jury when they argued the case.

But, uh — you know, there were instructions. The State requested Manslaughter in the First Degree.  That was not accepted to.  There was no other request for any other lesser included crimes.

So, part of this would be asking the Court to, in effect, on its own Motion, decide that, "Well, there is no evidence of Manslaughter One.  I can reduce that to Manslaughter Two on my own," which I don't believe that I can. Especially in — in the light of no exceptions, or any — or, when no requests for further lesser included's in this matter.

But, in weighing the factors that came out in Rodriguez vs. Buck, uh, there was not only a killing in that matter, but the body was just thrown off the side of the road. And that, in of itself, I don't think most people would think that it would shock the conscious if somebody might get a ten year sentence on somebody that they have been convicted of killing and disposing of a body in that way.

I mean, in this case, the family couldn't even recognize the victim.  It had to be done by a stranger with

Exhibit 5001 at 1795

1736                                    Sentencing

dental records.  So, I don't think it matches any of the criteria in Rodriguez vs. Buck.

So, the Motion, uh, against Ballot — on Measure 11 cases, that Motion would be denied.

Now, I've read the letters on the support of Mr. McGuffin.

Do you have anything else to say on behalf of — in the way of Sentencing?

MS. McCREA:   I would — I actually have a number of additional character reference letters, which were just provided to me this afternoon.  I haven't had an opportunity to show them to counsel.  So, I don't have copies.

MR. McCREA:   Give them to him.

THE COURT:   Uh, counsel, want to see those letters?

MR. FRASIER:   No.  They are fine.  We'll let the Court look at them.

THE COURT:   These are all additional — in addition to what you put in here?

MS. McCREA:   Yes.

THE COURT:   Okay.

You can put it on pause while I'm looking at these.

(RECESS)

MS. McCREA:   Your Honor, Pastor Rick Stevens

Exhibit 5001 at 1796

Statements        1737

is present and would like to address the Court just very, very briefly on Mr. McGuffin's behalf.

THE COURT:    Uh, normally, that — I mean, I don't take those type of comments because that opens it up to everybody making comments.  And, I guess, if you want to call him as a witness you can.  Then he's subject to cross examination.  But, you know, I normally don't take that — but, you have a right to present evidence.  I just wouldn't allow him to make a statement at this point in time unless he is subject to cross examination.

MS. McCREA:    Well — and I don't want to put him in that position because that — I don't that is fair to him.  So, um, we'll forgo calling him.

I would indicate to the Court that, um — that there was a back and forth between the parties on Restitution. The defense had indicated, as parts of its Motion to Continue, that it would be objecting to the Restitution.  That that issue has been worked out between the parties.  And so, the total Restitution amount is $1,738.

And our request, under ORS 137.106(4)(a), would be for the Court to make a determination here that Mr. McGuffin does not have an ability to pay the Restitution Judgement at the present time.  He's been in custody since August of last year.  And put in the Restitution Judgment that the — the payment schedule should be established by the

Exhibit 5001 at 1797

1738                            Statements

supervising authority in this case, as opposed to imposing it
on him to pay immediately.

The — the Court is in a situation where this is
a Ballot Measure 11 offense.  There is a mandatory minimum
sentence of a hundred and twenty months.  The prosecution has
not asked for anything additional.  So, I am assuming the
Court is going to impose what it must, which is a hundred and
twenty months.  And, I would simply ask for leave to respond,
if necessary, to anything brought up by the prosecution before
sentence is imposed.

THE COURT:    Mr. Frasier, I normally go with
the State first, but we were on this.  So, - - -

MR. FRASIER:    Your Honor, we don't have
anything further to add.  And the family of Ms. Freeman waives
any further — well, they — they do not wish to address the
Court at this point.

THE COURT:    Okay.

Mr. McGuffin, would you stand, please?

Do you have anything else to say, on your own
behalf?

DEFENDANT:    Yeah.  I'm — I do.

THE COURT:    Go ahead.

DEFENDANT:    I'll say that, um, I've been
pretty quiet through the last — past eleven years through this
Trial, its proceedings, and, obviously, for a good reason.

Exhibit 5001 at 1798

Statements          1739

Um, as you can see, anyone and everyone who has claimed to have talked to me has twisted my words around, has used them against me, or has completely lied about what I've said all together.  People also have stated that I've said things that God knows, Leah knows, and I know in my heart and soul, that I would never say.  That's why I've chose to read from this paper, so no one can claim I said any different.  I'd be happy to give anybody a copy so I don't get misquoted once again.

I will say one thing — or, actually, make that three things.  I'm innocent.  I'm innocent.  I'm innocent.  I've always claimed my innocence.  And people who try and say any different are lying, committing perjury, and getting away with it.  I won't say names.  They know who they are.  But, I will tell you this, I'm not going to stop claiming my innocence.  Not now.  Not ever.  And maybe — just maybe, one day people will start to see it, believe it.  But, in the meantime, you are putting an innocent person in jail.  You are tearing me away from my daughter and my family.

Not only did our precious Leah get her life so wrongfully take away from her, and now you are taking my life away from me — an innocent man's life.

I'd never wish — I'd never wish any mother to lose her daughter, especially the way Leah's mother, Cory, has lost hers.  And it truly saddens me that someone took Leah

Exhibit 5001 at 1799

1740                              Statements

away from her mother so quickly.  But, on that same note, this someone, whoever they are, they took Leah away from me, as well — my princess, my babydoll.  This is not justice by putting an innocent person in jail while the guilty person, or people, are still out there walking free.

And for that, I never wish anyone to have to walk in my shoes.  Not only did I lose someone I truly loved, cared about, and was devoted to, but I've also been betrayed, forgotten, used, judged, despised, hated, and treated like the scum of the earth by so many.  And on top of all that, I've been blamed and wrongfully convicted of a crime I did not commit and never could have committed.

It sickens me to think people can think that of me.  And I would never wish anyone to have to deal with that, not even my worst enemy.  As this has been the hardest thing to live through in my life.  And now it has become even harder with the injustice that's being served to me today.

I'd like to say just a few more things.  And it's that I've heard — we have heard many lies throughout this whole trial.  And I'd like to comment on them.  Forensic and evidence don't lie.  It speaks for itself.  It's not impartial.  It's not biased.  It's not emotionally involved. What it is, is absolute.  Forensics and evidence are true, hard facts.  They don't lie.  They can't lie.

But, I do know something that does lie, and

Exhibit 5001 at 1800

Statements       1741

it's people.  And we have definitely seen that in this Trial. My attorneys have even gotten key State witnesses to admit that they were lying under oath.  So, answer me this, how many more of those State witnesses were lying?  I know more were lying then there was ones telling the truth.

So, once again, forensics and evidence don't lie.  People lie.  They will.  They have.  And the big thing in this case is the forensics and evidence points away from me.  And that's why the District Attorney never talked about it at all, not one bit.  That right there should show my innocence and explain for itself.

So, follow the forensics.  Follow the evidence that's there.  It won't lie.  That will only lead you to — but the people will, and have.  And that will only lead you down the wrong path, to the wrong person as — as in my case.

And as like one of my attorneys, Shaun McCrea, has stated an Alfred Hitchcock film about the McGuffin, it being a signature in his movies, that the McGuffin was the scapegoat that lead to nowhere.  It was innocent.  And that's exactly what you have here.  I'm the McGuffin.  I'm the innocent scapegoat.

I'd like to say to all my friends, all my family, my loved ones, all my supporters, and for all of you who believe in me, I thank you so much for your support.  I'm forever grateful.  And my heart goes out to you all.  That's

Exhibit 5001 at 1801

1742                                        Judgment

what get's me through each and every day.

My innocence will be shown.  It will be proven. The fight's not over, not now, not ever.  Not until this wrong is made right.  I know, my family knows — Leah included — and many who believe in me know, this is wrong.  It's just wrong. It's unjust.  This is far from justice.  And we are still waiting to have this made right and for this decision to be overturned, and for me to be released so we can get the person, or people, responsible for this crime.  And that there would be true justice.  Justice for Leah.

Thank you, Your Honor.

THE COURT:    It will be the Judgement of the Court that you be sentenced to the legal and physical custody of the Oregon State Corrections Division for a period of 120 months.

Uh, parole thereafter would be a period of three years.

You are ordered to pay the Restitution for the amount of $1738.  That will be payable, as ordered by the Post-Prison Supervision Board.  Although, if there are moneys available to you in any accounts or earned, that money should — would be going to pay Restitution — pay the Restitution beforehand.  That would show some ability to pay.  But, generally, with somebody incarcerated they are not going to be able to pay it until afterwards.  But, money in — that you

Exhibit 5001 at 1802

Judgment      1743

have available to you, would be used to pay, uh — pay on the Restitution.

Uh, the people have enacted Measure 11, Mr. McGuffin.  And that is the sentence that the Court is required to impose, and is imposing on you.

It's tragic that a young fifteen year old girl is dead.  It's tragic that she was disposed of the way she was.  It's also tragic that somebody your age gets sentenced to prison, but you've been convicted of her — of causing her death.  In that sense, uh, the sentence is appropriate.

You will be remanded to the custody of the Sheriff for transportation to the Oregon State Correction Facility.

MS. McCREA:   And credit for time served will be DOC, Your Honor?

THE COURT:   Time served is automatic under the law.

*                          *                          *

Exhibit 5001 at 1803

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

STATE OF OREGON,                    )
                                    )
            Plaintiff,              )     CASE NO. 10CR0782
                                    )
                                    )     MOTION FOR NEW TRIAL
      vs.                           )
                                    )
 NICHOLAS JAMES McGUFFIN,           )
                                    )
            Defendant.              )
_____     )

TRANSCRIPT OF PROCEEDINGS

Volume 14, Pages 1744-1788

        BE IT REMEMBERED That, the above-entitled cause
came on regularly for hearing beginning at 8:56 a.m., Friday,
September 9, 2011 in the Circuit Courtroom of the Coos County
Courthouse in the City of Coquille, County of Coos, State of
Oregon, before the Honorable Richard L. Barron.

APPEARANCES

R. Paul Frasier, District Attorney for Coos County,
representing the Plaintiff.

Erika Soublet, Assistant District Attorney for Coos County,
representing the Plaintiff.


Robert McCrea, Attorney at Law, representing the Defendant.

Shaun McCrea, Attorney at Law, representing the Defendant.


        Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 5001 at 1804

Email Received from Donald K. McMichael, Technical Support Specialist for Coos County Courts, 12/13/11:

I listened to that entire day including the initial video appearance earlier in the court session. The initial video (from another location) came across fine as it was in a controlled location with limited background noise. When the McGuffin portion began I was listening live in case a problem were to arise. The location where Mr. McGuffin was being held had a considerable amount of background noise which was translating through the echo cancellation system. This "interference" was further compounded by the increased volume of people in the courtroom, media equipment, cooling system active, etc. The courtroom equipment lacks the capability to analyze and eliminate multiple sources of interference with 100% perfection. I was able to interpret what Judge Barron was saying by increasing the gain on Channel #1 albeit with some difficulty.

One of the solutions that I have found works very well in enhanced interference environments such as what took place in CTRM1 is to have the person on the far end of the video session "mute" their microphone and only activate it if they need to respond to a question or interject testimony. We have similar issues with the local jail as the video conference equipment is located in an area which acts like a giant echo chamber and the sounds of cell doors, inmates moving, etc can create interference within the FTR recording.

In this particular session I was not in a position to instruct the far end of the video conference to reposition or mute the microphone. The court staff is aware of potential interference issues but was unable to cope with the large amounts of media equipment allowed into the courtroom as well as the total amount of people in the gallery.


Signed by:

Kyle McMichael
Oregon Judicial Department
Tech. Support Spec.
541-396-2121 X259

Exhibit 5001 at 1805

1744

*                              *                              *

(With exception to defense attorney, the following proceeding was mostly not understandable due to background noise.)

THE COURT:    You've got to get your client on the - - -

(Whereupon video communication was established with the client.)

THE COURT:    Can you hear me?

DEFENDANT:    Yes, I can.

THE COURT:    (Not understandable) is here in the Court.  I just want to let you know.

DEFENDANT:    Okay.  Yeah.  I can actually see her.  So, - - -

THE COURT:    I don't — I don't know how to — other than turning this on to look at you, I don't know how to see that.  (Not understandable.)

(Not understandable.)

THE COURT:    Do you want him to see Ms. - - -

DEFENDANT:    No.  No.  No, I can see her.  I got — it's — it's a split screen.

THE COURT:    (Not understandable.)

DEFENDANT:    Okay.

THE COURT:    That's fine.  He's fine.

Okay.  All right.

Exhibit 5001 at 1806

1745

Ms. McCrea, this your Motion. And I've read the Motion. (Not understandable.)

Go ahead.

MS. McCREA: Your Honor, the defense has subpoenaed Officer Chris Webley concerning the Robert Welch matter, and I propose to call him at this time.

He's outside.

MS. SOUBLET: Your Honor, the State would object on the (not understandable.) (Not understandable) evidentiary (not understandable) Officer Webley's testimony (not understandable). So, I don't know that (not understandable).

THE COURT: (Not understandable.)

Uh, Ms. McCrea, the concern I have is — and I'm just looking at it quickly. The Motion is for a New Trial. And criminal cases generally fall (not understandable). Let me make sure.

And there is nothing in there — it refers to Affidavits and Declarations but not (not understandable). I mean, I looked at it real quickly here, but there is nothing that allows — that's done by Affidavits (not understandable) Affidavits for Declaration (not understandable).

MS. McCREA: Does it specifically prohibit testimony, Your Honor?

THE COURT: It doesn't prohibit it, but it

Exhibit 5001 at 1807

Motion for a New Trial        1746

does specifically say that it's done by Affidavit Declaration (not understandable).  (Not understandable.)  (Not understandable.)  (Not understandable).

I think specifically, such as, you know, Summary of Judgment Motion (not understandable), but I'm not sure.  So, I think they know how.  But, starting that precedent (not understandable) supposed to be done by an Affidavit (not understandable).

Is this merely saying what he did in relation to Mr. (not understandable)?

MS. McCREA:   I believe so.  The problem that the defense has — and it's referenced on Page 24 of the defense Motion for New Trial — is that the first time that the defense was told who the officer in question was — regarding this investigation, was at the Hearing on the Defense Motion to Postpone, prior to the Sentencing on August 1st.

And at that time, no reports or notes had been provided.  And no reports or notes that Mr. Webley have provided — have been provided since that time.  So, what I did was to subpoena Officer Webley.

I just had contact with him out in the hallway, in which he indicated to me that he did prepare a report.  He declined, which I understand — he declined to let me look at it without the District Attorney being present.  So, I have not been in a position to be able to provide any further

Exhibit 5001 at 1808

1747                         Motion for a New Trial

information to the Court or counsel absent bringing him here to Court with a subpoena duces tecum, to bring any reports and notes, so this matter can be further investigated.

So, what I would suggest, Your Honor, is either, One, I call him as an offer of proof, and have him testify to what he did in the — in terms of this investigation.

Or, Two, if the Court is not amenable to that, that I obtain the report from him and have that marked as an exhibit, and tender it as part of the defense (not understandable).

THE COURT:   I — I guess, the concern, of course, is that (not understandable) I don't know what your office did or did not do in relation to contacting the officer between that time and the Motion for a New Trial, which I believe had to be filed within ten days of the Judgment.

Uh, (not understandable) Officer Webley to get the Affidavits from him.  Now, it may have been he said, "Well, I won't give you an Affidavit."  But, we don't know that because your office did not contact (not understandable) and say what happened.  (Not understandable.)

Uh, (not understandable) I guess we could have been in a position where he would have — he would have said, "I won't give you an Affidavit."  Then it may have been that you would have done something to accommodate that without

Exhibit 5001 at 1809

Motion for a New Trial        1748

having contact with (not understandable).  Uh, there is no
Affidavit.

As far as your offer of proof goes, the main
concern I have here is that as far as Mr. Welch goes, it is
somewhat moot.  The State (not understandable) you and — and
your client.  (Not understandable.)  So, assuming that you
could come up with something, I think that I'll waive (not
understandable).

So, I don't like to make — I don't (not
understandable) offers of proof.  I don't like (not
understandable.)  (Not understandable.)  I don't want this to
turn into a long hearing.  And if you are satisfied with the
report, as opposed to calling him, and marking it as an
exhibit, I would prefer that.  And I can — if he comes in, I
can order you to — I can order him to give it to the Court.

Did you — have you seen the report?

MS. SOUBLET:    No, Your Honor.  And I just
think the record should be clear that once counsel filed the
Motion for a New Trial, she never asked the State for a report
from Officer Webley.  (Not understandable.)

THE COURT:    Well, I can order him to give
you, uh — turn it — turn it over to the Court — (not
understandable).

MS. McCREA:    Well, that — I — I want to make
some kind of offer of proof.  So, if that's the Court's

Exhibit 5001 at 1810

1749                         Motion for a New Trial

preference, I would — I would prefer to do that.  I will

indicated no, Number One, we did not make an attempt to

contact Officer Webley because our experience, throughout the

pendency of the — this case, is that police officers have

declined to have any contact with the defense and have

referred us back to the District Attorney's office.

I did not — Number Two, I did not make an

additional request for reports or notes because I had already

made a request of the District Attorney's Officer for that.

And — so, this was how I approached it, was through the power

of subpoena simply because the State was contending the

Affidavit submitted was not sufficient.

THE COURT:    (Not understandable.)

MS. McCREA:    I can do it.  I'm closer,

Your Honor.

THE COURT:    Officer, it's my understanding

that, uh, there is a report in question that Ms. McCrea asked

to see and you said not without the District Attorney's

Office, which is understandable.

And, uh, what I'm going to do is order you to

give me a copy of it.

Now, I have not read this.  I'm not going to

read it.

Cathy, would you make a copy for both counsel?

Can you wait for one minute, please?

Exhibit 5001 at 1811

Motion for a New Trial          1750

VOICE:    (Not understandable.)

OFFICER WEBLEY:    (Not understandable.)

THE COURT:    I think that's already in the record.

MS. McCREA:    I would ask that we have the copies on the record, as well, Your Honor, please?

THE COURT:    (Not understandable.)

You don't want a copy of your subpoena?

MS. McCREA:    I'm sorry?

THE COURT:    You don't want a copy of your subpoena?

MS. McCREA:    I don't need a copy of the subpoena, no.

THE COURT:    Is that sufficient for your proof — for the offer of proof?

MS. McCREA:    Yes, it is, Your Honor.

THE COURT:    Okay.

You are free to leave.

Uh, whatever you (not understandable).  I might say that my reference to Summary Judgment (not understandable) talking about having depositions taken (not understandable) not necessarily (not understandable).  So, (not understandable).  You know how to say whether his testimony allowed Summary of Judgment (not understandable) other than the fact the Court can order depositions in that case.

Exhibit 5001 at 1812

1751                        Motion for a New Trial

Uh, do you want to mark that as 1-0 — I don't what - - -

(Not understandable) - - -

MS. McCREA:    (Interposing) Do you want to start with 101 for this Hearing?  Or, - - -

THE COURT:    (Interposing) Why don't we just make it 301, then we'll know it's (not understandable).

MS. McCREA:    Okay.

No.

THE COURT:    Do you want them just all stapled together?

MS. McCREA:    That's fine.

THE COURT:    That would be the report plus the emails that went between the District Attorney's Office and the (not understandable)?

MS. McCREA:    Yes.

And then, additionally, Your Honor, I have what I would offer to the Court, for the purpose of this Hearing, as — we listed it as Respondent's Exhibit 302.

JUDICIAL ASSISTANT:    (Inaudible response.)

MS. McCREA:    Which — it's fine with me, Ms. Cress, as long as we all know what it is.

But, this is — this the excerpt of the closing argument of the State, Your Honor.  And I have a copy for prosecution.  It's now Defendant's Exhibit.

Exhibit 5001 at 1813

Motion for a New Trial          1752

I will also indicate to the Court that I attempted to obtain the Court record of the — the Hearing we had on July 5th, including the Court's rulings on the defense Motion in Limine.  The CD that I received ended up being a duplicate of testimony of another witness.  So, the person who is doing the transcriptions was unable to transcribe that information for me to provide to the Court and counsel.  But, I do have the prosecution closing argument which would be (not understandable.)

THE COURT:     (Not understandable.)  You are putting that in the record mainly in relation to the closing argument (not understandable) one argument concerning Mr. Frasier's statement about (not understandable).

MS. McCREA:     It is also in relation to the defense argument concerning the character evidence.  And it is in relation to the issue of the Motion for Judgment of Acquittal.  So, it applies to all three of those - - -

THE COURT:     (Interposing) Okay.

MS. McCREA:     - - - issues.

THE COURT:     I (not understandable) some portions of (not understandable.)  (Not understandable.)

MS. McCREA:     And the Court now has the - - -

THE COURT:     (Interposing) (Not understandable) - - -

MS. McCREA:     - - - transcript of the closing.

Exhibit 5001 at 1814

1753                          Motion for a New Trial

It is only the closing and the rebuttal of the prosecution.
It is not the defense closing.

THE COURT:    Okay.

Go ahead.

MS. McCREA:    Your Honor, concerning the issue
of what I will characterize, for the ease of discussion, bad
character, it is the defense position that it was error for
the Court to admit evidence of Mr. McGuffin using drugs.  This
included evidence of using marijuana the night of June 28th,
2000, at the Johnson Mill Pond, the evidence that he used
marijuana the night of June 28, 2000 with Brett Mauro, and the
evidence that he was smoking methamphetamine with Kristin
Steinhoff the night of June 28, 2000, or the early morning
hours of June 29th.

Secondly, it was error to admit evidence that
Mr. McGuffin had been in jail.

Third, it was error to admit evidence that he
had sex with women other than Leah Freeman, including the
testimony that he had sexual intercourse with Megan Davidson
after the disappearance of Leah Freeman but before her body
was found.  That he had sex with Melissa Smith after the
memorial for Leah Freeman, after her body was found.  And that
he had attempted to have sex with Ms. Steinhoff the night of
June 28, 2000 or the early morning hours of June 29th.

Additionally, it was error to admit the

Exhibit 5001 at 1815

Motion for a New Trial        1754

statements of Wayne McGuffin, via Christy Young Cagley, that the shoe was planted on Hudson Ridge.

It was error to admit the statement, I'll characterize it — on the courthouse steps by Melissa Beebe, where she claimed that Mr. McGuffin said, "It's amazing what you can get away with in Coos County."

And finally, was an error to admit evidence of what I would characterize as a confrontation and altercation testified to by Donna Dennis, by Adam Shinar, and by another individual, concerning Ms. Freeman dropping photographs and Mr. — Mr. McGuffin reacting to that.

It was error because - - -

THE COURT:    (Interposing) Well, (not understandable).

MS. McCREA:    But, Ms. Freeman had dropped some photographs on the ground and Mr. McGuffin had reacted. And I apologize.  I don't recall which witness mentioned that.

It is the defense position that there was the unfair, prejudicial effect of this evidence.  Each one of these items separately, as well as accumulatively, denied Mr. McGuffin substantial rights, such that he could be entitled to a new trial.

In this situation, the prosecution had an entirely circumstantial case.  And it is the defense position — although, I recognize the Court disagrees, (not

Exhibit 5001 at 1816

1755                    Motion for a New Trial

understandable) the Motion for Judgment of Acquittal — it is

the defense position that but for testimony of Dave Wakefield,

and the claim that Mr. McGuffin said to him, in 2002, "I

strangled that bitch and I'll kill you too," or words to that

effect, that there would not have been enough evidence for

this case to go to the jury.

We know from the evidence, that Mr. Breakfield

testified during the Trial that he believed what

Mr. McGuffin allegedly said to him was a confession.  It

occurred in 2002.  And Mr. Breakfield never told a living sole

about this contention, ever; year after year, after year,

until finally, police talked to him very recently and

questioned him.  And it is the defense position, that it is —

would not be reasonable for a jury to convict Mr. McGuffin

solely on the testimony of Mr. Breakfield.

And Mr. Breakfield's testimony was significant

because the prosecution refers to it twice in closing argument

— at Transcript, Page 6, Line 18 and Transcript 29, Lines 22

through 23 — and again, twice in rebuttal — at Transcript

Page 45, Line 20 through 23, and Page 46, Lines 8 and 9.

In this case, the prosecution skillfully

designed their presentation to create a dislike of

Mr. McGuffin.  But, the evidence that was presented was not

relevant and it was more unfairly prejudicial than it was

probative.

Exhibit 5001 at 1817

Motion for a New Trial       1756

This essentially amounted to character assassination of Mr. McGuffin and allowed the jury to give more weight to circumstantial evidence then they would otherwise.  Stated simply, it put Mr. McGuffin in a position where the jury would decide he was a, quote, "bad person" unquote.  It was propensity evidence and led them to believe he was someone who would do this — who would kill Leah Freeman.

Dealing specifically with the drug use, the defense admits it is irrelevant whether Mr. McGuffin was smoking marijuana on June 28, 2000.  It's irrelevant whether he was smoking at the Johnson Mill Pond, and it's irrelevent whether with Brett Mauro that night.  And Brett Mauro was specifically mentioned, by the prosecution in closing, at Transcript 44 — Page 44, Line 5.

The evidence may have been relevant if it had been used for rebuttal if Mr. McGuffin had testified concerning his ability to perceive and remember.  But, it was brought in in the prosecution's case-in-chief, and it was not relevant to show any consciousness of guilt or any kind of knowledge.  It was also — and the — the use of drugs was also brought up, in terms of the marijuana in rebuttal, onranscript Page 33, Lines 8 through 10 and 12 through 15.

The sum of this evidence was unfairly prejudicial because it communicated to the jury that

Exhibit 5001 at 1818

1757                          Motion for a New Trial

Mr. McGuffin was the kind of person who uses drugs.  He uses drugs when his girlfriend disappears.  But, there is no claim that this drug use had anything to do with her death.  Therefore, it was not relevant, nor — and it was more unfairly prejudicial then it was probative.

And likewise, with the evidence of Mr. McGuffin smoking methamphetamine with Kristin Steinhoff.  Both parties agree, the defense and the prosecution, that Leah Freeman disappeared by 11:30, when Tony Messerle found the shoe in the cemetery.

The evidence of Mr. McGuffin smoking methamphetamine with Ms. Steinhoff was - - -

THE COURT:    (Interposing) (Not understandable.)

MS. McCREA:    At the cemetery — by the cemetery.

I — I'm sorry, Your Honor.  I'm saying "cemetery," as opposed to Hudson Ridge.  That's the distinction I'm making.

THE COURT:    All right.

MS. McCREA:    Yeah.  On the road, by the cemetery.

THE COURT:    (Not understandable.)

MS. McCREA:    The smoking of methamphetamine occurred after that, sometime after 11:30.  And actually,

Exhibit 5001 at 1819

Motion for a New Trial     1758

after 12:03 when Mr. McGuffin had been stopped by Officer Danny Lee — the second police stop of the evening.

Smoking methamphetamine has nothing to do with what happened to Leah Freeman.  It has no relevance.  But, it is especially unfairly prejudicial because using methamphetamine has a much stronger societal stigma than one using marijuana.  And it has a strong bearing, the admission of this evidence, about the how the jury was led to feel about Mr. McGuffin in this case.  The drug evidence should not have been admitted.

Likewise, when we get to the evidence of the attempted sex with Kristin Steinhoff.  Given the timing of that, and the circumstances, and the way it was presented, it had no relevance to what happened to Leah Freeman.

In fairness, arguably, there may be an argument that could be made that the attempt of sex would show some state of mind of Mr. McGuffin concerning his relationship with Leah Freeman, more than any kind of use of methamphetamine. But here, that evidence — the evidence of attempted sex — was likewise more unfairly prejudicial then it was probative of anything because they didn't have sex.  He left the house and went to look for Leah.  The drugs and the attempted should not have been admitted.

Additionally, concerning sexual activity, there was testimony that Mr. McGuffin had sex with Megan Davidson

Exhibit 5001 at 1820

1759                        Motion for a New Trial

after Leah was missing but before her body was found.  Again, in terms of relevance, this did not tend to show anything relevant concerning Mr. McGuffin's relationship with Leah Freeman.  And was too attenuated to be relevant to — to the issues in the case.  And is was, under 403, more unfairly prejudicial to Mr. McGuffin because it was only designed to turn the jury against him.

He was not in the community, dressed in black, (not understandable) on his head.  And, essentially, what this evidence did — combined with the other evidence — was to put Mr. McGuffin in a position of moral culpability, which the jury then translated into legal culpability.  It was propensity evidence and they used as a basis improperly to convict (not understandable).

Additionally, there was evidence of Mr. McGuffin having sexual contact with Melissa Smith one time.  It was after the memorial was held for Leah Freeman.  This, as well, was not relevant because it was too attenuated.  It didn't show Mr. McGuffin's relationship with Leah Freeman.  It had no other relevance.  But, (not understandable) under 403, it was unfairly prejudicial, especially because of the accumulative effect.

The jury is being told Mr. McGuffin is a druggie.  He's a very sexual being.  They didn't like that.  And especially the nine woman jurors, they held it against

Exhibit 5001 at 1821

Motion for a New Trial        1760

him.  He's a bad person.  And that coupled with Mr. Breakfield's claim.  Made it more believable because the jury believed he was a bad person.

THE COURT:   I just want to say for the record, you are saying (not understandable).  (Not understandable.)  (Not understandable.)

MS. McCREA:   And I'm saying that there nine woman jurors.  And my inference would be there would be more likelihood that they would react to this evidence.  Yes, the Court - - -

THE COURT:   (Interposing) Whether that is true or not, as far as the men and woman who don't like him, that's — that (not understandable) being somewhat old school (not understandable).

MS. McCREA:   When we add to that the evidence that Mr. McGuffin had been in jail, which came through two separate witnesses — First, the testimony of Richard Bryant, who is in custody with Mr. McGuffin.  Mr. McGuffin — the testimony of Mr. Bryant was that Mr. McGuffin indicated to him that Mr. McGuffin can picture Leah laying there.

And, Secondly, told Mr. Bryant that Mr. McGuffin had nothing to do with it — had nothing do with Leah Freeman's disappearance or her death.  Evidence was actually exculpatory.  And the fact that Mr. McGuffin made statement while he was in jail with Mr. Bryant, had no

Exhibit 5001 at 1822

1761                          Motion for a New Trial

relevance whatsoever.

But, in addition, the State then called somebody from the jail, Darius Mede, to confirm that Mr. McGuffin had been in jail on certain, particular dates. Not only was there no relevance, but evidence served only for lack of Mr. McGuffin's character, additionally, to the drug use and his sexual activity.

So, now the jury has been told Mr. McGuffin is a drug abuser — and not just pot, but hard drugs like methamphetamine; he's promiscuous and has sex different woman; and he's a law breaker and an outlaw because he's been in jail. And, thus, the jury can infer from this character evidence that he broke the law once so he must have done it here.

This is shear propensity evidence, Your Honor. And it's very powerful, but it was not justified.

And then, in addition, we add to this evidence the statements of Melissa Beebe, the so-called courthouse-steps statement. She had contact with Mr. McGuffin in 2003 in reference to another court case, not this case. And that is when she reported he said, "It's amazing what you can get away with in Coos County." Now, the context of that conversation was that she said to him, "How did your court case go?" And he said, "Very well." And she said, "It's better than you deserve." And then he responded with, "It's amazing what you

Exhibit 5001 at 1823

Motion for a New Trial    1762

can get away with in Coos County." The prosecution then parlayed this into a confession.

And the prosecution, during closing, talked about the fact that Mr. McGuffin was a little bit arrogant. That's at Page 3 — sorry — Page 30, Line — beginning at Line 2.

"As I indicated, it's time to hold the Defendant accountable. It's been eleven years. We submit the Defendant think he's above the law. He's gotten away with it for eleven years, and thinks he can still get away with it for eleven years. What's the evidence to support that? The statement he made where he said, 'It's amazing what you can get away with in Coos County.'"

So, the State is specifically telling the jurors that this statement is related to the death of Leah Freeman and that Mr. McGuffin is confessing to it in the sense that he is saying, "Yeah. I killed Leah and I got away with it." Because otherwise it doesn't have any relevance because it would refer to the current case that Mr. McGuffin was dealing with, not the Leah Freeman matter.

But, of course, the defense position is it's — it's unfairly prejudicial and it doesn't have anything to do with the Leah Freeman case whatsoever. But, the cumulative effect we have is that the jury is being told Mr. McGuffin is

Exhibit 5001 at 1824

1763                          Motion for a New Trial

a drug abuser; he's promiscuous; he's an ex-con; he's been in jail; and he's arrogant; and he's bragging about killing Leah Freeman.

And, in fact, in this case — the circumstance evidence case — there was nothing concerning any motive.  Leah Freeman had written to Sherry Mitchell the night that they had the fight and she left, that she and Mr. McGuffin were getting along better.  There were positive notes written by Leah Freeman to Mr. McGuffin, which I read in to the jury at the Trial, near graduation.

Mr. McGuffin did testify, and Mr. Frasier did note that in his closing, that Leah was very happy that night.  And Leah's mother, Cory Freeman, has learned that she was very happy that night.  We had a lack of any physical evidence.  We had all the people who saw Mr. McGuffin on June 28, 2000, (not understandable) two police officers.

But, none of that mattered to the jury because we had so much propensity evidence concerning Mr. McGuffin, that they didn't like him.  And because of that propensity evidence, they believed that he would act consistently with the information they had of him, in terms of drug, sex, committing crimes, and bragging about killing, that they found him guilty on the circumstantial evidence in this case.

And then, the icing on the cake was the testimony of Christy Young Cagle, when she said that Wayne

Exhibit 5001 at 1825

Motion for a New Trial        1764

McGuffin said the shoe had been planted on Hudson Ridge, and the Nick McGuffin laughed and thought it was funny.  Now, there is no indication of what was funny.  What there was, was Wayne's, and we had an offer of proof with this before the Court allowed it into evidence.

But, this was a situation much like the situation in the movie "My Cousin Vinny", where the Defendant who is accused is being questioned by the officer.  And the Defendant says — the guy says, "We shot — we shot the Clerk." And the Defendant says, "I shot the Clerk?  I shot — I shot the Clerk?"  In the Trial it comes out as "I shot the Clerk, I shot the Clerk."  The Defendant said, "I shot the Clerk".

And so, we don't have the flavor of this.  We have simply, what Ms. Cagle is reporting, without anything to indicate that, in fact, it was an adoptive admission on the part of Mr. McGuffin.  But given all else that the jury heard about Mr. McGuffin — about Nick McGuffin, they are going believe it.  They are going find it consistent with his bad character.

And this was something that the prosecution argued to the jury.  In the closing argument, at Page 29, Lines 18 to 21, the prosecution indicated that Mr. McGuffin — "Defendant agreed with his brother Wayne that the shoe was planted to throw the police off."  And in rebuttal, at Page 43, Lines 18 to 24, the prosecution specifically

Exhibit 5001 at 1826

1765                    Motion for a New Trial

discounts the issue about Raymond Lewis and the receipt dated in May — the end of May — that had been found up on Hudson Ridge, by naming Raymond Lewis in the receipt, and saying again that Wayne had said the shoe was planted.

So, the cumulative effect of all of this character evidence, especially when combined with the Breakfield — the statements of Mr. Breakfield, are that the jury is going to be relying on the propensity evidence to the exclusion of the other evidence.

So, - - -

THE COURT:    (Interposing) (Not understandable.)  (Not understandable.)

In any event, go ahead with your argument.

MS. McCREA:    Well, that is — that is what I want to say on that issue.  Does the Court want me to go through everything?  Or, go — this - - -

THE COURT:    (Interposing) No.  That — no. Just do — argue what you want to argue.

MS. McCREA:    (Interposing) All right.

THE COURT:    Go ahead.

MS. McCREA:    Then on the second issue, which is the Motion for Judgment of Acquittal, that is laid out in the defense Motion.  And I have little to add to that.  I will say that the prosecution is correct that Lurch (phonetic) does talk about there being some evidence, and not necessarily

Exhibit 5001 at 1827

Motion for a New Trial        1766

connected to the Defendant.  However, - - -

THE COURT:    (Interposing) The standard, generally, is that there just has to be some evidence that a crime was committed.

MS. McCREA:    That's not what — that's not how the plain language Statute reads.

THE COURT:    Well, it's certainly what Lurch says.  (Not understandable) - - -

MS. McCREA:    (Interposing) And — and Lurch — I don't mean to interrupt.

THE COURT:    I — I think that has generally been consistent, (not understandable), in fact, is that you can't have a confession alone.  There has to be some evidence that a crime was committed.  In other words, somebody can't walk into the police station, "I killed John Doe", and they — there is no evidence that John Doe was ever killed, or ever alive, or whatever.

Generally, that's the type of thing (not understandable) it goes to.  It's got to somehow be connected to a particular Defendant.

Anyway, go ahead.

MS. McCREA:    Well, the difference is that what the Court just said, in terms of Lurch, is that a crime has to be committed.  The Statute specifically talks about the crime, which would indicate that it's more specific and would

Exhibit 5001 at 1828

1767                          Motion for a New Trial

be related to the Defendant.

THE COURT:    Well, and even — even that interpretation though, some crime was committed.  (Not understandable) evidence from which (not understandable).  That is, the killing of Ms. Freeman was not — there was evidence that the killing of Ms. Freeman was (not understandable).

MS. McCREA:    Well — and I disagree with the — with the Court's analysis - - -

THE COURT:    (Interposing) Okay.

MS. McCREA:    - - - based on the plain language of the Statute.  And the Survey of Cases that indicate, from Dennis on, to Lurch, that Lurch has diluted the standard improperly.

THE COURT:    (Not understandable.)

MS. McCREA:    Well, I make to you, to start with.

THE COURT:    All right.  There is not much I can do with what the Supreme Court does.

MS. McCREA:    So — and — so, it is our position, Number One, that the Motion for Judgment of Acquittal should have been granted.

Mr. McGuffin has now been acquitted of the charge of Murder.  And it is our position that he should likewise have been acquitted, except this couldn't come up

Exhibit 5001 at 1829

Motion for a New Trial      1768

before the Court because it was not before Court at that point — of the Manslaughter in the First Degree, which is why it's a basis for the Motion for New Trial.  Because, Manslaughter in the First Degree two specific elements — both the culpable mental state of reckless; and then the reckless, physical act of there being a death of a human being under circumstances manifest — manifesting extreme indifference to the value of human life.

And the State has to prove both elements.  And it is our position here that there was no evidence — there was nothing from which a rational trier of fact could determine how Ms. Freeman died.  And, therefore, they cannot extrapolate back to the circumstances manifesting extreme indifference to the value of human life.

THE COURT:   Well, (not understandable).  (Not understandable.)  That particular charge, Manslaughter, (not understandable) conduct of the Defendant is not (not understandable).  And what conduct surrounding the entire crime, frankly — and I think in that case, (not understandable), if I remember correctly.  And then, he berated the police, berated everybody (not understandable). So, frankly, conduct (not understandable) dump the body (not understandable) over an embankment.  (Not understandable) circ manifesting extreme difference to the value of human life, including, possibly, some of the other conduct he engaged in

Exhibit 5001 at 1830

1769                    Motion for a New Trial

(not understandable).  (Not understandable.)  (Not understandable) would you consider circumstances manifesting extreme indifference - - -

MS. McCREA:    (Interposing) Well, - - -

THE COURT:    Under Boone (phonetic) and the cases — I didn't read all the cases (not understandable).  I'm just familiar with Boone.  (Not understandable.)

MS. McCREA:    Right.

And — and looking at Belcher, it talks about the requisite physical act.  And I submit the requisite physical act has to do with the killing.  It is not anything that happens thereafter.

THE COURT:    (Not understandable) - - -

MS. McCREA:    (Interposing) The act is - - -

THE COURT:    - - - (not understandable).  (Not understandable) any question about the conduct of the Defendant (not understandable) entire circumstance (not understandable) occurred.

So, it's not just the crime itself.  (Not understandable.)  (Not understandable) overall conduct in addition to that the acts had already occurred, and (not understandable) thereafter.  So, it's not (not understandable) the crime itself.  And you could argue that (not understandable).  (Not understandable) and shooting somebody, or even stabbing them, (not understandable) hands-on crime,

Exhibit 5001 at 1831

Motion for a New Trial        1770

and that would be claiming somebody fell and couldn't breathe anymore.  (Not understandable.)

I'm not — on that part I'm not sure.  (Not understandable) you say, strangling is much more personal (not understandable).

MS. McCREA:    Well, that's our position concerning Manslaughter in the First Degree - - -

THE COURT:    (Interposing) Okay.

MS. McCREA:    - - - and the, um — the Motion for Judgment of Acquittal.

Now, in terms of the charge of murder, there was a very strong - - -

Oh.  No, I have — one — one other thing to say about, um — about the Motion for Judgement of Acquittal. There were the two statements that were involved.  One was the statement of Mr. Breakfield.  The other was a statement of Melissa Beebe, "It's amazing what you can get away with in Coos County."

THE COURT:    The first one, (not understandable).  The second one, there is a question about whether that would be a (not understandable) — a confession or admission.  That's what — I believe that's what you are going to be arguing.  And you can possibly make an argument of both ways, but as I understand what a confession is, they are just admitting guilt of some crime.  It doesn't have to be the —

Exhibit 5001 at 1832

1771                          Motion for a New Trial

the crime.

So, there is a question in my mind about the statement, "It's amazing what you can get away with. . ." There is no question in my mind that Mr. Breakman (not understandable).  (Not understandable.)

MS. McCREA:    All right.  Then I was — all I was going to do was refer to Manzela (phonetic), which is also sited in the defense Motion of 306 OR 303, from 1988.  And there the Supreme Court — the Oregon Supreme Court, Pages 315 and 316, said that the Defendant's Statement, if it's made for some purpose other than to acknowledge guilt.  And if it is not so closely related to the Defendant's confessions as to become part of it, properly deemed an admission and may, itself, be used to corroborate the Defendant's confessions.

And it is our position that either, A, the statement of Ms. Beebe was not relevant and should not have come in.  Or, B, it was a confession under the terms of Manzela because it was for the purpose (not understandable) to acknowledge guilt, and it was not for some other reason.  So, based on Manzela, that would be our position.

THE COURT:    And in State vs. (not understandable).  Whether or not — and your argument was that he was (not understandable).   (Not understandable.)   But, in the light most favorable to you, in that argue (not understandable.)   I don't know that I could specifically (not

Exhibit 5001 at 1833

Motion for a New Trial        1772

understandable).

Go ahead.

MS. McCREA:   The other issue is the charge of Murder.  And based on the strong Response of prosecution counsel, I sat down and looked at this.  And I very much wanted to see what was in — specifically, what was in the State's closing argument and rebuttal because I made the allegation on a good faith basis.  And let me say this; it is not my intention to get into character assassination of Mr. Frasier.  I like Mr. Frasier.  He is a worthy adversary. But, based on the statements that were made to the press, I had a legitimate concern over the fact that Mr. McGuffin had been charged with Murder and not Manslaughter from the beginning.

What Mr. Frasier said during his closing argument, at Page 2 of your Transcript, is:

"Now, I want to make something abundantly clear.  The State of Oregon is not saying that Nick McGuffin for a week, or two months, or a year, planned to kill his girlfriend.  They are not saying that on the morning of June 28th, when he woke up that day, he woke up with the idea of, 'I am going to kill Leah Freeman.'"

"The evidence we believe shows that a tragic set of circumstances came together on June 28th.  We

Exhibit 5001 at 1834

1773                          Motion for a New Trial

know these people were a devoted couple at times.

There is no question that at various points of this

relationship they expressed love and affection for

each other.  But they were violent with each other

at times.  We've got two people here that are fiery,

if you will.  And it was a relation, frankly, that

under the right conditions could erupt, and did

erupt into a violent end.'

"What happened June 28, 2000 was the pressures

of dealing with teenage emotions — whatever you want

to call it — erupted in what (not understandable)

the end of the life Leah Freeman."

And then, on Page 3 of the Transcript, at

Line 12, he also talks about the tragic mistake that he has

made.

Now, the question is, is it a matter of a difference

in semantics, in that Mr. Frasier in his Affidavit says, "I

did not believe Defendant had a premeditated desire or plan to

kill Leah Freeman."

And, I sat down and looked at the dictionary,

Your Honor — and all I had on hand at the moment was an Oxford

American Dictionary from the 1980's — and at Page 344 it

defines intent.  And it defines it as, "To have in mind as

what one wishes to do or see, or Two, to plan that a (not

understandable) shall be used or interpreted in a particular

Exhibit 5001 at 1835

Motion for a New Trial        1774

way."

And the — the concern here is that, based on the statement of the prosecution, it does not appear that there was a basis for charging Mr. McGuffin with intentional murder, but rather a basis for charging him, as he was eventually convicted under the lesser included offense, which is Manslaughter in the First Degree.

And in rebuttal, at Page 32, Line 18, Mr. Frasier also says, "Friction — friction got worse and again exploded into this catastrophe that ended up in Leah being dead."

Now, there are some other things that the prosecution could say in response, that they haven't said. And some of those things are that this matter went to the Grand Jury; and it was the Grand Jury's decision, not Mr. Frasier's decision.  Although, as we know from experience, the — the prosecutor is the only one in the Grand Jury with the witnesses and the Grand Juror (sic), so typically, (not understandable) has a certain amount of influence.

To get — Mr. Frasier could also point out that based on the results in this case, that it was a 10 to 2 verdict on the issue of Murder.  That at least two of the jurors believed that Mr. McGuffin was responsible for that. And that would be an argument, as well.

But, I am very bothered by the statements that

Exhibit 5001 at 1836

1775                          Motion for a New Trial

were made, both in terms of the State's closing argument and the statements that were made publicly to the press — those to the — the World newspaper, to the Oregonian, and to the, um, video media.

THE COURT:    (Not understandable.)

MS. McCREA:    And my concern is because I see this as unfairly prejudicial to Mr. McGuffin, and a substantial denial of his rights.  Because being charged with Murder, he was looking at a penalty conviction of life in prison with no possibility of parole for twenty-five years.

The Oregon Constitution has a presumption against release if a person is charged with the crime of Murder, as Mr. McGuffin was.  And, if a Release Hearing is requested, the amount of security which would be required for a charge of Murder is much greater than what would be required for a charge of Manslaughter in the First Degree, which carries a penalty of ten years in prison, as opposed to life, with a mandatory minimum of twenty-five.

Now, in this case, had Mr. McGuffin been charged with Manslaughter in the First Degree, he would have had a much better opportunity to obtain release on conditions.  As it was with the charge of Murder, the State filed objections to release before the defense ever filed anything requesting a Release Hearing.

The State, in its Response says, "Well,

Exhibit 5001 at 1837

Motion for a New Trial         1776

Mr. McGuffin could have gotten Court appointed counsel and then sought release on security conditions." Our point is, if he had been charged with Manslaughter in the First Degree, he would have had a better opportunity for release from the getgo.

And, the other aspect of it is, I have alleged that Mr. McGuffin was, while in custody, under a state of siege. And I would proffer to the Court that I have received, in Discovery from the State, personal letters that were sent to Mr. McGuffin that he did not receive in custody because the State took custody of them. That his cell was searched, and his personal papers — except for his legal papers — were taken on a routine basis.

Number Three, being in custody, he had limited access to counsel by telephone at specified times, and personal at specified times and places. And it — it simply was not same as if he were out of custody.

And so, his substantial rights were violated. And on that basis, we submit — additionally, he should be entitled to a new trial.

We went through the issues with Ms. Londagin (phonetic) at the Motion to Postpone. The person involved was Terry Middleton not Bill Middleton. The State has now submitted an Affidavit indicating that Ms. Londagin left a voicemail saying she doesn't know the family. I have nothing

Exhibit 5001 at 1838

1777                          Motion for a New Trial

to counter that with.  So, I'm — I'm not prepared to go forward with that issue.

It's the concern of Mr. Welch that we now have the report of Officer Webley in evidence.  I understand the Court's position about the Waiver on the part of the Defendant.  However, the defense concern is that at the time the decision was made, which was in Court at counsel table, the defense did not know who had taken the report, the specifics of the report, or the (not understandable) involved.

And Mr. — Officer Webley's report indicates more involvement concerning Mr. Welch than Mr. Welch indicates.

Now, I understand Mr. Welch denied that he had any contact.  The Court left it up to us and we left it up to the Court.  But, I'm just putting that on the record.

THE COURT:    (Not understandable.)

Ms. Soublet?

MS. SOUBLET:    Thank you, Your Honor.

(Not understandable.) (Not understandable.) Other than that, unless the Court has questions for me, (not understandable).

THE COURT:    Anything else?

MS. McCREA:    No, Your Honor.

THE COURT:    I just made some notes, and I want to make sure (not understandable).

Exhibit 5001 at 1839

Motion for a New Trial          1778

Uh, first of all, as to the Motion for Judgment of Acquittal — and I didn't specifically question you on this, Ms. McCrea, so perhaps you'll want to address it — and that is the issue of preservation on your Motion for Judgment of Acquittal, (not understandable).  (Not understandable.) (Not understandable.) (Not understandable.)

MS. McCREA:    Well, - - -

THE COURT:    (Interposing) I meant — I meant to ask you a question when you were doing it and I didn't. Then, I thought well that (not understandable).

MS. McCREA:    Logistically, it was — and maybe it was erroneous on my part, which, I suppose, could then be an issue for potential post-conviction relief, and that ends up being a possibility.  But, logistically, it was my understanding that the only thing the defense could move for Judgment of Acquittal on would be the charged offense, which was Murder.  Because the jury would not get to the Manslaughter charge unless and until they found Mr. McGuffin guilty — uh, not guilty — acquitted him of the Murder charge.

So, it wasn't actually before the Court at the point that the evidence comes in, either during the, um — when the State rests or when all of the evidence was brought in. So, that was the reason that the Motion was made solely on the charged offense of Murder.  That — that was my thinking, Your Honor.

Exhibit 5001 at 1840

1779                    Motion for a New Trial

THE COURT:    Just on the issue, to make sure that it's clear — and there is a real — there is recent case (not understandable) Brown, B-R-O-W-N, (not understandable) 2011, kind of talked about the preservation (not understandable).  Uh, but it was known from very early on that the State would contest the Manslaughter in the First Degree.

Ms. McCrea did move for Judgment of Acquittal as to the Murder charge.  The concern that the Court has is that that did not raise the issue of whether there was a manifest indifference — manifest — circumstance manifesting extreme indifference to the value of human life.  The Court didn't get a chance to rule on that.

Ms. McCrea may be correct that (not understandable) move against the charge itself because the order of deliberation.  It's not (not understandable).  At least that issue was not raised at the time.

And I even think that State vs. Brown is — generally is a case favorable to the preservation on behalf of (not understandable), would — would not apply.  And would say that that issue had to be raised at the time, if the Court wouldn't — was going to give the lesser included.  And just raising it at the time of Motion for Judgment of Acquittal may have — may have at least alerted (not understandable)objection to that lesser included because of this.  And there is no exception to that lesser included (not understandable).

Exhibit 5001 at 1841

Motion for a New Trial       1780

(Not understandable) circumstances manifesting extreme indifference to the value of human life.  In fact, part of the Motion for a New Trial is there was nothing to show that it was reckless.

So, that possibly — or, should have been raised through at least an exception at the time, if not for a Motion of Judgment of Acquittal.  And those specific weren't raised.  So, I'm not too sure that they really deserve (not understandable).

Uh, I might be taking these in somewhat of a reverse order.  And I do want to look at my notes on this, as I go along.

(Not understandable) quote (not understandable) in State vs. Dennis, uh, at 77 and 78 — and the only reason I'm concerned about that is that general language, especially on (not understandable) has been disavowed, both in (not understandable), which is cited, and (not understandable.)  So, I want to make that clear.  But, that was also, generally, on your argument about the fact that there had to be some other proof — some other proof of the crime — some other evidence of proof of crime and in lieu of the confession.  But, I think, clearly, that's been covered.

And clearly, there is evidence a crime was committed.  The doctor said this wasn't a natural death.  All the circumstances would indicate this wasn't (not

Exhibit 5001 at 1842

1781                          Motion for a New Trial

understandable).  All of the evidence showed this had to be a homicide.  Obviously, the question was, did he (not understandable) homicide at the time the Trial started?  But, I don't think there was really much argument (not understandable).  (Not understandable.)

Uh, (not understandable) briefly what a confession is and what an admission is.  And I've also talked about the fact that I think, clearly, there is evidence (not understandable).  That is, killing (not understandable).

As to the character evidence — and I again want to — want to raise somewhat of a preservation issue.  And that is, as I recall — and it's been awhile since I listened to it — but I went back and listened to the Omnibus Hearing, parts of it.  And the part that — when we came to arguing, as I recall — I was going through each one — I recall Ms. McCrea saying, "I want to raise this issue — put — put the State on notice that I'm objecting to these matters, generally."

But, I believe you also said, "I may have to object in Trial."  The Court did say — and did point out — and generally, I felt these things were admissible on other issues other than character.  And — but, that I would have to rule at Trial.  So, those matters were not objected to at the Trial, based on the whole colloquy between the State, and the defense, and the Court were having.

I think those matters would not be prepared by

Exhibit 5001 at 1843

                    Motion for a New Trial        1782

that (not understandable) in some matters, but (not

understandable) in other matters.  (Not understandable.)

Basically, it's a side issue of relevancy.  (Not

understandable) to make something relevant.  (Not

understandable) very little.  There may be, then, the issue of

(not understandable) to the point of (not understandable).

Relevance is not a lot (not understandable).  Many of them —

(not understandable) preservation issue, based on the Court's

ruling, (not understandable).  An perfect example of that is

the person — I forgot her name but she was the grandmother to

a student who (not understandable).  Her testimony was she saw

people arguing, but didn't know who they were.  The Court

ruled and said it there wasn't a sufficient connection.  It

wasn't coming in.  The State, then, later called the grandson,

who then said, "I specifically know it was Leah Freeman and

Mr. McGuffin who were arguing."  Therefore, the grandmother

was recalled and there was no objection, at that point to her

testimony, because of the foundation laid by her grandson, as

to who the parties were.  So, at that point, it was allowed

again but without objection.  (Not understandable.) (Not

understandable.)

          As far as using drugs on the night, even though

Mr. McGuffin didn't testify he did give (not understandable).

(Not understandable.)  It also would have to do with his

concern about Ms. Freeman, and using drugs (not

Exhibit 5001 at 1844

1783                              Motion for a New Trial

understandable).  (Not understandable.)  The jury can do anything with the evidence, but it doesn't make the evidence admissible (not understandable).

The fact that he was attempting to have sex, he testified it could have been Ms. Steinhoff, but also indicates (not understandable).  (Not understandable somebody could argue it's a way of consoling himself.  (Not understandable) also indicate (not understandable) allowed, then it's moving on.

Again, those are things that the jury can pick.  It's certainly relevant to whether or not he was that concerned on the matter.

And with the other, uh, woman, again, it would point that (not understandable) during the timeframe we talked about.  (Not understandable.)

The fact — the next fact that whether — when he was in jail, and the Court (not understandable) show he was in jail, not whether it — not what he was in jail for, but to show (not understandable).  (Not understandable) which could be important because here is somebody who was saying he was in jail with Mr. McGuffin.  The jury would certainly want to be able to know the circumstances under which the statement was made, and also what the credibility is of the client.  Excuse me.  The fact that he was in jail wouldn't come as a big shock because I doubt there is anybody — juror or otherwise — who

Exhibit 5001 at 1845

Motion for a New Trial        1784

(not understandable).

MS. McCREA:    This wasn't when — this wasn't when — this was back in 2003.

THE COURT:    I understand that.

MS. McCREA:    Okay.  But, - - -

THE COURT:    (Interposing) I understand it's back in 2003.  The fact that he was in jail (not understandable).  (Not understandable.)  The jury has a right to (not understandable) testimony (not understandable) motive to come up nu.

The other — the other matter, Ms. McCrea, is (not understandable) about the shoe being planted (not understandable).  Proof on that cited a Federal case that (not understandable) very similar, allowing that type of (not understandable) admission (not understandable) appropriate.

Again the Beebe matter, that can be construed possibly in different ways, but I think it's relevant and (not understandable).

Uh, the other thing about showing a bad relationship between them, obviously that's important in the (not understandable).  The defense was able to show it was a good relationship (not understandable) ups and down.  (Not understandable.)  So, I don't think — I think the evidence was clearly relevant to show the relationship — what it was — (not understandable).

Exhibit 5001 at 1846

1785                          Motion for a New Trial

Uh, as far as Mr. State — Mr. Frasier's statement, what — what would be clearer to me is that if deliberation — that might raise some issue.  And deliberation is not an issue.  It appears to be the more — argument about, "Well, there wasn't any deliberation."  (Not understandable.) In this case (not understandable) more — there wasn't any finding — in other words, there wasn't any deliberations.  So, I don't  (not understandable) didn't have a basis to charge Murder, as far as to argument.  (Not understandable.)  (Not understandable.)  (Not understandable.)   But, I don't think that they are too strong of statements (not understandable).

As far as Mr. Breakfield goes, the fact that he was sitting on this and didn't say anything for a long period of time, clearly his credibility (not understandable) brought up.  (Not understandable) the Court had no choice (not understandable).  (Not understandable.)  The jury can decide whether or not they accept Mr. Breakfield's testimony.

The argument about — concerning the argument of Murder instead of Manslaughter about him being — about Mr. McGuffin (not understandable) being released, at that time the Court's schedule sets security for Manslaughter in the First Degree at $1,000,000.  So, it was obviously less than Murder but it wasn't substantially (not understandable).  But, it was (not understandable) — it was at that point.  As I recall, there wasn't — there was a Request for Release (not

Exhibit 5001 at 1847

Motion for a New Trial        1786

understandable) but it was withdrawn (not understandable). So, speculating about the fact that he would have gotten out one way or the other. The Court never had to rule on that issue, there wasn't (not understandable).

So, uh — and in relation to your argument in that record that — that there was limited access, I think the only time you raised access with the Defendant during the Trial — and the Court corrected that matter — they assured that the jail wasn't going to do it again. But there wasn't any other issue ever raised about access or having limited — obviously, it's always better to have a (not understandable). (Not understandable). (Not understandable.)

We've talked about the juror misconduct and — although, I don't know that you are specifically withdrawing your argument about Ms. Londagin, but — but clearly the Affidavit from Ms. Soublet that said Ms. Londagin left and said, "I have no knowledge of the Freeman family." (Not understandable) any inference that she did something wrong in this matter. Whether her husband did or did not happen to know a relative of Ms. Freeman is irrelevant. Ms. Londagin says, "I have no knowledge of any of of these people. (Not understandable.)

And again, as to the other, Mr. Welch, the Court believed what he said. He — assuming Mr. Welch wasn't being truthful, he was off the jury and it had no effect on

Exhibit 5001 at 1848

1787                                        Ruling

what the jury did one way or the other.

Just make sure I (not understandable) something else.

So, based on the Court's review of this — the Motions — the Motion filed, the Court will deny the Motion for a New Trial.

And, Ms. Soublet, if you would submit (not understandable)?

MS. SOUBLET:    Thank you, Your Honor.

MS. McCREA:    And, Your Honor, did the Court receive Exhibit 302, for the purpose of this Hearing.

THE COURT:    I — I'll receive it for the — for an offer — for the offer of proof.  And I'm familiar with — (not understandable) - - -

MS. McCREA:    (Interposing) Okay.

THE COURT:    - - - closing argument.  So, I didn't have to reread the closing.  But, for the purpose of this Hearing, the Court will receive it as offer of proof (not understandable).

(Whereupon Defendant's Exhibit No. 302 was received into evidence.)

MS. McCREA:    And, may I impose on Ms. Cress to make me a copy of Exhibit 301 since I gave her the copy she gave me?

THE COURT:    (Inaudible response.)

Exhibit 5001 at 1849

Ruling        1788

MS. McCREA:    Thank you.

THE COURT:    I will certainly ask her to do that.

MS. McCREA:    Thank you, Your Honor.

THE COURT:    (Not understandable.)

All right.

We'll terminate this call, Mr. McGuffin, unless you had something else you wanted to bring up.  And, understand your counsel may or may not want you to do that, but if you had some question or something, I'm happy to answer

- - -

DEFENDANT:    (Interposing) No, that's — that's perfectly fine.

THE COURT:    Okay.

We'll terminate the call.

DEFENDANT:    All right.

(Whereupon video communication was terminated with the Defendant.)

THE COURT:    We'll take a brief recess for about ten minutes.

*                    *                    *

Exhibit 5001 at 1850

Certificate   1789

STATE OF OREGON      )
                     )   ss.
County of Coos       )


TRANSCRIBER'S CERTIFICATE


I, Diane B. Walberg, Court Transcriber for the State of Oregon, Fifteenth Judicial District, do hereby certify that I received the duly certified true copies of the audio record of the before-entitled cause, before the Honorable Richard L. Barron, Judge of the Circuit Court of the County of Coos, State of Oregon; and that I thereafter caused that record to be reduced to typewritten pages.

I further certify that the foregoing and hereto attached typewritten pages numbered 2 through 1788, inclusive, constitute a full, true and accurate record of the proceedings had upon the hearing of said cause, and of the whole thereof, to the best of my ability.


WITNESS my hand as Court Transcriber this 30th day of December, 2011.

Diane B. Walberg, Court Transcriber
South Coast Transcribing
PO Box 3414, Sunriver, OR   97707
541-593-1664, bdwalberg@aol.com

Exhibit 5001 at 1851