**Robert E. Franz, Jr.**    OSB #730915
E-Mail:  rfranz@franzlaw.comcastbiz.net
**Sarah R. Henderson**    OSB #153474
E-Mail:  shenderson@franzlaw.comcastbiz.net
FRANZ & HENDERSON
P.O. Box 62
Springfield, OR 97477
Telephone:  (541) 741-8220
Attorneys for Mark Dannels, Pat Downing, Kris Karcher, Shelly McInnes,
Raymond McNeely, Kip Oswald, Michael Reeves, Sean Sanborn, Eric
Schwenninger, Chris Webley, Anthony Wetmore, Craig Zanni, David Zavala, City
of Coquille, City of Coos Bay, and Coos County, Oregon

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| Nicholas James McGuffin, as an individual and as guardian *ad litem*, on behalf of S.M., a minor, | Case No. 6:20-cv-01163-MK |
| Plaintiffs, | |
| v. | |
| Mark Dannels, Pat Downing, Susan Hormann, Mary Krings, Kris Karcher, Shelly Mcinnes, Raymond Mcneely, Kip Oswald, Michael Reaves, John Riddle, Sean Sanborn, Eric Schwenninger, Richard Walter, Chris Webley, Anthony Wetmore, Kathy Wilcox, Craig Zanni, David Zavala, Estate of Dave Hall, Vidocq Society, City of Coquille, City of Coos Bay, Coos County, and Oregon State Police, | **Exhibit 5002 – GRAND JURY PROCEEDINGS July 14, 2010** |
| Defendants. | |

1

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

**STATE OF OREGON,**                    )
                                       )
          Plaintiff,                   )   Case No. 10-CR0782
                                       )
v.                                     )
                                       )
**NICHOLAS MCGUFFIN,**                  )
                                       )
          Defendant.                   )
_____)   Volume 1


Wednesday, July 14, 2010

GRAND JURY PROCEEDINGS


APPEARANCES:              **PAUL FRASIER**
                          **DISTRICT ATTORNEY**
                          125 East Eighth Avenue
                          Eugene, Oregon 97401


TRANSCRIBED FROM AUDIO RECORDINGS


TRANSCRIBED BY:           Peggy S. Jillson
                          987 Tivoli Street
                          Eugene, Oregon 97404
                          (541) 689-7964

Exhibit 5002 at 1

**WITNESS INDEX**

| | |
|---|---|
| COURTRIGHT, Cory | 3 |
| BERTRAND, Denise | 20 |
| MITCHELL, Cheri | 40 |
| MITCHELL, Margaret | 66 |
| BRYANT, Corey | 78 |
| PATTON, Ashley | 85 |
| LEE, Danny | 92 |
| ZAVALA, David | 99 |

Exhibit 5002 at 2

**COQUILLE, OREGON; WEDNESDAY, JULY 14, 2010, 6:13 P.M.**

-o0o-

**TESTIMONY OF CORY COURTRIGHT** (Continuing)

BY MR. FRASIER:

Q.    Okay.  I've turned on an additional recorder, since the video camera doesn't want to cooperate with us.

Okay.  I think where we left off was around 10:00 p.m. Nick had called your house and you were speaking to him on the phone?

A.    Yes.

Q.    Could you tell us what the conversation was about.

A.    Um, I just -- I just said hello, and he said, Hey, Cory, is Nick -- or, excuse me, Is Leah home?

And I said, No.  Why?

And he said, Well, I can't -- I don't know where she's at.  I can't find her.

And I said, What?  You can't find her?

And he said, Don't worry about it.  I'll bring her home here pretty soon.

I didn't think anything of it.  I figured, you know, he was out looking for her.

Q.    He didn't sound panicked at all, or anything like that?

A.    Um, no.  Really didn't.  Nothing that I remember.

Exhibit 5002 at 3

*Cory Courtright*

He just -- he just said, matter-of-factly, Well, don't worry about it. I'll go get her and I'll bring her home.

Q.    So you weren't too concerned, based on that conversation?

A.    No.

Q.    Okay. Later on you fall back asleep. Is --

A.    Yeah, I fell back asleep after that. And I woke up at 3:30 in the morning. And I had to use the rest room, and I just happened to peek in her room.

Q.    Was the door open or shut, do you remember?

A.    I -- I think it was shut because I pushed it open. Not -- not shut, shut, you know, the -- it wasn't --

Q.    Okay.

A.    I pushed it open and looked in there, and her bed was empty, she wasn't there.

Q.    Was there any lights on in that room?

A.    No.

Q.    Was the TV going?

A.    No.

Q.    What did you think then?

A.    My thoughts were, oh, my God, where is she? And then I just thought, well, she's got to be with Nick. She's got to be in his camp with him, at his parents' house, or something.

Q.    Had she spent the night with him before?

Exhibit 5002 at 4

*Cory Courtright*

A.    She did spend one night out there, um, after he -- after he graduated.  I did -- I did let her do that.

Q.    Again, you're a little worried, but you had nothing to cause you to think that something was out of the ordinary?

A.    Right.  I just -- I just figured she was with him.  I mean, yeah, there was -- there was panic inside me.  It's like, oh, God, where is my daughter?  And then I just started thinking, Well, she's got to be with him.  Um --

Q.    What time do you wake up in the morning?

A.    I -- I went back to bed and I just kind of laid there for a while, and I think I dozed back off.  And then I woke up at 6:30 and I went downstairs, and that's when my mom would always get up, at 6:30.

I went down there and told my mom that Leah wasn't home, and I was scared, and she said, Well, maybe you should call out at the McGuffins'.  Well, we were trying to hide the fact that Leah wasn't there from my dad because he was so sick.  He had COPD, and I didn't want to upset him.  So we kind of tried to hide it from Dad.

I said, well, she goes -- I think Kathy goes to work at 8:00, so I'm going to wait until then, and I did.  And I called out there about a quarter to 8:00.

She -- Kathy answered the phone, and I asked her if Leah was there.  Then she said, "No," or at least she

Exhibit 5002 at 5

didn't think so.  And then, she goes, "Let me go look."  And she had taken the phone with her, and I could hear her open the door.

I couldn't hear exactly what she was saying to Nick, but then he got on the phone and I said, "Where is my daughter?"

He goes -- and his answer was -- he said, "She didn't come home last night?"

And I said, "No, where is she?"  And then, I was really upset.  Then, I was upset.  And something was really wrong.

And he said he would come in and help me go look for her.

Q.    And did he come in to town?

A.    He did.  He came right in.

Q.    And what did you folks do when he got there?

A.    He got there, and um, I got in my car, and Denise and Nick got in his car, and just started driving around town.  I mean, not -- not together.  I mean, our cars weren't -- I don't know where they went.  I just started driving up and down streets.  Just in a state of panic.  And we must have done that, I don't know, for an hour or so, or longer.

We went back -- we all met back at my parents' house and it couldn't be hidden from my dad anymore.  And he

Exhibit 5002 at 6

knew.  And he was getting upset.  He told me I needed to go to the police station.  Something's wrong, because -- we knew Leah didn't run away or anything like that.  What had happened to her?

Q.    So, uh, you go to the police?

A.    Yes.

Q.    And at the time, it was uh, Mike Reaves was the Chief of Police here in Coquille.

A.    Yes.

Q.    Don't want to put words into your mouth, but did he kind of poo-poo the situation?

A.    Yes.  He um, kept telling me I needed to calm down, because I came into the room in a panic state, and he was going, "Well, what was she wearing?" and asking me that. And when I told him, I had to turn around and ask the kids, Denise and Nick.  Um.  Because I can't remember what she was wearing.

And they were going -- and that's when they repeated the clothing that she had on.  And I said -- and then I was referring it back to him, and when I said, "wife-beater," he kind of snarled at me and pointed at me and asked me why I would use that term.

I don't know, that's what they told me she was wearing, I was just telling you.  And just -- he wasn't very nice to me.

Exhibit 5002 at 7

Q.      What time was that, that you were in to the police station?

A.      The -- I'm not certain.

Q.      But sometime mid-day?

A.      Oh, no.  This was in the morning.  This was like 9:30, 10:00, maybe.  Somewhere in there.

Q.      Okay.  You -- obviously, she doesn't come home?

A.      Didn't.

Q.      Uh, and, um, did she make it to her -- her appointment at the health department?

A.      No, she didn't.

Q.      All right.

A.      But I didn't know that for quite a while.

Q.      Right, but she had an appointment scheduled that day, the 29th --

A.      Correct.

Q.      -- and she did not show up for that one?

A.      Right.

Q.      All right.  You're getting pretty worried now, about your daughter being missing?

A.      Yes.

Q.      And you start getting organized, get some people, putting posters up around town --

A.      Correct.

Q.      Notifying the media, so forth?

Exhibit 5002 at 8

*Cory Courtright*

A.    Yes.

Q.    The police get -- eventually get more involved in the investigation at some point.  The media is notified, those type of things?

A.    Right.

Q.    And again, nothing comes forward publicly; is that right?

A.    Right.

Q.    Now, during the next week or so, do you have contact with Nick fairly regularly?

A.    Yeah, somewhat.  Um, if not through a phone call, I would drive out there.

GRAND JUROR:  I'm sorry.  You said we can ask --

MR. FRASIER:  Sure.

GRAND JUROR:  Before we get a week away from this, I took some notes here.  See if I have this right: Nick was washing the car.  They were going to go to the Hagas'.  Is that how you pronounce it?

THE WITNESS:  Haga.

GRAND JUROR:  Haga house.  That was the plan, was to go there to watch a movie?  Is that right?

THE WITNESS:  Yeah, that -- that's a little iffy. All I know was she said that they were going to get movies.

I thought the plan -- I thought what she said was that they were going to go out to Nick's house to get some

Exhibit 5002 at 9

*Cory Courtright*

movies, and that then he was going to take her to Cheri's from 7:00 to 9:00, and pick her up at 9:00.  And then they were going to watch the movie.

GRAND JUROR:  Mm-hmm.

THE WITNESS:  At the Hagas' house.

GRAND JUROR:  When you talked to Nick, the -- when you called him and talked to Cheri, and then Nick got on the phone, had they said -- he said, had they gone out and watched movies, do you remember?

Had he said anything about whether they had --

THE WITNESS:  He didn't say anything --

GRAND JUROR:  Or that they had been together at all?

THE WITNESS:  Oh, or I'm sorry, are you talking about the next day?

GRAND JUROR:  Well, yeah, the next day.

THE WITNESS:  Oh.

GRAND JUROR:  Right.  Had they done -- what had he said they did the night before?

I mean, when you said, "Is she there?" did he say, "I" -- did he say anything about the time they'd spent together the night before?

THE WITNESS:  No, he just said that he had taken her to Cheri's at 7:00 --

GRAND JUROR:  That's at 7:00.

Exhibit 5002 at 10

11

*Cory Courtright*

THE WITNESS: -- and went to pick her up at 9:00, and he said she had already left.

GRAND JUROR: Okay. Okay.

BY MR. FRASIER:

Q. And I -- it's a couple of questions, kind of I was headed that way, but when you're talking to him the next day, or in the upcoming week, does he explain to you about -- well, first of all, let me ask you this question:

On the evening of June 28th, the morning of June 29th, does Nick maybe up and actually come to your home, knock on the door, and say, "Hey, is Leah here?"

A. No.

Q. Okay. And did you ask him or did he tell you if he had ever come to your house that night?

A. (Pause.) He, um, yeah -- oh, I cannot honestly answer that.

Q. Well, did --

A. I don't know if it was a --

Q. Did he tell you about that he came to your house and when he saw a light in the window and thought she was in her bedroom?

A. Yes.

Q. Okay.

A. And he said he threw --

Q. Okay. Well, tell the grand jury what he told you

Exhibit 5002 at 11

*Cory Courtright*

about that.

A.    He told me that he had come by at 2:30 in the morning, and her light was on, and that he had thrown some rocks up at her window.

GRAND JUROR:  I got a question.  He called you about 10:00 p.m., right?

THE WITNESS:  Yes.

GRAND JUROR:  Looking for her?

THE WITNESS:  Mm-hmm.

GRAND JUROR:  Okay.  That's what I thought.

BY MR. FRASIER:

Q.    Now, in regards to a light on in the bedroom, was there a light on in that bedroom that night?

A.    No.

Q.    And about throwing rocks at the window, did you have a problem with that?

A.    Yeah, because there's just grass under there.  I don't know.  Was he packing rocks in his pocket, or what, you know?

GRAND JUROR:  Somebody told me it was a tomato garden in the place.

THE WITNESS:  Um, my mom had all kinds of flowers around her house.  And yes, there was tomato plants there, correct.

GRAND JUROR:  But there wasn't like any gravel

Exhibit 5002 at 12

13

*Cory Courtright*

or --

THE WITNESS:  No.

GRAND JUROR:  -- rocks or anything like that?

THE WITNESS:  It was grass.

GRAND JUROR:  What time did you wake up and check her room?

THE WITNESS:  3:30.

GRAND JUROR:  3:30.  So that would be after he supposedly came?

THE WITNESS:  Correct.

BY MR. FRASIER:

Q.    Now, again, this would be about, uh, perhaps a week after Leah disappeared -- during that time frame, were you being supportive of Nick and, you know, believing him and what he was talking about?

A.    Oh, yeah.  I thought he was, uh -- well, he was helping look for her and helping her friends and -- and the community, uh, put up the posters of Leah, that she was missing, around town.

Q.    And was there an incident where he had been at the police station and had apparently been interviewed by the police and then he came over to your house with his parents?

A.    Yes.

Q.    Tell the grand jury how he behaved when he came over to your house after he'd been interviewed.

Exhibit 5002 at 13

A.    He, uh, came -- he got out of the car.  It was him and his parents.  They pulled up in the driveway.  He got out of the car, kind of holding his head like this, and headed right for the backyard.  My daughter Denise followed him back there.  Then she started screaming, "Mom, something's really wrong with Nick."

And this -- "What's wrong with him?"

And his father at that time told me he had just been down to the police station.

Q.    Was Nick -- how was he acting?  What was going on?

A.    Well, he was throwing up.  He threw up all over the backyard.

Q.    Did they actually take him to the hospital?

A.    Um, yeah.  After that they were going -- they were putting him in the back in the car, and I said, "Well, he -- he needs to see a doctor then, or something."

They said, "Yeah, that's what we're going to do.  We're going to take him to the hospital right now."

Whether they did or not, I don't know.  I assume they did.

Q.    Over time, has Nick and the McGuffin family, how they interact with you, has that changed?

A.    Drastically.

Q.    How so?

Exhibit 5002 at 14

*Cory Courtright*

A.    Well, I -- I mean, because I would go out to their house in the time that she was missing.  You know, just if they had heard anything, that type of thing.  Um, there would be phone calls, you know, if they had heard anything.

Up until, um, right after Leah's funeral, they just all stopped.  They just stopped.  There was no phone calls, he didn't come around.  Um, people -- his behavior seemed to change.  I don't even know how to describe it, but he just seemed a different person.

Q.    Have there been situations where he's driving a car here through Coquille and you're driving, and basically drives dangerously, cuts you off?

A.    Yeah.  There was one incident.  We'd been down to the Democratic convention in Bandon and we were coming over Beaver Hill, and he sped up alongside us and pulled over -- he almost ran us off the road.  Us being my friend Janet and her 84-year-old mother at the time, and Shelby Harvey, another friend of ours.

Q.    Have there been other instances where he's kind of driving by and he gives you the finger, and stuff like that?

A.    Yeah.  Um, my dad had a heart attack, and my mom and I got in his truck and we were rushing up to the hospital, and that's the first time I remember him doing that.  He drove by and he just flipped me his middle finger.

Exhibit 5002 at 15

*Cory Courtright*

GRAND JUROR:  Do you have -- I mean, did -- do you have any reason to think why he would behave that way?

THE WITNESS:  Well, his -- I think he thought I was becoming suspicious of him.

GRAND JUROR:  He's -- I mean, I'm not really -- I really know little or nothing of this, so I mean I'm -- I'm -- I'm -- I don't know anything about it.  But based on maybe articles in the paper, or based on just gossip in town, or -- or --

THE WITNESS:  My suspicions?

GRAND JUROR:  No, why he would be suspicious that you were susp -- why he thought you were suspicious of him.  Had you said something to him or his family?

THE WITNESS:  Well, uh, no.  But his dad came to our house one morning, and it had to have been after Leah's -- they found her body.

I woke up one morning to yelling downstairs, and I knew it was my dad.  And it scared me, again, because of his health.

And I went down there, and my dad and Bruce were screaming at each other.  My dad told him to leave because my daughter was dead, and he thought his son was responsible.

And I asked Bruce, I said, "What are you doing here?  Why are you doing this?"

He said, "Well, you don't come around anymore and

Exhibit 5002 at 16

my son thinks that maybe you might have had something to do with this."

MR. FRASIER:  So he's telling you that Nick is thinking that you did something to your daughter?

THE WITNESS:  No, he's telling me that Nick thinks that I think he did something to his [sic] daughter.

MR. FRASIER:  Oh, that's what happened.

GRAND JUROR:  But it wasn't -- I mean, I guess I'm trying to say it wasn't -- you hadn't accused him, you or your father or anybody in your family hadn't, at that point, made an accusation that you thought he was guilty of it?

THE WITNESS:  No.

GRAND JUROR:  Okay.  I'm -- so, I'm trying to figure out why he would be flipping you off and doing these things.  You know, what would, you know, that there was something that, other than that one --

GRAND JUROR:  Did that stuff occur after your father had the conversation with him?

THE WITNESS:  Yes.

GRAND JUROR:  Okay.  So that's what triggered that --

GRAND JUROR:  That could have triggered that behavior?

THE WITNESS:  Yes.

GRAND JUROR:  Okay.

Exhibit 5002 at 17

*Cory Courtright*

GRAND JUROR:  Now, when you were -- when you got cut off by Nick, going up, uh, Beaver Hill, you said you were with somebody.  Who was that?

THE WITNESS:  Um, my friend Janet.

GRAND JUROR:  Janet.

THE WITNESS:  Janet Reab, is her name.  And she was caregiving for a man by the name of Shelby Harvey.  And there was also her elderly mother in the car with us.

When that happened, we went -- I knew where Detective Pat Downing from the sheriff's department, I knew where he lived.  And we went directly to his house and told him what had happened.

MR. FRASIER:  I think I've covered just about all the questions that I wanted to ask you.  Have I missed anything that you think is (indiscernible)?

THE WITNESS:  (Pause.)  Mm, I can't think of anything.

MR. FRASIER:  I don't have any other things to ask her at this time.  Do you folks have anything that you'd want to ask her in addition to what you've been talked about so far?

GRAND JUROR:  What is -- what has been the relation since back then?  Do you see this person, Nick?

THE WITNESS:  I haven't seen him in --

GRAND JUROR:  Or the McGuffins?

Exhibit 5002 at 18

THE WITNESS:  I haven't seem them in quite a while.  Um, you know, it's been a long time.

GRAND JUROR:  He hasn't harassed you or anything like that, since then?

GRAND JUROR:  He still lives here?

THE WITNESS:  Um, I believe so.  I believe he lives in Coos Bay.  That's just what I've heard; I don't know.

MR. FRASIER:  Okay.  Anything else?

All right.  That will be it.  Okay?

THE WITNESS:  Thank you.

MR. FRASIER:  I'm going to reach over and turn off the tape for a second.

(Pause in recording.)

GRAND JUROR:  (Indiscernible) Denise?

THE WITNESS:  Yes.

GRAND JUROR:  How do you pronounce it?  Bert --

THE WITNESS:  Bertrand.

GRAND JUROR:  Bertrand.  Fine.

GRAND JUROR:  I'm the -- forgot what I'm called.  The -- anyway, I'm going to read you -- (Laughter.)

Forgot my title here.  The grand jury, the --

MR. FRASIER:  Foreperson.

GRAND JUROR:  The what?

MR. FRASIER:  Foreperson.

Exhibit 5002 at 19

**TESTIMONY OF DENISE BERTRAND** (Freeman)

(Witness sworn.)

BY MR. FRASIER:

Q.    Okay.  First of all I need to advise you that even though you saw me do it -- there's a little recorder there, and we're recording the proceedings of today.  All right?

A.    Okay.

Q.    And what I need you to do to make sure the recorder picks you up is speak loudly.  And sometimes the air conditioner kicks in, and when that happens you need to speak a little more loud, okay?

A.    Okay.

Q.    First of all, could you tell us your name and where you live.

A.    I am Denise Bertrand, and I live in Myrtle Point.

Q.    And are you related, or were you related to Leah Freeman?

A.    Yes.

Q.    How were you related to her?

A.    She was my sister.

Q.    And what was your age difference?

A.    Two years, one month, and one day.

Q.    Were you the older or the younger?

A.    Older.

Exhibit 5002 at 20

*Denise Bertrand*

Q.    So you, as the big sister, you had an opportunity to see Leah in school and things along that line?

A.    Oh, yeah.

Q.    What was Leah like when she was in school?  What were the type of things that she involved in and that type of thing?

A.    She loved her friends.  She loved sports.  And she loved finding the right balance of makeup to look beautiful but not trashy.  (Laughs.)  Mostly her friends and sports.

Q.    She started high school in the fall of 1999?

A.    Yes.

Q.    And you were at the high school then too?

A.    Yes.

Q.    You would have been a junior at the time?

A.    I was going into my junior year, yes.

Q.    All right.  Now, are you familiar with an individual at the high school at that time named Nick McGuffin?

A.    Yes.

Q.    Did you know him well?

A.    Um, no, not -- not at -- at first.  I, uh -- my fresh, my -- yes, my freshman year, he was a sophomore and I had a biology class that he was in.  Um, I was ahead in science, in school.  And, uh, I had that class with him.  I

Exhibit 5002 at 21

*Denise Bertrand*

didn't really visit with him much.

And then, after they started dating, I knew him obviously much better.  I knew of him but not that much of him.

Q.    Okay.  So it -- so we're clear, when your sister, Leah started at her freshman year, in the fall of that year that she started dating Nick McGuffin?

A.    I bel -- I believe it was -- at late -- at just a couple months into school, I believe.  Yes.

Q.    Now, uh.  Did you have a chance to observe how these two behaved while together there at the high school?

A.    (Pause.)  She -- I told her that I didn't -- I didn't like her dating him.

Q.    Why was that?

A.    Because she was a freshman and he was a senior, and seniors only want one thing from freshmans [sic].  And I didn't want her taken advantage of.

And she insisted that she wasn't stupid, and that she wanted me to be happy for her, and she was happy.  But she didn't always seem that happy, but most of the time she seemed pretty happy.

But she didn't really have a lot of contact with him in front of me because she didn't really -- she knew I didn't like them being together.

Q.    Okay.  So you had talked with her about, you

Exhibit 5002 at 22

*Denise Bertrand*

know, this is probably not a good idea, but she went ahead and did it anyway?

A.    I talked to both of them.  (Laughs.)

Q.    Okay.  How did Nick react when you talked to him?

A.    I think I startled him, really.  Uh, when I found out, it wasn't from either of them.  It was from one of Leah's friends I believe, in fact.

And, when you walk into the high school in Coquille High School, in the front main door you've got your office and your counselor office and stuff.  Straight ahead there is a bench area where you can go down the stairs and go downstairs by the gym.  A lot of the senior kids would hang out there, especially like the jocks and stuff, in between classes and before class.

And he was standing there.  I actually grabbed him and pushed him against the wall and said, "Don't hurt my sister."  He looked scared as hell.  And, you know, with that many people around, he didn't really say anything to contradict me.

I was very angry that he was dating my sister.

Q.    Did they ever argue?  Did you ever see them argue?

A.    (Pause.)  I don't know if I can -- it's been a while.  I don't know if I can necessarily specifically recall a specific argument per se, but there was a few times where

Exhibit 5002 at 23

*Denise Bertrand*

I'd hear her crying in her room.  And I'd go and talk to her, and she wouldn't want to talk a lot about it per se.  But I would just try and fix her hair for her, or do something, you know, to try and cheer her up and let her know I was there.

I'm trying to recall.  There was a couple times when he'd drop her off, she'd slam the door and run in the house, that kind of thing, but.

Q.    Well, at some point in time, your mom tried to put the stops onto this relationship.

A.    Mm-hmm.

Q.    Told them that -- told Leah that she couldn't see him anymore; is that right?

A.    Yes.

Q.    And you found out that they were still secretly --

A.    Yes.

Q.    -- seeing each other.

A.    My mom's, uh, friend, slash, boyfriend (laughs), whatever they decide to be today, um, had a house on -- still does, actually -- on 5th Street, West 5th Street over here. And her friend Cheri's house, um, is -- if you drive around, is on this like gravel road really close to theirs.  Or you can walk through this grass field to get over there.

And, um, I went over there looking for Leah to ask her something.  When I tried to call, nobody answered.

Exhibit 5002 at 24

*Denise Bertrand*

So I went over there and I knocked on the door and I knocked on the door; I'm like, "Leah, I know you're here.  Why aren't you answering the door?"

And finally, um, she answered the door, and I'm like, "What's going on?"  And she had this, like, really concerned look on her face.  And I'm like, "What?"  And she started walking and so I followed her in.  I'm not even for sure what it was I was asking her or getting her -- something like that.

But when I walked into the living room, Nick was sitting in the living room at her friend Cheri's house.  And I'm like, "What are you -- Mom is going to be pissed."

And she just cried and begged me, "Don't tell her, don't tell her."

Q.    Okay.  Your mom eventually backs down and lets them see each other.

A.    She didn't want to push Leah away, yeah.

Q.    Yeah.  Well, let's talk about June 28th, the day Leah disappeared, okay?

A.    Mm-hmm.

Q.    Now, at that time you had been -- you were working a couple of jobs; is that right?

A.    Yes.

Q.    One was at Hunter's Restaurant.

A.    Mm-hmm.

Exhibit 5002 at 25

26

*Denise Bertrand*

Q.    And the other one was where?

A.    Denny's Pizza.

Q.    Okay.  Now, the night before, had you worked late on June 27th?

A.    I worked -- yeah.  I believe it was either 4:00 or five o'clock that you started shift, and they closed at 11:00.  And you had a half hour, 45 minutes or so of clean-up before you actually got out.  And I worked there on the 27th and on the 28th.

Q.    Again, that's at Denny's Pizza?

A.    Yes.

Q.    Okay.  And so you get home late, and you decided on the 28th, "I'm sleeping in."

A.    Yeah.  (Laughs.)  I was very tired.

Q.    Okay.  And at some point in time did Leah come into your room and wake you up?

A.    She -- well, I heard them -- I heard a bunch of noise outside.  We were at -- we stayed at my grandparents' house.  And above the back door, there's two windows.  There's a hallway upstairs, the upstairs hallway window, and the window in the little room that I had that was right there by the back.

        And I -- you know, I could feel myself cranky, and I got up and I looked out the window and they were -- her and Nick were out there playing, cleaning his car.  Because

Exhibit 5002 at 26

*Denise Bertrand*

he had the seniors -- you know, you write on your windows with the white stuff, whatever that is.  And, uh, they were trying to get that cleaned off, and they were goofing off, and I laid back down.

And she had came up at one point and asked me if I wanted to come out and help, and I told her I wanted to sleep.

Q.    Do you remember what Leah was wearing that day?

A.    She was wearing --

Q.    There's a picture of her there.

A.    -- exactly what is on that picture, yes.

Q.    At some point in time, she and Nick leave?

A.    Yeah, it's the -- I'm not exactly sure when, but yeah.  They left.

Q.    And you never saw Leah again after that?

A.    No.  The last time I talked to my sister, I was telling her I didn't want to help with something.

Q.    Well, let's talk later on in the evening.

And you're working at Denny's that night, right?

A.    Yeah.  (Clears throat.)

Q.    And sometime after nine o'clock, does Nick show up at Denny's?

A.    He came in two or three times.

Q.    Okay.

A.    That night.

Exhibit 5002 at 27

*Denise Bertrand*

Q.      How's he acting when he comes in?

A.      He almost looked pale, and sweaty, which is weird to be that hot at nine o'clock at night.

Q.      Okay.

A.      He was -- and he was kind of in a hurry, and frantic.  And he just kind of ran in, in a kind of panicky glaze, like asking me if I'd seen Leah or if I'd heard from Leah.  I said, "No, I thought she was with you or Cheri."

And he's like, "Well, she was, but I can't find her."

And I'm like, "If I see her, I'll let her know you're looking for her.  And if you find her, let me know so I know she's okay."

GRAND JUROR:  She said, two or three -- two or three times, or -- just some --

THE WITNESS:  Ten years.  You know --

GRAND JUROR:  No, yeah.  But obviously, more than once?

THE WITNESS:  But -- oh, yeah.  It was at least twice.  It was two or three times.

GRAND JUROR:  And --

THE WITNESS:  I want to say three.

BY MR. FRASIER:

Q.      And he's coming in; he's out of breath, he's frantic, and you finally --

Exhibit 5002 at 28

*Denise Bertrand*

A.    Yeah.

Q.    -- looking at some of the reports, I think you at one point thought it felt strange because you didn't think it was that big of a deal.

A.    Well, yeah, because she -- and -- and when I said it to him, I was calm, you know, because I thought, you know, her and Cheri both and -- and their friend Melissa, you know, would go jogging all the time.

Um, the -- we would call it the loop.  You know, when you go through the middle of Coquille on Central Street, and all the way around and you come back to the highway and go around, it's a three-mile, almost exactly, loop.  And so it was a good way for them to, you know, write down for their exercise because they were pretty good at keeping up with enough exercise, keeping toned for their sports.  Keeping in shape, diving, that kind of thing.

And, uh, she would jog it sometimes by herself, sometimes with a friend, sometimes a couple of times a day. I -- you know, I figured maybe her and Cheri had gone out for a jog; I didn't see what the -- yeah.

Q.    Now, one of the times that he comes back that night, did you go outside to the car that he was driving?  Do you recall going outside Denny's and going to the car?

A.    (Pause.)  I don't know.

(Pause.)  Right now, I can't say that I do

Exhibit 5002 at 29

*Denise Bertrand*

remember that now.

Q.    Okay.  That's fine.  Uh, you get off shift 11:30, 11:45; is that right?

A.    Right.

Q.    And you go home and go to bed?

A.    Yeah.  I -- I went home, and she wasn't -- I, I believe I looked in her room and she wasn't there.  And I looked in my mom's room and it seems like my mom was asleep.  And as last I'd heard from my mom or her, one of the two, that she was going to be spending the night with Cheri, so I didn't -- you know.  Being's he was looking for her, I thought maybe I should check if she's not there, you know.  But then when she wasn't, I thought she was at Cheri's (indiscernible).

        GRAND JUROR:  About what time would that have been?

        THE WITNESS:  When you work at a pizza parlor, sometimes you get tired of eating pizza all the time, so I didn't always have dinner at the pizza parlor.  So, I might have got something to eat and drink before I went to bed, but probably sometime between 11:45, 12:15.

        GRAND JUROR:  Thank you.

BY MR. FRASIER:

Q.    Now, the next day, that would be June 29th, you wake up; Leah's not home?

Exhibit 5002 at 30

*Denise Bertrand*

A.    Leah's not home.

Q.    Mom's upset.

A.    Very upset.

Q.    She doesn't want Grandpa to know that Leah's missing.

Nick shows up, and do you two go off in Nick's car looking for Leah?

A.    I don't think we went looking for her.  I think -- we might have.  If anything, we probably would have called Cheri's house, because that's where she was supposed to be at.  I don't remember driving around looking for her that morning.

Q.    Okay.

A.    Um, I remember we went to the police station to file a missing persons.

Q.    This is Nick and you?

A.    And my mom.

Q.    Okay.  What's Nick telling you during, you know, that day and the next day about what happened to Leah?  What did he tell you, to the best of your recollection?

A.    If I remember right, he said that he went over there to Cheri's house and was trying to talk to her and she got upset.

No, he went over there to see her, and Cheri and her had got in an argument, I believe is what he told me.

Exhibit 5002 at 31

*Denise Bertrand*

And she walked off from Cheri's house, and he went driving looking for her and couldn't find her.

Q.    Did he say anything about coming over to your house, seeing a light in the window and throwing rocks at the window, or anything like that?

A.    I don't think he said anything that -- at that moment.  At some point, yes; I remember him saying, "I even went to her bedroom window and was throwing rocks at her window and she wasn't waking up so I knew she wasn't home."

Q.    Okay.

A.    Which is odd, because there was no rocks.

GRAND JUROR:  This Cheri -- is it Cheri, is that how you pronounce it?

THE WITNESS:  I believe it's Cheri.  Yeah, it's Cheri.

GRAND JUROR:  Did -- when you said they might have had -- he'd said they -- they had an argument or something, possibly?

Did anybody talk to her in that time frame about the argument or anything, or what -- what -- at that -- at that point?

THE WITNESS:  I --

GRAND JUROR:  Talk to her at all, I guess?  Do you know?

MR. FRASIER:  She's our next witness.

Exhibit 5002 at 32

*Denise Bertrand*

GRAND JUROR:  Oh.  Okay.  Oh, that's -- oh, okay.

THE WITNESS:  I was going to say I don't sure -- I heard from somebody.  I don't think it was her, though.

GRAND JUROR:  And Nick was the one that had said that they --

THE WITNESS:  Nick had said that her and Cheri had gotten in an argument, because he went by there to go see her and she wasn't there, and Cheri told her she left because they had got in an argument.

GRAND JUROR:  Okay.

THE WITNESS:  At some point, some -- ah, I wish I could -- I heard at some point from somewhere, not that that gives you much, that she and -- Cheri and Leah had got in an argument because she was trying to tell Leah that Nick had been cheating on her and Leah didn't want to believe it.  And that's why she left.

GRAND JUROR:  Okay.

THE WITNESS:  But I don't recall exactly where I'd heard that.

GRAND JUROR:  Okay.

Sorry.

MR. FRASIER:  Okay.

BY MR. FRASIER:

Q.    In the next following days, do you -- are -- well, first of all, you were -- in the days following Leah's

Exhibit 5002 at 33

*Denise Bertrand*

disappearance, you were supportive of Nick?

A.    Oh, yes.

Q.    Do you drive around with him?

A.    Drive around with him in his car; drive around with him in my mom's car; drive around with him in his parents' car --

Q.    Over the years, in retrospect, did you see things at that time that caused you to think, "Gee, I wished I'd have paid more attention to that now," or about anything he did back then and his behavior?

A.    He didn't -- if you're -- if you're looking for something in particular when you're driving around, you know, especially in a small town, you know a lot of people.  You stop and ask them, "Hey."  Did -- you knock on their door, or if they're outside ask them, "Did you -- did you see this person or this thing," you know, whatever you're looking for as you're driving around.

He never really stopped and asked anybody.  You know, that -- that always -- that strikes me as odd now, you know.  And as we're driving, I mean, I'm looking down alleyways and in between houses, you know.  You just -- probably desperate, I guess, to want to know where she's at and that she's okay.  He just seemed more focused straight ahead, like we're just driving.

Q.    Did he say things like, "I should have been there

Exhibit 5002 at 34

for her?"

A.    Yeah, he made -- yeah, he made lots of comments.

And I made some, but I was like, "What?  You know you're her boyfriend, but I'm supposed to be her big sister, if anybody should have been there for her."

Q.    What about other girls?  How did he, uh -- was he starting to go out with other girls before even Leah's body was found?

A.    Since all of this, I have heard of a girl at Coos Bay High School that he was trying to see, and the girl's parents were very concerned about him.  It struck him -- they struck him -- he struck them as not okay.  And, um, had the school try and not allow him on the property.

Q.    Okay.

A.    I have heard of a girl in Myrtle Point that he was dating be -- right before, and during everything with Leah, that a lot of her friends and family, again, he -- they did not like him.  He struck them -- you know, as being --

Q.    Okay.  Well let's --

A.    -- mean and controlling.

Q.    Let's not worry about things you heard now.  Let's back up, maybe did you actually -- before Leah's body was found, did you ever see him being with other girls, and things along that line?

A.    Before her body was found?

Exhibit 5002 at 35

*Denise Bertrand*

Q.    Yes.

A.    (Pause.)  I know that there was girls -- other, you know, friends and stuff that were driving around --

Q.    Okay.

A.    -- looking with him too.

Q.    Let's not worry about that then, okay?  Let's move on to something else.

Now, he told you that he had come by the house, and that he saw a light in Leah's window, and he threw some rocks at the window.  And did you have problems with that story?

A.    A few.  There's -- that -- we don't -- my grandparents didn't have, like, a gravel driveway to, you know, have rocks to throw up at the window, for starters. They had a lawn; you know, green grass, and below her window was tomato plants -- my grandpa's tomato pat -- plant patch, where he grew tomatoes at.  The driveway was concrete.  I mean, there was no rocks, so I wasn't sure about that aspect of things.

Also, I don't know what light he could have seen. She didn't -- there wasn't any -- there was no light on in her room.  I don't know what light he could have been seeing.

GRAND JUROR:  Was there just an overhead light in her room?  Or did she have a --

THE WITNESS:  She had an overhead light.  She had

Exhibit 5002 at 36

37

*Denise Bertrand*

a TV.

GRAND JUROR:  But when you checked on her, when you went there in and checked her room that night --

THE WITNESS:  Nothing was on.

GRAND JUROR:  -- nothing was on.  Okay.

BY MR. FRASIER:

Q.    Let's talk about -- it's been ten years now.  How has -- has Nick changed in how he deals with you or your mom?

A.    I never see him.

Q.    Okay.

A.    (Pause.)  His parents have this candle thing that they make, and they had a booth at the fair one year.  And they seemed awkward the way -- you know, like they were trying to be friendly but felt weird about being friendly, but I did not see him.  I think it's been probably four, five, six years since I've seen him.  And there was a lot of distance that both of us kept from each other.

Q.    One thing I want to ask you about -- this will be about a week after Leah's disappeared, Nick had been over at the police department and had been interviewed by the police and he came over to your house, to your parents' house.  How did he behave when he got there?

A.    Ill.  (Laughs.)  Ill.  He was -- kept, like, dry-heaving, and qwirking his entire body, and then finally did throw up.  It wasn't even -- part of it was my

Exhibit 5002 at 37

*Denise Bertrand*

grandparents' driveway, another part of it was the neighbor's side yard.  Just vomiting.  And then dry-heaving more, and then vomiting.  Couldn't stand up straight.  Very awkward behavior.  Panicky again, like sweaty again.  I didn't quite understand all that.  Why -- I don't know.  That was -- it was not normal.

MR. FRASIER:  All right.  I don't think I have any more questions for you.  Is there anything you think the grand jury ought to know about this that I haven't asked you about?

THE WITNESS:  (Pause.)  I don't think so.

MR. FRASIER:  Okay.

Grand jury want to ask any questions?

GRAND JUROR:  I've got one.

There may have been an exchange between your grandfather and Nick's father, is that about him thinking that, Nick had something to do with it.  Do you know anything about that?

THE WITNESS:  If I remember right, my grandpa was the first person to have doubt in him.  None of us, at first, wanted to believe that Nick would do something like that.  She cared about him a lot, and everybody of course wanted her to be happy.  Pretty close family.

And, uh, he's the first one, if I remember right, that started in on something's not right about that boy.  And

Exhibit 5002 at 38

*Denise Bertrand*

he -- my grandpa was very distraught on top of already having a lot of health problems to begin with.

Um, and one of the times that they came by, I do believe my grandpa had a pretty good yelling match with Bruce about his blanking son and how he's blanking wrong and I don't want you and your blanking son around my blanking house type-thing.

GRAND JUROR:  Did their -- did your perception of him or their perception of your family change after that encounter?  Does that -- because you said Nick has been very distant.  Was that the beginning of that distance, in your --

THE WITNESS:  That, yeah.  You know, after that, uh, my mom and I and my grandma and aunts and uncles that were around a lot definitely started getting more and more doubt in him, and he just stopped fighting for her, you know. He didn't -- he didn't continue to worry about her; he didn't come -- he started coming around less, and when he did he was more casual than he should have been and less worried and -- you just didn't see a lot of remorse on his face.  Especially after that incident, yes.

GRAND JUROR:  And that was after the funeral?  I mean, sometime after the funeral -- that exchange between your grandfather --

THE WITNESS:  Yeah, I believe it was shortly after that -- after the memorial, yeah.

Exhibit 5002 at 39

GRAND JUROR:  Okay.

MR. FRASIER:  Okay.  Any other questions?

All right.  That'll do it.

### TESTIMONY OF CHERI MITCHELL

(Witness sworn.)

BY MR. FRASIER:

Q.    Thank you.  This is the grand jury.  And before we get started, I need to tell you I got the recorder going. It's kind of obvious, but --

A.    (Laughs.)  Okay.

Q.    -- I need to tell you that.

A.    I figured that anyways.

Q.    Yeah.  If you would please, if you would speak up, and --

A.    Okay.

Q.    -- especially when the air conditioner's on, so we can be sure the recorder gets everything.

A.    Okay.  No problem.

Q.    First of all, could you tell us your name and where you live.

A.    My name is Cheri Mitchell, and I currently live in Coos Bay, Oregon.

Q.    And you, when you were growing up, did you live over here in the Coquille area?

A.    Mm-hmm.  I lived on North Elm, behind McKay's.

Exhibit 5002 at 40

*Cheri Mitchell*

Q.    And did you have -- in your freshman year of high school, did you have, I guess, your best friend, Leah Freeman?

A.    Yes.  I -- I mean, it's kind of goofy now to look back and say "best friend," you know, because you have all sorts of friends, but at the time, yeah, I would have said my best friend.  Yeah.

Q.    Okay.  How long did you know Leah Freeman?

A.    Uh, we became friends in the beginning of seventh grade, volleyball.  So, just three years.

Q.    Okay.  Um.  Well, let's move to the fall of 1999. That would be your freshman year of high school.

A.    Mm-hmm.

Q.    And -- you gotta do "yes" or "no."

A.    Yes.  Sorry.

Q.    -- because the recorder sometimes can't tell the difference between --

A.    Mm-hmm and hmm-mm?

Q.    Right.  Okay.  And did you become acquainted with an individual named Nick McGuffin?

A.    Yes.

Q.    How did you know Nick?

A.    I actually, I knew of him.  He was in my brother's grade, and so I'd already known of him.  They hadn't really been friends, but, you know, they'd been

Exhibit 5002 at 41

*Cheri Mitchell*

acquaintances.  And then he started dating Leah during volleyball, and so that's how I -- I mean, I don't think I ever really got to know him, but that's how I knew him better.

Q.    Leah starts dating Nick.  He's a senior, is that right?

A.    Yes.

Q.    She's a freshman?

A.    Mm-hmm.  Yes.

Q.    And, well, did you get an opportunity to observe this relationship?

A.    Um, a little.  I mean, quite a bit.  I actually -- you know, when they got together, we honestly spent less time together than we had, you know, the past couple years, but I did observe it.

Q.    How would you describe this relationship?

A.    Dramatic.

Q.    What do you mean by "dramatic?"

A.    Um, I think that -- like, Leah was a really happy, bubbly, pretty calm person, really.  And Nick brought out like this jealous side of her.

I think they brought out the worst in each other. I mean, I don't really know how he was aside from being with her, but I feel like the two of them together were just awful.  I mean, it was just a wrong fit.  He was jealous, and

Exhibit 5002 at 42

*Cheri Mitchell*

she was jealous, and she wasn't even a jealous person.  Um, you know.

And he had a temper, and, so it was just --

Q.    She had a temper too?

A.    I never -- I would have said no until I saw them together.  I think -- I mean, I don't know if it was that she had a temper, I think it was that she would get jealous.  Um, but it wasn't necessarily a temper.  Like he would get mad and just -- he had a temper.

Q.    Did they get into arguments and yelling back and forth at each other?

A.    Mm-hmm.  Yeah.  On a -- I mean, I think pretty regularly.

Q.    Okay.  Was there ever occasions that you saw Nick do things like, you know he'd get mad at Leah and do things hit a locker or the wall or something?

A.    He, um, down by the cafeteria in the high school, he punched a hole in the wall, I think twice, but I mean, I know it was at least once.  But I can't remember what he was mad about.  It was always something stupid.  It usually was.

Q.    But it involved Leah?

A.    She was there, yeah.  She was there.  He was mad at her, um, because I was with her at the time and that's why he punched it.

Q.    Now, were you concerned about Nick and Leah, that

Exhibit 5002 at 43

*Cheri Mitchell*

you wrote him a note telling him he needed to be nice to your friend?

A.    Yes, I did.  I'd like to clarify, though.  What I wrote in that note was in a movie and it was a joke at the time.  Okay.  I'm not a fruit.  (Laughs.)  It was a joke.

Q.    All right.  Does this appear to be a copy of the letter you wrote to Mr. McGuffin?

A.    (Pause.)  Looks about right.

Q.    Looks about right?  Okay.

You told him you didn't want him to hurt Leah.

A.    No, I didn't.

Q.    And you made reference to a movie in there, if he did something bad to her that you would do certain things to his anatomy.

A.    Yeah, I remember very clearly.  (Laughter.)  It was -- I mean, obviously I never thought this would happen and we would all be reading the note -- the letter.  But, yeah.

Q.    Okay.

I'm going to pass it around.  You folks can take it.

Did Mr. McGuffin respond to you?  Did he send a note back to you?

A.    He did.  Strange that we both kept our notes.

Q.    And I'm going to show you that.  Is that the note

Exhibit 5002 at 44

45

*Cheri Mitchell*

he sent back to you, or a copy of it at least?

A.    Yes, it is.  His handwriting is much better.

Q.    A lot of the things you wrote in your letter was that Leah was "your girl."

A.    We used to joke about -- me and Leah actually had t-shirts made, um, and hers said "Cheri's Girl," and mine said "Leah's Girl" on it.  And it used to just piss Nick off. And, um, you know, it was just a joke.

And so he used to always come up, whenever I was wearing my shirt, he'd be like, "No, she's my girl."  And so, it was just kind of an ongoing battle, you know?  I'd say, "No, she's my girl."  I mean, it -- it was just kind of a joke, obviously.  Now she's nobody's girl.

Q.    He wrote in there, in that note he wrote to you. "P.S.  She's my girl, not yours," and kind of underlined the "my girl" aspect of it.

A.    Yeah.

Q.    Okay.  Let's talk about June 28th, the day that Leah disappeared, okay?

Did you, in early morning, nine o'clock or so, try to get a hold of Leah?  Call her on the phone?

A.    Um, not that I remember, but there's a good chance I did.

Q.    Okay.

A.    I mean, I think I called her most days.

Exhibit 5002 at 45

*Cheri Mitchell*

Q.    All right.

GRAND JUROR:  Excuse me.  Will we get a chance to look at these again?

MR. FRASIER:  Sure.  You can keep them out, and probably look at them out there.  They're going to be part of this, so you're going to have access to them for a long time.

GRAND JUROR:  Okay.  Okay.

BY MR. FRASIER:

Q.    Did she -- well, had she left her swimsuit at your place?

A.    Yeah, it was from -- um, it hadn't been from our freshman year.  It was one I think that she'd had maybe either seventh or eighth grade.  I don't know if I borrowed it from her or something, but I mean it's -- I've had it for years.  I mean, obviously years now.  I still have it.  Um, but it wasn't one -- I mean, it wasn't even one that she had our freshman year.  But, yeah.

Q.    Was there some conversation about her coming over and picking up her swimsuit, or something along those lines?

A.    I don't think so.

Q.    Okay.

A.    I don't think that was why she was ever coming over.

Q.    Okay.

A.    I don't even know if, like, she would have wanted

Exhibit 5002 at 46

*Cheri Mitchell*

it.  It was kind of like out of date by the time, you know, she -- our freshman year.

Q.    All right.  So, but it -- was there some sort of plan made that Leah was going to come over on the evening of the 28th --

A.    Yes.

Q.    -- and be at your place?

A.    Yes.

Q.    Now, how did that come about?  How did that -- how did you make arrangements to do that, do you recall?

A.    I honestly don't remember.  I'm sure it was just on the phone.

Q.    Okay.

A.    You know.  I'm sure I just called her and -- you know, I hadn't spent a lot of time with her with just the two of us in a while.  Or -- or even, you know, with Nick there. I mean, I hadn't really seen her that much in a while.  Um, so.

Q.    How did -- how did your mom feel about Nick?

A.    Um, I don't really think that she -- like, as far as I know, I mean, she hadn't really felt necessarily anything about Nick.  You know.

It wasn't necessarily that she didn't like him. I think that we all knew that he did drugs.  You know, we knew that he smoked pot and, um, didn't really want that for

Exhibit 5002 at 47

*Cheri Mitchell*

Leah.

But it wasn't -- I don't think it was that anybody necessarily didn't like him.  It wasn't even necessarily that I didn't like him.  I just didn't like him with her.

Q.    Okay.

A.    I just didn't think he was good for her.

Q.    Okay.  So, she's supposed to be at your house about 7:00.  Does she show up about seven o'clock?

A.    I think so.

Q.    Okay.  How does she get there, do you recall?

A.    Nick dropped her off.

Q.    Was there anybody else with them?

A.    I don't know.  I didn't -- I don't remember going outside.

Q.    Okay.  So what happens when Leah comes over to your house?

A.    Um, she just came over.  We were up in my room and listening to music and hanging out.  You know, just kind of doing what girls do.

And at some point we decided that we wanted to go for a run.  Um, we used to do that a lot together; we'd go running together.  And so we were going to go for a run.

And I went down and asked my mom if I could go running with her, and she asked me if Leah was actually going

Exhibit 5002 at 48

*Cheri Mitchell*

to run the whole way with me and come back, or if I was going to be left by myself somewhere, because there had been a couple times in the past where me and Leah had gone running together and Nick would drive by and stop and Leah would get in the car with him and I would end up running by myself.

And so my mom was -- you know, she obviously didn't want me coming home -- I'd come home a couple times late by myself in the dark and she was mad about it. And so she was asking me, you know, if that was going to happen and I said, "I don't know what's going to happen, you know if he comes and drives by there's a chance she'll get in the car, you know. I don't know."

And so, you know, I was arguing with her because I wanted to go, and she didn't want me to go.

Q. Okay. So, you don't end up going running?

A. Mm-hmm.

Q. No?

A. No.

Q. Okay.

A. No running.

Q. And does Leah apparently overhear part of this conversation?

A. Yes. I mean our house was pretty small.

Q. Okay. Can --

A. It wasn't -- it wasn't even necessarily a

Exhibit 5002 at 49

*Cheri Mitchell*

conversation that we were trying to hide from her.

Q.    Okay.

A.    I mean, it wasn't like anything necessarily negative towards her.  I don't think -- like my mom wasn't trying to hurt her feelings; she was honestly just asking, you know, is Leah going to come all the way back with you?

Q.    Yeah.

A.    And so I took it, you know, like she was saying no, and didn't want to hear the words "no," because I was 14.

Q.    Okay.

A.    So.

Q.    How did Leah react?

A.    Uh.  She got mad.  I mean, she walked down the stairs and walked out, and I -- I mean, she took it really personal, you know?  She felt like my mom didn't like her at that point.

You know, I remember her walking outside and, you know, following her and she's saying, you know, "Your mom doesn't like me," or "Your mom hates me," or something.

I said, "No, she doesn't hate you, you know. It's just that she doesn't want me to walk -- you know, she doesn't want me to be in the dark by myself."

And so I think that, you know, she took it personal.  Um, but, you know, it wasn't.  And I tried to make her realize that.

Exhibit 5002 at 50

*Cheri Mitchell*

But then it -- you know, the whole conversation shifted to Nick and just the fact that, you know, I didn't want her smoking pot and I just thought she was above it, and -- I mean, you have to remember I was 14, and so at the time I'd never smoked pot, and it seemed like the end of the world that my friend was smoking pot.  You know, I don't smoke pot now, but I have.  And so at the time I just -- it was like the biggest thing in the -- you know, in the world, was like, you know, I can't believe you're smoking pot.  You know.

Q.    And, did she react to it like something to the effect of, "Well, I'm sorry I'm not good enough for you?"

A.    Yes.  That's what she said.

Q.    Okay.

A.    And there was -- you know, I'm -- it wasn't like a super short conversation, I just can't remember everything else that was said.

GRAND JUROR:  I got a --

When you say you were going go to -- this is, they said this is what she was wearing, most likely, the day of her disappearance.  Would that have been normal attire for you guys to go jogging in, then?

THE WITNESS:  No, she would have borrowed a pair of shorts from me.

GRAND JUROR:  Okay.

Exhibit 5002 at 51

THE WITNESS:  But we didn't go jogging.

GRAND JUROR:  So if she had gone, then she would have changed?

THE WITNESS:  Yeah, we wouldn't -- she wouldn't have been running in jeans.

GRAND JUROR:  Okay.

THE WITNESS:  No.

GRAND JUROR:  Okay.

BY MR. FRASIER:

Q.    While we're on it, that picture there:  Does that look like what Leah was wearing that day?

A.    Yeah, that's --

Q.    Now, she leaves at that point?

A.    Mm-hmm.

Q.    Yes?

A.    Yes.

Q.    Okay.  And then you go back inside your house, back to your apartment, or --

A.    Um, as far as I remember.

Q.    Okay.  Let me ask you this:  Leah and you, did you pass notes back and forth between each other all the time?

A.    Yes.  Quite regularly.

Q.    Even if you --

A.    We loved to write.

Exhibit 5002 at 52

*Cheri Mitchell*

Q.     Even if you're in the same room, rather than talk, you'd write a note?

A.     We, uh -- I think that that night was actually the only time that she'd ever actually wrote a note to me when I was in the same room.  And I actually remember thinking -- you know, wondering why she didn't just talk to me.

But she really did love to write.  It was just kind of a strange thing.  She -- she really loved her handwriting, and so she would always write notes and like, in her notes she would say, "Oh," you know, "Look at that L," or you know, "Look at that; that's so funny."  And so she just -- you know, I remember at volleyball games, or places where we had to be quiet, she would always just write little notes and pass them.  So she just -- and it wasn't just me.  I mean, she wrote to all of our friends.  So, she just liked to write stuff.

Q.     So, were you actually aware that she had written you a note there that night?

A.     Not until, um, after I went back upstairs.  I -- I mean, I knew that she was writing, but she also, you know, sometimes liked to write poetry and stuff like that.  And so I don't know -- I don't think I was aware that she was necessarily writing a note to me.  I knew she was writing, though.

Exhibit 5002 at 53

*Cheri Mitchell*

Q.     All right.  Did you -- you did actually find a note addressed to you from Leah?

A.     Yes.

Q.     And is that a copy of it?

A.     (Pause.)  Yes.

Q.     Obviously you don't see Leah again after she --

A.     Mm-hmm.

Q.     Sometime after she left, did Nick McGuffin show up at your house?

A.     Yeah, it wasn't that long after she left.  Um, not very long.  He showed up right at -- I'm pretty sure it was like, right at 9:00, right when he was supposed to show up.

GRAND JUROR:  What time did she leave, do you remember?

THE WITNESS:  It was like, 8:45 or, I mean, 8:50.  It wasn't very long.  It was just -- because I remember asking him, "You didn't pass her?"  Like, I was really surprised that he didn't -- they didn't cross paths.

BY MR. FRASIER:

Q.     And uh, when he gets there, you tell him she's already left.

A.     Mm-hmm.  I just said, you know, "We got in a fight; she left."

Q.     Okay.  And what did Nick do?

Exhibit 5002 at 54

A.   He just left.  He said, "Okay," and left.

Q.   Does he come back later?

A.   Yes.

Q.   About how long?

A.   Uh, it was like an hour or two.

Q.   Okay.

A.   I want to say it was like eleven o'clock, but it might have been 10:00.

Q.   Okay.

A.   Sorry.

Q.   When he shows up, how's he behaving?

A.   Uh, he was -- he was really worried that, you know, something bad had happened.  Um, he was pretty jumpy.

And at the time, I -- you know, it seemed kind of strange to me that he was so worried because it had only been like an hour or two.  And I thought she could be at the park, or -- I thought she was at the park.  I actually -- after he left, I drove down to the park with my brother because I thought she'd just be sitting there on the swings or something.

Um, but he came in, and I said, you know, "Well, did you call her mom?  Have you talked to her mom?"  And he hadn't called her mom, and so I said, "Well, call her mom," you know.  "She's probably at home."

And so I picked up the phone and gave him the

Exhibit 5002 at 55

*Cheri Mitchell*

phone, and he called her mom, and she obviously said she wasn't there.

And he -- he was pretty jumpy, but, I mean, for starters, Nick was really dramatic. And so on the one hand it was weird that he was so worried, and on the other hand I thought, well, maybe it's just Nick being Nick, you know. Because he was just such a -- you know, he was just so dramatic about it. I thought, well, I don't know what's wrong with him.

Q. Now, were you aware that Leah was going to go to the health department to get something?

A. I was, but it's hard to remember now. I mean, I know at the time I remember talking about it, and I know in the letter -- you know, that's what she's asking me to go with her to. Um, but looking back, I can't remember much about it.

Q. Okay. So, but -- well, I'll just pass over that then. Okay.

So, Nick calls Leah's home, Leah's not there, he leaves?

A. Mm-hmm.

Q. Yes?

A. Yes.

Q. Okay. And you decide with your brother to go look for her?

Exhibit 5002 at 56

A.    We didn't really decide to go look for her.  I honestly just thought she was at the park because we would go down to the park a lot just like when we were, you know, trying to get away or something.  We'd just go hang -- we'd hang out on the swings a lot.  So we just drove to the park, but --

Q.    And that would be the 5th Street park?

A.    Yes.

Q.    Okay.  It's about eleven o'clock at night?

A.    It was right after Nick left, so I want to say it was probably 11:00.

Q.    Okay.  We heard from Mrs. Courtright that the phone call came in around ten o'clock.

A.    Then it might have been 10:00.  It's hard -- I can't remember if Nick came back at 10:00 or 11:00.

Q.    Okay.

A.    I know that -- I'm sorry.  I mean I know, you know, that my, whatever I -- my old testimonies, I guess, way back then, would have what I said, but I just can't remember.

Q.    All right.  So you don't see Leah at the 5th Street park?

A.    No.

Q.    Okay.  So you go home?

A.    Yes.

Q.    And at the time did you have a boyfriend named

Exhibit 5002 at 57

Corey Bryant?

A.    Yes.

Q.    And Corey, did he show up at your house that night, on the night of June 28?

A.    Yes.

Q.    Okay.

A.    Interestingly, though, I didn't remember any of that until I just talked to him in the waiting room.

Q.    Okay.  (Laughs.)

A.    He remembers all of it.  He actually showed up when Nick showed up.

Q.    Oh, okay.

A.    So.

Q.    We'll talk to him.

A.    But yeah, so he could tell you.  I honestly didn't remember any -- I didn't remember him being there.

Q.    Right.  The next day, I guess this will be June 29th, about five o'clock, are you over at Corey Bryant's house?  Do you recall?

A.    I guess.

Q.    Okay.

A.    He just told me that too, as well.  (Laughter.)

Q.    Okay.  Did you learn from other girls that, hey, Leah didn't show up last night.

A.    Yes.

Exhibit 5002 at 58

*Cheri Mitchell*

Q.    And how did you react when you found that out?

A.    I honestly don't remember.  I -- I don't remember being really worried.  I mean, you know, on the one hand obviously I knew she should have shown up, but I didn't truly think that anything bad had happened to her.  It just -- I don't know, it just didn't seem realistic.

And so I think I was worried, but not -- I don't, I don't know how to explain it.  I mean, I knew she didn't run away, because I knew that she wouldn't have run away.  But I just -- it was hard to understand that something might have happened to her, I guess.

I mean I'd never had anybody in my life die at that point.  Like nobody.  And so I just didn't -- it didn't even seem like a possible solution, I guess.  I don't know.

Q.    Well, on the day following, about seven o'clock, were you at a boat ramp here in the county someplace?

A.    I guess.

Q.    Okay.  Well, did Nick show up at the --

A.    Yes.

Q.    And did he have anybody with him?

A.    I think Denise was with him.

Q.    And that's Denise Freeman?

A.    Yes.

Q.    And does he ask you if you know where Leah's at?

A.    They thought that she had run away, or that I was

Exhibit 5002 at 59

*Cheri Mitchell*

hiding her or something, I don't know. But they thought that I knew where she was, basically; and was asking me, you know, where she had run away to.

I remember Denise being really mad at me because she thought that Leah had run away and she thought I knew where she went, and she thought I would keep that from her family or something. And so she was saying, you know, "You've got to tell my mom where she is."

Q. Now, in the letter that -- or the note that Leah left for you, there's an indication that there had been some sort of a dispute or argument or spat that evening between her and Nick. The following Saturday, were you with Mr. McGuffin or did you see him?

A. Um, as far as, like, dates, as far as it being a Saturday, I don't remember. But I did see him shortly after.

Q. Okay. Did you ask him, Hey, Nick, what was -- what was the beef or what was the argument between you and Leah?

A. Um, I don't remember asking Nick, but I remember asking Leah about it.

Q. Okay.

A. I mean, I remember asking her, you know, if they were arguing because he seemed kind of angry that she was coming over at all. And she just said it was because he didn't want her to come over alone, which -- I don't know

Exhibit 5002 at 60

*Cheri Mitchell*

why, you know.

She was just saying that he wanted to come with her and she wouldn't let him because we hadn't spent any alone time in a long time.  Like, Nick was just always there.  And so, according to her, that was like their little spat, but I honestly can't remember what he said about it.

Q.    Okay.  Did Nick ask you about what you or your mom and Leah had unresolved?

A.    Probably.

Q.    Did you tell -- did you tell Nick how you felt that Leah had changed since she started dated him?

A.    I honestly don't remember any of this, but it sounds -- I mean, it's all possible.  I mean, it sounds like I -- I'm sure I could have told him that.

Q.    Okay.

A.    I just honestly don't remember these actual conversations.

Q.    Now, there was about a six-week period of time between Leah's disappearance and her body being found.  Did you have an opportunity to see how Nick was behaving during that six-week period in time?

A.    Um.  The only time I remember, he called -- again, I was with my boyfriend Corey at the time -- and he called me and asked me to meet him at Sturdivant Park.

Um, he said that there was a -- just like

Exhibit 5002 at 61

*Cheri Mitchell*

inscripture underneath the bridge or something, and he was sure it said "Pooh Bear," which was what Leah called him. And so he thought that she was like living under there or she'd been under there.

And so he asked me to go meet him there. And so I -- you know, I asked Corey to take me down there. And so I went down there. And he was, you know, real frantic and was just sure that she had been there and she was living there and he showed me this nothing.

I mean, he thought it said "Pooh Bear" and it said nothing. And we were -- we were just like, "Man, he's just -- he needs help; this says nothing."

But that was the only time I really remembered seeing him. And I just thought, you know, he was just really stressed-out at that point, I guess.

Q. Well, and looking at the police reports, there was a mention that before Leah's body was found that he had started dating other girls.

A. I heard that, but it was never something that I saw.

Q. Okay.

A. I didn't -- I mean, me and Nick didn't hang out; we didn't have the same friends. But I had heard that he was dating another girl.

Q. Okay. Did you ever hear anyone tell people that

Exhibit 5002 at 62

*Cheri Mitchell*

Leah was killed by Alicia Michaud and Bill Sero and Tom Stemmerman?

A.    Yes, he told me that.

Q.    Okay.

A.    That was when I -- I ran into him like two years, three years later.  That's when he told me that.

Q.    Now, when you ran into him that two or three years later, did he ask you if Leah was pregnant?

A.    Yes, which he also asked me again when I ran into him like two years ago.

Q.    And, to your knowledge, was Leah pregnant?

A.    Not to my knowledge.

Q.    What else did he tell you?

You said you ran into him a couple of years ago. What did he tell you at that meeting?

A.    Uh, well, we were -- I was out with my fiancé and we were just at a -- the dance club in Coos Bay, and he was with his girlfriend at the time.  And as soon as we walked in they started to walk out.

And I think I kind of -- like, I think that maybe she kind of glared at me.  She was -- she didn't -- she wasn't very nice to me.  I'd seen her a few times.  And so, you know, she kind of glared at me and then they both walked out.

And I kind of followed them, and I was like, you

Exhibit 5002 at 63

*Cheri Mitchell*

know, It doesn't -- it doesn't have to be like this.  Like I'm not pointing fingers at you.  I don't know anything and -- because there -- you know, he's blamed me for a lot over the years too.

And so I just told him, you know, This is a small town; we're going to run into each other.  And, you know, I don't want you to think that -- because I honest -- I didn't think that he had done it.  So I just told him, I don't want you to think that I thought that you did this.  And so -- you know.

He just told me, you know, that everywhere he goes in Coquille, people are calling him a murderer.  And I said, Well, why don't you move if you're really not a murderer.  I wouldn't want to listen to that every day if I hadn't done it.

And then we just started talking about Leah, like memories.  And you know, we were just out.  He was talking about like how bubbly and bouncy she was, and we were just kind of laughing about it because she was, I mean, just really bubbly.  Um, but we were just -- he talked, you know, really fondly of her.

GRAND JUROR:  When was this, again?

THE WITNESS:  This was two years, or -- yeah, it was about two years ago.

BY MR. FRASIER:

Exhibit 5002 at 64

*Cheri Mitchell*

Q.    Did he say something to you about everyone knows what happened to Leah.

A.    He said that to me at the party that I ran into him the first time.  And that was my senior year in high school, I ran into him at a party.

Q.    Okay.  And did he tell you what -- and this is when he tells you about Alicia Michaud --

A.    Yes.

Q.    -- and Bill Sero and Tom Stemmerman?

A.    Yes.

Q.    Did you ask him, Gee, why don't you go to the police with this information?

A.    Yes, I did.

Q.    And what is -- what was his response?

A.    He said that he'd -- I don't know if he said that he'd tried or that he'd thought about it, but that basically they were just so caught up with blaming him that they wouldn't listen to him.

Um, and he had said something about not necessarily that he was scared of -- it was, I think it was Tom Stemmerman.  Not that he was scared, but that a lot of people were too scared of him.

Because he said that everybody knows, and I was like, Well, even if you don't go forward, why can't somebody else go forward?  And he just said that everybody was scared

Exhibit 5002 at 65

*Margaret Mitchell*

of this Tom Stemmerman guy, so that was his reasoning for nobody going forward.

Q.    I think that's all the questions that I have for you.  Is there anything that you know that you think the grand jury ought to know about this, that I've not talked with you about?

A.    Um, I don't think so.

Q.    Okay.

A.    I mean, does anybody else have any questions?

Q.    That was going to be my next one.

Any questions from the panel?

GRAND JUROR:  I don't think so.

MR. FRASIER:  Okay.  You're done.

THE WITNESS:  Thank you.

GRAND JUROR:  Thank you.

### TESTIMONY OF MARGARET MITCHELL

(Witness sworn.)

BY MR. FRASIER:

Q.    Thank you.  First of all, I got to tell you, even though it's kind of obvious, I've got a recorder on and we're recording the proceedings here today.  And it's important that you speak up.  Sometimes the air conditioning kicks on, and you need to speak up during there.

And I had to talk to your daughter a little bit about "uh-huh" and "huh-uh," that we need "yes" or "no."

Exhibit 5002 at 66

A.    Okay.

Q.    Okay.  So, first of all, could you tell us your name please, and where you live.

A.    My name is Margaret Mitchell, also known as Peggy Mitchell, and I live -- um, you want my address?

Q.    Perhaps it's easier to --

A.    Coos Bay.

Q.    Coos Bay.

A.    Coos Bay.

Q.    And you're the mother of Cheri Mitchell?

A.    Yes.

Q.    And during the time period we're talking about here; 2000, 1999 to 2000, you lived over here in the Coquille area?

A.    Yes, I did.

Q.    Where did you live when you were over here?  Do you know?

A.    On North Elm Street.

Q.    And were you familiar with a girl named Leah Freeman?

A.    Yes.

Q.    How did you become acquainted with her?

A.    Um, Leah was very good friends with my daughter. Best friends, for a while.  And she, um, often spent two or three days at a time at our home.

Exhibit 5002 at 67

*Margaret Mitchell*

Q.    Okay.

A.    And -- and lived with us, stayed with us, spent the night with us, and --

Q.    What type of girl was Leah?

A.    She was, um -- she was actually very fun.  She was a kind of clown.  And she and Cheri, um, just romped and played and laughed and -- and, um, she was -- she was kind of like another daughter.  She really was.

Q.    In the fall of 1999 your daughter and Leah, they became freshmen at the high school here in Coquille?

A.    Yes.

Q.    And at some point in time did Leah begin dating an individual named Nick McGuffin?

A.    Yes.

Q.    Did you know Mr. McGuffin?  Nick McGuffin?

A.    Briefly.

Q.    Okay.  What can you tell us about him?

A.    Um, I only know Nick more through my sons and asking questions.  He was older, so he was in, I believe my oldest son's grade, Eric's.

And, um, and I -- I know that he was known to be a hothead.  Um, you know, he had a temper.

Beyond that, I know that when Leah began hanging out with Nick, um, I know that she came to our house less and less.  She spent less time with us, and so we rarely saw her,

Exhibit 5002 at 68

*Margaret Mitchell*

after that.

Q.    Were you concerned about this relationship between Leah and Nick to some degree?

A.    Um, I didn't have concerns beyond the fact that my daughter was her friend, and I -- and I -- and I knew only through the grapevine that Nick smoked pot and Nick did drugs.  And as a single mom, I -- I, um -- you know, I did my best to try to keep my kids from that.

And so my only real concerns were that my daughter would fall into that situation, which she never, fortunately, did.

Q.    Was there ever an occasion, now that you have -- looking through the police reports, I saw some indication that you had seen Leah out in front of what was referred to as the Fast Mart one day, and you had a discussion with her about some changes you had seen in her since she started dating Nick.  Do you recall that?

A.    I don't have any recollection of that.

Q.    Okay.

A.    That was a long time ago, I presume.

Q.    All right.  Let's go to the day Leah disappeared; June 28th, 2000.

She was supposed to be at your house around seven o'clock; is that right?

A.    I don't remember the exact time frame, but early

Exhibit 5002 at 69

70
*Margaret Mitchell*

evening.

Q.    Okay.  And did she actually show up at your house?

A.    She was at our house.

Q.    And did you see how she got there, or did she just --

A.    No, I didn't physically see it.

Q.    What happens when she -- when Leah arrives?

A.    When Leah arrived, I had -- I had either just gotten home from a ten-day stretch of very, very long days of work, or I got home just thereafter.

And so I remember Leah being there, and I remember, instead of going into my home, going out and sitting in a lawn chair and putting my feet up and letting the girls kind of have the house for a little while so that I could wind down.

Q.    All right.  At some point in time did your daughter approach you about whether she could go jogging?

A.    Yes, she did.

Q.    How did you respond to that?

A.    I responded as a mom who didn't want my daughter to go out in the dark and go jogging.  And I -- and I remember asking her, um, if she was going to jog Leah home, and then Leah was going to jog her back home -- which, of course, was sarcastic -- or if she was going to jog Leah home

Exhibit 5002 at 70

71

*Margaret Mitchell*

and then jog back by herself in the dark as she usually did.

And, um -- and when they told me that, "No, Mom, I'm sure that Leah's not going to jog me back home," I said, "You're really not going to go out tonight.  I'm too tired, and I just don't want you to do that."

Q.    Okay.  And was it -- did it become apparent that perhaps Leah had overheard that conversation?

A.    I'm sure she did.  I was pretty loud.

Q.    Okay.  And did Leah get upset?

A.    Yes, she did.

Q.    And did she leave shortly thereafter?

A.    She did.

Q.    What happened after Leah left?  Did anybody come by your house?

A.    Um, Nick returned.  And try as I do, I can't pull up any time frame.  But I know that he returned, um, shortly thereafter, and it was a short enough timeframe that I remember thinking and -- and probably voicing to my daughter, that there's no way he couldn't have passed her.

So I'm sure we're talking within about a 15-minute time period because it wouldn't have taken her more than probably 20 minutes to walk all the way home.  And if she jogged, it would have been less than that.

So, the first time, it would have been a short time frame, but I can't give you an exact.

Exhibit 5002 at 71

*Margaret Mitchell*

GRAND JUROR:  I'm sorry.  You say Nick returned. You had said you don't know how Leah got there initially, it's --

THE WITNESS:  No, I know -- I know how she got there, but I didn't physically see the vehicle.

GRAND JUROR:  Oh.

THE WITNESS:  He dropped her off.

GRAND JUROR:  Oh, okay.  Okay.

THE WITNESS:  He dropped her off.

GRAND JUROR:  So then he came back at 9:00? The --

THE WITNESS:  Yeah.

GRAND JUROR:  Okay.

THE WITNESS:  If -- and the time frame back then was clear.

GRAND JUROR:  Okay.  Yeah.  I understand.

THE WITNESS:  Okay.

GRAND JUROR:  Thanks.

THE WITNESS:  Okay.

BY MR. FRASIER:

Q.    Now, so he comes by, she's gone, he leaves?

A.    Yes.

Q.    Does he come back?

A.    Yes.

Q.    Do you -- can you give us a rough idea how long,

Exhibit 5002 at 72

73

*Margaret Mitchell*

how much time had passed?

A.    Roughly, maybe an hour.  And I -- and I know that I had already gone to bed, and so typically after that kind of a run at work, it probably, um -- ten-ish to 11:00.  It wouldn't have been much later than that.

It was late enough that I had just turned the lights off, and when we heard the knock at the door I came to the door and my daughter came down the stairs to the door.  Um, and so -- um, I'd have to just say roughly ten to 11:00.  I don't remember exactly now.

Q.    Okay.  Did you see him or talk with him when he came back?

A.    Um, very briefly.  And, um -- and I heard his voice.  I wasn't going to open the door and, um -- and I heard his voice and he sounded very nervous.  And so, because he was concerned, however this happened, um, we opened the door; I stayed there, um, and Cheri had a brief conversation.

And then Cheri either dialed the phone and handed it to him -- I don't think we really let him in the door.  And our phone was right there next to the door with a very long cord, and so I -- I believe -- I -- I believe Cheri dialed the phone and handed it to him, and called Leah's mother's house.

Q.    Okay.  Now, when he comes to the door, you said he seemed very nervous.  Did he -- I guess what I'm trying to

Exhibit 5002 at 73

*Margaret Mitchell*

figure out is how -- how was he behaving in terms of Leah not there, or him not being able to find Leah.  How would you describe that?

A.     You know, my only recollection is that he sounded frantic enough that I couldn't say just, "No, Leah's not here," and make him go away, which was my first gut instinct.

And so he sounded frantic enough that I let Cheri, you know, open the door and dial the phone.  And, um, he sounded very, very, very concerned.

But the whole thing made no sense, because he was so upset, yet he didn't check the one place she should have been if she wasn't at our house.  Um, especially since we told her she was -- told him she was jogging home.  That's the one place he apparently didn't check.  He said he hadn't called yet; Cheri asked.

Q.     Did it seem to you a kind of an overreaction, how he was behaving?

A.     Um, it was unusual for me to see that.  I had never really seen him upset or heard him in that way.  So to me it was a little bit of a shock.  Like I said, shock enough to say, "Okay, open the door."

Q.     At a later time, do you recall having a conversation with Nick about what had happened that evening?

A.     Um, not -- not -- I really don't.

Q.     Okay.

Exhibit 5002 at 74

A.    I really don't remember that.  I remember talking to Nick various times, or giving him a hug at a -- at a candlelight vigil or something, but I don't really remember having conversations with him.

Q.    Let me see if this will jog your memory.  It was in an official report that on the second of July you talked with Nick and he told you that he dropped -- that before he dropped Leah off at your place, Leah was bugging him.

A.    I'm sorry, I don't remember.

Q.    You don't remember that?

A.    I really don't.

Q.    Okay.  Did you have an opportunity to observe Nick or how he behaved in the upcoming weeks, or after Leah disappeared, at all?

A.    No, not -- not personally.

Q.    Okay.

A.    Oh, one -- one -- one.  No, not personally.

Q.    No?

A.    No.

GRAND JUROR:  Do you know -- did you have any way of knowing what kind of relationship Nick had with Leah's parents at that time?  Did you -- I mean, would you say for him to call them would have been -- he wouldn't been comfortable calling them, I guess?

THE WITNESS:  Yeah, I think he had, um -- even

Exhibit 5002 at 75

*Margaret Mitchell*

though Leah's mom -- you know, moms of teenage daughters and boyfriends.  Even though she was, um, probably not in love with that whole setup, I'm very sure they had a comfortable enough relationship that he could have called or he could have knocked on the door.  He had been there before.

GRAND JUROR:  Right, that day.

THE WITNESS:  Yeah.  So it -- it, um -- I'm very sure that he would have been comfortable enough.  Cory was that kind of mom that it -- it -- she wouldn't have freaked out about it.  She would have been more concerned about Leah.

GRAND JUROR:  And just so we're clear, Denny Freeman, Leah's father, the mom and dad had divorced.

THE WITNESS:  Right.  They didn't live together.

Now, at the time, was it -- see, I'm not even -- I'm not even remembering where Leah was living.  She was living in the house next to us, I believe at the time.  Around the corner from us.  Not with, um, Cory's parents, because they later moved in with Cory's parents.

GRAND JUROR:  And at the time --

THE WITNESS:  See, I'm not even sure.  They were living with Cory's parents on Knott, right?

GRAND JUROR:  Yes.

THE WITNESS:  Okay.  Right.

GRAND JUROR:  Thanks.  That's it.

MR. FRASIER:  All right.  Any -- I don't think I

Exhibit 5002 at 76

*Margaret Mitchell*

have any other questions.  Is there anything you think the grand jury ought to know about this that I haven't asked you?

THE WITNESS:  There's only one thing, and I'm only bringing it up because I'm not sure if anybody else has, and I know that Cory's father is since deceased, long since deceased.

And I do, um -- and I got to know him, um, the best after Leah was gone.  And I visited the house several times, and I had some very solid conversations with him about Nick.  And he -- um, he did tell me of the day that Nick -- and I had just missed it apparently, when I came over, that Nick had a polygraph, and --

MR. FRASIER:  No.  Don't -- don't -- don't --

THE WITNESS:  Don't talk about it?

MR. FRASIER:  Cannot talk about it.

THE WITNESS:  I will not.  I was just going to tell you what he said behavior-wise.

MR. FRASIER:  Yeah, well --

THE WITNESS:  But no.  Then that -- then there is nothing else.

MR. FRASIER:  Okay.

THE WITNESS:  Very little.  Um, very little interaction between Nick and myself.

MR. FRASIER:  Okay.

THE WITNESS:  Okay.

Exhibit 5002 at 77

MR. FRASIER:  Thank you.

Grand jury have any questions?  Okay.

THE WITNESS:  Okay.

MR. FRASIER:  Thank you.

THE WITNESS:  Can I ask a question?

MR. FRASIER:  Well, why don't we step outside and --

THE WITNESS:  I just want to understand about grand jury time frame.

MR. FRASIER:  Okay.  Let me turn this thing off.

### TESTIMONY OF COREY BRYANT

(Witness sworn.)

BY MR. FRASIER:

Q.    First of all, before we get started, even though it's kind of obvious, I have to advise you we have a tape recorder going here.  A digital recorder, and we're recording these proceedings, okay?

A.    Okay.

Q.    First of all, could you tell us your name and where you live.

A.    My name is Corey Bryant, and I live in Fernley, Nevada.

Q.    And have you lived in Coquille in the past?

A.    Yeah, I lived here from '99 to '01.

Q.    Okay.  Did you go to high school here?

Exhibit 5002 at 78

*Corey Bryant*

A.      Yes, sir.

Q.      Did you graduate?

A.      Yes, sir.

Q.      You got tired of a state that wasn't warm?

A.      Yeah.

Q.      Okay.  Um.  One of the previous witnesses in here was Cheri Mitchell.  Are you familiar with Cheri?

A.      Yes, sir.

Q.      And how did you know Cheri?

A.      Um, Cheri and I were really good friends in high school.  Um, we dated for quite a while.  Um, kind of kept in touch off and on over the years, but I live a long ways away.  So, not great friends like we used to be, but we were really good friends in school.

Q.      In the year 1999-2000, you're a student at the high school at that time?

A.      Yeah.

Q.      Were you like a junior that year, that would have been a junior year?  If you graduated 2001, that would have been your junior year?

A.      Yeah.

Q.      Okay.  Were you familiar with or did you know a person named Leah Freeman?

A.      Yeah.  She was Cheri's like best friend, so I saw her a lot.

Exhibit 5002 at 79

*Corey Bryant*

Q.    Saw her a lot?

How about a guy named Nick McGuffin?

A.    That was Leah's boyfriend.

Q.    Okay.  Did you -- while you were at the high school, had you -- you indicated that they were girlfriend and boyfriend?

A.    Mm-hmm.

Q.    Did you have an opportunity to observe their relationship, how they got along?

A.    Um, now and then, yeah.  Um, not, obviously, all the time.  I mean, I was with Cheri most of the time.  But, um, Nick never really let Leah hang out with Cheri, um, which was hard because they were like best friends.

Q.    All right.  Well, let's talk about the that day Leah Freeman disappeared.  That would be June 28, 2000.

Did you go over to Cheri Mitchell's house that night?

A.    Yeah, I did.

Q.    Do you recall about what time it was?

A.    Yeah, really easily.  Um, I went in there at, uh -- I went over to her house right about 8:30.  Um, I had to be at work at McKay's at 9:00.  I was working graveyard at McKay's grocery store.  Um, so I got there about 8:30.

Q.    What happened when you got there?

A.    Um, Cheri was in the driveway, and she was pretty

Exhibit 5002 at 80

*Corey Bryant*

upset because Leah and her had gotten into some kind of a -- and I wouldn't call it a dispute, but Leah was headed home, um, and had left.

And she was upset because she was worried that, uh, you know, there might be some feelings hurt or something in between them.

And so I was just standing out there talking to her in the driveway, and -- for about 10 minutes, maybe.

Q.    Okay.  Was Cheri crying?

A.    Yeah, Cheri was upset.

Q.    While you're there, does Nick McGuffin show up?

A.    Yeah, he showed up about 15 minutes after I got there.  Um, he was coming to get Leah and, uh, pick her up. And he got really unhappy with Cheri because Cheri said that Leah had already left, and he was kind of like annoyed, and like rolled his eyes and just took off in his car.

Q.    Okay.  Now, you had to go to work that night; is that right?

A.    Yeah.

Q.    And so you left shortly there -- after Nick left?

A.    Yeah, like, I think I waited until like 8:55 before I went to McKay's but it was only like two minutes down the street, so.

Q.    All right.  Okay.  Now, the next day, which would be June 29th, did you see Nick that day?

Exhibit 5002 at 81

*Corey Bryant*

A.    I didn't see him that day, but I was at my house with Cheri late that next afternoon, and Nick called. Basically were wondering if we were hiding Leah because Leah had never made it home or something.  And they were talking to Cheri; I didn't talk to him then.

Q.    Okay.  Was there ever a time when you were out at a boat ramp where Nick --

A.    That was about two days.

Q.    Okay.

A.    Two days after she has disappeared.

Q.    Now tell us about the boat ramp.

A.    Um, he had -- he had told Cheri that he swears that Leah had wrote something on the bridge out by Sturdivant Park, and, um, wanted to show Cheri and wanted Cheri to come down there and everything.  And it was just kind of odd, so I went with her.

And we never fully comprehended what he was trying to show us.  He was trying to say that, look, she wrote that, or something.  And he was talking about some like graffiti or something.

And, uh -- and we went on down the river to the boat ramp, and it was just Cheri and I, and then he showed back up.  And he was in -- he was with, uh, Denise, Leah's sister.

And they were like threatening us that, "Oh, if

Exhibit 5002 at 82

83

*Corey Bryant*

you're hiding Leah," and they're all mad at us because, you know, they're all -- they thought that Leah -- they're basically accusing Leah of running away and like hiding at my house or something.  It was really weird.

And we were like, "We don't" -- you know, "We don't know what you're talking about."  And he was all -- excuse my language.  I mean, he was pretty pissed off, it seemed.

Q.    Okay.  Did he -- did they actually ask if they could search your house?

A.    Yeah.  I told them, "Go ahead."

Q.    Okay.

A.    I ain't got nothing to hide.

Q.    You weren't hiding Leah?

A.    No.

Q.    Didn't know where she was?

A.    I wish I'd -- you know, I wish I had known where she went.

Q.    All right.  After the boat ramp thing, do you see Nick around town?  Anything along that line?

A.    Now and then, yeah.

Q.    How was his behavior like during that time?

A.    He could never look me in the eyes.  I'd look at him, and he'd always just look at the ground, like -- like he's hiding something or wanted to say something but he just

Exhibit 5002 at 83

*Corey Bryant*

couldn't.  We never -- he could never look me in the eyes (indiscernible).

Q.    I know.  You drove a long way from Nevada to be here, and I appreciate your time, but I've kind of run out of questions.

A.    Uh-huh.

Q.    Is there anything that I've forgotten to ask you that you think we ought to know about?

A.    There's one thing that I was -- that always strikes me odd about it all, was this one time at the high school Leah was showing Cheri a bunch of pictures of -- of her and Nick.  And, uh, it was like, just pictures that they had taken around the house and outside and stuff, you know.  Cute couple pictures.

And Leah dropped them and they spread out on the asphalt.  And Nick freaked out and he started yelling at her, "Why could you do that?  How could you do that?  I can't believe you'd do that."

And it was just like -- it was like, "Dude, chill."  You know, "Relax."

And it just -- ever since then, I always sensed like -- you know, obviously I saw the temper.  And I never really -- never really trusted him after that because he just -- he just seemed like he had lots of deep anger or something.  I don't know how to describe it.

Exhibit 5002 at 84

*Ashley Patton*

But it always -- it always just sat here -- it's always sat with me wrong.  I could just always -- I don't know.  I remember it so well.  I just don't understand it.

Q.    Okay.  Anything else?

A.    (Pause.)  No.

Q.    Grand jury want to ask him anything?

A.    Anything.  I mean, I'm here to help.

Q.    I think we got it.

A.    Okay.

Q.    Again, I appreciate you coming up from Nevada.

A.    Well, if you guys need anything, you know how to get ahold of me.

Q.    Okay.  Thank you.

A.    Thanks.

### TESTIMONY OF ASHLEY PATTON

(Witness sworn.)

Q.    First of all, even though it's kind of obvious, I turned on that recorder there, so we're recording everything here today, okay?

A.    Okay.

Q.    First of all, could you tell us your name and what city you live in.

A.    Ashley Patton.  Coos Bay, Oregon.

Q.    And previously -- you're married now?

A.    Yes.  Previously Ashley Hutchinson.

Exhibit 5002 at 85

*Ashley Patton*

Q.    Okay.  And did you live in the Coquille area in the past?

A.    Yes.

Q.    Did you go to high school here?

A.    Yes.

Q.    Graduate?

A.    Yes.

Q.    Okay.  While you were in school here, did you know an individual named Leah Freeman?

A.    Yes.

Q.    How did you know Leah?

A.    Um, ever since we were little kids, I don't remember how.  Just school and daycare and stuff.

Q.    Were you the same age?

A.    Um, she was a year or two younger than me.

Q.    Did you know Nick McGuffin?

A.    Yes.

Q.    And was he older than you?

A.    Um, he was two grades ahead of me.

Q.    Did you become aware in 1999, the fall of 1999 to 2000, did Leah and Nick -- did they start a dating relationship?

A.    Yes.

Q.    Did you have an opportunity to observe that relationship?

Exhibit 5002 at 86

*Ashley Patton*

A.     Yes.

Q.     Could you describe it for us a little bit.

A.     Uh.  It was on-again, off-again.  They fought a lot -- argued a lot.  Um.  That's pretty much all I really know.

Q.     Okay.

A.     I don't really remember very much.

Q.     Okay.  Did you have a job the summer of 2000?

A.     Yes.

Q.     Where did you work?

A.     Hunter's, and Coquille Pool.

Q.     Okay.  And Hunter's was a restaurant here in town?

A.     Yes.

Q.     The old Dairy Queen?

A.     Yeah.

Q.     That's now Colleen's?

A.     Colleen's, yeah.

Q.     All right.  On the evening of June 28, 2000, had you been over at Hunter's that day, or that evening?

A.     That was the day she disappeared, right?

Q.     Yes.

A.     Yes, I was at Hunter's.

Q.     Okay.  Were you working that night, or were you just over there?

Exhibit 5002 at 87

*Ashley Patton*

A.      I was just over there with some friends that were working.

Q.      Okay.  And did you leave that restaurant at some point in time?

A.      Yeah, a little bit before 9:00.  Because I had to be home at 9:00, I remember.

Q.      Okay.  And were you driving?

A.      Yes.

Q.      And which way did you drive?

A.      Um, I guess it was south on Central.

Q.      Okay.

A.      Towards town, more.

Q.      Okay.  That would be -- there's Hunter's, and then there would have been a bank, and then McKay's --

A.      Right.

Q.      -- then you were headed --

A.      That road.

Q.      -- you were headed that way?

A.      Yeah.

Q.      Okay.  Did you see Leah that night?

A.      Yes.

Q.      Where did you see her?

A.      She was walking in front of McKay's, um, kind of by the pay booth -- pay phone booth.  She was walking towards Hunter's.

Exhibit 5002 at 88

*Ashley Patton*

Q.    Okay.  So that would have been the opposite direction you were going?

A.    Yes.

Q.    Okay.  Do you remember what she was wearing?

A.    A white men's tank top, a wife-beater.  Um, I think some white shorts and some tennis shoes.  And I think she had a sweatshirt around her waist.

Q.    Okay.  That picture there, it reportedly was taken that day.  Does it --

A.    That was the tank top she was wearing.  I don't -- I think she was wearing shorts when I saw her, though.

Q.    Okay.

A.    I can't remember if she was wearing jeans.

Q.    All right.  And did you stop, talk to her at all?

A.    No.

Q.    Okay.  What did she -- could you tell how she was -- did she have an attitude, do you recall?

A.    She looked mad.  Uh, she had her arms crossed in front of her.  She just had a mad look on her face.  She was stomping.  And I just remember thinking, there's Leah, and she looks pissed.

Q.    Okay.  And then so she's heading towards Hunter's, and you head on home?

A.    Mm-hmm.

Exhibit 5002 at 89

Q.    Yes or no?

A.    Yes.  I'm sorry.

Q.    The next day, did you find out that Leah was missing?

A.    Yes.

Q.    How did you find out?

A.    I went in to work at the Coquille pool, and, um, my co-worker Shawna Ferrin (phonetic) asked if I'd seen Leah Freeman.  And I said, "No, was she supposed to be here?"  And they said, "No, she's -- she's missing; they haven't seen her."

And I said, "Oh, well, I saw her last night."  And they said, "Oh, you should call the police and let them know," so I did.

Q.    After Leah disappeared, did you ever have any contact with Nick McGuffin?  Observe him, or anything like that?

A.    Um, I don't remember when it was.  It was after she had disappeared.  I was with a friend, um, somewhere in town.  I don't remember exactly where we were, or why he was with us or anything.  But, um, I did get in a vehicle with him, and then I got out because I was -- I decided I didn't like the situation, and so I left.

Q.    Okay.  Was this before Leah's body was found or after?

Exhibit 5002 at 90

*Ashley Patton*

A.    I think it was after, because I'm pretty sure it was during the school year.  I think we were on lunch break or something.  I think it was like in September, October maybe.

Q.    I don't think I have any other questions.

Is there anything you think the grand jury needs to know about this case?

A.    Um.  (Pause.)  Not that I have to offer, unfortunately.  I don't think so.

MR. FRASIER:  Grand jury want to ask her anything?

GRAND JUROR:  What time was it when you think you saw her?  You said you saw her?

THE WITNESS:  I used to know the exact time.  I think the exact time was like 8:57, but I know for a fact that it was between 8:50 and nine o'clock.  That's all I can remember for sure.

GRAND JUROR:  Okay.  (Pause.)  That's it.

MR. FRASIER:  Okay.  Anything else?

(Pause.)  Okay.

THE WITNESS:  Shortest one, huh?  (Laughs.)

MR. FRASIER:  So far.

THE WITNESS:  Thank you.

MR. FRASIER:  Don't forget your purse.

THE WITNESS:  Thank you.  I would've.  I would

Exhibit 5002 at 91

*Danny Lee*

have been back though.  (Laughs.)

**TESTIMONY OF DANNY LEE**

(Witness sworn.)

BY MR. FRASIER:

Q.    First of all, could you tell us your name please, sir?

A.    Uh, my name is Danny Paul Lee.

Q.    And you reside here in Coquille?

A.    Yes, I do.

Q.    And you're now retired?

A.    Yes, sir, I am.

Q.    And previously what was your occupation?

A.    I was a police officer for the City of Coquille.

Q.    And how long were you with the city?

A.    Uh, approximately 18 years.

Q.    And since I forgot to do it, I need to tell you, even though it was obvious, I do have a recorder --

A.    Uh, there's a tape recorder --

Q.    It's --

A.    -- here in front of me, yes.

Q.    Okay.  And how long did you work with the City of Coquille as a police officer?

A.    Approximately 18 years.

Q.    I want to go to the evening of June 28th, early morning of June 29th, 2000.

Exhibit 5002 at 92

*Danny Lee*

Were you on duty that day, do you remember?

A.    Uh, I -- I believe I was.

Q.    Okay.  This would have been the evening that Leah Freeman disappeared.

A.    Correct.  I was on duty at that time.

Q.    During the course of your shift, did you stop a vehicle driven by Nicholas McGuffin?

A.    I didn't stop Nick.  Uh, I was working graveyard, and it would've -- our graveyard started at 11:00, and I'm thinking this would have been closer to midnight.  During the course of my patrol, I did have contact with, uh, Mr. McGuffin.

Q.    And how did you have contact with him?

A.    I was driving down 12th Street near Collier, and his car came up from the other side of 12th Street from Birch to Collier.  And I came across the intersection, and we stopped and we talked to each other from vehicle to vehicle.

Q.    All right.  And what did you talk about?

A.    Well, Nick was, uh, concerned, uh, that he couldn't find Leah.  That she had, uh -- she was walking somewhere, he didn't know where.  He couldn't find her, and he seemed quite concerned about trying to locate her.  Uh, he wanted to know if I could look for her, keep my eyes open for her.  And, uh, I agreed I would, and we went our separate ways, and I never saw Leah that evening.

Exhibit 5002 at 93

94

*Danny Lee*

Q.     How would you describe his demeanor when he was talking to you about Leah?

A.     Well, he seemed upset that he couldn't find her. Uh, I don't know if they had been together earlier that night, if there'd -- anything of that nature.  Uh, but he had a -- there was a genuine concern that he wanted to find her. That she was out walking, and that was a rather late hour.

Q.     Did he express to you any concern that she was missing, or that maybe to get police involved, or --

A.     Not that I was aware of at that time.

Q.     Okay.  Just be on the lookout for her?

A.     Yeah, if I'd seen her, you know.  Needed to be looking for her, if I found her.

Q.     Did you ask any questions about where it was the last time he saw her or did you check her house or anything like that?

A.     I didn't check any houses, and I don't recall a conversation about that in depth.

Q.     Okay.  How long would you say this contact was?

A.     Uh, five minutes or less.

Q.     Again, do you recall roughly when this was, about the time she --

A.     Time-way -- Time-wise, it was -- it was near midnight.  Around 12:00, uh, twelve o'clock.

Q.     I'm going to ask you some questions here.

Exhibit 5002 at 94

*Danny Lee*

During the course of this investigation, there was a search warrant executed on the home of the McGuffin family, and some documents were seized there.  And some of those documents, the McGuffin family for some reason believes that on the evening of June 28th, that your stepson and other persons were having a party at your house.

A.    Was this the night that Leah went missing?

Q.    Yes.

A.    I don't believe that at all.

Q.    Okay.  And do you -- you wouldn't have had a party at your house that night?

A.    Uh, no.

Q.    And -- well, why was that?  Were you -- because you were getting ready to go to work, or --

A.    Well, uh, I would be sleeping, for one.  And you don't disturb dad when he's sleeping before a graveyard shift.  So, uh, I don't see it happening.

Q.    Okay.

A.    If there was anything there, it would have been so quiet.  Huh, and I doubt that, if they're partying.

Q.    Okay.  Are you familiar with an individual named Tom Stemmerman?

A.    Whom?

Q.    Tom Stemmerman.

A.    Not off the top of my head.  It doesn't ring a

Exhibit 5002 at 95

*Danny Lee*

bell, no.

Q.    Okay.  To the best of your knowledge, has an individual named Tom Stemmerman ever been to a party at your house?

A.    Not that I'm aware of.

Q.    Okay.  Bill Sero.  Are you familiar with an individual named Bill Sero?

A.    I've -- I've heard the name, uh, on several occasions.

Q.    And, to the best of your knowledge, has he ever been at a party at your house?  Or has he ever been to your house?

A.    Not that I'm aware of.

Q.    Okay.  Alicia Michaud?

A.    I know who that is, and I've never had her near my house.

Q.    Okay.  Kristen Steinhoff?

A.    I know who Kristen is.  There's a possibility she may have seen my daughter.

Q.    Okay.

A.    Uh, my daughter ran around with her sister, uh, Stephanie.  And so there's a possibility that, uh, she may have been by a house -- by the house when my daughter was by there.

Q.    Okay.  Leah Freeman.  You know who she was?

Exhibit 5002 at 96

A.    I know who Leah was.  Uh, I, uh, had very few, if any contacts with Leah.

Q.    Okay.  And again, she's never been over to your house.

A.    Excuse me?

Q.    Leah's never been over to your house?

A.    Not that I'm aware of.

Q.    Okay.  And I'm sorry for asking you any of these questions, but this popped up in these documents.

A.    I -- feel free.

Q.    All right.  Well, the last question I have:

Seeing that they seem to think there's some sort of party or something at your house, did you have anything to do with Leah Freeman's disappearance or death?

A.    No, I did not.

Q.    Or hiding her body or anything along that line?

A.    I had nothing to do with anything involving Leah Freeman.

Q.    That's all the questions I have.

Is there anything I missed I should have asked you?

A.    Excuse me?

Q.    Is there anything I missed I should have asked you?

A.    Uh, not that I can think of.

Exhibit 5002 at 97

*Danny Lee*

Q.     Is there anything your wife wants me to ask you while I have you under oath?  (Laughter.)

A.     I didn't -- I didn't have -- I haven't had any parties involving minors or children.

MR. FRASIER:  Okay.  All right.  I don't think I have any -- questions?  Go ahead.

GRAND JUROR:  You made allusion to your wife. Was your wife at your house once you left --

THE WITNESS:  You know --

GRAND JUROR:  -- to go to work?

THE WITNESS:  I don't -- I got --

GRAND JUROR:  Was anyone at your house when you left for work?

THE WITNESS:  I got -- I got divorced.

GRAND JUROR:  Okay.

THE WITNESS:  Uh, in 2000, and I don't recall what month it was.  So I don't know if at the time, uh, my ex-wife was at the residence or not.

GRAND JUROR:  Okay.

THE WITNESS:  Uh, we're still on friendly terms. I mean I could call her and find out exact dates.  I don't do dates very well.

But I -- I have spoke with her about, uh, juvenile parties.  And, uh, she cannot recall ever having any parties with anyone that was under 21 years old at our

Exhibit 5002 at 98

*David Zavala*

residence.

MR. FRASIER:  Any other questions from the grand jury?

GRAND JUROR:  I can sympathize with the graveyard routine.  (Laughter.)

THE WITNESS:  Yeah, you can.

MR. FRASIER:  That's it.

THE WITNESS:  Okay.  Thank you.

GRAND JUROR:  Thank you.

**TESTIMONY OF DAVID ZAVALA**

(Witness sworn.)

BY MR. FRASIER:

Q.    Okay.  First of all, before I forget, I've started the tape recorder or the digital recorder here.  So, we are recording you, just to let you know.

A.    Okay.

Q.    First of all, sir, could you tell us your name, please, and your current occupation.

A.    First name's David, last name's Zavala.  Z as in Zebra, A, V as in Victor, A-L-A.  And I'm a police officer for the City of Keizer.

Q.    How long have you been at the City of Keizer now?

A.    I'm going on to 10 years.

Q.    Prior to that, where did you work?

A.    Prior to that I worked, uh, as a police officer

Exhibit 5002 at 99

100
*David Zavala*

here in the city of Coquille.

Q.    For how --

A.    For just a little bit over a year.  Um, I left September of 2000.

Q.    Okay.  I want to direct your attention, sir, to June 28th, 2000.  Were you on duty that day, sir?

A.    Yes, I was.

Q.    And were you working what I think is sometimes referred to as the swing shift?

A.    Yes.

Q.    During the course of your shift that evening, did you have contact with an individual named Nicholas McGuffin?

A.    Yes, I did.

Q.    And could you tell us, sir, about what time of the day it was and where you were at when you had contact with him.

A.    It was about, uh, 10:30.  I use military time, I just -- it was about 10:30.  I was, um, routine patrol.  I was driving eastbound on Highway 42, and I saw a vehicle driving, um -- I'm sorry, I was driving westbound, so I was heading out that way.  And I saw a vehicle coming my direction, which would have been driving eastbound on Highway 42.

And I noticed that the, uh, headlight out -- there was a headlight out on the vehicle.  I did a U-turn on

Exhibit 5002 at 100

*David Zavala*

the -- on the highway there, um, once I -- to pull the vehicle over.

Once I got behind the vehicle, I recognized the vehicle as the one that, uh, Nick McGuffin drives, which is a blue Mustang.

Q.    Okay.  So you pulled it over because of a headlight?

A.    Yes.  I pulled it over for the -- for the headlight violation.

Q.    Okay.  What happened when you contacted the vehicle?

A.    Um, I received -- can I refer to my report here?

Um, I remember, based on my report, he, uh, lit a cigarette as I approached the vehicle.  I asked him why he was driving without -- with only one headlight out.

And he told me, um, basically in substance that he was out looking for his girlfriend.  I knew that his girlfriend, uh, was Leah, and he asked me if I'd seen her.  I told him that I hadn't, but I told him I'd keep an eye out for her.

I knew that my shift was ending there within about 30 minutes.  Um, I basically just told him, "Hey, make sure you're not out later."  I said, "With a headlight out, you should -- you'd best get that fixed."  And, um, he told me that he'd make it quick as far as being out looking for

Exhibit 5002 at 101

102

*David Zavala*

her.

And when I got back in my patrol car, he ended up driving across the bridge, and I remember thinking that was kind of odd at the time, because I got back on the freeway and -- or on the highway, and I was thinking, "Well, if he was looking for his girlfriend, I would think that he'd be looking for her in town, not heading out of town."

Q.    So I'm clearly understanding what you're saying here, you're over here on 42 South, you're near Sturdivant Park.

A.    Yes.

Q.    And -- I don't know if that map's big enough. Maybe that one over there in --

A.    Yeah, it's on that one.  It would be down at the bottom of that map.

GRAND JUROR:  Where is --

GRAND JUROR:  It's on the bottom of --it's on that map.

GRAND JUROR:  Where you stopped is on that map?

THE WITNESS:  It's down there.  Very bottom of that map.  Sturdivant Park, right here.

BY MR. FRASIER:

Q.    Okay.

A.    So I was traveling westbound, and he was coming eastbound.

Exhibit 5002 at 102

*David Zavala*

Q.    And so then he turned into -- up over the bridge?

A.    Right.  And I --

Q.    You turned onto 42 South, and goes out past the park --

A.    Or towards River Park.

Q.    Yeah, right down here would be the --

A.    Mm-hmm.

GRAND JUROR:  Be 42S.

THE WITNESS:  They don't show the river very good on that one.

BY MR. FRASIER:

Q.    No, they don't.  (Laughter.)

A.    But there's a river there.

GRAND JUROR:  The road's 42S, not 42.

MR. FRASIER:  Yeah.

GRAND JUROR:  Coquille-Bandon.

BY MR. FRASIER:

Q.    42S.  Okay.  So he --

A.    I don't know if everybody can see that.

GRAND JUROR:  So we're clear, is he's not driving into town where --

THE WITNESS:  Correct.

GRAND JUROR:  -- people are, he's driving out --

THE WITNESS:  Right.  And that was the -- what I found odd, thinking, well, if he's out looking for her, he

Exhibit 5002 at 103

*David Zavala*

would go where I would assume, like you were saying, back into the town or the city, where people would be out.

GRAND JUROR:  But you would have seen him turn right of off 42, going towards Sturdivant Park then, correct?  And heading towards the bridge?

THE WITNESS:  Well -- and -- and that I -- I can't recall.

GRAND JUROR:  Uh-huh.

THE WITNESS:  I just -- I'm going based on what I --

GRAND JUROR:  You wrote here?

THE WITNESS:  -- I wrote down on my -- on the report.

GRAND JUROR:  Right.

THE WITNESS:  After -- the next day, after the fact.

GRAND JUROR:  Right.

THE WITNESS:  Um, so I can't recall.  I just remember -- I just documented here that he drove over the bridge.

GRAND JUROR:  Oh, so -- okay.  So you would have probably seen him go actually over the bridge?

THE WITNESS:  Right.

BY MR. FRASIER:

Q.    Now, just so we're clear, Mr. McGuffin was -- at

Exhibit 5002 at 104

*David Zavala*

the time his parents' residence was out -- to get there, you would have driven out that road to get out to towards --

A.    I -- yeah, I recall that, yeah.  Now that you bring that up, I -- I remember that being the case, that he did live out somewhere up here in the --

Q.    All right.  But I just wanted to make that clear. He could have been headed home.

A.    Correct.

Q.    All right.

A.    Correct.

Q.    Did he say his girlfriend -- he said he was looking for his girlfriend?

A.    Yes.  Yes.

Q.    How was he behaving when he -- I mean, what was his demeanor like when you contacted him?

A.    I've actually documented that, uh, he didn't -- and based on my notes he appeared a little nervous.  And like I said, he was smoking a cigarette.  Um, he did not show any signs of being upset.

Uh, and I -- but I -- and I also documented he did not have any signs that he'd been crying.  Um, I don't know -- you know, at the time, based on my -- on my notes, based on what I wrote down, um, I just made that observation thinking, "Well, if he was out looking for his girlfriend," um, I don't know.

Exhibit 5002 at 105

*David Zavala*

I mean, going back when we're all teenagers, I mean, got in a little fight or something, and you're kind of out looking for your girlfriend/boyfriend, and you're a little upset.  But he didn't appear that way.  He seemed pretty calm, other than smoking a cigarette.

Q.    Did he, you know, "Hey, my girlfriend's missing and we need to do a report.  We need to get the police involved.  We need to call out the mounties or whoever to come look for her."

A.    No, nothing like that.  He just said he was out looking for her, and I said I'd -- and I'd said, "Okay.  Well, I'll keep an eye out for her."

It was real casual.  We were just -- as a matter of fact, nothing that was of an urgent matter.

Q.    Now I've got some questions I need to ask you.  And again, I'm not trying to embarrass you or anything like this, but these are questions that I want to bring up with you.

Earlier this year there was a search warrant executed at the residence of the McGuffin family, and a series of documents were taken there -- from there.  And according to some of those documents, apparently the McGuffin family believes that your DNA would be found on Leah Freeman's body.

Is there any -- well, first of all, would there

Exhibit 5002 at 106

*David Zavala*

be any reason for your DNA to be found on her body?

A.    No.

Q.    Okay.  Did you have any contact with Leah Freeman on June 28th, 29th of 2000?

A.    That I can recall, that prior to, um, having contact with Nick at the time that -- of the traffic stop, no.

Q.    Okay.  They also -- well, I'll ask you this question, just so we're clear:  Did you have anything to do with her disappearance, hiding her body, anything along that line?

A.    No.

Q.    Okay.  Finally, again I don't mean to embarrass you.  Just a question I need to ask is, according to this paperwork, the McGuffin family for some reason believes that you're associated with a Kristen Steinhoff, who's supposedly an associate of Bill Sero and Tom Stemmerman, Alicia Michaud.

And my understanding is, is that you did know Kristen Steinhoff, but you had no type of intimate relationship with her?

A.    That's correct.  I knew her, but there was no type of intimate relationship.

Q.    She was a kid here in Coquille, went to the high school, and --

A.    Correct.

Exhibit 5002 at 107

*David Zavala*

Q.      And outside of knowing her as being a kid at the high school, and maybe trying to get her into the Job Corps or something like that, but you had no other --

A.      Correct.  That is a strictly professional relationship.  We're trying to help out -- help her out. Like you said, maybe tried to get her into Job Corps.

Q.      I don't think I have any other questions for Officer Zavala, who drove down from Salem.  I appreciate you doing that.

Does the grand jury want to ask him anything?

GRAND JUROR:  Had you had any other encounters with Nick, with -- before that?

THE WITNESS:  With Nick prior to the traffic stop?

GRAND JUROR:  That day, yeah.  Right.

THE WITNESS:  Yes.  I mean, working here, I mean, that was a small community.  I'm assuming you guys all live here.  Um, just my normal shifts, I knew who he was, along with a lot of the other kids.  So just routine encounters, whether it be law-enforcement related or just, uh, out running around, going to the Quick Mart.  Is that the name of the little -- is that --

GRAND JUROR:  Yeah.  On the highway?

THE WITNESS:  On the highway, as I --

GRAND JUROR:  Yeah.

Exhibit 5002 at 108

*David Zavala*

THE WITNESS: Yeah. Going there, buying a soda. And the kids were -- a number of them were hanging out there, and having encounters that way.

GRAND JUROR: Okay.

MR. FRASIER: Okay. Any other questions?

(Pause.) Okay. Thank you.

GRAND JUROR: Thank you.

THE WITNESS: Thank you guys. It's quite the process, I'm sure.

GRAND JUROR: Oh, yes.

GRAND JUROR: Thanks.

THE WITNESS: Mm-hmm.

(Conclusion of CD 043.)


--oOo--


I certify, by signing below, that the foregoing, pages 1 through 109, inclusive, is a correct transcript of a Coos County grand jury proceedings dated July 14, 2010, and transcribed this 8th day of November, 2010.


_____

PEGGY S. JILLSON, TRANSCRIBER

Exhibit 5002 at 109

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

**STATE OF OREGON,**                    )
                                        )
        Plaintiff,                      )   Case No. 10-CR0782
                                        )
v.                                      )
                                        )
**NICHOLAS MCGUFFIN,**                  )
                                        )
        Defendant.                      )
_____)   Volume 2

Wednesday, July 21, 2010

GRAND JURY PROCEEDINGS

APPEARANCES:              **PAUL FRASIER**
                          **DISTRICT ATTORNEY**
                          125 East Eighth Avenue
                          Eugene, Oregon 97401

TRANSCRIBED FROM AUDIO RECORDINGS

TRANSCRIBED BY:           Peggy S. Jillson
                          987 Tivoli Street
                          Eugene, Oregon 97404
                          (541) 689-7964

Exhibit 5002 at 110

**WITNESS INDEX**

KIRN, Mark                          3

McADAMS, Michael                    14

LEWIS, Raymond                      21

FULLER, Mary                        28

HYATT, (Hartwell) Alicia            34

BOUNDS, Thomas                      43

JENKINS, David                      52

JONES, Arthur                       67

CROOK, Heidi                        76

ERNLER, Josh                        91

BAKER, Darla                       104

Exhibit 5002 at 111

**COQUILLE, OREGON; WEDNESDAY, JULY 21, 2010, 11:20 A.M.**

-o0o-

**TESTIMONY OF MARK KIRN**

(Witness sworn.)

BY MR. FRASIER:

Q.    First of all, sir, could -- well, first of all, I need to advise you that we are recording the proceedings here today.  Just so you're aware of that, all right?

A.    Okay.

Q.    First of all, could you tell us your name please, and where you live, sir.

A.    Uh, my name is Mark Kirn, and I live at 10056 Highway 42, Coquille, Oregon.

Q.    And how long have you lived there, sir?

A.    Uh, six months now.

Q.    Okay.  And you're, uh --

A.    But I've lived in Coquille my whole -- pretty much, since I've been about 11.

Q.    Okay.

A.    So --

Q.    You went to high school here?

A.    Yeah, I went to high school here.

Q.    All right.  Do you have a job, sir?

A.    Yeah, I do.

Q.    What do you do?

Exhibit 5002 at 112

*Mark Kirn*

A.    Uh, I work for Charlie Yates Ranching.

Q.    Okay.  I want to direct your attention back to the year 2000.  Could you tell us how old you were back then.

A.    2000, I was, uh --

Q.    Ten years ago.

A.    -- 19.

Q.    19?  And had you graduated from high school already?

A.    Yes.

Q.    Okay.

A.    Or, 2000 no.  I didn't.  I was 2001.  I was -- that was my senior year in high school.

Q.    Okay.  I want to look at the summer of 2000 particularly -- well, June of 2000.

First of all, did you -- did -- were you acquainted or were you aware of a girl at the high school by the name of Leah Freeman?

A.    Yes.

Q.    And how well did you know her or anything like that?

A.    Uh, I -- just from school, you know.  She was a freshman, I was a senior.

Q.    Okay.

A.    She dated Nick McGuffin, and he was a year ahead of me and I knew him, so -- because we played sports together

Exhibit 5002 at 113

and whatnot.

Q.    Okay.  Um.  Did you know that Leah and Nick were boyfriend/girlfriend?

A.    Yes.

Q.    Could you describe for the grand jury that relationship.  Was it good?  Bad?  Different?

A.    Honestly, I don't know.  I didn't -- I didn't really hang around him at the time, you know.  It was more seeing him here and there, say "hi/bye" you know.

Q.    Okay.

A.    I -- I was never really alone around them to know how their relationship was like.

Q.    Okay.  That's fine.

Well, let's go to June 28th of 2000.  Do you know an individual named Mike McAdams?

A.    Yes.

Q.    How do you know Mr. McAdams?

A.    Uh, from school, and we used to skateboard together, and --

Q.    Okay.

A.    -- hang out.

Q.    Now, June 28th would have been the day that Leah Freeman disappeared.  Were you with Mr. McAdams that evening?

A.    Yes.

Q.    And had you gone someplace to get something to

Exhibit 5002 at 114

*Mark Kirn*

eat?

A.    Yeah, we were at Hunter's, I guess at the time. It was Dairy Queen, Hunter's, and then Burger Barn.  It's been a bunch -- but it was Hunter's at the time.

Q.    Okay.  And that's that little restaurant that's on Central here in Coquille?

A.    Yeah.

Q.    And on Callahan you have McKay's, and then you have a bank, and then you have a gas station -- or what was a gas station -- a motel, and then you finally get to Hunter's -- or the restaurant?

A.    Right, yeah.

Q.    I see.  And directing your attention to around nine o'clock.  Were you and Mr. McAdams inside the restaurant having something to eat?

A.    Yes.

Q.    And while you were there eating, did you -- did you happen to see Leah Freeman?

A.    Yes.

Q.    And where did you -- where was she?  Or where -- where were you and where was she?  How far apart, and so forth?

A.    She was on the highway -- or beside the highway. I don't remember if she was on the Hunter's side or the other side.  I believe she was on the same side as the restaurant,

Exhibit 5002 at 115

but it's been so long.

Q.    Okay.

A.    And she was walking towards the high school and -- well, the new police station and then the high school. In that direction.

Q.    Okay.  Do you recall, you know, how did she -- how did she appear as she was walking?

A.    I was, I -- I really don't remember.

Q.    Okay.  Was she walking fast?

A.    Yeah, I look -- I -- I mean it just -- I just remember her walking by.  I don't --

Q.    Okay.  Do you remember what she was wearing?

A.    I do remember a white tee-shirt and pigtails, because she always wore that and she was wearing that that night.  So I distinctly remember that.

Q.    Okay.  And when you say "pigtails," what do you mean?

A.    Her -- I think her hair was always in pigtails.

Q.    Oh, okay.  All right.

A.    I believe.

Q.    Okay.  And so you -- in which direction is she headed?

A.    She's headed, which -- towards the high school and stuff.  I don't --

Q.    Okay.

Exhibit 5002 at 116

8

*Mark Kirn*

A.    Would that be (pause) -- right?

Q.    Now, after you --

GRAND JUROR:  North.

THE WITNESS:  Due North and what?  Yeah, North.

BY MR. FRASIER:

Q.    Yeah, after you had finished eating, what did you do at that point?  Do you remember?

A.    I think, you know, at that time everybody hung out at Fast Mart.  I think we -- I went to Fast Mart after that.

Q.    Okay.

A.    Because there was always a big group of people there.

Q.    Did you see Nick McGuffin that night?

A.    I -- yeah, I think I remember seeing him at Fast Mart later.  It wasn't that long after -- well, it was a little while after.  I don't --

Q.    Looking at the police reports when they talked to you in 2000, you communicated it was somewhere around midnight.

A.    It could -- it very well could have been.

Q.    Okay.  And they -- do you recall what, if anything, Mr. McGuffin, Nick, said to you?  Or did you talk about anything?

A.    I just -- I think he asked me if I'd seen Leah,

Exhibit 5002 at 117

and I told him I'd seen her earlier in the evening walking towards the high school.

Q.    Okay.

A.    And then I think he drove -- I think he drove off after that.  I don't think we said anything else.  It's been so long, I can't really tell you for sure.  But I remember him asking if I'd seen Leah.

Q.    All right.  How was he acting?

A.    I really don't know.

Q.    Was he -- did he seem upset?

A.    Just kind of maybe upset or worried.  I --

Q.    Okay.

A.    It's been --

Q.    It's been a long time.

A.    Ten years is a long time to remember that.

Q.    Okay.  Let's talk about some other things here for a moment.

After she disappeared, did you have any other contact with Nick regarding Leah Freeman?

A.    Gosh, I -- you know -- it had been a while, I mean, since it all had happened.  But I went out to his house once with some friends.  When I got there, his dad and mom started yelling at me and told me to get the F out of there. "We read what you said," and this and that.  And I -- it was sometime after Leah's stuff came out online.

Exhibit 5002 at 118

*Mark Kirn*

Q.    Okay.

A.    Because they read something I said online -- maybe to you guys last time I was in here ten years ago.

Q.    Okay.

A.    Which I'd -- you know, I don't think I said anything that -- you know, like, "Oh, yeah, I really think Nick did it," or something.  But it was weird that they yelled at me like that over something I said, when I never -- you know, I didn't really say anything because I don't know nothing.  So, it was just weird to me.  I remember that.

Q.    Okay.  Have you had any contact with Nick since then?

A.    Not in like, five years probably.  I haven't seen him.

Q.    Okay.  And has he at any time talked to you outside of what we've already talked about today about Leah's disappearance or death or anything?

A.    No, not really.  No.

Q.    Okay.  Part of this grand jury is we're trying to, again, figure out what happened to Leah.

A.    Right.

Q.    Do you have any information about what happened to her at all?

A.    I -- you know, I don't.  I really don't.  I'd really like to know what happened but I --

Exhibit 5002 at 119

11

*Mark Kirn*

Q.    Okay.

A.    There's so many stories going around in a small town, you know.  I've heard five or six different ways that people have said, and I don't believe any of it, honestly. I --

MR. FRASIER:  Okay.  All right.  I don't think I have any more questions for him.  Does the grand jury want to ask him anything?

GRAND JUROR:  I -- I don't know, I'm not sure if it's relevant or not, but what were they yelling at you for? Because of something you posted online?

THE WITNESS:  Something I had said, like to the grand jury or to the police, or something.

GRAND JUROR:  Oh.

THE WITNESS:  They read a police report or -- or what I said in the grand jury, whatever's posted online.  I don't know; I haven't looked at it.

GRAND JUROR:  Posted online where?  By, like --

THE WITNESS:  Like "Justice for Leah" or something.

GRAND JUROR:  Oh, okay.

THE WITNESS:  Because after it came out online they were saying all, "We read what you said online, and you don't need to come out here," and this and that.  And it was just weird to me, because I -- you know, I don't remember

Exhibit 5002 at 120

*Mark Kirn*

saying anything --

GRAND JUROR:  Okay.

THE WITNESS:  -- that -- you know, that bad.
What -- just what I'm telling you guys now.  I mean --

GRAND JUROR:  Right.  Right.

THE WITNESS:  So it was just weird, and that's
why I remember that.

GRAND JUROR:  Okay.

MR. FRASIER:  Okay.  Any other questions?

GRAND JUROR:  Was it -- I -- well, you said you
hung out at the mini mart there?

THE WITNESS:  Yeah, Fast Mart.

GRAND JUROR:  Did they -- this, I mean you're --
and you're a senior at this point?

THE WITNESS:  Well, I -- if it was June, I had
just graduated.

GRAND JUROR:  So you were going to be a senior?

THE WITNESS:  I was just -- yeah.  No, I had just
graduated.

GRAND JUROR:  No, it was earlier.

THE WITNESS:  No, June 2000.  So, the year before
my senior year.  Okay.

GRAND JUROR:  Okay.  Got that right.

So, the freshman -- Leah would have been a
freshman.

Exhibit 5002 at 121

*Mark Kirn*

THE WITNESS:  Freshman.

GRAND JUROR:  So was that --

THE WITNESS:  So she was going into her sophomore year.

GRAND JUROR:  Okay.  That's kind of a place where the kids hung out, then?

THE WITNESS:  Right.

GRAND JUROR:  I mean, everybody in high school is hanging out there?

THE WITNESS:  Right.  Right.  In the parking lot, everybody --

MR. FRASIER:  And just so we're clear:  Fast Mart is the market that's over here by Hunter's by the --

THE WITNESS:  Just south of the --

GRAND JUROR:  The one that's closed down now.

THE WITNESS:  Yeah.

MR. FRASIER:  The one that's closed.

THE WITNESS:  Right.  Right.  Yeah.

MR. FRASIER:  There's another mini mart that's over by on --

THE WITNESS:  On the highway?

MR. FRASIER:  Right, on the highway.

THE WITNESS:  No, not that one.

GRAND JUROR:  I know which one you mean.  I know which one you mean.

Exhibit 5002 at 122

*Michael McAdams*

THE WITNESS:  Before Fast Mart shut down and that mini mart was built on the highway, everybody -- all the kids from school hung out at the parking lot of Fast Mart.

GRAND JUROR:  Yeah.

MR. FRASIER:  Okay.

GRAND JUROR:  What kind of car was Nick driving?

THE WITNESS:  Gosh, I've -- I want to say it was his maroon Thunderbird.  It was his parents' car, I think, at the time.  I'm almost sure that's what he was driving, but I'm -- it's been ten years so I can't say for sure or not.

(Pause.)

MR. FRASIER:  Okay.  Any other questions?

Okay.  All right, sir.  I think that'll do it.

THE WITNESS:  All right.  Thanks.

GRAND JUROR:  Thank you.

MR. FRASIER:  You can take off.

THE WITNESS:  All righty.

**TESTIMONY OF MICHAEL McADAMS**

(Witness sworn.)

BY MR. FRASIER:

Q.    First of all, sir, I need to tell you, it's obvious, but we're recording the proceedings here today.

First of all, tell us your name and where you live.

A.    Michael Joseph McAdams.  I reside at 55881 Finley

Exhibit 5002 at 123

*Michael McAdams*

Loop.

Q.    Okay.  And how old are you, sir?

A.    I'm 30 years old.

Q.    Are you employed at this time?

A.    Not currently.

Q.    Okay.  Year 2000.  I'd like go back to the year 2000.  You would have been 20 years old?

A.    Yes, sir.

Q.    And in particular the summer of 2000.

Well, first of all, did you know an individual named Leah Freeman?

A.    I knew her.  It was my friend's girlfriend.  I never really hung out with her, but I knew that that was his girlfriend.

Q.    And your friend was Nick McGuffin?

A.    Nick McGuffin.

Q.    And how long have you known Nick?

A.    Um, I live -- I'm from Fairview and they're from Coquille, and their parents owned a produce market across from 7-Eleven when I was younger.

Q.    Okay.

A.    And my dad knew their dad, so like I'd -- occasionally we'd go in and get vegetables and stuff.  So I met him that way, but I didn't actually start hanging out with him until high school.

Exhibit 5002 at 124

*Michael McAdams*

Q.    Okay.  And would you -- could -- were you close friends with him, or --

A.    Just good -- not, not like a best friend or even one that you would hang out with daily, but, you know, on a -- a friend.

Q.    Okay.  And you -- did you know that Leah Freeman and Nick McGuffin were boyfriend/girlfriend?

A.    Yes.

Q.    And did you have an opportunity to observe them together a little bit?

A.    Yes.  Yes.

Q.    What was their relationship like?

A.    Um, they were always really pretty quiet.

Q.    Okay.  Did you ever see them yelling at each other, or anything like that?  Or --

A.    No.

Q.    Hitting on each other?

A.    No.

Q.    Okay.  Do you know Mark Kirn?

A.    Yes, sir.

Q.    How do you know Mark?

A.    He was a better friend.  I used to hang out with him and -- and just run around.

Q.    Okay.  And June 28th, 2000 -- that would have been the day that Leah Freeman disappeared -- were you with

Exhibit 5002 at 125

*Michael McAdams*

Mr. Kirn that evening?

A.    Yes.

Q.    And where were you guys at?

A.    At Hunter's Eatery and Creamery.

Q.    Okay.  Do you remember about what time it was that you were there?

A.    Right at dusk.  Um, I'm going to say between eight and nine o'clock.

Q.    Okay.  When you were interviewed in 2000, you told the police 9:00.  Does that sound about right?

A.    Probably.

Q.    Okay.  What would your -- well, in terms of time, what you remember about time would have been better back then than it would be today?

A.    Yeah.  I -- I have my medical marijuana card, and I have been practicing medical marijuana since then.  So my memory isn't the best, but I remember that night pretty --

Q.    Okay.  All right.

A.    -- pretty good.

Q.    Now, while you're eating there, did you have an opportunity to see Leah Freeman?

A.    Yes, sir.

Q.    And could you tell us where she was, what direction she was headed, that type of thing?

A.    Me and Mr. Kirn were sitting at a table.  Um,

Exhibit 5002 at 126

*Michael McAdams*

there's tables lining the side, but ours was a center table, and I was facing the window.  He was facing towards me.

I observed her walk on the other side of the road -- the far side.  She was walking towards Fairview.  Um, I watched her walk just, you know, the window's view.  So 30, 40 feet across the window, and then back to eating.  I said, "There's Nick's girlfriend."  He turned around and looked and said "Yep," and then went back to it too.  Eating.

Q.   Okay.  Do you remember, you know, what she -- how she was acting as she was walking by?

A.   Um, just -- maybe a power walk.

Q.   Okay.

A.   Not, you know -- not -- not a slow mosey, but kind of going up the hill walking.

Q.   How was she dressed, do you recall?

A.   I'm thinking shorts and a white shirt.  Um, that's kind of --

Q.   Okay.

A.   I'm not --

Q.   All right.

A.   -- positive on that.

Q.   After you see Leah, what do you and Mr. Kirn do?

A.   We went down to Fast Mart.  I'm pretty sure we went to Fast Mart and hung out.  And if we didn't go to a party, then I went home.

Exhibit 5002 at 127

*Michael McAdams*

Q.    Okay.  Did you see Mr. McGuffin that night?  Nick McGuffin?

A.    Yeah.  I believe he showed up by himself, um, at Fast Mart.  (Pause.)  For maybe 10 minutes, I think.

Q.    Do you remember about what time it was?

A.    It would have had to been, um, I'm going to say 9:00 -- I'm going to say between 9:30 and 10:00 --

Q.    Okay.

A.    -- because we finished eating and then went right down there.

Q.    Okay.  And does Mr. McGuffin say anything to you?

A.    Like, when we used to hang down at Fast Mart, there'd be a big group of people, like 20-30.  So I'd be -- I mean, I remember him driving up, talking, and then leaving. I don't remember if I'd one-on-one interacted with him.

Q.    Do you remember what kind of car he was in?

A.    I believe he had a Thunderbird.

Q.    Okay.  Do you remember what color it was?

A.    Um, uh -- a merlot.

Q.    A merlot?  Like a maroon, red --

A.    That -- yeah, that's the color of my truck.  So, yeah.

Q.    Okay.  Did you hear Mr. McGuffin say anything?

A.    No.

Q.    Okay.  Did he ask you or did you hear him ask

Exhibit 5002 at 128

*Michael McAdams*

anybody, "Have you seen Leah," or anything like that?

A.    I don't recall.

Q.    All right.  Now, since Leah has disappeared, have you had much -- have you had any contact with Nick McGuffin?

A.    Um, after she disappeared, he was hanging out with me a lot, and you know, I felt really bad about what was going on.  So I was kind of hanging out with him, trying to help him deal with what was going on.  And then, uh, pretty much just kind of drifted apart, and I went.

Q.    When you were hanging with him, supporting him, what type of things would he tell you about Leah, or what happened, that type of thing?

A.    He -- we never really discussed, like, anything that happened.  It was just -- you could tell he was really distraught about it, and he'd be crying a lot, and -- and he'd just, like, we'd be all hanging out in the house. Hanging out, you know, together, and then I'd be all, "Where's Nick at?"

        And someone would be like, "He's just out sitting in his car," and he'd just be out there crying by himself.

Q.    Okay.  You've indic -- when was the last time, or about how long ago has it been since you had contact with Nick?

A.    I've -- I've seen him at the bar at, um -- at the Max (phonetic) over in Coos Bay, I'm going to say six months

Exhibit 5002 at 129

*Raymond Lewis*

to a year ago.

Q.    Okay.

A.    But before that, um, after this I moved to Rhode Island and did fiberoptics for a year, and then just never really started hanging out with him again.

Q.    Okay.  Again, one of the things we're trying to figure out in this grand jury is what happened to Leah Freeman.  Do you have any information as to what had happened to her?

A.    I do not.  Um, the information that I have is just what I've visually witnessed.

Q.    Okay.

A.    Just her walking down the road that night.

MR. FRASIER:  All right.  I don't think I have any other questions at this point.

Grand jury want to ask him anything?

(Pause.)  No?  Okay.

THE WITNESS:  All right.  Thank you.

GRAND JUROR:  Thank you.

MR. FRASIER:  You're free to go.

THE WITNESS:  Have a nice day.

**TESTIMONY OF RAYMOND LEWIS**

(Witness sworn.)

BY MR. FRASIER:

Q.    First of all, could you tell us your name sir,

Exhibit 5002 at 130

*Raymond Lewis*

and where you live.

A.    Uh, Raymond Lewis.  Um, Coquille.

Q.    Okay.  Mr. Lewis, this is the grand jury for Coos County.  And just so you're aware, I think you already figured it out, we're recording the proceedings, okay?

A.    Yeah.  Yep.

Q.    First of all, could you tell us, sir, how old you are.

A.    I'm 26 years old.

Q.    Okay.  And I want to go back to the year 2000.  That would have made you 16; is that right?

A.    Mm-hmm.  Yeah.

Q.    And were you a student at Coquille High School?

A.    Yes, I was.

Q.    While you were at the high school, were you acquainted with an individual named Nick McGuffin?

A.    Yes.

Q.    How did you know Mr. McGuffin?

A.    I've known Nick since I was a little kid.

Q.    Okay.  How would you describe your relationship or your association with Mr. McGuffin?

A.    Um.  Oh, that we weren't necessarily like good friends or anything, but I hung out with him with groups of people and been around him a little bit.

Q.    Okay.  Are you still close with him, or --

Exhibit 5002 at 131

*Raymond Lewis*

A.    No.  I haven't -- I haven't talked to him for quite a while.

Q.    And when you say "quite a while," can you give us a rough idea?

A.    Oh.  A year or two.  I might say hi if I see him --

Q.    Uh huh.

A.    -- around somewhere, but other than that I haven't really --

Q.    Okay.

A.    -- talked to him at all.

Q.    All right.  And did you know Leah Freeman?

A.    Um, well, yeah.  Yeah, I knew Leah.

Q.    Okay.  How would you describe that, in terms of -- was it like she was a kid a school, or --

A.    Yeah, it wasn't -- probably the same situation as Nick.  Not -- I mean, I knew Nick better than I knew Leah.

Q.    Okay.

A.    I didn't -- I never really hung out with her or anything.

Q.    Okay.  And did you know that Nick and Leah were boyfriend/girlfriend?

A.    Yes, I did.

Q.    Okay.  Did you have an opportunity to observe their relationship at all?

Exhibit 5002 at 132

*Raymond Lewis*

A.     I've never really paid much attention to it.

Q.     Okay.  Was there anything that caused you -- well, did you ever see anything that, you know, like they were arguing or anything like that?

A.     Not that I can recall, no.

Q.     Okay.  Nobody hitting on each other or anything like that?

A.     No.

Q.     Okay.  I want to go to the day Leah disappeared, June 28th.  According to some reports that I have, or some of the statements you made, and I think you testified at the grand jury back in 2000 --

A.     Yes.

Q.     -- you indicated before that sometime between 9:15 and 9:45 you were driving on Central here in Coquille.

A.     Yes.

Q.     Do you recall that, sir?

A.     Yeah.

Q.     Could you tell the grand jury -- well, first of all, did you see Leah?

A.     Yes.  Yes, I did.

Q.     Where did you see Leah?

A.     Um, Fast Mart area.  I'm not exactly sure what -- right by -- she was right by Fast Mart walk -- walking.

Q.     And which direction was she going?

Exhibit 5002 at 133

*Raymond Lewis*

A.    Um -- up the road.  I don't know which, which direction it would be.  North, I guess.

Q.    Okay.

A.    On Central.

Q.    Was she, like, headed towards the high school?

A.    Yes.  Yes.

Q.    All right.  Could you tell, you know, was she walking fast?  Did she look like she was upset?

A.    I couldn't really tell.  I was driving -- just driving by, and just happened to notice her walking up the road.

Q.    Okay.  What side of the street was she on, do you remember?

A.    She was on -- if I was coming down the hill from the high school, she was on the right-hand side of the street, on the Fast -- Fast Mart side of the road.

Q.    Okay.  And did you see her again after that?

A.    No.

Q.    Okay.  Do you recall what she was wearing?

A.    Not -- no, not --

Q.    Okay.

A.    Like, no.  I can't remember exactly what she was wearing.

Q.    All right.  And did you see Mr. McGuffin that night?  Nick McGuffin?

Exhibit 5002 at 134

*Raymond Lewis*

A.    Um.  I don't recall seeing him that night.

Q.    Okay.  I'm going back to the reports, I think from your previous grand jury testimony.  You said something about 10:30 to 10:45, you saw him driving by the Fairview turnoff on Central.  Do you recall that?

A.    No, I don't.

Q.    Okay.

A.    (Indiscernible.)

Q.    Okay.  And do you recall seeing Nick at all that night?

A.    No.

Q.    Okay.  After that day, did you have any contact with Nick?  Or did Nick come and ask you like where was Leah at?

A.    Um.  Yeah, I don't remember exactly how many days after.  It might have been the next night or two nights later.  I was on my way home and -- let's see, her grandparents lived in the same -- lived in the same neighborhood as I did.  And he was there.  And when I drove by, he'd stopped me and asked me if I had seen her.  And so I told -- I told him that I'd seen her walking by Fast Mart that night.

Q.    Okay.  Have you had any other contact with Nick where there's been a discussion about what happened to Leah, or anything like that?

Exhibit 5002 at 135

*Raymond Lewis*

A.    Nope.

Q.    Okay.  Did Nick -- after Leah disappeared, did Nick appear to change to you, in any way?

A.    Not -- no, not really.

Q.    Okay.

A.    I'd -- I'd only maybe seen him a couple times since then.  I mean, not just a couple times, but here and there I've just talked to him and said, "Hi, what's up," and that was the extent of it.

Q.    All right.  So you haven't in fact gone over to his house --

A.    Yeah, no.  Nothing like --

Q.    Drank beer, or anything like that?

A.    No, nothing like that.

MR. FRASIER:  Okay.  All right.  I don't think I have any other questions for Mr. Lewis.  Does the grand jury want to ask him anything?

GRAND JUROR:  You're sure you seen her on that side of the road?

THE WITNESS:  Yeah, on the right-hand side of the road.

GRAND JUROR:  Because the last two said they'd seen her on the other side.

THE WITNESS:  I'm -- I'm 100 percent positive.  She was on the Fast Mart side of the road.  On the right-hand

Exhibit 5002 at 136

side if I'm driving down the road.

GRAND JUROR:  And you would have been driving towards downtown, not towards the high school?

THE WITNESS:  Yes.  Towards downtown, yes.

GRAND JUROR:  Okay.  All right.

MR. FRASIER:  Any other questions?

All right.  That'll do it.

THE WITNESS:  All right.

MR. FRASIER:  You're free to go.

**TESTIMONY OF MARY FULLER**

(Witness sworn.)

BY MR. FRASIER:

Q.    Ma'am, this is the grand jury for Coos County. They seem to be really nice folks.  I haven't seen them bite anybody yet today.  (Laughter.)

A.    Well, you just never know.

GRAND JUROR:  It's still early.

THE WITNESS:  Yeah.

BY MR. FRASIER:

Q.    And I think it's obvious, but we are recording what's going on today.  I just wanted you to be aware of that.

A.    Okay.

Q.    First of all, could you tell us your name, please, and where you live.

Exhibit 5002 at 137

A.    Mary Fuller.  I live in Coos Bay.

Q.    Ms. Fuller, the grand jury -- what we're looking into is what happened to Leah Freeman --

A.    Mm-hmm.

Q.    -- back in the year 2000.

A.    Mm-hmm.

Q.    And I've received information that you might have been driving through town, here in Coquille, the evening that Leah disappeared.

A.    Mm-hmm.

Q.    Do you recall that?

A.    Yes.

Q.    Could you tell the grand jury, please, what happened.

A.    Um, well, I had been to church.  I'd taken a whole bunch of teenagers over there, and so there was a lot going on in the car.

Q.    Okay.

A.    And some of the things that I need to tell you, I'm not really sure whether that's exactly what I saw --

Q.    Okay.

A.    -- but you need to know it anyway.

Uh, we'd been to church.  And when you talked -- you guys talked to me on the phone, you told me what time you thought she disappeared, and that was the time that we were

Exhibit 5002 at 138

*Mary Fuller*

driving home from the Foursquare, which is just a few blocks from the school.

Q.    Okay.

A.    And we drove by the school.

Q.    Okay.

A.    And, um -- I'm sure of that part.  (Laughs.)

Q.    All right.

A.    I know that part.  But, remember, there was a lot of confusion.  The kids, you know --

Q.    Right.

A.    Kids.  (Laughs.)

But, um -- and I didn't think about it at the time, but later after I talked to you guys I -- I thought I remembered that when I passed the school where the gate is there --

Q.    Right.

A.    -- that a car cut in right behind me.  Just, zoom, you know.  I thought, well, gee, that's -- (laughs.) That kind of seemed dangerous to me, just kind of.

But anyway, then I saw -- I think I saw the guy park and run around the car.  Pull, you know, with his nose in, and get out and run around the car.  And he was on a mission.  You know how somebody's --

Q.    Mm-hmm.

A.    And I thought, "I wonder what that's all about."

Exhibit 5002 at 139

But then I really hadn't remembered in the beginning.

Q.     Mm-hmm.

A.     And, you know, when a few days have passed, do you remember it?  Did you dream it?  Did you imagine it, or did you really see that?

Q.     Mm-hmm.

A.     So.

Q.     Could you describe this car.  Was it --

A.     Well, it was kind of -- you know, it was getting dark.  But it was, um -- it looked red.  A small red car.  I don't know what kind.  And the guy was, um, medium height, on the short side.

Q.     Mm-hmm.

A.     But that's all.  I couldn't see anything else.

Q.     Okay.

A.     So.

Q.     Now, you said -- and I just want to back up here.

A.     Mm-hmm.

Q.     You're driving by the high school.

A.     Mm-hmm.

Q.     You see who you believe to be Leah Freeman.  Is that right?

A.     No, I didn't see Leah.

Q.     Okay.

Exhibit 5002 at 140

*Mary Fuller*

A.    Uh, I wasn't looking that way.  You know, it's right on top of that hill, and you just come over and --

Q.    Right.

A.    -- go by the school and you're down again.  So, you know.

Q.    Okay.  So, was there somebody in the van that later told you that they saw Leah?

A.    Yes.

Q.    And was that Alicia Hartwell?

A.    Mm-hmm.  Mm-hmm.

Q.    Okay.  So you did not see Leah at all?

A.    No.

Q.    But you did see this red car --

A.    Mm-hmm.

Q.    -- or whatever it was --

A.    I think it was red, but like I said, it was getting dark and it's hard to tell.

Q.    And it cut into the parking lot?

A.    And I wasn't really paying that much attention, to be truthful.  I think that's why I didn't really remember it right up front --

Q.    Okay.

A.    -- because it was just a…

Q.    Okay.  You did not know Leah Freeman at all, did you?

Exhibit 5002 at 141

*Mary Fuller*

A.    No.

Q.    So you weren't aware of any of her circumstances or anything?

A.    Hmm-mm.

Q.    All right.

A.    She -- her sister later married my grandson.

Q.    Oh, okay.

A.    But I've --

Q.    Denise?

A.    Yeah, but I've never talked to her about this.

Q.    All right.  Okay.  I think that's all the questions I have for you.  I'm going to ask the officers to talk to you because --

A.    Okay.

Q.    -- I don't -- I -- this is the first time I've heard about the car.

A.    Well, it's the first time I've brought it up --

Q.    Oh, okay.

A.    -- because I hadn't remembered it for a while. And to be really honest, guys, I'm not sure if I remembered it or thought I did at the time.

Q.    Okay.  That's fine.

A.    It's very vivid, but you know dreams can be too. So, I don't know.

MR. FRASIER:  Okay.  All right.  Does the grand

Exhibit 5002 at 142

*Alicia Hyatt*

jury have anything that you'd like to ask her?

(Pause.)  Okay.

THE WITNESS:  Should have taken a photo, huh?

(Laughter.)

MR. FRASIER:  All right.  Thank you.

THE WITNESS:  Thank you.  Am I free to leave now?

MR. FRASIER:  I need you to talk to the officers.

THE WITNESS:  Oh, okay.

MR. FRASIER:  Don't forget your purse.

### TESTIMONY OF ALICIA HYATT

(Witness sworn.)

BY MR. FRASIER:

Q.    First of all, this is the grand jury of Coos County.  We're looking into the death of Leah Freeman.  Kind of obvious, but we're recording the proceedings here today.  All right?

A.    Okay.

Q.    First of all, could you tell us your name and where you live.

A.    Um.  It's Alicia Hyatt now.  It used to be Hartwell.

Q.    Okay.

A.    And I live at 431 23rd Street, Myrtle Point.

Q.    All right.  And I don't mean to embarrass you.  My wife tells me I'm not supposed to ask these questions, but

Exhibit 5002 at 143

in 2000 how old were you?  The year 2000?

A.    In the year 2000 I was 12.

Q.    12.  All right.  I have received information that you were -- on June 28th of that year, you were basically in a car full of kids coming from the Foursquare Church, going back to Myrtle Point.

A.    Yes, I was.  It was me and a friend of mine with her grandmother.

Q.    Okay.

A.    We were coming back from church, at a play practice.  We were doing a summer play, so we were coming back from play practice.  And we came past the high school.

And her -- me and my friend, we were bickering about a shirt, I think it was.  I can't remember quite clear, but I remember I looked out the window and I saw Leah walking past the high school.

And I said, "Hey, I know that girl.  I remember her.  My mom used to babysit her when my mom worked at Denny's for her dad."  And then I remember seeing the car behind us stop, and then I don't know whether it started again, or what, because I went back to bickering with my friend.

But I remember seeing her walking past the high school, and then I saw the car stop, and I went to bickering with my friend so I don't know whether he left again or not.

Exhibit 5002 at 144

*Alicia Hyatt*

So.

Q.    Okay.  Well, let me ask you a couple questions, first of all.

You indicated you knew Leah because your mom babysat her?

A.    Yeah.

Q.    And your mom used to work at Denny's Pizza here in town?

A.    Yeah, when I was little.

Q.    Okay.  When you saw Leah that night, do you remember -- well, first of all, do you remember what kind of clothing she had on?

A.    Uh, she had a white tank top on and a pair of blue jean shorts.

Q.    Okay.  And did she -- you know, did she -- could you tell, you know, was she walking fast?  Did she look like she was angry, upset, or anything?

A.    I don't really remember.  I remember I seen her walking, and pretty much all I can remember.  I remember she was wearing a white shirt, and it was either shorts or a pair of blue jean pants.  I know they were blue jeans.

Q.    Okay.

A.    And, uh, she was just walking next to us.  She looked -- maybe walking a little fast because it was kind of dark out.  But --

Exhibit 5002 at 145

*Alicia Hyatt*

Q.    Okay.  Now, does that kind of look like what she was wearing?

A.    Yeah.  That was about what she was wearing, yeah.

Q.    Okay.

A.    The tank top and -- it was either shorts or pants.  I couldn't remember whether she was wearing shorts or pants.

Q.    Okay.  Now, you mentioned something about a car.  Could you tell me about the car.

A.    I remember it was a darker-colored car, and it was a little compact car like a -- maybe a Honda or a Nissan or something.  I don't know exactly what it was --

Q.    Okay.

A.    -- that stopped.  I know it was a darker little compact car.

Q.    And it stopped?

A.    It's -- it was the car right behind us.  It didn't leave the church; we had pulled out in front of it when we left the church.  And when we come up past the high school, it stopped behind us and talked to her, but I don't know whether it went again or whether she got in or what.  I don't know.

Q.    Okay.

A.    I wasn't really paying attention that far.

Q.    Okay.  And you don't remember the color of the

Exhibit 5002 at 146

*Alicia Hyatt*

car or anything?

A.    I -- I know it was darker.  It was probably a blue or black, or maybe a dark gray.  I'm not sure.

Q.    Okay.

A.    I know it was a darker-colored car.

Q.    Okay.

A.    And it was a little compact car.

Q.    Okay.  Outside of what you told us here today, do you have any other information about what might have happened to Leah that night?

A.    No, I don't.  And I don't really remember much else.  I -- I was 12.

Q.    12.  Okay.  What side of the street was she on?

A.    Uh, she was on the side of the high school.  She was by the fence --

Q.    Okay.  And --

A.    -- when I'd seen her.

Q.    Where, uh -- you know, that's a long fence there. Do you recall where she was in like -- say in relation to the gate?

A.    Um, the bus-boarding gate, or the gate to the --

Q.    Either one.

A.    Uh, she was about half in-between.  She was, uh, just past the bus bar, right on the edge of the corner, coming around in front of the school.

Exhibit 5002 at 147

*Alicia Hyatt*

Q.    Okay.

A.    That's where I remember seeing her.  And the car stopped about right there on the corner, just this side, about two car lengths from the gate going into the parking lot.

MR. FRASIER:  Okay.  Okay.  I don't think I have anything else to ask Alicia.

GRAND JUROR:  Do -- um, you say that you saw a car stop and someone get out.  Do you know that someone?  Did you recognize that person?

THE WITNESS:  I don't -- I didn't see that person.  I just saw them -- they, he -- I saw the car stop and someone was either leaning out or getting out.  I wasn't sure which.

GRAND JUROR:  But you could tell it was a male?

THE WITNESS:  It was a person.  I didn't know whether it was male or female.

GRAND JUROR:  Okay.  Because you said -- okay.

THE WITNESS:  It had short hair, so it could have been anybody.

GRAND JUROR:  So you couldn't tell whether it was a male or a female?

THE WITNESS:  Yeah, I couldn't tell whether it was male or female.  It had kind of, like, shaggy kind of hair almost like -- I don't know.  I can't think of anybody

Exhibit 5002 at 148

*Alicia Hyatt*

with that short of hair.

But it -- yeah.  I'm not sure whether it was male or female.  It was a darker figure.  And it was just -- it was either leaning out of the window or getting out of the car, I couldn't tell which.  I couldn't see if the door was open or not.  I was bickering with my friend over a shirt, so.  (Laughs.)

GRAND JUROR:  Okay.

THE WITNESS:  That conversation at that time was kind of more important, but --

GRAND JUROR:  Thank you.

THE WITNESS:  -- that's what I remember.

GRAND JUROR:  Who was your friend?

THE WITNESS:  Uh, my friend Krista Fisher (phonetic).  She's been married since then; I don't remember her name now.  (Laughs.)

GRAND JUROR:  Oh, okay.  She's still around?

THE WITNESS:  Uh, I believe she lives in Coos Bay.

GRAND JUROR:  Oh, okay.

THE WITNESS:  I'm not sure.  (Laughs.)

GRAND JUROR:  Okay.

MR. FRASIER:  All right.

GRAND JUROR:  I've got a question.

MR. FRASIER:  Sure.

Exhibit 5002 at 149

*Alicia Hyatt*

GRAND JUROR:  Did -- when, when it was told that Leah was missing, um, did that click real fast that you'd just seen her, at the time?

THE WITNESS:  I -- actually, I didn't hear that she was missing until the cop actually came to the house to ask me if I'd remembered anything, and I -- I'd been out of town.  I went on vacation into Washington to see my grandmother, and came back to find out she was missing.

GRAND JUROR:  Mm-hmm.

THE WITNESS:  And it was -- it was really upsetting, and I -- I told the police officer everything I remembered from that night.  But, you know, it had been two weeks since I'd been there, that --

GRAND JUROR:  Right.  Okay.

THE WITNESS:  Then I remembered, this is what I remember, and it was kind of really upsetting to me because I've known her since I was little.

GRAND JUROR:  Mm-hmm.

THE WITNESS:  And I grew up with her, and it was really upsetting to know that she was missing.

GRAND JUROR:  Yeah.

GRAND JUROR:  Had your -- had your mother con -- then contacted the police saying that she'd seen her -- you'd saw her?

THE WITNESS:  Uh, my mom had actually contacted a

Exhibit 5002 at 150

*Alicia Hyatt*

friend of ours, the friend who I was with.  That friend contacted her grandmother and said that I was out of town, but when I got back into town the cops could come up to the house and interview me too because I was in the van.

GRAND JUROR:  Mm-hmm.

THE WITNESS:  But that's how I found out, is I came home to find out she was missing.

GRAND JUROR:  Okay.  Thank you.

BY MR. FRASIER:

Q.    Um, I just have one other question that just came to mind.

When the police came and talked to you, do you recall if you told them about this car that stopped?

THE WITNESS:  I told them about the car, I think. I'm not sure.  I know it was a -- one of the county cops that come up to the house.  And I told him, I said I remembered seeing her and I remember seeing the car.  I don't remember if I told him it stopped or not.

MR. FRASIER:  Okay.

THE WITNESS:  I don't remember.

MR. FRASIER:  All right.

THE WITNESS:  I remember telling him that I saw the car and I saw her.  And I thought I saw the car stop, but I'm not sure if I told him that it did stop or not.

MR. FRASIER:  Okay.

Exhibit 5002 at 151

*Thomas Bounds*

THE WITNESS:  And I -- when I thought about it more, I remembered that I'd seen somebody leaning out the car, or getting out, I wasn't sure which.  But I forgot to tell him that.

MR. FRASIER:  Okay.  All right.

Any other questions?

(Pause.)  Okay.  I'm going to have you talk to the officers a little bit, if you don't mind.

THE WITNESS:  Okay.

**TESTIMONY OF THOMAS BOUNDS**

(Witness sworn.)

BY MR. FRASIER:

Q.    First of all, sir, this is the grand jury for Coos County, and --

A.    Nice to meet you.

Q.    -- we'll be looking into the disappearance and death of Leah Freeman.

It's obvious, but I need to tell you we're recording the proceedings, okay?

First of all sir, could you tell us your name and where you live.

A.    My name is Thomas Bounds.  Presently I live at 701 North Birch, No. 7.  During this time of Leah's disappearance I lived at 382 West Central Boulevard, No. 2, which is across from the high school.

Exhibit 5002 at 152

*Thomas Bounds*

Q.    Okay.  And you're related to some degree to --

A.    Uh, my cousin Diane is married to Richie, and Richie is Leah's uncle.

Q.    Okay.

A.    So she's a second cousin once removed.

Q.    All right.

A.    I think.

Q.    You were -- so you were familiar with Leah Freeman?

A.    Yes, I was.

Q.    You had known her --

A.    I'd known her since she was a little kid.

Q.    All right.  Okay.  I want to direct your attention, sir, to June 28th, 2000.  You indicated you were living in these apartments across from the high school?

A.    That's correct.

Q.    Are those apartments still there, or --

A.    Yes, they are.

Q.    Oh, okay.

A.    I actually lived in -- you're thinking of the one behind the gas station?

Q.    Yeah.

A.    We were next to that.

Q.    Next to that.

A.    Yes.

Exhibit 5002 at 153

*Thomas Bounds*

Q.    Okay.  Well, I guess I want to get right to it. The day that Leah disappeared, June 28th, 2000, did you see her that day?

A.    Yes, I did.  I saw her that evening.

Uh, my wife and I were going over to her mother's house; she lives on Knott Street.  And, uh, we had just recently moved there, uh, within the last few months.  And as we were driving over -- it was in the evening; I don't know what time.  It was still daylight.  We saw Leah at the high school, in front, like she was waiting for somebody.  Uh, one of the things that we remembered was her attire, because I made a comment to my wife that if it was my daughter I wouldn't let her stand out there in that kind of a dress.

Q.    Okay.

A.    Well, actually it was shorts and a kind of like a top that was midriff shown and bare shoulders.  And, uh --

GRAND JUROR:  Look at that.

THE WITNESS:  Yeah.  Oh, yeah.  I've seen that. That's not what she was wearing, though.

BY MR. FRASIER:

Q.    That's not what she was wearing?

A.    No.

Q.    Okay.  All right.  Go on.  Tell us what you --

A.    Okay.  We went over to, uh, my mother-in-law's house.  Spent a little time there, not long.  We came back

Exhibit 5002 at 154

*Thomas Bounds*

and it was dusk.  It was still light, but it was starting to get dark.  And at that time we saw Leah over at the phone booth on the phone.

Q.    About how much time had passed between the first time you saw her and the second time?

A.    Ah.  That I really couldn't tell you, but it seems to me like it would have been within half an hour or so, because I don't think we visited that -- that long that night.

Q.    All right.

A.    But I couldn't say absolutely for sure.

Q.    All right.  So she's at the gas station, and by the phone booth.

A.    Right.  And it was -- it was -- there was still a little light left.  It wasn't totally dark.

Q.    Okay.

A.    We went home.

And a little while later, I don't know how long it was, but, uh, we were in the house and we heard a scream, at which point I went outside and listened.

Q.    Okay.

A.    I listened for several minutes, because I was imagining those apartments there.  I never heard nothing after that, so I went back into the house.

Q.    Okay.  A scream.  Was it like a woman's scream?

Exhibit 5002 at 155

*Thomas Bounds*

A.    Yes.  It was a high-pitched, sounded like a child.  And that's why after I listened for a bit and didn't hear nothing else that -- because kids do that sometimes.  They scream at each other when they --

Q.    Yeah.

A.    You know, when one drives by another.  But, uh, I did go outside; I did listen; and I didn't hear anything after that.

Q.    All right.  Where the apartments are -- and I know this is kind of a difficult question to ask you, but could you kind of tell from what direction the scream came from?

A.    Yes, I could.  It sounded like it was over -- high school, um, the old, um -- the set of buildings that are next to us.

Q.    Okay.

A.    Okay.  It sounded like it came -- came from that direction.

Q.    All right.  Now, there's a road over there with the cemeteries --

A.    Right.

Q.    -- and the -- was it --

A.    Right.  Yeah.  It sounded like it was in that area.

Q.    Okay.

Exhibit 5002 at 156

*Thomas Bounds*

A.   Or in that direction -- general direction.

Q.   All right.

A.   Now, if you looked at it in a pie shape, it would probably be a direction like this that would include, uh, towards the end of the Courtney problem -- property --

Q.   Right.

A.   -- and towards the high school.  Basically in that direction.

Q.   Okay.

A.   I couldn't say exactly that it did come from the cemetery, just that it sounded from that direction.

Q.   From that direction.  Okay.  You're aware that one of Leah's shoes was found on that road.

A.   Uh, several days later.  They were -- it was found in the hedge, wasn't it?

Q.   Actually it was found in the middle of the road.

A.   Middle of the road?

Q.   Yeah.  Was this in the same general area that --

A.   Oh yeah.

Q.   -- where the scream had come from?

A.   Oh, yeah.  Yeah.  Because the pay phone is right there on that road next to the cemetery.  Of course, I don't think the pay phone is functional anymore.

Q.   Okay.  With cell phones, pay phones have kind of disappeared.

Exhibit 5002 at 157

*Thomas Bounds*

Okay.  Now, did you know Nick McGuffin at all?

A.    No.

Q.    Okay.  Did you -- you haven't had any contact with him?

A.    No.  No, I -- I'm -- they don't hang around us old farts.

Q.    Yeah, well -- yeah, I understand that.

Okay.  Is there anything else you want the grand jury to know about this that I've forgotten to ask you about?

A.    That's -- that's all I know for sure.

Q.    Okay.

A.    Anything else, it was just innuendo and gossip.

Q.    Okay.

A.    But those facts I know for certain.

Q.    You saw Leah that night --

A.    That's right.

Q.    -- by the high school.  Then a little later over at the gas station --

A.    At the pay phone.

Q.    -- pay phone.

A.    And it was twilight.  It was -- like I said, it wasn't quite dark yet, but there was still a little light left.

Q.    Right.  Okay.

A.    When I heard the scream, it was dark.

Exhibit 5002 at 158

Q.    It was dark.

A.    But I couldn't tell you what the time span was from the time we saw her in the pay phone.

Q.    Okay.

A.    It must have been enough so I didn't think it was her --

Q.    Okay.

A.    -- because I would have investigated if I would have thought that.

Q.    Okay.

A.    But if I would have heard other noises following the scream, I would have also investigated.

Q.    Okay.

GRAND JUROR:  Where's this -- where's this phone booth at?  Over by Shell -- what's the Shell station now?

THE WITNESS:  Yes.

MR. FRASIER:  Okay.

THE WITNESS:  And at the time they had those brick apartments, were still there.

GRAND JUROR:  Okay.

THE WITNESS:  The ones that they had tore down.

GRAND JUROR:  Okay.

THE WITNESS:  And I think it was --

MR. FRASIER:  Those brick apartments were where there's now storage units --

Exhibit 5002 at 159

*Thomas Bounds*

THE WITNESS:  Correct.

MR. FRASIER:  -- there?

THE WITNESS:  Well, they tore them down in two stages.  Um, both stages were still there when this all occurred.

MR. FRASIER:  Okay.

GRAND JUROR:  Were they -- were they abandoned, then?

THE WITNESS:  I think the front ones may have been.  I couldn't tell you for sure.  Because that's one of the things I thought was, well, if someone heard a scream, it's right next to the Courtney's property; that someone would have investigated otherwise.  But -- Because I'm a whole 'nother piece of property away.

MR. FRASIER:  Okay.  Anything else?

GRAND JUROR:  Could you describe what she -- what you thought she was wearing?

THE WITNESS:  She was wearing -- I don't know, from some reason it comes to mind as like a Spanish top.  You know, there's the midriff was showing, and I think she had, like, bare shoulders and it was kind of like, "poofied."  And she was wearing a pair of shorts.  Uh, I seem to think maybe they were white, but I couldn't guarantee that.

And it seems like the top was maybe yellow or blue.  I could be wrong with that too.  The colors I couldn't

Exhibit 5002 at 160

*David Jenkins*

tell you for sure.  But I do -- that's the reason it kind of stuck in my head, because when I saw her standing out there I made the comment that if it was my daughter I wouldn't let her be standing out there in that kind of a dress.

GRAND JUROR:  Like a tube top.

THE WITNESS:  Right.

GRAND JUROR:  Sounds kind of like --

THE WITNESS:  A tube top.  Yeah.

I know if her mother knew she was dressed like that, she wouldn't be standing out there dressed like that. Kids have a tendency to hide clothes; wear one thing when they're at home, and when they leave they change.

(Pause.)

MR. FRASIER:  Okay.  Any other questions?

Okay.  That will do it sir.  You're free to go.

GRAND JUROR:  Thank you.

THE WITNESS:  Thank you.

GRAND JUROR:  Thank you.

**TESTIMONY OF DAVID JENKINS**

(Witness sworn.)

BY MR. FRASIER:

Q.    First of all -- I guess maybe I can move up just a bit, but -- could you tell us your name, please, sir, and where you live.

A.    David Jenkins.  I live in Coquille, right outside

Exhibit 5002 at 161

*David Jenkins*

of town on Highway 42.  Uh, 9987 -- 9977 -- 99977 Highway 42, Coquille.

And that's right outside of town by Clyde From Glide.

Q.    Okay.  And how old are you, sir?

A.    31.

Q.    Okay.  So ten years ago, in the year 2000, you would have been 21.  Is that right?

A.    Yes, sir.

Q.    Okay.  Do you know an individual named Nick McGuffin?

A.    Yes, I do.

Q.    How do you know Mr. McGuffin?

A.    Uh, well, back when we were kids -- I'm going to say we were kids.  Uh, when he was younger, I used to sell him some pot once in a while.

Q.    Okay.

A.    He'd come over and we'd smoke out, and we'd take a ride and go smoke out.

Q.    All right.  Outside of smoking pot with him, is there -- did you hang out with him a lot or anything like that?

A.    Not really.  There towards the end of, uh -- right before his girlfriend got hurt, and he was really upset, uh, before then we would -- we were getting, you know,

Exhibit 5002 at 162

*David Jenkins*

kind of friendly through -- I knew Aaron West and a couple of the other guys, like Josh Ernler.  Um, and I was just never really in their group of, you know, kids because I skipped a grade when we were younger.  From the seventh I skipped eighth grade and went right into the ninth because of the RBD program back then, because I had an attitude and -- you know. I never had to crack a book; I just knew the answer.

Q.    Oh, okay.

A.    So.

Q.    All right.  Did you know Leah Freeman at all?

A.    Um, I knew of her.  I didn't know her personally, no.  I wish I could have; I hear she was a really good person.

Q.    Did you know that Nick and Leah were boyfriend/girlfriend?

A.    Yeah, I knew that much.  Yeah.

Q.    Okay.  Did you have an opportunity to see them together or anything like that?

A.    Um, once in a great while.  I'd see them walking once in a while.  Um, a couple of times I'd seen them like out downtown, but never really in a restaurant or nothing like that.  Not that type of setting, ever.

Q.    Okay.  So you didn't know -- you -- or would you know how their relationship was going or anything like that?

A.    Um, as far as I could see from the outside, it

Exhibit 5002 at 163

*David Jenkins*

was okay.  Um, I mean, normal boy -- boyfriend/girlfriend stuff.  "I want to do this."  "No, I want to do this."  You know?  And other than that, from what I hear and what I've seen, it was okay.

Q.    Okay.  Well, I want to direct your attention to the day that Leah disappeared.  That would have been June 28th, 2000, that evening.

Were you at the Fast Mart that evening?

A.    Oh, I could have been.  Honestly, I could have been.  I mean, I'm not going to say I wasn't, but yeah, I could have been.

Q.    Well, do you -- previously, you'd been interviewed by the police, and then you also testified to the grand jury in 2000.  Do you recall that?

A.    Yeah.

Q.    Okay.  In previous statements and testimony you say you were at -- you had been at the Fast Mart with Aaron West at about seven o'clock.

A.    Okay.  Yes, that's the night that, um, Brendan took my -- I had a key-chain switchblade.  And I didn't know, but in -- in our county and other counties in the state of Oregon, without a license you can't own an automatic weapon of any sorts.  And not -- be it a knife or a gun.

Q.    Oh, okay.

A.    So I didn't know that.  So he took it from me,

Exhibit 5002 at 164

*David Jenkins*

and -- even the key-chain.  He said it's still dangerous, and he took it.

Q.    Okay.  So then when you say Brendan, that's Officer Brendan --

A.    That's Officer Brendan, sorry.

Q.    -- with the Coquille Police Department.

A.    Yes, sir.

Q.    Now, while you're there at Fast Mart with Aaron, did Mr. McGuffin show up?  Nick?

A.    Um, possibly.

Q.    Okay.

A.    I don't -- I remember that that -- that same day, later on that evening, everybody was hanging out.  And I never really hung out -- hung out with them, like I say.  It was for a reason.

And, um, they all -- see, there's this thing about your preps and stoners and hippies and what you've got, you -- we're all grown up now, but, hey.

Um, anyway, they were getting searched by one of the officers.  I believe it could have been -- that was it. That was that same day, and that could have been him and one of his buddies.

Because one of them was -- was going to the military, what have you.  And basically they were -- got caught smoking pot, and neither one of them wanted to take

Exhibit 5002 at 165

the blame, so the whole subject was just dropped just so long as they got rid of the marijuana.

Q.    Okay.

A.    Which is, you know.

Q.    All right.  Again, I want to -- I'm going to go back to your statements that you made --

A.    Okay.

Q.    -- in 2000, and what you said to the grand jury in 2000.

You indicated that you're at Fast Mart with Aaron West, it's about seven o'clock, and Nick shows up and he's going to get cigarettes and a drink.  Recall that?

A.    No, I don't recall that at all.

Q.    And then you said that Mr. McGuffin said he needed to get away for a bit.  Do you recall that?

A.    No, I don't recall.  That wasn't me, I'm going to tell you that right now.

Q.    Okay.  Well, I can get the tape out and play it.

A.    Well, that's fine too, but that --

Q.    Okay.

A.    If it was me, then I don't remember it.  No.

Q.    All right.  And do you recall telling the grand jury that Nick was driving a Mustang?

A.    I recall telling the grand jury that Nick was driving a Mustang.  Me, him, and Aaron West went down to,

Exhibit 5002 at 166

58

*David Jenkins*

uh -- me and Aaron were already there, in his Plymouth Fury III.  And Nick came down to Johnson Mill Pond and popped open his trunk, talking about speakers and stuff.  And I couldn't -- it was just too clean for me.

Q.   Okay.  You went out to Johnson -- you were at Johnson Mill Pond.  Is that right?

A.   Yeah.

Q.   And Nick McGuffin's there; is that right?

A.   We were already there, and Nick comes driving in.

Q.   And Aaron West was there?

A.   Aaron West was there.

Q.   And Josh Ernler?

A.   Yep.

Q.   Okay.  Did you all four of you smoke some marijuana out there?

A.   Oh, yeah, we did.

As -- as -- at the same time, he were -- we're all gathered around Nick's car because Nick's a cool guy.  Nick's got, you know, his Mustang out there.  And he's talking about how he wants to put in speakers and this, that, and the other.  And, you know, we're all just talking about speakers and stuff.

So he opens his trunk and he's, you know, this is where things are going to be; and this, that, and the other.  Yeah.

Exhibit 5002 at 167

*David Jenkins*

Because I remember -- I remember that blatantly clear, still, to this day because it -- I couldn't fathom how a guy would have an entire blue car, and the inside's all done up, and the trunk's completely white. Still base-coat white.

Q.    Okay.

A.    I mean.

Q.    All right. You recall what time it was when you left the pond?

A.    No, I don't.

Q.    In previous statements you said nine o'clock. Does that sound about --

A.    It was pretty late. It was after dark.

Q.    All right. Did you go back to Fast Mart?

A.    Um, see, it's -- I don't remember my day-to-day goes [sic]. Like, uh, that's not -- you know. I -- I don't know how anybody can remember that from 10 years ago --

Q.    All right.

A.    -- to tell you the truth.

Q.    Previously, you testified that you saw -- you went back to Fast Mart, you saw Nick at Fast Mart, he was asking if you knew where Leah was.

A.    Yeah, I remember -- I remember something. Nick was looking for his girlfriend. He was upset because he couldn't find her, and they had been in an argument or

Exhibit 5002 at 168

*David Jenkins*

something like that.  I remember that, yeah.

Q.    And he was still driving the Mustang when you saw him at Fast Mart, right?

A.    Yes, he was.

Q.    Now, did he come back later?

A.    (Indiscernible.)  Um, it could have been the next day.

Q.    Okay.

A.    I remember -- I remember after that -- after that evening, at -- nobody wanted to talk to anybody.

Q.    Okay.

A.    But like I've told everybody, if I knew anything, you know, and if it comes -- arises, I'll -- I'd say it.

Q.    Okay.  Going back to what you testified to before, you indicated that Nick came back to Fast Mart sometime after the first time -- half hour, an hour, something like that.  And at that time he's driving a different car.  Do you recall that?

A.    Yeah, he was.  Oh, whose car was it?  I think it was his parents' car, I believe.

Q.    Okay.  Was it like -- do you remember what color it was?

A.    It was either -- um -- um -- it was either his parents' car or it was, uh, that -- there was an El Camino running around.  One of the guys owned that.

Exhibit 5002 at 169

*David Jenkins*

Q.    Okay.

A.    He was -- he was always -- he was friends with him.

Q.    Okay.  Was it -- well, I'm just going to go off here.

A.    Mm-hmm.

Q.    You indicated before he was driving a red or maroon-colored Thunderbird.

A.    Yeah, his parents' vehicle.

Q.    Okay.

A.    What he said was his parents' vehicle.

Q.    Okay.  Do you recall how Nick was acting when he came back in the Thunderbird?

A.    Upset.  Like, distraught.

Q.    Okay.

A.    Just, I want to say distraught now that I'm older, but to me back then it was just upset.  You know, he was like, frustrated with himself.  But now it's -- now, you know, there's -- he was distraught.

Q.    Okay.  Was he crying?

A.    Yeah.

Q.    Okay.  And do you see Nick over the next few days after Leah disappeared?

A.    I -- I don't remember exactly --

Q.    Okay.

Exhibit 5002 at 170

*David Jenkins*

A.    -- but I'm sure I have.  I did -- you know, at one point we went up to his parents' house and smoked a little bit.  And it was me and a couple of other fellows and Nick.

Q.    All right.  Now, do you know a girl named Michelle Emra (phonetic)?

A.    Yeah, I do.  I dated her.

Q.    You dated her?

A.    Bateman.

Q.    Okay.  And I'm going to ask you some questions.

Do you recall being at some sort of a party at Michelle's house in August of 2000?

A.    Nope.  Never partied there.

Q.    Never partied?

A.    Never partied there, not at her house.  I drank there once in a while, and that was pretty much it.  Because I -- my dad's an alcoholic, and now I pride myself on not turning into one.

Q.    Okay.

A.    I drink a beer once in a while, you know.  I mostly smoke a little weed, honestly, you know.

And I try not to even carry that over because now I got older kids and they're -- you know, kids catch on.  So you knock that shit off, eventually.

But I remember drinking there once, and there was

Exhibit 5002 at 171

*David Jenkins*

a couple of other people there, and I drank heavy that night. Well, she says she's going to call the cops on me.  And I had a bunch of pot and all this other stuff, so I got mad.  Yeah, I got mad.

Q.    Okay.  Well --

A.    And I just walk -- I got on my bike; I remember riding off.  I remember what's-his-face coming to Safeway to get me, because I was waiting on a cab to take me to a motel in Coos Bay.

Q.    Okay.  Well, the reason I'm asking is I've got some sources, some witnesses that the grand jury's going to hear from later, that -- at least one witness that saw you at a party with Mr. McGuffin, and that you asked Mr. McGuffin what he strangled Leah Freeman with.

A.    No.  No.  On my life, no.  Me and Nick -- this is how much we liked each other.  He came and got a bag of weed from me, and he left me the hell alone.  He never really liked me, and I never cottoned to him.

Q.    Okay.

A.    Like I said, towards the end, yeah, towards -- towards the end, because, you know, I knew Denise and Denise was a good person.  And she lived at Hillside Terrace.  And she would need things, like, once in a while a drywall.  Once in a while, you know, "Hey, can you get this off the wall for me so I don't get in trouble; my kid did this."

Exhibit 5002 at 172

64

*David Jenkins*

Well, being the person I am -- I'm poor, I know what it's like not to have money -- to be able to just say, "Hey, ring-a-ling contractor, come to make this disappear so that my landlord don't jump my butt for it."

"Well, yeah, Denise, I'm going to do that."

"Well, don't let nobody come and see you come to my house because of what you -- what you're known for. Okay? And I have children."

"Okay, Denise. No problem. I can do that."

So I come and do what I got to do, and leave.

Q. Okay. So I guess what I'm trying to ask you, and I want to make sure it's very clear: Did Nick McGuffin ever tell you that he killed Leah Freeman?

A. No, sir, he didn't.

Q. Okay.

A. No, sir. There -- that -- no. He never did. And if he --

Q. Do you know who killed Leah Freeman?

A. No, I don't. No, I don't, because that's --

Q. When was the last time you had contact with Nick McGuffin?

A. With Nick. Hmm, 10 years ago. That, since -- since that -- since the night he swapped the cars, because I felt -- I just felt in my gut something was weird. Since the night he swapped the cars, me and -- and shortly after that,

Exhibit 5002 at 173

*David Jenkins*

me and Aaron stopped becoming friends too.  We stopped -- we were -- we didn't hardly talk or anything.  That whole thing messed up everybody's friendship with everybody, you know.

Things I wanted to do and things I wanted to get in on weren't really allowed, or anything like that, because of this happening, you know.  And they were all good kids, as far as I'm concerned.  As far as I knew, they were all good kids.

And, you know, just -- no.  He never said nothing of the sort.

Q.    All right.

A.    And I lost a lot of good friends because of this.

Q.    Okay.

A.    If I knew -- like I said, if I knew or if I hear anything, even -- even until you guys put somebody away for him -- for it, if I knew or heard anything I'd say it.  Because it's wrong.  It's just totally wrong.

MR. FRASIER:  Okay.  I don't think I have anything else to ask Mr. Jenkins.

Does the grand jury want to ask him anything?

GRAND JUROR:  I'm a little fuzzy on the time line of the switching of the cars and when you saw the -- the mill pond?

THE WITNESS:  Okay.  Um, it was right all in jumble.  To me, it's jumbled up because I've -- I've mostly

Exhibit 5002 at 174

*David Jenkins*

logged since then.  And I had one thing on my mind:  Making money, logging, you know.  Trying to be honest, which means get out of, you know, selling pot and stuff; which I have been able to, you know, which is good for me.

Um, right around in the same time frame, within that night, that night he was at Fast Mart in his Mustang, I want to say.  And then the next -- with -- sometime within that evening or in the next morning, afternoon, he had -- was driving a total different car, a Thunderbird.  And he said it was his parents' car.

And that night was when -- or that next afternoon, right in there, before -- right before he swapped out cars, we were out there at the mill pond smoking out.  Because I remember, um, two days previous the sheriff's department caught me and Aaron coming out of there.

GRAND JUROR:  Okay.

MR. FRASIER:  Any other questions for Mr. Jenkins?

GRAND JUROR:  Was the mill pond a place where a lot of people hang out?

THE WITNESS:  Yes, ma'am.  A lot of the kids went out there, because it's out of town.  Normally the local police department stayed in town mostly, and the sheriffs were pretty relaxed back when we were kids, so.

MR. FRASIER:  Okay.  We've got to stop in a

Exhibit 5002 at 175

*Arthur Jones*

second, I think.  The tape ran out over here.

Oh, go ahead.

THE WITNESS:  Oh, okay.

MR. FRASIER:  It's recording there.

THE WITNESS:  Okay.  Sorry.  I'm -- the sheriff's department was pretty relaxed when we were kids.  And being's you're going to be kids, you're going to roughhouse, you're going to do things like that.  But if you're not blatantly out causing somebody else harm, or stealing or causing trouble, they mostly let some -- you know, a few things slide.  Which is, you know, in most local law enforcements, I don't care you're in Cincinnati or you're back here, you know, kids will be kids.  But then when something terrible happens, it needs to be dealt with.

MR. FRASIER:  Okay.  Any other questions?

(Pause.)  Okay.  I guess that will do it, Mr. Jenkins.

THE WITNESS:  Okay.

MR. FRASIER:  Mr. Jenkins, you're free to go.

THE WITNESS:  Okay.  Thank you, guys.

GRAND JUROR:  Thank you.

**TESTIMONY OF ARTHUR JONES**

(Witness sworn.)

BY MR. FRASIER:

Q.    Okay.  First of all, sir, this is the grand jury

Exhibit 5002 at 176

*Arthur Jones*

for Coos County, and we're looking into the disappearance and death of Leah Freeman.  And it's obvious, but we're recording the proceedings, okay?

A.    Right.

Q.    First of all, could you tell us your name, please, sir.

A.    Arthur C. Jones.

Q.    And where do you live, sir?

A.    In North Bend.

Q.    Okay.  Mr. Jones, phrasing -- well, first of all, do you, are you acquainted with an individual named Nick McGuffin?

A.    No.

Q.    Okay.  And not Leah Freeman herself?

A.    No.

Q.    Okay.

A.    I know who she is from all the media and everything, but I never met her.

Q.    Do you know an individual named Bill Sero?

A.    Yes, I do.

Q.    How do you know Mr. Sero?

A.    Oh, way back in the day, me and him used to be friends.

Q.    Okay.

A.    But he's done other stuff, and we went our ways

Exhibit 5002 at 177

*Arthur Jones*

before all this other stuff happened.

Q.    All right.  And Tom Stemmerman?

A.    Yeah, I know him.

Q.    And how well did you know him?

A.    I knew him decently well.  Like I said, it was another one of those things, like -- they both went downhill, bad.

Q.    Okay.  We'll just get right to it.  Again, I'm not trying to embarrass you or anything --

A.    Oh, no.  No.

Q.    -- or anything like that, okay?

You used to be involved with methamphetamine.

A.    Yes, I did.

Q.    And Stemmerman and Sero, were either one of them your sources, or --

A.    Um, yeah.

Q.    Okay.  And prior to Leah Freeman disappearing, were you close with Sero and Stemmerman?

A.    I wouldn't say, no, I was close.  Me and -- like I said, me and Bill were done years before that.  We had --

Q.    Okay.

A.    -- some disagreements, and, uh -- but I was still acquaintance with Tom.

Q.    All right.  After Leah disappeared, did you see a change in either one of these individuals?

Exhibit 5002 at 178

*Arthur Jones*

A.    For sure.

Q.    Okay.  Why don't you tell the grand jury about that, please.

A.    It's after, you know -- I stopped even going over after I seen their behaviors and stuff like that.  And, like, Bill Sero and me had the same day care.  So when I'd be there picking my kid up, and Erica would be coming and getting her kids, he just -- he was just a freak.  Check -- looking around at the car, opening the trunk.  Just almost everywhere you seen him with Erica, and she was doing something, he'd be outside that car.

Q.    Okay.  Do you recall being -- picking up your kids at day care around the time that Leah Freeman disappeared, at all?

A.    Um, no.  This would have been after.  After the fact that --

Q.    After.  Okay.

      Stemmerman.  Did you go out to his place?  You used to live off of --

A.    Yeah, I've been out there.

Q.    Okay.  And what road was that, east of -- Libby Drive?

A.    South Libby, yeah.

Q.    And after Leah Freeman disappeared, how did he behave out at his house?

Exhibit 5002 at 179

*Arthur Jones*

A.    Oh, it wasn't so much his behavior on his own, it was, uh, the change of where things took place.

Q.    Okay.  What do you mean by that?

A.    Well, it used to be down in the basement was his little shop, because he was always dinking around out back.  And then after a while, then, he was remodeling the downstairs and everything was upstairs and no one could go down there.

Q.    Okay.  Was there -- you mentioned his car.  Was there something about the trunk of his car?  Maybe I missed that when you were talking about that.

A.    Uh, who?

Q.    Stemmerman or Sero?

A.    Um, it wasn't something about his car.  I'm not sure, but he was just -- he seemed like he was checking it out, looking in the trunk, so I don't know exactly --

Q.    Okay.

A.    -- but it was just weird behavior.

GRAND JUROR:  Who was that?  I'm sorry.

THE WITNESS:  Bill.

BY MR. FRASIER:

Q.    Was there something to do with a garbage bag involving Mr. Stemmerman?

A.    Um, somewhat.  I mean, when I was there, Bill came down talking to Tom, and I was out there working on the

Exhibit 5002 at 180

*Arthur Jones*

car.  And all of a sudden they didn't -- they weren't wanting to talk around me, so they went off, but -- and it was some other guy that lived with Bill, I don't know who he was, had a black garbage bag.

Q.    Okay.  And was there anything said about this garbage bag?

A.    Like I said, they didn't want to talk in front of me.  So.

Q.    Okay.  I guess what I want to get to, sir, and you probably already know this, is that the McGuffin family and a couple of individuals -- for instance, do you know a guy named Scott Simons?

A.    Scott Simons.  It's not ringing a bell.

Q.    Okay.  Or an Andrew Ousley?

A.    No.

Q.    Okay.  The McGuffin family, and apparently they're relying on these people to some degree, they're claiming that you disposed of bloody clothing on behalf of Mr. Sero or Stemmerman.

A.    Nope.

Q.    And you did not do that?

A.    Not at all.

Q.    Okay.  Have you ever disposed of anything for these guys?

A.    I've never done nothing for those guys.  Nothing

Exhibit 5002 at 181

*Arthur Jones*

at all.

Q.    Okay.

A.    As I said, when I started seeing where he is and stuff like that, I was done.  I was -- didn't make contacts with him anymore after that.  I made up my own opinion, and that was that.

Q.    So we're abundantly clear, I just want to make sure we're clear:  You never disposed of any evidence for these --

A.    No.  I've never even seen a piece of evidence unless something was in that black bag.  I have no idea what was in it, I just know they didn't want to talk around me about whatever they were doing.

I've never seen a piece, never disposed of a piece, never touched a piece.

GRAND JUROR:  At the time this was going on, was this like a methamphetamine house?

THE WITNESS:  Yeah.

BY MR. FRASIER:

Q.    And Mr. Stemmerman, the narcotics unit eventually raiding his house several times, and he ended up going to prison, didn't he?

A.    Well, that's what I heard, but I was thinking it was something to do with the -- the case, is what I thought.  I didn't know.  I knew he ended up in jail, with prison time.

Exhibit 5002 at 182

But like I said, I didn't make contact with him after any of that, so I just figured it had to do with this case.

Q.   All right.  When was the last time you had contact with Stemmerman or Sero?

A.   Um, I couldn't even tell you a date even around about it.  It was when he moved the shop upstairs and he was remodeling, and that was there --

Q.   We're talking 10 years ago?

A.   Probably, yeah.  Somewhere in the time right after.

Q.   You haven't seen these guys for years?

A.   No.

Q.   Okay.  Do you have any other information about the death of Leah Freeman?  Anything that --

A.   Uh, no.  I really don't know anything about it, except for -- you know.  I just have my -- what I think, and you -- over the 10 years you hear different stories, and most of them seem to be -- have those guys in the stories.  So, I've -- in my mind, even if they turn out to be innocent, I'm -- I'm stuck with my opinion already.

Q.   All right.

A.   I wouldn't trust those guys as far as I could throw them.

MR. FRASIER:  I don't think I have any other

Exhibit 5002 at 183

*Arthur Jones*

questions for Mr. Jones.  Does the grand jury want to ask him anything?

GRAND JUROR:  The contact that you had at the kids' day care, that was after all of this went -- after June?

THE WITNESS:  Yeah, it was after she was missing and all that.

GRAND JUROR:  So right in that area, the end of June, when she went missing and all, you weren't having contact with either of these two people, or anything --

THE WITNESS:  No, except for at the daycare.  And he would be out, I would be in there, Erica would be coming in to get her kids.  And, you know, the windows are open. You could see him --

GRAND JUROR:  Sure.

THE WITNESS:  -- just acting weird.

GRAND JUROR:  Where was the day care at?

THE WITNESS:  It was right by Sunset School.  I think Michigan Street --

GRAND JUROR:  This is in --

THE WITNESS:  -- and Empire.

GRAND JUROR:  What kind of car did he have?

THE WITNESS:  I think it was a blue Taurus, I think.

GRAND JUROR:  Light blue, dark blue?

Exhibit 5002 at 184

*Heidi Crook*

THE WITNESS:  It was dark blue.

GRAND JUROR:  And did I understand correctly that right after the disappearance of Leah, that their attitude and demeanor changed?

THE WITNESS:  Right.  Bill's demeanor and his personality totally changed.  Tom just switched things up in his house, and it was just, you know, coincidental.  They're hanging out.  They don't want to talk around me at that time anymore.  And I just -- it was too weird for me.

GRAND JUROR:  Did they come to Coquille often?

THE WITNESS:  Um, Bill seemed to.  He seemed to go to Bandon and Coquille all the time, but I think the one -- I think the mom or something lived over here.  Erica's mom.  So, I don't know about Tom.

MR. FRASIER:  Anything else?

(Pause.)  Okay, sir.  That will do it.  You're free to go.

THE WITNESS:  Thank you.

GRAND JUROR:  Thank you.

### TESTIMONY OF HEIDI CROOK

(Witness sworn.)

BY MR. FRASIER:

Q.    First of all, this is the grand jury for Coos County, and we're looking into the death of Leah Freeman.  I think it's obvious, but I got to tell you we're recording the

Exhibit 5002 at 185

*Heidi Crook*

proceedings here today.

Q. First of all, could you tell us your name and where you live.

A. I'm Heidi Crook, and I live in -- my address? Or --

Q. Just where you live.

A. Okay. I live in Coquille, Oregon.

Q. Okay. How old are you?

A. I'm 30.

Q. And in the year 2000 you would have been 20?

A. Yep.

Q. Okay. Did you know an individual or do you know an individual named Nick McGuffin?

A. Yes.

Q. And how do you know Mr. McGuffin?

A. Um, through school. And he used to be friends with my brother.

Q. Okay. And your brother's name is?

A. Ricky Crook.

Q. Okay. How close were you with Nick, would you say?

A. I wasn't really close to him.

Q. Okay.

A. He was a few grades behind me.

Q. Okay. So you didn't hang out with him or

Exhibit 5002 at 186

78

*Heidi Crook*

anything like that?

A.    Not that I know of.  He hung out with my brother.

Q.    Okay.  Did you -- did you know Leah Freeman?

A.    Um, I know her sister.  I knew her sister.

Q.    Denise?

A.    Yeah.  I knew who she was, but I didn't know her.

Q.    Okay.  Did you associate with Leah at all?

A.    No.

Q.    Did you know that Nick McGuffin and Leah Freeman were boyfriend/girlfriend?

A.    Yeah.

Q.    Did you have -- did you know anything about how well they got along, that type of thing?

A.    No.

Q.    Okay.  I want to direct your attention now to June 28th, 2000.  That would have been the day that Leah disappeared.

Do you know a girl named Heather Reid?

A.    Yes.

Q.    And were you with Heather that night?

A.    Yes.

Q.    Could you tell the grand jury where you were, about what time it was, what you saw, that type of thing.

A.    Um.  I was driving in a car with Heather Reid, and we were driving along Central.  And this is about nine

Exhibit 5002 at 187

*Heidi Crook*

o'clock, and we -- it was Hunter's at the time, restaurant. And we saw Leah walking on Central towards the stoplight, with her arms crossed like she was cold.

Q.    Okay.  Which way was she going?

A.    Towards the stoplight.

Q.    Okay.  That would have been towards the high school?

A.    Yeah.

Q.    All right.  That used to be a blinking red light up by the bank.  I just wanted to make sure which direction we were going, okay?

A.    Oh, okay.

Q.    How was she dressed?

A.    She had a white tank top on.  So I remember, I remember.

Q.    Okay.  There's a picture there -- right there.

A.    I think that was the same one.

Q.    Okay.

A.    Well, it was white like that.

Q.    Right.  Okay.

      And how was she walking?  I mean, was she walking fast?  Did she look like she was upset?

A.    She looked like she was cold.

Q.    Okay.

A.    Like -- I don't know if she was walking fast,

Exhibit 5002 at 188

*Heidi Crook*

slow.  I don't -- I'm not really sure.

Q.    Okay.  And she was in front of Hunter's, the restaurant?

A.    Yeah.  Mm-hmm.

Q.    Which direction were you headed?

A.    The opposite of her.

Q.    Okay.  So you were headed towards downtown?

A.    Yeah.

Q.    What side of the street was she on?

A.    She was right in front of Hunter's.

Q.    So she was on that side of the street?

A.    Yeah, on that --

Q.    Okay.  And where were you headed at that time?

A.    To Heather Reid's house, or the place she was staying at the time.

Q.    Okay.

A.    The Leap (phonetic) residence, behind Safeway.

Q.    Okay.  So you take Heather home?

A.    Well, we --

Q.    Well, to where she was staying?

A.    We got back to her -- to her place, I remember it was 9:05.

Q.    Okay.

A.    We got back, because we had to put her kid to bed.

Exhibit 5002 at 189

*Heidi Crook*

Q.    All right.

A.    That's why I remember.

Q.    And how long were you there?

A.    I think I stayed -- no, I didn't stay the night there.

Q.    Okay.

A.    I'm not really sure.

Q.    Well, I'm going back to your statement --

A.    I'm not sure.

Q.    -- sets it up about you.  You went back home, or you drove home, or you drove someplace else.  And you didn't see Leah as you were driving down Central?

A.    I don't remember.

Q.    Okay.  I want to talk with you about some things. There's been some rumors flying around town.  There's been some people that police have interviewed.

First of all, do you know a young man named Jamie Thurman (phonetic)?

A.    I used to know him, a long time ago.

Q.    A long time ago you used to know him?

A.    Yeah.

Q.    Do you know a Nicole Lindsey (phonetic)?

A.    Yeah, I know who she is.

Q.    Okay.  We've got a couple of people that claim that you were -- that you claimed that you heard Jamie

Exhibit 5002 at 190

*Heidi Crook*

Thurman say that Bill Sero killed Leah.

A.    I haven't seen Jamie Thurman since, like, high school.

Q.    Okay.  All right.  So I guess I'm going to back up and ask you this question.  Have you ever heard Jamie Thurman say that Bill Sero killed Leah Freeman?

A.    No.

Q.    Okay.  So if people are running around saying that you are quoting Jamie Thurman, that's -- they're not telling the truth?

A.    Hmm-mm.

Q.    Okay.  That's a no?

A.    Yeah.  No.

Q.    Okay.  Now that we make sure we're clear for the cameras and so -- okay.

A.    Okay.

Q.    There's some other people that say that you've told people that Leah was killed when she was backed over by a car.

A.    Hmm.  There was a rumor going around that she got run over -- hit by a car, but --

Q.    Okay.

A.    -- I never heard the backed over by a car.

Q.    All right.  So -- well, I guess maybe the question I should have asked you, because I've got some other

Exhibit 5002 at 191

*Heidi Crook*

things about other people supposedly saying things, but do you know how Leah Freeman died?

A.    No.

Q.    Do you know who killed Leah Freeman?

A.    No.

Q.    Okay.  So, do you know who a Tom Stemmerman is?

A.    Yeah.

Q.    Have you ever told people that Tom Stemmerman killed Leah Freeman?

A.    I've told people, yes, that I've heard that Tom Stemmerman had something to do with it.

Q.    Okay.  All right.  And have you ever spoken to Tom Stemmerman about this incident --

A.    No.

Q.    -- about Leah Freeman?

A.    No.

Q.    Have you ever heard Mr. Stemmerman say, "I killed Leah Freeman?"

A.    No.

Q.    Okay.  The stuff that you've been telling people about has been what?  How -- where did you get this information that Tom --

A.    It was a rumor going around town.  I don't remember specifically who told me that, but --

Q.    Okay.

Exhibit 5002 at 192

84

*Heidi Crook*

A.    -- it was a rumor.  I haven't seen Tom since I found that -- that I heard that rumor.  I haven't seen him.

Q.    Okay.  Do you know this Bill Sero character?

A.    I did, yes.

Q.    Okay.  And have you had to -- Bill Sero, did he ever tell you that he killed Leah Freeman?

A.    No.

Q.    All right.  But you've heard rumors that he killed her?

A.    Yeah, mm-hmm.

Q.    Okay.

A.    Yes.

GRAND JUROR:  Could I, uh --

MR. FRASIER:  Go ahead.

GRAND JUROR:  Then anything that you've repeated is rumor, that you've heard, in relation to the death of Leah --

THE WITNESS:  Yeah.

GRAND JUROR:  -- or to whether Stemmerman or Sero --

THE WITNESS:  Mm-hmm.

GRAND JUROR:  -- killed her?

I get -- I guess what I'm -- what I'm asking is, is what you -- if -- if you said to anybody that so-and-so -- supposedly so-and-so or -- or Stemmerman killed Leah --

Exhibit 5002 at 193

*Heidi Crook*

THE WITNESS:  Yeah.

GRAND JUROR:  -- that you were repeating rumor and not factual knowledge?

THE WITNESS:  Yeah.  I wasn't there, so I -- I don't know if it was a fact or not.

GRAND JUROR:  Okay.  Thank you.

GRAND JUROR:  Well, allow me a little closer. I'll take it a step further.

Has anybody confessed to you that they killed Leah Freeman?

THE WITNESS:  No.

GRAND JUROR:  All right.

BY MR. FRASIER:

Q.    Okay.  Do you know a Kristen Steinhoff?

A.    Yes.

Q.    How well do you know Kristen?

A.    I used -- I used to know her really well, or I thought I did.

Q.    Okay.  Are you close with her now?

A.    No.

Q.    Okay.  How long have you guys not been talking or whatever?

A.    Um, I talked to her twice since she had her first child, and I don't know how old -- probably nine years, ten maybe.

Exhibit 5002 at 194

Q.    Okay.  At the time that Leah Freeman disappeared, you and Kristen were still close at that time?

A.    We were still hanging around each other, yeah.

Q.    Okay.  Has Kristen Steinhoff talked with you about the night that Leah disappeared?

A.    (Pause.)  No.

Q.    I've got information that said that Kristen Steinhoff told you that she and Nick drove around the night that Leah disappeared.

A.    She did tell me that --

Q.    Okay.

A.    -- so we did talk.  That's --

Q.    Okay.  Tell us what Kristen told you.

A.    -- the only conversation we had about it.

Q.    Okay.

A.    She told me that -- oh, she was trying to tell me that my brother wasn't at home that night that Leah disappeared.  She was arguing with me about it or something.

Q.    Okay.

A.    And she said that she drove Nick around, looking for Leah.

Q.    All right.  Okay.  So we're clear, the night that Leah disappeared, your brother Ricky Crook was at home asleep.

A.    Yeah.

Exhibit 5002 at 195

87
*Heidi Crook*

Q.    All right.

A.    That's what my mom said.

Q.    That's what your mom said.

A.    I mean --

Q.    Okay.  And Kristen was trying to tell you that no, Ricky was out doing stuff, right?

A.    Yeah.

Q.    Okay.  And then Kristen told you that she and Nick drove around that night looking for Leah Freeman?

A.    Mm-hmm.

Q.    Yes?

A.    Yes.

Q.    Okay.  Did she tell you which car they were in?

A.    No.

Q.    Do you recall telling the police they were in a borrowed car?

A.    She was -- I remember -- I didn't say Nick was. I mean, I remember saying that Kristen had borrowed a car and was driving around in a borrowed car.

Q.    Okay.

A.    I don't know if that's when Nick and her were driving around.

Q.    All right.  And did you have any indication that Nick McGuffin and Kristen were having a sexual relationship?

A.    Now I do.

Exhibit 5002 at 196

Q.    Okay.  How do you know that now?

A.    Because that's -- well, I think that now.

Q.    Okay.

A.    Just because that's the way she was.  I don't know, though.

Q.    Okay.  Do you recall something about Kristen showing you a necklace?

A.    Yes.

Q.    Tell the grand jury about this necklace.

A.    Well, I was in her grandma's -- at her grandma's house talking with her.  And she -- I was in her bedroom with her, and she showed me this necklace.  They were still looking for Leah then.

       And she pulled out this necklace.  It was, like, a beaded necklace, like a homemade one, that said -- it had Nick's name in beads.  And she told me that she found that in her stuff.

       That when she lived at this guy named Rick Henthorn's house, it was in -- she had stored her stuff there or something.  And when he gave her back her stuff, that that necklace was in there.

       I didn't think it was odd until --

Q.    Okay.

A.    -- later, I'm thinking back.

Q.    Now --

Exhibit 5002 at 197

89

*Heidi Crook*

A.    That was kind of creepy.  We didn't know anybody else named Nick that I knew of --

Q.    Okay.  So --

A.    -- around then.  So.

Q.    All right.  When she had her stuff stored at this other guy's place, was that before or after Leah disappeared?

A.    Before.

Q.    Okay.  And she got it back before Leah disappeared, or --

A.    She didn't tell me that part.

Q.    Okay.

A.    Somewhere, she said, "This, isn't it weird?"

Q.    Okay.  All right.  Did she represent to you that this necklace, the "Nick" was supposed to be Nick McGuffin on the necklace?

A.    No, she acted like she didn't know where it came, like --

Q.    Okay.

A.    I don't know.

Q.    Where it came from.  Okay.

A.    Yeah.

Q.    Have you ever heard Kristen say that she killed Leah Freeman?

A.    No.

Q.    Okay.  We got a couple of people saying that --

Exhibit 5002 at 198

*Heidi Crook*

or repeating -- I guess what they're saying is, is, "I've talked to Heather" -- or not Heather -- "Heidi.  Heidi told me that Kristen said she killed Leah so she could be with Nick McGuffin."

A.    No.  That's not --

Q.    Have you ever said anything like that?

A.    No.

Q.    All right.

A.    I might have said she probably killed her just to get with Nick.  I might have said that.

Q.    Okay.

A.    But not that she confessed to me.

Q.    All right.  Based on what you saw, she was interested in having some sort of relationship with Nick?

A.    She could have, yeah.

Q.    All right.  Kristen never told you that she had killed Leah Freeman?

A.    No.

Q.    Okay.  And again, I think I've asked you this already, do you know who killed Leah Freeman?

A.    No.

MR. FRASIER:  All right.  I don't think I have any other questions for Ms. Crook.

Does the grand jury have anything they want to ask her?

Exhibit 5002 at 199

*Josh Ernler*

(Pause.)  I guess you're lucky today.  Okay?

THE WITNESS:  Okay.  All right.

MR. FRASIER:  Thank you.

THE WITNESS:  Thank you.

MR. FRASIER:  Yep, you're free to go.

**TESTIMONY OF JOSH ERNLER**

(Witness sworn.)

BY MR. FRASIER:

Q.    First of all, this is the grand jury for Coos County.  We're looking into the disappearance and death of Leah Freeman.  It's obvious, but I've got to tell you I'm recording.  Okay?

First of all, could you tell us your name, please, and where you live, sir.

A.    Josh Ernler.  Myrtle Point, Oregon.

Q.    And how old are you, sir?

A.    Uh, 26 right now.  I'll be 27 in three days.

Q.    Okay.  The year 2000, that would have made you 16, 17?

A.    Yeah, somewhere around there.

Q.    Were you -- did you go here in Coquille?

A.    Yeah, I went to Coquille schools.

Q.    While you're -- well, did you know an individual, or do you know an individual named Nick McGuffin?

A.    Yeah, I know who he is.

Exhibit 5002 at 200

*Josh Ernler*

Q.    Okay.  How close, or how well do you know him?

A.    I've never really hung out with him.  I never was friends with him that I now remember at this point.  I remember him in school.  I remember him -- you know, I mean, I hung out a few times or whatever, but --

Q.    Okay.

A.    -- never more than -- had any slumber parties or sleepovers at his house or nothing, you know?  I mean, I --

Q.    Okay.  And since you guys graduated, you haven't been, you know -- go, like to the bars or anything?

A.    No.  No.  I think the last time I seen him was at Gay '90s, and I didn't speak much.

Q.    Gay '90s this year?

A.    Uh, no, not this year.  It's been probably, I think two years ago, three years ago, the last time I came over and went.

Q.    Okay.  Did you know Leah Freeman?

A.    I knew who she was.

Q.    And how did you know her?  Again --

A.    Uh, well, wait.  My mom's boyfriend is her daughter -- his daughter Melissa Bernoli (phonetic) was friends with her, and that was kind of like my stepsister; I remember her from then.  And I just remember her from school. I knew her sister, uh, Denise.  I've known Denise for years and years and years.

Exhibit 5002 at 201

93

*Josh Ernler*

Q.    Okay.  So you're -- I'm not trying to put words in your mouth or anything, but you're more associated with, say, Denise or whatever.  You don't --

A.    Yeah, yeah.  I'm not -- I'm not -- not familiar right now.  I never --

Q.    Okay.

A.    -- never was really, you know, closely associated with Leah or Nick.  You know, I mean I knew -- like I said, knew both of them.  I knew Nick better by far than I knew Leah, you know.

Q.    Okay.  Were you aware that they were boyfriend/girlfriend?

A.    Yeah.

Q.    Did you have an opportunity at the school or wherever, to observe how they behaved with each other?

A.    You know, I -- I don't really remember a lot of that stuff.  You know, it's kind of, uh -- well, I -- I quit school whenever I was like a junior and like it -- first part of my junior year --

Q.    Okay.

A.    -- or in my sophomore year, so I didn't really spend a lot of time, you know.  Like I said, I just kind of bounced around with everybody, and --

Q.    Okay.

A.    -- I turned into a -- a 15-year or 16-year-old

Exhibit 5002 at 202

and, you know, 17-year-old dumb-ass, I guess you could say. Excuse my language, sorry about that.

I mean, that's the best way to put it, you know. I mean --

Q.    All right.  Well, let's go to day -- the last day that Leah's seen, the 28th of June, 2000.  I've had some information that you -- well, first of all, do you know Aaron West?

A.    Yeah.

Q.    And David Jenkins?

A.    Yeah.

Q.    Okay.  And that evening, were you at the Fast Mart that evening?

A.    Yeah, I was at -- at the Fast Mart that evening.

Q.    And around seven o'clock, does Nick McGuffin show up?

A.    (Laughs.)  Now you're running time frames, and that's -- you know, it's been a long time ago.  I don't know what time, but, yeah, I do remember Nick coming up there.  I don't know if it -- from all the papers and everything else, and I just went through the report out there and read back what I said before, and I -- I said that he was driving a different car than he was at the mill pond.  And, you know, like I said, I do remember that, sort of.

Q.    Okay.

Exhibit 5002 at 203

95

*Josh Ernler*

A.    You know, like it's not -- like I said, this is all --

Q.    All right.  Well, let's --

A.    You know, that's a long -- that was a long time ago.  I would -- you know, I was a pothead back then, and -- you know.  That's -- that's about all I need to say about that one.  I mean, it --

Q.    Well, let me ask you a few questions about when -- when Nick shows up at the Fast Mart, is he driving that blue Mustang, do you recall?

A.    Gee, I don't remember.  Like I said, I -- you know, I -- I don't really, honestly, right now --

Q.    Okay.

A.    -- I don't remember what he was driving, but I know in my report that I said that he was driving that.  I'm not a liar.

Q.    Okay.

A.    I don't lie.  So, if I seen him driving that in there, or I said that then, then the chances are that that's what I'd seem him driving was the blue Thunderbird or Firebird or whatever it was.

Q.    How was Nick acting, do you recall?

A.    I mean, I don't -- I don't remember.

Q.    I remember going through the reports, he seemed to be upset with Leah.  You said something like he wasn't

Exhibit 5002 at 204

*Josh Ernler*

happy that day because of Leah.  It was the third day in a row he was having problems with Leah.

A.    Gee, I -- I don't remember saying any of that stuff.  I just read through the report and said that --

Q.    Okay.

A.    And it said in there, that said -- that I said a bunch of things that I don't remember saying either.

Q.    Okay.

A.    I don't, uh --

Q.    Well, do you guys eventually go out to Johnson Mill Pond?

A.    Uh, yeah.  Yeah, I remember we went out there.

Q.    And what happened?

A.    I don't remember the -- if we were hanging out before that or whatever.

Q.    Okay.

A.    I just -- yeah, we went out there, and we smoked some pot, and came back into town in separate vehicles or whatever.  You know, I was with Aaron, and I guess David.  I don't really remember that -- David being there.  I remember somebody else being there; I didn't remember it was David, but --

Q.    Oh, okay.

A.    He -- we just went over that out there, and --

Q.    All right.

Exhibit 5002 at 205

*Josh Ernler*

A.    Came back into town, and probably one of the --
with the -- as I remember, we went to Fast Mart and hung out
there.  And that was like, you know -- you know, a
park-and-hang-out place for all the kids.

Q.    Okay.

A.    And, uh, from there, that's when I remember I --
we seen Nick.

And I do remember seeing him come back to Fast
Mart that evening.  Time-frame-wise, you know, I'd say in 15
to 20 minutes later in there.  And I -- I don't remember if
it was 15, 20 minutes or, you know, to the next day.

You know, I mean, right now I'm -- you know, I
don't want to say anything that --

Q.    All right.

A.    -- you know, that's --

Q.    When he comes back to Fast Mart, does he say
anything?  Does he ask any questions?

A.    I -- I don't honestly remember, you know, any of
the conversation.

Q.    Okay.

A.    I don't remember a lot of what happened, you
know, back then.  I was --

Q.    Okay.

A.    It's been a long time ago, and --

Q.    Well, going through -- did you testify at the

Exhibit 5002 at 206

*Josh Ernler*

grand jury originally, too?

A.   Yeah.  Yeah, I did.

Q.   Going back through your testimony, do you recall he comes, he's in the Mustang; he leaves, and he comes back, and then he's in the T-bird.  Do you recall anything about that?

A.   No.  Like I said, I know I said he was in the -- driving the T-bird when he came back in there, whatever.

Q.   Okay.

A.   And, like I said, you know, I'm not a liar.

Q.   Okay.

A.   I'd -- I'd be all -- I don't have any reason to cover up for anybody or do anything like that.  So, you know, I mean, what I said was to the best of my knowledge that I know, you know.  I mean, like I said, you get -- you're grant -- you're dealing with somebody who was smoking pot, so --

Q.   Okay.

A.   -- I mean, I -- that does affect your memory, and I'm feeling that right now, you know.  These -- this many years later, you know.  I mean, I -- I don't smoke pot anymore.

Q.   Okay.

A.   I haven't in years and years and years, you know. I got away from being a -- I already said it once, I'm not

Exhibit 5002 at 207

*Josh Ernler*

going to do it again. (Laughs.)

Q. One of the things that's come up in the investigation is that there's this rumor floating around that on the evening that Leah disappeared that there was a party out in Fairview. And in this rumor that's floating around, it says that you and Aaron West and Nick and Leah were at this party.

Now, first of all, do you know anything about a party that night out in Fairview?

A. Uh, yeah, I heard many -- I heard that rumor, but I -- I didn't hear it with me and --

Q. Okay.

A. -- no. No, that ain't the truth, man. That is --

Q. Okay. All right. Well, did you go out to a party that night?

A. No.

Q. Okay.

A. I mean I -- not that I remember at all that night --

Q. All right.

A. -- going out to a party.

Q. And you saw Aaron and Nick in town that evening, not out at the -- they obviously weren't at another place like the rumor?

Exhibit 5002 at 208

*Josh Ernler*

A.    I -- I -- Aaron was my friend with me or whatever.  He stayed at my house all -- you know, off and on between his parents' house, my house in town, for quite a while there.  I don't, like I said, recall much -- much more towards the evening and --

Q.    Okay.

A.    -- you know, what happened.  Like I said, man, it's been a long time ago, you know.

Q.    All right.

A.    It's just all, I -- you know, I went out there and read through that and tried to jog my memory, and -- you know, I remember what was going on but, you know --

Q.    Okay.

A.    -- I guess I didn't remember --

Q.    Well, what I'm trying to do here is there's this rumor, and --

A.    Well, that's absolutely not the truth.

Q.    Okay.

A.    That night, I didn't go out to any party.

Q.    Okay.

A.    I know that I heard that a guy I went to school with, they were partying out towards that way, and that was John Sennik (phonetic).

Q.    Okay.

A.    And I remember being here --

Exhibit 5002 at 209

*Josh Ernler*

Q.    The Senniks.  So he's Dr. Sennik's son?

A.    Yeah.

Q.    And they live just right out of town.

A.    Yeah, that's -- that's his -- just right out of town.  I remember hearing all about that, and that party out there right after all this happened.  I remember that.  And they said that all those guys were doing acid, and --

Q.    Yeah.

A.    -- stuff.  And I'm -- I don't do none of that crap, you know.  Like I said, I was a pothead.  (Laughs.)

Q.    Okay.

A.    You know, I mean.

Q.    Now, I'm going to change subjects on you again, okay?

A.    Okay.

Q.    There was, well -- are you aware that Leah's shoes -- one shoe was found here in town?

A.    Yeah, I heard about that.  Yeah.

Q.    And that there was another shoe found out on Hudson Ridge?

A.    No, I --

Q.    Okay.

A.    The one on Hudson Ridge doesn't really --

Q.    Okay.  Did you ever tell anybody where those shoes would be found?

Exhibit 5002 at 210

*Josh Ernler*

A.    No.

Q.    Okay.  The reason I'm asking is there's this other rumor floating around that says, "I heard from Josh Ernler that Leah's shoe was on the road there by the cemetery and her other shoe was on the road out on Hudson Ridge, and he's telling me about this before the police ever announced that they had her shoe."

A.    No, man.  That's --

Q.    Okay.

A.    That's a bunch of BS.

Q.    Okay.  Again, we're trying to figure out what happened to Leah Freeman.  Do you know what happened to Leah?

A.    I know she was killed, and that's --

Q.    Okay.  Do you know who killed her?

A.    No.

MR. FRASIER:  All right.  I don't think I have any other questions for Josh.

Does the grand jury want to ask him anything?

THE WITNESS:  But I can ask you guys a question?

MR. FRASIER:  Sure.

THE WITNESS:  So is there -- you're trying to -- who's saying this?  Or there's -- am I not allowed to know, who's telling these --

MR. FRASIER:  I don't have it written down here; we can talk about that out in the hallway.  But --

Exhibit 5002 at 211

*Josh Ernler*

THE WITNESS:  Okay.

MR. FRASIER:  I don't have it --

THE WITNESS:  Because that's not --

MR. FRASIER:  Okay.

THE WITNESS:  -- that's not very cool, man.

MR. FRASIER:  Okay.  All right.

THE WITNESS:  I'm not -- I'm not having no part of that now that -- you know, there's a lot of rumors you can spread around, but that's -- yeah.

MR. FRASIER:  Okay.  All right.

THE WITNESS:  I don't want to be mixed up in this, man.  Like I said, I was a kid.

MR. FRASIER:  That's why I brought you here.

THE WITNESS:  I was a kid.  I smoked some pot with a guy.  And, you know, that was -- that was a mistake made, you know.  Smoking pot.  And I was being a kid; it's what, you know, a lot of us did around here.

And, uh -- you know.  I -- I didn't want to get mixed up in this, you know.  I got kids at home right now.  I got a family and a life, and -- you know.

I'll do more than -- more than anything to help you guys out.  If you have any questions, I'm going to be completely honest with you.  But I absolutely think that somebody should, you know, be taken care of on that one.  I just lost my cousin this last year, and --

Exhibit 5002 at 212

104

*Darla Baker*

BY MR. FRASIER:

Q.    Who was your cousin?

A.    Jayme Austin --

Q.    Jayme Austin, okay.

A.    -- was my cousin.  And, you know, that was, uh -- that was pretty tough for my aunt.  Seeing her go through that, you know.  And, uh, she's still, you know, having a tough time.  And I could just imagine what 10 years would do to somebody, so --

Q.    Okay.

A.    -- I imagine that.

Q.    All right.

A.    I sure hope you guys do your job, and if you have any questions for me, you know where to contact me, and --

GRAND JUROR:  We will.

THE WITNESS:  All right.

GRAND JUROR:  Okay?  Thank you.

THE WITNESS:  Thank you.  You guys have a great day.

MR. FRASIER:  Thank you.

THE WITNESS:  So I'm good to go now, right?

MR. FRASIER:  Yep, you're good to go.

**TESTIMONY OF DARLA BAKER**

(Witness sworn.)

BY MR. FRASIER:

Exhibit 5002 at 213

*Darla Baker*

Q.    This is the grand jury for Coos County.  We're looking into the death -- the disappearance and death of Leah Freeman.  And I have to tell you that we're recording the proceedings, even though it's probably pretty obvious what we're doing.

First of all, could you tell us your name please, ma'am?

A.    Darla Baker.

Q.    And you were also known as Darla Granger, years ago?

A.    Um, that's actually my step-dad's --

Q.    Okay.

A.    It's his name and my brother's name.

Q.    Oh, okay.

A.    So, it's easy to be confused.  (Laughs.)

Q.    Okay.  Well, that's the name that I saw on the police reports, so --

A.    Yeah.  Yeah.  That's what I told them out there.  No, I've never been Granger.  I've always been Baker.

Q.    Always been Baker.

A.    Yeah.

Q.    Okay.  And ma'am, do you live here in Coos County?

A.    I do not any longer.

Q.    Okay.  But did you in about the year 2000?

Exhibit 5002 at 214

106

*Darla Baker*

A.    I sure did.

Q.    Okay.  Did you know a girl named Leah Freeman?

A.    Yes, I did.

Q.    How did you know Leah?

A.    Um.  I went all through school with her sister. We were in the same class and played sports together, and our families were linked that way, and we were friends.  Um, Denise and I were friends, but then I probably seen her more when she started dating Nick because she was quite a bit younger than I was.

Q.    Okay.  And you also knew Nick McGuffin?

A.    I did.

Q.    Okay.  And how well did you know Nick?

A.    I thought I knew him pretty well.

Q.    Okay.  You say you thought.

A.    Well.  (Laughs.)

Q.    Okay.

A.    I mean, I did at that time.  We were -- we were really good friends.  Uh, we hung out a lot up until he started dating her, and he spent the majority of his time with her -- with Leah.

Q.    Did you have an opportunity to observe their relationship?

A.    I did.  Um, when Nick was in a relationship, he was definitely, um -- that was his main thing, you know.  He

Exhibit 5002 at 215

*Darla Baker*

spent his time.  He picked her up from school, spent lunch hours with her.  Out of school, on the weekends they were together.  Um, I'd see him, you know, on parties on the weekend and stuff.  Um, so, yeah.  I mean, he was always there if she was around, so.

Q.    Okay.  How did their relationship go?  Was it good?  Bad?  Rocky?

A.    Uh, she was young --

Q.    Okay.

A.    -- you know.  So, I mean, I think he probably -- he was quite a bit older than her, probably had a little bit higher standards.  Um, she was just a kid, you know.  Um, there was, you know -- yeah.  I mean I never seen him be violent or anything like that.

There was a party in Powers where he -- she had drank, which normally I'd never seen her drink or do drugs or anything like that.  She was -- she, I mean -- I don't know, peer pressure or whatever, but he ended up carrying her out. Um, it was a graduation party.  And putting her in his car and driving away.

Um, she was pretty quiet though, you know. And -- and I think she wasn't into the same atmosphere as what he was.  And so, I think to avoid argument, that they would just hang out with each other.

Q.    Okay.  I want to go to the day that Leah

Exhibit 5002 at 216

*Darla Baker*

disappeared.  We received information that you might have seen Leah the night she disappeared.

A.    Um, that's what the police said outside.  That's not true.

Q.    Okay.

A.    I -- I seen Nick and Denise the following morning, pretty early in the morning --

Q.    Okay.

A.    -- as I was leaving town.

Q.    So you saw Nick and Denise Freeman?

A.    I did.

Q.    What was going on there?

A.    Um, they were in front of Ricky Crook's house. And I think there was a couple other people around, maybe more Leah's friends.  Um, and Denise had asked me, "Have you seen her?  Have you seen Leah?"

And I was like, "No, I haven't."

Um, and at that time, you know, I just assumed maybe that she was at a friend's house or, you know, if her and Nick got in an argument, she just didn't want to be around him.

Um, he was pretty reserved and didn't say a lot. Um, had his arms crossed and, um -- it's pretty much when he turned like a shade of white, never seen color come back. And he didn't say anything.  And for the situation, the

Exhibit 5002 at 217

*Darla Baker*

behavior did seem a little odd because everybody knows

everybody, you know?  You can't walk across down -- back

then, anyway, you couldn't.  You knew everybody.

So that's why I was thinking, "Well, somebody

knows where she's at and they're just not going to tell

anybody," you know.

So, um, I, you know, hadn't seen her, and pretty

much just talked to Denise and he just sat back away on the

sidewalk, and I left town.

Q.    Okay.

GRAND JUROR:   Can you say that again?  Who said

what and who turned blank?

THE WITNESS:  Denise was the one who was -- was

up at my car.  I was sitting in my car.

GRAND JUROR:  Right.

THE WITNESS:  And, you know, you could tell that

she was kind of emotional.  And she's like, "Have you seen

Leah?  Have you seen Leah?"

I said, "No, I have -- I haven't seen her."

Nick was back, like on the sidewalk, and he

wasn't -- he didn't -- I don't even think he said anything to

me.  Which is weird because we have always been friends, you

know, all through school, or whatever.

And, um, for the situation that it was, he

usually didn't keep his mouth shut.  And for something like

Exhibit 5002 at 218

*Darla Baker*

that, for the situation that it was and, you know, apparently he had drove around the whole night looking for her and stuff. You know, at that point you'd think he'd be a little bit more, "Okay, this is -- this is when I seen her, this is where she was at. Where were you?" You know, type of thing.

Because at that time Denise was emotional. You could tell she'd been crying, she was upset, she was looking for her sister.

And, um, I don't think he really even said anything. He just kind of stood back and, um, I say he was white. His -- his -- his -- you know. And he never -- he never came back from that. Whenever I'd seem him later on in time or anything like that, he stayed really reserved and -- which is kind of strange.

BY MR. FRASIER:

Q. Okay. Outside of this contact that you talked about, have you had other contacts with Nick since then?

A. Um, I graduated in 2001, and I moved away at that time. Um, I'd seen him afterwards at a friend's house a few times, um, but he never really talked. He never really, you know. And he never really said anything, and it was -- like, about anything. You know. Not even -- (Laughs.)

I mean, he was really into his car and, you know, we were really good friends. I was friends with his family and stuff. And me and his brother were friends for a little

Exhibit 5002 at 219

111
*Darla Baker*

while.  Um, he just, you know, closed up.

So, I mean, I did see him afterwards, but I haven't had any real contact, um, with it.

Q.    Okay.

A.    Or him.  That I remember.  (Laughs.)

Q.    There's a rumor around town that Leah was run over by a car.  Have you heard that rumor?

A.    Yeah.

Q.    Do you know a girl named Kristen Steinhoff?

A.    Yeah.

Q.    And do you know Brent Bartley?

A.    Yeah.

Q.    Do you know a boy named Robert Hall?

A.    Yeah.

Q.    Okay.  There's a crazy rumor going around that you might have been in the car that ran her over.

A.    (Laughs.)  No.

Q.    Okay.

A.    I believe -- and this is what my best friend tells me, is that I was at Brent Bartley's grandma's house that night.  But it was 10 years ago.  I don't 100 percent remember.

But she's like, "Don't you remember Brent's mom showed up the next morning and was like, 'What are you guys doing here?  This is Grandma's house.  You're not supposed to

Exhibit 5002 at 220

112

*Darla Baker*

be drinking or hanging out.'"

And so, I believe, but I'm like, I don't -- I mean it was 10 years ago, you know. A lot's happened in that time period. Um, I just remember having to leave really early in the morning --

Q. Okay.

A. -- like at 7:00. I had an 11-hour drive.

No, I was not in a car with -- I didn't -- I knew Kristen. She was definitely on -- (pause.)

Q. Meth?

A. Yeah. So, no, I didn't. I knew where her house was. Kind of, sort of knew the people she ran with. Um, but she had been on drugs for a long time. I don't even know how long it even took her to get off them.

Q. Okay.

GRAND JUROR: You said you had to leave early that morning for an 11-hour drive?

THE WITNESS: Yeah.

GRAND JUROR: Where were you --

THE WITNESS: I was going to George, Washington, at the Gorge.

GRAND JUROR: Okay.

THE WITNESS: Yeah. And so -- and I stopped in Portland, picked up some friends, and we headed out. At that time, I -- you know, no big deal. And came home Sunday and

Exhibit 5002 at 221

there was roadblocks up, and I'm like, wow.  I'm like, something really, you know, is going on here.

BY MR. FRASIER:

Q.    Okay.  Anything else you think the grand jury ought to know?

A.    (Pause.)  No.  I'm like, I -- there's been so much speculation, and it's just really odd that nobody really knows the real story, you know?  So hopefully that's what comes out of this, but -- you know.

Everybody that I hung with that time, we talk about it all the time.  Everybody that -- it is a topic of conversation.  Everybody wants to know, you know.

And for a long time, you know, you'd hear that tweaker story of those people in the car, and this and that, and -- you know.  And people say, "Well, the police told me," you know, "that's not true."  And so there's only one other option that it could have been, you know?  I mean, unless somebody randomly came through town and something like that happened, you know?

So, I -- I really don't have anything else to say.

Q.    Okay.

A.    But, yeah.  I don't know.

Q.    All right.

A.    Yeah.

Exhibit 5002 at 222

*Darla Baker*

MR. FRASIER:  Does the grand jury want to ask anything else?

GRAND JUROR:  You said Kristen used meth at that time?

THE WITNESS:  Oh, yeah.

GRAND JUROR:  Okay.

THE WITNESS:  I don't even think she was in school.  I don't think -- she was in my class, and I don't think she -- she didn't graduate.

GRAND JUROR:  Okay.

THE WITNESS:  She started young.  I mean probably like our freshman year, is what I want to say.  And, uh -- I mean, she got super thin the summer going into 8th grade.  Like, lost like 35 pounds, and everybody's like, "God, that's kind of weird."  You know?  Um, I think she started our freshman year in high school, but she was -- yeah, she was major into drugs.  I mean, she was running with a crowd that, you know, you just hear about, you know.  I didn't really know them, but when I'd see her, you know, stick thin, just tiny, sunken-in, you know.  Only out at night, type of thing, you know?  (Laughs.)  You know, like, yeah.

I didn't hang out with her.  I -- it was -- I went to school with her.  I knew some of the people that she hung out with, in passing, and that was their same story too, you know.

Exhibit 5002 at 223

*Darla Baker*

MR. FRASIER:  Okay.  Anything else?

All right.  That'll do it.  You're free to go.

GRAND JUROR:  Thank you.

THE WITNESS:  All right.

(End of recording.)


--oOo--


I certify, by signing below, that the foregoing pages 1

through 115, inclusive, constitute a correct transcript of

FTR recordings provided of the above-entitled matter, this

22nd day of November, 2010.


_____

PEGGY S. JILLSON, TRANSCRIBER

Exhibit 5002 at 224

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS


**STATE OF OREGON,**                    )
                                        )
            Plaintiff,                  )   Case No. 10-CR0782
                                        )
v.                                      )
                                        )
**NICHOLAS MCGUFFIN,**                  )
                                        )
            Defendant.                  )
_____)   Volume 3



        Wednesday, July 21, 2010 (Afternoon Session)

                GRAND JURY PROCEEDINGS



APPEARANCES:                **PAUL FRASIER**
                            **DISTRICT ATTORNEY**
                            250 N. Baxter
                            Coquille, Oregon 97423









                TRANSCRIBED FROM AUDIO RECORDINGS


TRANSCRIBED BY:             Peggy S. Jillson
                            987 Tivoli Street
                            Eugene, Oregon 97404
                            (541) 689-7964

Exhibit 5002 at 225

2

**WITNESS INDEX**

HALL, Robert                    3

WEST, Aaron                     8

REID, Heather                   29

HALL, Dave                      45

OSWALD, Kip                     72

ZANNI, Craig                    78

SMITH, Patrick                  114

KARCHER, Kris                   127

Exhibit 5002 at 226

**COQUILLE, OREGON; WEDNESDAY, JULY 21, 2010, 4:58 P.M.**

-o0o-

**TESTIMONY OF ROBERT HALL**

(Witness sworn.)

BY MR. FRASIER:

Q.    First of all, this is the grand jury for Coos County, and we're looking into the disappearance of Leah Freeman, death of Leah Freeman.

First thing I got to tell you is we're recording, even though it's kind of obvious.  I have to let you know that we're recording the proceedings here today.

First of all, could you tell us your name, sir, and where you live.

A.    Robert Jesse Hall.  I live in Klamath Falls, Oregon.

Q.    How long have you lived in Klamath Falls?

A.    Four years.

Q.    You used to live here in Lakeview -- or, excuse me.  I grew up in Lakeview.  (Laughter.)  In Coquille?

A.    Yes, sir.

Q.    And your dad, Dave Hall, used to be a police officer here?

A.    Yes, sir.

Q.    And -- well, I don't remember.  He actually left here to go work in Lakeview, didn't he?

Exhibit 5002 at 227

A.    Correct.

Q.    Okay.  Mr. Hall, the reason I've brought you here today is that, as I explained to your dad earlier, is there's a rumor, some allegations floating around here in Coquille that you might know something about Leah Freeman's disappearance.  And I want to ask you some questions about that.

And so, first of all, the rumor that's floating around is that -- well, do you know a person named Brent Bartley, or did you know Brent Bartley?

A.    Yes, sir.

Q.    Kristin Steinhoff?  Did you know her?

A.    Doesn't ring a bell.

Q.    Okay.  And --

A.    No, but it's been a while.

Q.    Okay.  A girl named Darla?

A.    I -- I knew a girl named Darla.  She was a grade above me.

Q.    Okay.  And she's sometimes referred to as Darla Baker or Darla Granger or something like that.

A.    It -- it could be.

Q.    Okay.  Well, the reason -- the rumor is, is that you're being quoted that you talked to this girl named Darla, and that Darla told you that she and Brent Bartley and Kristin Steinhoff were in the car that ran Leah Freeman over.

Exhibit 5002 at 228

*Robert Hall*

And do you know anything about this?

A.    Never heard it whatsoever.

Q.    Okay.

A.    Never happened.

Q.    And you have never told anybody anything of that sort?

A.    No, sir.

Q.    Okay.  And the story goes further is, is you didn't tell your dad about it because you were friends with Darla and you didn't want Darla to get in trouble.

A.    Like I said, it never happened.

Q.    Never happened?

A.    No, sir.

Q.    Okay.  Since I brought you all the way over from Klamath Falls, I'd like to ask you a couple more questions.

A.    Shoot.  You can ask me anything.

Q.    Okay.  Did you know Nick McGuffin?

A.    Yes, sir.

Q.    How about Leah Freeman?  Did you know her?

A.    I knew of her.

Q.    Okay.

A.    Maybe said hi a couple times, just to --

Q.    How well did you know Nick?

A.    Well enough.  He was -- small town.  Everybody kind of hung out with one another at times.

Exhibit 5002 at 229

*Robert Hall*

Q.    Were you same age, or same grade?

A.    No, he was older and -- uh, I think one or maybe two grades above me.  I'm not really sure.

Q.    Okay.  So you -- basically, you saw him in the hallway at school and stuff like that?

A.    Yeah.

Q.    Did you ever hang out with him or anything?

A.    Yeah, quite a few times.

Q.    Like, at Fast Mart or someplace like that?

A.    Um, yeah.  I mean -- or, you know, at parties or -- you know --

Q.    Okay.

A.    -- generally it's -- everybody's there.

Q.    Okay.

A.    I mean, all different kinds of crowds.

Q.    All right.  Did you know that Nick and Leah were boyfriend/girlfriend?

A.    Yes, sir.

Q.    Did you have an opportunity to see how they interacted between themselves?

A.    Just at school, when everybody else did.

Q.    Okay.

A.    It was just normal boyfriend/girlfriend stuff.

Q.    Okay.  You didn't see anything like hitting the walls or stuff like that?

Exhibit 5002 at 230

*Robert Hall*

A.    Not that I recall, no.

Q.    Okay.  All right.  Did you have any, and have you had any -- well, have you had any contact with Nick since Leah disappeared?

A.    No.

Q.    Okay.  Has Nick ever told you anything about what may have happened to Leah or anything?

A.    No, sir.  I might have seen him a couple times at parties and stuff like that, but not -- nothing.

Q.    Nothing.  Okay.

And you probably may have already answered this, but do you have any information at all of what might have happened to Leah Freeman?

A.    No, sir.

MR. FRASIER:  Okay.  That's all the questions I have for Robert.  Does the grand jury want to ask him anything?  (Pause.)

GRAND JUROR:  That was short and to the point. (Laughter.)

MR. FRASIER:  Just trying to go through all these rumors and seeing where they go.

GRAND JUROR:  Yeah, I've got a question about the rumor.  Who's supposedly in this car?

MR. FRASIER:  Well, according to the rumor it's Brent Bartley, Kristin Steinhoff, and a girl named Darla;

Exhibit 5002 at 231

*Aaron West*

which I think it was the Darla we talked to earlier, before lunch.  Okay.

All right?  Okay.  Thank you, sir.

THE WITNESS:  Thank you.

MR. FRASIER:  You're free to go.

**TESTIMONY OF AARON WEST**

(Witness sworn.)

BY MR. FRASIER:

Q.    Thank you.  This is the grand jury for Coos County.  We're looking into the death of Leah Freeman.  And I guess the first thing I got to tell you is we're recording; it's kind of obvious, okay?

A.    Yeah.

Q.    All right.  First of all, could you tell us your name please, sir, and where you live.

A.    It's Aaron West, and right now I'm living at 1290 North Collier in Coquille.

Q.    Okay.  How old are you, sir?

A.    30.

Q.    So ten years ago, in the year 2000, you would have been 20?

A.    20, yeah.  Almost 21.  I'll be 21 in August.  Or, I would have been 21 in August.  I'll be 31 --

Q.    Okay.

A.    -- in August.  So --

Exhibit 5002 at 232

*Aaron West*

Q.    And have you lived in Coquille all your life, basically?

A.    Basically.  I went through college in Wyoming for 18 months.  Other than that, I've been in Coquille my whole life.

Q.    Okay.  Do you know or did you know an individual named Nick McGuffin?

A.    Yeah.  I did.  I did.  I know the whole family, and kind of grew -- I grew up with his older brother Wayne, and Nick was always the tag-along, and stuff.  So, yeah, I -- I know -- I know the whole family.  Haven't really been in contact with them for a long time, but --

Q.    When would be -- just approximately, how long has it been since you've had contact with the McGuffins?

A.    Um, Nick would have been the only one, and it would have probably been four or five years ago.  I've seen him out at Bandon Dunes.  My wife works out there, and I was picking her up, and she said -- she had mentioned that he was working there, and I seen him when I was picking her up and just said hi and he said hi, and we kind of went on our way.

Q.    Okay.

A.    But before that, it was during all this time. This time --

Q.    All right.

A.    -- was going on, was the last that I've really

Exhibit 5002 at 233

*Aaron West*

had anything to do with.

Q.    Okay.  Did you -- did you also know, or were you aware of an individual named Leah Freeman?

A.    Yeah.  Yeah, I know that -- that her and Nick were -- were going out.  And, you know, wherever Nick was, she pretty much was too.

Q.    Okay.  Did you have an opportunity to see how their relationship was?

A.    Um.  A little bit.  I saw her, like when they would show up at somebody's house where we were at, and stuff.  They'd interact a little bit.  You know, but it was pretty much -- I don't know.  They were -- seemed pretty normal kind of couple --

Q.    Okay.

A.    -- at that time.  I mean, they had their -- you know they would have their arguments and stuff every now and again.  Not very often, you know.  I think I've -- maybe two or three times -- heard them, you know, not agreeing on something.

Q.    Okay.  Was it kind of a quiet argument, or did they raise their voices, or --

A.    It was -- it was pretty quiet.  There was -- there'd be quite a few people around and stuff, and he -- he seemed to try to -- try to not make a scene --

Q.    Okay.

Exhibit 5002 at 234

*Aaron West*

A.    -- about it.

Q.    I want to go back to the day that Leah Freeman disappeared, which was June 28th, 2000.  And do you recall that evening being at the Fast Mart?

A.    Uh, yeah.

Q.    And were you acquainted with another boy named Josh Ernler?

A.    Yep.

Q.    And David Jenkins?

A.    Yep.  Yeah, they were both with me that night.

Q.    All right.  And around 7:00 in the evening, does Nick show up at the Fast Mart?

A.    Um, it was -- it -- probably around that time. It was -- it was early, early evening.

Q.    Okay.

A.    There was a bunch of us there.  It was a pretty local hang-out for everybody around that age.  There was, you know, 20, 30 people sometimes there.  But yeah, he pulled up kind of early-evening time, and was there.  Just hanging out and --

Q.    Was Leah with him when he pulled up?

A.    -- stuff.  Um, I think he was alone.

Q.    Okay.

A.    I'm not -- I'm not -- I can't quite remember if she was with him at that point or not, because I'd seen them

Exhibit 5002 at 235

*Aaron West*

off and on that whole day.

Q.    Okay.

A.    Because of, you know, we would run into each other and most of the people I hung out with.  And I know that she was with him a few times in the car, with him.  But, as far as exactly remembering that that time when he showed up if she was there, I'm not sure.

Q.    Okay.

A.    I know she was at her friend's house, or supposed to be going to her friend's house or something, some time -- some time after that.

Q.    All right.  Now, when he's at the Fast Mart there, do you recall what vehicle he was driving?

A.    Uh, yeah.  It was his blue Mustang.  I think it was blue.  Like a teal, baby blue -- older Mustang, like '60s -- maybe '66, '67 Mustang.

Q.    Okay.  Now, does Nick say anything to you or do you hear him say anything about being upset with Leah that night?

A.    Um, not really at that time.  Not at that time.

Q.    Okay.

A.    Later -- I mean, later on when we're talking we ended up going out to Johnson mill pond.

Q.    Okay.

A.    And he kept talking about being stressed out

Exhibit 5002 at 236

*Aaron West*

about having to pick her up at a specific time because they were -- something was going on with them, and they had to -- he was trying to fix it or something like that.  Um --

GRAND JUROR:  So, just for clarity, you four -- that's Josh Ernler, David Jenkins, you, and Nick -- you decide to drive out to Johnson mill pond?

THE WITNESS:  Johnson mill pond, yeah.  And Josh and -- Josh and Dave would ride with me, and Nick drove his own car out.

GRAND JUROR:  And it's while --

THE WITNESS:  And I know he was alone then.

GRAND JUROR:  And it's while you're out there at Johnson mill pond that Nick talks about having to go pick her up at a certain time --

THE WITNESS:  Yeah.

GRAND JUROR:  -- and being stressed out --

THE WITNESS:  Yeah.  Stuff, and not wanting her to walk because she -- she was either upset with him or something, I can't -- I don't really remember the gist of it.

Just that he was -- he seemed pretty stressed about being adamantly on time, and not messing this part -- this up, and not getting her mad at him any more than she already was.

GRAND JUROR:  Okay.

THE WITNESS:  But I mean, he never went into any

Exhibit 5002 at 237

*Aaron West*

detail as to what the -- they were upset with each other about.

BY MR. FRASIER:

Q.    Okay.  While you're there -- again, I'm not going to get anybody in trouble for this.  But while you're there, you guys smoked some marijuana?

A.    Yeah, we did.  We, uh -- I smoked a lot of marijuana back then.  We did -- most of us that were hanging out did all kinds of stuff at one point in time.

Q.    Okay.

A.    But, yeah.  That was the -- that was the main purpose of going out to Johnson mill pond, was a lot of times, everybody that was around at Fast Mart, you know, we would smoke pot in the parking lot and stuff.  And Steve didn't care about us being out there, you know.  He never came out there and watched us, or anything.  He was just happy to have people there that would go and buy his food out of his store and stuff.

But we'd just --

Q.    When you say Steve, you're referring to Steve Lyons?

A.    Yeah, the owner of Fast Mart.

Q.    The owner of Fast Mart, okay.

A.    And stuff.  And, uh -- we basically didn't want to share with everybody that was there.  And so we decided to

Exhibit 5002 at 238

go -- let's just go out of town, where do you want to go, I don't know, let's go to the mill pond. And that's where we ended up. It was -- it was -- yeah, to get stoned.

Q. Okay. How long were you out there, do you remember?

A. Uh, a good hour -- maybe two. We were out there for quite a while.

I remember that, because we'd -- we'd go out there and we'd go whip doughnuts in the big openings and stuff, and have fun and it was -- it was big and open and out of town, and that's where a lot of the local people would go there with, like, their four-wheel drives and their cars and stuff, and drive fast or, you know, spin around in the gravel.

So we were out there for quite a while, and --

Q. Now, Nick had to go and pick up Leah; is that right?

A. Yeah, and he was talking -- he started talking about -- he kept checking his watch and stuff, and asking me what my watch said and what time it was, again.

Then he had to go, and we were all, you know, we just were like, "All right. Well, we'll just finish this and then we'll go and it'll be all right. You're not going to be that late; you know, might be a couple of minutes late," kind of thing.

Exhibit 5002 at 239

*Aaron West*

Q.   Okay.

A.   Just kind of just blowing him off about him having to go because we were right in -- right in the middle of doing stuff.

And, uh, he sat there and fussed and stewed a little bit, but didn't really say anything.  And we finished what we were doing and took off back to town.

Q.   All right.

A.   And --

Q.   Now, you and Josh and David, you went back to Fast Mart?

A.   Yeah, we, uh -- we actually followed Nick into town, and he turned -- we're coming down on Central or something, whatever the street is at McKay's.  And he turned up 4th Street to, uh -- I think that's where Leah was supposed to be.  Out where he's supposed to pick her up, somewhere up 4th Street.

Q.   Okay.

A.   And we continued on and went to Fast Mart.  And we were going to wait for him there because he was supposed to come back up there, and we didn't know what we were going to do for the night; we hadn't figured that out yet.

It was just -- just now starting to get dusk at that point in time, so I figure it would probably be around 9:00 or so --

Exhibit 5002 at 240

Q.    All right.

A.    -- when we got back to Fast Mart.

Q.    And after you're at Fast Mart, does Nick show up again?

A.    Yeah, he did.  Probably it was within five or ten minutes after we got there.  He pulled up, and got out, and just asked like in general, not specifically to me or anything, just to everybody that was there, if anybody had seen Leah walking by because she wasn't where he was supposed to pick her up at.

I don't remember anybody seeing her, or at least saying that he saw her.  I didn't -- I hadn't seen her at that point in time.

Q.    Had you seen her -- did you see her that night at all?

A.    Not after -- I -- not after he showed up at Fast Mart and we went out to Johnson mill pond.

Q.    Okay.

A.    And I, um, didn't see her any time after that.

Q.    When he shows up at Fast Mart, you know, 10 or 15 minutes or five or ten minutes after you guys got back, do you remember what car he was driving?

A.    He was still -- he was still in his Mustang when he first showed up.

Q.    Okay.

Exhibit 5002 at 241

*Aaron West*

A.    And um --

Q.    So, he's asking where Leah is, and he's nervous.

A.    Yeah, he seemed kind of -- nobody really said they knew anything.  "No, we haven't seen anybody."

And, you know, some people had just shown up. Like we had just shown up there, and stuff.  And I can't remember if anybody specifically had seen her.

Q.    Okay.

A.    Or just in general maybe had seen her walk by.

Q.    So then what did he do at that point?

A.    He seemed kind of -- he really -- when he first got there he seemed kind of upset and stuff.  Worried, maybe. Kind of flustered.

And then he said he was going to go drive to her house and see if she had made it to her house yet, and he left Fast Mart and went up the road towards -- towards her house over on the Sanford Heights area, I think.

Q.    So he's going to where she's staying, or where she was living at the time?

A.    Yeah.  Yeah, that's where he said he was going to drive and see if he saw her walking or see if she had made it home yet, or not.

Q.    Now, to get that street, Knott Street, you would have to walk by the high school, right?

A.    Yeah.

Exhibit 5002 at 242

*Aaron West*

Q.    Now, did you see Nick again later that night?

A.    Yeah, I actually saw him several times.

Q.    Okay.

A.    He drove, um -- not really sure how long it was he was gone looking for her to see if she had went home.  It was quite a while.  You know, it could have been -- it could have been 30 minutes, it could have been an hour, maybe a little longer.

It was -- it was long enough that, you know, there was like, okay, he must have found her and went on his way, kind of thoughts --

Q.    Okay.

A.    -- and stuff.

And then he did -- he came back.  And, uh, I think at that point in time he might still have been driving the Mustang at that time.  He came back a couple hours after that time too, but either that time or the next time is when he had switched cars to a T-bird.  I can't remember, it was like a dark maroon, maybe, color.

Q.    Now, this --

A.    Mid '80s, early '90s T-bird.

Q.    Okay.  So he switched over to this Thunderbird?

A.    Yeah.

Q.    And that was his mom's car?

A.    Um, I think it was originally his mom's car, and

Exhibit 5002 at 243

he was either buying it from her or she was going to give it to him because she -- she was getting a new vehicle or something.  But he would drive it every once in a while, and stuff, months before this happened, thing.  And I'd see him driving it.

Like, he didn't have gas or anything.  And I know that Mustang was problematic in some areas, and stuff.  And it would break down, and he would show up the next day driving the Thunderbird, and stuff.

But he, uh -- he said that it -- that something like that happened.  It was either something with the fuel or he was out of gas or he was really low on gas and didn't have money to put in his gas tank, was what he said when he showed back up in the Thunderbird.

Because I said, "Where did your Mustang go," you know, because he'd been driving that all day.

Q.    Okay.  So, I just want to make sure.  You're absolutely certain that on June 28th, the day that Leah disappeared, he switched cars sometime that night?

A.    Yeah.  Yeah, 100 percent.  100 percent sure that he switched cars.  I specifically remember asking him where his -- where his Mustang was.

"I just saw you an hour or so ago leave Fast Mart in your Mustang, and now you're back and you're in the Thunderbird."  And it was something to do with either being

Exhibit 5002 at 244

*Aaron West*

out of gas -- he ran out or he was really low, so he got it back to his parents' house and got in that car, which is what he said.

Q.    How many times do you think you saw Nick that night?

A.    Maybe six?  Five, six, seven times, driving back and forth.  He never really stopped again.  Maybe once or twice he would stop at the Fast Mart.

I was at Fast Mart.  I don't know what time I left Fast Mart.  It was pretty late before I went home and stuff, because we'd just hang out there all evening.  Nothing else to do.

Q.    Okay.

A.    And we'd see him drive by, and he would look and he would wave every time he would drive by.  And then a little while later -- you know, an hour, maybe two hours later, half an hour sometimes, he'd drive back by.  And he kept going like, you know, he's looking for her kind of thing.

Q.    Right.

A.    Every once in a while he would stop on one of his passes and ask if anybody had seen her yet, or if anybody had heard from her.  And then he'd just go on his way, and stuff.

Q.    So, you stay at Fast Mart until whatever time you decide to go home.

Exhibit 5002 at 245

22

*Aaron West*

A.    Yeah.

Q.    All right.  Now, I take it you didn't go to a party that night?  Outside of going to Johnson mill pond, you didn't go to any party?

A.    No.

Q.    Okay.

A.    No, I -- in the days following that night, I heard that there was -- I had heard it was an acid party, is what I heard.  But up until that point in my life, I had never heard of anybody in Coquille having an acid party or mushroom party or --

Q.    Okay.

A.    -- anything like that.  That was new to me.  And then, you know, I didn't really believe that it was an acid party, but --

Q.    Okay.

A.    -- I had heard that there had been a party either that night or the night -- night after that, or --

Q.    All right.  Well, the reason I ask you about the party is there's this rumor floating around about a party.

A.    Uh-huh.

Q.    And one of -- the rumor that's floating around is that there was a party that night, the night that Leah disappeared, out in Fairview.  Do you know anything about a party out in Fairview?

Exhibit 5002 at 246

*Aaron West*

A.     Um, that's where I heard it was.  I heard it -- that it was, uh, Sennet's, uh -- the boy, the oldest boy John.

Q.     Okay.  Matt?

A.     I think John -- No, he's Matt's older brother.

Q.     Oh, okay.

A.     Because Matt was below me --

Q.     All right.

A.     -- three years, I think.  And then, his -- I think it's his older brother.  He's way taller than -- way taller than Matt.  He's a big guy, and --

Q.     Okay.

A.     I know it was John, that's it.  John Sennet.

Q.     Okay.

A.     I think his name was John, but he would go by his middle name a lot of times.

Q.     Okay.  Well --

A.     And, uh -- he supposedly was the one that was throwing a party out in Fairview.

Q.     Okay.  Were you ever at a party where Nick was at and Leah Freeman was at, you know, like either the night before or the night of the disappearance?

A.     Um, I was at a house -- I don't know the address or anything, but it's where the Hampton Apartments are on Dean Street.  There's a little crossroad that goes sort of

Exhibit 5002 at 247

24

*Aaron West*

straight across from it, and there's two little white houses set back from the road.

Brent Bartley and, uh, I think Chris Duncan were the ones that were renting the house.

Q.    Danny Lapine?

A.    Yeah, Daniel Lapine was there.  He -- he lived right there; I don't know if he was helping rent --

Q.    Okay.

A.    -- there, but yeah.  Brent -- Brent and Daniel, and I think Chris Duncan was another person living there.

And stuff.  And almost every night up until that point, there was always some kind of something going on. People were drinking every night, and --

Q.    Okay.

A.    -- you know, it was kind of like a party, but it wasn't like, an official, "We're having a party on this day." It was basically Daniel and Brent and Chris, just alcoholics just drinking all the time, people coming over, and it's a place you can go get drunk.

Q.    Okay.

A.    And you can just get tore up or --

Q.    All right.

A.    -- stuff.  And I -- I remember being there the night before that happened.  You know, stopping in, coming in and going out a couple times that day.  You know, I'd go over

Exhibit 5002 at 248

*Aaron West*

to that house probably at least once a day in the la -- you know, since the day they rented the place till during and after this happened, and stuff.  I mean, they were friends.  I went to school with Brent and Daniel.

Q.    Okay.  So you -- prior to Leah disappearing, days before or something, you might have seen Nick and Leah there in that house?

A.    Yeah.  Yeah, I know I've seen them at that house within the day -- either the day before, or the day before that.  Within one or two days before she disappeared, I know they were at that house.

Q.    Okay.  Now, since Leah's disappearance, have you had any contact with Nick?

A.    Other than -- other than just, you know, in passing, not really, except for I had seen him once at Bandon Dunes.

And I saw him, you know, for a few weeks maybe, that entire summer, I'd see him off and on and stuff during the day and stuff when he'd be out and about.  And, you know, we'd talk a little bit, and stuff.  But --

Q.    Did he ever talk with you about Leah disappearing?

A.    Um.  Yeah, he -- he talked about -- he talked about her a lot after she disappeared.  About finding her, and still looking for her, and not knowing how -- he -- he,

Exhibit 5002 at 249

you know, portrayed a genuinely sincere, um, depression maybe, about -- about the fact that she was gone. And, you know, whether or not that it was a, you know, a guilt thing, or whether or not it was, you know, just my girlfriend's gone. Because he -- you know, he seemed genuinely in love with her.

But, you know, at that age, you know 18 -- 17, 18 years old, who knows -- who knows what love is, in my mind. (Laughs.)

Q. Okay.

A. You know, kind of thing. But he seemed -- he seemed generally concerned and would ask on -- every time we'd see him, if anybody had heard anything or anybody knew anything or anything like that.

Q. Since this grand jury is looking into Leah's disappearance, do you have any information as to who might have killed Leah Freeman?

A. Um, not really. I mean, there is so much talk between all the little groups of people around town and stuff at that age. Or everybody had a different story. And I know that, uh, a guy named Bill Sero came up a lot.

Q. Okay.

A. And a -- and an Alicia Michaud came up a lot as possible, doing something. I had heard that -- I'd heard that somebody ran her over with a car, and it was Bill Sero

Exhibit 5002 at 250

*Aaron West*

and Alicia Michaud and somebody else.  I can't remember the third person's name, was in the car.  And they were, you know, talking about, "Oh, I wonder what it would be like to kill -- to run somebody over," and then -- all of a sudden, you know, they ran her over and freaked out and -- but this is all just stories.

Q.    But this, uh, what you've heard, you didn't hear this directly from Bill Sero or Tom Stemmerman?

A.    No.

Q.    This was just what people were talking --

A.    This is just what people were talking about, and stuff.  And every time -- I had met Bill Sero after the fact. I met him, maybe two or three times, just in -- uh, I'd show up with a friend of mine to somebody's house and he happened to be there.  And it was probably three or four days after she disappeared was the first time I'd ever met him.

Q.    Okay.

A.    You know, and I'd heard his name in the past as far as, you know, he's a drug addict kind of guy, and that, you know, if you need to get any kind of drugs, he can get whatever you want for you, kind of thing, and stuff.

And I finally met him on that day, and nothing at all was said at any of the times that I was around him about anything except for that he's going to sue.

One time I remember, he was ranting and raving at

Exhibit 5002 at 251

*Aaron West*

a house I went to.  It was -- I think it was on Collier too, right before it goes -- right before the Winninghams' house on the other side, you know, a little bit.  Somebody rented a house there that he stayed at.  Maybe a -- Ron Slegal or Ron Osburn.  I know he stayed there.

But he was ranting about how the news said that he -- he was one of the persons that did it, and that he was going to sue the news company and stuff.  He was ranting about how it's false as -- falsification or defamation of character.

Q.    Okay.

A.    But other than that, yeah.  I'd never heard him say anything, or any of the other people.

Q.    All right.  Just so we're clear, nobody's ever confessed to you that they killed Leah Freeman, right?

A.    No.

Q.    Okay.  And has anybody told you, "I saw Leah Freeman being murdered," or anything?

A.    No.  Nobody's ever told me that specifically.

Q.    The stuff that you have been hearing has all been second-, third-, fourth-hand.

A.    Yeah.  Yeah, it's all been, "I heard from this person that overheard Bill talking," or "I heard from this person that overheard Alicia talking," or --

Q.    Okay.

Exhibit 5002 at 252

*Heather Reid*

A.    -- kind of thing.  Yeah, it was all at least secondhand if not fifth or sixth or tenth --

Q.    Okay.

A.    -- kind of thing.

Q.    Is there anything else you think the grand jury ought to know about?

A.    Um.  Not really.  I can't really think of anything.  Um.  I don't -- I don't know.

MR. FRASIER:  Okay.  Grand jury want to ask him anything?

THE WITNESS:  Unless you have questions -- you have any questions about anything, I'd help.  (Pause.)

MR. FRASIER:  Okay.  I think you're done.

THE WITNESS:  All right.

GRAND JUROR:  Thank you.

MR. FRASIER:  You're free to go.

THE WITNESS:  Thank you.

## **TESTIMONY OF HEATHER REID**

(Witness sworn.)

BY MR. FRASIER:

Q.    First of all, this is the grand jury for Coos County, and we're looking into the death of Leah Freeman. Okay?  It's obvious, but I need to tell you I've turned the recorders on, so we're recording this, okay?

A.    Okay.

Exhibit 5002 at 253

*Heather Reid*

Q.    First of all, could you tell us your name, please, and where you live.

A.    Heather Reid; Corvallis, Oregon.

Q.    And how long have you lived in Corvallis, Heather?

A.    Five years now.

Q.    Five years?  You lived in Coquille before?

A.    Yes, I have.

Q.    Okay.  Did you grow up here?

A.    Um.  For the most part, kind of.  I went to school in North Bend.

Q.    Okay.  How long -- well, when did you live here in Coquille?

A.    From '98 to 2001, I think.

Q.    Okay.  How old were you when you lived here?

A.    18.

Q.    18?

A.    18 to 20.  18 to 21, pretty much.

Q.    All right.  While you lived here in Coquille, did you know an individual named Nick McGuffin?

A.    I did.

Q.    Okay.  And how do you know Nick?

A.    I previously dated him.

Q.    Okay.  How long did you date him?

A.    Not very long.

Exhibit 5002 at 254

*Heather Reid*

Q.    Okay.

A.    Not very long.  Just through some parties, I guess.  At -- just, just social fun.

Q.    Where did you meet him?

A.    Um --

Q.    How did you meet him?

A.    I do not -- you know, I can't even remember. Just, some of the parties around Coquille, I guess.  Heidi Crook, for the most part.  She was my best friend.

Q.    Okay.  Did you date him before or after Leah Freeman?

A.    Before.  Well before.

Q.    Okay.  How was Nick to date?  I guess that's a question I'm kind of curious about.

A.    Kind of quiet.

Q.    All right.  How did he treat you?

A.    Just fine.  He would -- when he would be drinking he would get kind of rambunctious with the guys, but he wouldn't -- I mean, he was always pretty much quiet.

Q.    How was he in terms of -- well, how long did you date him?

A.    Not very long.  Just a couple weeks.

Q.    A couple weeks?  Okay.  It wasn't like a like a long-term relationship thing?

A.    No.  No.

Exhibit 5002 at 255

*Heather Reid*

Q.    Okay.  Did you know Leah Freeman?

A.    Yes, I did.

Q.    And, how did you know Leah?

A.    My mom dated her dad back when she was two years old.  We used to live with her and Denise and Jenny, back when she was really, really little.  This was years and years -- yeah, when she was two.

Q.    So you've known Leah for a long time?

A.    Long, long, long time.

Q.    So, if I'm correct, your mom was dating Danny, and living together?

A.    Mm-hmm.

Q.    All right.  Did you know that Leah and Nick had been boyfriend/girlfriend?

A.    Mm-hmm.

Q.    I have got to -- "yes" or "no" for this.

A.    Yes.  Sorry.  Yes.

Q.    Okay.  Did you have an opportunity to observe their relationship a little bit?

A.    When he was dating her, I really didn't see him too often.  I didn't -- they were kind of a part of a different -- they were more a part of her age group than -- hanging out with friends and stuff, because she was a lot younger than me.

Q.    Okay.

Exhibit 5002 at 256

A.      And so they were -- I didn't really -- I'd see him driving through town or at Fast Mart or -- when it used to be Fast Mart.  And then -- just basically, I'd just see them, both of them, driving through town.  It would be the only time I would really ever see him.  I never saw him at any parties at or anybody's houses, because they were kind of hanging out with her age-level group.

Q.      Okay.  Did you ever see them argue or anything like that?

A.      Um, there was a few -- there was a couple times where their voices got kind of loud in the car, that they were parked at Fast Mart, and they would be kind of arguing back and forth.  But it wasn't like anybody's voice was louder than the others because you couldn't really hear what they would have been saying.  But you could tell that they were not pleased with each other at the moment.

Q.      Okay.  Did you ever see them hit each other or anything like that?

A.      Oh, no.  I never saw anything like that.

Q.      Okay.  So if there was any dispute, it was basically verbal?

A.      Yeah.

Q.      And nothing out of the ordinary that a couple wouldn't have gone through?

A.      Hmm-mm.  No.

Exhibit 5002 at 257

Q.    I want to go now to the day that Leah disappeared, which would have been June 28th, 2000.

Do you -- you indicated you were best friends with Heidi Crook?

A.    Mm-hmm.

Q.    Are you still acquainted with her?

A.    Yes.

Q.    Okay.  Were you with Heidi that evening?

A.    She was with me, yes.  We were -- actually, I was taking her home.  We were going down North Central, and I was just -- it was just before nine o'clock, I believe, and I was just getting ready to take her home.

I was stopped at -- getting ready to come up to that light right there, um, for 10th Street, out there by the middle school.

And she -- Leah Freeman was walking down the road.  If I'm going towards the light, she was on the left-hand side right -- somewhere right there between the ear place, that hearing aid place, and the bank.  Well, it's not the bank anymore, but --

Q.    It's City Hall.

A.    It's City Hall now.

Q.    Okay.  And Hunter's Restaurant is in there someplace?

A.    Yes.  Yes.  Yeah.  I think she was right -- I

Exhibit 5002 at 258

*Heather Reid*

think she was already past that.  She was right before the bank -- or, City Hall.  I'm sorry.

Q.    Well, if it was a bank then, call it a bank.

A.    It was a bank.  (Laughter.)

Q.    Okay.  Do you recall what she was wearing?

A.    Yes, I do.  Very clearly.  I don't -- I can't tell you which pants -- if she was wearing pants or shorts, but I can tell you exactly to the T, like it was yesterday, her tank top.

She was wearing a white tank top, and it was crystal white and it was just beautiful white.  And it had four -- it had four crisscrosses going down the back.  Because I commented as we were driving past her --

GRAND JUROR:  Something like that, or --

THE WITNESS:  I can't -- see, I -- no, that's, that's not the right type of tank top.  No, because it -- it was more -- it had more -- it didn't show this much in the arms, but in the back it showed almost her entire back.  But it had four -- just, like spaghetti straps.

MR. FRASIER:  Okay.

THE WITNESS:  And it was crisscrossed, and I remember that like it was yesterday.  Because I commented as we were driving past, I said, "I like that tank top."

BY MR. FRASIER:

Q.    Okay.  And how was Leah -- well, she's walking,

Exhibit 5002 at 259

right?

A.    Very mad.  She had her arms crossed, and she was very mad looking.  She was just kind of like she was stomping down the street, but -- like she's cold almost, like she was holding her arms like she was cold.  But her facial expressions, she was not happy.

Q.    What was the weather like that night, do you remember?

A.    It was -- well, it had been beautiful that day.  But it was -- it was getting kind of cold.  That's why I was going to take Heidi home, because she had to be home by nine o'clock.  So it was just a few minutes before 9:00 I was swinging around the block and I was going to pick her back up.  And I went right back to that stoplight there and she was already gone.

        And then I turned off and went down towards the Fairview turnoff; took a right, right there, and came back that shortcut, into -- back into town, on whatever; I'm not even sure what street that is, just the next --

Q.    Okay.

A.    -- that next one up that takes you back up to 10th Street.

Q.    All right.  So, you went back -- you're trying to find Leah.  You didn't see her?

A.    Mm-hmm.  Didn't see her at all from the Fairview

Exhibit 5002 at 260

37

*Heather Reid*

turnoff.

Q.    And you just went those two places?

A.    Yes.

Q.    Now, before you got to the stoplight, did you see Nick McGuffin that night?  Or did you see him at all?

A.    Um, I know I seen him in his mother's, uh, Thunderbird, the maroon-ish, reddish Thunderbird, or whatever color of car it was.  Uh, and he was parked at Fast Gas, and he -- I can't tell if he had -- I don't think he had anybody with him, but he was just staring at the -- that's all I can remember is just him staring at his steering wheel.  Nobody was around.

Q.    Where was he at?

A.    Fast Gas.  The old Fast Gas.

Q.    Fast Mart?

A.    Fast Mart.  I'm sorry.  Sorry, Fast Mart.

Q.    Fast Mart.

A.    Fast Mart.

Q.    Okay.  I was confused.

A.    On the left-hand side of the parking -- of the little parking lot there.

Q.    Okay.

A.    Over by the dumpster, kind of.

Q.    Did you stop to talk to him?

A.    No, I just drove by.

Exhibit 5002 at 261

38

*Heather Reid*

Q.    Okay.  He's --

A.    He's just -- I don't know if he was reading something, but he was staring straight ahead at his steering wheel.  And I thought that was kind of odd, but I didn't know if he was --

Q.    Why did you think it was odd?

A.    Well, because he was -- he didn't move his head, or he wasn't moving his head.

Q.    Okay.

A.    He was just staring straight.  I mean, I only drove by for a few seconds there, as I was going by, but he didn't move his neck.  He didn't look up.  He didn't move.  He was just straight at the steering wheel.

Q.    Okay.  And do you recall when this -- was this on your way home, or --

A.    Yes.

Q.    -- right after you dropped off --

A.    Yes.

Q.    -- Heidi.

A.    Uh, that part.  See, it seems like it was right beforehand.  It seems like I had seen him -- somewhere it said on the thing it says it was right beforehand, but I -- I thought it was after the fact that I saw Leah.

Q.    Well, whatever you remember, you tell us.

A.    From what I recall, I thought it was afterwards

Exhibit 5002 at 262

*Heather Reid*

that I had seen Leah, but from I guess what I just read on the little computer thing, it says I saw him beforehand.

Q.    Okay.  Well, we'll have to double-check that.

A.    Okay.  (Laughs.)

Q.    I want you to testify as to how you remember it.

A.    I -- how I remember it was that I saw him afterwards.

Q.    Okay.  Now, a couple days later, did you talk to Nick about -- or did he talk with you about where Leah was or anything like that?

A.    Um, that's another hard part.  You know, it seems like I did talk to him, and I think -- and I seen him somewhere and did talk to him, but I can't recall exactly what it was that we talked about.

Q.    Okay.  The reason I ask is there were some kind of reports that picked this up, and you tell me if I've got it wrong.  It says that you saw Nick a couple of days later. He asked if you knew where Leah was.  You told him no.  You tell -- you told him you saw him at Fast Mart that night.

Do you recall this at all?

A.    Mm-hmm.

Q.    And you told him that he was in the Thunderbird, or the T-bird.

A.    Mm-hmm.  Yes.

Q.    Do you remember this conversation?

Exhibit 5002 at 263

*Heather Reid*

A.    Yes.  Now I am.  Yes.

Q.    Okay.  Could you tell the grand jury, please, this conversation, what you remember.

A.    Um.  He was asking me if -- he was acting all concerned, of course, and everything, and was still trying to investigate, trying to figure out where she was at.  Asking me if I had seen her, and I told him exactly what I had told the FBI that night; that she was walking down the road, and everything.

And that's pretty much all I can really remember from what I had said.  I don't remember him asking questions or anything.  I just remember him asking me if I had seen her, and that was it.

Q.    Okay.  In the reports, there was something that he said he didn't remember being at Fast Mart.

A.    Mm-hmm.

Q.    And then he said something about, "Gee, I wasn't in the T-bird," or something like that.

A.    Yeah.  And now that you say that, yeah, I did kind of have a little, uh -- not an argument with him, but he basically tried calling me a liar.  And I said, "No, I know what I saw.  I saw you and it was you in your mom's car." That's -- thank you.

Q.    Okay.

A.    I didn't get down all the way, the computer.  I

Exhibit 5002 at 264

*Heather Reid*

didn't read it all.  (Laughter.)

Q.    No, that's -- But this -- you remember this?

A.    Yes, I do.

Q.    Okay.

A.    Yes, I do.

Q.    It's not based on the computer, or what I'm saying.  You --

A.    Nope.  I remember that now.  Thank you.

Q.    All right.  All right.

I've got a couple of other questions here.  As you're probably aware, there has been some rumors floating around town and -- about what happened to Leah and what have you.

Do you know a guy named Jamie Thurman?

A.    Mm-hmm.

Q.    And how about a Nicole Lindsey?

A.    Yeah.

Q.    Okay.  There's a story floating around town that you were over with Heidi Crook, you guys were over at Nicole's place, and Jamie Thurman starts talking about how Bill Sero killed Leah.  Do you remember this at all?

A.    I don't remember that particular time, but I do -- I do remember that rumor very, very well.

Q.    Okay.  Do you remember Jamie Thurman telling you this?

Exhibit 5002 at 265

*Heather Reid*

A.      No.

Q.      Okay.  The rumor -- okay.  So I want to make sure I'm clear.  Jamie Thurman never told you that Bill Sero killed Leah.  Is that right?

A.      I don't remember.  He could have, but I -- I don't remember that conversation.  I'm sorry.

Q.      Has anybody told you that they killed Leah Freeman?

A.      Not themself personally saying I -- that they personally, but I've heard --

Q.      What have you heard?

A.      That Bill -- Kristin Steinhoff was driving somebody's car.  And it was her, uh, Bill -- Bill Sero, and Alicia Michaud.  And they were driving down the road, coming from Brent Bartley's house, from the acid party.

        And Kristin already had a beef with -- or had problems with Leah because she really liked Nick at the time.  And she, I guess, was on acid and everything, and she was pretending like she was going to hit her, and actually did hit her is what I -- was told.  Or what I was -- what I heard.

        And some other -- I mean, some more -- I -- I tried to tell -- after I'd already made that report to the FBI then, I had talked to my stepbrother and talked to him.  And he told me another piece of information that I tried to

Exhibit 5002 at 266

*Heather Reid*

tell the FBI later on, but they didn't -- no, the police department, but they didn't want to hear it.

Q.     What was the --

A.     My -- my stepbrother Rocky Pierce said that he, Bill Sero, and Tom Stemmerman from Coos Bay on Libby Drive, had Leah's bloody clothes in my brother's car, in Rocky Pierce's car, and they took them over to Tom Stemmerman's and burned them over there.

Q.     Okay.

A.     And then that's -- they had her trapped over there for a few days.

Q.     Okay.  Whose clothes did they have?

A.     Leah Freeman's.

Q.     Leah Freeman's clothes.

A.     In a bag.

Q.     In a bag.  Okay.

But -- now, and who told you this?

A.     My stepbrother Rocky Pierce.

Q.     Okay.  All right.  Is Rocky around?

A.     Yes, he's in Myrtle Point.  I just talked to Officer Webley and McNeeley.

Q.     Okay.  Did you tell them what you just told us here?

A.     Mm-hmm.  They're going to go over there to Myrtle Point today.

Exhibit 5002 at 267

*Heather Reid*

Q.    Okay.  Very good.  Has Rocky lived over there a while?

A.    He's been there forever.

Q.    Okay.  And I'm going off the top of my head here. I don't have all the police reports right here in front of me, but I recall that Mr. Sero stayed with some people over in Myrtle Point in 2000.  Was Rocky living over there in 2000?

A.    Mm-hmm.

Q.    I want to say that he was staying with Rocky in 2000.

A.    He very well could have.  They were -- they used to be really good friends.

Q.    And I recall that, at least wherever this place was that Mr. Sero was staying over there, that police seized a whole bunch of clothes over there.  Do you --

A.    I don't know anything about that.

Q.    -- know anything about that?

Okay.  All right.  I'm just going off the top of my head here.

A.    Okay.

Q.    Okay.  Since you -- in the last few years, have you had any contact with Nick McGuffin?

A.    No.

Q.    Okay.  Outside of this rumor that you have told

Exhibit 5002 at 268

us about here today about Bill Sero, Alicia Michaud, Tom Stemmerman, and what your brother told you and this and so forth, do you have any information at all about what happened to Leah Freeman?

A.    No.  That's all I know.

Q.    And outside of what you told us, do you know what happened to her?

A.    That's all I know.

MR. FRASIER:  Okay.  I don't think I have any other questions.

Does the grand jury want to ask her anything?

(Pause.)  Okay.  All right.  Thank you.

THE WITNESS:  Thank you.

### TESTIMONY OF DAVE HALL

(Witness sworn.)

BY MR. FRASIER:

Q.    Okay.  First of all, this is the grand jury for Coos County, and we're looking into the disappearance of Leah Freeman, the death of Leah Freeman.

And it's obvious -- I turned on two different recorders, so you're aware we're recording this.

First of all, could you tell us, sir, who you are and what your occupation is.

A.    My name is David Hall.  I'm a police officer.

Q.    And you work now for where?

Exhibit 5002 at 269

*Dave Hall*

A.    Black Butte Ranch Police Department.

Q.    And do you have a rank there?

A.    I'm a sergeant.

Q.    Okay.  How long have you been a police officer, sir?

A.    Uh, let's see.  Going on 21 years.

Q.    Prior to Black Butte, you worked where?

A.    Um, Lakeview Police Department for a short period of time, and prior to that Coquille Police Department.

Q.    And is Coquille where you started your law enforcement career?

A.    No, I started in Lake County.  Lake County, Oregon.

Q.    Really?

A.    Yeah.  Sheriff's Department.

Q.    We got to talk.  (Laughter.)

Okay.  Anyway, so you've been a police officer nearly 21 years?

A.    Yeah.

Q.    I want to direct your attention, sir, to the year 2000, and specifically June of 2000.  You were working as a police officer at that time --

A.    Yes.

Q.    -- here in Coquille?

And on June the 29th of 2000, were you called in

Exhibit 5002 at 270

*Dave Hall*

by the chief -- the then-chief of police Mike Reaves to assist with an investigation?

A.    Yes, I was.

Q.    When you -- were you actually on duty that day or did he call you in or how did that work?

A.    No.  Uh, during -- during the 2000 year, I had -- we back up.  In 1999 I was involved, uh -- I had responded to a bar fight, and consequently took a person into custody. And during that time I suffered some knee injuries.  Well, starting in 2000, I started having several surgeries.

So essentially starting from January of 2000 through November of 2000, I was going in, having surgeries, and then I'd be released for light duty.  And that's what I was on at the time, was light duty.

Q.    And, as part of light duty, you would be called in to do maybe an investigation or something along that line?

A.    Yes, I did.

Q.    And on the 29th of June, did Chief Reaves ask you to come in and work what at that time was a missing persons case?

A.    Yes.  It was the disappearance of Leah Freeman.

Q.    Could you tell us what time of the day was it you got involved, and so forth.

A.    I believe it was early to late morning, on the morning of June 29th when I got called in to participate with

Exhibit 5002 at 271

48

*Dave Hall*

that.

Q.    And what information were you given when you initially got to working the case?

A.    Uh, she -- it was reported to me that Leah Freeman had failed to come home the night before, and this was highly unusual behavior for her.

And it was also explained that the last person to see Leah Freeman on the night of June 28th was a close friend named Cheri Mitchell.

Q.    And so what did you do with this information?

A.    I went to see Cory Courtright, uh, Leah's mother, to obtain a list of friends and associates who she might have went to stay with.  I asked Cory Courtright to make a list of phone numbers and addresses, and I would stop by later to pick those up.  Um, I also asked Cory if she knew of any personal problems that Leah was going through, or she may be having with other kids, enemies, et cetera.  And I was told by Cory that Leah was a very stable child, and she had no known personal problems or no enemies.

Q.    Okay.  While you're there at the Courtright -- well, first of all, where was this?  Where was Cory staying?

A.    Oh.  Uh, let's see.  She was staying at 1173 North Knott --

Q.    All right.

A.    -- here in Coquille.

Exhibit 5002 at 272

*Dave Hall*

Q.    And that is in what is sometimes referred to as the Sanford Heights area?

A.    Yes, it is.

Q.    Okay.  While you're there is -- Nicholas McGuffin, does he show up?

A.    Yes, he did.

Q.    And did you chat with him a little bit?

A.    Yeah.  I asked him to briefly give me a time when he last saw Leah.

McGuffin told me that he dropped Leah off at about 7:00 p.m. the night before at Cheri Mitchell's home, which is located at 444 1/2 North Elm.  McGuffin was supposed to return and pick up Leah at nine o'clock, but when he arrived she had already left.

Nick stated that he drove up and down Central, West Central looking for Leah, but he couldn't locate her.

He also stated he drove around until about 2:30 in the morning, Friday morning, and finally went home thinking Leah had went to a friend's home to stay, and that she was possibly mad at him for being late to pick her up.

Q.    Okay.  Now, in this statement that he gives you on the afternoon that Leah is reported missing, does he say anything about going to the home of Leah and throwing rocks at a window, and thinking she was at home?

A.    Yeah.  Um, he stated that later during an

Exhibit 5002 at 273

interview that chief Reaves conducted with him on June 30th.

Q.   All right.  But when you talked to him on the 29th, he made no mention of it?

A.   No, sir.

Q.   And he told you that he thought she had gone and spent the night with some friends?

A.   Exactly.

Q.   Okay.  All right.  Now, Nick also told you about going out to this Haga place?

A.   Um, he never mentioned it that night, no.

Q.   Oh, then it's the next day he told you?

A.   Yeah.

Q.   All right.  Did you at some -- well, okay.  At some point in time did you become aware that Nick and Leah had been out earlier in the evening on the day she disappeared, at the Haga place?

A.   Yeah, but that -- that, um -- my recollection and my notes is when we learned from Cory -- Cory contacted Chief Reaves and, uh, explained to him that she remembered Leah and McGuffin visiting Brent Bartley's grandparents, the Haga place, at the end of First Street.

And Cory thought we should see -- you know, we should go up there and -- to check and see if Leah may be staying at that location.

Q.   So I'm clear is, you find that out on the 29th

Exhibit 5002 at 274

51

*Dave Hall*

from Cory and not from him saying it?

A.    No.   We find that out, um, on the morning of the 30th from Cory Courtright.

Q.    Okay.  So you go out to the -- do you and Chief Reaves then go out to the Haga place?

A.    Yes, we did.

Q.    Now, I'm showing a map behind you.  Could you point out where the Haga place is, so everybody knows where we're talking about.

A.    Right here at the end of Fir.

Q.    All right.  And to get to the -- that place, there's a couple of different routes you could go to get there?

A.    Sure.  Sure, you could go down Elm and then all the way up, or you could go -- take Fir, right off of Central, and go all the way up.

Q.    All right.  And when you go up Elm, it's mostly paved most of the way?

A.    Yes, it is.

Q.    And if you go on Fir, you end up driving by the cemetery, is what that is.  On the North side of the cemetery there's this dirt road?

A.    Right.  This -- it's dirt road.  Well, it was eight -- no, ten years ago.

Q.    All right.  And most people, based on your

Exhibit 5002 at 275

*Dave Hall*

experience, if they were going to go up to this place, would have used the Elm Street?

A.    They would have used the Elm Street.

Q.    Okay.  So you go out there -- go ahead and sit down.

You go out there on the 30th, in the morning of the 30th?

A.    Yes.

Q.    Okay.  And what did you see when you went out there?

A.    Well, we went out there, we rang the doorbell, but we got no response.  And then we began to check the area around the house.

In the carport area next to a garbage compactor, um, there was a -- found a man's white tank-top shirt.  Um, Chief Reaves' observations were that the shirt was soaked with beer because of the smell -- and it must be noted too, to the grand jury, I don't have a sense of smell.  I haven't had one I can ever remember.

We walked around the back of the house onto the deck area, and then saw several empty beer cans and, on a bench, a funnel with a long hose attached; in essence, that they were using it for a beer bong.

Um, the house seemed secure, so we just left the area.

Exhibit 5002 at 276

*Dave Hall*

Q.    All right.  Now, later on Friday, June the 30th, did you -- was Nick McGuffin -- did he come into the police station with his mother, and did you and mostly Chief Reaves interview him?

A.    Yeah -- uh, no.  Um, Nick McGuffin came in, but uh, to my recollection he didn't come in with his mother.  That was Brent Bartley that came in with his mother.

Q.    Okay.  And was that interview recorded?

A.    Yes, it was.

Q.    Okay.  And you listened to a copy of that earlier, before you came --

A.    Yes, I did.

Q.    Is that accurate, or reflect what you heard?

A.    Yes, it did.

Q.    Okay.  I'm going to play that recording for you folks right now.  And let's see if I can do this.

(Pause.)  To save tape, I'm going to go ahead and shut the tape off.

(Recording off and back on.)

MR. FRASIER:  Okay.  Go ahead and ask your questions.

GRAND JUROR:  Who was the lady in the background?

THE WITNESS:  I believe that was Shelly Grant. She was a new officer the department just hired.

GRAND JUROR:  Oh, I see.  Part of the team.

Exhibit 5002 at 277

*Dave Hall*

THE WITNESS:  Yeah.

BY MR. FRASIER:

Q.    Towards the end there, it was kind of after Chief Reaves said he was turning the tape off, you can hear Nick say something about some pictures about Leah taken that day.

Did he supply some pictures to you guys eventually, what Leah was wearing, what she looked like that day?

A.    Yeah, I believe so.  It's hard for me to recollect.

Q.    And is that one of those?

A.    That looks like one of them, yes.

Q.    Okay.  And that was supposedly -- at least, your information was it was a picture of what -- of Leah that day, at Nick McGuffin's house earlier in the day?

A.    Yeah.

Q.    And in the background there, I've marked that as State's 2, we can see the -- what looks like a blue car.  Is that the blue Mustang that we've been referring to?

A.    That looks like the blue Mustang.

Q.    And off in the corner there's another window, and there's a reddish-type car there.  Mrs. McGuffin, did she have a Thunderbird that she kind of drove around town?

A.    That's correct.

Q.    And does that appear to be that car?

Exhibit 5002 at 278

*Dave Hall*

A.     Yes, it does.

Q.     After you get this statement from Nick about what she was wearing, the pictures and so forth, do you and Chief Reaves decide to go back out to the Haga place?

A.     Yes, we did.

Q.     Okay.  Could you tell the grand jury what you did.

A.     Well, we went out there to -- we got to thinking that -- after he explained what she was wearing, that the tank top that we had seen out at the residence, the Haga residence, could possibly be Leah's.

So we went back out there.  And when we arrived, we saw, A, that the tank top was missing.  All the beer containers had been cleaned up.  Um, everything was essentially spotless at the residence.

Um, we found the kitchen sliding glass door was unlocked and partially open, so we did a check of the residence but, uh, found that it was empty.  There was nobody around.

But it was completely a different contrast to when we were out there earlier.

Q.     Now, when this is first reported on June 29th, um, it's kind of treated as a missing persons case, right?

A.     A runaway.

Q.     A runaway?

Exhibit 5002 at 279

*Dave Hall*

A.      Mm-hmm.

Q.      And then the next day Leah doesn't show up, so things start changing a little bit?

A.      A little bit, yes.

Q.      I don't mean to embarrass you or anything along that line, but did you start suggesting to Chief Reaves, Hey, we might need to approach this at a different pace?

A.      Yes, I did.  I told him that I thought that we should call in the, um, Coos County homicide investigation team for additional help and resources.

Q.      And how did Chief Reaves respond to that?

A.      Um, he wanted to keep everything in house.  He kept thinking it was still just a -- a runaway and -- and he -- essentially, Chief Reaves had the attitude that everything was supposed to stay within the department and we didn't need any outside help.

Q.      At some point in time did Chief Reaves call in the FBI?

A.      Uh, I believe that suggestion came from Officer -- I was gone during this portion of time, and I came back to the PD -- I don't know if it was -- I don't what I would -- I can't remember or recollect.

But, um, Officer Shelly Grant had contacted the FBI field office in Eugene, and she explained our situation to them and asked if they could offer any assistance.  And

Exhibit 5002 at 280

*Dave Hall*

um, they said that they were going to send a team of agents to Coquille immediately, and they would arrive around noontime.

Q.    And again, this was before the homicide team here in Coos County was involved?

A.    Correct.

Q.    Okay. And, as part of this investigation, Nick in his statement talked about being with Brent Bartley for a period of time. Is that true?

A.    Yes.

Q.    And was Mr. Bartley interviewed at some point in time?

A.    Yeah, he was interviewed later that afternoon after McGuffin was. And we had Brent Bartley come in to City Hall to do a quick interview about his activities the night that Leah disappeared.

Q.    What did Mr. Bartley have to say?

A.    Well, Bartley, uh, came in with his mother Leslie. She accompanied him, and was present during the entire interview.

Bartley told to me that McGuffin and Leah came over to his house sometime after about 4:00 p.m. on Wednesday the 28th. They all -- he stated that they all smoked some marijuana and decided to go get some videos from McGuffin's house and go to Bartley's grandparents' house, which is the

Exhibit 5002 at 281

*Dave Hall*

Haga residence.

And then around 7:00 p.m. McGuffin and, um -- McGuffin, Bartley, and Leah left to take Leah to Cheri Mitchell's house and dropped her off.

McGuffin then picked up Bartley's girlfriend Nicky Price, and they drove back out to Haga's house.

Bartley said McGuffin stayed with Nicky and him until around 9:00 p.m. and then left to go pick up Leah.

Q.   Did he say anything further about what had occurred later that evening?

A.   Yeah, he said McGuffin returned a while later and stated he could not find Leah and he was going to continue looking for her.  At about 11:00 p.m. McGuffin returned and told Bartley and Nicky that he could not find Leah, so Bartley told McGuffin he would go and help her [sic] find her.  They dropped off Nicky Price at her house, and Bartley said he drove around with McGuffin until around 2:00 a.m. Thursday morning before McGuffin dropped him off at his house.

Q.   Did Bartley talk about, at any time, did he and Nick go to Leah's home, knock on the door and say, Hey, is she here, or anything along that line?

A.   No.

Q.   Did he mention anything about Nick throwing rocks at a window or anything along that line?

Exhibit 5002 at 282

*Dave Hall*

A.    No.

Q.    Now, eventually the interagency homicide or major crime team was involved with this case?

A.    Yeah, but that was quite a bit later.

Q.    Quite a bit later.

A.    Yes.

Q.    And I don't mean to pick on you or embarrass you. Did you express to Chief Reaves, Gee, I've never handled a case like this before --

A.    Yes, I did.  I felt, uh -- I felt very overwhelmed at this point.  I think at the time I was becoming concerned that I'd never done a homicide investigation.  I'd handled an attempted murder investigation, but I felt that I was in over my head and I didn't like being the lead investigator.  And I wanted to bring in the team, people that had 20-plus years of experience doing this exact same thing.

And he still wanted to -- still was treating it as just a missing person/runaway, and didn't want to bring in any other outside agencies.

Q.    Leah never shows up; is that right?

A.    No, sir.

Q.    And eventually the chief accedes to the idea of bringing in the major crime team?

A.    Yes, he did.

Exhibit 5002 at 283

60

*Dave Hall*

Q.    And that's about a week after Leah had disappeared?

A.    Uh, a good week.  Maybe -- maybe a week to -- yeah, I would say probably a good week that I remember.

Q.    And that was the point in time that I was asked to get involved too?

A.    Yes, sir.

Q.    Now, according to Nick in his statement, he said he'd been driving back and forth, up and down Central, and he had not seen Leah at all.

A.    Correct.

Q.    Yet you folks had developed witnesses like Ray Lewis, Mr. Kirn, Mr. McAdams, Alicia or Ashley -- you had developed several --

A.    A few, then.

Q.    -- different witnesses that during this time frame that he claims he was driving up and down Central, that they saw Leah.

A.    Yes, they did.

Q.    And did that strike you guys as interesting?

A.    Yes, completely odd.  That, uh, people at the old Hunter's restaurant had seen her walk by.  From various locations all along Central, as she was walking towards West Central, she was seen.

Q.    Okay.  With that information, eventually was a

Exhibit 5002 at 284

*Dave Hall*

search warrant obtained to search the McGuffin residence and -- well, not the McGuffin residence, but at least -- well, let me back up.

Q.    Did you guys ask to look at Mr. McGuffin's car?

A.    Yes, we did.

Q.    And did he agree to let you look at the Mustang?

A.    Yes, he did.

Q.    And could you tell us when that was, and what you guys amassed?

A.    Uh, let me look over my report very quickly here. (Pause.)  That would have been -- okay. (Pause.)  This would have been on July 5th.

Q.    Okay.  And the crime lab, Kathy Wilcox was asked to come with you?

A.    Yeah, I would -- what I did is I asked McGuffin if he would be willing to give his consent to look though his car, and he agreed.  I had McGuffin write out in his own handwriting a statement granting permission to search his car.

And then I contacted Mast Brothers Towing, and sent them along with an additional investigator, Lieutenant Buddy Young of North Bend Police Department, to pick up McGuffin's car at this home and transport it to the OSP crime lab in Coos Bay for processing.

Q.    One of the reports I've given you is Kathy

Exhibit 5002 at 285

*Dave Hall*

Wilcox's report of looking at the car.

GRAND JUROR:  I've got a question, if we --
before we answer that, okay?

MR. FRASIER:  Okay.

GRAND JUROR:  When you say you thought it was odd that you hadn't -- that he hadn't maybe seen her during that time frame going up -- you're saying that you thought it was kind of odd that Nick hadn't seen Leah, driving up and down the street.  Is that correct?

THE WITNESS:  Yeah, that he would -- you know, he arrived shortly after Leah had left the Mitchell residence.

GRAND JUROR:  Right.

THE WITNESS:  And we had numerous witnesses state --

GRAND JUROR:  Right.

THE WITNESS:  And yet he leaves immediately, and drives down -- drives up and down Central several times.

GRAND JUROR:  Right.

THE WITNESS:  Doesn't see her.  You know, we've got witnesses all along.

GRAND JUROR:  Right.  But I mean, from the testimony that we've been getting, my understanding was that if he picked -- if he showed up at 9:00, Leah had left about 15 minutes before that, so it is possible that she could have walked that distance, and by the time he left, she -- he

Exhibit 5002 at 286

*Dave Hall*

wouldn't have seen her.

But I mean -- so, I mean the time line that I've seen -- you guys can -- were discussing this.

THE WITNESS:  Sure.

GRAND JUROR:  It leads me to believe that if he showed up at nine o'clock, she could have gotten clear past, um --

GRAND JUROR:  The high school there --

GRAND JUROR:  -- Colleen's Restaurant by the time he actually left.

So, if he -- he -- he would have had to go clear over by the school where she was last seen.

I mean, so the fact that these people did see her go by, and if we follow the time line, it would be consistent that he would not have seen her.

That's -- am I right?  You guys can correct me if I'm wrong, but I can see where that would be --

GRAND JUROR:  According to the time line.

GRAND JUROR:  -- consistent with he wouldn't have seen her because she would have been past Colleen's by the time he -- he left Cheri's house.

GRAND JUROR:  I -- I would ask a question to go along with that, is, did he state a given area that he patrolled?  Or did he go all the way as far as Sanford Heights on Central?

Exhibit 5002 at 287

*Dave Hall*

THE WITNESS:  Uh, it's -- it's a -- to my recollection he stated that he went down Central all the way to West Central past the high school.  You know, the direction and route that she would have taken walking home.

GRAND JUROR:  Right.

THE WITNESS:  That was my understanding.

GRAND JUROR:  He said he went on every possible way --

THE WITNESS:  Yeah, exactly.

GRAND JUROR:  -- did the loop, he did everything.

THE WITNESS:  He did the loop.  He went everywhere.  He even went to, like, Fifth Street park, and all over.

GRAND JUROR:  Right.

GRAND JUROR:  (Indiscernible) waiting this morning in the van.  He'd seen him pull in to the high school.

MR. FRASIER:  Okay.  We --

GRAND JUROR:  Well, they don't know --

GRAND JUROR:  We don't know --

MR. FRASIER:  We need to -- we're kind of not asking questions here.  I think you guys are starting to deliberate a little bit.

GRAND JUROR:  Okay.  Yeah, I just wanted to clarify why you -- if there was something that I missed in

Exhibit 5002 at 288

*Dave Hall*

the time line.

THE WITNESS:  Okay.  Well, I haven't -- I haven't seen the time line in ten years.

GRAND JUROR:  Okay.  That's fine.

THE WITNESS:  But the thing was, is there was a couple of witnesses, like the two people at Hunter's that had seen her, if I remember correctly.  That was some time after 9:00.  You know, between say 9:05 and 9:15, that she's walking by Hunter's at that time.  But I have to look at the time line here.

GRAND JUROR:  Okay.  That's fine.

BY MR. FRASIER:

Q.    Nothing of significance was found when the car was searched on the 5th of July?

A.    No.

Q.    All right.  Now, in the interim, after the 5th of July -- I got to stand up; my back is hurting, if that's okay.

In the interim after the 5th of July, the district attorney's office got involved, was there ever a period of time where some of the kids were reluctant to talk to the police about what was going on?

A.    Oh, yeah.

Q.    And was there an accusation that somebody associated with the kids at the school or whatever was

Exhibit 5002 at 289

66
*Dave Hall*

telling them not to talk or something along that line?

A.   Yes, there was.

Q.   And was there a decision made to convene an investigatory grand jury to bring people in, to talk to them and see if we could figure out what was going on?

A.   Yes.

Q.   Now, as part of that grand jury, were you made aware that at least some of the witnesses were indicating that Nick had switched cars the evening that Leah disappeared?

A.   I recall that, yes.

Q.   And after that information was obtained later, towards the end of July, were additional search -- well, I shouldn't say additional.  Were search warrants obtained to once again look at Nick McGuffin's blue Mustang?

A.   Yes.

Q.   And the red or maroon Thunderbird that belonged to his mother?

A.   Yes.

Q.   Was also a search warrant executed on the McGuffin home?

A.   Yes, there was.

Q.   Various documents and things like that were taken out of the McGuffin home?

A.   Yes.

Exhibit 5002 at 290

Q.   All right.  Now, August the 3rd, 2000; that's when Leah's body is found?

A.   Yes, it was.

Q.   And the autopsy was performed the next day, August the 4th?

A.   Uh, yes, I believe so.  Correct.

Q.   And that was conducted over at Roseburg?

A.   Yes, it was.

Q.   You continued to be the lead investigator on this case for how long?

A.   Oh, well, off and on, because it was shortly thereafter when, uh, we recovered her body, I went off duty again for about eight weeks because I had an -- I think it was the second or third week of August I had an additional knee surgery.  And I didn't come back to work I think it was until like the 1st of October, somewhere in there.

Q.   All right.  And at some point in time, you -- when did you go to work for Lakeview?

A.   Uh, I left -- I left Coquille, um, the April -- the first of -- yeah, between the 1st and middle of April of 2002, I went to work for Lakeview.

Q.   The case was worked off and on during that time period?

A.   Yes, it was.

Q.   And nothing of significance or -- I mean, you

Exhibit 5002 at 291

couldn't make an arrest or anything --

A.    No.  No.

Q.    -- based on what you had?

Okay.  I don't think I've got any other questions for Officer Hall -- or Sergeant Hall.

Have I forgotten anything that you think we need to know about?

A.    I -- you know, I think early on when we did the first interview with Bartley --

Q.    Yes.

A.    -- his emotional --

Q.    Okay.  Go ahead.  Talk to us.

A.    Um, when we brought him in for that initial interview, at this point in time, you know, we're still thinking that she's a runaway, that -- or missing.  We don't know what we've got at this point.

And when we brought him in to conduct that interview that you heard, we had -- we had a picture similar to this, sitting at the table.  And when Nick came in and he seen that picture, he just became -- you know, he started sobbing, crying.  He was uncontrollable.  Uh --

Q.    Was it Nick or Brent Bartley?

A.    No.  No, this was -- this was, uh, Nick McGuffin.

Q.    Bartley?  This is Nick McGuffin.

A.    Nick McGuffin.

Exhibit 5002 at 292

*Dave Hall*

Q.    Okay.

A.    He's just -- he's out of control, and he looks at the picture and he points at the picture and he said, "I used to call her Angel."

And he's talking about her in the past tense, which really, really struck me as odd, because I'm just thinking -- you know, still at that juncture, I'm thinking he's -- she's just -- she's -- she's run away for a reason. And why is he talking about her in the past tense?

Q.    Okay.  And I don't know if I remember talking to you about this too, but later on he came in, and Mr. Bartley too, and they gave handwritten statements about where they were that evening?

A.    Yes, they did.

Q.    And wrote out their time schedule and things along that line?

A.    Exactly.

Q.    Those were sent to the FBI, those handwritten statements?

A.    Yeah, they were sent to Quantico.

Q.    Were there similar things in both of those statements about change of tense in terms of referring to Leah?

A.    Yeah.

MR. FRASIER:  All right.

Exhibit 5002 at 293

I don't think I have your hands.  Go ahead, ask him anything.

GRAND JUROR:  The interview that we just heard, the tape, was that under oath?

THE WITNESS:  No.  I think he was just -- he was asked to voluntarily come in and give a statement.

GRAND JUROR:  I don't remember hearing anything about them going to the mill pond.

GRAND JUROR:  He never divulged that.

GRAND JUROR:  He didn't divulge that.

THE WITNESS:  No, that didn't come out until later.

GRAND JUROR:  That's what I got down there too. They were out smoking pot.

GRAND JUROR:  Yeah.

GRAND JUROR:  He probably just didn't want --

GRAND JUROR:  Didn't want to take that sort of cat out of the bag.

GRAND JUROR:  No, I mean, tell the cops he went to smoke pot.

GRAND JUROR:  Yeah.

(Indiscernible discussion.)

BY MR. FRASIER:

Q.    Just so we're clear, I -- you mentioned that, uh, Bartley talked about how they all smoked marijuana that

Exhibit 5002 at 294

*Dave Hall*

evening.

A.     Mm-hmm.

Q.     Did that include Leah?

A.     The way I understood it, he said they all smoked marijuana that evening.

Q.     So that would have been Nick, Leah --

A.     Um, Ms. Price, and Bartley.

Q.     Okay.

GRAND JUROR:  Um, did -- you said that the beer party stuff, the tee shirt and the siphon, I think you said --

THE WITNESS:  Well, yeah, like the --

GRAND JUROR:  -- the beer bong?

THE WITNESS:  Right.

GRAND JUROR:  Did you ever find out who cleaned that up?

THE WITNESS:  No, we did not.  We only could think that it was either -- you know, I mean, it's pure speculation, but it was --

GRAND JUROR:  No one was ever asked what happened there?

THE WITNESS:  You know what, I don't remember, to be honest with you.

MR. FRASIER:  Any other questions?

GRAND JUROR:  I wonder if anyone -- apparently

Exhibit 5002 at 295

not.  These people who saw Leah walking along Central that evening also saw Nick, aside from the one driving along Central.

I mean, he was driving back and forth along Central, but it didn't seem like anyone saw him driving along Central who had seen Leah walking except the lady in the car who thought there was a car behind her that pulled in, and it could have been or it couldn't have been --

THE WITNESS:  I don't know about that.

GRAND JUROR:  Did anybody ever --

THE WITNESS:  That I don't recall.

GRAND JUROR:  -- follow?

THE WITNESS:  The day -- that could have been, but I don't recollect that at this point in time.

MR. FRASIER:  Anything else?

Okay.  You can go back to -- what beat?

THE WITNESS:  Sisters.

MR. FRASIER:  Sisters.

GRAND JUROR:  Enjoy the heat.

GRAND JUROR:  The weather out there.

THE WITNESS:  The weather?  It's just now getting hot.  We're probably getting summer.  We're supposed to be.

**TESTIMONY OF KIP OSWALD**

(Witness sworn.)

BY MR. FRASIER:

Exhibit 5002 at 296

*Kip Oswald*

Q.     First of all, sir, this is the grand jury for Coos County, and -- it's obvious, but I've turned on a couple of recorders.  We're recording the proceedings here today.

Could you first of all tell us your name and occupation, sir.

A.     My name is Kip Oswald.  I'm a patrol officer for North Bend Police Department at this time.

Q.     And prior to that, were you employed in law enforcement elsewhere?

A.     Yes.  I worked 23 1/2 years at Coos County Sheriff's Office, and I worked three and a half years at Hillsboro Police Department.

Q.     In the year 2000, were you working for the sheriff's office at that time?

A.     Yes, I was.

Q.     Were you -- at some point in time, you were a corporal, and a sergeant, and so forth, with the sheriff's office?

A.     Yes, I was.

Q.     I want to direct your attention, sir, to June-July of 2000.  Again, you were working for the sheriff's office at that time?

A.     Yes, I was.

Q.     And one of these days that you're working at the end of June or July -- 1st of July of 2000, did you find

Exhibit 5002 at 297

74

*Kip Oswald*

yourself going out towards the Hudson Ridge area of Coos County?

A.    Yes.

Q.    Where's Hudson Ridge at?

A.    Hudson Ridge is outside of Four Corners on Fairview.  You go to Fairview and turn right at the Four Corners, go up towards McKinley, and about approximately three-quarters of a mile from Four Corners there's a road that takes off to the left.  It actually has one coming from the east and one from the west that meet, and you go up to the left there, and that's Hudson Ridge.

Q.    And do recall what day it was that you went up there that we're going to be talking about here today?

A.    Yes, it was on the 5th of July, 2000.

Q.    Now, prior to you going out there on the 5th of July, were you aware that there was a girl missing in Coquille, Leah Freeman?

A.    I had just found that out.  Um, I had come back to work and found out that there was a girl missing.

Q.    All right.  And why did you go to this particular area, Hudson Ridge?  Why were you up there patrolling?

A.    This is an area I -- I had been to many times before, and there had been a lot of parties there.  Kids go there, and there's actually a place where fires have been, and you would find cans and stuff laying there a lot, and

Exhibit 5002 at 298

*Kip Oswald*

different paraphernalia that you knew that kids had been partying.

Q.    What time of the day was it that you went out there?

A.    Uh, this was about nine o'clock at night.

Q.    And as you're driving out there, did you happen to find a shoe?

A.    Uh -- yes, I did.  Um, I went up onto Hudson Ridge.  Approximately 200 yards onto Hudson Ridge there is a road -- access road to the power lines.  It goes both ways; the one to the right goes a little farther up, but the one to the left goes up onto the hill and up underneath the power lines.  And that's where the kids had been partying.

When I got up to an area there that turns a 90-degree turn, there was a shoe laying there.  And it's an area where people dump and stuff a lot.  I got out and looked at the shoe, and the shoe looked to be a shoe that you wouldn't throw away.  It was in good condition, and it did appear to be a woman's shoe.  In fact it had the size, 6W, on the bottom of it.  And, um -- so I picked that shoe up, uh, believing that it -- it possibly could be -- I didn't know at that time that it was, but I did pick it up and, uh, brought it back to town.

Q.    Okay.  When you picked it up, you picked it up with your bare hand?

Exhibit 5002 at 299

*Kip Oswald*

A.    Yes, I did.

Q.    Didn't use gloves?

A.    No.

Q.    Okay.  Just wanted to make sure.  (Laughs.)

Okay.  Now, at some point in time did you have contact with a guy named Tony Messerle?

A.    Yes, I did.

Q.    And how do you know Tony?

A.    Uh, Tony was working at the county shops at that time.

Q.    Did you have a conversation with Tony about a shoe --

A.    Yes, I did.

Q.    -- or about the shoe you found?

A.    Yes, I did.

Q.    Could you tell the grand jury when that was, where you were at, and how that came about.

A.    Well, he had -- he had told me about a shoe that he had found, um, over by the apartments that he was living in.  That was over by the graveyard across from the high school.  And he had described that shoe to me, and I believed this shoe to be the -- the same type of a shoe.

Q.    Okay.  And, did he actually come out to your truck and look at the shoe you had?

A.    Uh -- no, he didn't.

Exhibit 5002 at 300

*Kip Oswald*

Q.    Okay.

A.    I -- I actually -- when I came back to town, the FBI and Officer Hall, that was in here before me, they were having a roadblock where they were taking the day that she went missing, the time, and were trying to stop people, talk to them, and see if maybe they had seen somebody; seen her or something during that period in time that maybe they could jog somebody's memory.

But I stopped there and I asked the FBI guy what size of shoe she wore, and he didn't know for some reason. But, uh, then I talked to Hall. He looked in and looked at the shoe. He says, "That -- that looks like that could be her shoe."

So at that time I took it back to the sheriff's office and bagged it up and, um, tagged it and everything, and put it into evidence.

Q.    That shoe later was determined by DNA to actually be Leah Freeman's shoe; is that correct?

A.    Correct.

Q.    When it was turned over to the Coquille Police Department, they took care of that, entry-wise, what to do with the shoe?

A.    That's correct.

Q.    When the lab report was -- came back, it indicated that there was an unidentified male DNA on the

Exhibit 5002 at 301

*Craig Zanni*

shoe.  Did you later, at my request, give us a DNA sample to check it against you in the case?

A.    Yes, I did.

Q.    And it turned out that your DNA was on the shoe?

A.    Yes, it was.

Q.    All right.

Just so -- for some reason, the McGuffin family thinks that DNA from -- well, they thought it would be Officer Zavala, would show up on her body.  And of course I don't know where they're getting that, but the question I have for you, you didn't have anything to do with Leah Freeman's death, did you?

A.    No, I did not.  In fact, I -- I actually took a polygraph on that.

Q.    Well, we can't talk about polygraphs.

A.    Okay.

Q.    All right.  Thank you.

MR. FRASIER:  All right.  That's all the questions I have.

Any questions for the officer?  (Pause.)

Okay.  Thank you.

THE WITNESS:  Thank you very much.

                    **TESTIMONY OF CRAIG ZANNI**

                         (Witness sworn.)

BY MR. FRASIER:

Exhibit 5002 at 302

*Craig Zanni*

Q.    First of all, this is the grand jury for Coos County, and we're looking into the death of Leah Freeman. And, even though it's obvious, I need to advise you I'm tape-recording.  We're recording these proceedings here today.

First of all, could you tell us your name, please, and --

A.    Craig Zanni.

Q.    (Laughing.)  And your occupation?

A.    Uh, currently retired.  Other than -- other than being a special investigator for the district attorney's office and the sheriff's office and Coquille Police Department.

Q.    Okay.  And, you -- just so everyone's aware, we get to vote for you in November as the only person on the ballot for sheriff?

A.    As far as I know.

Q.    Okay.  (Laughter.)  You were -- you worked for the sheriff's office for how long?

A.    30 years.

Q.    And you worked there -- for the last many years you were with the sheriff's office, you were a detective sergeant?

A.    Yes.

Q.    In charge of investigations?

Exhibit 5002 at 303

*Craig Zanni*

A.     Yes.

Q.     And in that capacity, you've been involved in numerous homicide/death investigations, missing persons, and so forth?

A.     Yes.

Q.     I want to direct your attention to June 29th of 2000.  At that time you were the detective sergeant, still, at the sheriff's office?

A.     Yes.

Q.     Did you become aware that Leah Freeman was -- or, at least that there was a missing girl, a teenage girl, in the city of Coquille?

A.     Yes, I did.

Q.     What did you do when you heard that information?

A.     Well, that original information, a -- a detective who worked for me who is now retired, by the name of Mike Brinkley, and I were walking downtown.  It was lunchtime.

I happened to see the then-chief of police at Coquille.  I basically greeted him and asked him, you know, what's going on.  And he said, "Well, I've got this missing young girl."

I said, "That don't sound good."

And he goes, "Oh, it's probably just a runaway."

And I says, "Well," I said, "I've got some detectives over there," I says.  "We've been scheduled for

Exhibit 5002 at 304

*Craig Zanni*

court, but of course the -- the case pled out."  I said, "They're available; they could use the work, and I'll send them over."

He said, "Don't really need your help."

I said, "Well, somebody needs to sit down and see who the last person was with this victim, find out what's going on," I says.

He said, "Well, the boyfriend."

I said, "Somebody needs to sit down with the boyfriend and get a really detailed statement about what went on."  I said, "I'll send some detectives over and they'll help."

"No -- don't need them."

And so we went on.

Q.    Okay.  Did you actually, the next day, send a couple guys over to, you know --

A.    Well, a couple things happened.  That afternoon after lunch, as I was coming back, Mike Brinkley said he had to make some stops, so I walked back to the sheriff's office.

Unbeknownst to me, talking to Mike later, he'd gone over to the police department and offered to help.

And when I had gone back to the sheriff's office I talked to the then criminal division commander Larry Leader, and told him that -- you know, that Coquille has a missing girl case that just -- it bothers me.  I says, "We

Exhibit 5002 at 305

offered to help."

And unbeknownst to him, talking to Larry Leader later, that he'd gone over and talked to them and offered to send detectives over. Of course he was my boss; I think he could have arranged that.

Um, the next day, I don't believe we sent any detectives over because we were still basically told we weren't needed.

Q. All right. At some point in time you learn the FBI is in town, helping -- or supposedly helping?

A. Yes. In fact, uh, that was the first part of the following week.

In fact, on that Saturday, which was around the 4th of July, a couple of my detectives called me at home and said, "Hey, have you seen the paper? This girl's been missing. Something's wrong. So, we need to find out."

And the next thing I'm aware is the FBI is in town assisting the Coquille Police Department with their investigation.

Q. You contacted me during that time frame, expressing concern?

A. I'm sure I did.

Q. Okay.

A. I usually had -- when I had concerns about a case, you were usually one of the first people that heard

Exhibit 5002 at 306

83

*Craig Zanni*

about it.

Q.    Okay.  Did you -- well, finally at some point in time did Chief Reaves ask for the assistance of the major crime unit here in Coos County?

A.    Uh, eventually.  Uh, I don't recall the exact date, but I think it was around July 5th, 6th, or 7th.  Somewhere in there.

Q.    All right.  Why don't you tell the grand jury a little bit about our major crime team, so they understand it.

A.    Okay.  The major crime team came about years ago because it used to be literally that each agency, you know, basically handled whatever cases they had.  And for most things that's probably sufficient, but, you know, as we all grow mature and aware of what life's like, we get better.  And what had happened was, there were a couple of incidences that had caught -- had occurred in a couple of small communities, and they called particularly the state police and sheriff's office for help.

And what we had decided was, rather than get involved where it fell upon one agency to try and do a major case, that we would commit to an interagency agreement that basically we would have a team of people that each agency would provide some help to the best of their ability.  And that way, when you had a major incident, we'd have enough people to handle the situations, and also those people could

Exhibit 5002 at 307

be in getting the experience and training necessary to do those cases.

So what we did is, is by sending people to school and having them being involved in other cases that maybe they weren't the main investigator on, but assisted, they gained knowledge and experience and learned how to do those. And that was the whole purpose, is gaining experience, knowledge, and the ability to more effectively investigate those.

And it became very effective. We -- people had developed extreme expertise, very knowledgeable and understanding of the overall investigation.

And what it did was, for example, is if Powers, who has one officer now, called and we send the major crime team, they're going to end up with 15-20 trained investigators to help them with that case.

And, likewise, if something happened in North Bend, then the Powers officer could come over. He would assist. He would learn something from that and also have an extra body for North Bend, rather than just depleting all the manpower they had. So that was the purpose behind that.

It also had -- we had an assigned prosecutor, so if we needed, uh, legal advice on things that we were doing in an investigation, it was there.

We had people who were from the crime lab who were part of that team, so we had somebody who was very

Exhibit 5002 at 308

*Craig Zanni*

knowledgable of physical evidence, latent evidence, and those type of things, who was there to advise us on what to do.

We had people who had expertise in the interviewing techniques and that type of thing.

And, basically what we did was we brought a group of people, had experts in different fields to all help and gather so we had a complete group that could cover all the aspects of the investigation.

Q.    And that resource in this case was not brought to bear until probably a week after Leah had disappeared?

A.    It was not.

Q.    Now --

A.    We have changed protocols because of that, also.

GRAND JUROR:  That's what I was going to say. Why did he keep turning down the help?

THE WITNESS:  I don't know.

GRAND JUROR:  Was anyone on the Coquille police part of the crime team?

THE WITNESS:  They had been, yes.  They weren't at that time because they had a fairly inexperienced crew, but some of those people working at the department had been involved in our program in the past.

Since you asked the question, I will tell you we changed our protocols because it's one of those things sometimes, I don't know if it -- and -- and I'm not making a

Exhibit 5002 at 309

*Craig Zanni*

judgment call on this now.  But if it's personal, if it's conceptual, or afraid to admit I can't do something or I can't handle something, or it's they are really convinced they don't need it.  But the protocols I can tell you immediately changed after that, because shortly after this incident we had another one where another chief basically told me that "I don't need your help."  And I told him, I -- under no uncertain terms, let's put it that way.  It was a little more colorful than that, that I didn't care what he wanted; we were -- the -- the major crime team was coming.  And he could make room or he could just find a place to go sit, but it was going to be done right.

BY MR. FRASIER:

Q.    In the course of this investigation, obviously -- well, I shouldn't say obviously, but one focal point of this investigation has been the boyfriend of Leah Freeman, a Nicholas McGuffin.

A.    Yes.

Q.    Have there been other persons who have been looked at as potential suspects in this case?

A.    Yes.  Many.

Q.    One person that pops up that I would like you to talk to the grand jury about is a guy named Eldon or Sonny Shandlon (phonetic).

A.    -- Shandlon.  Yes.

Exhibit 5002 at 310

*Craig Zanni*

Q.    Why don't you tell the grand jury how he come onto the screen, and what we did in regards to that night.

A.    Um, while investigating this case, one of the things we were trying to do is basically, is -- there's a -- there's an old joke among police officers, considering -- in these kind of cases you usually pair up.  And I was paired up with Detective Sergeant Young from North Bend Police Department.  And our adage was, is we suspect everybody in the world because we -- the only people we know didn't do it is me and you, and I don't know about you, type of thing.

It came to his attention via a -- a report from some people that there was an individual who had lived in the apartments near the high school.  There's an old set of apartments which is now storage warehouses.

That had lived there, who had left the area on or about the time that Leah Freeman had disappeared.  Didn't have an exact date, but --

Q.    And this apartment that he'd been living in would have been close to where the shoe that was eventually determined to be Leah's was found by --

A.    Yes.

Q.    -- Mr. Messerle?

A.    Yes.  Exactly.

Q.    And what was the information, again, you had about Mr. Shandlon?

Exhibit 5002 at 311

*Craig Zanni*

A.    That he had lived there.  He was an odd character for a myriad of reasons.  And he had left, basically just left the area, and subsequently found out that he had left a lot of his clothes and other things in the apartment where he lived.

So at that point Sergeant Young and I began to try and find more out about him.  And, um, I don't know how much detail you want me to go into, but --

Q.    Let me -- just so I'm clear, and the grand jury's clear:  He's living in an apartment next to where the shoe was found, and basically within a couple of days of Ms. Freeman's disappearance he leaves town and leaves a whole bunch of his personal property in the apartment.  Doesn't tell the landlord he's leaving, nothing.  He's just gone.

A.    As I recall, I believe he was in debt to the landlord to start with.  But he just left, yes.

Q.    Okay.  We make some efforts to locate him?

A.    Uh, yes.  Traveling to Tennessee and Colorado, twice, kind of an effort.  Especially when -- fortunately we didn't have to drive to Tennessee, but we did drive to Colorado twice.

Q.    And after -- did you eventually find Mr. Shandlon?

A.    Yes, we did.

Q.    And were you able to eliminate him as a suspect?

Exhibit 5002 at 312

*Craig Zanni*

A.      Yes.  Uh, and we took fingerprints and DNA swabs, and interviewed him at length.

We had also -- our first trip to Colorado we missed him -- as it would come to find out after five days, we missed him by about 11 minutes.

But, um, we were able to do research and find out that he was abscond from the Naval Reserve and he was -- wasn't all that uncommon, from what we could tell, for him to just take off and leave whatever he had acquired and start all over someplace else.  He was basically very -- a very transient individual.

Q.      Now, was there also some guy that was in prison in Utah named Michael Miller that had written some letter?

A.      Yes.

Q.      And did you get to travel to the great state of Utah for that?

A.      Yes.

Q.      Could you tell us about that.

A.      Basically, he indicated by letter that he had information regarding the case and might be able to clear it. And we went over, and again did some background about why he was in prison and how long he had been in prison and those type of things, which basically led us to have concerns about what he might know.

And we did interview him, and it was typical of

Exhibit 5002 at 313

this, "You give me everything I ever ask for and get me out of prison, and I can solve your whole case."

And basically, those result with, "Well, as soon as you can show me some credibility, then we'll start moving towards your needs, but we have to have something."

And it was basically, uh, nothing of -- that, that -- he had nothing that somebody couldn't have gleaned from reading and following some of the stuff, that we could tell. And basically he just wanted to get moved to where he wanted to in the prison system and get what he wanted, and then maybe he could help us. But basically it resulted in nothing that indicates he had any information, or useful information or knowledge about the case.

Q.    Going back to June -- or July of 2000, within a couple weeks of the homicide team getting involved in this case, was a -- was the team, or was Coquille police contacted by an attorney in Roseburg by the name of David Terry regarding a woman named Alicia Michaud?

A.    Alicia Michaud. Yes.

Q.    And were you involved in interviewing Alicia Michaud on occasion?

A.    Which occasion?

Q.    Well --

A.    (Laughing.) On multiple occasions, yes.

Q.    Tell us about Alicia Michaud.

Exhibit 5002 at 314

*Craig Zanni*

A.    Alicia Michaud is a classic case of what happens when you become paranoid from excessive drug abuse, and it actually impairs your brain function -- my opinion.

Um, we interviewed her on multiple occasions because she claimed to have knowledge of -- of what happened to Leah Freeman, and how that all occurred.  And in each and every case the story she tale -- tells have been investigated and they do not hold up.  Uh, the time, the places she claimed things occurred aren't accurate.  The people involved we can account for, aren't where she said they were.

And I think when the -- in fact, the first time we interviewed her she was in a rehab group, and I think she has a fair amount of delusions.  And I'm not a doctor, but if there was -- if I ever thought I knew what the definition of that is, I think her picture would make a good definition because she -- she's just really messed up.

Q.    Her story, it's changed over every time you talked to her?

A.    Yes.

Q.    Though the basic story is, was Leah got run over by a car?

A.    Yes.

Q.    And when she first told you about this, was it -- did she say she was in the car, or somebody told you about the car, or was it a dream, a vision --

Exhibit 5002 at 315

*Craig Zanni*

A.    Well, as far as I recall, I think she said something about she was in either the car that -- I have to look at my reports because it's been a long time.  And I, quite frankly, try and forget what she told me.  And I find it frustrating just to think about it.

That she saw or was told by the persons directly involved that this is what happened.  And we were able to substantiate that the things that she presented out of that were not accurate.  That those people weren't in contact with her, and those types of things.

Q.    Right.  Did she also mention two individuals, Bill Sero and Tom Stemmerman?

A.    Yes, she did.

Q.    And was there efforts made to contact either individuals and see if they were involved in this at all?

A.    Yes.

Q.    And during the course of this investigation, did you find any credible evidence that connected William Sero or Tom Stemmerman to the death of Leah Freeman?

A.    No.  There's -- I couldn't even -- other than people claiming that that was a possibility, I've never been able to find anything to substantiate those claims, either physical, witness, any type of materials.

Q.    And just so we're clear, over the years you've worked on this case -- even though you were in the sheriff's

Exhibit 5002 at 316

*Craig Zanni*

office, you worked on this case over the years since Leah disappeared?

A.    Yes.

Q.    And in fact you've authored over 200 pages of reports?

A.    That I don't know, because I didn't count them.

Q.    Okay.  I'll show you one day.

A.    Okay.  Well, I did bring pictures of my dog in one of them.

Q.    Yeah, I saw that.  (Laughter.)

A.    I'll let him explain it.

Q.    Yeah, okay.

Now, over the years, any potential suspect or person of interest in this case, outside of Nick McGuffin, had any name that's come up through your investigation, at least the parts that you did, were you able to eliminate other people as suspects in this case?

A.    Yes.

Q.    The only person that you have not been able to eliminate through your investigation has been Nick McGuffin?

A.    That is correct.

Q.    All right.

Now, 2008, the case -- we got a new chief here in Coquille?

A.    Yes.

Exhibit 5002 at 317

*Craig Zanni*

Q.    Mark Dannels.

A.    Mark Dannels, yes.

Q.    And did he approach you about being on a cold case team to work on this?

A.    Yes, he did.

Q.    And starting in 2008 -- well, who was all on this cold case team?

A.    Um, there was a number of people.  There was myself; Tom Benz, who's retired from the state police; Sheriff Mike Cook, who's retired from sheriff's office; Larry Leader, who is a retired criminal division commander or lieutenant from the sheriff's office; Dale Oester, a retired investigator with the state police.  Um, I --

Q.    Did Jim Pex come in?

A.    Yeah, uh, Jim Pex, Lieutenant Jim Pex, who retired from the state police crime lab.

I think at some point Kathy Wilcox, a retired forensic scientist from the state police crime lab, has been involved.

And a myriad of people.  A lot of those people that I've named at some point were parts in the major crime team during their careers prior to their retirement.

Q.    And one of the things that had to be done was put the case back together, look at where the reports were, and the evidence and so forth.

Exhibit 5002 at 318

*Craig Zanni*

A.     Yes.

Q.     And you spent a lot of time in that regard, helping with the case?

A.     Uh, I spent a lot of times, uh, kind of as a ready reference to the case because I've tried to stay current with it and apprised to what's available, what information is coming up.  It's one of those that, you know, it -- if you could ever -- you know, you could have a special birthday wish, a resolution to those would be the best thing you could get.

Um, obviously because it involves a child, but it's like any other case.  You know that there's a way of resolving it if you can just find the right angle at this point in time.

Q.     Okay.  In going through some of the evidence that we've gone through, were there things that we found that were discovered in 2000 that were not brought to the attention of the team?

A.     There were numerous items, both physical evidence and witness information that, as reopening this case in 2008 has come to light, that -- I'll just use the word "shocking," but that's my opinion, I guess.  But, um, that -- that was not -- should have been available to investigators in the original investigation.  And had it been handled properly, would have been.  I'm being mean, but --

Exhibit 5002 at 319

*Craig Zanni*

GRAND JUROR:  Are you implying the original investigation via the police department or when the FBI -- from the time the FBI came on board?

THE WITNESS:  The FBI did -- what they did, they did very well.  But the problem was this case -- normally -- let me go back to when we were talking about the major crime team.  Normally what we do, and the most difficult part in a major case -- and I will tell you, if you ever get the opportunity to be a case officer, run for your life.

The case officer basically is supposed to be somebody has some experience, knowledge, and understanding of the program; where, as the information comes in, he evaluates it and tries to figure out where it should -- how it fits into the puzzle, what needs to be done with it, and if additional follow-up's needed and that type of thing.

So what we have done in years past is I ended up being the case officer on many of those cases.  Um, when it was a sheriff's office's case, I was the case officer, generally speaking.

So, what you try to do is have somebody who has that, to look at the case and basically manage it.

As an example, is a baseball team.  You have coaches, but you have the manager.  The coaches help the players, but the manager has overall control, and that would be the case officer.

Exhibit 5002 at 320

97

*Craig Zanni*

So as information comes in, he goes, Okay, this needs to go to the batting coach because this guy needs to work on -- he's going to be going against a left-handed pitcher.  And I hope I'm not losing anybody using a sports analogy, but left-handed pitcher, so he needs to work on his batting technique against left-handed batters.  Because he has to inherently know that, as a manager.

Well, a case officer is supposed to keep those things, and keep them organized.  And that's part of his job is to organize that information.

And what we have done, like when we had, as I mentioned before, small agencies, we would take them when they had an incident in their town.  We would try to develop their employees; say, "Okay, well, you have to have a case manager because it's your -- you know, in your city, it's your case."

Well, he doesn't have any experience.

That's okay.  We're going to put an experienced case manager to sit right there and walk him through it, so next time he'll know how.

Well, in this case, as I -- as it was brought up earlier, we offered to bring in the major crime team.  They decided to handle that in-house.  And when we finally did get involved, they assigned case managers who for all intents and purposes did everything they were capable of doing, but they

Exhibit 5002 at 321

had no experience and training.  And we were kind of held somewhat at bay to try and do that, to be involved more significantly to give them the opportunity to manage that.

In many cases, um -- you had an officer earlier in today who worked for Coquille.  When he was given that responsibility, we tried to help him as much as we could, but we were kind of -- at least, if nothing else, felt like we were being told, No, you know, you just stay back a little bit; we're handling this.  We -- we're on top of it.

So we tried to encourage him, give him -- we'll give him outlines and concepts of what he needed to do.  But I -- I don't think he was capable of doing it at that time, and we weren't allowed to get somebody who could involved.

BY MR. FRASIER:

Q.    That was -- it wasn't necessarily coming from Officer Hall that he didn't --

A.    No, Officer Hall was more than willing.  And many times he called, and I know as Larry Leader or -- at the time spent great lengths on him on the phone about, Okay, here's what you need to be doing, what you need to be looking at, here's how it needs to proceed.

At one point it was given -- unbeknownst to me, was a new -- an officer in Coquille, a female officer, who I later subsequently found out had never been to the academy. Had not even -- was not even through the training process, as

Exhibit 5002 at 322

*Craig Zanni*

a case manager.

GRAND JUROR:  Well, my kind of question is related to the evidence that you're saying has come up since then, that just was not --

THE WITNESS:  It was brought -- somebody discovered it, it was brought in, presented to the person in charge, and they basically went, "Oh, that's nice."

Although we might him -- want him investigating all the dog pictures, it never got to him that, Hey, look-it, we found another dog picture.  You might want to find out about this.  It didn't go where -- to the investigators in a manner that would in -- that would continue or enhance the investigation.

Boy, am I dumping on an employer?  (Laughter.)

BY MR. FRASIER:

Q.    Okay.  All right.

GRAND JUROR:  Couldn't, when that happens, it would go past a couple other people so that does have the practice --

THE WITNESS:  Normally, you know, it's one of those things, if you don't know, ask.

GRAND JUROR:  Yeah.

THE WITNESS:  You know.  But, you know, it -- there -- it's always one of those things is, is it wrong to not know?  No.  You can't know everything.  And so part of

Exhibit 5002 at 323

that is, you know, like you say, there's -- I -- I spent my career, part of my job is investigating major crimes and -- and dealing with people who were hardened criminals. And it was always fascinating to try and kind of play the mind game: What is their intention?

The real problem is, is generally most honest people don't -- it's a lot harder to figure out why they did certain things, because you don't spend that much time with them. And it -- and it gets kind of interesting to understand, okay, was it ego? Was it self-consciousness because they were afraid for somebody to know that they didn't know something?

And -- and then during those investigations you really don't have time to sit and play that game, you just want to get things done. And it gets --

GRAND JUROR: I know, but somebody could lose their -- lose their life over that.

THE WITNESS: Like I said, this is -- this is a -- the great example of why we've adapted and changed the rules that we have now. For example is if, um, we receive a call and some chief said, "No, I've -- we've got the problem, but we don't need you and we don't want you involved," I will tell you, I have -- since this case, there were a couple of cases where we had new chiefs come into town or something, different agencies that said, Well, I don't need you. And we

Exhibit 5002 at 324

said, Well, we don't care you need it, we're here, and this is now our investigation.  Because the DA is the lead prosecutor for any community or any county, and has authority to take that case away -- which the sheriff also does.  And on behalf of the sheriff who sent me here, you're not in charge anymore.  We'll take this.

Now, we want you to be involved, because it is your city, your department, and we're fine.  But we're not going to let you out there and just mismanage it.  It's not going to happen.

BY MR. FRASIER:

Q.    In this case -- and just a couple things.

Again, I don't want to sound like I'm picking on a lot of people.

Larry Leader or Lieutenant Leader was with the sheriff's office at that time?

A.    Mm-hmm.

Q.    And he was -- he's received a lot of training in interviews, interrogations, and things along that line?

A.    Yes, and he was a graduate of the FBI national academy.

Q.    And when the team did get involved, was he asked to be involved in doing any interrogations or interviews with anybody?

A.    No.

Exhibit 5002 at 325

*Craig Zanni*

Q.      Was like the service that Chief Reaves wanted him to do would be like walking down railroad tracks looking for evidence?

A.      Uh, yes.  And in fact I'll -- I'll just lay it out here.  I'm going to make some people mad, but life's tough in the big city.

Uh, Larry Leader -- one of Larry Leader's expertise is search and rescue.  When he was in the military, that's what he did in Alaska.  He was on a LRT team, which is long range patrol.  So Larry is -- and quite frankly is probably one of the most consummate woodsmans [sic] I've ever known or seen in -- in -- in -- at least in my life.

One of the things they did on many occasions during this investigation when we had teams out looking for Leah Freeman, he tried to provide input to the Coquille Police Department about looking.  And there is a process, and myself and many others go through because the sheriff's office responds to search and rescue.  There are trainings that -- how you conduct a search.  And in a case like this, how and where you conduct that search, and how you -- how you set up where you're going to search first and why those are of value.

For example, if you're searching for somebody that missed in a mountainous area, the first thing you do is you're not going to go check the top of the mountain, because

Exhibit 5002 at 326

people are going to go -- especially if they're hungry and wet and cold -- they're going to go downhill.  So you're probably looking from where they started downhill.  And there's -- there are actually computer programs that help you evaluate where you need to check.

And Larry is -- is probably the -- the best known expert in our area for this.  He was trying to give them ideas on where they needed to search first, and he was being overridden with -- of -- of his recommendations and stuff. "No, we don't need to check there right now; we need to check these areas."

And I know he was horribly frustrated, and he's just a much nicer guy than me because I would have just thrown a wing-ding fit.

And eventually, what happened was one of the -- when Leah's body was -- was found, what happened was one of the teams had come in from searching the areas that they had been directed by the -- the people running the Coquille case. And Larry said, "No, you need to go check this location."

"Why," was the question.

And he says, "It's quite evidenced from what we see, if this was a homicide" -- which at that time we were perceiving it was.  He says, "It's going to be a hasty body dump, they're not going to drive too far, and this is -- this is the one area that fits that criteria."  And as soon as

Exhibit 5002 at 327

*Craig Zanni*

they got out there, they found her body.

And this is probably at least a week after he'd been telling them, "This is where you need to check."

GRAND JUROR:  And by that, they slowed it up so they could have had forensic --

THE WITNESS:  Mm-hmm.

GRAND JUROR:  -- evidence.

GRAND JUROR:  So it would have only been five weeks instead of six?

THE WITNESS:  Well, it probably would have been sooner than that.  I'm being --

GRAND JUROR:  Okay.

THE WITNESS:  I'm trying not to be totally negative here.  I'm usually a happy-go-lucky guy, and I immediately find a lot of humor, but this is one of those cases that when we resolve it maybe I'll have some humor about some of those things, but until I do they're not quite there.

BY MR. FRASIER:

Q.    Since 2008, since the case has been re-opened, has the investigation been conducted in a manner that you believe, based on your professional opinion, is a competent way to do this?

A.    Absolutely.  I think it was very well done.  And just to trust that is one of the things is we had as many of

Exhibit 5002 at 328

*Craig Zanni*

the original officers who were involved there to provide information and resources, and we had a totally new set of officers go from step one and redo everything.

So, if we made a mistake, fine.  You know, you own up to it.  We made a mistake here.  It would have been better if we did that at that time, if we'd have known certain things.  We didn't.  Or we just made a mistake, you know.  We slipped up.  Fine.

And they went back and re-did each and every one of those steps.  And basically what they did is they did their own investigation.  And the former investigators, like myself, were there simply as a resource.  We didn't tell them what you should get out of this interview or anything else; we left them to do their job, and then basically compared it with what they got to what we got.

Q.    Okay.  I don't think I have anything else.

Is there anything that I forgot that I should have asked you?

A.    Um, how this relates to dog training.

Q.    Uh-huh.  We'll worry about that later.

(Laughter.)

GRAND JUROR:  Well, how do you know how to do it?

THE WITNESS:  Well, I lost my last dog.  I had to put him down three weeks ago.  So --

GRAND JUROR:  Sorry to hear that.

Exhibit 5002 at 329

THE WITNESS:  This is kind of -- this is kind of -- Mr. Frasier can explain how this is kind of the memorial service that -- of 25 years of bantering about dogs.

GRAND JUROR:  I got a question -- I got a question though, sir --

GRAND JUROR:  About the dog?

GRAND JUROR:  -- the transient person that was in that apartment complex that you said.

THE WITNESS:  Eldon Shandlon.

GRAND JUROR:  Yeah.  Did he have an automobile?

THE WITNESS:  Mm -- he did, but it was left in Powers, and it was gone through and processed and all that. It belonged -- I believe it was his grandmother.  Uh, Sergeant Young would remember because he dealt with her.  But it was his grandmother's, and there's no relationship to -- that we could find -- to that vehicle, that night.

In fact, without reading my reports I can't tell you for certain, but I believe he actually left before that date, if I recall.  I think he might have even left the day before or two days before.  I can't say -- I can't tell you that for certain because I haven't --

GRAND JUROR:  Okay.  And one other thing.  You said that -- and I may, I'm -- this is stunning.  You said there, your -- a minute ago, you said something about your -- was it the relation to how the investigation was done, that

Exhibit 5002 at 330

you were shocked or something?

THE WITNESS:  The fact that, well --

GRAND JUROR:  Well, no, I mean -- because, is there something --

THE WITNESS:  Well, for example --

GRAND JUROR:  -- where will you get the evidence? Like, is there more evidence --

THE WITNESS:  There's evidence, and I will -- and I will give you of example of that, is when they re-opened this case and were putting -- trying to process the files. And I don't know what -- I'm trying not to say something I shouldn't say, because there are rules.

But basically, when we have a case like this, it had been -- the people that worked for me and the people that I worked with and that I worked for, it has to have some kind of organization.  Usually, what you'll come down -- if you were to go into the Sheriff's office, you'd see a bunch of binders.  And they'll be broken down by forensic reports, officer interviews, witness statements, and those types things.  And they'll be alpha -- alphabetized, numerically in order, and some of it you'll have multiple binders.  Some of it will have just block sections of, with the -- the witness, and the key part of their statement that we want to know and how it relates, and there will be a relationship to a piece of physical evidence or supportive evidence of another

Exhibit 5002 at 331

statement.

When -- after Chief Daniels -- Dannels had talked to me about this, and we started moving forward, he got the files out.  And basically it was piles of reports stuck in a box.  There was no alphabet, number.  It was kind of like if you guys were taking notes, and I said, Now, we want you to make sense of what they do.  Okay, I'll do that.  And I just took and threw all of them in a box.

You have to sit down and go through that to process that, and that didn't happen.  And one of the big things that shocked me is one day Chief Dannels had come in and says, "Hey, what did you think of one of the suspect's interviews?"  And he was talking about the primary person of interest in this case.

And I go, "Well, he didn't really say nothing from what the report said."

He goes, "No, the taped interview."

And I'll tell each and every one of you, I get goosebumps now just thinking about it.  I go, "What taped interview?"

"Didn't you know that the chief had sat down and interviewed him and had tape-recorded it?  Have you ever heard it?"

I said, "I've not only not heard it --"

MR. FRASIER:  Okay.  Now we've got to stop

Exhibit 5002 at 332

because I ran out of tape.  (Laughter.)

THE WITNESS:  Just when you get a good story.

GRAND JUROR:  Speaking evil.

THE WITNESS:  We now break for commercial interruption.

MR. FRASIER:  I think what we need to do is take a break for a few minutes.  So why don't we stop for about five or ten minutes.

(Recording stops and resumes.)

THE WITNESS:  (continuing) -- always very -- how shall I put it -- sophisticated.  Always stood right, sat right.  And this is Cody the Cowboy.  (Laughter.)  If you happened to get in his way when he was doing a search, that was your problem because if you got bowled over -- which many officers found out, after having worked 13 years with this dog.  They're always used to a dog that would wait for them to get out of the way.  And then they subsequently quickly learned that when this dog came, get out of the way because he's not stopping for you.

MR. FRASIER:  Okay.  Where were we when the tape ran out?  I forgot what we were talking about.

GRAND JUROR:  Someone was asking a question.

GRAND JUROR:  I think we were pretty wrapped up and stuff, but you were saying about the evidence --

THE WITNESS:  Oh, the evidence.  We were talking

Exhibit 5002 at 333

*Craig Zanni*

about --

GRAND JUROR:  Oh, the tape.

THE WITNESS:  -- the tape.

And I was totally unaware.  I even asked -- and I've -- and -- and there's, there's some communication with myself and the other investigators who have retired.  I actually called them and asked them, "Were you aware that the primary person of interest in this case was ever interviewed on a tape?"  And most of their response was, "Well, that would have been really nice to know."  To have at least heard that and had some idea of what the response was.

Because part of what you do in this line of work is when people talk to you, people will tell you things whether they want to or not.  And part of that is, it's built-in, it's psychological, and you can control it.  But eventually, in any interview, parts of it will slip out, much is in handwriting analysis.  Things will come out that you don't want to come out, because we just do.

I want to give you an example of that.  Do you remember, about 12, 14 years ago there's a woman in, I think -- I believe it was in Kentucky, who drowned her children in the car?

GRAND JUROR:  Mm-hmm.

GRAND JUROR:  Uh-huh.

MR. FRASIER:  It was Georgia.

Exhibit 5002 at 334

*Craig Zanni*

THE WITNESS:  In Georgia, that's right.  I get all those places confused.  Traveling and driving around, it gets confusing.

The night -- first night she was on radio, there's a big story in the news.  She claimed a black man had abducted her kids, taken her car, and carjacked her.

In my experience and training -- and I am not an expert at it like many people are.  But the first night she was on there, she made a statement about, you know, I -- and -- and she -- her terminology, to explain it, I don't remember her exact words.  But when she spoke of her children, she spoke to them in the past -- of them in the past tense.

And the minute she said that I turned to my wife, I said, "She killed them."

And my wife goes, "How do you know that?"

I said, "Listen to what she said.  She said, well, she missed her kids and, you know, she knows they're -- they're -- they're much better now."  And I don't remember exactly what it was.  I said, but her terminology -- she's talking about those children.  They no longer live.  They are past.  And those kind of things creep into your terminology whether you want to or not, at some point.

Like I said, some people are better at hiding it than others.  But eventually, at some point, if you can talk

Exhibit 5002 at 335

to somebody, they will give you those little tidbits.  They will come out.

I would assume most of you have had children or been around children.  And it's always interesting when you talk to them, it's the same thing.  Everybody's heard as a child, or dealt with a child, when you said -- when they go, Well, how do you know that?  And a little bird told you.  And in fact the child told you, just by the way they said that.

You know, you say, "Who was the last one in the cookie jar?"

"Not me."  (Laughter.)

And you go, "Yes, you were."

"Well, how -- how did you know?"

"Well, a little bird told me."  Well, because those kinds of things are so engrained, we don't -- we don't even consciously do those.

And -- and I didn't lose the point, just in case you wondered.  That tape is much like that.  It would have been very interesting to have been -- had the opportunity back in 2000 when this investigation originally started, to know what was said, how it was said, and what went on with those because it would have been one more insight into where we could have gone with this.

MR. FRASIER:  All right.  I don't think I have any more questions for soon-to-be Sheriff Zanni.  (Laughter.)

Exhibit 5002 at 336

Does the grand jury have any questions for him?

THE WITNESS:  Please.

GRAND JUROR:  You had a question about the -- um, what do you call it?

GRAND JUROR:  Yeah, I don't know if it's for you, probably more than him.  But the mention of polygraphs has been brushed away several times --

MR. FRASIER:  Okay.  Polygraph evidence --

GRAND JUROR:  -- because they're not admissible in court, but we're not in court --

MR. FRASIER:  They are not --

GRAND JUROR:  -- so why are we not allowed to hear those?

MR. FRASIER:  They're not admissible in court. The rules of evidence apply to some degree to grand jury.

GRAND JUROR:  Oh, okay.

MR. FRASIER:  And because of that -- and again, I cannot stress strong enough.  You know, I've tried to tell people, Don't talk about polygraphs.  It's been brought up a couple times.  You cannot infer anything from a polygraph.

GRAND JUROR:  Right, right.  No, we're just -- I'm just curious on why it's being brushed away when we're not in court.

MR. FRASIER:  They shouldn't -- shouldn't talk about it.  So I don't want you to even consider it.

Exhibit 5002 at 337

*Patrick Smith*

GRAND JUROR:  Well, okay.  Yes.

MR. FRASIER:  All right?

THE WITNESS:  Okay.

MR. FRASIER:  Okay.

### TESTIMONY OF PATRICK SMITH

(Witness sworn.)

BY MR. FRASIER:

Q.    Why don't you hand me the -- the documents, there.  Thanks.

First of all, could -- well, first of all, this is the grand jury for Coos County and we're looking into the death of Leah Freeman.  Of course it's -- I have to advise you that we are recording the proceeding, even though it is obvious.  Okay?

A.    Yes, sir.

Q.    First of all, could you tell us your name, please.  And your occupation?

A.    I am Patrick Smith.  I am the police lieutenant for the City of Coquille.

Q.    All right.  And how long have you been with the City of Coquille?

A.    Since March 2005.

Q.    You came to work here after Leah Freeman disappeared; is that correct?

A.    Yes, sir.

Exhibit 5002 at 338

*Patrick Smith*

Q.    And during the time you came to work here, you became aware that there was this open case, open homicide case about Leah Freeman?

A.    Yes, sir.

Q.    And did you discuss this with Chief Reaves; the case, and so forth?

A.    I did.

Q.    Talked with him about trying to get the case re-opened, and things along that line?

A.    Yes, sir.

Q.    What kind of results did you have when you talked to the chief about this?

A.    Uh, little to none.  I mean, that is probably the best way to say it.  I mean, the -- when I first arrived there, the documents for the case and the case files and binders and stuff were, um, in complete disarray.  The documents were spewed all over various offices, so I probably spent the first two years trying to get everything back together and put everything back into some sort of orderly files and boxes and things of that nature, so we had everything at least in one location.

Q.    And in 2006 I wrote a letter to the department saying, These are the reports I have; I'm sure I have stuff you don't, and back and forth.

Did you talk with the chief about my thoughts of

Exhibit 5002 at 339

*Patrick Smith*

getting together and comparing notes and things along that line?

    A.    I think that's one of the things that probably sparked my interest in -- because it -- prior to that I didn't really even know anything about it.  Other than the fact that I had heard the name Leah Freeman, I didn't know anything that there was a -- an open case still on this.  So, after we received your letter, that's where I spent the next couple years trying to get everything back together again.

    Q.    All right.  No real efforts were made to work on the case during that time frame?

    A.    No.  Every now and then we might get a -- a tip would come in or something like that.  Someone might call in, but nothing of any kind of significance -- efforts was made in connection with the investigation.

    Q.    All right.  I want to direct your attention, I think it's to -- well, to -- is it 2007?  Matt Mandell (phonetic), Stacy Napier --

    A.    Yeah, that was probably the most intense type of investigation that we conducted.

    Q.    And in that time frame -- 2007, whenever it was -- did you -- had you received information originally, and I guess it went to the Coos Bay Police Department and then was referred to the Coquille Police Department, about a woman named Aubrey Shroeder in the Bend or Deschutes County

Exhibit 5002 at 340

*Patrick Smith*

area?

A.    Yes.

Q.    And she had described how an individual named Matt Mandell had told his girlfriend, who at that time was Aubrey Shroeder, about how he had been involved in disposing of the body of Leah Freeman?  How he personally had been involved in that?

A.    Yes.

Q.    And he had described to this Aubrey Shroeder about how Stacy Napier had been the one that run her over with the car?

A.    Yes.

Q.    Did you -- you got involved with that investigation to determine whether or not Mr. Mandell was giving a straight story in regards to that; is that correct?

A.    I did.

Q.    What was -- in checking out Mr. Mandell's background, did you try to figure out where he was the summer of 2000?

A.    I did.

Q.    And what did you find?

A.    I learned that Mr. Mandell was in custody at a juvenile facility -- correctional facility in Tillamook, Oregon.

Q.    And so he was not physically in Coos County when

Exhibit 5002 at 341

*Patrick Smith*

Leah Freeman disappeared.

A.    He was not.

Q.    And so he -- despite what he had been telling Aubrey Shroeder, he could not have been the one -- or he could not have been helping Stacy Napier get rid of the body?

A.    No.

Q.    Now, as part of your work at the -- at the -- at the police department, you're also the evidence custodian?

A.    I am.

Q.    And at my request today, did you provide to me the original documents -- some original documents that I asked to be produced?

A.    I did.

Q.    Okay.  One of those documents -- Nick McGuffin, when he was originally interviewed, did a handwritten statement about the time line and so forth?

A.    Yes, sir.

Q.    And Brent Bartley had done the same.

A.    He did.

Q.    And you guys have kept those originals in your custody since that time?

A.    We have.

Q.    And do those appear to be the copies of those two documents?

A.    Yes, sir.

Exhibit 5002 at 342

*Patrick Smith*

Q.    Okay.  In addition, were there other documents that I asked to be produced?  For example, in -- back in 2000, was Leah's room searched?

A.    It was.

Q.    And was a diary that belonged to Leah found there in the search of her room?

A.    Yes, a little black velvet diary.

Q.    Okay.  And does this appear to be a scanned copy of her diary?

A.    Yes, sir.

Q.    Were there other documents found?  Did Leah appear that she would maybe write a letter or a note to herself or something about Nick or something that she wanted to tell Nick but wouldn't give it to him in person?  And were those -- several of those documents produced?

A.    Yes.

Q.    I'm going to show you a couple.  These two there, and this one.

These -- those all appear to be documents that -- oh, here's another one.  Those all appear to be documents that came from Leah Freeman's room?

A.    Yes, sir.

Q.    Were some notes also found from Nicholas McGuffin to Leah that were written kind of odd on some paper?

A.    Yep.  They were kind of taped together, and they

Exhibit 5002 at 343

*Patrick Smith*

would make one big note.  And there were two of them, and these are them.

Q.    All right.  Now, back in 2000 there was a search of Leah's -- or, excuse me, Nick McGuffin's home.  Was his yearbook taken in that search?

A.    I believe so.  I have a yearbook that was taken during the search warrant.

Q.    Okay.  And does this appear to be pictures or scanned copies out of that yearbook?

A.    They are.

Q.    All right.  And this year -- wait a second.  Did I miss something?  (Pause.)

This year, a search warrant was -- well, let me back up.  When the case was re-opened back in 2008, was there -- that is maybe the one I'm looking for.  Yeah.

Did you and Chief Dannels, once he came on, did you guys go out and talk to Mr. and Mrs. McGuffin about this case, when you re-opened it?

A.    We did.

Q.    Could you tell us about the time you first made contact with them, how you guys got to know them, the request or whatever, and then how it went from there.

A.    Actually, it start -- started several -- probably, I want to say several weeks before we actually went to the McGuffins' house.

Exhibit 5002 at 344

*Patrick Smith*

Chief Dannels and I initiated a traffic stop on a, um, vehicle in the area of Fairview and West Central for a traffic violation, later determined that the driver of the vehicle was Bruce McGuffin, Nick McGuffin's father.

Chief Dannels was primary contact during the traffic stop, and he was driving the patrol vehicle, and he went out and subsequently contacted the driver.  I was standing back a little bit.  When Chief Dannels came back, I went, wow, this -- because the traffic stop seemed to go on for a long -- he was up there for like ten minutes.  He came back, and Chief Dannels and I got in the car.

After we left, he told me that was, you know, Bruce McGuffin, and they had gotten into this conversation and -- regarding, uh, the McGuffins coming forward.  They wanted us to look into certain elements of this investigation regarding Leah's disappearance.

Q.    And then, before the -- it became public knowledge that the investigation had been re-opened, as a courtesy, well, did you guys go out and talk to the McGuffins?

A.    Yeah, it was October -- in October.  Chief Dannels and I, on a Saturday, drove over to the McGuffins'.  It was pretty low key.  I think we weren't even in uniform.  We drove an unmarked car.  We drove up to Bruce McGuffin's house and we had contact with Bruce and Kathleen McGuffin,

Exhibit 5002 at 345

*Patrick Smith*

who is -- Kathleen is Bruce's -- or Nick's mother, Bruce's wife. And, um, sometime while we were there, during that conversation for a couple hours, Nick McGuffin arrived and we had an opportunity to talk with him for a short period of time as well.

Q.    Okay. Again in January of this year did you folks go out and talk to them, and let the McGuffins know that the case was going to be re-opened?

A.    We did.

Q.    How did they treat you when you went out there?

A.    Well, we pulled up in front of the -- Mr. McGuffin's house, and Bruce and Kathleen came out and Bruce started screaming profanities about "Get off the -- my fucking property," and things of this nature. And Kathleen was -- started crying, and she was spouting off things.

And so Mark tried to talk to them for a few seconds. They didn't have anything more to do with us, get off your property and leave.

Q.    Now, was it also made known to you from Mr. and Mrs. McGuffin that they had hundreds of pages of documents that would indicate the -- that Nick was not responsible for the death of Leah Freeman?

A.    During the -- our time the Chief and I went up to the McGuffins' residence back in October, a couple of months prior to that, they did make mention that they had hundreds

Exhibit 5002 at 346

*Patrick Smith*

of documents that they could supply that would help show evidence to exonerate Nick from this case.

Q.    Okay.  Did you ask them to give to you?

A.    We did.

Q.    Did they do it?

A.    Nope.

Q.    In January, again after this -- actually, it was the same that Mr. McGuffin told you guys not to come back without a search warrant, was an application made for a search warrant for the McGuffin property?

A.    It was.

Q.    For these documents?

A.    Yes, sir.

Q.    And at that time was the search warrant executed?

A.    Yes, sir.

Q.    And was there a bunch of documents in there that seemed to pertain to the Leah Freeman case?

A.    Yes, sir.

Q.    And were a bunch of those seized -- were they all seized?

A.    Yes, sir.

Q.    Now, today -- just a couple of documents here, that you -- one of the documents that you found appeared to be a document where one of the McGuffin parents was writing about a future trial?

Exhibit 5002 at 347

124

*Patrick Smith*

A.    Yes, sir.

Q.    And where Nick McGuffin, according to this document, was found guilty of murdering Leah Freeman?

A.    Yes, sir.

Q.    And that was one of the documents that was seized?

A.    Yes, sir.

Q.    And this document -- I'm referring to the paragraph that is second from the top, there -- was that another one of the documents that was seized back in January 2010?

A.    It was.

Q.    And could you read that paragraph for us, the second paragraph.  This one right here.

A.    Yep.

"Bruce told" -- and I can't quite tell how -- the second name is.

But "Bruce told" somebody "that he" something "north.  Don't be surprised if he shows you an attitude.  Somebody said, Well, I have nothing amongst" --

And it's N, period, so I'm assuming that's Nick.

-- "amongst N. that all say that.  And yes N. has a problem c," slash under it, "them, all of them, us included."

Then there's a line that says, "Lying, cheating,

Exhibit 5002 at 348

*Patrick Smith*

et cetera."

Q.    I'm back at 2000 now, when the search was done originally on the home.  Was there a note written by Mrs. McGuffin to Nick that was seized?

A.    There was.

Q.    And does this appear to be a copy of that?

A.    It is.

Q.    The last paragraph -- full paragraph there.  Would you read that for us, please.

A.    "I hope you calm down, because I'm worried you get too angry.  I hope you have a happy life, and we do care a lot about you.  Please take care of" -- some ticket.

Something, "is your responsibility."

Something about "your insurance card."

"Three current, not my" something "all part.

Love, Mom."

Q.    I don't think I have any other questions for Lieutenant Smith.

Is there something else I could have asked?

A.    Well, to -- should I make a reference regarding this?

Q.    Sure.

A.    Uh, I do remember during the search warrant, when we found these documents, um --

Exhibit 5002 at 349

*Patrick Smith*

Q.    And this is the document about the trial?

A.    This is -- yeah, the document about the trial.

Um, and I think it was Bruce commented something that they were writing a book about the incident, and this was one of the pages from that book that they were writing. This is a book that he intended on having published some day.

MR. FRASIER:  All right.  I don't think I have any other questions for the lieutenant.  Does the grand jury want to ask him anything?

Oh.  I know.  I got one other question.  I forgot.

BY MR. FRASIER:

Q.    Part of this case involved the McGuffins claiming that Alicia Michaud knew something about this case?

A.    Yes, sir.

Q.    And there was a letter, supposedly that Alicia had written to Nick McGuffin, and that they eventually at some point in time turned over, at least to the sheriff's office?

A.    Yes, sir.

Q.    Does that appear to be a copy of that letter?

A.    That's it.

MR. FRASIER:  Okay.  I don't think I have anything else to ask you.

Grand jury want to ask him anything?

Exhibit 5002 at 350

GRAND JUROR: Well, I -- it may be -- maybe about -- no.

MR. FRASIER: Okay.

GRAND JUROR: I'll ask you later.

**TESTIMONY OF KRIS KARCHER**

(Witness sworn.)

BY MR. FRASIER:

Q.    First of all, this is the grand jury for Coos County, and we're looking into the death of Leah Freeman.

A.    Mm-hmm.

Q.    And it's obvious, but I have a recorder going --

A.    Yes.

Q.    -- recording you.

A.    Mm-hmm.

Q.    And first of all, could you tell us who you are and what your occupation is.

A.    My name is Kris Karcher.  I am a forensic nurse for the county and I'm the chief deputy medical examiner.

Q.    How long have you been the chief deputy medical examiner?

A.    Um, the day after we found Leah was the very first day as the chief deputy medical examiner.  Up to that point I had been, um, part-time.

(Pause.)  So about 11 years?  What is -- what is it?  11 years?

Exhibit 5002 at 351

*Kris Karcher*

Q.    It's been ten years.

A.    Ten?  Ten years.

Q.    Why don't you tell the grand jury a little bit about your background, your training, what -- and what you do.

A.    Um, I -- I was an emergency room nurse for, oh, about 15 years.  And then I went back to school and got a master's level certificate in forensic nursing.  And, um, so now I -- I basically am a death investigator.

Um, I do -- probably half of what I do for the county are live victims of violence.  So I look at a lot of wounds, a lot of strangulation, that kind of thing.  And then do all of the death investigation for the county.

Q.    And as part of your work, you're assigned to work with the major crime team?

A.    Yes, I am.

Q.    And so when they have a homicide or a death, you're involved in recovery of the body, preservation of the body at least through autopsy, and so forth?

A.    Yes.  Mm-hmm.

Q.    In this case, August the 3rd of 2000, the body of Leah Freeman was found off of Lee Valley Road in Coos County?

A.    Yes.

Q.    And did you respond to the scene?

A.    Um, I was actually with the group that found her

Exhibit 5002 at 352

*Kris Karcher*

that morning --

Q.    Okay.  Well, why don't you --

A.    -- or that afternoon.

Q.    Why don't you tell the grand jury what happened.

A.    Uh, this happened to be a day that there were three detectives:  Two detectives from Coos Bay, a detective from North Bend, and myself.  All of us had a day off, is how we got there.

We, um, went to the sheriff's office.  We talked to one of the lieutenants there, um, and said, "We have a free day; we are going to go look for Leah.  Where do you think we should look?"  And he gave us three spots on a map to go and look, and Lee Valley Road was the -- the last place, um, at the end of the day that we went to check.

Um, a couple of the detectives were down by the creek off of Lee Valley Road, and myself and another detective were walking the road -- the roadside, um, along the shoulder of the road.

Um, the detective -- the two detectives down below, um, actually smelled something.  They were walking along the creek bed; the road's up here.  Um, they smelled something and so they walked towards the road and found Leah's body.

And then they called us, and we all kind of converged there and got the -- the major crime team going at

Exhibit 5002 at 353

*Kris Karcher*

that point.

Q.    All right.  Now, once the body was found, pictures were taken and so forth of where she was found?

A.    Yes.

Q.    And I believe the pictures have been already circulated to the grand jury, so they've already seen the scene, and so forth.

A.    Mm-hmm.

Q.    Could you describe for us the condition of the body, where -- and how it was positioned and so forth.

A.    Um, the -- she was badly decomposed.  Um, some -- there was some leg tissue.  Um, the organs were basically all, um, disintegrated and, um, decomposed.

She appeared to have like rolled down the bank. She was laying on her back, but one arm was kind of underneath her, one arm was across the front of her.

Um, there had been some rodent activity.  You could see bites in her clothes.

Q.    The leaves and branches and stuff?

A.    Right.  There was -- um, she was down in the foliage.  Um, some of the foliage was over her, and stuff, and --

Q.    Yeah.

A.    Yeah.  There were leaves and stuff that were -- she had been there for a period of time.

Exhibit 5002 at 354

*Kris Karcher*

Q.    Okay.  The body, when it was removed -- was a, like a piece of plywood brought in, and she was --

A.    Right.  We brought, um, a piece of plywood down, and then just kind of scooted it underneath her; kind of, pulled her up onto it.  And then put that in a bag and took that on, um, for autopsy.

Q.    The next day was the autopsy; is that right?

A.    Yes.  I think it was the next day.

Q.    And once the body had been removed -- and was it obvious, or did you see discoloring on the ground where the body had been laying?

A.    Right.  She had been laying there for a while. There was an area of decomp.  It's usually a dark -- darker color, um, where the body fluids as they -- as you decompose, had gone into the ground.

Q.    How do I want to put this?  When you say she had been there a while, what do you mean?

A.    She -- she had been there for several weeks.  Um, it -- probably from the time she disappeared.  Um, it would be consistent with that.

Q.    At autopsy, Dr. Olson was the autopsy surgeon?

A.    Yes, he was.

Q.    And you were present there?

A.    Yes.

Q.    What did you -- what was found at autopsy?

Exhibit 5002 at 355

132
*Kris Karcher*

A.      Not much as far as injuries or, um, causation. There was really nothing found.  She was just badly decomposed.  There were no organs really to, um -- to -- to examine.

Um, he found the hyoid bone.  The hyoid bone is in the neck.  You sometimes will hear it on news when they find a decomposed body or, um -- they will try to determine from a fracture or injury to the hyoid bone whether or not there has been a strangulation.

So, we -- he found the hyoid bone.  It -- it actually was in three pieces.  It doesn't fuse; that's how it comes.  Um, it comes in three pieces, and then it fuses together about age 21.  Hers was still in three pieces; it didn't look like there was any injury to it.

Um, as far as any other injury, we really didn't find any injuries or cause of her death at that point.

Q.      Sometimes in examining a body, if someone has been shot, you can look, say, find the bullet hole in the head, or look at the ribs or at the bones and see if there's any injury caused by a bullet.

A.      Right.  It would be highly unlikely to be shot and not have an injury to a bone.  Um, but it would be -- if -- and -- nothing -- and no injury to clothes.  Um, you would expect to find a bullet hole someplace.

Q.      The clothes were sent to the crime lab; no bullet

Exhibit 5002 at 356

*Kris Karcher*

holes were found in the clothes?

A.    No.

Q.    Was an attempt made to examine, say, for example, her ribs and so forth for knife marks, or --

A.    Right.  Um, when you're stabbed, you're often -- it often leaves marks on the bones.  It'll cut the bones; it'll scratch the bones.  Um, ribs.  Because to kill somebody by stabbing them is usually going to either be the neck or the chest area.

So, all the ribs were removed and each one was examined, um, for any sort of marks from a knife, and none were found.

Q.    Okay.  One of the rumors floating around town has been that Leah was shot in the head.  Her skull was examined?

A.    Yes, her skull was examined.

Q.    And there -- was there any indication of her skull -- uh, that she had been shot in the head?

A.    None.  No.

Q.    Were there any fractures in the skull?

A.    No.  There -- there was no injury to her skull.

Q.    Another rumor floating around town is that her teeth were pulled or -- and she was wearing braces at the time she disappeared -- or that her braces had been ripped out.  What can you tell us about her teeth and so forth?

A.    Her -- all of her teeth and braces were intact.

Exhibit 5002 at 357

*Kris Karcher*

In fact, that's one of the first things that was kind of -- you will see from the pictures too, that -- kind of startling. The -- you know, the mouth was open, but he saw all of her bright, shiny braces. Yeah, they were all intact.

Q. Okay. Another rumor is that all her fingers were cut off.

A. No. She had all of her fingers. And there were no injuries to them.

Q. Okay. Now, as part of this investigation, one of the things that you were trying to determine was if Leah had ingested some sort of controlled substance prior to her death.

A. Yes.

Q. The tissue that remained, some of that was able to be sent for some examination?

A. Right. They took some muscle from her leg, and sent it off for toxicology.

Q. And you're not able to test for all controlled substances?

A. Right. It's -- it's limited to the -- to the main, um, drug categories.

Q. And that lab report was attached to the autopsy report?

A. I believe it is, yeah.

Q. All right.

Exhibit 5002 at 358

*Kris Karcher*

A.    Mm-hmm.

Q.    And actually Leah was positively identified based upon her teeth and her braces and so forth.

A.    Yes, it was.  She was dental, um, positive.

Q.    Are you familiar with a procedure involving a maggot casings?

A.    Yes.

Q.    Why don't you tell the grand jury about that.

A.    Um.  Well, just a quick little summary of maggots.  When a maggot goes through its life-cycle, it -- the egg gets laid, it turns into a maggot.  Um, at some point it crawls from its food source.  If it's big enough, warm enough, whatever, it crawls away.

And it usually crawls like in a northeasterly direction about 4 to 10 feet away from the body, buries itself in the soil, and it becomes a cocoon like, um -- and they -- the shell of that cocoon is called a pupa.  That's P-U-P-A.

And, um, pupas then, the -- the maggot as it manifests itself into a fly, um, will come out of that pupa -- pupa, and will crawl out of the dirt and fly away.

Well, you can go back to a site and actually dig those pupas up.  And they are made of protein, and so if -- if the body that they have been feeding on died of drugs or had drugs in their system, it will be in that protein.

Exhibit 5002 at 359

*Kris Karcher*

And so we went out and spent some time, knowing where we might find the large portion of them, dug those up, sent probably 100 of these little casings off to the FBI lab. And then they rehydrate them and test them. And those were negative as well, for illegal -- the main illegal drugs.

Q.    There has been a -- since 2000, there has been a considerable amount of investigation trying to figure out who is responsible for Leah's death. One of the things that I want to ask you about: Was there an attempt made to see if you could find any DNA on Leah's clothing?

A.    Yes, there was.

Q.    And at the time in 2001, 2002, was there a discussion about if we could find what's sometimes referred to as touch DNA?

A.    Yes.

Q.    Could you tell the grand jury what touch DNA is.

A.    Touch DNA is, um, a DNA process. They swab where they think someone might have touched someone's clothes. Um, they're now doing it on skin and all sorts of things, but back then it was a relatively new process.

And it was the feeling that she had a metal, uh, button on her jeans. And so it was real hopeful that maybe there was DNA on that button, as well as other places on her clothes.

They look at places where people might have

Exhibit 5002 at 360

*Kris Karcher*

grabbed somebody, picked them up to move them; like under the arms. Um, you know, under the knees. Someplace where they've been picked up, they can sometimes get a transfer some -- somebody's hands, that's moved them, onto their clothes.

Q. In this case did you do some research to try to figure out who would do that type of testing back in 2001, 2000?

A. Right. Um, what we found was, is that there was a -- the labs in the United Kingdom, their forensic labs. They consistently are about five to ten years beyond the United States, and they were doing touch DNA.

And they were able to take DNA, and -- it's a process of replication. And they -- they exceeded the recommended, um, amount of replications here in the United States. They just -- they -- their testing was a little more sensitive than what we could do.

So all of the clothes we gathered up and, um, another detective and myself took them over to England, um, and they processed all those clothes.

Q. Unfortunately, you didn't get any results?

A. We did not get any results. There was no DNA, uh, found on her clothes.

Q. Now, since the death of Leah -- and the grand jury's heard this from a couple people so far -- there's been

Exhibit 5002 at 361

some rumors running around that Leah was killed by being hit by a car and run over.

As part of your duties as the medical examiner, are you also assigned to what's referred to as the crash team?

A.    Yes, I am.

Q.    Why don't you tell them what the crash team is.

A.    Uh, the -- the crash team is a motor vehicle crash reconstruction team.  And it -- it involves, um -- there's members of the team.  Um, there's a reconstructionist that does all the mathematical stuff, deciding how fast somebody might have been going.  There's some techs that help with measurements and all that thing.

And then my responsibility on the team is to look at the biomechanics of impact.  I look at injuries that people have sustained in a crash, and try to figure out what might have caused those injuries; what force might have caused those injuries.

Q.    And the crash team, in addition to looking at people that are inside of cars that were injured as a result of the car crash, also looks at cases where a car may have hit a pedestrian or something along that line.

A.    Yes.  We're called out on all pedestrian-vehicle crashes.

Q.    Can you tell the grand jury, in your experience

Exhibit 5002 at 362

*Kris Karcher*

when you're looking at someone who has been hit by a car that has been given an -- a fatal injury, or injury that killed them --

A.    Mm-hmm.

Q.    -- what type of things are you going to look for in a person's body for that?

A.    Well, first of all it would be highly unlikely that you would not have a fractured leg, right off the bat. Um, I have never seen anyone hit by a car, um, that -- in fact, I don't know that I've seen many that have been hit by a car that have survived that didn't have fractured legs. Fractured legs and heads, shoulders, elbows, seem to be the -- the main thing.

Usually, you're hit in the bumper in the leg, hit, and then you're thrown up on the -- on the hood of the car, impacting the -- the windshield or the A pillars. Shoulders, elbows, heads.  Um, so there's really distinctive injuries to a pedestrian being hit.

Q.    And do you often -- as part of your training, do you also look at their clothing?

A.    Yes.

Q.    And what type of things are you looking for there?

A.    You're looking for an imprint from the bumper. Um, you're looking for any sort of tears.  You're looking for

Exhibit 5002 at 363

140
*Kris Karcher*

the, um -- any sort of defect of the clothes that might have been caused by the vehicle, or might have been left on the vehicle that you can go back to the vehicle and find, like the imprint of jeans under the, the bumper.  Those kind of things.

Q.    In addition, if somebody's been hit by a car, and they bounce off the car and then hit the ground, is there things you're going to be looking for there?

A.    Right.  Any defect in the clothes.  Um, is that what you --

Q.    Sometimes referred to as road rash?

A.    Oh, yes.  Yeah.  It'll tear the clothes.  It'll tear the skin underneath it.  It'll remove the -- the fabric.  It will, um -- are you all familiar with road rash?

GRAND JUROR:  Uh-huh.

GRAND JUROR:  Yes.

THE WITNESS:  Um, it's just like an abrasion -- that skidding, sliding.  Well, it would do the same to clothes as well as the skin underneath.

BY MR. FRASIER:

Q.    In the examination of Leah Freeman's body, did you find or was there ever -- was there any broken bones found?

A.    No broken bones.  Her body was x-rayed from head to toe, as well.

Exhibit 5002 at 364

Q.    And in looking at her body, was there anything that caused you to believe, or -- well, that caused you to believe that she had been hit by a car with sufficient force to cause her death?

A.    No, there was not.  There were no defects in her clothes except for rodent activity.

Q.    That was my next question there.

A.    Oh, sorry.

Q.    Her clothes didn't show --

A.    No.  Mm-hmm.

Q.    -- any indication that she had been struck by a car?

A.    No.

Q.    Finally, I'm going to jump ahead so I don't have to bring you back at a later day --

A.    Okay.

Q.    -- if it's okay with you?

A.    That's fine.

Q.    Okay.  (Laughter.)

This year, during the course of the investigation, of course, there were the story about Leah having been hit by a car and causing her death.  And one of the cars supposedly was a car that Kristin Steinhoff had in her possession, which was a Kia automobile.

A.    Mm-hmm.

Exhibit 5002 at 365

Q.    And that car was purchased by the police and the district attorney's office earlier this year?

A.    Mm-hmm.

Q.    And did you help process that car?

A.    No, I did not.

Q.    Okay.

A.    Yeah.  I didn't process that car.  I processed the Mustang.

Q.    Okay.  And the Mustang that had belonged to Mr. McGuffin, Nick McGuffin at that time?

A.    Yes.

Q.    Did you help process that car again this year?

A.    Yes, I did.

Q.    What, if anything, did you find?

A.    Well, we didn't find a whole lot, but we did find, um -- we processed it by like vacuuming the trunk, um, taking some swabs off the inside of the -- the ceiling.

Um, they found a couple of, um, hair -- arm hairs, um, that we -- were in the vacuum filters of the trunk.  Uh, those arm hairs have little frays on the end of them that, um -- and it had little globules in them.  Now, this is microscopic, very microscopic.  Had little gob -- globules in there that is oftentimes seen with painters, somebody that's been painting.  That's paint in the arm -- in the -- in the hair.

Exhibit 5002 at 366

*Kris Karcher*

Um, and I don't believe that we were able to get DNA on those.

Q.    Okay.  Now, Mr. McGuffin, at the time that the car was in his possession, the rear quarter panel on the left side had been damaged, and that had been repaired?

A.    Yes.

Q.    And you saw that car back in 2000, did you?

A.    I did see that car back in 2000.

Q.    And, that rear quarter panel had been painted with primer, but it hadn't been painted the real color of the car yet, had it?

A.    Right.  It was just primer over the bumper -- or over the back fender.

Q.    Okay.  So the car, at some point in time, was going to need to be painted?

A.    Yes.  Mm-hmm.

Q.    All right.  So the fact that we found arm hairs with paint on it probably would indicate they came from Nick McGuffin, the owner of the car?

A.    Yeah.  Somebody that was painting.  Yes, you bet. Mm-hmm.

MR. FRASIER:  All right.  I don't think I have anything else to ask Ms. Karcher.  Does the grand jury want to ask her anything?

GRAND JUROR:  I do.  If it -- if the body was

Exhibit 5002 at 367

*Kris Karcher*

decayed, can you still tell if it had bruises on it, or anything?

THE WITNESS:  Uh, not -- not as well.  No. Mm-hmm.

GRAND JUROR:  Okay.

THE WITNESS:  And the leg muscles didn't have any bruising on them.  The upper body was really badly decomposed.  Ribs were exposed, all the organs were --

GRAND JUROR:  Yeah, and there's no way to tell if she was suffocated or --

THE WITNESS:  No.  Mm-hmm.  Mm-hmm.

GRAND JUROR:  Do you -- did you find a cause of death?  A probable/possible cause of death?

THE WITNESS:  No.  We --

GRAND JUROR:  Because it sounds like any of these could have --

GRAND JUROR:  Doesn't say there was any blood.  I mean, not much blood.

THE WITNESS:  I think that --

GRAND JUROR:  We don't --

THE WITNESS:  -- further on, I think.

MR. FRASIER:  What's that?

THE WITNESS:  The blood issue.

MR. FRASIER:  Oh, they found the blood on the shoe, and it's --

Exhibit 5002 at 368

THE WITNESS:  Mm-hmm.

MR. FRASIER:  Uh, yeah.  Yeah, they know -- I think they already know about that.

GRAND JUROR:  But --

GRAND JUROR:  Yeah.

GRAND JUROR:  I, uh --

GRAND JUROR:  And is that all?  Except for the clothes?  Or is this further on, up on --

MR. FRASIER:  Again, we'll have to wait.

GRAND JUROR:  Okay.

THE WITNESS:  Yeah.

GRAND JUROR:  Um, now you were up on the road when they found Leah's body?

THE WITNESS:  Yes.  Mm-hmm.

GRAND JUROR:  And you could not -- you couldn't see the body from the road?

THE WITNESS:  We were not as far down.  Once -- once we knew where the body was, you could go to the edge, and she was maybe six feet down an embankment, laying.

GRAND JUROR:  Yeah, I -- I know -- I know --

THE WITNESS:  She was just -- but --

GRAND JUROR:  I know the spot.  So --

THE WITNESS:  Right, but it's -- you know, it's -- it's shaded.  Um, it wouldn't be -- the smell would get your attention before that.

Exhibit 5002 at 369

146

*Kris Karcher*

The other thing that was noticeable when we came was it looked like there was a path that somebody -- the grass was tall along the shoulder of the road, but that area it looked like there was a path; that maybe somebody had walked over to the edge and looked down.  The -- the thing -- the -- um, the foliage was kind of down.  It could have been an animal, you know, coming back and forth through there, but, um, I did notice that.

GRAND JUROR:  Um, I -- that was, that was my question, was, was the foliage -- no doubt if she was thrown over the hill.  That, I mean -- that's kind of obvious.  That anything was mashed down would have had time to --

THE WITNESS:  Oh, yes.

GRAND JUROR:  Six weeks.

THE WITNESS:  Mm-hmm.

GRAND JUROR:  -- to stand back up?

THE WITNESS:  Mm-hmm.  Yeah.  You had to know that she was there, and you had to walk all the way to the edge to look down and see her.

GRAND JUROR:  By the position of the body, was it like they just dumped her?

THE WITNESS:  Yes.  Yes.  I think they just dumped her from the top and she rolled down, or -- there was a roll involved.  Maybe it was closer to the bottom, but --

GRAND JUROR:  Her legs crossed over, like she

Exhibit 5002 at 370

*Kris Karcher*

just --

THE WITNESS:  Mm-hmm.

GRAND JUROR:  -- tumbled?

THE WITNESS:  And one arm was in front, one arm was in back --

GRAND JUROR:  Right.

THE WITNESS:  -- like she had been --

BY MR. FRASIER:

Q.    Just so we're clear, Dr. Olson in his autopsy report, he signed the death certificate for Leah?

A.    Yes.

Q.    And he declared her death to be a homicide --

A.    Yes.

Q.    -- is that correct?

A.    Homicidal violence.

Q.    Of undetermined nature?

A.    Of undetermined nature.

GRAND JUROR:  How is that possible?  I'm confused on -- there was no signs of strangulation, stabs, gunshots --

THE WITNESS:  Um, do they have -- have they had the shoe testimony yet?

MR. FRASIER:  The -- they have been told about Leah Freeman's --

THE WITNESS:  Okay.

MR. FRASIER:  -- shoe being found, and also that

Exhibit 5002 at 371

*Kris Karcher*

they -- I gave them the lab reports earlier today about the shoe with the blood on it.

THE WITNESS:  Right.  And that was Leah's blood. And that was high-velocity blood that usually comes -- you can get it, like, if you're shot; the blood that sprays out. You can also get it when you cough, or, um, sneeze, something like that.

MR. FRASIER:  Right.

THE WITNESS:  Um, so, based on that, based on that she's been dumped, um, that's how he comes up with the homicidal violence.

GRAND JUROR:  But there's no broken bones?

THE WITNESS:  No broken bones.

GRAND JUROR:  No stabs?  No shots?

THE WITNESS:  No.  Um --

GRAND JUROR:  No strangulation?

THE WITNESS:  The hyoid bone that was intact does not -- you don't always break that.

GRAND JUROR:  Right.

THE WITNESS:  Um, and you don't always see that, like with manual -- or with ligature strangulation, which we wouldn't have been able to determine.

GRAND JUROR:  What --

THE WITNESS:  So.

GRAND JUROR:  What if she was stabbed in the

Exhibit 5002 at 372

*Kris Karcher*

place where she bled to death, but she didn't --

THE WITNESS:  And that's a possibility, but it -- it should have involved the clothes or we should have found blood on the clothes.

GRAND JUROR:  Mm-hmm.

GRAND JUROR:  And she was fully clothed, except she had no underpants, right?

BY MR. FRASIER:

Q.    And you --

A.    Yes.

Q.    -- you assisted in undressing her?

A.    Yes, uh-huh.

Q.    And the picture I've got there, marked 2, that supposedly a picture --

A.    This is -- this is what she was wearing, right here --

Q.    All right.

A.    -- with the jeans and the white -- um, it's actually a man's undershirt over a sports bra.  And that's what she's wearing.

GRAND JUROR:  And the -- the crotch of these pants was taken for samples for sexual assault?

THE WITNESS:  Uh-huh.  Mm-hmm.

GRAND JUROR:  And it was undetermined?

THE WITNESS:  Undetermined.  There was too much

Exhibit 5002 at 373

*Kris Karcher*

decomposition.

GRAND JUROR:  And we had another thing, too. That, uh -- that -- a couple of people have said there was like straps.  Well, she had a sports bra on, so when they seen her, could that look like it was cross straps, or more straps in the back?

THE WITNESS:  Well, what she did was she -- in the back, she had them tied in the back, so that it was --

GRAND JUROR:  Oh, she had them tied?

THE WITNESS:  Yeah, she had them tied in the back.

GRAND JUROR:  Yeah, it's, uh -- it's kind of typical of all of the young ladies that participate in sports.

THE WITNESS:  Uh-huh.

GRAND JUROR:  Right.  Yeah.

THE WITNESS:  Mm-hmm.

GRAND JUROR:  Mm-hmm.

THE WITNESS:  Yeah.

MR. FRASIER:  Okay.  Any other questions?

GRAND JUROR:  I do not believe so.

MR. FRASIER:  Okay.

THE WITNESS:  Good luck.

GRAND JUROR:  You too.

GRAND JUROR:  Thank you.

Exhibit 5002 at 374

*Certificate*

(Conclusion of recording.)

--oOo--

I certify, by signing below, that the foregoing pages 1 through 151, inclusive, constitute a correct transcript of wav recordings provided of the above-entitled matter, this 3rd day of December, 2010.

_____

PEGGY S. JILLSON, TRANSCRIBER

Exhibit 5002 at 375

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

**STATE OF OREGON,**              )
                                 )
          Plaintiff,             )   Case No. 10-CR0782
                                 )
v.                               )
                                 )
**NICHOLAS MCGUFFIN,**            )
                                 )
          Defendant.             )
_____ )   Volume 4

Friday, July 23, 2010 (AM Testimony)

GRAND JURY PROCEEDINGS

APPEARANCES:               **PAUL FRASIER**
                           **DISTRICT ATTORNEY**
                           125 East Eighth Avenue
                           Eugene, Oregon 97401

TRANSCRIBED FROM AUDIO RECORDINGS

TRANSCRIBED BY:            Peggy S. Jillson
                           987 Tivoli Street
                           Eugene, Oregon 97404
                           (541) 689-7964

Exhibit 5002 at 376

**TABLE OF CONTENTS**

**WITNESS INDEX**                    **page**

WETMORE, Anthony                3

LANDMARK, Amanda                10

MESSERLE, Tony                  13

STIDHAM (Kindred) Lyndee        20

LAPINE, Daniel                  27

MYERS, (Cannon) Quinn           37

BAUMER, Michael                 53

GRAHAM, Dustin                  63

MASON, Damon                    76

STORTS, Jennifer                86

BARTLEY, Brent                  97

Exhibit 5002 at 377

3

*Anthony Wetmore*

**COQUILLE, OREGON; FRIDAY, JULY 23, 2010, 12:17 P.M.**

-o0o-

**TESTIMONY OF ANTHONY WETMORE**

(Witness sworn.)

BY MR. FRAZIER:

Q.    First of all, sir, this is the grand jury for Coos County, and we're looking into the death of Leah Freeman. I need to tell you, even though it's obvious, we're recording you. Okay?

A.    Yes, sir.

Q.    First of all, could you tell us your name and your occupation, please.

A.    Anthony S. Wetmore. I'm a police officer with the City of Coos Bay Police Department.

Q.    How long have you been with the police?

A.    I've been at the police department since 1993, first three years as a 9-1-1 dispatcher, and then on the road as a -- either a patrol officer or a detective since '96.

Q.    In the year 2000 were you assigned to work on the detective or investigations division of your (indiscernible) department?

A.    Yes, I was.

Q.    And in the latter part -- well, in July of 2000 were you asked to assist with the major crime team in the investigation of the death of Leah Freeman?

Exhibit 5002 at 378

4

*Anthony Wetmore*

A.    Yes, I was.

Q.    Or a missing Leah Freeman?

A.    Yes, I was.

Q.    Directing your attention now to August the 3rd of 2000, were you working that day?

A.    Yes, I was.

Q.    Was that actually a day off for you or something?

A.    I don't believe it was.  I believe it was a regular day, if I recall.

Q.    All right.  When you came in, did you team up with a couple of people that day?

A.    Yes, I did.  We went out to breakfast, either during or at the start of our shift, I don't recall.  But it was with Detective Curt Bennett from North Bend PD, Detective Cal Mitts, who's also from Coos Bay PD, and medical examiner Kris Karcher.  And we had breakfast and discussed what we were going to do.

Q.    Now, did you actually come in to talk to Chief Reaves and say, Hey, what do you want us to do today?  Or did you guys kind of formulate your own plan?

A.    It -- it was on our own.

Q.    And what did you do?

A.    Well, it was decided we had talked to Lieutenant Larry Leader from the sheriff's office, just trying to get ideas of possible places to look, maybe areas that hadn't

Exhibit 5002 at 379

*Anthony Wetmore*

been considered to check.  Or just -- he's -- he's got years of experience and wealth of information in regards to missing people over the years, places where bodies have been found historically in the county.  Things like that.  Areas where, you know, difficult areas.

There were -- one area that we intended to hit was up Hudson Ridge, where one of the -- one of the shoes had been located, which we were aware had already been searched, but we wanted to -- to hit that area again, maybe -- maybe hit an area that hadn't been searched, or maybe find something that had been missed, because that obviously, because of the shoe, we felt was a significant area.

The other area that was suggested to us by Lieutenant Leader was an area on Lee Valley Road.  There's an area by the -- by the river or creek, I'm not real familiar with the geography around Coquille, but near the river or creek where, as Lee Valley Road goes uphill, there's a cliff off to one side over that river.  And to be honest I'm not sure why he suggested that area, if there'd been some historical significance as far as people being found or the fact that he just knew that was -- that would have been a difficult area to search.

We were aware that it was either search and rescue or maybe other detectives had checked the area of the river, but I believe it was in boats, and there was an area

Exhibit 5002 at 380

that was impassible by boats, that was below that cliff.  And so that was the other area that we were going to hit.

Um, we had decided, Detective Mitts and myself were going to get our -- go back home, equip ourselves, get some waders so that we could actually walk the river in the area that was impassible by boats.

And Detective Bennett and Kris Karcher were going to walk the road above the -- above the river, looking down, and we were going to kind of attack it from -- in that way.

As luck would have it, in my rush to equip up, get water, get -- you know, things that we knew we were going to need.  It was very hot out.  When I rushed back home to get my things, I forgot my waders.  So when we began searching that second area, which we arrived at that area about 2:50 in the afternoon, there's a gravel pull-off on Lee Valley Road that was just several hundred yards away from where -- where I later found the body.  We parked there.  Detective Mitts and myself started walking the river.  He was walking actually in the river.  I was walking along the edge of the river, since I had forgotten my waders conveniently.

We hadn't gone very far from the car, maybe within -- within a couple of hundred yards of where we had parked the car, we began walking the river.  I had stepped up onto a -- a root wad that was alongside the river, and just caught -- caught a whiff of something dead.  Unmistakable.

Exhibit 5002 at 381

*Anthony Wetmore*

And just -- just that fast, it was gone.

You know, it -- it stopped me dead in my tracks, and I looked around, continued smelling, and I -- I never smelled it again.  But I was so certain I had smelled something, I called Detective Mitts over.  He stood in the same spot, you know.  I -- I assumed that maybe I had gotten used to the smell, maybe, the way you sometimes do with, you know, candles in your home or things like that.  And he -- he didn't smell it.  He continued to go back to the river and began checking.

I was certain I had smelled something, and looking around that immediate area found -- found nothing.  And I just, for whatever reason, I headed off perpendicular from the river, just walking towards the treeline along Lee Valley Road, walking through the brush and looking around.  It was kind of -- thinking back on it, bizarre for me, because I never again, until I was literally standing over the body, didn't smell it again.  So it wasn't odor or anything like that that led me to that.  I just picked a direction and started going.

When I got to a dense brushy area, near the road, there was -- I could see trash and things like that that were kind of scattered throughout the area, which I later had been told was kind of a common area for people to dump garbage and things like that.  I got up along near the brush and I -- I

Exhibit 5002 at 382

*Anthony Wetmore*

saw what, looking through the brush, what drew my attention to that was it -- I saw what looked literally to be like a red -- like a glowing red lightbulb.

Um, and -- you know, I understand that all these thoughts probably happened just over a matter of a second or two, but it just seemed like an eternity. I'm looking at this glowing red, what looks like a glowing red lightbulb, and trying to process what that could possibly be. It looked real smooth. It looked like maybe it was plastic or something, and that the -- the sunlight was illuminating it. And as I kind of looked down and over to the right, I looked directly into the -- into the eyes of the -- or the face of a human body.

What it was that I was seeing, I realized, was the -- the heel of the female that had been kind of up in the air, the way she was situated with her one leg kind of propped up or on the other leg, however she was. And it was actually the sunlight coming through the -- through the heel, that I had seen initially.

Told Detective Mitts, you know, what -- you know, to come over to my location. I never did approach. Probab -- at that point, didn't approach any closer than probably from myself to the other end of this table, maybe, because there was brush between myself and the body, and I was looking through the brush seeing this. So I was maybe

Exhibit 5002 at 383

six, eight feet away.

Called Detective Mitts to my location, and I contacted Detective Main, who was our supervisor at that time, on the cell phone. And we began securing the area. A major crimes team call-out was initiated at that point, calling out other investigators.

While we awaited other people to arrive, I took crime scene tape from my vehicle. And we had blocked off the roadway on either side of where the body was located, several hundred yards either side, and I strung crime scene tape -- crime scene tape throughout the woods between where the body was located and the river, to block that area off as well.

Q.    When you found the body, did you have -- from what you could see, did it appear to have been laying there for a while?

A.    Yes, it did.

Q.    What would cause you to believe that?

A.    There was severe decomposition. I mean, obviously the hair wasn't decomposed. And that was one of the things that, you know, really startled me and startled me for months, you know, seeing that, was long blonde hair and other than that, everything, at least in the facial area, which the only part of the body itself that I could really see was the facial area.

And then the -- the foot, obviously, that had

Exhibit 5002 at 384

been exposed, because there was no sock on it.  Other than that, there was clothing, but what I could see was decomposed.

MR. FRAZIER:  I don't think I have any other questions for Officer Wetmore.  Does the grand jury want to ask him anything?  Okay.

THE WITNESS:  Thank you.

MR. FRAZIER:  You can go back to work.

**TESTIMONY OF AMANDA LANDMARK**

(Witness sworn.)

BY MR. FRAZIER:

Q.    First of all, could you tell us your name, please.

A.    Amanda Landmark.

Q.    And where do you live (indiscernible)?

A.    58864 Fairview Road, Coquille, Oregon.

Q.    This is the grand jury for Coos County, and we're looking into the death of Leah Freeman.  Kind of obvious, but I need to tell you we are recording the proceedings.

A.    I see.

Q.    Okay?

First of all, ma'am, how long have you lived in the Coquille area?

A.    Since I was 12, so 13 years.

Q.    And in the year 2000 -- well, I'm not supposed to

Exhibit 5002 at 385

ask this, according to my mom, but -- or according to my wife.  But how old were you in the year 2000?

A.     17, 18.

Q.     And were you a student at the Coquille High School at the time?

A.     Yes, sir.

Q.     Did you know an individual named Nick McGuffin?

A.     Yes, sir.

Q.     And how did you know Mr. McGuffin?

A.     I had grown up with him since the third grade.

Q.     How close would you say you were?

A.     Pretty close.

Q.     Did you know Leah Freeman?

A.     No.  Acquaintantly, like.  But not.

Q.     Did you know if Mr. McGuffin and Ms. Freeman were a boyfriend-girlfriend?

A.     Yes.

Q.     Did you have an opportunity at all to see how they interacted between themselves?

A.     No.

Q.     I want to direct your attention now to the day that Leah disappeared, which would have been June 28th of the year 2000.  At approximately 9:30 in the evening, were you at the -- what's known as the Fast Mart here in Coquille?

A.     If that's what's written down from ten years ago,

Exhibit 5002 at 386

*Amanda Landmark*

yes, I was.

Q.    And did you see Mr. McGuffin at the parking lot there?

A.    Apparently.  I -- I -- from ten years ago, it's hard to recall who, what, where, when, and why.  But that's what he had taken a statement down from ten years ago, and so that's what I'm sticking with.

Q.    Okay.  Do you recall this at all?

A.    No.

Q.    All right.  Do you recall seeing Mr. McGuffin at the Fast Mart?

A.    I don't recall that.

Q.    Do you recall him asking you if you had seen Leah?

A.    I don't recall it, sir.

Q.    And you -- do you recall him telling you that Leah had been in an argument with Sherry Mitchell (phonetic)?

A.    I don't recall it.

Q.    Okay.  Have you had any contact with Mr. McGuffin since Leah disappeared?

A.    Uh, just bumping into him in public.

Q.    Has Mr. McGuffin discussed with you what this happened -- or what happened to Leah Freeman?

A.    No.

Q.    Do you know what happened to Leah Freeman?

Exhibit 5002 at 387

*Tony Messerle*

A.    No.

MR. FRAZIER:  All right.  I don't think I have any other questions for her.  Does the grand jury have any questions for her?

GRAND JUROR:  So you have no recall of any of the statements that you gave?

THE WITNESS:  I don't.  Unfortunately.  Sorry.

MR. FRAZIER:  That's okay.

THE WITNESS:  Ten years ago is ten years ago.

MR. FRAZIER:  Okay.  Any other questions?

Is there anything you think the grand jury ought to know about this case?

THE WITNESS:  I don't have any pertinent information.

MR. FRAZIER:  All right.  Okay.  Unless there is any questions, that will be it.

THE WITNESS:  Okay.  Thanks, you guys.  Have a great day.

MR. FRAZIER:  Thank you.

**TESTIMONY OF TONY MESSERLE**

(Witness sworn.)

BY MR. FRAZIER:

Q.    Well, first of all, sir, this is the grand jury for Coos County, and we're looking into the death of Leah Freeman.  I think it's obvious, but I got to tell you we are

Exhibit 5002 at 388

recording the proceedings.  Okay?

A.    Okay.  Understood.

Q.    First of all, could you tell us your name, please, sir, and where you live.

A.    Tony Messerle.  I live in Springfield, Oregon.

Q.    And right now you're working as a truck driver for sand and gravel?

A.    Eugene Sand & Gravel, that's correct.

Q.    All right.  In the year 2000 were you living here in Coos County?

A.    I was.

Q.    And how long had you lived in Coos County?

A.    All my life.  I did six years in the service, and came back in '89.  Other than that, I've been here all my life.

Q.    Been on the school board here in Coquille?

A.    I have, 11 years.

Q.    When you were here in -- when did you actually leave Coos County?

A.    2009, January.

Q.    Prior to that, sir, how were you employed here in Coos County?

A.    Coos County road department.

Q.    And what did you do there?

A.    I was the lowboy operator.  I hauled heavy

Exhibit 5002 at 389

*Tony Messerle*

equipment.

Q.    I want to bring your attention to June 28th of 2000.  This was the day that Leah Freeman disappeared.  Were you working for the county that day?

A.    I was.

Q.    What shift were you working?

A.    Swing shift.  I was working in the shop at that time.

Q.    All right.  And what were you doing in the shop?

A.    Servicing vehicles, heavy equipment.  Likely.

Q.    And what were your hours on swing shift?

A.    I believe, if I remember correctly one o'clock to eleven o'clock at night.

Q.    And I want to direct your attention to when you got off work that night, on June 28th, did you go home at that point?

A.    I went straight home.

Q.    And what type of vehicle were you driving, do you recall?

A.    I was on my motorcycle.

Q.    And where were you living at the time?

A.    West Center -- or, excuse me, across from the high school.

Q.    Okay.

A.    West 18th.

Exhibit 5002 at 390

*Tony Messerle*

Q.    To get home how would you -- to get to your -- where you were living, how would you get there?

A.    I would take West Central and turn left on West 18th, and go straight back past the cemetery to my house.

Q.    When you were driving home that night, did you see anything out of the ordinary in the road?

A.    I did.

Q.    Could you tell the grand jury what you saw.

A.    I found a tennis shoe, right in the middle of the road.

Q.    And where was it located, that you saw this shoe?

A.    Just up from West Central, just past the gas station, probably, I'm going to say, a hundred yards or so.

Q.    And where was the shoe lying in relation to the road?

A.    Um, it's a narrow road, and I was assumedly driving right up the middle.  It was just right on my right side, so it was just off from the center line.

Q.    So you stopped?

A.    I did.

Q.    And picked up the shoe?

A.    I did.

Q.    Why did you pick up the shoe?

A.    Because my children just came in, I was just divorced, and I got my kids on weekends.  And they had come

Exhibit 5002 at 391

*Tony Messerle*

in, I think that day, and I hadn't seen them yet.  And the first thing I thought was that it could have been my daughter's shoe, since I live right there.

And I picked the shoe up and took it home, and being at night my kids were in bed, so I threw it on the kitchen floor and didn't think anything of it.  The next day I asked my daughter if it was her shoe, and it wasn't her shoe.  And so --

Q.    All right.

A.    -- that was the end of it.

Q.    Now, at some point in time you became aware that Leah Freeman was missing?

A.    That weekend, yes.

Q.    And did you -- what did you do with this shoe?

A.    Um, the -- it just -- well, that night I came in from swing shift, I grabbed the shoe because I thought it could have been my daughter's, not knowing even what her shoes looked like.  The next morning found that it wasn't her shoe.

I believe it just stayed there, in the kitchen.

And my parents came and collected my kids that very next day, and they took them to Lakeside, which is where we were all meeting that weekend.  And when we were coming home -- my kids knew Leah Freeman.  And when we were coming home we heard this blurb on the radio station, and my

Exhibit 5002 at 392

*Tony Messerle*

nine-year-old daughter said, Gee, Dad, I wonder if that's hers.  Referring to the shoe.

And there was a number that you could call, so when we got home to Coquille, I called that number and Coquille PD sent a young officer out, and he took a statement from me.

And I -- I think he took the shoe then, if I remember correctly.

Q.    All right.  A few days later, did you happen to run into Deputy Oswald, Kip Oswald?

A.    I did.  I don't remember exactly how long later.

Q.    Okay.

A.    I remember that night I took my daughter for ice cream, and I don't think it was the Dairy Queen still at the time, but that store was closed so we went on down to the 7Eleven.  And they had a roadblock that night.  And they were just asking people questions, that were going through town, if they remembered anything out of the ordinary, previously.

Q.    And when you say 7Eleven, it's also known as Fast Mart?

A.    Correct.

Q.    Okay.  Go ahead.

A.    The old 7Eleven, I'm sorry.

And long story short, I went in there, and it was real busy because I guess all the traffic being stopped and

Exhibit 5002 at 393

19

*Tony Messerle*

hung up.  And Kip Oswald, whom I know from my work because I serviced his vehicle as well as all the other deputies', said, Hey, Tony, come here, I want you to see something.

And so we walked outside and in his -- I believe it was a Ford Bronco that he worked in -- he had another tennis shoe.  And he asked me if that was it.  And I says, Is that what?  And he says, Does that look like the shoe you found?  And I said, Yes, it does.  And evidently he had found another shoe, or I would say the other shoe.

Q.    Okay.  And you had -- you went straight from work and you found the shoe?

A.    Yes.

Q.    If I were to tell you that the records said you got off work at 11:30, does that help you any?

A.    Yeah, I think I said they -- I don't know who, someone asked me what time, and I said, 11:33.  Because I went from work straight home, and that's what time it would be.

Q.    All right.

A.    And they asked me, Well, not many people know exactly where they are in a given point in time.  Well, that's -- that was my routine.

Q.    Okay.

A.    So I believe I said 11:33.

Q.    And you were at work all night prior to that at

Exhibit 5002 at 394

*Lyndee Stidham*

the county shop?

A.    Yes.

Q.    Don't mean to embarrass you or anything, but there was a rumor floating around at one time that you might have had something to do with Leah Freeman's disappearance, and I'm just going to ask you that straight up.

Did you have anything to do with her disappearance?

A.    Absolutely not.

Q.    And do you know anything about the death of Leah Freeman, other than what you've told us here today?

A.    I do not.

Q.    Is there anything else you think the grand jury needs to know I haven't asked you about?

A.    I really don't know anything.

MR. FRAZIER:  Okay.  Does the grand jury want to ask him any questions?

You can go back to Eugene or Springfield or wherever.

THE WITNESS:  Thank you, folks.

**TESTIMONY OF LYNDEE STIDHAM (KINDRED)**

(Witness sworn.)

BY MR. FRAZIER:

Q.    Okay.  First of all, this is the grand jury for Coos County, and we are investigating the death of Leah

Exhibit 5002 at 395

Freeman.  And it's kind of obvious, but we're recording the proceedings.  Just wanted to let you know that.  All right?

First of all, could you tell us your name, please, and where you live.

A.    My name is Lyndee Stidham.  I live in Medford, Oregon.  My former name is Lyndee Kindred.

Q.    And you used to live here in Coquille; is that correct?

A.    No, I live in Medford.

Q.    Yeah.  But you used to live --

A.    Oh, yes.  I lived in Coquille before, yeah.

Q.    Grew up in Coquille?

A.    Mm-hmm.

Q.    And went high school here?

A.    Yep.

Q.    I want to direct your attention to the year 2000.  Were you -- you were a student at the Coquille High School at that time?

A.    Yeah, I graduated in 2001.

Q.    Okay.  So you would have been -- the summer of 2000 would have been the summer before your senior --

A.    Before my senior year.

Q.    All right.  Did you know an individual named Nick McGuffin?

A.    Yes.

Exhibit 5002 at 396

*Lyndee Stidham*

Q.    And how did you know him?

A.    We were friends.  We dated for a little bit, but not necessarily like date-date.

Q.    Okay.

A.    We weren't a couple, but we hung out and kind of dated.

Q.    How close would you say you were with him?

A.    Uh, we were good friends for a couple of months. But mostly through high school we were more acquaintances.

Q.    Did you know Leah Freeman?

A.    Yes.

Q.    And how did you know her?

A.    We went to school together.

Q.    And how well did you know her?

A.    Not very well.  We never hung out.

Q.    Were you aware that Nick and Leah were boyfriend-girlfriend?

A.    Yes.

Q.    Did you see them together at the -- at school and things along that line?

A.    Mm-hmm.

Q.    Did you have an opportunity to see their relationship?

A.    Not really.

Q.    Okay.

Exhibit 5002 at 397

*Lyndee Stidham*

A.    No.  That was after Nick and I weren't really hanging out anymore, or --

Q.    Okay.

A.    So I didn't really pay much attention to him.

Q.    Well, I want to talk to you about the evening of June 28th, 2000, and that's the day that Leah disappeared.

A.    That was a Wednesday; is that right?

Q.    Yes, I believe so.  I've gone back and looked at your police report, and you testified at the grand jury originally --

A.    Yes.

Q.    -- several years ago?

A.    Mm-hmm.

Q.    Or back in 2000?

You used to be involved in Sawdusters; is that right?

A.    Yes.

Q.    What would you do with the Sawdusters?

A.    I was in the Olios.

Q.    And were you doing it that summer?

A.    Yes.

Q.    And had you had practice?  Did you have practice on --

A.    I had practice on Wednesday nights, from 7:00 to 9:00, and I usually left about 9:15, 9:30.

Exhibit 5002 at 398

*Lyndee Stidham*

Q.    And where did you live at that time?

A.    At my parents's, in Coquille, 1223 West 9th.

Q.    And where's that located in --

A.    Sanford Heights.

Q.    Sanford Heights.

      Were you aware of Leah Freeman staying with her grandfather --

A.    On Knott Street?

Q.    On Knott Street?

A.    Mm-hmm.

Q.    Is Knott Street the street you drive by?

A.    Yes.

Q.    Okay.  To get to your -- where you were living?

A.    Yes.

Q.    Do you recall if you saw Nick McGuffin that evening?

A.    You know, my memory from then is so blurred.  I remember stopping and talking to Nick, but I don't remember where.  I just looked at my statement out there, and it says I talked to him that night, but --

Q.    Okay.

A.    -- to be honest with you, I don't --

Q.    Remember where you were when you talked to him. Okay.

      Your previous statements, you indicated that it

Exhibit 5002 at 399

*Lyndee Stidham*

was on Knott Street?

A.    Yeah, I just read that.

Q.    And that you -- he asked you if you'd seen Leah. And do you recall that at all?

A.    No, I did not see her.

Q.    Well, did he ask you?

A.    Oh, did he ask?  I remember -- I remember him asking me.  See, I -- I remember talking to him in Sanford Heights, at one point, and I remember talking to him at Dairy Queen or whatever used to be --

Q.    Okay.

A.    -- at the Dairy Queen, if that was Hunter's at the time; I'm not sure.  I think it was him and Denise, but that was a couple nights later, I think.  And I think when I talked to Nick up in Sanford Heights I was by myself, but I might have been with a friend.

Q.    Okay.  When you talked to him in Sanford Heights, well, had you see Leah that night?

A.    No.

Q.    How was Nick behaving when you -- from the contact you did with him how was he behaving?

A.    He was really worried about where she was and hoping that I knew or I'd seen something, and had heard anything.  And he seemed really concerned, legitimately concerned.

Exhibit 5002 at 400

*Lyndee Stidham*

Q.    All right.  Since the 2000, since the disappearance of Leah, have you had any contact with Nick McGuffin?

A.    No.  I've seen him across the street and stuff, but --

Q.    Okay.  Have you ever talked with him about what happened to Leah or anything like that?

A.    No.

Q.    Um --

A.    Like I said, after my sophomore year, when -- we didn't really talk at all.

Q.    Do you have any knowledge as to what happened to Leah Freeman?

A.    No.

MR. FRAZIER:  I think I'm out of questions here. Is there anything that you feel the grand jury needs to know about this case?

THE WITNESS:  No.  I don't -- to be honest with you, everything is ten years ago, blur.  I didn't -- I remember saying I didn't know anything then, and -- sorry.

MR. FRAZIER:  Okay.

GRAND JUROR:  So you were stoned?

THE WITNESS:  (Laughing.)  No.  No.  Not at all.

GRAND JUROR:  Some of the witnesses we've talked to have memory problems because of extensive drug use.

Exhibit 5002 at 401

*Daniel Lapine*

THE WITNESS:  No, I never -- never did any drugs. With my friends as teachers, it was not -- (laughing).

GRAND JUROR:  I knew that, but I wanted to make sure it was clear.

THE WITNESS:  Yes.  No.

GRAND JUROR:  I know your dad, so.

THE WITNESS:  Never went near them.

GRAND JUROR:  Okay.  Now, this doesn't have anything to do with the case, but do you miss Sawdusters?

THE WITNESS:  Very much so.  Very, very much so. More than anything, the connection with my dad and stuff, doing it.

MR. FRAZIER:  Okay.  Any other questions?

If not, then I think that will do it.

THE WITNESS:  Okay.  So you guys don't have any questions about it?

GRAND JUROR:  Thank you.  No.

MR. FRAZIER:  That's it, and you can go back to Ashland.

**TESTIMONY OF DANIEL LAPINE**

(Witness sworn.)

BY MR. FRAZIER:

Q.    First of all, sir, this is the grand jury for Coos County, and we're looking into the death of Leah Freeman.  And I need to advise you, even though it's obvious,

Exhibit 5002 at 402

*Daniel Lapine*

that we're recording these proceedings today.

Okay.  You understand that?

A.    Yes.

Q.    All right.  First of all, could you tell us your name, please, sir, and where you reside.

A.    Daniel Lapine.  1051 Avenue A, Powers, Oregon.

Q.    How long have you lived in Powers, sir?

A.    One year.

Q.    Have you lived in the city of Coquille before?

A.    Yes, I have.

Q.    How old are you, sir?

A.    30.

Q.    In the year 2000, you would have been 20?

A.    Right.

Q.    And when you -- in the year 2000, were you living in a house here in Coquille?

A.    Right.

Q.    And who -- did you have roommates?

A.    Yes, I did.

Q.    And who were your roommates?

A.    Brent Bartley.

Q.    How long had you lived with Mr. Bartley?

A.    Mm, I wouldn't -- I'm not sure.  Probably two or three months.

Q.    Do you know an individual named Nick McGuffin?

Exhibit 5002 at 403

*Daniel Lapine*

A.    Yes, I do.

Q.    How do you know Mr. McGuffin?

A.    We went to school together.

Q.    And how well would you say you know Mr. McGuffin?

A.    Mm, no better than acquainting to.

Q.    Did he ever come over to your house that you shared with Mr. Bartley?

A.    Yeah.

Q.    About how often would he come over?

A.    Mm, I'm not sure.  Probably close to every day. Maybe a little bit less.

Q.    And when he came over, who was he primarily trying to see or be with?

A.    Uh, he's friends with Brent.

Q.    Do you know Leah Freeman, or did you know Leah Freeman?

A.    I've met her.

Q.    How did you know her or how did you meet her?

A.    Nick would bring her around the fire (phonetic).

Q.    Was -- from what you could see, was Leah and Nick, were they boyfriend-girlfriend?

A.    Yes, they were.

Q.    How well did they get along?

A.    I couldn't say.

Q.    Did they look like they were getting along well?

Exhibit 5002 at 404

30
*Daniel Lapine*

A.    I never seen them fighting or nothing, no.

Q.    Okay.  Mr. Lapine, just so we're clear too, I have to ask you this question.  You've had some trouble with the law before; is that correct?

A.    Right.

Q.    And you have a felony conviction; is that correct?

A.    Yes, I do.

Q.    How many felonies?

A.    One felony.

Q.    Just one?  And what is that felony?

A.    Assault 2.

Q.    And you actually got prison time for that?

A.    Yes, I did.

Q.    And you're on parole at this time?

A.    Yeah.

Q.    All right.  I want to go to the day of June 28th, 2000.  That would have been the day that Leah Freeman disappeared.  Are you acquainted with an individual named -- referred to as TJ Greaves?

A.    Yeah.

Q.    And how did you know TJ Greaves?

A.    Went to school together.

Q.    Did you spend any time at Mr. Greaves' house that day?

Exhibit 5002 at 405

*Daniel Lapine*

A.    Yes, I did.

Q.    Why don't you tell us how you spent the day, as best you can recall?

A.    Drinking.

Q.    Okay.  Where were you at?

A.    His parents' house.

Q.    And where was that?

A.    Um, just down the gravel road past Washington School.  I don't know the address.

Q.    All right.  So the Washington School is just a couple of blocks down the way here from the courthouse?

A.    Yeah.  It's -- it's like where the playground is, is a little gravel road that dips down and goes a little ways.

Q.    Okay.

A.    I couldn't tell you much more than that.  I went there a couple a times.

Q.    And when did you -- to the best of your recollection, when did you go over to TJ's house that day?

A.    Oh, early.  I wouldn't say any later than noon, (indiscernible).

Q.    How long did you stay?

A.    Mm, probably back and forth until probably four o'clock or so, I would think.

Q.    When you say back and forth, what do you mean,

Exhibit 5002 at 406

*Daniel Lapine*

back and forth?

A.     Running around.

Q.     Did you have a girlfriend at the time?

A.     Mm, probably on and off, yeah.

Q.     And was that Quinn Cannon?

A.     Yeah.

Q.     Did you see Nick McGuffin the evening of June 28th, 2000, the day Leah disappeared?

A.     I heard he was at my house, but I don't remember seeing him.

Q.     Did he ever come out to TJ Reaves' house while you were there?

A.     Not that I remember, no.

Q.     Did you see him the following day, the day after Leah disappeared?

A.     I believe so.  I'm not sure, but I remember them running back and forth.

Q.     Did he ask you at any time if you'd seen Leah?

A.     I remember him asking quite often.

Q.     Had you seen Leah?

A.     Um, not that I know of.

Q.     Does Nick tell you that Leah Freeman is missing?

A.     I can't remember.

Q.     Mr. Lapine, there's a -- one of the rumors floating around here in Coquille is that there was some sort

Exhibit 5002 at 407

33

*Daniel Lapine*

of a party the night Leah disappeared out in Fairview. And the rumor has you attending a party that night out in Fairview. Do you know anything about a party in Fairview that night?

A.    Absolutely not.

Q.    And I take it you did not go to a party in Fairview?

A.    No. You'll find in police records of that night that Jim Lee (phonetic) had stopped me and my buddies right in front of my house.

Q.    Okay. All right.

So the rumor is also that Nick and Leah were at a party, at this party in Fairview.

A.    I don't even know of a party out in Fairview.

Q.    Okay. Let me ask you a question, I think I know the answer, and it's probably a stupid question, but I'll ask anyway.

You were not at a party with Nick and Leah the night that she disappeared?

A.    Absolutely not.

Q.    Do you know Alicia Michaud?

A.    Yes, I do.

Q.    And how do you know Alicia Michaud?

A.    We went to school together.

Q.    Has she told you anything about the Leah Freeman

Exhibit 5002 at 408

*Daniel Lapine*

case?

A.    Not -- I mean, the discussions about this case, about her being gone was talked about a lot, but she didn't say anything significant.

Q.    Did she ever tell you, I know too much about Leah Freeman's disappearance?

A.    I believe so.  Oh.  She said -- yeah, she said some weird stuff, kind of, yeah.

Q.    What kind of weird stuff do you recall her saying?

A.    That she's saying she had bad vibes and all crazy stuff like that.  I'm -- I can't even remember exactly all the words, but, yeah, she was kind of freaking out.

Q.    Did she ever say she was in a car that ran Leah Freeman over?

A.    No.

Q.    Did she ever say somebody named Bill Sero or Tom Stemmerman had run over Leah with a car?

A.    No.

Q.    Did she ever tell you that Leah got run over by a car?

A.    No.

Q.    All right.  The police officers have brought to my attention they found an individual who apparently has indicated that you told this person that you knew who killed

Exhibit 5002 at 409

Leah Freeman, but before you can reveal that information you needed to talk to your mother. And then this same person is saying at a later time your mother told you not to talk about what happened.

A.    You need to -- um, my mother wouldn't say that, you know.

Q.    Okay. Do you know who killed Leah Freeman?

A.    I don't know who killed Leah Freeman.

Q.    Since the year 2000, have -- well, do you know what happened to Leah Freeman? Let me ask you that question.

A.    No.

Q.    Has anybody told you that they killed Leah Freeman?

A.    They never said Leah Freeman's name.

Q.    Okay.

A.    So I don't -- I can't say they said they killed her, but somebody said that they snapped a girl's noodle.

Q.    And who was this somebody?

A.    It was Bill Sero.

Q.    Bill Sero said he snapped somebody's noodle?

A.    Right.

Q.    Has anybody else indicated to you that they might have caused harm to somebody, without naming names?

A.    That -- what do you mean, caused harm to somebody.

Exhibit 5002 at 410

*Daniel Lapine*

Q.    Well, okay.  I want to say this.  Has anybody told you that they were involved in the murder of a young girl?

A.    No.

Q.    Has anybody told you they were involved in the disappearance of a young girl?

A.    No.

Q.    Since the year 2000, have you ever spoken -- have you had contact with Mr. McGuffin, Nick McGuffin?

A.    The year 2000?  I imagine I have, yeah.

Q.    Have you ever talked with Nick McGuffin about what happened to Leah Freeman?

A.    Mm, I'm sure it's been brought up, but we're -- there's never been any answers, you know.  I -- I don't know anything about it.

Q.    Do you have any information about the death of Leah Freeman?

A.    No.

Q.    Is there anything you think this grand jury needs to know regarding the death or disappearance of Leah Freeman?

A.    From me?

Q.    Yeah, from you.

A.    Um, I've said about all I know.

Q.    Okay.  All right.  I don't think I have any other questions for Mr. Lapine.  Does the grand jury want to ask

Exhibit 5002 at 411

*Quinn Myers*

him anything?

GRAND JUROR:  Yes.  One -- in what context did Bill say that?  What provoked that statement?

THE WITNESS:  Um, he was -- he was -- I know he was intoxicated -- I'm pretty sure he was intoxicated.  He was -- had his eyes -- he was basically out of it, and he was just mumbling and stuff.

And I was kind of shocked, you know.  And that's -- I assumed that's what he was talking about, but I can't say -- now, I can't say for sure that's what he was talking about.

GRAND JUROR:  He was just incoherent and rambling, kind of thing?

THE WITNESS:  Yeah.

GRAND JUROR:  How long after -- tell a time frame.

THE WITNESS:  I wouldn't say quite a year --

GRAND JUROR:  After the incident?

THE WITNESS:  Yeah.

MR. FRAZIER:  Any other questions?

Okay, sir.  That will do it.  You're free to go.

THE WITNESS:  You guys have a good day.

**TESTIMONY OF QUINN MYERS** (Cannon)

(Witness sworn.)

BY MR. FRAZIER:

Exhibit 5002 at 412

*Quinn Myers*

Q.    This is the grand jury for Coos County, and we are looking into the death of Leah Freeman.  Probably obvious, but I need to tell you we are recording everything.  Okay?

A.    Okay.

Q.    All right.  First of all, could you tell us your name, please, and where you live.

A.    My name is Quinn Myers.  I live here in Coquille.  Do you need my address?

Q.    No, just Coquille is enough.

A.    Okay.  I live here in Coquille.  My maiden name was Cannon.

Q.    All right.  And how long have you lived in Coquille?

A.    I was born here.  I moved away for just two years to -- or actually one year in North Bend, and I lived one year in Eugene.

Q.    Year 2000, were you living here in --

A.    Coquille?

Q.    -- Coquille?

A.    Mm-hmm.

Q.    And my wife keeps telling me I shouldn't ask women this question, but how old were you in 2000?

A.    Um, I would have been 19.

Q.    Were you -- are you familiar with an individual

Exhibit 5002 at 413

39

*Quinn Myers*

named Nick McGuffin?

A.    I am.

Q.    And how do you know Mr. McGuffin?

A.    He was a grade younger than me in school.  I went to high school with him.  He was my prom date.  I'm good friends with his older brother.  Back at that time we were all good friends.

Q.    Okay.  And the older brother was Wayne?

A.    Yes.

Q.    Prom date.  That -- what prom was that?

A.    Um, I was a Junior so it was the prom of 1998.

Q.    Okay.  How well would you say you know Nick McGuffin?

A.    Pretty well.

Q.    As his prom date, did you have -- were you actually in a dating relationship with him?

A.    No, never.  Always just friends, good friends.

Q.    And so you two decided just to go to the prom together, or --

A.    Yeah.  I was just in -- I wanted to go to the prom, and so I asked him because we were friends, to bring one of my friends.

Q.    Okay.  Did you know Leah Freeman?

A.    Um, I had met her.  I -- I only met her because she was Nick's girlfriend.  I was out of high school at that

Exhibit 5002 at 414

*Quinn Myers*

time, but still friends with him, and going out to his house one time, and she was there.

Q.    And Leah was somewhat younger than Nick, wasn't she?

A.    Yeah.  I believe she was a freshman when he was a senior.

Q.    I was looking at some of the reports, and you kind of thought it odd that Nick was dating a 15-year-old, or --

A.    You know, growing up in Coquille, it was kind of common for seniors to date freshman.

Q.    Okay.

A.    Their maturity levels seemed to match the younger girls.  I dated an older boy when I was that age.

Q.    Did -- would Nick bring Leah to some parties or get-togethers or whatever, in the --

A.    I was never at one where he did.  I had heard of them being at a party together.  The only one I could think of was one out in Powers, but I was not there.

Q.    Did you have an opportunity to observe their relationship?  You know, good?  Bad?  Indifferent?

A.    Um, the one time I was actually around them together was when I was out at his house visiting, and I think I made a comment about -- they were going to go to prom.  And I said, I -- you know, him being my friend, he

Exhibit 5002 at 415

wasn't really much of good date. I had him go to the car in the rain and get the camera and do things like that. And I just said, I hope he's a better prom date for you. And, you know, she just said, Oh, he will be. You know, she was talking it, but really other than that, I was probably around them for an hour, and --

Q. Okay. Well, I want to direct your attention to the day that Leah disappeared, and that would have been June 28th of 2000. And did you have a job at that time? Were you working?

A. I -- I was. I was working at Claire's Accessories, at the North Bend Mall.

Q. What time did you normally get off work?

A. There were two shifts. There was a 10:00 a.m. to 6:00 and a 12:00 to 8:00. And you stayed half an hour after and closed, so that night in particular I got off around 8:30.

Q. And are you familiar with Danny Lapine?

A. Yes, I was dating him at that time.

Q. When you got off work that night, did you go to Mr. Lapine's house?

A. Yes, I did.

Q. And he was sharing that at that time with Brent Bartley?

A. Yes.

Exhibit 5002 at 416

*Quinn Myers*

Q.    And what happened, to your best -- your recollection that night, what happened when you got there?

A.    When I was getting there, there was a group of people there.  They were getting ready to go to a party, and from what I recall it was at TJ Greaves' house.  I wasn't going to go to the party.  I had to work again the next day, and was just stopping off to see my boyfriend at the time.

I was sitting in a chair with direct view.  I was probably about eight feet or maybe just six feet from the front door.  And while I was there, I had probably been there for 10 to 15 minutes, Nick McGuffin came up to the door, just walking in.  He was acting like he was walking in and made eye contact with me, and just said, "Is Leah here?"

And I said, "No, why would she be here?"

And he said, "She's not?"  And he just turned around and left, after that.

Q.    Was Brent Bartley there at that time, do you recall?

A.    I don't recall if he was or not.

Q.    All right.  Was Mr. Lapine there while you were waiting there?

A.    Yes.

Q.    And were you folks going to go get something to eat or something?

A.    I think so.  Yeah, I don't remember exactly what

Exhibit 5002 at 417

*Quinn Myers*

ended up happening, but that was just something we normally did.

Q.    Okay.  So you did not go to this get-together at TJ greaves?

A.    No.

Q.    After eating or whatever you folks did, you went home?

A.    I went home.

Q.    Right.  Let's talk about the next day, the day after this.  Did you learn at some point in time that Leah was missing?

A.    Um, yeah.  I believe Daniel called me while I was at work, at Claire's.

Q.    Who called you?

A.    Daniel.

Q.    Yeah --

A.    Lapine, called me while I was at work, and told me that she was missing, that she'd disappeared.  And I said, Oh, that, you know, Nick was looking for her last night when I was at your house, because I didn't make a point to tell anyone else that inside.  I didn't think much of it when Nick came in and said, "Is she here?"  And that was probably, I don't know, not until like 5:00 or 6:00 in the evening that day when Daniel called and told me that.

Q.    Did you see Mr. McGuffin later?

Exhibit 5002 at 418

*Quinn Myers*

A.      That night?  Yes.  I got off work again about 8:30.  I went to the video store, rented a movie, and went back to Daniel Lapine's house.  At that point it was just Daniel and I and Bill Sero and Alicia Michaud there.

Q.      And so what happened while you were there?

A.      We were watching *Deuce Bigelow, Male Gigolo*.  I wasn't drinking, and I don't -- can't say in particular who was.  I don't really remember.  I'm assuming that they were drinking because I remember that later that night they were pulled over, and I believe both Alicia and Bill got in trouble for drinking.

While we were there, I don't know, probably a half hour, 45 minutes into the movie, Nick showed up.  He was emotional.  He -- he'd been crying.  And he said he had just been in a fight with Bill Middleton, who was Leah's uncle.  And said that Bill called him a 15-year-old girl abuser, or a 15-year-old abuser, or something.  He was upset about it.

At that point, what -- Bill Sero had said, told me earlier in the day, right -- I need to backtrack.

When I got to Daniel's house that night, Bill Sero -- I had said that's crazy that she is missing.  You know, what could have happened?  At that point there were rumors about someone getting out of jail or, you know, that was a former -- some type of sexual abuser or something.  So it was just, What could have happened?

Exhibit 5002 at 419

45

*Quinn Myers*

And Bill said, Yeah, I helped -- I heard about it, and I went and helped Nick look for her today.  That's what Bill said.  And again, I didn't ask more questions.

When Nick came there, Bill said, Now, what does she look like again?  And Nick went through explaining her, and said, She has blonde hair, she had a wife-beater on, big boobs.  And when she [sic] said that, Bill kind of chuckled to himself, and laughed.  And he said, Oh, what a way to explain her.

Alicia got upset and started crying, and ran outside.  And at that point Bill got up to follow her, and went outside, and just Nick and Daniel and I were inside, and Nick was just kind of talking about everything he'd done that day, and I don't remember specifics of where he looked.  I just remember him saying he drove out Fairview, looked along the side of the road.  So.

Q.   Okay.  Did he tell you about he had been late to pick up Leah the night before?

A.   He actually had said that he was seven minutes late.  I remember specifically it was seven minutes, he said.

Q.   All right.  Did he talk to you about Bill Sero, about him helping or things along that line?

A.   Um, not at that point in time.  Since then, yes, we had talked about that, and he had said, yeah, you know, now that you mention it, he was driving in a car in front of

Exhibit 5002 at 420

me with Erica, which was who -- her name was Erica Davidson (phonetic).  Bill Sero has children with her.  And she had a younger brother our age, as far -- mine and Nick, is what I'm referring to by our age.

And he said Erica stopped the car in the middle of the road and Bill got out and came over and said -- and it was in the daytime, the next day.  It would have been the 29th, and said, I heard that your girlfriend went missing, man.  I want to help you look for her.  And got in, and that they drove around and looked for her.

As far as where or anything, I'm not sure.

Q.    All right.  Did Nick tell you anything about how he thought it was odd that Bill Sero was offering to help him look for her?

A.    He did.  He said -- when we talked about this, after the fact, he had said he didn't think at the time about it, but since really not a lot of people knew, that night, or even until later the next day like I did, that she was missing, he said, you know, that was kind of weird that he knew about it, and that he stopped and did that.

Q.    All right.  Well, let's back up a little bit.

First of all, when did Nick say that -- or when was it that Sero supposedly got out of the car and got in the car with him?  Was that the day Leah disappeared?  The next day?

Exhibit 5002 at 421

A.    The next -- the next day.

Q.    The next day, all right.

And when did Nick tell you this?

A.    Um, Bill's the one who told me that, the next night.  And then later on, and I -- I don't know.  It wasn't really soon after, I wouldn't say.  It was probably a year or so after it all, we were talking about different things about it, and that's when he said, you know, now that you bring that up, I remember that that's what happened, and that he jumped out.

Q.    Let's go back to the movie.  Nick had described what his girlfriend -- what Leah looked like.  Alicia goes outside, Sero follows her out.

Does Alicia Michaud come back into the house?

A.    Um, she does come back into the house, and at that point her and I had a time away from the guys.  And I don't know if I took her in the other room just to kind of say, you know, I -- you're bawling, you're going to scare Nick and make him think something really bad happened, is what I was telling her at the time.  And she just said, I'm sorry, I have a really -- I have a really -- a bad feeling.  And just continued bawling.

I didn't know Alicia that well, so I didn't feel like with her, you know, to sit and try and confide.  At the time I'm just thinking maybe she ran away, even.  You know, I

Exhibit 5002 at 422

just didn't have the thought of something bad happening.

Q.    And Alicia is telling you that she's had a bad feeling about Leah's disappearance?

A.    Yes.

Q.    Do you know Kristen Steinhoff?

A.    I know who she is.

Q.    There's something about a roadblock and Kristen Steinhoff, and your name coming up?

A.    Yes.

Q.    Do you know anything about that?

A.    I do.  A week after Leah's disappearance, they had a roadblock, basically right in front of the -- I think it's a tax place now.  It was a hearing aid center then. Between Colleen's and the City Hall now.

Q.    All right.  That would have been Hunter's and Dairy Queen and --

A.    Yes.  Yeah.

Q.    It's now City Hall --

A.    The credit union.

Q.    -- and the credit union.  Okay.  Go ahead.

A.    Um, oh, we walked down there from -- we heard that was going on and walked down there from Daniel's house that day.  And I don't remember exactly who I was with.  I think Brent was with me.

Q.    Okay.

Exhibit 5002 at 423

*Quinn Myers*

A.    He's also a very close person that I know and liked.  And Kristen was standing there, when you drive through the lower part of the credit union there's a little water -- drop-off box for the payment.  She was standing right where that is, looking -- just by herself, looking at the people, the cops stopping people, asking them where they were a week ago and what they were doing, did they remember, at that time of night.

And we just kind of walked over to her, because I knew who she was.  And it wasn't really I ever hang out with her, but and asked, you know, what was going on.  She goes, I don't know.  I don't know.  What do you think they're -- what do you think they're talking about?  What do you think they're asking?  Just kind of really jittery and fishy and kind of strange about it.

Q.    Did -- and maybe I'm getting things confused.  Was there ever any repercussions about -- that you know about, about Kristen being there that night or anything like that?

A.    Not at that time, I hadn't heard.  I mean, I don't know of that.  I had heard that later on.

Q.    All right.  Now, you indicated that you knew or was acquainted with Bill Sero.  Is that right?

A.    I -- yes.

Q.    And Tom Stemmerman.  Do you know Tom Stemmerman?

Exhibit 5002 at 424

*Quinn Myers*

A.    I know Tom Stemmerman only because of my brother. He's my brother's age. I have an older brother, and he -- Tom's from Coos Bay, and my brother lived in Coos Bay and was friends with him. So I knew him through that way. I didn't know him because I knew Bill Sero or anything like that.

Q.    Brent Bartley. You indicated you knew him?

A.    Very well. Actually, he'd be the person I know the best of anyone in this situation.

Q.    How long have you known Brent?

A.    My whole life. Actually, my mother and his mother worked here at the courthouse together. And we grew up thinking we were cousins until we were old enough to know better, took baths together as little children.

Q.    Diane Cannon is your mother?

A.    Yes.

Q.    Say hi to her.

A.    I will.

Q.    Okay. All right. Now, let me -- I've got a couple of questions.

      Since 2000, have you had much contact with Nick McGuffin?

A.    Not a lot. I am -- I talked to him here and there after that happened, and I think I was pretty close with him for the year afterwards. Mm, I -- he's someone who at any point in time I can just call on the phone for no

Exhibit 5002 at 425

*Quinn Myers*

given reason and ask a question, like, you know, what did --
what did that person eat over there, or something like that.

And so we've -- have maintained that type of a
relationship, and I have talked to him in -- in the last six
months a couple times.  But aside from that, no, I don't keep
in -- in close contact.

Q.    Has he told you anything about Leah's
disappearance?

A.    No, nothing besides just what we -- he and I
talked about, of memories I've had and things.

Q.    Has he ever told you what he thinks happened to
Leah?

A.    Um, I don't think he's told me necessarily what
he thinks, as much as I've -- I have my thoughts of what I
thought happened.  I think I've expressed that more than he's
tried to express what he thinks happened.

Q.    What do you think happened?

A.    Um, I -- and I'm not sure exactly, and I remember
when I talked to Ray and Kris about this, I don't remember
what led me exactly to think this.  It was just a series of
things at the time I'd heard.

But I think that she was walking near the
graveyard by -- across from the high school, and that Bill
Sero and Kristen Steinhoff, and I don't know of anyone else
who were in the car, and like swerved to get her attention,

Exhibit 5002 at 426

*Quinn Myers*

because she had her head down, and they accidentally hit her and it went from there. It was an accident. They were trying to cover it up, I guess. I don't know what the circumstances were.

And this is just what I think. I -- I don't have any knowledge of why that is what I think. That's just what --

Q. Is -- well, let me back up. Is -- for example, has Alicia Michaud told you anything about what occurred?

A. No.

Q. Has Bill Sero told you this?

A. No.

Q. Tom Stemmerman?

A. No. I have not talked to Bill Sero or Tom Stemmerman, so.

Q. Okay. Kristen Steinhoff?

A. No.

Q. This is just kind of, if you will, stuff you put together from rumors on the street?

A. Yes. Yes.

Q. Would that be safe to say?

A. That's exactly it.

Q. I guess this is a question I've been asking everybody: Do you know who killed Leah Freeman?

A. No.

Exhibit 5002 at 427

*Michael Baumer*

Q.     All right.  And is there any other information, stuff I haven't asked you about, that you think the grand jury needs to know about this case?

A.     Um, I'm trying to think.  I'm mean well.  I -- I just can't think anything.  I can't.  I want to be as helpful as I can.

MR. FRAZIER:  Grand jury wants to ask her anything?

GRAND JUROR:  Was there any -- anything that struck you odd up at where your boyfriend stayed with Brent, anything after the disappearance that went on there?  Conversations that --

THE WITNESS:  Not at all.  Not at all.  I was -- as a matter of fact, I guess the one thing I could say that I think would be helpful is that I knew Brent Bartley's name's in this.  I'm 100 percent confident that if Brent Bartley knew anything he would have told me.  We were that close, and he -- I was his confidante.  So -- and no, there were never conversations about that.

MR. FRAZIER:  Any other questions?

All right.  That will do it.

THE WITNESS:  All right.  Thank you.

MR. FRAZIER:  You're free to go.

THE WITNESS:  Thank you.

**TESTIMONY OF MICHAEL BAUMER**

Exhibit 5002 at 428

*Michael Baumer*

(Witness sworn.)

BY MR. FRAZIER:

Q.    First of all, sir, this is the grand jury for Coos County, and we're looking into the disappearance of Leah Freeman, the death of Leah Freeman.

First of all, it's kind of obvious, but I do need to tell you we are recording these proceedings here today. Okay?

A.    Okay.

Q.    First of all, could you tell us your name, please, and where you live, sir.

A.    My name is Michael Baumer, and I live here in Coquille.

Q.    How long have you lived in Coquille, sir?

A.    Uh, about 20 years.

Q.    Do you know an individual named Nick McGuffin?

A.    Yes.

Q.    How do you know Mr. McGuffin?

A.    Well, when we were little kids, him and I were like best friends, went to grade school together, and then -- so I've pretty much known him most of my life.

Q.    Okay. How well would you say you know him? How close would you say you are?

A.    Currently?

Q.    Well, yeah, currently; let's talk about that.

Exhibit 5002 at 429

*Michael Baumer*

A.    We've drifted apart.  I don't really hardly know him at all anymore.

Q.    When you were growing up, how close would you say you were?

A.    Pretty close, really.  Pretty close.

Q.    Did you go to high school together?

A.    No.  I went to Myrtle Point, he went to Coquille.

Q.    Do you know other members of the McGuffin family?

A.    Just his parents and his brother.

Q.    Okay.  That would be Wayne, is his brother?

A.    Yes, sir.

Q.    How well would you -- or how close would you say you are to Wayne?

A.    Not even.  I don't really even know the guy.

Q.    And Mr. and Mrs. McGuffin?

A.    Again, when I was -- when I was a child I knew them pretty well, but since I've grown up, I've drifted apart from that family.  I don't really know them at all.

Q.    Okay.  Were you -- did you know Leah Freeman?

A.    Hmm-mm.  Not at all.

Q.    Not at all?  At any time did -- well, did you know that Nick and Leah were boyfriend-girlfriend?

A.    Not until after she disappeared and I read it in the newspaper.

Q.    Well, one of the things I want to talk with you

Exhibit 5002 at 430

*Michael Baumer*

about here today, sir, is according to Mr. and Mrs. McGuffin, they claim that an individual named Josh, and I believe his last name is Walman (phonetic).

A.    Mm-hmm.

Q.    Josh Walman.  They claim you told Josh Walman that a person who you would not identify confessed to you that this person, whoever this person was, was one of five people that killed Leah Freeman, and that there was a pact between the five not to tell people what happened.

A.    I wouldn't ident -- I heard this from Robert Hall -- Officer Hall, that was originally in charge of the investigation.  That's who told me that story.

I've always given up that kid's name.

Q.    Okay.  Well, then let's back up.  Okay.  So the person you -- first of all, was there a person that told you that they were part of it?

A.    They were not part of it, they heard from somebody -- he alleged that somebody in the car of the night that this all happened told him this story that I then told Mr. Walman, and he said -- he told me that story as if this person was in the car, they knew all about it, and were scared to -- just scared to talk.

Q.    Right.  Now, the person that told you this is Robert Hall?

A.    Mm-hmm.

Exhibit 5002 at 431

*Michael Baumer*

Q.    And Robert is the son of David Hall?

A.    Mm-hmm.

Q.    Okay?  Yes or no for the recording.

A.    Oh, sorry, yes.

Q.    And so it's your testimony that Robert Hall told you that -- well, did he name -- did Robert Hall tell you the names of people that were supposedly in this car?

A.    Yes.

Q.    And who -- what did he tell you about who was in this car?

A.    Um, there was a girl named Kristen Steinhoff in the car.  There was a kid named Brent Bartley in the car. And I can't remember the rest of the names anymore, and that, but -- so I don't know what else to tell you there.

Q.    Was Nick mentioned as being the car?

A.    No.  Not at all.

Q.    Was a girl named Darla mentioned?

A.    Yes.  I -- I believe Darla's the girl that actually told Robert Hall the story.

Q.    Okay.  And when did Robert Hall tell you this?

A.    Uh, I would say approximately nine years ago.

Q.    And did Robert Hall tell you why he -- if he had told his dad about this?

A.    He told me that he had not told his dad, and that this is information that his dad should have, but he didn't

Exhibit 5002 at 432

58

*Michael Baumer*

want to say anything because the girl that he had talked to and him were very close.  They were very good friends, and he feared for her safety.

Q.    The -- we had Robert Hall in the grand jury here Wednesday, and I asked him specifically about him telling anyone about the -- what you've just told us here today.  And he has -- he denied that he had told anybody that story, and didn't have any information whatsoever about this situation.

I guess my question is, how certain are you, sir, that Robert Hall told you this?

A.    Oh, I'm dead positive.  I know he told me this.

Q.    Was there anybody else there with you?

A.    Huh-uh.  It was him and I, we were hanging out. We were friends.

Q.    All right.  Okay.  At this point, I don't think I have any other questions.

Well, let me ask you this.  Mr. Baumer, outside of what you told us here today, do you have any information as to who killed Leah Freeman?

A.    Nope.  I just know that story that I was told by Robert Hall.  That's all I know.

Q.    And is there anything else you think the grand jury needs to know about this case?

A.    I don't think I have any information that would -- no.  So, no, I don't know.

Exhibit 5002 at 433

*Michael Baumer*

MR. FRAZIER: All right. Does the grand jury want to ask him any questions?

GRAND JUROR: Yeah. I'm -- I just want to make sure I got this clear. Darla supposedly told Robert about this car situation?

THE WITNESS: Mm-hmm.

GRAND JUROR: What exactly did she supposedly tell Robert? What did Robert tell you?

THE WITNESS: The story that I heard was that this girl Darla was in the back seat of the car and there was a couple of other -- this girl Kristen Steinhoff was in the back seat of this car, and there was somebody else that I can't remember. And there was a fellow driving, and I can't remember his name, and Brent Bartley was in the front passenger seat. And they had left this party and they had been drinking excessively and doing other drugs, and they were all messed up. And they took off driving down the road to go home, and they accidentally hit this girl. And they freaked out, went into panic mode, and stuffed her in the trunk of a car that they were all in, and drove her out towards Fairview and threw her over a bank somewhere.

And that she was scared to talk because she -- they were -- it was under threats, allegedly, that they would kill her or they would all turn on her and say she was the one who did it, and all these other little things like that

Exhibit 5002 at 434

*Michael Baumer*

that go on.

GRAND JUROR:  And how long after the -- she went missing was -- did you hear this story?

THE WITNESS:  I don't -- I don't think it was a full year, but pretty close to a year.  Maybe more like eight months, might be pretty accurate.

Trying to think, because I had just graduated high school when she disappeared, and then I was here for the rest of that summer and then started college in Eugene.  And then -- then I decided -- I came back.  After that college year was over, I came back.  I was there that summer, so that was -- I guess that was a year there.  So I guess I was -- I guess it would be more like 18 months later, I guess that would be more accurate.

GRAND JUROR:  Okay.  Do you know what kind of car they were in?

THE WITNESS:  No clue.

GRAND JUROR:  Did Robert -- from -- you're pretty -- I mean, you saw him.  You're absolutely sure Robert had told you this story?

THE WITNESS:  Be -- I do know, because he -- when he told me this, I was like -- because I asked him questions at the time.  His -- at one point his dad was the lead investigator on this case.

GRAND JUROR:  Right.

Exhibit 5002 at 435

*Michael Baumer*

THE WITNESS:  And I had asked him about, you know, Did you say something to your dad?  And he was like, Oh, man, I can't get this girl in trouble.  I can't do that to her.  It's not what you do to your friends.

GRAND JUROR:  Referring to who, Darla?

GRAND JUROR:  To Darla?

THE WITNESS:  Yeah.

GRAND JUROR:  Okay.  Thanks.

BY MR. FRAZIER:

Q.    And when did you tell the police about this?

A.    When they called me.

Q.    And when was that?

A.    It was a couple of weeks after Robert had told me that story, because I had kind of -- Josh Walman's one of my best friends on this planet, and I had told him.  And my understanding is, is that his mom heard our conversation, and then she was getting her hair done at one of the salons and had said something about it, and I guess the rumors flew through town.  And then boom, I got a call.

Q.    Do you remember who you talked to?

A.    The first time?

Q.    Yeah.

A.    Huh-uh.  I don't remember at all.

Q.    Is the name Ray Nichols ringing a bell with you?  Officer Nichols?

Exhibit 5002 at 436

*Michael Baumer*

Do you know who Officer Nichols is?

A.    Um, kind of know who Officer Nichols is.

Q.    Does he -- was he the one that talked to you?

A.    Could have been.  I -- I honestly don't know.  I don't remember.  It's been a long time ago.

GRAND JUROR:  But after the story got out, then you were called back in to give that story you just gave us to the police?

THE WITNESS:  Yeah.  Then I did -- they didn't even call me in.  They just talked to me over the phone.  I gave them -- I told them everything I knew at the time.

I -- I don't know if you guys have that statement.  It probably has all the names on there.  I just don't remember anymore, it's been so damn long.  But --

GRAND JUROR:  So somewhere about 18 months to two years after the -- she went missing, you gave a statement --

THE WITNESS:  Yeah.  Somewhere in there.

GRAND JUROR:  There should be statement, okay.

MR. FRAZIER:  Okay.  Is there any other questions?

GRAND JUROR:  I wonder why everyone's drifting apart from this Nick character.  Everyone we talk to.  They know him, but after it happened they're all drifting.

MR. FRAZIER:  Well, and we can't -- that's something you folks will have to decide.  We can't get into

Exhibit 5002 at 437

that, at this point.  Well, at least with this witness.

Is there any other questions for Mr. Baumer?

All right.  Thank you, sir.  You're free to go.

THE WITNESS:  Yes.

MR. FRAZIER:  Have a good day.

GRAND JUROR:  Thank you.

### TESTIMONY OF DUSTIN GRAHAM

(Witness sworn.)

BY MR. FRAZIER:

Q.    First of all, sir, this is the grand jury for Coos County, and we're looking into the disappearance and death of Leah Freeman.  Okay?

I need to advise you, and it's obvious, but I'm recording everything that's going on in here.  Okay?

A.    Hmm.

Q.    All right.  So when you respond to questions, you need to answer yes/no, if you would, please.  And since the air conditioner decided to kick on, it would be nice if you could speak up for us.

A.    Okay.

Q.    All right. First of all, could you tell us your name, please, and where you live, sir.

A.    My name is Dustin Graham.  I live at 896 West 17th Street here in Coquille.

Q.    And how long have you lived in Coquille, sir?

Exhibit 5002 at 438

*Dustin Graham*

A.    For my whole life, other than about a period of three months.

Q.    Do you know an individual named Nick McGuffin?

A.    Yes, I went to school with Nick McGuffin.

Q.    How well would you say you know Nick?

A.    Not that well.

Q.    How close did you -- well, right now, have you had much contact with Nick in the last few years?

A.    No, I have not.  I -- the last time I saw Nick we were driving down the road, we were coming from Lakeside, we were just getting off work, and he drove up next to our car, on the right, and yelled from his car to our car, at a guy that I was working with.  And he had said, Where's my money? And he yelled it pretty loud.

We pulled over, and the guy that I was working with got out of the car and they went and talked for a little while.  And I remember I was with Mike Pizzola.  I was working for Pizzola & Sons Construction at the time, and I was with the younger son, or the -- Mike Junior.

And I said, What's going on?  And we both looked at each other kind of weird, you know.  We look at Nick, What's going on, Nick?  You know.  Do you say hi to anybody anymore?  And that's the last time I ever saw him.

Q.    And how long ago was that?

A.    It was before I moved to Hawaii.  It was, I want

Exhibit 5002 at 439

*Dustin Graham*

to say about -- before this depression thing hit.  So it was about, I want to say, two years ago.

Q.    Did you know a girl named Leah Freeman?

A.    I -- I didn't know her personally.  I know -- knew of her.  I was an acquaintance of hers, I guess, at school.  I knew -- I knew her friends more than I knew her.

Q.    Were you aware that Nick and Leah were boyfriend-girlfriend?

A.    Yes, I was very aware of that.

Q.    When you say you were very aware of that, how -- what do you mean?

A.    They were together all the time.  They -- it seemed like they were inseparable, but he's -- I don't know, you know.  He -- that he -- I remember it specifically seeming like -- it seemed like he was really controlling. You know, that it was a really obvious thing around the school, you know, that he was pretty -- you know.  It was just -- they hung out all the time, and it didn't see -- it seemed like he kept her on a tight leash.  On a short rope, you know.

Q.    Did you ever see them argue, or anything?

A.    Yes, I did.

Q.    How often would you see them argue?

A.    Not very often.  I mean, I witnessed maybe two times.  I mean, I don't remember it specifically, but at

Exhibit 5002 at 440

school they'd yell at each other and stuff.  And in -- you know.  And it was just -- it was always like, you know, that look between, you know, when -- when people aren't getting along, you know, they're just -- you can -- you can tell, when people don't get along, and there stuff underlying, you know.  Stuff going on.

Q.    And did you ever see either one of them raise a hand towards the other?

A.    No.

Q.    Do you know a guy named Bill Sero?

A.    I know of Bill.

Q.    Okay.  How do you know of Bill?

A.    Um, I was -- I went to school, like -- let's see, with Ryan Davidson, and his sister is Erica, and I know his mom because Ruth Anne, his -- we did baseball when we were kids, and stuff.  And -- and I would always hear Ryan talk about Bill.  It seemed like he kind of looked up to him as a -- as a brother, or whatever, you know, because his -- him and his sister were together.  He used to talk about him all the time.

I remember maybe like going to his house once with -- with Ryan, but I mean, not -- I didn't know the guy, personally.  I just remember thinking that he was weird.

Q.    Okay.  Did you ever -- when you were living here in Coquille, did you ever live close to where Sero was

Exhibit 5002 at 441

*Dustin Graham*

living, Bill Sero?

A.    I did not.  I -- he -- I know that he lived in this apartment over in Sanford Heights, and that at one point in time around this whole time it was really late at night and I was with Jesse Newman (phonetic).  It was like 2:00 in the morning, and we were -- I don't even remember what we were doing.  We were out farting around at 2:00 in the morning.  We went over to his girlfriend's house that was in Sanford Heights.

Q.    Whose girlfriend's house?

A.    Katie Klevits (phonetic).  It was Jesse Newman's girlfriend Katie Klevits.

Q.    Okay.

A.    And I remember Megan Walker (phonetic) was there, and these were two girls that I'd never hang out with, and you know, it was kind of weird and odd for me to be there. The only reason I was there is because I was friends with Jesse and we were hanging out.

We get a knock on the door.  We're all -- we just walked inside, we get this knock on the door.  And it was Bill at the door, which is weird, you know.  It was weird. And he knocks on the door and he's like, What are you guys doing?  And we were just getting ready to smoke some weed. And he's like, well, do you guys want to come over to my house and smoke some weed with me?

Exhibit 5002 at 442

*Dustin Graham*

I didn't really think anything of it, you know. I said, Sure. We go around -- like there's these apartments in Sanford Heights. There's two different apartment complexes. And we go around and go into his apartment, and he sat there and he loaded a pipe with weed, and he sat there and looked at the ground and didn't say anything the whole time. And didn't -- didn't say anything.

And I remember, like really seriously, like why isn't this guy saying anything? You know. It was weird. And I just -- from then on I thought that guy was really weird. Just with everything going on, and the circumstances, that's just -- it was a bizarre situation.

Q.    When you say the circumstances and everything going on, what are you referring to?

A.    Well, like, you know, with people like it seems like there was a lot of hearsay and a lot of stuff going on around that time, you know. And I just remember like talking about it with Quinn and stuff afterwards, and going back again, like, you know, that's bizarre.

Q.    And you're referring to Leah Freeman's disappearance?

A.    Yeah. We -- because we would always go back and forth about, you know, who did it and what we thought about it. And -- you know, because I was with Quinn for five years, you know, and she was friends with Nick. She was good

Exhibit 5002 at 443

friends with Nick, and she would always tell me how she didn't thought he did it. And, you know, I should befriend him, you know. And -- and I don't know, he'd come over to the house sometimes and hang out with her, and they would talk, and he would -- and try to befriend me, but I just never felt the friendship connection with him, you know. And --

Q.    Okay. Now, I'd like to go back to this marijuana smoking thing, okay?

A.    Mm-hmm.

Q.    Do you recall in relation to when Leah disappeared, how soon after that this incident occurred with the marijuana? How soon after she disappeared?

A.    I have -- you know, I have no idea. Like all's I -- all's I relate it to is like -- and I say like around the time, is that when Quinn and I talked about it, you know, after everything had -- and, you know, and like I'm sitting here like, Where was I at this time? You know, because I still don't know what day it was or anything like that. I don't know where I was at the time, you know. And I'm just like is there anything that I know or said or you know, heard, that I could help with, you know. And we'd really seriously go back and talk about it over and over again, you know.

And like I lived -- I think over here at this

Exhibit 5002 at 444

*Dustin Graham*

Dean Street apartment at the time. And -- and it was around the time when Quinn and I were hooking up and getting together. And I just remember -- like it's really hard for me remember exact details about it, but I just really seriously remember thinking, after the fact, that looking back on it, it was the weirdest thing ever. You know, it's like why is this guy sitting and looking at the floor? You know.

Q. Okay. There's some indication, at least from talking to somebody, the police believe that this incident occurred in the early morning hours of June 29th, which would have been the night that Leah disappeared. Do you have any reason to believe that that's not the case, or anything like that?

A. No.

Q. Do you know Brent Bartley?

A. Um, yes, I know Bret -- Brent.

Q. How do you know Brent?

A. It's Quinn -- through Quinn. Quinn's cousin.

Q. All right. And is -- after Leah had disappeared and the weeks, month, or whatever are passing after Leah disappeared, did Bartley ever come over to your apartment and talk about Leah's disappearance?

A. He may have. But I'm -- I -- I was not there. I don't know anything about it.

Exhibit 5002 at 445

71

*Dustin Graham*

Q.    Do you know a guy named Doobie Marbut (phonetic)?

A.    Yes, I do.

Q.    And who is Doobie Marbut?

A.    Doobie is a guy that I had met at McKay's Market in Coquille, around, you know, this time when I lived over here on Dean Street.  And he lived with this lady, this old -- elderly lady named Sandy, and it was a friend of the family.  And I came home one day and he was standing on my porch, and he was always at my house from that point until he moved, he was always there, because his neighbor was Sandy and my -- I lived with Jeremy Waterman (phonetic) at the time and they were oh -- like if I wasn't there, Jeremy was there, you know what I mean.  And it was just like an open house kind of thing.  And Doobie was always there.  Because if he wasn't at McKay's, he was there.  And then there was a point I think he quit McKay's and was there all the time, and I ended up moving out and it was like my senior year in high school, and I ended up moving out and moving over to my friend's house in Charleston, to finish school, in Coos Bay.

Q.    Well, the reason I'm asking, do you know where Doobie Marbut is right now?

A.    I do.  He called me the other day.

Q.    Oh, yeah.  Where's he at?

A.    He is in Washington, I believe, like Spokane.

Q.    Do you have his phone number?

Exhibit 5002 at 446

72

*Dustin Graham*

A.    He called my -- my phone's in my car.  I can go get my phone like when we're done, and I'll give you his phone number.

Q.    Okay.  I'd appreciate that.  Okay.

A.    Yeah.

Q.    Here's the reason I'm asking you about Doobie, and (indiscernible).  Okay?  Because we have information Doobie Marbut was interviewed by the police back some time.  He says he's over at your place, that you're there and Bartley's there.

A.    Mm-hmm.

Q.    Okay?  And he says Bartley starts talking about some husband someplace had been ripped off for $5,000.  Do you remember if Brent ever talked about --

A.    I re -- I remember a lot of hearsay going on, and like just a lot of random -- like stuff being said, you know.  That may have been said, you know.  I don't know.  I can't -- I can't testify to that because I can't remember.

Q.    Well, let me run this through this with you, see if you recognize it.

According to Mr. Marbut, and he says you were present, Bartley was saying some husband had been ripped off for $5,000.  Leah and Nick had spent the money.  That the guy wanted his money back.  Leah took the blame, and she was mad about it, and when it came up that she'd take the blame that

Exhibit 5002 at 447

*Dustin Graham*

wherever they were at, she left walking.  There were five people in a car went looking for her.  The five were Bartley, Ricky Crook, Nick, Alicia Michaud, and Bill Sero.  And that they found her, they accidentally ran over her, they put her in the trunk, they drove out to Fairview by a rock pile, they found out she was still alive so they beat her to death and then dumped her body.

Do you recall ever hearing anything like that before?

A.     You know, it's -- it sounds very familiar. The -- this story sounds familiar, but I mean, like I said, that is details in there that I don't remember.

You know, the money thing, the Nick and -- Leah and Nick and the money thing sounds familiar.  I don't remember Brent coming to my house and saying this stuff.  I don't remember Doobie stating all this stuff.  I may have been at my house.  I might have been asleep when they came over.  You know, they stayed up late a lot.  And.

Q.     Okay.  Do you know who killed Leah Freeman?

A.     No, I do not.

Q.     Has anybody ever told you that they killed Leah Freeman?

A.     No.

Q.     Anybody tell you that they had something to do with the disappearance of Leah Freeman?

Exhibit 5002 at 448

*Dustin Graham*

A.    They -- no, not -- not directly.  But a friend of mine lived with a guy named Rowdy Howard.  And --

Q.    Okay.  Who's the friend?

A.    My friend's name is Brandon Decker.

Q.    And what did Brandon tell you?

A.    Brandon told me -- and this was just recently.  And Brandon told me that because -- again, here I am thinking, you know, is there anything I can do to help?  And I called him on the phone and I talked to him about it, and he said, Do you remember when I lived with Rowdy?  And we started talking about when he lived with Rowdy, and he told me that, Remember, I told you this?  And I'm like, No, I don't remember.  And he's like, Well, they got -- he told me that they got all high one night, and when I say high I mean on -- on white drugs, methamphetamine.

Q.    Okay.

A.    And he told me that -- which is a total, like shocker to me, because like, you know, Brandon and I used to do that stuff back in high school and we both quit, and it was just a shocker that he was still involved with that kind of stuff, I remember, you know, just recently.  It was like, God, you know, took you a while to -- to come out of it.

      And I remember him telling me that Rowdy had said that story to him, that --

Q.    What story?

Exhibit 5002 at 449

75

*Dustin Graham*

A.    The -- the "hit her with the car" story.  And I -- I don't recall him saying exactly what happened, but he said they hit her with the car and put her in the trunk and then, you know, blah-blah-blah-blah-blah.  And I said, Well, you need to -- you need to talk to the cops about this, you know.  And I said, I'm going to talk to -- to Webley about this, and I'm calling him.  And I called him.

Q.    Okay.  Now, when Brandon told you this, did -- he said Rowdy said they did this.  Who's they?

A.    Well, he said that -- he said that he -- Brandon had told me that he had admitted to him that he was directly involved.

Q.    Rowdy had?

A.    Mm-hmm.  And that -- that -- and then Brian told me that -- to -- he's all -- to talk to Katri -- to have him talk to Katrina Stanley, because that was Rowdy's girlfriend, and -- see, Brandon and -- and this Katrina girl, Brandon's girlfriend Michelle Bruggerman (phonetic), worked at the Bachelor's Inn strip club in Coos Bay.  And that's why I think Rowdy lived at his house, because they were -- those girls were stripping together at the BI.

        And they're real shady people, man.  I never -- I used to stop at his house on the way by to go -- when I was surfing, because I was good friends with Brandon, and always have been, you know.  And I'd just stop by to say hi once in

Exhibit 5002 at 450

a while.  And they'd be there.  And just thought it was weird, you know, Brandon's hanging out with these strippers and this weird guy.  But he told me that, you know.

Q.    Okay.  Now, is there anything -- well, (indiscernible).  Is there anything else you think the grand jury needs to know about Leah's death that you haven't -- outside of what you told us?

A.    No.

MR. FRAZIER:  Okay.

GRAND JUROR:  What is Rowdy's last name?

THE WITNESS:  Howard.

GRAND JUROR:  And what was his girlfriend's name?

THE WITNESS:  Katrina Stanley.  We used to call him Rowdwick.  We made fun of him because he was always high.

GRAND JUROR:  Thank you.

MR. FRAZIER:  Okay.  Any other questions?

All right.  You're free to go, sir.

THE WITNESS:  Thank you.

Oh, do you want that phone number?

MR. FRAZIER:  Yeah.

**TESTIMONY OF DAMON MASON**

(Witness sworn.)

BY MR. FRAZIER:

Q.    Could you tell us your -- well, give me your name, please, sir, and where you live.

Exhibit 5002 at 451

*Damon Mason*

A.    My name's Damon Mason.  I live at 692 West 15th Street, Coquille.

Q.    Mr. Mason, this is the grand jury for Coos County.

A.    Okay.

Q.    And we're looking into the death of Leah Freeman. I need to tell you that -- it's obvious, but we're recording the proceedings, okay?

Since the air conditioner kicked on, we'll need you to make sure you pick up -- or speak up.

A.    Oh, okay.  All right.

Q.    First of all, sir, you live here in Coquille; is that right?

A.    I do now, yes.

Q.    And how -- did you grow up here in Coquille?

A.    I graduated from high school here.

Q.    And after you graduated from high school, did you go into the military for a --

A.    Yes, I did.

Q.    -- period of time?

A.    Around two years.

Q.    Did you have a girlfriend here in Coquille?

A.    Yes.

Q.    And --

A.    Yes, I do.

Exhibit 5002 at 452

78

*Damon Mason*

Q.    Who was your girlfriend?

A.    Her name was Julianna Clawson (phonetic).

Q.    Are you familiar with the McGuffin family?

A.    Yes, I am.

Q.    How do you know the McGuffins?

A.    Went to school with them.

Q.    And which McGuffins did you go to school with?

A.    Um, Wayne was in my class, we graduated together. Nick was younger than I was.

Q.    And what year did you graduate?

A.    '98.

Q.    How close were you with Wayne?

A.    I was fairly close.  He was a friend that I hung out with quite a bit until I graduated from high school and left to the military.

Q.    After the military did you work in Hawaii for a while?

A.    Um, after the military, I came back to Oregon and I was here in Oregon for about two months, and I moved to California with my grandparents.  And I was there for nine months, and then I moved to Idaho, and I was in Boise for six years.

Q.    Okay.

A.    And then after my six years in Boise, I came back to the Oregon Coast and I was here for a few more months, and

Exhibit 5002 at 453

*Damon Mason*

I left to go to Hawaii with my dad.

Q.    And in Hawaii, did you -- was Wayne McGuffin living in Hawaii with you?

A.    Not when I first got there.  I was there for about a year before he showed up.  Maybe a little less than a year.

Q.    And when Wayne McGuffin showed up, did you guys get back together?

A.    Yes.  Yeah.  Found him a job doing granite work.

Q.    And how much did you see Wayne during the time -- that time period in Hawaii?

A.    I was there for about another year, and then I came back home.  My mom was getting a divorce and I needed to come home and help her take care of her property.  So I left.

Q.    And your mom has some property here --

A.    In Dora.

Q.    In Dora?  Okay.

Nick McGuffin.  Did you -- how close would you say you were to Nick?

A.    Not as close as Wayne.  You know, he was below me in school, so I didn't hang out with him a whole bunch.  I was -- hung out with Wayne more than I did Nick.

Q.    Now, did you know Leah Freeman or of her?

A.    I did not know her at all.  Nope.

Q.    And at some point in time did you become aware

Exhibit 5002 at 454

*Damon Mason*

that Nick and Leah were boyfriend-girlfriend?

A.    Yes.

Q.    And did you ever see them together at all?

A.    No.  I don't -- I never recognized that girl until I saw a picture of her in a store.

Q.    Do you know Brent Bartley?

A.    Yes.

Q.    How do you know Mr. Bartley?

A.    He was in my class, graduated in '98 with me.

Q.    Want to bring your attention back to the end of June of 2008.

A.    Mm-hmm.

Q.    Just so we're clear, I -- and your girlfriend, it was her birthday?

A.    2008?

Q.    Or, excuse me, 2000.  I'm sorry.

A.    Okay.

Q.    Thank you.

A.    Got me confused there for a second.

Q.    No, 2000, right?

A.    Right.

Q.    Okay. your girlfriend Julianna, her birthday was the end of June?

A.    Mm-hmm.

Q.    What was the date of her birthday, do you recall?

Exhibit 5002 at 455

81

*Damon Mason*

A.    I want to say like the 26th or 29th.

Q.    Okay.

A.    One of those days.

Q.    And --

A.    It's been a long time since I thought about her.

Q.    Did you come back to Coquille for her birthday, or did you want to?

A.    I was -- I was coming back on the weekends kind of regularly, from living down in California.

Q.    And just so we're clear, at the time that you came up for your girlfriend's birthday, you were on abscond status from the military; is that right?

A.    That's true, I was AWOL.

Q.    While you were up here, is this when Leah Freeman disappears?

A.    From my understanding she disappeared a couple of days before I showed up in town.

Q.    Now, do you recall a time -- after you got up here for your girlfriend's birthday, do you recall a time that you were with Brent Bartley?

A.    Yes, I do.

Q.    And were you driving him someplace?

A.    We were driving around, yes.  I can't recall exactly where we were going, but yes, he was in my vehicle and we were driving around Coquille.

Exhibit 5002 at 456

82

*Damon Mason*

Q.    Now, just so we're also clear, so the grand jury knows this, initially, when the police were talking with you about what you knew, and about Brent Bartley (indiscernible), you were reluctant to share information with the police. Is that right?

A.    Um, yeah.  I was -- it had been a long time, and -- and there was stuff that -- didn't remember, that came up.  You know.

Q.    And the police to you, well, you know, if you don't tell us what you know, you could be obstructing in investigation?

A.    Right.

Q.    And you indicated you wanted some assurances from me that I wouldn't prosecute you for obstructing if you told them what you knew?

A.    Correct.

Q.    And I told you I would do that; is that --

A.    Correct.

Q.    Now, in regards to Brent Bartley, he's riding with you in your car?

A.    It was a truck, but yes.

Q.    Okay.

A.    Vehicle.

Q.    And did you drive by the Fast Mart?

A.    Mm-hmm.  Yes.

Exhibit 5002 at 457

*Damon Mason*

Q.    And I believe in previous discussions with the police and myself you indicated that that was June 29th?

A.    I don't remember saying a date.

Q.    Okay.

A.    Because I'm not -- I'm not sure.  I know I was coming up here on the weekends, I had a full-time job down there.  Construction work, so.

Q.    So you drive by the Fast Mart; is that correct?

A.    Correct.

Q.    And what happens as you drive by the Fast Mart?

A.    Brent sees a cop, says, Oh, there's cops.  I said, What's going on?  Why are you scared to see the cops?  He said, Because Leah's missing.

And I was like, Leah?  What do you mean?  And he's like, Nick's girlfriend Leah is missing.  And I was like, Well, why are you scared, you know?  And he said, Because I was with Nick when she went missing.  And I was like, Well, this is -- this is crazy, you know.

And so later we talked, talked with Wayne, and --

Q.    Well, did -- let me back up.

A.    All right.

Q.    In previous conversations that you and the police and I have had, you indicated that Bartley said that he and Nick had been responsible for Leah's disappearance.

A.    I said that Brent was involved with Leah's

Exhibit 5002 at 458

84

*Damon Mason*

disappearance, because he was with Nick the night that it happened.

Q.    Okay.

A.    And from what I was told, they were both looking for her, that night.

Q.    All right.  Now I'm going to back up.  Now, as best as you can remember, tell us what Mr. Bartley said, to you, about not wanting to talk to the cops.

A.    He didn't say anything about not wanting to talk to them.  They just drove by and he said, There's the cops. I asked him why he was nervous.  He said because he and -- he was with Nick when that happened, when Leah was missing.

And so that's how Brent was involved with that, as far as I know.

Q.    Now, some time later you talked with Nick and Wayne McGuffin.  And I said later; a couple of days, a week, something like that?

A.    Mm-hmm.

Q.    Tell us what happened.

A.    I asked him why Brent was so scared about the cops, and I asked him what happened, and they said that they didn't have nothing to do with it, and don't ask about it any more, it's none of your business.  Our family has nothing to do with it.

And that was -- I was, you know, back, gone.  I

Exhibit 5002 at 459

*Damon Mason*

went back to California, was working.  Couple of months later I moved to Idaho.  Some guy named Bill from the FBI called me in Idaho.  I called him back, and he never returned my phone call.  And I was there for six years, I went to Hawaii for two years, and I come back to Oregon, and I started getting questioned.

Q.    Do you have -- has anybody ever told you that they were involved in the disappearance of Leah Freeman?

A.    No.

Q.    Had anybody told you that they killed Leah Freeman?

A.    No.

Q.    Do you know -- of your own knowledge, do you know who killed Leah Freeman?

A.    No.

Q.    Is there any other information that you want the -- or you believe the grand jury should know about this case?

A.    No.

MR. FRAZIER:  Okay.  Thank you.  I don't have any other questions for Mr. Mason.

GRAND JUROR:  (Indiscernible.)

THE WITNESS:  Okay.  And unless the grand jury's got anything.  Anybody want to ask him anything?

Okay.  You're free to go.

Exhibit 5002 at 460

*Jennifer Storts*

THE WITNESS:  All right.

**TESTIMONY OF JENNIFER STORTS**

(Witness sworn.)

BY MR. FRAZIER:

Q.    Okay.  This is the grand jury for Coos County, and we're looking into the death of Leah Freeman.  And it's obvious, but we're recording everything.

A.    Yes, sir.

Q.    Okay.  First of all, could you tell us your name, please, ma'am.

A.    It's Jennifer L. Storts.

Q.    And do you live out or have you lived out in the Fairview area?

A.    Yes, I have.

Q.    And you work up at Coquille Valley Hospital?

A.    Yes, I do.

Q.    And what do you do up at the hospital?

A.    I'm currently a laboratory manager.

Q.    Oh, you're the big shot.

A.    Yes.

Q.    Back in the year 2000, were you working in the hospital?

A.    Yes, I was.

Q.    And what were you doing at that time?

A.    I was a laboratory technician.

Exhibit 5002 at 461

*Jennifer Storts*

Q.      And did that sometimes involve -- well, what would you do as a lab tech?

A.      Well, as a lab tech we do a lot of things, but one of the things we do have to do is take call.  You know, at different hours, at that point of time, the call hours were a lot longer and a lot more involved than they are now, but we took up to 72 hours at a time on call, where we were continuously on call.

Q.      And do you know or are you acquainted with an individual named Brent Bartley?

A.      I am acquaint -- I do know Brent Bartley, yes.

Q.      And how do you know Brent?

A.      Brent is the brother of a very a good friend of mine.

Q.      How long have you known him?

A.      Um, at -- I don't remember a time that I don't -- I didn't know Brent, let's put it that way.

Q.      Well, I want to direct your attention to June 28th, the early morning hours of June 29th.  Had you been on call at the hospital?

A.      Yeah.  I'm going to assume it's -- I don't remember the exact dates.  I brought the sheet in, but yes, I was on call the night that --

Q.      According to the sheet you brought in, the last call you had or the last record or whatever you did was at

Exhibit 5002 at 462

*Jennifer Storts*

12:05 a.m --

A.    Mm-hmm.

Q.    -- on June 29th, 2000?

A.    Right.  That would have been the time that I clocked out or left the hospital, yes.

Q.    Right.  And when you -- to the best of your recollection, when you clocked out that night, did you drive directly home?

A.    I drove direct -- yes.  I drove directly home.

Q.    And that's in Fairview?

A.    Yes, it is.

Q.    Did you see something that was out of -- what struck out as the ord -- out of the ordinary?

A.    Yes.

Q.    Could you tell the grand jury what you saw.

A.    When I was driving home, you have to realize I had been -- I was at the very end of a 72-hour week -- you know, weekend of call, and I was exhausted.  And so a lot of times when you're on call, you go into a mode when you're gone, you just kind of, I'm driving home.  And as I was driving up Fairview Mountain, I was startled because I saw three people walking up the mountain, and you just don't expect at that time of night to see anybody on the mountain, much less walking.

          And once I came off my startled, I was kind of

Exhibit 5002 at 463

89

*Jennifer Storts*

like, Whoa, do I need to turn around and help?  And then as I came around the next corner I saw a vehicle, and I was like, oh, okay.  Never mind.  There's a vehicle.  Didn't think anything else of it, and drove on home.

So, yes.

Q.    Okay.  Now, later you were aware that -- you became aware that there was a missing girl here, it was young Leah Freeman?

A.    Yes.  Yes.

Q.    Thinking back at what you saw, did you -- well, at the time in 2000, in the year 2000, June 2000, did you go to the police and tell them what you saw?

A.    Yes, I did.  It probably took me about four or five days for it to really sink in, of what I did see.  And then I did go to Sheriff Reaves.

Q.    When you say to sink in what you saw, what did you realize that you saw?

A.    Well, honestly, I'm going to be honest with you, after you come off 72 hours and you're that tired, I didn't read the paper.  I, you know, kind of paid attention that somebody was missing, but didn't really pay attention to the day that she had went missing, that kind of stuff.  Was basically in oblivion about what was really going on until I had an employee approach me and said, You realize we were on that night?

Exhibit 5002 at 464

*Jennifer Storts*

And I went, Oh.  Oh.  Basically then, Oh, crap. And pulled my call sheet, and that's when I took it down to the police station.

Q.    Now, did you recognize any of these people?

A.    You know, I'm not going to say that quote/unquote recognized people.  I would say that there was familiar body -- there was a familiar body type.  I can't say that I saw anybody's face because the two male figures had on hood -- you know, sweatshirt hoodies.

Q.    But one -- at least one of the males looked familiar?

A.    Yes.  It appeared; you know, body type, stance, that one of the males was Brent.

Q.    Now, there was two males and a girl?

A.    Two males and a girl?

Q.    And could you describe what you recall of the girl?

A.    What I recall of the girl, and you have to realize it's all images and, you know, 11 years ago.  But a blonde-haired girl, gave the impression that -- just, you know, in the glimpse as you're driving by, the impression of intoxication.  As if the two males were helping her walk, but she was at that point -- from, once again, impressions -- she was at least walking, standing upright.  You know, somewhat on her own, but getting helped by the other two males.

Exhibit 5002 at 465

91

*Jennifer Storts*

If "helped" is the right word, you know what I'm saying, you know.

Q. Now, you said you saw a car a little further on?

A. A truck. A small truck.

Q. Did that truck seem familiar to you?

A. It did, but I don't remember much of the truck. It was -- and that was one thing that I cannot remember stuff on.

Q. And you know Kathy McGuffin, do you not?

A. Yes, I do.

Q. She works at the hospital?

A. Yes, she does.

Q. And at times she would drive a pickup truck?

A. Yes, she would.

Q. I believe you told the police that while you weren't certain, that you thought the truck kind of looked like Kathy McGuffin's truck?

A. Yes. It -- it had resemblances, yes.

Q. Now, you indicated that when you put all this together, you said, Oh my gosh, I better go tell the police?

A. Correct.

Q. And you went and talked to Chief Reaves of the Coquille Police Department?

A. Yes, I did. Yes.

Q. How did he react to your information?

Exhibit 5002 at 466

*Jennifer Storts*

A.    Um, he didn't treat me real well, I'll be honest with you.  Made me feel as if I really -- he basically, when I handed him the call sheet to prove to him what time I had left, he said, What are you giving this to me for?  And I said, So that -- you know, there's absolute proof of what time I left the hospital, and you could have an idea of what time I saw what I saw.

And he basically blew me off, didn't take any written statement whatsoever, and I left.

Q.    I don't think I have any other questions for you.

A.    Okay.

Q.    Do you have anything you think the -- other than what we've talked about, that the grand jury should know?

A.    Um, I can't think of anything else.

MR. FRAZIER:  Does the grand jury want to ask her anything?

THE WITNESS:  Do you guys have any questions for me?

GRAND JUROR:  When you say the body type, and you think it was kind of like Brent --

THE WITNESS:  Mm-hmm.

GRAND JUROR:  -- you're familiar with Brent and it struck you as that's who it was?  Is that why (indiscernible)?

THE WITNESS:  Yeah.  And it struck me as

Exhibit 5002 at 467

*Jennifer Storts*

especially -- and you know the bad thing about it is, which you have to understand, it's very hard for me to say that. That is a very good friend of mine's brother, okay? A friend that I've had my entire life, okay? So that's very difficult for me to even say that.

However, that -- it -- if, quote/unquote, it was Brent, it would have been Brent, Leah, and then whoever that other person was. And that person I saw up quick like this, with a hood. And what I saw, I can't say it wasn't him. Let me put -- I absolute -- I cannot say that it was not him. You know, the double-double negative thing. I can't say it wasn't.

Body type, the walk, the slim shoulders. The -- the skinniness.

GRAND JUROR: Could you see if the girl looked like Leah or did she have long hair or short hair?

THE WITNESS: All I remember about the girl was a skinny small girl with blonde hair. Blonde -- I mean, the blonde hair is what sticks out at me from -- you know.

GRAND JUROR: And clothing?

THE WITNESS: I can't -- I don't remember any of that.

GRAND JUROR: You said at Fairview Mountain?

THE WITNESS: Mm-hmm.

GRAND JUROR: Tell me, where's that?

Exhibit 5002 at 468

*Jennifer Storts*

Can you show on the map?  I think that map would have it over there.  Maybe you can help us.

THE WITNESS:  Yeah, I was going up the -- to the top side of Fairview Mountain.  I wasn't -- I hadn't crested the mountain yet.

GRAND JUROR:  I don't know if this shows the mountain on it.

THE WITNESS:  Um, so -- well, it would have been at the top side.  There's Bob Geaney Lane, so it would have been -- what road is that?

GRAND JUROR:  I think that is (indiscernible).

GRAND JUROR:  It's before you got to the top of --

THE WITNESS:  It's before you get to the top of Fairview Mountain.

GRAND JUROR:  Before Lee Valley?

THE WITNESS:  You remember, before Lee Valley turnoff, you guys -- if anybody remembers where Carol Major used to live, on that sharp corner.  There's a barn there.  So directly across from --

GRAND JUROR:  Where in relation to the Heeston (phonetic) house?

THE WITNESS:  The Hees -- the actual new Heeston house, or the --

GRAND JUROR:  The new Heeston.

Exhibit 5002 at 469

*Jennifer Storts*

THE WITNESS:  The new Heeston house.

GRAND JUROR:  Up on top of the hill.

THE WITNESS:  Or the -- the one on the very top of the hill, or the new one that they put in?

GRAND JUROR:  Oh, well, see, now I don't know about the --

THE WITNESS:  So you're talking about the one on the very top of the mountain?

GRAND JUROR:  Yeah, where Dean lived, himself.

THE WITNESS:  Okay.  So just about -- it's not even going to be a mile down the mountain on the Coquille side.  Does that make --

GRAND JUROR:  Okay.  About where the big sweeping corner is?

THE WITNESS:  Exactly.  That's why it startled me, because I'm going around.  So I come up, and there's the two -- so I'm coming up Fairview Mountain, and there's the two houses on the left, um, you know, as you're going up the mountain, the two that are kind of close to each other.

GRAND JUROR:  The original Heeston place.

THE WITNESS:  And see, I don't know that.  I don't know if that's it or not.

And you come around that first corner, and it's a -- it's a turn to the left, and then there's that driveway. Remember where it fell off, and they've had to do all that --

Exhibit 5002 at 470

*Jennifer Storts*

GRAND JUROR:  (Indiscernible) lives up there?

THE WITNESS:  I don't know that.  I don't know who lives up that side, who owns that place now.  And it's where the mountain -- the mountain actually slid off a little bit, and they had to do all that work.  That's where I saw them.  And then as you came around that other complete hairpin curve, is right where I saw -- right where I saw the truck.

GRAND JUROR:  And where were they carrying her, like off of the road --

THE WITNESS:  They weren't carrying --

GRAND JUROR:  -- or -- you know.

THE WITNESS:  They were just on the side of the road.

GRAND JUROR:  Going away from the car?  To the car?

THE WITNESS:  Going towards the car.  And the car was parked above where they were at.

GRAND JUROR:  How far?

THE WITNESS:  50 yards.  70 yards.

GRAND JUROR:  They were that far from the --

THE WITNESS:  Yes, because it -- because once again I had enough time to think as I was driving, do I need to go back and ask them if they need a ride, before.

GRAND JUROR:  And what color was the truck?

Exhibit 5002 at 471

*Brent Bartley*

THE WITNESS:  I can't tell you that.  I can't tell you that.  Not -- not with a for-certain answer, no.

MR. FRAZIER:  Okay.  Anybody else?  Any other questions?  I'm sure she wants to go back to work.

(Laughter.)

THE WITNESS:  I took PTO to be here.  This is my, quote/unquote, day off.

GRAND JUROR:  Thank you very much.

GRAND JUROR:  All right.  Go enjoy it.

THE WITNESS:  Yeah.

MR. FRAZIER:  All right.  Thank you.

### TESTIMONY OF BRENT BARTLEY

(Witness sworn.)

BY MR. FRAZIER:

Q.    First of all, sir, I just want to let you know, this is the grand jury for Coos County, and we're looking into the disappearance of Leah Freeman, and her death.  Okay?  It's obvious, but I've turned some recorders on, so recording what happens here today.  Okay?

A.    Yes.

Q.    All right.  First of all, could you tell us your name, sir, and where do you live?

A.    I'm Brent Bartley.  I live at 275 North Broadway, Apartment 301, Coos Bay, Oregon.

Q.    How old are you, sir?

Exhibit 5002 at 472

*Brent Bartley*

A.    30.

Q.    Do you grow up here in the Coquille area?

A.    Yes, born and raised in Coquille.

Q.    Went to high school here?

A.    Yes.

Q.    Graduated?

A.    Yes.

Q.    What year did you graduate?

A.    '98.

Q.    Do you know an individual named Nick McGuffin?

A.    Yes.

Q.    And how did you know Nick?

A.    Through I went to school with his brother, and that's how I met him.

Q.    And that would be Wayne?

A.    Yeah, Wayne McGuffin.

Q.    How well would you say you knew or you know Nick?

A.    Pretty good.

Q.    Did you guys hang out a lot?

A.    Yeah.  It started out I was hanging out with his brother, mostly.  And then he was always the tag-along little brother, and then we both had girlfriends, and then started hanging out more, and then -- stuff like that.  And then I got a DUII in '98, and he still had a driver's license, so getting rides and stuff.

Exhibit 5002 at 473

*Brent Bartley*

Q.    You've had some problems with alcohol, right?

A.    Yes.

Q.    And you've been sober, I've been told here, for how long?

A.    127 days.

Q.    And I want to congratulate you for that.

A.    Thank you.

Q.    That's very good, and I hope you do well.

Did you know Leah Freeman?

A.    Yes.

Q.    How well did you know Leah?

A.    Just through Nick, and Nick bringing her over to the house, and just that way.

Q.    You knew Nick and Leah were boyfriend-girlfriend?

A.    Yes.

Q.    How well did they get along, from what you could tell?

A.    They had their arguments, just like every couple, off and on.  And sometimes they would -- they would be getting along fine, and sometimes not.

Q.    Did you ever see either one of them raise a hand towards each other?

A.    No.

Q.    Well, I want to talk about the day that Leah disappeared.  That would have been June 28th of 2000.

Exhibit 5002 at 474

*Brent Bartley*

Do you remember much about that day, at this point?

A.    To a point.

Q.    Okay.

A.    I was drinking that day.

Q.    Well, to the best of your recollection, could you start off what you remember you doing that day.  How did the day start off?  You know, when did you get up, and -- you know, if you can.

A.    Oh, I don't know what time I got up.  I could not tell you.

Q.    Okay.

A.    But I know it's probably smoked pot early in the morning, and I don't know if I drank, I cannot remember.  But I know we were going to go out to my grandparents' house, is -- it was supposed to be me and my girlfriend and him and his girlfriend, just to get out of my house because it was a party house, and mostly guys there, and don't really want to have your girlfriend around a bunch of people all the time, especially guys.

Q.    Who was your girlfriend?

A.    Nicole Price.

Q.    Okay.  Go ahead.

A.    And then he came over with Leah, I don't know exactly what time.  Early afternoon.  And then we went out

Exhibit 5002 at 475

*Brent Bartley*

there, Nick and I and Leah, and went out there.

And then we decided that we wanted to cook something, so we went to -- me and Nick went to McKay's and got steaks, and I got orange juice because my grandparents have a nice liquor cabinet, and I was raiding their liquor cabinet. And we cooked steaks, and then we were supposed to go pick up Nicky, and then Leah wanted to go for a walk with her friend. And so me and Nick went and -- and Leah, dropped off Leah at her friend's house, and then went and picked up Nicky, I'm thinking around like 6:00 or 7:00.

Maybe not that late. I don't know exactly, like I'm saying. I don't wear a watch. I don't know exact times.

And then we went back to my grandparents' house. It was me and Nicky and Nick, and then Nick wasn't -- didn't really want to just hang out with us two, and so he left. And then me and Nicky sat there and watched TV and did -- made out, did the typical boyfriend-girlfriend stuff. And then, I want to say that he came back twice, but I'm not a hundred percent sure on that, before the third time that he actually picked us up. And roughly around -- between like 10:30 and 11:00.

And then we drove and dropped off Nicky. He was already saying -- the first two times that he came there, he was saying -- asked us if we'd seen or heard from her. And since I wasn't supposed to be at my grandparents' house

Exhibit 5002 at 476

*Brent Bartley*

because they were out of town, that I didn't answer the phone. I went and -- just because I didn't want to get caught there. I wasn't supposed to be there, period.

And then -- and I told him no both times. And he just looked kind of worried, and I didn't think nothing about it, and then we dropped off my girlfriend, like I was saying, between 10:30, 11:00. Maybe a little after 11:00, I'm not a hundred percent sure of time on that either.

And then me and Nick drove around town and he was just looking like up and down the streets, worried, couldn't find her. And then I remember pretty -- time is sort of just fuzzy in my mind, because I was drinking. And I remember stopping at the high school because he said that she usually like to go to get away, go out to the football field and just sit in the grandstands and think. And then I remember we drove by Sanford Heights, where she was living with her mom and her grandma, I believe so. And he was saying, Oh, the light's not on, she's not there.

And so we didn't even stop there. And then we went to the -- that park up Sanford Heights, and he got out and went and looked in the park, and I didn't, because I was in a knee brace. I wasn't that mobile. And then I don't know exactly where else we drove around or anything like that, but then I see Richard Bryant and he had marijuana, and I was a pot-head, and so I got out with him and went home.

Exhibit 5002 at 477

*Brent Bartley*

Q.    Let's back up a little bit.  I want to go over with you what you've said here in a little more detail.  Is that okay with you?

A.    Yes.

Q.    All right.  Now, you did a handwritten statement for the police back in 2000?

A.    Yes.

Q.    Let me see if I can find that real quick here.  I think that's it right there, if I can get to it.

Does that look like a copy of what you wrote out there?

A.    Yes.

Q.    And you wrote out some little times there on the sheet when you filled that out.  Is that right?

A.    Yes.

Q.    And those were the times that you basically -- were the best of your recollection at the time back in 2000, is that right?

A.    Yes.

Q.    Now, you put down there at four o'clock that Nick and Leah came over to your place.  Is that right?

A.    Yes.  I put it down on here.

Q.    And the latter part there, We were smoking pot, do you recall that, people smoking pot?

A.    Yeah.  We probably smoked pot, because I always

Exhibit 5002 at 478

104

*Brent Bartley*

smoked pot.  (Laughs.)

Q.    Right.  Well, let me ask you this question.

Was Leah smoking pot that night?

A.    I cannot recall.

Q.    Okay.  Have you ever seen Leah smoke pot?

A.    Yes.

Q.    With Nicholas?

A.    Yes.

Q.    And how often?  Well, I mean --

A.    She didn't smoke pot ever -- like we did.  Not every day, all day long.  But every once in a while.

Q.    All right.  You ever see her drink, alcohol?

A.    I don't recall.  She might have, but I don't think so.

Q.    Okay.

A.    I'm not a hundred percent sure.  It's been ten years, so.

Q.    Right.  Well, at any time prior to the -- to -- at any time that you've known Nick and Leah, did you ever see Leah drink?

A.    See, I don't recall.

Q.    Okay.

A.    No.

Q.    All right.  You go up to your grandparents' place.  That's the Haga place.  Is that right?

Exhibit 5002 at 479

105

*Brent Bartley*

A.    Yes.

Q.    And you -- according to your statement, you get there around 6:00.  Does that sound about right?

A.    It's maybe a little earlier.

Q.    Okay.

A.    Like I was saying, I don't wear a watch.  I don't -- back then I didn't have a cell phone, so I didn't keep track of time.

Q.    Now, you guys go down to the market, you get some stuff to barbecue.  Is that what you're going to do?  Or --

A.    Yes.

Q.    Okay.  And you come back, and then Leah wants to go be with Sherry Mitchell (phonetic).  Is that right?

A.    Yes.

Q.    So you drive with Nick and Leah, and you go to the Mitchell place?

A.    Yes.

Q.    And seven o'clock seem about the right time when you get there?

A.    Yeah.  Roughly, yes.  Somewhere around there. Because we picked up Nicky right after we dropped her off.

Q.    All right.  And then you drove back up to the Haga place?

A.    Yes.

Q.    And Nick's there for 10 or 15 minutes, and he

Exhibit 5002 at 480

doesn't want to hang around with you and your girlfriend. Does that sound about right?

A.    Yes.

Q.    So he leaves?

A.    Yes.

Q.    And you've got no idea what -- you don't know where he went during that time frame?

A.    No, just what I heard from other people, but -- no.

Q.    And so then it's like a couple of hours later that he comes back?

A.    Yes.

Q.    And he asked if Leah was there?

A.    Yes, if we'd seen her or heard from her.

Q.    Had you seen Leah after she was dropped off at Sherry Mitchell's?

A.    No.

Q.    You then -- does Nick leave and then come back again?  Is that (indiscernible)?

A.    I'm not -- it's a little fuzzy there.  I'm not a hundred percent sure, but I think he did.  It's just in my mind, I'm just -- I've been thinking about this for a long time.

Q.    Right.

A.    And I think he came back one more time, and then

Exhibit 5002 at 481

*Brent Bartley*

left again, and then came back and picked us up.  I think he did show up two times looking for her, but I'm not a hundred percent sure on that.

Q.    So the second time he picks you up, that's a little later in the evening?

A.    Yeah.

Q.    And you take Nicky home.  Is that what you do?

A.    Yes.

Q.    And then you and Nick drive around for a period of time looking for Leah?

A.    Yes.

Q.    I think you put in your handwritten statement there it was around 11:30 or so, that you dropped off Nicole? Does that sound about right?

Maybe I got it wrong.

A.    I can't see the times.  That's a seven, right?

Q.    Okay.

Actually, it got cut off, but that's -- how long did you stay with Nick, looking for Leah?

A.    I don't know the approximately time.  I don't have a clue.  What I'm understanding is that it wasn't that long, maybe a half an hour, hour, if that.

Q.    Do you recall ever going to Denny's Pizza with Nick?

A.    I think we stopped by there.  I'm not a hundred

Exhibit 5002 at 482

*Brent Bartley*

percent sure on that either, because I was intoxicated.  And just for you guys, that I drank to get drunk.  I didn't drink to ease -- or to -- just to mellow out.  I drank to drink.  I was a drinker.

GRAND JUROR:  Can I -- what car were you in?

THE WITNESS:  You've pick -- that's what I was trying to think too.  I'm like 30 percent sure that he switched rigs.  He drove -- dropped us off in the Mustang, and I think he picked us up in the T-bird.  But I've been thinking about that too.  I'm not a hundred percent sure on that.  I'm like 30 to 50 percent that it was a different rig.

BY MR. FRAZIER:

Q.    And you were -- because you didn't have a driver's license, you were dependent on Nick to drive you around at this point?

A.    Yeah.  Anybody I could get a ride from.

Q.    All right.  Do you know a guy named Damon Mason?

A.    Yes.

Q.    Do you recall being with Damon a day or two after Leah disappeared?

A.    Kind of.  Not really.

Q.    Do you recall being -- driving by Fast Mart and seeing a police officer?

A.    I -- people told me that.  Since -- well, just recently.  And I don't remember it, but I know what this is

Exhibit 5002 at 483

*Brent Bartley*

coming to, about what I said that I had something to do with it.  And I'm thinking I just was getting harassed by the cops so much, because I did get harassed by Reaves an awful lot, and I was being questioned, is what I should have said.  But I'm no speech major, or nothing like that.  It just came out wrong.

Q.    I guess another thing I want to ask you is that we've had a witness testify that someone matching your description was with another male and a blonde-haired female up on Fairview Mountain that night about a little after midnight or so.  Were you on Fairview Mountain that night?

A.    Hmm, no, sir.

Q.    Do you know a guy named Doobie Marbut?

A.    No.

Q.    Do you know Dustin Graham?

A.    Yes.

Q.    Have you ever been around Dustin's apartment with other guys there?

A.    Which one of his apartments?

Q.    Well --

A.    The one up above The Broiler, or --

Q.    Uh, the one, I think, on Dean Street.  I'm not sure.

A.    Oh, yeah.  Yes.  Because that -- we lived right by him.

Exhibit 5002 at 484

*Brent Bartley*

Q.    There's a guy named Doobie Marbut, and we're trying to track him down, all right?  But he's talked to the police and I'm trying to track him down and bring him in here for this, okay?

A.    I might have met him with Dus -- over at Dustin's, but I -- I'm so bad with names, I could -- if I seen his face I could maybe say it, but I can't remember names.

Q.    I'm trying to --

A.    Too many years of smoking pot.

Q.    All right.  Mr. Marbut, when he was interviewed by the police some time ago, he indicated that he had a conversation with you, and that you told him the following, okay?  So I want to go over this with you.

He said that you told him that some husband had been ripped off for $5,000, that Leah and Nick had spent the money.  The guy was upset and wanted his money back.  That Nick and Leah were someplace, and Nick set it up so Leah was going to take the blame for the $5,000 being gone.  She was mad about it.  That wherever they were, she left Nick with -- walking, and then five people went in a car looking for her.

And according to this Doobie Marbut guy, he says that you, Ricky Crook, Nick, Alicia Michaud, and Bill Sero were all in the car.  That you accidentally ran over Leah, put her in the trunk, drove her out to the Fairview area by a

Exhibit 5002 at 485

rock pile, but when you got there she was still alive.  And that you beat her to death and put her -- and dumped her body.  Okay?

A.    (Laughs.)

Q.    All right.  My first question is do you recall ever telling anybody that story?

A.    No.

Q.    All right.  Is that story true in any way, shape, or form?

A.    No.

Q.    Well, what I want to --

A.    First time I heard that.  (Laughs.)

Q.    Do you know Bill Sero?

A.    No.

Q.    Tom Stemmerman?

A.    Mm, no.  I've heard of him.  I don't really know who he is.  I might have met him once, but I wasn't running around with that kind of crowd.

Q.    Alicia Michaud?

A.    Yeah, I know who she is.

Q.    I'm sure you've heard a rumor floating around town that Bill Sero or Tom Stemmerman or Alicia Michaud ran over Leah with a car.  Have you heard that rumor?

A.    Yes.

Q.    Has Bill Sero ever told you that he drove or that

Exhibit 5002 at 486

Case 3:21-cv-01719-MTK    Document 172-2    Filed 01/07/25    Page 488 of 1495

112

*Brent Bartley*

he killed or hurt Leah Freeman?

A.    No.

Q.    Has Tom Stemmerman ever told you that?

A.    No.

Q.    Alicia Michaud?

A.    No.

Q.    Have you ever -- were you ever -- well, were you involved in Leah's death in any way?

A.    No.

Q.    Were you in a car that might have run over or hit Leah?

A.    No.

Q.    Let me back up and ask you a few more questions. I know you talked to the police here the other day.

Nick had a blue Mustang.  Is that right?

A.    Yes.

Q.    Was he kind of proud of that car?

A.    Yes.

Q.    How did he treat the interior of the car?

A.    Good.  He was a neat freak.  He was keeping it clean.

Q.    What about his trunk?

A.    Base -- I've seen it.  I've -- usually it was full of crap that he didn't like having in the front seat.

Q.    And the police put down on some notes they gave

Exhibit 5002 at 487

*Brent Bartley*

me that you said neat -- Nick was a neat freak about the front of the car --

A.    Yeah.

Q.    -- and threw everything into the trunk?

A.    Yeah.

Q.    Did that trunk change after Leah disappeared?

A.    I -- yeah.

Q.    And what did you see?

A.    Nothing.

Q.    What do you mean, nothing?

A.    Nothing was in there.

Q.    Okay.  The trunk was empty?

A.    No car -- no liner, nothing.

Q.    All right.  Did Nick tell you that he and Leah had cleaned the car earlier the day that Leah had gone missing?

A.    Yes.

Q.    How about Kristen Steinhoff?  Do you know Kristen Steinhoff?

A.    Yes.

Q.    On -- do you recall Nick talking to Kristen on the evening in question?  On the evening Leah died -- or disappeared?

A.    Yeah.  I think we stopped by there.  I'm not a hundred percent sure, but I think we stopped by there, and I

Exhibit 5002 at 488

told them that I got out.  But I can't remember if I actually got out.  I just remember in my mind that I've been to that house -- I was in that house once.  And I can't remember if it was that night or not.

Q.    And the -- you told the police that you recall Nick going in to the back room with Kristen and having a conversation?

A.    Yeah.  And that's what I was going -- recall that, because I can't remember if I went over there with Nick.  I know I've been in that house.  I -- that's all I can really remember, but I've only been in it once because I knew it was a bad crack house and stuff.  And I wasn't into meth.  And I did my fair share of little tests, playing with it here and there, but I didn't like any of that environment because if I would have got caught with it or on it my family would disown me.

Q.    Now, you did drive by Leah's house at least once.  Is that right?

A.    Yes --

Q.    And did Nick get out of the car, go up to the door, knock on the door and say, "Hey, is Leah here?"

A.    No.  I remember him just saying the light wasn't on.  We slowed down by it, and he looked up to I guess where her bedroom was, but -- where her bedroom was, because I did go up there once with Nick, before that.  Or up with Nick and

Exhibit 5002 at 489

*Brent Bartley*

Leah, I should say.

Q.    And the light was off, and so didn't -- he said she wasn't there, so you didn't get out and check the house of anything like that?

A.    Yes, that's right.

Q.    Now, the next night, June 29th, did you go back up to your grandparents' house in the 29th?

A.    Yes.

Q.    And did you have some friends up there and have a little bit of a party?

A.    Yes.

Q.    Was there beer-drinking?

A.    Yes.

Q.    Was there a beer bong there that night, that you recall?

A.    Probably.

Q.    Okay.  Your mom came up the next day and found you and a couple of kids passed out?

A.    Yes.

Q.    And your mom wasn't real happy about that, was she?

A.    No.  (Laughs.)

Q.    Now, on the 30th, did you talk to the police? The day after your all -- the party on the 29th of -- well, you talked to the police, right?

Exhibit 5002 at 490

*Brent Bartley*

A.    I can't remember -- I thought I went with Mya (phonetic) down to the Rogue for a couple of days, because I can recall getting back home from the Rogue and my mom calling me, freaking out, saying that they still haven't found her and the cops are looking for me.

And then I went down to there, and then I got harassed by Reaves and all that other crap.

Q.    The police apparently have, on the morning of the 29th -- well, excuse me, on the morning of the 30th, apparently after your mom had come and wake -- woke everybody up and kicked you all out, went up and looked over the place, and they said they were out there and they saw like a -- a T-shirt or whatever, that looked like it was soaked in beer, and there were beer cans and a beer bong, and stuff like that.

And then later -- they didn't think anything about it, and left the stuff there.  And then they came back later in the afternoon after they talked to Nick, and they went back up to look, and all the stuff had been cleaned up?

A.    Yeah.

Q.    Do you know anything about it being cleaned up?

A.    Yeah.  Me and Mya picked it all up and threw it in his car, because it was Mya's -- we called them wife-beaters, just a white tank-top.

Q.    Okay.  So that shirt belonged to Mya Stokes

Exhibit 5002 at 491

*Brent Bartley*

(phonetic); is that what --

A.    Yes.

Q.    And the beer cans and all the other stuff you got rid of?

A.    Yeah.  We cleaned it up --

Q.    How close are you to Nick right now?

A.    I haven't talked to him in years.  Well, I talked to him, 2008, when I got out of Bay Area First Step, he actually called me.  And then when I was at -- yeah, Bay Area First Step House, and he called me and invited me over for dinner.  And I just talked to him, but -- about that -- it, and he was just checking on me because I tried committing suicide.

And then I went to Hazelden Springbrook, and then I went to the Step House after that.  And then he just called and invited me over for dinner, and that was the last time I talked to him.

Q.    Since Leah disappeared, has Nick talked to you about Leah?

A.    No.

Q.    I think I've asked you this.  Do you know who killed Leah Freeman?

A.    No.

Q.    Do you have any information, any other information we haven't talked about here today, that you

Exhibit 5002 at 492

*Brent Bartley*

think the grand jury needs to know about?

A.    No.  Just about the car thing.  That I don't --
I'm not a hundred percent sure, but on -- in my mind, I'm
thinking it was the T-bird.  It was a different car.  But
like I'm saying, I'm not a hundred percent sure on that.

MR. FRAZIER:  I don't think I have anything else
to ask Mr. Bartley.  The grand jury want to ask him anything?

GRAND JUROR:  Did you ever ask Nick about the
trunk and why it was ripped apart?

THE WITNESS:  No.

GRAND JUROR:  Well, did it have a liner in it, to
your knowledge, before?

THE WITNESS:  I'm thinking it did.

GRAND JUROR:  You said that you -- did you say
that you were riding around with Nick and then you got out
and met somebody that wanted to smoke pot with you, and then
that's when you separated from Nick?

THE WITNESS:  Yes.

GRAND JUROR:  Who was that, that you --

THE WITNESS:  Richard Bryant.  I seen him down
here at the stop light right below the middle school.

GRAND JUROR:  And what time was that, do you
know?

THE WITNESS:  I don't know exactly what time.

GRAND JUROR:  Could you say if when they cleaned

Exhibit 5002 at 493

*Brent Bartley*

the trunk out -- when they washed the car that day and cleaned it, could they have cleaned the trunk out then?  All the stuff out of the trunk?

THE WITNESS:  I could not tell you.  I don't -- I didn't look in his trunk or --

GRAND JUROR:  Did -- thank you.

Do you know this Doobie Martin, I guess that you --

MR. FRAZIER:  Marbut.

GRAND JUROR:  What?

MR. FRAZIER:  Marbut.

GRAND JUROR:  Marmont?

MR. FRAZIER:  Marbut, M-a-r-b-u-t.

GRAND JUROR:  Marbut, okay.

THE WITNESS:  What a name.  (Laughs.)

GRAND JUROR:  Um, do you know what kind of vehicle -- did he have a vehicle?

THE WITNESS:  I don't know.

GRAND JUROR:  Okay.  Or a Rowdy Howard?

THE WITNESS:  I --

GRAND JUROR:  Doesn't ring a bell?

THE WITNESS:  I met Rowdy before, in jail, but --

GRAND JUROR:  Mm-hmm.  You don't know what kind of vehicle he had?

THE WITNESS:  No.

Exhibit 5002 at 494

*Brent Bartley*

MR. FRAZIER:  Had you ever seen Nick driving his mom's truck?

THE WITNESS:  Yeah.  Are you talking about that day?  Or just has he ever driven it, period?

GRAND JUROR:  That day or anytime?

THE WITNESS:  Yeah, I've seen him drive his mom's truck before, yeah.

GRAND JUROR:  Did he that day?

THE WITNESS:  Not that I know of.

GRAND JUROR:  Could it have been that truck, then?

THE WITNESS:  I don't know.  I don't know what the truck looked like that she saw, so I couldn't tell you. I don't know.

GRAND JUROR:  So his mom had a T-bird and a truck?

THE WITNESS:  I think the T-bird -- I can't remember if the T-bird was his mom's first, and then they gave it to him, but it was a maroon '80-something T-bird.

GRAND JUROR:  Okay.

MR. FRAZIER:  Okay.  Anything else?

GRAND JUROR:  Not as bad as last time, right?

THE WITNESS:  Oh, a lot better.  (Laughs.)

MR. FRAZIER:  Mind a little clearer?

THE WITNESS:  Yeah.

Exhibit 5002 at 495

*Brent Bartley*

MR. FRAZIER:  Well, again, I want to commend you for your sobriety, and that's great, and I hope you continue with what you're doing.

THE WITNESS:  I'm planning on it.  I leave this here?

MR. FRAZIER:  Yes.  That would be nice.  Okay.

THE WITNESS:  Okay.  Thank you guys.

(Conclusion of CD 046.)


--oOo--


I certify, by signing below, that the foregoing, pages 1 through 121, inclusive, is a correct transcript of a Coos County grand jury proceedings dated July 23, 2010, and transcribed this 5th day of November, 2010.


_____

PEGGY S. JILLSON, TRANSCRIBER

Exhibit 5002 at 496

Copies

1

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

STATE OF OREGON,                    )
                                    )
          Plaintiff,                )    Case No. 10-CR0782
                                    )
v.                                  )
                                    )
NICHOLAS MCGUFFIN,                  )
                                    )
          Defendant.                )
_____)    Volume 5


Friday, July 23, 2010 (PM Testimony)

GRAND JURY PROCEEDINGS


APPEARANCES:              PAUL FRASIER
                          DISTRICT ATTORNEY

                                    TABLE OF CONTENTS

                          GREAVE, Trinity J.              3

                          WRIGHT, Crystal                12

                          LAMBERT, Alicia (Michaud)      20

                          NELSON, Nicole (Price)         43

                          BERTRAND, Denise (Freeman)     51

                          SHELTON, Sherre (Bolger)       59

            TRANSCRIB     HOLLING, Nikki (Webber)        65

                          CROOK, Ricky                   73
TRANSCRIBED BY:
                          STEMMERMAN, Thomas             96

Exhibit 5002 at 497

2

## TABLE OF CONTENTS

GREAVE, Trinity J.                          3

WRIGHT, Crystal                            12

LAMBERT, Alicia (Michaud)                  20

NELSON, Nicole (Price)                     43

BERTRAND, Denise (Freeman)                 51

SHELTON, Sherre (Bolger)                   59

HOLLING, Nikki (Webber)                    65

CROOK, Ricky                               73

STEMMERMAN, Thomas                         96

Exhibit 5002 at 498

*TJ Greave*

**COQUILLE, OREGON; JULY 23, 2010; 6:13 P.M.**

**TESTIMONY OF TJ GREAVES**

(Witness sworn.)

BY MR. FRASIER:

Q.    Okay.  First of all, sir, this is the grand jury for Coos County, and we're looking into the disappearance and death of Leah Freeman.  And before we get started here I need to advise you, though it's obvious, that we're recording the proceedings.  Okay?

A.    I understand.

Q.    All right.  First of all, sir, could you tell us your name and where you live, sir.

A.    My name is Trinity Greave.  I live at 1201 Shelley Road, Apartment 38.

Q.    And are you sometimes known as TJ?

A.    Yep.

Q.    Back in the year 2000, where were you living then (indiscernible)?

A.    I was living at the end of Third Street.  1360 Canyon Way is what it's called.  It was Canyon Way then, they've changed it to Third Street now.

Q.    Okay.  And that's, if you're going to the Washington School, on the north side of the parking --

A.    Yeah, you go past Washington School, down the gravel road, and it's about an eighth of a mile down there.

Exhibit 5002 at 499

*TJ Greave*

Q.    And how long did you live there, sir?

A.    Um, I think six years, at that time.

Q.    Are you familiar with an individual named Nick McGuffin?

A.    Yes, I am.

Q.    And how do you know Mr. McGuffin?

A.    I went to school with him, all through high school.

Q.    And how close would you say you were, him and you?

A.    More of acquaintances.  I knew of him.  You know, we seen each other.  We knew each other, but we didn't really like hang out as friends or anything like that, besides maybe basketball at school or something like that.

Q.    Okay.  Do you know or were you aware of a girl named Leah Freeman?

A.    Yes.

Q.    And how did you know her?

A.    I didn't know her.  I had met her the -- a day -- the day before she disappeared.

Q.    And how did you meet her the day before?

A.    With Nick McGuffin.

Q.    And where was --

A.    He introduced her to me.

Q.    And where was that at?

Exhibit 5002 at 500

*TJ Greave*

A.      This was at Daniel Lapine and Brent Bartley's house on Dean Street.

Q.      And that's the only time you ever saw those two together?

A.      Yep.

Q.      Now, do you know Alicia Michaud?

A.      Yes, I do.

Q.      How do you know Alicia?

A.      I went to school with her also.

Q.      How close would you say you are to Alicia?

A.      We're friends.  We don't keep in contact after high school, but we were pretty good friends in high school. We talked almost every day.

Q.      Okay.  Danny Lapine or Daniel Lapine?

A.      Yeah, I was friends with him too, during school. But like I -- he went to prison for a while, and we don't really keep in touch after high school.

Q.      Well, I want to talk with you a little bit about the events of the day that Leah Freeman disappeared.  I guess that would be the day after you first met her.

Do you recall having a bunch of people over to your house, either during the day or at night?

A.      Uh, that night -- or not the day of her disappearance, but the day before, I did have a few people over at my house.

Exhibit 5002 at 501

*TJ Greave*

Q.    Was Alicia Michaud over at your house?

A.    No, she was not.

Q.    Do you know if Danny Lapine came over to your house that day?

A.    I don't believe he did.  He did call once, that night that she had disappeared, looking for her.  But he never did come by.

Q.    Okay.  What about Nick McGuffin --

A.    Uh, he wasn't over either.

Q.    The reason I'm asking these questions, sir, is we've talked to several people and they -- you know, for example, I believe Quinn Cannon previously testified that she was with Danny Lapine that day and that there was going to be some sort of get-together there.  And she didn't go, but Danny went over to your house the night that Leah disappeared.

A.    Okay.

Q.    And so I guess my question, are you sure that your guests that day were --

A.    I -- I can't be positive that he wasn't there. He may have come in and, you know, not made it all the way in the house.  Could have been outside with people, but I just never saw him.

Q.    And Alicia Michaud, we're going to be hearing from her later today, but in statements she's made to police

Exhibit 5002 at 502

she indicated she'd been at your place that night; stayed the night, even.

A.    Really.

Q.    Yeah.

A.    Okay.

Q.    So do you recall that at all?

A.    No, I don't recall seeing her at all.  But, I mean, I was under the influence pretty heavily that night also.

Q.    Okay.  Under the influence of what?

A.    Alcohol.

Q.    Then your relationship with -- or I shouldn't say relationship.  In your contacts with Alicia Michaud, has she ever told you anything about what happened to Leah Freeman?

A.    No.

Q.    And has she ever mentioned anything about a car running over somebody such as Leah Freeman?

A.    Um, she may have, but a lot of people say that, just because they -- that kind of talk was going around, so.

Q.    Okay.  Do you know a Bill Sero?

A.    I knew of him.

Q.    Okay.

A.    And I had seen him before.  I didn't know him personally.  I'd never met him before, but I knew of him.

Q.    Okay.  Tom Stemmerman?

Exhibit 5002 at 503

A.    No.

Q.    I guess what I'm trying to get to, sir, has anybody told you that they caused harm to Leah Freeman in any way?

A.    Um, no.

Q.    You kind of hesitated there.

A.    We -- I've heard stories, but I've never heard anybody say that they knew for sure that that's what's happened, or that's what they thought happened.

Q.    Do you know who killed Leah Freeman?

A.    No.

Q.    I don't think I have any other question for you, sir.  Is there anything you know that the grand jury should know about Leah Freeman's death or disappearance?

A.    No, sir.

MR. FRASIER:  All right.  That's all the questions I have for you.  Does the grand jury want to ask him anything?

GRAND JUROR:  You said you met Leah the day before she disappeared.

THE WITNESS:  Yep.

GRAND JUROR:  With Nick?

THE WITNESS:  Yes, with Nick.

GRAND JUROR:  Okay.  But the day of her disappearance Nick didn't come over?

Exhibit 5002 at 504

*TJ Greave*

THE WITNESS: Well, it did -- I -- I'm not exactly sure when she disappeared, so I don't know if it was that night of the day that I met her or if it was the next day. All I know is they started looking for her the next day. Some people were saying, you know, nobody's seen her. So I met her that day, and I guess that night was the last time she was seen.

BY MR. FRASIER:

Q.    Okay. Well, now let me back up here, because I'm -- that night, you had a get-together at your place?

A.    Mm-hmm.

Q.    And it's the next day that they are looking for Leah?

A.    Yeah.

Q.    All right. Well, let's talk about that night.

A.    Okay.

Q.    Who all was at your house?

A.    Um, Anthony Fowler, who's a good friend of mine. Josh Thompson. Willie Blum (phonetic). Chris Seeger (phonetic). My sister, Tasha Greave. Uh, my cousin Chris Miller. And a few other people came in and out, but like I said, I -- I don't know who (indiscernible).

Q.    Was Danny Lapine one of the them?

A.    He could have been.

Q.    Okay. Alicia Michaud, was she there?

Exhibit 5002 at 505

*TJ Greave*

A.    She says she was, but I don't remember seeing her.

Q.    Okay.

A.    So.

Q.    There's a -- did you ever go with Alicia to pick to get her -- she had a baby at that time; is that right?

A.    I believe she did.

Q.    And do you recall ever going with Alicia down to Safeway so she could drop her baby off with her parents?

A.    Mm, I was never there for that.

MR. FRASIER:  Okay.  All right.  Go ahead. Anybody else have questions?

GRAND JUROR:  How many bedrooms were at this house that you --

THE WITNESS:  At my parents' house?

GRAND JUROR:  (Indiscernible).

THE WITNESS:  It's three bedroom, two living rooms, two bathrooms.

GRAND JUROR:  So is it possible that Alicia was there with somebody else and spent --

THE WITNESS:  The -- it's very possible that they could have been there, because I did go to sleep early that night.

GRAND JUROR:  You said Alicia, you were friends with her in school?

Exhibit 5002 at 506

*TJ Greave*

11

THE WITNESS:  Mm-hmm.

GRAND JUROR:  Now, did -- were you in high school or -- at the time --

THE WITNESS:  Yeah, we were both in high school.

GRAND JUROR:  Did she drop out of high school?

THE WITNESS:  I don't know if she dropped out or got kicked out, I'm not really sure.

GRAND JUROR:  But I guess my question is, is were you --

THE WITNESS:  Did she stop going?

GRAND JUROR:  Yeah.

THE WITNESS:  That I noticed?  I don't know.  Now that I think about it, I don't really notice if she kept going to school except -- you know.  I don't think we had any classes together, anyway.

GRAND JUROR:  Okay.  So you were -- well, it was summer at that point anyway.

THE WITNESS:  Right.  Yeah.  But I don't remember if she was still attending school or not.

GRAND JUROR:  Okay.  Who did you live with that would -- may have been with Alicia that night, if she was there?

THE WITNESS:  Psssh.

GRAND JUROR:  Who lived in the house?

THE WITNESS:  My parents, but they were gone.

Exhibit 5002 at 507

C. Wright

GRAND JUROR:  And people spent the night that night?

THE WITNESS:  Mm-hmm.

GRAND JUROR:  But you don't know who --

THE WITNESS:  I don't know who all stayed the night.  The next day it was just me there, so I don't know where -- what happened after I went to sleep.

GRAND JUROR:  So when you woke up in the morning, there was no one else --

THE WITNESS:  No one was there.  It was just a big mess, yeah.

GRAND JUROR:  Did you own a car or vehicle at the time?

THE WITNESS:  No.

GRAND JUROR:  Okay.

MR. FRASIER:  Okay.  Any other questions?

Okay, sir.  That will do it.  You're free to go.

THE WITNESS:  All right.

**TESTIMONY OF CRYSTAL WRIGHT**

(Witness sworn.)

BY MR. FRASIER:

Q.     First of all, this is the grand jury for Coos County.

A.     Okay.

Q.     And we're looking into the death or disappearance

Exhibit 5002 at 508

of Leah Freeman.

A.    Okay.

Q.    First thing I've got to let you know is -- it's obvious, but we're recording the proceedings.

A.    All right.

Q.    Okay?

First of all, could you tell the grand jury your name and where you live, please.

A.    Crystal Wright, and I live in Coos Bay, Oregon.

Q.    And are you acquainted with an individual named Alicia Michaud?

A.    Yeah.  She's actually sitting right outside, which I wasn't too happy about that.

Q.    Okay.  I didn't know she was going to be here this early.  We'll call her (indiscernible).

Well, first of all, how well do you know Alicia?

A.    Um, our kids went to school together, and her and I became really good friends.  And she would come over to my house and hang out, and do laundry, and we just used to hang out during the days because neither one of us worked at that time.

Q.    Was Alicia into methamphetamine?

A.    Um, I knew she was into drugs.  I didn't know what sort of drugs, but I do know that she was into drugs.

Q.    All right.  I don't mean to embarrass you or

Exhibit 5002 at 509

*C. Wright*

anything, but did you guys use drugs together or anything?

A.    No, I -- I've never used drugs.

Q.    Okay.  Very good.

I have information that four or five years ago Alicia told you something about the Leah Freeman case.

A.    Yes, she did.

Q.    Okay.  Could you tell the grand jury, please, what Alicia told you about that.

A.    She told me she was with them the night that Leah had died.  That they were driving in Coquille and there was -- she only told me two of the other people's names.  And they seen her, they hit -- ran her over with their car.  And they thought they'd killed her.  They put her in the car with them, and Leah came to and started fighting for her life.  And they like started beating on her, took her up into the woods, and finished her off.  She told me they ripped out her teeth and tore her fingernails off, and then dumped her body.

Q.    Did she say who the other two people were?

A.    Bill Sero and Tom Stemmerman.

Q.    When she told you this, how was she behaving?

A.    Scared.

Q.    Scared?

A.    I told her she should go to the police, and she said that she had called once but didn't, you know, continue the call.  She had hung up before anybody answered.  She was

Exhibit 5002 at 510

C. Wright

too scared to say anything.

Q.    And she told you she had been to the police many years before and told the same story several times?

A.    No.

Q.    Okay.  I guess -- is that the only time she ever discussed Leah Freeman with you?

A.    Yeah, because I had told her, you know, I didn't even want to know about it because, you know, I didn't want my family endangered.  So I told her I didn't want to know about it, and she just kept talking and talking and told me what I just said, and -- I didn't want to know.

Q.    You told, I believe it was Officer Babb, with the Coos Bay Police Department --

A.    Yes.  He was my neighbor.

Q.    When did you first tell the police about this?

A.    Well, I called (indiscernible) and told him I would like to remain anonymous, shortly after you guys reopened the investigation.  And that same night I was going driving home and Officer Babbs was going for a run, and I happened to see him.  And I thought, okay, it's -- maybe it's supposed to be that I run into him and just talk to him.  So I talked to him a little bit.

I didn't tell him everything at that point, that I knew, and he said he would get back to me.  And when he did, he said that some of the stuff I said may not have been,

Exhibit 5002 at 511

*C. Wright*

you know, really what happened.  So the next time I seen him I said, Okay, well, maybe I have a little bit more information you might want to know, and that's when I told him about her teeth and her fingernails.  And he asked me how come I didn't tell him sooner, and I said, you know, I mean, I don't want to put my family in danger.  You know, this is my life too, you know.  And if they can do it once, who's to say they won't do it again, especially if I'm right, you know.  So.

Q.    Well, if I were to tell you her teeth were not pulled and she didn't lose her fingernails --

A.    That would make me feel a lot better.

Q.    Okay.  I'll tell you that (indiscernible).

A.    Okay.

Q.    Anything else about this that you think we ought to know about?

A.    No.

Q.    Do you have any other information about the death of Leah Freeman?

A.    No.

MR. FRASIER:  I don't have any other questions.  Does the grand jury want to ask her anything?

GRAND JUROR:  Was that the only time she ever mentioned this stuff to you?

THE WITNESS:  Yeah.

Exhibit 5002 at 512

C. Wright

17

GRAND JUROR:  Did she have a propensity to tell stories?

THE WITNESS:  She had never told anything like, you know, that before.  She just said that she was at that party and she was hanging around with them, and they went for a drive.  She said that they were all drugged-out and drunk, and that she remembers hitting her and then putting her in the car.  And then she said that she believed that they took her fingernails off and her teeth were pulled out, and they beat her with a crowbar and finished her off.

GRAND JUROR:  Do you know what kind of car?

THE WITNESS:  I don't know what kind of car it was.

GRAND JUROR:  So it sounds like, the way you just said that, that she was describing it as the -- what they had told -- someone had told her they did to her.  She wasn't actually saw --

THE WITNESS:  She said that she was in the car when it happened.  She said she was in the front seat, and that they had put her in the back seat, put Leah in back seat.

GRAND JUROR:  Mm-hmm.

THE WITNESS:  And they thought she was dead, and they were going to go dump her.  And she came to, I guess, and started fighting, so they started beating on her.

Exhibit 5002 at 513

GRAND JUROR:  Did they say where they did it at?

THE WITNESS:  They said they ran her over up by the high school, and then they put her in the back seat of the car, and then they turned on Fairview Road and went up that way.

GRAND JUROR:  Did they say whose car it was?

THE WITNESS:  They didn't -- she didn't tell me whose car.

GRAND JUROR:  Was there anything -- I know it's hard to probably remember all the conversation now, okay, but is there anything that led up to this in the conversation? Were you talking about anything?

THE WITNESS:  I don't -- you know, I've been thinking about how that conversation even came about, where she came out and was telling me.  I just -- all I remember is where I was standing in my house at the time, and she just came up to me and told me.  You know, I don't remember if there was something in the paper that had, you know, had her in it at the time.

GRAND JUROR:  Did it -- I mean, I'm trying to kind of get a feel for did it come across like I'm trying to get this off my chest, or just as a matter of fact I know what happened?

THE WITNESS:  She felt like she kind of -- it seemed like she wanted to get it off her chest.  That it had

Exhibit 5002 at 514

C. Wright

been something that she'd been wanting to talk about, and she felt like she could trust me, I guess.  You know, I'm actually a pretty good friend, but --

GRAND JUROR:  Mm-hmm.

THE WITNESS:  I mean, it took me this long to come forward with what she had told me.

GRAND JUROR:  So just recently you came forward with this?

THE WITNESS:  Yes, when you -- they reopened the case.

GRAND JUROR:  Mm-hmm.

GRAND JUROR:  Was there any special reason you would have thought that your family would be in danger if you pursued --

THE WITNESS:  Well, if they know that I'm giving up names of people who may have killed somebody, I mean --

GRAND JUROR:  So there are -- there was a kind of feeling around here that you -- people wanted to be quiet --

THE WITNESS:  Well, for one, I don't know who Bill Sero or Tim Stemmerman are.  I mean, I know who Tim -- or Tom is, because, you know, his dad's pretty big in the community with his construction business.  But I don't know what they look like, you know.  So -- she obviously knows who I am, but the other two don't, so.

GRAND JUROR:  Okay.

Exhibit 5002 at 515

GRAND JUROR: Do you -- I know this is probably a hard one, but do you think it's something -- well, she -- I mean, she would remember telling you this? I mean, wasn't she, at the time -- you think she probably remembers making this statement to you?

THE WITNESS: Oh, I'm sure she does, because when she seen me walking down the hall she about got a ghostly look on her face. And I'm sure she knows why I'm here, because other than that statement she told me, there would have been no other reason for me to be here.

MR. FRASIER: Any other questions?

I just thank you for coming forward.

THE WITNESS: That's why I was (indiscernible) a little bit. Otherwise, I --

MR. FRASIER: I'll come out with you, here.

**TESTIMONY OF ALICIA LAMBERT (MICHAUD)**

(Witness sworn.)

BY MR. FRASIER:

Q. Okay. First of all, this is the grand jury for Coos County, and we're looking into the death or disappearance of Leah Freeman. Okay?

A. Okay.

Q. It's obvious, but I need to tell you we're recording this, okay?

And because you're kind of soft-spoken, it sounds

Exhibit 5002 at 516

*A. Lambert*

like, you're going to need to speak up, especially when the air conditioner gets going.  Okay?

First of all, could you tell us your name and where you live, please.

A.    Alicia Lambert.  And 90790 Travis Lane, Coos Bay, Oregon.

Q.    And your maiden name is?

A.    Michaud.

Q.    How long have you been married now?

A.    Um, almost five years.

Q.    Well, we're here because of Leah Freeman, and I guess where I want to start with you is, well, did you know Leah Freeman?  Were you acquainted with Leah Freeman?

A.    No.

Q.    Nick McGuffin?

A.    Yes.

Q.    How did you know Nick McGuffin?

A.    I went to high school with him, and hung out with him a few times.

Q.    You went to --

A.    Well, more than a few times, but.

Q.    Went to high school here in Coquille?

A.    Yes.

Q.    Did you graduate?

A.    Yes, not from here though.

Exhibit 5002 at 517

22

A. Lambert

Q.     Okay.  Year 2000, I don't mean to embarrass you, but I think we need to talk about it.  Now, were you into -- did you have a drug problem?

A.     Yes.

Q.     What kind of drugs are we talking about here?

A.     Meth.

Q.     Okay.  And in the year 2000, summer of 2000, were you actually in a rehab program over in Roseburg?

A.     Yes.

Q.     At some point in time, the sheriff's office or the Coquille Police Department was notified by an attorney named David Terry -- do you know any David Terry?

A.     Yes.

Q.     And Mr. Terry indicated that we needed to talk to you, and so some sheriff's deputies or detectives came and talked to you.  Do you recall talking to them several times?

A.     Yes.

Q.     I guess what I want to know, ma'am, is what do you know about Leah Freeman's death.

A.     Um, do I just start from like square one?  I mean, I don't really --

Q.     Okay.  Well --

A.     I just know --

Q.     Go ahead, and I'll ask you questions.  Just go ahead and --

Exhibit 5002 at 518

A. Lambert

23

A.     Okay.  There are two --

Q.     -- tell us right from the beginning, everything you know.

A.     Okay.  I know that the night that she disappeared I had no idea what was going on.  We were at -- I was at a party at TJ's house.  There was a few small -- it was just small people -- you know, a small crowd there.  And my parents called me because I had my baby with me, and they came and picked my baby up and -- and so I had no idea what was going on.

The next day I was at Danny Lapine's house with Quinn and Bill and myself, and we were watching movies.  And all of a sudden Nick came in and like frantically was like, Oh my God, my girlfriend disappeared, da-da-da-da.  And like he was trying to show pictures and stuff.  And I -- I remember saying, I don't need to -- I don't need to see a picture.  Like, oh -- like something flashed in my head of like what -- you know, like -- and I have never met this girl like in my whole entire life.  And like pictures like -- just like flashed in my head, and stuff like that.

And I don't remember where -- what happened from that -- well, I know that night we -- I -- Bill was saying, Let's just go, will you take me home, da-da-da.  And so I drove him home.  My car ran out of gas.  Some police officers had came and arrested Bill and took me home, and -- and then

Exhibit 5002 at 519

A. Lambert

like a few days later my parents put me in that rehab.

And -- and I ran away from the rehab center with a -- with a girl, and we went to Tom's house, and that night --

Q.    Tom may be Tom Stemmerman?

A.    Yes.

Q.    Okay.  Go ahead.

A.    Um, that night he was like trying -- I mean he made very vivid like remarks to me and stuff.  He, um, pretty much told me I needed to give him sexual favors for the -- for the cab ride that I -- that he paid for.  And so he held a gun there, and made me do things, and -- and stuff.

And he told me like later on that night, it was like 2:00 or 3:00 in the morning, and he was telling me like that I needed to go look out into a trailer that had some like clothes and stuff of -- he was saying it Bill's or something, and that they were all bloody, and I needed to -- he wanted me to like go out there and look at these clothes.

And I was pretty kind of freaked out at that time, and I guess I had said some remarks, I don't remember what they were.  And he was saying like, oh, he -- I'm going to put a cap in your mouth like Leah Freeman.  And, you know, stuff like that.

Well, anyways, the next day I do remember going out there and into this trailer, and I know there was some

Exhibit 5002 at 520

*A. Lambert*

like clothes with like stuff on them. And so I remember that day I -- my mom like had -- frantically was calling all over, looking for me and stuff. And she got ahold of Tom and she begged him to like let me go, you know, as -- like, you know, because he was like kind of just like holding me there, saying you -- you're not leaving me, and blah-blah-blah. And you're a snitch. And he just kept like saying like remarks at me and stuff. And -- and -- but he did like tell me like stories of all the -- that him and Bill like hit her or something in a car, and...

Q. Okay. This is Stemmerman telling you this?

You have to answer out loud for the tape.

A. Yes. Yes.

Q. All right.

I'm going to back up and kind of go over this with you a little bit.

A. Okay. Because that's probably what I need.

Q. Okay. I'm going to over it with you, and I'm going to have some other questions for you too, (indiscernible).

But first of all, the night that Leah disappeared, you're over there at TJ Greave's house; is that right?

A. Yes.

Q. And did you stay the night there?

Exhibit 5002 at 521

26

A. Lambert

A.    Yes.

Q.    Did you stay the night with anybody in particular? Was there a part of the house you crashed in?

A.    I remember there was like a bunk bed and I do remember, I think Ben -- I'm going to say, I don't know -- I think was in the room with me.

Q.    Now, your baby. Your mom called you or your dad got ahold of you?

A.    Uh-huh.

Q.    And where did you meet your mom and dad with the baby?

A.    At -- at Safeway in Coquille.

Q.    And did anybody go with you?

A.    Trying to remember who drove me. Somebody drove me there. Um --

Q.    You told the police back in August of 2000 that it was Anthony Fowler.

A.    Okay. I think that's --

Q.    Does that sound right?

A.    Yes. Yes.

Q.    And after you dropped your baby off with your mom and dad, you had also said you went and smoked some pot with Anthony before you went back to TJ's. Does that sound about right?

A.    Yes.

Exhibit 5002 at 522

27

A. Lambert

Q.    You mentioned at the house was TJ, Megan -- do you remember Megan?

A.    Megan Pinkley.

Q.    Megan Pinkley?  Okay.

Ben, do you remember Ben's last name?

A.    Harvey.

Q.    Okay.  And a Brandon.  Do you remember Brandon?

A.    I do, but I don't know his last name.

And it wasn't my brother.  It was -- because I do have a brother named Brandon.

Q.    Um, and you told us about going to -- that evening you were over at Brent Bartley's with Bill Sero.

A.    The next night?

Q.    Yeah, the next night.

A.    Yes.

Q.    Okay.  How did you -- how do you know Bill Sero?

A.    Um, let's see.  Well, my brother and him were kind of friends, from long, like -- back in like high school. But I kind of remember like when I used to live in Myrtle Point I met like his brother and Bill and -- and so we just were kind of buddies and -- and also when I was dating Mike Hedrick, Mike was pretty good friends with Bill, so he always like called me his little sister, type thing.  And --

Q.    How did you come to be with Bill that night?

A.    That, I don't recall.

Exhibit 5002 at 523

A. Lambert

Q.    Bill -- did Bill have a girlfriend at the time, or --

A.    No.  No.

Q.    So you're over watching a movie.  Do you remember what the movie was?

A.    I don't.  Sorry.

Q.    If I said *Deuce Bigelow*, would that ring any bells?

A.    Actually it does, yes.  Okay.  I think it was *Deuce Bigelow*.

Q.    Okay.  Then did you go with Bill to the house, or you probably don't remember?  To Brent Bartley's, or that house.  How did you get there?

A.    I know I drove because I was in my car.  But I -- I think I went from my house to Brent's, and I'm not sure if Bill was already there or I -- I really don't (indiscernible).

Q.    That's fine.  I just want to know how you get there, so --

A.    Yeah.

Q.    Now, you -- after you -- you finished watching -- well, while you're there, Nick McGuffin shows up.

A.    Yes.

Q.    And he's upset about his girlfriend being missing?

Exhibit 5002 at 524

*A. Lambert*

A.      Mm-hmm.

Q.      Does he describe Leah to Bill?

A.      Yeah.  I mean, I remember he was saying like she had -- you know, she's blonde; she's a small, petite girl; and -- and I kind of was like -- for some reason, in my mind, like a picture of her just kind of like flashed before me.  I know it sounds really weird.

Q.      That's fine.  Go ahead.  That's fine.

A.      But -- and like I kind of like stopped him.  I'm like, Just stop.  Like I -- he was like trying to like shove pictures in my face and stuff.  And like Bill's.  And like she was like walking around, you know.  And -- and I was just saying, Stop it, you know, like.

Q.      So he told you, you and Bill, that she was petite, blonde hair.  Did he mention anything else about her anatomy at all?

A.      No.

Q.      Okay.

A.      Not that I recall.

Q.      Did he ever use the phrase "big boobs"?

A.      No, not that I recall.

Q.      So you're finished watching the movie and you leave?

A.      Yes.  I think I remember Bill saying it was -- Can you just drive me home?  Or, Let's go.  We need to go,

Exhibit 5002 at 525

A. Lambert

let's go.  And --

Q.    So he ends up in the car with you?

A.    Yes.

Q.    And as you're driving you run out of gas or your car breaks down, or what -- what happened?

A.    Yeah, I think we ran out of gas.  Or -- and it was really late and all the gas stations were closed.  And -- and my car ran out of gas.

Q.    And the police came up on you.  Where did you run out of gas at?

A.    Um, hmm.  I'm not really sure what street.  It was a side street, like from Daniel's house the side street, maybe right by -- close by that park.  It was somewhere like from there, a side street.  I mean, we weren't like on the main road, I don't think.

Q.    You say the park.  You mean like 5th Street Park, probably?

A.    Yeah.  It was somewhere along the lines right about there.

Q.    All right.

A.    I remember it was like right by a stop sign, so.

Q.    And then how did the police show up?  How do you --

A.    I don't know.  Like all of a sudden they were there.

Exhibit 5002 at 526

Q.    Okay.

A.    And, um --

Q.    And so you tell them you're out of gas?

A.    Uh-huh.

Q.    And they start checking out with you, like check your driver's license and stuff like that?

A.    Mm-hmm.

Q.    And then they find out that Mr. Sero had a warrant or something?

A.    Apparently.  Something, yeah.  And so they --

Q.    Arrested him?

A.    -- arrested him.

Q.    And did you get arrested that night?

A.    No.  And I'm not really sure if they drove me home or if they called my parents or -- I can't really remember how I ended up getting home from there.

Q.    Okay.

GRAND JUROR:  Did you need to get your car afterwards?

THE WITNESS:  I think we got it the next day.  I think my dad maybe went down and brought gas to it, and then -- then we drove it home, and --

BY MR. FRASIER:

Q.    Okay.  Now, did -- you had a note there that when you initially talked to the police that you told your

Exhibit 5002 at 527

A. Lambert

mother and the counselor that you'd had a vision or a dream about Leah's disappearance.

A.    I did.  I -- I went to a different -- it was like more of a -- like a transitional home for women.  Like a -- a drug-and-alcohol-free-based home.  And I remember -- like I almost felt like her -- I don't know the word, but like felt like her -- like she was there in the -- you know.  But anyways, I woke up and -- and I remember having like a vivid dream of like that she was already dead.  Like out, like Fairview somewhere.  And I do remember telling the police that I had this.

Q.    Do you remember saying that Leah's body would be found near a stream with a bag over her head?

A.    I do.

Q.    Now, a couple of days later the police talked to you again about it, and at that time you mentioned something about a sweatshirt.  Do you remember anything about a sweatshirt, or do you recall (indiscernible) sweatshirt?

A.    I don't.

Q.    Okay.  And you indicated that sometime during the evening while you were over at TJ's, somebody stole your gray hooded adidas brand sweatshirt?  And that you were looking for it, and people would remember that you were there because you were looking for the sweatshirt?

A.    That they what?

Exhibit 5002 at 528

*A. Lambert*

Q.    That people would remember you were there because you were looking for the sweatshirt?

A.    Uh-huh.

Q.    Does that ring any bells with you now?

A.    I don't want to say it does ring a bell, but it's like kind of faintly --

Q.    Okay.  We heard from some people -- now, there was another time you were interviewed at -- and this time you were in jail.  Coos County jail, down at the sheriff's office in 2000.  Do you recall that interview, now?

A.    Somewhat.  I'm not sure what I said.  It was --

Q.    You were inter --

A.    I was pretty --

Q.    Pretty what?

A.    Pretty messed up on drugs, back then.  So (indiscernible).

Q.    You've been sober for a while?

A.    Yeah.

Q.    How long?

A.    Oh, gosh.  Um, over seven years.

Q.    Okay.  So you've worked hard a getting off the meth and all the other stuff?

A.    Yeah.

Q.    All right.  There's a -- at the interview in October of 2000 you told the police you were told by Tom

Exhibit 5002 at 529

Stemmerman that he was in a car which also had Bill Sero and another subject by the name of Sean, and that they supposedly ran over the victim.

Do you recall telling the police this?

A.    Mm-hmm.

Q.    Okay.  Did Thomas Stemmerman tell you that?

A.    Yes.

Q.    And do you know who this Sean character was?

A.    I don't.  And I don't remember saying Sean, but.

Q.    And in this statement you told the police that you were told by Mr. Stemmerman that they put Leah in the trunk of their car and took her to the Stemmerman house for a couple of weeks, hoping she'd get better.

Do you remember telling the police that?

A.    Mm-hmm.

Q.    Okay.  Did Mr. Stemmerman tell you that?

A.    Yes.

Q.    And they kind of hoped that she'd either get better or whatever, and she ended up getting worse and died?

And what did Mr. Stemmerman tell you, what they did with Leah after she died?  Do you recall?

A.    I don't.

Q.    Do you recall telling the police they then dumped her body out in the Fairview area?

A.    I don't remember him telling me that.

Exhibit 5002 at 530

*A. Lambert*

Q.    Okay.  Did you believe him when he told you that?

A.    I don't think I did believe him.

Q.    Why is that?

A.    Just because he was -- I mean, like at the time it almost seemed like he was trying to feed my head with like stories, maybe.

Q.    Okay.  Now --

A.    Like making me believe other things, maybe, that --

Q.    Mr. Stemmerman was involved in the drug world at that time?

A.    Yes.

Q.    He was a dealer?

A.    Mm-hmm.

Q.    Sold drugs from his house out there on Libby Drive?

A.    Yes.

Q.    You told the police in 2000 that you believed Stemmerman was using this information to bolster himself as a drug big shot.  Do you remember telling the police that?

A.    I don't.

Q.    Okay.  Did Stemmerman tell you who was driving the car?

A.    No.

Q.    Did he tell you what kind of car it was?

Exhibit 5002 at 531

*A. Lambert*

A.    No.  If he did, I don't remember.

Q.    Do you know who Rowdy Howard is?

A.    Yes.

Q.    Who's Rowdy?

A.    Um, I dated him for a little while.

Q.    Were you dating him back then?

A.    Yes.

Q.    Did you tell the police that Rowdy may have some information that could shed some light on this?

A.    I may have, yes.

Q.    Now, this year, back in May, Officer McNeely and Officer Webley from the Coquille Police Department spoke with you.  Okay?

You told the police at that time you were having some memory issues.

A.    Mm-hmm.

Q.    Is that because of your drug use?

A.    Um, well, I've kind of been diagnosed with bipolar, and I don't know if it's -- stems from the drug use or not, but I do have --

Q.    Okay.  And I'm not trying to embarrass you or anything.

You told the police at the time of Leah's disappearance you had been using methamphetamine heavily, often staying up three to five days at a time.  Is that --

Exhibit 5002 at 532

*A. Lambert*

A.    Yes.

Q.    Is that true?

A.    Yes.

Q.    And that you were -- you've been diagnosed with being bipolar, and you've actually had some psychiatric treatment.  Is that right?

A.    (No audible response.)

Q.    I need to ask you a couple more questions, ma'am.

Have you ever told anybody that you were in the car when Leah Freeman was run over by a car?

A.    Mm, no.

Q.    We heard from a witness earlier today, and I think you probably saw her in the hallway --

A.    Mm-hmm.

Q.    -- that about four or five years ago that you told her that you were in the car with Tom Stemmerman and Bill Sero when Leah Freeman got run over.  Do you recall telling her that?

A.    I don't, no.

Q.    Did you talk with her about this at all?

A.    I think I did talk with her about it, but I never once said I was in the car.

Q.    Okay.  Well, my question is to you this:  Were you in the car?

A.    No.

Exhibit 5002 at 533

*A. Lambert*

Q.     Did you have anything to do with Leah Freeman dying?

A.     No.

Q.     Leah Freeman being kidnapped or disappearing or anything like that?

A.     No.

Q.     And you were using drugs a lot then, but are you absolutely certain you had nothing to do with Leah Freeman's death or disappearance?

A.     Yes.

Q.     Outside of what you told us about Mr. Stemmerman and Mr. Sero, has anybody else told you that they were involved in the death of Leah Freeman?

A.     No.

Q.     Have you had a conversation with Nick McGuffin about what occurred?

A.     I haven't, no.  I mean, maybe back then.

Q.     Okay.

A.     I don't really ever think I -- like one-on-one, ever had a conversation with him.  But I do know that when -- every time I have seen him, like on the streets or like at a market or something, like he like just stares me down and glares at me, and gives me like -- like -- I don't know, just makes me feel like sh (phonetic), and that I -- I don't know. And I've never.

Exhibit 5002 at 534

A. Lambert

Q.    Okay.  Did you write Nick a letter about this?

A.    Yes.

Q.    Okay.  I'm going to show you this particular document.  Is this the letter you wrote to Nick?

A.    Yes.

Q.    In that letter, do you make reference to Leah Freeman's death?

A.    Did I what?

Q.    Did you talk about Leah Freeman, in your letter?

A.    I think so, yes.

Q.    And did you intimate or did you tell Nick you knew what happened to Leah Freeman?

A.    Yes.

Q.    And was this based on what Stemmerman had told you?

A.    Yes.

Q.    Or Mr. Sero?

Well, let me back up.  Did Mr. Sero ever tell you he was involved in Leah's death?

A.    No.

Q.    So your source of information was Tom Stemmerman the whole time?

A.    Yes.  And my dreams were.

Q.    Your dreams.

A.    I mean, I really can't recall if like my dreams

Exhibit 5002 at 535

A. Lambert

were just like a -- a dream, or if someone actually -- I mean, I really wish I could remember and -- and tell you, like, Hey, someone told me that, or if it was really just like I visioned this. I mean, I know it sounds really weird, and (indiscernible).

Q.    Okay. Well, I guess I want to make sure, abundantly clear, you were not in that car?

A.    No.

Q.    And you had nothing to do with it at all?

A.    No.

Q.    Why did you write that letter to Nick?

A.    I don't know. I really don't know. I mean, I -- I see the letter, and it's my handwriting, and -- but frankly, I don't remember writing this letter. I don't even know -- I think when I -- I mean, I think I'm like allergic to drugs, and when I do drugs my brain or something goes absolutely somewhere else.

        And I just -- even if I was in jail and hadn't done it for like two or three weeks, I really think that like still it's, you know, something that's...

Q.    Is there anything else about Leah Freeman's disappearance that you haven't told us? Is there anything else you know about this (indiscernible)?

A.    No.

Q.    All --

Exhibit 5002 at 536

*A. Lambert*

A.      And I really want to do anything I can to help.

MR. FRASIER:  All right.  I don't think I have anything else to ask her right off the top of my head.  Does the grand jury want --

GRAND JUROR:  Yeah, I do.

(Indiscernible comments by grand jurors.)

GRAND JUROR:  You said when you went out there and -- to Stemmerman's house and he was -- he held a gun to your head and all that stuff, and then he told you to go to a trailer and get a bag of bloody clothes, was it blood?

THE WITNESS:  I glanced.

GRAND JUROR:  Yeah.

THE WITNESS:  And by the looks, yes.  But I -- I mean, I -- I don't know for sure.

GRAND JUROR:  And what did he have you get that and do with them?

THE WITNESS:  He didn't want me to get them, he just wanted me to go look at them.

GRAND JUROR:  Oh.  So you just looked at them, and --

THE WITNESS:  Yeah.

GRAND JUROR:  Did they look like Bill's clothes? Do you know what Bill was wearing, or --

THE WITNESS:  I -- they looked like men's clothing, yeah.

Exhibit 5002 at 537

A. Lambert

GRAND JUROR:  Right.

THE WITNESS:  (Indiscernible) clothes.

GRAND JUROR:  Okay.

GRAND JUROR:  Do you know what kind of car that Bill Sero had?

THE WITNESS:  Um, I don't think Bill had a car.

GRAND JUROR:  Or Tom?

THE WITNESS:  Tom had multiple cars.  I know there was a purple car at one point.  Um --

GRAND JUROR:  Dark purple?

THE WITNESS:  Yeah.  I think it was a dark color. Dark purplish.

GRAND JUROR:  Small or big?

THE WITNESS:  It was small, two-door.  I remember driving it once, (indiscernible) -- I mean at that time.

GRAND JUROR:  Compact?

THE WITNESS:  Yeah.  Um, but he had a lot of like junk cars at his house.  I don't know they actually run or...

GRAND JUROR:  You said that it was Stemmerman -- am I pronouncing that right?

THE WITNESS:  Yes.

GRAND JUROR:  That he's the one that threatened you with the gun?

THE WITNESS:  Mm-hmm.

GRAND JUROR:  Do you think he was a violent -- a

Exhibit 5002 at 538

*N. Nelson*                                                                    43

person capable of violence?  Like --

THE WITNESS:  Um, back then?  Yeah, he was pretty crazy, I mean, you know.  But I think that was -- stemmed from the drug use.  My brother knew Tom, like when they were kids, and I mean he was just -- I mean, you know, he wasn't like that.

GRAND JUROR:  You said there was (indiscernible) cars out there.  Was there any car that he drove frequently, like more than the others?

THE WITNESS:  I never really seen Tom drive, but I know that when I took off from that rehab center, I had a lot of my stuff with me.  And, um, when I called him to get my stuff back, he had told me that he burned it all, like in a car.  So.

GRAND JUROR:  How come the purple car?

THE WITNESS:  That just is vivid to me because I remember we went to the store one time and he --

GRAND JUROR:  Drove that one?

THE WITNESS:  We were in Coos Bay, and he asked if I wanted to drive.  And that just -- so.

MR. FRASIER:  Any other questions?

Okay.  I think that will do it, then.  You're free to go.

**TESTIMONY OF NICOLE NELSON (PRICE)**

(Witness sworn.)

Exhibit 5002 at 539

*N. Nelson*

BY MR. FRASIER:

Q.    First of all, this is the grand jury for Coos County, and we're looking into the death of Leah Freeman. It's obvious, but I have to tell you we are recording everything, so --

A.    Okay.

Q.    Okay?

A.    Mm-hmm.

Q.    First of all, could you tell us your name, please, and where you live.

A.    Nicole Nelson, and I live at -- in -- formerly Price.  And I live in Benicia, California.

Q.    Okay.  And because the air conditioner's on and we're recording, you'll need to speak up.

A.    Okay.

GRAND JUROR:  Where do you live currently?

THE WITNESS:  Benicia, California.

BY MR. FRASIER:

Q.    I guess you used to live here in Coquille.  Is that right?

A.    Correct.

Q.    Went to high school here?

A.    Correct.

Q.    Graduated?

A.    I did.

Exhibit 5002 at 540

*N. Nelson*

Q.    Okay.  Did you know -- when you were in school here, did you know a man named Nick McGuffin?

A.    Yes.

Q.    How did you know Nick?

A.    Um, he was a year older than me, and he dated my sister for a little while.

Q.    Okay.

A.    And it's a small town, so everybody just kind of knows everybody.

Q.    All right.  Did you know Leah Freeman?

A.    I knew who she was, yes.

Q.    If you -- well, you say you knew who she was, so you weren't close or acquainted or --

A.    Um, no.  Her sister was in my grade, and when we were younger I was friends with her sister for a little while, so I had been to -- I think it was her father's house at one point in time.  But in high school I wasn't really friends with Denise, and I knew who Leah was, but I wasn't really friends with her or anything.

Q.    Did you know that Nick and Leah were a boyfriend/girlfriend-type situation?

A.    Yes, I did.

Q.    Did you ever see them together?

A.    I don't believe so.

Q.    Okay.

Exhibit 5002 at 541

*N. Nelson*

A.    I lived in California my junior year, and moved back here my senior year, that summer before.

Q.    And that would have been the summer of 2000?

A.    Yeah.

Q.    You would have graduated in 2001?

A.    Yes.

Q.    Did you know Brent Bartley?

A.    Yes.

Q.    And how did you know Brent?

A.    We dated.

Q.    And were you guys dating in June of 2000?

A.    Yes.

Q.    Now, I want to go to the day that Leah Freeman disappeared, which I believe was June 28th.  Did you -- well, were you with Brent and/or Nick McGuffin that night?

A.    Yes.

Q.    Would you tell the grand jury, please, what you remember about that night and what happened, and so forth.

A.    Um, Brent and Nick picked me up and we went to Brent's grandparents' house, the Hagas.  And we were supposed to all be going out there to watch movies.  Leah was not in the car when they picked me up.  I mean, I remember going out there.  Leah wasn't there.  I remember Nick leaving at some point during that evening.  And then, other than that, I mean, they drove me back home.

Exhibit 5002 at 542

*N. Nelson*

Q.      Okay.  Did you actually see Leah that night?

A.      I did not.

Q.      Did Nick or Brent tell you what they were going to do after they dropped you off?

A.      Not that I can remember now.

Q.      Back in 2000 you were interviewed, I think it was by Buddy Young of the North Bend Police Department, who indicated they said they were going to go to somebody named Melissa's house to (indiscernible).  Okay?

A.      Did -- they were going there for?

Q.      They were going to go to Melissa Brugnoli's house to see if she had seen Leah.

A.      Oh.  I don't remember that.

Q.      Did you see Brent any more that night?

A.      Not after he dropped me off.

Q.      The next day, did you see Nick McGuffin?

A.      Um, I -- I don't remember.  There's a good chance I did, but I -- I don't remember.

Q.      All right.  You told the police back in 2000 that you saw Nick and he was upset that Leah missing, and he looked terrible, looked like he'd been crying.  Does that sound about right, or do you recall?

A.      I really don't recall.

Q.      Now, this year in April was -- you met with the police or the police met with you up in Florence.  You were

Exhibit 5002 at 543

N. Nelson

living in Florence area at that time?

A.    Correct.

Q.    Okay.  Now, had you had contact with Brent Bartley prior to the police?

A.    Yes.

Q.    What did Brent tell you?

A.    Um, he called me, I believe it was January 28th, to tell me that they had reopened the investigation into Leah's death, and basically just kept telling me that he wasn't a snitch.

Q.    Okay.

A.    So, um, he -- I thought he was drunk.  I mean, based on the conversation he was having with me and the way he was acting, I thought that he had been drinking, and -- but it -- I mean, basically that's what it was.  He just called to tell me that they had reopened it and he just kept telling me over and over that he wasn't a snitch.

Q.    Okay.  Um, we talked to Brent this morning, and he tell us he's been sober for about a hundred and twenty days.  Have you had any contact with him the last couple or three months?

A.    No, I have not.  That was the last time I spoke to him.

Q.    Okay.  And that's what I was going to ask, if you had speak -- spoken with him since he's gotten sober,

Exhibit 5002 at 544

49

*N. Nelson*

(indiscernible) any difference if you've seen it.

A.    Oh, um, I probably will see him while I'm here, but, um, no, I haven't.

Q.    All right.  Do you have -- do you know who killed Leah Freeman?

A.    No, I do not.

Q.    Do you have any information about who might have done it, or anything along that line?

A.    No, I do not.

Q.    Is there anything else that you might know of that -- well, is there anything you have that the grand jury should know about this?  That we haven't talked about?

A.    No.

Q.    Okay.  Oh, well, let me ask you this.

      Do you remember what car you were in when Nick took you -- when Nick and Brent took you home that night?

A.    His Mustang.

Q.    Did you ever see him driving a Thunderbird that night?

A.    No, I did not.

Q.    Okay.  The only -- all the times you saw him, he was in the Mustang?

A.    Yeah.  They picked me up in the Mustang, and then he left in it and came back in it, and then took me back home in it.  So, yeah, the time frame that I was with him, that

Exhibit 5002 at 545

*N. Nelson*

was the only vehicle that I saw that night.

MR. FRASIER:  All right.  That's all I have.  Does the grand jury want to ask her any questions?

GRAND JUROR:  Yeah.  During that conversation where he's emphatically saying he's not a snitch, what else was part of that conversation?

THE WITNESS:  Um --

GRAND JUROR:  Because he --

THE WITNESS:  Because he had -- when I talked to him, I believe he had already spoken to the police, and they wanted him to tell him -- tell them whatever he knew.  And so he kept telling me, I don't know anything, I'm not a snitch.  And I just told him, you know, if -- it's not about being a snitch.  We're talking about someone who lost their life, so if you know something --

GRAND JUROR:  Mm-hmm.

THE WITNESS:  -- you shouldn't look at it as you're snitching.  You need to come forward with that information.  And he said, But I don't know anything.  And I said, Okay, I believe you.

I mean, to me he sounded drunk, so I -- it wasn't a conversation I really wanted to even have with him, but --

GRAND JUROR:  Right.

THE WITNESS:  -- that was kind of what it -- what it started it.

Exhibit 5002 at 546

*D. Bertrand*

GRAND JUROR:  You've answered the question.  I just didn't know why he said that.

MR. FRASIER:  Any other questions?

Okay.  That will do it.

THE WITNESS:  Okay.

MR. FRASIER:  You're free to go.

GRAND JUROR:  Thank you.

MR. FRASIER:  Thank you.

**TESTIMONY OF DENISE BERTRAND (FREEMAN)**

(Witness sworn.)

BY MR. FRASIER:

Q.    Denise, I brought you back because the other night I was going through some materials that we took out of the McGuffin home, and there were some questions that came up, and I thought I would talk with you about that.

One of the things that I think you mentioned the other day is that when your sister first disappeared you were a supporter of Nick.  Is that right?

A.    Mm-hmm.

Q.    And you were out at the McGuffin home on occasion?

A.    Mm-hmm.

Q.    And you have to say yes or no.

A.    Yes or no.  Yes or no?  Yes.

(Laughter.)

Exhibit 5002 at 547

D. Bertrand

52

BY MR. FRASIER:

Q.    (Indiscernible), please.  Okay.

I'm looking at a note that we received that we found in the McGuffin home, and it says -- and I'll just read it to you, and then I'd like to have you comment on it.  All right?

A.    Okay.

Q.    The note says, Denise Freeman, Leah's sister, was at our house.  She told Bruce -- Nick's father -- that she was at the house, the guy she gets her bad drugs from.  Bruce told her of rumor that Bill, Tom, Alicia, and Kristen hit Leah with a car, paraded her around in a car in Coos Bay.  Leah came to.  Beat her, planted her shoes, et cetera.  Denise wouldn't say who the guy was, but saw something in -- of Leah's in this guy's bedroom.  She asked Bruce to keep quiet, as it would be just a big drug bust and she wants to prove more.  Bruce was concerned for Denise.  She said if anything happens, Leah's belongings would be in Denise's body.

Okay.  Do you recall ever having a conversation with Bruce Michaud -- or Bruce McGuffin, about this type of thing?

A.    No.

Q.    Okay.

A.    Um, a lot of times I remember them asking, Have

Exhibit 5002 at 548

*D. Bertrand*

53

you heard anything?  Or -- and I'd ask them the same, Have you heard anything new, or whatever.  Because it wasn't very easy to get a lot of information from the police at the time, and so it kind of was unfortunate that a lot of what you heard was rumor.

But I -- he -- what were the -- I heard from what people?

Q.    Well, she -- it's kind of confusing.  But it sounds like either you told Bruce or Bruce told you about a rumor that Bill, Tom, Alicia, Kristen hit Leah with a car.  And that you apparently knew who the guy was, and that you had seen something that belonged to Leah in his bedroom.

A.    I don't know who Tom is.  (Laughs.)  So that's awkward in itself.  At one point there was a rumor relating to a Bill --

Q.    Sero?

A.    -- Sero, yes.  And I had one brief conversation with him.  The -- and it wasn't even at his house.  I don't even know where his house is.  And --

Q.    That's Bill Sero's house?

A.    Yeah, I don't even know where that is.  I don't even know what Tom is -- who Tom is.  And there was Alicia --

Q.    Michaud?

A.    Michau -- well, Rashad, Michaud, something like that, yeah.  That I had seen around and knew of somewhat, but

Exhibit 5002 at 549

54

*D. Bertrand*

never been to her house either.

Q.    Okay.

A.    So I -- no, I --

Q.    Well, let me --

A.    That conversation I'm -- did not happen.

Q.    Okay.  Do you know a Tom Stemmerman?

A.    No.

Q.    Have you ever been in somebody's house and saw something that belonged to Leah in this person's bedroom, or anything like that?

A.    No.

Q.    Now, do you know a girl named Kayla Knight? Makayla, or --

A.    Makay -- yeah.  I was pretty good friends with her sister Maggie.

Q.    Maggie Knight?

A.    Mm-hmm.

Q.    Now, this is something else that came out of the McGuffin home, and I want to read this to you and have you tell us what you think about it.

Kayla told -- Kayla had said she had gone to Tom Stemmerman's house to buy some drugs.  When she walked into the living room, Denise Freeman was sitting on the couch.  Kayla proceeded to the back of the house to Tom's room.  She noticed in an adjacent room, through a

Exhibit 5002 at 550

*D. Bertrand*

crack of the door, the door was almost closed, a young blonde girl in a chair that was bound and gagged. She realized later it was Leah, and what bothered her most was that Denise was in the house at the same time.

Is any of that true?

A.    No.  If my sister was at a house in any condition like that, I would die saving her. (Laughs.) If I -- trying to, anyway. There is absolutely no way I would be sitting anywhere with my sister in a bad situation.

Secondly, I've nev -- I have never been in that person's home. I'm not even completely sure who that is.

Q.    And Mr. Stemmerman at the time was living off of Libby Drive. And I don't mean to embarrass you or anything (indiscernible), but did you ever buy drugs from anybody off of Libby Drive?

A.    (Sighs.) Caraway Road is pretty darn close to Libby Drive.

Q.    Caraway Road is out more towards the Empire -- or --

A.    And to the Charles -- closer to Charleston, yes.

Q.    Charleston.

A.    Um, there, I wouldn't say I bought it. I -- I had -- my dad's wife's daughter, Melinda, had a -- I guess you would call it a friend of -- as good as friends can be in that world. And I did not deal with my sister's death very

Exhibit 5002 at 551

*D. Bertrand*

well at all, and I ended up following her around and ended up at a place out there. But his name was Phil.

Q.    Phil Caraway?

A.    Yes. And -- or at least that's the name I was told. And, um --

Q.    (Indiscernible.)

A.    And I -- so I had ended up with her out there. And down the road, it -- perpendicular, I guess, to Caraway, is a Spring Street, I believe it's called. Spring or Spruce. I think it's Spring Street. And there was another guy that lived down -- it was like a one-minute walk from Phil's house to his house. And those were the only two places out there that I was ever involved in any of that.

Q.    Never something directly on Libby Drive?

A.    No, they were not on -- no. Not on Libby, no.

Q.    Now, the other thing I want to ask you about, there was a question -- again, on some of the papers I was going through the other night, a question about a necklace belonging to Leah that you may have gotten into your possession somehow.

Do you know anything about a necklace?

A.    There was a couple -- I got her -- I'm sorry. I forgot to turn that off. (Cell phone ringing.)

I'm sorry.

Q.    That's okay.

Exhibit 5002 at 552

*D. Bertrand*

57

A.    Um, I got her for -- I think it was Christmas one year, a necklace that said "No. 1 Sister" on it, and it was a little gold pendant on a gold chain.

And then she had kind of a homemade -- I don't know if she made it or her friend made it.  Probably her.  It was like a string material, almost like yarn, kind of a bluish-purplish-periwinkle-ish color.  And I don't know if you've seen the little mini dice that have letters on them instead of dots.  It had an N, an I, and a C, and K, and they were spaced out on it.  It said Ni -- you know, "Nick" was on the necklace.

Q.    Okay.

A.    Those are the only two I can think of.

Q.    All right.  And did you, after Leah died, did you have one or both of those necklaces.

A.    I ended up with a little jewelry, silver-colored -- I'd have to dig for it.  She had that in her room, and I had -- the necklace that I had got her, I wanted to hold onto forever, of course.  And somewhere at my house I have a little wooden box with a sliding door on it that I've put it in, yes.

Q.    All right.  So you've got the necklace that says "No. 1 Sister"?

A.    Mm-hmm.

Q.    Where did you get that?  I mean, how did you come

Exhibit 5002 at 553

*D. Bertrand*

in possession of it?

A.    It was in the silver box that was in the -- in the little silver tin that was in her room.

Q.    Okay.  What I'm getting to is, the material I had, for some reason they kind of thought you had gotten this necklace off her body.  And you --

A.    What?

Q.    And the necklace you had came out of her bedroom. Is that right?

A.    Yes.

Q.    Okay.  Now, the necklace that you described with the dice, with the letters, do you know if that was ever found in your sister's belongings?

A.    I have never seen it since, no.

Q.    Okay.  Can you do me a favor and ask your mom if she ever found that?

A.    Yeah.  I (indiscernible).

MR. FRASIER:  Okay.  And let me know one way or the other.

Okay.  I don't think I have anything else to ask you.  I hope I didn't upset you, but these are questions I had to talk -- that came up and I had to ask you again.

THE WITNESS:  That is so crazy.

MR. FRASIER:  Okay.  Does the grand jury have anything you'd like to ask her?

Exhibit 5002 at 554

S. Shelton

Okay.  (Indiscernible.)

THE WITNESS:  No.

MR. FRASIER:  Okay.

THE WITNESS:  Thank you.

**TESTIMONY OF SHERRE SHELTON (BOLGER)**

(Witness sworn.)

BY MR. FRASIER:

Q.    First of all, this is the grand jury for Coos County, and we're looking into the death of Leah Freeman.

A.    Okay.

Q.    And I think it's obvious, but I've got to tell you we're recording the proceedings.  Okay?

A.    Okay.

Q.    All right.  First of all, could you tell us your name, please, and what city you live in.

A.    My name is Sherre Shelton, and I live in Brookings, Oregon.

Q.    And you were also known as Sherre Bolger?

A.    Yes.

Q.    Did you used to live in the Coquille area?

A.    I did.

Q.    How long ago was it you lived here, and for how long?

A.    Um, let's see.  I moved here, I believe it was a month after Leah Freeman's disappearance, (indiscernible)

Exhibit 5002 at 555

*S. Shelton*

August area.  And then we moved to Brookings in 2003.

Q.    I want to ask you a few questions now.  And when you lived here, were you acquainted with a Benjamin Stoddard?

A.    Um, Ben had already passed away when I moved here.

Q.    Okay.  So he was already --

A.    Well, he passed away probably a week after I moved here.

Q.    And I have here in a report, and I don't know when this was done -- well, it said something about you moved to Coquille to live with Benjamin Stoddard, and that you lived at 895 North Collier.

A.    Right.  We rented the house together.  I'm the only one who ended up moving in.

Q.    Ben died before that occurred?

A.    No.  We had -- we had gotten in a fight and broke up.

Q.    Oh, you had a fight and broke up.

A.    And -- yeah.

Q.    Okay.  And then after you broke up, he died?

A.    Right.

Q.    All right.  And if I recall correctly, he committed suicide.  Is --

A.    Right.

Q.    All right.  To the best of your knowledge, some

Exhibit 5002 at 556

S. Shelton

61

people think he was murdered --

A.    Right.

Q.    -- but other people -- and the investigation showed it was a suicide.  Is that correct?

A.    Yeah.

Q.    Do you know a Kristen Steinhoff?

A.    Yeah, I met her when I moved here.

Q.    And how well did you know Kristen?

A.    Um, I didn't know her very well.  I guess back then we got into drugs together, and that's how I met her.

Q.    Did Kristen stay with you off and on during this time period?

A.    Yeah.

Q.    Did you ever get to meet an individual named Nick McGuffin?

A.    I met him one time.

Q.    All right.  And how did you meet him?

A.    I had a party at my house.

Q.    When the air conditioning kicks on, you really got to speak up.

A.    Okay.

Q.    All right?

Was Kristen Steinhoff there, at the party?

A.    Yeah, I think off and on.

Q.    Okay.  There's a note here that Ms. Steinhoff was

Exhibit 5002 at 557

62

S. Shelton

messing around with Nick McGuffin during this time period. Do you know anything about that?

A. I don't know anything about that.

Q. Did you become acquainted with a Tom Stemmerman and a Bill Sero?

A. I did.

Q. How did you get to know these two?

A. I actually met Tom maybe six months or a year before I moved to Coquille. And I -- back then I was using drugs, and that's how I became acquainted with them.

Q. Did Tom Stemmerman ever tell you anything about Leah's bloody clothes or stuff being in a bag, or something along that line?

A. Not that I remember.

Q. Okay. Did Kristen Steinhoff ever tell you that she had a theory about what happened to Leah Freeman?

A. Yeah, she told me, and -- and I know she told me a lot of things. I can't remember everything that she told me. But something that I do remember is that she said that Leah was hit by the car, and was still alive, and so they backed over her. And when I say "they," I don't even remember who she told me or if she told me what -- who was in the car.

Q. Tom Stemmerman, what type of person was he like?

A. He was not a good person. Very shady. Very

Exhibit 5002 at 558

S. Shelton                                                    63

secretive.  That -- not a trustworthy person.

Q.    Did Kristen Steinhoff ever tell you that Leah had been run over and had been put in Tom Stemmerman's attic?

A.    Yes.

Q.    Can you tell us what you remember her telling you about that?

A.    All's I remember is, like I said, that she said that Leah was hit by a car, and that she was still alive so they backed over her.  And that -- I know she told me something about a bloody shoe.  I don't remember, but they put her in the trunk, and that they locked her in Tom Stemmerman's attic.

Q.    Here a while back you were interviewed by Detective Looney or Sergeant Looney with the sheriff's office here in Coos County, came down to Brookings and saw you?

A.    Right.

Q.    Do you remember talking to Sergeant Looney about Nick doing a lot of pot back then?

A.    That would have probably been my husband who talked to him.

Q.    Oh, okay.

A.    I never had known Nick, but my husband was friends with him.

Q.    All right.  Bill Sero.  In -- did Bill Sero ever tell you anything about Leah Freeman's disappearance?

Exhibit 5002 at 559

64

*S. Shelton*

A.    Not that I remember.

Q.    Did Tom Stemmerman ever tell you anything about Leah Freeman's disappearance?

A.    Not that I remember.  Hmm-mm.

Q.    I guess the question I have for you is, has anybody ever told you that they killed Leah Freeman?

A.    No.

Q.    Do you have any idea who might have killed Leah Freeman?

A.    I don't.  There's a lot of theories that I have, but no, I don't know.  Um --

Q.    The theories you have are based on what --

A.    Based on everything that Kristen Steinhoff had told me.  And at that point in time I contacted the police department here in Coquille ten years ago, and told them what I knew.  And so.

Q.    But getting back to what you know about this, this came to you through rumor, secondhand information, or --

A.    Right.

Q.    -- third or fourth?

A.    Right.

Q.    You have no direct knowledge, of yourself, as to what happened to Leah Freeman?

A.    No.

Q.    Is there anything about this case you think the

Exhibit 5002 at 560

grand jury should know, that we haven't talked about with you?

A.    No.  Not -- not that I can think of.

MR. FRASIER:  Grand jury want to ask her any questions.

GRAND JUROR:  I mean, I guess I was indicating -- did you say Kristen Steinhoff is the one that told you the story about the kidnapping?

THE WITNESS:  Yeah.

MR. FRASIER:  Anybody else?

Okay.  I think that will do it.

THE WITNESS:  Okay.

**TESTIMONY OF NIKKI HOLLING (WEBBER)**

(Witness sworn.)

BY MR. FRASIER:

Q.    Okay.  First of all, this is the grand jury for Coos County, and we're looking into the death of Leah Freeman.  And it's obvious I turned on a recorder, so we're recording the proceedings.  I just wanted you to be aware of that.

First of all, could you tell us your name and where you live.

A.    Nikki Holling, and Coos Bay, Oregon.

Q.    All right.  And were you in the past known as Nikki Webber?

Exhibit 5002 at 561

*N. Holling*

A.    Yes.

Q.    Now, you're probably going to have to speak up because of the air conditioner, so everybody can hear you. All right?

A.    Okay.

Q.    The reason I've asked you here today is we received some information from the McGuffin family that we wanted to ask you about.  And were you familiar with an individual named Alex Schradel (phonetic)?

A.    Yes.

Q.    How did you know Alex?

A.    He was my boyfriend for probably six months.

Q.    Okay.  And he had been in jail here at Coos County for a while?

A.    I'm sure, yeah.

Q.    Okay.  That was one time he was on a -- oh, how do I want to put it?  He was on the work crew and he escaped from the work crew and he got into more trouble, and that type of thing.  Does that ring any bells with you?

A.    Yeah.

Q.    Okay.  Well, the reason I wanted to bring you in is apparently Mr. Schradel -- well, let me back up.

Do you know a Tom Stemmerman?

A.    Yes.

Q.    How did you know Tom?

Exhibit 5002 at 562

*N. Holling*

A.    Tom was my boyfriend also.

Q.    Before or after Alex Schradel?

A.    Bef -- no, after.

Q.    Okay.  Recently, I guess I need to bring this up, is as a -- at the time that you were with Mr. Stemmerman, did you actually stay with him, live with him out at his home on Libby Drive?

A.    Yes.

Q.    And was that during the time frame when Leah Freeman had disappeared, in the year 2000?

A.    Yes.

Q.    Okay.  Did you ever see Leah Freeman out at Tom Stemmerman's house?

A.    No.

Q.    There was a story floating around that she was hit by a car and taken to Tom Stemmerman's house, and then one story has her being tied up in the basement.  Another story that she was tied up and gagged in a bedroom.  And another story that she was stashed in the attic.

       Did you -- so just so we're clear, you never saw Leah Freeman out there at that house?

A.    No.

Q.    Okay.  Do you know anything about bloody clothes that were supposedly out at Tom Stemmerman's house?

A.    I heard that Bill Sero brought bloody clothes and

Exhibit 5002 at 563

*N. Holling*

put them in a trailer that was out front of Tom's house.

Q.    And -- but did you ever see these clothes?

A.    No.

Q.    Who told you that there was bloody clothes out there; do you recall?

A.    I -- hmm.  I don't recall, no.

Q.    Okay.

A.    That was at Tom's house, but I don't remember who was there.

Q.    All right.  You know Alicia Michaud?

A.    Mm-hmm.

Q.    How do you know Alicia?

A.    Oh, I met her, God, ten years ago, just through Tom.

Q.    Okay.  Did you ever spend -- you know, I'm not trying to embarrass you or anything, but did you ever spend any time in jail with Alicia?

A.    Yes.

Q.    Okay.  Did you tell the officers here lately that you didn't get along with her too well, so the jail staff kept you two separate?

A.    Yes.

Q.    Did Alicia ever threaten you?

A.    She did once, yeah.

Q.    And she tried to cut your throat, "like I did

Exhibit 5002 at 564

*N. Holling*

Leah Freeman's"?

A.    Yeah.

Q.    Okay.  Why don't you tell us about that statement, about what she told you about that.

A.    Um, I don't really remember what we were arguing about, but she apparently was angry and did say she would slit my throat like she did Leah Freeman's.  And they put her in her cell, and that was it.

Q.    Okay.  I guess I need to back up.  Did -- you were with Tom during the time frame that the police were investigating Leah Freeman's death.  Is that right?

A.    Yes, I believe.

Q.    And the actual time that Leah disappeared, you were actually in jail at that time.  Is that right?

A.    Yes.

Q.    You were in jail, according to jail records, June 26 of 2000 till July 21 of 2000.  That sounds about right?

A.    Yeah.

Q.    Now, I'm going to ask you a few questions.

Do you know Bill Sero?

A.    Yes.

Q.    Okay.  How well do you know Bill?

A.    I only met him three times, maybe.

Q.    Okay.  Has anybody told you that they killed Leah Freeman?

Exhibit 5002 at 565

*N. Holling*

A.    No.

Q.    Did Tom Stemmerman ever tell you that he ran over Leah Freeman with a car or harmed her in any way?

A.    No.

Q.    Out -- did Alicia Michaud, outside of "I'll cut your throat like I did Leah Freeman's," did she ever say anything about Leah Freeman being murdered?

A.    No.

Q.    Bill Sero, the same question?

A.    No.

Q.    Has anybody told you that they were involved in the death of Leah Freeman?

A.    No.

Q.    Outside of what we've talked about here this afternoon, is there anything else you think the grand jury needs to know about Leah Freeman?

A.    No.

Q.    Oh, let me ask you this:  Did Tom Stemmerman like it when people were scared of him?

A.    Hmm.  Uh, he probably did, yeah.

Q.    Okay.  I've reasoned that.

Did he carry any guns with him?

A.    Always.

Q.    Did he want people to know he had guns?

A.    Yeah.

Exhibit 5002 at 566

Q.    Did he ever point a gun at you or threaten you with a gun?

A.    No.

Q.    Did he ever hurt you in any way while you were with him?

A.    Nope.

Q.    Okay.  Have you ever had any contact with Nick McGuffin?

A.    My sister dated him for like two months.

Q.    Okay.

A.    But other than that, no.

Q.    And your sister is who?

A.    Cory Wilbur (phonetic).

Q.    Did you kind of warn your sister to stay away from Nick McGuffin?

A.    Um, I told her I'd heard, yeah.  But they worked together so it was kind of hard for her to stay away.

Q.    Okay.  Was that at the Captain's Choice?

A.    Yes.

MR. FRASIER:  Okay.  Now I think I'm out of questions.  Does the grand jury want to ask her anything?

GRAND JUROR:  Yeah, I do.

You were in jail from June 26th to July 28th, roughly?

THE WITNESS:  No --

Exhibit 5002 at 567

*N. Holling*

GRAND JUROR:  When you went to jail, did Tom conduct a lot of his business in his basement?

THE WITNESS:  What business?

GRAND JUROR:  Dealing drugs?

THE WITNESS:  Um, there was a room down there, so he was down there a lot, yeah.

GRAND JUROR:  Did that change after you got out of jail?

THE WITNESS:  Mm --

GRAND JUROR:  Did he not let people go down there for any reason?

THE WITNESS:  Huh-uh.

GRAND JUROR:  Did he still go down there?

THE WITNESS:  Yeah.

GRAND JUROR:  Okay.  Did you ever see the bag of bloody clothes?

THE WITNESS:  No.

GRAND JUROR:  Did Tom ever indicate what they were?  Were they Bill's, or did Bill bring them --

THE WITNESS:  Um, I --

GRAND JUROR:  -- from somebody else?

THE WITNESS:  -- heard Bill brought them, but I don't know from where or whose they were.

GRAND JUROR:  So you heard the story when you were back at Stemmerman's house?

Exhibit 5002 at 568

*R. Crook*

THE WITNESS:  It was probably after that, a couple of months after that.

GRAND JUROR:  So the story didn't -- you didn't hear it from either Tom or Bill, then?

THE WITNESS:  No.

GRAND JUROR:  Did you know what was going on in the room in the basement?

THE WITNESS:  That -- yes.

GRAND JUROR:  And what was that?

THE WITNESS:  Oh, he dealt a lot of drugs, for sure.

MR. FRASIER:  Any other questions?

Okay.  That'll do it.

THE WITNESS:  All right.

MR. FRASIER:  You can take off.  Thank you.

THE WITNESS:  You're welcome.

**TESTIMONY OF RICKY CROOK**

(Witness sworn.)

BY MR. FRASIER:

Q.    Okay.  This is the grand jury for Coos County. This -- and we're looking into the death of Leah Freeman. Okay?

And I have to advise you we're recording the proceedings.

A.    Okay.

Exhibit 5002 at 569

74

*R. Crook*

Q.    First of all, could you tell us your name, please, and where you live, sir.

A.    Ricky Crook.  Coquille, Oregon.

Q.    And are you a junior, senior or -- Ricky Crook, Jr., or Ricky Crook, Sr.?

A.    No.

Q.    But your dad's also named Richard Crook?

A.    Yeah, different middle name.

Q.    Different middle names, okay.

Just wanted to make sure I got that straight.

And how old are you, sir?

A.    I think I'm 26, 27.  I don't know.  (Laughs.)  I know my birth date.  Does that count?

Q.    Well, what year were you born?

A.    12/30/1982.

Q.    1982.

A.    Yeah.

Q.    So that would make you almost 28.

GRAND JUROR:  28.

MR. FRASIER:  He's 27.  He'll be 28 --

THE WITNESS:  27.  Darn it.  I was hoping I was 27.  Losing years fast.

BY MR. FRASIER:

Q.    Okay.  And have you lived in Coquille all your life?

Exhibit 5002 at 570

75

*R. Crook*

A.    For -- for the most part.  I haven't, but for the most part I have, yeah.

Q.    Okay.  Were you living in the Coos County area in the year 2000?

A.    Yes.

Q.    And were you going to school then?  It would have been ten years ago --

A.    I don't think -- I don't think I was, sir.  I dropped out when I was -- and I got my GED in my sophomore year.  That was about '99, is when I graduated from SWOCC.

Q.    All right.  Did you know or do you know a Nick McGuffin?

A.    Yes.

Q.    How do you know Mr. McGuffin?

A.    He was my friend while growing up.

Q.    And how close would you say you were to Mr. McGuffin?

A.    I was pretty close.  I mean -- yeah.  We were close.  My mom took him into her house and let him live there for a couple of months when he was having family problems.

Q.    And Leah Freeman?

A.    Yeah.

Q.    Okay.  Did you know her?

A.    Yeah.

Q.    How did you know her?

Exhibit 5002 at 571

76

R. Crook

A.    Um, Nick's girlfriend.

Q.    And how well did you know her?

A.    I wouldn't -- I mean, like I wouldn't say very well. I didn't -- we never called and talked on the phone. And, you know, I mean, if I seen her walking down the hall or something, you know, say if we were at school or in a store or something, we would say hi, I'm sure. But, you know, I wasn't like a good friend.

Q.    Okay. And did you at some point in time become aware that they were boyfriend/girlfriend?

A.    Yes.

Q.    Did you have an opportunity to see their relationship a little bit?

A.    Yeah.

Q.    How were -- well, Nick at the time was a senior -- is that correct -- in high school?

A.    Yeah, prob -- yeah. Yeah, he probably was.

Q.    And Leah was a freshman?

A.    Yes.

Q.    How did they get along?

A.    I -- I mean, they didn't have the best of relationships, but, you know, it wasn't much worse than anybody else's. I didn't -- it wasn't something out of the ordinary, I don't think. I mean, I didn't see anything wrong with it.

Exhibit 5002 at 572

77

*R. Crook*

Q.    Okay.

A.    But -- but they weren't the best -- you know, everything wasn't peachy-keen and happy all the time and everything.  But, you know, it wasn't to the point where anybody thought there was anything wrong with it, I don't think.

Q.    Back in 2000 you were interviewed by a detective with the state police named Kevin Roach?

A.    Roach?  Yep.

Q.    Okay.  Do you recall telling Detective Roach that there was a lot of little things that got in the way of their relationship and that they were really jealous?

A.    I -- I -- if I said it, yeah, it's probably true.

Q.    And was it -- did they have -- were they jealous?

A.    Uh, more on Nick's point than I -- I would say on her side, I think.  Because -- just because I hung out with him more than I hung out with her, you know, so -- yeah, jealous of everything.  But that's how it is in high -- I mean.

Q.    Okay.  Did you ever see Leah hit Nick?

A.    Yes, I have.

Q.    And what did you see?

A.    I seen her kind of -- she would kind of -- he was standing up the hill and she was kind of down the hill, and she just kind of jumped and she got in a full-on punch.  I

Exhibit 5002 at 573

R. Crook

mean, it wasn't like she -- it didn't hurt him or anything, you know.

Q.    When you saw Nick and Leah together, did you ever see Leah, while she was around Nick, drink alcohol?

A.    I prob -- yeah, I -- I bet I have, yeah.

Q.    And marijuana?  Using marijuana?

A.    Hmm.  I don't know if she did that.

Q.    Well, you told Detective Roach, I've seen Leah smoke marijuana and drink when she's around Nick.

A.    If I said it, then I must have said that, but it's been a long time.

Q.    Was there a graduation party that summer, or a camp-out type of thing in Powers?

A.    Yep.  Yep.  That's where she hit him.

Q.    Okay.  How did Nick react when she hit him?

A.    He actually did pretty good.  He did better than I thought he would have done.

Q.    Okay.  Did he clench his fists?

A.    I -- I don't specifically remember that, whether or not.

Q.    Do you recall telling Detective Roach that Nick clenched his fists, got mad, and said to her, "F you"?

A.    I don't know if I told him that.

Q.    Okay.

A.    I mean, I'm not -- if I did, what I remember

Exhibit 5002 at 574

R. Crook

right now is him grabbing her and like they -- not grabbing her, you know, but he grabbed her and he threw her on her shoulder, and they went into the tent, and everything was fine. There wasn't nothing bad happened that -- after that, you know, or nothing. But that's what I remember now, is him packing her -- I remember him packing her on his shoulder.

Q. You indicated that -- you know, at least according to Detective Roach's report, that Leah passed out about a half hour later, and he -- and Nick put her in the tent?

A. Yeah. So I -- I remember watching him -- him pack her towards the tent evidently. I remember him having her on his shoulder. And I don't remember him clenching his fists, but if -- if I told that guy that, you know, I wasn't -- I wasn't making anything up, so.

Q. Okay. Did you ever see Nick hit his car with his fists (indiscernible)?

A. (Laughing.) I wouldn't put it past him. Only thing, I can't -- like I said, I can't remember it right now, but it sounds about right. (Laughing.)

Q. Okay. From looking at what you told Detective Roach, you say in this report, I've seen Nick hit his car with his fist when he gets mad.

A. No, I'm -- I'm sorry, but yeah.

Q. Did Nick ever tell you what he thought his

Exhibit 5002 at 575

*R. Crook*

relationship with Leah was going to be like?

A.    I -- I don't -- I don't really know.  I mean, I don't -- not that I can recall, no.

Q.    Okay.  Recall telling Detective Roach that when Nick was drunk one night or (indiscernible), that Nick told you that his relationship was going to last longer than the rest of everyone else's, and that it was meant to be?

A.    I think -- like I said, if I told that guy that, I mean, I wasn't making anything up.  So.

Q.    Okay.  Did Nick tell you what happened the night that Leah disappeared?

A.    No.

Q.    All right.  Do you recall, again, Detective Roach saying, He said the night that Leah disappeared she and Cheri weren't getting along because Cheri mom -- Cheri's mom doesn't like me?

A.    Yeah.  I remember -- I remember that Cheri's mom didn't like Nick.  I knew that.

Q.    Okay.  How did you know that the night that Leah disappeared that they (indiscernible).  How did you come to that knowledge?

A.    Oh, Nick told me, that -- that they were fighting.

Q.    Okay.  Did he have -- did Nick tell you that Leah's mom -- that would be Cory -- liked Nick?  Cory

Exhibit 5002 at 576

81

R. Crook

Courtright?

A.    I don't know if Nick -- I always assumed she did.

Q.    Okay.

A.    But I don't know if -- remember anybody telling me that, or whatnot.

Q.    Did you also tell the officer that Leah's family likes Nick?

A.    Yeah, I think I did.  Because -- I mean, they were all family friends and everything, for a certain amount. And then it got so far into the investigation, and then Cory wasn't their friend no more.

Q.    Okay.  Do you remember telling the police that Cheri's mom didn't like Nick and Nick -- didn't like Leah and Nick hanging out at Fast Mart?

A.    Yeah, I'm sure I'm -- yeah, I probably told him. Would have been the truth.

Q.    Now, on the day that Leah disappeared, this would have been June 28th of 2000, do you recall what you did that day?

A.    I don't.  I --

Q.    Okay.

A.    If you tell me what I said, I mean, it might bring back a memory, but I don't -- not right offhand, I don't.

Q.    Okay.  It says you woke up a between 12:00 and

Exhibit 5002 at 577

*R. Crook*

12:30, and that you then went with Brent Crawford, Megan Simmie (phonetic), Randy Demain, and Joe Cranston, to Sugarloaf to go swimming?

A.    Yep.  Okay.  I remember now.  I scaled the rock that day.

Q.    Where's Sugar Road -- loaf?

A.    Um, you know where Indian Creek is?  Outside of Myrtle -- this side of the bridge.

Q.    Yeah.  Okay.

A.    There's kind of a bridge on the corner there.

Q.    Right.

A.    And that's -- they call that Sugarloaf, right there on the right.

Q.    Yeah.  And it said you were there from about 2:00 to 4:00, smoking pot, and you got high.

A.    Got -- um, probably.  That's what I did back then.

Q.    Okay.  Then at about 4:30 to 5:00 you went back to Coquille.  You rode back to town with Brent and Megan, and that you went to Brent's house and smoked some more marijuana around 6:00.  Does that sound right?

A.    Yeah, probably.

Q.    Uh, then you -- either Brent dropped you off at your house or you walked home; you didn't remember.  You went to bed and slept until the next day.  You got up at about

Exhibit 5002 at 578

R. Crook

10:00.

A.    Yeah.

Q.    That sound about right?

A.    Yeah.

Q.    Okay.

A.    I thought I got up earlier than that, but I don't know.  I -- the next day is when I woke up to Nick --

Q.    Okay.

A.    -- is what I remember.

Q.    That's when, the next day, he woke up to Nick.

Nick came over to your house.  Is that right?

A.    Yes.

Q.    Okay.  Tell us what happened when he came over.

A.    I -- I think he -- I think he walked right in the back door because, like I said, he was living there a couple months before all this happened.  Or six months, or something, I don't know exactly.  But at some point he lived with us for a couple of months.

And I think he just was coming in the back door, and I think at that point I was walking -- the bathroom's back there, and I think I was going towards the bathroom.  And I -- I remember him -- I was -- it was early.  I had just woken up.  And he came through the back door kind of frantically, and asked, Have you seen Leah, is the first thing he said.  And -- you know.  And I told him no, I

Exhibit 5002 at 579

R. Crook

hadn't, and I thought about saying something smart-ass about her being in my bed, whatever, but I didn't. And he -- Oh, she's missing, she's missing. And -- but I specifically remember asking, Did you check her house?

Q.    Okay.

A.    And the guy -- he told me no.

Q.    Told you no?

A.    Yeah. And that was always kind of weird to me, that -- and I even asked him about it, you know, a couple of years afterwards. I asked him about him saying that to me, about him telling me no. And -- and he said, Oh, I didn't say that. And I remember it. I mean, I'm pretty sure he said it. But I'm going to -- maybe he didn't, but --

Q.    Okay.

A.    -- I certainly remember it.

Q.    Do you remember telling the police that there was supposed to have been some acid or LSD that contained --

A.    Yeah, I -- I heard about that, yeah.

Q.    Okay. Did you tell the police that Nick told you that someone -- he thought that someone slipped Leah some acid?

A.    Uh, I -- if I said it, I probably believed it at one time, or something, you know. Or was told it. I didn't make it up.

Q.    Okay. Did you -- do you know Kristen Steinhoff?

Exhibit 5002 at 580

85

*R. Crook*

A.    Yeah.

Q.    Did Nick tell you about he and Steinhoff looking for Leah and seeing some sort of hitchhiker?

A.    I remember him telling me about looking for Leah, but I don't remember him talking about a hitchhiker.

Q.    Okay.  You indicated to Detective Roach that Nick told you that he and Kristen went looking for Leah and they saw a hitchhiker sitting on some rocks.  Nick said the hitchhiker was blonde, but not wearing a white shirt.  Nick said the hitchhiker was wearing a black sweatshirt, so they didn't stop to see if it was Leah. Nick said that when they got back to check if the hitchhiker was Leah, the hitchhiker was gone.

A.    I don't know about no -- that doesn't bring up anything.  I'm not -- if I said it, I mean, it's something I heard at the time or something.

Q.    Okay.  Sometime, probably a couple or three years ago, you had contact with Sergeant Zanni of the sheriff's office; do you recall that?

A.    Yeah.

Q.    And he came out to your place of employment.  At that time you were working for Yates Logging?

A.    Yates, yep.

Q.    And you told him you didn't have a problem talking with any of them about this at all?

Exhibit 5002 at 581

R. Crook

A.    No.

Q.    You kind of told him you were kind of punk kid back during the initial investigation, and you thought --

A.    Yeah.

Q.    -- you were willing to talk more at that point. Is that right?

A.    Yeah.

Q.    Kristen Steinhoff. Has Kristen Steinhoff ever told you what happened to Leah?

A.    No.

Q.    Okay. Do you know a guy named Bill Sero?

A.    Yes.

Q.    How do you know Sero?

A.    One of them guys, a name that was just an older crowd of people that you heard. And I wasn't in the best of crowds back then, and that was one of the bigger names that you heard up there, kind of in the crowd. I mean -- I mean, I wasn't -- we weren't -- you know, we didn't go hang out together or anything. But, I mean, I knew who he was.

Q.    Tom Stemmerman. Do you know Tom Stemmerman?

A.    I -- that was a name too. Like the first time I've seen him in my life is sitting out here in front -- or at least a second ago.

Q.    All right. Did you know a Jack Bentley?

A.    No.

Exhibit 5002 at 582

R. Crook

Q.      Okay.

A.      I don't think so.  Did he go by any other name?

Q.      Jack?  I don't think so.  Jack was a -- used to be a sheriff's deputy, and then became a private investigator here --

A.      Oh, Bentley Investigations, maybe?

Q.      Yes.

A.      Okay.  I read the crap online.

Q.      Okay.  So that's -- but you never --

A.      I've never met him, never talked to him or anything.

Q.      There's a rumor floating around town that Leah was hit by a car.

A.      Yeah.

Q.      Have you heard that rumor?

A.      Oh, yeah.

Q.      And one of the rumors, a couple of versions of it, puts you in the car.

A.      Ah, it's -- I heard that.  Well, that's the one that Zanni came up and told me about.  That's the first I ever heard of that one.

Q.      Okay.  Were you in a car --

A.      No.

Q.      -- that ran over Leah Freeman?

A.      No.

Exhibit 5002 at 583

R. Crook

Q.    Has anybody told you, directly to your face, that they were in the car that ran over Leah Freeman?

A.    No.  I -- well, Alicia Michaud didn't exactly tell me that she was in the car, but she acted like she was kind of involved in a roundabout way in that.  I seen her up in Baker City rehab center a long, long, long time ago.

Q.    Okay.  What do you recall Alicia Michaud telling you?

A.    Uh, she came -- I was there to see -- get my sister or visit my sister or something, and she came up, Oh, Ricky, and she recognized me and she gave me a big hug.  And she was telling me, I got to tell the cops that these all -- these people did it; all -- you know, the whole Bill Sero, Tom Stemmerman, Rowdy Howard names.  Didn't say nothing about Nick or Kristen.

Q.    Okay.

A.    Just told me them names, and told me they threw a shoe out and crap, to give the family hope.  And she acted like she was involved in it all at that point.  But I told that Kevin Roach guy that, and basically just blew it off.

Q.    Did -- when Nick came over to your house the day after Leah disappeared, did you go with him anywhere?

A.    I was trying to think of that.  I don't -- I remember looking -- like we went out to -- it's called Lois Diment (phonetic) Park, I think, out there by -- towards

Exhibit 5002 at 584

*R. Crook*

Arago.

Q.    Okay.

A.    And we went and looked around in the bushes and everything, but I don't know if it was that same day or within a couple of days.  So I don't know if I went out with him that exact next day or not.  I don't -- there's no reason why I wouldn't have, you know, if somebody seen me with him or something, because we were his friends and, you know, I was helping him look for his girlfriend, supposedly.

Q.    Was there -- Nick had a blue Mustang --

A.    Yeah.

Q.    -- that he was kind of proud of.

A.    Oh, God.

Q.    And he drove that most of the time, that Mustang?

A.    Yeah.  For the most part.

Q.    Was there another car he drove?

A.    Yeah, he drove -- the Mustang always -- kind of broke down all the time, because it was 1960-something.  And then he would drive the -- like I think I was his mom's Thunderbird, or --

Q.    What color was the Thunderbird?

A.    Maroon, I think.

Q.    Maroon, okay.  And the Mustang, was there a footprint on the passenger side of the windshield?

A.    I think that was in the T-bird.

Exhibit 5002 at 585

R. Crook

Q.    It was in the T-bird?

A.    I think so.

Q.    Okay.

A.    Yeah, there was.

Q.    Tell us about this footprint.

A.    There was a couple footprints that were Leah's, and I don't know.  He was just really weird -- not really weird on them, but he was just -- he had them footprints on there, and she wasn't around no more, and so he just made sure nobody touched them or anything.  And you had to be careful of the footprints.  And, I mean, but we were all his good friends, you know.  We respected that for -- from him, you know.  You know -- the girl's -- (indiscernible) was coming up missing, and --

Q.    Has Nick McGuffin told you anything about what happened to Leah?

A.    No.

Q.    Kristen Steinhoff?

A.    No.

Q.    Have you ever told Kristen Steinhoff that she needs to keep her mouth shut?

A.    Not about this case.

Q.    Have you told her about other stuff?

A.    (Laughs.)  Oh, I'm sure I told her that before.

Q.    The reason I'm asking is we've got a witness that

Exhibit 5002 at 586

R. Crook

says that on the evening after Nick McGuffin and we believe it's his father got into Kristen's face about talking about the case, that the same evening you came in a window and you were back in that room with Kristen, poking her in the chest, telling her she needs to keep her mouth shut.

A.    I did.  I heard that story just the other day too.

Q.    And -- is it true?

A.    No.  (Laughing.)  That's what I'm saying, that that person is going to get -- yeah.

Q.    What do you mean, that person is going to get what?

A.    Well, she's going to confuse herself in court and end up -- he has to realize that she's lying and everything and it -- it's all going to come out.  I mean --

Q.    Do you know -- did you ever -- there's another witness.  (Pause.)

A.    You like witnesses.

Q.    You know Polly Parks?

A.    Oh, yeah.

Q.    Did you ever go over to Polly Parks' with Nick McGuffin?

A.    Oh, yeah.

Q.    Did you ever talk about Leah Freeman in front of her?

Exhibit 5002 at 587

R. Crook

A.    I'm sure we did, yeah.

Q.    Did you and McGuffin talk about how Leah was pregnant at the time she disappeared?

A.    No.

Q.    What about Brent Bartley?  Do you know Brent?

A.    I know Brent, yeah.

Q.    Were you over at Polly Parks' with Brent Bartley?

A.    Mm, I (indiscernible).  I don't think Brent went there.

Q.    Okay.  Do you have --

A.    Maybe --

Q.    Did you, with Brent Bartley, ever tell Polly Parks that they told -- did you ever tell Polly Parks that Leah had been pregnant and that McGuffin didn't want to be the -- a dad?

A.    No, I'd guarantee I didn't say that.

Q.    Did you tell them that they had -- she had used a home pregnancy test, and the test was positive --

A.    No.

Q.    -- and she was planning to go see a doctor?

A.    No.  I didn't know if she was pregnant.  I mean, I've just heard the rumor that she was pregnant when it happened.  I don't know if she was or not, or -- yeah.

Polly is saying that I said that stuff?

Q.    Yes, sir.

Exhibit 5002 at 588

R. Crook

93

A.    Wow.

Q.    And then the other witness had you in the bedroom threatening Kristen Steinhoff.

A.    Oh, I heard that one, but I hadn't heard the Polly one.

Q.    Okay.

A.    I'm not much of the threatening type.  If I knew something, you guys would have already known about it.  I wouldn't be milling around (indiscernible).

Q.    Okay.  Is it your testimony that you had nothing to do with the disappearance of Leah Freeman?

A.    No.  Nothing whatsoever.

Q.    And you have not talked to anybody who has told you what has happened to Leah Freeman?

A.    No.

Q.    Do you have any information whatsoever about what happened to Leah Freeman?

A.    Not other than the stuff that I've already talked to the cops about it.  And I've been talking to them quite a bit lately.  And, I mean, I've given them everything that I've possibly ever heard or seen or what I believed.  And, you know, that's all I can give them, is pretty much what I've said.

Q.    Did Nick af -- act any different after Leah Freeman disappeared?

Exhibit 5002 at 589

R. Crook

A.    I would say that he probably did.  But just like I told the other people that say that, I don't know if it was for the good or the bad.  Or I don't know how to take it, you know.  It -- if it happened to me, you know, and my girlfriend came up missing or whatever, I don't know how I would act.

(Grand juror sneezes.)  God bless you.

I would say that -- I mean, I'm sure he wasn't acting the same.  He was acting different, sure.

MR. FRASIER:  Okay.  I don't think I have any other questions for Mr. Crook.  Does the grand jury want to ask him anything?

GRAND JUROR:  When you observed the Mustang over the time period that Nick was driving it --

THE WITNESS:  Yeah.

GRAND JUROR:  -- did you ever see the trunk?

THE WITNESS:  I've been asked that before, and I've tried to remember, and I just can't remember whether it was bare or not.  I just -- I don't know.  I remember he had the two speakers in the back.  I remember that.

GRAND JUROR:  In the back seat?

THE WITNESS:  No, they were -- there was -- in between the back seat and like the back window, there's a little like --

GRAND JUROR:  Oh, up on the shelf?

Exhibit 5002 at 590

*R. Crook*

THE WITNESS:  Like a fast-mat (phonetic) type thing, and he had his speakers up through there.  But I remember looking at them from the trunk side, but I just -- I've been asked that, and I just don't know what his trunk looked like.  I don't remember.

GRAND JUROR:  But there were speakers sticking down?

THE WITNESS:  Yes, there was two (indiscernible) speakers.  I remember those (indiscernible).

GRAND JUROR:  So do you talk -- do you or have you talked to Nick since (indiscernible)?

THE WITNESS:  I -- not in the past four or five -- maybe six or seven years, but I talked to him -- you know, we were good friends after it all, for a couple of years.  And then all of a sudden he kind of got a new girlfriend and didn't talk to nobody no more.

GRAND JUROR:  What about his family or his brother?

THE WITNESS:  No.  Yeah, Wayne lived at my house, and I don't know how long ago that was.  Probably five years ago, or three years ago maybe.  He lived -- he stayed at my house for a while, and that's about all I remember.

And then we talked, but we never talked about, you know, the case or anything.  I mean, we might have talked about it, but, you know, just what we've all heard and crap.

Exhibit 5002 at 591

*T. Stemmerman*

That's -- that's what -- it's more everybody just -- everybody has their own story or what they believe, you know, and it's -- you know, like I've heard 90 million things, and I've tried to tell the cops everything I've heard, and -- you know. But I truly believe one thing happened, and I told them that story, but whether or not it happened, I don't know. We're all going to find out now, I guess.

But I mean, I haven't talked to his dad or his mom or -- I haven't -- like I said, I haven't talked to him in -- I mean, it's been a long time. Since before he moved to Bend. I guess he moved to Bend with his new girlfriend.

GRAND JUROR: Okay.

GRAND JUROR: Did you have a vehicle at that time?

THE WITNESS: No, sir.

No, I didn't get a license until I was -- late.

MR. FRASIER: Any other questions?

Okay. Sir, that will do it. You're free to go.

THE WITNESS: Okay. Thank you.

**TESTIMONY OF THOMAS STEMMERMAN**

(Witness sworn.)

BY MR. FRASIER:

Q.    First of all, this is the grand jury for Coos County, sir, and we're looking into the disappearance of Leah Freeman, her death. Okay?

Exhibit 5002 at 592

*T. Stemmerman*

First of all, a little announcement I need to tell you.  It's obvious, but we're recording the proceedings anyway, okay.

A.    Okay.

Q.    First of all, could you tell the grand jury your name and where you live, sir.

A.    Thomas Stemmerman, and I live in Dayton, Oregon.

Q.    How long have you lived there, sir?

A.    A year and a half.  I lived in Sheridan right before that.

Q.    Okay.  And you used to live in the Coos County area?

A.    Yes, I did.

Q.    How long did you live here?

A.    I lived here 27 years, probably.

Q.    Did you go to school here?

A.    Yes, I did.

Q.    Graduate?

A.    Yes, I did.

Q.    Which high school did you go to?

A.    Marshfield.

Q.    Marshfield.

Mr. Stemmerman, again, I'm not here to embarrass you or anything along that line, but there's -- this case has presented some issues.  And I need to ask you some questions

Exhibit 5002 at 593

*T. Stemmerman*

that you may find offensive or whatever.  I -- unfortunately, I need to ask these type of questions.  Okay?

First of all, when you -- I want to go to the year 2000.  When you lived here in Coos County, you lived here in the year 2000?

A.    Mm-hmm.

Q.    And did you -- where did you live at that time?

A.    In my parents' house on Libby.

Q.    All right.  And did your parents live there too?

A.    No, did not, at that time.

Q.    Okay.  And just so we're clear with the grand jury, at that time you were involved with methamphetamine, correct?

A.    Yes, I was.

Q.    And you sold methamphetamine?

A.    Yes, I did.

Q.    In fact, the narcotics team raided your place a couple or three times out there?

A.    Yes, they did.

Q.    You ended up being prosecuted for delivery?

A.    Possession, delivery, and frequenting, yes. Three counts of each.  Or no, three counts of the -- the possession and delivery.  Two counts of frequenting, yes.

Q.    Okay.  And just for the sake of disclosure here, I was the prosecutor on that case back in --

Exhibit 5002 at 594

T. Stemmerman

A.    Yes, you were.

Q.    All right.  And you were convicted and you ended up going to prison for a period of time.  Is that right?

A.    Yes, I did.

Q.    How is your life now?  What are you doing now?

A.    I -- my -- it's great.  I'm an electrician again. I've been out of work for a while now because of the recession, but when I first got out I -- I moved in with my parents for a little while.  And worked on the coast in -- just out of Lincoln City, and then shortly after moved in with my brother in Salem.  And worked there for quite a while, for several different contractors, before I -- and lived in Salem until I bought I house in Sheridan.  Moved out there, and then I was working back and forth between Portland and Salem.  And stayed busy, real busy.  A lot of overtime and a lot of good work.

Got back into the union, three -- three or four years ago.  And then worked at the Salem hospital, and then I was laid off, and at that point in time there were two or three hundred guys on the (indiscernible) books, so I was sitting at home for quite a while, till just a couple of weeks ago.

Q.    Okay.  You're out of methamphetamine now, right?

A.    Have been since the day I went to jail.

Q.    And in -- and you feel pretty good right now?

Exhibit 5002 at 595

*T. Stemmerman*

A.    Yeah.  The boot camp was great, when I was -- when I was in -- in jail or in prison.  And that's where I was released from back then.

Q.    And you went through the boot camp (indiscernible)?

A.    Yes, I did.  I went through the boot camp.  It was a great program.

Q.    Well, let's spend a little bit of time here, sir.

Are you familiar with an individual named Nick McGuffin?

A.    Not -- no, other than this case and -- and papers and stuff like that.

Q.    Okay.  Had you ever met him before?

A.    Not that I know of.  Bill Sero had -- Bill Sero would stop by the house once in a while.  Every once in a while he'd have somebody with him that I wouldn't know.  And there were a few individuals that he'd -- you know, from time to time, once in a while, that he'd have that I -- I wasn't really aware of who they were, and that.  At that point in time in my life, the less I knew about people the better off it was for everybody involved, I think, you know.  It -- it's very possible that I had met him at some point in time, but I -- I really don't think so.

Q.    Okay.  Now, Bill Sero, you've mentioned his name.  How did you know him?

Exhibit 5002 at 596

*T. Stemmerman*

A.    I went to school with Bill.  I met him, I think my junior year in high school.  And we kind of became friends in high school, and -- and he -- he was somebody that, you know, we were friends.  He'd stop by once in a while.  We'd hang out every so often, and then he'd kind of drop off the map again and I wouldn't see him for six months or so.  And then, you know, I'd see him for a couple more weeks or whatever.  And we'd hang out every once in a while, but he wasn't -- wasn't always someone that I -- I trusted, as far as a friend, but, you know.

Q.    Alicia Michaud?

A.    Yeah, I met her for the first time through her brother; at her house, actually.  I used to live with Eric Freeman, and her brother would hang out with us from time to time, and that's how I first met her.

Q.    Now, you mentioned an Eric Freeman.  No relation to Leah Freeman, right?

A.    No.  No relation to her.  From the Coos Bay Freemans, (indiscernible).

Q.    Nikki Webber; Nikki Holling, I think since.  Did you know her?

A.    Yes.  I dated her for a while and she eventually lived at my house for a while.

Q.    And when were you dating her and was she living with you?  Do you recall, roughly?

Exhibit 5002 at 597

*T. Stemmerman*

A.    Um, after the first time I was raided.  Let's see, about right around the first time I -- I was raided, and the police came to my house.  I think I'd started hanging out with her about a week before that.

Q.    Do you know a Sherre Bolger?  Sherre Bolger?

A.    Yes, I do.

Q.    How did you know her?

A.    She used to -- she was one of my ex-wife's friends.  So she'd come over and hang out at the house once in a while.  And her and I became friends, so I'd see her from time to time.

Q.    Your ex-wife, who was that?

A.    Um, Michelle Raymond, now.

Q.    And at the time Michelle --

A.    Stemmerman.

Q.    Stemmerman.  All right.

I guess I'm just going to kind of get down to brass tacks here.  There's this rumor floating around town that you and Bill Sero or you yourself or you, Bill Sero, Alicia Michaud, or another guy named Rowdy Howard -- did you know Rowdy Howard?

A.    Yes, I did know Rowdy.  He was a friend of my brother's.

Q.    Did you or a combination of people like I talked about; Nick McGuffin, Brent Bartley -- did you know Brent

Exhibit 5002 at 598

*T. Stemmerman*

Bartley at all?

A.    No.

Q.    Nick McGuffin, Brent Bartley, Bill Sero, Alicia Michaud, so forth, were in a car on the night that Leah disappeared.  Ran her over with the car.  Do you know anything about this?

A.    No.

Q.    Were you ever -- did you do anything to Leah Freeman?

A.    No.

Q.    Did she ever -- did you ever harm her in any way?

A.    No.

Q.    (Indiscernible.)

A.    No.

Q.    Didn't have any contact with her whatsoever?

A.    Never seen her.  No.  Never met her, never seen her.

Q.    Part of the rumor that floats around is that after she was hit by the car, that she was taken to your home out there on Libby Drive.  And depending on who you talk to, she was held hostage in the basement --

A.    I've heard the same rumors a lot.

Q.    -- or held hostage in a bedroom, or she was stuffed in the attic.  Did you -- is that true?

A.    No.

Exhibit 5002 at 599

104

*T. Stemmerman*

Q.    Was she ever in your house?

A.    No.

Q.    Have you ever told anybody that you harmed Leah Freeman?

A.    No.

Q.    We've heard from -- well, like Sherre Bolger, I guess, and Alicia Michaud (indiscernible), that you told them directly that you had been in the car that ran over Leah.

And you never told them that?  Either one of them?

A.    No.  No.

Q.    One person who testified said that you gave -- and again, I'm not trying to embarrass you or anything.  I'm just trying to lay it out here.

When I came to running your business or your drug dealing or whatever, that you did it mainly out of the basement.  Does that sound about right?

A.    Yep.

Q.    And (indiscernible) basement (indiscernible)?

A.    Mm-hmm.

Q.    And then after Leah disappeared, that you wouldn't let anybody down in the basement and you wouldn't conduct business down there.  Did you change how you did things?

A.    Um, yes, I did, actually.  There was a friend of

Exhibit 5002 at 600

*T. Stemmerman*

mine that I had staying at the house that didn't want really anybody to know that he was there. He was hiding from the police at that point in time. And he was afraid that if someone saw him they would say that he was there, and then he would end up going to jail. And he ended up going to jail later on for it, so --

Q.    Okay. Who was that?

A.    I -- I can't remember his name. He was -- he was a friend of Mike -- ah, he lived at Mike's house in a trailer. What was his name?

Q.    Who was Mike's house (indiscernible)?

A.    You guys had to go all the way down to Texas or Alabama or somewhere to get him.

Q.    Okay.

A.    You know -- you remember kind of who I'm talking about?

Q.    (Indiscernible.)

A.    (Indiscernible.) Um, it -- it was an older gentleman. He was -- he was 40 or -- or 50. He had -- at one point in time he -- he thought he could try to manufacture methamphetamines, and I think he did at Mike's house. And that was -- he had a lot of the stuff at my house to do that with. Never actually tried to manufacture methamphetamine at my house, but that was -- that was the reason why nobody was allowed downstairs.

Exhibit 5002 at 601

T. Stemmerman

Q.    Because this guy was down there?

A.    Because he was down there, and he had some of the -- the chemicals and stuff to make meth -- methamphetamines.  And he -- he never did, he didn't have all the right containers and stuff like that to make methamphetamine, so.

Q.    Now, was there a trailer on the property?

A.    Yes, there was.

Q.    Where was this trailer at?

A.    The trailer was out in front of the house.  It was an old travel trailer from when I worked out of town.

Q.    Mr. Sero, did he have any clothes over at your place?

A.    He was -- he was moving from one place to another and -- and he had stopped by one day and told me that he didn't have enough play -- space to keep all of his boxes of clothes and whatever, that -- you know, he didn't need, at his new house at that time.  And knew I had the trailer out in front, and asked me if he could store some of his stuff in there.  And I told him yes, he could.

Q.    The police eventually came and got those clothes.  Is that right?

A.    I told them that they were there.  Yes, they did.

Q.    And the police seized those clothes back in 2000.

A.    Yeah.  I had -- I had heard a rumor that the

Exhibit 5002 at 602

*T. Stemmerman*

police were looking for Bill because -- and I don't remember why. They wanted to question him or give him a lie detector test or something like that. And -- and it was really the first that we'd kind of heard that he might be involved or, you know, the first rumor that -- that brought his name into it was because the police were looking for him to question him about it.

And, you know, we were all at the house, and it got me to thinking, well, they're looking for him, and I have some of his stuff stored out there. And so I got kind of nosy with it, and I went out to the -- the trailer, and I -- you know, I started going through all his boxes and -- and the clothes. And he had, I don't know, five or six or seven boxes of whatever out there, and there was some bags of clothes and stuff like that. And in one of the boxes with the clothes, there was -- it looked -- it looked like rusty stains. But, you know, I don't know what bloodstains would look like on clothes that have been washed or anything like that.

And so it -- it really made me nervous at that point in time. Because when he'd said he was going to store stuff out there, I didn't even bother to go out there and help him put anything into the trailer, you know. He -- he had it all out in the car. He says, I'll get it, you know. It's just a few boxes.

Exhibit 5002 at 603

*T. Stemmerman*

So I see this, you know, and I got kind of nervous and worried, and -- and wondering if he's, you know, storing something that he shouldn't be at my house. And I'd gone in the house. I told, you know, my wife, and whoever else was at the house at that point in time. It was always five or six people there. That, you know, there was some funny-looking stains on these clothes out there.

And it wasn't maybe more than a half hour, 45 minutes later -- oh, what's his name? The police officer from Coos Bay, I just remembered his name a few minutes --

Q.    Cal Metz?

A.    Cal Metz, stopped by and that's when I had got the official word, hey, yeah, we're looking for Bill Sero. Do you know where he is? And at that time I hadn't heard from him in a -- you know, in a week or two, or maybe three, I don't know. And I wasn't sure where he was. From the sounds of it, obviously he's hiding from, you know, the police, and I didn't know if he was -- had a probation violation or anything like that.

And so Cal asked me if I knew where he was, and I told him no, I didn't. And Cal asked me if -- you know, if you do hear from him, will you tell me? And I told him, I said, you know, you're kind of putting me in a bad spot, but, I mean, if it's really that important, you know, if this has something to do with that other thing, yeah, I'll tell you.

Exhibit 5002 at 604

*T. Stemmerman*

By the way, he's got some stuff stored out in my trailer that, you know, I'm not comfortable with. Some of it looks kind of funny, and -- and you guys should take a look at it.

Q. All right.

A. So Cal couldn't take -- legally, because they were Bill's stuff that he'd left in my house, he told me that he couldn't legally take it at that point in time. And I guess they came back, I don't remember if it was that day or the next day. But they came back, him and another officer, and told me that they had contacted Bill. They had a -- a signed thing from Bill saying that they could take the clothes. And -- and so I gave them all of his belongings and possessions at that point in time.

Q. Did you ever tell anybody that you thought there was some bloody clothing out there?

A. Yeah. Oh, yeah. Because when I went out and looked at the clothes, you know, I mean -- I see -- later to find out, after one of the raids, one of the police officers told me they had to have everything tested, and it was some kind of stain or mold or whatever. It wasn't actually anything, that was on the clothes. But when I looked at them, you know, I had no idea what that stuff looks like, and I see -- it -- it looked like rust stains, to me. But I didn't know, you know. It just --

Q. Okay. Alicia Michaud, let's talk about her a

Exhibit 5002 at 605

*T. Stemmerman*

bit.

Did she get meth from you on occasion?

A.    No, I don't believe I ever actually sold meth to her. She -- she did use meth at -- at my house, but no, I don't believe that I ever sold her meth.

Q.    Okay. Did she ever stay at your place for a while?

A.    Uh, yeah, she stayed a couple of nights. Never anything for long term. Maybe one or two nights, about it. Yeah, she used to hang out with my ex-wife when -- when my ex-wife was there. And then she's -- she came with other people, different times after that.

Q.    Was there ever a time she showed up in a taxi that she had come from --

A.    Yes, she did.

Q.    -- (indiscernible) Roseburg?

A.    Her and another girl, and they just showed up out of the blue, in a taxi. And I didn't know who the other girl was at that point in time. I was doing -- well, working in the backyard or something. It was during the middle of the day. And -- or in the evening. I think it was in the evening. And she -- I went back into the backyard. They ended up going into the house and hanging out with my -- my wife, and the wife came and got me and told me that, Hey, these -- these two were at a drug rehab that they were

Exhibit 5002 at 606

*T. Stemmerman*

supposed to be court-ordered at or whatever, and they took off. And now they're here, and they're looking for a place to stay. Because all she had told me originally was she was looking for a place to stay, you know, and needed a place to crash for the night or whatever. And I said, Fine, I don't care.

And after I found out, I was -- I was pretty nervous, and I -- I told her, you know, if this is court-ordered, you're just getting yourself in trouble. You're coming here, you're going to get me in trouble, and I'm not really comfortable with you being here. You can stay the night, but after that you need to go.

Her friend was only there for about an hour or two, I think, and we ended up giving her a ride over to some apartments in North Bend. Oh, I can't even remember what street. That -- down by North Bend 7Eleven, kind of. And dropped her off.

And then Alicia came back to the house and stayed the night, so.

Q.    Okay.

A.    The next day an officer showed up, her -- her dad called asking if she was there, and I told him yeah, she was. The officer showed up to pick her up and take her back because she was in violation or whatever, or something.

Q.    Okay.

Exhibit 5002 at 607

T. Stemmerman

A.      So that's -- she left the house.

Q.      Alicia claims that one of the times she was over at your house that she -- you told her that you were in the car that ran Leah over.  And -- but she also talked about, I guess at the same time, I think it was when she came over in this taxicab, that you had her do sexual things to -- to you, that you held a gun to her head.

A.      No.  Uh, we -- we had sex one night.  It was -- but it wasn't even that night.  That -- the -- the time we had sex was the night that I was raided.  She was there -- let's see.  We had sex at about 8:00 or 9:00 in the evening, and we ended up -- I was dating Nikki Webber at the time.  Nikki was in jail, and Alicia came on to me.  And, you know, dumb, and a kid, and whatever.  We started having sex, and the only thing I could think about in the back of my mind was Nikki Webber and I'm cheating on her, and I felt like just a piece of crap.

And -- and I kind of jumped up, ran upstairs, got my clothes on, and she's yelling at me she wasn't done, she wanted, you know, more of whatever, blah-blah-blah.

And Josh Thompson was at the house then, and another kid from -- from Bandon.  And she -- she was pretty irritated with me because -- you know, and I don't blame her.  I -- I didn't exactly -- it wasn't very respectful for me just to jump up and run out of the room like that, and tell

Exhibit 5002 at 608

*T. Stemmerman*

her, you know, I don't want to have anything to do with you, at that point.

But she ended up coming upstairs. We hung out there for a little while, went out to another kid's house in, um -- oh, just out of town. Hung out there for a little while. I don't think we got in his -- he had a hot tub. That's usually why we went out there.

And then Josh had a bunch of drugs with him, meth with him. We -- I think he might have sold some to that kid's house we went to, or somebody that was there at the time. And we ended up going home, and hung out there all night; you know, partied, whatever. And then the next morning the police showed up and -- and knocked my door down and arrested all of us, and we went to jail.

Q.    You got raided a couple of times; is that right?

A.    Yes, I did. Three times. Well, one time I wasn't there, and then two times I was.

Q.    Let's talk about Bill Sero for a little while.

Did you ever tell people that you thought Bill Sero was involved in Leah Freeman's death?

A.    In the beginning I didn't know -- you know, we sort -- we sort of hear rumors that the boyfriend may have had something to do with it. And then we heard that the boyfriend maybe had picked up Bill to help him look for her or something. And so when we all started hearing rumors

Exhibit 5002 at 609

114

*T. Stemmerman*

that, you know, Bill was in town or whatever, at that point in time here in Coquille, and that he knew the boyfriend and things like that, then some of us wondered, you know.  I mean, when the -- when the police started looking for him to question him, that's when we really questioned, okay, does -- did he have something to do with this?

I feel bad now because, you know, he's -- he's passed lie detector tests and he's --

Q.    Well, we can't talk about lie detector tests.

A.    Okay.  Well, he's -- it's become pretty apparent that he didn't have anything to do with it, you know.  And -- and I believed a lot of rumors about a lot of people that had something to do with it at that point in time, until I started hearing my name involved in it.  And when I started hearing rumors about me, and then, you know, everybody else, it was like -- it seemed like every three days I heard a different rumor with a different person involved in it.  And so, you know, at that point in time, I asked him four or five times, you know, did you have something to do with that?  And if there was anything Bill actually told me the truth in his life, I think that was probably it.

Q.    Okay.  Bill told you that he never was involved in --

A.    He told me he never was involved with it.

Q.    Okay.  Now, at the time that we're talking about

Exhibit 5002 at 610

*T. Stemmerman*

here, were you using meth too?

A.    Yes, I was.

Q.    Is it possible that you might have said something to somebody that could be interpreted that you had something to do with Leah Freeman's death and what you were trying to do was, okay, try to make yourself look like a big bad drug dealer?

A.    I doubt it.  Um, I -- I -- you know, yeah, I -- I tried to put myself off as being a tough guy because some of the people I was around were kind of scary.  You know, I had no business being involved with them.  Yeah, I had people try to rob me.  I had people steal from me.  I had -- you know, people threaten me.  I had a lot of -- a lot of people come after me.  I don't think that I would have ever told anybody that I had something to do with the Leah Freeman thing because I didn't.  You know, I mean, I would have told somebody who knows what else to try to scare them, but I don't think I ever would have said that.

Q.    One other thing.  There was one rumor I forgot to ask you about.  There was one rumor that Leah was murdered and brought to your house and buried in your backyard for a couple of weeks, and then dug up and moved to where she was eventually found.

A.    I heard that too.

Q.    Well, first of all, is that true?

Exhibit 5002 at 611

*T. Stemmerman*

A.    No.

Q.    Okay.  Second of all, people were saying that there was -- you could go out in your backyard and dig around and you could find stuff?

A.    You could, actually.  There was an old homestead in the backyard.

Q.    Okay.  What kind of things could you find if you go out there and dig?

A.    Toys.  You know, it was all from -- there was a lot of campaign buttons and union buttons and stuff, and seemed to be all from the '30s, '20s maybe.  I mean, it was pretty old stuff.  It was all the old tin toys, you know, the tin railroad cars, and tin -- you know, little cowboy stuff.  And -- yeah, it was a -- it was a lot of -- right when you dropped over the hill.  And I don't know if it had gotten pushed off to the side there when we built the road to the back when I was a kid or what it was, but you just start scratching off the surface and you'd find all kinds of stuff out there.  Just -- car parts, Model A parts.  You name it, we found a lot of it out there.

Q.    Do you recall telling the police here earlier this year that you'd go around -- you know, go out in your backyard and dig because when you were tweaking it was something to do?

A.    Yeah.

Exhibit 5002 at 612

T. Stemmerman

Q.    And when I say tweaking, that means you were using then?

A.    Mm-hmm.

Q.    Did Alicia Michaud go out there and help you dig --

A.    Yes, she did.  That was the day that -- that was the day that she had gotten drop -- or, no.  That was the day she left, when she had come in the taxicab.  It wasn't the -- when she had first arrived in the taxicab, it was the next day.

Q.    All right.  Did you say her parents picked her up?

A.    It wasn't her parents.  It was like a -- I keep wanting to say a truancy officer or something, but I don't think it was.  It was -- it had -- it was something to do with her -- she was supposed to legally be at the drug rehab in Roseburg.  And she had run away from there, and so it was somebody that her parents had talked to, to come pick her up.

It wasn't her parents.  I talked to her parents on the phone, and I think it was her dad that had called me and -- and asked me if she was there.  And I told him yeah, you know, and she's told me that she's, you know, run away.  And if you guys want to come get her, this is my address, you know.  So.

Q.    Could have been like a probation officer or a

Exhibit 5002 at 613

*T. Stemmerman*

drug rehab counselor or somebody like that?

A.    It could have been.  It was -- I believe it was in a marked car, that they were in, and it looked like kind of -- like an unmarked police car, if I remember right.  It wasn't anybody I recognized, but.

Q.    When it comes to -- well, you know, and I've told you about Alicia Michaud claiming that you threatened her with a gun to get her to have sex with you or something like that.  Was there ever a time when Michaud was around where you did shoot your gun or anything like that?

A.    Oh, yeah.  I shot the gun -- I had several guns.  I mean, I had several handguns.  I had several rifles.  And the back of my property drops off, and you go down to where the field is where it floods down below, and we can shoot back into the bank.  And it was -- you know, there was times when -- who knows?  Every -- seems just about everybody probably saw me shooting the guns back there.  Me and guys would go back there shoot off boxes of shells.  Something to do.

Q.    Was there ever a time you were over at a guy named Joe Clifton's place, and Rowdy Howard came over, and it got to be a dispute, and you were trying to go home and Rowdy's chasing you?

A.    Yeah, there was.

Q.    Why don't you tell us about that.

Exhibit 5002 at 614

T. Stemmerman

A.    Yeah.  Joe Clifton, he was the name I was trying to remember earlier from when we were at the house and all had left and then come back.  That was -- the night that we got busted, that was -- that was the house we had gone to.  I was hanging out with -- oh, there were several people there.  I think it was five or six people or whatever, at Joe's house.

And I think Joe and his -- or Rowdy and his girlfriend were living there.  They had a baby.  I had been kind of hanging out and talking to Rowdy's girlfriend, you know.  It was just friends having a good time, like at the time, and Rowdy had come home, and Rowdy was hanging out -- I think -- I think he might have been hanging out with Alicia Michaud then.  But he thought that I was trying to hang out with his girlfriend or his ex-girlfriend, or whatever they were at the time.  They were having their own problems.

And he started going pretty much ballistic.  He was throwing stuff around.  He was threatening to kill his girlfriend.  He was threatening to kill his baby, at that point in time.  He was starting to beat stuff up in the house.  And me and Joe and everybody else, you know, kind of ran outside and tried to figure out what to do get Rowdy out of there.  It was pretty apparent something was going to happen if everybody didn't start separating from him.  I mean, like I said, he was threatening to kill everybody in

Exhibit 5002 at 615

T. Stemmerman

the house at that point.

We -- Joe and somebody else ended up taking his -- their baby, and they took off in one car. Me, his girlfriend, and her friend took off in another car. And we headed towards my house, they went a different direction to somebody else's house, and trying to basically slim things down to where Rowdy didn't have any -- you know, he couldn't get at anybody to hurt them. It was kind of a high-speed chase back to my house. I mean, they were doing everything they could to stop me. Trying to run me off the road. Almost hit the car a couple of times.

When I got back to where my house was, my cousin was there, and I started to slow down, and Rowdy and them pulled in -- started to pull in right behind me, and whipped in and kind of cut me off, pulled right into my driveway. So I took off and went past the house and around to behind Libby Drive or whatever, on Fruitdale Drive. And where I could see over to where my house was, watching for headlights, and see if he was going to leave or stay there.

And he -- they stayed there. You know, we waited for maybe 15, 20 minutes, and their car never left. So we drove back around there. And when I drove back around there, he had gotten a pipe or something else that he had in his hands. His buddy that was driving the Ford Ranger, they both come charging at us, telling us they're going to kill us and

Exhibit 5002 at 616

*T. Stemmerman*

everything else.  I had my cousin's gun, and I shot it three times in the air to scare him.  He hit the dirt, we took off again, and then waited un -- until my cousin called me and told me that there was nobody at the house, so we could come back.  We were pretty sure he was going to kill somebody.

Q.    But that's the only time that you've ever like pulled a gun out during a fight?

A.    That is the only time I've ever pulled a gun out around anyone to -- to --

Q.    To scare them or --

A.    Anything.  Yeah, it is.

Q.    All right.  Again, just so we're clear, you had nothing to do with the death of Leah Freeman or her disappearance?

A.    No.  No.

Q.    And you have no firsthand information as to what happened to her?

A.    No.

Q.    No one's told her -- told you that they killed her or was involved in her disappearance?

A.    No.  No.

Q.    Is there anything else that we've talked about here -- other than what we've talked about here today, that you think the grand jury needs to know?

A.    Not that I can think of.  I wish I did know

Exhibit 5002 at 617

T. Stemmerman

something.

MR. FRASIER: All right. Grand jurors, you want to ask him any questions?

GRAND JUROR: Was there ever a time that a taxi -- a time when Alicia came out there that you told her to go to that trailer and look at the bag of clothes?

THE WITNESS: Be very possible. I told everybody in the house that there was something suspicious in the clothes, you know, because that was before that the -- the clothes had been tested. You know, I -- like I -- when I saw them, and I'm hearing Bill was looking -- they were looking to question him, I freaked out, because instantly -- I'm already, you know, using methamphetamines, and doing illegal activities in my house. And when I start hearing they're looking for him, and there's -- you know, they want to know from me if there -- where he's at. And then I see these clothes with the stain on them, you know, that made me nervous. It scared the hell out of me.

And so, yeah, I had gone in the house and told -- Alicia must have been there that day. I told everybody in the house that there's -- you know, there's -- there's some funny stains on these clothes. So.

GRAND JUROR: Gotcha.

GRAND JUROR: Did you by chance indicate that it could be blood on the clothes?

Exhibit 5002 at 618

123

*T. Stemmerman*

THE WITNESS:  It's very possible, yeah.  You know, I -- and I probably said that it looks like somebody's got -- it looked like bloodstains that somebody's washed, you know.  And it took a long time for that -- when the -- when the police officers removed the clothes from my house to send them off to get tested and everything else, you know, there's -- there was months in between we ever heard back that the -- they weren't bloodstains, at that point in time.  That the -- you know.  There wasn't any communication between me and police officers, so that was -- it was two or three months of me sitting here thinking this guy had left something in my house, you know.  And then come to find out later on that, you know, there was -- there wasn't actually anything on the clothes, so.

MR. FRASIER:  Okay.

GRAND JUROR:  When you looked at the clothes, did you take them out of the bag?  Did you just open the bag?

THE WITNESS:  I -- I kind of just moved them around in the bag, yeah.

GRAND JUROR:  Did you notice what kind of clothes?  Were they women's clothes?  Men's clothes?

THE WITNESS:  They were -- there was -- it's -- I think it was women's, men's, and children's.  So that was --

GRAND JUROR:  All mixed together?

THE WITNESS:  -- part -- yeah, that was part of

Exhibit 5002 at 619

T. Stemmerman

the confusion, you know.  I -- I just didn't know what to believe.

BY MR. FRASIER:

Q.    When -- well, let's also be -- you know, you were concerned about Bill leaving stuff at your house.  That, you know, you were also concerned, hey, I just don't need the cops here?

A.    Exactly.

GRAND JUROR:  Right.

THE WITNESS:  I mean, you know, I'm the first person to admit, you know, I wasn't doing anything right at my house, you know.  I had drugs all over the place.  I had people stopping by to buy drugs from me.  I had people -- you know.  I was -- the police being at my house was the last thing I wanted or needed at that point in time.  And unfortunately it was probably the best thing that could have ever happened to me because, you know, here I am today, and a completely different person ten years later because I got in trouble, because I did get busted.  So.

GRAND JUROR:  Okay.

THE WITNESS:  Yeah, at that point in time, I didn't want any law enforcement at my house.

BY MR. FRASIER:

Q.    And I just want to -- on the clothes.  In relation to when Leah Freeman disappeared, when did Sero

Exhibit 5002 at 620

*T. Stemmerman*

bring those clothes over?  Was it before she disappeared?  After?  Do you recall?

A.    Um, well -- man, that's hard to say.  I didn't have -- you know, I didn't even know Leah Freeman was even missing for weeks afterwards.  I didn't have -- I didn't get the paper.  I didn't have TV.  You know, the first time I had ever actually heard something, Sherre had been in Coquille and she said, Man, the -- she come back to the house and she said, Man, there's cops everywhere in Coquille.  You don't want to go there.

I remember saying, you know, Okay, I'm staying out of Coquille, then.  Which I never came down to Coquille anyways for anything.  Very rarely, except for to usually go to court because of something I done.

But -- so it's real hard for me to pinpoint.  But I would say -- I would say the clothes had only been there for a couple of weeks when -- when the officers had picked them up.  So --

Q.    Okay.

A.    -- around -- you know.  You'd have to find out from Cal when it was he actually picked them up.

Q.    If I was to tell you it was the early part of August that we came by, does that sound about right?

A.    Yeah.

Q.    All right.

Exhibit 5002 at 621

*T. Stemmerman*

A.    I really -- I didn't have a job, you know.  There wasn't much for me to keep track of time back then, really.

MR. FRASIER:  Any other questions?

GRAND JUROR:  Would you say when you were using meth you were -- your personality would change?  You could be more aggressive?

THE WITNESS:  Um, yeah, possibly.  I mean, everybody's -- methamphetamines, your -- your moods and stuff kind of go up and down and back and forth.  But I wouldn't as -- I wouldn't say aggressive.  You know, when I was in high school I used to get in fights all the time.  And the whole time I was using methamphetamines, I didn't get into a fight once, so.

GRAND JUROR:  (Indiscernible.)

THE WITNESS:  You know, it's hard -- hard saying, I guess.

GRAND JUROR:  Mm-hmm.

MR. FRASIER:  Okay.  Anything else, from anybody?

Okay.  Mr. Stemmerman, I'm glad you came down today, and we appreciate your being here.  And I don't think we have anything else to ask you at this time.  We may call you and ask some more, but at this point I don't -- we don't have anything more.

THE WITNESS:  Okay.

MR. FRASIER:  Thank you.

Exhibit 5002 at 622

T. Stemmerman

127

GRAND JUROR:  Thank you.

(Proceedings concluded.)

--oOo--

I certify, by signing below, that the foregoing pages 1 through 127, inclusive, constitute a correct transcript of WAV files provided of the above-entitled matter, this 4th day of May, 2011.

_Peggy S Jillson_
_____
PEGGY S. JILLSON, TRANSCRIBER

Exhibit 5002 at 623

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

**STATE OF OREGON,**                    )
                                        )
            Plaintiff,                  )   Case No. 10-CR0782
                                        )
v.                                      )
                                        )
**NICHOLAS MCGUFFIN,**                  )
                                        )
            Defendant.                  )
_____)   Volume 6


                    Friday, July 30, 2010

                  GRAND JURY PROCEEDINGS


APPEARANCES:                **PAUL FRASIER**
                            **DISTRICT ATTORNEY**
                            125 East Eighth Avenue
                            Eugene, Oregon 97401




                TRANSCRIBED FROM AUDIO RECORDINGS


TRANSCRIBED BY:             Peggy S. Jillson
                            987 Tivoli Street
                            Eugene, Oregon 97404
                            (541) 689-7964

Exhibit 5002 at 624

2

**WITNESS INDEX**

McGUFFIN, Wayne                    3

HAGA, Angela                      11

THURMAN, Jaime                    20

MICHAUD, Bradley                  29

SLAGEL, Ashley (Amelung)          44

MAYFIELD, Brandon                 51

NOAH, Sarah                       58

Exhibit 5002 at 625

**<u>COQUILLE, OREGON; FRIDAY, JULY 30, 2010</u>**

-o0o-

**<u>TESTIMONY OF WAYNE McGUFFIN</u>**

(Witness sworn.)

BY MR. FRASIER:

Q.    Okay.  First of all, sir, this is the grand jury for Coos County, and we're looking into the death of Leah Freeman.  Though it's obvious, and we have -- it's being recorded now --

A.    Yeah.

Q.    -- two different ways, video and audio.

So first of all, could you tell us your name, please, and where do you live, sir.

A.    Wayne Noel McGuffin.  I live in Hilo, Hawaii.

Q.    And do you have an exact address there, sir?

A.    Um, yeah.  16465 Laniuma Street, Orchidland, Hawaii.

Q.    Okay.

A.    Which is south of Hilo, ten miles or so.

Q.    Okay.  How long have you lived in Hawaii?

A.    A little over three years.

Q.    You are the brother of Nick McGuffin; is that correct?

A.    I am.

Q.    And you're the older brother; is that right?

Exhibit 5002 at 626

*Wayne McGuffin*

A.     Correct.

Q.     And going back to the year 2000, you were living here in Coos County?

A.     I was.

Q.     Still living at home at that time?

A.     Um, I was back and forth.  I was living with my aunt and then living with my parents, friends.  Kind of just jumping around from place to place, working and stuff.  So.

Q.     Did you know Leah Freeman at all?

A.     Vaguely, yeah, a little bit.

Q.     How did you know of her, or --

A.     Just as my brother's girlfriend, and didn't really talk to her that much, but knew her a little bit, yeah.

Q.     All right.  How well did your brother and Leah get along, from what you could see?

A.     I thought they got along great.

Q.     No issues at all, as far as you were concerned?

A.     Not that I could see, no.

Q.     Now, the night that Leah disappeared, and the subsequent days thereafter, you were at your aunt's house?

A.     I was, yeah.

Q.     And you stayed there --

A.     I was -- I was there for about two weeks.  My cousin had got a landscaping job, and I was working with him

Exhibit 5002 at 627

*Wayne McGuffin*

doing that.

Q.    When did you first see Nick after Leah disappeared?

A.    Must have been probably four or five days.

Q.    How was he behaving or reacting?

A.    He was not himself.  He was upset, didn't know where his girlfriend was.  Just not himself.

Q.    Appeared to be upset?

A.    Yeah, definitely upset.

Q.    Had he been crying and stuff?

A.    Oh, yeah, he was crying all the time.

Q.    I have some particular questions I want to ask you about.

Do you know a Ricky and Nicole Demain?

A.    Name sounds familiar.  Ricky Demain.

Q.    Nicky Demain, Ricky Demain, they -- they tell the police that you lived with them for a couple of months here in Coquille.

A.    Oh, okay, yeah.  Nicky Decker.  I didn't -- yeah. They got married.  Okay, yeah.  Yeah.

Q.    Yeah.

A.    They lived up at -- yeah.  Okay.  Yeah.

Q.    And --

A.    Yeah, I lived with them up at the Hillside Terrace for probably a couple of months.

Exhibit 5002 at 628

Q.    Well, Nicky Decker, Nicky Demain, whatever her name is, has indicated to us that you told them some things about the disappearance of Leah Freeman while you were living there?

A.    Yeah?

Q.    And do you recall what you told them?

A.    Yeah.  I told them that Bill and -- Bill Sero and Tom Stemmerman were supposedly driving a car, frying on acid, swerved to joke around, hit her, threw her in the trunk, realized later that she was still alive, and proceeded to do whatever.

Q.    And how did you find that out?

A.    Just from people talking.

Q.    Okay.  Well, here's what I want to ask you about, is because they indicate, or at least Nicky does, that there was a time that you were -- had been drinking.  And they've indicated to the police that you, while you were intoxicated, stated you wanted to talk to -- about Nick, but you couldn't talk about it because it was family, but you indicated that you were 95 percent certain that Nick had been involved in Leah's death.

A.    No way.  She's full of shit.

Q.    But why would she want to go (indiscernible)?

A.    She's full of crap.  There is no way.

Q.    Okay.  That she further stated that you had

Exhibit 5002 at 629

overheard your father Bruce and Nick talking in the kitchen, and Bruce had been covering for that.

A.    Mm-hmm.

Q.    Nicole said that Wayne told her, I don't know how he did it.

A.    No, never said that.  She's full of it.

Q.    She said that Wayne told her that there was a time when he was at the family home and Nick came in with blood on him and a bloody shirt.  Nick said Wayne [sic] went out with his father, saying, We've got to get this cleaned up.

A.    No.  (Laughs.)  Nope, never happened.

Q.    Nicole said Wayne told her his dad and Nick were in a panic.  And -- so, okay.

She goes on to tell us, I want to say something -- that you said, I want to say something and I just can't.  I hate my brother.

A.    No.  I love my brother.  She's full of it.

Q.    Do you know an individual named Polly Parks (phonetic)?

A.    I do, I think.

Q.    How do you know Polly Parks?

A.    As a tweaker.

Q.    Have you ever been over to her house?

A.    I have.

Exhibit 5002 at 630

*Wayne McGuffin*

Q.      Do you know a Christy Young or a Christy Cagley (phonetic)?

A.      Mm, I don't think so.  I probably do, though. Everybody knows everybody in this town.

Q.      Do you know the daughter of Polly Parks?  I believe her name's Pam.

A.      Possibly.

Q.      According to these individuals, they've told the police that you and Nick were at the home of Polly Parks one night, that there was discussion about Leah's disappearance, and there was a discussion about the shoe being found on Hudson Ridge.  And you've been quoted by these individuals, that the shoe, quote, was put there to throw them off.  It was meant to be thrown there.  They won't find anything there.

A.      I never said that.

Q.      Never said it?

A.      Never said it.

Q.      All right.  So it's your testimony here, as far as you know, the only way that you know that Leah Freeman died was because of Bill Sero and Tom Stemmerman?

A.      Yep.

Q.      Have you ever talked to those two?

A.      Have not.

Q.      Have the -- has anybody confessed to you that

Exhibit 5002 at 631

*Wayne McGuffin*

they were responsible for the death of Leah Freeman?

A.    Quite a few people have told me that that, and --

Q.    No, you didn't unders -- answer the question. The question is, has anybody told you directly that they themselves caused the death of Leah Freeman?

A.    No.

Q.    Is it safe to say, sir, that the information you have is totally based on rumor and what other people have said?

A.    Possibly.

Q.    When you say possibly, that intimates that you know something directly by --

A.    This is all rumor too, that you're hearing -- that you're telling me.  So --

Q.    No --

A.    -- it's all hearsay from them.

Q.    Right.

A.    Yeah.

Q.    But they're willing --

A.    So, I mean --

Q.    -- to come in here and say that you said it.

A.    Well, I didn't, so.

Q.    Okay.

Now, has anybody -- again, so we answer the question.  Has anybody told you, I killed Leah Freeman?

Exhibit 5002 at 632

*Wayne McGuffin*

A.      No.

Q.      Has anybody told you, I saw Leah Freeman being killed?

A.      No.

MR. FRASIER:  Okay.  Grand jury have any questions you want to ask him?

GRAND JUROR:  You say, you know, the rumors of the two -- of Bill and Tom, that they hit her, they were on acid, or whatever.

THE WITNESS:  You know, it's what I've heard the last ten years.

GRAND JUROR:  And no one in your -- you have not made any attempt to find out who they are or where they live or --

THE WITNESS:  I mean, I know who they are, but I am not going to be vigilant and go and, you know, accuse them of doing it.  I mean, I don't even know where they live.  I never really hung out with them anyway, so for me to go do that would be kind of far-fetched, yeah.

GRAND JUROR:  Do you believe that he did it?

THE WITNESS:  I do, actually, yeah.  Because I've heard from a lot of people.  A lot of people.

BY MR. FRASIER:

Q.      If I were to tell you that forensically we can prove that Leah Freeman was not killed by being hit by a

Exhibit 5002 at 633

car --

A.    I just said that.  They hit her, and they threw her in the trunk, and realized that she wasn't dead.

Q.    Okay.

A.    I said that when we started.

Q.    If I can prove to you -- say to you we can prove to you forensically she was not hit by a car, how does that affect your opinion?

A.    I still believe that.

MR. FRASIER:  Any other questions?

Okay.  You're free to go.

**TESTIMONY OF ANGELA HAGA**

(Witness sworn.)

BY MR. FRASIER:

Q.    First of all, this is the grand jury for Coos County, and we're looking into the death of Leah Freeman.

A.    Okay.

Q.    I need to advise you we are recording.  It's kind of obvious, but I have to tell you that affirmatively.

A.    Okay.

Q.    Okay.  First of all, could you tell us your name and where you live.

A.    My name is Angela C. Haga, and I live in North Bend, Oregon.

Q.    And are you familiar with an individual named

Exhibit 5002 at 634

Bill Sero?

A.    Yes.

Q.    How did you know Mr. Sero?

A.    I've known Bill Sero dating all the way back probably to my junior high days, which would have been the early '90s.  I'm not -- maybe '92, '93.

And through mutual friends, school, and then later I knew him because Erika Davidson and I -- who he has children with, and were in a long relationship, we had been long-term friends as well, dating all the way back to early junior high days.

Q.    And are you acquainted -- well, let me back up.

When Bill Sero and Erika Davidson were together, did they occasionally baby-sit for you, and things like that?

A.    Absolutely.  We did a lot of trading back and forth.  At one point we actually lived about a block from each other out in the Charleston area, when they had not been living out in the Coquille-Myrtle Point area.  And having children the same age, you know, we always tried baby-sitting back and forth.  And there was a period of time where Erika and Bill were both doing fairly well sober, when they had first had their children, and it made it easier, obviously, because me and my now ex-husband never had that crazy lifestyle that they really did.  So -- but there was a point in time that we did trade baby-sitting, yes.

Exhibit 5002 at 635

*Angela Haga*

Q.    And were you ever acquainted with Nick McGuffin at all?

A.    No.  I don't know who he is.

Q.    How about Leah Freeman?

A.    I don't even know who she is.

Q.    All right.

Well, the reason I asked you here today is there's some indication that the day that Leah Freeman disappeared, which would have been June 28th, 2000, Erika and Bill baby-sat for your -- you and your husband that night.

A.    As well as my memory serves me, it's been so long --

Q.    Okay.

A.    -- the night that this happened my ex-husband and myself had -- I can't even remember what.  We do have family out here in Coquille.  It could have been -- I don't even remember why, but they had baby-sat for us.  I don't remember if we went back into Coquille.  Baby-sat Elisa (phonetic) and Bradley that night, which is our children.  And about 11 o'clock that night we had come back out to Coquille to pick up the children.

And at that night was -- from where my memory, I mean, it's been so long, but that was the night that Leah apparently came up -- disappeared.  Disappeared.

And when I got back to Erica's, Bill was

Exhibit 5002 at 636

*Angela Haga*

sleeping, and I never did see him.  And I remember thinking that's really odd.  No, I don't have any proof at all that he was there sleeping.  So remembering back on the memories that I have, I don't have a solid proof that that was the night, but the memories, I remember having those thoughts, going, that was the night that she came up missing.

I don't have proof that he was sleeping in bed. You know, I didn't go in the room and peek under the blankets to see if he was there.

Q.    Okay.  Was he there earlier in the evening?

A.    Yes, he was.  When the children were dropped off, Erika and Bill were actually both there because they had their two small children, which they had just -- Jason was not even quite a year old at that point.  Their four-year-old and then my two- and four-year-old.

Q.    Okay.

A.    So it was -- required two adults to watch that many children.

Q.    And -- but Erika told you -- so I understand you correctly, Erika said he's asleep, but you didn't see him?

A.    Exactly.

Q.    All right.  Now, Mr. Sero is -- have you ever had any conversations with him about Leah Freeman disappearing or --

A.    Not that my memory recalls, no.  The only

Exhibit 5002 at 637

15

*Angela Haga*

conversations I think I've ever really had about this young gal Leah Freeman, um, was maybe the same gossip and hearsay that the community has heard and the same, you know, party chat that you hear, and so it's really hard to even know what is gossip and what's even real information that -- that I've heard.  And I don't recall ever having a conversation with Bill Sero about this.

        Q.    How about Erika Davidson; did she ever talk to you about it?

        A.    Okay.  Yeah.  Well, not directly about this Leah Freeman thing.  There was -- and again, it was some time in the amount of time that -- that Lee Valley Road was still closed off to the public.

        Q.    Right.

        A.    I don't know how long that was for.  In a 23-year-old's mind it seemed okay to, when a friend asked, Hey, let's cruise down Lee Valley Road, it was almost more like a, oh, it's a hey -- a looky-type thing.  You know, there was a crime committed, let's go down there.

            As an adult, thinking about it now, seems kind of weird, kind of creepy; kind of like, Really?  That she had me drive out there, and the road ended up being blocked so we had to turn around and come back.

            And the only things -- we never directly talked about this, but we've talked about Bill Sero -- Lee Valley

Exhibit 5002 at 638

*Angela Haga*

Road was a road that he liked to take her down when he was all spun out of his mind on methamphetamines.  He had been known to pistol-whip Erika, hold her at gunpoint -- and this is things she's told me.  I didn't see it myself, but he has a violent history and a violent past, being a very empowered and controlling kind of person when he was extremely high on drugs.  And he would take her out there and make her drive, you know, 60, 70 miles down the dirt road, and then slam her car into reverse, and then hit her really hard.

And I heard numerous different stories of his -- his history of violence.  And that's what my -- my biggest concern always was in the links that I heard linked to this young gal that lost her life.

Q.    Okay.  Do you have any other information about this case at all?

A.    No, I just would like to see it solved.

Q.    I've been asking any -- everybody this, because there has been so much rumor and stuff floating around.  Has anybody told you directly that they were responsible for the death of Leah Freeman?

A.    No.

Q.    Has anybody --

A.    No.

Q.    Anybody told you that they actually saw Leah Freeman being murdered or anything like that?

Exhibit 5002 at 639

17

*Angela Haga*

A.    No.    I did hear one story, I don't know if this really is it, but I heard that somebody said, and I could tell you who said that, that their -- that they saw her behind a freezer being tortured.  I don't know if that's -- if there's any truth.  Again, that was hearsay.  Her name is Tressa Mutskis -- Metskis (phonetic).  She's actually a local -- she lives in Eugene now, and she's from Myrtle Point.  She said she remembers a scary guy coming and -- like at a party, and then they ended up being where she was being held or something.  And again, she was -- she's 26 now, so she would have been a 16-year-old girl at that point, real close the age of all of these children.

Q.    Okay.  That's the first I've heard about a freezer.

A.    Yeah.  Yeah.  And again, you know, I don't know.  Again, I'm sure you probably -- I don't know if it's just crud information or if there's any truth to it or not.

Q.    Okay.  What I'll have you do when you step outside, I think one of the police officers are out there, and I'll ask you to tell them about this person so that they can check into it.

A.    And I believe they have.  I -- I don't know yet, though, but I'll -- yeah, I have talked to them just briefly about it.

Q.    Okay.  I just want to make sure they know about

Exhibit 5002 at 640

*Angela Haga*

it.

MR. FRASIER: All right. I don't think I have anything else to ask her. Does the grand jury wish to ask her any questions?

GRAND JUROR: The -- this story -- when you relayed the story about, was it Bill Sero and Erika, used to go to Lee Valley Road? Is that --

THE WITNESS: Yes. Yeah, that -- those are the -- the drug and joyrides that I don't know if you call them that, that he would take her on when he was having an utter outrage of being violent and mean and controlling. And he would just, you know, take her out to abuse her.

And I don't know the extent of the abuse --

GRAND JUROR: Did you ever actually see him abuse her?

THE WITNESS: I -- lots of physical -- or, excuse me, lots of verbal abuse. That's -- he always talked very degrading when he talked. But as for physical abuse, no, I think that was kept secret between the two of them. I saw bruises, lots of bruises.

GRAND JUROR: And who was it that told you Bill was asleep, you said, that night?

THE WITNESS: Erika.

GRAND JUROR: Okay. Thank you.

THE WITNESS: They had a little home right there

Exhibit 5002 at 641

*Angela Haga*

on -- let's see, it was like a fruit name of the street. Date Street or something like that, maybe, in Coquille. I don't know. Right before the high school. I could show where the apartment is, I just am not familiar with the streets of Coquille.

GRAND JUROR: Did you remember what kind of veh -- did Bill have a vehicle?

THE WITNESS: They had a -- a black Ford Taurus at that -- I want to say that's the only vehicle that they had. They kind of -- that was -- I think that it would have been the black Ford Taurus. Probably like a '96 model or something like that. And it still actually -- I think Sam Clausen still drives it around down, her step-dad. It's a painting car now.

GRAND JUROR: Did you know Tom Stemmick (phonetic)?

THE WITNESS: Stemmerman?

GRAND JUROR: Stemmerman, I mean. Excuse me.

THE WITNESS: From high school and school, and not -- no acquaintance other than just knowing each other from both growing up here. And I knew him and Bill were friends.

GRAND JUROR: Did he have a car, that you know of?

THE WITNESS: The only car that I remember Tom

Exhibit 5002 at 642

*Jaime Thurman*

having is like -- and I think it goes all the way back to high school, would have been a lowrider pickup truck of some sort. That's what I remember him driving, but I -- I don't know him as an adult at all. I only knew him back from high school.

And then obviously the community links that his name has been brought up in this also.

GRAND JUROR: Do you remember the color?

THE WITNESS: Pardon me?

GRAND JUROR: That lowrider pickup, do you remember the color?

THE WITNESS: I just remember he was one of those guys that had like bass, and lowrider pickups were -- I don't know. I honestly -- I don't even -- I don't know.

MR. FRASIER: Okay. Any other questions? Everybody's looking at me like I think they're done.

All right. Anything else you want to tell us?

THE WITNESS: I think I'm good.

MR. FRASIER: Okay. All right. Thank you, ma'am. You're free to go.

**TESTIMONY OF JAIME THURMAN**

(Witness sworn.)

BY MR. FRASIER:

Q. And could you tell you name, please, sir.

A. Jaime Thurman.

Exhibit 5002 at 643

21

*Jaime Thurman*

Q.    Mr. Thurman, this is the grand jury for Coos County, and we're looking into the death of Leah Freeman. It's kind of obvious, but I have to tell you we're recording everything, okay?  And I just need to find my sheet here.

Mr. Thurman, could you tell us, sir -- well, right now, where do you currently live?

A.    Redmond.

Q.    And how long have you lived in Redmond?

A.    About seven, eight years.

Q.    And do you know Nick McGuffin?

A.    No.

Q.    How about Leah Freeman, did you know them?

A.    No, I didn't know her.

Q.    How about Bill Sero?

A.    I knew Bill.

Q.    How did you know Bill?

A.    Um, let's see, when I lived out Riverton I -- he -- I knew he dated some girl that -- I guess they were broke up at the time and I started messing around with her, and then found out that she was dating him.  And then -- and after that I run into him at Safeway because of that, and that was about it.

Q.    We've kind of -- the reason we brought you over here today -- well, let me back up a second.  You know Tom Stemmerman, don't you?

Exhibit 5002 at 644

*Jaime Thurman*

How do you know Tom?

A.   I -- he's the -- he's my age.  I used to party with him, back in '93, '94, somewhere around there.

Q.   When was the last time you saw Bill and/or Tom?

A.   Uh, long time before this happened, I know that.

Q.   Well, the reason I brought you over here today is we've had some people that have been interviewed, and as part of this investigation we've been -- what?  900-some-odd people have been con -- have been named in the reports and this and that and the other.  And some of the information we have is that they've been quoting you as saying Bill Sero told you that he killed Leah Freeman.

A.   No.

Q.   Okay.  So Bill Sero never told you that --

A.   No.  If he did, I would tell you, because I don't like the guy.

Q.   Has Bill Sero told you anything --

A.   Hmm-mm.

Q.   -- about Leah Freeman?

A.   Absolutely not.

Q.   How about Tom Stemmerman, has he told you anything about Leah Freeman?

A.   Nope.

Q.   Now, there's been this rumor floating around town that Bill Sero and/or Tom were in a car and might have run

Exhibit 5002 at 645

*Jaime Thurman*

her over.  Have you heard that rumor?

A.    No.

Q.    Okay.

A.    Um, I mean, I've heard that rumor, but I think by them finding the shoe at the graveyard --

Q.    Yeah.

A.    -- they kind of put two and two together and thought that that's probably what happened.

Q.    Did -- I guess what I'm trying to get at, is it possible that maybe when you were drinking or partying you might have repeated the rumor or anything like that?

A.    No.  No.  They -- the detectives came out to my house and I -- the reason -- what I knew was because of Lisa Michaud or whatever her name was --

Q.    Alicia.

A.    -- she was running her mouth and -- to me, and then somehow they must have had a party, and then the detectives came out and talked to me after that.

Q.    What did Alicia tell you about that?  What has she told you about that?

A.    I don't remember.

Q.    Okay.

A.    One thing I do remember is that I -- you know, I drove Lee Valley Road probably twice a day, to my uncle's house and back home.  And she was with me one time, and I --

Exhibit 5002 at 646

*Jaime Thurman*

right where they found her, there was a road that went -- I don't know if that's where they found her up there, but a road that went off Lee Valley Road and kind of dead-ended.

And I drove down there in my little Luv, and she started freaking out.

Q.    Okay.

A.    So that told me that, you know, maybe -- and this was before they found her -- that she knew something was going on.

Q.    Okay.

A.    So I -- I called -- I don't know who I called, but --

Q.    Where is this little road on Lee Valley, that you're talking about?

A.    Well, after you hit the gravel, you go -- I think the road goes ten miles or something down that road.  Turns, and then turns again.  Makes a couple of turns, and there's a really sharp turn, and then it kind of goes into a long straight shot.  And then there's -- if you're on going towards Myrtle Point, the road kind of goes, unh (phonetic), and then stops.

Q.    Okay.  Well, this is a map over here.  Maybe I'll just come over here.

This is Lee Valley Road, and this is where the body was found.  Does that look anywhere close to where

Exhibit 5002 at 647

*Jaime Thurman*

you're talking about?

A.    Came over there -- was that gravel right here?

Q.    Yes, I believe so.

A.    I think Jim Judson's (phonetic) right there.

Yeah, it's pretty damn close right there, because there's a straight stretch there, and --

Q.    There's a big wide spot, kind of like a rock pile or something.

A.    It was right past that, yeah.

Q.    Right past that, okay.

A.    And about two turns, I think, past that.

Q.    All right.

A.    And I also, I think the day before that, before they found her -- or after they found her, I saw some pickups sitting out there.  I don't remember what I said, but there was a pickup sitting right by that road, and then I called and gave information about it, so.

It's been a long time.

Q.    When you knew Bill Sero, what kind of rig did he have?  What kind of --

A.    He never drove when I knew him.

Q.    What?  Excuse me.

A.    He never drove when I knew him.

Q.    Okay.

A.    But Alicia Michaud's the one that I think that --

Exhibit 5002 at 648

*Jaime Thurman*

Q.    She's the one --

A.    She's the one that knew a lot, because she disappeared after --

Q.    Right.  Okay.

Is there anything else about this case that you think the grand jury ought to know about?

A.    Nothing that I --

Q.    Okay.

A.    Most of my stuff, besides that driving the road every day.  And other than that, that's -- everything else is probably hearsay.

MR. FRASIER:  Does the grand jury want to ask him any questions?

GRAND JUROR:  Yes.

You said you went down this road and she -- she freaked out --

THE WITNESS:  She just wanted to get out of there.  She was --

GRAND JUROR:  And you said this is before they found the body?

THE WITNESS:  Yeah.  I think it was a couple of days before that.  And then I -- yeah, that was -- it was probably a couple of days before that.  Could have been before or after, I'm not -- you know, it's been a long time.

MR. FRASIER:  When she --

Exhibit 5002 at 649

*Jaime Thurman*

GRAND JUROR: When --

THE WITNESS: Well, she had to -- it had to have been before, because, you know, why would she freak -- she was disappeared after -- after that. Had to have been -- actually, it had to have been way before, had to have been, you know, a month. Because I think she disappeared before they even found her body.

BY MR. FRASIER:

Q.    Okay. She went into rehab.

A.    Yeah. Yeah, that's right. She did go in rehab.

Q.    And the police had contact with her --

A.    I thought she went into protective custody, but --

Q.    Yeah. She went to rehab.

GRAND JUROR: Whose idea was it to drive down the road?

THE WITNESS: I was just messing around with her, you know, man.

BY MR. FRASIER:

Q.    When she freaked out, what was she saying, to the best --

A.    She wanted to get out of there -- out of there. She wanted out of there.

Q.    Did she say why?

A.    No. Not until afterwards, when I probably

Exhibit 5002 at 650

*Jaime Thurman*

realized when they -- where they found her, that that's probably why.  She -- that she knew.  You know, to me it sounded like that she knew a lot, I mean, but she wasn't telling anybody anything.

Q.    All right.

GRAND JUROR:  That pickup you seen, was it a lowrider?

THE WITNESS:  No.  I think it was a bigger diesel pickup, but I can't be positive.  It wasn't, definitely a lowrider.  People -- lowriders wouldn't drive that road. That's pretty -- a pretty back road, especially when they took the grader down it.

GRAND JUROR:  When -- do you have a Chevy Luv -- you had a Chevy Luv --

THE WITNESS:  I had a Chevy Luv pickup.

GRAND JUROR:  What color was that?

THE WITNESS:  Blue and -- blue and white, with a canopy on it.  Little four-wheel drive.

But, yeah, I drove that road twice a day, at least twice a day, because my -- I lived clear outside of Myrtle Point, and my uncle lived right by Four Corners, so I was back and forth.  You know, and I thought maybe I might have saw the person that dumped them, but -- no clue.  I mean, I actually got -- they came to my work telling me I was trying to elude them.  I didn't know there were cops sitting

Exhibit 5002 at 651

*Bradley Michaud*

out there.  I was -- at the time I was driving my Nova, and I just went down.  I knew the roadblock was there, and that was the road I took all the time, and I hate going all the way over to Coquille and back to Myrtle Point.  And I drove out to the gravel pit and there was a white car sitting there, so I did a cookie and headed back to my uncle's because -- just checking to see if the roadblock was there, because I think they found her body that -- that day or the day before.  And I went back to my uncle's and they came to my work the next day, thinking I was trying to elude them.  I said, No, that's how I drive.  (Laughter.)

BY MR. FRASIER:

Q.    Anything else?

A.    No, I don't -- it's been so long that --

MR. FRASIER:  Okay.

Any other questions from the grand jury?

Okay, sir.  That will do it.  You're free to go.

THE WITNESS:  All right.  Thanks.

MR. FRASIER:  Thank you.

GRAND JUROR:  Thank you.

**TESTIMONY OF BRADLEY MICHAUD**

(Witness sworn.)

BY MR. FRASIER:

Q.    Sir, this is the grand jury for Coos County, and we're looking into the death of Leah Freeman.

Exhibit 5002 at 652

*Bradley Michaud*

A.    Mm-hmm.

Q.    It's obvious, but I've got to affirmatively tell you that we are recording the proceedings here this evening, or this -- today.

A.    Okay.

Q.    First of all, could you tell us your name, please, sir, and where you live.

A.    Brad Michaud, and I live at 93902 Jensen Lane. It's North Bend, Oregon.

Q.    And you're the father of Alicia Michaud?

A.    Right.

Q.    What we're doing here today, sir, is -- well, I have some questions about Alicia and some things that she said, and so forth.  But -- and again, I'm not trying to embarrass anybody or anything along that line.  I'm just trying to figure out -- we're trying to figure out what the heck happened.

A.    Oh, yeah.  Right.  No, it's fine.

Q.    Now, Alicia, she had a methamphetamine problem in high school.

A.    Oh, boy.

Q.    Understand we had her in here the other day --

A.    Right.

Q.    -- and she -- she told me she's been clean for about seven years.  Does that sound about right?

Exhibit 5002 at 653

31

*Bradley Michaud*

A.      Mm-hmm.  Yeah.  Yeah, probably is pretty close to that, I would think.

Q.      On June 28th of 2000, the night that Leah disappeared, I have information that you and your wife had come back from a trip and then got ahold of Alicia and picked up her baby.

A.      Mm-hmm.

Q.      Could you tell the grand jury about that, if you (indiscernible)?

A.      Yeah, it was -- oh, we'd gone through a lot of trouble, with the meth, which is understandable when it takes someone over like it did to our daughter.  And we -- the babe -- the child was -- her daughter was only like probably three, four months old then.

        What was the date, you said?

Q.      June 28th, 2000.

A.      And she was born in February, so -- yeah, so four months old.

        And, you know, we were just worried about her having her.  You know, we wanted her -- you know, she lived with us, and stuff, had the baby while she was living with us and everything.  And -- and so stayed up at the house up on Shelly Road, we lived at the time, up there.

        And so we were in deep concern for the -- for the safety of the granddaughter.  And so we -- we made up

Exhibit 5002 at 654

*Bradley Michaud*

something, I don't remember what it was at the time, to meet us at the Safeway parking lot.  I think we just got back from -- I think maybe San Diego or Mexico.  We go to kind of both places.

Anyway, she did meet us there with the girl -- with the granddaughter.  And I don't remember, you know, what we told her, I mean, that I can't at all remember why we had -- but we made up something.  And then we said -- and when she got there we said, well, you know, why don't we just take her for the night, you know, and come get her tomorrow, and she can spend the night or something.  We got back, we miss her, you know.  And so she let us take her, and I'm so grateful for that, because we might not have her if it wasn't for that.

Q.    Right.  And --

GRAND JUROR:  And what time was -- what time was this?

THE WITNESS:  That was eve -- it was dark.  So I -- you know, I'm not sure of the time, but I know it was -- it was after 9:00, probably, I bet.

BY MR. FRASIER:

Q.    I think you told the police back in 2000 that it was around ten o'clock.

A.    That probably sounds right, yeah.

Q.    It sounded like you'd flown in on a late flight

Exhibit 5002 at 655

*Bradley Michaud*

to North Bend --

A.    Okay.

Q.    -- and then --

A.    Yeah, because I -- I don't even think we'd been home yet, I don't think.  You know.

Q.    And she had been at some party at T.J. Greaves' (phonetic) place or something along that line?

A.    Uh, yeah.  I don't -- I -- she said something about a party, it seems like I recall, but I don't remember any names or anything.

Q.    When she came to -- with the baby, was anybody with her, that you can recall?

A.    No, and I don't even remember how she got there, to tell you the truth.  I mean, it's been ten years.

Q.    All right.

A.    I don't remember if she drove or some -- if somebody would have brought her, I would have remembered that, I would have thought.  But, yeah, I don't remember that.

Q.    She had a car?

A.    She had a car, yeah.  But whether she was driving it then -- she had a BMW that we sold her, or had for her, and -- and I don't remember if she had it.  I think we took it away from her because of all the -- the meth abuse and stuff.

Exhibit 5002 at 656

*Bradley Michaud*

Q.    Now, shortly after Leah disappeared, Alicia went into rehab for a bit over in Roseburg.

A.    Mm-hmm.

Q.    Did you arrange for that, or did your family arrange for that?

A.    Oh, I'm sure we did, yeah.

Q.    Okay.

A.    We arranged for quite a few of them, yeah.  And so I think we were -- it was never her going and getting it set up, until I think towards the end more, when she finally got really cured.  It was just -- I think we just finally had it, and -- you know.

Q.    When she went into rehab there in 2000, at some point in time she started saying some stuff about Leah Freeman and -- and I don't know if it was you folks or not, but she ended up with an attorney, David Harry.

A.    Mm-hmm.  Right.

Q.    Did you arrange for that, or was that something the rehab (indiscernible)?

A.    Boy, you know, she was in Roseburg.  And was that when she was at that -- that place in Rose -- like Deer Creek or something like that?

Q.    I don't know.

A.    I don't remember arranging that.  We didn't pay him.

Exhibit 5002 at 657

*Bradley Michaud*

Q.    Okay.

A.    Okay.  It was I think pro bono type of deal, I think.  And no, so we did not arrange for that.  No.

Q.    Well, has -- and the reason I bring you in for -- wanted you to come in and talk with the grand jury about this is she's been quoted by a whole bunch of different people about different stories about what happened to Leah.  You know, one version we hear is that Bill Sero ran her over with a car, or Tom Stemmerman ran her over with a car.  And then we've heard other stories where she said she was actually in the car when it occurred, or then other times it's these people told me this.  I mean, she's all over the place --

A.    Oh, yeah.

Q.    -- about what occurred.

Has she ever discussed with you about what she knew about Leah Freeman at all?

A.    About that, yeah.  Yeah, she did, you know. And -- or we might have asked her, you know.  And -- and she told me -- and this is honest-to-God truth, she said they -- they told her that they were -- Bill Sero and Stemmerman were frying on acid and they hit her.  They hit her in the vehicle on their way up to Coquille.  Like, it seems to me it was like that straight stretch just after you turn at the stop sign there and head east to Fairview.

Q.    Okay.

Exhibit 5002 at 658

A.    That's what I -- I don't know why I envision that it was there, but it was on the way that way, anyway, is what she told me.

And -- and I don't remember what she said after that.  She -- like they might have got her then and put her in the -- she wasn't dead, I kind of vaguely remember, and they put her in the trunk or something, took her to his house or something.  And that's all I -- that's what they told her, you know.

And she never said to me once that she was in the car.  Never said that to me.  And, you know, I'd have probably killed her myself if -- you know.  But she never did say that to me, and whether she was or not, I, you know, have no clue.

Q.    Well, and at the time she was pretty much into methamphetamine?

A.    Oh, yeah.  Yeah.  But, you know, they'd go their days when they're up for a long time, and then like, you know, she'd come and visit Tiana (phonetic) on a pretty regular basis.  Because we -- we got custody of the granddaughter then.  We still have custody.  And so she would come visit her and we told her, when you come visit, you better not be high, because you're not going to visit.

Q.    Right.

A.    And so that's when I had -- that's when I had

Exhibit 5002 at 659

*Bradley Michaud*

asked her some of this stuff too, I'm sure, you know, because she -- I wouldn't talk to her when she was spaced out. You know, you're not going to get anything truth out of her.

Q. There were a couple of times too, and I think we -- when we talked to her last week, that she talked about she might have seen this in a dream or a vision --

A. Mm-hmm.

Q. And then, you know, when people quoted her saying, Well, Bill told me this and then I was there and I saw it. And, you know, she -- she's been all over the place. But I was just trying to figure out what she told you, and what she told you was that Bill and Tom or Bill told her directly that that's what occurred?

A. Yeah, I don't know if it was Bill or Tom, or -- I thought it was Tom, but I'm not -- I couldn't swear by that. But they had told her that they were really high on acid and I think from that party or something, or from a party. They were partying, and that they hit her on the side of the road, or, you know, in the road, or off the shoulder or something like that, you know, and --

Q. Right.

A. I mean, she -- she wouldn't be in the middle of the road, I guess. But anyway, I mean, I don't know if that's what happened, if she got hit. But that's -- that's all she said as far as about them telling her that.

Exhibit 5002 at 660

*Bradley Michaud*

Q.   Right.

A.   And she did have dreams.  I mean, she told us about the dreams.  And, you know, told -- told my wife that, you know, she's in -- she's in a river, dead, somewhere.  And this was before they found her.

Q.   Right.

A.   And she probably -- I'm sure she's told you that, probably.

Q.   Well, when we've talked to her lately, just to answer your question, is is she -- she's telling us now that Bill and Tom never told her that.

A.   Really?  Wow.

Q.   Yeah.  So, but on the other hand, she's -- you know, we don't know, because quite frankly I think the meth has had an effect on her.

A.   Oh, definitely. Yeah.  Yeah.

Q.   Is there anything else about this case, sir, that you think we ought to know about?

A.   I have some letters here that my wife and I saved from way back then because of the -- getting the custody of the -- the granddaughter.  And they were from -- they were from -- I think a couple from jail.  And then one thing was from one of the rehabs, where they have you do a worksheet of something, you know.  And then one -- they must have had her write a letter to -- to Stemmerman, because it's some -- it

Exhibit 5002 at 661

*Bradley Michaud*

says Tom, and then goes on.

Q.    Okay.

A.    And it never got to Tom.  And I don't even know how it got to us, but we had gathered, you know, the -- when we'd get out of those places, or she'd leave, you know, we'd get all the stuff.  And we ended up with all the stuff all the time, and so we had a bag of letters, you know.  And we went through them, and so I brought in ones that I thought you might want to have a look at.  So you can make -- they made copies.  Now, if you want these originals, I'd like some copies.

Q.    Okay.  Who made copies?

A.    The detectives.

Q.    Oh, they made copies, over here?

A.    Yeah, because I told them about them, and they said, Well, can we go ahead and make some copies?  And I said, Well, yeah.

Q.    I think if you -- I'll have them give you the copies so I can have a chance to look at them, and the grand jury can look at them.

A.    Mm-hmm.  That's fine.

Q.    And if -- we'll give them back to you, the originals, if we don't need them.

A.    Yeah, if --

Q.    But we'll make sure you have copies.

Exhibit 5002 at 662

*Bradley Michaud*

A.    You know, and if she's just talked about, you know, being raped by Stemmerman and have -- held at gunpoint, and -- and all that stuff in these letters.  And -- and says on that letter to Tom, you know, at the end, you know, I just -- you know scares me to death what you did to that -- or what you said about that girl.  And -- but I mean, you'll -- you'll read it and see.

Q.    Yeah.

A.    And some are kind of -- you've kind of got to read them a couple times, because she -- some misspelling, is misspelled, and, you know.  But just, yeah.  I thought they might be helpful.  They might be helpful.

Q.    Well, I appreciate you doing that, sir.

A.    Yeah.  Well, I want this solved as much as anybody.  Really do.  The girl deserves justice.

MR. FRASIER:  Okay.  Any questions for Mr. Michaud?

GRAND JUROR:  You said you -- even when you were obviously intimately around her when she was on meth but when she was not doing it, would you say that the conversations and -- would be coherent?  I mean she -- when she wasn't doing it, she was fairly coherent?

THE WITNESS:  Yeah.  Yeah.  Yeah.  I thought like maybe 90 percent, you know.

GRAND JUROR:  Sure.  It was just really --

Exhibit 5002 at 663

*Bradley Michaud*

THE WITNESS: Yeah. Yeah. I mean, you could just tell where she -- you know, she didn't look like she was on them, but you could -- you know, she just looked bad from doing it for so long, you know. And just be real sunk-in, and I'm just -- you know, if you've seen people that have done that. And, but she was coherent, and answered questions, you know, or talked in a pretty normal -- you know.

GRAND JUROR: Would you say it really weighed on her, the death of Leland [sic] Freeman -- I mean, had --

THE WITNESS: I -- I think it's weighed on her for years. You know, I think it's -- it's been a lot of maybe the issue why she's been on the meth so long, like she was on it just to maybe ease the pain, you know. And that's -- that's all I can think of, you know.

And these guys got her hooked on it, all this crowd, and man, I mean, she just, fwuh (phonetic), went off the deep end there, and didn't care about her family. She -- the only thing that I think kept her alive was her daughter, knowing that some day she could be reconnected with her daughter.

And you'll see in this -- if you read these letters. And, you know, that just kept her going, you know.

GRAND JUROR: Did she repeat the same stories to you a lot?

Exhibit 5002 at 664

42

*Bradley Michaud*

THE WITNESS: Yeah, she -- yeah. I asked her the same thing, about those guys here, and that's the only thing I ever heard from her about that, you know. And she did say she seen some bloody clothes at Stemmerman's house. And -- and that's all I know about that. She -- you know, she never saw she -- said she saw the girl, you know, dead or anything. She didn't say that to me. She just -- just said that she did see some bloody clothes, and they -- they've held guns at her -- to her head, and -- you know.

And -- and in one of those letters she told us -- and I didn't even know the guy. I didn't even know the name. And told us that -- from jail.

I don't know how long she'd been in there. But, you know, when you're in jail, you're not -- have any access to the drugs or anything. And she told us, she said we -- she thought we should get a straight -- restraining order against Tommy Stemmerman. You know, I didn't know why, you know. And -- and we didn't. I just had -- I had some -- you know, plenty of guns around, and I thought, you know -- you know, keep them around, you know. And she said he doesn't know where we live, she said in a letter, but, you know, he knows who we are.

And she said he made threats. She told us, not in that letter, but said he made threats to her about the safety of our family, is what --

Exhibit 5002 at 665

*Bradley Michaud*

GRAND JUROR:  Did --

THE WITNESS:  -- is what --

GRAND JUROR:  Did Alicia -- didn't she go to his house, though, when she got out of --

THE WITNESS:  After rehab?

GRAND JUROR:  Yeah.

THE WITNESS:  He -- in one of those letters, he bought her cab for 200 bucks from Roseburg, I think, and told her to leave.  You know, Hey -- or gas.  I mean, I don't know, but she -- she -- I don't know what he told her, if he called her, if she called him.  But he paid for a cab to go to his house.  And this was after -- I think after the -- the murder.  And from Roseburg to his house here.

And that's when he -- that's when he allegedly raped her.  Because she wanted -- he wanted her -- no, a month later, it says in there, she -- he wanted to be paid back, you know, or have sex with him, and she said no.  And then I guess -- or you're not going to leave alive.

And then -- then just like minutes after that they were busted.  The -- a SCINT team came in and busted them, and held guns to their down on the floor, and arrested Tommy.  And I don't know if she got arrested, but I know Stemmerman did, at his house.

MR. FRASIER:  Any other questions for Mr. Michaud?

Exhibit 5002 at 666

*Ashley Slagle*

Okay, sir.  I think that will do it.  Thank you for coming in.

THE WITNESS:  Yeah.  Yeah.  You're welcome.

**TESTIMONY OF ASHLEY SLAGLE (AMELUNG)**

(Witness sworn.)

BY MR. FRASIER:

Q.    First of all, this is the grand jury for Coos County.

A.    Okay.  Hello.

GRAND JUROR:  Hi.

BY MR. FRASIER:

Q.    And we're looking into the death of Leah Freeman.

A.    Yes.

Q.    And I think it's obvious, but I turned on the recorder.  We're recording everything here today.

A.    Yes.

Q.    Okay?

First of all, could you tell us your name, please, and where you live.

A.    Ashley Slagle, maiden name is Amelung, and I live in Myrtle Point, which is 1816 Sunset Court.

Q.    And how long have you lived in Myrtle Point?

A.    Um, for one year.

Q.    Did you used to live in the Coquille area?

A.    Yes.

Exhibit 5002 at 667

*Ashley Slagle*

Q.    Did you go to school here in Coquille?

A.    Yes, I did.

Q.    While you were going to school here, are -- did you know an individual named Nick McGuffin?

A.    Yes.

Q.    How did you know Mr. McGuffin?

A.    I dated him in high school.

Q.    How long did you date him?

A.    About, I'd say, five or six months.

Q.    And did you know Leah Freeman?

A.    Yes, I did.

Q.    And how did you know Leah?

A.    Just from school.  I didn't like know her personally, but I knew her, you know.

Q.    Okay.  Um --

A.    I knew who she was.

Q.    In relation -- did you know that at some point in time Nick and Leah were boyfriend/girlfriend?

A.    Yes.

Q.    And your relationship with Nick, did that predate or postdate the relationship with Leah?

A.    She started dating him after the fact that I -- after we broke up, she started dating him.

Q.    Okay.

A.    Maybe a year or so after.

Exhibit 5002 at 668

*Ashley Slagle*

Q.    How did -- when you were with Nick, how did he treat you?

A.    Really, really -- he was a really -- he was a gentleman.

Q.    Okay.

A.    Really good.

Q.    One of the things I wanted to ask you about is there was I think one witness that told us that Nick exposed you to drugs and drinking and sex and --

A.    Um, that is not true.

Q.    So he was a gentleman to you?

A.    He was a very nice man, yes.  Or boy at the time, I guess.  (Laughs.)

Q.    How old were you when --

A.    Um, 14, almost 15.

Q.    And he -- how old was he?

A.    He was a junior, so I'm not too sure.

Q.    Were you a freshman at the time?

A.    Yes.

Q.    Do you know an individual named Bill Sero?

A.    Yes, I do.

Q.    And how do you know Mr. Sero?

A.    Baby-sitted [sic] his children.

Q.    And when did you baby-sit his children?

A.    Sophomore year?  15, 16, 17.  I mean, I knew

Exhibit 5002 at 669

*Ashley Slagle*

them.  I knew his brother-in-law, through school also, Ryan Davidson.  And that's how I met the family.

Q.     Then you knew Erika Davidson?

A.     Yes.  Yes, I baby-sitted her kids.

Q.     Have you ever had a discussion with Mr. Stemmerman about Leah Freeman?

A.     Stemmerman?

Q.     Or, excuse me, Sero.

A.     Okay.  Um, no, I did not have any conversations with him.

Q.     We've heard there's a rumor -- or I don't know, I shouldn't say a rumor --

A.     Mm-hmm.

Q.     I didn't put it here in my notes where we found it, but --

A.     Okay.

Q.     -- there was a witness that told us that they heard from you that Sero had killed Leah Freeman and he shot her in the face, cut her braces, pulled her teeth, and cut off her fingers.

A.     That's what I heard, personally, that Bill had did that --

Q.     Okay.

A.     -- with a couple of other people.  One of the names was Alicia Michaud.

Exhibit 5002 at 670

48
*Ashley Slagle*

Q.    Okay.

A.    I didn't know the other people that they said.

Q.    Tom Stemmerman?

A.    I don't know who that is.

Q.    But did Mr. Sero tell you this directly?

A.    No, he did not tell me that.

Q.    All right.  How did you get this information, do you recall?

A.    Um, just hanging around people, just discussion. Like I said, it was rumor and speculation at the time, just like it is now.  And I really can't remember who told me.  I mean, it was a bunch of people.

Q.    Has anybody told you that they were involved in the death of Leah Freeman?

A.    You mean Bill Sero?

Q.    No, I mean has anybody --

A.    Oh, come out and told me, personally, that they were?

Q.    Yeah.

A.    No.  No.

Q.    Okay.  Has anybody told you that they saw what happened to Leah Freeman?

A.    No.

Q.    The information you have is what other people have told you --

Exhibit 5002 at 671

*Ashley Slagle*

A.    What other -- like I said, rumor and speculation, yeah.

Q.    Right.

A.    Yes.

Q.    Is there anything else about this case that you think we ought to know about?

A.    No.  I mean, that's all I really know about. Nothing that's -- you know.  No.

Q.    Okay.  I don't have any other questions.

      Oh, let me ask you this.  When you were baby-sitting the -- for Sero and Erika, do you re -- do you know what type of cars they might have had?

A.    At the time it was a black Ford car.

Q.    Did they have any other cars?

A.    No, I don't think so, at the time.

Q.    And --

A.    I think Erika was the one that mainly drove that black car.

Q.    Did Bill have a -- like a lowrider pickup truck, or anything like that?

A.    Um, he may have, but I just -- to be honest with you, it was ten years ago and I really do not remember.

      MR. FRASIER:  Any other questions?

      GRAND JUROR:  You baby-sat for Bill, you said?

      THE WITNESS:  Yeah, I baby-sat for Erika and he

Exhibit 5002 at 672

was around when I was baby-sitting.

GRAND JUROR:  Did he -- would you describe him as having a temper or anything?

THE WITNESS:  Um, I'd describe him as a psychopath.  Yeah, he's really weird.

GRAND JUROR:  Okay.  So did you witness him have violent behavior?

THE WITNESS:  Yeah.  Oh, yeah.  He was a very strange man.

BY MR. FRASIER:

Q.    When we say violent behavior, did you ever see him hit anybody or --

A.    No.  I mean, he just -- I mean, more verbally than anything.  I mean, real -- he just was a very -- I can't ex -- I mean, like I said, he was very -- a strange person.

Q.    Did it bother you to baby-sit there?

A.    Uh, yeah.  I just never knew when they were going to show up, and -- you know, and just -- just -- I just didn't like baby-sitting for them.

Q.    They lived in Charleston then, correct?

A.    Um, at the time they lived in Coos Bay.  I guess it would be Coos Bay, North Bend, at the -- he didn't live there with her, but he was -- he'd come.

Q.    Come and go?

A.    Yeah, it was like an apartment building, complex.

Exhibit 5002 at 673

*Brandon Mayfield*

But I did visit when they did live in Charleston too. That's -- I very first met them when they lived in Charleston.

MR. FRASIER:  Any other questions?

Okay.  That will do it.

THE WITNESS:  All right.  Thank you.

MR. FRASIER:  You're free to go.

THE WITNESS:  Thanks.

**TESTIMONY OF BRANDON MAYFIELD**

(Witness sworn.)

BY MR. FRASIER:

Q.    Okay, sir.  First of all, this is the grand jury for Coos County, and we're looking into the death of Leah Freeman.

A.    Correct.

Q.    First of all I've got to tell you, you probably saw me do it, but we're recording the proceedings.

A.    Okay.

Q.    All right?

A.    Fine.

Q.    So first of all, could you tell us your name, please, sir, and where you live.

A.    Brandon Mayfield, and I live in Coquille, Oregon.

Q.    How long have you lived in Coquille, sir?

A.    About 15 years.

Exhibit 5002 at 674

Q.    Did you go to school here?

A.    No, I did not.

Q.    Did not, okay.

Do you know an individual named Nick McGuffin?

A.    Yes.

Q.    And how did you know Mr. McGuffin?

A.    Through my brothers going through school and all that.  I mainly knew his older brother Wayne.

Q.    Did you know Leah Freeman at all?

A.    Never.  Never met her.  The first time I ever seen her was when she was on TV missing there for a while.

Q.    Do you know an individual named Bill Sero?

A.    Yes, I do.

Q.    And how do you know Mr. Sero?

A.    Associate.  My wife kind of knew his -- his wife.  I don't know, his wife back in the day.  And we kind of hung out till he kind of got a little deep and dark.  (Laughs.)

Q.    Okay.  When you say deep and dark, what do you mean?

A.    Um, drugs.  Um, you know.

Q.    Okay.

A.    Drugs.  The meth and all that stuff, and the -- and just the --

Q.    He got into a lot of --

A.    -- wild style of things, you know.  It was --

Exhibit 5002 at 675

53

*Brandon Mayfield*

Q.    And you didn't want to be associated with it?

A.    No, I kind -- I cared about my kid, back in the day.  I didn't -- I kind of grew up a little bit, you know. It's --

Q.    Okay.  Well, the reason I brought you in here today, sir, is we have information that Bill Sero, at least some witnesses told us that you might know something about Bill Sero being involved in the death of Leah Freeman.  And I guess the question is, is did Mr. Sero at any time ever confess to you that he was involved in it?

A.    No, he didn't.

Q.    We've heard that -- you've been quoted as saying that Sero and a guy named Tom Stemmerman were driving through Coquille the night she disappeared, and she got hit with a car.  They took her to Stemmerman's house and they raped her, they killed her, they pulled her teeth.

Is that something you're familiar with?

A.    That's -- that's the story that I heard.

Q.    And -- well, why don't you just tell us --

A.    Okay.  That's the rumor I heard --

Q.    Well --

A.    Never from Bill.

Q.    Okay.

A.    Okay.  You want me to tell you the story I heard?

Q.    Yeah, tell us the story you heard.

Exhibit 5002 at 676

*Brandon Mayfield*

A.    Okay.  I heard that it was Bill Sero, Tom Stemmerman, Alicia Michaud, driving.  They hit her, by accident, I heard.  She was messed up.  They took her and they put her in the car.  They took her to -- I want to say -- Stemmerman's house?  Yeah.  They took her down there, and she wasn't quite dead yet.  And I heard they pulled -- they cut her fingers off, pulled her teeth out, pretty much mutilated her.

I never really -- I never head of a rape or anything like that.  And that was it.  I never -- I never heard the part of how the -- like if they dumped her body or anything like that.  It was the rumors that were going around, that I heard.

Q.    All right.

A.    And that's pretty much the only story -- I never heard no stories about Nick.  I never heard no other stories about anything else.

Q.    Okay.  Do you recall how you learned about this?

A.    No.

Q.    Okay.

A.    I am 100 percent sure Bill never confessed to me nothing like that.  Once this kind of started to go on, I was kind of -- my ties were done with him.  I might have seen him here and there, like Hey, or whatever, but I never had a conversation with him about this.

Exhibit 5002 at 677

*Brandon Mayfield*

Um, I want to say Josh McNair (phonetic) maybe ran the story by me, years ago. Um, I don't know. I can't help who I -- who I knew.

Q. Okay.

A. And that's the --

Q. Yeah, that's fine.

A. If I could help you guys, I would -- if I knew anything, I would totally tell you guys, you know. I wish I was more of a witness, because it's something that's --

Q. Well, I guess -- and just so we're clear, Sero didn't tell you that he was involved?

A. No, he did not.

Q. And do you know this Tom Stemmerman?

A. I do not. I do not.

Q. You never talked to him at all?

A. May have been around him before, never at my house, or I never had his phone number or nothing like that, or -- yeah.

Q. All right. And so we're clear, nobody's ever told you that, hey, I killed Leah Freeman?

A. Never. No.

Q. And has anybody told you, I was there and I saw what happened?

A. No. No.

Q. And basically what --

Exhibit 5002 at 678

A.    Per se.

Q.    What you've heard is what promote -- what somebody else told you?

A.    Exactly.

Q.    All right.

A.    Exactly.

Q.    Is there anything else about this case that you think we ought to know about that you have information about?

A.    No.  I just -- I wish I did.  It's -- this story, I hear it over and over.  I've -- I've been a -- I've lived in L.A. for 20 years, I've seen a lot of bad people.  And I think that story's 99.9 percent true.  How I heard it, how it went, the type of people they were, dealing with everybody in here, and I hope they don't think this is ratting or snitching, because it's not.  This is a girl's life, and this is something that -- I despise it, to say the least.  You know.

Q.    Okay.

A.    If I knew anything else, I would totally tell you guys.

Q.    Okay.

A.    Yeah.

MR. FRASIER:  Does the grand jury have any questions?

GRAND JUROR:  Do you know of any automobiles that

Exhibit 5002 at 679

they had?

THE WITNESS:  I heard that it was a Volkswagen bus.  Some sort -- something like that.

GRAND JUROR:  You're talking about --

THE WITNESS:  The vehicle that hit her.

GRAND JUROR:  -- the vehicle that -- oh.

THE WITNESS:  Yeah.  It's kind of, you know, the story I heard, it's in my head.  And that's -- that's the only thing I remember of -- about Leah Freeman, is this story I heard.  You know, it's something that when somebody tells -- you hear something like that, it's going to be in your head forever.

GRAND JUROR:  Did -- how would you describe Bill Seros [sic]?

THE WITNESS:  Cocky.  Wild.  Very easily influenced.

GRAND JUROR:  Did he drive at the time, do you know?

THE WITNESS:  Um, I'd say yes.  Not - not sure.  I don't even know if he had a driver's license or --

GRAND JUROR:  Where did he live when you knew him?

THE WITNESS:  He lived with Erika, and they lived over -- Charleston, in between like Coos Bay and Charleston there, is where they lived then.

Exhibit 5002 at 680

*Sarah Noah*

And I think, yeah, they were still together then. See, I don't know for sure about that.

MR. FRASIER:  Any other questions?

GRAND JUROR:  Anything in there for us?

THE WITNESS:  What's that?

GRAND JUROR:  Anything in your briefcase for us?

THE WITNESS:  No.  No.  I was -- I'm a contractor.  I was doing some bids out there.  I didn't know how long this was going to take.  (Laughter.)

GRAND JUROR:  I thought maybe you --

THE WITNESS:  I wish.  I wish I had, you know?

GRAND JUROR:  All right.

THE WITNESS:  I wish I had a crystal ball and I knew everything, you know.  This -- like I said, this is serious, and it's -- anxious to see the outcome.

GRAND JUROR:  Okay.

MR. FRASIER:  All right.  Anything else?

Okay, sir.  You're free to go.

THE WITNESS:  Thank you guys.

GRAND JUROR:  Thank you.

THE WITNESS:  Good luck.

## TESTIMONY OF SARAH NOAH

(Witness sworn.)

BY MR. FRASIER:

Q.    Okay.  First of all, this is the grand jury for

Exhibit 5002 at 681

*Sarah Noah*

Coos County, and we're looking into the death of Leah Freeman. I need to tell you that I turned the recorders on, so you're being recorded.

A.    Okay.

Q.    Okay?

A.    Okay.

Q.    First of all, could you tell us your name, please, and where you live.

A.    Sarah Noah. You mean my street address?

Q.    Just whatever town you live in.

A.    Coquille, Oregon.

Q.    How long have you lived in Coquille?

A.    Since seventh grade, so -- off and on, yeah. I moved a couple of times out, but pretty much my whole life.

Q.    All right. Do you know an individual named Nick McGuffin?

A.    Um, I've heard of him, but I never knew him.

Q.    Never --

A.    Not personally, no.

Q.    Okay.

A.    I'm sure I've crossed paths with him in --

Q.    Okay. And how about Leah Freeman herself?

A.    Leah, I never met personally either.

Q.    Okay.

A.    She was quite a bit younger than I was, so.

Exhibit 5002 at 682

*Sarah Noah*

Q.    Well, do you know an individual named Bill Sero?

A.    Yes.

Q.    And Tom Stemmerman?

A.    Yes.

Q.    And Rowdy Howard?

A.    Yes.

Q.    And how do you know all these three?

A.    Rowdy is the father of two of my children.

Q.    Okay.

A.    Bill and Tom were -- he went to school with them, grew up with them, so I met them through him.  Bill I knew a little longer because he was around here, dating a girl here, so --

Q.    Oh, yeah.

A.    -- I knew him a little bit through the years. But mainly through Rowdy, is how I came to know those two.

Q.    All right.  I've been trying to get -- to find Rowdy to bring him here, and I guess there's a warrant out for his arrest right now.

A.    Mm-hmm.  He's -- I can't find him either.  He hasn't been in contact with his kids or anything.  And he sent me a message over the computer and I told him I didn't want him anywhere near my children.  At this point I don't think he's --

Q.    Okay.

Exhibit 5002 at 683

*Sarah Noah*

A.      -- doing well enough.  So, um, I'd hope you could find him.

Q.      Yeah.  Well --

A.      I'd help you if I could.

Q.      No, we're -- we'll see what we can do.

A.      Right.

Q.      I guess the question I have for you here, I have information going through the police reports that have been given to me.

A.      Mm-hmm.

Q.      And you can see there's a bunch.

A.      Mm-hmm.

Q.      The information I had is that at some point in time you heard a rumor that Bill Sero had killed Leah Freeman and that you had confronted him about that.  Do you --

A.      Well, I remember asking him once about it, yes.

Q.      And what did Mr. Sero tell you when you confronted him about that?

A.      I can't remember fine details, but I know he didn't come out and admit it.  But he -- his demeanor really changed, he acted really strange.  Um, he gave her a ride that night.

Q.      Okay.  He told --

A.      That was all that I got out of him.  Yeah.

Q.      He told her that he gave her a ride?

Exhibit 5002 at 684

A.    That he gave her a ride that night, yeah.

Q.    And did you talk with a Tom Stemmerman about this?

A.    Yes.

Q.    And what did Mr. Stemmerman have to say?

A.    Tom at one point told me Bill did it.

Q.    Okay.

A.    It's just been so long to find -- you know, word-for-word, I don't know if I can repeat.

Q.    Okay.

A.    So --

Q.    And looking at the reports, there was something that Stemmerman told you that Sero had run over Leah with a car?

A.    Yeah.  Yeah.

Q.    And that's --

A.    I mean, I think I could say -- I couldn't go and -- right now, and say on -- on this day Tom told me these words exactly, but --

Q.    Okay.

A.    -- the story of it, I mean, I think I could -- of what happened.

Q.    You think --

A.    And it came from those men.  Those -- in that group.  Tom and Bill and Rowdy.

Exhibit 5002 at 685

*Sarah Noah*

Q.      Well, what did Rowdy have to say about that?

A.      Rowdy had said he -- he's really the one that -- he was -- says he was afraid for my well-being, and -- and he was off and running for weeks at a time.  He thinks Bill and Tom did it.  He told me that people had told him that, that he tried to get the information straight from Bill and Tom, and --

Q.      Okay.

A.      Um.

Q.      All right.

A.      I don't -- you know, I don't -- I don't know what.

Q.      Has anyone told you, you know, face to face, that -- talking to you, Hey, I killed Leah Freeman?

A.      No.

Q.      Had anybody told you, I was there and I saw what happened?

A.      No.

Q.      There was something Rowdy was saying about a -- being played a tape recorder?

A.      Yeah.

Q.      Do you know anything about that?

A.      From what he said.  Um, that the police had this tape, and on the tape it said that we need to get rid of her, that she knows too much.  And that they were talking about

Exhibit 5002 at 686

*Sarah Noah*

me.

Q. And -- okay. They were talking about you?

A. They were talking about me. And there was a point where I think I got in a little conversation with Bill and Tom about -- not about that tape. I didn't come out and ask them, you know, Do you guys -- Did you make a tape saying you wanted -- because it scared me to death, you know.

But they acted strange one day, and one of them was leaving town or something. And my car was broken down, and one of those guys was going to fix a part or something. And I made a comment about, Well, when you get back. And, um, they both looked at me and said, Well, no, you probably won't see us again. And, you know, the way that they said, I don't -- exact words, I told an officer about this sometime, so I should be wrote down.

Q. Yeah.

A. I got the feeling that they were -- you know, watch out. You know. You -- there's not going to be another time where you see us. Kind of a threat towards me. You know.

Q. Okay. You thought they were threatening you?

A. Yeah. Yeah, I felt very threatened. Yes.

Q. Did they -- well, let me ask you this. Has Bill Sero or Tom Stemmerman, have they ever hurt you?

A. No.

Exhibit 5002 at 687

*Sarah Noah*

Q.    They may have threatened you, but they've never gone and beat up on you --

A.    No.

Q.    -- or trashed your house?

A.    No.

Q.    Or your property, or --

A.    Hmm-mm.

Q.    Have they made nasty phone calls to you, trying to intimidate you in any way?

A.    Tom called me for a while after -- I went home to my mom and dad's.  I just panicked, went home, and got myself to a safe place.  He called me.

Q.    Okay.

A.    And I think he called me from jail one time, and -- and told me not to say anything; I mean, quit talking to people and -- well, I just cut off all -- I just got away from it.  You know, I didn't want to be in --

Q.    Well, Tom was a pretty big dope dealer at that point --

A.    Oh, yeah.

Q.    -- was he not?

A.    Yeah.

Q.    Okay.  And was he telling you not to talk about his dope dealing or --

A.    No.

Exhibit 5002 at 688

*Sarah Noah*

Q.    -- was he telling you not to talk about Leah?

A.    Not to talk about -- he didn't want me to tell anybody that he knew Bill.  He even told me at one point that they were trying to act like they didn't know each other, and not associate with each other because people would, you know, put that two and two together.  He told me that -- that Bill did -- that Bill ran her over, and he talked like he was there.

Q.    Okay.

A.    But that they were disassociating so that people didn't put the two of them together and make sense of it.

Q.    Okay.

A.    And that I shouldn't tell anybody that I'd talked to them, or don't tell anybody that we're friends, and --

Q.    Okay.

A.    -- you know, Bill and Tom were friends, or anything like that.

      So -- and then I just put -- taking it -- you know, I just cut my ties off.  So I don't even know what happened to them after that.

Q.    Right.

      I don't think I have any other questions for her.

      Is there anything else you think the grand jury needs to know about this?

A.    Um, I wonder about the man that came and talked

Exhibit 5002 at 689

*Sarah Noah*

to me that said he was a private investigator, and --

Q.    Mr. Bentley?

A.    Mike, I think his first name was.  I don't remember his last name.

Q.    Okay.  Jack?

A.    I don't remember his last name.  A picture -- the officers showed me a picture several months ago, and I could identify him from the picture.

Q.    Okay.

A.    So what -- he told me his name was Mike, at the time.

He tape-recorded many, many conversations with him and I.

Q.    Okay.

A.    I don't know where those tapes are or anything.  But, I mean, he had a lot to say to me, and I had a lot to say to him.  So whatever, you know, is not fresh in my memory, I mean, I think it would be a good idea for if you guys could ever come across those tapes or anything, to --

Q.    Okay.

A.    Or this guy.  I don't even know who that man was or if he really was a --

Q.    Well, if it was --

A.    -- to look back on it, a true private investigator or not, you know.

Exhibit 5002 at 690

*Sarah Noah*

Q.    If it was Jack Bentley, he has since died.

A.    See, and I don't know.  I can't -- I -- in my mind, the guy's name was Mike.

Q.    Okay.

A.    But a picture somebody has, one of the investigators has a picture of the guy.

Q.    Did he say he had been hired by the Freeman family?

A.    Um, I can't remember if he was hired by the Freeman family.  What he -- when he first came to me he said the Freemans had hired an investigator that ended up ripping them off for $10,000.  And my assumption was the guy was kind of flying solo, was trying to do this --

Q.    How long ago was this?

A.    This was back when this was all happening, back in -- I guess 2000, 2001.

Q.    Do you remember, how long ago was it that you looked at some pictures?

A.    A couple of months ago.

Q.    Okay.

A.    No, see.  Had an interview with Officer Dannels, and Officer Smith -- Smith, first?

Q.    Pat Smith?

A.    Yes.

Q.    Tall -- very tall?

Exhibit 5002 at 691

*Sarah Noah*

A.    Yeah.  Yep.

Q.    Okay.

A.    And then I had a follow-up interview with McNeely and Webley.

Q.    Who showed you the pictures?

A.    I think it was the interview with McNeely and Webley.

Q.    Okay.  I'll talk to them about that.

Okay?

A.    Yeah.

Q.    Anything else?

A.    And they also had a -- they were trying to find a -- I just talked to them.  The report of that interview with them.

Q.    Okay.

A.    They didn't know if you had a copy.  He's trying to find the report of it.  There might be some other questions after you read that, that you want to ask me.

Q.    Okay.  Well --

A.    So --

Q.    -- we'll worry about that later.

A.    Yeah.  I'll be twice.

MR. FRASIER:  Okay.  All right.  Does the grand jury have anything else to ask her?

GRAND JUROR:  Bill -- well -- yeah.  Would you --

Exhibit 5002 at 692

how -- would you describe him as -- well, he threatened -- sounds like he threatened you.  But would you consider him a violent-type person, or --

THE WITNESS:  Tom and Bill?

GRAND JUROR:  Yeah.

THE WITNESS:  Yeah.  You know, he was always known as you didn't mess with him.  You didn't mess with Bill.  He'd beat you up or whatever.  I mean, he was, amongst the men, up there at the top.  You didn't mess with Bill.  And he'd lose it, you know, and -- and freak out.  Yeah.  Yeah, I would definitely say he's the violent type, so.

GRAND JUROR:  Have you -- do you know which type of automobiles they had at that time, Tom and Bill?

THE WITNESS:  Um, what they were driving.  Um, tom had a -- give me a second here.  A Mitsubishi Eclipse.  It was kind of a newer, silver-ish -- that's what Tom was driving.

Bill, I don't know what he was driving.  He was borrowing a car from a guy that lived in Eugene and was down and staying with his brother, and it was a purple Kia.  He had that car the night that Leah went missing.  And I was staying at the house from where he borrowed the car from.

GRAND JUROR:  That was -- who had that one?

THE WITNESS:  Um, the guys --

GRAND JUROR:  The purple Kia?

Exhibit 5002 at 693

*Sarah Noah*

THE WITNESS: -- Bill had borrowed that car from. The guy's first name was Zack. I don't remember what his last name is. Jill Clifton's brother Zack owned the purple Kia, and Bill borrowed it from him.

GRAND JUROR: Okay. That was the night of the 28th?

THE WITNESS: The night that Leah was missing, yeah.

GRAND JUROR: Jill Clipton?

THE WITNESS: Clifton, C-L-I-F-T-O-N.

And they didn't bring the car back. It was supposed to be the agreement between Zack and Bill, bring the car back within a few hours. The car didn't come back till late the next day.

GRAND JUROR: And you remember that conversation that night?

THE WITNESS: I was there when the car left and came back, so.

GRAND JUROR: Oh, the next day, when it came back?

THE WITNESS: Yeah. Yeah. I was staying -- temporarily, I was staying at that house.

BY MR. FRASIER:

Q.    Okay. Which house was that?

A.    It was out at Green Acre -- the access road up on

Exhibit 5002 at 694

the hill there towards Green Acres.

Q.    And this was a purple Kia?

A.    Purple Kia, yeah.

Q.    If I were to tell you that Mr. Elderkin and a Kristen Steinhoff -- do you know her?

A.    Kristen Steinhoff, yeah.  She was with -- that night, she was one of the ones that borrowed the car too.

Q.    Yeah, she's the one that borrowed the car.

A.    Yeah.  She was -- yeah.  And she let Bill drive it that night.  She borrowed the car.  You know, it was supposed to be borrowed to her.  That -- Zack got upset because she -- the agreement was she borrowed it, but she let somebody else -- you know, she handed it over to Bill, after she agreed.  And then didn't bring the car back out till the next day.

GRAND JUROR:  When the car was brought back, any damage?

THE WITNESS:  Uh, not -- you know --

GRAND JUROR:  Anything different than the way it was left?

THE WITNESS:  I don't think anybody was looking for it because I don't think anybody knew --

GRAND JUROR:  Nothing noticeable?

THE WITNESS:  -- that she was even missing at that point, you know.

Exhibit 5002 at 695

*Sarah Noah*

Down the road, I don't know if it was a month later, a week -- a couple of weeks later or whatnot, in a conversation with Zack, he had taken the car back up to Eugene where he was from, and had some work done on -- on it. I don't know what kind of work, but it was up on whatever you call it.  Up in the air.  And the mechanic or whoever was working on in found blond hair underneath the car, when they had it up on the thing.

And that was -- in that same conversation, and that Zack -- that guy was -- he never did drugs.  He never -- he was down from Eugene visiting family, and kind of got sucked into that.  But he never -- he wasn't the partying type, like most of those people at that time, or -- or anything.  And --

GRAND JUROR:  Is it a dark purple, or --

THE WITNESS:  Yeah.  Um, almost the color of the sweatshirt she's wearing.  Around that color.

MR. FRASIER:  So when the car was being worked on and the blond hair was found, did anybody do anything with that?  Notify anybody?

THE WITNESS:  Mm, Zack, I don't know if -- if he did or not.  I know that in one of my past ten -- whatever years ago, interviews with an officer, I had mentioned this. I don't know if anybody else did.  I don't know if Zack told anybody but me.  That was when he kind of said, Well, that

Exhibit 5002 at 696

*Sarah Noah*

was the same night they borrowed my car, was the night Leah came missing. You know, and his -- whether it -- his assuming, is what it was --

GRAND JUROR: Mm-hmm.

THE WITNESS: -- was that because it was some time later that he had the car worked on, and he said they found that --

GRAND JUROR: So all that came together later?

THE WITNESS: -- so he kind of put it -- right. Not too much later, and within a month, I would say, time. But, I mean, I don't know if anybody else -- if he had told anybody else about that or -- or what.

GRAND JUROR: And when did he tell you about that? How much later was that, from when it happened?

THE WITNESS: It was about a month after it happened, yeah.

GRAND JUROR: So two months after the entire --

THE WITNESS: Yeah, maybe. I'd say all of this happened within a two-month span of time.

MR. FRASIER: Any other questions?

Okay. That's it. You're free to go.

THE WITNESS: All right. Thank you.

GRAND JUROR: Thanks.

(Conclusion of CD 048.)

Exhibit 5002 at 697

*Sarah Noah*

--oOo--

I certify, by signing below, that the foregoing pages 1 through 74 constitute a correct transcript of WAV files provided of the above-entitled matter, this 23rd day of February, 2011.


_____

PEGGY S. JILLSON, TRANSCRIBER

Exhibit 5002 at 698

1

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS


**STATE OF OREGON,**                )
                                    )
          Plaintiff,                )  Case No. 10-CR0782
                                    )
v.                                  )
                                    )
**NICHOLAS MCGUFFIN,**              )
                                    )
          Defendant.                )
_____)  Volume 7



          Friday, July 30, 2010 (Second session)

                GRAND JURY PROCEEDINGS



APPEARANCES:              **PAUL FRASIER**
                          **DISTRICT ATTORNEY**
                          125 East Eighth Avenue
                          Eugene, Oregon 97401







          TRANSCRIBED FROM AUDIO RECORDINGS


TRANSCRIBED BY:           Peggy S. Jillson
                          987 Tivoli Street
                          Eugene, Oregon 97404
                          (541) 689-7964

Exhibit 5002 at 699

**WITNESS INDEX**

OUSLEY, Andrew                        3

ELDERKIN, Zachary                    11

CORNWALL, Kimberly                   25

MIMS, Tina (Lehman-Post)             32

YOUNG, Christy (Cagley)              51

McMULLEN, Heather                    57

SERO, William (Bill)                 67

STEINHOFF, Kristen                   97

McNEELY, Ray                        162

Exhibit 5002 at 700

**COQUILLE, OREGON; FRIDAY, JULY 30, 2010**

-o0o-

**TESTIMONY OF ANDREW OUSLEY**

(Witness sworn.)

BY MR. FRASIER:

Q.    Sir, this is the grand jury for Coos County, and we're looking into the death of Leah Freeman.  It's obvious, sir, that we have turned the recorders on, so we're recording this here today.

Sir, could you tell us your name and where you live.

A.    My name is Andy Ousley.  I live in Homedale, Idaho.

Q.    How long have you lived there, sir?

A.    Mm, about ten years.

Q.    And prior to that, did you live over here in Coos County?

A.    I did.

Q.    How long did you live here?

A.    Oh, about 15 years.

Q.    Sir, the reason I asked you to come to grand jury was a couple of things.  My understanding is the police interviewed you in May of this year; they went out to Idaho and interviewed you.  And you indicated to them that you knew something about a guy named Art Jones having something to do

Exhibit 5002 at 701

with this case.

A.    Um, I actually -- what I told them was something that I had overheard.

Q.    Okay.  And what did you overhear?

A.    Somebody said that -- or the rumor was, that Art had disposed of some clothing, um, which supposedly was that gal's clothing.

Q.    All right.

A.    Now, I don't know positively one way or the other.  That is just what I had heard.

Q.    And this was not from Mr. Jones?

A.    No.

Q.    This was from --

A.    This was people talking at a party, and I had overheard that.

Q.    All right.  Because the way they wrote up the report was as you heard it from Mr. Jones, but you heard that from somebody else?

A.    Yes.  I didn't hear it directly from Mr. Jones.

Q.    All right.  And then the second thing is, well, do you know a Kristen Steinhoff?

A.    I do.

Q.    And how do you know Ms. Steinhoff?

A.    Um, I just knew her around.  You know.  One of the girls from around here.

Exhibit 5002 at 702

*Andrew Ousley*

Q.    Did Ms. Steinhoff tell you anything about an individual -- well, two individuals, named Bill Sero and Tom Stemmerman?

A.    Yes, she did.

Q.    What did she tell you about those two individuals?

A.    Well, actually what the story -- and I didn't get the whole story at one time -- was that she was with those guys in a vehicle that had run that girl over.  And I didn't get the whole story on what happened to her after that --

Q.    All right.

A.    -- but.

Q.    So she told you that she's in the vehicle with Bill Sero and Tom Stemmerman, and that they had --

A.    Yes.

Q.    -- run over Leah Freeman?

A.    Yes.

Q.    And what happened after that, you weren't sure?

A.    I don't know.  I didn't get any more information than that.  And -- and I really didn't know if she was just, you know, making it up or what, at the time.  Because I -- I don't think she was even 17 years old on that --

Q.    Okay.

A.    -- date.

Q.    And did she give you any indication where this

Exhibit 5002 at 703

had occurred?

A.    (sighs.)  I thought on the old road here.  I believe from -- from town here, the old highway going out.

Q.    Okay.  In the report I had from the officer it said somewhere between 7Eleven and what's called Fast Mart, and Four Corners, which is out in the Fairview area.

A.    I believe so.

Q.    Can you recall anything else that Ms. Steinhoff told you about this?

A.    Um, no, sir.

Q.    I know it's a long ways from Idaho, and I appreciate your coming here and tell the grand jury this.

Is there anything about this case that you know about that you think we ought to know about?

A.    No, sir.  Those are pretty much the only two things, that I know.

Q.    Had anybody ever told you that --

A.    And I don't know those guys personally --

Q.    Okay.

A.    -- you know.  I just barely knew them.

Q.    So you don't know Tom Stemmerman or you don't know Bill Sero?

A.    Not personally.

Q.    And I take it you didn't know Leah Freeman or Nick McGuffin --

Exhibit 5002 at 704

A.      No, I never met her before.

Q.      Okay.  Has anybody told you that they personally were responsible for the death of Leah Freeman?

A.      No, sir.

Q.      Has anybody told you they were there or saw what happened or anything like that?

A.      Well, that was what was implied from Kristen.

Q.      From Kristen.  But outside of Kristen, is there any --

A.      Oh.  No, sir.

Q.      Okay.  Again, I appreciate your coming from Idaho.  I don't have anything --

A.      I don't (indiscernible) --

MR. FRASIER:  I don't have any other questions to ask him.  Does the grand jury want to ask him anything?

GRAND JUROR:  So she said she was in the car?  When those two --

THE WITNESS:  I believe she had said she was driving.

GRAND JUROR:  She was driving?

THE WITNESS:  I -- I believe so.

GRAND JUROR:  Did she say what kind of a car?

THE WITNESS:  Um, no.  No.  I didn't ask any questions.  I just was -- I didn't even know if there was any truth to any of it at all.

Exhibit 5002 at 705

8

*Andrew Ousley*

GRAND JUROR:  Could this -- when she told you this, this was when?

THE WITNESS:  Um, this was actually before I even heard that she was missing or --

GRAND JUROR:  So was that -- at that time, do you know, was it July?  August?  Do you have --

THE WITNESS:  I -- I don't remember.  It's been a long time ago.

GRAND JUROR:  And you said you barely knew her?

THE WITNESS:  Um --

GRAND JUROR:  What brought you together in this conversation (indiscernible)?

THE WITNESS:  Um, well, let me think, here.  Um, she was friends with my girlfriend.  And --

GRAND JUROR:  Which was who?

THE WITNESS:  Excuse me?

GRAND JUROR:  Who was your girlfriend?

THE WITNESS:  Tamara Criswell (phonetic).  And she basically knew a lot of people that I knew.  And so I -- I had saw her occasionally.  Um.

GRAND JUROR:  And how did that -- how did the conversation come about, do you remember?

THE WITNESS:  I don't.

GRAND JUROR:  Did this come up to the police? Did -- at the time of this con -- did you -- with the police,

Exhibit 5002 at 706

were -- did you have a conversation?  Were you questioned and about -- know about this conversation back in 2000?

Did you ever tell the police back then?

THE WITNESS:  No, I didn't.

GRAND JUROR:  Did Tamara, your girlfriend, ever say anything about it, that she talked about it?

They were good friends, you said?

THE WITNESS:  No.  No.  Just other than what I knew.

GRAND JUROR:  Mm-hmm.

THE WITNESS:  What I just told you.

GRAND JUROR:  Was your girlfriend there when she said this?

THE WITNESS:  Um, I don't think so.  I don't think she was.

BY MR. FRASIER:

Q.    Are you still with Tamara?

A.    Oh, no.

Q.    Okay.

A.    No, that's --

Q.    Okay.

GRAND JUROR:  Do you remember where this took place?  And he may have asked, where the actual conversation took place?

THE WITNESS:  Not really.  I mean, I've --

Exhibit 5002 at 707

*Andrew Ousley*

because Tamara and I had kind of talked about it back and forth, you know, questioning it between us; thinking, you know, is there any truth to this? Or -- you know. But I don't remember the first time it actually took place.

GRAND JUROR: So when she told you that, you were with her without your girlfriend?

THE WITNESS: Yes.

GRAND JUROR: But you discussed it with your girlfriend, what she had told you?

THE WITNESS: I did.

GRAND JUROR: And you can't remember why she just confided in you and told you something? I mean, out of the blue? Or --

THE WITNESS: She had -- I believe she had said she was worried, you know, fearing for herself over this, or something. And -- and she -- you know, like I said, she was 17, and I just kind of talked about it with Tamara, and what we were thinking was this girl just -- you know, just drama, or what? You know. Is she just making stuff up? Because she was pretty young.

MR. FRASIER: Any other questions for him?

Okay. I think we're done, sir. You're excused.

THE WITNESS: Well, I hope I helped someone.

MR. FRASIER: We appreciate you coming, sir. Thank you.

Exhibit 5002 at 708

*Z. Elderkin*

THE WITNESS:  You bet.

**TESTIMONY OF ZACK ELDERKIN**

(Witness sworn.)

BY MR. FRASIER:

Q.    Sir, this is the grand jury for Coos County, and we're looking into the death of Leah Freeman.  It's kind of obvious, but I need to advise you we are recording the proceedings.  Okay?

First of all, could you tell us your name, please, and where you live.

A.    Zachary Elderkin, and I live in Rollins, Montana.

Q.    And how long have you lived in Montana, sir?

A.    This time, about a year and -- not even a year and a half.

Q.    Okay.  Have you lived in Coos County in the past, sir?

A.    Yes.

Q.    When, and how long?

A.    I spent three years here when I was a teenager, and then I spend probably about a year here, oh, in my mid-twenties.

Q.    Are you familiar with an individual named Nick McGuffin?

A.    I don't recall that name.

Q.    Okay.  Leah Freeman, did you ever meet her?

Exhibit 5002 at 709

A.    I do not think I ever met her, but I cannot be positive.

Q.    Heather McMullen, have you -- do you know Heather McMullen?

A.    I know a Heather, but I don't know a last name --

Q.    Okay.

A.    -- McMullen.

Q.    Okay.  Ramsey, sometimes?  Here in Coquille, had a daughter named Kristen?

A.    Yes, I know her.  I just never knew her last name.

Q.    Okay.  Never knew her last name.  Okay.

Well, let's talk about that for a second, sir.

Did you know a girl named Kristen Steinhoff?

A.    Is that her daughter?

Q.    Yes.

A.    Yes.

Q.    So you didn't know the last name, you just knew her by Kristen?

A.    No, I just knew their first names.

Q.    Kristen and Heather?

A.    Right.

Q.    Heather was the mother, Kristen was the daughter?

A.    Right.

Q.    And at the time, sir, were you the owner of a Kia

Exhibit 5002 at 710

automobile?

A.    I was.

Q.    And do you recall what the color was, of that car?

A.    It was kind of a purplish-blue.

Q.    Now, what I want to talk with you about, sir, is an incident that occurred in June of 2000, and were you in Coos County at that time?

A.    If that was relative to when this is, yes.

Q.    Were you actually living here or did you come down for a visit?

A.    Um, I was living in two places.  I was living at my brother's house in between Coquille and Coos Bay, and I had another place that I was living in, in Eugene.

Q.    All right.  And you had a daughter from another relationship down here?

A.    Yes, in Eugene.

Q.    In Eugene, okay.

Did you -- your brother, his name was Joe Clifton?

A.    That's correct.

Q.    The -- I -- we're going to be talking about with relation to loaning your car.  Do you recall loaning your car to (indiscernible) Kristen?

A.    Yes.

Exhibit 5002 at 711

Q.    Could you tell us, sir, what happened that night in terms of, you know, where did you meet Kristen, and what happened with her borrowing your car, where did you go. Could you just tell us what happened that night.

A.    Okay.  Well, I had -- that morning I had brought my daughter over to meet Kristen's mother.  I was dating Kristen's mother Heather.  And so I had spent some time over there, a few hours, and Kristen was messing around in her car.  This was before I was getting ready to go, and she was having some kind of car problems.

And she asked me to borrow my car.  I'd been around for a week or two, so, you know, knew her a little bit.  So I said it was okay as long as she had it back by a certain time, and I believe the time was 3:00 a.m. in the morning, because I had to go to work the next day in Eugene.

So she took me and my daughter back to my brother's house, and on the way we stopped at a turnout right by the highway and she got out and she talked to a young guy who was pretty shook up.  I didn't know what was wrong; I asked her when she got back in.  And she said that the guy had been missing his girlfriend and couldn't find her.

I didn't know him or the girlfriend.  And she was probably talking to him for five minutes, and got in the car, and then took me back to my brother's house and dropped me and my daughter off.  And I let her borrow the car.

Exhibit 5002 at 712

*Z. Elderkin*

And then she -- she got back a couple of hours later than she was supposed to with the car.

Q.    So instead of being there at 3:00 in the morning, she got there around 5:00 or so?

A.    Yeah, the exact time is hearsay.  It was a long time ago.  So I'm going to say 3:00 because that sounds correct.

Q.    Okay.  But she definitely was late?

A.    Yes, she was a couple hours late.

Q.    And upset you that she was late?

A.    Yes.

Q.    Now, when you went out to your brother's house, who all was in the car with you?

A.    I recall just Kristen, my daughter, and myself.

Q.    Do you know an individual named Bill Sero?

A.    I don't recognize the name.

Q.    And was there another male adult in the car with you?

A.    Mm, no.  It was just the three of us.

Q.    All right.  And you get out to Joe Clifton's place, and she drops you off.  How long was she there?

A.    Just long enough to drop me off, and then she took the car.

Q.    Did anybody get in the car with her, or was she by herself?  How did that work?

Exhibit 5002 at 713

A.      I don't know.  As far as I know, she just drove away.

Q.      Now, this place that she -- that you pulled over, was there a business there, do you recall?

A.      No.  Now there's a Roto-Rooter there, that didn't used to be there.

Q.      And there was a different business there at that time?

A.      I don't think there was any business.

GRAND JUROR:  You mean the one just as you're leaving Coquille, before you get on the --

THE WITNESS:  Yeah.

GRAND JUROR:  -- on 42 South?

THE WITNESS:  Yeah, I don't think there was a building there at all.

GRAND JUROR:  Maytag?

THE WITNESS:  I could be wrong.  It's been a long time.

BY MR. FRASIER:

Q.      When you stopped there and Kristen got out and talked with this individual, was there any other cars there that you --

A.      Just his Jeep.  He had a -- like Jeep Wagoneer.

Q.      Jeep Wagoneer, okay.

Now, what I want to talk with you -- well, do you

Exhibit 5002 at 714

know a gal named Sarah Noah?

A.    I don't recognize the name.

Q.    And the reason I bring her up is we had her here this morning, and she claims that she was out at Clifton's house, and that this Bill Sero was in the car, and left in the car with Kristen.  And if I'm hearing you correctly, there was nobody else in the car when you went out there, and as far as you know, Kristen was the only person in the car when you left?

A.    Right.  I don't recall if she left with anybody or not.  I don't recall if there was anybody else at my brother's house at that time.

Q.    The next thing I want to ask you about is about a week after this incident -- well, first of all, let me back up a second.

How many times did you let Kristen borrow your car?

A.    Just the once.  Just the one time.  Never again. She didn't bring it back on time.

Q.    And she hadn't borrowed it before?

A.    No.  No, that was -- just once.

Q.    The one and only time.  Okay.

About a week after you loaned her the car, did she call you on the phone and tell you anything about the car being involved in something?

Exhibit 5002 at 715

A.    No.  I actually was talking to her.

Q.    Okay.  Oh, so you actually saw her face-to-face?

A.    Yeah.

Q.    Okay.  Tell us about that.  Tell us what she said, what she told you.

A.    The only -- I don't know what the whole conversation was about, but what I do remember is that she had said that I should probably check my car for blonde hair and maybe check the trunk, you know, in case there's blood or something in it.  She was talking about that maybe the car had been used in the Leah Freeman thing.  And by then I had heard something about it.

And I did check the car, and found nothing.  So just because it was -- the statement kind of freaked me out a little.  So --

Q.    And --

A.    Well, I just chalked it up as too many rumors.

Q.    Another -- this Sarah Noah claims that you told her, like a month after this, that you'd taken the car and had the car up in Eugene, and taken -- took it in, like to get the oil changed or something.  And while it was up in the air, the mechanic found a blonde hair on the bottom of the car and brought it to your attention.

A.    No, but, you know, I had told quite a few people a story about running over a deer, a long time ago, where the

Exhibit 5002 at 716

deer was dead in the road, and I straddled the deer with the car, and actually had to -- drove over the deer. And when I took the car in to have the oil changed the next week, and the mechanic put it up there, the whole bottom of the car was just covered in hair and blood, because I'd ran over that deer. It just toughed it.

Q. So the business about blonde hair being underneath your car or being found by the mechanic, you --

A. No. No. But that deer story did happen, and it's possible maybe I told her that deer story.

Q. The car, you subsequent at some point in time lost possession of the car?

A. Right. A friend of mine took it to the coast and rear-ended somebody with it, and it stayed out on the coast for a while because I couldn't drive it back. And a repossession company finally came and got it and took it away. And it sat out there for a month or so.

Q. In regards to this case -- well, let me ask.

When you got the car back from Kristen, did you notice anything out of the ordinary with the car?

A. Nothing.

Q. Did it look like it had been cleaned out or anything like that?

A. No.

Q. I think there was some witness someplace, and I

Exhibit 5002 at 717

don't have it here in front of me, that indicated that you thought the car had been scrubbed clean before it had been given to you, it's never been as clean, or something along that line.  Do you recall anything like that?

A.    I do not recall anything like that.  Maybe that was true, maybe it's not.  I don't know.

Q.    When you got the car back, did you notice anything like any new dents or anything like that in the car?

A.    No.  I'd have been mad.  There was no damage to the car.

Q.    I think I don't have any other questions for Mr. Elderkin.  Well, let me ask you this:  Has anybody told you that they personally caused the death of Leah Freeman?

A.    No.

Q.    Has anybody told you that they were a witness to what occurred to her, that they saw what happened to her?

A.    No.  I did have one person tell me they think they knew who did it.  This was probably at least two weeks after that.

Q.    And who was that?

A.    I don't know.

Q.    Okay.

A.    I don't know the name of the person.  It's not somebody I knew very well.

Q.    Do you know the name of the person that told you

Exhibit 5002 at 718

*Z. Elderkin*

this?

A.   No.  I don't have any idea.

Q.   All right.

A.   I just remember somebody said something.  But I think that, you know, everybody was just talking about it then.

Q.   Do you have any reason to believe, sir, that your car was involved in hitting Leah Freeman or hitting any person on the night that you loaned it to Kristen --

A.   I don't -- I don't think so, because I didn't see any damage to the car.  Nothing on the car, nothing in the car.  And I think I would -- you know, if it cracked it or something, I think I would have noticed that.

And when she stopped and she talked to that guy, she was already missing.

Q.   Okay.

A.   I mean, he'd been wondering about it.  That's why I thought that that whole statement that the car had been used in it was a pile of hooey, because it was after the fact.

GRAND JUROR:  And you say he was driving a wag -- probably a Jeep Wagoneer or something?

THE WITNESS:  Yeah, he was driving a Jeep Wagoneer.

GRAND JUROR:  Was he alone, or could you tell?

Exhibit 5002 at 719

*Z. Elderkin*

THE WITNESS:  It was just him.  He was outside the front, trying to call on his cell phone, pacing back and forth.  And I happen to like Jeeps.

GRAND JUROR:  Could you tell what color it was?

THE WITNESS:  Dark.  It was just a darker one.  I mean, if it would have been bright orange, I would have remembered that.

GRAND JUROR:  So this would have been after 9:00 -- sometime after nine o'clock at night, or the evening?

BY MR. FRASIER:

Q.    Yeah.  When did you --

A.    Yeah, it was later in the day.

GRAND JUROR:  Or -- day or evening?

GRAND JUROR:  When you -- when she took her to your brother, it was what time?

THE WITNESS:  Yeah.  I don't know exactly.

GRAND JUROR:  Light?  Dark?

THE WITNESS:  But it --

GRAND JUROR:  Daytime?  Nighttime?

THE WITNESS:  It wasn't dark, dark.  So, I mean, maybe it could have been in the evening.  But it wasn't in the morning, it was later in the day.  So I had spent some time over at Heather's house.

GRAND JUROR:  And you said this individual looked -- did -- was upset.  Did you hear a conversation or

Exhibit 5002 at 720

anything, or did you just -- she just got back in the car and said he's upset because his --

THE WITNESS:  Yeah, I asked -- asked what the guy's problem was.

GRAND JUROR:  And she said?

THE WITNESS:  That he couldn't find his girlfriend, she'd been missing.

GRAND JUROR:  What kind of car was it that Kristen was having problems with?

THE WITNESS:  Uh, you know, I'm not sure, whatever kind of car she had.  It was a little foreign two-door, I believe.  But it might have been a -- I -- just a little car.  I've never been in it or went anywhere in it.

GRAND JUROR:  What color was it?

THE WITNESS:  I have no idea.

GRAND JUROR:  Would it --

THE WITNESS:  It was her car, though.

GRAND JUROR:  And it would have been out at -- when she borrowed your car, her car would have been at that location.  Is that --

THE WITNESS:  Yeah, her car was at her mother --

GRAND JUROR:  At the house where you were at --

THE WITNESS:  Yeah.  Yeah.

GRAND JUROR:  -- when she borrowed your car?

THE WITNESS:  Yes, parked in the driveway.

Exhibit 5002 at 721

*Z. Elderkin*

GRAND JUROR:  Would -- do you know if she had -- had she been there when you got home -- I mean, when you were there, she'd been there with you for some length of time before she borrowed the car?

THE WITNESS:  Yeah, she was piddling around in her car with the music going.  And I don't even know what was wrong with the car.

GRAND JUROR:  No, but I mean was --

GRAND JUROR:  She'd been there for a while?

GRAND JUROR:  She's been there --

THE WITNESS:  Yeah.

GRAND JUROR:  Do you think she had been there -- I guess, when did you arrive at the house?

THE WITNESS:  Well --

GRAND JUROR:  At her mother's house.

THE WITNESS:  Sometime early afternoon, maybe.

GRAND JUROR:  And she was there the whole time?

THE WITNESS:  I can't say that.

GRAND JUROR:  But she'd been in her car, the one that didn't run --

THE WITNESS:  Right.

GRAND JUROR:  -- listening to music and stuff?

THE WITNESS:  Yeah.

GRAND JUROR:  And you did get it back before dawn the next day?

Exhibit 5002 at 722

THE WITNESS:  Yes, I did.  Yes, I did.

GRAND JUROR:  Did you then take off for Eugene?

THE WITNESS:  Yes.

MR. FRASIER:  Any other questions for Mr. Elderkin?

Anything else you think we ought to know about, sir?

THE WITNESS:  I don't know.

MR. FRASIER:  Okay.

THE WITNESS:  I mean, the best way to find it is to ask it.

MR. FRASIER:  Okay.  All right.  Well, if there's no further questions, sir, we're done and you're free to go.

### TESTIMONY OF KIMBERLY CORNWALL

(Witness sworn.)

BY MR. FRASIER:

Q.    This is the grand jury for Coos County, and we're looking into the death of Leah Freeman.  And it's obvious, but we're recording everything.  Okay?

A.    Well, I hope so.

Q.    All right.  So, first of all, could you tell us your name, please, and where you live.

A.    Kimberly Cornwell.  I live on Highway 42 in Coquille.

Q.    How long have you lived here in the Coquille

Exhibit 5002 at 723

*K. Cornwall*

area?

A.    So long I can't remember.  Like 20 years.

Q.    Are -- do you know or are you acquainted with an individual named Nick McGuffin?

A.    No, I'm not.

Q.    And how about Leah Freeman?

A.    No.

Q.    How about Jason Stockwell?

A.    Stockton?

Q.    Stockton, yes.

A.    Yes.  He his the father of my youngest daughter.

Q.    And how long did you know Jason?

A.    Um, about two and a half years.

Q.    And I think I saw you come in the courthouse today, was that Mickey Crook that was with you today?

A.    David Jenkins.

Q.    David Jenkins, okay.  Are you and David together or is he just being supportive?

A.    We've been together for nine years, yesterday.

Q.    Do you know Kristen Steinhoff?

A.    Unfortunately.  (Laughter.)

Q.    How do you know Kristen?

A.    I met her through Jason.

Q.    And how well would you say you know her?

A.    Not really well.

Exhibit 5002 at 724

*K. Cornwall*

Q.    According to the information I have, there's some information that Kristen actually stayed with you and Jason for a period of time?

A.    When she was dating Jason -- I can't think what his last name is now.  The other Jason.

Q.    The other Jason.

And how long did she stay with you and your Jason?

A.    Um, I really don't know.  They stayed off and on for, I don't know, three or four months, at least.

Q.    Did Kristen ever tell you that she was involved in the death of Leah Freeman?

A.    Yes.

Q.    What did Kristen Steinhoff tell you?

A.    A lot of it I don't remember.  I know that she -- I remember that she said that she had a big part in it --

Q.    Okay.

A.    -- and I remember that she said at one point that she ran her over.  But other than that, I'm -- I know it was like a really long conversation, but I can't remember a lot of what she said.

Q.    All right.  According to the police report, you were interviewed back in 2000, or -- a long time ago?

A.    By a private investigator that I guess wasn't a private investigator.

Exhibit 5002 at 725

28

*K. Cornwall*

Q.    And was that Jack Bentley?

A.    I have no idea who he was.

Q.    (Indiscernible.)

A.    He tape-recorded the whole thing, and he was supposed to take it to the police kind of anonymously because I didn't want to get involved, you know, with -- I was scared.  So he was supposed to take it to them, and apparently the guy turned out to not be an investigator, which I just found out recently.

Q.    Okay.  (Pause.)  Going through here real quick.

All right.  Well, I'm trying to find out how we found out about you.

A.    According to Officer Webley, some -- somebody that was at my house the night that -- that Kristen told us all this stuff told them that they were at my house when she said all this.  So.

GRAND JUROR:  Well, do you recall who was at your house that night?

THE WITNESS:  I -- I remember Kristen was there, and both Jasons, and me.  Other than that, I don't remember anybody else being there that night.  They told me that there was somebody else, but.

MR. FRASIER:  Okay.  (Pause.)

GRAND JUROR:  You said she said to you, in person, that she was involved in some way?

Exhibit 5002 at 726

THE WITNESS:  Mm-hmm.

GRAND JUROR:  In a big way?

THE WITNESS:  I remember she told me that she ran her over, and she started laughing and said that she -- she wouldn't die, so she backed up and ran her over again.

And she -- her whole attitude kind of gave me the impression that -- um, kind of like she was pulling my leg, but at the same time kind of scared me.  So -- and I don't know any of these other people, so I didn't want anything to do with it because I don't know what they're going to do to me.

BY MR. FRASIER:

Q.    Okay.  I think where we found this out was from Jason Stockton, and he's now deceased.  Is that right?

A.    Yes.

Q.    He isn't with us anymore.

He was interviewed in the jail in 2001.

A.    Mm-hmm.

Q.    And according to the report I have here, he said that he and you were living together.  That Kristen Ramsey, or Steinhoff, was living with you, and that she told both of you that she, a person named Danny Hyatt, Leah Freeman, and her boyfriend had been at a party at Officer Danny Lee's house that night.

Does that ring any bells with you?

Exhibit 5002 at 727

A.    No.

Q.    And that the Mexicans had ordered the murder of Leah Freeman because her sister Denise owed too much money in drugs?

A.    The Mexicans sounds familiar, that she mentioned that.

Q.    Okay.  And that Kristen had said they'd gone out to Four Corners and then turned right towards Dora.  Stockton said Kristen told him and you that the incident occurred by the substation?

A.    I don't remember any of that.

Q.    Okay.

But as far as you can recall is -- from what I hear you here today saying, is that Kristen indicated she'd ran over Leah Freeman, and then she -- she hadn't died, so she backed up and backed over her again?

A.    And ran her over again.

Q.    Did she say who all was in the car with her when this occurred?

A.    I know -- I remember that there was at least one other person in the car with her, but I don't remember if she said who.  She probably did, but I don't remember who.  And it seems it was a male.

Q.    Do you know a Bill Sero?

A.    No.

Exhibit 5002 at 728

*K. Cornwall*

Q.    Tom Stemmerman?

A.    No.

Q.    Do either of those names sound familiar to you?

A.    Hmm-mm.

Q.    Ricky Crook?

A.    That name sounds familiar.

Q.    Could it possibly have been that name that was used by her?

A.    Mm, no, I don't think so.

Q.    Has anybody told you that they -- outside of Kristen Steinhouse [sic], has anybody told you that they were responsible for the death of Leah Freeman?  Anybody else?

A.    No.

Q.    Has anybody told you, other than Kristen Steinhoff, that they saw what happened to Leah Freeman that night?

A.    No.

MR. FRASIER:  I don't think I have any other questions to ask her.  Does the grand jury want to ask her anything?

GRAND JUROR:  You're -- I'm a little confused.

Did Jay -- was it Jason was your -- the father of your children?

THE WITNESS:  Jason Stockton is the father of my youngest daughter.

Exhibit 5002 at 729

32

*T. Mims*

GRAND JUROR:  And it was another Jas -- both Jasons, you said, were there that night?

THE WITNESS:  Yeah.

GRAND JUROR:  And the other Jason's name is?

THE WITNESS:  I'm still trying to think of what his last name is.  And I know it too.  I --

GRAND JUROR:  But did -- what kind of vehicles did they have, or do you know?

THE WITNESS:  Neither one of them drove.

GRAND JUROR:  Drove?

Do you know Kristen -- what Kristen -- did she have a car?

THE WITNESS:  No.  They got rides everywhere.  Usually by me.

GRAND JUROR:  Did they ever borrow your car?

THE WITNESS:  No.

GRAND JUROR:  Thank you.

MR. FRASIER:  Any other questions?

Okay.  I think that will do it (indiscernible), and you'll be free to go.

THE WITNESS:  Okay.

**TESTIMONY OF TINA MIMS**

(Witness sworn.)

BY MR. FRASIER:

Q.    Ma'am, this is the grand jury for Coos County,

Exhibit 5002 at 730

*T. Mims*

and we're looking into the death of Leah Freeman.  And it's obvious, but so we're recording everything today.  Okay?

First of all, could you tell us your name, please.

A.    Tina Marie Mims.

Q.    And where do you reside, ma'am?

A.    61457 Old Wagon Road, Coos Bay, Oregon.

Q.    And how long have you lived in Coos County?

A.    Most of my life.

Q.    Most of your life, okay.

A.    40 years, approximately.

Q.    I want to -- well, first of all, are you familiar with an individual named Nick McGuffin?

A.    Yes, sir, I am.

Q.    How do you know Nick?

A.    I know him from basically one meeting --

Q.    Okay.

A.    -- approximately ten years ago.

Q.    And where did you meet Nick at?

A.    At Kristen Steinhoff's grandmother's house, up by Tenth Street Market.

Q.    I'll get into that.  Is that the only time you ever met him?

A.    One other time, briefly, after that, I saw him. I didn't really meet with him, but I saw him in a vehicle

Exhibit 5002 at 731

*T. Mims*

with Mr. Crook.

Q.    Ricky Crook?

A.    Yes, sir.

Q.    Did you ever meet Leah Freeman?

A.    Yes, sir.

Q.    How did you know Leah?

A.    I knew her mother, Cory.

Q.    Okay.

A.    Just briefly.  I knew her sister Denise also, just from being kids around Coquille.

Q.    Did -- were you aware at some point in time that Nick and Leah might have been boyfriend/girlfriend?

A.    I was aware of the -- the first night that I met Nick, I was aware that that was her boyfriend.  I had heard before that she was dating a young man, Nick.

Q.    Did you ever see the two together?

A.    Never have I seen them together.

Q.    I want to talk with you -- I guess you know Kristen Steinhoff?

A.    Yes, sir.

Q.    And how do you know Kristen?

A.    I know her whole family.  I've known her since she was little, a baby.  Coquille, everybody knows everybody.

Q.    And Kristen was living with her grandmother at some point in time?

Exhibit 5002 at 732

*T. Mims*

A.    Yes, she was.

Q.    Kristen's mother is Heather McMullen?

A.    Yes, sir.

Q.    Was she also living there at that time, with her grandmother?

A.    Um, she had been prior to that night.  I'm not sure if she was still living there at that -- at that time, because she was in and out so much.

Q.    And where was grandma living?  Where was her house or --

A.    Approximately one block up from the old Tenth Street Market.  You turn left, and it was a white house there on the right-hand side.

Q.    So it's here in Coquille?

A.    Yes, sir.

Q.    Now, you indicated that about ten years ago you were at the home of Kristen's grandmother.  Was Kristen there also?

A.    Yes, sir.

Q.    And you met for the first time Nick McGuffin that night?

A.    Yes, sir.

Q.    Could you tell the grand jury, please, what happened that night.

A.    I was in Kristen's grandmother home --

Exhibit 5002 at 733

36

*T. Mims*

grandmother's home, with Kristen and two gentlemen. Everybody, of course, was partying. Two gentlemen walked in the front door. One of them directed Kristen to go to the rest room. The other one didn't engage in conversation, look at anybody, or anything. They went into the rest room.

I was in the living room for a while. I had to use the rest room, so I went back to use the rest room. I heard a conversation going on in the rest room. The young man in the rest room was threatening Ms. -- Kristen. Was threatening her. I heard the words that, "You could end up like Leah." Basically to keep her mouth shut. If everybody just keeps their mouth shut, everything would be okay.

The older gentleman that was with the young man also made a statement to the effect that she could end up like Leah Freeman, and that you need -- she needed to keep her mouth shut. And I -- I barged in and opened the door, and was very confrontive [sic] with them, and wanted to know exactly what the F was going on, were my exact words.

And the older gentleman didn't engage at all. He basically got up and exited the room, and as far as I know he left the house directly after that. I remained in the rest room. Nick engaged a conversation with me. That's when he confirmed that he was Leah Freeman's boyfriend, or had been Leah Freeman's boyfriend, was Leah Freeman's boyfriend.

And I was asking him exactly what was going on in

Exhibit 5002 at 734

*T. Mims*

the conversation in there, and basically I was being brushed off. He was trying to -- what I would call build a friendship, just conversate [sic] with me back forth on other things, like, you know, just some stupid silly little questions that people ask when they're trying to get to know you.

Nick Freeman -- or Nick eventually left the -- the rest room. I tried to discuss this with Kristen. She got to a point to where she was just so stressed out and so out of control that it was pointless to try to talk to her. And of course, like I said, everybody was partying that night. So she went back to her room, which was in the back of the house, and I returned to the living room -- after I used the rest room of course.

Q. Right. Well, let me ask you a few more questions about the young man who identified himself as Nick, the boyfriend of Leah.

A. Yes, sir.

Q. The time frame when this occurred, you were aware that Leah was missing?

A. Yes, sir, I was.

Q. Had Leah's body been found at that point, do you recall?

A. I don't believe so. No.

Q. So you think this was before Leah's body had been

Exhibit 5002 at 735

*T. Mims*

found?

A.    I believe so.

Q.    Now, the other gentleman, or the other man that was in there, could you describe him for us a little bit.

A.    He was an older gentleman.  Basic height, I want to say maybe 5,10, 5,11.  I didn't -- I -- he only stood up for a second to walk out.

Kind of gruffy [sic] looking.

Q.    All right.  Were you -- when you were interviewed the police here recently, were you shown a series of photographs of individuals?

A.    Yes, sir, I was.

Q.    And did you point out one of those pictures?

A.    Yes, sir, I did.

Q.    Do you recall the name of that person?  Did the police ever tell you who that was?

A.    I don't recall the name.  I recall that the gentleman that was in the rest room that night was referred to as Nick's dad that day.  I can't remember the name, I'm sorry.

Q.    And it was referred to -- who told you that it was Nick's dad?

A.    After I was told the name, I was told that that was Nick's father by the officers that were interviewing me.

Q.    All right.  So you were told that after the

Exhibit 5002 at 736

*T. Mims*

pictures were shown to you?

    A.    Yes, sir.

    Q.    Now, later that evening -- now, Kristen, after what happened in the bathroom, goes to her bedroom.  Is that right?

    A.    Yes, sir.

    Q.    Go ahead.

    A.    I -- also while I was at the bathroom door, I -- I recall hearing a statement that the gentleman -- the older gentleman had stated that he had rinsed the truck or hosed the truck or the trunk out.  Truck or trunk or something like that, rinsed or hosed it out.  So I wanted to -- I just remember that.  I wanted to make sure I got that.

            GRAND JUROR:  Okay.  It was the older gentleman in the bathroom?

            THE WITNESS:  It was the older gentleman that had stated that, yes, sir.

            GRAND JUROR:  And in the bathroom (indiscernible)?

            THE WITNESS:  Yes.

            GRAND JUROR:  So they both went in the bathroom?

            THE WITNESS:  They were both in the bathroom, yes, sir.

            GRAND JUROR:  Nick and the older guy?

            THE WITNESS:  And the older gentleman.

Exhibit 5002 at 737

And the older gentleman didn't engage in -- and the reason that is really strange to me is because when you're in a situation where people are using methamphetamine, and other people walk into a house, they are usually people that use also. They're -- they always engage. Maybe something stupid fall out of their mouth, maybe just that they're so high that they're talking to everybody, but there's always some type of interaction. This gentleman did not interact at all. He did not make any eye con. I mean, it was a very shrewd entrance, straight to the rest room. It was very uncomfortable feeling.

GRAND JUROR: So he didn't stay on the couch? Because you had said he sat on the couch, I thought.

THE WITNESS: No, he -- he went into the -- directly into the -- the rest room. I was sitting on the couch when they came in, so.

BY MR. FRASIER:

Q. All right. Now I guess maybe we better talk about this a little bit. You said everybody was partying. Did that include you?

A. That includes me.

Q. And what was everybody partying on, including you?

A. Methamphetamine.

Q. Later in the evening, did you hear something

Exhibit 5002 at 738

*T. Mims*

going on in Kristen's bedroom?

A.    I heard some ruckus back in Kristen's room, some thumping going on.  So I went back to check her.

Q.    What happened when you went back to check on her?

A.    Ricky Crook was coming through her bedroom window, and they were having a disagreement.

Q.    And what was going on?  What was being said?

A.    Ricky was threatening Kristen, telling her that she needed to be quiet and she basically -- if everybody just kept their mouth shut, and that she needed to quit talking to people.  I don't know if he was asking her to go with him at that -- at that time, or what.  I didn't get all the conversation, but it was -- there was a disagreement going back and forth.

Q.    Does he actually get in the room through the window?

A.    He came in the room, yes, sir.

Q.    So if I understand you correctly, she's telling -- he's telling her to keep her mouth shut, things along that line?

A.    Mm-hmm.

Q.    And did you get angry at him, tell him to shut up, and things like that?

A.    Yes.  I've known Ricky Crook his whole life.  Yes.

Exhibit 5002 at 739

*T. Mims*

Q.    Okay.  And what does Mr. Crook do to Kristen before he leaves the room?

A.    (Pause.)  It's been so long, and -- I know he threatened her.  He did grab her at one point and threaten her.  I can't recall exactly what he did when he left the room.  I'm sorry.  I'm nervous right now.

Q.    That's fine.

In the police report, when they interviewed you here a couple or three weeks ago, there was something about he poked her in the chest with his finger?

A.    Yes, he grabbed her like this, and poked her in the chest.

Q.    And did he say anything when he poked her in the chest?

A.    This -- the only thing that stands out in my head is that -- the thing that really stands out that they were saying was that she could end up like Leah.

Q.    Okay.

A.    And I'm really nervous even being here.  I don't come back to Coquille, you guys, because I live a different life now, so it makes me nervous to even be in this town.

Q.    So you've gotten away from the meth scene and all of that?

A.    Oh, I was never actually really part of the meth scene.  My drug of choice was alcohol.  I just happened at

Exhibit 5002 at 740

*T. Mims*

that time to be dibble-dabbling a little bit.  So.

Q.    But you've straightened up your life (indiscernible)?

A.    Oh, yes.  I'm in -- I'm in college now and, yeah, my life is a completely different life.

Q.    Good for you.  Good for you.

A couple days later, did you talk with Stein -- Kristen about what had occurred?

A.    Two diff -- a couple days later, I -- I returned to Kristen's grandmother's house.  I confronted Kristen in front of her grandmother.  My grandmother Marsha (phonetic) Lehman was with me, and she's no longer alive.  I -- I told Kristen that she needed to go to the police.  She needed to tell them what she knew, whether she was involved or not.

Kristen relayed to me that she was basically involved -- we had a discussion about the incident, and she relayed to me her part in it.  And I -- that's --

Q.    (Indiscernible) what she's doing?

A.    That she was driving the vehicle and Nick grabbed the steering wheel and the vehicle hit Leah Freeman down by the high -- between the high school and the Fairview turnoff, there on that straight stretch.

Q.    Okay.  And did she say anything about a shoe or anything like that?

A.    Yeah, she said that's how Leah's shoe was -- why

Exhibit 5002 at 741

*T. Mims*

it was there on the side of the road.

Q.    So she's driving, Nick reaches over, grabs the wheel, gets her, and -- or jerks the wheel, resulting in Leah being hit?

A.    Yes, sir.

Q.    Now, did you help her to try to contact the police?

A.    Yes, sir.  I set up a meeting with my neighbor, Officer Danny Lee.

Q.    And for some reason when she talked to Officer Lee, she didn't tell the whole story like you've told us here today.  Were you aware of that?

A.    I was aware of that after the fact.  I didn't find out until here recently when I spoke with the officers in Coos Bay.

Q.    Have you talked to Kristen in the last couple of weeks, couple of months?

A.    I spoke with Kristen on the phone the day of my interview with the Coos Bay Police Department, and one day since.

Q.    And what, if anything, has she had to tell you about this?

A.    Her -- she's -- she's a liar.

Q.    Okay.  She's not telling you anything?

A.    She's not -- she's not telling the truth.  She's,

Exhibit 5002 at 742

45

*T. Mims*

um -- I don't know what her reasoning is now.  She's actually changed her phone number since our phone call.  We were supposed to actually meet to get her children together with my grandchild, and she disconnected her phone.

Q.    Okay.  Is there anything else about this that you feel the grand jury should know about?

A.    Nick and Ricky Crook showed up at Kristen's house after this incident, and were asking her for them -- for her to go for a ride with them in her -- in the car.  I begged Kristen not to go because I had a really bad feeling.  She went with them anyway.  When she returned, she told me that they had taken her out to the old scout cabin, the gravel pit, which would be down Lee Valley Road, that first gravel pit on the left-hand side.  There used to be an old scout cabin across from it, up on the woods up there.  So that's what we use -- everybody used to refer to it as.  Years ago when I was in high school, people threw keggers up there, da-da-da-da-da.

And -- and when she got back she told me that's where they took her.  She told me that Ricky Crook sat in the back seat.  He was -- they parked there.  They were totally silent.  That he had a pistol laying next to -- was it a pistol or a knife?  I think it was a pistol, she said, laying next to him in the seat.  Never said anything.  They sat there for a while, then they returned her to town.

Exhibit 5002 at 743

46

*T. Mims*

When I spoke with her after that, my first speaking with her after these ten years, she said that they took her right on the edge of town by Scolaris' there, which at one time there was a little turnoff there, which is completely opposite of what was told to me ten years ago. So, but I did -- she did go to Danny -- Officer Danny Lee. I set up a meeting and my grandmother took her, drove her to it personally, so that's all I can think of.

Q.    Has anybody -- outside of what Kristen has told you, has anybody else told you anything about the Leah Freeman case? For example, has somebody told you, I killed Leah Freeman?

A.    (Pause, sighs.) Mm, not those exact words.

Q.    Okay. But what were the words that were told you?

A.    I don't know. I can't remember the exact words.

Q.    Who was this individual?

A.    I know -- I know that Ricky Crook, Nick, and Kristen were all involved in Leah's murder. I know that for a fact. There's no doubt in my mind. Ricky's father even confronted me after I've confronted Ricky Crook that night in Kristen's room.

Q.    Okay. And what did Ricky Crook's dad do?

A.    He went ballistic on me. He said I've known Ricky his whole life and that I should know that he's not

Exhibit 5002 at 744

*T. Mims*

capable of something like that.

And I'm telling you that I know that Ricky Crook is capable of something like this.

Q.    Okay.

A.    If -- I mean, he is.  He's been -- he's had behavioral issues for years, and I'm not talking just due to drug addiction or due to being provoked or anything.  He has had severe, severe anger issues since he was a small, small child.

I know nothing of Nick, except for that night.

Q.    Okay.  So outside of what you've told us here, and outside of these three individuals -- Kristen, Nick McGuffin, and Ricky Crook -- has anybody outside of that group of three told you that they might have been involved in the death of Leah Freeman?

A.    No.

Q.    And anybody outside of that group of three, anybody told you that they were there and witnessed what occurred?

A.    No.

MR. FRASIER:  Grand jury want to ask her questions?

THE WITNESS:  And I was told that the kids had all been at a party in Fairview earlier that night, if that makes any reference.  That was a thing that was brought up to

Exhibit 5002 at 745

*T. Mims*

me from Kristen too, that they had all been at Fairview.

GRAND JUROR:  Do you know what kind of cars they came in when they came to the house?

THE WITNESS:  They were in Nick's car when they came to the house, and I don't recall.  I remember it was dark -- I think it was a dark-color car.  It was nighttime, and it's been ten years ago, and I only saw it the one time, so.

GRAND JUROR:  Do you know what Ricky Crook drove, at the time?

THE WITNESS:  I don't think he drove back then. I don't believe so.  They've never really been a family of means, and he's never really been a kid to work.

GRAND JUROR:  What about when he came with his father?

THE WITNESS:  He -- his -- it was Rick himself that confronted me, days after this.  And he --

BY MR. FRASIER:

Q.    And -- so we're clear, Ricky Crook, his dad's name is Rick.

Go ahead.

A.    Yeah.  There's two.  We have Ricky and Rick.  So Ricky's the junior, Rick's the adult.

Q.    Okay.

A.    The confrontation I had with Ricky Crook was the

Exhibit 5002 at 746

night in her room.

And of course when they were at the car and I was telling her not to go, there was -- you know.

But his father confronted me days after that, and was asking me how I could accuse Ricky Crook of doing it. And it was pretty simple, because Kristen Steinhoff told me that Rick and Nick were there. It came right out of her mouth, and I believe her. She was hysterically crying. I believe back then, if things would have been handled different, maybe the truth could have came out back then, but in my opinion, I don't understand what's taken so long. That's --

GRAND JUROR: This party at Kristen's grandmother's when you overhead the conversation, that was after Leah had disappeared?

THE WITNESS: Yes, sir. And I believe it was before her body was found. And there is a way that we can actually figure that out, because I was on formal probation at that time. And I had just returned to my grandmother's house because I had done four months in jail on a violation for alcohol use. I had a problem with alcohol.

BY MR. FRASIER:

Q.    That's gold. That will help us figure that out. We'll work on that. Okay.

A.    Yeah. So it's pretty -- it's pretty easy to

Exhibit 5002 at 747

*T. Mims*

track my life back then.

Q.    Okay.

A.    But, you know, I can -- I must have been the only guilty person in jail, that's all I have to say, (laughter) because probation saved my life.  It took me a while to wake up, but I -- I don't think if I wouldn't have been on it, I would be alive today, so.

GRAND JUROR:  When she said -- and she described, she said Nick took the wheel, and then ac -- I think you said accidentally hit Leah --

THE WITNESS:  Mm-hmm.  She did say accidently. She didn't say like he was like, I'm -- I'm going to hit her. He just did it.

MR. FRASIER:  Right.

GRAND JUROR:  Now, and you said that was up between -- she said, to you, the location was, again?

THE WITNESS:  Between the high school and the Fairview turnoff.

GRAND JUROR:  Whose car was she driving at that time?

THE WITNESS:  You know, I've never gotten that out of her.  I even tried in a conversation where we recorded the other -- a couple of weeks back when I was at the police station.  And she said back then that she was -- when I had that conversation with her on the phone, she said she was

Exhibit 5002 at 748

driving a friend Zack's car at that time. But I don't -- it's never -- I -- yeah. I've never actually gotten that detail. I never got any details of what they did after the fact of -- you know, I was pretty much in Kristen's face, telling her that, You need to go to the police. You need -- you know.

MR. FRASIER: Any other questions? I think we're done.

THE WITNESS: Okay.

MR. FRASIER: Thank you. And you're free to go.

GRAND JUROR: Thank you.

**TESTIMONY OF CHRISTY DIANE YOUNG (CAGLEY)**

(Witness sworn.)

BY MR. FRASIER:

Q. Okay. First of all, ma'am, this is the grand jury for Coos County, and we're looking into the death of Leah Freeman. It's obvious, but I have to tell you I turned the recorders on, so we are recording what's going on. Okay?

A. Okay. All right.

Q. First of all, could you tell us your name, please, and where you live.

A. My name is Christy Diane Young, Y-O-U-N-G. I'm formerly Cagley, C-A-G-L-E-Y. I live in Bandon, Oregon.

Q. How long have you lived over there in Bandon?

A. I've lived in Bandon a year.

Exhibit 5002 at 749

*C. Young*

Q.      Okay.  Got to get to the right page here.

I have found it.

Okay.  Are you familiar with an individual named Nick McGuffin?

A.      Yes, sir, I am.

Q.      How do you know Nick?

A.      I know Nick McGuffin from hanging out with the Coquille kids back in 2000 and on.  We used to do drugs and party together.

Q.      And so did you actually live over here in Coquille, or were you --

A.      No, I lived in North Bend/Coos Bay.  I had very close friends, and I dated a kid from Coquille at the time.

Q.      Did you ever know Leah Freeman?

A.      I never knew Leah Freeman personally, just her boyfriend.

Q.      Did you ever see her and Nick together?

A.      Never.

Q.      Do you know Wayne McGuffin?

A.      Yes, I know Wayne McGuffin very well.

Q.      How do you know Wayne, again?

A.      The same scenario, again.

Q.      Do you know an individual named Polly Parks?

A.      I know Polly Parks very well.

Q.      And how do you know Polly?

Exhibit 5002 at 750

53

*C. Young*

A.    Polly is one of my very good friends, and my father's ex-girlfriend.

Q.    Was Polly -- years ago, was she involved in methamphetamine and stuff like that?

A.    Yes, sir, she was.

Q.    Do you know her daughter Pam?

A.    I know Pammie very well too.  And Sarah.

Q.    Was there ever a period of time that you were living with Polly Parks?

A.    Yes.

Q.    And do you recall when that was?

A.    Um, it was the summer that Leah had gone missing. I moved in with her two days after she had gone missing.

Q.    And while you were living with Polly Parks, do you recall Wayne and Nick McGuffin coming over to the home of Ms. Parks?

A.    Yes, sir, I do.

Q.    Did they come over a lot or --

A.    Quite a bit, yes.

Q.    Do you recall them ever talking about Leah Freeman and her disappearance?  Those two individuals?

A.    Uh, kind of chitchat, off and on.  More mainly when it first had happened, and they were investigating it and looking for her.  And when things would come up on the TV about it, they would have little comments to say about it.

Exhibit 5002 at 751

54

*C. Young*

Q.    Was there ever a discussion when -- with, let's say, Wayne, when it was announced publicly that a shoe belonging to Leah had been found on Hudson Ridge?

A.    Mm-hmm.

Q.    What do you recall Wayne McGuffin saying at that point?

A.    I remember Wayne kind of snickering and saying, They won't find anything from that.  That's been thrown there to put them off the trail.

Q.    Did he further explain what he meant by that?

A.    No, and I didn't care to elaborate with him on it.

Q.    You didn't want to know anything more?

A.    Hmm-mm.

Q.    Was that the --

A.    This is bad enough ju-ju as it is.

Q.    Now, do you recall, you know, you say you moved in there a couple of days after Leah went missing?

A.    Mm-hmm.

Q.    And that it was a period of time before her body was found.  Do you recall anything like that (indiscernible)?

A.    Oh, yeah.

Q.    When the body was found?

A.    Mm-hmm.

Q.    This discussion that we're talking about here

Exhibit 5002 at 752

*C. Young*

about the shoe on Hudson Ridge, it was put there to throw them off, do you recall if that was before or after Leah's body had been --

A.    Before.

Q.    Before the body was found?

A.    Before the body was found.  And I couldn't tell you exactly how long before, but it seems like there was a chunk of time in between the two events.

Q.    Now, did Polly have a scanner, police scanner?

A.    Yes, sir.  Always listened to it.

Q.    And what was she listening for?

A.    Um, she actually -- she never listened to anything in particular.

Q.    Okay.

A.    One, the noise, she loved the noise.

Q.    Mm-hmm.

A.    From previous experience and years before, she didn't like the lonely creepiness of that hill.  She loved the noise.  She'd just listen to things here and there.  If she did happen to hear, like a friend or something come up on it, she'd be like, Oh, you're in trouble, you know.  But nothing in particular.  It's not like she was sitting back going, Hmm, you know, that's what's going on, guys.

No.  It was just --

Q.    It wasn't like she was listening -- they're on

Exhibit 5002 at 753

*C. Young*

the way to search my house?

A.    No, she -- no, she's always just had a scanner. And, you know, to honestly, if she probably still has her scanner, she'd probably still be listening to it.  That's just the type of person she is.  She loves that noise, and the chitter-chatter of it.

Q.    Did you ever observe Nick in relation to that scanner?  I've heard some people talk about how Nick would come over and just sit there and listen to that scanner, like he was trying to figure out what the police were up to.

A.    Mm, I don't know that he -- I can't -- I can't personally say that's what -- how I feel, that it's what he was doing.  But yes, he would -- when it was going, they were looking for him, he would come over.  And if it wasn't on, he'd reach over, turn it on, and listen to it.

Q.    Okay.

A.    I don't know what he was listening for, but, you know, we can all assume.

Q.    Okay.  That's okay.  We shouldn't do that.  Okay.
       Outside of what you've told us here today, do you have any other information about Leah Freeman and her death?

A.    No, not really.

Q.    Okay.  Has anyone -- I've been asking everybody these questions, so I don't want you to feel left out, okay?

A.    (Laughing.)

Exhibit 5002 at 754

*H. McMullen*

Q.    Has anybody told you that they were personally responsible for Leah's death?

A.    No.

Q.    Has anybody told you that they saw, personally saw what occurred to Leah Freeman?

A.    No.

Q.    Just out of the blue, I think I'll ask you this.

Do you know Kristen Steinhoff at all?

A.    Yeah.

Q.    How do you know Kristen?

A.    Um, drugs.  Um, she -- her name's been thrown around out there with the whole entire case.

Q.    Has she ever told you anything about the case?

A.    I don't like Kristen at all.  I (indiscernible) speak with her.

Q.    Okay.

A.    Sorry.

Q.    No, that's okay.  That's fine.

Again, I don't think I have anything else to ask her.  Does the grand jury want to ask her anything?

Okay.  I think that does it.  You're free to go.

THE WITNESS:  Okay, guys.  Thank you.

GRAND JUROR:  Thank you.

THE WITNESS:  I hope I'm some kind of help.

**TESTIMONY OF HEATHER McMULLEN**

Exhibit 5002 at 755

(Witness sworn.)

BY MR. FRASIER:

Q.    Okay.  First of all, this is the grand jury for Coos County.

A.    Okay.

Q.    And we are investigating the death of Leah Freeman.

First thing I need to tell you -- it's obvious, but I turned on some recorders.  We're recording the proceedings here today.

A.    Okay.

Q.    All right?

First of all, could you tell us your name, please, and where you live.

A.    I'm Heather McMullen, and I live in Myrtle Point.

Q.    How long have you --

A.    My address?

Q.    No, that's fine.  Myrtle Point's okay.

And do you -- had you lived in Coquille before?

A.    Yes.

Q.    How long have you lived -- or had you been around the Coquille/Myrtle Point area?

A.    Um, well, I went to Coquille High School, so it was off and on since I graduated, I guess.  Or I almost graduated.

Exhibit 5002 at 756

*H. McMullen*

Q.    And you're the mother of Kristen Steinhoff; is that correct?

A.    Yeah.

Q.    Did you ever know a Nick McGuffin?

A.    I knew him, but not knew him.  He had just been to my house.

Q.    Okay.

A.    So I didn't really know him, but --

Q.    Did he come over like to visit Kristen or something along that line?

A.    Yeah.

Q.    Is that about it?

A.    Mm-hmm.

Q.    Okay.  Did you ever meet or know Leah Freeman?

A.    No, never.

Q.    Did you know an individual named Ricky Crook?

A.    Mm-hmm.

Q.    How do you know Ricky?

A.    He was a really good friend of Kristen's.

Q.    Individual named Zack Elderkin?

A.    Mm-hmm.  Yeah.  He was a friend of mine, and Kristen's.

Q.    I want to first of all talk with you about the evening that Leah disappeared, which would have been back in the year 2000.  Do you recall where you were living at that

Exhibit 5002 at 757

*H. McMullen*

time?

A.    At my mom's house on Dean Street.

Q.    And Kristen, was she living there too?

A.    Yeah.

Q.    And was this about the time that you were acquainted with Zack Elderkin?

A.    Mm-hmm.  Yeah.

Q.    Do you recall what kind of car Mr. Elderkin was driving at that time?

A.    Um, it was Kia.  It was like a new Kia, purple, dark purple.  Nice little car.  Mm-hmm.

Q.    Was there a day that Kristen borrowed Mr. Elderkin's car?

A.    Mm-hmm.  Yeah.

Q.    Could you tell us how that came about that she was borrowing -- well, what happened that night?

Why don't you just tell us what happened.

A.    Well, I'm not exactly sure how she ended up with it, but I know that she borrowed it for a few hours and -- it was supposed to be a few hours, but it turned into him being a few hours late for work.  So -- yeah.  He went to work at 6:00 in the morning at -- in Eugene at a mill, a steel mill.  So.

Q.    And she didn't get the car back on time?

A.    No.

Exhibit 5002 at 758

*H. McMullen*

Q.    And he was late for work?

A.    Right.

Q.    Now, did Kristen have a car at that time?

A.    Mm-hmm.  It was a little Hyundai Elantra.  And it was purple also, but it was like a really light purple.

Q.    Light purple?

A.    Yeah.  (Laughing.)  I don't know what the color of it is, but it's very light purple.

Q.    How well did that car run, the Hyundai?

A.    It ran pretty good.  It was a 2000, I think.

Q.    All right.

A.    So -- my mom bought it for her.  Helped buy it for her.

Q.    Who bought it for her?

A.    My mom.

Q.    Your mom bought it for her.  Okay.

We've heard some testimony that she borrowed Zack's car that night because her car wasn't running.  Do you recall if there was any particular problem?

A.    Well, it did have some transmission problems.  I think it went through a couple of transmissions, actually.

Q.    Okay.  All right.

Now, do you recall Kristen leaving with Mr. Elderkin in this car?  Do you recall that at all?

A.    No, but she could have, you know.  She may have.

Exhibit 5002 at 759

*H. McMullen*

Q.    You're just aware she borrowed the car?

A.    Hmm?

Q.    You were aware she borrowed the car?

A.    Oh, yeah, she -- I was aware.

Q.    Did you ever --

A.    I was seeing him, so, mm-hmm.

Q.    Did you see Kristen in that car?

A.    No, I didn't -- um, I don't think I actually seen her in it, but I knew she had it.

Q.    Did you see Kristen in the early morning hours of the following -- you know, this was June 28th in the evening when she borrowed the car.  Early morning hours of June 29th, did you see Kristen that morning?

A.    Um, yeah.  She was on the front porch and in and out of the house, and stuff.

Q.    Now, you had to get up early and go someplace?

A.    It wasn't real early, but I had community service that I was trying to work off, some --

Q.    Okay.  So did --

A.    -- at the fairgrounds, I think.

Q.    So you had be -- meet the bus to go over there to --

A.    No, I was driving.

Q.    Okay.  Was there anybody with Kristen that morning?

Exhibit 5002 at 760

63

*H. McMullen*

A.    Um, Ricky and Nick.  They were all on the front porch.  I don't remember if they came in the house or not, but I know my bedroom window was at the front of the house, by the street, and --

Q.    And both Nick and Ricky were on the porch with Kristen?

A.    Right.  Yeah.

Q.    Was it light out when this was --

A.    No, it was just like daybreak-ish.  It was one of those (indiscernible) -- foggy and -- and I didn't have -- I didn't have to get up right then, you know.

Q.    Okay.  So how did you --

A.    So I was still in my bedroom.

Q.    Oh, so you're in your bedroom and they're on the porch, and your window --

A.    Right.

Q.    -- is out --

A.    Yeah, the window's open --

Q.    Okay.  And that just --

A.    -- and it was warm.

Q.    -- opens out onto the porch?

A.    No.  It's -- opens out into the front yard, but the -- it's right next to the front porch.

Q.    Oh, okay.

A.    So the front porch is here, and then when you

Exhibit 5002 at 761

*H. McMullen*

come into the living room, my bedroom is right off of the living room.

Q.    But you saw them or you heard them?

A.    No, I saw them too.

Q.    Okay.

A.    You know.  I was inside the house and up and stuff, because my bedroom adjoins to the bathroom, which goes into another bedroom, and then goes into the kitchen.  And I just was up around.  But I could hear them talking and I knew who they were and I'd seen -- you know, I could see who was with her sometimes, you know.  But I --

Q.    Could you tell what they were talking about?  Do you remember what they were talking about?

A.    I couldn't tell what they were talking about, really.

Q.    Kristen -- you know, I don't mean to embarrass you or her or anything, but she had some issues back then.  Is that true?

A.    Oh, yeah.

Q.    She was into methamphetamine?

A.    Probably several issues.  Her and I didn't get along very well back there, and she was a little out of control and --

Q.    In fact there was a time or two where she actually assaulted you and the police would be called?

Exhibit 5002 at 762

*H. McMullen*

A.     Oh, yeah.

Q.     And she actually went to jail once at least --

A.     I did.  I did.  (Laughing.)  Because --

Q.     Or she went.  Kristen went to jail because she beat up on you?

A.     Right.  Well, she wasn't beating me up, but she would just like come from behind and just attack me and -- and I didn't know what was going on, really, with her, but --

Q.     Okay.

A.     Yeah, I thought that maybe she might need to learn a lesson.

Q.     Okay.

A.     Can't be doing that stuff.  And I had my boyfriend's eight-year-old daughter and -- and my nephew there, so --

Q.     Okay.

A.     You know.

Q.     You just couldn't have that kind of conduct going on around them?

A.     No.  Hmm-mm.

Q.     Are you aware of any -- well, let me ask you this.  Has Kristen told you anything about being involved in the death of Leah Freeman?

A.     No, not really.  She -- I knew that they were looking for her, and everyone was kind of upset and agitated

Exhibit 5002 at 763

*H. McMullen*

and stuff. But I had never really met her. I didn't -- I just never expected anything like this to happen.

Q.   Well, okay. Kristen has never told you anything about -- or has she told you anything about --

A.   No, not directly. No.

Q.   Has anybody told you -- I've been asking everybody these questions, so I don't want you to feel left out or anything. But has anybody told you that they killed Leah Freeman?

A.   No.

Q.   Has anybody told you that they saw what happened to Leah Freeman?

A.   No. No.

Q.   I'm assuming you've heard the rumor that -- or some rumors about this.

A.   Well, yeah, back -- you know, then, you know, I guess. Mm-hmm.

Q.   Is there anything about this case that you think the grand jury needs to know about?

A.   Nothing that I can think of, you know, really.

Q.   Okay. What was the rumor that you heard?

A.   Well, all I really know is Kristen and her friends were looking for Leah. Kristen had said she would wander -- was wandering off, and I knew they were looking for her. And, you know -- I guess.

Exhibit 5002 at 764

GRAND JUROR:  Have you head any rumor about, you know, she got run over by a car, or anything like that?

THE WITNESS:  Oh, I did hear something about maybe she had gotten hit by a car, when they bumped into her when they found her walking on the road or something.  I -- it's been a long time ago.

MR. FRASIER:  Okay.  Anything else?

GRAND JUROR:  Do you know anybody that had a Jeep Wagoneer back then?

THE WITNESS:  No.  Not that I can think of.

MR. FRASIER:  Any other questions?

Okay.  I think that does it.

THE WITNESS:  Okay.  Thank you.

### TESTIMONY OF WILLIAM SERO

(Witness sworn.)

BY MR. FRASIER:

Q.    First of all, could you -- well, let me back up a second.

This is the grand jury for Coos County.

A.    I guess so.

Q.    And we're looking into the disappearance and death of Leah Freeman.

A.    Okay.

Q.    It's obvious, we are recording everything here today.  Okay?

Exhibit 5002 at 765

*W. Sero*

A.    I'm guessing.  It's important, yeah.

Q.    First of all, sir, could you tell us your name and where you live.

A.    I'm William Robert Sero, Jr., and I live in Port Orchard, Washington.

Q.    How long have you lived up there in Port Orford -- Port Orchard?

A.    See, I moved back up there 2002 -- 2003.  Going into 2004, right around there.

Q.    And you used to live here in the Coos County area?

A.    Yes, sir, I did.

Q.    How long did you live down here?

A.    I moved here in '91.  I was a sophomore at Marshfield High School.  And I lived here until right around when I said I moved up there.  '99 in the area here, and then moved to Coos Bay for a couple of years, and then moved up to Port Orchard.

Q.    Did you ever live in California for a period of time?

A.    Yes, I did.

Q.    When and where?

A.    I lived in -- actually, I lived in Santa Rosa, California.  And Cazadero, California.

Q.    Okay.

Exhibit 5002 at 766

A.    And that was in -- let's see.  '95.  '94/'95 I logged down there for a logging company called Parmeter Logging.  I -- it was seasonal work.  I worked there seven months out of the year for three -- actually three years in a row, so.

Q.    And again, I don't want to try to embarrass you or anything, but you've had some problems with the law?

A.    Yes, sir, I have.

Q.    What type of things did you get in trouble for?

A.    Um, see, I have a -- a Burg charge from back in -- I don't know when it was here.

Q.    Burglary.

A.    A burglary.  Burg 1.  I have a Theft 2.  A UUMV, which is taking a motor vehicle.  And I have a VUSCA [sic] charge from 2004 or '5 I think.  It's a -- it's actually, what it is, it's a possession of controlled substance in Washington.  They call it -- it's called a VUSCA.

And that pretty much sums it up, that I was on.

Q.    All right.  And were you a methamphetamine user?

A.    Yes, sir, I was.

Q.    Are you now?

A.    No, sir.

Q.    You got yourself clean?

A.    Yes.

Q.    All right.

Exhibit 5002 at 767

A.    Have a good job.

Q.    When you lived here in the Coos County area, did you know a person named Nick McGuffin?

A.    Um, briefly, yes, sir.

Q.    How did you know Nick?

A.    He was a friend of my girlfriend's little brother.

Q.    And who was your girlfriend?

A.    Erika Davidson.

Q.    And her little brother was?

A.    Ryan Davidson.

Q.    Ryan Davidson.

A.    Yes, that's --

Q.    So that's how you knew Nick?

A.    Yes.  They went to school together.  They graduated the same -- same year.

Q.    Did you spend much time with Nick or anything like that?

A.    No, sir, I didn't.

Q.    Now, were -- did you ever meet or know Leah Freeman?

A.    Um, briefly I met her at Danny Lapine's house here in Coquille.  She was sitting in their vehicle outside the house, which was -- I believe it was Nick's vehicle. Once I met her then, and then again I seen her in the vehicle

Exhibit 5002 at 768

also, so it was some time after that.

Q.    Did you have an opportunity to see -- well, let me back up.

Were you made aware that Nick and Leah were boyfriend/girlfriend?

A.    Yes, sir.

Q.    Did you have an opportunity to see how well they got along?

A.    To my knowledge they didn't get along very well. I had heard there was one incident where one of his friends, I'm not sure if it was Daniel or it might have been Ryan, they had gotten in an altercation or a fight, and I wasn't there, so I can't really comment on that.  But that's all I know to my knowledge, that -- I know that they -- he used to -- she wasn't allowed to get out of the car.  I know that.

Q.    Okay.  He appeared to be very controlling of her?

A.    Yes, sir.

Q.    Now, you indicated your girlfriend at the time was Erika Davidson?

A.    Yes, sir.

Q.    And you actually have a child with her?

A.    Two.

Q.    Two children.

A.    Yes.

Q.    Did you -- you and Erika, did you live together

Exhibit 5002 at 769

here in Coquille?

A.    Yes, we did.

Q.    In the year 2000, the year Leah disappeared?

A.    Um, we had actually -- we were just moving out of a place up -- I'm not sure what the address is sir, sir, so I can't really tell you.  But yeah, we lived here in Coquille. From when my son was born in '99, to 2000, we -- we stayed in the area.  We got in a -- a house up here on the hill.  And we had an apartment just -- I don't know if it's west of town or --

Q.    Sanford Heights area?

A.    Um, yeah.  Right across, down from the old A&W. And you take a left.  I don't -- like I said, I don't know the address right off the top of my head, so.

Q.    All right.

Do you know a guy named Tom Stemmerman?

A.    Yes, sir, I do.

Q.    How did you know Tom?

A.    I went to school with him.

Q.    All right.  Mr. Sero, I think -- well, you're pretty much aware why we brought -- asked you to come down here today.

A.    Yes, I do.

Q.    You're aware that there is rumor been floating around here in town that you and Tom had something to do with

Exhibit 5002 at 770

*W. Sero*

Leah Freeman's death, or you alone or Tom alone, or somebody.

A.    Yes.

Q.    Your name and Tom's name, and Alicia Michaud. Did you know Alicia Michaud?

A.    Yes, sir, I do know Alicia.

Q.    That you three were somehow either together or individually involved in her death.

What do you know about Leah Freeman's death?

A.    I don't know anything about it.  Not at all.

I -- I know the allegations were going around at the time, and they were shot up in the air a few times.  And, you know, I -- I really can't comment on it because I don't know anything about it.  Not a -- I mean, myself or if they -- they do, I don't -- I have no idea.  I don't know why that was said or why somebody threw me under the bus, but that's -- yeah.  Not -- not to my knowledge.

Q.    Have you ever told anybody that you were involved in Leah Freeman's death?

A.    No, sir.

Q.    Do you have a rough idea in your mind the night that Leah disappeared, when that was?

A.    Now, is this before she did, or after -- well, at the time when it happened, I ran -- I can tell you this much. I ran into Nick and the only reason why I know that she had disappeared, quote/unquote, was he had mentioned it to me.

Exhibit 5002 at 771

And I guess -- I mean, everybody knew, because of it was going around town, but -- and I can't give you the exact date, but he had mentioned it to me at one point in time, that she was missing, and that -- I mean, I guess that it was the day after supposedly when she came up missing, which like I said, I don't know the exact date to -- to this day, but I mean, at the time he had mentioned it to me. But other than that, I don't -- you know.

Q.    Did you ever go get in a car with him and go look for her?

A.    No, sir.

Q.    You know, because we've heard some testimony about -- I think maybe it was Alicia Michaud that told us this, or somebody else, that the day after she went missing that -- maybe it wasn't Alicia. Maybe it was -- well, never mind. But that you had indicated or that Nick had indicated that you had been in the car with Erika and Nick was driving down the road and stopped. And you got out of the car from with Erika, and went up and got in the car with Nick, and then drove around town looking for her.

A.    No, actually what had happened, um, I was -- me and Erika had got in an argument at my house -- at our apartment, because she never came home that night. Supposedly that Erika -- or I mean Leah came up missing. I had walked to the store because we got in an argument. I was

Exhibit 5002 at 772

75

*W. Sero*

going to go get stuff for breakfast.  And in between Sanford Heights and the 7Eleven, Nick was driving past me and he had turned around and came back and asked me if I'd seen Leah, now.  That's -- that's exactly what went on.

And I'm all, No, I haven't.  I said, Why?  And he said, Well, I think she's missing.  And I was like, Well, that's kind of strange, and how do you know this?  And he goes, Well, I seen her last night.  And he was all, Well, do you want to get in the car?  And I said, Well, yeah, sure, you can give me a ride to McKay's.

And I hopped in the car with him and he actually drove me up the street to -- I don't know.  We went by McKay's and then he went up the Danny Lapine's house and I actually got out of the car at Danny Lapine's house and walked back down to McKay's.

Q.    Okay.

A.    And he just talked to me the whole time, and that was that.  He actually asked me at that time if I knew where to pick up any marijuana, and that's what he wanted.

This is all -- those other -- the police reports have all this stuff.  I don't know if you've seen them, but that's what happened.  And that's what -- that's where you would actually get somebody saying that I had been in his vehicle.  And that was the first and last time that I'd ever been in his vehicle, was that one time.

Exhibit 5002 at 773

*W. Sero*

Q.    And what car -- kind of car was it?

A.    It was a Mustang.  '78, I think, or something like that.

Q.    And where did he pick you up?

A.    Um, he picked me up -- you know where the -- the turn to LaVerne -- is that LaVerne park?

Q.    Right.

A.    Right there.  I was walking towards --

Q.    You were on Central, the main drag there, down --

A.    Yes.  Yes, sir.  Yeah.

Q.    And he picks you up there.  Just -- you're just past the high school, then?

A.    Yeah, just past -- right down there where it goes into that little valley and comes back up the little hill there.

Q.    Okay.

A.    Yeah.

Q.    And so he drove you to McKay's, then you went up to Lapines' --

A.    Well, we didn't even stop at McKay's.  He was going to -- and then he made the turn there and he went to Danny Lapine's.  He used -- I don't know where I'm at right here, but it was right over here by the -- the park, and up behind.

Q.    I have it.

Exhibit 5002 at 774

*W. Sero*

A.    Yeah.  I don't know if you have all that information, but yeah.  Um, yeah, that's where we went.  And I got out of his vehicle there and I walked down to McKay's.

Q.    When you're riding with Nick that day, what is he talking about?  What is he asking you?

A.    Oh, he wasn't asking me anything.  He was telling me that his girlfriend was missing.  He wasn't asking me anything.

Q.    Okay.

A.    He says, I know she's missing.  Something's wrong.  She would have called me by now.  And he just went on and on.  And that was -- that was it.

Q.    Now, you said he tried to score some dope from you or something?

A.    That's -- no, he asked me if I knew where to get any weed at.

Q.    Okay.

A.    So, yeah, I don't know why he even -- you know, at the time, to me, to -- to this day, I don't know why he just asked me that.

Q.    Okay.

A.    You know, I'm not sure.

Q.    How well did you and Nick get along?

A.    Me and Nick?

Q.    Yeah.

Exhibit 5002 at 775

*W. Sero*

A.    Um, like I said, I've only met him briefly a few times from -- from my little brother -- or Erika's little brother.  But I can't say that we had a relationship, really. Just, you know, a Hi and a, Hey, how you doing, or whatever. He'd come down and play basketball at Fifth Street park once in a while with a few of his friends because he had a friend that lived across the street from there.  But, you know, that would be the only time that I really ever said, you know, Hey, what's going on, would be then.  And then that day that he picked me up.

So I don't -- you know, he knew that I was Erika's boyfriend, and he was friends with Ryan, so.

Q.    Later on that day -- well, Alicia Michaud, you indicated you knew Alicia Michaud.

A.    Yes.

Q.    Did -- were you ever with Alicia Michaud over at Danny Lapine's place?

A.    Yeah, I believe I was over there one night.  We was just talking about this the other day, me and the officers.  Yeah, I had watched a movie over there with her at one point in time.  I don't remember exactly when it was, but it was -- yeah.

Q.    And was it in -- was -- did Alicia -- was there some -- well, did Nick show up while you're watching this movie?

Exhibit 5002 at 776

*W. Sero*

A.    Mm, I can't -- I really can't comment on that.  I had been drinking, so I'm not sure.  I can't really say that he did or didn't.

Q.    How did Alicia behave that night, do you recall?

A.    Fine.

Q.    We've heard that -- testimony that at this -- where you're watching a movie, Alicia's there, Danny Lapine's there, and his girlfriend's there.  And you're watching a movie.  About 45 minutes into it or so, then Nick McGuffin shows up and he talks about Leah being missing and that you asked him what the -- that what did Leah look like.  And he said something about blonde hair, petite, big boobs.

Do you recall that at all?

A.    Uh, it doesn't ring a bell.  I mean, the officers asked me the same thing.  I don't -- like -- to my -- to my knowledge, no, it doesn't.  It doesn't.  Not at all.

Q.    And that Alicia got upset, ran outside, was crying.  And that you had gone outside and comforted her and brought her back in.

A.    Well, at that point in time we had actually left and she got pulled over for running a stop sign, and I got arrested, actually.

Q.    Okay.

A.    So -- because I had a DOC warrant.

Q.    Department of Corrections warrant?

Exhibit 5002 at 777

*W. Sero*

A.    Yes.

Q.    You got a parole hold or probation violation.

A.    It was a probation violation, is what it was.

A parole violation, yeah.

Q.    Okay.  Mr. Sero, at the time that this was going on, I guess what I'm trying to -- I'm trying to figure out why people would want to run around and say you were involved in the death of Leah Freeman?

A.    I have no idea.  I'm still trying to figure that out.  I am.  I don't -- you know.  I did -- I didn't barely know her, didn't hang out with those -- those group.  They were a lot younger than me.  I hung out with Daniel and Alicia -- Alicia that night.

You know, it was just something that happ -- you know, she's like, Hey, you want to come watch a movie or whatever?  I think she had just gotten her license (indiscernible).  You know, and all -- she had her dad's BMW.  You know, I said, Yeah, whatever.

And we went and watched a movie for a little while, and then she ended up taking me -- well, actually, like I said, I got -- got arrested and went to jail.

But other than that, I don't -- I don't know.  Still to this day I'm trying to figure out why somebody threw me under the bus, and allegations were made and fingers were pointed, you know.

Exhibit 5002 at 778

*W. Sero*

Q.    Okay.  What I'd like to ask you about now is we heard some testimony -- well, do you know -- you probably do. I just want to -- I think her name was Haga.

A.    Say again?

Q.    Angela Haga, I believe her name was.

A.    Angela Haga.

Q.    Yeah.

A.    Yeah.

Q.    Be her, and her husband --

A.    Tim.

Q.    Yeah, Tim.

A.    Yeah.  I -- I worked for his dad, actually.  I logged with his -- his father.

Q.    Did you guys, you know, baby-sit back and forth? You know, somebody want to have a night out and you'd watch their kids?

A.    Yes, sir.  Yeah.

Q.    And vice versa?

A.    Most definitely, yeah.

Q.    Okay.  Angela tells us that she thinks the night that Leah Freeman disappeared was a night that Erika and you watched their kids.  Does that ring any bells with you?

A.    Uh, it was around the same time.  We was -- yeah. It was -- it was with -- like I said, you know, the dates. It -- the only reason why I know what I was doing around that

Exhibit 5002 at 779

*W. Sero*

time, because it was big deal around time -- around the town that Leah had came up missing.  And so there was these things going on with me and Erika, where we actually -- we were trying to work our relationship out.  We were fighting and stuff like that.  And she was working at the Mill Casino and she was working weird hours, weird shifts, and getting home later.

And so Angela had actually watched our -- our kids at the time.  And, you know, it was this -- she was trying to help us out so we could work our relationship out.  But I don't -- that night I actually had our kids at the -- at the house, at our apartment, until, I don't know, 9:30 or 10:00.

Q.    Okay.

A.    And --

Q.    Well, what I'm trying to figure out, where were you that night, that we can prove where you were that night.

A.    Yeah, well, I was at home.  And you can -- actually, Ruth Ann Clausen knows that I was at home, also.  I don't know if you guys got that information or not, but --

Q.    Who?

A.    Ruth Ann Clausen.  That's Erika's mother.

Q.    Ruth Ann Clausen?

A.    Yes.  She came and picked her -- I don't know.  I mean --

Exhibit 5002 at 780

*W. Sero*

Q.    Picked up the --

A.    The kids, about nine -- I was thinking 9:30 or 10:00 that night.  Maybe a -- maybe a little later, because Erika's shift got over at 10:00, so.

Q.    Okay.  I think I'm going to have to correct you then, because we've got Erika's work records for that night.

A.    Okay.

Q.    On June 28th, the day that Leah disappeared, Erika was not working that day.

A.    Oh, she wasn't working?

Q.    No.

A.    But I did have the kids at the house, though. She was not at -- she was not at home.  And like I say, we were -- we were trying to work our relationship out.

Q.    Okay.  Angela Haga says that she left her kids there with you and Erika that night so they could -- they could go out.

A.    Yeah.  Well, that would have been earlier in the day, maybe, but I ended up with the kids and Ruth Ann came and picked them up from me.

Q.    Ruth Ann did?

A.    That's -- yes.  That's -- that's the truth.

Q.    All right.

A.    She was gone.  See, I thought she was working a shift there at the casino.  She had lied to me then, because

Exhibit 5002 at 781

*W. Sero*

that's where -- to my knowledge she was at work.

Q.    Okay.  And after Ruth Ann came and got the kids --

A.    Mm-hmm.

Q.    What happened then?  What did you do that night?

A.    Um, I was -- basically I was at the house -- um, and I was by myself, and then I actually went over to the neighbor's house for a little while and watched some movies and drank some beer over there, probably till about 1:30 or 2:00 or something.  One o'clock in the morning, or something like that.  And then --

Q.    Did you invite somebody to go smoke some marijuana with you?

A.    I did -- I did -- actually, you know, I don't recall doing that, but I -- I was partying, so I may have because I -- at that point in time I think I did have some marijuana on me, and that probably -- I mean, that was -- that's the truth, yeah.

But it was -- see, how it got confused, because there was a -- there was another neighbor that Erika was friends with, that I didn't get along with, and there was a neighbor that lived right in the same complex as us.  Because there was another one on the other side of the fence.  I think it's low income or low housing or whatever it is there. I was over there probably till about 1:30 or 2:00.  One

Exhibit 5002 at 782

*W. Sero*

o'clock in the morning, I think, and then I went home and went to bed.

And Erika came home probably about -- I think about 8:30 is when I walked to the store, right around there. So.

Q. I guess -- well, Mr. Sero, let me ask you this. Again, I'm not trying to embarrass you or anything. We're just trying to figure out what's going on here.

At the time that this was going on, did -- you were involved in drugs; and it would be safe to say meth?

A. Yeah, I was working at that time too, but I was. Yeah, I was.

Q. Okay. And did you have a reputation of being a mean guy?

A. Um, it -- yeah, it was said that I was. I mean, not -- not -- I just didn't go around with a chip on my shoulder all the time or anything like that, but, you know, I didn't --

Q. Did you ever --

A. I didn't snap on people or anything like that. You know, I didn't --

Q. Okay. Did you beat anybody up? Get in fights?

A. Um, I've got -- I've gotten in a couple fights. Yeah, I did get in a couple of fights over the years.

Q. Did your relationship with Erika -- and, you

Exhibit 5002 at 783

*W. Sero*

know, we're talking ten years ago --

A.    Yeah.

Q.    -- so the statute of limitations has run, so you don't need to worry about getting in trouble.

A.    Oh, yeah, I understand.

Q.    But did you and Erika, did you ever hit her or she hit you?

A.    She hit me.  We had some -- there was a domestic dispute that had actually happened.  She was -- she was violent.  And she did -- you know, I mean, I just-- I didn't I never hit her.  I never put my hands on her or anything.  I protected myself mostly.

I remember one time I had to actually bring her out to her mom's house because she was just acting crazy and she tried to -- she -- I don't know.  She punched me on my mouth and then gave me a bloody nose at the same time, and that -- you know, her mom was -- met me in between and took her out -- took her out of the house, and took the kids out to her house.  But that -- it's all on record.  That was actually -- that was actually out in Myrtle Point, is were that was at.  When I lived in Myrtle Point.  And there was cops -- I went and talked to them, though, because I didn't --

Q.    Right.

A.    It was something that needed to be, you know,

Exhibit 5002 at 784

*W. Sero*

taken -- to address before it got out of hand.

Q.    Right.  Now, at some point in time you were living with some people, I want to say Rocky Pierce --

A.    Rocky Pierce, yes, and Deb -- and Debbie Pierce, that's his wife.

Q.    And that would have been in early August of 2000?

A.    Oh, something like that, yeah.  That's after she moved out -- after we moved out of the apartment, yeah, I didn't have a place to live and they -- they said I could stay.  I was logging, and working actually at the time.  And I was -- had my stuff there, and I would shower and change and stuff like that, and was trying to, you know, get back on my feet and get my own place.

Q.    Then the police were looking for you again.  I mean, you talked about how you'd been at Danny Lapine's place with Alicia Michaud --

A.    Yes.

Q.    -- and you were on your way home, she ran a stop sign, warrant popped up for you, you went to jail.

A.    Yes.

Q.    How long were you in jail?

A.    I did a drop.  I'd only have to spend -- that's ten -- ten days or --

Q.    Okay.  So you're --

A.    Maybe -- I can't be sure, because it's been so

Exhibit 5002 at 785

long.  But --

Q.    But once you got out, that would have been sometime in July?

A.    You -- yeah, something like that, I believe.  I believe.

Q.    Right.

A.    Like I said, I'm not --

Q.    And then you moved in with Rocky Pierce over in Myrtle Point?

A.    Yes, sir.

Q.    And then again the Department of Corrections were looking for you again; is that right?

A.    Yeah.  Yes.

Q.    You violated your probation again somehow, in some way?

A.    Yes, sir.  Yep.

Q.    And so the police were looking for you and they went over to Rocky's place?

A.    Yes, they did.

Q.    And you had a bunch of property there?

A.    They took some of my property over there.  Yes, they did.

Q.    They had a bunch of clothes there?

A.    Yes.

Q.    And we've heard something about some bloody

Exhibit 5002 at 786

clothing that got left at Tom Stemmerman's place?

A.    Yeah.

Q.    Okay.  Why don't you tell us about the clothing that ended up at Tom Stemmerman's place.

A.    Um, actually, we were just talking about that.  I was with the officers out there.  There was -- I don't know what the clothes are or where they came from, but to this day, what the police officers have told to me, that's never been proven to be blood.  It could be rust or whatever, but they did test.  I believe is what they said, they're not sure.  But -- because I asked about my property today.  They took some - they took some caulk boots, brand-new boots that I used for logging and had worn maybe for two weeks.  And a Nike fleece that my daughter had gotten me for my birthday at the time, and a few other things.  And I don't -- I don't know where the clothes came from or what, you know, because they asked me to find --

Q.    Okay.  How did you come to put clothes out at Tom Stemmerman's?

A.    I never -- that's what I'm saying.  I never brought anything over there.  I don't know why he'd say that they're mine or how they got those clothes.  Because at the time I wasn't even staying at Tom's house.  Erika had some of her possessions stored there in a -- a fifth-wheel.  And I don't know.  I have no idea.

Exhibit 5002 at 787

90

*W. Sero*

Q.    And when you say Erika had some things stored out there at Stemmerman's place --

A.    Yes.  It was a -- it was actually not a fifth-wheel but a trailer.

Q.    A trailer?

A.    Yes.

Q.    All right.  Do you know how those things got out there?

A.    I believe -- I know one time I made a trip out there with a friend of mine.  I'm not even sure who we went with.  We brought some stuff out there for her.  But her and Tom were friends also, so she had brought stuff out there via Tom's house.

Q.    But you helped her take some stuff?

A.    At one point I brought some -- like my daughter's stuffed animals and stuff like that, we had brought out there.  She had a whole Winnie-the-Pooh set, and we brought that stuff out there.

Q.    No, you got arrested the second time that summer, you were over at -- in Bandon.  Is that right?

A.    Yeah, I got arrested at gunpoint at the restaurant up there.  Yes.

Q.    At the Inn at Face Rock?

A.    Yes.

Q.    And you were brought back over here to jail?

Exhibit 5002 at 788

*W. Sero*

A.    Yes.

Q.    One of the TV stations, I forget which one it was --

A.    KCBY.  It was Channel 11 at the time.

Q.    -- put out that you'd been arrested for --

A.    For murder of Leah Freeman, yeah.

Q.    And you had not been arrested for the murder of Leah Freeman?

A.    No, sir, I wasn't.  No.

Q.    In fact, you filed a lawsuit or threatened to file a lawsuit?

A.    Yes.  No, I did file a lawsuit.

Q.    And for defamation of character?

A.    Yes, sir.

Q.    And did they end up paying you money?

A.    Yes, they did.

Q.    So you won your lawsuit?

A.    Yes, I did.

Q.    Now, the police came and talked to you about the clothing or whatever they had taken from --

A.    They actually never have talked to me.

Q.    Okay.  Officer -- I think it was a detective came to you in jail, said, Hey, can we take -- can we analyze the clothes?

A.    Yeah.  Yeah.

Exhibit 5002 at 789

*W. Sero*

Q.    And you gave them permission to do it?

A.    Yes, sir, I did.  Yes.

Q.    And you gave them permission to take whatever there was out --

A.    Whatever -- exactly.  Yeah.

Q.    -- at the Stemmerman place?

A.    Yes, sir.

Q.    And if I understand you correctly -- again, I'm not trying to put words in your mouth, but when the police came and asked if you could -- if they could look at the clothes, both at Rocky Pierce's and at the Stemmerman place, you had nothing to hide?

A.    Exactly, yeah.

Q.    And so you gave them permission to do that?

A.    Well, they had already done it.  They had already taken the stuff.  They never asked me, before they did it.

Q.    All right.  But you gave them permission to search it and --

A.    So there's a difference.  It was -- I never gave them permission to take my stuff.

Q.    Okay.

A.    I want to clarify that right now, because I -- at the time I was upset about it because I wasn't there and they took stuff at our -- already, and then they tried to give me a receipt after the fact and asked me if they could have

Exhibit 5002 at 790

*W. Sero*

permission to take -- they had already had the stuff. If they wanted to --

Q.    The stuff from Rocky Pierce's house.

A.    And -- yes, and from Tom Stemmerman's house.

Q.    Okay.

A.    I think. I don't know, because they -- to this day, when I ask questions about it, they get mad. So --

Q.    Well, if I were to tell you they did have the stuff from Rocky Pierce --

A.    Yeah.

Q.    Okay. And -- but the stuff at Stemmerman's they didn't have and waited till they talked to you. Does that sound about right?

A.    It could be, but at the time I was upset about the situation because they had already taken some stuff and they didn't -- they never -- you know, which is -- it's oke -- it is what it is. They're going to do what they want to do. But yeah, I did give them permission.

Q.    Right. Okay. Now, when I guess -- you know, I've kind of been hedging around this, so I'm just going to flat-out ask you.

Did you have anything to do with the death of Leah Freeman?

A.    No, sir.

Q.    Has anybody told you that they personally have

Exhibit 5002 at 791

*W. Sero*

been involved in the death of Leah Freeman?

A.    No.

Q.    Have you ever told someone that you were involved in the death of Leah Freeman?

A.    No, sir.

Q.    Has anyone told you that they were a witness to what happened to Leah Freeman?

A.    No.  Huh-uh.

Q.    Do you have -- I think I've asked you this, but I'll ask it again.  Do you have any knowledge of yourself what happened to her?

A.    No, sir.

Q.    Is there anything about this case that you -- other than what we've talked about already, that you think we need to know about?

A.    Well, I can say this much.  I know when Nick picked me up that day, I -- to my knowledge, since I'm a meth user, he was high on methamphetamine or some type of -- was sweating really bad, he was perspiring.  He had his shirt off.  He was just -- yeah.  He wasn't -- he wasn't acting like somebody that was able to make an important decision of any type.  He shouldn't have been driving on the road, shouldn't have been doing whatever it was that --

Q.    Is there anybody out there that you are aware of that would be so ticked off at you that they'd be spreading

Exhibit 5002 at 792

*W. Sero*

the rumor around that you killed Leah Freeman?

A.    No, sir.  I've been trying to figure that out for however long it's been going on now, you know.  Ten years. However long it is.

Q.    Did you have any reason to see Leah Freeman dead?

A.    No, sir.

MR. FRASIER:  I think that's all the questions I have for Mr. Sero.  Does the grand jury want to ask any?

GRAND JUROR:  I do.

Did you know anybody that had a Jeep Wagoneer?

THE WITNESS:  No, huh-uh.

MR. FRASIER:  Any other questions?

GRAND JUROR:  What color was Alicia's dad's BMW? Do you remember?

THE WITNESS:  I believe it was a little red car. I think it's red, I believe.

GRAND JUROR:  Erika -- do you know where Erika's --

THE WITNESS:  I'm trying to help you guys out.  I really am.

GRAND JUROR:  Yeah.

THE WITNESS:  She's up there in Washington, but I don't -- we don't really get along right now because she's still using.  She's in active addiction right now, and I'm -- you know, I'm always going to be in recovery and doing what

Exhibit 5002 at 793

*W. Sero*

I'm doing.  But I'm -- I've just talked to these guys out there, and I'm going to try to give her the money to get on a bus to come here.

BY MR. FRASIER:

Q.    Because I really would like her to --

A.    Yeah, I know that.  I know.  And we tried to get ahold of her before we came down here, but she couldn't -- she couldn't ride with me because my girlfriend and her don't really get along.  So -- but, I mean, I'm willing to pay the bus fare and everything for her to come down here.

Q.    Well, I'll pay for the bus fare.

A.    Oh, I understand that.  But, I mean, if that's an excuse, she can't use it, because my mom -- my mom and I will help her.  But we gave an address -- or not an address but her number, and she was staying with my sister, but she's not -- she's not now.  They got in an argument, so.

Q.    Okay.  Well, I appreciate that.  But if you find out where she's at, I -- we really need to --

A.    Yeah, I'm going to contact them and let them know.

Q.    Okay.  Any other questions?

A.    And if I can get an address for you, I will get the address in.

Q.    Yeah, that's what I'd really like, is an address.

A.    Yeah, I know.  I know.

Exhibit 5002 at 794

*K. Steinhoff*

MR. FRASIER:  Okay.  Any other questions?  Okay.
I think that will do it.

THE WITNESS:  All right.  Thanks, Paul.

MR. FRASIER:  Thank you.  You're excused.

### TESTIMONY OF KRISTEN STEINHOFF

(Witness sworn.)

BY MR. FRASIER:

Q.    Okay.  First of all, this is the grand jury for
Coos County, and we are looking into the disappearance and
death of Leah Freeman.  I have to advise you that we're
recording the proceedings here today.  You understand that?

A.    Mm-hmm.

Q.    Okay?

First of all, could you tell us your name,
please, and where you live.

A.    Kristen Steinhoff.  I live in North Bend.

Q.    And how old are you?

A.    28.

Q.    And have you lived here in Coquille?

A.    Yes.

Q.    And did you go to school here in Coquille?

A.    Yes.

Q.    Did you graduate from high school?

A.    No.

Q.    Do you know an individual named Nick McGuffin?

Exhibit 5002 at 795

*K. Steinhoff*

A.    Yes.

Q.    How long have you known Mr. McGuffin?

A.    Mm, since I was a freshman in high school.

Q.    Are you the same age as Nick McGuffin?

A.    No.

Q.    Is he older than you?

A.    Yeah.

Q.    How much older?

A.    I think he's a couple of years older than me.

Q.    All right.  Did you know Leah Freeman?

A.    No.

Q.    Did you ever meet her?

A.    No.

Q.    Were you aware of a relationship between Nick McGuffin and Leah Freeman?

A.    Yeah.

Q.    How did you know about this relationship?

A.    Nick always talked about her.

Q.    In the summer of 2000, where were you living then?

A.    On Dean Street, at my grandma's.

Q.    And who else was living there, besides your grandmother?

A.    Um, I think my mom was living there too.

Q.    Your mother is Heather McMullen?

Exhibit 5002 at 796

*K. Steinhoff*

A.    Yeah.

Q.    All right.  What I'd like to start off with is -- I guess I want to start off with the events of June 28th, 2000.  That's the day that Leah Freeman disappeared.  Were you at the Dean Street house that day?

A.    Yeah.

Q.    How -- were you there all day?

A.    No.

Q.    Why don't you tell us about your day.  What do you remember about that day?

A.    Um, did a lot of drugs then.

Q.    What kind of drugs did --

A.    Meth.  So I don't remember exactly what I did that day, but I probably just drove around and hung out with friends that day.

Q.    What kind of car did you have?

A.    A Hyundai Elantra.

Q.    What color was it?

A.    Purple.

Q.    There's various shades of purple.  Kind of a light purple?  Dark purple?

A.    Yeah, light purple, silver-ish color.

Q.    And how long have you had that car?  How long did you have that car?

A.    Since I was 16.

Exhibit 5002 at 797

100

*K. Steinhoff*

Q.    Did you have problems with that car?

A.    Yeah, the transmission or something in it was messed up.

Q.    Now, on June 28th of 2000, did you know or were you acquainted with an individual named Zack, Zack Elderkin?

A.    Yeah, he was my mom's friend.

Q.    Was he there at the house that day?

A.    Yeah.

Q.    And what type of car was he driving?

A.    A purple Kia.

Q.    Did you ask to borrow his car?

A.    Yeah.

Q.    Why did you borrow his car?

A.    So I could drive around and go out to one of my friend's house.

Q.    What was wrong with your car?

A.    The transmission.

Q.    In the early evening hours, where were you?  Were you at your mom's house, or your grandmother's house?

A.    Mm-hmm.  Yeah.

Q.    Yes or no?

A.    Yes.

Q.    Okay.  Did you go anyplace?  I mean, drive your car, drive your Hyundai anywhere or anything like that that day?

Exhibit 5002 at 798

*K. Steinhoff*

A.    I can't remember.  I'm not sure.  I don't know. If I did, it wouldn't have been too far because it was really messed up.

Q.    All right.  Now, Mr. Elderkin agrees to loan you his car.  Is that right?

A.    Mm-hmm.

Q.    And did he have some conditions about when you could -- you had to have the car back?

A.    Yeah, it was like 6:00 in the morning because he had to go to Eugene or something.

Q.    So what did you do?  Did you have to take Mr. Elderkin home so you could borrow the car?

A.    Yeah.

Q.    Where did you take him?

A.    Um, he lived on high -- the highway.  I don't remember the road.

Q.    Were you driving out towards Coos Bay?

A.    Yeah.

Q.    Did you turn off --

A.    It was right before the big corner by Green Acres store.

Q.    Okay.  So you turned off there and dropped him off at some house there?

A.    Mm-hmm.  Mm-hmm.

Q.    Did you pick anybody up at that house?

Exhibit 5002 at 799

*K. Steinhoff*

A.    No.

Q.    Did you -- when you drove Mr. Elderkin home, who all was in the car?

A.    Me and him and I think his daughter was in the back seat.

Q.    Do you know an individual named Bill Sero?

A.    Yeah.

Q.    Was Mr. Sero in the car?

A.    No.

Q.    Do you know a lady named Sarah Noah?

A.    Yeah.

Q.    Sarah tells us that Bill was in the car that day. Was there ever a time that you were in your car and you went out there and Sero was in your car?

A.    (Pause.)  No, I think that he was at my grandma's house earlier that day and I had given him a ride to his house.

Q.    Okay.

A.    But I'm not sure if that's the same day or not.

Q.    You'd given Sero a ride in your car?

A.    Yeah, mm-hmm.

Q.    In your Hyundai?

A.    Yeah.

Q.    When you're driving out to -- towards Green Acres, do you see Nick McGuffin?

Exhibit 5002 at 800

A.    Yeah.

Q.    Can you tell us where you saw Mr. McGuffin?

A.    At that old Econo-Rooter place.

Q.    At the time it was the Maytag?

A.    Yeah.

Q.    All right.  What happened when you saw Nick at the Econo-Rooter place or the Maytag place?

A.    He was walking in circles saying he couldn't find Leah.

Q.    Did you stop and talk with him?

A.    Yeah, because he was acting really weird.  There was no car, nobody there with him.  It was just him walking in circles in the dark saying he couldn't find Leah.

Q.    Did he say anything else about Leah?

A.    No, he just said he couldn't find her.

Q.    Did he say anything like, I hope she wasn't doing anything stupid?

A.    I can't remember.

Q.    You can't?

Did Nick -- well, did he confide -- did he come and see you on the -- I'm just going to ask in general.  Nick had several girlfriends in his past, right?

A.    I think so.

Q.    And when things were going bad between him and his girlfriends, would he come and talk to you about them

Exhibit 5002 at 801

then?

A.    No.

Q.    I have a tape-recorded interview of you with Officer Lee.  Do you recall talking to him at the park here in 2000?

A.    Kinda.

Q.    In September 2000?

And in that recorded interview, you told him that Nick had come to you several times in the past when things weren't working out with Freeman or his other girlfriends.

A.    I only remember -- I only knew one of his girlfriends recently -- well, from that time it was Megan Pinkley (phonetic).  And she was my best friend, but I don't really remember him having a lot of girlfriends.  I remember him hanging out with a lot of girls.

Q.    Okay.  Well, I'm getting back to what you told the police back in 2000.  You told them that Nick came to you several times when things weren't working out with his girlfriends.  Did --

A.    He might have.  If I said that, then it's probably true.

Q.    Okay.

A.    I don't really remember a lot of details.

Q.    And you told the police at that time that he would come over and talk at your house?

Exhibit 5002 at 802

*K. Steinhoff*

A.    Yeah.

Q.    And he did do that?

A.    Mm-hmm.

Q.    You know Scott Hamilton?

A.    Yeah.

Q.    And how do you know Scott?

A.    I went out with Scott.

Q.    Now, you saw Nick at the Maytag place, you drove Mr. Elderkin to his place, then you came back?

A.    Mm-hmm.

Q.    What did you do when you came back?

A.    I think I went to my house and then Nick showed up there.

Q.    All right.  Let me back up.  When you saw Nick at the Maytag place, do you recall what kind of clothing he had on?

A.    (Pause.)  Um, I don't -- I don't know.  I don't remember.

Q.    Well, did he have different clothes on when he came in later?

A.    Yeah.

Q.    Okay.  Tell -- well, what was different?

A.    His pants and his shirt.  I had noticed, um, that he had changed.  Because I know -- I remember at one point he was wearing khakis and a white T-shirt.

Exhibit 5002 at 803

106

*K. Steinhoff*

Q.     And when he came over to your house?

A.     He was wearing something different.

Q.     Something different, okay.

Now, did Scott Hamilton, did he try to come by? Was he trying to see you that night too?

A.     He might have.

Q.     Going back to the recorded interview you had with Officer Lee, you said that the night Nick -- after Nick came over to your house, Scott Hamilton came by and you kept telling Hamilton to come back later.

A.     Maybe.

Q.     Maybe?

A.     Probably, if it says that, then yeah.

Q.     Right.  What did Nick and you do after he came to your house?

A.     Did meth.

Q.     Excuse me?

A.     We smoked meth.

Q.     You both smoked meth together?

A.     Mm-hmm.

Q.     Did you get into the Kia and go look for Leah?

A.     Yeah.

Q.     How long did you go look for Leah?

A.     Not very long.  Maybe half an hour.  Maybe.  I'm not for sure.

Exhibit 5002 at 804

*K. Steinhoff*

Q.    Where did you drive to look for her?

A.    We drove around town and out to the Sennetts' road, and then turned around.

Q.    And how far -- that's not very far out Fairview Road?

A.    Huh-uh.  No.

Q.    Did you drive anywhere else?

A.    No.

Q.    Did you ever see Leah that night?

A.    No.

Q.    Did you go and get gas for the car?

A.    I can't remember.

Q.    Okay.  You told the officer, and it's recorded, you -- that they -- after you'd gone to the Fairview house, you went back to Kristen's home, and then you left and went to the gas station at the Haley building, and you -- Nick used the gas card to put gas in the car.

A.    I said that?

Q.    (Indiscernible.)

A.    I don't know.  If I said it, then yeah.  I can't remember.

Q.    All right.  What happened when you were -- you went, drove around for about a half hour or so, you come back to your house.

        What happens with Nick and you at your house?

Exhibit 5002 at 805

A.    We kissed and stuff.

Q.    When you say kissed and stuff, what do you mean?

A.    We kissed and stuff, and then almost had sex, but we didn't.

Q.    Now, he is supposedly boyfriend of Leah Freeman. Is that right?

A.    Mm-hmm.

Q.    And he's telling you that night that Leah is missing.  Is that correct?

A.    Mm-hmm.

Q.    And he's trying to have sex with you?

A.    Yeah.

Q.    So he kisses you?

A.    Yeah.

Q.    I don't mean to embarrass you, but he's touching you?  Is that correct?

A.    Mm-hmm.

Q.    What are you telling him during this time frame that he's trying to do this?

A.    I don't know.  It was just really weird.

Q.    Are you saying, you know, Hey, wait a minute, Nick.  You've got a girlfriend.  You know, this type of stuff, what are you doing?

Are you saying anything like that?

A.    I said that we shouldn't be doing anything.

Exhibit 5002 at 806

Q.    Why?

A.    Because he's got a girlfriend.

And I think I had a boyfriend; I think Scott.

Q.    Okay.  Does he actually expose himself to you?

A.    Yeah.

Q.    He takes his pants down, he actually wants to have sexual intercourse with you?

A.    Yeah.

Q.    And you keep telling him what?

A.    No.

Q.    Does he eventually stop?

A.    Yeah, we stopped.

Q.    Now, this Bill Sero character, do you know him?

A.    Yeah, kind of.  Well, I don't --

Q.    How about Tom Stemmerman?

A.    I only met him a couple times, through Sherre Bolger.

Q.    Part of the reason I have you here today is we've heard from several witnesses that have sworn under oath that they have heard you say that Bill Sero or Tom Stemmerman told you that they killed Leah Freeman.

A.    No, Sherre said that they told her that.  That there was a --

Q.    Okay.  Listen to my question.  Because my question is we've had people who have quoted you directly

Exhibit 5002 at 807

*K. Steinhoff*

saying that Bill Sero told you or Tom Stemmerman told you that they ran over Leah Freeman with a car.

A.    No.

Q.    Did Bill Sero ever tell you that?

A.    No.

Q.    Did Tom Stemmerman ever tell you that?

A.    No.

Q.    Did you ever tell anybody that?

A.    No.

Q.    That these people had told you this?

A.    No.

Q.    We've heard from several witnesses today who've indicated that you told them that you were driving the car when Leah Freeman was hit by a car.

A.    No.

Q.    No what?

A.    No, I didn't do that.  I've heard lots of rumors, even about myself.

Q.    Has anybody threatened you to keep your mouth shut?

A.    Yeah.

Q.    Who?

A.    Nick.

Q.    When?

A.    Um, right before the last grand jury.

Exhibit 5002 at 808

*K. Steinhoff*

Q.    And that was back --

A.    I think it was in 2000.

Q.    Okay.  What happened?

A.    Um --

Q.    Where were you?

A.    Um, at that church across from the junior high.

Q.    And what happened?

A.    He just told me to keep my F-ing mouth shut.

Q.    All right.

A.    And not to tell them that he was even at my house that night.

Q.    Did Nick ever come over to your house when you were living with your grandmother, and tell you to keep your mouth shut?

A.    No, he came over, and him and Ricky took me out to Poe Lane.

Q.    Okay.  We'll get to that in a second.

We've heard testimony today from an eyewitness that Nick and his father came over to your house when you were living with your grandmother.  That you were in the bathroom, that Nick told you you needed to keep your mouth shut or the same thing would happen to you that happened to Leah.

A.    No, I've never even met Nick's dad.

Q.    Well, I didn't say Nick's dad.  This is Nick

Exhibit 5002 at 809

*K. Steinhoff*

telling you this.

A.    Mm-hmm.

Q.    Did Nick come over to your house and, in the bathroom, tell you to keep your mouth shut?  Yes or no?

A.    Yes.

Q.    And that was -- you recall this as being at your grandmother's house?

A.    Mm-hmm.

Q.    Was there another person with him?

A.    I think it was Ricky Crook.

Q.    Okay.  Well, I'll talk about Ricky in a second, but in the bathroom, was there anybody else?

A.    Hmm-mm.

Q.    Now, have you ever told someone -- well, let's back up.

      We had a witness here today swear under oath that you told her that you were driving the car, that Nick McGuffin was in the car, that Ricky Crook was in the car. And as you were driving, you see Leah, and that Nick reaches over, grabs the steering wheel, jerks the wheel, and then the car hit Leah?

A.    No.

Q.    You never told anybody that?

A.    No.  Because Tina Lehman called me.  I had to change my phone number.  She called me and told me, Do you

Exhibit 5002 at 810

*K. Steinhoff*

remember standing in your grandma's kitchen telling me and your grandma that you and Nick were driving down the road and he yanked the steering wheel, that it ran over Leah?  And I never said that, ever.

Q.    Here's the problem I'm having, and I think the grand jury's going to have this problem.  We've had four, five, six people come in here and swear under oath that you told them certain things.  And you're telling us it never happened.

A.    No.

Q.    Why should we believe you?

A.    Because it's the truth.  I'm not lying.

Q.    Well, why would these other people come in and make up these stories?

A.    I don't know.

Q.    What have you done to people like Tina Lehman that would cause them to come in and say these things?

A.    I don't know.  I didn't have anything to do with this.  I wouldn't be involved.  And if I knew anything, I would have told.

Q.    Well, let's talk about that for a minute.

When you talked to the police -- you've talked to the police several times in the past, have you not?

A.    Mm-hmm.

Q.    You never told them about Nick coming over to

Exhibit 5002 at 811

*K. Steinhoff*

your house when you lived with your grandmother, and
threatening you, did you?

A.    Yeah, I think I did.

Q.    No.  Because today is the first time you were
asked that, by my instruction.  And you've -- you initially
said no, it didn't happen.  But then when I pressed you, you
now tell us it did occur.

A.    He -- yeah.  He was --

Q.    Your story was it happened at some church, but
when I pressed you, you came back and now said it's at your
house.  So you haven't been truthful with the police through
this, have you?

A.    Yeah, I told that when they came over to my house
the last time, when I told them about Poe Lane, I told them
the same thing.

Q.    Well, why didn't you tell them the first time
when they came and talked to you about this?

      Isn't it true the police --

A.    I told Dan Lee and David Zavala about them taking
me out to Poe Lane right the day after it happened.

Q.    Okay.  But you never --

A.    And they said that they --

Q.    -- told them about Nick McGuffin threatening you?

A.    Yes, I did too.

Q.    Okay.  If I were to get that tape recorder out

Exhibit 5002 at 812

*K. Steinhoff*

and play that recording for you?

A.     I don't know.

Q.     Okay.  How about -- you had another recorded interview with a detective named Davis.  Do you recall that?

A.     Hmm-mm.

Q.     Well, let me ask you this.  When you spoke with Dan Lee, did you ever tell Dan Lee that Nick McGuffin tried to have sex with you that night?

A.     Yep.

Q.     Okay.  All right.  And if the tape says differently?

A.     I've told the truth the whole time.

Q.     Did you tell Dan Lee that Nick tried to have sex with you while you were parked at the rock pile?

A.     The rock pile?  What?

Q.     Later in my conversation with Kristen -- this is Dan Lee -- she told me Nick tried to have sex with her while they were parked at the rock pile.  She told him no and she -- he did not pursue it any further.  Nick told her not to tell anyone because of the whole Leah thing.

A.     I don't remember.

Q.     Okay.  See how interesting that is, when we read things to you that you've told the police in the past, and you don't remember?

A.     I don't remember certain details of stuff.  I did

Exhibit 5002 at 813

*K. Steinhoff*

a lot of drugs.

Q.   All right.

Were you with Ricky Crook the night that Leah disappeared?

A.   I can't remember.

Q.   After Nick tried to have sex with you that night, what did you do?

Did you see Nick again that night?

A.   Um, I think I seen him at Fast Gas.

Q.   Did you see him at your house?

A.   I don't -- I can't remember.  I don't think so.

Q.   We've heard testimony here today that in the daylight, it was just turning daylight, so it would be around, I don't know, 5:30, six o'clock in the morning, that you, Ricky Crook, and Nick were on the front porch of your house.  Do you recall that.

A.   No, but if it says that, it's true, probably.  I just don't remember.

Q.   I didn't say if this said it was true, there was -- we had a witness testify that they heard -- that that person heard and saw you and Nick and Ricky on the porch of your house --

A.   I don't remember.

Q.   -- at daylight.

A.   I don't remember.

Exhibit 5002 at 814

*K. Steinhoff*

Q.    Well, let's talk about Ricky Crook a second.

Well, let me back up.

Did you ever have a necklace with nickname -- Nick's name on it?

A.    No.

Q.    No?

A.    No.

Q.    We've heard testimony that you were in possession of a necklace with little beads on it, dice-type beads, with the name Nick on it?

A.    No.

Q.    That's another person that made that up.  Is that right?

A.    No, but I never had a necklace that said that.

Q.    Okay.  But that's your testimony.  That's what you want these people to believe, that that was another person that made this up?

A.    Yeah.  I never had a necklace.

Q.    I mean, we've got a purse -- we've got people that are apparently making it up that you told them that Bill Sero and Tom Stemmerman killed Leah Freeman.  We've got people that have come in and sworn in here under oath that you told them that you were involved in killing Leah Freeman.

A.    Why would I say something --

Q.    We've had -- we've had people who came in who've

Exhibit 5002 at 815

*K. Steinhoff*

sworn under oath --

A.    Why would I say that I was involved in something that I was not involved in?  Why would I do that?

Q.    Well, that's not my problem.  It's your problem.

A.    Obviously.

Q.    So, why would all these people come in and lie?

A.    I don't know.

Q.    Ricky Crook, the night that Nick threatened you in the bathroom, did Ricky Crook come in the window of your house and threaten you too?

A.    I don't remember.

Q.    Well, you mentioned that you thought Ricky Crook was with Nick that night?

A.    He was with Nick that night, the night they took me out to Poe Lane.

Q.    Okay.  But this -- I'm talking about an entirely different night.

A.    I don't know.  What night are you talking about, then?

Q.    Okay.  There was a night before Leah Freeman's body was found.  We've heard testimony that you were at your grandmother's house, that there was kind of a party going on.  That Nick McGuffin showed up with an older gentleman and took you into the bathroom, and proceeded to threaten you to keep your mouth shut.  That I believe it was Tina Lehman came to

Exhibit 5002 at 816

*K. Steinhoff*

the door of the bathroom, overheard what was being said, came into the bathroom, and asked what the heck was going on. The older gentleman left. Nick tried to explain his way out. You got hysterical and went into your bedroom.

Then, that later that evening that Ricky Crook came in the bedroom window into your room, and was threatening you to keep your mouth shut about Leah Freeman, where again Tina Lehman comes in and intervenes and runs Ricky Crook out of the house.

A.    I don't remember.

Q.    Okay. I don't remember doesn't tell me much. Did the --

A.    I don't seriously remember. I don't know.

Q.    Is it possible that it happened?

A.    Maybe.

Q.    Why wouldn't you remember that?

A.    I don't know.

Q.    See, here's my problem. Second problem I've got. Seems like every time we talk to you, you come up with a little more information. You add to it. And I'm beginning to wonder if you feel that you have to keep your mouth shut because you're afraid somebody's going to hurt you.

A.    No. I would have told on them, if they told me anything. If they had any involvement and I knew, I would have told.

Exhibit 5002 at 817

K. Steinhoff

Q.    You realize, don't you, from the people that have testified here today, that this grand jury could indict you for the murder of Leah Freeman, don't you?

A.    Yeah, but I didn't do anything.  I wasn't involved in this.

Q.    What do you know about it?

A.    I don't know anything.  Everything that I've said, that's all I know, is how Nick was acting.

Q.    Okay.  But people keep coming and saying you're involved, you're involved, you're involved.

A.    I'm not.  There's no way that -- I'm not that kind of person.

GRAND JUROR:  Why was Nick telling you to keep your mouth shut?

THE WITNESS:  I don't know.  Because I told the cops that he was acting really weird that night.

GRAND JUROR:  Was it just that night, that he was acting weird?

THE WITNESS:  He was acting weird like throughout the whole time that she was missing.  He was hanging missing flyers, and just the way he was acting and the way he was talking, I don't know.  It was just really weird.

GRAND JUROR:  Had you and Nick had sex before?

THE WITNESS:  No.

GRAND JUROR:  Had you ever had sex?

Exhibit 5002 at 818

*K. Steinhoff*

THE WITNESS:  No.

BY MR. FRASIER:

Q.    This incident with Ricky Crook and Nick, where you went someplace, tell us about that.

A.    They took me out to Poe Lane and, um, there was a blowtorch and a shotgun in the back seat.  They were acting really weird.  And, um, I was joking around with Ricky, and I turned around and I said, What's wrong with you, because he was acting really weird.  He was just -- Nick kept staring at Rick.  Because Nick was driving, I was sitting in the passenger seat, and Ricky was sitting behind me.  And I noticed that Nick kept looking at Ricky through the rearview mirror.  And I was -- jokingly, I turned around and I said, What's so wrong with you?  And he just had a weird look on his face, and that's when I seen the gun and the blowtorch.

Q.    Okay.  When you say Poe Lane, where's Poe Lane?

A.    Um, right after Hungry Mountain on Fairview.

Q.    Okay.

A.    It was Daniel Lapine's -- where Daniel Lapine's mom's trailer was built, before the trailer was there.

Q.    Did you go on Lee Valley Road to get there?

A.    No.

Q.    No?

A.    No, it was -- it was right after the big steep hill on Fairview, and then you start going around the

Exhibit 5002 at 819

*K. Steinhoff*

corners, and then Poe Lane is like right here.

Q.    Okay.  When you were interviewed by Officer Lee, did you tell him about the gun and the torch?

A.    Yeah.

Q.    Are you sure?  Because there's no mention of it.

A.    There should be.

Q.    If I play that tape for the grand jury and it isn't there, what are you going to say?

A.    I told him.  I don't know why it wouldn't be there.

Q.    Why wouldn't it be on the tape if you, when you're giving the discussion -- when you're giving a statement?

A.    I don't know.  I told him the day after it happened.  I can't remember exactly which cop I told.

Q.    Okay.  How many cops did you talk to back in 2000?

A.    A lot.

Q.    Did Nick ever ask you what Hamilton had said to you about the way he was acting?

A.    What now?  Sorry.

Q.    Okay.  This is from your interview with Officer Lee back in 2000.  He said, Kristen said he saw Nick and that you told him what Scott Hamilton had told you.

A.    Yeah.  Nick and Scott had been hanging out

Exhibit 5002 at 820

K. Steinhoff

earlier the day, and Scott said that he took him out to where they found Leah's body, and Nick had told Scott about something about her head being on some rock or something. And I told Scott to stay away from him, because Scott was freaked out.

Q.    Nick asked Kristen about what Hamilton had said about the way he was acting. You indicated to Dan Lee -- again, this is on the tape -- that you told him that Nick was not crying and acting weird, but you demonstrated to him what he was doing when you told him what was going on.

Do you recall that?

A.    No.

Q.    You told the officer and you demonstrated to the officer that he put his elbows on his knees, put his face in his hands, and then started rocking back and forth.

A.    I don't remember.

Q.    And that Nick was in the bathroom of your house when he told you that, when this occurred.

A.    I don't remember.

Q.    You don't remember. Isn't it interesting when I tell you things --

A.    That I don't remember? Yeah, it's interesting.

Q.    Well, I mean it's --

A.    I did a lot of drugs.

Q.    -- it's either it didn't happen or I don't

Exhibit 5002 at 821

124
K. Steinhoff

remember or I don't know.

A.    Yeah, I'll tell you what I know, but some's -- I don't remember every detail.

Q.    Has anybody told you that they killed Leah Freeman?

A.    No.

Q.    Has anybody told you they were there when they killed Leah Freeman?

A.    No.

Q.    Were you there when Leah Freeman was killed?

A.    No.

MR. FRASIER:  Grand jury want to ask her anything?

GRAND JUROR:  I think -- just my opinion, I think there's stuff that you -- you know, that you're not saying that you know.  And you really need to --

THE WITNESS:  I would have told.  I don't --

GRAND JUROR:  You know, your butt's on the line, to put it frankly.

THE WITNESS:  But I don't know anything.  I would have told.  I'm -- I'm not that kind of person to keep something like this to myself.  I would have told.  I would have told on them right when they told me.

MR. FRASIER:  Okay.  I need to stop the tape here a second.  I'll leave the recorder on while I replace the

Exhibit 5002 at 822

*K. Steinhoff*

tape here.

GRAND JUROR:  Did -- why did you go out with them on that drive that day out to Poe Lane?  Were you on drugs?  The day you said you went out to Poe Lane when they had the gun and the torch.

THE WITNESS:  Why did I go?

GRAND JUROR:  Yeah.

THE WITNESS:  I don't know.

GRAND JUROR:  Were you -- was it -- were you doing drugs with them at that time?

THE WITNESS:  Um, not at the time we were sitting out there.  We didn't do anything.  They just sat there and didn't say anything.  Kind of freaked me out, and I told them to take me home.  I don't known why I went with them.

GRAND JUROR:  Had somebody warned you not to go with them?

THE WITNESS:  Yeah.

GRAND JUROR:  Who?

THE WITNESS:  Tina Lehman.  And it -- I heard for a couple of days that they were going to do something to me, and not to go anywhere with them.  And I don't know why I went with them.

GRAND JUROR:  Was there anything that Nick had told you that -- other than the fact that he made advances on you, that you were -- that he wouldn't want you to come

Exhibit 5002 at 823

*K. Steinhoff*

forward with as far as information?

THE WITNESS:  No.  I just kept telling the cops how weird he was acting.

GRAND JUROR:  When you returned that car late, was there anything wrong with it?

THE WITNESS:  No.

GRAND JUROR:  Did you fill it with gas, or did you run over anything, or --

THE WITNESS:  No, I didn't run anything over. There was nothing wrong with it.

GRAND JUROR:  You were just late returning it?

THE WITNESS:  Yeah.

GRAND JUROR:  Why were you late returning the car?

THE WITNESS:  Doing drugs.

GRAND JUROR:  Who were you doing drugs with?

THE WITNESS:  I can't remember exactly.  I know I did drugs with Nick that night, my mom, Zack.

GRAND JUROR:  Zack did drugs with you that night?

THE WITNESS:  He did drugs at my grandma's house.

BY MR. FRASIER:

Q.    Okay.  But you dropped Zack off at his place?

A.    Mm-hmm.

Q.    Did you do drugs after that, with Zack?

A.    No.

Exhibit 5002 at 824

127
*K. Steinhoff*

Q.    Okay.  So what we want to know, when you had the car, who were you doing drugs with?

A.    I think I went out to Hernan Cortez's house.  I can't remember exactly where I was all that night.

GRAND JUROR:  Hernan Cor -- where's that at?

THE WITNESS:  Um, Glen Aiken Road.

BY MR. FRASIER:

Q.    Who was with you when you went out to Hernan Cortez's place?

A.    I can't remember.

Q.    Was Nick with you?

A.    No.

Q.    Was Ricky Crook with you?

A.    I'm not sure.

Q.    Where else did you go?

A.    I drove around town.

Q.    Who was with you?

A.    I can't remember who was with me.  I don't know.

Q.    Who saw you?  Did anybody -- did you see any -- do you recall seeing anybody?

A.    I seen Nick at Fast Gas.

Q.    Okay.

A.    When I was spraying his car with air freshener because I was smoking in it.

Q.    All right.  Whose car?  It was Elderkin's car?

Exhibit 5002 at 825

*K. Steinhoff*

A.    Mm-hmm.

Q.    All right.  Elderkin smoked; is that right?

A.    Yeah.

Q.    So why would you spray the car if he's a smoker and he'd smoke in it?

A.    Because I can't stand the smell of stale cigarettes.

Q.    Did you clean up the car before you gave it back to Elderkin?

A.    No.

Q.    Vacuum it out?

A.    No.

Q.    Did you call Elderkin a couple -- a week or so later and tell him that he might want to check over his car because it might have been involved in the Leah Freeman case?

A.    No.

Q.    Well, that's what he just testified to.

A.    Well, I never said that.

Q.    You called him up or told him face-to-face that he might want to make sure that his car was okay, or look for blonde hair or blood on it.

A.    No.

Q.    Okay.  Another person making stuff up.

A.    I guess, because I never said that.

Q.    Okay.  I'm just telling you.  This man over there

Exhibit 5002 at 826

*K. Steinhoff*

has got it right.  You're heading down the road to being indicted for murder.

A.    I didn't do anything.

Q.    Well, you seem to know more than what you're telling us.

A.    No, I don't.  Obviously --

Q.    Yes, you do.

A.    -- by now I would have told.  I have four kids. I would have told you by now.

Q.    You need to think about those four kids, because you could very much end up in the jail over there, and you could go down for 25 to life.  So you need to think about this.

A.    I would have told if I knew anything.

Q.    That's what you keep saying, but it keeps getting worse and worse for you.

A.    Oh my God.

GRAND JUROR:  There's a lot of witnesses that, like he said, are testifying that you had something or you know something to do with this.

THE WITNESS:  I don't know anything.  I would have told.  (Crying.)

GRAND JUROR:  I mean, even if you were driving, now is the time to say something.

THE WITNESS:  I wasn't.  I didn't even know her.

Exhibit 5002 at 827

She didn't even know me.

GRAND JUROR:  Well, if Nick was playing around and accidently pulled the steering wheel, and he accidently hit her, it's an accident.

THE WITNESS:  No, nothing like that happened.

GRAND JUROR:  You did go with Nick to look for her though?

THE WITNESS:  Yes.

GRAND JUROR:  In what vehicle?

THE WITNESS:  The Kia.

GRAND JUROR:  Where'd you go?

THE WITNESS:  Just drove around town and out to the Sennetts' road, and that was it.

GRAND JUROR:  That was the Sennetts' Road. Where's that at?

THE WITNESS:  Um --

BY MR. FRASIER:

Q.    You mean the driveway to Dr. Sennett's house?

A.    Yeah.  We turned around right there.

GRAND JUROR:  What time was this?

THE WITNESS:  Um, it was after 9:00 sometime.

GRAND JUROR:  What time do you drop off Zack?

THE WITNESS:  I'm not sure.  Sometime after 9:00.

GRAND JUROR:  Do you see Nick before or after you dropped off Zack?

Exhibit 5002 at 828

*K. Steinhoff*

THE WITNESS:  Before.

BY MR. FRASIER:

Q.    Where did you see him at?

A.    At the -- the Maytag place.

GRAND JUROR:  But he didn't have a car there?

THE WITNESS:  No, there was no car there or anything, and he was walking in circles.

GRAND JUROR:  Did you see Nick in a vehicle at all that night?  Well, later it was in his car, right?

THE WITNESS:  Yeah.  When he came --

GRAND JUROR:  Which was -- what vehicle was that?

THE WITNESS:  Um, I can't remember because I seen him a couple of different times that night, but he was driving a different car each time.  And I can't remember the car that he came to my grandma's house in.  It was either the Thunderbird or the Mustang.

GRAND JUROR:  When Nick talked to you and threatened you, what did he say exactly?

THE WITNESS:  To keep my fucking mouth shut.

GRAND JUROR:  About what?

THE WITNESS:  Just him even being over at my grandma's house that night at all.

GRAND JUROR:  Why would that be a problem?

THE WITNESS:  Because I told the cops how weird he was acting.

Exhibit 5002 at 829

*K. Steinhoff*

GRAND JUROR:  Did he use meth a lot then, would you say?

THE WITNESS:  Yeah.

GRAND JUROR:  When you guys were at your house fooling around, was that after you went in the Kia and looked for Leah?

THE WITNESS:  No, I think it was before.

GRAND JUROR:  Well, what time was that?

THE WITNESS:  After 9:00 sometime.  I'm not sure.

GRAND JUROR:  One o'clock in the morning?

THE WITNESS:  It might have been.

GRAND JUROR:  Did you by any chance, during all this taking place, make statements in public or to various people in order to make Kristen, per se, look like the big man on campus?

THE WITNESS:  No.  Everybody was talking about it.  We just talked about all the rumors that we heard. That's all that I would have talked about, was the rumors.

GRAND JUROR:  What rumors?

THE WITNESS:  Just a lot -- there was lots of rumors.

GRAND JUROR:  Like what?

THE WITNESS:  That she got ran over.

GRAND JUROR:  By who?

THE WITNESS:  Um, Bill Sero, and just -- I heard

Exhibit 5002 at 830

K. Steinhoff

rumors up to there was Denise put a hundred-dollar hit out on her sister.  That's how stupid the rumors were.  It was just a bunch of crap.  And that's all that I ever talked about.

GRAND JUROR:  Mm-hmm.  So --

THE WITNESS:  Never said I did something, because I didn't.

GRAND JUROR:  Did you ever hear rumors that people were thinking you did?

THE WITNESS:  Yeah.

GRAND JUROR:  Did you ever spread a rumor or talk about the fact that you might have thought that Nick had done it?

THE WITNESS:  Yeah.

GRAND JUROR:  So you -- at the time you had said to other people you thought Nick was involved?

THE WITNESS:  Mm-hmm.  Yep, because how weird he was acting, why would he want me to keep my mouth shut about him being over at my house?  Just the little things that -- I don't know.  He just scared me.

GRAND JUROR:  But he never said anything to the effect that he was involved with Leah's death?

THE WITNESS:  No.

BY MR. FRASIER:

Q.    Did you do anything in the time you were with Nick -- in the time you were with Nick, did you do anything

Exhibit 5002 at 831

*K. Steinhoff*

to help him hide any evidence?

    A.    No.

    Q.    Did you help him move the body?

    A.    No.

        GRAND JUROR:  Do you know where she was found?

        THE WITNESS:  The dis -- two detectives took me out there, and showed me.

        GRAND JUROR:  Is it anywhere near where you went with them?

        THE WITNESS:  It was a long ways away from where I went with them.

        GRAND JUROR:  Had you ever been to that spot before or after, where they took you, these detectives?

        GRAND JUROR:  I -- after.  Because that's where my friend's mom's trailer was getting put in at.  But I'd never been there before.  Before that night that they took me.  That was the first time.

        GRAND JUROR:  Did you say you did not know Bill Sero?

        THE WITNESS:  I know him, but not real well.  I didn't really hang out with him a lot.

        GRAND JUROR:  Had you done drugs with him before?

        THE WITNESS:  Yeah.

        GRAND JUROR:  But did you go somewhere when you did the drugs?

Exhibit 5002 at 832

*K. Steinhoff*

THE WITNESS:  I can't remember.  I know I gave him a ride to his house once.

(Pause.)

MR. FRASIER:  Any other questions?

GRAND JUROR:  So you said you went out with them and you saw the gun and the blowtorch.  What did they say when you were out there?

THE WITNESS:  They didn't say anything.

GRAND JUROR:  You just sat in a car and said nothing?

THE WITNESS:  Yep.  They didn't say anything.  And it scared me so bad I kept telling them to take me home, and finally they did.

GRAND JUROR:  And what did they say during -- while they were driving?

THE WITNESS:  They didn't say anything.  They were just silent the whole time.

GRAND JUROR:  Did you find that odd?

THE WITNESS:  Yeah.  I was scared.  And I think that if there wouldn't have been people at my house that I wouldn't have come back.

GRAND JUROR:  What was the reason they took you?

THE WITNESS:  They said we're going for a drive.

GRAND JUROR:  And you just went with them?

GRAND JUROR:  Even after knowing --

Exhibit 5002 at 833

*K. Steinhoff*

THE WITNESS:  Yep.

GRAND JUROR:  -- that (indiscernible).

MR. FRASIER:  Why would you go with Nick McGuffin if you thought he was involved in Leah Freeman's death?

THE WITNESS:  I don't know.

GRAND JUROR:  Why would you go with Nick McGuffin and Ricky Crook when supposedly they're mad at you, want you to keep your mouth shut about what you told the police?

THE WITNESS:  I don't know.  I have no answer for that.  I have absolutely no idea.

GRAND JUROR:  It sounds incredibly stupid.

THE WITNESS:  Yeah.  I know.

GRAND JUROR:  So why would you do it?  I mean, it just doesn't make any sense.

THE WITNESS:  I don't know.

GRAND JUROR:  Have you ever been to Nick McGuffin's house?  Met his brother?

THE WITNESS:  I know his brother from school, but.

GRAND JUROR:  How about his mom or his dad?

THE WITNESS:  I've never met his mom or his dad.

GRAND JUROR:  At your grandmother's house the night that Nick told you to keep your mouth shut in the bathroom, he was the only one in the bathroom with you?

THE WITNESS:  That I can remember.  I don't

Exhibit 5002 at 834

137

*K. Steinhoff*

remember anybody else being in there.

GRAND JUROR:  Who did he come with?

THE WITNESS:  I think he came with Ricky Crook.

GRAND JUROR:  You didn't see an older guy around?

THE WITNESS:  No.

GRAND JUROR:  So if he came with Ricky Crook when that happened, and then Ricky Crook later climbed through your window, why would he come to your window and climb through your window?

THE WITNESS:  I don't know.

GRAND JUROR:  After being there, walking through the door?

THE WITNESS:  I don't know.

GRAND JUROR:  We don't either.  That's why we need some help.  (Laughs.)

THE WITNESS:  Well, I don't know either.

GRAND JUROR:  While in the bathroom when Nick told you to keep your mouth shut, did he also say that if you didn't the same thing would happen to you that happened to Leah?

THE WITNESS:  I can't remember if he said that. I just remember him telling me to keep my mouth shut.

GRAND JUROR:  Did you?

THE WITNESS:  What?

GRAND JUROR:  Keep your mouth shut --

Exhibit 5002 at 835

138

*K. Steinhoff*

THE WITNESS:  No.

GRAND JUROR:  -- after that?

THE WITNESS:  I talked to the cops every time they talked to me.

GRAND JUROR:  Did he come back after you had talked to the cops again, after being told to shut up?

Did he know you talked to the cops again?

THE WITNESS:  I had told -- I had told him because I think I talked to the FBI too.

GRAND JUROR:  Told who?

THE WITNESS:  I told --

GRAND JUROR:  Told Nick that you talked --

THE WITNESS:  I told Nick every time that I talked to the cops.

GRAND JUROR:  And what was his reaction?

THE WITNESS:  Mm, I don't remember.  I don't know.  I'm not sure.

GRAND JUROR:  Did Nick's parents know he was doing meth?

THE WITNESS:  I think so.  You could tell.  Just the change in his appearance and everything.

GRAND JUROR:  Were his parents the kind of people that would have taken that as were -- as they would have objected sternly to that?  Or do you know his parents that well?

Exhibit 5002 at 836

*K. Steinhoff*

THE WITNESS:  I didn't know his parents at all.

GRAND JUROR:  Have you been in any contact with Nick?

THE WITNESS:  No.

GRAND JUROR:  Since when?

THE WITNESS:  Since I moved away from Coquille when I was 18 or 19.

GRAND JUROR:  What year would that have been?

THE WITNESS:  I'm 28 now.

GRAND JUROR:  So ten years?  Nine years?

THE WITNESS:  Yeah.

GRAND JUROR:  So you moved right after this happened?

THE WITNESS:  Mm-hmm.

GRAND JUROR:  Where'd you move to?

THE WITNESS:  Um, Coos Bay.

GRAND JUROR:  With who?

THE WITNESS:  My boyfriend John.

GRAND JUROR:  You still with him?

THE WITNESS:  Mm-hmm.

GRAND JUROR:  What's his name?

THE WITNESS:  John Farley (phonetic).

GRAND JUROR:  It's -- do you think it's odd that some -- that several people have conflicting statements, and also that you don't understand why Nick would be telling you

Exhibit 5002 at 837

*K. Steinhoff*

to keep your mouth shut?  I mean --

THE WITNESS:  Yeah, I think that's odd.  I don't know.  I didn't have anything to do with it.  I wouldn't have had anything to do with this.

GRAND JUROR:  If he had threatened you with your life, and was pissed off that you were talking to the cops, why would you continue to tell him every time that you talked to the cops?

THE WITNESS:  Because he was acting weird, and I thought -- I thought that Nick had something to do with it.

GRAND JUROR:  But why would you tell Nick?

THE WITNESS:  I don't know.

GRAND JUROR:  Were you trying to help Nick by letting him know --

THE WITNESS:  No.  I quit hanging out with Nick at all after all this, because I was freaked out by it.

GRAND JUROR:  Did you feel threatened?  Do you still feel threatened?

THE WITNESS:  Yeah.  No.

GRAND JUROR:  That's why I'm curious why -- I don't understand.  If you felt threatened, why did you call him and --

THE WITNESS:  I didn't call him and tell him.  Like --

GRAND JUROR:  -- put yourself in danger?

Exhibit 5002 at 838

THE WITNESS:  -- if I seen him, I would tell him, but I didn't call him and tell him.

GRAND JUROR:  Why would you tell him anyway?

THE WITNESS:  I don't know.

GRAND JUROR:  Yeah.  I mean, he was --

THE WITNESS:  I don't know.

GRAND JUROR:  I mean, if he said I'm going to hurt you for it, you know, or what he did say, why would you bring that upon yourself?

GRAND JUROR:  That's like asking to be hurt.

THE WITNESS:  I don't know why.  I don't know.

GRAND JUROR:  A lot of the people that we talked to have had pretty good memory and are pretty sure in what they've said.  And you don't seem to know a lot of your story.

THE WITNESS:  Because I did a lot of drugs.

GRAND JUROR:  You've got a lot of I-don't-knows.

Well, a lot of these people did a lot of drugs.

GRAND JUROR:  So do (indiscernible).

GRAND JUROR:  Mostly everyone in here had had -- been involved.

THE WITNESS:  I don't know.

GRAND JUROR:  That's what I'm talking about. You -- that's your response to a lot of things.

THE WITNESS:  I don't remember every little tiny

Exhibit 5002 at 839

142
*K. Steinhoff*

detail of everything.  I was high on meth.  I don't know.

GRAND JUROR:  So was everyone else.

THE WITNESS:  Who knows?

BY MR. FRASIER:

Q.    Did Nick McGuffin tell you that he killed Leah Freeman?

A.    No.  I would have told if he did.  He -- I don't think if he -- he would have trusted me enough to tell me something like that.

Q.    He wanted to have sex with you, right?

A.    Yeah.

Q.    He wanted to have some sort of relationship with you, right?

A.    Not a relationship.  Just --

Q.    He wanted to have sex with you?

A.    Yeah.

Q.    Okay.  But he never told you what happened to Leah Freeman?

A.    No.

Q.    And Bill Sero never told you what happened to Leah Freeman?

A.    No.

Q.    And Tom Stemmerman never told you what happened?

A.    No.

GRAND JUROR:  So how long after having -- wanting

Exhibit 5002 at 840

*K. Steinhoff*

to have sex with you did the tables turn and he became hostile towards you?

THE WITNESS:  I don't know.

GRAND JUROR:  Do you know when you were confronted in the bathroom?

THE WITNESS:  I can't remember when.  It was a while after, not like the same day or anything.

GRAND JUROR:  Because people are able to remember -- you know it was ten years ago, but people are -- know where they were the day she went missing.  People know if certain things happened before the body was found or after.  You know, because this is a big deal, and there's a lot of things, you know, that stand out to everyone we've talked to.  And if I was someone that was being accused, I would think I'd remember more -- I would make sure that I would try to recall what was going on --

THE WITNESS:  Being --

GRAND JUROR:  -- to get my name out of this mess.  You know, where were you on that night?  What were you doing before?

THE WITNESS:  Being accused.  Being accused of what?  I'm not being accused of anything.  I didn't do anything.  I don't know.  I didn't really do much --

GRAND JUROR:  Well, you know that you were part of the rumors, right?  I mean --

Exhibit 5002 at 841

144

*K. Steinhoff*

THE WITNESS: Yeah. I didn't really do much -- anything that day except do drugs and drive around, the same thing I did every other day (indiscernible).

BY MR. FRASIER:

Q. Well, in case you haven't figured it out, you are being accused of killing Leah Freeman. People are telling us you did it, that you admitted to doing it. You are accused, so don't think you're not.

GRAND JUROR: People are putting you in the car with Nick, and Nick pulling the wheel.

THE WITNESS: I wasn't.

GRAND JUROR: Well, that's not going to get you off in court. I could almost guarantee that, you know.

If you got eight people saying that she was doing that, and you just say, Oh, well, no, I wasn't. I -- but I can't prove that. You got to give us something that's solid.

GRAND JUROR: And you can't remember somethings, and not other things. You can't leave no holes.

THE WITNESS: I didn't really do much of anything important that day except drive around and do drugs. That's it. I didn't do anything. I wasn't involved in this. I don't know anything about it. I wasn't told anything. I didn't see anything.

GRAND JUROR: Why was Nick so adamant to threaten you then, if you didn't know anything?

Exhibit 5002 at 842

K. Steinhoff

THE WITNESS:  I don't know.  I don't know.

GRAND JUROR:  He didn't threaten all these other people.

THE WITNESS:  I don't know.

GRAND JUROR:  He only threatened you.

He didn't tell anyone else to keep their mouth shut.

THE WITNESS:  I don't know why.

GRAND JUROR:  You're the only name that's come up with that.  Why you?

THE WITNESS:  I don't know.

GRAND JUROR:  When you heard the rumors that linked you to this crime, what did you do about it?

THE WITNESS:  Tried --

GRAND JUROR:  And you've heard the rumors, right?

THE WITNESS:  Yeah.

GRAND JUROR:  Okay.  So what -- when you hear a rumor like that, what did you do?  Just blow it off, or what?

THE WITNESS:  I knew that I didn't have anything to do with it --

GRAND JUROR:  So you just kept it to yourself?

THE WITNESS:  -- and I tried to tell people I didn't have anything to do with it.

GRAND JUROR:  Could you talk to Nick about, Hey, people are saying that me and you ran her over?  Or me and

Exhibit 5002 at 843

somebody ran them over -- or --

THE WITNESS:  Yeah.

GRAND JUROR:  What did he say?

THE WITNESS:  He didn't say anything.

GRAND JUROR:  Did he ask you if you had told the cops anything?

THE WITNESS:  No, I just told him about the rumors that I had heard.  And I had asked him too, if he had had anything to do with it, and he didn't say anything.  He didn't tell me.

GRAND JUROR:  What about your family?  Does your mother know where you were at that night?

THE WITNESS:  I'm not sure.  My mom was at the house that night.

GRAND JUROR:  But she didn't know that you come and went, or --

THE WITNESS:  I don't know.  She was doing drugs in the bedroom.

GRAND JUROR:  What time did you come home?

After you left that night with Zack's car?

THE WITNESS:  Home.  I can't remember.  It was late.

GRAND JUROR:  Late.  What's late?  Eleven o'clock at night's late for me.

THE WITNESS:  After I dropped Zack off, I came

Exhibit 5002 at 844

*K. Steinhoff*

right back home.

GRAND JUROR:  And stayed home?

THE WITNESS:  No.

GRAND JUROR:  And then did what?

THE WITNESS:  Did drugs, and that's when Nick came over.

GRAND JUROR:  And then what did you do?

THE WITNESS:  We left and looked for Leah.

GRAND JUROR:  What time was that?

THE WITNESS:  Late.  I can't remember exactly what time.

GRAND JUROR:  Well, what's late?  After midnight? Before midnight?

THE WITNESS:  It's after 9:00 sometime.

GRAND JUROR:  After 9:00.  A long time after 9:00?

THE WITNESS:  It might have been.

GRAND JUROR:  That was after you already returned the car?

GRAND JUROR:  No.

THE WITNESS:  No.

GRAND JUROR:  Because the car didn't get returned until sometime the next morning, right?

THE WITNESS:  Yeah, I was late.  It was -- I was supposed to be back at 6:00 but it was after 6:00.

Exhibit 5002 at 845

GRAND JUROR:  It was three o'clock.

THE WITNESS:  Huh?

GRAND JUROR:  It was the next day.

GRAND JUROR:  It was three o'clock, or after 3:00.  Because it was supposed to be there at 3:00, I believe.

(Indiscernible discussion among grand jurors.)

THE WITNESS:  It was three o'clock the next day?

GRAND JUROR:  Morning, yes.

GRAND JUROR:  No, it was three o'clock when he told you be home --

THE WITNESS:  Oh.  I thought it was 6:00.

GRAND JUROR:  And you didn't get home until 6:00.

THE WITNESS:  Oh, I thought it was 6:00.  I don't remember.

GRAND JUROR:  Do you remember Zack being upset?

THE WITNESS:  A little bit.

GRAND JUROR:  Or did he just take off?

THE WITNESS:  He was kind of mad.

GRAND JUROR:  He ever let you use the car again?

THE WITNESS:  Uh, no.

GRAND JUROR:  You don't know?  Or you --

THE WITNESS:  I don't know.  I can't remember.

GRAND JUROR:  Can't remember if you've ever drove that car more than once?

Exhibit 5002 at 846

*K. Steinhoff*

THE WITNESS:  I think I only used it once.

BY MR. FRASIER:

Q.    How did you get home from where Elderkin was staying?

A.    I don't remember.  I think he might have taken me home.  I'm not sure.

GRAND JUROR:  You were pretty good friends with Nick.  After he had threatened you, and just, you know, what you've known of him personally, just being friends, did you feel like he was the type of person that would go through with some type of violence toward you?

THE WITNESS:  After the way he was acting, yeah. But before that I didn't -- I couldn't believe that he would be involved in something like this.  But after, when he kept threatening me, then yeah.

GRAND JUROR:  Never saw him be mean to anyone?

THE WITNESS:  He was a bully.  Like my friend Megan Pinkley went out with him, and he was really possessive.

GRAND JUROR:  In what way?

THE WITNESS:  Like didn't want her talking to anybody else, and just stuff like that.

GRAND JUROR:  More jealousy and --

THE WITNESS:  Yeah.

GRAND JUROR:  Controlling, kind of?

Exhibit 5002 at 847

*K. Steinhoff*

THE WITNESS:  Yeah.

GRAND JUROR:  Well, this may not be the right thing to say, but I would say, young lady, that you should sit yourself down and think very hard about everything that transpired during that time, and try to figure out what you did say and what you didn't say.  Because just like everybody said here, you're tail end is sitting on the line.  And this I forgot, I don't know --

GRAND JUROR:  (Indiscernible.)

GRAND JUROR:  -- to us, sounds like a way out.

THE WITNESS:  It's not a way out.  I don't.  I would --

GRAND JUROR:  But you need to sit down and think about this stuff, and somewhere, I would say in the -- we could ask Paul to bring you back, if you can remember anything whatsoever.  Because right now you're not telling us anything that's helping us in any which way --

THE WITNESS:  It's because I don't know anything.  I would have told you.  I would have told a long time ago.  I don't know anything that would have helped you guys.  He didn't tell me anything.  I wasn't there.  I didn't see anything.

GRAND JUROR:  Well, what I've been alluding to is the fact that everybody else is saying that Kristen said this, Kristen said that.  Kristen says, I was driving the

Exhibit 5002 at 848

*K. Steinhoff*

car.  I ran over her.  I backed up and ran over her twice because she wasn't dead the first time.

THE WITNESS:  What?

GRAND JUROR:  All of these reports.

GRAND JUROR:  A lot of people.

GRAND JUROR:  And a lot of people are saying that.

GRAND JUROR:  That you were running around talking about it.

GRAND JUROR:  And if you're saying that --

THE WITNESS:  Well, everybody was talking about it.

GRAND JUROR:  If you did say that, you've got to dig into your memory and come up with, Yes, I did say that to try to make myself look like the big person on campus or whatever.  And -- because right now everything that's been said points toward Kristen Steinhoff.

THE WITNESS:  This is bullshit.

GRAND JUROR:  I'm sorry, but that's just exactly the way we have heard and listened.  (Indiscernible) --

GRAND JUROR:  So the fact that it's ten years ago doesn't help.

THE WITNESS:  What?

GRAND JUROR:  It doesn't help you either, just I don't remember, it was ten years ago, I was doing a lot of

Exhibit 5002 at 849

*K. Steinhoff*

drugs.

THE WITNESS:  I was.  I didn't do anything --

GRAND JUROR:  I understand, but --

THE WITNESS:  -- that was really that important that night, to remember every little detail.

BY MR. FRASIER:

Q.    I want to ask you, if you were so hung up on drugs, how do you know you didn't kill Leah Freeman?

A.    I know for a fact.

Q.    Okay.  And if you know that for a fact, why don't you know this other stuff as a fact?

A.    I don't know.

Q.    See?  There we go.

GRAND JUROR:  Who'd you drive around with that night?

THE WITNESS:  Nick.

GRAND JUROR:  And who?  Anyone else?

THE WITNESS:  Maybe Ricky.

GRAND JUROR:  Maybe, or yes?

THE WITNESS:  Maybe.  I'm not sure.  I don't remember exactly.  I don't know.

GRAND JUROR:  Why do you remember Nick and not anybody else?

THE WITNESS:  Because I remember me driving around with him, looking for her.

Exhibit 5002 at 850

*K. Steinhoff*

GRAND JUROR:  This after he tried to have sex with you?

THE WITNESS:  Yeah.

(Pause.)

GRAND JUROR:  Did you hang out with him the rest of the night?

THE WITNESS:  No.

GRAND JUROR:  Were you with him in -- where were you until 6:00 in the morning?

THE WITNESS:  Either driving around or at my grandma's house, or out at Hernan's.  I can't remember exactly where.  I probably went all three of those places.

GRAND JUROR:  With Nick?  All night?

THE WITNESS:  No, not with Nick all night.  I was only with him a short period of time to look for Leah, and that was it.

GRAND JUROR:  And that was a little after 9:00, you said?

THE WITNESS:  It was sometime after 9:00.

GRAND JUROR:  And then you never saw Nick after that?

THE WITNESS:  I seen him once when I went to the car wash to spray the car -- air freshener in the car, and he was at Fast Gas.

GRAND JUROR:  And the rest of the night you

Exhibit 5002 at 851

*K. Steinhoff*

didn't see him?

THE WITNESS:  No.

GRAND JUROR:  Why would you go to the car wash to spray air freshener?

THE WITNESS:  Because I don't like the smell of stale cigarettes.

GRAND JUROR:  I mean, did you get it from the car wash?

THE WITNESS:  Yeah.  They have the little mechanical sprayer --

GRAND JUROR:  Okay.

THE WITNESS:  -- you put 75 cents in and spray it.

GRAND JUROR:  Okay.  Just asking.

GRAND JUROR:  But you're absolutely sure you were not with Nick the rest of the night after that?

THE WITNESS:  I'm sure.

GRAND JUROR:  And where did you leave Nick?

THE WITNESS:  At my grandma's house.

GRAND JUROR:  Did he have a vehicle there?

THE WITNESS:  Mm-hmm.

GRAND JUROR:  You left Nick at your grandma's house?

THE WITNESS:  No, when we came back from looking for her, and couldn't find her, then he got his car and left.

Exhibit 5002 at 852

*K. Steinhoff*

GRAND JUROR:  From where?

THE WITNESS:  My grandma's house.

GRAND JUROR:  And what did you do?

THE WITNESS:  I can't remember exactly what I did.  Either drove around or --

GRAND JUROR:  And he never came back the rest of that night?

THE WITNESS:  Hmm-mm.

GRAND JUROR:  You're --

GRAND JUROR:  But you didn't get back until 6:00?

THE WITNESS:  Yeah.

GRAND JUROR:  I've got a question going back, sorry to back up.  But your first encounter with Nick on that day was at the Econo-Rooter?

THE WITNESS:  Yeah.

GRAND JUROR:  He was there at -- was he on a phone?

THE WITNESS:  I didn't see him on a phone.  I seen him walking around, pacing in circles, saying he couldn't find Leah.

GRAND JUROR:  And no vehicle, because -- I mean that's -- you just don't recall a vehicle?

THE WITNESS:  No, the -- there was no vehicle there at all.

GRAND JUROR:  Was it dark?

Exhibit 5002 at 853

*K. Steinhoff*

THE WITNESS: Yeah. The only thing that was lighting it up was that one street light right there on the -- the highway, kind of.

GRAND JUROR: So -- well, you said you drove around with him around nine o'clock. Did you see him after that, walking around?

THE WITNESS: I didn't see him walking around, after that.

GRAND JUROR: No, where you say --

GRAND JUROR: The Econo-Rooter.

GRAND JUROR: You said it was dark when you saw him on the (indiscernible)?

THE WITNESS: Yeah, it was when I was taking Zack home.

GRAND JUROR: That -- so that's your first -- that was your first encounter with him on that night?

THE WITNESS: Yeah.

GRAND JUROR: If it was dark, that's after 9:00. That had to have been least nine o'clock.

THE WITNESS: Yeah.

GRAND JUROR: And then when did you pick him up to go look for -- he -- where did you meet --

THE WITNESS: No, he came -- he came to my grandma's house.

GRAND JUROR: In his car at that -- then he was

Exhibit 5002 at 854

*K. Steinhoff*

in his car at that point?

THE WITNESS:  Yeah.  Mm-hmm.

GRAND JUROR:  Why did he come to your grandma's house?

THE WITNESS:  Because I said if he didn't find Leah I'd drive him around and help him find Leah.

GRAND JUROR:  So his car was --

THE WITNESS:  He said that they had got in an argument and she took off walking and he couldn't find her.

GRAND JUROR:  Okay.  And it stood out in your mind that it was odd that he didn't have a car there?

THE WITNESS:  Yeah.  It was really odd, because there was nobody around.

GRAND JUROR:  But he showed up to your house in a car?

THE WITNESS:  Yeah.

GRAND JUROR:  So why did -- why would he need you to drive him around?

THE WITNESS:  I don't know.

GRAND JUROR:  They got in an argument?

THE WITNESS:  Yeah.  He said they got in an argument and she took off walking, and he couldn't find her.

GRAND JUROR:  Where did this argument happen?

THE WITNESS:  I can't remember.  I don't think he even said where it happened.  They just said -- they were

Exhibit 5002 at 855

*K. Steinhoff*

arguing and she took off walking.

GRAND JUROR: Was -- when you came back from the Green Acres area, with Zack's car, was he still at the Econo place?

THE WITNESS: Huh-uh. I went straight to my grandma's house, and then he showed up at my grandma's house.

GRAND JUROR: And what car was he driving then?

THE WITNESS: I'm not sure. Either the Mustang or the Thunderbird. I can't remember exactly which one.

GRAND JUROR: Can't remember which one?

THE WITNESS: Huh-uh.

GRAND JUROR: So he showed up there and then --

THE WITNESS: But when he did show up there, I noticed that he was wearing different clothes.

GRAND JUROR: And that's when you guys were sitting there and he tried to have sex?

THE WITNESS: Mm-hmm.

GRAND JUROR: Right after he showed up and was supposedly looking for his girlfriend?

THE WITNESS: Yeah.

GRAND JUROR: And then you got in the car and looked for his girlfriend after that?

THE WITNESS: Mm-hmm.

GRAND JUROR: And you never saw -- how long do you --

Exhibit 5002 at 856

*K. Steinhoff*

THE WITNESS:  We drove around maybe a half an hour.

GRAND JUROR:  So say it was 9:30, so you -- back at your house at 10:00?  And you never saw him after that?

THE WITNESS:  I seen him one time at the Fast Gas.

GRAND JUROR:  And that was early in the morning?

THE WITNESS:  Yeah.

GRAND JUROR:  And we have testimony saying that you were on your porch with him, twilight --

THE WITNESS:  I don't remember being --

GRAND JUROR:  -- the next morning.  Probably around the time that you -- right before you probably took that car back.

THE WITNESS:  I don't remember being on the porch with him at all.

GRAND JUROR:  That was from your mother.

THE WITNESS:  When I came home.  I don't remember being on my porch with him at all.

GRAND JUROR:  Nick and Ricky.

Don't remember none of that, huh?

THE WITNESS:  No.

GRAND JUROR:  This isn't to embarrass you or anything.  Year-wise, about how long do you think you were involved in just the whole life with meth and that type of

Exhibit 5002 at 857

*K. Steinhoff*

situation you were in then?

Just roughly?

THE WITNESS:  Mm, I did it once when I was 13. My mom gave it to me.  And then I started doing it really heavily when I was 16 or 17.

GRAND JUROR:  And how long did that --

THE WITNESS:  Till I was 19.

GRAND JUROR:  Do you hang out with a lot of different people?  Do you --

THE WITNESS:  Did I hang out with a lot of different people?

GRAND JUROR:  But did you see a lot of different situations, people on meth?  Did you see anybody -- do you feel like it would bring anger out of somebody?  Or violence?

THE WITNESS:  No.

GRAND JUROR:  You said Nick started looking like he was doing meth.  So he was losing weight?

THE WITNESS:  Yeah.  I have pictures of me and him, and yeah.  You could totally tell that he was on something.

GRAND JUROR:  Pictures from where?

THE WITNESS:  From when I lived over by Safeway.

GRAND JUROR:  When was that?  Before or after this took place?

THE WITNESS:  Before.

Exhibit 5002 at 858

*K. Steinhoff*

BY MR. FRASIER:

Q.    Do you still have those pictures?

A.    Yep.

Q.    Will you give them to us?

A.    Yeah.

Q.    We'll ask the police --

A.    I was actually going to bring them, but I -- I don't know.  I didn't know if you guys would want them.

Q.    I'll send the police to come and get them.  All right?

MR. FRASIER:  Any other questions for her?

Well, before I turn you loose, what that gentleman said at the end of the table is right on.  Because there's people out there that have thrown you under the bus, and you need to figure out --

THE WITNESS:  I would have told if I knew anything or not.

MR. FRASIER:  I'm just --

THE WITNESS:  I know.  I heard.

MR. FRASIER:  I'm telling you, you need to sit down.  You need to figure out -- you know, you just need to have a -- what some people say, a Come-to-Jesus talk.  Because what that gentlemen told you at the end of the table there is spot on.  All right?

Anything else?

Exhibit 5002 at 859

*R. McNeely*

Okay.  You're done.

**TESTIMONY OF RAY McNEELY**

(Witness sworn.)

BY MR. FRASIER:

Q.    First of all, this is the grand jury for Coos County, as I'm sure you're aware.  And we have turned on the recorders.  You're being recorded, okay?

A.    Yep.

Q.    First of all, could you tell us your name and your occupation, please.

A.    Ray McNeely, police officer for the City of Coquille.

Q.    And how long have you been with the City?

A.    Coming up on five years, this October.

Q.    I want to direct your attention here in the last three, four, five weeks.  Well, you've been -- by Chief Dannels, you've kind of been made the de facto in charge of this investigation police officer from the Coquille Police Department?

A.    Yes.  Yes.

Q.    In the last few weeks, did you have an opportunity to speak with Tina Mims, I believe, otherwise known as Tina Lehman?

A.    Yes.

Q.    Okay.  Now, during the interview you had with

Exhibit 5002 at 860

163

*R. McNeely*

her, she indicated that she had witnessed a scene at the -- where Kristen Steinhoff was staying, and that there had been an incident where Nick McGuffin and an older gentleman had accosted Kristen Steinhoff in a bathroom.

Do you recall her telling you folks that?

A.    Yes, I do.  It was at her grandma's house.

Q.    All right.  And you were trying to figure out who the older gentleman was that was with Nick.  Is that correct?

A.    That's correct.

Q.    What did you do when she told you that story?

A.    We gave her -- I want to say it was probably seven to nine photos, I can't remember exactly how many.  And she looked through all the photos, and she set aside, I think like three of them.  Three or four of them, and kind of took the other ones aside.  And they looked real familiar to her.

And she kind of went through, and then she kept focusing on one photo, and said that that person looked -- could have been the person, but it looked older than the guy was.  And then that the guy back then was more scruffy.  And the picture that she had was more clean-cut.  And we told her that all these pictures are ten years older than obviously 2000, so.

Q.    And the picture she seemed to pick out, who was that picture of?

A.    Bruce McGuffin.

Exhibit 5002 at 861

Q.    And he's the father of Nick McGuffin?

A.    Yes.

Q.    Who -- other pictures that you had in this array, did you have pictures, say, of Ricky Crook?

A.    We did.

Q.    And who else?

A.    Bill Sero, Tom Stemmerman, Ricky, Brent Bartley, Wayne McGuffin, Nick McGuffin.  Of course Bruce.  That's all I could testify to.  There might have been a few more, but I'd have to look at my -- my notes for that.

Q.    But these were all people supposedly involved in some way or another in the case?

A.    Yeah.  That's why we pulled them, just pulled out the ones that their names get brought up the most, and just took the pictures off -- just with no names, and just let her see the pictures.  So.

MR. FRASIER:  Okay.  I --

GRAND JUROR:  When were these pictures taken?

THE WITNESS:  They're DMV photos that we pull off the computer.

GRAND JUROR:  So the last time they renewed?

THE WITNESS:  Yeah, the last time they went in. So some could be six months old; some could be, you know, two years old.  So kind of varying range, and I have no way of knowing, you know, when they were taken off that.

Exhibit 5002 at 862

165

*R. McNeely*

GRAND JUROR: So you say she -- it was like a most -- it wasn't -- I don't know how to put this. Would you say it was a positive, or she was the most likely of the pictures?

THE WITNESS: I wouldn't say positive. She kept focusing on that picture, and then she'd go through, and she kept going back to that one. She kept saying, this kind of looks like the guy, but this guy's older and clean-cut. The other guy was younger looking and scruffier, but she goes, the -- the features were the same, just not the -- I don't know how else to better describe that.

GRAND JUROR: The outside -- yeah.

THE WITNESS: Yeah. That the features were there, but not the -- the other stuff.

GRAND JUROR: Who were the other two that she set aside with that?

THE WITNESS: Nick and Wayne are the two that she set aside. That looked familiar, yeah.

GRAND JUROR: All McGuffins.

THE WITNESS: So -- and she knew Ricky Crook. So she'd known him from back when he was a little kid, so that person she knew the name of and knew who he was and knew that wasn't, obviously --

GRAND JUROR: Did she admit to knowing Nick at that time? Look at the photo and go, Oh, I know him, he's

Exhibit 5002 at 863

*R. McNeely*

Nick?

THE WITNESS:  No, it wasn't a direct like, Oh, I know who that is, that's Nick McGuffin.

GRAND JUROR:  Just Ricky?

THE WITNESS:  Yeah, just Ricky.  So apparently she was friend with -- I think she told us she was friends with Ricky's mom, I believe, if I remember correctly.  Or some part of his family.

(Indiscernible comments by grand jurors.)

MR. FRASIER:  Any other questions?

If not, that's it.

THE WITNESS:  All right.  Thank you.

GRAND JUROR:  Thank you.

(Proceedings concluded.)


--oOo--


I certify, by signing below, that the foregoing pages 1 through 166 constitute a correct transcript of WAV files provided of the above-entitled matter, this 26th day of February, 2011.


_____

PEGGY S. JILLSON, TRANSCRIBER

Exhibit 5002 at 864

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

**STATE OF OREGON,**                     )
                                         )
            Plaintiff,                   )   Case No. 10-CR0782
                                         )
v.                                       )
                                         )
**NICHOLAS MCGUFFIN,**                   )
                                         )
            Defendant.                   )
_____)

Tuesday, August 3, 2010

GRAND JURY PROCEEDINGS

Testimony of James Olson (CD 050)

APPEARANCES:                 **PAUL FRASIER**
                             **DISTRICT ATTORNEY**
                             125 East Eighth Avenue
                             Eugene, Oregon 97401

TRANSCRIBED FROM AUDIO RECORDINGS

TRANSCRIBED BY:              Peggy S. Jillson
                             987 Tivoli Street
                             Eugene, Oregon 97404
                             (541) 689-7964

Exhibit 5002 at 865

**COQUILLE, OREGON; TUESDAY, AUGUST 3, 2010**

-o0o-

**TESTIMONY OF JAMES OLSON**

(Witness sworn.)

BY MR. FRASIER:

Q.    First of all, Dr. Olson, this is a grand jury for Coos County, and we've been the last few days looking into the death of Leah Freeman.

A.    Mm-hmm.

Q.    And it's obvious I turned the recorder on.  I have to advise you I'm recording you, so -- (laughs).

Earlier today we had some technical difficulties with the recorder at the autopsy (indiscernible), so he was giving me a hard time about whether I can work these things or not.  (Laughter.)

Well, first of all, could you tell us your name, please, your occupation, and a little bit about your educational background.

A.    James Norman Olson, MD.

I'm a physician.  I do -- after high school, a long, long time ago, I went to the University of Washington and graduated with a Bachelor of Science in zoology.  Then to University of Washington medical school, with an MD degree. And then trained both there and at Tacoma General Hospital in Tacoma, Washington, in pathology.  I'm board certified in

Exhibit 5002 at 866

anatomic, clinical, and forensic pathology.  I've been practicing in this area since July of 1976.

Q.    And as part of your duties you're also the medical examiner for Coos County?

A.    Right, I am.  Coos County is one of seven counties I cover in the southwest corner of the state.  Coos, Curry, Douglas, Jackson, Josephine, Klamath, and Lake Counties are the district that I cover as the deputy state medical examiner.

Q.    And part of your duties then, sir, is to also do what's sometimes referred to as a forensic autopsy?

A.    Yes.  Yes.

Q.    Could you just tell the grand jury basically what a forensic autopsy is.

A.    Well, it's -- after a briefing by the investigating agencies, law enforcement agencies, we -- in an average case, do a complete autopsy on the remains of the individual.  Many of our cases are natural deaths, and not as complex as this case, or even one we had this morning.  We describe -- or I describe all of the unique identifying features of the individual, and injuries external, and then their internal component of injuries, and document those in a report.

So it's basically -- serves the purpose of determining cause and manner of death in an individual that's

Exhibit 5002 at 867

not under the care of a physician, or in any death that's suspicious, even if it is under the care of a doctor.

Q.    Now, cause and manner of death, can you explain that to the jury.

A.    Well, the cause -- cause is the actually physiologic event, such as a heart attack.  Manner of death is in the categories of natural, suicide, homicide, accidental, undetermined.  I mean, there are cases on occasion that we really cannot come up with a true cause of death, and depends on the situation the -- such as skeletal remains.

Q.    Now, in the situation we're talking about here, the -- I think this would have been in August of 2000, were you asked to do an autopsy or an examination of the remains of Leah Freeman?

A.    I was.  And the autopsy was performed ten years ago tomorrow, at the Douglas County morgue in Roseburg, Oregon.  Ironically, she was actually found today, ten years ago, about two hours later in the day.

Q.    Could you tell the grand jury what type of an examination you did, what you can tell us about the remains.

A.    Well, and initially I began with getting x-rays of the body to see if there were any foreign bodies such as bullets, portion of a knife that might have broken off, or something of that nature, as well as any obvious breaks,

Exhibit 5002 at 868

fractures of the bones.

Then a careful external description of the remains as they were received in a body bag was made, documenting all of the findings.

There really wasn't, essentially, an internal component to this.  I did open the head.  The brain was totally decomposed.  All of the internal organs were decomposed beyond any useful studies and evaluation.  So essentially what we had is a full -- or almost a full skeleton.  A couple of small bones were missing.  And the very dried, discolored skin and clothing that were attached to the body and held it together.

Q.    In examining the body, the bone structure, are there things you can look for that if a knife was used to kill her, or if she'd been shot -- are there things you can look for in the skeletal remains?

A.    Well, we went over every bone, and found no evidence of sharp-force trauma such as a knife wound.  Found no evidence of ballistic trauma, bullets.  No obvious blunt trauma to the body.  There were just no marks that could be found on the remnants of the skin, as well as the bones themselves, that suggested a mode of her death at that point.

Q.    Some people -- I don't know if anybody's told you this.  There's been a rumor floating around town that Leah Freeman had been hit by a car and either incapacitated or

Exhibit 5002 at 869

6

outright killed by being hit by a car. Did you see any type of injury, in looking at her, that would verify that type of a scenario?

A.    No.  No, I did not.

Q.    In this case, you -- when you completed your autopsy, you ruled that the manner of death was homicide. Could you explain to the grand jury, please, what -- how you came to that conclusion.

A.    Um, this is a case of a young girl, healthy, that disappears inexplicably, and is found dumped at a remote area, probably six, seven miles from the town of Coquille, I guess. Dumped down a ditch. There's just nothing natural about that death. I mean, if she had collapsed in public, why would she be there? Could she have died of a drug overdose? We found nothing to corroborate that.

We were fortunate in that there was enough -- she wasn't totally decomposed. There was some muscle in the right calf that I was able to harvest. We sent it for toxicology and that was completely negative. So all of the common abused drugs as well as illicit -- legal and illegal, were not present or identifiable in her body to suggest that possibility. So with the possibility of one consideration, did she die of a drug overdose and was dumped because the people that gave her the drugs didn't want to be incriminated? Well, there's no -- there are no drugs that

Exhibit 5002 at 870

were identifiable.

The death is clearly unnatural.  There's no reason for her to have died at age 15 of natural causes, nor to be disposed of in the way that she was.

The case is very similar to other cases, two of which I have going in other counties in the district, of girls who had gone missing even earlier than Leah Freeman, and were not found for years and years later.  One is the Stephanie Condon case, in Douglas County, and the other one is the Kaelin Glazier case in Jackson County.  And both of those are down to complete skeletal remains, with Condon only partial remains.  On that body we were able to identify injuries to the skull which are highly suspicious and didn't appear to be post-mortem.  On the Glazier case, while the skull is -- while everything's intact and there are no injuries to the bones, there was -- and this is not for any public distribution or dissemination, there was duct tape wrapped around the face, still identifiable.  I mean, clearly not a natural death.

We don't know precisely what killed either of these two young girls, and comparable age to this -- to Leah Freeman.  But you obviously have an unnatural death, and one that's highly suspicious for a homicide.

In this particular case it's the same situation. You just -- it's not natural, the way she's found.  We can't

Exhibit 5002 at 871

precisely delineate what happened to her.

And I had a case last year of two guys that killed another fellow in Douglas County, and it was obvious the guy -- the kid had been dead about the same time as Leah Freeman, and had been -- showed advanced decomposition, with almost no organs left at all because of the -- you know, temperatures that prevail, especially on the other side of the mountains this time of year, and the insect activity. But he had been hit with an ax; that we could verify.  In this case it's already been to trial, and both these guys have been convicted.  And so much of the left side of the face and head was crushed, so no -- no problem with the ax part.

Unbeknownst to me -- because the maggots preferentially start at natural body openings as well as any unnatural ones from wounds, and they greatly expand them as well as making their own holes as they gradually eat a body, which is essentially what their function is -- is that subsequent to that, I was asked is it possible he had his throat slit?  Well, one of the defendants in that case said he slit his throat as an act of mercy.  And I went over all of the neck organs.  There wasn't anything left except the bones.  Could not find a mark on him.

And you have the defleshing of the entire head, and then all the way down to here, like this.  Well, a single

Exhibit 5002 at 872

knife wound to the neck is not going to produce a hole that big.  And all I can say in that case is yes, it's possible.  There's nothing that excludes that possibility, but at the -- simultaneously, there's nothing that proves it either.

So -- but it's still, you know, on the basis of confessions and everything else, it went to a successful or a guilty verdict in that case.

But in this case we don't have much, but we also have a lot that's missing.  We don't have any of the internal organs to evaluate.  Much of the skin has been consumed and destroyed.

And could she have been strangled?  Easily.  Could have very been -- could have been strangled, and we'd never, at that state of decomposition and loss of tissue, been able to identify anything to prove it at all.  Had we found her the same day she was strangled, it would have been an easy determination to make.

Was it likely she was shot?  Probably not.  I mean, maybe in the abdomen or something, but no bone injuries to corroborate it.  No skin injuries.

Could she have been stabbed?  Yeah, she could have been stabbed or she could have had her throat cut; we'll never know.  Just like this fellow I just described.

Could she have died of blunt trauma and not had fractures of the skull?  Absolutely.  We just had a case I

Exhibit 5002 at 873

did for Siskiyou County in California, Yreka, of a 24-year-old lady that had gone missing back in April at a party, had witnessed a -- she -- her boyfriend got angry at her and tackled her and proceeded to beat her, and then buried her in a remote location. And subsequently somebody else came forth and said where the body was buried. She was significantly decomposed, but not to the extent Leah Freeman was.

But I was able to find a huge blood clot on the surface of the brain, even though the brain was down to just -- just about falling apart in your hands. And couldn't find all the bruises because the skin was discolored, dried, and -- but still, I mean, you could certainly corroborate and make a -- the accounts, as well as make a determination that she died of blunt force trauma. And the point being is that she did not have a fracture. There were no fractures of her skull.

So could Leah Freeman have been beaten to death? Yes, she could have been.

So we're -- we have a case that -- clearly not a natural death. It does not appear to be a drug overdose. No reason to ascribe it to the accidental category because I'm not finding injuries that would -- would suggest she was run over or fell any great distance or anything like that.

So we have a young woman that disappears, nobody

Exhibit 5002 at 874

comes forth, she's ultimately found, ironically on the very day we're -- you know, ten years ago today.

And you can't -- you can't ignore the fact this -- you know, this is a highly suspicious death. And who while I don't have the precise means of -- to say that -- how she was killed, it's a homicide till proven otherwise.

Q.    In this case you were also made aware, weren't you, that at least one of her shoes had been found with --

A.    Yes.

Q.    -- some -- what at the time was described as high velocity blood spatters on it?

A.    Yes.

Q.    Did that play in here?

A.    It did. I mean, there's no reason for her to be bleeding, in a natural death. I mean -- or even a drug overdose, it would be highly unlikely.

GRAND JUROR: Where would that blood have come from?

THE WITNESS: Don't know, without the --

GRAND JUROR: Could it have come from her?

THE WITNESS: Could have come from her mouth.

GRAND JUROR: (Indiscernible.)

THE WITNESS: She could have been coughing it, expectorating it. It's odd that it's on the sole of her shoe, unless it was off her body at that point.

Exhibit 5002 at 875

GRAND JUROR:  There was nothing on the top of the shoe?

THE WITNESS:  Apparently not.

GRAND JUROR:  So she stepped into it?

THE WITNESS:  Yeah.  And --

GRAND JUROR:  Or was --

THE WITNESS:  Or the shoe wasn't in its normal position.

GRAND JUROR:  But when they're decomposed like that, there's no way of finding out if she bled out or --

THE WITNESS:  No, because there are no -- she had virtually no identifiable internal organs left.  There was just no way to assess the injury, internally or externally.

GRAND JUROR:  There was no blood on the clothes, or anything --

THE WITNESS:  Well --

GRAND JUROR:  -- except for the shoe?

THE WITNESS:  -- the problem with the clothing at that stage is it's just soaked in tissue fluid.  As you decompose, you just sort of go back to a primordial ooze. Fluid comes out.  It's pretty grotesque.  But it soaked all the clothing, and in -- in this particular case the clothing is discolored and starting to deteriorate, and I don't believe we found anything that looked suspicious for a gunshot wound, a knife wound, or anything.

Exhibit 5002 at 876

GRAND JUROR: So she could have been smothered, even?

THE WITNESS: Yeah.

GRAND JUROR: Suffocated.

THE WITNESS: She could have been beat up and suffocated. We just don't know.

GRAND JUROR: On the drug test, um, that would -- like say if you were in a trunk and you get carbon monoxide and that, would that show up in the blood work?

THE WITNESS: No. If she's dead already, no.

GRAND JUROR: But so if it was like a --

THE WITNESS: It depends, one, on the car, I mean, if truly that's going to happen. If -- not all cars are that badly constructed that any CO comes up into the car.

GRAND JUROR: Mm-hmm.

THE WITNESS: But no, she -- she was -- we tested the muscle, and apparently is was a good sample. Amphetamines, methamphetamine were negative. Cocaine, its metabolites were negative. Morphine, blood organic basis. So, you know, as many drugs as possible, especially the ones that were most like to have been -- to come into a play in a death like -- if it had been a drug overdose, were all negative.

We were -- we were fortunate. There was actually an area of her body that was relatively protected from the

Exhibit 5002 at 877

elements as well as the animals.  It was just the right leg. Its position was out of the sun.  There was enough muscle that was in good shape that could be harvested, even after five weeks, and used for this testing, so.

GRAND JUROR:  When -- with this, I mean, obviously it's a homicide, but no real clear indication of how?

THE WITNESS:  No.  Hmm-mm.

GRAND JUROR:  How does that play out as far as proving it in court that this particular person did something, because we don't -- we can't say he did anything.

THE WITNESS:  Well, it's -- it's clearly a lot harder.  It's clearly a lot harder, and cases like this tend to be very tough ones.  And sometimes they linger on for years and years --

GRAND JUROR:  Right.

THE WITNESS:  -- because burden of proof is -- it just isn't quite enough to take it, either to a grand jury or any form of arrest and indictment.  But, you know, in two of these cases that I just described in other counties, you know, they finally just got enough to get over the edge.  I mean, fortunately those girls had evidence of injuries, so -- or homicidal violence modalities, especially the one with the duct tape, that, you know, are far more compelling to a grand jury -- or any of us, you know -- for homicide.

Exhibit 5002 at 878

But this case, it just doesn't add up any other way.  And we may never know unless somebody, you know --

GRAND JUROR:  Comes forward.

THE WITNESS:  -- confesses.  And I don't know that that's likely.

GRAND JUROR:  You said almost all the bones were found?

THE WITNESS:  Yeah, a few -- I think a few minor hand bones were probably taken away by animals.

GRAND JUROR:  The blood on her -- the bottom of her shoe was tested and proven to be hers?

THE WITNESS:  As far as I understand.  I had nothing to do with that, but I'm -- was made aware of that --

MR. FRAZIER:  And you have the lab report in that --

GRAND JUROR:  Okay.

MR. FRAZIER:  -- in there, that shows that.

GRAND JUROR:  I just wondered, on the bottom of her shoe, I just thought maybe in a struggle she kicked the person, and made him bleed, and got his blood on it.

THE WITNESS:  And it's her blood, though.

GRAND JUROR:  I assumed that you --

(Cell phone ringing, turned off.)

GRAND JUROR:  I assumed checked to see whether she had anything like fingernails, anything under the

Exhibit 5002 at 879

fingernails, struggling with someone.

THE WITNESS:  We had -- we had -- somebody describe that --

GRAND JUROR:  -- she's -- apparently was a person who was really a go-getter and probably wouldn't have just submitted unless she was knocked unconscious.

THE WITNESS:  We found no injuries.

GRAND JUROR:  Nothing that could have --

THE WITNESS:  No.

GRAND JUROR:  -- suggested that she had -- she resisted an attack?

THE WITNESS:  No.

BY MR. FRAZIER:

Q.    And just so we're clear, one of the rumors floating around town is that -- well, there was people say that whoever did this to her had cut all her fingers off and pulled her teeth and cut her braces and --

A.    No.  Because --

Q.    -- things like that.

A.    -- really graphically, x-rays showed the full set of upper and lower braces.  All of her teeth were there.  Two dentists came to the autopsy near the end and identified her, and all of her -- hands and fingernails are given a lengthy description in my report.

MR. FRAZIER:  Well, I don't think I have anything

Exhibit 5002 at 880

else to ask Dr. Olson.

Does the grand jury have anything else you'd like to ask him?

GRAND JUROR:  Is it possible, or likely -- it doesn't sound likely, but is it possible she was hit by a car without any breakage of bones and other evidence given when we found her?

THE WITNESS:  Be pretty unlikely.  I mean, it just really would be unlikely.  Yeah, usually you see fractures of the legs and --

GRAND JUROR:  If she had had road rash, would you have seen it?

THE WITNESS:  Not -- not at that stage.

GRAND JUROR:  Not at that point?

THE WITNESS:  No.

MR. FRAZIER:  Okay.  Any other questions for Dr. Olson?

Okay, sir.  All done.

THE WITNESS:  All righty.  Thank you.

GRAND JUROR:  Thank you.

(End of recording.)

Exhibit 5002 at 881

18

--oOo--

I certify, by signing below, that the foregoing pages 1 through 17, inclusive, constitute a correct transcript of .wav recordings provided of the above-entitled matter, this 14th day of February, 2011.


_____

PEGGY S. JILLSON, TRANSCRIBER

Exhibit 5002 at 882

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

**STATE OF OREGON,**                )

                         )

        Plaintiff,       )  Case No. 10-CR0782

                         )

v.                       )

                         )

**NICHOLAS MCGUFFIN,**       )

                         )

        Defendant.      )

_____) VOLUME 8

Wednesday, August 4, 2010

(Second session)

GRAND JURY PROCEEDINGS

APPEARANCES:

FOR THE PLAINTIFFS:     **PAUL FRASIER**
                      **DISTRICT ATTORNEY**
                      250 N. Baxter
                      Coquille, Oregon 97423

TRANSCRIBED FROM AUDIO RECORDINGS

TRANSCRIBED BY:        Peggy S. Jillson
                      987 Tivoli Street
                      Eugene, Oregon 97404
                      (541) 689-7964

Exhibit 5002 at 883

## WITNESS INDEX

| | |
|---|---|
| SIMON, Scott | 3 |
| MIDDLETON, Bill | 14 |
| EDGERTON, Megan | 34 |
| DEMAIN, Nicole (Decker) | 43 |
| PEET, Kimberly | 57 |
| BEEBE, Melissa | 64 |
| SHINAR, Adam (Brewer) | 77 |
| BRUGNOLI, Melissa | 82 |
| LINDEGREN, John | 87 |
| LINDEGREN, Hjordis "Jordi" | 95 |
| COOK, Lisa (Coleman) | 103 |
| PUGMIRE, Kim (Courtright) | 122 |
| MEADE, Darius | 134 |
| McNEELY, Ray | 137 |
| WEBLEY, Christopher | 148 |

Exhibit 5002 at 884

**COQUILLE, OREGON; WEDNESDAY, AUGUST 4, 2010; P.M. SESSION**

-o0o-

**TESTIMONY OF SCOTT SIMON**

(Witness sworn.)

BY MR. FRASIER:

Q.     First of all, sir, this is the grand jury for Coos County, and we're looking into the disappearance and death of Leah Freeman.

A.     Mm-hmm.

Q.     It's obvious with the start today that I turned on a couple of recorders, but I have to tell you we're recording the proceedings.  All right?

A.     Okay.

Q.     First of all, could you tell us your name, sir, and what city you reside in.

A.     Scott Simon, S-i-m-o-n.  And I live in Carmichael, California.

Q.     Mr. Simon, in the past have you lived here in the Coos County area?

A.     Yes.

Q.     And how long and -- well, when did you live here, and for how long?

A.     Well, I lived here pretty much my whole life until I went to nursing school at the Southwestern Oregon Community College.  I think I graduated in -- I want to say

Exhibit 5002 at 885

*S. Simon*

2003. And then shortly after that I got a divorce and moved down there promptly, actually before the divorce.

Q. Okay. Well, Mr. Simon, the reason I asked you to come here today is -- well, first of all, let me ask you, are you acquainted with an individual named Art Jones?

A. Um, I recall -- I knew him from high school, an acquaintance.

Q. Okay.

A. Never really hung out or anything, but I knew of him and maybe had a class or two with him.

Q. All right. As part of this investigation, I just want to read a couple of things to you here. I was just -- no. Here -- the first thing I want to say, read to you is something from materials that were seized from the McGuffin home, either earlier this year, or were seized in --

A. Who's the McGuffins?

Q. Well --

A. Do I need to know that? No?

Q. Well, Kathy McGuffin would be the mother. Bruce McGuffin is the father. Nick McGuffin is a son.

A. Oh, okay.

Q. All right?

A. Oh, okay.

Q. And according to the material I have, this is from either materials that were received by the police in the

Exhibit 5002 at 886

*S. Simon*

early 2000s or were in the materials that were seized in January of 2010. The McGuffins had written in their paperwork the following, and I just want to read you this first sentence.

Scott said Art Jones, a friend of Bill, Tom, et cetera, confided in Scott that Art had burned or disposed of clothes related to Leah, and that Bill and Tom were responsible for Leah's death.

A. That's not exactly what was said.

Q. Okay. What was said?

A. I can explain it to you. But there's some federal privacy laws.

Q. I'm not going to ask you about your dealing with Nick --

A. Okay.

Q. -- or talking to Nick or anything having to do with Nick.

A. What -- what I did is I called in a tip --

Q. Right.

A. -- to Coquille Police Department that my cousin John had told me that he heard a -- he heard from someone who heard from someone who heard from someone a drunken confession from Art Jones that -- and Art Jones in this -- this case was drunk and told someone that he was involved in it with Bill Sero -- I don't know if Tom -- I don't remember

Exhibit 5002 at 887

6

*S. Simon*

Tom being in it, but this is nine years ago.

Q.    Sure.

A.    But that Art Jones, Bill Sero, and it may have been Tom Stemmerman, maybe --

Q.    Okay.

A.    -- were standing around like afterwards, were like a around a burn barrel, and were burning some stuff. Burning some of her clothing or -- in a burn barrel, or something like that.  And that they had been involved in it.

I heard a tip, so I called it in.  Okay?

Q.    Okay.  Now, if I understood you correctly -- and please correct me if I'm wrong.  If I understood you correctly, you say you heard this from your cousin John --

A.    Yes.

Q.    -- who heard it from somebody who heard it from somebody who heard it from somebody?

A.    Right.

Q.    Something along that line?

A.    Yes.  Now, John -- when Pat Smith called me recently, a few weeks ago maybe, to ask me this, I told him where I heard it from, but they never really contacted John.

Q.    Okay.  Who's your cousin?

A.    John Gatzke.  G-a-t-z-k-e.

Q.    I think we've tried to get ahold of him, and --

A.    Well, he -- he called back twice, and did not get

Exhibit 5002 at 888

*S. Simon*

a call back.  I can get -- tell you how to get ahold of him if you'd like.

Q.    I certainly would.

A.    And then -- so I called in this tip that Art Jones and Bill Sero and I don't remember if Tom Stemmerman was involved or not.  It's been years.  But that may have been the other guy that I forgot about.

Q.    Okay.

A.    Were involved in this.

And I called in the tip, and apparently Pat Smith said he didn't have a record of that, or something to that effect.

Q.    Well, let me read you -- did you ever talk to Kathy McGuffin about this, do you recall?

A.    Yeah, I believe so.  Yeah.

Q.    Because here's a -- I'd like to read this to you.

"Scott Simon calls Kathy at home.  He was making sure it was all okay and cool that" -- well, I won't get into that because the -- we could get into the privacy stuff that you've mentioned.  But did you -- you told -- did you tell -- well, did they tell you they wanted you to go to the police with this information?

A.    Yeah, pretty much.

Q.    Okay.  You promised that you would go, and did Kathy McGuffin give you the name of Ray Nichols as the one

Exhibit 5002 at 889

8

*S. Simon*

you'd (indiscernible)?

A.    I believe -- she gave me the name of someone I don't remember.  But probably.

Q.    Did you tell Kathy that Art Jones had confessed to you --

A.    No.

Q.    Scott, or another Scott who told John's cousin who told Scott --

A.    Okay.  This is -- yeah.

Q.    Okay.

A.    John told me that it was this guy named Scott that worked or owned the Alder House.  Now, I don't -- I guess that place is closed, but John knows what it used to be or who this guy is that used to own it.  Now, he's moved out of the area, but I think it was maybe Scott's wife or girlfriend that heard the drunken confession.

But he never -- no one ever told me this, directly, or I would have immediately -- if someone confesses a murder to me or something, I'm going in immediately.  If it's hearsay, hearsay, I'm like, well, that's not going to do anything.  They're not going to listen to that anyway --

Q.    All right.

A.    -- sort of thing.  But, you know, grand jury, I guess we can use that, so --

Q.    Well, I'm just trying to track this.

Exhibit 5002 at 890

*S. Simon*

A.    Mm-hmm.  Okay.

Q.    Now, let me ask you this.  I think you've answered it, but I'll ask you this anyway.  Just -- nobody's told you directly that, Hey, I killed Leah Freeman?

A.    No.  No.

Q.    And nobody's told you that, Hey, I saw what happened to Leah Freeman, or anything like that?

A.    Nothing like that.

Q.    And outside of what you've told us here today, do you have any other information about what happened to Leah Freeman?

A.    Yeah, I do.  Well, I don't know if it's true, but now this -- my same cousin, he's --

Q.    John (indiscernible).

A.    He gets around.  Yeah.

Q.    Yeah.

A.    He works for my dad.  My dad owns a denturist business.  And they had a patient named Cindy Sero, and I don't know who we're trying to indict here or whatever, and so I'm just giving you everything.

Q.    We're just trying to figure out what the heck happened.

A.    Cindy Sero was their patient a few months ago, and she -- John said, Well, do you know Bill Sero?  Because we went to school with him, because he's never heard the name

Exhibit 5002 at 891

*S. Simon*

again.  And she said, Oh, you mean the guy that -- that was involved in that murder or whatever.

Q.    Okay.

A.    And apparently her husband, which is Bill's uncle or cousin or something, owns an upholstery business.  And Bill called and had his car reupholstered the same week that this girl disappeared.

Q.    Okay.

A.    Okay?  I don't know if you guys already know that or whatever, but --

Q.    I know something about that, yes.

A.    Okay.  Okay.  Well, you know --

Q.    If I were to tell you --

A.    Now --

Q.    Okay.

A.    Now, my dad's already talked to an attorney because she's a patient --

Q.    Right.

A.    -- and that absolves him from HIPAA if she says something like that and you want to talk to John about it.

Q.    Okay.  I can tell you that the police -- let me run this by you and see if this helps you any.

A.    Okay.

Q.    I can tell you the police talked to both Bill and Cindy several years ago.  They told them about Mr. Sero

Exhibit 5002 at 892

calling and making an appointment or when he called and talked about getting the car reupholstered, but then never followed through.

A.    Oh, okay.  Okay.  Okay.

Q.    Does that make sense to you at all?

A.    Yeah.  I think the important part is that he called the same week that the murder happened to re --

Q.    Right.

A.    -- to possibly reupholster it, which sounds kind of -- you know, like something someone might like to know.

Q.    Right.  It is.

GRAND JUROR:  Did he say what kind of a car?

THE WITNESS:  I didn't hear anything like that. Um, John may know more.  I can give you his number or whatever.

BY MR. FRASIER:

Q.    Or we can just bring Cindy in.

A.    He'll -- okay.

Q.    And direct our (indiscernible).

A.    Okay.  Okay.

Q.    Is there anything else?

A.    Um, yeah.  Or no, I guess not.  But so McGuffin's mom said that I said that someone confessed directly to me? Because that's not true.  Okay.

Q.    The first note said Scott said Art Jones confided

Exhibit 5002 at 893

12

*S. Simon*

in Scott that Art was -- had burned or, slash, disposed of clothes related to Leah, and that Bill and Tom were responsible.  And referring -- I believe Bill was Bill Sero and Tom is Tom Stemmerman.

A.    Probably.

Q.    Okay.  Then the mom is saying in the note that Scott told Kathy that Art Jones confessed to Scott another Scott had told John, a cousin to --

A.    That's more like it.

Q.    -- who told Scott Simon.

A.    Right.  So I called that in to -- to Ray, I guess.

Q.    Okay.

A.    And -- you know.

Q.    Okay?

A.    Yeah.

Q.    All right.  I don't --

A.    But I just told him -- you know, I didn't tell him at the time that it was my cousin that told me, because I didn't want -- you know.  And I said, But, you know, if you want to subpoena me and ask me who told me, I'll tell you, sort of thing.  And then my cousin John's on his own, and he's going to have to fess up or whatever.

Q.    Yeah.

A.    But he just said, Well, that's the problem.  No

Exhibit 5002 at 894

*S. Simon*

one -- no one will come forward and say where they heard this or that or whatever.

Q.    Right.

A.    And I said, Well, you can subpoena me and I'll tell you where I heard it from exactly.

Q.    Okay.

A.    You know.  Which I've talked to John about it, and he's fine now with telling you whatever.

Q.    Okay.  All right.

A.    So, that's all I really know.

MR. FRASIER:  All right.  Grand jury want to ask him any questions?

GRAND JUROR:  What did you think of Bill Sero at the time?  Did you know him?

THE WITNESS:  I grew up with -- well, I grew -- I went to Marshfield with Bill.  I don't know if he was the same year as I was.  I think he -- this is what I -- I don't really remember, but I think he got off an Indian reservation and he showed up at Marshfield when he was 15 or so.

And, you know, he's kind of a -- he used to get into a lot of fights.  Very athletic, but not in sports.  He was -- he'd, you know, get into fights with older guys if he heard that they beat up their girlfriends or whatever.  He'd go around just beating them up.  You know, he was a tough son of a bitch.

Exhibit 5002 at 895

And I do recall once I was at -- I was with my girlfriend's sister at Fred Meyer, and we saw Bill Sero there at Fred Meyer, and he's got like clothing with the hanger still on it over his shoulder, and he just waltzes out of the store, you know, without paying for it.  And -- you know.  My girlfriend's sister thought that was real cute.

So yeah, I think, you know, he's just kind of a --

GRAND JUROR:  Arrogant.

THE WITNESS:  -- asshole.  And, you know, maybe antisocial.  Probably antisocial.

MR. FRASIER:  Any other questions?

Okay, sir.  You're free to go.  I'll have the officers ask you about how to get ahold of John, out there in the lobby.

THE WITNESS:  Okay.  And now we're done-done?

MR. FRASIER:  And we're done-done.

THE WITNESS:  Okay.  Because I got to go back to California-California.

MR. FRASIER:  Yeah, yeah.  You can.

**<u>TESTIMONY OF BILL MIDDLETON</u>**

(Witness sworn.)

BY MR. FRASIER:

Q.   First of all, could you -- this is the grand jury for Coos County.

Exhibit 5002 at 896

*B. Middleton*

A.    Yeah.

Q.    And we're looking into the disappearance of Leah Freeman.

A.    Mm-hmm.

Q.    And death of Leah Freeman.

I have to advise you, even though I -- you watched me do it, I have to tell you I've got two recording devices going, all right?  So we're recording the proceedings here today.

A.    Yeah.

Q.    All right.  First of all, could you tell us your name, please, sir, and where you live.

A.    Uh, full name?

Q.    Yeah.

A.    Billy G. Middleton.  I live at 1931 Hayes Street in North Bend.

Q.    Have you lived in the Coquille area, sir?

A.    Oh, yes.

Q.    And were you at one point in time married to a sister of Cory Courtright?

A.    Legally we're still married.

Q.    Oh, legally you're still married?

A.    Yeah.

Q.    You both live over there now, in --

A.    No.  She lives in Bandon.

Exhibit 5002 at 897

*B. Middleton*

Q.    Oh, okay.  Okay.  I need a scorecard to keep here.

A.    (Laughing.)

Q.    Mr. Middleton, I want to talk with you a little bit -- well, first of all, did you know Leah Freeman?

A.    Oh, yes.  Very well.

Q.    How long did you know Leah?

A.    From birth.

Q.    What type of girl was Leah like?

A.    What type of girl?  Very active young lady. Fun-loving.  We had an exceptional relationship.  Even though she was on my wife's side of the family, we were very close. She stayed at our house at times, and...

Q.    All right.  And as she was growing up, eventually she goes to high school as a freshman at Coquille High School, and at some point in time she started going out with a guy named Nick McGuffin.

A.    Yes.

Q.    Did you know Nick McGuffin prior to that?

A.    Prior to that?  No.

Q.    And you were aware that they were a couple, boyfriend/girlfriend type of thing?

A.    Uh, her mother, Cory, told me that.

Q.    Did you have an opportunity to see how the two interrelated?

Exhibit 5002 at 898

17

*B. Middleton*

A.    Uh, yes, I did, some.  He was a controlling type of person with her.  Like I could see that he was the one kind of running the relationship.

Q.    Okay.  Did you see any changes in Leah once she started going out with this guy?

A.    Yes.

Q.    What kind of changes did you see?

A.    Uh, well, I could tell the way he held her and put her on his lap that there was probably sexual relationship-type changes that way.

Q.    Okay.  Did her demeanor, her behavior or anything change, outside of what you've described here?

A.    Yeah.  Her relationship with -- with me, I think stayed the same but I just saw her less.

Q.    Okay.  Leah disappeared on June 28th of 2000.  And if I remember reading the police reports correctly, a couple of days later or a week later there was an incident at your house involving -- at least on your front lawn or something along that line, involving Nick and Denise Freeman, someone else.  And there was a shouting match and the police got involved.

Do you recall that at all, sir?

A.    Hmm.  No, I do not recall that.

Q.    After Leah's body had been found, there was a memorial service at the high school.

Exhibit 5002 at 899

*B. Middleton*

A.    Yes.

Q.    Were there words spoken between you and Nick at the high school?

A.    Uh, yes, there was.

Q.    Could you tell the grand jury what happened, what schools -- what happened at the memorial?

A.    Well, I have to tell you, I -- from the moment she was missing, I felt that he was definitely connected to why she was missing.  And, you know, when her body was found, I became angry at times and he was angry back at me.  And at the -- when we had the funeral at the high school, the -- me and my stepson walked out, and then him, his dad and mom, let's say, stuck to together closely, came out and I -- and my stepson says, "Oh, here they come, Bill."  And I turned around and saw him, and I just stared at him.  And I couldn't help it.  At that point I did not say anything.

And then the mom stopped, and she goes, Why do you always think Nick murdered her?  And all that kind of stuff.  Screaming at me.  And I said, Why doesn't your husband say something?  Why are -- why are you the one doing the speaking up?  I'd rather talk to him about this.

And at that time both of them start walking towards us.  And my stepson says, Well, I'll grab the -- the younger one, and you take care of the older one.  And I said, Okay.

Exhibit 5002 at 900

*B. Middleton*

And at that time my brother-in-law came over and got between us, so we didn't even touch.  And at that time he was calling me names, filthy names, and I said, How can you guys come here?  You know your son murdered her.  You know that.  You cleaned up his trunk, of his car, in that -- in that 1968 Mustang, and completely made it look like a brand-new trunk.  I said, What was that all about?  You know.

And then -- then all of a sudden everybody got involved and -- and the detective was there, I can't remember his name.  Told -- told everybody to be quiet and -- and --

Q.    Sir --

A.    And Denise -- Denise got on me a little bit about that time.  She was walking out with Nick.  Not at that point.  She came running up.  And -- and that -- you know, that's just about it, what happened.  It was --

Q.    Okay.

A.    -- talk.

Q.    In some of the materials that we've been going through here, and correct me -- the grand jury can correct me if I'm wrong.  I think it was yesterday we were listening to a taped statement of a witness, and the witness had said something about Nick saying that he thought Bill Middleton was involved in Leah's death.

A.    Yeah, that's what the detective and the -- I think it was the captain.  Anyway, they came over to my house

Exhibit 5002 at 901

and they -- and they said, Well, we have to ask you this. And I said -- and they wanted to know where I was. And I said, Well, me and my wife were coming back from this -- well, that's when we saw Nick. Well, that might be later in the questions here, but I -- I have it if you don't have it.

Q.    Okay. Right.

A.    No, I said, we -- we were together. Me and my wife. We --

Q.    Okay. If I recall correctly, you and your wife were together the evening of June 28th of --

A.    Pardon?

Q.    The evening of June 28th, the day she disappeared, you and your wife were together?

A.    Yeah. Yeah. We both worked and then --

Q.    And you went down to Safeway and bought some ice cream --

A.    Yeah. Right.

Q.    -- or something along --

A.    Can't remember what we got, but yeah.

Q.    And the police asked you about that, and they went down and double-checked, and found your receipt or something.

A.    Yeah.

Q.    Okay.

A.    That's right. Because I used my card.

Exhibit 5002 at 902

Q.    Right.

A.    And the reason that they wanted to do that -- I don't know if that's your next question or something.

Q.    Okay.

A.    But for -- if you want me to speak, or --

Q.    Well --

A.    -- or want me to wait.

Q.    Or I was going to get to that.

On the eve --

A.    Oh.

Q.    On the day -- I guess we'll go there.

On the day of June 28th, did you see Nick at all?

A.    Yes.

Q.    And did you see Leah with him?

A.    Yes.

Q.    Where was that at, and (indiscernible)?

A.    Uh, there was a third party in the car also. That was Brent --

Q.    Bartley?

A.    Yeah.  Brent Bartley, yeah.

Q.    Okay.

A.    Brent Bartley and Nick were in the front, and Leah was in the back, and we both got a very good look at her.  Me and my wife both did.  Her hair was just -- Jesus -- all frizzed up, up sticking straight up in the air.  They had

Exhibit 5002 at 903

*B. Middleton*

the windows down, though, you know, and that -- that could be part of it.

And that was -- I never could come to a good time when I saw them, but they said they were going to check at the store because I used my Safeway card. And -- but I'm guessing it was between 6:00 and 7:00, so.

Q. Okay. Did you actually talk to Leah or Nick?

A. No.

Q. No. Just saw them there at the store?

A. No, we didn't see them at the store. We just -- so they were -- we were coming from the store and they were -- at that time you could make that -- let's see. We were coming this way and -- now, how did that work? We were coming back, yeah. And -- but they were going up this way, yeah. Probably --

Q. Okay. I'm totally confused.

A. All right. What do you call that? Used to be a --

Q. Well, let's -- we got a little map here.

A. Used to be a body shop there. Lansbury (phonetic) Ford, but maybe that was before your time here too. I don't know.

Q. Probably was.

This is Central Street going this way, and Safeway would probably be down here on First. And --

Exhibit 5002 at 904

*B. Middleton*

A.    Mm-hmm.

Q.    Down here, this would be Central.  McKay's is around in here.  So maybe you could --

A.    Well, we -- what's the street where the old City Hall used to be on?  What's that corner --

Q.    That's Collier.

A.    The main -- the main street.

Q.    No.  No.  It's Second Street over there.

A.    Okay.  But I'm talking about the Main Street -- Birch.  City Hall.

Q.    On Second and Birch.  Second and Birch.

A.    Okay.  We came -- we were coming up Second and then made the left that go -- there was a bank there --

Q.    Right.

A.    -- on the left, and then there was a video store on the right.

Q.    Right.

A.    And then that's -- we made the turn, and that's when we saw them, you know.  We were going this way and they were going that way.

Q.    Okay.

A.    Okay.

Q.    So they were headed -- looking like they were headed towards Safeway, and you're look -- you're headed towards home?

Exhibit 5002 at 905

*B. Middleton*

A.    Right.

Q.    Okay.

A.    Got it.

Q.    The picture I have in front of you, does that look like Leah that day?

A.    No.

Q.    Okay.  What was different?

A.    Hair.

Q.    Hair?

A.    Yeah.

Q.    All fuzzed up?

A.    Yeah, just -- I went, Wow.

Q.    Okay.

A.    I've never seen her look like that.  And I don't know if she was happy, sad, or what, but it looked like -- well, be a guess.

Q.    Have you had any -- have you had much contact or any contact over the last ten years with Nick McGuffin or Bruce or Kathy McGuffin?

A.    Uh, I talked to -- I need to back up a minute here, because it involved Bruce McGuffin coming back.  Af -- the day -- the day after the night, the next day when Leah was missing, in the morning, I went up to the Courtrights' house and -- and Nick was there.  Cory was there.  Denise was there.  I don't who all was there.  Their -- Cory's mom and

Exhibit 5002 at 906

*B. Middleton*

dad were there. And they were all talking, and I just kept watching him. And -- and then things kind of calmed down, and he was putting on a show -- what I call a show. And I asked him, I said, Could I talk to you in the laundry room by yourself? And he says, Sure. And so we went in there --

Q.    That's Nick?

A.    Yeah.

Q.    Okay. Go ahead.

A.    And we went in there and he goes, What's up? And I said, Well, tell me, did you guys have an argument or anything last night? And he goes, No, no, not at all. And I said, Oh, come on. You know, the way you've been treating her, and -- and you guys didn't have an argument?

And he goes, Oh, I guess we did have an argument, yeah. Then he admitted it to me, but he denied it the first time and then admitted it when I put a little bit of pressure.

Q.    Did he say what the argument was about?

A.    No. He didn't. I didn't ask him.

Q.    Did --

A.    And then at that point I went straight -- then he went, he left. They were going to go and interview on the City Hall steps down there. And I got to thinking about it, so I went straight down there. And I told the -- I don't know who all was down there. Whoever that big, tall chief of

Exhibit 5002 at 907

B. Middleton

police was at the time.

Q.    Okay.

A.    And --

Q.    Mike Reaves?

A.    Yeah.

And a captain, I believe was down there.  I told them about our discussion there.  I said he lied to me first time, and then he finally admitted it, that they did have an argument.  And -- you know, and that -- that was it.

And I -- and then I also told him that I saw -- saw Cory -- or Leah and Bartley and him together in the car.

GRAND JUROR:  I have a question.  How did you come to be -- what brought you over to the Cartwright [sic] your -- that morning?  Did -- was it because of Leah missing, you got called?

THE WITNESS:  Yeah.  And we only live like -- we only lived like two and a half blocks from them.  We were up there a lot.

GRAND JUROR:  Did Nick appear to be himself, or would you say he was acting peculiarly that morning?

THE WITNESS:  Well, to me -- to me, he was hiding it pretty good at that time.  But I could see that he just wasn't right, you know.  He was holding back something.  And -- you know.  Of course we didn't know what was up then, and I didn't know if she was just somewhere, who knows where.

Exhibit 5002 at 908

B. Middleton

And didn't know.  But I knew he knew something, by his actions.

GRAND JUROR:  Did you -- I have a couple of other questions, or do you want to go -- do some more?

MR. FRASIER:  Go ahead.

GRAND JUROR:  Were you aware he -- or would you say he was using drugs at that time?  Or were you aware of the fact that he might have been using drugs?

THE WITNESS:  Oh.  (Sighs.)  How can I -- I don't want to just say I think he was using drugs, although I do.  But --

GRAND JUROR:  That's okay if you say that.

THE WITNESS:  Yeah, I believe he was using drugs.

GRAND JUROR:  Do you think that Leah had been using drugs?

THE WITNESS:  I do.

GRAND JUROR:  And how about your sister-in-law, Courtright, the mother?

GRAND JUROR:  Cory.

MR. FRASIER:  Cory.

GRAND JUROR:  Cory.

THE WITNESS:  Uh, I don't know if she was.  I don't know that.

MR. FRASIER:  Okay.

GRAND JUROR:  Or the older -- or the other

Exhibit 5002 at 909

sister?

GRAND JUROR:  Or Denise?

GRAND JUROR:  Denise.

THE WITNESS:  Pardon?

GRAND JUROR:  Denise?

THE WITNESS:  Oh, I believe Denise was, yeah.

GRAND JUROR:  Her sister.

THE WITNESS:  You know, I'm going to -- I'm sitting here thinking about Cory at that time.  I'm trying to go back there and -- they were all living with her, with Cory's mother and father there.  You know, I can -- I just don't know, about that.

GRAND JUROR:  (Indiscernible.)

THE WITNESS:  I can --

BY MR. FRASIER:

Q.    Let me ask you a couple of questions.  We've heard some things today that frankly I think some of them this is the first time I've ever heard of it.  So I thought I'd ask you, and I'm probably going to ask Cory to come back and we'll be asking her most of these questions too.

Now, she had a boyfriend she was living with, I believe his last name was Murphy.

A.    Yeah.

Q.    And they lived some place else in town?

A.    Mm, not at that time.  Cory lived with her mom

Exhibit 5002 at 910

29

*B. Middleton*

then.

Q.    Yeah, but when -- Cory split up with Murphy at some point in time?

A.    Oh, they split up a few times, yeah.  Uh --

GRAND JUROR:  Were they living together at one point?

THE WITNESS:  At that -- no, they weren't living together then.

BY MR. FRASIER:

Q.    Okay.  In June of 2000 Cory and Denise and Leah were living with --

A.    Oh, okay, yeah.  Yeah.

Q.    Living with grandmother --

A.    You're right.

Q.    That was right?  Okay.

A.    But they also were living with Murphy during that time.  That just hit me when you --

Q.    Okay.  They had been living with Murphy --

A.    Yeah.

Q.    -- or they still were or they had moved out?

A.    No, they had been, and moved out, I believe.

Q.    All right.  Now, the -- one of the things I want to ask you, were you aware of any allegations that Murphy was trying to sexually abuse Leah Freeman?

A.    Oh, absolutely not.

Exhibit 5002 at 911

Q.    That was never brought to your attention?

A.    Oh -- no.

Q.    Okay.

A.    No, not -- I don't think so.  No.  You know, he - he had -- I can tell you Jim Murphy has a temper, and can be a not-a-very-nice guy, but that's not him, ever.  No.

Q.    All right.  We've heard testimony that earlier in the year 2000 that Leah was actually living out at the McGuffins' home for a couple of weeks.  Do you know anything about that?

A.    No.  Never heard it.

Q.    We've heard some testimony today, and this is from the McGuffin family, but we've heard testimony today that Cory was heavily -- or I shouldn't say heavily.  Was into methamphetamine, was using meth, I guess quite a bit, the way it was described, and that was one of the reasons that Leah was trying to stay away from around her.

A.    No.

Q.    Um --

A.    I mean, I -- Leah was never trying to stay away from her mom.

Q.    Okay.

A.    That I know of.  Hmm-mm.

Q.    All right.

A.    They always had a pretty good relationship.

Exhibit 5002 at 912

It's -- it's -- I'll wait for --

Q.    Okay.

A.    They -- they have always had a pretty good relationship, those two.

Q.    As far as you know, then, Leah didn't live out with the McGuffins at all?

A.    Well, you know, she may have been -- I'm sure she was out there, but as far as living there, no, I wouldn't say so.  Huh-uh.  No.  She was going to school.

Q.    Right.  How about Nick staying with Cory Courtright, staying in their home for a period of time?

A.    Nick staying with -- at the same residence with Cory?

Q.    Yes.  Did you ever see that?

A.    I remember one time Cory was kind of angry because Nick came walking down the stairs in the morning. But as far as living there, no.

Q.    Okay.  Okay.

A.    And I was there a lot.  I mean, me and my wife was there like every other day.

Q.    As far as you know, there never was a situation where Nick may have been kicked out of his own home and Cory allowed him to stay with them for a day or two or three, until --

A.    Hmm-mm.  No.  Absolutely not.

Exhibit 5002 at 913

Q.    -- he got things straightened out with his mom and dad?  Okay.

Since what you've talked about, have there been any other -- you know, say in the last five years or so, have you had any other contacts with the McGuffins, or anything like that?

A.    Last five years?  No.  I -- I don't believe so.

Q.    All right.

A.    I may not know him if I saw him today.

Q.    Okay.

A.    Yeah.

Q.    Finally, I've been asking everybody at least kind of three questions.  Has anybody told you that they were responsible for Leah Freeman's death?

A.    No.

Q.    Has anybody told you they saw what happened to Leah Freeman?

A.    No.

Q.    And I think I've already asked you.  You had nothing to do with Leah Freeman's --

A.    No.

Q.    Okay.  Is there anything else about this case you think the grand jury needs to know about that I've missed?

A.    Uh, oh.  (Sighs.)  Well, yeah, a couple things.

Denise had kind of -- it was Cor -- Leah's sister

Exhibit 5002 at 914

*B. Middleton*

Denise kind of took up with Nick McGuffin after -- and actually, it was -- I think that was even before her body was found. Maybe. I'm not sure of that.

But shortly after either they found the body, or even before maybe, Denise was with him a lot, in his car, with other kids. And I don't know what type of relationship they'd had. I -- I can't tell you that, but I saw them at a football game. That would put it in October or November. They were still hanging out. And I was walking out, and they wouldn't let Denise and him back in the game because they had left. Once kids leave, they won't let them back in.

And I said, Denise, why are you hanging out with Nick McGuffin? I says, He probably murdered your sister. And she started screaming at me, defending him, and that type of thing, and he just set there and grinned at me. Just grinned. Not denying it, not saying a word. Just grinned. The type of grin that, you know, just kind of told me that, "I did and I can get away with it."

And then -- let's see. What's the other thing? Oh -- I don't know. I'm just going to go ahead and say this.

I think -- I really believe that Denise Freeman knows more about this case than what she's letting on. I really believe that.

Q.    Okay.

A.    And I don't -- I'm not saying she's involved, but

Exhibit 5002 at 915

*M. Edgerton*

she knows something.

Q.    Okay.

A.    Because she -- she's -- she's -- became very cold after that, and -- and continuously ran around with Nick McGuffin.  That alone was so bad, you know.  Even if there was a chance that he killed your sister.  Maybe -- you know, or you're just -- why would you be doing that?

Q.    Okay.

A.    You know, that always frustrated me.  And no, I don't like him.  I'll throw that out.

Q.    All right.

A.    Like -- I really can't think of anything else that might...

MR. FRASIER:  Okay.  I don't have anything else to ask Mr. Middleton.  Does the grand jury want to ask him anything?

Looks like you're done.

THE WITNESS:  Thanks, you guys.

GRAND JUROR:  Thank you.

MR. FRASIER:  You're free to go.

**TESTIMONY OF MEGAN EDGERTON**

(Witness sworn.)

BY MR. FRASIER:

Q.    Okay.  First of all, this is the grand jury for Coos County, and we're looking into the disappearance and

Exhibit 5002 at 916

*M. Edgerton*

death of Leah Freeman.

I need to advise you, even though I think you saw me do it, I've got two different recording devices recording the proceedings here this afternoon.

A.    Mm-hmm.

Q.    And first of all could you tell the grand jury, please, your name and where you live.

A.    Megan Edgerton.  Do you want my full address?

Q.    Yes, please.

A.    92998 Poplar Lane, Coos Bay, Oregon.

Q.    And are you acquainted with an individual named Nick McGuffin?

A.    Yes.

Q.    How do you know Mr. McGuffin?

A.    He is my ex-boyfriend.

Q.    Did you actually live together with him?

A.    Yes.

Q.    How long did -- were you folks together?

A.    Uh, about eight and a half years we lived together.  We were together for nine.

Q.    And you have a child together; is that correct?

A.    Yes.

Q.    Were you ever acquainted with Leah Freeman?

A.    No.

Q.    During the time frame that you were -- well, let

Exhibit 5002 at 917

*M. Edgerton*

me back up a little bit. Do you now -- you're no longer with Mr. McGuffin; is that correct?

A.    No.  We have a relationship because of our daughter, which --

Q.    Correct.

A.    -- (indiscernible).

Q.    And you currently have some sort of a court proceeding about child custody, visitation, child support?

A.    Yes.

Q.    That's currently pending with the courts?

A.    Yes.

Q.    And that's set for a hearing or a trial in September of this year?

A.    Yes.

Q.    How would you describe your relationship with Nick as -- while he was with you?

A.    Um, I don't know.  It started pretty early.  I was still in school.  I don't know.  We met, did the whole young high school thing, and then eventually got serious, lived together, and had a kid.

Q.    All right.  I guess what I'd like to know is during a relationship with you, did Nick ever abuse you?

A.    No.  We did, like every relationship, have verbal disagreements.  But if you're asking me if he'd ever physically harmed me, no, he did not.

Exhibit 5002 at 918

*M. Edgerton*

Q.   At one point in time you were arrested, were you not, for assaulting him?

A.   Yes.

Q.   Are -- the eight, nine years you were together, eight and a half, nine years you were together, was there any period of time where you separated for a period of time?  A couple of weeks, something like that?

A.   Mm, yeah.  There was a few times, yes.

Q.   Now, do you know an individual named David Breakfield?

A.   Yes.

Q.   Who's Mr. Breakfield?

A.   He is an acquaintance of mine now.

Q.   All right.  Did you ever, quote, date him?

A.   Yes.

Q.   And was that during one of your periods of breakup with --

A.   Yes.

Q.   And do you know an individual named Jesse --

A.   Smisek?

Q.   Smisek?

A.   Yes.

Q.   And how do you know Jesse?

A.   I went to school with him.  I was never very fond of him.  He was kind of a grungy druggie, not a very good

Exhibit 5002 at 919

*M. Edgerton*

person.  I didn't want to associate with him, so I didn't.

Q.    How did Nick react to you being with David Breakfield?

A.    Well, we were separated.  Of course he wasn't very happy about it, but he accepted it.  There was nothing he could do.

Q.    Was there ever an incident where you were in a car with Mr. Breakfield and Mr. Simek or Simezek or however --

A.    Smisek.

Q.    Yeah.  And Nick chases you down and, for lack of better terms, run you off the road?

A.    No, we've never all three of us have been around each other, ever, at the same time.  That's never happened.

Q.    Okay.  Well, did it ever happen with just you and Mr. Breakfield?

A.    No.

Q.    Now, I'm going to tell you that Mr. Breakfield's going to testify next week, and he's going to testify to an incident such as that.  It's your testimony that that did not occur?

A.    No.  There was never a time where he followed us, and your quote, drove us off the road or tried to drive us off the road.

Q.    Okay.  All right.  Do you know a Nicky Demain or

Exhibit 5002 at 920

Nicky Decker?

A.    Yes.

Q.    How do you know her?

A.    We used to be friends in high school and in junior high.

Q.    And how close were you?

A.    Um, we were fairly close until she moved to Coquille.

Q.    Did you ever visit with her over here in Coquille?

A.    Yes.  She was the one that introduced me to Nick.

Q.    During your relationship with Nick McGuffin, has he ever talked with you about Leah Freeman?

A.    Yes.

Q.    What has Nick McGuffin told you about Leah Freeman?

A.    Um, about her?  Or about --

Q.    About what happened to her.

A.    He says that Bill Sero and Tom Stemmerman were the ones that killed her.

Q.    Okay.  Did he tell -- ever tell you why he knew that?

A.    Um, he said that they had confronted him before, and also a girl named, I think, Alicia Michaud -- I'm not sure how to pronounce her last name -- also told him that she

Exhibit 5002 at 921

*M. Edgerton*

was there the night that they killed her.  She also wrote him a letter a few days after Leah went missing.  I guess she tried contacting him, telling -- telling him she had something important to tell him.

Q.    All right.  But that's all he told you?

A.    Um, after the course of ten years, I've heard so many stories that I honestly can't remember everything.  A lot of it's just the rumor mill.  And, you know, if there's no facts to it, it's just word of mouth, I really don't -- you know, pay attention to it.

Q.    Did you ever tell Nicole Demain or her -- otherwise known as Nicole Decker, that Nick had gone on a rampage while he was intoxicated and that he said something to the effect to you of, quote, They thought Leah was dead but she wasn't, and they put her out of her misery?  And that Nick then told you or threatened your life if you ever told anybody that?

A.    No.  He did tell me that he thought that maybe it was an accident, what they did.  That maybe they had hit her or somehow injured her, and worried that they would get in trouble.  And they eventually killed her, but -- I don't know.  But he never said anything about threatening me about any of that.

Nicky Decker did call me, which you have on recording.  I did not know I was being recorded by the

Exhibit 5002 at 922

police, but she asked me what I had told her.  She wanted me to recap what I had told her a few years ago.  And I told her the same thing about Bill Sero and Tom Stemmerman, which is on recording.

Q.    But you never told Nicole Demain that Nick confessed to you that he'd been involved in the death of Leah Freeman?

A.    No, I told her that he had told me --

Q.    It's a yes-or-no answer, ma'am.

A.    No.

Q.    All right.

A.    Nick has never said that he was involved.

Q.    All right.  Nick has never told you in any way shape or form that he was involved?

A.    No.

Q.    Has anybody told you directly that they killed Leah Freeman?

A.    No.  Um, well, I have something I'd like to say, if you'd let me say it.  Nothing (indiscernible).

Q.    Has anybody told you, Hey, I killed Leah Freeman?

A.    No, nobody has.

Q.    Has anybody told you that they saw what happened to Leah Freeman?

A.    No.  Not directly to me.  It's just word of mouth of what I've heard.

Exhibit 5002 at 923

*M. Edgerton*

Q.    Do you have any personal knowledge as to what happened to Leah Freeman?

A.    Um, a few years back ago, when I was still in high school, it was towards the end of summer, Nick and I were over at Megan Pinkley's apartments in Coquille.  And I think her name's Kristen -- I'm not sure.  It was Bill's -- Bill's girlfriend --

Q.    Okay.  Wait a minute.  You didn't understand the question.  The question is, do you have any personal knowledge; in other words, do you, of your own senses, know what happened to Leah Freeman?

A.    How would I know?  I wasn't involved at that time.  No, like I have been telling you, I only know word of mouth.  I have something I would like to --

Q.    That's fine.  That's what I want to ask.

A.    -- tell you.

MR. FRASIER:  I don't have any other questions for this witness.  Does grand jury want to ask her any now?

THE WITNESS:  Can I tell you what I'd like to say?

MR. FRASIER:  No, you may not.  This is where you answer questions.

THE WITNESS:  Well, Bill's girlfriend told me that she knew Bill did it, and confessed.

MR. FRASIER:  Okay.  That's enough.  You're

Exhibit 5002 at 924

excused.

THE WITNESS:  Why don't you ask her --

MR. FRASIER:  We did.  She's been in here.

THE WITNESS:  Well, I told you.

**TESTIMONY OF NICOLE DEMAIN (DECKER)**

(Witness sworn.)

BY MR. FRASIER:

Q.    Ma'am, this is the grand jury for Coos County, and we're looking into the disappearance and death of Leah Freeman.

You probably saw me do it, but I turned on a tape recorder there, digital recorders.

A.    Mm-hmm.

Q.    We're recording the proceedings here, so I need to tell you that.  All right?

A.    Okay.

Q.    First of all, could you tell us your name, please, and where you live.

A.    Nicole Demain.  Myrtle Creek, Oregon.

Q.    And you were previously known as Nicole Decker?

A.    Yes.

Q.    Okay.  And you're married to --

A.    Randy Demain.

Q.    Did you used to live here in the Coos County area?

Exhibit 5002 at 925

*N. Demain*

A.    Yes.

Q.    How long did you live here?

A.    Um, we moved here when I was 10, and then I continued to live her up until I was about 17, and then from 17 to 23 I've been back and forth between Roseburg and here. So I don't know how many years, I didn't calculate, but --

Q.    (Indiscernible.)  Did you -- well, did you know a Nick McGuffin while you lived here?

A.    Mm-hmm.

Q.    How did you know Mr. McGuffin?

A.    When I was 15 I dated Ricky Crook, and him and Ricky were friends.

Q.    How well would you say you know him?

A.    Um, I never got super close to Nick.  He never really cared for me, I didn't care for -- it was a mutual thing.  But I knew of him, and through Ricky, and then we'd hang out every once in a while; Nick, Ricky, I and Megan.

Q.    Did you ever know Leah Freeman?

A.    No.

Q.    How about Wayne McGuffin?

A.    Yes.

Q.    How did you know Wayne?

A.    Um, I actually through high school, partying, met up with Wayne.  And then after high school my husband and Wayne had actually known each other for a while.  And my

Exhibit 5002 at 926

*N. Demain*

husband and I were dating at the time, and we got an apartment, and he lived next door to us. Well, then he moved out of his apartment with his girlfriend and moved in with us for a while. And then ever since then, it's been hit and miss on when we see him. I never see him anymore, but we used to hang out a lot. We used to be really close, Wayne and I.

Q. Let me ask you this question and -- well, do you also know a person named Megan Edgerton?

A. Yes.

Q. How do you know Megan?

A. When I first moved over here, I was in fifth grade. And she and I were in the same grade, and I actually met her through my younger brother because they had a thing, and then as we went into middle school, Megan and I became like best friends. And then we stayed friends for -- till I was about 15, 16. And then we kind of just drifted our own ways.

Q. Did you, in the course of your friendship, did you actually introduce Nick McGuffin to Megan?

A. Yes.

Q. Now, Megan and Nick were living together for a period of time. Were you aware of that?

A. Mm-hmm.

Q. And was there ever a time when Megan came and saw

Exhibit 5002 at 927

you here in Coquille, and you folks went down I think to the Safeway store or something?

Do you recall that?

A.     Mm-hmm.

Q.     Could you tell the grand jury what you recall that occurred.

A.     I remember one day just out of the blue she showed up at Hillside where my husband and I lived, and knocked on our door and said she wanted to hang out, and let's go party.  And I say, Okay.  Hadn't seen you in a while, sounds like fun.

So I hopped in the car with her and we were going to run to her house out in Coos Bay, I forget where that is.  But before that we stopped at the Safeway.  We didn't even go to the store, she just pulled over and we were talking.

And Nick called, and they argued like usual.  And then they got off the phone, I just remember looking at that sign, the insurance place.  And then she just started talking about stuff that Nick had said that -- she wouldn't go into detail, but I know that she was saying that one drunken night, on Nick's behalf, he had seen a picture of Leah in the bedroom or something, and just started ranting and raving about Leah this and Leah that.  But like I said, she never gave me detail.  She wouldn't give me detail.

And that he freaked her out, and she thought that

Exhibit 5002 at 928

he did it, just from everything he was telling her. Okay.

Q. Do you recall telling the police or quoting her as saying something to the effect of -- well, I'll just read what the police report says.

"According to Nicole Edgerton, told her McGuffin said they thought Leah was dead, but" --

A. Oh.

Q. -- "she wasn't, and they put her out of her misery"?

A. Mm-hmm.

Q. Could you tell us about that, and tell us how that came in?

A. The -- pardon me for my memory.

Q. Yes.

A. It was not something I ever thought that I'd have to repeat.

Q. Okay.

A. So I don't exactly know how this conversation came about, I just know she was telling me about when drunk -- Nick was drunk, and then things came up. And that was one thing I did remember, is he was crying or something, and said they thought she was dead, and they went back and checked, and then they put her out of her misery. I mean, just -- just like that. Just like what it says.

Q. And it wasn't that somebody else did it, it was

Exhibit 5002 at 929

the way she was telling you, you believed that Nick was there?

A.    Yeah.  Oh, yeah.

Q.    All right.  Now, you were interviewed by the police about that, correct?

A.    Mm-hmm.

Q.    And you told the police what she told you?

A.    Right.

Q.    And then the next day the police came and talked to you about doing what's sometimes referred to as a pretext phone call?

A.    Correct.

Q.    And you called her on the phone; is that right?

A.    Mm-hmm.

Q.    What happened when you called her on the phone?

A.    Started it off as a casual conversation.  Hey, I got your phone number from the police, which she was like, "I can't believe they gave it out," you know.

Um, I've never done any of that kind of thing before, so I didn't really know how to be.  And she had asked me, Did the police set you up to this?  And I said, No.  I lied because I didn't know I was supposed to tell the truth about that.

And so then we went on in casual conversation, and I tried to like squeeze in, you know, Remember the

Exhibit 5002 at 930

*N. Demain*

conversation?  She says she doesn't remember.  She asks me, Well, what did I tell you?  And I said what I already told you guys about, you know, Nick being drunk and all that.

And then she's like, Well, I don't talk about this over the phone.  I've already told them everything I know.  And then the conversation went, and we extended it into just casual conversation, Hi, how are you?  How old's your baby?  Such-and-such.

And then the next day, because Officer Webley and McNeely realized, you know, probably not a good idea to tell her a lie because if it comes up in court that's not going to be good.  So we went back, called her again, and that was a disaster of a conversation.

And I told her the truth, and I told her I was sorry.  She asked me, Well, why did you do it?  And I said -- I don't even remember what I said.  Just don't even remember what I said.  I just remember she asked me why I did it, and then I apologized.  And she told me to F off, and she told me I wasn't a good F'ing friend, and hung up the phone.

Q.    Let's talk about Wayne McGuffin for a minute. Did Wayne actually stay in your home for a period of time?

A.    Mm-hmm.  For like two months or so.  Maybe two and a half.

Q.    Was there ever a time that Wayne got drunk and he started talking about Leah Freeman?

Exhibit 5002 at 931

*N. Demain*

A.     Mm-hmm.

Q.     Could you tell the grand jury, please, what you recall about that.

A.     Oh, one night -- because Wayne, my husband, and I, we always would drink at the house.  And no big deal, casual.  And one night my husband actually went to bed early and Wayne and I, we stayed up and drank till the beer was gone.  And in the last couple of beers left, he just starts bawling.  And I'm trying to -- you know, What's wrong?  Are you okay?  And he didn't want to talk about it, didn't want to talk about it.  And all of a sudden, just out of the blue, this whole thing came up in conversation, and I asked him, Well, what are you talking about?  And he said, about the time when he was at the house and there was a ruckus in the kitchen and he stepped out to see what was going on, and there was blood all over Nick's shirt and hands, I guess. And then his dad -- Bruce, I guess is his name, said, Don't worry, we'll clear this up.  We'll get it figured out.

        And then there was a jump in the conversation; I don't know if it happened that night or if it was a later date, as to Wayne disagreeing with what was going on, and they got upset at Wayne for the fact that he didn't want to be involved in whatever this was.  And from there on, Wayne had very little to do with his family.  They don't talk. They don't -- as much as possible.  I don't know about now.

Exhibit 5002 at 932

*N. Demain*

I haven't talked to him in a while. But at that time he did everything he could to avoid them. And I remember taking him up to his family's house, and they were just mean. Mean, mean, mean to him. And he'd leave the house crying. Big old Wayne would leave the house crying. I remember that.

There aren't a whole lot of detail to memory because, again, didn't realize I had to come up one day and say all this. So I apologize for the lack of information.

Q. Okay. Let me just kind of go over here. I think when the police interviewed you, you mentioned that Wayne was 95 percent certain that Nick had been involved in Leah's death. Do you recall him saying that?

A. Mm-hmm.

Q. And that Wayne had said that Bruce had said to --

A. Nick?

Q. No. No. They were talking in the kitchen, and they had to cover up for Nick.

A. Mm-hmm.

Q. And Nicole said that Wayne told her, I don't know how he did it.

A. Mm-hmm.

Q. Do you recall him saying that specifically?

A. Yeah. He didn't know how he did it. He just knew he didn't want to be involved in it.

Q. And you say, quote, I want to say something, I

Exhibit 5002 at 933

*N. Demain*

just can't.  I hate my brother.

A.    Mm-hmm.  That was all the time.  He always said that.  He hated his brother.

Q.    Getting back, I forgot one thing.  When you were talking with Megan in the parking lot at the Safeway store --

A.    Mm-hmm.

Q.    Did she tell you that McGuffin had threatened her life if she told?

A.    Um, I know it says that, but when we were doing the interview, I don't remember saying that.

Q.    Okay.

A.    Um, I know that she was never really fully comfortable with him.  And that he had an awkward moment in the beginning of their relationship, where they went to the dunes and I think they were only together for like a couple of months at this point.  And they went to the dunes with Ricky, and I was supposed to go but I didn't.  And Nick kept asking her to go into the brush area; you know, patches of trees and stuff in the dunes, and she didn't want to, she didn't want to.  They finally got out and they went, and I guess he was acting weird.  And she went back to the truck and he got really upset with her.

And that kind of just started off the basis of their relationship as to how uncomfortable she always was, but couldn't seem to like part with him.  Because he was very

Exhibit 5002 at 934

53

*N. Demain*

controlling, very -- you know, verbally abusive.  I don't know physically so much, I never witnessed any physical things.  But I know she always was crying, and she would never admit that he physically hurt her, but in my opinion I wouldn't put it past him.

Q.    Well, you can't get into that, what your opinion is on that.

A.    Oh.  Well, I'm just saying, like it's in the report, like --

Q.    Yeah, and that's --

A.    Yeah.

Q.    We can't go there (indiscernible).

A.    Okay.

MR. FRASIER:  Okay.  I don't think I have any other questions for Ms. Demain.  Does the grand jury want to ask her anything?

GRAND JUROR:  Did Wayne do drugs (indiscernible)?

THE WITNESS:  Um, yes.

GRAND JUROR:  Do you know -- did you -- were you aware if Nick had been using drugs in 2000?  Or would you have been aware of that?

THE WITNESS:  Um, I know he smoked pot.  I don't know if he did meth.  I know meth was a big thing with that group of people.  I just don't know if he was involved in that.  But I know pot was the big one.

Exhibit 5002 at 935

*N. Demain*

GRAND JUROR: Was Ricky?

THE WITNESS: Ricky was, again, a pot-head. Meth, no. As far as I knew. Unless he did it when I wasn't around. So.

GRAND JUROR: You say Wayne always said he hated his brother?

THE WITNESS: Mm-hmm.

GRAND JUROR: And you say that he'd be -- is this when he was drinking? Just an --

THE WITNESS: Sober, smoking pot, drinking, he just hated his brother. Anything little that came up about Nick, he'd just be like, "I fucking hate him," or, you know, "That piece of shit." That -- I mean, he would just go off, and then I'd change the subject or somebody would change the subject, and then he was off.

MR. FRASIER: Okay. I need to stop to change the tape.

(Pause.)

MR. FRASIER: Okay. Go ahead. Anything --

GRAND JUROR: I just want -- and then you said he -- he stop -- did he stop seeing the family; Wayne?

THE WITNESS: He -- for the most part. I mean, he'd go up to their house and get clothes here and there, or whatever. But he never really hung out with them, and hardly talked to them. If he talked to anybody, it was his mom.

Exhibit 5002 at 936

*N. Demain*

But he never really talked to his dad.  And if it was his mom, it was short, you know, conversations.

GRAND JUROR:  This was over a period about the three years he lived with you?

THE WITNESS:  No, he lived with -- he didn't live with us for three years.

GRAND JUROR:  Oh, three months.

THE WITNESS:  Yeah.  Two and a half, three months.  Um, yeah, through that time.

GRAND JUROR:  They say they had a safe haven for all the kids up there, Bruce and his mom.  How come both the kids were always somewhere else?  Wayne living with you, Nick living with the --

THE WITNESS:  I don't know.  I never -- when --

GRAND JUROR:  You know, if they had such a great place for all the kids to go, why are they always gone?

THE WITNESS:  They -- I don't know Nick's situation, but Wayne, he hated being up there.  He did not -- did not if at all possible go up there if he didn't have to.  I took him up there a couple of times, and on the way up there he'd be happy, happy, happy.  And we'd hit the gravel road, and instantly, bam, angry.  Just frustrated and - and never failed, he'd always leave the house with an argument between his brother and him or his dad and him.

And his mom I never really saw, um, but when I

Exhibit 5002 at 937

went up there, it was -- I mean, it was a nice house and everything, but it wasn't comfortable.

I don't know it's that substantial, but --

GRAND JUROR:  Do you know when the -- this was that Wayne was up there and saw his brother coming in with bloody clothes?

THE WITNESS:  Uh, if I can remember correctly, it was somewhere around that night that Leah had gone missing and nobody had known she was missing yet.

GRAND JUROR:  To your recollection, was Wayne upset with his family before that, or was that the start of it, or when did that happen?

THE WITNESS:  I don't really know.  Um, as far as I know, it was probably not -- I don't know.  It might have been the start of it, but I don't know that him and his brother ever truly got along.  They never seemed like they ever did.  One seemed to be favored over the other, Nick being the favored one.

I don't know if they had problems before because I didn't really hang out with him before, up until he lived with us, pretty much.

GRAND JUROR:  Did Wayne ever say that he hated his brother before that?  Did you ever get that kind of conversation with him before Leah's disappearance?

THE WITNESS:  Um, never got into before, matter.

Exhibit 5002 at 938

*K. Peet*

And the conversation about Leah was the one time only. I never brought it up after that because Wayne's a very personal person. He doesn't talk about his problems. Doesn't talk about things.

At that time. I don't know about now, so.

MR. FRASIER: Any other questions?

Okay. I think you're done. You can go back to Myrtle Creek.

THE WITNESS: Gee. (Laughing.)

**TESTIMONY OF KIMBERLY PEET**

(Witness sworn.)

BY MR. FRASIER:

Q.    First of all, ma'am, this is the grand jury for Coos County, and we are looking into the death/disappearance of Leah Freeman.

I think it's obvious, but I need to tell you that we are recording these proceedings. Okay?

First of all, could you tell us your name and where you live.

A.    Kimberly Renae Peet, and I live on 1164 North Grape Street.

Q.    Here in Coquille?

A.    Coquille.

Q.    And have you lived here in Coquille your whole life, basically?

Exhibit 5002 at 939

58

*K. Peet*

A.    Basically, yes.

Q.    Did you go to school here?

A.    Yes.

Q.    Graduated from high school?

A.    I got my GED.

Q.    Okay.  Good for you.

Do you know an individual named Nick McGuffin?

A.    No, I do not.

Q.    How about Leah Freeman; did you know Leah Freeman?

A.    Yes.

Q.    And how did you know Leah?

A.    I went to middle school with her.

Q.    The reason I brought you in here today was a statement you had made to the police in August of 2000.  You had indicated you had been at a party at Michelle Emra's (phonetic) house.  Do you know a Michelle Emra?

A.    Michelle Bateman, yes.

Q.    And there was a party there at the house, as you recall?

A.    Yes.

Q.    And you told the police that you saw David Jenkins, Nick McGuffin, and another friend of Nick's at Michelle's house.  Do you recall this?

A.    Yes, I do.

Exhibit 5002 at 940

*K. Peet*

Q.    Could you tell the grand jury, please, what you recall of these three individuals; what they were saying, what they were doing at this party?

A.    I remember -- I was 13 years old.  I remember being there, hanging out with a couple of my younger friends, and we were all in a different room than the adults.  And they were in another bedroom, and they were all discussing and laughing, and I believe they were all smoking pot.  And somewhere along the lines we had heard a discussion with them, and they were talking about strangling Leah Freeman with her underwear.

Q.    At the time you talked with the police, you indicated that you -- that David Jenkins turned to Nick and said, You guys did it a little over the creative side, don't you think?  What did you strangle her with anyway?

      Do you recall that statement?

A.    No, I do not.

Q.    Do you remember who exactly was in this bedroom that was talking, about strangling her with her underwear?

A.    The only -- I mean, I remember them being there and stuff.  I just -- I really don't remember a lot of that.

Q.    Do you know who was in the bedroom?

A.    I remember Michelle.  And I didn't really know Nick except for his name, so -- and being there.  I never really seen him before.

Exhibit 5002 at 941

*K. Peet*

Q.    Okay.  But was he in this bedroom?

A.    Yes, he was.

Q.    And David Jenkins was in this bedroom?

A.    Yes.

Q.    And somebody said, you don't know who, that Leah was strangled with her underwear?

A.    Yes.

Q.    Did anybody dispute that?  In other words, did anybody say no, that's not true?

A.    No.

Q.    Did you hear any of these people talk about being down at Johnson Mill pond that night that Leah disappeared?

A.    No.  I don't remember.

Q.    Okay.  Let me read you this, see if you recall this.

        "She heard David say that he and Nick and Nick's best friend had been down at Johnson Mill pond smoking pot, and they had gone there because Nick said he wanted to get something off his chest.  He said that Leah was supposed to have been down at the pond with him."

        Do you recall that conversation at all?

A.    No.

Q.    All right.  But just so we're clear, you do recall that there was somebody said, and this was a group of Michelle, David Jenkins, and Nick McGuffin.

Exhibit 5002 at 942

*K. Peet*

Was there anybody else in the room?

A.    I don't know.  I really don't remember a lot of this.

Q.    Okay.  But you do recall clearly that somebody said she was strangled with her underwear?

A.    Yes.  Yes.  And I remember David Jenkins being the one who said it.

Q.    Oh, David Jenkins was the one that said she was strangled with her underwear?  Right.  Okay.

Has anybody told you that they killed Leah Freeman?

A.    No.

Q.    Has anybody told you, outside of what we talked about here today, that they saw what happened to Leah Freeman?

A.    No.

Q.    Do you have any personal knowledge of what happened to Leah Freeman?

A.    Other than hearsay, no.

Q.    Okay.  Other than what you've already told us, is there anything else you know?

A.    No.  No.

MR. FRASIER:  Okay.  I don't think I have any other questions for Ms. Peet.  Does the grand jury want to ask her anything?

Exhibit 5002 at 943

*K. Peet*

GRAND JUROR:  Michelle, what was her last name? Do you know Michelle --

THE WITNESS:  Michelle Bateman. yes.

GRAND JUROR:  Bateman?

Now, you said you heard David Jenkins say that, and then somebody else replied with the, You kind of went over the top with that, or --

THE WITNESS:  Yeah.  I think that was Michelle that said that, I believe.

GRAND JUROR:  That (indiscernible).

THE WITNESS:  Yeah, it was (indiscernible).  See, I know Michelle and I know David.  I --

GRAND JUROR:  Right.

GRAND JUROR:  What house were you -- where was this at?

THE WITNESS:  Um, right behind Co -- right by Safeway's.  My grandma owns an apartment complex up there. It was Blanche Manor.

GRAND JUROR:  And you say you were 13 at the time and you were in a separate room?

THE WITNESS:  Yeah.

GRAND JUROR:  And when did you -- did you give this statement to the police?

THE WITNESS:  Yes.  My mom told me to go down there because of stuff that was discussed there that --

Exhibit 5002 at 944

63

*K. Peet*

GRAND JUROR:  Okay.

GRAND JUROR:  And this was right at the time?

THE WITNESS:  Yes.

GRAND JUROR:  Do you know what time of night or --

THE WITNESS:  It was like 5:00 in the afternoon. It was in the afternoon.

GRAND JUROR:  That night?

THE WITNESS:  When that happened, yes.

GRAND JUROR:  The day of the disappearance?

THE WITNESS:  No.

GRAND JUROR:  Or the day after?

THE WITNESS:  This was probably weeks after.

GRAND JUROR:  Oh, okay.

GRAND JUROR:  But when, from the time you heard -- overheard it, how long until you went to the police with it?

THE WITNESS:  It was that day.

GRAND JUROR:  Same day?

THE WITNESS:  Yeah.

GRAND JUROR:  Do you recall if this happened after Leah's body was found or before?

THE WITNESS:  I believe it was after.

GRAND JUROR:  Have you talked to -- did you ever dis -- did you ever talk to David Jenkins or your -- I'm

Exhibit 5002 at 945

*M. Beebe*

sorry -- about it at all, or --

THE WITNESS:  Uh, no.

GRAND JUROR:  -- did your mother, or anything?

THE WITNESS:  No.  He -- my sister was married to his brother for a while.  He wasn't really somebody that hung around the family much.

MR. FRASIER:  Any other questions?

Okay.  I think you're free to go.

### TESTIMONY OF MELISSA BEEBE

(Witness sworn.)

BY MR. FRASIER:

Q.    First of all, this is the grand jury for Coos County.

A.    Mm-hmm.

Q.    And we're looking into the death and disappearance of Leah Freeman.

First of all, I think you saw me do it, but we've got two different recording devices going, recording the proceedings here today.

A.    Okay.  Okay.

Q.    First of all, could you tell us your name and where you live.

A.    Melissa Beebe.  And I live in -- out Ring Creek Road here in Coquille.

Q.    And how long have you lived there?

Exhibit 5002 at 946

*M. Beebe*

A.    I've lived out there about a year.  I've lived in Coquille all my life.

Q.    And you're related to Leah Freeman?

A.    Yes.

Q.    How are you related?

A.    She's my cousin.

Q.    All right.  I need to get this out so the grand jury knows.  You've had some trouble with the law in the past?

A.    Oh, absolutely.  Yes.

Q.    And would you tell them what kind of trouble you've had with the law.

A.    Well, in the past I've had drug and alcohol issues, and I've had several years now clean of drugs.  I had some domestic disputes with my former mate, and -- and lost my children over that.  And I've -- have got them back, in the meantime.  So.

Q.    All right.  So have you ever had anything like forgeries and --

A.    Oh, no, no, no.  No.

Q.    None of -- nothing like that?

A.    No.

Q.    It's just been drug-related?

A.    Right.

Q.    Okay.

Exhibit 5002 at 947

A.    And it's been many years ago, over ten years ago.

Q.    All right.  Okay.  I asked you to come in today because I want to talk to you about a situation involving Nick McGuffin.  Do you know Nick?

A.    I do.

Q.    And how do you know him?

A.    I know Nicholas through him being Leah's boyfriend.

Q.    In 2003, you wrote a letter or a note regarding an incident that occurred on November 3rd, 2003, outside the courthouse, correct?

A.    Correct.

Q.    And you gave that to Sergeant Zanni of the Coquille -- or, excuse me, the Coos County Sheriff's Office, correct?

A.    Correct.

Q.    I want to show to you here -- does that appear to be a copy of the note that you --

A.    Oh, yes.  Mm-hmm.  I have a pocket -- one in my pocket right now, as well.  Mm-hmm.

Q.    All right.  On November the 3rd, 2003, you were here at the courthouse, were you not?

A.    Yes.

Q.    In fact you were right out here at the bottom of the stairs up front?

Exhibit 5002 at 948

*M. Beebe*

A.    Correct.

Q.    And did you see Nick McGuffin then, at that time?

A.    I did.

Q.    And was he with a young girl?

A.    Yes, he was.

Q.    Did you happen to see her out in the hallway here today?  Do you recall if --

A.    No, I don't recall.  She was a blonde girl, the one that I saw him with that day.

Q.    Okay.  All right.  And then they came down the -- did they come down the stairs past you as you were outside the courthouse?

A.    Yes.

Q.    And as Nick was passing you by, did you make eye contact with him?

A.    Yes.

Q.    Did you say anything to him?

A.    Yes.  (Laughs.)

Q.    What did you say to him?

A.    I asked him how court went.

Q.    And how did he respond back to you?

A.    He turned to me and -- and said, Really good.  Really good.

        And then I couldn't keep my mouth to myself because I -- of the dispute with Leah and Nick.  And I said

Exhibit 5002 at 949

*M. Beebe*

to him, It's a lot better than you should be -- than it should have been for you, something on the -- on that terms.

Q.    All right.  Now, he's got this girl.  Does he put his arm around her?

A.    Mm-hmm.  He was -- I think he was -- had his arm around her the whole way out.

Q.    And did he go down to the sidewalk?

A.    Mm-hmm.

Q.    Did they cross the street?

A.    They crossed the street.

Q.    Did they -- did he turn around and look at you?

A.    Yes, he did.

Q.    Did he give you a grin?

A.    Yes, he did.

Q.    What did he do then?

A.    He then -- excuse me.

Q.    Go ahead.

A.    He then stated, "It's amazing what you can get away with in Coos County now, isn't it?"  This was his exact words to me.  And I -- I'll never forget that.  (Crying.)

Thank you.

Q.    What happened after he said that to you?

A.    Mm, well, he just -- he -- there was -- he was talking to a gentleman and a woman that I found out later I believe is his attorneys.

Exhibit 5002 at 950

*M. Beebe*

Q.    Okay.

A.    I'm not certain on that.  He kissed that girl, and -- and they got in their truck and I'll just never forget the look on his face, of -- he was just so devious looking.  And I know he -- what he was getting at.  He was referring to -- I believe in my heart he was referring to my cousin's murder.

Q.    You recall him saying, "It's amazing what you can get away with in Coos County?"

A.    Exactly what he said to me.

MR. FRASIER:  Thank you.

That's all the questions I have for her.  If you'd like to ask her any additional questions.

GRAND JUROR:  Have you seen him since?

THE WITNESS:  Um, matter of fact I have seen him since.  It's been quite a few years ago, I worked down at Bandon Dunes and he also worked down there.  And I ran into him in the hallway there, and he didn't say anything to me then.  He just gave me one of those snarky little grins, and -- and I was in the hallway by myself, and I just fled immediately.  I didn't want no part of it, you know.  I don't want any more problems, or anything like that.  Because he -- matter of fact, because he scares me, you know.

So -- and then I think I've only seen him a couple of times, driving by or something, since then.

Exhibit 5002 at 951

BY MR. FRASIER:

Q.   As this may come up at a later time, did you do anything when you were working out there at the Dunes -- did you do anything like go to management and say, Hey, look, you got Nick McGuffin working here --

A.   Uh, yes.  Actually my Aunt Cory and I both worked there, and we both -- we both did that.

Q.   And why did you go to management about that?

A.   Because he'd -- he intimidated me.  I -- for me.  I can only speak for me.  Just being around him intimidated me.

Q.   Were you trying to get him fired?

A.   You know, I don't think I was trying -- maybe that's what I was doing.  I think I was just letting them know the situation.

Q.   Okay.

A.   And the uncomfortableness of that.

Q.   What type of work was he doing at the --

A.   Um, it was something with the golf, you know, and I don't know.  I worked in the restaurant, and he didn't -- I don't even know how to play the game golf, so something out on the golf course.

Q.   Okay.  At the bare minimum, were you asking that he be kept away from you --

A.   Yes.

Exhibit 5002 at 952

*M. Beebe*

Q.    -- at work?

A.    Mm-hmm.

Q.    All right.  But as far -- and your aunt -- Aunt Cory was working out there too?

A.    Mm-hmm.  Yes.

Q.    What was she doing out there?

A.    She also worked at -- she was the hostess in the -- in the little pub there, and I was a busser/waiter there.

MR. FRASIER:  All right.  Any other questions you want to ask?

GRAND JUROR:  At that time did he know -- did he find out that you had gone to management?  Was there any repercussions from you going to management, for you or for him?

THE WITNESS:  No.  I don't believe he --

GRAND JUROR:  Did they just go --

THE WITNESS:  I think they just --

GRAND JUROR:  -- whatever?

THE WITNESS:  Yeah, it was like that.  And then I just stopped working.  I quit on my own because I just -- I couldn't handle the intimidation of seeing him there.  It just bothered me.

GRAND JUROR:  When Nick and Leah were having a relationship, did they get along good together?

Exhibit 5002 at 953

*M. Beebe*

THE WITNESS:  Um, yeah, it appeared -- it appeared that way, but I found out later, of course, that -- that it really wasn't as good as she wanted it to be.  Um -- excuse me.  He -- I remember him buying her flowers quite a few times.  A couple of times, like dozens of roses and stuff.  And later on having conversation with Leah, finding out that they'd had a fight.  Ending up -- being an abuser, or coming from someone that's been in domestic violence, I understand that people abuse you and then they try to reward you with gifts to make it better.

GRAND JUROR:  Do you think it was abuse or do you think it was just one of them teenage things?

THE WITNESS:  At first I thought it was just a teenage thing, but then after I heard more statements of like things that had happened at the school, and slapping her and stuff like that, I think it was escalating.  Over a period of time it was getting worse.

GRAND JUROR:  Did she ever confide in you and say that she -- he had slapped her?

THE WITNESS:  No.  She'd never -- she always tried to make it okay.

GRAND JUROR:  Okay.

THE WITNESS:  Yeah.  You know, she was 15 and she was in love, so she thought -- you know.

GRAND JUROR:  Did you ever see her with bruises?

Exhibit 5002 at 954

*M. Beebe*

Any evidence?  Physical evidence?

THE WITNESS:  No, but my mother -- my mother worked at the school, and she -- she saw him dragging her by her backpack a couple -- I think it was two different occasions if I'm correct.

BY MR. FRASIER:

Q.    Who's your mother?

A.    Terry Middleton.

Q.    Okay.

A.    Yeah.  And there was a couple of altercations, I believe, at school, that Mrs. Bloomquist (phonetic) had -- had noticed too.

GRAND JUROR:  At that time, were you aware that Leah might have been using drugs?  Or were aware that she did use drugs?

THE WITNESS:  I don't -- I didn't think Leah was using drugs at all.  I was aware that he was using drugs.

GRAND JUROR:  Had you seen him use drugs?

THE WITNESS:  I hadn't seen him.  I have never seen him use the drugs.  I know the people he was -- some of the people he was running with, and I know that they were using drugs.  And being a drug addict myself, I could see the signs of it, but I never, ever saw him personally use drugs.

BY MR. FRASIER:

Q.    There's some questions I -- I've been asking

Exhibit 5002 at 955

*M. Beebe*

everybody, that we're going to ask you questions too.

A.    Okay.  Mm-hmm.

Q.    Has anybody -- outside of what you've told us here today, has anybody told you that they killed Leah Freeman?

A.    No.

Q.    Has anybody told you that they saw what happened to Leah Freeman?

A.    No.

Q.    Did you have anything to do with Leah Freeman's --

A.    No.

Q.    Okay.  Outside of what you told us here today, is there anything else you think the grand jury needs to know?

A.    Um, I know I probably can't even say the word, can I?

Q.    No.

A.    Okay.

Q.    I think I know where you're going, and no, you can't talk about that.

A.    Yeah.  I can't say the word.  Okay.

GRAND JUROR:  The P word.

GRAND JUROR:  Yeah, the P word.

THE WITNESS:  Yeah, I can't say it.

MR. FRASIER:  Yeah, you know the word.

Exhibit 5002 at 956

*M. Beebe*

THE WITNESS:  Just his behaviors after Leah went missing were very, very strange.  His -- he was ver -- his behaviors were very strange.  Being her boyfriend, you would think that he would be there for the family, being supportive, being -- and instead of insulting and doing terrible things to us, you know, you would think he would be at our doorstep saying, "I never did anything to her."  But he -- he just eventually just drifted completely away from us.  You know, that's probably the best way I could put that.

GRAND JUROR:  On the day you met him here at the courthouse, when he made the comment about the -- getting away with things in Coos County, did he make any effort whatsoever to just direct that at you, without anybody else hearing?  Or was it just open for anybody to hear?

THE WITNESS:  It -- it was open for anybody to hear.  It was open for anybody to hear, because he -- I was standing right there, and he was cross -- I believe he was all the way across the street when he -- so he actually had to kind of holler it, you know, loud enough for me to hear.

MR. FRASIER:  Okay.  Anything else?

GRAND JUROR:  At that time, he was with what you thought was his attorney?

THE WITNESS:  I -- I think so.  They were -- he was at court, and I believe that the -- the elder gentleman and the woman that he was speaking to at the outdoor site, I

Exhibit 5002 at 957

*M. Beebe*

believe that was his attorneys.

BY MR. FRASIER:

Q.    But there was another girl, a younger girl he was with?

A.    Yes, yes.

Q.    And that's who he had his arm around?

A.    Right.  Correct.

GRAND JUROR:  So there were four of them over there?

THE WITNESS:  Right.  Mm-hmm.

GRAND JUROR:  And did he say what he said with his attorneys?

THE WITNESS:  Yes, all -- they were all three, plus him.  So all four of them were standing right there?

GRAND JUROR:  Theoretically they all heard it?

THE WITNESS:  Yes, absolutely.  I don't -- I don't know how they couldn't have.

GRAND JUROR:  Did you see any reaction from the other two people when he said that?

THE WITNESS:  They just got in their vehicle and left.

MR. FRASIER:  Okay.  Any other questions?

All right.  I don't think we have any other questions.

THE WITNESS:  Fine.

Exhibit 5002 at 958

MR. FRASIER:  You're free to go.

THE WITNESS:  All right.  Thank you very much.

**TESTIMONY OF ADAM SHINAR (BREWER)**

(Witness sworn.)

BY MR. FRASIER:

Q.    Sir, this is the grand jury for Coos County, and we're looking into the disappearance and death of Leah Freeman.

A.    Okay.

Q.    The first thing I need to tell you, it's obvious, but I turned on a couple of recorders here.

A.    Yes.

Q.    We're recording everything.  All right?

A.    Okay.

Q.    First of all, could you tell the grand jury, please, your name and where you live.

A.    Okay.  My new full name is Adam J. Shinar, and I live at 94342 Sether Street Lane.  And that's in North Bend, Oregon.

Q.    And you say it's your new full name?

A.    Yes, I was just married on October 12th, to my wife J.V. Shinar, and I took her last name.

Q.    Oh, okay.

A.    So -- yeah.  Just clear confusion.

Q.    Okay.  I --

Exhibit 5002 at 959

GRAND JUROR:  And your pre-marriage name was?

THE WITNESS:  Adam Brewer, and that's who was on my -- to be here.

GRAND JUROR:  The subpoena.

THE WITNESS:  Yes, for subpoena.

GRAND JUROR:  Yeah.  All right.

THE WITNESS:  Thank you.

BY MR. FRASIER:

Q.    Mr. Brewer, are you acquainted with or did you know an individual named Nick McGuffin?

A.    No, I did not.

Q.    How about Leah Freeman?

A.    I knew her through my employer at one time, which was Dennis Freeman, her father.

Q.    And that would have been at Denny's Pizza here in town?

A.    Correct.  And the years '97 through I believe '99, before I went to work in Winchester Bay.  And then I came back after that.

Q.    Well, first the thing I wanted to talk with you about here today, you -- were you living in the Coquille area at the time of Leah Freeman's disappearance?

A.    Yes, I do believe so.  I lived at Fairview, about two miles from the state park up there.

Q.    You came in, I believe, early in the

Exhibit 5002 at 960

*A. Shinar*

investigation and told the police you'd found a bone with tissue lying on it on Fairview Road?

A.    Yes.

Q.    And the police investigated that and that turned out to be an animal bone.  Is that --

A.    Yes, correct.

Q.    All right.  I also have in my notes here that you reported to the police that you had seen Nick and Leah get into a fight?

A.    No.  I do not remember that --

Q.    Okay.

A.    -- about any fighting or anything.

Q.    All right.  I guess I'll need to go and look up --

A.    Yeah.  I do not remember anything about that. That may have been -- something may have been said by somebody else.  I'm not exactly sure.

Q.    Yeah.

A.    But, yeah, kind of foggy.  It's been a while.

GRAND JUROR:  Would you have recognized Nick if you saw him, at that time?  Did you ever meet him?

THE WITNESS:  I've only seen him from a distance, so that's all I know there.  I never really seen them together.  The only time I seen here was like when I was on shift at Denny's Pizza.

Exhibit 5002 at 961

*A. Shinar*

GRAND JUROR:  Were you working there the night of her disappearance, June 28th?

THE WITNESS:  I do not believe so.  Um, I do not believe so.  I believe I was with my wife-to-be at the time, out at Fairview.  So other than that, no.

BY MR. FRASIER:

Q.    Okay.  I have here a report from a Detective Jim Davis of the Oregon State Police.  It indicates he spoke with you on August the 2nd of 2000, which would have been the day before Leah's body was found.

A.    Mm-hmm.

Q.    And he states it in the -- in the report he's saying, "He said that in late April of this year" -- referring to you -- "he saw Leah and Nick get into a fight in the parking lot of the Fast Mart in Coquille. They were shoving and pushing each other around, and ended when Nick threw his keys across the parking lot.

"He said he also observed Nick and Leah get into an argument in Denny's Pizza.  There was no pushing or hitting, just arguing."

A.    And that could -- that -- okay.  Back to the Fast Mart thing, um, I do remember something about keys being tossed.  And I did remember seeing two individuals.  And I did see Leah run to the phone thereafter, at that point. Sorry, flash.  Just kind of happened.

Exhibit 5002 at 962

*A. Shinar*

As far as the pizza parlor, it may very well have been that I was in there at one time that they had an argument around the video game machines. That is possible.

Q. Okay.

A. But yeah, I did know her. I didn't know him too much at the time.

Q. All right.

A. So.

Q. So I guess I -- I guess what I'm asking you here today, I know it's been ten years, but I guess do you recall this incident in Fast Mart, now?

A. I do recall just that I do remember the keys thing. I was probably there with somebody at the time too. But yeah, that's where I used to shop every once in a while, and I do remember seeing a confrontation between two people, that later Leah was part of it. So yeah, I do remember that. It wasn't very much --

Q. You say pushing -- do you recall seeing pushing and shoving?

A. No, I do not recover [sic] pushing and shoving, but I remember noise, arguing back and forth.

Q. And you do recall the keys being thrown across the lot?

A. Yes. Because I was just coming out the door when the keys got tossed. I do remember that. But that's -- it's

Exhibit 5002 at 963

just a very vague memory, but I do remember that.

Q.    I've been asking everybody that I can recall, I've been asking these questions.  Has anybody told you that they killed Leah Freeman?

A.    No, they have not.

Q.    Has anybody told you that they saw what happened to Leah Freeman?

A.    No, they have not.

Q.    Outside of what you've told us here today, do you have any information regarding Leah Freeman's death?

A.    No, I do not.

MR. FRASIER:  Thank you, sir.  I don't have any more questions.  Does the grand jury want to ask him anything?

Okay.  I think that's it.

THE WITNESS:  All right.  Thank you.

MR. FRASIER:  You're free to go.

THE WITNESS:  Have a good day.

**TESTIMONY OF MELISSA BRUGNOLI**

(Witness sworn.)

BY MR. FRASIER:

Q.    First of all, this is the grand jury for Coos County, and they're looking into the death/disappearance of Leah Freeman.

I think it's obvious, I've got two different

Exhibit 5002 at 964

*M. Brugnoli*

recording devices we're recording the proceedings.  I just need you to be aware of that.  All right?

A.    Okay.

Q.    First of all, could you tell us your name, please.

A.    Melissa Brugnoli.

Q.    And do you live here in the Coquille area?

A.    Mm-hmm.

Q.    How long have you lived here?

A.    All my life.

Q.    Are you acquainted with or did you know an individual named Leah Freeman?

A.    Yes.

Q.    How did you know Leah?

A.    I went to school with her.

Q.    How about Nick McGuffin?

A.    Yes.

Q.    And how did you know Nick?

A.    Just from school, and then Leah and Nick being together.

Q.    Okay.  I think from your statement there you've indicated that -- well, let me ask you this:  Were Nick and Leah boyfriend/girlfriend?

A.    Yes.

Q.    How was their relationship?  How well did they

Exhibit 5002 at 965

*M. Brugnoli*

get along, that type of thing?

A.    Just like any other typical high school relationship that I remember.  I mean, they fought, they got along.  Just the normal relationship, that I can remember.

Q.    I was looking here in the interview you had with the police, I think in the year 2000.  You indicated you saw Nick and Leah get angry with each other on occasion?

A.    Well, like the typical, you know, arguments that -- they were both jealous people, so just fighting back and forth.

Q.    You indicated, according to the police reports I have, the only violence you ever saw was one occasion when Leah was grabbed by both arms by Nick.  Do you recall that?

A.    I -- I honestly -- I don't recall that.  It wouldn't surprise me, but I don't recall it.

Q.    How was Nick in terms of the relationship with Leah, in terms of -- well, was he controlling?

A.    Um, I don't know if controlling's the word I would look for, but jealous, maybe.

Q.    All right.  Again, I have from your statement in 2000, Nick was very jealous and would not tolerate Leah being with other guys.

A.    Well, yeah.  Definitely.  He -- she wasn't really allowed to hang out with any other guys.

Q.    Do you know about any drug use that either Nick

Exhibit 5002 at 966

*M. Brugnoli*

or Leah may have been involved in?

A.    Not any -- like maybe smoking pot, but.

Q.    Okay.  I -- going again back to your statement, "She knows that Nick and Leah would smoke marijuana together?"

A.    Yeah.

Q.    Okay.  How did you know that they were smoking marijuana together?

A.    Just the hearsay.  I mean, and she told me that they had.

Q.    The night that Leah disappeared, you were -- where were you?

A.    I was at home.

Q.    And you have at least told the police in 2000 you had no idea what happened to Leah.  Is that right?

A.    Yes.

Q.    Okay.  There's some questions I've been asking everybody, and I'll just go ahead and ask you those questions too.  Has anybody told you that they killed Leah Freeman?

A.    No.

Q.    Has anybody told you that they saw what happened to Leah Freeman?

A.    I -- I've heard stories, but no one in particular told me that they had saw what happened.

Q.    You've heard a rumor around town or something

Exhibit 5002 at 967

about her being run over by a car --

A.    Yeah.

Q.    -- or something like that?

A.    Yes.

Q.    Have you heard names associated with that rumor?

A.    Yes.  I heard Bill Sero, Alicia Michaud, and whoever Alicia Michaud's boyfriend was at that time.

Q.    Tom Stemmerman?

A.    I just heard that name today, but --

Q.    Okay.  But Alicia Michaud and Bill Sero are the names you've heard with that?

A.    Yes.

Q.    Have you talked with either one of those individuals?

A.    No.

Q.    And the information you got, how did you get that information, the best you can recall?

A.    Mm, I mean just hearsay.  Like I said, I couldn't tell you who told me, but I've heard that story numerous times from many people.

Q.    So I take it you have no firsthand knowledge about what happened to Leah?

A.    Mm, no.

Q.    All right.  That just -- I've been asking people this too.  You had nothing to do with Leah's disappearance,

Exhibit 5002 at 968

right?

A.    No.

MR. FRASIER:  All right.  I don't think I have any other questions for Ms. Brugnoli.  Does the grand jury want to ask her anything?

Okay.  Free to go.

THE WITNESS:  All right.  Sorry I wasn't that much help.

### TESTIMONY OF JOHN LINDEGREN

(Witness sworn.)

BY MR. FRASIER:

Q.    Sir, this is the grand jury for Coos County, and we're looking into the disappearance of Leah Freeman and her death.

A.    Mm-hmm.

Q.    Okay?  And first of all, I've got to tell you, you saw me do it, but we've got two different recording devices recording the proceedings.  Okay?

A.    Yes, sir.

Q.    All right.  Mr. Lundegren [sic] -- well, first of all, could you tell us your name and where you live, please.

A.    John James Lindegren.  115 in Myrtle Point. It's -- it's on the Ash over there in Myrtle Point.

Q.    How long have you lived over in Myrtle Point, sir?

Exhibit 5002 at 969

88

*J. Lindegren*

A.    Two and a half years.

Q.    You have a sister that lives over here in Coquille?

A.    Yeah, 551 West Fourth Place.

Q.    Your sister's name is?

A.    Hjordis.

Q.    Hjordis?

A.    Yes.

Q.    And it's Lindegren?

A.    Yes, sir.

Q.    I apologize for using the wrong last name.

A.    That's fine.

Q.    You have a nickname here in town of Big John?

A.    That's me.

Q.    Okay.

A.    That's me.

Q.    All right.  Well, sir, I want to direct your attention back to the year 2000 --

A.    Mm-hmm.

Q.    And in particular I want to draw your attention to the evening of June 28th, 2000.  Were you at your sister's house watching television that night?

A.    Yes, sir, I was.

Q.    Were you watching a show named *Survivor*?

A.    Yes, I was.

Exhibit 5002 at 970

*J. Lindegren*

Q.    And was that the night Rudy got voted off?

A.    I think it was.  (Laughter.)

Q.    Kind of upsetting that Rudy got voted off?

A.    I didn't care.  My sister was really into it, but I wasn't all that into it.

Q.    Okay.  Now, where your sister lives, that's back behind the McKay's store, back in that area?

A.    Yes, sir, it is.

Q.    Now, after the show got over, did you go for a walk or walk out from your sister's house?

A.    Yeah, I was walking to my -- my residence.  I had been up there.  She was taking care of my big chow dog I had up there, so I went up and checked up on it.  And I was up there for a couple of hours, and then I watched that TV program.  And after it was over I said my goodbyes and -- and I took off.

Q.    All right.  And as you're walking -- and the show got over with about -- at nine o'clock.  Is that to the best of your recollection?

A.    Yes, sir.

Q.    So it's after 9:00 when you're out there walking towards your house?

A.    Yeah.

Q.    As you're walking, do you -- well, did you -- well, did you see a person later identified to you as Nick

Exhibit 5002 at 971

McGuffin?

A.    Yes.

Q.    And did you see a person named Leah Freeman?

A.    Absolutely.

Q.    Could you tell us where they were when you saw them?

A.    Well, I walked around, down the alley where my sister is, and I made the right-hand turn, and I walked down that -- that -- the road, going to Fourth.  And I saw them to my left.  They were probably -- I don't know, six feet from me, maybe eight feet from me.  And I said, you know, Hello, and continued up to the road, and went down to McKay's and then on home.

Q.    Were they by any particular vehicle or anything like that?

A.    There was a pickup parked, like for instance, there's a -- a place here, and then there's a place back behind it.  Then there's a little alleyway, I don't know, you know, 18 feet wide or so.  Then there's a place here and there was a pickup parked here (tapping sound).

When I was walking down, I walked beside the pickup, and they were over here, on the grass.  And I just said, Hello guys, and --

GRAND JUROR:  So you were between them and the pickup; is that what you're saying?

Exhibit 5002 at 972

THE WITNESS: Yeah.

BY MR. FRASIER:

Q. Within a day or two you became aware that this girl that you saw there, Leah Freeman, was missing?

A. Yeah. Yeah.

Q. And did you go to the police and talk to the officer named Randy Ulmer, and tell him what you saw?

A. Yeah. And also I believe it was two FBI officers also.

Q. Okay.

A. And I told them, and they said, Well, thank you very much. We'll be talking to you.

And that was about ten years ago.

Q. Now, earlier this year the police came back to you and talked with you about that?

A. Absolutely.

Q. And did they ask you to go with them and point out where you were and --

A. Yes.

Q. And did you do that, sir?

A. Yes, sir, I did.

Q. And you showed them exactly where this all occurred?

A. Absolutely.

Q. I'm going to have one of those officers come and

Exhibit 5002 at 973

*J. Lindegren*

tell the grand jury exactly where that was at and so forth, but --

A.    Okay.

Q.    All right.  Do -- let me see.  I've been kind of asking everybody these questions, so I'll ask you these too.

Has anybody told you that they killed Leah Freeman?

A.    Nope.

Q.    Has anybody told you they saw what happened to Leah Freeman?

A.    No.

Q.    And you never had anything to do with her disappearance either, did you?

A.    Oh, absolutely not, sir.

Q.    I've been asking everybody that.  I don't want you to take offense.  Okay.

MR. FRASIER:  I don't think I have any other questions for Mr. Lindegren.  Does the grand jury want to ask him anything?

GRAND JUROR:  Do you know what color the pickup was?

THE WITNESS:  No, ma'am.  See, I had not known. You know, if I'd known something was up, I'd have took -- you know, mental notes.  But I was just heading home.

GRAND JUROR:  Sure.

Exhibit 5002 at 974

*J. Lindegren*

THE WITNESS:  I don't know.

GRAND JUROR:  I understand.

THE WITNESS:  I don't even know -- you know, it's a pickup, but I don't know if it was a Chevy or Dodge or even what color it was.  I just -- I just walked around it.

GRAND JUROR:  Do you know if it was a small one?

GRAND JUROR:  Did it seem like a full-size or --

THE WITNESS:  Yeah, it was a full-size pickup.

GRAND JUROR:  You say it was Nick and Leah?

THE WITNESS:  Yes.

GRAND JUROR:  And you know -- did you know Nick and Leah?

THE WITNESS:  Yeah.  Yeah, I knew him.  You know, I grew up around here.  And I -- you know, I knew of -- Leah, you know, I know her uncles and -- you know.  I grew up around here.

GRAND JUROR:  Okay.  Mm-hmm.  And this was just after nine o'clock?

THE WITNESS:  I'd say, you know, to be real honest, between 9:10 and maybe 20 after.

GRAND JUROR:  Were they talking or saying anything or --

THE WITNESS:  Yeah.  Yeah.  No, they weren't --

GRAND JUROR:  Just talking?

THE WITNESS:  I didn't see any arguing or

Exhibit 5002 at 975

*J. Lindegren*

anything.  There were other people, down the driveway at that little house, but I never paid attention to anybody there.

GRAND JUROR:  They seemed to be separate from everybody else, though?

THE WITNESS:  Yes.

MR. FRASIER:  Any other questions from Mr. Lindegren?

GRAND JUROR:  Is it just the fact that the pickup was next to where they were sitting on the grass that linked them together?  Was there anything that you could tell if, you know, the pickup was one of them --

THE WITNESS:  No, the pickup was facing out towards Fourth.  And it was parked on the -- the right-hand side.  And it's real narrow there, so I walked around the truck, and they were over here.  And I just said hello and continued on my way.

GRAND JUROR:  Were they standing?  Standing up?

THE WITNESS:  Yes, sir.

MR. FRASIER:  Any other questions?

Okay, sir.  We appreciate you coming in.

THE WITNESS:  Ayup (phonetic).  And I appreciate it also.

MR. FRASIER:  Thank you.

GRAND JUROR:  Thank you.

Exhibit 5002 at 976

*H. Lindegren*

**TESTIMONY OF HJORDIS LINDEGREN**

(Witness sworn.)

BY MR. FRASIER:

Q.    Okay, ma'am.  First of all, this is the grand jury for Coos County.  And they're looking into the disappearance and death of Leah Freeman.  And you saw me do it, but I got to tell you, we are recording what's going on here today.

A.    Yes.

Q.    So first of all, could you tell us your name and -- well, you're the librarian here in Coquille, are you?

A.    I'm one of the library assistants.

Q.    Library assistant.  Okay.

A.    Mm-hmm.

Q.    Well, just tell us your name please.

A.    Okay.  My name is Jordi Lindegren, and I live in Coquille, and I work at the Coquille public library.

Q.    How long have you worked at the library?

A.    Oh, let's see, what year is this?  Oh, my goodness.  Coming up on 27 years.

Q.    Wow.  Good grief, you must know my kids as well as --

A.    I -- yes.  I've helped raise your children. (Laughter.)  And they're wonderful children, they are.

Q.    That could be good or bad.

Exhibit 5002 at 977

Ma'am, the previous witness, John Lindegren, he's your brother; is that right?

A.    He's my twin brother, mm-hmm.

Q.    Twin?

A.    Yes.

Q.    Really?

GRAND JUROR:  You look so much alike.

THE WITNESS:  Can't you tell?  (Laughter.)

BY MR. FRASIER:

Q.    Okay.  Well, I didn't know that.  I learn something new every day.

Ma'am, I want to direct your attention to June 28th, 2000, which is the day that Leah disappeared.

A.    Yes, mm-hmm.

Q.    Was your brother over at your house that day?

A.    Yes.

Q.    And do you remember about what time of the day it was he came over?

A.    Well, I can give you a little -- to back up.  My brother would come over to my house one time a week.  We had the ritual.  It was called *Survivor*.  And he would -- I wound up with custody of his dog Osa (phonetic), so that was his custodial day to walk the dog, have dinner, watch *Survivor*, and go home.

So that day -- and again, ten years ago, but I

Exhibit 5002 at 978

*H. Lindegren*

doubt that it -- my recollection was it didn't deviate too much from course, where he would show up at anywhere between 6:00 and 7:00. We'd have dinner. *Survivor* was on at 8:00 on Wednesdays. Watched the program. He'd do the dog on a short walk, and he'd go home.

Q. And the reason I brought you in today was kind of to confirm those dates.

A. Mm-hmm.

Q. The *Survivor* episode that you watched that night, was that the night Rudy got voted off?

A. Rudy -- it was something to do with Rudy. That's what I really can remember. It was -- because he was our guy, and I know John was T-O'd about something that had either been done to Rudy or that, because he was stomping off. And -- in regards to Rudy. So --

Q. And that was the first season of *Survivor*?

A. It was the first season of *Survivor*.

Q. Did John later tell you anything about seeing Leah Freeman?

A. Yes. He had said that he had run into Leah and a bunch of kids on the corner. He had talked to -- again, his name is Des Couch (phonetic), the neighbor, was out watering plants, and doing his hedge. And -- newly retired gentleman, who had a lot of time on his hands, who was kind of our own little neighborhood watch. And it -- John always talked to

Exhibit 5002 at 979

him, when he'd come around.  Everybody knew John's schedule with the dog, and they'd be out there to talk to him.

And they were, you know, going past, and then John had mentioned that Leah -- he went -- he'd run into Leah, and said hi to her and stuff --

Q.    Right.

A.    -- on the street.

Q.    Did he mention seeing Nick McGuffin there with her?

A.    Yes.  He mentioned that later, and in -- he didn't mention that in that same conversation.  I think that was like the next day's conversation.

Q.    Mr. Couch, who you refer to, he's since passed away?

A.    Yes, he's since passed away.

Q.    Outside of what you told us here today, you don't have any other knowledge about what happened to Leah Freeman?

A.    No.

MR. FRASIER:  I don't think I have any other questions for her.  Does the grand jury want to ask her anything?

GRAND JUROR:  Do you know what time for sure it was that your brother left?

THE WITNESS:  Okay.  *Survivor* got over at nine o'clock.  And they would -- it's usually about a five-minute

Exhibit 5002 at 980

*H. Lindegren*

thing they would do, what's happening the next week on *Survivor*.  And I actually think that John had missed that part because he was -- he'd leash up the dog and stuff, and head out the door.  So it was -- he probably left my house close to 9:00, maybe a little bit after that.  I'm a little iffy on that.  It -- actually, it could have been as much as like ten after 9:00, right in there.  And -- and then would do usually it was a half-hour to 45-minute walk, sometimes an hour.

GRAND JUROR:  So he took the dog for a walk after *Survivor*?

THE WITNESS:  Yes.  That's what I'm remembering.

GRAND JUROR:  The -- when he said he saw Leah --

THE WITNESS:  Mm-hmm.

GRAND JUROR:  -- was it when he was walking the dog or when he was walking -- he brought the dog back, and then walked home, correct?

THE WITNESS:  He brought the dog back to me, and then he went back out, but he'd come back to the house.  So it was -- yeah, that's true.  He did -- he came back after.  So it would have been on the walk out -- he wasn't that clear.  I always assumed that it was when he walked out the second time.

GRAND JUROR:  That's what -- well, we got the impression --

Exhibit 5002 at 981

*H. Lindegren*

GRAND JUROR:  Without the dog.

THE WITNESS:  Mm-hmm.  Without the dog, yeah.

GRAND JUROR:  Right.  You said he was walking home.

THE WITNESS:  Oh, okay.  That would -- that -- that's kind of what I'm remembering too.

GRAND JUROR:  So he would have walked the dog for five to ten minutes, after the show --

THE WITNESS:  It was longer than that.

GRAND JUROR:  So 15 minutes, so 9:15.  Then he brought the dog back.

THE WITNESS:  Right.

GRAND JUROR:  Then he walked home?

THE WITNESS:  Yes.

GRAND JUROR:  And then he told you the next day that he had seen --

THE WITNESS:  No, he came back to the house.

GRAND JUROR:  After he went home?

THE WITNESS:  No, no.  He -- okay.  He'd walk the dog.  He brought it back.  And then he'd gone out.  He had forgotten something.  He'd forgotten his -- his -- it was like a jacket.  Came back in and said goodbye, and headed out the door.

GRAND JUROR:  So I'm a little confused.

THE WITNESS:  He -- it was on his way home.

Exhibit 5002 at 982

*H. Lindegren*

GRAND JUROR:  And then he came back?

THE WITNESS:  He got -- yeah, he --

GRAND JUROR:  Oh, and then he left again.

THE WITNESS:  Right.  Yeah.

GRAND JUROR:  Oh, okay.

THE WITNESS:  It was -- he was -- he was sans dog, the last time.  Yeah, which -- sometimes it would take up to three times to get John home.

GRAND JUROR:  Okay.  (Laughter.)

THE WITNESS:  Because he was -- (laughing).  And actually I do think that he did take some food, took some food with him too.  That was part of the deal.

GRAND JUROR:  When he came -- so he -- when he -- as he headed home, he came back, said he'd seen Leah?

THE WITNESS:  Yes.

GRAND JUROR:  And then headed home again?

THE WITNESS:  Yeah.

GRAND JUROR:  And -- okay.

THE WITNESS:  Yeah.  Because I think that's when he was talking to Des, because there was -- he left and I thought he was gone, and he actually was just talking to the neighbor and came back for goodies later.

GRAND JUROR:  He didn't mention Nick at that time?  He just mentioned that he had seen Leah?

THE WITNESS:  No, that was -- well, the only

Exhibit 5002 at 983

other thing I think I have to contribute on that portion of it is I work at the library. And the police the next day were coming in, and they were looking for Leah Freeman. And that's when I knew that John had talked to her, so I tracked John down. Called him, and said, You need to talk to the police because they're looking for Leah Freeman and you saw her.

And he -- he came down to the library and said, Well, what's going on? I said, I don't know, they were looking at her -- you know, looking for her, and you need to -- but that was like the next day. That wasn't -- that was not -- or rather, possibly even two days later. It wasn't immediate. It wasn't like the next morning that they came in. It was like Thursday, Friday, that kind of -- I want to say Friday, even. It was a couple of days.

And to the best of my knowledge, that's when he called the police and told them what he knew.

GRAND JUROR: Okay. And you're clear that it was after *Survivor* that he started walking the dog?

THE WITNESS: Oh, yeah, it was.

GRAND JUROR: And that the normal dog walk was 45 minutes, you said?

THE WITNESS: It -- well, it would depend on if -- how lazy the dog was, or how lazy John was. But it would -- anywhere -- it was -- it was never a long marathon

Exhibit 5002 at 984

*L. Cook*

walk with the dog, it was anywhere from 10 minutes to a half an hour, he would walk the dog. And --

GRAND JUROR: Okay. And was it your impression that he saw Leah while he was walking the dog? Or after he returned the dog, started home, oh, and then forgot something and came back.

THE WITNESS: Well, I assumed it was after he had come back, but it could have been at -- while he was walking the dog. But I always assumed it was when he was headed for home.

GRAND JUROR: Do you recall about what time that was, after he walked the dog, started home?

THE WITNESS: (Sighs.) 9:30-ish. Right in there. I guess. That's a -- again, ten years. That's a -- just from the coming and going. It could have been as -- it was before ten o'clock. It could have been as late as maybe 9:45. But I'm -- I'm still thinking it was closer to -- to 9:30.

MR. FRASIER: Okay. Any other questions for Ms. Lindegren?

Okay. You can go.

THE WITNESS: Good. Thank you.

**TESTIMONY OF LISA COOK (COLEMAN)**

(Witness sworn.)

BY MR. FRASIER:

Exhibit 5002 at 985

*L. Cook*

Q.    First of all, ma'am, this is the grand jury for Coos County.  And we're -- or they are looking into the death of Leah Freeman, and disappearance.

A.    All right.

Q.    It's obvious, but I turned on a recorder.

A.    Okay.

Q.    Two different recorders, so I'm just letting you know we're being recorded here today.

A.    Okay.  Mm-hmm.

Q.    First of all, could you tell us your name, please, and where you live.

A.    My name is Lisa Cook, and I live in North Bend, Oregon.

Q.    Now, have you -- were you previously known as Coleman?

A.    As Lisa Coleman, correct.  Maiden name.

Q.    And you've always lived in the Coos Bay or North Bend area?

A.    Correct.

Q.    Are you familiar with an individual named Nick McGuffin?

A.    Yes.

Q.    How did you get to know Mr. McGuffin?

A.    About ten years ago we dated.  Um --

Q.    Okay.  When was that in relation to the

Exhibit 5002 at 986

*L. Cook*

disappearance of Leah Freeman?

A.     I think it was about maybe six months after she disappeared.

Q.     And when you say dated, how long were you dating, so to speak?

A.     Around just two to three months.

Q.     Your father, if I remember correctly, he was or is associated with the police department or the fire department --

A.     Mm-hmm.

Q.     -- or something over there?

A.     Was a reserve officer in North Bend a long time ago.

Q.     Did you ever meet or know Leah Freeman?

A.     No.

Q.     During the course of the time that you were dating Mr. McGuffin, was there ever an occasion where it came to light that Mr. McGuffin was a suspect or was suspected of being involved with Leah -- or Leah Freeman's disappearance?

A.     Well, I had heard that he was a suspect before we had dated.

Q.     Okay.

A.     And then my sister was dating his cousin, and she said, Oh, my boyfriend's cousin's really cute.  And he -- he's the guy that dated Leah Freeman, but I don't think he

Exhibit 5002 at 987

did it. So, I mean, I knew what I was going into at the time, but, you know, when you're 18 and...

Q. Okay.

A. (Laughs.)

Q. All right. Was there ever a time --

A. Sure, let's just hang out.

Q. Yeah. Okay. Was there ever a time he's like at the house and your dad is sitting there and saying, Okay, what's the deal about this Leah Freeman thing? Was it your understanding --

A. I --

Q. -- he got grilled about that?

A. I don't even know, honestly, if my parents really ever even met him.

Q. Okay. All right.

A. I think they just kind of -- they did not approve of it at all, but I was 18 and --

Q. Okay. When you're dating Nick, does he ever talk about Leah? Did he ever talk about Leah?

A. So when we first stated dating, I think a couple of days into it or whatnot, he had mentioned, So, you know who I am? And I said, Yeah. And he said, And you know -- do you have any -- you know, I'm Leah's ex-boyfriend. And I said, Yeah. And -- and he said, Do you have any questions about anything? And I said, No. Did you do it? And he

Exhibit 5002 at 988

107

*L. Cook*

said, No.  And I said, Well, that's all I need to know, then.

So I just figured it was a can of worms that I didn't need to open.  The past was the past, and we were just moving forward.

Q.    Did you see -- well, the reason I brought you here today was because you were interviewed back in 2000, 2001, by the sheriff's office regarding this case?

A.    Uh-huh.

Q.    Do you recall speaking with a Sergeant Zanni at the sheriff's office?

A.    I can't remember the -- their names.  I remember speaking to some police officers.

Q.    I think I need to find it real quick.

As you can see, I've got about 15 binders here. I'm trying to --

A.    (Indiscernible.)

Q.    I think -- according to the interview here, and I'll just kind of go over it with you, you advised that you'd met Nick McGuffin, you kind of hit it off and started going out.  He'd go with you on your paper route?

A.    Right.

Q.    You'd deliver papers in the early morning hours?

A.    Uh-huh.

Q.    What paper were you delivering?

A.    Um, it is getting that bad?  Oh, golly, I can't

Exhibit 5002 at 989

108

*L. Cook*

even remember what paper I was delivering for that long ago.

Q.    Was it the *Oregonian*, the *Register-Guard*?

A.    *Oregonian*.

Q.    *Oregonian*?

A.    (Laughing.)  Right.  2:00 a.m.

Q.    Did he ever make a statement to you that he was ready to get over Leah Freeman and have a new girlfriend?

A.    Um, I -- I'm -- I believe so.  That's why we started hanging out.

Q.    All right.  Did you ever see his bedroom in his home?

A.    I did go to his house once.

Q.    And did you see in his bedroom -- well, you described it in -- according to the police reports, you described Nick's room -- bedroom as having been like a shrine to Leah with photographs and pictures all over the room and all over the walls.

A.    And I honestly don't remember what his room looked like.  I can vaguely remember the living room, and --

Q.    Okay.  He had a blue Mustang that he was driving? Did that --

A.    No.  He was driving a T-bird.

Q.    A T-bird?

A.    When we were together.

Q.    Was there ever anything about a footprint on the

Exhibit 5002 at 990

*L. Cook*

inside of a passenger window?

A.    Right.  Well, my sister had told me Leah's footprints are on the dash of the window, and that he would get upset if anybody would try to wipe them off.  Um, and I can't remember if I asked him about it or -- or said anything about it, or whatnot.  I think we did come across it in a conversation one time, him saying that she had stuck her feet up there one time or something, and...

Q.    Okay.

A.    But I don't really remember a lot about that.

Q.    Did he ever get upset that he -- you're not to do -- well, let's see.  You started to wipe off the inside of the window on the passenger side.  He became upset, saying you're not supposed to do that?

A.    See, I -- I don't recall that.  I read -- I read the report earlier today, and I don't recall.

Q.    Okay.  Do you recall one occasion when -- according again to the report, where you and Nick accidentally ran into or -- or not ran into with a car.

We were out one evening and ran into Leah Freeman's sister and we -- and we --

A.    I think we ran across her one time, mm-hmm.

Q.    And did Nick tell you any particular way to behave?

A.    You know, I don't recall.  I vaguely remember we

Exhibit 5002 at 991

*L. Cook*

were -- I -- I -- I don't.  I don't remember.  I mean, I remember seeing her, and he acted a little bit different and stuff, and I don't think we acted like -- held hands or anything.  But I really can't remember what he may have said at that point in time.

Q.    Okay.  Because I have in a report, told you that --

A.    Right.

Q.    -- just act like friends, and not boyfriend/girlfriend.

A.    Right.  I guess that's what I said ten years ago.

Q.    Okay.

A.    And I'm -- don't -- I don't believe I lied, so I just remember saying it now.

Q.    Did he ever get upset and start crying?

A.    Right.  So the only thing that I can remember now, very distinctly, there was on occasion where it was late at night, and I think it was close to when we were discussing breaking up.  And I can't remember if we had been drinking or not, but it was really late and he was crying and he was looking down at the ground and kind of fidgeting with himself, you know, like -- like you could tell he was really uptight and upset about something.

And he started to talk in third party, Nick wishes this would have never happened.  Nick wishes he could

Exhibit 5002 at 992

*L. Cook*

go back and fix stuff.  Nick loves Leah so much.  And just was talking in the third party.

And it was kind of freaking me out a little bit. In a sense you want to know what happened because you've heard stories, but in another sense you don't want to know because -- do you really want to know?  So I decided to end the conversation, just because I didn't really want to know.

Q.    I -- and just sort of looking at the report, I just want to make sure I'm -- I understand this.  Back in 2000 you say he got very teary-eyed, threw himself face on the ground?

A.    Right.

Q.    And --

A.    So he was sitting on the ground.  I was on the couch and he was on the ground next to the couch.  And he was upset and he was crying.

Q.    Okay.

A.    And that's when he was kind of being real fidgety, looking downward, and --

Q.    Pulling his hair?

A.    Yeah, like pulling, you know, at his skin and like fidgety.

Q.    Kind of like --

A.    Like really upset and --

Q.    Okay.

Exhibit 5002 at 993

112

*L. Cook*

A.    -- disturbed.

Q.    Pounding on the floor?

A.    I think I'm recalling something -- not like angry, but just like frustrated, like uptight, upset.

Q.    Okay.  So -- and in the third person, he's saying things like, Nick is so stupid, Nick is so dumb --

A.    Right.

Q.    -- Nick -- Nick wants things as they were.  Nick liked it how it was before this all happened.

A.    Right.  Mm-hmm.

Q.    And I think you said, but you thought this was odd and you didn't really want to go there?

A.    Right.  I did but I didn't.

Q.    Okay.

A.    Because I liked him and I just didn't want to know.

Q.    Now, did Nick ever tell you anything about someone that -- who -- did he ever tell you who he thought killed Leah Freeman?

A.    Um, I think we talked about it one time, and there was some sort of a mention of -- there was two other guys involved, and Bill Sero.  And I know that at the point in time they did not talk and they did not like each other. And that he had thought that he had done it.  I can't re -- I can't remember why he had thought he had done it, but he had

Exhibit 5002 at 994

*L. Cook*

some reason, and I don't remember why.

Q.    All right.  I -- and I suppose they showed you this outside.  But there's Nick -- She stated that Nick one time told her that Bill -- Bill Sero, does that sound familiar?

A.    Right.

Q.    Is the one who killed Leah because when he was in high school he wanted to date her and she was mean to him and he was jealous of Nick, and that is why he killed her.

Do you recall that at all?

A.    I -- I don't remember that, but I obviously said it.  (Laughs.)

Q.    Okay.  All right.  Do you know Bill Sero at all?

A.    I don't.

Q.    Tom Stemmerman, do you know him?

A.    Tom's the other name.  I don't know them.  I may recognize their face in passing, but I don't personally know them.

Q.    And Alicia Michaud?  Do you know her?

A.    Name sounds familiar, but I don't, no.

Q.    Kristen Steinhoff?

A.    No.

Q.    Has anyone personally told you that they killed Leah Freeman?

A.    No.

Exhibit 5002 at 995

114

*L. Cook*

Q.    Has anybody told you that they saw what happened to Leah Freeman?

A.    No.

Q.    Okay.  I've been asking everybody this question. Don't take offense.

Did you have anything to do with Leah Freeman's disappearance?

A.    (Laughs.)  No.

Q.    Is there anything else, other than what you've told us about here today, that you think this grand jury should know about?

A.    I -- you know, the police had come and, you know, it's been a big deal recently, the ten-year thing, and bringing about it.  And it's always stories and hearsay and whatnot, and I don't know if stories are worth saying or whatnot, and I don't know names.  But there was a girl that I was working with recently, and I had told her that I had talked to the police about Leah Freeman, and she had told me that somebody she knew was really good friends with Nick's sister, and she supposedly overheard him admitting it to the sister.  And I don't know if they've been brought in or voiced or whatnot, but that's all I know recently.

Q.    Nick has a sister?

A.    No, no, no.  I'm sorry.  Friends with the sister.

Q.    Of Leah?

Exhibit 5002 at 996

*L. Cook*

A.    No.  The -- the lady that I work with, her friend's sister, Nick was friends with her.

Q.    Okay.  A lady you work with.

A.    Her friend's.

Q.    Her friend's.

A.    Sister.

Q.    Her friend's sister.

A.    Right.

Q.    And that person says that Nick told her -- whoever that person is --

A.    Said the sister overheard him telling her he was upset, he was over there, he had been drinking, and he was crying, and he had said something along -- she had overheard him telling her that they were tripping on acid and they were out driving around and they seen her and they were goofing off, and so they swerved the car towards her, and that they hit her.  And that they had taken her and supposedly --

Q.    And this --

A.    -- three of them.  The Bill Sero, Tom Stemmerman, and Nick.

Q.    Okay.

A.    And that they -- also because Leah, had to do something to her, so that if one's in trouble, they were all going to get into trouble.  But like I said, it's just stories.  I don't know.

Exhibit 5002 at 997

*L. Cook*

Q.    Okay.  Who is your friend at work, if I may ask?

A.    Um, she's just a co-worker, she's not personally a friend.

Q.    Okay.

A.    Her name's Martha.

Q.    Okay.  And where do you work?

A.    North Bend Medical Center.

Q.    Okay.

A.    And she's from Coquille.

Q.    Okay.  (Indiscernible) knows.  Okay.

A.    Right.

Q.    Have you told the police about this?

A.    No, I just -- they had already questioned me, and then I had this.

Q.    Because this is the first I've heard that.  Well, I mean, I've heard that particular version.

A.    Story.

Q.    Right.  And --

A.    Right.

Q.    So --

A.    But I don't know who the people were that she heard it from, or any of that.  And like I said, it's just stories, and -- and she heard a million stories, and does one say every single story to you, and bring it up?

Q.    No.

Exhibit 5002 at 998

*L. Cook*

A.    You know, this far into it.

Q.    Okay.  Well, I'm going to ask the officers to talk with you a little bit about that in the hallway, but --

A.    Okay.

MR. FRASIER:  Now, I don't think I have anything more to ask her.  Does the grand jury want to ask her anything?

GRAND JUROR:  I've got a couple of question.

Do you remember Nick being -- a friendship or a closer relationship with Denise, Leah's sister, after Leah passed -- Leah was gone missing, or gone?

THE WITNESS:  No.  Hmm-mm.  You know, I didn't even know of Nick, who Nick was or anything, until the time that we met, and then the time that we were together was brief.  And I have seen him barely a couple of times.  I know nothing of any --

GRAND JUROR:  But did you go to Coquille High School?

THE WITNESS:  I did not.

GRAND JUROR:  Okay.  So you weren't --

THE WITNESS:  I went to North Bend.

GRAND JUROR:  Okay.  So you have --

THE WITNESS:  So I don't.

GRAND JUROR:  Okay.  How about drug use?  Was Nick using drugs when you knew him?

Exhibit 5002 at 999

118

*L. Cook*

THE WITNESS:  Um, just smoking pot.

GRAND JUROR:  You know, when you said he was on the floor and he was kind of twitching and pulling at himself --

THE WITNESS:  Right.

GRAND JUROR:  -- is it -- are you relatively sure that he wasn't using meth or anything stronger than pot?

THE WITNESS:  We didn't do anything like that, and we were with each other all the time.  And I don't think --

GRAND JUROR:  I'm just asking --

THE WITNESS:  I never really got any impression.  I mean --

GRAND JUROR:  Okay.

THE WITNESS:  -- it wasn't something that we did, you know.  It wasn't anything that we were around or -- and we were together all the time.

GRAND JUROR:  So as far as you know --

THE WITNESS:  As far as I know, he was not.

GRAND JUROR:  He didn't use any of the time he was with you?

THE WITNESS:  No.

GRAND JUROR:  Okay.  Did you ever -- you say you only went to the house -- his house -- his family residence once?

Exhibit 5002 at 1000

*L. Cook*

THE WITNESS:  Right.

GRAND JUROR:  Where did he live then?  At --

THE WITNESS:  Parents' house.

GRAND JUROR:  And you just went there the one time?

THE WITNESS:  Yes.

GRAND JUROR:  And I'm not trying to -- I just -- I'm just trying -- did you go out for like three months?

THE WITNESS:  Mm-hmm.

GRAND JUROR:  So when you went out, you went other places?  At your house?

THE WITNESS:  We hung out at my sister's house at the time.  His cousin's house.  So my sister and his cousin lived together in North Bend.

GRAND JUROR:  Mm-hmm.

THE WITNESS:  And we would stay the night over there all the time.

GRAND JUROR:  He never -- you never -- I mean, I'm asking this way.  You never smoked pot at his parents' house, ever?

THE WITNESS:  No.

GRAND JUROR:  And you met his parents?

THE WITNESS:  One -- once or twice.  I think the mom had occasionally come into town, because next door the -- her sister had lived next door to the cousin.  I may have

Exhibit 5002 at 1001

120

*L. Cook*

spoke with her a couple of times after that, but nothing ever -- I mean, I brought him there to pick up clothes.  He -- I don't -- I don't -- he didn't have the car or the car had broken down or something at that point in time, and he wasn't driving it.  And so I drove him over here to get some clothes, and then we went back to North Bend and stayed.

GRAND JUROR:  So indeed he would stay out away from his house overnight?

THE WITNESS:  Right.  Right.  We were together every night.

GRAND JUROR:  At your sister's --

THE WITNESS:  At my sister's house.

GRAND JUROR:  Were you the one driving then?

THE WITNESS:  Yes.

GRAND JUROR:  You'd pick him up?

THE WITNESS:  Right.

GRAND JUROR:  And drive him back to North Bend --

THE WITNESS:  Right.

GRAND JUROR:  -- to spend the night?

THE WITNESS:  Right.  For a little bit in the beginning he had the car, and it was running.  But shortly after we had started dating, something went wrong with the car and he had to work on it or something.  It wasn't running and he wasn't driving anymore.

GRAND JUROR:  This is the Mustang you're talking

Exhibit 5002 at 1002

*L. Cook*

about?

THE WITNESS:  This is the T-bird.

GRAND JUROR:  The T-bird.

THE WITNESS:  I only know of the T-bird.

GRAND JUROR:  Okay.  Did he have a job?

THE WITNESS:  (Sighs.)  He never went to work when we were together.  (Laughs.)

GRAND JUROR:  Okay.  That's a yes, though?

THE WITNESS:  He may -- but I had a job.  So I don't really know occasionally what he did during the day while I was gone, but I don't think he had money or anything.

GRAND JUROR:  Okay.  Thank you.  (Indiscernible.)

THE WITNESS:  Yeah.

MR. FRASIER:  Any more questions?

GRAND JUROR:  So you really didn't spend a lot of time here in Coquille --

THE WITNESS:  No.

GRAND JUROR:  -- you spent a lot of time in North Bend where you were living?

THE WITNESS:  Exactly.  I think I had just taken him here once.  That's all I can recall.

Oh, you know what, I'm wrong.  I went to his friend's house one time, but I don't even really remember a lot about it.  And I don't even remember why we went over there.

Exhibit 5002 at 1003

*K. Pugmire*

GRAND JUROR: Okay. Do you know the friends concerned?

THE WITNESS: I can't remember. I know he drove a Mustang, but I can't remember.

MR. FRASIER: Okay. Any other questions?

All right. I think that will do it. You're excused.

THE WITNESS: Good. Okay.

MR. FRASIER: Thank you.

GRAND JUROR: Thank you.

THE WITNESS: You're welcome.

**TESTIMONY OF KIM PUGMIRE (COURTRIGHT)**

(Witness sworn.)

BY MR. FRASIER:

Q. First of all, this is the grand jury for Coos County.

A. Okay.

Q. And they're looking into the disappearance and death of Leah Freeman.

A. Mm-hmm.

Q. You saw me do it, but I got to tell you, we are recording everything here.

A. Gotcha.

Q. All right?

A. Sounds good.

Exhibit 5002 at 1004

*K. Pugmire*

Q.    So, first of all, could you tell us your name and where you live.

A.    My name's Kim Pugmire, and I live here in Coquille.  I recently moved from Portland.

Q.    And were you formerly known as Kim Courtright?

A.    Courtright, yes, too.

Q.    Are you -- well, you're related to Leah Freeman, are you not?

A.    Yes, I am.

Q.    And how are you related to -- a cousin?

A.    She's my cousin.

Q.    And how well would you say you knew Leah?

A.    Um, you know, we would get together at functions, but as we got older, I didn't get a chance to really get to know her too well, unfortunately.  We would say hi and have small talk, and that was about it.

Q.    Was she older?  Are you older?

A.    I was older.

Q.    Okay.

A.    I believe -- I'm two years older than her ex-boyfriend Nick.

Q.    All right.  Did you know Nick McGuffin?

A.    I did.  Nick and I were good friends in high school.

Q.    He was behind you in high school?

Exhibit 5002 at 1005

*K. Pugmire*

A.    He was two years behind me, mm-hmm.

Q.    How well would you say you knew Nick?

A.    I knew Nick fairly well.  We would have small talk and, I mean, he would actually even walk me to classes, you know, arm in arm, back, you know, when you're in high school.  And we were -- we were friends.  We were good friends.

Q.    You be -- did you become aware at some point in time that Leah and Nick were boyfriend/girlfriend?

A.    Yeah.  In fact, one of the last things I told Nick was, You take care of my -- my cousin, because, you know, she means a lot.

Q.    Did you have a chance to see them together?

A.    You know, I never -- I never really did see them much together.  I just seen them drive by in the car every once in a while together, and I'd --

Q.    Wave?

A.    -- give them a wave.

Q.    Did you have an opportunity to see how well they got along, or anything like that?

A.    Unfortunately I -- I haven't, no.

Q.    Okay.  After Leah disappeared, say within a few days after her disappearance, did you have any contact with Nick in the days after she disappeared?

A.    I -- I did.  He had approached me -- it used to

Exhibit 5002 at 1006

*K. Pugmire*

be Fast Mart.  (Indiscernible) confused.  Fast Mart, the old 7Eleven.

And he came up to me and he had said, Kim, you know I have nothing to do with this.  You know I have nothing to do with this.  And at that point in time I said, Oh, I believe you a hundred percent, you know.  I know you couldn't do anything like that.

Q.    Okay.

A.    Having to do with her -- her disappearance.

Q.    And was he insistent that you've just got to believe me, I didn't have anything to do with it?

A.    At first, you know, until I -- until I had said, Oh, I -- I understand.  Yeah, I wouldn't -- I wouldn't think that you have anything to do with this.  So.

Q.    Now, later on, did you also see him in different time, out near the area where Leah was eventually found?

A.    That same night, in fact.

Q.    Okay.

A.    What had happened was we were at 7Eleven.  I -- myself and my boyfriend at the time, and one of his friends. And we had left 7Eleven and those guys were milling around a red car that I don't know -- I don't whose red car it was, and I don't really remember the people that Nick was with, to be honest.  But we had driven -- we were starting to drive up Fairview, and that red car passed us, really fast.  And I

Exhibit 5002 at 1007

*K. Pugmire*

didn't think anything of it until we go to -- we were heading out Lee Valley Road.

Q.    Okay.

A.    And right where the pavement ends and it turns to gravel, about 200 yards or so into the gravel there's that pull-out area.  And that's where we saw that red car.  And the guy that I was with needed to use the bathroom, but I felt the need to not stop, at that point in time.

Q.    Did you see Nick there?

A.    Yes.

Q.    And what -- was he in the car or outside the car?

A.    They were all outside the car, kind of moving around, talking.  I don't know.  I don't know exactly what they were doing because I didn't -- I decided I didn't want to stick around.

Q.    Okay.  Did you recognize any of the other people there with him?

A.    I did not.

Q.    Now, you're aware Leah's body was eventually found --

A.    In that same area.

Q.    Okay.  Do you know -- have you ever been exactly to the spot where --

A.    I have not, no.

Q.    So you don't know where -- how far away the body

Exhibit 5002 at 1008

*K. Pugmire*

was when it was eventually found, from where you saw Nicholas?

A.    I unfortunately don't, no.  All -- all I have heard in -- is that she -- her body was found at the Boy Scout cabin.

Q.    Cabin?  Well, farther up the road.

A.    Oh.

Q.    And I think on the other side of the road from where the old Boy Scout cabin is.

A.    I'm not exactly sure where that is either.

Q.    Have you had any contact with Nick since that time?

A.    No, I haven't.

Q.    Has anybody told you -- I've been asking everybody these questions.  Has anybody ever told you that they were responsible for Leah's death?

A.    No.  Huh-uh.

Q.    Has anybody told you they saw what happened to Leah?

A.    No.

Q.    I've been asking everybody this.

A.    Right.  I understand.

Q.    But you -- did you have anything to do with Leah's death?

A.    No.

Exhibit 5002 at 1009

*K. Pugmire*

Q.    All right.

Now, is there anything else about this situation you think the grand jury needs to know?

A.    Not -- not that I can think of, no.

MR. FRASIER:  I don't think I have any other questions for her.  Does the grand jury wish to ask her any questions?

GRAND JUROR:  Did you know if they were on drugs?

THE WITNESS:  At that time, no, I don't.  At the time I saw him.  No, I don't -- I didn't notice of anything. He seemed fairly normal at that point.

GRAND JUROR:  You say you couldn't recognize anyone else who was standing around outside the car where the red car was stopped?

THE WITNESS:  Mm-hmm.

GRAND JUROR:  You didn't see Leah then, at that point?  Would you have recognized whether there was all guys or there was a girl there?

THE WITNESS:  It was all -- it was all guys.  And to my best recollection, there was three of them.

GRAND JUROR:  Okay.  Count -- that's Nick and --

THE WITNESS:  Nick in -- included, correct.

BY MR. FRASIER:

Q.    Do you know a gentleman named Ricky Crook?

A.    I do know Ricky, mm-hmm.

Exhibit 5002 at 1010

129

*K. Pugmire*

Q.    Ricky was not one of those out there?

A.    Not to my -- I don't know.  I really don't know, to be honest.

Q.    Okay.  All right.  You were basically concentrating on --

A.    I was just concentrating, yeah, on Nick.

Q.    Okay.

A.    And -- and what he was coming up to me and saying and stuff.

Q.    All right.

GRAND JUROR:  So you -- let me see if I understand this right.  You're driving up Fairview Road there?

THE WITNESS:  Mm-hmm.

GRAND JUROR:  And then they -- they pass -- this car passes you.

THE WITNESS:  Mm-hmm.

GRAND JUROR:  Then it pulled into this area you were just describing?

THE WITNESS:  Mm-hmm.

GRAND JUROR:  And you -- you're -- you pulled in there behind?

THE WITNESS:  They were way ahead of us.  They had already pulled in and they were outside doing something before I had even gotten close.

Exhibit 5002 at 1011

130

*K. Pugmire*

GRAND JUROR:  Okay.  And your boyfriend --

THE WITNESS:  They were really --

GRAND JUROR:  -- pulled in to stop there?

THE WITNESS:  They wanted to use the rest room, and then I decided I didn't like -- I didn't -- it didn't feel right to me.  All of a sudden I -- I was just like I don't want to be anywhere near anybody out here in the country.

GRAND JUROR:  It was just you and your boyfriend were in your car?

THE WITNESS:  It -- I was driving my boyfriend's truck, and then one of his friends was with us as well.

GRAND JUROR:  Oh, okay.

THE WITNESS:  We were taking the back roads to go to Myrtle Point.

GRAND JUROR:  Okay.

BY MR. FRASIER:

Q.    And you were actually on Lee Valley Road at this point?

A.    Yes.

GRAND JUROR:  Okay.  And then -- so then did the three of you pull over and stop?

THE WITNESS:  We started to stop.

GRAND JUROR:  Started to stop?

THE WITNESS:  And then I said, i don't want to

Exhibit 5002 at 1012

*K. Pugmire*

get out right now.  I have -- I don't -- I don't want to get out right now.  I don't have a good feeling.  Let's go down the road.  And so then we went down the road about a mile or so, and they used the rest room.

GRAND JUROR:  So Nick didn't come up to the car?

THE WITNESS:  No, huh-uh.

GRAND JUROR:  You just saw him?

THE WITNESS:  Mm-hmm.

GRAND JUROR:  And this was after Leah had disappeared?

THE WITNESS:  This was about four days or so after she had disappeared.

GRAND JUROR:  If you went out there now, do you think you could remember where it was at?

THE WITNESS:  Yeah.  I could point out to where the car was parked.

GRAND JUROR:  But that was the same night that Nick had talked to you about --

THE WITNESS:  Yes.

GRAND JUROR:  -- not having anything to do --

THE WITNESS:  He -- he had talked to me, came up to me, couldn't -- and told me, I have nothing to do with this.  We left, and then he left, passed us, and then we slowly caught up to him where -- wherever he was out there.

GRAND JUROR:  What kind of truck were you

Exhibit 5002 at 1013

*K. Pugmire*

driving?

THE WITNESS:  Uh, it was a -- I believe it was a green Ford.  Older.

GRAND JUROR:  Full-size pickup?

THE WITNESS:  Yeah.  And they were driving a red car, a red like sedan -- sedan.  I'm not -- I don't know the kind -- I don't know the make or anything.  It was older.

GRAND JUROR:  Did -- you say that it was their idea to stop there to go to the bathroom?

THE WITNESS:  Mm-hmm.

GRAND JUROR:  You were driving, though, so they asked you --

THE WITNESS:  I was driving them.  They had been drinking.

GRAND JUROR:  (Indiscernible.)  Is there like a -- is there a Porta-Potty or something there?  Or --

THE WITNESS:  No.  They were just going to go --

(Indiscernible conversation among jurors.)

GRAND JUROR:  -- I guess I made that assumption, but I just wanted to -- I thought maybe it was a -- you know, a little pull-out or --

THE WITNESS:  No, there's nothing -- there's nothing.  There's just a pull-off.  They -- they were aware there was a pull-off right there, that I could just pull over real quick.

Exhibit 5002 at 1014

*K. Pugmire*

GRAND JUROR:  Okay.  Okay.  Gotcha.

MR. FRASIER:  Any other questions?

GRAND JUROR:  What time -- I guess what time of day was that?

THE WITNESS:  Mm, around 10 o'clock at night, 11 o'clock at night.

GRAND JUROR:  Oh, so was it dark?

THE WITNESS:  It was dark out, yeah.

GRAND JUROR:  You could still see Nick, though? I'm -- I mean, it was dark, but you could still make him out?

THE WITNESS:  Yeah.  Yeah.  It was -- and it was the same exact car, too.

GRAND JUROR:  Okay.

THE WITNESS:  Because when you, you know, drive by, it's not that far off, away.

GRAND JUROR:  Yeah.

GRAND JUROR:  Would you know a Thunderbird if you saw one?  Do you know cars?

THE WITNESS:  Yeah.  It wasn't a Thunderbird, I know that.

GRAND JUROR:  It was smaller?

THE WITNESS:  It was smaller than a Thunderbird.

MR. FRASIER:  Any other questions?

Okay.  Hearing none, you're free to go.

THE WITNESS:  All right.  I'm good to go.  And

Exhibit 5002 at 1015

good luck to you guys.

GRAND JUROR:  Thank you.

THE WITNESS:  Thank you for putting the time into it.

**TESTIMONY OF DARIUS MEADE**

(Witness sworn.)

BY MR. FRASIER:

Q.    First of all, could you tell us your name, please, sir, and what your occupation is.

A.    My name is Darius Meade, and I'm an administrative corporal for the sheriff's office in the jail.

Q.    And how long have you worked at the Coos County jail?

A.    I've worked for the sheriff's office since 1998, patrol for almost three years, and corrections for the other nine.

Q.    As part of your responsibilities there at the Coos County jail, does the jail keep records of when a particular individual is brought into the jail, what dates he's brought in, and how long he's there, and that type of thing?

A.    Yeah, we -- we keep very strict records on that.

Q.    And do you also keep records of what cells or what part of the jail they're held in?

A.    Yeah, at the time of book-in we assign them a

Exhibit 5002 at 1016

*D. Meade*

cell, and it's recorded in the computer management system.

Q.    This morning we heard testimony from an individual named Richard Bryant.  He indicated that sometime in the past, and he wasn't really clear when, he had been held at the Coos County jail, and that -- or at least a portion of that time he shared a cell with a Nicholas McGuffin.

At my request, did the Coquille police department contact the jail to get records regarding that?

A.    Did they contact the jail?

Q.    Yeah.

A.    I honestly don't know.  I wasn't part of that.

Q.    Let me show you those.  Do those appear to be official jail records there?

A.    Yes.  I -- I believe they did contact the jail commander.  I believe I did hear about that.

Q.    All right.  And are those there, those two documents there, are those the type of records your -- you would keep from your computer system, regarding who's in jail and where they're kept and so forth?

A.    That's correct.  These are off the old Dalen (phonetic) system.  We've upgraded our system, but this is what -- what we used at that time, yes.

Q.    Regarding Mr. Bryant, is there a notation there that in September of 2002 until November of 2002 that he

Exhibit 5002 at 1017

*D. Meade*

had -- he was held at the Coos County jail?

A.    There is.

Q.    And does it indicate what cell he was held in?

A.    Yes, it does.  He was held in C-108.

Q.    And regarding Mr. McGuffin, the next sheet, is that regarding Mr. McGuffin?

A.    It is.

Q.    And does it show that he was in the jail September 16th of 2002 to September 24th of 2002?

A.    It does.

Q.    And does it show what cell he was kept in?

A.    Yeah.  It also shows that he was in cell C-108.

Q.    And so during the same time period, at least for a short period of time, a week or so, Mr. McGuffin and Mr. Bryant were held in the same cell?

A.    That is correct.

MR. FRASIER:  That's all the questions I have for the deputy.  Does the grand jury want to ask him anything?

GRAND JUROR:  Does there anything special happen during that week with either of them?  Did anybody -- either of them complain about their cellmate or make any kind of noises --

THE WITNESS:  I honestly don't know.  This -- we have limited access to this old Dalen system.  It would have to be looked at if there was any comments in the system on

Exhibit 5002 at 1018

*R. McNeely*

that.  Nothing -- nothing that I know of right off the top of my head.

GRAND JUROR:  Thank you.

BY MR. FRASIER:

Q.    And I don't think I told you, we are recording this.  You were aware that I was recording this, right?

A.    Yeah, I saw you push the button.  Yes.

Q.    All right.  I don't want to get in trouble.

A.    (Laughing.)  Not from me.

MR. FRASIER:  Any other questions for Corporal Meade?

GRAND JUROR:  So they bunked together.  There's bunk beds or something in that?  Or --

THE WITNESS:  Yeah, the cells -- this was in section 3-B of the jail, has two large blocks, C and D.  This would have been in the C side.  And in the cells they're just steel bunks, one on top of the other.  So they would have been in the same cell, one on the top bunk, one on the bottom bunk.

MR. FRASIER:  Anything else?

Okay, sir.  That will do it.

THE WITNESS:  Thank you.

**TESTIMONY OF RAY McNEELY**

(Witness sworn.)

BY MR. FRASIER:

Exhibit 5002 at 1019

Q.     First of all, Officer McNeely, you've testified, I think it was last week, before the grand jury?

A.     Yes.

Q.     Tonight -- or this afternoon, what I'd like to talk with you about a little bit is earlier this year, at my request, did you -- well, first of all, did you become aware of a police report written in 2000 that had been drawn to your attention by me, where an Officer Ulmer had interviewed Mr. John Lindegren?

A.     Yes.

Q.     And at my request, did you go and find Mr. Lindegren and interview him about what he told Officer Ulmer in the year 2000?

A.     Yes.

Q.     And to just briefly recap, he told you that on the evening that Leah disappeared he saw Leah and Nick together at a particular location in Coos -- in Coquille?

A.     Yes, that's correct.

Q.     Did he -- did you actually have him go and show you exactly where this location was where he saw Leah and Nick together?

A.     Yes, I did.

Q.     Could you point out on the map, show us where they were at.

A.     (Pause, referring.)  So -- (laughs) -- kind of

Exhibit 5002 at 1020

*R. McNeely*

hard to -- basically there's a -- Cheri Mitchell's house, which was Leah's friend.  Her house sat back behind another house.  And so there was another house was kind of in front that blocked the view of the road.  And John pointed that they were right there on that roadway, that he walked by them within from me to you, and actually ackno -- I think he said he said hi or some kind of acknowledgment to them as he walked by.

Q.    Now, he told you that it was the day that Leah disappeared, and he'd been over at his sister's house?

A.    That's correct.

Q.    And that was Jordi Lindegren?

A.    Yes, correct.

Q.    And she works at the library here in Coquille?

A.    Yes, she does.

Q.    Did you go and talk to her too, about this?

A.    We did go and talk to her.

Q.    Did you become aware from both of them that they indicated that this had occurred after they had watched *Survivor*?

A.    Yes, they were very adamant that they were -- very adamant. (Laughter.)  Overly adamant, that they were -- knew it was that date because she was a huge *Survivor* fan, and she knew it was that day and that time, and there was no way it could have been any other day because she knew

Exhibit 5002 at 1021

*Survivor.*

Q.    Now, June 28th, 2000, was a Wednesday; sure it's correct?

A.    Correct.

Q.    All right.  And when you came back and told me about *Survivor*, did I express to you some misgivings that *Survivor* wasn't on Wednesday night?

A.    You did.

Q.    Did I tell you that my wife is an avid *Survivor* watcher and it's always on Thursday night?  (Laughter.)

A.    You did.

Q.    And I never can see -- watch anything else except *Survivor* on Thursday night?

A.    You did.

Q.    So did I ask you to verify whether or not *Survivor* at that particular time was on Wednesday night?

A.    You did.

Q.    What did you do?

A.    We looked up on -- online, and just basically computer searched, found out through the network that it ran on Wednesday nights from eight to nine o'clock on -- so it ran on June 28th, Wednesday night, the night Leah disappeared, from 8:00 to 9:00, exactly like Jordi and John had said.

Q.    Did you find an actual publication that, okay,

Exhibit 5002 at 1022

this was what was on CBS on that night, that particular night?

A. Yes, we did. And printed it off, gave a copy to you, and we have a copy with us.

Q. And did that particular publication talk about the *Survivor* show that night?

A. Yes, it did.

Q. Did I talk about somebody named Rudy getting voted off? (Laughter.)

A. I don't remember, so --

Q. Okay. You were able --

A. I didn't -- well, I didn't watch it. I didn't go that far. I just verified that it was on that time.

Q. So the best of your knowledge, what Jordi and John were telling you, at least in regards to the night *Survivor* was on, the time frame, you were able to verify that?

A. Correct.

Q. Now, I'm going to ask a couple of other questions here. Earlier today the McGuffins were in and -- well, first of all, when this case was reopened initially, that would have been in -- shortly after Chief Dannels became the chief here?

A. Yeah, would have been August of '08.

Q. And at that time did Chief Dannels -- and we'll

Exhibit 5002 at 1023

*R. McNeely*

have him come in next week.  But did he organize what is sometimes referred to as a cold case team, where he had four or five retired detectives come in and work on the case, and so forth?

A.    Yes, he did.

Q.    Initially, what the officers did was find the reports and catalog what we had, organized it, look at the evidence, and that type of thing?

A.    Correct.  They went over it.

Q.    And then in January of this year, then it became public that we were investigating this case?

A.    Yeah, we activated a current team, made up of our major crimes team unit.

Q.    And it was at that time that people went out and started interviewing people and so forth?

A.    Correct.

Q.    According to the McGuffins earlier today -- well, for example I'm going to use a woman by the name of Tosha Ekblad.  Are you familiar with Tosha Ekblad?

A.    Yes, I am.

Q.    And had I given you a slip of paper that -- well, let me back up.  You saw Mr. McGuffin a couple of weeks ago, stopping in the parking lot of the Coquille Police Department?

A.    Correct.

Exhibit 5002 at 1024

*R. McNeely*

Q.    You saw him hand me a piece of paper?

A.    Correct.

Q.    Did you -- did I then subsequently hand the paper to you?

A.    You did.

Q.    And did that paper indicate that somebody named Tosha Ekblad needed to be interviewed?

A.    Yeah, stated -- yes.

Q.    And did you go and find Tosha?

A.    Yes, we did.

Q.    Did you have any trouble finding Tosha?

A.    Yes, we did.

Q.    Okay.  Tell us about, did you eventually have face-to-face contact with her?

A.    No, we had over-the-phone contact with her.

Q.    Have you ever had face-to-face contact with her?

A.    No, we have not.  Just her mom and grandma.

Q.    My question to you here is the McGuffins claim that -- well, first of all Officer Webley.  Are you two teamed together at this point as part of the investigation?

A.    Yes, we are.

Q.    And you're the two that are primarily running around getting all the stuff I want done?

A.    Yes, we are.

Q.    All right.  If I say go interview somebody,

Exhibit 5002 at 1025

you're the guys?

A.    Yes, correct.

Q.    Now, did you guys threaten Tosha Ekblad; you know, if you don't change your story, you're going to go to prison or you're going to lose your kids or what have you?

A.    No, we did not.

Q.    What -- tell us about the contact such as you recall.

A.    We -- the McGuffins gave us the contact information, so we tried to run her down.  It was a little hard at first because the phone number didn't work and she uses her grandma's address.  So we finally did get ahold of that grandma again, actually just yesterday, and her -- Tosha's mom was there also.  And they both told us the same story of what their daughter had told them.

And so they -- her mom actually called from her mom's cell phone, got ahold of Tosha, handed the phone over to Officer Webley, who then talked to her.  And she didn't bring up any of the stuff that she had told her mom and grandma, so at that point Officer Webley handed the phone to me.  I told her that, you know, we were looking into Leah Freeman's death, and that we needed to know every information she had.  And that she needed to be truthful and honest.  She said she was.

I said, Well, your grandma and your mom both told

Exhibit 5002 at 1026

*R. McNeely*

us different stories than what you're telling Officer Webley on the phone.  I said, So if it comes to it, and you go to grand jury, and you're going to tell - you need to tell the truth.  Because if your mom and grandma say you told them this, and you say you didn't, we may have issues with lying in grand jury, which you can't lie in grand jury because that's a felony and that's a crime.

And at that point she went ahead and disclosed to Officer Webley what she had told her mom and grandma.

Q.    And we're going to issue her a subpoena and bring her in next week to tell the grand jury?

A.    Yes, we are.

Q.    All right.  Did Officer Webley in your presence ever threaten her with going to jail or prison?

A.    No.  She actually thought Officer Webley was very nice.

Q.    I guess my question is -- too, is especially Bruce McGuffin is complaining that the police are harassing the witnesses, are threatening the witnesses, telling the witnesses they need to change their stories, or anything along that line.

Have you or any officer in your presence ever done that to a witness in this case?

A.    No, we have not.

Q.    What else did I say I was going to ask you about?

Exhibit 5002 at 1027

*R. McNeely*

A.    Do you want to talk about Tosha leading us to Jesse, or --

Q.    No, we'll worry about that next week.

A.    Okay.

MR. FRASIER:  I don't think I have any other questions for Officer McNeely.  Does the grand jury want to ask him anything?

GRAND JUROR:  Are we going to see -- or I guess I'm -- with Tosha, we -- assuming we hear, but the testimony that she gave over the phone, when she finally did, she corroborated what mother and grandmother had said then?

THE WITNESS:  Correct.  Yes.

GRAND JUROR:  Can we ask him what that was?

MR. FRASIER:  Go ahead, tell them what --

THE WITNESS:  Okay.

GRAND JUROR:  Yeah.  I mean, do you just leave us hanging here?

THE WITNESS:  Okay.  When she -- when we first contacted her, she just told us that she had heard a bunch of rumors and stories about Bill Sero and Tom Stemmerman, and that it was all hearsay and she didn't have any direct knowledge.  The part that her grandma and mom told us is that she had said that a Jesse Sh -- I'm going to slaughter the last name -- Smisnek or Smidge -- Smidgely, something like that.  It's S-m-i -- anyways, it's just kind of hard to

Exhibit 5002 at 1028

*R. McNeely*

pronounce.  That he had supposedly told their daughter and granddaughter a bunch of stuff about -- because he'd lived right by Nick McGuffin, and that Nick was building forts out in the woods and acting weird, and all this other stuff.

And so when we asked, when Officer Webley wanted to talk to Tosha about that, she didn't want to say anything about that at first.  Then after we told her that her mom and grandma have already told us about that, then that's when of course what I just told you.  Then she came forward with what she had told her mom and grandma.  So.

BY MR. FRASIER:

Q.    Did she ever tell you she had any direct knowledge of what happened to Leah Freeman?

A.    No, she did not have any direct knowledge.

Q.    And you're going to serve that subpoena on her sometime in the --

A.    Hopefully tomorrow, yes.

MR. FRASIER:  Okay.  Any other questions for Officer -- whatever your name -- McNeely.  (Laughter.)

GRAND JUROR:  I think we'll probably see him again.

MR. FRASIER:  You might.

THE WITNESS:  Maybe even in a different shirt again, too.  (Laughter.)

GRAND JUROR:  Good shirt.

Exhibit 5002 at 1029

THE WITNESS:  Okay.  Thank you.

MR. FRASIER:  Okay.

THE WITNESS:  Ross Dress For Less.  (Laughter.)

MR. FRASIER:  Okay.  That will do it.

THE WITNESS:  All right.  Thank you.

GRAND JUROR:  Thank you.

### TESTIMONY OF CHRISTOPHER WEBLEY

(Witness sworn.)

BY MR. FRASIER:

Q.    Okay.  Officer Webley, we didn't get it on tape but you've just been sworn in.  Is that correct?

A.    Yes, I have.

Q.    And it was on the audio.

First of all, can you -- well, first of all, tell us your name, please, and your occupation.

A.    My name is Chris Webley, W-e-b-l-e-y.  I'm a police officer for the City of Coquille, be working on four years now.

Q.    I want to direct your -- well, you've been -- let me back up here.

You and Officer McNeely have been tasked by Chief Dannels to be the primary two from your department to be working on the case of the disappearance and death of Leah Freeman?

A.    That's correct.

Exhibit 5002 at 1030

Q.    This morning we heard testimony from -- would have been Bruce McGuffin, indicating his claim that you had threatened a witness named Tosha Ekblad in -- to get her to change her story in front of the grand jury.

Have you had contact with this Tosha Ekblad?

A.    I have.

Q.    And did you talk to her yesterday?

A.    I did.

Q.    Did you talk to her face-to-face?

A.    No, did not.

Q.    Was it by phone?

A.    It was.

Q.    How did that conversation go?

A.    Um, at the beginning, was just a little hesitant to speak with me.  Officer McNeely spoke with her for a little bit, we kind of traded off, and then she was actually very cooperative.  We had a pleasant conversation.  She didn't threaten me, I didn't threaten her.  I -- and she really didn't change her story.  She did tell me some more information, but I'm afraid I don't know -- I have absolutely no idea why anyone would say that, is the best way I can put it, I guess.

Q.    All right.  Did -- Officer McNeely's testified that apparently originally she wasn't forthcoming with certain information that she'd told her mom and her

Exhibit 5002 at 1031

*C. Webley*

grandmother?

A.    Yes.

Q.    And you gave the phone to Officer McNeely?

A.    Correct.

Q.    And he explained to her if she came to grand jury and didn't tell the truth that she'd get into trouble?

A.    I believe that's the case.  I actually was talking to someone else while he was on the phones, but I believe that's true, yes.

Q.    Since this investigation, since you've been involved in this investigation, have you or any officer in your presence threatened any witness in this case to change their story in any way?

A.    Absolutely not.

MR. FRASIER:  Thank you.  That's all the questions I have for Officer Webley.

THE WITNESS:  Nothing further?  Appreciate you folks's time.

GRAND JUROR:  Thank you.

(End of recording.)

Exhibit 5002 at 1032

151

*C. Webley*

--oOo--

I certify, by signing below, that the foregoing pages 1 through

150 constitute a correct transcript of WAV files provided of

the above-entitled matter, this 7th day of April, 2011.


_____

PEGGY S. JILLSON, TRANSCRIBER

Exhibit 5002 at 1033

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

**STATE OF OREGON,**          )
                             )
      Plaintiff,          )  Case No. 10-CR0782
                             )
v.                           )
                             )
**NICHOLAS MCGUFFIN,**         )
                             )
      Defendant.          )
_____) VOLUME 9

Wednesday, August 4, 2010

GRAND JURY PROCEEDINGS

APPEARANCES:

FOR THE PLAINTIFFS:        **PAUL FRASIER**
                           **DISTRICT ATTORNEY**
                           250 N. Baxter
                           Coquille, Oregon 97423

TRANSCRIBED FROM AUDIO RECORDINGS

TRANSCRIBED BY:        Peggy S. Jillson
                       987 Tivoli Street
                       Eugene, Oregon 97404
                       (541) 689-7964

Exhibit 5002 at 1034

2

## WITNESS INDEX

BRYANT, Richard                              3

HAIGHT, Stacy (Napier)                      12

McGUFFIN, Kathleen                          18

McGUFFIN, Bruce                             39

WILSON, Zachary                             98

KNIGHT, Huey Delbert                       110

Exhibit 5002 at 1035

3

*R. Bryant*

**COQUILLE, OREGON; WEDNESDAY, AUGUST 4, 2010**

-o0o-

**TESTIMONY OF RICHARD BRYANT**

(Witness sworn, appearing telephonically.)

BY MR. FRASIER:

Q.    Mr. Bryant, this is the grand jury for Coos County, and we are looking into the death of Leah Freeman.  I need to tell you that we are recording the proceedings here today, so I just want you to be aware that we're recording, all right?

First of all, could you tell us your full name and your -- and what city you live in, sir.

A.    Richard Ernest Bryant.  I live in John Day, Oregon.

Q.    And Mr. Bryant, you're currently in the custody of the Grant County jail; is that correct?

A.    Yeah, unfortunately.

Q.    Ah.  You're there on a probation violation; is that correct?

A.    Yeah.

Q.    What -- I guess I have to ask you this, sir.

What felony convictions do you have?

A.    Um, a felony conviction?  I got one in 2000 for possession of controlled substance, and that's the only felony conviction I have.

Exhibit 5002 at 1036

Q.    Right.  And what are you on probation for now?

A.    My -- well, my wife at the time now, when she was 20 I bought alcohol for her, we drank together.  And she's 24 now, and that's what I'm on probation for.  I bought alcohol for her four years ago.

Q.    Okay.  So furnishing alcohol to a minor, is that the charge?

A.    Yeah.  Yeah.

Q.    All right.  Sir, did you used to live in the Coos County area?

A.    Yeah, in Coquille.

Q.    And when was that?

A.    Um, from '90 -- '91 or so, to 2001 or '2.

Q.    All right.  While you were here, did you know an individual named Nick McGuffin?

A.    I did.

Q.    And how well --

A.    Yeah.

Q.    How well did you know him, sir?

A.    Um, pretty good at the time, since fifth grade, you know.  That's when I started to go -- going to school there in Coquille.  And I knew him from fifth grade till I moved.

Q.    All right.

A.    I mean pretty good in a way.  We hung out quite a

Exhibit 5002 at 1037

R. Bryant

bit, you know, talked a lot.  Did some illegal things, you know.  Doing drugs, drinking, stuff like that, you know.

Q.    What type of drugs?

A.    Um, meth, pot, mushrooms.  I mean, pretty much anything you really get your hands on, at the time.  I mean, we were young, so --

Q.    Right.  Did you know Leah Freeman at all?

A.    I did.

Q.    Yeah.  How well --

A.    That was his girlfriend at the time.

Q.    Okay.  How well did you know her?

A.    Um, I didn't know her as well as I knew him.  I knew her, you know, pretty good by -- you know, who she was.  She was always with him.  I knew her sister, her stepsisters, her stepbrothers, her mom, stuff like that.  I mean, her personally, I knew her, but, you know, not that well.

Q.    You mentioned that Nick and Leah were boyfriend/girlfriend.  How well did they get along?

A.    Um, to the -- to their parents, to the outside, it looked like they got along really well.  But they were constantly arguing and fighting, all the time.  I mean, it just seemed like it was just an ongoing battle between.  I don't know what they were fighting about.  They were -- it seemed like they were always fighting.  But on the outside, when people would ask if there -- everything's all right,

Exhibit 5002 at 1038

R. Bryant

everything was fine.

Q.    When you say fighting, was it mostly -- was it all verbal?  Was there any physical problems, in terms of somebody hitting somebody?

A.    Um, I'm not too sure about the physical part.  I mean, they would argue a lot, and you know, one would -- she would take off walking or something like that.  And, you know, he'd be like, Whatever.  Screw you.  And he would go his way, and the next thing you know, the -- it was like nothing happened.

Q.    Okay.

A.    So mainly verbal, from what I seen and heard.

Q.    Now, you're aware that Leah Freeman disappeared in the latter part of June of 2000; is that right?

A.    Yeah.  I -- I couldn't personally remember the exact date, but, yeah, I know about that.  I remember.

Q.    When did you first learn or how did you first learn that Leah Freeman was missing?

A.    Um, from Nick, actually.  I was living on Dean Street in -- I think it was Apartment 9, there in the Dean Street apartments.  And it was probably 6:00 of -- 6:00, 6:30 in the morning, there was a knock on my door.  And I opened the door and it was Nick.  And, you know, from my observation I would say he'd been up all night, you know, doing some meth or whatever.  His eyes were all bugged out and he kept

Exhibit 5002 at 1039

R. Bryant

telling me that Leah was missing and something had happened to her. And I was like, What are you talking about? I was like, What do you mean, she's missing, something's happened to her? And he had a picture of her, and he was holding the picture up to me, going, She's missing, something's happened to her.

I was like, Nick, I've known you for getting on eight years or whatever. I know what she looks like. I don't need to see a picture of her. And he was like, No, something's happened, she's missing.

And that was just the weirdest -- weirdest thing I've ever experienced with Nick. And that's when I learned that she'd allegedly been missing or something had happened. I didn't really know she was missing till a couple -- like a day or two after that.

Q.    All right. Now, at some point in time, both you and Nick were in jail together; is that right?

A.    Yeah, it was that one -- oh, I would say it was a couple of months after she had gone missing, I would think.

Q.    And you actually shared a cell with him?

A.    Yeah.

Q.    What, if anything, did Nick McGuffin tell you while you were in jail together?

A.    Um, you know, we talked quite a bit. He had begun another relationship with a -- with a girl that was

Exhibit 5002 at 1040

8

*R. Bryant*

underage, that lived on -- on Charleston Road.  Between Coquille and Charleston there was that little road going over the mountain.  I've forgot what it was called.  It was --

Q.    Libby Drive?

A.    Yeah.  Or -- Libby Road or Libby Drive, yeah.

Well, he would go over that way to go see her. He wasn't supposed to see her, and that's what he was in jail for, for violating either a restraining order or seeing her or something.

Well, he was telling me about Leah, and he was starting to talk about her, and I was like, you know, Well, what's going on then; how you feeling?  Because, you know, when you're in jail, emotions just drain out of you.  And he just started bawling, and I was like, What's going on?  He was like, I can just -- I can see her laying there, and I couldn't do anything to help her, and I can't do anything about it.

And I'm just going, Holy crap, man.  I don't want to hear about this.  And -- you know, and I actually told him to shut up because I -- I really didn't want to hear about it.  I didn't know if he was just going and talking and talking, or if he -- this was stuff actually coming out. And, you know, I was basically trying to comfort him at the time because he was freaking out about being in jail and nobody was bailing him out.

Exhibit 5002 at 1041

He said that, you know, about the Leah case, they -- his parents weren't going to let nothing happen to him, and they would make sure he got a lawyer and -- you know, stuff like that.

And I told the jail guard about it after it happened, because he left my cell. And I told him, I was like, You know, I don't know if this is going to mean anything, but, you know, this is kind of what he told me, but nothing ever happened.

Q.    Okay. Do you know anything else about Leah Freeman's disappearance or death?

A.    Uh, I just -- you know, we hung out with some really shady characters. And around that time when this was starting to go on, I do know that like Aaron West and whatnot, and them, took a polygraph --

Q.    Okay. We can't talk about that, okay.

A.    Oh, sorry.

Q.    It's all right.

A.    But those people were like -- you know, around that time, were just freaking out. And, you know, they wouldn't leave my place. I don't know why. It was just -- I don't know, they wouldn't leave me. And they were acting really weird around this whole time.

Q.    Did you know a Tom Stemmerman?

A.    It sounds really familiar, but I don't think so.

Exhibit 5002 at 1042

*R. Bryant*

Q.    Okay.  How about Bill Sero?

A.    Bill Sero -- yeah.  Yeah.  Um, I do know him.  He actually makes me really nervous, just even talking about him right now.  That guy kind of scares me half to death.

Q.    Yeah.  Has Mr. Sero ever told you that he killed Leah Freeman?

A.    No.  No, he never told me that flat-out.  I was in jail with him too.

Q.    Okay.  I assume you've heard a rumor that Mr. Sero or Mr. Stemmerman may have run her over with a car?

A.    I did hear something about that.  It's coming to hear, but I thought it was about another gal that may have done it, but I've heard something about it.

Q.    Okay.  Alicia Michaud?

A.    Yeah.  Alicia Michaud and, um -- uh, Stephanie -- I can't remember her name right now.  Stephanie something.

Q.    Do you remember the name Kristen Steinhoff?

A.    That's who it was, Kristen.  That's who I was thinking of.  Not Stephanie, Kristen Steinhoff.

Q.    Has anybody told you that they were involved in the death of Leah Freeman?

A.    No.

Q.    Has anybody told you that they saw what happened to Leah Freeman?

A.    Um, no, not -- not really, other than what kind

Exhibit 5002 at 1043

of Nick was saying to me.  Other than, I see -- you know, I can see her laying right there and I couldn't really do anything to help her.  You know, stuff like that.  Other than anyone else, no.

Q.    Is there anything else you think the grand jury needs to know about this case?

A.    I don't -- I don't think so.

MR. FRASIER:  All right.  Does the grand jury -- do you guys want to ask him any questions?

GRAND JUROR:  The mention of Aaron West, Aaron West and who were acting funny?

THE WITNESS:  Um, oh, let's see.  Who -- who all was it?  It was Aaron.  Nick was acting really -- Nick was acting really funny throughout the whole thing.

GRAND JUROR:  Right.

THE WITNESS:  Um, you know, it was mainly Aaron, on that part.  Because he -- he was at my house for like two weeks after all this was going down.  And, you know, he got questioned and whatnot, and he was just -- basically, it was like he was hiding at my house.  And, you know, I didn't think I was doing anything wrong by letting him stay there, considering there was no charges or anything, so.

MR. FRASIER:  Okay.

THE WITNESS:  So.

MR. FRASIER:  Any other questions?

Exhibit 5002 at 1044

*S. Haight*

GRAND JUROR:  You said the -- Bill Sero, his name still bothers you because he was -- had you seen him be violent before?

THE WITNESS:  Oh, yeah.  Very, extremely.

GRAND JUROR:  Hit -- hit people?

THE WITNESS:  Yeah, he -- I've watched him slap people.  I've seen him hit a guy across the face with a gun. He -- he had lots of guns.  Just violent, and it was, you know, stuff that I wouldn't want to ever experience again, being around those type of people.  You know.  Unfortunately, it was a bad place that I put myself, you know, doing drugs and stuff like that.  But, you know, he was a scary guy.

MR. FRASIER:  Okay.  Any other questions?

None?  Okay.

Mr. Bryant, that will do it, and thank you.

THE WITNESS:  You're welcome.  Thank you.

**TESTIMONY OF STACY HAIGHT (NAPIER)**

(Witness sworn.)

BY MR. FRASIER:

Q.    First of all, this is the grand jury for Coos County, and we are looking into the death, disappearance and death of Leah Freeman.

A.    Correct.

Q.    Okay?  It's obvious, but I turned on a couple of recorders, and I've got to tell you we're recording this.

Exhibit 5002 at 1045

*S. Haight*

A.    Correct.  Okay.

Q.    Okay?

First of all, could you tell us your name and where you live.

A.    Stacy Haight.  I live in Coos Bay.

Q.    Okay.

A.    63749 Alley Drive.

Q.    Have you been in the past known as Stacy Napier?

A.    Yes.

Q.    Ma'am, do you know an individual, or did you know an individual named Matt Mundell (phonetic)?

A.    Yes.

Q.    How did you know Mr. Mundell?

A.    Uh, we went to school together.

Q.    Okay.

A.    And we were -- we were pretty good friends, fairly good friends, anyway.

Q.    I assume you're aware that a couple of years ago Mr. Mundell --

A.    Yeah.

Q.    -- was telling people that basically that you ran over Leah Freeman with a car, and moved her to your house, and then --

A.    Right.

Q.    -- he came over to your house and helped you.

Exhibit 5002 at 1046

That Leah had already died, and then that he helped you move the body someplace else?

A.    Correct.

Q.    I guess what we're trying to find out, that's not true?  Or is it --

A.    No.

Q.    -- true?  Is it true?

A.    No.  No.

Q.    Okay.

A.    I was in car -- California at the time, and he was incarcerated at the time, so there's no way it could even be possible, you know what I mean?  Like if you were to look at the paperwork, like he wasn't even around.  He'd been incarcerated.

Q.    Okay.

A.    And I was at a family's house.

Q.    Just so we know for the record, where were you when Leah disappeared?

A.    California.

Q.    What --

A.    In Clear Lake, California.  Well, Kelseyville, at my aunt and uncle's house.

Q.    And their name is?

A.    Uh, Jim and Tanny -- Jim and Tammy Cook.

Q.    Okay.  Are they still there?

Exhibit 5002 at 1047

15

*S. Haight*

A.    Yes.

Q.    The reason I'm -- I just want to establish that. If somebody were to press this, then we know to go contact to verify what you're telling us.

A.    Right.  Correct.  Yeah.  No, that's fine.

Q.    All right.  So we're clear, you had nothing to do with this?

A.    Nothing to do with it.

Q.    Can you think of any reason why Mr. Mundell would be trying to drag you into the middle of this?

A.    Uh, no.  He is a troubled kind of kid, and he's known for using a lot of drugs, and I'm sure that had a lot to do with it, you know.  Like -- yeah.

Q.    Do you have any knowledge at all of what happened to Leah Freeman?

A.    Um, several years back I was in a bad place at a bad time, I suppose, and I heard a couple of guys fighting over some stuff.  And when they brought me in before I told them, you know, what I heard and whatnot --

Q.    Okay.

A.    -- about a couple of guys fighting about a boyfriend like heard something from his girlfriend that the brother loaned somebody a van, and they ran over a girl.  And that the -- they had her up just off of Libby Road, or something like that.  And I've let -- I told everybody -- or

Exhibit 5002 at 1048

not everybody, but told the --

Q.    The police.

A.    -- the police and everything when they brought me in, everything --

Q.    Do you remember who these two people were that were arguing?

A.    Um, the two that were arguing were Jimmy Rozier (phonetic) was arguing with Shane Hayes (phonetic).

Q.    Okay.

A.    And it was Shane Hayes's little sister that Jimmy Rozier was dating at the time.

Q.    Okay.

A.    So.

Q.    Did you ever know a Tom Stemmerman or a Bill Sero?

A.    I've -- I've heard the names, but I don't know them personally, no.

Q.    Has anybody ever told you that they personally killed Leah Freeman?

A.    Mm, no.

Q.    Has anybody ever told you they saw exactly what happened to Leah Freeman?

A.    No.

Q.    Okay.  Was -- Mr. Rozier and Mr. Hayes, they were fighting to -- did it sound like they were involved in Leah's

Exhibit 5002 at 1049

17

*S. Haight*

death or it was just that --

A.    Oh.

Q.    -- they'd heard about it?  How did that sound?

A.    Well, no.  It was Shane's -- well, what I had been told was it was Shane's van that had hit her.

Q.    Oh.

A.    And they were fighting because the little girl had seen, you know, what had happened at the time, you know. And she was scared to death, and hiding in a closet, and wouldn't come out, and all kinds of stuff, you know.  And then that's -- I don't know.  It's been a long time ago, and I -- I don't really remember everything but --

Q.    Okay.

A.    -- that's the extent of what I know.

MR. FRASIER:  I don't think I have any other questions for you.

Does the grand jury want to ask her anything?

GRAND JUROR:  You said it was a girl hiding?

THE WITNESS:  Yeah.

GRAND JUROR:  Was that Shawn's girl or --

THE WITNESS:  Shane's --

GRAND JUROR:  Shane's --

THE WITNESS:  Shane's sister, which was Jimmy Rozier's girlfriend.

GRAND JUROR:  Okay.

Exhibit 5002 at 1050

THE WITNESS:  Correct.

GRAND JUROR:  Do you know what kind of van it was?

THE WITNESS:  No, I don't.  I'm not sure.

MR. FRASIER:  Okay.  Any other questions?

Okay.  That will do it.  You're free to go.

THE WITNESS:  Thank you.

MR. FRASIER:  Thank you.

**TESTIMONY OF KATHLEEN McGUFFIN**

(Witness sworn.)

BY MR. FRASIER:

Q.    First of all, could you tell us your name, please, ma'am, and where you live.

A.    Kathleen McGuffin.  The whole address?

Q.    Uh --

A.    Coquille, Oregon.

Q.    That's fine.

A.    Okay.

Q.    Good.  And how long have you lived in the Coquille area, ma'am?

A.    28 -- well, we moved here in '85.

Q.    Well, first of all I guess I need to introduce. This is the grand jury for Coos County.

A.    Mm-hmm.

Q.    And they're looking into the death of Leah

Exhibit 5002 at 1051

Freeman.

A.    Mm-hmm.

Q.    It's obvious, but I've got two different recorders going --

A.    That's fine, yeah.

Q.    -- to record what you're saying.  Okay?

A.    Mm-hmm.

Q.    You're the mother of Nick McGuffin; is that correct?

A.    Yes.

Q.    And how old is Nick?

A.    28.

Q.    And at the time we're going to be talking about here, he was --

A.    18.

Q.    His birth -- he was 18?

A.    Yeah.

Q.    And his girlfriend was Leah Freeman?

A.    Yes.

Q.    How long were they together, do you --

A.    Um, pretty much the beginning of that school year, so it would have been September or October of '99.

Q.    Okay.

A.    Yeah.

Q.    How well did they get along, do you know?

Exhibit 5002 at 1052

*K. McGuffin*

A.    Um, the first couple of months I didn't -- she didn't really come out to the house a lot and we didn't know her well.  But right after Christmas she was at our house every day.  They had their usual tits and tats that teenagers do, but they got along fine.

Q.    Nick at the time, what type of cars did he have access to?

A.    Um, he drove the -- the blue Mustang, and at times he had the Thunderbird.

Q.    Now, I'm a little confused about the Thunderbird and where it was in terms of the family cars.

A.    It was my husband's car.

Q.    It was your husband's car?

A.    Yeah.

Q.    And you had a vehicle you drove too?

A.    Yeah, and I'm trying to remember what I had then. I think it was a little Ranger pickup.

Q.    Any other cars in the family at the time?

A.    No.

Q.    So it was just the Mustang, the Thunderbird, and the pickup.  Okay.

A.    If that's what I had then, if I can remember right.

Q.    Now, I'd like to talk with you about the evening of June 28th.  That would have been the night that Leah

Exhibit 5002 at 1053

*K. McGuffin*

disappeared.

A.    Mm-hmm.

Q.    Nick had left earlier in the day to be with Leah, as far as you knew; is that right?

A.    Yeah, I was at work that day, so yeah.

Q.    Did you -- well, did you have any contact with Nick prior to midnight of that evening?

A.    Yes, I did.  He called me about 10:20.

And first of all, I don't have any of my paperwork, because I took diligent notes all through this proceeding, and all my notes and everything was confiscated from my home in January of 2010, so I am doing this strictly from memory.

He called about 10:20, 10:25, wanting to know if Leah had called because he was looking for her.

Q.    Did he ever come out to the house that night prior to midnight?

A.    No.

Q.    Okay.

A.    Well, he was out -- they were out there earlier like in the day.

Q.    In the day?

A.    Right.  Right, right.

Q.    But in the evening hours --

A.    In the evening --

Exhibit 5002 at 1054

Q.    -- after you got home?

A.    Not at all.  And he was driving the blue Mustang. The Thunderbird was parked in our driveway.  He was restricted from the Thunderbird on Monday night, the 26th, because the two of them had been doing too much playing.  He was supposed to be finding a job, and my husband took the keys from the Thunderbird away.  The Thunderbird was parked in our driveway.  The keys were in our bedroom.  He had no access to it.

Q.    Okay.  So I guess the follow-up question I have to that is we've had several people testify here at the grand jury that they --

A.    That they saw him in two vehicles.  The one thing that I can think of on this was Monday night was the night he -- because up until then he was driving the Thunderbird because the Mustang had been wrecked.  It had a gas leak from whatever.  My husband was trying to fix it.  It kept leaking, so he let him drive the Thunderbird.  And that was Monday night when they came home about 7:00 p.m., he hadn't looked for a job, so we took the Thunderbird away and said, You're going back to the Mustang.  Deal with it.

Q.    Okay.

A.    And from Monday night on, he did not drive the Thunderbird at all.

Q.    All right.  We've also had testimony that Nick

Exhibit 5002 at 1055

changed his clothes that night.

A.    Who would know?  Who would know if he changed his clothes?

Q.    We've got at least one witness that saw him earlier in the evening that saw him later with a different set of clothes on.

A.    Well, I don't know that for a fact, but --

Q.    Okay.  I'm just curious.

A.    Yeah.

Q.    Okay.  I had another witness, I think it was Officer Zavala, testify that he saw Nick after he stopped him for the headlight --

A.    Mm-hmm.

Q.    -- that he saw --

A.    On the Mustang.

Q.    Yeah, on the Mustang.

That when he finished stop -- he -- the stop was on the bypass that goes around Coquille.

A.    Oh, right, right.

Q.    That Nick then proceeded on Highway 42 South, drove over the bridge and appeared to be headed the direction where you folks live.

A.    What time was that?

Q.    At the time of the stop, I supposed.  Right afterwards.

Exhibit 5002 at 1056

A.    What time was that?

Q.    Uh, I'd have to look it up real quick, but I think that was around -- it was after Leah went missing, so a little bit after 9:00.

A.    No, he didn't come out to the house at all.  And my husband and I were there the entire evening.

Q.    What time did Nick get home the next day?

A.    Um, he got home that night, 2:30, 3:00 in the morning.

Q.    Did he check in with you before he went to bed?

A.    No, I heard him come in.

Q.    You heard him come in.

A.    Mm-hmm.

Q.    When did you first learn Leah was missing?

A.    Um, well, from him calling that night, said he was looking for her, and then he came home and I just figured everything was okay.  That next morning, Thursday morning, Cory called, his -- her mother, and said she hadn't came home.  And he got up and went to town and went over to Cory's house.

Q.    What time was that?

A.    Ten to 8:00.  I was just headed to work the next morning.  That was Thursday morning.

Q.    Had Leah ever spent the night at your place?

A.    She spent the night one night, and that was right

Exhibit 5002 at 1057

before graduation -- that I know of.

Q.    Okay.

A.    And that was not at our okay, at first.  But Cory, Leah, and Nick had agreed that she could spend the night on -- because we had a graduation get-together, and so we gave in and said she could stay the night.  Cory said it was okay she could spend the night because she was on her period and they wouldn't be having sex, so she was okay with it.  So I figured if the mother was okay with it, it was okay.

Also, the -- you talk about Officer Zavala pulling Nick over.  He actually got pulled over twice that night, Wednesday night.

Q.    Yes, I've heard that.

A.    With in addition to getting pulled over twice, he went up two or three different times to different police officers and asked for their help.  They told him, She'll show up, don't worry about it.

Q.    Let me ask you the source of that information, where do you get that?

A.    My son.

Q.    So you yourself cannot personally verify that?

A.    No.

Q.    The headlight on the Mustang, do you know when it went bad?

Exhibit 5002 at 1058

A.    I thought it was -- was it a headlight or a brake light?

Q.    Headlight.

A.    I have no idea.

Q.    You mentioned earlier that your paperwork had been confiscated.

A.    Mm-hmm.

Q.    When Chief Dannels came to town, did you folks mention to him that you had several hundred pages of documents that --

A.    Yeah.  It was probably about a year ago, I -- he was -- I work at the hospital, and he was doing an in-service.  And I went up to him, told him we'd like to talk to him.  I thought a new police officer was going to look at this information and maybe look at it unbiasedly, so we wanted to help again.  We've always been helpful.  So that was probably August.

Finally, towards the end of the year he called and came out to our house.  We sat and spoke with him.  And yeah, we told him we had paperwork.  However, it was all paperwork -- any information, every time I got a piece of information, I documented it.  In fact, this was mine, that I turned in.  Every time I got a piece of information, the first phone call I ever made was to the police department, to give them the information.

Exhibit 5002 at 1059

*K. McGuffin*

Q.    Did the police ask you to share the documents with them?

A.    I don't remember exactly --

Q.    Okay.

A.    -- what was said that day.

Q.    Because I've gone to the reports, and what I've been told is that you said you would want to talk to a lawyer first before you gave it up.

A.    I don't remember exactly.  My husband remembers that a little bit better than I do.  Because then at the time Nick showed up, his girlfriend and my granddaughter were there, so.

Q.    Now, you gave me through your attorney, or through Nick's attorney, a list of people that you would like to have seen at the grand jury.  Is that correct?

A.    Yes.

Q.    I just want you to know the major -- the vast majority of those people I have called or will be called.

A.    Except for you haven't called my sister.

Q.    Um --

A.    Julie Wilson.

Q.    Okay.  But the -- I -- we've called the people that she has given us --

A.    Information about?

Q.    -- information about.

Exhibit 5002 at 1060

28

*K. McGuffin*

A.    Okay.  That's good.  I hope you call all of them. I had like 55 names.

Q.    I've called the majority of them.

A.    Okay.

Q.    That we can find.

A.    Okay.

Q.    So --

A.    She's easy to find.  (Laughing.)

Q.    I understand that, but -- now, you obviously believe your son Nick didn't have anything to do with this.

A.    I totally believe my son didn't have anything to do with it.  He had no time to do it.

Q.    Okay.

A.    And I know he wouldn't have done anything.  If by chance it was something accidental, he would have called me. I work at the hospital.  He would have called me.  And if had he done anything, he wouldn't be here today either.  He'd have killed himself.

Q.    Okay.  Does Nick have a problem with anger?

A.    He's got a temper, yes.

Q.    Have you talked with him about his anger problem?

A.    Yeah.

Q.    Has it gotten any better?

A.    Much -- actually much better.  He's got a two-and-half-year-old daughter, and he's great with her.

Exhibit 5002 at 1061

*K. McGuffin*

Everybody has somewhat of an anger.  That does not make you a murderer.

Q.     Well, no, but not everybody has their mother write a note to them complaining about their anger problem.

A.     Um, this mother wrote a note to him?

Q.     Yes, ma'am.

A.      Okay.

I wished I had written a date on here.

You got to realize too, that here this -- here this child just graduated from high school.  He -- he never had a job.  He was just a high school football player, whatever.  All he thought about was his girlfriends and his cars.  And have this come down on him, and from the very get-go have the police harass you the way he has been harassed, he's had a rough, rough, rough time.

I wished I did have a date on this.

MR. FRASIER:  I don't have any questions, further questions of Mrs. McGuffin.  Does the grand jury want to ask her anything?

GRAND JUROR:  On that -- ma'am.

THE WITNESS:  Just a second.

(Pause.)  You don't know when this was?

BY MR. FRASIER:

Q.     Well, I know it was taken in the search warrant at the end of July in 2000.

Exhibit 5002 at 1062

*K. McGuffin*

A.    Okay.  This was probably in December, because --
I do know when this was written, now.

Um, the beginning of his high -- senior year, he had an injury.  He was not able to play football, so he wasn't playing football and he did get into meth.  Leah and him met, and Leah was the one that got him -- she didn't like him doing meth, so she got him away from it, and this was right before Christmas because that's when him and I got in a big argument and I kicked him out and he went and lived with Cory and Leah through Christmas.  And then in January he came home, and he was done doing meth.

And that was what that was.

Q.    Okay.

A.    And then him and her were at our house every single day thereafter.

GRAND JUROR:  Well, it's kind of interesting you say -- you say he's done doing meth because we have witnesses that say he was doing meth the day that Leah went missing.  That he was high on -- people that use drugs.

THE WITNESS:  Marijuana.

GRAND JUROR:  Mm-hmm.  I think we've had testimony that says more than marijuana.  And that he had been using more than marijuana for some time --

THE WITNESS:  Hmm.

GRAND JUROR:  -- near that time frame.

Exhibit 5002 at 1063

THE WITNESS:  Hmm.

GRAND JUROR:  And we have multiple witnesses.

GRAND JUROR:  We have people that say that he -- they smoked crank with him that night.

GRAND JUROR:  That day.

THE WITNESS:  That night?  Hmm.

GRAND JUROR:  And testimony from people who saw him and describe him as being high on something other than marijuana.  The -- the different type of a personality.

THE WITNESS:  But are -- are they --

GRAND JUROR:  So --

THE WITNESS:  Are they official that they can -- a reliable person that can justify telling if somebody's on a different drug?

GRAND JUROR:  Well, let's say this.  You just said that he didn't do drugs since December.

THE WITNESS:  Meth.

GRAND JUROR:  Meth.

THE WITNESS:  Yes.  That I thought.

GRAND JUROR:  Okay.

THE WITNESS:  But does that make you a murderer?

GRAND JUROR:  No.  I'm just saying, thought, that your testimony was just that -- that we have --

THE WITNESS:  That I know about.  I'm not saying for a fact that -- I can't know what he does.  Do you know

Exhibit 5002 at 1064

what your children do every minute of the day?

GRAND JUROR:  Ma'am, I'm not here to be questioned.

THE WITNESS:  No, right.  But --

GRAND JUROR:  So please don't question me.

THE WITNESS:  Yeah, but you see where I'm -- what I mean.  I don't -- I can't say he did or didn't --

GRAND JUROR:  Right.

THE WITNESS:  -- because I'm not with him a hundred percent --

GRAND JUROR:  But you just did say he didn't, to us.

THE WITNESS:  That I know.

GRAND JUROR:  Thank you, for clarifying that.

THE WITNESS:  Yeah.  That I know.

GRAND JUROR:  So you didn't actually see Nick at 2:00 or 2:30?  You heard --

THE WITNESS:  No, I heard him come in.  Correct.

GRAND JUROR:  So you don't know for sure if he was there?

THE WITNESS:  Oh, if he was there?

GRAND JUROR:  Right.  If you didn't see him, you don't know.

THE WITNESS:  Well, he went in and went -- I heard him and he went in and went to bed.  And then woke up

Exhibit 5002 at 1065

*K. McGuffin*

and it was him in his bed.  Nobody else would have came into my house because nobody else had a key.

GRAND JUROR:  And you said -- you said until eight o'clock.  Because we have testimony that people have seen him in between the hours you say he was at home.

THE WITNESS:  Between 2:00 and 8:00 in the morning?

GRAND JUROR:  Right.

THE WITNESS:  Well, I saw him when he got up and answered the phone, coming from his bedroom.  Nobody else would have came into my house without a key, because our house was locked up.

GRAND JUROR:  Did you see him with Aaron West that night?

THE WITNESS:  Um, did I see him?

GRAND JUROR:  Mm-hmm.

THE WITNESS:  No, Aaron West was one of the ones that he was out at Johnson Mill pond, smoking pot.

GRAND JUROR:  And now, where did you get that information?

THE WITNESS:  From Nick.  And obviously from Aaron West too, because it's in his so-called testimony.

I've also heard that David Jenkins was the one out there with him also, and I've heard David Jenkins telling people that he was involved with Bill Sero.

Exhibit 5002 at 1066

*K. McGuffin*

Has that witness been called?

BY MR. FRASIER:

Q.    Yep, both of them.

A.    The Clemmons (phonetic) or whatever their name was?

Q.    No.  We've called Mr. Jenkins and Mr. Sero.

A.    But what about the -- Mr. Jenkins -- Ella Clemmons, her -- he's related to David Jenkins.  David told Ella he was involved with Leah's murder, with Bill.

Q.    (Indiscernible.)

A.    And then Deanna Crenshaw (phonetic) knows Art Jones, who also said he was involved.

Q.    Art Jones has been here.

A.    And Tosha Erblad [sic] was called, and --

Q.    Tosha Ekblad?

A.    Or Ekblad, whatever.  We did not know who she was until just a month ago, this Tosha.  She came forward and went to my sister, who works at the smoke shop.  She said she knew everything that went down.  She also said yesterday, came in and talked to my sister, on her own, and said she got a call from a Coquille police officer, Mr. Webley.  He was threatening her that she would go to prison, lose her children, if she didn't start telling the truth.  So are they tampering with witnesses?

Q.    They interviewed her yesterday because she was

Exhibit 5002 at 1067

*K. McGuffin*

dodging them.  And finally found her yesterday, and she told the police that she had no firsthand knowledge as to what occurred to Leah Freeman --

A.      Hmm.  And then I did just give Officer McNeely another name, Carmen Kahn (phonetic).

Q.      (Indiscernible.)

A.      Yeah, as just a new name that I found.  She lives in Coos Bay, and he wrote it down.  And apparently she's supposed to know everything that happened too.

And then there's Sean Buchanan (phonetic), who is a friend of my nephew.  Has he been called?

Q.      Sean Buchanan we can't find.

A.      Okay.  Sean Buchanan was in jail with an Alex Scribner (phonetic) at the time, and --

Q.      Ma'am, the grand jury -- you have to understand something.

A.      Okay.

Q.      The hearsay rule applies in grand jury.  So you've gotten this information from I don't know how many different people, and you --

A.      But they should be called.

Q.      Well, and we've told you we've tried to find Mr. Buchanan --

A.      Right.

Q.      -- and we can't find him.  We -- and that's one

Exhibit 5002 at 1068

*K. McGuffin*

person we can't.  But you can't sit here and read --

A.    But what about Glen Beattie (phonetic)?  Was he --

Q.    Mr. Beattie gave information about who?

A.    Mr. Beattie was the one that was at the restaurant the night Mr. Sero was arrested.

Q.    Okay.  And Mr. Sero --

A.    And him --

Q.    -- has been here to the grand jury.

A.    Hmm.

Q.    Okay?  So, I mean, Mr. Beattie can't give anything more than what Mr. Sero has told us.

A.    No, because Mr. -- Mr. Beattie -- or Beattie, whatever his name was, knew the waitress there who knew what Bill had done, and she was scared, which is why she called the police, because she knew he was coming in.

Q.    Okay.

A.    And that's the night he was arrested.

What about this Alex Scribner that knew Sean Buchanan?

Q.    We can't find him either, but we've called his girlfriend.

A.    Okay.  What about, um, Kenny Wilsey (phonetic) and his parents?  And Ben Stoddard (phonetic) that was murdered?

Exhibit 5002 at 1069

*K. McGuffin*

Q.    Ma'am, that was not a murder.

A.    Okay.

Q.    I personally was involved in that.  That was a suicide.

A.    Okay.

Q.    That's totally unrelated to this.

A.    Even the note that he left?

Q.    It's totally unrelated.

A.    Hmm.  Okay, then.  What about Scott Simons [sic], the --

Q.    He's testifying this afternoon.

A.    Good.  He was a nurse's aide at Bay Area Hospital.

Q.    Ma'am, you don't get to tell them about what they're going to say.

A.    Okay.

Q.    All right.

A.    Okay.

GRAND JUROR:  I have a question.  You said that Cory thought it was okay for Leah to spend the night that one night.

THE WITNESS:  Mm-hmm.

GRAND JUROR:  What night was that?  When was that?

THE WITNESS:  It was before graduation.  I can't

Exhibit 5002 at 1070

*K.  McGuffin*

remember exactly which night it was.  We had a get --
gathering, a get-together of family and a bunch of friends,
and --

GRAND JUROR:  When was graduation that year, (indiscernible)?

THE WITNESS:  I don't remember.

MR. FRASIER:  Okay.

THE WITNESS:  June.

MR. FRASIER:  It's usually the second Sunday in June.

THE WITNESS:  Yeah.

GRAND JUROR:  So this could have been just before?

THE WITNESS:  Week or two before.

GRAND JUROR:  Somewhere in the beginning of June, then?

THE WITNESS:  Or the end of May.

(Pause.)

MR. FRASIER:  Are there any other questions from the grand jury?

Okay.  That will do it, then.

THE WITNESS:  Great.  Can I ask you a question, though?  Is there any possibility I can get copies of my paperwork back, that was taken in January?

MR. FRASIER:  I will tell Chief Dannels to do

Exhibit 5002 at 1071

that.

THE WITNESS:  Thank you.

**TESTIMONY OF BRUCE McGUFFIN**

(Witness sworn.)

BY MR. FRASIER:

Q.    First of all, sir, this is the grand jury for Coos County.

A.    Good morning.

Q.    They are looking into the death of Leah Freeman.

A.    Okay.

Q.    I think it's obvious, but I have to advise you that we are recording the proceedings.

A.    Oh, not a problem.

Q.    Okay.  First of all, sir, could you tell us your full name and where you live.

A.    Bruce Richard McGuffin.  I live at 56246 Baker Road, Coquille, Oregon.

Q.    And you've lived in the Coquille area since about 1985; does that sound about correct?

A.    Yeah, I've been living in Oregon since '74.

Q.    Okay.

A.    Yeah.

Q.    And you're the father of Nick McGuffin?

A.    Yes.

Q.    And Wayne McGuffin?

Exhibit 5002 at 1072

*B. McGuffin*

A.    Yes.

Q.    I want to go back, sir, to about the year 2000 -- well, to the year 2000.  Your son Nick had a girlfriend at that time named Leah Freeman?

A.    Right.

Q.    How -- I guess -- do you recall when the relationship started and how it went with him -- with Nick and her?

A.    Yeah.  Started in the fall of '99, that they had met.  He spent Christmas with Cory and Leah, and then right after that's when we met Leah.  She ended up moving into our house shortly after that because Cory's boyfriend tried to molest her.  So then Leah was living with us for approximately three months before her death, although that she did -- she had to be home at midnight, and had -- then she could come back out at our house at 8:00 in the morning.  But from 12:00 to 8:00 she had to go home.

At that time Cory was on crank, Denise was on crank.  She wouldn't leave her boyfriend -- Cory wouldn't.  We eventually got to Cory and finally got her off the crank, because I had known Cory for over 20 years prior to this.

Q.    When you say "crank," you're referring to methamphetamine?

A.    Methamphetamines, yeah.

Denise was on them, and this was one thing that

Exhibit 5002 at 1073

Leah just was totally against.  Nick happened to be -- when she met Nick, he was in hard times.  He was on the meth also.  And she got Nick off of it, and everything was happy.  Everything was going good.  Cory stayed out at our house quite often, usually on the weekends and that.  And then as for Denise, she was usually out there probably just about every day also, but she's the other daughter.

Um, then she went disappearing.  Disappeared one night, and that's what started all this situation here.

Q.    How well did Nick and Leah get along?

A.    They did really good.  The biggest problem that they had was their friends.  Their friends liked to interfere into their situation.  The night of her abduction, they were arguing that night because Leah's girlfriend, which was her best girlfriend, had called her up early that morning and said that her mother needed to talk to her.  And we knew where all this was going to go, so they were there arguing about that because Leah didn't want to go, Nick didn't want her to go, but Leah figured since it was her best friend that she needed to go to this woman's house and get bitched out, was pretty much what it was.

So --

Q.    Let me ask you a question, sir.

A.    Okay.

Q.    What's the source of information you have for

Exhibit 5002 at 1074

*B. McGuffin*

that?

A.    That's directly from the -- the girlfriend and the mother.  Yeah.

Q.    Okay.  You personally spoke with Cheri Mitchell?

A.    Yes, I did.

Q.    And with Mrs. Mitchell?

A.    I personally spoke to the -- to Cheri and to the -- the daughter.

Q.    Okay.

A.    And the daughter, she was really upset because she didn't feel that what she was saying to Leah -- her mom was saying to Leah, was right.  She started in saying that Nick was a low-life and, you know, he was into the drugs, which at that time he wasn't.  He was completely off of them because Leah had got him off of them.

Um, and I -- as for the -- more of the escalating of it, I don't know.  She just finally got pissed off and left the house crying.  She was seen by several witnesses that -- while she was walking down the road, that she was crying and having a hard time at it.

Nick went out to, oh, what they call the mill pond.  He went out there with Weise (phonetic) and David Jenkins.  When they came back and Nick was all --

Q.    When you say Weise, you mean Aaron West?

A.    Okay.  Aaron West, yeah.  And David Jenkins.  I

Exhibit 5002 at 1075

get some of the names are messed up.

They went out there.  I guess Nick had told David Jenkins what had been going on.  And so when they came back from the log pond, Nick went up to -- to the house to try to get Leah, and of course with that he found out that she'd already left 20 or 30 minutes prior to that.

Uh, David Jenkins, now, this is from David Jenkins, he got --

Q.    Sir, I -- you cannot testify to what another person told you here in grand jury.  The hearsay rule applies.

A.    If he told me?

Q.    Yes.  You cannot testify about what Mr. Jenkins told you.

A.    But he just allowed me to say what the daughter and the mother said to me.

Q.    Well, the reason I did that, sir, because they're -- the testimony they gave seems to be entirely different to what you just told us.

A.    Oh.

Q.    So --

A.    Okay.

Q.    Okay.  And Mr. Jenkins has already testified here, and he has already told the grand jury what happened that night.

Exhibit 5002 at 1076

*B. McGuffin*

A.      Oh, okay.  So what he tells me, then, is different.  Is that what you're saying?

Q.      No.  At this point, the other thing is, it's not responsive to the question I asked you.  The question I asked you was how well did your daughter [sic] and Nick get along.  And you --

A.      I think I explained that quite well.

Q.      All right.  Let's move on to, now, cars that Nick -- what was the car that Nick had at that time?

A.      The '67 Mustang California Special.

Q.      All right.  And it had a problem with the gas tank; is that correct?

A.      Yes.

Q.      And as part of the -- he had had an accident or something, and poked a hole in the gas tank?

A.      Right.

Q.      And you folks were -- he also did something to the rear quarter panel; is that right?

A.      Well, that was a month before any of this, yeah.

Q.      Okay.

A.      That corner panel has nothing to do with this case.

Q.      So the quarter panel had been fixed, but it had only primer paint on it at the time Leah --

A.      Correct.

Exhibit 5002 at 1077

*B. McGuffin*

Q.    The gas tank had not been fixed?

A.    No.  I -- the gas tank needed to be pulled.

Q.    All right.  And to pull the gas tank, how would you do that, sir?

A.    There's several -- I think almost a dozen or 18 bolts on the inside.

Q.    Of the trunk?

A.    Of the trunk.  So you got to undo these bolts, and then the gas tank drops out.

Q.    All right.  Now, so you had told -- because there's been this story about the trunk being cleaned out, and then stuff being burned, and stuff along that line.

A.    Yeah, I heard about this stuff being burned.  Who said that?

Q.    Um, I'm -- you know, you're not here to ask me questions, okay.

A.    I get to know who is telling things about me, I thought.

Q.    No, not in this proceeding, you do not.

A.    Oh, well, then I guess I can't answer the question.

Q.    Okay.  What my question, though, was, is did you have Nick clean out the trunk in order to fix the gas tank?

A.    No.

Q.    When the police looked at the trunk shortly

Exhibit 5002 at 1078

after -- and this would have been --

A.    After the car was brought back, Officer Hall came up to me and asked me if there was anything in the trunk.  I told him there was a rubber mat in there, and asked him if he wanted it.

Q.    Okay.  When the police looked at the trunk in early July, there was nothing in the trunk.

A.    Right.

Q.    There was no jack, spare tire --

A.    Mm-hmm.

Q.    No nothing.

A.    No.

Q.    Was that the normal for this car?

A.    Yeah, because it hadn't been completed.  All there was is just a rubber mat that was thrown back there.

Q.    Now, the family at the time, you had a Mustang; is that correct?

A.    No, I had a Thunderbird.

Q.    Thunderbird.  The Mustang belonged to Nick?

A.    Correct.

Q.    The maroon Thunderbird belonged to you?

A.    Right.

Q.    And then your wife had a vehicle she drove?

A.    Right.

Q.    Was that some sort of pickup truck?

Exhibit 5002 at 1079

A.    I think it was a Ford that we had back then, Ford pickup.  I'm not quite positive of that.  I'd have to see my paperwork, and you've got all that.

Q.    Let me go through the evening as best as you can recall, sir, from June 28th of 2000.

A.    Okay.

Q.    Were you at home all day or were you working?  Or how did that work --

A.    No, what it was is I was driving log truck and we were off that week because of the long -- it was the 4th of July weekend, plus the other was it was high heat, so --

Q.    Okay.

A.    -- the warning was put out for fire danger, so -- how fire danger was.

Q.    Right.

A.    So we were shut down in the afternoons.

Q.    And were you there at home that afternoon?

A.    Yeah.

Q.    Were you there when Nick and Leah came over to get some movies (indiscernible)?

A.    I don't know if that's what they came over to get.  I -- I know that's when I had overheard the argument about the girlfriend and the girlfriend's mother.

Q.    Okay.  And so Leah was actually out at your house that afternoon; is that right?

Exhibit 5002 at 1080

*B. McGuffin*

A.    Mm-hmm.  Yeah.

Q.    I'm going to work with a couple of pictures here real quick, if I can find them.  Excuse me.

That's the trunk of the car, while I was thinking about it?

A.    Yeah.

Q.    Okay.  I'll go in here.

A.    The whole car had been completely redone except for that.

Q.    Does that appear to be what Leah was wearing that day?

A.    Yeah.

Q.    And that's act --

A.    I'm pretty sure it was.  That's what she always wore.

Q.    And those are actually pictures taken inside of your home --

A.    Yes, they are.

Q.    Right.  And in the background of this one picture, which I've marked as 2, we can see the Mustang in the back there?

A.    Correct.  Yeah --

Q.    And that's the maroon Thunderbird?

A.    -- mm, I don't know if that's the maroon Thunderbird or if that's the -- the pickup.  But it's what

Exhibit 5002 at 1081

*B. McGuffin*

the Thunderbird looked like.

Q.    Okay.  I'm just asking.

A.    No, it don't mean any difference, you know.

GRAND JUROR:  So the pickup was red?

THE WITNESS:  It was a copper, bright copper color.

BY MR. FRASIER:

Q.    Was your wife home at the time that they came?

A.    Yeah, we were all three there.

Q.    All right.

A.    Or all four of us.

Q.    Then Nick and Leah leave, and do you see Nick and Leah again that evening?

A.    No.  She disappeared that evening.

Q.    Okay.  And did you see Nick, say before midnight?

A.    No.  He -- well, I think he was home around 11:30.  I don't know.  I know he put in a call around 10:00. 10:20, and told us what was going on.  He also had talked to his mother.  But, you know, we all knew Leah, and sometimes she would get excitable about things that piss her off, and she would just go for a walk.  So that's kind of pretty much what we thought had happened, is she just --

Q.    What time did Nick come home, to the best of your recollection?

A.    I really -- because I was sleeping, so I really

Exhibit 5002 at 1082

*B. McGuffin*

can't -- couldn't say. I was told 11:30, but that's hearsay, so --

Q.   Okay. We've heard that Nick had been grounded from the Thunderbird.

A.   Right.

Q.   And he did not have access to a Thunderbird that night --

A.   No, he did not.

Q.   Um --

A.   He was grounded from the Thunderbird because him and Leah went out and they were supposed to go weed-eating in the backyard, and he burnt up my weed-eater by sitting and putting it in the water and playing in the water with it.

Q.   Okay.

A.   So I got pissed off and told him that they don't get the car. Plus then he was late getting her home because she's supposed to be home at midnight, and I guess didn't get her home till one o'clock, so Cory and I talked and I took the car from him.

Q.   Did -- so we're clear, Nick never switched cars that night?

A.   No. Impossible.

Q.   All right.

Now, do you know if Nick ever changed his clothes that evening?

Exhibit 5002 at 1083

51

*B. McGuffin*

A.    He never came home that evening, so there'd be no way.

Q.    The Mustang, Nick was stopped by Officer Zavala because the headlight was out.

A.    Right.

Q.    How long had that headlight been out, do you know?

A.    Think it actually went out when he wrecked the car, which was couple of weeks prior to that.

Q.    Was that the gas tank or the quarter panel?

A.    The gas tank.

Q.    The gas tank.

A.    Yeah.

GRAND JUROR:  So what kind of accident?

THE WITNESS:  I fixed the -- he said his car didn't have any power, so I fixed the throttle on it so that it would open up.  And he went up Fairview and -- a little too fast.  And being a Mustang, the way they're built, the rears don't have no weight.  So what it did is swung out on him.  He went backwards into a ditch, and hit a fencepost that was marking a culvert.  And what it did is it ripped that tank underneath, but he was able to get maybe three, four gallons of gas in there, and then he could drive around, and that's what he ended up doing that night.  So he did call and want the T-bird, but I told him there was just -- it

Exhibit 5002 at 1084

52
*B. McGuffin*

wasn't going to happen.  And so that's --

Q.    Did he talk to you when he called?

A.    Yeah.  Yeah.

Q.    And the headlight would have been from that accident?

A.    Yeah.  Yeah.  So it had been two weeks prior to the...

Q.    Was this the same phone call where he talked to your wife about Leah, if Leah was out at the house, or is this a different phone call?

A.    Yeah.  Yeah.  Same one.

Q.    Okay.  The -- do you know what time, roughly, Nick came home that night?

A.    Like I said, I -- I don't really know.  I think it was around 11:30, but it could have been later.  In fact he got pulled over three times by your officers that night.

Q.    Okay.  And then --

A.    In fact, once I think they checked the trunk.

Q.    Okay.  Who told you that?

A.    Uh, Nick did.  And then we went through the police report for that night.  I think it was in there that he was stopped three times.

Q.    Okay.

A.    Act -- well, he may not have been stopped.  He stopped twice for the light, and I think he stopped the cops

Exhibit 5002 at 1085

53

*B. McGuffin*

once and asked for their assistance, if they would help him. And they got kind of tizzy with him, and they said, Well, let us see your trunk.  So they opened up the trunk, and --

Q.    Well, I guess my question is who told you that they asked to look in the trunk?

A.    My son did.  And then it's in the police report that we have.

Q.    Do you know an individual named Kristen Steinhoff?

A.    Yes.

Q.    How do you know Kristen?

A.    Just from hearsay.

Q.    Okay.  Have you ever met her?

A.    No.  I've never met Bill, I've never met Tom, I've never met any of those people.

Q.    You've never been to Kristen Steinhoff's house?

A.    Huh-uh.  I don't even know where she lives.

GRAND JUROR:  So Nick came home when you're sleeping, eleven -- what time did you go to sleep that night?

THE WITNESS:  I -- me?

GRAND JUROR:  Yeah.

THE WITNESS:  I think I was in bed by ten o'clock.  We got the ten -- the phone call by 10:20, he showed up, we got up.  And, you know, I didn't pay attention to the time.  So that's why I can't say that it was 11:30 or

Exhibit 5002 at 1086

*B. McGuffin*

midnight or whatever, because we were more concerned about what was going on, and --

GRAND JUROR:  He showed up, you said?

THE WITNESS:  Yeah.  Yeah.

GRAND JUROR:  And you were up then?

THE WITNESS:  No, I got up.  My wife and I both got up, because we wanted to know what was going on.

GRAND JUROR:  And that was when?

THE WITNESS:  Like I said, around -- I don't know because I didn't look at the clock, so I would imagine 11:30, midnight, somewheres there.  So.

GRAND JUROR:  So did --

GRAND JUROR:  I thought you had said that you had -- you were asleep and you didn't know if he came home.

THE WITNESS:  I was asleep at 10:30.  I went to bed.

GRAND JUROR:  Right.

THE WITNESS:  Or ten o'clock.  We got called at 10:20, 10:30 --

GRAND JUROR:  Right.

THE WITNESS:  He came home.  The wife got up, and I got up.  But like I said, I don't know what time it is because I didn't look at the time.

GRAND JUROR:  Well, that's not what you said earlier.  You said you were sleeping and you had no idea what

Exhibit 5002 at 1087

time he got home.

THE WITNESS:  I did -- that's what I mean.  I have no idea of what time he got up -- got home, because I didn't check the time.

GRAND JUROR:  But you talked to him about everything that was going on, you said?

THE WITNESS:  We asked him what was going on, and he said he couldn't find Leah.  He said the police wouldn't help him.  Nobody would help him try to find her.  He wanted the car, the T-bird, because he only could put a couple gallons of gas into the tank, and the light -- headlight was out.

GRAND JUROR:  And that's why --

THE WITNESS:  But I told him it wasn't going to happen, so no.  T-bird stayed there.

GRAND JUROR:  Did he have access to the Ranger, to the -- your wife's pickup?

THE WITNESS:  No.  No.

GRAND JUROR:  Did he ever drive it?

THE WITNESS:  Never rode -- drove the Ranger that I know of, no.

GRAND JUROR:  Did he have his own key to the cars?

THE WITNESS:  Nope.  Keys were all up on my head-bed [sic].

Exhibit 5002 at 1088

*B. McGuffin*

GRAND JUROR:  But he had drove your T-bird plenty of times before, where he could have just made a copy, right?

THE WITNESS:  He could have.

GRAND JUROR:  Okay.  Because we have testimony saying that he was --

THE WITNESS:  Yeah, I know you have testimony saying, but the testimony is wrong because Monday was the day that he got the T-bird back, and that's when everybody saw him.

GRAND JUROR:  That's your testimony.

THE WITNESS:  No.  No.

GRAND JUROR:  Monday.  The following Monday?

THE WITNESS:  The following Monday is when I gave him the T-bird back.

Now, what you guys got to consider is everybody in this town was on acid that night, or were cranking, so a lot of these people don't even know what they really saw. And you can't relate to it because you've never done acid. You've never done crank.  If you've done it, then maybe you could relate to what was going on in this town that night, because it was pretty sad.

GRAND JUROR:  What time did you see him the next morning?  Or did you?

THE WITNESS:  Oh, I saw him -- I got up at 6:00 and he was there, sitting in the chair, holding the phone.

Exhibit 5002 at 1089

GRAND JUROR: At 6:00?

THE WITNESS: Yeah. I'm always up at 6:00, if not earlier. I drive log truck, so I'm up at two, three o'clock in the morning.

GRAND JUROR: I thought you were off for the weekend.

THE WITNESS: Yeah, I was off for the week, but I drive log truck, so I get up at two, three o'clock in the morning.

GRAND JUROR: Was he home then?

THE WITNESS: Pardon me?

GRAND JUROR: Was he home then, when you got up?

THE WITNESS: Well, when we got up at that night, he was home.

GRAND JUROR: Well, you said you get up at two or three o'clock in the morning.

THE WITNESS: When I worked.

GRAND JUROR: So what time did you get up that morning?

THE WITNESS: I got up at six o'clock that morning. He was sitting in the chair with the phone.

GRAND JUROR: Or -- on the phone?

THE WITNESS: No, holding the phone.

GRAND JUROR: What time was he there till, that day?

Exhibit 5002 at 1090

THE WITNESS:  I don't know.  Denise came out and one of Denise's friends came out, and then they got in the car and took off to try to see if they could locate Leah.  So I imagine they took off around eleven, twelve o'clock, something like that.  But pretty much after that Leah and -- or not Leah, but Denise and I can't think of the other girl's name, were pretty much with him all the time, every day.

GRAND JUROR:  And Maggie Downs (phonetic)?

THE WITNESS:  Maggie Downs.  That's who it was, yeah.

BY MR. FRASIER:

Q.    You mentioned Leah had gotten Nick off the drugs.

A.    Yep.

Q.    What kind of drugs are we talking about?

A.    Methamphetamines.

Q.    What about marijuana?

A.    Yeah, he smoked pot, but then so do I.

Q.    Right.  How long had it been since Nick had quit using meth, do you know?  Prior to Leah disappearing?

A.    Oh, gee.  He quit right away, when they met.  Yeah, because she wouldn't have anything to do with him.  And they quit right away, and that's when they went over to have Christmas at Cory's house.

Q.    All right.  And it's your testimony that Cory Courtright was on meth?

Exhibit 5002 at 1091

A.      Yeah.  She was at that time.  So was Denise.

GRAND JUROR:  Did you ever see them do it?

THE WITNESS:  No, because I don't like to get into it.

GRAND JUROR:  What made you think they were doing it?

THE WITNESS:  Just by the way they act.  You can tell a meth user from a mile away.

GRAND JUROR:  What do you mean, you didn't like to get into it?

THE WITNESS:  I saw no reason to do it.  All it does is makes you stupid.  It makes you do things that --

GRAND JUROR:  Oh --

THE WITNESS:  -- you shouldn't be doing.  And it does make you do crazy things.  Makes you do things that you would really not do.

I know because both of my sons got into it. Wayne got into it.  In fact there's a lot of kids around this area that got into it.  It's one reason why we kind of set up a safe house at our house, and we had a lot of kids that came there and stayed with us, not only just because they were having problems, but they were having problems at home.

We had one kid that got beat up every time he saw his dad.  And so we had a place where kids could come and they could talk to us and they -- you know, to feel free.

Exhibit 5002 at 1092

60

*B. McGuffin*

GRAND JUROR:  Do you smoke pot with your son?

THE WITNESS:  Yeah.  We're adults.  I have my card.  I'm disabled.

MR. FRASIER:  Is there any other questions for Mr. McGuffin?

GRAND JUROR:  Did you have an -- did you talk to Cory's father one evening?  Go in the house and have an argument with him about who was responsible for Leah's death?

THE WITNESS:  Yeah.  That was the day that I went down to the police station and Officer Hall came out and told me that "Your son murdered Leah."  And then he went to Cory and told Cory that Nick McGuffin murdered your daughter.

So I went over to the house to see what Cory had heard, and that's when the argument started.  And it wasn't really an argument, it's just he can't hear, so you got to talk really loud.  And so when I was talking, he kept misinterpreting what I was saying, so I'd have to talk a little bit louder so that he could understand what I was saying.  And finally it just got out of control and I just left.  It wasn't worth it, you know.  They wanted to believe what the police were saying --

GRAND JUROR:  So you're saying Officer Hall said to you --

THE WITNESS:  Yeah.

GRAND JUROR:  -- that your son murdered her?

Exhibit 5002 at 1093

THE WITNESS:  Murdered Leah Freeman.

GRAND JUROR:  A police officer actually made that accusation to you?

THE WITNESS:  Yeah.  And then he made that accusation to Cory.

Do you want to know a few more accusations?  He won't allow it.

GRAND JUROR:  The -- we have records of your son making statements that he was at Leah's house at like 2:00 or 2:30 in the morning.

THE WITNESS:  Probably was.

GRAND JUROR:  But I thought he was at your house at 11:30?

THE WITNESS:  I told you, I didn't look at the clock when I got up, so I would not have any idea.  You know, I got up.  I told you I don't know.

GRAND JUROR:  You went back to sleep --

THE WITNESS:  Because --

GRAND JUROR:  -- after that, before you got up at your regular 3:00 a.m.?

THE WITNESS:  Mm, no, because I think we set out there and talked about what was going on, and --

GRAND JUROR:  So you just stayed up?

THE WITNESS:  Yeah, just stayed up.  We knew we were going to have to start doing something, and that's when

Exhibit 5002 at 1094

*B. McGuffin*

we started doing the fliers and putting them all around.

GRAND JUROR:  So you now can't tell whether that time period from when you got up and stayed up was 11:30 or midnight or 3:00 or 4:00 in the morning?

THE WITNESS:  Not really.  I don't ever pay attention to time.

GRAND JUROR:  So you say you stayed up --

THE WITNESS:  Right.

GRAND JUROR:  -- so you would know if he left, but you said he may have very well went over there?

THE WITNESS:  What?

GRAND JUROR:  At 2:00 or 2:30?

Your testimony is that you stayed up from the time you woke up.

THE WITNESS:  Yeah.  Nick was already home.

GRAND JUROR:  Right.

THE WITNESS:  So if anything had happened, then that meant that he did it before he came home, so then that means I was up at 2:30, 3:00.

GRAND JUROR:  With him --

GRAND JUROR:  (Indiscernible.)

GRAND JUROR:  -- talking to him?

THE WITNESS:  With him, yes.

GRAND JUROR:  But what I asked you was -- I stated that we have testimony from Nick saying that he was at

Exhibit 5002 at 1095

63

*B. McGuffin*

her house at 2:30 in the morning.  And you said, well, that may very well be --

THE WITNESS:  That may very well be.  That's what I told you.

GRAND JUROR:  You would not have known if your son left?

THE WITNESS:  He didn't leave the house because I told you that I was already talking to him.

GRAND JUROR:  So how could it very well be that he could have been over there?

THE WITNESS:  Didn't I just tell you that I didn't know what time it was?

GRAND JUROR:  It -- it --

THE WITNESS:  Did that not make any relevance to you, at all?

GRAND JUROR:  No, it doesn't.

THE WITNESS:  It don't, huh?

GRAND JUROR:  You said you were up from 11:30 on. So you --

THE WITNESS:  No, no, no, no.  I didn't.

GRAND JUROR:  I believe that --

THE WITNESS:  I didn't say I was up from 11:30 beyond.

GRAND JUROR:  That -- he asked you if you went back to sleep --

Exhibit 5002 at 1096

*B. McGuffin*

THE WITNESS:  I said --

GRAND JUROR:  -- and then woke up at your normal two or three o'clock in the morning.  You said, No, I just stayed up.

THE WITNESS:  You asked me if Nick had come home and if I -- was around 11:30 at night.  And I told you I didn't know that.

GRAND JUROR:  Yeah, I know that.

THE WITNESS:  I told you that three times now.

GRAND JUROR:  I know that.

THE WITNESS:  But three times now you want to come back at me and say that I was up at 11:30.  So, now, when do you want to get your story right?

GRAND JUROR:  The way I -- (indiscernible).  At 10:30 you said there was a phone call.

THE WITNESS:  Right.

GRAND JUROR:  So you were awake at 10:30 at night?

THE WITNESS:  Yes.  10:20.

GRAND JUROR:  Okay.  So at some time after that --

THE WITNESS:  I got up again.  Yeah, because Nick was home.

GRAND JUROR:  And then you said you norm -- you woke up at six o'clock in the morning.

Exhibit 5002 at 1097

THE WITNESS:  Yeah, normally that's when I'm up, is at 6:00.

GRAND JUROR:  So where in there did you sleep?  I mean, because now we've got you --

THE WITNESS:  I don't.

GRAND JUROR:  So you were up all night?

THE WITNESS:  Off and on all night long, yeah. So I don't recognize what time it was, because when he came home is when I got up.  I didn't see what time it was because, like I told you, I don't ever pay attention to time.

GRAND JUROR:  But you're saying that you got up and stayed up because you usually get up at 2:30.

THE WITNESS:  Right.

GRAND JUROR:  And then earlier you said you woke up at six o'clock --

THE WITNESS:  At six o'clock in the morning, right.

GRAND JUROR:  Well, which is it?

THE WITNESS:  Well, I must have went back to bed.

GRAND JUROR:  Did you stay up or did you -- well -- (laughs).

THE WITNESS:  He was there --

GRAND JUROR:  So you don't know.

THE WITNESS:  -- so I talked to him, and then we must have went back to bed.  You know, this is 20 years ago.

Exhibit 5002 at 1098

If I have my paperwork --

GRAND JUROR:  It's not 20 years ago.

THE WITNESS:  Or ten years ago.  If I had my paperwork that they took from us, then he could read right in there exactly what happened.

GRAND JUROR:  This is a pretty serious night, and your son's being looked at for murder.  I would -- I'd think I would remember --

THE WITNESS:  Well, yeah.

GRAND JUROR:  -- if I stayed up or went to bed.

THE WITNESS:  You wouldn't.  No, you wouldn't.  And you haven't lived our life.

GRAND JUROR:  Okay.  So then how can you remember all of these other facts so factually?

THE WITNESS:  Because they're all written down.

GRAND JUROR:  But you can't even remember if you went to bed or not, or what time was it?

THE WITNESS:  Like I said, I remember everything from this paperwork, because it was ten years ago.  If he wants to give me my paperwork, I'll give you the exact precise time.

GRAND JUROR:  So you're saying you can -- you -- so you're saying you want to prepare a statement off of the stuff you've written down off of hearsay that Nick's told you?

Exhibit 5002 at 1099

67

*B. McGuffin*

THE WITNESS:  No, this is documentation of what people have come to us and told us.

GRAND JUROR:  Right.  People have told you.

THE WITNESS:  Yeah.

GRAND JUROR:  So it's --

THE WITNESS:  So I can see where you're going.

GRAND JUROR:  It's third -- secondhand --

THE WITNESS:  You just want -- you just want to hang my son for something that he didn't do, huh?

GRAND JUROR:  No, I just want the truth from you, is what I want.

THE WITNESS:  No, you're not.  No, you're not.

GRAND JUROR:  Well --

GRAND JUROR:  I have a question.

THE WITNESS:  Please.

GRAND JUROR:  Officer Hall, when he accused your son of murdering Leah --

THE WITNESS:  Right.

GRAND JUROR:  -- was anything done about that?  I mean, false --

THE WITNESS:  Our attorney has told us that we can't really file anything yet.  And that's really where this is all coming down to, is if he can't get my son to be the murderer, there's going to be the biggest lawsuit in this area that it's ever seen, because we have been harassed for

Exhibit 5002 at 1100

ten years.  You see how it is going to a store and have somebody yell at you that your son's a murderer.  Or have someone come up to you and say, I'm going to kill you.

GRAND JUROR:  (Indiscernible.)

THE WITNESS:  You try to live that way.  And then have the cops come and chase you around, go to your jobs, interfere with your jobs.  Ten years of this shit.  I mean, do you think we don't have an attitude?

GRAND JUROR:  Well, there's --

THE WITNESS:  When the whole thing is --

GRAND JUROR:  Excuse me, there is other people --

THE WITNESS:  No.  When the whole thing is, is when this body was found --

GRAND JUROR:  Right.

THE WITNESS:  -- their officers should have never touched it.  They should have let the FBI go in there, and this could have been solved.

GRAND JUROR:  Well, we -- just so you know. We're adjourning -- we're here to try and solve this.

THE WITNESS:  I understand that.

GRAND JUROR:  You're not the only person that's been in here, or approached at work or at their house.  There are many people.

THE WITNESS:  Right.

GRAND JUROR:  And some of them perhaps more than

Exhibit 5002 at 1101

you have.  So --

THE WITNESS:  I doubt that, because most of those people are being approached now.  They haven't been approached over the whole ten years of this situation.

GRAND JUROR:  Okay.

GRAND JUROR:  And there's other people that are being pointed, saying that they did it too.  So your son's not --

THE WITNESS:  That isn't what we hear.

GRAND JUROR:  Right.  But the thing we're trying to do is get a -- not a story, but an actual time line of when people were where they say they were.  And we have a lot of conflicting testimony.

And when you said, I didn't live through that time and know what these drugs do, I had children, and I know exactly what that time was like.  Exactly, okay.  So don't think I don't understand what kids can do and what drugs can do.  Don't think for one minute --

THE WITNESS:  I didn't say that I didn't live through that.

GRAND JUROR:  No, you --

THE WITNESS:  I said that I didn't want no part of Cory and what she was doing.

GRAND JUROR:  No.  You said that we don't un -- we may not understand what it was like.

Exhibit 5002 at 1102

*B. McGuffin*

THE WITNESS:  Well, you may not.

GRAND JUROR:  But I do.  But I do.

THE WITNESS:  Okay.

GRAND JUROR:  So I want to make that clear.

THE WITNESS:  That's fine.

GRAND JUROR:  So you're not talking to a bunch of naive people.  At least one of us here at this table, I can understand totally.

THE WITNESS:  Okay.  You know where I'm coming from.

GRAND JUROR:  Right.  But I have a question then, because you say that he didn't do meth after Christmas --

THE WITNESS:  Right.

GRAND JUROR:  -- when he became close with Leah and her --

THE WITNESS:  Right.

MR. FRASIER:  And then somehow her mother quit using also, and Denise.

THE WITNESS:  Yes.

GRAND JUROR:  And who brought this about?

THE WITNESS:  No, Denise never did quit.

GRAND JUROR:  Okay.  Is this hearsay, or do you know this?

THE WITNESS:  No, I know this.

GRAND JUROR:  You saw her use?

Exhibit 5002 at 1103

THE WITNESS:  I know Cory uses.  Positively, I know Cory uses.  Or did at that time.

GRAND JUROR:  But how?  Can you give us some proof?  Can you give us something to back that up?

THE WITNESS:  Being seen by people.  By her husband.

GRAND JUROR:  Okay.  All right.  But --

THE WITNESS:  Do you know what you don't understand is that we've been here for so many years.  Down at Denny's Pizza, that was the main crank house around here.

GRAND JUROR:  Okay.  This is hearsay, and I'm going to stop you because I'm not going there.

THE WITNESS:  It's not hearsay.

GRAND JUROR:  My point is going to be that we have testimony from people who say your son was using at the time of Leah's disappearance.  And not using, but using heavily.

THE WITNESS:  No.  Not possible.

GRAND JUROR:  And you say you would understand -- you would notice it.  You would see what they --

THE WITNESS:  Yeah, I'd notice it.

GRAND JUROR:  But all the other testimony we have --

THE WITNESS:  See, the thing is, is --

GRAND JUROR:  -- is wrong then.  All the other

Exhibit 5002 at 1104

testimony we have that saw him that night, on something other than marijuana --

THE WITNESS:  Has to be wrong.

GRAND JUROR:  -- that are eyewitnesses, are wrong.  And your son was clean?

THE WITNESS:  That would be wrong.  Because Nick was invited back to the house after that.  Nick was kicked out of the house in November because of the crank.

GRAND JUROR:  And you don't think that he'd used again since then?

THE WITNESS:  No, he has not.

GRAND JUROR:  Okay.  That's all.  That's...

GRAND JUROR:  You just said yourself, you would know if he was.

GRAND JUROR:  Right.

THE WITNESS:  So why wouldn't I, when I had two sons that went through it?  I had a good friend that was going through it.  And maybe I didn't see Cory take it, but when Cory starts running circles around the house and can't control her actions, yeah, that's a sign of being on crank.

GRAND JUROR:  Did your other son, Wayne, get off it?

THE WITNESS:  Yeah.

GRAND JUROR:  When did he get off it?

THE WITNESS:  When we sent him to Hawaii.

Exhibit 5002 at 1105

*B. McGuffin*

It's a bad thing in this area.  Everybody involved in this case is into it, because of the people that are in this case.  But then we get conflicting stories out there that, you know, Bill and Tom are just, you know, great people, and never had nothing to do with it.  But then we have a witness that came in here -- was it last Friday, Tosha?  And told you about the bloody clothing that Bill had.  Well, you didn't hear what happened to her yesterday.

BY MR. FRASIER:

Q.    That's a different witness.  The Tosha that came in yesterday is a different witness than --

A.    No, I'm talking about the Tosha that came in here and talked about the bloody clothing that she saw from Bill.

Q.    Oh, so somebody has discussed with you secret grand jury testimony?

A.    Oh, all of them have.

Q.    I see.

A.    Yeah.  It's not a secret, what you people are doing in here.  Not at all.  Everything is out there.

It's -- it's sad that it's not being kept secret, but you have people that are coming to us, going to other people, going to authority figures, and letting them all know because you're not really stating to anybody that they have to keep their mouth shut.

Q.    Okay.

Exhibit 5002 at 1106

*B. McGuffin*

A.    And another thing is, is with the Tosha, is one of your officers went out there yesterday and threatened her that if she didn't change her story that he's going to take her kids and put her jail.

Q.    And who told you that?

A.    Uh, that's from Tosha, and it was Officer Chris --

Q.    Webley?

A.    Webley.

Q.    Okay.

A.    And that's not the only one.  Every person that has come in here against Bill and Tom has had the same thing done to them.  The cops are harassing them and telling them to change their stories.  So if this is how we're -- this is justice?

GRAND JUROR:  Kristen --

THE WITNESS:  I'm really, really --

GRAND JUROR:  Kristen told us that she smoked meth with Nick that same night.

GRAND JUROR:  That night.

THE WITNESS:  Who?

GRAND JUROR:  Kristen.

GRAND JUROR:  And her testimony has never changed.

THE WITNESS:  Kristen?

Exhibit 5002 at 1107

*B. McGuffin*

MR. FRASIER:  Kristen Steinhoff.

GRAND JUROR:  Kristen Steinhoff.

GRAND JUROR:  She smoked with him that night.

THE WITNESS:  No.  Kristen --

GRAND JUROR:  Said he tried getting into her pants.

GRAND JUROR:  Smoked it that night.

GRAND JUROR:  That night.

THE WITNESS:  Well, Kristen's got an obsession with Nick, is what the problem is with Kristen.  Kristen has had --

GRAND JUROR:  That's just because you said he quit after Christmas.

THE WITNESS:  He did.

GRAND JUROR:  But he -- she's not the only one.

GRAND JUROR:  This is June, you know.

THE WITNESS:  Yeah.

GRAND JUROR:  So he didn't quit.

THE WITNESS:  Well, he didn't act it at home. You know, that's all I can say.

GRAND JUROR:  Have you contacted people that met before the grand jury?

THE WITNESS:  Have I done what?

GRAND JUROR:  Have you contacted people that have met with us at this grand jury?

Exhibit 5002 at 1108

*B. McGuffin*

THE WITNESS:  No.  They've contacted me.

GRAND JUROR:  They've contacted you?

THE WITNESS:  Yes.

GRAND JUROR:  They've call you up?

THE WITNESS:  Yes.

GRAND JUROR:  Would you be interested in knowing who they are?

MR. FRASIER:  Yes, I would.

GRAND JUROR:  I would be.

THE WITNESS:  Well, Tosha is one of them.  Um, see who the other one is, is -- like I said, I'm bad with names.  Um, actually Tosha didn't get ahold of me.  She got ahold of Kathy's sister because Kathy's sister is the one --

GRAND JUROR:  So it's hearsay --

THE WITNESS:  -- that she went to.

GRAND JUROR:  So it's hearsay.

THE WITNESS:  No, we talked to her on the phone about it.

GRAND JUROR:  Tosha?

THE WITNESS:  Yeah, last night.

GRAND JUROR:  Since the grand jury?

THE WITNESS:  She's scared, and she's scared shitless, yeah.  She don't know what to do.

GRAND JUROR:  Tosha --

MR. FRASIER:  And she was supposed to have

Exhibit 5002 at 1109

*B. McGuffin*

testified last --

THE WITNESS:  Uh, she was supposed to have testified last Friday, and you -- or the Friday before, and you canceled it, and then she came -- I think she came in here the following Wednesday.  Last Wednesday?

GRAND JUROR:  What's the last name?

THE WITNESS:  I -- my wife would have that.

GRAND JUROR:  I don't remember Tosha meeting with us.  I don't think we've had a -- and you don't have a last name?

THE WITNESS:  I can get it from my wife.

GRAND JUROR:  So there's a person that we don't -- we can't identify --

GRAND JUROR:  Not on our list.

GRAND JUROR:  -- that you have hearsay that is giving out grand jury testimony (indiscernible).  Just makes no sense.

THE WITNESS:  She said she was here.

GRAND JUROR:  Well, it ain't grand jury testimony if she wasn't here.

GRAND JUROR:  If she wasn't here, it couldn't have been grand jury testimony.  It's just -- it's fictitious, the whole thing.

THE WITNESS:  Well, she was here.

GRAND JUROR:  We have a list of the people that

Exhibit 5002 at 1110

came and the days they came.

GRAND JUROR:  Yeah, we have a list on everybody that came and when, and we don't have a Tosha.

GRAND JUROR:  There is no Tosha.

GRAND JUROR:  There is no Tosha.

GRAND JUROR:  Unless she's called something else.

Do you have all the previous lists?

GRAND JUROR:  I do a --

GRAND JUROR:  I've got them here.

GRAND JUROR:  I do.  I do.  I have them.

GRAND JUROR:  Nope.

GRAND JUROR:  And there's no Tosha.

GRAND JUROR:  There's nobody named Tosha.

GRAND JUROR:  Nope.

GRAND JUROR:  Nope.

GRAND JUROR:  So who --

THE WITNESS:  She was brought in.

GRAND JUROR:  Tosha who?

GRAND JUROR:  Someplace.

THE WITNESS:  I don't know.  You want me to get her name?

GRAND JUROR:  No.  No.

GRAND JUROR:  Does she have a different name?

BY MR. FRASIER:

Q.    First name?

Exhibit 5002 at 1111

*B. McGuffin*

A.    I don't know.  I have no idea.  You know, this girl came to my sister-in-law and we gave the paperwork to -- that's the paperwork that I gave to you.

Q.    You're referring to Tosha Ekblad.  She has not testified before the grand jury.

A.    Okay.  Now I understand.  Now I understand. That's why they're changing her testimony.  Okay.  Well, you'll get to meet her, but she may not be what she wanted to say.  But she said she wouldn't come in here and lie to you, so she's not going to change her story.

We also have another new witness too.

Q.    You gave that to the officers?

A.    Right.

Q.    All right.

A.    (Indiscernible.)

GRAND JUROR:  Well, I guess we'll find out about that then, if she's going to come in and testify.

THE WITNESS:  Well, she's scared really bad because of what happened yesterday.  And as --

GRAND JUROR:  What happened yesterday?

GRAND JUROR:  -- yesterday?

THE WITNESS:  Yesterday Wesley [sic] -- Officer Wesley went to her and told her that if she didn't change her story he was going to have her two kids taken away from her and have her put in jail.

Exhibit 5002 at 1112

*B. McGuffin*

GRAND JUROR:  Well, she can testify that when she meets the grand jury, then.

THE WITNESS:  I hope she does.  I really hope --

GRAND JUROR:  Maybe we should talk to Officer Wesley.

MR. FRASIER:  Webley.

GRAND JUROR:  Webley.

MR. FRASIER:  You want to talk to them both, we'll get them both here.

GRAND JUROR:  Sure.

THE WITNESS:  Yeah.  He'll lie to you.  They've all been lying to us, so it won't be anything different.

MR. FRASIER:  Okay.  Anything else?

All right.

GRAND JUROR:  I have one.  Excuse me.

MR. FRASIER:  Okay.

GRAND JUROR:  Aaron West.

THE WITNESS:  Yeah.

GRAND JUROR:  Tell me about Aaron West.

THE WITNESS:  Aaron West went out to --

GRAND JUROR:  Yeah, the pond.

THE WITNESS:  -- the pond.

GRAND JUROR:  But what did he -- just tell me about what he -- what Aaron West's relationship with your son and his -- you know a lot about the community.

Exhibit 5002 at 1113

*B. McGuffin*

THE WITNESS:  Yeah.

GRAND JUROR:  And you have no shortage of opinions.

THE WITNESS:  No, I don't.  I know all these kids because they came --

GRAND JUROR:  So if you know --

THE WITNESS:  -- out to our houses for, you know, years.

GRAND JUROR:  Tell me about -- so tell me about Aaron West.

THE WITNESS:  Aaron West is very flighty.  Very insecure.  And then after all of this went down, he won't even come around the family anymore, like he has something to do with it.  And it's --

GRAND JUROR:  Was he a good friend of Nick's?

THE WITNESS:  No, actually he was a friend of Wayne's until he stole his stereo out of his car.  He's a thief.  He's a cranker.

But no, Aaron West is -- we come to find out he's not one to trust.

GRAND JUROR:  Okay.

GRAND JUROR:  When Nick came home that night, whatever time that -- whatever, that and then you say you and your wife got up --

THE WITNESS:  Right.

Exhibit 5002 at 1114

*B. McGuffin*

GRAND JUROR: -- with him, talked to him, and got fliers made up, did you guys go out and (indiscernible) --

THE WITNESS: Um, I didn't go out that day. My wife and I didn't go out that day because we wanted to stay home by the phone. What happened is when she had mentioned it was Denise and whoever the other girl was, they went around and they were together for several days at a time there, trying to put up fliers, trying to figure out what's going on. On July 4th we came acrossed [sic] a -- a girl that fit this identity and everything. She was seen down in Port Orford. My son and I went down there, and headed down to Crescent City, and we actually found the girl, and she did look similar to Leah, but it wasn't her.

So we spent that whole night. We got back here at probably 3:30 that morning, four o'clock. And -- excuse me. And then at seven o'clock we had to go in and visit the police, and that's when they did his polygraph. I'm sure --

MR. FRASIER: You can't talk about the polygraph.

THE WITNESS: Can't talk -- okay. Good thing. I'm glad they can't be brought in here.

And please, ask more. I mean, there's so much more information.

GRAND JUROR: You mentioned that Cory had a boyfriend that had molested, was that --

THE WITNESS: Tried. Tried to molest --

Exhibit 5002 at 1115

*B. McGuffin*

GRAND JUROR:  And where did you get that information?

THE WITNESS:  That was from Leah.  She called us out at the house and wanted us to get ahold of Nick because her mom's boyfriend wouldn't leave her alone and kept chasing her.  Chased her into the bathroom, and then chased her into her bedroom.  And she locked her bedroom and called us, and wanted to know where Nick was.  And --

GRAND JUROR:  You didn't -- did you call the police?

THE WITNESS:  Uh, you know, that was Cory's situation.

GRAND JUROR:  Well, it was Leah's situation.

THE WITNESS:  Leah didn't want anything to do with it because Cory didn't want her boyfriend turned in.  So we told Cory that we would take Leah.  She could stay at our house.  And, you know, we'll take care of her.  And which she did.  She pretty much stayed there.  It was probably two weeks later that -- after talking with Cory, that that's when we finally got her to pull her head out.  You know, your kid is more important than this crank boyfriend of yours.  And, you know, you need to get away from all of this and start seeing life again.

And so we pretty much -- that's when we started helping her get off the crank.

Exhibit 5002 at 1116

84

*B. McGuffin*

GRAND JUROR:  Did that boyfriend leave?

THE WITNESS:  I don't know what ever happened to him.  I really don't.  When this investigation broke, I know that his name did come up, but I don't know where he went to.

GRAND JUROR:  He wasn't living at the time -- with her at the time of Leah's disappearance?  Or was he?

THE WITNESS:  No, he wasn't, because she had already moved out on him.  She had moved in with her mom and dad.  And then that's when -- which was like a two-week interval there before she moved out with her boyfriend and went -- and moved in with her mom and dad.  Well, Leah went and stayed with us for those two weeks.  And then when Leah's mom moved back into with her grandmother and grandfather, then that's when we started the deal of that Leah had to be home at midnight, and Nick could pick her up at eight o'clock in the morning.

GRAND JUROR:  You implied that she stayed with you till midnight.

THE WITNESS:  Right.

GRAND JUROR:  This was at the time of Leah's disappearance, because of the boyfriend?  Although the boyfriend, as far as you know, wasn't there?

THE WITNESS:  Well -- well, try this one again.

GRAND JUROR:  At the time Leah disappeared --

THE WITNESS:  Right.

Exhibit 5002 at 1117

GRAND JUROR:  -- she was staying with you until midnight?

THE WITNESS:  Right.

GRAND JUROR:  Because, you said, she didn't want to be around the boyfriend, correct?

THE WITNESS:  No, I didn't say that.  She came and stayed with us because she didn't want to be around the boy -- around Cory's boyfriend.

GRAND JUROR:  Right.  Right.

THE WITNESS:  So she stayed with us for two weeks.  Then Cory moved out, and moved in with her mom and dad, and then that's when Leah went and started staying with her.

GRAND JUROR:  So at that time she wasn't staying at your house until midnight?

THE WITNESS:  She was always staying at our house till midnight.

GRAND JUROR:  Whether the boyfriend was there or not, then?

THE WITNESS:  He was always there.

GRAND JUROR:  At the parents' house, now?

THE WITNESS:  No, at our house.

GRAND JUROR:  No, not --

GRAND JUROR:  Did she stay at your house all -- night after night, all the time?

Exhibit 5002 at 1118

*B. McGuffin*

THE WITNESS:  What are we --

GRAND JUROR:  Cory's boyfriend.  Cory's boyfriend, at the time Leah disappeared, where was he living?

THE WITNESS:  Oh, I don't know.

GRAND JUROR:  Then why was Leah still staying at your place until midnight?

THE WITNESS:  Because Cory was still living with her boyfriend.

GRAND JUROR:  I --

THE WITNESS:  For the first two weeks.

GRAND JUROR:  No, no, no.  This is the time of Leah's disappearance, Cory's -- Cory was living with her parents.  Correct me if I'm wrong here.

THE WITNESS:  Well, she was living with her mom, but she stayed at our house till midnight and didn't go -- and then came back at 8:00 in the morning.

GRAND JUROR:  And you're talking about Leah?

GRAND JUROR:  You're talking about Leah?

THE WITNESS:  Yeah.

GRAND JUROR:  But why?  If the boyfriend was -- if the point of Le -- of Cory moving in with her parents --

THE WITNESS:  Yeah.

GRAND JUROR:  -- was the boyfriend is -- her -- Cory's boyfriend is no longer around --

THE WITNESS:  Right.

Exhibit 5002 at 1119

*B. McGuffin*

GRAND JUROR:  -- then Leah -- then you -- Leah was just coming out to your house till midnight because she could?  That's my point.

THE WITNESS:  Yeah.  No.  Because they were going together.

GRAND JUROR:  Is that (indiscernible)?  Yeah.

THE WITNESS:  They were going together.

GRAND JUROR:  Right, I understand that.  But it -- you understand what I'm saying.  You -- this process started because of a boyfriend --

THE WITNESS:  Right.

GRAND JUROR:  -- a boyfriend that now no longer is in the picture.

THE WITNESS:  Right.  And Cory continued it on.

GRAND JUROR:  Okay.

THE WITNESS:  Yeah, I mean this is -- a lot of this that went on wasn't of our dealings, it was because Cory said that this could be -- could be done this way.

GRAND JUROR:  Did Leah --

THE WITNESS:  We --

GRAND JUROR:  -- ever stay overnight?

THE WITNESS:  Yes, she stayed over two nights. One was graduation night.  Cory was there, and upset my wife and I very much.  But Cory said that's what she wanted.

The other night that she spent the night was, oh,

Exhibit 5002 at 1120

probably two days before she was abducted.  And what it was is I happened to get up in the morning at two, three o'clock, and they were in bed and she was supposed to be home at midnight.  So I got them up, told them, get in her car and get her home.  And when they -- he got back, that's when I took the T-bird from him.

GRAND JUROR:  Well, that's why you took the T-bird?

THE WITNESS:  That was one of the reasons why I took the T-bird.  The other one was because he ruined my weed-eater.

GRAND JUROR:  (Indiscernible.)

THE WITNESS:  Isn't that what I said earlier, was because of the weed-eater, and the --

GRAND JUROR:  Yeah.  Yeah.  But I mean, this -- but this, I mean, is a little more -- this would stand out in my mind more as a reason to ground the child than the weed-eater, but that's just me.

THE WITNESS:  No, they just did the both -- same thing at the same time, and that's -- you know, I take so much, and then that's it.  Then dad gets mad.  So that's when the car got taken away, because he had broke the rules.  Both of them broke the rules.  I mean, the rules was she is home at midnight, and you can pick her back up at 8:00 in the morning.  And that's how Cory wanted it, so we went on what

Exhibit 5002 at 1121

Cory wanted.  We kind of let her just have her -- her way.

GRAND JUROR:  But you're saying Cory was clean at this time?

THE WITNESS:  Yes, she was.  Yes.  Cory was a good friend.  The only thing that turned it was Hall.  You know, that's what turned her -- turned her against us.

GRAND JUROR:  What's that?

THE WITNESS:  What Hall had told her.  Officer Hall.

GRAND JUROR:  But that was Hall.  Why would that turn Cory -- you're saying --

THE WITNESS:  Officer Hall --

GRAND JUROR:  Right.

THE WITNESS:  -- told Cory that my son murdered her daughter.

GRAND JUROR:  Right.

THE WITNESS:  So why wouldn't that turn her against us?

GRAND JUROR:  Oh, turned her against you.

THE WITNESS:  Against us, yes.  Otherwise, we were really good friends with Cory.

GRAND JUROR:  Did she say that she believed that your son did it, to you?  To your face?

THE WITNESS:  Not really.

GRAND JUROR:  Well, maybe she doesn't think Nick

Exhibit 5002 at 1122

*B. McGuffin*

did it.

THE WITNESS:  Uh, too much on the Internet.  That's her belief.

GRAND JUROR:  You can't believe everything that's on the Internet.

THE WITNESS:  Well, when you sit there and you're the one punching in, that yeah, Nick murdered my daughter, then yeah, I would say that that was from Cory unless somebody else is using her name.

GRAND JUROR:  Oh, she did that to you?

THE WITNESS:  Yes.  On the Internet.  Not personally, on the Internet.

GRAND JUROR:  Did Cory say why she thought it was okay that Leah could spend the night at your place with Nick?  Was there any discussion of that?

THE WITNESS:  There was no problems.  I mean, we were good friends.  I mean really --

GRAND JUROR:  But -- but that only happened a couple of times.  You said twice, she spent the night?

THE WITNESS:  Well, yeah, but that was Cory's -- yeah, the first one was Cory's idea.  I mean -- the second one --

GRAND JUROR:  Okay.  And what did she explain to you about that idea?  Did she say anything, or just let him stay?

Exhibit 5002 at 1123

THE WITNESS:  No.  She said that it's graduation. She's on her period, and that I want those two to be able to sleep together tonight.

GRAND JUROR:  And that was graduation night?

THE WITNESS:  Graduation night.

GRAND JUROR:  What did you say about that, in your home?  I mean, you son having a girl that was underage --

THE WITNESS:  Mm, no.  That's what I said, and that's what the wife said, and Cory stood up and said, Hey, this is my night, this is my daughter's night, and I want it this way.

GRAND JUROR:  Yeah, but she turned around and took him to jail for statutory rape.

THE WITNESS:  Well, I think we -- oh, that was with his other girlfriend.

GRAND JUROR:  Just because a girl has her period don't mean that they can't have sex.

THE WITNESS:  Mother's consent.

MR. FRASIER:  That doesn't --

THE WITNESS:  I know.  I didn't -- we raised hell about it.

GRAND JUROR:  But you're the father there.

THE WITNESS:  We raised -- well, you know, it was that we were, you know, being real good friends with Cory,

Exhibit 5002 at 1124

and we gave Cory some leniency.  It's not something that we wanted --

GRAND JUROR:  I would never let my child do that.

THE WITNESS:  -- to do.

Well, you're the mother of the child, and you're the one telling me that it could be done.

GRAND JUROR:  I'd be the father of the son who could go to prison for rape.

GRAND JUROR:  Yep.

GRAND JUROR:  That's what I would be.

MR. FRASIER:  Well, back up.  Back up, folks.  I got to tell you, in regards to Nick and Leah, if they were having sex, because of their age differences, it would not have been a crime.

GRAND JUROR:  It wouldn't have been?

MR. FRASIER:  All right.

GRAND JUROR:  I got a question about some Internet accusation, you said.

THE WITNESS:  Yeah.

GRAND JUROR:  You were on the Internet and you saw -- you brought up a screen that had an accusation that you -- she felt you were responsible for the death of --

THE WITNESS:  Yeah, this just came out not too long ago, that I was responsible also.

GRAND JUROR:  Did you print it out?

Exhibit 5002 at 1125

*B. McGuffin*

THE WITNESS:  Oh, yeah.  They got 300 pages of it.

GRAND JUROR:  You actually printed that screen out that said --

THE WITNESS:  Yeah.  We have all of it, and they came out and confiscated it from us.  We offered it all to Dannels, up front, and he didn't want it.  Two weeks later he came out with a search warrant and took everything we had.

We've been collecting information for ten years.  It's just -- you know, maybe it is hearsay, but a lot of these people that are coming to us are telling us exactly what they have seen.  We wrote it down.  They won't go to the police because they get harassed.  And that's what's been going on out there, is they do get harassed.  And so we would turn it in to the police officers.

Well, back at that time, nobody would listen to us because we were trying to save our son.  So it has only been this year here that we finally were going through this that they've got all of our paperwork and they're able to go through all of the witnesses that we have and go through it.

GRAND JUROR:  I would think they should be listening to you, if you're trying to save your son.  Just as much as --

THE WITNESS:  No, they didn't want to.

GRAND JUROR:  -- anyone else.

Exhibit 5002 at 1126

*B. McGuffin*

THE WITNESS:  They didn't want to.  They don't want to now.

GRAND JUROR:  Well, don't you think it's kind of ironic that we're meeting now?  I mean, you say they don't want to hear, but we're here to try and discover what happened.  So just --

THE WITNESS:  We weren't invited to the first one, so we're pretty -- quite impressed that we're invited to this one.

GRAND JUROR:  We don't -- we didn't know that, see.

THE WITNESS:  Yeah.  No, I'm amazed I was invited to this one, truthfully.  Because I'd be willing to sit here and talk to you for hours about what we have.  But like I said, I don't have my paperwork, so it's real hard to pull from ten years of memories of, you know, what -- where everything went.  I mean, we got hundreds of people.  We just came up with another witness today that lives -- and you guys should be able to hear her.  She lives there, right by Bill and Tom.  She saw everything.

And the way I see it, with everything that I've heard and everything that I've seen, we've had two friends be killed because of this.  Because they got information that was going to prove that Nick was not the one that did it, and both of them were killed.  One of them they wrote off as a

Exhibit 5002 at 1127

*B. McGuffin*

suicide, except that kid was left-handed and was shot in the head with his right. The other one was tied and bound like a Mafia killing, which you did find the guy that killed him. But -- (sighs). Oh, God. Like I said, I'm terrible with names, but he was bound and tied, and they had a Mexican that I think was part of the Mafia that you guys had captured.

GRAND JUROR: Harvey Davis?

THE WITNESS: Yes. Yes. Harvey.

GRAND JUROR: That was Harvey Davis. Okay.

THE WITNESS: Harvey was a very good friend of mine. He was into the crank scene. He knew what was going on. He knew Bill and Tom. And I think he got a little carried away with what he was doing, and that's why he was killed the way he was killed, because --

BY MR. FRASIER:

Q. But how was his death related to Leah?

A. Because he knew information that he was trying to get to us. I don't know if the death is related, but all I know is he told me --

Q. You just said that --

A. -- he had some information --

Q. Okay.

A. -- that he wanted to give to me, that he knew my son was innocent. And two days later we found out that he's tied, bound, and shot.

Exhibit 5002 at 1128

*B. McGuffin*

Q.    Okay.  But you had no information to suggest --

A.    No, because I never got him.

Q.    But -- well, no, what I'm saying is you want the grand jury to believe that he was murdered because of Leah Freeman, but you have no evidence to support that, do you?

A.    He died.

Q.    He got -- okay.  He died.  But what evidence do you have that says he was killed because he knew --

A.    Pretty much because he told me that if I die because of this, then this is what's went on.  Same as with the other one that died.  He left his letter to his mother, saying, If I die while I'm getting this information, these people did it.

Q.    Okay.

A.    That's how I know.  I mean, it's just -- it's what he told me.

Q.    Okay.

A.    So, yeah, Harvey's dead because of it, and then who's the other one?

Q.    Harvey's not dead because he stole meth from the Mexicans?

A.    Well, I think that had a lot to do with it.

Q.    Okay.

A.    Yeah.  (Laughter.)

      Yeah.  I mean, you usually don't tie and bind

Exhibit 5002 at 1129

*B. McGuffin*

somebody and, you know, murder them Mafia way --

Q.    Who told you he was tied and bound?

A.    Oh, I (indiscernible) say that.

Q.    Okay.  Because I handled that case.  He was not tied and bound.

A.    Oh.  Okay.

Q.    So -- I mean, he was buried.  He was wrapped up in plastic and buried.

A.    I'd heard he was tied and bound and shot.

Q.    Well, he was not tied and bound.  He wasn't shot.

A.    Whatever.  I don't know.  It's just like some of the other people that said that they saw her sitting in a room, tied and bound.  And now they're denying it.  Kaylie [sic] Knight.  Have you had her in here yet?

Q.    Not yet.

A.    Not yet?

Q.    Not yet.

A.    Okay.  And then the Knight family?

Q.    We'll hear from them, again.

A.    Okay.  Well, if he tries to deny anything, you know, that was a recorded conversation that's in our paperwork.

Q.    Okay.  I've seen it.

A.    Okay.

MR. FRASIER:  Any other questions for

Exhibit 5002 at 1130

*Z. Wilson*

Mr. McGuffin?

Okay, sir.  That will do it.

THE WITNESS:  Okay.  Thank you, gentlemen, and ladies.

GRAND JUROR:  Thank you.

### TESTIMONY OF ZACHARY WILSON

(Witness sworn.)

BY MR. FRASIER:

Q.    First of all, sir, just so you're aware, this is the grand jury for Coos County.

A.    Mm-hmm.

Q.    And let me make sure that I have -- didn't know if I hit the button or not.  Yes, I did.

The second thing I have to tell you is we are recording the proceedings.  I've got two different recording devices going for us.

A.    All right.

Q.    I guess my first question to you, sir, is if you could tell us your name and where you live.

A.    My name is Zachary Wilson, and I live at 134 -- 13459 Highway 241, Coos Bay, Oregon.

Q.    And have you lived in the Coquille area in the past?

A.    Yes.  I've been here my whole life.

Q.    All right.  You were -- have you been married in

Exhibit 5002 at 1131

*Z. Wilson*

the past?

A.    Yes.

Q.    And who was -- who were you married to?

A.    Candy Davis, Candy Wilson.

Q.    Candy Wilson.  Do you know where she's at right now?

A.    Yes, I do.

Q.    And where's she at?

A.    Simic (phonetic), Florida.  She's living with her dad.

Q.    Okay.  Is she in the military or --

A.    No.

Q.    But she's living with her dad?

A.    Yes.

Q.    Do you have her dad's address, by chance?

A.    I don't.  My mother might have it, because he wanted her to send some shirts to him, from her store.

Q.    All right.  If your mom's got the address, could you --

A.    I think you can look it up on the Internet.

Q.    Oh.

A.    On -- my mom's a part --

Q.    Yeah, the store.

A.    My mom's -- yes, my mom owns Donna's Country Store, down the street.

Exhibit 5002 at 1132

Q.    Oh.

A.    Okay.  And my mom's partner Stacy, she looked up Candy, all her information --

Q.    Oh, really.

A.    -- on the Internet.  And I told like your assistant that.

Q.    Oh, one of the --

A.    When I called in to the DA's office.

Q.    Okay.  Because I -- we've been trying to talk to her, and I've not been -- without success.

A.    Good luck.

Q.    Good luck?  Okay.  All right.

Yeah, did you actually grow up here in the Coquille area?

A.    I was -- grew up right up the road.

Q.    And your dad -- what's your dad's name?

A.    Louis (phonetic) Wilson.

Q.    Louis Wilson.  You actually are next-door neighbors to the McGuffins?

A.    Yes.

Q.    Did you and -- are you acquainted with Nick McGuffin?

A.    I know Nick.  I haven't seen him for probably four or five years, but --

Q.    All right.  Is he about the same age as you --

Exhibit 5002 at 1133

*Z. Wilson*

A.    He's a year older than I am.

Q.    Year older, okay.  Did you see him at school, and things along that line?

A.    Yes.

Q.    When you guys were growing up, were you pals, buddies?

A.    We were acquaintances, but we weren't really real hang -- we didn't hang out.

Q.    Did you know Leah Freeman at all?

A.    I knew Leah Freeman.  She was one of my ex-wife's real good friends.

Q.    Then -- and again, that's Candy?

A.    Yeah, Candy Wilson.  She's still using my last name, Wilson.

Q.    Wilson.  And at that time it was Candy Davis?

A.    Yes.

Q.    Just trying to keep my facts straight.

A.    Her mother lives in North Bend, and she's doing state day care over there.  And she would know how -- she would know Ed's address.

Q.    Oh, okay.  What's her mother's name, do you --

A.    Deanne (phonetic) Davis.

Q.    Deanne Davis.

A.    Or maybe Pattee.  She might have went back to her maiden name.

Exhibit 5002 at 1134

*Z. Wilson*

Q.    Or Pattee?

A.    Yeah.

Q.    P-A-T-T-E-E?

A.    T-E-E, mm-hmm.

Q.    Okay.  And she does state day care?

A.    Yes.

Q.    So the DHS people would know where she's at?

A.    They should.

Q.    Okay.  We'll try to find her.

A.    I know she is in North Bend.

Q.    She lives in North Bend, okay.

The reason I brought you in here today is a couple of things.  Well, back in the year 2000, I believe you were interviewed by the police, and there were -- that you might have known something or heard something about Leah getting in to a fight with her boyfriend or something.  Do you recall that statement you made to the police?

A.    I don't.  It's been ten years.

Q.    Okay.  Let me just read to you what I have here, and see if this rings any bells to you.

"Zack said he and Tony Anderson were at a party the night Leah disappeared.  Zack said Freeman and her boyfriend had gotten into a fight, and that Freeman had left without her boyfriend."

Is that -- does that ring any bells for you?

Exhibit 5002 at 1135

*Z. Wilson*

A.    I don't ever remember being anywhere with Tony Anderson, but I was best friends with his brother Dustin Anderson.

Q.    Okay.  All right.

A.    And Dustin may recall.  Boy, I -- like I say, it's been ten years.

Q.    Did you ever see Nick and Leah together?

A.    Yes.

Q.    How was -- what was their relationship like?

A.    Every time I saw them, they got along just fine. They were -- they were always holding hands and -- you know, public displays of in -- affection.  You know.  I mean, they were -- seemed real close.  They seemed like a good couple.

Q.    Okay.  Did they have any fights or anything like that that you saw?

A.    Not that I can remember.

Q.    Did you see anything where, you know, they would hit each other or something like that?

A.    No.

Q.    Okay.  The reason I ask you that is because in the police report I want to read this quote to you:

        "Zack said Freeman and her boyfriend always were hitting each other, causing bruises on her."

        Apparently Brandy was present -- who's Brandy? Brandy --

Exhibit 5002 at 1136

A.      Would be Brandy Lemmer (phonetic), would have been Dustin's girlfriend.  Her last name's Harvey now.  She lives in Coos Bay.

Q.      All right.  Now, I asked Brandy if she was present and she said yes, but she did not remember what was said.

A.      Okay.  But I don't ever remember -- I don't remember her being there.

Q.      Okay.  Um --

A.      Because I got hurt when I was in the service too.  I don't --

Q.      Yeah, you were in battle --

A.      I have a mental illness, yeah.

Q.      Oh, okay.

A.      And so I -- there's parts of my life that I don't remember.

Q.      Right.  Okay.

A.      I had to get a disability for that.

Q.      All right.  I'm sorry.  Did you -- were you hurt?  Injured?  Accident?

A.      Uh, I had an allergic reaction to a vaccination they gave me.

Q.      Oh, really?

A.      And it messed -- actually messed up the pH of the liquid around my brain.

Exhibit 5002 at 1137

Z. Wilson

Q.    Okay.  So for anthrax of something, was it?

A.    Don't know what it was.  They won't exactly tell me what's --

Q.    Which vaccine it was for?

A.    But the VA gave me a hundred percent disability for it.

Q.    Really?

A.    Yes.

Q.    Okay.  Well, I guess what I want to ask you about is apparently Bruce and Kathy McGuffin think you might know something about what happened to Leah.  Do you have any information that what happened to Leah Freeman?

A.    I don't.

Q.    Okay.

A.    And I was with my dad the night it happened.  And the next day I helped Nick put up wanted -- missing posters, up in Powers.

Q.    Okay.  Went to Powers with him and --

A.    Yeah, I was -- went to the White Cedar Days --

Q.    Oh, okay.

A.    -- the next day, and helped -- I -- we ran into each other, and I helped him, you know.  He gave me some posters and I went to put up -- put up posters.

Q.    Okay.

A.    Yeah.  My ex-wife would be the one you --

Exhibit 5002 at 1138

*Z. Wilson*

Q.    Yeah, that's what I would really like to --

A.    She's -- um, everything she's -- everything I've ever heard about it has come from her.

Q.    Okay.

A.    And the only thing I have heard about it was that Stephanie Gilfillan (phonetic) had run her over with a van, or something to that effect.

Q.    Stephanie Gilfillan?

A.    Yes.

Q.    Okay.

A.    But that's all I've --

Q.    And this is what your wife told you?

A.    That's what my wife told me.

GRAND JUROR:  What was the last name --

GRAND JUROR:  Gilfillan.

GRAND JUROR:  -- of Stephanie?

THE WITNESS:  Gilfillan.

GRAND JUROR:  Gilfillan?

BY MR. FRASIER:

Q.    Let's see.  Do you know this woman, at all?

A.    Yes, I do.

Q.    Is she around?

A.    I'm not sure.  Her parents should live up at Fairview.  It's Brian Gilfillan's her dad.  He works with my mom (indiscernible), I know that.

Exhibit 5002 at 1139

*Z. Wilson*

Q.    Okay.  Brian Gilfillan.  Okay.

I'll have the police go and check, see if we can find her.

Do you know a Tom Stemmerman or Bill Sero?  Have you heard these names?

A.    I know the names.  I know that his name's floating around there in the jail a lot.

Q.    Yeah.

A.    But I don't know either one.

Q.    Well, let me ask you this question:  Has anybody told you that, Hey, I'm the one that killed Leah Freeman?

A.    No.

Q.    Has anybody told you, I was there and I saw what happened to her?

A.    No.

Q.    Do you have any information at all, other than what you've told us already, about the death of Leah Freeman?

A.    I -- I do not.

MR. FRASIER:  Okay.  Sir, I think that's all the questions I have, but the grand jury may have some questions for you.

GRAND JUROR:  No.

GRAND JUROR:  I'm good.

MR. FRASIER:  Looks like -- I'm sorry to make you wait so long, but --

Exhibit 5002 at 1140

Z. Wilson

THE WITNESS:  That's okay.

GRAND JUROR:  Did --

MR. FRASIER:  Go ahead.

GRAND JUROR:  Nick.  When you said you ran into Nick to post -- put some posters up in Powers --

THE WITNESS:  Yeah.

GRAND JUROR:  -- you said.

Did he go to Powers with you, or just --

THE WITNESS:  No, he was a Powers -- he was in Powers at White Cedar Days.  I -- I don't know what he was doing up there, but he was -- he was up there and we just ran into each other, like after the parade or whatever.

GRAND JUROR:  Was this -- do you know a time line?  Was that the day after?

THE WITNESS:  I believe it was, because I know my mom had gone up there to sell T-shirts.  And I remember it was White Cedar Days or something up -- I'm pretty sure it was White Cedar Days, because there was a --

BY MR. FRASIER:

Q.    White Cedar Days is around July 4th?

A.    Mm-hmm.

Q.    Okay.

GRAND JUROR:  Okay.  Um -- okay.  That's fine.

GRAND JUROR:  Would that have been during the week, White Cedar Days?  Or just on the weekends?

Exhibit 5002 at 1141

Z. Wilson

GRAND JUROR:  It's a couple days later.

THE WITNESS:  I think it was a weekend.

GRAND JUROR:  It's a weekend thing.

GRAND JUROR:  It's probably that following weekend.

GRAND JUROR:  Did you -- would you -- do you have any knowledge of if Nick might have been using drugs at that time?

THE WITNESS:  I would -- I'd probably say so. His -- his dad does.

GRAND JUROR:  Yeah.  Okay.

THE WITNESS:  Um, marijuana I know for a fact. And I've heard -- I've heard cocaine, but I don't know that for a fact.

GRAND JUROR:  Did you actually do drugs with his dad?

THE WITNESS:  I've never done drugs with his dad.

GRAND JUROR:  Have you seen his dad use drugs?

THE WITNESS:  No.

GRAND JUROR:  Okay.

THE WITNESS:  I do know he has a medical marijuana card.  And he has admitted to me that he does use drugs.

GRAND JUROR:  Oh, he has?

THE WITNESS:  Yes.  Just right outside the door

Exhibit 5002 at 1142

*H.D. Knight*

here.

GRAND JUROR:  Mm, yes.

GRAND JUROR:  Oh, yeah.  (Laughter.)  Thanks.

MR. FRASIER:  Any other questions?

Okay, sir.  That was -- will do it.  You're free to go.

THE WITNESS:  Thank you.

GRAND JUROR:  Thank you, Zack.

### TESTIMONY OF HUEY DELBERT KNIGHT

(Witness sworn.)

THE WITNESS:  Yes, sir, with the reservation that all I know is hearsay and rumors.

GRAND JUROR:  Well, whatever you say is just to your knowledge.

THE WITNESS:  Other than that -- (laughs.)

BY MR. FRASIER:

Q.    Okay.

A.    Best of my knowledge.

Q.    All right.  Mr. Knight, this is the grand jury for Coos County, and they're looking into the death/disappearance of Leah Freeman.

A.    Leah Freeman, okay.

Q.    Okay.  I think it's obvious, but I need to tell you, I've got two different recorders going, recording the proceedings, okay?

Exhibit 5002 at 1143

A.    Yeah.

Q.    First of all, sir, could you tell the grand jury your name and where you live.

A.    Huey D. Knight, Jr.  And I live on Lone Pine Lane out in McKinley.

Q.    How long have you lived out there, sir?

A.    About 24 years.

Q.    I see you're a member of the Fairview Fire Department?

A.    Yes.  Dora-Sitkum, Fairview.  I'm a lieutenant over in Dora, and I'm a safety officer at Fairview, and then I'm also with Coquille and Myrtle Point ambulances as an EMT first responder.

Q.    Oh.  So you're kind of busy?

A.    Yeah.

Q.    (Laughing.)  All right.

Mr. Knight, I -- the reason I brought you here today was because -- well, let me back up a little bit, okay. You're acquainted with the McGuffin family, Bruce and Kathleen?

A.    Yes.  Yes.

Q.    How well have you known them?

A.    Well, I first became acquainted with them through Kathy's sister Julie, some number of years ago.  And I can't tell you back when, in maybe the early '90s or before.  And

Exhibit 5002 at 1144

*H.D. Knight*

Bruce and Kathy's two boys, Wayne and Nick, were approximately my two daughters' ages, and they went to school together, so that's kind of how I've inter-tied and knew them.

Q.    Okay.  Part of the reason that I've -- well, the main reason I brought you here today, is earlier this year a search warrant was done on the home of Mr. and Mrs. McGuffin and some documents were seized.  There were some other documents that the police had come into possession from the McGuffin family, perhaps back as in 2004.  And as part of those documents, the McGuffin family seem to believe that you have information that would exonerate Nick as being the person responsible for the death of Leah Freeman.

What information do you have about Leah Freeman's death?

A.    Well, I would say that that's actually a false statement, and I have no information personally that would exonerate or apply guilt to Nick in any way.  I was not there, have no personal information.  You know, the only thing I've got -- and, you know, it's as I inter -- when I was interviewed by state and county and federal folks, and everything, you know, is rumors.  That's -- that's all I've ever heard.  But as far as any information, how could I possibly exonerate Nick or anybody else, I wasn't there.

Q.    Now, you have two daughters; is that correct?

Exhibit 5002 at 1145

*H.D. Knight*

A.     Yes, Magdalena and Makayla (phonetic).

Q.     And Magdalena, sometimes referred to as Maggie?

A.     Yes, that's the one we call Maggie, yes.

Q.     And --

A.     And then Kayla.

Q.     -- Kayla.  And Kayla is in Arizona now?

A.     Yes, sir.  Yes, sir.

Q.     Let me see if I can find them.  I'm just going to look here in the paperwork real quick.  (Pause.)

A.     Do you mind if I turn my chair a little bit?

Q.     Oh, certainly.  You can do whatever you want.  I have --

A.     Yeah, it will keep me from -- (laughing) -- hopefully I can kind of share.  There we go.  How's that?

Q.     Okay.  This is a notation in their paperwork from the McGuffin home.  It's dated October 8th, 2000.  I'm just going to read it to you.

A.     Okay.

Q.     "Kathy" -- which was Kathy McGuffin -- "calls Julie," which is her sister; is that correct?

A.     Yes.

Q.     -- "because we want to know what Delbert knows. She calls him and then us.  He won't say who, but someone respectable or an authoritative female adult who knows for a fact Alicia" -- and I believe they're

Exhibit 5002 at 1146

referring to Alicia Michaud --

A.    Okay.

Q.    -- "knows something.  Alicia is back from rehab and is now in Coos County jail.  She saw bloody clothes and knows all.  Since Leah's disappearance, Alicia is so freaked out she stayed high on drugs to forget, and that was the reason she was sent to rehab."

Were you the source of that information, sir?

A.    No, I -- I guess I -- I vaguely remember my -- my daughters mentioning that Alicia might know something.

Q.    Okay.

A.    You know.

There again, that's just rumors, you know.

Q.    As much as you can recall, that's all you would have said, is Alicia might know something?

A.    Yes.

Q.    All right.  Now, the next notation, this is on November 11th of 2001:  "Information from Julie from Maggie Knight" -- that would be your daughter?

A.    Yes.

Q.    "Maggie's sister Makayla, now living outside Tucson, and Josh McNair partied at the Stemmermans' house the weekend after Leah disappeared, and supposedly saw Leah at the Stemmermans' house."

Has your daughter ever told you anything like

Exhibit 5002 at 1147

*H.D. Knight*

that?

A.    No.

Q.    Okay.  Also, "Makayla told Maggie that the night Leah disappeared, five people in Kristen Steinhoff car hit her; Rowdy, Tom, Bill, Alicia, Kristen.  And threw Leah in the trunk, went out to Hudson Ridge and when opened the trunk she was still alive and they beat her. Supposedly Leah was taken to Tom's basement."

Have you ever heard that before?

A.    No.

Q.    All right.  The next notation in the paperwork they have is November the 12th of 2001, and I'm just again going to read this to you, okay?

And, um, "At approximately 9:30 a.m. Bruce went to see Delbert."

Do you recall Bruce coming and seeing you that day?

A.    On what date?

Q.    November 12th, 2001.

A.    That would be hard to remember.  Um, at what time?

Q.    Well, it says about 9:30, but let me tell you what he says --

A.    Okay.  That might -- that might help.

Q.    -- (indiscernible).  That might jog your memory.

Exhibit 5002 at 1148

*H.D. Knight*

A.    Because I saw him off and on, here and there, you know.

Q.    Okay.  "When Bruce confronted Delbert, Delbert said he knew Nick had nothing to do with Leah's murder. In fact, on Saturday night, July 1, 2000, Kayla had gone to Tom Stemmerman's house to buy some drugs.  When she walked into the living room, Denise Freeman was sitting on the couch.  Kayla proceeded to the back of the house to Tom's room.  She noticed in an adjacent room, through the crack of the door, a young blonde girl in a chair that was bound and gagged.  She realized later it was Leah.  What bothered her the most was that Denise Freeman was also in the house."

My understanding is Mr. McGuffin is saying you told him that.

A.    No.

Q.    Okay.

A.    No, sir.

Q.    "Delbert proceeded to tell Bruce that Kayla is scared for her life.  If they found out they saw Leah that night, she would be killed.  Delbert said, What can I do?  I have to protect my family, so I sent her away.

"Bruce said, Why didn't you tell us sooner?  Why are you all running and leaving us to hang?  I thought you were our friends.  You totally f'd us, Delbert.

Exhibit 5002 at 1149

Where is she?

"At that time Maggie came out of the bedroom. Bruce asked her if she knew all of this too. She said yes. Bruce said, You've been coming out to see us several times this past year and you never thought about telling us what happened. You people are really f'd up. I can't believe that we've known you people for two decades and this is how you treat us.

"Delbert said" -- I'm assuming she's referring to the Makay -- he's referring to Makayla -- "that she was in Arizona. Bruce asked if I would have her come back and testify to what happened. Delbert said he would have her come back and we didn't have to worry. Bruce told him he hoped he was going to keep his word."

Did any type of conversation like that ever occur between you and Mr. McGuffin?

A.      I do -- honestly do not recall that kind of a conversation ever happening. I don't remember any of that. That's the first time I've ever heard that kind of a conversation.

Q.      All right. Let me look through here just a little bit more.

GRAND JUROR: Has he been over to your house? Back then, did he come over?

THE WITNESS: Yes.

Exhibit 5002 at 1150

GRAND JUROR:  Okay.

THE WITNESS:  Yes.  I -- I vaguely remember him asking me some questions at one time or another, what I might know.  And I just told him all I've heard is rumors, Bruce.  I know nothing.  I wasn't there, and rumors are kind of like rheumatoid arthritis, you know.  It's nasty, it's persistent, it hurts.

BY MR. FRASIER:

Q.    Yeah.

A.    You know.  They're not worth passing on, particularly, you know.

GRAND JUROR:  Did you ever get in an argument with him about that?  Do you recall an argument?

THE WITNESS:  You know, I did get in an argument, and I wouldn't really call it an argument.  They were accusing me at Julie's house.  Her and her boy Joe were accusing me of spreading rumors and saying things that weren't untrue -- that were untrue, about Nicholas.  And I told Julie and Joe both at that time, and that was at Julie's house over in North Bend, I said, I don't know what you're talking about, Julie.  I haven't done any of that.

And we've been estranged from the McGuffins and from Julie ever since then.  We were good friends before that, but basically ever since then we've been estranged. I've seen Kathy up at the hospital a few times, either when

Exhibit 5002 at 1151

I'm going in to get testing or when I was up there doing my medical stint, you know, for my EMT certification.

The last time I saw Kathy I asked, you know, How are you doing?  She said, Well, fine if everybody'd quit lying.  And I said, Well, what are you talking about?  And she's, Well, you know.  And I went, Well, I don't know.  And went on about my business.

But -- and there wasn't really argument.  I mean, Julie and Joe kind of put the third degree on me, you know, trying to get me to say some things.  And I told them, just like I told you guys, the only thing I've heard is rumors, and I don't like spreading rumors.  They've come to me, and -- the rumors have, but I don't like to pass them on because, number one, I wasn't there.

I really don't have any personal knowledge of whatever might have taken place with Leah.  Hope it gets solved.  Hope whoever's responsible has to account for it.  But I have no personal knowledge.  You know, I -- like I said, it's rumors.

BY MR. FRASIER:

Q.    Okay.  Do you have any reason to believe that either one of your daughters were involved in Leah's death --

GRAND JUROR:  No.

BY MR. FRASIER:

Q.    Well, it's kind of a tough question to ask,

Exhibit 5002 at 1152

*H.D. Knight*

but --

A.    Well, I -- I mean, I know my daughters better than anybody, and -- and they're just not that kind of people, at all.  They were both very upset about it.  Maggie, my oldest daughter, is engaged to Mark Shields, who is Cory's nephew, you know.  So there's kind of a connection there, you know.  And plus I went to school with the Courtrights, you know, and so I've known them since way back.  And I know that Cory's been really suffering, the family.  And if I'd have known anything, I'd have come forward a long time before now.

Q.    Okay.  These are some questions I've been asking everybody, okay?

Has anybody told you that they killed Leah Freeman?

A.    No.

Q.    Has anybody told you that they saw Leah Freeman being -- that they saw whatever happened to Leah Freeman?

A.    No.

Q.    Okay.  Outside of what I asked you here today, sir, is there anything you think this grand jury needs to know?

A.    Well, a couple of things.  I mean, Makayla back -- back after this had happened, you know, after Leah disappeared, had told me that her and -- and Alicia knew some things, you know.  Couldn't get her to tell me what it was.

Exhibit 5002 at 1153

*H.D. Knight*

The only other thing that I can remember -- and it does stick in my memory because I had a similar experience when I was a teenager.  I was in Frazier's coffee shop one morning, I think it was on a Saturday morning.  And I overhead some kids at a couple of tables behind me and it sounded like they were kind of like making up scenarios, trying to figure out, you know, where Leah was or what had happened to her, and that sort of thing.  And I'd heard one of them say that -- that Nick was very possessive, very jealous.  That he had been looking for her and she wasn't where she was supposed to be, and that he was driving around looking for her, and when he saw her wanted to frighten her and teach her a lesson, um, in driving real close to her at a -- at a pretty good rate of speed.  And this kid said that -- you know, that he felt that Nick had messed up, you know, in his judgment or whatever, and actually hit her.

Q.    Mm-hmm.

A.    When I turned around to see who was -- you know, who this conversation was coming from, I didn't recognize the four boys that were sitting there talking, and they got up and left right away.

Q.    Okay.

A.    Like I say, a similar situation actually happened to me one night coming home from a late dance at the Fairview -- or not Fairview, I'm sorry, the Myrtle Point

Exhibit 5002 at 1154

*H.D. Knight*

fair.

Q.    Mm-hmm.

A.    And I was hitchhiking out of Myrtle Point, in that straight stretch where all the guardrail goes for about a mile there.

Q.    Yeah.

A.    And hitchhiking, and here comes a car, and it was coming closer and closer and closer to me leaning against the guardrail.  And finally at the last second I kind of bailed over the guardrail backwards, you know.  And I really feel that if I hadn't have done that, that those guys would have hit me.

And they screeched to a stop, got out of their car, you know, laughing and joking as I'm crawling up the bank.  And, Here, come on, we'll give you a ride.  I noticed that they were obviously been drinking and I was like, No, you almost hit me.  Get away from me.

And I -- I experienced that --

Q.    Yeah.

A.    -- so that's why it kind of rang true to me when I heard those boys talking about that.  I -- I thought, well, that sounds very familiar (laughing), and turned around to see who it was.

Even though my two daughters were in Coquille for junior high and high school, I knew very few of the kids

Exhibit 5002 at 1155

*H.D. Knight*

because I, you know, live out in McKinley, and was working at the time, and -- and -- through those years.  And -- and I -- I just -- I didn't go to a lot of functions.  A few basketball games, things like that.  My wife Linda, she went to most of the functions, and she knew a lot more of the kids than I did.  So I didn't recognize any of those boys that day.

Other than that, I really can't remember some of the other things.  I know there's probably other rumors that I heard, you know.

Q.    Right.

A.    I just kind of discounted them and let them go.

Q.    Outside of that, is there anything else you know that could help the grand jury here?

A.    Uh, I really don't think so.

Q.    Okay.

A.    I don't think there's anything else I have to offer.

MR. FRASIER:  Does the grand jury want to ask Mr. Knight any questions?

GRAND JUROR:  How well did you know Nick?

THE WITNESS:  Pardon?

GRAND JUROR:  How well did you know Nick?

THE WITNESS:  Well, I knew Nick from the time he was a pretty little guy, you know.

Exhibit 5002 at 1156

*H.D. Knight*

GRAND JUROR:  Would you say --

THE WITNESS:  But as far as hanging out with him or anything, you know, the vast age difference and everything, the few times that I'd seen the McGuffins.  Never been to McGuffins' house.  So it was generally, you know, seeing them in passing.  Seeing him around my -- my daughters or whatever, you know, at some function or something.  So not really very well, you know.

GRAND JUROR:  Okay.

THE WITNESS:  Him or Wayne, either one.  I -- you know.  I knew them.  But closely?  No, not really.

GRAND JUROR:  Did you know Cory very well?

THE WITNESS:  Yes, I -- I remember Cory from school, you know, back in my school days.  And not, you know, real close to her either, but knew her.  Knew her sisters and stuff, out -- like I said, my -- my eldest daughter is engaged to Mark, and that's her nephew.  I don't know how many times have I seen her in my life.  Not very many, other than back in school, you know.  And I believe she was -- can't remember whether she was in front of me or behind me. There was a couple of sisters there, one ahead of me, and I think one behind me.

GRAND JUROR:  You said you were kind of pretty good friends with the McGuffins at one time?

THE WITNESS:  Yeah.

Exhibit 5002 at 1157

*H.D. Knight*

GRAND JUROR:  Did the parents use drugs of any sort, that you were aware of?

THE WITNESS:  Uh, I don't really have any personal knowledge of that.  Um, I know the kids were always, you know, experimenting around and --

GRAND JUROR:  Right.

THE WITNESS:  -- one thing and another.  Most all kids do.  (Laughing.)

Oh, you know, the other thing that I do remember my daughter Maggie telling me, was that her and Makayla had gone to the McGuffins' house, I think where they're currently living now.  Nick had restored -- Nick and Bruce had restored this car, done a complete restoration on it for Nick.  And Maggie and Kayla said they'd gone over there to visit, or whatever they were doing, and they noticed that there was a makeshift like paint booth, a plastic structure in the side yard there.  And that they were working on Nick's car again.  And Maggie goes, Well, what's -- you guys have completely restored that.  What's going on there?

And -- and then she told me that they decided they didn't like the way the -- the trunk had come out, so they were replacing the lining in the trunk and redoing that.  And she thought that was a little strange, in light of that, and also telling me that Nick was acting pretty strange.  He was acting, you know, out of sorts, not normal for Nick.

Exhibit 5002 at 1158

GRAND JUROR:  What kind of time frame was this after she went missing, that they saw that?

THE WITNESS:  That I can't tell you.  I really can't remember.  I'm not sure that Maggie ever told me when that was.  It was sometime after she was found.

GRAND JUROR:  Right.

BY MR. FRASIER:

Q.    Um --

A.    As far as I know.

Q.    Is one of your daughters still here local?

A.    Yes.

Q.    Which one is that?

A.    Maggie.

Q.    Maggie?

A.    Yes.

Q.    I thought I had subpoenaed her, but I'm not seeing her on my list.

A.    I'm surprised that you didn't, you know.  I mean, she's here and --

Q.    Yeah.

A.    -- she probably has some things to offer.  I --

Q.    Yeah, I will.  I will add --

A.    She'd already -- she'd also told me that she's kind of surprised that Mark hadn't been subpoenaed because he had been riding around with Nick at some point earlier,

Exhibit 5002 at 1159

*H.D. Knight*

whatever, that evening, looking for Leah.

Q.    Okay.

A.    And then, you know, it became time for him to go home or do whatever, and they separated, you know.

Q.    Mark who?

A.    Shields.

Q.    Mark Shields, okay.

A.    Yeah, that's -- that's Cory's nephew.  Yeah.

Q.    And just off the top of my head, I've -- and as you can see there's a bit of -- to this case.

A.    Good grief.

Q.    I don't remember Mark's name coming up.  It may very well be in there, but --

A.    Yeah.

Q.    Are they living together?

A.    Yes.

Q.    And --

A.    Yeah, they're engaged.  They have a son together.

Q.    Where do they live?

A.    They just moved.

Q.    Oh, okay.

A.    See if I can remember the address now.  It's on like North 15th Place.  Or East --

Q.    I'll have --

A.    -- 15th Place.  I'm not sure.  I could tell you

Exhibit 5002 at 1160

*H.D. Knight*

on the map, or show you about where it is.  It's -- you know where Milky Way Dairy --

Q.    Yeah.

A.    -- and -- and the feed shop and everything is? It's kind of up on the hill up there.

Q.    Okay.

A.    So you go just past -- coming from Fairview, that first right-hand turn --

Q.    After --

A.    -- that would come into Tenth Street, and that's sort of thing --

Q.    Right.  Yeah.

A.    You take that right-hand -- or left-hand, I'm sorry, turn there, and -- and then another left, and it goes up that gravel road that goes up the hill --

Q.    Right.

A.    -- there.  They just moved up there.

Q.    Okay.  I'll have the police go talk to them.

A.    Yeah.

Q.    Okay.

A.    Yeah.  Easy to find.

Q.    Okay.  All right.

A.    I mean, I could give you her phone number, if it would help.

Q.    Do you know the phone number off the top of your

Exhibit 5002 at 1161

*H.D. Knight*

head?

A.    Yeah.  503 --

Q.    503.

A.    Yeah, it's a cell phone.

Q.    Okay.

A.    881 --

Q.    881.

A.    -- 5628.

Q.    5628.

A.    Yeah.

Q.    I'll have the police go looking for them.

A.    Yeah.  Yeah.  The last time I talked to Maggie, I think it was last week -- no, actually I talked to her yesterday.  But the time I talked to her about that I was going to be coming in to grand jury, she's, Yeah, I'm really surprised that they didn't serve Mark and I with the subpoenas.

Q.    Well, I thought I had her at least, so --

A.    Yeah.

Q.    -- I will take care of that.

A.    Yeah.  Okay.  Yeah.

GRAND JUROR:  The Mustang -- the vehicle, the blue Mustang, that Bruce and Nick --

THE WITNESS:  Restored?

GRAND JUROR:  -- restored, did you get to see it

Exhibit 5002 at 1162

when it was restored?

THE WITNESS:  Got to think about that for a minute.

GRAND JUROR:  In particular, did you ever see what they did with the trunk?

THE WITNESS:  I --

GRAND JUROR:  What did they -- how did they restore that?

THE WITNESS:  No, I didn't see anything that --

GRAND JUROR:  Or did you hear anything?  Did they put a liner in?  Put white --

THE WITNESS:  I think I saw it -- or one of the girls, you know, riding with me, said, Oh, there's -- there's Nick's car that he restored.  You know, and pointed it out like at the high school parking lot or someplace.  And so I -- you know I'd seen it then.

Maggie said that she was kind of surprised that -- that after having restored this car from top to bottom, side to front, the whole thing and everything, and including the trunk -- and that she had seen the trunk, and it looked real nice and everything.  You know, the whole interior of the car.  Why would they be ripping that out and doing it over again?

And -- and their -- they told her, said, Well, we just didn't like the way it came out, so we're doing it over

Exhibit 5002 at 1163

again.

MR. FRASIER:  Okay.  Any other questions for Mr. Knight?

Okay, sir.  I think that will do it.  You're free to go.

THE WITNESS:  Okay.

GRAND JUROR:  Thank you.

MR. FRASIER:  Thank you for coming in.

THE WITNESS:  All right.  Hope I helped.  Like I said, I don't know much.

(End of recording.)

--oOo--

I certify, by signing below, that the foregoing pages 1 through 131 constitute a correct transcript of WAV files provided of the above-entitled matter, this 1st day of April, 2011.

_____

PEGGY S. JILLSON, TRANSCRIBER

Exhibit 5002 at 1164

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

**STATE OF OREGON,**            )
                                )
          Plaintiff,            )  Case No. 10-CR0782
                                )
v.                              )
                                )
**NICHOLAS MCGUFFIN,**          )
                                )
          Defendant.            )
_____)  VOLUME 10

Wednesday, August 11, 2010

(Afternoon session)

GRAND JURY PROCEEDINGS

APPEARANCES:

FOR THE PLAINTIFFS:      **PAUL FRASIER**
                         **DISTRICT ATTORNEY**
                         250 N. Baxter
                         Coquille, Oregon 97423

TRANSCRIBED FROM AUDIO RECORDINGS

TRANSCRIBED BY:          Peggy S. Jillson
                         987 Tivoli Street
                         Eugene, Oregon 97404
                         (541) 689-7964

Exhibit 5002 at 1165

## WITNESS INDEX

MERCER, Thomas                     3

GRISHAM, Georgia                  11

DAVIDSON, Erika                   29

McOWEN, Lisa                      50

STEVENS, Kyla                     57

COOPER, Troy                      68

NELSON, Sharon                    76

NORTNESS, Mark                    86

DENNIS, Donna                     92

JONES, Cynthia                    97

KNIGHT, Magdalena                105

SHIELDS, Mark                    113

DANNELS, Mark                    118, 147

Exhibit 5002 at 1166

3

*T. Mercer*

**COQUILLE, OREGON; Wednesday, August 11, 2010; 5:42 P.M.**

-o0o-

**TESTIMONY OF THOMAS MERCER**

(Witness sworn, appearing by telephone.)

BY MR. FRASIER:

Q.    Okay.  Mr. Mercer, this is the grand jury for Coos County.  We're looking into the disappearance and death of Leah Freeman.  We are recording it on our end, so I have to tell you that we're doing that, okay?

A.    Yes.

Q.    First off, if you'd tell us your name please, sir.

A.    Uh, I'm Thomas G. Mercer.

Q.    And Mr. Mercer, were you previously employed by the Coquille School District?

A.    Yes, I was.

Q.    When did you work for the Coquille School District?

A.    Uh, my time in Coquille was -- began in the fall of 1995 and ended in the spring of 2000.

Q.    You currently live in California; is that correct?

A.    Yes, I do.

Q.    And for health reasons, you've asked to appear today by video conference.

Exhibit 5002 at 1167

A.    Yes.

Q.    All right.  Mr. Mercer, while you were -- well, what was your occupation, or what was your position at Coquille High -- with the Coquille School District?

A.    I was a -- excuse me.  I was a -- my official position was as a -- just as teacher.  Became a tenured permanent teacher at Coquille High School.  I taught about 18 different subjects over the course of my time at Coquille, which was approximately five years.  I was also a football coach for several years at Coquille High School, and I was also a track coach at Coquille High School.  I was also -- one of my assignments was as the student council advisor.

Q.    While you were working at Coquille High School, did you become acquainted with an individual named Nicholas McGuffin?

A.    Yes, I did.

Q.    And he was a student there at the high school?

A.    He was a student at the high school, yes.

Q.    Did he also play football, to your recollection?

A.    Yes, he did.  He played football, and as I recall he also played baseball, but I was not involved with the baseball program.

Q.    Mr. Mercer, we had subpoenaed from the high school some records pertaining to Nicholas and his behavior, and one of the things that I noted is that there seemed to

Exhibit 5002 at 1168

*T. Mercer*

have been some issues with you and Nicholas, at least in the fall of 1999.  Do you recall any of these types of incidents?

A.    I -- I recall that there were a number of incidences.  They were during my time at Coquille and the time of Mr. McGuffin's time at Coquille.  We had a number of different, uh, issues.  Um, I know that there -- and I -- and I very honestly can't tell you if it was at that exact time, but there had been issues, not only behavior in the classroom, behavior on the football field, as well as one time -- and I do not recall because it has been 11 years, I believe -- where I caught the individual using marijuana in the school parking lot.  It -- as I recall, it was reported.  But I do not remember what the follow-up, if any, there was with that incident.

Q.    I have here in the records here there was an incident in September of 1999 where Nicholas McGuffin directed profanity at you.  Do you recall something along that line?

A.    Mr. Frasier, without -- and without trying to be flippant about an answer like this, that was not an unusual circumstance with Mr. McGuffin using profanity directed at myself.  So, if -- if the records indicate that, it was a situation that, yes, did happen.  And it was one time it was something that was reported, you know, on the school records.  But it certainly was not the only time that that had happened

Exhibit 5002 at 1169

*T. Mercer*

at the time that Nick or any of those students were at the high school.

Q.    Okay.  Well, in your -- you -- I think you kind of mentioned that -- well, let me ask you this:  Did you -- did you and Nick have any issues or problems there at the high school?

A.    Yes, we did.

Q.    Could you describe, somewhat, those issues.

A.    The issues that I had as -- as Nick moved his way through Coquille High School was a pattern of insubordinance, defiance, truancy.  There was his association with others.  He knew that I did not agree with things that I was hearing, not only that he was talking about but others that were talking about, about social behavior and things that he was involved in which he knew that was not acceptable to me.

And I have felt was -- at the time, but still am, very vocal in my opposition to that kind of behavior.  And I'm sure that there were some in -- influences that -- on Nick himself, that contributed towards his feelings against me.

Q.    Now you mentioned social behavior.  What -- issues that he had there.  What are you talking about, sir?

A.    His -- as -- as -- as Nick moved through Coquille High School, he became much more aggressive towards other students.  Much more, as far as bullying.  Much -- again,

Exhibit 5002 at 1170

7

*T. Mercer*

much more defiant.  And the use of drugs, the use of alcohol, was not only becoming more and more apparent, but it was becoming very common knowledge amongst the student body.  And overhearing him talk, and others talk with him about what was going on.

Q.    I think you earlier said that there might have been an issue with him when he was playing football.  Did I misunderstand you, or was there an issue there?

A.    He would -- it was just the -- the typical issues that a coach and a player would -- would have.  But the kind of issues that, if you are having some difficulties or issues that are outside of football, outside of practice, become magnified when you try to correct or discipline a player because of their attitude or their behavior.  Because they tend to take it more personally because they also know that they're going to be in your classroom on the next day.

Q.    Okay.  Did you -- or were you acquainted with Leah Freeman at all?

A.    Uh, no, sir.  I'm not saying that I had never met her.  I know that she was there at the high school.  But that last year, I believe it was her first year, I did not have a freshman class, and I don't recall having any personal relationship with her.

Q.    Were you aware that Nick and Leah, at least for some part of the school year, at least the last half of the

Exhibit 5002 at 1171

school year, were a couple or boyfriend/girlfriend?

A.    I knew that Nick had a girlfriend, but I could not say that it was Leah Freeman because I -- I honestly did not know her personally.  I did know that he had a girlfriend.  That's all I can really say.

Q.    Mr. Mercer, had -- I -- is there anything else about Nick's behavior at the high school, or what you saw, that you think the grand jury ought to know in this case?

A.    Well, actually, sir, there's a lot of things I guess maybe one could say.  And trying to be as helpful as possible, but also being as appropriate to the grand jury and to yourself, and to be helpful in this case, I do know that there was problems that were created by his older brother --

Q.    Uh --

A.    -- and his re -- his older brother's relationship to me.  And that affected our relationship.  And with activities that Nick became more and more involved in, and others that were associates of his older brother that he spent a lot of time with, particularly his junior and senior year.

And those activities were well-known around -- around town, at the high school.  And they weren't of a positive nature, whatsoever.  Again, he continued to get much more defiant.  He was -- became much more indifferent about anything when it came to school or schoolwork.  There were

Exhibit 5002 at 1172

many more instances where there was classroom discuss -- disruptions, where Nick was asked to leave or was disciplined in some manner.

And in many cases -- and this may be kind of a flaw somewhat in our system, was the fact that not everything that happens one day in a classroom gets written up because we're trying to deal with problems as we -- you know, as much as we possibly can right at the particular time.

Q.    You mentioned his older brother.  Is that Wayne McGuffin?

A.    Yes, it is, sir.

Q.    And there were discipline issues at the high school involving Wayne too.  Is that right?

A.    Yes, sir.

Q.    And you were involved in some of those issues with Wayne McGuffin; is that correct?

A.    Yes, sir.

Q.    I'll throw this out there.  There's been at least some people that are saying that you were -- you treated Nick differently because of his brother Wayne.  In other words, you would pick on Nick because of Wayne, what Wayne did with you.  How would you respond to that, sir?

A.    My response to that would be that I didn't treat Nick differently because of Wayne.  Nick's treatment was in part the result of his association in activities with Wayne.

Exhibit 5002 at 1173

*T. Mercer*

MR. FRASIER: Okay. Mr. Mercer, I don't have any more questions that I'd like to ask you. I'd -- I'll ask the grand jury if they want to ask you anything.

GRAND JUROR: Mr. Mercer, did you -- did you know if they were having trouble with their parents, or did you know the parents of Wayne and Nick?

THE WITNESS: I don't know of anything specifically, when it comes to their parents. And honestly, I was there for five years. I don't ever recall -- and I'm not saying that it didn't happen, but I don't recall of actually having inter -- interaction with their parents, whether it's when they were playing with us -- involved in athletics or a back-to-school night or parent night.

More than likely I had an opportunity to actually -- to meet them and say hello, when we would have, for example, our football orientation meeting or something like that. But there was nothing as far as any real meetings that I can remember.

GRAND JUROR: Sir, did Wayne also play football? Is that part of how you knew him?

THE WITNESS: Yes, he -- yes, he did, sir.

GRAND JUROR: His activity in the community and stuff that you're referring to, and his brother being involved in that you didn't agree upon, what exactly are you talking about?

Exhibit 5002 at 1174

THE WITNESS:  What I'm making reference to is the activity in underage drinking, underage tobacco use, drug use, the selling of drugs, the use of drugs on campus.  And providing minors -- even though they were minors themselves, the providing minors with tobacco and alcohol and drugs.

GRAND JUROR:  Okay.

GRAND JUROR:  That's it.

GRAND JUROR:  That's it for me.

MR. FRASIER:  Mr. Mercer, I believe that's all the questions we have for you.  Thank you for coming in and going to the DA's office there to help us out here.  We appreciate you appearing and testifying here today.

THE WITNESS:  Well, I'm glad to do it.  And -- and please know that I am -- I am sorry that I could not make the trip and be there in person.  But if there is anything that I can do to -- to help the people of Coquille in this situation, please let me know, and I will try to make myself available as best as I possibly can.

MR. FRASIER:  All right.  We appreciate that, sir.  Thank you, and we'll turn off the recordings at this time.

### TESTIMONY OF GEORGIA GRISHAM

(Witness sworn.)

BY MR. FRASIER:

Q.    Ma'am, this is the grand jury for Coos County,

Exhibit 5002 at 1175

*G. Grisham*

and they're looking into the disappearance and death of Leah Freeman.

A.    Yes.

Q.    Okay?

A.    Okay.

Q.    We're recording everything.  I got to tell you, we're recording.

A.    Okay.

Q.    Okay?

A.    That's okay.

Q.    All right.  So, first of all, could you tell us your name and where you live.

A.    I'm Georgia Grisham, and I live out at Fairview, in Coquille here.  I have for 44 years.

Q.    Okay.  Somebody told me today you're 91.  Is that right?

A.    Yeah, that's right.  I was 91 the 4th of July.

MR. FRASIER:  All right.

GRAND JUROR:  Yeah, all right.

GRAND JUROR:  Congratulations.

GRAND JUROR:  Congratulations.

GRAND JUROR:  Celebrated at 90-year-old thing downtown, here?

THE WITNESS:  Sir?

GRAND JUROR:  Were you celebrated at the -- that

Exhibit 5002 at 1176

thing down at City Hall?

THE WITNESS:  No.  I stayed home.  (Laughter.)

No, I'll take it back.  I went and played bingo.

GRAND JUROR:  Oh, okay.  (Laughter.)

BY MR. FRASIER:

Q.    Well, I hear you like to play bingo a lot.

A.    I do.

Q.    Okay.

A.    That's my vice.

Q.    Your vice is bingo.  Okay.

Ma'am, ten years ago Leah Freeman disappeared.

A.    Yes.

Q.    And I have information that on the night that she was last seen, which I think was June 28th, 2000, you were coming back from bingo that night.

A.    That's right.

Q.    Okay.  Where were you playing bingo that night?

A.    At the casino.

Q.    Over in Co -- in Coos Bay?

A.    In Coos Bay, yes.

Q.    All right.  Do you recall what time in the evening it was when you were coming back?

A.    Well, the best I can remember, I think it was a little after 10:00.  Just a few minutes after 10:00.  Because they got out usually around a quarter to -- to 10:00.  And

Exhibit 5002 at 1177

*G. Grisham*

it -- it took me that time to come over.

Q.    Okay.  So you drove straight back from --

A.    Yes, I did.  I always do.

Q.    Okay.  Didn't stop at the grocery store or get gas or --

A.    No.

Q.    -- anything like that?

A.    No.

Q.    Okay.  Now, I've been told that you saw Leah someplace?

A.    Yes.  As I was heading from Coos Bay, up there by Roseburg Lumber, there was a car parked, and there was two people.  I don't -- I can't remember if they were men or women, because it was dark.  But there was two people, I remember that.

And when I came on down and turned on the road there, West Central, to come home out to Fairview, why, this girl come just real fast right across, staggered right out across there in front of me, and all -- I almost hit her.  If I hadn't have been on my best behavior and watching what I was doing, I would have hit her.  But I wheeled over to the left side of the road, because she came right off of that post there, that says "Welcome to Coquille Oregon" on it.  Big post.  There's a great big long pole there.  And that's where she came across that.

Exhibit 5002 at 1178

And the only thing I could think of, what maybe -- what happened, what I thought of at the time, well, maybe that those people out there had broke down and sent her to get help.  That's the only thing I could think of.  But I thought, My God, why would they send her when they could go -- one of them go theirself, you know.

And then I come on home, and I was shaking so badly, just, I just -- I just was like that.  I was scared to death because I almost hit her, like I said.  If she had been another two or three feet ahead, I would have hit her.

Q.    Okay.

A.    I couldn't have missed her.  But I didn't hit her, thank God.

Anyway, I went home.  And my husband is always in bed by that time, but he was up.  And I said -- he said, What's the matter with you?  And I said, You know, I just almost hit a young girl tonight.  And he said, What?  Where?  And I told him.  And he said, Well, what was she doing out there?  I said, I don't know, but she just come a-staggering right out in front of me there, come across there.  And I said I just had to whip real hard to keep from hitting her.

Q.    Okay.

A.    And I said I didn't want to hit nobody, and he said, No, you don't.  So I went to bed, but I didn't do too much sleeping that night, I'll tell you.

Exhibit 5002 at 1179

16

*G. Grisham*

Q.    Okay.  Now, did you know prior to this -- are you okay?

A.    What?

Q.    Are you okay?

A.    Yes.

Q.    Let me get some kleenex.

A.    Do I know her?  No, I didn't know her.  (Crying.)

Q.    You didn't know her?

A.    I never saw the girl before.

Q.    Okay.

A.    So, when it came out in the paper, that was Red said, Well, do you want to call the cops and tell them?  And I said no.  But when it came out in the paper there, the next day --

Q.    Mm-hmm.

A.    -- I said, By God, that's the girl I almost hit.

And he said, Well, we'll go down there and you can report it down at the -- town.  So we came down to the courthouse, and it was all -- it was closed.  So I said, Well, I'll go over to the City Hall.  And I went over to the City Hall, and I took the policeman out there and showed him exactly where she was at.

And I don't remember if I told him then, that day, or not about the people that I saw up there with the rig parked up there, because it was dark and I just -- because I

Exhibit 5002 at 1180

17

*G. Grisham*

come around the -- the road there, I saw them parked there. But I don't know -- I couldn't swear if it was men, women, or both. I don't have any idea. But I do know that there was two people by that -- out setting out by that vehicle.

And so I showed the guy that. And so then it's been -- was -- oh, it must have been a couple of months or so, they wanted me to come back in, and I went and I took these cop -- city policeman out there again, and showed him exactly what -- where I had seen it and everything.

Q.    Okay.

A.    And where it was at, and what -- where it -- where she was at, and where I saw the -- the rig up there and the people with it.

And that's all that -- and then I -- the -- here, a while back, the -- I didn't think any more about it. I mean, well, every time I go by there, I see her running out, cutting -- you know, coming out across. Every time I turn in there, I see that person.

Q.    All right.

A.    And --

Q.    Do you remember what she was wearing that night?

A.    It was dark, and the light is across the street over there.

Q.    All right.

A.    And it didn't show up very much. I just saw --

Exhibit 5002 at 1181

you know, when something happens that quick, you don't have time to take a good look at what people are wearing or anything.  But, it was -- to me, like, it seemed like it was something kind of dark.  I don't remember.  I really couldn't tell you about that.

Q.    Okay.

A.    But then later on, here -- well, not too long ago, a policeman, I think from Bandon, and the state police --

Q.    Okay.

A.    -- came down to the restaurant.  I was down here at the restaurant, at the Devil's Kitchen.  And they wanted to talk to me.  And I said, What have I done now?  You know, just something like that, you know?  And he said, Nothing, it was pertaining to that Freeman case.

Q.    Okay.

A.    And I said, Well, I'll tell you just exactly what I've told everybody else.

Q.    Okay.

A.    And that's all I did.

Q.    All you can tell us.

A.    Yeah.

Q.    All right.

A.    That's what I remember, and that's -- but like I said, every time I go turn on road, I see that person.

Exhibit 5002 at 1182

*G. Grisham*

Q.    Okay.

A.    You know, it's there.

Q.    All right.  Anything else that you know about this case?

A.    No, not anything else.  I don't know anything else.  I don't know the people or anything.

Q.    Okay.

A.    And the -- but --

GRAND JUROR:  Do you remember the kind of rig that was -- do you remember the kind of car that was by -- that the two guys were by?

THE WITNESS:  No.  It was dark.  It was dark up there where they were parked.  You know where that -- the retaining -- or the cup -- the guard, guardrail did all the way around?  Well, they were parked right in there.  There's a wide spot right there at the kind of end -- at the end of that.  And that's where the car was parked.  And I just come -- you know, when you're driving you don't pay attention to what's off to the side.  The only thing, I did see two people.

MR. FRASIER:  Right.

THE WITNESS:  And I couldn't swear if my life depended on it if they were men or women or both.  Now, I could not tell you.  Or their -- but they were there that night.

Exhibit 5002 at 1183

MR. FRASIER:  Right.

THE WITNESS:  And that's all I --

GRAND JUROR:  You said this was about what time?

THE WITNESS:  A little after 10:00, because it's around 10:30 when I get home.  And I don't know exactly what time they close over there at the, you know, at the Mill. At --

GRAND JUROR:  And you live out in Fairview a little ways?

THE WITNESS:  Yes.  I live 10 miles out.

GRAND JUROR:  Oh, okay.

THE WITNESS:  And I -- it usually takes me about 15 to 20 minutes to get out there, if I drive sensible.

GRAND JUROR:  Yeah.

THE WITNESS:  Let's put it that way.

GRAND JUROR:  (Indiscernible.)

THE WITNESS:  Sometimes I don't drive very sensible.

GRAND JUROR:  So, did -- oh, I'm sorry.

GRAND JUROR:  No, go ahead, Ruth.  Go ahead.

GRAND JUROR:  So did you think it was the young lady that you hit?  Did you think it was a girl that you hit?

THE WITNESS:  Yes, it was -- yes, it was a girl. Yes.  Because I -- she was right in front of me.  She was close as me to you.

Exhibit 5002 at 1184

GRAND JUROR:  Could you --

THE WITNESS:  When I --

GRAND JUROR:  -- see what color her hair was?

THE WITNESS:  Huh?

GRAND JUROR:  Could you see what color her hair --

THE WITNESS:  Honey, I didn't take time to look at nothing.  I said, Oh --

GRAND JUROR:  Okay.  But you think it was a little girl?

THE WITNESS:  -- and I -- all I was thinking was, get away; don't hit her.  Hit it, you know.

GRAND JUROR:  Okay.

THE WITNESS:  That's the only thing I was thinking about.

GRAND JUROR:  Now, this -- I'm just trying to place it all together.  This was just before you turned to --

THE WITNESS:  I had just turned off the road -- highway, in the turn-around there.  And you -- you can go out there and look.

GRAND JUROR:  Right by the Econo-Rooter and --

THE WITNESS:  Huh?

GRAND JUROR:  Right by Maytag, at the time.

GRAND JUROR:  The Econo-Rooter and stuff, that's right there?

Exhibit 5002 at 1185

22

*G. Grisham*

THE WITNESS:  Yeah.  Right across there, yes.  I had turned off the highway, and just made my turn and come around.  And I just got up on the West Central there --

MR. FRASIER:  Right.

THE WITNESS:  -- when the -- she came just darting out, right -- right by that -- by that pole.

GRAND JUROR:  What was she doing --

GRAND JUROR:  Now I've got it.

THE WITNESS:  Huh?

GRAND JUROR:  What did she do?  Was she just crossing the street, or was she like indicating -- trying to get you to stop?

THE WITNESS:  Sir, I couldn't tell you if she was -- if she was trying to get out in the road, or what.  I mean, I really couldn't tell you.  Because the only thing I was thinking about was don't hit that person.  You know, how you -- something like that.  Because --

MR. FRASIER:  Right.

THE WITNESS:  -- God knows you don't want to hit somebody.

GRAND JUROR:  Oh, yeah.

THE WITNESS:  Because I've had a couple weirdos trying to stop me at night, going home.

GRAND JUROR:  Yeah.  Yeah.

THE WITNESS:  And I've always managed to get away

Exhibit 5002 at 1186

*G. Grisham*

from them because -- and I keep my rig always locked when I'm driving.  I always lock my car.  So, that's -- it's --

GRAND JUROR:  The vehicle with the two individuals, that was past that little Cedar Point -- now it's called Cedar Point Industrial Park --

THE WITNESS:  Well, no.  Now, listen --

GRAND JUROR:  So, you're down the hill from that, right?

THE WITNESS:  You know where the -- at the end of the -- there's a guardrail that goes up on the side of the road, all the way up there to -- to where they all make them -- that -- there's big draw piles and things in there now.

GRAND JUROR:  Yeah, right.  Exactly.

THE WITNESS:  Okay.  And it was right there.  The rig was parked right at the end of the --

GRAND JUROR:  The guardrail.

THE WITNESS:  Those guard-ways, there.  Right off the road, yes.

GRAND JUROR:  How far away was the girl from the car?

THE WITNESS:  Oh, it's quite a ways down there.

GRAND JUROR:  Oh, okay.

THE WITNESS:  And that's what made me think, well, why would you send someone -- that's the only thing I

Exhibit 5002 at 1187

could think of.  They had broke down or something, and was sending somebody that -- to get help.  And I thought, well, that don't make sense either, this time of the night.  Where would you go?  You know.

But it's -- it's -- it's weird.  It was weird.  I mean, it's something that I hope never happens to me again.  Let's put it that way.  Because it's something that I -- I don't want to go through again, let's put it that way.

MR. FRASIER:  Mm-hmm.

THE WITNESS:  Because, like I said, I never turn onto that road now, but what I don't see her, right there.

GRAND JUROR:  But you saw enough of her so that when her -- when a picture of Leah was in the paper, you recognized that person?

THE WITNESS:  Yes.  I did just the minute that I saw her.  I said, Red, that's the girl that I almost hit.

MR. FRASIER:  Okay.

THE WITNESS:  And he said, Well, we go in and report that.  So we went right in to the courthouse, and they -- it was closed, so I went over to the City Hall and reported it.

(Pause.)  And so -- and I had took the cops out there two different times to show them.

GRAND JUROR:  Now, was the -- you said the Mill Casino.  Was it the Mill Casino, or was it somewhere else?

Exhibit 5002 at 1188

*G. Grisham*

Where did you play bingo at?

THE WITNESS:  At the Mill Casino.

GRAND JUROR:  The Mill?  Really?

THE WITNESS:  They used to play bingo there.

GRAND JUROR:  Oh, okay.

THE WITNESS:  All the time.  Yep.  I played there day and night, probably.  (Laughter.)

GRAND JUROR:  Well --

THE WITNESS:  Shouldn't tell that, but --

(Laughter.)

GRAND JUROR:  Thank you.

MR. FRASIER:  Okay.  Anything else?

THE WITNESS:  Well, I told them --

GRAND JUROR:  When you drove by them, did you put those two together; the car with the two people standing near it, and the girl?

THE WITNESS:  Well, you know, after it came -- after that came out, I did.  I kind of -- could they have been up there waiting on her?

GRAND JUROR:  Could they have been related?  But you say there was some distance between them, so it's --

THE WITNESS:  Yeah, there's quite a bit of distance.  Yes.

GRAND JUROR:  Was there anything else that made you think that -- like she knew that there were two people

Exhibit 5002 at 1189

there, or they knew that she was there?

THE WITNESS:  No.  No.  Huh-uh.

GRAND JUROR:  Okay.

THE WITNESS:  But it just --

GRAND JUROR:  I mean, it's late at night. There's not many people walking.

THE WITNESS:  Yeah, at late at night, and you're wondering.  Why would there be two people up there, and then her coming this way?  Just --

GRAND JUROR:  Okay.

THE WITNESS:  -- you know.  That's what -- because I couldn't figure out who it was or anything.  Well, I didn't know, you know, or anything.  And, like I'd -- as far I'm concerned, I had never seen the girl before in my life.  But it just -- right there.  And it's still there. And it'll probably always be there.  But -- anyway.  But I -- to the best of knowledge, my knowledge, I have told you all that I can -- can tell.  I mean it.

GRAND JUROR:  When she -- I assume that the girl saw you at some point?

THE WITNESS:  Huh?

GRAND JUROR:  The girl saw you driving at some point.  Did she try to get off the road?  She just ran there? Or she just kept coming?

THE WITNESS:  No, she just kept coming right at

Exhibit 5002 at 1190

*G. Grisham*

me, straight at me.  What --

GRAND JUROR:  Was she trying to flag you down?

THE WITNESS:  No, huh-uh.

GRAND JUROR:  Okay.

THE WITNESS:  But I -- the only thing I thought maybe was that, when I turned, my lights might have blinded her.  But I -- because -- well, she wasn't walking normal.  Let's put it that way.  Walking or running normal, whatever you want to say.  It wasn't normal, on trans -- moving.

GRAND JUROR:  Staggering, or --

THE WITNESS:  Huh?

GRAND JUROR:  Was she staggering, or what was --

GRAND JUROR:  It kind of looked like she was --

GRAND JUROR:  Weaving?

THE WITNESS:  Weaving, or something.

GRAND JUROR:  Like she was (indiscernible.)

THE WITNESS:  I don't know exactly what you would say, how it would be.  But she wasn't -- well, I don't know exactly how to say it because it was -- she wasn't coming right straight at me, you know.  But, it just -- but all I could think of was getting that car out of the way, and I --

GRAND JUROR:  Sure.

THE WITNESS:  I was driving a Chevy van.

GRAND JUROR:  Did you -- did you -- did you think to stop?  Did you clear her by enough that you realized you

Exhibit 5002 at 1191

28

*G. Grisham*

did not hit her?

THE WITNESS:  Yeah, I knew I hadn't hit her.  I knew I hadn't hit her.

GRAND JUROR:  Okay.  That's what I mean.  Yeah. So, you had no reason to pull over or stop or --

THE WITNESS:  No.  No.  Huh-uh.  I did not.

GRAND JUROR:  It just scared you real bad.

THE WITNESS:  It just scared the H out of me, I'll tell you.  It really did.  And -- but, I was -- I shook all the way home.  I don't know how I ever drove home, to be truthful with you.  Because it -- it was so exasperating, you know, to come so close to hitting somebody, and not.  But no, I did not hit her.  I --

GRAND JUROR:  Well, yeah.  I -- I understand.

THE WITNESS:  Yeah.

GRAND JUROR:  It's been -- you know, I thought maybe --

THE WITNESS:  Yeah.  No.

GRAND JUROR:  -- you thought you had hit her.

THE WITNESS:  Huh-uh.  No.  But like I said, I was driving a Chevy van.

GRAND JUROR:  Mm-hmm.

THE WITNESS:  And --

GRAND JUROR:  Okay.

THE WITNESS:  So, just -- oh.

Exhibit 5002 at 1192

MR. FRASIER:  Okay.  Any other questions?

THE WITNESS:  Anybody else want to know anything? I can tell you if I can.

MR. FRASIER:  Okay.

GRAND JUROR:  Ma'am.

MR. FRASIER:  That's it.

GRAND JUROR:  Thank you very much.

GRAND JUROR:  Thank you.  Happy birthday.

GRAND JUROR:  Thank you.

THE WITNESS:  Oh, I've already had that.

GRAND JUROR:  That's for the next one.

(Laughter.)

THE WITNESS:  No, there's going to be nine more.

### TESTIMONY OF ERIKA DAVIDSON

(Witness sworn.)

BY MR. FRASIER:

Q.    Ma'am, while I'm standing here, before I go over and sit down, this is the grand jury for Coos County.

A.    Okay.

Q.    And they're looking into the disappearance and death of Leah Freeman.  It's obvious, but I got to tell you, we're recording everything here today.

A.    Okay.

Q.    All right.

A.    That's fine.

Exhibit 5002 at 1193

*E. Davidson*

Q.    First of all, could you tell us your name and where you live.

A.    My name is Erika Anne Davidson, and I live in Port Orchard, Washington.

Q.    How long have you lived in Port Orchard?

A.    Three years.

Q.    Okay.

A.    About.

Q.    Do you know an individual named Bill Sero?

A.    Yes, I do.

Q.    How do you know Mr. Sero?

A.    I have two children with him.

Q.    Did you folks actually live together for a period of time?

A.    We lived together, probably, for -- (pause) -- probably six, seven years.

Q.    And when you lived together, did you live together here in Coos County?

A.    Yes.

Q.    When did you live in Coos County?

A.    Well, I lived in Coos County pretty much all my life until --

Q.    Well, when did you move to Washington?

A.    Um, 2005.

Q.    2005?

Exhibit 5002 at 1194

*E. Davidson*

A.    No, 2007.

Q.    2007.

A.    Yeah, sorry about that.

Q.    And prior to that you lived here in Coos County?

A.    I lived in Portland, Oregon, as well.

Q.    Okay.  Year 2000 --

A.    '05 to '07.

Q.    Okay.  Year 2000, were you living here in Coos County?

A.    Yes.

Q.    Did you actually live here in Coquille?

A.    I did.

Q.    Were you living with Mr. Sero at least for a period of time in 2000?

A.    Yes.

Q.    When were you living together with Mr. Sero, and where did you guys live?

A.    We lived -- I don't remember name of the street. It's -- I can't remember.  It's across from the Little Devil Restaurant now.

GRAND JUROR:  Knott.

MR. FRASIER:  Okay.

THE WITNESS:  Up in that area.

GRAND JUROR:  Knott Street?

THE WITNESS:  Yep.  Up off of there, and in some

Exhibit 5002 at 1195

*E. Davidson*

apartments.

BY MR. FRASIER:

Q.    Okay.  Sometimes referred to as Sanford Heights?  Okay.

A.    I don't know.

Q.    All right.  Did you live there in that apartment the whole year of 2000?

A.    No.  Actually, I didn't live there very long at all.

Q.    Okay.  The summer of 2000, were you living there at that time?

A.    I don't -- I don't remember like what --

Q.    Okay.  Did you have a job?

A.    Yes.  I worked at the Mill Casino --

Q.    Okay.

A.    -- in North Bend.

Q.    Now, did you ever meet or know Nick McGuffin?

A.    Yes.

Q.    How did you know Mr. McGuffin?

A.    I met him through my brother, Ryan Davidson.  They all went to school together.

Q.    Okay.  Did you know Leah Freeman at all?

A.    I didn't personally know her, but I worked -- I knew who she was.  I worked, um, with her dad when I think I was like 15 or 16.  And I knew Nick, so I knew that that was

Exhibit 5002 at 1196

*E. Davidson*

his girlfriend at the time.

Q.    Okay.  Did you ever see those two together?

A.    I'm going to say probably.  Maybe driving -- driving somewhere or something.

Q.    Okay.

A.    But we didn't -- we didn't --

Q.    All right.

A.    Yeah.

Q.    Do you have any recollection of when Leah Freeman disappeared?  Do you remember which -- you know, this happened towards the end of June, June 28th, 2000.  Do you have any recollection where you living with -- or where you were living at that time, anything along that line?

A.    Yeah.  I was living here in Coquille.

Q.    Okay.

A.    Up on -- off Knott.

Q.    Okay.

A.    And then from there I moved to North Bend.

Q.    Okay.  And were you living with Mr. Sero when you were living off of North Knott?

A.    Yes.

Q.    Okay.

A.    Like I said, we didn't live there very long.  Um, I got evicted.

Q.    Okay.

Exhibit 5002 at 1197

*E. Davidson*

A.    I was at work one day, and some people were over, and they were probably talking about things that were inappropriate.  And I came home from work and had an eviction notice on my door.

Q.    Okay.

A.    So I -- like I said, we didn't live there very long.

Q.    All right.  Now, you -- I'm sure you've heard the rumor floating around town that Bill Sero and Tom Stemmerman killed Leah Freeman.  Is that --

A.    I heard -- I've heard some -- something along those lines, yeah.

Q.    All right.

A.    Melissa [sic] Michaud and, um, Tom Stemmerman.

Q.    Okay.

A.    And Bill Sero.  Everybody said that -- that Bill Sero was weird and acting weird and all that.  So yeah, I heard that.

Q.    Okay.  Well, you're living with him at the time. Did he get weird on you?

A.    Well, he was on methamphetamines.

Q.    Okay.

A.    So, to me, people that are on that are weird.

Q.    Okay.

A.    Act weird, you know.

Exhibit 5002 at 1198

Q.    Mm-hmm.

A.    And he acted -- he --

Q.    We've heard some testimony, I forget the lady's name right off the top of my head, that had brought her kids over to be baby-sat.  And she puts it on the night that Leah disappeared, and said you were home and Bill was home, and you baby-sat for their children that evening.  Do you -- does that --

A.    That I baby-sat her kids?

Q.    Either you or Bill did, or both of you.  I can't remember the woman's name --

A.    I don't --

Q.    -- right off the top of my head.

A.    That's 10 years ago, so it's like hard to -- but I don't recall me baby-sitting anybody's kids.

Q.    Okay.  It was -- let me --

A.    I had my own kids.  I mean --

Q.    Okay.

GRAND JUROR:  Maybe it was a situation where you guys --

GRAND JUROR:  Where you switched off?

GRAND JUROR:  Yeah.

THE WITNESS:  I don't even remember that.

GRAND JUROR:  You know, you watched her kids, and she watched your kids.

Exhibit 5002 at 1199

36

*E. Davidson*

THE WITNESS:  I don't remember that.

MR. FRASIER:  Okay.  Let me see if I can find it real quick, and maybe we can --

(Pause.)

THE WITNESS:  I know the only kid I really watched was, uh, Gavin.  Gavin.  His mom was Heather -- Heather Landmark, maybe, was her name?

MR. FRASIER:  Landmark --

THE WITNESS:  That's the only kid I can think of that -- that's because she lived by me, so I mean.

GRAND JUROR:  McMullen?

THE WITNESS:  Hmm?

GRAND JUROR:  McMullen?  That it?  No?

MR. FRASIER:  Landmark --

GRAND JUROR:  Reid?

THE WITNESS:  Hmm?

GRAND JUROR:  Reid?  Heather Reid?

THE WITNESS:  Oh, I --

MR. FRASIER:  Heather Reid.

THE WITNESS:  Okay.  I think I -- yeah.

MR. FRASIER:  Nope, that's not the one that --

THE WITNESS:  I know who that is.

GRAND JUROR:  That's the first one.

GRAND JUROR:  (Indiscernible.)

(Pause.)

Exhibit 5002 at 1200

*E. Davidson*

THE WITNESS:  And I had -- I had day care for my kids.

GRAND JUROR:  Dave said it.

MR. FRASIER:  Hmm?

GRAND JUROR:  Dave said it.

THE WITNESS:  I worked, they had day care.

(Indiscernible discussion.)

GRAND JUROR:  Alicia Slag -- Slagle?  Ameling? Amelung?  Alicia Amelung.  Amelung, A-M-E-L-U-N-G.  Dated Nick in high school.  Describes knew Bill Sero, baby-sitter.

THE WITNESS:  Ashley.

GRAND JUROR:  Ashley.

THE WITNESS:  There was Ashley Amelung.

GRAND JUROR:  Ashley.  Yeah.  She said you baby-sat.  You traded off baby-sitting.

THE WITNESS:  Well, I don't think Ashley had kids 10 years ago.  I think Ashley's --

GRAND JUROR:  She baby-sat for you.

THE WITNESS:  She might have.  I --

GRAND JUROR:  She's the girl that came over and was the baby-sitter.

THE WITNESS:  Might have --

GRAND JUROR:  She would, yeah.

THE WITNESS:  You know, I think --

GRAND JUROR:  Angela Haga.  Is that the one that

Exhibit 5002 at 1201

*E. Davidson*

traded off?

THE WITNESS:  Oh, that's my girlfriend Angela. Yeah.

GRAND JUROR:  Okay.

THE WITNESS:  But I don't remember --

GRAND JUROR:  Ashley said she baby-sat for you.

THE WITNESS:  She might have actually baby-sat for me a couple of times in the day, though, because I worked.

GRAND JUROR:  Okay.

GRAND JUROR:  That's right.

GRAND JUROR:  She stated, Early evening Bill and Erika were, uh, baby -- baby-sitting for me.

THE WITNESS:  Okay.  That might -- Angela, maybe.

GRAND JUROR:  She was not sure if Bill was home when I picked -- when she picked up the kids, Bill was asleep.

THE WITNESS:  I don't know, you guys.

GRAND JUROR:  Yeah, that --

THE WITNESS:  I don't remember.

GRAND JUROR:  Who was that again?  That was --

THE WITNESS:  Angela was like my best friend, and --

GRAND JUROR:  Angela Haga, yeah.

THE WITNESS:  -- her and I did do a lot of that.

Exhibit 5002 at 1202

GRAND JUROR:  Okay.

THE WITNESS:  But not after I moved over here.  I don't remember.

GRAND JUROR:  Okay.

GRAND JUROR:  But that's who -- that's who --

BY MR. FRASIER:

Q.    Yeah, it was Angela Haga.  Yeah, those are my notes too.  So --

A.    Yeah, we've -- her and I have known each other for like 20 years.  So maybe.

BY MR. FRASIER:

Q.    Okay.  Well, after Leah Freeman disappeared, did -- well, I have this information.  The McGuffin family -- well, do you know Bruce McGuffin or Kathy McGuffin?

A.    I don't think so.

Q.    That will be the parents of Nick McGuffin and Wayne McGuffin.

A.    No.

Q.    Okay.  They seem to have information that after Leah disappeared, that Bill, while he was sleeping, would have nightmares and would be screaming about how he killed Leah, and he was having nightmares about what happened to Leah.  Do you know anything about that at all?

A.    No.  But like I said to you, when Bill does drugs, Bill is weird, okay?  I mean it.  I -- meth does

Exhibit 5002 at 1203

*E. Davidson*

weird -- I'm not going to say that it does more to other people than it does other people, but some people get really -- it's like -- and you're uncomfortable to be around them, or -- you know.  It's just -- I don't ever, and I never heard anything like that.  And if I ever did hear anything like that, I'm sure I probably wouldn't have kept my mouth quiet.

Q.    Okay.

A.    I mean.

Q.    How long were you with Mr. Sero where you guys continued to live together after Leah Freeman disappeared?

A.    We weren't.

Q.    Okay.  And when you say "weren't" --

A.    We were no longer together.  We moved out of the apartment.

Q.    Okay.

A.    I went and got my own apartment --

Q.    And he went his way?

A.    -- in North Bend.

Yeah.  And that's been that long ago.

Q.    Okay.  How long after Leah disappeared did you move out?

A.    It had to have been within the same -- because I remember I told you guys I was at work one night, and it was just -- it was all of that, like jumbled in.  So it had to

Exhibit 5002 at 1204

have been like within a week or so.

Q.    Okay.  We got your -- some of the stuff we have there in the -- is your employment records from the --

A.    Yeah.

Q.    -- from the Casino.  And the night that Leah disappeared, you were not on the clock.

A.    Right.  I found that out, but I guess I was the day before --

Q.    Okay.

A.    -- or something.

Q.    All right.

A.    It's hard to remember.

Q.    Well, let me ask you this.  Has -- did Bill Sero ever tell you he killed Leah Freeman?

A.    No.

Q.    Did Tom Stemmerman ever tell you he killed Leah Freeman?

A.    No.

Q.    Alicia Michaud, did she ever say she killed Leah Freeman?

A.    No.

Q.    Do you know who Ricky Crook is?

A.    I think Haley -- Haley -- if he's Haley and, um --

Q.    Heidi?

Exhibit 5002 at 1205

*E. Davidson*

A.    Heidi's brother --

Q.    Okay.

A.    -- I know who he is.  I don't know him.

Q.    All right.  Well, let me ask you this question. I'll just put it to you this way.  Has anybody told you that they killed Leah Freeman?

A.    No.

Q.    Has anybody told you that they saw what happened to Leah Freeman?

A.    I was told that, um -- I was told that Nick --

Q.    Okay.  Now, that's --

A.    I mean, you know, I was never told that anybody -- I mean, I never heard it come out of anybody's mouth that they did it.

Q.    Okay.

A.    I've just heard rumors.  I guess that's all I could say.  Rumors from this person or that person.

Q.    All right.  I know this question is going to come up, so I'm going to go ahead and ask you.  How did Bill Sero treat you?

A.    Um, I'd say how we treated each other.  Not good.

Q.    Okay.  For lack of a better term, was he a mean SOB?

A.    Not -- no.  I mean, we had our fights, don't get me wrong, but I probably beat up on him more than -- you

Exhibit 5002 at 1206

*E. Davidson*

know.  It -- we were young.  It was -- yeah.  But no, he never -- he wasn't like that.

Q.    Okay.  Do you have any information, first-hand information about what happened to Leah Freeman that night?

A.    No.

MR. FRASIER:  I don't think I have any other questions for Erika.  Do you guys want to ask her anything?

GRAND JUROR:  It was brought up in previous testimony that Bill, when he would get high on meth, that he would take you out to Lee Valley Road and drive along, and drive real fast and stop and beat up on you, and -- and in the same general vicinity of where Leah was found.

THE WITNESS:  No, you know who that was, actually?  It wasn't Bill Sero, so somebody had their information.  Um, it was James Crabtree that did that.  So.

GRAND JUROR:  All this rumor starts --

THE WITNESS:  And, no -- for -- for -- seriously, I got -- I got a broken wrist from him.  And I -- I just found out it was broken six years ago.  I mean that it got broke six years ago.  I had surgery the 20th.  That was James Crabtree, not Bill Sero.

GRAND JUROR:  But he took you up there, to that area?

THE WITNESS:  James Crabtree?

GRAND JUROR:  Yeah.  I mean, the story -- the

Exhibit 5002 at 1207

*E. Davidson*

testimony that we got was that you were driven up to Lee Valley Road and beat up up there, or something.

THE WITNESS:  Yeah, that was by James Crabtree.

GRAND JUROR:  In what year was this?

THE WITNESS:  This was in 2000 -- um, '3?  '4?  Let's see, I was 24, 25.  I'm 32 Friday.  And so --

GRAND JUROR:  It's about 2004, maybe?

THE WITNESS:  Mm-hmm.  2003, 2004.  That was James Crabtree, not Bill Sero.  Like I said, I was probably meaner to Bill Sero than he was to me.

GRAND JUROR:  Were you doing drugs when you were up there and that happened?

THE WITNESS:  On Lee Valley Road?

GRAND JUROR:  Yeah.

THE WITNESS:  Was I doing drugs?

GRAND JUROR:  Yeah.

THE WITNESS:  Yes.

GRAND JUROR:  Would you consider that area someplace that drug users went in those days?  Up that Lee Valley Road area?

THE WITNESS:  No.  I know drug users used to go down, um -- you know right when you're coming into town, there's that Robin's Super Shine, there's the mill back there?  That road back down there used to be nasty.  People would go down there and drink and use drugs down there, but

Exhibit 5002 at 1208

45

*E. Davidson*

not up --

GRAND JUROR:  Is that where the Mill Pond is?

GRAND JUROR:  No, no, no.  This is right up here where the -- where the, uh --

THE WITNESS:  Where mill --

GRAND JUROR:  Where they have the -- you can get gravel, sand, and stuff.

THE WITNESS:  Isn't that a mill?  Roseburg Lumber?

GRAND JUROR:  On the top there.

GRAND JUROR:  That's Cedar Point.

THE WITNESS:  Roseburg Lumber.

GRAND JUROR:  Cedar Point, yes.

THE WITNESS:  Yeah, yeah, yeah.

GRAND JUROR:  The road out to Roseburg Lumber, yes.

THE WITNESS:  Yeah.  That was a nast -- that was --

GRAND JUROR:  And who -- who would have -- who would you say were people who would have frequented that?

THE WITNESS:  Um, like, I don't know, I guess you could say Gordy.  Gordy, I don't even know his last name.  I didn't -- I didn't really have a lot of friends here.

GRAND JUROR:  Yeah.  But I mean, you know, you say you know that people used that area as a place to do

Exhibit 5002 at 1209

*E. Davidson*

drugs.

THE WITNESS:  Yeah.

GRAND JUROR:  Behind the, what's now the --

THE WITNESS:  Like, Areola (phonetic), those guys.

GRAND JUROR:  Did Bill go there?

THE WITNESS:  No.  Bill and I -- like I said, we didn't really hang out over here until I moved over here. And I wasn't here about long.  I mean, I don't know.  Maybe he might have gone down there.  I was never with him.  But not to my knowledge.

GRAND JUROR:  Well, I mean, only reason I would say that is if you say that you suspect or you know that that was a drug use area, where you got -- where -- is there more information that you can provide with that?

THE WITNESS:  No.  That --

GRAND JUROR:  Just that you believe that was an area?

THE WITNESS:  Well, you could see.  If you drove down there, there was beer bottles --

GRAND JUROR:  Mm-hmm.

THE WITNESS:  There was this and that, you know.

GRAND JUROR:  So, I mean.  So you had been down there yourself, before then?

THE WITNESS:  Not down there doing that, no.

Exhibit 5002 at 1210

*E. Davidson*

GRAND JUROR:  No, I know that.  But I mean, you -- what I'm trying to get at, that's all I'm saying, is that what makes you --

THE WITNESS:  Yeah, because my step-dad lives right across up there in the, um, trailer --

GRAND JUROR:  The trailer park?

THE WITNESS:  Yeah.  I've fished down there before.  Actually, I got a striper bass down there.

GRAND JUROR:  So you're familiar with that area behind the --

THE WITNESS:  Mm-hmm.

GRAND JUROR:  -- on the road down to Roseburg Lumber.

THE WITNESS:  Yeah.  You could tell there was paraphernalia and stuff all over the place.

MR. FRASIER:  Okay.

GRAND JUROR:  Can you describe the -- because I'm just curious, because -- I mean, because of the location of the crime and the fact that you were up there a few years later with an individual, who -- what happened at that instance?

THE WITNESS:  That we ended up out there?

GRAND JUROR:  Yeah, and he broke your wrist and everything.

THE WITNESS:  We were -- we were in an

Exhibit 5002 at 1211

48

*E. Davidson*

altercation at my step-dad's right acr -- up Cedar Point.

GRAND JUROR:  Mm-hmm.

THE WITNESS:  And he forced me in the car.  And when we got into the car, that's just -- I think he was probably -- my step-dad said he was calling the cops.  That's what it was.  And my -- that's -- he drove me out that way.  And then my brother had heard about it, and my brother actually ended up driving up the hill, got me out of the truck.  And -- you know.  And then I was arrested after that.  So, it wasn't anywhere we went to -- I mean, it isn't -- yeah, I think you get to Laverne Park up that way, don't you?

GRAND JUROR:  What's that?

THE WITNESS:  Okay.  I mean, other than going to, like, Laverne Park, or --

BY MR. FRASIER:

Q.    Let me ask you this.  I forgot to ask you this.

After Leah disappeared, I've got some notes here that you told police that you saw -- well, how did you first learn that Leah was missing?

A.    I think it -- Nick at the -- um, I think it was Safeway.  I saw him down there.  I was down there get -- probably getting groceries or something.

Q.    All right.  And how did -- what did Nick tell you?  What do you recall about that contact?

A.    Um, I remember him saying that he couldn't find

Exhibit 5002 at 1212

*E. Davidson*

her, and he was acting really worried.

Q.    Did you try to reassure him?

A.    Well, I just said, I'm sure -- you know, Did you guys get in a fight or something?  You know, maybe she just doesn't want to talk to you.  I remember saying something like that.

Q.    You say something about, you know, she might be at a friend's house --

A.    I said -- yeah.

Q.    -- and (indiscernible) her soon?  That type of stuff?

A.    Something.  I didn't think that she was dead, you know.

Q.    Did he seem really worried about her?

A.    He seemed overly stressed to me.  That's why I asked, Well, did you guys get in a fight or something?

Q.    Okay.

A.    You know, and I only -- I knew Nick -- I had met Nick a few times with my brother Ryan.

Q.    Did you think it was strange that he seemed to be so worried?

A.    Yeah, like I said, because I didn't think she was dead.

Q.    Okay.

A.    Or had been murdered, or -- you know.

Exhibit 5002 at 1213

Q.    You didn't think it was that big of a deal at that time?

A.    No.

MR. FRASIER:  Okay.  Thank you.  That's -- that's all I've got.  Okay.  You're done.  You can go back to Port Orchard.

THE WITNESS:  Okay.  Thank you.

GRAND JUROR:  It's raining up there.

THE WITNESS:  Yeah.

### TESTIMONY OF LISA McOWEN

(Witness sworn.)

BY MR. FRASIER:

Q.    This is the grand jury for Coos County.  They're looking into the disappearance of Leah Freeman.

And you saw me do it, but I've got to tell you we're being recording, okay?

A.    Yes.

Q.    Could you tell us your name and your occupation, please.

A.    Lisa McOwen, and I'm an analyst with the Department of Justice.

Q.    How long have you worked there?

A.    A little over four years.

Q.    And an analyst.  Could you tell the grand jury, please, what type of things you do there as an analyst.

Exhibit 5002 at 1214

*L. McOwen*

A.    We assist law enforcement agencies with criminal cases, doing research, charts, financials, spreadsheets. Whatever they need for a criminal case.

Q.    All right.  Now in this case you were asked to assist in being an analyst on the case of the disappearance of Leah Freeman.

A.    Yes.

Q.    And in the course of that, you were supplied by me or the police with a complete copy of all the reports.

A.    Yes.

Q.    5,400-and-some-odd pages.

A.    Yes.

Q.    All right.  (Laughter.)

One of the things I asked -- did I ask you to create some, or did the police ask you to create some what's referred to as timelines?

A.    Yes.

Q.    Now, we got back here two charts back here that the grand jury has available to them.  Were these charts that you prepared?

A.    Yes.

Q.    All right.  Now, this first chart over here that talks about Nick McGuffin handwritten timeline, Brent Bartley and the McGuffin-created timeline.  Could you tell us where the source of the information is for the -- that you did for

Exhibit 5002 at 1215

that chart?

A.     In the police reports there was timelines that were handwritten by Nick McGuffin and Brent Bartley right after Leah's disappearance.

Q.     And so what you did is, using those handwritten statements, you put the -- according to -- like on this side it's Nick's handwritten statement of where he was, according to him.

A.     According to him, times and where he was.

Q.     And the same thing for Mr. Bartley.

A.     Yes.

Q.     And then in the middle here, I gave you a document that had been seized from the McGuffin residence this year, which was a timeline that the McGuffin family had put together?

A.     Yes.

Q.     And then you put that in the middle here?

A.     Correct.

Q.     Okay.  So that's how that chart came into being?

A.     Yes.

Q.     All right.

       This chart over here, Leah Freeman Homicide Vehicle Sightings and Timeline, could you tell us about that. Where -- what's the information from there?

A.     That information is from the police reports,

Exhibit 5002 at 1216

where officers either got witness statements and wrote them in the reports, with the dates and who they saw where.

Q.     All right.  And I noticed some of these things in here you put in red.  What do the red comments signify?

A.     Some of them are discrepancies where -- and I'd have to read them specifically to see, but it's where they don't match up, time -- at the same time and being in the same place.

Q.     Now, these other charts we have behind you, the -- that's a blow-up I did of, I believe, one of your drawings over there --

A.     Mm-hmm.

Q.     -- of the area.  You did that?

A.     Yes.

Q.     And pointing out where particular locations were where certain events occurred?

A.     Yes.

Q.     And then the one behind you is what you did in Coos County?

A.     Yes.

MR. FRASIER:  Okay.  I'm just laying a foundation for these charts for you, so you can understand where that came from.  I don't think I have anything else to ask Lisa, unless you want to ask her anything.

GRAND JUROR:  Nice job.

Exhibit 5002 at 1217

*L. McOwen*

THE WITNESS:  Thank you.  (Laughter.)

GRAND JUROR:  Five thousand pages, huh?

THE WITNESS:  Yes.

GRAND JUROR:  How long did that all take?

GRAND JUROR:  Ten years.  (Laughter.)

THE WITNESS:  Uh, it -- it probably took me almost three weeks of reading to get through the reports.

GRAND JUROR:  I'm just curious why that one's in yellow, when Nick was seen at Fast Mart.  Why is that one in yellow?  Can you read it?

THE WITNESS:  I'd have to read what it says.

GRAND JUROR:  Is there a yellow (indiscernible).  The red ones are discrepancies, right?

THE WITNESS:  Yes.

GRAND JUROR:  And what -- and I'm sorry.  What are the green ones on this side, are -- they're still, they're still under this --

MR. FRASIER:  Right.

GRAND JUROR:  Okay.  Okay.

MR. FRASIER:  Okay?  Anything else for Lisa?

GRAND JUROR:  So what is the yellow?

GRAND JUROR:  Oh, what do you think?

GRAND JUROR:  I don't know.  What does the yellow one say, so she can --

GRAND JUROR:  Says Nick was sent -- was seen at

Exhibit 5002 at 1218

55
*L. McOwen*

Fast Mart by Jenkins and West.  Jenkins stated Nick was upset and crying at 9:30.

THE WITNESS:  I think that was a newly-added one, that was from the more recent interviews.

GRAND JUROR:  Oh, okay.

GRAND JUROR:  Also, alongside of it, on the opposite there, that he went -- supposedly, at 9:30 he was supposed to be on his way to Bart or --

GRAND JUROR:  And then -- and Brent says he got there at 10:00 p.m.

GRAND JUROR:  And father says he was at home.

(Laughter.)

MR. FRASIER:  Okay.

GRAND JUROR:  I got one more question.  On -- you have on Nick's and Brent's, the green highlighted one?

THE WITNESS:  Mm-hmm.

GRAND JUROR:  Is that something related to the McGuffin?  Why are they green?  Because I see McGuffins' is green.

THE WITNESS:  Um, it may be that -- I -- I would have to look at them and compare them.  Offhand, I don't remember, but it may be because they related more to the other time -- this timeline from police reports.  I'm not sure.  I -- I'd have to look at it, and it's been a little while since I actually --

Exhibit 5002 at 1219

L. McOwen

GRAND JUROR:  Right.

THE WITNESS:  -- read the timelines again.

GRAND JUROR:  Well, I've got -- I'm just trying to understand if we're supposed to have some sort of, you know --

THE WITNESS:  Sometimes the color-coding --

GRAND JUROR:  -- education.

THE WITNESS:  -- was more for my purpose or to --

GRAND JUROR:  Okay.

THE WITNESS:  -- to highlight something new that I added --

GRAND JUROR:  That's what I wondered.

THE WITNESS:  -- for the officers to look at.

GRAND JUROR:  Yeah, I wanted to know if we were supposed to pay special attention to those --

THE WITNESS:  Yeah.

GRAND JUROR:  -- different things and that.

MR. FRASIER:  I guess what we'd say is don't worry about the colors.  All right?  (Laughter.)

GRAND JUROR:  Okay.

THE WITNESS:  The -- the process of the charts was a lot of updating as more reports and interviews got done.  So, as I would add something new, I probably color-coded it so they would know it was something new added.

GRAND JUROR:  That -- I'm a visual learner, so I

Exhibit 5002 at 1220

just had to make sure.

THE WITNESS:  Sure.  (Laughter.)

Fair.

GRAND JUROR:  Was part of your job to make any conclusions --

THE WITNESS:  No.

GRAND JUROR:  -- or just do this?

THE WITNESS:  Just do that.

GRAND JUROR:  So you have not come to any conclusions?

THE WITNESS:  No.  I put the data together so that --

GRAND JUROR:  That's not fair to ask her.

THE WITNESS:  -- so that the officers can --

GRAND JUROR:  I figured I'd try.  (Laughter.)

THE WITNESS:  -- get more of a visual picture.

MR. FRASIER:  Okay.

GRAND JUROR:  You did a good job.

THE WITNESS:  Thank you.

MR. FRASIER:  Anything else?

All right.  Thank you.  You can disappear.

THE WITNESS:  Thank you.

**TESTIMONY OF KYLA STEVENS**

(Witness sworn.)

BY MR. FRASIER:

Exhibit 5002 at 1221

Q.    Okay.  This is the grand jury for Coos County, and they're looking into the disappearance and death of Leah Freeman.  It obvious, but I got to tell you we're recording everything here today.  All right?

First of all, could you tell us your name and where you live.

A.    My name is Kyla Danae Stevens, and I live in North Bend on 2570 26th Street.

Q.    And do you know an individual named Nick McGuffin?

A.    Yes, I do.

Q.    How do you know Mr. McGuffin?

A.    I met Nick, like a year ago, through, um, our employment at the Mill Casino.  And we started dating, like a couple months ago, and I moved in with him.  So that's kind of how I know him.

Q.    All right.  He had been living with or dating an individual named Megan Edgerton?  Is that --

A.    Yeah.

Q.    Okay.  And apparently they had broken up, and then that's when you got together with him?

A.    Yeah, a couple months after.

Q.    Okay.  I guess what we're -- I guess we'll just get right down to it.  Did you actually live with Nick for a while, or --

Exhibit 5002 at 1222

59

*K. Stevens*

A.    Mm-hmm.  Yes, sir.

Q.    Okay.  And where were you living together?

A.    Um, at his house on Access Road in Englewood -- or Green Acres.  Sorry.

Q.    Has Nick ever talked to you about Leah Freeman?

A.    Yeah, a couple times.

Q.    Okay.  What has he told you about Leah Freeman?

A.    You just want to know the whole story --

Q.    I want to know the whole story.

A.    -- that I've been told?

Q.    From Nick.

A.    Okay.

Q.    I mean, not from other people.

A.    Right.

Q.    What has Nick told you about Leah Freeman?

A.    Okay.  Um, I'll start it out by telling you that that night he was at his friend's Brent's waiting to pick up Leah.  And she was at another friend's house, and I guess they were supposed to have like a barbecue or something that night.  And he arrived at her house like ten minutes after 9:00, and her friend had been crying and said that they had gotten into a fight and Leah had walked off.  Left the house walking.

And so after he had found that out, he went around looking for her.  He said that he had pulled over a

Exhibit 5002 at 1223

*K. Stevens*

police officer.  Like I guess he was swerving, trying to get pulled over I guess, so he could tell the officer that she -- he can't find her.  And I guess he said that they just kind of shunned him.  And he went to Leah's sister's work and told her that she can't -- he can't find Leah.  And she kind of shunned him too, and -- so I guess after he couldn't find her, he just went home.

And then the next day went around looking for her, and I guess showed a girl -- and I get the names mixed up.  There was an Erika and an Alicia.  Um, one -- he went up to one of the girls and showed her a picture of Leah, and before she ever said anything she just broke down into tears and told Nick that she's sorry because she knows what happened to her and that it was her boyfriend Bill that did it.

And, um, I guess there had been a letter written to Nick from one of the two, I don't know, um, saying that she hears Bill wake up in the middle of the night screaming from nightmares about Leah, and that she's sorry what Nick has to go through because of it.

Q.    Um --

A.    And then he told me -- I don't know how he knew this, but that, um, Leah had been walking that night, and somebody was driving a car and pretended to hit her.  And actually hit her, and then picked her up and put her in their

Exhibit 5002 at 1224

*K. Stevens*

car and drove her to some guy named Tom's house on, like, Libby Lane in Coos Bay.  And did whatever they did to her there, and then took her back to Coquille.

Q.    Was there anything about an acid party, or people being high on acid?

A.    Yeah, I guess there was like a hundred hits of acid that came into Coquille that night or something.  And everyone was all messed up.

        (Pause.)

BY MR. FRASIER:

Q.    Now, when you started dating Nick, were you aware of -- did you have any idea who Nick was, or relation to --

A.    Absolutely not.

Q.    Okay.  And --

A.    He had moved away from Bend, and for all I knew he had just moved back into town from Bend.  And I just thought he was from Bend and moved into this town.

Q.    Okay.

A.    So, I mean, I had no idea who he was.

Q.    So, it came out that the police were re-opening the investigation --

A.    Mm-hmm.

Q.    -- into Leah Freeman's death.

A.    Mm-hmm.

Q.    Were you guys together at that point?

Exhibit 5002 at 1225

A.    Yeah.  Well, we weren't officially -- I think I wasn't living with him, but we were hanging out quite a bit.

Q.    All right.  And then that is when he -- when it came out, that's when he started telling you about this?

A.    Yeah.  Actually, the -- my parents had heard about it, and said that they wanted to talk to me about it.  And he wanted to talk to me about it before my parents did, I guess.  So that night he actually told me the story I just told all of you.

And my parents were kind of freaked out about it, so they wanted to talk to Nick.  And he went over there and talked to my parents.  And my parents were more comfortable after talking to him, but I wasn't there.  I didn't --

Q.    Okay.  There has been some concern -- and I don't know where this came from, and I just want to make sure it's clear.  There's been some concern that people might be telling you what to tell us here today, or anything like that.  Has anybody told you what to say to us?

A.    Absolutely not.

Q.    Okay.

A.    No.

Q.    So, the police haven't told you what to say --

A.    No.

Q.    -- here today?

A.    Hmm-mm.

Exhibit 5002 at 1226

*K. Stevens*

Q.    The McGuffin family hasn't told you what to say?

A.    Hmm-mm.

Q.    Okay.  And I think the grand jury probably needs to know this, but I'm not going to ask you any questions about it.  But currently, right now, you're -- you've been charged with a crime relating to harassment of Mr. McGuffin.

A.    Mm-hmm.

Q.    You guys had a fight or something.

A.    Yeah.

Q.    Okay.  I'm not getting into it.

A.    Uh-huh.

Q.    I don't want to know anything about it.

A.    Right.

Q.    Your lawyer's asked me not to go there --

A.    Okay.

Q.    -- and I'm not going to do that.

A.    Okay.

Q.    But I think they need to know that there's that issue there.

A.    Mm-hmm.

Q.    All right?  Okay?

A.    Yeah.

Q.    All right.  Has anybody told you that they killed Leah Freeman?

A.    No.

Exhibit 5002 at 1227

*K. Stevens*

Q.    Has anybody told you that they were there and saw what happened to her?

A.    No.

Q.    Outside of what you've told us here, do you have any firsthand information about what happened to Leah Freeman?

A.    No.

MR. FRASIER:  Okay.  Does the grand jury want to ask her anything?

GRAND JUROR:  How was your relationship with Nick?  When were you with him?  That's where I was kind of --

THE WITNESS:  Um --

GRAND JUROR:  You're not with him no more?

THE WITNESS:  No.  We broke up after this incident had happened about -- let's see, it was like a couple of weeks ago, this happened.  And we, since then, haven't been talking or anything.  I mean, I have a no contact order with him.

GRAND JUROR:  Yeah.

THE WITNESS:  Like, I can't even work right now because of it.

So, about three months ago was when we started -- like is when I moved in with him.  But just since he started working at the Mill and we started hanging out.  I mean, a couple months after he started working there.

Exhibit 5002 at 1228

GRAND JUROR:  And he -- does he work in the same area?

THE WITNESS:  We both work in food and beverage. He's in the banquet department, I'm -- work in the restaurant at the Mill.

GRAND JUROR:  That's where I've seen you.

THE WITNESS:  (Laughs.)

GRAND JUROR:  You're a hostess.

THE WITNESS:  Yeah.

GRAND JUROR:  How was your relationship when you were with him?

THE WITNESS:  It was good.  I mean, he was a good boyfriend to me.  He was a great father.

GRAND JUROR:  Did you have kids with him?

THE WITNESS:  Hmm-mm.

GRAND JUROR:  Okay.  So why do you make that comment?

THE WITNESS:  Just because he has a daughter with Megan, and he has --

GRAND JUROR:  Oh, okay.

THE WITNESS:  -- they have joint custody, so I see her a lot.  Well, did.

GRAND JUROR:  So, he would -- was he ever violent or aggressive with you?

THE WITNESS:  Just with this past incident that

Exhibit 5002 at 1229

*K. Stevens*

happened.  I mean, it was a mutual thing, but --

MR. FRASIER:  Well, let's -- we can't --

THE WITNESS:  Okay.

MR. FRASIER:  We can't talk about that, okay?
So.

GRAND JUROR:  So, he only told you one time about
what had transpired with Leah?  That one time.  He didn't
mention it again?

THE WITNESS:  Well, he mentioned it a couple more
times.  I mean, he wouldn't re-tell the diff -- a different
story or anything.  Just, you know, little bits and pieces of
it.  Like, I guess recently a lady came forward with -- I
guess she was a witness to seeing Bill and Tom and Alicia or
Erika or whatever, seeing them burn Leah's clothes.  And I
guess -- I mean, that's just something he told me.  Just
little things that he said about it.  I mean, it's not -- he
doesn't, you know, talk about it a lot.

GRAND JUROR:  Did he talk about his brother at
all, Wayne?

THE WITNESS:  Uh-huh.

GRAND JUROR:  Did you ever meet Wayne?

THE WITNESS:  Yeah.

GRAND JUROR:  Do you know Wayne?

THE WITNESS:  Well, I just met Wayne, actually.
I ran into him at the mall because he was her -- here for the

Exhibit 5002 at 1230

*K. Stevens*

grand jury, but --

GRAND JUROR:  Mm-hmm.

THE WITNESS:  -- um, he went over to visit him a couple months ago in Hawaii.  And I talked to him a little bit, but nothing about, like, the case or anything with Bruce.

GRAND JUROR:  He did go over to visit in Hawaii a couple months ago?

THE WITNESS:  Mm-hmm.  Or Wayne.  Sorry.  Yeah.

GRAND JUROR:  Yeah, okay.

GRAND JUROR:  Was that just to get together, as far as you know?

THE WITNESS:  Yeah, just a little -- he was wanting to get away from work and town for a little bit, stayed over there with him.

GRAND JUROR:  Did you meet his parents?

THE WITNESS:  Mm-hmm.

(Pause.)

GRAND JUROR:  Did his parents say anything about the case?

THE WITNESS:  Um, yeah, a little.  No things. Just his dad had said, um -- because I guess people had seen Nick driving a Mustang and a T-bird that night or something. And he just told me that he had the keys to that T-bird and it was locked up in the shed.  And like I guess it was a

Exhibit 5002 at 1231

*T. Cooper*

joke, Daddy took the T-bird away, that -- in that time.  So, I mean, it's -- they wrote out their own little timeline and then compared it to the timeline that the police put together and -- I don't know.

GRAND JUROR:  So they made you privy to a lot of information, then, actually about what --

THE WITNESS:  Kind of, yeah.

GRAND JUROR:  Are you scared of Nick?

THE WITNESS:  I wouldn't say scared, no.

(Pause.)

MR. FRASIER:  Any other questions for Kyla?

Okay.  I think you're done.  You're free to go.

THE WITNESS:  Thank you.  Have a nice day.

GRAND JUROR:  Thank you.

### TESTIMONY OF TROY COOPER

(Witness sworn.)

BY MR. FRASIER:

Q.    First of all, this is the grand jury for Coos County.  They're looking into the disappearance and death of Leah Freeman.  And I got to tell you we're recording everything.

A.    Okay.

Q.    All right.  First of all, could you tell us your name, please, sir, and the city you live in.

A.    Troy Cooper.  Coquille, Oregon.

Exhibit 5002 at 1232

*T. Cooper*

Q.    Mr. Cooper, are you -- did you used to work at Coquille High School?

A.    Yes.

Q.    Do you still work there?

A.    I still do.

Q.    Okay.  Why did I think you left town?

A.    (Laughs, coughs.)  Excuse me.

Q.    Okay.  All right.  Oh, well.  Anyway.

You -- well, working for the school district, you're a teacher or a coach or both?

A.    Both.

Q.    Okay.

A.    Yes.

Q.    Where do you work?  What part of the district do you --

A.    Right now I work exclu -- exclusively at the high school.  Previously I've worked at the high school as a teacher and as a coach at the middle school.

Q.    Back to the year 2000, were you employed at the high school?

A.    And the middle school, both.

Q.    And the middle school?

A.    Yes.  If I recall --

Q.    Right.

A.    -- correctly on that.

Exhibit 5002 at 1233

*T. Cooper*

Q.    Okay.  During the time frame you were at the high school, did you have contact with a student named Nick McGuffin?

A.    Names, I'm just -- you know, I can't remember the name very well.

Q.    Okay.

A.    So, I'd have to remember the actual --

Q.    All right.

A.    -- incident, I guess, more.

Q.    Well, let me hand you that.

A.    Okay.

Q.    Let me see if you recall.

A.    Okay.  Yeah.  I remember this incident.  So -- I just couldn't place the name on it.

Q.    Okay.  There was an incident in the -- in March of 1999 with you and Nick McGuffin?

A.    Correct.

Q.    Could you tell the grand jury what happened with you folks.

A.    Um, as I recall it, um -- I got to kind of remember.

I was heading towards my classroom.  I had to leave for some reason, temporarily.  And when I came back, a student was talking to, as I recall, Leah in my classroom. And I basically informed that student that he needed to leave

Exhibit 5002 at 1234

my classroom and be wherever he's supposed to be.

He -- as he left, he basically did the -- you know, if you're guy, you kind of know the shoulder thing, where you throw your shoulder at somebody to kind of let them know. It's kind of a threatening posture sort of thing, if I recall. And, um, we had a -- somehow that incident had evolved.

So -- so that's really the only contact I had with that student. I never had him in a class or anything like that. But -- but I do recall taking that, um, up to the office. It's -- I don't know, it seems so long ago. I -- I don't remember many of the details there, but I do recall that.

Q. Okay. This document that I have here, is this the document that you actually prepared for the office?

A. Um. (Pause, referring.)

Yeah. This would be something that I would have prepared.

Q. All right.

A. So.

Q. In addition to him putting the shoulder to you as he was walking past you, there was -- later on in the day there was some more contact between -- well, I shouldn't say contact. There was more words spoken, were there not, later in the day?

Exhibit 5002 at 1235

*T. Cooper*

A.    Yeah, it's -- it's hard for me to remember the later part there.  I do remember the door incident.

Q.    Okay.

A.    Um, it -- and I recognize this as my own writing with regards to that.  Uh, the most that I remember about that day was I really had to control my anger that day.

Q.    Okay.

A.    Because I did, uh, consider his -- his actions over the top for a student.  Especially -- you know, I've had students get a little bit out of control, I suppose, but none of them actually looked or acted like they wanted to step outside for a fight or something like that.  Whereas -- whereas, as I recall, this incident was a little bit more towards that end of, you know, let's step outside and finish it out there, sort of thing.

Q.    So you wrote this incident up and sent it to the front office, for the high school?

A.    Yeah, I'm pretty sure I would have talked to -- somehow, I recall more talking with, um, Ms. Nortness about this, than Tim.

Q.    Okay.

A.    But Tim may have been the person I talked to.

If I wrote this up, then that would have meant that it was a -- that I had seen it as a -- as a major incident for me.  I don't normally would -- I would almost --

Exhibit 5002 at 1236

*T. Cooper*

I would rarely write up a whole, you know, paper on one incident with a student unless I was quite aggravated by the events.

Q.    Okay.

(Pause.)  All right.  But this is an incident, if I understood correctly what you're saying, is that this was not the normal run-of-the-day thing that you would have happen at the high school --

A.    Oh, no.  It was quite --

Q.    -- when he was a student.

A.    It was quite heightened as far as physical contact with a student.  A student who didn't even know me personally, so there wasn't -- it couldn't be described as banter or playing around.  It was -- it was a straight stranger getting into the face of another stranger, basically.

Q.    And it --

A.    And one of the strangers being an authority figure at the time.

Q.    Yeah.  And basically it got started because you're going to your classroom, he's standing in this doorway.  He should be in class.  You told him go to class, and then he --

A.    And then he bumped my shoulder at that time.

Q.    All right.

Exhibit 5002 at 1237

*T. Cooper*

A.     -- and that's where I confronted him on that, after he did that.  I was going to let him off on the talking to my student --

Q.     Yeah.

A.     -- in my classroom, just as long as he went to the -- went to his classroom.

Q.     Okay.

A.     But from there it escalated.

MR. FRASIER:  I don't think I have anything more to ask you.

Does the grand jury want to ask him anything?

GRAND JUROR:  Did you ever have another incident after that with Nick?

THE WITNESS:  Not that I recall.  Most of my contact was with Leah.  I was her coach, and that sort of thing.  So, and that's why I remember the door part, because it was Leah talking to him at the time.  So I knew him as her boyfriend, and that was about it.

GRAND JUROR:  What was Leah's reaction?

THE WITNESS:  Leah, um -- you know, Leah and I had a pretty good relationship because I was her coach.  And so Leah was -- she was pretty accustomed to doing what I asked her to do, I guess, as a former coach, a volleyball coach, and -- and whatnot.  I really don't remember her reaction too.  I mean, it -- once he bumped shoulders with

Exhibit 5002 at 1238

me, my focus was very much on the student, to make sure that I controlled whatever that situation was going to become at that point.

GRAND JUROR:  But Leah didn't step in --

THE WITNESS:  Oh, I can't --

GRAND JUROR:  -- and apologize for him or anything like that, that you recall?

THE WITNESS:  I can't remember anything of that nature, um, there.

(Pause.)

GRAND JUROR:  Did Leah's involvement with sports and stuff like that change at all when she was dating this guy?

THE WITNESS:  Uh, I -- I -- you know, I don't know.  I mean, I had her when she was a seventh grader, as a volleyball player.  I mean, I just remember her as, you know, the great kid and a fantastic server.  I still do.

Um, but I -- you know, she was with another coach in high school, so.  We -- she was, uh, in my computer class I -- if I recall on this particular incident.

(Pause.)

MR. FRASIER:  Anything else?  Okay.

THE WITNESS:  Okay.

MR. FRASIER:  You're free to go.

THE WITNESS:  Thank you.

Exhibit 5002 at 1239

GRAND JUROR:  Thank you.

**TESTIMONY OF SHARON NELSON**

(Witness sworn.)

BY MR. FRASIER:

Q.    Okay, ma'am.  This is the grand jury for Coos County, and they're looking into the death/disappearance of Leah Freeman --

A.    Okay.

Q.    -- in the year 2000.

It's obvious, but I got to tell you I'm recording everything.

A.    Okay.

Q.    First of all, could you tell us your name and your occupation.

A.    My name is Sharon Nelson, and I'm employed by the Coquille School District.  I'm currently in the capacity of high school principal.

Q.    How long have you been the principal?

A.    I've been the principal starting my fourth year.

Q.    Okay.

A.    I think.  (Laughter.)

Q.    And your husband is Wayne the barber?

A.    Yes.  Wayne "Roxy" Nelson, the barber.

Q.    Right here?

A.    Yes.  Yes.

Exhibit 5002 at 1240

*S. Nelson*

GRAND JUROR:  "Free candy Wayne"?

THE WITNESS:  Uh, and ice cream.

GRAND JUROR:  You guys have an interesting barber here in town.

GRAND JUROR:  Yeah.

GRAND JUROR:  Cute little town we have here.

THE WITNESS:  Yes, it is.

MR. FRASIER:  If you want to know anything in town, you go to Wayne's shop.

GRAND JUROR:  Yeah.

THE WITNESS:  I go check to see to how well I've done, too.

MR. FRASIER:  Okay.  (Laughter.)

BY MR. FRASIER:

Q.    I want to go back to the year 2000, the school year of 1999/2000.  What was your capacity with the school district then?

A.    I was teaching at the high school, teaching health and P.E.

Q.    And did you know Nick McGuffin and Leah Freeman?

A.    I had them both as students.  I -- I believe, and I have not checked the grade books, but I believe I had Leah -- if she was a freshman, she would have been in my P.E. classes.  And I do know that Nick was a health student, and so I had him at least one or two terms in my health classes.

Exhibit 5002 at 1241

Q.    All right.  Were you aware, during that school year, that at some point in time Nick and Leah began to be a couple, dating?

A.    Yes.  Yes.

Q.    Boyfriend and girlfriend?

A.    Yes.

Q.    What was your observation of that relationship?

A.    Um, it -- from a teacher's perspective, you know, we try to keep a good eye on our senior-and-freshman couples, because that -- you know that -- that often can lead to some -- mm, I don't want to lead you into thinking bad things, but it is what it is.  And when we have freshman girls and senior boys, it makes us be a little bit more cautious.  It isn't uncommon.  It continues to happen, but some of us who are parents are just a little more mindful to -- to be watchful for those kind of couples.

Q.    And when you were being mindful of this --

A.    Mm-hmm.

Q.    -- what did you see, or what did you observe in relation to this particular couple?

A.    This particular couple, um, I think over time they had gone from that infatuation period -- it's kind of like a -- a domestic violence case.  And I'm -- and I'm going to explain myself because I taught this in my health classes.

When they first get together, they're -- there's

Exhibit 5002 at 1242

*S. Nelson*

that honeymoon phase where everything is lovey-dovey, hand-holding, nice.  Nice conversations back and forth.  And everyone knows that this couple really enjoys each other's company.  And then somewhere during that cycle, they -- there's accusations of, you know, whatever.  And -- and there's some confrontation.

Nick and Leah, not unlike any other couples, you know, sometimes would express their arguments to the point that you could hear them.  You would see them.

I'm not sure how often, but it's very, very possible that they would break up to make up.  That that's -- that's a common pattern.  And I don't believe that Nick and Leah were -- were -- I think that's just -- was their relationship.

During the course of the time that they were together -- and I absolutely don't know what that was, because being in the Coquille School District for thirty-plus years, time does mesh.  But during the course of that school year, especially during the springtime, that they were -- they were a couple that often would fight.  They would fight in the parking lot.  Yelling at -- at each other.  And then, next thing we knew, they were back together and lovey-dovey again.  So that cycle was -- was what I would see as their pattern of -- of togetherness in their relationship.

Q.    I guess I don't know how to word this --

Exhibit 5002 at 1243

*S. Nelson*

A.        Mm-hmm.

Q.        -- but I guess I'll just try to -- from what you could see, did this appear to be a healthy, appropriate relationship, or was it doomed to failure?

I don't know how else to put it.  (Laughs.)

A.        Well, it -- I've had a chance to think a lot about this, and -- and what I would hope that you understand is that I'm -- I'm trying to recollect things ten years ago. And yet, starting in September, I will have couples that get together and they will go through these cycles.  And that's part of a teenage cycle of -- of learning how to communicate in a relationship.

And so, it -- it -- in comparison to other couples who get together, this particular couple was -- seemed to have more difficulty in -- in good communication, where they -- they could respect each other.  It was a lot of yelling and screaming, and they just didn't mature very well in that respect.  And that's what I remember from that particular couple.

I don't think I answered the question, but I don't want to lead you to -- you know, down different paths.

Q.        Actually, you did answer it.

A.        Okay.

Q.        I don't have any other questions to ask you.  Is there anything that you feel the grand jury needs to know

Exhibit 5002 at 1244

*S. Nelson*

about in this case that, you know, that we haven't talked about here today?

A.    You know, I've thought a lot about what you may be asking, when I came in --

Q.    Okay.

A.    -- because one of the difficulties, you know, have been was, you know, my role back when -- when she first disappeared.  And I know that I was contacted just very informally, and notified that -- that she was missing.  And I was currently in Newberg at George Fox University taking administrative coursework.  And I had come back at -- was asked to come back into town and to talk to Chief Reaves.

And I feel bad because I hope that I didn't leave the impression with Chief Reeves that she was a runaway, but I have to admit that I did say, You know, it isn't -- it wouldn't surprise me if they got into a verbal argument, knowing that these kids probably were partiers, and that, you know, she just hasn't come home yet.  I don't -- I -- I just want you to understand that I feel horrible because maybe if I had never said that, things could have turned out differently.  Um, at least with finding her sooner, for the family's sake.

But yet, you need to understand that Leah and Nick, both, were kind of in a -- I guess a love-hate relationship in that pattern.  And they were not quiet about

Exhibit 5002 at 1245

*S. Nelson*

their -- their arguments with one another.  And that's -- and that's an important aspect.

I never -- never did witness Nick hitting her, but they definitely would be in each other's faces when they argued.  And it was bad-language argument.  And -- but I never did see any physical violence.  But that's just my -- I did not ever see that.  I, you know, heard different things.

But I also need to let you know that, in ten years, I'm not sure if you were to ask me any other questions, if it's something I heard and now think that's what I remember.  That's -- that's what's -- I think, has -- has been difficult.

But the things that you've asked me, I -- I have very clear recollection of some of this -- this pattern, because those were things that I remembered, thinking back about, wow, could -- could something really bad have -- have happened.  And ultimately it ended up that it -- it did turn out really bad for Leah.

So, I just wanted you to know that that's -- that was something that has really bothered me.  That -- that she -- she could have very easily gone, slept it off -- a party.  Um, not informed her mom, and not come home, and then come home a couple days later.

So -- but that's all I know.

GRAND JUROR:  I have a question.

Exhibit 5002 at 1246

*S. Nelson*

THE WITNESS:  Yes.

GRAND JUROR:  We've at least heard rumors, if not facts, that people at the high school were reluctant to talk to the police at first, were told to keep quiet.  Do you know anything?

THE WITNESS:  Boy, no.  I -- in fact I, like I said.  In fact the phone call came to me at George Fox in my apartment, from Wayne, who said, You need to get ahold of Chief Reaves; Leah Freeman's missing.

GRAND JUROR:  From Wayne?

THE WITNESS:  From Wayne, my husband.

GRAND JUROR:  The barber.

THE WITNESS:  The barber.

GRAND JUROR:  Wayne the barber.

THE WITNESS:  The barber.

And -- and so I did.  I called Chief Reaves, and -- and --

GRAND JUROR:  Okay.

THE WITNESS:  -- and said, Wow, what's -- what's going on?

GRAND JUROR:  You never heard anything about --

THE WITNESS:  I -- I --

GRAND JUROR:  -- people being reluctant to talk?

THE WITNESS:  Shoot.  I don't know anything -- no, I had not heard anything like that.

Exhibit 5002 at 1247

*S. Nelson*

GRAND JUROR:  Okay.

THE WITNESS:  I just know that I talked to him.

GRAND JUROR:  Okay.

THE WITNESS:  And he didn't have a problem asking me questions at that time.  I think it was in McKay's parking lot.  I don't know, maybe he was doing something --

MR. FRASIER:  I think the allegation was, just to clear it up, it wasn't that employees of the district or adults were --

THE WITNESS:  Mm-hmm.

GRAND JUROR:  There -- there were some allegations floating around at the time that the kids were told not to talk to the police by somebody.  And --

THE WITNESS:  I see.

MR. FRASIER:  And do you recall or --

THE WITNESS:  No.

MR. FRASIER:  -- know anything about that?

THE WITNESS:  No.

MR. FRASIER:  Okay.

THE WITNESS:  No.  Good to know.

MR. FRASIER:  Okay.

GRAND JUROR:  The real question is, what has Wayne the barber heard?  (Laughter.)

THE WITNESS:  You know, Wayne and I have talked about this, obviously, a whole lot.  And Wayne hears a lot of

Exhibit 5002 at 1248

things, and I hear a lot of things, but neither one of us were there. And what I have said, in this case or any other case that -- that turns out tragically for -- for families, if you know something, shame on you for not coming forward. If you're hearing something, and you've heard it second-, third-, or fourth-hand --

GRAND JUROR: Don't repeat it.

THE WITNESS: -- who -- who did you hear it from, and -- and what value is it? Because what I do know in this town is that -- that you hear something and it's like the old grapevine. By the time it comes all the way back to here, boy, it's completely different. But yet it's gospel by the time this person hears it. And so that's -- I understand your -- your difficult challenge, because I think that's what some of this is.

I also know, being -- you know, being a high school educator, that -- that there -- there is admission, at least on some kids' parts, that they were in attendance where these kids were under-age drinking and doing some other drugs. And so that element alone is going to keep a lot of people quiet. And that -- that messes up a lot of stuff. Had it not had alcohol and drugs with under-age folks who thought they could get busted, and all the -- all the layers that go into that, I think that we may have had a quicker outcome.

Exhibit 5002 at 1249

That's -- I think that's clouding someone's memory, and their willingness to come forward.

MR. FRASIER:  Okay.  Any other questions for Mrs. Nelson?  I'm sure she wants to get back to the high school and back to work.

THE WITNESS:  Oh, I'm so excited.  My third day back.  (Laughter.)

GRAND JUROR:  Hard to contain yourself.

THE WITNESS:  I know.

GRAND JUROR:  No kids yet, but those students --

**TESTIMONY OF MARK NORTNESS**

(Witness sworn.)

BY MR. FRASIER:

Q.    This -- you're aware.  I think you probably already know this, sir, but this is the grand jury for Coos County, and they're investigating the disappearance and death of Leah Freeman.

It's obvious, but I got to tell you we are recording everything in here today.

So, first of all, could you tell us your name, please, and your occupation.

A.    I'm Mark Nortness.  I'm currently the principal at Coquille Valley School in Coquille.

Q.    Okay.  And that's what's sometimes referred to as the middle school?

Exhibit 5002 at 1250

A.    What's referred to as the middle school, yes. It's now three through eight, so it's Coquille Valley School.

Q.    All right.  And prior to that you were assigned to the high school?

A.    I was vice principal and athletic director at the high school from 2000 -- from 1993 to 2000.

Q.    All right.  And during the time frame that you were at the high school, did you become acquainted with an individual named Nick McGuffin?

A.    I did.

Q.    And I want to direct your attention, and I don't know -- I probably should have warned you about this, but I didn't.  In May of 2000, was Mr. McGuffin, Nick McGuffin -- he apparently had been suspended from school, and he came back on the property or something along that line?  Do you recall that?

A.    Yeah, I think I -- there's -- have some recollection of the fact that there was some disciplinary matter in May that required a suspension for a period of time.

Q.    And were you informed by a Mr. Sterrett that Nick was back in the hallway between classes and had refused to leave the building?

A.    I don't recall that specific detail.

Q.    Okay.

Exhibit 5002 at 1251

A.    Oh, yeah.

Q.    I'll show you that, there.

A.    Yeah.

      (Pause.)  Okay.

Q.    Do you remember that incident?

A.    Somewhat.

Q.    Okay.

A.    Somewhat.

Q.    Could you tell the grand jury about it, please.

A.    Um, again, the details, I don't know those specific as details of it.  I know that when there was -- when he was suspended, we had some issues with him returning to campus.  I -- my recollection is it had more to do with -- with -- with the parking lot.  And, um, again, the other details are not clear to me.

Q.    Okay.

A.    Sorry.

Q.    There was one that -- I guess I'll just, to -- he was in the building, and you saw him.  And you said, Hold on. You were telling him to leave, and --

A.    Okay.  That's where it may have init -- initially occurred --

Q.    Okay.

A.    -- and it spilled over to the parking lot.

      I think I was -- again, I -- it's been ten years,

Exhibit 5002 at 1252

and I'm not --

Q.     Okay.

A.     Um, you know, that -- there -- there were words exchanged.  And I was asking if he would leave the building, and -- and he became very confrontational.  I had a tough time directing him out of the building, and -- um.

Q.     He had a girlfriend at that time named Leah Freeman.  Were you -- did you -- were you aware of this relationship?

A.     Yes, I was.

Q.     Did it appear that the reason he kept coming back on campus or whatever was because he wanted to see Leah?

A.     Yeah, I believe so.  I believe he was in that particular part of the -- of the hall because that was a freshman hall.  I knew of their relationship and I knew that -- that that would -- and I -- as -- I believe that he was there actually to see her.  Yes.

Q.     Okay.  Did you have an opportunity to see these two together as a couple there at the high school?

A.     I did, you know, whenever I --

Q.     What was the --

A.     I'm sorry.

Q.     What was their relationship like?

A.     Um, you know, my recollection was that it was the -- it was one of those senior-to-freshman relationships

Exhibit 5002 at 1253

90
*M. Nortness*

that we all -- we -- we -- we were really concerned about.  I felt that there was definitely sort of -- sort of dominance there.  I think that, if I recall, there -- I -- I didn't feel he treated her very well.  I felt there was a lot of -- that he was -- he was -- and I think he talked down to her.

I think on one -- there was one incident where I -- I believe he physically grabbed her.  And -- and there was another incident where I saw him actually lift her up and push her over and do some things.  And I just -- it was -- it was difficult, again, as it was always difficult with freshmen and senior boys.  And this was one that it just really stood out in my mind.

Q.    Okay.

A.    Yep.

MR. FRASIER:  I don't think I have anything else to ask Mr. Nortness.  Does the grand jury want to ask him anything?

GRAND JUROR:  When is registration?  (Laughter.)

Never mind.

GRAND JUROR:  Did you have Wayne as a student?  Or in the -- or while -- were you in the school?

THE WITNESS:  Wayne McGuffin?  Yes, I did.  Yeah.

GRAND JUROR:  What were your impressions of Wayne?

THE WITNESS:  Um.

Exhibit 5002 at 1254

GRAND JUROR:  Do you recall?

THE WITNESS:  You know, boys -- both boys, you know, tended -- tended -- there were -- there were -- there were quite a few fights involving those boys.  And I don't know how much you want me to go into the really --

GRAND JUROR:  You can tell me whatever you want.  I'm curious.

THE WITNESS:  Just sort of freely speak on that?  I don't want to just go --

MR. FRASIER:  Yeah, you can.  Go ahead.

THE WITNESS:  Okay.  Um, yeah.  Again, we had issues with the boys fighting and taking responsibility for their actions.  And some -- some possible drug use going on at that time with those guys.  But I think between the two boys, if we're comparing the two, that Nick was much more sort of volatile, impulsive, and -- I definitely had issues with Nick.  I think it was the incident Paul was referring to where -- where actually our principal had asked me to back off that because I, you know -- in fact, our principal dealt with Nick from then on until he graduated.  So -- so, yes, I did have my -- I'm sorry if I got away from your --

GRAND JUROR:  No, that's okay.

THE WITNESS:  That.

MR. FRASIER:  Any other questions for Mr. Nortness?

Exhibit 5002 at 1255

Okay.  That will do, sir.

THE WITNESS:  Thank you.

GRAND JUROR:  Thank you.

GRAND JUROR:  Get back to work.  (Laughter.)

**TESTIMONY OF DONNA DENNIS**

(Witness sworn.)

BY MR. FRASIER:

Q.    First of all, ma'am, this is the grand jury for Coos County, and they are investigating the disappearance and death of Leah Freeman.  I've got to tell you that we're recording everything here today.

A.    Okay.

Q.    All right.  First of all, could you tell us who you are and what city you live in.

A.    My name is Donna Dennis, and I live in Coquille.

Q.    How long have you lived in Coquille, ma'am?

A.    Since 1972.

Q.    And I take it you have some grandchildren?

A.    Yeah, a lot of them.

Q.    Okay.  You have one named Mike Dennis?

A.    Yes, I do.

Q.    The reason I've asked you here, ma'am, is I have information that you were picking up your grandson Mike at Coquille High School in the year 2000, and you saw an incident in the parking lot.

Exhibit 5002 at 1256

*D. Dennis*

A.    Yes, I did.

Q.    Could you tell the grand jury what you saw, what happened?

A.    Yeah.  I was sitting in the car waiting for Michael.  He did not have his driver's license yet, so it was one of those things.  And I happened to glance up and see a couple walking across the far end of the parking lot where the hurricane fence is around the high school.

And they were arguing, you could tell.  They were back and forth and back and forth, and I was kind of watching because it was kind of amusing.  And all of a sudden they got to this car, and he grabbed her.  And that set up my radar because when I was 19 years old I was badly beaten by a man I was living with, repeatedly.  So I don't like physical contact.

And he pushed her up against the side of the car.  And instantly her demeanor changed.  She folded her arms and had her head down, and that to me was, you know, not a good sign.  And then he opened the car door, and he was still yelling at her, and pushed her in the car.

Well, about that time Michael came to the car.  And I said, You should have seen what happened over there.  And he looked up and saw the car and went, Ah, that's nothing new.  I said, Well, it's not acceptable.

And so -- and I'll be honest with you, I think at

Exhibit 5002 at 1257

*D. Dennis*

the time I had a cell phone.  You have a cell phone for so long, you forget when you first got it.  But I did call the school, and I told them there was a situation in the parking lot that they needed to handle.

Michael at the time did not tell me anybody's name.  I had no clue who was involved.  It wasn't long after that that Leah disappeared.  And Michael came home, and I was telling him that it had come across the news that this young lady had disappeared.  And I knew Leah's name.  In a town this size, if any of you are from here, you kind of know all the kids your kids have known and gone to school with, and school plays, Christmas programs.  So I didn't know Leah directly, but I knew her name and I knew the Freemans' name.

And so I said something to Michael, and I said, I just don't remember what Leah looks like.  And he goes, Well, you saw them in the parking lot.  And I went, What?  And he goes, That's who was in the parking lot fighting with her boyfriend.  And I went, You're kidding me?  And he goes, No, that's who it was.

So that's the only reason I knew it was Leah.

Q.    Okay.  It's what Mike told you.

A.    Yes.

Q.    And based on what Mike was telling you, the boy would have been Nick McGuffin?

A.    Yes, I believe that's his name.  All he said was

Exhibit 5002 at 1258

95
*D. Dennis*

that's her boyfriend and they fought all the time.

Q.    All right.

A.    And then he went on to say a whole bunch of other stuff, but --

Q.    Okay.

A.    -- that's all hearsay.

Q.    Do you recall what kind of car it was?

A.    Now, I thought it was either a Mustang or Camaro. I -- you know --

Q.    Yeah.

A.    -- I don't remember.  I'm old.  And I -- I wasn't really sure.  But I --

Q.    Do you remember what color it was?

A.    No, I really don't.

Q.    Okay.

A.    I couldn't say.  I just got -- when I saw the car, they were walking towards it.  I thought, well, that's kind of a nice car.  You know, kids these days have a lot nicer cars than we did when we were kids.  But, yeah.  So.

Q.    All right.

A.    That's about it.

MR. FRASIER:  All right.  Thank you.

That's all the questions I have for her.

Does the grand jury with to ask her any questions?

Exhibit 5002 at 1259

*D. Dennis*

GRAND JUROR:  When he grabbed her and pushed her up against the car, she didn't fight back?

THE WITNESS:  No.  She folded her arms and put her head down.  And remembering from my days, I knew that that was a sign of giving up.  You argue, and then if you think you're going to get hit, you come into yourself.

I'm no expert.  I'm just saying that's --

MR. FRASIER:  That's how you reacted?

THE WITNESS:  Yeah.  That's how I reacted.  It was -- it -- you know, you'd sass back, but if he reacted, you --

GRAND JUROR:  Backed down.

THE WITNESS:  -- folded in on yourself and were submissive so you didn't get hit.

MR. FRASIER:  I don't think -- anything else you want to ask her?

GRAND JUROR:  I don't think so.

MR. FRASIER:  Okay, ma'am.

THE WITNESS:  All righty.

MR. FRASIER:  That will do it.

THE WITNESS:  Thank you.

GRAND JUROR:  Thank you.

GRAND JUROR:  Thank you.

MR. FRASIER:  Thank you.

GRAND JUROR:  Thank you.

Exhibit 5002 at 1260

*C. Jones*

## TESTIMONY OF CYNTHIA JONES

(Witness sworn.)

BY MR. FRASIER:

Q.    Ma'am, this is the grand jury for Coos County, and these folks are looking into the disappearance and death of Leah Freeman.  I've got to tell you that I'm recording everything here today.

A.    Okay.

Q.    First of all, could you tell us your name and what city you live in.

A.    Cynthia Jones, and I live in Coquille.

Q.    How long --

A.    I live in two places, actually.

Q.    Oh, do you?

A.    Yeah.

Q.    Where else?

A.    Klamath Falls.

Q.    Really?

A.    Mm-hmm.

GRAND JUROR:  Small world.

BY MR. FRASIER:

Q.    How long have you --

A.    Yes.

Q.    Would you --

A.    Since March.

Exhibit 5002 at 1261

Q.    Oh, okay.

A.    But I live mainly -- been living (indiscernible).

Q.    Okay.  I was born in Klamath Falls.

A.    Oh.

Q.    Anyway.

Ma'am, were you living or were you in the area in the year 2000?

A.    Yes.

Q.    I have information that was brought to me by the police that on the evening of June 28th, 2000, you were driving by the old Shell gas station here in Coquille.

A.    Yes.

Q.    And that you saw a young girl in a phone booth at that station.

A.    Yes.

Q.    Could you tell the grand jury -- well, first of all, did you know who Leah Freeman was?

A.    Yes.

Q.    How did you know Leah?

A.    My daughter had coached her in Sawyer basketball.

Q.    Okay.  So this is about what time in the evening that you're driving by the Shell?

A.    Well, it's been a long time, but I think you're right.  It's about 9:30.  I think that's what the --

Q.    Could you tell the grand jury what you saw.

Exhibit 5002 at 1262

*C. Jones*

A.    I was turning, and I looked at the phone booth, and I saw this -- saw Leah in there.  And she just kind of had an expression on her face like -- like that.  And the door was shut.  She had on a white tank top.

Do you want me to tell them about the two cars over here?

Q.    Sure.  Go ahead.

A.    Over --

Q.    Tell them everything you saw.

A.    The reason I remember this is that these two guys were across the street on the sidewalk, and this one guy had dark hair.  And he was just screaming violently at this other guy that was with him.  And that's why I thought it was so crazy, you know.  And I remembered that.

GRAND JUROR:  So one of the guys was screaming at the other guy?

THE WITNESS:  Mm-hmm.

GRAND JUROR:  On the other -- over on the school's -- on the school side?

THE WITNESS:  Yes, over on the school side.

GRAND JUROR:  Okay.

THE WITNESS:  Facing towards the -- the phone booth.

GRAND JUROR:  The phone booth.  Okay.

BY MR. FRASIER:

Exhibit 5002 at 1263

*C. Jones*

Q.    Were they -- were these two guys that you saw, were they on the sidewalk that goes around the high school or were they on the other side of the fence?  Do you recall?

A.    They were on the sidewalk.

Q.    Okay.  Was there any vehicles or cars nearby?

A.    There were some vehicles that were parked -- one vehicle over on the side, right on that side.  And then they were standing here.

Q.    Okay.  Was it -- it was on the street?

A.    No, it was in the -- it was, I thought -- I saw in the parking.

Q.    In the parking area?

A.    In the parking area.

Q.    Of the high school?

A.    Mm-hmm.

Q.    Okay.

A.    But I don't know if that was theirs or not.

Q.    Do you remember what type of car it was, or --

A.    I just knew it was old --

Q.    Old?

A.    -- and kind of big.

Q.    Did you see any color, or anything like that?

A.    Well, it says in my thing blue/green.

Q.    Okay.

A.    Because then when I testified that I did see --

Exhibit 5002 at 1264

that I -- see it's so foggy because it's been ten years, you know.

Q.    Yeah.

A.    And I'm losing my brain already, I feel like.  So I --

Q.    But there's no doubt in your mind that you saw Leah Freeman?

A.    I saw Leah, yes.

Q.    In that -- in that gas station phone booth?

A.    In that gas station phone booth.

Q.    Okay.  Outside of what we talked about here today, is there anything else you know about this case you think we ought to know about?

A.    No.

Q.    Okay.

A.    I really don't.  I just hope that they catch him.  You know, whoever --

Q.    Okay.

A.    Hope it gets closed.

Q.    Okay.

A.    So.

MR. FRASIER:  Does the grand jury wish to ask her anything?

GRAND JUROR:  You said 9:15.  Was it getting dark, or how did you know that -- the time?

Exhibit 5002 at 1265

*C. Jones*

THE WITNESS:  It was very light outside.  It was light.  I could see pretty good.

GRAND JUROR:  Were you pretty sure of the time?

THE WITNESS:  At the time that I report, I was --

GRAND JUROR:  Mm-hmm.

THE WITNESS:  -- because I came forward right away and talked to the -- the police officers came --

MR. FRASIER:  I had it at 9:30.

GRAND JUROR:  I had 9:30.

THE WITNESS:  9:30.

GRAND JUROR:  9:30, what you said.  Yeah.  Sorry.

THE WITNESS:  That's okay.

GRAND JUROR:  You came forward after -- that evening, or after you --

THE WITNESS:  No, after --

GRAND JUROR:  -- heard that Leah was missing?

THE WITNESS:  Mm-hmm.  Yes.

GRAND JUROR:  Okay.

THE WITNESS:  I can't -- does it say how long? It wasn't very far.  It doesn't matter, I just --

MR. FRASIER:  I'd have to look it up.

THE WITNESS:  Yeah, it wasn't very --

MR. FRASIER:  It doesn't say here.

THE WITNESS:  -- long after it happened.

GRAND JUROR:  Did you recognize either of the two

Exhibit 5002 at 1266

C. Jones

guys?

THE WITNESS:  I didn't.  I just remember the one had dark hair and baggy clothes and, and just the way he was screaming was so -- you know, it was like, oh.

GRAND JUROR:  Do you -- that was to be my question.

He was screaming at the other gentleman, not across the street at Leah?

THE WITNESS:  No, he was screaming at this other guy.  And I can't -- I don't -- I didn't see their faces because I was turning, and then I saw her.  And I just thought, whoa.

GRAND JUROR:  Do you remember -- he had dark hair.  Do you remember if he was tall or short or --

THE WITNESS:  He seemed kind of tall.  I don't know, maybe the guy was shrinking down as he was talking to him.

I've played this over and over in my head, but he seemed -- he just had on baggy clothes, and dark hair.

GRAND JUROR:  Okay.

GRAND JUROR:  Did you know anyone named Nick McGuffin?

THE WITNESS:  You know, I didn't know him.  No.

GRAND JUROR:  Okay.

THE WITNESS:  I didn't really know him.

Exhibit 5002 at 1267

C. Jones

GRAND JUROR:  Did you know Wayne McGuffin?

THE WITNESS:  No, I didn't know him either.  I --
I've heard them talked about and that, because of this case,
I think.

GRAND JUROR:  Mm-hmm.

(Pause.)

MR. FRASIER:  Any other questions?

GRAND JUROR:  Did it look to you like there was
some relationship between these two guys on this side of the
street and Leah in the phone booth?  Were they looking, or
was she looking at them?

THE WITNESS:  She was -- she was facing towards
them.  I -- I put that there was something going on there.
Myself, I thought something was going on.

GRAND JUROR:  Okay.

THE WITNESS:  But.

GRAND JUROR:  It's all right.

THE WITNESS:  Okay.

MR. FRASIER:  Anything else?

Okay.  That will do it.

GRAND JUROR:  Thank you.

GRAND JUROR:  Thank you.

MR. FRASIER:  You're free to go.

THE WITNESS:  All right.  Thank you.

GRAND JUROR:  Thank you.

Exhibit 5002 at 1268

**TESTIMONY OF MAGDALENA KNIGHT**

(Witness sworn.)

BY MR. FRASIER:

Q.    Ma'am, this is the grand jury for Coos County, and they're looking into the disappearance and death of Leah Freeman.  And I need to tell you that we're recording the proceedings here today.  Okay?

A.    Okay.

Q.    First of all, could you tell us your name and where you live.

A.    My name is Magdalena Knight.  I live here in Coquille.

Q.    How long have you lived here in Coquille?

A.    My entire life.

Q.    Okay.  And we heard from an individual last week -- I think it was last week.  Huey Delbert Knight.

A.    That was my father.

Q.    Okay.  Mr. Knight told us that we ought to bring you in because he seems to think you might know something about this case.  Your dad.  So that's why I had a subpoena issued for you.

Let me back up a little bit with you and ask you some questions here.  First of all, do you know a Nick McGuffin?

A.    Yes.

Exhibit 5002 at 1269

*M. Knight*

Q.    Well, do you know the McGuffin family?

A.    Yes.

Q.    How well do you know the McGuffin family?  How long have you known them?

A.    They've known me since before I was born.

Q.    Okay.  And you've known Nick?

A.    My entire life.

Q.    And Wayne?

A.    My entire life.

Q.    Bruce and Kathy?

A.    My entire life.

Q.    Okay.  How close would you say you were with these people?

A.    Before the incident, fairly close.

Q.    Okay.

A.    We were all family friends.

Q.    After the incident?

A.    Um.

Q.    Changed?

A.    Yes, sir.

Q.    Okay.  Well, let me ask you a few questions here.

      Leah disappeared in June of 2000.  Were you familiar with the cars or cars -- the car or cars Nick McGuffin was driving at that time?

A.    Um, yes.  I -- mostly just the Mustang.

Exhibit 5002 at 1270

*M. Knight*

Q.    All right.  Why don't you tell us about that Mustang a little bit, or what you know about it.

A.    Mm.  I know it was a gift --

Q.    Okay.

A.    -- I believe.  And it was something for Nick.

Q.    Okay.  I have here in the report you told the police the car had been purchased by the family, and had been a restoration project for Nick's graduation.

A.    I'm pretty sure it was for his graduation.  I don't know specifically.  It was a gift, though.

Q.    Okay.  You said something about the family unveiling the car after it was complete.

A.    Oh, well, sure.  Nick showed it off to everybody at school.

Q.    Okay.  There was something else somebody was telling me that you might know something about having to do with the trunk of the car or seeing him do something with the trunk of the car.  Do you know anything about the trunk of that Mustang?

A.    Well, what had taken place is I was going up to their house to visit on Bell Oak (phonetic).

Q.    Okay.

A.    When they lived up there.

Um, all I know is that Bruce was working on the car.

Exhibit 5002 at 1271

Q.    Okay.  And do you recall when that was in relation to when Leah disappeared?  Before or after?

A.    This was before I even knew that she was missing --

Q.    Okay.

A.    -- or considered missing.

Q.    Okay.

A.    So, I wasn't close friends with her.  I was more friends with her older sister.  She was the one I was --

Q.    Denise.

A.    Yes.

Q.    Okay.  When you say Bruce was working on the trunk of the car, what did you see?

A.    I -- just that he was in there working on the car.  I didn't see anything specific.  I didn't think anything of it at time.

Q.    All right.  Now that you've had a chance to think about it, we know that Leah disappeared on the evening of June 28th, 2000.  Do you have any idea if it was actually before she actually disappeared, or it was after she disappeared?

A.    I'm sorry, I can't give you a definite date.

Q.    Okay.

A.    All I know is this car was finished when we were in school.

Exhibit 5002 at 1272

*M. Knight*

Q.    Okay.

A.    And then on -- it was being worked on again.

Q.    Okay.  All right.  I want to share with you some things, or talk with you about some things.

Apparently, the McGuffin family feels that you, your dad, or your sister Makayla knows what happened to Leah Freeman.  Do you know anything about what happened to Leah Freeman?

A.    I do not.

Q.    Okay.

A.    My sister does not either.

Q.    Okay.

A.    She was not even here.

Q.    Okay.  Your sister, when disappeared, or --

A.    The time -- the time line is, is my sister was involved with a bad crowd around here, and my dad wanted to get her out of the environment.  She was long gone.  She was in Wisconsin working on, I think it was the pipeline --

Q.    Okay.

A.    -- with my mother, when this took place.

Q.    When that took place.

A.    And then she was here.  She came home for a visit, and then she was gone again, before I think she was even found.

Q.    All right.

Exhibit 5002 at 1273

A.    So it was back and forth.  She was in Wisconsin, though --

Q.    All right.

A.    -- when this took place.  So she doesn't know anything.

Q.    Okay.

A.    Unless she found out something when she came back --

Q.    Really.

A.    -- but she wasn't here when it took place.

Q.    She physically wasn't here when it took place?

A.    No.  No.

Q.    All right.  I want to read to you something that we took out of a document that was taken out of the McGuffin home.  This is supposedly something that by either Kathy McGuffin or Bruce, but probably Kathy McGuffin wrote.

Let me -- apparently Bruce went to see Delbert. Delbert proceeded to tell Bruce that Kayla is scared for her life.  If they find out that she saw Leah that night, she would be killed.  Delbert said, What can I do?  I have to protect my family, so I sent her away.

Bruce said, Why didn't you tell us sooner?  Why are you running and leaving us to hang?  I thought you were our friend.  You totally left us, Delbert.  Where is she?

At that time Maggie came out from the bedroom.

Exhibit 5002 at 1274

*M. Knight*

Bruce asked her -- and this would mean that's you -- if you -- if she knew all of this too.  You said yes.  Bruce said, You have been coming out to see us several times this past year, and you never thought about telling us what happened?  You people are really F'd up.  I can't believe we've known you people for two decades and this is how you treat us.

Delbert said she was in Arizona.  Bruce said if we -- if we would have her come back -- if he would have her come back and testify as to what happened.  Delbert said he would have her come back and he didn't have to worry.  Bruce told him he hoped he was going to keep his word.

Do you recall anything like that occurring?

A.    I don't even recall him coming out to the house.  But that's -- it's -- it's been a long time ago.

Q.    Okay.

A.    So, this -- it -- he may have come out to the house.

Q.    Okay.

A.    I don't know anything.  I don't know why he would say that about me.  My sister is now in Arizona, but she was gone before anything ever took place.  She was already moved out of the state.

Q.    Okay.  Did you have anything to do with Leah's death?

Exhibit 5002 at 1275

*M. Knight*

A.    No.

Q.    Okay.  Let me ask you these questions.  Has anybody told you that they killed Leah Freeman?

A.    No.

Q.    Has anybody told you they were there and saw what happened to her?

A.    No.

Q.    And just so we're clear, you never told Bruce McGuffin that you knew what happened, that Makayla knew what happened, that Makayla saw what happened, or anything like that?

A.    Absolutely not.

MR. FRASIER:  All right.  I don't think I have any other questions for Ms. Knight.  Does the grand jury want to ask her anything?

GRAND JUROR:  What did you -- well, what kind of person would you say Wayne was?  Wayne McGuffin.  Did --

THE WITNESS:  Going to school?

GRAND JUROR:  Yeah.  Just your interaction with Wayne.  How would you describe him?  Did you have any takes on his personality?  Good to be around?  Fun to be around?

THE WITNESS:  For the -- for the most part, yeah.  He -- he can be a little scary, a little intimidating.  Just -- he's just a big guy.  I'm a girl, so.  Yeah.  Um, we always seemed to get along just fine.

Exhibit 5002 at 1276

GRAND JUROR:  How did he and Nick get along?

THE WITNESS:  Fine as far as I saw.

MR. FRASIER:  Okay.  Anything else?

Okay.  You're free to go.

THE WITNESS:  All right.  Thank you very much.

**TESTIMONY OF MARK SHIELDS**

(Witness sworn.)

BY MR. FRASIER:

Q.    Okay.  First of all, just to let you know, this is the grand jury for Coos County, and they are looking into the death and disappearance of Leah Freeman.  It's obvious, but I need to tell you we are recording everything here today.  Okay?

A.    Understood.

Q.    First of all, could you tell us your name please, and where you live.

A.    Mark Shields.  I live in Coquille.  659 Southeast 15th Place.

Q.    Okay.  The previous witness that testified, Maggie Knight, do you know her?

A.    Mm-hmm.

Q.    And how do you know her?

A.    She's my fiancée.

Q.    And do you folks actually live together?

A.    We do.

Exhibit 5002 at 1277

*M. Shields*

Q.    Sir, how long have you lived in the Coquille area?

A.    Mm, most all my life.

Q.    Okay.  Do you know a Nicholas McGuffin?

A.    I do.

Q.    How do you know Nick?

A.    I've been friends with him for many years.  I knew his brother from school.

Q.    Did you actually go to school with them?

A.    Um, not really went to school with them.  I went to school with his brother Nicholas -- or Wayne.

Q.    Okay.  Did you know Leah Freeman?

A.    Quite well.

Q.    How did you know Leah?

A.    She's my cousin.

Q.    Okay.  Were you aware that Nick and Leah were boyfriend/girlfriend?

A.    I was.

Q.    Did you have an opportunity to see those two together and how they related to each other?

A.    Very limited.

Q.    Well, from what limited contact that you saw, what did you see?

A.    They seemed to be fairly normal young kids.  You know, just a young couple.  Not really anything odd to speak

Exhibit 5002 at 1278

of, just --

Q.    All right.  In regards to this case, last week we had Delbert Knight in --

A.    Mm-hmm.

Q.    -- and he seemed to think you knew something about this case, and thought we ought to bring you in here today.

Well, let me ask you this.  How did you first learn that Leah was missing?

A.    I got a phone call from my aunt and was informed of it.

Q.    Okay.  And your aunt's Cory Courtright?

A.    Correct.

Q.    Did you help try to find her?

A.    I did.  I actually was in a vehicle with Nick, riding around with him for quite a while within the first couple of days after her disappearance.

Q.    Okay.  What did Nick have to tell you about what was going on?

A.    He didn't really say a whole lot of anything.  He seemed really weird, and he never spoke a whole lot about anything.  He just -- his actions, his demeanor was very odd.

Q.    When you say odd, what do you mean?

A.    He would just -- he'd close his eyes and become very sick to his stomach.  He had -- it was almost like he

Exhibit 5002 at 1279

was going through post-traumatic stress disorder or something. He was becoming very ill every time he would close his eyes.

Q.    Okay.

A.    He would pull over off the side of the road and have to get out and he would vomit. It was very odd. Not anything like I'd ever known Nick to be.

Q.    Did he say anything about what happened the night that Leah disappeared, to you?

A.    No, he really wouldn't talk about it.

Q.    Okay. He didn't give you a time line like, I dropped her off at Cheri's and I was supposed to pick her up, or anything like that?

A.    Not really to speak of, no.

Q.    Okay. Have you remained close with Nick over the years?

A.    No.

Q.    Was there a period of time that Nick started to treat you differently, or --

A.    Well, I'd say within a couple of weeks after her disappearance, he went and made himself very scarce. He didn't come around at all anymore.

Q.    Okay. Has anybody told you that they killed Leah?

A.    No.

Exhibit 5002 at 1280

Q.    Has anybody told you they were there and saw what happened to her?

A.    No.

Q.    I've been asking just about everybody this question, but did you have anything to do with her disappearance?

A.    Not at all.

Q.    Okay.  Did you -- is there anything about this case you think the grand jury needs to know about?

A.    Um, not really that I can think of.  I mean, basically, you know, I spent a little bit of time with him -- very little time with Nick after her disappearance.  And as I said, I mean, I've known the kid for quite a few years, and after she had disappeared he seemed like a totally different person.  His whole -- his whole person changed.  He was a completely different individual, and nothing like I'd ever known him.

Q.    Okay.  Wayne McGuffin.  What was he like?

A.    Normal kid.  Kind of a bully in school.

MR. FRASIER:  Okay.  I don't think I have any other questions to ask him.  Does the grand jury want to ask him any questions?

(Pause.)  Okay.  I think that will do it, sir.  We're set.

THE WITNESS:  Have a good evening.

Exhibit 5002 at 1281

GRAND JUROR:  Thank you.

THE WITNESS:  Thank you, guys.

**TESTIMONY OF MARK DANNELS**

(Witness sworn.)

BY MR. FRASIER:

Q.    Okay.  First of all, sir, could you tell us your name and occupation.

A.    My name is Mark Joseph Dannels.  I'm currently employed by the City of Coquille as their police chief.

Q.    And how long have you been the police chief here?

A.    Since August of 2008.

Q.    Prior to that, sir, do you have other experience in law enforcement?

A.    Yes.

Q.    And what was that?

A.    I entered the law enforcement profession back in May of 1984 with the City of Bisbee, Arizona, Police Department.  I left there in January of 1986 to join the Cochise County Sheriff's Office, which is in southern Arizona south of Tucson.  I worked my ranks from deputy sheriff up to the rank of deputy commander, where I retired in -- August 15th of 2008 to take the job here in Coquille.

Q.    When you came to Coquille -- well, actually prior to you coming to Coquille, as part of the interview process and so forth, did you become aware of this case that had been

Exhibit 5002 at 1282

*M. Dannels*

pending since 2008 [sic], the death of Leah Freeman?

    A.    Yes, I did.

    Q.    And once you had taken the job and had actually come to work here, what if anything did you do to address this case?

    A.    I spoke down -- I sat down with Mr. Frasier, our district attorney here in Coos County, sitting to my left asking me the questions, in regards to his thoughts on this case since I wasn't here eight years prior when it happened. He showed an interest in putting this case back into light, and putting it back together and seeing if there was something we could do with it.

            The first thing I recognized, looking at my files, was we had to put the case back together.  And -- well, we have a manual file, and we have matching files that matched what the district attorney's office had.  And to make sure that we both had files that were identical, that we could say, Okay, this is our good solid case file that we could move forward with.

            And -- and what I did also was I contacted officers that were involved in the case back in 2000 that could help me put the case back together, and so I could understand what happened back then and what didn't happen back then.

            And -- and we did that for about 11, 12 months

Exhibit 5002 at 1283

before we went public with the case.

Q.    So you actually -- the officers that you had brought in, these were law enforcement officers that had retired, and you brought back to kind of help out, put this thing back together?

A.    Correct.  Based on what you had asked -- what you had told me who was involved, and other things I had heard through other agencies.

Q.    Those individuals included people like retired detective Sergeant Craig Zanni with the sheriff's office. Retired Sheriff Mike Cook.  Retired Lieutenant Larry Leader. Jim Pex, who was retired from the Oregon state crime lab. Those types of individuals?

A.    Yes.  All of them above, yes.

Q.    Once the case had been put back together, then did you ask for the assistance of what's sometimes referred to as our major case team, or our major incident team, however they want to call it; where we, you know, had other officers involved come to -- come back and work on the case?

A.    Correct.  Mr. Frasier and I actually came together, and being long beyond the major crime scene, we actually hand-selected people from the major crime scene that we felt really could show an interest in helping solve this case.

Q.    And we went public with that at the latter part

Exhibit 5002 at 1284

of January this year?

A.    January 20 -- 24th.  24th, 25th of 2010.

Q.    What was your intent when you got all these people together?  What did you want them to do in terms of this investigation?

A.    My main objective was to see if we could solve the homicide case of Leah Freeman.  Prove and disprove -- there's a lot of, there were a lot of rumors out there.  And I call them rumors until I felt they were -- and the team felt -- we worked under a team, investigative-type environment.  That we were comfortable and confident that what we had discovered, we could move forward with.

Q.    How many different officers did we have involved in this case?

A.    I -- at different times, over 30 officers, depending on what we were doing that day.  Whether it be a search warrant or whether it be a surveillance or whether it be just going through files or putting team assignments out to go out and do interviews.

Q.    Did you send officers to such places as Montana, and Idaho, Washington, Arizona?

A.    Them and myself all traveled, yes.

Q.    Okay.  One of the things in this case, was there an attempt to find the Mustang that had been in the possession of Mr. McGuffin at the time that Leah had

Exhibit 5002 at 1285

disappeared?

A.    Yes.

Q.    Was the Mustang actually found?

A.    Yes, it was.

Q.    And did your department take custody of that vehicle, for a couple months at least?

A.    Yes, we did.

Q.    Did you have that vehicle inspected for potential evidence in this case?

A.    Yes.  We actually spoke to the prior crime lab technician and had it re-inspected to make sure nothing was missed.

Q.    And was anything of evidentiary value found in the Mustang?

A.    No.

Q.    There was a purple Kia that apparently Zack Elderkin had loaned to Kristin Steinhoff the night that Leah disappeared.  Was an attempt made to find that car?

A.    Yes, there was.

Q.    And was the car located?

A.    Yes.

Q.    And where is it now?

A.    It is sitting by -- it's at the city yard, here in our custody.

Q.    Did your department and my office in essence buy

Exhibit 5002 at 1286

*M. Dannels*

that car?

A.    Yes, we own that car.

Q.    Okay.  Did you -- did you have -- again, have the crime lab go over that particular vehicle?

A.    Yes.

Q.    Was anything of evidentiary significance found?

A.    In regard to this case, no.

Q.    Mr. and Mrs. McGuffin, Bruce and Kathy McGuffin, have you had contact with those people?

A.    Yes, I have.

Q.    When did you first have contact with them?

A.    The first contact was either later part of 2008, early 2009.  I came -- Lieutenant Smith and I made a traffic stop on a vehicle for a traffic violation, unbeknownst to who the driver was or the owner was.  I believe it was a speeding violation.  And the driver turned out to be Bruce McGuffin.

At that time he introduced himself to me as he had been wanting to meet me as the new police chief, and wanted to sit down with me and talk to me about this case.  I advised him I would get with him and follow through with his request.  And, um, we left it at that, and I gave him a warning for the speeding.  I believe it was speeding.

Q.    At sometime in the -- later, did you actually go out to the McGuffin home to discuss the matter with them?

A.    Yes, I did.

Exhibit 5002 at 1287

*M. Dannels*

Q.    And could you tell the grand jury what happened.

A.    I -- I had also been asked by the wife too, on a separate occasion where I ran into her, about the same offer. So in October of 2009 I made a request or a follow-up to their request to come to their home and to spend a few minutes with them in regards to what they would like to address with me.  And I did do that.

Q.    What happened in that meeting?

A.    During the meeting Bruce and Kathy -- I was at their home off Baker Road.  I sat down.  I had Lieutenant Smith with me.  When I walked in and sat down, they started asking me about what DNA I had.  I advised them I was not going to disclose or discuss the case with them.

Mr. McGuffin stated at that point that he would offer up his DNA.  I said, That's -- that's kind of you.

And -- and then asked me -- explained that he wanted me to prove his son's innocence.  I advised him and his wife that my job was to prove who committed the -- the murder of Leah Freeman.  Whether that be his son or somebody else, that was my goal.

When the case was looked at and open -- he had no idea I had been looking at the case for the following year. He -- I didn't divulge that.

He -- he then went into the -- the fact I should be looking at people like Bill Sero, Tom Stemmerman.  I --

Exhibit 5002 at 1288

*M. Dannels*

and people like that, that, you know, had really been ignored in the case.  In that conversation, Nick McGuffin showed up.

Do you want me to continue with that?

Q.    Sure.

A.    Nick McGuffin showed up with his then-girlfriend, Megan Edgerton.  And they had a child.  In fact Bruce and Kathy were watching his child when I got there.

Nick didn't say much at first.  He was kind of stand-offish.  But then, once he saw that we were having a professional and polite dialogue, Nick jumped in and made a comment that -- same thing.  You need to be looking at Tom Stemmerman and Bill Sero and -- and Alicia Michaud, and just all kinds of names.

And I asked the question, I said, Why would I look at them?  And, Tell me why.  The next thing they stated that they're dangerous people, they're drug dealers.  And then I remember stating that there's a lot of dangerous people out there.  There's a lot of drug dealers out there, but why specifically them?  And they didn't give me an answer.

Then they -- Bruce made a comment to me that he had 300 pages of documents to prove Nick's innocence when he was arrested.  He goes, I'd like to share those with you, but I'm hesitant to do that.  And -- and we're going to -- we're going to wait and see what happens.  And we're going to hold

Exhibit 5002 at 1289

*M. Dannels*

that for when he's arrested.

GRAND JUROR:  Wayne or Nick?

THE WITNESS:  Nick.

GRAND JUROR:  Okay.

THE WITNESS:  When -- when he's arrested.

GRAND JUROR:  When he's arrested.

THE WITNESS:  I'm sorry.

And I advised them at that point that I would be in touch, and let them know what I've -- what we're going to do with the case.  And -- and I told Nick, if he wants to talk, talk to me.  I mean, I'm available.  I'm easy to get ahold of.  And we shook hands and I left.

BY MR. FRASIER:

Q.    These documents that Bruce referred to.  Based on what you were hearing from Bruce, did these documents -- I mean, he says they would exonerate Nick.

Did you take that to mean that it would show who the true killer of Leah Freeman was?

A.    They stated that, and I apologize if I didn't enlighten on that.  They stated that it would show his innocence and who killed Leah Freeman.  And -- and so which really sparked my -- why not give those to me?  But -- yes, to your answer.

Q.    Okay.

A.    Or questions.

Exhibit 5002 at 1290

*M. Dannels*

Q.     All right.  Getting down to January 2010, January 24th, you announce that.  The day before you made your public announcement that the case was being re-opened or revitalized, however you want to phrase it, did you attempt to notify the McGuffin family of what your department was going to do?

A.     As a professional courtesy and to hold my word, on the day before we did our press conference, Lieutenant Smith and I went to Nick McGuffin's residence about 10:00 in the morning and knocked on the door.  Nick came to door.  It took him a few minutes.  Came to the door.  Looked like he was sleeping.  And -- based on his demeanor.

I -- I greeted him.  I said, Nick, can I come inside?  He allowed me in his home with Lieutenant Smith.  I said, Nick, the purpose of my visit today is to let you know, tomorrow we're going to have a press conference.  We're going to open up the case for Leah Freeman, and try to see if we can find out who killed Leah Freeman.

And Nick got very nervous with me, to the point he was sweating from his brow, and said -- started making the comment, you know, Why didn't you just call me?  Why are you here?  I said, Because I'm keeping my word to you.  I told you if -- based on you and your parents' request, that I would do my best to solve this case.  And I didn't want you to see that we opened this case without a professional visit

Exhibit 5002 at 1291

*M. Dannels*

from me.

And I -- at that point I advised him that if he had anything to prove his innocence, as stated several months prior, that I would be available to sit down with him or have one of the team members talk to him.  He started yelling at me about, you know, Tom Stemmerman, Bill Sero, Alicia Michaud; that's who I should be looking at.  Why am I at the house?  I said, Nick, I'm doing this as a courtesy.  And -- and actually I -- a couple times I just would say, Nick, Nick, Nick, calm down.  I've been -- I'm doing this as your -- for your benefit.

We walked out.  We never addressed -- raised our voice to address him in any other way.  He followed us out into the front yard where he continued to yell at us.  We got in our car and we drove away.

We directly drove to his parents' house, and -- to advise them, per their request and per our conversation. As we -- Lieutenant Smith and I pulled in there, Bruce McGuffin was on the front porch.  I got out the passenger seat.  Lieutenant Smith was driving.  I took two steps and Bruce started yelling profanity about, This is F'ing harassment.  And Kathy McGuffin came out from the inside onto the porch stating similar about the harassment.

And Bruce says, Get the F off my property unless you have a search warrant.  I said okay, got back in the car,

Exhibit 5002 at 1292

*M. Dannels*

and we left.

Q.    Based on -- well, you had -- these documents that they said would show who the real killer of Leah Freeman was. Did you ask the team, or was -- did the team apply for a search warrant for the Bruce and Kathy McGuffin home?

A.    Yes, we did.

Q.    And did you subsequently execute -- was that warrant subsequently executed to obtain those documents?

A.    Yes, it was.

Q.    Have you or other members of the team gone through those documents page by page?

A.    Yes.

Q.    Now, one of the things Bruce McGuffin seems to keep raising is bloody clothes associated with Bill Sero.

A.    That's correct.

Q.    In going through the case file, did you find that in August of 2000 -- excuse me, August of 2000, that clothes belonging to Mr. Sero had been seized from a residence where he was staying at that time in Myrtle Point?

A.    Coos Bay.

Q.    No, there was two residences.

A.    Okay.  Yeah.

Q.    Was -- and they were --

A.    They were seized, yes.

Q.    Okay.  And then there was the Tom Stemmerman

Exhibit 5002 at 1293

home, he had clothes out there.  And the police in 2000 had actually seized those clothes?

A.    Yes, that's correct.

Q.    In looking through the case file, did it appear that those clothes had been sent to the crime lab to check to see if they had any blood on them?

A.    Back in 2000, no.

Q.    Did -- were they sent this year?

A.    They were sent in the current investigation, yes.

Q.    In some of those clothes, or at least on one shoe, there appeared to be some sort of blood.  Is that correct?

A.    Yes.

Q.    And was that sent to the DNA lab for further testing to see if there was any connection with this case?

A.    Yes, it was.

Q.    And did you speak with the DNA laboratory last Friday?

A.    Yes.

Q.    Thursday, whenever it was?

A.    Yes, I did.

Q.    And were you told that the testing done on the clothing of Bill Sero, if there was any blood on there, it belonged to Mr. Sero and nobody else associated with this case?

Exhibit 5002 at 1294

*M. Dannels*

A.      Correct.

Q.      Now -- (pause.)

Mr. Bruce McGuffin had testified in front of the grand jury that the police in this case have been intimidating witnesses, have been out there yelling and screaming -- or I shouldn't say yelling and screaming, but them telling or threatening witnesses that they need to change their story to conform to whatever the police want them to testify.  Have you or any officer in your presence ever done that?

A.      No.

Q.      Are you -- has any complaint been brought to you outside of Mr. McGuffin, from any witness saying that they're -- someone's been trying to intimidate us into testifying in this particular manner?

A.      No.

Q.      If that occurred, what would you have done?

A.      I would address the investigators to what's going on.  We -- we took the approach on this that we would talk to as many people that was listed that was involved in this case back then, and -- and re-interview them.  The majority of people were very -- I can't think of any conflict where -- we had a couple that just didn't really want to talk to us.  But it was simple enough:  Okay.  Thank you.  Here's our card.  But I don't recall ever any really difficult ones that just

Exhibit 5002 at 1295

really stood up and said, you know, they don't want to talk to us.

MR. FRASIER:  Okay.  I don't think I have anything else to ask the chief.  Does the grand jury want to ask him anything?

GRAND JUROR:  Do you know why all this -- the clothes and everything, why all this wasn't tested in 2000?

THE WITNESS:  I -- I can't answer that, ma'am. One thing, we -- when we opened the case with fresh eyes, with a new team back in January, they actually came on about a month before that.  We took on this case that it happened the day before we started.  And so everything we had, if it wasn't analyzed, we had to analyze it.  If it was analyzed, we re-looked at the evidence to see if it needed to be re-analyzed again.  And, uh, so we -- we took it fresh. Fresh eyes, fresh look.

GRAND JUROR:  So, you didn't have much of anything as far as DNA or --

THE WITNESS:  In physical evidence, no.

GRAND JUROR:  All right.

THE WITNESS:  Unfortunately.

GRAND JUROR:  So, in your professional opinion, the case that you've developed now, do you feel that you discovered enough new evidence to indicate anybody in this case?  More than last year?  Or --

Exhibit 5002 at 1296

MR. FRASIER:  I -- I -- I don't think that's a question that -- I'm not sure that's a proper question I can let you ask.

GRAND JUROR:  Well, I'm asking --

MR. FRASIER:  That's a question you have to decide, not what the chief decides.

GRAND JUROR:  No, but I'm asking -- the new evidence indicates more than the old evidence.  Because you've said you looked at new evidence, right?

Am I wrong?

MR. FRASIER:  Um --

GRAND JUROR:  I thought he said he discovered things that haven't been done.

MR. FRASIER:  Okay.

GRAND JUROR:  And did --

MR. FRASIER:  You're asking him that -- you can ask him what things that weren't done that he had, but if you're asking him to express an opinion about who's guilty in this case, I don't think you can do that.

GRAND JUROR:  Okay.

MR. FRASIER:  All right.  Okay.

GRAND JUROR:  So, we can't have his professional opinion as part of the investigation team?

MR. FRASIER:  Well, maybe I can phrase the question this way, and maybe this will -- okay.

Exhibit 5002 at 1297

In the course of this investigation, did you try to eliminate individuals as potential suspects in this case?

THE WITNESS:  Yes.

MR. FRASIER:  Is there anyone you've not been able to eliminate?

THE WITNESS:  Yes.

MR. FRASIER:  And who is that?

THE WITNESS:  Nick McGuffin.  And -- can I elaborate on that?

MR. FRASIER:  Sure, I guess.  (Laughter.)

But I -- we got to be careful.

THE WITNESS:  Okay.  I won't then.

GRAND JUROR:  I have a question.  You -- you said that when you talked to Bruce and Kathy, you wanted to share -- or Bruce had 300 pages of documents and wanted to share them with you, but didn't share them until -- you said until he is charged.  Who is he?

THE WITNESS:  He's Nick.

GRAND JUROR:  So Bruce and Kathy knew that there was a focus on Nick?

THE WITNESS:  Yes.

GRAND JUROR:  No one else, at that point?

THE WITNESS:  The main objective was for me to become their investigative agent to prove his innocence. And -- and I advised them that I can't be their agent.  I

Exhibit 5002 at 1298

*M. Dannels*

work for the state.

GRAND JUROR:  The -- I think you said when they said -- I think you said, Until he's arrested, or something like that.  Charged.

What would lead them to believe -- I mean, other than suspicion.  Was there -- I mean, I've got the impression through this whole process that the McGuffins have felt their son was the -- to put it -- the prime suspect, let's say.

Is there any official reason for them to believe he was?

THE WITNESS:  When I spoke to the McGuffins on -- talked to Kathy, talked to Bruce, and then came together as one at their home.  Not one time did I ever say Nick was a suspect.  Not one time did I ever say that the focus of this investigation should be on Nick, or will be on Nick.  It was the focus of solving the case and proving who killed Leah Freeman.  Their assumptions were that Nick --

GRAND JUROR:  Wasn't the prime -- or was a suspect.

THE WITNESS:  Yeah.  That was never a plan from me.

GRAND JUROR:  Just to be -- it was their assumption.

THE WITNESS:  Yes.

BY MR. FRASIER:

Exhibit 5002 at 1299

*M. Dannels*

Q.     And let me -- just so we're clear here, Chief, when you entered this investigation, you didn't have any preconceived notions as to who was guilty or anything along that line?

A.     No.

Q.     And was it your intent to look at, or to look at the evidence in the case, what the out -- investigation found as the case progressed, and see where it led, versus, Okay, we're going to pin this on Nick McGuffin come hell or high water.

A.     Actually, I was probably a -- um -- and that's why I wanted to see what the case needed to be put back together, or how to put it back together, on what -- like what you said, some things that weren't done.  And -- and then, like I'm looking forward and seeing these time lines.  And -- and, um, we wanted to get a good look at a time line to see what people had told us, where that looked compared to other statements.

And so I was -- I wasn't set that Nick McGuffin did it.  Even though he was the boyfriend and stuff, I wasn't convinced of anything, based on the fact that I didn't investigate this back in 2000.

I've worked general crimes.  I've worked in law enforcement a long time.  And -- and so even though -- I mean, that might have been a focus back in 2000.  It wasn't

Exhibit 5002 at 1300

my focus.

And then as the case progressed and, you know, eliminations were made here and there, it finally got to the point of credits and discredits, and who could we give credit to and who could we not give credit to.  And -- and the question of who could I eliminate, and that was Nick McGuffin.

GRAND JUROR:  When you say you couldn't eliminate Nick, is it -- is that largely based on the time line?

If I -- is that -- is there physical, or evidence other than the time line that you would attribute to that?

THE WITNESS:  The unique thing about this case, this is -- you know, and I don't want to speak out.  This is a circumstantial case.  This is a case that is a 10-year case, cold year case -- cold case that, you know, 10 years later we're sitting here today.  Those are very difficult, as we know, because you can't pull something -- a lot of times you can't pull something up that wasn't pulled up in the first 24 or 48 hours.

The best thing that we had going for us, once we got into the case and started putting time lines together and starting to figure out who said what, who didn't say what, and got back into the investigation with the current times -- and every time we did an interview, we brought it back into a case file and put that into perspective; where it fits into

Exhibit 5002 at 1301

this investigation, and whether it be a credit or discredit. And what I mean by that is we do have what Nick had told us back then, and -- told the previous chief investigator, I mean.

And then we get statements that either discredit that, credit that, or his own time line.  I mean, we think, well, he couldn't have been because this person's saying this.

So that's what I mean by looking at the case at an entirety.  I mean, who -- who's saying what, and -- and that's why so many people are involved in this case.  We talked to so many people.  And -- and I just can't eliminate him as a suspect.  I just -- I can't.

And it comes to the point where so many other people have been brought up, so many theories are out there over 10 years that have grown.  And we tried to chase all of those rumors down.  A lot of them go into phantom -- phantom-type voices where, I don't remember.  I don't know where that came from.  Some we can chase right back to sources.  But the bottom line is that one thing we can do is eliminate a lot of people into except for one.

GRAND JUROR:  Let's go back just a little bit. Your initial visit to the McGuffins was basically upon their request.

THE WITNESS:  That is correct.

Exhibit 5002 at 1302

*M. Dannels*

GRAND JUROR:  They asked you that they wanted to talk about the -- what they were accused of, or whatever. And you went to their house and did what you said you would --

THE WITNESS:  Correct.

GRAND JUROR:  -- basically?

THE WITNESS:  I saw Kathy up at the hospital here where she works, and -- let me rephrase that.  I saw her at the hospital.  I was teaching security classes for their staff up there.

I had no idea who Kathy McGuffin was.  And I was walking away from teaching the class one day.  She followed me out in the parking lot and said, Can I talk to you?  I said, Sure.  And then she introduced herself as Kathy McGuffin and goes, I know my husband has talked to you and invited you out.  You know, I want to -- we would like to spend time with you.

I said, I apologize.  Based on the fact of our busy-ness here in Coquille, we've had a lot of unexpected. And I said, So I apologize for that, but I really want to come and visit you all too.  I said, So, you know, give me a little time to catch up on a few things.

And then in October of 2009 I went and visited. I called and said, Hey, can I come out?  You bet.  So.

GRAND JUROR:  And then from that, you said that

Exhibit 5002 at 1303

you would stay in contact, I guess basically if there was

anything else to progress with the case.

THE WITNESS:  Correct.

GRAND JUROR:  Now, you went to Nick first?

THE WITNESS:  I went to Nick first.  He had --

GRAND JUROR:  And he called them too, no doubt,

before you could get -- okay.

THE WITNESS:  Yep.

GRAND JUROR:  And you still had not indicated

that he was the suspect?

THE WITNESS:  Not one time have I ever told the

McGuffins that their son was my suspect, or our suspect in

this case.

GRAND JUROR:  Can I ask what -- I don't know if I

can ask this either, but I'll ask.  (Laughter.)

Can you tell us what brought you to eliminate

Bill Sero and the other guy who -- Tom --

GRAND JUROR:  Tom --

GRAND JUROR:  -- Stemmerman?

GRAND JUROR:  -- Stemmerman.

MR. FRASIER:  Go ahead.

THE WITNESS:  First of all, we had -- we wanted

to look at who -- who would have a purpose or a motive to

kill Leah.  We could find nothing that connects the two with

Tom Stemmerman, with Bill Sero.  Based on age difference,

Exhibit 5002 at 1304

*M. Dannels*

number one.  Based on statements from other people.  There's not one person that we talked to in this investigation that said, Yeah, Leah Freeman hung out with Tom Stemmerman.  Leah Freeman hung out with Bill Sero.  Nobody ever told us that.  So we could never find a motive there.  There was nothing there that connected the two.  So that was one.

Number two was we could find nothing that ever brought them together that night.  Nothing that ever put them together, saying they were riding, they were at a party, they were -- not one evidence.  Not one person says they ever knew each other or were together, ever.  And to include that night they went missing.

So we just could not -- and -- and -- you know what I mean?  We just eliminated them.  Everywhere we went, every theory that was presented.  And a lot of theories that were presented came, um -- can I say that?  That the --

MR. FRASIER:  Go ahead.

THE WITNESS:  The stuff we seized from the McGuffins that our team looked into.  And then we were provided some stuff.

We actually took that to heart.  Being open-minded in this case, I did not want to go in on a closed mind.  And -- and we took each lead and ran that down.  And each lead took us nowhere.  Most of them were like, What are you talking about?  I don't know what you're talking about.

Exhibit 5002 at 1305

142

*M. Dannels*

That -- who said that?

And so there's just nothing there.  I mean, there's nothing that I can articulate to the district attorney -- our team couldn't -- that Bill Sero or Tom Stemmerman were connected to them, that has any substance to it.  Nothing.

GRAND JUROR:  Got a little follow-up on that. Kind of my understanding is, at least Tom Stemmerman, I kind of got the impression that, if they were involved, that somehow whoever was involved in the situation ended up taking her and stashing her at Tom Stemmerman's.  So he wouldn't have a direct link with her, other than someone got into a jackpot, and brought her there and tried to stash her.

Because that was one of the theories, was the -- that she's -- his business was conducted in the basement, and then right then it stopped.  And he said some fugitive was down there and that's why it stopped down there, and he was hiding this guy out.  If I'm just -- you know.

THE WITNESS:  We -- we went to the lengths of even -- there was a -- another theory out there that she was buried in the shallow behind Stemmerman's house.

GRAND JUROR:  Mm-hmm.

THE WITNESS:  We excavated the whole property back there.

GRAND JUROR:  Mm-hmm.

Exhibit 5002 at 1306

THE WITNESS:  And rooted it out, brought in all kinds of experts, and nothing.

GRAND JUROR:  Mm-hmm.

THE WITNESS:  Nothing to show anything.

GRAND JUROR:  Okay.

GRAND JUROR:  When did the DOJ get involved and create these time lines?

THE WITNESS:  DOJ became involved in -- in the latter part of October.  No, actually it is -- is -- we had the cold case still in -- in place.  Putting it back together.  They helped us put it back together with the charts and stuff.

And then, as we progressed into the new team, the current investigators, which she -- Lisa, who was super with us, helped put that together.  Every time we'd get some new information, we ship it up, she would add it.  We'd delete it if we needed to adjust our charts.  Whatever was pertinent to what we were investigating.

So she's been with us pretty close to the beginning, now that I think about it.

GRAND JUROR:  The -- we had a witness in earlier that stated she believed she almost hit Leah with her vehicle.

And you're familiar with this story, testimony?

THE WITNESS:  Right.

Exhibit 5002 at 1307

*M. Dannels*

GRAND JUROR:  Down there right by what's now Econo-Rooter.  And really in my mind, from all we've heard, that's probably the last sighting of Leah, time-wise, because it was dark.  Her timing.  So her story -- but -- you can correct me if you have something different on this.  But her story would be one of the last sightings of Leah.

And from that point on, I'm kind of asking you as a professional, you can't rule out that she saw -- he saw -- she -- this lady saw her by herself, or didn't see anyone right by her.  That that couldn't have been a ra -- and I hate to put random, just a random abduction.  At some point someone else could have -- there could have -- she could have fallen into foul play with just -- with a -- as a random event from that point on either.  You couldn't really rule that out.  Is that fair to say?

THE WITNESS:  I don't know if --

GRAND JUROR:  I know I'm putting you on the spot, kind of.  But that's, in my mind -- you guys can correct me, too.  That's the last known credible -- and if you want to say credible sighting of her, if that was her.

THE WITNESS:  I -- the last sightings we have was her at the old Chevron which is now the Shell station.  That's -- so --

GRAND JUROR:  Other than -- I think the --

GRAND JUROR:  The 90-year-old --

Exhibit 5002 at 1308

GRAND JUROR:  -- the 90 year old would put it later than that.

GRAND JUROR:  Yeah.

THE WITNESS:  And again, I can't account for what she's, you know, saying.  I -- um.

GRAND JUROR:  I, I know that, I know that you -- we have a -- someone who's not ruled out.  But there isn't anything else in that timeframe that says there's --

GRAND JUROR:  That one of us didn't do it.

GRAND JUROR:  But --

GRAND JUROR:  Yeah, right.  That's -- yeah.

BY MR. FRASIER:

Q.    I guess what he's asking is that -- can we rule out that a stranger out in the middle of -- that came into Coquille that night abducted Leah, killed her, and then dumped her body?

A.    I guess I think different, under that.  I -- being so involved in the case, and you know, it being a circumstantial case, I look at what a reasonable person would believe.  And -- and that's why you -- you folks are sitting here today.

But based on the totality of evidence and circumstances in this case -- I say evidence based on statements and stuff.  That I -- I would have a hard time believing -- when I say hard, difficult for me to even be

Exhibit 5002 at 1309

*M. Dannels*

reasonable with the -- to understand that somebody abducted her. And then -- I -- based on what I know and the discredits towards Nick McGuffin, I -- I would have a hard time believing that. That's --

GRAND JUROR: Now, when you say discredits, that -- that's good. That's something new.

When you say discredits towards Nick McGuffin, those are largely based on his statements and the time line?

THE WITNESS: His own statements, and as others discrediting him. And based on his unreasonable acts that night.

GRAND JUROR: And behavior.

THE WITNESS: Behavior, yes. I'm sorry. Behavior.

GRAND JUROR: And like the lady in the phone booth was seen -- that coach in the phone booth -- that seen her in the phone booth, she was just -- and I mean all these kids were on drugs, but she was just going about her everyday business on -- on her way home.

(Pause.) A lot -- you could see where a lot of kids were scared because they were all -- these were all young kids and they were all on drugs. They were all afraid they'd all be in -- in jail together.

MR. FRASIER: Okay. I think we're getting into deliberation now, not questions of the chief, so I think --

Exhibit 5002 at 1310

*M. Dannels*

GRAND JUROR:  Yeah.

THE WITNESS:  Thank you.

MR. FRASIER:  That's -- is there anything else you want to ask Chief Dannels?

(Pause.)  Okay.

THE WITNESS:  Thank you.

GRAND JUROR:  Thank you.

GRAND JUROR:  Thanks for your hard work.

THE WITNESS:  Uh-huh.  Thank you.

(Pause in recording.)

MR. FRASIER:  Swear you back in again.

(Laughter.)

THE WITNESS:  I'm going to stand up.  You're making me feel bad, standing up and sitting down.

(Witness Dannels sworn again.)

BY MR. FRASIER:

Q.    There was one thing I forgot to ask you, and I need to do it real quick before I run out of tape.

Oh, we ran out of tape.  (Laughter.)

GRAND JUROR:  (Indiscernible.)  The audio too?

MR. FRASIER:  Okay.

(Indiscernible discussion among grand jurors.)

GRAND JUROR:  Where in Arizona were you?  South of Tucson, you said?

THE WITNESS:  Sierra Vista.

Exhibit 5002 at 1311

*M. Dannels*

GRAND JUROR:  Sierra Vista.  My -- my stepson's an EMT down in Tucson.

THE WITNESS:  Is he.

GRAND JUROR:  Been there for quite a while.

THE WITNESS:  Yeah.  Sierra Vista's got Fort Huachuca, the military base.

GRAND JUROR:  Oh, uh-huh.

THE WITNESS:  And that's how I got from Illinois, where I grew up, down there.  I was in the military for two years.

GRAND JUROR:  Yeah.  That's go -- my wife's going down to Tucson tomorrow.

GRAND JUROR:  I had a question about Bisbee.

THE WITNESS:  Yeah, that's --

GRAND JUROR:  Which canyon did you get?

THE WITNESS:  For working?

GRAND JUROR:  Hooker Canyon or -- (Laughter.)

GRAND JUROR:  Hooker Canyon?  Tell us more.

GRAND JUROR:  Next to Society Canyon.

THE WITNESS:  You know, I went to the police academy when I was 20 years old, and it was kind of weird because in Arizona, even back in '94 -- it sounds so young.  You can go to the police academy at 20, but you had to be 21 before you graduated.  So -- which I did.  But during firearms I couldn't even buy ammunition because I was too

Exhibit 5002 at 1312

*M. Dannels*

young.  I had to have one of the classmates buy me ammunition.

So it's amazing, but Bisbee was my first cultural environment.  Boy, I'll tell you -- because it's such a diverse town.  You got the old Bisbee, which is kind of traditional, you know.  And then you got the border side of Bisbee, which is down by the border, and then you got the old town.  So it's -- it's a unique town.  I mean, I learned a lot there.

GRAND JUROR:  We came up out of there -- we'd been down to Mexico on a tour, and when we come through there, and of course the road's up there on the edge of the line, you know --

THE WITNESS:  Right.

GRAND JUROR:  -- and you look down, and that's when the travel guide says -- you know, he says one canyon was where the house -- all the houses of ill repute were, and the other canyon's the -- the other canyon was where all the nice people lived.

GRAND JUROR:  Yep.  And it's true.  It's a very unique town, you know.

BY MR. FRASIER:

Q.    One thing I forgot to ask you.  You've gone back and talked to Kristin Steinhoff?

A.    Yes, I have.

Exhibit 5002 at 1313

Q.    Okay.  When she testified, she talked about some pictures she had of Nick, and I asked her if she would turn those over to the police.  Did she get those to you?

A.    Yes.  Yesterday at three o'clock.

Q.    Now, are those the pictures that she gave you?

A.    Yes, these are copies of the originals --

Q.    Okay.

A.    -- that I made.

Q.    All right.  I guess there's been some concern that Kristin's been holding back information, and that you tried to -- well, did you talk with her yesterday, tell her that the grand jury were wrapping up, that type of thing?

A.    Yes, I did.

Q.    And is she still insisting she doesn't know anything about what happened?

A.    Kri -- I've talked to Kristin several times during this investigation, and her and I have had a -- a professional, but dealing relationship.  And what I mean by that is she doesn't yell at me; she doesn't, you know, slam doors on me.

But one thing she does is we can have a -- a talk kind of like we're just doing a few minutes ago with you all here.  But as soon as I get into the hard questions, we call it, about what did you see that night; you know, what were you told that night or what were you involved with that

Exhibit 5002 at 1314

*M. Dannels*

night, she cries and she shuts down and claims that in fact -- and -- and says, This is -- and she uses the word "BS" all the time.

And -- and I've asked her several times, Are you scared? And she says yes. But I can't -- she won't tell me. She won't tell me what happened.

GRAND JUROR: So wouldn't that make her a suspect?

THE WITNESS: It did go -- very much so.

GRAND JUROR: So she wasn't eliminated, then?

THE WITNESS: I have nothing --

GRAND JUROR: For involvement at least.

THE WITNESS: I --

GRAND JUROR: Or knowledge.

THE WITNESS: Can I speak on that?

MR. FRASIER: Sure.

THE WITNESS: I -- I have nothing -- and again, goes back to the reasonability of this case and how we credit/discredit people. I can't eliminate her for seeing something or knowing something that night. I have nothing to tie her to Leah either, except for Nick. And her involvement I believe was post Leah's tragedy. Okay.

MR. FRASIER: Okay. Any other questions?

GRAND JUROR: Yeah, I was just thinking. Right at the end here, we got some information -- the -- the

Exhibit 5002 at 1315

elderly woman.  I -- for better -- I can't run up -- too many names here to remember.

But she had said that there was a car they saw, with a couple individuals, perhaps up by where it's now Cedar Point Industrial Park up there.  And at the road -- now, the road on that side of town, some people have mentioned that that -- is that, at that time, that was also a normal drug-use area also?

GRAND JUROR:  The one that goes down into Roseburg Lumber?

GRAND JUROR:  Cedar Point Road.

THE WITNESS:  Cedar Point Road.  I know the area, but I can't say it was a drug area based on my lack of being here.

GRAND JUROR:  From that period of time.  Okay.

THE WITNESS:  Excuse me on that.

GRAND JUROR:  Okay.

MR. FRASIER:  Okay.  Anything else?

Okay.  Let's try this again.

THE WITNESS:  Thanks again.

GRAND JUROR:  Thanks.

THE WITNESS:  Thank you.

(End of recording.)

Exhibit 5002 at 1316

153

*Certificate*

--oOo--

I certify, by signing below, that the foregoing pages 1 through 152 constitute a correct transcript of WAV files provided of the above-entitled matter, this 11th day of April, 2011.

_____

PEGGY S. JILLSON, TRANSCRIBER

Exhibit 5002 at 1317

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

**STATE OF OREGON,**          )
                             )
           Plaintiff,        )   Case No. 10-CR0782
                             )
v.                           )
                             )
**NICHOLAS MCGUFFIN,**        )
                             )
           Defendant.        )
_____) VOLUME 11


Wednesday, August 11, 2010

GRAND JURY PROCEEDINGS



APPEARANCES:

FOR THE PLAINTIFFS:        **PAUL FRASIER**
                           **DISTRICT ATTORNEY**
                           250 N. Baxter
                           Coquille, Oregon 97423




TRANSCRIBED FROM AUDIO RECORDINGS


TRANSCRIBED BY:        Peggy S. Jillson
                       987 Tivoli Street
                       Eugene, Oregon 97404
                       (541) 689-7964

Exhibit 5002 at 1318

2

**WITNESS INDEX**

COURTRIGHT, Cory                    3

FISHER, Austin                      13

DAVIDSON, Megan                     19

HAMILTON, Dennis "Scott"            32

SMITH, Melissa                      51

REAB, Janet                         66

PARKS, Pauline "Polly"              77

BREAKFIELD, David                   95

HEFFNER, Amber                      106

KRUTCHFIELD, Stacy (Lyons)          114

CURRAN, Juliana (Reab)              122

MAURO, Brett                        130

SMITH, Pamela                       144

PIZZOLA, Heather                    153

EKBLAD, Tosha                       159

HYATT, Alicia (Hartwell)            165

SMISEK, Jesse                       171

Exhibit 5002 at 1319

**COQUILLE, OREGON; WEDNESDAY, AUGUST 11, 2010; 11:59 A.M.**

-o0o-

**TESTIMONY OF CORY COURTRIGHT**

(Witness sworn.)

BY MR. FRASIER:

Q.    Okay, ma'am.  You've been here before; you know these folks.

A few things came up last week that we -- some questions we wanted to -- specifically I had, that we wanted to talk about with you.

At the time Leah disappeared, you were living with your parents in the Simpson Heights area?

A.    Sanford Heights area?  Yes.

Q.    Sanford Heights.

A.    Mm-hmm.

Q.    Okay.  Don't want to keep saying something that's not --

And prior to that, you had a boyfriend or a relationship with an individual named Jimmy Murphy?

A.    Yes.

Q.    And you folks had lived together.  Is that correct?

A.    Yes.

Q.    Last week we heard an allegation that Mr. Murphy had attempted to sexually abuse Leah, that that information

Exhibit 5002 at 1320

had brought to you -- been brought to your attention, and that you didn't do anything about it.

So I guess my first question is were you ever aware that Mr. Murphy had made any inappropriate advances to Leah?

A.    Absolutely not.

Q.    Okay.  And then, Mr. McGuffin indicated that for about two weeks Leah actually lived with the McGuffins, and part of the reason she was living with you was because she was trying to get -- or living with them was she was trying to get away from Mr. Murphy.

Did she ever live with the --

A.    Absolutely not.

Q.    Okay.

A.    No.

Q.    Another thing -- I'm not trying to embarrass you or anything, but this is what came up, and so I'm going to ask you.  Mr. McGuffin claimed that you were heavily into methamphetamine in 2000, and that's another reason why Leah was either staying with them or hanging around the McGuffin residence a lot.

A.    That's a lie.

Q.    Okay.  All right.

A.    That is a lie.

Q.    Okay.  I -- did you -- were you using

Exhibit 5002 at 1321

methamphetamine at all in the year 2000?

A.     No, I was not.

Q.     Okay.

A.     Hmm-mm.

Q.     Did Nicholas ever live with your family at all?

A.     (Laughs.)  Sorry.

Q.     Okay.

A.     It's not funny.

Uh, no, he never, ever, ever, lived with me.  In either home that I lived in.  No.

Q.     Okay.  All right.

Just a couple other questions about Leah that I want to ask you.  First of all, as far as you knew, Leah was in perfect health?

A.     Yes.

Q.     She had -- she'd been involved in athletics at the high school and at the middle school, correct?

A.     Correct.

Q.     And every year she would have had to have a physical and that type of thing to participate?

A.     Correct.

Q.     And nothing was ever brought to your attention that she had, like diabetes, or a congenital heart defect, or anything like that?

A.     No.

Exhibit 5002 at 1322

Q.    All right.

A.    No.

Q.    In the days leading up to the day of when Leah disappeared, did you see anything in how she was behaving or anything like that that caused you concern that she might cause harm to herself?

A.    Uh, no.

Q.    Okay.

A.    Huh-uh.

MR. FRASIER:  I think those are the questions I have.

Grand jury want to ask her anything?

GRAND JUROR:  Did your daughter -- I mean -- did your daughter Denise use meth at the time?  Did your daughter --

MR. FRASIER:  Denise.

GRAND JUROR:  -- Denise use methamphetamines in the year 2000?

THE WITNESS:  In the year 2000, after Leah disappeared, yes, she did.

GRAND JUROR:  Okay.  Did she spend time with Nick for a period of time, like into the school year in that year?

THE WITNESS:  Yes, she did.

GRAND JUROR:  Okay.

GRAND JUROR:  Did Nick live at your house during

Exhibit 5002 at 1323

Christmas that year, for a couple weeks?

THE WITNESS:  In the year 2000?

GRAND JUROR:  Well, it would be going into 2000.

GRAND JUROR:  1999.

GRAND JUROR:  Christmas of '99.

THE WITNESS:  No.  No.  He never did.  As a matter of fact, I can tell you where he was staying.  He was staying on Grape Street with a girl by the name of, uh, Shelly Fisher.

GRAND JUROR:  Here again, I don't want to embarrass you or anything, Cory, but it was also brought out that it was suspected that Leah was pregnant.  Did -- do you know anything about that?

THE WITNESS:  I don't.  I don't know.  All I know is that I had become aware that they were -- had become sexually active, which led me to make the appointment for, um, the health department --

GRAND JUROR:  Mm-hmm.

THE WITNESS:  -- to get her on birth control pills.

GRAND JUROR:  One other quick question from me.  And it was stated that on graduation night that you had allowed Leah to sleep with Nick at the McGuffins'.  That you had stated that it was okay because it was during her period and there would be nothing to worry about.

Exhibit 5002 at 1324

THE WITNESS:  No, that's not exactly the way it went.  That was the one and only night Leah was ever allowed to stay at the McGuffin home.  Um, the kid -- uh, Nick and Leah kept bugging me, oh, I don't know, maybe up to a week before his graduation.  They were going to have a party out there for his graduation.  And they did.  And they did.

And I kept saying no at first, and they finally talked me into it with -- I -- but I also said, I'm going out there when I get off work, because I had seen his parents but never actually met them.  That is the night that I actually met Bruce and Kathy McGuffin.  And I went out there after work.  I probably got there at about 10:30 and left at 11:30, and Leah was already asleep when I got there.

BY MR. FRASIER:

Q.    I want to follow up on that a little bit.  That was one thing I was going to talk with you about, before I forgot to put it on my notes.

But when we had Bruce McGuffin in front of the grand jury last week, he tried to lead us to believe that it was all your idea that Leah spend the night there.  That you absolutely insisted that this occur.  That you felt that this was something special for Leah.  The McGuffins were kind of -- at least the way I was interpreting Mr. McGuffin -- was that they were kind of reluctant to allow this to happen, but because you were so forceful they acquiesced.

Exhibit 5002 at 1325

*C. Courtright*

How -- what was your recollect -- what is your recollection on how this came about?

A.    Of how she got to stay?

Q.    Yeah.  I mean --

A.    Again, I think I just --

Q.    Okay.  Did you have a discussion with the McGuffins about her staying, with Mr. and Mrs. McGuffin, the parents, about this?

A.    No, because I hadn't -- again, I hadn't met them or really even talked to them until that night.

Q.    Okay.  And what kind of conversation did you have with them that night about Leah staying with them?

A.    Um, actually since it was just the night that I had first met them, we just -- I just remember sitting out on their porch.  The party seemed to be pretty much over.  There was just a few people hanging around:  The neighbors.  Um, maybe a few of Wayne's friends.  We just kind of -- I felt like we were just kind of getting to know one another.  Um, and again, Leah was -- they said Leah was already asleep.

Q.    Okay.  Did they -- Mr. and Mrs. McGuffin seem at all reluctant to allow Leah to stay the night there?

A.    No.

MR. FRASIER:  Okay.

GRAND JUROR:  Did you see Leah that evening then, when you got over there?  Or they just said she was asleep,

Exhibit 5002 at 1326

*C. Courtright*

and you didn't interrupt, you didn't bother to --

THE WITNESS:  Yeah, because I -- I didn't even go in their house that night.

GRAND JUROR:  Okay.

THE WITNESS:  I just sat out on the front porch with them at this big picnic table, and visit -- they were across the table from me, and visited with them.

My daughter Denise did go in, and so I did know that Leah was -- I mean, I know that Leah was in there, therefore.

GRAND JUROR:  Did you see Nick, or was he also in -- inside in the party?

THE WITNESS:  Uh, yeah, I saw Nick just briefly. He was kind of coming and going, in and out of the house, and -- that's what I remember about that night.

GRAND JUROR:  So, that was June of 2000, and that was the first time you met them?

THE WITNESS:  Mm-hmm.

GRAND JUROR:  Because they led us to believe that they had known you for years and helped you with this meth problem because you were so close to them.  Correct?  Isn't that what he said?

THE WITNESS:  Wow.

GRAND JUROR:  He said he'd known you for years.

THE WITNESS:  Oh.  No, no, no, no, no.  I had

Exhibit 5002 at 1327

never met these people until then.

GRAND JUROR:  Okay.

THE WITNESS:  That -- that's a lie.

GRAND JUROR:  All right.

THE WITNESS:  Yeah.  Whoa.  Interesting.

(Pause.)

MR. FRASIER:  I think that we --

GRAND JUROR:  My major problem, or my major question that I had of Cory was -- you asked it, Paul.  The accusation that you had -- that you were on meth, and that -- during the period that -- after Leah had disappeared, that you were really heavy into it, and that you were bouncing off the walls at the house.  And they were there and they -- they were trying to help you.

And that was my major question.  And --

GRAND JUROR:  Did you ever go into their house?

THE WITNESS:  Have I ever been into that?

GRAND JUROR:  Inside the house?  Their -- McGuffins' house?

THE WITNESS:  Yes, I've been in their house.  When we were looking for Leah --

GRAND JUROR:  Okay.

THE WITNESS:  -- and that type of thing.  Yeah.

GRAND JUROR:  But not with Leah, not before she disappeared?

Exhibit 5002 at 1328

*C. Courtright*

THE WITNESS:  Not that -- no, huh-uh.  No.

GRAND JUROR:  Okay.

GRAND JUROR:  But did you use meth after -- have you ever used meth?

THE WITNESS:  Um, back in 1988, meth was a part of my life for a few years.  And that's -- I haven't touched it since.

GRAND JUROR:  You say for a few years, though.  Was that preceding '88 or -- because that would put you at --

THE WITNESS:  No.  Um, probably --

GRAND JUROR:  No, '88.

GRAND JUROR:  Oh, '88.  Sorry.  I'm sorry.

THE WITNESS:  Yeah, it's '88 until -- maybe even '87.  In that frame there.  Maybe until -- I mean, I would -- the latest I could say would probably be '90.  But I haven't touched it since.

GRAND JUROR:  But you say that you didn't meet Bruce McGuffin until 2000.  So the year 2000 was the first time you met Bruce.

THE WITNESS:  Yes.

GRAND JUROR:  Did you ever know that Bruce used meth?

THE WITNESS:  Did -- uh --

GRAND JUROR:  During that time?

THE WITNESS:  At that time?  No.

Exhibit 5002 at 1329

*A. Fisher*

GRAND JUROR:  In 2000.

THE WITNESS:  In -- in 2000, did I know that Bruce used meth?  No.

GRAND JUROR:  Did you smoke pot with both kids?

THE WITNESS:  Yeah.  Yeah.

GRAND JUROR:  You never went to school or anything with any of these people?

THE WITNESS:  With any of the McGuffins?

GRAND JUROR:  Yeah.

THE WITNESS:  No.

(Pause.)

MR. FRASIER:  Okay.  Anything else?

GRAND JUROR:  That's all I've got.

MR. FRASIER:  All right.  You're done.

GRAND JUROR:  Thank you for all your --

GRAND JUROR:  Pleasure.

THE WITNESS:  I'd like to thank you all for your time in this.  Hopefully, I won't have to come back. (Laughs.)

GRAND JUROR:  We hope so too.

MR. FRASIER:  Okay.

THE WITNESS:  Thank you so much.

**TESTIMONY OF AUSTIN FISHER**

(Witness sworn.)

BY MR. FRASIER:

Exhibit 5002 at 1330

Q.    First of all, sir, this is the grand jury for Coos County, as we're looking into the disappearance and death of Leah Freeman.  I need to tell you, it's obvious, but I -- we've got two recorders going on here, so --

A.    Okay.

Q.    -- you're being recorded here today.

First of all, could you tell us your name, please, sir, and where you live.

A.    Austin Fisher.  Coquille, Oregon.

Q.    And Mr. Fisher, did you know Leah Freeman?

A.    Yes, I did.

Q.    How did you know Leah?

A.    Um, we were pretty good friends in middle school. We -- you know, middle-school-style dated for about two or three months.

Q.    All right.  Did you make an acquaintance with Nick McGuffin?

A.    Yeah.

Q.    Okay.  Now, when you were middle-school dating, as you put it, Leah, what grade were you in?  Do you recall?

A.    Um, it was the summer out of eighth grade going into our freshman year.

Q.    Okay.  And were you still going with her, so to speak, when you started your freshman year?

A.    Yeah, for about a month.

Exhibit 5002 at 1331

*A. Fisher*

Q.      Then you broke up?

A.      Yeah.

Q.      Okay.

A.      Well, whatever.  Yeah.

Q.      Okay.  Separated?

A.      Yeah.

Q.      Okay.  At some point in time did Leah then start dating Nicholas McGuffin?

A.      Mm-hmm.

Q.      Got to say yes or no, please.

A.      Yes, yes.

Q.      Okay.

A.      Yes, he did.

Q.      Thank you.

        Did you have any contact after you began -- well, after Nick began dating Leah, did you have any contact with Nick, or did he come and talk with you about Leah or things along that line?

A.      Yeah.  He was really jealous of me because, like I said, you know, me and her kind of dated before.  So he, you know, didn't like me, in particular, really talking to her at all.  Still probably doesn't like me particularly.

Q.      Okay.  Did he talk to you about staying away from Leah?

A.      Yeah, he threatened to beat me up one time if I

Exhibit 5002 at 1332

*A. Fisher*

talked to her or whatever, but --

Q.    Would he scream at you?

A.    Um, I don't know if he screamed at me.  But yeah, I guess he yelled at me once.

Q.    Did he use foul language?

A.    Oh, yeah.

Q.    Did he ever threaten to kill you?

A.    Not that I remember.

Q.    I was looking at your statement back in August of 2001.  It says that, you know -- "I asked Austin to tell me how Nick threatened him, and he explained Nick would scream at him, using foul language, and threatened to kill him."

A.    Well, yeah.  I mean, it's been 10 years, so.

Q.    Okay.

A.    Um, I know he would yell at me, and I don't know if -- I know he threatened to, you know, beat me up a lot, but I don't know --

Q.    Yeah.

A.    He might have said, I'll kill you, you know, but --

Q.    Okay.

A.    -- I don't --

Q.    But that was -- he was saying, Stay away from Leah or I'm going to --

A.    Yeah.  Pretty much, yeah.

Exhibit 5002 at 1333

Q.    All right.  I've been asking these questions of everybody.  Has anybody ever told you that they killed Leah Freeman?

A.    No.

Q.    Has anybody told you that they saw what happened to Leah?

A.    No.

Q.    Okay.  Outside of what we talked about here today, do you have any other information about this case that you think the grand jury should know?

A.    Not that I can think of, no.

Q.    Okay.

A.    I don't really know anything that would help in, you know --

Q.    All right.

A.    -- like that matter, I guess.

Q.    Okay.

A.    I mean, I've heard rumors, the same thing everybody else does, but --

Q.    Okay.

GRAND JUROR:  When you did talk to Leah, after she met Nick, did she talk to you about Nick?  What did she say?

THE WITNESS:  Um, she did, but she got awful, you know, short with everybody when she started hanging out with

Exhibit 5002 at 1334

18

*A. Fisher*

Nick.  He was pretty controlling and, uh, she didn't -- really nobody ever -- she isolated herself a lot.  And so I didn't really get to see her --

GRAND JUROR:  So, she kind of went along with what he wanted?

THE WITNESS:  Yeah, she did.

(Pause.)

MR. FRASIER:  Okay.  Any other questions?

GRAND JUROR:  How about the relationship when you seen them together?

THE WITNESS:  Most of the time they were fighting.  They -- they argued a lot, and there was always screaming.  There was never an argument; it was always screaming back and forth.  So it was either one extreme to the next, you know.  They're either hugging and kissing, lovey-dovey, or they're just screaming at each other.  It was -- you know?  So.

(Pause.)

GRAND JUROR:  Did you see any physical fighting between the two of them?  Like slapping, hitting?

THE WITNESS:  Um, I've seen, you know, where he would come up to her yelling and then she'd push him away and stuff like that, and then he'd try to grab her and then she'd push away.  Just, you know, things like that.  But nothing like -- never any fists or nothing.  Uh, no, I didn't.  I

Exhibit 5002 at 1335

never saw that.

GRAND JUROR:  Thank you.

GRAND JUROR:  In your opinion, was she capable of defending herself with Nick?  Was he somewhat --

THE WITNESS:  Against a man that was four or five years older than her?  Probably not.

GRAND JUROR:  Well, I mean --

THE WITNESS:  I mean, if he really wanted it to happen.  I mean, I -- no.  I would say no.

GRAND JUROR:  Okay.

(Pause.)

MR. FRASIER:  Any other questions?

Okay, sir.  That will do it.

THE WITNESS:  All right.  Thank you.

GRAND JUROR:  Thank you.

**TESTIMONY OF MEGAN DAVIDSON**

(Witness sworn.)

BY MR. FRASIER:

Q.    Okay.  First of all, this is the grand jury for Coos County, and we're looking into the disappearance and death of Leah Freeman.  It's obvious, but I just need to tell you we are recording the proceedings.  Okay?

A.    Okay.

Q.    First of all, could you tell us your name and where you live.

Exhibit 5002 at 1336

A.    I'm Megan Rae Davidson, and I live in Tacoma, Washington.

Q.    And did you live in the Coos County area in the past?

A.    I did.

Q.    How long ago was it that you lived here?

A.    Um, about two years ago.

Q.    Okay.  You left here about two years ago?

A.    Mm-hmm.

Q.    Were you living here in the year 2000?

A.    Yes, I was.

Q.    Did you go to high school here?

A.    Yes, I did.

Q.    Did you know an individual named Nick McGuffin?

A.    Yes, I do.

Q.    And how long did you -- have you known Nick?

A.    I've known Nick since I was in seventh grade.

Q.    Leah Freeman.  Did you know Leah Freeman?

A.    I did know Leah.

Q.    And how did you know her?

A.    I just know Leah from high school.

Q.    Were you aware of Nick and Leah being boyfriend/girlfriend?

A.    Yes, I was.

Q.    Did you have an opportunity to see these two

Exhibit 5002 at 1337

together?

    A.    Yes, I did.

    Q.    How well did they get along?

    A.    Um, from what I've seen, they got along great.  I did get to witness an argument in Powers, Oregon.  And, um, when we all drinking and, uh, Leah and Nick got into a fight.  And she, uh, was hitting him, and I -- and he picked her up over his shoulders and just carried her to the car and put her to sleep.

        And that's the only -- I didn't really hang out with them much.

    Q.    Okay.

    A.    I was more friends with Nick, so.

    Q.    I'd like to go the night that Leah disappeared, which was June 28th of 2000.  Did Nick call you to ask you if you'd seen Leah?

    A.    Yes, he did.

    Q.    Could you describe that conversation and how you felt about it.

    A.    Um, well, it was really early in the morning.  And, um, to be honest, I don't -- I couldn't tell you what time.  I just know that it was really early, probably between 4:00 and 6:00 a.m.  And, he -- I picked up my phone, and he said, "Megan," and his voice sounded really shaky.  And he asked me if I had seen Leah.  And I replied, "No, Nick.  Why

Exhibit 5002 at 1338

would I have seen Leah," because we have -- Leah and I never hung out.  It was --

Q.    Okay.

A.    -- me and Nick were friends.

And so I found it strange that he was asking me if I'd seen Leah.

Q.    Okay.  Now, after -- well, a couple of weeks or so after Leah disappeared, was Nick having problems with his mom and dad?

A.    Um, yes.  I -- I do believe so.  I can't remember why.  I think it was just the stress --

Q.    Okay.

A.    -- of the situation had gotten to the family. And I can't exactly remember, you know, why they weren't getting along.

Q.    Okay.  Did he actually move in with you and your mother?

A.    Um, he stayed with me and my mom, yes.  For a shorter period of -- not too long.  I can't exactly remember how long, but more than a week.

Q.    Okay.  While he was there, did he ask to engage in sex with you?

A.    Um, yeah.  Well, we -- Nick and I have always had a relationship like that, because we were boyfriend and girlfriend.

Exhibit 5002 at 1339

*M. Davidson*

Q.    Okay.

A.    And, so -- I mean, I -- yeah.

Q.    Okay.  This was before Leah's body was found --

A.    Mm-hmm.  Correct.

Q.    Okay.

A.    And I, uh -- yeah.

Q.    And so are you -- what did you say to him when he was --

A.    Well, I asked him.  I was like, are -- Nick, you know, are you sure you're ready?  And he just replied, Yeah, it's fine.

Q.    And so you did have sexual intercourse with him?

A.    Yes.

Q.    Did Nick ever tell you anything about what he thought happened to Leah?

A.    No.  I don't remember Nick ever bringing anything up about -- I'm -- he just got really weird afterwards.  And I -- I honestly don't remember him ever saying anything to me about it.

Q.    Okay.  Did you or do you know Kristen Steinhoff?

A.    Yes, I do.

Q.    And you have been friends with her, best friends since seventh grade?

A.    Yes.

Q.    Okay.  And you had a falling-off about -- she was

Exhibit 5002 at 1340

*M. Davidson*

using methamphetamine pretty often; is that correct?

A.    Mm-hmm.

Q.    Do you know if she -- if Kristen and Nick hung out together?

A.    Yes.

Q.    Do you know if they used methamphetamine together?

A.    I can't say for -- I've never seen them do it, but yes.

Q.    How do you know that?

A.    Well, because they're -- Kris -- that's all Kristen ever did, and -- and Nick got into it really bad, and I'm pretty sure that's the only reason why those two would have hung out.

Q.    When was Nick into methamphetamine pretty bad?

A.    Um --

Q.    In relation to Leah's disappearance?  Before?  After?  During?

A.    Well, I know before their relationship we'd all messed around with it, you know, just trying it out.  And then some of us didn't go back, and some of us did.  And Nick was one of them that did go back after Leah's disappearance.

Um, I've never seen him do it, but I know Nick and he just was never the same.  And he was ghost-white, and skinny, and hanging out with Kristen.  So that right there

Exhibit 5002 at 1341

*M. Davidson*

gives me --

Q.    Okay.  All right.

Now, after he'd been initially interviewed by the police, I think this year, you called him back in May and wanted to talk to him about a car that Kristen Steinhoff had.  Could you tell the grand jury about that.

A.    Well, I just -- I had asked the police if they ever -- you know, they were asking me about, um, Nick's Mustang, and Nick's Thunderbird, and -- and I just said, Well, what about the purple Hyundai that Kris -- that was Kristen's car?  And I know Nick drove it around a lot, and then Kristen also drove it around, and she got pulled over all the time because they knew it was her and she wasn't legal to drive.  But I just thought that maybe, since it -- the purple car had never been brought up, maybe it should have been brought up.  Because, you know, maybe it -- you know.

Q.    Okay. All right.  That car, did that -- I think you also told the police that the car was often broke down and not very reliable.

A.    Right.  It was broke down a lot.

Q.    Okay.  I've been asking this of a lot of witnesses, so I'll ask you this.  Has anybody told you that they killed Leah Freeman?

A.    No.

Exhibit 5002 at 1342

Q.    Has anybody told you that they saw what happened to Leah Freeman?

A.    Um, I -- Alicia Michaud would get drunk and say -- say she knew what happened, but she would never get into detail with me.

Q.    Okay.

A.    I personally think she was looking for attention, um, because I think if she knew something, then -- but nobody has ever -- no --

Q.    Okay.

A.    -- just blatantly said, you know.

Q.    Is there anything else that we haven't talked about here today that you think the grand jury needs to know?

A.    I don't think so.  I wish I could be more help, I know that.

Q.    Okay.

A.    Because 10 years is a long time and -- you know.

Q.    Okay.  Any other questions?

GRAND JUROR:  How well did Alicia and Nick get along together?

THE WITNESS:  Alicia?

GRAND JUROR:  Yeah.  And Nick.

THE WITNESS:  I -- I don't know.  I don't even know how -- I'd never even seen Nick and Alicia hang out, honestly.  It -- Alicia was into the meth also.  So, you

Exhibit 5002 at 1343

know, everybody just kind of falls into, you know,

communicating in our small little town, you know.

I -- but I honestly don't remember Alicia and

Nick ever being friends and hanging out, one on one.

GRAND JUROR:  Did you ever meet Nick's parents?

THE WITNESS:  Mm-hmm.  I know them really well.

GRAND JUROR:  Did -- had you been to their -- and

so you've been to their house?

THE WITNESS:  Mm-hmm.

GRAND JUROR:  Was drug use -- marijuana prevalent

use there?

THE WITNESS:  Yes.

GRAND JUROR:  So kids could come and go and use

marijuana there?

THE WITNESS:  Um, yes.  I'm not -- I've never

been out there and used marijuana while his parents were at

the home.  But we used to go out there, yes, and smoke.

GRAND JUROR:  Okay.  Did --

THE WITNESS:  I know his mom doesn't use.

GRAND JUROR:  Did Nick and his -- you say Nick

had a falling-out a couple weeks after.  He never said what

drove -- what that was about?

THE WITNESS:  No.  I just assumed it was his

girlfriend was missing, you know.  I -- and meth, and

alcohol.

Exhibit 5002 at 1344

*M. Davidson*

GRAND JUROR:  Did --

THE WITNESS:  I just assumed it was stress, and --

GRAND JUROR:  They didn't -- they didn't call your parents -- how were your parents with that situation? With him being there?

THE WITNESS:  Well, my parents are -- were divorced.  My dad, the other day, was asking, What was your mother thinking?  And I think it was just that my mom really had a lot of respect for Nick.  And I think she felt bad for him because she would have never let anybody else move into my home.  But, um, back then, apparently my mom was okay, but my dad would have never been okay with a male living in my house.  I was only 16, 17.  So.

GRAND JUROR:  Was the McGuffin house known among the kids as a place to hang out?  A place to get -- how --

GRAND JUROR:  A safe house.

GRAND JUROR:  -- a safe house?  Yeah.  Was that ever, you know -- kids would go there to get away from their parents for a while --

THE WITNESS:  No.

GRAND JUROR:  -- or anything like that?

THE WITNESS:  No.  Not that I'm aware of.

GRAND JUROR:  What is your opinion of Nick's mom and dad?

Exhibit 5002 at 1345

*M. Davidson*

THE WITNESS:  My opinion of Nick's mom and dad is they're great people.  I've -- I've, you know.  His mom, I know, is the sweetest person.  Um, you know, his dad was always really nice.  I've never seen anything, you know -- never seen them fighting, or anything like that.  As far as I know, they're just really normal, you know.

GRAND JUROR:  Did you know Wayne?

THE WITNESS:  Mm-hmm.

GRAND JUROR:  What's your opinion of Wayne?

THE WITNESS:  I do not like Wayne, whatsoever.

GRAND JUROR:  And for what reason?

THE WITNESS:  Well, because he's -- how do I put this?  Force -- he -- he's really touchy-feely, and he's forceful.  Like my -- my friend Darla, you guys have already talked to her.  He actually pinned her down.  One night we were down at the bars, and this was -- obviously we were 21.  And they went outside, and he was trying to kiss Darla, and Darla didn't want anything to do with it, and he actually held her down and gave her hickeys on her neck.

And Wayne has always given me the creeps.  I will never be alone in the same room with Wayne because he just gives me that vibe.  I don't know if it was because he -- you know, he never got a lot of attention from females.  So he kind of forced it, I think, you know?  I --

GRAND JUROR:  And most of your time you were

Exhibit 5002 at 1346

*M. Davidson*

around Wayne was while you were dating -- or while you were hanging with Nick, though?

THE WITNESS:  Yeah.  Yeah, and I've hung out -- Wayne hangs out with a lot of my other friends too.  So, you know, it's a small town.  We all party together and all end up in the same area.

GRAND JUROR:  Did you ever get the sense that Nick was looked on more favorably by his parents than Wayne was?

THE WITNESS:  No.  I -- I think they were equal. I think -- I mean, I didn't live in the home with them, but, you know, they all -- you know, when they turned 16 they both got cars.  And, you know, their dad spent a lot of time with them working on vehicles and stuff like that.  I would say that they treated them equally.  I couldn't see them not.

GRAND JUROR:  What kind of car did Wayne get?

THE WITNESS:  Well, I just remember -- it was a -- well, Wayne's out of town, of course.  (Laughs.)

GRAND JUROR:  Uh-huh.

THE WITNESS:  I don't know when he was 16. When -- I remember, he had a Thunderbird, and a pickup.  An old little pickup.  And all kinds of cars, he went through them.  As did both of the boys.

GRAND JUROR:  When you saw the blue Thunderbird that Nick had, were you --

Exhibit 5002 at 1347

*M. Davidson*

THE WITNESS:  The Mustang?

GRAND JUROR:  The Mustang, excuse me.  Were you familiar with it?

THE WITNESS:  Mm-hmm.

GRAND JUROR:  Did you see -- was it all decked out and finished on the inside?

THE WITNESS:  Yes.  But I do know that there was a question about the trunk, and I do know that that was taken out because there was a gas leak.  I do know that for a fact because we would sit in the car, and when you're driving you would get high off of the fumes.

GRAND JUROR:  Mm-hmm.

THE WITNESS:  So I know that they -- that was an issue, and they were working on that.

GRAND JUROR:  But before --

GRAND JUROR:  So there wasn't a bed liner or a trunk liner or anything?

THE WITNESS:  No.  I don't -- I never remember there being a trunk liner in there.  But honestly, I never really, you know, paid that much attention.

GRAND JUROR:  You're a girl.

THE WITNESS:  Yeah.  And I just -- I do know that there was gas problems, and I do know that they were working on trying to fix it.  So.

GRAND JUROR:  Did he keep a lot of stuff in his

Exhibit 5002 at 1348

trunk?

THE WITNESS:  I don't think so.  I don't think so.  Nick's a really clean person.  His cars were always really tidy, so I wouldn't think so.  But I never seen, so.

MR. FRASIER:  Any other questions?

GRAND JUROR:  Were the McGuffins the type of parents that would do anything for their kids?

THE WITNESS:  I would think to a certain extent. But I don't think if they thought that their son had something to do with this, that they would, you know -- I don't think that they would hide it.  I -- I don't think. But I don't know.

I know I'm a mother, and if my son, you know, was accused of doing something like this, I would definitely have to tell somebody.  I don't think that I would, you know -- that Leah is somebody's daughter.  So, I don't -- I hope that they would.

MR. FRASIER:  Okay.  Anything else?

Okay.  You're done and free to go.

GRAND JUROR:  Thank you.

THE WITNESS:  Bye.

GRAND JUROR:  Thank you.

**TESTIMONY OF DENNIS "SCOTT" HAMILTON**

(Witness sworn.)

BY MR. FRASIER:

Exhibit 5002 at 1349

Q.    Okay.  First of all, this is the grand jury for Coos County and we're looking into the disappearance and death of Leah Freeman.  It's obvious, but I need to tell you, we are recording what's going on in here today.  Okay?

A.    Yep.

Q.    First of all, could you tell us your name, please, and where you live.

A.    My name is Dennis Scott Hamilton, and I live in Coquille, Oregon.

Q.    And you commonly go by your middle name, Scott?

A.    Yeah, I go by Scott, but Dennis is my first name.

Q.    All right.  Sir, do you know an individual named Nick McGuffin?

A.    Yes, I do.

Q.    How well do you know him?

A.    Well, we've gone to school since the third grade, so I know him pretty well.

Q.    Leah Freeman.  Did you know Leah Freeman?

A.    I knew her.  I didn't really hang out with her a whole lot.  I mean, we went to prom with her together and all that, but other than like hanging out with her, I didn't hang out with her or nothing.

Q.    When you say you went to prom together, what do you mean by that?

A.    Well, me and my girlfriend at the time and Nick

Exhibit 5002 at 1350

*S. Hamilton*

and Leah, we all went to prom together.

Q.    And that would have been the year 2000?

A.    Yeah.

Q.    And that was the year Nick graduated?

A.    Yeah.

Q.    Okay.  Did you graduate in 2000?

A.    Yes, I did.

Q.    Okay.

A.    Barely, but I did.  (Laughter.)

Q.    All right.  Ben, my son, graduated the same year?

A.    Yeah.  We all -- we wrestled together and everything in the fall.

MR. FRASIER:  Yeah, I know.  I can't remember.  Okay.

GRAND JUROR:  (Indiscernible.)

MR. FRASIER:  All right.

BY MR. FRASIER:

Q.    Well, I want to talk about -- well, first of all, could you tell us, how did -- from what you could see, how well did Nick and Leah get along?

A.    They got along good in my eyes, you know.  Yeah, they fought just like any couple does, but I never seen anything that would make me worry.

Q.    Okay.  Well, let's talk about the night that Leah disappeared, which would have been June 28th, 2000.  Did you

Exhibit 5002 at 1351

*S. Hamilton*

see Nick that night?

A.   I didn't talk to him personally, but I did see him.

Q.   Where did you see him?

A.   I seen him at Kristen Steinhoff's house.

Q.   Okay.  And at the time -- who were you dating at that time?  Was it Melissa Smith?

A.   Yeah, I -- I was dating her at the time.

Q.   Okay.  And you were also kind of getting interested in Kristen Steinhoff?

A.   Yeah, I was being a bad kid.

Q.   All right.  On the night that Leah disappeared, you saw Nick and Kristen together over there at Kris -- at her house?

A.   Yeah, they were at her house.

Q.   Did you kind of sneak up on a window and eavesdrop on them?

A.   Yes, I did.

Q.   And why'd you do that?

A.   Well, I always went through her window.

Q.   Okay.  (Laughter.)

A.   It was just what I did.

Q.   All right.

A.   I just happened to catch Nick in there, and so --

Q.   Okay.  (Laughter.)

Exhibit 5002 at 1352

A.    I just stood there quietly.  (Laughter.)

Q.    All right.  Well what, if anything, did you hear while you were standing outside the window?

A.    The only thing I heard was Nick saying that he needed help with something, and he needed her help.  He said that a couple times, repetitively, and then they both left in his car.  So, that's when I just went home.

Q.    Okay.  What car was that?

A.    His Mustang.

Q.    Did you ever show yourself to them that night?

A.    No, I did not.

Q.    Now, later on, did you have a conversation with Nick about what had happened with Leah that night, where she'd been, and so forth?  Where he'd dropped her off, and so forth?

A.    I've never talked to Nick about how that all happened.

Q.    Okay.

A.    He -- he asked me if I'd -- like, the next day, if I'd seen Leah last night or anything like that.  I said, No, I didn't see her.

Q.    Okay.

A.    You know.

Q.    Well, the reason I was asking that, there was something in the history reports about him telling you that

Exhibit 5002 at 1353

he'd gone to pick her up at Cheri Mitchell's, and he actually did pick her up and then dropped her off at McKay's.

A.    He -- he did say something about he was -- well, see that's the part that I can't remember, you know.  It's been a while.

Q.    Okay.

A.    But we talked about that he was -- she was -- Leah was wanting to go to Cheri's, and went out from -- what I remember is Nick didn't want her to go to Cheri's.

Q.    Okay.

A.    So, from there I remember him saying something about dropping her off at McKay's, but I don't remember Leah already being there.  I thought Nick was supposed to take her there.

Q.    Okay.  I just want to look at something real quick here.

GRAND JUROR:  Were you pretty sure that Nick wasn't happy about her going?

THE WITNESS:  Yeah, I'm pretty -- I'm sure about that.  I knew Nick was mad about it, because Nick wanted to hang out with her and Leah wanted to go hang out with her friend, and --

GRAND JUROR:  Mm-hmm.

THE WITNESS:  -- Nick was all mad about it.

BY MR. FRASIER:

Exhibit 5002 at 1354

38

*S. Hamilton*

Q.    Well, while I'm looking at this -- I can't seem to find it real quick, but there was a -- about a week after Leah disappeared, did Nick ask you -- or after Leah's body had been found, did Nick ask you to go for a ride?

A.    Yeah.  He picked me up at Fast Mart.

Q.    Okay.  Where'd you go?

A.    He -- he didn't tell me where we were going, but he ended up taking me down Lee Valley Road, where they found her body at.

Q.    And what happened when you got there?

A.    He -- we drove down the road a little ways, right close to where the old Boy Scout camp was down there, and he parked on the left side of the road, and we got out.  And I was like asking him what we were doing, and he was real quiet and acting kind of weird.

And we walked back down the road a little bit where you can look down in the ravine, and he kept talking weird about how he could see her laying down there by this rock.  And he's -- this certain boulder.  He just kept pointing at it, acting real weird.

And that's when I was like, You know, Nick, I don't know what happened.  I mean, I -- you know, I'd like it if you took me back to town, because I don't really want to hang around you right now because you're acting kind of strange.

Exhibit 5002 at 1355

Q.    Okay.  And did he say anything like wishing he could have helped her?

A.    He -- yeah.  He said -- he said he would -- he wished he could have helped her, and he -- he's talking about how he could -- it's like he could picture her laying there, which it really made me feel weird.

Q.    Okay.  Now look at this here.  I found what I was looking for.  You were interviewed by the police about what you knew about the case.  Is that right?

A.    Yes, I was.

Q.    Okay.  And I'm just going to read to you what the police put in their report.  We'll see if this jogs your memory.

        "Hamilton said once when he began wondering if McGuffin might have had something to do with Freeman's disappearance, Hamilton said he came out and asked McGuffin to his face if he had anything to do with it. According to Hamilton, McGuffin denied anything and offered a brief explanation.  Hamilton said McGuffin told him that he was supposed to pick up Freeman at Cheri Mitchell's house, but had been late and Freeman had already left.  Hamilton said McGuffin told him that he found Freeman walking, and picked her up in his car, then began arguing with her.  According to Hamilton, McGuffin said that Freeman wanted out of the car, and he

Exhibit 5002 at 1356

*S. Hamilton*

let her out near McKay's."

Do you recall telling the police that?

A.    I don't remember saying that -- anything about Nick picking her up there, because I thought it was the other way around.  I thought Nick was supposed to be dropping her off there, and he didn't want to.

Q.    Okay.

A.    But that's when I told them when they talked to me a month ago, or two months ago, or whenever it was.

Q.    All right.  Well, did the police try to have you do a phone call to Nick and get him to say what we just talked about here today?

A.    The only thing that he said when I called him is he told --

Q.    Well, I don't want to get into what he said there, okay?  But I just -- I mean, the police clearly thought that you were telling them that Nick picked her up after she left Cheri's, right?  That's why they were having you make the phone call.

A.    They were having me make the phone call to see if he'd say anything --

Q.    Okay.

A.    -- that would make him look --

Q.    All right.

A.    -- guilty of it, which in my eyes he kind of did.

Exhibit 5002 at 1357

41

*S. Hamilton*

Q.    Well, never mind.

Okay.  Now -- (Pause.)

Did you ever hear from Nick that Bill Sero was the one that killed Leah?

A.    No, I've never heard Nick say anything like that. You know, to be honest, Nick didn't really say anything about it.

Q.    Well, I'm having a little problem here, Scott, because I'm looking at the reports.

It says here, "Hamilton told me that approximately two weeks prior to Freeman's body being found, he recalls McGuffin saying that Bill Sero was responsible for her disappearance."

A.    Well, I didn't say that, so --

Q.    How did you say --

A.    -- I'm sure I'd remember.

Q.    "Hamilton said that it seemed like he was throwing it out there because everyone was looking at him.  Hamilton did not recall McGuffin giving any details, just mentioning it."

A.    I don't remember Nick ever saying anything about Bill, ever.  I mean, lots of people did say stuff about Bill, but I don't even hardly know Bill, so.

Q.    Okay.  Well, let me ask you these questions.

Has anybody told you that they killed Leah

Exhibit 5002 at 1358

Freeman?

A.    No.

Q.    Has anybody told you that they saw what happened to Leah Freeman?

A.    No.

Q.    Is there anything else about this case that you think the grand jury should know about?

A.    The phone call when I called Nick.

Q.    Well, we can't get into that.  Okay?

A.    The fact that Nick's dad confronted me at the smoke shop.

Q.    Okay.  Tell us about that.

A.    Uh, I don't know if it's three weeks, I guess.  A month ago, maybe?

Q.    Okay.  What happened?

A.    I was going to stop at the smoke shop to get a pack of cigarettes, before I --

Q.    This is the smoke shop over in Coos Bay?

A.    Coquille -- no, Coquille.

Q.    Oh, here in Coquille.

A.    Yeah, right here in Coquille.

And I walked in there, and I was -- I was at the counter buying my pack of cigarettes and I heard someone say my name.  And they sounded kind of grumpy.  So I looked up, and there was Bruce.

Exhibit 5002 at 1359

*S. Hamilton*

And, you know, we had known each other for a long time, so I was like, "Hey Bruce," you know, "what's up?"

And he looks at me, all mad, and he's all, "I don't know, you fucking tell me."

And I was like, "Life's a struggle and money makes the world go round."  And he didn't say nothing else to me, and I left.  And when I came back in there the next morning, Greg said he was just talking about me trying to set him up or something.  And Greg's the one that owns the store, so.

Q.    Okay.

A.    But he was talking about -- going off about how I was trying to set him up and whatever else.  And like Greg said, he was finally making himself look all guilty or something, so I was -- that's all that was said to me.  But I thought that was weird.  I don't know why he'd say anything to me.

Q.    Okay.

A.    But that's the only weird thing that's happened.

MR. FRASIER:  All right.

GRAND JUROR:  The district attorney asked you if you knew who had killed Leah, or had anybody said anything about it.  And I guess the last one, that he didn't ask, was did you kill Leah Freeman?

THE WITNESS:  No, I did not.

Exhibit 5002 at 1360

*S. Hamilton*

GRAND JUROR:  Do you know Wayne McGuffin?

THE WITNESS:  Yeah, I know Wayne.

GRAND JUROR:  What -- would you describe Wayne to me, in your opinion?

THE WITNESS:  In my opinion?

GRAND JUROR:  Yeah.

THE WITNESS:  A mouthy son of a bitch.

GRAND JUROR:  You don't like Wayne.

THE WITNESS:  No, I don't.  Never have.

GRAND JUROR:  Did -- how much older was he than Nick?

THE WITNESS:  A year.  A year and a half.  I think he was only a class or two ahead of us.

GRAND JUROR:  Ahead of you.  Uh-huh.  Did he -- how was his relationship, as far as you know?

THE WITNESS:  Brothers.  Fought all the time.

No, I guess not.  They probably fought more than me or me and my brother, but --

GRAND JUROR:  Had you been out to the McGuffin house before?

THE WITNESS:  Oh, yeah.

GRAND JUROR:  Was it a pretty prevalent pot house?  I mean, people --

THE WITNESS:  Well, yeah.

GRAND JUROR:  The dad approved of it, didn't he?

Exhibit 5002 at 1361

*S. Hamilton*

Didn't care?

THE WITNESS:  He didn't care.

GRAND JUROR:  The mother, though, was she ever there when the -- this took out -- took place?

THE WITNESS:  She was usually home, if she wasn't at work, you know.  She was --

GRAND JUROR:  She knew about it, then?

THE WITNESS:  Oh, yeah.  She knew about it.

Go ahead.

GRAND JUROR:  Did kids hang out at McGuffins' house as a kind of safe house?  You know, where the -- when their own home couldn't --

THE WITNESS:  I'd say yeah.  There were probably a few kids that probably hung out there just to get away from their own house because they could get away with things there rather than at their own house.  Yeah.  I'd have to say yeah.

GRAND JUROR:  Okay.  You didn't --

GRAND JUROR:  But they didn't stay there.  They didn't sleep there or spend two weeks in there or anything, or --

THE WITNESS:  I -- I don't think they did anything like that.  I think they just went out there at the end of the day, and would go home at night, you know.

GRAND JUROR:  Okay.

GRAND JUROR:  They probably -- what, that they

Exhibit 5002 at 1362

*S. Hamilton*

could get away with more at the McGuffins' house than they could have at home?

THE WITNESS:  Yeah.

GRAND JUROR:  Yourself included?

THE WITNESS:  I didn't really hang out there a whole lot.

GRAND JUROR:  Oh, okay.

THE WITNESS:  You know, I'd go out -- I went out and fixed his car for him, and stuff like that.

GRAND JUROR:  It's a -- oh.  Okay.

GRAND JUROR:  Do you know about his gas tank problem?  The Mustang?  Did you work on that at all with him?

THE WITNESS:  No.  I never worked on his Mustang.

GRAND JUROR:  Oh.  On other cars?

THE WITNESS:  This is after the fact.

GRAND JUROR:  Okay.

(Pause.)

GRAND JUROR:  Were you familiar, did -- somebody already asked about the Mustang.  Were you familiar with his Mustang?

THE WITNESS:  Yeah.

GRAND JUROR:  What kind of shape was it in?

THE WITNESS:  It had a half-assed paint job on it.  (Laughter.)

I mean, other than that, it wasn't real great.

Exhibit 5002 at 1363

*S. Hamilton*

GRAND JUROR:  Yeah.

THE WITNESS:  I think they were slowly trying to fix it up, but it's a Ford, so I'm not a big Ford fan.

GRAND JUROR:  You don't know why Nick took you out to Lee Valley Road though, huh?

THE WITNESS:  No, he didn't -- he didn't say nothing.

GRAND JUROR:  But he freaked out there?

THE WITNESS:  Yeah.  That's what he said.

GRAND JUROR:  He got all paranoid, and --

THE WITNESS:  Just acting weird, you know?  When he --

GRAND JUROR:  How was he before he got out there, though?

THE WITNESS:  Quiet.  Didn't really say a whole lot.  Then when I kept asking him where we were going, he's all, Oh, we're just going for a drive.

GRAND JUROR:  You guys go out there a lot?

THE WITNESS:  No.  I never went out Fairview with Nick, which I thought was weird.

GRAND JUROR:  Was that before or after the body was found?

THE WITNESS:  This -- see this is my rough spot of remembering, because you know, you think there'd be crime scene tape or something, though.  There was nothing like that

Exhibit 5002 at 1364

48

*S. Hamilton*

out there when we went out there, so I can't honestly say if it was before or after. And I told the cops that when they interviewed me the last time, too. You know, I --

GRAND JUROR: You didn't bother to go look over the bank where he was looking, then?

THE WITNESS: I mean, I walked over. I was right next to him. I seen the boulder he was pointing at, but -- I was like -- that's when I got kind of freaked out and went down by him, you know, and was, Hey, you know.

GRAND JUROR: Was that before school started again?

THE WITNESS: Yeah, that's before school started again. Pretty sure. Well, I was out of school, so.

GRAND JUROR: Well, so was Nick.

THE WITNESS: Yeah, we were both out of school, so. It's a tough one to say, too. It hadn't been real close, though.

GRAND JUROR: How was the weather?

THE WITNESS: You know, it was sunny. It was sunny.

GRAND JUROR: Probably still summer. (Laughter.)

GRAND JUROR: Before school started.

GRAND JUROR: September probably wasn't too far away.

THE WITNESS: That's a good call there. I like

Exhibit 5002 at 1365

*S. Hamilton*

that one.  That -- it was a sunny day.  It was a sunny day.

GRAND JUROR:  Probably in the early fall, I think.

THE WITNESS:  Yeah.

GRAND JUROR:  Do you know the location where Leah's body was found?

THE WITNESS:  Yeah.  The cops -- I actually went out there with the cops.

GRAND JUROR:  Oh.

THE WITNESS:  They had -- they took me out there to show them --

GRAND JUROR:  (Indiscernible.)

GRAND JUROR:  Was it near that location where you went with Nick?

THE WITNESS:  I took them right where Nick took me.

GRAND JUROR:  So it was the same one.

GRAND JUROR:  Same spot.

THE WITNESS:  Same spot.  I took them right where he took me.  So.  Well, it was a little more grown up, but -- you know.  I'm the outdoorsy type.  I know all the woods, hunt and fish, all that stuff.

GRAND JUROR:  What did Wayne drive back then, do you know?

THE WITNESS:  He either had his gold-and-black

Exhibit 5002 at 1366

*S. Hamilton*

'72 El Camino or he had an older -- what was that car?  I don't think it was a Thunderbird because Nick had the red one.  Maybe it was an older Thunderbird.  Gray?  Or Silver?  Either -- I'm thinking he drove the El Camino more than anything, though, so.

(Pause.)

Because we always used to race.  Because I had a '64 El Camino.

GRAND JUROR:  You must be a Chevy guy.

THE WITNESS:  Well, I'm kind of a Dodge-Chevy guy.  I like Dodge, but they're expensive, and Chevy's cheap.

GRAND JUROR:  Until you go buy a new one.

THE WITNESS:  Well, unless you go buy a brand-new one.  We're talking old.

GRAND JUROR:  Oh, okay.

THE WITNESS:  No fuel injection, none of that.  Simple plain-jane.

(Pause.)

MR. FRASIER:  Any other questions?

GRAND JUROR:  I don't think so.

MR. FRASIER:  Okay.  That will do it.  You're excused.

THE WITNESS:  All right.  All you guys have a good day.

MR. FRASIER:  You too.

Exhibit 5002 at 1367

*M. Smith*

GRAND JUROR:  Thank you.

THE WITNESS:  You're welcome.

### TESTIMONY OF MELISSA SMITH

(Witness sworn.)

BY MR. FRASIER:

Q.    Okay.  First of all, this the grand jury for Coos County, and we're looking into the disappearance and death of Leah Freeman.  I need to tell you, it's obvious, but we're recording everything.

A.    Okay.

Q.    Okay?

A.    Okay.

Q.    First of all, could you tell us your name, please, and where you live.

A.    Melissa Smith.  I live in North Bend, Oregon.

Q.    Previous witness we had in here, Scott Hamilton, do you know him?

A.    Mm-hmm.

Q.    Did you know him?

A.    Yes.

Q.    Could you tell us how you knew Scott, what your relationship was like with him?

A.    Um, I knew him.  We dated for about two years in high school.

Q.    Okay.  And you went to the prom with him?

Exhibit 5002 at 1368

A.    Yes.

Q.    (Indiscernible.)

A.    Him, Nick, and Leah.

Q.    All right.  Did you graduate in 2000?

A.    2002.

Q.    2002.

A.    Mm-hmm.

Q.    Did you know Nick McGuffin?

A.    Yes.

Q.    How well would you say you knew him?

A.    Um, pretty well.  Me, Scott, Leah, and Nick all hung out together quite a bit right before she disappeared.

Q.    And Leah, you knew her, obviously.

A.    Mm-hmm.

Q.    How well would you say you knew her?

A.    Um, pretty well.  We were very close right before she disappeared.

Q.    Okay.  You were aware that there -- well, you were aware that Nick and Leah were boyfriend/girlfriend?

A.    Correct.

Q.    Could you tell the grand jury what you saw of their relationship, how they behaved with each other and so forth.

A.    Um, most of the time they were pretty happy.  And they fought, like teenage couples do --

Exhibit 5002 at 1369

*M. Smith*

Q.    Okay.

A.    -- I guess you could say.

Q.    Uh --

A.    So, it was pretty honest -- it was pretty back and forth.  Um, he had cheated on her one time, and they briefly broke up.  And, um, she was really upset about it.  And they fought for quite a while about that.  And that was before we all went to prom together.  And then they -- they got back together after that.

Q.    Okay.  Looking at -- I believe you were interviewed by a state policeman we talked to earlier this year, Detective Asmus (phonetic).  And looking at the reports and stuff, there was an indication that you told the police that Nick was doing drugs at the time.

A.    Mm-hmm.

Q.    What type of drugs was Nick using?

A.    Um, I never seen him do it.  It's just, um, what I hear.  And I believe it was meth.  I believe.

Q.    Did Leah have a problem with Nicholas using methamphetamine?

A.    Mm-hmm.

Q.    How do you know that Leah had a problem?

A.    Um, because they would fight about it often, and she disapproved.  And that would be the cause of some of their fights.

Exhibit 5002 at 1370

54

*M. Smith*

Q.    Okay.

A.    She highly disapproved of it.

Q.    Okay.  All right.  Yeah.

A.    Sorry.

Q.    It's all right.

Now, you broke up with Scott Hamilton, basically on the day that Leah disappeared.  Is that right?

A.    The same day we broke up.  Yeah.

Q.    And it's because you found out he was messing around with Kristen Steinhoff?

A.    Mm-hmm.

Q.    Okay.

A.    Yeah.  (Laughs.)

Q.    Now, did you have a conversation with Leah on the day, or the day before she disappeared?

A.    The day before she disappeared, her, Nick, Scott, and I all went to the river.

Q.    Okay.

A.    Out towards Powers.  Um, and we all had a good day.  We just went out there and spent the day together.  Um, that day we -- I did talk to her on the phone.  I can't remember if it was at her house or if it was at Nick's house, but we were going to hang out that night.  And Scott and I --

Q.    Let me back up there.

A.    Oh, sorry.

Exhibit 5002 at 1371

55

*M. Smith*

Q.      This is the night that she disappeared.

A.      Correct.

Q.      Okay.

A.      Correct.  Yeah.

Q.      So, you're talking to her on the phone.  You don't know which house she's at.

A.      I can't remember if it was Nick's house.  I believe it was Nick's house.

Q.      Okay.

A.      I believe she was at Nick's house.  And I was calling her because Scott and I were breaking up.  And I was basically postponing our plans that we had, um, because I wasn't having a good day, obviously.

Q.      Right.

A.      Um, so she said that was fine.  She sounded upset, and I could hear Nick in the background calling her names and arguing with her.  And I asked her if she wanted to talk, and she said that she couldn't right then.  And so I told her that I would get ahold of her later and talk to her, because obviously I had some things to talk to her about as well.  And, um, then I got off the phone and that was the last time I talked to her.

Q.      Okay.  And you could hear Nick in the background shouting at her; is that right?

A.      Um, yeah.  Well, raised his voice.  It was a

Exhibit 5002 at 1372

56

*M. Smith*

higher tone.

Q.    Okay.

A.    Um, calling her the B word.

Q.    Okay.  So he was calling her a bitch?

A.    Correct.  Correct.

Q.    Telling her to get off the phone?

A.    Um, I do -- I couldn't hear him telling her to get off the phone, but it indicated that way, like --

Q.    Okay.

A.    -- they were in the middle of an argument, maybe.

So basically, I -- and I could pick up on that. So basically I just told her that I would talk to her later, because she sounded like she needed to talk.  And that was the last time I talked to her.

Q.    Okay.  Now, the rest of the day, June 28th, you were -- you have a friend named Cristina Walter.

A.    Mm-hmm.

Q.    And you were with her for the rest of the evening, and basically stayed the night at her house?

A.    At Myrtle Point, yes.

Q.    Okay.

A.    Yes, I did.  Uh, we did -- we were at Scott's house for a while that night, and then her mom picked us up at Scott's house and, um, we went back to Myrtle Point.

Q.    Okay.

Exhibit 5002 at 1373

*M. Smith*

A.    And stayed the night at her house.

Q.    Now, the next day, did you get a phone call from your step-mom?

A.    Mm-hmm.

Q.    And did she ask you if you knew where Leah was at?

A.    Mm-hmm.  Yeah, at about 7:00 in the morning, Christina's mom came in and woke me up, saying that my mom was on the phone -- my step-mom was on the phone.  And, um, that concerned me, because she never -- you know, it was pretty early, you know.

Q.    Sure.

A.    So, um, I answer the phone, and she asked me if I knew where Leah was at.  And I told her that I didn't but I had just talked to her on the phone the day before, and the last I knew she was at Nick's -- I believe it was at Nick's house, the last I knew.  And she told me that Cory called my house, asking Judy if Leah was with me or if I knew where Leah was or if we'd seen her.  Um, and Leah -- and Cory was frantic on the phone.  And I told her that I didn't, and Christina and I got up and, you know, did what everybody else did and tried to go find her or see if we could, you know --

Q.    Okay.

A.    -- do anything to try to figure out where she was.  Because as soon as my step-mom had told me that she

Exhibit 5002 at 1374

58

*M. Smith*

didn't come home that prior night, then we obviously got

worried because it wasn't like her to do that.  She was

really close with her mom and told her mom everything she was

doing, and so that just -- that immediately got us --

Q.    Concerned.

A.    -- concerned.

Q.    All right.

A.    Yes.  Yeah.  Even though it was the very next

morning, and so.

Q.    All right.  Did you see Nick later that day?

A.    Yeah.  Yeah.  We all got together and tried

looking for her.

Q.    Okay.  How did -- how was Nicholas behaving?

A.    Um, he was behaving very upset.  Um, very

distraught.

Q.    Okay.

A.    Um, which, at the time, I mean I guess we all

were, but he was kind of over -- you know, kind of

over-dramatic.

Q.    Over-dramatic?

A.    I guess you could say.  But I didn't really see

it at the time.  Everybody was upset.  I was upset.

Q.    Okay.  Was he frantic?

A.    Mm-hmm.

Q.    Crying?

Exhibit 5002 at 1375

59

*M. Smith*

A.    Yeah.

Q.    Did he seem extreme in what he was saying?

A.    Mm-hmm.  Yeah.  My sister had to calm him down a couple times.  But I can't remember if it was that day --

Q.    Okay.

A.    -- or what day it was exactly.  It's all kind of a blur after that.

Q.    Okay.

A.    But, yeah, um, my sister had to calm him down. My dad -- my dad talked to him quite a bit, and said that -- my dad -- my dad actually brought to my attention that he was kind of over-dramatic for us not knowing what had happened.

Q.    Okay.

A.    You know, for her only being missing for such a short time at the time that my dad had seen him.  It was when he came over to my house, so.

Q.    Okay.  Did Nick ever tell you what happened that night, where he'd seen Leah?

A.    Um, he had stated that he was supposed to go pick her up and that she wasn't there, at her friend Cheri's house.  And he told me that he had drove by her house and tried looking up in her window, and then he got concerned when she wasn't home and he spent all night driving around looking for her.

Q.    So he said he was driving around all night after

Exhibit 5002 at 1376

*M. Smith*

he looked in her window?

A.    I believe so.  I know at one point he went and looked at his -- at her window.

Q.    Okay.

A.    Tried to see if he could see in her window.

Q.    Okay.

A.    And he stated that he was just out driving around looking for her all night.

Q.    Okay.

A.    And that he wasn't with her.

Q.    Okay.

GRAND JUROR:  What was -- I got a question.

THE WITNESS:  Mm-hmm.

GRAND JUROR:  As a friend, when you say he looked in her window, her window was on the second story, right?

THE WITNESS:  I think so, yeah.  I wasn't at her house very much.  I believe it was up, though.  That's what I was just going to -- I was just going add that.  So he had to look up.  And I think he was looking for a light, or some sort of indication that she was there.

BY MR. FRASIER:

Q.    Nick, when he's talking about Leah, did he ever -- in the form of the language he was using, did he ever change -- well, did he refer to her in the past tense?

A.    Um, yeah.  Quite a bit, actually.  Um, when him

Exhibit 5002 at 1377

and I would hang out and talk, he would -- often before she was found, he would use past tense and say things like, Leah used to be, or Leah was, or Leah used to like this or do this. And I would always say -- I wouldn't -- I didn't find it strange right at the time, but I would always correct him, and I would say, No. I was like, Don't talk like that. It's like Leah is, Leah does. And I was like, we're going to find her, you know.

Q. Okay.

A. I was just optimistic about it. And I didn't find it strange, um, until I started really thinking about it, until after she was found. And I started re-thinking all of the stuff in my head.

Q. Did you ever ask him why he was using the past tense when referring to Leah?

A. No, I didn't find it strange. I just -- I just -- I just corrected him. And I just tried to give him hope. And I had hope. So, basically, since I didn't find it strange, I didn't question it --

Q. All right.

A. -- at the time, so.

Q. Did he -- did Nick ever explain to you any theories he had about Leah's disappearance, what happened to her?

A. Hmm-mm. No. Just that he didn't know, or it was

Exhibit 5002 at 1378

*M. Smith*

out of the ordinary for her.  He never tried to come up with any excuses.  Like he never said to me, Well, maybe she ran away, or -- he never did that with me.  Trying to make things look as though they weren't.

Q.    Now, I don't want to seem like I'm embarrassing you or anything, but after Leah's body was found, did you and Nick -- well, for lack of better terms, I guess I'll just come out and ask it.  Did you guys have sex?

A.    Yes.  It was one time after her body was found, and we were out at his house, and, um, he -- we had had some alcohol.  He provided alcohol.  We -- I got pretty drunk, for me.  And he simply -- we were talking, and he was -- stated that he would -- he knows that Leah would want her best friend to be with him, and that he would rather her best friend -- it was all this stuff he was saying.

Q.    Okay.

A.    And it happened one time and that was the only time.

Q.    All right.  Could you tell us, you know, how quick after -- I mean, we're trying to figure in relation to when Leah's body was found, how much time had passed before this incident occurred?

A.    I think it was a couple weeks.

Q.    The memorial service had already been held, or do you know?

Exhibit 5002 at 1379

*M. Smith*

A.    No, that had -- no, it was after that.

Q.    It was after --

A.    It was after that, yeah.

Q.    It was after the memorial service?

A.    Yes.  Yes, it was.  Yes, if I believe correctly, it was.

Q.    Okay.  Questions I've been asking everybody, I'll ask you too.

A.    Yeah.

Q.    Has anybody told you that they killed Leah Freeman?

A.    No.

Q.    Has anybody told you that they saw what happened to Leah Freeman?

A.    No.

Q.    Again, I'm asking just about everybody this question:  You didn't kill Leah Freeman, did you?

A.    No.  No.

Q.    All right.  Is there anything other than what we've talked about here today that you think the grand jury needs to know?

A.    Um, not off the top of my head, I don't think. I'm a little nervous, so I'm trying to think.  Um, I believe all that pretty much covers it, unless anyone has any questions.

Exhibit 5002 at 1380

64

*M. Smith*

GRAND JUROR:  Did you know Wayne?

THE WITNESS:  Who?

GRAND JUROR:  Wayne McGuffin.  His older brother?

THE WITNESS:  His -- no.  I'd been out to his house a couple times and I met his parents a couple times, but I don't recall ever meeting his brother.

GRAND JUROR:  What time did you talk to Leah on the phone the last time you talked to her?

THE WITNESS:  Um, I was trying to recall, and I think it was in the afternoon, but I'm not sure on a specific time.  I can't recall.  I believe it was in the afternoon though, because, uh, when Scott and I were breaking up, it was shortly after, right -- right in -- right around there was when I was calling her to basically cut our plans for that evening that we had.

GRAND JUROR:  You'd heard about Kristen?

THE WITNESS:  About who?

GRAND JUROR:  You'd heard about Kristen?

THE WITNESS:  Mm-hmm.  Yes.

GRAND JUROR:  Did you know Kristen?

THE WITNESS:  Um, briefly.  I didn't know her on a personal level.  I'd seen her a couple of times and met her a couple times.  I didn't care to, honestly.  So.  I didn't know about her until I found out that he cheated on me with her, so.

Exhibit 5002 at 1381

*M. Smith*

GRAND JUROR:  I mean, how did you find that out?
Was it -- (indiscernible.)

THE WITNESS:  Um, well, I went and got some STD
checking and I had, um, chlamydia.

GRAND JUROR:  Oh.  I'm sorry.

THE WITNESS:  And, yeah, I lost my virginity to
Scott, and he's the only person I had ever been with.  And so
I basically confronted him, and that's how I figured it out.
So he kind of had to tell me.  So, that's how I found out.

GRAND JUROR:  What were your plans for that night
that you were canceling?

THE WITNESS:  Um, we were just going to hang out.
I think that we didn't really make plans for that night.  We
had went to the river the day before, and I know we weren't
going to do that again.

GRAND JUROR:  You guys as couples, or you and
Leah?

THE WITNESS:  Me and Leah.  And possibly Scott
and Nick.  We just -- basically, when we left each other the
day before when we went to the river, we said, Let's hang out
tomorrow.  Okay, you know.  So we were going to call the next
day and make plans and do whatever, but it didn't really work
out that way.  But --

GRAND JUROR:  Did Leah say anything about going
to another girlfriend's house that -- later that night?

Exhibit 5002 at 1382

THE WITNESS:  Hmm-mm.  No.  I didn't know she was going to Cheri's house.

GRAND JUROR:  Okay.

THE WITNESS:  When I talked to her on the phone, it was just briefly.  Um, I asked her if she needed to talk because I heard her and Nick arguing and I heard him call her a bitch, and she said she couldn't.  And I told her I'd talk to her later, and that was the last time I talked to her.

(Pause.)

MR. FRASIER:  Any other questions?

GRAND JUROR:  I don't think so.

MR. FRASIER:  Okay.  I think that will do it.

THE WITNESS:  All right.

MR. FRASIER:  You're free to go.

GRAND JUROR:  Thank you.

THE WITNESS:  Thank you, guys.

**TESTIMONY OF JANET REAB**

(Witness sworn.)

BY MR. FRASIER:

Q.    Okay.  First of all, ma'am, this is the grand jury for Coos County.  We're looking into the disappearance and death of Leah Freeman.  One thing I need to tell you about, it's obvious, but we're recording everything here today, okay?

A.    Okay.

Exhibit 5002 at 1383

*J. Reab*

Q.    First of all, could you tell us your name, please, and where you live?

A.    Janet Reab.  From Coquille.

Q.    Okay.  Ma'am, do you know the McGuffin family?

A.    Yes, I do.

Q.    How do you know the McGuffin family?

A.    My daughter went to preschool with Nick McGuffin, and previous to that they had a fruit stand, and I used to take my kids down there almost every day and get them some piece of fruit.  And we met them there.  But, uh, Nick always went to school; he was in Juliana's class, my youngest daughter.  They were friends all through school.

Q.    You became aware that -- well, let me -- did you know Leah Freeman at all?  Let me ask you that.

A.    Oh, yes.

Q.    And how did you know Leah?

A.    Um, her mother and I were friends.  And, uh, when Cory would need a babysitter, if her family couldn't do it, she would bring her kids to my house, and vice-versa.  The kids grew up knowing each other.  They were all about the same ages, and they played together.

Q.    Did you know if Nick and Leah were boyfriend/girlfriend?

A.    Yes, they were.

Q.    Did you have an opportunity to observe them

Exhibit 5002 at 1384

*J. Reab*

together?

A.    Yes.

Q.    How well did they get along?

A.    Uh, they seemed to get along, at least in front of me.  Um, my --

Q.    Did -- you became aware that Leah disappeared at the end of June of 2000; is that right?

A.    Yes.

Q.    And I want to ask you about an incident that occurred a few days before Leah's body was found.  Did you and your daughter and a friend -- I guess and your grandson -- were you all at Fifth Street Park?

A.    Yes, we were.

Q.    Could you tell us what happened at Fifth Street Park.

A.    Um, well to start it out, I'd have to go to the last day of school.  Juliana, my daughter, had to ask Nick for a ride home because, uh, she had a lot of stuff to carry, and she walked.  So nick had brought her home.  Nick got out on the front porch and talked.  And nick had told her that they had been fighting, that he and Leah had been fighting, and asked her advice about what to do about it because Leah was starting to hit him and it hurt.  And she said, Well, tell Cory.  Maybe she needs -- she's got some anger issues or something.  She might need some counseling.

Exhibit 5002 at 1385

69

*J. Reab*

And then that day at the park, we were there with my grandson.  He was on the swings.  And Nick and Ricky Crook drove by, and Juliana waved at him.  They pulled the car over.  And clear from the other side where he parked over to the swings, I noticed -- noticed it was kind of bizarre because Nick hollered at Juliana.  He says, "Boy, I sure wish I had something to bitch about now."  About Leah hitting him.

Um, I thought that was kind of strange.  I didn't understand why he didn't wait until he got up to us to say it, you know, instead of hollering it.

And they got over to the swings, and we were all talking, and then the police came by.  Nick started cussing. "Some of those damn cops, they won't leave me alone."

And Juliana said, "Well, maybe you should go and take a polygraph."

Q.    Yeah, we can't talk about the polygraph.

A.    Well --

Q.    We really can't.

A.    Okay.  Um.  I can't even finish it?

Q.    No, we -- well --

A.    Because, um --

Q.    Why don't -- she said, Why don't you go talk to the police, basically?

A.    Well, he said, "I did."  And she said, "And?"

Q.    Again, we can't talk about it.

Exhibit 5002 at 1386

*J. Reab*

A.    Okay.  Um, I'm sorry.

Q.    Okay.  We just can't talk about it.  All right.

A.    Um.

Q.    What happened after that?

A.    Um, now I'm off track.  (Laughter.)

We -- we thought that was kind of strange.  And, um, Ricky said, The reason they're after him so bad -- the reason they're after Nick so bad is because Brent Bartley can't keep his timeline straight.

And Ricky was standing there looking down at the sand on the ground, and kind of kicking at the sand with his feet, back and forth.  And, uh, Nick was standing there kind of looking at him, but Ricky was looking down.  And he can't keep his timeline straight, he said, because he was so high on acid.  LSD.  And I thought, hmm, that's the first time I've heard that.

And, uh, Nick was trying real hard to get Ricky's attention, like to shut him up.  But Ricky was still looking down, kicking at the sand.  And the color drained out of Nick's face.  I mean, he was mortified that that had come out.  I could tell.

Well, by the time we left, everyone that was with me was under the impression that, uh --

Q.    I don't think we can go there.

A.    Okay.

Exhibit 5002 at 1387

71

*J. Reab*

Q.    Okay.

A.    We had been real defensive of Nick up until that point.

Q.    Right.  Now, let me ask you this.  I want to change subjects with you a little bit.  Later on, a year or two or so later, were you riding in a car with Cory where Nick passed you and some bad things kind of happened?

A.    Oh, yes.

Q.    Could you tell the grand jury about that.

A.    Um, we were coming back from Bandon, and we were taking North Bank Road.  And it had become a habit of Nick's, whenever he would see me driving, ever after that park incident, to try to intimidate me.  And he passed us -- there was a bit of a straight stretch.  He passed and there was an oncoming car.  He almost had a head-on.

Like it -- like I said, this was becoming a habit with him.  Um, I was probably on the police log once a week for him pulling that kind of stuff.  He would come flying out of 7Eleven -- you know, Fast Mart, when he'd see me drive by.  He's just sort of sit there in the parking lot, and if I'd go by -- with my daughter in the car too.  He would wait until we'd get up in front of the Burger Barn, then just come flying up and passing me on the wrong side and trying to get me to hit him.

And I was always turning it in, but nobody would

Exhibit 5002 at 1388

72

*J. Reab*

ever do anything about it.  And I know it was on -- it had to be on video or something because the credit union was right there, and I'm pretty sure they've got cameras all over.  But nobody would ever do anything.

And that time, um, we tried to get something done, and we couldn't locate the red car.  I advertised for it, but nobody would ever respond.  Because that was reckless driving.  I mean, he could have killed somebody in a head-on, or run me off the road and I wasn't going anywhere.  I had my mother and Cory in the car, and my daughter.

Q.    Was there an incident with you and the McGuffin family and other people at Walmart?

A.    Yes, there was.

Q.    About when was that?

A.    Um, probably around October or November, after Leah's body had been found.  Um, I was pretty much under the impression that Nick had had something to do with it, but after the day at the park, we've never had contact.  And this was the first time that I had really seen him at -- was at Walmart.

And I didn't want to smile and nod.  I didn't want to talk to him.  I didn't want to glare at him.  I wanted to pretend like I didn't see him.  So I turned, and I was playing with one those displays they've got in the aisle. The next thing I know, I've got Nick right there going, Why

Exhibit 5002 at 1389

*J. Reab*

don't you just eyeball me some more?

I said, What?

And he repeated it, Why don't you just eyeball me some more?

And I'm, whoa.  And I said, I wasn't.

He's, you know, kind of a big fellow.  And the man that I was there with, he was up at the checkstand.  And I told him what had happened and he said, Well, we don't want anything to do with this.  And he went back and found Nick, who was with his mother.  And he was going to tell him, Nick, we don't have anything to do with this.  Just leave us alone.

Well, his mom, before this fellow Shelby, before he could even get it said, uh, Kathy McGuffin started ramming him with -- and he's -- he's a disabled man.  She was ramming him with her shopping cart.  Boom, boom.  Well, he came back around and told me what had happened, and she was hollering, Bruce, Bruce.

And he was at the checkstand, telling me what all had gone on.  And I look up, and here they come.  The whole crew.  And I'm telling the checker, I think maybe you should call the police, you know.  I think maybe you should.  She's not paying any attention to me.  Bruce McGuffin looks at Shelby and says, You -- you leave him alone.  Don't even mess with him.  He said -- let me think.  It's been a long time.  Let me think exactly what was said.

Exhibit 5002 at 1390

74

*J. Reab*

(Pause.)  Oh, uh, Shelby started to say, Well that punk, you know, needs to leave us alone, and -- how did that go?

Q.    It's all right.

A.    I'm sorry.  It's been so long.  It was stated by Bruce McGuffin, "I ought to take you outside and kill you," to Shelby.  And Shelby got real loud.  He said, "You mean there's two murderers in your family?"  He said, "Because that punk right there is the one that killed Leah Freeman."

That's what Shelby said.

They still wouldn't call the police.  We tried to, uh -- well, we notified the police here.  They didn't seem to care.  And I know they had it all on video.  The assault -- you know, Nick accosting me in the aisle, the whole thing.  They had to have it on video, but the police here didn't really care.  And they told us, Oh, it happened in North Bend, you should contact them.  They said, Well it seems to have something to do with the Freeman case.  You should take it back to Coquille.

Well, we just, Uh-huh.  Coquille, they didn't care, okay?  That was the impression I had, because every time I would go down there with any information, or the fact that he had done something to Juliana, tried to intimidate her or whatever, they didn't care.  Nothing was ever done.

Q.    Okay, ma'am.  A few questions I've been asking

Exhibit 5002 at 1391

75

*J. Reab*

everybody:   Has anyone told you that they killed Leah Freeman?

A.      No.

Q.      Has anybody told you that they saw what happened to Leah Freeman?

A.      No.

Q.      I've been everybody this, so I'm going to ask you too.  Did you kill Leah Freeman?

A.      No.

Q.      Okay.  (Laughter.)

Outside of what we talked about here today, is there anything else you think the grand jury needs to know about?

A.      (Pause.)  When, uh -- when we would put up Leah's fence -- I'm sure you probably all saw Leah's fence, at the high school.  We would decorate it to remind people, you know, that we had a murdered kid.  And to also spark some fire under the Coquille City Police because they ought to be mighty embarrassed.

And the last time we decorated it was right before Christmas.  Um, and that was about the six-month mark of when she had disappeared.  And Nick was over at the service station.  He didn't come help.  He just watched.  And I know that there were some kids there that went and hid when we left, and they said, We're going to watch him.  They were

Exhibit 5002 at 1392

76

*J. Reab*

afraid that he was going to tear it down. And he would never come to any of the vigils or anything like that. You'd have thought with it being his girlfriend that he would have been at every one.

MR. FRASIER: That's all I have. Does the grand jury want to ask her anything?

(Pause.)

THE WITNESS: There was another incident. Um, it seems like after that incident at the park that Nick did everything he could to intimidate my daughter. And she was with my son one time and that was when Coast to Coast was open. And my son wanted to go to Coast to Coast, and my daughter was still sitting in the car.

And Nick came driving down the street. He spotted my daughter. He did a U-ee in the street, and sat right outside of the car, staring at her until a car came behind him and honked. And after that, he knew what my son drove, and he would try to intimidate him.

And the only reason I could ever figure out was why he was acting like that was because we just knew too much. That LSD incident, I think, was -- because that's when it all started. We'd always been friends until then. But that day at the park everything changed.

I asked Cory after, you know, Did you know these kids were on LSD that night? She said, No, Nick told me that

Exhibit 5002 at 1393

Brent Bartley was so drunk he couldn't remember.

MR. FRASIER:  Okay.  Anything else?  Okay.

Ma'am, that will do it.

GRAND JUROR:  Thank you.

THE WITNESS:  Okay.

MR. FRASIER:  Thank you.

### TESTIMONY OF PAULINE "POLLY" PARKS

(Witness sworn.)

BY MR. FRASIER:

Q.    Okay, ma'am.  First of all, this is the grand jury for Coos County, and we're looking into the disappearance and death of Leah Freeman.  I need to tell you too that the proceedings are being recorded.  Okay?

A.    Yes.

Q.    First of all, could you tell us your name and where you live.

A.    My name is Pauline Parks.  I live at 929 Anderson in Coos Bay, Oregon.

Q.    And how long have you lived at -- on that address in Anderson?

A.    Um, since November of 2009.

Q.    And prior to that, have you lived in the Coquille area?

A.    No.

Q.    Okay.  Where have you lived?

Exhibit 5002 at 1394

78

*P. Parks*

A.      I lived -- prior to that, I lived at 63346 Shinglehouse in Coos Bay, Oregon.

Q.      Okay.  Do you know an individual named Nick McGuffin?

A.      Yes, I do.

Q.      Do you know Wayne McGuffin?

A.      Yes.

Q.      How do you know these two individuals?

A.      They, um, used to come to my house and party.

Q.      All right.  Ricky Crook.  Do you know Ricky Crook?

A.      Yes.

Q.      And how do you know Mr. Crook?

A.      The same.

Q.      Did you ever meet or know Leah Freeman?

A.      I met her once.

Q.      And how did you meet Leah?

A.      Uh, Nick brought her over to the house and introduced her to me.

Q.      Okay.  I don't mean to embarrass you, but I think we need to talk about this.  In the year 2000, you were pretty heavily involved in using meth and marijuana; is that correct?

A.      Correct.

Q.      And did you meet Nick McGuffin through Ricky

Exhibit 5002 at 1395

Crook?

A.    I did.

Q.    All right.  The methamphetamine.  How did you -- where did you get the methamphetamine that you were using?

A.    Most of the time it came, um -- it was delivered to my house always, but it came through Nick and Wayne and Ricky and Brett.

Q.    Brent?

A.    Brett.

Q.    Brett?  Okay.  Brett --

A.    Mauro.

Q.    Mauro.  Okay.

A.    He was their driver.

Q.    He was the driver.

In your presence, did Nick use methamphetamine?

A.    Yes.

Q.    And was he using it prior to Leah Freeman's disappearance, at your house?

A.    Yes.

Q.    Okay.  How did you find out that Leah had disappeared?

A.    Um, Nick and Ricky and Wayne came to my house one night and said that she had been missing about a week, and that they didn't know where she was at.  And that, uh -- I don't know, this is -- yeah.  It was about a week after her

Exhibit 5002 at 1396

*P. Parks*

disappearance that Nick showed up at the house and told me that she had been missing.

Q.    Okay.  How was he behaving when he's telling you that?

A.    Um, not like somebody that had a girlfriend missing.  He was talking about, uh, he was really horny and needed a piece of ass.

Q.    Okay.  Did you have a police scanner?

A.    Yes, I did.

Q.    Did Nick ever come over and listen to your scanner?

A.    Yes.

Q.    Could you describe this for us.  You know, was it before the body was found, after the body, how -- tell us what was --

A.    Nick -- Nick came over -- started coming over after Leah was missing, occasionally.  Whenever -- whenever the FBI would talk to people, then he'd come over and listen on the scanner.  Whenever the FBI showed up at my house, later on that day Nick would be there to listen to the scanner.

Um, the one time I remember the most was when -- was right after the FBI had left, and I had told them where I had heard that her body had been laying.  And Nick came over that night and did nothing but zone in on the scanner.

Exhibit 5002 at 1397

*P. Parks*

That's the first time I can remember he didn't want to get high, he just wanted to listen to the scanner.

Q.     Okay.  Excuse me a moment.

(Pause.)  You mentioned that you had been told where Leah's body would be found.  This was prior to the body actually being found that you were told this?

A.     Yes.

Q.     And who told you where the body would be found?

A.     It was ten years ago.  I don't remember everybody.  But it was Nick and Wayne and Ricky, is the three I really remember.  There was somebody else there, but I don't remember who it was.  And they just basically described a house, uh, some residence, and where -- how -- where and how the body was supposedly laying down there.

Q.     And did -- were names with roads or anything like that mentioned?

A.     Not that I remember.  I remember being able to tell the person I was giving the information to, I remember being able to tell him, you know, the way they described it.  I don't go up Fairview, so they -- I -- the roads wouldn't do me any good.

Q.     Okay.

A.     Okay.  So I remember them being able to describe how to get to the house, and where the body would be found, and what the house was supposed to look like.  You know, I

Exhibit 5002 at 1398

82

*P. Parks*

felt confident enough that I could describe where the house was at, and what the house looked like, because it seems like they even gave me the color of the house. And that she was down off of a bank. And that's where her body was.

Q. Okay. Tell us, to the best of your recollection, what this description was.

A. I thought hard about it. Um, you know, and I really apologize. I was doing a lot of drugs back then, and some things in my mind, uh, they don't let me remember everything, all of -- all day. Um, I really apologize. (Crying.) Um.

All I remember was like a ranch house, and it had a fence. And there was a gravel -- gravel pit. And she was down over there. And they thought it was funny, because they went and checked on the body a couple of times, and the body was there. And the cops had went out there and looked and didn't see it. And -- I don't know. Um.

Q. Was the road described like it was a paved or gravel --

A. It was a gravel road, is what I had then -- I had been to lead to believe, instead of -- there was a lot of talk about gravel, is basically what I remember. And the gravel --

Q. And this house, when it was described, do you remember what color was used to describe it?

Exhibit 5002 at 1399

A.    Um, you know, not off that, no.

Q.    Okay.  But there was something about a fence?

A.    There was a fence.  It was -- it was like a wire fence with posts.

Q.    And you went by this house, and this fence, and then --

A.    I didn't go by it.

Q.    Well, I mean in the description that you were given.  You go by the house, the fence, and then they'd come up to where the body was?  Is that how it was described to you?

A.    No.

Q.    Okay.

A.    No.  It was like -- it wasn't really described that way, whether it was on this side of the house or the other side of the house.

Q.    All right.

A.    It was just the house and the gravel pit, and where it would be in association.

Q.    Okay.  Where would the body be in association with the house?

A.    There was just -- I don't know.  Uh, the house -- you would come -- okay.  This is really -- I don't really understand whether it was on which side of the house.  So all I know is that they said that you could park the car.  There

Exhibit 5002 at 1400

*P. Parks*

was a house and a fence off to this side.

And there was a gravel pit down here. And it was just over -- I don't -- because I never understood whether it was a pit. To me a gravel pit is a great big place where you go get gravel. This seemed like they were telling me it was just over this gravel bank.

Because at first her -- she was up here, and they made sure she was down further, so that she wouldn't be right next to the road.

GRAND JUROR: Now, this is a -- the conversation that you overheard Nick, Wayne, and Ricky having?

THE WITNESS: Yeah.

GRAND JUROR: They told you, or it was a conversation?

THE WITNESS: It was a conversation they were having in my front room. My front room -- I would sit over here, and they sat over in front of my TV across the room from me, so it was not uncommon for them to talk --

GRAND JUROR: Mm-hmm.

THE WITNESS: -- you know. Because there was always a lot of people there, you know. And when Ricky and all them come, then they would just grab chairs and sit down in the middle of the floor. So it was easier for them to sit and talk, you know, sometimes --

BY MR. FRASIER:

Exhibit 5002 at 1401

Q.      You say that you --

A.      -- by theirselves.  And I'd already -- I had already been talked to by the FBI at that point, and, you know, told them that I didn't have a problem keeping my ears open.

And that's what I did, is whenever I heard any of those guys say anything I thought might help, I jotted down what I explained to officers is what I call crack notes, because I was a crackhead.

And I also knew that if they seen me writing down stuff, then I'd have to explain what I was doing with them there.  So a lot of times I would hear stuff, and then I would have to wait for them to not be in front of me.  So -- and I would grab paper, and I would write down these little notes to help me remember when I got a chance to go to police officer, what to tell him.

Q.      Now, in addition to Wayne and Ricky Crook being there during this conversation, was Nick there?

A.      Um, the night of -- that I found out about the house, Nick was there.

Q.      Okay.  Now, was there any discussions in your house regarding Leah's shoes and where they were found?  Do you recall any conversations like that?

A.      I remember when they found the first shoe, I believe it was the one that was found downtown.  I don't

Exhibit 5002 at 1402

*P. Parks*

remember which one was found.  When they found the first shoe, there was a -- there was a comment made at my house that it had been put in the wrong place.

Q.    Now --

A.    That that's not where it was supposed to have been put.

Q.    Who was there when this comment was made?  Do you recall?

A.    Pretty much -- it was Wayne, Ricky, I want to say Nick was there, and so was Brett.

Q.    Okay.  There was another shoe found on Hudson Ridge.  Was there any conversation about that, do you recall?

A.    That's the one up by -- um, they did have a discussion about it.  And it -- it was -- not a whole lot. They tried saying that the police officer that found the shoe had planted the shoe there, was one thing.  And, uh, that they had hid -- was not in the right place.

Q.    Okay.

A.    The shoe was not in the right place, was what it was with that one.  It wasn't in the right place.

Q.    Okay.

GRAND JUROR:  So that was the story for both shoes?

THE WITNESS:  One was put at the wrong place, the other was not in the right place.  Like, it may have --

Exhibit 5002 at 1403

*P. Parks*

should have been found somewhere else in that same area.  The other one I don't believe was supposed to have been left along the road, was what I thought.

BY MR. FRASIER:

Q.    And again, the people that are involved in this, while this conversation is going on you're talking about, is Wayne McGuffin, Nick McGuffin, Ricky Crook, and Brett Mauro?

A.    That was all there.

GRAND JUROR:  Brett Mauro or Brent Bartley?  Brett Mauro?

THE WITNESS:  Brett Mauro is the one that always brought them over to the house.  They rode in the back of his truck all the time.  They -- Wayne and Ricky would climb in the back.

GRAND JUROR:  What kind of truck did he have?

THE WITNESS:  It was a little truck, like a Datsun, or -- just a little vehicle.  Because it looked really funny because Wayne's pretty large, and Brett was pretty large, and stuff.  And to see this little tiny truck with these -- all these people and, you know, roust -- robust people coming out of it, was --

GRAND JUROR:  Do you remember what color that truck was?

THE WITNESS:  You know, um -- white?  Yellow?  Light colored.

Exhibit 5002 at 1404

88

*P. Parks*

(Pause.)

BY MR. FRASIER:

Q.    Outside of what you told us here today, has anybody told you that they killed -- or that -- has anybody told you that they killed Leah Freeman?

A.    No.

Q.    Has anybody told you that they saw what happened to Leah Freeman?

A.    Um, in that -- in that year, that couple years, yeah.  There was a lot of people -- a lot of people that tell me that they knew what happened.

Q.    They knew what happened, but did anybody say I was there and I saw what happened to her?

A.    Yes.

Q.    Who?

A.    Um, like I said, a lot of people.  I had Micaela Knight (phonetic) tell me she was there.  Alicia Michaud told me she was there.

Q.    Okay.

A.    You know, for two of them.

Um, Steve Robeson (phonetic) said he was there.

And, let's see, basically that whole group.  It was -- it was -- there was so many people.  Uh -- little Josh -- um.

Q.    Josh Ernler?

Exhibit 5002 at 1405

*P. Parks*

A.    That's the one.  You know, that said he was -- he was at that party and he knew what had happened.  And stuff.

There was a -- people said that they drove by the body, and seen the body.  And in my mind, back then, that meant that they had to have known what had happened that night in order to drive by to see what had happened, you know.

Q.    Who said they drove by and saw the body?

A.    Um, there was -- Alicia told me, Micaela told me, and Bill Sero.  All three said that they had drove by and seen the placement of the body, and had checked on her.  One of them came back and told -- sat at the house, and said that they had taken -- had taken pliers and pulled her braces off.

MR. FRASIER:  Okay.

GRAND JUROR:  You said "at the party."  What party?

THE WITNESS:  The night that she disappeared, there was supposed to have been a big party that they were all going to.  That, um -- it seems like it was acid that was supposed to be coming in out of town.  And they were going to have a big -- you know.  Smoke a lot of weed, do some drinking, do some meth.  And he wanted --

GRAND JUROR:  Said anybody's house?

THE WITNESS:  Um, I don't really know whose house it was supposed to be at.  Uh, it wasn't something that I

Exhibit 5002 at 1406

*P. Parks*

would do.  When I partied, I partied only at my house and I didn't go anywhere else.  So they didn't invite, and stuff.

So, um, I don't really know whose.  I know, um -- I want to say it's a house up the river that a bunch of them, they always partied at and went to.  So.

GRAND JUROR:  But you remember hearing them earlier that day making plans to go the party?  Is that --

THE WITNESS:  Uh, you know --

GRAND JUROR:  -- how you knew about it?

THE WITNESS:  I knew that there was a party.  Whenever they planned a party, you know, days ahead of time, you know.  Um, so you'd hear them talking, and you knew they were having this -- they were going to have this party.

And then, that night those kids wouldn't come over, so then I knew that's where they were at, basically.  It was a crazy time.

GRAND JUROR:  And that's what happened that night, too?  They didn't come over, so you assumed --

THE WITNESS:  Right.

GRAND JUROR:  -- they went to the party?

THE WITNESS:  Right.

(Pause.)

GRAND JUROR:  You said Brett Mauro was in the house when they were talking?

THE WITNESS:  Brett was there.  Brett was always

Exhibit 5002 at 1407

*P. Parks*

there, and stuff.  Except for -- except for the night that

Nick -- Nick came to the house one night just to sit and

talk.  And pretty much just sit there and get high, listen to

the scanner, and bullshit.  And he came by himself that

night.  Nobody came with him.

GRAND JUROR:  So they drove in the little truck a

lot?  All the boys?

THE WITNESS:  Yeah, there was a little truck.  It

seemed like for a while Brett drove like a little Toyota

Corolla kind of car every once in a while.  But most of the

time it was that little white truck, and the -- because it

doesn't -- the little car doesn't hold very many people.  And

people would just come out of -- you know, Ricky and the guys

would crawl out of the back, and --

GRAND JUROR:  Did it have a camper top or

something?

THE WITNESS:  No.

GRAND JUROR:  Okay.

GRAND JUROR:  Did you know Wayne very well?  His

brother?  Nick's -- Wayne?

THE WITNESS:  Wayne?

GRAND JUROR:  McGuffin?

THE WITNESS:  It was -- probably better than I

knew Nick.

GRAND JUROR:  Okay.

Exhibit 5002 at 1408

*P. Parks*

THE WITNESS:  And stuff.  Because Wayne would come over and -- and BS and talk more than Nick would.  And Nick was more -- I don't know how to explain it.  Nick was more reserved and quiet, where Wayne was more laughing and outgoing.  You know, just normally.  So, yeah, I probably could say I knew Wayne a little bit better just because we talked more.

GRAND JUROR:  Did he -- how did he come across to you?  You say in these conversations that you overheard where they're talking, that Wayne was at most of those conversations, as far as you know?

THE WITNESS:  Mm-hmm.

GRAND JUROR:  The ones where they were saying where the shoe might have been dumped.

Now, would those conversations perhaps have been after they'd been talked about on the scanner, and they were making comments about it, as far as you know?

THE WITNESS:  No, I don't believe so.  I don't believe so.  Because a lot of that stuff what -- that they talked about was nothing that was on the scanner.

GRAND JUROR:  Mm-hmm.

THE WITNESS:  Because that's what I'd listen for --

GRAND JUROR:  Okay.

THE WITNESS:  -- to know what to tell the police

Exhibit 5002 at 1409

*P. Parks*

officer I was talking to at the time, is if it was on the scanner then the police already knew about it and that's not something I would have to jot down.  If it wasn't on the scanner, and I thought it could help, then that's what I jotted down and took to the police officer.

GRAND JUROR:  What happened to those notes, do you know?

THE WITNESS:  Um, a couple of them I found and I did turn over to the police officers.  The other ones, it's been ten years and I've moved.  And they were little notes that as far as I had known -- I even looked here recently for them.  I went through everything I have because I was sure I still had all those notes.  I kept a lot of things from back then, and just kind of put them away.

GRAND JUROR:  But you didn't find them?

THE WITNESS:  I couldn't find them.

GRAND JUROR:  Did the conversation on the scanner ever pertain to this?  Was there ever anything on the scanner that caught their attention, or they were just listening to see if there was something?

THE WITNESS:  They would listen to anything that was on Leah.  The times they found the shoes --

GRAND JUROR:  Okay.

THE WITNESS:  -- that was a perk-up, and we'd turn the scanner up and everybody would shut -- shut up more

Exhibit 5002 at 1410

and see where they found them.

And then that would start like -- you, you've seen, I'm sure, drunk discussions in between a bunch of drunks.  Well, in between a bunch of drug addicts is not too much farther different, you know?  And they would sit and they'd kind of bounce it back and forth.  It was really, you know -- and that's where you'd hear, well, that's not where that shoe was supposed to be at.  That's not the shoe she was wearing that night, this one guy said.  I don't know what shoes she was wearing, so -- you know.  That wasn't anything I felt significant on.

But if there wasn't -- you know, if they were just coming over and sitting, they didn't pay too much attention to the scanner.  The scanner was there -- um, I had the scanner previously, before I ever started using.  The scanner I used -- if your name came across my scanner more than twice, I didn't allow you in my house.  Because that was my safeguard.  That was my -- my meth rules, or whatever rules you want to do.  We all lay them down for us when we party at our house.  That was one of mine.  If I heard your name on the scanner, that meant the cops were involved in your life too much and you didn't need to come to my house.

GRAND JUROR:  So, self-preservation.

THE WITNESS:  Pretty much.  You start putting down rules when you have people come to your house 24 hours a

Exhibit 5002 at 1411

*D. Breakfield*

day.  You start finding little ways that you can kind of give yourself 10 minutes.  It's not a good life.

MR. FRASIER:  Any other questions?

Okay.  That will do it.

GRAND JUROR:  Thank you very much.

THE WITNESS:  Thank you.

### TESTIMONY OF DAVID BREAKFIELD

(Witness sworn.)

BY MR. FRASIER:

Q.    Okay.  First of all, sir, this is the grand jury for Coos County, and they are looking into the disappearance and death of Leah Freeman.  And it's kind of obvious, but we're recording everything in here today.

So first of all, could you tell us your name and where you live.

A.    David Christopher Breakfield.  68681 Ridge Road, North Bend, Oregon.

Q.    How long have you lived there, sir?

A.    About six, seven years.  I -- I moved out and in, but it's been in my family's name for about 10 years.

Q.    Okay.  Mr. Breakfield, I want to go back a few years ago -- well, did you ever become acquainted with a girl named Megan Edgerton?

A.    Yes.

Q.    How did you meet Megan Edgerton?

Exhibit 5002 at 1412

*D. Breakfield*

A.    Uh, I went to school at the Destinations Building.  It's CE2, at Marshfield.  I was approached one day by a lady -- well, a young woman, who said that she wanted to hang out.  So we started hanging out.  We dated for, I don't know, I'd say six months on and off.  You know, nothing serious.

Q.    Okay.  And that was Megan?

A.    Megan.

Q.    All right.  Did you become aware at some point in time that Megan had an ongoing relationship, an off-again on-again with --

A.    Yes.

Q.    -- an individual named Nick McGuffin?

A.    Yes.

Q.    Was there ever an incident where Mr. McGuffin, for lack of better terms, had driven you guys off the road?

A.    Yes.

Q.    Could you tell the grand jury about that.  Explain what happened.

A.    Uh, I was driving Megan home.  Uh, I was in my roommate's truck.  She lives out on a country road out there.  I can't remember the name, but there's a barn.  And Nick McGuffin was parked in his truck on the side of that barn.  And as I drove by -- as I drive -- drove, driving to the barn, headlights came on and he drove at us in an -- at a

Exhibit 5002 at 1413

angle about like this.

And I hit the brakes; he went past me up here. Got out of the car. There was some screaming and yelling. Ended up, I believe, with like a little fist-fight, and that was it.

Q. All right. Do you know a girl named Tiffany Teyes (phonetic)?

A. Yes, I do.

Q. And how do you know Tiffany?

A. Um, Tiffany was a good, good friend of mine.

Q. Okay. Was she --

A. Um --

Q. She was a cousin to --

A. Megan.

Q. -- Megan?

A. Yes.

Q. Was there ever an occasion when you were over at Tiffany's place that Megan was there, and then --

A. Yes.

Q. -- Nick showed up, and he's like on the roof of the house?

A. Yes.

Q. Tell the grand jury about that, please.

A. Uh, Tiffany Teyes was my neighbor. She lived right up the street from me when I lived on Pine Street in

Exhibit 5002 at 1414

Coos Bay, Oregon.  Uh, so like I said, I spent a lot of time up there.

Um, at the time Tiffany was married.  I believe, uh, still.  Her husband was in the Coast Guard, so he was out of town.  Um, we were hanging out, and the next thing you know there was thumping on the roof.  So we go out.  Thump, thump, thump, thump.  We go out the door.  Nick's truck's driving away.

Q.    Okay.  Did you run into Mr. McGuffin a few days later?

A.    Um, I'm not sure if it was a few days later or prior, or -- I've, I've run into him --

Q.    Okay.

A.    -- probably three times.  One time at my school. That was the first time, where he drove around Marshfield High School for 35 minutes.

Q.    Okay.

GRAND JUROR:  What year are we talking about?

BY MR. FRASIER:

Q.    Yeah, what are we talking about here?

A.    Um, what year did I graduate?

GRAND JUROR:  No, the year that -- the first time this happened.

THE WITNESS:  The first time it happened, I would have been, I think the end of my junior year.  So, '03.

Exhibit 5002 at 1415

GRAND JUROR:  2003.  Okay.

THE WITNESS:  And that was, like I said, the -- the first day that me and Megan hung out.  It was like the next day we -- I was walking out of school, and there was a gray Chevy -- nice -- nice -- nicer-looking pickup truck.  I think it was a Chevy, like step-side.  And it's driving around.

And next thing I knew, Megan was saying, Oh, that's my boyfriend, and he's all pissed off.

BY MR. FRASIER:

Q.    Is -- did Nick McGuffin ever threaten you?

A.    Yes.

Q.    Can you tell us approximately when it was he threatened you and what he said?

A.    Um, the night of the car incident, he had threatened me that night.  Just basic violence.  I'll kick your ass, I'll beat you up, I'll kick your ass this or that.  And it slowly progressed into, I'll f-ing kill you.

Q.    All right.

A.    Many, many things.  Done it before, do it again.

Q.    Okay.

A.    Um, and at the time I just thought he, you know, wasn't right.  And I've -- I worked in a bar.  I'm a bouncer.  So, you know, almost every fistfight that I've ever seen in a bar ends with a guy saying, "I'll kill you."  So, like I

Exhibit 5002 at 1416

said, I -- I don't know.  I -- I didn't look at it deep, I guess.

Q.    Okay.  Well, there were two things the police brought to my attention here in the last week.

A.    Mm-hmm.

Q.    That you were quoted as been saying that Nick said.

A.    Mm-hmm.

Q.    One of the things was, quote, I strangled that bitch's neck, and it wouldn't be hard for me to do you too.

A.    Yeah.

Q.    So, could you tell us when that occurred, roughly, and to the best of your recollection the circumstances and what he said.

A.    I would -- I think that, um, that was another one, like I said, that happened out at Megan's house.  Like, it's a long dirt road to get to her house.  And I believe at one point in time she'd had to have a restraining order against him because he was creeping around her property.

Well, I -- like I said, we were seeing each other on and off for a while.  I was driving out there.  He was there.  It was daytime.  There was no physical altercations. He just told me to basically stay away from Megan.  And I said no.  And at that point was when he went on to make remarks about, I've done this before and I'll do it again.

Exhibit 5002 at 1417

*D. Breakfield*

Don't think I won't kill you.  I strangled that bitch, I'll strangle you too.  Several other remarks I don't know if I can remember.

Q.    Okay.  But you're real clear that he said, "I strangled that bitch"?

A.    At the time I didn't even know -- at the time, like I said, I was a 17-year-old kid.  I didn't even know who this guy was or who he was referring to in any way, shape, or form.  I did not even know this person.

Q.    Okay.  But he did tell you, "I killed before, it wouldn't be hard to kill you," or --

A.    Yeah.  The guy is crazy.

Q.    Did you eventually break off your relationship with Megan because you didn't want to deal with this issue?

A.    Yes, sir.

Q.    Okay.

A.    Well, not -- okay.  I -- I broke it off, and then I believe Nick left for a little while.  We kind of hooked back up again for a little bit.  And then at one point she was just so used to being treated the way he was treating her that that's -- I -- I treated her good.  And it -- it was awkward to her.  You know, because he would abuse her mentally, from what she was telling me.  Physically.  You know, would tell her that she's a c-word, and she's sleeping with other people, and she's nasty, and he's not going to

Exhibit 5002 at 1418

touch her.  But he doesn't want anybody else to.  So these are things that I am getting from her.  Like I said, he's got some social issues.

Q.    All right.  Outside what we have talked about here today, do you have any other information about the death of Leah Freeman which you think the grand jury should know?

A.    No, sir.  Um, like I said, I'd never met her. Uh, the only thing that I've ever heard was just from this and afterwards, you know, people saying small things.  But nothing that I -- nothing that I can recall at all, that I know as far as what -- what went down.  The only thing that I know, as far as what went down, is the stories that I've heard location-wise, and from the newspapers and whatever, you know.

MR. FRASIER:  All right.  I don't think I have anything else for Mr. Breakfield.  Does the grand jury want to ask you anything?

GRAND JUROR:  Which Megan?  What's Megan's last name?

THE WITNESS:  Edgerton.  E-D-G-E-R-T-O-N.

GRAND JUROR:  Was she -- was she there when Nick made that statement, the statements that, you know, we --

THE WITNESS:  No, sir.

GRAND JUROR:  You were at her house, but she was inside or something?

Exhibit 5002 at 1419

*D. Breakfield*

THE WITNESS:  No, sir.  It was, uh -- like I said, her, her gravel road was a good two miles --

GRAND JUROR:  Right.

THE WITNESS:  -- from the -- the start of her property to her house.  And it's way out in the country, uh, you know, out past the Sause Brothers boat building place out there, out past TNT Market.  It is way out there.  So he's like, you know what I'm saying, right at her property line as I'm driving to her road.

GRAND JUROR:  Oh, okay.  Okay.

THE WITNESS:  Oh, okay.  Uh, maybe one more thing.  I don't know if -- I don't think it's --

MR. FRASIER:  Okay.

THE WITNESS:  -- has anything to do with anything, but Tiffany Teyes and I also had a small relationship.

MR. FRASIER:  Right.

(Pause.)  Okay.

THE WITNESS:  And that's about it.

MR. FRASIER:  All right.

GRAND JUROR:  When you were at Tiffany's and you heard somebody on the roof, and then you went outside and you saw Nick driving off, or someone -- a vehicle that looked like his driving away, did you talk to Tiffany about it?  Does she know Nick?  Or did she --

Exhibit 5002 at 1420

*D. Breakfield*

THE WITNESS:  Oh, yeah.

GRAND JUROR:  -- have any idea what was happening?

THE WITNESS:  Well, she -- she -- she knew -- knew who Nick was.  Like I said.

GRAND JUROR:  Did she have -- I mean, was there a relationship there that Nick was complaining that you were there?  I mean, was he --

THE WITNESS:  Oh, with me and --

GRAND JUROR:  Tiffany?

THE WITNESS:  No, the reason Nick was there was because I was seeing -- I was still seeing Megan.

GRAND JUROR:  I see.

THE WITNESS:  Once -- once me and Megan finally hooked back up again, and Megan had told me that she didn't want to be with me no more, she'd rather be with Nick because he -- that's how -- what she was used to or whatever, um, the only reason me and Tiffany ever had a thing was, like I said, we were neighbors.  Her husband came home one day from the Coast Guard, and had already sold -- sold her truck and traded it in for a new rig and filed for divorce because he had thought that we were sleeping together.  Which, at the time, we were not.  So, he divorces her that night.  She come down to my house crying.  I was her friend.  I took care of her.  And a couple weeks later we ended up dating for a

Exhibit 5002 at 1421

*D. Breakfield*

little while.  And that's the end of the time.

After that, she -- Tiffany had moved, and Megan and me quit -- I -- I broke it -- quit contacting her.

GRAND JUROR:  After you and -- the relationship between you and Megan had ended, the problems with Nick ended at the same time?

THE WITNESS:  Oh, yeah.  It was all about her.  I mean, it's not a coincidence.

GRAND JUROR:  So your opinion was that Nick was sitting in the car waiting for you --

THE WITNESS:  Oh.

GRAND JUROR:  -- to come that -- how do you mean, specifically --

THE WITNESS:  Yeah.

GRAND JUROR:  -- for you, because he knew that you were having a --

THE WITNESS:  Well, like I said, the -- there had been several times, you know, just creeping around.  Around my neighborhood.  Drive by my house.  Drive by my school.  Uh, it was like the guy knew where I was all the time.

(Pause.)

GRAND JUROR:  So he kind of stalked you, in other words?

THE WITNESS:  I would say, yeah.

(Pause.)

Exhibit 5002 at 1422

GRAND JUROR:  Do you know his brother, Wayne?

THE WITNESS:  No, sir.  He is the only one of the family that I have met.

(Pause.)

MR. FRASIER:  Okay.  Any other questions?

Okay.  That will do it.  Thank you, sir.  You're free to go.

THE WITNESS:  Thank you.

MR. FRASIER:  Don't forget your hat, there.

GRAND JUROR:  Thank you.

THE WITNESS:  Have a good day, everybody.

### TESTIMONY OF AMBER HEFFNER

(Witness sworn.)

BY MR. FRASIER:

Q.    First of all, ma'am, this is the grand jury for Coos County, and we're looking into the disappearance and death of Leah Freeman.  And to start off, I need to tell you we are recording everything.  All right?

A.    Okay.

Q.    First of all, could you tell us your name and where you live, please.

A.    It's Amber R. Heffner.  It's, um -- do I need give my full address?

Q.    Just the city's name where you live.

A.    Winston, Oregon.

Exhibit 5002 at 1423

Q.    All right.  Do you know or did you know an individual named Nick McGuffin?

A.    I knew him.

Q.    Okay.  How well would you say you knew him?

A.    Not very well.  He was just an acquaintance.

Q.    All right.  Leah Freeman.  Did you ever know Leah Freeman?

A.    Um, I knew of her because of my best friend.  It was her cousin.

Q.    Okay.  And did you know that Nick and Leah were boyfriend/girlfriend?

A.    Uh, yes, I did.

Q.    Did you ever see them together?

A.    Um, out, like at the store or at the park.  That was about it.

Q.    How well did they seem to get along?

A.    Um, they seemed okay.  They had their fights and squabbles like any other teenage relationship.

Q.    Okay.  I want to direct your attention, I guess to the night that Leah disappeared, which was June 28th of 2000.  I have information, or at least police reports have been given to me, that at some point that night that Nick came over to your house.  Do you recall that at all?

A.    Nick came over where?

Q.    To your house.

Exhibit 5002 at 1424

A.    I wasn't even in town.

Q.    Okay.

A.    I was up in Vancouver, Washington, picking up my brother.

Q.    Okay.  Was there some time that Nick came over to your house?

A.    No.  Nick's never been to my house.

Q.    All right.  Well, the information that I have is that the night that Leah disappeared -- well, let me get the police report out.

(Pause.)  Well, I'm looking at a police report that was written in August of 2000.  It was written by a Sergeant Craig Zanni at the sheriff's office.  Indicates that he spoke to you on August the 8th of 2000.  In the report, it says -- I'm just going to quote right here:

"Amber Heffner stated the night the victim disappeared Nick came over to her house about 1:00 a.m. However, her story's changed.  She was then gone for approx -- her story's changed.  She was then gone for approximately four days after the victim's disappearance.  And then, on August the 3rd, she spoke with Polly Parks about what had been going on with her friends."

A.    I -- honestly, I -- Nick had not been at my house.  My mom still lived there at the time and was working

Exhibit 5002 at 1425

*A. Heffner*

at Social Security, and she would have been home.  I was up in Vancouver, Washington, picking up my brother.  He was coming over from, um, Alabama to come visit me.  My mom was the one that called and told me on the way home -- or I called her in Eugene and told her we were on our way home, and she's the one that told me about Leah disappearing.

Q.    Okay.

A.    So.  I don't remember talking to Craig Zanni.  I talked to Kip Oswald and told him a lot of information I got from Polly Parks.

Q.    Okay.

A.    I don't remember talking to Craig.

Q.    All right.  "Amber Heffner indicated that the shoe that was recovered on Hudson Ridge was planted the next day to cover the person who had done the crime."

A.    Yes, I remember telling Kip that from what I -- the information I got from Pauline Parks.

Q.    All right.  You got that from Pauline, you didn't get it directly?

A.    No.  I got -- everything I said to Kip was hearsay from Polly, and she said she had been talking to the FBI and also talking to police, and had also spoke to -- with Kip too.

Q.    All right.  Let me ask you these questions, then:

Has anybody told you that they killed Leah

Exhibit 5002 at 1426

*A. Heffner*

Freeman?

    A.    No.

    Q.    Has anybody told you that they saw what happened that night?

    A.    No.

    Q.    Do you have any information about what happened to Leah Freeman?

    A.    No.  It's all speculation.  Hearsay.  What I've heard.  Even last night I heard stuff before I came over.

            MR. FRASIER:  All right.

            (Pause.)  Okay.  I don't think I have any other questions for her.  Grand jury have any questions?

            GRAND JUROR:  You say last night you heard stuff. So is this an on-going thing; these guys, people talking about what's happening in here?

            THE WITNESS:  You know, I'm not too sure.  It might be, because the information was given to my best friend, who is -- like I said, is Leah's -- was Leah's cousin.  Um, about is -- she was calling it a conspiracy theory of what happened that night, that it supposedly was an accident.  Um, I don't know.  I just -- honestly, I don't like the rumors.  If things are being said in here, it should be left in here.  Just like out there.  As soon as people were leaving from in here, they were out there talking to their friends about everything that was said, with questions

Exhibit 5002 at 1427

*A. Heffner*

were being asked.  Um, to me, that's not fair for the -- for, um, if a trial is going to happen.  It's not fair that they're trying to get their story straight, because this murder needs to be solved.

GRAND JUROR:  Do you know what the dates were when you were gone to Washington?

THE WITNESS:  You know, I -- I wish I knew.  I know that my mom, when I called from Eugene, she told me that it was in the paper, in the *Coquille Sentinel*.  So I don't know when that first day that it was published in the *Sentinel*, but I was up in Washington for four days, and my brother flew in.  I picked him up from Portland International, and then brought him down.  He was here for a week.  I do have pictures at home when my brother first got here.  I -- they have a date on them.  I mean, I could call back and give a date, if that would help out.  I don't mind doing that.

GRAND JUROR:  How did you know Paul -- miss, how did you know Polly Parks?

THE WITNESS:  She was a friend of mine, so.

GRAND JUROR:  Did you know she was a meth user?

THE WITNESS:  Yes.

GRAND JUROR:  Were you using meth at the time too?

THE WITNESS:  At the time, no, I wasn't.

Exhibit 5002 at 1428

*A. Heffner*

GRAND JUROR:  Okay.

THE WITNESS:  At the time, I only smoked pot.

GRAND JUROR:  Okay.  So you didn't -- did you frequent the house when -- you say you didn't really know Nick that well.

THE WITNESS:  No, I didn't.  I just knew him as an acquaintance.  We never hung out.  I didn't really care for him.

GRAND JUROR:  So, you didn't hang out at Polly -- Polly's house then, really?

THE WITNESS:  No, I hung out at Polly's house a lot, but Nick never really -- if he did come over, it was when I had left, so I never really interacted with Nick over there.

GRAND JUROR:  But you knew Polly was using, right?

THE WITNESS:  Yes, I did.

GRAND JUROR:  Did you interact with anyone else that -- for example, we've heard Ricky was there?

THE WITNESS:  Ricky -- Ricky Crook?  Um.

GRAND JUROR:  At her house.  Would you -- did you meet Ricky there, at Pauline's house?

THE WITNESS:  Um, well, no.  Ricky and I, we grew up together.  I've known him since he was like three.  So we've grown up here in Coquille.  We lived just right down

Exhibit 5002 at 1429

the hill from one another.  So I've known him my entire life.

GRAND JUROR:  Did you see Ricky at Pauline's?

THE WITNESS:  Yeah.  Ricky -- I would see him occasionally there at Polly's.

GRAND JUROR:  By himself?

THE WITNESS:  Um, he was with other people.  It wasn't Nick.  It was Nick's brother Wayne.

GRAND JUROR:  Wayne?

THE WITNESS:  He would come with Wayne McGuffin.  Um, he hung out with Wayne, and -- well, that's basically it.  Wayne -- oh.  And then, um, Mike Pizzola was like his best friend, so Wayne and Mike and him would come over.

GRAND JUROR:  But not Nick?

THE WITNESS:  Um, I saw Nick there --

GRAND JUROR:  That you saw?

GRAND JUROR:  -- like, one time when I was leaving, he was coming.  So, I just kind of hung out with my little group of -- of people.  We would go over -- go over for a couple of hours and then leave.

GRAND JUROR:  But Wayne, Nick, and Ricky didn't come together, as far as you know?

THE WITNESS:  No.  As far as I know, no.  It was just Ricky and Wayne and --

GRAND JUROR:  Mike Pizzola?

THE WITNESS:  Mike Pizzola, yeah.

Exhibit 5002 at 1430

*S. Krutchfield*

GRAND JUROR:  He was -- he was Ricky's -- whose friend was he?

THE WITNESS:  Ricky Crook's.

GRAND JUROR:  Ricky Crook's.  Okay.

GRAND JUROR:  How about a Brent Mauro?

THE WITNESS:  Brett Mauro?  Yeah, Brett would come over quite a bit.

(Pause.)

GRAND JUROR:  Did they do drugs in your presence then, or --

THE WITNESS:  You know, we all did.  We all smoked pot.  I'm not going to lie.  Back then --

GRAND JUROR:  Well, yeah -- (indiscernible).

THE WITNESS:  I mean, there's no reason.

GRAND JUROR:  But, did they do anything else?

THE WITNESS:  Just -- with them, it was just we all just smoked pot.  That was it.

GRAND JUROR:  Okay.

MR. FRASIER:  Any other questions?

Okay.  That will do it.

GRAND JUROR:  Thank you.

THE WITNESS:  Thank you.

**TESTIMONY OF STACY KRUTCHFIELD (LYONS)**

(Witness sworn.)

BY MR. FRASIER:

Exhibit 5002 at 1431

*S. Krutchfield*

Q.    First of all, ma'am, this is the grand jury for Coos County, and they are looking into the death and disappearance of Leah Freeman, okay?

I do need to tell you that I am -- well, we're recording the proceedings here today.

First of all, could you tell us your name and where you live.

A.    Yes.  Um, it's actually Stacy Krutchfield now.

Q.    Okay.

A.    It was Lyons.

Q.    All right.

A.    And, um, I've lived here in Coquille, out in the Fairview area.

Q.    Okay.  How long have you lived in this area?

A.    Um, well, I grew up here.  I lived here most of my life.  We moved away after high school for a few years, and then moved back about a year and a half ago.

Q.    Okay.  Your family, or your dad at least, owned what used to be call the Fast Mart?

A.    No.  (Laughs.)

Q.    No?  Got the wrong Lyons?

A.    Nope.  (Laughs.)

Q.    Got the wrong Lyons.  Okay.

A.    Yeah.

Q.    All right.  Well, never mind.

Exhibit 5002 at 1432

*S. Krutchfield*

Did you know Leah Freeman?

A.    Yes.

Q.    How did you know Leah Freeman?

A.    Uh, we went to school together.

Q.    And Nick McGuffin.  Did you know Nick?

A.    Yes.

Q.    And how did you know Nick?

A.    From school.

Q.    Did you become aware that Nick and Leah were boyfriend/girlfriend there for a period of time?

A.    Yes.

Q.    Could you describe their relationship, how well they got along.

A.    Well, um, it was kind of a -- I don't know.  An up and down, I guess I should say.  They were together about eight months, and for most of it there was, you know, happy times and then they would have fighting a lot.  And, um, there would be -- um, I don't know.

The fights -- I mean, the arguments that I had seen were actually at the school.  And it would be her being jealous over something, or her being mad over something.  And the fights that I had seen, you know, she was pretty aggressive towards him.  And he was, um -- he was trying to kind of keep her off of him, trying to back off.

And there was a time that they got in a fight.

Exhibit 5002 at 1433

*S. Krutchfield*

He had punched the school wall.  He punched a hole in the wall at school.  But I had never actually seen him be physical towards her.  I saw more her being physical towards him, which was really out of character for her.  She wasn't normally an aggressive or -- or violent person, I guess.  She was more happy-go-luck type of person, so it was kind of out of character for her.

Q.    Did Leah tell you that she and Nick were having sex?

A.    Yes.

Q.    Did she describe to you the first time what happened, during the first time they got -- they had sex?

A.    She said that she was drunk the first time that they had sex.  But -- go ahead.

Q.    Did she say where the booze came from?

A.    No.

Q.    Okay.  Leah disappeared June the 28th of 2000, and then her body was found August the 3rd right near -- did you see Nick in between that?

A.    Um, you know, I can't remember because I was living -- I had left to live with my sister about a week before she disappeared, and I was with -- I had lived up there the whole summer, and I don't remember.  I don't remember if I came down or not during that time.

Q.    Well, I have in my notes that apparently one of

Exhibit 5002 at 1434

*S. Krutchfield*

the police reports that you indicated that in the year --

back in 2000, that you saw Nick between when Leah disappeared

and when Leah's body was found, and you noted he had a bunch

of hickeys on his neck.

A.    Um, you know, I may have.  I don't remember that

far back, but I think the instance of him having hickeys on

his neck was something that I had heard, not witnessed.

Q.    Okay.

(Pause.)  Would you describe their relationship,

Nick and Leah's, was it good?  Bad?  Trouble?

A.    Um, well, we, as her friends, felt that it was

bad because she kind of changed a lot during their

relationship.  She, um -- I mean being fresh -- we were

freshmen in high school.  Being freshmen, we were still

really young and innocent and, you know, not really into

partying or into any of that yet.

And when we first met him, he had actually dated

one of our other friends for a really short period of time,

who was in our same grade.  And, um -- and then he had -- he

had kind of just started hanging out with our group of

friends for some reason.  I don't even know why.  And, um,

him and Leah started dating.

And it -- at first we all liked him.  I mean, we,

you know, had no reason to not like him.  But then, um, she

kind of pulled away from us a lot because she was smoking pot

Exhibit 5002 at 1435

119

*S. Krutchfield*

with Nick, and at that time that was just really, really horrible to us because none of us had ever -- you know, most of us, at least, I guess should -- you know, didn't really -- didn't really do any of that type of stuff.  So, to us, we just felt like she was making really bad decisions at the time by -- by partying and by getting into that kind of stuff.

And at that time we kind of started not to like Nick because we felt that they didn't bring out the best in each other.  I mean, I had mentioned before that, you know, she was -- they would get in fights, and she would be kind of violent towards him.  And that's not something that we were used to seeing in her.

And then as she knew that we weren't a big fan of Nick's, and so then she started pulling away from us and not really wanting to hang out with us as much, and always just hanging out with him.  And so that -- I think that kind of made us, you know, angry at him and at her for -- for kind of -- I don't know, making the bad decisions and -- and kind of trading us in for the relationship.

Q.    Has anybody told you that they killed Leah Freeman?

A.    No.

Q.    Has anybody told you they saw what happened to her?

Exhibit 5002 at 1436

A.    No.  Not that they saw what happened to her. There's been several rumors that -- that went around since she disappeared that -- that have -- I don't even know where they stemmed from, but --

Q.    Okay.

A.    -- I've heard several rumors.

Q.    Very good.  Is there anything else that you feel the grand jury should know?

A.    Um, well, actually -- actually, backing up.  The last question that you just said.  There was -- a couple of months ago, in December, I guess it was.  We were out at, um, the bar, at Mr. Zack's.  And there was a girl there who I didn't recognize, but she was sitting alone, and so she came and we invited her to come sit with us.  And she said she didn't know very many people from Coquille, um, but she knew Nick.  And someone who was sitting with us said, "Oh, that's the guy who killed Leah," just nonchalantly.  And she got really upset.

And it turned out that she had -- was Nick's girlfriend.  Um, not at the time, but she had been.  And I found out later, I think that was actually the mother of his child.

Q.    Are you going to --

A.    I don't know her name.

Q.    Okay.

Exhibit 5002 at 1437

*S. Krutchfield*

A.    But that's who somebody had told me afterwards that it was.  And, uh, you know, she got upset.  And I just said, Hey, you know.  Nobody -- nobody's been convicted, you know.  It's not a big deal, just calm down.

And so then she sat there and she talked to us for a while, and she told me -- um, she said, You know Bill Sero and his girlfriend -- I -- I don't know who -- what her name is either.  But he -- she said, um, they used to hang out with me and Nick.  And the girlfriend apparently had told her that Bill would wake up having nightmares about, um, what he'd done.  That basically that he had -- that he had done it.

And I thought that was really odd for her to tell me that.  You know, because she knew that I was friends with Leah.  And, um, I -- I just found it odd.  I don't know why she would tell me that.

And, um, also I guess -- again, this is kind of hearsay because I -- I heard about this through somebody else.  But apparently Nick had received a letter from Alicia Michaud some time back saying that she did it and that Bill Sero did it, and outlining the whole thing.  And, um, a friend of ours had said that she actually saw the letter and had read it.  And again, very odd that that would come up.  So, I don't know.

Q.    If I were to tell you that I got a copy of the

Exhibit 5002 at 1438

*J. Curran*

letter in that stack there, and it doesn't mention any of that stuff, would that surprise you?

A.    Um, I guess.  I mean, it's hearsay to me, you know.

Q.    Okay.

A.    I know that there's lots of rumors that go around.  So, to me it's just really odd that it all ties in so much where, you know, one of the rumors that's went around this whole time has involved Bill Sero.  And the other one, of course, has involved Nick.  And those are the two main things.  And for rumors to come -- or rumors or -- or whatever they are, to come from Nick that involve Bill, it's just kind of odd how it all ties in.  And I don't know the details, so it's hard for me to put together.

MR. FRASIER:  Okay.  I don't have any other questions for Stacy.  Does the grand jury have any questions?

(Pause.)  Okay.  You're free to go.

GRAND JUROR:  Good job.

THE WITNESS:  Thank you.

GRAND JUROR:  Thank you.

**TESTIMONY OF JULIANA CURRAN (REAB)**

(Witness sworn.)

BY MR. FRASIER:

Q.    First of all, this is the grand jury for Coos County, and we're looking into the disappearance and death of

Exhibit 5002 at 1439

*J. Curran*

Leah Freeman.  And we are recording everything today, okay?

A.    All right.

Q.    All right.  First of all, could you tell us your name, please, and where you live.

A.    I'm Juliana Curran, and I live at 270 North Dean Street, Coquille.

Q.    And you're married now; is that correct?

A.    I am.  I was Juliana Reab 10 years ago.

Q.    All right.  Your mother --

A.    Janet Reab, yes.

Q.    -- previously testified this morning.

Do you -- did you know Nick McGuffin?

A.    Yes, I did.  I've known him ever since I was probably about three or four years old.  And they had a little fruit stand down the hill, and I kind of had my first crush on Nick, you know?  I was in first grade with him. I've known him since I was really little.

Q.    Okay.  Did -- did you know Leah Freeman?

A.    Yes, I did.  I've known Leah my whole life as well.  Probably much better than Nick.  Um, my mom was friends with Cory and Denny when I was little.  My mom used to work at Denny's Pizza.  And any kind of family gatherings or anything, we had birthday parties, Denise and Leah came over.  And so -- Leah went camping with us.  Denise went camping with us.  I mean, we were all really good friends.

Exhibit 5002 at 1440

124

*J. Curran*

So.

Q.    Okay.  Now, I want to talk with you -- well, did you know that Nick and Leah were boyfriend/girlfriend?

A.    I did.  I could see that in the hall.

Q.    Okay.

A.    You could tell when they held hands or -- you know, you knew in high school who was with who.

Q.    Okay.  Did you see how well they got along?

A.    I did, and how well they didn't get along.  I can remember Nick telling me, um -- he had me -- I had him giving me a ride home one day.  I had a heavy backpack.  And we got to talking, and he said he had to get right back because he had to go pick up Leah.  Because she got out, I think, a class after me.  I had one class earlier.  I only had six classes and she had seven, or something like that.

So, he had to go get her because otherwise she would get angry and violent, he said, toward him.  Didn't talk about like fists and like physical or anything, but she would get violent, he said.

Q.    Okay.

A.    So that kind of seemed wrong.  And I said, Have you told her mom?  You know, not that I wanted to make a problem in their relationship, but nobody needs to have control issues in high school.  They're not even married, you know?  You don't need to be answering up to anybody.

Exhibit 5002 at 1441

*J. Curran*

Q.    Okay.

A.    So I told him that I thought that he needed to tell her mom.

Q.    All right.

A.    And I could see in the hall that there was sometimes issues between the two of them.

Q.    All right.  Now, you became aware, June 28th of 2000, that Leah disappeared?

A.    The next day, actually, was made aware that she didn't come home.  Nick knocked on my door.

Q.    Okay.

A.    He brought Maggie, um --

Q.    Maggie Downs?

A.    -- Downs.

Q.    All right.

A.    She's Downs.  Um, over to my house.  And they knocked on the door looking for Leah.

And I thought that would be so weird for Leah to come to my house.  Now, Denise, yes.  Because Denise and I were real tight; you know, her sister.  But for Leah to go all the way up the edge of town -- okay.  If she needed a place to be, I was right there.  I'd open my door for her.  But why would she come hang out or need a place to be?  That just seemed bizarre.  I didn't even tell my mom that Leah was -- didn't come home.  It -- just didn't think anything of

Exhibit 5002 at 1442

126
*J. Curran*

it.  And then she -- it came out in the papers, like a week later.

Q.    All right.  Now, eventually her body was found in August of 2000.  Prior to the body being found, were with you -- were you with your mom and a couple other people at Fifth Street Park?

A.    I was, yes.

Q.    And did --

A.    We took Gabe to the -- my nephew, to go play on the swings.  He was like two and a half or something.  It were a long time ago.

Q.    Okay.  That would have been Fifth Street Park here in Coquille?

A.    Mm-hmm.  Mm-hmm.

Q.    Did you see Nick and Ricky Crook?

A.    We did.  Leah was still missing.  I waved at them because I wanted to see what was going on.  I was classmates and -- with Ricky, and I knew Nick.  He was Leah's boyfriend, so I wanted to know what -- you know, if anything was going on.  If they had any gossip they could share or anything.  It was kind of bizarre having a missing person in Coquille.

So I waved at them to come on over, and he pulled over and came over and talked to me.  And the conversation that we had took place kind of by the tennis courts.  He barely even came down the steps.  And I more met him, and

Exhibit 5002 at 1443

*J. Curran*

more walked up with him and Ricky.  And what we talked about was Leah was still missing, and I said, you know, The police, are they, you know, talking to you?

And, Yeah, they are.  They're, you know, interested in me.

And we started talking about, Well, have you got anything?

Q.    Okay.  Yeah.  There's one area we can't talk about.  I don't know if I told you.  With the test, we can't talk about any testing, okay?

A.    Oh, okay.

Q.    All right?  So, we're not going to --

A.    We --

Q.    -- not going to go there.

A.    Okay.

Q.    Did he --

A.    That was talked about, but okay.

Q.    Yeah, we can't talk about that.

A.    Okay.

Q.    All right.  Did he say something to the -- something to effect of, Remember the last time we talked, how I was complaining about Leah?

A.    Mm-hmm.

Q.    Okay.  Why don't you tell the grand jury about that.

Exhibit 5002 at 1444

128

*J. Curran*

A.    The last time we talked, I -- well, Leah was, had disappeared.  Uh, wait.  Can you re -- say that again?  Just so that I make sure that I know what I'm --

Q.    Okay.  According to the police report, this is at the park, Nick stopped and got out of the car and was walking towards you, yelling before he got over to you, "Remember the last time we talked, how I was complaining about Leah?"

A.    Yeah.  "I wish there was something we could complain about now."

Yeah.  Because she had -- she was missing.  And we hadn't seen her.  And she's gone and, you know, he seems like he's upset.  You know, where -- well, nobody's found anything.  I mean, it seems like the police are kind of looking toward him as being a suspect, that he's -- he's upset that she's still disappeared, and there's nothing happened yet.

I didn't get to thinking that there was anything wrong with Nick until that day.  And then I started questioning Nick and what had happened in his relationship, just because the way that he came across.  And then after that, I think that he knew that I -- I don't know.  That maybe people were starting to question him and what he -- what his involvement may have been.

Q.    Okay.

A.    And he started getting real angry at people.

Exhibit 5002 at 1445

*J. Curran*

Every time we'd -- he'd rev his engine when he'd go by me. I was scared.

I had a real good relationship with Nick. He was my friend. I didn't want to think anything bad. And then -- and then it got to where I didn't want to walk at the highway maybe at dark because he might mow me down or something.

Q. Okay. So he really changed after the Fifth Street Park incident?

A. Big time. Oh, yeah. He accosted me anytime I was out downtown. I don't know what happened, but he snapped and it was like a whole different person. It was like a guilty person came out. Nobody that seemed to care about a girl that had gone disappearing like that would act like that. If he really loved her, I don't think that he would be angry and aggressive and he would -- he would be more trying to fight it and um, get it solved.

Q. Has anybody told you that they killed Leah Freeman?

A. No.

Q. Has anybody told you that they were present and saw what happened to her?

A. No.

Q. Outside of what we talked about here today, is there anything else that you think grand jury needs to know?

A. There's all kinds of rumors that I've heard. All

Exhibit 5002 at 1446

kinds of stuff.  But whether anything is -- it's all hearsay, you know?  I just want it solved, and I think that there's a lot that had happened that kids are afraid to talk.

And whoever knew, I mean -- there's a lot of scary names out there that I've heard, and I don't know who the people are, but I know that there's a lot of people out there that I'm like, I don't want to know you.  I don't know how you're tied in, but --

MR. FRASIER:  Okay.  All right.

Grand jury want to ask her anything?

(Pause.)  Okay.

GRAND JUROR:  Thank you.

THE WITNESS:  You're welcome.  Hope you guys solve it.

**TESTIMONY OF BRETT MAURO**

(Witness sworn.)

BY MR. FRASIER:

Q.    First of all, sir, this is the grand jury for Coos County, and -- I'm going to stand up for a little bit because of my -- so I'm going to stand for a little bit.  The grand jury's looking into the disappearance and death of Leah Freeman, okay?  First thing I have to tell you is that we are recording everything that's going on in here, okay?

A.    That's fine.

Q.    Just want you to be aware of that.

Exhibit 5002 at 1447

First of all, could you tell us your name, please, and where you live.

A.    My name is Brett Mauro and I live at 94795 Vista Lane.

Q.    Okay.  And how long have you lived there, sir?

A.    Two months.

Q.    Okay.  Have you lived in the Coos County area, Coquille area, for most of your life?

A.    Uh, most of my life, yeah.

Q.    Did you go to high school here?

A.    Yes, sir.

Q.    Did you know Nick McGuffin?

A.    Yes, sir.

Q.    How did you know Nick?

A.    Went to school together.  Hung out a little bit.

Q.    All right.  Did you know Leah Freeman?

A.    Yes.

Q.    How did you know Leah?

A.    I've known her all my life.  Um, I called her gram -- grandma and grandpa grandparents, you know?  I know her family very, very well.

Q.    Okay.  Did you know that Nick and Leah were boyfriend/girlfriend?

A.    Yes, sir.

Q.    All right.  Did you see them together?

Exhibit 5002 at 1448

*B. Mauro*

A.    Yes, sir.

Q.    Could you describe what their relationship was like.

A.    Hit or miss, kind of, you know?  Sometimes it was good, sometimes it was bad.

Q.    Okay.  I want to direct your attention, sir; I have information.  On the evening that Leah disappeared, which would have been June 28th of 2000, you were at the Fast Mart that night.  Did you see Nick McGuffin there?

A.    I did, sir.

Q.    It was about -- what time was it?  Do you recall?

A.    9:35 to 9:40, somewhere in there.

Q.    Okay.

A.    Maybe a little bit later, maybe a little earlier, but not any earlier than 9:30.

Q.    Okay.  Did you -- what did Nick tell you when you saw him?

A.    Uh, he said she was gone, was his exact words.  I said, No, she can't be gone.  She has to be at her grandparents' house, or her mother's house.  She can't be gone.

Q.    Okay.  And what did he say?

A.    He says, No, Brett, she's gone.  I have to go find her.  Once again I said, No, she's not gone.  You know, gone, to me, is gone.  So, you know.

Exhibit 5002 at 1449

*B. Mauro*

Q.     But he kept saying No, she's --

A.     Kept, he -- because the first conversation there was at seven or eight times he said "gone."

Q.     All right.

A.     Pale, pasty.  Wasn't Nick, you know?

Q.     All right.  You must have talked to him again --

A.     Um --

Q.     -- that night?

A.     He told me when he left he was going to see, um, Jason Rice and Aaron West, I do believe.

Q.     Okay.

A.     I want to say they were going to the Mill Pond, but it's been a long time so I can't -- that's not stuck in my brain, but I do believe that's what was said.

Q.     Okay.

A.     And then it wasn't 10 o'clock yet, and he showed back up.

Q.     All right.

A.     And said, Let's go for a ride, my girlfriend's gone.

Q.     Okay.

A.     I got in the car.  We rode around for a minute. Real somber.  Never really said much.

Q.     Okay.  Now, did you and he smoke some marijuana?

A.     Yes, we did.

Exhibit 5002 at 1450

*B. Mauro*

Q.    Do you know a lady named Polly Parks?

A.    I do.

Q.    Do you know Ricky Crook?

A.    I do.

Q.    Wayne McGuffin?

A.    I do.

Q.    Okay.  Have you ever been over at Polly Parks' place with Nick --

A.    Yes.

Q.    -- and Wayne and --

A.    Yeah.  Ricky, all of them.

Q.    -- Ricky, all of them?

We've heard some testimony here today that at -- while you at Polly Parks' house with Wayne and Nick and Ricky that, prior to the body of Leah Freeman being found, somebody was describing where the body was at.  Do you know anything about that?

A.    You know, there was a rumor in town that there was a grave at Tom Stemmerman's, and that the body was passed around from Polly's house to Tom's house.  Which is -- whatever, it's a rumor.

Q.    Okay.

A.    Whatever.  I don't know.

Q.    But do you recall talking about that?

A.    I don't recall.

Exhibit 5002 at 1451

*B. Mauro*

Q.    Okay.

A.    I could have, you know, but I don't remember. You know, we talked about this --

Q.    Well --

A.    You know, this -- this comes up once a week, or once a month with our friends, you know.  Lots of conversations.

Q.    Was there any discussion about Leah's shoes, and where Leah's shoes were found?

A.    I -- I don't remember.  I could have.  I -- like I said, I -- I don't remember.

Q.    Okay.  Was there ever a description given to you where the body might be found --

A.    No, sir.

Q.    -- involving --

A.    Never.

Q.    -- involving something (indiscernible) down the road?

A.    No.

Q.    Did you ever see the body of Leah prior to it being found?

A.    No, sir.  We wouldn't be in this position if I had seen the body.

Q.    If you had seen the body, what would you have done?

Exhibit 5002 at 1452

*B. Mauro*

A.      Well, I would have -- like I say, we wouldn't be here.  It would have been solved already, you know what I mean?  Or further along than this.

Q.      Has anybody told you that they killed Leah Freeman?

A.      No, sir.

Q.      Has anybody told you that they were there and saw what happened?

A.      No, sir.

Q.      Were you involved in her death --

A.      No, sir.

Q.      Okay.

A.      I've been asked that before, and I -- no, sir.

Q.      Okay.  Other than what we've talked about here today, is there any other information that you know about this case?

A.      Um, I do know that her feet print were on Wayne's windshield -- or, uh, Nick's windshield.  Her feet prints.  And one day it was foggy and I went to wipe it off, and he did freak out on me.  Yell and scream.

Q.      Okay.  Not -- don't do that.

A.      Yeah.  But, um, other than that, I really -- um.

MR. FRASIER:  Okay.

Grand jury want to ask him anything?

GRAND JUROR:  What kind of vehicle did you have

Exhibit 5002 at 1453

137

*B. Mauro*

at that time?

THE WITNESS:  I had a -- it was GMC S-15, just like an S-10, but it was a -- GMC makes it, not Chevy. Two-wheel-drive pickup.  It was white.  I want to say it was an '87 or something.  It was my vehicle.  White in color, red pin-striping.

GRAND JUROR:  Did you have a car, or just the truck?

THE WITNESS:  I had a truck.  I just had my truck, that's all I had.

GRAND JUROR:  Where was it -- who did -- were you driving it --

THE WITNESS:  No.  I had a suspended driver's license at the time.  I was on foot.

GRAND JUROR:  Would you -- we're -- at this point, you may have driven Wayne and Nick around quite a bit?

THE WITNESS:  Uh, you know, everybody in town, you know, as people get their licenses suspended, I -- you know, me too.  But I was older than most of my friends --

GRAND JUROR:  But at that time, or the time talking about right after Leah's disappearance, did you go up to Polly's house quite often?

THE WITNESS:  Oh, yeah.

GRAND JUROR:  So were you involved in meth then, at the time?

Exhibit 5002 at 1454

138

*B. Mauro*

THE WITNESS:  Oh, yeah.

GRAND JUROR:  So, all your -- the whole group of you that would have been -- I think it was Wayne, you, Wayne, Nick --

THE WITNESS:  Oh, there was -- the whole town was doing it, man.  I just can't narrow it, you know?  I mean, it was pretty prevalent when I was that young.

GRAND JUROR:  So, do --

THE WITNESS:  Real, real prevalent.

GRAND JUROR:  Did you know Wayne?

THE WITNESS:  Oh, yeah.

GRAND JUROR:  What did you think of Wayne?  What was your opinion on him?

THE WITNESS:  Mouthy piece of shit.

(Laughter.)  Sorry, but that's -- that's Wayne, you know?

GRAND JUROR:  Had you ever been out to their house?

THE WITNESS:  Oh, yeah.  Oh, yeah.

GRAND JUROR:  Did you know the father?

THE WITNESS:  Yeah.

GRAND JUROR:  Did he allow drugs, alcohol?

THE WITNESS:  Uh, it was just -- I don't know if it was -- I mean, it happened out there.  Not -- and I didn't go out there very much, so I don't know all; if it was

Exhibit 5002 at 1455

*B. Mauro*

allowed or it just happened.

GRAND JUROR:  But you were driving up there shortly after Leah's disappearance, then?

THE WITNESS:  Yeah, I can't -- I couldn't answer that.  I don't recall.

GRAND JUROR:  But you're sure that at the time --

THE WITNESS:  Yeah, I was on foot.  Yeah.

GRAND JUROR:  When she disappeared?

THE WITNESS:  Yes.  Because I was walking in between Judy's New Image -- like where Judy's New Image is down -- what is that?  Seventh?  Sixth Street, down through the little gully there, and you come up between Exxon and Judy's New Image, now.  And it puts you out at Fast Mart.

GRAND JUROR:  Did you give a report to the police right after this?

THE WITNESS:  Oh, yeah.  Yeah, I talked to the FBI shortly after this.

GRAND JUROR:  And what did you do that evening, after you --

THE WITNESS:  I couldn't -- I don't know what I did after that.  I could -- I couldn't even --

GRAND JUROR:  Did you and your friends drive without a license even though it was suspended?

THE WITNESS:  I never did.  I never did.

GRAND JUROR:  You're sure?

Exhibit 5002 at 1456

*B. Mauro*

THE WITNESS:  I can't -- I can't quote my friends --

GRAND JUROR:  That's your left hand.

THE WITNESS:  I -- I promise you, I never drove.  That's one thing -- like I -- I had a vehicle the whole time, but I never, ever drove.  And you can look at my police reports.  You know, I -- I don't have any driving while suspendeds, or any --

GRAND JUROR:  How about the other kids?

THE WITNESS:  I can't -- you know, that's not for me to say.

GRAND JUROR:  Ah.  I mean, it's not going to hurt now.

THE WITNESS:  No, no.  But I'm just saying, I'm not -- you know what I mean?  I'm sure it's happened, but I'm not going to be like, yeah, he did it.  I -- you know, I mean, I don't keep track of when they get their license suspended or whatever, you know?  When they're in trouble or not.

GRAND JUROR:  And there's the bunch of kids.  I know what kids do.  (Laughing.)

THE WITNESS:  But I will tell you right now, I never drove without my license.  I didn't want -- you know.  I'd have two or three suspensions on it as it was.  I didn't need any more.

Exhibit 5002 at 1457

*B. Mauro*

GRAND JUROR:  Oh, my goodness.

THE WITNESS:  So --

GRAND JUROR:  So, in other words --

THE WITNESS:  I was --

GRAND JUROR:  -- you drove, and then got caught?

THE WITNESS:  No.  No, no --

GRAND JUROR:  And then got suspended?

THE WITNESS:  I -- just like I told you, you can look at my police reports.  I've never had a driving while suspended.  Not once.

GRAND JUROR:  Yeah, but that doesn't mean you didn't get caught.

THE WITNESS:  I never drove.  I never drove.  I never drove when I had a suspended driver's license.

GRAND JUROR:  How many times did you have it suspended?

THE WITNESS:  Aw.  First time, I was 17.  And then after that, you know, I'd have it for six months, it would get suspended.  After, you know, stupid little stuff you do, and they suspend your driver's license, you know.  But I never drove without a driver's license.  My truck would sit there.  I didn't want to get in trouble for driving.  I was already in trouble for a driving offense.  Why get in trouble more?

GRAND JUROR:  Did you get your license back

Exhibit 5002 at 1458

*B. Mauro*

shortly after Leah disappeared?

THE WITNESS:  Do you see, I -- you just asked me that question, and I don't -- I, I can't --

GRAND JUROR:  Well --

THE WITNESS:  I -- I -- I -- I -- I don't -- I don't remember.  I don't recall, like my exact dates of getting my license back.

GRAND JUROR:  Okay.

THE WITNESS:  I could have, yes.  I might not have, no.  You know what I mean?  I don't know.  I don't remember.

GRAND JUROR:  Would -- where -- did you -- would -- we've had testimony that you'd driven Nick and Wayne and Ricky, I think, around quite a bit.

THE WITNESS:  Oh, yeah.

GRAND JUROR:  Okay.  Did -- was one of the places you were -- where did you guys frequent?  Did you have any -- you've got Johnson Pond.  Did you have any --

THE WITNESS:  Aw, you know.  We'd go to (indiscernible), we'd go for drives.  Just drive around, you know.  It was --

GRAND JUROR:  Was the area in that -- was the area that Leah's body's found, is that -- was that like an area -- was that a place where you guys --

THE WITNESS:  I never went there when I was a

Exhibit 5002 at 1459

*B. Mauro*

kid.  Ever.  Never, ever.

GRAND JUROR:  Was it some place you'd go to drink and do drugs?

THE WITNESS:  No.  I -- I didn't.  People would go party there, but I didn't.

GRAND JUROR:  Was there a lot of drug activity at Polly Parks'?

THE WITNESS:  Yeah.  (Laughing.)

GRAND JUROR:  Were you at -- we've heard testimony that there was a scanner there, and at some points people would really -- a police scanner.  People --

THE WITNESS:  Oh, yeah, yeah.

GRAND JUROR:  -- you guys would focus in on the police scanner.

THE WITNESS:  Oh, yeah.

GRAND JUROR:  What was said while that was happening?

THE WITNESS:  Oh, I don't know.  I don't remember general conversations.

GRAND JUROR:  Okay.  But as far as you can recall, nothing about Leah, even though --

THE WITNESS:  No.

GRAND JUROR:  -- that was the object of the police scanner --

THE WITNESS:  Well, that wasn't the object of the

Exhibit 5002 at 1460

*P. Smith*

police scanner was Leah.  And not -- you know what I mean?
It was a tweaker house.

GRAND JUROR:  Okay.

THE WITNESS:  Tweakers listen to the scanner.

GRAND JUROR:  Just to be sure you weren't --

THE WITNESS:  They --

GRAND JUROR:  -- going to be caught?

THE WITNESS:  -- they carry them all around the street, you know what I mean?  It's not because -- I mean, it wasn't my house.  I don't know if that was a reason it was put in or not, but I would assume that it was because of the drugs that were involved.  Like I say, it was pretty prevalent when we were kids, you know.  People change. Obviously, I weigh 300 pounds, you know?

(Laughter.)

MR. FRASIER:  Any other questions?

Okay.  That will do it.  You're free to go.

THE WITNESS:  Have a good day, you guys.

GRAND JUROR:  Thank you.

## TESTIMONY OF PAMELA SMITH

(Witness sworn.)

BY MR. FRASIER:

Q.    First of all, this is the grand jury for Coos County, and they are looking into the disappearance of Leah Freeman.

Exhibit 5002 at 1461

A.    Mm-hmm.

Q.    First thing I got to tell you is we're recording everything, all right?

A.    I had no idea.  (Laughing.)

Q.    Okay.  All right.  First of all, could you tell us your name, please, and where you live.

A.    Pamela Smith.  929 Anderson.

Q.    And you're the daughter of Polly Parks?

A.    Sure enough.

Q.    At the time that Leah Freeman disappeared in the year 2000, how old would you have been?

A.    In the year 2000, it was July-ish, I would have been ten.  Nine, ten.

Q.    All right.  Now, your mother, in the year 2000, was pretty much into the drug scene; would that be right?

A.    For about 10 months, she was pretty hard core into it, yeah.

Q.    Methamphetamine use and so forth?

A.    Yes.

Q.    Did she use around you?

A.    Um, no.  I was -- any time anybody ever came around, I was either in the other room or I was at the neighbor's house.  I was kept pretty well away from it.

Q.    All right.  Do you know who Nick McGuffin is?

A.    I know the -- the first name.  I couldn't put a

Exhibit 5002 at 1462

*P. Smith*

face to it but, yeah.

Q.    Wayne McGuffin?

A.    Again, the name.

Q.    Okay.  Ricky Crooks?

A.    That one I could put a face to, I think.  I'm pretty sure.

Q.    The guy that was just in here, Brett Mauro?

A.    Yeah.

Q.    Okay.  Do you recall while you were -- that summer, while you're at home, do you recall these guys being over at your house?

A.    Yeah.  A lot.  (Laughing.)

Q.    A lot?  Okay.  Did you ever hear them talking about Leah Freeman and what happened to her?

A.    Before she was actually discovered -- or before Nick said that she was missing, there wasn't a whole lot of talk --

Q.    Okay.

A.    -- about Leah.  I had no idea who she was.  My mom met her just a couple weeks before she was missing.

Q.    Okay.  What about after she was missing?  Was there --

A.    After she went missing, it was kind of like a brainstorming session for a few weeks to place people that had been in the house.  My mom started actually looking at

Exhibit 5002 at 1463

*P. Smith*

people as, you know, being murderers and stuff like that. She pretty much cleaned house after that.

Q.    All right.  Do you recall any discussions where Wayne, Nick, Ricky, and Brett were involved, talking about Leah?

A.    Not Nick.

Q.    Okay.

A.    But Wayne, Ricky, and Brett was there.  I wasn't in the room, so I can't specifically say who was talking, but I know that they were there.

Q.    When you say they, it's Wayne --

A.    Wayne, Ricky, and Brett.

Q.    Okay.  What do you remember being said?

A.    That Leah was taken care of, and she was in a basement somewhere, and they didn't know what to do with her.

Q.    Did you hear anybody else talk about Leah? Anything else that was said about her?

A.    (Pause.)  Like -- (Laughing.)

That she hadn't cooperated -- well, I don't know. It -- it was a huge discussion, and I was only paying like part-way attention to it because I was a kid and I didn't know any better.  It was kind of like a TV show to me --

Q.    All right.

A.    -- at the time.

And I had -- I heard them talking just about her

Exhibit 5002 at 1464

*P. Smith*

not being there, and that they needed to do something with her, and that she was taken care of.  I remember them using Nick in the conversation, but they didn't use his name.

Q.    Okay.  Has anybody told you that they killed Leah Freeman?

A.    No.

Q.    Has anybody told you that they were there and saw what happened to her?

A.    No.

Q.    Anything else, other than what we talked about here today, that you think the grand jury should know about?

A.    (Pause.)  It was a really hard time in my life. (Laughing.)  I don't know.  Not really about the case specifically, because it was almost irrelevant to me at the time, being a 10-year-old kid.

MR. FRASIER:  Okay.  I don't have any other questions for this witness.  The grand jury want to ask her anything?

GRAND JUROR:  You said --

GRAND JUROR:  I had a question.  Did the -- who drove these guys to your house, do you remember?

THE WITNESS:  Brett.

GRAND JUROR:  Brett.

THE WITNESS:  Brett was the driver.  He --

because Nick didn't drive, and Ricky didn't drive.  And when

Exhibit 5002 at 1465

*P. Smith*

they were all together, they would all come together. And Brett was usually there.

GRAND JUROR: You said that they referred to someone who you think was Nick.

THE WITNESS: Mm-hmm.

GRAND JUROR: When they had their conversation. What did they -- how did they refer to him? What did they say about him?

THE WITNESS: They called him "Dog." They, they used a different name. Like they talked about him consistently in their conversation, but they didn't use his name. They, you know, like just, Dog did this, and -- you know.

GRAND JUROR: Were they saying that "Dog" had something to do with her death?

THE WITNESS: Not at the time, no. Because this was before -- this conversation was before Nick come over and said that she was missing.

MR. FRASIER: Okay. Let's stop for a second. I need to change the tape.

(Pause.)

BY MR. FRASIER:

Q. Okay. I've changed the tape. I want to back up a little bit. You were saying that this conversation where they were referring to the Nick, it was like Dog did this and

Exhibit 5002 at 1466

*P. Smith*

Dog did that.

A.    Mm-hmm.

Q.    And then you said, if I understood you correctly, that this conversation occurred before you knew that Leah was missing?

A.    Yes.

Q.    So -- okay.

GRAND JUROR:  Is that the same conversation in which they said that things were -- she, or something, or things were being taken care of.

THE WITNESS:  Mm-hmm.  That was the same conversation.  It was before Nick had come to our house and said that Leah was missing.

GRAND JUROR:  So, it -- and when did Nick -- how much after -- when did Nick come to the house and say that she was missing?  Do you remember, was it --

THE WITNESS:  It was about a week later.

GRAND JUROR:  About a week later.

GRAND JUROR:  You hadn't -- you hadn't heard before then that Leah was missing?

THE WITNESS:  I didn't know Leah.  I didn't know anybody.  I was sitting my bedroom one night, and I overhear this conversation that they're having.  And I -- I had no idea, you know, what they were talking about really, but I did overhear it.  Um, it was kind of interesting because I --

Exhibit 5002 at 1467

it's not everyday conversation that people talk about somebody being taken care of.  And --

GRAND JUROR:  Something about a basement, and --

THE WITNESS:  That she -- she was in a basement, and she was being looked after.  Being taken care of.

GRAND JUROR:  Something about she hadn't cooperated well?  That --

THE WITNESS:  There was -- before the conversation, people would come over and they would be so excited about this acid party that was coming up.  This party that was supposed to bring everybody together.  Nobody really liked Leah, and it was supposed to just make everybody cool.  And, what I heard -- I don't know if it's rumor or not, but what I heard was that she didn't cooperate at the party, and she either OD'd or she got really angry with them feeding her the drugs.  And they tied her up or strangled her or something like that.

GRAND JUROR:  This you heard after -- years later?

THE WITNESS:  It was around the same -- it was probably about a month or two.

GRAND JUROR:  Okay.  So there was somebody in the house probably talking?

THE WITNESS:  There was a lot of talk.

GRAND JUROR:  Okay.

Exhibit 5002 at 1468

*P. Smith*

GRAND JUROR:  Do you recognize the name Bill Sero?  Or Tom Stemmerman?

THE WITNESS:  Stemmerman?  Yes.  And what was the first one?

GRAND JUROR:  Bill Sero.

THE WITNESS:  Bill Sero.  Yeah, I do.  I recognize the name, but I wouldn't be able to put --

GRAND JUROR:  A face with it?

THE WITNESS:  No.  Before about two months ago, none of this stuff had even been brought up in 10 years, so --

GRAND JUROR:  Did they ask you questions at the time?  Were you asked questions that young?

THE WITNESS:  No, not back then.  My mom was an informant, so --

GRAND JUROR:  Right.  And you were 10 years old, yeah.

THE WITNESS:  Yeah.

GRAND JUROR:  I see.

(Pause.)

MR. FRASIER:  Any other questions?

Okay.  That will do it.

GRAND JUROR:  Thank you.

THE WITNESS:  All right.  Am I dismissed?

MR. FRASIER:  Yes.

Exhibit 5002 at 1469

*H. Pizzola*

THE WITNESS:  Okay.  (Laughing.)

**TESTIMONY OF HEATHER PIZZOLA**

(Witness sworn.)

THE WITNESS:  Yes, but I was also told I could read my deposition to see what I said, because I don't really remember what happened 10 years ago.

GRAND JUROR:  But just what you're going to tell us today is to the best of your knowledge --

THE WITNESS:  Right, yes.

GRAND JUROR:  -- all true?  Nothing but the truth, so help you God?

THE WITNESS:  Yes.

GRAND JUROR:  Thank you.

THE WITNESS:  Thank you.

BY MR. FRASIER:

Q.    Did the officers talk with you outside?

A.    No.

Q.    Okay.  Well --

A.    Because I asked that on the phone when I talked to one of them here like a week ago, because I don't really remember --

Q.    Okay.

A.    -- a lot, really.

Q.    Well, first of all, this is the grand jury for Coos County.  They are looking into the death and

Exhibit 5002 at 1470

disappearance of Leah Freeman, okay?  It's obvious, but we're recording everything, all right?

A.    Mm-hmm.

Q.    First of all, could you tell us your name and where you live, please.

A.    Heather Ann Pizzola.

Q.    Okay.

A.    442 West 19th Street, Coquille.

Q.    All right.  And have you lived in the Coquille area most of your life?

A.    Um, as an adult.

Q.    All right.  Do you know a Nick McGuffin?

A.    Yes, I do.

Q.    How do you know Nick?

A.    Um, he played football with my son, I think, Matt.  Yeah.

Q.    All right.  Did you know Leah Freeman?

A.    Yes.

Q.    And how did you know her?

A.    Um, she was Nick's girlfriend, and they used to come to my house.

Q.    Okay.  Did you see them together as a couple?

A.    Yes.

Q.    How did they get along?

A.    Um, most of the time pretty good.  But, you know,

Exhibit 5002 at 1471

*H. Pizzola*

you hear them arguing and stuff like kids do, I guess.

Q.    Okay.  Well, I was -- the reason I brought you is, according to the police reports that I have, you indicated that the night that Leah disappeared, you had been at the Fast Mart to purchase some beer.

A.    Yes.

Q.    Okay.  And that while you were there, you saw Nick McGuffin.

A.    No, I seen another guy, I think.  Um, they had -- they just released from the jail.

Q.    Okay.

A.    If I can remember right, and I thought he was suspicious, but I didn't tell him -- I didn't know anything that she was missing yet, but later on.

Q.    Okay.

A.    So.

Q.    Well, I guess the -- one of the things I'm looking at is, according to the police report, you recall Nick McGuffin coming over and asking if anyone had seen Leah.

A.    That's what I -- I don't know, because I don't remember.  I'd like to read the -- the report.  I don't -- honestly, it's been 10 years.

Q.    Okay.

A.    I've been drinking, and it's a long time ago.

Q.    Okay.  Has Nick McGuffin ever talked to you about

Exhibit 5002 at 1472

*H. Pizzola*

what happened to Leah Freeman?

A.    Um, maybe right afterwards.  After she was missing and stuff like that.

Q.    Do you recall anything about what Nick might have told you about what happened to Leah?

A.    No.

Q.    Okay.  Has anybody told you that Leah -- has anybody told you they killed Leah Freeman?

A.    No.

Q.    Has anybody told you that they saw what happened to Leah?

A.    No.  I've heard all kinds of rumors, though.

Q.    Right.  Have you talked to -- do you know Bruce and Kathy McGuffin?

A.    Yes.

Q.    Have you talked with them about this?

A.    If I did, it was a long, long, long time ago.  I haven't even seen them for some time.

Q.    All right.  Outside of what we've talked about, do you have any information about the disappearance/death of Leah Freeman?

A.    I -- nothing that I can -- just rumors I've heard around town, that's -- you know.

MR. FRASIER:  Okay.  All right.  That's all I have.  Does the grand jury want to ask her any questions?

Exhibit 5002 at 1473

157

*H. Pizzola*

GRAND JUROR:  When you seen this other person, who was this other person you seen at the Fast Mart that night?

THE WITNESS:  Um, some guy that they -- he was -- acted like he was spun-out to me, and even -- I'd been doing yard work, so I went to Fast Mart to get some more beer so I could finish my yard work.  Anyways, this guy was trying to get ch -- money, like break a hundred or something from Steve, and Steve -- and then he was just wanting to use Steve's phone, and the guy was just really being weird.  And Steve, like, No, you need to leave.  Leave my premises.  And all that stuff.

And I just -- later on, when I found out Leah was missing, it just -- the guy seemed like he was cracked-out to me, and I was --

GRAND JUROR:  But you didn't know him?

THE WITNESS:  No.  But they -- I -- I do know that they had just released him from the jail because I talked to the sheriff about it after I knew -- knew she was missing and stuff, and they said that they had just released that guy from jail.  And the guy was saying he was just released from jail, and he was trying to break a hundred and stuff.  I don't know if that has any bearing or not, but it just --

GRAND JUROR:  So you didn't hear any name, or --

Exhibit 5002 at 1474

*H. Pizzola*

THE WITNESS:  No.

GRAND JUROR:  I'm sorry, is your son name -- is your son Matt?

THE WITNESS:  Yeah.

GRAND JUROR:  It's not Mike, it's Matt?

THE WITNESS:  I have a Mike, a Matt, a Chris, and a Nick.

GRAND JUROR:  Okay.  Is your son Mike, did he used to hang around with Wayne McGuffin?

THE WITNESS:  Um, Mike would hang around with a bunch of different kids about that age -- yeah, sometimes.

GRAND JUROR:  Okay.  He would talk about hanging out with him and Ricky Crook --

THE WITNESS:  Well, he still hangs out with Ricky, but I don't even -- I haven't seen Wayne for a long time.  But, they -- they all hung out together when they were younger.

GRAND JUROR:  Okay.

THE WITNESS:  I mean, all the kids would come to my house and congregate.

GRAND JUROR:  Okay.

MR. FRASIER:  Any other questions?

Okay.  That will do it.

GRAND JUROR:  All right.

THE WITNESS:  Okay.  Well, good luck you guys.  I

Exhibit 5002 at 1475

hope you find who did it.

GRAND JUROR:  Thank you.

GRAND JUROR:  Thank you.

**TESTIMONY OF TOSHA EKBLAD**

(Witness sworn.)

BY MR. FRASIER:

Q.    First of all, ma'am, this is the grand jury for Coos County and they're looking into the disappearance and death of Leah Freeman.

A.    Yes, sir.

Q.    It's obvious, but we're recording everything in here today.

A.    Okay.

Q.    All right.  First of all, could you tell us your name, please, and where you live.

A.    My name is Tosha Tyee (phonetic) Ekblad, and I live at 718 F Street, Space No. 30, Coos Bay, Oregon 97420.

Q.    The reason I have you here today is three or four weeks ago, or several weeks ago, I was given a note by Bruce McGuffin.  Do you know a Bruce McGuffin?

A.    No, sir.

Q.    Saying that apparently you knew what happened to Leah Freeman.

A.    I don't mean to roll my eyes at you, it's just um, kind of, uh, odd.  Because the only thing -- am I allowed

Exhibit 5002 at 1476

*T. Ekblad*

to say, or were you just going to ask me questions?  I'm sorry.

Q.    Well, I guess my next question is what do you know?

A.    Um, honest to God, I don't know anything first-hand, just what everybody in Coos County is saying.

Q.    Okay.

A.    I've heard from probably at least 120, 150 people, at least -- and that's probably an understatement, that Billy Sero and Tommy Stemmerman did it.  That's all I've heard.  That's all I've heard.

Q.    That's all you've heard?  Okay.

A.    But -- but --

Q.    Okay.

A.    -- I did find out the other day, and I called Officer Webley --

Q.    Yes?

A.    -- and gave him a name.  Um, supposedly -- and like I said, I don't know if this is true or not.  Carmen Kahn (phonetic), I guess, knows the whole story from start to finish.  And so I gave him that name.  But that's all I know. I don't know anything first-hand, honest to God.  And that Carmen person didn't tell me that.

Q.    Okay.

A.    It's just through this, that the --

Exhibit 5002 at 1477

T. Ekblad

Q.    All right.  Well, I want to back up a little bit with you, and talk with you about -- after I got the note, the police went to talk to you.  And just so we're clear, you had told, I believe it's your mother or your grandmother or both of them, that you were also aware of a guy named David Breakfield, and something about being run off the road by Nick McGuffin with Megan Edgerton.  Was that you?

A.    No.

Q.    Okay.

A.    But, Jesse Smisek.

Q.    Oh, Jesse Smisek.

A.    He is -- uh, said that it happened, something like that happened to him.

Q.    Okay.

A.    He was telling my mother and my grandmother.  I was there, but I was in the house.

Q.    Okay.

A.    I have a little baby that just turned 11 months and I have a 10-year-old.  Anyway, I heard part of the story, but I didn't -- he did say that Nick, I guess, had run him off the road, but I don't know this David Breakfield person. I've never met Nick McGuffin, or anything.  But he said he knows him real well, and that he's a real, real strange person.  But I've never met him.  I can't judge his character in any way.

Exhibit 5002 at 1478

*T. Ekblad*

Q.    Okay.  All right.  Well, what I want to get to is this:  Mr. McGuffin, Bruce McGuffin, came in front of the grand jury last week and told the grand jury that you had been threatened by the police, that you had been told by the police that if you didn't tell a particular story that you were going to go to prison --

A.    That's not true.

Q.    Okay.

A.    That is not true.  I swear.

Q.    Have you ever talked to Bruce McGuffin?

A.    No, sir.

Q.    Never been to his house?

A.    I -- no, sir.

Q.    If I remember his testimony correctly, he said you were out at his house last week telling him that the police had been mistreating you.

A.    I swear on my children I have never met this person, I've never met Nick McGuffin, I never -- the only person that I know that knows those people or is related to them is a -- her name's Julie.  She works at Save On Smokes in Bunker Hill.  I guess she is a relative of Nicholas -- or Nick McGuffin's mom.  I think it's her sister, I believe.

Q.    Okay.

A.    No.  That is not true.  I don't even know where they live.

Exhibit 5002 at 1479

Q.      Okay.

A.      Gee.

Q.      My question to you is this:  Has anybody threatened you to lie in here today?

A.      No.  No.  I've only talked to two officers, Officer Webley and his partner.  I can't remember his name.

Q.      McNeely.

A.      They have never threatened me or anything.  That is not true.  They've been -- we've been out in the hall talking.  They've been more than polite.  And professional. That is a damn lie, pardon my French.

Q.      Okay.

A.      That is not true.

Jesus.  What people won't say.

MR. FRASIER:  Now -- (Laughter.)

GRAND JUROR:  Tell us about it.  (Laughter.)

BY MR. FRASIER:

Q.      Just so we're clear, nobody's told you that they killed Leah Freeman?

A.      No, sir.  No.

Q.      Nobody's told you that they were there and saw what happened?

A.      No.  No, sir.

Q.      You weren't involved in this at all?

A.      I didn't live in the state at the time.  But, no.

Exhibit 5002 at 1480

T. Ekblad

No, sir.

Q.    Okay.

A.    I'm -- I swear.  I -- I don't think this is funny.  I feel horrible, and I wish to God I could help.  But no.  Honestly, everybody keeps saying that those two gentlemen did it.

Q.    Yeah.

A.    That's the only thing that I have heard.

And Bruce McGuffin, that is wrong.  And I wish I could do something because he shouldn't be able to get away with that.

MR. FRASIER:  Okay.  I don't think I have anything else to ask her.

THE WITNESS:  Jesus.  (Laughter.)

MR. FRASIER:  Careful.

GRAND JUROR:  Be careful.

THE WITNESS:  I'm sorry.

MR. FRASIER:  You're being recorded.

GRAND JUROR:  Don't say anything incriminating, now.

THE WITNESS:  No, but come on.

MR. FRASIER:  Okay.  Anything else?

THE WITNESS:  If they were going to threaten somebody, they would surely threaten somebody more important than I am.

Exhibit 5002 at 1481

MR. FRASIER: All right. Anything else? No. You're free to go.

THE WITNESS: Thank you, sir. You guys have a nice day. Thank you for your time.

GRAND JUROR: Thank you.

THE WITNESS: Jesus.

**TESTIMONY OF ALICIA HYATT (HARTWELL)**

(Witness sworn.)

BY MR. FRASIER:

Q. Okay. Alicia -- you're Alicia Hartwell.

A. Yes. It's Hyatt now.

Q. Hyatt, yeah.

A. Yes.

Q. Hartwell previously. You testified a couple weeks ago here at the grand jury.

A. Yes, I did.

Q. The reason I had you come back is after you testified, you had talked -- if I remember your testimony correctly, you had seen Leah walking by the high school the night she disappeared.

A. Yes.

Q. And you had described a car that had pulled up or had turned a u-turn or something, and came around behind the van you were in.

A. And it had stopped. It was following behind us.

Exhibit 5002 at 1482

*A. Hyatt*

We had pulled out in front of it.

Q.    Okay.  And you talked -- I had the police come and interview you --

A.    Yeah.

Q.    -- we'll hear about that.

Is there anything about how that car looked that night that you can recall that struck you as -- well, was -- did it look like the car was operating properly?  Was there any problems with the car?

A.    Uh, I remember one of the lights was dimmer than the other one.  It seemed like it was going out.  It looked like it had -- it was an older car, because it had the big glass bulbs.  My dad's a mechanic; I know cars.  So, I know it was older, because it had the glass bulbs in it, and one of them was dimmer than the other.  It seemed like it was going out.  I can't remember which side it was on, to tell you honestly, but I remember one was dimmer than the other one.

MR. FRASIER:  That's all I have for her.

GRAND JUROR:  And did you recognize the kind of car?

THE WITNESS:  It was an older -- uh, I didn't recognize it until I saw the pictures of it.  It was a M -- I knew it was an older Ford car, and it was dark colored.  It was the pictures that I'd seen, um, I described it as the

Exhibit 5002 at 1483

*A. Hyatt*

blue Mustang that I'd seen in there.  Because I knew it was a

darker-colored car.  And out of all these other pictures,

that's the one I remember.  Because I remember the front end

of it.

I remember it stopped, and I know there was at

least two people in the car, because the driver never moved,

but someone from the passenger either leaned out or got out.

I couldn't tell which.

GRAND JUROR:  And you were the 12-year-old on the

bus, correct?

THE WITNESS:  12-year-old in the van, yes.

GRAND JUROR:  The van, yes.

THE WITNESS:  In the van leaving church.

GRAND JUROR:  We've seen a lot of people, I'm

just -- to make sure I know who you are.

THE WITNESS:  Yeah, I was leaving the Foursquare

church up above the old A&W.

GRAND JUROR:  And this was when you saw -- I'm

trying to -- because you'd recognize Leah because you --

THE WITNESS:  I've known since I was little.  My

mom used to babysit her.

GRAND JUROR:  And she was on the same side of the

road where the vehicle stopped?

THE WITNESS:  Yes.

GRAND JUROR:  So she was basically right there

Exhibit 5002 at 1484

*A. Hyatt*

where the vehicle was pulled over?

THE WITNESS:  Yeah, it -- it was almost like it stopped to talk to her.  I wasn't sure, you know, I was going -- I wasn't really paying attention then.

GRAND JUROR:  So, was that --

THE WITNESS:  Didn't think something like this would happen.

GRAND JUROR:  So they were on the side of the high school, or the Shell Station?

THE WITNESS:  High school.

GRAND JUROR:  High school side (indiscernible).

THE WITNESS:  Yeah.  When we pulled out from the stop sign, leaving the church, the car was down by the, um, eye doctor's office.  And it followed us up to about where the high school is at, and I had seen her, and then it -- I saw the car stop.  And then we continued on.  We didn't stop and see anything else, so.

GRAND JUROR:  And you definitely, in your remembering, was two people in the car?

THE WITNESS:  There was definitely two people in the car.  The driver never moved from behind the wheel, but someone either leaned out or got out.  I'm not exactly sure. I don't remember seeing the door open, but it may have.  I don't know.  But there was two people in the car.

GRAND JUROR:  Was there anything that it just

Exhibit 5002 at 1485

169

*A. Hyatt*

come to you in recollection the light was dim or out, or was anything -- did anyone indicate that that might have been the case, or was that just strictly from your memory?

THE WITNESS:  No, that was from my memories.  I remembered that one light was dimmer than the other one.  I just can't remember which side it was on, but I do remember that because I was laughing about it.  And I was like, Ha-ha, it's almost a -- a game we played when we were little called "padiddle."  It was one car, and you know, if the light was dimmer than the other one, it was "padiddle."  Or it was "popeye" if it was out.  So, I remember it was padiddle because it was one light dimmer than the other one, not out.

(Laughter.)

GRAND JUROR:  Padiddle.  Let me write that down.  How do you spell that?  (Laughter.)

THE WITNESS:  I'm not sure.

GRAND JUROR:  The car or padiddle?

GRAND JUROR:  Not a popeye.

THE WITNESS:  It wasn't a popeye; it was padiddle.

GRAND JUROR:  And did you continue to observe that?  Did you observe whether Leah had got into the car and left with the car, the car left her, anything like that?

THE WITNESS:  After the car stopped, after the car stopped and I seen someone lean out or get out, I'm not

Exhibit 5002 at 1486

170

*A. Hyatt*

exactly sure which, I don't know.  But we continued on.  I wasn't really paying attention.  I was too busy arguing with my friend over a sweater, so.

GRAND JUROR:  Okay.

THE WITNESS:  I was a 12-year-old kid.

GRAND JUROR:  And this was where you turned into the high school parking lot?

THE WITNESS:  It was just --

GRAND JUROR:  Up on the upper level, I mean.  The --

THE WITNESS:  Yeah, it was not at the bus part.  It was kind of in between the bus part and the parking lot to the high school.  And it was right there on that corner.

GRAND JUROR:  So, there's no -- it's just a shoulder.  There's not -- they just pulled over.

THE WITNESS:  Yeah, it's -- it was almost as they stopped in the middle of the road.

GRAND JUROR:  The road, okay.

GRAND JUROR:  Right where the cross is set up there, with flowers.

THE WITNESS:  Yeah, just -- just -- it was just -- actually, our van was right about where that is.  It was just a little bit farther back.  Like, about two car lengths back when it stopped, and right around that area.

GRAND JUROR:  And right across from the gas

Exhibit 5002 at 1487

station, almost.

THE WITNESS:  Yeah.  It was on the side by the fence and like not next to the other one.  (Creaking door heard.)

Noisy.

MR. FRASIER:  Is there anything else?

Okay.  That will do it.

GRAND JUROR:  Thank you for coming back.

THE WITNESS:  Thank you.

**TESTIMONY OF JESSE SMISEK**

(Witness sworn.)

BY MR. FRASIER:

Q.    Sir, first of all, this is the grand jury for Coos County, and they are looking into the disappearance of, and death of Leah Freeman.

A.    Yep.

Q.    And it's obvious, but I'm recording everything here today, okay?

A.    Okay.

Q.    First of all, could you tell us your name, please, and where you live.

A.    I'm Jesse Smisek.  I live in -- I live right next to, in the access road, but I ain't staying there right now.

Q.    No, okay.

A.    Because McGuffin lives right next door to me.

Exhibit 5002 at 1488

172

*J. Smisek*

Q.    Oh, okay.  Nick McGuffin lives right next door to you?

A.    Yeah.  So, I don't stay -- I haven't stayed there in three and a half weeks at my house, ever since the cops started coming around.

Q.    Okay.  Talking to you?

A.    Yeah.

Q.    Mr. Smisek, I've got information that you might have been in a car or something, where --

A.    Yes.

Q.    -- Nick McGuffin ran you off the road?

A.    Yes.  About six years ago or so, with David Breakfield.

Q.    Okay.  And who else was in the car?

A.    Uh, this girl Megan, which was, uh, Nick McGuffin's ex-girlfriend, I guess, at the time.

Q.    Okay.

A.    Most recent ex-girlfriend.

Q.    Okay.  Could you tell us what happened.

A.    We were -- it was about one o'clock in the morning, we were going up Coos River Highway, probably going about a hundred miles an hour, and all of a sudden the headlights turn on right behind us at the bumper.  And she said, "Oh, shit, it's Nick."  And I was like, "Who's Nick?" She told me that I probably know him from the cigarette store

Exhibit 5002 at 1489

J. Smisek

because he worked at the cigarette store in Bunker Hill.  And I did know who he was, and I was like, "Great."

And then -- but anyway, we proceeded up Daniels Creek Road, and he was trying to run us off the road, and kept trying to run us off the road.  And we went up Morgan Creek to her house, and he proceeded to try to run us off the road.  And he cut us off right at her driveway.

And -- where we had to go up a left-hand hill, and he got out and he freaked out on her.  And then when we left, like we took her back up to her house after he left and freaked out on us, and he told me that he's going to kill me or something like that because he thinks I robbed him a long time ago.  And then he proceeded to -- he left, and then we went up to her house.

About an hour after we were at her house, we left, and his car was parked down behind a barn on the beginning of Morgan Creek Road, and he was walking up through the fields because we had seen somebody with a flashlight. So we were guessing it was him, since his car was parked behind the barn, you know?  That's about it.

Q.    Did you have any other contact with Nick McGuffin?

A.    No, I have a feeling that he creeps around my woods around my house out there, right next door to where he lives right now, yeah.  But I haven't had any contact with

Exhibit 5002 at 1490

*J. Smisek*

him since then.

Q.    Okay.

A.    But I'm pretty sure I've caught him in my yard out there --

Q.    All right.

A.    -- in the middle of the night, but there ain't -- you know, that ain't contact with him.

Q.    I've been asking everybody these questions, so I'll ask you too, okay?  Has anybody told you that they killed Leah Freeman?

A.    No, sir.

Q.    Has anybody told you that they were present and saw what happened to Leah?

A.    No, sir.

Q.    And I assume you had nothing to do with her death?

A.    No, sir.

Q.    Okay.  Outside of what we talked about here today, is there anything else you think the grand jury should know?

A.    Nick McGuffin's got something wrong with his head, so I wouldn't put it past him.

Q.    Okay.  I mean, we -- that's --

A.    He freaks me out.

Q.    Okay.  That's speculation on your part.

Exhibit 5002 at 1491

*J. Smisek*

A.    Yeah, it is.

MR. FRASIER:  Anything else?

GRAND JUROR:  When you moved to -- how long have you been living at that --

THE WITNESS:  I'd say two and a half months, but I didn't know that he was my neighbor.

GRAND JUROR:  So, until three weeks ago?

THE WITNESS:  Yeah, until about three, four weeks ago.  Once I re -- knew it was -- he was my neighbor, it didn't even bother me because he never approached me or bothered me at all.  And then when the detectives showed up to my parents' house in Bunker Hill, that's when I stopped going home.  Because, you know, his aunt works across the highway from my parents' store, or from my parents' home.  And she started questioning me about it.  So, I figured he knew, so if he had anything out to get me for, then he'd do it if I was at home, because we live right next door to each other in the woods.  So I haven't been home in three weeks, besides in the daytime to get my stuff for me and my daughter.

GRAND JUROR:  Before that, did he do anything?  You know, there were no -- in the first month or whatever, to -- while you were still living there?

GRAND JUROR:  This is largely based then, on the experience you had six years ago?

Exhibit 5002 at 1492

*J. Smisek*

THE WITNESS: Yes. He freaks me out. Like I said, man, I'm as personally -- personally, I'm afraid of the guy. He's a creep.

(Pause.)

GRAND JUROR: And Megan never said anything to you about --

THE WITNESS: No. She said that that was Leah Freeman's ex-boyfriend when we were at her house. And then, I was just like, Oh, great. Then, from then on, I was convinced, you know? Once, you know. How he's doing that psychotic shit, trying to run us off the road. You know, I was convinced. That convinced me right there, that you know, maybe he did.

GRAND JUROR: Did you report that to anyone?

THE WITNESS: No.

(Pause.) It's just been a feeling of mine, you know? I don't even know how I ended up here today, just because I talked my feelings to somebody.

GRAND JUROR: Well, trying to run you off of the road is more than a feeling.

THE WITNESS: Yeah, well, that -- that, he knew I wasn't driving. He was after the guy driving, not me. You know. I was just in the vehicle.

GRAND JUROR: Who was driving?

THE WITNESS: David Breakfield.

Exhibit 5002 at 1493

*J. Smisek*

GRAND JUROR:  Breakfield, yeah.  I remember.

MR. FRASIER:  Okay.  Anything else?

THE WITNESS:  No, sir.

MR. FRASIER:  I was asking the grand jury, but okay.

THE WITNESS:  Oh.  Great.  (Laughter.)

MR. FRASIER:  All right.  Okay.  That will do. You're free to go.

THE WITNESS:  Thank you, guys.

GRAND JUROR:  Thank you.

(End of recording.)


                        -o0o-


I certify, by signing below, that the foregoing pages 1 through 177 constitute a correct transcript of WAV files provided of the above-entitled matter, this 25th day of March, 2011.


        _____

              PEGGY S. JILLSON, TRANSCRIBER

Exhibit 5002 at 1494