**Robert E. Franz, Jr.**    OSB #730915
E-Mail:  rfranz@franzlaw.comcastbiz.net
**Sarah R. Henderson**    OSB #153474
E-Mail:  shenderson@franzlaw.comcastbiz.net
FRANZ & HENDERSON
P.O. Box 62
Springfield, OR 97477
Telephone:  (541) 741-8220
Attorneys for Mark Dannels, Pat Downing, Kris Karcher, Shelly McInnes,
Raymond McNeely, Kip Oswald, Michael Reeves, Sean Sanborn, Eric
Schwenninger, Chris Webley, Anthony Wetmore, Craig Zanni, David Zavala, City
of Coquille, City of Coos Bay, and Coos County, Oregon

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| Nicholas James McGuffin, as an individual and as guardian *ad litem*, on behalf of S.M., a minor, | Case No. 6:20-cv-01163-MK |
| Plaintiffs, | |
| v. | |
| Mark Dannels, Pat Downing, Susan Hormann, Mary Krings, Kris Karcher, Shelly Mcinnes, Raymond Mcneely, Kip Oswald, Michael Reaves, John Riddle, Sean Sanborn, Eric Schwenninger, Richard Walter, Chris Webley, Anthony Wetmore, Kathy Wilcox, Craig Zanni, David Zavala, Estate of Dave Hall, Vidocq Society, City of Coquille, City of Coos Bay, Coos County, and Oregon State Police, | **Exhibit 5004 – Grand Jury Testimony** Mark Kirn |
| Defendants. | |

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

GRAND JURY PROCEEDINGS

Dates and times not provided on recording.

MALE SPEAKER:  Would you raise your right hand, please?

Do you solemnly swear that your testimony in the case now pending shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes.

MARK KERN (phonetic),

A witness called by the state, having been first duly sworn was examined, and testified under oath as follows:

DIRECT EXAMINATION

BY UNIDENTIFIED PROSECUTOR:

Q    Could you tell us your name, please, sir?

A    Mark Kern (phonetic).

Q    Mr. Kern, this is the grand jury for Coos County, all right, and we're investigating the disappearance of Leah Freeman.

A    Right.

Q    We have a video camera; it's kind of obvious.  But we are recording what's going on here today.

A    Okay.

Q    All right.  First of all, could you tell us where you live, please?

A    587 North Collier.

Q    And how long have you lived there, sir?

A    Since seventh grade or eighth grade and --

Q    Okay.

A    -- I'm a senior now, so (indiscernible).

Q    You're 17, are you?

A    I'm 18.

Q    18.

A    I was probably 13, I think; I'm not sure.

Q    Okay.  How long have you lived in Coquille?

A    Since fifth -- fourth grade.  Fourth grade, so --

Q    Eight years, thereabouts?

A    Yeah.

Q    Something like that.

A    Eight or nine years.

Q    Okay.  Mr. Kern, are you familiar with an individual named Nick McGuffin?

A    Yes.

Q    And how do you know Nick?

A    I've been friends with him since my freshman year in high school.  Or my eighth grade year actually.

Q    Okay.  And Leah Freeman, do you know Leah Freeman?

A    Yeah, I did know her.

Q    And how long had you known her?

A    I've known her, like, from around town, like I've seen her before.  But I really didn't know her until, like, this school year.

Q    Yeah.

A    This last one.

Q    And why was that?

A    Just because she was in the high school now and I just talk to everybody.

Q    Okay.  Were you aware that she and Nick were boyfriend and girlfriend?

A    Yeah.

Q    Okay.  You saw them together at school?

A    Oh, yeah.

Q    How long had they been together as far as you know?

A    I have no idea.

Q    Was it a month?  A week?

A    It was over two months; I'm sure.

Q    Okay.  What was their relationship like?

A    I don't know.  It was kind of off-and-on.  They were, like, nice one day.  The next day, they'd be arguing.  You know, it'd just go off-and-on.

Q    Okay.  When they argued, what were the arguments like?

A    Just about stupid stuff, like her talking to another guy or him looking at another girl, you know.

Q    Okay.  Stupid, little things like that?

A    Yeah, stupid, little high school stuff.

Q    Okay.  And when they argued, how bad did the arguments get?

A    I -- not too bad.  They'd -- like she'd take off walking and he'd go behind her and talk to her and then they'd get in the car and be made up again.

Q     Okay.  Did you ever see anything where they, you know, they got violent with each other or somebody hit somebody or pushed, stuff like that?

A     I think I saw Leah hit Nick before.  But Nick never did anything back to her.

Q     Okay.  I want to direct your attention now to June 28th.  That would have been the day that Leah disappeared.

A     Okay.

Q     All right.  Did you see Nick at all that day?

A     Yeah, I saw him right after I saw Leah.

Q     Okay.  Let me back up then.

A     All right.

Q     You say you saw Leah.

A     Yeah.

Q     How many times did you see Leah?

A     Just once.

Q     And where were you when you saw Leah?

A     At Hunters.

Q     That used to be the old Dairy Queen here in town?

A     Yeah.

Q     And that's on Central?

A     Yeah.

Q     The same street as McKay's?

A     Yeah.

Q     All right.  And where did you see Leah, where was she?

A     She was, like, on the Hunters side of the road walking, like, up

towards the middle school and the high school and all that stuff on Central.

Q    Okay.  Kind of to the north or?

A    Yeah.  Well, I don't know what direction it is, but --

Q    Okay.

A    -- that way.

Q    She's walking that way.  And that way would have been away from McKay's?

A    Right, away from Hunters too.  Straight down (indiscernible).

Q    Like the credit union is next door to Hunters, so she --

A    Yeah, so she was going that way.

Q    She was going towards the credit union?

A    Yeah.

Q    All right.  What happened -- well, you're at Hunters.  What are you doing at Hunters?

A    We were eating.

Q    Who's "we?"

A    Me and Mike McAdams.

Q    Okay.  Having something to eat?

A    Yeah.

Q    Okay.  And you see her walk by?

A    Mike actually saw her first.  He said, "Who's that?"

    And I said -- I turned and looked and I was, like, "Well, that's Nick's girlfriend, Leah."  And then we turned around and started eating again.

Q    Okay.  Do you recall what Leah was wearing?

A    A white shirt and blue jeans maybe.

Q     Okay.  You don't -- you --

A     I know it was a white shirt.  I'm not sure of what kind of --

Q     Okay.

A     -- pants she had on.

Q     This is a photograph that we've had of her.  Does that look like the shirt she was wearing?

A     Yeah.

Q     It looks like a --

A     Either, like, a wife-beater or a tank top or something.

Q     You say "wife-beater" I'm not quite what you mean.  What --

A     Well, that's what they call the little white undershirts.

Q     Oh, okay.  I never heard that before.

A     Well, that's what the teenagers call them.  I don't know --

Q     Okay.  All right.  And how did she appear when she was walking by?

A     She -- I just saw, like, the backside of her.

Q     Okay.

A     Because she was already -- I was sitting on like -- say Mike was sitting there and I was sitting here.  And I looked -- the windows are right there.

Q     Yeah.

A     I looked out that way and she was, like -- you know the big pole that the sign's on?

Q     Right.

A     She was, like, right by that.

Q     Okay.

A     So she was just walking with her arms together like this up the road.

Q    Did she appear to be upset or could you tell?

A    She could've been, but I really couldn't tell.

Q    And that was the only time you saw Leah?

A    Right.

Q    And about what time of the evening was this?

A    9:00, 9:10, somewhere in there.

Q    Okay. Why do you think it was somewhere around 9:00 or 9:10?

A    Because I remember, we had to hurry up to get to Hunters before it closed and it closes at 9:00.

Q    Okay.

A    And I think it was like five minutes before 9:00 or ten minutes before 9:00 that we got there. Then we had already had our food, so I'm guessing like 9:10 or so is like.

Q    Okay. So you'd been at Hunters at least long enough to order?

A    Right. And get our food.

Q    And get your food.

A    Right.

Q    And you were in a hurry to get there because you knew they closed at 9:00?

A    Right. So --

Q    Now, did you see Nick that night?

A    Yeah, I did. Like we got done eating and we drove down the street to Fast Mart maybe or -- no, Mike took me back to my Bronco, that's -- because my Bronco was at the movie store because that's where he picked me up.

Q    Okay. And the movie store, which movie store?

A    Video Hut.

Q    Okay.

A    The brown building down there.

Q    Yeah.  It's across the street from McKay's?

A    Yeah.

Q    All right.

A    I was renting a movie and he pulled in.  He was like, "What are you doing?"

I was like, "Nothing."

He's all, "Well, you want to go get something to eat?"

I was like, "All right."

Went up there and got something to eat.  And then he dropped me off and I drove -- I was driving home, because I live on North Collier, like up the street from Fast Mart there.  And I pulled into Fast Mart, because that's where all my friends hang out.

And Nick's like, "Have you -- have you seen Leah?"

I was like, "I saw her like 10 or 15 minutes, you know, ago walking up that way."

He's like, "All right."  And he took off.

Q    Okay.  Do you remember what car he was driving?

A    The T-Bird, I think.  I'm pretty sure.  Red Thunderbird.

Q    And this is after you'd finished eating and you'd gone and picked up your car and then you're back at Fast Mart --

A    Right.

Q    -- so you're not sure what time, but 9:30, quarter to 10:00, something

like that?

A    Maybe like even 9:20, 9:30, somewhere in there.

Q    Okay.  I take it you don't wear a watch?

A    No, I don't.  I'm not good with time at all so --

Q    Okay.

A    -- I'm just guessing here.

Q    Okay.  That's fine.  We're just trying to figure out the best we can.

A    All right.

Q    Did you see Nick again that night?

A    I did see him late that night.

Q    Okay.  And where was that?

A    Around Fast Mart again, I think it was.  Yeah --

Q    Okay.

A    -- I got done watching my movie and just went down to see if any of my friends were still there hanging out.  I saw Nick and he's like, "Are you sure you saw Leah da, da, da?"

I was like, "Yeah, I saw her walking up that way."

He's like, "Okay.  I can't find her and her mom doesn't know where she's at."

Q    Okay.  What car was he driving then?

A    I think it was still the T-Bird.

Q    Still the T-Bird.

A    I'm pretty sure.

Q    Okay.

A    I'm pretty sure that's what car it was.

Q    Okay.  And this was after you watched your movie?

A    Yeah.  This was, like, probably midnight or so.

Q    All right.  Did you see Nick again that night?

A    No, that's (indiscernible).

Q    When you saw him, you know, the first and the second time, how was he acting?

A    He was -- the first time, you know, he was like, "All right.  I'll go find her."  Just like he normally is.  And then the next, like -- well, the time after I saw him after that, like midnight or so, he was, like, kind of worried looking.  You know, kind of acting worried about where she was.

Q    Okay.

A    Like, I don't know, I can't find her.  Saying that kind of stuff.

Q    Okay.  Have you -- did you see -- have you talked to Nick since the day Leah disappeared?

A    Yeah.

Q    Have you talked to him once, twice, or --

A    (Indiscernible) yeah, I've talked to him a number of times.

Q    What have you talked about?

A    I don't know.  We try not to talk about that because he doesn't -- trying to forget about it, but I mean (indiscernible).

Q    Is he -- have you told him that you've been talking to the police?

A    Yeah.  I mean he knew.  Everybody knows that everybody has talked to the police.

Q    Okay.  Did you tell him what you've told the police about seeing Leah and so forth?

A    Like my -- about what happened at Hunters and all that?

Q    Yeah.

A    No.  All I've told him is that I saw him at Hunters.  I never told him really anything else.

Q    All right.  Have you -- you've known Nick for quite some time I take it?

A    Yeah.

Q    Have you ever gone and done things with Nick out in the woods, that type of thing?

A    Not out in the woods.  I guess we've been camping before, yeah.

Q    What -- where would you go camping?

A    Oh, out at Powers.

Q    Okay.

A    I think we went (indiscernible) we went somewhere out in Fairview. Cherry Creek.

Q    Cherry Creek?

A    Yeah.  Middle Creek comes out (indiscernible).

Q    Is there a place up by Cherry?

Where did you go camping at Cherry Creek?

A    The helicopter pond.

Q    Helicopter pond?

A    Yeah.

Q    Is that sometimes referred to as the goldfish pond?

A    Maybe.

Q    Okay.

A    I have no idea.

Q    Okay.

A    I just know they used it for logging.

Q    Okay.  How long ago has it been since you've been camping out there?

A    Oh, school year.

Q    School year?

A    Yeah.

Q    Last school year?

A    Yeah, this last one just past.  I don't know if Nick was there that time, but that's the last time I've been out there.

Q    Okay.

A    Me and Nick haven't been out there for a long, long time.

Q    Okay.  Okay.  Do you have any idea of what happened to Leah?

A    I have no idea.

Q    Okay.  I take it since June 28th; you haven't seen her?

A    I have not seen her.

Q    Haven't heard from her?

A    (Indiscernible.)

Q    You haven't talked to anybody that says they know where she's at or anything like that?

A    All you -- all you hear is rumors, you know.

Q    Okay.

A    Heard that they found her a couple times.  Or the police found her and that's not true.  Just stuff that's been going around.

Q    Okay.

UNIDENTIFIED PROSECUTOR:  I don't think I have anything else to

ask.  So does the grand jury want to ask anything?

MALE SPEAKER:  You're that it was the T-Bird that night (indiscernible) the second time (indiscernible) or the Mustang?

THE WITNESS:  I'm not positive, because it's hard to remember.  That was a while ago.

MALE SPEAKER:  Did you say that that last time you saw him that he said he'd been over to her house and --

THE WITNESS:  I think --

MALE SPEAKER:  -- her parents hadn't seen her?

THE WITNESS:  -- I think that I said, "Well, do her parents know where she's at?"

And I think he said, "No."  He said, "No."  I'm pretty sure.

I could have -- no, I'm pretty sure that was that night.  I'm thinking it could be (indiscernible) but I think it was that night.

UNIDENTIFIED PROSECUTOR:  Any other questions?

(No audible response recorded.)

UNIDENTIFIED PROSECUTOR:  Okay.  I need to remind you on your subpoena there was an order and the order directed all the witnesses, you cannot discuss the fact you've been subpoenaed to be here.

THE WITNESS:  Right.

UNIDENTIFIED PROSECUTOR:  And you can't tell anyone what you talked about here today.

THE WITNESS:  Right.

UNIDENTIFIED PROSECUTOR:  So basically, what it is, we don't want you talking to anybody about -- we don't want anybody to know you were even

here.  Okay?

THE WITNESS:  Yeah.

UNIDENTIFIED PROSECUTOR:  Now, I realize people out in the hall, but --

THE WITNESS:  Yeah.  I mean a lot of people know I was here, just because --

UNIDENTIFIED PROSECUTOR:  Yeah.  But we just don't want you -- you cannot talk about being here.

THE WITNESS:  Right.

UNIDENTIFIED PROSECUTOR:  Okay.  Got any questions about that?

THE WITNESS:  No, I'm totally cool with that.

UNIDENTIFIED PROSECUTOR:  Okay.  And you realize what happens if you do?

THE WITNESS:  Right.

UNIDENTIFIED PROSECUTOR:  Okay.  I just want to make sure you --

THE WITNESS:  I know you get in trouble.  I don't know exactly what happens, but --

UNIDENTIFIED PROSECUTOR:  Well, you could go to jail.

THE WITNESS:  Right.  I know that.

UNIDENTIFIED PROSECUTOR:  Okay.  Any other questions?

(No audible response recorded.)

UNIDENTIFIED PROSECUTOR:  Okay.  Thank you, sir.  You're excused.

THE WITNESS:  All right.  Thanks a lot.

* * *

Mark Kern (phonetic) Grand Jury Testimony
Date Unknown
Page 15 of 16
Exhibit 5004 at 15

STATE OF OREGON)
                                    :  ss.
COUNTY OF UNION)


       I, JANET C. PRYCE, a court-approved transcriber for the courts of the State of Oregon and the United States Federal Courts, do hereby certify:

       That I am a certified electronic court transcriber and that my certification with the American Association of Electronic Reporters and Transcribers is current and in good standing.

       I am not a relative, employee, attorney or counsel of any of the parties to said action, or a relative or employee of any such attorney or counsel.  I am not financially interested in the said action or the outcome thereof.

       Said transcript is a full, true and correct transcription, to the best of my ability.

       DATED this 13th day of May 2016.

                              /s/ Janet C. Pryce
                              Janet C. Pryce, CET, ICDT
                              Certified Electronic Court Transcriber
                              1417 Progress Loop
                              La Grande, OR  97850
                              (541) 805-1130
                              jpryce@eoni.com