**Robert E. Franz, Jr.**    OSB #730915
E-Mail:  rfranz@franzlaw.comcastbiz.net
**Sarah R. Henderson**    OSB #153474
E-Mail:  shenderson@franzlaw.comcastbiz.net
FRANZ & HENDERSON
P.O. Box 62
Springfield, OR 97477
Telephone:  (541) 741-8220
Attorneys for Mark Dannels, Pat Downing, Kris Karcher, Shelly McInnes,
Raymond McNeely, Kip Oswald, Michael Reeves, Sean Sanborn, Eric
Schwenninger, Chris Webley, Anthony Wetmore, Craig Zanni, David Zavala, City
of Coquille, City of Coos Bay, and Coos County, Oregon

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

Nicholas James McGuffin,
as an individual and as guardian
*ad litem*, on behalf of S.M., a minor,

        Plaintiffs,

          v.

Mark Dannels, Pat Downing, Susan
Hormann, Mary Krings, Kris Karcher,
Shelly Mcinnes, Raymond Mcneely,
Kip Oswald, Michael Reaves, John
Riddle, Sean Sanborn, Eric
Schwenninger, Richard Walter,
Chris Webley, Anthony Wetmore,
Kathy Wilcox, Craig Zanni, David
Zavala, Estate of Dave Hall,
Vidocq Society, City of Coquille,
City of Coos Bay, Coos County,
and Oregon State Police,

        Defendants.

Case No. 6:20-cv-01163-MK

**Exhibit 5005 –**
**Grand Jury Proceedings**
**David Jenkins**

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

GRAND JURY PROCEEDINGS

Dates and times not provided on recording.

DAVID JENKINS,

DIRECT EXAMINATION

BY UNIDENTIFIED PROSECUTOR:

Q    -- into the disappearance of Leah Freeman.

And first of all, I need to advise you that we are recording the proceedings here today, so everything that you say will be recorded.  I need for you to answer out loud and -- and I need you to answer loud so the microphone can pick you up.  All right?

A    Okay.

Q    Mr. Jenkins, how old are you, sir?

A    I'm 22.

Q    And do you live here in the Coquille area?

A    Yes, I do.

Q    How long have you lived here?

A    About eight years.

Q    Are you familiar with an individual named Leah Freeman?

A    Yeah, I am.

Q    How long have you known Leah Freeman?

A    I just recently met her within the last six months.

Exhibit 5005 at 1

Q    How did you meet Leah?

A    Through Nick.

Q    And who --

A    Nick McGuffin, which was her boyfriend.

Q    Okay.  You need to make sure you speak up (indiscernible).

A    (Indiscernible.)

Q    Okay.  How long have you known Nick McGuffin?

A    Probably about a year.

Q    And how do you know Nick?

A    I went to school with him.

Q    Would you get together often with Nick?

A    Um, not real often.  I'd see him at Fast Mart when I was just hanging out.  You know, hanging around.  I always used to talk to him quite a bit.  Do (indiscernible).

Q    And Nick is the one that introduced you to Leah?

A    Well, she was -- she was with him, and I asked about her and he said that was my girlfriend Leah.  And, you know, I said hi.  That was it.

Q    And you would say how long ago it was that you realized that they were boyfriend and girlfriend?

A    When I first seen them.

Q    Yeah.

A    (Indiscernible.)

Q    All right.  So that would be about six months?

A    Yeah.

Q    What was their relationship like?

A    I don't know.  It was -- it was okay, I guess.  I never seen them fight or nothing.

Q    Did you ever see them get upset with each other?

A    Well, yeah.

Q    Okay.  Could you describe one of those instances, how -- how did they act?

A    Nick was just uptight and she was just quiet.  She wouldn't say nothing to nobody except for hi and bye.

And, you know, it was like they'd been in an argument, but they weren't still overly aggressive to each other.  They were, you know, pretty calm about it.

Q    During the time frame that you saw them together, were they pretty inseparable?

A    Yeah, they were pretty close.  They were a close couple.

Q    (Indiscernible.)

A    One of the closest ones I've seen in a while.

Q    If you saw Nick, did you -- would you expect to see her with him?

A    Most of the time, yeah, unless she was over at one of her friend's houses or something.  He was either -- he was either -- 99 percent of the time, he was either on his way to go get her or had just dropped her off somewhere.

Q    How would he act if he couldn't find her or he didn't know where she was?

A    He would look until he found her.

Q    And how would he act when he was looking for her?

A    Frantic.  Like he, like, you know, something is wrong.

Q    Now, I want to direct you back to June 28th, and that would have been three weeks ago yesterday.  And I'm sure you know that's probably the day -- that is the day that Leah disappeared.

A    Yeah.  Nick was with me and a friend of mine.

Q    Okay.  Now, I want you to tell us, let's start with about noon on that day, and I'd like you to tell us your activities that day and what happened.  And let's start about noon, all right?

A    Okay.  I didn't even wake up until about 11:30 or 12:00.  I got into town and nobody was around.  I went over to Richard Bryant's and sat there and visited for a while.

Q    Richard Bryant is who, a friend of yours?

A    Yeah.  And I came back into town; I'm not sure what time it was.  I ran into Aaron West about, oh about 7:00, 6:30 or 7:00, somewhere around in there, and was visiting with him for a little bit.  Went into the Fast Mart and got me a soda.

Q    Okay.  Where were you visiting with Aaron?

A    At Fast Mart.

Q    At Fast Mart.

A    (Indiscernible) parking lot there.

Q    Okay.  Go ahead.

A    I went in, got me a soda.  Went and sat in his car for a little bit and smoked a couple cigarettes and was bullshitting with him for a little bit.

And I seen Nick pull up by between Wilson-Dunn Glass and Les Schwab and I had Aaron run me over there real quick, because I wanted to see what he was up to.  And I talked to him for a little bit and then we both -- both cars went back to Fast Mart and then --

Q    Okay.  Let's stop for a second.

Okay.  Now, you saw Nick and he was there by Wilson-Dunn --

A    Yeah.

Q    -- the glass place?

A    (Indiscernible) still in the Fast Mart.

Q    Okay.  What kind of car was he driving?

A    He was driving his Mustang, the blue Mustang.

Q    All right.  Who was in the car with him?

A    No one, just him.

Q    Just him.  Leah wasn't there?

A    No, she wasn't.

Q    Okay.  So he goes over to where you guys are at Fast Mart or you, what do you do?

A    Yeah, we went and -- I had Aaron run me over by him because he has his blinker on the other way.  He was going out to Fast Gas to get something to eat and get gas for his car.

I stopped him and I talked to him for a couple minutes.  And then we went back to the Fast Mart and then he got his -- his drink and something to eat there.

And then we had made plans to go out to Johnson Mill Pond and bullshit for a little bit, because there was nothing to do in town.  And he went to Fast Gas to get gas and then he was going to meet us out there.

And we -- we went out there at approximately 8:00, in between 8:00 and 8:30 we got there.  We sat there and we talked for a while, and he said he had to go about eight minutes after 9:00 because he was late to pick up Leah, and he

took off from there.

And I seen him later on that night.  He -- well, actually about 9:15, roughly, I'm not quite sure of the time, he -- we seen him back at Fast Mart because that's where we went.  We came from Johnson Mill Pond right back into town at Fast Mart.

And then a few minutes after we were at Fast Mart, he come -- he rolled up in there and asked if we'd seen Leah walking.  And I told him no and Aaron told him no.  And he said, because he -- he was late to get her about eight or nine minutes and she wasn't where she was going to be picked up at.  And he said if you see her to tell her that he's looking for her and then he went to look for her.

And later on that evening, I seen him again.  He had went home and traded his car for his mom's Thunderbird and was driving it, because he was running out of gas, and he was still looking for Leah.

Q    Okay.  Let me back up and ask you some questions here.  Okay.

Can you tell us, please, what type of clothes Nick had on that night?

A    I think he had a pair of cream-colored dress slacks on.  I'm not -- I'm not too sure of what his shirt was.  But I think he was wearing a pair of dress (indiscernible).

Q    Do you remember what kind of shoes he had on?  Tennis shoes?  Boots?

A    No, I don't.

Q    Okay.  Okay.  Now, let me question you here a few things and let me see if I understand you correctly from what you're saying here today, okay.  And correct me if I'm wrong if I misunderstand, okay.

Now, it's my understanding from what you just testified to that you saw Nick somewhere around 7:00 o'clock at Wilson-Dunn?

A    Roughly, yeah.

Q    Roughly.  And then you talked with him a little bit at Fast Mart and then you decide to go out to Johnson Mill Pond?

A    Uh-huh (affirmative).

Q    You have to -- yes or no.

A    Yes.  Yes.

Q    Okay.  And so then you drive out to Johnson Mill Pond and you're there for how long?

A    We were there for roughly about 45 or 55 minutes.

Q    Okay.

A    Almost an hour.

Q    Almost an hour?

A    Yes.

Q    So what time do you think you left the pond?

A    From Johnson Mill it was probably 8:10 -- or 9:10, somewhere around in there.

Q    Okay.  8:10 and 9:10?

A    No, 9:10.  9:10.

Q    Are you sure, it's 9:10?

A    Yeah.  Because he was going to -- he was going to pick up Leah at 9:00 o'clock.

Q    Okay.

A    And he was, he said he was eight to ten minutes late --

Q    Okay.

A    -- to pick her up.

Q    So it's your testimony that you must've gotten out there then like quarter to 8:00 or maybe even 8:00 o'clock?

A    Yeah.

Q    How long did you sit at Fast Mart talking with him?

A    Probably about five minutes.

Q    Okay.  Now, since the time that Leah has disappeared, have you talked to Mr. McGuffin?

A    Yeah.  I've seen him around.

Q    How many times have you talked with him between now -- between today and when Leah disappeared?

A    Not very much, because he's been staying at home.  Probably about five or six times, I'd say.

Q    Have you talked with him on the phone?

A    No.

Q    What have you talked about?

A    I just asked him how he was doing -- how he's doing and if they -- if anything new had came up --

Q    Okay.

A    -- of (indiscernible) Leah's disappearance.  And he said no and (indiscernible) and a couple of times, he started crying (indiscernible) him cry, so --

Q    Did you tell him about you being interviewed by the police?

A    I told him the FBI came to my house and talked to me a little bit.

Q    Okay.  Did you tell him what the FBI was asking you?

A    No, I sure didn't.

Q    Okay.  Well, I want to ask you some questions about what you told the

FBI.  I've got a report here from the North Bend Police Department, what have you.

Now, they indicate in the report -- now, you remember being interviewed by them, do you not?

A    Yes.

Q    Okay.

A    Yeah.

Q    And I believe it would've been on July 5th, the day -- it'd been almost a week after she disappeared.  Do you remember that?

A    That was the second time they talked to me.  They talked to me at my house --

Q    Okay.

A    -- probably about three or four days after she came up missing.

Q    All right.  Now, do you remember telling the North Bend Police and the FBI that you, about 7:00 o'clock, you saw Nick in his Mustang parked near Stamper's (phonetic)?

Okay.  That would be the Wilson and Dunn?

A    Yeah.  He was at the stop sign.

Q    Okay. And you spoke briefly with him.  Mr. McGuffin told you that he was going to Fast Mart to get some smokes and a drink.

A    Yeah. Well, he was going to Fast Gas.

Q    Okay.

A    And I told him we were at Fast Mart, so he just went over there.

Q    Okay.  So you went over to Fast Mart and you drove out to Johnson Mill Pond.  And according to this report, you told the police on that day that you arrived at Johnson Mill Pond about five after 7:00.

A    About five after 7:00?

Q    Yeah.

A    Like I said, I'm rough -- I'm rough estimating the times, because it was three weeks ago and --

Q    Okay.

A    -- I don't, you know --

Q    All right.

A    -- try to keep tabs on what I do.

Q    And you told the police at that time, you spent your time at Mill Pond listening to Mr. McGuffin's stereo and that you had smoked a couple bowls of marijuana; is that correct?

A    I'm not going to incriminate myself, but yeah.

Q    Well, you don't need -- I am not going to charge you with possession of marijuana.  Okay?

A    I understand that, sir.

Q    So you don't need to be worried about incrimination in that regards.

A    Okay.

Q    And then according to your interview, then you kicked back, waited for time to pass, and that you -- that Nick then left at about 8:00 o'clock to go pick up Leah.

A    Well, roughly.  I'm not -- I'm not exactly sure, when he was going to go pick her up.  But when he left, he was eight -- eight to ten minutes late to go get her.

Q    Okay.

A    And that's why I kept telling them that.  I -- I don't -- I'm not a time

guy, you know, I don't keep tabs on the time of what I do things.  But (indiscernible) he insisted to keep poking questions, so I answered them to the best of my knowledge.

Q    Okay.  And you followed Nick to town?

A    Uh-huh (affirmative).

Q    And where did he go?

A    He turned at Safeway.  I guess he was going to go pick up Leah.

And we turned by the Broiler and went straight through to Main Street right into (indiscernible) to Fast Mart.

Q    Did you know where he was going to pick up Leah?

A    I think some girl's, Cherie's or Shirley's or I'm not, you know, I'm not sure.

Q    All right.  Now, Nick, you've known him for how long again?

A    About a year.

Q    Have you ever gone with Nick out towards Fairview, Four Corners area?

A    No.

Q    Are you familiar with that property at all, area?

A    Yeah.  I used to live out there a long time ago.

Q    Okay.  Towards Laverne Park, that type of thing?

A    On the right by Four Corners.

Q    Hudson Ridge, do you know where that is?

A    Yeah, (indiscernible).

Q    Okay.  Have you ever heard Nick talk about that area, Hudson Ridge?

A    No.  I never even knew what was up there.

Q　　Okay. All right. Let's get back to what happened at Johnson Mill Pond and I want you to think very carefully on your answers here. We have a statement from an eyewitness that saw -- who was at Johnson Mill Pond fishing and he indicated that at 7:30 he saw the blue Mustang, operated by Mr. McGuffin, followed by an older vehicle.

What's the car that Mr. West drives?

A　　A Plymouth Fury III.

Q　　Okay. And it's a big car?

A　　Yeah.

Q　　Blue?

A　　Blue and white.

Q　　Four-door, that type of thing?

A　　Yeah.

Q　　Went to the end of the pond, turned around at the loop. There were several people in the car with Aaron, nobody with Mr. McGuffin.

They saw Mr. McGuffin park his car and that Mr. West apparently pulled his car up next to it. And then after about five minutes, Mr. West backed out of the road and left Johnson Mill Pond area. Watched him drive away.

Now, I've got a witness now that's telling me you guys were only out there five minutes, and you're telling us that you were there 45.

A　　At least.

Q　　Okay.

A　　At least.

Q　　How do you explain this?

A　　Because (indiscernible) an eighth of weed takes a while to smoke and

we smoked a whole eighth of weed.

Q      How do you explain this eyewitness saying you guys were there for five minutes?

A      He was drinking beer or something because he's full of shit.

We got there first.  Me, Aaron, and Josh were riding in Aaron's car. We got there; we drove around a little bit to see if Nick got there before us.  He didn't.  We pulled and parked and waited for him.

Q      Okay.

A      Blade cutters come down to cut the grass, so we moved out into the middle of the road basically, so that they could get their job done.  And then Nick came down and said he'd -- he had drove around a little bit and we weren't there so he parked.  And he seen us go by and we were like maybe three minutes behind him.

Q      He further told us that you guys got out of the car, went over to Mr. McGuffin's car.  He couldn't see exactly because the grass was too high.  And that he's looking at you guys were all looking at the car apparently that Mr. McGuffin's driving and that you then get into Mr. West's car and drive off.

A      (Indiscernible.)

Q      What did you see in Mr. McGuffin's car?

A      I never got out of Aaron's car.

Q      Okay.  Mr. Jenkins, I'm going to warn you here --

A      Okay.

Q      -- I'm not giving you immunity for lying.

A      I'm not lying.  I don't lie.

Q      If you are lying, you are looking at a potential possible five-year prison

sentence, so I want you --

A    I don't lie.

Q    -- to be perfectly understand here.  The person that gave us this information was an off duty police officer.

A    I ain't lying.

Q    Now, get back to where were ya.  Were you there for 45 minutes or were you there for 5 minutes?

A    We were there for at least 45 minutes.

Q    Are you covering up for Mr. McGuffin in any way?

A    No.

Q    Has Mr. McGuffin told you anything about what happened to Leah?

A    No, he didn't.

Q    Do you know Brent Bartley?

A    Yeah, I know Brent Bartley.

Q    Has Brent Bartley told you anything that has happened to Leah?

A    No.  I haven't seen Brent since -- since a month at least.

Q    You haven't talked to Mr. Bartley since this incident occurred?

A    Before it.

Q    Okay.  What did you talk about with Mr. Bartley then?

A    Before anything came down?

Q    No.  After this incident came.

A    After this, I haven't seen him.

Q    Okay.  You're telling us that at about 7:30 or 8:00 o'clock at night there was people out there working cutting the grass?

A    Roughly, yeah, about that time.

Q    One last chance, because if you're found --

A    I don't lie, all right.

Q    Mister -- you know --

A    I'm not covering for nobody.

Q    Somebody's not telling the truth here.

A    It sure in the hell ain't me.

Q    I sure as hell hope not.

A    I don't lie.  And why would I lie for somebody who killed somebody if they did it?

Q    Okay.

A    I mean, come on, that would --

Q    You're --

A    -- get me in trouble.

Q    -- you're the one that's the friend of --

A    I'm in enough trouble.

Q    -- you're the one that's the friend of Mr. McGuffin --

A    Yeah, I talk to him; I see him.

Q    -- (indiscernible) this other guy.

A    I smoke pot with him sometimes.

Q    And you smoked pot with him that night?

A    Yeah, I did.

Q    Did you ever see Leah smoke pot?

A    No.  The only time that I even said hi to Leah is when she was with Nick, and that's the only time I ever seen her unless she was on her daily walk or whatever she does walking through town.

Q    Do you remember talking with Lieutenant Young of the police -- of the North Bend Police Department, and this would've been probably on the 10th of July? Just about a week ago, just a little over a week ago.

A    I'm not sure if I talked to the North Bend police. Because the only person I was talking to was the guy with the bald head and he said he was --

Q    Okay. That's --

A    -- a federal investigator. And if he lied to me then there you go.

Q    The first time he was with you; he was with the federal investigator.

A    The redheaded guy?

Q    Right. And Lieutenant Young from the North Bend Police Department indicates that on July the 10th that he and Kirk Bennett (phonetic), who is also a North Bend police officer, they tried to contact you. They found you at -- near Security Bank. They asked if they could speak with you and that you then went with them --

A    Yes.

Q    -- to behind Immanuel Baptist Church.

A    Yeah, I did.

Q    All right. And at that time you indicated to the officers that the word on the street is, is that Leah was abducted. What did you mean by that?

A    That's bullshit. He asked me what I thought.

Q    Well --

A    And I said, "I think she must have been taken, because she's nowhere around and nobody can find her."

Q    Okay.

A    That was my exact words.

Q    Why did you say that?

A    Because when somebody comes up missing and you can't find them, what's the first thought that comes into your head?

Q    So it wasn't because somebody told you she was abducted?

A    No.  He asked me what I thought happened to her and I told him.  See, now he's twisting my story around.  I'm going to have to go get a lawyer.

Q    Now, Mr. Jenkins, I'm having some problems here, because I've got one person that says you said this and now your story is different.  Now I've got another witness that says your story is different.  And now, I've got a third witness that says your story's different.

That's three different people that all of a sudden have something out for you.  I'm having a problem with this.

A    I don't know what to tell you.

Q    Last chance.

A    I'm not covering for nobody if that's what you're thinking.

Q    Do you know what has happened to Leah Freeman?

A    No, I don't.

Q    Do you know where she's at?

A    No, I don't.

Q    Do you know if she's dead or alive?

A    No, I don't.

Q    Anything else you want to tell us?

A    No.  But if you want to give me a polygraph, I'd be (indiscernible) do it.

Q    Polygraph is inadmissible in court, sir, so it wouldn't do us any good.

A    Well, I mean just for your knowledge and for my knowledge, and for

everybody in this room's knowledge, because I won't cover for somebody and if somebody killed someone and I knew about it, I would turn them in no matter if it was my mom or my brother or my cousin.

UNIDENTIFIED PROSECUTOR:  Does the grand jury want to ask any questions of this witness?

(No audible response recorded.)

UNIDENTIFIED PROSECUTOR:  Go ahead.  Speak loud, sir.

MALE SPEAKER:  David, you stated that later that evening, apparently after 9:08, that Nick traded cars with his mom, got a Thunderbird.

THE WITNESS:  Yeah.  He went home and got her car.  I'm sure he left his car at home.

MALE SPEAKER:  Okay.  How do you know that?

THE WITNESS:  Because I was at Fast Mart when he came directly back to Fast Mart.  I think he was driving his Mustang when he came back to Fast Mart, because he came back to Fast Mart and he asked if we'd seen Leah, and we told him no.

And he said, well, he was going to go look for her.  So he went to drive around.

And then, like, not even a half hour later, he showed back up and he was driving his mom's car.

MALE SPEAKER:  Does Nick usually have money?

THE WITNESS:  I don't -- I'm not sure.  I've never seen him spend, you know, (indiscernible) lot of money or whatever, but --

MALE SPEAKER:  Because I know that, that little gas station is open until midnight.

THE WITNESS:  Uh-huh (affirmative).

MALE SPEAKER:  So it was after midnight or before midnight (indiscernible) back with his mom's car?

THE WITNESS:  Roughly around 9:30 or so.

MALE SPEAKER:  (Indiscernible - away from microphone.)

THE WITNESS:  I'm not -- I'm not completely sure of the times, but it was roughly around 9:00 or 9:30, somewhere between then.  Because I went home at about 10:00 or 10:30.  And then -- because Aaron took me home and then Aaron went home himself.

MALE SPEAKER:  So he would've drove his mom's Thunderbird until real late that night or (indiscernible)?

THE WITNESS:  He was driving it.  I seen him about three or four more times that night after 9:00 and he was driving until -- I seen him driving it until I went home, and I went (indiscernible) --

MALE SPEAKER:  What time was that (indiscernible)?

THE WITNESS:  I went home at about roughly around 10:00 or 10:30.  And (indiscernible) the officers and (indiscernible) questioned me about it and they both know that I stay out really late and they asked me why I went home so early.  And I had a job interview is the reason why I went home so early.  (Indiscernible) probably stay out until 1:00 or 2:00 in the morning and God only knows (indiscernible).

UNIDENTIFIED PROSECUTOR:  Any other questions from the grand jury?

(No audible response recorded.)

UNIDENTIFIED PROSECUTOR:  Anything else you want to tell us?

THE WITNESS: No. But if you're -- if you want to do a polygraph, I'm willing to do it.

UNIDENTIFIED PROSECUTOR: I need to --

THE WITNESS: Because I am tired of being accused by people, all right. Calling me a liar. And then people lie to me saying they're FBI when they're from North Bend.

UNIDENTIFIED PROSECUTOR: Okay. Mr. Jenkins, I need to remind you of the order that you were served with. You are not to disclose to any person that you have been subpoenaed to testify here today. You understand that, you're not to tell one person --

THE WITNESS: I ain't even told --

UNIDENTIFIED PROSECUTOR: -- you've been here.

THE WITNESS: -- nobody nothing.

UNIDENTIFIED PROSECUTOR: All right. And you are not to disclose to any person anything that has occurred within this room today. You understand?

THE WITNESS: No problem.

UNIDENTIFIED PROSECUTOR: All right. And do you understand what will happen if you do disclose that to anyone other than your own lawyer?

THE WITNESS: Yep.

UNIDENTIFIED PROSECUTOR: And what is that?

THE WITNESS: I'll probably go to jail.

UNIDENTIFIED PROSECUTOR: All right. As long as you understand. Okay.

Unless there's some other questions?

(No audible response recorded.)

UNIDENTIFIED PROSECUTOR:  You're excused.

* * *

STATE OF OREGON)

       : ss.

COUNTY OF UNION)


  I, JANET C. PRYCE, a court-approved transcriber for the courts of the State of Oregon and the United States Federal Courts, do hereby certify:

  That I am a certified electronic court transcriber and that my certification with the American Association of Electronic Reporters and Transcribers is current and in good standing.

  I am not a relative, employee, attorney or counsel of any of the parties to said action, or a relative or employee of any such attorney or counsel.  I am not financially interested in the said action or the outcome thereof.

  Said transcript is a full, true and correct transcription, to the best of my ability.

  DATED this 11th day of May 2016.

      */s/ Janet C. Pryce*
      Janet C. Pryce, CET, ICDT
      Certified Electronic Court Transcriber
      1417 Progress Loop
      La Grande, OR  97850
      (541) 805-1130
      jpryce@eoni.com