**Robert E. Franz, Jr.**      OSB #730915
E-Mail:  rfranz@franzlaw.comcastbiz.net
**Sarah R. Henderson**      OSB #153474
E-Mail:  shenderson@franzlaw.comcastbiz.net
FRANZ & HENDERSON
P.O. Box 62
Springfield, OR 97477
Telephone:  (541) 741-8220
Attorneys for Mark Dannels, Pat Downing, Kris Karcher, Shelly McInnes,
Raymond McNeely, Kip Oswald, Michael Reeves, Sean Sanborn, Eric
Schwenninger, Chris Webley, Anthony Wetmore, Craig Zanni, David Zavala, City
of Coquille, City of Coos Bay, and Coos County, Oregon


IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| Nicholas James McGuffin, as an individual and as guardian *ad litem*, on behalf of S.M., a minor, | Case No. 6:20-cv-01163-MK |
| Plaintiffs, | |
| v. | |
| Mark Dannels, Pat Downing, Susan Hormann, Mary Krings, Kris Karcher, Shelly Mcinnes, Raymond Mcneely, Kip Oswald, Michael Reaves, John Riddle, Sean Sanborn, Eric Schwenninger, Richard Walter, Chris Webley, Anthony Wetmore, Kathy Wilcox, Craig Zanni, David Zavala, Estate of Dave Hall, Vidocq Society, City of Coquille, City of Coos Bay, Coos County, and Oregon State Police, | **Exhibit 5015 – Grand Jury Proceedings Cherie Mitchell** |
| Defendants. | |

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

GRAND JURY PROCEEDINGS

Dates and times not provided on recording.

UNIDENTIFIED PROSECUTOR:  Okay.  Go ahead, sir.

MALE SPEAKER:  Will you raise your right hand, please?

Do you solemnly swear that your testimony in the case now pending shall be the truth, the whole truth, and nothing but the truth, so help you God?

(No audible response recorded.)

MALE SPEAKER:  Thank you.

CHERIE MITCHELL,

A witness called by the state, having been first duly sworn was examined, and testified under oath as follows:

DIRECT EXAMINATION

BY UNIDENTIFIED PROSECUTOR:

Q    Could you tell us your name, please, ma'am?

A    Cherie Mitchell.

Q    Cherie.  Okay.  This is the grand jury for Coos County and we're investigating the disappearance of Leah Freeman.  And first of all, I need to tell you that we do have the video camera going and I've noticed your voice is really soft, and so --

A    I'm sorry.

Q    -- you're going to have to speak up so we can all hear you and so the

Exhibit 5015 at 1

camera can pick you up.  Okay?

A    Okay.

Q    First of all, could you tell us where you live?

A    At 444 North Elm Street.

Q    Okay.  You really need to speak up so that camera picks you up.  Okay?

A    Okay.

Q    And I won't get offended if you yell at me.

Okay.  Do you know a person named Leah Freeman?

A    Yeah, I do.  She's my best friend.

Q    How long have you known her?

A    I've known her probably since the third grade, but we didn't actually become friends until just a few years ago.

Q    And when you say you're her best friend, would she come over and spend a lot of time with you?

A    She used to.  She used to spend, like, every single day with me; she was always with me.  But lately, when she got together with Nick, I guess we weren't really so close, so we didn't just spend as much time together.

Q    Okay.  Now, you mentioned Nick, is that Nick McGuffin?

A    Yeah.

Q    And how long have you known Nick?

A    I've known Nick, probably longer than I've known Leah.  He used to be friends with my brother in like the fifth grade maybe.  But I haven't actually talked to him again since I got to be friends with Leah.

Q    Okay.  And how long has it been that he and Leah were friends?

A     I think, like, maybe late September or early October.

Q     How'd they get along?

A     I guess they got along pretty well.  They had -- lately, they kind of, like in the last few months they had fights like every day over the stupidest little things, but --

Q     Okay.  And you say, "fights."  Could you define what you mean by "fights" (indiscernible)?

A     Loud voices.

Q     Okay.

A     Occasionally, Leah hit him.  I don't think he ever hit her, as far as I know.

Q     Okay.

A     But I really don't know.

Q     All right.  Did -- I think you inferred to a little bit, but when Leah and Nick got together, she wasn't around you as much?

A     Well, in the beginning of their relationship it was -- it was still pretty similar.  But after, I guess, a while in that relationship, she got closer to him and just spent more time with him.

Q     Okay.  So she wasn't over as much and that type of thing.  When she would come over, would Nick come with her?

A     A lot of the time he did.  He did actually, almost every time, except the last time she came over.  And usually when she came over, she would just stop for like ten minutes just to see what I was doing that day or something like that.

Q     And Nick would be there with her?

A     He would.

Q      Okay.  Okay.  I'd like to now talk about the day Leah disappeared, which I think was a Wednesday, June 28th, four weeks ago yesterday.  Did you see Leah that day?

A      Yes.

Q      And could you tell us, please, just tell the grand jury about what time you saw her and where you were at, what occurred basically, okay.

A      Leah stopped by my house.  She got dropped off by Nick at about 7:00 o'clock.  And she came up to my room and we just talked a little bit, and looked through magazines, listened to music, just normal stuff.  And then she left around 9:00.

Q      Okay.  Was there a problem at your house when she left at 9:00?

A      For some reason, she'd gotten the impression that my mom didn't like her.  I guess, lately she's thought that a lot.

        And then I got in -- it wasn't really, I guess, what you would call an argument, just maybe a disagreement, and she was present.

Q      Okay.

A      (Indiscernible.)

Q      Well, let's back up a little bit.  We know -- we've listened -- we've talked to your mom and I know the police have talked to you.  Did you -- did you and Leah want to go jogging that night?

A      Yes.

Q      Why don't you tell us about that?

A      Actually, she didn't want to go jogging, but I was sitting there begging her to go jogging until she finally gave in.  And I went downstairs to ask my mom.  And by the time she gave in, it was almost 9:00.  It was probably, like, ten till or

something like that.  And I went downstairs to ask my mom if I could go.

And I -- she hates it when I go out jogging in the dark or alone or something like that.  So she was just, she didn't really want me to go, and she was saying that I hadn't asked for a long time, which was true, because I didn't have anyone to jog with.

And then I guess Leah came downstairs and for some reason from that conversation, she got the idea that my mom didn't like her and she walked out the door.

Q        Okay.  Was there a part of the disagreement with your mother, was there kind of a discussion of are you going with Leah?  Is Nick going to pick her up halfway and then you're going to have to come home by yourself; was there something like that going on?

A        I think she might have mentioned that, since almost every time that I went jogging with Leah, Nick always seemed to (indiscernible) where she was and pulled up and she'd usually get in the car with him, and I'd end up jogging home the rest of the way by myself.

Q        Okay.

A        I think she (indiscernible).

Q        And was it basically your mom didn't want you to go jogging because she was afraid you'd be out there by yourself?

A        Yes.

Q        Okay.  And do you think that Leah may have heard some of this that was going on?

A        Well, I think she heard all of it; she was just right upstairs.

Q        Okay.  All right.  So then, Leah goes up -- out the front door and

leaves?

A    Uh-huh (affirmative).

Q    Did you meet her out in the driveway or something?

A    Yeah, I chased her and --

Q    Okay.  Why don't you tell us about that?

A    While she was walking out, I chased her, like, right away, as soon as she shut the door.  So I caught her actually still in the carport.  And I just asked her why she left, because it did not make any sense to me.

She said something like my mom hates her and she just kind of started crying.  And I was just trying to convince her that my mom didn't hate her, because she doesn't.  And I just told her it was basically sadness.

I mean Leah's changed a lot from the way she was and when we knew her.  It's just kind of sad to see her now and --

Q    Well, when you say she's changed, this change occurred while she was with Nick?

(No audible response recorded.)

Q    Okay.  Could you tell us the changes that you saw?

A    Well, I guess mainly it was just her habits.  Or I don't know, when she got together with Nick -- well, actually, she had a little history a few summers ago, like four maybe, where she was into drugs a little bit.  Then she'd gotten out of it and she was -- she was, like, really good not to drink anything at all.

And then when she got together with Nick, she had actually started it all over again and it was -- I don't know, it's only (indiscernible) I'm not into it at all and she didn't used to be at all, and it was really weird to see her like that.  And it's (indiscernible) --

Q    When you say "drugs," what type of drugs?

A    I think mostly pot.

Q    Okay.

A    Occasionally alcohol.  (Indiscernible.)

Q    And how do you know she was using marijuana?

A    I -- I've seen her high a couple of times.  I mean her and Nick would drive by and stop and talk to us.

And then not too long ago, I went swimming with them and we went out on the -- on the way to Powers.  And I guess Nick had brought some stuff with him and Leah, she didn't really get high, but she took a hit and she (indiscernible).

Q    Okay.  So you saw Leah using marijuana with Nick there?

A    Yeah.

Q    And he supplied to her the marijuana?

A    I think so.

Q    Okay.

A    There was a lot of people there, so I didn't know (indiscernible).

Q    Okay.  All right.

Okay.  So let's get back to the driveway.  She's sad.  Is she crying?

A    I -- I'm -- yeah, she did actually start crying.

Q    And you too, I have to think a little bit?

A    I didn't start crying until -- see actually, we kept walking while we were talking and we'd gone out of my driveway and to the end of my street and we were talking there, and that's when I started crying.

Q    Okay.  So you walk out of your driveway onto Elm Street.  And do you walk towards West Fourth?

Exhibit 5015 at 7

A    Yes.

Q    Okay.

A    (Indiscernible) I don't know my streets around there very well, but yeah.

Q    Yeah. Yeah. Okay. And you left her -- she left you at the -- where Elm intersects with West Fourth?

A    Yes.

Q    And what was she like when she left you there at West Fourth?

A    She was crying, but she wasn't like she was hysterical or anything, she was just tears running down her face. She was walking fast. And I just figured Nick would come up and pick her up and (indiscernible) a minute.

Q    Which way did she go on West Fourth when you saw her leave?

A    She walked down like she was going to McKay's.

Q    Okay. Towards Central (indiscernible)?

(No audible response recorded.)

Q    How long did you stand there and watch her?

A    I stood there watching her for 15 seconds maybe.

Q    Okay. You didn't watch her go until you couldn't see her anymore or anything like that?

A    I (indiscernible).

Q    Okay. And then you went home?

(No audible response recorded.)

Q    And this was all around 9:00 o'clock, thereabouts?

A    Yes.

Q    Okay. Did you see Nick that night?

A    Yes. Actually, he stopped by around 9:08, something like that (indiscernible). And I was actually out in my driveway and he pulled up and asked if Leah was there.

I said, "No, she already left." And I just said, "We got in a little argument."

And he just drove away. I don't think he -- I don't even know if he said okay or anything. I think he might have said okay or something like that. And he just drove away.

Q    How much time do you think passed between the time that you last saw Leah and the time that Nick pulled up?

A    About five minutes (indiscernible).

Q    Okay. And what car was he driving?

A    He was in the (indiscernible).

Q    And so you told her -- you told him he wasn't -- she wasn't here, that she'd left, and then he drove off?

A    Uh-huh (affirmative).

Q    Okay. What happened then?

A    I -- I think I went back inside. No, actually, my boyfriend was over and I sat there with him in his truck for a while and we just talked. And then he left at 10:00.

And then Nick came over about 10:15 again and said he still hadn't found Leah. And I asked him if he had called her house. So he -- he said he hadn't called her house. So he stopped by -- or he called her house from my house and he asked her mom to go check if Leah was home. And she said she wasn't home, so then he just left like he was going to keep looking for her.

Q    Okay.  Did you see what car he was driving?

A    That time, no, I didn't.

Q    Okay.  How long was he at the house?

A    Like three minutes maybe.

Q    And did you see him again that night?

A    No, I didn't.

Q    Since Leah has disappeared, have you talked with Nick since?

A    Yes.  I -- it was actually the day that she disappeared.  The day after the night, he -- I talked to him a couple times.  He just basically just asked me if I knew anything at all and I told him I didn't.

And then I talked to him again a couple nights later and we went looking kind over (indiscernible) underneath this bridge, because he saw some writing that said "I love Nick" and he was kind of freaking out because he didn't know if it was hers or not.  So we went over there.  Then we walked along the railroad tracks down (indiscernible) and that was about it.  And then I talked to him for a little while at (indiscernible) and then he left.

Q    Okay.  I couldn't see there, I was just making sure it was working.

Have you talked to Nick at all past that time that you went out driving with him (indiscernible) have you talked with him again?

A    Well, actually (indiscernible).  Well, I saw him last night at the little thing and he (indiscernible) he said, "Hi, Cherie Lee."  And that was it.

Q    That's all, you haven't had any conversations with him like, you know, what happened or anything like that?

(No audible response recorded.)

Q    Is there anything that you think we need to know about?

Is there anything you know that we ought to know about regarding where Leah might be or what happened to her or anything along that line?

A    I wish, but I -- I really don't.

Q    Okay.

UNIDENTIFIED PROSECUTOR:  Does the grand jury have anything you want to ask?

(No audible response recorded.)

UNIDENTIFIED PROSECUTOR:  Sir?

MALE SPEAKER:  Yeah.  I'd like to know if you know how Nick and Leah's mother gets along.  I mean, you know, like you had to talk him into calling, do you know if they got along at all or?

THE WITNESS:  I think, like, during the beginning of Leah and Nick's relationship she actually liked him a lot.  And then a little while into it -- well, like, I guess Nick like (indiscernible) little thing and made Leah cry.  And when they'd talk on the phone, Leah would, like, always start crying while they were talking on the phone.  So her mom kind of started not wanting Leah to see Nick or be around Nick.

And then she started liking Nick again.  I guess he started spending more time over there, so I think she actually likes him now.  But (indiscernible) some periods where she's like him and (indiscernible).

UNIDENTIFIED PROSECUTOR:  Go ahead, sir.

MALE SPEAKER:  Do you know if Leah had any physical problems?

THE WITNESS:  (Indiscernible) physical, none that I know of.

MALE SPEAKER:  Do you know if she was pregnant?

THE WITNESS:  Actually, I don't.  I don't know if she would have

even told me though.  She was actually -- she had an appointment the next day to go get put on birth control at the health center, so I'm going to guess she probably wasn't pregnant, but I really don't know.

FEMALE SPEAKER:  Cherie, you said that Leah would from time-to-time hit Nick.  You know, just, can you kind of describe was it hard like or (indiscernible)?

THE WITNESS:  Yeah, like she hurt him.  Sometimes she -- she usually -- she usually only did it when she was high and she (indiscernible).  But they did have one really bad fight in the school parking lot and she hit him there.  And actually, a cop stopped by and asked them to leave.  And I know she hit him pretty hard then.

She usually just slapped him.  I know she kicked him in the shin (indiscernible).

FEMALE SPEAKER:  But he didn't return the (indiscernible)?

THE WITNESS:  No, I don't think so.  I -- as far as I know, she never said he hit her.  And I really don't think he could hit a girl, not really (indiscernible).

BY UNIDENTIFIED PROSECUTOR:

Q    Did -- the night you saw Leah on June 28th, the last time you saw her, did she appear like she was high or had been using?

A    I don't think she was.  According to Nick, he said that she wasn't.

And Leah is one of those people that when she gets high, everybody knows it.  And she -- she can't shut up.  And she wasn't like that that night.  She was pretty calm and she was just herself, so I really don't think she was.

Q    Okay.

UNIDENTIFIED PROSECUTOR:  Any other questions?

(No audible response recorded.)

UNIDENTIFIED PROSECUTOR:  Okay.  I need to remind you about the order that was attached to your subpoena.  You're not to disclose to anyone that you've been here today and you're not to discuss with anyone what you've testified about here.  Okay?  Any questions?

THE WITNESS:  Does that mean I can't talk to my mom about it either?

UNIDENTIFIED PROSECUTOR:  Well, I guess in this situation you can talk with mom, and mom can talk to you, but please, do not share anything with anyone else.

THE WITNESS:  Okay.

UNIDENTIFIED PROSECUTOR:  All right?  Is that okay?

THE WITNESS:  (Indiscernible.)

UNIDENTIFIED PROSECUTOR:  If that's it then, we'll --

MALE SPEAKER:  I have a question.  How was she if a stranger were around her?

Like if a stranger was to walk up to her or driving by and tried to talk to her or something like that?

THE WITNESS:  I guess I would have to say that she wouldn't really talk to a stranger.  But I guess if she knew someone, if she just knew them slightly, I mean even like not real well at all, she would probably talk to them.  I know she's talked with some people that she knew were friends with Nick just to see if she could find out where Nick was if she didn't know.  But I don't think she would talk actually to an actual stranger.  But I guess if somebody just, like, asked for

directions or something like that, I'm sure she would tell them.

UNIDENTIFIED PROSECUTOR:  Sir?

MALE SPEAKER:  What was Nick's best friend's name?

THE WITNESS:  I don't really know.  I -- I know Nick has a few close friends.  (Indiscernible) Crook and Mike Pagola (phonetic).  I think (indiscernible) Brent Bartley.  (Indiscernible) best friends and stuff.

MALE SPEAKER:  Do you know Brent Bartley?

THE WITNESS:  No.  Actually, I don't even know what he looks like. I've heard the name, but that's about it.

UNIDENTIFIED PROSECUTOR:  Anything else?

(No audible response recorded.)

UNIDENTIFIED PROSECUTOR:  Okay.  You're excused.

* * *

Cherie Mitchell  Grand Jury Testimony
Date Unknown
Page 14 of 15
Exhibit 5015 at 14

STATE OF OREGON)

                                    :  ss.

COUNTY OF UNION)


        I, JANET C. PRYCE, a court-approved transcriber for the courts of the State of Oregon and the United States Federal Courts, do hereby certify:

        That I am a certified electronic court transcriber and that my certification with the American Association of Electronic Reporters and Transcribers is current and in good standing.

        I am not a relative, employee, attorney or counsel of any of the parties to said action, or a relative or employee of any such attorney or counsel.  I am not financially interested in the said action or the outcome thereof.

        Said transcript is a full, true and correct transcription, to the best of my ability.

        DATED this 13th day of May 2016.

                                */s/ Janet C. Pryce*
                                Janet C. Pryce, CET, ICDT
                                Certified Electronic Court Transcriber
                                1417 Progress Loop
                                La Grande, OR  97850
                                (541) 805-1130
                                jpryce@eoni.com