**Robert E. Franz, Jr.**    OSB #730915
E-Mail:  rfranz@franzlaw.comcastbiz.net
**Sarah R. Henderson**    OSB #153474
E-Mail:  shenderson@franzlaw.comcastbiz.net
FRANZ & HENDERSON
P.O. Box 62
Springfield, OR 97477
Telephone:  (541) 741-8220
Attorneys for Mark Dannels, Pat Downing, Kris Karcher, Shelly McInnes,
Raymond McNeely, Kip Oswald, Michael Reeves, Sean Sanborn, Eric
Schwenninger, Chris Webley, Anthony Wetmore, Craig Zanni, David Zavala, City
of Coquille, City of Coos Bay, and Coos County, Oregon


IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

Nicholas James McGuffin,
as an individual and as guardian
*ad litem*, on behalf of S.M., a minor,

        Plaintiffs,

        v.

Mark Dannels, Pat Downing, Susan
Hormann, Mary Krings, Kris Karcher,
Shelly Mcinnes, Raymond Mcneely,
Kip Oswald, Michael Reaves, John
Riddle, Sean Sanborn, Eric
Schwenninger, Richard Walter,
Chris Webley, Anthony Wetmore,
Kathy Wilcox, Craig Zanni, David
Zavala, Estate of Dave Hall,
Vidocq Society, City of Coquille,
City of Coos Bay, Coos County,
and Oregon State Police,

        Defendants.

Case No. 6:20-cv-01163-MK

**Exhibit 5016 –
Grand Jury Proceedings
Ashley Hutchinson**

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

GRAND JURY PROCEEDINGS

Dates and times not provided on recording.

UNIDENTIFIED PROSECUTOR:  Okay.  Go ahead, sir.

MALE SPEAKER:  Would you raise your right hand, please?

Do you solemnly swear that your testimony in the case now pending shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

MALE SPEAKER:  Thank you.

ASHLEY INTASON (phonetic),

A witness called by the state, having been first duly sworn was examined, and testified under oath as follows:

DIRECT EXAMINATION

BY UNIDENTIFIED PROSECUTOR:

Q    Could you tell us your name, please, ma'am?

A    Ashley Intason (phonetic).

Q    First of all, I need to tell you, it's obvious, but we've got a video camera going and we're recording the testimony here today.

A    (Indiscernible.)

Q    Okay.  Ashley, this is the grand jury for Coos County and we are looking into the disappearance of Leah Freeman.  I think you've already probably figured that out.  Okay.

A    Uh-huh (affirmative).

Q    And so first of all, could you tell us, please, do you live here in Coquille?

A    Uh-huh (affirmative).

Q    Where do you live?

A    I live on the North (indiscernible) Highway.

Q    Okay.  How long have you lived here?

A    Since I was about four.

Q    Okay.  So you've lived here a long time?

A    Yeah.

Q    All right.  Are you familiar with Nick McGuffin?

A    Yes.

Q    And how long have you known him?

A    About four years.

Q    And how old are you?

A    I'm 16.

Q    And you go to high school here?

A    Yes.

Q    And you'll be a junior next year?

A    Yes.

Q    Did you know Nick from high school?

A    I knew him from middle school.

Q    Okay.

A    But yes.

Q    But did you see him at high school all the time?

A    Yes.

Q    Okay.  And do you know Leah Freeman?

A    Yes.

Q    How long have you known Leah?

A    Actually, probably since I was really little.  I'm not really sure on what age, but since very young.

Q    Okay.  So you've known her for a long time too?

A    Uh-huh (affirmative).

Q    How close were you with Leah?

A    Not very.  I don't talk to her.

Q    Okay.

A    I just know who she is when I see her.

Q    Okay.  So basically, a person you see at school and that type of thing?

A    Uh-huh (affirmative).

Q    And Nick, were you close to Nick at all?

A    No.

Q    Okay.  Basically the same thing, saw him at school?

A    Uh-huh (affirmative).

Q    Could you tell, based on your contacts, whether Leah and Nick were boyfriend and girlfriend?

A    Yeah.

Q    Did you see them together at the high school?

A    Yeah (indiscernible) in the halls (indiscernible).

Q    Did they appear to be close?

A    Sometimes.  But sometimes, they fought.

Q    Okay. When you say that "sometimes they fought," did you actually see them argue or?

A    Yeah.

Q    Okay. Could you tell the grand jury, you know, about these arguments? What did they look like? Were they, you know, verbal or?

A    It was -- he never touched her and she never touched him. They just stood in front of each other and Nick would, like, yell at Leah, or Leah would be yelling at Nick and the other person would be saying that I'm sorry and just kind of walk by and --

Q    Okay. And would they be intense or?

A    Sometimes. But I guess it depended on, you know, how big the problem was. But if it was just a little argument, then they'd just argue it out and it would be over with. Sometimes they'd be mad and Leah would storm off or Nick would just walk away.

Q    Okay. And again, you never saw them hit each other or anything like that?

A    No.

Q    I want to talk with you now about June 28th, the day Leah disappeared. Did you see Leah at all that day?

A    Yes.

Q    And do you recall about what time it was you saw Leah and where?

A    It was about -- it was between five minutes and three minutes to 9:00 that night and she was walking in front of McKay's.

Q    Okay. When you say it was between five and three minutes to 9:00 --

A    It was, like, 8:55 or 8:58, something like that.

Q    Did you have a watch on or a clock?

A    I have a clock in my car.

Q    Okay.  So you're at McKay's?

A    Uh-huh (affirmative).  I was driving past McKay's.

Q    Driving past McKay's and you saw Leah?

A    Yeah.

Q    And which way was she going?

A    She was walking towards Hunters.

Q    And which side of the street was she on?

A    The side of the street that McKay's is on.  She was right -- she was, like, in McKay's parking lot.

Q    Okay.  And do you recall how she was dressed?

A    She was wearing a white tank top and white khaki shorts and white tennis shoes.

Q    Okay.  And when you saw her did you actually -- did you talk to her or you just saw her?

A    No, I just saw her.

Q    Okay.  And you've known her for several years and you have no doubt that was Leah you saw in the parking lot?

A    Yeah, it was definitely Leah.

Q    Okay.  How was she acting?

A    She looked really mad.

Q    Why do you say she looked mad?

A    She was walking fast and she had her arms crossed and just the look on her face was -- she was, like, glaring.

Q    Okay.

A    And looking straight ahead.

Q    Did you try to talk to her at all?

A    No.  I just drove past.

Q    Okay.  And you say it's between five and a couple of minutes to 9:00 that you saw her?

A    Uh-huh (affirmative).

Q    All right.  Did you see Leah again after that?

A    No.

Q    Now, Nick McGuffin, did you see him that night?

A    No.

Q    What did you do after you saw Leah?

A    I went home.

Q    And you stayed home the rest of the night?

A    Uh-huh (affirmative).

Q    Did you -- have you seen Nick since Leah disappeared?

Have you talked with him?

A    I haven't talked to him, but I actually seen him yesterday or the day before.

Q    Okay.  You saw him driving around town or something?

A    Uh-huh (affirmative).

Q    All right.  So you -- and you haven't talked to him?

A    No.

Q    In the time that you've known Nick, have you ever heard him talk about places that he liked to go, like out towards Fairview or anything like that?

A    No.

Q    Okay.  I don't think I have any other questions.

UNIDENTIFIED PROSECUTOR:  Go ahead, sir.

MALE SPEAKER:  How did you remember the 8:58 or 8:55?

THE WITNESS:  Because I was supposed to be home at 9:00 o'clock and I left Hunters at about five minutes to 9:00.

MALE SPEAKER:  (Indiscernible) there?

THE WITNESS:  Huh?

MALE SPEAKER:  (Indiscernible) real close?

THE WITNESS:  Yeah.  So I was in a hurry and I looked at my clock and -- I mean I don't recall exactly what time it was, but it was between those times.

MALE SPEAKER:  (Indiscernible.)

BY UNIDENTIFIED PROSECUTOR:

Q    So on your way home.  Did you make it home by 9:00?

A    Yes.

MALE SPEAKER:  At 8:59.

BY UNIDENTIFIED PROSECUTOR:

Q    You didn't get into trouble then?

A    No.

Q    Okay.  All right.  Do you have anything else you think we ought to know about?

A    No.

Q    I need to remind you, unless there's other questions, with the subpoena there was an order and we don't want people talking about what they

were questioned about here today.  In fact, we don't even want anybody to know you were here today.  Okay?

A    Okay.

Q    For the time being.

A    Okay.

Q    And people that talk about what happens here today, it says you could go to jail, so we would like people to keep quiet and what have you.  Okay?

A    Okay.

Q    Any questions for us?

A    No.

Q    Okay.  Thank you.

* * *

STATE OF OREGON)
                                    : ss.
COUNTY OF UNION)


        I, JANET C. PRYCE, a court-approved transcriber for the courts of the State of Oregon and the United States Federal Courts, do hereby certify:

        That I am a certified electronic court transcriber and that my certification with the American Association of Electronic Reporters and Transcribers is current and in good standing.

        I am not a relative, employee, attorney or counsel of any of the parties to said action, or a relative or employee of any such attorney or counsel.  I am not financially interested in the said action or the outcome thereof.

        Said transcript is a full, true and correct transcription, to the best of my ability.

        DATED this 13th day of May 2016.

                                    /s/ Janet C. Pryce
                                    Janet C. Pryce, CET, ICDT
                                    Certified Electronic Court Transcriber
                                    1417 Progress Loop
                                    La Grande, OR  97850
                                    (541) 805-1130
                                    jpryce@eoni.com