**Robert E. Franz, Jr.**     OSB #730915
E-Mail:  rfranz@franzlaw.comcastbiz.net
**Sarah R. Henderson**     OSB #153474
E-Mail:  shenderson@franzlaw.comcastbiz.net
FRANZ & HENDERSON
P.O. Box 62
Springfield, OR 97477
Telephone:  (541) 741-8220
Attorneys for Mark Dannels, Pat Downing, Kris Karcher, Shelly McInnes,
Raymond McNeely, Kip Oswald, Michael Reeves, Sean Sanborn, Eric
Schwenninger, Chris Webley, Anthony Wetmore, Craig Zanni, David Zavala, City
of Coquille, City of Coos Bay, and Coos County, Oregon

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

|  |  |
|---|---|
| Nicholas James McGuffin, as an individual and as guardian *ad litem*, on behalf of S.M., a minor, | Case No. 6:20-cv-01163-MK |
| Plaintiffs, | |
| v. | |
| Mark Dannels, Pat Downing, Susan Hormann, Mary Krings, Kris Karcher, Shelly Mcinnes, Raymond Mcneely, Kip Oswald, Michael Reaves, John Riddle, Sean Sanborn, Eric Schwenninger, Richard Walter, Chris Webley, Anthony Wetmore, Kathy Wilcox, Craig Zanni, David Zavala, Estate of Dave Hall, Vidocq Society, City of Coquille, City of Coos Bay, Coos County, and Oregon State Police, | **Exhibit 5017 –** **Grand Jury Proceedings** **Margaret Mitchell** |
| Defendants. | |

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

GRAND JURY PROCEEDINGS

Dates and times not provided on recording.

UNIDENTIFIED PROSECUTOR:  Go ahead.

MALE SPEAKER:  Will you raise your right hand, please?

Do you solemnly swear that your testimony in the case now pending shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes.

MALE SPEAKER:  Thank you.

MARGARET ANN "PEGGY" MITCHELL,

A witness called by the state, having been first duly sworn was examined, and testified under oath as follows:

DIRECT EXAMINATION

BY UNIDENTIFIED PROSECUTOR:

Q    Ma'am, could you tell us your name, please?

A    Margaret Ann Mitchell, also known as Peggy Mitchell.

Q    Okay.  Ma'am, this is the grand jury for Coos County and as I explained to you earlier, this is the -- we're looking into the disappearance of Leah Freeman.  And as I also explained to you before, we do have a -- we are videotaping these proceedings, but I need to let you know that the recorder is going.

Could you tell us, ma'am, where you live?

A    444 North Elm (indiscernible).

Q    And is that here in Coquille?

A    (Indiscernible.)

Q    How long have you lived there, ma'am?

A    About three years.

Q    Are you familiar with an individual named Leah Freeman?

A    Yes.

Q    And how long have you known Leah?

A    Pretty close to the same, two and a half to three years.

Q    And how did you become acquainted with her?

A    She is my daughter's best friend.

Q    Does she come over to your house a lot?

A    She has.

Q    Are you also familiar with an individual named Nick McGuffin?

A    I am somewhat.

Q    Okay.  And how do you know Mr. McGuffin?

A    Mostly from baseball teams with my sons when they were younger. (Indiscernible) goes, or has gone to the high school with all of my kids.

Q    All right.  At some point in time, did you become aware that Nick McGuffin and Leah Freeman were boyfriend and girlfriend, that type of thing?

A    Yes.

Q    Did you have an opportunity to observe them together at some point in time?

A    I did.

Q    Did Mr. McGuffin ever come to your house on occasion?

A    One time that I was home, he was in my home with Leah.  And he's

probably been there a couple other times.

Q    Okay.  You indicated that your daughter was best friends -- or is best friends with Leah.  Did you see a change in Leah in terms of coming over to your house, that type of thing, when she started getting involved with Nick McGuffin?

A    Yes.  (Indiscernible.)

Q    Could you tell us what the differences were?

A    Well, she'd basically spent the better part of a year and a half to two years with us.  She spent a lot nights there and a lot of days, did everything with us.  And then when she started dating Nick, she rarely came.  It was a rare occasion when she came by.  And less and less.

Q    Did you have an opportunity to observe what their relationship was like, Nick and Leah?

A    Not firsthand, not really.

Q    All right.  I want to direct your attention, ma'am, to June 28th of this year.  That would have been the day that Leah disappeared.  Did you see Leah that day?

A    Yes.

Q    Could you tell the grand jury the best you can recall when she came over to your house, how long she was there, and what happened while she was there?

A    That day was probably the first time Leah ever came to my house that I didn't hug her and greet her openly.  Because she was due to come over (indiscernible) my daughter said, "Mom, please don't say anything about Nick and upset Leah.  She's coming over; she hasn't been over for a long time.  She's going to be here a couple of hours."

And so I had just worked 11 straight days at work and I was pretty tired anyway, not in a great mood, and so I (indiscernible) and went outside.  Leah showed up around 7:00.  She had been dropped off by Nick, I was told.  And I, basically, spent the better part of that time out in my yard in a lawn chair reading a book.

The door was open.  The girls were upstairs laughing (indiscernible) kind of coming up and down the stairs a little bit, probably getting (indiscernible).

And I went in.  It got kind of chilly, it was getting a little bit dark, and so I went inside.  And I'm not sure what time exactly, maybe 8:30 or so, and just was on the couch doing whatever.

And about almost 9:00 o'clock exactly, my daughter came down the stairs and had on a sweatshirt.  She was putting a sweatshirt on and I asked her where she was going.  She said she and Leah were going jogging.  And I told her she wasn't going out, that it was going to be dark before long.  We kind of had a little heated discussion, which we've done many times -- many, many times about this (indiscernible).

Q    How old is your daughter?

A    (Indiscernible) 14 (indiscernible).  And I asked her, and I asked her loud and clear, "Is Leah going to jog all the way with you to the high school or will she get picked up by Nick like she usually does, or will she run home, and will you end up coming home alone?"

And then she, my daughter, told me that probably that Nick would pick her up or she would go home, because the high school was almost to her home, and yes, she probably would be coming home alone.

And so I said again, "No, you can't go."

And real shortly after that, Leah came downstairs and went out the door. And I didn't see her face. And my daughter went out the door behind her. And just moments after that, my daughter was at the end of the driveway crying hysterically.

And I called her inside and spent the next five minutes or so asking what happened (indiscernible) her. And what she told me was that Leah said something to the effect that, well, I should probably just go, your mom hates me. And my daughter can tell you what she said after that.

Q    Uh-huh (affirmative).

A    And that was it. And also, my daughter can tell you what time Nick came by looking for her.

And then I don't know if you want to hear what happened when Nick came by.

Q    Yeah. I guess, now she left and it was around 9:00 o'clock that she left?

A    She left really close to 9:00.

Q    Okay.

A    (Indiscernible) right at 9:00.

Q    And Nick came back to the house, or came to the house after 9:00?

A    Yes.

Q    How many times did he come by?

A    Twice, according to my daughter. But it was the second time that I actually heard his voice.

Q    Okay. The second time that you actually saw him, or I mean the time you actually saw him, would have been, according to your daughter, the second

time --

A    Uh-huh (affirmative).

Q    -- do you know about what time that was?

A    It should've been really close to 10:15 or so.

Q    Okay.

MALE SPEAKER:  10:15?

THE WITNESS:  Yeah.

BY UNIDENTIFIED PROSECUTOR:

Q    The way my house is set up is that I have a (indiscernible) old house and my bathroom is right next to my front door.  I happened to be in the bathroom, so I just sat quietly so nobody really knew I was there.  That's what you do when somebody comes to the door (indiscernible) in the bathroom.

And so I heard Nick.  I heard somebody knock at the door and my daughter was upstairs getting ready to go to bed.  And I heard Nick's voice and he asked something to the effect of have you seen her, has she been back, or did she come back, that kind of thing.

And (indiscernible) said something to the effect of, no, didn't you find her yet?

And he said no.

And she said, "Well, where did you look?"

And he said, "Everywhere."

And she said, "Well, did you check her house?"

And he said, "No."

And she said, "Well, I think you need to check her house, Nick.  Here, you should call or something."  And she gave him the phone (indiscernible) right

next to the door.

And I heard him call Corey, Leah's mom.  And her hold and double-check and run upstairs to see, you know, Leah wasn't home.  And (indiscernible).

A    Right.  Did you see Mr. McGuffin again that night?

Q    (Indiscernible.)  How long would you say Mr. McGuffin was at the house at 10:15?

A    That whole phone call and conversation couldn't have taken much more than five minutes, if that.

Q    Since June 28th, have you had any contact with Mr. McGuffin at all?

A    Twice.

Q    And roughly, when did that occur?

A    The first time, maybe a week and a half to two weeks ago and I made the contact.  I called just to say hello to him, just to try to understand the time frame of Leah left in broad daylight and the last place she was seen couldn't have taken her more than 10 or 15 minutes at the most, and how in the world did you come by 10 minutes later and not see her.

Q    Uh-huh (affirmative).

A    And I couldn't get (indiscernible) from that.

Q    What did he say?

A    He said he has no idea.  He doesn't understand it.  He said his headlight was bad.

I said, "But Nick, it was broad daylight.  It was 9:00 o'clock; it wasn't dark."

And he said, "Well, my eyes are really bad" or something.  Or (indiscernible).

Anyway, but he did mention that his headlight's out.  That I know for a fact.  He was missing one headlight and he probably just missed her, and but he doesn't know how he could have missed her.  It wasn't a very long conversation.

Q    And then you saw him again a second time?

A    No, I haven't seen his face yet and that's what I was wanting to do.

Q    Uh-huh (affirmative).

A    So I've called him, probably three times or four times in the last two weeks.

Q    Uh-huh (affirmative).

A    He called me back once and left a message and it sounded like he didn't really want to talk to me.  And I left a message just telling him (indiscernible) I haven't seen him since this has happened and I know he's having a hard time and I'd kind of like a chance to talk to him (indiscernible) you know.  My house is pretty quiet; my yard's pretty quiet.  I'm not at work for a week or so.

And so he did call and leave a message.  Sorry he missed me; he'd try to call me later.  And then that probably was two days ago or so.

Q    Uh-huh (affirmative).

A    And then yesterday, I called him and reached him and he was real short on the phone.  And I said, "Well, I just heard you're not really talking to anybody, and so you probably don't want to talk to me either."  And I don't know, I just kind of told him I want you (indiscernible) you know.

Q    Uh-huh (affirmative).

A    But I kind of told him that I just wanted to talk to him, I wanted a chance, and if he ever wanted to talk, that he's welcome to come over.

And I saw him last night at the candlelight vigil (indiscernible).

Q       Okay. How was he acting last night at the vigil?

A       Very stoic.

Q       I take it you didn't get a chance to talk with him much at all last night?

A       He hasn't wanted (indiscernible).

Q       Okay. Ma'am, do you have any other information of -- that you think we ought to know about regarding Leah's disappearance or is there anything else you think we ought to know?

A       (Indiscernible.)

Q       Okay. Do you know if Leah or Nick were involved with drugs in any way?

A       I've not witnessed it, but I know from conversations, many, many conversations with my daughter that it wasn't just seeing Nick that kept Leah away from my daughter a lot since about September or October or November, it was that she went back to habits that she had prior to being my daughter's friend and that she was at least smoking pot and drinking on occasion with Nick.

Q       Okay.

UNIDENTIFIED PROSECUTOR:  I don't have any other questions. Does the grand jury?  Yes, sir?

MALE SPEAKER:  When he came back about 9:00 o'clock and you said that you know he had a headlight out and he couldn't see in the daylight, he was driving an old Mustang; is that true?

THE WITNESS:  No.  When he came back -- I'm totally confused by your question, because when he came back, the first time I didn't see him.  My daughter (indiscernible) then.  She can answer that for you.  And the second time

he came back, I only heard his voice, I didn't even see his face, and I didn't see the vehicle he was driving then and that was a quarter after 10:00.

MALE SPEAKER:  Like 10:15?

THE WITNESS:  Right.

UNIDENTIFIED PROSECUTOR:  Any other questions?

(No audible response recorded.)

UNIDENTIFIED PROSECUTOR:  Ma'am, this is the little speech I've been giving everybody, there was an order attached to your subpoena and we ask you to follow that order, and that is that we ask that you not disclose to anyone that you have been here to testify and not disclose to anyone your testimony here today.

THE WITNESS:  (Indiscernible.)

UNIDENTIFIED PROSECUTOR:  Okay.  If there isn't anything else, then you're excused then.

* * *

STATE OF OREGON)

COUNTY OF UNION)

: ss.

I, JANET C. PRYCE, a court-approved transcriber for the courts of the State of Oregon and the United States Federal Courts, do hereby certify:

That I am a certified electronic court transcriber and that my certification with the American Association of Electronic Reporters and Transcribers is current and in good standing.

I am not a relative, employee, attorney or counsel of any of the parties to said action, or a relative or employee of any such attorney or counsel.  I am not financially interested in the said action or the outcome thereof.

Said transcript is a full, true and correct transcription, to the best of my ability.

DATED this 13th day of May 2016.

*/s/ Janet C. Pryce*
Janet C. Pryce, CET, ICDT
Certified Electronic Court Transcriber
1417 Progress Loop
La Grande, OR  97850
(541) 805-1130
jpryce@eoni.com