**Robert E. Franz, Jr.**    OSB #730915
E-Mail:  rfranz@franzlaw.comcastbiz.net
**Sarah R. Henderson**    OSB #153474
E-Mail:  shenderson@franzlaw.comcastbiz.net
FRANZ & HENDERSON
P.O. Box 62
Springfield, OR 97477
Telephone:  (541) 741-8220
Attorneys for Mark Dannels, Pat Downing, Kris Karcher, Shelly McInnes,
Raymond McNeely, Kip Oswald, Michael Reeves, Sean Sanborn, Eric
Schwenninger, Chris Webley, Anthony Wetmore, Craig Zanni, David Zavala, City
of Coquille, City of Coos Bay, and Coos County, Oregon

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

Nicholas James McGuffin,
as an individual and as guardian
*ad litem*, on behalf of S.M., a minor,

        Plaintiffs,

          v.

Mark Dannels, Pat Downing, Susan
Hormann, Mary Krings, Kris Karcher,
Shelly Mcinnes, Raymond Mcneely,
Kip Oswald, Michael Reaves, John
Riddle, Sean Sanborn, Eric
Schwenninger, Richard Walter,
Chris Webley, Anthony Wetmore,
Kathy Wilcox, Craig Zanni, David
Zavala, Estate of Dave Hall,
Vidocq Society, City of Coquille,
City of Coos Bay, Coos County,
and Oregon State Police,

        Defendants.

Case No. 6:20-cv-01163-MK

**Exhibit 5018 –**
**Grand Jury Proceedings**
**Sharon Nelson**

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

GRAND JURY PROCEEDINGS

Dates and times not provided on recording.

UNIDENTIFIED PROSECUTOR:  Okay.  Go ahead.

MALE SPEAKER:  Raise your right hand, please.

Do you solemnly swear that your testimony in the case now pending shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

SHARON NELSON,

A witness called by the state, having been first duly sworn was examined, and testified under oath as follows:

DIRECT EXAMINATION

BY UNIDENTIFIED PROSECUTOR:

Q    Could you tell us your name, please, ma'am?

A    My name is Sharon Nelson.

Q    Okay.  This is the grand jury for Coos County and we are investigating, as you're probably already aware, the disappearance of Leah Freeman.  And I do have to advise you we have the video camera going and we are recording the proceedings here today.

First of all, could you tell us what your occupation is?

A    I'm currently employed by the Coquille School District as an administrator for (indiscernible).

Q    And prior -- and you just got that appointment here this summer?

A    That is correct.

Q    And prior to that, what was your assignment with the school?

A    I was a health and PE teacher at Coquille High School for the last 22 years.

Q    Ma'am, in your capacity at the high school, are you acquainted with Leah Freeman and Nicholas McGuffin?

A    I am; they were both my students.

Q    Okay.  Did you become aware during this last school year that Nick and Leah were boyfriend and girlfriend, that type of thing?

A    Yes, I did.

Q    Did you have an opportunity to observe them in the high school and how they behaved and so forth?

A    Yes, I did.

Q    Could you tell the grand jury, please, what you observed and your observations of their relationship?

A    I observed two young people who were in a beginning relationship that was moving extremely fast without any communication skills.  I felt that toward the spring of the school year -- and I'm not sure how long they'd been together, I don't keep track of it, but I would say for several months -- that it was becoming extremely noticeable to all school personnel, including the teachers and the students and the administration, that these two people were needing some help in their relationship as far as being able to communicate effectively with one another.

Q    Did you have an opportunity to observe disagreements there at the high school between the two?

A    I've walked in -- I've walked into situations where these two people have been yelling and screaming at each other.  I have observed them in conversation where they were very, very much displaying affection toward one another.  I have witnessed them talking about different types of possible jealousy issues, a girl or a guy has looked at him too long, or misread the information coming to them.

I've seen all facets of the emotions that these two people displayed towards one another.  I never witnessed any physical abuse.

The few times that I either walked into a classroom where they were talking or arguing, or the times that I would see them in the hallways in front of many students talking or arguing, I never once saw either person strike out and hit the other person.  I've seen the aftermath, I've seen the anger and the frustration by Nick when he has put his hand through a wall, punched a wall, punched a locker.  He got angry and walked away from her.

I have witnessed her wanting to strike out and hit him in an argument and he would contain her and hold her arms.  I've seen that twice.

Q    At the request of another employee at the school district, were you asked to kind of look into this situation a little bit?

A    Yes, I was.  It was either April or May, I don't -- but it was later on in the school year.  And after a heated argument that I did not witness, but had heard from these two adults, they were asking that something be done, that they were afraid that it was getting out of hand.  And I had the opportunity to step into the main office as a substitute administrator that next day and so I took the opportunity to call Leah's mom and asked her to come in and visit about the relationship, as I saw it, with her daughter and Nick.

Q    And did Mrs. Courtright come in and see you?

A    Yes, she did that next morning.

Q    Could you tell us what you talked about with her, please?

A    I asked her how the relationship -- how she saw the relationship going with her daughter and Nick. And she said that things seemed to be fine at home.

And when I described the things that I've already said to you about what I had seen and heard from other people, talking about their relationship at the school, she was -- she was concerned that she had never seen that part of it at home. None of that had ever come out at home, that they never argued, they didn't do those kinds of things at the home situation.

And I -- she and I talked about Leah's grades being affected by this. They would oftentimes spend so much time arguing that they both would be late to class and those kinds of things were affecting both of their academic performances. So that was pretty much, I based it more on that than anything else, that I was concerned for their academic success.

Q    Now, if I remember correctly, Leah would have been a freshman and Nick would have been a senior last year?

A    That is correct.

Q    Did their arguments and how they were getting along, did that disrupt the school any?

A    I believe so. It was brought to the vice principal and the principal's attention several times by other faculty members by them witnessing different outbursts of anger and frustration. And that's -- it's not just the anger and frustration that we saw, we also saw a lot of displays of affection, close body contact, hugging and kissing, you know, the whole gambit of emotions in a

relationship.

Q     And I guess these problems were referred to Mr. Norton and some other authorities at the school?

A     He is the main person who handles most of those types of disruptions.

Q     Now, I forgot what I was going to ask.  In your viewing this relationship, did you see it as one that was in trouble I take it?

A     Yes.

Q     And could you describe in what ways did you think it was in trouble?

A     I didn't doubt that they both had strong affection, they called it love, in what they understood love to be, for one another.  I felt that -- that their relationship in the few months that they'd been together had gone through the advanced stages of what most of us who are married would consider a five-year marriage and yet had no communication skills to sustain a meaningful relationship, and so I was very concerned about that.

Q     And if they had those skills then this could have -- could be a very fine relationship between the two?

A     I felt that they both wanted to work toward that.  Yes, it could've -- it definitely would have helped, yes.

Q     Okay.

MALE SPEAKER:  Do you know if Nick had any eyesight problems, wore glasses or anything like that?

THE WITNESS:  He sat in the back of my classroom and I do remember there were several times when he did say that he couldn't see the overhead that I had on.  I never witnessed him wearing glasses or didn't know if he wore contacts or not.  But being a senior, he oftentimes would (indiscernible) move

(indiscernible) himself.

UNIDENTIFIED PROSECUTOR:  I don't think I have anything other to ask.  Any other questions from the grand jury?

(No audible response recorded.)

BY UNIDENTIFIED PROSECUTOR:

Q    Is there any other information you think we ought to know about?

A    I can't think of anything else.  I had an opportunity to -- when this first started developing, I had an opportunity to talk to, I believe, Dave Hong (phonetic).

Q    Okay.

A    And Chief Reeves.

Q    Okay.

A    And gave them pretty much the exact information that I've given you. They asked me the same questions.

Q    Okay.

A    During the weeks that have transpired, I have not been able to come up with anything else that would be of any value or help that I can be aware of.

Q    Okay.  I need to remind you -- this is a little speech I give to everybody, the order that was attached to the subpoena, if you would, please, we ask that you not disclose that you've been here and that you not disclose to anyone the fact that -- or the testimony you've given here today.  Okay?

(No audible response recorded.)

Q    Any questions for me?

(No audible response recorded.)

Q    Okay.  All right.  Thank you, ma'am.

A    Thank you.

* * *

STATE OF OREGON)
                                    :  ss.
COUNTY OF UNION)


        I, JANET C. PRYCE, a court-approved transcriber for the courts of the State of Oregon and the United States Federal Courts, do hereby certify:

        That I am a certified electronic court transcriber and that my certification with the American Association of Electronic Reporters and Transcribers is current and in good standing.

        I am not a relative, employee, attorney or counsel of any of the parties to said action, or a relative or employee of any such attorney or counsel.  I am not financially interested in the said action or the outcome thereof.

        Said transcript is a full, true and correct transcription, to the best of my ability.

        DATED this 13th day of May 2016.

                            /s/ Janet C. Pryce
                            Janet C. Pryce, CET, ICDT
                            Certified Electronic Court Transcriber
                            1417 Progress Loop
                            La Grande, OR  97850
                            (541) 805-1130
                            jpryce@eoni.com