**Robert E. Franz, Jr.**    OSB #730915
E-Mail:  rfranz@franzlaw.comcastbiz.net
**Sarah R. Henderson**    OSB #153474
E-Mail:  shenderson@franzlaw.comcastbiz.net
FRANZ & HENDERSON
P.O. Box 62
Springfield, OR 97477
Telephone:  (541) 741-8220
Attorneys for Mark Dannels, Pat Downing, Kris Karcher, Shelly McInnes,
Raymond McNeely, Kip Oswald, Michael Reeves, Sean Sanborn, Eric
Schwenninger, Chris Webley, Anthony Wetmore, Craig Zanni, David Zavala, City
of Coquille, City of Coos Bay, and Coos County, Oregon

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

Nicholas James McGuffin,
as an individual and as guardian
*ad litem*, on behalf of S.M., a minor,

        Plaintiffs,

        v.

Mark Dannels, Pat Downing, Susan
Hormann, Mary Krings, Kris Karcher,
Shelly Mcinnes, Raymond Mcneely,
Kip Oswald, Michael Reaves, John
Riddle, Sean Sanborn, Eric
Schwenninger, Richard Walter,
Chris Webley, Anthony Wetmore,
Kathy Wilcox, Craig Zanni, David
Zavala, Estate of Dave Hall,
Vidocq Society, City of Coquille,
City of Coos Bay, Coos County,
and Oregon State Police,

        Defendants.

Case No. 6:20-cv-01163-MK

**Exhibit 5020 –
Grand Jury Proceedings
Aaron West**

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

GRAND JURY PROCEEDINGS

Dates and times not provided on recording.

UNIDENTIFIED PROSECUTOR:  Go ahead.

MALE SPEAKER:  Will you raise your right hand, please?

Do you solemnly swear that your testimony in the case now pending shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes.

AARON WEST,

A witness called by the state, having been first duly sworn was examined, and testified under oath as follows:

DIRECT EXAMINATION

BY UNIDENTIFIED PROSECUTOR:

Q      Okay.  Could you tell us your name please, sir?

A      Aaron West.

Q      Okay.  Mr. West, this is the grand jury for Coos County and we are investigating the death and disappearance of Leah Freeman, which I think you're aware of.

A      Yes.

Q      First of all, I need to let you know that we are recording the proceedings here today.  All right.  You need to speak up loud --

A      All right.

Q    -- so we can understand you.  All right?

A    (Indiscernible.)

Q    First of all, could you tell us where you live, sir?

A    My address?

Q    Sure.

A    58862 Old (indiscernible) Road.

Q    And how long have you lived in the Coquille area?

A    I grew up here and then I'm back temporarily until I go back to college.

Q    You're back at home living with mom and dad?

(No audible response recorded.)

Q    Graduated from high school here?

A    Yep.

Q    How long ago?

A    In '98.

Q    Okay.  And how old are you, sir?

A    I'm 20.

Q    Mr. West, are you familiar with Leah Freeman?

A    Yeah.  I've been around her before and I knew she was Nick's girlfriend.

Q    Okay.

A    So I've been around her with him.

Q    How long have you known Leah?

A    Seven, eight months since I got back (indiscernible).

Q    Now, you've been away at school?

A    Yes.

Exhibit 5020 at 2

Q    And where were you going to school?

A    Wyoming Technical Institute.

Q    Is that somewhere in --

A    Laramie, Wyoming.

Q    Okay.  Now, you came back to town and you met Nick at that time or you knew him?

A    No.  I grew up with Nick, Nick and his brother Wayne.

Q    Okay.  And it's when you came back that you --

A    That's when I, yeah, I first met Leah.

Q    Okay.  So you've known her for seven, eight months, nine months?

A    Yeah.  Because I got back the day after Christmas, this last Christmas.

Q    Could you describe for us please the relationship, how you viewed the relationship between Mr. McGuffin and Leah?

A    Decent I would say.  It wasn't the best relationship.

Q    Why do you say that?

A    They argued a lot.

Q    Did they ever get physical with each other?

A    No, I never saw them do anything like that.  I just seen them arguing (indiscernible) and then a couple days later they'd be back together.

Q    Would they -- were they, you know, a possessive type couple?

Were they together all the time or was it just kind of fleeting?

How is --

A    Most of the time they were together when I saw Nick.

Q    So if you saw Nick, you would expect to see Leah also?

A    Yeah.

Q    Now, I want to direct your attention back to June 28th.  That's the day Leah disappeared.

A    Uh-huh (affirmative).

Q    I'd like for you to please tell the grand jury, let's start about noon --

A    All right.

Q    -- and just tell the grand jury please what your activities were like that day, what you did.

A    Well, I drove around a lot.  We just -- me and a couple people that were with me were driving around most of the afternoon and we were at Fast Mart a few times just hanging out there.

And then we saw Nick in the early evening.  I don't really remember what time it was, 6:00 or 7:00 in the evening and he was driving around.  And, well, I don't really recall after that until probably around 8:00 when we saw Nick again and we went out to Johnson Mill Pond for a while.

Q    Okay.  Let me stop you a second.  Now, you say you saw Nick driving around at --

A    We saw him at Fast Mart.

Q    At Fast Mart?

A    Yeah.

Q    Okay.  Now, when you say "we" was there somebody with you?

A    Yes.  There was two people with me, David Jenkins and --

Q    Okay.

A    Josh (indiscernible).

Q    All right.  Okay.  I guess I'm a little -- okay.  You saw him at Fast Mart?

A    Yeah.

Q    Did you see him earlier in the day?

A    We saw him just driving through town.

Q    Okay.  And what car was he driving (indiscernible)?

A    The blue Mustang that he has.

Q    Okay.  Now, when you saw him at Fast Mart, do you know what -- about what time of the night it was like?

A    It was probably 6:30 or 7:00.  I'm not really sure of the exact time, but it was early evening.

Q    All right.  Okay.  I guess I'm a little confused, because did you meet him there at Fast Mart or did he drive up to you at Fast Mart?  How did that occur?

A    We were hanging out there.

Q    Okay.

A    There was quite a few people there and we were just hanging out and he came up and we started talking -- went over and talked to him.

Q    Went over where?

A    Over to where he was parked when he pulled in.

Q    Okay.

A    And just started talking to him.

Q    And how long did you talk with him there?

A    Probably 10, 15 minutes.

Q    Was there anyone in the car with him at that time?

A    No, there wasn't.

Q    So he was by himself?

A    Yes.

Q    Okay. How long did you talk with him at Fast Mart?

A    Like 10 or 15 minutes is all we talked to him. And then he wanted to go out to Johnson Mill, so we followed him out there.

Q    Okay. So you followed him out there?

A    Yeah.

Q    Okay. And what happened when you got out there?

A    He was -- he wanted to smoke some weed so he was doing that and we were just bullshitting and smoking cigarettes at the time (indiscernible).

Q    Yeah, that's fine. Who was smoking the marijuana?

A    Um --

Q    Just so you know, I'm not going to charge anybody with possession of marijuana. Okay?

So I'm not worried about people smoking a little bit of grass, okay?

A    Yeah.

Q    Okay. I just -- we want to know what happened out there.

A    All right. Well, just about everybody (indiscernible) took, like, a couple hits off of it. Because he offered it to me and then the other two people that were with me, and then he was.

Q    Okay. Mr. Jenkins says you smoked about, I think he called it an eighth of an ounce of marijuana.

A    An eighth of an ounce?

Q    Yeah.

A    I don't know if it was that much.

Q    Okay.

A    But they -- they probably loaded the pipe five or six times.

Q    Okay.  Who brought the stuff out there?

A    I had a little bit that I gave to Nick and I think Nick had some too.

Q    Okay.  Now, have you seen Nick smoke marijuana before?

A    Yes, I have.

Q    Have you seen Leah smoke marijuana?

A    No.  I never saw her smoking it.

Q    How long would you say you were out there?

A    Probably an hour, hour and a half.

Q    Okay.  And what happened while you were there?

A    He was talking about how she made him wait, like, three hours. Because he was supposed to pick her up, he was talking about that and he didn't really seem too happy about it, but that was about all he was talking about.

Q    Okay.  And then who left first?

A    We left together.  I followed him out.

Q    Okay.  And where did you go from there?

A    We went back to Fast Mart and he went out, I guess to go pick up Leah.

Q    Did you know where he was going to pick up Leah?

A    No, I do not.

Q    Okay.

A    I don't know.  He turned by the post office to go up (indiscernible) back into town.  We turned by Safeway.

Q    Okay.  You turned by Safeway and he turned by the post office?

A    Yeah.

Q    Now, how would you say -- what's your relationship like with Nick?

A    Pretty good.

Q    Would you call him a friend?

A    Yeah.

Q    Have you talked with Nick since Leah's disappearance?

A    Yeah, I talk to him just about every day.

Q    Okay.  In person?  By phone?

A    Yeah, in person.

Q    Okay.

A    Just when I see him driving around town, he usually stops.

Q    What have you talked about?

A    Everything, pretty much.  Just whatever (indiscernible) talked about. And we've talked about Leah and if anybody had heard anything for about the first week.

Q    Now, you've been interviewed by the police a couple of times; right?

A    Yeah, several times.

Q    And did you ever tell Nick about you being interviewed by the police?

A    Um, he was actually at Fast Mart one time when one of the officers came up there (indiscernible) me, so he pretty much knew.

Q    Okay.  Did you ever tell Mr. McGuffin what the police were asking you?

A    No, I didn't.

Q    Did Mr. McGuffin ever ask you what was going on, what kind of questions you were being asked?

A    No, he didn't.

Q    Now, after you turned off and you went back to Fast Mart, what

happened then?

A    We went up there and probably 10 or 15 minutes later, Nick came up and asked us if we had seen Leah walking anywhere or seen her at all, because he couldn't find her.  And we hadn't seen her, so he took off.

And we just stayed at Fast Mart.

Q    Okay.  What car was Nick driving when he went back to Fast Mart?

A    His parents' T-Bird.

Q    Okay.  So from the time you left him -- by the time you pull out of Johnson Mill Pond and you go back to town and he makes the turn by the post office and then you go to Fast Mart --

A    Uh-huh (affirmative).

Q    -- the next time you see Mr. McGuffin, he's driving his mom and dad's T-Bird?

A    Yes.

Q    And how much time would you estimate elapsed between the time you last saw Mr. McGuffin until the time you saw him at Fast Mart?

A    Probably 20 or 25 minutes from when we turned off and we couldn't see him anymore.  And then we went up to Fast Mart and we were at Fast Mart for probably 10 or 15 minutes.

Q    And at that time he's asking you where's Leah and that type of thing --

A    Yeah.

Q    -- and have you seen her?

A    Yeah.

Q    Had you seen her when --

A    No.  I hadn't --

Q    -- while you were --

A    -- seen her the whole day.

Q    Mr. West, just so you know, we've interviewed a witness who was out at Johnson Mill Pond who I believe is -- works for the sheriff's office.

A    Uh-huh (affirmative).

Q    Okay.  And -- well, could you describe your car for us, please?

A    It's a multicolored, long, old (indiscernible).

Q    Okay.  Okay.  He indicates that about 7:30, he saw the blue Mustang known to be operated by Nick McGuffin, and it was followed down to Johnson Mill Pond by an older, or by another vehicle, a blue, older, four-door, driven by you, Mr. West.

A    Yeah.  Half -- half of the car is blue.

Q    Okay.

A    The driver's side and the other half is white.

Q    Okay.  You then drove around the loop -- you go to the end of the pond and drove around the loop.  That Mr. McGuffin was the only person in his vehicle and that there were several people in your car.

That would have been you and Mr. Jenkins and --

A    And Mr. Emler (phonetic).

Q    Mr. Emler.  It says that Mr. McGuffin was the first to pull into the road and was followed by you.

A    Uh-huh (affirmative).

Q    After about five minutes, Mr. West backed out of the road and left Johnson Mill Pond.

A    We didn't actually left.  We went down towards the beginning, because

there was tractors going around mowing the lawn.

Q    And it was about 7:30 in the evening or whatever it was?

A    Yeah, when we were out there, they came right by us.  And then another one came by, so we down towards the beginning of Johnson Mill Pond.

Q    Up there by the shop?

Almost to the shop or where?

A    Yeah.  Like the second or third pullout down from when you first go and get on the gravel road.

Q    Okay.  And that's where you were spending your time?

A    Yes.

Q    Smoking cigarettes and taking hits off the pipe and that type of thing?

A    Yes.

Q    And you stayed there for how long?

A    We were out there; it was at least an hour, maybe an hour and a half. I don't really recall how long we were out there.

Q    Okay.

A    But it was quite a while.

Q    Where you parked, were you visible from that area?

Was other people around?

A    No.  The only way you would've seen us is to drive by on the road, because there was brush around where we pulled in.

Q    Were you looking for a spot you could go and smoke dope in private so nobody would catch you, that type of thing, is that what you're doing or?

A    Yeah, pretty much.

Q    Now, in talking to people on the street, that type of thing, have you

heard anything about what might have happened to Leah?

A    I've heard stories from -- I don't know who to believe.  I've heard that they've found her so many times and that she was up at Sanford Heights getting into a truck with somebody.

Q    All right.  Do you know what's happened to Leah Freeman?

A    No, I don't.

Q    Have you seen Leah Freeman since June 28th?

A    No.

Q    Has anybody told you anything about where she's at, whether she's dead or alive or anything along that line?

A    Huh-uh (negative).  Just what the rumors that have been going around.

Q    Okay.

UNIDENTIFIED PROSECUTOR:  Does the grand jury want to ask any questions?

MALE SPEAKER:  (Indiscernible) did you guys get out of your car at Johnson Mill and go over to look in the back of Nick's Mustang?

THE WITNESS:  Huh-uh (negative).  I don't think we got out of the car the whole time.

MALE SPEAKER:  (Indiscernible - away from microphone.)

THE WITNESS:  Huh-uh (negative).

BY UNIDENTIFIED PROSECUTOR:

Q    Oh, could you tell us what type of clothes Nick had on, do you recall, that night?

A    I'm not really sure.  I think maybe blue jeans, maybe.

Q    Okay.

A    He was sitting in his car, so I didn't really see.  I think he had, like a -- I think his shirt was like a hockey shirt or a football shirt, the kind of silk shirts --

Q    Okay.

A    -- that are jerseys.  I think he was wearing one of those.

Q    Okay.  You've known Nick all your life basically, right?

A    Since about sixth grade.

Q    Are you familiar with the Fairview area, Four Corners?

A    Yeah.

Q    Have you ever heard of a place called "Hudson Ridge?"

A    Yeah, I've heard of it.

Q    Have you ever been out there?  Do you know where it's at?

A    Yeah.

Q    Have you ever gone driving, you get to Four Corners and head, like, towards McKinley, Dora?

A    Turn right?

Q    You turn right.

A    Yeah.

Q    (Indiscernible.)

A    Up there off that road a ways.

Q    Have you ever been out there with Nick?

A    No.

Q    Have you ever heard Nick talk about the area?

A    Huh-uh (negative).

Q      Okay.  Mr. West --

UNIDENTIFIED PROSECUTOR:  Any other questions the grand jury wants to ask him?

(No audible response recorded.)

UNIDENTIFIED PROSECUTOR:  I need to remind you, sir, that court order you received with your subpoena --

THE WITNESS:  Yeah.

UNIDENTIFIED PROSECUTOR:  -- you're not to discuss that you've been subpoenaed to be here today or tell anybody you've been here today.

THE WITNESS:  (Indiscernible.)

UNIDENTIFIED PROSECUTOR:  Okay.  And you're not to discuss anything that's occurred inside the room here today with anyone other than if you, for whatever reason, hire your own lawyer on this thing, then you can talk to him about it.  But you can't talk to anybody about what occurred in here today.

THE WITNESS:  All right.

UNIDENTIFIED PROSECUTOR:  You understand that?

THE WITNESS:  Yes.

UNIDENTIFIED PROSECUTOR:  And you understand the penalty if you do?

THE WITNESS:  Yes, I do.

UNIDENTIFIED PROSECUTOR:  Okay.  If there isn't anything else, then you'll be excused.  Okay.

* * *

STATE OF OREGON)

COUNTY OF UNION)

: ss.

I, JANET C. PRYCE, a court-approved transcriber for the courts of the State of Oregon and the United States Federal Courts, do hereby certify:

That I am a certified electronic court transcriber and that my certification with the American Association of Electronic Reporters and Transcribers is current and in good standing.

I am not a relative, employee, attorney or counsel of any of the parties to said action, or a relative or employee of any such attorney or counsel. I am not financially interested in the said action or the outcome thereof.

Said transcript is a full, true and correct transcription, to the best of my ability.

DATED this 11th day of May 2016.

*/s/ Janet C. Pryce*
Janet C. Pryce, CET, ICDT
Certified Electronic Court Transcriber
1417 Progress Loop
La Grande, OR  97850
(541) 805-1130
jpryce@eoni.com