# Norman (Norm) W. Frink
503-222-0067
normanfrink@aol.com

October 7, 2024

**<u>VIA EMAIL</u>**
Meredith A. Sawyer
Anthony R. Scisciani, III
HWS Law Group
1500 Fourth Avenue Suite 200
Seattle, Washington 98101
msawyer@hwslawgroup.com
ascisciani@hwslawgroup.com

Re:     McGuffin v. Dannels, *et al.*
        Court/Venue   :      U.S. District Court District of Oregon (Eugene (6))
        Case No.      :      6:20-cv-01163-MK

Dear Ms. Sawyer:

I have been retained by HWS Law Group to act as an expert witness on behalf of the Vidocq Society with respect to the above referenced case. I have been asked to provide information and opinions on the following topics:

- An overview of accepted standard practices in Oregon for death investigations and homicide prosecutions, including an explanation of the constitutional and statutory obligations of the district attorney and law enforcement in such cases, typical collaboration between district attorney offices and law enforcement agencies, and the ultimate independence of the district attorney with respect to decision making regarding the grand jury process and prosecution of a criminal case;
- An explanation regarding accepted standard practices in Oregon regarding law enforcement and the district attorney's use and reliance upon a wide range of sources and resources in conducting death investigations and homicide prosecutions;
- To provide opinions as to the whether it was within standard accepted practice for the Coquille Police Department and the Coos County District Attorney's Office to interact with the Vidocq Society as part of their investigation into the death of Leah Freeman and whether such interactions made the Vidocq Society or any of its members the agent or representative of those agencies in the eyes of those agencies;
- To provide opinions as to whether the conduct of the Vidocq Society and its member Richard Walter had any bearing on the investigation, arrest, prosecution, conviction, and sentencing of Nicholas McGuffin for the homicide of Leah Freeman;
- To provide opinions as to whether the Vidocq Society or its member Richard Walter fabricated any inculpatory evidence that was used in the criminal trial or suppressed evidence that would have been favorable to Nicholas McGuffin;

October 7, 2024
Page 2

## I.    <u>Professional Background and Qualifications</u>

I attended Lake Forest College and graduated Phi Beta Kappa with a Bachelor of Arts Degree with a major in History in 1974.  I attended Washington & Lee University School of Law and graduated cum laude with a Juris Doctor Degree in 1977.  I was a member of the Oregon State Bar from 1977 until 2023.  I was a deputy district attorney in Multnomah County, Oregon from 1977 until 2012 serving as Chief Deputy District Attorney from 1982 until 2012. The Multnomah County District Attorney's Office was divided into two divisions at the time with each supervising about 40 to 50 attorneys and support staff. Each division was subdivided into various units.  Each division was headed by a chief deputy district attorney with senior deputies in charge of the units reporting to that person.  The chief deputy district attorneys reported to the District Attorney. The District Attorney is a non partisan state official, elected in each of Oregon bs 36 counties for a term of four years.  The units I supervised included ones devoted to drugs cases, property crimes, gang prosecutions, sexual assaults and robberies. Homicides were handled on a division wide basis with most homicides assigned to my division. One of my duties as Chief Deputy District Attorney was to lead and supervise the investigation, charging and prosecution of those homicide cases in Multnomah County for 30 years.

 I personally prosecuted dozens of homicide cases and supervised hundreds of them.  I instituted new procedures for the involvement of the District Attorney's Office in homicide investigation and officer involved deaths and for the subsequent charging and prosecution of those cases. During that time I was a member of the Oregon District Attorney's Association and received and conducted training on death investigations for that organization from time to time. I received an award for Outstanding Legislative Achievement from it in 1993. For many years I was a member of the Association of Government Attorneys Involved In Capital Litigation and attended many of its conferences and received training there in death investigations.  Upon my retirement as Chief Deputy District Attorney at the end of 2012 I received a Valued Partnership Award from the Homicide Detail of the Portland Police Bureau.

Since my retirement I have been contacted and hired as a consultant and expert witness by several entities.   This includes being retained as an expert witness by the Boy Scouts of America in civil cases to provide opinions regarding the sufficiency of investigations in instances where sexual abuse by Boy Scout officials was alleged, conducting a mock cross examination of a prospective witness, and being retained by the Portland Public School Board as part of a team to conduct an investigation of allegations of sexual harassment and possible abuse of students by an employee of the school system.  As part of this investigative team, I reported the results of our investigation to the Portland Public School Board in a public session based on our written report.  I have not testified at trial or in deposition in the past four years.

## II.    <u>Compensation</u>

My compensation rate is $350 per hour for all consulting, testimony, travel and any other work conducted in this matter.  My compensation is not contingent upon the outcome of my analysis, the substance of opinions I form, the testimony I may be asked to give, or the outcome of this case.

October 7, 2024
Page 3

### III.　　Methodology and Materials Reviewed

In formulating my opinions in this case I undertook a comprehensive review of the extensive file materials related to the investigation, prosecution, and appeal of the Leah Freeman case, as well as the materials related to the post-conviction proceedings and the materials related to the current civil matter. I also relied upon my education and thirty five years of experience as a prosecuting attorney in Multnomah County, which includes my knowledge of the Oregon State Constitution and statutory authority, the United States Constitution, and materials published by the Oregon State Legislature. The list of the materials I reviewed and relied upon is attached as **Exhibit A-1**.

### IV.　　General Timeline of Relevant Events Related to Opinions

The following is a timeline that contains some of the most relevant facts which contributed to my opinions.

| Date | Event |
|---|---|
| June 28, 2000 | Leah Freeman's disappearance; initially treated as runaway. |
| July 5, 2000 | Coquille Police Department eventually involves Major Crime Team after several days. |
| Summer 2000 | Initial grand jury proceedings begin; no indictment. |
| August 3, 2000 | Freeman's body is found outside of Coquille. |
| | Coquille Police Department and Major Crime Team continue to investigate. |
| April 2001 | Freeman homicide case goes cold, and no arrests are made. However, prior District Attorney Paul Burgett arranges to have additional DNA testing done on clothing in England. |
| 2008 | New Coquille Chief of Police Mark Dannels is hired. |
| 2008-2010 | Chief Dannels works with Coos County District Attorney Paul Frasier to renew investigation and reconsider all evidence. A new investigative team is formed and evidence is reexamined. Fresh interviews are conducted. |
| July 2009 | Chief Dannels and DA Frasier discuss consulting with the Vidocq Society. Coquille Police Department has contact with Vidocq Society to set up presentation at monthly luncheon regarding Freeman homicide. |

October 7, 2024
Page 4

| | |
|---|---|
| November 2009 | Fred Bornhofen, Vidocq Case Manager, has statement assessments done by three individuals of statements by Nicolas McGuffin and Brent Bartley. |
| January 21, 2010 | Freeman case is presented to the Vidocq Society at their luncheon in Philadelphia by DA Frasier, Chief Dannels, Coos County Sheriff Craig Zanni, and DOJ analyst Lisa McGowen in attendance. Vidocq member Richard Walter gives DA Frasier his first article regarding "power assertive" theory. Following luncheon they have dinner with Walter. |
| January 25, 2010 | Chief Dannels holds press conference announcing that Freeman case has been reopened. |
| Late spring/early summer 2010 | At request of ABC Show 20/20, Walter travels to Coquille to be interviewed regarding Freeman homicide. Walter meets briefly with Chief Dannels and other Coquille police officers and DA Frasier. Walter gives DA Frasier a second article to review.<br><br>DA Frasier learns of issues regarding Walter's credibility in prior case and concludes Walter is not credible. DA Frasier severs ties with Vidocq Society and Richard Walter. |
| July 2010 | DA Frasier convenes new grand jury; 119 witnesses are called during the proceedings. |
| August 23, 2010 | Grand jury issues indictment of McGuffin.  McGuffin is arrested by Coquille Police Department and is charged with murder. |
| October 15, 2010 | First ABC Show, 20/20 *"What happened to Leah Freeman"* airs regarding Freeman's homicide. |
| July 5, 2011 | Trial of Nicolas McGuffin for murder of Freeman begins.  Trial lasts 10 days. |
| July 19, 2011 | McGuffin is convicted of manslaughter in first degree by jury. |
| August 1, 2011 | McGuffin is sentenced to 10 years in prison.<br><br>After trial, but prior to sentencing Vidocq Society's  summary of Freeman case is prepared titled:  "207. The Murder of Leah Freeman, 2000" as part of its Synopsis of Vidocq Society Cases. |
| 2013-2014 | McGuffin's appeals to Oregon Court of Appeals and Oregon Supreme Court fail. |

October 7, 2024
Page 5

| January 20, 2015 | McGuffin files Original Petition for Post Conviction Relief in Malheur Circuit Court. |
| --- | --- |
| May 23, 2016 | McGuffin files 1st Amended Petition for Post Conviction Relief |
| December 22, 2016 | McGuffin files 2nd Amended Petition for Post Conviction Relief |
| May 25, 2018 | McGuffin files 3rd Amended Petition for Post Conviction Relief |
| May 31, 2016 – March 20, 2019 | DA Frasier sends series of 14 installment letters to DOJ (Paul Reim) responding to claims asserted Petition for Post Conviction Relief. |
| March 22, 2019 | McGuffin files 4th Amended Petition for Post Conviction Relief |
| June 21, 2019 | McGuffin Files 5th Amended Petition for Post Conviction Relief |
| August 12-14, 2019 | Post Conviction Relief Trial held in Tillamook County. |
| August 19, 2019 | General Judgment entered regarding 5th Amended Petition for Post-Conviction Relief.  Court denies claim of Actual Innocence but vacates conviction based on ineffective counsel as related to claim of unidentified DNA evidence and undisclosed witness. Remands to trial court for new trial |
| December 17, 2019 | DA Frasier Press Release;  Dismissal of Claims against McGuffin; McGuffin released from prison. |
| February 28, 2020 | Second ABC 20/20 Show, "*Last Seen Walking*", airs regarding release of McGuffin from prison. |
| July 20, 2020 | McGuffin files civil lawsuit against 24 defendants in Oregon Federal District Court, including Vidocq Society and Richard Walter, alleging that their conduct resulted in his wrongful conviction. |
| October 27, 2021 | McGuffin files First Amended Complaint in Federal District Court. |
| January 27, 2023 | McGuffin files Second Amended Complaint in Federal District Court. |

## V.     Summary of Opinions Offered in this Matter

**A.     Overview of accepted standard practices in Oregon for death investigations and homicide prosecutions.**

October 7, 2024
Page 6

Although there is no specific constitutional or statutory basis for it, in practice the district attorney in each of Oregon's 36 counties is often referred to as the chief law enforcement officer in the county.[1] This is because, with some limited exceptions, the district attorney has the final discretion on who can be charged with a crime within a given county.  They are state officers created by Article VII, section 17 of the Oregon Constitution. Specifically in death investigations under ORS 146.090 the district attorney and the district medical examiner are the responsible parties for those investigations. They are also responsible in conjunction with local courts for convening and conducting grand juries.  Grand juries have the power to investigate and charge crime within their counties upon the legal advice and counsel of the district attorney and have the power to subpoena witnesses and evidence.  Thus, while subject to constitutional and statutory restraints, the district attorney has wide ranging power, authority, and discretion as to investigative means, the charging of persons for crime, and the prosecution of crimes that are charged.

Nevertheless, district attorneys have a collaborative rather than supervisory role with police agencies within a county.  This is because as a practical matter police agencies have far more personnel and resources to investigate crime within their jurisdictions and because police agencies have independent power under Oregon law to arrest for crimes.  Because of this, there are widely different approaches that a given district attorney will have regarding the involvement of their offices in the investigation of crimes. Specifically in death investigations some Oregon district attorneys will rarely be involved until a police agency makes an arrest or otherwise brings them a case that the agency determines needs to be reviewed for a charging decision.

Based on my review of the materials in this matter, in 2009-2010 the Coos County District Attorney Paul Frasier ("DA Frasier" or "Frasier")  was  heavily involved and ultimately had the final say as to the nature and scope of the investigation of the death of Leah Freeman, the nature and scope of the grand jury that indicted Nicholas McGuffin, and the nature of the decision to indict and prosecute him.[2]

**B.      Accepted practice regarding use and reliance upon outside sources to conduct death investigations and homicide prosecutions.**

Based on my decades of experience in criminal homicide investigations, it is the widely accepted practice and expectation that law enforcement and the district attorney's office will collect information from a wide variety of sources and resources for the purposes of identifying the perpetrator or perpetrators of a homicide and obtain convictions if they are legally and constitutionally warranted.

**C.      Effect of the Vidocq Society's minor involvement in the investigation of  Leah Freeman's homicide and McGuffin's indictment, arrest, prosecution, conviction, and sentencing.**

Based on all of the materials I have reviewed, in my opinion the Vidocq Society ("Vidocq Society" or "Vidocq") is largely a social club of mostly retired law enforcement officers and forensic experts who purport to have expertise in various aspects of the criminal justice system and often do. My opinion is

---

[1] Dep. of Paul Frasier (current case) at 17:17-20; Article  *DAs and Their Deputies  Written Reference Materials*", 2021-23 Joint Ways and Means Committee, available at olis.oregonlegislatture.gov;

[2] By way of contrast, DA Frasier's approach was considerably different from his predecessor DA Paul Burgett who took a much more hands off approach with respect to the initial investigation of Leah Freeman's disappearance by Coquille law enforcement in 2000;

October 7, 2024
Page 7

that Vidocq's interaction with the investigation of Nicholas McGuffin was minor and, at most, had an insignificant impact on the investigation of Leah Freeman's murder. Furthermore, Vidocq's involvement had no effect whatsoever on the decision to indict, arrest, prosecute, and try McGuffin for Leah Freeman's murder. Additionally, it had no effect whatsoever on McGuffin's conviction and sentencing. I have the identical opinion regarding Richard Walter ("Walter") who was one of the founding members of the Society, with respect to his limited involvement with the investigation into Freeman's homicide.

**D. Absence of any evidence that supports Plaintiffs 'claims that the Vidocq Society or Walter fabricated or suppressed evidence.**

There is no evidence in any of the material I reviewed indicating that the Vidocq Society fabricated inculpatory evidence or suppressed exculpatory evidence in McGuffin's case. In addition, there is no evidence that Walter suppressed exculpatory evidence in McGuffin's case. To the extent Walter's theories that the perpetrator in the Freeman case had a "power assertive" personality is considered "fabrication" in that it was not based on real science and to the extent he repeated false information about the case to the media, neither his theories nor any false reporting had any appreciable impact on the investigation of Freeman's death and no impact whatsoever on the indictment, arrest, prosecution, conviction, and sentencing of McGuffin.

**VI. <u>Basis for Opinions</u>**

The opinions stated above are based on my education, training, and over three decades of experience as a prosecuting attorney, my knowledge in that role of the standard and accepted practices in the criminal justice system, applicable constitutional and statutory obligations of law enforcement and the district attorney's offices, and my review and assessment of the materials and information detailed below.

1. Based on my review of all of the grand jury testimony from 2000 and various police reports from that year, along with the depositions of law enforcement officials involved with this case, it is clear to me that McGuffin was the primary suspect in death of Leah Freeman from the very beginning in 2000 and that never changed. Thus, the fact that members of the Vidocq Society may have agreed with that assessment is immaterial to McGuffin's ultimate prosecution and conviction.

2. In the Fifth (and final) Amended Petition for Post Conviction Relief in the post-conviction case that overturned McGuffin's conviction and remanded his case for retrial in Coos County, there is no assertion of any action or conduct by the Vidocq Society or Walter that either contributed to the arrest, prosecution, or conviction of McGuffin. Indeed, neither the Vidocq Society nor Walter are even mentioned in the final post-conviction petition or in the Petitioner's Trial Memorandum, or the General Judgment of the post-conviction court.[3]

3. I have reviewed the 133 page Trial Memorandum filed by McGuffin's attorneys in the post-conviction relief case as indicated above. This Trial Memorandum is worthy of individual consideration because of its length and comprehensiveness and because when it was filed in 2019 McGuffin was still in prison, convicted of homicide, his appeals denied.

---

[3] Fifth Amended Petition for Post-Conviction Relief; Petitioner's Trial Memorandum; and General Judgment;

October 7, 2024
Page 8

4.      In my experience, attorneys for such a person will raise any claim no matter how attenuated in order to overturn the conviction of their client.  Certainly, the claim, if true, that the Vidocq Society and Walter did the various nefarious things alleged in the current lawsuit would be of vital assistance to the goals of McGuffin and his post-conviction attorneys (one of whom is representing him in the current lawsuit).  Yet, there is not a word in this lengthy and comprehensive document about the Vidocq Society or Walter.  This at a time when both from discovery in the criminal case and from the airing of a national television show in 2010 (the ABC 20/20 show), the involvement of the Vidocq Society and Walter in the case was well known.  Moreover, my review of pleadings and discovery in the current case gives no indication that any new evidence has been discovered since 2019 which shows that either the Vidocq Society or Walter's actions had any impact on the case at all.

5.      In the Second Amended Complaint filed in the current civil case the only actions Plaintiffs have asserted to have been taken by the Vidocq Society or Walter are either blatantly false assertions or the conduct alleged did not have any appreciable effect on the investigation of Leah Freeman's murder nor any effect whatsoever on the indictment, arrest, prosecution, conviction, and sentencing of McGuffin at all.  The following are examples of clearly false statements asserted in the Second Amended Complaint:

a.      Plaintiffs falsely asserted that McGuffin was "exonerated." [4]  In fact, Senior Judge Patricia Sullivan specifically refused to exonerate McGuffin in overturning his conviction and rejected his claim of "Actual Innocence."  Indeed, Judge Sullivan referred to a summary of evidence by Frasier from which she asserted "a jury could find the defendant guilty." [5]  District Attorney Paul Frasier similarly refused to exonerate him, stating he was dismissing the case for other reasons.[6]

b.      Plaintiffs falsely assert that the City of Coquille _hired_ the Vidocq Society and Walter.[7]  There is no evidence in any of the materials I reviewed that this is true.  In fact, the initial email exchanges between Fred Bornhofen, the Vidocq case manager, and Chief of Police Mark Dannels ("Chief Dannels") that began Vidocq's involvement in the Freeman case show that there was no employer-employee relationship between the City of Coquille and the Vidocq Society.[8]  Moreover, all the information about the Vidocq Society I reviewed indicates the Vidocq Society has never been hired by anyone.  In fact, Walter ultimately resigned from the Vidocq Society after a dispute when he wanted to be allowed to work for payment on a case that Vidocq had previously been involved with.[9]

c.      Additionally, Plaintiffs' assertion that the Vidocq Society is "an unlicensed private 'investigation' firm" is contradicted by both by the Mission Statement of the Vidocq

---

[4] Second Amended Complaint ("SAC") at ¶ 25;
[5] General Judgment, dated 11/19/19 at p. 4;
[6] District Attorney's Press Release dated 12/17/19;
[7] SAC at ¶106;
[8] Emails and attached written materials between Fred Bornhofen and Chief Dannels, dated July 07/2009 (CPD 004601-4603);
[9] Dep. of Cohan. Vol. II (current case) at 138-13;

October 7, 2024
Page 9

Society and the deposition of Barbara Cohan, Vidocq's designated representative in this case.[10]

6.      Based on my decades of experience in criminal homicide investigations it is the widely accepted practice and expectation that police and district attorney's offices will collect information from a wide variety of sources, including, but not limited to: forensic examinations of crime scenes, autopsies, fact witnesses, expert witnesses, search warrants, interviews of suspects, examination of business and other records, results of polygraphs and electronic surveillance. The purpose, of course, is to obtain information and develop ideas that might help to identify the perpetrator or perpetrators of a homicide and obtain convictions if they are legally and constitutionally warranted. The utilization and reliance upon and consideration of information and evidence from sources outside the investigative team does not usually operate to make any outside source what the investigators would consider an agent of the law enforcement agency or district attorney's office. I am unaware of any office which would view such interactions as giving rise to such legal relationships - except when expert witnesses are hired, confidential and reliable informants are used and directed, and in other isolated instances. Accordingly, the Coquille Police Department and DA Frasier's consideration of Vidocq and Walter's nominal input regarding the Freeman case, while a less frequently used type of outside source input, does not appear to me to have caused either office to have considered them their agents. This was also confirmed by both Chief Dannels and DA Frasier in their depositions in the current case.[11]

7.      The Vidocq Society's involvement was extremely minor with respect to the investigation of the Freeman case. Vidocq's limited involvement is set forth below:

a.      After its initial contact with Chief of Police Dannels in July of 2019, the Vidocq Society arranged for District Attorney Paul Frasier, Chief of Police Mark Dannels, Coos County Sheriff Craig Zanni, and DOJ analyst Lisa McGowen to travel to Philadelphia and present the Freeman case at one of the monthly luncheons hosted by the Society. The Vidocq Society paid for Frasier and Dannels and the City of Coquille paid for Zanni and McGowen to go because Frasier and Dannels thought it would be helpful to include them. The luncheon took place on January 21, 2010 and consisted of a power point presentation by DA Frasier summarizing the Freeman investigation which lasted about two hours. Prior to the presentation, the Coquille Police Department provided a written summary of the case to the Vidocq Society and it was distributed to some members.

b.      Also prior to the presentation, Vidocq arranged for three "statement assessments" (discussed below) to be done on two statements by McGuffin and one by witness Brent Bartley. Those statement assessments were given to Chief Dannels.

c.      Vidocq Society member Walter spoke to DA Frasier both before and after the presentation. He also had dinner with Frasier and others that night. He told Frasier of a "profile" he had arrived at of Freeman's murderer that fit McGuffin and gave Frasier a published article he had co-authored, entitled "*Profiling Killers: a Revised Classification*

---

[10] Mission Statement of Vidocq Society at www.Vidocq.org; Dep. of Cohan, Vol. I at 124 – 130;

[11] Dannels Dep. Vol. III (current case) at. 78-81; 89-90; Frasier Dep. (current case) at 240-242; 249;

October 7, 2024
Page 10

*Model for Understanding Sexual Murder*." He told Frasier the article backed up what he had said about the Freeman murderer and McGuffin. DA Frasier did not read the article until he returned to Coquille.[12]

        d.      After the day of the luncheon there is no evidence of any interaction between any member of the Vidocq Society and anyone connected with the investigation - other than Walter who later traveled to Coquille.

8.      The statement assessments (referred to above) of McGuffin and Bartley's witness statements were done at the request of the Vidocq Society member Fred Bornhofen and provided to Chief Dannels prior to the Coquille presentation at the Vidocq Society luncheon. A statement assessment purports to be a technique used to determine whether the person who made the statement is telling the truth or being deceptive based on linguistic indicators in the statement. Whether it is junk science or not may be debated, but Chief Dannels and DA Frasier testified that these statement assessments were never used at all.[13] Plaintiffs have also admitted this in responses to Requests for Admission.[14] I have found no information they were used in the 2010 grand jury.

9.      As indicated above, Walter gave DA Frasier a published article he had co-authored after the January 2010 Vidocq Society luncheon, *"Profiling Killers: a Revised Classification Model for Understanding Sexual Murder"* saying that it contained information about a type of criminal offender that he, Walter, labeled "power assertive." He said it was relevant to the Freeman case and fit McGuffin. He urged Frasier to read the article. However, after reading the article when he returned to Oregon, Frasier concluded that, in his view, it had to no relevance to the case and it certainly did not "fit" McGuffin. In fact, the article ties the "power assertive" term to serial killers with sexual motivations, which Frasier did not believe were relevant to the Freeman homicide.[15] Frasier testified he was "disappointed in the trip" and felt that the Vidocq Society had given him "nothing" that could assist in the investigation.[16]

10.    In the late spring or early summer of 2010, sometime before the Freeman case was presented to the grand jury, the ABC show 20/20 brought Walter to Coquille for several days to be part of an episode regarding Freeman's homicide. There is no specific evidence in any of the material I reviewed that anyone else at the Vidocq Society knew that Walter was going to Oregon or that Vidocq authorized him to go. In his deposition testimony Walter implied that someone at Vidocq did authorize this, but his testimony lacks specifics and credibility generally.

11.    While in Coquille, Walter initially met with Chief Dannels and some of the investigators. Based on his testimony and that of Chief Dannels, he was given some photographs to look at. However, he was never given access to the entire investigative file. At some point, he went with Chief Dannels to the location where Freeman's body was found and

---

[12] Third Installment Letter re PCR proceedings, dated 8/10/16 from DA Frasier to Paul Reim (DOJ);

[13] Dannels Dep. Vol. III (current case) at 101:23-102:4; Frasier Dep. (current case) at 242;

[14] Plaintiffs' Responses to Vidocq's First Set of Requests for Admission, dated 9/30/24 (referring to use at trial);

[15] Third Installment Letter in PCR proceedings, dated 8/10/16 from Paul Frasier to Paul Reim (DOJ);

[16] Frasier Dep. (current case) at 88-93, referencing Exhibit 6, *"Profiling Killers: A Revised Classification Model for Understanding Sexual Murder"* (DA's Bates Nos. 5562-5604);

October 7, 2024
Page 11

was filmed there talking to Chief Dannels by ABC.[17]  There is no evidence in any of the materials I reviewed that Walter said or did anything that affected their investigation.  Chief Dannels testified in his deposition to the same.[18]

12.     At the request of Chief Dannels, Walter met with DA Frasier during his visit to Coquille and urged Frasier to limit the upcoming 2010 grand jury to a narrow set of witnesses that focused on McGuffin.  Frasier rejected that request and ended up presenting 119 witnesses to the grand jury.  This is an unusually large number of witnesses for a grand jury to hear from in a given case. DA Frasier was also clear in his deposition that he did not recommend that the grand jury indict McGuffin. Instead, he told the grand jury it should decide without any opinion from him whether anyone should be indicted and, if so, who.[19]

13.     In that same conversation between Walter and Frasier, Frasier told Walter that the article he had previously given him was not relevant to the Freeman case because in his opinion Freeman's homicide did not involve a sexual assault or a serial killer.  Walter then gave Frasier another article that he had authored alone, but which had not been published and said it was relevant.  DA Frasier testified that he never read the article.[20]

14.     That same night, DA Frasier, Chief Dannels, Sheriff Craig Zanni, Walter, and others went out to dinner.  During the dinner Walter made a number of assertions about the Jack the Ripper case.  DA Frasier and Sheriff Zanni drove home from the dinner together.  Zanni told Frasier he was a Ripper case buff and the things Walter had said about the case were largely false.  Frasier asked Zanni to vet Walter as soon as possible.[21]

15.     Sheriff Zanni then conducted an internet search of Walter and discovered that he had been accused of misconduct, including perjury regarding his credentials in a prior homicide case where the defendant's conviction was set aside because of his testimony as an expert witness. Frasier was informed the following day. From reading about the prior case, Frasier concluded Walter had created the "profile" to fit the already charged defendant.  From this he concluded Walter was doing the same kind of thing with his "profile" in the Freeman case and McGuffin.[22]

16.     Based on my review of all relevant information, all indications are that DA Frasier put a firewall between the Freeman investigation and Walter and the Vidocq Society the day he reached this conclusion and prior to the convening of the 2010 grand jury.  That status never changed.  In fact, in his deposition during the PCR proceedings Frasier referred to Walter as an "idiot." [23]

17.     No member of the Vidocq Society (including Walter) testified before the 2010 grand jury or at the 2011 criminal trial of McGuffin.  Based on my review of the proceedings and the

---

[17] Dannels Dep. Vol. III (current case) at 79-85; See Video of 10/15/ 10 ABC 20/20 Broadcast;
[18] Dannels Dep. Vol. III (current case)at 79-85;
[19] Frasier Dep. (current case) at 65-66.;
[20] Frasier Dep. (current case) at 92-93; referencing Exhibit 6, "*Non-Sexual Murder and Violent Crimes.*"  (DA Bates Nos 5605-5614);
[21] Frasier Dep. (current case) at 157-161;
[22] Third Installment Letter in PCR proceedings, dated 8/10/16 from Paul  Frasier to Paul Reim (DOJ);
[23] Frasier Dep. (current case) at 114-116; Frasier Dep. (PCR case) at 161;

October 7, 2024
Page 12

word searches that have been conducted of all proceedings at my direction, neither Vidocq nor Walter nor any of Walter's theories or articles were presented at either proceeding.[24]

There is no evidence that the minor involvement of Vidocq Society or Walter had any appreciable effect on the investigation of Freeman's death. Dannels testified that all he could remember was Vidocq suggesting they "keep an eye on" McGuffin after they reopened the case to see if that turned up anything but in the end, it did not.[25] Further, there is no evidence that Vidocq or Walter's conduct – from the time of the luncheon presentation and including Walter's subsequent contact with the investigation in Coquille - had any impact on the arrest, indictment, arrest, prosecution, conviction, and sentencing of McGuffin at all. Frasier's statement in his deposition in the current lawsuit "You know, I don't recall the Vidocq Society giving me any advice. And, frankly, I was disappointed in the trip" and "... they didn't give us any suggestions whatsoever that I recall" is telling.26 The lack of impact is further reinforced by the fact that Frasier severed all ties with Vidocq and Walter while Walter was in Coquille after learning about his credibility issues as referenced above.

18.    Plaintiffs' very muddled allegations in the Second Amended Complaint that the statements Walter made on the 2010 ABC 20/20 episode had some bearing on the jury's ultimate decision to convict McGuffin are refuted by the evidence in this case.[27] First, the show was broadcast on October 15, 2010 after McGuffin had been indicted – but prior to trial – and therefore the show could not have had any bearing on his indictment. Second, long before the broadcast aired, DA Frasier had severed the minor ties that Walter and Vidocq had with the Freeman investigation. Third, McGuffin's defense attorney hired a consultant regarding the issue of pre-trial publicity and it appears a poll may have been conducted in the county. In any event, she withdrew her motion for a change of venue after conferring with the consultant on the issue, suggesting the 20/20 show was immaterial.[28] Fourth, voir dire of the jury pool appears to have indicated there was no effect based on the 20/20 show. I say "appears" because I did not have a transcript of voir dire, but it is extremely unlikely that the possible effect of pre-trial publicity on the jurors would not have been explored in voir dire. Frasier seemed to indicate in his letter to the Department of Justice with respect to the post-conviction action that it had been.[29] If the jury pool was found to be tainted by pre-trial publicity it is hard to believe the motion for change of venue would not have been renewed. There is no evidence that that happened. Finally, McGuffin's 5th Amended Petition for Post-Conviction Relief did not allege that the 20/20 broadcast had any bearing or adverse effect on the verdict or that his defense attorney should have sought a change of venue.[30]

---

[24] I caused and directed a word search to be conducted of all the grand jury testimony and trial testimony for anything connected to the Vidocq Society and Richard Walter and his theories. I also caused and directed a word search to be conducted of major portions of the post-conviction relief proceedings. I reviewed the results of those word searches. Attached as **Exhibit A-2** are summaries of the three word searches, including the terms searched and corresponding results. This report will be supplemented to include my independent word searches of these proceedings and confirmation of the prior search results. [25] Dannels Dep. Vol. II (current case) at 326-327;

[26] Frasier Dep. (current case) at 88:23-89:5;

[27] SAC at ¶¶ 140-150; 202;

[28] Dep. of Shaun McCrea (current case) at 213-214;

[29] Third Installment Letter, dated 8/10/16 from Paul Frasier to Paul Reim (DOJ), pp. 7-8;

[30] Compare 3rd Amended Petition with 5th Amended Petition;

October 7, 2024
Page 13

19.     Plaintiffs' claim in the Second Amended Complaint that Vidocq and Walter suppressed evidence that was exculpatory to McGuffin is without any support in the record.[31]   Based on my review of the documents and testimony in this case, it is clear that all documents referencing Vidocq's limited involvement in the Freeman investigation were turned over by DA Frasier to McGuffin's defense counsel prior to trial.[32]

The only material Plaintiffs now allege that the Vidocq Society "suppressed" in violation of the *Brady* rule is that portion of the Vidocq Case Synopsis regarding the Leah Freeman case, which is designated as "207. The Murder of Leah Freeman, 2000".  Deposition testimony of Vidocq members indicate the summary was prepared by now deceased Vidocq member, Fred Bornhofen, who kept a list of cases presented at Vidocq Society luncheons.  The information in the summary appears to have come, at least in part, from Walter.  Assuming that the *Brady* obligation even applies to Vidocq, a dubious assertion, the content of the Freeman case summary clearly indicates that it was created after McGuffin was convicted, but before he was sentenced so it could not have been disclosed before the criminal trial.  Most importantly, the case summary is not exculpatory, impeaching, or mitigating, but instead suggests that McGuffin was the perpetrator, refuting any obligation to disclose.  While this suggestion was based on information that was in part untrue or misleading, that does not make it exculpatory, impeaching, or mitigating.  Plaintiffs give no suggestion of how the summary could have been used in McGuffin's favor.

20.     Plaintiffs also allege in Second Amended Complaint that Vidocq and Walter fabricated evidence presented at trial.[33]   In my review of the materials, Plaintiffs have not specifically identified any trial exhibit that was fabricated or falsified by or at the direction of the Vidocq Society or Walter.  Plaintiffs have not identified any witness who gave false testimony at the direction of Vidocq or Walter.

The only possible material that Plaintiffs seem to point to that was allegedly fabricated or false is Walter's "profile" of the perpetrator as having a "power assertive" personality. Even if this "profile" could be characterized as "fabricated" or "false" because it is not based on accepted science, it is immaterial because the "profile" never became evidence. Walter's "power assertive" theory was never presented at grand jury or trial and never relied upon by Frasier or the other investigators after Frasier learned of Walter's misconduct in the prior case.  This is based upon my reading of substantial portions of the 2010 grand jury testimony, part of the omnibus hearing testimony, the criminal trial opening and closing statements, substantial portions of the criminal trial testimony, and the declarations, trial memorandums, and depositions in the post-conviction case that plaintiffs have produced as part of their initial FRCP 26 disclosure.   In nothing I read was there anything related to Walter, the Vidocq Society, or "power assertive" theory - except for Frasier's solitary reference to Walter as an "idiot," in his deposition during the post-conviction proceedings, already mentioned above.[34]

---

[31] SAC at ¶¶196- 207; 230-236; 237-250;
[32] Dep. of Frasier (current case) at 89-91, referencing Exhibit 5;
[33] SAC at ¶¶196-207; 230-236; 237-250
[34] This reference was repeated in his deposition in the current case.

October 7, 2024
Page 14

In addition, I directed that a word search to be done of all the testimony from those events (except for the post-conviction trial which is available only in audio form). The word searches revealed no indication in the materials I did not personally review of any influence of Walter, the Vidocq Society, or the "power assertive" theory in any of these proceedings.

21.     Finally, I have reviewed the deposition of Nicholas McGuffin in the current lawsuit, his statements with the first 2020 show that was aired in 2010, his interview with ABC in the second 20/20 show that aired in 2020 after his criminal conviction was vacated, and his declaration in the post-conviction relief case.  Nowhere in any of these public statements does McGuffin assert any connection between the Vidocq Society and Walter and his indictment, arrest, prosecution, and conviction.  This is a person who now asserts he was wrongfully prosecuted and convicted for the homicide of his 15 year old girlfriend and that evidence against him was fabricated and evidence in his favor was suppressed and that these actions had a horrible and prolonged effect on his life.  The fact that such a person does not assert any specific action by Vidocq or Walter or indicate any grievance against them on multiple occasions when discussing the case in different ways and forums is a further  indication to me that evidence of such conduct by Vidocq and Walter does not exist.

As with the dog that doesn't bark in the Holmes story, the absence here, as with the many absences noted above, is crucial evidence.[35]

## VII.     Closing

Considering the vast amount of material regarding this case that I have reviewed it is my opinion that there is no basis for the allegations against the Vidocq Society and Richard Walter in the current lawsuit.  As to the Vidocq Society, it appears to be a well-meaning group composed of mostly former and some current law enforcement professionals and forensic experts from various fields.  It may be that it has provided some real assistance to law enforcement in some cases.  However, that did not occur in this case - and it is clear that the idea that the Vidocq Society played some role in solving the Freeman murder was basically concocted in the 2010 ABC 20/20 show.  Indeed, Chief Dannels testified that the show's suggestion that the Vidocq Society solved the crime was false.[36]  The materials reviewed conclusively establish that the Vidocq Society did not affect the investigation of Leah Freeman's death in any appreciable manner nor did its involvement have any bearing whatsoever on the indictment,

---

[35] In the short story, "The Silver Blaze," written by Arthur Conan Doyle, Sherlock Homes is called in to assist when Scotland Yard fails to solve a murder.  There is a watchdog on the premises of the initial crime scene.  After examining the scene and the known evidence, Holmes summarizes his conclusions and finally the following exchange with the Scotland Yard detective occurs:

Detective: "Is there any other point to which you would wish to draw my attention"
Holmes: "To the curious incident of the dog in the night-time."
Detective: "The dog did nothing in the night-time."
Holmes: "That was the curious incident."

Holmes concluded from the fact that the dog did not bark that the perpetrator was known to the dog and friendly with it. Thus, from the fact that something did not occur the field of suspects was substantially narrowed.
[36] Dannels Dep. Vol. II (current case) at 333-335; Vol III. (current case) at 44-45.

October 7, 2024
Page 15

arrest, prosecution and conviction of Nicholas McGuffin. Moreover, there is no evidence whatsoever that the Vidocq Society fabricated evidence against McGuffin or suppressed evidence that favored him. My conclusions as to Richard Walter are the same except to the extent that some of his fanciful assertions and theories about crime assessment might be considered fabrications by some. In any event, they had no appreciable impact on the case.

I declare under penalty of perjury under the laws of the United States that the foregoing findings, conclusions and opinions are made on a more probable than not basis. I respectfully reserve the right to supplement or otherwise modify my opinions based on the receipt and examination of additional information.

_____

Norm Frink

Dated: ___10/07/2024_____

**EXHIBIT – A-1**

**Exhibit A-1**
**Documents Reviewed by Norman Frink**

I.        2000 Grand Jury Transcripts
   a)        Bartley, Brent
   b)        Emler, Josh
   c)        Hamilton, Scott
   d)        Intason, Ashley
   e)        Jenkins, David
   f)        Kern, Mark
   g)        Kindred
   h)        Kristofferson, Christy
   i)        Lweis, Raymond
   j)        McAdams, Michael
   k)        Mitchell, Cherie
   l)        Mitchell, Margaret
   m)        Nelson, Sharon
   n)        Price, Nicole
   o)        Rice, Jason
   p)        _____, Kristen
   q)        West, Aaron
II.       2010 Grand Jury Transcripts
   a)        Bertrand, Denis
   b)        Bryant, Corey
   c)        Courtright, Cory
   d)        Hutchinson, Ashley
   e)        Lee, Danny
   f)        Mitchell, Cheri
   g)        Mitchell, Margaret
   h)        Zavala, David
   i)        Baker, Darla
   j)        Bounds, Thomas
   k)        Crook, Heidi
   l)        Ernler, Josh
   m)        Fuller, Mary
   n)        Hall, David
   o)        Hall, Robert
   p)        Hyatt, Alicia
   q)        Jenkins, David
   r)        Jones, Arthur
   s)        Karcher, Kris
   t)        Kim, Mark
   u)        Lewis, Raymond
   v)        McAdams, Michael

| w) | Oswald, Kip |
|---|---|
| x) | Reid, Heather |
| y) | West, Aaron |
| z) | Zanni, Craig |
| aa) | Smith, Patrick |
| bb) | Bartley, Brent |
| cc) | Baumer, Michael |
| dd) | Bolger, Sherre |
| ee) | Cannon, Quinn |
| ff) | Crook, Ricky |
| gg) | Freeman, Denise |
| hh) | Graham, Dustin |
| ii) | Greave, Trinity |
| jj) | Kindred, Lyndee |
| kk) | Lanmark, Amanda |
| ll) | Lapine, Daniel |
| mm) | Mason, Damon |
| nn) | Messerle, Tony |
| oo) | Michaud, Alissa |
| pp) | Price, Nicole |
| qq) | Stemmerman, Thomas |
| rr) | Storts, Jennifer |
| ss) | Webber, Nikki |
| tt) | Wetmore, Anthony |
| uu) | Crystal, Wright |
| vv) | Amelung, Ashley |
| ww) | Cagley, Christy |
| xx) | Cornwell, Kimberly |
| yy) | Elderkin, Zachary |
| zz) | Haga, Angela |
| aaa) | Lehman-Post, Tina |
| bbb) | Mayfield, Brandon |
| ccc) | McGuffin, Wayne |
| ddd) | McMullen, Heather |
| eee) | McNeely, Ray |
| fff) | Michaud, Bradley |
| ggg) | Noah, Sarah |
| hhh) | Ousley, Andrew |
| iii) | Sero, William |
| jjj) | Steinhoff, Kristen |
| kkk) | Thurman, Jaimie |
| lll) | Olson, James |
| mmm) | Beebe, Melissa |
| nnn) | Brugnoli, Melissa |

| | |
|---|---|
| ooo) | Bryant, Richard |
| ppp) | Coleman, Lisa |
| qqq) | Courtright, Kim |
| rrr) | Decker, Nicole |
| sss) | Edgerton, Megan |
| ttt) | Knight, Huey |
| uuu) | Lindegreen, Hjordis |
| vvv) | Lindegreen, John |
| www) | McGuffin, Bruce |
| xxx) | McGuffin, Kathleen |
| yyy) | Meade, Darius |
| zzz) | Midleton, Bill |
| aaaa) | Napier, Stacy |
| bbbb) | Peet, Kimberly |
| cccc) | Shinar, Adam |
| dddd) | Simon, Scott |
| eeee) | Webley, Christopher |
| ffff) | Wilson, Zachary |
| gggg) | Breakfield, David |
| hhhh) | Cooper, Troy |
| iiii) | Courtright, Cory |
| jjjj) | Davidson, Erika |
| kkkk) | Davidson, Megan |
| llll) | Dennis, Donna |
| mmmm) | Ekbald, Tosha |
| nnnn) | Fisher, Austin |
| oooo) | Grisham, Georgia |
| pppp) | Hamilton, Dennis |
| qqqq) | Heffner, Amber |
| rrrr) | Hyatt, Alicia |
| ssss) | Jones, Cynthia |
| tttt) | Knight, Magdalena |
| uuuu) | Lyons, Stacy |
| vvvv) | Mauro, Brett |
| wwww) | McCowen, Lisa |
| xxxx) | Mercer, Thomas |
| yyyy) | Nelson, Sharon |
| zzzz) | Nortness, Mark |
| aaaaa) | Parks, Pamela |
| bbbbb) | Parks, Pauline |
| ccccc) | Pizzola, Heather |
| ddddd) | Reab, Janet |
| eeeee) | Reab, Juliana |
| fffff) | Shields, Mark |

     ggggg)    Smisk, Jesse
     hhhhh)    Smith, Melissa
     iiiii)    Stevens, Kyla
     jjjjj)    Mark Dannels

**III.**    Timelines
    a)    CPD007258 Assoc Pic Timeline
    b)    CPD007270 Handwritten Timeline
    c)    CPD007276 Nick & Brent Handwritten Timeline
    d)    CPD007279 Leah Freeman Homicide Vehicle Sightings/Timeline

**IV.**    06.03.2000 Nick McGuffin Statement Audio
**V.**    06.30.2000 Nick McGuffin Statement PDF
**VI.**    2010 Grand Jury Witness Listing
**VII.**    2010.08.23 Oregon v McGuffin Indictment
**VIII.**    2011.04.14 Trial Testimony Omnibus Hearing Zanni
**IX.**    2011.7.07 Criminal Trial List of Exhibits
**X.**    2011.07.07 Criminal Trial Opening Statements
**XI.**    2011.07.11 Trial Testimony Zanni
**XII.**    2011.07.18 Criminal Trial Closing Statements
**XIII.**    2011.07.18 Trial Testimony Zanni
**XIV.**    Dannels' Criminal Trial Testimony
**XV.**    Full Criminal Trial Transcript
**XVI.**    Index for Full Criminal Trial Transcript
**XVII.**    Zanni Criminal Trial Testimony – All Dates
**XVIII.**    Post Conviction Relief Declarations
    a)    Szarkowski, Amanda
    b)    Baker MD, Andrew
    c)    McGuffin, Bruce
    d)    Kinsey, Charity
    e)    Nasir, Huma
    f)    Hornak, Jennifer
    g)    McGuffin, Kathy
    h)    McNeely, Kenn
    i)    Christofferson, Kristy
    j)    Barksdale, Larry
    k)    Traglio, Maegan
    l)    Boden, Marie
    m)    Hathaway, Mona
    n)    McGuffin, Nicholas
    o)    Price, Nicole
    p)    Mintonye, Sara
    q)    Kinsey, Shelley
    r)    Defreitas, Virginia
    s)    McGuffin, Wayne

**XIX.**    Post Conviction Relief Depositions

a)       Frasier, Paul
b)       Barksdale, Larry
c)       Nasir, Huma
d)       Kaplan, Marla
e)       Moore, Janelle
f)       Sermeno, Winter
g)       McCrea, Shaun

**XX.**       Post Conviction Relief Exhibit Lists
    a)       2016.05.19 Exhibit List 1st Amd Pet for PCR
    b)       2019.07.15 Def Exhibit List PCR
    c)       2019.07.29 Petitioner's Exhibit List PCR

**XXI.**       Frasier Letters to Paul E. Reim 1-14
**XXII.**       2018.05.23 3rd Amended PCR Petition
**XXIII.**       2019.02.26 State Def MPSJ re Post Conviction
**XXIV.**       2019.03.21 Plaintiff Response to MPSJ
**XXV.**       2019.03.22 4th Amended PCR Petition
**XXVI.**       2019.04.01 Def Reply to Petitioner's Opposition to PSJM
**XXVII.**       2019.06.21 5th Amdended PCR Petition
**XXVIII.**       2019.06.28 Pet Trial Memorandum
**XXIX.**       2019.07.03 MPSJ Order
**XXX.**       2019.07.15 Defendants trial memorandum
**XXXI.**       2019.11.19 General Judgment (Post Conviction)
**XXXII.**       2019.12.17 Coos County DA Fraser PCR Press Release and MTD
**XXXIII.**       McGuffin v Dannels et al Depositions
    a)       2023.01.12 Nicholas McGuffin Deposition
    b)       2023.01.12 Nicholas McGuffin Deposition Exhibits 401-407, 527, 534, 545, 701-702
    c)       2013.01.13 Nicholas McGuffin Deposition
    d)       2023.08.29 Robert Paul Frasier Deposition
    e)       2023.08.29 Robert Paul Frasier Deposition Exhibits 1-31
    f)       2024.02.14 Barbara Cohan-Saavedra deposition
    g)       2024.02.14 Barbara Cohan-Saavedra deposition exhibits 1-13
    h)       2024.06.27 William Fleischer Deposition
    i)       2024.06.27 William Fleischer Deposition Exhibits 1-13
    j)       Fleisher Bates Nos 000001-000203
    k)       2024.06.27 Barbara Cohan Deposition
    l)       2024.06.27 Barbara Cohan Deposition Exhibits 6-19
    m)       2022.04.14 Vol 1 – Mark Dannels Deposition
    n)       2022.07.14 Vol II – Mark Dannels Deposition
    o)       2023.09.01 Vol III – Mark Dannels Deposition
    p)       2022.07.14 Mark Dannels Exh 15  CPD004582-4607
    q)       2023.12.04 Shaun McCrea Deposition
    r)       2023.12.04 Shaun McCrea Deposition Exhibits
        i)       2023.12.04 McCrea Dep Exhibits 1-15
        ii)       Exhibit 16_CD04-Kristen Steinhoff Interview June 17 2010

s)	2024.06.25 Shaun McCrea Deposition
t)	2024.06.25 Shaun McCrea Dep Exhibits
u)	2022.06.30 Richard Walter Deposition
v)	2022.06.30 Richard Walter Deposition Referenced Documents
  i)	2010.08.11 Cold Case Squad ABC News-Doc
  ii)	27134578-1-Doc 138-1 Exhibit 1 Decl of J
  iii)	27134588-1-Doc 138-7 Exhibit 7 Decl of J
  iv)	Mark McClish Statement Analysis
  v)	Murder on the Menu Doc 138-5 Exhibit 5 Decl of JP
  vi)	Synopsis of Vidocq Society Cases
w)	2022.04.25 Michael Reaves Deposition

**XXXIV.**	Documents produced related to Vidocq Society
  a)	CPD Bates No. 004599-004607 Excerpts from City Discovery
  b)	CPD Bates No. 011696-011717 Excerpts from City Discovery
  c)	CPD Letter to VS re Case Summary VIDOCQ 001753-1758
  d)	Vidocq Society Production VIDOCQ 000001-001752

**XXXV.**	2020.12.07 Dkt 55 Def Vidocq-Walter's 12(b)(6) MTD
**XXXVI.**	2021.07.27 F&R re Def 1st FRCP 12(b)(6) MTD Dkt 83
**XXXVII.**	 2021.09.28 Dkt 99 Order Adopting Judge Kasubhai's F-R
**XXXVIII.**	2021.12.01 Dkt 106 Defs Vidocq-Walter's MTD 1st Amd Cmplt
**XXXIX.**	2022.09.16 Dkt 128 Findings-Recommendations
**XL.**	2022.12.28 Order upholding 7-27-21 F&R re MTD Dkt 139
**XLI.**	2023.01.27 Second Amended Complaint
**XLII.**	2023.03.13 Municipal, County Def Ans to 2nd Amd Comp
**XLIII.**	2023.03.13 State Def Ans to 2nd Amd Cmplt
**XLIV.**	2023.03.20 Dkt 154 Def VIDOCQ Ans to 2nd Amd Cmpt
**XLV.**	2023.04.10 Def Walter's Ans & Aff Def to Def Vidocq Cross-Claim
**XLVI.**	2023.04.21 Def Walter's Ans to 2nd Amd Cmplt
**XLVII.**	ABC 20/20 episodes 2010, 2020.
**XLVIII.**	Plaintiff's List of Brady Material, dated 1/23/24
**XLIX.**	Plaintiffs Responses to Defendant Vidocq's First Set of Requests for Admission, dated 9/30/24
**L.**	DAs and Their Deputies Written Reference Material 2021-23 Joint Ways and Means Committee

**EXHIBIT – A-2**

**Exhibit A-2**
**Word Searches Conducted**

## 2010 Grand Jury Testimony

| Word | Findings | Description |
|---|---|---|
| Walter | Melissa Smith 8/11/2010 | n/a as it refers to her friend Cristina Walter |
| Vidocq | n/a | |
| Society | Mark Dannels 8/11/10 | n/a as it refers to the location of Society Canyon |
| Philadelphia | n/a | |
| Article | Cory Courtright 7/14/10 | n/a as it refers to articles in the paper |
| Power Assertive | n/a | |
| PA | n/a | |
| Statement Analysis | n/a | |
| McClish | n/a | |
| Kelly | n/a | |
| pregnant | Cheri Mitchell 7/14/10 p. 63<br><br><br>Cory Courtright 8/11/10 p. 7 | Question: "When you ran into him that two or three years later, did he ask you if Leah was pregnant?" Mitchell Answer: "Yes, which he also asked me again when I ran into him like to years ago." Question: "And, to your knowledge, was Leah pregnant?" Answer: "Not to my knowledge."<br>Question: "It was suspected that Leah was pregnant. Did -- do you know anything about that?" Answer: "I don't. I don't know. All I know is that I had become aware that they were --had become sexually active, which led me to make the appointment for, um, the health department--" ... "to get her on birth control pills." |
| birth control | Cory Courtright 8/11/10 p. 7 | duplicate to above  "to get her on birth control pills" |
| pills | Cory Courtright 8/11/10 p. 7 | duplicate to above  "to get her on birth control pills" |
| suicide | Brent Bartley 7/23/10 p. 117<br><br>James Olson 8/3/10<br><br>Bruce McGuffin 8/4/10 pp. 94-95<br><br>Kathleen McGuffin 8/4/10 pp. 36-37 | n/a Nick checked in on Bartley because Bartley had tried committing suicide.<br>n/a medical examiner description of job<br>n/a states that there was a person who could prove that Nick was not the murderer. That person was murdered but they wrote it off as a suicide.<br>Kathleen asks the examiner about Ben Stoddard who was murdered. Examiner states he was personally involved in that and it was a suicide. |
| impregnated | n/a | |

Exhibit A-2

# 2011 Criminal Trial Transcript

| Word | Findings | Description |
|---|---|---|
| Walter | n/a | |
| Vidocq | n/a | |
| society | p. 1332, 1456 | n/a references American Society of Clinical Pathology, American Society of Crime Lab Directors |
| Philadelphia | n/a | |
| article | pp. 1729, 261, 440, 1078, 1298, 1303, 1305, 1306, 1789 | n/a: references articles of constitution, jury instructions re research, articles of clothing, articles from Chorley Lab re: clothing analysis (p. 1303) |
| power assertive | n/a | |
| assertive | n/a | |
| PA | could not check | |
| Statement Analysis | n/a | Larry Barksdale deposition p. 44 line 9. Barksdale states he also performs statement analyses. |
| McClish | n/a | |
| Kelly | n/a | |
| pregnant | p. 91 pdf, Transcript p. 37 | Mark Ranger testimony. McGuffin told Ranger that he and Leah had been together about ten months. Question posed by examiner regarding whether he said anything about her possibly being pregnant. Response: "He told me that he did not, uh - as far as he knew, that she was not pregnant." |

Exhibit A-2

| birth control | p. 178 pdf. Transcript p. 127, lines 1-20. | Sherry Ann Mitchel testimony. Nick dropped Leah off at her house. She thinks Nick had wanted to come in with her. Leah and Nick had been "scuffling", having "a little bicker about it", but then he left, and Leah came in. States she doesn't remember for certain but thinks Leah had an appointment to go to the Health Department to get birth control the following day and that she (Mitchell) was going to go with her. |
| | p. 181 pdf, Transcript p. 127 | Sherry Ann Mitchell testimony (see above in "birth control" for context). Examiner: "There was an appointment to go to the Health Department to get birth control?", Answer: "Yes". |
| | p. 355 pdf. Transcript D3 47-48. | Courtwright (Mom) testimony. States she had a discussion with Nick and Leah about them having sex. Courtwright told them that if they were going to continue to do it that "she was going to have to get on some form of birth control pills." "I also told them that I was going to make an appointment for Leah to get on birth control" through the Coos County Public Health Department. |
| | p. 129 pdf, Transcript p. 75 | Dean Perske (OSP) testimony. States he had specifically asked McGuffin if he and Leah had sexual relations recently prior to her disappearance. Nick indicated that they had one or two days before. Nick said they did not use birth control on a regular basis. (lines 11-12) |
| pills | p. 355 pdf. Transcript D3 47-48. | (Duplicate to above): Courtwright (Mom) testimony. States she had a discussion with Nick and Leah about them having sex. Courtwright told them that if they were going to continue to do it that "she was going to have to get on some form of birth control pills." "I also told them that I was going to make an appointment for Leah to get on birth control." That was through the Coos County Public Health Department. |
| suicide | pdf p. 126, Transcript 72 | Dean Perske (OSP) testimony. Examiner. "Was suicide brought up?". Answered yes. He (Nick) "felt that if - that it - one of the other possibilities may be suicide if she had heard that he was maybe seeing another woman. And he denied that he was." |
| | pdf p. 1031, Transcript D5 238 | Perske testimony. "if she found out or thought that he was seeing another girl, that he - that she may have committed suicide" |

Exhibit A-2

|  | pdf p. 1338, Transcript D7 12. | Unrelated, regarding witness Pex's professional experience. |
|  | pdf p. 1394, Transcript D7 67. | Unrelated, regarding witness Olson's professional experience. |
|  | pdf. p. 1666, transcript p. D9 67. | Closing argument, Frasier. "If it's an accident, why is her body placed where it is? If she committed suicide, why is somebody hiding the body(?)" |
| impregnated | n/a | |

Exhibit A-2

## Post Conviction Relief Declarations, Depositions, Trial Memoranda

| Word | Findings | Description |
|---|---|---|
| Walter | n/a | |
| Vidocq | p. 161 of Paul Frasier Deposition 5/31/19 Line 12 | (Lines 4-19) The other thing I did was the grand jury -- Chief Dannels only wanted me to present stuff that showed Nick's guilt. He wanted me to go in and do a grand jury basically in one day or one afternoon and get an indictment on Nick. I told him no. That was not a popular decision with him. In fact, he had people come talk to me, and one of them was an idiot from the Vidocq Society trying to get me to change my mind. And I refused to do that. I said we have to run down in grand jury every last one of these rumors and potential suspects. And so that's why there's 110, 120 people that were interviewed or questioned in front of the grand jury. I felt we needed to do a complete and total investigation. |
| Society | p. 161 of Paul Frasier Deposition 5/31/19 Line 12 | *see above* |
| | p. 19 of Stephenie Winter Sermeno Deposition 6/24/19 | *n/a* references the American Society of Crime Laboratory Directors |
| Philadelphia | n/a | |
| Article | unrelated references | n/a 1) Declaration of Andrew Baker Ex 2, P. 1. References articles by Matshes and Lew re development of criteria for certification of homicide. 2) Larry Barksdale deposition includes 14 references to articles but none are related, they generally reference articles he co-authored, blood stain articles he has found helpful, etc. 3) Marla Kaplan deposition includes 11 references scientific articles regarding recovery of DNA from shoes 4) Janelle Moore deposition includes 15 references to articles she reviewed in preparation for her deposition including Recovery of DNA from Shoes and Recovery of Trace DNA and Its Application to DNA Profiling of Shoe Insoles |
| power assertive | n/a | no inclusions of "assertive"; search for "power" alone only included PowerPoint references. |
| assertive | n/a | |
| Statement Analysis | unrelated references | one reference in Barksdale's deposition stating that he performs statement analysis |
| McClish | n/a | |
| Kelly | n/a | |
| pregnant | n/a | |
| birth control | n/a | |
| pills | n/a | |

Exhibit A-2

| | unrelated references | reference in Larry Barksdale Declaration exhibit 1, p. 6 regarding bloodstain pattern in suicide by gunshot; references on page 106 and 144 of Frasier's deposition to bloodstains related to an unrelated suicide/suicides; |
|---|---|---|
| suicide | Paul Frasier deposition p. 197 | That's why we got her (Leah's) medical records and that's why we spent a lot of time looking at things like is there road rash on her clothes, is there any evidence that suggests that she was --that she died of natural causes, a suicide or accidental death. We couldn't find any evidence that would indicate that that was in fact the case. |
| impregnated | n/a | |

Exhibit A-2