IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

STATE OF OREGON,                    )
                                    )
                Plaintiff,          )    CASE NO. 10CR0782
                                    )
                                    )    PLEA HEARING
        vs.                         )
                                    )
 NICHOLAS JAMES McGUFFIN,           )
                                    )
                Defendant.          )
_____)

TRANSCRIPT OF PROCEEDINGS

Volume 1, Pages 2-7

BE IT REMEMBERED That, the above-entitled cause

came on regularly for hearing beginning at 1:03 p.m., Tuesday,

August 24, 2010 in the Circuit Courtroom of the Coos County

Courthouse in the City of Coquille, County of Coos, State of

Oregon, before the Honorable Michael J. Gillespie.

APPEARANCES

R. Paul Frasier, District Attorney for Coos County,
representing the Plaintiff.


Shaun McCrea, Attorney at Law, representing the Defendant.


Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

index   i

## INDEX OF PROCEEDINGS

### Volume 1, Pages 2-182

**(Please refer to index li for explanation of Page Numbering.)**

PLEA HEARING, August 24, 2010                                    2

Motions Due September 24, 2010                                   4

Status Hearing Set for October 11, 2010                          5



PRETRIAL HEARING, October 14, 2010                               8

Motions Due December 15, 2011                                    8

Omnibus Hearing Set for April 14th and 15th of 2011    8

Jury Trial Set for May 10th through 20th of 2011       8



OMNIBUS HEARING, April 14, 2011                                  10

Motion for Change of Venue Withdrawn by Defendant                11

Motion to Admit Statements by Plaintiff                          11

Motion to Exclude Witnesses by Defendant                         12

     Motion Granted by the Court                                 12


Plaintiff's Witnesses:

     Danny P. Lee                                                12

          Direct Examination by Mr. Frasier                      13

          Cross Examination by Ms. McCrea                        15

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

INDEX (Continued)

Volume 1, Pages 2-182 (Continued)

OMNIBUS HEARING, April 14, 2011 (Continued)

Plaintiff's Witnesses (Continued):

David Hall                                                16
        Direct Examination by Mr. Frasier                17
        Cross Examination by Ms. McCrea                  24
Michael W. Reaves                                         31
        Direct Examination by Mr. Frasier                32
        Cross Examination by Ms. McCrea                  33
Mark Ranger                                               34
        Direct Examination by Mr. Frasier                35
        Cross Examination by Ms. McCrea                  40
        Redirect Examination by Mr. Frasier              48
Everett "Buddy" Young                                     49
        Direct Examination by Mr. Frasier                49
        Cross Examination by Ms. McCrea                  58
Dean Perske                                               66
        Direct Examination by Mr. Frasier                66
        Cross Examination by Ms. McCrea                  76
Craig Zanni                                               88
        Direct Examination by Mr. Frasier                88
        Cross Examination by Ms. McCrea                  91

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

index   iii

INDEX (Continued)

Volume 1, Pages 2-182 (Continued)

OMNIBUS HEARING, April 14, 2011 (Continued)

Plaintiff's Witnesses (Continued):

    Mark Joseph Dannels                                    91

        Direct Examination by Mr. Frasier          92

        Cross Examination by Ms. McCrea            97

        Redirect Examination by Mr. Frasier       106

        Recross Examination by Ms. McCrea         107

    David Zavala                                         108

        Direct Examination by Mr. Frasier         108

        Cross Examination by Ms. McCrea           113


Defendant's Motion to Exclude                            116

    Argument on Behalf of Defendant                  116

    Motion Denied by the Court                       118


Plaintiff's Motion to Admit Statements (Continued)       123

Plaintiff's Witnesses:

    Sherry Ann Mitchell                              123

        Direct Examination by Mr. Frasier         124

        Cross Examination by Ms. McCrea           131

Plaintiff Rests On Motion to Admit Statements            142

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

index   iv

INDEX (Continued)

Volume 1, Pages 2-182 (Continued)

OMNIBUS HEARING, April 14, 2011 (Continued)

Plaintiff's Motion to Admit Statements (Continued)

    Argument on Behalf of Defendant                   145


Plaintiff's Motion in Limine 2                          146

    Argument on Behalf of Defendant                   146

    Argument on Behalf of Plaintiff                   149

    Motion Denied by the Court                        151


Plaintiff's Request for a Jury View                     152

    Argument on Behalf of Defendant Against           152

    Argument on Behalf of Plaintiff                   154

    Jury View Granted by the Court                    155


Plaintiff's Motion for Discovery                        155

    Argument on Behalf of Defendant                   155

    Discovery Deadline April 20, 2011                 156


Defendant's Request for Telephonic Witnesses            157

    Request Granted by the Court                      158


Memos Due April 18, 2011                                158

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

INDEX (Continued)

Volume 1, Pages 2-182 (Continued)

OMNIBUS HEARING, April 14, 2011 (Continued)
Responses Due April 20, 2011                                    159


Motions, Objections, Rulings of the Court
     10, 11, 12, 116, 118, 143, 148, 153.



PRETRIAL HEARING, May 5, 2011                                   165
Defendant's Request for Postponement                           165
Jury Trial Reset for July 5th Through 22nd                     165
Defendant Agrees to Possibility of Mr. McCrea                  167
     Not Being Available


Plaintiff's Motion for Discovery                               170
     Discovery Due by May 27th, 2011                           171



PRETRIAL HEARING, June 21, 2011                                174
Plaintiff's Motion for Discovery                               174
     Argument on Behalf of Plaintiff                           174
     Argument on Behalf of Defendant                           175

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

index    vi

INDEX (Continued)

Volume 2, Pages D1 2 to D1 32


JURY TRIAL, DAY 1, July 5, 2011                          D1 2

PRETRIAL MATTERS, July 5, 2011                           D1 2

Plaintiff's Motion to Admit Statements                   D1 3

      Plaintiff Withdraws Motion for the Present Time     D1 3

Defendant's Motion in Limine                             D1 3

      Court Discusses Lay Opinion                         D1 4

      Court Discusses Testimony of Different Witnesses    D1 6


JURY TRIAL, DAY 1, July 5, 2011                          D1 16

Introduction to the Case                                 D1 16

Voir Dire Begins, but Not Transcribed                    D1 28

                  (END OF DAY ONE)


Volume 2, Pages D2 2-D2 37

JURY TRIAL, DAY 2, July 6, 2011                          D2 2

Defendant Requests No Reaction Instruction               D2 8

      Request Granted by the Court                        D2 9


Plaintiff's Motion to Exclude Witnesses                  D2 9

      Motion Granted by the Court                         D2 9


Discussion of Unanimous Verdict versus 11-1              D2 9

      Verdict Will Need to be Unanimous                   D2 10

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

index   vii

INDEX (Continued)

Volume 2, Pages D2 2 to D2 37 (Continued)

JURY TRIAL, DAY 2, July 6, 2011 (Continued)

Request for No Reaction Instruction Withdrawn    D2 14

Jury of Fourteen Sworn                           D2 23

Precautionary Instructions                       D2 24

Jury View                                        D2 35

(END OF DAY TWO)

Volume 3, Pages D3 2 to D3 111

JURY TRIAL, DAY 3, July 7, 2011                  D3 2

Opening Statement on Behalf of Plaintiff         D3 3

Opening Statement on Behalf of Defendant         D3 18

Plaintiff's Witnesses:

    Raymond Lee McNeely                          D3 32

        Direct Examination by Mr. Frasier        D3 32

    Cross Examination by Mr. McCrea              D3 34

    Jeff Walker                                  D3 37

        Direct Examination by Mr. Frasier        D3 37

        Cross Examination by Ms. McCrea          D3 39

    Cory Courtright                              D3 41

        Direct Examination by Mr. Frasier        D3 41

        Cross Examination by Ms. McCrea          D3 70

        Redirect Examination by Mr. Frasier      D3 83

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

index   viii

INDEX (Continued)

Volume 3, Pages D3 2 to D3 111 (Continued

JURY TRIAL, DAY 3, July 7, 2011 (Continued)

Defendant's Request to Read Exhibit 215              D3 84

    Request Granted by the Court              D3 84


Plaintiff's Witnesses (Continued):

    Cynthia Ann Jones                              D3 87

        Direct Examination by Ms. Soublet        D3 88

        Cross Examination by Ms. McCrea          D3 91

    Matthew Phillip Carney                         D3 95

        Direct Examination by Mr. Frasier        D3 95

        Cross Examination by Mr. McCrea          D3 99

        Redirect Examination by Mr. Frasier      D3 109


Volume 4, Pages D3 112-D3 222

    Denise Bertrand                                D3 112

        Direct Examination by Ms. Soublet        D3 112

        Cross Examination by Ms. McCrea          D3 133

        Redirect Examination by Ms. Soublet      D3 141

    Stacy Lyons Crutchfield                        D3 141

        Direct Examination by Ms. Soublet        D3 142

        Cross Examination by Ms. McCrea          D3 147

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

index    ix

INDEX (Continued)

Volume 4, Pages D3 112 to D3 222 (Continued)

JURY TRIAL, DAY 3, July 7, 2011 (Continued)

Defendant's Motion to Dismiss Witness                    D3 149

    Court Request Foundation From Plaintiff           D3 150


    Plaintiff's Witness (Out of the Presence of the Jury):

        Donna Dennis                                  D3 150

            Direct Examination by Ms. Soublet       D3 151

    Court Rules Lack of Foundation                    D3 153

    Argument on Behalf of Plaintiff                   D3 154

    Court Grants Motion to Dismiss Witness            D3 154


Plaintiff's Witnesses (Continued):

    Craig Zanni                                       D3 155

        Direct Examination by Mr. Fraiser             D3 155

        Cross Examination by Mr. McCrea               D3 160

    Anthony S. Wetmore                                D3 161

        Direct Examination by Ms. Soublet             D3 162

        Cross Examination by Ms. McCrea               D3 169

    David Leo Main                                    D3 171

        Direct Examination by Mr. Frasier             D3 171

        Cross Examination by Mr. McCrea               D3 175

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

index    x

INDEX (Continued)

Volume 4, Pages D3 112 to D3 222 (Continued)

JURY TRIAL, DAY 3, July 7, 2011 (Continued)

Plaintiff's Witnesses:

    Adam J. Shinar Brewer                                 D3 176

        Direct Examination by Mr. Frasier         D3 177

        Cross Examination by Ms. McCrea           D3 180

        Redirect Examination by Mr. Frasier       D3 187

    Patrick Dexter Smith                                 D3 188

        Direct Examination by Ms. Soublet         D3 188

        Cross Examination by Mr. McCrea           D3 216

                (END OF DAY THREE)


Volume 5, Pages D4 2 to D4 168

JURY TRIAL, DAY FOUR, July 11, 2011                      D4 2

Plaintiff's Witnesses:

    Austin Fisher                                        D4 2

        Direct Examination by Mr. Frasier         D4 2

        Cross Examination by Ms. McCrea           D4 5

        Redirect Examination by Mr. Frasier       D4 8

    Brent Bartley                                        D4 8

        Direct Examination by Ms. Soublet         D4 9

        Cross Examination by Ms. McCrea           D4 21

        Redirect Examination by Ms. Soublet       D4 33

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

index    xi

INDEX (Continued)

Volume 5, Pages D4 2 to D4 168 (Continued)

JURY TRIAL, DAY 4, July 11, 2011 (Continued)

Plaintiff's Witnesses:

Melissa Smith                                        D4 34

    Direct Examination by Ms. Soublet            D4 34

    Cross Examination by Mr. McCrea              D4 42

    Redirect Examination by Ms. Soublet          D4 52

Sherry Mitchell                                      D4 53

    Direct Examination by Mr. Frasier            D4 54

    Cross Examination by Ms. McCrea              D4 77

    Redirect Examination by Mr. Frasier          D4 86

Margaret (Peggy) Mitchell                            D4 87

    Direct Examination by Mr. Frasier            D4 88

    Cross Examination by Ms. McCrea              D4 94

    Direct Examination, Cont'd by Mr. Frasier    D4 97

Corey Bryant                                         D4 98

    Direct Examination by Mr. Frasier            D4 98

    Cross Examination by Mr. McCrea              D4 103

    Redirect Examination by Mr. Frasier          D4 108

Joshua Emler                                         D4 109

    Direct Examination by Ms. Soublet            D4 109

    Cross Examination by Mr. McCrea              D4 114

    Redirect Examination by Ms. Soublet          D4 117

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

index    xii

INDEX (Continued)

Volume 5, Pages D4 2 to D4 168 (Continued)

JURY TRIAL, DAY 4, July 11, 2011 (Continued)

Plaintiff's Witnesses:

Aaron West                                          D4 119

    Direct Examination by Ms. Soublet              D4 119

    Cross Examination by Mr. McCrea                D4 125

    Redirect Examination by Ms. Soublet            D4 128

John Lindegren                                      D4 130

    Direct Examination by Mr. Frasier              D4 130

    Cross Examination by Ms. McCrea                D4 136

Ashley Patton                                       D4 142

    Direct Examination by Ms. Soublet              D4 143

    Cross Examination by Ms. McCrea                D4 147

Mark Kirn                                           D4 150

    Direct Examination by Mr. Frasier              D4 150

    Cross Examination by Ms. McCrea                D4 155

Mike McAdams                                        D4 159

    Direct Examination by Mr. Frasier              D4 159

    Cross Examination by Ms. McCrea                D4 165

Volume 6, Pages 169-261

Heidi Crook                                         D4 169

    Direct Examination by Ms. Soublet              D4 169

    Cross Examination by Ms. McCrea                D4 172

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

index    x

INDEX (Continued)

Volume 6, Pages D4 169 to D4 261 (Continued)

JURY TRIAL, DAY 4, July 11, 2011 (Continued)

Plaintiff's Witnesses:

Heather Reid                                        D4 174

        Direct Examination by Ms. Soublet          D4 174

        Cross Examination by Ms. McCrea            D4 181

Ray McNeely                                         D4 184

        Direct Examination by Mr. Frasier          D4 185

        Cross Examination by Mr. McCrea            D4 189

Raymond Lewis                                       D4 198

        Direct Examination by Mr. Frasier          D4 199

        Cross Examination by Ms. McCrea            D4 204

        Redirect Examination by Mr. Frasier        D4 224

Alicia Hyatt                                        D4 226

        Direct Examination by Mr. Frasier          D4 227

        Cross Examination by Mr. McCrea            D4 233

Thomas Bounds                                       D4 241

        Direct Examination by Ms. Soublet          D4 241

        Cross Examination by Ms. McCrea            D4 245

Dan Lee                                             D4 248

        Direct Examination by Mr. Frasier          D4 248

        Cross Examination by Ms. McCrea            D4 253

        Redirect Examination by Mr. Frasier        D4 259

(END OF DAY FOUR)

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

index   xiv

INDEX (Continued)Volume 7, Pages D5 2 - D5 137


JURY TRIAL, DAY 5, July 12, 2011                          D5 2

Motion by Defendant for Co-Counsel Objections            D5 2

Court's Ruling                                           D5 6

Plaintiff's Witnesses, Continued:

    Brett Mauro                                          D5 7

        Direct Examination by Mr. Frasier               D5 7

        Cross Examination by Ms. McCrea                 D5 12

    Kristen Steinhoff-Ramsey                            D5 18

        Direct Examination by Ms. Soublet               D5 18

        Cross Examination by Ms. McCrea                 D5 29

        Redirect Examination by Ms. Soublet             D5 45

    Tina Mims                                           D5 47

        Direct Examination by Mr. Frasier              D5 48

        Cross Examination by Ms. McCrea                 D5 51

        Redirect Examination by Mr. Frasier            D5 54

    Scott Hamilton                                      D5 55

        Direct Examination by Mr. Frasier              D5 55

        Cross Examination by Mr. McCrea                 D5 63

Motion by Defendant that Grand Jury Tape be
    Offered for Impeachment                             D5 98

    Motion Denied by the Court                          D5 99

        Cross Examination, Cont'd by Mr. McCrea         D5 99

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

index   xv

INDEX (Continued)

Volume 7, Pages D5 2 - D5 137 (Continued)


JURY TRIAL, DAY 5, July 12, 2011 (Continued)

David Zavala                                          D5 107

    Direct Examination by Mr. Frasier                D5 107

    Cross Examination by Ms. McCrea                  D5 114

Defendant's Witness (Out of order):

David Zavala                                          D5 120

    Direct Examination by Ms. McCrea                 D5 120

    Cross Examination by Mr. Frasier                 D5 121

    Redirect Examination by Ms. McCrea               D5 122

Plaintiff's Witnesses, Continued:

Tony Messerle                                         D5 125

    Direct Examination by Mr. Frasier                D5 125

    Cross Examination by Mr. McCrea                  D5 132

Kip Oswald                                            D5 137

Volume 8, Pages D5 138-D5 280

    Direct Examination by Mr. Frasier                D5 138

    Cross Examination by Mr. McCrea                  D5 147

    Redirect Examination by Mr. Frasier              D5 157

Randy Ulmer                                           D5 159

    Direct Examination by Mr. Frasier                D5 159

    Cross Examination by Ms. McCrea                  D5 162


Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 102  Page 16 of 1666 to
State Defendants' Motion for Summary Judgment

INDEX (Continued)

Volume 8, Pages D5 138-D5 280 (Continued)

JURY TRIAL, DAY 5, July 12, 2011 (Continued)

    Jennifer Lee Storts                                D5 164

        Direct Examination by Ms. Soublet         D5 165

        Cross Examination by Mr. McCrea           D5 176

        Redirect Examination by Ms. Soublet       D5 182

    Zack Elderkin                                     D5 182

        Direct Examination by Ms. Soublet         D5 183

        Cross Examination by Ms. McCrea           D5 187

    Michael Reaves                                    D5 189

        Direct Examination by Mr. Frasier         D5 190

        Cross Examination by Ms. McCrea           D5 198

    David Hall                                        D5 200

        Direct Examination by Mr. Frasier         D5 200

        Cross Examination by Mr. McCrea           D5 220

    Mark Ranger                                       D5 227

        Direct Examination by Mr. Frasier         D5 227

        Cross Examination by Mr. McCrea           D5 230

    Dean Perske                                       D5 232

        Direct Examination by Ms. Soublet         D5 232

        Cross Examination by Mr. McCrea           D5 241

        Redirect Examination by Ms. Soublet       D5 251

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

INDEX (Continued)

Volume 8, Pages D5 138-D5 280 (Continued)


JURY TRIAL, DAY 5, July 12, 2011 (Continued)

    Everett John Young                                      D5 251

        Direct Examination by Ms. Soublet              D5 252

        Cross Examination by Ms. McCrea                D5 257

    Juliana Curran                                          D5 266

        Direct Examination by Mr. Frasier              D5 267

        Cross Examination by Ms. McCrea                D5 270

        Redirect examination by Mr. Frasier            D5 273

Plaintiff Witness Outside the Presence of the Jury:

    Christy Diane Cagley-Young                              D5 274

        Direct Examination by Mr. Frasier              D5 275

        Cross Examination by Ms. McCrea                D5 277

        Clarifying Examination by the Court            D5 279

                (END OF DAY FIVE)


Volume 9, Pages D6 2-D6 112

JURY TRIAL, DAY 6, July 13, 2011                            D6 2

Motion by Defendant to Exclude Witness                      D6 2

Motion Denied by the Court                                  D6 11

Plaintiff's Witnesses:

    Scott Hamilton                                          D6 16

        Excused as Witness                             D6 17

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

<u>INDEX  (Continued)</u>

<u>Volume  9,  Pages D6 2-D6 112  (Continued)</u>

JURY TRIAL, DAY 6, July 13, 2011 (Continued)

    Michael Dennis                                           D6 19

        Direct Examination by Ms. Soublet         D6 19

        Cross Examination by Ms. McCrea           D6 23

    Donna Dennis                                             D6 25

        Direct Examination by Ms. Soublet         D6 25

        Cross Examination by Mr. McCrea           D6 28

        Redirect Examination by Ms. Soublet       D6 30

    Kimberly Pugmire                                         D6 30

        Direct Examination by Mr. Frasier         D6 31

        Cross Examination by Ms. McCrea           D6 35

        Redirect examination by Mr. Frasier       D6 37

    Megan Rae Davidson                                       D6 38

        Direct Examination by Ms. Soublet         D6 38

        Cross Examination by Ms. McCrea           D6 45

        Redirect Examination by Ms. Soublet       D6 50


Defendant's Witness (Out of order):

    Megan Rae Davidson                                       D6 52

        Direct Examination by Ms. McCrea          D6 52

Exhibit 102  Page 19 of 1666 to
State Defendants' Motion for Summary Judgment

INDEX (Continued)

Volume 9, Pages D6 2-D6 112 (Continued)

JURY TRIAL, DAY 6, July 13, 2011 (Continued)

Plaintiff's Witnesses, Continued:

Christy Diane Young (Cagley)                          D6 53

    Direct Examination by Mr. Frasier               D6 54

    Cross Examination by Ms. McCrea                 D6 57

    Redirect Examination by Mr. Frasier             D6 61

Richard Bryant                                       D6 62

    Direct Examination by Mr. Frasier               D6 62

    Cross Examination by Ms. McCrea                 D6 66

Darius Mede                                          D6 70

    Direct Examination by Mr. Frasier               D6 70

Kathy Wilcox                                         D6 73

    Direct Examination by Mr. Frasier               D6 73

        Volume 10, Pages D6 113 to D6 253

    Direct Examination by Mr. Frasier, Cont'd   D6 113

    Cross Examination by Ms. McCrea                 D6 123

    Redirect Examination by Mr. Frasier             D6 169

David Breakfield                                     D6 176

    Direct Examination by Ms. Soublet               D6 177

    Cross Examination by Mr. McCrea                 D6 182

    Redirect Examination by Ms. Soublet             D6 190

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

                                    index    xx

<u>INDEX  (Continued)</u>

<u>Volume 10, Pages D6 113 to D6 253 (Continued)</u>

JURY TRIAL, DAY 6, July 13, 2011 (Continued)

    Scot Rogers                                      D6 194

        Direct Examination by Mr. Frasier         D6 194

    Tony Wetmore                                     D6 198

        Direct Examination by Ms. Soublet         D6 198

        Cross Examination by Ms. McCrea           D6 209

        Redirect Examination by Ms. Soublet       D6 211

    Kris Karcher                                     D6 211

        Direct Examination by Ms. Soublet         D6 212

        Cross Examination by Ms. McCrea           D6 233

        Redirect Examination by Ms. Soublet       D6 241

    Melissa Beebe                                    D6 243

        Direct Examination by Mr. Frasier         D6 244

        Cross Examination by Ms. McCrea           D6 246

Judicial Notice of Defendant's Case 03CR1566         D6 248

            (END OF DAY SIX)

<u>Volume 11, Pages D7 2-D7 193</u>

JURY TRIAL, Day 7, July 14, 2011                     D7 2

Plaintiff's Witnesses:

    James Pex                                        D7 3

        Direct Examination by Mr. Frasier         D7 4

        Cross Examination by Ms. McCrea           D7 27

        Redirect Examination by Mr. Frasier       D7 47

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

INDEX (Continued)

Volume 11, Pages D7 2-D7 193 (Continued)


JURY TRIAL, Day 7, July 14, 2011 (Continued)

Plaintiff's Witnesses:

Kris Karcher                                        D7 51

        Direct Examination by Ms. Soublet          D7 51

        Cross Examination by Ms. McCrea            D7 52

        Redirect Examination by Ms. Soublet        D7 53

Ray McNeely                                         D7 53

        Direct Examination by Mr. Frasier          D7 54

        Cross Examination by Ms. McCrea            D7 58

James Norman Olson                                  D7 62

        Direct Examination by Mr. Frasier          D7 62

        Examination In Aid of Objection            D7 70
        by Mr. McCrea

        Direct Examination by Mr. Frasier (Cont.)  D7 71

        Examination In Aid of Objection            D7 86
        by Mr. McCrea

        Direct Examination by Mr. Frasier (Cont.)  D7 87
        by Mr. Frasier

        Cross Examination by Mr. McCrea            D7 89

        Redirect Examination by Mr. Frasier        D7 102

        Recross Examination by Mr. McCrea          D7 107

        Redirect Examination by Mr. Frasier        D7 107

Plaintiff Rests                                     D7 109

Exhibit 102  Page 22 of 1666 to
State Defendants' Motion for Summary Judgment

INDEX (Continued)

Volume 11, Pages D7 2-D7 193 (Continued)

JURY TRIAL, Day 7, July 14, 2011 (Continued)

Defendant's Motion for Judgment of Acquittal          D7 109

    Motion Denied by the Court                     D7 111

Defendant's Objection to Exhibit 84                  D7 111

    Objection Sustained by the Court               D7 115


Plaintiff Rests                                      D7 115


Defendant's Witnesses:

    Quinn Leslie Marie Myers                       D7 115

        Direct Examination by Ms. McCrea          D7 115

        Defense Offer of Proof Out of the         D7 124
        Presence of the Jury

        Cross Examination by Ms. Soublet          D7 126

    Kenn Meneely                                   D7 127

        Direct Examination by Ms. McCrea          D7 127

        Examination in Aid of Objection           D7 142
        By Mr. Frasier

        Direct Examination (Continued) by         D7 143
        Ms. McCrea

        Cross Examination by Mr. Frasier          D7 165

        Redirect Examination by Ms. McCrea        D7 182

(END OF DAY SEVEN)


Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 102  Page 23 of 1666 to
State Defendants' Motion for Summary Judgment

INDEX (Continued)

Volume 12, Pages D8 2-D8 79

JURY TRIAL, Day 8, July 15, 2011                          D8 2

Defendant's Witnesses:

   David Main                                             D8 3

      Direct Examination by Ms. McCrea               D8 4

   Dale Oester                                            D8 7

      Direct Examination by Ms. McCrea               D8 7

      Cross Examination by Mr. Frasier               D8 13

   Mark Perry                                             D8 15

      Direct Examination by Ms. McCrea               D8 16

      Cross Examination by Mr. Frasier               D8 19

   Ellen Marie Richardson                                 D8 21

      Direct Examination by Ms. McCrea               D8 21

      Cross Examination by Ms. Soublet               D8 24

   Lyndee Stidham                                         D8 25

      Direct Examination by Ms. McCrea               D8 25

      Cross Examination by Ms. Soublet               D8 30

      Redirect Examination by Ms. McCrea             D8 31

   Steve Quackenbush                                      D8 32

      Direct Examination by Ms. McCrea               D8 32

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

INDEX  (Continued)

Volume 12, Pages D8 2-D8 79


JURY TRIAL, Day 8, July 15, 2011                      D8 2

Defendant's Witnesses:

    Margaret Elizabeth Buehner                        D8 34

        Direct Examination by Ms. McCrea              D8 36

        Cross Examination by Mr. Frasier              D8 45

        Redirect Examination by Ms. McCrea            D8 49

        Recross Examination by Mr. Frasier            D8 51

    Kenn Meneely                                      D8 55

        Direct Examination by Ms. McCrea              D8 56

        Cross Examination by Mr. Frasier              D8 63

        Redirect Examination by Ms. McCrea            D8 66


Plaintiff Stipulates to Defendant's Map              D8 68

                 (END OF DAY EIGHT)


Volume 13, Pages D9 2-D9 165

JURY TRIAL, Day 9, July 18, 2011                      D9 2

Discussion with Juror No. 75, Mr. Welch regarding     D9 2
    Communication Outside of Court

Juror Welch will be Excused                           D9 8


Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 102  Page 25 of 1666 to
State Defendants' Motion for Summary Judgment

INDEX (Continued)

Volume 13, Pages D9 2-D9 165 (Continued)

JURY TRIAL, Day 9, July 18, 2011 (Continued)
Defendant's Witnesses:

    Haley Greenway                                    D9 12

        Direct Examination by Ms. McCrea        D9 13

        Cross Examination by Ms. Soublet        D9 18

    Barbara Ladawn Carr                               D9 19

        Direct Examination by Ms. McCrea        D9 19

        Cross Examination by Ms. Soublet        D9 34

Defendant Rests


Plaintiff's Rebuttal Witnesses:

    Kathy Wilcox                                      D9 35

        Direct Examination by Mr. Frasier       D9 35

        Cross Examination by Mr. McCrea         D9 37

        Redirect Examination by Mr. Frasier     D9 46

    Craig Zanni                                       D9 49

        Direct Examination by Mr. Frasier       D9 49

Plaintiff Rests on Rebuttal                               D9 50

Defendant Waives Presentation of Rebuttal Evidence        D9 50

Defendant's Renewal of Motion for Judgment of             D9 51
    Acquittal

    Motion Denied by the Court                        D9 51

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

index   xxvi

INDEX (Continued)

<u>Volume 13, Pages D9 2-D9 165 (Continued)</u>


JURY TRIAL, Day 9, July 18, 2011 (Continued)


Jury Charge                                          D9 54


Closing Argument on Behalf of Plaintiff             D9 64

Closing Argument on Behalf of Defendant             D9 96

Final Argument on Behalf of Plaintiff               D9 132

Final Jury Charge                                    D9 157


Exceptions to Instructions by Plaintiff Waived      D9 161

Exception to Instructions by Defendant              D9 162


Jury Deliberates                                     D9 162

Jury Instructed to Come Back Tomorrow                D9 163

                    (END OF DAY NINE)


                <u>Volume 13, Pages D10 2-D10 7</u>

JURY TRIAL, Day 10, July 19, 2011                   D10 2

Jury Verdict                                         D10 2

Court Sends Jury Back to Fix Verdict                 D10 3

Jury Verdict                                         D10 4

Polling of the Jury                                  D10 5

        Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Exhibit 102  Page 27 of 1666 to
State Defendants' Motion for Summary Judgment

INDEX (Continued)

Volume 13, Pages D10 2-D10 7 (Continued)


JURY TRIAL, Day 9, July 18, 2011 (Continued)

Verdict Received by the Court                          D10 6

Sentencing Set for August 1, 2011                      D10 7

                        (END OF DAY TEN)


SPECIFIED PAGES:

Objections, Motions, Rulings of the Court

        D3 25, D3 103, D3 104, D3 109, D3 110, D3 149,

            D3 155, D3 174, D3 219.

        D4 39, D4 53, D4 117, D4 118, D4 185, D4 186,

            D4 187.

        D5 2, D5 6, D5 16, D5 38, D5 46, D5 68, D5 76,

            D5 84, D5 85, D5 86, D5 87, D5 88, D5 89,

            D5 98, D5 99, D5 102, D5 102, D5 141,

            D5 142, D5 192, D5 196, D5 231, D5 240,

            D5 244, D5 245, D5 262, D5 263, D5 277,

            D5 278, D5 280.

        D6 2, D6 11, D6 12, D6 13, D6 22, D6 63,

            D6 27, D6 28, D6 45, D6 48, D6 49, D6 178,

            D6 184, D6 185, D6 189, D6 190, D6 191,

            D6 192, D6 192, D6 193, D6 196, D6 197,

            D6 242, D6 243.

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664


                                index   xxviii

INDEX (Continued)


SPECIFIED PAGES (Continued):

Objections, Motions, Rulings of the Court (Continued)

D7 109, D7 110, D7 115, D7 119, D7 120, D7 122,
    D7 124, D7 126, D7 143, D7 168, D7 192.

D8 10, D8 13, D8 28, D8 29, D8 41, D8 44,
    D8 45, D8 49, D8 50, D8 51, D8 58, D8 62,
    D8 63, D8 64, D8 65, D8 66.

D9 23, D9 32, D9 33, D9 36, D9 40, D9 41, D9 46,
    D9 48, D9 54, D9 116, D9 136, D9 143, D9 144,
    D9 150.

Instructions to the Jury

D2 24, D2 36.

D3 61, D3 182, D3 220.

D4 83, D4 87, D4 129, D4 129, D4 187, D4 226, D4 260.

D5 6, D5 68, D5 95, D5 97, D5 102, D5 112, D5 123,
    D5 142, D5 193, D5 194, D5 196, D5 245, D5 273.

D6 16, D6 18, D6 18, D6 28, D6 72, D6 112, D6 194,
    D6 207, D6 220, D6 249, D6 249.

D7 62, D7 69, D7 108, D7 120, D7 123,  D7 125,
    D7 186, D7 193.

D8 6, D8 12, D8 15, D8 52, D8 68, D8 72.

D9 52, D9 54, D9 92, D9 94, D9 112, D9 143,
    D9 149, D9 150, D9 157, D9 163.

D10 6.

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

index   xxix

INDEX (Continued)

SPECIFIED PAGES (Continued):

Proceedings Out of the Presence of the Jury

    D2 31, D2 36.

    D3 62, D3 150, D3 182, D3 222.

    D4 87, D4 129, D4 226, D4 260.

    D5 2, D5 95, D5 112, D5 123, D5 124, D5 194, D5 273.

    D6 2, D6 72, D6 91, D6 92, D6 101, D6 230 D6 112,
        D6 194, D6 249.

    D7 62, D7 108, D7 109, D7 114, D7 123, D7 186,
        D7 193.

    D8 2, D8 52, D8 68, D8 73, D8 78.

    D9 2, D9 52, D9 93, D9 95, D9 112, D9 144, D9 149,
        D9 161, D9 162, D9 164.

    D10 2, D10 3, D10 4, D10 6.

Stipulations

    D4 83, D4 129, D6 91, D6 92, D6 101, D6 230, D8 68.

Volume 14, Pages 183-257

POST-TRIAL MOTIONS, August 1, 2011         1713

Defendant's Motions to Continue and Allow Contact     1714

    Argument on Behalf of Defendant         1714

    Argument on Behalf of Plaintiff         1718

    Motion to Continue Denied by the Court     1719

    Motion to Allow Contact Denied by the Court    1723

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

index   xxx

INDEX (Continued)

Volume 14, Pages 183-257 (Continued)

POST-TRIAL MOTIONS, August 1, 2011 (Continued)

Ballot Measure 11 Motion                                    1723

        Argument on Behalf of Defendant                     1723

        Argument on Behalf of Plaintiff                     1732

        Motion Denied by the Court                          1736


SENTENCING, August 1, 2011                                  1736

Statement on Behalf of Defendant                            1736

Statement on Behalf of Plaintiff Waived                     1738

Statement by Defendant Waived                               1738

Judgment of the Court                                       1742



MOTION FOR NEW TRIAL, September 9, 2011                     1744

        Argument on Behalf of Defendant                     1746

        Statement on Behalf of Plaintiff                    1777



MOTION FOR JUDGMENT OF ACQUITTAL, September 9, 2011         1777

        Argument on Behalf of Defendant                     1777

        Motion Denied by the Court                          1786


CERTIFICATE OF TRANSCRIBER                                  1789

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

index   xxxi

INDEX OF WITNESSES
PLAINTIFF'S WITNESSES:                PAGE TESTIMONY BEGINS

Omnibus Hearing, April 14, 2011:

Danny P. Lee                                          13

David Hall                                            17

Michael W. Reaves                                     32

Mark Ranger                                           35

Everett "Buddy" Young                                 49

Dean Perske                                           66

Craig Zanni                                           88

Mark Joseph Dannels                                   92

David Zavala                                         108

Sherry Ann Mitchell                                 124


Jury Trial, July 7, 2011:

Raymond McNealy                              D3 32

Jeff Walker                                  D3 37

Cory Courtright                              D3 41

Cynthia Ann Jones                            D3 88

Matthew Phillip Carney                       D3 95

Denise Bertrand                              D3 112

Stacy Lyons Crutchfield                      D3 142

Donna Dennis (Out of Jury's Presence)        D3 151

Craig Zanni                                  D3 155
Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

index   xxii

INDEX OF WITNESSES


PLAINTIFF'S WITNESSES:                    PAGE TESTIMONY BEGINS

July 7, 2011 (Continued):

Anthony S. Wetmore                            D3 162

David Leo Main                                D3 171

Adam J. Shinar Brewer                         D3 177

Patrick Dexter Smith                          D3 188


July 11, 2011:

Austin Fisher                                  D4 2

Brent Bartley                                  D4 9

Melissa Smith                                 D4 34

Sherry Mitchell                               D4 54

Margaret (Peggy) Mitchell                     D4 88

Corey Bryant                                  D4 98

Joshua Emler                                  D4 109

Aaron West                                    D4 119

John Lindegren                                D4 130

Ashley Patton (Hutchinson)                    D4 143

Mark Kirn                                      D4 150

Mike McAdams                                  D4 159

Heidi Crook                                   D4 169

Heather Reid                                  D4 174


Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

index   xxxiii

INDEX OF WITNESSES

PLAINTIFF'S WITNESSES:                    PAGE TESTIMONY BEGINS

July 11, 2011 (Continued):

Ray McNeely                                        D4 185

Raymond Lewis                                      D4 199

Alicia Hyatt (Hartwell)                            D4 227

Thomas Bounds                                      D4 241

Dan Lee                                            D4 248


July 12, 2011:

Brett Mauro                                        D5 7

Kristin Steinhoff-Ramsey                           D5 18

Tina Marie Mims                                    D5 48

Dennis Scott Hamilton                              D5 55

Tony Messerle                                      D5 125

Kip Oswald                                         D5 138

Randy Ulmer                                        D5 159

Jennifer Storts                                    D5 165

Zack Elderkin                                      D5 183

Mike Reaves                                        D5 189

David Hall                                         D5 200

Mark Ranger                                        D5 227

Dean Perske                                        D5 232

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

index   xxxiv

INDEX OF WITNESSES

PLAINTIFF'S WITNESSES:                    PAGE TESTIMONY BEGINS

July 12, 2011 (Continued):

Everett (Buddy) Young                     D5 252

Juliana Curran (Reab)                     D5 267

Christy Diane Young (Cagley)              D5 275
    (Outside of Jury Presence)


July 13, 2011:

Dennis Scott Hamilton                     D6 16
    (Recalled and Released Without Testimony)

Michael Dennis                            D6 19

Donna Dennis                              D6 25

Kimberly Courtright Pugmire               D6 31

Megan Rae Davidson                        D6 38

Christy Diane Young (Cagley)              D6 54

Richard Bryant                            D6 62

Darius Mede                               D6 70

Kathy Wilcox                              D6 73

David Breakfield                          D6 177

Scot Rogers                               D6 194

Tony Wetmore                              D6 198

Kris Karcher                              D6 212

Melissa Beebe                             D6 244

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

index   xxxv

INDEX OF WITNESSES

PLAINTIFF'S WITNESSES:                    PAGE TESTIMONY BEGINS

July 14, 2011:

James Pex                                          D7 4

Kris Karcher                                       D7 51

Ray NcNeely                                        D7 54

James Olson                                        D7 62


DEFENDANT'S WITNESSES:                    PAGE TESTIMONY BEGINS

July 12, 2011:

David Zavala                                       D5 120


July 13, 2011:

Megan Rae Davidson                                 D6 52


July 14, 2011:

Quinn Myers                                        D7 115

Kenn Meneely                                       D7 127


July 15, 2011:

Dale Oester                                        D8 7

Mark Perry                                         D8 16

Ellen Richardson                                   D8 21

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

index   xxxvi

INDEX OF WITNESSES

DEFENDANT'S WITNESSES:                PAGE TESTIMONY BEGINS

July 15, 2011:

Lyndee Stidham                                      D8 25

Steve Quackenbush                                  D8 32

Margaret Buehner                                   D8 36

Kenn Meneely                                       D8 56


July 18, 2011:

Haley Greenway                                     D9 13

Barbara Ladawn Carr                                D9 19


PLAINTIFF'S REBUTTAL WITNESSES:       PAGE TESTIMONY BEGINS

July 18, 2011:

Kathy Wilcox                                       D3 35

Craig Zanni                                        D9 49

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

index   xxxvii

INDEX OF EXHIBITS

| PLAINTIFF | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| Omnibus Hearing, April 14, 2011: | | | |
| 1 | Search Warrant Packet, 1/24/2010 | 121 | 122 |
| 2 | Victim's Letter to Sherry Mitchell | 130 | 130 |
| 3 | Letter from Victim to Defendant | 142 | 143 |
| 4 | Letter from Victim to Defendant | 142 | 143 |
| 5 | Letter from Victim to Defendant | 142 | 143 |
| 6 | Letter from Victim to Defendant | 142 | 143 |
| 7 | Document, Victim's Diary | 142 | 143 |
| 8 | Document - Poem | 142 | 143 |
| 9 | Document, Poem "Thoughts" | 142 | W/D |
| 10 | Audio Interview with Defendant | 20 | 20 |
| 11 | Statement of Defendant, 7-5-00 | 22 | 22 |
| 12 | Miranda Form | 36 | 36 |

| DEFENDANT | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| Motion for New Trial, September 9, 2011 | | | |
| 301 | Mr. Webley's Report | 220 | — |
| 302 | State's Closing Argument | 221 | — |

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

index   xxxviii


INDEX OF EXHIBITS (Continued)

| PLAINTIFF | DESCRIPTION | OFFERED | RECEIVED |
|-----------|-------------|---------|----------|
| Jury Trial, July 5-19, 2011: | | | |
| 1 | Photograph, Leah Freeman Before Her Death | D3 43 | D3 43 |
| 2 | Google Map of Area Where Victim was Found | D7 57 | D7 57 |
| 3 | Google Map of Area Where Victim was Found | D7 57 | D7 57 |
| 4 | Google Map of Area Where Victim was Found | D7 57 | D7 57 |
| 5 | Google Map of Area Where Victim was Found | D7 57 | D7 57 |
| 6 | Google Map of Area Where Victim was Found | D7 57 | D7 57 |
| 7 | Victim, Day of Incident | D3 54 | D3 54 |
| 8 | Victim, Day of Incident | D3 54 | D3 54 |
| 9 | Photograph, Front of Home | D3 50 | D3 51 |
| 10 | Photograph, West Side of Home | D3 50 | D3 51 |
| 11 | Photograph, West Side of Home | D3 50 | D3 51 |
| 12 | Photograph, East Side of Home | D3 50 | D3 51 |
| 13 | Photograph, East Side of Home | D3 50 | D3 51 |
| 14 | Photograph, Back of Home | D3 50 | D3 51 |
| 15 | Photograph of Mitchell Home | D4 55 | D4 55 |
| 16 | Photograph, Front of Mustang | D3 121 | D3 121 |
| 17 | Photograph of Mustang | D6 77 | D6 77 |

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

index   xxxix

INDEX OF EXHIBITS (Continued)

| PLAINTIFF | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 18 | Photograph of Mustang | D6 77 | D6 77 |
| 19 | Photograph of Mustang | D6 77 | D6 77 |
| 20 | Photograph of Mustang | D6 77 | D6 77 |
| 21 | Photograph of Mustang | D6 77 | D6 77 |
| 22 | Photograph of Mustang | D6 77 | D6 77 |
| 23 | Photograph of Mustang | D6 77 | D6 77 |
| 24 | Photograph of Mustang | D6 77 | D6 77 |
| 25 | Photograph, Front of Thunderbird | D3 121 | D3 121 |
| 26 | Photographs of Thunderbird | D6 95 | D6 95 |
| 27 | Photographs of Thunderbird | D6 95 | D6 95 |
| 28 | Photographs of Thunderbird | D6 95 | D6 95 |
| 29 | Photograph of Shoe | D3 132 D6 85 | Withdrawn D6 85 |
| 30 | Photograph of Shoe | D6 85 | D6 85 |
| 31 | Photograph of Swab Locations and Close-up of Blood | D6 85 | D6 85 |
| 32 | Photograph of Swab Locations and Close-up of Blood | D3 174 D6 85 | D3 174 D6 85 |
| 33 | Photograph, Yearbook Where it was Found | D3 174 | D3 174 (Conditionally) |
| 34 | Photograph, Lee Valley Road | D6 201 | D6 201 |
| 35 | Photograph, Lee Valley Road | D6 201 | D6 201 |
| 36 | Photograph, Lee Valley Road | D6 201 | D6 201 |

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

index   xl

INDEX OF EXHIBITS (Continued)

| PLAINTIFF | DESCRIPTION | OFFERED | RECEIVED |
|-----------|-------------|---------|----------|
| Trial, July 5-19, 2011 (Continued): | | | |
| 37 | Photograph, Lee Valley Road | D6 201 | D6 201 |
| 38 | Photograph, Lee Valley Road | D6 201 | D6 201 |
| 39 | Photograph of Body from Road | D6 221 | D6 221 |
| 40 | Photograph of Body | D6 221 | D6 221 |
| 41 | Photograph of Body | D6 201 | D6 201 |
| 42 | Photograph of Body | D6 221 | D6 221 |
| 43 | Photograph of Body | D6 221 | D6 221 |
| 44 | Photograph of Body | D6 221 | D6 221 |
| 45 | Photograph of Body | D7 70 | D7 70 |
| 46 | Photograph of Victim's Pants | D6 108 | D6 108 |
| 47 | Photograph of Victim's Pants | D6 108 | D6 108 |
| 48 | Photograph of Victim's Pants | D6 108 | D6 108 |
| 49 | Photograph of Victim's Pants | D6 108 | D6 108 |
| 50 | Photograph of Victim's Pants | D6 108 | D6 108 |
| 51 | Photograph of Victim's Shirt | D6 113 | D6 113 |
| 52 | Photograph of Victim's Shirt | D6 113 | D6 113 |
| 53 | Photograph of Victim's Shirt | D6 113 | D6 113 |
| 54 | Photograph of Victim's Shirt | D6 113 | D6 113 |
| 55 | Photograph of Victim's Shirt | D6 113 | D6 113 |
| 56 | Photograph of Victim's Bra | D6 118 | D6 118 |

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

index   xli

INDEX OF EXHIBITS (Continued)

| PLAINTIFF | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| | Trial, July 5-19, 2011 (Continued): | | |
| 57 | Photograph of Victim's Bra | D6 118 | D6 118 |
| 58 | Photograph of Victim's Bra | D6 118 | D6 118 |
| 59 | Photograph of Victim's Sock | D6 120 | D6 120 |
| 60 | Photograph of Victim's Sock | D6 120 | D6 120 |
| 61 | Photograph of Victim's Sock | D6 120 | D6 120 |
| 62 | Photograph Taken by English Lab of Victim's Clothing | D6 226 | D6 226 |
| 63 | Photograph Taken by English Lab of Victim's Clothing | D6 226 | D6 226 |
| 64 | Photograph Taken by English Lab of Victim's Clothing | D6 226 | D6 226 |
| 65 | Photograph Taken by English Lab of Victim's Clothing | D6 226 | D6 226 |
| 66 | Photograph Taken by English Lab of Victim's Clothing | D6 226 | D6 226 |
| 67 | Photograph Taken by English Lab of Victim's Clothing | D6 226 | D6 226 |
| 68 | Photograph Taken by English Lab of Victim's Clothing | D6 226 | D6 226 |
| 69 | Photograph Taken by English Lab of Victim's Clothing | D6 226 | D6 226 |
| 70 | Photograph Taken by English Lab of Victim's Clothing | D6 226 | D6 226 |
| 71 | Photograph Taken by English Lab of Victim's Clothing | D6 226 | D6 226 |

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

index   xlii


INDEX OF EXHIBITS (Continued)

| PLAINTIFF | DESCRIPTION | OFFERED | RECEIVED |
|-----------|-------------|---------|----------|

Trial, July 5-19, 2011 (Continued):

| | | | |
|---|---|---|---|
| 72 | Photograph Taken by English Lab of Victim's Clothing | D6 226 | D6 226 |
| 73 | Lindegren Identified Location | D4 135 | D4 135 |
| 74 | Lindegren Identified Location | D4 135 | D4 135 |
| 75 | Map of Coquille | D3 33 | D3 33 |
| 76 | Map of Coos County | D3 33 | D3 33 |
| 77 | Diagram of Leah's Home Upstairs | D3 38 | D3 38 |
| 78 | Copy of Mustang Registration | D4 188 | D4 189 |
| 79 | Copy of Thunderbird Registration | D4 188 | D4 189 |
| 80 | Letter from Sherry Mitchell to Defendant | D4 58 | D4 59 |
| 81 | Response of Defendant to Sherry Mitchell | D4 62 | D4 62 |
| 82 | Note from Victim to Sherry Mitchell | D4 67 | D4 67 |
| 83 | Defendant's Time Line | D5 210 | D5 211 |
| 84 | Brent Bartley Time Line (Received for Record Only, Not to Jury) | D5 219 | - - |
| 85 | Victim's Letter to Nick, Asshole | D3 218 | D3 218 |
| 86 | Victim's Letter to Nick, 1/7/00 | D3 218 | D3 218 |

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

INDEX OF EXHIBITS (Continued)

| PLAINTIFF | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| Trial, July 5-19, 2011 (Continued): | | | |
| 87 | Victim's Letter to Nick, Chicken Shit | D3 218 | D3 218 |
| 88 | Victim's Note, Thoughts | D3 218 | D3 218 |
| 89 | Victim's Poem, He Picked Me Up | D3 218 | D3 218 |
| 90 | Victim's Diary | D3 218 | D3 218 |
| 91 | Nick's Note to Victim, Trust Me | D3 218 | D3 218 |
| 92 | Victim's Note to Nick, Hey Babe | D3 218 | D3 218 |
| 93 | Yearbook Pages | D3 219<br>D4 129 | —<br>D4 130 |
| 95 | Defendant Recorded Interview with Reaves and Hall | D5 192 | D5 192 |
| 96 | Victim's Right Shoe | D7 2 | D7 2 |
| 97 | Victim's Left Shoe | D7 2 | D7 2 |
| 98 | Victim's Pants | D7 2 | D7 2 |
| 99 | Victim's Shirt | D7 2 | D7 2 |
| 100 | Victim's Bra | D7 2 | D7 2 |
| 201 | Victim's Sock | D7 2 | D7 2 |
| 202 | Victim's Hairbrush | D3 219 | D3 220 |
| 203 | Victim's Toothbrush | D7 2 | D7 2 |
| 204 | DNA Standards, C. Courtright | D7 2 | D7 2 |

index   xliv

INDEX OF EXHIBITS (Continued)

| PLAINTIFF | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| | Trial, July 5-19, 2011 (Continued): | | |
| 205 | DNA Standards, D. Freeman | D7 2 | D7 2 |
| 206 | DNA Standards, Defendant | D7 2 | D7 2 |
| 207 | OSP Lab Report, 8/27/00 | D6 91 | D6 91 |
| 208 | OSP Lab Report, 9/6/00 | D6 101 | D6 101 |
| 210 | OSP Lab Report, 1/21/01 | D6 92 | D6 92 |
| 211 | Lab Report from England | D6 230 | D6 230 |
| 212 | Microtrace Report, 3/15/11 | D6 230 | D6 230 |
| 213 | Microtrace Report, 4/6/11 | D6 230 | D6 230 |
| 214 | Victim's Medical Records | D3 64 | D3 65 |
| 215 | Defendant's Medical Records | D3 68 | D3 68 |
| 216 | Defendant's Timeline Seized Withdrawn | D6 196 D6 250 | — |
| 218 | Transcript of Defendant's Interview (Received for Record Only) | D5 192 | D5 197 |
| 221 | Photograph, Coquille HS, Bus Gate | D4 229 | D4 230 |
| 222 | Photo, North Elm & Central | D5 130 | D5 130 |
| 223 | Photograph, North Elm & Central | D5 130 | D5 130 |
| 224 | Photograph, North Elm | D5 130 | D5 130 |
| 225 | Photograph, North Elm | D5 130 | D5 130 |
| 226 | Photograph, North Elm | D5 130 | D5 130 |

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

index   xlv


INDEX OF EXHIBITS (Continued)

| PLAINTIFF | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| Trial, July 5-19, 2011 (Continued): | | | |
| 227 | CD Video of Hudson Ridge Shoe | D5 142 | D5 142 |
| 232 | Photograph, Hwy 42/42S Junction, Eastbound | D5 110 | D5 110 |
| 233 | Photograph, Hwy 42/42S Junction, Westbound | D5 110 | D5 110 |
| 234 | Photograph, Hwy 42/42S Junction | D5 110 | D5 110 |
| 235 | Photograph, DFN Card Lock | D5 110 | D5 110 |
| 236 | Western Auto Receipt, | D5 147 | D5 147 |
| 237 | Letter, Victim to Defendant | D7 3 | D7 3 |
| 238 | Letter, Victim to Defendant | D7 3 | D7 3 |
| 239 | Letter, Victim to Defendant | D7 3 | D7 3 |
| 240 | Time Log Sheet, Jennifer Storts | D5 168 | D5 168 |
| 241 | CD of Grand Jury Testimony | D7 62 | D7 62 |
| 242 | CD Recording of Phone Call, Scott Hamilton to Defendant | D6 13 | D6 13 |
| 243 | CD of Grand Jury Testimony | D6 13 | D6 13 |
| 244 | Victim's Death Certificate | D7 86 | D7 87 |

Exhibit 102  Page 46 of 1666 to
State Defendants' Motion for Summary Judgment

```
                                            index   xlvi


                     INDEX OF EXHIBITS (Continued)


    DEFENDANT        DESCRIPTION               OFFERED    RECEIVED

    Trial, July 5-19, 2011 (Continued):

       101        Photograph of Gas Station   D3 94      D3 94

       102        Photograph, Mustang Back Seat D4 24     D4 24

       103        Photograph, Close-up of     D4 24      D4 24
                  Speaker

       104        Letter from Victim to       D7 187     D7 187
                  Defendant

       105        Letter from Victim to       D7 187     D7 187
                  Defendant

       106        Letter from Victim to       D7 187     D7 187
                  Defendant

       107        Letter from Victim to       D7 187     D7 187
                  Defendant

       108        Letter from Victim to       D7 187     D7 187
                  Defendant

       109        Letter from Victim to       D7 187     D7 187
                  Defendant

       110        Letter from Victim to       D7 187     D7 187
                  Defendant

       111        Letter from Victim to       D7 187     D7 187
                  Defendant

       112        Letter from Victim to       D7 187     D7 187
                  Defendant

       113        Victim's Note               D7 187     D7 187

      113A        Victim's Note               D7 187     D7 187

       114        Note from Victim to Defendant D7 187    D7 187


       Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664
```

index   xlvii

INDEX OF EXHIBITS (Continued)

| PLAINTIFF | DESCRIPTION | OFFERED | RECEIVED |
|-----------|-------------|---------|----------|

Trial, July 5-19, 2011 (Continued):

| PLAINTIFF | DESCRIPTION | OFFERED | RECEIVED |
|-----------|-------------|---------|----------|
| 115 | Chris' Note to Victim | D4 80 | D4 80 |
| 116 | Chris' Note to Victim | D4 80 | D4 80 |
| 117 | Chris' Note to Victim | D4 80 | D4 80 |
| 118 | Chris' Note to Victim | D4 80 | D4 80 |
| 119 | Chris' Note to Victim | D4 80 | D4 80 |
| 120 | Chris' Note to Victim | D4 80 | D4 80 |
| 121 | Sun and Moon Data, 6/28/00 | D7 190 | D7 190 |
| 123 | Victim's Letter to Mr. Hall | D4 83 | D4 83 |
| 124 | Google Map, Johnson Mill | D7 59 | D7 60 |
| 126 | Reward Poster | D9 11 | D9 11 |
| 127 | Photograph of Thunderbird | D6 140 | D6 140 |
| 128 | Summary | D9 11 | D9 11 |
| 129 | Summary | D9 11 | D9 11 |
| 130 | Summary | D9 11 | D9 11 |
| 131 | Summary | D9 11 | D9 11 |
| 132 | Summary | D9 11 | D9 11 |
| 133 | Summary | D9 11 | D9 11 |
| 134 | Summary | D9 11 | D9 11 |
| 135 | Photo - Victim's Right Shoe | D7 140 | D7 140 |
| 136 | Photo - Victim's Left Shoe | D7 140 | D7 140 |

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

index   xlviii

INDEX OF EXHIBITS (Continued)

| PLAINTIFF | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| | Trial, July 5-19, 2011 (Continued): | | |
| 137 | Inner Fold Inside Evidence Bag From Victim's Shoe | D7 143 | D7 143 |
| 138 | Two Brown/Blonde Hairs | D7 143 | D7 143 |
| 139 | Photograph, Left Shoe | D7 144 | D7 144 |
| 140 | Photograph, Left Shoe | D7 144 | D7 144 |
| 141 | Photograph, Left Shoe | D7 144 | D7 144 |
| 142 | Photograph, Tank Top | D7 146 | D7 146 |
| 143 | Photograph, Tank Top | D7 146 | D7 146 |
| 144 | Photograph, Close-up of Tank Top | D7 148 | D7 148 |
| 145 | Photograph, Close-up of Tank Top | D7 148 | D7 148 |
| 146 | Photograph, Sports Bra | D7 151 | D7 151 |
| 147 | Photograph, Demonstrative | D7 154 | D7 154 |
| 148 | Photograph, Demonstrative | D7 154 | D7 154 |
| 149 | Photograph, Tank Top | D7 155 | D7 155 |
| 150 | Photograph, Tank Top | D7 155 | D7 155 |
| 151 | Photograph, Tank Top | D7 155 | D7 155 |
| 152 | Photograph, Sports Bra | D7 155 | D7 155 |
| 153 | Vehicle Registration | D8 20 | D8 21 |
| 154 | Meneely Report (For Record Only) | D8 58 / D8 62 | — / — |

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

index   xlix


INDEX OF EXHIBITS (Continued)


| PLAINTIFF | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| Trial, July 5-19, 2011 (Continued): | | | |
| 155 | Map | D9 11 | D9 12 |
| 157 | Demonstrative Vehicle Photographs(For Record Only) | D9 33 | D9 33 |
| 158 | Demonstrative Vehicle Photographs(For Record Only) | D9 33 | D9 33 |
| 159 | Photographs Demonstrative Vehicle(For Record Only) | D9 33 | D9 33 |
| 160 | Demonstrative Vehicle Photographs(For Record Only) | D9 33 | D9 33 |
| 161 | Demonstrative Vehicle Photographs(For Record Only) | D9 33 | D9 33 |
| 162 | Photograph of Mustang | D9 25 | D9 26 |
| 163 | Photograph of Mustang | D9 25 | D9 26 |
| 164 | Photograph of Mustang Interior | D9 32 | D9 32 |
| 166 | Photograph of Mustang Interior | D9 32 | D9 32 |
| 171 | Photograph of Mustang Trunk | D9 29 | D9 29 |
| 172 | Photograph of Mustang Trunk | D9 29 | D9 29 |
| 173 | Check for Purchase of Vehicle | D9 31 | D9 31 |
| 174 | Vehicle Title, Defendant | D9 33 | D9 33 |
| 175 | Vehicle Title, William Huff | D9 32 | D9 32 |


Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

index    1


INDEX OF EXHIBITS (Continued)


Motion for New Trial, September 9, 2011:

| DEFENDANT | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 301 | Police Report and Emails | — | — |
| 302 | Document, Transcription | 257 | 257 |

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Z                                          index    li

## INDEX OF VOLUMES

### AND EXPLANATION OF PAGE NUMBERING

| VOLUME | | Pages |
|---|---|---|
| 1 | PRETRIAL PROCEEDINGS | 2-182 |
| | Plea Hearing, August 24, 2010 | 2-7 |
| | Pretrial Hearing, October 14, 2010 | 8-9 |
| | Omnibus Hearing, April 14, 2011 | 10-164 |
| | Pretrial Hearing, May 5, 2011 | 165-173 |
| | Pretrial Hearing, June 21, 2011 | 174-182 |

**The following are Trial Days numbered with a "D" signifying the day of the Trial, then the page number of that day. This is done for simplification in finding something.  The actual page numbers would be 183-1712.**

| 2 | Jury Trial, Day One, July 5, 2011 | D1 1 2-D1 32 |
|---|---|---|
| | Jury Trial, Day Two, July 6, 2011 | D2 2-D2 37 |
| 3 | Jury Trial, Day Three, July 7, 2011 | D3 2-D3 111 |
| 4 | Jury Trial, Day Three, Continued | D3 112-D3 222 |
| 5 | Jury Trial, Day Four, July 11, 2011 | D4 2-D4 168 |
| 6 | Jury Trial, Day Four, Continued | D4 169-D4 261 |
| 7 | Jury Trial, Day Five, July 12, 2011 | D5 2-D5 137 |
| 8 | Jury Trial, Day Five, Continued | D5 138-D5 280 |
| 9 | Jury Trial, Day Six, July 13, 2001 | D6 2-D6 112 |
| 10 | Jury Trial, Day Six, Continued | D6 113-D6 253 |

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

index   li

### INDEX OF VOLUMES (Continued)

### AND EXPLANATION OF PAGE NUMBERING

VOLUME                                                          Pages

11   Jury Trial, Day Seven, July 14, 2011    D7 2-D7 193

12   Jury Trial, Day Eight, July 15, 2011    D8 2-D8 79

13   Jury Trial, Day Nine, July 18, 2011     D9 2-D9 165

     Jury Trial, Day Ten, July 19, 2011      D10 2-D10 7

**The following are page numbers after the completion of the Trial (1530 pages plus Pre-Trial of 182) beginning with Page 1713, and continuing with what those page numbers were be had the Trial been numbered consecutively.**

14   POST-TRIAL PROCEEDINGS                          1713-1736

         Post-Trial Motions, August 1, 2011    1713-1736

         Sentencing, August 1, 2011            1736-1743

         Motion for New Trial, Sept. 9, 2011   1744-1777

         Motion for Judgment of Acquittal,     1777-1788
         September 9, 2011

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

STATE OF OREGON,                    )
                                    )
            Plaintiff,              )    CASE NO. 10CR0782
                                    )
                                    )    JURY TRIAL
        vs.                         )
                                    )
 NICHOLAS JAMES McGUFFIN,           )
                                    )
            Defendant.              )
_____    )

TRANSCRIPT OF PROCEEDINGS

Volume 2, Day 1, Pages D1 2-D1 32

BE IT REMEMBERED That, the above-entitled cause
came on regularly for hearing beginning at 9:19 a.m., Tuesday,
July 5, 2011 in the Circuit Courtroom of the Coos County
Courthouse in the City of Coquille, County of Coos, State of
Oregon, before the Honorable Richard L. Barron.

APPEARANCES

R. Paul Frasier, District Attorney for Coos County,
representing the Plaintiff.

Erika Soublet, Assistant District Attorney for Coos County,
representing the Plaintiff.


Robert McCrea, Attorney at Law, representing the Defendant.

Shaun McCrea, Attorney at Law, representing the Defendant.


        Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

D1 2

1    *                          *                          *

2              (Jury panel out.)

3              JUDICIAL ASSISTANT:    All rise.

4              THE COURT:    Be seated, please.

5              First of all, this is State vs. McGuffin.  It's

6    a pretrial matter.  The jury is not in the jury room (sic).

7              There was one juror, Ms. Dungee.  She's on

8    about the fourth page, like the 98th juror.  And, staff

9    informed me that when she came in, she kind of cowered in the

10   corner and didn't even get in line.  And she was visibly

11   shaking and upset.  Told staff she can't be around people.

12   Didn't let us know before.  Didn't send her questionnaire in

13   until today, and didn't have a doctor's excuse.  But, they

14   said she was visibly shaking and upset, and I just allowed

15   them to excuse her.

16              I just — I wasn't going to put — they — they

17   felt it wasn't — she wasn't making it up.  It looked very

18   real.  So, I didn't think — and we have over a hundred and

19   five jurors.  But, I let them go ahead and excuse her rather

20   than make somebody suffer.

21              Okay?

22              MR. FRASIER:    (Inaudible response.)

23              MS. McCREA:    (Inaudible response.)

24              THE COURT:    Uh, I had two quick matters.  As

25   soon as we know the jury has been oriented and ready, I'm

```
   D1 3                               Motions
```

 1  going to stop this procedure because we take it up after

 2  selection.

 3            There was a Motion to Admit Statements by the

 4  State in relation to a — a recent decision, State vs. Davis.

 5  In a — in a conference in my chambers, off the record, between

 6  counsel, Mr. Frasier informed me that he wasn't pursuing that

 7  at the present time.  He may pursue it in rebuttal possibly,

 8  and he would let me know.  So, any Hearing we would have to

 9  have would be then.

10            The other matter, then, left pending, is

11  Ms. McCrea's Motion in Limine.  And Mr. Frasier filed a

12  Response.  And the Court has reviewed those matters.

13            So, uh, let's see.  Did you bring down the

14  original of that, Ms. McCrea?

15            MS. McCREA:   (Inaudible response.)

16            THE COURT:   If you didn't, we just need it

17  sometime.  I — I have a copy.  But, - - -

18            MS. McCREA:   Yes.  I intended to bring it

19  down, Your Honor.  And I think my staff mailed it to you.  I

20  do — I do have another physical copy, - - -

21            THE COURT:   (Interposing) Oh, that's fine.

22            MS. McCREA:   - - - but - - -

23            THE COURT:   I've got a — I've got a copy.  I

24  just — I was just wanting the — wanting the - - -

25            MS. McCREA:   (Interposing) Yes, - - -

```
 1                 THE COURT:    - - - a record to be - - -
 2                 MS. McCREA:    - - - it would make total sense
 3      to bring the original, but I think it was already mailed to
 4      the Court.
 5                 THE COURT:    That's fine.
 6                 Okay.  Uh, Mr. Frasier, raised the timeliness
 7      of the Motion.  And, of course, I don't — that may be correct.
 8                 My problem, uh, Mr. Frasier, is that, uh — and
 9      I would prefer to have these because what — if — one prejudice
10      that you possibly suffer is a ruling that you would want to
11      appeal when they come this late.  Uh, and if I rule something
12      out and you wanted to appeal it, that puts us in a — in a
13      tight situation.  Other than that, I guess Ms. McCrea could
14      even wait until the Trial and — and object.  Then the Court
15      would have to rule on it.
16                 So, uh, I would rather have these matters
17      brought up early so we can do the Pretrial beforehand.  But,
18      in this case, I'm not — I wouldn't not hear those based on
19      timeliness.
20                 MR. FRASIER:    Very well.
21                 THE COURT:    Okay.  Uh, some of this stuff I
22      can look at.  I mean, I'll — I'll hear argument.  The fact
23      that there is a lay opinion — as long as there is there a
24      basis for a lay opinion, it's allowable.  And I — that's the
25      problem with not hearing it.  I think in some of these cases,
```

D1 5                                    Lay Opinion

1   I'm going to have wait until we actually are in Trial to make

2   a ruling.  But, generally, a lay opinion that has some basis

3   for it — a foundation — is allowable, just as the same as any

4   other one.  So, that in and of itself is not grounds for

5   excluding something.

6                Okay.  Now, the first one relates to, uh, drug

7   use.  Let me get this.

8                Uh, I — I guess, my feeling, generally —

9   especially if Mr. McGuffin is going to testify and he's on the

10  — on the list — is if, in fact, he was using drugs or people

11  are going to testify he was using drugs, that goes to his

12  recollection.  And that would generally, at least for no other

13  purpose, it would be relating — it would — it would come in

14  for that basis, as a part of his, uh — whether he could

15  recollect things.  So, it would come in on that.

16               Uh, as I understand, the other theory is that —

17  of Mr. — of the State's offering it, is that, uh — based on

18  what they perceived as the defense strategy, which is that

19  Mr. McGuffin was very concerned about, uh, his — Ms. Freeman.

20  And that instead of out looking, he's out taking drugs and, uh

21  — a related matter, attempting to have intercourse with

22  somebody.

23               Now, the defense may — may say none of that is

24  true, but if they have witnesses who have testify to it,

25  generally, it would appear to be, uh, somewhat relevant.  So —

1   and relevancy isn't a high standard.

2          I'm going to kind of give you my feeling on

3   these things, and if you have something you want to put on the

4   record, go ahead and put it on the record, either of you?

5   Okay?

6          MR. FRASIER:    (No audible response.)

7          MS. McCREA:    (No audible response.)

8          THE COURT:    Uh, Donna Dennis — again, that's

9   kind of a — a foundation matter.  Uh, it — it appears that

10  there is some way that she thinks she recognizes Ms. Freeman

11  and Mr. McGuffin, uh, and — uh, there might have to be some

12  time element in there.  But generally, if she can relate it to

13  him that would again have a relationship because that could go

14  to — that could go to motive.  That could go to a lot of

15  things.  So, that would generally be admissible.

16          Mr. Breakfield, uh, if he's — I'm assuming that

17  this statement that he — that is allegedly attributed to

18  Mr. McGuffin, came after Ms. Freeman was missing or — or, her

19  body was discovered.

20          MR. FRASIER:    That's correct.

21          THE COURT:    Okay.  And I think that statement

22  of — that, "I strangled the bitch and can do so to you", would

23  be admissible after — if it's after the death of Ms. Freeman.

24  I mean, that could be construed as an admission.

25          Uh, I don't want to go into a lot of details

D1 7                           Preliminary Matters

1   that — that he's all of a sudden, uh — to — to show jealousy,

2   because as I recall Mr. Breakfield dated Ms. Edgerton, who had

3   some relationship with Mr. McGuffin, it's alleged. And, I'm

4   not too sure that his jealousy — alleged jealousy, as related

5   to one person, necessarily relates to this case. So, I

6   wouldn't want a lot of background. You could say that, "He

7   confronted me. We both at one time dated somebody." But, I

8   don't want a lot of stuff on that — on that issue.

9             MR. FRASIER:   We can do that, Your Honor.

10            THE COURT:   Mr. Bryant, uh — it would appear

11  that that would be relevant. And we could — Mr. Bryant's — is

12  he — he the one in custody?

13            MR. FRASIER:   No.

14            THE COURT:   Mr. - - -

15            MR. FRASIER:   (Interposing) Uh, yes, he is in

16  custody at the time.

17            THE COURT:   Mr. — Mr. Bryant was in custody

18  with Mr. McGuffin?

19            MR. FRASIER:   That's correct.

20            THE COURT:   Okay. Uh, but he was in on — and

21  I can certainly give a limiting instruction as to — you know,

22  that's irrelevant on this case what he was in custody for, but

23  I think the custody, the fact they were in jail together,

24  would have — that surrounds the statement. And it would be

25  too hard to say what it was, but I can certainly give a

Preliminary Matters          D1 8

1  limiting instruction, if requested, to say that that has

2  nothing to do with this charge, and they can't consider for

3  any purpose.  The only purpose it was offered is to show under

4  the circumstances in which the statement was made.

5          Dustin Graham, you are not calling as a

6  witness, but may call — call in rebuttal.  So, if that — if

7  you are going to call him in rebuttal, bring that up so we can

8  — I can rule on that.

9          MR. FRASIER:    We'll do that.

10         THE COURT:    And Melissa Beebe, it would seem

11 to me to be admissible as a possible admission.

12         Uh, it came out of - - -

13         MS. McCREA:    (Interposing) Excuse me,

14 Your Honor.  I — maybe I can — maybe I can help a little bit.

15         In — in going through the — the evidence and

16 the State's Response, it appears to me that the State's

17 rendition is so different than what the defense anticipates

18 the evidence to be, that in most of these instances, I now

19 believe - - -

20         And my — and my effort was — let me digress for

21 just a moment.  My effort in filing the Motion was to try to

22 bring these matters before the Court and to put Mr. Frasier on

23 notice, without having to do this piece meal during the time

24 of the Trial.

25         THE COURT:    Right.

D1 9                          Preliminary Matters

1              MS. McCREA:   Because then we have to keep

2    sending the jury out and dealing with these issues.

3              But, in terms of Mr. Frasier's Response, it

4    appears — and Melissa Beebe is an example of that — that we

5    are so far apart on what we anticipate the witness is going to

6    say, that we may just have to do that in some of these

7    instances.  Because, with Ms. Beebe, the — it is the defense

8    position, prosecution rendition leaves out a crucial statement

9    that she made according to the Discovery.

10             And that is that before Mr. McGuffin made any

11   statement back to her — the context of it was that she saw him

12   at the Courthouse.  That she said to him, "How did Court go

13   for you?"  And he said, "Very well."  Or, "Fine." Or,

14   something.

15             And then she said, "It's a lot better than it

16   should have been for you."  And his statement back to her was

17   only in response to that.  So, that part gets left out by the

18   prosecution.

19             So, I'm just saying it's going to depend on the

20   how the witness testifies at the Trial.

21             And the same for Donna Dennis.  The same for

22   Mr. Breakfield, Austin Fisher, Richard Bryant.  And with

23   Richard Bryant, the State's position is that the defense may

24   contend that these statements were not made.  I doubt that we

25   are going to take that position.  However, I anticipate that

Preliminary Matters          D1 10

1  Mr. Bryant's testimony, based on the Discovery, is going to be

2  different then the characterization of the prosecution that

3  Mr. McGuffin was remembering things.  But rather it was — it

4  will be our position — was musing about things.

5                  The same with Tina Mims and, um — and Adam

6  Shiner.

7                  Now, the — the situation with Kimberly Peak is

8  different because she is being called to testify - - -

9                  THE COURT:    (Interposing) I don't — Kimberly

10  Peak is one — I don't — I don't consider that an adoptive

11  admission.  So, I — I — that one, I generally wouldn't allow,

12  because I - - -

13                  MS. McCREA:    (Interposing) And — and the

14  statement to David Jenkins would be — the statement that David

15  Jenkins allegedly made, that he denies making, is hearsay.

16                  THE COURT:    Well, we don't — Ms. Peak —

17  Ms. Peak — I don't consider that an adoptive admission.  So —

18  you know, it generally wouldn't be coming in, unless you could

19  show me something else.  The circumstances I don't think —

20  it's just silence.  And — and I don't think that, in and of

21  itself — at least looking at Kirkpatrick and reading some of

22  the — reading the Oregon case and a — and a couple Federal

23  cases, I just don't think that it makes — that it goes over

24  the hump to get — get that in.  So, that one generally would

25  not be coming, in unless something else is shown to me, of

D1 11                     Preliminary Matters

1   course.

2                   MS. McCREA:    Okay.

3                   THE COURT:    And the thing — I do want to

4   mention, of course, there may circumstances, such as

5   Ms. Beebe, when you say there is other circumstances.  That

6   may be true and she may testify that.  It still might be

7   admissible because the jury can infer something else from that

8   — a — a broader thing than — than what it is.

9                   Mr. — Mr. Frasier was not going into what the

10  crime was related to Ms. Beebe's statement.  That may be

11  something that you want to bring out because it shows what it

12  was.  But it — and the whole statement.  But it still may be

13  admissible just because it's a — it's a statement of — it's

14  surprising — or, "Surprising what you can get away with in

15  Coos County," it may still be something that the jury, with

16  all things, would want to consider.

17                  So — I mean, I'll listen to it.  But,

18  generally, what you are saying is the facts may be a little

19  different than what he's brought out.  And that may true.  And

20  that, in some case, may lead to me saying it's not admissible.

21  But other cases, generally, I think it probably is going to be

22  admissible.

23                  MS. McCREA:    And — and I understand the

24  Court's position.  And — and, my intent in bringing these

25  things before the Court was to raise these issues as soon as

Preliminary Matters          D1 12

1   reasonably practicable.

2              THE COURT:    Right.

3              MS. McCREA:    And also, to put the State on

4   notice that there may be issues with these matters because —

5   of course, the State's going to — I know that Mr. Frasier is a

6   worthy adversary and he's going to make a strong and (sic)

7   opening statement as he can.  But I certainly would like to

8   avoid, through the — through the course of the Trial, having

9   to request a Motion for Mistrial because of issues that I

10  didn't bring up at — in the very beginning.  And many of these

11  things, as the Court notes, are things we are going to have to

12  deal with as they come out through the course of the witnesses

13  in the Trial.

14             THE COURT:    Okay.  Uh, let me — that

15  generally covers most of these with, one — let me look at the

16  — it's the Reaves — let me look at my note here.

17             Uh, the — the statement in relation to the —

18  the Reaves, about — that Mr. McGuffin allegedly made here

19  about, uh — when he reminded her of the statement about,

20  "She's been hitting me," and that sort of thing.  Uh, and then

21  he said, "I wish. . ." — supposedly — ". . .I had something to

22  bitch about now."  I — that sounds to me more as if it's a

23  statement relating to if she were alive.  Uh, I mean, "I wish

24  she were alive, so I — so I could bitch about something like

25  that," as opposed to it being a negative comment.  But, I

D1 13                        Preliminary Matters

1   don't really think that's necessarily admissible.

2              Uh, the rest of it about the relationship, and

3   the hitting that — you said the hitting would probably —

4   generally, be — show the relationship was bad, so that

5   generally would be coming in.

6              Uh, the rest of them, I think, generally, are

7   what I've said before, with the exception of Austin Fisher.

8   Let me look at a note there.  Uh, and Austin Fisher was a —

9   was a boy that — isn't that the boy who dated — who dated

10  Ms. Freeman earlier?

11             MR. FRASIER:    Yes.

12             THE COURT:    That one I'm — about, "I'll beat

13  you up," could show possessiveness in relation to Ms. Freeman.

14  As I said, the other possessiveness related to Ms. Edgerton, I

15  don't think is necessarily probative of anything.   In

16  relationship with Ms. Freeman, it probably is.

17             So, generally, except for the things that I've

18  specifically mentioned, I think, with possible exception

19  coming up here in Trial, would generally be admissible.

20             MS. McCREA:    There was also — regarding the

21  Reaves, Your Honor, there was the issue of the alleged contact

22  where Ricky Crook was present, and making statements.  And

23  Mr. McGuffin was supposed to be make — doing hand gestures

24  trying to get him - - -

25             THE COURT:    (Interposing) I don't - - -

Preliminary Matters       D1 14

1                  MS. McCREA:   - - - to stop.

2                  THE COURT:   - - - generally think that's

3    probably admissible.  Because I don't know that she doesn't —

4    that — that's broad interpretation.  So, generally, I don't

5    think that is admissible.

6                  MS. McCREA:   Okay.  Thank you.

7                  THE COURT:   Okay.

8                  The jury ready yet?

9                  JUDICIAL ASSISTANT:   (Inaudible response.)

10                 THE COURT:   Are these people that are crossed

11   out on this list the ones that aren't here?

12                 JUDICIAL ASSISTANT:   (Inaudible response.)

13                 THE COURT:   Do they have a copy of this?

14                 JUDICIAL ASSISTANT:   (Inaudible response.)

15                 THE COURT:   Okay.  You have a copy of — of —

16   a copy of people who have been crossed out.  So, you can take

17   out, uh, - - -

18                 Oh, this — this is fourteen?

19                 JUDICIAL ASSISTANT:   (Inaudible response.)

20                 THE COURT:   Yeah.  That would be helpful.

21                 Okay.  Tell — tell Kay to let us know.

22                 JUDICIAL ASSISTANT:   (Not understandable.)

23                 THE COURT:   I — I would question — counsel,

24   I would — I would caution, when — to be able to feed this to

25   the other courtrooms so they can hear it, I'm — I'm pressing

```
   D1 15                    Preliminary Matters
```

1  the panic button that we usually have so we can go through

2  that audio system.  If we don't do that, then we have to go

3  through another audio system that has about a ten-second delay

4  between what I say and what they hear down there, which is too

5  long.  I mean, we've — we've had that.  So, it's going to be

6  through this audio system.  But, this audio system in here is

7  extremely sensitive.  So, anybody who moves a pencil is going

8  to be heard.

9              I am going to ask the jurors to be as quiet as

10 possible.  You know, so you shuffle papers, they are going to

11 hear shuffling papers and not voices.  So, please — please be

12 as careful as possible with that.  I mean I can't cram a

13 hundred people into this courtroom.  We are going to get about

14 seventy of them in here.  I'll tell you that now, and I'll

15 tell the jury that, also.

16             Okay?

17             MR. FRASIER:    (No audible response.)

18             MS. McCREA:    (No audible response.)

19             THE COURT:    As soon as the jury is ready,

20 we'll bring them out.

21                        (RECESS)

22             (Jury panel out.)

23             THE COURT:    My understanding is that you'll

24 have no problem because the jurors are going to be sitting in

25 here filling out things.

1          You'll have no problem, Mr. McGuffin, going out

2   and around?

3          Is that correct?

4          (No audible response.)

5          We were told that - - -

6          JUDICIAL ASSISTANT:    (Interposing) I spoke

7   with this — the deputy, to go (not understandable).

8          So, Mr. McGuffin, when — when you leave the

9   courtroom, you go out that way with — Ms. McCrea will walk out

10  with you.

11          DEFENDANT:    Okay.

12          THE COURT:    And, obviously, there will be

13  deputies around there, but — rather than have you back through

14  there.

15          JUDICIAL ASSISTANT:    (Not understandable.)

16          THE COURT:    Okay.

17                  (RECESS)

18          (Jury panel in.)

19          JUDICIAL ASSISTANT:    All rise.  Circuit Court

20  of the State of Oregon, the County of Coos, is now in session.

21          THE COURT:    Be seated please.

22          Okay.  Ladies and gentlemen, this is case of

23  State of Oregon vs. Nicholas McGuffin.

24          Mr. Frasier, are you ready for the State?

25          MR. FRASIER:    The State is ready, Your Honor.

```
   D1 17                      Introduction
```

 1          THE COURT:    Ms. McCrea, are you ready for

 2  Mr. McGuffin?

 3          MS. McCREA:    The defense is prepared,

 4  Your Honor.

 5          THE COURT:    If all jurors in the room, and in

 6  the adjoining courtroom, would please stand and raise your

 7  right hand, and answer "I will" at the end of the oath.

 8          (Whereupon the jury panel was sworn by the

 9  Bailiff to truthfully answer all questions regarding their

10  qualifications.)

11          THE COURT:    Have a seat, please.

12          I would mention a couple things.  We have an

13  audio and a video feed going into the next courtroom so jurors

14  there can hear that.  The microphones that are being used are

15  extremely sensitive in this courtroom.  So, I would ask people

16  to not talk and to try to keep the squirming to a minimum

17  because the other courtroom, uh, that hears this is going to

18  pick up any paper shuffling, or any — any movement at all, and

19  it may mask what we are — we are hearing.

20          This is the best audio system we can use.  If

21  this does not work as well, we have another audio system that

22  can set up, but it is not as good because there is about a

23  ten- second delay between my speaking and the other courtroom

24  hearing what I'm saying.  And that's too long a delay so we

25  are trying this system to make sure it works.

1          I would ask that everybody listen carefully as

2 possible because that will speed up this process as we are

3 going through here.

4          I want to, first of all, introduce parties.

5 Seated closest to you at counsel table is Mr. Paul Frasier,

6 who is the District Attorney for Coos County.  To

7 Mr. Frasier's right is Ms. Erika Soublet, who is the Chief

8 Deputy District Attorney for Coos County.

9          To Ms. Soublet's right is Mr. Robert McCrea,

10 and he is one of the attorneys representing Mr. McGuffin.  And

11 seated to Mr. McCrea's right is Ms. Shaun McCrea, who is also

12 an attorney representing Mr. McGuffin.

13          And then, Mr. Nicholas McGuffin is at the end

14 of counsel table.  He is the Defendant in this case.

15          Mr. McGuffin has been charged with the crime of

16 Murder.  The charge reads that he did, on June 28, 2000, in

17 Coos County, Oregon, did unlawfully and intentionally cause

18 the death of Leah — Leah Freeman, another human being.

19          Mr. McGuffin has plead not guilty.  That means

20 he denies these allegations.  He is presumed to be innocent.

21 And that presumption stays with him until such time, if it is

22 reached, that you are convinced beyond a reasonable doubt of

23 his guilt.

24          The fact that he has been charged with this

25 crime cannot be considered by you as indicating that he is

D1 19                                    Introduction

1   guilty of the crime.  That is merely the formal process of

2   bringing a charge before the jury.  The jury determines

3   whether he is guilty or not guilty of the crime.

4            The State has the burden of proving his guilt

5   beyond a reasonable doubt.  He has no burden of proving or

6   disproving anything in the case.

7            Uh, this courtroom will get warm.  There is an

8   air conditioning system, but the air conditioning system — if

9   we turn it on — would mask everything that I say.  So, it's

10  not going be on and the courtroom will get warm.  During the

11  recesses, we will have it on to try to make sure it gets as

12  cool as possible.  But, I just want to advise you that it —

13  that it will get warm in this matter.

14           You were all given clipboards with a

15  questionnaire.  And you were asked not to look at that

16  questionnaire until you were told to, and that will be at the

17  end of this process.  And I want to make sure that you

18  understand that that questionnaire is being filled out under

19  oath, just as your questioning would be when we ask you a

20  question.  So, please look at it carefully, read it carefully,

21  and answer it as truthfully as you can.

22           Once we get to that process of you filling out

23  the questionnaire, then when you fill it out, we will release

24  you for a short period of time.  Probably until about 12:45,

25  so we can copy those, get them collated, and give them to the

Introduction          D1 20

1   attorneys and the parties so they have a chance to review

2   those before we start the process.  We will be trying to start

3   — restart the process after the questionnaire is done at 1:00.

4   So, if you leave the courtroom, you'll have to be back here

5   about 12:45.  And we will try to get started at 1:00 and start

6   questioning jurors.

7                    I will point out to you that the Constitution,

8   and our law, requires that we have a fair cross section of the

9   community.  And that means people who are older, people who

10  are younger, people who are employed, people who are

11  unemployed, people with children, and people without children.

12  All factors.

13                   I will take into account your — try to take

14  into account, as best I can, your personal circumstances and

15  what hardships it may or may not cause you.  I cannot

16  guarantee that you will be released because of a particular

17  circumstance in your life.  There are some cases that just

18  take a longer time to try.  This case has had some publicity

19  in it, so it's going to take a longer process to go through

20  this procedure and get it done.

21                   We are as anxious to have a jury picked as you

22  are, but it will take some time.  And I will try to excuse

23  people that I feel really have to — that really have to be

24  excused.  But, I cannot guarantee that.  So, again, it relates

25  — we have to have a section whether you are employed, or

D1 21                          Introduction

1    unemployed, children or not, older or younger, I'll take it

2    into account the best I can.

3              Uh, I envision the picking of the jury to take,

4    obviously, today and tomorrow, and possibly into Thursday.  I

5    can't tell you how long it will take.  It just depends on how

6    we will go.  What we are going to do, though, is — is somewhat

7    a little different.  We've — we've got fourteen in the jury

8    box.  We will question fourteen, myself and the attorneys.

9    And as soon as we have those fourteen chosen that we think, at

10   that point, uh, there is no particular reason to excuse them,

11   we will excuse those fourteen people with directions that they

12   will be called back at a certain point in time.

13             We will then put another fourteen in the box

14   and go through the same procedure, excuse those people to come

15   back, and then we'll put another fourteen in the box to go

16   through that a third time.  And then, we may have a few other

17   jurors in there.

18             The reason for that is that the parties are

19   also entitled to exercise what are called peremptory

20   challenges.  And that means they don't have to give a specific

21   reason, but there up to twenty-six peremptory challenges in

22   this type of case.  So, that's why we need to select that many

23   jurors, to make sure we have enough jurors to fill the jury

24   box and for peremptory challenges.

25             Now, there are other times where jurors are

Introduction     D1 22

1  excused for what's "cause" — that is, a particular reason.

2  And those don't count in that twenty-six.

3          Uh, I do want to stress that you need to be as

4  patient as possible.  We are trying to move this on as quickly

5  as we can.  And again, if you listen carefully, that will

6  help.

7          I would point out the staff cannot change the

8  procedures, or change anything that's in here.  So, uh — we

9  all sometimes are in situations we don't especially appreciate

10  and we would prefer to be somewhere else; but complaining to

11  the staff, or asking them to change something, is not going to

12  work and it's not going to be very helpful because they can't

13  change it without directions from me.  So, if you want to say

14  something to them it's fine.  They are just not going to be

15  able change, or probably accommodate your request.

16          I would also stress, specifically — and the

17  questionnaire says this — don't ask people for help on your —

18  on your questionnaire, and don't tell people what you wrote on

19  your questionnaire.  And if you are excused, and you are still

20  a member of the jury — that is if the first — we pick the

21  first fourteen and we say, "Okay.  You can home for awhile," —

22  and this applies to all jurors, not just the fourteen — do not

23  discuss this case with anybody — your husbands, children,

24  friends, neighbors, no one.

25          And do not go out and do any independent

D1 23                           Introduction

1   research — go to the Internet, go — go look at past news

2   articles, do any of that.  All of that is completely improper.

3   And I'm mentioning it because jurors have done it time after

4   time.  I've had people go on — after they have been told this,

5   go on the Internet and do searches of people and then come out

6   — and it's found out.  That type of conduct can jeopardize an

7   entire case.

8            And so, I want to stress specifically, do not,

9   under any circumstances, talk to anybody about it, or do any —

10  any independent research, including looking up definitions of

11  words.  Anything.  Don't bring anything into the courtroom —

12  newspaper articles, anything.

13           And again, I — I trust people to do this.  I

14  think in most cases, most jurors follow these rules exactly.

15  But, I've had in cases — and usually every case that is

16  lengthy or — or has more notoriety, I've had people go ahead

17  and violate it.  So, please do not violate what I've told you

18  to do.  That is basically a Court Order not to do it.

19           Uh, you will note when you fill out the

20  questionnaire, that there are about a 160 witnesses scheduled

21  to testify.  This Trial is supposed to take three weeks, give

22  or take.  I can't ever guarantee how long, exactly, a Trial

23  will make (sic).  Sometimes they move faster.  And even though

24  they mention about 160 witnesses, some witnesses are extremely

25  short.  Some witnesses may be longer.  So, it may move quicker

Introduction        D1 24

1   than — than you think.  But, right now it's scheduled to — to

2   be a three-week Trial.

3            Uh, there is room for you to add anything.

4   There are — there are about five pages of witnesses.  You are

5   asked, if you know any of these witnesses, to fill out — just

6   to put down who you know, and how you know them, and how long.

7   And there is room for you to answer each of the questions.

8   Try to read it carefully.  And when it says, "If you've read

9   or heard anything about this story," please don't just put, "I

10  read — I read about this story."  If you remember specific

11  details, write down the specific details you remember, uh,

12  just so we are aware of what you do remember on this case, if

13  you remember anything.

14           At this time, then, what I'm going to do —

15  unless counsel has anything else — is that we are going to

16  recess.  We are going to leave you in the courtroom — and

17  we'll probably turn the air conditioning on while you are on

18  (sic) there — to fill out the questionnaire.  When you are

19  done filling out the questionnaire, you can give it to

20  Ms. Cress or - - -

21           Is Ms. Marino in the other room?

22           JUDICIAL ASSISTANT:    (Inaudible response.)

23           THE COURT:    - - - or Ms. Marino, who is in

24  the other courtroom.  Fill it out, sign it, put your juror

25  number on.  Make sure your juror number is on the pages.  And

D1 25                                    Introduction

1  then you will be free to leave, to come back at about — I

2  would want everybody back here at 12:45.

3              Are the jurors in the courtroom in the order

4  they are going to be called?

5              JUDICIAL ASSISTANT:    (Inaudible response.)

6              THE COURT:    Okay.  Uh, I - - -

7              JUDICIAL ASSISTANT:    (Interposing) (Not

8  understandable.)

9              THE COURT:    - - - want the fourteen here,

10  that are seating the jury box, to remember where your seats

11  are, uh, because when we bring you back, you'll — you fourteen

12  will be seated in this position.

13              We may, then, ask the other jurors, and get

14  them in order, and put you in the order that you'll actually

15  be called — we already know that order — so we don't have

16  people have — having to walk over each other.

17              I would ask that you keep your juror buttons

18  on, so people know.  We have a lot of people that are

19  associated with this case.  So, you keep them on.  If anybody

20  attempts to approach you about the case, tell them you cannot

21  talk about it and to leave you alone, and report that to

22  Court personal and we will try to deal with that as quickly as

23  possible.  But, keep your juror button on even when you are in

24  the community, so people will know that you are a juror.  And

25  hopefully most people will know not to approach you and talk

Introduction          D1 26

1   to you about the case.

2               Okay.  Does counsel have anything else before

3   we recess for them to fill out the questionnaire?

4               MR. FRASIER:    Nothing from the State,

5   Your Honor.

6               MS. McCREA:    No, Your Honor.

7               THE COURT:    Okay.  Does any juror in this

8   room have a question about any of the procedures before I —

9   before I take a break and allow you to start filling out your

10  questionnaires?

11              JUROR:    (Inaudible response.)

12              THE COURT:    Yes, sir?

13              JUROR:    You stated that we weren't supposed

14  to look up the meaning of any words we don't understand?

15              THE COURT:    If you have a question about that

16  during the process, sir, I will try to explain it.  I — I want

17  it — I want to explain.  Most legal terms mean the same thing

18  they do in everyday life.  There are some specific

19  definitions.  For instance, the word "intentional" is defined

20  in the questionnaire.  So, that has a specific legal meaning.

21  But most words in the law mean exactly what they mean in

22  everyday life.  So, there is really not a lot of complication

23  about that.  Okay?

24              JUROR:    Thank you.

25              THE COURT:    Anything else?

```
   D1 27                           Introduction
```

 1              JUROR:   (No audible response.)

 2              THE COURT:   Okay.  Then the parties will take

 3   a — a recess.

 4              As I said, fill out the questionnaire.  Just be

 5   back in the jury assembly room by 12:45.  And we will try to

 6   get started.  When I ask about patience, I'm even talking

 7   about that.  Just getting all — getting over a hundred people

 8   organized is not the easiest process in the world.

 9              Okay?

10              We will be in recess then.  Fill out the

11   questionnaires and be back at 12:45.

12              Okay.  We'll be in recess.

13                            (RECESS)

14         (Jury in.)

15              JUDICIAL ASSISTANT:   All rise.

16              THE COURT:   Be seated, please.

17              First of all, I want to thank all of the jurors

18   for cooperating with this process.  And — you've made it quite

19   easy.  And the staff has been able to collate and get this

20   together.  So, I want to thank all of you very much for your

21   efforts and your cooperativeness with the Court.

22              Uh, we are going to start.  Just to explain, I

23   will ask the jurors — the fourteen jurors, here as a group,

24   some questions and then the attorneys will each have a chance

25   to ask you some questions.

1    First of all, we are going to pass out a — just

2    a list of questions that I'm going to ask generally.  And when

3    I ask them — I'll read them to you — I want you to circle the

4    ones that may apply to you.  We'll pass those out now.

5           While she's doing that, also, I would ask that

6    everybody in the courtroom, kind of remember where your seat

7    is.  Because we've got it lined up that if somebody has to

8    come up here they are kind of in order so people don't have to

9    crawl over each other to get out.  So, try to remember where

10   you are — where — where you are sitting so we can keep that

11   order.

12          And if you — I'll just kind of wait and then

13   I'll read the questions, and you can circle the ones that

14   apply to you.

15          You have to leave the window closed, ma'am.

16          JUROR:   (Not understandable.)

17          JUDICIAL ASSISTANT:   You have to leave the

18   window closed.

19          (Whereupon voir dire was conducted by the

20   Court, the State and the Defense.)

21          THE COURT:   And you come back at 1:00, you

22   fourteen, the rest of you be back here at 8:45.  Have a good

23   evening and drive carefully, please.

24          Thank you.

25          Did you get a new panel sheet for us here?

D1 29                          Introduction
1          MR. FRASIER:    I think this for you.

2          THE COURT:    You've got a third panel sheet?

3          MR. FRASIER:    (Not understandable) the expert

4    jurors that they had it on (not understandable.)

5          THE COURT:    This is the third one — Panel

6    Three.  Okay.

7               Yeah, I've got mine, too.

8               Okay.  Yeah.  Uh, save those and I'll — I'll

9    use yours when I get to the end.  Okay.

10              Thanks.

11              Uh, sir, if you want wait just at, uh, my

12   office door — just outside my office door.  She'll get to you

13   then.

14         JUROR:    Okay.  Right down the - - -

15         THE COURT:    (Interposing) Yeah.

16         JUROR:    - - - hallway?

17         THE COURT:    It's just around the corner.

18   It's the first - - -

19         JUROR:    (Not understandable) - - -

20         THE COURT:    When you go around the corner,

21   it's right there.

22         JUROR:    First door on the right, there?

23         THE COURT:    First door on your right.

24   Correct.

25         JUROR:    All right.  Thank you.

Introduction          D1 30

1          THE COURT:    You bet.

2          Okay.  Ms. Cress is going to talk to him.  I

3    don't know that I'm going to wait to go over it with you or

4    make you wait to — to do that.

5          Uh, I appreciate the questioning.  We got

6    through two panels.  We'll do one tomorrow.  I plan to

7    probably just — after we get through another fourteen, have a

8    — maybe another six people just to make sure we have plenty in

9    case people change their mind.  So, that will give us a total

10   of 48 jurors for peremptories, and, uh, I think that would be

11   — that will be plenty.

12         Uh, I didn't ask — do people want the Jury View

13   before or after opening statements?  I — I think, generally,

14   it's before, but — so, you can give an opening statement and

15   talk about what they've seen.

16         MR. FRASIER:    I — I agree with the Court.  I

17   think before is — is preferable.

18         I do need to say — about the scheduling issue —

19   I've got two witnesses who I've got to put on Thursday or they

20   are unavailable.  So, - - -

21         THE COURT:    (Interposing) I — I don't see a

22   problem because I think we are going to have - - -

23         MR. FRASIER:    (Interposing) Okay.

24         THE COURT:    I think we are going have,

25   probably, enough jurors by noon.  And if it goes similar to

D1 31                          Introduction

1    what this is — and most of these questionnaires — I haven't

2    looked through the rest of them — have been people who haven't

3    — don't know about this case.  They don't have an opinion.

4              Now, we may get a load of — a load of these —

5    on these, where all of a sudden that's changed.  But I'm —

6    hopefully, we can get all the jurors passed for cause by noon

7    through the selection, have the fourteen, and have the bus.

8    And then, we've got Thursday for opening statements and your

9    witnesses.

10             MR. FRASIER:    All right.  That's fine.

11             THE COURT:    Possibly, even one opening

12   statement tomorrow.  So, - - -

13             Okay?

14             Anything else?

15             (No audible response.)

16             JUDICIAL ASSISTANT:    (Not understandable.)

17             THE COURT:    The juror who wants to be

18   released, his girlfriend just had a baby four weeks ago.  He's

19   — he's the sole support of the family.  If he doesn't work,

20   they don't get paid — he doesn't get paid.

21             JUDICIAL ASSISTANT:    (Not understandable.)

22             THE COURT:    Why is he in the courtroom?

23             Oh, one — Juror 169?

24             MS. McCREA:    Kevin Jones?

25             JUDICIAL ASSISTANT:    Yes.

```
                                    Introduction      D1 32
 1              THE COURT:    Mr. Jones.

 2              MR. FRASIER:    I have no objection to him

 3  being released.

 4              MS. McCREA:    I don't object either.

 5              THE COURT:    Tell Mr. Jones he doesn't need to

 6  come back.

 7              JUDICIAL ASSISTANT:    Right.  But he needs to

 8  call in for (not understandable)?

 9              THE COURT:    He needs to call in for other

10  cases, yes.

11              Anything else?

12              MR. FRASIER:    No.

13              MS. McCREA:    (Inaudible response.)

14              THE COURT:    Okay.  We'll try to get started

15  at 9:00.

16              Thank you.

17                    (END OF DAY ONE)

18

19  *                         *                         *
```

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

STATE OF OREGON,          )
                             )
         Plaintiff,     )   CASE NO. 10CR0782
                             )
                             )   JURY TRIAL
     vs.               )    DAY 2
                             )
 NICHOLAS JAMES McGUFFIN,   )
                             )
         Defendant.     )
_____)

TRANSCRIPT OF PROCEEDINGS

Volume 2, Day 2, Pages D2 2 to D2 37

BE IT REMEMBERED That, the above-entitled cause

came on regularly for hearing beginning at 9:21 a.m.,

Wednesday, July 6, 2011 in the Circuit Courtroom of the Coos

County Courthouse in the City of Coquille, County of Coos,

State of Oregon, before the Honorable Richard L. Barron.

APPEARANCES

R. Paul Frasier, District Attorney for Coos County,
representing the Plaintiff.

Erika Soublet, Assistant District Attorney for Coos County,
representing the Plaintiff.


Robert McCrea, Attorney at Law, representing the Defendant.

Shaun McCrea, Attorney at Law, representing the Defendant.


     Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

D2 2

1    *                            *                            *

2                 JUDICIAL ASSISTANT:    All rise.  Circuit Court

3    in the State of Oregon, in Coos County, is in session.

4                 THE COURT:    Be seated, please.

5                 Good morning.

6                 Good morning, to those in the room.

7                 I forgot to press a button when I said "good

8    morning" the first time.  So, now I'm welcoming you, also.

9                 Uh, we'll start then, uh, with Ms. Carocci?

10                (Whereupon voir dire was continued by the

11   Court, the State and the Defense.)

12                THE COURT:    Okay.  This is a real convenient

13   breaking point.

14                I guess, the bad news may be that I've done

15   this long enough that I get paranoid and worried about what's

16   going to happen when we start selecting these jurors because

17   I've had some jurors — when we've gone through this process —

18   find something where we have had to excuse them.  So, I am

19   going to want all of you to come back at 1:00.

20                The good news is that I don't think that's

21   going to happen.  And we'll — we'll go through this process

22   and pick a jury and then you'll all be released.  But, if we

23   pick six more than we — than I think we are going to need to

24   go through the entire process - - -

25                But as I've said, I've had this — we've got to

D2 3

1   this point where then I've had to excuse people, and we need

2   more people.  And I don't want to let all the jurors go and

3   then — and then have to figure out where — where we are going

4   to get jurors.  Because I've had to send police officers out

5   on the street and actually grab people off the street to serve

6   as jurors, and I don't want to have to do that.  They don't

7   appreciate that.

8              So, uh, what I will do is just release all of

9   you for lunch.  And, if all of you — we will probably make

10  arrangements for — we'll make arrangements for the 46 people

11  to come back to the jury room.  The remainder of you will be

12  in that jury assembly room.  And as soon as we get the jury

13  picked, then we will release you.  If for some reason we need

14  another juror to come down here, we'll let you know.  And

15  we'll try to do that as quickly as possible because I have all

16  the other jurors coming back at 1:00, and we should be able to

17  go through the process very quickly.

18             I appreciate your patience in being here.

19  You've been courteous.  I really appreciate your help in doing

20  this.

21             So, everybody is excused until 1:00.  And if

22  you would just come back, we'll — as I said, we'll — we'll

23  sort out the 46 people, bring them down here.  The other

24  people will remain.  Just be back at 1:00.

25             We can do this two different ways.  We can just

D2 4

1  — I can have all 46 jurors in here.  We can sit 14 and just

2  excuse them as we normally do, so you get a chance to look at

3  them.  Or, we can just go down the list if you don't need to

4  see the jurors again, and just start exercising the

5  peremptories.  I don't — I don't care which way.

6          Seat 14, start excusing people.  You each have

7  13 peremptories.  The last two names would be the alternates,

8  unless you two agree on something else.  Or, we can not call

9  them in and just start excusing them.  I don't care which way.

10          MS. McCREA:     I'm — I'm thinking about it,

11  Your Honor.

12          THE COURT:     I — I - - -

13          MS. McCREA:     (Interposing) I — it's - - -

14          THE COURT:     - - - understand.

15          MS. McCREA:     It's one of those things where I

16  — I'm thinking we can do it from the list, but I just don't

17  want to put myself in a position where, um, - - -

18          THE COURT:     (Interposing) My only thought is

19  that — you know, you can see the people doing it.  I don't

20  care which way because, obviously, if we do it without them

21  being here it can even be quicker because we don't have to

22  call people up to sit down.  And I'm all for quicker.  But I

23  also want to make sure that you know who you are excusing and

24  — and remember that.

25          So, again, uh — I guess, if — if you can't

D2 5

1   agree on it, we are going to have the people in the courtroom

2   and excuse them.  So, we are going to do it the normal —

3   that's the normal way.  If you can agree on the other

4   procedure, then it's fine.  So, there is a default position is

5   what I'm telling you.

6          MR. FRASIER:   Well, I — I think from my

7   perspective, Your Honor, I would rather see them in the box,

8   for me.

9          THE COURT:   Okay.

10         MS. McCREA:    That makes it easy.

11         And I had an experience in Jackson County where

12  I excused the wrong juror because I didn't see them.  So, it

13  makes me reticent.

14         And — and, Your Honor, at some point, may I

15  confer with Mr. McGuffin about our peremptories before we

16  actually — either now or - - -

17         THE COURT:    (Interposing) Oh, yeah.

18         MS. McCREA:   - - - ten minutes ahead of - - -

19         THE COURT:    (Interposing) That's - - -

20         MS. McCREA:   - - - time?

21         THE COURT:    That's not a problem.

22         I'd like to — I'd like to do it at 1:00.  It's

23  just because I've held about - - -

24         MS. McCREA:    (Interposing) Yes.

25         THE COURT:    - - - forty-some jurors here that

D2 6

1  I'm going to have to release.  But, yeah, that's not a

2  problem.  The deputies will allow you to do that — to confer

3  with that.

4           We are going to go, two, two, two, two, two,

5  and then at the end it will be — you are each entitled to one

6  extra, I believe, with the — yeah, one extra with the two

7  alternates.  So, then it will go — once we exercise — well, we

8  just exercise — it will go two, two, two, until the last, and

9  then it will be one and one.  So, - - -

10           Okay?

11           MS. McCREA:    Yes.

12           MR. FRASIER:    Your Honor, in regards to the

13  alternates, I don't have a problem with the last two being the

14  alternates, but I would prefer that they not be told they are

15  the alternates until the end of the - - -

16           THE COURT:    (Interposing) I don't plan - - -

17           MR. FRASIER:    - - - Trial.

18           THE COURT:    - - - to tell them.  I think

19  that's the smart — I would prefer that just because they don't

20  know, at the point in time, uh, and I think that makes it

21  easier for them to have to listen to the case and that sort of

22  thing.

23           So, as long it — that's agreeable with you,

24  Ms. McCrea?

25           MS. McCREA:    Yes, Your Honor.

D2 7

1            THE COURT:   Okay.  And we'll have the View

2   then — your bus is ready when?

3            MR. FRASIER:   Well, I can — I had told him to

4   be — I had told him yesterday 1:30.  Then I — because we were

5   going slower, I told him 2:00.  But, I guess I can get him

6   here at 1:30.

7            THE COURT:   And I think by the time we get

8   done with the peremptories here, it will be, uh — I — I think

9   2:00 is probably a good idea because I've got to advise them

10  of what — and all I'm going to do is tell Ms. Cress to point

11  out — she's got a script of the what the View is — of what the

12  trip will be.  She's just going to say, you know, "Take notice

13  of McKay's," or the other landmarks, and not say anything

14  else.

15            Uh, on our off-the-record discussion,

16  Ms. McCrea and Mr. McGuffin are going to be on the bus with

17  the deputies.

18            And, Mr. Frasier, you said you would prefer to

19  be in the lead car.  I — I'm not going to be there.  I have a

20  little concern about one side being on the bus and not the

21  other side.  I don't care whether you miss — you or

22  Ms. Soublet go, but I think one of you ought to be on the bus.

23            MR. FRASIER:   All right.  That's fine.  I'll

24  ride on the bus, then.

25            THE COURT:   Okay.

D2 8

1          I just — I just think it's better to have that.

2  Uh, and everybody's agreed that I don't have to go so I'm not

3  going to.

4          Okay?

5          MS. McCREA:    I have one other request,

6  Your Honor.

7          After the jury is sworn, I request that the

8  Court give an instruction consistent with the Uniform Trial

9  Court rule.  And I don't — I didn't bring that with me.  I

10  apologize.  But, there is - - -

11          THE COURT:    (Interposing) The — the

12  precautionary one?

13          MS. McCREA:    Well, there is a rule about that

14  the — the parties and no one is supposed to have a reaction in

15  the courtroom.  And, it is a concern because often there is —

16  there is a reaction by the jurors, or by the media, that the

17  parties are not — you know, not showing a reaction.  And the

18  reason for that is because the Court instructs us not to.

19          THE COURT:    Okay.  Let me get to the part

20  - - -

21          Well, there is one that's about four pages.  I

22  think that's after the jury is selected.  And what you want me

23  to do is, basically, go over that?

24          MS. McCREA:    Yes.

25          THE COURT:    Okay.  And I will look at that.

D2 9                    Motion to Exclude Witnesses

1   Some of the — I'm not going to repeat what I've repeated —

2   what I've already said.  But, I will generally look at it.  I

3   normally don't give that, but the — the request is reasonable,

4   so I'll certainly look at it and try to give it.

5                   Anything else?

6                   MS. McCREA:    No, Your Honor.

7                   MR. FRASIER:    Uh, for the record, we would

8   Move to Exclude Witnesses.

9                   And I believe we've agreed that Ms. Bonk can be

10  in the courtroom for the defense.  And Officer McNeely can be

11  in the courtroom for the State.

12                  THE COURT:    Okay.

13                  MS. McCREA:    That's correct.

14                  THE COURT:    And the Statute says this case is

15  11 to 1.  That's what we are instructing the jury on?  Okay?

16                  MR. FRASIER:    On - - -

17                  THE COURT:    The Murder Statute — Statute.

18                  You want it unanimous?

19                  MR. FRASIER:    I thought it was unanimous.

20                  MS. McCREA:    Yeah.

21                  THE COURT:    No. 136.  Unless there is

22  something done recently that I'm not aware of.

23                  MR. FRASIER:    (Not understandable.)

24                  THE COURT:    I just looked at again this

25  morning.  That always worries me when somebody looks at me

D2 10

1   like, "What are you talking about?"

2               No. 136.450(2), "Except when the State requests

3   unanimous verdict, the verdict of guilty for Murder or

4   Aggravated Murder, shall be by concurrence of at least eleven

5   of twelve."

6               MR. FRASIER:   No. 136 what?

7               MS. McCREA:   No. 136.450.

8               THE COURT:   Subsection 2.

9               It would still be 10 to 2 to find somebody not

10  guilty.

11              MR. FRASIER:   Can I get back to the Court on

12  that?  Um, I think there has been some advice that we've been

13  given by the Attorney General not to follow that Statute.  And

14  I want to - - -

15              THE COURT:   (Interposing) I have — I had some

16  problems myself with it because I'm not too sure why it — only

17  the State gets to request unanimous verdict.  I — I've always

18  questioned that, but I wanted to make sure that the issue —

19  I'm assuming you may have because my — my initial reaction

20  was, "Well, why only one side gets to request that?"

21              MR. FRASIER:   Right.  And I - - -

22              THE COURT:   (Interposing) So, if that's — if

23  it's unanimous, it's fine with me.  It always has been.  It's

24  just that that Statute is in existence.

25              MR. FRASIER:   Let me double check on that,

D2 11

1   Your Honor, but I think I'm going to want unanimous.

2                    THE COURT:   Well, and I'm — I know the

3   defense would want unanimous.  I — I just wanted to point out

4   the Statute because it's there, and I don't want that to

5   become a problem later.

6                    So, unanimous it's fine.  It's always been that

7   way.  And I'm not too sure the reasoning behind that Statute.

8   I'm not too sure the reasoning behind giving the State to

9   request it.  It always seemed — when I read that Statute a

10  long time ago, it always seemed to be — be unfair, and, uh,

11  something about just allowing one side.

12                   So, I will take it, unless I'm told otherwise,

13  that it's going to be a unanimous verdict.

14                   Okay?

15                   MR. FRASIER:   All right.

16                   MS. McCREA:   Yes.

17                   THE COURT:   All right.

18                   Anything else?

19                   MS. McCREA:   No, Your Honor.

20                   MR. FRASIER:   (Inaudible response.)

21                   THE COURT:   Okay.

22                   (Whereupon voir dire continued.)

23                   THE COURT:   Okay.  That brings us down to 44

24  jurors, which is still enough.

25                   What I do plan to do — I'll let you know ahead

D2 12

1  of time — is call the entire jury in.  And I may or may not

2  say that some idiot was outside the courtroom, in which I've

3  told you on an off-record discussion, photographing jurors and

4  may have their cars.  And that — I would probably even tell

5  them that that — the only thing that went on U-Tube was the

6  little confrontation with the police outside.  And that he's

7  been instructed he cannot do that any further.  And then, if

8  that happened — if something like that happened, he may be

9  prosecuted for Contempt.

10             But, I want to know whether that effects

11  anybody sitting on the jury, whether that would affect them,

12  or at all effect how they would look at — look (sic) or decide

13  this, so I can get a feel for the entire panel.  I don't want

14  to question each individual juror that way.  But, I do want to

15  get an idea of — if anybody — and I will ask, you know, "Is

16  anybody real concerned about this?  Or would it affect them?

17  Something like that, and see of there is a raise of hands.

18             If there is an objection to that procedure, you

19  want me to do something else, let me know.

20             MR. FRASIER:    I don't have problem with that

21  procedure, Your Honor.

22             MS. McCREA:    It's fine, Your Honor.

23             THE COURT:    Okay.

24             Ms. Greeley and Ms. Farr can be told they are

25  excused.  Bring the other, I guess, 26 people down here.  Seat

D2 13

1   them down here.  And bring the 14 into the jury box and then

2   we will - - -

3                    JUDICIAL ASSISTANT:    (Interposing) (Not

4   understandable.)

5                    THE COURT:    (Not understandable).  Yeah, for

6   other cases.

7                    And you might remind them, specifically, that —

8   that admonition about not talking to people in other cases

9   applies all the time — and so, not to do it.

10                   And for the record, the precautionary

11  instruction that Ms. McCrea was talking about, uh, I have

12  planned giving a version — a very short version of that

13  because there is some things in there I think the jury should

14  take.  But, there wasn't anything about the reaction.  And I

15  think what somebody may be talking about is I always say

16  before I receive a verdict, "There is to be no reaction to the

17  verdict."

18                   So, I don't — uh, there is no specific

19  instruction that covers, you know, people may not — people

20  aren't supposed to react, so don't watch them or something.

21  And I — I don't know how I would ever phrase that because I

22  think jurors, especially, need to watch witnesses.  They watch

23  the Defendant.  They watch everybody during the Trial.

24                   I would be a little leery about questioning it.

25  But as I understand, Ms. McCrea, since that's not in an

D2 14

1  instruction anywhere, you didn't particularly care about the

2  instruction being given now?

3                    MS. McCREA:   I — I looked up the instruction

4  in the Uniform Trial Court Rules.  It's in the Court Decorum

5  and it is limited to taking the verdict.  So, that is fine,

6  Your Honor.

7                    THE COURT:   Okay.  And I did have her Xerox

8  the precautionary instruction that talks about objections and

9  those things.  So, I think I will give that.  I cut out all

10  the part about doing research and stuff because I've pretty

11  well covered that already.

12                    Okay.

13                    JUDICIAL ASSISTANT:   (Not understandable.)

14                    THE COURT:   Okay.

15                    Cathy, make sure all the other jurors remain

16  until we are done with the (not understandable).

17                    JUDICIAL ASSISTANT:   Right.

18                    THE COURT:   If you could remove your hats,

19  please?  If you could remove your hats, please?

20                    Thank you.

21                    Good afternoon.

22                    Thanks for your patience.  We've had a few

23  things that we've — we've been working.  We haven't been

24  sitting.  We've been — having a few things we had to do.

25                    Got two things.  The first thing is I've

D2 15

1  already had to excuse two of the jurors who were selected for

2  not following the Court's instructions.

3          I realize that we put jurors in a — in a new

4  position and an uncomfortable position about don't speak to

5  people, don't do this, but I am serious about those

6  instructions.  They can affect an entire Trial.  And it is not

7  fair to the parties.  And both jurors have violated those

8  rules.  So, they are excused.

9          Now, I — I don't totally get upset with people

10 because, as I said, this is a new experience for you.  But, it

11 is very important.  I mean, these — all these cases are

12 important that we try.  People are entitled to a fair trial.

13 And I think anybody in a situation being here, one party or

14 the other, would want them to be treated fairly.  And so, I

15 expect that to be done.  And I don't expect to have to tell

16 people this admonition time after time after time.  I expect

17 them to listen to it and follow it.  Okay?

18         Secondly, my understanding is at the noon hour,

19 at least, there was some gentleman out there that — I probably

20 shouldn't use the word "gentleman" — who was photographing

21 jurors and possibly juror cars.  Okay.  Uh, he — he has now

22 been told that if it occurs again, he very — may very well be

23 arrested for Contempt and prosecuted for Contempt.

24         Uh, we don't expect people to do that.  So —

25 and I can't enter — enter a general Order to the community

D2 16

1  that says, "Don't take pictures of jurors," so there was no

2  specific Order to anybody.  But, he has now been informed of

3  what may happen if he does it again.

4              Uh, I believe he is about seventy years old.

5  He did — the police did go out and talk to him.  As soon as we

6  found out, I sent some officers down there.  They did talk to

7  him.  And he has put on U-Tube his confrontation with the

8  police officers, not any jurors.

9              So, the media allows — I mean, we have all

10 these multi things, and people put them on.  And — and, uh, I

11 have no control over people who do stupid things, unless they

12 do them within the courtroom, or violate an Order that I have,

13 then I — then I can do something about it.  But, generally, I

14 can't deal with stupidity on that basis.

15             My question to you, though, is there any juror

16 who, because of that, feels that now they cannot be a fair and

17 impartial juror in this case?  And — and I — if — if it — if

18 you have a concern about it, I need you to raise your hand and

19 talk about it now because I don't want it to become an issue

20 later because that creates a problem.

21             And, I understood that he might have been rude

22 to people, rude to some jurors on that matter.  But, I do need

23 to know if anybody has a problem, a concern, or a question

24 about it, please raise your hand and we'll deal with it now.

25             JUROR:  I know he took my picture.  Is this —

D2 17

1   like, I'm wondering if I should be concerned about it.  What

2   concerns are possible, or - - -

3                  THE COURT:   You know, I — I don't — from my

4   experience over the years, most people who do things are — you

5   know, are completely harmless.  They do stupid things.  They

6   don't think.  They don't care — they don't seem to think about

7   other people or other feelings.  And why they do it, I have no

8   idea.  I can't do anything about that now.  But, I — you know,

9   I — I have no idea.  So, I — I — that's just from experience.

10  I can't tell you what somebody's going to do.  If they put it

11  on U-Tube, there is not a lot that can be done about it.

12                  But, uh, I — I can only do what I've done.  And

13  I don't know that — I can't tell you there is a specific

14  concern.  My — my knowledge is the man doesn't have any —

15  there is no criminal record or anything that we are aware of

16  (Not understandable).  So, - - -

17                  VOICE:   Your Honor, if — anybody who came out

18  between 12:00 and 12:20 had their photograph taken.  Anybody

19  who wore a juror button.

20                  THE COURT:   Okay.

21                  Well, again, that's a twenty-minute period.

22  And I think within about — within five minutes of me learning

23  of it — even closer than that — there were deputies that went

24  out — out there.  Uh, and he left at that point in time.  And,

25  as I said, the only thing he's put on U-Tube is the fact that

1   he recorded the little confrontation he had with the deputies.

2           But, again, if anybody is concerned about that,

3   wants to raise an issue about that, this is the time to do it

4   because we are now going to be selecting the fourteen people

5   who are going to be sitting on this case.

6           Okay?

7           Yes, sir.

8           JUROR:   At this point, you have no idea what

9   his motive or his goal is?

10          THE COURT:   I — I wouldn't even — I wouldn't

11  even venture a guess.  He — I — my understanding is he lives

12  in Myrtle Point.  So, he's in this general area.  I don't know

13  what his interest is.

14          JUROR:   I was — I was sitting there.  I spoke

15  with him.  Uh, it didn't seem as if he was doing anything

16  wrong.  In his mind, he was very clearly within his rights.

17  And, was quite offended that he was being asked to leave.  Did

18  not want to wait around to see you.  He just said, you — you

19  know, "Either arrest me or I'm leaving."  And there was no —

20  no ability to arrest him, so he left.

21          I didn't think much of it, probably still

22  won't.  But, I would — was, in hindsight, curious what his

23  motive was.

24          THE COURT:   And — and I'm not too sure

25  whether he would say anything other than fact — my only

D2 19

1   understanding is he said, "Well, it's in the public and I can

2   do what I want."  And - - -

3                  JUROR:    (Interposing) That's exactly - - -

4                  THE COURT:    And, actually, - - -

5                  JUROR:    - - - what he said - - -

6                  THE COURT:    And, generally, - - -

7                  JUROR:    - - - three times.

8                  THE COURT:    Generally, people can do what

9   they want.  There might not being crime about it, but the

10  Court's authority does extend — uh, and there is a specific

11  rule that says jurors should not be photographed anywhere, on

12  — on a case in which they are sitting.

13                 So, there is a Court rule that relates to that.

14  He may or may have not have known about that.  There is

15  nothing that I'm going to do about his past conduct.  If — if

16  he violates something in the future, there may be something

17  done at that point in time.  Because then he is aware that

18  there is a Court rule.

19                 But again, I — I can't talk to anybody's

20  motivation.  The only thing I can do is ask the jurors if they

21  are going to be affected by this in any way because then

22  that's not fair to the parties.

23                 Yes, sir?

24                 JUROR:    I'm, uh — I'm not concerned about it

25  all, you know.  But, um, someone else came up with an idea in

D2 20

1   there.  Would it a bad idea to take our badges off until we

2   came to this room?  Or, is that not allowed?

3               THE COURT:    No, you can do that.  My — I — I

4   prefer it, obviously, that they are — they are worn during the

5   — if you are selected as a juror, during the Trial because you

6   are going to go out to lunch, and — and there is — there are a

7   lot — there is 160 witnesses.  So, people are going to be out

8   to lunch, and I'd prefer that somebody know that you are a

9   juror just so they stop talking around that when you are on

10  the case, when you are in the courthouse.  When you go home,

11  obviously, you are out — out in the community, I don't think

12  it's necessary.  But, during a Trial it has been helpful

13  because it's — had people not be around you.

14               JUROR:    Okay.

15               THE COURT:    Okay?

16               Yes, sir.

17               JUROR:    Your Honor, I — I had just like the

18  opposite thing happen yesterday.  On our break we went to

19  lunch and, uh, people saw the button, and it instantly made

20  them want to come up and talk to you about it (not

21  understandable).

22               THE COURT:    Well, and that's the risk you

23  run.  But, it also - - -

24               JUROR:    (Interposing) Yeah.

25               THE COURT:    - - - the right to say, "Hey, I'm

D2 21

1  a juror, don't talk to me." So, I mean it does that as
2  opposed - - -
3              JUROR:   (Interposing) It kind of draws — it
4  seemed like it was drawing attention.
5              THE COURT:   Well, it — it may, but it — they
6  may come up if you are here, anyway, and ask you, or - - -
7              JUROR:   (Interposing) Yeah.
8              THE COURT:   - - - they may just start — if
9  you are standing somewhere, start talking around — talking
10  around that. If they see the button, you can easily say, "I'm
11  a juror, don't talk to me - - -
12             JUROR:   (Interposing) Okay.
13             THE COURT:   - - - about it. Don't do this
14  sort of thing."
15             So — you know, there is pros and cons of it,
16  but I've just found that it's better — it gives you some
17  protection to say, "I'm a juror, don't talk to me."
18             Okay. Anybody else?
19             (No audible response.)
20             Okay. Then, we are going to start the process
21  of whittling every — whittling this down to where we get
22  fourteen people. Uh, but again, I don't want anybody to be
23  afraid to raise their hand or say something.
24             Okay?
25             JURORS:   (No audible response.)

D2 22

1          (Whereupon voir dire was continued by the

2    Court, the State and the Defense.)

3          THE COURT:    Well, if I'm correct after all

4    this, the parties have indicated they are now satisfied with

5    the fourteen jurors seated.

6          Before I swear you fourteen in, I always go

7    over this again — once more.  Once you are sworn — once you

8    are sworn in as a jury, you are it; and you cannot get off

9    because you decide that it's inconvenient, or some other

10   purpose.  You can't get off.  And if something came up where

11   you actually had a reason to get off, then depending on the

12   number we had left, we might have to start the whole process

13   again.  So, I want everybody to take just a second or two and

14   think bout it.

15         Is there anybody that has any questions,

16   concerns, or anything about being on this jury and serving

17   before we swear you in?  And I have — I have other jurors here

18   and other jurors down there.  Does anybody have any questions,

19   concerns, or anything they want to raise before you are sworn

20   in?

21         JURORS:    (No audible response.)

22         Okay.  It's called a fair notice and fair

23   warning.

24         If the fourteen of you would please stand and

25   raise your right hand.

D2 23

1              (Whereupon a jury of fourteen were duly

2    empaneled and sworn to try the above entitled case.)

3              THE COURT:   Have a seat, please.

4              The other jurors in the room are excused.  You

5    can leave your jury buttons, uh, here and you are free to

6    leave.  We will excuse the other jurors, also.

7              I do wish to thank you very much.  It's — you

8    are a very important part of the process even if you don't end

9    up serving.  We call in a great number of people.  As you saw,

10   we excuse a lot.  I can never tell exactly how many jurors we

11   need for specific cases.  Sometimes I think people wonder why

12   we call in so many.  I think you see that the process

13   sometimes excludes people, and so we have to have to have as

14   many people as we can.  That we make sure we have a fair cross

15   section of the community.  I think we've, obviously, done that

16   at this point in time.  But, I do thank you for your service.

17             Please call in as directed.  You are free to

18   leave.

19             (Remainder of Jury Panel exits.)

20             THE COURT:   Do you want to pass that out to

21   the jurors?

22             I'm going to give you a precautionary

23   instruction at this point in time.  And then I'll give you

24   another instruction that's not written down, about a Jury View

25   that will be taken this afternoon.

Precautionary Instructions          D2 24

1          JUROR:    (Not understandable.)

2          THE COURT:    The Jury View.

3          JUROR:    View?

4          THE COURT:    View.

5          JUROR:    Do you want us to read this now?

6          THE COURT:    I'll read it to you.  Read along

7     with me if you would, please.  Okay?

8          Members of the jury, the law that applies to

9     this case will be given to in part in these precautionary

10    instructions.

11          After you've heard the evidence, and before the

12    arguments from the lawyers, I will give you further

13    instruction regarding the legal rules you must follow in

14    deciding this case.

15          Your duty is to decide the facts from the

16    evidence.  You and you alone are the judges of the facts.  You

17    will hear the evidence, decide the facts, and then apply those

18    facts to the law I will give you.  That is how you will reach

19    a verdict.  In doing so, you must follow the law whether you

20    agree with it or not.

21          To be an effective juror, you must also not be

22    influenced to any degree by personal feelings, sympathy for,

23    or prejudice against, any party, witness, or lawyer, or any

24    other participant in the case.

25          The evidence you are to consider in this case

D2 25                    Precautionary Instructions

1  consists of testimony of witnesses and exhibits received in

2  evidence.

3          Exhibits are physical things, such as letters,

4  photographs, charts, or physical objects.  You will be able to

5  examine the exhibits while you deliberate.

6          You may draw any reasonable inferences from the

7  evidence, but you must not engage in guesswork or speculation.

8          From time to time, a lawyer may make an

9  objection.  I will decide whether or not it is proper under

10  the law for you to consider such evidence.  Do not speculate

11  about why the objection was made or about why I ruled as I

12  did.

13          If I overrule on objection, the question may be

14  answered or the exhibit received.  If I sustain an objection,

15  the question cannot be answered or the exhibit cannot be

16  received.  Whenever I sustain an object — an objection to a

17  question, ignore the question and do not guess what the answer

18  would have been.

19          Sometimes I may order that evidence be stricken

20  from the record, and that you are to disregard it or ignore

21  the evidence.  When you are deciding the case, you must not

22  consider the evidence that I told you to disregard.

23          The opening statements and the closing

24  arguments of the lawyers are intended to help you understand

25  the evidence.  Although, their statements and arguments are

Precautionary Instructions          D2 26

1  not part of the evidence.

2          You must not interpret — interpret any

3  statement, ruling or remark I make during this Trial as any

4  indication that I have formed any opinion about the facts or

5  outcome of this case.  You and you alone are to decide the

6  facts.  You must decide how believable that evidence is, and

7  what weight or value you will give the evidence.

8          You may take notes if you wish during the

9  trial.  However, please keep in mind that each party is

10  entitled to the considered decision of each juror.  Therefore,

11  during deliberations you should not give undue weight to other

12  jurors notes if those notes conflict with your recollection of

13  the evidence.

14          Do not allow your note-taking to interfere with

15  your ability to observe, evaluate testimony.

16          Whenever you leave the courtroom, your notes

17  should be left in the jury room.

18          Do not discuss this case during the trial with

19  anyone, including any of the lawyers, parties, witnesses, your

20  friends, or members of your family.  Do not discuss this case

21  with any — any other jurors until you begin your deliberations

22  and — at the end of the case.

23          Do not attempt to decide this case until you

24  begin your deliberations.

25          Do not communicate with anyone, by any means,

D2 27                    Precautionary Instructions

1    concerning what you see or hear in the courtroom.  Do not try

2    to find out more about this case, by any means, other than

3    what you learn in the courtroom.

4                    Ignore any attempted improper communication.

5    If any person tries to communicate with you about this case,

6    tell that person you cannot discuss the case because you are a

7    juror.  If the person persists, simply walk away and report

8    the incident to the Court.

9                    After you have rendered your verdict, or have

10   been otherwise discharged by me, you will be free to do any

11   research you choose, or to share you experiences either

12   directly, or through your favorite electronic means.

13                   Remember that all phones, PDA's, laptops, or

14   other electronic devices must be turned off while you are in

15   Court and while you are deliberations.

16                   We will now hear opening statements — they will

17   be delayed probably until tomorrow — in which the lawyers

18   will outline the evidence that they expect it to be.  After

19   opening statements, the evidence will be presented.  At the

20   conclusion of the evidence, I will instruct you about the law

21   that applies to this case.

22                   The lawyers will make their closing arguments

23   to you and you will begin your deliberations.  At the end of

24   the trial, you will have to make a decision based on what you

25   recall of the evidence.  You will not have a written

Precautionary Instructions          D2 28

1  transcript to consult, and it is difficult to play back

2  recorded testimony.  So — so, that's not typically done.  I

3  urge you to play close attention to the testimony as it is

4  given.

5          I will be talking to the attorneys about the

6  timing of the opening statements.  But, before that is done

7  you are going to have a Jury View.

8          The Court has arranged for a Jury View in this

9  case.  This is an opportunity for members of the jury to look

10  at some particular location or locations.  The Jury View

11  itself is not evidence, but is taken simply to enable each of

12  you to better understand and evaluate the evidence that will

13  be presented in the courtroom.

14          While on the Jury View, please stay together as

15  a group.  Either the Court or the Bailiff may point our

16  certain features for you to observe.  Do not allow any person

17  to talk to you about the case.  Do not ask any person any

18  questions about the case during the Jury View.  The law

19  specifically prohibits any person other than the Judge or the

20  Bailiff, and that's Ms. Cress, from speaking with the jury on

21  any subject connected to the Trial.

22          You will be placed on a bus and they will drive

23  around different locations in Coquille and maybe outside of

24  Coquille.  That is going to take about an hour or two.  So,

25  we'll take a brief recess before you — before you go on that.

```
   D2 29                  Precautionary Instructions
```

1              JUROR:   Is that today?

2              THE COURT:   Today.

3              JUROR:   Okay.

4              THE COURT:   This afternoon.

5              Ms. Cress will point out certain things, except

6    don't ask her questions.  She's not allowed to answer any

7    anyway.  And she'll just point out things and say, "Take note

8    of this.  Take note of that."  And then you can - - -

9              When you come back, my guess is that it will be

10   closer to 5:00, so I don't think opening statements will be

11   done.  I'm going to talk to the attorneys about that briefly

12   while we take a recess.

13             Please remember the admonition that we've gone

14   over time and time again about talking to people.  It is

15   really important for you to assert yourself.  If somebody

16   comes up, tell them to stop and walk away.  Don't allow them

17   to talk to you or - - -

18             Yes, ma'am.

19             JUROR:   Just so I'm clear, I understand that

20   talking about the case — do people know that we are on this

21   case, or (not understandable)?

22             THE COURT:   I would — I would not even

23   mention it because that's the type of thing — somebody

24   mentioned the buttons seem to encourage people.  There is a

25   reason for the buttons.  But, I wouldn't — I — you could say

1   you are a juror.  And if they say, "What case?", say, "It

2   doesn't matter I can't talk about it."  That's what I would

3   prefer.

4          So, it does require a certain amount of

5   assertion that we normally don't necessarily do in our life.

6   We don't tell people to shut up and quit talking to us.  But,

7   basically, that's what I'm telling you to do.

8          Okay?

9          JUROR:   (Inaudible response.)

10         THE COURT:    Uh, the restroom is in there.

11  This is a non-smoking building.  I don't know if there is any

12  smokers left on the jury, but at this point in time we don't

13  have the personnel, really, to divide smokers from non-

14  smokers.  You can smoke on other breaks when you are outside.

15  Not on the bus and probably not on the Jury View.  So, at this

16  point, you — you are probably prohibited smoking.

17         I will have you use the jury room.  That —

18  there is two restrooms in there.  That's where you will be

19  going.  When you report in the mornings from now on you'll be

20  in there.

21         If — uh, you will probably come back to the

22  courthouse — be coming to the courtroom.  I'll be — if we

23  don't hear opening statements, and I don't think we are going

24  to, I will then excuse you for tomorrow morning to come in and

25  start the opening statements, and then we'll start hearing

D2 31

1   evidence tomorrow.

2                   So, if all of you would step into the jury room

3   at this point in time.

4                   Yes, ma'am?

5                   JUROR:   (Not understandable) tablets so we can

6   take notes?

7                   THE COURT:   There will be tablets and pens

8   and pencils for you to take notes if you wish to do that, yes.

9                   JUROR:   And this is our order how we sit?

10                  VOICE:   (Simultaneously) (Not understandable)

11  - - -

12                  THE COURT:   This is where you - - -

13                  VOICE:   (Interposing) (Not understandable.)

14                  THE COURT:   Yeah, this is where you are

15  supposed to — just to help me keep track of things.

16                  Thanks.

17                  (Jury out.)

18                  Mr. Frasier, are you going to have somebody sit

19  up at the table with you?

20                  MR. FRASIER:   (Interposing) Um, - - -

21                  THE COURT:   A representative?

22                  MR. FRASIER:   No.  I wasn't really going to

23  designate him as a representative.  I just wanted him to be

24  able to come and go as — as we need him.  And he was going to

25  sit back here.

D2 32

1                THE COURT:    Who is that?

2                MR. FRASIER:    Officer McNeely.

3                THE COURT:    Okay.  Officer — Officer McNealy

4   will be the designated representative for the State.  And he

5   can come in and go out, even though witnesses are excluded and

6   he may be one.  But, the State has the right to designate

7   somebody who is a representative.  He will be it.

8                Okay.  I don't think we have time for opening

9   statements today.

10               How long are — you said you had two witnesses

11  that had to be on what — tomorrow?

12               MR. FRASIER:    Right.

13               THE COURT:    I assume we'll have time.

14               MR. FRASIER:    I think we will tomorrow.  That

15  shouldn't be a problem.

16               THE COURT:    Okay.  I'm hoping to start at

17  9:00 tomorrow.  But, tomorrow I think Judge Stone has

18  something, so he can't take all of them.  I took some morning

19  matters this morning.

20               JUDICIAL ASSISTANT:    (Not understandable.)

21               THE COURT:    Okay.  So, he has stuff going.

22  And I'll have to take my 8:30 stuff.  I don't think it's too

23  extensive.  And I'll try to get started at 9:00 tomorrow.

24               But, we'll go on to the Jury View.

25               Is — is your bus out here?

D2 33

1            MR. FRASIER:    I'm assuming so.

2            THE COURT:    Okay.  And I do — just give them

3    a few minutes to go to the restroom and then they'll go.

4            Uh, - - -

5            MR. FRASIER:    (Interposing) The plan is for

6    Mr. McGuffin to be taken out first to the bus.  Then once he's

7    on the bus, then we can — we'll give the high sign for the

8    jury.

9            THE COURT:    And, uh, Mr. McGuffin, just —

10   you've been very polite and courteous.  And make sure you

11   understand that the deputies have to be there.  And I know you

12   won't do anything, but just keep in mind that these are the

13   fourteen people who are going to be judging whether you are

14   guilty or not guilty.  So, act accordingly.  And I know

15   Ms. McCrea has already talked to you about that.  But, the

16   deputies have to be there, and they are going to treat you

17   with courtesy, as the — I believe they have.  Uh, so — just so

18   there is no problem.  Okay?

19           DEFENDANT:    Is it okay that I bring a — a

20   notepad?  (Not understandable.)

21           THE COURT:    I'm not going interfere with the

22   — I — I think Ms. McCrea is going to tell you just to sit

23   there and listen.  I don't know what taking notes would do

24   one way or the other.  I — I really don't specifically care.

25   But, I would make sure no one knows what you are writing down,

D2 34

1   other than your counsel.  Because if people see things, that's

2   going to be a problem you've created yourself.

3                    DEFENDANT:   Yes, Your Honor.

4                    THE COURT:   Okay.

5                    MS. McCREA:   Your Honor, is it a definite we

6   are not doing openings today?

7                    THE COURT:   We are not going to give opening

8   - - -

9                    MS. McCREA:   (Interposing) Okay.

10                   THE COURT:   - - - today - - -

11                   MS. McCREA:   (Interposing) Thank you.

12                   THE COURT:   - - - because by the time you get

13  back it will be too late.

14                   Anything else?

15                   MS. McCREA:   Just — I hope the counsel can

16  have a short recess before we get on the bus?

17                   THE COURT:   Yes.  We - - -

18                   MS. McCREA:   (Interposing) Because - - -

19                   THE COURT:   - - - will do that.  I think,

20  probably, - - -

21                   (Laughter.)

22                   THE COURT:   - - - we'll take - - -

23                   VOICE:   (Not understandable.

24                   MS. McCREA:   You're not.

25                   THE COURT:   (Interposing) I always wanted to

D2 35

1    sing my grandchildren - - -

2                    MS. McCREA:    Mr. Frasier and I are.

3                    THE COURT:    - - - songs — "The Wheels on the

4    Bus Go Around and Around".   But, I won't do that.

5                    Uh, I will — let's try to shoot for 2:45 that

6    you get on the bus.

7                    MS. McCREA:   Yes.  Thank you, Your Honor.

8                    THE COURT:   Okay.

9                    Oh, I — I am going to have Ms. Cress tell the

10   jury that Mr. McGuffin, you, Mr. Frasier, and she will be on

11   the bus and that I will not be on the bus.

12                   MS. McCREA:   Very good, Your Honor.

13                   THE COURT:   Okay.

14                   Cathy, you can tell them that.

15                   (Chatter among parties in the courtroom.)

16                           (RECESS)

17                   (Jury in.)

18                   JUDICIAL ASSISTANT:   All rise.

19                   THE COURT:   Be seated, please.

20                   I would like to have you here by 9:00 tomorrow

21   morning.  And we will get started with - - -

22                   And, in fact, Cathy, am I going to be able to

23   be done with my 8:30 stuff?

24                   JUDICIAL ASSISTANT:   (Inaudible response.)

25                   THE COURT:   Why don't you get here about ten

D2 36

1    to 9:00 — 8:50?  And then, I have some matters in the morning

2    I'm going to have to take.  Hopefully they will be over so we

3    can get started at 9:00 with the opening statements.

4                    Ms. Gauvin, I hope you are feeling better.

5                    VOICE:    She's a trooper.

6                    THE COURT:   Good.

7                    JUROR:    (Not understandable.)

8                    THE COURT:   Uh, when you come in, just come

9    directly into the courtroom.  And, if we have proceedings

10   here, you can go behind the chairs and go directly into the

11   courtroom (sic), if you would at that point.

12                   Remember the admonition that I've given you

13   about not discussing, or doing research, or having anybody

14   approach you about this.

15                   I appreciate all that you've done so far.  And,

16   uh, have a pleasant evening.  Be back at 8:50 tomorrow

17   morning.  Okay?

18                   JUROR:    Thank you.

19                   JUROR:    Yep.

20                   JUROR:    Have a good night.

21                   THE COURT:   Thank you.

22                   (Jury out.)

23                   THE COURT:   Anything else today?

24                   MS. McCREA:   No, Your Honor.

25                   MR. FRASIER:   No.

D2 37

1           THE COURT:    Okay.  Thank you.  See you

2   tomorrow morning.  Thanks a lot for your work on the case.  I

3   appreciate it.

4

5   *                            *                            *

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

STATE OF OREGON,                          )
                                          )
            Plaintiff,                    )     CASE NO. 10CR0782
                                          )
                                          )     JURY TRIAL
        vs.                               )      DAY 3
                                          )
  NICHOLAS JAMES McGUFFIN,                )
                                          )
            Defendant.                    )
_____)

TRANSCRIPT OF PROCEEDINGS

Volume 3, Day 3, Pages D3 2 to D3 111

BE IT REMEMBERED That, the above-entitled cause

came on regularly for hearing beginning at 9:07 a.m., Thursday,

July 7, 2011 in the Circuit Courtroom of the Coos County

Courthouse in the City of Coquille, County of Coos, State of

Oregon, before the Honorable Richard L. Barron, and a jury.

APPEARANCES

R. Paul Frasier, District Attorney for Coos County,
representing the Plaintiff.

Erika Soublet, Assistant District Attorney for Coos County,
representing the Plaintiff.


Robert McCrea, Attorney at Law, representing the Defendant.

Shaun McCrea, Attorney at Law, representing the Defendant.


        Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

D3 2

1    *                              *                              *

2              (Jury in.)

3              JUDICIAL ASSISTANT:    All rise.  Circuit Court

4    in the State of Oregon, in Coos County, is now in session.

5              THE COURT:    Be seated, please.

6              Good morning.

7              VOICE:    Good morning.

8              THE COURT:    We'll try it for now.

9              I'm going to try to leave the air conditioner

10   on so we can — it will be reasonably cool.  If it gets to the

11   point where somebody can't hear, including me, I'll have it

12   turned off.  But, we are going to try to operate with that at

13   this point in time.

14             Uh, I welcome all people who are attending this

15   Trial.  It is a public Trial and you are welcome in the

16   courtroom.  What you are not welcome to do is show any

17   reaction to what anybody says or done.  If I see anybody

18   shaking or nodding their head, or talking too loudly, or

19   making any gestures showing approval or disapproval or

20   something, I'll have them removed from the courtroom and they

21   will not be allowed back.  So, your — you have a certain right

22   to be here.  And I'm glad you are here, but you have the right

23   only to listen.

24             Okay.  Mr. Frasier, you may give the State's

25   opening statement.

```
D3 3                              Statements
```

1                    Ms. Soublet, you may give - - -

2                    MS. SOUBLET:    (Interposing) Thank you,

3      Your Honor.

4                    THE COURT:    - - - the State's opening

5      statement.

6                    MS. SOUBLET:    Counsel.  Members of the jury.

7                    On June 28, 2000, fifteen year old Leah Freeman

8      went up to her mother, Cory Courtright, kissed her on the

9      cheek, told her she loved her, she'd see her later, and then

10     got into the passenger side of the Defendant's blue 1967

11     Mustang and drove away.  And that was last time Cory

12     Courtright saw her daughter.

13                   Leah Freeman, as the evidence will show, as she

14     grew up, was a happy-go-lucky child.  Was very into sports.

15     Despite her petite size, was a pretty good basketball player.

16     Had a circle of friends that she hung out with, which included

17     Sherry Ann Mitchell and Stacy Lyons Crutchfield.  And even in

18     the eighth grade, had a boyfriend, Austin Fisher.

19                   But, when Leah started highschool in the fall

20     of 1999 and met the Defendant, Nicholas James McGuffin, a

21     seventeen year old senior, the evidence will show that she

22     started to change.  It was a relationship that she kept secret

23     from her mother, Cory Courtright, and older sister, Denise

24     Bertrand, despite the fact they'll tell that she had had a

25     good relationship with both her mother and her sister.

Statements          D3 4

1              It was a relationship — the evidence will show

2      in the testimony from Stacy Lyons Crutchfield and

3      Sherry Ann Mitchell — that was toxic at times, troubled at

4      best.  And that as that school year progressed, the

5      relationship was troubled with more than just the normal

6      teenage — teenage angst.

7              But, you'll hear in Leah's own words, from

8      entries made in her diary; from letters that she wrote to

9      friends, Sherry Ann Mitchell; from letters that she wrote to

10     the Defendant that were found after her death and

11     disappearance; that that relationship was troubled with both

12     jealousy and anger issues.  Was troubled with trust issues.

13             You'll hear from Austin Fisher how the

14     Defendant threatened to kick his butt at one time for spending

15     time with Leah.

16             You'll hear in the Defendant's own words how he

17     referred to Leah as being "his girl" now and not Sherry

18     Mitchell's anymore.

19             You'll hear about arguments that they had.  At

20     one point, in April of 2000, got into an argument in the

21     parking lot of McKay's, where the Defendant was so mad that he

22     threw his keys across the parking lot.

23             Got into arguments at school, on the school

24     premises, witnessed by people at the school.

25             And you'll hear how, as the school year

D3 5                                    Statements

1   progressed, after all those things that one would expect his

2   senior — prom and graduation — the Defendant was still living

3   out at his parent's residence on Baker Road.  Still had access

4   to two automobiles, his blue 1967 Mustang and his parent's

5   maroon Thunderbird.

6            And on June 28, 2000, he was at the Courtright

7   residence , which was then at 1173 North Knott Street,

8   spending time with Leah, having her help him wash off the

9   grease paint that was on his car from graduation.  And that as

10  Leah was getting ready to leave the residence, told

11  Ms. Courtright what her plans were for the day, that she was

12  going to spend time with Sherry Mitchell.  Taking her mother's

13  advice, spend more time with her friends, not so much time

14  with the Defendant.

15           And after leaving the Mitchell (sic) residence,

16  they went to the Defendant's house, where this picture was

17  taken on June 28, 2000.  And whatever good mood that they had

18  had, as they were at the Courtright residence at 1173 North

19  Knott, was gone by the time they got to the McGuffin

20  residence.

21           And you'll know this because Melissa Smith, a

22  friend of the Defendant's and a friend of Leah Freeman's,

23  called Leah and spoke to her at the McGuffin residence.  And

24  she'll tell you that she could hear the Defendant in the

25  background yelling at Leah, calling her a bitch.  Could tell

Statements          D3 6

1  that Leah was upset and didn't want to talk right then.  And

2  indicated that she talked to Melissa later.

3          And at some point after this photograph was

4  taken on June 28, 2000, the Defendant and Leah left his

5  parent's residence.  They went and picked up Brent Bartley and

6  went out to his grandparent's residence, the Haga Ranch.  And

7  hung out there for part of the afternoon — watching a movie,

8  maybe having something to eat — before the Defendant took

9  Leah, in his blue 1967 Mustang, to Sherry Ann Mitchell's

10  house, located at 44½ North Elm Street.  And dropped off Leah

11  to spend time with Sherry Ann Mitchell, as planned.

12          And Sherry Ann Mitchell will tell you, in that

13  two hours, between 7:00 and 9:00 on June 28, 2000, she and

14  Leah spent time much as you would expect teenage girls to

15  spend their time — up in her room talking, listening to music,

16  discussing their plans for the summer.

17          You'll hear how Sherry Ann Mitchell found a

18  letter that Leah wrote and left in the room for her, which

19  she'll tell you wasn't unusual for her to do.  But, as one

20  would expect from a conversation with two teenage girls, it

21  eventually turned to boys.  Specifically, to the relationship

22  with the Defendant.  And that conversation ended in tears,

23  both on Sherry Ann Mitchell's part and on Leah Freeman's part.

24          And Sherry Ann Mitchell and her mother, Peggy

25  Mitchell, will tell you Leah ran from the house upset,

D3 7                                Statements

1   indicating that she was sorry she wasn't good enough for them

2   anymore.  And Sherry Ann Mitchell will tell you that she

3   attempted to calm Leah down, to tell her that it wasn't Leah,

4   it was the relationship with the Defendant that needed to end.

5          And shortly after, Leah goes storming off in

6   the direction she would need to walk if she was going home,

7   the Defendant pulls up at 44½ North Elm Street, in his blue

8   1967 Mustang, looking for Leah.  And was told, by Sherry Ann

9   Mitchell, who is still crying at that time, that they got into

10  a fight and Leah walked off to go home.  The Defendant, you'll

11  hear, drove away from  44½ North Elm Street.

12         And the evidence will show, from John

13  Lindegren, who was at his sister's house watching TV, walking

14  his dog (not understandable) — the Defendant actually caught

15  up with Leah Freeman after she left Sherry Ann Mitchell's

16  house.  Was seen in an argument outside on Elm Street, near

17  Sherry Ann Mitchell's house, sometime after 9:00 on

18  June 28, 2000.

19         And you'll hear from Scott Hamilton, a friend

20  of the Defendant's, how the Defendant told him he picked up

21  Leah after she left Sherry Ann Mitchell's house.  They got

22  into an argument and she got out of the car at McKay's.  And

23  it's at McKay's where actually Patty Hutchinson (phonetic)

24  will tell you she saw Leah Freeman.  Could tell that she was

25  upset by the look on her face.

Statements          D3 8

1          And Heidi Crook and Mark Kirn will tell you

2     they saw Leah walking along Central Avenue by Hunter's

3     Restaurant that evening.  That Heather Reid, who was with

4     Heidi Crook, will tell you that she's known Leah since she was

5     three years old, and could tell by the look on her face that

6     she was upset.  And Heather Reid was so concerned about Leah

7     walking Central alone, that time of night and that upset, that

8     after she dropped off Heidi Crook, she went back looking for

9     Leah to give her a ride home.  And will tell you that she made

10    it all the way to the Fairview Road turn off on Central and

11    didn't see her again.

12          But Ray Lewis will tell you he saw Leah walking

13    by the Credit Union.  And Alicia Hartwell will tell you that

14    she saw Leah at the high school, in the parking lot, walking

15    towards the Defendant's car after 9:00 on June 28th of 2000.

16          Cynthia Jones will tell you that she saw Leah

17    at a gas station across the street — which is now the Shell,

18    use to be the Chevron — in the phone booth looking at two guys

19    across the street in the high school parking who were having

20    an argument.

21          And Thomas Bounds, a distant relative of Leah

22    Freeman's, will tell you that he lived in the apartments

23    behind the gas station on North Elm.  And that he was driving

24    pass the highschool earlier, saw Leah there in the parking

25    lot, noticed the top that she was wearing.  As he went into

D3 9                                    Statements

1   town and came back about twenty minutes later, didn't see her

2   again.  And went back to his residence at those apartment

3   complexes, and will tell you that he heard a scream sometime

4   later, which he could tell was a young child.  Didn't know

5   what it was.  And didn't hear anything else after that, so

6   went about his business.

7              And the evidence will show that while all these

8   people are seeing Leah walking along West Central Avenue, the

9   Defendant is seen, himself.  He is seen by Kristin Steinhoff

10  at the Econo Rooter, right there where Central meets the

11  bypass for Highway 42.  It's there, Kristin Steinhoff will

12  tell you, she saw the Defendant in the parking lot, by the

13  Econo Rooter store, by himself — with no cars around —

14  standing and looking at the ground.

15             And Kristin Steinhoff will tell you she asked

16  the Defendant what he was doing.  Made a joke about stealing

17  flowers.  The Defendant, who was upset, told her that Leah was

18  missing and he couldn't find her.  Kristin Steinhoff will tell

19  you she told the Defendant to come by her house later if he

20  still couldn't find Leah and she would help him look for her.

21             The Defendant, the evidence will show, went to

22  Denny's Pizza, and spoke to Denise Bertrand, Leah's older

23  sister, asking her if she had seen Leah.  And Ms. Bertrand

24  will tell you the Defendant was visibly upset at that time.

25  She didn't think it was that big of a deal.  This was shortly

Statements          D3 10

1    after 10:00 in the evening on June 28th.

2              The Defendant — the evidence will show — went

3    up to the Haga Ranch and asked Brent Bartley if he had seen

4    Leah, if she had been back up there.

5              The evidence will show, from Officer David

6    Zavala — then of the Coquille Police Department, now the

7    Keiser Police Department — that he stopped the Defendant for

8    that blue 1967 Mustang with only one headlight.  And that upon

9    contacting the Defendant, informing him he needed to get that

10   headlight taken care of before the graveyard shift came on,

11   the Defendant asked him if he had seen Leah.  He couldn't find

12   her, and asked Officer Zavala to keep a look out for her.

13             And Officer Zavala will tell you that he told

14   the Defendant he would do that.  And then he watched as the

15   Defendant continued to drive on Highway 42, and made that turn

16   to go over the bridge and out to Baker Road, as if going back

17   to his parent's house.

18             And the evidence will show that the Defendant

19   came back in to Coquille later that evening, now in the early

20   morning hours of June 29, 2000.  Went to Brent Bartley's house

21   and picked up him.  And drove around looking for Leah.

22             And Brent Bartley will tell you how they went

23   to Sanford Heights Park, and he stayed in the car, the

24   Defendant got out, walking in the park calling Leah's name.

25   How they went to the high school.  And Brent Bartley stayed in

D3 11                              Statements

1   the car but the Defendant got out, went looking for Leah and

2   calling her name.  And then when they got back to 1173 North

3   Knott Street, Brent Bartley will tell you the Defendant didn't

4   get out of the car.  Just indicated that the house was dark,

5   she must be home and mad at him, and drove off.

6           It's after that the Defendant goes to Kristin

7   Steinhoff's house, ostensibly  to take her up on her offer of

8   help in looking for Leah.  But, Kristin Steinhoff will tell

9   you that once at her residence she noted two different things

10  about the Defendant.  One was that he had changed clothes from

11  what he had been wearing earlier in the evening, when she saw

12  him by the Econo Rooter store.  And the other, that he was

13  driving a different car — his parent's maroon Thunderbird —

14  different from the car that she had seen him in earlier in the

15  day.

16          And at Kristin Steinhoff's house, at a time

17  when the Defendant has indicated to multiple people that he's

18  upset and looking for Leah, he takes the unusual step in

19  deciding to do two things with Kristin Steinhoff.  One, was

20  use a controlled substance, methamphetamine.  And the other,

21  was to try to have sex with her.  Going so far as to get her

22  on the bed, attempting to take her clothes off, and exposing

23  his penis to her before Kristin Steinhoff stopped it.  And

24  after that incident happened, he went back out driving around

25  Coquille looking for Leah.

Statements          D3  12

1          Multiple people will tell you, other than just

2    Kristin Steinhoff, they saw the Defendant in his parent's

3    maroon Thunderbird on June 29, 2000.  Specifically, Aaron

4    West, Heather Reid, and Brent Bartley, all remember the

5    Defendant driving his parent's maroon Thunderbird on June 29,

6    2000.

7          And at some point, the Defendant went home to

8    his parent's house out on Baker Road, which is where he was

9    when Cory Courtright called on June 29, 2000, shortly before

10   8:00 a.m., looking for her daughter.  And she'll tell you that

11   the Defendant asked — when asked where Leah was, his response

12   was, "You mean she didn't come home last night?"

13          And you'll actually hear from Ms. Courtright

14   how earlier on June 28, 2000, the Defendant called her when he

15   went back to Sherry Ann Mitchell's house about 10:15, looking

16   for Leah.  And told Cory Courtright not to worry, that he

17   would bring Leah home that night.  Yet, on June 29, 2000 he's

18   home asleep and Leah isn't home.

19          And the evidence will show he came into town,

20   went with Cory Courtright and Denise Bertrand to the Police

21   Department and helped them file a missing police — Missing

22   Person's Report.  And you'll hear that that report wasn't

23   taken very seriously, at that time, by the Police Department.

24   But, despite the fact that Cory Courtright, Denise Bertrand,

25   and the Defendant, himself, were saying, "Leah would never run

D3 13                              Statements

1  away", it was treated, basically, as a "runaway".

2           And it's not until June 30th, the very next day,

3  that Officer David Hall and then Chief Mike Reaves, with the

4  Coquille Police Department, talked to the Defendant about what

5  happened on June 28th. And you'll hear, in the Defendant's own

6  words, what he told them. How he described Leah as being the

7  love of his life, and what happened on June 28, denying that

8  he ever saw her again after she left Sherry — after he dropped

9  her off at Sherry Ann Mitchell's at 7:00.

10          Doesn't mention going to Kristin Steinhoff's

11 house and attempting to have sex with her and doing drugs with

12 her. Doesn't mention picking Leah up, getting into an

13 argument with her, and having her get out of the car at

14 McKay's.

15          And in the days and the weeks that follow, as

16 family and friends looked for Leah, as an investigation

17 continued, additional resources were brought in, and evidence

18 was recovered. Specifically, a tennis shoe down the street

19 from that gas station where Leah was seen by Cynthia Jones on

20 June 28th, and the area near Thomas Bounds' residence where he

21 heard the scream on June 28th. The tennis shoe that was

22 identified as belonging to Leah Freeman. A tennis shoe that

23 had Leah Freeman's blood on the sole of that shoe. And you'll

24 hear, in the course of the investigation, that the second shoe

25 that matches that was found out on Hudson Ridge road sometime

1   later.

2           And as the search continued, with officers

3   attempting to find Leah Freeman's body, you are going to hear

4   how on August 3, 2000, Detective Tony Wetmore was working with

5   Detective Cal Mitts, Detective Kurt Bennett was working with

6   newly-appointed Deputy Medical Examiner Kris Karcher, went out

7   on that day to check three specific places where they thought

8   they might find Leah Freeman's remains.  And the last place

9   that they were going to check was Lee Valley Road.

10          And Detective Wetmore will tell you how it was

11  a fluke that he didn't bring his hip waders with him so he

12  couldn't walk in the river with Detective Mitts as originally

13  planned.  And wound up having to walk along the river bank,

14  down by Lee Valley Road.  And Detective Whitmore will tell you

15  that he stepped onto a slight hill — mound of earth — and

16  caught a whiff of something, which he immediately recognized

17  as a smell of decomposing flesh.  And he attempted to catch

18  that whiff again.  Couldn't figure out where it came from.

19  Stepped off the mound and started to look, and found what was

20  later to be identified as the badly decomposed remains of Leah

21  Freeman.

22          You'll here how the Major Crimes Team was

23  activated.  The Oregon State Police Crime Laboratory came out

24  and were able to determine that Leah's body had been there for

25  quite some time.  And an autopsy was performed by

D3 15                          Statements

1   Dr. James Olson, of the State Medical Examiner's Office.  That

2   despite the badly decomposed nature of her remains, was unable

3   to find any evidence that she had suffered a gunshot wound.

4   Was unable to find any evidence that she had been stabbed.

5   Was unable to find any evidence that she had suffered any sort

6   of blunt force trauma, or had been badly beaten.  But, that

7   despite those lack of findings, despite her badly decomposed

8   status, was able to determine that the manner of her death was

9   homicide of a unspecified trauma.

10          And you'll hear how after that, the

11  investigation went somewhat cold.  With officers contacting

12  the Defendant the next day, on August 4th — or, August 5, 2000

13  to tell him that Leah's remains had been found.  He'll be able

14  to tell you about the change in his demeanor.  How earlier on

15  in the investigation he had been calm, and not nervous.  But,

16  on that day after Leah's body was found, was chain smoking

17  cigarettes as fast as he could light them and was short in his

18  answers with them.

19          And during the years between August of 2000 and

20  January of 2010, the investigation remained cold.  But, in

21  October of 2009, Officer Pat Smith, of the Coquille Police

22  Department, went to the McGuffin residence out on Baker Road,

23  at their invitation, to talk about the status of the

24  investigation.  And during that contact, the Defendant showed

25  up and told Officer Smith that he knew who killed Leah

Statements        D3 16

1  Freeman, but declined to give a name.

2            And in January of 2010 when the investigation

3  went public, officers interviewed everybody who was still

4  alive — who had been interviewed in 2000 — and tracked down

5  new leads.  Specifically, Jennifer Storts, who will tell you

6  that she was coming home from her shift at Coquille Valley

7  Hospital the early morning hours of June 29, 2000 — going out

8  Fairview Road to her house — and as she came around a corner,

9  where you wouldn't expect to find people walking, found two

10 guys walking with a blonde hair girl in between them, as if

11 holding him (sic) and supporting him (sic).  It startled her

12 so much, she wasn't sure what she had seen.  And just as she's

13 deciding whether or not she needs to stop and offer them a

14 ride, sees a vehicle on the side of the road and figures that

15 everything is okay.

16           You'll hear from Richard Bryant how the

17 Defendant told him, sometime after Leah Freeman's body was

18 found, that he kept seeing her laying there.  That he couldn't

19 do anything about it.  And how he couldn't believe that he let

20 bad things happen to Leah.

21           And you'll hear from David Breakfield, who

22 dated the Defendant's later girlfriend, Megan (not

23 understandable) — Megan Edgerton, at some point prior to 2000.

24 And how the Defendant didn't like that really.  Didn't like

25 that fact that Mr. Breakfield was dating is on-again, off-

D3 17                                    Statements

1    again girlfriend; to the point where he threatened

2    Mr. Breakfield.  Telling him specifically, "I strangled that

3    bitch and I can do the same to you."  "I killed before and I

4    can kill again."

5                    The evidence will show that as leads were

6    followed up on, the conclusion the police arrived at — the

7    conclusion supported by the evidence — was that on June 28,

8    2000, the Defendant met up with Leah Freeman at a time when he

9    was upset that she wasn't spending time with him that night —

10   chose to spend time with her friends.  At a time when was

11   upset that she was losing friends, and realizing the toxic

12   nature of the relationship needed to end.  And that volatile

13   mix of those two individuals came to a violent end, with Leah

14   Freeman's life being taken, the actions of the Defendant, and

15   her body dumped off the side of Lee Valley Road in an effort

16   to cover things up.

17                   At the end of the State's case, after you hear

18   the defense case, after all the evidence is presented, the

19   State is confident that you will weigh the evidence carefully

20   and impartially, and will reach the same conclusion that the

21   person responsible for intentionally causing the death of Leah

22   Nicole Freeman is Nicholas James McGuffin.  I'm confident that

23   you will find a verdict of guilty, convict him of the charge

24   for which he was indicted by the Coos County Jury, find him

25   guilty of Murder because the State will have proven it's case

Statements        D3 18

1   beyond a reasonable doubt.

2           Thank you.

3           THE COURT:    Ms. McCrea, you may give

4   Mr. McGuffin's opening statement.

5           MS. McCREA:    May it please the Court.

6   Mr. McGuffin.  Counsel for the prosecution.  Members of the

7   jury.

8           Nick McGuffin and Leah Freeman were young and

9   they were in love.  And that includes all of the kind of

10  teenage things that go along with that kind of love.  They did

11  have arguments.  They would verbally fight and then they would

12  make up.  And it was very public.  It would happen at school.

13  It would happen in town.  It was a thing like a passing

14  thundershower.

15          Now, when Nick and Leah started dating in the

16  fall of 1999, Leah's mom, Cory, did not approve of

17  Nick McGuffin because there was an age difference between the

18  two of them — because Leah was fifteen and Nick was seventeen,

19  would turn eighteen in April of 2000 — figured that he would

20  graduate.  And Cory discouraged the relationship.  And

21  eventually, she told Leah, "You cannot date Nick McGuffin."

22  And she forbid Leah to see him during the months of December

23  1999 and January of 2000.

24          Well, a couple of things happened because of

25  that.  One is, Leah and Nick were sneaking around behind her

D3 19                               Statements

1    back.  And the second thing is it caused a strain between the

2    mother and daughter, in terms of their relationship.  And

3    eventually, Cory relented and said, "Okay.  You guys can

4    date," and had allowed Nick to come over to the house in March

5    of 2000.

6              Now, at that point, the — they were then the

7    Freeman's — Denise, the older sister, Leah, and Cory Freeman

8    were all living with Cory's friend — or, boyfriend,

9    Jimmy Murphy, in a particular area of town.  And Mr. Murphy

10   did not approve of the relationship between Leah and Nick.

11   And would not allow Nick to come over to the house or to call

12   after 9:30.

13             Eventually, Mr. Murphy and Leah — Leah's mom,

14   Cory Freeman, had a parting of the ways.  And the girls and

15   their mother moved into Leah's grandparent's place, Cory

16   Freeman's parent's house on Knott Street, which is where we

17   went yesterday for the Jury View.  So, that's where they were

18   residing.

19             Now, Cory Freeman's — now Courtright — father

20   was — was an old school kind of guy.  And he didn't much

21   approve of this older guy-younger girl relationship either.

22   And he wouldn't allow Nick up on the second floor where Leah's

23   bedroom was.  And he had some pretty strong ideas about how a

24   couple should act.  So, that's where we start in terms of the

25   context.

1      We expect the witnesses will testify that yes,

2   indeed, there were arguments, but that overall they had a

3   happy relationship.  Yes, they did spend a lot of time

4   together, and that was at the expense of some of Leah's

5   relationships with her girlfriends.

6      In early June — the last day of school in 2000

7   was June 14th.  In early June, there was a graduation party at

8   Nick McGuffin's parents home, Kathy and Nick (sic) McGuffin,

9   out on Baker Road, which is one of the other places that we

10  saw on the Jury View yesterday.  And Leah's mom, Cory

11  Courtright went so far as to allow Leah to spend the night out

12  there, the night of the graduation party, with Nick and his

13  family.  And she went out and participated for a period of

14  time.  So, things were proceeding pretty much the way they

15  would with a couple of kids.

16     On June 28th, which is the fateful day — and let

17  me say, everyone — I'm sure everyone in this room feels

18  nothing but incredible sympathy and sorrow for the Courtright

19  family and for the loss of Leah Freeman.  That they're — the —

20  just got to — just got to make sure that that's out there.

21     So, on the 28th of June, Nick and Leah are at

22  Cory Courtright's house and they are, as counsel says, washing

23  the car because it was graduation, there were white letterings

24  on the side of the windows of his 1967 Mustang.  They were

25  having a great time.  They were spraying water at each other.

D3 21                              Statements

1  They were laughing.  And we expect that Cory Courtright will

2  tell you that Leah was in a — in a exceptionally great mood.

3                  Leah tells her, "I'm going to go over to

4  Sherry's for a couple of hours then Nick is going to pick me

5  up at 9:00.  We are going to go back to the Haga's and have a

6  barbeque, watch a movie."  And she sees her off.

7                  So, they — Nick and Leah go and pick up their

8  friend Brent Bartley.  Go up to the grandparent's place, the

9  Haga's — where the bus had a time turning around yesterday —

10 and hang out for awhile.  And then, it gets to be almost 7:00.

11 This rendevous with Sherry Mitchell, Leah's friend, has been

12 pre-arranged.  Nick takes her down to Sherry's home.  Brent is

13 with them.  And on the way, Nick says to Leah, you know, "Are

14 you sure you want to do this.  Do you want me to come with you

15 because I know there is going to be trouble?"  Kind of like,

16 "I know Sherry doesn't like me or approve of me."  And Leah

17 says, "No.  No.  I want to go spend time with Sherry."

18                  So, he drops her off.  Nick and Brent then go

19 pick up Brent's girlfriend, Nicki Price.  And the three of

20 them go back to the Haga residence.  But, Nick doesn't want to

21 be a third wheel.  He wants to give them some privacy, so he

22 leaves, goes down to Fast Mart, which is on Central — the

23 place that was closed when we went by it yesterday — and hangs

24 out for awhile.  Sees some guys he knows, and they end up

25 going out to the Johnson Mill Ponds.  Only not the parking

Statements          D3 22

1   area that we saw yesterday, but way down at the other end —

2   almost a mile.

3              And, yeah, they were doing stuff we'd rather

4   they weren't doing.  They smoked some marijuana together.  And

5   then, Nick realizes what time it is, and says, "I got to go

6   pick up Leah," because it's almost 9:00.  He gets to Sherry

7   Mitchell's after 9:00.  Between, probably, 9:05 and 9:10.  He

8   comes up Central, turns down Fourth by McKay's, comes up to

9   Sherry's house, and does not see Leah.  But, then when he gets

10  there, he sees Sherry standing in the yard with her boyfriend

11  Cory Bryant, and she, Sherry, is crying.  Nick says, "What

12  happened?"  And Sherry explains that they had a fight.  They

13  had an argument, and that Leah left.

14             Now, the arrangement between Leah and Nick was

15  that he was going to pick her up at 9:00.  This argument

16  occurred substantially before that, the evidence will show,

17  because the argument was initially about Sherry wanting to go

18  jogging — what's called the loop — the area around Central,

19  with Leah.  And Leah's mom — I'm — yeah, and Leah — and

20  Sherry's Mom, Peg Mitchell, saying, "No."  And she told Sherry

21  she didn't want her to because, apparently, there had been

22  times in the past when Leah and Sherry had gone jogging, Nick

23  had come by and picked up Leah, and then Sherry had gone home

24  by herself.  And Peg Mitchell didn't want Sherry coming home

25  in the dark by herself, and was very disapproving.

```
   D3 23                        Statements
```

 1           Leah overheard this and came downstairs and

 2    left the house.  Sherry went after her.  And this conversation

 3    — or, confrontation, if you will, ensued to the point that

 4    Sherry is saying to Leah, "You need to break up with Nick —

 5    he's not good for you; you shouldn't be around him — which

 6    upsets Leah.  She says, "I'm sorry I'm not good enough for

 7    you," and she stormed off.

 8           Two things, you can infer from the evidence,

 9    were going through her mind.  One, she was angry with her

10    friend and her friend's mom.  And Two, she's angry with Nick

11    because he was right, because he told her there were going to

12    be problems when she went over there.  So, she leaves.

13           Now, when she left is going to be a critical

14    issue in this case because the testimony — there — and there

15    is going to be going a lot of testimony for a lot of people.

16    And you, as the jurors, are going to have to decide which of

17    that testimony fits and is consistent with what occurred on

18    June 28th.

19           Because the evidence will be that they were

20    going to go jogging.  Nick was supposed to pick Leah up at

21    9:00.  So, it would be sometime before the 9:00 time, and time

22    to come back from the jogging trip, before Nick would pick her

23    up.

24           So, Leah takes off walking.  And we submit,

25    that the evidence will show that Mr. Lindegren is mistaken if

Statements          D3 24

1  he says that he saw the two of them, Leah and Nick together.

2  Because Nick comes looking for Leah.  She's not a Sherry's

3  Mitchell — Sherry  Mitchell's house.  He then goes looking for

4  her down Central.  Stops at Fast Mart.  Runs into some of the

5  guys that he had been out at the Johnson Mill Ponds with, and

6  says to them, "Have you seen Leah?"  And they say, "No", which

7  we submit, the evidence will show, means she was already past

8  Fast Mart by the time Nick got there.

9          Other people do see her along the way — along

10  Central.  And later on, other people see Nick.  But, we submit

11  the evidence will show that no one saw Nick catch up with Leah

12  at any time along the road on Central.

13          But, Nick goes looking for her.  He goes to

14  Fast Mart.  He drives the loop.  He goes to Brent Bartley's

15  house on Dean Street looking for her.  He goes to, um — he

16  goes to the pizza place and talks to the sister, Denise.  He

17  goes up to Haga's.  He goes a number of places.  And you are

18  going to hear the testimony about the different places he went

19  and who he saw.  He does not go home to his parent's house.

20          At 10:15, he does go back to Sherry's, again

21  looking for Leah.  And at that point, asks if he can call Cory

22  Courtright — Cory Freeman — Leah's mom, to see if she has come

23  home.  He calls and she's not there.  So, he continues

24  looking.  He goes back to Fast Mart at some point and he calls

25  his mother to see if, for some reason, Leah would be out at

D3 25                              Statements

1   his house on Baker Road.  She is not there.

2              Now, you have to understand something about

3   this 1967 Mustang.  This car had been damaged in an accident,

4   and had a leaky gas tank.  So, Nick would only fill it up with

5   a little bit of gas at a time.  And, in terms of Officer

6   Zavala seeing him cross 42, as if he were going home, where he

7   was actually going was to — let me see if I can get this right

8   — the CN — CNF — or, CF — CNP card lock pumps, because that's

9   where he would gas up his car.

10             So, he did get stopped by Officer Zavala.  He

11  did tell him he was looking for Leah.  He told everybody that

12  night he was looking for Leah.  He bought more gas and he kept

13  looking for her.  He was stopped again about midnight, 12:03,

14  by Officer Danny Lee.  Same issue, his headlight was — was

15  dim.  And he told Officer Lee, again, he was looking for Leah.

16             Nick does go over to Kristin Steinhoff's house.

17  He talks to her.  And you've got to remember we are dealing

18  with a guy who is barely eighteen.  In Nick's mind, he's very,

19  very concerned.  He's panicking - - -

20             MS. SOUBLET:     (Interposing) Objection.

21  Argumentative.  Argumentative.

22             THE COURT:     Overruled.

23             MS. McCREA:    He's panicking because he

24  doesn't believe that Leah would run away.  He is worried that

25  something has happened to her.

1          On the other hand, we submit the evidence will
2    show, his mind is also concerned that maybe she was angry, and
3    maybe she went off to a party, and maybe she's hanging out
4    with some other guy.
5          And Kristin Steinhoff, the evidence will show,
6    doesn't do anything to dissuade him of this.  But, in fact,
7    that's what she tells him — she, Kristin Steinhoff, thinks is
8    going on.
9          So, they have this little interlude, which Nick
10   is the one who cut off and said, "No.  I can't do this."  And,
11   it was going to be payback.  And, he realizes he doesn't know
12   what's going on, and it's not okay.
13         So, at that point, Kristin Steinhoff offers to
14   drive him out to where there had been a party the night
15   before.  And this is at a doctor's house.  The doctor is named
16   Stinnott (sic).  And the house is a little ways out Fairview —
17   just maybe a mile out Fairview, from where the Jury View —
18   were we started from Central yesterday.
19         And so, Ms. Steinhoff has a Kia vehicle that
20   she's borrowed from her mother's friend.  They go in the Kia
21   because, at that point, Nick McGuffin doesn't have much gas in
22   his car, and he's also concerned about getting stopped for a
23   third time with the dim headlight and getting a ticket for
24   that.  So, they drive out to Stinnott's (sic).  They go up and
25   the — the house dark.  There had been a party the night

D3 27                                        Statements

1   before, but there is no party that night.  They come back to

2   town and Nick leaves Kristin Steinhoff's house.

3            From there, he goes — and — and he's gone a —

4   he's gone a number of places, and — and you are going to hear

5   all the evidence of that.  He goes back over by Leah's house

6   and he stands outside her window, which is kind of on the

7   side, and he looks up and he doesn't exactly see a light on,

8   but he sees some flickering that could be a reflection from

9   the television in her room.  And he — there is a gravel

10  driveway next to the Freeman house — next — and next to her

11  window.  So, he picks up a couple of little stones and tosses

12  them at the window to see if she'll respond.  She doesn't, but

13  he figures, "Well, the TV is on.  She's mad at me.  I'm — I'm

14  going to go home."  So, he goes home.

15           The next morning, when he gets the call from

16  Cory Courtright, he immediately goes over to her house.  Nick

17  and Denise, Leah's sister, go out looking for Leah, as does

18  her mom.  Eventually, they are so concerned — and, um, Leah's

19  grandfather is so concerned and upset — that they all, Nick

20  and Cory, go down to the Police Department and make a Missing

21  Persons Report.  And then things go into play at that point.

22           Now, at some point, the police ask Nick if they

23  can do an examination on his Mustang, and he agrees to that.

24  So, the police take possession of his Mustang, and they do — I

25  submit the evidence will show — a very thorough examination

Statements        D3 28

1  inside and out, cracks and crevices, looking for everything

2  and anything that would connect Nick to Leah's disappearance.

3  They don't find anything.  And that's in the year 2000.

4  Nick cooperates with them and makes statements,

5  which as counsel says, you will hear.  The investigation

6  proceeds.  There was the shoe found on — by the cemetery.

7  There was, then, the shoe found by Hudson Ridge, as well as

8  some other items — a receipt with someone's name on it other

9  than Mr. McGuffin's name.  And then, eventually, as counsel

10 says — and I don't mean to repeat everything, but you are

11 going to hear the evidence — Ms. Freeman's body is located.

12 Now, an autopsy is done and no cause or manner

13 of death can be determined.  The State continues to

14 investigate.  They take Ms. Freeman's clothing, and the shoes,

15 and they send them to a laboratory in England, whom they

16 believe have a more advanced system of DNA analysis.  And, DNA

17 has determined that, in fact, these are Leah Freeman's shoes,

18 and it is Leah Freeman's blood on the shoe.

19 And, the analysis by the Oregon State Crime Lab

20 Individual is that the blood on the shoe was what is called

21 medium to high velocity blood spatter.  Which means that — we

22 submit the evidence will show, that there is going to be blood

23 in the air around where the spatter was.  And so, there should

24 be some transfer of that blood onto other objects.  So, for

25 example, the evidence will show, if Ms. Freeman — if Leah was

D3 29                              Statements

1  transported, there should be some trace evidence of that blood

2  in the vehicle where she was taken, or on the perpetrator's

3  clothing, or somewhere.

4            So, the State Crime Lab and the prosecution are

5  looking for some connections with that evidence.  So, they

6  send the — the clothing and the shoes to England for analysis.

7  And England does an analysis.  And interestingly enough, the

8  evidence will show that there are — there is a hole — or, a

9  cut mark in the sports bra and the shirt, which may have been

10 made at the same time.  So, the English lab cannot rule out

11 stabbing in this case.

12           What is significant in terms of what the

13 evidence will show for us is that the DNA does not show any

14 connection between Mr. McGuffin and Leah Freeman's death.  The

15 analysis by the lab in England does not show any connection

16 between Leah Freeman's death and Nick McGuffin.  And the State

17 continues to do their investigation and analysis.  And, in the

18 year 2000, eventually the Grand Jury is closed and nothing

19 more occurs.  And Nick McGuffin tries to live his life,

20 knowing that he is under the shadow of suspicion in this

21 community.

22           And in 2009, 2010, a new police chief comes on,

23 the case is reopened, and a new Grand Jury is convened, and

24 people are talked to.  And you are going to hear what they

25 have to say.

Statements     D3 30

1        But, also, of interest to you and important, is

2   that the State kept investigating forensically.  The — the

3   blue Mustang had been sold to somebody else.  The State went

4   to the owner of that car — the blue Mustang — Mr. — Mr.

5   McGuffin's Mustang and said, "May we search it again?  May we

6   take custody of it and analyze it again?"  And she allowed

7   them to so.  And they took it away and they looked at to their

8   heart's content.  They took paint samples.  They did whatever

9   they — they did.

10        The State also went and found the Kia, the

11   little vehicle that Kristin Steinhoff and Mr. McGuffin had

12   been in the night of June 28th.  And they did an examination of

13   that vehicle, as well.  And in that vehicle they did find

14   evidence of semen and some evidence of blood.  Those were not

15   connected to Leah Freeman.

16        So, they sent — going back to the Mustang, they

17   sent what they found to a special lab in — near Chicago,

18   called Micro Trace (phonetic).  And Micro Trace came up with

19   hair and fibers, and they — a bunch of things.  And they found

20   a paint chip — a little tiny paint chip on the tank top that

21   Leah Freeman had been wearing, on the clothing that had been

22   saved.  And this lab, Micro Trace, did an examination, a

23   comparison of that chip to see if it matched the paint on the

24   Mustang or the paint on the Kia, and there was no connection.

25        And lest I forget, there was also a search of

D3 31                          Statements

1    the Thunderbird, and that didn't turn anything up.

2            And it is also of interest, for your

3    consideration in evaluating the testimony of the witnesses,

4    that on January 26, 2010, when the case was reactivated — I'm

5    not sure if it's trooper or detective — John Riddle of the

6    Oregon State Police went out with another officer and posted

7    reward posters throughout Coquille and Coos Bay for the arrest

8    and conviction of whoever killed Leah Freeman — in the amount

9    of $10,000.

10           So, you are going to hear evidence about all of

11   these things.

12           Now, what have I forgotten to tell you?

13           We all feel for the Courtright family.  It is a

14   tragedy what happened to Leah Freeman.  But when you, the

15   jurors, hear all of the evidence in this case, we expect that

16   based on that evidence, there was not a timeframe when

17   Nicholas McGuffin could have caught up with, or did catch up

18   with Leah Freeman and do anything to her.  On the contrary, he

19   was looking for her.

20           And we expect that the evidence — the forensic

21   evidence — and there is going to be a lot of it — that you are

22   going to be looking at, is going to have no connection

23   whatsoever to Nicholas McGuffin.  So, you will be voting not

24   guilty because he's an innocent man.

25           Thank you.

McNeely   D     D3 32

1            THE COURT:   Call your first witness.

2            MR. FRASIER:   Thank you, Your Honor.

3            We'd call Officer McNeely.

4                    RAYMOND LEE McNEELY

5    was thereupon produced as a witness on behalf of Plaintiff

6    and, having first been duly sworn to tell the truth, the whole

7    truth and nothing but the truth, was examined and testified as

8    follows:

9            THE COURT:   Have a seat up here, please.

10            If you would bring the microphone closer to

11   you.  Thank you.

12            Go ahead, Mr. Frasier.

13            MR. FRASIER:   Thank you, Your Honor.

14                    DIRECT EXAMINATION

15   BY MR. FRASIER:

16       Q.   Could you state your name, please, sir, and spell

17   your last name for the record?

18       A.   Raymond Lee McNeely, M-c-N-E-E-L-Y.

19       Q.   And what is your occupation, sir?

20       A.   I'm a Police Officer for the City of Coquille.

21       Q.   How long have you been with the Police Department in

22   Coquille?

23       A.   Five and a half years.

24       Q.   And at the request of your administration — at least

25   at one time Chief Dannels — were you asked be, basically, in

```
     D3 33                              McNeely  D
 1   charge of the reopening of the investigation in the death of
 2   Leah Freeman?
 3        A.   Yes, I was.
 4        Q.   Now, I want to show to you a couple of exhibits
 5   here.  They've been marked as State's Exhibits 75 and 76.  And
 6   I ask if you can identify these (not understandable)?
 7        A.   Yes, I can.
 8             Uh, sorry, Your Honor.
 9        Q.   State's — uh, are these, uh, diagrams or maps of the
10   area of Coquille and also of the Coos County area?
11        A.   Yes, they are.
12        Q.   And do they accurately portray the areas as they
13   would have been on June 28th of 2000?
14        A.   Yes, they do.
15             MR. FRASIER:   Your Honor, we would offer
16   State's Exhibit 75 and 76.
17             MR. McCREA:   There is no objection to 75 and
18   76, Your Honor.
19             THE COURT:   They are received.  Thank you.
20             (Whereupon Plaintiff's Exhibit Nos. 75 and 76
21   were received into evidence.)
22             THE COURT:   Thank you.
23        Q.   Officer, I'm going to ask you — I'm just going to
24   hold up State's Exhibit 75.  Can you describe that to the
25   jury, please?
```

McNeely  D     D3  34

1    A.   The — that's the streets of Coquille.  Shows the —

2  Central Avenue, and the bypass, and the river, and - - -

3    Q.   Okay.  And State's Exhibit 76, describe that,

4  please.

5    A.   It's a map of the outlining area of Coquille.

6  Again, that's the City of Coquille there on the left.  Then

7  that shows the road out Fairview, the road to Lee Valley Road

8  where Leah's body was discovered, and then Hudson Ridge, where

9  the other shoe was found.

10   Q.   Thank you.

11        MR. FRASIER:   Your Honor, that's all the

12  questions I have right at the moment for Officer McNeely.  I

13  will recall him later as we go through this proceeding.

14        THE COURT:   Any cross examination?

15        MR. McCREA:   I — may I look at them?

16        THE COURT:   You may.

17        MR. McCREA:   It takes me awhile, Your Honor.

18  I - - -

19        THE COURT:   (Interposing) That's all right.

20  Go ahead.

21        MR. McCREA:   (Not understandable.)

22               CROSS EXAMINATION

23  BY MR. McCREA:

24   Q.   Officer McNeely, as I understand it, you weren't

25  part of the original investigation, then, back in 2000?

D3 35                                    McNeely   X

1      A.   No, I was not.

2      Q.   And so, when did you start working on the

3  investigation?

4      A.   I started working on the investigation of January of

5  2010, actively.

6      Q.   And as part of that, you reviewed all of the — all

7  of the investigation that had gone before?

8      A.   It was divided up between three officers in the

9  department, in sections.

10      Q.   Well, did you eventually, yourself, review all of

11  the investigation that had been done?

12      A.   Not personally, every single page.  We divided up

13  into three sections with two other officers and they briefed

14  me on what they had had.  And I had gone through stuff, but to

15  say "every single page", I would not testify to that.

16      Q.   All right.  When — when you made up the map, what

17  did you use as your source material to make up the map?

18      A.   That was at the assistance of DOJ.

19      Q.   I'm - - -

20      A.   (Interposing) Department - - -

21      Q.   - - - sorry?

22      A.   - - - Of Justice.

23      Q.   Oh, the Department of Justice?

24      A.   Yes.

25      Q.   All right.  By — by source of material, I was — I

McNeely   X    D3 36

1  was referring to — as — as far as, where the dark lines are

2  indicated.

3      A.    (No audible response.)

4      Q.    The dark lines are significant on the map?  Is that

5  correct?

6      A.    Yeah.  They trace significant routes — or, where

7  - - -

8      Q.    (Interposing) Oh.

9      A.    Like, the one goes out to Lee Valley, where the body

10 was found.  And - - -

11     Q.    And the — and the — the lines are placed there to

12 indicate the locations, then, that were significant in the

13 original investigation?

14     A.    Correct.

15     Q.    All right.  Thank you.

16             MR. McCREA:    That's all the questions I have.

17             THE COURT:    You may step down.

18             You are needed for further attendance, so you

19 are not excused.

20             Call your - - -

21             WITNESS:    (Interposing) Thank you,

22 Your Honor.

23             THE COURT:    - - - second witness.

24             MR. FRASIER:    Thank you, Your Honor.

25             We call Trooper Walker.

```
D3 37                                    Walker  D
```

1                          JEFF WALKER

2  was thereupon produced as a witness on behalf of Plaintiff

3  and, having first been duly sworn to tell the truth, the whole

4  truth and nothing but the truth, was examined and testified as

5  follows:

6              THE COURT:   Have a seat up here, please.

7                      DIRECT EXAMINATION

8  BY MR. FRASIER:

9      Q.   Can you state you name, please, sir, and spell your

10  last name for the record?

11     A.   My name is Jeff Walker, W-A-L-K-E-R.

12     Q.   And what is your occupation, sir?

13     A.   I'm a Senior Trooper with the Oregon State Police.

14     Q.   And where are you stationed?

15     A.   Uh, currently, I'm actually stationed out of the

16  Center Point Area Command, which is near Medford.

17     Q.   Have you been stationed elsewhere?

18     A.   I was stationed here in Coos Bay, uh, for about

19  seven years, uh, a couple years prior to today.

20     Q.   And as part of your duties at the State Police, are

21  you sometimes called upon to do diagrams?

22     A.   Yes, I am.  I'm an ACTAR (phonetic) accredited

23  Collision Reconstructionist, which allows me to do the crime

24  scenes and crashes, and stuff of that nature.

25     Q.   And at the request of my office, did you on — well,

```
                                    Walker  D    D3 38
 1   in — as part of this investigation, go to the residence of

 2   1173 Knott Street, here in - - -

 3        A.   (Interposing) Yes, I did.

 4        Q.   - - - Coquille?

 5        A.   Yes, I did.

 6        Q.   And did you prepare a diagram of the upstairs of

 7   portion of this particular residence?

 8        A.   Yes, I did.

 9        Q.   I'll show you what's marked as State's Exhibit

10   No. 77.  And, do you recognize this, sir?

11        A.   That is the — an enlargement of the scaled diagram

12   that I produced for this case.

13        Q.   Uh, and was it scaled, as I understand it?

14        A.   Yes, it was.

15        Q.   Does this accurately portray what you saw — the

16   diagram?

17        A.   Yes, it is.

18             MR. FRASIER:   Your Honor, we would offer

19   State's Exhibit 77.

20             MS. McCREA:   This, to me, is identical to

21   what I have here.

22             There is no objection — there is no objection,

23   Your Honor.

24             THE COURT:   Received.

25             (Whereupon Plaintiff's Exhibit No. 77 was
```

```
   D3 39                              Walker   X
```

1  received into evidence.)

2       Q.    Thank you.

3              MR. FRASIER:    That's all the questions I have

4  of this witness.

5              THE COURT:    Ms. McCrea.

6              MS. McCREA:    I have just a couple of

7  questions.

8                      <u>CROSS EXAMINATION</u>

9  <u>BY MS. McCREA:</u>

10      Q.    Hi Trooper.

11      A.    Hi.

12      Q.    So, (not understandable) — on — on your diagram,

13  - - -

14              MS. McCREA:    Sorry, Judge — (not

15  understandable).

16      Q.    On your diagram, these little kind of — are these

17  doors?

18      A.    Those are doors.

19      Q.    Okay.

20      A.    And they also show the — the swing of the door.  So,

21  in other words, the hinge of the door is on this side, showing

22  that the door opens that way.

23      Q.    So, we are — when we are looking at the diagram —

24  and I'm — I'm referring to — it says "Attic Access Panel" on

25  the left, and there is like a — (not understandable) this

Walker   X    D3 40

1   triangle that kind of swings down — those are going to be

2   doors?

3        A.   Yes.

4        Q.   Okay.

5        A.   Yeah.

6        Q.   And likewise, where it says "Ceiling Light", the

7   things on the two sides would also be doors?

8        A.   Yeah.  Anywhere you see one of these, there is a

9   door.

10        Q.   Okay.  So, they look kind of like chart notes?  I'm

11   — I'm trying to get this so we have it in the record so - - -

12        A.   (Interposing) Correct.

13        Q.   Okay.  All right.

14             And the ones that are sort of like triangular, are

15   those doors, or is that something else?

16        A.   Those are what are called "bifold doors" that are

17   commonly found in closet areas.

18        Q.   All right.  Thank you.

19                THE COURT:   Anything else?

20                MS. McCREA:   No, Your Honor.

21                THE COURT:   Mr. Frasier?

22                MR. FRASIER:   I have no further questions.  I

23   ask that the witness be excused.

24                THE COURT:   Any objection?

25                MS. McCREA:   No, Your Honor.

```
 D3 41                              Courtright  D
```

 1          THE COURT:    You are excused from further

 2   attendance.

 3          Call your next witness.

 4          MR. FRASIER:    Thank you, Your Honor.

 5          We call Cory Courtright.

 6          THE COURT:    Raise your right hand, please,

 7   ma'am.

 8                      CORY COURTRIGHT

 9   was thereupon produced as a witness on behalf of Plaintiff

10   and, having first been duly sworn to tell the truth, the whole

11   truth and nothing but the truth, was examined and testified as

12   follows:

13          THE COURT:    Have a seat up here, please.

14          If you could lean forward and make sure the

15   microphone is about that distance is fine.

16          WITNESS:    Okay.

17          THE COURT:    Go ahead, Mr. Frasier.

18          MR. FRASIER:    Thank you, Your Honor.

19                   DIRECT EXAMINATION

20   BY MR. FRASIER:

21      Q.   Could you tell us your name, please, ma'am, and

22   spell your last name for the record?

23      A.   Cory Courtright, C-O-U-R-T-R-I-G-H-T.

24      Q.   Where do you live, ma'am?

25      A.   Right now, I live at 351 West Fifth Street in

Courtright   D    D3  42

1  Coquille.

2      Q.    Have you lived in Coquille for a period of time?

3      A.    Oh, yes.  Most — most of my life.

4      Q.    Have you been married, ma'am?

5      A.    Yes.

6      Q.    And were you married at one time to an individual

7  named Denny Freeman?

8      A.    Yes, I was.

9      Q.    And Mr. Freeman — Denny Freeman — did he have

10 business here in town?

11     A.    Yes, he did.

12     Q.    And what was that?

13     A.    Denny's Pizza.

14     Q.    Okay.  Did you work there?

15     A.    Yeah.  Off and on for several years — many years.

16     Q.    Mr. Freeman and you, did you divorce?

17     A.    We did.

18     Q.    In - - -

19     A.    Um, in '88, I believe.

20     Q.    Mr. Freeman still with us?

21     A.    No.

22     Q.    Passed away?

23     A.    Yeah.  He passed away.

24     Q.    Do you have any children with Mr. Freeman?

25     A.    Yes.  I had two.

D3 43                                    Courtright   D

1    Q.   And who are they?

2    A.   Denise Marie Bertrand, now, and — and Leah Nicole

3  Freeman.

4    Q.   And when was Leah born?

5    A.   Leah was born October 29, 1984.

6    Q.   I'm going to show a picture to you here.  It's

7  marked as State's Exhibit No. 1.  Do you recognize that

8  picture?

9    A.   Yes, I do.

10    Q.   And is that a picture of your daughter?

11    A.   Yes, it is.

12    Q.   And, does it show she looked when — shortly before

13  she disappeared?

14    A.   Yes, it does.

15              MR. FRASIER:   We would offer State's Exhibit

16  No. 1, Your Honor.

17              MS. McCREA:   There is no objection, Your

18  Honor.

19              THE COURT:   Received.

20              (Whereupon Plaintiff's Exhibit No. 1 was

21  received into evidence.)

22    Q.   I want to go back, uh, to the years 1999 and the

23  year 2000.

24    A.   Okay.

25    Q.   What — what year of school was Leah in 1999/2000?

Courtright   D     D3 44

1       A.   She was a freshman in high school.

2       Q.   And where did she go to school?

3       A.   Here in Coquille High School.

4       Q.   And at — at the time that school started, where were

5   you living at that time?

6       A.   Um, we were living at 351 West Fifth Street.

7       Q.   Was that with, uh, an (not understandable) - - -

8       A.   (Interposing) With Jim Murphy.

9       Q.   Was he your boyfriend at that time?

10      A.   At that time, yes.

11      Q.   And during the course of the school year, did Leah

12  develop a relationship with anyone?

13      A.   Yes.

14      Q.   Did she have a boyfriend?

15      A.   Yes.

16      Q.   And who was that?

17      A.   Nick McGuffin.

18      Q.   Do you see him here in the courtroom?

19      A.   Yes, I do.

20      Q.   Point him out for us, please.

21      A.   It's the Defendant.

22      Q.   Um, what types of things did Leah do in school her

23  freshman year?

24      A.   Um, she was into volleyball, basketball, and she did

25  some track.

```
    D3 45                           Courtright  D
```

1    Q.   How did she do as an athlete?

2    A.   She — very well.

3    Q.   How about her school work?

4    A.   It was average.  Um, C's, B's, I would say.

5    Q.   What was her health like?

6    A.   She was in great health.

7    Q.   Did she have any health problems?

8    A.   No.

9    Q.   Did she have any issues like heart murmur or

10   anything like that?

11   A.   Oh, no.

12   Q.   Diabetes?

13   A.   No.

14   Q.   Uh, did you have a family doctor in Coquille?

15   A.   Um, yeah.  Her doctor was Brazier, I believe, at the

16   time.

17   Q.   As part of going — being involved in sports, did she

18   have to have a physical every year?

19   A.   Yes.

20   Q.   Any — any problems as a result of that?

21   A.   No.

22   Q.   Um, did she have problems with her teeth?

23   A.   Yeah.  She had braces.

24   Q.   How long did she have braces?

25   A.   Oh.  Um — gosh.  I — I don't know that I can answer

Courtright   D     D3 46

1  that.  Shoot.  Maybe a year.  Or — or, under — maybe even

2  under a year.

3      Q.   How would you describe your relationship with your

4  daughter Leah?

5      A.   We had a good relationship.  We were - - -

6      Q.   (Interposing) (Not understandable) - - -

7      A.   - - - close.  Um, I thought we talked about a lot of

8  things.  I — I always thought she was pretty honest with me.

9      Q.   Now, um, when you became aware that she was involved

10  with the Defendant, Mr. McGuffin, how did you feel about that?

11      A.   I didn't like the idea because he was seventeen and

12  she was only fifteen.  Um, but he brought her home from school

13  a couple of times and came to the door and — you know, when he

14  brought her home.  And, um, at first I said, "No."  But, I

15  could see that she was interested in him and he seemed like a

16  nice kid, and so I — I let them go out.

17      Q.   Was there a period of time you actually said, "No",

18  you didn't want them dating?

19      A.   Yes.

20      Q.   Did you find out they were actually seeing each

21  other behind your back?

22      A.   Yes, I did.

23      Q.   How did you react to that?

24      A.   I was angry.  And — and I — I told them that they

25  could no longer see each other.  Um, Leah began to cry a lot

D3 47                              Courtright  D

1   when he would — after they would hang up from the phone.  And,

2   um, I was hearing of, um, some fighting between the two of

3   them at school.  And, um, I told them they had to quit seeing

4   each other.

5        Q.   But they continued to see each other?

6        A.   Nick — yes.  And her sister, Denise, finally told me

7   about it — that they were sneaking around.  Leah would tell me

8   she was going jog- — it wasn't just at school.  Leah would

9   tell me she was going jogging and, in fact, a few times she

10  was actually going to meet Nick.

11       Q.   Did you eventually relent and let your daughter be

12  with Mr. McGuffin?

13       A.   Yes.

14       Q.   Why did you do that?

15       A.   Because I didn't — I figured I couldn't stop it.

16  And I didn't want to have a relation — I didn't — I wanted our

17  relationship to remain honest and truthful.  And I didn't want

18  her to sneak around.  And I didn't really think I had a whole

19  lot of control over whether she saw him, if she was going to

20  be sneaking around.

21       Q.   Now, after you relented, did you have a discussion

22  with both your daughter and Mr. McGuffin about sex?

23       A.   Yes, I did.

24       Q.   And what was this discussion?

25       A.   I told her to have him come to the house.  And I

Courtright  D     D3 48

1  told them both that I realized that I couldn't stop them from

2  seeing one another, and that they were going to continue to do

3  it.  But, if they were going to continue to do it — I knew

4  that they were having sex — or, I had heard this and — that

5  she was going to have to get on some form of birth control

6  pills.

7       Q.   Did you talk with them about parenthood and things

8  like that?

9       A.   Yes, I did.

10      Q.   What did you tell them?

11      A.    I told them that neither one of them were anywhere

12  near ready to be parents.  And I wasn't ready to be a

13  grandparent.  Uh, and so — I also told them that I was going

14  to make an appointment for Leah to get on birth control.

15      Q.   And was that through the Coos County Public Health

16  Department?

17      A.   Yes.

18      Q.   Now, during the — the school year — uh, around the

19  time of prom, did Leah go to the prom?

20      A.   Yes, she did.

21      Q.   Who did she go with?

22      A.   She went with Nick and, um, two other friends of

23  theirs, Scott Hamilton and Melissa Smith.

24      Q.   At some point in time did you move from the

25  residence of Mr. Murphy?

```
    D3 49                              Courtright  D
```

1      A.   Yes.

2      Q.   And approximately when was that?

3      A.   Um, I believe it was the end of May.

4      Q.   What year?

5      A.   Uh, 2000.

6      Q.   And where did you move to?

7      A.   We moved to my parent's house on Knott Street.

8      Q.   And that address was - - -

9      A.   1173 North Knott.

10     Q.   And was there a part of the house that you and your

11  daughters moved into?

12     A.   Yeah.  We all had our own separate rooms upstairs.

13     Q.   Now, I previously showed you, I believe, State's

14  Exhibit 77.  Do you recognize this?

15     A.   Yes.

16     Q.   Okay.  I'm going to - - -

17          Okay.  This is a laser pointer.  That dot there,

18  push on the red — you see the red dot?

19     A.   Yeah.

20     Q.   Okay.  Using that laser pointer - - -

21              THE COURT:    (Interposing) Excuse me.

22              Ms. Freeman — Ms. Courtright, I'm sorry, could

23  you move the microphone around so it's still in front of your

24  mouth?

25              WITNESS:    Oh.

Courtright  D    D3 50

1          THE COURT:    Reasonably close to you.  Thank

2    you, ma'am.

3               Go ahead.

4      Q.    Using that, uh, pointer, could you point out where

5    your room was?

6      A.    My room would be here.

7      Q.    Okay.  And where was Denise's bedroom?

8      A.    Denise's bedroom was over here.

9      Q.    And Leah's bedroom?

10     A.    Right across from mine.

11     Q.    Was there a restroom upstairs?

12     A.    No.

13     Q.    It was downstairs?

14     A.    Right.

15     Q.    Now, I want to show to you what I've previously

16   marked as State's Exhibits 9, 10, 11, 12, 13, and 14.  If you

17   would look at those briefly?

18   Do you recognize those pictures?

19     A.    Yes.

20     Q.    And are — are these pictures of 1173 Knott Street?

21     A.    Yes, sir.

22     Q.    Now, these were pictures were taken earlier this

23   year.  Is the house layout the same as it was in the year

24   2000?

25     A.    Yes.

```
   D3 51                        Courtright  D
```

1          MR. FRASIER:   We'd offer State's Exhibits 9

2    through 14.

3          MS. McCREA:    There is no objection, Your

4    Honor.

5          THE COURT:   No. 9 through 14 are received.

6          (Whereupon Plaintiff's Exhibit Nos. 9, 10, 11,

7    12, 13, and 14 were received into evidence.)

8    Q.   I put up on the screen here State's Exhibit 9.

9    Could you describe that for us, please?  What is this a

10   picture of?

11   A.   It's a picture of my parent's house, where we lived.

12   Q.   And is that the front part of the house?

13   A.   Yes, it is.

14   Q.   This is State's Exhibit 10.  Do you recognize that,

15   too?

16   A.   Yes.

17   Q.   And what is this a picture of?

18   A.   That's the side of the house.

19   Q.   And this is State's Exhibit 11.  Do you recognize

20   that?

21   A.   Yes.  That's also the side of the house.

22   Q.   Now, where was Leah's bedroom in relation to this

23   side of the house?

24   A.   It's up at the top up there.

25   Q.   Using that laser pointer that I gave you, the —

Courtright  D    D3 52

1  could you point out — is there a window to her bedroom in this

2  picture?

3      A.   Yes.

4      Q.   Point that out, please.

5      A.   Right there.

6      Q.   This is State's Exhibit 12.  Do you recognize that?

7      A.   It's kind of — um, yes.

8      Q.   And is, again, that 1173 Knott Street?

9      A.   Yes, it is.

10     Q.   And is — is that a different part of the house?

11     A.   Yes.  That's the other side of the house.

12     Q.   State's Exhibit 13?

13     A.   That's the same side of the house.

14     Q.   All right.  And finally, State's Exhibit 14?

15     A.   That's the back.

16     Q.   When you moved in with your parents, was there still

17  property of yours and your daughter's at the residence of

18  Mr. Murphy?

19     A.   Yes.

20     Q.   Why is that stuff still there?

21     A.   We left in a hurry that morning.  Mr. Murphy and I

22  had had a — had had a disagreement, and I told the girls to

23  just grab some clothes and — as did I — and we left.  And we

24  went to my parent's house.

25     Q.   Was it your intent to abandon that stuff there at

D3 53                              Courtright   D

1    Mr. Murphy's house?

2         A.   Oh, no.  No.  We planned to come back and get it at

3    some point.  I just didn't know when.

4         Q.   I want to direct your attention now to

5    June 28, 2000.  Earlier in the day — well, do you recall that

6    day, ma'am?

7         A.   No.

8         Q.   Okay.

9         A.   I mean, I — I — not the early afternoon or the

10   morning — what — I don't know if I worked that day, or if I

11   had been shopping or something that day, but I remember coming

12   home around 4:00.

13        Q.   Now, what happened when you came home?

14        A.   When I came home, Nick's car was in the driveway.

15   And him and Leah were cleaning off the window.  The, um,

16   seniors write on the windows, and they were cleaning that off

17   of his window.

18        Q.   And how were they behaving?

19        A.   They were laughing and having fun.

20        Q.   How long were they there?

21        A.   They left shortly after I got there.  Um, I would

22   guess maybe even ten or fifteen minutes after I got there.

23        Q.   Do you remember what your daughter was wearing?

24        A.   Um, blue jeans and a white tank top.

25        Q.   I want to show to you what's marked as State's

Courtright   D     D3 54

1  Exhibits No. 7 and State's Exhibit 8.  Are those pictures of

2  your daughter?

3       A.   Yeah.  Yes.

4       Q.   And are those pictures as she appeared on June 28th

5  of 2000?

6       A.   Yes.

7            MR. FRASIER:   We would offer State's Exhibits

8  No. 7 and 8.

9            MS. McCREA:   (10:23:21) No objection,

10 Your Honor.

11           THE COURT:   Received.

12           (Whereupon Plaintiff's Exhibit Nos. 7 and 8

13 were received into evidence.)

14      Q.   The tank top she's wearing, had she had that for a

15 period of time?

16      A.   I'm not sure.

17      Q.   And this — we are looking at State's Exhibit 7.

18 We'll now go to State's Exhibit 8.

19           Her hair color — what was her hair color?

20      A.   Blonde.

21      Q.   Before Leah left, did she say anything to you?

22      A.   (Witness crying.)  I'm sorry.

23      Q.   Do you need a break?

24      A.   I'll be okay.

25           She said something about that she was going to take

D3 55                              Courtright  D

1   my advice, because I had told her she needed to spend more

2   time with her friends — not so much time with Nick.  And

3   shortly after I had gotten home from wherever I had been that

4   day, she said, "I've decided to take your advice, mom.  I'm

5   gonna, um — I'm gonna go see Sherry.  Nick's going to take me

6   there, but first we are going out to Nick's house."  Something

7   about movies and that Nick was going to take her to Sherry's

8   at 7:00.  And that maybe they would go to the Bartley's — or,

9   excuse me, the Haga's to watch the movies, I think was how it

10  went.  And, um — and I said, "Good.  I'm glad to hear that,

11  Leah.  That you are spending — going to spend time with your

12  friends instead."

13          And she was just getting ready to leave, and she

14  jumped up and kissed me on the cheek and said, "I love you,

15  mommy."

16          I never saw her again.

17      Q.   What time were you expecting Leah back that night?

18      A.   I can't remember if it was 11:00 or 12:00.  Um, it

19  almost seems like it might have been 12:00 because it was

20  going to be later.  You know, she — they were — she was going

21  to go see Sherry, and then I figured to watch a movie, you

22  know, it would take a few hours.  And so, I'm not positive if

23  I told her to be home at a 11:00 or 12:00.

24      Q.   Later on in the evening, did you get a phone call

25  from the Defendant, Mr. McGuffin?

Courtright   D     D3 56

1    A.   Yes.

2    Q.   Do you recall about what time that was?

3    A.   Um, like about five minutes after 10:00.

4    Q.   And what did the Defendant say to you in that

5    telephone conversation?

6    A.   He said, "Hey, Cory, is Leah there?"  And I said,

7    "No.  Why?"

8         And he said, "Well, I can't find her."  I said,

9    "What?"

10        He said, "Oh, don't worry."  He goes, "I — I'll —

11   I'm going right now.  I'll go look for her.  I'll — I'll bring

12   her home."

13   Q.   Now, did you ever hear from the Defendant again that

14   night?

15   A.   No.

16   Q.   Did he ever come to the door — knock on the door,

17   asking if Leah was home?

18   A.   No.

19   Q.   Did he ever call you again to say, "I haven't found

20   her ?"

21   A.   No.

22   Q.   At some point in time, do you go to sleep on the

23   evening of June 28th?

24   A.   Yeah.  I, uh — I fell asleep shortly after that

25   phone call.

```
   D3 57                              Courtright   D
```

 1    Q.   Did you wake up in the middle of the night?

 2    A.   I woke — I woke up at 3:30.  I had to go to the

 3  bathroom.  And I looked in her room.

 4    Q.   Who's room?

 5    A.   Leah's room.

 6    Q.   What did you see?

 7    A.   Her bed was empty.  She wasn't there.

 8    Q.   Any lights on in her room?

 9    A.   No.  I turned the light on.

10    Q.   Was there a television in the room?

11    A.   I — I don't recall right now.

12    Q.   Do you recall any type of light from any type of

13  source being on in that room?

14    A.   No.

15    Q.   When you saw your daughter wasn't home, what did you

16  think?

17    A.   Well, I just thought, "My God."  I was shocked

18  because she hadn't ever done anything like that.  Never not

19  come home.  I — I thought, "She must be with Nick.  She's —

20  she's got to be with Nick.  He said he was going to find her."

21    Q.   Back up a little bit.

22         Had you ever allowed Leah to spend the night with

23  the Defendant?

24    A.   Um, yes.

25    Q.   Could you tell us about that?

Courtright  D    D3 58

1    A.   Um, at Nick's graduation that year, which was — I'm

2    not positive of the date.  It was either — I think it was

3    June 11th or the 13th.  She kept asking me if she could go out

4    there and spend the night because Bruce and Kathy were going

5    to be there — his parents were going to be there.  And they

6    were going to have a party because of his graduation.  And she

7    really wanted to go.  And she told me that other friends of

8    hers were being allowed to go.  And I said, "Yes."  Well, it

9    took awhile, but I said, "Yes."  And I said, "But, when I get

10   off work I'm going to come out there and meet his parents,"

11   because I had never met them.

12   Q.   Did you do that?

13   A.   Yes, I did.  I went out there.  Um, I think I got

14   off work a little bit early that night.  And I think I got out

15   there around 11:00 — 10:30 or 11:00.

16   Q.   Now, going back to you checked her room she's not

17   there, you eventually go back to bed?

18   A.   Yes.

19   Q.   And do you get up — what time did you get up?

20   A.   Well, I went back to bed.  And I think I might have

21   even dozed off, um, for a little bit.  But, um, my mother — my

22   mother always had a special time that she got up.  She always

23   got up at 6:30 in the morning.  And I heard her get up and so

24   I ran down there.  And I was scared because — well, not just

25   because Leah wasn't there, but my dad had health issues.  And,

```
     D3 59                          Courtright  D
```

1  um, I was scared for him to find out that his granddaughter

2  wasn't there and I didn't know where she was.

3          And — so anyway, I got up at 6:30 when I heard my

4  mom.  And I told my mom — I said, "Mom, Leah's not home."  She

5  said, "Where is she?"  And I said, "I don't know.  She's got

6  to be out at the McGuffin's.  Where else could she be?"

7          She goes, "Well, should you call out there this

8  early?  And — it's kind of early."  "I know Kathy goes to

9  work, I think, around 8:00."  So, I waited until about ten to

10  8:00 and called out there.

11      Q.    And did you talk with the Defendant over the phone?

12      A.    Yes.

13      Q.    And what did you talk about?

14      A.    I just asked him if — I said, "Is Leah out there?"

15  And he said, "No."

16          And I said, "Well, where is she?"  He said, "She

17  didn't come home last night?"

18          And I said, "No.  Where is she?"  He goes, "I don't

19  know, but I'll be right in.  I'll be right in town."

20      Q.    Did he come to your residence?

21      A.    He — he did come right away, yes.

22      Q.    And did you talk with him when he got to your house?

23      A.    Yes.

24          I was asking him — you know, I was like, "Was there

25  parties last night?  Could she have gone to a party?"  He

Courtright  D    D3 60

1  claimed there wasn't any parties that night.

2      Q.   Did he tell you when the last time he saw her?

3      A.   When he took her to Sherry's at 7:00.

4      Q.   Did he say anything about coming by your house?

5      A.   I don't believe so.

6      Q.   Did you eventually go to the Coquille Police

7  Department?

8      A.   Yes.

9      Q.   And who went with you?

10     A.   Pardon me?

11     Q.   Who went with you?

12     A.   Um, Nick and my daughter, Denise, and I went.

13     Q.   Um, what happened?

14     A.   (No audible response.)

15     Q.   Well, first of all, who did you speak with?

16     A.   Um, at that time, it was Chief of Police, um, Mike

17 Reaves.  And he just — he wasn't very nice.

18        I started — he was asking what she wearing, and I

19 was — I was in a little bit of a panic mode and, uh — and I

20 couldn't quite remember, and so I was asking Denise and Nick.

21 I was — you know, "God, I can't remember.  What was she

22 wearing?"  And then, they said she was wearing the blue jeans

23 and a — what they called a "wife beater" — a "wife beater" tee

24 shirt — or, tank top.

25        And so, I said that to him.  And he proceeded to

```
     D3 61                          Courtright  D
```

 1   yell at me for using that word, "wife beater".  And, um, he

 2   just, uh, gave me papers from — what is that organization?

 3   The National Exploited — I can't remember - - -

 4        Q.   (Interposing) The Center for Missing and Exploited

 5   - - -

 6        A.   (Interposing) Yes.

 7        Q.   - - - Children?

 8        A.   Thank you.  That was — I filled out the — went home,

 9   filled out papers for that.

10        Q.   Did you take it back to him?

11        A.   Yes.

12        Q.   Anything happen that day?

13        A.   Anything happen that day?

14        Q.   Did the police come to your house?  Did they do

15   anything?

16        A.   Yeah.  They — they came by a couple times.  I

17   remember, um, Dave Hall coming by a few times.

18        Q.   And Dave Hall was who?

19        A.   He was an officer at the Coquille Police Department.

20   I don't know what rank.

21             MR. FRASIER:   Your Honor, can counsel and I

22   approach?

23             THE COURT:   Yes.

24             (Bench conference.)

25             THE COURT:   We'll take the morning recess.

```
                                    Courtright  D    D3  62
```

1          Everybody in the audience, remain seated until

2    the jury has a chance to go to the jury room.  You take your

3    notes with you and be in the jury room.  It will probably take

4    about — take about fifteen minutes.  Remember the admonition

5    not to discuss the case.

6               (Jury out.)

7               THE COURT:   I do want to take this

8    opportunity to remind people in the audience that they are

9    not, specifically, to go to any witness who's schedule to be

10   here and talk to them about what witnesses have testified in

11   Court.

12              And I expect counsel to tell their witnesses

13   that they are not to talk to people in — if they are scheduled

14   to be a witness, they are not to talk to other people about

15   the testimony that's here.  Okay?

16              THE COURT:   We'll be in recess until, uh,

17   five to.

18              You may step down.

19              WITNESS:   All right.

20                      (RECESS)

21              (Jury in.)

22              JUDICIAL ASSISTANT:   All rise.

23              THE COURT:   Be seated, please.

24              Uh, Ms. Courtright, if you would retake the

25   stand, please.

```
    D3 63                              Courtright  D
```

1           You are still under oath.

2           Go ahead.

3           <u>DIRECT EXAMINATION (Continued)</u>

4    <u>BY MR. FRASIER:</u>

5       Q.   Over the years, were you familiar with your

6    daughter's handwriting?

7       A.   Yes.

8       Q.   Had you seen it on multiple occasions?

9       A.   Yes.

10      Q.   And do you believe if you looked at a particular

11   document, you could identify it — whether it's her handwriting

12   or not?

13      A.   Yes.

14      Q.   I'm going to show to you what's been previously

15   marked as State's Exhibits No. 85, 86, and 87.  If you would

16   look at those, please?  Do you recognize the handwriting in

17   those particular documents?

18      A.   Yes.

19      Q.   And do — who do you identify that handwriting as

20   being?

21      A.   Leah's.

22      Q.   I'll show you what's marked as State's Exhibit

23   No. 82, and ask if you can identify the handwriting?

24      A.   Yes.

25      Q.   And who's handwriting is that?

Courtright   D    D3 64

1    A.    Leah's.

2    Q.    Did your daughter keep a diary?

3    A.    Yes, she did.

4    Q.    And when she wrote in her diary, did she address the

5    entries to a particular person or - - -

6    A.    Yes.  I'm trying to remember who she — I believe, it

7    was "Patty".

8    Q.    I'll show you now what's marked as State's Exhibit

9    No. 90.  If you would look through that?  Do you recognize

10   that?

11   A.    Yes.

12   Q.    Do you recognize the handwriting in there?

13   A.    Yes, I do.

14   Q.    And who's handwriting is it?

15   A.    It's Leah's.

16   Q.    I also have what's marked as State's Exhibits 88, 89

17   and 92.  Do you recognize the handwriting on those particular

18   documents?

19   A.    Yes.  It's Leah's.

20   Q.    I think I asked you before, your daughter was in

21   good health, as far as you knew?

22   A.    Yes.

23         MR. FRASIER:    Your Honor, I have here what's

24   marked as State's Exhibit 214, which is the medical records of

25   (not understandable) Ms. Freeman (not understandable).

```
    D3 65                              Courtright  D
```

1              MS. McCREA:    (Not understandable.)

2              There is no objection, Your Honor.

3              THE COURT:    Received.

4              (Whereupon Plaintiff's Exhibit No. 214 was

5    received into evidence.)

6        Q.   You indicated that the last time you saw your

7    daughter was in the afternoon of June 28, 2000?

8        A.   Yes.

9        Q.   In the days following, did you have contact with the

10   Defendant during that time period?

11       A.   I'm sorry.  Could you repeat that?

12       Q.   Did the — in the days following your — your

13   daughter's disappearance, did the Defendant ever have contact

14   with you?

15       A.   Yes.

16       Q.   Uh, were you supportive of him?

17       A.   Yes, I was.

18       Q.   Did he help in this — in looking for your daughter?

19       A.   Yes.

20       Q.   Did you have posters made up for her?

21       A.   Yes.

22       Q.   Did he help place those posters?

23       A.   Yes.

24       Q.   Uh, are you related, in some manner, to Howard

25   Leatherman?

Courtright   D    D3 66

1     A.   Yes, I am.

2     Q.   How are you related to Mr. Leatherman?

3     A.   He's my mother's cousin.

4     Q.   And just for the record, Mr. Leatherman is the

5  creator of the Leatherman Tool?

6     A.   Yes, he is.

7     Q.   And he's somewhat wealthy?

8     A.   Yes, he is.

9     Q.   Did he offer money as a reward to help find Leah?

10    A.   Yes, he did.

11    Q.   And back in the year 2000, how much money did he

12  offer in terms of the reward?

13    A.   He offered $5,000.

14    Q.   When the case was reopened in 2010, thereabouts, did

15  he offer additional funds to - - -

16    A.   (Interposing) Yes, he did.

17    Q.   And how much total was the reward, uh, when it was

18  put out again in the year 2000 — or, - - -

19    A.   (Interposing) He - - -

20    Q.   - - - 2010?

21    A.   He added another $5,000, making it $10,000.

22    Q.   To your knowledge, has anyone ever been given any of

23  that money?

24    A.   No.

25    Q.   Now, going back to the year 2000, the early part of

```
     D3 67                          Courtright  D
```

1   July — so, the 2nd, 3rd, thereabouts — was there a time where

2   the Defendant came over to your house with his parents?

3        A.    The — yes.

4        Q.    Okay.  And was there an incidence where he threw up?

5        A.    Yes.

6        Q.    Could you tell us about that, please?

7        A.    Well, his — him and his parents pulled up in the

8   driveway.  And myself and my sister and — I don't know — maybe

9   even a few other family members, were just kind of pacing

10  around out in the driveway.  And they pulled up — the

11  McGuffin's pulled up with Nick.

12           He got out of the car.  I started talking to his

13  parents.  And the next thing I knew, my daughter, Denise, came

14  running from the backyard and said, "Oh my gosh, mom, there is

15  something wrong with Nick."  And I said, "What do you mean

16  there is something wrong with Nick."  She said, "He's in the

17  back.  He's throwing up."

18       Q.    And did Mr. And Mrs. McGuffin take the Defendant

19  from there?

20       A.    Yes.

21       Q.    Is — to your knowledge did they — well, - - -

22           Let me ask this question.  Was it your understanding

23  that Mr. McGuffin had just come from an interview with the

24  police?

25       A.    Yes.

Courtright   D    D3 68

```
 1                  (Discussion between counsel.)
 2                  MR. FRASIER:    Your Honor, I have here what's
 3     marked as State's Exhibit No. 215.  They are records
 4     pertaining to that (not understandable) for the Defendant.
 5     And we would offer them.
 6                  MS. McCREA:    I'm — I'm sorry, what's the
 7     purpose of offering the records?
 8                  MR. FRASIER:    To show his anxiety attack on
 9     that day.
10                  MS. McCREA:    If I could have just a moment,
11     Your Honor?
12                  THE COURT:    Yes.
13                  MS. McCREA:    There is no objection.
14                  THE COURT:    Received.
15                  (Whereupon Plaintiff's Exhibit No. 215 was
16     received into evidence.)
17          Q.   Your father has since passed away?
18          A.   Yes.
19          Q.   And what type of a individual was your father?
20          A.   He was a good guy.  My dad was a — he was a good
21     father.
22          Q.   Kind of — using the vernacular — straight laced?
23          A.   Pardon me?
24          Q.   Kind of straight laced?
25          A.   Yes.
```

```
    D3 69                          Courtright  X
```

1    Q.   How did he feel — well, would he allow Nick to go

2  upstairs to Leah's bedroom?

3    A.   No.

4    Q.   After Leah disappeared, prior to her body being

5  found, did your father have an argument with either the

6  Defendant or his father?

7    A.   Um, I'm sorry, I don't understand that question.

8    Q.   Did your father have a argument with the Defendant,

9  or with the Defendant's father after Leah disappeared?

10   A.   Yes.

11   Q.   Were you present for that?

12   A.   Um, I was upstairs asleep, and the argument woke me

13 up.

14   Q.   And who was there?

15   A.   It was Bruce McGuffin.

16   Q.   After that argument — we cannot get into what was

17 said, but after that argument, what was your relationship like

18 with Nick McGuffin from then on?

19   A.   I don't think I saw him after that.  I don't think I

20 saw Nick after that.

21   Q.   Now, I want to back up just a bit — prior to your

22 daughter's disappearance.  Did the Defendant ever come to you

23 and discuss an issue that was bothering him in his

24 relationship with Leah?

25   A.   Yes.  I vaguely remember one afternoon.  She was in

Courtright   X   D3 70

1  school and he had come over and — saying something about Leah

2  was hitting him — being mean and hitting him, and he claimed

3  that it hurt.

4      Q.   And what did you advise him?

5      A.   I said, "Well, then maybe you two should stop seeing

6  each other."  And — and then I spoke to Leah about it.

7      Q.   Did you talk to Leah about that?

8      A.   Yes, I did.

9          MR. FRASIER:   I believe that's all the

10  questions I have of Ms. Courtright at this time, Your Honor.

11          THE COURT:   Ms. McCrea?

12                    CROSS EXAMINATION

13  BY MS. McCREA:

14      Q.   Ms. Courtright, you indicated that Leah was a pretty

15  good athlete?

16      A.   Yes.

17      Q.   She played volleyball, and track, and — and I think

18  there was another sport?

19      A.   Basketball.

20      Q.   Basketball.

21          And I'm — I'm sorry, I'm going to have to ask you to

22  speak up.  It's really hard to hear on this side of the room.

23          Thank you.

24      A.   Okay.

25      Q.   Perfect.

```
    D3 71                          Courtright  X
```

1           Thanks so much.

2      A.   Uh huh.

3      Q.   And she also — you indicated that during the period

4  of time when you told her that she could not see Nick

5  McGuffin, that she would tell you that she was going jogging,

6  and she would go see Nick instead.  Is that right?

7      A.   Yes.

8      Q.   But did Leah like to jog, also?

9      A.   Yes.

10      Q.   And was she a fast walker?

11      A.   Um, I don't know if I would say "fast walker".  I

12  don't - - -

13      Q.   (Interposing) Okay.  Well part of — part of

14  athletics, in terms of, um, track is the person has to be able

15  to run?  Right?

16      A.   Correct.

17      Q.   Okay.  And was she a fast runner?

18      A.   Track wasn't actually one of her favorite sports.

19  Um, Track was probably on the bottom of that list of sports

20  that I gave you.

21      Q.   Okay.  So, you don't think she was a fast runner?

22      A.   I can't really answer that because I don't know how

23  to define that.

24      Q.   Did - - -

25      A.   (Interposing) I'm sorry.

Courtright  X    D3 72

1    Q.    Let me ask you a different question.  Did she enjoy

2  running?

3    A.    Yes.

4    Q.    And did she like to run with Sherry Mitchell?

5    A.    Yes, she did.

6    Q.    Did she run with some other friends?

7    A.    Um, Sherry is the only I remember off of the top of

8  my head right now.

9    Q.    In terms of Leah's wardrobe, did she have any tops —

10  if — do you know what I mean by the term "peasant blouse"?

11    A.    (No audible response.)

12    Q.    That doesn't — that doesn't strike a chord?

13    A.    No.

14    Q.    Okay.  Then, let me ask this.  Did she have any tops

15  that were kind of flowy, either in the shoulders or down at

16  the bottom, that you remember?

17    A.    Actually, yes, I do remember one.

18    Q.    Okay.  Can you describe it for us?  I know it's been

19  a long time.

20    A.    Um, I — I'm remembering one outfit that I bought

21  her, that I have never seen.  Last I had heard it was at the

22  McGuffin's home.  Um, it was a pair of cropped off short —

23  shorter pants.  Not shorts, but in between your ankles and

24  your knee.

25    Q.    Uh huh.

```
    D3 73                        Courtright  X
```

1      A.   They were white.  And a — it's a summer top, and it

2  just kind of has spaghetti straps and it flowed out at the

3  bottom, - - -

4      Q.   (Interposing) Okay.

5      A.   - - - from here on out.  I don't know if you can see

6  that or not, but - - -

7      Q.   (Interposing) Do you remember what color it was?

8      A.   I remember it being light in color.  And it might of

9  had some kind of a little pattern running through it.

10      Q.   But, that was different than what you saw her

11  wearing when she left your house on June 28th?

12      A.   Yes.

13      Q.   Okay.  Now, on June 28th, when Nick and Leah were

14  washing his Mustang, I think you indicated that they were

15  laughing together?

16      A.   Yes.

17      Q.   And they were spraying each other with the hose?

18      A.   Yes.

19      Q.   And joking around?

20      A.   Yes.

21      Q.   And that — that day Leah was in — Leah was in an

22  exceptionally great mood?

23      A.   She was.

24      Q.   Okay.  So, they left your house — would it be around

25  4:00?

Courtright  X    D3 74

1    A.   Yes.  Shortly after 4:00, I believe.  Yeah.

2    Q.   Now, Ms. Courtright, you — at the time we are

3   talking about, June 28, 2000, you had a television in your

4   bedroom?

5    A.   Yes.

6    Q.   And Leah had a television in her bedroom?

7    A.   Yes.  I believe she did.

8    Q.   Okay.  And is it fair to say that you often fall

9   asleep watching television?

10   A.   Yes.

11   Q.   And the night of June 28th, you went upstairs to

12   watch TV and fell asleep?

13   A.   Correct.

14   Q.   Do you recall — Mr. Frasier asked you about whether

15   Nick McGuffin said anything to you about coming by the house.

16   Do you recall talking to Chief Reaves on June 29, 2000, and

17   telling him that Nick told you he came by at 2:00 a.m. and

18   thought he saw a TV light on in Leah's room?  He was unable to

19   get anyone's attention, called to you, and threw rocks at

20   Leah's window, so then he went home.

21   A.   And — and your question is what?

22   Q.   My question is — well, you — you talked to

23   Chief Reaves on a number of occasions?  Right?

24   A.   Yeah.

25   Q.   Okay.

D3 75                                    Courtright   X

1      A.   Yes.

2      Q.   And you talked to him — I'm looking at his report

3  from June 29, 2000.  And this is what he indicates you told

4  him, so I'm wondering if this refreshes your recollection of

5  Nick telling you that he came by at 2:00 a.m. and thought he

6  saw a TV light on in Leah's room, threw rocks at the window,

7  didn't get a response, and then went home?

8      A.   I — I think he might have told me that.

9      Q.   Okay.  Now, when you got up at 3:30 and went into

10 Leah's room, you did turn the light on at that time?  Is that

11 right?

12     A.   Oh.  Yes.

13     Q.   Okay.  And you are not sure, when you checked in

14 Leah's room, whether her door was open or shut?

15     A.   I believe I pushed the door open to — yes.

16     Q.   Okay.  But, when you pushed the door open, you

17 weren't sure whether it was all the way closed?  Is that fair?

18     A.   I didn't have to turn the knob - - -

19     Q.   (Interposing) Okay.

20     A.   - - - to open the door.

21     Q.   All right.  The — the photographs of Leah that we

22 have in evidence — I think they are Exhibits 1 and 2.  I'm

23 sorry.  They — they are 7 and 8.  Those photographs were taken

24 by Mr. McGuffin?

25     A.   I — I don't know what photographs you are talking

Courtright   X     D3 76

1   about.

2              MS. McCREA:    Where are they?  May I have 7

3   and 8, please?

4        Q.   I'm sorry, Ms. Courtright.

5        A.   Oh.

6        Q.   Those photographs, yeah, (not understandable).

7        A.   I'm sorry.  Okay.  Yeah.

8        Q.   Okay.  So — and were those — do you know — were

9   those photographs taken that day by Nick McGuffin?

10       A.   Um, he said they were.

11       Q.   Okay.

12       A.   So, I'm — I'm assuming they were.

13       Q.   Well, they weren't taken by you?

14       A.   No.

15       Q.   Okay.

16       A.   No.  Huh uh.

17       Q.   And is that Mr. McGuffin's house?  Do you know?

18       A.   I believe this is their house.

19       Q.   It — because you were out at the house at least once

20   - - -

21       A.   (Interposing) Yes.

22       Q.   - - - for the graduation party?

23       A.   Right.

24       Q.   And then after Leah went missing, you went out to

25   the house on a number of occasions?  Is that right?

```
    D3 77                              Courtright  X
```

1        A.    Yes.

2        Q.    Okay.  And, um, do — do you know who the person is

3    who is partly in the picture?

4        A.    No.

5        Q.    Does that appear to be Nick's Mustang in the - - -

6        A.    It does.  It appear — it appears to be.

7        Q.    And do you remember when Leah was scheduled to get

8    her braces off?

9        A.    Hmm, I think — ugh, probably sometime in August.  It

10   wasn't too long after she was found.

11       Q.    The relationship between Nick and Leah, began in

12   about October of 1999?  Is that right?

13       A.    Yes.

14       Q.    And you've indicated that you didn't approve

15   initially because of the age difference?

16       A.    Yes.

17       Q.    And — now, my understanding is that it was between

18   December of '99 and January of 2000 that Leah was not allowed

19   to date Nick?  Is that your recollection?

20       A.    Approximately.  I — I — I can't - - -

21       Q.    (Interposing) That's fair.

22       A.    Yeah.

23       Q.    That's — that's perfectly fine, Ms. Courtright.

24   That's - - -

25             And there was a time in — in about — was it

Courtright   X     D3 78

1   approximately about March, then, that you — you relented, as

2   you put it, and allowed them to get back together?

3       A.   Yes.

4       Q.   Okay.  And once — once they were back to together,

5   and you had a chance to observe them, they spent a lot of time

6   together?  Is that fair?

7       A.   Yes.

8       Q.   And they did things like watching movies together?

9       A.   Yes.

10      Q.   Hanging out in Nick's car?

11      A.   Uh, I — uh, possibly.

12      Q.   Okay.  Well, when you lived at the house on Fifth

13  Street with Mr. Murphy, Mr. Murphy did not approve of Nick

14  McGuffin?

15      A.   Correct.

16      Q.   And Mr. McGuffin was not allowed to telephone or

17  come by after 9:30?  Is that right?

18      A.   Correct.

19      Q.   Okay.  And, um — and it was a — is it fair to say it

20  was a pretty — it was a pretty bad breakup with Mr. Murphy

21  when you and the girls left that house?

22      A.   The — the morning we left, yes.

23      Q.   Yeah.  And was part of that an altercation between

24  Leah and Jim Murphy?

25      A.   No.  The altercation was between Denise and Jim

```
     D3 79                              Courtright   X
```

 1  Murphy.

 2        Q.   Okay.  It was between Denise and Jim Murphy?

 3        A.   Yes.

 4        Q.   And did — and Leah called Nick to come get her?  She

 5  packed a backpack and had him come get her?

 6        A.   Yes.

 7        Q.   Now, when you moved, then, to your parents' place,

 8  your — your dad's been characterized as being straight-laced —

 9  what I might call "old school"?

10        A.   Yes.

11        Q.   And he was very particular about when Nick should be

12  there with Leah?  Would that be fair?

13        A.   Yes.

14        Q.   Okay.  And did Nick and Leah talk on the phone a

15  lot?

16        A.   Um, by "a lot" you mean — I - - -

17        Q.   (Interposing) Well, they are teenagers.  I mean

18  - - -

19        A.   Yeah.  They did, - - -

20        Q.   (Interposing) Okay.

21        A.   - - - I guess.

22        Q.   And — and Nick gave Leah rides to and from school,

23  didn't he?

24        A.   Some of the times.

25        Q.   Some of the times he would be late and she would go

Courtright    X    D3 80

1   off to school without him?

2       A.   He was pretty much there to pick her up.

3       Q.   Okay.  When Nick came over to help you go look for

4   Leah the — the next morning, on the 29th, he appeared to be

5   extremely concerned?  Would that be fair to say?

6       A.   You know, I — I don't feel comfortable answering

7   that because I wasn't concentrating on him.

8       Q.   Okay.

9       A.   My concentrations were on, "Where is Leah?"

10      Q.   Because you were particularly concerned?

11      A.   Yes.

12      Q.   But, in terms of the speed in Nick McGuffin

13  responding to your phone call, he came right in — came right

14  - - -

15      A.   (Interposing) Yes.

16      Q.   - - - over?

17      A.   Yes, that's - - -

18      Q.   (Interposing) Okay.

19      A.   - - - true.

20      Q.   And he made himself available to assist you in any

21  way, in trying to find Leah?

22      A.   Yes.

23      Q.   And he and Denise drove around in his Mustang for a

24  period of time?  And you drove around in a separate car?

25      A.   Yes.

```
    D3 81                        Courtright  X
```

1      Q.    And then he went with you to the Police Station to

2   make the Missing Persons Report?

3      A.    Yes.  I caught up with him at the gas — I caught up

4   with them at the gas station.  And I began to panic and I

5   said, "We got to. . ." — I was worried about my dad and his

6   health, for one thing, along with Leah.  Um, I said that we

7   needed to contact the police.  Let's go back to my mom and

8   dad's.  And we all did.  We then informed my dad that Leah

9   hadn't come home.

10     Q.    Now, was — was Nick McGuffin present when you talked

11  to your dad?

12     A.    Uh, I believe so.

13     Q.    Did your dad have any reaction toward Mr. McGuffin?

14     A.    I don't recall.

15     Q.    Well, — and part of your concern on the 29th, with

16  Leah missing, is she was not the type to run away?  Is that

17  right?

18     A.    Correct.

19     Q.    Do you remember when, approximately, it was when

20  Nick McGuffin came over to talk to you about his concerns with

21  Leah hitting him?

22     A.    Somewhere near the end of the school year.

23     Q.    And was this a long discussion or a short

24  discussion?

25     A.    It — it was real short, actually.  He - - -

```
                                    Courtright   X    D3 82
 1      Q.   (Interposing) Okay.

 2      A.   - - - was - - -

 3      Q.   (Interposing) Give me just one moment.

 4           MS. McCREA:   May I approach, Your Honor?

 5      Q.   Ms. Courtright, I'm not going to be asking you about

 6  — oh, I — I'm sorry.

 7           MS. McCREA:   I've approached the witness,

 8  now, so I'm so sorry.

 9      Q.   I'm not going to be asking you about an exhibit and

10  not let you see it.

11           MS. McCREA:   I don't have this marked.  I

12  just want to see if this helps.

13      Q.   Is this a picture of the reward poster that came out

14  in 2010?

15      A.   Yes.

16      Q.   And, um — and the reward is for $10,000?

17      A.   Yes.

18      Q.   And the requirement is that it's for the arrest and

19  successful prosecution for the murder of Leah Freeman?

20      A.   That's what it says.

21      Q.   Okay.  And did you see these posters around the

22  area?

23      A.   Yes.

24      Q.   Thank you.

25      A.   Uh huh.
```

```
   D3 83                          Courtright  ReD
```

 1          MS. McCREA:    That's all the questions I have

 2   of Ms. Courtright.

 3              THE COURT:    Redirect?

 4              MR. FRASIER:    Thank you, Your Honor.

 5                    REDIRECT EXAMINATION

 6   BY MR. FRASIER:

 7      Q.    Ma'am, did your daughter Leah ever run away from

 8   home?

 9      A.    No, never.

10      Q.    And in your contacts with the — the Defendant, him

11   taking your daughter out and so forth, what kind of car did he

12   have?

13      A.    What kind of car did the Defendant have?

14      Q.    Yes.

15      A.    Um, a Mustang.

16      Q.    Do you recall what color it was?

17      A.    Blue.

18      Q.    Was there any other car he might have driven?

19      A.    Sometimes he drove his parent's, um — was it a

20   Thunderbird?  Or — I think it was a Thunderbird.

21      Q.    And do you recall what the color was?

22      A.    I believe it's like maroon color.

23      Q.    And, uh, State's Exhibit 7 — you did identify this

24   for counsel, but do you see the — the Mustang in the

25   background of that picture?

D3 84

1       A.   Yes.

2       Q.   And looking over in State's Exhibit 7, to the other

3   side of another window, do you see another vehicle?

4       A.   I can't tell that it's a vehicle.

5       Q.   Okay.  (Not understandable) - - -

6       A.   (Interposing) Okay.

7            MR. FRASIER:   That's all the questions I

8   have.

9            THE COURT:   You may step down, ma'am.  You

10  are not excused.  Uh, you may remain, obviously, in the

11  courtroom.

12           Call your next witness.

13           MR. FRASIER:   I apologize, Your Honor, but I

14  don't have anybody here until 1:00.  We — we went faster than

15  what I thought we would.

16           MS. McCREA:   Can — I would request permission

17  to read into the record Exhibit 215, which is very short.  It

18  was the medical record concerning Mr. McGuffin, and it has

19  been received.

20           THE COURT:   I don't care.  That's fine.

21           MS. McCREA:   Omitting the Affidavit and the

22  Emergency Room Record Face Sheet, this is an Emergency Room

23  Note of July 2, 2000:

24           "Nicholas McGuffin: Chief — chief complaint

25           anxiety.'

D3 85

1        "Present illness: This young man is suffering

2       some severe anxiety and mental anguish apparently

3       after his girlfriend went missing with no clues, and

4       she has been gone for several days now.  The police

5       are searching.  They are afraid she may have been

6       abducted.  They apparently were quite close.

7       He has very restless nights sleep, maybe four to

8       five hours last night.  He's in a great deal of

9       anguish.  He is vomiting, driving around, crying,

10      and needs some relief from his mental distress if

11      possible."

12      "He was brought in by his parents.  He has been

13      somewhat suicidal.  They have been watching him

14      closely.  They have control of his medications.  He

15      is not driving, no means, et cetera.  There is no

16      prior history of mental disorder."

17      "O, for Opinion:  The patient is basically

18      incommunicado.  He is writhing around. . ."

19      "I'm sorry, Observations: The patient is

20      basically incommunicado.  He is writhing around,

21      lying face down.  Initially, he was

22      hyperventilating.  We gave him a brown bag and then

23      he stopped breathing, holding breath for awhile,

24      then resumed breathing."

25      "Otherwise, this HE — and that's what it says —

D3 86

1          neurological status is in tact.  He is somewhat

2          flushed.  He is weeping and obviously quite

3          depressed."

4              "A: Acute situational stress depression,

5          actually grief reaction."

6              "S: Because of his nausea and emisis, we gave

7          him Phenergan 100 IM.  He is to wait in the ER until

8          things are settled down.  And then, Xanax 1 mg four

9          to six hours prn anxiety and sleep, No. 6

10          dispensed."

11             "The parents will keep control over all

12          medications.  His return to see Dr. Sinnott, if

13          needed."

14             "Signed John C. Counts, M.D."

15          Thank you, Your Honor.

16          THE COURT:   We'll be in recess until 1:00.

17             Everybody else in the courtroom remain seated

18   until the jury has a chance to leave the courtroom for lunch.

19             Be back at 1:00, please.  Put your name on your

20   notes and leave in the jury room, please.

21             (Jury out.)

22          THE COURT:   I'd also like to remind people in

23   the courtroom, do not approach the jurors at all or attempt to

24   talk to them.

25             Okay.  We'll be in recess until 1:00.

```
    D3 87                                        Jones   D
```

 1                    (LUNCHEON RECESS)

 2              (Jury in.)

 3              JUDICIAL ASSISTANT:    All rise.

 4              THE COURT:    Be seated, please.

 5              Call your next witness.

 6              MS. SOUBLET:    The State calls Cynthia Jones.

 7              THE COURT:    Ms. Jones, if you would raise

 8    your right hand, please.

 9              Ms. Jones, - - -

10              WITNESS:    (Interposing) Yes.

11              THE COURT:    - - - raise your right hand,

12    please.

13                    <u>CYNTHIA ANN JONES</u>

14    was thereupon produced as a witness on behalf of Plaintiff

15    and, having first been duly sworn to tell the truth, the whole

16    truth and nothing but the truth, was examined and testified as

17    follows:

18              THE COURT:    Have a seat up here, please.

19              You — make sure you are close to the

20    microphone.  That's close enough.  And make sure you keep your

21    voice up.  We have an air conditioning system on and you are

22    going to have to project your voice.

23              WITNESS:    All right.

24              THE COURT:    Okay.

25              Go ahead.

Jones  D    D3 88

1          MS. SOUBLET:     Thank you, Your Honor.

2                      DIRECT EXAMINATION

3   BY MS. SOUBLET:

4       Q.   Ms. Jones, can you state your full name and spell

5   your last for the record?

6       A.   It's Cynthia Ann Jones.  You spell Jones, J-O-N-E-S.

7       Q.   And, Ms. Jones, how long have you lived in Coquille?

8       A.   I'd say since the 9th grade.  So, - - -

9       Q.   (Interposing) A long time?

10      A.   - - - twenty - - -

11           Yes, a long time.

12      Q.   And do you know — or, did you know the victim, Leah

13  Freeman?

14      A.   Yes, I did.

15      Q.   Can you tell the jury how you knew her?

16      A.   Well, she was raised with my niece.  Well, my niece

17  was in her same class, and then we coached her for a year in

18  basketball.

19      Q.   And when was that, that you coached her in

20  basketball?

21      A.   She was in like the 2nd or 3rd grade.

22      Q.   I want to turn your attention to June 28th of 2000.

23  Do you remember that night?

24      A.   Yes.

25      Q.   Okay.  Where were you around 9:30 p.m. on that day?

```
     D3 89                              Jones   D
```

1       A.    I was driving towards my house.

2       Q.    And where was your house located?

3       A.    It's on North First Street.  You turn to go by the

4    Shell station.

5       Q.    Okay.  And at that time, did you see Leah Freeman?

6       A.    Yes, I did.

7       Q.    And where was she when you saw her?

8       A.    She was in the phone booth.

9       Q.    Okay.  Where was the phone booth located?

10      A.    As I turned to my right, the phone booth was just

11   like fifteen feet away, if — if that much.  It's just right

12   next to the road.

13      Q.    And what were the lighting conditions like there, at

14   that phone booth?

15      A.    It was still light outside.

16      Q.    Did you notice anything about Leah that night?

17      A.    No.  She — I looked at her and she just went - - -,

18   like that, and she seemed fine.

19      Q.    Did you notice what she was wearing?

20      A.    Yeah.  She did have on a white tank top.

21      Q.    Did you notice anyone else in the area at that time?

22      A.    Yes.  The reason I remember it is there was two men

23   over — across the street just screaming violently.  One was

24   just screaming violently at the other one.  And, um, I looked

25   at them first as I was turning, and then I looked at her.  She

Jones   D    D3 90

1    — she seemed to be fine and — and I just went on.

2        Q.   Do you remember where — you say "across the street",

3    what's across the street from the gas station in that

4    intersection?

5        A.   Um, it was right in front of the high school.

6        Q.   Do you remember anything other than the fact that

7    they were screaming at each other — about the two gentlemen?

8        A.   No.  I really don't.  I really don't.

9        Q.   Do you remember seeing any cars in the area,

10   obviously other than the one that you were in?

11       A.   No.  I — I really didn't.  I think there might have

12   been one in the parking lot, but I — I didn't really remember

13   it.

14       Q.   Do you remember what the car in the parking lot

15   looked like?

16       A.   It's just been so long, that I — I have to even say

17   — I don't really know.  I'm sorry.  I don't know.  I was

18   thinking it was maroon or — I don't know.  I can't remember.

19       Q.   Did you make a - - -

20       A.   (Interposing) Sorry.

21       Q.   - - - connection between the gentlemen in front of

22   the high school and Leah?

23       A.   No.  I — I knew something was going on, but she

24   seemed to be fine.  You know, she didn't seem to - - -

25       Q.   (Interposing) And when you say - - -

```
   D3 91                                    Jones   X
```

1      A.   - - - be afraid.

2      Q.   When you say, "one was screaming at the other", how

3   would you describe that screaming?

4      A.   Oh.  It was — it was violent.  He was very, very

5   upset.

6      Q.   Thank you.

7           MS. SOUBLET:    Nothing further.

8           THE COURT:   Ms. McCrea?

9                       CROSS EXAMINATION

10  BY MS. McCREA:

11     Q.   Ms. Jones, I understand you were — you were heading

12  home?

13     A.   Yes.

14     Q.   So, is it correct you were traveling west on

15  Central?

16     A.   I'm not good with that west stuff.

17     Q.   Okay.

18     A.   I'm sorry.

19     Q.   Okay.

20     A.   I was heading from town.

21     Q.   From town?

22     A.   Yes.

23     Q.   And then you turned right at the gas station?

24     A.   Yes.

25     Q.   And that would have you going up the road past the

```
                                      Jones   X    D3 92
 1  cemetery on your left?

 2      A.   Yes.

 3      Q.   Okay.  I just wanted to make sure I got the — I got

 4  the connections right.

 5           MS. McCREA:   Okay.  With counsel's permission

 6  — I'm sorry I didn't get the chance to print this.

 7      Q.   I'm going to show you a photograph.  We are going to

 8  — we are just going to call this, for the sake of

 9  identification, Defense Exhibit 101.

10           Do you recognize this location?

11      A.   Yes.

12      Q.   And what is it?

13      A.   Well, it's the shell station and the phone booth is

14  not there anymore, as you can see.

15      Q.   Right.  And would the phone booth be where that slab

16  of cement was?

17      A.   Yes.

18      Q.   Okay.

19      A.   (Not understandable) - - -

20      Q.   (Simultaneously) And does - - -

21           Does that look like how it looks now?

22      A.   Yes.

23      Q.   Okay.  And this slab of cement would have been where

24  the phone booth was where you saw Leah Freeman?

25      A.   Yes.
```

```
   D3 93                                    Jones   X
```

 1      Q.    And was it actually - - -

 2                    THE COURT:    (Interposing) Just a minute.

 3                    Ma'am, - - -

 4                    WITNESS:    (Interposing) Yes.  I'm not - - -

 5                    THE COURT:    - - - when — when she's that

 6   close, you are not talking to her.  You are still talking to

 7   everybody - - -

 8                    WITNESS:    (Interposing) Okay.

 9                    THE COURT:    - - - in the jury.

10                    MS. McCREA:    I'm sorry.

11                    THE COURT:    You are going to have to move the

12   microphone over, closer to the front of you.  When she moves

13   over there and you starting talking to her - - -

14                    WITNESS:    (Interposing) Uh huh.

15                    THE COURT:    Because the mike isn't picking

16   it up.  Okay?

17                    WITNESS:    Okay.

18                    THE COURT:    Okay.

19      Q.    Sorry.

20      A.    That's okay.

21      Q.    So, was it actually the typical, old, glass phone

22   booth?

23      A.    Yes.

24      Q.    Okay.  Not like a (not understandable) stand at the

25   — stand at a little stand?

Jones    X    D3  94

1     A.   No.

2     Q.   And — and you saw — and this would be — okay.  You

3   answered — you answered that.

4          MS. McCREA:   Okay.  Your Honor, with the

5   Court's permission, and if counsel doesn't object, I'd move to

6   — I would offer Defense Exhibit 101, and I will replace this

7   with a printed copy on Monday.  And I will send a copy to

8   Mr. Frasier.

9          MR. FRASIER:   No objection.

10          THE COURT:   Okay.  No. 101 is — will be

11   received.

12          (Whereupon Defendant's Exhibit No. 101 was

13   received into evidence.)

14          You'll get a copy to us on Monday.

15          And you — yes?

16          MS. McCREA:   Yes.  Thank you.

17     Q.   And — and, Ms. Jones, you indicated that it was very

18   light out?  Is that correct?

19     A.   Yes.  It hadn't gotten dark yet.

20     Q.   Thank you.

21          MS. McCREA:   That's all the questions I have,

22   Your Honor.

23          THE COURT:   Any redirect?

24          MS. SOUBLET:   None, Your Honor.

25          THE COURT:   You are free to step down and you

```
   D3 95                                    Carney   D
```

1   are free to leave.

2                WITNESS:    Thank you.

3                THE COURT:   Excused.

4                Call your next witness.

5                MR. FRASIER:    Thank you, Your Honor.

6                We call Matthew Carney.

7                THE COURT:    Well, you are going to have to

8   wait for a few minutes.

9                Step forward, please, sir.

10               Raise your right hand.

11                  MATTHEW PHILLIP CARNEY

12  was thereupon produced as a witness on behalf of Plaintiff

13  and, having first been duly sworn to tell the truth, the whole

14  truth and nothing but the truth, was examined and testified as

15  follows:

16               THE COURT:   Have a seat here, please.

17                  DIRECT EXAMINATION

18  BY MR. FRASIER:

19       Q.   Could you state your name, please, sir, and spell

20  your last name for the record?

21       A.   Yeah.  Matthew Phillip Carney, spelled C-A-R-N-E-Y.

22       Q.   And where do you reside, sir?

23       A.   Pendleton, Oregon.

24       Q.   Um, do you have an occupation, sir?

25       A.   I do.  I work for a sporting goods store.

Carney  D    D3 96

1     Q.    And are you also in the Military?

2     A.    I am, yes.

3     Q.    I was intending to call you next week after we

4  called some other witnesses, but you have an obligation next

5  week?

6     A.    I do.  I'm getting ready to deploy to Afghanistan.

7     Q.    And when do you leave for Afghanistan?

8     A.    I have to attend a school in — the 10th of August —

9  or, uh, 10th of July for, uh, a Personal Security Detail

10  School.  And then I deploy August 29th.

11     Q.    You'll be leaving the area when?

12     A.    I'll be leaving the area 10 July.

13     Q.    Mr. Carney, have you lived in the Coquille area?

14     A.    Yes.

15     Q.    And when did you move here?

16     A.    Moved here in 1990 and moved 2002.

17     Q.    And how old were you when you moved her in 1990?

18     A.    First grade — six.

19     Q.    And — so, you would have been what when you left in

20  2002?

21     A.    Just graduated from high school — uh, eighteen.

22     Q.    While you were here in Coquille, were you familiar

23  with an individual named Raymond Lewis?

24     A.    Yes, absolutely.

25     Q.    And how did you know Mr. Lewis?

```
     D3 97                              Carney  D
```

1    A.   Grew up together since little kids.  Always been

2 very close.

3    Q.   How often would you see each other?

4    A.   Every single day.

5    Q.   Now, when did you graduate, sir?

6    A.   2002.

7    Q.   Now, were still at — you were at Coquille High

8 School?

9    A.   Uh, yes.

10    Q.   And you were familiar with the Leah Freeman

11 disappearance?

12    A.   Yeah, absolutely.

13    Q.   You were aware of roughly when she disappeared and

14 so forth?

15    A.   Uh, yeah.

16    Q.   Were you friends with Mr. Lewis at that time?

17    A.   Yes.

18    Q.   Now, directing your attention to, uh, the timeframe

19 that Leah Freeman disappeared, did you have contact with

20 Mr. Lewis?

21    A.   Yes.  Uh huh.

22    Q.   And could you describe for us?

23    A.   Uh, together pretty much every day.  I mean, we were

24 pretty much best friends growing up.  So, - - -

25    Q.   And, in particular, the evening of June 28, 2000, do

Carney   D     D3 98

1  you remember being with Mr. Lewis?

2      A.   Um, no, not specifically being with him.  But, I do

3  recall us talking about that later on after, um — after, I

4  guess, the investigation went on throughout the years.  I

5  think shortly after, he was told, um — or, he came to somebody

6  and told them that he had seen her walking home that night, on

7  his way to my house.  But, I don't particularly remember — I

8  mean, it was probably a couple years when - - -

9      Q.   (Interposing) When - - -

10     A.   - - - we started talking - - -

11     Q.   - - - Mr. Lewis came over and visited you, what time

12  of the day would he come over to your house?

13     A.   Oh, that was in the summer time, so I'm sure we were

14  together — I guess I can't specifically — that day?  Is that

15  what you are - - -

16     Q.   (Interposing) Well, - - -

17     A.   - - - asking?

18     Q.   - - - during that week, what time would he come

19  over?

20     A.   We were probably together all day every day.

21     Q.   Evening?  After, - - -

22     A.   (Interposing) Sure.

23     Q.   - - - 9:00?

24     A.   Yeah.  We were together.

25     Q.   Do you recall a time period where he did not come

```
    D3 99                                    Carney   X
```

1  over and see you?

2      A.   No.

3      Q.   Thank you.

4           MR. FRASIER:    That's all the questions I have

5  for Mr. Carney.

6           THE COURT:   Ms. — Mr. McCrea?

7                   CROSS EXAMINATION

8  BY MR. McCREA:

9      Q.   Mr. Carney, you indicated that you had been friends

10  for how long?

11     A.   Probably since we were seven, eight years old.

12     Q.   All right.  So, you knew Mr. — Mr. Carney (sic)

13  really well?

14     A.   Uh, Mr. Lewis, yes, sir.

15     Q.   I'm sorry.  You are Mr. Carney?

16     A.   Yes, sir.

17     Q.   You knew — you knew Mr. Lewis really well?

18     A.   Yes.

19     Q.   And you did things together?

20     A.   Absolutely.

21     Q.   And would you say you were really, really close

22  friends?

23     A.   Yes.

24     Q.   And you still are?

25     A.   Yes.

Carney   X    D3 100

1    Q.   And, did you go hunting together?

2    A.   Uh, yes.  Uh, in high school, no, we didn't hunt

3    together.  We didn't really hunt much, I guess you could say.

4    Q.   But, Mr. Lewis went hunting at that time, didn't he?

5    A.   Yes.

6    Q.   And he had a 4x4 pickup?

7    A.   Yep.  I believe he did.

8    Q.   And did he have a lift kit on that?

9    A.   Uh huh.

10   Q.   And that would have been at the time we are talking

11   about, on the 28th of June of 2000?

12   A.   Uh, yeah.

13   Q.   And it was common for him to go up on Hudson Ridge,

14   wasn't it?

15   A.   Oh, yes.  Everybody was always up there.

16   Q.   Okay.  But — but, particularly, Mr. — Mr. Lewis was

17   very familiar Hudson Ridge, right?

18   A.   Was, yes.

19   Q.   And to get to Hudson Ridge, that we are talking

20   about, is you take off from — on Fairview, off Central, and

21   just keep following it out to Four Corners and then turn

22   right?

23   A.   Right.  If you were going to - - -

24   Q.   (Interposing) All right.

25   A.   - - - to Middle Creek, sure.

D3 101                                    Carney  X

1      Q.   And did — uh, in your experience and acquaintance

2  with Mr. Lewis, did he keep hunting equipment in his pickup

3  sometimes?

4      A.   Uh, no.  I wouldn't think hunting equipment.  As far

5  as rifles, you mean?  Or binoculars?  Or, - - -

6      Q.   Pardon?

7      A.   Uh, rifles or binoculars?  Is that what you are

8  referring to?

9      Q.   Rifles or binoculars — he did or did not?

10     A.   Um, no.

11     Q.   What about hunting knives?

12     A.   No.  I wouldn't think so.  Not in his - - -

13     Q.   (Interposing) Did - - -

14     A.   - - - pickup.

15     Q.   Did he have a hunting knife?

16     A.   I'm sure he did, but I couldn't say for sure.

17     Q.   You say he probably did?

18     A.   Probably did.  Yeah.

19     Q.   Yeah.  Okay.

20     A.   Uh huh.

21     Q.   And, as far as the — as the night of the 28th, you

22  don't have a specific recollection of his coming over?  Isn't

23  that correct?

24     A.   Not specifically, no.  The — the first time I was

25  asked about it, I guess, was just a few days ago.  So, ten

Carney   X    D3 102

1   years ago I can't — I - - -

2       Q.   (Interposing) Right.

3       A.   I don't have a specific recollection.

4       Q.   It — it came up a few days ago - - -

5       A.   (Interposing) Right.

6       Q.   - - - when an investigator contacted you?  And that

7   was one of the law enforcement people - - -

8       A.   (Interposing) Right.

9       Q.   - - - here?

10      A.   Uh, Officer Webley, I believe.

11      Q.   But, going back to the — the time when he would come

12  over, how long would he usually spend if he did come over in

13  the evening?

14      A.   Oh.  In the summer time, we would be out probably

15  until it was our curfew, I guess you could say.  So, we would

16  probably be out — I know I couldn't be out running around

17  until 2:00 or 3:00 in the morning, or anything crazy like

18  that.  So, - - -

19      Q.   (Interposing) I'm sorry.  You talk really fast and

20  I'm really old.  So, - - -

21      A.   (Interposing) Yes, sir.

22      Q.   - - - we — we need to make an adjustment.

23      A.   Sure.

24           Uh, I know I wasn't allowed to be out - - -

25      Q.   (Interposing) Beyond - - -

```
    D3 103                                Carney   X
 1      A.   - - - till, - - -
 2      Q.   - - - what?  I didn't - - -
 3      A.   - - - you know, - - -
 4      Q.   - - - catch that.
 5      A.   - - - 2:00 or 3:00 in the morning, I was not allowed
 6  to be out.  So, maybe midnight I would say I would definitely
 7  have to be - - -
 8      Q.   (Interposing) All right.
 9      A.   - - - home in - - -
10      Q.   (Interposing) Midnight?
11      A.   - - - the summertime.  Yes.
12      Q.   So, he'd come over around 9:00, and you — he'd
13  either stay or you would do things together until around
14  midnight?
15      A.   Sure.  I'm sure he had to be - - -
16      Q.   (Interposing) All right.
17      A.   - - - home, also.
18      Q.   So, we have — we are in a situation where he was out
19  — just assume this be the situation — he was out driving
20  around between 9:00 and 9:45, and — and then, uh, a situation
21  where he was hurrying to get home by — at a time around 10:45;
22  that would — that would indicate it was probably not a night
23  he came over to your house, would it not?
24           MR. FRASIER:   I think that - - -
25      A.   (Interposing) Uh, - - -
```

Carney   X    D3 104

1              MR. FRASIER:    - - - calls for speculation,

2    Your Honor.  I would object to the question.

3              THE COURT:    Sustained.

4              MR. McCREA:    Well this — this witness is

5    called out of order.  And so, I don't have a chance to lay the

6    foundation that would go with as normal, Your Honor.  And it

7    puts — he's not - - -

8              THE COURT:    (Interposing) So, you are telling

9    me - - -

10             MR. McCREA:    - - - going to be - - -

11             THE COURT:    - - - you will lay a foundation?

12             MR. McCREA:    Pardon?

13             THE COURT:    You are telling me you will lay a

14   foundation for - - -

15             MR. McCREA:    (Interposing) Yes.

16             THE COURT:    - - - this?

17             MR. McCREA:    I — I — in fact, I will here and

18   now indicate, specifically, the foundation therefore.  By that

19   I mean, in the question to the witness.

20             THE COURT:    All right.  Go ahead.

21             MR. McCREA:    All right.

22   Q.   I want you to assume, Mr. Carney, that on the 20th of

23   July in 2000, that Mr. Lewis testified before the Coos County

24   Grand Jury.  And he testified at that time that he was driving

25   around and made three separate passes through the area on

```
     D3 105                                      Carney   X
 1   Central where McKay's and — and — the Hunter Room, and where,
 2   more specifically, fast food he was located.  That's what I'm
 3   trying to get out.
 4        A.   Yeah.
 5        Q.   And — then, uh, he was hurrying to get home at ten —
 6   between 10:30 — or, 10:30 to 10:45 to get — to get home.  Now,
 7   assuming that that's what he testified to the Grand Jury at
 8   that time, in — wouldn't that indicate to you that that was
 9   not a night he came over to your house?
10        A.   Um, that's possible.
11        Q.   All right.
12        A.   Yes.  Yeah.
13        Q.   And more specifically, if he — so, if we are looking
14   at 9:45 to 10:30, that's only 45 minutes?  Correct?
15        A.   Uh huh.
16             THE COURT:   Your — your answer was - - -
17             WITNESS:   Yes.
18        Q.   All right.  How far is it from the area of — where
19   the fast food market is located to your house?
20        A.   Hmm, a minute and a half, two minutes if you were
21   driving, probably.
22        Q.   Okay.  How long does it take to drive that far?
23        A.   From — from let's say, uh, Fast Mart to my house?
24        Q.   Yes.
25        A.   Yeah.  Probably two minutes tops.
```

Carney   X   D3 106

1        Q.   Okay.  Just a couple of minutes?

2        A.   A couple of minutes, yes.

3        Q.   But, uh — now, at the time you — you spent together,

4   you were friends with him, - - -

5        A.   (Interposing) Uh huh.

6        Q.   Uh, you were — you were, at that time, what, sixteen

7   years old?

8        A.   Fifteen or sixteen, yes.  Uh, let's - - -

9        Q.   (Interposing) And - - -

10       A.   - - - see - - -

11       Q.   (Interposing) And Mr. Lewis was sixteen years old?

12       A.   Right.

13       Q.   And you — you talked about things as friends will?

14       A.   Uh huh.

15       Q.   Did you talk about girls?

16       A.   Uh, not so much probably when we were younger like

17   that.  But, yeah, I'm sure we did.  Yeah.

18       Q.   All right.  Now, did you have — as part of your

19   acquaintance and friendship with Mr. Lewis, did you have

20   classes with him?

21       A.   Yes.

22       Q.   And did you have a Home Ec class that year?

23       A.   Oh, I don't even — I don't recall.  I don't

24   remember.

25       Q.   All right.  Let me ask it this way.  Did you and he

D3 107                                    Carney  X

1   have a class together where Leah Freeman was in that class?

2       A.   Uh, I don't remember having a class with her.  No.

3       Q.   Do — now, you knew where Mr. Lewis lived?  Correct?

4       A.   Oh, yes.

5       Q.   And you knew that — that Leah Freeman lived just up

6   the street, on the — on the 28th of June, from where Mr. Lewis

7   lived?

8       A.   Um, I don't know where she lived, but I knew that

9   she lived in Sanford Heights.

10      Q.   All right.  And that — and, uh, did — during your

11  friendship discussions with Mr. Lewis, did he ever talk about

12  Leah Freeman?

13      A.   No.  Not to me, no.

14      Q.   Uh, you knew who she was?

15      A.   I knew who she was, yes.

16      Q.   Did you think she was cute?

17      A.   She was attractive, yes.

18      Q.   Attractive?

19      A.   Yeah.

20      Q.   Okay.  Now, the first time that Mr. Lewis caught up

21  to you, that — he was at your house the night that she

22  disappeared, - - -

23      A.   (Interposing) Uh huh.

24      Q.   - - - was some days later than the date she

25  disappeared?  Isn't that correct?

Carney   X    D3 108

1    A.    Yes.  As — as far as I can remember us ever talking

2    about that night, and him saying that he had seen her on the

3    way to my house, I would say — I don't remember ever talking

4    about that until maybe a year or years later.

5    Q.    Okay.  When — when he brought it up, he said an

6    investigator to talk to him?

7    A.    Right.

8    Q.    And he said to you that he was over at your house?

9    A.    Uh, yeah, on his way over to my house, yes.

10    Q.    He was on his way over to your house?

11    A.    Yes.

12    Q.    That you and he had been together that night?

13    A.    Right.

14    Q.    All right.  And so, then as time went by, when the

15    two of you would talk about it, he would always make it out

16    that he had been over at your house that night when she

17    disappeared?  Right?

18    A.    Right.  Right.

19    Q.    Okay.

20    A.    As I remember, yeah.

21         MR. McCREA:    Can I have just a moment,

22    Your Honor?

23         THE COURT:    Uh huh.

24    Q.    Okay.  And — and — we'll go back to — (not

25    understandable) I clearly understand.  You don't have a

```
     D3 109                              Carney  ReD
```

1   recollection here, today, whether he was at your house that

2   night or not?  Correct?

3        A.   No, I don't.

4        Q.   All right.  Thank you very much.

5        A.   Uh huh.

6             THE COURT:   Redirect?

7                    REDIRECT EXAMINATION

8   BY MR. FRASIER:

9        Q.   Mr. Carney, - - -

10       A.   (Interposing) Uh huh.

11       Q.   - - - how long have you known Mr. Lewis?

12       A.   From today?  Probably, uh — oh, probably close to

13   twenty years — eighteen years probably.

14       Q.   And even though you live in Pendleton, do you have

15   contact with him?

16       A.   Yeah.  Not as much.  I'm pretty busy out there.

17   But, yeah, I still have contact with him.  Yeah.

18       Q.   Just in your contact with Mr. Lewis, do you have a

19   personal opinion as to his character for trustworthiness?

20       A.   Uh, Yeah.

21            MR. McCREA:   Wait a minute.  That's outside

22   the scope of any cross examination, Your Honor.

23            THE COURT:   No.  I think it's within the

24   scope.

25            MR. McCREA:   All right.

Carney   ReD  D3 110

1          THE COURT:    Go ahead.

2      Q.   Do you have an opinion as to his character for being

3  trustworthy?

4      A.   Yes.

5      Q.   And what is that opinion?

6      A.   That he is trustworthy.  Uh huh.

7      Q.   Mr. Lewis ever told that he was involved in any way,

8  shape or form with the disappearance of Leah Freeman?

9      A.   No.

10     Q.   Now, in regards to Hudson Ridge, you indicated

11  Mr. Lewis has been up there a lot?

12     A.   Oh, yeah.  We've been up there, sure.

13     Q.   Have you been up there?

14     A.   Oh, yes.  Uh huh.

15     Q.   Hudson Ridge, this area, what is — as the kids here

16  in Coquille — you are one of them — or, you were here - - -

17     A.   (Interposing) Right.

18     Q.   - - - in high school, - - -

19     A.   (Interposing) Sure.

20     Q.   - - - what was Hudson Ridge like for high school

21  kids?

22     A.   It was like a playground if you had a truck, I guess

23  you could say.  There was mud and there was open space to be a

24  kid, shoot guns and - - -

25     Q.   Were there parties up there?

```
     D3 111                              Carney  ReD
```

1      A.    Uh, yeah, I think there was.

2      Q.    Drinking?

3      A.    Sure.

4      Q.    Uh, bonfires?

5      A.    Sure.

6      Q.    Thank you.

7            MR. FRASIER:   I believe that's all the

8   questions I have, Your Honor.

9            THE COURT:   You may step down.  You are free

10  to leave.

11           WITNESS:   Okay.

12           THE COURT:   I have a responsibility to orient

13  a jury.  So, I'm going to have to take a recess.  I'm sorry

14  about this break.  And it was — I wanted to get started and I

15  wasn't sure exactly when I had to do it, but everybody is

16  there so I have to go do it now.

17           So, we are going to take a brief recess so I

18  can do that, and then we'll come back and restart with the

19  next witness.  Okay?

20           Everybody else remain seated until the jury has

21  a chance to go to the jury room.

22           (Jury out.)

23           THE COURT:   About fifteen minutes.

24           MR. McCREA:   What did he say?

25           MS. McCREA:    Fifteen minutes.

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS


STATE OF OREGON,                    )
                                    )
          Plaintiff,                )    CASE NO. 10CR0782
                                    )
                                    )    JURY TRIAL
     vs.                            )     DAY 3 - Continued
                                    )
 NICHOLAS JAMES McGUFFIN,           )
                                    )
          Defendant.                )
 _____)


TRANSCRIPT OF PROCEEDINGS

Volume 4, Day 3, Pages D3 112 to D3 222

BE IT REMEMBERED That, the above-entitled cause

came on regularly for hearing beginning at 9:07 a.m., Thursday,

July 7, 2011 in the Circuit Courtroom of the Coos County

Courthouse in the City of Coquille, County of Coos, State of

Oregon, before the Honorable Richard L. Barron, and a jury.

APPEARANCES

R. Paul Frasier, District Attorney for Coos County,
representing the Plaintiff.

Erika Soublet, Assistant District Attorney for Coos County,
representing the Plaintiff.


Robert McCrea, Attorney at Law, representing the Defendant.

Shaun McCrea, Attorney at Law, representing the Defendant.


Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

D    D3 112

1                        (RECESS)

2              (Jury in.)

3              JUDICIAL ASSISTANT:    All rise.

4              THE COURT:    Be seated, please.

5              Sorry about that.

6              Call your next witness.

7              MS. SOUBLET:    The State calls Denise

8    Bertrand.

9              JUDICIAL ASSISTANT:    Step on in and stand in

10   the middle, and raise your right hand.

11             THE COURT:    Raise your right hand, please.

12                      DENISE BERTRAND

13   was thereupon produced as a witness on behalf of Plaintiff

14   and, having first been duly sworn to tell the truth, the whole

15   truth and nothing but the truth, was examined and testified as

16   follows:

17             THE COURT:    Have a seat up here, please.

18             If you would get closer to the microphone,

19   please, and keep your voice up.

20             All right.  Go ahead.

21             MS. SOUBLET:    Thank you, Your Honor.

22                      DIRECT EXAMINATION

23   BY MS. SOUBLET:

24      Q.   Ms. Bertrand, can you state your full name and spell

25   your last for the record?

```
    D3 113                              Bertrand   D
```

 1      A.   Denise Bertrand, B-E-R-T-R-A-N-D.

 2      Q.   Ms. Bertrand, how long have you lived in Coos

 3  County?

 4      A.   My whole life.

 5      Q.   Where do you live right now?

 6      A.   Myrtle Point.

 7      Q.   Do you have family in the area?

 8      A.   I do.

 9      Q.   Who?

10      A.   I have four children, and my husband, and his large

11  family, and my mother still lives here in Coquille.  I have a

12  couple aunts in the area.  An uncle in the area.  And they are

13  married ones, and their children — my cousins — several.

14      Q.   And your mother would be Ms. Cory Courtright?

15      A.   Yes, it is.

16      Q.   And where were you living in the school year

17  1999/2000?

18      A.   Um, my mother and I both were living at, um, her

19  parents', my grandma and grandpa's house on Knott Street, here

20  in Coquille.

21      Q.   Was there a time where you were living someplace

22  other than on Knott Street that school year?

23      A.   Uh, we were also — um, it's up behind McKay's on

24  Fifth Street — during part of the year — a friend of my

25  mother's owns a house there.

Bertrand  D    D3 114

1      Q.    Somebody else living with you then?

2      A.    My sister, Leah.

3      Q.    Leah?

4      A.    Yes.

5      Q.    And how much younger than you was Leah?

6      A.    Two years, one month, and one day.

7      Q.    How would you describe Leah growing up?  What type

8  of person was she?

9      A.    She was incredible.  She was energetic.  She was

10  gorgeous.  She was funny.

11     Q.    Did you have a good relationship with your sister?

12     A.    A great one.

13     Q.    How about her relationship with your mother?

14     A.    Pretty good.  Pretty good relationship with my mom.

15  We — they were pretty good about being pretty open and honest

16  with each other.

17     Q.    Was there anything that Leah liked to do,

18  particularly at school?

19     A.    Sports.  She loved sports.  She loved hanging with

20  her friends, playing with her friends, socializing,

21  occasionally studying.  But, mostly — mostly her sports.  And,

22  um, the most of her last year of school revolved around, uh —

23  around hanging out with her boyfriend.

24     Q.    And who was her boyfriend her last year of school?

25     A.    Uh, Nick.

```
    D3 115                          Bertrand  D
```

1    Q.   Is that Nicholas McGuffin?

2    A.   Yes, it is.

3    Q.   Do you see that person in the courtroom today?

4    A.   I sure do.

5    Q.   Can you point him out for me and tell me what he's

6  wearing?

7    A.   He is wearing a black tie with a printed — or, a

8  black shirt with a printed blue and white tie.

9    Q.   And how long have you known the Defendant?

10    A.   Um, my freshman year him and I shared a biology

11  class, which would have been two years prior to Leah's

12  freshman year.

13    Q.   Were you in the same class with the Defendant?

14    A.   No.  He's — he's a grade ahead of me.

15    Q.   And how did you become — actually, let me back up.

16  You said Leah was very into sports.  Was there any sport in

17  particular that she excelled at?

18    A.   Basketball and volleyball both, but basketball.

19    Q.   How tall was your sister?

20    A.   Not very.  She was one of the shorter members of the

21  team.  She was — probably barely hit five foot.  Maybe an inch

22  under five — somewhere in that area, right around five foot.

23    Q.   Would that have been her freshman year?

24    A.   Yes.

25    Q.   Her height?

Bertrand  D    D3 116

1           (Not understandable) petite?

2      A.   She was very petite.

3      Q.   And you mentioned that Leah had a circle of friends

4  that she liked to hang out with.  Do you remember who those

5  were?

6      A.   Sherry Mitchell was her best friend in the whole

7  wide world.  She also had — she was very close with Stacy

8  Urler (phonetic), Stacy Lyons, Melissa Brugnoli.  Those were

9  the most frequent.

10     Q.   And when the school year started, how — did you

11 notice a change in Leah?

12     A.   At the beginning of the year was — it wasn't that

13 big — you know, towards — a little bit more into the year she,

14 um — she didn't seem to have her friends in her life as much

15 as before.  It was mostly revolved around her boyfriend.

16     Q.   And how did you find out that she was dating the

17 Defendant?

18     A.   A friend of hers actually told me.  Sherry told me.

19     Q.   Do you remember when that was?

20     A.   Hmm, not very long into the school year.  I — maybe

21 — maybe two months into the school year.

22     Q.   And what did you do when you found out that your

23 sister was dating a senior?

24     A.   I — again, you know, Leah and I got along very well.

25 I was surprised that she didn't tell me first.  But, she knew

D3 117                                    Bertrand   D

1   that I would not be happy.  I was very overprotective of her,

2   watching out for her.  And, I'm also not an idiot and wasn't a

3   fan of — and there is not usually a good reason, in my

4   opinion, for a senior boy to be dating a freshman girl.  And

5   that bothered me.  And she probably knew that would bother me,

6   and so she didn't tell me.  So, I was surprised at that — that

7   she didn't tell me, but I could see why at the same time.

8        Q.   And did you tell your mother at that time?

9        A.   Um, yes.  Yes, I did.

10       Q.   And what was her reaction?

11       A.   She was none too thrilled either.

12       Q.   Was there a time when you ever had concerns about

13  Leah being in that relationship with the Defendant?

14       A.   Several times.  I, um — I told her when I found out

15  that I was not a fan of it.  And she knew at that point, after

16  mom talked to her, that she wasn't a fan of it, as well.  And,

17  um, my mom actually told them that they were not allowed to

18  date.  "You are not going to see him anymore."

19            And so, they stopped.  And I went over to Sherry's

20  house from the house on Fifth Street, up behind McKay's —

21  Sherry's house was also up behind McKay's — and — to ask her

22  something, and to my surprise they were sitting together on

23  the couch at Sherry's house — Nick and - - -

24       Q.   (Interposing) When you say - - -

25       A.   - - - Leah.

Bertrand  D    D3 118

1    Q.   - - - "they" you are referring Leah and - - -

2    A.   (Interposing) Nick and - - -

3    Q.   - - - Nick?

4    A.   - - - Leah.  Yeah.

5         And I looked at her, I'm like, "What are you doing?"

6  And Sherry's mom made the comment that she thought it would be

7  better if they were going to see each other behind people —

8  that they were still being supervised if they were going to

9  hide it.

10        So, - - -

11   Q.   (Interposing) Did you tell your mother about that

12  - - -

13   A.   I sure - - -

14   Q.   - - - discovery?

15   A.   I did.  I told her — I told Leah that I wouldn't

16  tell her, but I did tell her because I felt she should know.

17  And she waited awhile before she said anything, hoping Leah

18  would be honest about it.  And I kept encouraging Leah to tell

19  her.

20   Q.   Did that - - -

21   A.   (Interposing) (Not understandable) - - -

22   Q.   - - - eventually happen?

23   A.   Yes.

24   Q.   How long after you discovered the two of them were

25  still seeing each other outside of school was it before Leah

```
       D3 119                              Bertrand  D
```

1   told your mom?

2        A.   It was a few weeks.  It was a couple weeks.

3        Q.   Did you ever have an occasion to see Leah after

4   she'd been out on a date or spent time with the Defendant?

5        A.   Yeah.  Several times.  Uh, sometimes they were

6   awfully short.  She would come in like she was upset, which

7   was unusual because we were pretty good about talking prior

8   about everything together.  You know, "How was your day?  What

9   did you do?  Oh, that would of ticked me off.  Did that tick

10  you off?"  You know, general, throughout the day, how our

11  feelings were.

12          And there were times where when she would come in it

13  was mostly a storm off to her room.  And I would try to follow

14  her and she'd — "I'm just really tired and. . .", like she —

15  obviously, something negative had happened that she didn't

16  want to discuss with me, which again was unusual for the

17  relationship that we had.

18       Q.   Did you ever have an opportunity to find her crying

19  in her room?

20       A.   More than once.

21       Q.   And what had she been doing prior to your finding

22  her crying in her room?

23       A.   She had either gotten back from getting dropped off

24  by her boyfriend or had a phone call with her boyfriend, or

25  been at a friend's house and had her boyfriend stop by there.

Bertrand  D    D3 120

1      Q.   And how would you describe the relationship between

2    the Defendant and Leah?  Were they equals?

3      A.   No.

4      Q.   Who was in control?

5      A.   I would by far say that Nick was in control of their

6    relationship.

7      Q.   Are you aware of whether or not he — where he was

8    living that school year?

9      A.   Where Nick was living?

10     Q.   Yes.

11     A.   Yes.

12     Q.   And where was that?

13     A.   It's out Baker Road.  Out, uh — if you go over the

14   dike on 42 South, and cut on a sharp left back on Fat Elk

15   Road.  A couple miles out there there is a gravel road that

16   turns off to the right, called Baker Road.

17     Q.   And are you aware whether or not he had a car?

18     A.   Yes.  He had a car.  His parents had a couple cars

19   that he'd borrow.

20     Q.   And I'm going to hand you what's been marked, for

21   identification purposes as State's Exhibit 16, and and ask you

22   if you recognize that?

23     A.   That is his — that is Nick's blue Mustang.

24     Q.   Okay.  And State's Exhibit 25?

25     A.   That is Nick's parents' maroon Thunderbird.

```
   D3 121                              Bertrand  D
```

1          MS. SOUBLET:    I would offer State's Exhibit

2    16 and 25.

3          MS. McCREA:    No objection, Your Honor.

4          THE COURT:    Received.

5          (Whereupon Plaintiff's Exhibit Nos. 16 and 25

6    were received into evidence.)

7      Q.   Ms. Bertrand, I'm going to hand you State's Exhibits

8    9, 10, and 11, and ask you to look at those and tell me if you

9    recognize them?

10     A.   Yeah.  The first one is my grandparents' house on

11   Knott Street.

12     Q.   (Not understandable.)

13     A.   As are the other two, yes.

14     Q.   Okay.  And in Exhibit 11, is there — what part of

15   the house does that show?

16     A.   No. 9, 10, 11 — so, the back one.

17          Uh, this is the, um, left side of the house if you

18   are facing the house from the street.

19     Q.   And is Leah's bedroom window depicted in that?

20     A.   Yes, it is.

21     Q.   And where is it depicted?

22     A.   It is on the second floor, above the tall skinny

23   window, which was my grandparents' bedrooms below.

24     Q.   I want to take you to the summer of 2000.  Were you

25   working?

Bertrand   D    D3 122

1      A.    I was working two jobs.

2      Q.    And where were those jobs?

3      A.    I would work part time at the pizza parlor and I

4  would work part time at Hunter's Eatery and Creamery, which

5  was prior to that the Dairy Queen on the main drag.

6      Q.    And by the "pizza parlor", you are referring to your

7  dad's - - -

8      A.    (Interposing) Denny's - - -

9      Q.    - - - restaurant?

10     A.    - - - Pizza.  Yes.

11     Q.    What was your job at Denny's?

12     A.    I was a cook/oven watcher.  And occasionally would

13  help on the front counter, as well.  And, um, as with

14  everybody, you are part of the clean up crew at the end of the

15  night.

16     Q.    Do you remember what the hours for Denny's Pizza

17  were in the summer of 2000?

18     A.    Yeah.  We always closed at 11:00, no matter what

19  night of week it was.

20     Q.    And on June 27, 2000, did you work that day — or,

21  that night?

22     A.    Yes, I did.

23     Q.    Do you remember where you were working?

24     A.    I was working at Denny's.

25     Q.    Do you remember what time you got home that day —

D3 123                              Bertrand  D

1   or, that night?

2       A.   Oh, it was — I would say somewhere in the vicinity

3   of 11:45 — 11:30, 11:45.

4       Q.   Were you scheduled to work the next day on June 28th?

5       A.   Yes.  Yes, I was.

6       Q.   Did you remember an occasion when you were woken

7   sometime during the day on June 28th and you didn't want to be?

8       A.   Yes.

9       Q.   Can you tell the jury about that?

10      A.   Um, working, you know, that late you — me at least,

11  you know, wanting a certain amount of hours of sleep to be

12  able to function the next day.  I, um, was awakened somewhere

13  — I would say it was about 8:00 or 9:00 in the morning.  I was

14  still very tired.  I may have been a little earlier than that,

15  so I would say 8:00-ish.

16          And, um, my window was on the other side of the

17  house, upstairs, which is the right side of the house if you

18  are looking at it and — which is right above the driveway.

19  Nick had come in his blue Mustang that he had the senior

20  writings all over, and they were washing the car in the

21  driveway.  And being loud and playful while doing so, which is

22  normal.  Um, but I was trying to sleep and it woke me up.  And

23  I peeked out and saw that they were cleaning it and goofing

24  off while they were cleaning the car.  And tried to lay back

25  down.

Bertrand  D    D3 124

1        Leah, a few minutes later, came upstairs and asked

2   if I wanted to help them.  And the last thing I ever got to

3   say to her was, "No.  I want to sleep."

4        Q.   How did she react to that?

5        A.   She seemed — she was like, "Okay.  I'll talk to you

6   later."  And she went back down the stairs and they finished

7   cleaning the car, and then they ended up leaving.

8        Q.   And did you have an opportunity to see the Defendant

9   that night on June 28th?

10       A.   Yes.  I, uh, was working at the pizza parlor.  And

11  he came into the pizza parlor a few times, briefly.  He

12  practically ran in and asked if I had seen Leah or heard from

13  Leah, and I told him, "No.  I thought she was with you or at

14  Sherry's house."  And he's like, "Well, I went there to get

15  her and she wasn't there, and I can't seem to find her."  And

16  I didn't think much of it at the time.

17       Q.   Backing up right there.  Do you remember what time

18  that was?

19       A.   Hmm, there was more than one time that he came in.

20  I — I would say the first time was somewhere around 8:30,

21  9:00, 9:30.  Somewhere between 8:30 and 9:30.

22       Q.   Were you looking at your watch at that time and

23  making note of it?

24       A.   No.  It was — you know, the routine is typically

25  around 9:00-ish is when we start doing all the — wipe down all

D3 125                                   Bertrand  D

1   the tables, filling salt shakers and pepper shakers, and

2   things, and that's what I was out doing when he came in the

3   first time.

4       Q.  And what did you notice, if anything, about his

5   demeanor that first time?

6       A.  He was very short of breath and shaking, and

7   anxious, and I found it odd, but didn't think really anything

8   of it, of course, at the time.

9       Q.  Was there a time when he came back in, too, or you

10  saw him again that night?

11      A.   Yeah.  He came back in later before we closed.  I

12  think that the time was somewhere closer to the 10:00 mark.

13  Um, it had been — if I remember right, I'm pretty sure, that

14  there hadn't been very people in that night and so we were

15  pretty much all done with our cleanup.  It was just re-

16  cleaning up whatever we had made a mess of if somebody else

17  came in to order a pizza or anything.

18          Um, and he was of the same demeanor; practically

19  running in, anxious, frantic.  My — and I told him both times,

20  "If I see her, I'll — you know, I'll have her try and call

21  you, you know, and let you know that — where she's at if you

22  are that worried."

23      Q.  And what was his response to that?

24      A.  "Oh, okay."  And like ran out the door in mid-

25  sentence and - - -

Bertrand   D     D3 126

1      Q.   Did you see him again that night?

2      A.   I — you know, I — I know he came in at least twice.

3   I don't recall if it was three times or not.

4      Q.   Did you eventually go back home to the house on

5   Knott Street that night?

6      A.   Yeah.  I got home like — you know, somewhere around

7   11:45-ish.

8           And, uh, I found it odd that — that he was so

9   worried and didn't know where she was.  And I thought she was

10  supposed to be spending the night at her friend Sherry's

11  house.  But, I know a lot of times when she goes to a friend's

12  houses, that he would come over and hang out with her there.

13  Or, they would leave for awhile and then he'd bring her back

14  and she finished the night at her friend's house.

15          So, I peaked in her room.  When you go up the

16  stairs, my door was immediately to the left.  If you walk

17  around the banister to the right, there is two doors over

18  there.  The one on the left was my mom's and the one on the

19  right was Leah's.  I peaked in her room and she wasn't in

20  there.  There was nothing on in there.  And I went back to my

21  bed and lied down thinking, "Yeah.  She's at Sherry's house.

22  What's he — what's he so worried about?"

23     Q.   When you say, "There was nothing on in there," are

24  you referring to lights?

25     A.   There was no light on.  There was no — a lot of

D3 127                                    Bertrand   D

1   times she liked to watch the late night Bob Vila Do It

2   Yourself shows and — which I always thought was hilarious —

3   and then she would watch a lot of the, um — the beauty

4   makeover shows to get tips for her make-up and, you know,

5   things like that.  And there was nothing on.  There was no

6   light on.  There was no TV on.  There was no — there was

7   nothing.  She wasn't in there.

8       Q.   So, how did you find out that Leah hadn't come home

9   that night?

10      A.   Well, I — like I said, peaking in the room.  And

11  then I went to bed.  And my mom woke me up to tell me that

12  Leah still wasn't home, and she's not at Sherry's house, and

13  they — she can't find her, and Nick can't find her.  And Nick

14  had come over and the three of us — being my mother, me and

15  Nick — went to the Police Station to file a Missing Persons

16  because we couldn't find her anywhere.

17      Q.   And that would have been the Coquille Police

18  Department?

19      A.   Yes.

20      Q.   And how did that go?

21      A.   Very horribly.  She — they informed us that they

22  could not report her as a missing person because she was a

23  minor, and typically that they are not actually missing.  That

24  they would have to put her in as a runaway.  And, I, very

25  honestly, told them, "You are crazy.  She is not a runaway.

Bertrand  D    D3 128

1  She has nothing to run away from.  Everything that she has,

2  wants, and could want is right here.  You know, who is she

3  going to run away with?  Her boyfriend?  He's right here.

4  Who's she going to run away from?  You know, we were so close.

5  All of her friends are here.  None of her friends know where

6  she's at.  What is she running away from?"

7         They didn't care.  They insisted that we put it in

8  as a runaway because that's the typical thing that happens at

9  her age.

10     Q.   Did you have an opportunity on that day — on

11 June 29th — to ask the Defendant what had happened the night

12 before?

13     A.   There was several times that, you know, we tried

14 talking to him — my mother and I both.  And he just — he

15 insisted that he went — he dropped her off at Sherry's house.

16 And when he went to pick her up that she wasn't there.  That

17 he hadn't seen her and that he had been looking all over for

18 her.

19     Q.   Do you remember if he told you where he looked for

20 your sister?

21     A.   I — I — specifically, no.  I know that he — you

22 know, he was rant — rambled on.  "I drove all over.  I looked

23 at this."  But, I remember he had stated he looked at people's

24 houses and on streets in between, but I — what specific houses

25 he said at that time, no, I can't quote you on.

```
D3 129                              Bertrand  D
```

1   Q.   Did you ever ask him or did he ever tell you whether

2   or not he came by your house?

3   A.   He said he had come by.  In fact, I think he said he

4   talked to my grandpa even one time when he knocked on the

5   door, and said that he hadn't seen her come home.

6   Q.   Did you ever have an opportunity to — did he ever

7   mention doing anything to get Leah's attention at her window?

8   A.   Yeah.  At one point, he had stated that he had

9   thrown rocks at her window — this picture you handed me here.

10   Q.   Is that State's Exhibit 11?

11   A.   Yes.

12          MS. SOUBLET:    And it's up on the big screen

13   for the jury to see.

14   Q.   Were there rocks underneath that window?

15   A.   No.  Between the chimney that you see there and the

16   wall that comes out where the skinny, tall window is, which is

17   where my grandparent's room is, there is a little area there

18   that my grandpa would always plant his tomatoes in.  Every

19   year he planted — he had a garden up on the separate section

20   that he did strawberries in, and green beans, and everything

21   else in, but his tomatoes he always did in that section right

22   there.

23   Q.   I'm going to interrupt you right there.  Hand you a

24   laser pointer — that little green button right there.  I ask

25   you to point to the jury so they see on Exhibit 11 where you

Bertrand   D    D3 130

1   are talking about.

2        A.   It was in between this brick fireplace that goes

3   into the living room.  And this far window with the wall here,

4   this was my grandparents' bedroom.  There is an opening right

5   here in between the — if you come down this way, this is the

6   green grass walk through that goes clear through to the

7   backyard.  But, this narrow opening right here is where he

8   always planted his tomatoes every year.

9        Q.   And can you point so the jury can see what you're

10  talking about where Leah's bedroom window was?

11       A.   Right there.

12       Q.   Thank you.

13       A.   Yep.

14       Q.   After you left Coquille Police Department, did you

15  have an opportunity to drive around with the Defendant looking

16  for Leah?

17       A.   Many times.  Many, many, many times.

18       Q.   And how would you describe his demeanor or actions

19  during those times?

20       A.   He did a lot of talking, but it was mostly about

21  him.  "This my fault.  I can't believe I can't find her.  I

22  shouldn't have — I should have been there.  I should have been

23  there on time.  I should have picked her up earlier.  I should

24  have done this.  I should have done that.  Where — why didn't

25  I come to here and why didn't I look at this place before.

D3 131                                    Bertrand  D

1   And why didn't I this."  And it wasn't, uh, "I hope she's

2   okay."  It was all about him and how he should have done this

3   and he would have done that.

4        Q.   As the investigation into your sister's

5   disappearance continued, were you initially supportive of the

6   Defendant?

7        A.   Yes.

8        Q.   Was there a time in the beginning of July when he

9   came to your house after having been interviewed by the

10  police?

11       A.   Yes.

12       Q.   And do remember what, if anything, he did while at

13  your house?

14       A.   He was extremely pale.  And he had both of his

15  parents with him.  And apparently it had gone very negatively,

16  or difficult for him, and he looked ill — like I said, pale.

17  And the next thing I know he was throwing up in the driveway.

18  Actually, it was right to the edge of the driveway, which was

19  partially on the neighbors property.

20       Q.   Did you notice a change in the Defendant after

21  Leah's memorial service?

22       A.   He was far more distant.  He wasn't, you know,

23  checking in anymore.  He wasn't — there didn't seem to be any

24  sense of support whether him wanting our support, or him — you

25  know, wanting us to give him support.  There wasn't any — it

Bertrand  D    D3 132

1  was, "Wow.  We are on our own now.  She's not here.  She's

2  gone and I don't really need to socialize with you guys

3  anymore."

4       Q.   Did you ever have an opportunity — were you ever

5  asked to identify articles of Leah's clothing, particularly

6  shoes?

7       A.   Yes.

8       Q.   And I'm going to show you what's been marked for

9  identification purposes, as State's Exhibit 29, and ask you if

10  you recognize that?

11       A.   Yes, I do.

12       Q.   What do you recognize it to be a photograph of?

13       A.   One of Leah's pairs of Nike tennis shoes.

14            MS. SOUBLET:    I would offer - - -

15       A.   (Interposing) Half of the pairs of Leah's Nike

16  tennis shoes.

17            MS. SOUBLET:    I would offer State's

18  Exhibit 29.

19            MS. McCREA:    Can — can we confer for just a

20  second?

21            THE COURT:    (No audible response.)

22            MS. SOUBLET:    I'll withdraw that request.

23            And I have no further questions.

24            THE COURT:    Okay.

25            Cross?

```
     D3 133                              Bertrand   X
```

 1                        CROSS EXAMINATION

 2   BY MS. McCREA:

 3        Q.   Ms. Bertrand, when you were out looking for Leah,

 4   the day after she didn't come home with Mr. McGuffin, you were

 5   concerned about her whereabouts?  Is that a fair statement?

 6        A.   Absolutely.

 7        Q.   And Mr. McGuffin was concerned about her

 8   whereabouts?  Is that a fair statement?

 9        A.   He appeared to be.

10        Q.   Okay.  When he came to Denny's the night before, on

11   more than one occasion, you've described him as being

12   breathless and — would — would worried be a fair adjective for

13   how he seemed?

14        A.   Anxious is a better word.

15        Q.   Anxious.  Okay.  Now, you were working so you

16   couldn't take a lot of time to chat with him.  Is that right?

17        A.   That's true.

18        Q.   Because you were cleaning the tables, doing sort of

19   the shutdown of the restaurant?

20        A.   Correct.

21        Q.   So, did Nick have an opportunity to tell you that

22   Sherry and Leah had been in a — in an argument?

23        A.   No.  He told me — no, he didn't tell me.  Sherry

24   told me later.

25        Q.   Okay.  And at some point, did you or your mom call

Bertrand  X   D3 134

1  over to Sherry Mitchell's asking if Leah was over there?

2    A.   My mom called over there the next morning before

3  waking me up.

4    Q.   Okay.  And did you find out, then, that next morning

5  that Sherry and Leah had been in an argument?

6    A.   It wasn't in the morning when I talked to Sherry.  I

7  believe it was actually in the afternoon, Sherry had told me,

8  yes.

9    Q.   All right.  So — so that same day?

10    A.   Yes.

11    Q.   Did you have any discussion with Nick McGuffin about

12  the argument that Sherry and Leah had had?

13    A.   I don't believe so.

14    Q.   How long were you and Nick McGuffin driving around

15  looking for Leah?

16    A.   There was several different occasions.  I — I think

17  — I drove around without him several times, as well.  But with

18  him, there was probably about three to five times, and each

19  time was probably between a half hour to an hour.

20    Q.   Now, in terms of Nick saying that he had been

21  looking all over for Leah the night of June 28th, he did come

22  into Denny's Pizza at least twice?

23    A.   Yes.

24    Q.   And that was over a period of, what, the time

25  separated by maybe an hour, in your recollection?

D3 135                                    Bertrand  X

1        A.   Hour to an hour and a half, somewhere in there, yes.

2        Q.   And in terms of how he was acting, the fact that he

3    would be anxious, would not be unusual given the relationship

4    between Nick McGuffin and your sister Leah, would it?

5        A.   I'm not — I'm not sure what you are asking there.

6        Q.   Okay.  Well, didn't Nick McGuffin see himself as

7    Leah's guardian?

8        A.   I can't say I would use the word "guardian".

9        Q.   Okay.  Well, I'm looking at a report — an interview

10   with you from July 3, 2000 with William Soul (phonetic) of, I

11   believe, the Federal Bureau of Investigation.  And you were

12   asked why McGuffin would have seemed worried at that point

13   that he did not know where Leah was, and you replied that

14   "McGuffin sees himself as Leah's guardian and he is totally in

15   love with her."  Do you remember - - -

16       A.   (Interposing) Well, at - - -

17       Q.   - - - saying that?

18       A.   - - - point, as I answered her question towards the

19   beginning, I was a supporter of Nick.  And back then, in that

20   time, yes, I probably used — would have used that word.

21       Q.   Okay.  So, that's what you — you agree that's what

22   you said back on July 3, 2000?

23       A.   If it's in there, then I probably did, yes.

24       Q.   Okay.  They did spend a lot of time together, right?

25       A.   Oh, yes.

Bertrand   X    D3 136

1       Q.    And — and some of the time was bad.  You've

2  described how Leah would come home and sometimes be crying.

3  But some of the time was good, wasn't it?

4       A.    Yes.

5       Q.    And they went to the prom together?

6       A.    Yes, they did.

7       Q.    And the — the last morning that you saw her, as

8  you've described, they were outside washing the car, and

9  laughing and playing?

10      A.    Yep.

11      Q.    And she was happy and in a good mood?

12      A.    Yes.

13      Q.    And would it be fair to say that she was devoted to

14  Nick McGuffin?

15      A.    Very so.

16      Q.    And he appeared to be devoted to her?

17      A.    I don't know about that.  There were several times

18  where — when they were hanging or driving around together —

19  spending time together — and they would go where there was a

20  group of his friends at; she was very okay to sit in the car

21  and wait for him to be done socializing with his friends.  And

22  sometimes that was hours, but she could just wait in the car

23  until he was done.  But, if she wanted to go visit with a

24  friend, he certainly didn't wait for her.  It was more of a,

25  "I'll just drop you off and I'll check back and see if you are

D3 137                          Bertrand  X

1  ready later."

2         I don't know if I'd call that devotion.

3    Q.   All right.  Well, you've also indicated when she

4  would be at a friend's house he would show up to see her?

5    A.   Yeah.  Yes, he would.

6    Q.   He telephoned her at the house?

7    A.   At our house or at the - - -

8    Q.   (Interposing) Yeah.

9    A.   Yes.

10    Q.   And she — would she telephone him?

11    A.   Yes.

12    Q.   Now, Ms. Bertrand, you indicated that they arrived

13  and you were awakened on June 28th really early, like around

14  8:00 or 9:00 in the morning?  Is that correct?

15    A.   Yes.

16    Q.   And how long did they stay at the house, to your

17  recollection?

18    A.   Cleaning the car?  They — they probably continued to

19  clean the car for a half hour or so.

20    Q.   Okay.  So, you think that they left in the morning

21  around 9:30 or 10:00?

22    A.   Best recollection, yes.

23    Q.   Did you go to work that day, on the 28th?

24    A.   (No audible response.)

25    Q.   I should say, what time did you go to work?  Because

Bertrand   X   D3 138

1   of course you went to work because Nick came into Denny's.

2        A.   My shift started at, um, either 4:00 or 5:00.  I was

3   supposed to be there at 5:00, but they kind of had it worked

4   out with me where they would call me if they were getting busy

5   earlier so I could come in earlier to help.

6             MS. McCREA:    Now, if I could have Prosecution

7   Exhibit 10, please?

8        Q.   And, Ms. Bertrand, is what's been admitted into

9   evidence as prosecution Exhibit 10.  Is that your

10  grandparents' house on Knott Street?

11       A.   Yes, it is.

12       Q.   Is it the same one that we've been talking about?

13       A.   Yep.

14       Q.   Does that photograph show the side of the house with

15  Leah's bedroom window?

16       A.   Yes, it does.

17       Q.   Okay.  And that is sort of here onto the left side

18  of that?

19       A.   Yep.

20       Q.   Okay.  The house next door has a gravel driveway

21  that we can just see in the photograph, right?

22       A.   Yep.

23       Q.   And it had that driveway back in 2000?

24       A.   Yep.

25       Q.   So, there would have been stones, which Mr. McGuffin

```
   D3 139                            Bertrand  X
```

1   could have picked up from that driveway and thrown at the

2   window?

3        A.   Yes.

4             But I — that doesn't — just because there was stones

5   there that he could have thrown, there wasn't any under the

6   window.

7        Q.   I understand that.

8        A.   Okay.

9        Q.   I understand that.  But there were stones close by,

10  - - -

11       A.   (Interposing) Yes.

12       Q.   - - - just over the fence in the other driveway?

13            Now, at the time that Leah was dating Nick, after

14  your mom had approved the relationship — because there was a

15  time when your mom said, "No.  You can't — you can't see

16  Nick"?

17       A.   That's right.

18       Q.   And they were sneaking around behind her back?

19       A.   That's right.

20       Q.   And then she relented and said, "Okay.  I — you

21  know, I'm going to let you guys see each other," right?

22       A.   That's right.

23       Q.   And at that point, were you then — I'm talking about

24  back then, not how you feel now — back then, were you

25  supportive of the relationship?

Bertrand   X    D3 140

1    A.    I was leery, but I wanted her to be happy.

2    Q.    Okay.

3    A.    So, I didn't fight her on it.

4              MS. McCREA:    If I can have just a moment,

5    Your Honor?

6              THE COURT:    You may.

7    Q.    Ms. Bertrand, just one last question.

8              On the night of June 28th, the last time that

9    Mr. McGuffin came to see you at Denny's, do you remember him

10   asking you to come out with him to help search for Leah?

11   A.    No.

12   Q.    Do you remember that you were going to meet someone

13   else and you said that you couldn't go out with Nick?  That

14   you were meeting a coworker?

15   A.    After work, that's why I didn't get home until

16   11:45, is I had gone with a friend because we were done

17   cleaning up at about ten — 11:15 or so.  And so, I was with a

18   friend for a little bit and then got home at a 11:45.  I don't

19   recall telling him that, but I guess I may have.

20   Q.    Okay.  Thank you.

21              MS. McCREA:    I have nothing further, Your

22   Honor.

23              THE COURT:    Redirect?

24              MS. SOUBLET:    Just briefly.  Thank you,

25   Your Honor.

```
     D3 141                              Bertrand  ReD
```

1                    <u>REDIRECT EXAMINATION</u>

2    <u>BY MS. SOUBLET:</u>

3         Q.    Ms. Bertrand, prior to June 28, 2000, had there ever

4    been an opportunity when your sister, Leah, didn't come home

5    and didn't let her mother know where she was?

6         A.    Absolutely not.

7         Q.    Thank you.

8              MS. SOUBLET:    Nothing further.

9              THE COURT:    You may step down.

10             Do you want this witness to remain available?

11             MS. SOUBLET:    No, Your Honor.  Thank you.

12   She may be released.

13             THE COURT:    Without objection, you are

14   released.

15             WITNESS:    Thank you.

16             THE COURT:    Call your next witness.

17             MS. SOUBLET:    The State calls Stacy Lyons.

18             JUDICIAL ASSISTANT:    Step into the middle and

19   raise your right hand.

20                    <u>STACY LYONS CRUTCHFIELD</u>

21   was thereupon produced as a witness on behalf of Plaintiff

22   and, having first been duly sworn to tell the truth, the whole

23   truth and nothing but the truth, was examined and testified as

24   follows:

25             THE COURT:    Have a seat up here, please.

1          Go ahead.

2               MS. SOUBLET:    Thank you.

3                    <u>DIRECT EXAMINATION</u>

4     <u>BY MS. SOUBLET:</u>

5          Q.   Ms. Crutchfield, can you state your full name and

6     spell your last for the record?

7          A.   Yes.  It's Stacy Crutchfield, C-R-U-T-C-H-F-I-E-L-D.

8          Q.   Ms. Crutchfield, I'm going to ask you to scoot a

9     little bit closer to the microphone, and try and keep your

10    voice up so we can hear you, - - -

11         A.   (Interposing) Okay.

12         Q.   - - - and don't have to turn off the AC.

13              But, your name used to — is your maiden name Lyons?

14         A.   Yes.

15         Q.   And how long have you lived in Coos County?

16         A.   Um, well, I've lived here most of life.  I — I lived

17    here for the first eighteen years and then moved away, and

18    I've been back about three now.

19         Q.   Okay.  And when you lived here, did you live in

20    Coquille?

21         A.   Yes.

22         Q.   Okay.  What schools did you go?

23         A.   Elementary, I actually started out in Fairview and

24    then I came — I moved into town and came to both Jefferson,

25    Lincoln, the Coquille Middle School, and then Coquille High

```
     D3 143                          Crutchfield   D
```

 1    School.

 2         Q.   And did you know Leah Freeman?

 3         A.   Yes.

 4         Q.   How long had you known Leah Freeman?

 5         A.   Um, we had went to school together since

 6    approximately fourth grade.

 7         Q.   And in freshman year of high school, how would you

 8    describe your relationship with Leah?

 9         A.   Um, we were friends.  We had classes together and

10    played sports together.  We shared lockers that year and the

11    year before.

12         Q.   I'm sorry.  You dropped off there at the end.  You

13    shared - - -

14         A.   (Interposing) Sorry.

15         Q.   - - - lockers?

16         A.   Um, yeah.  We shared lockers that year and the year

17    before.

18         Q.   And the year before you would have been at the

19    middle school?

20         A.   Yes.

21         Q.   You say you played sports.  What sports did you play

22    with Leah?

23         A.   Um, well, in middle school we played basketball

24    together and volleyball.  And I don't — I don't recall in high

25    school playing together.  I'm not sure.

Crutchfield  D    D3 144

1    Q.    Did Leah have another — any other circle of friends

2    that she hung out with?

3    A.    During high school or prior?

4    Q.    (No audible response.)

5    A.    Um, during — not for the most part, not until her

6    and Nick got together, and then she hung out with that group

7    of people, as well.

8    Q.    Okay.  When you say "Nick" are you referring to the

9    Defendant, Nicholas McGuffin?

10   A.    Yes.

11   Q.    And how long have you known the Defendant?

12   A.    I met him eleven years ago when they got together,

13   when I went to high school with them.

14   Q.    Had you hung out with him or hung out in the circle

15   of people that he hung out with prior to Leah dating him?

16   A.    Not really.  We were just acquaintances from school.

17   Q.    And do you know how much older than you he was?

18   A.    Three years.

19   Q.    Do you remember when it was that Leah and the

20   Defendant started dating?

21   A.    It was around October of our freshman year.

22   Q.    That would have been the school year 1999/2000?

23   A.    Yes.

24   Q.    How would you describe, uh, their relationship?

25   Happy?

```
   D3 145                         Crutchfield  D
```

1    A.    Um, well, at times.  There — she really cared about

2    him a lot.  And you could tell that she really — she really

3    loved him and she was really serious about him pretty quick.

4    Um, but their relationship was also pretty emotional at times.

5    They argued and, um, their arguments could get pretty heated.

6    And, um — so, it seemed like when they were — they were happy,

7    they are happy.  But when they are not, they — they really

8    weren't.

9    Q.    And prior to Leah dating the Defendant in October of

10   1999, what had her personality been like?

11   A.    She was pretty spunky.  She was, um, just kind of

12   fun loving and goofy.  Goofy is always the word I used to

13   describe her because she was kind of silly and — and, um, you

14   know, just — just kind of a happy-go-lucky person.

15   Q.    And did you notice a change in her after she started

16   dating the Defendant?

17   A.    Yes.

18   Q.    And what was that change?

19   A.    I had never seen her be, um, quite as, I guess,

20   aggressive as — as I did in that relationship.  She would get

21   upset if, um — she — she would get jealous if she thought that

22   he was flirting with other girls.  And, um, she would get

23   really angry about it.  And I had never really seen — I had

24   never really seen her be angry before.  She wasn't really much

25   of an angry person.

Crutchfield  D    D3 146

1    Q.    And when you say "angry" what do you mean?

2    A.    Um, I mean that she would — she would get mad at him

3    because she thought he was flirting with other girls.

4    Q.    Was there an incident in May of 2000 on the track at

5    the high school?

6    A.    Yes.  I don't remember what the circumstances were

7    surrounding it, but for some reason she was upset with him.

8    And, um, it was during our PE class.  We were walking around

9    the track together, her and I.  And he had came out on the

10    track because he wanted to talk to her because she was upset

11    with him.  And she started pushing him, and she was yelling at

12    him.  And she kept pushing him, pushing him, and — and me and

13    a couple of the other people were trying to break it up, at

14    that point.  And, um, he — he kind of was just trying to back

15    off and — and kind of hold her back from hitting him.

16    Q.    Had you ever seen, prior to her dating the

17    Defendant, Leah acting that way?

18    A.    No.

19    Q.    Is that a "no"?

20    A.    No.  Sorry.

21    Q.    How much — what was the height difference between

22    the two?

23    A.    Pretty significant.  I would have to say — I mean,

24    her — her head probably went to about his chin.  It was pretty

25    significant height difference.

```
    D3 147                              Crutchfield  D
```

1      Q.    Do you remember — uh, when was the last time you saw

2    Leah?

3      A.    It was about a week before she went missing.

4      Q.    And where were you?

5      A.    I was living across from her at the time.  And I was

6    at my house and I was getting ready to leave for the summer,

7    and, um, she actually came over to my house to tell me

8    goodbye.  And we talked for a little while, just out on — in

9    front of my place.  And then, Nick pulled up to her

10   grandparents' house, where her and her mom were staying at the

11   time.  And so, we walked over there and talked over there for

12   awhile until I left.

13     Q.    And did Leah seem surprised to see the Defendant?

14     A.    Um, I don't — I don't really recall.  I know she

15   wasn't expecting him to be coming.  I mean, she didn't say

16   that she was expecting him to be coming over, but I don't know

17   that I would say she was surprised.

18     Q.    Thank you.

19            MS. SOUBLET:    I have - - -

20     A.    Uh huh.

21            MS. SOUBLET:    - - - nothing further.

22                    CROSS EXAMINATION

23   BY MS. McCREA:

24     Q.    Do you remember, did she seem pleased to see him?

25     A.    Um, as I recall, it was more just — just kind of

Crutchfield   X    D3 148

1    like, "Oh, there is Nick.  Let's go talk to him."

2        Q.   All right.  And these — these arguments, like the —

3    the one on the track, Ms. Crutchfield, that — this was not an

4    effort where the two of them tried to go away somewhere

5    private to have a tiff?  Is that right?

6        A.   They — they did try to walk away from the group of

7    us.  There was — I was walking with Leah and there was a few

8    other people because it was during a class.  And they kind of

9    walked away to talk.  But then when we saw that it was getting

10   heated, then we walked back over there.

11       Q.   Okay.  So, how many people were in the class?

12       A.   Oh.  Um, I would — I would have to guess maybe ten

13   or fifteen.  I — I don't know for sure.

14       Q.   Was it coed or all girls?

15       A.   Coed.

16       Q.   Coed.  So, Nick and Leah walk a little ways away and

17   she starts yelling at him?

18       A.   Uh huh.

19       Q.   And — and then, she starts pushing him?

20       A.   Uh huh.

21       Q.   And he didn't push back, he was just trying to hold

22   her off?  Is that right?

23       A.   He — yeah.  He had his hands up like he was trying

24   to hold her back from — from pushing.

25       Q.   And is it fair to say that Nick McGuffin was Leah

```
       D3 149                              Crutchfield   X
```

1   Freeman's first real boyfriend?

2        A.   Um, first serious boyfriend, yes.

3        Q.   (Not understandable) — that's — that's the word I

4   wanted — first - - -

5        A.   (Interposing) Uh huh.

6        Q.   - - - "serious boyfriend".

7             Okay.  Thanks.

8                  MS. McCREA:   That's all the questions I have,

9   Your Honor.

10                 THE COURT:   Anything else?

11                 MS. SOUBLET:    No, Your Honor.  Thank you.

12                 THE COURT:   You may step down.  You are free

13  leave.

14                 WITNESS:   Thank you.

15                 THE COURT:   Call your next witness.

16                 MS. SOUBLET:    The State calls Donna Dennis.

17                 MR. McCREA:   Your Honor, we do have a matter

18  for the Court in connection with this witness.

19                 There has been a motion regarding the

20  testimony.

21                 THE COURT:   Uh, this — this was the most

22  recent Motion you filed?

23                 MR. McCREA:   Pardon?

24                 THE COURT:   This was the most recent Motion,

25  or the one prior that we heard?

```
                                           Dennis        D3 150
 1              MR. McCREA:    I think it's the most recent

 2   Motion.

 3              THE COURT:    Let me look at it.  Just a

 4   minute.

 5              Well, I think my problem, Mr. McCrea — and I

 6   said this at the earlier Hearing — was that the State is going

 7   to have to lay a foundation.  And I'm not too sure — are you

 8   asking to have that laid out of the presence of the jury?

 9              MR. McCREA:    Yes — yes, Your Honor.

10              THE COURT:    Okay.

11              Ladies and gentlemen, I'll ask you to step into

12   the jury room.  Occasionally there are witnesses or evidence

13   that I'm going to have to hear some legal argument before I

14   determine whether you can hear it or not, and it's hard to do

15   that when you are sitting here.  So, I'll ask you to step into

16   the jury room.

17              (Jury out.)

18              THE COURT:    Step forward, please, ma'am.

19   Raise your right hand.

20                        DONNA DENNIS

21   was thereupon produced as a witness on behalf of Plaintiff

22   and, having first been duly sworn to tell the truth, the whole

23   truth and nothing but the truth, was examined and testified as

24   follows:

25              THE COURT:    Have a seat up here, please.
```

D3 151                                        Dennis   D

1              Go ahead, please.

2              MS. SOUBLET:     Thank you, Your Honor.

3                    <u>DIRECT EXAMINATION</u>

4    <u>BY MS. SOUBLET:</u>

5         Q.   Ms. Dennis, can you state your name and spell your

6    last for the record?

7         A.   Donna Dennis, D-E-N-N-I-S.

8         Q.   And how long have you lived in Coos County?

9         A.   Oh, uh, thirty-eight years.

10        Q.   You were living here in the school year 1999/2000?

11        A.   Correct.

12        Q.   Okay.  And did you have family living with you at

13   that time?

14        A.   Yes.

15        Q.   And who was that?

16        A.   Our grandson.  We raised him.

17        Q.   Okay.  And what's his name?

18        A.   Michael.

19        Q.   What school did Michael go to?

20        A.   Coquille High School.

21        Q.   (Not understandable) occasion in the spring of 2000

22   when you picked him up from high school?

23        A.   Yes.

24        Q.   Was that a routine of yours to pick him up?

25        A.   Yes.  Most generally, yes.

Dennis   D    D3 152

1     Q.    And is there an incident that sticks in your memory

2   that happened in the parking lot of the high school?

3     A.    Yes.

4     Q.    And can you tell the Judge what that incident was?

5     A.    Well, I, uh, was sitting in the car waiting for

6   Michael and — teenager watching, which is about the only thing

7   you can do — and I happened to notice a couple coming from the

8   far end of the high school, walking across the parking lot

9   towards the hurricane fenced area where the kids park.  And

10  they were — appeared to be bickering.  And, uh — and I was

11  kind of watching.

12         And, uh, they got over to the car.  And when they

13  got to the car is — he grabbed her arm and threw her up

14  against the car — or, pushed her up against the car.  I

15  wouldn't say "threw".  Forced her up against the car.

16    Q.    Do you remember what he looked like?

17    A.    Not really.

18    Q.    Do you remember what she looked like?

19    A.    Lightish-colored hair, medium height.  I was

20  probably halfway across the parking lot, so I didn't — wasn't

21  up close and personal.

22    Q.    Do you remember, uh, what kind of car?

23    A.    Uh, it was a sporty number.  I would say either a

24  Camaro, Mustang, something like that.  I'm not a real car

25  expert.  So, - - -

D3 153                                    Dennis   D

1          Q.   Ms. Dennis, I'm going to hand you State's

2     Exhibits 1, 7, and 8 and ask you to look at those, and tell me

3     if you recognize the person in those.

4          A.   Yes, I do.

5          Q.   And who do you recognize?

6          A.   That's Leah Freeman.

7          Q.   Do you recognize her as being the same person you

8     saw in the parking lot of the high school?

9          A.   I could not say that.

10         Q.   Does she appear to match the description of the

11    person you saw in the parking lot?

12         A.   Yes.

13         Q.   And prior to the incident in the parking lot at the

14    high school, had you seen or known her before?

15         A.   Uh, the kids all went to school together, so you

16    knew them as smaller children.  I hadn't seen her in years, so

17    I did not - - -

18         Q.   (Interposing) I'm showing you what - - -

19         A.   - - - wouldn't have recognized her.

20         Q.   I'm showing you what's been received as State's

21    Exhibit 16 and asking you if you recognize that?

22         A.   I — I, honestly, could not tell you.  It was from

23    the back of the car and I don't remember the color.

24              MS. SOUBLET:    For purposes of foundation, I

25    have no further questions.

Dennis   D    D3 154

1                    THE COURT:    That doesn't appear to be enough.

2                    MR. McCREA:    I didn't hear what the Court

3    said.

4                    THE COURT:    I — I said that doesn't appear to

5    be enough.

6                    MR. McCREA:    I agree.

7                    THE COURT:    I — I thought you would, but I —

8    I have to hear from the State.

9                    MR. McCREA:    I'm sorry, Your Honor.

10                   MS. SOUBLET:    Well, Your Honor, I think

11   Ms. Dennis' testimony about Ms. Freeman — recognizing from the

12   pictures, that she matched the general description of the

13   individual in question is sufficient for her to testify about

14   the incident in the parking lot.

15                   THE COURT:    A light-haired teenage girl does

16   not seem to me to be too unusual.

17                   MS. SOUBLET:    Your Honor, she also indicated

18   she was of medium height, which the testimony from both

19   Ms. Bertrand and Ms. - - -

20                   THE COURT:    (Interposing) I think the - - -

21                   MS. SOUBLET:    - - - Crutchfield - - -

22                   THE COURT:    The testimony, as I recall, was

23   that Leah was short, under five foot, which I don't consider

24   medium height.

25                   Unless you have something else, the testimony

```
     D3 155                              Zanni   D
```

1    won't come in.

2                MS. SOUBLET:    I have nothing further.

3                THE COURT:    You may step down, ma'am.  You

4    are free to leave.

5                Bring the jury in, please.

6                (Jury in.)

7                THE COURT:    Okay.

8                I've ruled that the testimony of that witness

9    will not be heard by the jury.

10                Call your next witness.

11                MR. FRASIER:    Thank you, Your Honor.

12                We call Sheriff Zanni.

13                         CRAIG ZANNI

14   was thereupon produced as a witness on behalf of Plaintiff

15   and, having first been duly sworn to tell the truth, the whole

16   truth and nothing but the truth, was examined and testified as

17   follows:

18                THE COURT:    Have a seat here, please.

19                     DIRECT EXAMINATION

20   BY MR. FRASIER:

21      Q.   Can you state your name, please, sir, and spell your

22   last name for the record?

23      A.   Craig Zanni, Z-A-N-N-I.

24      Q.   And what is your occupation, sir?

25      A.   I work for the Coos County Sheriff's Office and the

```
                                      Zanni   D    D3 156
```

1  citizens of Coos County.

2      Q.   In what capacity?

3      A.   I'm the Sheriff and the former Dog Handler and Dog

4  Trainer.

5      Q.   How long have you been the Sheriff?

6      A.   Since January 1st of this year.

7      Q.   Prior to that, sir, were you with the Sheriff's

8  Office?

9      A.   Yes.  Since 1977.

10      Q.   Could you tell the jury, please, what you did while

11  you worked at the Sheriff's Office prior to being elected

12  Sheriff?

13      A.   Uh, prior to being elected Sheriff, uh, my last

14  thirteen years with the Coos County Sheriff's Office, I was

15  the Chief of Investigations.  In 2004 I left and became the

16  Director at the South Coast Interagency Narcotics Team.  I

17  retired from there in 2007 and then became a Special

18  Investigator for the District Attorney's Office in the Coos

19  County Sheriff's Office, and did background investigations for

20  local agencies.

21      Q.   At some point in time you retired?

22      A.   I think I did.  I'm not sure at this point.

23      Q.   And — and — then you came back as the Sheriff?

24      A.   Yes.

25      Q.   All right.  Now, I would like to direct your

```
    D3 157                                    Zanni  D
 1  attention, sir, to the year 2000.  Where were you assigned at

 2  that time?

 3      A.   I was a Chief Investigator for the Coos County

 4  Sheriff's Office, a Detective Sergeant.

 5      Q.   And did you become aware, at some point in time,

 6  that there was a missing girl here in the Coquille area named

 7  Leah Freeman?

 8      A.   Yes.

 9      Q.   And at some point in time did you become involved in

10  this investigation?

11      A.   Yes.

12      Q.   And have you been involved in that investigation off

13  and on since that — that time?

14      A.   Yes, I have.

15      Q.   Now, directing your attention, sir, to July the 7th

16  of the year 2000, um, were you asked to go to the home of an

17  individual named Jimmy Murphy?

18      A.   Yes.

19      Q.   And were you asked to, uh, look into a bedroom that

20  had been associated with Leah Freeman?

21      A.   Yes, I was.

22      Q.   And what was your purpose in going there, sir?

23      A.   To see if there were any items that Leah Freeman had

24  there, or had left there that were of any evidentiary value or

25  might be of evidentiary value.
```

Zanni   D   D3 158

1     Q.   And in the course of looking in this bedroom, did

2   you find what you believed to be property of Ms. Freeman?

3     A.   Yes, I did.

4     Q.   I'll show you, first of all, a metal tin box, and

5   ask if you can identify this?

6     A.   Yes.

7     Q.   And did you find that box when you were searching

8   this room?

9     A.   Yes, I did.

10    Q.   Did you examine the contents inside this box?

11    A.   Yes.

12    Q.   Now, I'm going to open the box for you, sir.  Was

13  there inside what appeared to be a diary?

14    A.   Yes.

15    Q.   I'll show what's been marked as State's Exhibit 90.

16  Does that appear to be the diary that you saw that was in

17  there?

18    A.   Yes.

19    Q.   And were there other notes in there that, uh,

20  appeared to have handwriting on them?

21    A.   Yes.

22    Q.   I'll show you what's marked as State's Exhibits —

23  excuse me — 88, 89 and 92.  Were those — appear to be

24  documents that were inside there?

25    A.   No. 88, yes; 89, yes; 92, yes.

```
     D3 159                               Zanni   D
```

1      Q.   And State's Exhibit 91, was that also found inside

2  the box?

3      A.   Yes.

4      Q.   What did you do with this box after you seized it

5  - - -

6      A.   (Interposing) Seized it - - -

7      Q.   - - - (not understandable)?

8      A.   - - - and they were turned over to the Coquille

9  Police Department.

10     Q.   And for what reason were they given to the Coquille

11 Police Department?

12     A.   For review for potential evidentiary value.

13     Q.   Now, were you also asked to go to 1173 Knott Street?

14     A.   Yes.

15     Q.   And what was the reason for you to go there?

16     A.   To obtain any samples that we could that may contain

17 DNA or information related to the victim that might aid in the

18 search for the victim.

19     Q.   What type of things, based on your training and

20 experience, would you look for that would have, uh, DNA on it

21 that you could identify, say, for the victim in this case,

22 Leah Freeman?

23     A.   Uh, bedding, clothing, toothbrush, hairbrush,

24 personal items.  Uh, that the person either handled or would

25 have carried or had on their person.

Zanni   X    D3 160

1      Q.    I'll show you now what's marked as State's Exhibit

2  No. 202.  Do you recognize that item?

3      A.    Yes.

4      Q.    And did you seize something from the — the bathroom

5  or bedroom of Ms. Freeman?

6      A.    Yes.

7      Q.    And what was it that you seized?

8      A.    Her hair brush.

9      Q.    And is State's Exhibit 202 the hair brush that you

10  seized?

11      A.    Yes.

12      Q.    What did you do with that?

13      A.    Turned it over to Coquille Police Department.

14      Q.    Thank you.

15            MR. FRASIER:    That's all the questions I have

16  at this time, Your Honor.

17            THE COURT:    Cross?

18                    <u>CROSS EXAMINATION</u>

19  <u>BY MR. McCREA:</u>

20      Q.    Sheriff Zanni, just one thing.  You were asked a

21  question — did — about did you believe that this might be Leah

22  — or, did you believe this was Leah Freeman's property — some

23  question of that nature?

24      A.    Yes.

25      Q.    Did anyone accompany you on this - - -

```
     D3 161                              Zanni  X
```

1       A.   (Interposing) Yes.

2       Q.   - - - destination?

3       A.   Yes.  There were - - -

4       Q.   (Interposing) And - - -

5       A.   - - - family — there were family members present on

6   both occasions.

7       Q.   You had some family members present?

8       A.   Yes.

9       Q.   So, what you did — are you saying what you did was

10  you relied on what they said as to whose property it was?

11      A.   Yes.

12      Q.   Okay.  Thank you.

13              MR. McCREA:    That's all the questions I have.

14              THE COURT:    Any redirect?

15              MR. FRASIER:    No, Your Honor.  Ask the

16  witness to be excused.

17              THE COURT:    Without objection, Sheriff, you

18  are excused from further attendance.

19              WITNESS:    Thank you, Your Honor.

20              THE COURT:    Call your next witness.

21              MS. SOUBLET:    The State calls Officer Tony

22  Wetmore.

23                  ANTHONY S. WETMORE

24  was thereupon produced as a witness on behalf of Plaintiff

25  and, having first been duly sworn to tell the truth, the whole

```
                                        Wetmore  D    D3 162
```

1  truth and nothing but the truth, was examined and testified as

2  follows:

3           THE COURT:    Have a seat here, please.

4           Go ahead, please.

5           MS. SOUBLET:    Thank you, Your Honor.

6                   DIRECT EXAMINATION

7  BY MS. SOUBLET:

8       Q.    Officer Wetmore, can you state your full name and

9  spell your last for the record?

10      A.    Anthony S. Wetmore.  It's W-E-T-M-O-R-E.

11      Q.    Officer Wetmore, I'm going to ask you to scoot

12  closer to the microphone and keep your voice up so we don't

13  have to turn the AC off.

14      A.    Okay.

15      Q.    And can you tell the Grand — tell the jurors how you

16  are employed?

17      A.    Uh, with the City of Coos Bay Police Department as a

18  — currently, as a Patrol Officer.

19      Q.    And how long have you been with Coos Bay PD?

20      A.    I've been with the Department eighteen years,

21  fifteen as, uh, either a Patrol Officer or an Investigator.

22      Q.    And in the year 2000, what was your assignment with

23  the Police Department?

24      A.    I was assigned to the Investigations Unit as a

25  Detective at that time.

```
   D3 163                            Wetmore   D
```

1    Q.   Okay.  And what is being assigned as a Detective

2    mean?

3    A.   Uh, our department — as opposed to some that do it

4    like a promotion where you go to investigations until you are

5    promoted upwards, our department, as well as a lot of smaller

6    departments, uh, it's — it's basically a rotation.  You apply,

7    are selected.  Still have to have certain qualifications.  And

8    after a set amount of time — or, usually a set amount of time

9    — typically three years, four years — you'll rotate back to

10   Patrol and somebody else will — will rotate over.

11   Q.   And in 2000, how long had been in on that rotation

12   of Detectives?

13   A.   Uh, I had been on the road as a sworn Officer for

14   approximately four to five years at that time.  And I believe

15   I had been in Investigations for maybe a year to two years —

16   maybe a year.

17   Q.   I'm sorry.  I'm going to have to ask you to speak

18   up.  Was that a year to two years in Investigation, - - -

19   A.   (Interposing) I — I believe - - -

20   Q.   - - - at that - - -

21   A.   - - - so.

22   Q.   - - - time?

23        And when were you assigned to assist in the search

24   for Leah Freeman?

25   A.   Uh, it would have been around the beginning of July,

Wetmore   D    D3 164

1   I believe, initially.  On the first of July we were requested.

2       Q.    Okay.  And on July 28th of 2000 did you have an

3   opportunity to assist the service of a Search Warrant?

4       A.    Yes, I did.

5       Q.    And what house were you searching?

6       A.    Uh, it was the residence where Nick McGuffin lived,

7   as well as his parents, and I believe possibly his brother.

8       Q.    And where is that residence located?

9       A.    Uh, it's in Coos County.  It's 56246 Baker Road.

10      Q.    And who all assisted in the service of the Search

11  Warrant that day?

12      A.    Uh, there were a number of people.  I couldn't name

13  everybody, obviously.  From our department, Detective Dave

14  Main, Detective Cal Mitts, and myself from Coos Bay.  There

15  were a lot of officers I don't recall from, uh, other members

16  of our Homicide Team, Oregon State Police, Coquille, probably

17  North Bend.  I couldn't tell you everybody that was there,

18  though.

19      Q.    Were you assigned to work with a particular partner?

20      A.    Yes, I was.

21      Q.    And who was that?

22      A.    Detective Cal Mitts from our department.

23      Q.    And were you assigned to search a particular area of

24  the residence?

25      A.    Yes, I was.

```
D3 165                              Wetmore  D
```

1    Q.   And where was that?

2    A.   We were assigned to go through the bedroom of the

3 Nick McGuffin.

4    Q.   And in going through the Defendant's bedroom, did

5 you have an opportunity to seize items of evidentiary value?

6    A.   Yes, I did.

7    Q.   And when you seized those items, what would you do

8 with them?

9    A.   Uh, place them in a bag to be turned over to the

10 person that was logging the evidence.

11    Q.   Okay.  And how would you identify those items as

12 having been something that you found?

13    A.   Uh, typically, if it's an item that I've sealed, I

14 would tape it, would initial it, would date it, and would log

15 it in.  Typically, on a larger case where you've got items of

16 evidence coming in from multiple people they would be turned

17 over to the person logging the evidence — show them what it is

18 — who would fill out the form and the various paperwork that

19 goes with it.

20    Q.   And did you have a particular way of identifying by

21 numbers or letters items that you found?

22    A.   Yes.  I — although I — I don't recall on that date

23 if that was an item — if the items that were seized, if I

24 actually was the one to literally close the bag or — it would

25 have been identified by my evidence numbers, which are ASW

```
                                         Wetmore  D    D3 166
 1   followed by a sequential number.

 2       Q.   Okay.  Such as 001?

 3       A.   Yes, ma'am.

 4       Q.   Officer Wetmore, I'm going to hand you that, ask you

 5   to look inside at the items and tell me if you recognize the

 6   items inside that bag?

 7       A.   Yes, I do.

 8       Q.   And what do you recognize those items inside that

 9   bag to be?

10       A.   This is a — this a collection of various notes,

11   letters, things that appear to be to or from Mr. McGuffin.

12       Q.   And to or — when you say "to or from" they are

13   obviously written by somebody else?

14       A.   Somebody other than me, yes.

15       Q.   Okay.  And do you — did you have an opportunity to

16   look at those items and see who they were written by?

17       A.   Very briefly.

18       Q.   And who was that?

19       A.   Some of them were from Nick McGuffin.

20            MS. McCREA:   I'm sorry.  I — I'm really

21   having trouble hearing you, sir.  Some of those were from

22   where?

23            WITNESS:   Some of the items appeared to be

24   from Mr. McGuffin - - -

25            MS. McCREA:   (Interposing) From - - -
```

```
   D3 167                              Wetmore  D
```

 1                WITNESS:   - - - or - - -

 2                MS. McCREA:   - - - Mr. McGuffin?

 3                WITNESS:   Or, to Mr. McGuffin.

 4                MS. McCREA:   Or, to Mr. McGuffin?  Okay.

 5                WITNESS:   Yes, ma'am.

 6     Q.   Those items that were to Mr. McGuffin, who did they

 7   appear to have been written by?

 8     A.   Various people.  No particular person that I recall.

 9   There was just various documents.  Some — there were some

10   notes that were, I believed, signed by Ms. Freeman — by Leah —

11   by the girlfriend.

12                MS. McCREA:   I'm sorry.  By who?

13                WITNESS:   By Leah.

14                MS. McCREA:   Okay.

15     A.   But I — I don't recall those being the only items

16   that were seized.  I'm sure there were some notes from other

17   people, as well.

18     Q.   And when you, uh, completed your search of the

19   Defendant's bedroom, did you put those items in the bag as you

20   just previously described?

21     A.   Yes, I did.

22     Q.   And labeled them with what evidence number?

23     A.   ASW-001.

24     Q.   Thank you.

25                MS. SOUBLET:   I have no further questions of

Wetmore   D    D3 168

1   the witness at this time.

2                THE COURT:    What was the exhibit number of

3   the bag, or did you have that - - -

4                MS. SOUBLET:     (Interposing) There isn't an

5   exhibit number of the bag.

6                THE COURT:    Okay.

7                Go ahead.

8                MR. FRASIER:    There are several documents

9   marked as State's Exhibits inside.

10               THE COURT:    Okay.  That's fine.

11               Uh, Ms. McCrea?

12               MR. McCREA:    Could we take just a moment,

13  Your Honor?

14               THE COURT:    Yes.

15               MR. McCREA:    Your Honor, we don't — (not

16  understandable).  (Not understandable) items — it's at a time

17  that the Court might be considering a recess anyway — to give

18  us a chance to look at what — what it is - - -

19               THE COURT:    (Interposing) I'm not considering

20  - - -

21               MR. McCREA:    - - - inside the bag.

22               THE COURT:    - - - right now.

23               Uh, do you know — is there a number — numbers

24  on the reports that you — that you got from the District

25  Attorney?

D3 169                                    Wetmore  X

1               Mr. Frasier, Do you know where — where it is?

2               MR. FRASIER:   To be honest with you, I'll

3    have to double check, but I'm not sure Detective Wetmore wrote

4    a report about the seizure of this.

5               THE COURT:   Did you write a report?

6               WITNESS:   I don't believe, so, sir.

7               THE COURT:   Okay.

8               MS. McCREA:   That's why we don't have one.

9               THE COURT:   That's correct.  It doesn't sound

10   like anybody has one.

11              MS. McCREA:   Okay.

12              THE COURT:   Do you have - - -

13              MS. McCREA:   (Interposing) Let me - - -

14              THE COURT:   - - - any cross?

15              MS. McCREA:   I have just a couple of

16   questions, Your Honor.

17              THE COURT:   Okay.

18                    <u>CROSS EXAMINATION</u>

19   BY MS. McCREA:

20       Q.   Officer — is it Officer Wetmore?

21       A.   Yes, ma'am.

22       Q.   Okay.  Officer Wetmore, when you and the other

23   officers executed the search warrant at Mr. McGuffin's

24   residence, was he there?

25       A.   I don't recall.  He — he may have been.  I don't

Wetmore   X    D3 170

1  recall, specifically, Nick McGuffin.  I do recall, uh, the

2  mother, father — I believe the brother's name was Wayne.  I

3  recall those three being there.  Mr. McGuffin may have arrived

4  during the Search Warrant.  I don't recall him being there

5  when we arrived, though.

6       Q.   Does it refresh your recollection that Mr. McGuffin

7  actually opened the door for you, that his parents were

8  working?

9       A.   I don't know that I was there when the door was

10  opened.  I couldn't say who — who answered - - -

11       Q.   (Interposing) (Not understandable) - - -

12       A.   - - - it.  But, - - -

13       Q.   Then, Officer, we won't belabor it any further.

14       A.   Okay.

15       Q.   Thank you.

16            MS. McCREA:    Nothing further, Your Honor.

17            MS. SOUBLET:    Subject to being recalled

18  later, but I have no further questions for him at this time.

19            THE COURT:   You may step down.  You are not

20  excused.  You may be called later.

21            WITNESS:   Yes, sir.

22            THE COURT:   Okay.

23            Call your next witness.

24            MR. FRASIER:   Call Dave Main.

25            MR. WETMORE:   Your Honor, should I - - -

```
   D3 171                                    Main  D
```

 1              THE COURT:    (Interposing) Uh, just give that

 2   to Mr. Frasier.

 3              Thank you.

 4              Raise your right hand, please.

 5                         DAVID LEO MAIN

 6   was thereupon produced as a witness on behalf of Plaintiff

 7   and, having first been duly sworn to tell the truth, the whole

 8   truth and nothing but the truth, was examined and testified as

 9   follows:

10              THE COURT:   Have a seat here, please.

11                      DIRECT EXAMINATION

12   BY MR. FRASIER:

13      Q.   Could you state your name, please, sir, and spell

14   your last name for the record?

15      A.   David Leo Main, M-A-I-N.

16      Q.   And your occupation — what is your occupation at

17   this time, sir?

18      A.   I drive truck for Main Rock.

19      Q.   And how long have you been doing that?

20      A.   Five years, sir.

21      Q.   Prior to that what was your occupation?

22      A.   I was a Police Officer for the City of Coos Bay.

23      Q.   For how long?

24      A.   Thirty one years, two months.

25      Q.   And why did you leave?

Main  D    D3 172

1    A.    PERS.  They were doing away with the money (not

2    understandable) so I decided it was a good time to leave.

3    Q.    So you retired?

4    A.    Yes, sir.

5    Q.    Now, what type of position did you have with — with

6    the Coos Bay Police Department?

7    A.    I — upon my retirement, I was Sergeant in charge of

8    Investigations.

9    Q.    And how long have you been working in

10   Investigations?

11   A.    Five years.

12   Q.    Were you working in Investigations in the year 2000?

13   A.    Yes, sir, I was.

14   Q.    Now, at some point in time did you and other

15   officers in your department become involved in the

16   investigation of the disappearance of Leah Freeman?

17   A.    Yes, sir, we did.

18   Q.    And in particular, did you assist in the execution

19   of a Search Warrant at the home of the Defendant, off of Baker

20   Road, on July 25, 2000?

21   A.    July 25th?

22   Q.    Well what — do you recall what day it was?

23   A.    July 28th of 2000, sir.

24   Q.    Okay.  I can't read my own writing.  All right.

25   A.    Yes, sir.

```
     D3 173                                  Main   D
```

1      Q.   July 28th?

2      A.   Yes, sir, I did.

3      Q.   And in particular, did you seize any evidence there?

4      A.   Yes, sir, I did.

5      Q.   I'm going to show to you this particular bag here.

6  And, actually, I'm going to ask you to open it up, if you

7  will, and ask if you can identify the contents inside there?

8           There is a book, marked State's Exhibit — I believe

9  it's 93.

10     A.   State's Exhibit 93?

11     Q.   Do you recognize that, sir?

12     A.   Yes, sir, I do.

13     Q.   And did you seize that particular book?

14     A.   Yes, sir, I did.

15     Q.   Where did you find it, to the best of your

16  recollection?

17     A.    In the residence there was a counter between the

18  kitchen and the living room.  And it was lying there on the

19  counter - - -

20     Q.   (Interposing) (Not understandable) - - -

21     A.   - - - on the living room side.

22     Q.   I'll show State's Exhibit No. 33, and ask if you can

23  identify that?

24     A.   Yes, sir, this is where I located this annual from

25  Coquille High School.

1    Q.   And does State's Exhibit 33 accurately portray how

2  you found this book?

3    A.   Yes, sir.

4                MR. FRASIER:    I'd offer State's Exhibit 33.

5                MR. McCREA:    Your Honor, at this point, there

6  doesn't appear to be any — any relevancy to the issues in this

7  case of being developed by Exhibit 33.  Therefore, we object

8  to it.

9                THE COURT:    Uh, Mr. Frasier, that's a picture

10  of the annual?

11                MR. FRASIER:    A picture of where the annual

12  was found.

13                THE COURT:    Okay.  You are going to introduce

14  the annual?

15                MR. FRASIER:    I'll be - - -

16                THE COURT:    (Interposing) Okay.

17                MR. FRASIER:    - - - introducing annual.

18  We'll be drawing the jury's attention to specific portions of

19  the annual.

20                THE COURT:    Okay.  Right now I'll

21  conditionally receive it, in that its being tied up because I

22  think they want to show where it was found, One.  And Two, if

23  the — if the annual is then received in evidence that would be

24  relevant to it.  So, I'll receive it conditionally to it being

25  tied up.

```
     D3 175                                          Main   X
```

1           (Whereupon Plaintiff's Exhibit No. 33 was

2    conditionally received into evidence.)

3                MR. FRASIER:    All right.

4                MR. McCREA:    Nothing more, Your Honor.  Thank

5    you.

6         Q.   Now, in regards to what is marked as State's

7    Exhibit 93, the annual, did you, uh — you seized that?

8         A.   Yes, sir, I did.

9         Q.   And you put it into a bag marked with an exhibit

10   number?

11        A.   Yes, sir.

12        Q.   And then, what did you do with the item once you had

13   seized it?

14        A.   It was turned over to the property officer at

15   Coquille Police Department.

16        Q.   Thank you.

17                MR. FRASIER:    That's all the questions I have

18   for (not understandable).

19                THE COURT:   Cross?

20                      CROSS EXAMINATION

21   BY MR. McCREA:

22        Q.   Mr. — I guess it's now Mr. Main, formerly Officer

23   Main?

24        A.   Yes, sir.

25        Q.   Did you write any report on this search?

Shinar  D    D3 176

1      A.   No, sir, I did not.

2      Q.   All right.

3                MR. McCREA:    That's all the questions I have.

4                THE COURT:    Uh, he's released then?

5                MR. FRASIER:    Yes, please, Your Honor.

6                THE COURT:    You are free to leave.

7                WITNESS:    Thank you, Your Honor.

8                THE COURT:    Call your next witness.

9                MR. FRASIER:    Thank you, Your Honor.

10               We'd call Mr. Shinar.

11               THE COURT:    Sir, if you would step forward,

12    please, right up to the table there and raise your right hand.

13                      ADAM J. BREWER SHINAR

14    was thereupon produced as a witness on behalf of Plaintiff

15    and, having first been duly sworn to tell the truth, the whole

16    truth and nothing but the truth, was examined and testified as

17    follows:

18               THE COURT:    Have a seat here, please.

19               Make sure you remain pretty close to that

20    microphone.

21               Keep your voice up when you are answering

22    questions.

23               WITNESS:    Thank you.

24               THE COURT:    And — and you can move it down.

25               Go ahead.

```
     D3 177                                Shinar  D
```

1          MR. FRASIER:    Thank you, Your Honor.

2                      DIRECT EXAMINATION

3    BY MR. FRASIER:

4        Q.    Could you state your name, please, sir, and spell

5    your last name for the record?

6        A.    Adam J. Brewer, B-R-E-W-E-R.

7        Q.    And do you also go by the last name — a different

8    last name?

9        A.    Oh, Shinar.  That is my current last name as of the

10   marriage.

11       Q.    You chose, when you got married, to take your wife's

12   name?

13       A.    Correct.

14       Q.    And, sir, where do you reside?

15       A.    I reside in North Bend.

16       Q.    How long have you lived in the Coos County area?

17       A.    Oh, about twenty-two years.

18       Q.    Did you used to reside in the Coquille area?

19       A.    Correct.

20       Q.    And approximately when did you reside in Coquille?

21       A.    From nine — about '96 to about 2003.

22       Q.    During the timeframe that you lived in the Coquille

23   area, did you become acquainted with the Defendant in this

24   case, Nicholas McGuffin?

25       A.    I know of him but we are not friends or anything

```
                                    Shinar   D    D3 178
```

 1   like that.

 2       Q.   How did you know of him?

 3       A.   I knew him through Leah Freeman.

 4       Q.   And did — how did you know Leah Freeman?

 5       A.   I met her through working at Denny's Pizza, which —

 6   which was her father, um, Dennis Freeman.  And I met her one

 7   day with Mr. McGuffin, also, at the restaurant.  And that's

 8   how knew him through her.

 9       Q.   You were aware that they were boyfriend/girlfriend?

10       A.   Correct.

11       Q.   Now, directing your attention to April of 2000, did

12   you have an occasion to be at what sometimes referred to as

13   the Fast Mart - - -

14       A.   (Interposing) Yes, I - - -

15       Q.   - - - here in Coquille?

16       A.   Yes, I was.

17       Q.   And did you see Leah Freeman and the Defendant at

18   the Fast Mart?

19       A.   Yes, I did.

20       Q.   Could you describe for the jury, please, what you

21   saw?

22       A.   At the time, I was returning from an evening

23   function at a church, and I had come up to my car at Fast

24   Mart.  I put my stuff in the vehicle.  And at the time, my

25   wife to be was there working.  And I was approaching the

```
     D3 179                              Shinar  D
```

1   entrance, and I had noticed Mr. McGuffin — side profile —

2   another gentleman beside him, and somebody they were holding

3   against the ice machine.  And, um, at that time, I just kind

4   of went inside.  Um, as I was passing the door, there was a

5   little bit of conversation going on between two people in that

6   group.  Um, just — just, um, "You need to leave me alone."

7   Things like that.

8           I don't know really what's going on I'm just there

9   to see my girlfriend at the time, and she was getting ready to

10  get off work.  And so, I wait inside.  We were there talking

11  for a few minutes.  And at the time — after we talked for just

12  a couples minutes, there was a big slam/bang outside.  And me

13  and her went to the door, and there was somebody running off,

14  one person throwing keys through the air, and some screaming

15  going on.

16          Um, so people have already been dispersed.  And all

17  I's (sic) could see was the back of Leah Freeman's sweatshirt,

18  which was from — her basketball sweatshirt for the school.

19  And that's about all that I do remember of that moment and

20  that evening.

21      Q.   All right.  So, you saw Ms. Freeman where — where —

22  did you see her prior to you going in the store?

23      A.   I thought at the time that there was — I know there

24  was three people there.  I did not see exactly who was the

25  third person being pushed against the ice machine.

Shinar   X   D3 180

1    Q.   But, after the bang, you did see Leah Freeman?

2    A.   Yes.  Because her — the back of her jersey — or, her

3    sweatshirt, I should say, says "Freeman" on the back of it,

4    and the letters which was for the Red Devil's basketball, that

5    I remember from when she was in school.

6    Q.   Did you see the Defendant at that time?

7    A.   Yes, I did.  He was throwing his keys in the air,

8    um, hollering something.  I don't really remember.  Just some

9    screaming, some things like that.

10   Q.   Thank you.

11            MR. FRASIER:    That's all the questions I have

12   of Mr. - - -

13            THE COURT:   Ms. McCrea?

14              CROSS EXAMINATION

15   BY MS. McCREA:

16   Q.   This was — this was what month — I'm sorry — Mr. —

17   it's Mr. Brewer now, right?

18   A.   Actually, Shinar.  But, - - -

19   Q.   (Interposing) I'm sorry.  Mr. Shinar.  I want to get

20   — I want to get the — names are important, Mr. Shinar.

21            So, this was — I think you said April - - -

22   A.   (Interposing) Correct.

23   Q.   - - - of 2000?

24   A.   Correct.

25   Q.   Okay.  And you were interviewed by the Coquille

```
     D3 181                            Shinar   X
 1   Police Department back in August of 2000?  Do you remember
 2   that?
 3        A.   Yes, I do.
 4        Q.   And at that time you didn't say anything to Officer
 5   Davis about somebody being pushed up against an ice machine,
 6   did you?
 7        A.   No, I did not.
 8        Q.   And what you did say was that you saw keys being
 9   thrown across the parking lot?
10        A.   Correct.
11        Q.   Now, you testified, also, before the Coos County
12   Grand Jury in August of 2010?  Do you remember that?
13        A.   Yes, I do.
14        Q.   And when you testified before the Grand Jury in
15   August of 2010, and you were asked about whether you would
16   recognize Mr. McGuffin, you indicated that you have only seen
17   him from a distance.
18        A.   No.  It was not the question pertaining to that.
19   That was do I know him?  And I said, "from a distance," which
20   I clearly said already.
21        Q.   I think the question was, "Did you ever meet him?"
22   And the answer was, "I've only seen him from a distance."
23        A.   No.  That — that was question wasn't answered that
24   way.  I said, "I know him from a distance."
25        Q.   "I know him from a distance"?
```

Shinar   X    D3 182

1      A.   Uh huh.

2      Q.   (Simultaneously) Okay.

3           Do you recall also testifying that you had never

4   really seen Leah Freeman and Nick McGuffin together?  The only

5   time you had seen her was like when you were on shift at

6   Denny's Pizza?

7      A.   No.  That's not correct.

8      Q.   That's not what you said?

9      A.   No.

10      Q.   Okay.

11           MS. McCREA:   Your Honor, I — I need to — I

12   need to pull the Grand Jury testimony.  And I believe this is

13   the State's last witness for the day.  So, if we could take

14   our afternoon recess, I will pull that.

15           THE COURT:   Okay.  We'll take a recess

16   hopefully for no more than fifteen minutes.

17           If you would step into the jury room, please.

18           (Jury out.)

19           You can step down for the moment, sir.  Don't

20   leave.

21           WITNESS:   Back in the hall?

22           THE COURT:   Yeah.  You'll be called back.

23           Is this going to be your last witness today?

24           MR. FRASIER:   We have one more that we can

25   call.

```
 D3 183                                    Shinar   X
```

1      THE COURT:    Okay.  I want — I want it called.

2  So, we — I realize it's hard to schedule these people

3  sometime, but I would hope that we could have full days.

4      MR. FRASIER:    Well, - - -

5      THE COURT:    (Interposing) Okay.

6      MR. FRASIER:    - - - so do we.

7      THE COURT:    Okay.  Uh, we'll be in recess for

8  about fifteen minutes.

9                         (RECESS)

10         (Jury in.)

11         JUDICIAL ASSISTANT:    All rise.

12         THE COURT:    Be seated, please.

13         Go ahead, Ms. McCrea.

14         MS. McCREA:    Thank you, Your Honor.

15         CROSS EXAMINATION (CONTINUED)

16  BY MS. McCREA:

17      Q.   Okay.  Mr. Shinar, you — do you recall testifying

18  before the Coos County Grand Jury on August 4th of last year,

19  2010?

20      A.   Yes, I do.

21      Q.   And that was the Grand Jury looking into the

22  disappearance and death of Leah Freeman?

23      A.   Correct.

24      Q.   And you were placed under an oath just like you were

25  today?

Shinar   X   D3 184

1      A.   Yes, I was.

2      Q.   You were sworn to tell the truth?

3      A.   (No audible response.)

4      Q.   Yes?

5      A.   Yes.  Correct.

6      Q.   And you were asked questions by Mr. Frasier at that

7   time, during the Grand jury — the same prosecutor who is here

8   with us today?

9      A.   Correct.

10      Q.   At the same time you were also asked some questions

11   by Grand Jurors in that proceeding?  Is that right?

12      A.   I don't remember being asked by too many Grand

13   Jurors during that proceeding at all.

14      Q.   And I'm going to ask you again.  Do you remember

15   being asked the question, "Would you have recognized Nick if

16   you saw him at that time?  Did you ever meet him?"  And you

17   answering, "I've only seen him from a distance.  So, that's

18   all I know there.  I never really seen them together.  The

19   only time I've seen her was like when I was on shift at

20   Denny's Pizza."

21      A.   Yeah, that — part of that is correct, yes.  But not

22   a hundred percent.

23      Q.   Okay.  Mr. Shinar, I have the tape recording - - -

24      A.   (Interposing) Uh huh.

25      Q.   - - - of that Grand Jury Proceeding with that

```
    D3 185                              Shinar   X
```

1  question and that answer.  And I'm hoping you are going to be

2  able to hear it.

3          Here we go.

4          (Whereupon a portion the audio recording of the

5  Grand Jury Proceeding is played for the witness as follows:)

6              "I never really seen them together.  The only

7              time I've seen her was like when I was on shift at

8              Denny's Pizza."

9      A.   Oh, I remember that part of the conversation, yeah.

10 But, it's not hundred percent of what you asked me a moment

11 ago — when I was here a minute ago.  You asked me if I - - -

12     Q.   (Interposing) (Not understandable) - - -

13     A.   - - - ever or not have meet — met him.  And that —

14 that was not clearly anything said there.  It was all jarble.

15     Q.   You did not understand this?

16     A.   No.  I remember — I could hear half of it.  But, the

17 first part was like — the (not understandable) part was like

18 all just jumbled.

19     Q.   Could you hear your answer, - - -

20     A.   (Interposing) Yes, - - -

21     Q.   - - - Mr. Shinar?

22     A.   - - - I could hear my answer, - - -

23     Q.   (Interposing) And what did - - -

24     A.   - - - as what I replied to.

25     Q.   All right.  And was your answer the same as what I

Shinar   ReD  D3  186

1  just quoted to you a moment ago?

2       Would you like me to read it to you again?

3    A.   You can read it to me again.  I can try to see what

4  you want me to answer to.

5    Q.   My question is were you asked the question and did

6  you give the answer that you just heard on this tape

7  recording?

8    A.   Yes, that is correct to that particular part of the

9  question.  But, you asked a two-part question earlier.

10    Q.   Okay.  I'm not dealing with earlier.  I'm dealing

11  with since Court has reconvened.

12    A.   Okay.  Great.

13    Q.   So, are we on the page since - - -

14    A.   (Interposing) I hope so.  Because I didn't say

15  everything you said earlier.

16    Q.   Okay.  Mr. Shinar, let me withdraw what I asked you

17  earlier.

18    A.   Uh huh.

19    Q.   Let's just deal with what we've talked about since

20  Court reconvened.

21    A.   Uh huh.

22    Q.   Did you — were you asked the question and did you

23  give the answer that you had only seen Nick from a distance

24  and what was played on the tape here?

25    A.   Yes.  That is correct.

```
   D3 187                                    Shinar  ReD
```

 1    Q.   Okay.  Thank you very much.

 2           MS. McCREA:    No further questions for this

 3   witness, Your Honor.

 4           THE COURT:   Redirect?

 5                 REDIRECT EXAMINATION

 6   BY MR. FRASIER:

 7    Q.   Mr. Shinar, when you testified at the Grand Jury

 8   last August, did I also ask you about seeing Ms. McGuffin —

 9   Ms. Freeman and Mr. McGuffin at Denny's Pizza?

10    A.   Yes.  Correct.

11    Q.   Did I ask you if you had seen them be in an argument

12   there at the pizza place?

13    A.   Correct.

14    Q.   Did you describe a — recalling something occurring

15   around the video games?

16    A.   Correct.  Um, as you go to Denny's Pizza, there is a

17   video game.  It's in the middle.  And there is a corridor that

18   leads up there.  At the time that I was there — it wasn't that

19   I was working there at that time at all.  This was just

20   shortly before April that I had seen the two arguing in the

21   hallway.  Her arms went up and then she ran after him.  But,

22   that's the only thing I seen there.

23    Q.   Thank you.

24           MR. FRASIER:   That's all I have.

25           THE COURT:   You may step - - -

```
                                          Smith   D    D3 188
 1                 MS. McCREA:    (Interposing) (Not

 2  understandable) - - -

 3                 THE COURT:   - - - step down.  You are - - -

 4                 WITNESS:    (Interposing) Okay.

 5                 THE COURT:   - - - released from further

 6  attendance.

 7                 WITNESS:   Alrighty.  Thank you.

 8                 THE COURT:   Call your next witness.

 9                 MS. SOUBLET:    The State call Officer Pat

10  Smith.

11                 THE COURT:   Raise your right hand, please.

12                    PATRICK DEXTER SMITH

13  was thereupon produced as a witness on behalf of Plaintiff

14  and, having first been duly sworn to tell the truth, the whole

15  truth and nothing but the truth, was examined and testified as

16  follows:

17                 THE COURT:   Have a seat up here, please.

18                 WITNESS:   Thank you, sir.

19                    DIRECT EXAMINATION

20  BY MS. SOUBLET:

21     Q.   Officer Smith, can you state your name and spell

22  your last for the record?

23     A.   Patrick Dexter Smith, S-M-I-T-H.

24     Q.   And how are you employed?

25     A.   I'm a Police Officer with City of Coquille Police
```

D3 189                                    Smith   D

1   Department.

2        Q.   How long have you been with Coquille PD?

3        A.   Since March 2005.

4        Q.   Okay.  Do you have any prior law enforcement

5   experience?

6        A.   I do.

7        Q.   And where was that?

8        A.   In the City of Coburg, in the City of Oakridge, and

9   in California.

10        Q.   Okay.  So, how many total years law enforcement

11   experience?

12        A.   Somewhere in the neighborhood of a little over

13   fifteen years.

14        Q.   I'm sorry.  Did you say fifteen?

15        A.   Fifteen.

16        Q.   And what's your current assignment at Coquille

17   Police Department?

18        A.   I'm a Patrol Officer.

19        Q.   Okay.  Do you have any other special duties that you

20   do for the Police Department?

21        A.   I'm a Evidence Custodian.

22        Q.   Can you tell the — the jurors what an Evidence

23   Custodian does?

24        A.   It's my task to make sure that the evidence that's

25   logged in is what the officer says is prop — it's properly

Smith  D    D3 190

1  packaged in some type of integrity packaging.  And then,

2  depending on what the officer requests, whether it be shipped

3  off to the lab for further testing, some other facilities for

4  additional testing, or lodged into evidence and then held for

5  Court.  And then, I release property from the evidence room

6  for — for Court purposes or other purposes.

7      Q.   And do you keep, in the normal course of Police

8  Department business, any records or logs of items that come

9  into evidence and when they leave (not understandable)?

10     A.   I do.

11     Q.   How long have you been the Evidence Custodian?

12     A.   Uh, since December 2008.

13     Q.   And at that time was the Coquille Police Department

14 located in the same building it's located in now?

15     A.   Uh, since December 2 — yes, it was.  Since the —

16 since the time I've been the Evidence Custodian.

17     Q.   And prior to that, when you started in March of

18 2005, was it located someplace different?

19     A.   It was.

20     Q.   Was there a time when you moved?

21     A.   We did.

22     Q.   And when do you — when was that?

23     A.   That was around August 2007, September 2007,

24 somewhere in that time period.

25     Q.   And during that move — do you remember what day of

D3 191                                    Smith  D

1   the week the move occurred on?

2       A.   Uh, we finalized moving — the evidence room was the

3   last thing that we moved from the old City Hall, which was on

4   a Friday.  Uh, sometime during that time period.

5       Q.   And where is the evidence room located at the new

6   location — the credit union building?

7       A.   Um, it's in kind of a basement area underneath the

8   City Manager's Office.

9       Q.   And how does one access that — that room?

10      A.   There is a single-door entrance just outside the

11  drive-thru area of the City Hall.

12      Q.   And did you notice anything or have any concerns

13  about that evidence room when you did the move from the old

14  City Hall to the credit union building.

15      A.   Well, there were a couple things.  Number One, when

16  we moved in there, there wasn't any electrical supply outlets

17  for inside the room.  Um, and then there was — the exterior

18  door that was on the evidence room had the hinges on the

19  outside of the door, which would make it easy for anyone to be

20  able to come through and pop the hinges out, remove the door,

21  and gain access.

22      Q.   Did you do anything to rectify that problem with the

23  door?

24      A.   I did.

25      Q.   And what was that?

Smith   D    D3 192

1    A.    I went to the Coquille Supply and purchased a door —

2    a metal door, and installed it on the inside of that same door

3    jamb so there would be a door with an inside swing with a

4    deadbolt on it, and then the door on the outside.  So, there

5    is actually two doors on one door jamb.

6    Q.    And do you remember how — you indicated you had a

7    dead bolt?  Is that correct?

8    A.    Yes.  There is a dead bolt.

9    Q.    And who had keys to the evidence room over that

10   weekend?

11   A.    Myself and Officer Randy Ulmer.

12   Q.    And were you, prior to finishing up your work week

13   that week, able to move all the evidence from the old location

14   to the new location?

15   A.    Yes.  We did it all in one day.

16   Q.    And as part of that move, was there any sort of

17   refrigeration source?

18   A.    There was.

19   Q.    Okay.  And what's kept in the refrigerator?

20   A.    Uh, generally, evidence from biohazardous type

21   materials.

22   Q.    And where was that item placed?

23   A.    That was placed inside the evidence room.

24   Q.    Was there ever an opp — ever a time during that

25   move, from the old location to the new location, that that

D3 193                                        Smith  D

1   refrigerator was left outside, unattended, and unsecured?

2        A.   No.

3        Q.   And how long was it before you were able to get an

4   electrical socket in that room?

5        A.   We'll we moved in on that Friday.  I worked in the

6   evidence room most of that weekend securing that new door.

7   And it was that Friday when I realized there wasn't electrical

8   outlets, so I talked with the Director of Public Works.  And

9   he got a hold of an electric company and they were there the

10  following Monday.

11       Q.   And when you returned to work on Monday, did you

12  have an opportunity to observe the refrigerator?

13       A.   I did.

14       Q.   Was it still secured?

15       A.   It was still secured.

16       Q.   Was there anything else you noticed about it?

17       A.   I noticed some drainage coming from the

18  refrigerator.

19       Q.   And who was the Evidence Custodian at that time?

20       A.   Randy Ulmer.

21       Q.   Was there ever an opportunity after you moved from

22  the old location to the new location for there to be an audit

23  conducted of the evidence?

24       A.   There was.

25       Q.   And when was that?

Smith  D    D3 194

1    A.    That was sometime during the January — or,

2  December/January — well, December 2008, January 2009,

3  somewhere in that area.

4    Q.    Now, as a result of that audit, are you aware of any

5  problems with evidence related to the Leah Freeman case being

6  missing?

7    A.    Everything was accounted for.

8    Q.    When you started at the Coquille Police Department

9  back in March of 2005, were you aware of or assigned to the

10  Leah Freeman case at that time?

11    A.    No.

12    Q.    Okay.  When did you become assigned to it?

13    A.    Well, I don't think we — really anyone was

14  specifically assigned to it until after Chief Mark Dannels

15  arrived here in Coquille.  Um, we specifically had material

16  and documents, and things of that nature, that I would put

17  together periodically.  Uh, but not until after Chief Dannels

18  arrived did we actually, specifically, start the investigation

19  again.

20    Q.    When you say "materials and documents" are you

21  referring to police reports or evidence?

22    A.    Police reports.

23    Q.    And when you say "put them together" what do you

24  mean?

25    A.    Well, when we first — when I first arrived here in

```
     D3 195                              Smith  D
```

1    March of 2009, a variety of officers had come and gone through

2    the Coquille Police Department.  So there was a variety of

3    documents, police reports, follow-up sheets, notes, things of

4    that nature were placed in different offices and things of

5    that nature in the Police Department.

6         Q.   I'm sorry, Officer Smith, did you say when you

7    arrived in March 2009 or 2005?

8         A.   I'm sorry.  March of 2005.

9         Q.   So, when you say you started gathering reports, how

10   long did it take you to put those reports together in one

11   place?

12        A.   Off and on through the course of a couple years.

13        Q.   Was this the only case that you were working on at

14   that time?

15        A.   No.

16        Q.   Was there — this the only case that anyone in the

17   department was working on at that time?

18        A.   No.

19             MS. McCREA:    May I have Exhibit 82?

20        Q.   Officer Smith, I'm going to hand you what's been

21   marked as Exhibit 82.  I believe it's your Evidence Item

22   No. 159.  And ask if you can tell me when that item was lodged

23   into evidence at the Coquille Police Department?

24        A.   It was lodged into evidence on July 1, 2000.

25        Q.   And do you show in your records that item ever

```
                                          Smith   D    D3 196
```

1   having been released?

2        A.   No, ma'am.

3        Q.   And how can you verify or assure that it's the same

4   exhibit?

5        A.   Uh, the evidence tape was placed on the evidence —

6   top of the envelope.  And this is a specialized integrity

7   tape.  You can't break the seal — you can't open the envelope

8   without breaking the seal.

9        Q.   And did you have an opportunity to open

10  Item No. 159, in preparation for this Trial?

11       A.   Yes, ma'am.

12       Q.   And inside that is there an exhibit sticker on the

13  item inside?

14       A.   There is.

15       Q.   And what's that exhibit sticker number?

16       A.   State's Exhibit 82.

17       Q.   Thank you.

18            MS. McCREA:    Put that back, please.

19       Q.   Mr. Smith, I'm going to hand you what's been marked

20  as State's Exhibit — I believe it's your Evidence Item   No.

21  160 — and ask if you can tell me when that item came into

22  evidence at Coquille Police?

23       A.   On July 4, 2000.

24            THE COURT:    I'm sorry.  The exhibit number,

25  again?

```
      D3 197                              Smith  D
```

1          WITNESS:    Exhibit No. is — Exhibit No. 96.

2          THE COURT:    Thank you.

3          Sorry.

4      Q.   Your Evidence Item No. is - - -

5      A.   No. 160.

6      Q.   Okay.  And do you show that item as ever having been

7  released or returned to the Police Department?

8      A.   I do, on several occasions.

9      Q.   Okay.  Can you tell the jury when that was?

10     A.    It was released and sent to the Crime Lab, to Oregon

11  State Police, on March 10, 2000.  It was returned from the lab

12  on September 29, 2000.  It was released and shipped to the

13  United Kingdom on March 25, 2001.  It was returned to Coquille

14  Police Department on March 25, 2010.  It was shipped to Micro

15  Trace on May 19, 2010.  Returned on April 8, 2011.  Released

16  for forensic examination by — to Kenn Meneely on — on

17  May 28, 2011.  And returned it back to evidence on

18  June 8, 2011.

19     Q.   And again, as with the previous item, how can you

20  assure or verify that this exhibit is in the same condition —

21  same item - - -

22     A.   (Interposing) It has the original packaging — um,

23  the original tag, and it would have been sealed with integrity

24  tape on multiple occasions.

25     Q.   Officer Smith, in reference to Exhibit 96, can you

```
                              Smith  D    D3 198
```
1  tell me when the first day was you show it leaving Coquille

2  Police Department?

3      A.   On March 10, 2000.

4      Q.   Okay.  Officer Smith, do you have copies of the

5  documents you prepared for Trial today?

6      A.   I do, here.

7      Q.   Okay.  I'm asking you — we are looking at Evidence

8  Item No. 160.  And can you tell me when the first time that

9  item came in to Coquille Police Department?

10      A.   It came into Coquille Police — I'm sorry — on

11  July 4, 2000.

12      Q.   Okay.  And when was the first time it was released

13  from the Coquille Police Department?

14      A.   July 10, 2011.

15      Q.   Okay.  I'm going to show you what's been marked, for

16  identification purposes, State's Exhibit 97.  I believe it's

17  your Evidence Item No. 170.  And as you if you can tell me

18  when that item came into evidence?

19      A.   That item came into evidence, lodged on

20  July 5, 2000.

21      Q.   And do you — when do you show that item having been

22  released from Coquille Police Department?

23      A.   July 10th of 2000.

24      Q.   And when was it returned?

25      A.   September 29, 2000.

```
D3 199                              Smith  D
```

1     Q.   Can you go through the other times that item was

2  released and returned to the Coquille Police Department?

3     A.   Released on March 25, 2001.  Returned on

4  March 15, 2010.  Released on May 19, 2010.  Returned on

5  April 8, 2011.  Released on May 28, 2011.  And returned on

6  June 8, 2011.

7     Q.   And, Officer Smith, those times, you are talking

8  about Exhibit No. 97, your Evidence Item No. 170, being

9  released.  Where was it released to?

10     A.   The first time the evidence was released was to the

11  Oregon State Crime Lab.  The second time it was released, was

12  sent to United Kingdom.  The third time it was released it

13  went to Micro Trace.  And the final time it was released it

14  went out to Kenn Meneely for forensic examination.

15     Q.   And how can you verify or assure that that a —

16  Exhibit No. 96, your Evidence Item No. 170, is the same item?

17     A.   It has the original packaging material, it has the

18  original tag from the evidence, and it's been sealed every

19  time with evidence tape.

20     Q.   Officer Smith, I'm showing you what's been marked,

21  for identification purposes, State's Exhibit 202, your

22  Evidence Item No. 168.  And ask me (sic) if you can tell me

23  when that item was lodged into evidence at Coquille Police

24  Department?

25     A.   Item No. 168 was lodged into the Coquille Police

```
                                      Smith  D   D3 200
```

1   Department on July 5, 2000.

2       Q.   And do you show this having been released to anyone?

3       A.   It was released to the Oregon State Crime Lab on

4   July 10, 2000.

5       Q.   And when was it returned?

6       A.   It was returned on October 13, 2000.

7       Q.   And when was the next time that item was released?

8       A.   It was released to the United Kingdom on

9   March 25, 2001.

10      Q.   And when was it returned?

11      A.   It was returned to the Coquille Police Department on

12  March 15, 2010.

13      Q.   And how can you assure that that Exhibit 202, your

14  Evidence Item No. 160, is in the same condition?

15      A.   They have the same original packaging material and

16  it's been secured with evidence tape — has the original tag

17  still on it.

18      Q.   Officer Smith, I'm handing you what's been marked,

19  for identification purposes, State's Exhibit 203, your

20  Evidence Item No. 171.  Asking you if you can identify that

21  for me?

22      A.   Item 171 is one toothbrush from the victim.

23      Q.   And when do you show that item as having been lodged

24  into Coquille Police Department evidence?

25      A.   It showed being lodged in on July 11, 2000.

```
D3 201                                    Smith  D
```

1    Q.   And do you show that item as having been released to

2  anyone?

3    A.   I do.  I show it was, um, released to the Crime Lab

4  in, uh, — July 10, 2000.  It was returned from the crime lab

5  on September 29, 2000.  It was again released to United

6  Kingdom on March 25, 2001.  And returned to the Coquille

7  Police on March 15, 2010.

8    Q.   And how can you assure that your Item No. 171 is in

9  the same condition?

10    A.   It's in the original packaging.  And it still has

11  the originally evidence tape and tag on it.

12    Q.   Officer Smith, I'm handing you what's been marked,

13  for identification purposes, as State's Exhibits 204 and 205 —

14  your Evidence Items No.'s 182 and 183 — and ask you if you can

15  tell me when those items came into the Coquille Police

16  Department?

17    A.   Item No. 182 was lodged in on July 19, 2000.  And

18  our Item No. 183 was lodged into evidence on July 24, 2000.

19    Q.   And when was Evidence Item No. 182 released?

20    A.   It was released to the Oregon State Crime Lab on

21  July 24, 2000 and returned on September 29, 2000.

22    Q.   What about Evidence Item No. 183, Exhibit 205?

23    A.   It was also released to the Crime Lab on

24  July 24, 2000 and returned on September 29, 2000.

25    Q.   And what is Exhibit No. 204, your Evidence Item

```
                                    Smith   D    D3 202
```

1   No. 182?

2       A.   No. 182 is, uh, from Cory Freeman, and it is a DNA

3   sample.

4       Q.   And what is Exhibit 205, your Evidence Item No. 183?

5       A.   It's also a DNA sample from Dennis Freeman.

6       Q.   And how can you assure that those two exhibits are

7   the same exhibits?

8       A.   It's in the original packaging and it's still

9   secured with evidence tape.

10      Q.   Officer Smith, I'm handing you what's been marked,

11  for identification purposes, as State's Exhibit 206, your

12  Evidence Item No. 190.  Asking you, first, to identify that

13  for me and tell me what it is.

14      A.   No. 190 it's a mouth swabs and pubic head standards.

15      Q.   From?

16      A.   From, uh, Mr. Nick McGuffin.

17      Q.   And when was Evidence Item No. 190, Exhibit 206,

18  lodged in the Coquille Police Department?

19      A.   It was lodged on July 28, 2000.

20      Q.   And when was it released to the crime lab?

21      A.   It was released to the Oregon State Crime Lab on

22  March 28, 2000.  Returned on September 19, 2000.

23      Q.   Officer Smith, I'm going to back you up there - - -

24      A.   (Interposing) I'm sorry.

25      Q.   - - - and ask you to look at your documents again

D3 203                                        Smith  D

1    and tell me when it was released to the Crime Lab?

2        A.   Again, my records — my note says, "Crime Lab Oregon

3    State Police on July 28, 2000."

4        Q.   Okay.  And when was it returned from the Crime Lab?

5        A.   September 19, 2000.

6        Q.   And when was it released to the United Kingdom?

7        A.   On March 25, 2001.

8        Q.   And when was it returned?

9        A.   On March 15, 2010.

10       Q.   Officer Smith, I'm going to hand you your Evidence

11   Item No. 192.  And ask you to tell me when that item was

12   lodged into evidence at Coquille Police Department?

13       A.   On July 29, 2000.

14       Q.   Okay.  And do you ever show records of that item

15   having been released to anyone?

16       A.   No.

17       Q.   I'm going to ask you to look inside exhibit — your

18   Evidence Item No. 192 and tell me if there are documents in

19   there with exhibit stickers on them?

20       A.   There are.

21       Q.   Okay.  And can you read what those exhibit stickers

22   are?

23       A.   State's Exhibit No. 80, 85, 86, 87, and 228.

24       Q.   And Officer Smith, how do you know that your Item

25   No. 192 is in the same condition as it was when it was

```
                                    Smith   D    D3 204
 1  received?
 2      A.   It's in the same packaging in there that has
 3  evidence tape on it.
 4      Q.   Okay.  And did you have an opportunity to open up
 5  that bag in preparation for this Trial?
 6      A.   I did.
 7      Q.   And are the contents in similar — the same condition
 8  as when you opened them last week?
 9      A.   Yes.
10      Q.   I'm handing you your Item No. 199, Exhibit No. 93,
11  and ask me — if you can tell me when that item came into
12  evidence at Coquille Police Department?
13      A.   Lodged into evidence on July 29, 2000.
14      Q.   And inside that bag is there a item with an exhibit
15  sticker on it?
16      A.   There is.
17      Q.   What's that exhibit sticker?
18      A.   State's Exhibit No. 93.
19      Q.   Did you ever show that item having been released
20  from Coquille Police Department?
21      A.   I do not.
22      Q.   How do you know it's the same exhibit as it was when
23  it was lodged?
24      A.   It has the same packaging material is in here as it
25  was before.
```

```
    D3 205                              Smith  D
```

1      Q.   Officer Smith, I'm going to hand you what's been

2    marked, for identification purposes as State's Exhibit 98,

3    your Evidence Item No. 212.  And ask you if you can tell me

4    when that item was lodged into evidence?

5      A.   This was item was lodged into evidence on

6    August 4, 2000.

7      Q.   And what is your Evidence No. 212, State Exhibit 98?

8      A.   Blue jean pants.

9      Q.   Okay.  And when were those items (sic) released from

10   your custody?

11     A.   Was sent to the Oregon State Crime Lab on

12   August 9, 2000.

13     Q.   And when — were they returned?

14     A.   They were not returned.  They were released

15   subsequently from that location on March 25, 2001 to United

16   Kingdom.

17     Q.   And when were they returned from the United Kingdom?

18     A.   On March 15, 2010.

19     Q.   And when were they shipped to Micro Trace?

20     A.   On May 19, 2010.

21     Q.   And when were they returned?

22     A.   On April 8, 2011.

23     Q.   And were they sent anywhere else after that?

24     A.   They were sent to Kenn Meneely for forensic

25   examination on May 28, 2011 and returned on June 28, 2011.

Smith   D   D3 206

1     Q.   And how can you be sure that that exhibit is the

2   same exhibit - - -

3     A.   (Interposing) I'm sorry.  Just to clarify that.  I

4   read the wrong date on this.  They were returned to Coquille

5   Police on June 8, 2011.

6     Q.   Thanks for that clarification.

7          And how can you be sure that that Evidence Item

8   No. 212, Exhibit 98, is in the same condition?

9     A.   It's in the — has the original packaging material

10   with it, and still secured with evidence tape.

11     Q.   Officer Smith, I'm handing you what's been marked,

12   for identification purposes, as State's Exhibit 99, your

13   Evidence Item No. 213.  And ask if you can first tell me —

14   identify what that is?

15     A.   This is a tank top.

16     Q.   Okay.  And when was that item lodged into Coquille

17   Police Department custody?

18     A.   On August 4, 2000.

19     Q.   And when was it sent to the Crime Lab?

20     A.   Sent to the Crime Lab on August 9, 2000.

21     Q.   And when was it released from there to the United

22   Kingdom?

23     A.   On March 25, 2001.

24     Q.   And when was it returned from the United Kingdom?

25     A.   On March 15, 2010.

```
     D3 207                                    Smith   D
```

1      Q.   And when was it shipped to Micro Trace?

2      A.   On May 19, 2010.

3      Q.   And when was it returned from Micro Trace?

4      A.   On April 8, 2011.

5      Q.   And when was it sent to Mr. Meneely and returned to

6    from Mr. Meneely?

7      A.   It was picked up by Mr. Meneely on May 28, 2011 and

8    returned on June 8, 2011.

9      Q.   And how can you be sure that Evidence Item No. 213,

10   Exhibit 99, is the same exhibit?

11     A.   It has the originally packaging and still has

12   evidence tape secured.

13     Q.   Officer Smith, I'm going to hand you what's been

14   marked, for identification purposes, as State's Exhibit 100,

15   your Evidence Item No. 213.  And ask you, first, if you could

16   tell me what that is?

17     A.   This is a sports bra.

18     Q.   And when was that item received first into Coquille

19   Police Department custody?

20     A.   On August 4, 2000.

21     Q.   And when was it sent to the Crime Lab?

22     A.   On August 9, 2000.

23     Q.   And when was it released and returned to and from

24   the UK?

25     A.   It was released on March 25, 2001 and returned on

```
                                     Smith   D    D3 208
```

1  March 15, 2010.

2      Q.   And when was it shipped to and returned from Micro

3  Trace?

4      A.   It was released on May 19, 2010 and returned on

5  April 8, 2011.

6      Q.   And when was it sent to Mr. Meneely and returned

7  from Mr. Meneely?

8      A.   It was picked up on May 28, 2011 and returned on

9  June 8, 2011.

10      Q.   And how can you be sure that Item No. 214,

11  Exhibit 100, is the same?

12      A.   It has the original packaging material and it's

13  still secured with evidence tape.

14      Q.   Officer Smith, I'm handing you what's been marked,

15  for identification purposes, as State's Exhibit 201, your

16  Evidence Item No. 215.  Asking you, first, to identify that

17  for me.

18      A.   Item 215 is a left sock.

19      Q.   And when was that item lodged into Coquille Police

20  Department evidence?

21      A.   On August 4, 2000.

22      Q.   And when was it released to the Crime Lab?

23      A.   On August 9, 2000.

24      Q.   And when was it sent to and returned from the UK?

25      A.   Released on March 25, 2001.  And returned on

```
D3 209                                    Smith  D
```

1   March 15, 2010.

2       Q.   And how can you be sure that that item is Exhibit

3   No. 201, your Evidence Item No. 215, is the same?

4       A.   It's still in the original packaging material and

5   still secured with evidence tape.

6       Q.   Officer Smith, I'm handing what's — your Evidence

7   Item No. 167.  Asking you, first, if you can identify what

8   that is?

9       A.   It's a metal box containing the victim's diary.

10      Q.   And when was that item lodged into evidence?

11      A.   It was lodged on July 7, 2000.

12      Q.   And do you ever show that item being released?

13      A.   It was released to the Case Officer on

14  March 15, 2001.  And it was returned back to the evidence room

15  on March 16, 2001.

16      Q.   And how can you be sure that, uh, exhibit — your

17  Evidence Item No. 167, Exhibit 90, is the same?

18      A.   It still has the — the original tag and still

19  secured with evidence tape.

20      Q.   Officer Smith, I'm going to ask you to pull out the

21  tin, open it up — the inside of it — and tell me if there are

22  items in there with exhibit numbers on them.

23      A.   State's Exhibit 9-0, State's Exhibit 88, State's

24  Exhibit 89, State's Exhibit 92, and State's Exhibit 91.

25      Q.   And how can you be sure that those exhibits, your

1  Evidence Item No. 167, are in the same condition?

2      A.   They are in the original packaging with, uh —

3  secured with evidence tape.

4      Q.   Officer Smith, I'm going to hand you your Evidence

5  Item No. 3873.  Ask you if you can open that up and tell me,

6  are there documents inside with exhibit stickers on them?

7      A.   You ask that I open this up?

8      Q.   Yes.  Are there documents inside with exhibit

9  stickers on them?

10     A.   There are.

11     Q.   And what are those exhibit stickers?

12     A.   State's Exhibit 83 and State's Exhibit 84.

13     Q.   And when were those documents lodged into Coquille

14 Police Department evidence?

15     A.   On April 6, 2011.

16     Q.   And how can you be sure that those items are in the

17 same condition?

18     A.   It's in the packaging when it was packaged for

19 evidence and secured with tape.

20     Q.   Officer Smith, I'm going to hand you what's been

21 marked as your Exhibit No. 3 — your Evidence Item No. 3206.

22 Ask you to look at that and tell me are there documents inside

23 with exhibit stickers on them?

24     A.   There is.

25     Q.   Okay.  And what's that exhibit sticker?

```
     D3 211                              Smith   D
```

1          A.   No. 81.

2          Q.   When was that item lodged into evidence?

3          A.   It was lodged into evidence on January 28, 2010.

4          Q.   And how can you be sure that that item is in the

5     same condition as it was?

6          A.   It's in the original packaging with evidence tape.

7          Q.   Officer Smith, I'm handing you your Evidence Item

8     No. 3197.  Asking you to open that and tell me are there items

9     inside with exhibit stickers on them?

10         A.   There is.

11         Q.   Okay.  And what are the exhibit stickers?

12         A.   It's State's Exhibit 230.

13         Q.   Okay.  And when was that item lodged into Coquille

14    Police Department?

15         A.   It was lodged on July 25, 2010.

16         Q.   Okay.  And do you show that item ever having been

17    released?

18         A.   It was released to Grand Jury on July 20, 2010.

19         Q.   And returned on when?

20         A.   On the same day.

21         Q.   And how can you be sure that that evidence item

22    number is in the same condition?

23         A.   It's in the — the same packaging and evidence tape.

24         Q.   Officer Smith, I'm handing you what's been

25    identified as your Evidence Item No. 3201, and asking you if

```
                                    Smith  D   D3 212
 1   you can tell me when that item came into evidence?
 2       A.   This was lodged into evidence on July — or, I'm
 3   sorry, January 25, 2010.
 4       Q.   Officer Smith, I'm going to ask you to open up that
 5   evidence bag — item, and tell me are there documents inside
 6   with State's exhibits stickers on them?
 7       A.   There is.
 8       Q.   And what's the exhibit number?
 9       A.   No. 216.
10       Q.   And when was that item lodged into evidence?
11       A.   On January 25, 2010.
12       Q.   Do you ever show that item having been released from
13   evidence?
14       A.   No, ma'am.
15       Q.   How can you be sure it's the same exhibit?
16       A.   It's in the same original packaging secured with
17   evidence tape.
18       Q.   And finally, your Evidence Item No. 3203.  Asking
19   you to tell me when that item came into Coquille Police
20   Department custody.
21       A.   On January 25, 2010.
22       Q.   Can you open it up and tell me are there documents
23   inside with State's exhibit stickers on them?
24       A.   There is.
25       Q.   And what's that exhibit number?
```

```
     D3 213                                    Smith  D
```

1    A.   Exhibit No. 229.

2    Q.   Do you ever show that evidence item number being

3 released from Coquille Police Department custody?

4    A.   It was released to Grand Jury on July 20, 2010,

5 returned that same day.

6    Q.   And how can you be sure it's the same exhibit?

7    A.   It's still secured with evidence tape and in the

8 original packaging.

9    Q.   Officer Smith, I want to shift gears and talk about

10 your involvement in the Leah Freeman investigation.

11        Actually, Officer Smith, before we start talking

12 about your investigation — your role in the Leah Freeman

13 investigation, why did you do an audit of the evidence room in

14 December of 2008?

15   A.   There was an indiscretion from the Evidence

16 Custodian prior to that time.  And when it came to light we

17 secured the evidence room.  And based on an investigation from

18 an outside agency, it was recommended that a complete audit be

19 made.

20   Q.   And by indiscretion, you mean Officer Randy Ulmer

21 stole money from the evidence room?

22   A.   Yes, ma'am.

23   Q.   Now, turning your attention to your role in the Leah

24 Freeman investigation.  On October 18, 2009, were you working

25 that day?

```
                                      Smith   D    D3 214
 1        A.   I was.

 2        Q.   Did you have an opportunity to go to the McGuffin

 3   residence?

 4        A.   I did.

 5        Q.   And where is that located?

 6        A.   56246 Baker Road.

 7        Q.   And what was your understanding of the reason for

 8   going there?

 9        A.   Uh, Chief Dannels had had a couple prior contacts

10   with Bruce and Kathleen McGuffin, in connections to their

11   wanting to discuss the case with Chief Dannels.

12        Q.   So, were you invited there?

13        A.   We were.

14        Q.   And how long were you at the residence that day?

15        A.   Probably under two hours.

16        Q.   And how would you describe the tone of the

17   conversation that day?

18        A.   Oh, it was very good.

19        Q.   And at some point during the two hours you were

20   there at the McGuffin residence, did the Defendant arrive?

21        A.   He did.

22        Q.   And during that time there, did he ever make

23   statements to you about knowing the identity of who killed

24   Leah Freeman?

25        A.   He did.
```

```
D3 215                                   Smith  D
```

1     Q.    Did he give you a name?

2     A.    He did not.

3     Q.    Did he ever make statements about documents which

4  would clear is — prove him innocent?

5     A.    He did.

6     Q.    Did he provide those documents to you?

7     A.    He did not.

8     Q.    And on January 2010, did you participate in a Search

9  Warrant at the McGuffin residence?

10    A.    I did.

11    Q.    And what was your role there?

12    A.    Pretty much just kind of overseeing everything.

13 Doing logistics, getting packaging material for the officers

14 that were conducting searches.

15    Q.    Acting as an Evidence Custodian?

16    A.    Um, I was assisting with making sure they had

17 everything necessary for it, and that it lodged into evidence

18 properly.

19    Q.    Thank you.

20          MS. SOUBLET:    I have nothing further.

21          THE COURT:   Ms. McCrea?  Or, is it

22 Mr. McCrea?

23          MR. McCREA:   (No audible response.)

24                 CROSS EXAMINATION

25 BY MR. McCREA:

Smith  X   D3 216

1       Q.   When you served the Search Warrant, uh, that was to

2   find the documents that talked about who killed Leah Freeman?

3       A.   Yes, sir.

4       Q.   And, there — there were letters and so forth told

5   about people that supposedly did this?  Isn't that correct?

6       A.   Yes, sir.

7       Q.   And these were — these were then used as the basis

8   for further investigation?

9       A.   Yes, sir.

10      Q.   But, none of those documents indicated that this had

11  been done by Mr. McGuffin?  Isn't that correct?

12      A.   Not to my knowledge.  I didn't read the documents.

13      Q.   All right.  (Not understandable) - - -

14           In conjunction with the exhibits, and for easy

15  reference, the — the shoes that were put into evidence, let's

16  call them Leah's shoes just for easy reference.  Okay?

17      A.   Yes, sir.

18      Q.   All right.  Um, one shoe reportedly came from up by

19  the cemetery?  Correct?

20      A.   Yes, sir.

21      Q.   And which one is that, Detective?  Is that the right

22  shoe or the left?

23      A.   All I have listed on my information is Item No. 160.

24      Q.   Okay.  So, you don't indicate which?

25      A.   No, sir.

```
     D3 217                                    Smith   X
 1        Q.    Then, do your records show whether it was the right
 2   or left shoe that was found up at Hudson Ridge?
 3        A.    That would be Item No. 170.  And, no, sir, my — my
 4   documents don't show that.
 5        Q.    Okay.  They're — that's one of the things you
 6   identified here?
 7        A.    Yes, sir.
 8                MR. McCREA:   May we — may we see 96 and 97?
 9                MR. FRASIER:   I can answer the question if
10   you wish.
11                MS. McCREA:   Okay.
12                MR. FRASIER:   No. 160, or Exhibit 96, is the
13   right shoe from the cemetery.  Exhibit 97, Item No. 170, the
14   left shoe from Hudson Ridge.
15                MS. McCREA:   Okay.  Got it.
16                Thank you.
17        Q.    Thank you very much.
18                MR. McCREA:   That's all.
19        A.    Your welcome, sir.
20                THE COURT:   Any redirect?
21                MS. SOUBLET:   No, Your Honor.
22                THE COURT:   Do you want this witness to
23   remain available?
24                MS. SOUBLET:   He — Your Honor, yes.  Subject
25   to recall, but he may be released at this time.
```

D3 218

1              THE COURT:    You — you may leave at this

2    point, but you are still subject to recall.

3              WITNESS:    Yes, sir.  Thank you.

4              THE COURT:    And I take it that's it for the

5    day?

6              MR. FRASIER:    I — I would like to do at this

7    time, Your Honor, based on the testimony that we have heard so

8    far, offer certain exhibits.

9              We would offer State's Exhibits 85, 86, and 87.

10             THE COURT:    Any objection to those?

11             MS. McCREA:    May we see them?

12             THE COURT:    (No audible response.)

13             MR. McCREA:    We have no further objections

14   other than what I've already been litigating,    Your Honor.

15             THE COURT:    Okay.  Those — they are received.

16             (Whereupon Plaintiff's Exhibit Nos. 85, 86, and

17   87 were received into evidence.)

18             MR. FRASIER:    Thank you, Your Honor.

19             And then, in regards to Sergeant Zanni's — or,

20   Sheriff Zanni's testimony, we would offer State's Exhibits 88,

21   89, 90, 91, and 92.

22             MR. McCREA:    Your Honor, we have no further

23   objection beyond what we've - - -

24             THE COURT:    (Interposing) They are - - -

25             MR. McCREA:    - - - already - - -

D3 219

1                    THE COURT:    - - - received.

2                    MR. McCREA:    - - - litigated.

3                    THE COURT:    Thank you.

4                    (Whereupon Plaintiff's Exhibit Nos. 88, 89, 90,

5     91, and 92 were received into evidence.)

6                    MR. FRASIER:    And finally, we would offer

7     202, the hair brush, and State's Exhibit 93, the annual.

8                    THE COURT:    I'm sorry.  The exhibit numbers,

9     again, were?

10                    MR. FRASIER:    No. 93 and 202.

11                    MS. McCREA:    (Simultaneously) 202.

12                    THE COURT:    Thank you.

13                    MS. McCREA:    I don't - - -

14                    MR. McCREA:    Your Honor, as to 93, we object

15    on the grounds of relevance.  And it — it's — there may be

16    some inference that the State feels can be drawn from this.

17    But, if we are going to — we are going to have to be

18    enlightened regarding what that is, because it isn't readily

19    apparent on the face of it, as to the issues in this case.

20                    THE COURT:    Is there a particular page?

21                    MR. McCREA:    And — pardon?

22                    MR. FRASIER:    There is several photographs in

23    there of Ms. Freeman that are circled — or, with hearts.

24    There is a picture in one part where it's not clear, but the

25    handwriting on the side identifies it as Leah.  And then there

D3 220

1   is some comments about "my girl", something to that effect.  I

2   can point these out to counsel.  Or, - - -

3                  THE COURT:    (Interposing) Okay.

4                  MR. FRASIER:    - - - at — at a later - - -

5                  THE COURT:    (Interposing) What about 202?

6   Are you going to object to 202?

7                  MR. FRASIER:    In fact, what I can do is I'll

8   - - -

9                  MR. McCREA:    (Interposing) No.

10                  MR. FRASIER:    I will scan out the pictures I

11  think are relevant.

12                  THE COURT:    Okay.

13                  MR. McCREA:    Oh.

14                  THE COURT:    No. 202 is received.

15                  (Whereupon Plaintiff's Exhibit No. 202 was

16  received into evidence.)

17                  MR. McCREA:    Yeah.

18                  THE COURT:    Uh, and that's the last time —

19  uh, things you are going to offer?

20                  MR. FRASIER:    Yes.

21                  THE COURT:    Okay.  So, I can let the jury go?

22  Correct?

23                  MR. FRASIER:    Yes.

24                  THE COURT:    Okay.  There is no more witnesses

25  today.  We are not working tomorrow, as I indicated to you.

```
     D3 221
```

1   So, we'll come back Friday.  And if you get here at 9:00.

2                   I have stuff Monday morning.

3                   JUDICIAL ASSISTANT:    (Not understandable.)

4                   THE COURT:    Monday.  Did I say Friday?

5                   JURORS:    Yes.

6                   (Laughter.)

7                   THE COURT:    I really — we all know you are

8   listening.

9                   (Laughter.)

10                  So, Monday — I have stuff Monday.  And, uh, it

11  depends on how it goes, whether I'll get it done.  So, just be

12  here at 9:00.  We'll try to get started as soon thereafter as

13  we can.

14                  Remember the admonition — leave your notes

15  here.  Specifically, remember your admonition — this is three

16  days.  Don't allow anybody to talk to you.  Don't talk about

17  the case.  Don't do anything in relation to investigating,

18  looking up things, going online, reading papers, doing

19  anything about the case at all.  Keep that in mind.

20                  Everybody else in the courtroom remain seated

21  until the jury has a chance to leave.

22                  And you can probably leave your buttons here if

23  you want.  You can get them Monday morning, so you don't

24  forget them.

25                  THE COURT:    Is that it, Cathy?  One more —

D3 222

1  two more.  Okay.  There they go.

2              (Jury out.)

3              THE COURT:   (Interposing) Okay.  Mr. Frasier,

4  as I understand it, you are going to specifically point out to

5  the defense what pages you are interested in — or, scan the

6  ones you are looking at?

7              MR. FRASIER:   Yes.  I can do that.  I'll

8  either do it tonight or first thing in the morning and I can

9  email it to counsel.

10             THE COURT:   Okay.  So, I'll hold ruling on —

11 on 93 until you have a chance.

12             And then, you may or may not renew the

13 objection.

14             And at least, uh — then Monday morning we can

15 take that up.

16             MR. FRASIER:   Right.

17             THE COURT:   Okay.

18             We will be in recess, then, until Monday at

19 9:00.

20                  (END OF DAY THREE)

21

22 *                    *                    *

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS


STATE OF OREGON,                    )
                                    )
            Plaintiff,              )     CASE NO. 10CR0782
                                    )
      vs.                           )     JURY TRIAL
                                    )      DAY FOUR
NICHOLAS JAMES MCGUFFIN,            )
                                    )
            Defendant.              )
_____    )

TRANSCRIPT OF PROCEEDINGS

Volume 5, Pages D4 2 to D4 168

        BE IT REMEMBERED That, the above-entitled cause

came on regularly for hearing beginning at 9:04 a.m., Monday,

July 11, 2011, in the Circuit Courtroom of the Coos County

Courthouse in the City of Coquille, County of Coos, State of

Oregon, before the Honorable Richard L. Barron and a jury.



APPEARANCES

R. Paul Frasier, District Attorney for Coos County,
representing the Plaintiff.

Erica Soublet, Assistant District Attorney for Coos County,
representing the Plaintiff.

Shaun McCrea, Attorney at Law, representing the Defendant.

Robert McCrea, Attorney at Law, representing the Defendant.


     S. Jean Sprouse, Court Transcriber, XV Judicial District, 503-325-5254

```
                                      Fisher   D      D4 2
 1              (Jury In.)

 2              JUDICIAL ASSISTANT:    All rise.

 3              The Circuit Court of State of Oregon, County of

 4   Coos is now in session.

 5              THE COURT:   Be seated.

 6              Good morning.  Did you have a good weekend?

 7              Mr. Frasier, call your next witness.

 8              MR. FRASIER:    Thanks, Your Honor.

 9              We would call Austin Fisher.

10                        AUSTIN FISHER

11   was thereupon produced as a witness on behalf of the Plaintiff

12   and, having first been duly sworn to tell the truth, the whole

13   truth and nothing but the truth, was examined and testified as

14   follows:

15              THE COURT:   Have a seat up here, please.

16                      DIRECT EXAMINATION

17   BY MR. FRASIER:

18       Q.   Could you state your name please, sir, and spell

19   your last name for the record?

20       A.   Austin Fisher, F-I-S-H-E-R.

21       Q.   Where do you live, sir?

22       A.   Coquille.

23       Q.   How long have you lived in Coquille?

24       A.   All my life pretty much.

25       Q.   Did you go to school here?
```

```
                                      Fisher   D       D4 3
 1        A.    Yes.

 2        Q.    Did you graduate from Coquille High School?

 3        A.    Yes.

 4        Q.    Did you attend the, what's sometimes referred to as

 5   the middle school here in Coquille?

 6        A.    Yes.

 7        Q.    While you were attending the middle school did you

 8   become acquainted with an individual named Leah Freeman?

 9        A.    Yes.

10        Q.    How did you know her?

11        A.    We were really good friends.

12        Q.    When did you get to know her?

13        A.    Seventh grade.

14        Q.    And at some point of time were you, for lack of

15   better terms, boyfriend/girlfriend?

16        A.    Kinda, yeah.

17        Q.    When was that?

18        A.    Eighth grade — end of eighth grade — for the summer.

19        Q.    And your freshman year, were you two still together?

20        A.    No.  We — just at the beginning, but not very long.

21        Q.    Now, did you personally observe Leah have a new

22   boyfriend after you?

23        A.    Yes.

24        Q.    And who was that?

25        A.    Nick McGuffin.
```

```
                                    Fisher   D       D4 4
```

 1        Q.    The Defendant in this case?

 2        A.    Yes.

 3        Q.    Now, after the Defendant began being with Leah

 4   Freeman, did you have a conversation with him regarding

 5   contact with Leah Freeman?

 6        A.    Yes.

 7        Q.    And what did the Defendant tell you in that

 8   conversation?

 9        A.    He told me that if I talked to her or went around

10   her then he was going to beat me up.

11        Q.    Did you have an opportunity yourself to personally

12   observe Leah Freeman and the Defendant together?

13        A.    Yes.

14        Q.    What were they like when they were together?

15        A.    I saw them arguing a lot, but I — that's about it.

16   I didn't see them a lot.

17        Q.    Okay.  When you say arguing, did they raise their

18   voices?

19        A.    Yes.

20        Q.    And where did you see this?

21        A.    At school.

22        Q.    Thank you.

23              MR. FRASIER:    That's all the questions I have

24   of the witness at this time, Your Honor.

25              THE COURT:    Ms. McCrea.

Fisher    X       D4 5

1          MS. McCREA:    Thank you.

2                    CROSS EXAMINATION

3   BY MS. MCCREA:

4       Q.   Mr. Fisher, you indicated that you and Leah Freeman

5   were really good friends?

6       A.   Yes.

7       Q.   You're nodding yes.  Sorry, you have to answer out

8   loud.

9       A.   Yes.

10      Q.   Okay.  And when you were kinda boyfriend and

11  girlfriend, you really liked her.  Is that fair to say?

12      A.   Yes.

13      Q.   She broke up with you after the freshman school year

14  started?

15      A.   Yeah.  It was kind of a mutual thing.

16      Q.   Even after the two of you parted ways, you still

17  really like her.  Right?

18      A.   We were friends.

19      Q.   And there was an occasion when you and Leah and

20  Sherry Mitchell and maybe somebody else went bowling together?

21      A.   Maybe, probably.

22      Q.   I realize it's been a long time ago.

23      A.   Yeah.

24      Q.   Now, when Leah Freeman started going out with Nick

25  McGuffin, you and Leah were freshman and Nick McGuffin was a

Fisher   X      D4 6

1  senior.  Is that right?

2      A.   Yes.

3      Q.   So, he was an upper classman and you guys were just

4  beginning high school?

5      A.   Yeah.

6      Q.   And Nick — would it be fair to say that Nick was

7  pretty popular at school?

8      A.   Yeah, probably.

9      Q.   And he had played football for Coquille High School?

10     A.   Yeah.

11     Q.   He didn't play in the year of — the fall of 1999

12 though because he had broken his neck.  Do you remember that?

13     A.   Yes, yeah.

14     Q.   So, you would see Leah and Nick around school

15 occasionally.  Now, the conversation with Nick McGuffin when

16 he said if you talked to Leah he would beat you up, didn't

17 that happen after you and some other kids, specifically Casey

18 and Josh, were teasing Leah after New Years insinuating that

19 she and Nick McGuffin had had sex?

20     A.   I don't remember that.

21     Q.   Okay.  Well, I'm - - -

22          MS. McCREA:    If I might approach, Your Honor.

23          THE COURT:    You may.

24     Q.   Mr. Fisher, I'm going to show you a copy of a page

25 out of Exhibit No. 90 which is Leah Freeman's diary.  And I'm

```
                                  Fisher   X      D4 7
```

1    going to ask you to take a look at this:

2             "All day Austin, Casey and Josh were asking me if I

3             had a good time on New Years and asinine crap like

4             that.  I don't really care that they think I had sex

5             with him even though I didn't."

6             Does that refresh your recollection about teasing

7    her?

8        A.    No.  But if she said it, then it's probably true.

9        Q.    Okay.  Do you remember - - -

10            Well, let me get back to the microphone.

11            Mr. Fisher, after you and Lea Freeman were no longer

12   boyfriend and girlfriend, you still had contact and you would

13   still telephone her from time to time.  Is that right?

14       A.    Yeah.

15       Q.    Did you have hopes of getting back together with

16   her?

17       A.    No.

18       Q.    Just friendly terms?

19       A.    Yeah, just friends.

20       Q.    And back in 2000 you had relatives living in the

21   Fairview Area near Hudson Ridge.  Is that right?

22       A.    Yes.

23       Q.    Did you have a pickup at that time?

24       A.    I think so.

25       Q.    Now, you turned sixteen on June 23rd, 2000.  Did you

Fisher   ReD   D4 8

1   get your driver's license right away?

2       A.   No.

3       Q.   In terms of your family up near Hudson Ridge, that

4   would have been your uncle?

5       A.   My grandparents.

6       Q.   Your grandparents.  Okay.

7            Thank you.

8            MS. McCREA:   That's all the questions I have.

9            THE COURT:   Any redirect?

10                    <u>REDIRECT EXAMINATION</u>

11   <u>BY MR. FRASIER:</u>

12       Q.   Mr. Fisher, did you have anything to do with the

13   disappearance of Leah Freeman?

14       A.   No, sir.

15       Q.   Thank you.

16            MR. FRASIER:   That's all I have.

17            THE COURT:   You may step down and you're free

18   to leave.

19            Call your next witness.

20            MS. SOUBLET:   State calls Brent Bartley.

21            THE COURT:   I'm sorry.  Did you say Brent or

22   Frank?

23            MS. SOUBLET:   Brent.

24            MR. FRASIER:   Brent.

25            THE COURT:   Thank you.

                                          Bartley   D      D4 9

 1                        BRENT BARTLEY

 2   was thereupon produced as a witness on behalf of the Plaintiff

 3   and, having first been duly sworn to tell the truth, the whole

 4   truth and nothing but the truth, was examined and testified as

 5   follows:

 6            THE COURT:   Have a seat up here, please.

 7                       DIRECT EXAMINATION

 8   BY MS. SOUBLET:

 9        Q.   Mr. Bartley, can you state your full name and spell

10   your last for the record?

11        A.   Brent William Bartley, B-A-R-T-L-E-Y.

12        Q.   Mr. Bartley, how old are you?

13        A.   Thirty-one.

14        Q.   Where do you live?

15        A.   275 North Broadway, Apartment 301, Coos Bay, Oregon,

16   97420.

17        Q.   Did you used to live here in Coquille?

18        A.   Yes.

19        Q.   When was that?

20        A.   About three or four years ago I think.  It's been

21   that - - -

22        Q.   (Interposing) Did you grow up here in Coquille?

23        A.   Yes.  Born and raised.

24        Q.   What high school did you go to?

25        A.   Coquille.

```
                                         Bartley   D    D4 10
```

1    Q.   How do you — do you know the Defendant,

2  Mr. McGuffin?

3    A.   Went to school with him.

4    Q.   Okay.  Were you in the same grade?

5    A.   No.  He was younger than me.

6    Q.   So, how did you meet him?

7    A.   His brother was in my grade.

8    Q.   Did you ever have an opportunity to hang out with

9  him?

10   A.   Yes.

11   Q.   When was that?

12   A.   Can you be more specific?

13   Q.   Did you hang out with him in high school, after you

14  graduated from high school?

15   A.   Both.

16   Q.   Were you aware of whether or not the Defendant had

17  any cars?

18   A.   Yes.

19   Q.   What were those?

20   A.   A Mustang and a T-bird.

21   Q.   I'm showing you what's been received as State's

22  Exhibit No. 16 and asking you if you recognize that?

23   A.   Yes.

24   Q.   What is that?

25   A.   A Ford Mustang.

```
                                        Bartley   D     D4 11

 1        Q.   Is that the Defendant's Mustang?

 2        A.   Yes.

 3        Q.   And Exhibit No. 25, do you recognize the car in

 4   that?

 5        A.   Which one?

 6        Q.   The maroon one?

 7        A.   Yes.

 8        Q.   Okay.  And what is that?

 9        A.   A Ford T-bird.

10        Q.   Is that the same car you saw the Defendant sometimes

11   drive?

12        A.   Yes.

13        Q.   In the summer of 2000 were you working?

14        A.   Yes.

15        Q.   A long time ago, difficult to remember?

16        A.   Yes.

17        Q.   Are you aware of whether or not the Defendant had a

18   girlfriend then?

19        A.   Yes.

20        Q.   Who was that?

21        A.   Leah Freeman.

22        Q.   How — did you know Ms. Freeman other than her

23   association with the Defendant?

24        A.   What do you - - -

25        Q.   (Interposing) Did you know her before?
```

```
                                      Bartley  D    D4 12
1      A.   No.

2      Q.   Did you have an opportunity to ever see them

3  together?

4      A.   Yes.

5      Q.   When was that?

6      A.   All the time.

7      Q.   Was there a time, like, where you would see her

8  specifically?

9      A.   What do you mean?

10     Q.   Did you see her other than seeing her with the

11 Defendant?

12     A.   No.

13     Q.   Did you have a chance to see them together on more

14 than one occasion?

15     A.   Yes.

16     Q.   Okay.  And what was their relationship like?

17     A.   Good.

18     Q.   Do you remember saying that they would fight and

19 makeup?

20     A.   I've never seen them fight.

21     Q.   Where were you living in the summer of 2000?

22     A.   I don't know the exact address.  I can't even

23 remember the exact address.  But, over by Dean Street in

24 Coquille.

25     Q.   Was that a house, an apartment?
```

Bartley  D    D4 13

1      A.    A house.

2      Q.    Who else lived there?

3      A.    Daniel LaPine.

4      Q.    Were you yourself dating anyone in the summer of

5  2000?

6      A.    Yes.

7      Q.    Who was that?

8      A.    Nicole Price.

9      Q.    Is her name now Nelson?

10      A.    Yeah.

11      Q.    Did you ever have a chance to see the inside of the

12  Defendant's Mustang?

13      A.    Yes.

14      Q.    What was the inside of that car like?

15      A.    Clean.

16      Q.    What about the trunk?

17      A.    Dirty, because that's where he would throw all the

18  stuff, usually.  Then after it was clean.

19      Q.    I'm sorry?  You said then what?

20      A.    It was clean.

21      Q.    When was that?

22      A.    After this all happened.

23      Q.    By this all happening, you mean after Ms. Freeman

24  went missing?

25      A.    Yes.

Bartley   D    D4 14

1      Q.   I want to turn your attention to June 28th, 2000.  Do

2   you remember that day?

3      A.   Kinda, yes.

4      Q.   Why kinda?

5      A.   Because it's been eleven years ago.

6      Q.   Were you drinking that day?

7      A.   Yes.

8      Q.   Were you asked by the police to do a timeline of

9   events?

10     A.   Yes.

11     Q.   Do you remember when that was?

12     A.   When I wrote it down?  No, I don't remember the day.

13  I did it.

14     Q.   Was it after June 28th?

15     A.   Yeah.

16     Q.   Mr. Bartley, I'm going to hand you what's been

17  marked for identification purposes as State's Exhibit No. 84

18  and ask you if you recognize that?

19     A.   Yes.

20     Q.   What do you recognize it to be?

21     A.   My written statement.

22     Q.   That's the timeline that we're talking about?

23     A.   Yes.

24     Q.   Did you have plans to hang out with anyone that day

25  on June 28th, 2000?

```
                                        Bartley  D    D4 15
 1      A.   Yes.

 2      Q.   Who was that?

 3      A.   Nick and Leah.

 4      Q.   Anyone else?

 5      A.   And Nicky.

 6      Q.   Where were you going to spend the day?

 7      A.   At my grandparent's house.

 8      Q.   Okay.  And where is that?

 9      A.   I don't know the address.  I'm bad with that.

10   Sorry.

11      Q.   Is it called the Haga Ranch or residence?

12      A.   It's the Haga's — yeah, my grandparent's house.

13      Q.   Is that in town or out of town?

14      A.   Out of town.

15      Q.   Do you remember how you got to that residence?

16      A.   Yeah.

17      Q.   How was that?

18      A.   Ms. McGuffin.

19      Q.   In what car?

20      A.   His Mustang.

21      Q.   Was anyone else with you at that time?

22      A.   Yeah.

23      Q.   Who was that?

24      A.   Leah.

25      Q.   Do you remember when you got to your grandparent's
```

Bartley   D     D4 16

1  house?

2      A.   This says four, but I can't remember exactly times.

3      Q.   Was it in the morning or in the afternoon?

4      A.   Afternoon.

5      Q.   Late in the afternoon or early in the afternoon?

6      A.   Early.

7      Q.   Was Ms. Nelson with you at that time?

8      A.   No.

9      Q.   Were you supposed to be at the — at your

10 grandparent's house?

11     A.   No.

12     Q.   Do you remember what your plans were once you got to

13 your grandparent's house?

14     A.   Yes.

15     Q.   What was that?

16     A.   Watch movies and hang out.

17     Q.   So, did you do that?

18     A.   No.

19     Q.   Why not?

20     A.   We — because we went and dropped off Leah and then

21 we picked up Nicky.  And then - - -

22     Q.   (Interposing) Do you remember — I'm sorry.

23     A.   Oh, no.  Go for it.

24     Q.   Do you remember what time you went and dropped off

25 Ms. Freeman?

```
                                    Bartley  D    D4 17
 1      A.   No.  I - - -
 2      Q.   I'm going to ask you to look at Exhibit No. 84 and
 3  tell me if that refreshes your recollection about what time
 4  you dropped off Ms. Freeman?
 5      A.   About six or seven I guess.
 6      Q.   Where did you drop her off?
 7      A.   At a friend's house — I can't even — Mitchell is her
 8  last name.  I can't remember her first name.
 9      Q.   How did you get there from your grandparent's house
10  to the Mitchell Residence?
11      A.   McGuffin.
12      Q.   In what car?
13      A.   The Mustang.
14      Q.   What did you do after that?
15      A.   Went and picked up Nicky.
16      Q.   Okay.  And what after that?
17      A.   Went back to my grandparent's house.
18      Q.   When you say we, you're talking about everybody?
19      A.   No.  Me, Nick and Nicky.
20      Q.   Okay.  Was there a time when the Defendant left your
21  grandparent's residence again?
22      A.   Yeah.
23      Q.   When was that?
24      A.   About fifteen, twenty minutes after all three of us
25  got back there.
```

```
                                    Bartley   D     D4 18
 1      Q.   Okay.  Did he tell you where he was going?

 2      A.   No.

 3      Q.   Did he tell you whether or not he was coming back?

 4      A.   Yeah.  He was our ride.

 5      Q.   Did you see him again that night after he left your

 6 grandparent's house?

 7      A.   Yeah.

 8      Q.   When was that?

 9      A.   About nine I think.  He came back and asked if we

10 seen her.  And we said, "No."  Then he left again.  And I

11 can't remember if he came back another time and asked us or if

12 he came back the third time and just picked us up.

13      Q.   Okay.  When you say seen her, you're referring to

14 Ms. Freeman?

15      A.   Yes.

16      Q.   Were you expecting to see Ms. Freeman back out at

17 the house?

18      A.   He was supposed to go pick her up.  I was expecting

19 them both to come back, yeah.

20      Q.   Were you expecting to see her by herself back at

21 your house?

22      A.   No.

23      Q.   Were you expecting to hear a phone call from her?

24      A.   No.  I wasn't answering the phone.  I wasn't

25 supposed to be out there.
```

Exhibit 102  Page 363 of 1666 to
State Defendants' Motion for Summary Judgment

```
                                    Bartley  D    D4 19
 1      Q.   So, when the Defendant came back from — came back
 2   and asked you if you'd seen Ms. Freeman, what did you do?
 3      A.   I said, "No."
 4      Q.   Did you notice anything about his demeanor at that
 5   time, the way he was acting?
 6      A.   No.  Just kinda worried that he couldn't find her.
 7      Q.   Do you remember what time you left your
 8   grandparent's residence for good that night?
 9      A.   Ten, eleven, somewhere in there.
10      Q.   How did you get home from your grandparent's
11   residence?
12      A.   McGuffin.
13      Q.   The Defendant?
14      A.   Yes.
15      Q.   Where did he drop you off?
16      A.   Right below the middle school in Coquille.
17      Q.   Did you come straight from your grandparent's house
18   to below the middle school?
19      A.   No.  We went and dropped off Nicky.  And then me and
20   him — he was still worried.  He couldn't find her.  So, we
21   went to the high school.  And he stopped and got out and
22   looked.  And then we went by her house and the light wasn't on
23   so we didn't stop.  And then we stopped at Sanford Heights and
24   he got out and went and checked the park.  And then drove me
25   back — we went back towards town.  And that's when I seen
```

```
                                  Bartley   D    D4 20
 1  Richard Bryant and got out.

 2      Q.   When you say he got out at the park, are you

 3  referring to the Defendant?

 4      A.   Yeah.

 5      Q.   Okay.  Did you get out of the car?

 6      A.   No.

 7      Q.   Why not?

 8      A.   I had a knee brace on and I was gimped up.

 9      Q.   Do you remember him saying anything to you when you

10  went past Ms. Freeman's Residence?

11      A.   Just the light wasn't on, so we didn't stop.

12      Q.   Do you remember going to Denny's Pizza at some point

13  that night?

14      A.   No, not really.  I heard I was there, but I — I was

15  drinking.

16      Q.   Did you ever have a chance to see the Defendant

17  driving a car other than the Mustang on June 28th, June 29th,

18  2000?

19      A.   No, not that I can recall.

20      Q.   Do you remember speaking to officers in July of

21  2010?

22      A.   Probably.

23      Q.   Talking to Detective - - -

24      A.   (Interposing) Yeah.

25      Q.   - - - McNeely - - -
```

Bartley   X    D4 21

1       A.    (Interposing) Oh, yeah.

2       Q.    - - - and Officer Webley?

3       A.    Yes.

4       Q.    At that time you indicated that you saw the

5    Defendant in the Thunderbird later that night?

6       A.    See, that's what I was — maybe I thought it.  But I

7    said in my statement that you've got in your hand that says I

8    was sixty percent.  I don't know if it was a different rig or

9    not.  And I said I was about sixty percent sure that it could

10   have been a different rig.  But I didn't know.  I can't

11   recall.

12      Q.    Did you have an opportunity to see the inside of the

13   Defendant's trunk after June 28th, 2000?

14      A.    Yes.

15      Q.    What was different about it?

16      A.    It was clean, cleaned out.

17      Q.    Thank you.

18            MS. SOUBLET:    Nothing further.

19            THE COURT:    Ms. - - -

20                       CROSS EXAMINATION

21   BY MS. MCCREA:

22      Q.    (Interposing) Mr. Bartley, I'm — this is not

23   intended to embarrass you.  But, back in June of 2000 you

24   would — you have characterized yourself back then as a

25   drinker.  Is that fair?

Bartley   X    D4 22

1      A.   Yes.

2      Q.   And that you would drink to get drunk?

3      A.   Yes.

4      Q.   And you drank a lot of alcohol back then?

5      A.   Yes.

6      Q.   And you smoked marijuana?

7      A.   Yes.

8      Q.   You were intoxicated the evening of June 28th, 2000?

9      A.   Yes.

10     Q.   So, that is part of why you have some memory issues

11  concerning specific times?

12     A.   Yes.

13     Q.   Now, the idea to go to your grandparent's house was,

14  you were going to go with your girlfriend Nicky Price.  And

15  Nick McGuffin was going to go with his girlfriend Leah

16  Freeman.  Right?

17     A.   Yes.

18     Q.   And the idea was to have a quiet place where you

19  could have a barbecue and watch some movies away from the

20  house you shared with Daniel LaPine because it was, forgive

21  me, kind of a party house?

22     A.   Yes.

23     Q.   And not — and there were a lot of guys who would

24  hang out there.  And the idea was for the two couples to have

25  some time together?

Bartley    X    D4 23

1      A.   Yes.

2      Q.   So, that night, Nick McGuffin was in the Mustang.

3  And that was, to your understanding, his car.  But

4  occasionally he would drive his parent's T-bird?

5      A.   Yes.

6      Q.   Were you aware that he had been grounded from

7  driving the T-bird on June 26th?

8      A.   No.

9      Q.   Were you aware that Nick had been in sort of a

10 little race with Daniel LaPine in his Mustang previously and

11 had put a hole in the gas tank of the Mustang?

12     A.   Yeah.

13     Q.   You were aware of that?

14     A.   Yeah.  I think it happened out Fairview.

15     Q.   Out Fairview.  Okay.

16          Were you present when that happened or you just

17 heard about it?

18     A.   No.  Just heard about it.

19     Q.   Now, the inside of the Mustang - - -

20          MS. McCREA:   If I could approach, Your Honor.

21 And I'm going to show Mr. Bartley what's been marked for

22 identification as Defense Exhibits Nos. 102 and 103.

23          This is No. 102.  And then the close up is

24 No. 103.  Thank you.

25     Q.   So, Mr. Bartley, I'm showing you what's been marked

Bartley   X     D4 24

1  for identification as Defense Exhibits Nos. 102 and 103.  Do

2  you recognize that back seat of that vehicle?

3       A.   Yes.

4       Q.   And is that Nick McGuffin's Mustang from back in

5  2000?

6       A.   Yes.

7       Q.   Does it fairly and accurately portray how that back

8  seat looked with the stereo speaker?

9       A.   Yeah.

10                MS. McCREA:    We'd offer Exhibits Nos. 102 and

11  103, Your Honor.

12                MS. SOUBLET:    No objection.

13                THE COURT:    Received.

14                (Whereupon Exhibits Nos. 102 and 103 were then

15  received into evidence.)

16       Q.   So, Mr. Bartley, this was a pretty good speaker that

17  took up the whole — one whole passenger side of the back seat.

18  Is that fair?

19       A.   Yes.

20       Q.   And when you and Mr. McGuffin took Leah Freeman over

21  to her friend's house, you were sitting in the front seat and

22  Leah was in the back seat?

23       A.   I can't recall.  I imagine.  See, I just can't

24  recall if I was or not.

25       Q.   I understand.  But you did have on a knee brace?

Bartley   X     D4 25

1     A.   Yes.

2     Q.   Because you had hurt your knee, I think, jumping off

3   a bridge?

4     A.   Yes.

5     Q.   The place that you dropped Leah Freeman off was

6   behind McKay's Market.  Do you remember that?

7     A.   Yes.

8     Q.   And when you - - -

9          Well, let me back up.

10         So, is this the correct chronology, you and Nick and

11  Leah went out to your grandparent's, the Haga property?

12    A.   (No audible response.)

13    Q.   You're nodding yes?

14    A.   Yes.

15    Q.   We've got to get it on the record.

16         And to get to the Haga property you would walk up on

17  — well, if you were walking.  Or if you were driving the most

18  direct route would be to drive up Elm, past the cemetery and

19  keep on going up?

20    A.   Yes.

21    Q.   And it's a — it is a little ways out from — from

22  let's say the high school?

23    A.   It's a mile.

24    Q.   It's a mile.  Okay.

25         So, the three of you go up to your grandparent's.

```
                                    Bartley   X    D4 26
```

1   And then at some point do the three of you go out to Nick

2   McGuffin's parent's home to get some videos?

3        A.   I think we did it earlier.  I can't remember.

4        Q.   Got the videos earlier?

5        A.   Yeah.

6        Q.   Okay.

7        A.   I can't remember a hundred percent.

8        Q.   And Leah Freeman was with you at the time?

9        A.   Yeah.

10            MS. McCREA:   And may I have Exhibits Nos. 7

11   and 8, please?

12            Thank you.

13       Q.   Mr. Bartley I'm going to show you what's been

14   introduced into evidence as Exhibits Nos. 7 and 8.  And do you

15   recognize Leah Freeman?

16       A.   Yes.  I think that's me, probably.

17       Q.   That was going to be my next question.  Okay, this

18   is State's Exhibit No. 7.  And there is a shirt and an arm on

19   part of the photograph.  And you think that was you?

20       A.   Yes.

21       Q.   Do you remember photographs being taken out at

22   Nick's house on that day?

23       A.   No.

24       Q.   Had you been drinking before that time?

25       A.   Probably.

Bartley   X    D4 27

1    Q.   Had you been smoking marijuana?

2    A.   Yes.

3    Q.   Okay.  So, in your recollection is this how Leah was

4  out at Nick McGuffin's parent's house on June 28th when you all

5  were there?

6    A.   Yeah.

7    Q.   So, you got the videos.  You went to your

8  grandparent's house.  And then Leah had plans to go see her

9  friend?

10   A.   Yes.

11   Q.   So, you went with Nick to drop her off at her Sherry

12  Mitchell's house?

13   A.   Yes.

14   Q.   Then Nick was supposed to pick her up after a couple

15  of hours?

16   A.   Yeah, that's what my understanding was.

17   Q.   Now, did you and Nick also go to McKay's and get

18  some steaks to cook?

19   A.   Yeah.  And O.J.

20   Q.   And some O.J.

21   A.   For the mixed drinks.

22   Q.   Okay.  To make mixed drinks.

23        So, after you left Sherry Mitchell's then you and

24  Nick McGuffin went over and picked up your girlfriend Nicky

25  Price?

```
                                    Bartley   X    D4 28
```

 1     A.   Yes.

 2     Q.   Now, Nicky Price, you had a relationship with her

 3   from, what, 2000 to about 2003?

 4     A.   Yeah.

 5     Q.   Do the two of you have a child together?

 6     A.   Yes.

 7     Q.   Did you part amiably or less than amiably?

 8     A.   Less.

 9     Q.   Less than amiably.

10          Are you on good terms now?

11     A.   Yeah, getting better.

12     Q.   When you got back to the Haga's it was just the

13   three of you, Nick McGuffin, your girlfriend Nicky Price, and

14   you?

15     A.   Yes.

16     Q.   So, after about fifteen minutes Nick left.  Did he

17   say anything about not wanting to be a third wheel?

18     A.   Yes.

19     Q.   So, he left.  And then he — you knew he was going to

20   come back to pick you guys up and give you a ride home?

21     A.   Yes.

22     Q.   Now, you talked about when he came back.  And when

23   he came back he was in the Mustang?

24     A.   Yes.  It's starting to get fuzzy.  I'm pretty sure

25   though.

Bartley   X     D4 29

1    Q.   Because you had been drinking during the period of

2    time after you picked up Nicky Price and you were at your

3    grandparent's?

4    A.   Yes.

5    Q.   In terms of Nick McGuffin's demeanor, is it fair to

6    say he looked kind of worried?

7    A.   Yes.

8    Q.   And that didn't surprise you because it wasn't like

9    Leah to disappear?

10   A.   No.

11   Q.   No, it was not - - -

12   A.   (Interposing) Yeah, it wasn't like it.

13   Q.   And so once you took Nicky Price home, then you went

14   with Nick McGuffin looking for Leah Freeman?

15   A.   Yes.

16   Q.   And the two of you went to the high school because

17   Nick said that Leah liked to go there to get away, just to go

18   out to the football field and sit in the stadium and — or the

19   grandstands — and think?

20   A.   Yes.

21   Q.   So, Nick went and looked there?

22   A.   Yes.

23   Q.   And he didn't see her.

24   A.   Yeah, correct.

25   Q.   Did you go with him or did you wait in the car?

Bartley   X     D4 30

1      A.   I waited in the car.

2      Q.   And then you drove to Sanford Heights where Leah had

3   been living with her mom and her grandmother?

4      A.   Yes.

5      Q.   And you knew where Leah's house was?

6      A.   Yes.

7      Q.   So, as you went by the house you've indicated that

8   Nick said, "She's not there.  There's no light on?"

9      A.   Yes.

10      Q.   And did you slow down to look?

11      A.   Yes.

12      Q.   And then up from the house on Knott Street at

13   Sanford Heights, there is a little park.  Right?

14      A.   Yes.

15      Q.   And Nick went down to the park to check to see if

16   Leah was there?

17      A.   Yes.

18      Q.   And you stayed in the car?

19      A.   Yes.

20      Q.   So, when Nick came back he didn't give you any

21   indication that he'd seen Leah?

22      A.   No.

23      Q.   And you were with Nick McGuffin that night looking

24   for Leah probably between thirty minutes to an hour?

25      A.   Yeah.

Bartley   X    D4 31

1     Q.   To the best of your recollection?

2     A.   Yeah.

3     Q.   And then you saw Richard Bryant.  And Richard Bryant

4  had marijuana?

5     A.   Correct.

6     Q.   Okay.  And so you got out so you could go smoke

7  marijuana with Richard Bryant?

8     A.   Correct.

9     Q.   And Nick didn't go with you.  He kept — he said he

10  was going to keep looking for Leah?

11     A.   Correct.

12     Q.   Now, the next day, on June 29th, 2000, you had a

13  party at your grandparent's place?

14     A.   Yes.

15     Q.   And basically your mom busted you for that later on.

16     A.   Yes.

17     Q.   Is that right?

18     A.   Yes.

19     Q.   And there was a white sort of tank top, what we

20  might call a wife beater at that location?

21     A.   Yes.

22     Q.   And that didn't belong to Leah Freeman, did it?

23     A.   No.

24     Q.   It belonged to a guy named Myah (phonetic) Stokes?

25     A.   Yes.  And it was there because we spilled beer and

```
                                        Bartley   X    D4 32
```

1    he used it to clean it up.

2         Q.   Used his shirt to clean it up?

3         A.   Yeah.  It's Myah.

4         Q.   Now, Mr. Bartley, the Prosecution has indicated that

5    someone matching your description was with another male and a

6    blonde female on Fairview Mountain around midnight on June

7    28th, 2000.  Were you on Fairview Mountain that night?

8         A.   No.

9         Q.   Were you anywhere near Fairview Mountain around

10   midnight on June 28th?

11        A.   No.

12        Q.   Early morning hours of June 29th, 2000?

13        A.   No.

14        Q.   Thank you.

15             MS. McCREA:    That's all the questions I - - -

16             I'm sorry, Your Honor.  Just a moment.

17             THE COURT:    Okay.

18        Q.   Mr. Bartley, if you remember, when you went with

19   Nick McGuffin to drop off Leah Freeman behind McKay's at

20   Sherry Mitchell's house, do you remember Nick saying anything

21   to Leah Freeman about Leah going over to Sherry's wasn't a

22   good idea, that Leah and Sherry were going to have a fight?

23   Anything like that?

24        A.   Not that I can recall, no.

25        Q.   Okay.

Bartley   ReD   D4 33

1           Thank you.

2                MS. McCREA:    That's all I have, Your Honor.

3                THE COURT:    Any redirect?

4                MS. SOUBLET:    Just briefly.

5                Thank you, Your Honor.

6                     REDIRECT EXAMINATION

7    BY MS. SOUBLET:

8       Q.   Mr. Bartley, were you the only one drinking that

9    day?

10      A.   Yes.

11      Q.   Did you ever see the Defendant drink that day?

12      A.   No.

13      Q.   In your — you indicated you went to get steaks and

14   orange juice from McKay's?

15      A.   Correct.

16      Q.   Was that before or after you dropped off

17   Ms. Freeman?

18      A.   No.  She was still at my grandparent's house.  It

19   was just me and Nick.  We left her there and went to the store

20   and then came back.

21      Q.   Thank you.

22                MS. SOUBLET:    Nothing further.

23                THE COURT:    You may step down and you're free

24   to leave.

25                WITNESS:    Okay.  What do I do with this, Your

```
                                        Smith   D     D4 34
```

1   Honor?

2                THE COURT:   Just leave it there, please.

3                WITNESS:   Okay.

4                MS. SOUBLET:   The State calls Melissa Smith.

5                THE COURT:   You can get that exhibit if you

6   want, Cathy.

7                        MELISSA SMITH

8   was thereupon produced as a witness on behalf of the Plaintiff

9   and, having first been duly sworn to tell the truth, the whole

10  truth and nothing but the truth, was examined and testified as

11  follows:

12               THE COURT:   Have a seat up here, please.

13               Go ahead.

14               MS. SOUBLET:   Thank you, Your Honor.

15                      DIRECT EXAMINATION

16  BY MS. SOUBLET:

17       Q.   Ms. Smith, can you state your full name and spell

18  your last for the record?

19       A.   Melissa Marie Smith.

20       Q.   And the last name?

21       A.   Smith.

22       Q.   How do you spell it?

23       A.   S-M-I-T-H.

24       Q.   Ms. Smith, did you grow up here in Coquille?

25       A.   For the most part.

```
                                    Smith   D    D4 35
```

1    Q.   Which high school did you go to?

2    A.   Coquille Valley High School - - -

3    Q.   (Interposing) Can - - -

4    A.   Oops.

5    Q.   I'm sorry?

6    A.   Until my senior year.  And then I went to

7  Marshfield.

8    Q.   And did you know Leah Freeman?

9    A.   Yes.

10   Q.   How did you know her?

11   A.   We were friends, like, the last eight months that

12  she was alive.

13   Q.   That would have been the school year 1999-2000?

14   A.   Correct.

15   Q.   How do you know the Defendant?

16   A.   We were also friends.

17   Q.   Were you friends with anyone else through him?

18   A.   I was dating Scott Hamilton at the time, which was

19  friends with Nick.

20              THE COURT:   I'm sorry, the name you were

21  dating?

22              WITNESS:   Scott Hamilton.

23              THE COURT:   Thank you.

24   Q.   Did you — how would you — did you have an

25  opportunity to see the Defendant and Leah Freeman together?

```
                                      Smith   D    D4 36
```

1      A.   How did I what?  I'm sorry.

2      Q.   Did you have a chance to see the Defendant and Leah

3   Freeman together?

4      A.   Yeah.

5      Q.   How would you describe their relationship?

6      A.   Basically like any other teenage, high school

7   relationship.  It was, um - - -

8      Q.   (Interposing) Would they fight and makeup?

9      A.   Yeah.

10     Q.   Do you know where the Defendant was living in the

11  summer of 2000?

12     A.   Yes, at his parent's house.

13     Q.   Do you know whether or not he had access to any

14  cars?

15     A.   Yes.

16     Q.   And what were those cars?

17     A.   He had his car and his parent's car.

18     Q.   And what was his car?

19     A.   A Mustang.

20     Q.   What was his parent's car?

21     A.   A Thunderbird I believe.

22     Q.   I want to turn your attention to June 27th, 2000.  Do

23  you remember that day?

24     A.   Yes.

25     Q.   Okay.  And what did you do that day?

Smith  D    D4 37

1      A.    The four of us had drove up to the river, out

2  towards Powers, and went swimming out there.

3      Q.    When you say the four of us, you're referring to

4  yourself, Scott Hamilton, the Defendant and Ms. Freeman?

5      A.    Correct.  Yes, sorry.

6      Q.    How did you get out there?

7      A.    In — I believe Nick drove his parent's Thunderbird

8  that day.

9      Q.    And on June 28th, 2000, do you remember that day?

10      A.    Yes.

11      Q.    Did you have a chance to speak to Ms. Freeman that

12  day?

13      A.    I did talk to her on the phone just for a couple

14  minutes that day.

15      Q.    Do you remember when?

16      A.    I can't remember the exact time, no.

17      Q.    Why were you calling her?

18      A.    I had called her to let her know that I was just

19  going home that night.  And I wasn't going to have any plans

20  or anything to do anything.

21      Q.    And did you hear anyone else in the background while

22  you were on the phone with Ms. Freeman?

23      A.    I had heard Nick.  But I don't know who he was

24  talking to.

25      Q.    Do you remember telling the police that you could

```
                                    Smith   D    D4 38
```

1  hear him yelling at Ms. Freeman to get off the phone and

2  calling her a bitch?

3      A.   Not at her.  I heard him saying that, but it wasn't

4  at — I don't — I can't — I don't know if it was at her or not.

5  She didn't say anything.

6      Q.   And you — do you remember how Ms. Freeman sounded on

7  the phone?

8      A.   Yeah.  She sounded a little — just a little upset.

9  And I had asked her what was wrong.  And she said that she

10 would tell me later.  And I never — that was the last time I

11 got to talk to her.

12     Q.   So, on June 29th, 2000, do you remember that day?

13     A.   Yes.  Yeah.

14     Q.   Why do you remember that day?

15     A.   Because that day my step mom had called me at seven

16 in the morning to ask me if I had seen Leah because her mom

17 had called my step mom to see if we had seen her.  And I

18 hadn't.  And so then we had gotten up and tried looking for

19 her.

20     Q.   When you say - - -

21     A.   (Interposing) Driving around looking for her.

22     Q.   Where did you go looking for her?

23     A.   We just drove around, all around Coquille.  I was

24 staying at Myrtle Point — in Myrtle Point at a friend's house.

25 I ended up staying the night there.  And so, we went with — I

Smith    D    D4 39

1  think my sister came and picked us up.  And we had just drove

2  back to Coquille and looked all over, driving around.

3      Q.   Did you see the Defendant during that time?

4      A.   I believe I did see him that day, yes.

5      Q.   Okay.  And how would you describe his demeanor?

6      A.   Nervous and trying to find — well, not nervous.

7  Just anxious trying to find her.

8      Q.   Do you remember saying that he was very distraught

9  and overly dramatic?

10              MR. McCREA:    Object to leading the witness,

11  Your Honor.

12              THE COURT:    Overruled.

13      A.   Oh - - -

14              THE COURT:    You can answer.

15      A.   Oh, sorry.  He was — he was upset.  She was missing.

16  So, he was upset.

17      Q.   Did you have a chance to ask him what happened?

18      A.   No.

19      Q.   You didn't speak to him about what happened or he

20  tell you what happened with Ms. Freeman the night before?

21      A.   No, no.

22      Q.   Do you remember anything else about the Defendant's

23  demeanor in the days or weeks after Ms. Freeman disappeared

24  and before her body was found?

25      A.   Just that he was upset that she was missing.

```
                                    Smith  D    D4 40
```

1    Q.   Do you remember whether or not he would have

2  referred to Ms. Freeman in the past tense?

3    A.   I can't really remember exactly.  I don't want to

4  say.  It was a long time ago.

5    Q.   Do you remember telling police officers back in 2000

6  that the Defendant kept referring to Ms. Freeman in the past

7  tense?

8    A.   I can't — I don't really remember that.  I think

9  that — I think one time it had.  And I corrected him and said

10  that she was going to come home.

11    Q.   And this was prior to - - -

12    A.   (Interposing) I can't remember the exact date that

13  that was or when that was.

14    Q.   And this was prior to her body being found?

15    A.   Correct, yes.

16    Q.   Did you have a chance to see the Defendant after her

17  body was found?

18    A.   Yes.

19    Q.   What happened on that occasion?

20    A.   I seen him quite a bit after.  I don't know which —

21  when you — what day you're talking about.

22    Q.   I'm talking about the opportunity or the time when

23  you and Mr. McGuffin had sex?

24    A.   That happened.

25    Q.   So, after — at some point shortly after

Smith   D    D4 41

1  Ms. Freeman's body was found you slept with the Defendant?

2      A.   After her — awhile after her memorial service, yes.

3      Q.   How did that occur?

4      A.   I was drinking and it happened one time.  And after

5  it happened it never happened again.  And it was a mistake.

6  It was just — I was emotional and vulnerable and it just

7  happened.

8      Q.   Do you remember what if anything the Defendant said

9  to you during that?

10     A.   Just that — um - - -

11         We were reading.  I had like letters and stuff.  And

12  we were just looking at pictures and stuff.  And he had said

13  that he knows that if he was with anybody that Leah would want

14  it to be with one of her good friends.

15     Q.   Do you remember talking to detectives back in 2000

16  about this case and being asked to describe the relationship

17  between the Defendant and Ms. Freeman?

18     A.   I'm sure, yeah.

19     Q.   Okay.  And do you remember telling the detectives

20  what percentage you would place on how in love Ms. Freeman was

21  with the Defendant?

22     A.   That — I don't recall that and I was going to read —

23  I don't recall anything about a percentage.  When I was asked

24  about that a couple weeks ago, I don't remember anything about

25  that.  And it doesn't sound familiar to me.  So, no I don't

```
                                      Smith    X     D4 42
```

1   know that.  I did want to see it.

2        Q.   The last paragraph.

3        A.   Okay.  Yeah, still reading that, it still doesn't

4   sound familiar to me at all, actually.

5        Q.   So, you don't remember telling detectives that she

6   only loved him seventy-five percent?

7        A.   Yeah, I don't.  I don't remember that at all,

8   actually.

9        Q.   Thank you.

10       A.   Everything else I remember saying.  But the percent

11  thing just doesn't ring a bell in my mind at all.

12       Q.   Thank you.

13            MS. SOUBLET:   Nothing further.

14            WITNESS:   Yeah, okay.

15            THE COURT:   Mr. McCrea.

16                    CROSS EXAMINATION

17  BY MR. MCCREA:

18       Q.   Ms. Smith - - -

19       A.   Uh huh.

20       Q.   I'm Robert McCrea.  I'm here on behalf of Nick

21  McGuffin.  You've never talked to me before, right?

22       A.   No.  No, I haven't.

23       Q.   You've never even seen me before have you?

24       A.   No, I have not.

25       Q.   And I you as it were.

Smith    X    D4 43

1          And you were questioned.  You were questioned by the

2    FBI back in July of 2000?

3          A.    Correct.

4          Q.    And that was an Agent Sole or Soley or Souley,

5    something like that?

6          A.    I can't even remember the name.

7          Q.    Okay.  But he was an FBI agent, anyway?

8          A.    I remember that.

9          Q.    Were you fairly well impressed being questioned by

10   an FBI agent?

11         A.    Impressed?

12         Q.    Oh, it just — the FBI is sort of — has a larger

13   stature you might say, than other types of law enforcement in

14   your mind.  Is that fair to say?

15         A.    I'm sure, yeah.

16         Q.    Okay.  And at that — at the time that you were

17   talking with him that was in July of 2000, before Leah's body

18   had been found?

19         A.    Before, yes.

20         Q.    And you — she'd — you'd gotten to be pretty good

21   friends with her?

22         A.    Uh huh.

23         Q.    And the way this came about was, at that time Scott

24   Hamilton was friends with the Defendant, Mr. McGuffin.  And

25   you were going with, as the expression is used — at least back

```
                                        Smith   X    D4 44
```

1    in my day the expression was used - - -

2        A.   (Interposing) Uh huh.

3        Q.   - - - with Scott?

4        A.   Yes.

5        Q.   And Leah and Nick McGuffin were going together?

6        A.   Correct.

7        Q.   And that's how you got acquainted?

8        A.   Correct, yeah.

9        Q.   And then you guys did things together?

10       A.   Uh huh.

11       Q.   All right.

12            So, after doing that for a number of months you

13   became really pretty good friends with Leah?

14       A.   Correct.

15       Q.   You liked her?

16       A.   Yes.

17       Q.   Was she cute?

18       A.   Yeah.

19       Q.   By cute I mean physically attractive?

20       A.   Yeah, she was — yeah.

21       Q.   Again, forgive some of my expressions.  They may be

22   out of date.

23            Anyway, when you talked to the FBI agent, you were

24   interested in helping as much as you possibly could?

25       A.   Uh huh.

```
                                  Smith   X    D4 45
```

1       Q.   To see if you had information that would help find

2  her.  Correct?

3       A.   If I — yeah.  Yeah.

4       Q.   Right.  And at that time, you advised the FBI agent

5  that Nick McGuffin and Leah Freeman argued like any regular

6  couple?

7       A.   Yeah.

8       Q.   Okay.

9       A.   That's what - - -

10      Q.   (Interposing)  But you went on to tell him that Nick

11 and Leah loved each other more than anything?

12      A.   They were happy when they were happy.  And they — it

13 was just like a regular high school relationship.  It - - -

14      Q.   (Interposing) All right.

15      A.   Everybody — I mean, I didn't see any perfect

16 relationship in high school.

17      Q.   Well, what I'm getting at specifically, did you make

18 the statement to him that they loved each other more than

19 anything?

20      A.   I can't remember what exactly I said.

21      Q.   Do you recall saying they had planned a future

22 together?

23      A.   I don't know if I said those exact words.  I can't

24 remember honestly.

25      Q.   Okay.

Smith   X   D4 46

1      A.   That was a long time ago.  I don't - - -

2      Q.   What about the statement — this statement that they

3    wanted three children and had selected names for them?

4      A.   Well, I remember Leah and I were talking about baby

5    names.  I don't remember — I don't remember three, but I

6    could've said that.  But I remember talking about names.

7      Q.   Okay.  And - - -

8      A.   (Interposing) We had home ec together and we had

9    those — those babies that you had to take care of.  And that

10   was that year.  So we — well, I had one.  And I remember us

11   talking about baby names.

12     Q.   And you've indicated that if they did have arguments

13   that Leah Freeman yelled much more during the arguments than

14   Mr. McGuffin did.  Right?

15     A.   She was pretty feisty.  They both were.

16     Q.   Okay.  But it's fair to say Leah had a pretty sharp

17   tongue?

18     A.   She spoke her mind when she — yeah.

19     Q.   All right.  I'm not trying to say anything bad.  I'm

20   just - - -

21     A.   (Interposing) Oh, no.

22     Q.   And, you said in observing the relationship between

23   them, you had known Leah Freeman to strike Mr. McGuffin, but

24   you'd never known him to strike her?

25     A.   Yeah, I don't remember saying that either.

```
                                    Smith   X    D4 47
```

1      Q.   You don't recall that?  Is that accurate as to how

2   it was between them, though?

3      A.   I had seen them argue.  I don't recall seeing

4   anybody hit anybody.

5      Q.   Okay.  You don't recall it being a physical

6   difficulty between them is what you're saying?

7      A.   No, I don't recall that at all.  I know there was

8   arguing.  But I don't remember any physical violence.

9      Q.   And, on the day before the 28th of June, 2000, the

10  four of your had gone swimming together?

11     A.   Correct, yes.

12     Q.   And you had a really good time?

13     A.   Yes.  It was — yeah.

14     Q.   And you felt so good about it that that's why you

15  wanted to get together the next day?

16     A.   Correct.

17     Q.   And then you broke up with your boyfriend, Scott the

18  next day?

19     A.   Correct.

20     Q.   So, you didn't get together?

21     A.   No.

22     Q.   And - - -

23         MR. McCREA:   Excuse me, Your Honor.  Let me

24  have just a moment please?

25         THE COURT:   Yes.

Smith    X    D4  48

1      Q.    In terms of what went on after the 28th, you saw

2    Mr. McGuffin a number of times when you and other people were

3    looking, trying to find Leah?

4      A.    Correct.

5      Q.    And he was very upset?

6      A.    Correct.

7      Q.    Distraught as it were?

8      A.    Uh huh.

9      Q.    Is that fair?

10      A.    Yes.

11      Q.    And then after the time that the body was found and

12    the memorial service had been held, you and Mr. McGuffin got

13    together and were going over reminisces.  Is that correct?

14      A.    Yes.

15      Q.    And this was probably at least a couple weeks or

16    more after - - -

17      A.    (Interposing) After the service, correct.

18      Q.    - - - after the services.  All right.

19            And you were having something to drink at that time?

20      A.    Yeah.

21      Q.    Both of you?

22      A.    Uh huh.

23      Q.    And you got very sentimental?

24      A.    I would say, yeah.

25      Q.    I don't mean to make this maudlin at all, but both

Smith   X     D4 49

1   of you got very sentimental?

2        A.   (No audible response.)

3        Q.   And you got very emotional?

4        A.   (No audible response.)

5             THE COURT:    Please, ma'am, you can't hear.

6   You're going to have to answer out loud.

7        A.   Oh, sorry.  Yes.  Yes.

8             THE COURT:    You have to make sure the

9   microphone's in front of you.

10       A.   Yes.  Sorry.  Okay.  I'm trying to see him, too.

11       Q.   I can - - -

12            THE COURT:    (Interposing) Move the microphone

13  over then.

14            WITNESS:    Oh, okay.

15       Q.   I can see you nod your head, but the recorder can't.

16       A.   Sorry.  Sorry.

17       Q.   That's fine.

18            Anyway, you got very sentimental, the two of you?

19       A.   Correct.

20       Q.   And you began to feel very close, one to the other?

21       A.   Yeah.

22       Q.   Well, it led into one of the more emotional

23  experiences between individuals, and that is — that's when you

24  had sex together.  Is that correct?

25       A.   Correct, yeah.

Smith   X    D4 50

1    Q.    And it was just the one time incident?

2    A.    Just one time, yeah.

3    Q.    Excuse me.

4          One thing, going back to the swimming.  And I don't

5    mean to bounce around out of order, swimming on the 27th of

6    June, did Leah have kind of an accident and jump off a rock

7    and hit her head or get her head off a rock while you were out

8    there swimming?

9    A.    I — not that I recall.

10    Q.    Pardon?

11    A.    Not that I recall.

12    Q.    Okay.

13    A.    She was jumping off the rocks.  But I can't remember

14    if she had an accident of some sort.

15    Q.    She was jumping off a rock?

16    A.    Uh huh.

17    Q.    Did - - -

18    A.    (Interposing) Into the water.

19    Q.    Did — pardon?

20    A.    Into the water, yeah.

21    Q.    Into the water?

22    A.    Uh huh.

23    Q.    Was there some interchange with Mr. McGuffin —

24    between Mr. McGuffin, that is to say Nick McGuffin, and Leah

25    Freeman about her jumping off the rock where he was saying she

```
                                  Smith   X     D4 51
```

1  should be careful.  He was concerned she might hurt herself?

2      A.   Um — I can't remember exact words.  But I know I

3  didn't — I didn't want to.  And I thought they were crazy for

4  jumping off the rocks.

5      Q.   What about — she seemed okay?

6      A.   Yeah.

7      Q.   In any event, the overall thing was you had a really

8  good time?

9      A.   Yeah, yeah.  We had a really good day.  It was a

10 really good day.

11     Q.   One last thing.

12     A.   Okay.

13     Q.   Even though you had broken up with Scott Hamilton

14 did he happen to hear you talking on the phone about the fact

15 that you and Nick had had sex?

16     A.   Yes.

17     Q.   And he had got really upset about it?

18     A.   Yes, he did.

19     Q.   Really angry with you?

20     A.   Uh huh.

21     Q.   Really angry with you guys, both of you?

22     A.   Yes.

23     Q.   I said that was the last thing, but I guess one

24 other thing.  It may come up here.  Without having to get you

25 back here.  You guys went to the prom together; you guys in my

```
                                        Smith   ReD   D4 52
```

1   terminology being you and Leah and Nick and Scott - - -

2        A.    (Interposing) Right.

3        Q.    - - - all went to the prom together?

4        A.    Yes, we did.

5        Q.    And Leah was wearing a white dress?

6        A.    Uh huh.

7        Q.    And this was in the latter part of May that you had

8   the prom?

9        A.    Yeah.  I can't remember the exact date, but I think

10  it was in the end, towards the end.

11       Q.    And she started her menstrual period at that time?

12       A.    Correct, yeah, that night.

13       Q.    Was concerned about the white dress, etcetera?

14       A.    Yeah.

15       Q.    All right.  But, you do have a recollection of that

16  happening?

17       A.    Yes.

18                MR. McCREA:    Those are all the questions I

19  have of this witness, Your Honor.

20                THE COURT:    Redirect.

21                MS. SOUBLET:    Thank you, Your Honor.

22                        REDIRECT EXAMINATION

23  BY MS. SOUBLET:

24       Q.    Ms. Smith, how old were you in the summer of 2000?

25       A.    I had just turned sixteen on June 22nd.

```
                                        Smith   ReD   D4  53
```

1        Q.    How old was the Defendant?

2        A.    Eighteen, I believe — eighteen.

3        Q.    Where did the alcohol come from on the night when

4    you guys had sex?

5        A.    I can't remember.  I don't remember how I got it.

6        Q.    Do you remember telling officers that you felt like

7    you — you felt like Defendant took advantage of you?

8              MR. McCREA:    I'll object, irrelevant, what

9    she felt like in that regard.  And besides it's a 404 issue,

10   Your Honor.

11             THE COURT:    I don't know about the — I'm not

12   too sure.

13             I'll sustain the objection to that question.

14             MS. SOUBLET:    Nothing further.

15             THE COURT:    You may step down.  You're free

16   to leave.

17             WITNESS:    Thank you.

18             THE COURT:    Call your next witness.

19             MR. FRASIER:    Call Sherry Mitchell.

20             SHERRY MITCHELL

21   was thereupon produced as a witness on behalf of the Plaintiff

22   and, having first been duly sworn to tell the truth, the whole

23   truth and nothing but the truth, was examined and testified as

24   follows:

25             THE COURT:    Have a seat up here, please.

```
                                    Mitchell  D    D4 54
```

1                     <u>DIRECT EXAMINATION</u>

2    <u>BY MR. FRASIER:</u>

3        Q.    Could you state your name please, ma'am, and spell

4    your last name for the record?

5        A.    Sherry Mitchell.  It's M-I-T-C-H-E-L-L.

6              MR. FRASIER:    Would you pull that microphone

7    up and scoot up to it a little bit that would help.

8              WITNESS:    Is that better?

9              MR. FRASIER:    Yes.

10       Q.    Could you tell us where you live?

11       A.    I currently live in North Bend, Oregon.

12       Q.    Have you lived in the City of Coquille in the past?

13       A.    I have.

14       Q.    When was that?

15       A.    From my seventh grade year until a little after

16   graduation, so 2003.

17       Q.    When you lived here in Coquille did you live at a

18   particular location?

19       A.    I did.  I lived up behind McKay's on North Elm

20   Street, at forty-four — four, four, four and a half.

21       Q.    All right.

22             I'm going to show you what's marked as State's

23   Exhibit No. 15.  Do you recognize what's portrayed in that

24   photograph?

25       A.    I do.  That was my house.

```
                              Mitchell  D    D4 55
```

1    Q.   And does it accurately portray where your house was

2    and so forth?

3    A.   Yes.

4              MR. FRASIER:   Your Honor, we'd offer State's

5    Exhibit No. 15.

6              MS. McCREA:   No objection, Your Honor.

7              THE COURT:   Received.

8              (Whereupon Exhibit No. 15 was then received

9    into evidence.)

10   Q.   Ma'am, I'm going to put this up on the screen here.

11   There's a — or should be — a laser pointer there.  And the red

12   triangle, push it.  Okay?

13   A.   Okay.

14   Q.   Could you describe this property where you lived at,

15   please?

16   A.   Yeah.  I lived — my mom actually owned both houses.

17   And I lived in the one in the back there down that little

18   driveway.

19   Q.   There's actually two houses there?

20   A.   There's two houses.  There's this one up in the

21   front.  And then down this driveway there's a second house.

22   Q.   And is that one - - -

23   A.   (Interposing) And that's the one I lived in.

24   Q.   Who lived there with you?

25   A.   My mom.

```
                                    Mitchell  D    D4 56
 1      Q.   Anyone else?

 2      A.   My older brother — one of my older brothers lived

 3  there for awhile.  And I'm not sure at what point he moved

 4  into the front house.  So, sorry.

 5      Q.   Okay.  The house in the back where you were living,

 6  where's the door to get into it?

 7      A.   It's right where this — sorry — where this is.  It's

 8  just a little bit to the left of that.

 9      Q.   Now, in the — well, did you know an individual named

10  Leah Freeman?

11      A.   Yes, I did.

12      Q.   How did you know Leah?

13      A.   She was a really good friend of mine.

14      Q.   When did you become acquainted with her?

15      A.   Seventh grade volleyball.

16      Q.   Did you go to school with her?

17      A.   I did.

18      Q.   Where?

19      A.   Coquille High School and well, in middle school.

20      Q.   Middle school.

21           And, how long were you friends?

22      A.   For about three years.

23      Q.   How would you describe your relationship with

24  Ms. Freeman?

25      A.   She was the person that I was closest to at the
```

Mitchell   D    D4 57

1    time.  She was my best friend.

2         Q.    When you started to know her when you were in middle

3    school, what was she like?

4         A.    She was hilarious.  She was so funny and she was fun

5    and she was goofy and like this little ball of energy that

6    nobody could keep up with.  She was just — everybody wanted to

7    be around her.  Like she was just friends with everybody.  I

8    mean, she was just — I don't know — she was awesome.

9         Q.    In the fall of 1999 — well, let me back up.

10             Were you in the same grade with her?

11        A.    I was.

12        Q.    In the fall of 1999 did you start high school

13   together?

14        A.    We did.

15        Q.    What type of activities did she participate in?

16        A.    We played volleyball.  She played volleyball her

17   freshman year.  I don't think that she played basketball that

18   year.  She was a basketball player, but I don't think that she

19   played that year.  If she did I don't remember it.  I remember

20   her playing volleyball.

21        Q.    During the course of her freshman year did — of your

22   own personal knowledge — did you observe whether or not she

23   had a boyfriend?

24        A.    She did.  She was dating Nick McGuffin.

25        Q.    And when did that start?

```
                                    Mitchell  D    D4 58
1      A.    During volleyball.

2      Q.    Did you have some concerns?

3      A.    I did.

4      Q.    What were your concerns?

5      A.    When they first got together my concerns were just

6   that he was just kind of a known — he was known to be a

7   druggy.  So, I was just concerned because I felt like Leah was

8   pretty young to be dating somebody older who was a druggy.

9      Q.    Did you actually write a letter to Mr. McGuffin?

10     A.    I did.

11     Q.    I'm going to show you now what's been previously

12  marked as State's Exhibit No. 80 and I believe previously

13  identified by Officer Wetmore.  Do you recognize that letter?

14     A.    I do.

15     Q.    And did you write that to the Defendant?

16     A.    I did, with the help of Leah.

17     Q.    With the help of Leah?

18     A.    Yes.

19     Q.    Was it intended to be serious, a joke, what?

20     A.    Well, the part about — I didn't want him to hurt

21  her.  And I think that she had concerns, too, because he was

22  kind of a flirt.  And so she wanted to know what his response

23  would be as well.  But, it was mostly a joke.

24                MR. FRASIER:   I'd offer State's Exhibit

25  No. 80.
```

Mitchell   D    D4 59

1          MS. McCREA:    There's no objection.

2          THE COURT:    I'm sorry?

3          MS. McCREA:    There's no objection, Your

4    Honor.

5          THE COURT:    The exhibit number again?

6          WITNESS:    Eighty.

7          THE COURT:    Mister - - -

8          MS. SOUBLET:    No. 80.

9          THE COURT:    No. 80 is received.

10         (Whereupon Exhibit No. 80 was then received

11   into evidence.)

12    Q.    Would you read that for the jury, please?

13    A.    Me?

14    Q.    Sure.

15    A.    Oh, um - - -

16    Q.    (Interposing) Can you read it from there?

17    A.    I think so.  It says:

18              "Mr. McGuffin, okay, here's the deal.  I'm

19              writing you this letter for one reason only.

20              The reason is Leah.  First of all, if you have

21              any bad intentions towards her then I'll be

22              forced to kick your ass.  Second, if you get

23              her started on drugs . . ."

24         My handwriting was terrible.

25    Q.    Okay.  Perhaps if I just - - -

```
                                        Mitchell   D     D4 60
```

1     A.   Yeah, I'm sorry.

2     Q.   Let me just go ahead and have you - - -

3     A.   (Interposing) Okay.  I'm sure.  Okay.

4     Q.   Why don't you go ahead and just read it?

5     A.   Okay.

6                "Second, if you get her started on drugs be the

7                other half of her losing her virginity or

8                anything like that, I'll be so pissed.  Also,

9                you're not to be alone with her when you're

10               drunk or high.  And if you break her heart I'll

11               gut your balls like a fish and use your dick as

12               a fishing pole.  If you think I sound bossy

13               just remember that she is my girl and I'm

14               loaning her to you.  So be thankful.  Anyway,

15               have a fun relationship.  Love always, Sherry

16               Ann."

17    Q.   Now, you mentioned in there that Leah was my girl?

18    A.   Uh huh.  It was a joke.  We had t-shirts made.

19    Q.   What type of t-shirts?

20    A.   Her t-shirt said Sherry's girl; and my t-shirt said

21   Leah's girl.

22    Q.   Did you receive a response back from the Defendant

23   in writing to that letter?

24    A.   I did.

25    Q.   I'm going to show you now what's been marked as

Mitchell  D     D4 61

1   State's Exhibit No. 81.  Do you recognize that?

2       A.   I do.

3       Q.   Is that the letter you received back from the

4   Defendant?

5       A.   Yes.

6       Q.   Now, you kept that in your personal possessions for

7   several years?

8       A.   I did.  I don't think I really knew it was there to

9   be honest.  I kept it with a box of letters from high school.

10  But, yeah, I did.

11      Q.   And last year when the case was reopened were you

12  asked to go through your personal papers?

13      A.   Uh huh.  And that's when I found it in here and

14  handed it over.

15      Q.   And is that letter in the same condition is was when

16  you first received it?

17      A.   Well, the paper is a little browner, but yes.

18      Q.   Has there been any changes to the writing or

19  anything - - -

20      A.   (Interposing) No.

21      Q.   - - - along that line?

22      A.   No.

23      Q.   You turned it over to the police then?

24      A.   (No audible response.)

25              THE COURT:   Your answer is yes?

```
                                         Mitchell  D     D4 62
1                 WITNESS:   Yes.
2                 MR. FRASIER:   We'd offer State's Exhibit
3    No. 81.
4                 MS. McCREA:   There's no objection.
5                 THE COURT:   Received.
6                 (Whereupon Exhibit No. 81 was then received
7    into evidence.)
8        Q.   Would you read that for the jury, please?
9        A.   Yes.  It says:
10                "Sherry Ann:  First of all I like Leah a lot
11                and there's no bad intentions towards her.  I
12                wouldn't hurt Leah.  I couldn't hurt Leah.  I
13                like her too much.  If anyone is going to hurt
14                somebody it would have to be her hurting me,
15                just because it doesn't seem like she likes me
16                that much.  I just hope she doesn't stop liking
17                me, because I like her too much for that.  Oh,
18                yeah, and I wasn't planning on getting Leah
19                started on any bad habits.  I'm not like that.
20                I don't want her to start anyways.  And another
21                thing, if you used my thing as a fishing pole
22                and gutted my balls I would have to seriously
23                hurt you.  After I got out of the hospital,
24                anyways.  So, anyway Leah does like me or what?
25                Because sometimes she doesn't act like it.  And
```

Mitchell  D    D4 63

1          I'm not going to stop trying, but I just need

2          to know.  Well, I've got to go.  Your friend,

3          Nicholas James.

4          P.S.  She's my girl, not yours.  Just kidding."

5     Q.    During the course of the school year as the

6  Defendant and Leah were together did you observe anything

7  different about Leah?

8     A.    I did.

9     Q.    What did you see?

10    A.    Well, she started using drugs.  She stopped being

11 like bubbly and happy and fun to be around.  And kinda became

12 like serious and dramatic.  And she was really jealous which I

13 didn't remember her being before.

14    Q.    Did you have an opportunity to observe her with the

15 Defendant?

16    A.    On occasion.  Mostly just at school.  I didn't

17 really — I hung out with them only once that I can really

18 remember.

19    Q.    How would you describe what their relationship was?

20    A.    Dramatic.

21    Q.    What do you mean by that?

22    A.    They were both pretty jealous.  And they were both

23 also kind of flirty.  So they would flirt with other people

24 and get really jealous.  And they would, like, fight in the

25 parking lot of the high school in front of everybody.  And it

```
                              Mitchell   D    D4 64
```

1  was just dramatic.

2      Q.   Did they fight (not understandable)?

3      A.   I don't remember what the fights were about.  I just

4  remember on one or two occasions them fighting in the parking

5  lot with people around.  And I remember Leah slapped him.  And

6  it was just — it wasn't really like her to be so public like

7  that.

8      Q.   Did you ever see the Defendant strike her?

9      A.   I didn't.

10     Q.   The only thing you saw was her striking him?

11     A.   Uh huh.  I saw him strike a wall, but not her.

12     Q.   Was that after an argument with her or during an

13 argument with her?

14     A.   I don't — again, I don't know what they were

15 fighting about.  But it was something.  And it was at the

16 school, down by our cafeteria.

17     Q.   And you saw the Defendant hit a wall?

18     A.   Twice.

19     Q.   And was there any damage to the wall?

20     A.   Yeah.  He put holes in them.

21     Q.   I want to direct your attention now to June 28th,

22 2000.  Do you remember that day?

23     A.   I do.

24     Q.   And was there some arrangements made for Ms. Freeman

25 to come over to your place?

Mitchell  D    D4 65

1      A.    Uh huh, there was.

2      Q.    And what were the arrangements as best as you can

3  recall?

4      A.    I can't remember who called who, but I know it was a

5  phone call.  And we had agreed that she would come over to my

6  house around seven.

7      Q.    And did she come over to your house at seven?

8      A.    She did.

9      Q.    And did you observe her arriving?

10     A.    Kind of.  I mean, I opened the door and you know, I

11  saw her get out.

12     Q.    Get out of?

13     A.    Of the car.

14     Q.    Which car?

15     A.    I don't remember.

16     Q.    All right.  And who's car?  Who was driving?

17     A.    I know Nick was — Nick dropped her off.

18     Q.    And what happened when Ms. Freeman got out of the

19  car?

20     A.    They weren't like fighting or anything.  They were

21  just kind of, maybe like a little tension.  And then she just

22  came inside.

23     Q.    And what did the Defendant do when she came inside?

24     A.    I think he left.

25     Q.    Now, once Leah came inside what did you — what did

```
                                    Mitchell  D    D4 66
```

1    you two do?

2        A.    We just hung out.  We went in my room and listened

3    to music and hung out.  She wrote me a letter while I was

4    sitting there and made fun of my music.  And - - -

5        Q.    (Interposing) You mentioned she wrote you a letter?

6        A.    She did.

7        Q.    When did you — did you see her writing this letter?

8        A.    I saw her writing.  I don't think I knew she was

9    writing me a letter.  It wasn't uncommon for her to do that,

10   though.  I mean, she just wrote letters all the time.  So, I

11   saw her writing.  I don't think that I actually found it until

12   after she left.  Like, I realized it was a letter that she was

13   writing to me.

14       Q.    And it was after she left that you found it?

15       A.    I think so.

16       Q.    Let me show you what's been marked as State's

17   Exhibit No. 82 and ask if you can identify that?

18       A.    Yes.  That's the letter she wrote me.

19       Q.    And is it in the same condition as when you found

20   it?

21       A.    Yes.

22       Q.    The writing hasn't been changed or anything like

23   that?

24       A.    No.

25       Q.    And you turned that over the police back in the year

```
                                  Mitchell   D     D4 67
 1   2000?

 2      A.   Yes.

 3              THE COURT:    Your answer was yes?

 4              WITNESS:    Yes.  Sorry.

 5              MR. FRASIER:    Your Honor, we'd offer State's

 6   Exhibit No. 82.

 7              MS. McCREA:    There's no objection, Your

 8   Honor.

 9              THE COURT:    Received.

10              (Whereupon Exhibit No. 82 was then received

11   into evidence.)

12      Q.   Would you read that for the jury, please?

13      A.   Yes.  It says:

14              "6/28 of 2000.  Sherry Ann Mitchell.  Hey girl,

15              how are you?  I hope you can come.  It would

16              make me feel better.  Not that I know if you'll

17              even read this by then.  Anyways, how's life?

18              All here I guess.  Nick and I have been getting

19              along a lot better.  I wasn't really mad at

20              Nick when I got out to come over to the house.

21              I just didn't feel like being around him

22              anymore tonight.  I love him to death, but that

23              boy gets an attitude sometimes.  And that was

24              one of them.  Anyways, this music you're

25              listening to is really giving me the heebie
```

Mitchell   D    D4 68

1          jeebies.  Just kidding.  I don't really mind.

2          Oh, good, now you're changing it.  Well, I'm

3          going to go now.  I love you.  Love, Leah

4          Nicole."

5     Q.   Now, when Ms. Freeman came over that evening, what

6   were your plans?

7     A.   I don't — we were just going to hang out.  I don't

8   think we made plans.

9     Q.   Was there a point in time where a discussion was had

10  about going jogging?

11    A.   Uh huh.  Yeah, while she was there we decided that

12  we were going to go jogging together.

13    Q.   And how much time had elapsed from the time she

14  arrived until you started having this discussion about

15  jogging?

16    A.   Probably like an hour, hour and a half.  I mean it

17  was eight or eight thirty.

18    Q.   Had you gone jogging with her before?

19    A.   Yeah.  We went jogging together a lot.

20    Q.   When you went jogging where would you go?

21    A.   Just around Coquille.  Sometimes we would run the

22  loop.  Sometimes we would jog down to Fifth Street Park.  I

23  mean, we didn't have a particular path.  We would just jog.

24    Q.   How long would these jogs take?

25    A.   I mean it would depend on where we went.  You know,

Mitchell   D     D4 69

1   sometimes they would just be — I mean, it wasn't like an

2   exercise thing.  It was like a leisure thing.  So, I mean,

3   they would sometimes turn into a walk that would take a few

4   hours.  I mean - - -

5       Q.   Now, when you said the loop, just so we're clear.

6   What's the loop?

7       A.   The new highway around Coquille and like through, by

8   the high school.

9       Q.   You would run down Central, out on the bypass and

10  then back - - -

11      A.   (Interposing) Yes.

12      Q.   - - - back to your house?

13      A.   Yes, yes.

14      Q.   Now, did Ms. Freeman come with jogging clothes?

15      A.   No.  We didn't plan on going jogging before she got

16  there.

17      Q.   And was there — how would — well, if you were to

18  have gone jogging, what type of clothing would she have used?

19      A.   She would have just borrowed some of my shorts.  And

20  I think she — I mean, she had on a tank top she could have

21  jogged in.  And she had on her shoes that she could have

22  jogged in.  She would have just borrowed shorts.

23      Q.   Did you go and talk to your mom about going jogging?

24      A.   I did.

25      Q.   And where was your mom when you had that discussion?

Mitchell   D     D4 70

1    A.    I think she was just downstairs.

2    Q.    Did Leah come downstairs with you?

3    A.    Not in the beginning.  I think she was changing.

4    Q.    What happened when you went downstairs and talked to

5  your mom?

6    A.    Well, I went down to ask her if I could go jogging.

7  And she said, "No."  She asked — well, she asked if Leah was

8  going to jog the whole way with me.

9         And I said I didn't know because it was close to the

10 time when Nick was going to come get her.  And so, in the past

11 he had — sometimes when we were jogging he would pick her up

12 somewhere in the middle of our jog and I would run home alone.

13 And my mom would get mad that I was in the dark by myself.

14        And so, when she asked me that I said I didn't know

15 because I didn't.  And so she said she didn't want me to go.

16 And so I got in a fight with her because I wanted to go

17 jogging.

18    Q.    What time was it that you understood the Defendant

19 was coming to pick up Ms. Freeman?

20    A.    Nine.

21    Q.    Was there a concern that you would have enough time

22 to go jogging and still be back in time for - - -

23    A.    (Interposing) I don't remember ever really thinking

24 about it, to be honest.  I mean, I think that I kind of

25 assumed that somewhere during our jog he would pick her up.

```
                                       Mitchell  D    D4 71
```

1   And that was fine with me.  It just wasn't fine with my mom.

2       Q.   So, you indicated you got into a fight with your mom

3   about not going?

4       A.   Uh huh.

5       Q.   Was it verbal?

6       A.   Yeah.

7       Q.   Loud?

8       A.   Probably.

9       Q.   Okay.  Did you go back upstairs to where Leah was?

10      A.   I think she came — she came down while we were

11  fighting.  My mom and I were fighting.  Because I was trying

12  to get her to let me go.  And Leah came down.

13      Q.   How was Leah dressed at that time?

14      A.   I think she was back in her jeans.  I don't know if

15  she ever actually changed or not.  I went downstairs.  And I

16  assumed she was changing, but - - -

17      Q.   Do you recall what she was wearing that night?

18      A.   Yeah.  She was wearing a white men's wife beater,

19  but it wasn't a men's because it had elastic straps on it.

20  And I think she was wearing light colored jeans and like

21  running shoes.

22      Q.   I'll show you State's Exhibits Nos. 7 and 8.  Does

23  that appear to be what she was wearing that day?

24      A.   Yes.

25      Q.   What happened when Ms. Freeman came down the stairs?

```
                                    Mitchell   D     D4 72
```

1      A.    She just walked straight outside.

2      Q.    Try to stop her?

3      A.    Well, I followed her.

4      Q.    What happened?

5      A.    She said, "Oh," you know, she said, "Your mom hates

6   me."

7            And I said, "She doesn't, you know, she doesn't hate

8   you.  She just doesn't want me running by myself in the dark."

9            And I said, you know, "It's happened a few times."

10           And I said, "She doesn't hate you."

11     Q.    How did she respond?

12     A.    Well, I think I had told her, you know, it wasn't

13  about her.  You know, of course that we loved her.  That it

14  was just maybe about some of the decisions that she'd been

15  making lately that made my mom, you know, just not sure if —

16  if I should go running with her or not.  And then of course we

17  started talking about her doing drugs and Nick.

18     Q.    What did you tell her?

19     A.    I just — just that I didn't think she should be

20  doing drugs.  I thought she was better than that.  I mean, it

21  wasn't honestly about Nick.  It was about — you know, what she

22  was doing.

23     Q.    Did you discuss her relationship with Nick?

24     A.    Uh huh.  Yeah.  Yes.

25     Q.    What was said?

Mitchell   D     D4 73

1    A.    Just that he — I mean, I didn't think they were very

2  good together.  They were — they didn't bring out the best in

3  each other; they brought out the worst in each other.  And,

4  you know, it wasn't something that I had really told her

5  before.  And so I was just honest and just told her I didn't

6  think they were a great couple.

7    Q.    How did she respond?

8    A.    She said, "I'm sorry I'm not good enough for you."

9  And she walked away.

10   Q.    Which way did she walk?

11   A.    She walked from Elm down Fourth towards McKay's.

12   Q.    Did you follow her?

13   A.    No.  I stood there and watched her for a little bit.

14  I think I thought she was going to come back.  I thought she

15  would turn around.  But I didn't follow her.

16   Q.    Where was she the last time you saw her?

17   A.    Walking on Fourth, just probably like in between my

18  road and where the road goes down.

19   Q.    Do you recall roughly about what time it was when

20  she left?

21   A.    It was almost nine.  It was like maybe eight forty-

22  five, eight fifty.  It was really close to nine.

23   Q.    After she left what did you do?

24   A.    I went back inside and — I was crying.  So, I just

25  went home.

```
                                    Mitchell   D    D4 74
 1      Q.   Did the Defendant eventually show up?

 2      A.   He did, just like minutes after.

 3      Q.   When you say minutes, can you give us an approximate

 4  amount of time?

 5      A.   It wasn't long.  I remember he — when he showed up,

 6  I said, "You had to have just missed her."

 7           I said, you know, "I'm sure, you know, she's not

 8  far."

 9           And I told him, "She's . . ." you know, I said,

10  "She's probably walking home.  You'll catch her."

11      Q.   Now, you had walked to her house with her from your

12  house?

13      A.   Yeah.

14      Q.   Multiple times?

15      A.   Yes.

16      Q.   Was there a particular route that she took?

17      A.   We wouldn't usually go all the way down to McKay's.

18  I don't know what route she took that night.  But normally we

19  would have gone left on — I don't know the name of the road.

20  But it would take you left and you would come down by Fast —

21  the old Fast Mart.  And then we would hit the — Central.

22      Q.   And this road would — if you're talking about turn

23  off, this is off of Fourth?

24      A.   Yes.

25      Q.   That would be before you get to McKay's?
```

```
                                    Mitchell   D     D4 75
 1      A.   Yes.  There's two roads.  And it would have been the
 2   first one if you left my house.  Sorry, I don't know the name
 3   of it.
 4      Q.   Now, when the Defendant came to your house what did
 5   you tell him?
 6      A.   I told him, "We got in a fight.  She just left.  I'm
 7   sure you can catch her."
 8      Q.   When you said you into a fight, did you describe
 9   what the fight was about or anything like that?
10      A.   I — I — not that I remember him.  As far as I
11   remember he didn't ask.  I didn't tell him.  He got in the car
12   and left.
13      Q.   After the Defendant left — well, let me ask you
14   this.  What type of car was he in when he came, do you recall?
15      A.   I don't remember.  I know he had two cars.  And I
16   don't remember what he was ever driving.  So, sorry.
17      Q.   That's okay.
18           After the Defendant left, what did you do?
19      A.   I don't remember.  I probably went upstairs,
20   probably went up to my room.
21      Q.   Did you leave your house?
22      A.   No.  I stayed there.
23      Q.   At some point in time did the Defendant return?
24      A.   Yeah, he came back.  It was about an hour later.  It
25   was about ten o'clock.
```

```
                                    Mitchell  D    D4 76
```

1    Q.   What happened when he came back to your house?

2    A.   He came back, asked if Leah was there.  I said, "No.

3  You didn't find her?"

4         And he said, "No."

5         I said, "Well, she probably walked home.  You know,

6  did you call her mom?"

7         And he said, "No."

8         I said, you know, "Well, call her mom."  And I gave

9  him the phone and dialed it for him.  And he called Cory and

10  Leah wasn't there.  And then he left again.

11    Q.   Did you see him again that night?

12    A.   No.

13    Q.   Did you do anything after he had come to your house

14  and said that he couldn't find Leah.  Did you do anything

15  after that?

16    A.   Yeah.  I had my older brother drive me down to Fifth

17  Street, just because it was a place that me and Leah went

18  often with each other.  And I thought, well, you know, Nick

19  wouldn't probably drive there and think she was there.  I

20  thought maybe she's down there on the swings or something.

21  And so I just had my brother drive me to Fifth Street.  And

22  she wasn't there.  And so then I just went back home.

23    Q.   Thanks.

24         MR. FRASIER:   Your Honor, that's all the

25  questions I have at this time.

```
                                    Mitchell   X    D4 77

 1              THE COURT:    Ms. McCrea.

 2                     CROSS EXAMINATION

 3   BY MS. MCCREA:

 4       Q.   Ms. Mitchell, after Leah Freeman left — well, let me

 5   back up.

 6            You were dating a guy named Corey Bryant back on

 7   June 28ᵗʰ of 2000.  Is that correct?

 8       A.   Yes.

 9       Q.   And after Leah Freeman left, after the fight between

10   the two of you, your boyfriend Corey Bryant showed up at your

11   house?

12       A.   Yes.  I honestly — that wasn't something that I even

13   remembered.  But I ran into him a few months back and he told

14   me about that.  I'm sure he did.  It wouldn't have been

15   something that stuck in my head because he came by a lot.

16       Q.   And at this point, on June 28ᵗʰ, you've indicated

17   that you've said some things to Leah that you had never said

18   to her before?

19       A.   (No audible response.)

20       Q.   You're nodding yes?

21       A.   Yes.

22       Q.   And she became extremely upset in response.  Is that

23   fair?

24       A.   Yes.

25       Q.   And that made you be extremely upset as well?
```

```
                                    Mitchell   X    D4 78
 1        A.   Yes.

 2        Q.   And I think you said that you started crying?

 3        A.   Yes.

 4        Q.   Do you know if Leah was crying when she left?

 5        A.   Yes, she was.

 6        Q.   She was crying.  Okay.

 7             When she came over at around seven o'clock, was your

 8   mom home at that time?

 9        A.   I don't remember if my mom was home or if she got

10   home at some point while Leah was there.

11        Q.   But the two of you, you and Leah, were upstairs in

12   your room as you say, hanging out?

13        A.   Uh huh.

14        Q.   Uh huh, yes?

15        A.   Yes.

16        Q.   Sorry.  We've just got to get it on the record.

17        A.   Yes.

18        Q.   Okay.  Now, prior to this rendezvous, on June 28th,

19   would it be fair to say that you and Leah had not been

20   spending as much time together as you had been in the past?

21        A.   Yes, it would be fair.

22        Q.   When — the two of you would do a lot of stuff.  But

23   when Leah started dating Nick McGuffin, she was spending most

24   of her time with him.  Is that correct?

25        A.   Yes.
```

```
                                    Mitchell   X     D4 79
```

1    Q.    The two of you would write notes back and forth?

2    A.    Yes.

3    Q.    And I want to, if I might, show you some notes.

4          MS. McCREA:    Let me show Counsel first.

5          It's kind of hard to navigate back here.

6    Q.    Ms. Mitchell, I'm going to show you what's been

7    marked for identification as Defendant's Exhibits Nos. 115,

8    116, 117, 118 — let me try not to drop them on the floor —

9    119, and 120.  Would you just take a second and take a look at

10   those?

11   A.    Yeah.

12   Q.    So, do you recognize each of those exhibits as notes

13   that you sent to Leah or gave to Leah Freeman?

14   A.    Are you asking me if I remember them all or if I

15   recognize them?

16   Q.    Well, do you — okay.  Let me ask you this.  Can you

17   not remember them.  The first one which would be Exhibit — is

18   that No. 116?

19   A.    No. 115.

20   Q.    No. 115.  That is a typed document.  The rest of

21   them are handwritten?

22   A.    Yes.

23   Q.    So, is the typed document signed by you?

24   A.    Yes.

25   Q.    And you remember writing that to her?

Case 6:20-cv-01163-MTK    Document 295-2    Filed 01/07/25    Page 425 of 1666

Mitchell   X    D4 80

```
 1        A.   Yes.

 2        Q.   Okay.  The other ones, do you recognize your

 3   handwriting?

 4        A.   Yes.

 5        Q.   And do you believe that these are documents that you

 6   gave or sent to Leah?

 7        A.   Yes, I do.

 8        Q.   And do they — obviously they're copies of the

 9   originals.  Do they appear to be what you gave to her?

10        A.   Yes.

11             MS. McCREA:    With Mr. Frasier's permission

12   since the originals are in the custody of the Prosecution we

13   would offer Nos. 115, 116, 117, 118, 119, and 120, Your Honor.

14             MR. FRASIER:    I have no objection.

15             THE COURT:    Received.

16             (Whereupon Exhibits Nos. 115 116, 117, 118,

17   119, and 120 were then received into evidence.)

18        Q.   So, Ms. Mitchell, I'm not going to ask you to read

19   all of those out loud.  But the tenor of those notes is, you

20   and Leah had the kind of relationship where the note that she

21   wrote to you the night of June 28th, she started out, "Hey

22   Girl?"

23        A.   Uh huh.

24        Q.   Yes?

25        A.   Yes.
```

Exhibit 102  Page 425 of 1666 to
State Defendants' Motion for Summary Judgment

Mitchell   X    D4 81

1    Q.   Okay.  Sorry.

2         And you would start out some of your notes that way.

3    And some of them you would start out saying, "Hey my girl,"

4    kind of thing.  Right?

5    A.   Um-m-m.  Okay.  Yes, "Hey, how's my girl."  Right.

6    Q.   And some of them, it was, "Hey sexy girl?"

7    A.   Uh huh.

8    Q.   Or, "Hey sexy lady," that sort of thing?

9    A.   Uh huh.  Yes.

10   Q.   Okay.  And then I want to show you what's been

11   marked for identification as Defendant's Exhibit No. 123.  Do

12   you recognize that document?

13   A.   No.

14   Q.   The document is addressed to a Mr. Hall.  And do you

15   recognize the handwriting in the document?

16   A.   Yes, it's Leah's.

17   Q.   It's Leah's handwriting.  And were you interested in

18   a boy at school at that — in 2000 by the name of Robert Hall?

19   A.   Yeah.  We went to homecoming or something together.

20   Q.   Okay.

21   A.   That was about the extent of our relationship

22   though.

23   Q.   And in this letter, in Leah's letter, in her

24   handwriting, to Mr. Hall, she references the same type of

25   language to him as you wrote to Nick McGuffin about not

Mitchell   X    D4 82

1  breaking her heart and the language about, "I'll gut your

2  balls like a fish and use your dick as a fishing pole?"

3      A.   Uh huh.

4      Q.   So, do you know, was she writing that at the same

5  time that you're writing the letter to Mr. McGuffin?

6      A.   It sure looks like it.

7      Q.   Do you - - -

8      A.   (Interposing) I don't remember it, but I know that

9  Leah was with me when I wrote the letter to Nick.  And it

10 looks like — I don't remember this.  But we obviously wrote

11 one to him as well.

12     Q.   And it was in the tenor of sort of a joke or a fun

13 kind of thing?

14     A.   Uh huh.  I'm sure I wanted to know what his response

15 would be, the same way she wanted to know what Nick's was

16 going to be.

17     Q.   And that was Exhibit No. 123.

18          MS. McCREA:   We'd offer No. 123, Your Honor.

19          MR. FRASIER:   Your Honor, I don't have an

20 objection to No. 123, but I think we need to lay the

21 foundation of where it was found.  And I don't have a problem

22 stipulating to it.  But my understanding is, No. 123 was found

23 in Ms. Freeman's property.

24          Correct?

25          MS. McCREA:   I received it from you in

Mitchell  X    D4 83

1  discovery.  So, I believe it was found in her property, yes.

2          THE COURT:    Okay.  He just wants to

3  stipulate.  And you're saying you believe.  Is that a

4  stipulation or not?  I don't care whether you do.  I just need

5  to know.

6          MR. FRASIER:    My point is it didn't come from

7  Mr. Hall.  It came from - - -

8          MS. McCREA:    (Interposing) It was — yes, the

9  parties can stipulate, Your Honor, that this document, Exhibit

10  No. 123, was found in Ms. Freeman's possessions when the

11  search was done either at the premises of Mr. Murphy or at the

12  house on Knott Street.  And it has been in the Prosecution's

13  possession ever since.

14          MR. FRASIER:    That's fine.

15          THE COURT:    Okay.

16          You can take that stipulation as a fact in the

17  case, Ladies and Gentlemen.

18          MR. FRASIER:    With that I don't object to the

19  exhibit.

20          THE COURT:    It's received.

21          (Whereupon Exhibit No. 123 was then received

22  into evidence.)

23      Q.   Ms. Mitchell, just a couple more questions.  So,

24  Leah's — Leah Freeman started dating Nick McGuffin in the fall

25  of 1999?

Mitchell   X     D4 84

1          A.    Yes.

2          Q.    And there was a time when Leah's mother, Cory

3     Courtright, said to Leah, "You're not going to see Nick

4     anymore?"  Do you remember that?

5          A.    Vaguely.

6          Q.    And Leah was upset about that.  Wasn't she?

7          A.    Well, yeah.

8          Q.    And then eventually her mom said that she could see

9     Nick again?

10         A.    Yeah, I think she kind of gave in, because what else

11    was there to do?  She wanted to be able to communicate with

12    her daughter.  And she knew Leah was going to hide it from

13    her.

14         Q.    Okay.  So, during the period of time when Leah was

15    dating Nick the two of you would exchange notes and that sort

16    of thing, but you weren't doing as much together as friends as

17    you had been?

18         A.    Correct.

19         Q.    And based on the concerns that you've expressed, and

20    you tell me if I'm right or wrong, and the fact that Nick

21    McGuffin was significantly older than Leah Freeman, would it

22    be fair to say that you did not approve of their dating

23    relationship?

24         A.    Absolutely.

25         Q.    But the first time you actually made that known to

Mitchell   X    D4 85

1   Leah was the night she came over on June 28th?

2       A.   It wasn't the first time I made it known.  It was

3   the first time that I made it known maybe as strongly as I

4   did.  It was the first time that I was just blatantly honest

5   with her.  It's — Leah never thought that I thought her and

6   Nick were a great couple.  But it was the first time that I

7   just told her exactly how I felt.

8              MS. McCREA:   If I might just have a moment,

9   Your Honor.

10             THE COURT:   Yes.

11      Q.   So, Ms. Mitchell, is it fair to say that Leah was

12  not mad at Nick McGuffin when she arrived at your house?

13      A.   When I asked her, because like I said there had been

14  some tension.  I noticed some tension.  I asked her if they

15  were okay?  And she said that they weren't really fighting,

16  buy that Nick hadn't wanted her to come by herself.  Like he

17  had wanted to come in with her.  And she wouldn't let him.

18  And so there had been some tension there because of that.

19      Q.   Okay.  But that - - -

20      A.   (Interposing) But I don't think they were fighting,

21  fighting.

22      Q.   Okay.  And she wasn't mad at Nick.  Nothing had

23  changed concerning him when she left your house?

24      A.   Not that I knew of.

25      Q.   Okay.  Thank you.

```
                                      Mitchell  ReD  D4 86
```

1          MS. McCREA:   Nothing - - -

2     A.   She didn't say, "I'm going to break up with him or

3  anything."

4     Q.   Yeah.  Her reaction was more to the contrary.  She

5  was mad at you for bringing it up?

6     A.   Yes.

7     Q.   Okay.

8          MS. McCREA:   Nothing further, Your Honor.

9          THE COURT:   Redirect.

10          MR. FRASIER:   Thank you.

11                    REDIRECT EXAMINATION

12  BY MR. FRASIER:

13     Q.   Ms. Mitchell, you indicated I think in response to

14  Counsel's questions that you didn't think it was a good idea

15  for these two to be together because of their age difference.

16  Was there other reasons?

17     A.   It wasn't as much their age difference as it was the

18  drug factor.  You know, the factor that Nick was kind of a

19  known flirt.  And he was definitely a know druggy.  But then

20  as time went on I didn't think they were good together.  They

21  fought a lot.  They were, you know, Leah had changed a lot.

22  She went from being really happy and funny to just kind of

23  upset a lot.  And she — I had never seen her be angry and slap

24  somebody or be overly dramatic or overly jealous.  I'd never

25  seen those things from her.  And I felt like maybe they — he

```
                                   Mitchell   ReD   D4 87
```

1   brought that out in her.

2        Q.   And you expressed that to her before she left?

3        A.   Yes.

4        Q.   Thank you.

5             MR. FRASIER:   That's all I have, Your Honor.

6             THE COURT:   You may step down, ma'am.   You

7   are free to leave.

8             WITNESS:   Thank you.

9             THE COURT:   We will take a recess until about

10  eleven.

11            Everybody else remain seated until the jury has

12  a chance to go to the jury room.

13            (Jury Out.)

14            THE COURT:   We'll be in recess until eleven.

15            (RECESS.)

16            (Jury In.)

17            JUDICIAL ASSISTANT:   All rise.

18            THE COURT:   Be seated please.

19            Call your next witness.

20            MR. FRASIER:   Thank you, Your Honor.

21            We call Peggy Mitchell.

22            MARGARET (Peggy) MITCHELL

23  was thereupon produced as a witness on behalf of the Plaintiff

24  and, having first been duly sworn to tell the truth, the whole

25  truth and nothing but the truth, was examined and testified as

```
                                      M. Mitchell   D     D4 88
 1  follows:

 2              THE COURT:   Have a seat up here, please.

 3                    DIRECT EXAMINATION

 4  BY MR. FRASIER:

 5      Q.   Could you state your name please, sir, and spell

 6  your last name for the record?

 7      A.   Margaret Mitchell.  Do you want my real name?

 8      Q.   Sure.

 9      A.   Margaret Mitchell.  Last name, M-I-T-C-H-E-L-L.

10      Q.   Do you have a nickname?

11      A.   Peggy.

12      Q.   Where do you live, ma'am?

13      A.   I live in North Bend, Oregon.

14      Q.   Are you familiar with Sherry Mitchell?

15      A.   Yes.  That's my daughter.

16      Q.   In the summer of 2000, could you tell us where you

17  were living?

18      A.   Four forty-four and half North Elm Street in

19  Coquille.

20      Q.   How long had you lived there?

21      A.   That's a good question.  A few years.

22      Q.   Are you familiar with an individual named Leah

23  Freeman?

24      A.   Yes.

25      Q.   How do you know Ms. Freeman?
```

1    A.   Leah and my daughter were very good friends for a
2  few years.
3    Q.   When did they first get to know each other?
4    A.   I don't exactly know.  Middle school maybe.
5    Q.   How often would you see Leah?
6    A.   In the past, often.  Sometimes she spent two or
7  three days in a row at our house.  And — are you talking about
8  in the past or when I last saw her?
9    Q.   Well, okay.  Let me - - -
10   A.   (Interposing) It changed.  It changed.  In the past
11 she spent a lot of time with my daughter.
12   Q.   And this would be while they were in middle school?
13   A.   Yes.
14   Q.   Did they play sports together?
15   A.   They did.
16   Q.   What type of sports?
17   A.   Track and volleyball.
18   Q.   Were they in the same grade?
19   A.   Yes.
20   Q.   Now, in the fall of 1999, your daughter became a
21 freshman at Coquille High School?
22   A.   Uh huh.  Yes.
23   Q.   And that would have been at the same time that Leah
24 Freeman became a freshman?
25   A.   Yes.

M. Mitchell   D    D4 90

1      Q.    Now, you indicated that she spent a lot of time at
2  your house, but then that changed?
3      A.    Right.  Yes.
4      Q.    When did that occur that she stopped coming over so
5  much?
6      A.    Roughly about the time she started dating Nick.
7      Q.    You became aware that she was dating the Defendant
8  Nicholas McGuffin?
9      A.    Yes.
10     Q.    Did you have an opportunity to observe these two
11 together?
12     A.    No.
13     Q.    I want to go now to June 28th of 2000.  Do you
14 remember that day, ma'am?
15     A.    Yes.
16     Q.    Had you been working that day?
17     A.    Yes.  I — yes.
18     Q.    About what time was it when you got home?
19     A.    About seven p.m.
20     Q.    And who was there when you got there?
21     A.    Leah.  My daughter was there and Leah was there.
22     Q.    She had gotten there before you did?
23     A.    Either just before or just after.  I didn't go right
24 in the house.
25     Q.    And what did the two girls do when they got — while

M. Mitchell    D    D4 91

1   you were there?

2       A.   They were upstairs in Sherry's room doing what girls

3   do.

4       Q.   What were you doing?

5       A.   I was — actually I was out in my yard in a lawn

6   chair just trying to relax.

7       Q.   Now, how long — well, let me ask you this.

8            Did you have any idea how long Leah was supposed to

9   be there that night?

10      A.   I understood Nick was to pick her up around nine.

11      Q.   Now, did your daughter, Sherry, come to you and ask

12  if she could go jogging?

13      A.   Yes, she did.

14      Q.   Do you recall roughly when in the evening that was?

15      A.   Roughly nine-ish.

16      Q.   And what happened when your daughter came and asked

17  you?

18      A.   I was a mom.  We got in an argument.  I told her no,

19  she couldn't go running.  And, you know, we got in a little

20  argument about that.

21      Q.   Where was Leah during this?

22      A.   Leah, at the time — I'm not sure if Leah was still

23  upstairs or downstairs.  But we were right at the base of the

24  staircase.

25      Q.   And did Leah come downstairs shortly after this

M. Mitchell   D    D4 92

1    argument?

2        A.    Yes.

3        Q.    And how was she behaving when she came downstairs?

4        A.    She seemed upset, went out the door kind of quickly.

5        Q.    Did you follow her?

6        A.    I did not.

7        Q.    Stay in the house?

8        A.    I did.

9        Q.    Do you recall what she was wearing that night?

10       A.    I don't.  But when both girls came downstairs and

11   wanted to go running, they both had shorts on.

12       Q.    I'm going to show you what's marked as State's

13   Exhibits Nos. 7 and 8.  I believe it's been represented were

14   taken of Leah that day.  Do they — does that help your memory

15   any?

16       A.    She often wore a tank top.  I — it doesn't.

17       Q.    What happened after Leah went out the door?

18       A.    My daughter followed her.

19       Q.    Did you see or hear what happened?

20       A.    I didn't.

21       Q.    Did your daughter eventually come back in the house?

22       A.    She did.  She came back a few minutes later, very

23   upset because Leah had been crying.

24       Q.    Did your daughter have a boyfriend at that time?

25       A.    She did.

M. Mitchell   D    D4 93

1    Q.    Do you recall his name?

2    A.    His name was Corey.

3    Q.    Did Corey show up at any time?

4    A.    I don't remember.  He was there often, but I don't

5    remember.

6    Q.    Now, did the Defendant show up at your home?

7    A.    That would be Nick?

8    Q.    Yes.

9    A.    Yes, he did.

10    Q.    About what time was that?

11    A.    Roughly ten or fifteen minutes after nine.

12    Q.    Let me back up.  We've heard testimony that the

13    Defendant showed up shortly after Leah left.  Did you see him

14    at that time?

15    A.    I'm not sure.  I think so.  I think — I remember

16    being with Sherry at the time.  And both of us — either I

17    heard him right next to the door.  Sherry said, "You should

18    have just passed him," or, "Just passed her because she just

19    left."  That's all I remember.

20    Q.    Now, you recall him coming back at around ten?

21    A.    Yes.

22    Q.    Can you describe what happened when he came to your

23    house at ten o'clock?

24    A.    I think I had just locked the door.  We were just

25    getting ready to go to bed.  And he sounded pretty frantic

M. Mitchell   X    D4 94

1  behind the door.  So, I let Sherry open it.  And said he

2  hadn't found Leah still.  And so we were both very surprised.

3  And Sherry asked him if he had talked to Cory, to Leah's mom.

4  And Nick hadn't.  And so she dialed the phone and handed him

5  the phone so he could call her.

6        Q.   Did you let him in your house?

7        A.   No.

8        Q.   How long did he talk on the phone?

9        A.   Not long.  Just long enough to ask if she'd seen

10  Leah yet.

11        Q.   What happened when the phone call was done?

12        A.   Nick left.  We closed the door.  I went to bed.

13  Shortly thereafter Sherry's brother — one of her brothers took

14  her to the park to go and see if Leah was where Sherry might

15  be.  And Sherry came back home.

16        Q.   Did you see Leah Freeman again after the time you

17  saw her at your house?

18        A.   No.

19        Q.   Thank you.

20             MR. FRASIER:   That's all the questions I have

21  at this time.

22             THE COURT:   Ms. McCrea.

23                   CROSS EXAMINATION

24  BY MS. MCCREA:

25        Q.   Ms. Mitchell, the house on Elm where you were living

M. Mitchell   X    D4 95

1  with your daughter in June of 2000 was a pretty small house,

2  wasn't it?

3      A.   Yes.

4      Q.   And Sherry's room was upstairs?

5      A.   Yes.

6      Q.   So, when you and Sherry were arguing at the base of

7  the stairs, the volume — well, let me put it this way.  Did

8  the volume of the argument increase?

9      A.   I don't remember.

10      Q.   Was it the kind of situation where she said, "Can

11  Leah and I go jogging?"

12           And you said, "No."  And she continued to persist in

13  trying to get you to change your mind?

14      A.   Yes.

15      Q.   Okay.  So, she's saying, "Come on, mom, let us go."

16           And you're saying, "No?"

17      A.   That's right, yes.

18      Q.   All right.  And the two of you were talking in

19  voices that would have carried upstairs?

20      A.   Yes.

21      Q.   Okay.  How long did the argument last, as best you

22  can recall?  How many times — let me rephrase it this way.

23  How many times do you think you had to say no?

24      A.   Typically it would have been three or four.  So, I'm

25  going to say it two to three minutes at the very most.

M. Mitchell   X    D4 96

1    Q.   During the time that you were telling Sherry no,

2   didn't you also indicate to her that you didn't want her to

3   have to come back in the dark if Nick came by and picked up

4   Leah?

5    A.   Yes.

6    Q.   And that was the concern that you had?

7    A.   Yes.

8    Q.   So, were the two of you still arguing when Leah came

9   downstairs?

10   A.   I don't remember.

11   Q.   So, Leah comes downstairs.  And did she say anything

12   before she walked out the door?

13   A.   Not to me, no.

14   Q.   She appeared to be upset?

15   A.   Yes.

16   Q.   And then Sherry went out after her and you did not

17   hear that conversation?

18   A.   No.  That's right.

19   Q.   When Nick McGuffin came back to the house around ten

20   o'clock, did you see what car he was driving?

21   A.   No.

22   Q.   When once he spoke with Cory, with Cory that is

23   Leah's mom, he indicated to you that he was going to continue

24   looking for Leah?

25   A.   I don't remember.  I just remember that's what we

M. Mitchell   X    D4 97

1  expected.

2      Q.   And he didn't say anything to the contrary?

3      A.   No.

4      Q.   Thank you.

5          MS. McCREA:    That's all the questions I have.

6          THE COURT:    Any redirect?

7          MR. FRASIER:    I have one matter I didn't

8  bring up in my direct that I remember.

9          THE COURT:    Okay.

10              DIRECT EXAMINATION, Continued

11 BY MR. FRASIER:

12     Q.   Ma'am, a few days before June 28th, do you ever

13 recall being at the Fast Mart store and talking to Leah

14 Freeman about her relationship with Nick McGuffin?

15     A.   I don't remember.

16     Q.   Do you ever recall telling Leah at any time that you

17 were upset with her behavior and what she was doing and places

18 she was hanging out?

19     A.   No.

20     Q.   Okay.

21         MR. FRASIER:    That's all I have.

22         THE COURT:    Any cross on that point?

23         MS. McCREA:    No, Your Honor.

24         THE COURT:    You may step down, ma'am.  You

25 are free to leave.

Bryant   D      D4 98

1              Call your next witness.

2              MR. FRASIER:    Call Corey Bryant.

3                        COREY BRYANT

4    was thereupon produced as a witness on behalf of the Plaintiff

5    and, having first been duly sworn to tell the truth, the whole

6    truth and nothing but the truth, was examined and testified as

7    follows:

8              THE COURT:    Have a seat up here, please.

9              Make sure you sit closer please and make sure

10   the microphone's in front of you there and keep your voice up,

11   please.

12             Go ahead.

13             MR. FRASIER:    Thank you.

14                     DIRECT EXAMINATION

15   BY MR. FRASIER:

16        Q.   Could you state your name please, sir, and spell

17   your last name for the record?

18        A.   Corey Bryant, B-R-Y-A-N-T.

19        Q.   Where do you live, sir?

20        A.   Right now I'm residing in Redmond, Oregon.

21        Q.   Have you lived in the City of Coquille before?

22        A.   Yes.

23        Q.   When did you live here in Coquille?

24        A.   From 1999 to 2001.

25        Q.   Did you go to school here while you were here?

```
                                        Bryant   D    D4 99
```

1      A.    Yes.

2      Q.    What school did you go to?

3      A.    Coquille High School.

4      Q.    And when you went to school here what grades were

5  you in?

6      A.    Sophomore to senior.

7      Q.    Did you graduate?

8      A.    Yes, sir.

9      Q.    Now, are you familiar with an individual named

10  Sherry Mitchell?

11     A.    Yes.

12     Q.    And how do you know Sherry?

13     A.    Sherry and I were good friends in high school and

14  then we dated for awhile.

15     Q.    Do you recall when you dated?

16     A.    It would be my junior year.  So, 2000.

17     Q.    Now, when you lived here in Coquille, where did you

18  live?

19     A.    I lived with my Aunt Beth out on Green Acres.

20     Q.    Did you have a job?

21     A.    Yeah.  I worked at McKay's grocery store.

22     Q.    Were you working there the summer of 2000?

23     A.    Yes.

24     Q.    What type of work did you do at McKay's?

25     A.    Courtesy clerk, stocked shelves, just about anything

```
                                    Bryant   D    D4 100
```

1  they needed around the store.

2      Q.   Was that back when the McKay's here in Coquille was

3  open twenty-four hours a day?

4      A.   It wasn't open twenty-four.  It was still closing at

5  nine o'clock at night.

6      Q.   I want to direct your attention now to June 28th,

7  2000.  Do you remember that day?

8      A.   Yeah.

9      Q.   Did you go over to the home of Sherry Mitchell?

10     A.   I did.

11     Q.   Do you recall roughly what time it was when you went

12  over there?

13     A.   It was about eight thirty.

14     Q.   What time did you — did you have to work that night?

15     A.   Yeah.  I had to work at nine.

16     Q.   What happened when you got there?

17     A.   Sherry and Leah had just had some little dispute or

18  something, nothing major, and Leah had just walked home and

19  Sherry was kind of upset.

20     Q.   Was Sherry crying?

21     A.   A little bit, not really.

22     Q.   Had you seen Leah Freeman?

23     A.   Not that night.

24     Q.   Now, while you were there with Sherry did the

25  Defendant show up?

```
                                      Bryant   D    D4 101

 1       A.    Nick?

 2       Q.    McGuffin.

 3       A.    Yes.

 4       Q.    What happened when the Defendant showed up?

 5       A.    He was there to pick up Leah and she wasn't there.

 6  Sherry told him that she had just left.  And he kind of rolled

 7  his eyes and left.

 8       Q.    Did you see Mr. McGuffin again that night?

 9       A.    No.

10       Q.    Did you see Leah Freeman at all that night?

11       A.    No.

12       Q.    Now, I want to back up a little bit to the school

13  year, 1999/2000.  Were you aware that Leah Freeman and Nick

14  McGuffin were boyfriend/girlfriend?

15       A.    Yes.

16       Q.    How did you get to know Leah Freeman?

17       A.    She was one of Sherry's best friends.

18       Q.    And did you become acquainted with the Defendant

19  Nick McGuffin?

20       A.    Yes.

21       Q.    How did you become acquainted with him?

22       A.    Through school and through Leah.

23       Q.    Did you ever see an incident in the parking lot at

24  the high school involving Leah Freeman and the Defendant?

25       A.    Yes.
```

Bryant   D   D4 102

1    Q.   Could you tell the jury please what you saw?

2    A.   Yeah, they had just got some couples pictures

3 together.  And she accidentally dropped a couple of them on

4 the ground.  And Nick got mad and was like, "Why did you throw

5 those on the ground?"  He was mad at Leah.  And she was

6 apologizing.  But she didn't do it on purpose.

7    Q.   What was the Defendant's voice like as he's talking

8 to her?

9    A.   He was agitated; wasn't very pleased at all.

10    Q.   Was he loud?

11    A.   Yeah.

12    Q.   Did you have an opportunity to see these two

13 together?

14    A.   In which way?

15    Q.   Well, did you ever see Leah and Nick together at

16 school?

17    A.   Oh, yeah.

18    Q.   What was their relationship like?

19    A.   It had its ups and downs.  Lots of times they

20 weren't — they were not getting along and not talking or mad

21 at each other.

22    Q.   And other times they were good?

23    A.   Of course.

24    Q.   Thank you.

25         MR. FRASIER:   That's all the questions I have

```
                                          Bryant   X   D4 103
```

1   at this time.

2            THE COURT:    Mr. McCrea.

3                    CROSS EXAMINATION

4   BY MR. MCCREA:

5        Q.   Mr. Bryant, before coming here and going back to the

6   year 2000 you talked to an Officer Wetmore about what you had

7   seen the night of the 28th of June of 2000.  Is that correct?

8        A.   I believe so, yes.

9        Q.   And at that time did you indicate to him that you

10  had gone down to the Mitchell's that evening.  Correct?

11       A.   Yes.

12       Q.   And that you knocked on the door?

13       A.   No.  I met Sherry in the yard that evening.

14       Q.   Well, all right.  Do you recall what you told him?

15       A.   The officer?

16       Q.   Yes.  Did you tell him you knocked on the door?

17       A.   I might have.

18       Q.   All right.  And did you tell him that Sherry had

19  been crying in the bathroom?

20       A.   I didn't think she was crying in the bathroom, no.

21       Q.   My question is, did you tell the officer that?

22       A.   I'm not sure.  I've not read my original statement.

23       Q.   Did he make notes as you were talking to him?

24       A.   Yeah.

25            MR. McCREA:    May I approach the witness, Your

```
                                          Bryant   X    D4 104
```

1    Honor?

2              THE COURT:    You may.

3         Q.   I'm going to hand you a copy of some handwritten

4    notes, a portion of which is underlined up at the top.  Would

5    you take a moment to read that please?

6         A.   Out loud?

7         Q.   Does that refresh your recollection of what you told

8    Officer Wetmore?

9         A.   Yeah.

10        Q.   It does?

11        A.   Yeah, I - - -

12        Q.   (Interposing) All right.

13             So — and I don't mean to turn my back on you, but

14   let me go back.

15             So you — and you talked to him something like a week

16   or so after Leah had disappeared.  Correct?

17        A.   Yeah.

18        Q.   All right.  And at that time you did tell him that

19   you had knocked on the door.  Right?

20        A.   Yeah.

21        Q.   And that Sherry had been crying in the bathroom?

22        A.   Yeah.

23        Q.   And then that it was some ten minutes later before

24   Mr. McGuffin arrived?

25        A.   Uh huh.

                                            Bryant   X   D4 105

1       Q.   Now, you had driven down — what would it be, Fourth

2   Street to get to Elm?

3       A.   I believe so.  The one that goes up next to McKay's.

4   I'm not familiar with the exact number.

5       Q.   All right.  Well, you had driven down the street

6   that comes from McKay's down to Elm where the Mitchell's live.

7   Correct?

8       A.   Uh huh.

9       Q.   And then you had driven in on Elm Street where the

10  Mitchell's home is?

11      A.   Correct.

12      Q.   And McKay's sits up on Central?

13      A.   Uh huh.

14      Q.   And when you drove down there to get to the

15  Mitchell's home, you didn't see Leah Freeman walking along

16  Fourth Street.  Correct?

17      A.   Correct.

18      Q.   And you didn't see her on Elm as you drove in?

19      A.   Correct.

20      Q.   And so then, after you were there it was still some

21  ten minutes or so before Mr. McGuffin arrived?

22      A.   Yeah, correct.

23      Q.   And you testified before the Grand Jury here back in

24  July of 2010, at that time did you even estimate that it might

25  have been fifteen minutes after you arrived before he showed

                                        Bryant   X   D4 106

1   up?

2       A.   Yeah.

3       Q.   Okay.  So, would it be fair to say there was an

4   appreciable amount of time from the time you showed up at the

5   Mitchell's until Mr. McGuffin got there?

6       A.   Yeah, ten, fifteen minutes.

7       Q.   Okay.  And when he did show up, were you present

8   when there was a conversation between Sherry Mitchell and

9   Mr. McGuffin about what had gone on regarding Leah Freeman?

10      A.   Yes.

11      Q.   And didn't she spend the time to tell him that there

12  had been a fight between her mother and herself and that this

13  had caused Ms. Freeman to become upset?

14      A.   Yes.

15      Q.   Okay.  So, there was this conversation went on in

16  which this whole thing was discussed with Mr. McGuffin?

17      A.   Uh huh.

18      Q.   And it was after this conversation then before

19  Mr. McGuffin when to see if he could find Leah Freeman.

20  Correct?

21      A.   Correct.

22      Q.   Now — well — then you indicated that you went back —

23  yeah, you went back up Fourth Street up — or whatever street

24  it is, Fourth if it is — to McKay's and went to work that

25  night?

1    A.    Correct.

2    Q.    And you didn't see anything of Leah Freeman as you

3    went back up to McKay's?

4    A.    No.

5    Q.    You talked about the relationship between

6    Mr. McGuffin and Ms. Freeman.  He became angry when she

7    dropped a whole bunch of something.  I didn't quite catch what

8    it was.

9    A.    They were photos.

10    Q.    A whole bunch of photos on the ground?

11    A.    Correct.

12    Q.    And they sort of spread out all over the place?

13    A.    Correct.

14    Q.    One of those frustrating type things?

15    A.    Yeah, but he seemed a little more mad about it, like

16    that she had meant to do it and she hadn't.  She — it was an

17    accident.

18    Q.    Okay.  So — but there was nothing physical went on?

19    A.    Besides him raising his voice and being very

20    agitated with her, no.

21    Q.    He raised his voice?

22    A.    Yeah.

23    Q.    All right.  But the answer is no, there was nothing

24    physical?

25    A.    No.

```
                                        Bryant   ReD  D4 108
```

1       Q.   You never saw anything physical regarding

2   Mr. McGuffin and Ms. Freeman.  Isn't that correct?

3       A.   Correct.  I - --

4       Q.   (Interposing) All right.  Thank you.

5            MR. McCREA:    That's all the questions I have.

6            THE COURT:    Redirect.

7            MR. FRASIER:    Thank you, Your Honor.

8                  <u>REDIRECT EXAMINATION</u>

9   <u>BY MR. FRASIER:</u>

10      Q.   Mr. Bryant, Counsel asked you about what Sherry

11  Mitchell had told Mr. McGuffin when he arrived at the Mitchell

12  home.  And Sherry Mitchell told Mr. McGuffin that there had

13  been an argument?

14      A.   Uh huh.

15      Q.   Is that correct?

16      A.   Correct.

17      Q.   Do you recall what she talked about?

18      A.   Just that Peggy and Sherry and Leah had had some

19  type of dispute.  I wasn't standing right there listening word

20  for word.

21      Q.   Did you hear anything about Sherry Mitchell saying

22  to Mr. McGuffin that she had told Leah that she felt that the

23  relationship between the two was bad, things like that?

24      A.   Not that evening, but I had heard that before.

25      Q.   Did you ever hear Sherry that night say anything to

Emler    D    D4 109

1    Mr. McGuffin about that?

2        A.    No.

3        Q.    Thank you.

4            MR. FRASIER:    That's all I have.

5            THE COURT:    You may step down and you are

6    free to leave.

7            WITNESS:    Okay.

8            THE COURT:    Call your next witness.

9            MS. SOUBLET:    The State calls Josh Emler.

10                    JOSH EMLER

11    was thereupon produced as a witness on behalf of the Plaintiff

12    and, having first been duly sworn to tell the truth, the whole

13    truth and nothing but the truth, was examined and testified as

14    follows:

15            THE COURT:    Have a seat up here, please.

16            Scoot closer to the microphone please.    And

17    keep your voice up, please.

18            Go ahead.

19            MS. SOUBLET:    Thank you, Your Honor.

20                DIRECT EXAMINATION

21    BY MS. SOUBLET:

22        Q.    Mr. Emler, can you state your full name and spell

23    your last for the record?

24        A.    It's Joshua D. Emler, David Emler, E-M-L-E-R.

25        Q.    Mr. Emler, did you used to live here in Coquille?

```
                                     Emler   D     D4 110
```

1      A.   Yes, I did.

2      Q.   Okay.  And what high school did you go to?

3      A.   Coquille.

4      Q.   Do you know the Defendant, Mr. McGuffin?

5      A.   Yeah, I know who he is.

6      Q.   How do you know him?

7      A.   Mostly from school, just know him from being around.

8  Kind of know everybody I that went to school with him.

9      Q.   Are you the same age?

10     A.   I don't know.  Probably roughly the same age.  I

11  don't know if he's — I might be a little bit younger than him.

12     Q.   What year did you graduate from high school?

13     A.   I never graduated from school.

14     Q.   What year did you attend Coquille High School?

15     A.   To my junior year.  I think was until '98, '99.

16     Q.   In the summer of 2000 were you still living in

17  Coquille?

18     A.   Yes.

19     Q.   Do you remember June 28th, 2000?

20     A.   I don't remember specific dates, but yeah I know

21  what date we're talking about here.

22     Q.   Had you been hanging out with anybody that day?

23     A.   Yeah, Aaron, David and me.  And we went out — went

24  to the Mill Pond with him, come back into town and got to Fast

25  Mart.

Emler  D   D4 111

1    Q.   Let me back you up there.

2    A.   Okay.

3    Q.   By Aaron, you mean Aaron West?

4    A.   Yes.

5    Q.   And David, you mean David Jenkins?

6    A.   Yes.

7    Q.   And by him your referring to the Defendant?

8    A.   Yes.

9    Q.   Where had you and Mr. West and Mr. Jenkins been

10   prior to seeing the Defendant?

11   A.   I think we were at Fast Gas if I remember right.

12   Q.   Fast Gas or Fast Mart?

13   A.   Fast Mart, sorry.

14   Q.   Do you remember what time you saw the Defendant?

15   A.   No, I don't remember what time it was.

16   Q.   Do you remember how he got to Fast Mart?

17   A.   In his car through his driving.

18   Q.   What car was that?

19   A.   The blue Mustang.

20   Q.   Once the Defendant came to Fast Mart what happened?

21   A.   I don't really remember.  We ended up going out to

22   the Mill Pond one way or another.  I was riding with Aaron.

23   Q.   Is that Johnson Mill Pond?

24   A.   Yes.

25   Q.   What was the reason for going out to Johnson - - -

```
                                       Emler   D    D4 112
 1      A.    (Interposing) We went out to smoke pot.

 2      Q.    By pot you mean marijuana?

 3      A.    Yes.

 4      Q.    Do you remember how long you were out at Johnson

 5   Mill Pond?

 6      A.    Not really.

 7      Q.    Do you remember who all smoked marijuana?

 8      A.    Yeah.  All the four of us, David, me, Aaron and

 9   Nick.

10      Q.    That's the Defendant?

11      A.    Yes.

12      Q.    And what happened after you were done smoking

13   marijuana out at Johnson Mill Pond?

14      A.    We headed back into town.

15      Q.    Do you remember the Defendant saying anything about

16   Ms. Freeman while out at Johnson Mill Pond?

17      A.    No.  I don't really remember much of, you know, the

18   day.  I don't know, I've had this much time just, you know,

19   like you say it's been a long time ago.  It's not something

20   that I really remember a whole bunch about.  I just know I was

21   out there because you guys came to me and asked me before.  Or

22   excuse me, these guys came to me and asked me before, you

23   know, a bunch of questions and asked me where I was and what I

24   did.  And I came in here and you know, I cooperated.  I went

25   in and did everything they asked me to do.  I just — you guys
```

Emler   D   D4 113

1  have it all on videotape.  I know that I went to the DA and

2  told them what I knew then.  I'm sure that that's more

3  reliable than what I remember now.  You know, it's been a long

4  time ago.

5       Q.   And would one of those times have been back in 2000,

6  shortly after Ms. Freeman's disappearance?

7       A.   Yes.

8       Q.   Do you remember speaking with police officers then?

9       A.   Yeah.  I remember — I remember having — it was you

10  know — there was a lot of different people coming and talking

11  to me.  And they asked us to come down.  I had to go down and

12  take a lie detector test.  I had to go to the DA's office.  I

13  remember, you know, doing that stuff.

14       Q.   Mr. Emler, I'm show you your statement and ask you

15  to read it to yourself and tell me if you — tell me when

16  you're done.

17       A.   Okay.

18       Q.   You're done?

19       A.   Yeah, I'm done.

20       Q.   After you were at Johnson Mill Pond did you have an

21  opportunity to come back in town?

22       A.   Did I have an opportunity to come back into town?

23  By that you mean?

24       Q.   Well, did you stay out at Johnson Mill Pond all

25  night or did you go home?

Emler   X   D4 114

1    A.   No.  We went back into town.

2    Q.   Okay.  And where did you go when you back into town?

3    A.   We went back into Fast Mart.

4    Q.   Did you see the Defendant later that night?

5    A.   Yeah.

6    Q.   Okay.  Do you remember what car he was driving when

7    you saw him later that night?

8    A.   I don't really remember exactly.  I said there that

9    he was driving the other car.  I don't remember that

10   specifically.  I honestly don't.

11   Q.   The other car would be the Thunderbird?

12   A.   Yeah.

13   Q.   Did the Defendant say anything to you when he came

14   back to Fast Mart?

15   A.   I don't remember.

16        MS. SOUBLET:   Nothing further.

17        THE COURT:   Cross.

18              CROSS EXAMINATION

19   BY MR. MCCREA:

20   Q.   Is it correct it was a little after nine that you

21   left the Johnson Mill Pond?

22   A.   I — sir, I don't remember.  I just — you know,

23   timelines.  Like I said it's been a long time ago.  I

24   really - - -

25   Q.   (Interposing) That's fine.  If you don't remember

Emler    X    D4 115

1   you can just tell me you don't remember, Mr. Emler.

2        A.   Yeah, I just don't remember.

3        Q.   I don't mean to beleaguer you about it.  You

4   understand?

5        A.   Yeah, I understand.

6        Q.   Now — but you went — you went — you left and

7   Mr. McGuffin left.  Correct?

8        A.   Yes, as far as I know.

9        Q.   And you went to Fast Mart?

10       A.   Yeah.

11       Q.   And Fast Mart was a young people hang — a young

12  people's — possessive form — hangout - - -

13       A.   (Interposing) Yeah.

14       Q.   - - - back at that time?

15       A.   Yes.

16       Q.   So, it's the sort of place where young people would

17  congregate in the evening?

18       A.   Yeah.

19       Q.   And, after you had been there for awhile, then

20  Mr. McGuffin showed up?

21       A.   See that's — I know he showed back up, but I — you

22  know, like I said I know I said all this and a lot of I don't

23  really remember.  It's been a long time ago, man.  It's not —

24  you know, just - - -

25       Q.   (Interposing) That's fine.  But you do remember he

Emler    X    D4 116

1  showed up?

2      A.   Yeah, I remember seeing him again that evening.  I

3  do remember that.  I don't remember what he was driving, what

4  was said - - -

5      Q.   (Interposing) All right.

6      A.   - - - what time it was, but - - -

7      Q.   (Interposing) Wait.

8           But let me take it sort of a step at a time, for

9  both of us.  Okay?

10     A.   Okay.

11     Q.   He showed up?

12     A.   Yeah.

13     Q.   All right.  And did you have a memory of how long

14 you had been at Fast Mart when Mr. McGuffin showed up?

15     A.   That I don't really remember.  I know we had been

16 there for a few though.

17     Q.   All right.  That's fine.  If you don't — and you

18 don't have to, you know, make any excuses for it.  It's fine.

19     A.   Yeah.

20     Q.   And as I understand it, at this time you don't

21 remember what car he was driving when he showed up?

22     A.   No, sir, I don't.

23     Q.   All right.  And then do you remember whether or not

24 you saw him drive by or — well, drive by Fast Mart some more

25 times later that evening?

Emler   ReD  D4 117

1    A.    I don't remember seeing him drive by later that

2    evening.  As far as I know I — I know I seen him drive by.  I

3    remember that part, but I don't remember what he was driving.

4    I - - -

5    Q.    (Interposing)  Okay.  Did he look — did it appear as

6    though he was looking for someone?

7    A.    I couldn't tell you.

8    Q.    All right.  That's fine, Mr. Emler.

9          Thank you.

10              MR. McCREA:    We have no other questions.

11              THE COURT:    Any redirect?

12              MS. SOUBLET:    Just briefly.

13              Thank you, Your Honor.

14                    REDIRECT EXAMINATION

15   BY MS. SOUBLET:

16   Q.    So, Mr. Emler, you're saying you don't remember

17   telling the police that the Defendant was driving the Mustang

18   at the Mill Pond and the Thunderbird later?

19   A.    I don't remember saying that on there.  I remember —

20   you know, like I said, from what I've read.  When I came into

21   the DA this last time, they let me read through it again.  And

22   I'd seen what I said there.

23   Q.    What you told the police in 2000 would be correct?

24   A.    What I'd seen on there seemed kind of - - -

25              MR. McCREA:    (Interposing) Excuse me, Your

Emler   ReD  D4  118

1   Honor.  I object to the form.  A question gets asked and then

2   the witness is going on at considerable length, well beyond

3   the scope of the question, number one.

4            Number two, then I object to Counsel leading

5   the witness - - -

6            THE COURT:    (Interposing)  Those objections

7   - - -

8            MR. McCREA:   - - - on the most recent

9   question.

10           THE COURT:   Both of those objections are

11  overruled.

12           Go ahead and ask your question again.

13  Q.   What you told the police in 2000 was correct?

14  A.   On the statement right there?

15  Q.   Yes.

16  A.   There's some of that is something I don't think I

17  said.  I don't remember saying that.  And what's on that

18  statement there did not seem to me like something I would say.

19  It seemed kind of corny.

20  Q.   Would it be safe to say that your memory in 2000

21  about the events that happened in 2000, is better than your

22  memory here today?

23  A.   Yeah.  It would be.

24  Q.   And what your testimony at Grand Jury in 2000 would

25  be better than your memory here today?

West    D    D4 119

1      A.    Yeah, absolutely.

2      Q.    Thank you.

3            MS. SOUBLET:    Nothing further.

4            THE COURT:    You may step down and you're free

5    to leave.

6            Call your next witness.

7            MS. SOUBLET:    The State calls Aaron West.

8                          AARON WEST

9    was thereupon produced as a witness on behalf of the Plaintiff

10   and, having first been duly sworn to tell the truth, the whole

11   truth and nothing but the truth, was examined and testified as

12   follows:

13           THE COURT:    Have a seat here, please.

14           Go ahead.

15           MS. SOUBLET:    Thank you, Your Honor.

16                      DIRECT EXAMINATION

17   BY MS. SOUBLET:

18     Q.    Mr. West, can you state your full name and spell

19   your last for the record?

20     A.    Aaron David West, W-E-S-T.

21     Q.    Mr. West, did you go to or did you grow up in

22   Coquille?

23     A.    Yes, I did.

24     Q.    What high school did you go to?

25     A.    Coquille High School.

West   D   D4 120

1    Q.   And how do you know the Defendant, Mr. McGuffin?

2    A.   I grew up with his family.

3    Q.   Okay.  Would that be his brother, Wayne McGuffin?

4    A.   Yeah, his older brother, Wayne.

5    Q.   Did you know Leah Freeman?

6    A.   Just through Nick, yes.

7    Q.   And when you say through Nick what do you mean?

8    A.   I — the first time I met her was when I — he brought

9    her over to a friend's house.

10   Q.   Were you aware of whether or not they were dating?

11   A.   Yeah.  He said they were.

12   Q.   When was that?

13   A.   It would be two or three, maybe four weeks before

14   she came up missing.

15   Q.   How often would you say you saw Ms. Freeman prior to

16   her disappearance?

17   A.   After I met her, almost a daily — almost a daily.

18   Every time I saw Nick.

19   Q.   I want to turn your attention to June 28th, 2000.  Do

20   you remember that day?

21   A.   A little bit.  I've been refreshed about it, yeah.

22   Q.   Were you hanging out with anyone in particular that

23   day?

24   A.   Josh Emler and David Jenkins and Nick, off and on

25   that day.

West   D   D4 121

1     Q.    Okay.  Where were you guys hanging out?

2     A.    Fast Mart mainly.

3     Q.    When you're at Fast Mart who's with you?

4     A.    David and Josh Emler were with me.  And then Nick

5  would show up off and on in his car.  There was a whole bunch

6  of people there.

7     Q.    Do you remember what car he was driving?

8     A.    His blue Mustang.

9     Q.    On that day was there a time when he came to Fast

10  Mart and stayed with you?

11    A.    Yeah.  He hung out for awhile.  I'm not sure about

12  how long.  And we visited and stuff.  And then we decided to

13  go for a drive.  And we went out to Johnson Mill Pond.

14    Q.    What was the reason for going out to Johnson Mill

15  Pond?

16    A.    We went out to go get high on marijuana.

17    Q.    Do you remember what time that was?

18    A.    It was late afternoon, seven, eight o'clock

19  probably.

20    Q.    At that time was Ms. Freeman with the Defendant?

21    A.    No.  He said that he had dropped her off at a

22  friend's house.

23    Q.    Once out — how did you get out to Johnson Mill Pond?

24    A.    I drove my car and he followed in his.

25    Q.    What car was that?

West   D   D4 122

1    A.   The blue Mustang.  And I have — had a Plymouth at

2 that period in time.

3    Q.   And once out at Johnson Mill Pond, where did you

4 guys go?

5    A.   Towards the end of it, just parked alongside the

6 pond.

7    Q.   Okay.  And what did you do while out there?

8    A.   Just hung out, visited, smoked some marijuana.

9    Q.   Did you have a chance — when you say smoked some

10 marijuana, who was smoking marijuana?

11    A.   All four of us were that were out there.

12    Q.   Did you have a chance to talk to the Defendant while

13 you were out at Johnson Mill Pond?

14    A.   Yeah.  He pulled up beside my car and we were just

15 visiting about, just normal things.  He was talking about this

16 and that being he was a little upset because him and — I think

17 him and Leah had an argument or something earlier in the day.

18 Or I'm not quite sure what it was about.  But he was talking

19 about having to pick her up at a specific time and not wanting

20 to be late to pick her up.

21    Q.   Do you remember how long you were out at Johnson

22 Mill Pond?

23    A.   A good hour or so probably, an hour and a half

24 maybe.  I wasn't really keeping too much track of the time

25 except for he was supposed to be back I think around nine or

1  something to pick her up.  I know it was getting pretty close

2  to that time.

3      Q.   Was there a time when the Defendant wanted to leave

4  but you all didn't?

5      A.   Yes.  Yeah, it was pretty close to nine.  He was

6  wanting to go.  And I don't know about Josh or David, but I

7  told him that, you know, it's — don't worry about it.  You

8  know, I kinda persuaded him to stay and finish what we were

9  doing.

10      Q.   And then what happened?

11      A.   After we were done he took off first.  And I

12  followed him.  And we went back into town.  And he - - -

13      Q.   (Interposing) Did you see where he went?

14      A.   Yeah, he turned — he turned at a street past me, I

15  think up by the post office maybe.  I turned right there by

16  Safeway.  And we were going to meet back at Fast Mart.  And I

17  seen him turn up Fourth Street by McKay's.   And I continued

18  to Fast Mart.

19      Q.   Did you see him again later that night?

20      A.   Yes.  It was maybe ten, fifteen minutes after that

21  he came to Fast Mart and asked if anybody had seen Leah

22  walking by or anything or knew if any of us had seen her or

23  anything because she wasn't where she was supposed to be.

24      Q.   Do you remember what his demeanor was like?

25      A.   He was maybe upset, kinda.  He could have just — he

West   D   D4 124

1   could have just been stoned.  Or, he wasn't his normal, you

2   know, happy-go-lucky as he was before we left.

3        Q.   Did he tell you what he was going to do?

4        A.   No.  He said he was going to go look for her, drive

5   — I think he was going to drive to her house, hers and her

6   mom's house to see if she had made it home yet.  And then he

7   took off driving towards the high school.

8        Q.   Was there a time when you saw him later again that

9   night?

10       A.   Yeah.  I saw him several times that night.  He drove

11  by a few times, Fast Mart, while I was there.  He stopped a

12  few times just to ask if anybody had seen her yet, because he

13  said he still hadn't found her.

14       Q.   Was there a time when you saw him drive in a car

15  other than the Mustang?

16       A.   Yeah.  Later that night he pulled in and he was

17  driving a red Thunderbird.  Said he had either — I can't

18  remember exactly why he had parked the car.  It was either —

19  he was either getting low on gas or it was a mechanical

20  problem.  But he said that he had to take it out to his

21  parent's house and switch cars.

22       Q.   Did you ever see him in the Mustang again that

23  night?

24       A.   No.

25       Q.   Finally, Mr. West, you have a conviction in 2002 for

West    X    D4 125

1   forgery.  Is that correct?

2       A.   Yes.

3       Q.   And a conviction in 1998 for Theft Third.  Is that

4   correct?

5       A.   1997 or 1998, something like that.

6       Q.   Thank you.

7            MS. SOUBLET:    Nothing further.

8            THE COURT:    Any cross?

9                    CROSS EXAMINATION

10  BY MR. MCCREA:

11      Q.   Mr. West, it wasn't unusual in your past experience

12  with Mr. McGuffin for him to drive his parent's car, the

13  Thunderbird.  Is that correct?

14      A.   Yeah.  He drove it quite often.  And he - - -

15      Q.   (Interposing) Okay.  And when you're attempting to

16  recall something, do you tend to form — do you try to form a

17  mental picture in your mind about what it was happened?

18      A.   Yes.  It's how I usually do it.

19      Q.   How long was it after the 28th of June before the

20  police talked to you about what you had seen the evening of

21  the 28th?

22      A.   At least two or three weeks if - - -

23      Q.   (Interposing) Probably about a week?

24      A.   At least two weeks, three weeks.

25      Q.   About a week?

West   X   D4 126

1      A.   Two, at least - - -

2      Q.   (Interposing) Two weeks?

3      A.   At least two weeks after.  It was quite awhile

4  afterwards.

5      Q.   It was quite awhile after?

6      A.   Yes.

7      Q.   Okay.  So, it was — it's fair to say that it was

8  quite awhile after the 28th of June before you were trying to

9  bring up in your memory what you had seen that night.  Right?

10     A.   Yes.

11     Q.   And you had been smoking marijuana?

12     A.   Yes.

13     Q.   And in — you had a discussion about this with

14  Officer Buddy Young at one time, didn't you?

15     A.   I'm not sure of the officer's name, but there was

16  several officers that discussed things with me.

17     Q.   Did you indicate to him that you'd been — you'd been

18  pretty screwed up with having smoked the marijuana?

19     A.   Oh, yeah.  I smoked a lot of marijuana at that point

20  in time of my life.

21     Q.   Now — so — but as best you could bring up your

22  memory — well, strike that.  Let's go to - - -

23          Mr. McGuffin came to Fast Mart after you guys went

24  back to town from Johnson Mill Pond.  And he asked if you'd

25  seen Leah, right?

1    A.   Yes.

2    Q.   And indicated he was looking for her?

3    A.   Yes.

4    Q.   And then that continued through — on through the

5 night.  Isn't that correct?

6    A.   Yes, it did.

7    Q.   He went by maybe six, seven times?

8    A.   It could've been that many, yes.

9    Q.   And sometimes he'd stop and ask if anybody had seen

10 Leah yet?

11   A.   Yes.

12   Q.   And did he appear as he would stop by later on to be

13 getting upset and concerned about not finding her?

14   A.   He seemed to be more upset or his demeanor changed

15 throughout the night.

16   Q.   And in terms of when you finally left Fast Mart, do

17 you have a time frame as to when you finally left Fast Mart

18 and went home?

19   A.   Probably between eleven p.m. and midnight I would

20 guess.

21   Q.   Eleven and midnight?

22   A.   Yes.

23   Q.   All right.  And this process of Mr. McGuffin going

24 by, stopping in, looking, went on right up to the time that

25 you left and went home?

```
                                      West   ReD  D4 128
```

1    A.   Yes.

2    Q.   Is that fair?

3         MR. McCREA:    I think that's all the questions

4  I have of this witness, Your Honor.

5         THE COURT:   Any redirect?

6              REDIRECT EXAMINATION

7  BY MS. SOUBLET:

8    Q.   Mr. West, do you remember speaking to Officer Zavala

9  on July 7th, 2000?

10   A.   Might have been that day.  I do remember kinda

11 talking to him.

12   Q.   Would it be safe to say that your memory of what

13 happened in 2000 was better in 2000 than it is today?

14   A.   Yes.

15   Q.   Would it be safe to say that your testimony at Grand

16 Jury would be better than what it is today?

17   A.   Yes.

18   Q.   Thank you.

19         MS. SOUBLET:   Nothing further.

20         THE COURT:   You may step down.

21         Call your next witness.

22         MR. FRASIER:   Your Honor, we are — don't have

23 any more witnesses before lunch.

24         THE COURT:   Okay.

25         Everybody else remain seated until the jury has

```
                                      West   ReD  D4 129
```

 1   a chance to leave.

 2                Remember the admonitions.  Leave your notes in

 3   the jury room.  Be back at 1:00 please.

 4                (Jury Out.)

 5                THE COURT:   One o'clock.

 6                (LUNCH RECESS)

 7                (Jury In.)

 8                JUDICIAL ASSISTANT:   All rise.

 9                THE COURT:   Be seated please.

10                Call your next witness.

11                MR. FRASIER:   Thank you, Your Honor.

12                First we have a stipulation, Your Honor.

13                THE COURT:   Okay.

14                MR. FRASIER:   In regards to Mr. Fisher the

15   parties would stipulate that he first obtained his driver's

16   license on October 23rd, 2000.

17                THE COURT:   Okay.

18                Ladies and Gentlemen, you may consider that as

19   a fact in the case.  The parties have stipulated to it.

20                MR. FRASIER:   And while I'm standing here, we

21   have reached an agreement on what pages from the annual,

22   State's Exhibit No. 93.  And I would offer that at this time.

23                THE COURT:   Okay.

24                MR. FRASIER:   (Not understandable) Counsel

25   previously.

Lindegren   D    D4 130

1          MS. McCREA:    Yes.

2          THE COURT:    That's exhibit number?

3          MR. FRASIER:    No. 93.

4          THE COURT:    No. 93 is received.

5          (Whereupon Exhibit No. 93 was then received

6    into evidence.)

7          MR. FRASIER:    Call John Lindegren.

8                    JOHN LINDEGREN

9    was thereupon produced as a witness on behalf of the Plaintiff

10   and, having first been duly sworn to tell the truth, the whole

11   truth and nothing but the truth, was examined and testified as

12   follows:

13          THE COURT:    Have a seat up here, please.

14          Make sure you get close to the microphone.

15   Thank you.

16          Go ahead.

17                 DIRECT EXAMINATION

18   BY MR. FRASIER:

19     Q.   Could you state your name please, sir, and spell

20   your last name for the record?

21     A.   John Lindegren, L-I-N-D-E-G-R-E-N.

22          MR. FRASIER:    Why don't you pull the

23   microphone a little closer to you.  Thank you.

24     Q.   First of all, could you tell us where you live, sir?

25     A.   115 Ash, Myrtle Point, Oregon.

Lindegren   D   D4 131

1    Q.   How long have you lived there?

2    A.   Two years.

3    Q.   Have you lived in the City of Coquille?

4    A.   Yes, I have, sir.

5    Q.   How long and when did you live in Coquille?

6    A.   Off and on all my life, sir.  I've lived in only a

7    couple other places.

8    Q.   Do you have relatives in the area?

9    A.   Yeah.  Yes, I do, my sister.

10   Q.   What's your sister's name?

11   A.   hJordis, H-J-O-R-D-I-S.

12   Q.   And does she have a nickname?

13   A.   Jordie.

14   Q.   Does she work?

15   A.   She does.  Coquille library.

16   Q.   Now, I want to direct your attention, sir, to the

17   summer of 2000, the year 2000.  Did you live here in the

18   Coquille area?

19   A.   I did, sir.

20   Q.   And did your sister live here in the Coquille area

21   then?

22   A.   Yes, sir.

23   Q.   Where did she live?

24   A.   551 West Fourth Place.

25   Q.   Where is that at in relation to the McKay's Market

Lindegren   D    D4 132

1   in Coquille?

2       A.   You go up Fourth and then you turn onto Fourth Place

3   I believe and you go around a little — a little alleyway deal.

4       Q.   Are you familiar with the North Elm Street in that

5   area?

6       A.   Yes (not understandable) yes.

7       Q.   Now, you're aware that an individual, a young girl

8   named Leah Freeman disappeared in June of 2000?

9       A.   Yes, sir, I am.

10      Q.   Directing your attention to June 28th, 2000, do you

11  recall that day?

12      A.   Yes, I do.

13      Q.   Had you been over at your sister's house?

14      A.   Yes, I had.

15      Q.   What were you doing there?

16      A.   I went over there — I had a dog.  I just got out of

17  a ten year relationship and I didn't have any place to take my

18  dog.  So she was taking care of my dog.  So I'd come up there

19  and play with the dog and watch TV up there and — and I was up

20  there at the time.

21      Q.   In particular do you recall what you were watching

22  that night?

23      A.   Survivor.

24      Q.   When the show was over, what did you do, sir?

25      A.   I went outside and messed with the dog a couple few

Lindegren    D    D4 133

1  minutes.  And then I left.

2      Q.  Where were you going?

3      A.  I was walking down to — I had rented an apartment in

4  town.  And I was walking home.

5      Q.  Did you walk on North Elm?

6      A.  Yes, sir, I did.

7      Q.  Are you familiar with the Defendant in this case,

8  Mr. McGuffin?

9      A.  Yes, I am.

10     Q.  How do you know him?

11     A.  I've met him around.  You know, I grew up around

12  here.

13     Q.  And Leah Freeman, were you familiar with who she

14  was?

15     A.  Yes.

16     Q.  How did you know her?

17     A.  I know some of her family and I grew up around here.

18     Q.  Now, after you had watched Survivor — well, first of

19  all do you recall what time Survivor came on at night?

20     A.  I think it came on about eight o'clock.

21     Q.  And how long of a show was it?

22     A.  A one hour show.

23     Q.  So, it ended somewhere around nine?

24     A.  Yes, sir, I believe it did.

25     Q.  And after the show, that's when you went out and

```
                                    Lindegren   D   D4 134
```

1  played with your dog a little bit?

2      A.   Yeah.

3      Q.   And then you started to walk home?

4      A.   Yes, sir, I did.

5      Q.   Again you were walking on North Elm?

6      A.   I was, sir.

7      Q.   Did you see Leah Freeman that night?

8      A.   I did, sir.

9      Q.   Did you see Nicholas McGuffin that night?

10     A.   Yes, I did, sir.

11     Q.   See them together?

12     A.   I did.

13     Q.   Where?

14     A.   At — once you walk down on North Elm — I don't know

15  what the address is.  There's a house and then a gravel road

16  and a house behind it.  I'm not familiar with the address or

17  anything.

18     Q.   Now, did the police interview you about this?

19     A.   Yes, they did.

20     Q.   And did they actually take you to this location that

21  you described?

22     A.   They did, sir.

23     Q.   Did you point out where you saw these individuals?

24     A.   I did, sir.

25     Q.   I'm going to show you what's marked as State's

```
                                    Lindegren  D    D4 135
```

1  Exhibit No. 73 and 74.  Do you recognize that?

2        A.    Yeah, I do.

3        Q.    Do those pictures portray the area where you saw

4  Leah Freeman and Nicholas McGuffin?

5        A.    Yes, sir, it does.

6        Q.    And this was after nine o'clock?

7        A.    Yes.

8        Q.    Do these picture accurately portray what you saw?

9        A.    Yes.

10       Q.    Now there's some orange cones in there.  What do

11  they represent?

12       A.    That's where I saw these people.

13             MR. FRASIER:    At this time, Your Honor, we'd

14  offer State's Exhibits Nos. 73 and 74.

15             MS. McCREA:    There's no objection, Your

16  Honor.

17             THE COURT:    Received.

18             (Whereupon Exhibits Nos. 73 and 74 were then

19  received into evidence.)

20       Q.    I'm going to put up on the screen here, sir, what's

21  marked as State's Exhibit No. 73.  Can you see that from where

22  you're at?

23       A.    I do, sir.

24       Q.    Do you see those two cones, orange cones?

25       A.    Uh huh.

```
                                          Lindegren   X    D4 136
```

1    Q.   Who was standing where?

2    A.   I don't know, sir.  I remember seeing them there.  I

3    don't know who was standing.  Leah was there.  I saw her.  And

4    I saw Mr. McGuffin.

5    Q.   Could you tell if they were talking or anything like

6    that?

7    A.   Yeah, they were talking.

8    Q.   When you — did you walk by them or what happened?

9    A.   Uh huh.

10   Q.   What happened?

11   A.   I was just walking by.  There was a pickup that was

12   parked there in the road.  So, I walked around it.  And I was

13   walking down to Fourth.  And I just said, "Hello."  And just

14   proceeded on walking.

15   Q.   Did you see them again after that?

16   A.   I did not, sir.

17   Q.   Thank you.

18         MR. FRASIER:   That's the questions I have,

19   Your Honor

20                   CROSS EXAMINATION

21   BY MS. MCCREA :

22   Q.   Mr. Lindegren, you didn't see a blue Mustang in that

23   area that night did you?

24   A.   No, ma'am, I did not.

25   Q.   And the guy that you saw was about medium height?

                                              Lindegren   X    D4 137

1          A.   I don't know, six foot.

2          Q.   And the girl that you saw had her hair pulled back

3     from her head?

4          A.   I believe so.

5          Q.   Now, this was — your dog — her name was what, Oca?

6          A.   Yes, ma'am.

7          Q.   And she was a chow mix?

8          A.   Yes, ma'am.

9          Q.   Do you still have her?

10         A.   No.

11         Q.   Okay.  And so basically you had visitation rights

12    with her at your sister's house?

13         A.   I guess you could put it that way.

14         Q.   Okay.  Because you didn't — like you said you didn't

15    have any place to keep her back in June of 2000?

16         A.   You're correct, ma'am.

17         Q.   So, would it be fair to say that you and your sister

18    had a ritual where you would come over and have dinner, watch

19    some TV, walk Oca and then go home?

20         A.   Yes.

21         Q.   Okay.  And the night that we're talking about, June

22    28th, 2000, you came over and you had dinner, had something to

23    eat, watched Survivor, took the dog for a walk and then went

24    home?

25         A.   I believe I went over and walked the dog and I ate,

```
                                    Lindegren   X    D4 138
```

1   I watched some TV, and then I played with the dog a little

2   more, and then left.

3        Q.   How big was this dog, Mr. Lindegren?

4        A.   About ninety-five pounds.

5        Q.   Ninety-five pounds.  Okay.  And at this time, in

6   June of 2000, how old was she?

7        A.   Oh, I don't know, two or three.

8        Q.   Okay.  So, she had quite a bit of energy?

9        A.   Yeah.

10       Q.   She wasn't an old dog who was content to just hang

11  out on the carpet?

12       A.   No.  I don't believe so, ma'am.

13       Q.   Okay.  And typically when you went to visit your

14  sister you would take Oca your dog for a walk?

15       A.   Yes, ma'am.

16       Q.   And didn't you take Oca for a walk on June 28th,

17  2000?

18       A.   I believe so.

19       Q.   Okay.  And didn't you typically take Oca for a walk

20  after you watched Survivor?

21       A.   Sometimes I did; sometimes I didn't.

22       Q.   Okay.  And is it possible you took her for a walk

23  after Survivor on June 28th?

24       A.   No, ma'am, I don't believe so.

25       Q.   So, if your sister said that you did take the dog

1  for a walk you would disagree with that?

2      A.   All I can testify is what I remember as being a

3  truth, you know.  And I think I went over there about five in

4  the afternoon.  And I do believe I run the dog before that.

5      Q.   When you would — when you say run the dog, would you

6  typically put her on a leash and walk her through the

7  neighborhood?

8      A.   No.  I'd let her walk beside me.

9      Q.   Okay.  So, she was a well trained dog that didn't

10  need a leash?

11      A.   You got it.

12      Q.   And the two of you would make, say, for lack of a

13  better term, a loop around the neighborhood?

14      A.   Yeah.  I'd go down the road.  And I go up Cedar and

15  go down where the old county barns were and then come back

16  around.

17      Q.   So, typically your walks with Oca would go anywhere

18  from ten minutes to forty-five minutes?

19      A.   Yeah.  Yeah.

20      Q.   How long do you think you played with Oca the night

21  of June 28th?

22      A.   Oh, I don't know, ten minutes maybe.  After I had

23  went out.  Yeah.

24      Q.   I'm sorry.  After you went out?

25      A.   Of her house.

Lindegren   X   D4 140

1     Q.   Okay.  So, you think you played with Oca after

2   Survivor was over?

3     A.   Yeah.

4     Q.   Because it was your dog and you were - - -

5     A.   (Interposing) Yeah.

6     Q.   - - - I'm guessing pretty attached to her?

7     A.   Yeah, I was, ma'am.

8     Q.   So, Survivor's over and then you go out and play

9   with Oca.  And then you start walking home?

10    A.   I did, ma'am.

11    Q.   Okay.  And that's when you see the male and the

12  female in front of the Mitchell's home where we saw the orange

13  cones - - -

14    A.   (Interposing) Yeah - - -

15    Q.   - - - in the photograph?

16    A.   - - - where you saw the cones.

17    Q.   Now, Mr. Lindegren, the first time that you spoke to

18  the police was on July 16th, 2000?

19    A.   Yes, ma'am.

20    Q.   And the pickup you saw was parked partially in the

21  road.  Is that correct?

22    A.   It was, ma'am.

23    Q.   So you had to walk around it - - -

24    A.   (Interposing) I did, ma'am.

25    Q.   - - - to get past?

```
                                    Lindegren   X    D4 141
 1          Now, at this point when you're walking around the

 2   pickup and you see the couple, you didn't have the dog with

 3   you?

 4        A.   No, ma'am.

 5        Q.   Thank you, Mr. Lindegren.

 6             MS. McCREA:    That's all the questions I have

 7   of you.

 8             THE COURT:    Any redirect?

 9             MR. FRASIER:    Nothing at this time, Your

10   Honor.

11             THE COURT:    Does that mean you want him to

12   remain available?

13             MR. FRASIER:    We may need him to remain

14   available, but he can go and go about his business.  We'll get

15   a hold of him if we need him.

16             THE COURT:    Mr. Lindegren, you are — you are

17   free to leave now, but you're still under subpoena.  You're

18   not released from that.  And they may want to call you back

19   later.  This trial is scheduled to be this week and into next

20   week.  So, you'll have to make yourself available.  If you

21   want to go anywhere let the DA's office know where they can

22   always contact you to call you back.

23             WITNESS:    Okay, sir.  Do I get any hours?

24   You know, do I get — you know, they — do I get any time?

25             MR. FRASIER:    We'll give him as much headway
```

```
                                    Lindegren   X    D4 142
 1   as we can.
 2              WITNESS:   Yeah, that's what I meant.
 3              THE COURT:   You'll get some time, yeah.
 4              WITNESS:   Okay.
 5              THE COURT:   Just make sure they know where
 6   you are.
 7              WITNESS:   Okay.  Because I may — I'm a
 8   concrete finisher and - - -
 9              THE COURT:   (Interposing) That's fine.
10              WITNESS:   Okay.
11              THE COURT:   All right.
12              Call your next witness.
13              MS. SOUBLET:   State calls Ashley Patton.
14                      ASHLEY PATTON
15   was thereupon produced as a witness on behalf of the Plaintiff
16   and, having first been duly sworn to tell the truth, the whole
17   truth and nothing but the truth, was examined and testified as
18   follows:
19              THE COURT:   Have a seat up here, please.
20              If you would scoot way forward, please, right
21   next to the microphone.  And you can bend it down so it's
22   right even with your mouth.
23              Okay.  Thank you.
24              Go ahead.
25              MS. SOUBLET:   Thank you, Your Honor.
```

Patton   D    D4 143

<u>DIRECT EXAMINATION</u>

1

<u>BY MS. SOUBLET:</u>

2

3      Q.   Ms. Patton, can you state your name and spell your

4  last name for the record?

5      A.   Ashley Patton, P-A-T-T-O-N.

6      Q.   I'm going to ask you to - - -

7           THE COURT:   No.  If you could raise your

8  volume, please.  Speak louder.

9           WITNESS:   Do I need to say it again?

10          MS. McCREA:   We'll have them turn off the air

11 conditioner.

12          WITNESS:   Okay.

13     Q.   Ms. Patton, is your last name — did your maiden name

14 used to be Hutchinson?

15     A.   Yes.

16     Q.   Have you lived in Coquille before?

17     A.   Yes.

18     Q.   Were you living in Coquille the summer of 2000?

19     A.   Yes.

20     Q.   Were you still in school at that time?

21     A.   Yes.

22     Q.   Okay.  What school were you going to?

23     A.   Coquille High School.

24     Q.   What — in the school year '99/2000 what year were

25 you?

```
                                        Patton   D    D4 144
 1        A.    A sophomore.

 2        Q.    Do you know Leah Freeman, or did you know Leah

 3   Freeman?

 4        A.    Yes.

 5        Q.    How long had you known Leah Freeman?

 6        A.    Since we were little kids.  I couldn't — probably

 7   ten years.

 8               THE COURT:    Ma'am, I'm sitting right next to

 9   you and I can hardly hear you.  You're going to have to really

10   supply some volume.

11               WITNESS:    Okay.

12        A.    Probably about ten years or longer.

13        Q.    Do you know the Defendant, Mr. McGuffin?

14        A.    Yes.

15        Q.    How do you know him?

16        A.    From school, when we were kids.

17        Q.    Did you see him and Ms. Freeman in the school year

18   1999/2000?

19        A.    Yes.

20        Q.    What did you know about their relationship?

21        A.    Basically that they were together.

22        Q.    By together you mean boyfriend/girlfriend?

23        A.    Right.

24        Q.    Did you have an opportunity to see them interact

25   with each other?
```

Patton   D   D4 145

1      A.   Yeah on different various occasions in the hallway

2   at school and maybe sometimes at Fast Mart or something like

3   that.

4      Q.   How would you describe their relationship?

5      A.   Pretty much like any other high school relationship.

6   It seemed like sometimes they were mad at each other;

7   sometimes they were getting along.  Just depended on the day.

8   Nothing unusual I noticed though.

9      Q.   I want to turn your attention to June 28th, 2000, do

10  you remember that day?

11     A.   Yes.

12     Q.   Had you been working some place that summer?

13     A.   I worked at Hunter's Eatery and Creamery.

14     Q.   Were you working on June 28th?

15     A.   I don't think I was working.  I think I was just

16  visiting friends there.

17     Q.   Did you have an occasion to see Ms. Freeman on June

18  28th?

19     A.   Yes.

20     Q.   What time was that?

21     A.   It was a few minutes before nine o'clock at night.

22     Q.   Where were you?

23     A.   I was driving my car down Central Avenue by McKay's.

24     Q.   Where was Ms. Freeman?

25     A.   She was walking by the pay phone in front of

```
                                    Patton   D    D4 146
```

1    McKay's.

2         Q.   Did you notice what she was wearing?

3         A.   She was wearing a men's white tank top and I think

4    khaki shorts and tennis shoes.

5         Q.   I'm showing you what's been received as State's

6    Exhibit No. 8 and asking you if you recognize that?

7         A.   Yeah.

8         Q.   What is that?

9         A.   A men's white tank top.

10        Q.   Is that a photo of Ms. Freeman as you saw her on —

11   with that top on June 28th?

12        A.   Oh, yes.

13        Q.   Did you notice anything about her?

14        A.   She looked really mad.  She was walking really fast.

15   And she had her arms crossed.  And she was looking down.  And

16   she had a frown on her face like she was upset about

17   something.

18        Q.   Do you remember where she was walking?

19        A.   In front of the pay phone in front of McKay's, on

20   the sidewalk.

21        Q.   Headed what direction?

22        A.   Towards Hunter's and the Credit Union and — I don't

23   know what direction that is.  Sorry.

24        Q.   Towards the high school?

25        A.   Yeah.

Patton   X   D4 147

1      Q.   Did you see the Defendant that night?

2      A.   I think I saw his car at Fast Mart on occasion when

3  I drove by a few times.  But I didn't actually physically see

4  him.

5      Q.   What car?

6      A.   Once I saw the Mustang.  And another time I saw the

7  maroon Thunderbird.

8      Q.   Thank you.

9           MS. SOUBLET:   I have nothing further.

10           THE COURT:   Cross.

11                CROSS EXAMINATION

12  BY MS. MCCREA:

13      Q.   Ms. Hutchinson, you were — I'm sorry.

14           What's your current name?

15      A.   Patton.

16      Q.   Patton.  Thank you.

17           Ms. Patton, you would see Nick McGuffin in town from

18  time to time.  Is that fair?

19      A.   Yes.

20      Q.   And occasionally you would see him driving a blue

21  Mustang?

22      A.   Yes.

23      Q.   And other times you would see him driving a maroon

24  Thunderbird?

25      A.   Right.

Patton    X    D4 148

1    Q.    And it just depended on what day and what time he

2    might be driving which car?

3    A.    Yes.

4    Q.    Okay.  Now, on June 28th, 2000 when you saw Leah

5    Freeman, you've indicated that she was walking fast on North

6    Central heading toward the high school?

7    A.    Yes.

8    Q.    And is it correct that you didn't recall seeing

9    anybody else in the area around her?

10    A.    Yes.

11    Q.    And you certainly didn't see Nick McGuffin anywhere

12    near her at that point?

13    A.    No.

14    Q.    Now, you were heading the opposite direction that

15    she was going?

16    A.    Yes.

17    Q.    Okay.  But as long as you could see her, you didn't

18    see any contact between her and Mr. McGuffin?

19    A.    No.

20    Q.    And you didn't stop and have any conversation with

21    Leah Freeman?

22    A.    No.

23    Q.    Did you see her at all later on that night?

24    A.    No.  I think I stayed home the rest of the night.

25    Q.    So, in terms of your observations of Mr. McGuffin

Patton    X    D4 149

1  the rest of the night, you were heading into town when you saw

2  Leah Freeman.  Did you then go back to Fast Mart for a period

3  of time?

4        A.   No.

5        Q.   So, your observations of Mr. McGuffin might have

6  been a night different than June 28th?

7        A.   No.  It was like earlier in the night - - -

8        Q.   (Interposing) It was - - -

9        A.   - - - or throughout the day.  It was that day.  It

10  wasn't any time after I saw Leah.  It was some time that day

11  before I saw Leah.  I have no idea approximately when.

12        Q.   I understand.  It's been a long time.  So, if you

13  saw Mr. McGuffin in the Mustang or in the Thunderbird, it

14  would have been before you saw Leah Freeman - - -

15        A.   (Interposing)  Yes.

16        Q.   - - - walking?

17        A.   Yes.

18        Q.   Okay.  That's great.  Thank you.

19             MS. McCREA:   Nothing further, Your Honor.

20             THE COURT:   Ms. - - -

21             MS. SOUBLET:   (Interposing) No redirect.

22             THE COURT:   You may step down and you're free

23  to leave.

24             MR. FRASIER:   Call Mark Kirn.

25

Kirn   D   D4 150

<u>MARK KIRN</u>

1

2  was thereupon produced as a witness on behalf of the Plaintiff

3  and, having first been duly sworn to tell the truth, the whole

4  truth and nothing but the truth, was examined and testified as

5  follows:

6              THE COURT:   Have a seat up here, please.

7              Move closer to the microphone, please, right up

8  there.  Okay.  And keep your voice up, please.

9              Go ahead.

10             MR. FRASIER:   Thanks, Your Honor.

11                     <u>DIRECT EXAMINATION</u>

12 <u>BY MR. FRASIER:</u>

13     Q.   Could you state your name please, sir, and spell

14 your last name for the record?

15     A.   Mark Kirn, K-I-R-N.

16     Q.   Where do you live, sir?

17     A.   I live in Myrtle Point.

18     Q.   Have you lived in Coquille?

19     A.   Yes.  I lived in Coquille my whole life until three

20 months ago.

21     Q.   Go to school here?

22     A.   Yes, sir.

23     Q.   Go to Coquille High School?

24     A.   Yes, sir.

25     Q.   What year did you graduate?

Kirn    D    D4 151

1      A.    2001.

2      Q.    While you were attending Coquille High School did

3  you become acquainted with or at least recognize or were

4  familiar with the Defendant in this case, Nicholas McGuffin?

5      A.    Yes, sir.

6      Q.    How well would you say you knew him?

7      A.    I knew him pretty well.

8      Q.    And did you ever go out to his house, that type of

9  thing?

10     A.    Yes, sir.

11     Q.    Did you know Leah Freeman?

12     A.    Yes, sir.

13     Q.    How did you know Ms. Freeman?

14     A.    Just from school and from Nick.

15     Q.    And when you say from Nick, what do you mean?

16     A.    Just that he was dating her.

17     Q.    That would have been what year, do you recall?

18     A.    Oh, '98, '99, somewhere in there.  I don't — I don't

19  remember.

20     Q.    Now, do you know an individual named Mike McAdams?

21     A.    Yes, sir.

22     Q.    How do you know Mr. McAdams?

23     A.    From school and — from school.

24     Q.    Now I want to talk about the summer of the year

25  2000, in particular June 28th, 2000.  Do you remember that day,

```
                                           Kirn   D    D4 152
```

1  sir?

2      A.   Not really, no.

3      Q.   Do you remember a day where allegedly Ms. Freeman

4  disappeared?

5      A.   Yes.  Yeah.

6      Q.   Do you recall where you were that evening?

7      A.   I was at Hunter's Eatery and Creamery I guess is

8  what it was called.

9             MR. FRASIER:   You'll have to speak up.

10     A.   I was at Hunter's, the old Dairy Queen.

11     Q.   And what's it currently called?

12     A.   Colleen's.

13     Q.   Why were you there?

14     A.   I was eating.

15     Q.   With who?

16     A.   Mike McAdams.

17     Q.   Do you recall about what time of the evening it was

18  you were there?

19     A.   No, sir, I don't.  It was — it was later in the

20  evening but I can't tell you an exact time.

21     Q.   Do you recall talking to the police back in the year

22  2000?

23     A.   Yes.

24     Q.   And do you recall testifying at the Grand Jury in

25  the year of 2000?

```
                                              Kirn   D    D4 153
 1       A.   Yes.

 2       Q.   Do you recall telling the Grand Jury and also the

 3  police officers that it was around nine o'clock?

 4       A.   Yes.  That sounds about right.

 5       Q.   Now, while you were eating there at the restaurant,

 6  at Hunter's, did you see Leah Freeman?

 7       A.   Yes.

 8       Q.   And where was she when you saw her?

 9       A.   She was walking from, like the Les Schwab side of

10  town towards the high school on - - -

11       Q.   (Interposing) Do you recall what she was wearing?

12       A.   A white t-shirt I think.  I'm pretty sure.  A white

13  t-shirt.

14       Q.   Okay.  This is State's Exhibit No. 7.  Does that

15  refresh your memory any?

16       A.   Yes.  That looks like the shirt she was wearing that

17  night.

18       Q.   Okay.

19            MR. FRASIER:   Can you speak up so the jury

20  can hear you?

21       A.   Yeah, that looks like the shirt she was wearing that

22  night.

23       Q.   Could you tell anything about her demeanor when she

24  was walking up the street?

25       A.   No, sir.  It's been so long, I couldn't.
```

Kirn   D    D4 154

1    Q.    Did you see which direction she was headed?

2    A.    She was headed towards the high school, that

3    direction.

4    Q.    Now, did you see her again that evening?

5    A.    No, sir.

6    Q.    After you finished eating at the restaurant, where

7    did you go?

8    A.    To Fast Mart.

9    Q.    And did — who went with you to Fast Mart?

10    A.    I think Mike McAdams was probably with me.  And that

11   was where everybody used to hang out when we were in school so

12   there was quite a few people there.  I can't recall who

13   exactly.

14    Q.    While you were there did you see the Defendant,

15   Mr. McGuffin?

16    A.    Yes, sir.

17    Q.    Do you recall what car he was driving?

18    A.    I think it was the Thunderbird, but I'm not a

19   hundred percent sure.  It's been so long I can't tell you

20   exactly.

21    Q.    Did you see him later in the evening?

22    A.    No, sir.

23    Q.    Just saw him that once?

24    A.    I — yeah, just that one time.

25    Q.    And how much time had passed from the time you

Kirn   X   D4 155

1  finished eating until you saw the Defendant?

2       A.   I don't remember.

3       Q.   Short period of time; longer period of time?

4       A.   It could've been.  I really don't remember that far

5  back that good.

6       Q.   Would your memory about what you told the police

7  officers and the Grand Jury back in the year of 2000 be better

8  than today?

9       A.   Yes, sir.  Yeah.

10      Q.   Thank you.

11           MR. FRASIER:   That's all I have, Your Honor.

12                    <u>CROSS EXAMINATION</u>

13  <u>BY MS. MCCREA:</u>

14      Q.   Mr. Kirn, when you saw Nick McGuffin that night on

15  June 28th, 2000 he was with Leah Freeman's sister?

16      A.   I don't remember.  There was someone with him, but I

17  can't recall who it was.

18      Q.   Do you remember it was a female?

19      A.   No, I don't remember.

20      Q.   Okay.  Do you remember telling the police that you

21  stopped to talk to Nick.  And that you believe you saw Leah's

22  sister in the Thunderbird with Nick looking for Leah?

23      A.    If that's what I told them back then, that's

24  probably what happened.  I really can't tell you now for sure.

25  It's been a long time.

Kirn   X   D4 156

1        Q.   I understand.  I understand.

2             So, on June 28th, 2000, as best as you can remember,

3    you and Mr. McAdams were going to go get a movie and watch a

4    movie later?

5        A.   Yeah, possibly.

6        Q.   Okay.  And you decided to go to Hunter's to get

7    something to eat - - -

8        A.   (Interposing)  Yes.

9        Q.   - - - before that?

10       A.   Yes.

11       Q.   And at that time Hunter's closed at nine o'clock,

12   didn't it?

13       A.   I don't know.

14       Q.   So the two of you had to go to get something to eat

15   before it closed?

16       A.   Well, yeah, I imagine.

17       Q.   When you saw Leah Freeman, is it correct that

18   Mr. McAdams was facing the window and you were sitting with

19   your back to the window?

20       A.   No.  I don't know if that's correct or not.

21       Q.   Okay.

22       A.   I think we were sitting both sideways to the window.

23       Q.   Okay.  Did Mr. McAdams ask you who Leah Freeman was

24   as she walked by the window?

25       A.   I — yeah, I think so.

Kirn   X   D4 157

1      Q.   And you indicated that's Leah Freeman, or that's

2   Nick McGuffin's girlfriend?

3      A.   Yeah I think — yeah, I think that's what happened.

4      Q.   And Leah Freeman was walking right by the window of

5   Hunter's.   Is that correct?

6      A.   I — I don't know.

7      Q.   And she had her arms wrapped around her like she was

8   cold?

9      A.   Maybe.  I - - -

10     Q.   (Interposing) Okay.  If that's what you told Officer

11  Downing back in 2000, that would have been your recollection

12  then?

13     A.   Yes.

14     Q.   Okay.  And she was walking fast?

15     A.   I can't — I couldn't tell you.

16     Q.   So, again, if that's what you told the officer when

17  he interviewed her (sic) that would have been your

18  recollection at the time?

19     A.   Yes.

20     Q.   Okay.  Now, you've indicated you only saw Nick

21  McGuffin one time the night of June 28th, 2000.  Did I get that

22  right?  As best as you — I'm not trying to trick you here

23  Mr. Kirn, I just want to - - -

24     A.   (Interposing) No.  As best as I can remember, but

25  I've — I could've seen him more than that.  I just can't

```
                                        Kirn   X   D4 158
```

1  remember.

2      Q.   Okay.  And your recollection is that you saw Nick

3  McGuffin at Fast Mart?

4      A.   Yes.

5      Q.   And at that time do you remember telling him that

6  you had seen Leah Freeman walk past Hunter's?

7      A.   Yes.

8      Q.   But you don't remember what time that was?

9      A.   No.

10     Q.   And in terms of Fast Mart, you indicated that that's

11 quite — that was quite a hang out back in the year 2000?

12     A.   Yes.

13     Q.   I mean it looks kind of lonely now.  It's all shut

14 down?

15     A.   Yeah.

16     Q.   But on a typical summer night, like June 28th, 2000,

17 would there have been a lot of kids hanging out?

18     A.   Yes.

19     Q.   People coming and going?

20     A.   Yes.

21     Q.   Would it be pretty unusual on a summer evening for

22 the parking lot at Fast Mart to be empty?

23     A.   Yes.

24     Q.   Thank you.

25          MS. McCREA:   That's all the questions I have,

McAdams    D    D4 159

1  Your Honor.

2              THE COURT:    Redirect.

3              MR. FRASIER:    No further questions, Your

4  Honor.

5              THE COURT:    You may step down.  You're free

6  to leave.

7              Call your next witness.

8              MR. FRASIER:    Call Mike McAdams.

9                       MIKE MCADAMS

10  was thereupon produced as a witness on behalf of the Plaintiff

11  and, having first been duly sworn to tell the truth, the whole

12  truth and nothing but the truth, was examined and testified as

13  follows:

14              THE COURT:    Have a seat up here, please.

15              Scoot a little closer, please and keep your

16  voice up.

17              Go ahead.

18                   DIRECT EXAMINATION

19  BY MR. FRASIER:

20      Q.   Could you state your name please, sir, and spell

21  your last name for the record?

22      A.   Michael Joseph McAdams, M-C, capital A-D-A-M-S.

23      Q.   Where do you live, sir?

24      A.   I live in Brownsville, Oregon.

25      Q.   Have you lived in Coquille?

McAdams   D    D4 160

1      A.   Yes, sir.

2      Q.   When have you lived in Coquille?

3      A.   A large part of my life.  I just recently moved to

4  Brownsville two months ago.

5      Q.   Did you go to school here?

6      A.   Yes, sir.

7      Q.   Go to Coquille High School?

8      A.   Yep.

9      Q.   Did you graduate?

10      A.   Yep.

11      Q.   What year?

12      A.   '98.

13      Q.   Are you familiar with the Defendant in this case,

14  Mr. McGuffin?

15      A.   Yes, sir.

16      Q.   How do you know him?

17      A.   He's one of my good friends.

18      Q.   And were you familiar with an individual named Leah

19  Freeman?

20      A.   As an acquaintance through — it was his girlfriend.

21      Q.   When you say his, you're referring to Mr. McGuffin?

22      A.   Yes, sir.

23      Q.   Now, do you know an individual named Mark Kirn?

24      A.   Yep.

25      Q.   How do you know Mr. Kirn?

McAdams   D   D4 161

1      A.   He used to be one of my friends, too.

2      Q.   I want to direct your attention, sir, to the summer

3   of 2000, in particular June 28th of 2000.  Were you with

4   Mr. Kirn that day?

5      A.   Yep.

6      Q.   Did you go anywhere with him?

7      A.   Yep.

8      Q.   Where did you go?

9      A.   We went to Hunter's Eatery and Creamery.

10     Q.   And that's a restaurant here in Coquille?

11     A.   Yep.

12     Q.   On what street, do you recall?

13     A.   It's right next to the new City Hall, Main Street.

14  I don't know.  Is that Main Street?

15     Q.   Central?

16     A.   Central, there you go.

17     Q.   And has that restaurant changed names since then?

18     A.   Yeah, two or three times.

19     Q.   Do you know what it's currently called?

20     A.   Colleen's.

21     Q.   Do you recall about what time of the evening it was

22  when you got there?

23     A.   I'm going to say right before closing, right at

24  dusk.  So, I'm going to say right around eight o'clock maybe.

25     Q.   Do you recall talking with the police back in 2000?

```
                                        McAdams   D    D4 162
```

1    A.    Vaguely.

2    Q.    And do you recall telling them it was around nine

3    o'clock?

4    A.    Yeah.  I mean, depending on the hours, you know,

5    summer and daylight savings time.  Around nine o'clock.

6    Q.    Now, while you were there with Mr. Kirn, did you get

7    something to eat?

8    A.    Yeah.

9    Q.    Was this during the process of the restaurant

10   closing up?

11   A.    No.  It was just towards the end of the night.  Not

12   a whole lot of people there.

13   Q.    While you were eating there did you see Leah

14   Freeman?

15   A.    Yes, sir.

16   Q.    Where did you see her?

17   A.    On the far side of the street, walking uphill

18   towards the stop light.

19   Q.    Walking in that direction what landmarks would you

20   go to, coming up?

21   A.    There used to be a sign there saying that there's a

22   stop light.

23   Q.    What I'm getting at is what direction was she going?

24   A.    North.

25   Q.    And that would be towards the high school?

McAdams   D    D4 163

1      A.    Yes, sir.

2      Q.    Could you tell what she was wearing?

3      A.    I'm pretty sure she was wearing shorts and a white

4  shirt.  But I've thought about it so many times that, like,

5  the color can change in my head just by thinking about it.

6  So, I'm going to say a white shirt and shorts.

7      Q.    Let me show you State's Exhibit No. 7.  Does that

8  refresh your memory, sir?

9      A.    Yeah.

10      Q.    And does that look like at least the top she was

11  wearing?

12      A.    Yes, sir.

13      Q.    Could you tell what her demeanor was like?

14      A.    She was like a speed — like walking uphill faster

15  than, you know, nonchalant.  Just kind of going up the hill

16  trying to keep pace.

17      Q.    Did you see her again after that?

18      A.    No, sir.

19      Q.    Did you see the Defendant that night?

20      A.    Yeah, later down at the store.  That's the meeting

21  spot where we'd all hang out.  And if there was something

22  going on, we'd diverse from there.

23      Q.    And do you recall the name of this store?

24      A.    Fast Mart.

25      Q.    Okay.  Do you recall how much time had elapsed from

McAdams   D    D4 164

1  the time you finished eating until the time you went to Fast

2  Mart?

3      A.   Directly.  About twenty minutes, half an hour maybe.

4      Q.   And how long was it from the time you finished

5  eating until you saw the Defendant?

6      A.   I'm going to say forty-five minutes maybe.  He just

7  pulled up, you know, right as we're all hanging out there.  He

8  just pulled up like normal.

9      Q.   Do you recall what kind of vehicles the Defendant

10  drove during that time period?

11      A.   When he pulled up to the store that night I believe

12  he was in the Thunderbird.  He had a Mustang and a truck.

13      Q.   Okay.  On the evening that Leah Freeman disappeared,

14  June 28th, did you see the Defendant driving the blue Mustang?

15      A.   I don't — I mean, I don't believe so.  I think he

16  was driving the Thunderbird.

17      Q.   Did you talk with the Defendant while he was at Fast

18  Mart?

19      A.   I would have greeted him and said, "How's it going?"

20  And just talked, you know, like a normal day.

21      Q.   Did the Defendant ever tell you anything or ask you

22  anything about Ms. Freeman being missing or anything like

23  that?

24      A.   No.

25      Q.   Thank you.

McAdams   X    D4 165

1          MR. FRASIER:    That's all the questions I have

2    at this time.

3          THE COURT:    Go ahead.

4                    CROSS EXAMINATION

5    BY MS. MCCREA:

6      Q.   Mr. McAdams, I'm looking at a report that you gave

7    to Officer Perske back on July 26, 2000.  And does it refresh

8    your recollection that after you and Mr. Kirn ate, that you

9    were tired and dropped Mr. Kirns back off at the video store

10   and went home to bed because you had to be at work at five

11   o'clock?

12     A.   I mean, if that's the report I gave, that's the best

13   of my recollection of 2000.  You know, it's 2012.  I done my

14   share of cannabis in my time and my recollections aren't very

15   good twelve years later, but I did have to work at five in the

16   morning.  And all the time I would stay up and hang out with

17   my friends, you know, because I was young and - - -

18     Q.   (Interposing) And it's easier to do when you're

19   young, huh?

20     A.   Yeah, quite definitely.

21     Q.   Yeah.  Look, I'm not trying to give you a hard time,

22   Mr. McAdams.

23     A.   I see.

24     Q.   So, when you were relaying to us the meeting with

25   Nick McGuffin at Fast Mart, the way that you're phrasing it,

McAdams   X    D4 166

1   "I would have greeted him and just talked about the usual

2   stuff."  Is it that you don't have a specific recollection of

3   actually - - -

4        A.   (Interposing) Yeah.  I can't think of exact words

5   that I would have said.  Anything we would have specifically

6   talked about, it was — I don't know.

7        Q.   And you would typically run into Nick McGuffin at

8   Fast Mart.  Is that fair?

9        A.   That's — yeah.

10       Q.   So on what, a daily basis maybe?

11       A.   Yeah.  We hung out a lot.

12       Q.   Okay.  And you would see Nick McGuffin driving the

13  blue Mustang on some occasions?

14       A.   Yeah.

15       Q.   And other times you would see him in the maroon

16  Thunderbird?

17       A.   Yeah.

18       Q.   And it wasn't a significant thing if he was in one

19  car or the other?

20       A.   No.

21       Q.   And going back eleven years to 2000, you don't have

22  a specific recollection as to what car he was driving that

23  night, if you saw him?

24       A.   I don't have a hundred percent accurate.  But in my

25  mind it sticks out that he was driving the Thunderbird.

McAdams   X   D4 167

1    Q.   Now, on June 28th you and Mr. Kirn were going to get

2    a movie.  And you decided to go to Hunter's to get a bite to

3    eat first?

4    A.   I don't know if we were going to get a movie.  But I

5    know that I was definitely in to get something to eat.

6    Q.   Okay.  I'm looking at a report of a statement you

7    gave to Officer Perske where it says, "They decided to get a

8    movie and go to Hunter's for a bite to eat."

9    A.   Okay.

10   Q.   So, that could be you just don't have a recollection

11   of - - -

12   A.   (Interposing) Yeah.

13   Q.   - - - the movie part of it right now?

14   A.   Yeah.

15   Q.   Did you guys — to your recollection, did you get a

16   movie that night?

17   A.   I don't believe so, because I would have been going

18   home after that, or you know, hang out a little bit.  And

19   that's not — we didn't watch movies.  That wasn't hanging out.

20   You know what I mean?  We'd go drive or do something, be

21   active, not really sit around and watch movies.

22   Q.   And back on June 28th, 2000, Hunter's would close at

23   nine o'clock?

24   A.   I'm pretty sure.

25   Q.   And that's why you guys wanted to get there, to get

McAdams   X   D4 168

1    something to eat before it closed?

2        A.   Yeah.

3        Q.   Okay.  And the two of you were sitting there.  And

4    you were facing the window and Mr. Kirn was facing toward you?

5        A.   Yeah.

6        Q.   And then Leah Freeman walks by.  And did — and so

7    you saw her?

8        A.   Yeah, I looked up.  And I was eating hamburger.  And

9    I said, "Isn't that Nick's girlfriend?"

10            Mark turned around and looked and said, "Yeah."

11            And we just went back to eating.

12       Q.   Okay.  And what you noticed was she was walking at a

13   fairly quick pace?

14       A.   Yeah.  She was — I mean she's going uphill.  So,

15   when you're walking uphill you tend to lean forward and have a

16   continual stride to keep your momentum forward.

17       Q.   And you would characterize it more as a power walk

18   than just moseying up the hill?

19       A.   Yes.

20       Q.   Okay.

21            Thank you.

22            MS. McCREA:    That's all the questions I have.

23            THE COURT:    Redirect.

24            MR. FRASIER:    I have nothing further, Your

25   Honor.

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

STATE OF OREGON,                    )
                                    )
            Plaintiff,              )    CASE NO. 10CR0782
                                    )
        vs.                         )      JURY TRIAL
                                    )  DAY FOUR, Continued
NICHOLAS JAMES MCGUFFIN,            )
                                    )
            Defendant.              )
_____    )

TRANSCRIPT OF PROCEEDINGS

Volume 6, Pages D4 169 to D4 261

        BE IT REMEMBERED That, the above-entitled cause

came on regularly for hearing beginning at 9:04 a.m., Monday,

July 11, 2011, in the Circuit Courtroom of the Coos County

Courthouse in the City of Coquille, County of Coos, State of

Oregon, before the Honorable Richard L. Barron and a jury.


APPEARANCES

R. Paul Frasier, District Attorney for Coos County,
representing the Plaintiff.

Erica Soublet, Assistant District Attorney for Coos County,
representing the Plaintiff.

Shaun McCrea, Attorney at Law, representing the Defendant.

Robert McCrea, Attorney at Law, representing the Defendant.


S. Jean Sprouse, Court Transcriber, XV Judicial District, 503-325-5254

```
                                          Crook   D    D4 169
```

 1          THE COURT:    You may step down.  You're free

 2          to leave.

 3          WITNESS:    Thank you.

 4          THE COURT:    Call your next witness.

 5          MS. SOUBLET:    The State calls Heidi Crook.

 6                        HEIDI CROOK

 7   was thereupon produced as a witness on behalf of the Plaintiff

 8   and, having first been duly sworn to tell the truth, the whole

 9   truth and nothing but the truth, was examined and testified as

10   follows:

11          THE COURT:    Have a seat up here, please.

12          Scoot close to the microphone, please.  Move it

13   down.  You can move it further down than that if you want.

14   The whole thing moves.  And then so it's there.  And then

15   speak up, please.

16          Go ahead.

17          MS. SOUBLET:    Thank you, Your Honor.

18                     DIRECT EXAMINATION

19   BY MS. SOUBLET:

20      Q.   Mrs. Crook, can you state your full name and spell

21   your last for the record?

22      A.   Heidi Crook, C-R-O-O-K.

23      Q.   I'm going to ask you to speak up loud enough so

24   everybody can hear you.  We don't have to turn the air

25   conditioner off.

```
                                    Crook   D    D4 170
 1          Mrs. Crook, have you lived in Coquille all your

 2   life?

 3       A.   Yes.

 4       Q.   Were you living here in 2000?

 5       A.   Yes.

 6       Q.   Do you know the Defendant Nicholas McGuffin?

 7       A.   Yes.

 8       Q.   How do you know him?

 9       A.   He was my brother's friend and I went to school with

10   him.

11       Q.   Were you the same age?

12       A.   No.

13       Q.   Older or younger?

14       A.   Older.

15       Q.   By how many years?

16       A.   Three.

17       Q.   Did you know Leah Freeman?

18       A.   I knew her sister.

19       Q.   Did you know whether or not she and Defendant were

20   dating in the school year '99-2000?

21       A.   I think so.

22       Q.   I want to turn your attention to June 28, 2000.  Do

23   you remember that night?

24       A.   Yes.

25       Q.   Who were you with?
```

```
                                     Crook   D    D4 171
```

1     A.    Heather Reid.

2     Q.    Do you remember where you were headed?

3     A.    Yes.

4     Q.    Where was that?

5     A.    To my house on Elliott Street.

6     Q.    How were you getting there?

7     A.    Heather was driving.

8     Q.    Do you remember what time that was?

9     A.    A little before nine p.m.

10    Q.    Driving — how do you — going which way?

11    A.    Towards the stop light on Central.

12    Q.    Did you see Leah Freeman that night?

13    A.    Yes.

14    Q.    Where was she?

15    A.    In between the motel and Hunter's Restaurant.

16    Q.    Do you remember what side of the street she was on?

17    A.    The same side as the motel.

18    Q.    Do you remember what she was wearing?

19    A.    A white tank top.

20    Q.    I'm going to show you State's Exhibit No. 7 and ask

21    you if you recognize that?

22    A.    Yeah.  Yes.

23    Q.    What's Exhibit No. 7 a photo of?

24    A.    A picture of Leah wearing jeans and a white tank

25    top.

Crook   X   D4 172

1      Q.   Is that same tank top you saw her in on June 28th,

2    2000?

3      A.   Yes.

4      Q.   Did you notice anything about Ms. Freeman?

5      A.   She looked like she was cold.  Her arms were crossed

6    across her chest.

7      Q.   Did you see her again that night?

8      A.   No.

9      Q.   Thank you.

10           MS. SOUBLET:   Nothing further.

11                    CROSS EXAMINATION

12   BY MS. MCCREA:

13      Q.   So, Ms. Crook, when you say that you were coming to

14   the stop light.  You and Ms. Reid were heading into town?

15      A.   We were heading towards the middle school.

16      Q.   You were heading towards the middle school.  Were

17   you on Central?

18      A.   Yes.

19      Q.   Okay.  So, were you going the same direction or the

20   opposite direction as Ms. Freeman?

21      A.   The same.

22      Q.   Okay.  So you were going the same direction.  And

23   she was close to Hunter's Restaurant?

24      A.   Yes.

25      Q.   And so you came up behind Leah and passed her.  Is

```
                                        Crook   X    D4 173
```

1   that right?

2        A.   Yes.

3        Q.   And she was on the Fast Mart side of the road?

4        A.   Yes.

5        Q.   And she was walking fast?

6        A.   I'm not sure.

7        Q.   But you saw that she had her arms crossed over her

8   chest?

9        A.   Yes.

10       Q.   When — during the time that the two of you observed

11  her, you didn't see her stop, did you?

12       A.   No.

13       Q.   And you didn't see Mr. McGuffin come up and meet up

14  with her?

15       A.   No.

16       Q.   Nobody else was with her during the time that you

17  observed her?

18       A.   No.

19       Q.   Okay.  And June 28th, 2000, I realize it's been a

20  long time, but it was a pretty nice evening?

21       A.   It was almost dark.

22       Q.   Okay.  But up until the point — until that point it

23  had been a nice day?

24       A.   Yes.

25       Q.   Okay.  All right.  I know I'm asking you to remember

```
                                            Reid   D    D4 174
```

1    a long time ago.

2              Thank you.

3              MS. McCREA:    That's all the questions I have.

4              THE COURT:    Any redirect?

5              MS. SOUBLET:    No, Your Honor.

6              THE COURT:    You may step down and you're free

7    to leave.

8              Call your next witness.

9              MS. SOUBLET:    The State calls Heather Reid.

10                        HEATHER REID

11   was thereupon produced as a witness on behalf of the Plaintiff

12   and, having first been duly sworn to tell the truth, the whole

13   truth and nothing but the truth, was examined and testified as

14   follows:

15             THE COURT:    Have a seat up here, please.

16             And if you'd scoot up close to the microphone.

17   You can bend it down so it's equal with your mouth.  And then

18   keep your voice up, please.

19             Go ahead.

20             MS. SOUBLET:    Thank you, Your Honor.

21                     DIRECT EXAMINATION

22   BY MS. SOUBLET:

23      Q.  Ms. Reid, can you state your name and spell your

24   last for the record?

25      A.  Heather Lynn Reid, R-E-I-D.

Reid    D    D4 175

1      Q.    Ms. Reid, did you grow up in Coquille?

2      A.    No, I did not.  I grew up in North Bend.

3      Q.    In the summer of 2000 were you living in Coquille?

4      A.    Yes, I was.

5      Q.    Where were you living?

6      A.    I was living up at Shelley Road Apartments.

7      Q.    Do you know the Defendant?

8      A.    Yes, I do.

9      Q.    How do you know him?

10     A.    Just a friend.

11     Q.    Did you go — what high school did you go to?

12     A.    North Bend High School.

13     Q.    Did you know Leah Freeman?

14     A.    Yes, I did.

15     Q.    How did you know Leah?

16     A.    Just from being here in Coquille and being friends

17  with her sister.

18     Q.    Her sister Denise?

19     A.    Denise.

20     Q.    How long had you known Ms. Freeman?

21     A.    I've known them for years.  My mom used to date

22  their dad years and years ago when Leah was two.

23     Q.    Would you say you grew up with Ms. Freeman?

24     A.    Yeah.

25     Q.    And are you the same age as her sister Denise or

Reid   D    D4 176

1    older or younger?

2        A.   I'm older.

3        Q.   How older?

4        A.   I'm not sure.  A couple year.  I'm thirty-one, so

5    I'm not sure how old she is.

6        Q.   In the school year 1999-2000, did you ever see the

7    Defendant and Ms. Freeman together?

8        A.   Yes, I did.

9        Q.   Were you aware of what the relationship was?

10       A.   Boyfriend/girlfriend.

11       Q.   Did you know what their relationship was like?

12       A.   No, I don't.

13       Q.   Did you have an opportunity to see them in an

14   argument?

15       A.   No.

16       Q.   Do you remember telling the police back in 2000 that

17   you saw them in a verbal argument at Fast Mart?

18       A.   I don't remember.

19       Q.   If you said that back in 2000 would your memory be

20   better then than it is today?

21       A.   Probably.

22       Q.   Ms. Reid, I want to turn your attention to June 28th,

23   2000.  Do you remember that day, that night?

24       A.   I'll try.

25       Q.   Did you have an opportunity to see Ms. Freeman that

```
                                      Reid   D    D4 177
 1  night?

 2       A.   I did.  I saw her walking right there by the

 3  Hunter's Eatery on the left hand side of North Central,

 4  walking down the road.

 5       Q.   Okay.  Was there anyone else with you?

 6       A.   Heidi Crook was with me.

 7       Q.   Where were you going?

 8       A.   I was taking Heidi Crook home to her mother's house.

 9       Q.   Do you remember what Ms. Freeman was wearing?

10       A.   Yes, I do.

11       Q.   What was that?

12       A.   She was wearing a white tank top.  It had four or

13  five criss crosses across the back.  And she was wearing — I

14  don't remember if she was wearing shorts or if she was wearing

15  pants.  But I remember the tank top.

16       Q.   I'm going to show you Exhibit No. 7 and ask you if

17  you recognize that?

18       A.   No.

19       Q.   When you saw — do you remember what time it was when

20  you saw Ms. Freeman?

21       A.   It was right — right before nine o'clock.  Just a

22  few minutes to nine.

23       Q.   And where was she?

24       A.   She was on — going down North Central towards the

25  high school way.  She was on the left hand side, right there —
```

Reid   D    D4 178

1   by I believe it's Colleen's Restaurant now.  She was just

2   right about there walking down the road with her arms crossed.

3       Q.   Did you notice anything else about her at that time?

4       A.   She just looked very cold.

5       Q.   Do you remember telling the police that she looked

6   mad?

7       A.   She either looked mad or she looked cold.  But she

8   didn't look happy.

9       Q.   Sorry?

10      A.   She just didn't look happy.  She was either mad or

11  she was cold.  I wasn't sure.  She had her arms criss crossed.

12      Q.   Where did you go after seeing Ms. Freeman?

13      A.   I went to the stop light there at the middle school

14  and took a right and went up Tenth Street and took Heidi home.

15  Went around the block and came back down to see if she was

16  still walking because I was going to give her a ride.  And she

17  wasn't there.

18      Q.   Why were you going to give her a ride?

19      A.   Because she looked cold.

20      Q.   Do you know how far you drove on Central looking for

21  her?

22      A.   I just came down to the gas station.  I guess it was

23  the old BP gas station and went down to the stop light again.

24  And she wasn't in the range of being able to see.

25      Q.   So, is that before or after the Fairview turnoff?

Reid   D    D4 179

1     A.   Before.

2     Q.   Did you see the Defendant that night?

3     A.   I don't remember if it was that night or if it was

4  the next day.

5     Q.   By the next day, are you talking early morning hours

6  of June 29th?

7     A.   It was in the middle of the daytime.  I just

8  remember it being a nice sunny day.

9     Q.   Where was he then?

10    A.   Fast Mart.

11    Q.   Do you remember telling the police back in 2000 that

12 you saw him at Fast Mart that same night?

13    A.   I just don't remember if it was that same night.

14 I'm assuming it was the next day or earlier — previously that

15 day.  Because it was sun shiny.  It was a nice day.  And when

16 I had seen Leah it was almost dusk.

17    Q.   Do you remember testifying at Grand Jury?

18    A.   Yes, I do.

19    Q.   You testified back in 2000 and 2010?

20    A.   Yes.

21    Q.   Is it fair to say that your memory in 2000 was

22 better than your memory here today?

23    A.   It's hard to say.  When I get in front of a crowd of

24 people I get scared.  And I kind of blank out.  And so I don't

25 remember.

Reid   D    D4 180

1    Q.   Were you with a crowd of people when you were

2    speaking with police officers back in 2000?

3    A.   No.

4    Q.   If I show you your statement from 2000 and ask you

5    to read that to yourself and tell me when you're done.

6         MS. McCREA:    May we know which statement this

7    is, Counsel, what officer?

8         MS. SOUBLET:    I don't, but it's Page

9    No. 3890.

10        MS. McCREA:    Thank you.

11   Q.   Are you done?

12   A.   Yes, I am.

13   Q.   Does that refresh your recollection about telling

14   the officers that you saw the Defendant at Fast Mart in the

15   Thunderbird that night?

16   A.   Yes.

17   Q.   You did say that?

18   A.   Yes, I did.

19   Q.   Do you remember having a conversation with the

20   Defendant about seeing him that night in the Thunderbird?

21   A.   I do.  I just — I was thinking it was the day after

22   the fact.  But I guess it wasn't.  I'm not sure.  I just don't

23   remember.  I can't be positive.

24   Q.   What was Defendant's reaction to your telling him

25   you saw him in the Thunderbird on June 29th when you told

Reid   X   D4 181

1  police that?

2      A.   Everything's just kind of confusing because he was

3  driving both cars, his car and his mother's car.  And I

4  remember seeing him at one point in his mom's Thunderbird

5  sitting at Fast Mart by himself.  And he was just sitting,

6  staring at the steering wheel.  But I drove by for just a

7  couple seconds.  And just saw the side of him.  So I don't — I

8  don't remember anything past that.

9      Q.   And you had an opportunity to tell the Defendant

10 that you told the FBI that.  Correct?

11     A.   Yes.

12     Q.   That was after Ms. Freeman's disappearance?

13     A.   Yes.  He asked me if I had gone and talked to them

14 and reported everything that I knew?

15     Q.   And what was his reaction when you told him that you

16 told the police you saw him in the Thunderbird?

17     A.   I don't remember what his reaction was.

18     Q.   So, you don't remember saying that he told you you

19 were mistaken and getting upset.  And him calling you a liar?

20     A.   No, I do not remember that at this point.

21          MS. SOUBLET:   Nothing further.

22                    CROSS EXAMINATION

23 BY MS. MCCREA:

24     Q.   Ms. Reid, in terms of you telling Mr. McGuffin that

25 you saw him at Fast Mart in the Thunderbird, his reaction was

Reid   X   D4 182

1  — I'm sorry.  Telling him that you saw him at Fast Mart, his

2  reaction was, he specifically asked you what — "Wait, what car

3  was I in?"

4       A.   Yes.

5       Q.   And then when you told him he was in the Thunderbird

6  his reaction was, he was not in the Thunderbird.  Is that

7  right?

8       A.   Yes, that he was in his own car.

9       Q.   And as you've said, he drove both cars, maybe not

10  interchangeably, but quite often?

11       A.   Yes.

12       Q.   So it's hard to remember now back eleven years what

13  car he was driving then.  And probably it would also be true

14  back in 2000 trying to remember on a specific day looking

15  back, what car he was in?

16       A.   That's correct.

17       Q.   So, when you were taking Ms. Crook home, you were

18  coming — you were going in the same direction as Leah Freeman?

19       A.   Yes.

20       Q.   And you passed her.  And then you went up to Tenth.

21  Is that where the stop light is?

22       A.   Yes.

23       Q.   And you took a right?

24       A.   Yes.

25       Q.   And as near as you can tell Leah Freeman continued

```
                                      Reid   X    D4 183
 1   on?

 2        A.   Yes.

 3        Q.   So, from Tenth you then went up to Elliott?

 4        A.   That's correct.

 5        Q.   Is that right?

 6        A.   That's correct.

 7        Q.   And then — and how far was it to Elliott from where

 8   you turned at Tenth?

 9        A.   Down to — what is it?  Two blocks.

10        Q.   Two blocks?

11        A.   Two blocks past — down Elliott.  And then to the

12   right again down to the BP gas station out there.  Right where

13   you come out at Fast Mart.

14        Q.   Where you come out at Fast Mart?

15        A.   Yeah.

16        Q.   Okay.  And then you dropped off Ms. Crook.  And took

17   a right on — if this is right.  I'm looking at your statement

18   from back in 2000.  A right on Dean to Tenth and then back to

19   Central?

20        A.   That's correct.

21        Q.   And then you stopped at the light.  And you did not

22   see Leah Freeman anywhere?

23        A.   I did not.

24        Q.   And at that point you did not see Nick McGuffin

25   anywhere either?
```

Exhibit 102  Page 529 of 1666 to
State Defendants' Motion for Summary Judgment

Reid   X   D4 184

1    A.   No.  And then I went home to my grandmother's.

2    Q.   And then you went home?

3    A.   Yes.

4    Q.   So, when you saw Leah walking I think you indicated

5  that she looked cold and she could have been mad.  Her facial

6  — you nodded yes.

7    A.   Yes.

8    Q.   I'm sorry.  We have to get it on the record.

9         And her facial expression was that she was not

10 happy?

11   A.   Yes.

12   Q.   And she was walking fast?

13   A.   She was walking fast, yes.

14   Q.   Thank you.

15              MS. McCREA:   That's all the questions I have,

16 Your Honor.

17              THE COURT:   Redirect.

18              MS. SOUBLET:   No, Your Honor.

19              THE COURT:   You may step down and you're free

20 to leave.

21              Call your next witness.

22              MR. FRASIER:   We'll call Officer McNeely

23 briefly, Your Honor.

24              You're still under oath.

25              THE COURT:   You're still under oath.  You've

McNeely   D    D4 185

1    testified.

2                        RAY MCNEELY

3    was thereupon produced again as a witness on behalf of the

4    Plaintiff and, having previously been duly sworn to tell the

5    truth, the whole truth and nothing but the truth, was examined

6    and testified as follows:

7                      DIRECT EXAMINATION

8    BY MR. FRASIER:

9        Q.   Officer McNeely, previously today we heard from a

10   witness named Melissa Smith.  Did you have an opportunity to

11   interview her previously?

12       A.   Yes, I did.

13       Q.   When did you interview her?

14       A.   On April 22nd, 2011 at approximately 12:30 in the

15   afternoon.

16       Q.   And did you have a conversation with her about her

17   overhearing — well, her having a phone call or a phone call

18   discussion with Leah Freeman the day she disappeared?

19       A.   Yes, I did.

20       Q.   And did she relate to you that she had heard the

21   Defendant say something - - -

22       A.   (Interposing) Yes, she - - -

23       Q.   _- - - while she was on the phone?

24       A.   Yes, she did.

25       Q.   Could you tell us what - - -

McNeely   D    D4 186

1                    MR. McCREA:    Your Honor, I'll object.

2                    THE COURT:    As?

3                    MR. McCREA:    Well, there wasn't any

4    foundation laid for this to be introduced, Your Honor.

5                    THE COURT:    Well, I think he's offering it

6    for impeachment.  And I think the witness was asked that.

7                    MR. McCREA:    Pardon?

8                    THE COURT:    I think the witness was asked the

9    question about this conversation.

10                    And it's being offered for impeachment I

11    assume, Mr. Frasier?

12                    MR. FRASIER:    That's correct.

13                    THE COURT:    Okay.

14                    MR. McCREA:    Then we ask for limiting

15    instruction.

16                    THE COURT:    I will give one.

17                    MR. McCREA:    But I continue the objection on

18    the basis that there was no foundation laid specifically where

19    the witness was asked if she made this statement to the

20    officer so she could explain this statement.

21                    THE COURT:    Well, she was certainly asked

22    about it.  I know that.  And I think she was asked about

23    whether she talked to the police.  I don't know specifically

24    about this officer.  With that I think you might be right.

25    But she was asked if she made it and told the police that, as

```
                                    McNeely  D    D4 187
```

1    I recall.

2              Mr. Frasier.

3              MR. FRASIER:    Our recollection is she was

4    asked specifically, "Did she speak with either Officer McNeely

5    or Officer Webley?"

6              THE COURT:    Okay.

7              The objection is overruled.

8              Ladies and Gentlemen, when a witness testifies

9    to something or says, "I don't remember," or says, "I didn't

10   say that," and is given the statement and said, "Did you say

11   this to so and so or the police?"

12             And they deny it.  You can — the party offering

13   it can then call a witness who then says — who in effect says,

14   "Yes, she did tell me that."

15             You can accept that and hear that testimony

16   only for your determination of whether — in this case

17   Ms. Smith — was telling the truth or not.  You cannot accept

18   it as direct evidence that she actually said it.  Just that

19   you can take it as whether or not she was telling the truth or

20   not when she was testifying as a witness.

21             Okay.  Go ahead.

22             DIRECT EXAMINATION, Continued

23   BY MR. FRASIER:

24        Q.   What did Ms. Smith tell you regarding what she

25   overheard the Defendant say?

McNeely   D    D4 188

1    A.    She told myself and Officer Webley that on the day

2    that Leah disappeared, that she had called Leah.  And she

3    remembers that Leah and Nick were fighting.  She said that

4    while she was on the phone she could hear Nick in the

5    background yelling at Leah, calling her a bitch.

6          Smith said she asked Leah if she wanted to talk, but

7    Leah was upset and said she would just talk to her later about

8    it.

9    Q.    Now, I'm going to show to you what's marked and been

10   previously received as State's Exhibit No. 16 which is

11   identified as being the blue Mustang.  Do you recognize that?

12   A.    Yes, I do.

13   Q.    And can you see the license number there?

14   A.    Yes, I can.

15   Q.    And can you read that license number for us?

16   A.    Yes.  PBA840.

17   Q.    Now, I'll show you what's marked as State's Exhibit

18   No. 25.  Does that show the maroon Mustang (sic) that we've

19   been discussing?

20   A.    The maroon Thunderbird.

21   Q.    Thunderbird?

22   A.    Yes.

23   Q.    And can you at least read part of that number?

24   A.    SM, I believe it's Q, 836.

25          MR. FRASIER:    Your Honor, I have here what's

McNeely   X    D4 189

1  marked as State's Exhibits Nos. 78 and 79 which are certified

2  copies of registrations for those two particular vehicles.

3  And we would ask that they be admitted at this time.

4          MS. McCREA:    There is no objection to No. 78

5  and 79, Your Honor.

6          THE COURT:    They are received.

7          (Whereupon Exhibits Nos. 78 and 79 were then

8  received into evidence.)

9          MR. FRASIER:    I have nothing further to ask

10 Officer McNeely at this time.  I'll probably recall him later.

11         THE COURT:    Okay.

12         Mr. McCrea.

13                 <u>CROSS EXAMINATION</u>

14 BY MR. MCCREA:

15     Q.    Detective McNeely, the conversation to which you

16 made reference with Melissa Smith occurred the 22nd of April,

17 2011?

18     A.    Correct.  April 22nd, 2011.

19     Q.    And at that time you had — you didn't make any kind

20 of recording of this conversation.  Is that correct?

21     A.    We did not record the conversation, no.

22     Q.    So, you had the conversation, and then you went

23 somewhere and typed up a report?

24     A.    Officer Webley typed up the report, yes.

25     Q.    So, you didn't even do the report?

McNeely   X    D4 190

1    A.    After he wrote the report I reviewed it for

2    accuracy, agreed with it, and then - - -

3    Q.    (Interposing) And now you have — you have reviewed

4    other — well, strike that.

5            Let's approach it this way.

6            So, what you did was you reviewed the report and

7    then relied upon your recollection of what you thought

8    Ms. Smith had said at this interview.  Correct?

9    A.    Officer Webley and I interviewed Ms. Smith, he wrote

10   up the report.

11   Q.    My question's simple.  You read the — when you

12   reviewed the report you looked at it and checked it against

13   your memory of what the interview had been.  Is that correct?

14   A.    Yes, that's correct.

15   Q.    Because you had nothing else that — to which you

16   could go and determine exactly what she'd said.  Correct?

17   A.    Correct. (Not understandable.)

18   Q.    All right.  And - - -

19           MR. McCREA:    All right.  That's all the

20   questions I have.

21           THE COURT:    Any redirect?

22           MR. FRASIER:    No, Your Honor.

23           THE COURT:    You may step down.  You're still

24   needed as a witness.  So, you're not excused.

25           WITNESS:    Thank you, Your Honor.

D4 191

1          THE COURT:    Call your next witness.

2          MR. FRASIER:    Your Honor, we're still waiting

3   for some witnesses to get here, but I do have some things we

4   could do to fill in some time.

5          THE COURT:    Okay.

6          MR. FRASIER:    I'd like to read into the

7   record several of State's Exhibits that have been previously

8   received.

9          THE COURT:    You may.

10         MR. FRASIER:    The first is State's Exhibit

11  No. 86 which is a letter previously identified in a

12  handwriting of Leah Freeman to the Defendant.  It is dated

13  1/7/00.  It reads:

14              "Nicholas, I can't believe I miss you as much

15              as I do and it's only Friday.  I'm gonna be

16              crying all day Sunday.  Well, then you call me

17              and asked me if I wanted to stay at her house

18              tonight, but I told her it wouldn't be very

19              much fun because I'm in such a ass mood.  I'm

20              sad and very irritable."  Parentheses, "(PMS)"

21              close parentheses.

22          "Everybody was pissing me off today,

23              especially Heidi, Casey, Richard, and

24              Catherine.  Rio . . ."  I think it's

25              Rio.  ". . . decided she's gonna have me stay

D4 192

1          at her house and have Grant and Kyle stay at
2          his/her house.  And there we'll be.  All in
3          accordance, of course."

4

5          Then she writes, spelling parenthesis pointing
6    to the word:

7               "Stacey gave me this jacket thing and it
8          smelled so gross.  It was flat out disgusting.
9          Sherry asked if she could wear it just to walk
10         home because it was really cold and she didn't
11         have a sweater.  She put it on as I was
12         walking away to talk to Sherry and Rio.  When I
13         went back she was wearing Melissa's sweater.
14         So I asked her if she was too good for it or
15         something.  So she made me smell it.  And she
16         was definitely too good for it.  Like I said it
17         was disgusting."

18              "Guess what?  Right.  I'm listening to
19         Faith.  One of the few songs that reminds me of
20         you.  No offense but I really don't want to be
21         reminded of you right now.  It makes me really
22         sad.  Almost to the point of crying, which I
23         don't want to do because I know I'm going to be
24         doing that pretty soon, which is why I'm not
25         wearing any makeup.  I look like such a grungy

D4 193

1    loser today.  I wore no makeup.  I got

2    toothpaste all over my sweater, and I had my

3    hair up with my hairs falling all over the

4    place."

5         "Next, I washed dishes and got water all

6    over my sweater.  It was just a really bad day.

7    But it didn't really matter because I didn't

8    see you anyway.  Did you notice I am way more

9    comfortable around you than I used to be?

10   Think about it.  I wouldn't eat in front of

11   you.  I didn't want to say anything too

12   personal or sincere.  I was always so worried

13   that you would get mad at me, so I wouldn't do

14   or say a lot of things.  Things have changed so

15   much.  I think they've changed for the better.

16   Do you ever wonder why I don't tell you I love

17   you when you tell me?  Do you want to know?

18   Well, as stupid as it's going to sound, it's

19   because I just don't want to get old.  I don't

20   want it to get old.  A lot of my problems are

21   because of my dad.  I think this is one of them

22   because I used to tell him I loved him all the

23   time, like ten, fifteen times a day.  And I

24   haven't told him that.  He hasn't told me that

25   in like four to five years.  I just don't want

D4 194

1          that to happen to us.  Do you really think

2          we'll end up together?  I hope so because I

3          can't see myself with anybody else.  And I

4          definitely don't want to have to."

5              "But our opinions are so different.  I

6          don't want to live in a big town.  You do.  I

7          don't want harsh drugs in my life.  You

8          probably do.  And you're probably going to want

9          me to work before and while.  You know what, it

10         doesn't really matter for now."

11             "Well, baby, I'm going to go.  I'll help —

12         I hope you're having fun in Seattle.  Love you,

13         Leah Nichole McGuffin."

14

15         This is State's Exhibit No. 85.  It is dated

16     1-19-00.

17             "Nick, okay, I don't understand how you can

18         be such an asshole to me.  You claim that

19         you're pissed off because everything in your

20         life sucks, yet you only take your anger out on

21         me.  And I didn't do a damn thing.  I'll admit

22         I didn't tell you about Luke . . ." parentesis,

23         "(slightly)" close parenthesis, ". . . putting

24         the moves on me.  But I didn't think that was a

25         big deal.  Besides, you were pissed before

D4 195

1        that.  And Sherry said you weren't even mad

2        about that.  But you know what?  You have no

3        reason to be mad at me.  The only reason for

4        you being mad at me that I can think of, would

5        be because of the Luke thing.  But you

6        shouldn't be because it's not like I lied to

7        you or anything.  I mean, that was never the

8        question.  You asked me — you asked if we did

9        anything.  You asked if we kissed, held hands,

10       and that kind of thing.  But, yes, I can

11       honestly say I did none of the above.  Just

12       because he tried, doesn't mean we actually did

13       anything.  He didn't even try to kiss me.  It

14       was like just stupid little flirty things.  I'm

15       sorry, but if you're mad about that, you need

16       to just get over it."

17             "You know what's sad?  I really don't

18       think, quote, "we" end quote, are going to last

19       very long.  Well, not as long as I thought and

20       hoped.  I was thinking more along the lines of

21       forever.  But from the way things are looking I

22       don't see that happening.  Don't get me wrong,

23       I still love you to death.  But you can't keep

24       treating me . . ."

25             Excuse me.

D4 196

1  "But you can't keep treating me like I'm

2  just your bitch because I can't and won't put

3  up with that.  I've been putting up with it for

4  a long time and I am so sick of it.  I depress

5  all of my friends.  Not that I'm ever really

6  with my friends.  But when I am I depress them

7  because you depress me.  And what I don't

8  understand is how you can smile and be just

9  peachy fucking keen when you're with your

10  friends.  But when you're just with me, life

11  sucks.  I don't understand it.  Aren't I

12  supposed to make you happy?  Apparently I'm not

13  doing a very good job.  Maybe you should just

14  fire me.  That's not at all what I want, but if

15  we can't make each other happy, maybe

16  something's wrong with our relationship.  Maybe

17  we're wrong for each other.  Maybe we were

18  never right for each other.  I mean, we don't

19  have anything in common.  We argue all the

20  time.  And I don't say anything without pissing

21  you off.  And I really think that me being a

22  freshman really bothers you.  I tell you the

23  truth, I don't know why I'm with you.  I love

24  you.  It's just that I don't know why I love

25  you."

D4 197

1          "With all these problems we have you'd

2          think we would have broken up a long time ago.

3          Love you, Leah."

4          "P.S.  I will never ride in the back of

5          your car again no matter what."

6

7          And, I'll read State's Exhibit No. 87, Your

8    Honor.  It's undated.  It reads:

9          "Nicholas James, I know you think this is

10         chicken shit of me, but for me this is the best

11         way of getting through to you.  I can't talk to

12         you because I will cry.  And you don't seem to

13         approve of me crying.  And telling you how I

14         feel without you interrupting me makes it a lot

15         easier also.  Anyways, the reason I'm writing

16         this is because changes have to be made.  Baby,

17         I'm sorry but I cannot keep arguing with you

18         about everything we do.  It's wearing me out

19         and breaking my heart."

20         "I don't understand how we got so bad.

21         How can two people that love each other and

22         care about each other so much treat each other

23         like we do?  Hitting you and us talking to each

24         other like we do.  I don't understand it and I

25         don't think I ever will.  Everyone knows how

Lewis   D   D4 198

1          much we have — how much we love each other.
2          And I'm pretty sure that no one can explain it
3          either."
4             "Well, what I think is that we've been
5          with each other so much that we've forgotten
6          how much we need each other.  So, my question
7          for you is, would time apart help?  Maybe we
8          need to for once miss each other.  We just need
9          to miss the way we need each other because we
10         do need each other.  We just need to miss that.
11         Love you, Leah Nicole, aka baby doll."

12

13         We have a witness that's here now, Your Honor.
14  We call Raymond Lewis.
15         THE COURT:   Okay.
16               RAYMOND LEWIS
17  was thereupon produced as a witness on behalf of the Plaintiff
18  and, having first been duly sworn to tell the truth, the whole
19  truth and nothing but the truth, was examined and testified as
20  follows:
21         THE COURT:   Have a seat up here, please.
22               DIRECT EXAMINATION
23  BY MR. FRASIER:
24     Q.   Could you state your name please, sir, and spell
25  your last name for the record?

Lewis   D    D4 199

1          A.    Raymond Lewis, L-E-W-I-S.

2          Q.    Mr. Lewis, could you scoot up by the microphone and

3    pull it up there by you.  We need everybody to speak up.

4          A.    Raymond Lewis, L-E-W-I-S.

5          Q.    Now, Mr. Lewis, could you tell us where you live?

6          A.    Coquille, Oregon.

7          Q.    Have you lived in Coquille — how long have you lived

8    in Coquille?

9          A.    Twenty-seven years.

10         Q.    Are you familiar with an individual named Leah

11   Freeman?

12         A.    Yes, I know who she is.

13         Q.    How did you know Ms. Freeman?

14         A.    She was an underclassman at Coquille High School.

15         Q.    You went to Coquille High School?

16         A.    Yes.

17         Q.    What grades did you go through there?

18         A.    Freshman through senior year.

19         Q.    Did you graduate?

20         A.    Yes, I did.

21         Q.    When you were in high school did you know Leah

22   Freeman from high school?

23         A.    I knew who she was.

24         Q.    What grade were you in when she was at the high

25   school?

```
                                          Lewis   D    D4 200
```

1        A.    I was a sophomore.

2        Q.    Do you know the Defendant in this case, Nicholas

3    McGuffin?

4        A.    Yes, I do.

5        Q.    How do you know Mr. McGuffin?

6        A.    He also went to school there.

7        Q.    Mr. Lewis, I'd like to direct your attention, sir,

8    to June 28th, 2000.  This was the day that Leah Freeman

9    allegedly disappeared.  Do you recall that day, sir?

10       A.    Yes, sir.

11       Q.    And in the evening hours that night did you have an

12   opportunity to see Leah Freeman?

13       A.    I did.

14       Q.    Where did you see Ms. Freeman?

15       A.    I saw her walking on the corner — or, walking on the

16   street by Fast Mart.

17       Q.    Which direction were you headed?

18       A.    I was headed into town, into downtown from the high

19   school area.

20       Q.    So, you would have been headed towards the south?

21       A.    Yes, south.

22       Q.    And you would have been headed in the direction of

23   McKay's and so forth?

24       A.    Yes, McKay's.

25       Q.    Now, did you — where did you see Ms. Freeman?

```
                                    Lewis  D   D4 201
```

1      A.   She was walking by Fast Mart.

2      Q.   Do you recall what her demeanor was like?

3      A.   No, I don't.

4      Q.   What direction was she going?

5      A.   She was going north, towards the high school.

6      Q.   Do you recall what side of the street she was on?

7      A.   She was on the right hand side as I was going down

8  towards McKay's.

9      Q.   So that would have been on the same side of the

10 street as what businesses?

11     A.   Fast Mart — I don't know what the building next to

12 it would have been at the time.

13     Q.   Do you recall what she was wearing?

14     A.   A white shirt.

15     Q.   I'll show you what's marked as State's Exhibit

16 No. 7.  Do you recognize that?

17     A.   I — yeah, it looks like a white shirt.

18     Q.   Does it look like the shirt she was wearing that

19 night?

20     A.   I don't recall.

21     Q.   What was her demeanor like?

22     A.   I didn't pay any attention.  I just happened to

23 glance over.  And I was driving through town.

24     Q.   Where were you headed?

25     A.   I was headed to a friend's house.

```
                                              Lewis   D    D4 202
```

1      Q.    Who was that?

2      A.    Matthew Carney.

3      Q.    Now, how well did you know Leah Freeman?

4      A.    No, I didn't know Leah very well.

5      Q.    Did you have any classes with her?

6      A.    Not that I can recall.

7      Q.    Would you say that Ms. Freeman was a cute, good

8  looking girl?

9      A.    Yeah.

10      Q.    Did you have any interest in the girl?

11      A.    No.

12      Q.    I bring this up, Mr. Lewis, because we're going to

13  hear testimony later on about a place called Hudson Ridge.

14  Are you familiar with that?

15      A.    Very familiar.

16      Q.    How do you know Hudson Ridge?

17      A.    Hunt, go play in the mud, go shoot guns up there

18  regularly, used to party up there a lot.

19      Q.    When you say used to party up there, was there other

20  kids that would go up there an party?

21      A.    Oh, yeah.

22      Q.    And how often would you say you went up to Hudson

23  Ridge Road Area?

24      A.    Two, three times a month.

25      Q.    At the time that we're talking about here, the

```
                                         Lewis   D   D4 203
```

1   summer of 2000, what type of vehicle did you have?

2        A.   I had a 1988 Chevy four wheel drive pickup.

3        Q.   This pickup, how long did you have it?

4        A.   Two years.

5        Q.   At the time you were in high school, did you ever go

6   out with Ms. Freeman?

7        A.   No.

8        Q.   Did she ever ride in your truck?

9        A.   No.

10       Q.   Ever go anywhere with you?

11       A.   No.

12       Q.   Now, I believe we're going to hear testimony later

13  on that a shoe of Ms. Freeman was found up on Hudson Ridge,

14  but we're also going to hear some testimony that a receipt was

15  found — we'll have the officer testify.  Kind of far away, but

16  do you recognize this receipt?

17       A.   Yes.

18       Q.   And, that receipt is that made out to you?

19       A.   Yes, it is.

20       Q.   And we've marked it as State's Exhibit No. 236.  Do

21  you know how this receipt got up on Hudson Ridge?

22       A.   I don't have any idea.  It could've fell out of my

23  truck.

24       Q.   Now your truck, what type of a truck was it?

25       A.   '88 Chevy pickup.

Lewis   X   D4 204

1    Q.   Did you do any modifications to it?

2    A.   I did.

3    Q.   What type of modifications?

4    A.   Lift and tires, bigger tires.

5    Q.   This receipt here, what is that for?

6    A.   It is for the three inch body lift.

7    Q.   Where did you keep this receipt?

8    A.   I don't know.  It was probably on the floor board.

9    Q.   Of your truck?

10   A.   Yeah.

11   Q.   Mr. Lewis, did you have anything to do with the

12   disappearance or death of Leah Freeman?

13   A.   No.

14   Q.   Thank you.

15        MR. FRASIER:   That's all I have, Your Honor.

16        THE COURT:   Mr. McRea.

17                    CROSS EXAMINATION

18   BY MR. MCCREA:

19   Q.   Mr. Lewis, you're good friends with Matthew Carney.

20   Right?

21   A.   Correct.

22   Q.   And, when the police talked to you — at least when

23   they talked to you in the year 2011 — you said you were going

24   over to his house that night.  Is that correct?

25   A.   Yes.

Lewis    X    D4 205

1    Q.    And as a matter of fact you said that you went over

2    there and that you spent time together that night.  Correct?

3    A.    I don't recall.

4    Q.    Well, does this — I'm looking at a report that was

5    made in a discussion with Officer Webley stating:

6                    "He definitely remembers going to Carney's

7              house and that Carney was home when he got

8              there.  But he did not know if he stayed the

9              night or went home later."

10             Is that the statement you made to the police?

11   A.    Yes.  That is the same one I made.

12   Q.    All right.  With regard to Mr. Carney, have you seen

13   Mr. Carney since last Thursday?

14   A.    No, sir.

15   Q.    Pardon?

16   A.    No.

17   Q.    So, you've not discussed what his testimony was

18   here?

19   A.    He told me he — I talked to him on the phone.

20   Q.    All right.  You didn't see him, but you talked to

21   him on the phone?

22   A.    And — when he had left.

23   Q.    So, he discussed with you what his testimony was?

24   A.    He — a little bit, yes.

25   Q.    What do you mean by a little bit?  How long did you

```
                                    Lewis   X   D4 206
```

1  talk?

2      A.   Five minutes maybe.

3      Q.   Okay.  So, he described to you the questions he'd

4  been asked about you?

5      A.   No.  He asked — he talked to me about just partying

6  up on Hudson Ridge.

7      Q.   He talked to you about what?

8      A.   Partying up Hudson Ridge and shooting up - - -

9      Q.   (Interposing) Partying up Hudson Ridge?

10     A.   - - - and going shooting up Hudson Ridge.

11     Q.   And — well, I'm sorry.  Did he talk to you about

12  going up on Hudson Ridge as such or about his testimony in

13  that regard?

14     A.   Just going up Hudson Ridge.

15     Q.   All right.  But my question had been to you, did he

16  talk to you about what his testimony had been?

17     A.   No, sir.

18     Q.   No?

19     A.   No.

20     Q.   All right.  Now — excuse me.

21          You live out on what's called Stanton Heights?

22              MR. McCREA:   May I approach, Your Honor?

23              THE COURT:   Yes.

24     Q.   You live out in the general area of what's known as

25  Stanton Heights?

Lewis   X   D4 207

1      A.   Sanford Heights.

2      Q.   Pardon?

3      A.   Sanford Heights.

4      Q.   Okay.  Here's a map.  This is a map that's in

5   evidence as State's Exhibit No. 3.

6           Can you see that all right, Mr. Lewis?

7      A.   It's very vague.

8      Q.   Very vague?

9      A.   Yes.

10     Q.   Can you see it now?

11     A.   Yes, sir.

12     Q.   All right.  I'm going along a dark line here on this

13  map which I understand is Central.  Does that orient you as to

14  what's on the map?

15     A.   I can't really tell, but — sorry.

16          THE COURT:   You're going to have to — when

17  you turn that way, and you have to see the map, but would you

18  move the microphone - - -

19          WITNESS:   (Interposing) Yes.

20          THE COURT:   - - - over in front of you and

21  then keep your voice up.  Even though Mr. McCrea is close the

22  jury still has to hear you.

23          WITNESS:   Yes, sir.

24          THE COURT:   Thank you.

25     Q.   Can you tell now?

```
                                    Lewis   X   D4 208
 1      A.   Yes.  It looks to be Central.

 2      Q.   And here's Knott - - -

 3           THE COURT:   (Interposing) I'm sorry.  Did you

 4   say it looked like Central?

 5           WITNESS:   Yes.

 6      Q.   I'm now pointing at Knott Street where the dark blue

 7   line comes down Central and then makes the turn down on the

 8   map?

 9      A.   Yes, sir.

10      Q.   All right.  And down here where I'm pointing there's

11   a little square?

12      A.   Yes, sir.

13      Q.   All right.  Now, if that's where Leah Freeman was

14   living at that time, where on this map would you have been

15   living?

16      A.   Do you want me to point it out?

17      Q.   Yes, sir.

18      A.   I (not understandable).

19      Q.   You pointed to a place on the map that's down a

20   short — there's a short distance to an intersection and then

21   down at the next intersection?

22      A.   Yes.

23      Q.   All right.  So, at that time you and - - -

24           Forgive me for turning my back, but I can't walk any

25   other way.
```

Lewis   X   D4 209

1          You and Leah Freeman were neighbors in the sense

2    that you lived on — both lived up there on Knott Street?

3          A.   Yes.

4          Q.   Is that correct?

5          A.   Yes.  Sorry.

6          Q.   And you knew she lived up there?

7          A.   Yes.

8          Q.   And you had probably seen her around her

9    grandparent's house there.  Correct?

10         A.   Correct.

11         Q.   Now, in addition, let's go to this matter of high

12   school and classes.  The year 2000, didn't you get into a Home

13   Ec class?

14         A.   I don't know what year I would have taken it.

15         Q.   Well, a cooking class?

16         A.   I don't remember a cooking class.

17         Q.   Let's go at it another way.

18              I want you to think really hard.  Didn't you and

19   Leah Freeman have a class together?

20         A.   I can't remember, sir.

21         Q.   Excuse me?

22         A.   I can't remember.

23         Q.   Well, in terms of your — of your acquaintance with

24   her, at least you knew who she was?

25         A.   Yes.

Lewis   X   D4 210

1    Q.   You thought she was good looking?

2    A.   Yeah.

3    Q.   Attractive as it were?

4    A.   Right.

5    Q.   Okay.  And you knew that she and Nick McGuffin were

6    girlfriend/boyfriend?

7    A.   Correct.

8    Q.   But you'd never seen any arguments or fights between

9    them.  Is that correct?

10   A.   Correct.

11   Q.   But you had some acquaintance with Nick McGuffin,

12   didn't you?

13   A.   Yes, I did.

14   Q.   You had enough acquaintance with him to tease him

15   some, didn't you?

16   A.   I don't recall.

17   Q.   Well, let me ask you more specifically.  Didn't you

18   have occasion to overhear Ms. Freeman from confiding in one of

19   her friends about what her sexual activity was with

20   Mr. McGuffin?

21   A.   I don't recall that.

22   Q.   Do you recall going and teasing Mr. McGuffin about

23   what his sexual activity was with Ms. Freeman?

24   A.   I do not.

25   Q.   Now, are you saying that that flat didn't happen, or

```
                                          Lewis   X   D4 211
```

1  you just don't remember?

2      A.   I don't remember, sir.

3      Q.   Just — pardon?

4      A.   I don't remember.

5      Q.   You just don't remember?

6      A.   Right.

7      Q.   You're not saying it didn't happen?

8      A.   Correct.

9      Q.   In any event, at that time you had a pickup?

10      A.   Yes.

11      Q.   An '88 Chevy?

12      A.   Yes.

13      Q.   And you got this lift kit for it?

14      A.   Right.

15      Q.   And when you got the lift kit you put it on layaway

16  to start with?

17      A.   Yes.

18      Q.   And that's what the receipt was written for?

19      A.   Yes.

20      Q.   And that receipt's dated the 30th of May?

21      A.   Yeah.  I didn't see the date on it.

22      Q.   Well, Counsel.  I don't know what the number is.

23            MR. FRASIER:   It does say May 30th, 2000.

24      Q.   All right.  I have here State's Exhibit for

25  identification as No. 236.  So, that's the receipt for the

```
                                           Lewis   X   D4 212
```

1  layaway of the lift kit?

2     A.   Yes, it is.

3     Q.   All right.  And this was in your pickup, was it?

4     A.   Yes, it was.

5     Q.   And so, somehow it got from your pickup into being

6  out on Hudson Ridge?

7     A.   Yes, it did.

8     Q.   And that had to occur sometime then between the 30th

9  of May and when it was found up there?

10     A.   Yes, sir.

11     Q.   Now, you would go up there to hunt?

12     A.   Yes.

13     Q.   What would you hunt?

14     A.   Deer and elk.

15     Q.   Pardon?

16     A.   Deer and elk.

17     Q.   All right.  Between the 30th of May and let's say the

18  5th or 6th of July of 2000 there wasn't any deer season open,

19  was there?

20     A.   No, sir, there wasn't.

21     Q.   Wasn't any elk season open?

22     A.   No, sir.

23     Q.   So, you didn't have reason to go up there to be

24  hunting deer or elk?

25     A.   Correct.

Lewis   X   D4 213

1    Q.    And you'd hunt them with a high powered rifle?

2    A.    Yes, sir.

3    Q.    Did you keep the rifle in your pickup?

4    A.    No, sir.

5    Q.    Some people have the things on their back — on the

6    back window.  You didn't have one of those, a gun rack?

7    A.    No, sir.  No.

8    Q.    What model pickup was this?  By that I mean, did it

9    just have the one set of seats or was it a so called extra cab

10   type?

11   A.    It was a regular cab long bed with a bench seat.

12   Q.    Pardon?

13   A.    It was a regular cab with a bench seat.

14   Q.    I'm missing part of what you're saying.  It was?

15   A.    A regular cab pickup, single cab.

16   Q.    Single cab?

17   A.    With a bench seat.

18   Q.    Did it have a canopy on it?

19   A.    No, sir.

20   Q.    What color was it?

21   A.    Maroon.

22   Q.    Dark maroon or light maroon?

23   A.    Light.

24   Q.    Light?

25   A.    Yes.

Lewis    X    D4 214

1     Q.   And the — okay.

2          When you hunted deer and elk you'd have to dress

3     them out when you get them?

4     A.   Correct.

5     Q.   And you'd need a hunting knife, right?

6     A.   Correct.

7     Q.   So, you had a hunting knife?

8     A.   I owned one, yes, sir.

9     Q.   Pardon?

10    A.   Yes, sir.

11    Q.   Did you have a twenty-two also, besides a high

12    powered rifle?

13    A.   Yes, sir.

14    Q.   Pardon?

15    A.   Yes, sir.

16    Q.   A pistol or a rifle or both?

17    A.   Rifle.

18    Q.   Rifle?

19    A.   Rifle.

20    Q.   That's a regular twenty-two rim fire?

21    A.   Yes, sir.

22    Q.   And so, going back to the time that you saw Leah

23    Freeman.  Now, what time did you see her?

24    A.   I don't know the specific time, but it was close to

25    dusk.  I believe that it was getting — starting to get dark.

Lewis    X    D4 215

1    Q.    It was what?

2    A.    Starting to get dark.

3    Q.    Starting to get dark?

4    A.    Yes.

5    Q.    In addition to testifying here, you testified before

6    the 2000 Grand Jury on the 20th of July of 2000.  Is that

7    correct?

8    A.    Correct.

9    Q.    At that time did you indicate that you had seen her

10    between nine fifteen and nine forty-five?

11    A.    I believe so, sir.

12    Q.    All right.  And then you were asked, "Why the half

13    hour spread between nine fifteen and nine forty-five?"  Do you

14    remember you were asked why such a spread?

15    A.    I don't recall that.

16    Q.    Okay.  Do you remember saying that in the course of

17    seeing her that you had come around there twice or two or

18    three times.  And you don't remember which time you saw her?

19    A.    No, I don't.

20    Q.    You don't recall?

21    A.    I don't recall that.

22    Q.    Now, like with the other, are you saying that's not

23    what was said, or you just don't remember what was said?

24    A.    I don't remember, sir.

25    Q.    In any event, is it correct that you didn't just go

Lewis   X   D4 216

1   by her once, but you drove around a few more times?

2       A.   I don't recall that, sir.

3       Q.   Well, excuse me.

4            MR. McCREA:   May we set up - - -

5            MS. SOUBLET:   The (not understandable) or the

6   video?

7            MR. McCREA:   The video, whichever one you've

8   go on.

9            MS. SOUBLET:   Do you want that exact place?

10           MR. McCREA:   With the court's permission, the

11   — my electronic skill is little or none.  But we have a

12   relatively short disk of the Grand Jury presentation.  And I'm

13   asking that co-counsel be allowed to display that to the

14   witness to see if it refreshes his recollection, Your Honor.

15           THE COURT:   That's fine.

16           MR. McCREA:   Pardon?

17           THE COURT:   That's fine.

18           MR. McCREA:   Fine.  Thank you.

19           MS. McCREA:   I confess my technological

20   skills are not - - -

21           THE COURT:   (Interposing) Okay.

22           (Whereby a short video tape was played for the

23   witness.  Not transcribed.)

24       Q.   Now, Mr. Lewis, through the courtesy and the efforts

25   of the co-counsel, you have had the opportunity of seeing and

Lewis   X    D4 217

1  hearing your testimony before the Grand Jury back in 2000, on

2  the date of the 20th of July, 2000.  Does that refresh your

3  memory as to what happened that night?

4      A.   No, sir, it doesn't.

5      Q.   Pardon?

6      A.   I don't recall what happened that night.

7      Q.   Well, would your memory have been accurate as to

8  what happened on the night of June 28th, 2000 when you

9  testified on July 20th of 2000?

10     A.   Yes, sir.

11     Q.   And did you see that at that time that you testified

12 that you came around there twice or two or three times at the

13 time you saw Ms. Freeman walking?

14     A.   Yes, sir.

15     Q.   Pardon?

16     A.   Yes, sir.

17     Q.   And Mr. Frasier asked you whether you saw the first

18 time or the third time.  You saw that?

19     A.   Yes, sir.

20     Q.   That would have been accurate as to what happened?

21     A.   Yes, sir.

22     Q.   You said you couldn't remember which time it was?

23     A.   Correct.

24     Q.   And that you had said that it could've been that you

25 saw her from nine fifteen to nine forty-five.  Is that

Lewis     X     D4 218

1    correct?

2          A.    Correct.

3          Q.    So — and that would have been accurate.  You

4    could've seen her as late as nine forty-five?

5          A.    Yes, sir.

6          Q.    And then you indicated that you saw Mr. McGuffin

7    that night, also?

8          A.    That's correct.

9          Q.    Do you remember seeing Mr. McGuffin?

10         A.    I do not recall that.

11         Q.    But you saw on that Grand Jury testimony that you

12   did say that you saw Mr. McGuffin?

13         A.    Yes, sir.

14         Q.    And he was driving his Mustang?

15         A.    Yes, sir.

16         Q.    And that's the Mustang that was blue with a white —

17   one fender that's the white primer color?

18         A.    I don't remember if it was white or gray, but, yes

19   sir.

20         Q.    Gray?

21         A.    Right.  Yes, sir.

22         Q.    I stand corrected.  You're probably accurate.  More

23   accurate than I am.

24         A.    Yes.

25         Q.    All right.  And that you indicated that you saw him

```
                                    Lewis   X    D4 219
```

1   at ten, ten thirty, ten forty-five, something like that?

2        A.   Correct.

3        Q.   And that would have been accurate as to when you saw

4   him?

5        A.   Uh - - -

6        Q.   What's on the Grand Jury testimony would have been

7   accurate at that time as to what you saw?

8        A.   Yes, sir.

9        Q.   And the time you saw it?

10       A.   Yes, sir.

11       Q.   Okay.  And you indicated that you were trying to get

12   home in a hurry at that time?

13       A.   Yes, sir.

14       Q.   Do you remember that, that you were trying to get

15   home in a hurry?

16       A.   I don't remember trying to get home in a hurry, no.

17       Q.   Now, in terms of going up to Hudson Ridge, we've got

18   it pinned down that there wasn't any deer or elk season open.

19   Did you go up there to go mudding?

20       A.   Yes, sir.

21       Q.   But this was — this was dry then in that summer,

22   wasn't it?

23       A.   Correct.

24       Q.   So, there wasn't any mud to go running around in up

25   there?

Lewis   X   D4 220

1    A.   There was on one road.  There was on one road, sir.

2    Q.   All right.  Do you remember going up there between

3    the 30th of May and let's say the 5th of July?

4    A.   I do not recall.

5    Q.   And so you can't tell us any people who were with

6    you when you went up there that period of time?

7    A.   No, sir.

8    Q.   And you said you went up there a whole lot?

9    A.   Yes.

10   Q.   You've never seen Mr. McGuffin up there, though,

11   isn't that correct?

12   A.   That is correct.

13   Q.   You've never heard him talk about going to Hudson

14   Ridge, have you?

15   A.   Correct.

16   Q.   And, in terms of Hudson Ridge, let's deal with this

17   in a sense.  This is another map.  It's in evidence as State's

18   Exhibit No. 5.  Are you able to orient yourself on this map?

19   A.   Can't really read it.

20        THE COURT:   Mr. Lewis, I don't care if you

21   get down and look at it closely.  I just don't want you to

22   start to talking until you get back on the stand and the

23   microphone is there.

24        WITNESS:   Okay.

25   A.   I don't recognize all the roads or anything like

Lewis    X    D4 221

1   that, but it is Fairview Road.  Yes, sir.

2        Q.    All right.  I'm pointing over on the left side of

3   the map at a short purple line running down on the map which

4   is labeled Knott Street.  Are you able to pick up on that?

5        A.    Yes, sir.

6        Q.    And that's where Leah Freeman lived?

7        A.    Correct.

8        Q.    And that's also where you lived?

9        A.    Correct.

10       Q.    And then I have moved over to the light somewhat, to

11  a long line that goes straight and then does some jagged or

12  rather wiggly lines to the north.  And, you recognize that

13  where this starts is at Central?

14       A.    Yes, sir.

15       Q.    Where that line goes up is about where the cemetery

16  is?  Is that correct?

17       A.    Yes, sir.

18       Q.    Then, from the area where the cemetery is, the next

19  main street, moving my finger over more to the light on the

20  map and the heavy purple line, this would be Fairview Road

21  going out?

22       A.    Correct.

23       Q.    And it's correct is it not that if you go from this

24  cemetery area down to Central you can then go onto Fairview

25  Road.  And that would proceed to take you all the way out?

Lewis   X   D4 222

1          I'm now bringing my finger across — completely

2     across — to the right side of the map where Hudson Ridge Road

3     takes off?

4          A.   Correct.

5          Q.   And off Fairview Road also, I'm now putting my

6     finger toward a line running down from the very long purple

7     line running a shorter distance down the map.  This is Lee

8     Valley Road.  Correct?

9          A.   I believe so, yes.

10          Q.   All right.  Now, did anyone in law enforcement,

11     including the Grand Jury, did they — did anyone talk to you

12     back in 2000 about how it was that your receipt was up on

13     Hudson Ridge Road Area?

14          A.   I was just called in.

15          Q.   Pardon?

16          A.   I was just called in by them to look at the receipt.

17          Q.   You were what?

18          A.   I was called in when they had found the receipt, to

19     look at it.

20          Q.   I'm sorry?

21               THE COURT:   He said he was called in to look

22     at the receipt.

23          Q.   Okay.  They called you in to look at the receipt?

24          A.   Correct.

25          Q.   And you identified it as yours?

Lewis   X   D4 223

1      A.   Yes, sir.

2      Q.   Did they ask you how it came to be up there?

3      A.   I don't recall, sir.

4      Q.   All right.  Did they ask you to have a look in your

5   pickup at that time?

6      A.   I don't believe so.

7      Q.   And they didn't look at your pickup at that time,

8   did they?

9      A.   No, sir.

10      Q.   In fact, your pickup has never been processed by the

11   crime lab or any agency like that, isn't that correct?

12      A.   Correct.

13      Q.   They never — they never searched your home?

14      A.   Correct.

15      Q.   So, nothing has been done by law enforcement up to

16   and including this moment to try to establish whether or not —

17   in our pickup or at your home — there's something that

18   establishes a connection between you and the disappearance of

19   Leah Freeman.  Is that correct?

20      A.   Correct.

21      Q.   When you saw her she was walking, right?

22      A.   Yes, sir.

23      Q.   And she was alone?

24      A.   Yes, sir.

25      Q.   And she looked like, at least the direction she was

```
                                          Lewis   ReD  D4 224
```

1   walking, was toward where she lived?

2       A.   Correct.

3       Q.   And toward where you lived?

4       A.   Correct.

5       Q.   And did you — did you consider offering her a ride

6   home?

7       A.   I — no, sir.

8       Q.   Pardon?

9       A.   No, sir.

10      Q.   No?  I see.

11           And it's your testimony then that you never saw her

12  again after that?

13      A.   Correct, sir.

14      Q.   Thank you.

15               MR. McCREA:    That's all the question I have.

16               THE COURT:    Redirect.

17               MR. FRASIER:   Thank you, Your Honor.

18                    REDIRECT EXAMINATION

19  BY MR. FRASIER:

20      Q.   Sir, Counsel asked you about a twenty-two rifle or

21  pistol that you had.

22      A.   Rifle, sir.  Yes.

23      Q.   And what was it again?

24      A.   It was a twenty-two Ruger, ten twenty-two.

25      Q.   A rifle?

```
                                      Lewis   ReD  D4 225

 1      A.   Yes, sir.

 2      Q.   And where did you keep that?

 3      A.   At home.

 4      Q.   Keep it in your truck?

 5      A.   Not unless I was shooting it, sir.

 6      Q.   And your hunting knife, where did you keep that?

 7      A.   At home as well.

 8      Q.   Did you ever keep it in your truck?

 9      A.   Sometimes it was in there.

10      Q.   For what reason would it be in your truck?

11      A.   If I left it in there.

12      Q.   Now, was Leah Freeman ever in your truck?

13      A.   No, sir.

14      Q.   Was Leah Freeman ever at your house?

15      A.   No, sir.

16      Q.   Would there have been any reason to look at your

17 truck?

18      A.   No, sir.

19      Q.   Again, did you have anything to do with the death of

20 Leah Freeman?

21      A.   No, sir.

22      Q.   Thank you.

23            MR. FRASIER:   That's all I have, Your Honor.

24            THE COURT:   You may step down.  You're free

25 to leave.
```

Lewis   ReD  D4 226

1                   WITNESS:    Thanks.

2                   THE COURT:    We'll take a recess.

3                   WITNESS:    Should I move this?

4                   THE COURT:    Yes.  To get it out of the way,

5      yes.

6                   Everybody else remain seated until the jury has

7      a chance to go to the jury room.

8                   Take your notes.  Remember the admonition.

9      We'll take around twenty minutes.

10                  (Jury Out.)

11                  THE COURT:    About three twenty.

12                  (RECESS)

13                  (Jury In.)

14                  JUDICIAL ASSISTANT:    All rise.

15                  THE COURT:    Be seated please.

16                  Call your next witness.

17                  MR. FRASIER:    Thanks, Your Honor.

18                  We call Alicia Hartwell — Alicia Hyatt.

19                           <u>AUSTIN FISHER</u>

20     was thereupon produced as a witness on behalf of the Plaintiff

21     and, having first been duly sworn to tell the truth, the whole

22     truth and nothing but the truth, was examined and testified as

23     follows:

24                  THE COURT:    Have a seat up here, please.

25

1                      DIRECT EXAMINATION

2   BY MR. FRASIER:

3       Q.   Could you state your name please and spell your last

4   name for the record?

5       A.   It's Alicia Hyatt, H-Y-A-T-T.  It was Hartwell, but

6   I recently got married.

7                 MR. FRASIER:   You need to scoot up to the

8   microphone, please.

9                 WITNESS:   Sorry.

10                 MR. FRASIER:   And you need to speak up.

11                 WITNESS:   I was a little quiet there.  Sorry.

12                 MR. FRASIER:   If you don't speak up we have

13   to shut the air conditioning off.

14                 WITNESS:   No, don't do that.

15      Q.   You indicated now your married name is Hyatt?

16      A.   Yes.

17      Q.   And your maiden name was?

18      A.   Hartwell.

19      Q.   Would you spell that for us, please?

20      A.   H-A-R-T-W-E-L-L.

21      Q.   And, where do you live now?

22      A.   Right now I'm living in Coos Bay.

23      Q.   Had you lived in the Myrtle Point Area?

24      A.   Yes.

25      Q.   When did you live in Myrtle Point?

Hyatt   D    D4 228

1    A.    Pretty much from the time I was in the sixth grade

2    until I graduated high school.

3    Q.    Did you attend church functions, that type of things

4    over here in Coquille?

5    A.    Yeah, at the Four Square Church over here in

6    Coquille over by the high school.

7    Q.    I'm going to direct you now to the summer of the

8    year 2000.  How old were you then?

9    A.    About eleven.  I was almost twelve.

10   Q.    Did you know Leah Freeman?

11   A.    Yeah.  When I was younger my mom used to babysit

12   her.  And she worked at Denny's Pizza.  I knew Leah and Denise

13   very well.

14   Q.    In the summer of 2000, June of 2000 — well, to get

15   right to it, June 28th of 2000, that would have been the day

16   she allegedly disappeared?

17   A.    Yeah.

18   Q.    Did you happen to be in the Coquille area that day?

19   A.    Yes.  I was attending a church practice for our

20   summer Christmas program — or, our summer play program.

21   Excuse me.

22   Q.    What time of the day was this practice?

23   A.    It was in the evening.  I'm not exactly sure what

24   time we left.  But I know we got there at about five in the

25   afternoon.

```
                                    Hyatt   D    D4 229
```

1      Q.   When you were leaving, do you recall what time of

2   the day it was when you left?

3      A.   It was late in the night.  I'm not exactly sure what

4   time.  I was eleven.  I really didn't care what time it was at

5   the time.  I was out past curfew, so.

6      Q.   Was it still daylight?

7      A.   No.  It was very dark out.

8      Q.   Now, did you see Leah Freeman that night?

9      A.   I did.  In a van, I was with a friend of mine and

10   her grandmother.  We were coming home.  And as we drove past

11   the high school she had been walking past.  And I had spotted

12   her but I didn't say anything else.  I went back to talking

13   with my friend.

14      Q.   And where did you see her in relation to the high

15   school?

16      A.   It was about halfway between the main gate entrance

17   where everyone parks and down below where the bus barn area

18   is.

19      Q.   I'll show you now what's marked as State's Exhibit

20   No. 221.  Do you recognize that?

21      A.   Yes.  That's about where I seen her, right about

22   here, walking.

23      Q.   And does that show you the area where you saw her?

24      A.   Yes.

25           MR. FRASIER:   We'd offer State's Exhibit

```
                                      Hyatt   D   D4 230
```

1  No. 221.

2              MR. McCREA:    No objection, Your Honor.

3              THE COURT:    Received.

4              (Whereupon Exhibit No. 221 was then received

5  into evidence.)

6     Q.   While I'm getting the projector warmed up here,

7  could you describe — do you recall what Leah Freeman was

8  wearing when you saw her?

9     A.   It was a white tank top.  And it was either jeans

10  shorts or a pair of blue jean pants.  I couldn't quite tell.

11  It was pretty dark.

12    Q.   I'll show you what's marked as State's Exhibit

13  No. 7.  Do you recognize - - -

14    A.   (Interposing) Yes.  That's about what she was

15  wearing that evening.

16    Q.   Could you tell if — well, could you tell what her

17  demeanor was like when you saw her?

18    A.   I really didn't pay attention too much.  It seemed

19  she might have been a little upset or so.  She was walking

20  quite fast.

21    Q.   As you were driving by, did you see any other

22  vehicles?

23    A.   As we pulled out from the church, about where

24  Coquille Vision Center is I noticed a car that was coming,

25  followed us and about stopped right about where we're seen

Hyatt   D    D4 231

1    her.  It was just shortly after that that the car behind us

2    stopped.

3        Q.    What did — was there anything that drew your

4    attention to this car?

5        A.    One of the headlights looked a little dimmer than

6    the other one.  And I didn't really pay attention much to it,

7    but it did look a little bit dimmer than the other one.  And I

8    noticed that.

9        Q.    Do you recall what the shape of the headlights were?

10       A.    They were really round as in, like, an older car.

11   The glass bulbs.

12       Q.    Now, your family, do they do work with cars?

13       A.    My dad's a mechanic.  My mom and my dad have always

14   been really into cars.  I've been around them all my life.

15       Q.    And, this one headlight that was dim, why did that

16   cause you concern?

17       A.    I figured the bulb was about to go out or it seemed

18   that way.  It was kinda funny.  I don't know why.  It's always

19   been something that I've noticed.  Ever since I was little,

20   with me and my brothers, we always played in the car, you

21   know, Pedittle or Popeye, you know, one's dimmer; one's out.

22   So, it was kind of a game.  I've just always noticed things

23   like that.

24       Q.    Okay.  On the screen now is State's Exhibit No. 221.

25   And this is a laser pointer.  And it's got a little red button

```
                                       Hyatt   D    D4 232
```

1   on top.

2        A.   Okay.

3        Q.   Could you, using that laser pointer, point out on

4   the screen where you saw Leah Freeman?

5        A.   When I first spotted her she was right about through

6   here.  And then the car stopped right along up here, in this

7   area.  When I first noticed that it was slowing down or

8   stopping was right about there.

9        Q.   What else could you tell us about this car that you

10  saw?

11       A.   I'm not sure whether it was one or two people in the

12  car, but I did notice that they did stop and the passenger

13  door had opened.  And she'd stopped to talk to them.  But by

14  the time that I really, you know, had seen anything else we

15  were too far around the corner to see much after that.

16       Q.   Could you describe this car for us?

17       A.   I know it was an older model car.  It looked about

18  like a front end of a Mustang is what I was assuming.  My

19  mom's always been really into later Mustangs.  A '69 is her

20  favorite car.  So, I've been looking at them for years.

21       Q.   This has been marked as State's Exhibit No. 16.

22  Does that look familiar?

23       A.   Yes, that does.  It looks about like the front end.

24  It was a darker colored car I noticed, and it was an older —

25  it seemed.  It was pretty dark, so I couldn't tell you exactly

```
                                    Hyatt   X   D4 233
```

1  what color it was.

2      Q.   Did you see how many people were in the car?

3      A.   Not for sure.  It looked at least one.  There may

4  have been a second person, but I am not a hundred percent sure

5  on that.  It seemed like there was two, but it may have just

6  been the way the shadow from the light hit them.

7      Q.   Did you see Ms. Freeman approach the car?

8      A.   Yes.  She stopped and spoke to someone in the car.

9  It appeared that she had known who it was.

10      Q.   Then you went on home?

11      A.   Yeah.

12      Q.   Thank you.

13         MR. FRASIER:   That's all the questions I have

14  of the witness.

15         THE COURT:   Mr. McCrea.

16            CROSS EXAMINATION

17  BY MR. MCCREA:

18      Q.   Ms. Hyatt, I want to put this in total context.  You

19  were riding in a van with some other young folks.  Is that

20  correct?

21      A.   One other girl.

22      Q.   Pardon?  One other?

23      A.   It was just one other girl.  And her grandmother was

24  driving.

25      Q.   And the driver of the van was Mary Fuller?

Hyatt   X    D4 234

1      A.   Yes, that's correct.

2      Q.   And you were — and forgive me because I couldn't

3 hear a lot of what you said on direct examination.

4      A.   Sorry.

5      Q.   You were twelve or so at the time?

6      A.   It was just before my twelfth birthday.

7      Q.   So, you were still eleven?

8      A.   Yes.

9      Q.   You were eleven years old.  And when this happened

10 you were in the process of bickering with this other person

11 over a shirt.  Isn't that right?

12     A.   That's correct.

13     Q.   Okay.  So, the bickering with the other person was

14 taking the main part of your attention.  Is that fair?

15     A.   No.  I was actually trying to stop.  I was - - -

16     Q.   (Interposing)  It wasn't?

17     A.   No, it wasn't.  We were bickering over it and I had

18 just stopped talking to her on the way home, because I did not

19 want to deal with it any farther.

20     Q.   Okay.  I'm not hearing what you're saying.  Speak

21 up, please.

22     A.   Sorry.  No.  I stopped arguing with her about that

23 point because I just, I didn't want to argue with her any

24 longer over it.  I had stopped talking to her and starting

25 paying attention out the window.  That's when I noticed Leah.

Hyatt   X   D4 235

1    Q.   Well, the first time that you were contacted

2  regarding this would have been along about in July or the

3  first part of August of 2000.  Is that correct?

4    A.   Yes.

5    Q.   And so at that time what happened would have

6  happened something just over a month before.  Correct?

7    A.   Correct.

8    Q.   And that was Officer Downing with whom you spoke?

9    A.   Yes.  He came to my parent's house.

10    Q.   And at that time, is this what you told him?  That

11  you were riding with Ms. Fuller and some other kids in

12  Ms. Fuller's car and does remember seeing a girl that appeared

13  to be the same as the girl in the pictures?  And you advised

14  that you remembered seeing this girl walking right near the

15  high school and that the girl was a blonde haired female

16  wearing a white top and blue jeans.

17         And then you went on to say that you don't — you did

18  not know Leah personally, but your parents do.  But you did

19  remember that the girl you saw was very similar to the girl in

20  the photographs around town.

21         Is that what you told him?

22    A.   If that's what it says, then yes.  I don't exactly

23  remember what I said.  I was eleven.

24    Q.   Would you like to see the report?

25    A.   No.  I believe what - - -

Hyatt   X   D4 236

1      Q.   (Interposing)  Okay.

2           So, that's what you actually reported as to what

3    you'd seen?

4      A.   Yes.  The officer really didn't ask me too many

5    questions.

6      Q.   I can't hear you.

7      A.   The officer really didn't ask me too many questions

8    when he came to the house.  And he really didn't listen to

9    much of what I had to say.  He asked me a couple questions.

10   And before I finished with what I was trying to say he turned

11   around and walked off of our porch and got in his car and

12   left.  I didn't even tell him everything that I had seen that

13   night.

14     Q.   And in terms of what you saw, you said the person

15   was walking fast.  Right?

16     A.   Yes.

17     Q.   And it was getting dark?

18     A.   It was pretty dark out and it seemed to be getting

19   darker, yes.

20     Q.   Pretty dark out at that time.  So, what you were

21   seeing was, you were seeing in pretty dark conditions.  Right?

22     A.   Yes.

23     Q.   All right.  And you did testify before the Coos

24   County Grand Jury the 21st of July of 2010.  Is that correct?

25     A.   Yes.

Hyatt   X   D4 237

1    Q.   All right.  And at that time you talked about the

2    car that had stopped.  You said the car that stopped, it was a

3    darker colored car?  Is that what you testified?

4    A.   Yes.

5    Q.   And that it was a little compact car, like maybe a

6    Honda or Nissan or something?

7    A.   No.  I do not remember saying - - -

8    Q.   (Interposing) You (not understandable)?

9    A.   No.  I said it was a car.  I didn't know what form.

10   It looked like an older model's car.  But it didn't look like

11   a compact car.

12   Q.   Actually, didn't you say twice or more that it was a

13   darker, little compact car?

14   A.   It was a darker smaller car.  It didn't look too

15   compact.  If I said that, then I mis-spoke.  I apologize for

16   that.

17   Q.   Excuse me.  Pardon?

18   A.   I said it was a darker smaller car, but I don't

19   remember calling it a compact car.  If I said that in the

20   report then I mis-spoke it.  But I know it was a darker

21   colored older small car.

22   Q.   If you said that before the Grand Jury, that would

23   have been your best recollection at that time.  Is that

24   correct?

25   A.   Yes.

```
                                        Hyatt   X   D4 238
```

1      Q.   As a matter of fact if you said a third time, "I

2  know it was a darker colored car."

3           Mr. Frasier says, "Okay."

4           And then you say, "And it was a little compact car."

5           Does that sound — does that refresh your memory of

6  what you testified to?

7      A.   Not really.  I was kind of under a lot of stress at

8  that point.  I do remember saying a lot of it, but I didn't

9  remember calling it a compact car.  I know it was a smaller

10  car.

11      Q.   Okay.  In any event, it had two headlights?

12      A.   Yes.

13      Q.   And one was just a little dimmer than the other?

14      A.   Yeah.  It seemed like it was going out or they'd had

15  the brights on and one wasn't working correctly or something.

16      Q.   And in terms of — well — you didn't — if I

17  understand what you're saying correctly, you couldn't tell if

18  there were one or two people in the car?

19      A.   No.  I could not tell if there was two or not.

20      Q.   And in terms of anyone that — anyone that had any

21  contact with Ms. Freeman, you couldn't tell if that person was

22  a male or a female.  Is that right?

23      A.   No.  It was a dark figure in the car.

24      Q.   Pardon?

25      A.   No.  It was just a dark figure to me.  I couldn't

```
                                       Hyatt   X    D4 239
```

1   tell whether it was male or female.

2          MR. McCREA:    May I see Exhibit No. 15?

3      Q.    Is it correct that your testimony — that you said

4   the car could be black?

5      A.    I said it was darker.  It seemed like a black or a

6   dark green or maybe a dark blue.  I wasn't quite sure.

7      Q.    You said it could be black or blue or dark gray?

8      A.    Yeah.  It was darker colored.  I wasn't quite sure

9   of the color.

10     Q.    And I'm not clear.  You're not identifying this car

11  pictured in No. 15 (not understandable).  Is that correct?

12     A.    No.  I said it seemed similar to the car.  I'm not

13  saying that was the exact car.

14     Q.    But, if you indicated — forgive my glasses here — in

15  your Grand Jury testimony that it could have been a Honda or a

16  Nissan, that would be accurate as to your recollection.  Is

17  that correct?

18     A.    I don't remember saying that.  But if it's in there,

19  then I probably did say that.  I don't - - -

20     Q.    (Interposing) I'm sorry?

21     A.    The more I thought about that evening, the more it

22  couldn't have been a smaller compact car like a Nissan or a

23  Honda or something like that.  It was an older model's car

24  because the headlight was different.  And it was round, not

25  square.

Hyatt   X   D4 240

1      Q.   I'm sorry.  My question was pretty short.  It was

2  just — if you indicated to Grand Jury it could have been a

3  Honda or a Nissan would that have been accurate of your

4  recollection at the time?

5      A.   At the time that's what I said, then that is what I

6  said.  But I do not remember saying that.

7      Q.   (Not understandable.) Okay.

8           Now, Mary Fuller was operating the van.  You said

9  that before?

10     A.   Yes.

11     Q.   And did you say anything at the time to her so that

12  she would take a look at the car?

13     A.   No.

14     Q.   Did you say anything out loud?

15     A.   Other than that I noticed the girl on the side of

16  the road and said - - -

17     Q.   I'm sorry?

18     A.   No.  Not about the car at all.

19     Q.   Well, or — okay.  Okay.

20          Excuse me.

21          MR. McCREA:   I think that's all the questions

22  I have of this witness.

23          THE COURT:   Redirect.

24          MR. FRASIER:   No further questions, Your

25  Honor.

```
                                       Bounds   D    D4 241
```

1          THE COURT:   You may step down and you're free

2    to leave.

3          Call your next witness.

4          MS. SOUBLET:    The State calls Thomas Bounds.

5                      <u>THOMAS BOUNDS</u>

6    was thereupon produced as a witness on behalf of the Plaintiff

7    and, having first been duly sworn to tell the truth, the whole

8    truth and nothing but the truth, was examined and testified as

9    follows:

10          THE COURT:   Have a seat up here, please.

11          MS. SOUBLET:    Mr. Bounds, I'm going to ask

12   you to scoot up close to the microphone and make sure we can

13   hear you over the AC so we don't have to turn it off.

14          WITNESS:    Testing.

15                    <u>DIRECT EXAMINATION</u>

16   BY MS. SOUBLET:

17      Q.   can you state your name and spell your last name for

18   the record?

19      A.   Thomas Bounds, B-O-U-N-D-S.

20      Q.   Mr. Bounds, have you lived in Coquille all your

21   life?

22      A.   No, I have not.

23      Q.   In the summer of 2000 were you living in Coquille?

24      A.   Yes, I was.

25      Q.   Where were you living?

```
                                  Bounds   D   D4 242
```

1        A.    I was living at 382 West Central Boulevard,

2   Apartment No. 2.

3        Q.    Where is that in relation to the high school?

4        A.    That is across from the high school, caddy corner

5   somewhat.  Slightly to the east of the gas station.

6        Q.    That's a Shell station now - - -

7        A.    (Interposing)  Yes.

8        Q.    - - - was a Chevron station in 2000?

9        A.    That is correct.

10       Q.    Did you know Leah Freeman?

11       A.    Yes, I did.

12       Q.    How did you know her?

13       A.    She is my second cousin by marriage.

14       Q.    I want to turn your attention to June 28th, 2000.  Do

15   you remember that evening?

16       A.    Yes, I do.

17       Q.    Okay.  Was there a time where you were driving past

18   the high school that night?

19       A.    Yes, there was.  Actually it wasn't during the

20   night.  It was still daylight.  I don't know what time it was,

21   but my wife and I were going over to our mother-in-law's

22   house.  And as we drove past the high school Leah Freeman was

23   there in front of the high school standing like she was

24   waiting for someone.

25       Q.    Did you notice anything about her at that time?

1       A.   Other than I thought her attire was a little bit

2   risque.  That's the only reason I really remembered, because I

3   commented to my wife that I was wondering if her mother knew

4   that she was wearing that kind of a top.  She was wearing

5   somewhat of a — I believe it was a strapless top, but I'm not

6   sure.  I don't remember that well.

7       Q.   You didn't approve of the top?

8       A.   No.  But I'm kind of conservative anyway.

9       Q.   Do you remember which direction you were headed?

10      A.   Yes.  I was heading out of town towards 42nd.

11      Q.   Did you do anything or — to catch Ms. Freeman's

12  attention at that time?

13      A.   Oh, my wife and I waved at her.  We know her.  And

14  she waved back.

15      Q.   How long was it before you returned home?

16      A.   That I couldn't say honestly.  I do know it was

17  daylight when we went over there.  And it was just starting to

18  get a little dark when we headed home.

19      Q.   Did you have an opportunity to see Ms. Freeman at

20  that time?

21      A.   Yes.  At that time as we were turning into the

22  Chevron Station going to our drive, we saw Leah at the pay

23  phone behind the gas station.

24      Q.   Was she doing anything?

25      A.   No.  She was standing there.  Again, like she was

Bounds   D    D4 244

1   waiting for somebody.

2        Q.   What did you do?

3        A.   We went home.  Got out of the car and went into the

4   house.  Got my bathrobe on.  Wife turned on the TV.  And about

5   that time I thought I heard a scream from outside.

6        Q.   Can you describe the scream?

7        A.   Kind of high pitched.  Sounded like from a young

8   person.  I didn't hear it quite all that well.  The metal

9   storage units that are between us and where the pay phone is

10  has a tendency to misdirect sound a little bit, so I was not

11  sure if — exactly where the sound came from.  But I did step

12  outside to listen further.  And I didn't hear nothing else.

13       Q.   How long was it after you saw Ms. Freeman standing

14  at the phone booth was it until you heard the scream?

15       A.    I would guess fifteen to twenty minutes.  But then

16  I'm not exactly sure on that either.

17       Q.   When you stepped outside did you see or hear anyone

18  else?

19       A.   No, I did not.

20       Q.   When you say it was a high pitched scream, how would

21  you further describe that?

22       A.   Young female.  It sounded like a kid.  And of course

23  the property next to us, where the phone booth is at, the

24  Courtney Property, they do have children there also.  So, at

25  that point I wasn't sure if it was just a kid squealing or if

Bounds   X   D4 245

1  it was one of the high school kids screaming at each other as

2  they drive by like they do sometimes.  I — but I didn't hear

3  anything after I had stepped out.

4      Q.   Thank you.

5           MS. SOUBLET:   Nothing further.

6                    CROSS EXAMINATION

7  BY MS. MCCREA:

8      Q.   Mr. Bounds, can you describe to us in a little more

9  detail where in relation to the high school that you saw Leah

10  Freeman?  In other words, was she — was she inside the fence?

11  Was she outside the fence?

12     A.   She was outside the fence.  I would say twenty to

13  thirty yards from the entranceway.

14     Q.   And which entranceway, the bus entranceway or

15  the - - -

16     A.   (Interposing) Oh, no.  The regular school

17  entranceway.

18     Q.   Okay.

19     A.   And she was on the town side.

20     Q.   And she was on the town side?

21          I'm sorry.  It's really hard to hear back here.  So,

22  that's why - - -

23     A.   (Interposing) It was on the town side.

24     Q.   Thank you.  Okay.

25          And as you passed by where she was, she was by

```
                                        Bounds   X    D4 246
```

1    herself?

2        A.   Yes, ma'am, she was.

3        Q.   And she didn't appear to be in distress in any way?

4        A.   No.  But she did look like she was waiting for

5    somebody.

6        Q.   Like, she was just hanging out?

7        A.   Yeah.  She had that look like she was, you know,

8    waiting for somebody.

9        Q.   Okay.  And as you and your wife passed by, you gave

10   like a friendly wave to her acknowledging that you recognized

11   her?

12       A.   Yes, ma'am, we did.

13       Q.   And she gave you the same kind of a wave back?

14       A.   Yes, that's correct.

15       Q.   It wasn't like a, "Hey, come here.  Help me."  It

16   was just a, "Hey, how you doing?"

17       A.   No.  No, it was not.  And that was during the

18   daytime.

19       Q.   Okay.  Now, when you came back and you saw her at

20   the phone booth?

21       A.   Uh huh.

22       Q.   This would be the phone booth that no longer exists

23   by the service station?

24       A.   That is correct.

25       Q.   What was then a Chevron Station and is now a Shell

```
                                      Bounds    X    D4 247
 1   Station?

 2        A.    Yes, ma'am.

 3        Q.    And when you came back and you saw her at the — she

 4   was at the pay phone.  Right?

 5        A.    Yes, ma'am, she was.

 6        Q.    And is it correct that she appeared to be on the

 7   phone as you passed by?

 8        A.    Yes, it did.

 9        Q.    When you hear the scream, Mr. Bounds, you stepped

10   outside to see if you could hear anything else?

11        A.    Yes, ma'am, I did.

12        Q.    I'm sorry.  I didn't mean to cut you off.

13        A.    Yes, ma'am, I did.

14        Q.    And you didn't hear anything after that.  Is that

15   right?

16        A.    That's correct.

17        Q.    Thank you.

18              MS. McCREA:    I have nothing further, Your

19   Honor.

20              THE COURT:    Redirect?

21              MS. SOUBLET:    No, Your Honor.  Thank you.

22              THE COURT:    You may step down, sir.  You're

23   free to leave.

24              Call Dan Lee.  Call your next witness.  I'm

25   going by your schedule.
```

Lee   D   D4 248

1          MR. FRASIER:   Call Dan Lee.

2          THE COURT:   Okay.

3                    DAN LEE

4   was thereupon produced as a witness on behalf of the Plaintiff

5   and, having first been duly sworn to tell the truth, the whole

6   truth and nothing but the truth, was examined and testified as

7   follows:

8          THE COURT:   Have a seat here, please.

9                 DIRECT EXAMINATION

10  BY MR. FRASIER:

11     Q.   Could you state your name please, sir, and spell

12  your last name for the record?

13     A.   Yes.  Danny Paul Lee, L-E-E.

14          MR. FRASIER:   Mr. Lee, could you pull that

15  microphone down there, pull it up close to you, so (not

16  understandable) and speak loudly if you will.  Otherwise we

17  have to turn the air conditioning off.

18          WITNESS:   Okay.

19          Can you hear that?

20          MR. FRASIER:   Thank you.

21     Q.   Sir, in the past have you been employed as a police

22  officer for the City of Coquille?

23     A.   Yes, I have been.

24     Q.   And how long did you work for the City of Coquille?

25     A.   Approximately eighteen years.

Lee    D    D4 249

1     Q.    Do you have other experience in law enforcement?

2     A.    I had a brief stint with the Sheriff's Office for

3  about nine months as a reserve deputy.

4     Q.    How long did — what time period did you work for the

5  Coquille Police Department?

6     A.    Oh, from April of '86 until approximately January of

7  '05.

8     Q.    And in 2005 did you retire?

9     A.    Yes, I did.

10    Q.    Still retired?

11    A.    I am.

12    Q.    Now, I want to direct your attention, sir, to June

13 28th, 2000.  Were you working as a police officer that day?

14    A.    Yes, I was.

15    Q.    Could you recall the shift you were working, sir?

16    A.    I believe it was graveyard.

17    Q.    And a graveyard shift, what hours did that cover?

18    A.    I believe we started our graveyards at eleven

19 o'clock at that time, p.m., and then we ran to — in the

20 morning, like, seven.

21    Q.    So, you would have started your shift at eleven p.m.

22 June 28th, then finished sometime in the morning on June 29th?

23    A.    Yes.  That's correct.  Yes.

24    Q.    Now, while you were on duty that evening, and in

25 particular around midnight, did you have contact with the

Lee    D    D4 250

1   Defendant in this case, Nicholas McGuffin?

2        A.   Yes, I did.

3        Q.   Where were you when this contact occurred?

4        A.   I was in a patrol car and I was west bound on East

5   Twelfth Street, just about where Collier crosses there.  It's

6   a stop sign on Twelfth.  Collier is through traffic.

7             Mr. McGuffin was headed eastbound on Twelfth, on the

8   other side of North Collier Street.  And I noticed there was a

9   headlight out on the vehicle.  I didn't know it was McGuffin

10  at the time.  And I came across the intersection and stopped

11  in the road.  And we spoke from car to car.  And I let him

12  know that he had an equipment problem at that point.

13       Q.   Did you actually turn — stop his car?

14       A.   Yes.  I don't believe we turned the cars off.  But

15  we were stopped in the road.

16       Q.   Did you turn your overhead lights on to - - -

17       A.   (Interposing) No.  There was no stop.  It was a

18  casual contact.

19       Q.   So, you're like in the middle of the intersection

20  or?

21       A.   No.  I believe it was on the Twelfth Street itself.

22       Q.   And when you pulled up what did you say to the

23  Defendant?

24       A.   I let him know that he had a headlight out.  And

25  that was basically what I had to say.  I mean, you know, he

Lee   D   D4 251

1  told me a couple of things during the contact.

2      Q.    What did he tell you?

3      A.    He told me that he couldn't find Leah, his

4  girlfriend.  And that she was apparently out walking around in

5  that area.  And he wanted to know if I would keep my eye open

6  for him (sic) and — or for her.  Excuse me.   And if I did see

7  her maybe I could give her a ride home.

8      Q.    Did you agree to do that?

9      A.    Yes, I did.

10     Q.    How did the Defendant appear to be — well, how was

11 he behaving when he was talking to you?

12     A.    Well, he seemed upset that he couldn't find Leah.

13 He had been looking for her, apparently, and he couldn't find

14 her.  And then in turn asked me if I would keep an eye out for

15 her.  He seemed genuinely upset that he couldn't locate her.

16     Q.    Did you notice anything about his physical

17 appearance?

18     A.    His eyes may have been a little glassy, a little

19 watery, a little glassy.

20     Q.    The car he was driving, you indicated a headlight

21 was out?

22     A.    That's correct.

23     Q.    Could you describe the car further for us?

24     A.    It was a sixties model Mustang.

25     Q.    Was there anything distinctive about the Mustang?

Lee    D    D4 252

1    A.    Not that I can recall off the top of my head.

2    Q.    I'll show you what's been previously received as

3    State's Exhibit No. 16 and ask if you can identify that?

4    A.    It would appear to be the vehicle that Mr. McGuffin

5    had been driving that evening and in the past he drives that

6    car.

7    Q.    Have you seen him drive any other type car?

8    A.    On occasion I — I've seen him to drive — I believe

9    his parents had like a red Thunderbird.

10    Q.    How many times did you see Mr. McGuffin that

11    evening?

12    A.    As far as I can recollect I had only seen him the

13    one time during the course of the evening.

14    Q.    And during the course of that evening, you're on

15    patrol.  Is that correct?

16    A.    That's correct.

17    Q.    Did you ever, like, go into the police station for a

18    couple hours to write reports or things like that?

19    A.    That's a good possibility, but I don't recall.

20    That's been way too long ago.

21    Q.    Did you ever see Leah Freeman that night?

22    A.    I did not see her that evening, no.

23    Q.    Thank you.

24              MR. FRASIER:    That's all the questions I

25    have.

Lee   X   D4 253

1                THE COURT:   Ms. McCrea.

2                MS. McCREA:    Thank you, Your Honor.

3                Mr. Lee, bear with me.  I want to (not

4     understandable) down.

5                MR. McCREA:    Excuse me, Your Honor.  Not to

6     interrupt Ms. McCrea, but it's been pointed out to me that

7     when I used the map with the witness Mr. Lewis, that I

8     erroneously referred to them as Exhibits Nos. 3 and 5.  And in

9     fact Exhibit No. 3 that I — in other words the exhibit that I

10    termed Exhibit No. 3 is Exhibit No. 75.  And the exhibit that

11    I termed Exhibit No. 5 is really Exhibit No. 76.

12               THE COURT:    Thank you.

13               MR. McCREA:    Let the record show that

14    correction and my error.

15               THE COURT:    Okay.

16               MR. McCREA:    I guess it's on the back and I

17    was looking at something on the front.

18               THE COURT:    Okay.  Thank you.

19                         CROSS EXAMINATION

20    BY MS. MCCREA:

21       Q.  So, Mr. Lee, I have — I have on the easel what has

22    been entered into evidence as Exhibit No. 75.

23       A.  Okay.

24       Q.  And it's kind of hard to see, so if you want to come

25    down here and take a look at it, please feel free to do so.

Lee     X     D4 254

1    And then we'll get you back over here.

2         A.   Okay.

3              WITNESS:   So - - -

4              (LAUGHTER)

5              MS. McCREA:   (Interposing) Sorry.

6              WITNESS:   That's not a problem.

7              MS. McCREA:   I didn't mean to put you in that

8    position.

9              WITNESS:   It's okay.

10             MS. McCREA:   So, I just want you to get

11   oriented.

12             We'll let you get over by the microphone and

13   see if you can help us with this.

14             WITNESS:   Okay.

15        Q.   So, all right.  So, it was actually after midnight.

16   I mean, so technically we're to June 29th, 2000, when you had

17   the contact with Mr. McGuffin.  Is that right?

18        A.   That is correct.

19        Q.   And before you had the contact with Mr. McGuffin,

20   you actually had contact with Scott Hamilton.  Is that right?

21        A.   That's a possibility.

22        Q.   Okay.  Well, I've got your report here.  Would you

23   like to take a look at it?

24        A.   Sure.

25        Q.   I'm just going to make you put your glasses on

Lee    X    D4 255

1  again.

2      A.    That's not a problem for me.

3      Q.    If you'd look at that top highlighted paragraph.

4      A.    I can do that.

5            Okay.

6      Q.    So, at midnight you had a contact with Scott

7  Hamilton.  Is that right?

8      A.    According to my report, yes I did.

9      Q.    Okay.  And since you have your report and I don't,

10  where did that contact take place?

11      A.    That was in the one thousand block of North Dean

12  Street.

13      Q.    Of North Dean Street.  So, what would be the closest

14  cross street?

15      A.    Well, it would probably be Twelfth or Eleventh.  I'm

16  assuming it would probably be closer to Twelfth.

17      Q.    So, that would be in this area?

18      A.    Well, I can't see the map.  I - - -

19      Q.    (Interposing) Okay.  Eleventh and Twelfth and Dean

20  Street?

21      A.    Yes.  Dean Street parallels Collier.  And Twelfth

22  Street is a short block, about two blocks long that crosses

23  Collier from Dean.  So, if I seen him on — in the — or in the

24  one thousand block of Dean, I would be approaching the twelve

25  hundred block or the Twelfth Street that went across Collier.

Lee    X    D4 256

1    Q.    Do you - - -

2    A.    (Interposing) So, earlier in the evening.  Yes, in

3    there.

4    Q.    At midnight?

5    A.    Yes, at midnight.

6    Q.    According to your report?

7    A.    Yeah.

8    Q.    And Scott Hamilton was operating, as you put in your

9    report, a primer gray El Camino.  Is that right?

10    A.    Correct.  That's the vehicle he usually drove.

11    Q.    And primer gray is sort of that preparatory stuff

12    when the car is not painted?

13    A.    Yeah.  Yes, it's a light gray.

14    Q.    Okay.  Do you remember why you had contact with

15    Scott Hamilton at that time?

16    A.    I do not.

17    Q.    It's not in your report?

18    A.    No.

19    Q.    And then, three minutes later, at 12:03, in other

20    words at three minutes after midnight is when you had the

21    contact with Mr. McGuffin?

22    A.    Yes.

23    Q.    And can you go through for me again, Mr. Lee, where

24    you were and where Nick McGuffin was coming from?

25    A.    Sure.

Lee    X    D4 257

1          THE COURT:    If you step over there, make sure

2   you keep your voice up, please.

3          A.    Okay.  I've got to orient myself again, because I

4   got away from the map.  All right.

5          So, which location do you want to know?

6          Q.    I want to know where you had the — where you were

7   coming from when you first saw Nick McGuffin?

8          A.    Come off of Dean, come onto Twelfth.  And

9   Mr. McGuffin's car was coming this direction on Twelfth.  And

10  I was heading this direction.

11         Q.    So you were heading west; he was heading east?

12         A.    Exactly.

13         Q.    Okay.  And — okay.

14         I'll let you — I want to make sure we get you on the

15  record.

16         You've indicated that this was not where you turned

17  on your overhead lights and affected a traffic stop.  The two

18  of you just met.  Both cars stopped.  And you rolled down your

19  windows and talked?

20         A.    Exactly.

21         Q.    Okay.  And at that point the reason that you made

22  contact with Mr. McGuffin was because you noticed that his

23  blue Mustang had a headlight out?

24         A.    Right.

25         Q.    Do you remember if it was the right or the left?

Lee   X   D4 258

1    A.   I have no idea at this time.

2    Q.   But the headlight was out.  It wasn't a situation

3  where it was dim.  It was out?

4    A.   It was not functioning.

5    Q.   It was not functioning.  Okay.

6         And that's when he had the conversation with you

7  about looking for Leah.  And the whole conversation lasted,

8  what, maybe five minutes at the maximum?

9    A.   I would — if that.  Yeah, a very brief contact.

10   Q.   All right.

11   A.   Headlight was exchanged.  He gave me the information

12  about looking for Leah.  And we went on our way.

13   Q.   And he did appear to be genuinely concerned to try

14  to find her.  Is that right?

15   A.   That is correct.

16   Q.   Okay.  Now, do you have any recollection of seeing

17  Mr. McGuffin later that night?  In other words, the early

18  morning hours of the 29th at Fast Mart when you were there with

19  Officer Zavala?

20   A.   I don't recall.  I don't even recall being at Fast

21  Mart with Officer Zavala.  We used to stop in at Fast Mart on

22  a very frequent occasions.  It's where the kids hung out.  And

23  we would stop in there and chat with the kids and see what was

24  going on; see how they were doing.  You know, sometimes you

25  pick up a suspended driver there; sometimes you could get a

Lee   ReD  D4 259

1    DUII driving into the store.

2        Q.    Okay.  So, you could have stopped there that night,

3    but you don't have a specific recollection?

4        A.    Exactly.

5        Q.    All right.  I'll take that from you.

6              Thank you very much.

7        A.    You're welcome.

8              MS. McCREA:    No further questions, Your

9    Honor.

10             THE COURT:    Redirect?

11             MR. FRASIER:    Just briefly.

12                  REDIRECT EXAMINATION

13   BY MR. FRASIER:

14       Q.    Are you familiar with Kristin Steinhoff?

15       A.    I know who that person is, yes.

16       Q.    And did you know where she was living at the time

17   that we're talking about here, June 28th?

18       A.    I believe she was living on Dean Street.  I believe

19   the address there was a corner house, the first house back on

20   the right when you turned onto Dean.  And I believe the

21   address was like 1026, something like that.

22       Q.    Where is that in relation to where you had contact

23   with Mr. McGuffin?

24       A.    Within probably half a block or a block of that

25   area.  It's on the same street that I was traveling before I

Lee   ReD  D4 260

1  turned onto Twelfth Street.

2      Q.   Thank you.

3           MR. FRASIER:   That's all I have.

4           THE COURT:   You may step down.

5           Mr. Frasier.

6           MR. FRASIER:   We've tried to get some other

7  witnesses in because we were ahead of schedule, and we weren't

8  successful, Your Honor.  We went faster than I really thought

9  we would today.

10          THE COURT:   Okay.

11          We will be in recess then.

12          Everybody else remain seated until the jury has

13 a chance to leave.

14          Remember the admonition.  Leave your notes in

15 the jury room.  Nine o'clock.

16          JUROR:   Are we done for the day?

17          THE COURT:   Done for the day.

18          (Jury Out.)

19          THE COURT:   Nine o'clock.

20          If the air conditioning system is really

21 preventing you from hearing, I can turn it off.  I don't want

22 to — I mean, it's nice to be cooler, but it's better to hear.

23 So, you guys let me know tomorrow.  This morning it wasn't on.

24 This afternoon it was.  And so I just need to know in the

25 morning whether it's going to be a problem or not.

D4 261

1              MS. McCREA:    When the witnesses speak up,

2    it's not a problem.

3              THE COURT:    And I try to do that, but at a

4    certain point in time it doesn't do any good to repeat it five

5    or six times because they answer me in the same level of voice

6    they answered me before.  And without getting nasty, which I

7    prefer not to do, I - - -

8              MS. McCREA:    (Interposing) I understand, Your

9    Honor.

10             THE COURT:    Okay.  Just let me know.

11             MS. McCREA:    Okay.

12             THE COURT:    We'll be in recess until nine.

13                      (END OF DAY FOUR.)

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS


STATE OF OREGON,                          )
                                          )
            Plaintiff,                    )    CASE NO. 10CR0782
                                          )
      vs.                                 )    JURY TRIAL
                                          )     DAY FIVE
NICHOLAS JAMES MCGUFFIN,                  )
                                          )
            Defendant.                    )
_____  )

TRANSCRIPT OF PROCEEDINGS

Volume 7, Pages D5 2 to D5 137

        BE IT REMEMBERED That, the above-entitled cause

came on regularly for hearing beginning at 9:19 a.m., Tuesday,

July 12, 2011, in the Circuit Courtroom of the Coos County

Courthouse in the City of Coquille, County of Coos, State of

Oregon, before the Honorable Richard L. Barron and a jury.



APPEARANCES

R. Paul Frasier, District Attorney for Coos County,
representing the Plaintiff.

Erica Soublet, Assistant District Attorney for Coos County,
representing the Plaintiff.

Shaun McCrea, Attorney at Law, representing the Defendant.

Robert McCrea, Attorney at Law, representing the Defendant.


    S. Jean Sprouse, Court Transcriber, XV Judicial District, 503-325-5254

D5 2

1          (Jury out.)

2          JUDICIAL ASSISTANT:    All rise.

3          The Circuit Court of State of Oregon, County of

4    Coos is now in session.

5          THE COURT:    Be seated please.

6          Mr. McCrea.

7          MR. McCREA:    Your Honor, I have this matter

8    for the Court.

9          Pursuant to Uniform Trial Court Rule 6.100, and

10   the practice of the Court.  Except for good cause shown, any

11   witness is to be examined by only one Counsel per party.  And

12   we have been abiding by that.  And I don't intend that we

13   should change that as far as examining a witness in terms of

14   asking a witness questions.

15         But as an example, in the case of Ms. Hyatt

16   yesterday, the combination of my less than perfect hearing

17   coupled with the air conditioning created a situation where I

18   would ask her a question and she would go on at extreme length

19   in a somewhat soft voice.  And I found myself in a situation

20   where I wasn't able to hear hardly a word she was saying.  And

21   as a consequence I was unable to tell if she was answering the

22   question or if she was providing observations and

23   dissertations that were prejudicial and objectionable.  And

24   that was very troubling.  And due to the fact of the

25   application of the Rule 6.100, I was the one that was

D5 3

1   obligated to make the objection.

2              Now, I know the Court doesn't have any solution

3   for my hearing.  And I know that the Court has only what might

4   be termed limited assistance concerning the air conditioning.

5   But what I'm asking the Court to do — what I'm moving the

6   court to do is, for good cause shown, to enlarge the privilege

7   to object the testimony to the co-Counsel in this case so that

8   even though I'm examining the witness, Ms. McCrea would have

9   the option and opportunity to interpose an objection if same

10  were necessary.

11             And I have discussed this problem with the

12  Defendant personally so that he is aware, number one, that the

13  problem exists on my part.  And I feel that the problem could,

14  under some circumstances, amount to inadequate assistance of

15  Counsel.  And as I said this has been very troubling to me in

16  reflection.

17             And it would appear that by doing so, by the

18  Court allowing such a motion and allowing Ms. McCrea to

19  interpose an objection or a Motion to Strike if that was

20  appropriate, as well as my doing so, that it would resolve the

21  problem.  And the Defendant has indicated that would be

22  satisfactory to him to continue as we are with that additional

23  provision.

24             THE COURT:    And I'm sorry.  The name of the

25  witness you said?

D5 4

1              MR. McCREA:    Oh, Ms. Hyatt, the young woman

2    who was eleven years old when she was on the van.

3              THE COURT:    Okay.  I'm just trying to locate

4    her.

5              MS. McCREA:    Lisa Hartwell.

6              MR. McCREA:    Lisa — pardon me.  Alicia

7    Hartwell, now Hyatt.

8              THE COURT:    Right.

9              MR. McCREA:    Is the witness, Your Honor.

10             THE COURT:    I'm just trying to locate - - -

11             MR. McCREA:    (Interposing) So the record is

12   clear, I have also discussed the situation that occurred — the

13   situation as it occurred with that witness with the Defendant,

14   Mr. McGuffin.  And he does not raise any objections or

15   proceedings based on what occurred though I have made it clear

16   to him I could not hear what she was saying and could not make

17   objections.

18             THE COURT:    Well, you know, I have noticed

19   that.  The problem that it creates sometimes is that — and I

20   was going to mention it — is that there is some overlapping,

21   which I assume is partly due to your hearing in that you're

22   speaking and the witness is speaking.  And you're tying to get

23   her to say, to at least speak up so you can hear it.  And that

24   requires — and then all the sudden we're overlapping on the

25   record.  And that's a bit of a problem.

D5 5

1          I mean, my first solution, before I go to start

2    having Counsel do that is just not have the air conditioning

3    on.

4               MR. McCREA:    Is what?

5               THE COURT:    Not have the air conditioning on.

6               MR. McCREA:    Well, today that may not pose

7    that much of a problem, that's true, Your Honor.

8               THE COURT:    So, I would prefer to try — to

9    try it that way at first, just because that rule is one — it's

10   a long standing rule.  I mean, it proceeded the Uniform Trial

11   Court Rules.  And I'll see if that works first of all, because

12   I didn't notice the problem in the morning yesterday when the

13   air conditioning wasn't on.  So, I would prefer to handle it

14   that way at this point.

15          If it gets too uncomfortable in this courtroom,

16   whether it shows rain out there or not, it can get

17   uncomfortably warm.  And if not, then I'll consider the other

18   matter.

19          I don't know whether the State has any

20   objection one way or the other, but I prefer at least to

21   handle it way I'm going to handle it right now.

22               MR. McCREA:    I — excuse me.

23               THE COURT:    Mr. Frasier.

24               MR. FRASIER:    That's fine, Your Honor.  And

25   you know, if it gets to the point where we have to turn the

D5 6

1  air conditioning on, I don't have a problem with what he's

2  proposing.

3          THE COURT:    Okay.

4          We'll try it the first way, just not having the

5  air conditioning on.

6          Okay?

7          MR. McCREA:    Very well.

8          THE COURT:    Bring the jury in.

9          (Jury In.)

10          THE COURT:    Good morning.

11          I noted yesterday in the morning we didn't have

12  the air conditioning system on, and there didn't seem to be a

13  problem.  And yesterday when the air conditioning was on even

14  some jurors were having some problems.  We're going to try it

15  without the air conditioning because my alternative frankly is

16  I ask people to speak up, and this is an unusual setting for

17  most people.  And they revert to what they normally do.  And

18  that is they say, "Okay, I understand."

19          And then they use the same voice they've always

20  used.  And my alternative is to start yelling at them which I

21  don't like to do.  Because then it becomes a battle between me

22  and the witness.  And that's not a good thing.

23          So, we'll try it without the air conditioning.

24  And if it gets too warm and too uncomfortable, just let me

25  know and I will try to politely — politely as I can — urge the

Mauro    D      D5 7

1   witnesses to speak up.

2          I mean, the microphone does provide some

3   amplification, but not a lot.  Most of it has to come from

4   their own voice.  And it's — and if I interrupt all the time

5   telling them to speak up, then everybody loses track of what

6   anybody's saying except for me saying, "Speak up."  And that's

7   not a good thing.  So, we'll try it without the air

8   conditioning.

9          Call your next witness, please.

10         MR. FRASIER:    Thanks, Your Honor.

11         We call Brett Mauro.

12                        BRETT MAURO

13  was thereupon produced as a witness on behalf of the Plaintiff

14  and, having first been duly sworn to tell the truth, the whole

15  truth and nothing but the truth, was examined and testified as

16  follows:

17         THE COURT:    Have a seat here, please.

18                   DIRECT EXAMINATION

19  BY MR. FRASIER:

20     Q.  Could you state your name please, sir, and spell

21  your last name for the record?

22     A.  Brett Mauro, M-A-U-R-O.

23         THE COURT:    Would you scoot closer, please,

24  to the microphone?

25         MR. FRASIER:    Just going to ask you to scoot

Mauro   D      D5 8

1   up closer to the microphone.

2        Q.   Can you tell us where you live, sir?

3        A.   94795 Vista Lane.

4        Q.   What city?

5        A.   Coquille?

6        Q.   How long have you lived in the Coquille Area?

7        A.   All my life.

8        Q.   I would assume you were living here in the year

9   2000?

10       A.   Yes

11       Q.   Did you go to school here?

12       A.   Yes, sir.

13       Q.   And what year did you — did you go to high school?

14       A.   Yeah.

15       Q.   Did you graduate?

16       A.   '97.

17       Q.   Are you familiar with the Defendant in this case,

18   Nicholas McGuffin?

19       A.   Yes, sir.

20       Q.   How do you know Mr. McGuffin?

21       A.   We all grew up together.

22       Q.   Were you acquainted with an individual named Leah

23   Freeman?

24       A.   Yes, sir.

25       Q.   How did you know Leah?

Mauro    D      D5 9

1      A.   Grew up together all out lives.

2      Q.   Did you — were you aware that at some point in time

3 the Defendant and Ms. Freeman were boyfriend/girlfriend?

4      A.   Yes, sir.

5      Q.   And did you have an opportunity to observe them

6 together?

7      A.   Oh, yes, sir.

8      Q.   What could you tell us about their relationship

9 based on what you saw?

10     A.   Off again, on again, real rocky.

11     Q.   Were there times it was good?

12     A.   Times it was good; times it was bad.

13     Q.   Did you ever see them argue?

14     A.   Yeah, a few times.

15     Q.   Did you ever see any physical altercations - - -

16     A.   (Interposing) No, sir.

17     Q.   Now, I want to direct your attention, sir, to June

18 28th of the year 2000.  That is the day allegedly that

19 Ms. Freeman disappeared.  Do you recall that day, sir?

20     A.   I do.

21     Q.   Did you see the Defendant that day?

22     A.   Yes, I did.

23     Q.   Where did you see him?

24     A.   Fast Mart.

25     Q.   Do you recall about what time of the day it was?

Mauro    D    D5 10

1      A.   Nine forty-ish, roughly.

2      Q.   And did you have contact with the Defendant?

3      A.   Yes, sir.

4      Q.   Do you recall what kind of — was he in a vehicle?

5      A.   Yes, sir.

6      Q.   Do you recall what kind of vehicle?

7      A.   He was in his Mustang.

8      Q.   Could you tell the jury please what happened when

9   you had contact with the Defendant?

10     A.   I asked the Defendant to go somewhere with me and he

11  said, no, his girlfriend was gone.

12          And I said, "She can't be gone.  She has to be

13  somewhere."

14          And he said, "No.  She's gone."

15     Q.   And did he repeat that she was gone?

16     A.   Four or five, six times.

17     Q.   How was he acting when he said, "She's gone?"

18     A.   He was a little different.

19     Q.   Did you see him later in the evening?

20     A.   Fifteen, twenty minutes later.

21     Q.   And do you recall what kind of vehicle he was in at

22  that time?

23     A.   I cannot recall.  I don't remember that.

24     Q.   And how was he behaving at that time?

25     A.   Same as the prior conversation.

```
                                    Mauro    D      D5 11
```

 1      Q.    What was he saying?

 2      A.    He said, "Come on.  Let's go.  My girlfriend's

 3   gone."

 4      Q.    Did you ever go for a ride with him?

 5      A.    Yeah, I got in the vehicle.

 6      Q.    Where did you go?

 7      A.    I can't really remember where our exact place we

 8   went.  I think we went down River Road.  But, it's been so

 9   long ago, I might not remember that correctly.

10      Q.    How long were you with him?

11      A.    Fifteen, twenty minutes.  Maybe half an hour tops,

12   you know.  Not very long at all.

13      Q.    Did you go someplace and park?

14      A.    Yeah.

15      Q.    What did you do?

16      A.    We got stoned.

17      Q.    When you say you got stoned, what do you mean?

18      A.    We smoked marijuana.

19      Q.    Both of you?

20      A.    Yes, we did.

21      Q.    While you were parked smoking marijuana, what does

22   the Defendant say?

23      A.    We don't really talk.  The conversation I really

24   don't remember.  It was not much of a conversation, I don't

25   believe.  I don't remember the exact conversation.

```
                                    Mauro   X    D5 12
```

1       Q.   Was he saying anything about Ms. Freeman?

2       A.   I don't believe at that time, after we had gone for

3  a ride he said anything about Ms. Freeman?

4       Q.   Excuse me.  I didn't hear.

5       A.   I don't think he talked about Leah at all during the

6  car ride or the conversation.

7       Q.   Was there a time in — a couple days later that you

8  went for a ride with him to Roseburg?

9       A.   No, sir.

10      Q.   All right.

11           MR. FRASIER:   Those are the questions I have.

12           Thank you, Your Honor.

13           THE COURT:   Ms. McCrea.

14                    CROSS EXAMINATION

15  BY MS. MCCREA:

16      Q.   So, Mr. Mauro, what you've described here today

17  concerning your conversation with Mr. McGuffin is what you

18  told Officer Webley back in March of 2010.  Is that right?

19      A.   Correct.

20      Q.   And you talked to other police officers or

21  authorities back in the year 2000 closer in time to June 28th,

22  2000.  Isn't that right?

23      A.   Yes, ma'am.

24      Q.   In fact you talked to somebody in the FBI?

25      A.   Yes, ma'am.

Mauro   X   D5 13

1      Q.   And that would have been Officer Ferrera

2      A.   Sure.  I — I can't remember the name.

3      Q.   But somebody from the FBI?

4      A.   Yeah, it was a brief conversation.

5      Q.   Okay.  And that was on July 5th, 2000?

6      A.   I don't remember the exact date, ma'am.

7      Q.   Was it close in time to June 28th, 2000?

8      A.   Sure.  I don't — I mean, I don't remember the exact

9  dates.

10     Q.   That's fine.

11          And when you talked to Special Agent Ferrera, at

12  that point you told him you saw Nick McGuffin at 9:15 and Nick

13  was in his blue Mustang, didn't you?

14     A.   I don't remember that conversation.

15     Q.   Mr. Mauro, would you like to look at the report to

16  see if this refreshes your recollection?

17     A.   Sure.  I don't remember any of that.

18     Q.   Are you saying it didn't happen or are you saying

19  you don't - - -

20     A.   (Interposing) No, I'm not saying it didn't happen.

21  I don't remember that at all.

22     Q.   You remember talking to the FBI?

23     A.   Yeah.  But I don't remember the conversation.

24  That's really - - -

25     Q.   (Interposing) I'm sorry do you - - -

Mauro    X    D5 14

1    A.    (Interposing) No.  I just don't remember it at all.

2  I don't remember.

3    Q.    Now, Mr. Mauro, when you talked to Officer Webley on

4  March 5th, 2010, did anybody give you a - - -

5    A.    (Interposing) No, ma'am.

6    Q.    I'm sorry.  I appreciate you anticipating, but let

7  me finish the question.  Okay?

8    A.    Sorry.

9    Q.    So, no one gave you a copy of Agent Ferrera's report

10 that I just showed you here today?

11   A.    No, ma'am.

12   Q.    And nobody gave you a report of Lieutenant Buddy

13 Young concerning the statements that you made to him on July

14 10th, 2000?

15   A.    Was he part of the homicide investigation team?

16   Q.    Yes.

17   A.    I do remember talking to him.  Yeah, I remember that

18 one.

19   Q.    Let's deal with Buddy Young for a minute.  When you

20 talked to Buddy Young you didn't tell him anything about going

21 and smoking marijuana with Nick McGuffin the night of June

22 28th, did you?

23   A.    By - - -

24   Q.    (Interposing) Here's the whole part.  I'm not trying

25 to - - -

Mauro    X    D5 15

1    A.    (Interposing) If I didn't — if I didn't I just
2  didn't say it.  I mean, I believe you.
3    Q.    So — and you talked to Lieutenant Buddy Young on or
4  about July 10th, 2000?
5    A.    Okay.
6    Q.    So — well?
7    A.    Yeah, yeah, somewhere in there.
8    Q.    Okay.
9    A.    I don't remember dates.
10    Q.    All right.  And he talked to you about — one of the
11  things he talked to you about was drug parties going on that
12  night.  Right?
13    A.    Yes, ma'am.
14    Q.    And he talked to you about use of illegal drugs?
15    A.    Yes, ma'am.
16    Q.    And you didn't mention anything to him about having
17  gone and smoked marijuana with Nick McGuffin that night?
18    A.    I didn't.  But it just wasn't, you know, a big deal
19  I didn't think.
20    Q.    You knew Leah Freeman was missing?
21    A.    Yeah.
22    Q.    And you testified here today that Mr. McGuffin made
23  a statement that she was gone?
24    A.    Uh huh.
25    Q.    And so, but that wasn't a big deal to you?

```
                                 Mauro   X    D5 16
 1      A.   Oh, it was.

 2      Q.   But you didn't mention it?

 3      A.   I — I didn't I guess.

 4      Q.   And when — and so the first time you mentioned it

 5  was in this interview with Mr. Webley on March 5, 2010?

 6      A.   Okay.

 7      Q.   And in terms of — now, do you have any recollection

 8  of having talked with Special Agent Ferrera back in early

 9  July?

10      A.   I don't.

11      Q.   You don't remember talking to him at all?

12      A.   I mean, I remember him standing there, and a

13  conversation.  But I don't remember any of the conversation.

14      Q.   You don't remember telling him that Mr. McGuffin

15  said that - - -

16           MR. FRASIER:   (Interposing)  Your Honor, I'm

17  going to object.  He already says he doesn't remember.  So I

18  think - - -

19           THE COURT:   (Interposing) Well, she can ask

20  him again.  If he says he can't remember again, then she can

21  go on to something else.

22           Go ahead.  Ask him.

23      Q.   You don't remember that Mr. McGuffin said to you

24  that Leah Freeman had got — just got into an argument with her

25  best friend?
```

```
                                    Mauro    X      D5  17
```

1       A.    I don't remember saying that.

2       Q.    And you don't remember saying that you observed

3  Mr. McGuffin driving up and down Central Street?

4       A.    I don't remember the conversation to that officer at

5  all.

6       Q.    Do you remember seeing Mr. McGuffin driving up and

7  down Central?

8       A.    Yeah.

9       Q.    And when you went with Mr. McGuffin as you

10  testified, to go smoke marijuana, you left with him from Fast

11  Mart.

12      A.    Yes, ma'am.

13      Q.    Is that right?

14      A.    Yes, ma'am.

15      Q.    And who else was around at that point?

16      A.    I couldn't even tell you.  I have no idea.  I don't

17  remember who was there.

18      Q.    Thank you, Mr. Mauro.

19            MS. McCREA:    Nothing further, Your Honor.

20            THE COURT:    Redirect.

21            MR. FRASIER:    No further questions, Your

22  Honor.

23            THE COURT:    You may step down.  You're free

24  to leave.

25            Call your next witness.

Steinhoff   D     D5 18

1          MS. SOUBLET:    The State calls Kristen

2    Steinhoff.

3                  KRISTEN STEINHOFF-RAMSEY

4    was thereupon produced as a witness on behalf of the Plaintiff

5    and, having first been duly sworn to tell the truth, the whole

6    truth and nothing but the truth, was examined and testified as

7    follows:

8          THE COURT:    Have a seat up here, please.

9                  DIRECT EXAMINATION

10   BY MS. SOUBLET:

11       Q.   Ms. Steinhoff, can you state your name and spell

12   your last name for the record?

13       A.   Kristen Steinhoff-Ramsey, S-T-E-I-N-H-O-F-F dash

14   R-A-M-S-E-Y.

15          MS. SOUBLET:    I'm going to ask you to scoot a

16   little closer to the microphone and make sure you speak up so

17   we can hear you.

18       Q.   Ms. Steinhoff-Ramsey, how long have you lived in

19   Coos County?

20       A.   Most of my life.

21       Q.   Were you living here in 2000?

22       A.   Yeah.

23       Q.   Do you know the Defendant, Nicholas McGuffin?

24       A.   Yes.

25       Q.   How do you know him?

Steinhoff   D     D5 19

1      A.    Because I lived in Coquille for a long time.  We

2    just — I don't know.

3      Q.    So, you know him from being around in Coquille?

4      A.    Yeah.

5      Q.    How long have you known him?

6      A.    Probably since 1999.

7      Q.    Did you know the victim, Leah Freeman?

8      A.    No.

9      Q.    Where were you living in the summer of 2000?

10     A.    At my grandma's house.

11     Q.    Where was your grandmother's house located?

12     A.    On North Dean.

13     Q.    Is that here in Coquille?

14     A.    Uh huh.

15     Q.    Do you remember the exact address?

16     A.    1026.

17     Q.    Was there anybody else living there at the house

18   besides you and your grandmother?

19     A.    My mom.

20     Q.    What's your mother's name?

21     A.    Heather McMullen.

22     Q.    Did you have a car?

23     A.    Yes.

24     Q.    What was that car?

25     A.    A Honda Elantra.

```
                                        Steinhoff   D     D5 20
 1      Q.   How long had you had it?

 2      A.   Since I was sixteen.

 3      Q.   How old were you in the summer of 2000?

 4      A.   Seventeen.

 5      Q.   Was that car reliable?

 6      A.   No.

 7      Q.   What was wrong with it?

 8      A.   The transmission kept going out and the starter.

 9      Q.   Do you know what type of car the Defendant had?

10      A.   A Mustang.

11      Q.   Do you know whether or not he had access to any

12  other cars?

13      A.   The Thunderbird.

14      Q.   I want to turn your attention to June 28th, 2000.  Do

15  you remember that day?

16      A.   Some of it.

17      Q.   Were you doing drugs that day?

18      A.   Yes.

19      Q.   What kind of drugs?

20      A.   Meth.

21      Q.   That's Methamphetamine?

22      A.   Uh huh.

23      Q.   Were you doing any other drugs that day?

24      A.   No.

25      Q.   Were you driving your car that day?
```

Steinhoff   D    D5 21

1    A.   I was driving Zach's car.

2    Q.   Okay.  Is that Zachary Elderkin?

3    A.   Yeah.

4    Q.   And why were you driving Mr. Elderkin's car and not

5    yours?

6    A.   Because my car, it wouldn't start.  There was

7    something wrong with it.

8    Q.   What type of car was Mr. Elderkin's car?

9    A.   A Kia.

10   Q.   Do you remember where you were when you got the car

11   from Mr. Elderkin?

12   A.   I was at my grandma's house.  And I took him home.

13   Q.   When you say you took him home, where was home,

14   where did you drive him to?

15   A.   Access Road.

16   Q.   Where is that?

17   A.   It's on the highway, on your way to Coos Bay.

18   Q.   Is that near Green Acres?

19   A.   Uh huh.

20   Q.   Is that a yes?

21   A.   Yes.

22   Q.   Was there a time when you were supposed to have the

23   car back?

24   A.   Yeah, like six in the morning, before six because he

25   had to go to work.

Steinhoff  D    D5 22

1      Q.   When you drove out to Green Acres, did you see

2  anyone on the way?

3      A.   Nick.

4      Q.   Where was Mr. McGuffin?

5      A.   In that Econo Rooter parking lot, that little pull

6  out.

7      Q.   Do you remember what time that was?

8      A.   No.

9      Q.   Was it daylight, dusk?

10     A.   No, it was dark.

11     Q.   Do you remember what he was doing?

12     A.   Walking.

13     Q.   When you say walking, what do you mean?

14     A.   He was walking and said he couldn't find Leah.

15     Q.   So, you're indicating he said he could find Leah,

16  that must mean you stopped?

17     A.   Yeah, I stopped to see what he was doing.  Because

18  there was no cars there.  It was just him.

19     Q.   And he told you he could find Leah?

20     A.   Yeah.

21     Q.   And who did you know Leah to be?

22     A.   His girlfriend.

23     Q.   Did he tell you anything else at that time?

24     A.   No.  I told him that if he didn't find her by the

25  time I got back that I would help him look for her.

Steinhoff   D    D5 23

1    Q.   So, what did you do after having that conversation?

2    A.   I took Zack home and then came back into town.

3    Q.   Do you remember how long that took you?

4    A.   No.

5    Q.   When you got back into town did you see the

6    Defendant still by the Maytag or Econo Rooter place?

7    A.   No.

8    Q.   What did you do when you got back to town?

9    A.   I can't remember if I went to my grandma's house or

10   — I think I went straight back to my grandma's house.

11   Q.   Was there a time when the Defendant showed up at

12   your grandmother's house that night?

13   A.   Yeah.  Yes.

14   Q.   Do you remember what he was wearing at that time?

15   A.   No.

16   Q.   Was it the same thing that he had on when you saw

17   him at the Maytag store?

18   A.   I'm not sure.

19   Q.   Do you remember testifying before Grand Jury in

20   2000?

21   A.   Not really.  A little bit.

22   Q.   Is it safe to say that your memory then would be

23   stronger than it is today?

24   A.   Yes.

25   Q.   Do you know Scott Hamilton?

Steinhoff   D     D5 24

1      A.    Yes.

2      Q.    Do you remember seeing him that night?

3      A.    And if you told the Grand Jury back in 2010 that

4   Mr. Hamilton — you saw Mr. Hamilton that night, that would be

5   a better recollection than today?

6      A.    Yes.

7      Q.    And if you told the Grand Jury back in 2010 that the

8   Defendant was wearing different clothes when he showed up at

9   your house than when you saw him earlier, that would be a

10  better recollection than today?

11     A.    Yes.

12     Q.    How long was the Defendant at your house that night?

13     A.    I'm not sure — awhile.

14     Q.    Okay.  Did something happen while he was at your

15  house?

16     A.    We did drugs.

17     Q.    When you say drugs, what type of drugs?

18     A.    Meth.

19     Q.    So you're saying that the Defendant did

20  Methamphetamine as well?

21     A.    Uh huh.

22     Q.    That's a yes?

23     A.    Yes.

24     Q.    Did anything else happen while he was at your house

25  that night?

Steinhoff   D     D5 25

1        A.    Yes.

2        Q.    What's that?

3        A.    He just touched my chest and tried to kiss me and

4    stuff.

5        Q.    When you're saying touched your chest, you're

6    referring to your chest or to your breast?

7        A.    Yeah, to my breast.

8        Q.    Was that above the clothes or under the clothes?

9        A.    Above the clothes.

10        Q.    Where were you when that was happening?

11        A.    On my bed.

12        Q.    Where was he when that was happening?

13        A.    On my bed.

14        Q.    Were you sitting up or lying down?

15        A.    I can't remember.

16        Q.    When you say he kissed you, are you talking about on

17    the lips?

18        A.    Uh huh.  Yes.

19        Q.    Did he do anything else to you?

20        A.    He tried to unbutton my pants.

21        Q.    Okay.  Did he do anything else?

22        A.    No.

23        Q.    Do you remember telling Grand Jurors that he exposed

24    his penis to you?

25        A.    Yes.

Steinhoff   D    D5 26

1    Q.    Did that happen?

2    A.    Yes.

3    Q.    Do you remember him trying to take off his pants?

4    A.    Yes.

5    Q.    Do you remember him attempting to touch your crotch

6  area on the top of your pants?

7    A.    Yes.

8    Q.    Whose idea was it for that to happen?

9    A.    I don't know.

10    Q.    Did you stop it?

11    A.    Yeah, we both stopped.

12    Q.    Why did you stop it?

13    A.    Because we were just friends.

14    Q.    Do you remember telling the Grand Jury that you

15  stopped it because it was weird that Leah was missing?

16    A.    Yes.

17    Q.    Was there a time that evening when you drove the

18  Defendant around looking for Ms. Freeman?

19    A.    Yes.

20    Q.    Was that before or after he attempted to have sex

21  with you?

22    A.    I can't remember.

23    Q.    Whose car were you in?

24    A.    In Zack's — in the Kia.

25    Q.    In the Kia?

Steinhoff   D    D5 27

1      A.   Uh huh.

2      Q.   Where did you go?

3      A.   We just drove around town looking for her and out

4  past that Scolari's Farm and turned around in the Sinnott's

5  driveway.

6      Q.   Okay.  That's Doctor Sinnott's house?

7      A.   Yes.

8      Q.   How long did that take?

9      A.   I'm not sure.

10     Q.   After doing that did you go back to your house?

11     A.   Yes.

12     Q.   Okay.  Did you see the Defendant again that night?

13     A.   I seen him at Fast Gas.

14     Q.   Okay.  And where is Fast Gas?

15     A.   It's on the highway.

16     Q.   What was he doing?

17     A.   I can't remember.

18     Q.   Fast Gas, is that the same thing as Fast Mart?

19     A.   Yes — no.  It's the one on the highway, like if

20  you're going towards Studevant Park.

21     Q.   I'm sorry?

22     A.   If you're going towards Sturdevant Park it's that

23  Fast Gas right there by the car wash.

24     Q.   Okay.  Do you remember seeing the Defendant in a

25  different car that day?

Steinhoff    D    D5 28

1      A.   Yes.

2      Q.   What car was that?

3      A.   The Thunderbird.

4      Q.   After Ms. Freeman went missing did you speak to the

5   police?

6      A.   Yes.

7      Q.   And did you tell the Defendant that you'd spoken tot

8   he police?

9      A.   Yes.

10      Q.   Was there a time when the Defendant talked to you

11   about that?

12      A.   Yes.

13      Q.   Where did that happen?

14      A.   At the church parking lot across from the middle

15   school.

16      Q.   What happened at that time?

17      A.   He just told me to keep my mouth shut.

18      Q.   Did he tell you anything else?

19      A.   No.

20      Q.   Do you somebody by the name of Tina Leeman or Tina

21   Mims?

22      A.   Yes.

23      Q.   Okay.  Was there a time in 2000 when she was at your

24   house?

25      A.   Yes.

Steinhoff   X    D5 29

1    Q.   Did the Defendant show up at your house at that

2  time?

3    A.   Yes.

4    Q.   Did you have a conversation with him about your

5  talking to the police?

6    A.   Not that I can remember.

7    Q.   Do you remember telling the Grand Jury that the

8  Defendant threatened you and told you to keep your mouth shut

9  or you'd end up like Leah?

10    A.   I don't remember.

11    Q.   You don't remember telling the Grand Jury that?

12    A.   No.

13    Q.   But if that was your testimony in 2010 your memory

14  then would be better then than it was today?

15    A.   Yes.

16    Q.   Thank you.

17        MS. SOUBLET:   I have nothing further.

18        THE COURT:   Ms. McCrea.

19            CROSS EXAMINATION

20  BY MS. MCCREA:

21    Q.   Ms. Steinhoff-Ramsey, since June 28th of 2000 you've

22  talked to the police a number of times?

23    A.   Yes.

24    Q.   A whole bunch of times.  Is that fair?

25    A.   Yes.

Steinhoff   X     D5 30

1       Q.   You've got to speak up so we can hear you.

2       A.   Yes.

3       Q.   Okay.  And you talked to different police officers.

4   Is that correct?

5       A.   Yes.

6       Q.   And you've talked to the District Attorney?

7       A.   Yes.

8       Q.   And you've testified before the Grand Jury twice?

9       A.   Yes.

10      Q.   And you've never withheld the fact that you have had

11  these contacts with law enforcement from Mr. McGuffin, have

12  you?

13      A.   No.

14      Q.   You haven't gone out of your way to make sure that

15  Nick knew you had spoken with the police.  But when it came

16  up, you would let him know?

17      A.   Yes.

18      Q.   Okay.  Now, in terms of him supposedly threatening

19  you at the church parking lot, that was a time when you and

20  Scott Hamilton were at the church and you'd been drinking?

21      A.   I don't remember me drinking.  I hardly ever drank

22  then.

23      Q.   Well, okay.  Back in 2000 you made a statement to

24  Officer Zavala on July 10th, 2000.  Do you remember that?  You

25  may not remember the exact date, but close in time to when

Steinhoff    X    D5 31

1  Leah Freeman disappeared?

2      A.   Yes.

3      Q.   Okay.  And then on September 12th, 2000, which would

4  be maybe what, eight to ten weeks after Leah Freeman

5  disappeared, you sat down with Officer Danny Lee and made a

6  statement to him.  Right?

7      A.   (No audible response.)

8      Q.   At Sturdevant Park?

9      A.   Oh, yes.

10     Q.   And Josh Felker was there?  Or Joe Felker?

11     A.   Joe.

12     Q.   Okay.  Was Joe Felker a friend of yours?

13     A.   Yes.

14     Q.   And Joe Felker was present when you had the

15  conversation with Danny Lee?

16     A.   I don't remember if he was there.

17     Q.   Do you remember having the conversation with Danny

18  Lee at Sturdevant Park?

19     A.   Yes.

20     Q.   And the reason that you got hold of Danny Lee to

21  talk to him was because you wanted to make sure everyone knew

22  that you didn't have anything to do with Leah Freeman's

23  disappearance?

24     A.   Yes.  Because there was a bunch of rumors going

25  around.

Steinhoff   X    D5 32

1     Q.    There were rumors going around?

2     A.    Yes.

3     Q.    And Danny Lee tape recorded that conversation,

4  didn't he?

5     A.    I can't remember.

6     Q.    So, when you talked to Danny Lee on September 12th,

7  2000.  And this would be after Leah Freeman's body was found.

8  Is that right?

9     A.    Yes.

10    Q.    When you talked to Danny Lee on September 12th, you

11  told him that you had been drinking the night of June 28th,

12  didn't you?

13    A.    I can't remember that.  I don't remember.

14    Q.    And you told Danny Lee that when you were at the

15  church parking lot that you and Scott Hamilton had been

16  drinking?

17    A.    I don't remember that.

18    Q.    I have a transcript of the conversation.  And I'm

19  going to show you this portion of it.

20         MS. McCREA:     It's Page No. 8, Counsel.

21    Q.    To see if this refreshes your recollection.  So, if

22  you'd take a look at this, ma'am, down to here.

23         I'm not trying to keep you from looking at anything

24  else, but that's what's pertinent.

25    A.    I don't remember being drunk.  I might have been.

```
                                      Steinhoff   X     D5 33

 1      Q.   You might have been.

 2      A.   Yeah, I don't remember, though.

 3      Q.   All right.  And in terms of what this says, is, it

 4 says that you talked to Nick once.  And that was the night

 5 before.

 6           And Mr. Lee says, (not understandable).

 7           And you say, "I was all drunk at the church.  Me and

 8 Hamilton were."

 9           Is that what the transcript says?

10      A.   Yes.

11      Q.   And you're not saying this isn't what you said,

12 you're just saying you don't remember it?

13      A.   Yes.

14      Q.   And what you remember is that you might have been

15 drinking?

16      A.   Yes.

17      Q.   All right.  Now, when you saw Mr. McGuffin on June

18 28th, 2000 at the Econo Rooter or what's now the Maytag Store,

19 you indicated it was dark?

20      A.   Yes.

21           MS. McCREA:   I'm going to move back over here

22 so you can face the microphone.  And we really need you to

23 speak up.  Okay?

24           WITNESS:   Okay.

25           MS. McCREA:   I'm sorry.  I know it's hard,
```

```
                                       Steinhoff  X    D5 34
```

 1  but we (not understandable).

 2      Q.   Okay.  So, when you saw Mr. McGuffin at the Maytag

 3  Store, you've testified that it was dark?

 4      A.   Yes.

 5      Q.   And it wasn't just dusk, it was dark?

 6      A.   Yes.

 7      Q.   Right?

 8      A.   Yes.

 9      Q.   And in fact you told the Grand Jury that the only

10  light there was, was from a street light on the highway?

11      A.   Yes.

12      Q.   And you indicated that Mr. McGuffin was there and

13  you got out of the car and teased him and asked him if he was

14  stealing flowers?

15      A.   Yes.

16      Q.   And at that time he told you he was looking for Leah

17  and he couldn't find her?

18      A.   Yes.

19      Q.   And it's correct he was not on the phone at that

20  time, isn't it?

21      A.   He wasn't on the phone?

22      Q.   Was not on the phone?

23      A.   No.

24      Q.   He wasn't talking on a phone?

25      A.   No.

Steinhoff   X     D5 35

1    Q.   Okay.   And you told him that if he still couldn't

2    find Leah to come over to your house later and you would help

3    him look for her?

4    A.   Yes.

5    Q.   Okay.   And then at some point he did come over to

6    your house?

7    A.   Yes.

8    Q.   And he came in the blue Mustang?

9    A.   Yes.

10   Q.   And when he came in, what he said to you was, quote,

11   "I hope she did not do something stupid." unquote?

12   A.   Yes.

13   Q.   And he kept saying that during the time that he was

14   with you?

15   A.   Yes.

16   Q.   And he was really concerned about where Leah was?

17   A.   Yes.

18   Q.   And he also told you, and this is a quote, "When all

19   my other girlfriends have done this in the past, they have

20   been out cheating on me?"

21   A.   Yes.

22   Q.   And he was worried that she was with another guy?

23   A.   Yes.

24   Q.   And he was worried she might be at a party

25   somewhere?

Steinhoff   X    D5 36

1       A.   Yes.

2       Q.   And he was also worried that maybe something else

3  had happened to her?

4       A.   Yes.

5       Q.   And you — you liked Nick McGuffin, didn't you,

6  Ms. Steinhoff-Ramsey?

7       A.   Yeah, we were friends.

8       Q.   Well, he was also an attractive guy?

9       A.   Yeah, but I didn't like him like that.

10       Q.   Okay.  Well, and the two of you did smoke some

11  Methamphetamine together?

12       A.   Yes.

13       Q.   And at some point the two of you did get kind of, as

14  you said, kissing and a little involved?

15       A.   Yes.

16       Q.   And it was like Nick was concerned that Leah was out

17  with somebody else and it was going to be payback?

18       A.   I don't know.

19       Q.   Well, the bottom line is the two of you didn't have

20  sex that night, did you?

21       A.   No.

22       Q.   And you've never had sex with Nick McGuffin?

23       A.   No.

24       Q.   And you offered to drive him in the Kia out to

25  Sinnott's property because there had been talk of a party

Steinhoff    X    D5 37

1  being out there.  Is that right?

2      A.   Yes.

3      Q.   And Sinnott's is out Fairview, but not very far out

4  Fairview.  Is that correct?

5      A.   Yes.

6      Q.   So you took the Kia.  Now, do you remember that Nick

7  had a headlight out that night on the Mustang?

8      A.   No.

9      Q.   Did he tell you anything about having been stopped

10  by the police twice for having a headlight out?

11      A.   I can't remember if he did.

12      Q.   But you took the Kia and you drove?

13      A.   Yes.

14      Q.   And the two of you went out to Sinnott's and there

15  was no party there?

16      A.   Yeah.

17      Q.   The place was dark?

18      A.   Yes.

19      Q.   Okay.  You've got to speak up for me just a little

20  bit.  I'm sorry.

21      A.   Yes.

22      Q.   Thank you.

23           And there were no cars around?

24      A.   No.

25      Q.   So the two of you came back to town?

Steinhoff    X    D5 38

1          A.    Yes.

2          Q.    And when you came back to town you went over to —

3    I'm blanking on the name of it — the card lock place.  And

4    Nick put some gas in your car.  Do you remember that?

5          A.    No.

6          Q.    Okay.  But you went back to your house.  And at that

7    point Nick left.  Is that right?

8          A.    Yes.

9          Q.    And then you went — you went over to Hernan Cortez's

10   house?

11                MS. SOUBLET:    Objection.  Beyond the scope of

12   direct.

13                THE COURT:    Are you asking that in relation

14   with Mr. McGuffin?

15                MS. McCREA:    Well, my next question was going

16   to be Mr. McGuffin was not with her?

17                THE COURT:    Then I'll sustain the objection.

18         Q.    Once Mr. McGuffin left, you didn't see him again

19   that night.  Is that right?

20         A.    I think I'd seen him once at the Fast Gas.

21         Q.    You saw him at Fast Gas after he left your house?

22         A.    I think so.  I think I seen him once there.

23         Q.    All right.  And in terms of you driving around with

24   him, and looking for Leah and driving out to Sinnott's, that

25   would have been — might have been later than midnight?

Steinhoff   X    D5 39

1      A.   I'm not sure.

2      Q.   Okay.  I'm going to show you a transcript of your

3   conversation with Danny Lee and see if this helps you

4   remember.  This is - - -

5            MS. McCREA:    Should be Page No. 6, Counsel.

6      Q.   Take a look at that?

7      A.   This whole page?

8      Q.   Well, just the highlighted part.  Don't mean to make

9   you read all of it.

10     A.   Yes.

11     Q.   Does that refresh your recollection?

12     A.   Yes.

13     Q.   That it may have been later than midnight?

14     A.   Yes.

15     Q.   And then in terms of — as long as I'm up here.  In

16  terms of drinking the night of June 28th, 2000, would you take

17  a look at Page No. 3.  And just take a look at this and see if

18  that refreshes your recollection?

19     A.   Yes.

20     Q.   You were drinking the night of June 28th?

21     A.   I might have been.  I don't really remember,

22  but - - -

23     Q.   But that's what you told Danny Lee on - - -

24     A.   (Interposing) Yeah.

25     Q.   - - - September 12th.  The transcript says I was

Steinhoff   X    D5 40

1    drinking that night, too?

2        A.   (No audible response.)

3        Q.   You're nodding yes?

4        A.   Yes.

5        Q.   I don't mean to give you a hard time, we just have

6    to make sure we get it into the record.

7        A.   Okay, yes.

8        Q.   Now, when you talked to Danny Lee — well, scratch

9    that.

10            Now, when — okay.  When you talked to Danny Lee, you

11   talked to him about there was a time when Nick McGuffin came

12   over to your grandmother's house.  And then Tina Mims came

13   there and Nick started crying and talking to Tina Mims about

14   Leah having disappeared?

15       A.   Yes.

16       Q.   And that was about — I don't know what day September

17   12th, 2000 was, but the day that this occurred, the

18   conversation between Nick and Tina Mims, was the Monday prior.

19   Do you remember that?

20       A.   No.

21       Q.   It was a few days prior?

22       A.   (No audible response.)

23       Q.   And Nick McGuffin was talking to Tina Mims about who

24   Nick thought had killed her?

25       A.   I don't remember.

Steinhoff   X     D5 41

1    Q.    And Ricky Crook was there.  And Ricky wanted to

2    leave.  So, you and Ricky went around the corner and got Nick

3    McGuffin's T-bird and brought it back to your house.  Do you

4    remember that?

5    A.    No.

6    Q.    Now, when you talked to — when you talked to Officer

7    Zavala, you didn't tell him anything about Nick having changed

8    his clothes.  Did you?

9    A.    I don't remember.

10    Q.    Ms. Steinhoff-Ramsey, I'm going to show you — this

11    is Officer Zavala's report from July 10, 2000.  And I want you

12    to take a minute and read through that and see if there's

13    anything in there about Mr. McGuffin changing his clothes.

14          Okay?

15          Does that refresh your recollection?

16    A.    Yeah.

17    Q.    There's nothing in there about you telling him that

18    Nick McGuffin had changed his clothes, was there?

19    A.    No.

20    Q.    Now, I'm going to ask you to take a look at Page

21    No. 10 of the transcript of your interview with Dan Lee and

22    see if that refreshes your recollection about Nick McGuffin

23    coming over when Tina Mims was there.

24          Does that refresh your recollection?

25    A.    A little bit.

Q. Okay. In the sense that the time that Tina Mims was at your house and Nick McGuffin came over to your house when Tina Mims was there, that Nick was talking to Tina Mims about what had happened to Leah, in other words her disappearance?
A. Yes.
Q. And that night Nick McGuffin did not take you in the bathroom and make any threats to you, did he?
A. No.
Q. And in fact, any other time that Tina Mims was there, he didn't make any threats to you?
A. Um — him and Ricky drove me out to Poe Lane.
Q. Okay. He and Ricky drove you out to Poe Lane. And that was the night when Tina Mims was there?
A. Yes.
Q. And she wanted to do Methamphetamine, and you guys didn't want to do meth with her. Is that right?
A. I don't remember.
Q. And so you drove out to Poe Lane to take a little time for her to leave so you could come back and do drugs and not share them with her?
A. No. There was a shotgun in the back seat.
Q. Whose car was it?
A. Nick's.
Q. Okay. There was a shotgun in the back seat. Nick didn't threaten you with the shotgun in any way, did he?

Steinhoff   X     D5 43

1      A.   No.

2      Q.   And you guys went out to Poe Lane.  You sat there

3  for a few minutes.  And then you came back?

4      A.   Yes.

5      Q.   Okay.  And no threats were made to you in any way,

6  shape or form?

7      A.   No.

8      Q.   Okay.  He didn't say anything threatening to you?

9      A.   No.

10     Q.   He didn't take any threatening action towards you?

11     A.   No.

12     Q.   And neither did — who else was in the car?

13     A.   Ricky Crook.

14     Q.   Ricky Crook.  And Ricky Crook didn't either, did he?

15     A.   No.

16     Q.   Okay.  All right.

17          MS. McCREA:   If I could have just a moment,

18  Your Honor.

19          THE COURT:   Yes.

20     Q.   And you've indicated you didn't remember Scott

21  Hamilton being at your house?

22     A.   Yes.

23     Q.   On June 28th.  Wasn't Scott — you were dating Scott

24  Hamilton at that time, weren't you?

25     A.   Yes.

Steinhoff    X    D5 44

1    Q.    And wasn't Scott coming to your house — came a

2  number of times.  And you kept telling him to come back?

3    A.    Yes.

4    Q.    So, you saw him a number of times at the time that —

5  around the time Nick McGuffin was at your house that night?

6    A.    I don't remember how many times I seen him.

7    Q.    But it was more than once?

8    A.    It could've been.

9    Q.    But Scott Hamilton - - -

10    A.    (Interposing) I know that it was at least once.

11    Q.    At least once.  Okay.  So, Scott Hamilton did not go

12  out to Sinnott's to see if there was a party with you and

13  Nick?

14    A.    No.

15    Q.    Did he follow the two of you out there in his own

16  car?

17    A.    Not that I know of.

18    Q.    Okay.  He wouldn't have been invited if he had?

19    A.    No.

20    Q.    And the car that you borrowed from Zack Elderkin,

21  that was a purple Kia?

22    A.    Yes.

23    Q.    And do you know whether — well, let me phrase it

24  this way.  That car was later seized by the police and

25  examined.  Is that right?

Steinhoff   ReD   D5 45

1      A.   Yes.

2      Q.   And it was processed to see if there was any

3   evidence in it?

4      A.   Yes.

5      Q.   And to your knowledge there wasn't any evidence?

6      A.   Yes.

7      Q.   Now, Ms. Steinhoff-Ramsey, during the times that you

8   have had contact with various officers of law enforcement, the

9   District Attorney, and the Grand Juries, you have consistently

10  and always told them that you don't know anything about the

11  disappearance of Leah Freeman.  Is that right?

12     A.   Yes.

13     Q.   And it is true that you don't know anything?

14     A.   Yes.

15     Q.   And you didn't have anything to do with her

16  disappearance?

17     A.   Yes.

18     Q.   Thank you.

19          MS. McCREA:    That's all the questions I have,

20  Your Honor.

21          THE COURT:    Redirect.

22          MS. SOUBLET:    Briefly.

23          Thank you, Your Honor.

24                    REDIRECT EXAMINATION

25  BY MS. SOUBLET:

```
                                     Steinhoff   ReD   D5 46
 1       Q.   Ms. Steinhoff-Ramsey, do you remember telling Tina
 2   Mims to talk to Officer Lee back in 2000?
 3       A.   No.
 4       Q.   Do you remember testifying before the Grand Jury in
 5   2010 that when you went out to Poe Lane you thought you — you
 6   were scared of the Defendant and Ricky Crook?
 7       A.   Yes.
 8       Q.   Do you remember telling the Grand Jurors that you
 9   thought if there hadn't been people at your house you wouldn't
10   have come back?
11       A.   Yes.
12            MS. McCREA:   Excuse me.  I object to all the
13   leading, Your Honor.
14            THE COURT:   Overruled.
15            Go ahead.
16       Q.   That's a yes, you remember making that statement?
17       A.   Yes.
18       Q.   Do you remember doing a handwritten statement last
19   year for the police?
20       A.   No.
21       Q.   Okay.  Look at that and tell me if you recognize the
22   handwriting?  Look at both pages.
23            Are you done looking at it?
24       A.   Yes.
25       Q.   And do you recognize it?
```

                                        Steinhoff   ReD   D5 47

1      A.   Yes.

2      Q.   Whose handwriting is that?

3      A.   It's mine.

4      Q.   What's the date on it?

5      A.   June 27, 2010.

6      Q.   Do you remember making that statement?

7      A.   Yes.

8      Q.   In that statement you indicated the Defendant told

9  you to keep your mouth shut and stop talking to the police?

10     A.   Yes.

11     Q.   Thank you.

12          MS. SOUBLET:   I have nothing further.

13          THE COURT:   You may step down.  And you're

14  excused without objection from further attendance.

15          Call your next witness.

16          MR. FRASIER:   Thank you, Your Honor.

17          We call Tina Mims.

18                      TINA MIMS

19  was thereupon produced as a witness on behalf of the Plaintiff

20  and, having first been duly sworn to tell the truth, the whole

21  truth and nothing but the truth, was examined and testified as

22  follows:

23          THE COURT:   Have a seat up here, please.

24

25

<center>DIRECT EXAMINATION</center>

BY MR. FRASIER:

3    Q.   Could you state your name please, ma'am, and spell

4 your last name for the record?

5    A.   Tina Marie Mims, M-I-M-S.

6    Q.   Where do you live, ma'am?

7    A.   Coos Bay, Oregon.

8    Q.   Have you — are you acquainted with the Coquille

9 Area?

10    A.   I grew up in Coquille.

11    Q.   Are you familiar with the Defendant in this case,

12 Mr. McGuffin?

13    A.   Breifly.

14    Q.   And are you also familiar with an individual named

15 Kristen Steinhoff?

16    A.   I've known her her whole life.

17    Q.   Are you familiar with her family?

18    A.   Yes, sir.

19    Q.   Now, in the year 2000 do you recall where you were

20 living at that time?

21    A.   In Coquille at my grandmother's house.

22    Q.   Where was that?

23    A.   On East Fifth Street.

24    Q.   Now, do you know where Kristen Steinhoff was living

25 in the summer of the year 2000?

Mims    D      D5 49

1      A.    At her grandmother's house, one block from the Tenth

2   Street Market.

3      Q.    When was the first time you met the Defendant in

4   this case?

5      A.    An evening at her home.

6      Q.    And was that during the summer of 2000?

7      A.    Yes, sir, it was.

8      Q.    Do you recall in relation to the disappearance of

9   Leah Freeman, was it before or after?

10      A.    It was after the disappearance of Leah.

11      Q.    Do you know, when you first met her, had the body of

12   Ms. Freeman been found?

13      A.    I do not believe so at that time.

14      Q.    Was Ms. Steinhoff at the house while you were there

15   that evening?

16      A.    Yes, sir.

17      Q.    Could you describe to the jury, please, what

18   happened when the Defendant came over?

19      A.    There was approximately four of us sitting in the

20   living room of Ms. Steinhoff's grandmother's home.  The

21   Defendant entered the home with an elderly gentleman.  And

22   directed Kristen to go to the restroom and speak with him.

23   The other gentleman said nothing.  They went to the restroom.

24      Q.    When you say they, you're referring to?

25      A.    Nick McGuffin and the gentleman that was with him.

Mims    D    D5 50

1    Q.    What happened then?

2    A.    Then I proceeded back shortly after, because I

3    needed to use the restroom.  And I overheard a conversation

4    that wasn't very pleasant.

5    Q.    What did you hear the Defendant say?

6    A.    Basically Kristen was being threatened by Nick;

7    being told that she needed to keep her mouth quiet.  I heard

8    also somewhat of a conversation about — I don't know if it was

9    trunk or a back of a vehicle being cleaned up or cleaned out.

10    Q.    What did you do when you heard this?

11    A.    I opened the door and asked what was going on.

12    Q.    Did you go inside the bathroom?

13    A.    Yes, sir, I did.

14    Q.    What happened after you entered the bathroom?

15    A.    The elderly gentleman exited.  Nick engaged in a

16    conversation with me.

17    Q.    What did the Defendant tell you?

18    A.    He relayed to me that he was not threatening

19    Kristen, that he was Leah Freeman's boyfriend at that time.

20    And actually tried to engage in a calm conversation with me.

21    Q.    Do you recall what he was talking about?

22    A.    Not specifically.  It's been a long time.

23    Q.    And after you had this conversation, what did the

24    Defendant do?

25    A.    He stayed for a short while and then left her

Mims    X     D5 51

1   residence.

2        Q.    Thank you.

3              MR. FRASIER:    That's all the questions I have

4   at this time, Your Honor.

5              THE COURT:    Ms. McCrea.

6                        CROSS EXAMINATION

7   BY MS. MCCREA:

8        Q.    Ms. Mims, you only met Nick McGuffin one time.

9   Right?

10       A.    At that time, yes.

11       Q.    Well, you told the Grand Jury that you know him from

12  basically one meeting approximately ten years ago?

13       A.    Yes, ma'am.

14       Q.    And this was the meeting that you've described here

15  today?

16       A.    Yes, ma'am.

17       Q.    And as a result of what you tell us had occurred,

18  you suggested to Kristen Steinhoff that she should talk to

19  Danny Lee.  Is that right?

20       A.    Yes, ma'am, I did.

21       Q.    And she did that?

22       A.    Yes, ma'am, she did.

23       Q.    Now, you didn't talk to Danny Lee about this, did

24  you?

25       A.    No, ma'am.

Mims   X   D5 52

1    Q.   And after Kristen Steinhoff did a recorded interview

2    with Danny Lee and later you found out that she didn't mention

3    any of what you told us to him, you didn't contact him at that

4    time?

5    A.   No, ma'am, I did not.

6    Q.   And you didn't talk to anybody in law enforcement

7    about what you testified to here today until June 29th of last

8    year?

9    A.   I felt approaching Danny Lee should be sufficient

10   enough.  He was an officer for Coquille Police.  He was

11   supposed to handle the situation.  Obviously, he did not.

12   Q.   Okay, ma'am.  My question was, up until June 29th,

13   2010, you didn't contact or talk to anyone in law enforcement

14   about what you testified to here today?

15   A.   No, ma'am.

16   Q.   No, you didn't.  Is that a confirmation?

17   A.   No.

18   Q.   Sorry?

19   A.   No, ma'am.

20   Q.   Okay.  So, the first time that this information came

21   up was when you talked to Officer Webley on June 28th, 2010?

22   A.   I don't remember the exact date, but yes, it was

23   Officer - - -

24   Q.   (Interposing) So, about a year ago?

25   A.   Yes, ma'am.

```
                                        Mims   X    D5 53
```

1    Q.    Now, you are friends with Kristen Steinhoff's

2    family.  Is that right?

3    A.    Not at this time, but yes, at one time I was.

4    Q.    And you know Leah Freeman's mother Cory?

5    A.    Yes, I do.

6    Q.    And you know Leah Freeman's sister, Denise?

7    A.    Yes, ma'am, I do.

8    Q.    And at the time that you made the observations that

9    you've testified to here today, Ms. Mims, at Kristen

10   Steinhoff's grandmother's house, you and the other people at

11   the house were partying.  Is that a fair statement?

12   A.    Yes, ma'am.

13   Q.    And you had been using Methamphetamine that night?

14   A.    Yes, ma'am.

15   Q.    Had you been using any other drugs?

16   A.    No, ma'am.

17   Q.    Any alcohol?

18   A.    Possibly.  I can't recall.

19   Q.    And at that time you were using on a regular basis,

20   Methamphetamine and alcohol?

21   A.    No, ma'am.  Alcohol was my drug of choice.

22   Q.    All right.  So, Methamphetamine was something that

23   you used occasionally?

24   A.    Yes, ma'am.

25   Q.    And on the night in question you had been using

1    Methamphetamine?

2         A.   Yes, ma'am.

3         Q.   And you didn't make any notes of this conversation

4    after it supposedly happened, did you, Ms. Mims?

5         A.   No, ma'am, I did not.

6         Q.   Thank you.

7              MS. McCREA:    Nothing further, Your Honor.

8              THE COURT:    Redirect.

9                        REDIRECT EXAMINATION

10   BY MR. FRASIER:

11        Q.   Ma'am, Counsel asked you that the first time you

12   told somebody about this was in June of last year.  Why did

13   you wait so long?

14        A.   I came forth to the Coquille Police Department and I

15   put forth an effort to do what was right then.  With no help.

16   I was on felony probation at that time.  Could not get anyone

17   to listen as far as the Coquille Police Department.  Danny Lee

18   was my neighbor.  I spoke with him in confidence and I felt I

19   could confide in him and talk to him and something would come

20   out; something would be done about it.  It didn't happen.  I

21   didn't feel that at that time there were other officers on the

22   police force that I could confide in them and trust them.  And

23   that's my honest opinion.

24              I don't know why I never said anything after all the

25   years since this.  I have no idea why.  I do not have an

```
                                        Hamilton   D     D5 55
```

1  answer for that.  For that I am ashamed.  But, then I tried to

2  do that right thing and no one would listen.

3      Q.   Thank you.

4           MR. FRASIER:    That's all I have, Your Honor.

5           THE COURT:    You may step down and you're free

6  to leave.

7           Call your next witness.

8           MR. FRASIER:    Call Scott Hamilton.

9                     SCOTT HAMILTON

10  was thereupon produced as a witness on behalf of the Plaintiff

11  and, having first been duly sworn to tell the truth, the whole

12  truth and nothing but the truth, was examined and testified as

13  follows:

14           THE COURT:    Have a seat up here, please.

15                  DIRECT EXAMINATION

16  BY MR. FRASIER:

17      Q.   Could you state your name please, sir, and spell

18  your last name for the record?

19      A.   My name is Dennis Scott Hamilton.  And, it's

20  H-A-M-I-L-T-O-N.

21      Q.   Where do you live, sir?

22      A.   I live in Myrtle Point, Oregon now.

23      Q.   You lived in Coquille?

24      A.   Yes, I have.

25      Q.   Did you go to Coquille High School?

```
                                         Hamilton   D     D5 56
 1       A.   Yes, I did.

 2       Q.   What year did you graduate?

 3       A.   2000.

 4       Q.   What do you do for work?

 5       A.   I'm a construction worker.

 6       Q.   Did you come from the job today?

 7       A.   More or less.

 8       Q.   Are you familiar with the Defendant in this case,

 9   Mr. McGuffin?

10       A.   Yes, I am.

11       Q.   How do you know him?

12       A.   We've known each other for a long time.

13       Q.   When you say a long time, can you give us an idea?

14       A.   Since the third grade.

15       Q.   Were you familiar with somebody by the name of Leah

16   Freeman?

17       A.   Yes, I was.

18       Q.   How did you know Ms. Freeman?

19       A.   I knew Leah through Nick.

20       Q.   When you say you knew Leah through Nick, what do you

21   mean by that?

22       A.   When Leah and Nick dated, then Nick was my friend of

23   course through school, that's how I met her.

24       Q.   Were you and Mr. McGuffin, the Defendant, in the

25   same grade?
```

Hamilton    D      D5 57

1      A.   Yes, we were.

2      Q.   Graduated at the same time?

3      A.   Yes, we did.

4      Q.   And your senior year, did you go to the prom?

5      A.   Yes, I did.

6      Q.   And who'd you go to the prom with?

7      A.   I went with Melissa Smith.

8      Q.   Was it a double date?

9      A.   Yes.

10     Q.   And who was else?

11     A.   Nick and Leah went with us.

12     Q.   Now, how long did you date Melissa Smith?

13     A.   Two and a half, three years I think.

14     Q.   Do you recall when you broke up?

15     A.   Yeah, it was the later part of my senior year or

16   right out of school.

17     Q.   Why was that?

18     A.   Oh, because I was a bad kid back then.  And I

19   thought it was a good idea to be able to cheat on her.

20     Q.   Who were you cheating with?

21     A.   Kristen Steinhoff.

22     Q.   Now, I want to direct your attention, sir, to the

23   evening — late evening — of June 28th, 2000 or early morning

24   hours of June 29th, 2000.  This is the night Leah Freeman

25   disappeared.  Do you recall that evening?

```
                                     Hamilton   D     D5 58
```

 1      A.   Yeah.

 2      Q.   And do you recall being at Kristen Steinhoff's

 3  Residence?

 4      A.   Yes, I do.

 5      Q.   Do you recall roughly what time it was while you

 6  were there?

 7      A.   Nine thirty, ten.

 8      Q.   Did you go by that house several times?

 9      A.   I used to go over there quite often during that

10  period of time, yes.

11      Q.   When you went over to see Ms. Steinhoff, how would

12  you go into the house?

13      A.   I'd go through her bedroom window.

14      Q.   Why would you go through the bedroom window?

15      A.   It was just the way I went.

16      Q.   Were you afraid of getting caught there?

17      A.   Probably.

18      Q.   When you were at Ms. Steinhoff's Residence, did you

19  see the Defendant there?

20      A.   Yeah.

21      Q.   And again, do you recall roughly what time this was?

22      A.   I'd say it was around nine thirty, ten — nine to

23  ten.

24      Q.   Where were you?

25      A.   I was at her back window to her bedroom.

```
                                      Hamilton   D    D5 59
```

1      Q.   Did you hear anything?

2      A.   Yeah, I heard — they were in there talking.

3      Q.   Did you hear the Defendant say anything?

4      A.   Yes, I did.

5      Q.   What did the Defendant say?

6      A.   The only thing I heard him say was that he didn't

7   know what to do and he needed help.

8      Q.   Now, did you see the Defendant and Ms. Steinhoff

9   leave?

10     A.   I watched them leave her room, but I didn't leave

11   until after they left.

12     Q.   Was there a time that you ran out of the bushes and

13   asked what was going on?

14     A.   I don't remember asking what was going on that

15   evening, no.  Later on I asked.

16     Q.   Okay.  Now, about a week after Ms. Freeman

17   disappeared, did you go for a ride with the Defendant?

18     A.   Yes.

19     Q.   Where did you go?

20     A.   He drove us out Fairview, out to Lee Valley Road.

21     Q.   What happened — when you say we, who was there?

22     A.   Just Nick and I.

23     Q.   And you said you went to Lee Valley Road?

24     A.   Yes.

25     Q.   And did you stop anywhere?

```
                                  Hamilton   D    D5 60
```

1    A.    Yeah, we stopped a little ways past the big gravel

2    pit down there.

3    Q.    When you say past the gravel pit, you're coming from

4    Fairview Road?

5    A.    Yeah, coming from Fairview turning onto Lee Valley.

6    Q.    Right.

7    A.    And the gravel pit's on your left.  And it was just

8    maybe fifty yards past that.

9    Q.    And you stopped?

10   A.    Yeah.

11   Q.    Did you get out of the car?

12   A.    Yes, we did.

13   Q.    What happened when you got out of the car?

14   A.    Nick kept looking down over the bank and talking

15   about how, it's like he could see her laying down there by

16   some rock or stump.

17   Q.    Did you see anything?

18   A.    I seen a rock or a stump down there, but other than

19   bushes and sticks, no.

20   Q.    Now, did you talk with the Defendant about what had

21   happened the night that Ms. Freeman had disappeared?

22   A.    We talked a little bit about it, but you could never

23   get a whole lot out of Nick about it.

24   Q.    To the best of your recollection, what has the

25   Defendant told you about the night that Leah Freeman

Exhibit 102  Page 667 of 1666 to
State Defendants' Motion for Summary Judgment

Hamilton   D     D5 61

1   disappeared?

2       A.   That she was supposed to be going to a friend's

3   house.  And I think they may have gotten in an argument over

4   it and what not.  And at some point or another that they met

5   up again in a store.  Nick found her.  And they were arguing.

6   And she got out of the car somewhere around McKay's.  Nick

7   said he drove around the loop and went back to go find her,

8   but never could find her.

9       Q.   Now, he told you that he picked her up and then

10  dropped her at McKay's?

11      A.   Yes.

12      Q.   Now, when was the first time you told the police

13  about that?

14      A.   Just this new stuff here.

15      Q.   When the case was reopened?

16      A.   Yeah.

17      Q.   And you told Officer Webley or Officer McNeely that?

18      A.   Yes, I did.

19      Q.   Now, I brought you to the Grand Jury last year.  Do

20  you recall that?

21      A.   Yes, I do.

22      Q.   And I asked you about that, didn't I?

23      A.   Uh huh.

24      Q.   And what — and you didn't remember — you didn't tell

25  the Grand Jury about Nick telling you this, did you?

```
                                     Hamilton   D    D5 62
 1      A.   No.

 2      Q.   Why didn't you tell the Grand Jury?

 3      A.   I was nervous and I just didn't think about it I

 4   suppose.  I mean, this is kind of big thing and I got kind of

 5   nervous about it all.  So, it just didn't cross my mind at the

 6   time.

 7      Q.   When the police brought you to see me?

 8      A.   Yes.

 9      Q.   I played for you your Grand Jury testimony?

10      A.   Yes, you did.

11      Q.   Do you recall that?

12      A.   Yeah, I recall that.

13      Q.   What did you tell the officers and me when I played

14   that for you?

15      A.   That I was shocked of what I said because it didn't

16   even make any sense to me.

17      Q.   Why was that?

18      A.   Because it's not what I remember.

19      Q.   And you remember Mr. McGuffin telling you that he

20   had picked up Leah and dropped her at McKay's?

21      A.   Yes, I do.

22      Q.   Is there any doubt in your mind on that?

23      A.   No.

24      Q.   Have you had any trouble with the law in the last

25   few years?
```

Hamilton   X    D5 63

1    A.   Other than driving.  That's my big downfall.

2    Q.   Driving while suspended?

3    A.   That and tickets.  I was kind of a rebel with no

4  cause.

5    Q.   All right.

6         Thank you.

7              MR. FRASIER:    That's all the questions I

8  have.

9                    CROSS EXAMINATION

10 BY MR. MCCREA:

11   Q.   Mr. Hamilton, you and — you and your — when she was

12 your girlfriend, Melissa Smith, did things with Mr. McGuffin

13 and Ms. Freeman a number of times.  Is that correct?

14   A.   No.

15   Q.   No?

16   A.   We went to prom together.

17   Q.   Well, you went swimming together the day before she

18 disappeared, didn't you?

19   A.   No.  Not to my knowledge.  I do not remember that.

20   Q.   Mr. Hamilton, do you have some memory difficulties?

21   A.   No.  I have a good memory, actually.

22   Q.   Do you have comprehension difficulties?

23   A.   No.

24   Q.   Understanding difficulties?

25   A.   No.

```
                                    Hamilton   X     D5 64
 1      Q.   Did the four of you go out to what's known as
 2   Letterman's Pool out by Powers and spend the whole day and
 3   have a really good time?
 4      A.   No, not to my knowledge, no.  I do not remember that
 5   at all.
 6      Q.   Well, altogether — maybe this isn't altogether, but
 7   you've talked — you talked to Officer Main in 2000.  Right?
 8      A.   Yeah, if that's his name.
 9      Q.   Pardon?
10      A.   I don't — it's hard to remember a lot of the
11   officers names back then, but yeah.
12      Q.   Okay.  Well, you talked to Officer Main in 2000,
13   Detective Oester in 2000, Detective Perske in 2000, Detective
14   Oester again in September of 2000, and then you — let's see
15   here — talked to the Officers Weber and McNeely in January of
16   2010?  Went to the Grand Jury in August of 2010.  Does that
17   all sound correct?
18      A.   Yes.  That sounds right.
19      Q.   And then Weber and McNeely got you back again in
20   April of '11.  Does that sound like the times you talked to
21   the police?
22      A.   Yes, it does.
23           MR. FRASIER:   Your Honor, just so the
24   record's clear, it's Officer Webley, not Weber.
25           THE COURT:   Okay.
```

```
                                        Hamilton   X    D5 65

 1              MR. McCREA:    Sorry.  What is it?

 2              MR. FRASIER:    Webley.

 3              THE COURT:    Webley, all right.  Webley.

 4       Q.   Now, let's start out.  You did have some occasion to

 5  see what the relationship was like between the Defendant and

 6  Ms. Freeman.  Correct?

 7       A.   Yes.  We all went to school together.

 8       Q.   Pardon?

 9       A.   Yes.  We all went to school together.

10       Q.   Okay.  And it was your testimony in the Grand Jury

11  they got along pretty well?

12       A.   For the most part, but they'd argue just like

13  anybody else.

14       Q.   Okay.  And in terms of what you've testified here,

15  you've testified here that you broke up with Ms. Smith because

16  you were cheating on her with Kristen Steinhoff.  Right?

17       A.   Yes.

18       Q.   And you were going over there and having sex with

19  her?

20       A.   Yes, I was.

21       Q.   And what happened was, you picked up a disease from

22  her and infected Ms. Smith.  Right?

23       A.   Yeah.

24       Q.   And she confronted you about that?

25       A.   Yes, she did.
```

Hamilton    X    D5 66

1    Q.    And she dropped you because of having done that?

2    A.    She — we broke up because I cheated on her, yes.

3   That was after the fact.

4    Q.    So then at that point your girlfriend was Kristen

5   Steinhoff?

6    A.    Yeah.

7    Q.    And so you went over there then the night of the 28th

8   and Nick McGuffin was there?

9    A.    Yes, he was.

10    Q.    So, now you'd lost Ms. Smith as your girlfriend and

11   your girlfriend is Steinhoff, but Nick McGuffin's over there.

12   Does that bother you?

13    A.    No.

14    Q.    So, it's your testimony that you sneaked up to the

15   back bedroom window.  Right?

16    A.    Yes.

17    Q.    Okay.  And that was your — that was the way you and

18   — you did your visiting with Ms. Steinhoff, was you'd go in

19   the back bedroom window?

20    A.    Yes, I would.

21    Q.    And you sneaked up there because — it's your

22   testimony — because you saw Mr. — is it your testimony —

23   because you saw Mr. McGuffin's Mustang was parked out there?

24    A.    Yeah.  I seen his car parked out there.

25    Q.    Okay.  But you didn't let them know you were there?

Hamilton   X    D5 67

1    A.   No.  Because I always walk up to the window like I

2    did every time.

3    Q.   Well, but you didn't say, "Hey, you guys I'm here at

4    the back window?"

5    A.   Well, no.

6    Q.   Did you do anything to attract their attention?

7    A.   No, I didn't.

8    Q.   Did you have any contact with them whatsoever?

9    A.   That evening, no.

10   Q.   Pardon?

11   A.   That evening, no.

12   Q.   Okay.  This is the evening of the 28th?

13   A.   Yes.

14   Q.   Now — and then they went off together in the

15   Mustang?

16   A.   Yes.

17   Q.   On July 1oth you were contacted by an officer.  And

18   at that time you said that you'd been at Kristen Steinhoff's

19   house until after midnight; that you had shown up at Kristen

20   Steinhoff's between nine and ten — no.  Excuse me.  Until

21   after midnight.  And that Nick has shown up at Kristen

22   Steinhoff's between nine and ten and he was in the Mustang.

23   And you told that officer that was pissed off and acted

24   confused.  And Nick told Hamilton and Steinhoff that he had

25   been late to pickup Leah at Sherry's.  He was supposed to pick

Hamilton   X    D5 68

1   her up at nine p.m. and he got there at nine o-five p.m.  Nick

2   told them he looked for her but couldn't find her.

3            And Hamilton said that Nick had told him of rumors

4   in Port Orford that - - -

5                    MR. FRASIER:   (Interposing) Objection.  Your

6   Honor, is there a question here?  I mean, he's reading a

7   report.

8                    MR. McCREA:   I'm going to ask him if - - -

9                    MR. FRASIER:   If this is to refresh his

10  memory, show it to him.

11                   MR. McCREA:   I'm not trying to refresh his

12  memory, I'm doing impeachment as they do it.

13                   THE COURT:   Well, I'm not too sure that's

14  impeachment that you're asking, because he's here, yeah.  I

15  mean, I guess you can ask him if he said that.  I don't have a

16  problem with you asking him a question after you read that.

17  I'm not too sure you're impeaching him right now.  So - - -

18                   Mr. Frasier, he can ask the question and read

19  that.

20                   Ladies and Gentlemen, I want to make it clear

21  to you, when somebody asks a question and somebody says they

22  don't remember it, that's — you can't take the question as a

23  fact.  But whether he — whether they ask it or the State asks

24  it.  The question is the question.  The answer is what's

25  important in relation to the question.

```
                                    Hamilton   X     D5 69

 1              So, go ahead and ask your question.  I don't
 2      have a problem with you reading it and asking him a question
 3      about it.
 4              MR. McCREA:    Thank you.
 5         Q.   Let's break it into — into two parts.
 6              Did you hear what — what I had read to you from the
 7      report so far, Mr. Hamilton?
 8         A.   Yeah.
 9         Q.   And isn't that what you said to Officer Main on the
10      10ᵗʰ of July, 2000?
11         A.   No, I don't believe so.  Because I don't remember
12      talking to Nick or Kristen either that night.  So, that — Port
13      Orford and all that, that is nothing to my memory.
14         Q.   All right.  The second part is, didn't you go on to
15      tell Officer Main that Nick had told you of rumors in Port
16      Orford that Leah was seen with an unknown girlfriend going to
17      California?  And that you also mentioned an argument that the
18      two had at Letterman's Rock?  "They were fighting, but mostly
19      yelling at each other three weeks ago."  Then stated this
20      happened about a week before her disappearance you thought.
21         A.   I don't remember any of that.  I don't remember
22      nothing about Port Orford, California.  And we didn't go
23      swimming with them at Letterman's.  So - - -
24         Q.   (Interposing) Are you denying that you said these
25      things?
```

Exhibit 102  Page 676 of 1666 to
State Defendants' Motion for Summary Judgment

```
                                        Hamilton   X    D5 70
```

1    A.   I'm denying that I said those, because I didn't say

2   those to my memory.

3    Q.   This doesn't refresh your memory at all?

4    A.   No, it doesn't ring no bells.

5    Q.   On — then did you have contact with another — with

6   an officer — let me back up and be sure I get something pinned

7   down.

8         Do you even remember having contact with an officer

9   in July of 2000?

10    A.   Yeah.  I remember them talking to me, yeah.  They

11   took swabs — they took saliva samples from me and everything

12   because somebody said I did it.

13    Q.   Excuse me?

14    A.   They took saliva samples from me and everything back

15   in 2000.

16    Q.   The point is that you do remember you were contacted

17   by the police and you gave them a statement in 2000, July?

18    A.   Yes.  And I told them the same thing that I told

19   them when they reopened this.

20    Q.   In other words you're saying that you told them in

21   July the same thing that you told them in January?

22    A.   Other than Nick taking me out Lee Valley Road, yes.

23    Q.   In dealing with that, this matter of going out to

24   Lee Valley Road, that was — that was about a week after the

25   body was found.  Right?

Hamilton   X     D5 71

1    A.   Somewhere around that time.  I couldn't remember for

2  sure.

3    Q.   Okay.  But the body had been found?

4    A.   I'm not sure.  I can't remember.  It's ten years

5  ago.

6    Q.   All right.  Anyway, police had contact with you in

7  August of 2000.  Isn't that correct also?

8    A.   When?

9    Q.   August of 2000?

10    A.   I think they only talked to me the one time.

11    Q.   Well, didn't an Officer — Detective Oester contact

12  you and you told him that your girlfriend was Kristen

13  Steinhoff.  And your ex-girlfriend was Melissa Smith.  And on

14  June 28th you were at Melissa's until about eight o'clock.  And

15  then you went home.  And at nine to nine thirty you went over

16  to Kristen Steinhoff's house and Nick was there sitting in his

17  Mustang.  And Kristen was on the porch.

18         And Nick asked him if he had seen Leah.  And he told

19  Nick that he had not seen Leah.  And Nick said that he saw

20  Leah and she was with another guy, to beat the hell out of the

21  guy and take Leah home.  In his opinion Nick seemed genuinely

22  concerned.  Isn't that what you told Oester as to what had

23  happened?

24         MR. FRASIER:   For the record, Your Honor,

25  it's Detective Ester (phonetic), not Oster (phonetic).

```
                                      Hamilton   X    D5 72
 1              THE COURT:    Okay.
 2              MR. McCREA:    I'm sorry.  Auster (phonetic)?
 3      A.   I can't say I remember.  I can't remember saying
 4   that.
 5      Q.   Pardon?
 6      A.   I can't remember that.
 7      Q.   Let me get it clear again.  And, are you saying it
 8   didn't happen or just you don't have any memory of it?
 9      A.   I don't remember what you just read, no.
10      Q.   Did it happen?
11      A.   Who's to know?  I don't remember.
12      Q.   Okay.  Did you go on to tell him that Nick and
13   Kristen were going to put gas in a purple Kia.  So he waited
14   at Kristen's house.  They left about ten thirty and were gone
15   about fifteen to twenty minutes before they came back.  When
16   they got back they said they had gone to Sinnott's — that
17   would be the doctor's place — to see if Leah was there.  But
18   she wasn't.  Did you make that statement?
19      A.   I don't remember saying anything about that.
20      Q.   Did you go on to say, in that same conversation,
21   that Nick left Kristen's at midnight, possibly a little after.
22   You stayed another fifteen to twenty minutes before Kristen
23   left to take the purple Kia back to the guy that owned it near
24   Green Acres.  Then you left and went home and got home about
25   ten o'clcok.  Did you make that statement to the detectives?
```

Exhibit 102  Page 679 of 1666 to
State Defendants' Motion for Summary Judgment

Hamilton   X    D5 73

1       A.   Not that I remember.  No, I don't - - -

2       Q.   Detective Oester as I've been corrected?

3       A.   But that's what I'm saying, this is ten years ago.

4  It's hard to remember some of it.  I remember the stuff that's

5  stuck in mind that seemed funny.  But other than that, I don't

6  remember all that other stuff.

7       Q.   All right.  Did you make this statement at that same

8  conversation?  Excuse me.

9       A.   Well, if it's the same conversation I'm pretty sure

10  I probably won't remember it.

11       Q.   The same conversation with Detective Oester.

12                  "On the night of June 28th he never saw

13              Nick and Kristen Steinhoff in her bedroom.

14              When he got to Kristen's that night he turned

15              down his CD player when he pulled in and saw

16              that it was nine and Nick was there just

17              getting out of his car and walking up to the

18              door.  It wasn't dark yet but it was close

19              enough that he had his headlights on.  Nick was

20              very calm and didn't act like anything was

21              happening."

22          Did you make that statement to Detective Oester?

23       A.   I don't remember hardly talking to the detectives

24  back then, years ago.

25       Q.   Speaking of your headlights, you had round

```
                                    Hamilton   X     D5 74
 1  headlights on your car?

 2       A.   Indeed.

 3       Q.   Also in August, you had — did you have contact with

 4  another officer, Perske who interviewed you?

 5       A.   I don't remember the name.

 6       Q.   Well, you got interviewed by another officer on — in

 7  August, right?

 8       A.   Of 2000?

 9       Q.   Correct.

10       A.   I got talked to once by the detectives to my memory.

11       Q.   Well, didn't you get talked to another time and said

12  — you said the following?  You said that you were McGuffin's

13  best friend and that you knew Leah well.  And the day before

14  Freeman came up missing — in other words 6/27/2000 — Hamilton,

15  Nick McGuffin, Freeman and Melissa Smith, Hamilton's

16  girlfriend at the time, all went swimming out at the

17  Letterman's Hole by Powers?

18       A.   No, I wouldn't have said that because it never

19  happened.

20       Q.   Never happened?

21       A.   It never happened.

22       Q.              "They were there until around five or five

23                  thirty and McGuffin dropped him back off at

24                  Smith's house?  Hamilton went home and then

25                  drove over to Kristen Steinhoff's who was
```

Hamilton   X     D5 75

1          sleeping."

2          You didn't make that statement?

3     A.   Not to my memory, no.

4     Q.        "Hamilton said he went back home and

5               worked on his car and watched some TV until

6               eight thirty or nine when he went back to

7               Steinhoff's."

8          Did you say that?

9     A.   Again, no, not to my memory, no.

10    Q.        "When Hamilton got there McGuffin was

11              already there talking to Kristen.  Kristen and

12              McGuffin left in her Kia and got gas,

13              supposedly at the Fast Gas in Coquille and were

14              back in about twenty minutes.  When they got

15              back McGuffin told Hamilton that they had

16              gotten the gas and then went by a party at —

17              quote — "doc's" — end quotes, house looking for

18              Leah.  And then returned to Steinhoff's."

19              "Hamilton said that this was getting

20              around dusk, but was not really sure of the

21              exact time."

22         Did you make that statement?

23    A.   No.  And you already read all this to me.

24    Q.   Pardon?

25    A.   You already asked me these questions.  I can only

Hamilton   X   D5 76

1   say no so many times.

2        Q.   "Hamilton said . . ."  Excuse me.

3        A.   I can only say no so many time, sir.

4        Q.   Pardon?

5        A.   I can only say no so many times, sir.  You're asking

6   me the same questions.

7        Q.   Well, these are different statements.

8        A.   Well, if I don't remember it, I don't remember it.

9        Q.   Well that's what we wanted to know is how good your

10  memory is, among other things.

11             MR. FRASIER:   Your Honor, I'm going to object

12  to the commentary.

13             THE COURT:   Sustained.

14             MR. McCREA:   I withdraw it, Your Honor.

15             THE COURT:   All right.

16             MR. McCREA:   Withdraw it.

17             THE COURT:   Okay.  Don't do it, please.

18             MR. McCREA:   Apologize to the Court.

19             THE COURT:   All right.

20        Q.        "Hamilton said they sat around and talked

21             for a few minutes and McGuffin then left.

22             Hamilton said he stayed there for another

23             fifteen or twenty minutes before going home.

24             Hamilton thought that he got home about one

25             a.m."

```
                                        Hamilton   X     D5 77
```

1        Did you make that statement?

2    A.   Again, no.

3    Q.   In September of 2000, you talked to a police

4  officer.  This would be Detective Oester again.  Do you

5  remember that?

6    A.   No.

7    Q.   Didn't you at that time indicate that about a week

8  after Leah's body was found that you were going to Chris — I

9  guess it's Miller or Mueller's — place above Fairview with

10  Nick McGuffin.  It was about eight p.m. in the evening.  And

11  Nick asked him if he wanted to see where Leah's body had been

12  found?

13    A.   I have no memory of that.

14    Q.   Well, when you went out there to see where Leah's

15  body had been found, that was the time that you were on your

16  way out to Chris's place, were you not?

17    A.   I don't remember stopping by Chris's place because

18  Nick just drove out to Lee Valley Road.  And then I wanted to

19  go back to town after awhile.  We never went out there.

20    Q.   Okay.  But you had been going to go to Chris's

21  place?

22    A.   I don't remember anything about going out to Chris's

23  place, no.

24    Q.   All right.  Anyway, did you make the statement as I

25  just read to you?

```
                                        Hamilton   X    D5 78
 1      A.   No, I - - -

 2      Q.   (Interposing) Did you make that statement?

 3      A.   - - - couldn't have, because I don't remember going

 4  out to Chris's house or anything.

 5      Q.   Well, let me ask you if you made the statement that

 6  you went out there about a week after Leah's body was found?

 7      A.   Nick took me out to the Lee Valley Road sometime

 8  around that time, but - - -

 9      Q.   (Interposing) Okay.  Actually, there were markers

10  out there, weren't there?

11      A.   No.

12      Q.   There was a cross and some flowers?

13      A.   I don't remember seeing any markers or anything.

14      Q.   Well, all right.

15           Going on with the statement in conversation:

16                "Hamilton stated that he told Nick that he

17                didn't, but as they were driving to Fairview,

18                Nick turned onto Lee Valley Road and drove out

19                past the rock pit.  Nick was looking to the

20                left, driving slow and pointed out where the

21                grass was mashed down.  He said, 'That's where

22                her body was found.'"

23                "Nick drove about twenty feet past this

24                spot and stopped the car and then got out.  And

25                Nick walked back to where the grass was mashed
```

```
                                          Hamilton   X    D5 79
```

 1                  down and went down over the river bank toward

 2                  the river."

 3      A.   He looked down over the hill and was talking about

 4  that spot that I was talking about.

 5      Q.   Okay.  All right.

 6           And so — and then Nick pointed out to you the spot

 7  where Leah had been found?

 8      A.   He just said it looks like he could see her laying

 9  down there.  That's all he said.

10      Q.   Well, all right.  He said - - -

11           Well, actually, what you told — didn't you make the

12  statement to Detective Oester there in September, you said:

13                  "You were really uncomfortable at this

14                  point and wanted to leave.  But Nick came back

15                  up the bank.  And he had a picture of Leah in

16                  his hand.  And he was crying and looking at the

17                  picture.  And then walked up to him . . ."

18                  That's you.

19                  ". . . and hugged him.  And Nick was

20                  saying that he could picture Leah lying down

21                  there with her head on a rock."

22           Did you make that statement?

23      A.   I may have made a statement similar to that.  But I

24  don't remember giving him a hug or nothing.  I told him it

25  would be all right, because I was still trying to be there for

```
                                      Hamilton   X     D5 80
 1   him.

 2        Q.   And you'd try to be there for him?

 3        A.   I tried to be there for him.

 4        Q.   Okay.  So, the hugging would have been consistent

 5   with that.  Right?

 6        A.   Yeah, I don't remember hugging him, though.

 7        Q.   And so then you started walking together.  And you

 8   walked back to the car.  And then you got in the car and drove

 9   on to Chris's.  Isn't that what you said?

10        A.   No.  We went back to town after we left there.

11        Q.   Well, in any event, in any of the statement you made

12   to the police in 2000, you never indicated that Mr. McGuffin

13   said that after he had gone by Sherry's to pick up

14   Ms. Freeman, to pick up Leah, that he found her and picked her

15   up and then they argued and he dropped her off at McKay's.

16   you never told any officers that back in 2000.  Isn't that

17   correct?

18        A.   Correct.  And the reason because is Nick didn't say

19   anything to me about it until I was fixing his Stratus.

20        Q.   All right.  But, let's get this pinned down.  You

21   never said anything about it to any police officers until

22   January of 2010.  Correct?

23        A.   When they reopened the case, yes.

24        Q.   Okay.

25             Now, you're saying something to the effect that he
```

Hamilton   X    D5 81

1    didn't say anything about it until you asked him about it?

2        A.   More or less.

3        Q.   When and where did you ask him about it?

4        A.   At his house — his mom and dad's house — when I was

5    fixing his car.

6        Q.   Pardon?

7        A.   At his mom and dad's house when I was fixing his

8    car.

9        Q.   When you were fixing his car?

10       A.   Yeah, his '95 Dodge Stratus.  The tranny went out.

11   I replaced it for him.

12       Q.   Didn't you say at Grand Jury that you'd never helped

13   him work on his car?

14       A.   On his Mustang, yes.

15       Q.   On his Mustang yes what?

16       A.   I've never worked on his Mustang.

17       Q.   I see.  All right.  Let's - - -

18            So, you asked him at the house, but when?  What year

19   was this?

20       A.   It was probably four or five years ago.  Four years

21   ago.  I don't know what time it was.  I don't keep track of

22   when I work on people's cars.

23       Q.   Well, it was a lot of years ago if you asked him

24   this supposedly, right?

25       A.   Three, three and a half, four years ago.  That's

Hamilton   X     D5 82

1   about what it was, yeah.

2        Q.   In any event, the first time you told the — any

3   police — about it, that would have been Officer Webley.

4             MR. McCREA:    Did I get it right?

5             MS. SOUBLET:    Yes.

6        Q.   Webely and Officer Meneely — McNeely?

7        A.   Yes.  That's when I first got brought back up.

8        Q.   Okay.  So, you talked to them in January of 2010?

9        A.   Yeah.

10        Q.   And at that time isn't that also the first time that

11   you — that you told this narrative about going over to

12   Steinhoff's house and you were going to go in through the

13   bedroom window.  And that instead you saw Nick's Mustang.  And

14   then you stopped and listened at the window and heard this

15   whispered conversation.  Right?

16        A.   No.  I told them ten years ago about that.

17        Q.   You told them ten years ago?

18        A.   When they first — when this all happened.  I told

19   them that I came up to the window and all that.  I told them

20   all about that.

21        Q.   You told them just that way, not what I read you,

22   but what - - -

23        A.   (Interposing) To my knowledge, yes.  That's what I

24   said to them.

25        Q.   All right.

Hamilton   X    D5 83

1          And at that time, in January, didn't you also tell

2     them that two weeks prior to the body being found you recalled

3     Mr. McGuffin saying that Bill Sero, S-E-R-O, was responsible

4     for her disappearance?

5          A.   I remember Nick saying something about Bill, yeah.

6          Q.   But, what I want to know is, you told the officer

7     that in January?

8          A.   That Nick had said something about Bill doing it,

9     yeah.

10         Q.   Okay.  And you said that it seemed like he was just

11    throwing it out there because everyone was looking at him?

12         A.   It kinda seemed that way, yeah.

13         Q.   Yeah, okay.

14         Now, Mr. — well, you indicated that you were asked

15    the question and indicated that you talked to Mr. McGuffin

16    about the — what had happened.  And you've indicated that what

17    he told you is this thing about picking her up and dropping

18    her at McKay's.  Actually, after the conversation at the —

19    with the police in January they wanted you to try to get

20    Mr. McGuffin to admit that to you, didn't they?

21         A.   In 2010?

22         Q.   Pardon?

23         A.   2010?

24         Q.   No — in 2010, yes.

25         A.   They wanted — repeat your question.

1    Q.    They wanted you to try to get Mr. McGuffin to admit

2    that he had told you that he picked Ms. Freeman up after

3    Sherry Mitchell's and then dropped her off at McKay's.  Right?

4    A.    They — I don't remember them wanting me to get him

5    to admit anything, but yeah I did call him.  Make a phone

6    call.

7    Q.    Well, they didn't want you to get him to admit

8    anything, huh?

9    A.    I don't remember what.  I remember calling him to

10   see what he would say.  They wanted him to say something, but

11   the only thing they said is, told me to tell them not to tell

12   them about him taking me out there.

13   Q.    Well, then he said — as a matter of fact, you then

14   also said — if you'll pardon the words — "Fuck it.  Go ahead

15   and tell them whatever you want to."  Isn't that what he said?

16   A.    He said that.  Then I asked him about him taking me

17   out there.  And he told me not to tell them about that.

18   Q.    But that's when he said, well, you can go ahead and

19   tell them whatever you want.  But, let's - - -

20   A.    (Interposing) Let's bounce around.

21   Q.    But, well okay we'll deal with that to some extent.

22            MR. FRASIER:    Just so we're clear, with this

23   line of questioning I take it, the Defense is waiving any

24   objection to that action?

25            THE COURT:    To?

Hamilton   X     D5 85

1          MR. FRASIER:   Well, Your Honor, that this was

2     a situation where a pretext phone call was attempted.

3          THE COURT:   I understand.

4          MR. FRASIER:   I just want to make - - -

5          THE COURT:   (Interposing) I'm not too sure

6     about what you said whether it waives or not, but he's going

7     into it, so you can go into it, obviously.

8          MR. FRASIER:   All right.

9     Q.   Well, as a matter of fact, they coached you before

10    this phone call, didn't they?

11    A.   No.

12    Q.   Pardon?

13    A.   No.

14    Q.   Didn't coach you?

15    A.   There was no coaching.

16    Q.   They didn't indicate to you what they wanted you to

17    ask him and what they wanted you to try to get him to say?

18    A.   They didn't say anything about trying to get him to

19    say anything.  They just wanted me to call and ask him and

20    tell him, "Hey, what do you want me to do?"

21    Q.   All right.  So, you called him?

22    A.   Yep.

23    Q.   And, when you called him, one of the first things

24    you told him was you're going to talk to the detectives, be

25    talking to them tomorrow?

```
                                    Hamilton   X      D5 86
 1      A.   Yeah.

 2      Q.   And he said, "Um, you can say really whatever you

 3   want.  I mean, as far as that part I mean."

 4           Didn't he say that?

 5      A.   He did say that.  But then I said, "Well, do you

 6   want me to tell them, what about you taking me out there?"

 7           And Nick's like, "Oh, I kind of forgot about that.

 8   Well, if you would, don't tell them about that."

 9      Q.   Well, he was embarrassed about that, wasn't he?

10      A.   I don't know - - -

11           MR. FRASIER:    (Interposing) I'll object to

12   the question.  I don't know how the witness can say he was

13   embarrassed.

14           THE COURT:    Sustained.

15      Q.   In any event — okay, but let's deal with this

16   conversation about — at McKay's.  You said — let's see here —

17   in the conversation - - -

18           You asked him this, you said, "Well, about when,

19   when you were telling me about you know, the night when all

20   that shit happened, that you and Leah got in a fight and you

21   dropped her off at McKay's or what not.  Do you remember — you

22   remember telling me that, right?"

23           And Mr. McGuffin said, "No.  Because I dropped her

24   off at Sherry's."

25           Isn't that what he said?
```

```
                                        Hamilton   X    D5 87
```

1      A.   No.  I don't think he said that.

2      Q.   You don't think he said that?

3      A.   No.  That's when he just kinda said, "Tell them

4  whatever you want."  And then I asked him about him taking me

5  out there.

6      Q.   No.  I'm talking about dropping her off at McKay's.

7  Did you hear what I just read you?

8      A.   Yes.  I'm not deaf.

9      Q.   All right.  And he said, "No, because I dropped her

10 off at Sherry's."

11     A.   You're talking about the phone call I made?

12     Q.   I'm talking about the phone call.

13     A.   Yeah.  I don't remember him saying anything about

14 dropping her off at Sherry's.  When I asked him about that, he

15 went to, "Well, you can tell them whatever you want."

16     Q.   Yeah, okay.

17     A.   And then I asked him, "Do you want me to say

18 anything about you taking me out there?"

19          And Nick said, "Well, I kinda forgot about that.  If

20 you would don't tell them about that."

21     Q.   Well - - -

22     A.   (Interposing) For the second time.

23     Q.   Actually, he said — he said — he didn't say he

24 forgot about it.  He said - - -

25          MR. FRASIER:   (Interposing) Your Honor - - -

```
                                  Hamilton   X    D5 88
```

1          MR. McCREA:    Excuse me.

2          MR. FRASIER:    Just play the tape.

3          MR. McCREA:    Isn't this - - -

4          WITNESS:    Play the tape.

5          THE COURT:    Okay.

6          MR. McCREA:    We may do that.

7          THE COURT:    Okay.  He can ask the question.

8     Q.    Let's deal with dropping her off at McKay's that you

9     testified here.  And what he said was — you said:

10               "Well, that's the story.  Okay.  I thought

11               you told me that you — I remember you telling

12               me that you guys were fighting or something.

13               And I thought she just got out of the car by

14               McKay's or something?"

15               And he said, "No."

16               You said, "Well, that's ten years ago,

17               though, so."

18               And he said, "Well, yeah.  So I dropped

19               her off at Sherry's because fucking she said

20               she was going to go in there for a couple of

21               hours.  And then she was going to come back

22               with Brent and Nicky Price.  And that's who I

23               was with that night."

24               And you said, "Oh."

25               And he said, "Fucking, she was.  And see,

```
                                        Hamilton   X     D5 89

 1                we were having a barbecue and she was going to

 2                come back and we were going to eat.  But, no, I

 3                mean, we got into a little bit of a tizzy but

 4                it wasn't really a fight, because what it was,

 5                is Sherry was giving her a guilt trip because

 6                she hadn't been hanging out with her.  And Leah

 7                really didn't want to hang out with her because

 8                Sherry and her weren't getting along."

 9                     And you said, "Yeah."

10                     And he said, "Fucking Sherry's been talking

11                shit about her.  And I don't even — me and her

12                got into it really.  It wasn't even an

13                argument, it was just fucking me telling her

14                that she needs to realize who her fucking true

15                friends were."

16                      I was like, "You know, Sherry's just

17                fucking was talking shit about her constantly.

18                And I kept on hearing about it.  And you know,

19                me . . ."

20                MR. FRASIER:    (Interposing) Your Honor, is

21       there a question here?

22       Q.   Isn't that what he said?

23                THE COURT:    That's the question.

24                MR. FRASIER:    All right.

25       A.   I don't remember anything about a barbecue or
```

Hamilton   X     D5 90

1   anything.  What I remember is, when I asked him about it, he

2   kinda shoved it off and told me I could tell them whatever I

3   want.  And again, like I said, I asked him if he wanted me to

4   tell them about going out Lee Valley.  And he asked me not to.

5        Q.   Well, in any event, when you talked to him on the

6   phone he indicated that all he'd done was dropped her off at

7   Sherry's and then tried to pick her up there.  And she wasn't

8   there.  Right?

9        A.   I don't remember him saying anything about dropping

10  Leah off at Sherry's, no.

11       Q.   So, you don't remember that?

12       A.   I don't remember him saying that, no.

13       Q.   Okay.  Now, Mr. Frasier has talked to you about —

14  about your testimony in Grand Jury in, I believe it would have

15  been August 11th of 2010.  And he asked you questions about

16  what Mr. McGuffin had told you.  Right?

17       A.   Yes.

18       Q.   And at that time — let's see.  Dealing with this

19  matter of dropping her off at McKay's.

20            Oh, all right.

21            Mr. Frasier asked you if he had made a statement

22  like that, about dropping her off at McKay's didn't he?

23       A.   Yeah, he did.

24       Q.   And you indicated that you didn't remember any

25  statement like that?

Hamilton   X     D5 91

1      A.   Yes, I did.

2      Q.   Okay.  And then Mr. Frasier said that he was going

3 to read to you what the police put in their report so you

4 could jog your memory.  And so, he read to you the police

5 report as follows:

6              "Hamilton said once when he began

7              wondering if McGuffin might have had something

8              to do with Freeman's disappearance, Hamilton

9              said he came out and asked McGuffin to his face

10             if he had anything to do with it.  According to

11             Hamilton, McGuffin denied anything and offered

12             a brief explanation."

13             "Hamilton said McGuffin told him that he

14             was supposed to pick up Freeman at Sherry

15             Mitchell's house but had been late, and Freeman

16             had already left.  Hamilton said McGuffin told

17             him that he found Freeman walking and picked

18             her up in his car and began arguing with her,

19             according to Hamilton.  McGuffin said that

20             Freeman wanted out of the car.  And he let her

21             out near McKay's."

22         And then he asked you:

23             "Do you recall telling the police that?"

24         Didn't he ask you that in that form in Grand Jury?

25     A.   I don't — he didn't — I don't remember him asking me

```
                                    Hamilton   X    D5 92
 1   that in Grand Jury.

 2        Q.   You don't remember that.  And then after he had read

 3   you that report and asked you that question, do you recall

 4   telling the police that your answer was:

 5                    "I don't remember saying that, anything

 6                    about Nick picking her up there because I

 7                    thought it was the other way around.  I thought

 8                    Nick was supposed to be dropping her off there

 9                    and he didn't want to."

10        A.   Yeah, I do remember that.  But like I told Frasier,

11   I was nervous - - -

12        Q.   (Interposing) No.  My question is, you do remember

13   that now?

14        A.   Yes.  I never said I didn't remember that.

15        Q.   And so, at that time — and then he went on to ask

16   you about a question about:

17                    "Did you ever hear from Nick that Bill Sero

18                    was the one that killed Leah?"

19                    "And you said, 'No, I never heard Nick say

20                    anything like that.  You know, to be honest

21                    Nick didn't really say anything about it.'"

22             Do you remember that question and that answer?

23                    A.   No.  Because I wouldn't have said no,

24   because I've heard Nick say something about Bill Sero a dozen

25   times.
```

Hamilton   X     D5 93

1    Q.   My question is, do you remember his asking that
2  question and you gave that answer?
3    A.   No, I don't remember — I remember telling him that
4  I've heard say something about Bill Sero, yes.  But I never
5  remember saying no, I didn't hear Nick say something about
6  that.
7    Q.   Well, he asked you at that time, he said as follows:
8              "Question: Well, I'm having a little
9              problem here Scott.  Because I'm looking at the
10             report.  It says here, 'Hamilton told me that
11             approximately two weeks prior to Freeman's body
12             being found, he recalls McGuffin saying that
13             Bill Sero was responsible for her
14             disappearance.'
15        And your answer was:
16             "Well, I didn't say that.  So . . ."
17        Do you recall that question and that answer?
18    A.   I remember saying that I — Nick has talked about
19  Bill Sero doing it, yes.  I remember saying that.
20    Q.   You remember saying what?
21    A.   Nick saying something about Bill Sero doing it.
22    Q.   No, my question was, do you recall when he
23  asked - - -
24    A.   (Interposing) Then no.  I don't recall.
25    Q.   All right.

```
                                        Hamilton   X    D5 94
```

1      A.    The one I say is what I know.

2      Q.    You don't recall what he said in Grand Jury.  Do you

3   recall that he then said:

4                    "How did you say . . ."

5           And you kind of interrupted him and said:

6                    "I'm sure I remember."

7           And he went on to say, to quote:

8                    "Hamilton said that it seemed like he was

9                    throwing it out there because everyone was

10                   looking at him.  Hamilton did not recall

11                   McGuffin giving any details, just mentioning

12                   it."

13          That finished his question.  And then your answer

14   was:

15                   "I don't remember Nick ever saying

16   anything about Bill, ever."

17     A.    Well, that would be a lie because I've obviously

18   remembered that.

19     Q.    Wait, wait.  What's a lie?

20     A.    Me saying that Nick's never said anything about Bill

21   doing it because I've known — I've heard him say it.  He said

22   it to me before.

23     Q.    Well, you're saying that what you said in Grand Jury

24   was a lie?

25     A.    I may have been nervous and said the wrong thing.

```
                                    Hamilton   X     D5 95
```

1   But - - -

2        Q.   Well, when — are you saying that when you said, "I

3   don't remember Nick ever saying anything about Bill ever."

4   That that was a lie on your part?

5        A.   I wouldn't call it a lie.

6        Q.   Well.

7        A.   Because I've told them before that I've heard Bill —

8   him say something about Bill doing it.  So - - -

9        Q.   All right.

10            My question is, is that what you said in Grand Jury?

11       A.   I don't believe so, because it wouldn't make sense

12   for me to say that.

13       Q.   Now, after you had testified in Grand Jury - - -

14            THE COURT:    (Interposing) You're going to go

15   to a different topic.  How much longer are you going to be?

16   We've been going about two hours.  I'm trying to get — allow

17   you to finish this, but we've been going a couple hours.

18            MR. McCREA:    Oh, okay.  Well, I'm probably

19   going to take another fifteen minutes at least, Your Honor.

20            THE COURT:    Then we'll take a recess at this

21   point in time.

22            Everybody else remain seated until the jury has

23   a chance to go to the jury room.

24            Please remember the admonition.

25            (Jury Out.)

Hamilton   X    D5 96

1              THE COURT:    You can step down.  You'll have

2    to come back.  But you can step down.  You can take a recess

3    and then just come back.

4              We'll take about fifteen minutes; maybe between

5    ten and fifteen after.

6              If anybody plans to play any tape recordings or

7    anything, have that ready to go when we come back, either one.

8              Okay?

9              We'll be in recess until about ten after —

10   twelve after.

11             (RECESS)

12             (Jury In.)

13             JUDICIAL ASSISTANT:    All rise.

14             THE COURT:    Be seated please.

15             Go ahead, Mr. McCrea.

16             Proceed, please.

17             MR. McCREA:    Okay.  Thank you, Your Honor.

18                  <u>CROSS EXAMINATION, Continued</u>

19   <u>BY MR. MCCREA:</u>

20      Q.   Mr. Hamilton, one sort of housekeeping matter, the

21   automobile that you were driving around in that night was a

22   primer gray El Camino.  Is that right, on the 28th of June,

23   2000?

24      A.   Yes.

25      Q.   Okay.

```
                                    Hamilton   X     D5 97
 1              MR. McCREA:    Now, we have the pertinent
 2    portion of the Grand Jury testimony keyed up, Your Honor.  I'd
 3    ask through the assistance of Counsel, be played for the
 4    witness to see if it refreshes his recollection.
 5              THE COURT:    That's fine.
 6              And when you start it, I'm just going to pause
 7    the tape so it doesn't pick it up.
 8              And then again, this is just for refreshing his
 9    memory.
10              (Whereupon Grand Jury tape was played for the
11    jury off the record.  Not transcribed.)
12              THE COURT:    I don't particularly care.  I
13    told the jury this is just to refresh his memory.  They're not
14    taking anything — taking notes about this, correct, until
15    there's questions asked.  Unless you have some objection I
16    don't have a problem with this going into the Court, it's just
17    for his refreshing of his memory.  But, there's no way I can
18    have him punch the button.  There's a (not understandable).
19              Go ahead.
20              (Whereupon Grand Jury tape was played for the
21    jury off the record.  Not transcribed.)
22              MR. McCREA:    I may have mis-spoke in part.
23    Actually, it's our position that this testimony on this —
24    before the Grand Jury — it both is a matter of refreshing his
25    recollection, but also it may be offered and the jury may hear
```

```
                              Hamilton  X    D5 98
```

1  it as impeachment of his testimony that is contrary to that.

2  And enough foundation has been laid, I submit at that point,

3  that it is improper impeachment to offer this testimony.

4  Because it's been referenced to him and he has - - -

5              Well, pursuant to Rule 613 I think it is - - -

6              THE COURT:    (Interposing) Okay.  You're

7  wanting to offer the playing of that for the jury for

8  impeachment purposes?

9              MR. McCREA:    Yes.  As well as to refresh his

10  recollection if it does.

11             THE COURT:    Any objection?

12             MR. FRASIER:    Your Honor, I think there are

13  parts of this testimony that would not be otherwise be

14  admissible.  I don't think the whole is admissible.

15  Therefore, I would like an opportunity — and I don't have a

16  problem with Counsel and I working together to come up with

17  something that we believe is presentable.  And I don't have a

18  problem doing that later in this trial.

19             But I do object at this point because I do

20  believe there are parts that are not proper impeachment, nor

21  are they admissible.

22             THE COURT:    Okay.

23             He's not objecting to you offering it for

24  impeachment on those particular points you've raised with him,

25  but there are other parts that haven't.  So, playing the whole

```
                                        Hamilton   X      D5 99
```

1   tape could lead to the admission of evidence that's not

2   admissible.  And I won't allow that.  I don't know what the

3   objections are, first.  But in the sense you're only offering

4   it as to certain parts, and those are the only parts that

5   should be played.

6                    Obviously, that will have to be done between

7   you and counsel.  And if you can't do it then I'm going to

8   have to listen to it - - -

9                    MR. McCREA:   (Interposing) All right.

10                   THE COURT:   - - - and make a ruling on it.

11  So, we'll stop the playing of this now until you can — and

12  I'll make sure Mr. Hamilton's available.  Until you can work

13  out something.  And if you haven't worked out something, then

14  — and then, at least until I have a chance to review and make

15  a ruling on what the objections are.

16                   Okay?

17                   MR. McCREA:   That's fair.

18                   Thank you, Your Honor.

19                   THE COURT:   Yep.

20                   Now, do you have anything else of Mr. Hamilton?

21                   MR. McCREA:   Yes.

22                   THE COURT:   Go ahead.

23                   <u>CROSS EXAMINATION, Continued</u>

24  <u>BY MR. MCCREA:</u>

25     Q.   Now, Mr. Hamilton, after you'd appeared at the Grand

1  Jury and testified, then the Officers Webley and McNeely, they

2  got you back into the police station.  Isn't the correct?

3       A.  Down at the DA's office?

4       Q.  Pardon?

5       A.  They came and talked to me again after I talked at

6  the Grand Jury?

7       Q.  Yeah, they talked to you again?

8       A.  Yeah, they did.

9       Q.  All right.  And at that time, they said that — they

10  told you that the trial was coming up and they wanted to get

11  this — get this thing correct about what Mr. McGuffin had told

12  you.  Is that right?

13       A.  They wanted to talk to me about what I said.

14       Q.  Right.  And they indicated that there had been a

15  problem regarding what you'd said in Grand Jury?

16       A.  Yeah.

17       Q.  And they said that this part about the picking up

18  and dropping off at McKay's was really important to them?

19       A.  They just were asking me why I would change what I

20  said.  The only thing that I had was I was nervous in front of

21  all of them, just like today.  And I messed up what I said.

22       Q.  Well - - -

23       A.  (Interposing)  Because when they told me — when they

24  replayed what I said, it bewildered me, because I didn't

25  understand why I would have even said that.  Because I know

```
                                   Hamilton   X    D5 101
```

1   what I knew in my head that was opposite from what I said.

2        Q.   Well, they — so, they went — they talked to you

3   about what had happened - - -

4        A.   (Interposing) They asked me why — why it changed.

5   They asked me why it changed.

6        Q.   Why you changed in Grand Jury?

7        A.   Yeah.

8        Q.   All right.  And in the course of talking about it,

9   they indicated that this was really important to them.  Right?

10       A.   They didn't indicate nothing.  They were just

11  wanting to know why I would change what I said.  And like I

12  told you just a second ago, that I was nervous in front of all

13  of them and I just mixed up my own words.

14       Q.   Well, didn't they say the following?

15                 "Some of this stuff that's really important

16              is right there at the last you said?"

17            Referring to their report:

18                 "Where here you asked Nick about a kind of

19              explanation.  You became suspicious.  You said

20              that he told you he was supposed to pick up her

21              at Sherry's house.  He'd been late.  And he

22              told you that he found her walking and picked

23              her up.  And they started — they started

24              arguing and he told you that he had dumped her

25              out at McKay's; that she went out.  He let her

Hamilton   X   D5 102

1                    out near McKay's.  That's obviously an

2                    important thing to us.  That evidently that

3                    didn't come across."

4          Did they say that to you?

5     A.   I can't remember those exact words - - -

6     Q.   (Interposing)  Well, did they — excuse me.

7     A.   - - - that they said that to me.

8          Not to my knowledge, no, I can't say they said it

9     was important.  I could see how it probably was important.

10    Q.   All right.  So, in substance they said that to you?

11    A.   They never came out and said that this is very

12    important and you need to fix what you did.  They just asked

13    me why I would change my story in front of Grand Jury.  And

14    like I told them, I was nervous in front of all of them just

15    like anybody else would be.  And I mixed my own words up.

16    Q.   All right.  Before you testified - - -

17    A.   (Interposing) I'll take a polygraph on that.

18    Q.   Pardon?

19    A.   They even had me take a polygraph about that.

20              MR. McCREA:   I object, Your Honor.

21              THE COURT:   Sustained.

22              MR. McCREA:   Move to strike.

23              THE COURT:   The jury is to disregard the last

24    remark.

25    Q.   Mr. Hamilton, did anyone talk to you again just

D5 103

1   before you testified?  When's the last time you talked to law

2   enforcement, let me put it that way?

3        A.   A month and a half, two months ago.  It's been

4   awhile now.

5        Q.   Pardon?

6        A.   It's been awhile now.  I couldn't tell you for sure

7   time.

8        Q.   Well?

9        A.   It's been a month and a half or so at the least.

10       Q.   During a recess did anybody talk to you?

11       A.   No.

12       Q.   The — all right.  A few more questions.

13            So, after the officers went over with you your

14   statement and said in words or substance it was important,

15   then you said, "Yes, that's right.  That's what was said."

16   Correct?

17       A.   No, what I said was, is, "I can't believe I said

18   that.  It doesn't make any sense why I would have said that,

19   because it goes against what I know."

20       Q.   Well, anyway - - -

21            MR. McCREA:   I believe that's all the

22   questions I have until we're able to get this matter resolved.

23            I'm sorry, Your Honor.

24            THE COURT:   That's all right.

25            MR. McCREA:   All the questions I have until

D5 104

1    we get it resolved regarding the Grand Jury testimony.

2                    THE COURT:    Mr. Frasier, do you want to

3    reserve your redirect until this other matter is straightened

4    out and he's finished cross?  Or do you want to redirect on

5    some of it now?

6                    MR. FRASIER:    Actually, Your Honor, I have no

7    redirect.  So, at this point I don't have a problem with him

8    stepping down from the stand.  And if he keeps us apprized of

9    where he's at we'll get him back.

10                   THE COURT:    Okay.

11                   And I don't envision this problem being solved,

12   like, over the noon hour.  If you can it's fine.  But I'm not

13   going to delay other witnesses waiting for that.  So it may be

14   that you have to resolve it in the evening as opposed to

15   there.  And I'll order him to be available.

16                   But if you can resolve it over the noon hour,

17   fine.  But I don't want to sit and delay and delay witnesses

18   while we're waiting for that matter to be resolved.

19                   MR. FRASIER:    Right.

20                   MR. McCREA:    Well, probably we can.  I don't

21   think it's that difficult.  But we'll see.

22                   THE COURT:    Okay.

23                   MR. McCREA:    The other thing, as long as —

24   while this witness is still on the stand, so there's no doubt

25   in Counsel's mind, we're prepared — as a matter of fact, we'd

D5 105

1   be prepared to offer the pretext telephone tape or disk,

2   whatever it is.

3                    MR. FRASIER:    That's fine.

4                    THE COURT:    Okay.

5                    If you have it, offer it and I'll receive it.

6                    MR. McCREA:    Well, we needed — we were doing

7   the Grand Jury so we could only key up one thing.

8                    THE COURT:    Okay.

9                    So, you want — it's a tape recording?

10                   MR. FRASIER:    It's a digital recording.    It

11  can be played on a computer.    I have no problem doing that at

12  a later time.    The witness does not need to be on the stand

13  for that.    I mean, we can play it anytime we get the exhibit

14  ready.

15                   THE COURT:    Is that agreeable?

16                   MS. McCREA:    Yes.    I can — I can cue it up

17  right now, Your Honor.

18                   MR. FRASIER:    Well, if we're going to have it

19  as an exhibit, I would prefer it to be on a CD ready to go.

20  And - - -

21                   THE COURT:    (Interposing) So, then it's in

22  evidence.

23                   MR. FRASIER:    Then it's in evidence.

24                   THE COURT:    Right now it's not — you don't

25  have a CD right now?

D5 106

1          MS. McCREA:    I do not have it here with me,

2    no.  I didn't anticipate I was going to need it this morning.

3          THE COURT:    Okay.  I understand that.  Well,

4    get it on a CD so when it's offered — then when it's done it

5    can be given to the — Ms. Cress to keep.

6          MS. McCREA:    Yes.

7          THE COURT:    Okay.

8          Mr. Hamilton, I'm going to ask you to be back

9    at one o'clock.  And if they've got this one thing

10   straightened out, then you'll be back on the stand.  If not,

11   then I will probably release you for the rest of that day to

12   come back tomorrow at, like, nine o'clock and we'll restart.

13         MR. FRASIER:    Your Honor, I would suggest it

14   will be tomorrow morning.  Because by the time they tell me

15   what they want and we go through and excise out, it's probably

16   going to be tonight before I - - -

17         THE COURT:    (Interposing) That's fine because

18   Mr. McCrea thought it could be done over the lunch hour.

19   You're telling me it can't.

20         So, just be back here at nine o'clock in the

21   morning.

22         WITNESS:    All right.

23         THE COURT:    Okay, you're released until

24   tomorrow at nine.

25         Call your next witness.

Zavala   D    D5 107

1              MR. FRASIER:    Thank you.

2         We call Officer Zavala.

3                        DAVID ZAVALA

4    was thereupon produced as a witness on behalf of the Plaintiff

5    and, having first been duly sworn to tell the truth, the whole

6    truth and nothing but the truth, was examined and testified as

7    follows:

8              THE COURT:    Have a seat up here, please.

9                     DIRECT EXAMINATION

10   BY MR. FRASIER:

11        Q.   Could you state your name please, sir, and spell

12   your last name for the record?

13        A.   First name is David.

14             Last name is Z as in Zebra-A-V as in Victor-A-L-A.

15        Q.   And what is your occupation, sir?

16        A.   I'm a police officer for the City of Kaiser.

17        Q.   How long have you worked for the City of Kaiser?

18        A.   It's been about almost eleven years.

19        Q.   Prior to that, sir, were you employed as a police

20   officer in another location?

21        A.   Yes, here in the City of Coquille.

22        Q.   How long had you worked in the City of Coquille?

23        A.   Just about over a year.

24        Q.   I'd like to direct your attention, sir, to June 28th

25   of 2000.  Were you on duty that day?

Zavala    D    D5 108

1    A.    Yes, I was.

2    Q.    And I want to direct your attention now to about ten

3    thirty p.m. in the evening.  Did you have contact with the

4    Defendant in this case, Mr. McGuffin?

5    A.    Yes, I did.

6    Q.    Where did you have contact with him?

7    A.    I was — like I said I was on duty.  I was driving on

8    Highway 42.  I was driving eastbound.  And I saw Mr.

9    McGuffin's blue Mustang.  At the time I didn't know it was his

10   until after he had passed me.  He was driving westbound.  I

11   noticed that the headlight was out.  So, I turned around on

12   the vehicle and pulled it over off of, I believe it's Highway

13   42 south, going into Sturdevant Park there.

14   Q.    And this — when you're talking about Highway 42,

15   you're talking about the bypass around the City of Coquille?

16   A.    Yes.

17   Q.    Why did you stop the car again?

18   A.    There was a headlight out.

19   Q.    Did you approach the car?

20   A.    I did.

21   Q.    And how many people were in the car?

22   A.    There was only one individual.  And that was the

23   driver, Mr. McGuffin.

24   Q.    Tell us what happened when you got out of the car

25   and approached the car?

Zavala   D    D5 109

1      A.   Well, as I approached the car, I spoke with

2   Mr. McGuffin and let him know the reason for the stop there.

3   And I asked him what he was doing out at that time of the

4   night with — driving around with only one headlight on.  And

5   he told me that he was out looking for his girlfriend.  And he

6   had asked me if I had seen her.  I told - - -

7      Q.   (Interposing)  Did you who his girlfriend was?

8      A.   Yes.

9      Q.   Who was that?

10     A.   Leah Freeman.

11     Q.   Okay.  Go ahead.

12     A.   So I told that I hadn't seen her, but I told him I'd

13  keep an eye out for her.  My shift was ending in about twenty

14  minutes.  And so then I told him that he should probably get

15  home because of the fact that grave robbers coming out and he

16  shouldn't be driving without a headlight out.

17     Q.   How did he respond to that?

18     A.   He said he knew that and he would make it quick.

19  And after that he ended up leaving.  And he ended up going

20  across the bridge there, past — over the river.

21     Q.   Did you know where the Defendant lived?

22     A.   I believe it was that area.  I believe his family

23  lived in that general direction.

24     Q.   Now, how was the Defendant's demeanor when you had

25  contact with him?

Zavala   D    D5 110

1    A.    Well, based on my report here he did appear a little

2 nervous.  He did light a cigarette when I approached him.  But

3 he didn't show any signs of being upset or any signs of — that

4 he'd been crying.

5    Q.    I want to show you a series of pictures here marked

6 State's Exhibits Nos. 232, 233, 234, and 235 and ask if you

7 could look at those for a minute.

8    A.    Okay.

9    Q.    Do you recognize the area as portrayed in those

10 photographs?

11   A.    Yes, I do.

12   Q.    And is this the area that we're talking about where

13 the stop occurred?

14   A.    Yes.

15   Q.    And do these pictures portray the area as you

16 remember it on the evening of June 28th, 2000?

17   A.    Yes.

18        MR. FRASIER:    We'd offer, Your Honor, State's

19 Exhibits Nos. 232 through 235 inclusive.

20        MS. McCREA:    There's no objection, Your

21 Honor.

22        THE COURT:    Received.

23        (Whereupon Exhibits Nos. 232, 233, 234, and 235

24 were then received into evidence.)

25   Q.    This is State's Exhibit No. 232.  Can you see that

Zavala   D    D5 111

1   on the screen, sir?

2            MR. FRASIER:    I'm going to dim the lights.

3        A.   Yes, I can see it.

4        Q.   Could you describe this photograph for us, please?

5        A.   The — that's Highway 42.  And then where that speed

6   sign there — where it says speed limit of forty miles an hour

7   — that is — I believe is that Highway 42 South towards the

8   park and over the river.

9        Q.   This is State's Exhibit No. 233.  Do you recognize

10  that?

11       A.   Yes.  That's just a different — same location, just

12  a different viewpoint.

13       Q.   Can you see the area where you pulled the car over?

14       A.   Yes, just past the speed limit sign there on the

15  right.

16       Q.   There's a laser pointer there — the red - - -

17       A.   (Interposing) Right about there.

18       Q.   And Sturdevant Park, where's that at?

19       A.   Just further down the road.

20       Q.   Now, backing up.  I'm going to back up to No. 232.

21  You mentioned you saw the Defendant drive across a bridge?

22       A.   Yes.

23       Q.   Do you see the bridge in that photograph?

24       A.   Yes.  The bridge is right there.

25       Q.   And the car went over the bridge?

```
                                            Zavala   D    D5 112
```

1                     THE COURT:    Just a minute.

2                     Ma'am, are you all right?

3                     JUROR:    Yes.

4                     THE COURT:    You have water?

5                     JUROR:   Yes, I have.

6                     THE COURT:    Do you want a recess?

7                     JUROR:    (Not understandable.)

8                     THE COURT:    Yes, certainly.

9                     THE COURT:    We will take a recess, if all of

10   you would step into the jury room, please.

11                    Are you all right.  Do you need help getting

12   back there?

13                    JUROR:    (No audible response.)

14                    THE COURT:    Okay.

15                    (Jury Out.)

16                    THE COURT:    Just let me know when she's

17   ready.  We'll start back when the juror's ready.

18                    You can step down for the moment.

19                    (RECESS)

20                    (Jury In.)

21                    JUDICIAL ASSISTANT:    All rise.

22                    THE COURT:    Be seated please.

23                    Are you all right?

24                    JUROR:    Sorry.

25                    THE COURT:    No problem.  Glad you're better.

1           Mr. Frasier, go ahead.

2           MR. FRASIER:    Thank you, Your Honor.

3           DIRECT EXAMINATION, Continued

4    BY MR. FRASIER:

5      Q.   Officer Zavala, before I forget, what type of

6    vehicle was this that you stopped?

7      A.   It was a blue Mustang.

8      Q.   Now, going back to State's Exhibit No. 232.  I'm now

9    going to go to State's Exhibit No. 234.  Is there some sort of

10   a card lock or a gas station, CFN, near this intersection?

11     A.   If I recall correctly there is.  I believe it's

12   behind that building there.

13     Q.   All right.  And let's look at State's Exhibit

14   No. 235.  Does that help you there?

15     A.   Yes.  Right in there.

16     Q.   Where is that in relation to Highway 42 South?

17     A.   To be honest with you, I'd have to look back at the

18   pictures again to - - -

19     Q.   Okay.  Let's go back here to No. 234.

20     A.   If I recall correctly, that's the turn off right

21   there to the right.

22     Q.   Okay.

23     A.   Tough angle here, but we'd be looking at right in

24   there.

25     Q.   All right.  Now, did you see this blue Mustang go

Zavala   X   D5 114

1    into the CFN or the card lock station?

2        A.   No.  It continued over the bridge.

3        Q.   Thank you.

4            MR. FRASIER:    Those are the questions I have,

5    Your Honor.

6            THE COURT:   Ms. McCrea.

7            MS. McCREA:   Thank you, Your Honor.

8                    CROSS EXAMINATION

9    BY MS. MCCREA:

10       Q.   Is it detective?

11       A.   Officer.

12       Q.   Officer, okay.

13            Officer Zavala, you've indicated that you were in

14   uniform on the night of June 28th, 2000.  Right?

15       A.   Yes.

16       Q.   And you were operating a marked patrol vehicle?

17       A.   Excuse me.  Yes.

18            MS. McCREA:   Need water?

19            WITNESS:   No.  I've had a cough for about a

20   week and a half now.

21            MS. McCREA:   All right.

22            WITNESS:   Thank you, though.

23            MS. McCREA:   I just didn't want you to be

24   uncomfortable.

25       Q.   When you made contact with Mr. McGuffin, I think you

Zavala   X   D5 115

1  said you were traveling eastbound.  But actually you were

2  traveling westbound, weren't you?

3      A.   That is correct.

4      Q.   And Mr. McGuffin was traveling eastbound?

5      A.   Correct.  Yes.

6      Q.   Now, you indicated in your report that you stopped

7  him about twenty-two thirty hours which would be ten thirty?

8      A.   Yes.

9      Q.   And it could've been a little earlier than that,

10 couldn't it?

11     A.   I guess it could've been.

12     Q.   Well, this report was made on July 12th, 2000.

13 Correct?  Is that right?

14     A.   Yes.

15     Q.   And your contact with Mr. McGuffin was on June 28th,

16 2000.  So that's a period of approximately two weeks.  Right?

17     A.   Yes.

18     Q.   Now do you have your notebook from June 28th with you

19 today, sir?

20     A.   No, I do not.

21     Q.   Okay.  I have a copy of your notebook which I have

22 received courtesy of the Prosecution.

23     A.   Okay.

24     Q.   Could you take a look and see if that looks to be a

25 copy of your notebook - - -

Zavala    X    D5 116

1    A.    (Interposing)  Yes.

2    Q.    - - - from that time?

3    A.    Uh huh.

4    Q.    Okay.  And then I'm turning to a page that's got

5    referenced, No. 62800.  That would be June 28th, 2000?

6    A.    Yes.

7    Q.    Does this appear — this is a copy of your notebook?

8    A.    Yes.

9    Q.    Okay.  And that's your handwriting?

10   A.    Yes.

11   Q.    And typically what you do is you make notations in

12   your notebook as things happen during your shift?

13   A.    Yes.

14   Q.    And on June 28, 2000, as you've indicated, you were

15   working until eleven o'clock that night?

16   A.    Yes.

17   Q.    So, you made notations in your notebook concerning

18   the contact you had with various individuals?

19   A.    Yes.

20   Q.    When you had the contact with Mr. McGuffin, did you

21   turn on your overhead lights to affect a traffic stop?

22   A.    That I do not recall if I did exactly.  But I would

23   assume that I did.  Especially on that evening with the

24   traffic being there.  It's more of a safety concern at a

25   minimum.  But to pull them over, yes.

1    Q.   Sure.  And the car that he was driving, you've

2  indicated was a blue Mustang.  And it was an older vehicle.

3  Did you recognize it as a '67 Mustang?

4    A.   Not great with cars.  It was a blue Mustang; older

5  vehicle, yes.

6    Q.   Okay.  And in terms of Mr. McGuffin's reaction to

7  your overhead lights, pulled up and stopped in a reasonable

8  time?

9    A.   Yes.

10    Q.   And had the contact with you as you've described?

11    A.   Yes.

12    Q.   Now, you don't know what kind of a mechanical

13  condition Mr. McGuffin's car was in that night when you

14  contacted him on June 28th.  Is that right?

15    A.   No.

16    Q.   And you've indicated, according to the State's

17  photographs that we now have in evidence, that the stop

18  occurred close to the entrance of Sturdevant Park.  Is that

19  right?

20    A.   Prior to the entrance, yes.  There's that little

21  gravel area there.

22    Q.   And typically, in the evening there is a gate that

23  is placed across the entrance to the park?

24    A.   If I recall correctly, yes.

25    Q.   Okay.  Do you have any recollection whether the gate

Zavala   X   D5 118

1   was there that night or not?

2       A.   No, I do not.

3       Q.   So, in terms of Mr. McGuffin driving over the

4   bridge, you've indicated you saw him drive over the bridge.

5   And you didn't wait to see whether he came back over the

6   bridge or not?

7       A.   No.

8       Q.   So, you don't know if he did come back over the

9   bridge?

10      A.   That is correct.

11      Q.   On the far side of the bridge, to the right side,

12  isn't there a place called the Fishtrap where one can turn

13  around.  It's kind of a circle area?

14      A.   To be honest with you, I don't remember.

15      Q.   So, there could be.  You just don't - - -

16      A.   (Interposing)  Right.

17      Q.   You're up in Kaiser now.  You're not down here

18  anymore?

19      A.   It's been a couple years, yes.

20      Q.   All right.  I just want to go back to your notebook

21  for just a minute.  And I want you to take a look, beginning

22  at June 28th, 2000 through the course of your shift.  And in

23  terms of what's in your notebook, there is nothing written in

24  your notebook contemporaneously with your contact with

25  Mr. McGuffin on June 38th, 2000.  Is that right?

```
                                          Zavala   X    D5 119
1        A.   It doesn't appear so.  Correct.

2        Q.   And I'm — take your time.  So, what you put in your

3   report, written on July 12, 2000, was what you reconstructed

4   from your memory after the fact?

5        A.   Yes.

6        Q.   Okay.  Thank you.

7        A.   Uh huh.

8        Q.   And Officer Zavala, it is correct that the gas

9   station card lock area is fairly close to where you had the

10  contact with Mr. McGuffin?

11       A.   Yes.

12             MS. McCREA:   If I can just have a moment,

13  Your Honor.

14             THE COURT:   Okay.

15             MS. McCREA:   Nothing further.

16             THE COURT:   Mr. Frasier.

17             MR. FRASIER:   I have nothing further.

18             THE COURT:   You may step down.  And you're

19  free to leave.

20             MR. FRASIER:   Your Honor, he was subpoenaed

21  by the Defense.  Is he released from that also?

22             THE COURT:   Okay.

23             Do you need Officer Zavala back?  If it's

24  something you can take care of now, out of order, that would

25  be fine.  If not, then I'll order him back.
```

Zavala   D    D5 120

1          MS. McCREA:    Just very briefly, if I can take

2     care of it now.

3                          DAVID ZAVALA

4     was thereupon produced as a witness on behalf of the Defendant

5     and, having previously been duly sworn to tell the truth, the

6     whole truth and nothing but the truth, was examined and

7     testified as follows:

8                        DIRECT EXAMINATION

9     BY MS. MCCREA:

10         Q.   Officer Zavala, back in July of 2000 you interviewed

11    Kristen Steinhoff-Ramsey.  Is that right?

12         A.   I'd have to look back at some of my other reports

13    here to verify that.

14         Q.   Would it help if I showed you the report?  Or do you

15    have reports with you?

16         A.   I have some here, yes.

17         Q.   Okay.

18         A.   On what date was that?

19         Q.   July 10, 2000.

20         A.   Okay.  I have the report here.

21         Q.   During the time when you interviewed Ms. Steinhoff-

22    Ramsey, she indicated to you that Mr. McGuffin kept saying to

23    her, the night of June 28th, when he was at her house, that,

24    quote, "I hope she did not do something stupid." unquote?

25         A.   Okay.

Zavala   X   D5 121

1    Q.   Was that in your report?

2    A.   Yes.

3    Q.   Is that what Ms. Steinhoff-Ramsey told you?

4    A.   That's what — again, this was several years ago.  If

5    I indicated that in my report, especially if I put it in

6    quotation notes, yes, I would assume that's what she told me.

7    Q.   Okay.  And likewise that Ms. Steinhoff-Ramsey told

8    you that when Nick McGuffin was at her house on June 28th, that

9    he told her, quote, "When all my other girlfriends had done

10   this in the past they've been out cheating on me." unquote?

11   A.   Yes.

12   Q.   Thank you.

13            MS. McCREA:    That's all the questions I have.

14            THE COURT:    Mr. Frasier.

15            MR. FRASIER:    Thank you, Your Honor.

16                      CROSS EXAMINATION

17   BY MR. FRASIER:

18   Q.   In your interview with Ms. Steinhoff, she also told

19   you, did she not, that she had seen Mr. McGuffin at the Maytag

20   store?

21   A.   Yes.

22   Q.   And she had asked him jokingly if he was stealing

23   flowers?

24   A.   Correct.

25   Q.   And she also told you that the Defendant said he was

```
                                        Zavala   ReD  D5 122
 1   looking for Leah?

 2       A.   Yes.

 3       Q.   Did she also tell you she didn't notice a car in the

 4   area of the Maytag Store?

 5       A.   Yes.

 6       Q.   Thank you.

 7              MR. FRASIER:   That's all I have.

 8              MS. McCREA:   And I'm sorry, Your Honor, I

 9   neglected to address one area if I might just briefly.

10              THE COURT:   Go ahead and address it.

11                   REDIRECT EXAMINATION

12   BY MS. MCCREA:

13       Q.   Officer Zavala, Ms. Steinhoff-Ramsey also — her name

14   was Steinhoff then — also told you when you interviewed her on

15   July 10, 2000, that when she went home that Scott Hamilton was

16   there waiting?

17       A.   Yes.

18       Q.   Okay.

19              MS. McCREA:   That's all, Your Honor.

20              THE COURT:   Anything on that, Mr. Frasier?

21              MR. FRASIER:   No, Your Honor.

22              THE COURT:   Now you are free to leave.  Go

23   back to Kaiser and won't have to come back here.

24              We will take our recess at this time, lunch

25   recess.
```

```
                                    Zavala   ReD  D5 123
 1              Everybody else remain seated until the jury has
 2  a chance to leave the courtroom.
 3              Leave your notes in the jury room.  Remember
 4  the admonition.
 5                 JUROR:    What time?
 6                 THE COURT:    One o'clock.
 7                 (JURY OUT.)
 8                 THE COURT:    Okay.  Maybe five after.
 9                 (LUNCH RECESS)
10                 (JURY OUT.)
11                 JUDICIAL ASSISTANT:    All rise.
12                 THE COURT:    Be seated please.
13              Somebody has a matter I was told.
14              Ms. McCrea.
15                 MS. McCREA:    Your Honor, I understand the
16  court does not have control over the people in the audience.
17  But it is a concern that it was reported to me by the Defense
18  investigator that there are persons out in the hallway who are
19  discussing the testimony of witnesses.  And our efforts are —
20  on both sides are being made not to taint witnesses who are
21  excluded.
22                 THE COURT:    Right.
23                 MS. McCREA:    And so if the Court could just
24  give, perhaps a gentle admonition.
25                 THE COURT:    I've done that once already.  I
```

Zavala   ReD  D5  124

1  can do it again, but then it — and I'll be happy to do it at

2  all times.  But it only kind of gets to the people who are in

3  the courtroom.  And so — and that's why when I first did it, I

4  said, "I expect Counsel to tell their witnesses that, because

5  that way it could get there."

6                    But I will certainly do it again.  Do you

7  prefer me to do that with the jury present or not present?

8                    Not present.  You're shaking your head not

9  present.  Everybody else is kind of silent.  So - - -

10                   MS. McCREA:    (Interposing) That's fine.

11                   THE COURT:    Okay.

12                   You need to come in or stay out.  Don't stand

13  with the door open.

14                   I do want to remind people that are in the

15  courtroom that they are not allowed to go out and talk about

16  the case where other witnesses might hear.  There are

17  witnesses out in the hall.  And if you want to talk about it,

18  go home and talk about it, not out in the hallway.  It's

19  improper to talk to any witnesses or be around any witnesses

20  when you're talking about the case or what people testified

21  to.

22                   So, do not talk about witness's testimony when

23  you're out in the hallway.

24                   Okay.

25                   Bring the jury in.

Messerle   D   D5 125

1          (Jury In.)

2               THE COURT:   Mr. Frasier.

3               MR. FRASIER:   Thank you, Your Honor.

4          We call Tony Messerle.

5                      TONY MESSERLE

6     was thereupon produced as a witness on behalf of the Plaintiff

7     and, having first been duly sworn to tell the truth, the whole

8     truth and nothing but the truth, was examined and testified as

9     follows:

10              THE COURT:   Have a seat up here, please.

11                    DIRECT EXAMINATION

12    BY MR. FRASIER:

13         Q.   Could you state your name please, sir, and spell

14    your last name for the record?

15         A.   Tony Messerle, M-E-S-S-E-R-L-E.

16              MR. FRASIER:   Could you scoot forward a

17    little bit so you're close to that microphone there?

18              Thank you.

19         Q.   Mr. Messerle, where do you currently live?

20         A.   Springfield, Oregon.

21         Q.   Prior to that have you lived in Coquille?

22         A.   I have.

23         Q.   Are you related to the Messerle family noted here in

24    Coquille?

25         A.   I am.

Messerle   D     D5 126

1    Q.   Who's your dad?

2    A.   Ken Messerle.

3    Q.   Former State Senator?

4    A.   That would be the same person.

5    Q.   There's a Messerle that just was appointed County

6  Commissioner?

7    A.   Yes, there was.

8    Q.   And who's that?

9    A.   He's my dad's brother, my uncle.

10   Q.   When you lived here in Coquille, where did you live,

11 sir?

12   A.   I lived on 536 West Eighteenth Street.

13   Q.   Do you have children?

14   A.   I do.

15   Q.   How many?

16   A.   Three.

17   Q.   Do you have boys, girls?

18   A.   I have two boys and a girl.

19   Q.   And ages?

20   A.   Twenty-four, twenty-one, and twenty.

21   Q.   Now, directing your attention to the year 2000, were

22 you living in Coquille at that time?

23   A.   I was.

24   Q.   At that same residence we discussed?

25   A.   I was.

Messerle   D   D5 127

1    Q.    Were you children living there or staying with you

2  on occasion?

3    A.    Every other weekend, visitation.

4    Q.    You're divorced?

5    A.    Yes.

6    Q.    And where were you working at the time, sir?

7    A.    Coos County Road Department.

8    Q.    What did you do at the road department?

9    A.    I worked swing shift in the shop, service department

10  in the road department shop.

11    Q.    And did you have a particular shift in the year 2000

12  that you were working?

13    A.    Yes.  I was working swing shift.

14    Q.    And what hours was that, sir?

15    A.    I believe it was three to eleven thirty.

16    Q.    Now, I want to direct your attention to the day that

17  allegedly Leah Freeman disappeared, June 28th of the year 2000.

18  Were you working that day?

19    A.    I did, yes.

20    Q.    Did you work a full shift?

21    A.    Yes.

22    Q.    You would have gotten off work at about what time?

23    A.    Eleven thirty.

24    Q.    And how would you have — well, how did you drive to

25  get home?

Messerle   D    D5 128

1      A.   I had a motorcycle at the time.

2      Q.   How did you — what route did you take to get home?

3      A.   I left the shop on Central and came straight up

4  Central and turned on Elm Street at the gas station, went

5  straight to my home which is straight up that street.

6      Q.   As you're traveling up Elm Street, did you notice

7  something in the road?

8      A.   I did.

9      Q.   What did you see?

10     A.   I saw something glint at me.  And I stopped.  It was

11 a tennis shoe.

12     Q.   Did you pick this tennis shoe up?

13     A.   I did.

14     Q.   Why did you pick this tennis shoe up?

15     A.   I had just got my kids for the weekend.  And I

16 hadn't seen them yet.  They were deposited at my house.  And

17 the first thing that went through my mind is it could have

18 been one of my kids' shoes.

19     Q.   So, you picked it up?

20     A.   Yes.  It was in proximity to where I live.

21     Q.   What did you do with this shoe?

22     A.   I took the shoe home and put it on the kitchen

23 floor.

24     Q.   Now at some point in time — well, did you figure out

25 it wasn't one of your kids' shoes?

Messerle   D   D5 129

1    A.    The next morning, yes.

2    Q.    At some point in time did you become aware that

3  there was a missing girl in Coquille?

4    A.    The following Sunday.  Like I said my kids were with

5  me for the weekend.  We went with my parents to Lakeside.  On

6  our way back home to Coquille from Lakeside, we heard all the

7  stuff on the radio of this missing girl.

8    Q.    And did you connect this shoe to some — to the case

9  to some degree?

10    A.    Not really.  My daughter suggest, you know, "Gee,

11  dad, we should call."  Because I had this shoe and it wasn't

12  theirs.  And so when I got home I did.  I called the Coquille

13  PD.  They had a number at the time.

14    Q.    Did an officer come and see you?

15    A.    Yes.

16    Q.    Was that Officer Randy Ulmer?

17    A.    I do not recall the officer's name.

18    Q.    Did you give the shoe to that particular officer?

19    A.    I did.

20    Q.    I'm going to show you what's been marked as State's

21  Exhibit No. 96.  And it's kind of hard to see, but does that

22  kind of look like the shoe you gave to the officer?

23    A.    I remember the shoe being a light tennis shoe.

24    Q.    Now, I want to show you a series of photographs

25  here, sir, State's Exhibits — marked State's Exhibits

Messerle    D    D5 130

1   Nos. 222, 223, 224, 225, and 226 and ask if you can look at

2   those photographs.  And if you recognize the area portrayed in

3   them?

4         A.   I do.

5         Q.   And does this show the area where you were driving

6   that day and where you saw and found this shoe?

7         A.   Yes.  It's really my route home.

8         Q.   I'll take those back.

9               MR. FRASIER:   We would offer State's Exhibits

10  Nos. 222 through 226 inclusive.

11              MR. McCREA:   There's no objection, Your

12  Honor.

13              THE COURT:   They're received.

14              (Whereupon Exhibits Nos. 222, 223, 224, 225,

15  and 226 were then received into evidence.)

16        Q.   Mr. Messerle, I'm going to put up here on the

17  screen, this is State's Exhibit No. 222.  Can you see that

18  over there?

19        A.   I can.

20        Q.   Now, this portrays a Shell gas station?

21        A.   Yes.

22        Q.   At the time, in 2000 was it a Shell gas station

23  there?

24        A.   It could've been a Chevron.  I don't know when it

25  changed.  But it was a Chevron Station.

Messerle   D    D5 131

1       Q.   And does it portray North Elm Street?

2       A.   If you were to turn up that street to your left.

3       Q.   And is that the route you went is up, turning left?

4       A.   Yes.

5       Q.   State's Exhibit No. 223.  Do you recognize that?

6       A.   I do.

7       Q.   What is this a picture of?

8       A.   It would be the opposite side of the street.  The

9   gas station would now be to our — behind us — and you would

10  turn right to go up Elm Street.

11      Q.   And would this show the way you were coming from the

12  county shops?

13      A.   Yes.

14      Q.   You would have been driving on the — well, in this

15  picture it would be the left side of the road?

16      A.   Yes.

17      Q.   Coming toward Elm Street?

18      A.   Yes.

19      Q.   This is State's Exhibit No. 224.  Can you describe

20  that for us, please?

21      A.   That is looking straight up Elm Street from Central.

22      Q.   How far up Elm Street were you when you saw this

23  shoe?

24      A.   The best I can tell you from that picture there, I

25  think it would be about the second little shadow in the

```
                                   Messerle   X    D5 132
```

1  street.

2      Q.   This is State's Exhibit No. 225.  See if I can

3  darken it some more.  Do you recognize that area?

4      A.   That would be about where I just stated.

5      Q.   All right.  And there's a laser pointer in front of

6  you, sir.  A black object that's got a red diamond or triangle

7  on top.  And that's the button to — no.

8           Would you point out where you found the shoe?

9      A.   Right about there.

10     Q.   Was it — where in the road was it?

11     A.   As I was coming up the road it's a narrow street.

12  There's not really a right or left side.  And I was coming up

13  more to the right of course.  And it would have been right in

14  front of me.  So, it was to the right of the centerline.

15     Q.   This is State's Exhibit No. 226.  Could you point

16  out again where you saw the shoe?

17     A.   There.

18               MR. FRASIER:   That's all the questions I have

19  of the witness at this time, Your Honor.

20               THE COURT:   Mr. McCrea or Ms. McCrea?

21               MR. McCREA:   Oh, I'm sorry, Your Honor.

22                     <u>CROSS EXAMINATION</u>

23  <u>BY MR. MCCREA:</u>

24     Q.   Mr. Messerle, when you pointed the laser, it

25  appeared that you were pointing into what might be termed

Messerle   X    D5 133

1   about halfway in between the centerline and the edge of the

2   road on the right side.  Is that where you meant it to be?

3        A.   Yes.

4        Q.   And you were on a motorcycle, but you haven't given

5   us much description what kind of motorcycle?

6        A.   It was a Honda Nighthawk, not a large bike.

7        Q.   Not a large bike.  Did it have a windshield?

8        A.   No.

9        Q.   Okay.  So you were out where you had a good view of

10  whatever was on the road?

11       A.   Once I drove up to it, yes.

12       Q.   I beg your pardon?

13       A.   Once I drove up to it, yes.

14       Q.   Okay.  The shoe wasn't itself all that visible.  Is

15  that a fair statement?

16       A.   When I picked it up I knew it was a shoe.

17       Q.   I didn't mean it that way.  I meant as you're

18  driving down the road.  You saw something reflective?

19       A.   Yes.

20       Q.   Okay.  And it was a reflection rather than seeing a

21  shoe that first caught your eye?

22       A.   Yes.  It was in my line of travel.

23       Q.   And that caused you to stop to see what it is is

24  reflecting?

25       A.   Yes.

Messerle   X    D5 134

1    Q.    And at that point you backed your bike up a bit to

2    get to where the shoe was?

3    A.    I did not back up.

4    Q.    Oh, okay.  You stopped where the shoe was?

5    A.    Yes.

6    Q.    And I know it's been eleven years ago, but I — I

7    need to ask this question.  Do you recall what position the

8    shoe was in on the road?

9    A.    Whether the shoe was lying on its side or sitting

10   straight up or — at all — I honestly do not recall.

11   Q.    All right.  That's what I meant.  That's what I'm

12   driving at.

13         And do you recall whether the laces were tied or

14   untied?

15   A.    I do not.

16   Q.    Now, in terms of how you dealt with the shoe, you

17   just picked it up with your hands?

18   A.    Yes.

19   Q.    Now, you were riding a motorcycle, were you wearing

20   gloves?

21   A.    I don't believe I was.

22   Q.    In any event, let's deal with how you dealt with the

23   shoe further.  You took it — in terms of your taking it home.

24   You took it home and the first thing you did was just put it

25   on the kitchen floor?

1     A.   Yes.

2     Q.   And did you do anything to alter or change it as you

3   put it on the kitchen floor?

4     A.   My kids were in bed and I went straight to bed.

5     Q.   Did the shoe as you casually — well maybe.  Did the

6   shoe as you observed it appear to be in good condition?

7     A.   Yes.

8     Q.   Did you notice any damage or, what I'm trying to

9   say, smudges or anything on it?

10     A.   No.

11     Q.   All right.  Now, when was the next time you had

12   occasion to take a look at the shoe?

13     A.   The next morning I asked my kids, before I left for

14   work, if it was any of their shoes?  And they said, "No."

15     Q.   In the process of asking the kids about the shoe,

16   was the shoe handled or just left where it was?

17     A.   I honestly don't know.  I don't know if any one of

18   us picked up the shoe or just looked at it where it was on the

19   floor.  If meant nothing at the time.

20     Q.   But, nobody tried to wear the shoe?

21     A.   No.

22     Q.   And then once — well, maybe I should go step-by-

23   step.

24          None of your kids indicated it was their shoe?

25     A.   Correct.

Messerle   X    D5 136

1    Q.   So, from that point until the time a police officer
2  came, did the shoe just stay in one place?
3    A.   Yes.
4    Q.   Okay.  And you didn't do anything to change its
5  condition?
6    A.   Nothing.
7    Q.   So, let's talk about the tied or untied.  As far as
8  the tied or untied part, whatever it was, it was still the
9  same as it had been when you turned it over to a police
10 officer?
11   A.   Yes.
12   Q.   And as far as its condition, having to do with
13 damage or smudges or anything like that, that remained the
14 same as well?
15   A.   Yes.
16   Q.   Okay.  To the best of your knowledge and ability,
17 then, you turned it over in the — the same condition you found
18 it?
19   A.   Yes.
20   Q.   And, you got off work you think around eleven
21 thirty?
22   A.   Yes.
23   Q.   I've seen in reports that you estimate that you
24 found the shoe between eleven thirty-five and eleven forty.
25 Does that seem about right?

Messerle   X    D5 137

1      A.   I remember saying eleven thirty-three because I went

2  straight home every night.  Shift work is the same every

3  night.

4      Q.   I'm sorry I'm a poor — I have - - -

5      A.   I believe I said eleven thirty-three.  That's what

6  comes to my mind.  And I don't remember anything other than

7  that.

8      Q.   Eleven thirty-two?

9      A.   Eleven thirty-three.

10      Q.   Oh, eleven thirty-three.  Okay.  It didn't take you

11  long to get from the shop - - -

12      A.   (Interposing) No.

13      Q.   - - - to where the shoe was?

14      A.   Exactly.

15      Q.   Okay.  But in any event, would it be fair to say

16  that in your recollection you would have found the shoe, no

17  question about it, by eleven forty-five?

18      A.   Yes.

19                MR. McCREA:    That's all the questions I have,

20  Your Honor.

21                THE COURT:    Any redirect?

22                MR. FRASIER:   No, I have no redirect.

23                THE COURT:    You may step down, sir.  And

24  you're free to leave.

25                MR. FRASIER:   Call Officer Oswald.

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS


STATE OF OREGON,                        )
                                        )
            Plaintiff,                  )    CASE NO. 10CR0782
                                        )
      vs.                               )      JURY TRIAL
                                        ) DAY FIVE, Continued
NICHOLAS JAMES MCGUFFIN,                )
                                        )
            Defendant.                  )
_____ )

TRANSCRIPT OF PROCEEDINGS

Volume 8, Pages D5 138 to D5 280

      BE IT REMEMBERED That, the above-entitled cause

came on regularly for hearing beginning at 9:19 a.m., Tuesday,

July 12, 2011, in the Circuit Courtroom of the Coos County

Courthouse in the City of Coquille, County of Coos, State of

Oregon, before the Honorable Richard L. Barron and a jury.



APPEARANCES

R. Paul Frasier, District Attorney for Coos County,
representing the Plaintiff.

Erica Soublet, Assistant District Attorney for Coos County,
representing the Plaintiff.

Shaun McCrea, Attorney at Law, representing the Defendant.

Robert McCrea, Attorney at Law, representing the Defendant.


      S. Jean Sprouse, Court Transcriber, XV Judicial District, 503-325-5254

```
                                    Oswald   D    D5 138
```

1                        <u>KIP OSWALD</u>

2  was thereupon produced as a witness on behalf of the Plaintiff

3  and, having first been duly sworn to tell the truth, the whole

4  truth and nothing but the truth, was examined and testified as

5  follows:

6              THE COURT:   Have a seat here, please.

7                   <u>DIRECT EXAMINATION</u>

8  <u>BY MR. FRASIER:</u>

9      Q.   Could you state your name please, sir, and spell

10 your last name for the record?

11     A.   Kip Darwen Oswald, O-S-W-A-L-D.

12     Q.   What is your occupation, sir?

13     A.   I'm a police officer.

14     Q.   Who do you work for?

15     A.   I currently work for North Bend Police Department.

16     Q.   How long have you worked for the North Bend Police

17 Department?

18     A.   Almost five years.

19     Q.   Prior to that did you work for another police

20 agency?

21     A.   I worked for Hillsboro Agency for three and a half

22 years and Coos County Sheriff's Office for twenty-three and a

23 half years.

24     Q.   When did you work for the Sheriff's Office?

25     A.   Between '83 and 2006.

```
                                          Oswald  D   D5 139
```

 1      Q.    Why did you leave the Sheriff's Office and then end

 2   up at North Bend Police Department?

 3      A.    I retired but I had to go back to work because I

 4   couldn't afford the insurance.

 5      Q.    In the summer of 2000 were you — who were you

 6   working for in the summer of 2000?

 7      A.    Coos County Sheriff's Office.

 8      Q.    In the month of July of 2000 had you become aware

 9   that there was a missing girl in the Coquille Area named Leah

10   Freeman?

11      A.    Yes.  I found out the day of this occurrence.  And

12   she had apparently gone missing the week prior.

13      Q.    Now, as part of that did you decide on your own to

14   go and look at certain locations in the county to see if you

15   could find her?

16      A.    Yes, I did.

17      Q.    Was there a particular location that you went to out

18   towards the Fairview Area?

19      A.    Yes.

20      Q.    Where was that?

21      A.    I went out onto Lone Pine Lane and started checking

22   roads off to the sides.  Ended up on Hudson Ridge.

23      Q.    Are you familiar with the Hudson Ridge Road Area?

24      A.    Yes, I am.

25      Q.    In your capacity as a Deputy Sheriff, have you gone

```
                                    Oswald   D    D5 140
```

1   out there a lot?

2       A.   Many times.

3       Q.   Why is that an area you patrol frequently?

4       A.   I did, because I've often found places where there

5   have been parties and stuff at the particular location that I

6   went to where there'd been fires.  And you'd often see a lot

7   of evidence of drinking and drugs going on there.

8       Q.   Had you also seen areas where there had been illegal

9   garbage dumping?

10      A.   Yes.

11      Q.   Now, directing your attention, I believe it's to

12  July the 5th of the year 2000.  Is that the day that you went

13  up Hudson Ridge?

14      A.   Yes.

15      Q.   And could you describe where you went up the Hudson

16  Ridge Road?

17      A.   I turned off Lone Pine Lane and went up.  It's

18  approximately three hundred, four hundred yards up to a road

19  that goes off to the left which is an access road to the power

20  lines.  And it drives up, oh I guess it's probably seventy-

21  five yards, and goes underneath the power lines.

22      Q.   As you're driving up this road did you see anything

23  that your attention was drawn to?

24      A.   Yes.  I got up to where there's a ninety degree turn

25  in the road.  And it's just prior to the top of that road.

```
                                          Oswald   D    D5 141
```

1  And there was a shoe lying the road.

2      Q.   Now, is this before you get to the power lines or

3  after the power lines?

4      A.   It's just before you go under the power lines, yes.

5      Q.   I'm going to — can you describe this shoe that you

6  saw, sir?

7      A.   It was a white Nike tennis shoe, women's.  I believe

8  it was size six.

9      Q.   Let me just show you what's been marked - - -

10      A.   (Interposing) Yes.

11      Q.   - - - as State's Exhibit No. 97.  Does that look

12  like the shoe you found?

13      A.   All I can see is that little bit in there of the

14  shoe, but it's been awhile.  I think it is, yes.

15      Q.   Now, let's talk about where you found the shoe.

16  Prior to coming into court today, this CD I have here is

17  marked State's Exhibit No. 227.  Did you watch this particular

18  CD?

19      A.   Yes, I did.

20      Q.   And is this a video showing going up Hudson Ridge

21  Road to where you found the shoe?

22      A.   That's correct.

23      Q.   And does it accurately portray what you saw that day

24  or the area at least?

25      A.   Yes.

Oswald   D    D5 142

1           MR. FRASIER:    Your Honor, at this time we'd

2   offer State's Exhibit No. 227, video only.  There's no audio

3   with this.

4           MR. McCREA:    We do object to No. 227.  It's a

5   re-enactment as I understand it, Your Honor.  And it's the

6   Defendant's position that it is not in a very real sense a

7   natural display of precisely how the area appears and how the

8   finding occurred.

9           THE COURT:    When was the tape taken?

10          MR. FRASIER:    When did we?

11          WITNESS:    The tape was made approximately two

12  and a half weeks ago.

13          THE COURT:    You might ask him if there's —

14  what differences if any there are.

15      Q.   Is there any differences in the conditions of the

16  road or the area where the shoe was found?

17      A.   There has been a little bit of logging near the top

18  where some trees have been fallen.  The road itself appears to

19  be the same other than, at the time that I was going up there,

20  there was some garbage dumped off to the left hand side that's

21  not there in the pictures.

22          THE COURT:    The Objection's overruled.  The

23  exhibit will be received.

24          (Whereupon Exhibit No. 227 was then received

25  into evidence.)

Oswald   D    D5 143

1              THE COURT:    Just keep in mind that it was

2    taken two and half weeks ago.  And it's just to show you the

3    area that he is talking about.

4              Will you be questioning the witness during the

5    showing of this?

6              MR. FRASIER:    I was going to ask him to

7    describe what is - - -

8              THE COURT:    (Interposing) That's fine.

9              I just wanted to make sure we kept the

10   recording going.

11             Go ahead.

12   Q.   Officer, as this is playing could you describe it

13   for us, please?

14   A.   This is looking at Lone Pine Lane.  And these two

15   access roads to the right and the left of this car are

16   actually Hudson Ridge, the access also off of Lone Pine.

17             This is starting up Hudson Ridge.

18             What this is going to do is going to show you from

19   Lone Pine all the way up to the point where I located the

20   shoe.

21             Where we turn off to go onto the access road up

22   underneath the power lines.  I actually get out and walk and

23   he follows me up there.

24             Now you see the start of the logging road there and

25   the access road to the left there.  Those trees and stuff over

Oswald   D   D5 144

1  there were not logged at the time that this occurred.

2         This corner, in 2000 there was garbage along that

3  corner and back into the trees a little bit.

4         When I came around this corner right here, I saw the

5  show laying in the road.  And I'll point to where the shoe is

6  here — it was — in a minute.

7      Q.   Are you standing there?  Is that where the shoe was?

8      A.   That's where I was pointing on that — the right

9  side, the middle of the road.

10         What he's doing here is just showing the area.  It's

11  pretty much the same except right at the very top of the

12  picture you can see that there were some trees that were

13  there.

14      Q.   What did you do with the shoe that you found?

15      A.   I picked it up and I took it back to Coquille.  At

16  the time that I came into town the FBI in Coquille were

17  running a road block where they were checking cars that had

18  come through on that same day the week prior to ask them if

19  they had seen anything.  And I asked them if they knew what

20  size that she wore.

21         They weren't sure at that time.  And I showed them

22  the shoe.  They said that it appears to match another one that

23  they had and asked me to put it into evidence.

24      Q.   And so you turned it over to the Coquille Police

25  Department?

Oswald  D    D5 145

1    A.   No.  I turned it into evidence at Coos County

2  Sheriff's Office.

3    Q.   And to the best of your knowledge was it then turned

4  over to the Coquille Police Department at a later time?

5    A.   It was later turned over to them, yes.

6    Q.   Now, when you found the shoe, do you recall what its

7  position was on the road?

8    A.   It was laying sideways.  I remember being able to

9  see that it was white when I pulled up there.  So it had to

10  have been laying on its left side.

11    Q.   And do you recall the condition of the laces,

12  anything along that line?

13    A.   I believe it was — they were untied.

14    Q.   Now, when you picked the shoe up, did you pick it up

15  with your bare hands or did you put some gloves on?

16    A.   I picked it up with my bare hands.

17    Q.   Later on it was determined there was some male DNA

18  on that shoe?

19    A.   And it was mine, yes.

20    Q.   And you gave a sample and they determined it was

21  your DNA?

22    A.   That's correct.

23    Q.   Now, did you go back up?  After you turned the shoe

24  in, did you go back up there a couple days later to look

25  around to see if you could find any more evidence up there?

Oswald   D   D5 146

1        A.   I did.

2        Q.   And in particular did you go up there on July — I

3    believe the 7th of 2000?

4        A.   Yes, I did.

5        Q.   I'm going to show to you what's marked as State's

6    Exhibit No. 236 which has previously been identified as a

7    receipt in the name of Raymond Lewis.  Do you recognize that,

8    sir?

9        A.   Yes, I do.

10       Q.   Did you find that receipt on July the 7th?

11       A.   Yes, I did.

12       Q.   Where did you find that receipt?

13       A.   In the photographs when I said that we'd be turning

14   onto the road that was the access road off of Hudson Ridge

15   Road and I was pointing out where the trees were that were

16   cut.  If you go straight there and you go about a hundred

17   yards to a hundred and fifty yards there's a road that takes

18   off to the left.  And there had been a vehicle that had —

19   vehicle tire track that had spun out there.  And it looked

20   like somebody had turned around there.  And I saw this laying

21   in the road.  And since somebody had appeared to have gotten

22   out of a vehicle at that location and had spun out I picked up

23   the receipt and then checked the area to make sure that there

24   wasn't something else there.

25       Q.   And how far away was this receipt from where you had

Oswald   X   D5 147

1  found the shoe?

2       A.   Hundred to hundred and fifty yards.

3       Q.   Is that a straight line as the crow would fly?

4       A.   It would be down — it would be down over the hill

5  from the top of the hill underneath the power lines down to

6  that other road.

7            MR. FRASIER:   Your Honor, we'd offer State's

8  Exhibit No. 236.

9            MR. McCREA:   No objection.

10           THE COURT:   No. 236 is received.

11           (Whereupon Exhibit No. 236 was then received

12  into evidence.)

13           MR. FRASIER:   I don't believe I have any

14  further questions for the witness at this time.

15           THE COURT:   Cross.

16                 CROSS EXAMINATION

17  BY MR. MCCREA:

18      Q.   It's Officer Oswald now.  Is that correct?

19      A.   Yes.

20      Q.   I tried to listen carefully, but forgive me if I'm

21  redundant of some of what you said.

22           You went up this access road.  And this goes up to

23  the power line itself.  Is that correct?

24      A.   Yes.  It goes up underneath the power lines and then

25  drives — actually, if you go to the left, drives out a little

Oswald   X   D5 148

1   bit farther underneath there.

2       Q.   And in the video you're walking up there.  But the

3   road is a road that you could drive a vehicle up there.  Is

4   that correct?

5       A.   That's correct.

6       Q.   Pardon?

7       A.   That's correct.

8       Q.   Okay.  And you walked up the road for the video in

9   order to get the best display you could of what the road was

10  like?

11      A.   Yes, sir.

12      Q.   All right.  Now, dealing with the receipt which is

13  now in evidence as No. 236, if you don't go up this access

14  road, the road goes — Hudson Ridge Road — goes on — I don't

15  know, it seems to me like it's east.  But it may be some other

16  direction for a ways to where you found the receipt.  Is that

17  correct?

18      A.   That's correct.

19      Q.   And you found the receipt where there's a branch in

20  the road?

21      A.   There's a road that takes off to the left.  And it

22  was just probably ten to fifteen feet this side of that road.

23      Q.   Of where the branch takes off to the left?

24      A.   Yes.

25      Q.   Okay.  Was there anything else around the receipt?

Oswald   X   D5 149

1      A.   Just the evidence of somebody backing up to the edge

2   of the road and then where their tires spun out.

3      Q.   And that's — did you talk about that before that I

4   just wasn't able to hear?

5      A.   Yes.  I think I explain it just a little different,

6   but I did, yes.

7      Q.   Somebody had back up, tires had spun, and then - - -

8           But, aside from this disturbance on the road, were

9   there any other items that looked like they may have fallen

10  out there?

11     A.   No.

12     Q.   Now, going back to the access road.  Did you then

13  later go back to the access road where you found the shoe and

14  make a further examination?

15     A.   Yes, I did.

16     Q.   And at that time did you find two spent — that is to

17  say fired — twenty-two cartridge cases?

18     A.   I think I did.  Are you referring to one of my

19  reports?

20     Q.   Yes, yes.

21     A.   Which one are you referring to?

22     Q.   I'm not — let me - - -

23           MR. McCREA:   May I approach?

24           THE COURT:   You may.

25     Q.   This is what I was looking at.

Oswald   X   D5 150

1    A.   Okay.  So we're on the — is it this?  Yeah, I think

2    this is just the — I have the observations.  I don't have that

3    part.  Yes, sir.

4    Q.   Does that bring back a memory?

5    A.   Yes, it does.

6        MR. McCREA:    So, forgive me.  I'll go back.

7    Q.   Without having to go to the trouble of prevailing of

8    Mr. Frasier to put the video back up, were the twenty-two —

9    spent twenty-two cartridges found in the general area where

10   you have indicated on the video you found the shoe?

11   A.   Yes.  All of these items were.  And that's why I

12   picked them up, just in case they may of some evidentiary

13   value.

14   Q.   And, in that same area did you also find some items

15   that you describe as being three napkins or towelettes?

16   A.   Yes, I did.

17   Q.   With regard to the napkins or towelettes, did you

18   make a note of the fact that they had been there when you had

19   found the shoe previously, there in this same area?

20   A.   I didn't know that.  Just the age of them appeared

21   that they could have been and that's why I picked them up.  I

22   didn't notice whether they were or not at the time.

23   Q.   Well, I — would you please look at Page 2 of your

24   report under observations.  And look at the third paragraph

25   there please?

Oswald   X   D5 151

1      A.   I don't remember that in my memory, but I did put

2  down there I noted that they were at that location when I

3  found the shoe.

4      Q.   Okay.  And I don't mean to belabor the issue, but

5  that's part of being a police officer, is to make reports?

6      A.   Absolutely.

7      Q.   And the reason that you do it is to get it down

8  accurately at the time that it's known to you as to what

9  happened?

10     A.   That's correct.

11     Q.   Okay.  And so is it fair to say that you put it in

12 the report that those were there when you found the shoe,

13 that's that the fact, that they were there when you found the

14 shoe?

15     A.   Yes.

16     Q.   Okay.  So, you seized those.  Is that right?

17     A.   Yes, I did.

18     Q.   And in addition — well, I don't know about in

19 addition.  But in conjunction with seizing those napkins or

20 towelettes, they had some residue on them according to your

21 report?

22     A.   Yes.  There's an unknown residue.

23     Q.   I'm sorry, what kind of residue?

24     A.   Yes.  It was an unknown residue.

25     Q.   Okay.  You didn't know what it was?

Oswald   X   D5 152

1    A.   No.

2    Q.   And it's not your job to do analysis to try to find

3 out what it is?  I mean, that's not part of your patrolman

4 job?

5    A.   No.  It's just my job to send it to the lab to find

6 out what it is if that's - - -

7    Q.   (Interposing) Okay.  How did you handle these items?

8 By that I mean you had picked up the shoe with your hands, but

9 how did you go about processing the napkins or towelettes with

10 the residue?

11    A.   I don't remember.

12    Q.   Excuse me?

13    A.   I don't remember.

14    Q.   Okay.  What about the cartridges?  Do you remember

15 how you handled them?

16    A.   I don't.

17    Q.   Well, let me ask you this.  Do you have a standard

18 procedure as to how you — well, strike that.  Let me back up.

19        By the time you found the napkins or towelettes with

20 the residue, had you become aware that this shoe you found was

21 probably the shoe from the missing Leah Freeman?

22    A.   Yes, I had.

23    Q.   Okay.  So, it's fair to say that things that were to

24 be found in this area you now knew were important?

25    A.   They could be, yes.

Oswald   X   D5 153

1    Q.   Okay, that's fair.  It could be important.  So,

2  would it have been a standard police procedure to try to

3  handle these items — by these items I'm referring to the spent

4  twenty-two cartridges and the three napkins or towelettes with

5  residue — in a way that would preserve the sanctity of their

6  nature?

7    A.   It should be.  But the only thing I'm saying is, I

8  don't remember.

9    Q.   Pardon?

10    A.   The only thing I'm saying is I don't remember

11  exactly how - - -

12    Q.   (Interposing) Oh, I understand that.

13    A.   - - - I picked them up.

14    Q.   I'm just asking you - - -

15    A.   (Interposing) I don't know if I picked them up with

16  a pen or whether I had gloves on or — I just don't remember

17  that part right now.

18    Q.   That would have been proper police procedure.

19  Right?

20    A.   Yes.

21    Q.   Okay.  And that's normally what's used when you're

22  trying to keep — when you know that evidence could be

23  important?

24    A.   That's correct.

25    Q.   Okay.  Now, what did you do with these items after

Oswald   X   D5 154

1  you seized them?

2      A.   I took them to the Coos County Sheriff's Office and

3  they were placed into evidence.

4      Q.   Now, when you place them in evidence they are

5  registered in, in some manner?  Is that correct?

6      A.   Yeah.  They're placed on a card.  You put what Item

7  No. 1 is; Item No. 2.  And then you mark them on the bags and

8  make sure everything is marked so it coincides with the card

9  so they know what's in evidence with that case.  It's got the

10  case number on it.  And it's placed into evidence in the box.

11      Q.   You — and then they're preserved in a sealed bag?

12      A.   They're in a bag where there's tape put on the

13  outside of the bags or staples and/or.  And then they're

14  placed into a locked box.

15      Q.   Okay.  And that's done to preserve them?

16      A.   Yes.

17      Q.   Now, do you know what was done to process those

18  items to see what if anything could be derived from them?

19      A.   I do not.  I was not privy to any of the things that

20  were sent in or what was examined.

21      Q.   Have you seen them here today?

22      A.   I saw the shoe.  And I don't know what else was in

23  the bag.

24      Q.   No, I'm — the twenty-two cartridges and the napkins

25  or towelettes?

Oswald   X   D5 155

1      A.   No.  I haven't seen those.

2      Q.   Not seen those.  After you checked them into

3   evidence did you ever see them again?

4      A.   No.

5      Q.   And did anyone ever interview you and talk to you

6   about where you had obtained those and what the — you know,

7   and their circumstances, such as the fact that they had been

8   there when you found the shoe?

9      A.   I - - -

10     Q.   (Interposing) By anyone, I mean law enforcement

11  person?

12     A.   I don't remember a conversation of that.

13     Q.   The video we saw here, it probably was said, but I

14  didn't catch it.  When was that made?

15     A.   About two and half weeks ago.

16     Q.   Two and a half weeks ago?

17     A.   Yes, sir.

18     Q.   When you were up there, it was in July of 2000.

19  Correct?

20     A.   That is correct.

21     Q.   And it was — it was dry that summer, was it not?

22     A.   I remember that evening as being very warm.

23     Q.   Excuse me?

24     A.   I remember that evening being very warm.  I don't

25  know how the whole summer was, but it was dry that day, yes.

1      Q.   Well, let me get at it this way, to get to the

2  point.  The road was dry up there?

3      A.   Yes, it was.

4      Q.   You didn't have any traction problems?

5      A.   No, I did not.

6      Q.   You didn't see any mud?

7      A.   No.

8      Q.   And that includes down where the receipt was found.

9  You didn't see any mud down there?

10     A.   No, I don't believe so.

11     Q.   And there was some dampness showing on the video.

12  That's what's there now or at least when it was made.  So,

13  it's not quite the same as when you made it.  Right?  I mean,

14  as when you were there?

15     A.   Yeah.  If it was damp, it wasn't damp then.  No.

16     Q.   Pardon?

17     A.   It wasn't damp then, no.

18     Q.   Okay.  That's all I'm trying to get at.

19          Then, was the - - -

20              MR. McCREA:    May I have just a moment, Your

21  Honor?

22              THE COURT:    Go ahead.

23     Q.   Oh.  In the property list I'm looking at it

24  indicates there were some photographs made of the evidence.

25  Is that correct?

Oswald   ReD  D5 157

1    A.    That is correct.

2    Q.    Did you do that?

3    A.    Yes, I did.

4    Q.    And the photographs you made, did they give a good

5    representation as to what the evidence looked like?

6    A.    Yes.

7    Q.    Have you seen the photographs here today?

8    A.    No.

9    Q.    Thank you Officer Oswald.  Thank you very much.

10         THE COURT:   Redirect.

11             REDIRECT EXAMINATION

12   BY MR. FRASIER:

13   Q.    Officer Oswald, Hudson Ridge Area, is that known as

14   an area where people go to party?

15   A.    Yes.

16   Q.    Is there locations up there where people go what's

17   sometimes referred to as mudding?

18   A.    Yes.  In fact, right up at the top of that hill

19   there's a hill that goes down to the Hudson Ridge Road that's

20   been used a lot for mudding, in particular.

21   Q.    Is there a particular location where actually

22   there's a stream or a river that runs across the road?

23   A.    There is down below where it goes back onto Middle

24   Creek.  There's a portion of road that cuts back and goes back

25   down to Middle Creek.

```
                                    Oswald   ReD  D5 158
```

1      Q.    And is that wet or muddy year round?

2      A.    Yes, it is.

3      Q.    Now, in regards to these twenty-two shells, where

4  were they found?  How far were they away from where you found

5  the shoe?

6      A.    In the general proximity.  There's — if I were to

7  estimate, probably ten feet each side of — maybe fifteen feet

8  each side of where I found the shoe, I located these items.

9      Q.    And, these towelettes, where were they in relation

10 to the shoe?

11     A.    Same general area.

12     Q.    Were they with the twenty-two shells or - - -

13     A.    They were just items that were in the area that were

14 — they were kind of spread around that I picked up that were

15 there.  I thought maybe could be evidential value.

16     Q.    Now, in your experience as a deputy up there, have

17 you seen people target shoot and things like that up there?

18     A.    Yes.  There's quite often shell casings and garbage

19 there.

20     Q.    And you indicated earlier that there was actually a

21 pile of garbage?

22     A.    Yes.  It was pretty common to go up there on that

23 particular corner that I was pointing out.  And there would be

24 actually truckloads of garbage there.  And at that time there

25 was garbage.

Ulmer   D    D5 159

1    Q.   How far away was the garbage from where you found

2    these towelettes and stuff like that?

3    A.   Probably twenty-five feet.  It would have been right

4    behind where I was standing and I was — well, it would have

5    been to my right when I was standing pointing down at the

6    ground.

7    Q.   Thank you.

8         MR. FRASIER:   That's all I have.

9         THE COURT:   You may step down and you're free

10   to leave.

11        WITNESS:   Thank you.

12        THE COURT:   Call your next witness.

13        MR. FRASIER:   Call Randy Ulmer.

14                    RANDY ULMER

15   was thereupon produced as a witness on behalf of the Plaintiff

16   and, having first been duly sworn to tell the truth, the whole

17   truth and nothing but the truth, was examined and testified as

18   follows:

19        THE COURT:   Have a seat here, please.

20                 DIRECT EXAMINATION

21   BY MR. FRASIER:

22   Q.   Could you state your name please, sir, and spell

23   your last name for the record?

24   A.   Randy Ulmer, U-L-M-E-R.

25   Q.   Mr. Ulmer, what is your current occupation?

```
                                        Ulmer   D    D5 160
```

1      A.    Currently I work at a hardware store.

2      Q.    Previously you were employed by the Coquille Police

3  Department?

4      A.    That's correct.

5      Q.    How long were you with the police department?

6      A.    Approximately ten years.

7      Q.    I don't mean to be embarrassing to you, but there's

8  a couple things I need to ask.  While you were working for the

9  police department did you have a gambling problem?

10     A.    Yes, I did.

11     Q.    And it got out of control?

12     A.    Yes, it did.

13     Q.    While you worked for the police department were you

14 in charge of the evidence locker?

15     A.    Yes, I was.

16     Q.    And as part of your gambling problem did you remove

17 some money from the - - -

18     A.    (Interposing) Yes, I did.

19     Q.    And you were subsequently prosecuted for Theft in

20 the First Degree?

21     A.    I was.

22     Q.    You plead guilty to that?

23     A.    Yes, I did.

24     Q.    Resigned your position with the police department?

25     A.    Yes, I did.

Ulmer   D    D5 161

1    Q.    Now, I want to go back to the year 2000.  Were you

2    working as a police officer then?

3    A.    Yes, I was.

4    Q.    And you became aware in the late June, early July

5    that there was a missing girl here in Coquille?

6    A.    That's correct.

7    Q.    And that would have been Leah Freeman?

8    A.    Yes.

9    Q.    Now, are you familiar with Tony Messerle?

10   A.    Yes, I am.

11   Q.    How do you know Mr. Messerle?

12   A.    Well, I met Mr. Messerle a few times in my life.

13   One particular occasion I — he had called in and found an item

14   on North Elm Street which was a shoe, which was possibly Leah

15   Freeman's shoe.

16   Q.    Did you go to his residence?

17   A.    Yes, I did.

18   Q.    Did you recover that shoe?

19   A.    I did.

20   Q.    I'm going to show to you what's marked as State's

21   Exhibit No. 96.  And looking at the tags there and so forth

22   can you identify that shoe?

23   A.    That appears to be the correct one.

24   Q.    And you took that from Mr. Messerle at that time?

25   A.    Yes.

Ulmer   X   D5 162

1    Q.   And you placed it at the Coquille Police Department?

2    A.   Yes, I - - -

3    Q.   (Interposing) In the evidence locker?

4    A.   Yes.

5    Q.   Did you have contact with Deputy Kip Oswald?

6    A.   Um, I believe I did.

7    Q.   Did Deputy Oswald discuss with you about having

8    found a shoe up on Hudson Ridge?

9    A.   I honestly don't recall.

10   Q.   All right.

11        MR. FRASIER:   I don't believe I have any

12   further questions for Officer or Mr. Ulmer, Your Honor.

13        THE COURT:   Ms. McCrea.

14              CROSS EXAMINATION

15   BY MS. MCCREA:

16   Q.   Mr. Ulmer, when did you receive the shoe, Exhibit

17   No. 96 from Mr. Messerle, what day?

18   A.   If I can refer to my reports?

19   Q.   Of course.

20   A.   I don't believe I have a copy of that one.

21   Q.   Well, I can show you what I have, but it may not be

22   helpful in terms of the date.

23   A.   I believe it was June 28th, 2000.

24   Q.   Okay, so — June 28th?  That's the day that

25   Ms. Freeman went missing.

Ulmer   X    D5 163

1          A.   Okay.

2               MS. McCREA:    Mr. Frasier, are you prepared to

3     assist?

4               MR. FRASIER:    Yes.  July the 4th, 2000 is the

5     date on the tag.

6          A.   That would be the correct date, then.

7          Q.   Thank you.

8          A.   Thank you.

9          Q.   And to obtain the shoe you had received information

10    from dispatch that there was a shoe that you needed to go pick

11    up or an item you needed to pick up?

12         A.   Correct.

13         Q.   So, you went to Mr. Messerle's residence.  Is that

14    right?

15         A.   That is correct.

16         Q.   Made contact with him and he gave you the shoe?

17         A.   That's correct.

18         Q.   At the time that you first saw the shoe was it

19    sitting on his kitchen floor?

20         A.   I believe he met me outside with the shoe.

21         Q.   So, he carried it out and handed it to you?

22         A.   I believe.

23         Q.   And did he have it in his bare hands?

24         A.   I don't recall how he was handling it at the time.

25         Q.   I understand.  It's been a long time ago.

```
                                        Ulmer   X   D5 164
 1      A.   Quite awhile.
 2      Q.   When you took possession of it were you wearing
 3  gloves or were you bare handed?
 4      A.   I was wearing gloves at the time.
 5      Q.   You were wearing gloves.  And then you put it in a
 6  bag?
 7      A.   Yes.
 8      Q.   Okay.  And to your knowledge that was then logged
 9  into evidence and submitted for analysis?
10      A.   Correct.
11      Q.   And there was no indication as far as you know that
12  Mr. Messerle's DNA was found on that shoe?
13      A.   Not that I know of, no.
14      Q.   Thank you.
15           MS. McCREA:   Nothing further, Your Honor.
16           THE COURT:   Any redirect?
17           MR. FRASIER:   I have no further questions,
18  Your Honor.
19           THE COURT:   You may step down.  You're
20  excused; free to leave.
21           WITNESS:   Thank you, Your Honor.
22           THE COURT:   Call your next witness.
23           MS. SOUBLET:   State calls Jennifer Storts.
24           MS. McCREA:   Excuse me, Your Honor.
25           Actually Mr. Ulmer is under Defense subpoena,
```

1  but he doesn't need to be — remain here now.

2             THE COURT:   Do you want him back, though?

3             MS. McCREA:    I want him back at some point,

4  but we'll make arrangements with him.

5             THE COURT:   Okay.

6             Mr. Ulmer, you're not excused from the case.

7  So, make sure that Ms. McCrea or a representative of her

8  office is aware of how they can get a hold of you.  I don't

9  think it's like fifteen minutes notice, but it will be half a

10  day or some type of notice like that.

11             MS. MITCHELL:   Yes.

12             WITNESS:   (Not understandable.)

13             THE COURT:   Okay.  That's fine.

14             Step forward, please, Ms. Storts.

15                    JENNIFER STORTS

16  was thereupon produced as a witness on behalf of the Plaintiff

17  and, having first been duly sworn to tell the truth, the whole

18  truth and nothing but the truth, was examined and testified as

19  follows:

20             THE COURT:   Have a seat up here, please.

21                  DIRECT EXAMINATION

22  BY MS. SOUBLET:

23     Q.   Ms. Storts, can you state your full name and spell

24  your last for the record?

25     A.   It's Jennifer Lee Storts, S-T-O-R-T-S.

1          MS. SOUBLET:    You can actually pull that

2    microphone down.

3          THE COURT:    (Not understandable.)

4          WITNESS:    Okay.  Perfect.  There we go.

5          MS. SOUBLET:    I'm going to ask you to keep

6    your voice up to make sure that everybody can hear you.

7          WITNESS:    Okay.  Not a problem.

8     Q.   Ms. Storts, how are you employed?

9     A.   I'm the lab manager at Coquille Valley Hospital.

10    Q.   How long have you been at Coquille Valley?

11    A.   At least eleven years.

12    Q.   Were you working there in the summer of 2000?

13    A.   Yes, I was.

14    Q.   And what was your position at that time?

15    A.   At that time I was just a generalist.

16    Q.   Okay.  Working in the lab?

17    A.   Working in the laboratory, yes.  I was an MT.

18    Q.   Do you know Kathy McGuffin?

19    A.   Yes, I do.

20    Q.   How do you know her?

21    A.   She also works with me in the radiology department.

22    Q.   Are you aware or do you know what type of car

23    Ms. McGuffin drove in the summer of 2000?

24    A.   Yes, I believe so.

25    Q.   And what was that?

Storts   D    D5 167

1      A.   She drove like a step-side truck.

2      Q.   A pickup?

3      A.   Pickup, yes.  I'm sorry.  A pickup with a step-side.

4      Q.   Ms. Storts, I want to turn your attention to June

5   28th, June 29th, 2000.  Were you working that day?

6      A.   I was working that evening, yes — that day and

7   evening.

8      Q.   Okay.  Were you working a regular shift or an on-

9   call shift?

10     A.   An on call shift.

11     Q.   Which means what?

12     A.   Which means basically you work so many hours.  And

13  then if somebody comes into the ER or an in-patient needs some

14  lab work, they call us back into the hospital.  And we do

15  thing then and then we go back home afterwards.

16     Q.   Are you required to keep some sort of track of your

17  hours when you're called in on on-call hours?

18     A.   Yes, we are.

19     Q.   How do you do that?

20     A.   Basically when we enter the hospital we write down

21  the time that we were there, the patient that we drew, and

22  then we also — when we go to leave — we write down that time

23  that we leave the hospital again.

24     Q.   And are those records kept in the normal course of

25  Coquille Valley Hospital business?

Storts    D    D5 168

1    A.    Yes, they are.

2    Q.    Ms. Storts, I'm going to hand you what's been marked

3    for identification purposes as State's Exhibit No. 240 and ask

4    you if you recognize that?

5    A.    Yes.  That's my call log sheet for June of 2000.

6    Q.    How do you recognize that as being yours?

7    A.    Well, first off my maiden name is Jennifer DeBord.

8    And that's my handwriting.  And my name's at the top.

9            MS. SOUBLET:    We'd offer State's Exhibit

10    No. 240.

11            MR. McCREA:    There's no objection.

12            THE COURT:    Received.

13            (Whereupon Exhibit No. 240 was then received

14    into evidence.)

15    Q.    Ms. Storts, in looking at Exhibit No. 240, can you

16    tell me what time you got off at Coquille Valley Hospital on

17    June 28th?

18    A.    Five minutes after midnight.

19    Q.    And where were you living at that time?

20    A.    I was - - -

21            MR. McCREA:    (Interposing) Excuse me.  I

22    couldn't - - -

23            I'm sorry, Your Honor, this witness is speaking

24    very quickly.  And I'm having difficulty hearing what she's

25    saying.  I didn't catch the time.

Storts   D     D5 169

1          WITNESS:    I'm sorry, sir.

2          Five minutes after midnight.

3          MR. McCREA:    Thank you very much.

4      Q.    Where were you living at that time?

5      A.    I was living exactly at the eight mile marker out

6  Fairview.

7      Q.    So, when you got off shift from Coquille Valley, how

8  did you go home?

9      A.    I actually take, like, the back road that will take

10  you out onto Fairview Road, right by Milky Way Feed and Pack.

11  And then I drive Fairview Mountain home.

12      Q.    And while driving out on Fairview Mountain after

13  midnight on, which would now be June 29th, 2000, did you see

14  someone?

15      A.    I came around the corner as I was going up Fairview

16  Mountain.  And it startled me because I was exhausted and

17  driving home.  And I came around the corner and saw two males

18  and a short female.  The males were on each side of her

19  walking up Fairview Mountain.

20      Q.    Do you remember where on Fairview Mountain Road that

21  was?

22      A.    Approximately, yes.  We took some pictures of the

23  spot.  There had been some changes because the road had

24  sluffed off since 2000.  And they'd had to do some

25  reconstruction of the road.  But, yes.

Storts   D   D5 170

1    Q.   And what mile marker is it closest to?

2    A.   I couldn't tell that off the top of my head.  Sorry.

3    Q.   Do you remember talking to detectives last year when

4  this case was reopened?

5    A.   Yes.

6    Q.   Do you remember possibly telling them that it was

7  closer to mile marker four?

8    A.   Well, it was — what I had told them is it was where

9  Carol Major used to live.  That's how I had told them, and

10 they came up with mile marker four, because I know where her

11 driveway was.

12   Q.   And I take it you'd been out there with somebody and

13 took pictures?

14   A.   Yes.

15   Q.   And when was that?

16   A.   Some time last year.

17   Q.   That was near mile marker four?

18   A.   Yes.

19   Q.   And what was the road like in 2000?

20   A.   You mean — well, there was an actual — a little bit

21 of an shoulder where somebody could walk along that side of

22 the road.  If that's what you mean.  I'm a little confused by

23 your questions.

24   Q.   That is what I meant.

25   A.   Okay.

Storts   D   D5 171

1    Q.    Whether or not there was a shoulder?

2    A.    There was a shoulder at that time.

3    Q.    Where were the people when you saw them?

4    A.    They were on the side of the road walking up

5 Fairview Mountain.

6    Q.    So, on the same side as you're driving?

7    A.    Absolutely, yes.

8    Q.    And did you notice anything about — well, first of

9 all how could you tell they were two men and a woman?

10    A.    I would just say by basically what they were

11 wearing.  They were wearing dark hoodies.  They both had their

12 hoods up.  Basically body structure would be the only way that

13 I could definitively tell you if they were men or not.  That

14 would be it.

15    Q.    If I understand correctly, you consider somebody who

16 watches people.  Is that right?

17    A.    I — well, yes, I'm in the — you know, I see people

18 everyday.  And I see a lot of people, yes.

19    Q.    What if anything did you notice about the girl?

20    A.    The girl was shorter than the two guys, had very

21 distinct, very blonde hair.

22    Q.    Did you notice anything else about her?

23    A.    That would be about it.

24    Q.    Do you remember telling Detective Asmus (phonetic)

25 and Detective Andrews that she was skinny and appeared to be

```
                                        Storts   D    D5 172
```

1  slouched down?

2       A.   Yes, yes.

3       Q.   You know Brent Bartley?

4       A.   I do know Brent Bartley.

5       Q.   How long have you known Brent Bartley?

6       A.   I basically can't remember not knowing him because

7  I've been very good friends with his sister for most of my

8  life.

9       Q.   So, in 2000 you would have known him for a period of

10  time?

11      A.   Yes.

12      Q.   How often would you think you'd seen Brent Bartley?

13      A.   I don't know.  In the last year or in my lifetime?

14      Q.   In 2000?

15      A.   In 2000?

16      Q.   Quite a bit?

17      A.   Well, I can't really tell you I saw him a lot in

18  2000.  I can't remember that many years ago.  I'm sorry, but —

19  I mean, I've seen, but I couldn't tell you how many times.

20      Q.   Do you remember telling Detective Andrews and

21  Detective Asmus that the stature of one of the two men and the

22  way the person was walking appeared to be Brent Bartley?

23      A.   Yes.  I said I could not rule him out.

24      Q.   What about the other guy?

25      A.   Approximately the same height.  That's all I can

Storts   D   D5 173

1    tell you.  Same type of stature.

2        Q.   After seeing those three people on — off of the

3    road, what did you do?

4        A.   Well, at first — like I had originally said, they

5    startled me.  And so then when I kinda got my wits back about

6    me, I thought to myself, "Well, maybe I need to turn around

7    and find out if they need help," because you don't usually see

8    somebody walking on Fairview Mountain at that time.  And as I

9    came around the next corner that's when I saw a vehicle.  And

10   that's when I determined that they had a vehicle, therefore I

11   didn't need to stop and see if they needed help.

12       Q.   And when you came around the corner, how far away

13   was the vehicle from where you saw the people?

14       A.   I — you know what — a hundred yards, a hundred fifty

15   yards, something like that.

16       Q.   What type of vehicle was it?

17       A.   All I could tell the detectives was that it was a

18   pickup truck.  And it was not normal as far — it was not a

19   normal large pickup truck.  It was not a little pickup truck.

20   It was — all that sticks out in my mind is that it was

21   unusual.  And that is all I can tell you.

22       Q.   Did you — when did you become aware that Leah

23   Freeman was missing?

24       A.   It was in the papers.  I mean, whenever it was in

25   the papers and the radio.  The next day, the day after.  I

Storts   D    D5 174

1   don't know.

2       Q.   And did you attempt to relay what you saw to

3   Coquille Police?

4       A.   Yes, I did.

5       Q.   Who did you tell?

6       A.   I told Chief Reaves.

7       Q.   How was Chief Reaves' reaction to your information?

8       A.   He — he didn't — he basically made me feel like an

9   idiot for coming forward.  He wanted to know what this piece

10  of paper was and asked me — flat out asked me, "Well, why are

11  you giving this to me?"

12          And I said to him, "I'm giving this to you to prove

13  what time I left the hospital.  And nothing else was ever

14  done."

15      Q.   Was there a time when — was there a time when you

16  told the police again?

17      A.   Yes.

18      Q.   When was that?

19      A.   I also at the time — well, when the case was

20  reopened, worked with Nicky Daniels.  And when it came out on

21  the news that they were reopening the case and that they had

22  re-interviewed witnesses, I asked Nicky, I said, "Well, do

23  they need to see me?"

24          And she said, "Well, what for?"

25          And that's when I told her about the night that I

Storts   D   D5 175

1   was on call.

2          And she said, "They know nothing about that."

3      Q.   And you were interviewed the next day?

4      A.   And I believe it was the next day, yes.

5      Q.   Do you know what the relationship of Kathy McGuffin

6   is to the Defendant?

7      A.   I do now, yes.

8      Q.   What is that?

9      A.   That Kathy is Nick's mother.

10     Q.   And sometime after you saw the people on Fairview

11  Road back in June — June 29th, 2000, did you have an

12  opportunity to observe Ms. McGuffin in a pickup in the parking

13  lot of the hospital?

14     A.   Yes.

15     Q.   And did you notice anything different about her

16  tires?

17     A.   That — I am not comfortable answering that question.

18     Q.   Do you remember telling Detective Asmus and

19  Detective Andrews - - -

20     A.   (Interposing) I told them that there were

21  rumors - - -

22     Q.   (Interposing)  I'm not asking — let me interrupt

23  you.  I'm not asking about rumors.  I'm asking you if you

24  observed Ms. McGuffin's tires?

25     A.   Yes.

Storts   X   D5 176

1    Q.   Did those tires appear to be new?

2    A.   Yes, they did.

3    Q.   Thank you.

4         MS. SOUBLET:   I have nothing further.

5         THE COURT:   Mr. McCrea.

6

7         MR. McCREA:   Well, yeah.  (Not

8    understandable.)

9                    CROSS EXAMINATION

10   BY MR. MCCREA:

11   Q.   You looked at Ms. McGuffin's pickup since that time,

12   as I understand what you're saying to Counsel.  Is that

13   correct?

14   A.   Since what time, sir?

15   Q.   Since the time that you saw the matter of the people

16   and the pickup out on Fairview Mountain?

17   A.   Uh huh.  That next week, yes.

18   Q.   And you never — you never told or identified the

19   pickup as Mrs. McGuffin's pickup.  Isn't that true?

20   A.   That's correct.

21   Q.   Okay.  And you don't identify it as her pickup now?

22   A.   I cannot tell you that for sure, no.  That was

23   eleven years ago and - - -

24   Q.   (Interposing) Okay.  And it was a small pickup as

25   the same type as Mrs. McGuffin has?

Storts   X   D5 177

1      A.   I can't even tell you that for positive.  What I can

2  tell you is that it was an unusual pickup; and it was not a

3  normal small pickup; and it was not a normal large pickup.

4      Q.   It was - - -

5      A.   (Interposing) It just sticks — it just sticks out my

6  brain as being unusual.  That's the only thing my brain will

7  tell me now at this point, is that it was unusual.

8      Q.   Well, as I understand what you're saying, you don't

9  tie it together as being Mrs. McGuffin's pickup at this point?

10     A.   I cannot tell you for positive that it was, no.

11     Q.   All right.  Now, as far as the person.  Two people

12  had hooded sweatshirts on?

13     A.   Correct.

14     Q.   And they had the hoods up on the hooded sweatshirts?

15     A.   Correct.

16     Q.   And you saw no faces of either of those people?

17     A.   I saw no faces.

18     Q.   And they were about the same height, both of them?

19     A.   Approximately, yes.

20     Q.   Okay.  And the — so, those persons could have been

21  females also with hoods up on the sweatshirt?

22     A.   It is possible.  I did not see faces.

23     Q.   Yeah, right.  Okay.  And then the person in the

24  center, you thought was a female because the person had long

25  hair?

1    A.   I did not say that she had long hair.  The only

2   thing that sticks out to me is that it was very blonde hair.

3    Q.   Oh, blonde.  I misunderstood.  Beg your pardon.

4         The person had blonde hair?

5    A.   Yes.

6    Q.   Was it long or short?

7    A.   I can't tell you that.

8    Q.   All right, so it could have been - - -

9    A.   (Interposing) Let's put it this way.  It was not

10   short spiky hair.  It was definitely in a style that went this

11   way.  But I couldn't tell you if it was shoulder length or if

12   it was long.  That I cannot tell you.

13    Q.   A lot of male in this area at the time wore their

14   hair long.  Is that correct?

15    A.   I can't tell you because I didn't — I don't know.  I

16   guess if guys wear their hair long; they wear their hair long.

17   I'm not sure that that's a relevant question.

18    Q.   Let me phrase it this way.  And I don't mean to

19   badger you at all.  Could this have been — the person in the

20   center — could it have been a small skinny male that had long

21   blonde hair?

22    A.   I can't tell you that it wasn't.

23    Q.   Yeah, that's what I'm getting at.

24    A.   That's what I'm — yeah.

25    Q.   All right.  And, the — and in terms of the one

1  person and the relationship if any toward Brent Bartley,

2  again, it's a place where you can't say it wasn't Brent

3  Bartley?

4       A.   Correct.  That's what I told them.  I cannot say

5  that it was not Brent.

6       Q.   Right.

7       A.   But I can also not tell you that it was.

8       Q.   Yeah, so - - -

9            Now, I didn't hear you talk about this, but I need

10  to ask you because I saw something in the report.  Did you get

11  some impression regarding the person in the center that they

12  might be intoxicated or something?

13       A.   You know, yes.  They — originally I was asked if

14  that person was alive.  My impression is that that person in

15  the middle was still alive, but that the person needed help

16  walking.

17       Q.   Okay.  So, they could have been intoxicated or drug

18  overdosed, something like that?

19       A.   As long as they could halfway be up on their feet,

20  yes.

21       Q.   Well, but they appeared - - -

22       A.   (Interposing) There was a person on each side

23  holding - - -

24       Q.   I'm sorry.

25       A.   I'm sorry, sir.  Go ahead.

Storts   X   D5 180

1    Q.   Well, I think I interrupted you.  And I apologize.

2         They appeared to be on their own feet and motivating

3    with assistance.  Is that a fair characterization?

4    A.   Correct.  That's a good way — yes.  There was a

5    person on each side obviously helping.  But the person was on

6    their own feet yet.

7    Q.   Now, I didn't quite catch where you live out there?

8    A.   I lived exactly at the eight mile marker at that

9    time.

10   Q.   Is that — is that still on Fairview Mountain?

11   A.   It's actually on the other side of Lee Valley Road.

12   It's more out Fairview.

13   Q.   Okay.

14   A.   Toward — it's not at Four Corners.  It's actually

15   between Lee Valley Road and Four Corners.

16   Q.   Well, how — about what mile marker is Lee Valley

17   Road?

18   A.   Lee Valley Road is right before the seven mile

19   marker.

20   Q.   Just before the seven mile?

21   A.   Correct.

22   Q.   Okay.  So, where you saw these people was still

23   three miles before you get to Lee Valley Road?

24   A.   Yes.  It was not — I had not crested the mountain at

25   that time.

```
                                        Storts   X    D5 181
```

1    Q.   Okay.  And just a couple other things, Ms. Stort.  I

2    don't mean to keep you unduly long.  You got off at 12:05, you

3    checked out.  Correct?

4    A.   Correct.

5    Q.   You'd been on duty for seventy-two hours?

6    A.   Yes, round about.  I'd been on for a very long

7    period of time.

8    Q.   And you wanted to go home?

9    A.   Very much so.

10   Q.   So you got out of there just as quickly as you

11   could?

12   A.   Absolutely.

13   Q.   Okay.  And you went directly from the hospital out

14   to where you saw the people?

15   A.   Correct.

16   Q.   So, would it be fair to say that you got to where

17   the people were within about ten minutes of the time you left?

18   A.   Correct.

19   Q.   So, we're placing what you saw as happening roughly

20   around twelve fifteen a.m.?

21   A.   Yeah, give or take a few minutes, yes.

22   Q.   That's all — excuse me.  That would be what you

23   said.

24        Thank you.

25        MR. McCREA:   That's all the questions I have,

```
                                          Storts   ReD  D5 182
```

1    Your Honor.

2                    THE COURT:    Redirect.

3                    MS. SOUBLET:    Just briefly.

4                    Thank you, Your Honor.

5                    <u>REDIRECT EXAMINATION</u>

6    <u>BY MS. SOUBLET:</u>

7        Q.   Ms. Storts, what were you driving?

8        A.   Let's see.  In 2000, um.  I was probably driving my

9    green Geo Metro in 2000 — a teal green Geo Metro.

10       Q.   And did either one — did any one of the three people

11   that you saw walking on Fairview Mountain turn around or turn

12   their heads?

13       A.   No.  Nobody turned around, but they kinda turned

14   like this as I drove by.

15       Q.   In your direction or away from you?

16       A.   In my direction.

17       Q.   Thank you.

18                   MS. SOUBLET:    Nothing further.

19                   THE COURT:    You may step down.  You're free

20   to leave.

21                   WITNESS:    Does somebody want this exhibit?

22                   THE COURT:    Just leave it there, please.

23                   WITNESS:    Okay.

24                   MS. SOUBLET:    The State calls Zack Elderkin.

25

Elderkin   D   D5 183

1                              ZACK ELDERKIN

2   was thereupon produced as a witness on behalf of the Plaintiff

3   and, having first been duly sworn to tell the truth, the whole

4   truth and nothing but the truth, was examined and testified as

5   follows:

6                    THE COURT:    Have a seat up here, please.

7                    Go ahead.

8

9                    MS. SOUBLET:    Thank you, Your Honor.

10                         DIRECT EXAMINATION

11  BY MS. SOUBLET:

12       Q.    Mr. Elderkin, can you state your full name and spell

13  your last for the record?

14       A.    Zachary David Elderkin.  And it's E-L-D-E-R-K-I-N.

15       Q.    Mr. Elderkin, where were you living in 2000?

16       A.    I was living with my brother a few miles out of

17  Coquille headed toward Coos Bay.

18       Q.    Is that near Green Acres?

19       A.    I'm not sure.

20       Q.    Had you lived here long?

21       A.    No.  I probably been there six months.

22       Q.    Did you know someone by the name of Heather McMullen

23  back in the summer of 2000?

24       A.    Yes.

25       Q.    Do you know someone named Kristen Steinhoff-Ramsey?

```
                                    Elderkin   D    D5 184
 1      A.   Yes.

 2      Q.   Who is she in relation to Heather McMullen?

 3      A.   She is Heather's daughter.

 4      Q.   Do you know where they were living in the summer of

 5   2000?

 6      A.   They were living here in Coquille.

 7      Q.   Do you remember where?

 8      A.   No.

 9      Q.   Was there an occasion - - -

10           Did you have a vehicle in the summer of 2000?

11      A.   I did.

12      Q.   What was that?

13      A.   It was a '99 Kia Sophia.

14      Q.   Okay.  And what color was it?

15      A.   Kind of a purplish blue.

16      Q.   Was there an occasion where you lent that car to

17   Kristen Steinhoff?

18      A.   Yes.

19      Q.   Do you remember what day that was?

20      A.   I think it was Thursday.

21      Q.   Would that be June 28th, 2000?  Does that sound

22   familiar?

23      A.   I have no idea.

24      Q.   Why did you lend Kristen your car?

25      A.   She said she was having car problems.  And I was
```

1  dating her mother.  And that was her daughter, so I lent her

2  the car.

3      Q.   Where were you when you gave her the car?

4      A.   At her house.

5      Q.   At Ms. Steinhoff's house?

6      A.   Yeah.

7      Q.   Here in Coquille?

8      A.   Yes.

9      Q.   Were there any restrictions on when you had to have

10  the car back?

11      A.   Yes.

12      Q.   When was that?

13      A.   She was supposed to have it back at one a.m. in the

14  morning because I needed to go to work in Eugene at six a.m.

15      Q.   Okay.  Did you have to be in Eugene at six a.m., or

16  you had to leave at six a.m.?

17      A.   I had to be there at six a.m.

18      Q.   How would you get from outside of Coos Bay to

19  Eugene?

20      A.   I would drive that car.

21      Q.   I meant what route would you take?

22      A.   Usually I went through Drain.

23      Q.   When you gave Ms. Steinhoff the car, what happened?

24      A.   I don't understand.  What do you mean what happened?

25      Q.   Well, did you spend the night at Ms. McMullen's

```
                                      Elderkin   D    D5 186
```

1   house or did you go home?

2        A.    No.  She took me and my daughter back to my

3   brother's house where I was staying.

4        Q.    Okay.  And did something happen on that drive home?

5        A.    Yeah.  She stopped and talked to some guy on the

6   corner right by the highway.  Some guy that I don't know who

7   it was.  And when she got back in the car she said the guy

8   couldn't find their girlfriend.

9        Q.    Okay.  When you say stopped by the highway, are you

10  talking about where Central meets the bypass?

11       A.    I have no idea.

12       Q.    Okay.  Was there a store near there?

13       A.    Not that I'm aware of.

14       Q.    Was there anyone else in the area?

15       A.    Like how do you mean?

16       Q.    Any other people standing near him?

17       A.    No.

18       Q.    Do you remember what time that was?

19       A.    Daylight.

20       Q.    Well, there's different types of daylight.  Bright

21  daylight, nearer to dusk?

22       A.    I have no idea.

23       Q.    After Ms. Steinhoff got back into the car, what

24  happened?

25       A.    She took me and my daughter back to my brother's

```
                                  Elderkin   X   D5 187
```

1   house.

2        Q.   Did you get your car back?

3        A.   Eventually.  She was late with it.

4        Q.   Did you ever let Ms. Steinhoff borrow your car

5   again?

6        A.   Never.

7        Q.   Thank you.

8             MS. SOUBLET:   I have nothing further.

9                       CROSS EXAMINATION

10  BY MS. MCCREA:

11       Q.   Mr. Elderkin, the guy you saw at the place on the

12  highway, he was — he was near a Jeep Wagoneer.  Is that right?

13       A.   That's what I remember.

14       Q.   Okay.  And you remember that because you're kind of

15  an fashionato of Jeep Wagoneers?

16       A.   No.  I just like automobiles.  A bit of a gear head.

17       Q.   Okay.  And it was a Jeep Wagoneer.  And it was a

18  dark color.  Is that right?

19       A.   That's correct.

20       Q.   Do you remember what color it was?

21       A.   Just a dark color.

22       Q.   Okay.  And if it had been a bright orange or that

23  kind of color you would have remembered it?

24       A.   Maybe.

25       Q.   Okay.  Well, you testified at the Grand Jury, right?

```
                                    Elderkin   X    D5 188
 1     A.   Yes, I did.

 2     Q.   And that was on July 30th, 2010?

 3     A.   If you say so.

 4     Q.   Okay.  And at that point you were asked if you could

 5  tell what color the Jeep Wagoneer was.  And you responded,

 6                   "Dark.  It was just a darker one.  I mean,

 7               if it would have been bright orange I would

 8               have remembered that."

 9          Does that sound like what you were asked and what

10  you answered?

11     A.   Yeah.  That would have been an answer I said.

12     Q.   Okay.  That sounds like something you'd say?

13     A.   Yes.

14     Q.   Okay.  Now, at some point, Mr. Elderkin, when you

15  still had the car, did the police take possession of it and

16  search it?

17     A.   No, they did not.

18     Q.   At some point did you become aware that the police

19  had gotten the car and were processing it for evidence?

20     A.   Just a matter of a few months ago.

21     Q.   A few months ago they did that?

22     A.   Yeah.

23     Q.   And there was no indication in terms of police

24  contact with you after they processed that vehicle, that they

25  needed to talk to you about anything more concerning the car.
```

Elderkin   X   D5 189

1   Is that fair?

2        A.    That's correct.  I'm unaware if they had already

3   processed it or if they were still processing it.

4        Q.    But in terms of, since the time that you became

5   aware that that car that you used to own, the Kia, was

6   processed, there hasn't been anything more in terms - - -

7        A.    (Interposing) No.  There has not.

8        Q.    Okay.  Mr. Elderkin, just one other question.  The

9   man that you saw near the Jeep Wagoneer, was he trying to call

10  on a cell phone?

11       A.    Yes, he was.  And he was pacing back and forth in

12  front of the van - - -

13       Q.    (Interposing) Okay.

14       A.    - - - like he was agitated.

15       Q.    All right.  Thank you.

16            MS. McCREA:   I have no further questions.

17            MS. SOUBLET:    No redirect.

18            THE COURT:    You may step down and you're free

19  to leave.

20            Call your next witness.

21            MR. FRASIER:    Thank you.

22            We call Mike Reaves.

23                 MICHAEL REAVES

24  was thereupon produced as a witness on behalf of the Plaintiff

25  and, having first been duly sworn to tell the truth, the whole

Reaves   D    D5 190

1  truth and nothing but the truth, was examined and testified as

2  follows:

3            THE COURT:    Have a seat up here, please.

4                     <u>DIRECT EXAMINATION</u>

5  <u>BY MR. FRASIER:</u>

6       Q.   Could you state your name please, sir, and spell

7  your last name for the record?

8       A.   Michael W. Reaves, R-E-A-V-E-S.

9       Q.   Your current occupation, sir?

10      A.   I'm retired.

11      Q.   And prior to retiring, what were you?

12      A.   I was the chief of police of Coquille.

13      Q.   How long were you the chief of police in Coquille?

14      A.   About twelve years.

15      Q.   Were you a police officer prior to that, also?

16      A.   Yes.

17      Q.   How long were you in law enforcement and where did

18  you work?

19      A.   I was chief of police in Coquille; I was the chief

20  of police for three years in Oakridge; I worked for the (not

21  understandable) County Sheriff's Department for a total of —

22  in Florida — for a total of twelve years.  I worked for the

23  (not understandable) Police Department in Florida for a total

24  of three years.  And I was a security policeman in the United

25  States Air Force for six years.

Reaves    D    D5 191

1     Q.    Directing your attention, sir, to the summer of the

2  year 2000, were you working as a police chief at that time

3  here in the City of Coquille?

4     A.    Yes, I was.

5     Q.    Directing your attention to June 29th of 2000, were

6  you contacted by Cory Courtright and informed that her

7  daughter Leah Freeman was missing?

8     A.    The report was made to the police department, yes.

9     Q.    You became aware of that report?

10    A.    Yes, I did.

11    Q.    And as time progressed you assigned an officer to be

12  in charge of the investigation, if you will?

13    A.    Yes, I did.

14    Q.    And who was that?

15    A.    Dave Hall.

16    Q.    Now, after — well, as part of this you learned that

17  the Defendant in this case, Mr. McGuffin, was the boyfriend of

18  Leah Freeman at the time she disappeared?

19    A.    Yes.

20    Q.    Did you or Officer Hall make arrangement for an

21  interview to be conducted of the Defendant?

22    A.    Yes, I did.

23    Q.    And was that interview conducted on June 30th of

24  2000?

25    A.    Yes, it was.

Reaves    D    D5 192

1    Q.    And was it recorded?

2    A.    Yes, it was.

3    Q.    I'll show you what's been previously marked as

4    State's Exhibit No. 95.  Have you listened to that CD prior to

5    your testimony today?

6    A.    Yes.

7    Q.    And is that a recording of that interview that you

8    had with the Defendant?

9    A.    It's a copy of the recording that I made, yes.

10    Q.    And does the recording or the copy accurately

11    portray the conversation that you had with the Defendant?

12    A.    Yes.

13    Q.    And State's Exhibit No. 218, is that a transcript of

14    the interview?

15    A.    Yes.

16    Q.    And does the transcript accurately portray the

17    interview?

18    A.    Yes.

19            MR. FRASIER:    Your Honor, at this time we'd

20    move for the admission of State's Exhibit No. 95 and State's

21    Exhibit No. 218.

22            MS. McCREA:    There's no objection to State's

23    Exhibit No. 95, Your Honor.

24            THE COURT:    No. 95 is received.

25            (Whereupon Exhibit No. 95 was then received

1  into evidence.)

2          MS. McCREA:    Your Honor, at this time we'd

3  object to No. 218.  I'd like an opportunity to compare it

4  since I — I want to make sure that it's an exact

5  representation and the evidence is actually the Defendant's

6  statements which are on the CD and not the transcript itself.

7          THE COURT:    Well, I realize that.  I'll give

8  you a chance to do it.

9          I think the only thing that those exhibits are

10 helpful to is some — and to me sometimes they're more helpful

11 when they're listening to the tape if we all, including the

12 jury has a copy of that so they can follow it.  Understand

13 that the tape is — it's an aid to the jury.  I understand your

14 point.

15         But I'll certainly give you the time before I

16 decide whether to receive it or not to look it over. And we'll

17 have the tape played.  So I guess you could be looking it over

18 while the tape's being played and find out whether it's

19 accurate or not.

20         So, I'll reserve my ruling on that for now.

21 You have a copy to pass to the jury, is that what the hold up

22 is?

23         MR. FRASIER:    Yes, I do.

24         THE COURT:    Well, have you listened — you've

25 listened to the tape I'm quite sure, Ms. McCrea?

Reaves    D    D5 194

1          MS. McCREA:    I have, Your Honor.

2          THE COURT:    Okay.  I just have found that

3   it's an aid to the jury.

4          And if I allow you to do this, Ladies and

5   Gentlemen, the tape is what's important.  If there's something

6   on the tape that's not on the transcript, then obviously you

7   have to listen to the tape and not the transcript.  Because

8   that's somebody's best effort to transcribe what's there.

9   It's just an aid to them to assist it.

10         If you want a little time to consider it before

11  I probably will allow the jury to see it, I will give you that

12  time.

13         Do you have some other areas you can go on it?

14         MR. FRASIER:    Actually, this is all I was

15  going to cover with the chief.  It takes about fifteen

16  minutes, Your Honor, fifteen, twenty minutes.

17         If the Court wants to take a break now, we

18  could - - -

19         THE COURT:    (Interposing) Okay.  I can take

20  that now.

21         We'll take a fifteen minute break.

22         If you would step into the jury room.

23         Everybody else remain seated until the jury has

24  a chance to go in the room.  And we'll take that.  That will

25  give Ms. McCrea a chance to review that.

Reaves    D    D5 195

1          (Jury Out.)

2          THE COURT:    I might add that if I allow this

3   to go to the jury I would receive the transcript itself merely

4   for the purpose of the record and not to go to the jury,

5   because the tape is the best evidence of that.  But I do think

6   it's of assistance to the jury in these cases to be able to

7   follow that along.  I would then, if I do that, just put

8   No. 218 into the record for any appellate purposes, but it

9   wouldn't be sent back to the jury room.

10          MR. McCREA:    Oh.

11          THE COURT:    Okay?

12          MS. McCREA:    With that understanding, Your

13   Honor, I'm fine with it then.

14          I'm sorry.

15          I understood that it was being — Counsel was

16   offering it as - - -

17          THE COURT:    (Interposing) Well, he may have.

18   But that would be my ruling.

19          MS. McCREA:    Well, and I — and with what the

20   Court's ruling would be is acceptable.

21          THE COURT:    Good.

22          I should quit while I'm ahead, then.

23          Let's take a recess.  Fifteen minutes.

24          You may step down.

25          (RECESS)

Reaves   D    D5 196

1          (Jury In.)

2          JUDICIAL ASSISTANT:    All rise.

3          THE COURT:    Be seated please.

4          MS. McCREA:    Your Honor, with regard to

5    State's Exhibit No. 218 the Defense agrees it is appropriate

6    for the jury to have the transcripts during the time that

7    Exhibit No. 95, the tape is played, but that the Exhibit No.

8    218 will not be entered into evidence, but will be of

9    assistance here in the courtroom for the jury.

10          THE COURT:    Okay.

11          What is indicated is that you will receive this

12   transcript so you can follow along with the tape recording.

13   Make sure  when you're reading along that you're listening,

14   because the tape, obviously, is what was actually was said.

15   And then when the case goes to the jury to deliberate you will

16   have the tape recording but not the transcript at that time,

17   because it's just an aid for you.  And it's going to be an aid

18   for you while you're listening to it but not at a later time.

19          Okay?

20          Pass them out, please.

21          And you may go ahead and — when the jury gets

22   that.  And you're not going to be asking the witness any

23   questions about it while the tape's being played?

24          MR. FRASIER:    No, I'm not.

25          THE COURT:    Okay.  So you can put it on - - -

Reaves   D    D5 197

1                As soon as the tape starts being played you can

2    pause the FTR.

3                MS. McCREA:    Excuse me, Counsel.  We have an

4    issue.

5                MR. FRASIER:    Your Honor, on Page — well,

6    it's marked four in the corner, I — there appears to be some

7    handwritten comments on the transcript that should have been

8    whited out.  They're not whited out.

9                THE COURT:    Okay.

10               So, they all have — don't read the stuff on it.

11               Okay.  Cathy, can you get those back, white

12   out - - -

13               Is it a lot?

14               MR. FRASIER:    No.  It's just two words and an

15   asterisk.

16               THE COURT:    Okay.

17               Just white out the two words and the asterisk

18   then give it back to the jury.

19               Don't rush.  I don't want you to fall.

20               THE COURT:    Okay, go ahead.

21               And you can pause it when he starts the tape.

22               (State's Exhibit No. 95, the audio tape was

23   played for the jury.  Not transcribed.)

24               THE COURT:    Then the transcript No. 218 is

25   received for the record, not for the jury.

Reaves   X    D5 198

1          (Whereupon Exhibit No. 218 was then received

2    for the record only, not for the jury.)

3                    THE COURT:    Go ahead.

4                    MR. FRASIER:    Thank you, Your Honor.

5                    I have no further questions of Chief Reaves.

6                    THE COURT:    Ms. McCrea.

7                    MS. McCREA:    Thank you, Your Honor.

8                        CROSS EXAMINATION

9    BY MS. MCCREA:

10        Q.   Chief Reaves, the statement of Mr. McGuffin we just

11   heard was on June 30th, 2000.  Is that right?

12        A.   I believe so.

13        Q.   Mr. McGuffin came in with Cory Courtright to make

14   the missing persons report on June 29th, the day before?

15        A.   I don't know that.

16        Q.   Did you make a request of Mr. McGuffin to come in

17   and give a statement on June 30th?

18        A.   I asked him — either myself of Hall asked him to

19   come in, yes.

20        Q.   Okay.  And he was happy to do that?

21        A.   He was there voluntarily, yes, ma'am.

22        Q.   Yeah.  And you set an appointment time because we

23   heard on the tape he said he didn't want to be late?

24        A.   I think so.

25        Q.   Was there other conversation before you turned on

```
                                        Reaves   X    D5 199
 1   the tape recorder?

 2        A.   Yes.

 3        Q.   And was it different than what we have here in

 4   evidence?

 5        A.   No.

 6        Q.   And the other person who was there — well, there was

 7   Deputy Hall was present.  Is that right?

 8        A.   Yes.

 9        Q.   And the - - -

10        A.   Officer Hall.

11        Q.   I'm sorry.  Officer Hall.  Sorry.

12             Officer Hall.  And then the woman who was present

13   was Mr. McGuffin's mother, Kathy McGuffin?

14        A.   Kathy McGuffin was there, yes.

15        Q.   And where was the statement taken?

16        A.   It was taken in the upper office of the Coquille

17   Police Department.

18        Q.   And that's why we hear some other extraneous noise

19   on the tape?

20        A.   Well, that's the first time I've heard that

21   extraneous noise.  I think this is a copy of a copy of a copy.

22   I don't believe it's on the original tape.

23        Q.   All right.  Thank you.

24             MS. McCREA:   That's all the question I have.

25             THE COURT:   Any redirect?
```

```
                                          Hall   D    D5 200
```

1          MR. FRASIER:    No, Your Honor.  That's all I

2    have.

3          THE COURT:    You may step down.  You're free

4    to leave.

5          Call your next witness.

6          MR. FRASIER:    Call Dave Hall.

7                        DAVID HALL

8    was thereupon produced as a witness on behalf of the Plaintiff

9    and, having first been duly sworn to tell the truth, the whole

10   truth and nothing but the truth, was examined and testified as

11   follows:

12         THE COURT:    Have a seat up here, please.

13                    DIRECT EXAMINATION

14   BY MR. FRASIER:

15     Q.   Could you state your name please, sir, and spell

16   your last name for the record?

17     A.   David Hall.  Last name spelling H-A-L-L.

18     Q.   Where do you live at this time, sir?

19     A.   Paisley, Oregon.

20     Q.   Lake County?

21     A.   Yes, sir.

22     Q.   In the summer of 2000 how were you employed?

23     A.   I was employed as a police officer for the City of

24   Coquille.

25     Q.   How long had you worked for the City of Coquille as

```
                                    Hall   D    D5 201
```

 1  a police officer?

 2       A.   I think it was a total of ten years.

 3       Q.   And in June of 2000, were you working for the City

 4  of Coquille at that time as a police officer?

 5       A.   Yes, I was.

 6       Q.   In particular June 29th of 2000, were you asked by

 7  then Chief Reaves to lead an investigation into the

 8  disappearance of Leah Freeman?

 9       A.   Yes, I did.

10       Q.   At the time you were on light duty with the police

11  department?

12       A.   Yes, I was.

13       Q.   You had an injury or something?

14       A.   I had knee surgery.  I had had two knee surgeries

15  and I was on light duty.  And they put me on day shift while I

16  was healing up.

17       Q.   And because you're on light duty you could — it was

18  easier for you to be a detective type individual?

19       A.   That's correct.

20       Q.   Had you ever investigated a case like this before?

21       A.   Never.

22       Q.   Since then?

23       A.   Never.

24       Q.   On the — well, did you have contact with the

25  Defendant on June 29th, 2000?

```
                                    Hall   D   D5 202
```

1      A.   Yes.

2      Q.   Where did you have contact with him?

3      A.   At Leah Freeman's home.

4      Q.   Why had you gone by there?  Why did you go to Leah

5  Freeman's home?

6      A.   I was requested by Chief Reaves to go by and talk to

7  Cory in the disappearance of Leah Freeman, that she hadn't

8  returned home the night before.  And I had went over there to

9  ascertain names of friends, acquaintances, and what have you

10 from Cory so I could start checking out some leads of, you

11 know, possibly where she went.  If she was a run away or what.

12     Q.   What time of the day was this, do you recall?

13     A.   I believe it was in the afternoon.

14     Q.   And the Defendant was there when you arrived?

15     A.   I believe he showed up after I arrived, if I

16 remember correctly.

17     Q.   Did you speak with him?

18     A.   Yes, I did.

19     Q.   And what did you talk with him about?

20     A.   I asked him when was the last time he had seen Leah.

21 And what he had done with her the previous day.

22     Q.   Did you ask him to give you like a brief time line?

23     A.   Yes, I did.

24     Q.   What did the Defendant tell you?

25     A.   I'll just refer to my notes.

Hall   D   D5 203

1                 "He had dropped Leah off at seven p.m. the

2                 night before at Sherry Mitchell's house.  And

3                 then he was supposed to return and pick her up

4                 at about nine p.m. that same evening.  And when

5                 he arrived she had already left.  And then he

6                 stated that he drove up and down Central

7                 looking for her until about two thirty in the

8                 morning at what time he went home."

9      Q.   Did he say where he thought Leah was, when he went

10  home at two thirty?

11     A.   He thought that she was possibly staying at a

12  friend's house because she may have been upset with him

13  because he was late picking her up at Sherry Mitchell's house.

14     Q.   Now, in an attempt to locate Ms. Freeman, was there

15  some sort of teletype or attempt to locate issued?

16     A.   I don't recall.  I don't believe so at that point.

17     Q.   At some point in time you had learned that she had

18  been out at the residence of Brent Bartley's grandparents?

19     A.   That's correct.

20     Q.   Had you gone out there to look around?

21     A.   Yes, we did.

22     Q.   And when you went out there — how many times did you

23  go out there?

24     A.   Chief Reaves and I both went out there one time.

25  And then I believe we went out the next day also.

```
                                     Hall   D   D5 204
```

1      Q.   Now, the first time you went out there, that would

2   have been Thursday — or, June 29th?

3      A.   That's correct.

4      Q.   And what if anything did you note out there?

5           Well, first of all the grandparents' place is out at

6   the end of what road?

7      A.   I believe it's at the end of Fir.

8      Q.   And what if anything did you note when you were out

9   there that day?

10     A.   When Chief Reaves and I arrived we noticed some of

11  the (not understandable) and the back yard, that there was a

12  lot of empty beer cans.  There was a funnel with a hose on it

13  that I ascertained at the time that was a beer bong.  There

14  was a white tank top shirt like a men's tank top shirt that

15  Chief Reaves, when he picked it up he said it smelled of beer.

16     Q.   Did you collect any evidence or anything at that

17  time?

18     A.   No, sir.

19     Q.   Now, on June the 30th you were present while the

20  Defendant was interviewed?

21     A.   Yes, sir.

22     Q.   And that was on — that was recorded?

23     A.   Yes, sir.

24     Q.   And during that interview you learned that she —

25  Ms. Freeman — had been wearing a white tank top?

Hall   D   D5 205

1    A.   That's correct, sir.

2    Q.   Based on that information what did you guys do then?

3    A.   We went back out to the Haga Residence to look for

4    that item.

5    Q.   What happened when you got out there?

6    A.   When we arrived everything — we noticed everything

7    had been cleaned up.  All the beer cans were gone.  And the

8    place was essentially cleaned up.

9    Q.   Now, Leah Freeman wasn't located during that first

10   week?

11   A.   No, sir.

12   Q.   At some point in time the FBI was invited to help

13   with the investigation?

14   A.   Yes, sir.

15   Q.   July the 5th the major crime team for Coos County was

16   asked to be involved?

17   A.   Yes, sir.

18   Q.   And there were police officers from Roseburg and

19   Klamath Falls that came to help?

20   A.   Yes, sir.

21   Q.   Other agencies in the county such as Coos Bay

22   Police, North Bend Police, and the crime lab?

23   A.   Yes, sir.

24   Q.   At the time there was a crime lab in Coos County?

25   A.   That's correct, sir.

```
                                        Hall  D   D5 206
```

1     Q.   Where was that?

2     A.   Excuse me, sir?

3     Q.   Where was the crime lab at that time?

4     A.   At that time it was in Coos Bay.

5     Q.   There were numerous witnesses interviewed?

6     A.   Yes, sir.

7     Q.   One week to the day after Leah disappeared was there

8  a road block set up?

9     A.   Yes, sir.

10    Q.   And could you tell us why it was set up one week to

11 the day after she disappeared and so forth?

12    A.   Well, in essence when we had the FBI agents come

13 over and we briefed them on the information we had at that

14 time, and it was their — from their experience they decided

15 they wanted to set up a road block at that particular time of

16 the evening because people are essentially creatures of habit.

17 They either walk the same direction to and from their home, to

18 say, to go to the store or someone else's home.  And that by

19 having the road block at that particular time of the night

20 when Leah went — disappeared — we thought it may — somebody

21 would come up with some more information or recall something

22 from the week prior.

23    Q.   Now, during that first week did you become aware of

24 a set of tennis shoes that had been found?

25    A.   Yes, I did.

Hall   D   D5 207

1    Q.   One having been found near the Chevron gas station?

2    A.   Yes.

3    Q.   By the cemetery?

4    A.   Yes, sir.

5    Q.   And another that had been found on Hudson Ridge?

6    A.   Yes, sir.

7    Q.   Based on that were you asked to obtain an item from

8    Leah Freeman's personal possessions where her DNA could be

9    obtained?

10   A.   Yes, sir.

11   Q.   And were you also asked to get DNA samples from her

12   parents, Cory Courtright and Denny Freeman?

13   A.   Yes, we were.

14   Q.   I'll show you what's been marked as State's Exhibits

15   Nos. 204 and 205.  Do you recognize the tags on those bags and

16   so forth?

17   A.   Yes, I do, sir.

18   Q.   What are those two items?

19   A.   The one item are swabs from Corliss Courtright; and

20   the other one is swabs from Denny Freeman.

21   Q.   And you obtained those swabs?

22   A.   Yes, sir.

23   Q.   How do you get these swabs?  What do you do?

24   A.   You have a tube with a couple of swabs in them.  And

25   we put on — we glove up.  And then take the swabs and go

Hall   D   D5 208

1  inside the cheeks of the mouth and just swab the mouth, place

2  them back in the container, seal them and enter them into

3  evidence.

4      Q.   Now did you actually go to where Leah Freeman was

5  living at that time off of Knott Street?

6      A.   To?

7      Q.   Leah Freeman's home where she had been living?

8      A.   Yes.

9      Q.   Off of Knott Street?

10     A.   Correct.

11     Q.   And did you obtain the toothbrush that was

12  identified to you as being Leah Freeman's toothbrush?

13     A.   I don't recall exactly if I did at that point.  I

14  can't remember.

15     Q.   Let me show you what's marked as State's Exhibit

16  No. 203.

17     A.   Okay.  That's a toothbrush.  Yes.  But it's not on

18  my handwriting on the evidence tag.

19     Q.   Right.  But the evidence tag indicates you seized

20  it?

21     A.   Yes.

22     Q.   These items would have been placed into evidence at

23  the Coquille Police Department?

24     A.   That is correct, sir.

25     Q.   And would they have then subsequently been sent to

```
                                    Hall   D    D5 209
```

1   the crime lab for analysis?

2       A.   That's correct, sir.

3       Q.   Did you also at some point in time get a swab or a

4   DNA sample from the Defendant?

5       A.   Yes, we did.

6       Q.   I'll show you what's marked as State's Exhibit No.

7   206.  Do those appear to be the swabs that were obtained from

8   the Defendant?

9       A.   I don't see — all I see is McGuffin's name up here.

10  But I don't see a tag on who collected the evidence.

11      Q.   Okay.  We'll come back to that.

12      A.   Okay.

13      Q.   You do recall though that there was a DNA sample

14  obtained from the Defendant?

15      A.   Yes, sir.

16      Q.   And that was to conduct further investigation as the

17  case went on?

18      A.   Exactly.

19      Q.   Now, the shoes in the case, those were subsequently

20  sent to the crime lab for analysis?

21      A.   That's correct, sir.

22      Q.   And prior to the body of Leah Freeman being

23  discovered were you made aware of certain results of DNA that

24  had come off those shoes?

25      A.   That's correct.

                                  Hall  D    D5 210

1        Q.    And were you made aware that the shoes had been

2   identified as having DNA of Leah Freeman?

3        A.    That's correct.

4        Q.    Now, was the Defendant asked to come into the

5   Coquille Police Department I believe on the 5th of July of

6   2000?

7        A.    Yes, he was.

8        Q.    And as part of that coming in and being interviewed,

9   did you ask him to do a time line of the events of the day

10  that Leah Freeman disappeared?

11       A.    Yes, we did.

12       Q.    And did you ask him to write that out on a pad of

13  paper?

14       A.    Yes, I did.

15       Q.    I'm going to show you what's marked as State's

16  Exhibit No. 83 and ask if you can identify that?

17       A.    Yes.   This is the Defendant's written statement and

18  time line that he wrote out for us that day.

19       Q.    And if you'll just briefly look through it, does

20  that document appear to be in the same condition as it was

21  when you received it from the Defendant, Mr. McGuffin?

22       A.    Yes, sir, it is.

23             MR. FRASIER:    Your Honor, at this time we'd

24  offer State's Exhibit No. 83.

25             MR. McCREA:    No objection, Your Honor.

```
                                          Hall   D   D5 211

 1              THE COURT:    Received.

 2              (Whereupon Exhibit No. 83 was then received

 3    into evidence.)

 4       Q.   Officer, if you would please or Mr. Hall, if you

 5    would please, would you read the document to the jury?

 6       A.   Starting at the beginning, sir?

 7       Q.   Yes.

 8       A.   Okay.

 9                  "2:00 to 4:00 - Left Leah's house.

10                  And then he's got 4:00 - went to Brent

11                  Bartley's house.

12                  5:00 - Me, Leah, and Brent went out to my

13                  house to get a couple of movies.

14                  5:45 - Went to Brent's grandparent's

15                  house.  Brent had a couple of drinks.  I had

16                  one mixed drink.  I don't know if Leah had any.

17                  6:50 - Left to take Leah to Sherry

18                  Mitchell's house.  Leah told me to come back in

19                  two hours, which is about nine o'clock.

20                  7:00 - Brent and I went and picked up

21                  Nicky Price and I took them both up to Brent's

22                  grandparent's house.

23                  7:30 to 9:00 - I hung out at Fast Mart

24                  until about eight o'clock.

25                  8:00 - Drove around, went out to Mill
```

```
                                        Hall   D   D5 212
```

1    Pond, came back into town.

2         9:05 - Went up to Sherry's house.  When I

3    got there Sherry was crying and said Leah and

4    Sherry's mom got into an argument.  Also said

5    Leah had just left.

6         9:15 - Drove up Central looking for Leah.

7    Drove back down Central, took a left at

8    Stamper's, then another left at the next stop

9    sign.  Came back across from Fast Mart by hair

10   place and drove back up Central.  Went to west

11   Coquille turnoff and turned around.

12        9:45 - Drove by Fast Mart again and I

13   think Brett Mauro yelled at me, but I just kept

14   driving because I was looking for Leah.  A

15   bunch of people hanging out at Fast Mart.

16        10:00 - I might have seen Tim Woosley

17   walking around.

18        10:15 - Went back to Sherry's.  She said

19   that Leah didn't come back.  And she said maybe

20   she walked out to your house.  Called Leah's

21   mom, asked if Leah was home.  And she said,

22   "No."

23        10:30 - Called my mom from Fast Mart to

24   see if Leah had called, but she didn't.

25        10:40 - Talked to Mark Kirn.  He said that

Hall   D   D5 213

1          him and Mike McAdams seen her walking by

2          Hunter's between . . ."

3     Then he's got writing - - -

4          ". . . between ten and ten forty — Went up

5          to Brent's grandparent's house, but Leah wasn't

6          there.

7          10:50 - Zavala pulled me over for one

8          headlight and I told him that I was looking for

9          Leah and asked him to help find her.

10         10:55 - Went to Denny's Pizza and asked

11         Denise, Leah's sister, if she stopped by.  And

12         she said, "No."

13         11:05 - Seen Richard Bryant walking and he

14         said he hadn't seen her either.

15         Between 10:40 and 11:00 - Went to high

16         school and seen two people walking the track

17         and asked them if they had seen a girl walking

18         around in a tank top.  They also said, "No."

19         The couple were driving a maroon Arrowstar van.

20         11:30 - I went back up to Brent's house to

21         pick him and Nicky up.

22         11:40 - Dropped Nicky off and me and Brent

23         went looking for Leah for about another forty-

24         five minutes.

25         11:50 - Went by Leah's house and I didn't

Hall   D     D5 214

1    think she was home so we kept looking.  Also, I

2    talked to two girls at the Sanford Heights

3    playground.  And they also didn't see her.

4         Midnight - Seen Danny Lee and asked him to

5    look for her because I couldn't find her.  He

6    kinda ignored me and didn't pay attention.

7         After midnight - Saw Richard Bryant again.

8    Brent got out of the car.  And him and Richard

9    went up to Brent's house by Dean Street.

10        12:30 - Went back by Leah's house.  Still

11   didn't think she was home.

12        1:00 - Talked to Kristen Steinhoff for

13   about forty-five minutes to an hour at her

14   house to see if she had seen her.

15        2:00 - Went back by Leah's and seen a

16   glare in her window which I thought was the TV

17   in her bedroom.  So, I went and threw a couple

18   of rocks at her window to see if she was there,

19   but she didn't answer.  I thought she was

20   sleeping.

21        2:00 to 2:30 - Looked around town just in

22   case she wasn't home and I didn't see her.  I

23   decided to head home about 2:30 or 3:00 in the

24   morning.

25        3:00 a.m. - Went to bed.

Hall   D   D5 215

1              4:00 a.m. - Got a phone call.  My mom

2         answered but the person hung up.

3              7:30 in the morning - Leah's mom calls and

4         said that she didn't come home and that her TV

5         was probably the glare in Leah's room.

6              I don't know who called at four in the

7         morning, but I think it might have been Leah

8         trying to contact me."

9              And it's signed by Nicholas James

10        McGuffin.

11   Q.   I want to jump ahead to August the 3rd of 2000.  Do

12   you recall what happened that day?

13   A.   Yes I do.

14   Q.   And what happened on August the 3rd of 2000?

15   A.   At approximately three thirty in the command post I

16   was contacted by Officer Kurt Bennett of the North Bend Police

17   Department.

18   Q.   Were you informed that a body had been found?

19   A.   Yes, he did.

20   Q.   Did you respond out to the scene?

21   A.   I personally did not respond.  I made contact with

22   Lieutenant Pex of the Oregon State Police and advised him of

23   where her body was found and to get his crime team together to

24   meet other people out there at the scene.

25   Q.   This body was eventually recovered that day?

```
                                    Hall   D    D5 216
```

1      A.   Yes, sir.

2      Q.   And the next day, on August 4th was there an autopsy

3   performed on the body?

4      A.   That is correct, sir.

5      Q.   And was it your understanding based on that autopsy

6   that this body had been identified as that of Leah Freeman?

7      A.   That's correct, sir.

8      Q.   Did you attend the autopsy?

9      A.   Yes, sir, I did.

10      Q.   And at the time that the autopsy was conducted was

11   the body still wearing clothing?

12      A.   Yes, it was.

13      Q.   Do you recall what was on the body?

14      A.   She was wearing a white tank top, like a men's tank

15   top shirt and — I can't vividly remember what she was wearing.

16   I thought it was pants.  But I'm not sure, sir.

17      Q.   Were you directed or did you seize the clothing as

18   it was removed from the body?

19      A.   I did, sir.

20      Q.   Was there a sock on the body?

21      A.   Excuse me, sir?

22      Q.   Sock?

23      A.   I believe so, but I can't remember, sir.

24      Q.   I'll show you what's marked as State's Exhibit

25   No. 201.  It's marked as DEH004.  D-E-H, would those be your

```
                                  Hall   D   D5 217
```

1    initials?

2        A.   That's correct, sir.

3        Q.   And when you seized an item you would mark it with

4    your initials and then there would be a number after those

5    initials?

6        A.   That's correct, sir.

7        Q.   And the number would be the number of exhibits you

8    had received up to that point?

9        A.   That's correct, sir.

10       Q.   And in this situation this was marked as DEH004, and

11   is identified as a sock?

12       A.   That's correct, sir.

13             THE COURT:   Sorry.  The State's Exhibit

14   number is?

15             MR. FRASIER:   No. 201.

16             THE COURT:   Thank you.

17       Q.   This is marked as State's Exhibit No. 99.  You

18   indicated that the body had a top on it.  I know it's hard to

19   see with all of this, but - - -

20       A.   (Interposing) Yes, that's correct.  That's my

21   handwriting.

22       Q.   And you seized this at that time?

23       A.   Yes, sir.

24       Q.   Do you recall if the body had a bra on?

25       A.   I don't recall, sir, no.

Hall  D   D5 218

1      Q.   I'm going to show you what's marked as State's

2  Exhibit No. 100.  It's hard to see, but can you identify any

3  of it?

4      A.   That looks like it, sir.

5      Q.   And you would have seized that, also?

6      A.   That's correct.

7      Q.   Were there pants on the body?

8      A.   I believe there was, yes, sir.

9      Q.   This is State's Exhibit No. 98.  Do you recognize

10  that?

11      A.   Yes, it is.  That's my handwriting.  And those were

12  blue pants.

13      Q.   Those were seized by you?

14      A.   Yes, sir.

15      Q.   These items that we've been referring to here,

16  State's — these four items of clothing — the pants, the bra,

17  the top, the sock, you delivered those to the evidence room at

18  the Coquille Police Department?

19      A.   Well, at first, because of the condition of the

20  clothing, we rented a secure storage facility and hung the

21  garments up and put, like, white paper underneath of them.

22  And then we hooked up a fan inside the secure room and let the

23  fan try to air out the garments for several days before we

24  packaged them up and placed them into evidence.

25      Q.   Just so we're clear, what was the condition of the

```
                                        Hall   D    D5 219
 1  body?

 2      A.   You want a - - -

 3      Q.   (Interposing) Well, when you were at the autopsy,

 4  this is a — well - - -

 5      A.   (Interposing)  It was — it was severely decomposed.

 6      Q.   And the clothing, were — was it still moist, wet?

 7      A.   Very.  Very, very moist.

 8      Q.   I want to back up a little bit.  On July the 5th,

 9  when you interviewed the Defendant and he did that handwritten

10  time line for you?

11      A.   Yes, sir.

12      Q.   Was Brent Bartley also asked to come in that night?

13      A.   That day.  Yes, sir, he was.

14      Q.   Did you ask him to do a time line?

15      A.   Yes, sir, I did.

16      Q.   And this has been marked as State's Exhibit No. 84.

17  Is that the time line that Mr. Bartley prepared for you?

18      A.   Yes, it is.

19      Q.   Again, is it in the same condition?  It hasn't been

20  changed or anything like that?

21      A.   No, sir.

22           MR. FRASIER:   Your Honor, we'd offer State's

23  Exhibit No. 84.

24           MR. McCREA:   It's hearsay, Your Honor.  I

25  don't think - - -
```

```
                                        Hall   X    D5 220
```

1              It's hearsay.  I don't understand what - - -

2              THE COURT:    (Interposing) Sustained.

3              MR. McCREA:    All right.

4              MR. FRASIER:    That's all we have, Your Honor.

5              THE COURT:    You — if you're not withdrawing

6    that, we need to give it to Ms. Cress.  You've offered it.  I

7    sustained the objection to it.  It goes into evidence, but not

8    to the jury.

9              MR. FRASIER:    All right.  Thank you.

10             THE COURT:    Cross.

11                        CROSS EXAMINATION

12   BY MR. MCCREA:

13        Q.    If — I'm not totally clear.  Is it Officer Hall now?

14        A.    No, sir.  I'm retired.

15        Q.    Retired?

16        A.    Yes, sir.

17        Q.    When you're retired do you go from an officer to a

18   mister, then?

19        A.    Yes, sir.

20        Q.    All right.  So, Mr. Hall, as I understand what

21   you're saying, you became the lead investigator on the Leah

22   Freeman case.  Is that correct?

23        A.    I was appointed by Chief Reaves.

24        Q.    Is that kind of like being drafted?

25        A.    Yes, sir.

Hall   X    D5 221

1      Q.   Is that sort of the way you felt, that you were

2   drafted there?

3      A.   Yes, sir.

4      Q.   In any event, you're pretty much familiar then with

5   how the investigation proceeded?

6      A.   Yes, sir.

7      Q.   And you have indicated to us that you had joining

8   in, a number of agencies.  And that included the FBI.

9   Correct?

10      A.   That's correct.

11      Q.   And that included the Oregon State Crime Lab?

12      A.   Yes, sir.

13      Q.   And that included — it also included the Oregon

14   State Police?

15      A.   Yes, sir.

16      Q.   Coquille Police Department?

17      A.   Yes, sir.

18      Q.   And I believe you mentioned some other — oh, the

19   Sheriff's Office?

20      A.   Sheriff's Office, North Bend Police Department - - -

21      Q.   (Interposing)  Coos County Sheriff's Office?

22      A.   Yes, sir.

23      Q.   Now, in terms of what you've testified to regarding

24   your dealings with Mr. McGuffin, Mr. McGuffin — let's see.

25   Your first contact with him was on the 29th?

```
                                      Hall   X   D5 222
 1       A.   Yes, sir.
 2       Q.   And when you talked with him on the 29th, he talked
 3   with you freely and cooperatively?
 4       A.   Yes, sir.
 5       Q.   And then when you talked to him — let's see.  Well
 6   you had him prepare a time line.  Isn't that correct?
 7       A.   Excuse me, sir?
 8       Q.   Oh, you had him prepare a time line.  Oh, okay, here
 9   we go.  And he was cooperative about doing the time line?
10       A.   Yes, sir, he was.
11       Q.   One thing I didn't hear mentioned, did you ask him
12   for permission to search his Mustang?
13       A.   Yes, sir, I did.
14       Q.   And did he give you that permission?
15       A.   Yes, sir, he did.
16       Q.   In writing?
17       A.   Yes, sir.
18       Q.   And did you search the mustang then?
19       A.   At that particular time we had — I had sent
20   Lieutenant Bunny Young from North Bend Police Department and
21   Mast Brother's Towing.  And went out and picked up the Mustang
22   at his parent's house.
23       Q.   Okay.  You picked it up, took it into custody?
24       A.   Yes, sir.
25       Q.   And then did you request or direct or whatever the
```

Hall   X    D5 223

1   right term is, for it to be processed by the crime lab?

2        A.   Yes, sir.

3        Q.   And was that done?

4        A.   To my knowledge, yes sir.

5        Q.   All right.  I guess the thing I didn't mention, is

6   you got a swab, a DNA swab from Mr. McGuffin?

7        A.   Yes, sir.

8        Q.   Was he fully cooperative doing that?

9        A.   Yes, sir.

10       Q.   All right.  There was reference to the body having a

11  sock.  There was just one sock, is that correct?

12       A.   That I can remember, sir.

13       Q.   I don't mean to beleaguer you with things like that.

14  There were no shoes on the body?

15       A.   No, sir, not that I recall.

16       Q.   And you indicated that, based on what information

17  you had received, the shoes that had been found had been

18  identified as hers?

19       A.   Yes, sir.

20       Q.   Now, with regard to those shoes, have they been sent

21  to the crime lab for processing?

22       A.   Yes, sir, they were.

23       Q.   And that would have been the right shoe as you

24  understand it, was the first shoe found.  But then the left

25  shoe was the second shoe found?

Hall   X   D5 224

1      A.    That I don't recall the order in which — which was

2    found, sir.  But both of them were sent to the crime lab.

3      Q.    They both went for processing?

4      A.    Yes, sir.

5      Q.    And you indicated that the clothing was put in

6    storage and then you had a fan — well, do it — blowing on it?

7      A.    To help - - -

8      Q.    (Interposing) Was the clothing processed at all?

9    Did you — was any residue removed from it or anything like

10   that - - -

11     A.    (Interposing)  No, sir.

12     Q.    - - - before you started this process?

13     A.    No, sir.

14     Q.    And the — with regard to the tank top, white top

15   that you'd seen up at the — that would have been at the Haga's

16   Residence?

17     A.    Yes, sir.

18     Q.    Okay.  Do you have any recollection what size that

19   was?

20     A.    No, sir, I don't.

21     Q.    Did you examine it at all?

22     A.    I didn't.  I didn't touch it.

23     Q.    All right.  Did any law enforcement person examine

24   it as far as you know?

25     A.    That day that Chief Reaves and I went up, he had

                                          Hall   X    D5 225

1   reached down and I can't recall if he grabbed it or not, but

2   he said it said it had — it was soaked.  And it had an odor of

3   beer.

4        Q.   Odor of beer?

5        A.   Yes.

6        Q.   Okay.  Well, you saw it.  And then you saw the one

7   that was on the body.  Wasn't the one on the body a different

8   kind of tank top than the one you'd seen up at Haga's?

9        A.   No, sir.  In my recollection, they both appeared to

10  be the same style.

11       Q.   The same style?

12       A.   Yes, sir.

13       Q.   And that's the man's undershirt type style?

14       A.   Yes, sir.

15       Q.   But beyond that, you can't whether they were the

16  same size, for example?

17       A.   No, sir.

18            MR. McCREA:    It will be one moment, Your

19  Honor.

20       Q.   Did you conduct a search of the McGuffin's home?

21       A.   Yes, sir, we did.

22       Q.   And were they cooperative about that?

23       A.   At what — I don't understand when you say conducted.

24       Q.   Well, you — did you conduct — did you conduct a

25  search back in 2000 in the — well, let's say in the July,

1  August time frame?

2      A.   Yes, sir, we did.

3      Q.   So — well, you obtained a search warrant?

4      A.   Exactly, sir.

5      Q.   I didn't mean to get it confused.  And with the

6  search warrant you went out and conducted the search and

7  seized whatever you thought was appropriate to seize to be

8  processed.  Correct?

9      A.   At the time that the search warrant was conducted at

10 the McGuffin residence, Sheriff Zanni and a team went out

11 there.  And they were the one that conducted that.

12     Q.   Okay.  Well, it wasn't a case where you had asked

13 for permission to search and been refused and then got a

14 search warrant?

15     A.   No, sir.

16     Q.   Okay.  You chose to use the search warrant process?

17     A.   Yes, sir.

18     Q.   Thank you very much Mr. Hall.

19          WITNESS:   Thank you, sir.

20          THE COURT:   Redirect.

21          MR. FRASIER:   I don't have any further

22 questions, Your Honor.

23          THE COURT:   You may step down and you're free

24 to leave.

25          WITNESS:   I'm free to go, Your Honor.  Thank

Ranger   D    D5 227

1   you.

2              THE COURT:   Call your next witness.

3              MR. FRASIER:    Thank you, Your Honor.

4              We call Mark Ranger.

5                        MARK RANGER

6   was thereupon produced as a witness on behalf of the Plaintiff

7   and, having first been duly sworn to tell the truth, the whole

8   truth and nothing but the truth, was examined and testified as

9   follows:

10             THE COURT:   Have a seat up here, please.

11                   DIRECT EXAMINATION

12  BY MR. FRASIER:

13      Q.   Could you state your name please, sir, and spell

14  your last name for the record?

15      A.   My name is Mark Ranger, R-A-N-G-E-R.

16      Q.   You're currently retired.  Is that correct?

17      A.   Yes.  I was with the State Police for twenty-seven

18  years and I retired about five years ago.

19      Q.   Where were you stationed?

20      A.   Primarily in Roseburg.

21      Q.   I'd like to direct your attention, sir, to the

22  summer of the year 2000.  Were you working for the State

23  Police at that time?

24      A.   Yes.

25      Q.   In the month of July of the year 2000, were you

Ranger   D   D5 228

1  asked to come over to Coquille and assist in the investigation

2  of the disappearance of Leah Freeman?

3      A.   Yes.

4      Q.   In particular I'd like to direct your attention to

5  July the 5th of 2000.  Were you over here in Coquille that day

6  working this investigation?

7      A.   Yes.

8      Q.   Did you have an opportunity that day to meet with

9  the Defendant in this case, Nicholas McGuffin?

10     A.   Yes.  I met with him over at the Coquille Police

11 Department at about one thirty in the afternoon on the 5th of

12 July.

13     Q.   When you sat down and talked with him, was there

14 anybody else there with you when you were speaking with him?

15     A.   No.

16     Q.   And did you ask him to give — well, to tell you what

17 that he and — what had happened to Leah Freeman?

18     A.   Yes.

19     Q.   Could you tell us, well, what did the Defendant have

20 to say?

21     A.   Well, I asked about his relationship with Leah.  And

22 he told me that he had been going with Leah for about ten —

23 the past ten months.  And as far as he knew she wasn't

24 pregnant.  And that he expected to marry her in the future.

25     Q.   Did he have a nickname for her?

1    A.   Yeah.  He stated to me at one point, he said, quote,

2 "Mark, I used to call her Angel."

3    Q.   Now, the word use or used, was that past tense?

4    A.   Yes.

5    Q.   Did he — well, how did the interview go from there?

6    A.   Well, from then — at that point I asked him what he

7 thought — what did he think happened to Leah?

8         And he told me that he suspected that maybe someone

9 had kidnapped her.  He said maybe she had ran away.  He

10 thought that possibly, although she wouldn't knowingly take

11 drugs, that maybe somebody gave her some acid and she O.D.'d.

12        And then he also mentioned that possibly she fell

13 down somewhere and hit her head.

14    Q.   Now, acid.  Is that a street name for a particular

15 drug?

16    A.   LSD.

17    Q.   Now, did you talk with the Defendant more during the

18 day?

19    A.   Yeah, I wanted to go over his time line that evening

20 and when was the last time he saw Leah on the night of

21 June 28th.

22        He told me the last time he saw Leah was when he and

23 his friend Brent Bartley dropped her off at her friend's house

24 around seven to seven o-five p.m.  From there they went and

25 picked up Nicky Price who was Brent's girlfriend.  And then

Ranger   X    D5 230

1    they went over to Brent's grandparent's home.  They arrived at

2    the grandparent's home around seven twenty to seven thirty

3    p.m.

4           He said he didn't stay long and left around seven

5    thirty p.m.  From there he stopped at the Fast Mart and then

6    went out and hung out at the Mill Pond.  He said he left the

7    Mill Pond around nine p.m. to pick up Leah.  But when he went

8    by she had already left.

9           He drove around looking for her, and could not find

10   her.  He did not go to Leah's house because he knew she

11   wouldn't go home until after eleven if she was around town.

12          He denied any involvement in Leah's disappearance.

13      Q.   Thank you.

14           MR. FRASIER:    That's all the questions I

15   have.

16           THE COURT:    Ms. McCrea.

17           Mr. McCrea.

18                    CROSS EXAMINATION

19   BY MR. MCCREA:

20      Q.   Oh, just one thing about — used to call her Angel?

21   She was missing at this time, right?

22      A.   Yes.

23      Q.   You can't very well call her anything if she's

24   missing.  Right?

25      A.   I'm not tracking that.

Ranger   X   D5 231

1    Q.   Well, let me — you said he used to call her Angel?

2    A.   Right.

3    Q.   Okay.  And you're talking to him on the 5th of July?

4    A.   Correct.

5    Q.   And she's been missing since the 28th of June.

6  Right?

7    A.   Right.  Missing for about a week.

8    Q.   Pardon?

9    A.   She'd been missing for about a week.

10   Q.   Yeah, been missing for about a week.  And so he was

11  referring to how he used to call her before she was missing.

12  Right?

13            MR. FRASIER:   Well, Your Honor, that calls

14  for A) speculation; and he's also asking this witness - - -

15            THE COURT:   (Interposing) Sustained.

16            MR. McCREA:   All right.

17   Q.   Well, at the time that you were talking to him

18  Ms. Freeman wasn't there for him to call her any particular

19  name.  Isn't that correct?

20   A.   Correct.

21   Q.   And he was cooperative with you through what you

22  talked about?

23   A.   Yes.

24            MR. McCREA:   I don't have any other

25  questions.

Perske   D    D5 232

1                THE COURT:    Anything further?

2                MR. FRASIER:    No, Your Honor.  And ask the

3    witness be excused.

4                THE COURT:    You are excused from further

5    attendance.

6                Call your next witness.

7                MS. SOUBLET:    State calls Dean Perske.

8                         DEAN PERSKE

9    was thereupon produced as a witness on behalf of the Plaintiff

10   and, having first been duly sworn to tell the truth, the whole

11   truth and nothing but the truth, was examined and testified as

12   follows:

13               THE COURT:    Have a seat up here, please.

14               Go ahead.

15               MS. SOUBLET:    Thank you, Your Honor.

16                    DIRECT EXAMINATION

17   BY MS. SOUBLET:

18      Q.   Mr. Perske, can you state your full name and spell

19   your last for the record?

20      A.   Dean Perske, P-E-R-S-K-E.

21               MS. SOUBLET:    I'm going to ask you to pull

22   the microphone a little bit closer to you and speak up so

23   everybody can hear you.

24      Q.   How are you — how are you employed now?

25      A.   I'm not.  I'm currently retired as of six months

Perske   D    D5 233

1   ago.

2       Q.   What are you retired from?

3       A.   Oregon State Police.

4       Q.   How long were you with the State Police?

5       A.   The State Police, twenty-seven years.

6       Q.   And in July of — June or July of 2000, what was your

7   assignment with the State Police?

8       A.   I was a detective assigned to the criminal division.

9       Q.   Working out of what office?

10      A.   The Roseburg.

11      Q.   On July 20th, 2000, were you asked to assist Coquille

12  Police Department in the investigation of Leah Freeman's

13  disappearance?

14      A.   Yes, I was.

15      Q.   Why were you asked to become involved?

16      A.   They were looking for additional help from other

17  detectives from outside the area to help follow up on the

18  investigation that had already been ongoing.

19      Q.   And on July 28th of 2000 were you working that day?

20      A.   Yes.

21      Q.   And on that day did you have contact with a person

22  later identified as the Defendant, Mr. McGuffin?

23      A.   Yes.

24      Q.   Page 24 of your report if you can get there.

25      A.   Yes, got it.

1    Q.   What was your reason for contacting the Defendant on

2    that day?

3    A.   On that day we were executing a search warrant on a

4    vehicle at his house and on the Defendant there himself.

5    Q.   And when you say we, were you working with a

6    partner?

7    A.   Yes.  I was assigned with an Officer Jim Davis who

8    was another State Police officer on that day.  There were

9    other officers from several agencies involved in this

10   investigation that did the other part of the search warrant.

11   Q.   What was the reason for serving the search warrant

12   on the Defendant?  What were you getting from him?

13   A.   We were collecting hair and saliva samples and

14   taking body photographs.

15   Q.   What was the reason for collecting saliva samples?

16   A.   For possible comparison with further evidence that

17   was found, or evidence that was found.

18   Q.   Mr. Perske, I'm going to hand you what's been marked

19   for identification purposes as State's Exhibit No. 206 and ask

20   you if you recognize that?

21   A.   Let's see.  It says oral swabs and with an

22   identification number on it.  I — looks like our evidence —

23   standard evidence packaging.

24   Q.   When you say oral swabs, can you tell the jurors,

25   how did you take that sample, a saliva sample from someone?

Perske   D    D5 235

1      A.    We take a — the crime lab provides us with these —

2   they're sterile cotton swabs on — it looks like glorified Q-

3   tip.  You rub the inside of the mouth and on the cheek.  You

4   stand them up.  You let them dry before they're sealed in any

5   packages.  We take usually four of those.  And, like I say,

6   they're dried for a period.  Right there and then they're put

7   in some packaging and sent to the crime lab.

8      Q.    Is there an agency case number associated with

9   Exhibit No. 206?

10     A.    I see the coding number on the top of it.  Oh yes,

11  00 — I don't have my glasses.  I see a case number, Oregon

12  case number down at the bottom.  And I can't read it.  I don't

13  have my glasses on.

14     Q.    Did you have an opportunity to speak with the

15  Defendant after taking those samples from him?

16     A.    Yes.  Officer Davis and I spoke with him after that.

17     Q.    How would you describe his demeanor?

18     A.    Very casual, very open.  Talked to us freely.  He

19  was read a copy of the search warrant, advised of his Miranda

20  Rights, and then asked if he would waive those and talk with

21  us.  And he said, "Sure."

22     Q.    Where did this take place?

23     A.    Basement of the Coquille Police Department.

24     Q.    Did you have an opportunity to ask him what had

25  happened on June 28th?

Perske   D    D5 236

1      A.   Yes.  We — after collecting those samples, we went

2  over and asked — he agreed to talk to us.  So, I said, "Hey,

3  can we go over again with what you did that day," what went

4  on.  So, he went over with a statement, giving us his

5  whereabouts for what he'd done.

6      Q.   And what did he tell you had happened on June 28th?

7      A.   That he had gone to pick up his girlfriend Leah.  He

8  had gone over to Sherry Mitchell's to pick her up between nine

9  and nine ten.  And she had already left by the time he'd got

10 there.

11          He then drove up Central Street and Knott Street

12 then back down Fifth Street near the park.  And up around

13 Central by the Fast Mart.

14          He repeated that he drove around town looking for

15 Ms. Freeman for quite a while.

16          I asked him if he remembered running into anybody?

17          He did recall running into a subject named Brett

18 Mauro by the fast Mart, a subject named Mark Kirn over by

19 Farr's at about ten thirty p.m. and two other subjects, a Glen

20 Cannon and a Daniel Lapine in the front yard of the Brack

21 Shack or Brent Bartley's house.

22          And he said nobody had claimed to see Leah Freeman

23 that he spoke to that evening.

24     Q.   Did you have an opportunity to ask him about his

25 relationship with Ms. Freeman?

Perske   D     D5 237

1    A.    Yes.

2    Q.    What if anything did he tell you about her?

3    A.    That that was the first girl that he had ever truly

4    loved out of several girlfriends.  They had gone through tough

5    times like anybody else does in a young relationship, but that

6    they had kind of worked some of their main problems out.  And

7    things were going good at that time.

8    Q.    Did he ever mention any rules that he had with

9    Ms. Freeman?

10   A.    He talked about that they had some rules.  I noted I

11   mentioned that in the report, but I didn't make specific

12   things.  And I don't recall them being anything of

13   significance.

14   Q.    Did you ask the Defendant whether or not he

15   contacted anybody else that night looking for Ms. Freeman?

16   A.    He indicated that he had gone to the — when we were

17   trying to pin down some closer times and stuff about where he

18   might have gone around town — he did indicate that he had gone

19   to the card lock by the Caboose over in Coquille and that he'd

20   got a few gallons each time.  And that thing would log the

21   time when you enter a card lock or something.  It tracks the

22   time.  So, he said I could — that could vouch for when I was

23   driving around town.

24        And then he said he also made a phone call at home

25   to his mom.  They have an eight hundred number that would also

Perske   D    D5 238

1  — it spits apparently a record out showing them, you know,

2  when a call comes in and stuff.  So they could track a time

3  from that.

4     Q.   Did you have an opportunity to ask the Defendant

5  what he thought had happened to Ms. Freeman?

6     A.   Yes.

7     Q.   What was his response?

8     A.   One of the snares that he gave out was that she may

9  have been walking, possibly along a river and fallen and hit

10 her head and done that.

11        Or, that she may have — if she found out or thought

12 that he was seeing another girl, that he — that she may have

13 committed suicide.

14    Q.   I want to turn your attention to August 4th, 2000.

15 Did you see the Defendant on that day?

16    A.   Yes.

17    Q.   Who was with you?

18    A.   Lieutenant Buddy Young.

19    Q.   What was the reason for contacting the Defendant

20 August 4th, 2000?

21    A.   That was — Ms. Freeman's body had been discovered

22 the day before.  So we were sent out to go out and contact

23 Mr. McGuffin and advise him of the find of her body.

24    Q.   Were you able to do so?

25    A.   Yes.

Perske   D   D5 239

1    Q.   How would you describe his demeanor on that day?

2    A.   This was a — when we contacted him at his house, he

3    was already aware of what had been found.  At this time he was

4    very obviously nervous, to the point of shaking, smoked —

5    chain smoking cigarettes, one after the other.  And just — I

6    mean, very, very nervous, very — somewhat agitated appearing.

7    Q.   Mr. Perske, in the course of helping out on this

8    investigation did you have an opportunity to speak to Melissa

9    Smith?

10   A.   Yes.  She was one of several people I spoke with.

11   Yes.  On August 18th.

12   Q.   I'm sorry.  Was that August 18th of 2000?

13   A.   Yes.  At about one p.m. I spoke with her.

14   Q.   During the course of the interview with Ms. Smith,

15   did you have an opportunity to ask her about Ms. Freeman and

16   Mr. McGuffin's relationship?

17   A.   Yes, that was one of the things we discussed.

18   Q.   During that conversation did Ms. Smith indicate she

19   noticed a change in their relationship?

20   A.   Yes.

21   Q.   Can you tell the jurors what Ms. Smith told you?

22   A.   Ms. Smith said when they were first going out they

23   always talked like a lot of young people do, how much we love

24   each other, and I love you a hundred percent, and comments

25   like that back and forth.  But a couple days prior to

Perske   D    D5 240

1   Ms. Freeman turning up missing, she noticed it was a

2   noticeable different to her between the attitude - - -

3                    MR. McCREA:    (Interposing) Excuse me, Your

4   Honor.  I don't recall there being any foundation for this

5   particular testimony with Ms. Smith.  And I object therefore.

6   What I'm referring to, of course, is the requirement she be

7   given an opportunity - - -

8                    THE COURT:    (Interposing) Right.

9                    MR. McCREA:    - - - to explain or deny.

10                   THE COURT:    Right.

11                   MS. SOUBLET:    And I did cover that with

12  Ms. Smith.

13                   THE COURT:    With — did you mention Officer

14  Perske?

15                   MS. SOUBLET:    I did.

16                   THE COURT:    Yeah.  Okay.

17                   Overruled.

18      Q.   You can continue.

19      A.   What she indicated is, like I say, they went from I

20  love you very much, I love you a hundred percent, the playful

21  banter back and forth, to I only love you — the last couple

22  days prior was — she was only making that comment, I only love

23  you seventy-five percent now.  And it was a noticeable, again,

24  difference to her from what she had exhibited them between

25  each other prior to that, the two days prior.

                                        Perske   X    D5 241

1      Q.   Thank you.

2           MS. SOUBLET:   I have nothing further.

3           THE COURT:   Mr. McCrea.

4           MR. McCREA:   Thank you.

5                    CROSS EXAMINATION

6    BY MR. MCCREA:

7      Q.   Mr. Perske, I know — did you say you didn't bring

8    your reading glasses?  Is that?

9      A.   No, I did not.

10     Q.   Okay.  So, you're having to read reports as best you

11   can, so to speak?

12     A.   The reports are text I can read fairly well.  It was

13   the fine print on this evidence thing - - -

14     Q.   (Interposing) Oh, okay.

15     A.   - - - that I couldn't quite bring into focus.

16     Q.   Great.  That's fine.

17          Now, did you conduct some of the interviews with

18   Detective Easter (phonetic) of the Oregon State Police?

19          MR. FRASIER:   Ester (phonetic).

20          THE COURT:   I think it's Ester.

21     A.   Detective Oester, yes.

22          MR. McCREA:   I keep trying to get that right,

23   Your Honor.

24          THE COURT:   That's fine.  I just wanted to

25   make that they know.

Perske   X   D5 242

1      Q.    With Detective Oester of the Oregon State Police?

2      A.    Yes, I did.

3      Q.    And I want to deal with a couple things here.  When

4  Mr. McGuffin is talking with you, and this refers to I believe

5  it's the 28th of July, and he — this is when he — this is when

6  he's very open, very casual, very cooperative, right?

7      A.    Yes.

8      Q.    And at that point Ms. Freeman's body had not been

9  found.  Correct?

10     A.    Correct.

11     Q.    And did you talk to him about whether or not he

12  cared for her, whether he had feelings for her?

13     A.    Yes.  That's — as I stated before, he talked about

14  that this was the first girl that I really truly loved.

15     Q.    Okay.  So, the information you had was that he felt

16  very deeply for her.  Correct?

17     A.    That was his statement, yes.

18     Q.    And regarding that same conversation for a moment,

19  away from the — when he talked about getting gas a number of

20  times, did he explain that he had a leak in the gas tank on

21  the Mustang?

22     A.    Not that I recall or noted in my report if he - - -

23     Q.    (Interposing) Didn't you — weren't you curious why

24  he would get small quantities?

25     A.    Well, I'm — at the time I - - -

Perske   X    D5 243

1      Q.    (Interposing) If you don't recall - - -

2      A.    - - - don't think.  No.  Maybe there was a reason.

3  Maybe his folks said, "Hey, you can't put more than five

4  gallons in," so you bump it up.

5      Q.    Okay.

6      A.    I — I — it wasn't something that brought up a — any

7  red flag in my opinion.

8      Q.    In any event, on August 4th when you saw him, then he

9  was — you said very nervous?

10     A.    Yes.

11     Q.    He was upset.  Isn't that correct?

12     A.    Yes.  He was noticeably agitated.

13     Q.    All right.  So, now the body has just been recovered

14  the day before, or that is to day discovered the day before,

15  August 3rd, correct?

16     A.    Yes.

17     Q.    So, you're talking to Mr. McGuffin the very next day

18  after the body has been found.  Right?

19     A.    Yes.

20     Q.    And so you're talking to a person that indicated he

21  cared very deeply about the person that has now been

22  determined to be dead.  Right?

23     A.    Yes, that was his statement.

24     Q.    Okay.  And so, — well, let's put it this way.  In

25  your experience people get upset when somebody they care about

```
                                        Perske   X    D5 244
 1   very deeply is dead — dies as it were?

 2       A.   Yes.  I've seen that, yes.

 3       Q.   All right.   Now, I want to talk about a different

 4   matter.

 5            MR. McCREA:    And, Your Honor, this is a

 6   matter of efficiency actually, maybe.  Because one of the

 7   persons about whom I asked regarding statements of

 8   Mr. Hamilton this morning is Mr. Penske (sic) — Mr. Penske

 9   when he was an officer of the State Police.  And I would,

10   rather than call him back in our case, which we would do if we

11   have to, but - - -

12            THE COURT:    (Interposing) If the DA doesn't

13   object, I have no problem with it.

14            MS. SOUBLET:    I have no objection.

15            MR. FRASIER:    It's Officer Perske, not

16   Penske.

17            MR. McCREA:    Perske.  Okay.

18            You have no objection?

19            MS. SOUBLET:    No.

20            MR. McCREA:    Okay.

21            May I approach the witness, Your Honor?

22            THE COURT:    You may.

23       Q.   I believe I have in my hand the same report that

24   you've been utilizing.  Is that correct?

25       A.   Thirty-one pages?
```

1     Q.    Let me look.  Yes.

2     A.    Yes, that's - - -

3     Q.    (Interposing)  All right.  I'd ask you to turn to

4  Page 29 of the 31.

5     A.    Yes.

6     Q.    And the last paragraph on that page, do you see

7  that?

8     A.    Regarding the August 15th at 3:15 or 3:35 interviewed

9  Dennis Scott Hamilton?

10     Q.    Yes.

11          MS. SOUBLET:    Your Honor, sorry to interrupt,

12  but before Counsel goes any further.  If this is for

13  impeachment purposes I would request a limiting instruction.

14          THE COURT:    This is for impeachment purposes

15  as I understand it.  Correct, Mr. McCrea?

16          MR. McCREA:    I'm sorry I didn't hear.

17          THE COURT:    This is for impeachment purposes?

18          MR. McCREA:    Yes.

19          THE COURT:    Okay.

20          Ladies and Gentlemen, as I instructed you

21  before, when a witness is asked about statements and denies

22  them or doesn't recall and they call another witness to

23  testify about those statements, you can consider that only for

24  its bearing on the credibility of the witness who previously

25  testified, not for whether it's true or not.  Just on the

Perske    X    D5 246

1    credibility of that witness.

2              So, this relates to Mr. Hamilton.  You can use

3    this testimony in assessing his credibility as a witness.

4              Go ahead.

5              CROSS EXAMINATION, Continued

6    BY MR. MCCREA:

7    Q.   I'd ask you then, Mr. Perske, to refer to that

8    interview and the question is, did you question Mr. Hamilton

9    regarding this case?

10   A.   Yes.

11   Q.   And would you be willing — would you please read

12   your report as to what you discussed and what Mr. Hamilton

13   told you?

14   A.   Start from August 15th?

15   Q.   Yes.

16   A.             "On August 15th, 2000 at approximately 3:35

17                  p.m. I interviewed Dennis Scott Hamilton

18                  regarding this case.  Hamilton had been

19                  identified as a friend of McGuffin who had been

20                  with him the day before and on the day of the

21                  disappearance."

22                  "Hamilton said that he was McGuffin's best

23                  friend and that he knew Leah well.  The day

24                  before Freeman came missing — and I have in

25                  parenthesis (on 6/27/2000) Hamilton, Nick

Perske    X    D5 247

1           McGuffin, Freeman and Melissa Smith — and I

2           have in parenthesis (Hamilton's girlfriend at

3           the time) end of parenthesis — all went

4           swimming out at the Leatherman's Hole by

5           Powers.  They were there until around five or

6           five thirty and McGuffin dropped them back off

7           at Smith's house."

8               "Hamilton went home and then drove over to

9           Kristen Steinhoff's who was sleeping.  Hamilton

10          said he went back home and worked on his car

11          and watched TV until about eight thirty or nine

12          when he went back to Steinhoff's.  When

13          Hamilton got there, McGuffin was already there

14          talking to Kristen.  Kristen and McGuffin left

15          in her Kia and got out supposedly at the Fast

16          Gas in Coquille and were back about twenty

17          minutes."

18              "When they got back McGuffin told Hamilton

19          they had gotten the gas and then went by a

20          party at — in quotation's "Doc's house" —

21          looking for Leah.  And then returned to

22          Steinhoff's."

23     Q.   Now, would you stop there for just a moment.  The

24  first part of what you read referred to the swimming at the

25  Leatherman's Hole on 6/27.  Did you at some point talk with

Perske    X    D5 248

1  him or begin talking with him about what he had done on the

2  28th of June?

3      A.    You mean further in that statement?

4      Q.    Yes.

5      A.    Did you want me just to continue reading what he

6  told me or - - -

7      Q.    (Interposing) Well, what I want to get sorted out is

8  whether or not he told you that they went out looking for Leah

9  in the Kia on the 27th or whether he was telling you they went

10  looking for Leah in the Kia on the 28th of June.

11      A.    Well, he — as he started his statement this — what

12  he was describing to me, the way I took it was that it was the

13  day before Leah came up missing.  And that was on 6/27.  So, I

14  assume this is the 26th.

15      Q.    I'm sorry?

16      A.    The statement I just read is what he described — it

17  started out was:

18                  "Hamilton said that he was with McGuffin —

19              he was McGuffin's best friend.  That he knew

20              Leah well.  The day before Freeman came up

21              missing . . ."

22          Which was on the 27th.

23      Q.    Yeah, right.

24      A.    Then, blah, blah, blah, the statement I just read.

25  So, I'm assuming that what I just read and told everybody was

                                        Perske    X    D5 249

1   on the 26th, based on his deal.

2        Q.    Well - - -

3        A.    Not the day she came up missing.

4        Q.    She came up missing on the 28th, did she not?

5        A.    I have in parentheses the 27th.

6        Q.    Well, Ms. Freeman came up missing on the 28th.

7   That's been the testimony here.

8        A.    28th?  "The day before came up . . ."  Oh.  The day

9   before — yeah.  She came up missing on the — he came up on the

10  27th, the day before.  If she was missing on the 28th, the 27th

11  then is what this occurred on.

12       Q.    All right.  So, they went looking for — I mean, they

13  went swimming on the 27th, the day before?

14       A.    Yes.  This is the day before.  All this is - - -

15       Q.    (Interposing) Okay.  Now, what's confusing.  And I

16  don't mean to criticize your report or your report writing, is

17  he then describes Kristen Steinhoff — you, in your report have

18  him describing Kristen Steinhoff and McGuffin leaving in the

19  Kia.  And when they came back, he said they had gotten gas and

20  went by a party at "Doc's house" looking for Leah.  And then

21  returned to Steinhoff's house.

22             And what I'm trying to ascertain is, what day did he

23  tell you that was taking place?  If you can tell?

24       A.    Well, like I say from the way it's written in this

25  context isn't it the day before she came up missing these are

Perske   X    D5 250

1   the events that occurred.  So that would be on the 27th, the

2   day before this came up missing, that's when they went and got

3   this gas and stuff.  If it was another day I would hopefully

4   have broken it into another paragraph and started with that.

5       Q.   Well, all right.

6            Did you talk to him about what he had done on the

7   evening of the 28th of June, 2000?

8       A.   I asked him some general questions and as he said he

9   had no knowledge of who was responsible for Freeman's

10  disappearance.

11      Q.   Okay.  But, like my question is, did — beyond that

12  did you talk to him — talk to Mr. Hamilton about what he,

13  Mr. Hamilton, had done on the 28th of June, 2000?

14      A.   Well, I guess — if you're referring to the part he

15  said he got home about one a.m. the following morning which

16  would have been the day that she disappeared, I guess so.  For

17  an hour of time, that's when he said he got home on the day

18  she actually disappeared.

19      Q.   I'm sorry.  I - - -

20      A.   His last thing says that he stayed around there for

21  twenty minutes after they get back — they get back from the

22  thing.  And then he was there until about — he got home about

23  one a.m. that following morning.  So, yes, he — I guess I did

24  talk to him a little bit about what he did on the 28th.  Then

25  he gave the generic statement that he didn't have any more

Perske   ReD  D5 251

1   information regarding her disappearance.

2        Q.   All right.

3             MR. McCREA:    I don't have any other questions

4   of this witness.

5             THE COURT:    Redirect.

6             MS. SOUBLET:    Just briefly.

7             Thank you, Your Honor.

8                 REDIRECT EXAMINATION

9   BY MS. SOUBLET:

10       Q.   Mr. Perske, when you were interviewing the Defendant

11  the first time on July 28th, 2000, while Ms. Freeman's body was

12  still missing, did he appear to be upset?

13       A.   No.  Very low key.

14       Q.   The only change occurred after Ms. Freeman's body

15  was found?

16       A.   Correct.

17       Q.   Thank you.

18             MS. SOUBLET:    Nothing further.

19             THE COURT:    You may step down.  You're free

20  to leave.

21             WITNESS:    Thank you.

22             Call your next witness.

23             MS. SOUBLET:    The State calls Sergeant Buddy

24  Young.

Young    D    D5 252

<u>EVERETT JOHN YOUNG</u>

1

2   was thereupon produced as a witness on behalf of the Plaintiff

3   and, having first been duly sworn to tell the truth, the whole

4   truth and nothing but the truth, was examined and testified as

5   follows:

6                  THE COURT:    Have a seat up here, please.

7                  Go ahead.

8                  MS. SOUBLET:    Thank you, Your Honor.

9                       <u>DIRECT EXAMINATION</u>

10  <u>BY MS. SOUBLET:</u>

11       Q.    Sergeant Young, can you state your full name and

12  spell your last for the record?

13       A.    Everett John Young, Y-O-U-N-G.

14       Q.    How are you employed?

15       A.    The City of North Bend Police Department.

16       Q.    How long have you been with North Bend Police

17  Department?

18       A.    Thirty-three years.

19       Q.    In the summer of 2000 what was your assignment at

20  North Bend Police Department?

21       A.    I was working — I was a lieutenant at the time, but

22  I was pretty much in management.  But it was also working with

23  the major crimes team.

24       Q.    And on — as part of working with the major crimes

25  team, were you asked to assist the Coquille Police Department

Young   D    D5 253

1   into the investigation of Leah Freeman's disappearance?

2       A.   I was.

3       Q.   On July 5th, that day, did you have contact with the

4   Defendant?

5       A.   I did.

6       Q.   Where did that take place?

7       A.   At the Coquille Police Department in the squad room

8   area.

9       Q.   Actually prior to that had you been asked to seize

10  any evidence?

11      A.   Yes.  Myself and I believe it was Detective Pat

12  Downing, went up to the residence of Nick McGuffin and seized

13  the Mustang that was up there.

14      Q.   What type of Mustang was it?

15      A.   It was a Ford Mustang.  I believe it was a '67, if I

16  remember correctly.

17      Q.   Is that a car that you're familiar with?

18      A.   Yes.

19      Q.   How are you familiar with it?

20      A.   I had a '67 Mustang myself when I was in high

21  school.

22      Q.   Once at the Coquille Police Department and you had

23  an opportunity to talk with the Defendant, did you get talking

24  about the Mustang?

25      A.   We did, yes.

Young    D    D5 254

1    Q.    And after doing that the Defendant started talking

2    to you about Ms. Freeman?

3    A.    Yes.

4    Q.    Did you have an opportunity to ask him what had

5    happened on June 28th, 2000?

6    A.    Well, yes.  And we were talking a little bit about

7    her circumstances and disappearing stuff.  And I asked him,

8    when he was looking for her, why he didn't drive directly to

9    her residence when he couldn't find her at her friend's house

10    — Mitchell's house — or anywhere along the route.  Why didn't

11    he just go to see if she went home?

12    Q.    And what was his response?

13    A.    He stated that he knew absolutely that she would not

14    have gone home.  Said that she hated to be there.  And that

15    she just wouldn't have gone home.  So, he didn't bother to go

16    there to look for her.

17    Q.    Did you have an opportunity to ask him whether or

18    not Ms. Freeman would have taken a ride from a stranger?

19    A.    I did.

20    Q.    And what was his response?

21    A.    His response was pretty emphatic.  He said that

22    there was no way that Leah would ever take a ride with a

23    stranger.  He then paused a bit and continued stating that she

24    might take a ride with a stranger under very unusual

25    circumstances, such as if she was extremely depressed and

                                        Young   D   D5 255

1    feeling like nobody loved or cared for her.

2            He then stated that Leah was feeling this way on

3    that night that she disappeared because she had just had a

4    confrontation with her friend, a friend at Sherry Mitchell's

5    house.  With Sherry's mother I believe it was, Peggy Mitchell,

6    who expressed her opinion that Leah was not a good influence

7    on her daughter and said she was pretty saddened and upset by

8    that.

9        Q.   When you say she, meaning?

10       A.   Meaning Leah.

11       Q.   Did you have an opportunity to ask him whether or

12   not he thought Leah would have run away?

13       A.   Excuse me?

14       Q.   Did you ask him whether or not Ms. Freeman would

15   have run away?

16       A.   I did.  If he thought she'd run away.  And he said

17   he didn't think she would run away, at least not without

18   talking to him and letting him know in case he wanted to go

19   with her.

20       Q.   Was there ever a discussion about a phone call at

21   his parent's house?

22       A.   Yes.  In that same conversation about her running

23   away, he mentioned that on the morning of June 28th about four

24   o'clock in the morning, he received a phone call at his

25   residence, but that nobody knows who it was.  I found the

Young   D   D5 256

1   statement kind of strange.  I asked him how he could have had

2   knowledge that the phone call was for him if he doesn't know

3   who it was.

4        He said that he knows it was for him because nobody

5   would call his house at that hour unless it was for him.  He

6   stated that he — had he answered the phone instead of his

7   mother the caller would not have hung up.  He didn't give any

8   consideration to the fact that it could have been a wrong

9   number or somebody realized after the first few rings and hung

10  up or if they heard an unfamiliar voice they might have hung

11  up.  He was convinced somebody was trying to call him, but he

12  would not elaborate as to who he thought it might have been or

13  for what purpose they might be calling him.

14       Q.   Sergeant Young, let me interrupt you there.  You

15  said at four a.m. on June 28th.  Do you mean four a.m. on June

16  29th?

17       A.   Well, that would have been — he said on the morning

18  of June 28th at about four o'clock.  That's what I have in my

19  report.  So, that's what he told me.

20       Q.   After that discussion about the four a.m. phone

21  call, did the Defendant start speculating about what could

22  have happened to Ms. Freeman?

23       A.   He did.  He started talking about how she might have

24  been walking along the river and stumbled and hit her head on

25  a rock and fallen into the river.  It seemed kind of like a

```
                                        Young   X   D5 257
```

1  strange off the wall statement to me, especially considering

2  all the other possibilities that could have happened.

3          I asked him if he truly believed that Leah, who was

4  a good looking female, nice physique, would have been stupid

5  enough to walk along a dark, secluded river bank wearing a

6  tight fitted, you know, wife beater shirt like she had on;

7  taken the chance that, you know, somebody might have seen her

8  down there and taken advantage of her?

9          He then said he did not believe she would be that

10  stupid.

11      Q.   Thank you.

12              MS. SOUBLET:   I have nothing further.

13              THE COURT:   Ms. McCrea.

14                    CROSS EXAMINATION

15  BY MS. MCCREA:

16      Q.   So, it's — I'm sorry — Lieutenant Young?

17      A.   No, ma'am.   It's sergeant.

18      Q.   Sergeant.   Sorry.

19      A.   That's okay.

20      Q.   So, Sergeant Young, the conversation that you were

21  having with Mr. McGuffin at this point, and this was what,

22  July 5th, 2000?

23      A.   Right.

24      Q.   Part of it was, Mr. McGuffin would make a statement

25  and, for example, Mr. McGuffin saying, "If she would ever take

Young   X   D5 258

1   a ride with a stranger."

2          And then you would sort of say to him, "Why do you

3   think that?"  Or you would challenge his response.  Is that

4   fair?

5      A.   Yeah.  I don't think I'd challenge it, but I was

6   curious as to why he was saying some of those things or

7   thinking the way he was thinking.  Because it just — some of

8   it just seemed a little bit odd to me.

9      Q.   Well, and you knew the he had been talked to by a

10  number of other officers before your conversation with him?

11     A.   I would assume somebody talked to him.  I couldn't

12  tell you how many people had talked to him.  I wouldn't know

13  that.

14     Q.   Okay.  Well, for example, when Nick McGuffin told

15  you that she — that Leah may have been walking near the river

16  and stumbled and hit her head on a rock and fallen into the

17  river, you did challenge him, didn't you?

18     A.   Yes.  It just seemed odd to me.  And I asked him,

19  you know, why he would have thought that, being just the way

20  she was dressed and everything.  Did he really think she would

21  go walking along a river in the dark?

22     Q.   Okay.  And at that point you were not aware that

23  Leah and Nick and Melissa Smith and Scott Hamilton had gone

24  swimming up at Leatherman's pool up Powers the day before Leah

25  Freeman disappeared?

Young   X   D5 259

1    A.   I was not aware of that, ma'am, no.

2    Q.   And I assume Mr. McGuffin didn't tell you anything

3    about that during his conversation with you?

4    A.   No, ma'am.

5    Q.   But you asked him to speculate on what might have

6    happened to Leah Freeman.  Is that right?

7    A.   No.  He was — he was talking about her walking along

8    the river.  And he was just espousing upon that.  And I

9    thought of all of the other possibilities, why was he doing

10   that?

11   Q.   Okay.  My question is, you were asking him what he

12   thought may have happened to her?

13   A.   Okay.

14   Q.   Is that right?

15   A.   Probably, yeah.

16   Q.   And so he was telling you different things that may

17   have happened?

18   A.   You could look at it that way, yeah.

19   Q.   He was speculating?

20   A.   Yeah.

21   Q.   Okay.  And this was on July 5th, 2000?

22   A.   Uh huh.

23   Q.   Leah disappeared on June 28th, 2000?

24   A.   Correct.

25   Q.   So, at this point it's been about a week?

1    A.   Correct.

2    Q.   There hasn't been any word from her; she hasn't

3  turned up anywhere.  Is that fair?

4    A.   Yes.

5    Q.   And Mr. McGuffin at the time that he had this

6  conversation with you, voiced aloud his frustration over her

7  disappearance, didn't he?

8    A.   Yes.

9    Q.   And he was concerned that she hadn't come back?

10   A.   That's what he was conveying.

11   Q.   Okay.  And in fact, when he talked about the

12 possibility of her running away, he indicated she would never

13 have run away without him or at least telling him that she was

14 leaving in case he wanted to go with her?

15   A.   Correct.

16   Q.   That's what he said?

17   A.   Yes.

18   Q.   Okay.  Now, the — the major — what is the major

19 crime team?  Or what was it back in 2000?

20   A.    It was a team comprised of investigators from all

21 the different agencies in the area, because we're small down

22 here.  If my agency had a major crime, we wouldn't expect one

23 or two of our guys to handle it.  So, the team would get

24 called out.  And there was a commitment that all these

25 officers belong to you for at least a week to help you gather

                                        Young   X   D5 261

1    up the evidence and get statements and what not and try and

2    solve the crime.

3            It was kinda like you scratch my back, I'll scratch

4    yours.  Then, when it's your turn, we'll all come to your

5    house.  So, it was just a team of experienced guys that got

6    together to help each other.

7        Q.   And as part of being on this investigation you

8    indicated that you seized Mr. McGuffin's 1967 blue Mustang.

9    Right?

10       A.   Yes, ma'am.

11       Q.   And this was done pursuant to a written consent that

12   he provided?

13       A.   That's — yes.

14       Q.   And the Mustang was not served at his residence, but

15   in fact you called a tow company and towed it to a secure

16   facility so that you or sort of the generic you, the major

17   crime team, could go through the Mustang at their leisure.  Is

18   that right?

19       A.   Correct.

20       Q.   And there was no time limit on how long the crime

21   team could keep the Mustang in order to go through it?

22       A.   I'm not aware of any time limit.

23       Q.   Okay.  Well, you went to get it?

24       A.   Right.

25       Q.   And did you have contact with Mr. McGuffin when you

```
                                   Young   X    D5 262
```

1  went to get the Mustang?

2      A.   I believe we did, and his dad.

3      Q.   Okay.  And they didn't say, "Okay.  You got to have

4  it back here within twenty-four hours?"

5      A.   Not to us, no.

6      Q.   To anybody?

7      A.   I don't know if they said it to anybody else.  They

8  didn't say it to us.  We just went to observe it getting onto

9  the tow truck and then taking it to the State Police

10 headquarters where we secured it.

11     Q.   Okay.  And it wasn't returned within twenty-four

12 hours.  Right?

13     A.   I don't believe so, no.

14     Q.   It was — in fact the crime lab had it for a long

15 period of time and went through it very, very carefully.  Is

16 that fair?

17     A.   Yes.  I would say that's fair.

18     Q.   And it was what we would call totally processed?

19     A.   I would say so.

20          MS. McCREA:    Give me just a moment, please.

21     Q.   Sergeant Young, did you just talk to Mr. McGuffin

22 this one time on July 5th, 2000?

23     A.   No.  There was another time - - -

24          MS. SOUBLET:    (Interposing) Objection.

25 Beyond the scope of direct.

```
                                        Young   X    D5 263
```

1           THE COURT:   Well, we're talking about him

2    taking statements.  So, I'll allow it.

3           Go ahead.

4    A.   There was another time when myself and Detective

5    Perske who I believe was already in here, we went out to

6    retrieve a sweatshirt out at the McGuffin's residence.

7    Q.   That's fine.  We don't - - -

8           MS. SOUBLET:   (Interposing) Your Honor, I

9    would also object on grounds of hearsay.

10          MS. McCREA:   Well, we don't — that's fine.  I

11   didn't — we don't need to get into it.  I don't want to — I'm

12   happy to assist Counsel in this.

13   Q.   My question then is directed at the July 5th, 2000

14   conversation with Mr. McGuffin.

15   A.   Okay.

16   Q.   And although it doesn't indicate it in your report,

17   do you remember when you had the conversation about Leah

18   hitting her head, or Mr. McGuffin saying — I'm sorry.  Of Leah

19   hitting her head on a rock and falling into the river.  That

20   in fact Mr. McGuffin told you that when they had gone swimming

21   at Leatherman's pool that she had fallen and hit her head on a

22   rock?

23   A.   I don't remember that, but in that type of a case if

24   that was told to me, I would have put that down.  I'd have

25   documented that.

Young   X   D5 264

1    Q.   So, you don't have any recollection of that.  And

2  you're saying it's not in your report.  So, it didn't happen.

3    A.   No.  It's not in my report because I don't have — if

4  it was told to me, I would have put it in there.  And if it's

5  not there, then I'm going to say that it wasn't told to me.

6    Q.   So, now the phone call that Nick indicated that he

7  received at four in the morning?

8    A.   Okay.

9    Q.   He was positive that that phone call was for him?

10    A.   That's what he said.

11    Q.   Okay.  And didn't he indicate to you that he

12  believed that phone call had either been from Leah or from

13  someone who knew something about where she was?

14    A.   I don't remember that.  In fact, I thought it was

15  weird because he's — he just said he didn't know who it was,

16  but was sure that it was for him.

17    Q.   Right.

18    A.   So, I thought that rather odd.

19    Q.   And, okay.  He said that he was sure it was for him.

20  And that came — well it would actually be the night of June

21  28th or the early morning technically of June 29th?

22    A.   Okay.

23    Q.   And it was after nine o'clock when Mr. McGuffin, on

24  June 28th went to find Leah Freeman and she was not at Sherry

25  Mitchell's.  Right?

```
                                       Young   X   D5 265
```

1    A.   Yes.

2    Q.   Okay.  So, this call at four in the morning is close

3    in time to Leah Freeman's disappearance?

4    A.   Okay.

5    Q.   And Mr. McGuffin had expressed to you his concern

6    about her location and about finding her?

7    A.   Yes.

8    Q.   Is that all true?

9    A.   Yeah.  He was concerned about where she was.

10   Q.   And so the phone call at four a.m. — well, I don't

11   mean to make you speculate although you've done some of that

12   about your opinion concerning the phone call - - -

13              MS. SOUBLET:   (Interposing)  I'm going to

14   object to the argumentative nature - - -

15              THE COURT:   (Interposing) Sustained.

16   Q.   Well, let's deal with this just for a minute.  So,

17   the fact that Nick was sure that he received — that the phone

18   call would have been for him, was rather bizarre to you

19   because he didn't know who was calling?

20   A.   Correct.

21   Q.   But it would be consistent of him believing it was

22   for him if he believed that the call was from Leah Freeman.

23   Right?

24              MS. SOUBLET:   Objection.  Speculative.

25              THE COURT:   Sustained.

```
                                    Young   X    D5 266
```

1               MS. McCREA:   I have nothing further, Your

2   Honor.

3               THE COURT:   Redirect.

4               MS. SOUBLET:   No.  Thank you.

5               THE COURT:   You may step down.  And you're

6   free to leave.

7               WITNESS:   Thank you, sir.

8               MS. McCREA:   Actually, I believe - - -

9               THE COURT:   (Interposing) Is he under your

10  subpoena?

11              MS. McCREA:   I believe so, yes.

12              WITNESS:   Okay.

13              THE COURT:   And you need him back.  Is that

14  correct?

15              MS. McCREA:   Yes.

16              THE COURT:   Okay.

17              Just be available to come back.

18              Do you have another witness now, or - - -

19              MR. FRASIER:   I have one short witness I

20  think we can get done before five.

21              THE COURT:   Fine.

22              MR. FRASIER:   Call Juliana Curran.

23              MS. McCREA:   I'm sorry, Counsel, who was the

24  witness?

25              MR. FRASIER:   Juliana Curran, used to be

Curran   D   D5 267

1   Reab.

2                 MS. McCREA:    Thank you.

3                     <u>JULIANA CURRAN</u>

4   was thereupon produced as a witness on behalf of the Plaintiff

5   and, having first been duly sworn to tell the truth, the whole

6   truth and nothing but the truth, was examined and testified as

7   follows:

8                 THE COURT:    Have a seat up here, please.

9                 Go ahead please.

10                MR. FRASIER:    Thank you.

11                    <u>DIRECT EXAMINATION</u>

12  <u>BY MR. FRASIER:</u>

13      Q.   Could you state your name please, ma'am, and spell

14  your last name for the record?

15      A.   Juliana Danielle Curran, C-U-R-R-A-N.

16                MR. FRASIER:    Could you pull that microphone

17  a little bit closer to you?

18                WITNESS:    Okay.

19                MR. FRASIER:    And you're going to need to

20  speak up.

21                WITNESS:    Again?

22                MR. FRASIER:    Yes.

23      Q.   Would you do it over again?

24      A.   I'm Juliana Danielle Curran, C-U-R-R-A-N.

25      Q.   And you're married at this time?

```
                                    Curran   D    D5 268
```

1       A.   I am.

2       Q.   And your maiden name was?

3       A.   Reab, R-E-A-B.

4       Q.   Have you — or do you live in the Coquille Area?

5       A.   I do.

6       Q.   How long have you lived here?

7       A.   I was born in Coquille.  I've never left.

8       Q.   Go to high school here?

9       A.   I did.  I graduated.

10      Q.   What year did you graduate?

11      A.   2001.

12      Q.   Are you familiar with the Defendant in this case,

13   Nick McGuffin?

14      A.   I am.

15      Q.   How do you know Mr. McGuffin?

16      A.   I've know him since — before I started school.  I

17   had first grade.  I went to school with him since the

18   beginning.

19      Q.   And were you familiar with Leah Freeman?

20      A.   I was.

21      Q.   How did you know her?

22      A.   My mom and Cory have gone back years.  My mom used

23   to work at Denny's Pizza and I grew up playing with Denise and

24   Leah.

25      Q.   Were you the same year high school that the

Curran   D   D5 269

1  Defendant was?

2      A.   Originally.  I was held back.  So, I was supposed to

3  originally graduate in 2000.  But because I have medical

4  concerns, they held me back.

5      Q.   So, you graduated a year later?

6      A.   Uh huh, due to my stomach.

7      Q.   Now, I want to direct your attention to the latter

8  part of the school year of 1999-2000.

9      A.   Okay.

10     Q.   Was there a day that the Defendant offered you a

11 ride home or you asked the Defendant for a ride home?

12     A.   Yes.

13     Q.   And, were you aware that the Defendant and Leah

14 Freeman were boyfriend/girlfriend?

15     A.   I was.

16     Q.   In this ride home from school did the Defendant tell

17 you anything about his relationship with Ms. Freeman?

18     A.   He did.  He said that he needed to get back right

19 away to pick up Leah from school.  He said there was abuse in

20 the relationship, that she had hit him.  And that he didn't —

21 he didn't want a fight, so he needed to get right back and

22 pick her up from school.  I told Nick that he needed to tell

23 Cory that Leah was hitting him.  And that maybe she needed

24 some counseling or something.

25     Q.   Thank you.

```
                                            Curran   X    D5 270

 1              MR. FRASIER:    That's all the question I have,

 2    Your Honor.

 3              THE COURT:    Any cross?

 4                         CROSS EXAMINATION

 5    BY MS. MCCREA:

 6         Q.   Ms. Reab, this was the last day of school - - -

 7         A.   (Interposing) I believe - - -

 8         Q.   - - - in June of 2000?

 9         A.   Yes.

10         Q.   Do you remember what day of the month that was?

11         A.   Uh - - -

12         Q.   I know it's been a long time.

13         A.   I'd have to look at a calendar.

14         Q.   Okay.  Was it like maybe around the first part of

15    June?

16         A.   I do believe so, yeah.

17         Q.   And actually, you asked Nick for a ride home, didn't

18    you?

19         A.   I did.

20         Q.   Okay.  And he was happy to give you a ride?

21         A.   Oh, for sure, yeah.  I used to walk on the highway.

22    And it was a heavy backpack and — why not?

23         Q.   It was nice to have a ride for a change?

24         A.   You bet.

25         Q.   So, he expressed some concern to you about the way
```

Curran   X   D5 271

1   that Leah was treating him?

2        A.   Yes.

3        Q.   And he asked for your advice?

4        A.   Yeah.  I mean he was more — he was telling me that

5   there was abuse in the relationship.  He needed to get back

6   and go pick up Leah so there wouldn't be a fight.  She

7   wouldn't basically physically attack him, smack him, hit him,

8   whatever, slap — a fight.  I mean, it sounded like she would

9   get physical.

10       Q.   Okay.  So, he was doing you a favor and this came up

11  in the context of he needed to get back and not be late in

12  picking up Leah?

13       A.   Right.  Because that could start a fight where she

14  might physically attack him.

15       Q.   All right, all right.  I got it.  Okay.

16       A.   Yeah.

17       Q.   And you grew up with Leah and with her sister,

18  Denise?

19       A.   Uh huh.  And I actually - - -

20       Q.   (Interposing) And your family's been friends - - -

21            Okay.  Let's wait.  I'm going to ask you a question.

22  And then you can answer it.  Okay?  Otherwise we're both

23  talking on the record.  Okay.

24            So, you grew up with Leah and Denise Freeman?

25       A.   Uh huh.

Curran   X   D5 272

1    Q.   Your mom worked at Denny's Pizza.  Is that right?

2    A.   When I was really, really little, yes.

3    Q.   And so you've known the Freeman family for a long

4    time?

5    A.   Uh huh.

6    Q.   Okay.  And how long did it take for Nick to give you

7    a ride home?

8    A.   Oh, it was just instant.  I mean, it was really — it

9    was a quick thing.  It didn't take any time at all.  I just

10   live at the (not understandable) at the end of town.

11   Q.   So, in terms of him asking for your advice, you told

12   him that he should talk to somebody?

13   A.   Cory, Leah's mom.

14   Q.   Talk to Leah's mom.  And he thanked you for your

15   advice?

16   A.   Yeah.  It sounded like that, you know, he thought

17   that was a good thing to maybe tell Cory that it was getting

18   physical.  And maybe she needed some counseling or, you know,

19   that it needed to be talked about.

20   Q.   Okay.  Very good.

21        Thank you.

22        MS. McCREA:   Nothing further, Your Honor.

23        THE COURT:   Redirect.

24        MR. FRASIER:   Just one question.

25

```
                                          Curran   ReD  D5 273

 1                      REDIRECT EXAMINATION
 2   BY MR. FRASIER:
 3        Q.   Based on your acquaintanceship with Leah Freeman,
 4   had you known her to be aggressive?
 5        A.   No.  No.  She's never attacked anybody as far as I'd
 6   seen, you know.
 7        Q.   Thank you.
 8                  MR. FRASIER:   That's all I have.
 9                  THE COURT:   You are free to leave.  You may
10   step down.
11                  WITNESS:   Thank you.
12                  THE COURT:   We'll take the evening recess at
13   this time.
14                  Nine o'clock.  Everybody else remain seated
15   until the jury has a chance to leave.
16                  Remember the admonition.  Leave your notes in
17   the jury room, please.
18                  (Jury Out.)
19                  THE COURT:   If I'm reading your list right,
20   do you plan to rest tomorrow?
21                  MR. FRASIER:   I'm hoping so, yes.
22                  THE COURT:   Okay.
23                  Just so — and if I read this correctly, it's
24   probably some time in mid afternoon?
25                  MR. FRASIER:   I hope so, yes.
```

D5 274

1                THE COURT:    Okay.

2                So, the Defense will have some witnesses

3   available?

4                MS. McCREA:    Like Mr. Frasier says, I hope

5   so.

6                THE COURT:    Okay.

7                MR. FRASIER:    Your Honor, before we adjourn

8   for the evening, I do have a witness that I intend to call

9   tomorrow, but it might be a good idea that the court hear it

10  outside the presence of the jury, because I - - -

11               THE COURT:    (Interposing)  Okay.

12               MR. FRASIER:    And I'm prepared to do that

13  now.

14               THE COURT:    All right.

15               Go ahead.

16               MR. FRASIER:    And that would be Ms. Cagley,

17  Christy Diane Cagley.

18               THE COURT:    Okay.  That's fine.  Let's go.

19               CHRISTY DIANE CAGLEY (YOUNG)

20  was thereupon produced as a witness on behalf of the Plaintiff

21  outside the presence of the jury, and, having first been duly

22  sworn to tell the truth, the whole truth and nothing but the

23  truth, was examined and testified as follows:

24               THE COURT:    Have a seat up here, please.

25               Go ahead.

Young   D   D5 275

<p align="center">DIRECT EXAMINATION</p>

1

BY MR. FRASIER:

2

3        Q.   Could you state your name please, ma'am, and spell

4   your last name for the record?

5        A.   Christy Diane Cagley, C-A-G-L-E-Y.

6        Q.   Have you been previously name as Young, by the last

7   name of Young?

8        A.   Yes.

9        Q.   Now, Ms. Young, we called you in here today because

10  we want to ask you some questions to determine the

11  admissibility of your testimony.  Okay?

12       A.   Okay.

13       Q.   Now, the questions that I have for you, are you

14  familiar with an individual named Polly Parks?

15       A.   Yes, I am.

16       Q.   And how do you know Polly Parks?

17       A.   She's been a good friend of mine for about eleven

18  years now.

19       Q.   Was there a period of time that you lived with

20  Ms. Parks?

21       A.   Yes.

22       Q.   When was that?

23       A.   Been about ten years now.

24       Q.   Do you recall in relation to the disappearance of

25  Leah Freeman, when — taking that into account — when you lived

```
                                          Young   D    D5 276
```

1  with Ms. Parks?

2      A.   Two weeks, two and a half weeks right after Leah

3  disappeared I moved in with Polly.

4      Q.   Do you recall an occasion after Leah Freeman

5  disappeared and after you moved into the home of Polly Parks

6  where the Defendant and his brother Wayne McGuffin were at

7  Ms. Parks' home?

8      A.   Yes, I do.

9      Q.   Do you recall a television set being on?

10     A.   Yes, I do.

11     Q.   Do you recall a report on the television that a shoe

12  had been found on Hudson Ridge?

13     A.   I do.

14     Q.   In the presence of the Defendant do you recall what

15  Wayne McGuffin said?

16     A.   He looked at his brother.  And he said, "Ah, they

17  won't find anything from that shoe."

18          And Mr. McGuffin himself over there laughed about

19  it.  And it was kinda brushed under the rug.

20     Q.   Do you recall telling the police that — and I

21  believe you also testified at the Grand Jury — that the shoe

22  had been put there to put the police off?

23     A.   Yes.  It was put there deliberately to make them

24  think that she'd been out there.

25     Q.   How did the Defendant react to that statement by

```
                                        Young   X   D5 277
```

1   Wayne McGuffin?

2       A.   He thought it was kind of humorous.  It didn't

3   really concern him much.  He found it to be humorous, like

4   kind of - - -

5       Q.   (Interposing) Did he laugh?

6       A.   He kinda just snickered about it and was, like,

7   "Yeah.  I know what you're talking about."  You know.

8       Q.   Thank you.

9               WITNESS:   You're welcome.

10              MR. FRASIER:   That's the proposed testimony I

11  intend to offer tomorrow.

12              THE COURT:   Any examination of this?  Or any

13  objection now?  You can examine and make your objection or

14  make an objection, Counsel.

15              MS. McCREA:   Well, I object to it.  I mean,

16  it's hearsay.  It's a statement of Wayne McGuffin.

17              I guess, yeah.  Let ask her a couple questions.

18                   CROSS EXAMINATION

19  BY MS. MCCREA:

20      Q.   So, I'm sorry.  Is it Ms. Cagley now?

21      A.   No.  It's Young.

22      Q.   It's Young.  Because I've got both your names on

23  this report.

24              So, Ms. Young, the first time that you spoke to

25  anyone in law enforcement about what you've testified here

```
                                    Young   X    D5 278
```

1   today was July 20th, 2010.  Is that right?

2       A.   Yes.

3       Q.   And you spoke to Officer McNeely of the — Officer

4   McNeely and Officer Webley?

5       A.   Yes.

6       Q.   And you hadn't told anybody what you've told us here

7   today prior — in terms of law enforcement — prior to that

8   time?

9       A.   No.

10      Q.   And the statement that was made was solely a

11  statement of Wayne McGuffin, not of Nick McGuffin?

12      A.   Yes.

13              MS. McCREA:   Your Honor, our position is it's

14  hearsay.  It is — the Defense is put in a position where it's

15  very difficult to cross examine because the statement didn't

16  come up until 2010.  And it is more prejudicial than it is

17  probative.

18              THE COURT:   Uh - - -

19              MR. McCREA:   (Not understandable.)

20              MS. McCREA:   And, I'm sorry.

21              And what?

22              MR. McCREA:   (Not understandable.)

23              MS. McCREA:   Yes.  And Mr. McGuffin did not

24  adopt the statement of Wayne McGuffin.

25              THE COURT:   Ms. Cagley, just let me go over

```
                                             Young   CourtD5 279
```

1   this again.

2                          <u>CLARIFYING EXAMINATION</u>

3   <u>BY THE COURT</u>:

4       Q.   When the report came on about the shoe and Mr. Wayne

5   McGuffin, you say, said, "They won't find much from that."

6            What was Mr. Nick McGuffin's reaction?

7       A.   He was looking right at his brother, having a

8   conversation with him and agreeing with him.  And he thought

9   it was funny.

10      Q.   He was agreeing — looking at him and saying in

11  effect — whether he said the words — nodding his head or

12  something to show he agreed with him?

13      A.   Uh huh.

14      Q.   Okay.  And the next statement, Mr. Wayne McGuffin

15  you say made, was, "Somebody planted it to throw people off."

16  And at that point the Defendant laughed?

17      A.   Yes.  He snickered about it.

18      Q.   Okay.

19           THE COURT:   The first part, from what she's

20  testified would clearly indicate that the Defendant adopted

21  it, the circumstances.

22           The second part, would not indicate that.

23  Although in the context — and I looked at this in relation to

24  — I think the other witness testified but I ruled out.

25           I just want to look at it a little closer,

1  because the context of the whole conversation actually may

2  indicate from what's she's testified to, that even the laugh

3  at the second part may be part of the overall circumstance.

4  And you don't need somebody saying, "I agree with that

5  statement." for it to be an adoptive admission.

6          So, I will look at it and let you know tomorrow

7  morning whether she will be allowed to testify.

8          Okay?

9          But I think at least the first part she would

10 be, clearly.

11         MR. FRASIER:    All right.

12         THE COURT:    Okay.

13         Ma'am, you'll have to be back at nine tomorrow.

14         MR. FRASIER:    That's fine.

15         WITNESS:    Okay.  Thank you.

16         THE COURT:    We'll be in recess.

17             (END OF DAY FIVE)

18

19 *                    *                    *

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS


STATE OF OREGON,                    )
                                    )
            Plaintiff,              )     CASE NO. 10CR0782
                                    )
      vs.                           )     JURY TRIAL
                                    )      DAY SIX
NICHOLAS JAMES MCGUFFIN,            )
                                    )
            Defendant.              )
_____    )

TRANSCRIPT OF PROCEEDINGS

Volume 9, Pages D6 2 to D6 112

        BE IT REMEMBERED That, the above-entitled cause

came on regularly for hearing beginning at 8:59 a.m.,

Wednesday, July 13, 2011, in the Circuit Courtroom of the Coos

County Courthouse in the City of Coquille, County of Coos,

State of Oregon, before the Honorable Richard L. Barron and a

jury.

APPEARANCES

R. Paul Frasier, District Attorney for Coos County,
representing the Plaintiff.

Erica Soublet, Assistant District Attorney for Coos County,
representing the Plaintiff.

Shaun McCrea, Attorney at Law, representing the Defendant.

Robert McCrea, Attorney at Law, representing the Defendant.


        S. Jean Sprouse, Court Transcriber, XV Judicial District, 503-325-5254

D6 2

1                    (Jury out.)

2                    JUDICIAL ASSISTANT:    All rise.

3                    THE COURT:    Be seated please.

4                    Ms. McCrea.

5                    MS. McCREA:    Your Honor, I would request to

6     be heard further concerning the witness Christy Young-

7     Cagley - - -

8                    THE COURT:    (Interposing)  Go ahead, please.

9                    MS. McCREA:    - - - and that matter.

10                   We had her short testimony yesterday.  I just

11    received her CCH from the State this morning.  She does not

12    have any impeachable felony convictions, but she does have

13    some arrests.  The State has indicated to me that she has not

14    been offered anything nor has she been promised anything in

15    exchange for her testimony.

16                   But my additional concern is in looking at the

17    discovery.  The Court had ruled that this was an adoptive

18    admission based on Oregon Rule of Evidence 801.4(b))(B),

19    that - - -

20                   THE COURT:    (Interposing) You're talking

21    about what I said yesterday?

22                   MS. McCREA:    Yes.

23                   THE COURT:    And it's not something in the

24    past (not understandable)?

25                   MS. McCREA:    No, no, what the court said at

D6 3

1    the end of the day yesterday.  And I confess this was — I

2    appreciated that Mr. Frasier brought it up so we all had a

3    chance to look at it, but it was unexpected at the moment, so

4    I did need a little bit of time to think about it.  And my

5    concern, Your Honor, is that based on the report of the

6    interview of Officer McNeely and Officer Webley of Ms. Young-

7    Cagley on July 20th, 2010, the report says she stated in 2000

8    she lived with Nicole Lindsey in Fairview above the Halfway

9    Tavern a ways.

10                "Young said about two days after Leah went

11                missing she moved in with Pauline Parks.  And

12                then she talked about Nick and Wayne McGuffin

13                nonchalantly talking at Parks' house about

14                Leah's disappearance and the shoe being found

15                up on Hudson Ridge.  Young said Wayne said,

16                quote 'Ha.  That was put there to throw them

17                off.  It was meant to be thrown there.  They

18                won't find anything there.' unquote."

19

20                And then, in the Grand Jury testimony when

21    Ms. Cagley-Young testified before the Grand Jury on July 30th,

22    2010, ten days later, she was asked by Mr. Frasier a question:

23                "Was there ever a discussion when, with,

24                let's say Wayne, when it was announced publicly

25                that a shoe belonging to Leah had been found on

D6  4

1          Hudson Ridge?"

2     Answer:   "Uh huh or um huh."

3     Question: "Do you recall Wayne McGuffin saying —

4          what do you recall Wayne McGuffin saying at

5          that point?"

6     Answer:   "I remember Wayne kind of snickering and

7          saying, 'They won't find anything from that.

8          That's been thrown there to put them off the

9          trail."

10    Question: "Did he further explain what he meant by

11         that?"

12    Answer:   "No.  And I didn't care to elaborate with

13         him on it."

14    Question: "He didn't want to know any more?"

15         And then they go onto other matters.  So, in

16   both the Grand Jury testimony and the interview with the

17   police officers, there was no indication by the witness of any

18   supposed reaction of Mr. McGuffin where it could be an

19   adoptive admission.  And the question was specifically put to

20   her at Grand Jury, "Was there ever a discussion?"

21         And the only thing she testified to, under

22   oath, was what Mr. Wayne McGuffin said; not anything regarding

23   Nicholas McGuffin.

24         So, it is our position that it is not an

25   adoptive admission, and that it should go to the

D6 5

1   admissibility, not simply the weight of the evidence because

2   under 403 it is so prejudicial and inflammatory.  And further,

3   it implicates an issue which we've not brought up in the case

4   to date because we've been trying to make everything work.

5   But I feel compelled to bring up at this moment, Your Honor.

6              It implicates in addition, an issue of

7   Mr. McGuffin's right to a speedy trial concerning pre-

8   indictment delay, because Ms. Freeman disappeared back on June

9   28th, 2000.  There was a Grand Jury in the year 2000.  There

10  was a Grand Jury in 2010.  And Mr. McGuffin was discharged in

11  August of 2010.  And now we have witnesses and information

12  coming up in such a manner that it is difficult if not

13  impossible for the Defense to effectively investigate,

14  confront and challenge this type of witness in this type of

15  situation.

16             And I submit that under Article 1 section 10,

17  that violates Mr. McGuffin's right to a speedy trial; Article

18  1 section 10 is the equivalent of Mr. McGuffin's rights under

19  the Sixth Amendment; under Barker versus Wingo; 407 United

20  States 514 from 1972.  And as I know the Court well knows, the

21  requirements under Barker versus Wingo are the length of

22  delay, and under the federal standard whether Defendant

23  asserted his right which he doesn't need to do under the State

24  standard.  The  - - -

25             THE COURT:    (Interposing) Let me just ask

D6 6

1  something.  It's been a while since I read Barker, but is that

2  — I don't recall that necessary being a pre-indictment delay

3  case as opposed to a post-indictment delay case?

4               MS. McCREA:   No.  But that does set out the

5  standard.

6               THE COURT:   It sets out the standard for

7  post-indictment delay?

8               MS. McCREA:   Yes.

9               THE COURT:   But not pre-indictment delay?

10              MS. McCREA:   Right.

11              THE COURT:   There's a difference.

12              MS. McCREA:   There is a difference, Your

13  Honor.

14              THE COURT:   Okay.

15              Go ahead.

16              MS. McCREA:   Yeah, no, but I'm - - -

17              THE COURT:   (Interposing) I just wanted to

18  make sure I was correct on Barker.

19              MS. McCREA:   Yes.  You're tracking.

20              My contention is that the problem we've had

21  here is the pre-indictment delay.

22              THE COURT:   I understand that.

23              MS. McCREA:   Okay.

24              THE COURT:   But Barker — when you quote

25  Barker, that's as I recall a post-indictment delay case.  And

D6 7

1   the standards are different.

2                    MS. McCREA:    Well, and I - - -

3                    THE COURT:    (Interposing) You finish your

4   argument, but - - -

5                    MS. McCREA:    Well, my position would be that

6   the standards are not so significantly different that the

7   result would be different according to what I'm saying.  And

8   that is that there was a significant delay here.  And that the

9   reasons for the delay are not such that it's justifiable.  And

10  that there's this admitting this witness's testimony

11  specifically would be prejudicial to Mr. McGuffin in this

12  case.  And therefore, that's an additional reason for this

13  witness to be excluded.

14                    THE COURT:    Okay.

15                    Well, you are raising the issue of pre-

16  indictment delay.  Are you making a motion to dismiss this

17  case because of pre-indictment delay based on this?  Because

18  I'm not getting that necessarily.  You said it raises an

19  issue.  But you haven't — you're not — you're not telling me

20  you're moving to dismiss it on that grounds.  And if you're

21  not, I'm not going to rule on it.

22                    MS. McCREA:    I'm moving to exclude this

23  witness on that ground.

24                    THE COURT:    Okay.  All right.

25                    Well, it appears to me, and I want you to

D6 8

1    correct me if I'm wrong.  The basis of your motion is that

2    this witness has come up somewhat late.  And that in two

3    statements she didn't specifically mention a response by

4    Mr. McGuffin.  Where in her testimony yesterday she mentioned

5    specifically a response by Mr. McGuffin.  And that response in

6    effect is what the Court said would allow the testimony.

7              And if at least one of the basis, the main

8    basis, is that her two statements are inconsistent with her

9    statement on the stand, that could possibly be said to apply

10   to every witness here.  And you would be asking me to say that

11   evidence is inadmissible because there's contradictions.  And

12   that has always been a jury function; and not a court function

13   if they're there.

14             Now there may be some point — some point in a

15   case where it is so clear and so obvious that the court might

16   have to rule that something is inadmissible as opposed to it

17   is admissible and it's up to the jury to decide the

18   credibility and that through listening and through listening

19   to arguments where Counsel can certainly bring up all the

20   inconsistencies they wish to bring up, because we've gone

21   through that with several witnesses.

22             But generally that is a function of the jury

23   and not the Court and it doesn't effect the admissibility.  It

24   may effect the weight the jury give to it through argument.

25   Now, specifically in this case — and I wanted to make sure I

D6 9

1    heard the witness correct.  When I questioned her, I said,

2    "Tell me again what happened when the first statement came up

3    when Mr. Wayne McGuffin allegedly said, 'Well, they won't find

4    anything from that.'"

5             And Ms. Cagley indicated that Mr. McGuffin

6    nodded his head, laughed.  And then the second statement was

7    that somebody planted it there.  And Mr. McGuffin again,

8    allegedly laughed.

9             That would indicate in her testimony, at least

10   here, and Mr. Frasier that's the only reason I would allow it,

11   because of the nod.  Because it showed agreement.  And in fact

12   there is a case, United States versus Tocco, T-O-C-C-O, 135

13   Federal third, 116, a 1998 case in which a witness said that

14   one co-defendant confessed to committing arson with another

15   co-defendant.  The witness then went to the co-defendant and

16   described — said this other person has confessed to me that he

17   committed the crime along with you on behalf of his brother.

18   And the witness nodded.  And the Court upheld the

19   admissibility of that as acquiescence.

20             It wasn't silence, it was acquiescence.  So,

21   there is case law that would indicate that the nod of a head

22   certainly shows acquiescence.  And in that case to me it was

23   much more ambiguous than this case.  Because in this case

24   there were direct statements.  In that case I guess you could

25   even say ambiguity was that he was just nodding his head while

D6 10

1   the witness was talking.  But the Court allowed it and

2   certainly said ambiguity doesn't stop admissibility.

3           So I think the statement would be admissible

4   again.  And the witness specifically said Mr. McGuffin nodded.

5   If it was merely somebody who chuckled at some remark, it

6   wouldn't be —  I wouldn't allow it.  But with the nod I would

7   allow it.  And then the chuckle then would be consistent with

8   what Ms. Cagley described as a further kind of laughing at the

9   second statement.  So, I think both statements would come in.

10          The pre-indictment delay, I think as Counsel is

11  very aware there are very few if any cases — I mean, I'm sure

12  there are cases where pre-indictment delay has led to a

13  dismissal or in this case you're not moving for a dismissal.

14  But you're saying that in effect should lead me to exclude the

15  witness.  There have been other witnesses who will testify —

16  who have testified and may testify in the future who have come

17  forward at a later time.

18          And those cases are — in that sense those

19  witnesses are no different than this witness.  And pre-

20  indictment delay has to show actual prejudice before a Court

21  would ever dismiss something based on pre-indictment delay as

22  opposed to post-indictment delay where there has to be not

23  only some — possibly some prejudice, but a lengthy delay for

24  no reason.  This case was indicted in 2010.  And I had the

25  issue before, but the issue clearly wouldn't — the pre-

1  indictment delay in this case was based on investigation.  And

2  there's nothing to show that the State delayed ten years to do

3  this for any advantage.  And the witness is here in person and

4  can be cross examined.  And so there's no prejudice based on

5  this witness coming in because you have the right to cross

6  examine the witness.

7          So, I will deny your motion.

8          MS. McCREA:    And the Court is also denying it

9  on the 403 basis?

10         THE COURT:    Yeah.  I — you know, both sides

11 introduce evidence that's prejudicial to the other side.  I

12 mean, that's the nature of the evidence.  The State introduces

13 evidence that tries to show Mr. McGuffin is guilty; you

14 introduce evidence to try to show he's not guilty.  And I

15 guess in that sense all evidence that's introduced is

16 prejudicial.

17         But I don't see that the prejudice — this case,

18 based on the witness coming forward in 2010 or whatever it is,

19 is any different than any other witness.  And I don't see that

20 this — that the prejudice of this is so inflammatory or

21 different than any other prejudice — and other statements.  I

22 think witnesses who testified, for instance, that Mr. McGuffin

23 threatened to strangle them or kill them, similarly to

24 Ms. Freeman was obviously prejudicial.  And would be, if it's

25 inflammatory, might even be more inflammatory than this.  But

D6 12

1   I don't find either of those statements so inflammatory that

2   it would lead to me not admitting the evidence.

3                     So, your motion's denied.

4                     Bring the jury in.

5               (Jury In.)

6               THE COURT:     Counsel approach, Ms. McCrea and

7   Mr. Frasier.

8               (SIDEBAR)

9               THE COURT:     Call your next witness, please.

10              MS. SOUBLET:     State calls Michael Dennis.

11              MR. McCREA:     Excuse me, Counsel and Your

12  Honor, I thought we were going to go on with Mr. Hamilton this

13  morning.

14              THE COURT:     We certainly — did — was there

15  some sort of agreement reached or - - -

16              MR. McCREA:     Uh - - -

17              THE COURT:     (Interposing) If there was that's

18  fine.  And I think it would be better to finish Mr. Hamilton

19  before going to another witness as long as there is some

20  agreement reached on what was going to be - - -

21              MR. McCREA:     (Interposing) The State found

22  what we had intended to offer satisfactory and was kind enough

23  to make a copy of that portion of the Grand Jury testimony,

24  which is as I understand it, Exhibit No. 243, Your Honor.

25              THE COURT:     Okay.

D6 13

1                    MR. FRASIER:   What I've done, Your Honor, is

2    I have the phone call.  And it's marked as State's Exhibit

3    No. 242.  And then I have the Grand Jury testimony that's

4    marked as State's Exhibit No. 243.  We're prepared to offer

5    those as exhibits.

6                    THE COURT:   Okay.

7                    MR. McCREA:   And yeah, we were going to offer

8    them anyway.  So, they're doubly offered, I guess you could

9    say, Your Honor.

10                   THE COURT:   I'm just going to rule once.

11                   How many — No. 243 and what?

12                   MR. FRASIER:   No. 242.

13                   THE COURT:   Okay.  Nos. 242 and 243 are

14   received.

15                   (Whereupon Exhibits Nos. 242 and 243 were then

16   received into evidence.)

17                   MR. FRASIER:   I also have, Your Honor, what

18   I've marked as No. 241 which is an excerpt of the Grand Jury

19   testimony of Ms. Reid.  I previously provided that excerpt to

20   Counsel yesterday.  We would offer No. 241 also.

21                   MR. McCREA:   I defer to co-Counsel.

22                   THE COURT:   Any objection to that?

23                   MS. McCREA:   Yes.  I'm sorry I didn't realize

24   it was an exhibit.  He just handed me a CD and I haven't

25   listened to it.  So, if we could - - -

```
                                                    D6 14
 1              THE COURT:    (Interposing) All right.  I'll
 2   allow - - -
 3              MS. McCREA:   - - - defer that.
 4              THE COURT:   I'll withhold ruling on that for
 5   now.
 6              MS. McCREA:   Thank you.
 7              MR. FRASIER:   With the admission of the
 8   exhibits, Your Honor, I do not see a reason to put
 9   Mr. Hamilton back up there.  We can play these at any time for
10   the jury.
11              THE COURT:   I don't know whether Mr. McCrea
12   had finished his cross examination.  If all you wanted to do
13   was play that, I don't see the necessity either.
14              But if you wanted him on the stand for some
15   reason, I'll call him back.
16              MR. McCREA:   I want him on the stand for very
17   good reasons, Your Honor.
18              THE COURT:   Okay.
19              Then let's get Mr. Hamilton back in.
20              And you want those played.  And then you'll
21   question him.  Correct?
22              MR. McCREA:   Well, actually what I want to do
23   is, I want to establish some more foundation concerning the so
24   called pretext phone call so it's understood the circumstances
25   under which this is made.
```

Exhibit 102  Page 902 of 1666 to
State Defendants' Motion for Summary Judgment

D6 15

1                THE COURT:    Okay.

2                Do you wish to do that before these tapes are

3    played or after?

4                MR. McCREA:    It doesn't have to be before the

5    Grand Jury tape, but it needs to be before the phone call

6    tape.

7                THE COURT:    Okay.

8                I just want to make sure that we do that,

9    because the — when we play the tape I'm not going to have the

10   FTR on to record the tape because it's already in evidence.

11   So, I just want to make sure that you're not going to be

12   asking questions during that time so we don't have to — the

13   reporter doesn't have to be going back and forth.

14               So, whatever order you want to do it.  I just

15   want to make sure of the order.

16               MR. McCREA:    Yes, Your Honor.  It's very

17   simple.  I just hadn't discussed my process — intended process

18   and procedure with Mr. Frasier.  We intend to play the Grand

19   Jury testimony which we were in the process of doing before;

20   and to complete that.

21               THE COURT:    And that was for impeachment

22   purposes?

23               MR. McCREA:    Yes, that's correct.

24               THE COURT:    Okay.

25               Go ahead.

D6 16

1          MR. McCREA:    And then we have — and then I
2    have some questions of Mr. Hamilton about and concerning the
3    phone call.

4          THE COURT:    Okay.

5          MR. McCREA:    And then we would play the phone
6    call.  And that - - -

7          THE COURT:    (Interposing) Okay, that's fine.

8          MR. McCREA:    - - - would be the end of my
9    questioning of Mr. Hamilton.

10          THE COURT:    Okay.

11          Call Mr. Hamilton back in.

12          Mr. Hamilton, if you'd have a seat back here.

13          You're still under oath.

14          Just to explain the procedure, they're going to
15    play the Grand Jury — your Grand Jury testimony.  They won't
16    be asking you any questions.  So, you can just sit and listen
17    and not say anything.  Then, when that's done they will be
18    asking you some questions.  And then they'll play another tape
19    about some phone calls.

20          The first tape, the one on the Grand Jury
21    testimony is for impeachment.  That is you can use it to
22    assess Mr. Hamilton's credibility, but for no other purpose.
23    In other words, again, it's not offered for the truth of what
24    was said, it's just whether it effects his credibility or not.

25          Okay.

D6 17

1              Then, go ahead and play the Grand Jury tape,

2    please.

3              And you don't have to — you can pause the FTR

4    during the playing of that Grand Jury tape.

5              THE COURT:    Go ahead.

6              MR. McCREA:    Well, I don't like to make this

7    trial any longer than necessary nor does anyone else.  And if

8    I — if what Counsel is proposing is that we don't Mr. Hamilton

9    any further and that we just play the tapes, and we excuse

10   Mr. Hamilton, that would be fine with the Defense that we do

11   it that way.

12             THE COURT:    Okay.

13             So, you don't need him as a witness any longer?

14             And Mr. Frasier, you don't need - - -

15             Okay.  Now, you don't need him as a witness any

16   longer, Mr. Frasier, either?

17             MR. FRASIER:    No.

18             THE COURT:    Okay.

19             Then he's excused.

20             MR. McCREA:    Right.  We just excused him.

21             THE COURT:    Mr. Hamilton, you may step down.

22   And you're free to go.

23             Okay.  It sounds like you can now play it.

24             MR. FRASIER:    Okay.

25             THE COURT:    And again, when it starts you can

D6 18

1   pause FTR.

2              FTR is For the Record, that's what they call

3   that recording system.  Just so you know what that stands for.

4              (State's Exhibit No. 243, the audio tape was

5   played for the jury.  Not transcribed.)

6              MR. FRASIER:   Does Counsel wish the phone

7   call to be played now?

8              MR. McCREA:   Yes.

9              THE COURT:   And I understood this was being

10  offered for more than impeachment, the phone call, as opposed

11  to just impeachment.  It was being offered for other purposes

12  or just impeachment again?

13             MR. FRASIER:   I would submit that this should

14  be received as substantive evidence.

15             THE COURT:   The phone calls?

16             MR. FRASIER:   Yes.

17             THE COURT:   Yes, that's what I thought it was

18  being offered.  I just wanted to make sure.

19             Okay, that's fine.

20             Play the phone calls.

21             You can consider this tape for any purpose.

22             (State's Exhibit No. 242, the audio tape was

23  played for the jury.  Not transcribed.)

24             THE COURT:   Go ahead and call your next

25  witness.

Dennis   D    D6 19

1              MS. SOUBLET:    The State calls Michael Dennis.

2                      MICHAEL DENNIS

3    was thereupon produced as a witness on behalf of the Plaintiff

4    and, having first been duly sworn to tell the truth, the whole

5    truth and nothing but the truth, was examined and testified as

6    follows:

7              THE COURT:    Have a seat here, please.

8              Go ahead, please.

9              MS. SOUBLET:    Thank you, Your Honor.

10                    DIRECT EXAMINATION

11   BY MS. SOUBLET:

12        Q.   Mr. Dennis, can you state your full name and spell

13   your last for the record?

14        A.   Michael Dennis, D-E-N-N-I-S.

15        Q.   Mr. Dennis, have you grown up in Coquille?

16        A.   Yes.

17        Q.   Lived here all your life?

18        A.   Yes.

19        Q.   Did you go to Coquille High School?

20        A.   Yes, I did.

21        Q.   What grade were you in the school year 1999-2000?

22        A.   In 1999-2000 I believe I was a sophomore.

23        Q.   Did you know the Defendant, Nicholas McGuffin?

24        A.   Yes, I did.

25        Q.   How do you know him?

Dennis   D     D6 20

1      A.   Mostly through passing in school.  Never really hung

2    out much or anything.  Pretty much said, "Hi," here and there.

3    That was about it.

4      Q.   Did you know the victim, Leah Freeman?

5      A.   Yes.

6      Q.   How did you know her?

7      A.   Pretty much the same relation.

8      Q.   Were you aware whether of not she and the Defendant

9    were involved in a relationship?

10     A.   Yes.

11     Q.   Okay.  And what did you know that relationship to

12   be?

13     A.   Fairly troubled relationship.  I mean, they fought,

14   from what I'd see every once in awhile.  I never witnessed

15   anything severe, you know, real physical or anything.  A

16   little bit of pushing and shoving was about the most that I'd

17   ever seen.

18     Q.   Who were you living with in 2000?

19     A.   My grandma and grandpa.

20     Q.   What's your grandmother's name?

21     A.   Donna Dennis.

22     Q.   Was there an opportunity near the end of the school

23   year when your grandmother came to pick you up after school?

24     A.   Yes.

25     Q.   And at that time were you asked to identify some

```
                                     Dennis   D    D6 21
1   people for her?

2        A.   Yes, I was.

3        Q.   Who were the people you were identifying?

4        A.   Nick McGuffin and Leah Freeman.

5        Q.   Where were they when you made that identification?

6        A.   I'm not sure of the directional facing, but if

7   you're facing the road outside of the high school it would be

8   towards the left hand corner there.

9        Q.   Okay.  Is that in the parking lot?

10       A.   Yes.

11       Q.   Were they next to something?

12       A.   More or less, kind of away from the fence in the

13  middle of the parking lot there.  There wasn't really anything

14  around that I could remember except for their vehicle.

15       Q.   What vehicle was that?

16       A.   The blue Mustang.

17            MS. SOUBLET:   Can I see Exhibit (not

18  understandable)?

19       Q.   Mr. Dennis, I'm showing you what's been received as

20  Exhibit No. 16 and asking you if you recognize that?

21       A.   Yes.  I recognize the license plate.

22       Q.   What is it a picture of?

23       A.   A blue Mustang.

24       Q.   Whose blue Mustang?

25       A.   Nicholas McGuffin's.
```

Dennis   D   D6 22

1      Q.   Was there an opportunity after that incident in the

2   parking lot when the incident came up again between you and

3   your grandmother?

4      A.   Came up again?

5            MS. McCREA:   Excuse me.  It sounds like

6   actually we're getting into back door hearsay, Your Honor.

7   And I object.

8            THE COURT:   I'm not sure yet.  Because that

9   question just — I think in essence did they discuss it again

10  and she — and the witness didn't answer.  But that question

11  wouldn't be objectionable.

12           But be careful if you're going to ask him what

13  grandma said.

14           MS. SOUBLET:   I'm not going to ask him what

15  his grandmother said.

16           THE COURT:   All right.

17           Then go ahead.

18     Q.   Was there a time when that incident — you discussed

19  that incident again with your grandmother?

20     A.   The same incident, I believe we discussed it a

21  little bit on the way home, for the most part.  And that was

22  about it.

23     Q.   Was there a time after Leah Freeman's disappearance

24  where that incident came up again?

25     A.   I honestly can't remember.  She may have asked me

Dennis   X     D6 23

1  about it at one time, you know, asked if maybe I felt there

2  was anything.

3                 MS. McCREA:    Well, wait a minute.

4                 THE COURT:    Sustained.

5                 You can't testify to what your grandmother

6  said.

7                 WITNESS:    Okay.

8      Q.    Thank you.

9                 MS. SOUBLET:    Nothing further.

10                THE COURT:    Ms. McCrea.

11                     CROSS EXAMINATION

12 BY MS. MCCREA:

13     Q.    Mr. Dennis, so you were in high school with Leah

14 Freeman and Nick McGuffin?

15     A.    Yes.

16     Q.    And you're giving us your impressions now eleven

17 years later of their relationship.  Right?

18     A.    Yes.

19     Q.    And you'd see them in the hallways at school or as

20 you said out in the parking lot?

21     A.    Yes.

22     Q.    And would it be fair to characterize the

23 relationship as passionate?

24     A.    I'd say that they cared for each other.

25     Q.    Okay.  And you indicated that there would be

```
                                    Dennis   X    D6 24
```

1   arguments and this sort of thing.  Would there also be times

2   when you would see them displaying public affection?

3        A.   Yes.

4        Q.   And they were together a lot?

5        A.   As far as I can remember they were together quite

6   often, yes.

7        Q.   Okay.  And the times that they had arguments, that

8   was very public, wasn't it?

9        A.   Yes.

10       Q.   All right.  So, they didn't really care who heard

11  them or who saw them, they were going to do what they were

12  going to do with each other?

13       A.   Yeah.  It seemed like it, yeah.

14       Q.   Okay.  And this time in question when you saw them,

15  Leah Freeman and Nick McGuffin in the parking lot.  What you

16  remember is seeing them standing by Mr. McGuffin's blue Ford

17  Mustang?

18       A.   Yes.

19       Q.   Thank you.

20            MS. McCREA:   That's all the questions I have,

21  Your Honor.

22            MS. SOUBLET:   No redirect.

23            THE COURT:   You may step down and you're free

24  to leave.

25            WITNESS:   All righty.

D. Dennis   D    D6 25

1          THE COURT:   State calls Donna Dennis.

2                      DONNA DENNIS

3   was thereupon produced as a witness on behalf of the Plaintiff

4   and, having first been duly sworn to tell the truth, the whole

5   truth and nothing but the truth, was examined and testified as

6   follows:

7          THE COURT:   Have a seat here, please.

8                   DIRECT EXAMINATION

9   BY MS. SOUBLET:

10     Q.   Ms. Dennis, can you state your full name and spell

11  your last for the record?

12     A.   Donna Dennis, D-E-N-N-I-S.

13     Q.   Mrs. Dennis, do you live here in Coquille?

14     A.   Yes.

15     Q.   Were you living here in the school year 2000?

16     A.   Yes.

17     Q.   Did you have anyone living with you at that time?

18     A.   My grandson Michael.

19     Q.   Was there an occasion when you picked your grandson

20  up from school?

21     A.   Yes.

22     Q.   When — do you remember when in the school year that

23  was?

24     A.   Not precisely, no.

25     Q.   Near the first half of the school year, which would

D. Dennis   D     D6 26

1   be in 1999 or - - -

2      A.   Oh, what part of the school year.  I'm sorry.  I

3   thought you asked which year.  It would have been towards the

4   end of the school year.

5      Q.   While you were picking your grandson up from high

6   school, did you have an opportunity to witness people in the

7   parking lot?

8      A.   Yes.

9      Q.   Was there any people in particular that drew you

10   attention?

11      A.   There was a couple that were having words as they

12   were walking across the parking lot.

13      Q.   Okay.  When you say having words, what do you mean?

14      A.   Arguing.  It looked like arguing.

15      Q.   So, what did you do?

16      A.   I was just watching.

17      Q.   And was there a point where the argument — where you

18   became concerned about the argument?

19      A.   Yes.  It — when they got to a car it accelerated

20   into more of a physical.

21      Q.   Okay.  Let me back you up.  When you say couple are

22   you talking boy/girl, girl/girl?

23      A.   Boy/girl.

24      Q.   And when they got to the car what happened?

25      A.   He grabbed her by the arm and slammed her up against

D. Dennis   D      D6 27

1   the car.

2        Q.   What happened after that?

3        A.   She — her posture changed.  And she lowered her head

4   and folded her arms and which bothered me, the posture.

5   Then - - -

6        Q.   (Interposing) Did you take — I'm sorry.

7        A.   I'm sorry.  Then Michael got in the car.

8        Q.   And at that point, without telling me what he said,

9   did you have an opportunity to ask him who the couple was?

10       A.   Yes, I did.

11       Q.   Was he — without again, without telling me what he

12  said — was he able to identify the couple?

13       A.   Yes, he was.

14       Q.   Were you concerned about that incident?

15            MR. McCREA:   Object.  It's irrelevant whether

16  she was concerned about it or not.  It doesn't go to any issue

17  here.  It tends to be a 403 also, Your Honor.

18            THE COURT:   Well, a 403, I'm not too sure.

19            Is there a question after this?

20            MS. SOUBLET:   There is.

21            THE COURT:   Go ahead.

22            I'll overrule it.

23       Q.   Were you concerned about the incident?

24       A.   Yes.

25       Q.   Did you report that incident?

D. Dennis   X    D6 28

1       A.   Yes.

2               MR. McCREA:    Object.  I object; move to

3    strike.

4               THE COURT:   If it's - - -

5               MR. McCREA:   (Interposing) On the same basis.

6               THE COURT:   Right.

7               I'm not too sure what that goes to.  She's

8    testified about the incident and what happened.  What happened

9    thereafter, unless there's some specific thing that — other

10   than the reporting it's not particularly relevant to any

11   issue.

12              MS. SOUBLET:   Your Honor, I think it's

13   relevant that she reported it to the high school.

14              MR. McCREA:   Well, I object.

15              THE COURT:   No.  If that's it I'll sustain

16   the objection and strike.

17              MS. SOUBLET:   Then I have nothing further.

18              THE COURT:   Okay.

19              The last answer is stricken.  And the other one

20   before that about whether she was concerned and reported it

21   that's stricken.  Don't consider it.

22              Go ahead, Mr. Frasier — I mean Mr. McCrea.

23                        CROSS EXAMINATION

24   BY MR. MCCREA:

25       Q.   Ms. Dennis, this argument between these two people

D. Dennis   X     D6 29

1    proceeded across the parking lot for some distance.  Right?

2         A.   Correct.

3         Q.   And you were watching it from — watching it and

4    being kind of amused originally.  Right?

5         A.   Yeah, pretty much.

6         Q.   And you couldn't — you couldn't hear what the

7    argument was about?

8         A.   No.

9         Q.   And therefore — well, never mind the therefore.

10        As a matter of fact you never did hear what they'd

11   been arguing about?

12        A.   Oh, no.  Huh uh.

13        Q.   All you saw was got to the car.  Correct?

14        A.   Correct.

15        Q.   And then he physically got her in the car.  Is that

16   correct?

17        A.   Eventually, yes.

18        Q.   And while this was happening, Michael your grandson

19   came up.  Correct?

20        A.   Correct.

21        Q.   And Michael saw them at the car, also.

22        A.   Correct.

23        Q.   And he saw them at the car before they got in the

24   car.  Correct?

25        A.   Correct.

D. Dennis   ReD   D6 30

1    Q.   All right.  So, Michael saw what happened as far as

2  their getting the car, also.  Correct?

3    A.   Correct.

4    Q.   All right.

5              MR. McCREA:    That's all the question I have.

6              THE COURT:    Any redirect?

7                    REDIRECT EXAMINATION

8  BY MS. SOUBLET:

9    Q.   Ms. Dennis, when you saw the gentleman push the

10  woman, was it into the car or across the car?

11    A.   Originally, up against the car then into the car.

12    Q.   Thank you.

13              MS. SOUBLET:    Nothing further.

14              THE COURT:    You may step down and you're free

15  to leave.

16              WITNESS:    Thank you.

17              MR. FRASIER:    Call Kim Pugmire.

18                    KIM PUGMIRE

19  was thereupon produced as a witness on behalf of the Plaintiff

20  and, having first been duly sworn to tell the truth, the whole

21  truth and nothing but the truth, was examined and testified as

22  follows:

23              THE COURT:    Have a seat up here, please.

24              Go ahead.

25              MR. FRASIER:    Thank you, Your Honor.

Pugmire   D     D6 31

1                        DIRECT EXAMINATION

2    BY MR. FRASIER:

3         Q.   Could you state your name please, sir, and spell

4    your last name for the record?

5         A.   Sure.  Kimberly Pugmire, P-U-G-M-I-R-E.

6         Q.   And you're currently married?

7         A.   Yes.

8         Q.   Your maiden name?

9         A.   Courtright.

10        Q.   Are you familiar or were you familiar with an

11   individual named Leah Freeman?

12        A.   Yes.

13        Q.   How did you know her?

14        A.   She's my cousin.

15        Q.   Are you familiar with the Defendant in this case,

16   Mr. McGuffin?

17        A.   Yes.

18        Q.   How do you know him?

19        A.   We went to school together.

20        Q.   Where were you in relation to him in terms of school

21   year?

22        A.   We were pretty decent friends.  We would walk

23   through the halls together.  Hang out a little bit.

24        Q.   All right.  Were you older than him, younger?

25        A.   Older by two years.

Pugmire   D    D6 32

1      Q.   Now, did you become aware at some point in time that

2  the Defendant was dating your cousin, Leah Freeman?

3      A.   Yes, I did.

4      Q.   Did you have an opportunity to observe these two

5  together?

6      A.   Not so much.

7      Q.   Now, you're aware that your cousin disappeared on

8  the evening of June 28th of 2000?

9      A.   Yes.

10     Q.   A few days after she disappeared did you have a

11  conversation with the Defendant about Ms. Freeman being gone?

12     A.   I did.

13     Q.   Do you recall how many days after it had been

14  reported she was missing that you discussed this with him?

15     A.   It was somewhere around three or four days.

16     Q.   And what happened?  What did the Defendant tell you?

17     A.   I had pulled into a parking lot, used to be Seven

18  Eleven.  And he approached me and we had not seen each other

19  before she had been missing.  And he came up to me and said,

20  "Kim, you know, I have nothing to do with this.  You know, I

21  have nothing to do with this."

22          And I said, "I know that.  You don't have to tell me

23  twice."

24     Q.   And what time of the day was this?

25     A.   It was evening.  It was dark.

Pugmire   D   D6 33

1      Q.   Who were you with?

2      A.   I was with an ex-boyfriend at the time and one of

3  his friends.

4      Q.   And what type of vehicle were you in?

5      A.   It was a green Ford pickup.

6      Q.   What did you do after you had this conversation with

7  Mr. McGuffin?

8      A.   We proceeded to head out Fairview.

9      Q.   Where were you headed?

10      A.   We were taking the back roads to Myrtle Point.

11      Q.   So, when you went over Fairview Mountain or Hungry

12  Mountain or whatever they call it, where did you go from

13  there?

14      A.   Could you repeat that?

15      Q.   Well, did you end up on Lee Valley Road?

16      A.   Yes, correct.

17      Q.   And — well, as you're headed out towards Lee Valley

18  Road, do you see the Defendant again?

19      A.   I do.

20      Q.   Where do you see him?

21      A.   At that gravel pull off right off Lee Valley Road.

22      Q.   What vehicle was he in?

23      A.   A red vehicle that I saw him in at the parking lot

24  of Seven Eleven.

25      Q.   Now, was he with anybody?

```
                                    Pugmire   D     D6 34
```

1        A.   Yes.  I believe he was with the two guys that he was

2   with at the store.

3        Q.   When you left the store, who left first, you - - -

4        A.   (Interposing) We did.

5        Q.   Okay.  And as you're going out to Lee Valley Road

6   were you passed by this car?

7        A.   Correct.

8        Q.   Could you tell us about that, please?

9        A.   Right as we were heading out I did notice that that

10  red car that they were in had passed us.  I would say within

11  the first couple minutes of leaving.

12       Q.   Now, when you get out on Lee Valley Road, you see

13  the car again?

14       A.   Correct.  As we pull over.

15       Q.   And where were you pulling over?

16       A.   To that gravel pull off, the very first gravel pull

17  off on Lee Valley Road.

18       Q.   Is it a large area?

19       A.   Yes.  Correct.

20       Q.   Why did you pull over?

21       A.   Because the two gentlemen that I was with needed to

22  use the restroom.

23       Q.   Now, did you see the Defendant there?

24       A.   I did.

25       Q.   What happened when you saw him?

```
                                        Pugmire   X     D6 35
```

1      A.   I felt that I did not want to stop at that time.

2  And we continued to go on.  I had them get back in the car and

3  go.

4      Q.   And where did you go from there?

5      A.   We continued on the gravel road.  And I pulled over

6  about a mile away for them to go to the bathroom.

7      Q.   Thank you.

8           MR. FRASIER:   That's all the questions I

9  have, Your Honor.

10          THE COURT:   Ms. McCrea.

11                  CROSS EXAMINATION

12  BY MS. MCCREA:

13      Q.   Ms. Pugmire, you did know Nick McGuffin fairly well

14  in high school.  Right?

15      A.   Yes.  Correct.

16      Q.   And the two of you would make small talk?

17      A.   Uh huh.

18      Q.   And in fact you — and you were good friends.  Is

19  that a fair statement?

20      A.   Yes.

21      Q.   And in fact the two of you — he would walk you to

22  class and you'd walk to class arm in arm on occasion?

23      A.   Correct.

24      Q.   Okay.  You knew that he was dating your cousin Leah?

25      A.   Yes.

Pugmire   X    D6 36

1      Q.   And at one point you said to him, "You take care of
2   my cousin . . ."
3      A.   (Interposing) Uh huh.
4      Q.   " . . . because you know she means a lot?"
5      A.   Right.
6      Q.   So you kind of charged him to be her guardian?
7      A.   Right.
8      Q.   Okay.  Now, the night that you saw him at Seven
9   Eleven in the red car, it wasn't a Thunderbird, was it?
10     A.   No.
11     Q.   It was a smaller car than that?
12     A.   Yes.  Correct.
13     Q.   Do you remember, was Nick driving or was somebody
14  else driving?
15     A.   You know, I wasn't paying attention as to was
16  driving.
17     Q.   Okay.
18     A.   Because they left after us as well.
19     Q.   And when you got to the area of the gravel pit, Nick
20  and the other guys were out of the car?
21     A.   Correct.
22     Q.   Just standing there?
23     A.   Right.
24     Q.   Okay.  And as you started to pull in or slow down,
25  he didn't make any gestures to you or anything did he?

Pugmire   ReD   D6 37

1    A.   No, huh uh.

2    Q.   Didn't yell at you or say anything?

3    A.   No.

4    Q.   Okay.  And when you saw him at Seven Eleven, there

5   wasn't anything unusual about the way he looked that caught

6   your attention, was there?

7    A.   No, huh uh.

8    Q.   And what time of day was this?

9    A.    It was nighttime.  I believe it would be right

10   around ten o'clock.

11    Q.   Thank you.

12          MS. McCREA:   Nothing further, Your Honor.

13          THE COURT:   Any redirect?

14          MR. FRASIER:   Yes, just briefly.

15               REDIRECT EXAMINATION

16   BY MR. FRASIER:

17    Q.   Just so we're clear, the old Seven Eleven eventually

18   turned into what's called the - - -

19    A.   (Interposing) Fast Mart, correct.

20    Q.   All right.  Thank you.

21          MR. FRASIER:   That's all I have, Your Honor.

22          THE COURT:   You may step down, ma'am.  You're

23   free to go.

24          WITNESS:   Thank you.

25          THE COURT:   Call your next witness.

Davidson   D     D6 38

1          MS. SOUBLET:    The State calls Megan Davidson.

2                      MEGAN DAVIDSON

3   was thereupon produced as a witness on behalf of the Plaintiff

4   and, having first been duly sworn to tell the truth, the whole

5   truth and nothing but the truth, was examined and testified as

6   follows:

7          THE COURT:    Have a seat here, please.

8          I think it would be - - -

9          MS. SOUBLET:    Your Honor, I don't believe she

10  can make it up to the witness stand.

11         THE COURT:    No, she cannot. I agree with

12  you.  I think it would be — if she gets — positions herself in

13  front of one of the microphones on the jury rail — that one or

14  that one — that would be fine.

15         MR. FRASIER:    Is this okay?

16         THE COURT:    That's fine.

17         And whoever's going to cross examine her, if

18  you wish to go around so you can see her testify, that would

19  be fine.

20                   DIRECT EXAMINATION

21  BY MS. SOUBLET:

22    Q.   Ms. Davidson, can you state your full name and spell

23  your last for the record?

24    A.   Megan Rae Davidson, D-A-V-I-D-S-O-N.

25    Q.   Is Davidson your married name or - - -

```
                                    Davidson   D    D6 39
 1      A.   Yes.

 2      Q.   Was your maiden name Hinkley?

 3      A.   Yes.

 4      Q.   Do — did you grow up in Coos County?

 5      A.   Yes.

 6      Q.   In Coquille?

 7      A.   Yes.

 8      Q.   How do you know the Defendant?

 9      A.   We went to school together.

10           THE COURT:   Ms. Davidson, I would ask you to

11   raise your voice a little, please.

12      A.   We went to school together.

13           THE COURT:   Thank you.

14      Q.   And that would include high school?

15      A.   Yes.

16      Q.   Okay.  And did you know Leah Freeman?

17      A.   Yes.

18      Q.   How did you know Ms. Freeman?

19      A.   Just from school.

20      Q.   Did you know whether or not she was involved in a

21   relationship with the Defendant?

22      A.   Yeah.

23      Q.   Were you involved in a relationship with the

24   Defendant?

25      A.   A relationship?  No.
```

```
                                         Davidson  D    D6 40
 1       Q.   Okay.  Did you occasionally have sex with the
 2   Defendant?
 3       A.   Yeah.
 4       Q.   Is that a yes?
 5       A.   Yeah.
 6       Q.   And that's during the time when he was dating - - -
 7                 THE COURT:    (Interposing) Excuse me, ma'am.
 8   I'm sorry.  I don't - - -
 9                 WITNESS:    (Interposing) Yes.
10                 THE COURT:    Thank you.
11                 WITNESS:    Sorry.
12                 THE COURT:    That's all right.
13       Q.   Was that during the time when he was dating
14   Ms. Freeman?
15       A.   Yeah.
16       Q.   I want to turn your attention to June 29th, 2000.  Do
17   you remember that day?
18       A.   No, not really.
19       Q.   Do you remember speaking to the Defendant that day?
20       A.   I think in the morning.
21       Q.   Okay.  And do you remember what the conversation was
22   about?
23       A.   Are you talking about when he called my house?
24       Q.   Yes.
25       A.   He called and wondered if I had seen Leah.
```

```
                                    Davidson   D    D6 41
 1      Q.   What did you tell him?

 2      A.   I said, "No."

 3      Q.   Did you — were you — did you consider yourself to be

 4   friends with Ms. Freeman?

 5      A.   Not — no.  I mean, no.

 6      Q.   You were friends with the Defendant?

 7      A.   Yes.

 8      Q.   After you got out of school that year had you seen

 9   Ms. Freeman between then and when the Defendant called you

10   early in the morning asking about it?

11      A.   I'm sorry.  What?

12      Q.   After you got out of school that year, had you been

13   spending time with Ms. Freeman?

14      A.   No.

15      Q.   After the Defendant asked you if you'd seen

16   Ms. Freeman, what did you say?

17      A.   I said, "No."

18      Q.   Did you ask him why you would have seen her?  Why he

19   was calling you?

20      A.   I think I recall saying, "No.  Why would I know?"

21   Because me and Leah weren't like that.  But I think he was

22   just frantic calling anybody and everybody he could.

23      Q.   Was there a time after Ms. Freeman's disappearance

24   when the Defendant moved into your house?

25      A.   Yeah.  When he stayed there.  He didn't like move
```

Exhibit 102  Page 929 of 1666 to
State Defendants' Motion for Summary Judgment

```
                                        Davidson   D     D6 42
```

1    in.  But, yeah, he stayed there.

2        Q.   Okay.  And by staying there, you mean staying

3    overnight?

4        A.   (No audible response.)

5        Q.   That's a yes?

6        A.   Yeah.

7        Q.   Wasn't living with his parents at that time?

8        A.   No.  I don't know.

9        Q.   And during that time, did you have an occasion to

10   have sex with the Defendant?

11       A.   I don't remember.

12       Q.   Do you remember talking with Officer McNeely and

13   Officer Webley last May, 2010?

14       A.   Yeah.

15       Q.   And at that time you told them that you'd had sex

16   with the Defendant after Ms. Freeman went missing and prior to

17   her body being found?

18       A.   Right.  But you just asked me if I'd done it many a

19   time?

20       Q.   No.  I just asked if you'd had sex with the

21   Defendant?

22       A.   Well, I already answered that, yes.

23       Q.   And I'm now asking specifically about the time

24   between Ms. Freeman's disappearance and before her body was

25   found?

```
                                   Davidson   D     D6 43
```

1          A.   I think so, yes.

2          Q.   You actually told the officers that the Defendant —

3     you asked the Defendant whether or not he was ready.  Is that

4     right?

5          A.   I don't remember.

6          Q.   You don't remember telling Officer Webley and

7     Officer McNeely that you asked the Defendant, "Are you sure

8     you're ready?"

9          A.   No.

10         Q.   I'm going to hand you your statement and ask you to

11    read - - -

12         A.   (Interposing) This is the statement that they took

13    from me.  This — they twisted my words - - -

14         Q.   (Interposing) Ma'am, I'm asking you to read that

15    statement, the paragraph I've pointed out.  Right here.  To

16    yourself and tell me when you're done.

17         A.            "According to Megan, she asked him, "Are

18                  you sure you're ready?"

19         Q.   Ms. Davidson, I asked you to read it to yourself.

20         A.   Oh.  Okay.

21         Q.   Are you finished reading that paragraph?

22         A.   Yes.

23         Q.   Okay.  And you're saying you don't remember telling

24    Officer McNeely and Officer Webley - - -

25         A.   (Interposing) No.

Davidson   D    D6 44

1    Q.   - - - that you asked the Defendant is he was ready?

2    A.   No.

3    Q.   Do you remember telling the — Officer McNeely and

4  Officer Webley — that the Defendant indicated that, yes, he

5  was ready.

6    A.   No, I don't remember that.

7    Q.   Do you remember testifying at Grand Jury that the

8  Defendant had said he hadn't had sex in three weeks?

9    A.   No.

10   Q.   It would be safe to say that at the time you

11 testified at Grand Jury and the time you made these statements

12 to Officer McNeely and Officer Webley, that your memory was

13 better than it is today?

14   A.   My memory sucks.  I don't know what you're asking.

15   Q.   Well, I'm asking if your memory sucked less back in

16 2010 when you made that statement?

17   A.   It probably sucks the same.

18            MS. SOUBLET:   Nothing further.

19            THE COURT:   Ms. McCrea.

20            Just a minute, ma'am.

21            MS. SOUBLET:   You have to wait.

22            MS. McCREA:   It's like an obstacle course in

23 here.

24            THE COURT:   Right.

25

Davidson    X    D6 45

<u>CROSS EXAMINATION</u>

<u>BY MS. MCCREA:</u>

1    Q.    I know, now you've got to deal with another lawyer.

2    Sorry.

3    A.    Okay.

4    Q.    So — okay.  Ms. Davidson, I understand you're saying

5    you're having a hard time with your memory?

6    A.    Yes.

7    Q.    The night before Mr. McGuffin called you.  You'd

8    said that — Counsel asked you if he'd called you about looking

9    for Leah.  Do you remember if you had gone to a party the

10   night before?

11                MS. SOUBLET:    Objection.  Beyond the scope of

12   direct.

13                MS. McCREA:    Well, it goes to - - -

14                THE COURT:    No, no, no.

15                I'll overrule that.

16                Go ahead.

17   Q.    Do you remember if you'd gone to a party the night

18   before?

19   A.    Yes.

20   Q.    That's a yes?

21   A.    Uh huh.

22   Q.    Okay.  And did Nick ask you anything about if —

23   well, that's the point.  You went to a party the night before.

```
                                    Davidson    X     D6 46
 1  That's fine.

 2       A.    Uh huh.

 3       Q.    Now, in terms of Nick staying at your house, was —

 4  do you remember when that was?

 5       A.    I don't remember specific dates, no.

 6       Q.    Okay.  And you were friends with Nick McGuffin?

 7       A.    (No audible response.)

 8       Q.    You're nodding yes?

 9       A.    Yes.

10       Q.    Sorry, I'm trying - - -

11       A.    Sorry, yes.

12       Q.    I know.  I know.  I'll just keep reminding you.

13             And you weren't that close to Leah Freeman?

14       A.    No.

15       Q.    And in terms of Nick and Leah's relationship, you

16  observed that they had a good relationship?

17       A.    Yes.

18       Q.    Okay.  And Counsel had brought out that you had sex

19  with Nick McGuffin while he was dating Leah Freeman.  I'm

20  sorry and that's — I don't mean to embarrass you.  And was it

21  — it was a situation where despite that it appeared to you

22  Nick McGuffin was devoted to Leah Freeman?

23       A.    Yes.

24       Q.    And did they spend a lot of time together?

25       A.    Yes.
```

Davidson   X     D6 47

1     Q.   And occasionally did you see them have arguments?

2     A.   I've seen them have a argument one time.  But other

3  than that we didn't really hang out together as a group.

4     Q.   And the argument that you saw them have was up at

5  Powers?

6     A.   Uh huh.

7     Q.   And that — you're — yes?

8     A.   Yes.  Sorry, yes.

9     Q.   Thank you.  That's okay.

10          And during that argument Leah got mad at Nick and he

11  put her over his shoulder and took her to the tent?

12     A.   Yes.

13     Q.   Okay.

14     A.   Or actually I think to the car.

15     Q.   To the car?

16     A.   To put her to bed.

17     Q.   Okay.  To put her to bed.  And Mr. McGuffin

18  typically drove a blue Mustang?

19     A.   Typically yes.

20     Q.   Okay.  He also would sometimes drive his parent's T-

21  bird?

22     A.   (No audible response.)

23     Q.   You're answering yes.

24     A.   Yes.  Sorry.

25     Q.   Thank you.  Okay.

```
                                  Davidson   X    D6 48
```

1          And you had occasion to ride in that Mustang?

2     A.   Yes.

3     Q.   And is it correct that there was a gas leak in the —

4    from the trunk?

5     A.   Yes.

6     Q.   There was a gas leak in that car?

7     A.   Yes.

8     Q.   Okay.  And you knew that because when you're riding

9    in the car it smelled like gas?

10    A.   Yes.

11    Q.   Okay.  And you had occasion to look in the trunk

12   during the period of time before Leah - - -

13              MS. SOUBLET:    (Interposing) Objection.

14   Beyond the scope.

15    A.   Um - - -

16              THE COURT:    (Interposing) Just a minute,

17   ma'am.

18    A.   No, I don't think I ever - - -

19              THE COURT:    (Interposing) No, ma'am.  Just a

20   minute.

21              Do you have her subpoenaed also?  Because this

22   is beyond the scope.

23              MS. McCREA:    My investigator is nodding yes.

24   I thought we had her subpoenaed.

25              THE COURT:    Okay.  Then she is beyond — that

```
                                    Davidson   X    D6 49
```

1  is beyond the scope.

2              So, I'll sustain the objection to that.

3              If you wish to — are you done with your cross?

4              MS. McCREA:   If I could just ask a couple

5  more questions on cross.

6              THE COURT:   That's fine.  And then rather

7  than have Ms. Davidson come back, I would allow you to call

8  her as your witness now.

9              MS. McCREA:   Okay.

10             THE COURT:   Okay.

11             Go ahead and finish your cross.

12                   CROSS EXAMINATION, Continued

13 BY MS. MCCREA:

14     Q.   Now, Ms. Davidson, you started to respond to a

15 question by the Prosecution Counsel that — concerning your

16 statement that your words had been twisted.  And you were cut

17 off.  What did you want to tell us?

18     A.   Well, I just feel like they took some things that I

19 said and completely switched them around.  They used words

20 that I've never even used before.  That's just what I mean.  I

21 mean, I just — it's definitely not word for word for what I

22 said.  And — okay.

23     Q.   All right.

24             MS. McCREA:   So, now what I'm going to do, is

25 I'm going to ask you - - -

```
                                    Davidson   ReD   D6 50
```

1          THE COURT:    (Interposing) Before you do

2     that- - -

3          Is there any redirect on this — on her cross?

4          MS. SOUBLET:    There is, Your Honor.

5          THE COURT:    Go ahead and ask your questions.

6                    REDIRECT EXAMINATION

7     BY MS. SOUBLET:

8          Q.   Ms. Davidson, you had an opportunity to talk with

9     Officer McNeely and Officer Webley in May of this year, didn't

10    you?

11         A.   Yeah.

12         Q.   Okay.  And on that occasion they gave you an

13    opportunity to look at your police statement — your statement

14    from 2010, the one I just showed you.  Is that right?

15         A.   Yeah.

16         Q.   And then they gave you the opportunity to make

17    corrections to that?

18         A.   No.

19         Q.   So, you're saying you don't remember talking with

20    Officers - - -

21         A.   (Interposing) Did not give me any — he said he was

22    going to.  And then he didn't.  He asked me questions.  And

23    that was it.

24         Q.   And in those questions that he asked you, that was

25    to clear up any questions or concerns you had about how your

```
                                    Davidson   ReD   D6 51
```

1    earlier statement had been written?

2        A.    I guess.

3        Q.    You're still friends with Mr. McGuffin, aren't you?

4        A.    I would say yes.

5        Q.    And you don't want him to be convicted, do you?

6        A.    If he did, then yes.  But if he didn't, no.

7        Q.    Thank you.

8              MS. SOUBLET:    I have nothing further on that.

9              THE COURT:    Okay.

10             Now, Ms. McCrea you may call her as your own

11   witness.  And we will have you examine her.

12             MS. McCREA:    Okay.

13             So, I'm calling the Defense witness (not

14   understandable).

15             I promise we're going to have you out of here

16   in a couple of minutes.

17             WITNESS:    Okay.

18             THE COURT:    This beats you having to come

19   back a second time.

20             All right?

21             WITNESS:    Okay.  No, that's fine.

22             THE COURT:    All right.

23             Now, just listen to the questions and answer

24   them, please.

25             WITNESS:    Okay.

Anderson   D    D6 52

1                    <u>MEGAN DAVIDSON</u>

2  was thereupon produced as a witness on behalf of the Defendant

3  and, having previously been duly sworn to tell the truth, the

4  whole truth and nothing but the truth, was examined and

5  testified as follows:

6                    <u>DIRECT EXAMINATION</u>

7  <u>BY MS. MCCREA:</u>

8     Q.   So, I just want to talk to you a little bit about

9  the Mustang.

10    A.   Okay.

11    Q.   And you testified already that there were occasions

12 when you rode in the Mustang.  And you had testified that you

13 knew that there was a leak in the gas tank because you could

14 smell it in the car?

15    A.   Yes.

16    Q.   Now, do you remember there being a trunk liner in

17 the Mustang?

18    A.   I don't recall ever even looking in the trunk.  So,

19 I can't say.

20    Q.   All right.  I'm going to see if I can refresh your

21 recollection.  You testified before the Grand Jury for Coos

22 County on August 11th, 2010, so last year.  And at that time

23 you were asked a question by a Grand Juror:

24              "So, there wasn't a bed liner or a trunk

25              liner or anything?"

Anderson  D    D6 53

1          And you answered:

2                 "No, I don't.  I never remember there

3                 being a trunk liner in there.  But honestly I

4                 never really paid that much attention."

5      A.   Yeah.  I didn't pay any attention to if there was a

6  trunk liner.  And I — I don't recall seeing the trunk very

7  often.  We rode in the car.

8      Q.   Do you remember there being a big speaker in the

9  back seat?

10     A.   I'm sure there was, but no I don't.

11     Q.   All right.

12          Thank you, Ms. Davison.

13                 MS. McCREA:    That's all the questions I have,

14  Your Honor.

15                 THE COURT:   Do you have any cross?

16                 MS. SOUBLET:    No.  Thank you.

17                 THE COURT:   Ma'am, you are free to leave.  If

18  somebody would assist her in backing up, please.

19                 Call your next witness.

20                 MR. FRASIER:   Call Christy Young.

21                       CHRISTY YOUNG

22  was thereupon produced as a witness on behalf of the Plaintiff

23  and, having first been duly sworn to tell the truth, the whole

24  truth and nothing but the truth, was examined and testified as

25  follows:

Young   D    D6 54

1                THE COURT:    Have a seat here, please.

2                Go ahead.

3                MR. FRASIER:    Thank you, Your Honor.

4                        DIRECT EXAMINATION

5    BY MR. FRASIER:

6        Q.    Could you state your name please, ma'am, and spell

7    your last name for the record?

8        A.    Christy Diane Cagley, C-A-G-L-E-Y.

9        Q.    Are you also known as Young?

10       A.    Yes, I am.

11       Q.    Are you married?

12       A.    Yes, I am.

13       Q.    What's your married name?

14       A.    Young.

15       Q.    And Cagley's your - - -

16       A.    (Interposing) Maiden.

17       Q.    How long you been married?

18       A.    Three years.

19       Q.    Where do you live at this time?

20       A.    I live in Bandon.

21       Q.    Ma'am, I'd like to — well, let me ask you this

22   question.  Are you familiar with an individual named Polly

23   Parks?

24       A.    Yes, I am.

25       Q.    How do you know Ms. Parks?

Young   D    D6 55

1      A.    Polly and I have been friends for ten, eleven years.

2      Q.    Are you familiar with an individual named Leah

3    Freeman?

4      A.    I know her name.  I never met her personally.

5      Q.    Are you familiar with the Defendant in this case,

6    Mr. McGuffin?

7      A.    Yes, I am.

8      Q.    Are you familiar with his older brother, Wayne?

9      A.    Yes, I am.

10     Q.    How do you know those two?

11     A.    Acquaintances through Polly, hanging out, things

12   like that.

13     Q.    Now, in the year 2000 were you actually living with

14   Ms. Parks?

15     A.    Yes, I was.

16     Q.    And approximately — well, let me ask you this.  Are

17   you aware when Leah Freeman disappeared?

18     A.    Yes.

19     Q.    In relation to the time she disappeared, when did

20   you move in with Ms. Parks?

21     A.    About two and a half weeks later.

22     Q.    Now, while you are staying with Ms. Parks, was there

23   ever an occasion after you moved in that the Defendant and his

24   brother Wayne were at Ms. Parks' residence?

25     A.    Yes.

Young    D    D6 56

1    Q.    And do you recall is this was before or after the

2    body of Ms. Freeman had been discovered?

3    A.    Before.

4    Q.    Was there a television news program, something on

5    while these two individuals were there?

6    A.    Yes.

7    Q.    Was there something about a shoe being found on

8    Hudson Ridge?

9    A.    Yes.

10    Q.    Was the Defendant present when this came out over

11    the television?

12    A.    Yes, he was.

13    Q.    And was Wayne McGuffin present?

14    A.    Yes, he was.

15    Q.    In the presence of the Defendant what did Wayne

16    McGuffin say?

17    A.    Wayne looked at his brother and addressed him and

18    the room that, "Oh, they won't find anything from that shoe.

19    It was put there to make them think she was up there."

20    Q.    How did the Defendant respond to that comment?

21    A.    Not as — he nodded his head in agreement,

22    acknowledged his statement, and laughed about it.

23    Q.    Was there a further comment made about the shoe

24    being put there to throw the police off?

25    A.    Yes.

Young   X     D6 57

1    Q.   Who made that comment?

2    A.   Wayne.

3    Q.   How did the Defendant respond to that comment?

4    A.   He thought it was funny.

5    Q.   Thanks.

6         MR. FRASIER:   Your Honor, those are the

7    questions I have.

8         THE COURT:   Ms. McCrea.

9              CROSS EXAMINATION

10   BY MS. MCCREA:

11   Q.   Ms. Young, are you related to Raymond Cagley?

12   A.   Yes, I am.  He's my cousin.

13   Q.   He's your cousin.  And in June of 2000, he lived

14   over by what is now the Shell gas station?

15   A.   Yes, he did.

16   Q.   Near — in one of those apartment?

17   A.   Yes.

18   Q.   And that's near Elm where the other Leah Freeman

19   shoe was found?

20   A.   Yes.

21   Q.   So, when you moved in with Polly Parks in the year

22   2000, you were what, seventeen?

23   A.   Eighteen.

24   Q.   Eighteen.  And you stayed there for how long?

25   A.   I would say three, three and a half months.

Young   X    D6 58

1    Q.   During the summer of 2000, after Leah Freeman

2  disappeared and the investigation was proceeding, there was a

3  lot of stuff on television as things developed.  Right?

4    A.   Yes.

5    Q.   So, for example, the shoe being found on Hudson

6  Ridge was a topic of conversation?

7    A.   On the television, yes.

8    Q.   Okay.  Well, you're talking at Polly Parks.  And it

9  apparently was the topic of conversation there as well?

10    A.   No, ma'am.

11    Q.   Well, didn't you just testify that Wayne McGuffin

12  made a statement about it?

13    A.   I testified that he made a statement.  I or Polly

14  never did.

15    Q.   Okay.  There were other people present when Wayne

16  McGuffin made his statement?

17    A.   Uh huh.

18    Q.   Is that a yes?

19    A.   Yes.

20    Q.   And you've indicated at that point Leah Freeman's

21  body had not been discovered?

22    A.   No, ma'am.

23    Q.   So, nobody knew where she was?

24    A.   Not to my knowledge.

25    Q.   Nobody knew in the sense of what had happened?

Young   X   D6 59

1      A.   No.

2      Q.   Okay.  And so it was — it was at that point a

3   mystery?

4      A.   Somewhat, yes.

5      Q.   And around town, if you know, was it a topic of

6   conversation?

7      A.   Yes.

8      Q.   Now, Ms. Young, you were interviewed by Officer

9   McNeely and Officer Webley on July 20th of 2010.  Do you

10   remember that?

11      A.   Yes, I do.

12      Q.   And at that point you told them that Wayne said,

13   "Ha.  That was put there to throw them off.  It was meant to

14   be thrown there.  They won't find anything there."  Is that

15   what you told them?

16      A.   Yes, ma'am.

17      Q.   And at that time you didn't tell them anything about

18   Nick McGuffin nodding his head, did you?

19      A.   Yes, I did.  I said that he thought it was funny and

20   I found it very odd that he found it funny.  And he agreed

21   with him.

22            THE COURT:   Could you scoot closer to the

23   microphone?

24            WITNESS:   Yes, I can.

25      Q.   Ms. Young, I'm going to show you a copy of Officer

Young   X    D6 60

1  Webley's report.  And just take your time and take a look and

2  see if there's anything in there that indicates that you told

3  them that he thought it was funny.

4        A.   Nope.

5        Q.   There's nothing in there about Nick McGuffin nodding

6  in response, is there?

7        A.   No.

8        Q.   And the first time, Ms. Young, that you talked to

9  law enforcement about this was on July 20th, 2010.  Right?

10       A.   Yes.

11       Q.   Then you testified before the Coos County Grand Jury

12  on July 30th, 2010.  Do you remember that?

13       A.   Yes, I do.

14       Q.   And at that point you were asked a question as to,

15  was there ever a discussion when let's say, Wayne, when it was

16  announced publicly that a shoe belonging to Leah had been

17  found on Hudson Ridge.  And you responded, "Uh huh."

18            And then you were asked, "What do you recall Wayne

19  McGuffin saying at that point?"

20            And you responded, "I remember Wayne kind of

21  snickering and saying, 'They won't find anything from that.

22  That's been thrown there to put them off the trail.'"

23       A.   Yes.

24       Q.   Is that what you said?

25       A.   Talking to his brother, yes.

```
                                    Young   ReD   D6 61
 1      Q.    And then the next question was, "Did he further

 2   explain what he meant by that?"

 3            And you responded, "No.  And I didn't care to

 4   elaborate with him on it."

 5      A.    That's true.

 6      Q.    And during the Grand Jury you didn't say anything at

 7   all about Mr. McGuffin laughing or nodding in agreement or

 8   thinking it was funny?

 9      A.    Yes.

10      Q.    You did not say that?

11      A.    No.

12      Q.    Thank you.

13            MS. McCREA:    That's all the questions I have.

14            THE COURT:    Redirect.

15                 REDIRECT EXAMINATION

16   BY MR. FRASIER:

17      Q.    Ma'am, when you testified at the Grand Jury was I

18   the person that asked you the questions?

19      A.    Yes, you were.

20      Q.    Did I ask you how the Defendant reacted?

21      A.    No, you did not.

22      Q.    Thank you.

23            MR. FRASIER:    That's all I have, Your Honor.

24            THE COURT:    You may step down, ma'am.  You

25   are free to leave.
```

                                        Bryant   D    D6 62

1                WITNESS:    Thank you.

2                THE COURT:    Call your next witness.

3                MR. FRASIER:    Call Richard Bryant.

4                        RICHARD BRYANT

5    was thereupon produced as a witness on behalf of the Plaintiff

6    and, having first been duly sworn to tell the truth, the whole

7    truth and nothing but the truth, was examined and testified as

8    follows:

9                THE COURT:    Have a seat up here, please.

10                    DIRECT EXAMINATION

11   BY MR. FRASIER:

12        Q.   Could you state your name please, sir, and spell

13   your last name for the record?

14        A.   My name is Richard Bryant, B-R-Y-A-N-T.

15        Q.   Where do you currently live, sir?

16        A.   John Day, Oregon.

17        Q.   How long have you lived in John Day?

18        A.   Since 2007.

19        Q.   Have you previously lived here in the Coos County

20   Area?

21        A.   Yeah.  I was born and raised here.

22        Q.   Go to high school here?

23        A.   Yeah.

24        Q.   Do you know the Defendant in this case, Nicholas

25   McGuffin?

Bryant   D    D6 63

1        A.    Yes, sir, I do.

2        Q.    How do you know him?

3        A.    We went to school probably about six years or so

4    together.  I mean, we weren't like hang out buddies and stuff

5    like that but we knew each other at the first, you know, five

6    or six years of school.

7        Q.    Were you in the same grade?

8        A.    Yeah.

9        Q.    Now, Mr. Bryant, you've had some problems with the

10   law?

11       A.    Oh, yeah.

12       Q.    And you've been convicted of some felonies in the

13   past?

14       A.    Yeah.  I have one felony on my record from - - -

15       Q.    (Interposing) What is that?

16       A.    Possession of a Controlled Substance.

17       Q.    Now, Mr. Bryant, you — well, were you familiar with

18   Leah Freeman?

19       A.    Yeah.

20       Q.    How did you know Ms. Freeman?

21       A.    I knew her mainly from being Nick's girlfriend.  I

22   knew other parts of her family vaguely, but they were like

23   step-brother or something like that.

24       Q.    All right.  Now, did you have an opportunity to see

25   Mr. McGuffin and Ms. Freeman together?

```
                              Bryant   D     D6 64
```

1      A.   Yeah.

2      Q.   Could you describe what you saw?

3      A.   You know, your general couple.  They would have

4  their moments where they didn't get along.  You know, most of

5  the time you'd just see them, you know, driving by in their

6  car and — the majority of the time.

7      Q.   All right.  Now, you're aware that Ms. Freeman

8  disappeared the evening of June 28th, 2000?

9      A.   Yes.

10     Q.   The following morning does the Defendant show up at

11 your house?

12     A.   He did.

13     Q.   Do you recall what time of the day it was?

14     A.   I would have to say between seven thirty — six

15 thirty, seven thirty in the morning.  It was pretty early in

16 the morning.

17     Q.   Were you still asleep?

18     A.   Yeah.

19     Q.   And what happened when the Defendant came to your

20 house?

21     A.   Well, I got a knock on the door.  I opened the door

22 and Nick was standing there.  And he was telling me that Leah

23 was missing and something had happened.  She was gone.  And he

24 had a picture of her.  And, you know, I was like, "What do you

25 mean she's gone?  Maybe she's at a friend's house.  Maybe she,

```
                                    Bryant   D     D6 65
```

1    you know, went with someone."

2           But he was pretty adamant that she was missing and

3    something bad had happened.  And he wanted me to help her —

4    help him find her.

5       Q.   Now, I want to direct your attention to — it would

6    actually be the year of 2002.  And actually September of 2002.

7    Had you been incarcerated in the Coos County Jail?

8       A.   Probably.  I couldn't exactly say that date, but

9    probably.

10      Q.   When you were incarcerated at the Coos County Jail

11   did you at times have a cell mate?

12      A.   I did.

13      Q.   And in that time frame did you have the Defendant as

14   a cell mate?

15      A.   I did.  I can't remember for the period amount of

16   time we were cell mates, but yeah.

17      Q.   And during that time frame that you're together, did

18   the Defendant talk with you about Leah Freeman?

19      A.   It was a very short discussion, but yeah.

20      Q.   What did he tell you?

21      A.   He was a little emotional at the time, you know, he

22   was crying and telling me that, you know, he can picture her

23   laying there and her head sitting on a rock and there was

24   nothing he could do about.  And there was nothing he could do.

25      Q.   Thank you.

Bryant   X     D6 66

1          MR. FRASIER:    That's all I have of the

2    witness, Your Honor.

3          THE COURT:    Ms. McCrea.

4                    CROSS EXAMINATION

5    BY MS. MCCREA:

6     Q.   Mr. Bryant, you testified before the Coos County

7    Grand Jury about this matter on August 4th of last year, didn't

8    you?

9     A.   Yes.

10    Q.   And at that time what you told them Mr. McGuffin

11   said was, "I can just — I can see her laying there.  And I

12   couldn't do anything to help her.  And I can't do anything

13   about it."  Isn't that what you said?

14    A.   Yes.

15    Q.   You didn't say anything about her head laying on a

16   rock?

17    A.   I think I remember saying something about that.

18    Q.   Would you like to — would you like to hear your

19   testimony, hear the tape?

20    A.   I think I just did.

21    Q.   Okay.  So, are you saying that you remember now you

22   didn't say the rock part?

23    A.   I thought I did, but apparently I didn't.  But

24   that's what I remember the conversation being in the jail.

25    Q.   Okay.  And Mr. McGuffin, even in 2002, was very

```
                                        Bryant   X    D6 67
```

1   emotional about Leah Freeman?

2        A.   (No audible response.)

3        Q.   You have to answer out loud.  Sorry.

4        A.   Yeah, yeah.

5        Q.   And he was still upset about her disappearance?

6        A.   Yeah.

7        Q.   Is that fair?

8        A.   Yeah.

9        Q.   And he indicated to you that he didn't have anything

10   to do with her disappearance, didn't he?

11        A.   We didn't really talk that much into detail.  I had

12   mentioned something to him about how the - - -

13        Q.   (Interposing) Okay, wait.  Let's not get into that.

14   Just - - -

15        A.   (Interposing) Yeah.

16        Q.   Did he tell you — yes or no did he tell you he

17   didn't have anything to do with her disappearance?

18        A.   Yes, he did say that.

19        Q.   Okay.  When he came to your house with the

20   photograph of Leah, could it have been a day later than June

21   29th?

22        A.   No, I don't believe so.

23        Q.   Okay.  But he had a photograph of Leah with him?

24        A.   Yeah.

25        Q.   And you're saying he came between approximately

                                    Bryant   X    D6 68

1   what, six thirty and seven thirty in the morning?

2        A.    Yeah.  It was pretty early in the morning.  It — I

3   might have to say between six thirty and eight thirty in the

4   morning.  It was pretty early in the morning for me.

5        Q.    Well, I understand.  The reason I'm asking about

6   whether it could be a different day is because we've had

7   testimony in the case that Cory Freeman called Mr. McGuffin at

8   his parent's home at about seven forty-five, eight o'clock.

9   And he immediately went over to her house from his parent's

10  house.

11       A.    I don't know anything about that.

12       Q.    Okay.  But to your recollection it would have been

13  the morning of the 29th?

14       A.    Yeah.

15       Q.    In any event, when Nick McGuffin came to your house

16  he was extremely concerned that Leah had not — could not be

17  found?

18       A.    Yes.

19       Q.    And he was upset?

20       A.    Yeah.

21       Q.    And he was asking for your help in — or, you know,

22  wanted to know if you had seen her?

23       A.    Yeah.

24       Q.    Now, the night before, had you been to a party?

25       A.    No, I don't think so.

                                        Bryant   X    D6 69

1      Q.    Okay.

2            MS. McCREA:    May I have a moment?

3      Q.    And in your observations, Mr. Bryant, of the

4   relationship between Mr. McGuffin and Ms. Freeman, they had

5   some arguments but it looked like they got along really well?

6      A.    I would say yeah for the most part.  I mean, it just

7   seemed like a general couple.  I mean, every — to me I think

8   everybody has their moments where they argue and fight.  I

9   mean, it just seemed kinda normal.  I mean, they actually did

10  seem relatively happy.

11     Q.    Okay.  For teenagers?

12     A.    Yeah.

13     Q.    Yeah.  Okay.  And when they would have an argument,

14  wouldn't it be like, she would take off walking or he — and

15  then he would go his way.  And the next thing you know it

16  would be like nothing happened?

17     A.    Yeah, I would say so.  You know, it would be a — I

18  think there was maybe an instance I can remember where she

19  would take off walking and you know, they would probably be

20  heated.  And, you know, the next thing you know they'd be in

21  the car together.  And like you said it was like nothing

22  happened.

23     Q.    Okay.  Public displays of affection?

24     A.    Yeah, I would say so.

25     Q.    Okay.

Mede    D    D6 70

1          MS. McCREA:    That's all the questions I have.

2     Thank you.

3          THE COURT:    Redirect.

4          MR. FRASIER:    Nothing further.  I ask that

5     the witness be excused.

6          THE COURT:    You are free to leave.

7          WITNESS:    Thank you.

8          THE COURT:    Call your next witness.

9          MR. FRASIER:    Call Darius Mede.

10                    DARIUS MEDE

11    was thereupon produced as a witness on behalf of the Plaintiff

12    and, having first been duly sworn to tell the truth, the whole

13    truth and nothing but the truth, was examined and testified as

14    follows:

15          THE COURT:    Have a seat up here, please.

16                  DIRECT EXAMINATION

17    BY MR. FRASIER:

18     Q.   Could you state your name please, sir, and spell

19    your last name for the record?

20     A.   Darius Mede, M-E-D-E.

21     Q.   And what is your occupation, sir?

22     A.   I work for the Coos County Sheriff's Office in the

23    jail right now.

24     Q.   And what are your responsibilities in the jail?

25     A.   I'm in charge of administration of the jail.

Mede    D     D6  71

1      Q.    As part of being in charge of the administration are

2    you also in charge of the records that are kept at the Coos

3    County Jail?

4      A.    I am.

5      Q.    Are there records kept in the normal course of

6    business with the jail?

7      A.    There are all kinds of records.

8      Q.    And in particular is there a record kept of when a

9    particular individual may have been in jail and if they had

10   been in jail where they were held, particular inside the jail?

11     A.    Yes.  We keep a record of everybody's housing

12   assignment.

13     Q.    I'm going to show what's marked as State's Exhibit

14   No. 94.  Do you recognize this document, sir?

15     A.    I do.  It's a housing assignment out of our computer

16   system.

17     Q.    And this is something that's, again, kept in the

18   normal course of business?

19     A.    It is.

20     Q.    And the first page, is that housing record for who?

21     A.    Richard Ernest Bryant.

22     Q.    And the second page is for who?

23     A.    Nicholas James McGuffin.

24     Q.    Do the records indicate that Mr. Bryant and

25   Mr. McGuffin shared a cell from September 16th of 2002 to

Mede   D     D6 72

1   September 24th of 2002?

2       A.    They do.

3       Q.    Thank you.

4             MR. FRASIER:    That's all the questions of

5   this witness.

6             THE COURT:    Cross.

7             MS. McCREA:    No questions, Your Honor.

8             THE COURT:    You may step down.  You are free

9   to leave.

10            Call your next witness.

11            MR. FRASIER:    Your Honor, my next witness

12  will be rather lengthy.  So, if you want to take a morning

13  break.

14            THE COURT:    That's fine.

15            If the jury would step into the jury room.

16  Take your notebooks.  Remember the admonition.

17            Everybody else remain seated until the jury has

18  a chance to go to the jury room.

19            (Jury Out.)

20            THE COURT:    Okay.

21            About five to.

22            (RECESS)

23            (Jury In.)

24            JUDICIAL ASSISTANT:    All rise.

25            THE COURT:    Be seated please.

```
                                        Wilcox   D     D6 73
```

1           Call your next witness.

2           MR. FRASIER:    Thank you.

3           We call Kathy Wilcox.

4                           KATHY WILCOX

5    was thereupon produced as a witness on behalf of the Plaintiff

6    and, having first been duly sworn to tell the truth, the whole

7    truth and nothing but the truth, was examined and testified as

8    follows:

9           THE COURT:    Have a seat here, please.

10          Go ahead, please.

11          MR. FRASIER:    Thank you, Your Honor.

12                       DIRECT EXAMINATION

13   BY MR. FRASIER:

14       Q.   Could you state your name please, ma'am, and spell

15   your last name for the record?

16       A.   It's Kathy S. Wilcox, W-I-L-C-O-X.

17       Q.   Your current occupation is?

18       A.   I'm retired from Oregon State Police.

19       Q.   And what did you do for the Oregon State Police?

20       A.   I was a criminalist for the State Police and then a

21   detective for two years.

22       Q.   When you say you were a criminalist, what does that

23   mean?

24       A.   I was a criminalist for fifteen years.  That's what

25   I was hired for.  A criminalist is a forensic scientist who is

Wilcox   D     D6 74

1   a sworn officer.  And so we're in charge of the crime scenes,

2   the analyzing of evidence, drug cases, firearms, tool marks,

3   all of the CSI stuff.

4       Q.   Could you tell us a little bit about your training

5   and background experience?

6       A.   Yes.  I have a Bachelor of Science degree from

7   Oregon State University.  It was awarded in 1980.  I went to

8   work for the Lane Memorial blood bank.  My degree was in

9   microbiology.  So, I worked in blood banking for two years.

10  We then moved to Washington and worked at Fred Hutchinson

11  Cancer Research Center which was — I was an HLA technologist

12  which is DNA typing for bone marrow and kidney transplants.

13          And it might not seem that long ago, but that's when

14  DNA for forensics was just really getting started.

15          So, we moved back to Oregon.  All our family is

16  here.  And I worked for two years at North Bend Medical Center

17  as a medical technologist primarily in hematology, blood

18  studies and urinalysis — some chemistry.

19          And then I was hired by the Oregon State Police as a

20  criminalist to work in the crime labs.  A lot on the different

21  lab experiences I had and the DNA experiences.

22      Q.   When did you start working for the State Police?

23      A.   1987.

24      Q.   Where were you assigned to work?

25      A.   I was assigned to the Coos Bay lab.

Wilcox   D     D6 75

1    Q.    There actually was a State Police Crime Lab in Coos

2    Bay?

3    A.    Yes.  Oregon State Police Crime Lab in Coos Bay,

4    Oregon.

5    Q.    Does it currently exist?

6    A.    No.  I was closed in 2002.

7    Q.    And is that when you left the crime laboratory

8    system?

9    A.    Yes.  And I went to detectives for two years before

10   I retired.

11   Q.    Now, as part of your work as a criminalist or a

12   forensic scientist, were you at times called upon to process

13   vehicles for forensic evidence?

14   A.    Yes, I was.

15   Q.    Could you describe for the jury please when you

16   process a car, what type of things are you looking for; what

17   types of things did you do?

18   A.    A car processing, of course you'd usually just do —

19   you'd know a little bit about the case.  You might not know

20   everything.  Sometimes I kinda like didn't want to know

21   everything.  But, so it depends on what you were looking for,

22   blood spatter or weapons or other kinds of fluids or residues.

23        But it always starts with a bright light

24   examination.  And there is actually nothing better than doing

25   it outside in the sunlight.

Wilcox   D     D6 76

1          Then we usually take it to a vehicle bay.  You use

2    alternate light sources which give you different wave length

3    of light.  And it improves contrast.  So, if you have, like,

4    black residue on a black sweatshirt, by using different wave

5    lengths sometimes the residue will appear white or pink.  So,

6    you find stains, often body fluids.  Like urine will show up.

7    Sometimes it almost fluoresces, when otherwise you might not

8    be able to see it.  Same with semen and blood which might be

9    dark red, might appear to be black.  And then the fabric might

10   turn out to be gray.  It just depends on the different things.

11         We use Luminal for finding blood residue that is not

12   visible to the naked eye.  And to do that you have to have a

13   room totally dark.  So we always do that in a vehicle bay.

14   And we usually tarp everything also.  And photography.  And

15   then of course, just going through it with the vacuum sweeping

16   and taping of the seats if they're fabric.  If you just run a

17   big piece of strapping tape over it you can pick up fibers and

18   hairs you might not otherwise see.

19         Just a thorough examination.

20   Q.   And over the course of the time you worked with the

21   crime lab, could you estimate how many cars you might process?

22   A.   Oh, a hundred.

23   Q.   I'm going to direct your attention now, ma'am, to

24   July the 6th of 2000.  Were you asked to examine a 1967 Mustang

25   with the Oregon license numbers PEA640 — or, excuse me — 840?

Wilcox   D     D6 77

1      A.   Yes, I was.

2      Q.   First of all what I'm going to do is show you a

3  series of photographs.

4           MR. FRASIER:   May I have State's Exhibits

5  Nos. 16 through 24?

6      Q.   I'm going to show you what's marked as State's

7  Exhibits Nos. 16 through 24.  Can you identify the vehicle

8  that's portrayed in this series of photographs?

9      A.   This is the 1967 Mustang.  And it has that Oregon

10 license plate PEA840.

11     Q.   And State's Exhibits Nos. 17 through I believe it's

12 No. 24, are these pictures that were taken during the

13 examination of the (not understandable)?

14     A.   Yes, they are.

15     Q.   And do they accurately portray what you saw as you

16 processed this vehicle?

17     A.   Yes, they do.

18          MR. FRASIER:   Your Honor, we'd offer State's

19 Exhibits Nos. 17 through 24.

20          MS. McCREA:   There's no objection, Your

21 Honor.

22          THE COURT:   Received.

23          (Whereupon Exhibits Nos. 17, 18, 19, 20, 21,

24 22, 23 and 24 were then received into evidence.)

25     Q.   Now, I'm going to — there's a laser pointer there

Wilcox   D     D6 78

1    and it has a red dot on it right here.

2         A.   Okay.

3         Q.   And I'm going to be putting the pictures up on the

4    screen here.

5              MR. FRASIER:   Could we dim the lights please.

6         Q.   This is State's Exhibit No. 16.  Could you describe

7    this for us, please?

8         A.   This is the Mustang that we were just talking about.

9         Q.   Now, did you process the Mustang where it was found

10   or was it taken to a particular location?

11        A.   The crime lab had a vehicle bay behind it.  And

12   that's where it was taken.

13        Q.   This is State's Exhibit No. 17.  Is this the vehicle

14   in the bay?

15        A.   Yes, it is.

16        Q.   While I'm thinking about it, was there a problem

17   with the gas tank?

18        A.   Yes, it leaked.

19        Q.   Did you do anything to recover the gas that might

20   have - - -

21        A.   (Interposing) Well, I think I put some kitty litter

22   down later.

23        Q.   Now, this picture here, State's Exhibit No. 17, what

24   does it show?

25        A.   That is the Ford Mustang.

Wilcox  D    D6 79

1    Q.    And from what prospect?

2    A.    Oh, that is the rear of it.

3    Q.    This is State's Exhibit No. 18?

4    A.    Yes.

5    Q.    Could you describe that for us, please.

6    A.    That is the Mustang once again.  And that would be

7    the passenger side.

8    Q.    This is State's Exhibit No. 19.

9    A.    The passenger side looking from the back corner.

10   Q.    State's Exhibit No. 20.

11   A.    That would be the driver's side.  And it was primed

12   on the back corner with white paint.

13   Q.    State's Exhibit No. 21.

14   A.    That again is the back corner where the primer is.

15   And I probably was also trying to get a picture of the wheel.

16   Q.    State's Exhibit No. 22.

17   A.    That is the trunk.

18   Q.    When you examined the trunk, was there anything

19   inside the trunk?

20   A.    Not a thing.  Nothing.

21   Q.    Spare tire?

22   A.    No spare tire.  No trunk liner.  I remember when I

23   opened it, I was going, like, "Wow."  There was just nothing.

24   Q.    State's Exhibit No. 23.

25   A.    I believe that's a closeup of the trunk, the inner

```
                                              Wilcox   D     D6 80
```

1    part of the trunk.  Yes.

2         Q.   And State's Exhibit No. 24.

3         A.   That is another closeup.  I was probably sectioning

4    it off and getting the different corners of it.

5         Q.   Could you tell us what you did with this car?

6         A.   I can.  I generated a report.

7                        "I first examined and photographed the

8                   outside of the vehicle.  There was a moderate

9                   amount of road dust on the vehicle and some

10                  minor damage to the front fender below the

11                  bumper.  This damage did not appear to be

12                  recent.  The left rear side fender was primed

13                  with white paint.  The car had dripped a small

14                  amount of gasoline.  The vehicle condition was

15                  consistent with its age."

16                       "The interior of the vehicle was examined

17                  and photographed.  The interior surface did not

18                  appear to have been recently wiped clean.  A

19                  locksmith was called to open the trunk.  The

20                  trunk compartment was empty.  There was no

21                  spare tire or any type of trunk liner."

22                       "The engine compartment was examined and

23                  nothing of any apparent significance was noted.

24                  The exterior, interior and trunk area of the

25                  car were further examined using special

1          alternate lighting techniques.  These areas

2          were also chemically tested for blood.  No

3          blood was found."

4              "The interior floor was vacuumed.  And the

5          chemical testing was Luminal."

6      Which you see on TV all the time when you turn out

7  the lights and light up things.  Only I must say they don't do

8  it correctly, but it's TV.

9      Q.   Did you do — or did you think about doing tape

10 lifts?

11     A.   I did.  I did.  I — if I recall I didn't do tape

12 lifts because it was vinyl seating.  And it was clean.  I

13 mean, it was wiped clean.  There wasn't anything visibly

14 there.  You usually do tape lifts on fabric when you want to,

15 like, lift dog hair or whatever hairs you want to lift or

16 trace evidence.

17         I didn't do a microscopic examination of like the

18 vacuum sweepings, but I looked them over.  And since I'd done

19 cars before where people have been abducted, the things I was

20 looking for is, like, maybe glitter off of somebody's t-shirt,

21 or hair that's been pulled out of their head.  If you look at

22 hair it's very different if it's been pulled out or if it just

23 falls out.  There's a different look to it.

24         There was no wads of hair.  There was nothing really

25 remarkable about anything that I saw in there.

Wilcox   D    D6 82

1      Q.   When you examined the trunk, did you look like at

2  the trunk lid on the inside of the trunk lid.  Did you look at

3  that, too?

4      A.   Yes, I did.

5      Q.   See anything of significance there?

6      A.   No, I did not.

7      Q.   How long would you say you worked on this car?

8      A.   I can say exactly.  These are the notebooks we keep

9  for what we do during the day.  And so I can go to - - -

10         I worked on it all day.  I put field investigation

11  on the car eight hours.

12     Q.   Now, I want to go to the tenth of July.  Had you

13  been made aware that a pair of shoes had been found with one

14  shoe found in a different location than another here in Coos

15  County?

16     A.   Yes, I had.

17     Q.   And that they were believed to be the shoes of

18  Ms. Freeman?

19     A.   Yes.

20     Q.   And did you do an examination of both shoes?

21     A.   Yes, I did.

22     Q.   I'm going to show to you what's previously been

23  marked as State's Exhibits Nos. 96 and 97.  Do you recognize

24  the shoes or your markings?

25     A.   Yes.  This is my Exhibit No. 1, KW.  That's my — and

Wilcox   D     D6 83

1    our case number 00N481 — that's the lab's case number.

2        Q.   And State's Exhibit No. 96, your Exhibit No. 1, that

3    would be the — what shoe would that be?

4        A.   Right.  Exhibit No. 1 is the right shoe.

5        Q.   And I believe we've had testimony that Exhibit No.

6    97, the right shoe — or excuse me — No. 96 - - -

7        A.   (Interposing)  No. 96 is the right shoe, yes.

8        Q.   - - - was found on Elm Street?

9        A.   Okay.

10       Q.   Exhibit No. 97, do you recognize that?

11       A.   This is the left shoe that was submitted at the same

12   time.

13       Q.   I believe we've had testimony that that was found on

14   Hudson Ridge?

15       A.   Okay.

16       Q.   Now, did you examine both of these shoes?

17       A.   Yes, I did.

18       Q.   What type of — when you examine shoes like this in a

19   forensic setting, what are you doing?

20       A.   Okay.  Well, on my worksheet I first — of course,

21   first you just examine them using good lighting.  The big

22   secret with the crime lab is we have excellent lighting and we

23   have different kinds of lighting which makes us very popular

24   at crime scenes, because we can bring it with us, too.

25            But — so, I examined it with good lighting, bright

Wilcox   D    D6 84

1  light examination; special light examination is what it's

2  under.  So, I do regular light examination, bright light

3  examination, a low powered microscopic examination, and I

4  tested three spots on the right shoe with a presumptive test

5  for blood.  And it was negative.

6         And I tested — I had — I don't remember how many I

7  tested.  I think I tested six.  And I had four presumptive

8  tests for blood on the left shoe.  I further tested one of

9  those and it was human blood.

10     Q.   Now, in the course of examining the left shoe, the

11  one from Hudson Ridge, did you take photographs of that

12  particular shoe?

13     A.   Yes, I did.

14     Q.   I'm going to show you now what's been previously

15  marked as State's Exhibits Nos. 29 through 32 and ask if you

16  can identify those photographs?

17     A.   Yes.  These are photos that I took in the lab.  I

18  have the same ones in my lab notes.

19     Q.   And do they accurately portray what you saw?

20     A.   Yes, they do.

21         MR. FRASIER:   We would offer State's Exhibits

22  Nos. 29 through 32.

23         MS. McCREA:   There's no objection, Your

24  Honor.

25         THE COURT:   Received.

Wilcox   D    D6 85

1          (Whereupon Exhibits Nos. 29, 30, 31 and 32 were

2    then received into evidence.)

3     Q.    This is - - -

4          MR. FRASIER:    Can you dim the lights please.

5     Q.    - - - State's Exhibit No. 29.  Could you describe

6    this for us a little bit, please?

7     A.    This is just the shoe sitting on the lab bench.  I

8    think I put it on a piece of white paper which I would usually

9    do in case any trace evidence came off of it.  And I just took

10   a photo straight down at it.

11    Q.    In looking at the top of the shoe, is there anything

12   of significance that you noticed?

13    A.    I'm not sure what you mean.  I think there was a

14   couple of stains on the shoelaces, but they were not tested at

15   that time.

16    Q.    I notice that the shoe appears to be untied.  Was

17   that how the shoe arrived in the jail — or, in the lab?

18    A.    Yes.

19    Q.    This is State's Exhibit No. 30.  Could you describe

20   this for us, please?

21    A.    This is a photograph of the sole of the shoe, just

22   straight down at it, looking at it straight down.

23    Q.    When you examined the sole of the shoe what if

24   anything did you note?

25    A.    Well, I had noticed that there were a couple of

Wilcox   D    D6 86

1  small blood spatter droplets on it.  And you could pretty much

2  see them with the — almost with the naked eye.  And then with

3  the low powered microscope they were quite clear.

4      Q.   This is State's Exhibit No. 31.

5      A.   That is a closeup of the ball of the foot on the

6  shoe on the sole.  And I was trying to capture the small

7  little blood spatters that were on that.

8      Q.   I notice there's some circles drawn on this

9  photograph?

10      A.   Yes.  I'm circling the blood spatter, since it's

11  pretty hard to see on that black sole.

12      Q.   Using the laser pointer could you point out the

13  areas that you saw this blood spatter?  On the top there's a

14  red - - -

15      A.   (Interposing) I don't want to put anybody's eye out.

16  Okay.

17          There was a spot right — right about there.  I think

18  I've got it.  There was one on top of the tread.  I think I

19  described them each.

20              "Right shoe, looking down towards front to

21                the back."

22          I might be able to describe them better if I look at

23  my notes.  Okay.  One, two — now, I can't find it.  Anyway,

24  there was one there.  Oh, okay.  There's one down here.  And I

25  think there were a couple of smears on the top.  You might be

1  able to see that right there.  One up there.  I think I had

2  like four of them.

3      Q.   This is State's Exhibit No. 32.  Is that a further

4  closeup?

5      A.   Yes.  There we go.

6      Q.   And in this photograph there's a square marked?

7      A.   Oh, okay, yes.  Because I think that was — the sole

8  of the shoe had the little traction knobs on it.  And that one

9  was a little bit to the side of the traction knob, which to me

10  — you know, it's not a stepped in blood.  It's spattered on

11  there.  And that's what I think I was trying to capture.

12  Right on the edge over right about there.

13      Q.   Okay.  Let's talk a little bit about blood spatter.

14  You know, you indicated that this wasn't stepped in blood.

15  Could you talk — tell us about blood drops, spatter, what is

16  this?

17      A.   Well, we actually do quite a bit of study on it.

18  And I've taken like week long classes on it where you — if you

19  think about it, you know, if you have like a cut on your

20  finger or anywhere and it drips, when it — depending on the

21  surface it hits, it makes a big drip.  It's going to be at

22  least a dime to a nickel size from just a drop of blood.

23  There's that much volume in it.  Depending on what it falls on

24  and how it falls.

25          And then you have blood that is smeared.  You know,

Wilcox   D    D6 88

1   if there's wet blood and you smear it.  And if you smear it

2   with a shoe, it might leave a shoe print.  If you smear it

3   with hair, you've got hair in it.

4           You have — oh, and TV is great at showing this, you

5   know, pulsated blood.  If someone dies of a — or is wounded

6   terribly like with a vein, you'll actually have these little

7   arcs of blood coming out of them and dripping down the wall.

8           So, you have — you know, unless you really think

9   about it, you don't realize how many different kinds of blood

10  spatter there are.

11          When you have droplets this small, we call that

12  spatter.  And it — it has force behind it.  You don't get this

13  kind of blood spatter just by, you know, flicking a drippy

14  finger.  It has to be — some force has to be involved, like a

15  sneeze or a blow to something.  Usually something that's

16  already bloody has to be hit to cause small droplets to come

17  off.  You might even think of it as, if you were painting and

18  you're doing a painting technique where you pull back the

19  brush and let the paint fly.  You get smaller ones the harder

20  you do it.  And they have to be fairly close, because they

21  also can dry pretty fast.

22  Q.   Now, in looking at the bottom of the left shoe where

23  you found these, did you sample this blood in some way?

24  A.   I did.  I took a moistened cotton swab and touched

25  it to them and then we do a presumptive test called a

Wilcox   D    D6 89

1   Phenolphthalein test.  And it turns a bright orange in the

2   presence of blood.  You put a — you take a little tiny bit of

3   sample, just — you can't even see it microscopic.  And you put

4   a few drops of solution on it.  And it turns a bright pink for

5   — that's just a presumptive test for blood.

6           Then I further took some of that and ran a antigen

7   antibody card that reacts specifically for human blood.  And

8   that pretty much all I did because I could see I didn't have

9   much sample.  And I didn't want to consume too much evidence.

10   Q.   Now, in regards to the two shoes, what efforts were

11   made forensically to determine if there was any scientific

12   evidence to show whose shoes they belonged to or who had been

13   wearing them?

14   A.   Well, as soon as we — actually I asked them — I had

15   heard about the shoes to submit them to the lab because they

16   were wondering if they were Leah's for sure — Leah Freeman's.

17   and I said, "Well, just submit them.  And we'll send them for

18   DNA analysis."  Because we had, at that point, collected some

19   of Leah Freeman's items and the Portland lab would do the

20   final DNA analysis on those.

21   Q.   And in particular there had been a DNA sample from

22   Cory Courtright, the mother of Leah Freeman?

23   A.   Well, that is, you know, how you could establish

24   paternity or fraternity is to do the parents.  And then I

25   think we also had Leah's toothbrush, I think is what they used

Wilcox   D     D6 90

1   to get her DNA.

2        Q.   Now, in conjunction with this case were the shoes,

3   the samples from Cory Courtright, Denny Freeman, and the

4   toothbrush of Leah Freeman, were they sent to — for further

5   forensic examination?

6        A.   Yes.  They were sent to the Oregon State Police

7   Forensic Lab in Portland.

8        Q.   Why were they sent to Portland?

9        A.   Portland did all the DNA analysis.  It's — it takes

10  a lot of resources and training to do DNA.  So, it's all

11  centralized.  All the crime labs in Oregon except for a couple

12  Defense crime labs are all State run.  So, we're all tied in

13  together.  We're all basically the same — the same lab.  We're

14  just in different, you know, physical locations.

15       Q.   And one lab may have a specific thing they

16  specialize in?

17       A.   Oh, yes.  Portland was the largest lab.  And they

18  had a whole DNA unit, which you know, requires a PhD and

19  people specially trained and special equipment.

20       Q.   Now, was there a report returned from the Portland

21  Crime Lab regarding the analysis of the two shoes, the blood

22  spatter and so forth?

23       A.   Yes, there was.

24            MR. FRASIER:   Your Honor, by stipulation, I

25  think we've agreed that State's Exhibit No. 207 is — we would

                                        Wilcox  D    D6 91

1  offer that report in lieu of calling the forensic scientist

2  that did those tests.

3              MS. McCREA:    It is so stipulated, Your Honor.

4              THE COURT:    Thank you.

5              It's received them.

6              (Whereupon Exhibit No. 207 was then received

7  into evidence.)

8      Q.    In regards to the shoes and the DNA testing that was

9  done, can you tell the jury please, were these shoes

10 identified as belonging to or having been worn by a particular

11 individual?

12     A.    The tennis shoes and the blood on the shoes matched

13 Leah Freeman.

14     Q.    Now, in examining the left shoe, the one with the

15 blood on it, did the crime lab also find a DNA profile for

16 another individual?

17     A.    Okay.  Let's see, I think they found — they did find

18 another individual.  They found a minor profile.

19     Q.    And that was for a male?

20     A.    Yes.

21     Q.    And subsequently there was a DNA standard obtained

22 from Deputy Oswald?

23     A.    Yes, there was.

24     Q.    Was that sent to the lab, up to Portland to compare

25 with what was found?

Wilcox   D    D6 92

1      A.   Yes, it was.

2           MR. FRASIER:   Again, by stipulation, Your

3      Honor, I have State's Exhibit No. 208 which is the report of

4      that test.

5           MS. McCREA:   There's no objection.  We have

6      stipulated to it, Your Honor.

7           THE COURT:   It's received.

8           (Whereupon Exhibit No. 208 was then received

9      into evidence.)

10     Q.   I'm handing you No. 208.  What did the crime lab

11     find in regards to this minor profile belonging to a male?

12     A.   Let's see.  Where is that?

13     Q.   Oh, excuse me.  I gave you the wrong report.

14     A.   Right.  This is the report on something else, socks.

15     Q.   I'm sorry.

16          MR. FRASIER:   I withdraw No. 208, Your Honor.

17          THE COURT:   Okay.

18          MR. FRASIER:   No. 210 is the right - - -

19          MS. McCREA:   (Interposing) You'd better look

20     at it this time.

21          THE COURT:   No. 210 is received then.

22          (Whereupon Exhibit No. 210 was then received

23     into evidence.)

24          THE COURT:   Assuming that's stipulated to?

25          MS. McCREA:   Yes, it's stipulated to, Your

```
                                        Wilcox   D     D6 93
 1   Honor.

 2                   THE COURT:    Okay.

 3                   It's received.

 4      Q.   And again, did they identify — was it identified who

 5   the minor profile, male profile came out to?

 6      A.   Yes.

 7                      "The DNA profile of Kip Oswald is

 8                   consistent with the minor profile in the

 9                   previously analyzed exhibit."

10           They call it two point three left to Nike shoe.

11      Q.   Now, let's go back to the original report, the first

12   report, and the right shoe, the one that's been identified as

13   being found on Elm Street.  Was there any other DNA associated

14   with any other individual found on that shoe, other than Leah

15   Freeman?

16      A.   No.  They only found Leah Freeman's on the right

17   shoe.

18      Q.   Now, after you had examined the shoes — well, were

19   you working closely with the investigators in terms of the

20   missing Leah Freeman?

21      A.   Yes, I was.

22      Q.   And did you at times go out and help them in

23   searches of a variety of different areas?

24      A.   Yes, I did.

25      Q.   Was there a time that you had gone out with
```

Wilcox  D     D6 94

1   investigators and had gone to the cemetery or near the gas

2   station where the right shoe was found on Elm Street?

3       A.   Yes, I did.

4       Q.   Could you tell the jury please what you did, what

5   you found, what happened?

6       A.   Okay.  That was July 20th of 2000.  And I took the

7   crime lab pickup and we searched the cemetery.  I think we did

8   a line search where everybody sort of lines up and just walks

9   slowly at the same pace.  I only collected three or four

10  items.  The cemetery was well kept and neat and tidy.  There

11  was a little bit of trash around.  But it either didn't fit

12  the time frame or didn't have any evidentiary value at that

13  time.  So, we collected some things.  And didn't do much else

14  with it.

15      Q.   Did you look at these items later on at the lab

16  or - - -

17      A.   (Interposing) I don't think so.

18      Q.   Wasn't anything that, as you looked at it, that

19  jumped out?

20      A.   That is correct.

21      Q.   Now, eventually a search warrant was obtained to

22  search the residence of the Defendant at that time and also

23  the maroon Thunderbird?

24      A.   Yes.

25      Q.   Did you participate — did you go out to the scene?

Wilcox   D     D6 95

1        A.    Yes, I did.

2        Q.    And that would have been on July 28th of 2000?

3        A.    Yes, it is.

4        Q.    First of all, let's talk about the Thunderbird.  Did

5    you process the Thunderbird?

6        A.    I did.

7        Q.    I'm going to show to you what's previously been

8    marked as State's Exhibits Nos. 25 through 28.  Do you

9    recognize the vehicle portrayed in those photographs?

10       A.    Yes.  This is the Thunderbird here.  I was going to

11   find its license plate number.  Oh, search warrant came first.

12   It's this one right here.  It's SMQ836.  This one right here.

13       Q.    And some of these photographs, at least No. 27 and

14   No. 28, are these pictures that you took of the vehicle?

15       A.    Yes.  You can see it's in the evidence bay at that

16   point.

17       Q.    And these pictures all accurately portray what you

18   saw?

19       A.    Yes, they did.

20            MR. FRASIER:    State's Exhibit No. 25 has

21   previously been received.  We would offer State's Exhibits

22   Nos. 26 through 28.

23            MS. McCREA:    No objection, Your Honor.

24            THE COURT:    Received.

25            (Whereupon Exhibits Nos. 26, 27 and 28 were

```
                                    Wilcox   D    D6 96
 1   then received into evidence.)

 2        Q.   I'm going to put on the screen now these particular

 3   photographs.  This is State's Exhibit No. 25.  The Thunderbird

 4   we're talking about is this vehicle here.  Is that correct?

 5        A.   Yes, it is.

 6        Q.   This is State's Exhibit No. 26.  Would that be the

 7   rear of the vehicle?

 8        A.   I — yes.  It's way small there.

 9        Q.   This is State's Exhibit No. 27.  Would this — does

10   this show the vehicle in the evidence bay?

11        A.   Yes, it is.

12        Q.   I see what looks like some kitty litter there.  Is

13   that what you spread on the floor because of the gas leak from

14   the Mustang?

15        A.   I think that was what it was for.

16        Q.   And this is State's Exhibit No. 28.

17        A.   Yes.

18        Q.   Could you tell the jury please what you did with

19   this particular vehicle?

20        A.             "I first photographed the outside of the

21                  vehicle.  The vehicle appeared to be in good

22                  condition with a few minor dings and dents in

23                  it.  It was covered with a light coating of

24                  road dust."

25             When I — when I say things like that, what I'm also
```

                                   Wilcox   D     D6 97

1   saying is that it hadn't recently been detailed or cleaned.

2   It was consistent with having been driven time past, you know,

3   nothing unusual as far as one area wasn't clean and one

4   wasn't.  So are kind of my key words to myself.

5                    "Examination of the exterior of the car

6                    failed to reveal any recent damage, blood or

7                    anything of apparent scientific significance."

8                    "I next photographed and examined the

9                    interior of the car.  The interior was

10                   cluttered with empty cigarette containers, soda

11                   bottles, CD's and miscellaneous items.  No

12                   blood was detected."

13                   "A note written on tissue paper was seized

14                   from the center console of the car.  Leah had

15                   apparently written this note to Nick.  No other

16                   items were seized during the search."

17                   "Examination of the trunk revealed a few

18                   clothing items, two tool boxes, and a few

19                   miscellaneous items.  The spare tire and the

20                   tire iron were also in the trunk.  No blood or

21                   any items of apparent scientific significance

22                   were noted."

23           And I ended the search of the car at approximately

24   four thirty p.m.

25       Q.   When you indicate that you didn't find any blood,

1  what type of testing did you do to look to see if there was

2  any blood or anything like that in the car?

3      A.   Well, I — to tell you the truth I don't have my

4  original lab notes from that.  I just have the reports.  But

5  what I would usually do is the same thing.  I would do bright

6  light examination with — we actually had halogen lights we

7  could set up around there.  Flash — a good flashlight even

8  helps.  And alternate light source.  I don't think I Luminal'd

9  that car because there was no indication it had been cleaned

10  and there was no blood detected.

11      If I see anything that might even remotely be blood,

12  I usually run the presumptive test, the Phenolphthalein test

13  because it's quick and easy and you can just do it and toss

14  the swab away if it's negative.  It's not — unless there's

15  some reason to make note of that, it's not a big test.  It's

16  not a big thing that we make a big deal out of.  It's just a

17  quick and easy test.

18      And just a thorough examination.  That was pretty

19  much it.

20      Q.   How much time do you think you spent on this

21  vehicle?

22      A.   I think I only spent a couple hours on this vehicle.

23  I wasn't really getting anything that indicated any kind of

24  crime scene there.

25      Q.   Now, let's go back to the search of the residence of

1   the Defendant off of Baker Road at that time.  Did you

2   actually go out there?

3        A.   I did.  I did go.

4        Q.   And while you were there were you asked to look at

5   some items?

6        A.   Yes, I was.

7        Q.   What type of things were you asked to look at?

8        A.   I think my part of the search was apparently the

9   suspect's bedroom.  I did a couple other bedrooms.  I don't

10  really remember doing his bedroom.  And they also brought me

11  some guns that previously had been removed from the house to

12  look at.

13       Q.   And when you examined the guns, what if anything did

14  you notice?

15       A.   They — I made a note of which guns they were.  And,

16  let's see if I've got that.  And I examined them for use and

17  any blood spatter that might have blown back on it, like if

18  someone is — either handles a gun that's got blood on it or

19  it's been near somebody who's bleeding.  Or if they're even

20  close when they shoot.  Sometimes they get high velocity blood

21  spatter on the gun itself.  And it can be very small.

22            And I didn't find any of that.  When the crime scene

23  — it had been quite awhile.  And the guns had left the

24  residence and were brought back by family members.  I found no

25  blood.  I didn't think they were very good evidence, to tell

```
                                         Wilcox   D    D6 100
 1   you the truth.
 2        Q.   Is there — was there some bats or anything like that
 3   you were looking at?
 4        A.   Oh, yes.  Let me look at my report real quick.
 5   Well, the three firearms were brought to me.  And I remember
 6   there was an aluminum bat brought to me also.  I can't
 7   remember if it came from the residence or if someone brought
 8   them to me — one of the family members.  But it was tested for
 9   blood and it was negative, also.
10        Q.   Now, during the course of the search of the
11   Defendant's bedroom, was there a white Adidas sock that
12   appeared to have some blood on it that was found?
13        A.   Yes, there was.
14        Q.   And was that eventually submitted to your lab for
15   analysis?
16        A.   Well, it was a white sock.  I can't — to don't think
17   that was an Adidas sock.  It was a white sock that was
18   submitted.
19        Q.   And this sock, was there actually another sock too
20   that was - - -
21        A.   (Interposing) Okay.  We've got to the get the sock
22   straight.
23        Q.   Yeah.  Do you show — I believe it's Exhibits Nos. 11
24   and 12.  Do you show those two types of socks being - - -
25        A.   (Interposing) Okay.  Exhibit No. 11 was a sock.  It
```

Wilcox   D    D6 101

1   had — it was not like Leah's sock.  And she had one sock on

2   her when they eventually found her body.  And it was an Adidas

3   sock.  So, the white sock found at the residence I don't think

4   was an anklet sock.  It was just a white crew sock.  It had a

5   single little, small drop of blood on it.

6        Q.   And eventually there was another sock, and Adidas

7   sock that was found hanging on the fence at Coquille High

8   School?

9        A.   Yes.  And that sock — it was given and exhibit

10   number.  I don't think it ever actually even came to the lab.

11   It was sent directly from Coquille PD to Portland.

12        Q.   Now, I have here at this time — hopefully I have the

13   right one — Exhibit No. 208.  This is the DNA report as to

14   those two socks.

15            MR. FRASIER:   We'd offer that pursuant to the

16   stipulation.

17            MS. McCREA:   It's so stipulated, Your Honor.

18            THE COURT:   It's received.

19            (Whereupon Exhibit No. 208 was then received

20   into evidence.)

21        Q.   The — what did the lab find in regards to the —

22   well, first of all let's talk about the sock that came out of

23   the Defendant's bedroom that had a little bit of blood on it.

24   What was the result of that?

25        A.   Nick McGuffin's DNA profile does not match the DNA

1  profile previously obtained from the white Adidas — oops,

2  wrong sock.  Shoot.

3         Okay.  Exhibit — the lab Exhibit No. 11 was the

4  white sock taken from the suspect's bedroom.  Nick McGuffin

5  could not be eliminated as a source of the mixture previously

6  obtained from Exhibit No. 11, the white sock.

7     Q.   And the other sock, they couldn't find any DNA at

8  least of people related to this case?

9     A.   That is correct.

10    Q.   Now, during the course of this investigation, was

11 there a variety of things submitted to you to look at?

12    A.   There were many items submitted to the lab to look

13 at.

14    Q.   Do you have those submission reports there with you?

15    A.   I do.  I think I printed them out.  They gave me a

16 CD.  These are just the submission slips.

17    Q.   Let's - - -

18    A.   (Interposing) There's lots.

19    Q.   What types of things were submitted?

20    A.   Well, the — since we had a lot of officers looking

21 for evidence for this case, they would submit things they

22 found from beside the road that looked suspicious, pieces of

23 rope, you know, scraps of cloth that looked like they had a

24 red stain on them.  One was — I think I had a piece of nylon

25 rope, a knife and a blood stained cloth which sounds awful,

1  but it was something from a logging truck.  It wasn't a

2  stained cloth, it was a logging flag.  It wasn't even unusual.

3  And it was some sort of knife that was used to cut — you know,

4  a utility knife.  Wrappers, beer cans that they thought might

5  be found or associated with the scene from near Leah's route

6  or where items that were known to be hers were found.  Since

7  it was scattered about the county.  There were lots of things

8  they could pick up, just in case.

9       Q.   Did they send you a box with a dead cat in it?

10      A.   They did.

11      Q.   And where — do you recall where that came from?

12      A.   Well, I think it — there was — I'm actually — live

13  in north county, but there's a dump area out in Coquille by

14  Fairview or some place.  And people dump their animal bones

15  and their dead cats and items that they don't know what to do

16  with over the bank.  And they thought that this sweatshirt

17  that was wrapped around a dead cat might have something to do

18  with the crime scene.

19           So, I looked at all that, photographed it, tested

20  it.  There was a big piece of pelvic bone with it.  It was

21  probably an elk or a cow.  It was very large.  But they were

22  not associated with the disappearance and death of Leah

23  Freeman.

24      Q.   These items, there was like beer cans and things

25  like that?

1    A.    Yes.  There was quite a bit of — everybody was

2    looking really hard.  So, they were thinking anything that

3    might help.

4    Q.    And in all these things that you looked at, did you

5    find anything that connected these items in any way to the

6    disappearance of Leah Freeman?

7    A.    No, I did not.

8    Q.    Now, Ms. Freeman's body was located August 3rd of

9    2000?

10   A.    Okay.

11   Q.    Were you involved in the recovery of her body?

12   A.    No.  My Lieutenant Pex went to that crime scene.

13   Q.    Were you asked at a later time to examine the

14   clothing that had been removed from the person of Leah Freeman

15   at the autopsy?

16   A.    Yes, I was.

17   Q.    Could you tell us, please — well, first of all let's

18   back up a little bit here.  Once the body had been located was

19   there — one of the focuses of the investigation was to try to

20   determine how Ms. Freeman had actually died?

21   A.    That is correct.

22   Q.    And when you examined the clothing, what were you

23   looking for?

24   A.    We were looking for any signs of violence.  Sexual

25   assault was big of course.  Blood.  Stabs, tears in the

1  clothing, anything that might indicate the manner or cause of

2  her death.

3      Q.   If a person is, let's say been shot with a firearm

4  through their clothing, what type of holes — what would you be

5  looking for?

6      A.   Well, of course a bullet would make a hole.  And

7  depending on the caliber, it might be small or large.  Usually

8  bullets are very hot when they hit clothing.  So, depending on

9  the type of clothing of course, it can make a very neat hole,

10 considering that it might leave a very horrible wound.  So,

11 we're looking for tiny holes even.  Because a twenty-two can

12 leave a very small hole that's easy to overlook.  But it can

13 still be there.  So, we're looking at the holes.

14      Of course, any stipling or gun shot residue from a

15 close firearm contact would actually result maybe from burning

16 of the fabric or even gun powder being deposited on fabric.

17 And of course associated blood with that.

18      Knifings of course would give a cut.  And tearing or

19 a sexual assault might result in tearing or cutting if a knife

20 is used.

21      Q.   And are the hole sometimes — well, in a body that's

22 been laying outside let's say for several weeks — would there

23 be holes left say by animal predation and things like that?

24      A.   Yes, there would.

25      Q.   And are they going to be different that, say, a

1   bullet hole or a knife hole?

2       A.   Yes, they will.

3       Q.   In what way would they be different?

4       A.   Well, animals of course are chewing and tearing at

5   fabric and they fray the edges.  They also might go for

6   certain areas.  And even insect of course activity can cause

7   some of these things.

8            And Leah Freeman's clothes were in very bad

9   condition.  They had been out there.  And it had been in the

10  middle of summer.

11      Q.   When you say bad condition, what do you mean?

12      A.   They were — she had laid out for over a month in

13  Coquille in the middle of summer.  And she had basically

14  melted in her clothes.  So, there was a lot of body fluids.

15  You have the adipose tissue had sort of melted.  You had

16  insect activity.  And you had animal activity.

17      Q.   Now, the clothing was submitted to your lab and you

18  began your examination when?

19      A.   It was — it wasn't quite some time later.  I think

20  it was actually in October.

21      Q.   Okay.

22      A.   Here we go.  No.  It was August 9th.  I'm sorry.

23      Q.   And as part of your examination what would you do

24  with the clothing when it arrived?  Or what would you do to

25  examine the clothing?

Wilcox   D    D6 107

1    A.   Once again, you use — with clothing and well, any

2    smaller item — you always spread out butcher paper under it so

3    as you examine it, if any trace evidence falls off, you have a

4    nice clean white surface.  So, it was laid out on butcher

5    paper.  It was really deteriorated.  So, I did it mostly — I

6    had a very large fume hood to do it under because it was

7    really smelly.

8        And I checked the pockets.  I made note of their

9    condition.  I examined — examination of debris failed to

10   reveal any trace evidence.  No significant fibers or trace

11   evidence was noted.  No blood was noted.  And that was — I was

12   looking at the jeans then.

13       One thing about her clothes which is important in

14   other crime scenes is, her clothes were very usual clothes.

15   She had blue jeans on, a white t-shirt, a white cotton sports

16   bra.  There wasn't any unusual fabric or unusual fibers or

17   anything brightly colored, anything that would be of a more

18   unique nature that might tie her in with a crime scene or a

19   place, like carpet fibers or you know, a fur coat or

20   something.

21   Q.   And as part of your examination did you photograph

22   the items as you examined them?

23   A.   Yes, I did.

24   Q.   I'll show you now what's marked as State's Exhibits

25   Nos. 46 through 50 and ask if you can identify those pictures?

Wilcox   D   D6 108

1      A.   Well, these are the front of the victim's jeans.

2   And they're laid out.

3      Q.   Are those pictures you took?

4      A.   Yes, they are.  I have them in my lab notes.

5      Q.   Are they pictures of the pants of Ms. Freeman?

6      A.   Yes, they are.

7      Q.   Do those pictures accurately portray what you saw?

8      A.   Yes, they do.

9           MR. FRASIER:   We would offer State's Exhibits

10  Nos. 46 through 50.

11          MS. McCREA:   There's no objection, Your

12  Honor.

13          THE COURT:   Received.

14          (Whereupon Exhibits Nos. 46, 47, 48, 49 and 50

15  were then received into evidence.)

16          THE COURT:   I'm sorry.  The number again?

17          MR. FRASIER:   Nos. 46 - - -

18          WITNESS:   (Interposing) Nos. 46 through 50.

19          THE COURT:   Thank you.

20     Q.   Ma'am - - -

21          MR. FRASIER:   Can we dim the lights please.

22     Q.   - - - I'm going to put up here State's Exhibit

23  No. 46.  Could you describe this for the jury, please?

24     A.   Those are the pants that were submitted as Leah

25  Freeman's pants.  And they were just blue jeans I believe.

Wilcox   D   D6 109

1  And they are as I described them before.  They were in very

2  bad condition and I checked for fibers, trace evidence.  The

3  pockets were empty, blood.  And of course semen and any body

4  fluids — any trace evidence.

5       Q.   I notice down there on the bottom, "Examination of

6  debris failed to reveal AASS."  What does that mean?

7       A.   Anything of apparent scientific significance.

8       Q.   Now, I noted — you say no blood was noted?

9       A.   That is true.

10       Q.   Now, Ms. Freeman had decomposed significantly?

11       A.   Yes.

12       Q.   Would there be a difference if she had been bleeding

13  versus decomposing in looking at the pants or any piece of

14  clothing?

15       A.   Well, I would think if there had been a significant

16  wound you would still have the blood stain on there, even

17  though you had — the adipose tissue when it decomposes is very

18  — it's greasy.  So, it was very kind of greasy and of course

19  dark.  I mean, these started out blue and now they're kind of

20  brown.  So, I would be still looking if there had been a large

21  blood stain for the red or the brownish stain that would

22  indicate a wound.

23       Q.   And you didn't see any of that on the pants?

24       A.   That is correct.

25       Q.   And this is State's Exhibit No. 47.  Could you

1  describe this for us, please?

2      A.   I think that is just another view of the pants,

3  especially of the top area.  Since of course we would be

4  concerned with a sexual assault.  So I spent a lot of time

5  looking for any trace that there might have been any left —

6  any kind of a semen trace.

7      Q.   And how would you look for, say, semen in this

8  situation?

9      A.   Well, there's alternate light sources which improve

10  contrast.  So, like if you can turn out the lights and put

11  different wave lengths of lights on there.  Semen often times

12  almost fluoresces.  That's a good way to find things.  And

13  then there was chemical testing.  And I know I did a lot of

14  that because that was a big concern with this case.  So, I

15  took little samples from, you know, the crotch area and other

16  places looking for — a chemical test on something maybe I

17  couldn't see.  All the chemical tests, all my visuals were

18  negative.

19      Q.   This is State's Exhibit No. 48.  Could you describe

20  that for us, please?

21      A.   I think that is a back view of the jeans.

22      Q.   Were there any holes that you recall in the pants?

23      A.   Yes, there were some animal holes in the pants.

24      Q.   This is State's Exhibit No. 49.

25      A.   That is the bottom seat area of the victim's jeans.

Wilcox   D    D6 111

1  And I took a couple of pictures.  And I — it was reported to

2  me or I remember seeing a picture that she was found on her

3  back.  So, it would kind of make sense that the bottom part of

4  her jeans would be more disintegrated.

5      Q.   Why is that?

6      A.   Just more pooling of the body fluids and animal

7  activity and insect activity.

8      Q.   These holes that we see in State's Exhibit No. 49,

9  would they be — well, let me ask you this.  Are they

10  consistent with being like, say, a bullet hole or a knife

11  hole?

12      A.   No, they are not.

13      Q.   Why is that?

14      A.   Well, they're fairly large for a bullet hole.  The

15  larger one is — my scale is in inch increments on one side

16  closest to the hole and centimeters on the other side.  So,

17  that large hole is way big for a bullet hole.  And also

18  they're frayed around the edges.  They're frayed and they're

19  gnawed on looking, if that's a scientific term.  They're not

20  clean in any way.

21      Q.   And this is State's Exhibit No. 50.  The other hole,

22  you measured that, too?

23      A.   Yes.

24      Q.   And again, did that have any consistency with say a

25  knife wound or being shot or something like that?

```
                                      Wilcox   D    D6 112
 1      A.   No.

 2      Q.   And again, why?

 3      A.    The frayed — frayed edges are a big part of it.  The

 4  size and the shape.

 5           MR. FRASIER:   Your Honor, this is a good

 6  place to break if you wish.

 7           THE COURT:   Okay.

 8           We'll break for the lunch hour.

 9           Everybody else remain seated until the jury has

10  a chance to leave.

11           Leave your notebooks in the room.  Remember the

12  admonition.  Be back at one o'clock.

13           (Jury Out.)

14           THE COURT:   You may step down.

15           Okay, 1:00.

16           (LUNCH RECESS)

17           (Jury In.)

18           JUDICIAL ASSISTANT:   All rise.

19           THE COURT:   Be seated, please.

20           Mr. Frasier, you may continue.

21           MR. FRASIER:   Thank you, Your Honor.
```

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

STATE OF OREGON,                    )
                                    )
            Plaintiff,              )     CASE NO. 10CR0782
                                    )
      vs.                           )       JURY TRIAL
                                    )  DAY SIX, Continued
NICHOLAS JAMES MCGUFFIN,            )
                                    )
            Defendant.              )
_____)

TRANSCRIPT OF PROCEEDINGS

Volume 10, Pages D6 113 to D6 253

        BE IT REMEMBERED That, the above-entitled cause

came on regularly for hearing beginning at 8:59 a.m.,

Wednesday, July 13, 2011, in the Circuit Courtroom of the Coos

County Courthouse in the City of Coquille, County of Coos,

State of Oregon, before the Honorable Richard L. Barron and a

jury.

APPEARANCES

R. Paul Frasier, District Attorney for Coos County,
representing the Plaintiff.

Erica Soublet, Assistant District Attorney for Coos County,
representing the Plaintiff.

Shaun McCrea, Attorney at Law, representing the Defendant.

Robert McCrea, Attorney at Law, representing the Defendant.

        S. Jean Sprouse, Court Transcriber, XV Judicial District, 503-325-5254

Wilcox   D    D6 113

1              DIRECT EXAMINATION, Continued

2    BY MR. FRASIER:

3        Q.   Ms. Wilcox, as part of your examination did you also

4    do a detailed examination of the tank top shirt that was found

5    on the body of Ms. Freeman?

6        A.   Yes.

7        Q.   I'm going to — did you take photographs of that

8    during your examination, also?

9        A.   Yes, I did.

10       Q.   I'll show you what I've marked as State's Exhibits

11   Nos. 51 through 55 and ask if you can identify those

12   photographs?

13       A.   These are the photographs I took in the lab.

14       Q.   Do they accurately portray what you saw?

15       A.   Yes, they do.

16            MR. FRASIER:   We would offer State's Exhibits

17   Nos. 51 through 55.

18            MS. McCREA:   There's no objection, Your

19   Honor.

20            THE COURT:   Received.

21            (Whereupon Exhibits Nos. 51, 52, 53, 54, and 55

22   were then received into evidence.)

23       Q.   I'm going to put up on the screen here now what

24   would be State's Exhibit No. 51.

25            MR. FRASIER:   Could you dim the lights for us

Wilcox  D   D6 114

1  again please?

2     Q.   Could you describe the — what the shirt looked like

3  and what you found?

4     A.   The shirt was in very poor condition.  It's I think

5  originally a white — a white men's sleeveless t-shirt.  And it

6  had some animal or insect — probably animal — holes in it.

7  And a lot of forest debris and insect casings and shells and

8  stuff.

9     Q.   Again, in your examination are you looking for

10 things like a bullet hole or a knife hole or something along

11 that line?

12    A.   Yes.

13    Q.   And how did you examine this?  What did you do to

14 examine this shirt?

15    A.   I think I used the same methods of bright light,

16 alternate light source, took maybe some samples to test if I

17 thought they looked like anything that might even remotely

18 possibly have a body fluid on it like semen or blood.

19    Q.   Did you find any hole in this shirt that you could

20 associate with having been caused say by a bullet?

21    A.   No.  None was apparent.

22    Q.   Now, when you're looking for something that's caused

23 let's say by a knife or a sharp instrument, what type of

24 things are you looking for in that type of situation?

25    A.   Well, usually people don't stand still if they're

Wilcox   D    D6 115

1   being stabbed.  So, often it will be a slashing cut or, you

2   know, it can just be a stabbing mark.  A lot of times it's —

3   if it's a cut along the seam that usually — you know, through

4   the seam — that's a knife usually because that's a tougher

5   material.  And of course associated blood, concentrated blood

6   around a hole.

7       Q.   Now, again, you're looking for blood staining?

8       A.   Yes, around a hole.

9       Q.   Well, in particular on this shirt were you looking

10  for any blood staining on the shirt as a whole?

11      A.   Well, some.  However, once again she had sort of

12  melted in her clothing.  So, a presumptive test for blood

13  might not be definitive.  I was looking for a — if a wound had

14  bled there would still be a darker stain in that area.

15      Q.   Now, did you find any holes in this shirt that you

16  would associate with having been caused by a sharp instrument?

17      A.   No.

18      Q.   Did you find any staining that would be, say,

19  consistent with blood having drained from a stab wound?

20      A.   No.

21      Q.   Now, looking at — let's go to State's Exhibit No. 52

22  here.  These are close ups of the holes that you did find?

23      A.   Yes.

24      Q.   These are in the upper left front of the shirt?

25      A.   Yes.

Wilcox   D    D6 116

1    Q.   Now, when you found a hole in the shirt or other

2  pieces of clothing, was there something you did to highlight

3  them for photograph purposes?

4    A.   Well, I like to put a white piece of paper behind

5  these items since they were stained dark brown.  And that made

6  the holes show up better.

7    Q.   Now, I want to clarify something.  This here in the

8  upper — or excuse me — the lower right hand corner.  That's

9  actually a hole made when the photograph was punched to put it

10  in the binder?

11    A.   Maybe — well, oh.  Let's look.  Yes, that is the

12  hole punch.

13    Q.   This wasn't actually a hole that you found in the

14  shirt?

15    A.   No, I didn't remember that hole.

16    Q.   These holes here in the middle of the photograph,

17  what did you associate these with?

18    A.   Just animal activity.

19    Q.   This is State's Exhibit No. 53.  There seems to be

20  some differentiation in color here.  Could you — from the top

21  part of the shirt or whatever to the bottom.  Can you describe

22  why that would be?

23    A.   I just remember seeing actually one photograph of

24  the body at the scene.  And she was lying on her back.  So,

25  all I can think of is maybe how the garments fell against her

Wilcox   D    D6 117

1    body or — I'm not sure, actually.

2        Q.    All right.  Again, in the top part of the picture

3    there's a kind of round hole.  Again, is that a hole punch for

4    the binder?

5        A.    Yep.  Yes, that is.

6        Q.    These holes that we see here, what did you determine

7    in examining them?

8        A.    That they were animal or insect activity.

9        Q.    This is State's Exhibit No. 54.  Can you describe

10   that for us?

11       A.    That is the back of the t-shirt.

12       Q.    And again, this is State's Exhibit No. 55.

13       A.    Okay.

14       Q.    And did you find a hole in the back of the shirt?

15       A.    Let me find this.  Yes, I did.

16       Q.    And is this the hole that we're looking at here?

17       A.    Yes.

18       Q.    And again, did you ascribe this to any particular

19   cause?

20       A.    No.  Just it was a frayed hole.  Animal activity,

21   general disintegration.

22       Q.    Now, there was also a bra, a sports bra that she was

23   wearing?

24       A.    Yes.

25       Q.    And did you examine that?

Wilcox   D    D6 118

1      A.   Yes, I did.

2      Q.   And did you photograph that also?

3      A.   Yes.

4      Q.   I'll show you how what's been marked as State's

5  Exhibits Nos. 56 through 58 and ask if you can identify these

6  photographs?

7      A.   These are the photographs I took of the sports bra

8  in the lab.

9      Q.   And do they accurately portray what you saw?

10     A.   Yes, they do.

11            MR. FRASIER:    We'd offer State's Exhibits

12  Nos. 56 through 58.

13            MS. McCREA:    There's no objection, Your

14  Honor.

15            THE COURT:    Received.

16            (Whereupon Exhibits Nos. 56, 57, and 58 were

17  then received into evidence.)

18     Q.   This is State's Exhibit No. 56.  Could you describe

19  this for us, please?

20     A.   This was I believe originally a white lady's sports

21  bra.

22     Q.   And what did you do to examine this particular item

23  of clothing?

24     A.   Once again put it on some white butcher paper,

25  photographed it, looked at it under a bright light and

Wilcox   D    D6 119

1  examined it for any blood, semen, but marks, hole marks.

2      Q.   And in examining the bra did you find any holes or

3  anything like that that you associated with, say, being shot

4  or having been made by some sort of sharp object?

5      A.   No, I did not.

6      Q.   This is State's Exhibit No. 57?

7      A.   Yes.

8      Q.   Could you describe this for us, please?

9      A.   That is the back — a photograph of the back of the

10  sports bra.

11      Q.   And what was the condition of the back of the bra?

12      A.   Very bad, extremely — I think I wrote in my notes it

13  was in extremely poor condition.

14      Q.   Now, this is State's Exhibit No. 58.  Did you do

15  something to help show the photograph or show the holes that

16  were in the back there?

17      A.   I slipped a piece of white paper into the sports bra

18  so that the tearing and the holes in the back would be more

19  noticeable.

20      Q.   Again the holes that you saw in the sports bra, did

21  you see anything again that you would associate with, say,

22  having been caused by a bullet or some sort of sharp object?

23      A.   No.

24      Q.   Now, there was one other item of clothing you

25  examined?

Wilcox   D    D6 120

1      A.   Yes.  I had one sock.

2      Q.   I'll show you now what's marked as State's Exhibits

3  Nos. 59, 60 and 61 and ask if you can identify those?

4      A.   These are pictures of the sock I took while

5  examining them in the lab.

6      Q.   That was one sock?

7      A.   Yes.

8      Q.   And again these pictures accurately portray what you

9  saw?

10     A.   Yes.

11          MR. FRASIER:    We would offer State's Exhibits

12  Nos. 59, 60 and 61.

13          MS. McCREA:    Is this Exhibit No. 11 or 12?

14          MR. FRASIER:    This is off the body.

15          MS. McCREA:    Off the body, okay.

16          There's no objection, Your Honor.

17          THE COURT:    Received.

18          (Whereupon Exhibits Nos. 59, 60 and 61 were

19  then received into evidence.)

20     Q.   This is State's Exhibit No. 59.  Could you describe

21  that for us, please?

22     A.   This is a sock.  And I don't remember now, but I

23  called it an Adidas sock.  So, that little black mark at the

24  top must be the Adidas symbol.  I assume I looked it up at the

25  time.

Wilcox   D    D6 121

1      Q.    And in examining the sock, did you go through the

2    same routine as you did with the other pieces of clothing?

3      A.    Yes, I did.

4      Q.    This is State's Exhibit No. 60.  Was there holes

5    found in the sock?

6      A.    Yes, there were.

7      Q.    And did you look at those holes to determine their

8    origin and things along that line?

9      A.    Yes, I did.

10     Q.    What did you find?

11     A.    The sock was in the same condition as the other

12   clothing.  I did not note anything of — that was remarkable

13   forensically.

14     Q.    Again, did you find anything associated — that you

15   could see — associated to a bullet hole or something having

16   been caused with a sharp object?

17     A.    No.

18     Q.    And finally, this is State's Exhibit No. 61.  Again,

19   could you describe this for us, please?

20     A.    That is the top of the sock.  And I think I was

21   taking a closeup of the symbol.  And you can see there is some

22   animal — some insect casings and things on there to show the

23   condition of the sock and the type of sock it was.

24     Q.    Now, you retired from the crime lab.  What year was

25   it that you retired?

Wilcox   D    D6 122

1    A.   I retired from the crime lab in 2002.  They actually

2  closed the crime lab.  And I became an Oregon State Police

3  Tribal gaming detective for two years before I actually

4  retired.

5    Q.   So, after 2002 did you do any additional forensic

6  work in this case?

7    A.   No.

8    Q.   Now, were you made aware prior to trial that the

9  clothing in this case had been released to a Defense expert to

10  look at them, Mr. Kenn Meneely?

11    A.   I just found out a couple days ago.

12    Q.   And were you given a copy of Mr. Meneely's report?

13    A.   Yes, I was.

14    Q.   And are you aware that Mr. Meneely claims to have

15  found some holes in at least the shirt and the bra that he

16  associates with being made with some sort of sharp object?

17    A.   Yes.

18    Q.   Did you look at that report?

19    A.   Yes, I did.

20    Q.   And did you review your photographs and your

21  findings from the — your examination that you did in the year

22  2000?

23    A.   Yes, I did.

24    Q.   In the areas where Mr. Meneely claims there's holes,

25  did you find similar items that he claims to see today?

Wilcox   X   D6 123

1       A.   Well, he did make a note that in the upper left

2   front of the shirt that there were holes.  And there are.  But

3   he further goes to say I think that one of the holes

4   associated with it looked like it had been cut.

5           And I — I don't know what he's referring to.

6       Q.   Did you see any hole in that shirt at that time that

7   would - - -

8       A.   (Interposing) No.

9       Q.   - - - reflect that?

10      A.   No.

11      Q.   And in the bra there's a similar hole that he refers

12  to or a slice or a cut.  Again, did you, in your examination

13  of the bra, did you find anything like that in the year 2000?

14      A.   No, I did not.

15      Q.   Thank you.

16          MR. FRASIER:   That's all the questions I have

17  at this time.

18          THE COURT:   Cross.

19                CROSS EXAMINATION

20  BY MS. MCCREA:

21      Q.   Ms. Wilcox, let's deal with that last part first.

22  So, the photographs that we have here in evidence today are

23  based on the examination that you did in the year 2000?

24      A.   That is correct.

25      Q.   So, the exhibit, Exhibit No. 61, the closeup of the

Wilcox    X    D6 124

1  sock.  We were looking for the Adidas symbol?

2      A.    Yeah.

3      Q.    You don't need to get it out.  I'm just going to ask

4  you - - -

5      A.    (Interposing) Okay.

6      Q.    So, that was a closeup.  The other ones that you

7  took were from your perspective in the examination.  Right?

8  In other words that's the only closeup photo we have?

9      A.    Of the sock?

10      Q.    No.  Of all of these items - - -

11      A.    (Interposing) No.

12      Q.    - - - of clothing?

13      A.    No.  If you look at the photos, I have a broad photo

14  of the whole thing.  Close up of areas of interest, like the

15  front crotch area of the pants.  And then closer items with

16  the gray ruler in there.

17      Q.    Right.

18      A.    That — those are closeups of the holes, the

19  different holes.

20      Q.    Okay.  And those closeups are as close as you got.

21  Would that be fair to say?

22      A.    Yes.

23      Q.    Okay.  Now, let's come back to that.  But, you

24  talked about a lot of things.  And I'd like to kind of break

25  them down a little bit if we can.  My poor seat mates are

```
                                        Wilcox   X    D6 125
```

1   getting pushed out with all of my stuff.

2          So, you used the term trace evidence a number of

3   times during your testimony.  Right?

4        A.   That's correct.

5        Q.   And that's a term of art for a forensic scientist?

6        A.   Yes.

7        Q.   And it actually — well, I'm going to read you a

8   quotation and see if you recognize this:

9                  "Wherever he steps, wherever he touches,

10                 whatever he leaves even unconsciously, will

11                 serve as a silent witness against him.  Not

12                 only his fingerprints or his footprints, but

13                 his hair, the fibers from his clothes, the

14                 glass he breaks, the tool mark he leaves, the

15                 paint he scratches, the blood or semen he

16                 deposits or collects."

17                 " All of these and more bear mute witness

18                 against him.  This is evidence that does not

19                 forget.  It does not confuse by the excitement

20                 of the moment.  It is not absent because human

21                 witnesses are.  It is factual evidence.

22                 Physical evidence cannot be wrong.  It cannot

23                 perjure itself.  It cannot be wholly absent.

24                 Only human failure to find it, study, and

25                 understand it can diminish its value."

Wilcox   X    D6 126

1          Are you familiar with that statement?

2     A.   Yes, I am.

3     Q.   And was that made by — is that made by Professor

4  Edmond Locard?

5     A.   Yes, it is.

6     Q.   And is that considered to be the Locard Exchange

7  Principle?

8     A.   I hadn't heard it used that way, but yes, it's

9  similar.

10    Q.   Okay.  Well, what's it mean to you?  What have you

11  heard it called?

12    A.   Let's see, what did they call that?  What's the

13  title of that, I can't remember?

14    Q.   Well, it's from the — it was first published in a

15  book by Professor Paul Kirk.

16    A.   It's just the fact that wherever someone's been they

17  should leave traces of themselves or take a trace of their

18  environment with them.

19    Q.   Okay.  And the — let me try this again.

20         Professor Locard was considered to be like the

21  father of modern forensic science.  Is that fair?

22    A.   Yes.

23    Q.   Okay.  So, in terms of trace evidence — and you

24  talked a lot about it Ms. Wilcox.  I just want to kinda

25  organize it a little.  In other words, you're going to have —

Wilcox   X   D6 127

1  trace evidence could be fairly described — and you correct me

2  if my words aren't right.  But could fairly be described as

3  small objects that as you say, are either taken or left, that

4  may not be readily visible to the naked eye, for example?

5       A.   That would be correct.

6       Q.   Okay.  And whether it is — whether something is left

7  is going to depend on the nature of the evidence.  Right?

8       A.   Yes.

9       Q.   Or whether something is taken is going to depend on

10  the nature of the evidence?

11       A.   That is correct.

12       Q.   So, certain materials pick up evidence.  Like you've

13  talked about blood spatter.  Yes?

14       A.   Yes.

15       Q.   Okay, sorry.

16            And things like hairs can be left?

17       A.   That is correct.

18       Q.   Okay.  And other materials or things can lose

19  evidence.  For example, there's chemical tests for whether

20  somebody is under the influence of alcohol, because alcohol

21  dissipates.  Right?

22       A.   Yes.

23       Q.   Okay.  And your job as a forensic scientist in this

24  case was to look for trace evidence, things that had been left

25  behind, for example, on items that were provided to you in the

Wilcox    X    D6 128

1   crime lab?

2       A.   That is correct.

3       Q.   Okay.  And that's because, when a person for example

4   touches something, they may, as we've talked about, leave

5   something like their DNA?

6       A.   They could, yes.

7       Q.   Or their fingerprints?

8       A.   They could, yes.

9       Q.   Things like hair/

10      A.   Yes.

11      Q.   Or lipstick?

12      A.   Yes.

13      Q.   Paint chips?

14      A.   Yes.

15      Q.   Fibers?

16      A.   Yes.

17      Q.   Blood?

18      A.   Yes.

19      Q.   Okay.  Or they could take something with them.  For

20  example, you could end up with something on a shirt such as a

21  fiber or a paint chip that went with the individual.  Right?

22      A.   Right.  Or from the scene.

23      Q.   Exactly.  Thank you.  That's putting it better than

24  I am.  Yeah, they take something from the scene?

25      A.   Yes.

Wilcox   X   D6 129

1    Q.   So, if somebody for example, drove their truck

2    through the mud, they may have that mud on their tires when

3    they leave the scene?

4    A.   Correct.

5    Q.   And that's what you as a forensic scientist are

6    doing, is looking to see if any trace evidence is either left

7    at an area or has been taken, transported, somewhere else?

8    A.   Yes.

9    Q.   Okay.  And you described for us that one of the

10   first things that you do is you just flat look at an object or

11   an area.  Right?

12   A.   That is correct.

13   Q.   So, in this case you talked about you looked at the

14   blue Mustang.  First you did a visual examination?

15   A.   That is correct.

16   Q.   Okay.  And in terms of looking at a scene, you went

17   out to the cemetery where the first shoe was found.  And you

18   and other officers paced the scene looking for particular

19   items that might be of interest?

20   A.   Correct.

21   Q.   Okay.  So, a visual examination.  And there's lots

22   of ways to do that.  And you've talked a little bit about

23   that.  First you look at, for example in ordinary light.

24   Right?

25   A.   Yes.

Wilcox   X   D6 130

1    Q.   Then you can use bright light which may even just be

2    a flashlight?

3    A.   Yes.

4    Q.   Okay.  And then you've got some special lights that

5    you use that can make things appear that wouldn't appear

6    otherwise?

7    A.   Yes.  They — well, they improve contrast.

8    Q.   Okay.  Improve contrast.  Thank you.

9    A.   So you can see them better.

10   Q.   Right, so you can see them better.

11        So, for example, that's what you can do in terms of

12   using Luminal in order to see if there was blood in an area.

13   Right?

14   A.   That is correct.

15   Q.   Now, something like Luminal, is it correct that even

16   if — let's say you were looking at a trunk of a car.  And even

17   if somebody had hosed out the trunk of that car, is Luminal

18   still going to pick up residue of blood in that trunk?

19   A.   It could.

20   Q.   Okay.  And are there other things that you have used

21   that are more sensitive?

22   A.   The thing about Luminal is it actually works well on

23   older blood, if any is left.  It's not real specific.  And it

24   actually will react with things like rust and — I mean they

25   make — I just like people to know they make it all look so

Wilcox    X    D6 131

1  simplistic on TV.  And it's a little more complicated than

2  that.  But it's a presumptive test.

3          And Luminal is especially good on, say if you had a

4  lot of blood spatter on a wall.  And someone had cleaned it

5  up.  And, I don't know about usual people, but at crime scenes

6  people usually don't clean up at all.  I don't know if that's

7  in a hurry or whatever.  But, that actually can improve.  And

8  then it ages a little bit.  It improves finding it with

9  Luminal.  But the problem with Luminal, especially in an

10  outdoor scene or on metal, is it can react with metal.  It can

11  actually react with cleaning solutions.

12          I remember I had a car, the entire car lit up

13  because they had cleaned it with something that reacted with

14  the Luminal.

15          And it also reacts with some plant materials.  So,

16  it's not very specific.

17      Q.   Okay.  It's - - -

18      A.   (Interposing) So, once you identify that there's

19  something there, then you test it further.  And those further

20  tests would narrow it down to, yes it is blood; yes, it is

21  human blood; or, not.

22      Q.   Okay.

23      A.   So, there are things more specific than Luminal.

24  Luminal is a tool used to find trace blood.

25      Q.   Got it.  So, Luminal is kind of like the digital —

Wilcox   X    D6 132

1  like a binary yes/no.  Either — because you were talking about

2  a presumptive.  So if you find - - -

3      A.   (Interposing) Right.  Yes, it's a presumptive test.

4  Yes.

5      Q.   Okay.  So, when you use Luminal, you could find — it

6  will give you — if it gives you a positive, then you go

7  forward to see if it is blood or if it is rust or it is

8  something else.  And do more and more sensitive tests to make

9  a determination?

10     A.   That is correct.

11     Q.   Okay.  And if you don't get any presumptive positive

12  from the Luminal, you don't go any further?

13     A.   That is correct.

14     Q.   Okay.  And now, and is there also — and if Luminal

15  shows blood, can it also indicate to you blood patterns?

16     A.   It can, yes.

17     Q.   Okay.  So, like your example with the wall?

18     A.   Yes.

19     Q.   It could show you if something had been wiped?

20     A.   Exactly.

21     Q.   Okay.  And in this case, based on your examination

22  of Mr. McGuffin's blue Mustang, there was no presumptive blood

23  in the trunk of the car?

24     A.   That is correct.

25     Q.   There was no presumptive blood anywhere on the

Wilcox   X   D6 133

1  Mustang?

2       A.    That is true.

3       Q.    And also with the Thunderbird, same thing?

4       A.    That is true.

5       Q.    Okay.  Now, in addition to the chemical items that

6  you used such as Luminal — and I know there is a whole bunch

7  of different things that you can do — you can also look at

8  things microscopically.  Right?

9       A.    Yes.

10       Q.    So, there's lots — you know, you can use your eyes

11  as an aid.  And you can use a magnifying lens.  And there's

12  all sorts of different kinds of microscopes, aren't there?

13       A.    Yes, there are.

14       Q.    What are some of the kinds of microscopes that you

15  used back in 2000?

16       A.    Well, we had compound microscopes, stereo

17  microscopes.  We had the — like the bullet scope.  We had two

18  field of visions at the same time.  I used a low powered

19  microscope on things like clothing and things like that to

20  start off with because they're bulkier.  And you can put a

21  larger object under there.  And with good lighting and even an

22  eight powered magnification, I mean it just makes a world of

23  difference on the things you can see.

24       Q.    Right.  The closer you get, the more you can see?

25       A.    The problem with being closer, like with a stereo

Wilcox   X    D6 134

1   microscope, is that you're looking at a smaller and smaller

2   field.

3       Q.   Uh huh.

4       A.   So, you have to, like, put things on a slide.  So,

5   like if you wanted to look at the root of a hair to see

6   whether it had been, you know, pulled out and stretched or

7   whether it had been — just fallen out naturally, in which case

8   it looks more like a little light bulb because it's all

9   rounded off and kind of done for.  You just — you'd have to

10  put it on a slide and put it under a microscope.  But then

11  you're looking at such a small area.

12          So, for things like clothes and larger items, you

13  know, you start out with the most - - -

14      Q.   (Interposing) The bird's eye view?

15      A.   Yeah, the bird's eye view and go smaller and smaller

16  and smaller.

17      Q.   Right.

18      A.   You find a little piece of glitter or something that

19  might tie a place or a thing with something else.  Then you

20  zero in more and more and more.

21      Q.   Okay.  And do you know how long you spent examining

22  the clothes?

23      A.   Oh, I would — I would say — well, I could probably

24  figure it out.  These were for time cards, too.  Okay.  So how

25  long did I spend in the lab doing clothes?

Wilcox   X   D6 135

1          It was — I would think that would have taken me

2    pretty close to a day.

3          Q.   Okay.

4          A.   Or, you know, maybe not steadily, but - - -

5          Q.   (Interposing) That's fine.  I'm not trying to give

6    you a hard time.  I just wanted - - -

7          A.   (Interposing) Oh, okay.  Well, I just trying to

8    think how long that would have taken.

9          Q.   - - - just an estimate.

10         A.   Say a day.

11         Q.   Okay.  All right.

12              And in this case, in this situation, you had — you

13   were aware that one shoe had been found at what we've called

14   Elm Street, the cemetery area that you went out and searched.

15   And the second shoe was found on Hudson Ridge.  And then the

16   body was found in a different location.  Right?

17         A.   Yes.

18         Q.   So, part of what you were considering was that you

19   had three separate crime scenes?

20         A.   Possible crime scenes, yes.

21         Q.   You were going to look at three different places or

22   they were going to look and bring them back to you, for

23   evidence.  Right?

24         A.   Yes.

25         Q.   And you weren't the only forensic scientist working

1  on this case.  Right?

2      A.    No.  There were two forensic scientists at the Coos

3  Bay lab.  My boss was Lieutenant Pex.  He was also a working

4  criminalist.

5      Q.    And that's Jim Pex?

6      A.    Yes.

7      Q.    Yeah, okay.  Now, you were asked about the shoe, the

8  shoes.  And I'm interested right now in the left shoe.  And I

9  wanted to ask you, Ms. Wilcox, when we had Exhibit No. 31 up

10  on the board, which gave us a closeup of the ball of the foot,

11  there was some writing on the photo that labeled it as the

12  right shoe.  Would that have been an error?

13      A.    Oh, yes.

14      Q.    Okay.

15      A.    That is bad.

16      Q.    I just wanted to make sure I was — that I was

17  tracking with that.  Okay.

18          And, you've indicated that there were blood droplets

19  on that shoe.  And you've talked about them a little bit.  And

20  isn't it correct that your analysis was that on that shoe,

21  there was a high velocity blood droplet on the side of the

22  traction square?

23      A.    Yes.

24      Q.    Okay.  And you talked a little bit about blood

25  spatter.  And blood spatter is essentially blood that's

1  traveled through the air and lands on other surfaces?

2      A.   Yes.

3      Q.   Okay.  And you talked about this, but I'm going to

4  just kinda organize it if you'll indulge me.

5          So, you've got, let's say, low impact blood spatter

6  which may be like a bloody nose where you talked about it

7  drips down and makes sort of a large surface?

8      A.   Yes.

9      Q.   Okay.  That wasn't stated well.  You stated it much

10  better.

11         And then we could categorize it as medium velocity

12  which would be more like when somebody gets punched in the

13  nose?

14     A.   Yes.

15     Q.   Okay.  And then it's going to be more on the surface

16  of the skin or the clothing?

17     A.   And usually a person's already bleeding, just so you

18  know, when that happens.  Because you have — say, you have

19  blood on your face.  And then you get smacked or hit.  Then

20  the blood will come off in a smaller droplet - - -

21     Q.   (Interposing) Okay.

22     A.   - - - and get deposited.  It's usually closer to the

23  person or the object that the blood is coming from because

24  it's not as heavy.  It actually doesn't have the mass to go

25  through the air very far, unless it's just dripping of course.

Wilcox   X    D6 138

1  But - - -

2      Q.   (Interposing) And that's why - - -

3      A.   Yeah.  But that's considered medium velocity.  It's

4  usually — low velocity is drip blood; medium velocity is low

5  impact; high velocity is considered — usually a gunshot wound.

6  Because you've got a lot of force there.  And the blood will

7  almost aerosol.

8      Q.   The blood almost aerosols?

9      A.   Yes.

10      Q.   And it could be from something other than a gunshot.

11  Right?

12      A.   Right.  Those are just good examples.  But you kinda

13  get the idea of what they mean by the force involved.

14      Q.   So, when you say aerosol, that means you're going to

15  have lots of little droplets going sort of in every direction.

16  Would that be fair?

17      A.   Correct.  But also the little small droplets don't

18  go as far.  That's another thing to keep in mind.

19      Q.   All right.  So, if someone is injured or if they're

20  bleeding, if there's high velocity blood spatter, you would

21  expect to find evidence of that — of that aerosol effect —

22  residue of that blood at least close by in the area of where

23  the person was?

24      A.   Yes.

25      Q.   So, if they were — if they were in a car, then you

Wilcox    X    D6 139

1    would expect to find that residue in a car?

2        A.    Yes.

3        Q.    And if they were transported from one place to

4    another, it could be in the car, in a blanket that was wrapped

5    around the person in the car.  It could be on the individual

6    who intentionally inflicted the cause of the blood spatter?

7        A.    Right.  Well, then it would usually be transfer

8    blood.

9        Q.    Okay.

10        A.    Blood spatter — it's huge field actually.  When you

11    get into forensics, it involves, you know, a lot more

12    specifics to, you know, describe it.  Transfer blood, smear

13    blood, you know, tracked blood, whatever.

14        Q.    But here, given the fact that you'd found this high

15    velocity blood spatter, the droplet on the side of the left

16    shoe, you were looking for evidence of blood spatter in other

17    locations.  Is that fair?

18        A.    Yes.

19        Q.    Okay.  And in terms of the evidence that you looked

20    at, you didn't find any?

21        A.    Correct.

22        Q.    You didn't find any in Mr. McGuffin's Mustang?

23        A.    True.

24        Q.    Nothing in his house?

25        A.    That is true — well, the one little white sock had

Wilcox   X    D6 140

1   some blood.

2       Q.   Well, but that was not Leah Freeman's blood.  Right?

3       A.   That is correct, yes.

4       Q.   And nothing in the Thunderbird?

5       A.   That's true.

6       Q.   Okay.  Now - - -

7            Oh, speaking of the Thunderbird.

8            MS. McCREA:    May I approach, Your Honor?

9            THE COURT:    You may.

10      Q.   Ms. Wilcox, I'm going to show you what I've marked

11  for identification as Defense Exhibit No. 127.  Does that

12  appear to be another perspective on the Thunderbird that you

13  searched?

14      A.   Yes, it does.

15      Q.   And that would be back in 2000 at Mr. McGuffin's

16  parent's residence?

17      A.   Well, right now the car is in the crime lab bay, I

18  think.

19      Q.   Okay.  Okay, well - - -

20      A.   (Interposing) But yes.

21      Q.   It came from - - -

22      A.   (Interposing) Yes.

23      Q.   Okay.  And is that how it looked when it was in the

24  crime lab bay back in 2000?

25      A.   Yes.

Wilcox    X    D6 141

1          MS. McCREA:    We'd offer Defense Exhibit

2   No. 127, Your Honor.

3          MR. FRASIER:    No objection.

4          THE COURT:    Received.

5          (Whereupon Exhibit No. 127 was then received

6   into evidence.)

7      Q.   Now, what I'd like to do, Ms. Wilcox is go through

8   some of the things that were found (not understandable).

9          MS. McCREA:    And forgive me.  I have to get

10  my pen.

11         WITNESS:    I have to get my glasses.

12         MS. McCREA:    Oh, I didn't mean to make you

13  put your glasses on.

14         WITNESS:    (Laughter.)

15     Q.   All right.  This is a summary that we've marked as

16  Defense Exhibit No. 128.  Now, you talked about there were a

17  whole bunch of things so you can process.  Right?

18     A.   Yes.

19     Q.   And I just want to kind of go through those with you

20  if I could.

21         So, we have the Mustang car that was searched on

22  July 6th, 2000.  Right?  You processed that?

23     A.   Yes.

24     Q.   And there was nothing of significance found on that.

25     A.   Correct.

```
                                        Wilcox   X    D6 142
 1      Q.    Okay.  So, there was nothing associated to Nick
 2   McGuffin.  Is that fair?
 3      A.    Well, it was his car.
 4      Q.    Okay.  But in terms of — I'm talking about forensic-
 5   wise - - -
 6      A.    (Interposing)  Oh, forensic.
 7      Q.    Forensic evidence?
 8      A.    No.  I didn't find anything that looked of apparent
 9   scientific significance to this case.
10      Q.    Scientific significance.
11      A.    Thank you.
12      Q.    Okay, yeah.  You had that acronym?
13      A.    Yeah.
14      Q.    And likewise, there was nothing - - -
15           THE COURT:    (Interposing) Just a minute.
16           Can you move the microphone (not
17   understandable)?
18           WITNESS:    Yes.
19           MS. McCREA:    Perfect.
20      Q.    And there was nothing of scientific significance
21   associated to Leah Freeman.  Is that right?
22      A.    On the Mustang.
23      Q.    On the Mustang.  I know.
24      A.    Yes.
25      Q.    There was a note in the Thunderbird?
```

Wilcox   X   D6 143

1      A.   Yeah, Thunderbird.

2      Q.   Yes.  And then we've got the right Nike shoe.  And

3   that was OSP Exhibit No. 1, Agency No. 160.  That was at Elm

4   Street.  And when that analysis was done by you on July 17th

5   there was no blood.  Right?

6      A.   Yes.

7      Q.   And then you've got the — talked to us about the DNA

8   report.  And there was no DNA on that shoe associated to

9   Mr. McGuffin?

10     A.   That is correct.

11     Q.   There was DNA on that shoe associated to Leah

12  Freeman?

13     A.   Yes.

14     Q.   Now, as to Oregon State Police No. 2, Agency No. 70,

15  that was the left Nike shoe from Hudson Ridge.  And on that

16  shoe there was no blood associated with Mr. McGuffin?

17     A.   That is correct.

18     Q.   There was blood associated with Leah Freeman?

19     A.   Yes.

20     Q.   And there was DNA associated with Leah Freeman?

21     A.   Yes.

22     Q.   But there was not DNA associated with Mr. McGuffin?

23     A.   Yes.

24     Q.   Now, we have in evidence — I believe we have in

25  evidence a hairbrush which was Oregon State Police No. 3168.

Wilcox    X    D6 144

1   And that was from Ms. Freeman?

2        A.    Yes.

3        Q.    And that was used as the standard for her DNA

4   analysis?

5        A.    That and a toothbrush.

6        Q.    And a toothbrush.  Which - - -

7        A.    (Interposing) I actually think they would have used

8   the toothbrush, but I'm not sure.

9        Q.    All right.

10       A.    That would have been a better thing to use.

11       Q.    And voila, No. 4, Agency No. 171, the toothbrush?

12       A.    That is correct.

13       Q.    So, that was associated — it was used as a standard.

14  And it was associated with Ms. Freeman, but not connected to

15  Mr. McGuffin?

16       A.    It was just a standard.  I don't think it was

17  supposed to be connected - - -

18       Q.    (Not understandable.)

19       A.    - - - to him.

20       Q.    I know you do wonder, though.

21       A.    Yes.

22       Q.    And then as to five, six and seven which are M-A-F

23  one, two and three.  Those were a yellow rope, a knife, and a

24  red flag.  Now, you referred to those in your direct

25  examination.  Right?

Wilcox   X    D6 145

1    A.   Yes.

2    Q.   Somebody had brought you a yellow rope.  They

3  brought you a utility knife, and they brought you what looked

4  to be kinda awful, but it turned out to just be like a logging

5  flag?

6    A.   Yes.  It actually had a logging company's name on

7  it.

8    Q.   Okay.  And those items did not have any association

9  to either Mr. McGuffin nor to Ms. Freeman?

10   A.   That is correct.

11   Q.   Then we have items that you obtained when you did

12  the grid search of the cemetery.  And that was on July 27th,

13  2000?

14   A.   Yeah.

15   Q.   And that would be the yellow paper, the fragment of

16  cloth, and the condom and the wrapper?

17   A.   That is correct.

18   Q.   And you indicated that you found those things and

19  seized them but they weren't examined?

20   A.   As far as I know, they never went anywhere else.

21   Q.   Okay.  So, for our purposes there's no scientific

22  significance to either Ms. Freeman or Mr. McGuffin?

23   A.   Yes.  That is correct.

24   Q.   And then we have Exhibit No. 11.  And I've got (not

25  understandable), too.  Exhibit No. 11, the white sock.  That

Wilcox   X   D6 146

1  was from Mr. McGuffin's residence?

2      A.   Yes.

3      Q.   That was seized on August 27th or was examined on —

4  I'm sorry.  It was examined on August 27, 2000 for blood.  And

5  then was examined on September 6th, 2000 for DNA?

6      A.   Okay, yes.

7      Q.   Is that right?

8      A.   Yes.

9      Q.   Okay.  And it did have blood on it?

10     A.   Yes.

11     Q.   And that blood was associated with Mr. McGuffin?

12     A.   Oh, he could not be excluded.

13     Q.   Okay.  So - - -

14     A.   (Interposing) Wasn't that it?

15     Q.   Yes.  So, he could not be excluded.  So, we can

16  consider it associated with him?

17     A.   Yes.

18     Q.   But it doesn't — it's not associated to Leah

19  Freeman?

20     A.   That is correct.

21     Q.   And then there were three firearms examined at the

22  McGuffin's residence?

23     A.   Yes.

24     Q.   And none of those were shotguns, were they?

25     A.   No.  One was a pellet gun.  I could probably tell

Wilcox   X    D6 147

1  you exactly what they were.  Okay.  Here we go.  I did not put

2  much store by these firearms, to tell you the truth.  Because

3  they had been out — as a criminalist you like to get your

4  evidence - - -

5      Q.   (Interposing) Fresh?

6      A.   Fresh.  Thank you.

7           The three firearms were as follows:

8                "A Crossman air gun, Power Master 66

9                pellet rifle, a High Standard — the Plinker

10               twenty-two caliber pistol, and a serial number.

11               And a Martin's firearm, twenty-two long rifle."

12          So, I had two twenty-two long rifles — well, one was

13  a pistol; one was a long rifle; and one was a pellet gun.

14      Q.   And when you were doing the execution of the search

15  warrant at the McGuffin's property, that started at — well,

16  you met with members of the major crime team at eight a.m.

17  And then at approximately nine thirty you met at the

18  residence.  And then you finished that at approximately

19  one p.m.?

20      A.   That is correct.

21      Q.   Just trying to help you.  I didn't know if you had

22  closed the book on your report yet.

23      A.   Not yet.

24      Q.   All right.  And one of the other things that you can

25  do in your analyses is to have items tested to see if there's

Wilcox    X    D6 148

1   any latent prints.  Right?

2       A.   That is correct.

3       Q.   And that was done on some items in this case, wasn't

4   it?

5       A.   I believe so.

6       Q.   So, that was — we talked about the firearms.  Those

7   had no scientific association to Mr. McGuffin or Ms. Freeman.

8   Correct?

9       A.   That is correct.

10      Q.   Okay.  And then Exhibit No. 12 which was Agency

11  No. 226, was the Adidas anklet sock that was found on a fence.

12  And DNA cuttings were taken on August 27th, 2000.  And it was

13  analyzed.  And that did not have any association with

14  Mr. McGuffin.  Is that right?

15      A.   Yes.

16      Q.   And likewise it didn't have any association with

17  Leah Freeman?

18      A.   Yes.

19      Q.   And were you involved in the fibers being removed

20  from that sock on November 3rd, 2000?

21      A.   I don't think so.  I think that was the sock that

22  went directly from Coquille PD to the Portland lab.

23      Q.   Okay.  So, that would be part of the DNA work?

24      A.   Yes.  We gave it a exhibit number I think just to

25  keep everything in order.  But, I don't think it even — I even

Wilcox   X   D6 149

1  examined it.

2      Q.   Okay.  So that would be part of the DNA report you

3  testified about, no scientific significance regarding either

4  Ms. Freeman or Mr. McGuffin?

5      A.   That is correct.

6      Q.   And likewise we talked about the Thunderbird car.

7  Nothing of scientific significance concerning Mr. McGuffin.

8  And we had a note apparently from Ms. Freeman to Mr. McGuffin?

9      A.   That is correct.

10     Q.   There was nothing of scientific significance, DNA,

11 latent prints?

12     A.   That is correct.  Well, I didn't do latent prints

13 on the car.  We knew he had driven it.  You know, we knew

14 people had been in it.

15     Q.   So, I can write no on both of these?

16     A.   Yes.

17     Q.   All right.  And then in addition, there was a lot of

18 work done here.  Right?

19     A.   Yes.

20     Q.   Okay.  So, Oregon State Police Officer (sic) No. 14,

21 Agency No. 1 were some swabs that were taken from the wall of

22 an abandoned house and examined on September 11th, 2000?

23     A.   Okay.

24     Q.   Do you have that report?

25     A.   I might.  But I think Lieutenant Pex did those —

                                        Wilcox   X   D6 150

1   that.

2        Q.   Okay.  Are you sure?

3        A.   So you might have to ask him about that.

4        Q.   I might have to ask him.  That's fair.  That's more

5   than fair.

6        A.   Because he did some of the crime scenes.  It kinda

7   went over a long period of time.  We might have had other call

8   outs, too.

9        Q.   I understand.

10       A.   Yes.  I made a note that Pex did our Exhibit No. 14

11  and 15.

12       Q.   Okay.  Then we will leave that one for the moment.

13           We will go onto what's been marked for

14  identification as Defense Exhibit No. 130.  And we have Oregon

15  State Police Office No. 18, Agency No. 88 — 188.  And I'm

16  going to go on with No. 189.  And then there was not a number

17  on the other one.  So, Nos. 18, 19 and 20 for the OSP numbers,

18  agency numbers, and that was a sheep skin rug, a quilt - - -

19           Well, let's deal with the sheep skin rug and the

20  quilt.  Those were both from a garage on First Street?

21       A.   Yes.  I remember them being submitted.

22       Q.   Okay.  Do you want to look at your report?

23       A.   Did I write that, where they were from?  Yes.  Well,

24  I didn't write down where they were from, but I remember them

25  being submitted.

Wilcox   X   D6 151

1      Q.   Okay, it thought — oh, here.

2      A.   I did?

3      Q.   Yeah.

4      A.   Okay, I guess I do need to review.  Okay.

5           Yes, there it is.

6      Q.   Okay.

7      A.   From the garage on First Street, Coquille.  Okay.

8      Q.   And there was no blood detected on either the sheep

9 skin rug or the quilt.  Right?

10     A.   That is correct.

11     Q.   And so those items were not associated with either

12 Mr. McGuffin or Ms. Freeman?

13     A.   That is correct.

14     Q.   And then there was OSP No. 20 which didn't have an

15 agency number was a tire iron which had been purportedly

16 seized at Hudson Ridge.  And that was examined on September

17 18th, 2000.  And there was no blood and no hair?

18     A.   That is correct.

19     Q.   Okay.  So, that wasn't associated with Mr. McGuffin

20 or Ms. Freeman in terms of scientific evidence?

21     A.   That is correct.

22     Q.   Now, then we have three items that you talked about.

23 And that was OSP Nos. 21, 22, and 23.  And those are Agency

24 Nos. ASW000 — ASW010, ASW20, ASW30 being for No. 10 the blue

25 sweatshirt and animal bone that you talked about?

Wilcox   X   D6 152

1    A.   Yes.

2    Q.   Okay.  And that was wrapped around a cat carcass?

3    A.   Yes.

4    Q.   Okay, which was near the body.

5         ASW20 was the cat itself, the cat carcass.  And

6    ASW30 was a box containing the cat and the sweatshirt?

7    A.   That is correct.

8    Q.   And those were brought in because they were found

9    near the body, right?

10   A.   Yes.

11    Q.   Okay.  And those were examined on September 28th,

12   2000 in terms of blood.  And you did determine it was cat

13   blood?

14   A.   Yes.

15   Q.   Okay.  And obviously that isn't related to either

16   Ms. Freeman or Mr. McGuffin?

17   A.   That is true.

18   Q.   No other blood but the cat blood, right?

19   A.   That is correct.

20   Q.   And the box that the cat had been in was examined

21   for latent prints and no prints were found?

22   A.   You know, I don't remember seeing the report.  Did —

23   I don't know if you have the latent print report?

24   Q.   You know, I'm not sure that I do.  I guess - - -

25   A.   (Interposing) We were — I think we were going to

Wilcox   X   D6 153

1  send it for prints.  I'm not sure it ever got done.  And the

2  reason being is, it was not a good piece — I mean, it was

3  already eliminated.  Once again, you don't do more when you've

4  already eliminated.

5       They found — this is what I'm remembering.  It was

6  reported to me they found the man who had thrown the cat over

7  the bank.  It was big orange tom and he didn't like it I

8  think.  He had done away with it and thrown it over there.

9  They traced him down somehow.

10       I think that saying there were no prints is maybe

11  not correct because I don't think latent prints were ever

12  actually performed.

13       Q.   Okay.  Would it be fair to say there were no prints

14  — there was no positive evidence of prints associated with

15  Mr. McGuffin or Ms. Freeman?

16       A.   Yes.

17       Q.   Okay.  Then if we do it this way.

18       Then, there were some tape lifts done.  Well, what

19  are tape lifts?  Can you explain those to us?

20       A.   Tape lifts is — what was that of?  Well, you just

21  take — you can just use strapping tape.  Of course you can get

22  fancy forensic tape, too.  You just get a big piece of clear

23  tape.  And like say if you wanted to take hairs off an

24  upholstered car seats (not understandable).  You know, you

25  just make a big loop of tape with the sticky side out and then

Wilcox   X   D6 154

1   just run it over there.  And it picks up surface hairs.  I

2   mean, you don't necessary want every piece of sand that's ever

3   been ground in there.  You want the things that are

4   associated, hopefully, with your recent crime scene, hairs,

5   fibers, from maybe somebody sitting there and shedding hairs

6   or things off of their clothing.  And a tape lift is a way to

7   kind of concentrate.  You know, you could do the whole back

8   seat of a car, just - - -

9        Q.   (Interposing) Right.

10       A.   Depending on how dirty it was or just the head rest.

11  And then you lay it out.  You can even stick it to a piece of

12  paper and examine it under a microscope quickly and easily.

13  And if you get, you know, something interesting you can pull

14  it out and do further work with it.

15       Q.   So, what would be something interesting?

16       A.   Well, I'm just thinking of different cases where

17  people have found things.  Hairs are always good.  I'm

18  thinking right now of cars.  If you have hairs that are pulled

19  out as opposed to falling out.

20       Q.   Okay.

21       A.   Especially if you have a wad.  But then of course

22  you might see them.  There have been cases done on trace

23  evidence.  When I mentioned the glitter.  Wonderful forensic

24  case where a little girl was wearing a glittery shirt.  And

25  the glitter actually, when you put it under a high powered

1   microscope, actually was a certain shape that was associated

2   with her t-shirt, to show she'd been in the car.

3        Q.   Right.

4        A.   So, that's kind of trace evidence.  But it's not

5   actually — going trace evidence on a crime scene is tough.

6   That's why these are well studied and important.  But you

7   always try for the trace evidence.

8        Q.   Well, because stuff gets left or stuff gets taken?

9        A.   Exactly.

10       Q.   All right.  And so you have to look to see if you

11  can find it.

12            So, you did tape lifts — no, this was Mr. Pex.

13       A.   I'm not sure.

14       Q.   I think that's Mr. Pex?

15       A.   Yes.

16       Q.   Okay.

17       A.   I'm not sure what shirt you're talking about.

18       Q.   Leah Freeman's shirt.  Sorry LF, yeah.

19       A.   Oh, okay.

20       Q.   So, we'll talk to him about that.

21            Okay.  Now we get to the — sort of what you were

22  talking about, the general stuff.  So, there were a bunch of

23  beer bottles and beer cans and bottle caps and those kinds of

24  things that were brought in from various locations for you to

25  examine.  Is that right?

Wilcox   X   D6 156

1          A.   Yes.

2          Q.   Okay.  So, we have OSP No. 28, Agency No. JP3, a

3    beer can and a glass.  And those were examined in — on

4    September 29th, 2000.  I think that was when you did your

5    analysis.  And there was nothing of scientific significance

6    found related to Mr. McGuffin or Ms. Freeman?

7          A.   That is correct.

8          Q.   I'm trying to figure out a way - - -

9          A.   (Interposing) The only thing I might say is you say

10   no prints or no DNA sampled.  So, they probably weren't good

11   candidates for those things.  So, they probably weren't done

12   is what I'm saying.

13         Q.   Yeah.  (Not understandable.)

14         A.   Okay.

15         Q.   (Not understandable.)

16         A.   Okay.

17         Q.   I'm trying to figure out a way to cut this (not

18   understandable).  But I don't know if then you're going to be

19   able to see it, Ms. Wilcox.  So, Exhibit No. 131.

20              Let's see if we can do it this way.  Can — you can't

21   see that, can you?

22         A.   Yes, I can see it.

23         Q.   Can you?  Okay.

24              So, OSP Nos. 29 through 37 which are Agency Nos. JP4

25   through JP12.  And those are respectively a bottle cap, a blue

Wilcox   X    D6 157

1  rag, beer can, beer can, beer can, pop can, beer can, beer

2  can, and then No. 12 is blood on cardboard.

3           So, in terms of — let's deal with No. 29 through 33,

4  those were all items that were found by — either by the side

5  of the road or it's not clear, that you did an analysis on, on

6  at least September 29th, 2000.  Is that right?

7       A.   Yes.

8       Q.   Okay.  And we have nothing in terms of those

9  exhibits of any scientific significance related to

10  Mr. McGuffin or Ms. Freeman?

11       A.   That is correct.

12       Q.   Then there were additional beer cans — I'm sorry — a

13  pop can, a beer can, and a beer can which are JP8, 9, — sorry

14  — JP9, 10 and 11, that were brought to you for examination

15  because they were found near the body?

16       A.   That is correct.

17       Q.   And you examined those as well on September 29,

18  2000?

19       A.   Yes.

20       Q.   And again, nothing of scientific significance

21  related to Mr. McGuffin or Ms. Freeman?

22       A.   Yes.

23       Q.   And then as to OSP No. 37, Agency No. JP12, the

24  blood on the cardboard, this was near a deer which was in the

25  — near the location of the body?

Wilcox    X    D6 158

1    A.    Yes.

2    Q.    And you examined that on September 29th, 2000, and it

3  was animal blood?

4    A.    Yes.

5    Q.    Okay.  So again, no - - -

6    A.    (Interposing) Yes.  I think I just said not human.

7    Q.    Okay.

8    A.    So, I probably did presumptive for blood and not

9  human blood.

10    Q.    All right.  But — so in other words if there had

11  been something you were concerned about you would have gone

12  further?

13    A.    Yes.  It might not — probably was — but it might not

14  even have been blood.  I'm not sure.  Wasn't concerned.

15    Q.    Okay.  I mean, there was a lot of stuff being

16  analyzed for this case, wasn't there?

17    A.    Yes.

18    Q.    Okay.  Then we get to the things that you testified

19  to on direct examination which is OSP No. 39 which is DEH1-

20  212, the jeans that Ms. Freeman was wearing that were on her

21  body.  And No. 40 which was the shirt that you testified about

22  which was on Ms. Freeman.  And the bra, No. 41 which was on

23  Ms. Freeman.  And likewise, No. 42 which was the Adidas white

24  sock that was on Ms. Freeman.

25          And in terms of the jeans, the shirt, and the bra,

Wilcox   X   D6 159

1   you did an analysis on October 11th, 2000.  And there — in

2   terms of the forensic results there was nothing of scientific

3   significance associated with Mr. McGuffin?

4        A.   That is correct.

5        Q.   Was there anything of scientific significance

6   associated with Ms. Freeman?

7        A.   They came from the medical examiner's office, so I

8   knew they were her clothes.

9        Q.   Okay.  And then in terms of the Adidas white sock,

10  hairs were found on that?

11       A.   They were hairs, but they turned out to be her own.

12  And they were post mortem.  In other words they were from her

13  body after she had died.

14       Q.   And nothing connected to Mr. McGuffin?

15       A.   That is correct.

16       Q.   Now, in looking at — when you're examining clothes

17  like this and you have something like the sports bra and the

18  tank top.  And if we assume that she was wearing the sports

19  bra with the tank top over it?

20       A.   Yes.

21       Q.   One of the things that you would look for would be

22  whether you had two cuts that were of identical or two holes

23  that were of identical size?

24       A.   Yes.  Or you mean, like went through?  Well, clothes

25  being items?

Wilcox   X   D6 160

1      Q.   Yes — that — yes.

2      A.   Yes.

3      Q.   And that was my next question.  Is did you find

4  something?

5           And they wouldn't necessarily — if you had two holes

6  of the same size, they wouldn't necessarily be in exactly the

7  same location.  Isn't that right?

8      A.   Well, I didn't see the body.  So, I got the clothes

9  already.

10     Q.   Right.

11     A.   So, I'm not sure how her clothes were arranged on

12 her as far as, if something was pulled up or down.  I mean,

13 I'm assuming the bra was where it should be, you know, if her

14 t-shirt got pulled up or those kind of things.

15     Q.   Oh, sure.  Okay, let's assume - - -

16     A.   (Interposing) Is that what you're - - -

17     Q.   (Interposing) Yeah.  On a — yeah, but on a — let's

18 assume on a generalized basis.

19     A.   Okay.

20     Q.   If you have a situation where a person is wearing a

21 sports bra and a shirt over it.  And the person is, let's say,

22 stabbed.  Then there's going to be a cut.  And the stab goes

23 through both pieces of clothing?

24     A.   Yes.

25     Q.   Then you're going to have some kind of a hole in

Wilcox   X   D6 161

1  both the sports bra and the tank top?

2      A.   Yes.

3      Q.   But they might not line up identically because of

4  the movement of the fabric?

5      A.   That is correct.

6      Q.   Okay.  All right.  And one of the things you would

7  look at would be a comparison of the size of the two holes to

8  see if they were pretty similar?

9      A.   Yes.

10      Q.   Okay.  We're almost done.

11          Now, you had mentioned during direct examination

12  about insects.  And — I'm sorry.  It's an unpleasant topic,

13  but is it correct that when someone dies insect activity,

14  depending on the environment, may start almost immediately?

15      A.   Yes.

16      Q.   Okay.  And when we're talking about insects, we're

17  talking about flies laying eggs which create maggots?

18      A.   Yes.

19      Q.   They refer to maggots basically?

20      A.   Yes.

21      Q.   I know it's not (not understandable) but - - -

22          And it — once — once a — if a person is still alive

23  then it may take more time for the insect activity.  Is that

24  fair?

25      A.   Yeah.  A blow fly doesn't lay on a live person.

Wilcox   X    D6 162

1    Q.   Okay.  Thank you.

2    A.   And they usually don't lay at night.

3    Q.   Okay.  They don't lay at night.  But as soon as a

4  person is deceased the blow flies will start - - -

5    A.   (Interposing) Yes.

6    Q.   - - - procreating?

7    A.   Yes.

8    Q.   Okay.  And they generally go toward the body

9  orifices or any wounds.  Would that be fair?

10    A.   Yes.

11    Q.   Okay.  So, if a person — if a person were - - -

12         Okay, if there were a deceased person, for example,

13  in the trunk of a vehicle, you would expect that if there was

14  access to that trunk, if it wasn't sealed tight, the blow

15  flies would be making their way in there?

16    A.   Yes.

17    Q.   Okay.  Immediately?

18    A.   Yes.

19    Q.   Okay.  And if you did a search later on, are you

20  going to see evidence of that?

21    A.   Yes.

22    Q.   All right.  So, then we have OSP No. 43 which was

23  hair from Ms. Freeman, post mortem.  And that was examined on

24  October 11th, 2000.  Now, that was a hair standard?

25    A.   Yeah.  I just said head hair.  I have to look at my

Wilcox   X   D6 163

1  original report.

2          Okay.  Did you have a question about that one?

3     Q.   Well, what does that — what is it that that's - - -

4          Okay, let me try that again.

5          How is it that you characterized that as a hair

6  standard?

7     A.   A hair standard is — we take a sample of her hair

8  and just keep it.

9     Q.   Okay.

10     A.   In case it became important later in the case.

11  Because the body was going to be disposed of it, pretty bad

12  shape.

13     Q.   And the body was cremated?

14     A.   That's what I was told.

15     Q.   Okay.  All right.  So - - -

16     A.   (Interposing) So that would just be standard.  In

17  any case we would take, you know - - -

18     Q.   (Not understandable) and not associated with

19  Mr. McGuffin?

20     A.   Yes.

21     Q.   Okay.  And then - - -

22     A.   (Interposing) Associated with Leah should be yes.

23     Q.   I'm sorry.  Thank you.

24     A.   It was her standard.

25     Q.   Absolutely.  Thank you.

Wilcox   X   D6 164

1    A.    Be used for comparison if it was needed.

2    Q.    If it became relevant later on?

3    A.    Yes.

4    Q.    Sure.  Okay.  And then Oregon State Police No. 44

5    was a piece of cellophane that was found under her head that

6    you examined on October 11th, 2000?

7    A.    Yes.  I think that just came from the crime scene.

8    And they — it just came with the body, so - - -

9    Q.    And there was nothing significant about that

10   regarding either individual?

11   A.    That is correct.  It was a four inch by five inch in

12   size.  So, it was probably just a piece of trash.

13   Q.    And then there was some duct tape, OSP No. 49 seized

14   from Mr. McGuffin's Mustang.  And there was also a thirty-four

15   inch piece of duct tape, OSP No. 50 from Hudson Ridge, and you

16   — as well as a purple glove, No. 51 from Hudson Ridge.  And

17   you examined those three items on April 2nd, 2002?

18   A.    Yes.

19   Q.    And the duct tape in the Mustang and the duct tape,

20   the thirty-four inch duct tape did not match?

21   A.    That is correct.

22   Q.    Okay.  So we don't have any association to either

23   Mr. McGuffin or Ms. Freeman?

24   A.    I think the duct tape from the Mustang, I took the

25   end of the duct tape — because duct tape is often involved in

Exhibit 102  Page 1053 of 1666 to
State Defendants' Motion for Summary Judgment

Wilcox   X   D6 165

1    a kidnaping or a restraining or whatever.  So, I took it kind

2    of like a standard.  The duct tape that was submitted by an

3    officer.  I think he just found that beside the road, it was

4    very aged.  It was actually starting to separate.  And duct

5    tape is pretty sturdy stuff.  So, if it's separating it's

6    probably a piece of trash that had been sitting by the road

7    for quite a while, because it was very dry and the fibers were

8    coming apart.  If anyone has used duct tape that takes awhile.

9         Q.   (Not understandable.)

10        A.   It probably was not associated with the crime at

11   all.

12        Q.   I can write no?

13        A.   You might want yes for associated with McGuffin just

14   because it was from his Mustang.

15        Q.   Thank you.

16        A.   Yes.

17        Q.   Okay.  Now, in terms of attempting to determine a

18   cause of death or a manner of death, you mentioned both of

19   those terms in your direct examination.   A manner of death

20   would be how a person dies.  Right?

21        A.   Yes.

22        Q.   And the cause of death would be what killed them?

23        A.   Yes.

24        Q.   Okay.  So, if it was like a blow to the head that —

25   would that be both — could be both the cause and the manner of

Wilcox    X    D6 166

1  death?

2      A.    That would be a cause if they died.  And a manner of

3  death would be from the blow, the cracked skull.  And manner

4  of death would usually probably be associated with more —

5  we're talking more evidence.  Well, both of them could produce

6  evidence, but you would have bleeding.

7      Q.    Uh huh.

8      A.    So, I'm talking about manner of death as in bleeding

9  or from a forensic standpoint.

10     Q.    Right.  And in this case if you know, was there an

11  effort made to try to examine Ms. Freeman's bones?

12     A.    Yes.  I actually talked to — I think it was Doctor

13  Bennett that did this autopsy in Roseburg?

14     Q.    Actually, Doctor Olson.

15     A.    Doctor Olson.  I think he was in Roseburg at the

16  time, though.  And they did — I talked to him about that

17  because I thought perhaps, you know, they hadn't thought about

18  getting nicks off the bones and stuff.  But they had.  They

19  had cleaned off each bone.  They told me that.

20     Q.    And do you know if x-rays were made?

21     A.    I do not know.

22     Q.    Let me make sure I didn't forget something.

23     A.    You didn't get the (not understandable) glove, the

24  purple glove.

25     Q.    Oh, thank you.

Wilcox   X   D6 167

1    A.   Well, the reason I'm — it's interesting is I found

2  out that loggers actually use those gloves, too.  So, you find

3  them out in the woods.

4    Q.   Okay.

5    A.   They do because their hands get so sweaty in their

6  gloves, they put rubber gloves - - -

7    Q.   (Interposing) Underneath.

8    A.   I found that out later.  I thought it was

9  interesting.

10    Q.   All right.

11    A.   Because you find gloves and stuff in the woods, it's

12  not necessarily a — you know, a bad thing.

13    Q.   Right.  Okay.  So, that — the purple rubber glove

14  was not associated to Mr. McGuffin or Ms. Freeman?

15    A.   Yes.

16    Q.   And the matters thereafter are after you left the

17  crime lab?

18    A.   I'm sorry, what?

19    Q.   Well, the other matters I have on here are not

20  associated with when you were still with the crime lab or

21  doing the other matters.  Okay?

22    A.   Okay.

23    Q.   These right here.

24         MS. McCREA:    Let me just go check my notes.

25    Q.   All right.  I just have a couple more questions,

Wilcox   X   D6 168

1   Ms. Wilcox.

2          On the right shoe which — the right shoe would have

3   been — I know Mr. Frasier will correct me if I'm wrong.  Is

4   No. 96, the one from Elm Street.  Do you remember was that —

5   when you received it was it tied or untied?

6          A.   I don't specifically remember.

7          Q.   And when you received Exhibit No. 97, the left shoe,

8   do you recall that there were some hairs either in that shoe

9   or with that shoe already packaged up?

10         A.   No, I do not.

11         Q.   Bear with me just a moment.

12               Ms. Wilcox, I'm just going to show you this

13  photograph of a paper pull with an evidence number on it and

14  see if you remember that as being with the left shoe?

15               MR. FRASIER:    Excuse me.  Is it the right

16  shoe?  Weren't we talking about the left shoe?

17               MS. McCREA:    No.  It's the left shoe.

18               MR. FRASIER:    All right.

19               WITNESS:    It's No. 2.

20         Q.   If you don't remember - - -

21         A.   (Interposing) I don't remember.  You know, there

22  might have been a hair in the shoe or something.

23         Q.   Right.

24         A.   Probably Leah's own, but - - -

25         Q.   (Interposing) Yeah.  Just checking.

Wilcox   ReD  D6 169

1    A.   No, I do not remember seeing that.

2    Q.   Okay.  Thank you.

3         All right.  I'm sorry, Ms. Wilcox, I've got one more

4    question.

5         Concerning the blood spatter that you saw on the

6    shoe, is there any way that you can express an opinion as to

7    what direction the blood spatter would have come or gone?

8    A.   No.

9    Q.   Okay.  Thank you.

10        MS. McCREA:   That's all I have, Your Honor.

11        THE COURT:   Redirect.

12        MR. FRASIER:   Thank you, Your Honor.

13                  <u>REDIRECT EXAMINATION</u>

14   <u>BY MR. FRASIER:</u>

15   Q.   Why wouldn't you be able to determine direction?

16   A.   For one, there was very small amount of blood

17   spatter.  And also I don't know where the shoe was.  I mean,

18   it's not a wall.  It's not — it's moving around itself.  So, I

19   don't know where it was in relationship to where the blood was

20   coming from.

21   Q.   All right.  Let's go back a little bit about trace

22   evidence a little bit.  Trace evidence, is it hardy, fragile,

23   what's it like?

24   A.   Well, it's very small, so it's hard to find.  And it

25   of course can be carried away or swept away easily.

1    Q.   And in terms of finding fragile or — excuse me.   In

2   terms of finding trace evidence, the sooner you find the

3   object or examine the object would it be safe to say that's —

4   the sooner you do it the more probability rate arises that

5   you'll be able to find it?

6    A.   That is correct.

7    Q.   So, if a body had been laying out for five weeks are

8   there the chances of finding trace evidence from somebody who

9   had committed the crime, would it be well greater when the

10   body was first placed there; or, less when the body's finally

11   found?

12    A.   It would be less.  And especially, you know, outside

13   in warm conditions.

14    Q.   Why is that?

15    A.   Well, you saw the conditions of her clothes was very

16   bad.  And if there had — say, there had been a small semen

17   sample, it would have been totally overwhelmed by her own body

18   sort of melting in her clothes.

19    Q.   Let's talk about trace evidence, in particular let's

20   say hairs.  In terms of the Defendant in this case being the

21   boyfriend of Ms. Freeman, what would be the scientific

22   significance of finding a hair from the Defendant on her

23   clothing?

24    A.   It would — it wouldn't be significant.

25    Q.   Why is that?

Wilcox   ReD  D6 171

1    A.   It was reported to me that Leah Freeman rode in the

2   Mustang often, maybe every day.  So, I wasn't really concerned

3   if I'd found one of her blonde hairs in the car.  If I'd found

4   a giant wad of torn out hairs I might have been concerned.

5   But I wasn't concerned about finding his hair.  I wasn't

6   really concerned about finding a couple of her hairs.  I think

7   she was blonde at that time.  And, you know, another small

8   amount of trace evidence from her didn't mean a lot.

9         Another thing is her clothing, like I said, was very

10  generic, ubiquitous.  You see, you know, cotton fibers

11  everywhere.  You see blue jean fibers everywhere.  These are

12  not — trace evidence is a very hard way to solve a crime.  You

13  hear about these things on TV or — and they do it, you know,

14  in a half hour.  It's a really hard way to solve a crime.

15  It's unusual actually, to solve a crime with just trace

16  evidence.

17    Q.   Now, Counsel asked you about — well, let's talk

18  about Luminal a bit.  There was a question about, "Well, if

19  you hosed out a trunk and then you were to use Luminal on the

20  trunk would you still be able to find residue of blood in

21  there?"

22         And you said — I believe your answer was you could?

23    A.   That is correct.

24    Q.   Would you always find blood, even after it's been

25  hosed out?

Wilcox   ReD  D6 172

1      A.   No.

2      Q.   Why not?

3      A.   It would depend on anything else.  It's how well you

4   cleaned it.  If the blood was fresh when you hosed it out, of

5   course it would come out more easily than if it would have

6   been dried.  Luminal actually works best on old dried blood.

7   It binds with the heme in the blood.  So, kind of broken down

8   blood works better.

9           But it all has to do with the cleaning process.

10  We've had other cases where, you know, we've known that a

11  jacket was soaked in somebody's blood.  If someone cleans it

12  really well, you might not find it.  Usually they don't, and

13  you can find it even after they've washed it.  But, it just

14  depends.  A lot of — it depends on a lot of things.

15     Q.   Does the fact that you failed using Luminal to

16  detect blood in the trunk of the Mustang mean there was never

17  any blood in that trunk?

18     A.   No.

19     Q.   Now, you talked about the blood spatter found on the

20  bottom of the shoe.  I believe you classified that as high

21  velocity blood spatter and you mentioned that being shot would

22  be a good example of where high velocity blood spatter comes

23  from.  Is there other ways?

24     A.   Well, that is just an example.  That is a school of

25  classifying blood.  Low blood, drip blood is low velocity.

Wilcox   ReD  D6 173

1   Medium velocity, high velocity.  This is kind of medium high

2   velocity blood spatter.  But I was just trying to make an

3   example of the difference.  And it's — again, there was not a

4   lot of blood here.  But I can tell you it was not dripped

5   blood.  It — maybe some of it was a little tiny bit of

6   transfer blood.  It was medium to high velocity blood spatter.

7        Q.   What other things could cause it other than a gun

8   shot?

9        A.   Well, being hit with an object.  I've seen it with

10  tire irons.  And I've also seen it with a gun shot.  You know,

11  you have the aerosol blood, but you also have larger droplets,

12  too, coming off of a gunshot wound.

13            Usually you have — when you get medium velocity, you

14  have something that's already bleeding.  So, the first blow

15  will open a wound.  Say if you get smacked in the nose.  You

16  know, there's a second when you're not going to be bleeding.

17  You start bleeding, you get smacked again.  Then you would get

18  a medium to high velocity blood spatter.  There's usually

19  quite a bit of force behind it.  It would be a forceful smack

20  to make small droplets.

21       Q.   Let's say a person had a split lip and coughs.

22       A.   Uh huh.

23       Q.   And the blood is expelled by the cough, what — how

24  would you classify that?

25       A.   Coughing could definitely be a medium to high

Wilcox   ReD  D6  174

1   velocity blood spatter, especially if it, like, if it was

2   inside their mouth.

3        Q.    What about a sneeze?

4        A.    Yes.

5        Q.    Counsel asked you about if a dead body had been

6   placed in the trunk of the car would the flies immediately try

7   to get into the trunk and be with the body.  You mentioned

8   something about flies don't lay eggs at night?

9        A.    Well, that's one of the ways we can usually tell if

10  a person — say you find somebody the next day and you don't

11  know what time of the day they died the night before.  Was it

12  in the evening or was it when it was in the middle of the

13  night?

14          Blow flies don't usually lay eggs at night.  So, if

15  they had eggs on them, they probably died before nightfall.

16  It's just — it's just some examples.  There's a whole field of

17  entomology with forensics.  And it's — you know, I would — I

18  would have called in an expert if it was, you know, a more

19  recent case.

20       Q.    Now, Counsel went through a large amount of the

21  evidence, well probably all the evidence that was submitted to

22  you for examination on those charts.  And I won't go through

23  all of those again.  But, a large number of these things, you

24  did not find anything that connected the item to Ms. Freeman

25  or to the Defendant?

1    A.    That is correct.

2    Q.    Did you find any evidence on any of those items that

3    connected them to any person?

4    A.    No.

5    Q.    So, for example one of these beer cans that

6    obviously somebody had to have handled, drank from and threw

7    beside the road, you didn't find any trace evidence on those

8    items that we could have used to identify anyone?

9    A.    That is correct.  Well, they did identify the cat

10   situation.

11   Q.    Did identify who - - -

12   A.    (Interposing) Yes.

13   Q.    - - - knocked the cat off?

14   A.    I don't know — one of the officers traced it down.

15   Q.    And the last thing I'd like to talk with you about

16   is one of the things that Counsel talked with you.  I want to

17   put up on the screen here, this is State's Exhibit No. 8.  And

18   maybe what I'll do is I'll go — I'm going to go to State's

19   Exhibit No. 7.  Oops.

20         This is a picture allegedly taken of Ms. Freeman the

21   day she died.  How would you describe how well that shirt fit

22   her?

23   A.    It fitted her tightly.

24   Q.    Now, if she had been stabbed, would you expect — if

25   she had been stabbed through the shirt and through the bra,

Wilcox    ReD  D6 176

1  would you expect the holes in a situation where she's wearing

2  a form fitting shirt, line up at least somewhat close?

3      A.   Yes.

4      Q.   Thank you.

5           Finally, in your examination of the clothing of

6  Ms. Freeman, did you find any evidence whatsoever that

7  suggested she had either been shot or stabbed?

8      A.   No.

9      Q.   Thank you.

10              MR. FRASIER:    That's all I have.

11              THE COURT:    You may step down.  And you are

12  free to leave - - -

13              Unless you want her to remain?

14              MR. FRASIER:    I'd ask her to come back and be

15  present when the Defense expert testifies.  And I believe

16  that's going to be tomorrow morning.

17              THE COURT:    Is that correct?

18              MS. McCREA:    Yes.

19              THE COURT:    Then you're not excused.  You

20  need to come back tomorrow morning.

21              Your next witness is going to be how long?

22              MS. SOUBLET:    It will be short.

23              THE COURT:    Okay.

24              Call him.

25              MS. SOUBLET:    The State calls David

1066 of 1666

Breakfield   D    D6 177

1  Breakfield.

2                    DAVID BREAKFIELD

3  was thereupon produced as a witness on behalf of the Plaintiff

4  and, having first been duly sworn to tell the truth, the whole

5  truth and nothing but the truth, was examined and testified as

6  follows:

7              THE COURT:   Have a seat up here, please.

8              Okay, scoot closer to the microphone.

9              Go ahead.

10             MS. SOUBLET:   Thank you, Your Honor.

11                   DIRECT EXAMINATION

12  BY MS. SOUBLET:

13     Q.   Can you state your full name and spell your last for

14  the record?

15     A.   David Christopher Breakfield, B-R-E-A-K-F-I-E-L-D.

16     Q.   Mr. Breakfield, how old are you?

17     A.   Twenty-six.

18     Q.   And do you know someone by the name of Megan

19  Edgerton?

20     A.   Yes.

21     Q.   And how do you know Ms. Edgerton?

22     A.   We were friends in school.

23     Q.   Would that be in high school?

24     A.   Yes.

25     Q.   And when was that?

Breakfield  D    D6 178

1      A.    Nine years ago.

2      Q.    And do you know the Defendant, Mr. McGuffin?

3      A.    Yes.

4      Q.    And how do you know him?

5      A.    Also through Ms. Edgerton.

6      Q.    Was there a time — you say you knew Ms. Edgerton.

7  Was there a time when you were dating Ms. Edgerton?

8      A.    Yes.  I guess you could call it that.

9      Q.    How old were you at that time?

10     A.    Sixteen, seventeen.

11     Q.    Was there a time when you broke up with

12  Ms. Edgerton?

13     A.    Several.

14     Q.    Was there a time when you were with Ms. Edgerton

15  after she had recently broken up with the Defendant?

16     A.    Yeah.  According to her word, yeah.

17     Q.    And was there an altercation with the Defendant?

18     A.    Yes.

19          MR. McCREA:    Wait a minute.  Wait a minute.

20  Object.  This isn't relevant to any issue here.  And they're

21  both 403 and 404 issues, this evidence, Your Honor.  And this

22  is outside the scope of what I thought they intended to try to

23  introduce.  We have made objection to this evidence getting

24  outside of the only incident that may be relevant here.

25          THE COURT:    I think as I recall that I felt

```
                                     Breakfield  D    D6 179
 1   this evidence was admissible.  I'm going to hear the question,

 2   but I — if you're — if she's going where I think she's going

 3   in this matter, then - - -

 4                 Well, hold it.

 5                 No, that was on — let me get my notes.  No.  At

 6   least my notes reflect that part of this was admissible.  And

 7   I believe I stated on the record why part of it was

 8   admissible.

 9                 So, you filed your motion in limine.  And at

10   least the part that I found in relation to — let me get to the

11   State's response, because I just read yours.

12                 I think with one caveat, I had ruled that his

13   statements would be admissible.

14                 What year are you asking him about?

15                 MS. SOUBLET:   I'm asking about the incident

16   Your Honor ruled was admissible.

17                 THE COURT:   Right.  But I'm — do you have a

18   year?  Was it after 2000?

19                 MS. SOUBLET:   Yes, Your Honor.  He just

20   indicated he dated Ms. Edgerton nine or ten years ago.  It

21   would be after 2000?

22                 THE COURT:   Okay.

23                 Then I had ruled that this evidence was

24   admissible.

25                 MR. McCREA:   Well, may we approach, Your
```

```
                                    Breakfield   D    D6 180
 1   Honor?
 2              THE COURT:    Yes.
 3              (SIDEBAR)
 4              THE COURT:    We had a semantics problem and
 5   we've taken care of it.
 6              Go ahead.
 7              MS. SOUBLET:    Thank you, Your Honor.
 8      Q.   Mr. Breakfield, was there a confrontation with the
 9   Defendant?
10      A.   Several.
11      Q.   I want to talk about one where he made threats to
12   you.  Do you remember that?
13      A.   Yes.
14      Q.   And what if anything did the Defendant tell you?
15      A.   He said, "I strangled . . ."
16           Do you want me to say this?
17      Q.   I want you to say exactly what he told you.
18      A.   He said, "I strangled that bitch and I'll strangle
19   you, too."
20      Q.   Did he say anything else to you?
21      A.   No.
22      Q.   Do you remember telling — talking to Officer Webley
23   and Officer McNeely last August about this case?
24      A.   Yes.
25      Q.   Do you remember talking to them about the same
```

```
                                    Breakfield   D    D6 181
1   confrontation that we're just talking about now?

2        A.   Yes.

3        Q.   And is it safe to say at the time you did that, that

4   your memory of that incident is fresher now than is was then —

5   fresher then than it was now?

6        A.   Fresher then than it is now?

7        Q.   Yes.

8        A.   No.

9        Q.   Mr. Breakfield, I'm going to show you your statement

10  and ask you to read the last paragraph to yourself, not out

11  loud.

12             Just right there.  Let me know when you're done

13  reading that.

14             Are you done?

15       A.   Yeah.

16       Q.   Does that refresh your memory?

17       A.   Yes.

18       Q.   What else did the Defendant say to you during that

19  confrontation?

20       A.   He would take my life as well.

21       Q.   What exactly did he say?

22       A.   "I've killed before and I'll kill again."

23       Q.   Did he also tell you, "I ain't afraid to kill you?"

24       A.   Yes.

25       Q.   Thank you.
```

Breakfield   X    D6 182

1          MS. SOUBLET:    I have nothing further.

2          THE COURT:    Mr. McCrea.

3                    CROSS EXAMINATION

4  BY MR. MCCREA:

5      Q.    And the statement that Counsel showed you, you made

6  that statement or substantially to that effect to the officer

7  on August 5th of 2010.  Is that correct?

8      A.    Yes.

9      Q.    And it's your testimony when this purportedly

10 happened, it was just you there and Mr. McGuffin?

11     A.    Yes.

12     Q.    And this happened back in 2002?

13     A.    Yes.

14     Q.    And so, after Mr. McGuffin said that to you, you

15 were then aware that Mr. McGuffin had confessed to you that he

16 had killed somebody by strangling them.  He had killed female

17 person by strangling them.  Is that right?

18     A.    People say a lot of things.

19     Q.    Pardon?

20     A.    I said, people say a lot of things when they're

21 angry.

22     Q.    I'm sorry?  Should I say it again?

23          THE COURT:    He said, "People said a lot of

24 things when they're angry."

25          MR. McCREA:    Oh, people said a lot of things.

Breakfield   X   D6 183

1      Q.   Well, but you became aware of the — of Leah

2   Freeman's disappearance death, did you not?

3      A.   I'd heard rumors.

4      Q.   Pardon?

5      A.   I'd heard rumors.

6      Q.   Okay.

7      A.   I was a sixteen year old boy.

8      Q.   And you lived here in this Coos Bay Area in nineteen

9   — or rather in 2002.  Correct?

10     A.   Yes, sir.

11     Q.   And you lived here in 2003?

12     A.   Yes.

13     Q.   And there was publicity that came out about the fact

14   that she was still missing during the time you're living here?

15     A.   Yes.

16     Q.   And you — did you go to the police and tell them in

17   2002 what Mr. McGuffin had said?

18     A.   No.

19     Q.   Did you go to the police and tell them in 2003 what

20   he'd said?

21     A.   No.

22     Q.   Did you go to the police and tell them in 2004 what

23   he said?

24     A.   No.

25     Q.   Well, you knew that Ms. Freeman had been his

```
                                    Breakfield   X    D6 184
```

1  girlfriend, didn't you?

2       A.    I never knew Ms. Freeman.  Like I said, everything

3  that I heard was from another party.

4       Q.    Well, you — but you heard the information?

5       A.    Yes.

6       Q.    And you testified at Grand Jury that you also saw

7  things in the paper?

8       A.    Yes.

9       Q.    And you heard things on television?

10      A.    Yes.

11      Q.    Okay.  And let's go to 2005.  Did you go to the

12  police in 2005 and tell them that Mr. McGuffin had confessed

13  to strangling Ms. Freeman?

14      A.    No.

15      Q.    Did you go in 2006?

16      A.    Do you just want to skip forward to 2008, or '09 or

17  - - -

18      Q.    Pardon?

19      A.    No, I did not.

20      Q.    All right.  You knew — you had contact with the

21  police along in this time frame, didn't you?

22      A.    No.

23      Q.    No contact at all?

24            MS. SOUBLET:    I'm going to object to that

25  question.

```
                                    Breakfield   X    D6 185
 1            THE COURT:    Well, depending on the question
 2    it could be rather broad.
 3            If your question is limiting it to this type of
 4    statement, then I'll allow it.  But the question is fairly
 5    broad.
 6      Q.   Well, my question is — let me put it this way.  You
 7    knew where to find the Coquille Police Station, did you not?
 8      A.   Yes.
 9      Q.   And you knew where to find the Sheriff's Office?
10      A.   Yes.
11      Q.   And you knew where to find the District Attorney's
12    Office?
13      A.   Yes.
14      Q.   And were you aware that the number for the FBI is in
15    the phone book?
16      A.   No, I was not aware of that.  Thank you, though.
17      Q.   All right.  But in any event — but we go clear up to
18    2010 before you ever told anybody that you claim this
19    statement was made to you.  Isn't that correct?
20      A.   Correct.
21      Q.   Pardon?
22      A.   That's correct.
23      Q.   And Ms. Edgerton, Megan Edgerton, was someone that
24    you kept trying to date, isn't the right, including up to and
25    in 2010?
```

```
                                    Breakfield   X    D6 186
 1        A.   No.  That's not correct.

 2        Q.   Well, didn't you ask her in 2010 to go on a — oh,

 3   come to your kid's birthday party?

 4        A.   Yes.  That's correct.

 5        Q.   And she said, "No?"

 6        A.   Yeah, but it had nothing to do with physical

 7   relations or anything otherwise.

 8        Q.   Pardon?

 9        A.   It had nothing to do with any kind of a

10   relationship.

11        Q.   Well, what — I mean, she didn't do anything with you

12   in 2010.  Right?

13        A.   No.  Yeah, that's correct.

14        Q.   And you are now aware you are carrying this secret

15   that Mr. McGuffin has confessed to you that he strangled,

16   according to you, his previous girlfriend Ms. Freeman.

17   Correct.  You're carrying this secret?

18        A.   Actually there was — there was never a name stated.

19        Q.   No.  But he — but you knew that that's girlfriend

20   and you knew who that — that was who — that was his girlfriend

21   and that's who became missing.  And therefore, you could form

22   the - - -

23        A.   (Interposing) Yes.  I knew that, but - - -

24        Q.   - - - connection, couldn't you?

25        A.   Yes.  I knew that, but if - - -
```

Breakfield   X    D6 187

1     Q.    (Interposing) All right.

2     A.    - - - you want to be technical, he could be talking

3  about anybody.

4     Q.    Pardon?

5     A.    You could be talking about anybody.

6     Q.    Well, but you didn't think he was talking about

7  anybody, did you?  You thought he was talking about his —

8  about Ms. Leah Freeman.  Isn't that what you thought?

9     A.    I'm not sure what I thought.  Like I said I was a

10  sixteen year old boy.

11     Q.    Well, I'm talking about as time went by, and you got

12  more and more information.  Didn't — weren't you — if he made

13  that statement to you, weren't you curious enough to start

14  talking to people about who it was he would have killed?

15     A.    No, sir.

16     Q.    You didn't care who he killed?

17     A.    Um, I just tried to stay as far away from the

18  situation as I could.

19     Q.    No.  My question was, did you not care who he had

20  killed?

21     A.    Uh — I just stayed out of the situation.

22     Q.    Ms. Edgerton, you considered her a friend, didn't

23  you?

24     A.    Yeah.  She was a friend.

25     Q.    Okay.  And you consider her someone you like?

Breakfield   X    D6 188

1      A.    For a brief point in time, yeah.

2      Q.    Pardon?

3      A.    For a brief period in time, yeah.

4      Q.    Well, did you go warn Ms. Edgerton that Mr. McGuffin

5  had confessed to you that he killed somebody?

6      A.    Oh, yeah.  She knows what me and her talked about.

7      Q.    The question is, did you go warn her?

8      A.    Yeah, me and her have talked about it.

9      Q.    When did you ever talk to her about it?

10     A.    There was several occasions.  Like I said, I think

11 she was just playing both sides of the field.

12     Q.    No.  My question is when did you talk to her about

13 it?

14     A.    I'd say 2004.

15     Q.    So — but you testified earlier that you didn't talk

16 to anybody about it?

17     A.    Well, I didn't tell her the exact words, but I told

18 her to stay away from him.

19     Q.    Well, you — no.  My question is — and you've

20 answered this.  You didn't talk to anybody about the fact that

21 he purportedly confessed to you of having killed somebody?

22     A.    Oh, no.

23     Q.    Right?

24     A.    No, no.

25     Q.    All right.  And it wasn't until you talked to these

Breakfield  X   D6 189

1   two officers August 5th of 2010, eight years after he

2   supposedly said this, that you told anybody about it.

3   Correct?

4       A.   Correct.

5       Q.   All right.  And at that time there had been reward

6   posters put up around here of ten thousand dollars for

7   information leading to the arrest and conviction of the person

8   that was responsible for Ms. Freeman's death.  Isn't that

9   correct?

10      A.   I have no knowledge of that.

11      Q.   You — it's your testimony you didn't know there was

12  a reward?

13           MS. SOUBLET:   Objection.  Asked and answered.

14      A.   No, I did not.

15           THE COURT:   He answered it.

16           Go onto something else.

17      Q.   Also, if Mr. McGuffin was put in prison then that

18  your opportunity to be able to do things with — to be with the

19  — Megan Edgerton would be much simpler.  Isn't that correct?

20      A.   No, that's not correct.

21      Q.   Not true?

22      A.   No, that is not true at all.

23      Q.   All right.  So, these things just all the sudden

24  when these officers talked to you, you remembered this and

25  decided to tell them about it.  Is that how it happened?

Breakfield   ReD  D6 190

1      A.    As far as I know I was subpoenaed to come there.

2  And then I was sworn in when I got there.  So - - -

3      Q.    (Interposing) No, I'm - - -

4        You weren't subpoenaed to talk to the officers on

5  August 5th, were you?

6      A.    No.

7      Q.    All right.  So, just you're talking to the officers.

8  They want to talk about Mr. McGuffin.  Right?

9      A.    Correct.

10     Q.    And so it's at this time that you just remember this

11  and for the first time tell somebody, specifically these

12  officers, that that's what he said?

13            MS. SOUBLET:    I'm going to object.  Asked and

14  answered several times.

15            THE COURT:    Sustained.

16            MR. McCREA:    Well - - -

17            That's all the question I have.

18            THE COURT:    Any redirect?

19            MS. SOUBLET:    Just briefly.

20            Thank you, Your Honor.

21                  REDIRECT EXAMINATION

22  BY MS. SOUBLET:

23     Q.    Mr. Breakfield, did you used to wrestle in high

24  school?

25            MR. McCREA:    Object.  It's irrelevant.

Breakfield   ReD  D6 191

1        THE COURT:   Go ahead.  I'll give you some

2   leeway as long as you tie it up.

3        MS. SOUBLET:   I'm going to tie it up quickly.

4   Q.   Did you used to wrestle in high school?

5   A.   Yes.

6   Q.   Do you consider yourself a pretty tough guy?

7        MR. McCREA:   Object.  It's irrelevant.

8        THE COURT:   I'll overrule it.

9        I'm expecting her to get somewhere.  If we're

10  not getting there, I - - -

11        MR. McCREA:   (Interposing) Well, and I object

12  to where she expect to go, for that matter.

13        THE COURT:   Well, since neither of us are

14  totally sure of where she's going, that's a problem.

15        I'll strike the testimony - - -

16        MR. McCREA:   (Interposing) Well, may we

17  approach?  May we approach, Your Honor?

18        THE COURT:   Sure, go ahead.

19        MR. McCREA:   Or else I'd ask you to — okay.

20        THE COURT:   (Interposing) Come on up.

21        (SIDEBAR)

22  Q.   Mr. Breakfield, why didn't you tell the police when

23  it first happened?

24  A.   When it first happened?

25  Q.   Right.

```
                                    Breakfield  ReD  D6 192
1      A.   I believe I've answered that already as well.

2      Q.   Were you scared?

3      A.   I was a sixteen year old kid.

4      Q.   So, is that a yes, you were scared?

5           MR. McCREA:   Wait a minute.  Object.  Leading

6  the witness, Your Honor.

7           THE COURT:   Overruled.

8      A.   Yes, I was scared of the entire situation, which is

9  why I took myself out of it.

10     Q.   And have you had a recent contact with Megan

11  Edgerton?

12     A.   No.  Just I think I've gotten a couple texts from

13  her.

14     Q.   Trying to keep you from coming to testify?

15           MR. McCREA:   Object, Your Honor.  I object to

16  leading the witness like that and putting it before the jury.

17           THE COURT:   Well, I think I'll sustain that

18  one.

19           You can ask another question.

20     Q.   Has anyone — has Ms. Edgerton had contact with you

21  about your testimony?

22           MR. McCREA:   Well, wait a minute.  Unless

23  it's connected to the Defendant it's irrelevant whether

24  anybody's had contact - - -

25           THE COURT:   (Interposing) No.  I think it
```

```
                                    Breakfield   ReD  D6 193
 1  could go to bias - - -
 2              MR. McCREA:    (Interposing) Pardon?
 3              THE COURT:    Go to bias of a witness, possible
 4  bias of a witness.
 5              So, I'll allow the question and the answer.
 6              Go ahead.
 7     Q.   Has Ms. Edgerton contacted you about your testimony?
 8     A.   Yes.
 9     Q.   Has she attempted to keep you from testifying?
10              MR. McCREA:    Object to leading Your Honor.
11     A.   Um - - -
12              THE COURT:    I think you need to rephrase the
13  question and ask it in more general terms than that.
14              I'll sustain that objection.
15     Q.   What did she ask you to do?
16     A.   She didn't ask me to do anything.  She just told me
17  that I was wrong.
18              MS. SOUBLET:    Nothing further.
19              THE COURT:    Okay.
20              You may step down and you're free leave.
21              The last piece of evidence, Ladies and
22  Gentlemen, you can use if you choose.  It's always up to you,
23  on whether or not Ms. Edgerton might be biased.  It can be
24  used for no other purpose other than that.
25              Okay.
```

Rogers   D    D6 194

1          We'll take a recess for about twenty minutes.

2          Everybody else remain seated until the jury has

3   a chance to leave.

4          Go in the jury room.  Take your notes.

5   Remember the admonition.

6          (Jury Out.)

7          THE COURT:   Okay.  We'll be in recess until

8   3:00.  I mean, 3:15.

9          (RECESS)

10         (Jury In.)

11         JUDICIAL ASSISTANT:   All rise.

12         THE COURT:   Be seated please.

13         Call your next witness.

14         MR. FRASIER:   Thank you, Your Honor.

15         We call Scot Rogers.

16                     SCOT ROGERS

17  was thereupon produced as a witness on behalf of the Plaintiff

18  and, having first been duly sworn to tell the truth, the whole

19  truth and nothing but the truth, was examined and testified as

20  follows:

21         THE COURT:   Have a seat here, please.

22                  DIRECT EXAMINATION

23  BY MR. FRASIER:

24     Q.   Could you state your name please, sir, and spell

25  your last name for the record?

Rogers   D    D6 195

1      A.   Scot Rogers, R-O-G-E-R-S.

2      Q.   What's your occupation, sir?

3      A.   I'm a police officer with the City of Coos Bay.

4      Q.   How long have you been with the City of Coos Bay?

5      A.   Twelve years now.

6      Q.   Your present assignment, sir?

7      A.   Patrol officer.

8      Q.   Prior to that did you have a different assignment?

9      A.   I did.  I was a detective in the investigations unit

10 at the Coos Bay Police Department.

11     Q.   How long were you a detective, sir?

12     A.   Four years.

13     Q.   I want to direct your attention to January of 2010.

14 Were you working as a detective for the Coos Bay Police

15 Department at that time?

16     A.   Yes, sir.

17     Q.   And as part of being a detective were you assigned

18 to work with what's sometimes referred to as major crime team?

19     A.   Yes, I was.

20     Q.   In particular I want to direct your attention to

21 January 24th of the year 2010.  Were you asked to participate

22 in the execution of a search warrant that was executed at the

23 home of the Defendant's parents off of Baker Road here in

24 Coquille?

25     A.   Yes, I was.

Rogers   D   D6 196

1    Q.   And during the course of that search did you seize

2  any particular items?

3    A.   Yes, I did.

4    Q.   Now, I'm going to show to you a bag here and a piece

5  of evidence and ask if you can identify that, please?

6    A.   That is a bag of paperwork that I seized from that

7  residence.  It has my initials on it and the item number.  So,

8  it would have been one of the first sets of documents that I

9  recovered.

10    Q.   And you marked it with your initials, TSR?

11    A.   Yes, I did.

12    Q.   And 001?

13    A.   Yes.

14    Q.   And in particular here, inside this is a document

15  that's been marked as — excuse me — State's Exhibit No. 216?

16    A.   Yes.

17    Q.   And to the best of your knowledge you seized that as

18  part of this paperwork that's in this exhibit here?

19    A.   Yes, I did.

20         MR. FRASIER:   Your Honor, at this time we

21  would offer State's Exhibit No. 216.

22         MS. McCREA:   Your Honor, we object based on

23  foundation, relevance, and hearsay.

24         THE COURT:   Let me see it.

25         This was seized from Mr. McGuffin's house?

Rogers    D    D6 197

1                    MR. FRASIER:    Parent's house.

2                    THE COURT:    Parent's house.

3                    Excuse me, what room was this seized in?

4                    WITNESS:    The parent's bedroom, sir.

5                    THE COURT:    Is that all you have of this

6    witness?

7                    MR. FRASIER:    Yes.

8                    THE COURT:    Okay.

9                    I'm going to sustain the object right now.

10   But, I'll hear arguments and maybe tie it up later because I

11   want to talk a little bit about this.

12                    Anyway, do you have any cross examination?

13                    MS. McCREA:    No, Your Honor.

14                    THE COURT:    Okay.

15                    MR. FRASIER:    Thank you, Your Honor.

16                    THE COURT:    And I want to make sure that if

17   at a later time I rule that it's admissible, are you going to

18   want this witness back or not?

19                    MS. McCREA:    I think the court asked the two

20   questions I was going to ask.  So, no.

21                    THE COURT:    Okay.

22                    You may step down and you're free to leave.

23                    WITNESS:    Thank you, Your Honor.

24                    THE COURT:    You had nothing else of him,

25   Mr. Frasier?

Wetmore    D    D6 198

1              MR. FRASIER:    No.  That's all I had, Your

2    Honor.

3              THE COURT:    Call you next witness.

4              MS. SOUBLET:    The State recalls Officer

5    Wetmore.

6              THE COURT:    You're still under oath, Officer.

7    Retake the stand.

8                        TONY WETMORE

9    was thereupon again produced as a witness on behalf of the

10   Plaintiff and, having previously been duly sworn to tell the

11   truth, the whole truth and nothing but the truth, was examined

12   and testified as follows:

13                     DIRECT EXAMINATION

14   BY MS. SOUBLET:

15     Q.   Officer Wetmore, I want to turn your attention to

16   August 3rd, 2000.  Was that a scheduled work day for you?

17     A.   Yes, it was.

18     Q.   Who were you working with?

19     A.   On that day I was with Detective Cal Mitts who's

20   also with Coos Bay Police Department, Detective Bennett from

21   North Bend Police Department, and the medical examiner Kris

22   Karcher.

23     Q.   What was your plan for the day?

24     A.   We first met at Cozy Kitchen in North Bend to kind

25   of discuss how we were going to do this.  And our plan was, we

1   were — the four of us were coming down to Coquille to check

2   several areas or search several areas and go from there.

3        Q.   What were you searching for?

4        A.   The body of Leah Freeman.

5        Q.   What were those areas that you were going to search?

6        A.   There were two areas.  The first area was an area on

7   Hudson Ridge.  And the second area was on Lee Valley Road.

8        Q.   And after that meeting at Cozy Kitchen were you

9   supposed to do something?

10       A.   Yes.  We were wearing essentially our — what we wear

11  in investigations a lot of times, suits and ties and that sort

12  of thing.  Our plan, obviously, being the middle of the

13  summer, being August, it was extremely hot out.  We weren't

14  exactly dressed to search and traipse through the woods and

15  that sort of thing.  We were to go home, change clothes,

16  gather needed items to go down and search.  For example,

17  water, some snacks.  We had no idea how long we were going to

18  be down there, in addition to changing our clothes.

19            The most important thing that I was supposed to

20  gather as well as Detective Mitts was, us both being

21  fishermen, we were going to get our waders because the area on

22  Lee Valley Road, the plan was that we were going to walk up

23  the creek, shallow areas of the river that we didn't believe

24  boats would have been able to search.  And we were going to

25  walk in our fishing waders further down.

Wetmore   D   D6 200

1    Q.    And did you remember to grab those hip waders?

2    A.    I did not.  The most important thing I forgot and

3    left it home in my rush to change clothes and get water and

4    things like that.

5    Q.    When you searched Hudson Ridge, did you find

6    Ms. Freeman's remains?

7    A.    No.

8    Q.    What happened when you went to Lee Valley Road?

9    A.    We went to Lee Valley Road — we arrived there

10   approximately ten minutes to three.  We parked in a large

11   gravel pull out that was near a gate that led back down to a

12   little — I guess I'd call it a camping area that was near the

13   river.  We parked near there.  And the plan was, Detective Cal

14   Mitts and myself were going to go along the river.  Detective

15   Mitts in the river since he remembered his waders.  And the

16   best I could do was follow alongside on the edge of the river.

17          Kris Karcher and Detective Bennett were going to

18   walk the road up Lee Valley and essentially parallel us, but

19   they were going to go the road, which rises to an area —

20   basically a cliff — where it's above the river.

21   Q.    Officer Wetmore, I'm going to hand you what's been

22   marked for identification purposes as State's Exhibits Nos. 34

23   through 38 and then No. 41 and ask you to look at those and

24   tell me if you recognize those?

25   A.    Yes, I do.

Wetmore    D    D6 201

1    Q.    What are those photos of?

2    A.    In general or each one?

3    Q.    In general.

4    A.    This is the scene that I described, the area where

5    we parked as well as the location where I located the body on

6    Lee Valley Road.

7    Q.    And do those exhibits depict the scene as you

8    remember them on August 3rd, 2000?

9    A.    Yes, they do.

10                MS. SOUBLET:    I would offer State's Exhibits

11    Nos. 34, 35, 36, 37, 38, and 41.

12                MS. McCREA:    There is no objection, Your

13    Honor.

14                THE COURT:    Received.

15                (Whereupon Exhibits Nos. 34, 35, 36, 37, 38 and

16    41 were then received into evidence.)

17                MS. SOUBLET:    I think Counselor, there's

18    actually been a (not understandable) mistake, Nos. 34 and 36.

19    I believe (not understandable).

20    Q.    Officer Wetmore, what's here is State's Exhibit — on

21    the screen is No. 36.  Can you verify with me if that's the

22    same thing there as No. 34?

23    A.    Yes, ma'am.

24    Q.    What is the jury looking at in State's Exhibit

25    No. 36 as it's displayed on the screen?

Wetmore   D   D6 202

1      A.   This is taken essentially standing in the middle of

2   Lee Valley Road looking down past a gravel pull out area which

3   you can see on the left near where the two vehicles are

4   parked.  And that's essentially the gravel pull out that I

5   referred to.

6      Q.   Then, State's Exhibit (not understandable).

7              THE COURT:   Excuse me.  I was reading

8   something.  Were the exhibits — they were No. 34 through 38

9   and 41.  That was received.  And then you talked about an

10  exhibit number.  Did the numbers change at all?

11             MR. FRASIER:   Apparently, Your Honor, when I

12  prepared these slides, I misnumbered the slides for the

13  screen.

14             THE COURT:   Okay.  But those are the exhibits

15  that were offered.  And I've received them.  Those aren't

16  changed?

17             MR. FRASIER:   No.  It's just the numbers are

18  screwed up on the screen.

19             THE COURT:   All right.

20             Thanks.  Okay.

21             Go ahead.

22     Q.   Officer Wetmore, what's up on the screen is Exhibit

23  No. 35.  You would agree with it's No. 37, you would agree

24  with me is that photo there, No. 35?

25     A.   Correct.

Wetmore    D    D6 203

1    Q.    Can you tell me what the jury is looking at there in

2    Exhibit No. 37?

3    A.    This is a gate in the — in previous photo the gravel

4    pull out is on the left.   This is a gate with a road that

5    leads down towards the — what I referred to as I think a

6    camping area which is down near the river.   That gate is back

7    in a — in one corner of that gravel pull out.

8    Q.    And Officer Wetmore, what's up there as Exhibit

9    No. 38, you would agree with me is that photo there that's

10   labeled as Exhibit No. 36?

11   A.    Correct.

12   Q.    Okay.   And can you tell the jurors what they're

13   looking at there?

14   A.    This is looking down from standing on Lee Valley

15   Road.   This is looking further down the — again, using the

16   gravel pull out as a reference — the gravel pull out would be

17   behind the person taking the photograph to the person's left.

18   And the area up ahead where the person's standing in the frame

19   there, the area to the left there is where the body was

20   located.

21   Q.    And I take it those crime scene cones and the police

22   car weren't there when you got there?

23   A.    Correct.

24            THE COURT:    Can Counsel approach real quickly

25   here.

Wetmore   D   D6 204

1              (SIDEBAR)

2

3              THE COURT:    Go ahead.

4      Q.    And Officer Wetmore, you would agree with me that

5    what's up there as Exhibit No. 33, is actually this photo here

6    No. 37?

7      A.    Correct.

8      Q.    Can you tell the jurors what they see there?

9      A.    This is taken again on Lee Valley Road.  The photo

10   is taken looking back towards the direction of the gravel pull

11   out, which in this case would now be on the right of the

12   screen.  And to the right is the area where the body was

13   located.

14     Q.    And Officer Wetmore, you would agree with me that

15   what's up there as No. 34 is this same photo here, No. 38?

16     A.    Yes, ma'am.

17     Q.    Can you tell the jurors what they see there in that

18   exhibit?

19     A.    This was — and I'll think how best to describe.  The

20   body would be located — the body obviously is not visible in

21   this location.  But it's directly through the weeds, down an

22   embankment.  At the time this was taken when the body was

23   located, there was no approach to the body from the road.  We

24   actually came in from the river on the back side which is

25   where I located her.

Wetmore   D    D6 205

1        After the scene was cordoned off, we found that

2   there's essentially a break in the weeds as if at least one

3   person or several people — that's unknown — but somebody or

4   something had traveled through the brush there.  There was an

5   obvious part and vegetation that was moved aside as if

6   somebody had went through that area.

7        Q.   Officer Wetmore, when you got to Lee Valley Road,

8   where did you and Detective Mitts walk first?

9        A.   We walked — the gate in the one photo that leads

10  back towards the river.  We walked down that little road a

11  short distance to that, or near that camping area up to the

12  river.  Again, Detective Mitts having his waders and me not

13  having the wader, Detective Mitts began working his way out

14  into the water.  I essentially followed alongside, but on the

15  edge of the river rather than actually being in the water.

16       Q.   Did something happen while you were walking along

17  the river?

18       A.   We traveled a very short distance.  I would estimate

19  maybe — maybe less than a hundred yards.  We had barely just

20  arrived.  I went to step up on a large root wad that was along

21  the edge of the water.  And as I stepped up on the root wad I

22  caught an unmistakable but fleeting odor of decomposition.

23  And I paused there, began looking around that root wad trying

24  to see where that odor had come from.  But as quickly as I had

25  sniffed the odor it was gone.  I didn't smell it again at that

Wetmore   D    D6 206

1   point.  But I was certain I had smelled something.  I didn't

2   see anything in the immediate vicinity while I was standing on

3   that root wad.

4        I called out to Detective Mitts.  My feeling was

5   possibly like potpourri in your house and you become

6   accustomed to it, and then you no longer smell it until you

7   leave the house and come back in.  I thought maybe that's

8   what's happening.  The odor's still here.  So, I called

9   Detective Mitts over to my location and actually had him stand

10  in the same spot and asked if he smelled anything.

11       He didn't.  So he returned back to the river and

12  continued down.  However, I was certain I had smelled

13  something and began walking away from the river trying to

14  locate what I had smelled.

15       Q.   Were you able to locate that?

16       A.   Yes.

17       Q.   How did that happen?

18       A.   I walked — I obviously wasn't involved in any

19  measurements that may have been taken, but I had walked

20  essentially perpendicular from the river in a direction that

21  would have been back towards the roadway I would estimate

22  maybe seventy-five, maybe a hundred yards from the river.  I'm

23  walking through vegetation, get to an area where I'm now

24  walking through trees.  And I'm just essentially looking

25  around.  And I'm still not smelling anything.  But I was just

Wetmore   D    D6 207

1  trying to locate what was the source of what I smelled.

2        And as I got nearer the road I began seeing where

3  garbage and miscellaneous items are, you know, apparently

4  thrown from vehicles would be my guess, and things that don't

5  belong in the woods.  As I got closer to the roadway, at one

6  point I saw essentially what appeared to me to be a shining

7  red lightbulb, several feet off the ground that I saw through

8  some brush.  And I paused, focused on that, and took a moment.

9  Didn't understand what I was seeing.  That's what drew my

10 attention.

11       Then began to see what I felt may have been

12 clothing, which didn't seem odd before as I walking through

13 because this area is somewhat littered with garbage and things

14 like that.  So, this essentially red light drew my attention.

15 And the I realized, you know, this was maybe clothing as well.

16 And all this probably only took just a second, but it seemed

17 like ten minutes that I was looking at this.  And I looked

18 over a little bit to the right of the red light and looked

19 into the face of what appeared to be Ms. Freeman.

20       MS. SOUBLET:    Your Honor, now would be the

21 time for No. 41.

22       THE COURT:    Okay.

23       I just want to tell people and apprise the jury

24 and everybody that the next photo will show the body.  And

25 we've heard descriptions of the body.  So, it's not going to

Wetmore   D   D6 208

1  be pleasant.  But if there's any member of the audience that

2  does not want to see this, this is the time to leave.  Because

3  I want no reaction from anybody about this.

4          Okay, you're warned.

5          Go ahead.

6      Q.   Officer Wetmore, State's Exhibit No 41, can you tell

7  the jurors what it is they see there?

8      A.   It's a little bit difficult for me to see the lower

9  right of the photograph.  But in the center essentially that's

10  one of the legs that's sticking up in the air with a foot

11  exposed.  The red light that I referred to was actually the

12  heel area with light coming through it is what drew my

13  attention to that area.  But that's one of the legs sticking

14  up.  And then from this angle appears to be the body as well.

15      Q.   And what did you do after finding what you believed

16  to be Ms. Freeman's remains?

17      A.   I stopped right there.  At that point when I

18  realized what I was looking at, I was approximately, maybe six

19  feet, maybe eight feet away from her with kind of a row of

20  vegetation, briars and that sort of thing, between myself and

21  the body.  And I quite honestly, I was shocked at the

22  discovery.  And I yelled out probably quite frantically for

23  Detective Mitts who came over to my location.

24      Q.   And after getting Detective Mitts over to your

25  location is that when you called out the crime team?

Wetmore   X   D6 209

1    A.   We contacted Corporal Dave Main who was our

2  supervisor at the time.  And a call out was initiated.

3    Q.   Thank you.

4          MS. SOUBLET:   I have nothing further.

5          MS. McCREA:   May I see Exhibit No. 41,

6  please.

7                 CROSS EXAMINATION

8  BY MS. MCCREA:

9    Q.   Officer Wetmore, in Exhibit No. 41, toward the

10 bottom right there's a black object.  Do you know, was that an

11 old tire?

12   A.   Looking at this photo I can't tell.  It doesn't

13 appear to be a tire to me.  And I — from memory I don't recall

14 a tire being, you know, in that area as a part of the scene.

15   Q.   Can you identify that object at all?

16   A.   Not with this photograph.  I don't recall.

17   Q.   Do you have any recollection of what that was?

18   A.   No, I don't.

19   Q.   The photographs that we've seen show yellow evidence

20 tape or crime tape along the road?

21   A.   Yes, ma'am.

22   Q.   And that was put up by you after the discovery of

23 the body to make sure that the scene stayed secure?

24   A.   Correct.  We - - -

25   Q.   (Interposing)  And like — I'm sorry.

Wetmore    X    D6 210

1      A.    I was just going to say, we blocked off the roadway

2   with our vehicles as well as strung crime scene tape.

3      Q.    And set up the orange cones?

4      A.    Possibly the cones — I don't remember.  We had it

5   thoroughly blocked off at that point.  So there wouldn't

6   necessarily — there wouldn't really have been a need for us to

7   put up the cones.  Those — I don't recall for certain if those

8   were set up by us or possibly the crime lab when they arrived.

9   Because we — we literally blocked off the entire roadway from

10  both directions.

11     Q.    And the reason that you did that was so it could be

12  a secure perimeter so that you could — you could do the exam —

13  you, being you the authorities — could do the examination that

14  needed to be done, get the body moved, and then have the rest

15  of the crime team do their forensic analysis.  Is that right?

16     A.    Correct.

17     Q.    And was — to your knowledge — once the body was

18  moved, was the scene then thoroughly searched the next day?

19     A.    From the best of my recollection — I know the scene

20  was held for some time.  I wasn't assigned to it the following

21  day, so I don't recall what may or may not have been done.  I

22  know the scene was held.  It wasn't released the moment we

23  left.

24     Q.    And the location where you found the body was not in

25  the water.  Right?

Wetmore   ReD  D6 211

1    A.   Correct.  It was not in the water.

2    Q.   All right.  Thank you.

3              MS. McCREA:    No further questions.

4              THE COURT:    Redirect.

5                   REDIRECT EXAMINATION

6    BY MS. SOUBLET:

7    Q.   How far away from the river was Ms. Freeman's body?

8    A.   Like I say, I wasn't involved in any measurements if

9    measurements were done from the river to the edge of the

10   roadway there.  But just from my best estimation, I would

11   guess I probably walked seventy-five yards; probably no more

12   than a hundred yards from the stump that I had stepped up on

13   and smelled the odor to the edge of the road.  I would guess

14   between seventy-five yards and a hundred yards.

15             MS. SOUBLET:    Nothing further.

16             THE COURT:    You may step down.

17             Do you want this witness to remain?

18             MS. SOUBLET:    No, not the State.

19             THE COURT:    Without objection you're free to

20   leave.

21             WITNESS:    Thank you, Your Honor.

22             THE COURT:    Call your next witness.

23             MS. SOUBLET:    The State calls Kris Karcher.

24

Karcher   D    D6 212

1                              <u>KRIS KARCHER</u>

2    was thereupon produced as a witness on behalf of the Plaintiff

3    and, having first been duly sworn to tell the truth, the whole

4    truth and nothing but the truth, was examined and testified as

5    follows:

6                   THE COURT:    Have a seat up here, please.

7                   Go ahead.

8                   MS. SOUBLET:    Thank you.

9                        <u>DIRECT EXAMINATION</u>

10   <u>BY MS. SOUBLET</u>:

11        Q.   Ms. Karcher, can you state your full name and spell

12   your last for the record?

13        A.   My name is Kris Karcher.  The last name is spelled

14   K-A-R-C-H-E-R.

15        Q.   How are you employed?

16        A.   I am the Chief Deputy Medical Examiner for Coos

17   County.

18        Q.   How long have you been the Chief Deputy Medical

19   Examiner for Coos County?

20        A.   Since about 2000, the Chief Deputy Medical Examiner.

21   I've been with Coos County since 1998 in the medical

22   examiner's office.

23                   MS. SOUBLET:    Ms. Karcher, I'm going to ask

24   you to put the microphone a little bit closer to you so we can

25   hear you over all the sirens outside.

Karcher   D    D6 213

1          WITNESS:    Okay.

2     Q.    As the — do you have some sort of medical degree?

3     A.    I have a Bachelor's degree in science of nursing.

4  And my background prior to being the Chief Deputy Medical

5  Examiner was in emergency room nursing.

6     Q.    How long have you had that Bachelor of science in

7  nursing?

8     A.    Since 1989.

9     Q.    How long were you employed as an emergency room

10 nurse?

11    A.    A total of about fifteen years.

12    Q.    And what sort of qualifications — what do you have

13 to go through in order to become a deputy medical examiner?

14    A.    Well, in Oregon you need to be appointed by the

15 District Attorney.  Here in Coos County we have some

16 qualifications, which is a Bachelor's degree in either a

17 medical field or in the forensic field.  And you need to be a

18 member registered with the American Academy of Medical/Legal

19 Death Investigators.  And that's a written national test that

20 you need to take and pass.

21    Q.    And I take it you took that test and passed that

22 test?

23    A.    Yes.

24    Q.    When was that?

25    A.    I believe 1997.

Karcher    D    D6 214

1    Q.    Any sort of ongoing qualifications or certifications

2    you need in order to keep that?

3    A.    Yeah.  You need to have — it's a whole list of

4    things.  Every five years you have to re-apply for

5    registration.  You don't have to take the test again, but it's

6    a lot of continuing education to keep the certification

7    current.

8    Q.    What is forensic nursing?

9    A.    Forensic nursing is — it's — it combines the nursing

10   science with forensic science and the criminal justice world.

11   So, it's just kind of a — if you put us — we're just a spoke

12   of the wheel of the whole criminal justice system.

13   Q.    Is there a — do you have some sort of degree in

14   forensic nursing?

15   A.    I have a Master's level certificate in forensic

16   nursing that I received in 1998 from the University of

17   Colorado in Colorado Springs.

18   Q.    Are there any sort of ongoing credits that you have

19   to get in order to keep that?

20   A.    No.  There is none to keep the forensic nursing, huh

21   uh.

22   Q.    And part of that studies in forensic nursing do you

23   — have you received training in strangulation?

24   A.    Yes.

25   Q.    Can you tell the jurors what that consisted of?

Karcher   D    D6 215

1      A.    That was part of our class — our classroom.  I've

2   also done a lot of separate training in strangulation, both

3   through the State of Oregon, the Department of Human

4   Resources, as well as through several of the different law

5   enforcement agencies that have taught it.  It is also

6   something that I teach on a regular basis to law enforcement,

7   to hospital personnel, to first responders, EMT's, paramedics

8   and such.

9      Q.    How many hours of instruction on strangulation do

10   you think you've received in your career?

11      A.    Received?

12      Q.    Yes.

13      A.    Oh, I would say probably several hundred hours of

14   instruction

15      Q.    And how many times have you taught it?

16      A.    Several hundred times.  Numerous times.  It's kind

17   of an ongoing classroom.  Yeah.

18      Q.    And in the course of your duties as an ER nurse, how

19   often would you see victims of strangulation?

20      A.    Often.

21      Q.    How often?

22      A.    Depending on which emergency department that I was

23   working in at the time.  But you can see several a week.  Most

24   current ER that I worked in was at Bay Area Hospital.  And I

25   would say we probably saw someone that came in with a

Karcher   D    D6 216

1  complaint of being strangled probably three to six times a

2  month, would be my guess.

3       Q.   Have you previously been qualified as an expert

4  witness on strangulation?

5       A.   Yes, I have.

6       Q.   Can you define strangulation for the jurors?

7       A.   Strangulation is — it's an asphyxia which is lack of

8  oxygen to the brain.  And you can strangle somebody either by

9  occluding their airway or by occluding their circulatory

10 system to your brain.  Your brain has to have oxygen.  And if

11 you stop either the flow of blood going in or coming out, your

12 brain will go without oxygen.

13      Q.   How much pressure is required to occlude an airway?

14      A.   Actually very little.  It takes about — the carotid

15 arteries takes about eleven pounds of pressure to block those

16 or to occlude the artery.  That's what's taking blood to the

17 brain.  It's about four pounds of pressure to the jugulars

18 which is bringing blood back out of the brain.  And about

19 thirty-three pounds of pressure on the airway or your larynx

20 here.

21           To reference that - - -

22           Can I just go on here?

23      Q.   Yes.

24      A.   To reference — so you have some idea of pounds of

25 pressure.  A male — a young male, his dominant hand can make a

Karcher   D    D6 217

1  grip of about a hundred and twenty-six pounds of pressure.

2  Between a thumb and index finger is about twenty-five pounds

3  of pressure.  So, hands around the neck can be very lethal.

4      Q.   How long does it take for someone to lose

5  consciousness?

6      A.   When you occlude the carotid which is carrying the

7  oxygen, it only takes about ten seconds.  That's similar to

8  like a choke hold which police will use sometimes.  It takes

9  about ten seconds.  The others take about sixty seconds, but

10  if it's not released, it's going to result in death probably

11  within three to four minutes.

12      Q.   In the course of your studies in both becoming a

13  forensic nurse and then becoming qualified to be a deputy

14  medical examiner, have you received training in blood spatter?

15      A.   Yes.

16      Q.   Can you tell the jurors what that consisted of?

17      A.   That also was part of my schooling back when.  It –

18  numerous conferences where they have specialized in blood

19  spatter I have attended.  I also have years of experience and

20  learning from masters that are on the scene as well as I am.

21  And then I also teach it as well.

22      Q.   What are your — what do your job duties as Chief

23  Deputy Medical Examiner entail?

24      A.   As Chief Deputy Medical Examiner I oversee all of

25  the death investigations — medical examiner death

Karcher   D   D6 218

1  investigations in the county.  Those would include, like,

2  homicides, accidents, suicides, some natural deaths.  I

3  oversee the scene investigation as well as the — like an

4  external autopsy if an autopsy is not done.  And then I

5  arrange and assist with autopsies that are done in the county.

6      Q.   And when you assist in autopsies, what do you mean?

7  What's your function there?

8      A.   My function is to get the body ready for our

9  forensic pathologist to perform an autopsy.  Usually involves

10 photographing, doing toxicology, assisting him with whatever

11 he might need as he performs the autopsy.

12     Q.   And in the summer of 2000, were you the Chief Deputy

13 Medical Examiner at that time?

14     A.   It was the day before.  It was right before I

15 started as the Chief Deputy Medical Examiner.  I was just

16 changing.

17     Q.   Had you been working part time as the Chief Deputy

18 Medical Examiner?

19     A.   I had been working part time as the Assistant Chief

20 Deputy Medical Examiner.

21     Q.   So then on August 3rd, 2000, who were you working

22 with that day?

23     A.   That was a day off.  The following day was the day

24 that I started as Chief Deputy Medical Examiner.

25     Q.   Did you go out and assist in the Leah Freeman

Karcher   D    D6 219

1   investigation that day?

2       A.   Yes, I did.

3       Q.   And who were you with?

4       A.   I was with Detective Wetmore, Detective Bennett from

5   the North Bend Police Department, and Detective Cal Mitts from

6   the Coos Bay Police Department.

7       Q.   And what areas of Coos County did you search that

8   day?

9       A.   We started in the morning at — we dropped of

10  Detective Mitts at Laverne Park up Fairview.  And it had been

11  suggested to us different areas to look.  And he was — we

12  dropped him off.  He was going to search the river.  And then

13  Detective Wetmore, myself and Detective Bennett, we went up to

14  Hudson Ridge.  And we — although we had searched that road

15  numerous times, we went further up the road.  And we kind of

16  split off.  And each one of us took an area of the road.  We

17  went for about an hour and then came back, looking on both

18  sides of the roadways.

19      Q.   And did you find Ms. Freeman's remains in that

20  location?

21      A.   No, we didn't.  Then we continued — our last

22  recommended area to look was on Lee Valley Road.  And at that

23  point we dropped off — it had been suggested that we look

24  along the creek.  And along the roadway there is an area where

25  there's kind of a cliff and it kind of goes down.  So, you

Karcher   D    D6 220

1  could drop something off and you might not see it from the

2  roadway.

3          So, our — two of us — Detective Bennett and myself

4  walked the road.  We dropped Detective Wetmore and Detective

5  Mitts off down below, along the creek bed.  And we located the

6  body — Detective Wetmore located the body just at the — just

7  off the shoulder of the road down an embankment.

8      Q.   Ms. Karcher, I'm going to hand you State's Exhibits

9  Nos. 34 through 38 and ask you to look at these and tell me if

10  you recognize them?

11     A.   Yes.

12     Q.   And what are those photos of?

13     A.   Those are depicting the area of Lee Valley Road

14  where we actually stopped to let Detective Wetmore and

15  Detective Mitts off.  And then further up the road where we

16  actually found the body.

17             MS. SOUBLET:   Your Honor, may we approach?

18             THE COURT:   Yes.

19             (SIDEBAR)

20             THE COURT:   As I did earlier, there's going

21  to be another set of photographs that are going to be more

22  graphic than the other ones.  And I have not seen them, but

23  again, we had a description of what the body looked like from

24  Ms. Wilcox.  So, if anybody again feels that they don't want

25  to be in the room when those are shown they need to leave

Karcher   D    D6 221

1   because I want no reaction from anybody.

2              And again, I just want to let the jury know

3   that these photos will be coming.

4              Okay.  Go ahead.

5              CROSS EXAMINATION, Continued

6   BY MS. SOUBLET:

7      Q.   Ms. Karcher, I'm going to hand you what's been

8   marked for identification purposes as State's Exhibits

9   Nos. 39, 40, 42, 43, and 44 and ask you to look at those and

10  tell me if you recognize those?

11     A.   Yes.

12     Q.   And what do you recognize those collectively to be?

13     A.   Those are pictures from looking over the bank and

14  pictures of the body of Leah Freeman.

15     Q.   Do those pictures depict the scene as you remember

16  them on August 3rd, 2000?

17     A.   Yes, they do.

18              MS. SOUBLET:    I would offer Nos. 39, 40, 42,

19  43, and 44.

20              MS. McCREA:    There's no objection.

21              THE COURT:    Received.

22              (Whereupon Exhibits Nos. 39, 40, 42, 43 and 44

23  were then received into evidence.)

24     Q.    Ms. Karcher, starting with State's Exhibit No. 39,

25  can you tell the jurors what it is they see there?

Karcher   D    D6 222

1      A.    That's just — the roadway is right here.  And that's

2  just the shoulder of the road and kind of an open area.  And

3  the body is right down this embankment.

4      Q.    Okay.  And State's Exhibit No. 40?

5      A.    That's also looking down.  This is her body down

6  here.  This actually is a leg.  And then — it's hard to see —

7  this is a sock and then there is a leg that comes out this

8  direction.  This is a knee of her right leg — excuse me — her

9  left leg.  And this is kind of the knee of her right leg

10  underneath.

11      Q.    And State's Exhibit No. 42?

12      A.    That's the body from about the neck down.  This is a

13  foot that has no sock on it.  And it's kind of mummified.  And

14  then this is the other leg that — the left leg crosses over

15  the right leg.

16      Q.    And State's Exhibit No. 43?

17      A.    Also of the body.  This is the head — Leah's head.

18  Her mouth is open, blonde hair.

19      Q.    And finally, State's Exhibit No. 44?

20      A.    That's just a closer of her head.  It also shows her

21  left arm.  Her left arm was kind of laying over her chest.

22  Her right arm was kind of underneath her back.

23      Q.    And what does that suggest to you, one arm over the

24  chest and the other arm under the back?

25      A.    That she rolled down this embankment.

Karcher   D   D6 223

1    Q.   After finding Ms. Freeman's remains, what did you do

2  at the scene?

3    A.   At the scene we waited for the crime lab to come.

4  Lieutenant Pex from the crime lab came.  We took some

5  photographs.  And then we removed the body.  And the body was

6  transported to Ambling and Shroeder Funeral Services.

7    Q.   And where is that located?

8    A.   In Coquille.

9    Q.   What was the reason for — actually, backing up.

10  Before you get there.  Could you tell by the condition of

11  Ms. Freeman's remains whether or not she'd been at the scene

12  for awhile?

13    A.   Yes.  She was badly decomposed.  The area around

14  where she was laying was badly discolored, stained.  The

15  foliage around her had died.  As you decompose you release

16  gases and it will kill the plants and stuff around the body.

17  And it appeared that she had laid there for awhile and

18  decomposed in that spot.

19    Q.   And on the next day, August 4th, 2000, did you attend

20  the autopsy?

21    A.   Yes, I did.

22    Q.   And who performed that autopsy?

23    A.   Doctor Olson, James Olson.  He's Coos County's

24  forensic pathologist.

25    Q.   And what was your role at the autopsy?

Karcher   D    D6 224

1      A.   My role was to take photographs, assist in any way I
2  could.  We were — the autopsy was actually done at the Douglas
3  County Medical Examiner's Office.  And they had an autopsy
4  assistant that also helped Doctor Olson.
5      Q.   You said you took photographs, what did you take
6  photographs of?
7      A.   Of the body.
8      Q.   Were any articles of clothing recovered from the
9  body?
10     A.   Yes.
11     Q.   What were those?
12     A.   Those were a — it's a men's white tank top
13 undershirt, a sports bra, pair of jeans, and one sock I
14 believe.
15     Q.   Were those seized?
16     A.   Those were seized.
17     Q.   What was the reason for seizing those?
18     A.   For evidentiary value.
19     Q.   Did you take any samples of Ms. Freeman's body and
20 send those for testing?
21     A.   Yes, we did.  We took — she was badly decomposed.
22 And so we took some muscle from one of her thighs that we did
23 a toxicology on.  And then we also took — we cut a piece of
24 the femur from the leg, the femur bone, your thigh bone, just
25 in case we needed anything for DNA we would have that.

Karcher    D    D6 225

1    Q.    Do you know how Ms. Freeman's remains were

2    identified?

3    A.    They were identified through a dentist.  His name

4    escapes me, but through dental records.

5    Q.    You said the clothing was sent for analysis.  Who

6    was that originally sent to?

7    A.    Originally the crime lab here in Coos County — in

8    Coos Bay looked at them.

9    Q.    And then did you arrange for additional testing of

10   those clothing?

11   A.    Right.  We — in one of those conferences that we all

12   attended, there was a speaker there from England.  Her name

13   was Inspector Diane Taylor.  And she spoke on the developments

14   in DNA that were being done in England.  And so we eventually

15   contacted her and we — Detective Mitts and myself actually

16   hand carried all of her clothes to England where they were

17   further tested over there.

18   Q.    And when did that testing occur?

19   A.    I believe that was in March of 2001.

20   Q.    Ms. Karcher, I'm going to hand you what's been

21   marked for identification purposes as State's Exhibits Nos. 62

22   through 72 and ask you to look at those and tell me if you

23   recognize them?

24   A.    Yes.

25   Q.    And what are State's Exhibits Nos. 62 through 72

Karcher   D    D6 226

1  photographs of?

2      A.   They're pictures of the clothes.

3      Q.   And where were those pictures taken?

4      A.   Some are taken by our crime lab in Coos Bay.  And

5  I'm not certain if there isn't some in here from — that were

6  taken over in England as well.

7      Q.   And do those pictures, Nos. 62 through 72 accurately

8  depict Ms. Freeman's clothes as you remember them?

9      A.   Yes, they do.

10          MS. SOUBLET:   I would offer State's Exhibit

11  Nos. 62 through 72.

12          MS. McCREA:   There is no objection, Your

13  Honor.

14          THE COURT:   Received.

15          (Whereupon Exhibits Nos. 62, 63, 64, 65, 66,

16  67, 68, 69, 70, 71, and 72 were then received into evidence.)

17          MR. FRASIER:   Your Honor, I feel compelled to

18  clarify the witness's testimony.  All of those pictures were

19  taken by the laboratory in London — or in England.

20          THE COURT:   Okay.  Thank you.

21      Q.   Ms. Karcher, starting with State's Exhibit No. 62,

22  can you tell the jurors what it is?

23      A.   That is that man's — it actually started off as a

24  white tank top undershirt that she was wearing.

25      Q.   And are we seeing the front or the back?

Karcher    D    D6 227

1    A.    You are seeing the front.

2    Q.    And Exhibit No. 63?

3    A.    In No. 63 you are seeing the front.  And I believe

4  it's the lower right abdomen area.  And there's some holes in

5  the — in the shirt.

6    Q.    And Exhibit No. 64?

7    A.    No. 64 is the upper right — excuse me — left chest

8  area.

9    Q.    No. 65?

10   A.    That is the back of one of the straps.  And I

11  believe it's on the left side where there's some damage on the

12  back, the upper back of it.

13   Q.    State's Exhibit No. 66?

14   A.    That is the back of the shirt showing some — it's

15  decomposition kind of damage to the back of the shirt.

16   Q.    Okay.  And State's Exhibit No. 67?

17   A.    That's also the back of the shirt.  That's up where

18  the straps have been tied in the back.

19   Q.    And State's Exhibit No. 68?

20   A.    That is the back of a sports bra.

21   Q.    And is there damage noted in State's Exhibit No. 68?

22   A.    Yeah.  On the left there, the left back, there is a

23  large hole.

24   Q.    State's Exhibit No. 69?

25   A.    That's just a close up of the back of the sports

Karcher   D    D6 228

1    bra.

2        Q.   State's Exhibit No. 70?

3        A.   That is I believe the back — it is the back of the

4    sports bra.  And I believe it's on the left side.

5             Is that what it says up there?

6             Left side.

7        Q.   State's Exhibit No. 71?

8        A.   That's the jeans that she was wearing.

9        Q.   And is that the front of the jeans?

10       A.   This is the front.  There is some holes, some damage

11   there in the crotch area and around the left pocket.

12       Q.   And is there a notation on that photograph about

13   that damage?

14       A.   Not on my photograph, there is not.

15       Q.   State's Exhibit No. 72?

16       A.   That's the back side of the jeans with again some

17   damage in the crotch area and the inner thigh.

18       Q.   And are you aware of whether or not the lab in

19   England completed a report?

20       A.   Yes, they did.

21       Q.   I'm showing you State's Exhibit No. 211 which has

22   been stipulated to and asking you to look at it and tell me if

23   you recognize that?

24       A.   Yes, I do.

25       Q.   What is it?

Karcher   D   D6 229

1      A.    This is a report from the Chorley Laboratory in

2  Chorley, England.  And it's a brief description of each of

3  those articles that we just looked at.  And then their summary

4  and conclusion.

5      Q.    What is their summary and conclusion of

6  Ms. Freeman's clothing?

7      A.    That there is nothing to indicate the presence of

8  semen on the items examined.  There was no specific pattern in

9  blood to indicate trauma such as a stabbing assault, although

10 such possibility cannot be discounted.  The tapings and

11 swabbing that were — they were going to be retained.  They

12 also lifted with tape and took swabs.

13          Anyway, the overall findings was that there was no

14 additional scientific evidence to further the investigation.

15     Q.    After returning from England and getting the clothes

16 back, did you arrange for additional testing of that clothing?

17     A.    We — yes, we did.

18     Q.    Okay.  And where did that testing take place?

19     A.    That took place in — it's called Microtrace.  And

20 it's in Elgin, Illinois which is a suburb of Chicago I do

21 believe.

22     Q.    And when were the — do you know when the clothes

23 were sent to Microtrace?

24     A.    I don't — I don't remember the date right off the

25 top of my head.  It's been within the last year or two.

Karcher   D    D6 230

1    Q.   Ms. Karcher, I'm going to hand you State's Exhibits

2   Nos. 212 and 213 which have been stipulated to and ask you to

3   look at those and tell me if you recognize them?

4    A.   Yes, I do.

5    Q.   What — starting with State's Exhibit No. 212, what

6   is that?

7    A.   This is a report that was written to Lieutenant

8   Smith with the Coquille Police Department.  And it's just

9   referencing the items that were received in his — in their

10   laboratory.  Um - - -

11    Q.   (Interposing) Ms. Karcher, let me interrupt you

12   right there.

13    A.   I'm sorry.

14        MS. SOUBLET:   I would offer Nos. 211, 212 and

15   213.

16        MS. McCREA:   We did stipulate and we do

17   stipulate to those.

18        THE COURT:   Those three exhibits are

19   received.

20        (Whereupon Exhibits Nos. 211, 212 and 213 were

21   then received into evidence.)

22    Q.   You can continue.

23    A.   Thank you.

24        Anyway, it's a summary of what — what all had been

25   sent to their lab in Elgin, Illinois.  And then what they also

Karcher    D    D6 231

1  located on the items that were sent.

2      Q.    And what was the conclusion from Microtrace about

3  the articles of clothing that were sent?

4      A.    They found — we initially sent two tape lifts from

5  Leah's clothes that were actually taken on the scene when we

6  found Leah.  We sent those.  We sent her clothes to compare

7  any of the fibers that might have — might coexist between the

8  two items.

9          In summary they were able to find a few human hairs.

10  And they found some paint — a paint particle on one of her

11  items of clothing, her shirt.  And were not able to continue

12  any further with that.

13          They sent the hair samples back to us.

14      Q.    And what about State's Exhibit No. 213?

15      A.    No. 213 is items that were sent from a Mustang and

16  also a Kia.

17      Q.    And what's the conclusion of Microtrace in reference

18  to those articles?

19      A.    Basically the same.  They were able to find some

20  human hair, but nothing definitive that would link the car

21  with the victim.

22      Q.    Did you have an opportunity to assist in the

23  processing of vehicles associated with this case?

24      A.    Just the Mustang, not the Kia.

25      Q.    And when did that happen?

Karcher   D    D6 232

1    A.    That happened — I am not certain of the date.

2    Q.    What was your role in processing the vehicle?

3    A.    I just went and helped Mr. Pex who was processing

4    the vehicle.  I went and helped in any way I could.  I took

5    some photographs.

6    Q.    Are you aware of whether or not any items of

7    evidentiary value were recovered?

8    A.    We — he used a vacuum and actually vacuumed the

9    trunk area.  And vacuumed it in through a filter so that there

10   was a filter catch that caught any trace evidence that might

11   have been in there.  He also did a couple of swabs which was —

12   he — was presumptive for blood.  Which turned out not to be

13   blood.

14          He took some samples of the rug in the back of the

15   window.  And also some — I believe there was some foam that

16   was in the back seat area.  He collected that.

17   Q.    Did you have an opportunity to examine any other

18   articles of clothing that belonged to Ms. Freeman?

19   A.    No.

20   Q.    Did you have an opportunity to examine or look at

21   any shoes that belonged to Ms. Freeman?

22   A.    I saw her shoes, yes.

23   Q.    Now, are you aware of whether or not there was

24   anything of evidentiary value on those shoes?

25   A.    There was high velocity blood spatter on the shoe.

Karcher    X    D6 233

1   It would be the show that was found at Hudson Ridge.

2        Q.    How can one get high velocity blood spatter?

3        A.    High velocity blood spatter is usually seen like

4   with a gun shot wound or an explosion, something like that.

5   It's more of like a mist.  But you can get it when you cough

6   or when you sneeze.  If there's blood in your mouth or nose it

7   will spray out of your mouth like a high velocity blood

8   spatter would if it was a gun shot.

9        Q.    Would it be possible to get that from strangulation?

10       A.    You could get — remember when I said the blood goes

11  up and it needs to come back.  And sometimes when it goes up,

12  it can keep going up and it can cause like venus pressure.  I

13  mean the veins just fill up and fill up until they might

14  rupture.  Could rupture in the nose; in the mouth.  The other

15  thing she could — there could have been something, a cut in

16  her mouth.  She was wearing braces.  Anything that would have

17  produced a little blood, either in her nose or her mouth could

18  have caused that high velocity blood spatter.

19       Q.    Thank you.

20             MS. SOUBLET:    I have nothing further.

21             THE COURT:    Ms. McCrea.

22                    <u>CROSS EXAMINATION</u>

23  <u>BY MS. MCCREA:</u>

24       Q.    So, Ms. Karcher, the reason that you and Cal Mitts

25  took Ms. Freeman's clothes — and you also took her shoes to

Karcher    X    D6 234

1   the United Kingdom, to the UK, was because you — you, meaning

2   the powers that be, the authorities so to speak.

3       A.   Uh huh.

4       Q.   Felt that England, the UK was maybe five to ten

5   years ahead of the United States back in 2000 on what's known

6   as touch DNA?

7       A.   Yes.

8       Q.   Is that right?

9       A.   Yes.

10      Q.   Okay.  And can you give us just a brief run down on

11  what touch DNA is?

12      A.   Touch DNA is what they're — they're doing more

13  routinely here in the United States.  But it's the ability to

14  — it's kind of a low count numbered DNA.  And it has to do

15  with how the DNA is replicated.  But they're able to —

16  anything that you might have touched, they can swab that and

17  get DNA.  They're doing it now more with, like, grabbing skin.

18  They're able to swab the skin and get DNA from an assailant.

19      Q.   Okay.  So — and there's different kinds of DNA.

20  Right?  So, you've got touch DNA, you've got mitochondrial

21  DNA.  And I think there's another kind of DNA, also?

22      A.   Yeah, uh huh.

23      Q.   But these things went to England because they were

24  experts and they were going to see what they could do?

25      A.   Yes.

Karcher   X   D6 235

1    Q.   All right.  And the report that came back indicated,

2    in terms of their findings, that stabbing as a cause of death

3    could not be ruled out.  Is that fair?

4    A.   That's what their conclusion was, yes.

5    Q.   Okay.  And that was back in — I'm sorry — was it

6    2000 or 2001?

7    A.   It was — I believe that we were there in March of

8    2001.

9    Q.   Okay.  Then, the situation with Microtrace — well,

10   before anything was sent to Microtrace, the 1967 blue Mustang

11   was — no longer belonged to Mr. McGuffin.  Is that right?  If

12   you know.

13   A.   It's my understanding that it no longer belonged to

14   Mr. McGuffin.

15   Q.   And through arrangements with the current owner,

16   that Mustang was taken into police custody again in 2010 — or

17   was that — yeah, 2010?

18   A.   Yes.

19   Q.   Okay.  So, the authorities had possession of the

20   Mustang.  And another thorough search as you've described by

21   Mr. Pex, was conducted.  Is that fair?

22   A.   That's fair.

23   Q.   And you were with him and taking note and taking

24   photos and that sort of thing?

25   A.   Yes.

Karcher   X   D6 236

1    Q.   And so at that time the — and the Mustang was in

2    police custody for more than twenty-four hours, wasn't it?

3    A.   As far as I know.  It's kind of out of my realm.

4    Q.   I understand.  But it wasn't like a rush situation?

5    A.   No.

6    Q.   You had plenty — you and Mr. Pex had all the time

7    that you needed to search that Mustang as much and as

8    completely as you wanted to?

9    A.   Yes.

10   Q.   And you did so?

11   A.   Yes.

12   Q.   And that included as you said Mr. Pex using a vacuum

13   with a filter and using that in every crack and crevice of the

14   Mustang?

15   A.   Yes.

16   Q.   You're nodding yes.  Okay.

17        And even like the — what is it?  The bolts were

18   examined.  Right?

19   A.   Yes.

20   Q.   Okay.  It was a very thorough examination?

21   A.   Yes.

22   Q.   And you know that the Kia was also obtained and

23   processed as well.  Is that right?

24   A.   Yes, uh huh.

25   Q.   Okay.  And then all of the things that were found as

Karcher    X    D6 237

1    a result of the processing of the Mustang were sent to this

2    lab at Microtrace?

3        A.    Yes.

4        Q.    And in addition, what was found in the Kia was sent

5    to the lab at Microtrace?

6        A.    Yes.

7        Q.    In addition, Leah Freeman's clothing and her shoes

8    were sent to Microtrace for them to do an independent trace

9    evidence analysis.  Is that fair?

10        A.    That's fair, yes.

11        Q.    Okay.  So, in terms of Microtrace doing their

12    independent analysis, they — you said they found some hairs

13    and some things.  The big thing that they found — and it

14    wasn't actually literally big, but the interesting thing that

15    they found, let's say, was a paint chip particle that you

16    mentioned?

17        A.    Yes.

18        Q.    And that was gray in color, wasn't it?

19        A.    Yes, it was.

20        Q.    And the reason — well, scratch that.

21             And in addition to the other things that were sent

22    to Microtrace, that you and Mr. Pex had obtained from

23    processing the Mustang, paint samples of that Mustang were

24    sent to Microtrace as well, weren't they?

25        A.    As far as I know, yes.

Karcher   X    D6 238

1    Q.   Well, and the intention was for Microtrace to be

2    able to compare this gray paint chip particle that had come

3    off Leah Freeman's tank top to see if it matched the paint on

4    Mr. McGuffin's Mustang?

5    A.   Yes.

6    Q.   And that comparison was done, wasn't it?

7    A.   Yes, it was.

8    Q.   And there was absolutely no match between that paint

9    particle and Mr. McGuffin's Mustang?

10    A.   No.

11    Q.   No there wasn't?

12    A.   No there wasn't.

13    Q.   Okay.  And likewise, the paint particle did not

14    match the Kia?

15    A.   Correct.

16    Q.   Okay.  Now, when you — when you saw Ms. Freeman's

17    body, is it correct, Ms. Karcher, that she was fully clothed?

18    A.   Yes, she was.

19    Q.   All right.  So, her jeans were completely on her

20    body?

21    A.   Yes, they were.

22    Q.   She had the sports bra on?

23    A.   Yes.

24    Q.   And the tank top was over the sports bra?

25    A.   Yes, it was.

Karcher   X   D6 239

1     Q.    Now, in addition to the testing and things that

2   you've mentioned here today, there were also efforts to obtain

3   maggot casings from under where the body had been?

4     A.    Actually the maggot casings are a short distance

5   from where the body.  Maggots tend to migrate and then — and

6   dig a hole in the soil.  And become flies later on.

7     Q.    Right.

8     A.    Uh huh.

9     Q.    Sorry.

10    A.    Uh huh.

11    Q.    You're absolutely right.

12          But there was an effort made to collect

13  approximately a hundred of these maggot casings.  And those

14  were sent to the FBI for analysis.

15    A.    Yes.

16    Q.    Is that correct?

17    A.    Yes, they were.

18    Q.    Now, you were present for the autopsy with Doctor

19  Olson?

20    A.    Yes, I was.

21    Q.    And you're familiar with what we call the hyoid

22  bone?

23    A.    Yes, I am.

24    Q.    All right.  That's H-Y-O-I-D and it's really hard to

25  say?

Karcher   X   D6 240

1      A.   Uh huh.

2      Q.   Okay.  And the hyoid bone is in the neck.  Correct?

3      A.   Correct.

4      Q.   All right.  And a lot of times — not every time —

5  but a lot of times, if a person has been strangled there will

6  be a fracture to the hyoid bone.  Is that fair?

7      A.   Yes, that's fair.

8      Q.   And sometimes it will be broken?

9      A.   Yes.

10     Q.   Now, the hyoid bones comes in — in this situation it

11  was actually in three pieces?

12     A.   Right.

13     Q.   And it doesn't fuse.  That's how it comes?

14     A.   You're hyoid bone fuses in early — in your early

15  twenties.  It comes — you're born with a hyoid bone, but it

16  comes in three pieces.  It does not fuse as one until you

17  reach your early twenties.

18     Q.   Right.  And Leah Freeman's hyoid bone was still in

19  three pieces?

20     A.   Yes, it was.

21     Q.   But it did not appear that there had been any injury

22  to it.  Is that right?

23     A.   That's right.

24     Q.   Okay.  And based on your examination and analysis

25  you did not find a cause of death for Ms. Freeman, did you?

Karcher   ReD  D6 241

1       A.   No, we didn't.

2       Q.   And you didn't find a probable slash possible cause

3  of death either, did you?

4       A.   No, we didn't.

5       Q.   Thank you.

6            MS. McCREA:    That's all the questions I have,

7  Your Honor.

8            THE COURT:    Any redirect?

9            MS. SOUBLET:    Just briefly.

10           Thank you, Your Honor.

11                    REDIRECT EXAMINATION

12 BY MS. SOUBLET:

13      Q.   Ms. Karcher, is it your understanding that the

14 reason the lab in England was unable to recover DNA was due to

15 the condition of the clothing?

16      A.   Yes.  It was badly decomposed.

17      Q.   Where is the hyoid bone located?

18      A.   The hyoid bone is — it's kind a horseshoe shaped

19 bone that's right in your — it's at the top of your larynx or

20 your airway and holds your tongue out of the way.  It's

21 attached to nothing other then tissue, but it's what keeps

22 your tongue from falling down into your throat.

23      Q.   And in the case of strangulation, the hyoid bone

24 would not be broken if the only thing that was cut off was the

25 blood.  Is that correct?

Karcher   ReD  D6 242

1    A.   That's — yeah, that's why you don't always see it

2    fractured.  Is there's numerous ways to strangle that don't

3    affect the hyoid bone.

4    Q.   You had an opportunity to observe the complete

5    autopsy of the Ms. Freeman's remains.  Is that correct?

6    A.   Yes.

7    Q.   And during that, were her bones examined?

8    A.   Yes, they were.

9    Q.   And what were they examined for?

10   A.   I should rephrase that.  She was x-rayed for

11   fractures.  And then all of her ribs, vertebras were all

12   examined for any sort of defect, like a cut from a knife,

13   anything like that.

14   Q.   Did you find any defects?

15   A.   No, we didn't.

16   Q.   Did you find any fractures?

17   A.   No, we didn't.

18   Q.   And in fact didn't Doctor Olson determine her death

19   - - -

20           MS. McCREA:    (Interposing) Well, excuse me.

21   I object to the leading nature of redirect, Your Honor.

22           THE COURT:    Sustained.

23   Q.   Was Doctor Olson able to determine whether or not

24   her death was accidental?

25           MS. McCREA:    Well, I object.  It calls for

Karcher   ReD  D6 243

1  speculation on the part of the witness.

2           MS. SOUBLET:   I think Counsel opened the door

3  with her questions.

4           THE COURT:   Well, Doctor Olson's going to

5  testify, isn't he?

6           MR. FRASIER:   He is.

7           MS. SOUBLET:   He is.

8           THE COURT:   Okay.

9           Go on to something else.

10           MS. SOUBLET:   I have nothing further.

11           THE COURT:   You may step down.  You're free

12  to leave.

13           MR. FRASIER:   Your Honor, could we approach?

14           THE COURT:   Yes.

15           (SIDEBAR)

16           THE COURT:   Call your next witness.

17           MR. FRASIER:   Call Melissa Beebe.

18           THE COURT:   We were just discussing some

19  scheduling things.

20                    MELISSA BEEBE

21  was thereupon produced as a witness on behalf of the Plaintiff

22  and, having first been duly sworn to tell the truth, the whole

23  truth and nothing but the truth, was examined and testified as

24  follows:

25           THE COURT:   Have a seat up here, please.

Beebe   D   D6 244

1        Go ahead.

2            MR. FRASIER:   Thank you, Your Honor.

3                    DIRECT EXAMINATION

4   BY MR. FRASIER:

5        Q.   Could you state your name please, ma'am, and spell

6   your last name for the record?

7        A.   Melissa Beebe, B-E-E-B-E.

8        Q.   Where do you live?

9        A.   Coquille.

10       Q.   How long have you lived in Coquille?

11       A.   All my life.

12       Q.   Are you acquainted with an individual named Leah

13  Freeman?

14       A.   Yes.  She was my cousin.

15       Q.   Are you acquainted with the Defendant in this case,

16  Nicholas McGuffin?

17       A.   Yes.

18       Q.   How do you know Mr. McGuffin?

19       A.   Through the relationship with Leah and him had.

20       Q.   I take it you were aware they were boyfriend and

21  girlfriend?

22       A.   Yes.

23       Q.   Now, I want to direct your attention, ma'am, to

24  November the 3rd of 2003.  Do you recall where you were that

25  day?

Beebe    D    D6 245

1    A.    Yes.

2    Q.    Where were you?

3    A.    Coos County Courthouse.

4    Q.    Do you recall what time of the day it was?

5    A.    Actually I believe it was after lunch time.  I'm not

6    quite sure what time of the day it was.

7    Q.    Did you see the Defendant that day?

8    A.    Yes, I did.

9    Q.    Where did you see him?

10   A.    On the front steps out here, in front of the

11   courthouse.

12   Q.    And did you ask him any questions?

13   A.    Yes, I did.

14   Q.    What question did you ask him?

15   A.    I asked him, "How did court go?"

16   Q.    How did the Defendant respond?

17   A.    He said, "Good.  It went real good."  I think is

18   exactly what he said.

19   Q.    How did you respond to that?

20   A.    In a way I probably shouldn't have.  I said, "Well,

21   it's a lot better than it should have gone for you."  Is what

22   I said.

23   Q.    What happens then?

24   A.    He crossed the street over to his vehicle and turns

25   around and said, "Yes.  It's amazing what you can get away

Beebe   X   D6 246

1  with in Coos County, now, isn't it?"

2      Q.   Was he with anybody?

3      A.   Yes.  I believe it was his girlfriend.

4      Q.   Thank you.

5          MR. FRASIER:    That's all the questions I

6  have.

7                  CROSS EXAMINATION

8  BY MS. MCCREA:

9      Q.   Ms. Beebe, Mr. McGuffin was not here at the

10 courthouse on anything to do with this case, was he?

11     A.   No, I don't believe so.

12     Q.   Okay.  And this was back in 2003?

13     A.   Correct.

14     Q.   And when you said how did court go?  You didn't say

15 it in a friendly way, did you?

16     A.   Not exactly, no.

17     Q.   Okay.  You kinda said it in a way to goad him,

18 didn't you?

19     A.   Probably so.

20     Q.   And he responded in kind?

21     A.   I think he responded exactly how he wanted to

22 respond.

23     Q.   Well, you said sort of sarcastically, "How did court

24 go?"

25     A.   "How did court go?"

Beebe   X   D6 247

1     Q.   All right.  And then responded by saying, "Good.

2  Real good?"

3     A.   Uh huh.

4     Q.   All right.  And that infuriated you, didn't it?

5     A.   It made me a little bit irritated, yeah.

6     Q.   Okay.  Well, you wrote down — it made you so angry

7  you wrote down a statement in November after this happened.

8  Right?

9     A.   Yes, I did.

10    Q.   And the term you used was infuriated.

11    A.   Okay.

12    Q.   Do you want to see your statement?

13    A.   No, that's fine.

14    Q.   Okay.  Because I'm happy to show it to you.  I'm not

15  trying - - -

16    A.   (Interposing) That's fine.

17    Q.   Okay.  And by the time you made the next comment to

18  him he was across the — he had crossed Baxter Street.  Right?

19    A.   Correct.

20    Q.   And you yelled at him, "Good.  It's a lot better

21  than you should be?"

22    A.   Yes, that's right.

23    Q.   And that's when he responded back to you about it's

24  amazing what you can get away with in Coos County?

25    A.   Correct.

                                        Beebe   X   D6 248

1      Q.   All right.  And he didn't say anything else?

2      A.   Nope.

3      Q.   You didn't say anything else?

4      A.   No.

5      Q.   That was the whole contact?

6      A.   That was it.

7      Q.   All right.

8           MS. McCREA:    Nothing further, Your Honor.

9           THE COURT:    Redirect.

10          MR. FRASIER:    I have nothing further, Your

11   Honor.

12          THE COURT:    You may step down, ma'am.  You're

13   free to go.

14          WITNESS:    Thank you.

15          MR. FRASIER:    Your Honor, I'd ask the Court

16   to take Judicial Notice of its file of 03CR1566, unrelated

17   matter involving the Defendant.  In particular I'd ask the

18   Court to take Judicial Notice that the Defendant had an

19   appearance in Court on November the 3rd, 2003.

20          MS. McCREA:    I'm sorry.  What was the case

21   number, Counsel?

22          THE COURT:    03CR1566.

23          MS. McCREA:    1566.

24          THE COURT:    And without objection, the Court

25   will take Judicial Notice that Mr. McGuffin was in court on

```
                                        Beebe   X    D6 249
```

1   November 3rd, 2003.

2                MR. FRASIER:   Your Honor - - -

3                THE COURT:   You can consider that as a fact

4   in this case.

5                MR. FRASIER:   The next witness I have would

6   be more than what we have time for tonight.  So, I would

7   suggest we adjourn until tomorrow.

8                THE COURT:   I will excuse you for the

9   evening.  The State has indicated it may rest its case

10  tomorrow, even in the morning.  And the Defense would start.

11  We will still be going into next week.  And I won't speculate

12  on how long that is at the present time.  But just be here at

13  9:00 tomorrow.

14               It should be fine, Cathy?

15               JUDICIAL ASSISTANT:   (No audible response.)

16               THE COURT:   Okay.

17               Just be here at 9:00.

18               Remember the admonition.  Leave your notes in

19  the jury room.

20               Everybody else remain seated until the jury has

21  a chance to leave the courtroom.

22               (Jury Out.)

23               THE COURT:   Two things, Counsel.  One, there

24  was an Exhibit No. 33 which was the picture of the annual that

25  I conditionally received on the basis of Counsel agreeing what

D6 250

1   pages would come out of that.  And you've now agreed to it.

2   So, I don't see any reason not to receive a picture of that.

3                    Does anybody have anything further on that?

4                    MS. McCREA:    That's fine, Your Honor.

5                    THE COURT:    No. 33 is received.

6                    (Whereupon Exhibit No. 33 was then received

7   into evidence.)

8                    THE COURT:    The next issue is Exhibit No.

9   216.  And - - -

10                   MR. FRASIER:    (Interposing) Your Honor, I'll

11  just withdraw that to solve everybody's problems.

12                   THE COURT:    Okay.  (Not understandable)

13  easier.

14                   It's — you don't want it in evidence then?  I

15  mean, you don't want it as - - -

16                   MR. FRASIER:    (Interposing) I'll just

17  withdraw it.

18                   THE COURT:    Withdraw it.  Okay.

19                   No. 216 is withdrawn.

20                   Unless there's anything else?

21                   MS. SOUBLET:    There is, Your Honor.  I'd like

22  to be heard on the issue of Exhibit No. 84, Mr. Bartley's time

23  line.

24                   Your Honor sustained an objection to its

25  admission yesterday as hearsay.  And I would actually offer it

D6 251

1   I think as impeachment of Mr. Bartley.  I specifically

2   questioned him from that time line for that reason.  He

3   indicated his memory was better then than it was when he was

4   testifying here today and actually gave answers consistent

5   with having to be refreshed from Exhibit No. 84.

6           So, I think it's admissible as 613 for

7   impeachment purposes.

8           MS. McCREA:   I don't agree.  And I guess what

9   I'd ask is to be able to think about it overnight and provide

10  the Court with a reasoned response.

11          THE COURT:   Okay.

12          I prefer those to unreasoned responses.

13          MS. McCREA:   Well, I might fare better with a

14  reasoned response.

15          THE COURT:   Right.

16          MS. McCREA:   So, if we could take it up first

17  thing in the morning?

18          THE COURT:   That's fine.

19          MS. McCREA:   Thank you.

20          THE COURT:   Could you give me that —

21  Mr. Barley's time line?

22          What's the exhibit number?

23          MS. SOUBLET:   No. 84.

24          THE COURT:   Okay.

25          Thank you.

D6 252

1    Oh, I just need to see Counsel briefly in my

2 office.

3    MS. SOUBLET:    All of us?

4    THE COURT:    No. 241 is what?

5    No. 241 was the Grand Jury testimony of

6 Ms. Reib?

7    MR. FRASIER:    Yes.  I haven't offered — well,

8 we - - -

9    THE COURT:    (Interposing)  You haven't

10 offered it?

11    MR. FRASIER:    Well, I did offer it, but they

12 wanted time to review it.

13    MS. McCREA:    And the problem is I have a

14 Macintosh computer so I can't play what they provided me.  But

15 I know that Mr. Frasier discussed it with Mr. McCrea.  And I

16 think there's been an agreement.  But he's — since we're - - -

17    THE COURT:    (Interposing) To admit it or not

18 to admit it or - - -

19    MS. McCREA:    Well, to admit the — of the

20 excerpt that Mr. Frasier wants to admit for impeachment.

21    THE COURT:    Okay.

22    MS. McCREA:    Or Ms. - - -

23    MS. SOUBLET:    (Interposing) Well, before we

24 go downstairs why don't we just play it on our computer since

25 we're done for the day?

D6 253

1           MS. McCREA:    Well, I think they've already
2 got it set.  So, we're fine.
3           THE COURT:    If you want to listen to it, I'll
4 play if for you.
5           THE COURT:    So, you've worked out what you're
6 going to play?
7           MR. FRASIER:    Yes.
8           THE COURT:    Okay?
9           MS. McCREA:    Yes.
10          THE COURT:    Then No. 241 will be received as
11 it relates to what you're going to play.
12          (Whereupon Exhibit No. 241 was then received
13 into evidence.)
14          MR. FRASIER:    Do you want to see all four of
15 us, you know, or just - - -
16          THE COURT:    (Interposing) Yeah, that would be
17 fine.
18                  (END OF DAY SIX.)

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

STATE OF OREGON,                        )
                                        )
            Plaintiff,                  )     CASE NO. 10CR0782
                                        )
                                        )        JURY TRIAL
        vs.                             )          DAY 7
                                        )
 NICHOLAS JAMES McGUFFIN,               )
                                        )
            Defendant.                  )
_____)


TRANSCRIPT OF PROCEEDINGS

Volume 11, Pages D7 2-D7 193

        BE IT REMEMBERED That, the above-entitled cause

came on regularly for hearing on Day 7 of the trial, beginning

at 9:08 a.m. on Thursday, July 14, 2011, in the Circuit

Courtroom of the Coos County Courthouse in the City of

Coquille, County of Coos, State of Oregon, before the Honorable

Richard L. Barron, and a jury.

APPEARANCES

R. Paul Frasier, District Attorney for Coos County,
representing the Plaintiff.

Erika Soublet, Assistant District Attorney for Coos County,
representing the Plaintiff.


Shaun McCrea, Attorney at Law, representing the Defendant.

Robert McCrea, Attorney at Law, representing the Defendant.

        Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

D7 2

1      *                          *                          *

2                  (Jury in.)

3                  THE COURT:    Be seated.  Good morning.

4                  Mr. Frasier?

5                  MR. FRASIER:    Your Honor, before we start

6      with testimony, I have a couple housecleaning things to do.

7                  THE COURT:    Okay.

8                  MR. FRASIER:    First of all, I don't believe

9      I've done it yet.  But, we would offer into evidence the

10     clothing of Ms. Freeman and her shoes, which would be State's

11     Exhibits 96, 97, 98, 99, 100 and 201.

12                 THE COURT:    Any objection?

13                 MS. McCREA:    No, Your Honor.

14                 THE COURT:    They're all received.

15                 (Whereupon Plaintiff's Exhibit Nos. 96, 97, 98,

16     99, 100 and 201 were received into evidence.)

17                 MR. FRASIER:    We would also offer State's

18     Exhibits 203 which is the toothbrush of Ms. Freeman, 204, 205

19     and 206, which are the DNA standards from Cory Courtright,

20     Danny Freeman and the Defendant.

21                 MS. McCREA:    There's no objection.

22                 THE COURT:    Those are received.

23                 (Whereupon Plaintiff's Exhibit Nos. 203, 204,

24     205, and 206 were received into evidence.)

25                 MR. FRASIER:    We would also offer — I believe

D7 3

1  we have an agreement that without having to recall Sheriff

2  Zanni, that certain exhibits — I'm going to agree that certain

3  things that they want to have that were seized by Officer

4  Wetmore and Sergeant — or, excuse me, Sheriff Zanni, to be

5  admitted without recalling them.

6           I have three exhibits, which would be State's

7  Exhibits 237, 238 and 239.

8           MS. McCREA:    Yes.

9           THE COURT:    Those are received.

10          (Whereupon Plaintiff's Exhibit Nos. 237, 238

11  and 239 were received into evidence.)

12          MR. FRASIER:    With that, we would call Jim

13  Pex.

14          THE COURT:    When we ended yesterday, there

15  was an offer on State's Exhibit 84.  And I think we can take

16  that up a little later, because there may be a couple things

17  that I want to hear about and review.  So, we'll take that up

18  a little later.

19                         JAMES PEX

20  was thereupon produced as a witness on behalf of Plaintiff and,

21  having first been duly sworn to tell the truth, the whole truth

22  and nothing but the truth, was examined and testified as

23  follows:

24          THE COURT:    Have a seat here, please.  Thank

25  you.

Pex    D        D7 4

1                      <u>DIRECT EXAMINATION</u>

2    <u>BY MR. FRASIER:</u>

3        Q.    Could you state your name please, sir, and spell your

4    last name for the record?

5        A.    My name is James Pex, P-E-X.

6        Q.    And what is your occupation, sir?

7        A.    I retired from the Oregon State Police and I now run

8    my own businesses in forensic consulting.

9        Q.    When you worked for the State Police what did you do,

10   sir?

11       A.    I was the Director of the State Police Crime

12   Laboratory here in Coos Bay, and Interim Director for the Crime

13   Laboratory in Medford.

14       Q.    The Crime Laboratory in Coos Bay — does it exist?

15       A.    Not anymore.  No.

16       Q.    What happened there?

17       A.    Budgetary cuts.

18       Q.    And after the Lab closed, is that when you retired?

19       A.    After I retired, the Lab closed.

20       Q.    Oh.  Okay.  In that regards?

21       A.    Yes.

22       Q.    Okay.  Well, could you tell us a little bit, sir,

23   about your — well, your training and background in forensic

24   science?

25       A.    Yes.  I have a Master of Science, primarily in

```
   D7 5                                    Pex   D
```

1  Chemistry, from Southern Oregon University.  My Bachelors

2  Degree was from OIT in Medical Technology.  I joined the Oregon

3  State Police in 1978 and went through a lot of different

4  training courses, both in Oregon and at the FBI Academy in

5  Quantico, Virginia.

6          I worked in the Eugene Crime Laboratory and the

7  Medford Crime Laboratory for approximately ten years, was

8  promoted to the Director of the Laboratory here in Coos Bay in

9  about 1990.  I stayed there as the Director, and I also

10 continued to work cases and crime scenes until my retirement.

11     Q.   Could you tell us if you have a specialty

12 certifications?

13     A.   Yes, I do.  My specialty certifications — I'm a Board

14 Certified Forensic Scientist with the American Board of

15 Criminalistics.  Of course I'm — I was a Certified Police

16 Officer and I have it in retired status, and a specialist

17 certification in Clinical Chemistry with the American Society

18 of Clinical Pathology.

19     Q.   What does "board certified" mean?

20     A.   It means you take a national exam and you have to

21 pass the exam in order to be accepted by the association.

22     Q.   Do you belong to any professional societies?

23     A.   Yes, I do.  I belong to the American Academy of

24 Forensic Sciences, the International Association of Blood Stain

25 Pattern Analysts, the Association of Tool Mark and Firearm

Pex   D        D7 6

1  Examiners, the American Board of Criminalistics, and the

2  International Association for Identification.

3      Q.   Could you tell us, well, about your professional

4  experience in forensic science?

5      A.   As I joined the State Police in 1978, it was our

6  practice to be general Criminalists at that time.  The training

7  began in-house with the more experienced members of the

8  Laboratory.  We started going out on crime scenes.  I think I

9  went out on my first one within a couple of months of moving to

10 Eugene.  And we continue working in general criminalistics,

11 which means that you go out to the crime scenes.  You do the

12 photography.  You collect your own evidence.  You bring it back

13 to the Laboratory and you do your own examinations at that

14 time.

15      If there were bullets in rifles and guns involved, we

16 would examine them ourselves.  If it was a trace evidence

17 examination, we would look at the hairs and fibers ourselves —

18 and the clothing exams — and then we would write reports and

19 testify to our findings.

20      As forensic science developed in the later years of

21 my work with the State Police, they became more specialized and

22 we would send evidence off to individuals who did nothing but a

23 certain type of evidence examination.  So, there was a

24 transition period later in my career to a more specialized area

25 of forensic science.

D7 7                                              Pex   D

1      Q.   What area was that?

2      A.   For me it was blood stain pattern analysis, firearms,

3   tool marks examinations, and crime scenes.

4      Q.   Now, when you were the Director of the Crime Lab what

5   were your duties there?

6      A.   It was to supervise the other members of the

7   Laboratory, participate in crime scene examinations within our

8   region, which extended from the California border as far north

9   as Lincoln City, and in as far as Roseburg at different times.

10     Q.   Have you received any special awards for your work?

11     A.   Yes, I have.  I was recognized by the American

12  Academy of Forensic Sciences with their Regional Award in

13  Criminalistics in 1985.  I received an Oregon State Police

14  Commendation Award from the Superintendent of State Police in

15  1991.  I received another Public Service Award from the Oregon

16  Peace Officers Association in 1996.  I received a District

17  Attorney's Commendation Award from Coos County District

18  Attorney Paul Burgett in 1998.

19          Then I received another Oregon State Police Letter of

20  Commendation from the Forensic Services Division in February of

21  1999.  I received a second Public Service Award from the Oregon

22  Peace Officers Association in May of 2000.  And then again

23  received an Oregon State Police Commendation Award from the

24  Forensic Services Division of the State Police in 2001.

25     Q.   Outside of your work as a Criminalist, have you had

Pex   D         D7 8

1   other awards given to you?

2        A.   Um, I'm trying to think what comes to mind.  I

3   participated in a lot of other things.  I sit on the — I have a

4   Governor's Appointment to the Ocean Policy Advisory Board for

5   the Governor of Oregon.  I also was Chairman of the Coos County

6   Marine Reserves Committee that made decisions regarding our

7   local ocean policy on marine reserves here over the last

8   eighteen months.

9        Q.   So, you're a fisherman?

10        A.   Oh, yes.  Oh, yes.

11        Q.   Now, could you tell us, after you joined the Crime

12   Lab system did you receive any training in how to process a

13   crime scene?

14        A.   That's an integral part of what we — our

15   responsibilities.  And, like I said, I responded to my first

16   crime scene with more senior members of the group.  I think I

17   was in the Laboratory probably 60 days.

18            And early on, of course, in your first few years with

19   the organization you attend a lot of different training

20   seminars and specialization training.  At that time, they did a

21   lot of in-house, within-state training regarding crime scenes

22   and the various aspects.  But, we also attended training at

23   Quantico, Virginia, at the FBI Academy.  I normally went back

24   there at least once a year.

25        Q.   Have you provided training to law enforcement and

D7 9                                        Pex   D

1   other forensic scientists?

2        A.   That — again, in the latter years of my work with the

3   Oregon State Police I spent a good deal of time training police

4   officers, as well as other members of the communities, on crime

5   scene investigations, evidence examinations, forensic

6   photography.  I had a Federal grant to teach forensic

7   photography related to domestic violence and taught courses in

8   that throughout the United States.

9        Q.   Laboratories you've worked in — have they been

10  accredited — nationally accredited?

11       A.   Yes.  All of the Crime Laboratories in Oregon were —

12  have been accredited since 1985.

13       Q.   And what does that mean?

14       A.   That means that a — again, there's a national

15  organization — the American Association of Crime Laboratory

16  Directors — that sets up a — certain protocols and inspections

17  of your laboratory.  You have to meet their standards.  And we

18  have been meeting those standards here in Oregon since 1985.

19       Q.   Now, in working in the Crime Lab, is there a system

20  set up where there's some sort of auditing or checking done on

21  the work of the other scientists?

22       A.   Yes.  Part of this accreditation process means that a

23  team comes in from out of state every five years and goes

24  through the records and the reports in all of the Crime

25  Laboratories in Oregon.

Pex  D    D7 10

1        Once a year, we have to do our own internal auditing.

2   And, as a Lab Director, you are an inspector and your

3   responsibility was to go to other laboratories and, excuse me,

4   inspect them for the quality of work that is being done.

5        Q.   And while you were the Director of the Coos Bay Lab,

6   was an audit done of your facility?

7        A.   Oh, yes, once a year and then once every five years.

8        Q.   And while you were Director of the Coos Bay Lab, who

9   worked for you there?

10       A.   Kathy Wilcox.  Then we had other people that came

11  through, worked there, transferred into other laboratories, as

12  well.  But, related to this case, Kathy Wilcox was employed

13  there.

14       Q.   And during the time that you supervised Ms. Wilcox,

15  was there ever any issue with her work?

16       A.   No.

17       Q.   Have you been qualified as an expert and testified

18  before?

19       A.   Many times.

20       Q.   And have you — outside of Oregon, have you testified

21  in other states?

22       A.   I have.

23       Q.   What other states?

24       A.   Oregon, Washington, Idaho, California, Kentucky,

25  North Carolina.

D7 11                                              Pex   D

1      Q.   Has the miliary taken advantages of your services?

2      A.   Oh, yes.  I've worked cases internationally, as well

3   — cases that originated in Iraq, Kyrgyzstan.  I was in Iraq, in

4   Fallujah, in February doing a crime scene processing for the

5   military.

6      Q.   Now you are retired now and you have your own

7   business?

8      A.   Yes.

9      Q.   What do you call that business?

10     A.   I actually own two businesses.  My primary business

11  is Pex Forensic Consulting.  And then I have another business

12  called International Forensic Experts that is a group of

13  forensic experts that are subcontracted under that business.

14     Q.   And who do you work for?  Or, who hires you in your

15  private practice, so to speak?

16     A.   Most of the time it's the defense community that

17  hires us.  We have been hired by the prosecution, as well, on

18  occasion.  But, primarily the work comes through the defense.

19  They seem to be the ones that have the money to buy it — to

20  hire us.  And also the military — the contracts that I get

21  through the military actually come through the prosecutor's

22  office, even though oftentimes they're for the defense.

23     Q.   Have you ever been — in your private practice, have

24  you ever been appointed or asked to be like a neutral party to

25  look at some evidence when there's a dispute between people —

Pex   D      D7 12

1   or experts?

2       A.   Yes, I have.

3       Q.   And in particular, what type of case?

4       A.   A couple years ago a case in San Diego.  There was a

5   dispute over the interpretation of blood stain patterns in a

6   homicide investigation.  The prosecution's expert came to one

7   conclusion.  The defense's expert came to an opposing

8   conclusion.  And the Prosecutor and defense counsel got

9   together and decided they would go out for a third party to

10  review the evidence independently and to see what conclusion

11  they might reach.  And they had to have the consent of the

12  experts in the case, as well.  And I was selected for that.

13          I went to San Diego, examined the evidence and

14  reached conclusions regarding that case and the individual who

15  was — has been in jail for two years and accused of murder was

16  set free.

17      Q.   So, the prosecution accepted your - - -

18      A.   (Interposing) Yes.

19      Q.   Now, in the course of your career have you — I think

20  you've talked about going to crime scenes.  But, let's be a

21  little more specific.  How about homicide scenes?

22      A.   With — early on in our career with the State Police

23  we responded to a variety of different scenes.  Sometimes they

24  were sexual assaults, suicide investigations.  We worked close

25  with the arm of the Medical Examiner's Office and any

D7 13                                        Pex   D

1  suspicious death we would respond to.

2         In the later years, we limited those responses

3  primarily to death investigations and, of that, the majority of

4  which were homicide investigations.

5      Q.   And over the years, sir, can you give us an idea of

6  how many homicide scenes you have been to and processed?

7      A.   You know, we never kept a record on that.  But, it

8  was a lot.  I mean, we went on a lot of investigations.

9  Sometimes we would be at scenes and they'd be waiting for us to

10 finish up there so we could get on to the next one.

11     Q.   The Director of the Coos Bay Lab, was your work —

12 let's say there's a homicide in Coos County.  Would you be

13 called to go there?

14     A.   Yes.

15     Q.   There would be times when you would be asked to go to

16 other parts of the state?

17     A.   Yes.  Besides the region in which my Laboratory had

18 responsibility, if there were specialized circumstances in

19 other places in the state, they would fly me in to do

20 processings there, as well.

21     Q.   Now, Mr. Pex, I want to direct your attention now to

22 July of the year 2000.  You were the Director of the Lab at

23 that time?

24     A.   Yes, I was.

25     Q.   And during that month, was a pair of shoes that were

Pex    D      D7 14

1   subsequently identified as belonging to Leah Freeman brought in

2   to the Lab?

3       A.   Yes.

4       Q.   And with Kathy Wilcox, did you look at these shoes?

5       A.   Yes.

6       Q.   And I believe it's the left shoe, which I believe is

7   State's Exhibit 97 in this case — did you examine that — the

8   sole of that shoe?

9       A.   Yes, I did.

10      Q.   With Ms. Wilcox?

11      A.   Yes.

12      Q.   What did you see?

13      A.   I saw impact spatter on the sole of that shoe —

14  impact blood spatter.

15      Q.   Let's talk about blood spatter a little bit.  First

16  of all, could you tell us — you indicated your specialty is —

17  at least one of your specialities is blood spatter?

18      A.   That's correct.

19      Q.   Can you tell us how you got there and what your

20  background is?

21      A.   When we talk about interpretation of blood patterns

22  and blood stains, there are quite a variety of them.  If

23  there's just — I'll give you an example.  If a person has a

24  bloody nose and they're just bleeding and the blood is just

25  dripping on the floor, historically we've called that — what's

```
   D7 15                                    Pex   D
```

1   called low velocity impact spatter.  The only influence on that

2   blood is really gravity and it falls and the droplets are all

3   fairly large and consistent in size.

4           When — let's say this person has a bloody nose and is

5   also involved in a fist fight.  And he — he is bleeding and has

6   blood on the surface of his skin and he gets hit again.  We're

7   adding extra energy to that liquid.  And the droplets tend to

8   break up and be smaller.  And they can vary in size from down

9   to a millimeter to a centimeter in size.  It just depends.

10          Then the third category is that which is associated

11  with a gunshot.  In that situation, you oftentimes get a mist

12  of blood, kind of like you would get with a spray can — very,

13  very tiny droplets.

14          There is some overlay if you're just looking at a few

15  blood stains.  It's — oftentimes you can tell.  They're too

16  small, for example, to be just low velocity, just dripping to

17  the ground.  But, on the other hand, they could be from a

18  situation there is an assault taking place, or from a shooting.

19  You can't really define it.

20          So, we refer to that as impact spatter.  Impact

21  spatter is blood that has traveled through the air.  And if

22  it's small in size, it could be the result of some type of a

23  beating going on.  Blood that's dripping into blood can splash

24  and cause small droplets.  There are a couple of different

25  origins for small stains.

Pex   D      D7 16

1       Q.   Now, you indicated that what you saw on the shoe was

2  impact - - -

3       A.   (Interposing) Yes.

4       Q.   - - - spatter?

5            And that would be consistent with what?

6       A.   Again, there are multiple choices when all you have

7  is a few small blood stains.  As I go through the choices —

8  we've talked about blood that drips into blood and splashes and

9  creates little droplets.  You can have an assault where someone

10  is struck and you'll get the formation of small droplets.  You

11  can have someone who has blood in their esophagus and they

12  cough and they can create small droplets of blood.  And, of

13  course, in a shooting circumstance you get anywhere from a very

14  small mist to larger droplets, as well, in combination.

15            So, those are the primary categories that come to

16  mind.

17       Q.   Now, on August the 3rd of 2000, the body of Leah

18  Freeman was discovered.  Did you go to that scene?

19       A.   Yes, I did.

20       Q.   Could you tell the jury, please, what you did when

21  you went to that scene?

22       A.   As we do in all crime scenes, is when we arrive on

23  scene we determine is the scene secured?  You know, what

24  information is available at the time?  How much information —

25  "What do I know about the scene?"  And then we — who did an

D7 17                                    Pex  D

1   initial overview?  Someone had to look at the body and ensure

2   that the person is dead.  And then generally they back of the

3   scene and secure it at that point.

4        Then we decide what it is that we intend to do in

5   terms of the processing.  We organize that.  Then I set up a

6   path or a direction in which everyone who goes in or out is

7   going to follow this path so we don't contaminate the rest of

8   the crime scene by people just inadvertently coming and going.

9        And once we establish how we're going to process it,

10  then we go forth and do that.

11       Q.   And what did you do in this particular case?

12       A.   In this particular case, I set up a place where

13  everyone is going to come and go.  We go in first and we

14  photograph the scene, take notes of what we see.  And then I

15  took some initial — what we call "adhesive tape lifts" off the

16  pants and off the upper clothing.  And I requested that someone

17  take a piece of plywood and cut it so that it will fit inside a

18  large body bag.  And so they did that.  We were able to — after

19  we had searched the curtilage and carefully documented the

20  body, we were able to slide this plywood under the deceased and

21  put them inside the body bag and take them out completely

22  intact for the Medical Examiner to examine.

23       There's more.  I guess, I - - -

24       Q.   (Interposing) Go ahead and tell us.

25       A.   Okay.  The — one of the things is that the search

Pex   D     D7 18

1   parameters — the scene size is of two-fold.  The first there is

2   the area that's immediately around the body.  And that has to

3   be extensively searched to see if there's anything there of

4   evidentiary value.  It is often said in our business when

5   people ask us what is it that we're looking for, we often

6   respond, "We don't know, but we'll tell you when we find it."

7   So, that is how we pursue a methodical search of the area.

8          Then there is also the egress into the area.  Someone

9   had to get there and dispose of this body at this location.

10  So, we also searched from the main highway road, down this

11  gravel road, all the way from its junction all the way to where

12  the body was located and beyond.  And someone walked the roads

13  and we do what's called a line search, where people walk along

14  in its entire length to see if there's anything of value that

15  we pick up along the way.

16     Q.   Now, in your career as a forensic scientist, have you

17  ever had cases where the homicide occurred at one location but

18  the body ends up at the second location?

19     A.   Oh, sure.

20     Q.   And what do we — what do they commonly refer to this

21  as?

22     A.   Dumped body.

23     Q.   In examining this scene and the position of the body

24  and so forth, did you come to a conclusion in your opinion as

25  to was this where Leah Freeman died, or something?

```
    D7 19                              Pex   D
```

1    A.   That isn't always easy to establish.  The one thing

2  that I noticed right away is that her legs were crossed.  And

3  that is often an indication that someone has been rolled over.

4  Whether rolled over going down the embankment, or rolled over

5  on the site, I don't know.  But, when you turn someone who is

6  laying on their back, for example, or laying on their stomach

7  and you grab them by the shoulders, the upper body, and roll

8  them over, it causes the legs to cross.  That doesn't — that's

9  an indication.  That's not absolute, but it's something you

10 notice.

11       And based upon her position and its relationship to

12 the road, it had the appearance of having been a dead — deposed

13 at that site as a dumped body.  But, that's not absolute.

14    Q.   Now, after — well, let me ask you this question.  In

15 searching the immediate area around the body what, if anything,

16 did you find?

17    A.   There were a number of items that we collected.  Of

18 course, there was the adhesive lifts that I took.  There were

19 some beer cans that were located.  We took a white bottle cap.

20 There was a blue rag that was found, 7-Up cans.  And there was

21 also — just west of the body there was a — I think portions of

22 a deer carcass and some cardboard with some blood on it.  And,

23 of course, we immediately tested that to determine if it was of

24 human origin and it was not.  I surmise it's associated with

25 the deer remains.

Pex   D     D7 20

1      Q.    This other evidence that you indicated, — the pop

2   cans and what have you — to your knowledge were they

3   subsequently looked at to see if there was anything of

4   evidentiary value on them?

5      A.    Sure, they were submitted for latent print

6   examination.

7      Q.    Was anything discovered?

8      A.    I don't recall that there was.

9      Q.    Now, the body was removed the same day it was found?

10     A.    Yes.

11     Q.    Did you go back out the next day?

12     A.    Yes, I did.

13     Q.    And what did you do when you went back out there?

14     A.    One of the things that we do is we — after the body

15  has been removed is we — we sift the area where the body was to

16  see if there is anything that may have soaked into the ground.

17  For example, if a person is shot, there might be a bullet in

18  there — in the ground.  And so we'll take the soil out and

19  we'll sift it and see if we can pick up anything of evidentiary

20  value.

21         We also — there was some grass and plant materials on

22  the hillside leading up to the road.  We clipped all of that

23  and then searched the area quite closely between the road and

24  where the body was located, as well.

25     Q.    When you say "sift the earth underneath where the

D7 21                                    Pex   D

1   body was found," what are you looking for?

2        A.   Again, it's a — could be buttons, could be a bullet,

3   cartridge cases, personal items.  People leave behind the

4   darndest things sometimes.  So, you don't know until you search

5   and see what you can find.

6        Q.   And in your sifting, did you find anything of

7   scientific or evidentiary value?

8        A.   Not in this case.  No.

9        Q.   Now, the other search — walking up the road and down

10  and so forth — did you participate in that or did you direct

11  that?

12       A.   No.  I advised the agency that this is something that

13  needed to be done.  They got people together and did that.

14       Q.   And, again, to the best of your knowledge, was

15  anything of evidentiary value to this case discovered?

16       A.   Other than, like I said, these items that I had

17  mentioned earlier were collected and were available.  But, I

18  don't know that anything of value came of them.

19       Q.   Now, you mentioned the tape lift that you did of the

20  pants and the shirt.  Could you describe what you mean by "tape

21  lifts" and what you did?

22       A.   What we do is you use just a really good adhesive

23  tape and — like packaging tape, for example.  You take — you

24  pre-examine it and make sure there isn't already a lot of

25  contamination on it.  But, you peel it off of a roll, double it

Pex   D     D7 22

1   around, and you just apply it to the surface like that, peel it

2   off, and then put it on a piece of clear Mylar.  And then what

3   you're looking for is anything that might have been picked up

4   in terms of hairs or fibers while the body was at various

5   locations prior to where it's at now.

6          And so I brought those back to the Laboratory and

7   examined them to see if there's anything of investigative value

8   there.  Examination of hairs of and fibers is primarily a

9   comparative technique.  You have to have something to compare

10  it to.  And at that point, my involvement was just to see if

11  there's a preponderance of black fibers on there.  I could see

12  what I believed to be the color of the clothing.  But, were

13  there other fibers that didn't match that, that might be of

14  investigative leads.

15     Q.   Excuse me.  I didn't quite understand the last part.

16  Did you see other fibers, you say?

17     A.   There were lots of fibers collected.  But, I didn't

18  see anything that would be of an investigative lead.  For

19  example, if on her blue jeans if there was a whole bunch of red

20  fibers, then that might be of value that she was, at one point,

21  on something that was red.

22     Q.   Now, these tape lifts and the stuff you're

23  collecting, is that sometimes referred to as trace evidence?

24     A.   Yes.

25     Q.   And trace evidence — could you describe — was this

```
    D7 23                                    Pex   D
```

1   stuff hardy?  Will it stay forever?  Or, fragile?  What's it

2   like?

3       A.   It's hard to say whether it will or will not.  But,

4   for the most part, the long — the more time that goes by, the

5   more it's going to dissipate.

6       Q.   So, in this case, with a body that — well, based on

7   your training and experience, did it appear that this body had

8   been there awhile?

9       A.   Yes.

10      Q.   And, again, based on your training and experience,

11  would the likelihood have been — well, let's back — let me

12  rephrase the question.

13           If the body had been found shortly after it was

14  placed where it was found, would the likelihood of finding

15  usable trace evidence be higher then, or when you eventually

16  got to it?

17      A.   It would have been higher in the beginning.  Of

18  course it depends somewhat on the clothing that you're looking

19  at, too.  If it's a fairly smooth surface then it's not going

20  to retain other fibers and hairs that might initially stick to

21  that long.  I had a case in which a person had shoes that had

22  velcro attachments on it, and of course the fibers remained in

23  that velcro almost permanently.  So, in that situation, you

24  know, you have something that's going to go on for a long time.

25           But, in this circumstance in the clothing that she

Pex   D      D7 24

1  was wearing, as time goes by the trace evidence is going to be

2  more difficult to detect.

3      Q.   Now, last year you were asked to — by my office to

4  assist in this investigation again?

5      A.   Yes.

6      Q.   And as part of that, there were two vehicles that the

7  Coquille Police Department had obtained — a '67 Mustang and a

8  purple Kia?

9      A.   Yes.

10      Q.   Now, did you have anything to do with searching or

11  examining either one of those vehicles?

12      A.   Yes, I did.  What I did is I called a company called

13  Microtrace back east.  They're well known throughout the

14  country for their examinations of trace evidence.  They have a

15  lot of specialized equipment.  I asked them if there was

16  anything that's changed in time or anything I should know

17  before I went forward with this processing of these vehicles.

18  And what I did is, they gave me — said, "No, nothing has really

19  changed."  The methods I use are still of value today.  So, I

20  went forward and photographed these vehicles and searched them.

21      Q.   And did you remove anything from these vehicles?

22      A.   Yes.  I took some vacuum sweeps and I think some

23  carpet standards.

24      Q.   Did you remove any screws or anything like that?

25      A.   Yeah, in the trunk.  One of the things that when

D7 25                                        Pex   D

1   you're looking for blood stains, everything is affected by

2   gravity.  So, to give you a hypothetical, if there was blood on

3   the floor or blood in the trunk or something like that, it's

4   going to continue to move downward.  And so, you know, you pull

5   up carpets and look under the carpets inside the car and test

6   that area.  You look in the trunk and you get down to the metal

7   and sometimes the blood will accumulate under the screws.

8           In this case, there was screws that hold the gas tank

9   in place.  And so I pulled out a number of these screws and

10  tested underneath those, as well, to see if I could locate any

11  blood stains.

12      Q.   And did you find any?

13      A.   No.

14      Q.   The evidence that you — the vacuum sweepings and

15  things along that line — to your knowledge, was that sent to

16  Microtrace?

17      A.   Yes.  I gave them to Kris Karcher, and I believe she

18  sent those on.

19      Q.   And to the best of your knowledge, sir, in your

20  examination of these vehicles, was anything of evidentiary

21  value pertaining to this case found?

22      A.   That wasn't reported back to me that anything was.

23  So, I have not been close and involved in that.  But, no one

24  has indicated to me that there was anything.

25      Q.   Going back to the — when the body was found, have you

Pex   D     D7 26

1  had cases before where you've had somebody that has laid out

2  for awhile and decomposed to the extent we saw here?

3       A.    Yes.

4       Q.    Now — and you had an opportunity, at least that day,

5  to examine the clothing or see the clothing of Ms. Freeman as

6  it was on her body?

7       A.    Yes.

8       Q.    Did you see any indication of — well, in the course

9  of your career, you've dealt with homicides where people have

10 been stabbed?

11      A.    Yes.

12      Q.    And bled to death?

13      A.    Yes.

14      Q.    What type of things would you be looking for in those

15 situations?

16      A.    We would be looking for what we would call an incised

17 cut in the clothing, or in the body, itself.  And these are

18 generally linear and it's — differentiating these, sometimes,

19 from animal abuse can be difficult.  But, you know, we can

20 surmise based upon what we see on the clothing and what is the

21 result of the autopsy exam if the two go together or not.

22           And so remember that a crime scene is a place where

23 you collect evidence.  Clothing exams, like you're discussing,

24 is something that we do in more detail once it gets back to the

25 Laboratory.

```
      D7 27                                    Pex   X
```

1      Q.   Did you see any indication at the scene of a large

2   amount of blood loss?

3      A.   You couldn't tell in this case.  No.

4      Q.   And why is that?

5      A.   She was sufficiently decomposed that I don't think

6   you could tell, for sure.

7      Q.   All right.  Thank you.

8               MR. FRASIER:   I think that's all the questions

9   I have at this — oh.

10      Q.   Let me ask you this.  You're not being paid to

11   testify here today, are you?

12      A.   No.

13      Q.   Thank you.

14               MR. FRASIER:   That's all I have.

15               THE COURT:   Ms. McCrea?

16                        CROSS EXAMINATION

17   BY MS. McCREA:

18      Q.   So, Mr. Pex, you indicated that you looked at the

19   shoes with Kathy Wilcox?

20      A.   Yes.

21      Q.   And this was in your capacity as her supervisor?

22      A.   Yes.

23      Q.   So, the two of you discussed her findings?

24      A.   Yes.

25      Q.   And then were you present when she communicated her

Pex   X     D7 28

1   findings to other police officers investigating in this case?

2        A.   I may or may not have been.  No.

3        Q.   Okay.  Were you involved in briefings with the — with

4   the Major Crime Team?

5        A.   On occasion, yes.

6        Q.   Okay.  And you're indicating that your opinion is

7   that this was an — or, how did you put it — impact — did you

8   say "spatter" or "splatter"?

9        A.   Spatter.

10       Q.   Spatter, with no "L"?

11       A.   Right.

12       Q.   Okay.  An impact spatter.  And you're not saying that

13   your opinion is inconsistent with Ms. Wilcox's opinion.  You're

14   just saying that you have a more generalized opinion?

15       A.   I don't know what her — what opinion that she stated

16   while she was here in the courtroom.  I don't know if what I'm

17   saying is more generalized or not.  What I saw was impact

18   spatter on the bottom of them shoes.  From an investigative

19   standpoint, that generally means that some type of violence has

20   occurred.

21       Q.   Okay.  All right.  Now — and as you've said, you've

22   testified previously in a number of criminal cases as a

23   forensic expert, right?

24       A.   Yes.

25       Q.   And you're very, very familiar, obviously, with the

```
    D7 29                                    Pex   X
```

1  concept of trace evidence?

2       A.   Yes.

3       Q.   Yeah?

4       A.   Yes.

5       Q.   Okay.  Yes.  And we talked about Locard's Exchange

6  Principle yesterday.  You're familiar with that, right?

7       A.   Yes.

8       Q.   And, basically, to sort of paraphrase that, it means

9  that if someone does something — let's say if someone kills

10  someone, that person is likely to either leave trace evidence

11  at the scene or take something with them?

12       A.   In general, yes.

13       Q.   Okay.  In other words, stuff gets transferred from

14  one place to another?

15       A.   That is the hope.

16       Q.   I know it wasn't eloquently put.  But, it's - - -

17       A.   (Interposing) Yes.  That's the hope.

18       Q.   All right.  And your job as a forensic scientist is

19  to look for this trace evidence, maybe — you know, ideally, to

20  solve a crime if you can.  But if not, to try to corroborate

21  other evidence that develops.  Is that fair?

22       A.   Yes.

23       Q.   Okay.  And in this case — well, let's assume.  Let's

24  assume a hypothetical.  Let's assume that we have testimony

25  that a witness claims that the Defendant strangled the

Pex   X     D7 30

1  decedent, the person who died.

2      A.  Okay.

3      Q.  Okay?  And in that situation, it's going to be

4  important the places that you look to try to corroborate that

5  statement.  Right?

6      A.  Yes.

7      Q.  Okay.  And so places that you're going to look is —

8  you've talked about looking at the body?

9      A.  Yes.

10     Q.  Looking at the clothing on the body?

11     A.  Yes.

12     Q.  Looking at the scene where the body was found?

13     A.  Yes.

14     Q.  And you're also going to be looking at things related

15 to the suspect?

16     A.  Yes.

17     Q.  Okay.  And one of the things that would be important

18 to do would be, if possible, to do an examination of him close

19 in time to either the discovery of the body or the person's

20 disappearance.  Would that be fair?

21     A.  Yes.

22     Q.  Okay.  And because you want to see if there was

23 evidence that a struggle between the suspect and the person had

24 taken place, right?

25     A.  Yes.

```
    D7 31                                Pex   X
```

1    Q.   And there might be what we would consider trace

2    evidence such as scratches on the person — the suspect's face,

3    yes?

4    A.   Yes.

5    Q.   I'm sorry?

6    A.   Yes.  Yes.

7    Q.   Or his hands?

8    A.   Yes.

9    Q.   Right?  Or his torso, that kind of thing?

10    A.   Yes.

11    Q.   Okay.  Bruises?

12    A.   Yes.

13    Q.   Okay.  And then it would also be important,

14    especially in a situation such as this, where you've indicated

15    that it appeared to be a dumped body, - - -

16    A.   (Interposing) Yes.

17    Q.   That's such an awful term.

18    A.   It is.  It really is.

19    Q.   - - - well, that there was transfer from one place to

20    another?

21    A.   Yes.

22    Q.   Okay.  Then assuming that we know that the distance

23    where the body was found was out Lee Valley Road, which is a

24    significant — well, it's a significant distance from where the

25    first shoe was found on Elm Street, right?

Pex   X    D7 32

1      A.   Yes.

2      Q.   And it's also a significant distance from where the

3  second shoe was found on Hudson Ridge?

4      A.   You know, I'm not familiar — quite familiar where

5  Hudson Ridge is, because I never went out there.

6      Q.   Okay.  But, it was — you didn't see a sign just down

7  the road from the entry to Lee Valley that said "Hudson Ridge,"

8  right?

9      A.   That said "Hudson Ridge"?  No, I didn't see that.

10      Q.   All right.  So, you're going to infer — I mean, as a

11  forensic scientist, that probably the body was transported in a

12  vehicle.  Is that fair?

13      A.   Yes.

14      Q.   And so the likely place to look for trace evidence

15  would be in a vehicle that a suspect had been driving that was

16  known to you, right?

17      A.   Correct.

18      Q.   Or, that the suspect had been riding in?

19      A.   Correct.

20      Q.   Okay.  So, in this case, you went back in 2010 and

21  you were asked to process the 1967 blue Mustang that had

22  belonged to Nick McGuffin, right?

23      A.   Yes.

24      Q.   Okay.  And you did that?

25      A.   Yes.

```
     D7 33                              Pex   X
```

1      Q.   Okay.  And you talked about what you did there in

2  terms of the vacuuming and it was a very thorough vacuuming.

3  Is that right?

4      A.   Yes.  It's not complex.  But, yeah, it's as thorough

5  as you would expect for this type of examination.

6      Q.   Okay.  Well, you even vacuumed the car's ceiling.  Is

7  that correct?

8      A.   Yes.

9      Q.   Took — and you took — also took foam from the car's

10  trunk?

11      A.   Yes.

12      Q.   Fiber from the trunk?

13      A.   Yes.

14      Q.   Carpet from the back window?

15      A.   Yes.

16      Q.   And vacuumed evidence from both the trunk and the

17  back seat?

18      A.   Yes.

19      Q.   And then went into the car frame near the gas tank,

20  and you've described taking out some of the screws and bolts?

21      A.   That's correct.

22      Q.   Okay.  Now, the — so, there's — really, I sort of

23  mixed up two different things here.  One is that you were

24  vacuuming to look for fibers or hairs or any kind of that sort

25  of trace evidence, right?

Pex   X    D7 34

1      A.   Yes.

2      Q.   And then in terms of your examination of the place

3   near the gas tank and the screws and screw holes and bolts,

4   that was an examination for blood?

5      A.   Yes.

6      Q.   And you also did an examination of the car generally

7   for blood?

8      A.   Yes.

9      Q.   And did you use Luminol to do that?

10      A.   You know, I think I did.  Let me check my records and

11   see if I wrote it down.

12          I didn't write down in my notes that I Luminoled, but

13   I remember having it with me.  But, I don't have independent

14   recollection whether I did or did not.  Ms. Karcher was with me

15   and perhaps she can recall.

16      Q.   So — and it's fair to say, isn't it, Mr. Pex, that

17   Luminol is very sensitive to trace evidence of blood?

18      A.   Yes, it is.

19      Q.   And it can go — it can detect blood up to, what, one

20   in ten thousand?

21      A.   One in one hundred thousand.

22      Q.   I'm sorry.  One - - -

23      A.   One in a hundred thousand.

24      Q.   One in a hundred thousand dilution?

25      A.   Yes.

```
D7 35                                    Pex   X
```

1    Q.   Okay.  And isn't it true that blood evidence is

2    something that tends to last for a long time?

3        A.    It depends.  Here we're talking ten years.  And there

4    is no history in between on what transpired with the vehicle

5    and/or they know what was evidence.  If this particular vehicle

6    was used for the transport of Leah Freeman and there was blood

7    in the vehicle at that time, you know, if it was preserved and

8    nothing ever happened to it again for ten years, I would expect

9    to find it.  But, I have no — without any interim history,

10   there is no guarantee that even though it may have been there

11   at one time, that even Luminol would detect it.

12       Q.   But, Luminol is pretty good at detecting small trace

13   amounts?

14       A.   Yes, it is.

15       Q.   And the area in the cracks and the bolt holes was a

16   pretty - - -

17       A.   (Interposing) Well, you can't Luminol that area

18   because it's metal.

19       Q.   Okay.

20       A.   And all metals will show up with Luminol.

21       Q.   Is there also another dye that reacts to blood?

22   Phenol - - -

23       A.   (Interposing) Phenolphthalein?

24       Q.   Yeah.

25       A.   That's the one we use when we swab for blood and I

Pex   X     D7 36

1  did do that in several areas and tested for the presence of

2  blood.

3      Q.   And is it even more sensitive than Luminol?

4      A.   No.

5      Q.   Is it as sensitive as Luminol?

6      A.   No, it's not.  But it is, say, sensitive to one in

7  ten thousand.

8      Q.   Okay.  So, you used both of those techniques on the

9  Mustang and you didn't find any evidence of blood.  Is that

10 right?

11     A.   That's correct.  I want to say the caveat — I think I

12 Luminoled that car.  I don't remember, and I didn't for sure.

13 And I didn't write it down.  But, I think I did.

14     Q.   Okay.  Well, you were — you were doing your best to

15 determine whether there was any trace evidence of blood in that

16 Mustang?

17     A.   Right.

18     Q.   And you didn't find any?

19     A.   I didn't find any.

20     Q.   Okay.  And the whole point of the processing was you

21 were using your best efforts and the best techniques in order

22 to determine if there was any trace evidence in that car,

23 right?

24     A.   Yes.

25     Q.   Okay.  Now, we've sort of talked about — you talked

```
    D7 37                              Pex   X
```

1  about the material is important.  So, if you have — you talked

2  about the shoes with the velcro.  The fibers are more likely to

3  hang out there for awhile than if you have something that's

4  like a nylon jacket?

5      A.  That's correct.

6      Q.  Okay.  So, in the situation where you've got cotton

7  jeans or a cotton tank top, that's more likely than a nylon

8  windbreaker - - -

9      A.  (Interposing) That's correct.

10     Q.  - - - to find — okay.  To find trace evidence?

11     A.  Yes.

12     Q.  Okay.

13     A.  I know where you are going.

14     Q.  All right.  I know.  And you've talked about that the

15  environment is important.  So, you know, given the time that

16  had passed from Ms. Freeman's disappearance to when the body

17  was discovered, there had been a lot of decomposition.  So, the

18  body wasn't in very good condition, right?

19     A.  That's correct.

20     Q.  And the clothing was not in very good condition?

21     A.  No.

22     Q.  Okay.  And so that's — so, in terms of finding stuff,

23  you said that it's going to be more likely on the first day

24  than down the line, but it just depends on the circumstances,

25  right?

Pex   X      D7 38

1    A.   That's correct.

2    Q.   So in this case, in fact, Microtrace, the lab that

3 you mentioned, found a gray paint chip particle on the tank top

4 when they did the examination, didn't they?

5    A.   You know, I'm not — I heard that.  But, I have seen

6 no reports.

7    Q.   Okay.  We have the report in evidence.

8    A.   Okay.

9    Q.   So — all right.  And part of what is also important

10 concerning the work with trace evidence is the amount of

11 diligence that is put in to trying to find evidence.  Is that

12 fair?

13    A.   Yes.

14    Q.   Okay.  Because it takes a lot of time on the task,

15 right?

16    A.   Yes.

17    Q.   I mean, a lot of time.  And you've got to look at the

18 evidence and you've got to be looking for different kinds of

19 trace evidence, correct?

20    A.   Yes.

21    Q.   Okay.  And isn't it true that when you worked for the

22 State Police they didn't like you spending too much time — and

23 I'm sort of talking about you and the other people at the Lab —

24 they didn't like you spending too much time on cases because

25 they had to have statistics at the end of the month and you

```
    D7 39                                    Pex   X
```

1   needed to have a certain number of cases going?

2       A.   That's true.

3       Q.   Okay.  And doing the trace evidence is time

4   consuming?

5       A.   Yes.

6       Q.   Okay.  Now if we assume a hypothetical, Mr. Pex, if a

7   person is placed in a car and is bleeding — let's say profusely

8   — would you expect to find evidence of the blood in the car?

9       A.   It depends on how — on the circumstances.

10      Q.   Uh huh.

11      A.   If it's immediately afterwards, I would hope to.  If

12  someone has gone through and cleaned the vehicle extensively,

13  or it's been a long period of time, or it's been 110 degrees in

14  that vehicle, you know, all summer long — there's a lot of

15  factors — it had been rained on — a lot of factors to consider.

16  But, it just depends.

17      Q.   Okay.  I'm glad you mentioned that, if somebody has

18  cleaned something.  Even if somebody cleans a surface, Luminol

19  is still going to be able to find trace evidence of blood,

20  isn't it?

21      A.   Not always.

22      Q.   But, in most cases?

23      A.   You hope to.

24      Q.   And often you do?

25      A.   We do at times.  Yes.

Pex   X     D7 40

1    Q.    Okay, because - - -

2    A.    (Interposing) Because people don't realize, I guess,

3  how sensitive the method is and they will, for example, clean

4  the carpet with some detergent and you can't see it anymore, so

5  they assume it's gone.  For us, it's not gone.  We can still

6  find it.  So, it has applications, but it is not perfect.

7    Q.    And let's assume another situation.  If a person was

8  — if two people are in a car — let's just assume — and one is

9  struggling to get out, and struggling to the point that they

10  get the door open and one of the shoes comes off and is left,

11  would you expect that there's going to be some — there could

12  potentially be some trace evidence of that struggle left in the

13  car?

14    A.    There could be.  There could be.

15    Q.    Such as fibers?

16    A.    If there's blood on the shoe, then one would assume

17  that some type of a incident occurred near the shoe.

18    Q.    Now, I don't know how extensive your involvement with

19  the case was.  Were you — were you familiar with some maggot

20  casings being collected?

21    A.    No.

22    Q.    No?  Okay.

23          MS. McCREA:    May I approach, Your Honor?

24          THE COURT:    You may.

25    Q.    So, Mr. Pex, I have on the easel what's been marked

```
    D7 41                                    Pex   X
```

 1   for identification as Defense Exhibit 129.  And is it correct

 2   that you did a forensic examination of some swabs of a wall of

 3   an abandoned house on September 11, 2000, which was OSP No. 14,

 4   Agency No. 1, and also did an examination of some papers with a

 5   stain on September 11, 2000, OSP No. 15, Agency No. 2?

 6       A.   Yes.

 7       Q.   And there was no evidence of blood on those sites?

 8       A.   On either one.

 9       Q.   Okay.  So, there was nothing of forensic significance

10   associated to either Mr. McGuffin or Ms. Freeman?

11       A.   (No audible response.)

12            THE COURT:   I'm sorry.  Did the witness

13   answer?

14            WITNESS:   Yes.  I said no.

15            THE COURT:   Okay.  Thank you.

16            WITNESS:   Thank you, Your Honor.

17            MS. McCREA:   Oh, I'm sorry.

18       Q.   I've got you turned away.

19            THE COURT:   If you could move the microphone

20   in front of you when you're looking that way, please.

21       Q.   This is marked for identification as Exhibit 130.

22   And that — that includes reference to OSP's No. 26 and 27,

23   Agency Nos. JP1 and JP2, which were tape lifts that were taken

24   from Leah Freeman's shirt that you talked about today?

25       A.   Yes.

Pex   X     D7 42

1      Q.   Okay.  And those were sent for examination to

2    Microtrace.  And we have the Microtrace information in evidence

3    and there's no indication of any forensic evidence connected to

4    Mr. McGuffin of Ms. Freeman?

5      A.   Okay.

6      Q.   Oh, I neglected to ask you.  You also did the

7    examination of the 1999 Kia?

8      A.   Yeah.  I believe I did.  I know I examined the

9    Mustang, and I think I looked at the Kia.  I believe I did.

10     Q.   Okay.  And in Exhibit 133 there was car evidence

11   obtained from the Kia, OSP No. 52, and that included sperm

12   heads on the seat and blood in the trunk liner and the rear

13   floor board?

14     A.   Okay.

15     Q.   Do you know that?

16     A.   I don't recall that.

17     Q.   You don't recall that?  But, you did the search?

18     A.   You know, I don't have notes on this Kia.  I believe

19   that I can — in my own recollection - - -

20             MR. FRASIER:    (Interposing) Counsel, that was

21   processed by the Springfield Lab.

22             WITNESS:   Was it?

23             MR. FRASIER:    There's a report done.

24             MS. McCREA:    Oh, okay.

25             WITNESS:    That's why I don't have notes on it,

```
    D7 43                               Pex   X
```

1   then.

2                    MS. McCREA:    All right.

3                    WITNESS:    I remember seeing it.  But, you

4   know, old age is not my friend sometimes.

5                    MS. McCREA:    Mr. Frasier, are you willing to

6   stipulate that there was nothing found in the Kia associated

7   with Mr. McGuffin?

8                    MR. FRASIER:    I'm willing to stipulate that

9   there was nothing found in the Kia that implicated anyone in

10  anything in this case.

11                   MS. McCREA:    All right.  Well, Mr. McGuffin is

12  the only one in the case.

13                   MR. FRASIER:    Well, my point is - - -

14                   THE COURT:    (Interposing) You're either going

15  to stipulate or not.

16                   So, that's his stipulation.  If you don't accept

17  it, fine.  There's no stipulation.  We'll go on.

18                   MS. McCREA:    Well, I'll accept it.

19                   THE COURT:    Okay.

20                   You can consider that as a fact.

21                   Go on.

22                   MS. McCREA:    All right.

23      Q.    And then you — you took the foam from the car's trunk

24  and the fiber from the trunk, right?

25      A.    Yeah.  That was from the other one — the other

Pex   X     D7 44

1   vehicle.

2       Q.   I'm sorry.  Yes.  From the Mustang?

3       A.   Right.

4       Q.   And we have the Microtrace report and there's nothing

5   concerning Mr. McGuffin in that.

6            And then, finally, in  Exhibit 134, this deals with

7   the other things taken from the Mustang — the carpet from the

8   back window, the tape lifts from the trunk, the vacuumed

9   evidence from the trunk and back seat, the car's ceiling, near

10  the gas tank of the car and screw holes and bolts?

11      A.   Yes.

12      Q.   Right?  And there was — and those were sent to

13  Microtrace.  And so we have - - -

14      A.   (Interposing) I turned it all over to Ms. Karcher.

15  And I assume they were.

16      Q.   Right.  And we have that in evidence and there is

17  nothing connected to Mr. McGuffin.

18           And then you weren't involved in the beer cans?

19  Ms. Wilcox testified about that.

20      A.   No.

21      Q.   Okay.  So — okay.  Thank you.  All right.

22           MS. McCREA:    I'm sorry.  Just a moment, Your

23  Honor.

24      Q.   Mr. Pex, regarding the blood on the — the blood was

25  on the bottom of the shoe, right?

```
      D7 45                                     Pex   X
```

1      A.   Yes.

2      Q.   And in terms of that being impact spatter, as you put

3  it, if your shoe is on, it's going to be pretty hard to cough

4  blood onto the bottom of your shoe, isn't it?

5      A.   Yes.

6      Q.   Now, in terms of the scene where the body was found,

7  there was no indication to you that there was any evidence of

8  gasoline — for example, gas that had leaked out of a gas tank —

9  around that area?

10     A.   Well, nothing of that nature was found.  But, it

11  might not be after that period of time.

12     Q.   Well, you don't know.  But, anyway, you didn't find

13  any, right?

14     A.   That's correct.

15     Q.   And then in terms of the transport of the body, your

16  — your best belief is that, given — well, scratch that.

17          That's — did the deer carcass appear to have been

18  dumped?

19     A.   Yes.

20     Q.   And — okay.  Oh — and, Mr. Pex, in your experience

21  you talked about being called in as a neutral third party in

22  cases, right?

23     A.   Yes.

24     Q.   And you've also had situations where you've re-

25  examined evidence or crime scenes after the State has done

Pex   X    D7 46

1  their examination, as an expert for the defense, and actually

2  found something the State has missed, haven't you?

3      A.   Yes.

4      Q.   Okay.  And one case was a case down in Klamath Falls

5  where the Oregon State Police had already — had processed a

6  scene?

7      A.   I can't remember anything in Klamath Falls.  You're

8  going to have to refresh my memory a little more on that.

9      Q.   Well, I thought there was a case where they had

10  already completed their examination of the crime scene and you

11  did an examination and caused them to - - -

12      A.   (Interposing) Oh.  That was out east of Klamath Falls

13  — yeah, in Paisley.  That's correct.  It did not go well for

14  the Oregon State Police.

15      Q.   Okay.  And there was at least another incident, I

16  believe, where — I'm not sure if it was Nevada?  The State was

17  unable to do an identification in a firearm case — a bullet

18  comparison — and you were able to do the identification?

19      A.   That's correct.  The ATF did not come to the right

20  conclusion.

21      Q.   All right.  Thank you, Mr. Pex.

22          MS. McCREA:    That's all the questions I have,

23  Your Honor.

24          THE COURT:    Redirect?

25          MR. FRASIER:    Thank you, Your Honor.

D7 47                                           Pex    ReD

1                    REDIRECT EXAMINATION

2  BY MR. FRASIER:

3      Q.   Well, Mr. Pex, you were the forensic scientist in

4  charge of the Lab back in 2000 when the majority of this

5  evidence was processed?

6      A.   Yes.

7      Q.   Did you guys screw it up?

8      A.   I don't think we did.

9      Q.   Well, let's — I've got a few questions here.  If we

10 assume the body of Leah Freeman was placed where she was found

11 at or near June 28th of 2000, the body was found on August 3rd

12 of 2000 — well, gasoline, does it just stay forever in a

13 particular location?

14     A.   No.  It's a — they are volatile hydrocarbons and they

15 evaporate with time, or sink into the soil and dissipate.

16     Q.   And so would you expect to find — if gasoline had

17 leaked there, would — it had been five weeks — would you expect

18 to find any sign?

19     A.   Not during the summer on a — on a gravel road.

20     Q.   Now, counsel talked with you about the pressures of

21 the Lab trying to, "Don't spend too much time on the case

22 because we need our stats up," and this and that and the other.

23 Did you feel that you and Ms. Wilcox spent the amount of time

24 that you needed to spend on this case?

25     A.   Yes, absolutely.  I was always in hot water over

Pex   ReD   D7 48

1  situations involving casework, because we did spend a lot of

2  time on what we did.  And the — there was a change.  I used to

3  do my own trace evidence exams, but they became more

4  specialized and wanted certain individuals to just specialize

5  in trace evidence.  So, I shipped that evidence to the

6  Springfield Crime Laboratory and they were to do a more

7  extensive examination there.

8      Q.   Now, in your course of your career — well, you've —

9  in addition to going out to homicide scenes, you process

10  evidence from other homicides where you didn't actually go out

11  and see the scene?

12     A.   Sure.  Sure.

13     Q.   And how many homicides would you estimate you've been

14  involved in processing evidence on over the years?

15     A.   Thousands.

16     Q.   In the course of your career as a forensic scientist,

17  of the thousands of homicide cases you've worked on, can you

18  give us a rough approximation of how many were absolutely

19  solved because of trace evidence?

20     A.   Few.  But, some have been.

21     Q.   Some have been?

22     A.   That's correct.

23     Q.   But, the vast majority have not?

24     A.   The process in dealing with an investigation is if

25  you have other evidence that's of value — for example, you have

```
     D7 49                                    Pex   ReD
```

 1  a DNA match, you probably won't do the trace evidence at all.

 2  If you have a bullet from a body and you have a firearm and you

 3  match the bullet back to that firearm, you probably won't do

 4  trace.  There are steps involved in the process, those where

 5  you go on to do extensive trace examinations.  I have had

 6  success in some cases.

 7          And a case that I was not involved in, but has made a

 8  lot of national recognition, is the Georgia child killings that

 9  occurred in the — I think it was the 1980's down there — serial

10  killings of children.  That case was almost based entirely on

11  trace evidence.  But, that's because there was no other

12  evidence in the case.

13      Q.   All right.  Now, have you had cases where you know

14  the body has been moved, and it's subsequently identified to

15  you which vehicle or how the body was moved?  Have you had

16  cases where you've gone back once that information was given to

17  you, and you've processed this vehicle, and you failed to find

18  any evidence?

19      A.   Yes.

20      Q.   Counsel talked with you a little bit about the — this

21  theorem or principle about wherever a person goes, they leave

22  something behind or they take something with them?

23      A.   Locard's Principle.

24      Q.   Yes.  Is that an absolute?

25      A.   No.  It is a principle.  It's not an absolute.  That

Pex   ReD   D7 50

1    is a foundation for which we do our work, but it doesn't mean —

2    there are certain limitations.

3        Q.   Now, in this case, Kathy Wilcox — when you — you

4    supervised her, as I recall?

5        A.   Yes.

6        Q.   Did — was there a procedure with her reports that you

7    have to approve of her reports before they were sent out?

8        A.   Yes.  I technically review her notes and then did she

9    follow of the steps that she should follow.  And then we do an

10   administrative review on, is all the paperwork that's supposed

11   to be there, there?  So, there are two reviews, one technical

12   and one administrative.

13       Q.   And you did that on all of her reports that she - - -

14       A.   (Interposing) Yes.

15       Q.   - - - did in this case?

16       A.   Yes.

17       Q.   Including the examination of the clothing of

18   Ms. Freeman?

19       A.   Yes.

20       Q.   And did you find any problems with her work?

21       A.   No.

22       Q.   Thank you.

23            MR. FRASIER:    That's all I have, Your Honor.

24            THE COURT:    You may step down, sir.

25            And did you want this witness to remain, also?

```
     D7 51                              Karcher  D
```

1            MR. FRASIER:    I think he has to go Portland,

2  Your Honor, so I'll let him go.

3            WITNESS:    Another crime scene.

4            THE COURT:    You're excused from further

5  attendance.

6            WITNESS:    Thank you.

7            THE COURT:    Your next witness?

8            MR. FRASIER:    Uh, we'd like to recall Kris

9  Karcher.

10            THE COURT:   Okay.

11                      KRIS KARCHER

12  was thereupon again produced as a witness on behalf of

13  Plaintiff and, having previously been duly sworn to tell the

14  truth, the whole truth and nothing but the truth, was examined

15  and testified as follows:

16            THE COURT:    Sit here, please.

17            Go ahead.

18            MS. SOUBLET:    Thank you, Your Honor.

19                   DIRECT EXAMINATION

20  BY MS. SOUBLET:

21     Q.   Ms. Karcher, there was some discussion yesterday

22  about maggot casings associated with this case?

23     A.   Yes, there was.

24     Q.   And do you know what happened with those maggot

25  casings?

Karcher   X     D7 52

1      A.   Um, those maggot casings were collected at the scene

2   about probably two and a half years after we found the body.

3   And we sent those to the FBI Tox Lab.  They — initially, our

4   hope was that they could do what's called an HCG, which is a

5   pregnancy test.  Casings are — they're like the cocoon that the

6   maggot, when it leaves the body and it goes, it will bury

7   itself in the ground and then where — that's where it will

8   become a fly and eventually emerge from the ground.

9           So, those casings dry out.  They're left in the

10  ground.  But, they're a protein and they can absorb toxins from

11  the body or the source of their food.

12          So, we collected the casings, sent them to the Tox

13  Lab at the FBI, hoping that they would be able to do a

14  pregnancy test, which they cannot do.  They still are unable to

15  do that.  But, they did do a drug tox — a drug toxicology on

16  those casings that came back as negative.  There was no drugs

17  found.

18      Q.   Thank you.

19          MS. SOUBLET:    I have nothing further.

20          THE COURT:    Any questions?

21                   CROSS EXAMINATION

22  BY MS. McCREA:

23      Q.   Well, the examination that they did for drugs was

24  limited to just some certain drugs, right?

25      A.   Right.  It's the normal drug screen.

```
      D7 53                                    Karcher   ReD
```

1    Q.   Okay.  And the reason that you use maggot casings to

2    look for toxicological results is because maggots are blow — I

3    guess they start out as blow flies.  Flies tend to go to the

4    dead body, especially to the areas where — if there's any

5    wounds, right?

6    A.   If there is a wound, that's usually where they'll

7    start.  Yeah.

8    Q.   Okay.  And then they go to different orifices, like

9    the mouth or other areas?

10   A.   Correct.

11   Q.   Okay.  Thank you.

12          MS. McCREA:   That's all the questions I have.

13          THE COURT:   Anything else?

14          MS. SOUBLET:   Just briefly.  Thank you, Your

15   Honor.

16                 REDIRECT EXAMINATION

17   BY MS. SOUBLET:

18   Q.   Ms. Karcher, what's included in a normal drug screen?

19   A.   A normal drug screen checks for benzodiazepines,

20   which is like the Valium, that kind of thing; cocaine;

21   methamphetamine; heroin; and the morphines — that group.

22   Q.   Thank you.

23          MS. McCREA:   Nothing further.

24          THE COURT:   You may step down.

25          MR. FRASIER:   We would recall Officer McNeely.

McNeely   D     D7 54

1       THE COURT:     You're still under oath, Officer.

2                       RAY McNEELY

3    was thereupon again produced as a witness on behalf of the

4    Plaintiff and, having previously been duly sworn to tell the

5    truth, the whole truth and nothing but the truth, was examined

6    and testified as follows:

7                       DIRECT EXAMINATION

8    BY MR. FRASIER:

9       Q.   Officer McNeely, there's been some discussion

10   throughout this case of a location where Econo-Rooter is at and

11   where a Maytag store was at.  Are you familiar with this

12   location?

13      A.   Yes, I am.

14      Q.   Did you tell the Grand Jury in 2000 — well, first of

15   all, where is this location we're talking about?

16      A.   It's right where West Central meets 42.

17      Q.   Is that the north end of the bypass that goes around

18   Coquille, or the south end?

19      A.   It would be the north end.

20      Q.   Now, the Maytag business no longer is there?

21      A.   Correct.

22      Q.   And today what is the business that is there?

23      A.   Econo-Rooter.

24      Q.   Now, are you familiar with Sturdevant Park?

25      A.   Yes, I am.

D7 55                                    McNeely  D

1    Q.   And there's a gate at that park?

2    A.   Yes, there is.

3    Q.   Where is this gate located?

4    A.   It's probably about 30 — maybe 30 yards past the

5    entrance — 30, 40 yards.

6    Q.   And in your course of your work as a patrol officer

7    for the City of Coquille, have you had the opportunity to turn

8    around there?

9    A.   Yes, many times.

10    Q.   Is there adequate room to do it?

11    A.   Yes, there is.

12    Q.   This gate, in the course of your experience as a

13    police officer, is it closed every night?

14    A.   No.  Usually, we'll notify public works if the water

15    is getting high, and they'll close it during flood stage to

16    keep people out of the park.

17    Q.   Now, I believe Ms. Steinhoff testified about a

18    particular place she had been taken by the Defendant.  I

19    believe it was called Coe Lane.  Do you know where that's

20    located at?

21    A.   Yes, I do.

22    Q.   I'm going to put up here on the easel (not

23    understandable).  This is State's Exhibit 76.  If you want to

24    step down, Officer, and point out on the map where Coe Lane is?

25    A.   Approximately it would be right about here, before

McNeely   D     D7 56

1   Lee Valley Road and when you come down off of the (not

2   understandable) Fairview Road, and it's kind of (not

3   understandable) sort of drop down.  Between that part where you

4   drop down where Lee Valley Road (not understandable.)

5

6       Q.   Now, for purposes of demonstrative evidence and so

7   forth, I'm going to show you what's been marked as State's

8   Exhibit No. 2.  Do you recognize that?

9       A.   Yes, I do.

10      Q.   And is that appear to be a Google map image that also

11  points out various locations in this case?

12      A.   Yes, it does.

13      Q.   And does it appear to be accurate?

14      A.   Yes, it does.

15      Q.   State's Exhibit No. 3 — is it, again, similar?

16      A.   Yes.

17      Q.   And it includes areas such as where the grandparent's

18  house of Mr. Bartley is located at?

19      A.   Correct.

20      Q.   And does that accurately portray the area?

21      A.   Yes, it does.

22      Q.   State's Exhibit 4, again a Google map area.  Does

23  this show the location of such places as Johnson Mill Pond, the

24  McGuffin home, where the body was found, and also Hudson Ridge?

25      A.   Yes, it does.

```
     D7 57                              McNeely  D
```

1      Q.   State's Exhibit 5, does that show, again, the

2   location where Ms. Freeman's body was found?

3      A.   Yes, it does.

4      Q.   And State's Exhibit 6, the relationship of Hudson

5   Ridge to where the body was found?

6      A.   Yes.

7           MR. FRASIER:   Your Honor, we'd offer State's

8   Exhibits 2 through 6.

9           MS. McCREA:   There's no objection, Your Honor.

10          THE COURT:   Received.

11          (Whereupon Plaintiff's Exhibit Nos. 2, 3, 4, 5

12   and 6 were received into evidence.)

13     Q.   The areas we've been talking about in this case —

14   Hudson Ridge, Lee Valley Road, City of Coquille, the McGuffin

15   home, Johnson Mill Pond — could you tell us all what county and

16   state they're located in?

17     A.   Coos County, Oregon.

18     Q.   Finally, did you grow up in the Coquille area?

19     A.   Yes.  I've lived here for 28 years.

20     Q.   Are you familiar with Hudson Ridge?

21     A.   Yes, I am.

22     Q.   Graduate from high school here?

23     A.   Yes, I did.

24     Q.   And high school — did you used to go mudding?

25     A.   Yes, we did.

McNeely   X     D7 58

1      Q.   Where?

2      A.   Lots of places, but Hudson Ridge was one of the

3  places we'd go.  It was right near my friend's house.

4      Q.   And were you able to go mudding there year 'round?

5      A.   Yes.  There's creeks and stuff up there.  In

6  particular, on the power line roads there's one that goes down

7  into a creek bottom where there is mud there that you can go

8  year 'round.

9           MR. FRASIER:   Thank you, Your Honor.  That's

10  all I have.

11           THE COURT:   Cross?

12                CROSS EXAMINATION

13  BY MS. McCREA:

14      Q.   Officer McNeely, when you turned around at Sturdevant

15  Park, you haven't been driving — well, you've been driving a

16  patrol car?

17      A.   Correct.

18      Q.   Okay.  And what year is that patrol car?

19      A.   I honestly couldn't tell you, ma'am.

20      Q.   Okay.  It has power steering?

21      A.   Yes, it does.

22      Q.   All right.  It wasn't a 1967 Mustang that you were

23  using to try to turn around?

24      A.   No, it was not.

25      Q.   Okay.  And it would be — your patrol car, I'm

D7 59                                    McNeely  X

1    assuming, is kept in good mechanical condition?

2        A.    I hope so.

3        Q.    No problems with the linkages or having the gears get

4    stuck, that kind of thing?

5        A.    No, ma'am.

6        Q.    And most likely it's an automatic transmission?

7        A.    Yes, it is.

8        Q.    Okay.  Now - - -

9              MS. McCREA:    If I could approach, Your Honor?

10             THE COURT:    You may.

11       Q.    Since you're conveniently here, Officer McNeely, I'm

12   going to show you what's been marked for identification as

13   Defendant's Exhibit 124.  Is that a Google map of the Johnson

14   Mill Pond?

15       A.    Yes, it is.

16       Q.    And does that appear to fairly and accurately depict

17   that area?

18       A.    Yes, it does.  Yep.

19       Q.    All right.

20             MS. McCREA:    We'd offer - - -

21       Q.    Did you want to say something else?

22       A.    No.  I just said yes.

23       Q.    Okay.

24             MS. McCREA:    We'd offer Defendant's Exhibit

25   124, Your Honor.

1                    MR. FRASIER:    No objection.

2                    THE COURT:    Received.

3                    (Whereupon Defendant's Exhibit No. 124 was

4      received into evidence.)

5           Q.    So, Officer McNeely, in this case we have — we have

6      testimony from — I believe it's Deputy — I'm sorry if I don't

7      get the — from Deputy Oswald that a receipt was found near the

8      first fork up at Hudson Ridge.  Are you familiar with that?

9           A.    Yes, I am.

10          Q.    Okay.  Because I know you've been in and out during

11     the — but, you're familiar with the case, right?

12          A.    Yes.  Correct.

13          Q.    And the testimony also was that there was evidence,

14     or an indication when Deputy Oswald looked at that area near

15     the receipt, that a vehicle had either spun out or turned

16     around.  There were indications of tire tracks, okay?

17          A.    Okay.

18          Q.    Now, in terms of where one goes mudding in the

19     summer, for example in June at Hudson Ridge, that the creek

20     area — the muddy area is different than the location near that

21     fork in the road that Deputy Oswald described, isn't it?

22          A.    It's not in the exact location.  No, ma'am.

23          Q.    Well, is it a ways away?

24          A.    No.  You can go up — do you want me to use the map?

25          Q.    Sure.  Go ahead.

D7 61                                    McNeely  X

1    A.   Fairview Road comes off like this, and this is where

2    that park is where the jury view was.  Then you go up here and

3    there is a power line road that runs along there that a lot of

4    the kids would go on, and go just four wheeling all the time.

5    There's a little flat spot up on top that kids will party at

6    and stuff.

7         And that road that Kip is talking about is before

8    that and it kind of comes around and links back up to this

9    road.  And then you go down this road long enough there's a —

10   kinda like a "U" shaped like that and the creek is in the

11   bottom.  But, you could either access it from this road or from

12   going from that road.

13   Q.   So, the receipt — would it be fair to say the receipt

14   was closer to where the shoe was found than to where the area

15   of water was found?

16   A.   Correct.

17   Q.   Okay.  Thank you.

18            MS. McCREA:   That's all the questions I have.

19            THE COURT:   Any redirect?

20            MR. FRASIER:   That's all I have, Your Honor.

21            THE COURT:   You may step down.

22            WITNESS:   Thank you, Your Honor.  Do you want

23   me to take that down?

24            THE COURT:   No, that's fine.  You can leave

25   it.

D7 62

1          MR. FRASIER:    Call Dr. Olson.

2          THE COURT:    How long will he be?

3          MR. FRASIER:    Uh, my direct will probably be

4  fifteen, twenty minutes, Your Honor.

5          THE COURT:    Let's take our recess now and then

6  we'll get it all done.

7          Everybody remain seated until the jury has a

8  chance to go the jury room.

9          Take your notes, remember the admonition.

10          (Jury out.)

11          THE COURT:    Ten forty-five.

12                      (RECESS)

13          (Jury in.)

14          THE COURT:    Be seated, please.

15          Call your next witness.

16          MR. FRASIER:    Your Honor, before I do that, I

17  have State's Exhibit 241, which is an excerpt of the Grand Jury

18  testimony of Heather Reid.  I would offer the exhibit and would

19  then like to play that.  It's real short — a couple minutes.

20          THE COURT:    Okay.

21          Any objection?

22          MS. McCREA:    No, Your Honor.

23          THE COURT:    Received.

24          (Whereupon Plaintiff's Exhibit No. 241 was

25  received into evidence.)

```
     D7 63                                    Olson  D
```

1              THE COURT:    And you can play it.

2              (Whereupon State Exhibit 241, the audio tape of

3    the Grand Jury testimony was published for the jury.)

4              MR. FRASIER:    Now, we'll call Dr. Olson, Your

5    Honor.

6              THE COURT:    Okay.

7              Step forward please, sir.  Raise your right

8    hand.

9                      <u>JAMES NORMAN OLSON</u>

10   was thereupon produced as a witness on behalf of Plaintiff and,

11   having first been duly sworn to tell the truth, the whole truth

12   and nothing but the truth, was examined and testified as

13   follows:

14             THE COURT:    Have a seat here, please.

15                      <u>DIRECT EXAMINATION</u>

16   <u>BY MR. FRASIER:</u>

17       Q.   Could you state your name please, sir, and spell your

18   last name for the record?

19       A.   Dr. James Norman Olson, O-L-S-O-N.

20       Q.   And what is your occupation, sir?

21       A.   I'm a physician and I specialize in hospital

22   pathology, as well as forensic pathology.

23       Q.   Could you tell us, sir, a little bit about your

24   training and education?

25       A.   After high school, four years of undergraduate work

Olson   D     D7 64

1  with a Bachelor of Science degree at the University of

2  Washington, four years of medical school at the University of

3  Washington, a year of internship and then — also at the

4  University of Washington, Pathology residency at Tacoma General

5  Hospital in Tacoma, Washington — so, basically, twelve years.

6         I'm Board Certified in Anatomic, clinical and

7  Forensic Pathology and actively engage in the practice of both

8  disciplines.

9     Q.   You indicated you're Board Certified in Forensic

10  Pathology.  First of all, what does it mean to be Board

11  Certified?

12     A.   Board Certification is a national examination in the

13  various specialties in medicine and in pathology.  It includes

14  the two primary disciplines of anatomic and clinical, which

15  would be surgical pathology or running a laboratory — hospital

16  pathology, essentially.  And then there are several sub-

17  specialties, like (not understandable) Pathology or corensic

18  Pathology, Microbiology, Blood Banking, Molecular Diagnostics.

19         At any rate, you take a national examination.  The

20  first one is three days of rigorous testing.  And if you pass

21  it, you are Board Certified in Anatomic and Clinical.  And then

22  the sub-speciality examinations are held, I think, just once a

23  year and they're a one-day test, testing your knowledge to see

24  if you're, at least on a national level, judged to be competent

25  to practice that particular branch of medicine.

```
    D7 65                                Olson   D
```

1      Q.   And how long have you been Board Certified in

2    Forensic Pathology?

3      A.   Uh, 1997.  I practiced quite a bit before that.  But,

4    I challenged the boards on the basis of experience in 1997 and

5    passed them.

6      Q.   Now, could you tell us what the sub-specialty

7    Forensic Pathology — what is that?

8      A.   It's the discipline of pathology and medicine, in

9    particular, that applies basically the knowledge and principles

10   of medicine to resolution of medical legal issues, obviously

11   such as we're engaged in today.

12     Q.   And you have done what's sometimes referred to as

13   autopsies?

14     A.   Yes, I have.

15     Q.   How long have you been doing those, sir?

16     A.   I've been doing them since residency.  So, basically,

17   almost — oh, gee, you'd be looking at since '72.  So, almost 40

18   years.

19     Q.   In regards to Coos County, do you have a position or

20   contract with Coos County?

21     A.   I contract with Coos County, as well as several other

22   counties, on an annual basis to perform the autopsies for the

23   county and serve as the designated Medical Examiner for this

24   county, as well as several others.

25     Q.   And what is your job as the Medical Examiner?

Olson  D    D7  66

1      A.    The Medical Examiner supervises the various — in my

2  case, I supervise the various county Deputy Medical Examiners.

3  You've already heard testimony from the Coos County Deputy —

4  Chief Deputy Medical Examiner, Coos — Kris Karcher.  She has

5  counterparts — excuse me, she has counterparts in other

6  counties performing the same function.  And we discuss the

7  cases, determine if an autopsy or toxicology is necessary.

8  Yeah.

9           THE COURT:    We're getting him a glass of

10  water.

11           WITNESS:    Thank you.

12      A.    Anyway, I can continue.

13      Q.    Go ahead.  Your work as the Medical Examiner — are

14  you asked to make determinations on what — go ahead.

15      A.    Thank you.

16      Q.    Are you asked to make determinations of what the

17  manner and cause of death are?

18      A.    Yes.  That's our function.

19      Q.    Could you tell us what "manner of death" means, and

20  "cause of death" means?

21      A.    Well, cause of death precedes the manner.  Cause of

22  death would be the actual injury or disease process that sets

23  in place the physiologic derangements that lead to death.  And

24  the manner of death is the — basically, five categories, which

25  would be natural, which is the overwhelming majority of cases

D7 67                                        Olson   D

1   we see; accident, which would be probably the second most

2   frequent category; suicide, which has also, especially now in

3   the times we live in, become quite a frequent category, as

4   well; homicide, obviously hands — death at the hands of another

5   individual, or individuals; and then undetermined.

6        There's another category, which is a transitional

7   category of pending investigation, which ultimately, after all

8   avenues of investigation are exhausted the cause — or, manner

9   of death is described either to undetermined or to another

10  category.

11  Q.   And when you're doing what's referred to as a

12  forensic autopsy, could you just briefly explain to the jury

13  what you do in that type of an examination?

14  A.   In a typical forensic autopsy of — actually, most any

15  autopsy, really — should be proceeded with careful review of

16  the information that's available at the time preceding the

17  autopsy up to the autopsy, itself, which would include any

18  police briefings, in the case of a homicide or an accident — an

19  unnatural death; review of medical records that are — that can

20  be obtained prior to the autopsy — just generally acquiring all

21  the information you can.

22       It then would proceed to the autopsy, itself.  Would

23  be examination of the body, a careful examination externally,

24  trying to take samples or any evidence — trace evidence that

25  might be on the body is collected, photographed, documented

Olson  D    D7 68

1    prior to the actual removal of clothing and examination of the

2    unclothed body.  It proceeds, depending on the type of the case

3    — you know, if it's a completely natural death, you don't need

4    to spend a great deal of detail on that particular part of the

5    examination.

6          In a case like this, greater detail is required.

7    But, all of the clothing, any unusual items on or about the

8    body that are brought with it to the autopsy, are described and

9    documented and possibly taken into evidence.

10          And then the body is described, it's general physical

11   descriptors — size, age, weight, appearance of the body as you

12   are receiving it — whether it's a death that appears to have

13   been recent or, in this particular case, where you're dealing

14   with badly decomposed remains.  They're described as such.

15          But — and then an internal examination, which

16   typically involves a complete examination of the head, neck,

17   chest, abdomen and extremities, where required, dissection and

18   retention of tissues and fluid on tissue samples for other

19   examples, such as DNA or toxicology.

20      Q.   Now, directing your attention, sir, to August the 4th

21   of the year 2000, were you asked to perform a forensic autopsy

22   on the remains of what was determined to be Leah Freeman?

23      A.   Yes, I was.

24              MR. FRASIER:    Your Honor, could we approach?

25              THE COURT:    Yes.

D7 69                                          Olson  D

1              (Bench conference, not recorded.)

2              THE COURT:    As I did yesterday, ladies and

3    gentlemen, there is going to be one picture of the remains of

4    Ms. Freeman on the autopsy table.  And it probably is even a

5    little bit more graphic than the other two.  And so what I've

6    told other people is, if they do not to remain in the courtroom

7    while that's being shown, this is the time to leave because I

8    want absolutely no reaction to anything from anybody at this

9    point in time.

10             So, if you're not comfortable being in here with

11   that, then you should leave.

12      Q.   Dr. Olson, I'm going to show you what we've marked as

13   State's Exhibit No. 245 and ask if you can identify this?

14      A.   This is a photograph taken as the body was received

15   and removed from body bags — two of them — and the body was

16   placed on a piece of plywood to facilitate removal.  And it

17   shows a depiction of the individual in her state prior to

18   anything other than just an external examination.

19             THE COURT:    Can everybody on the jury hear the

20   doctor?

21             (Inaudible response.)

22             THE COURT:    You have a soft voice, and other

23   times you talk a little rapidly, so it's hard to follow.  So,

24   if you could keep your voice up, please.

25             WITNESS:    Okay.

Olson   InAid D7 70

1           And, Mr. Frasier, you were standing there.

2   That's why I asked.

3       Q.   And does this picture accurately portray what you

4   saw?

5       A.   Yes, it does.

6               MR. FRASIER:   We'd offer State's Exhibit 45.

7               MR. McCREA:    May I inquire briefly in aid of

8   objection?

9               THE COURT:   Yes.

10               EXAMINATION IN AID OF OBJECTION

11  BY MR. McCREA:

12      Q.   Doctor, does this photograph, Exhibit 45, in any way

13  assist you in giving your opinions concerning the results of

14  the autopsy?

15      A.   I think it just depicts the condition of the body

16  that we were dealing with and the limitations that will

17  probably be discussed further on.

18      Q.   Is that — you think it would be of assistance?

19      A.   I would say yes.  I think so.

20      Q.   Pardon?

21      A.   Yes, I believe it will be of assistance.

22               MR. McCREA:    We have no objection.

23               THE COURT:    Received.

24               (Whereupon Plaintiff's Exhibit No. 45 was

25  received into evidence.)

D7 71                                        Olson   D

1              DIRECT EXAMINATION (Continued)

2    BY MR. FRASIER:

3        Q.   If you'd grab that, Doctor — there's a laser pointer

4    here with a red dot on top.

5            I put State's Exhibit 45 up on the screen.  Could you

6    describe the condition of the body for us, please?

7        A.   The body was significantly decomposed.  We're dealing

8    with an interval of, I think, a little over five weeks, at

9    least.  That's the head, residual hair — blonde hair that

10   certainly was consistent with the last photograph taken of the

11   decedent and, I believe, used in a missing persons report or

12   flyer.

13           Right side of the head, essentially, skeletonized.

14   That would be the right lateral surface of the skull and facial

15   structure.  It's a little dark and difficult to see that the

16   body is fully clothed.  And, again, clothing that pretty much

17   matches what was described as the decedent's clothing on or

18   about the time she disappeared.

19           It's soaked in dark brown in multiple areas, and

20   that's the result of fluid oozing out from the body as it

21   decomposes.

22       Q.   And how you would classify the condition of this

23   body?

24       A.   Well, I would say that she was probably close to

25   almost being completely skeletonized.  No usable internal

—

Olson   D      D7 72

1   organs were left to evaluate for injury or disease.  And it was

2   basically — the most intact part of the body was the right

3   calf, which had somehow, just due to positioning, temperature,

4   whatever, not been consumed by insects, animals or

5   significantly decomposed.  And we were actually, as we may

6   discus later, able to use that for toxicologic examination.

7   So, the right foot, ankle and calf were probably the best

8   preserved parts of the body.

9        Everything else was down to skeleton and dried,

10   mummified skin.  That, itself, was also significantly

11   discolored, most of which being a brown to black color.  The

12   best preserved skin and identifiable Caucasian skin was, again,

13   on the right lower extremity.

14    Q.   Dr. Olson, could you describe for the jury what you

15   did in examining this body?

16    A.   What I did was, basically, take it as I saw it, layer

17   by layer, and describe the body in the position, roughly, that

18   we received it.  The right arm was up and behind the body in

19   kind of an unusual, awkward position.  The left was resting

20   across the front of the body, about the abdomen, lower chest

21   level.  I described the clothing, any — the general condition

22   of the clothing and any holes that — of which there are

23   numerous holes, which I was of the impression were due to post

24   mortem animal activity, depredation of the body.

25        And then just removed the clothing, item by item,

```
     D7 73                              Olson  D
```

1  gave it a description and then proceeded describing the body as

2  I saw it from head to toe, detailing the general condition,

3  skeletonization of it, the condition of what residual tissue

4  was left, what items — what parts of the body had decomposed

5  and were no longer there or recognizable.  In this particular

6  case, I would include the brain, the entire central nervous

7  system, all of the internal organs from the neck, chest and

8  abdomen and pelvis — none of those survived.

9      Q.   Now, in examining the remains, first of all, did the

10  body still have braces on the teeth?

11      A.   Yes.  There were braces — upper and lower braces on

12  the — on both — or, rather, on the teeth.

13      Q.   An identification was made that this was the body of

14  Leah Freeman based on dental records?

15      A.   It was.  At the end of the autopsy, two dentists — I

16  believe practicing in the Roseburg area — volunteered to

17  examine x-rays that were provided — dental x-rays by her

18  regular dentist or orthodontist, I guess, and confirmed that

19  they certainly matched those x-rays and made an identification

20  of the decedent.

21      Q.   And while I'm thinking about it, prior to the

22  autopsy, were x-rays taken of the body?

23      A.   Yes.  A full set of x-rays were taken.  And the

24  autopsy, itself, was performed at the Douglas County morgue in

25  Roseburg.  And x-rays were obtained at Mercy Medical Center, a

                                          Olson   D      D7 74

1   hospital — the hospital in Roseburg, I guess, under the

2   supervision of the Deputy Medical Examiner for Douglas County,

3   at that time Rick Benowait (phonetic).  And a full set of

4   skeletal x-rays were obtained that were examined prior to the

5   autopsy.

6        Q.  And did you examine those x-rays?

7        A.  I looked at them, yes.

8        Q.  And what did you find, if anything?

9        A.  I didn't see anything that would suggest gross

10  trauma.  I didn't see any obvious fractures of any of the

11  bones.  I didn't see any retained foreign objects, such as a

12  bullet.  I didn't see skeletal trauma that would suggest

13  possible gun shot injury.  I didn't see anything that suggested

14  remnants of a — say a knife or other sharp force implement

15  being in the body or a fragment of it.  In short, basically, it

16  was a negative examination.

17       Q.  Now, in your examination, as part of the — after the

18  clothing was removed — in your experience have you dealt with

19  persons who have been stabbed?

20       A.  Yes.  I've had several this year and I have one to do

21  as soon as I'm done here.

22       Q.  And have you, in the course of your experiences as a

23  forensic pathologist, found on bones of a deceased individual

24  who has been stabbed, evidence that they've been stabbed?

25       A.  Yes, I have.

D7 75                                        Olson  D

1      Q.   And could you describe what you would be looking for

2  in that situation?

3      A.   Well, typically, if it's a stab wound to the chest,

4  it would be difficult in most cases to miss a rib.  So, there

5  usually is sharp incised wound, either completely through in

6  some cases or at least partially through one or two ribs,

7  depending on the width of the knife and its orientation when

8  the stab wound is inflicted.

9           You could conceivably slice someone's throat, which

10  is essentially a deep incised wound, and not do damage to the

11  (not understandable) bodies.  So, I have seen that without

12  significant skeletal trauma.

13          Stab wounds to the extremities, it may or may not —

14  depending on the depth of the muscle and soft tissue — strike a

15  long bone.  So, it varies.  But, typically a stab wound to the

16  chest would be — it's difficult to envision the majority of

17  those being accomplished without at least some rib injury or

18  injury to the sternum, the breast bone.

19      Q.   Now, did you also visually inspect the ribs, the

20  vertebrae, what have you, of Ms. Freeman's body?

21      A.   Yes, I did.

22      Q.   And what, if anything, did you find?

23      A.   I didn't find any trauma of any sort.

24      Q.   Did you find any evidence that she'd been stabbed?

25      A.   No.

Olson    D    D7 76

1    Q.    Did you find any evidence that she had been shot?

2    A.    No.

3    Q.    Her skull — what was the condition of her skull?

4    A.    The skull showed no fractures.  A complete

5    examination — I removed what residual scalp and facial skin

6    that was on the skull and examined the cranium itself, as well

7    as the facial bones in the jaw and the cervical — or, neck,

8    vertebrae.  I did actually examine the entire (not

9    understandable) column.  But, I found nothing.

10          Near the end of the autopsy, after having examined

11    the skull externally, I did treat it as we would a normal

12    autopsy to remove the brain, and used a bone saw and removed

13    the top of the — of the skull and found the brain was

14    completely decomposed.  But, there were no obvious fractures

15    externally or internally, and no retained objects inside the

16    skull.

17    Q.    Now, you're — are you familiar with the — well, let's

18    back up a little bit.  In regards to the rib cage, we've talked

19    about being stabbed.  If somebody had been shot, what type of

20    things would you be looking for there if they'd been shot in

21    the chest area?

22    A.    You could — I mean — it would be difficult, again, if

23    you're shot in the chest, most of the time there will be a

24    perforating injury to a rib or ribs, and possibly not just the

25    front ribs.  Say that you're shot from the front or side, but

Exhibit 102  Page 1218 of 1666 to
State Defendants' Motion for Summary Judgment

D7 77                                    Olson   D

1   also additional ribs if the bullet itself exits.  There's also

2   the possibility of damage to the breast bone or to the

3   vertebral column.

4       Q.   And did you find any type of injury to the ribs or

5   that type of thing indicating that Ms. Freeman had been shot?

6       A.   Nothing that suggested that she had been shot.  I

7   mean, it doesn't absolutely exclude it.  But, I didn't see

8   anything that would have pointed towards that.

9       Q.   Now, you indicated there was some skin that had

10  mummified?

11      A.   Most of the skin that was left had become leather-

12  like and brown to black in color.

13      Q.   And you examined what was left of the skin?

14      A.   I did.  And the intact parts on the extremities and

15  elsewhere on the body I examined it and I couldn't find any

16  obvious injuries.

17      Q.   Now, in regards to the chest area, was there any skin

18  left from that area?

19      A.   Very little.

20      Q.   But, you were able to find some?

21      A.   Some, but I didn't — most of the useful skin was over

22  the left side of the face and then over the — what was left on

23  the forearms — some on the hands and the lower legs.

24      Q.   Now, as part of your examination, do you also try and

25  do toxicological examinations?

                                        Olson   D      D7 78

1        A.   I do.  In a case like this, if it — she were

2   completely skeletonized, it would not have been possible under

3   usual circumstances.  But, as I alluded to earlier, there was

4   actually surprisingly well-preserved muscle — calf muscle in

5   the right lower leg.

6        Q.   And did you excise part of that?

7        A.   I did.  I took 120 grams of that.

8        Q.   And did you cause that to be tested for the presence

9   of controlled substances?

10       A.   I did.

11       Q.   And what were those results?

12       A.   The results were negative.  The tests that were

13  performed on the muscle were negative for amphetamine;

14  methamphetamine; cocaine and its metabolites, including a

15  metabolite, coke-ethylene that will result if alcohol and

16  cocaine are used simultaneously; morphine, as well as one of

17  the metabolites that would be seen from heroin — heroin is

18  basically a form of morphine — were tested.  And that was

19  negative.

20            And then a blood organic-based screen was performed

21  that is described as negative.  And the blood organic base

22  would typically include common drugs that we would see

23  therapeutically, as well as common drugs of abuse —

24  prescription drugs such as tranquilizers, synthetic narcotics,

25  antidepressants, antihistamines, some anesthetics, topical

```
     D7 79                              Olson   D
```

1   anesthetics.  So, that particular exam would exclude a broad

2   category of drugs that might be abused or used.

3        Q.   Nothing was found?

4        A.   Nothing was found.  The toxicology results were

5   negative.

6        Q.   Now, did you also — well, are you familiar with the

7   concept of strangulation?

8        A.   Yes.  I've seen that many times.

9        Q.   And I think some people, when they watch TV, they

10  think strangulation means cutting off the breath.  Is that all

11  that's entailed?

12       A.   No.  Typically, strangulation can involve multiple

13  modalities.  The biggest, most significant would be cutting off

14  vascular supply to the brain, leading to unconsciousness.

15  There's also the possibility — in some individuals there's a

16  part of the carotid artery that supplies the brain, and where

17  it branches into the part that goes into the brain and the

18  external branch that supplies parts of the face and jaw — there

19  it is the carotid sinus.  And that helps in regulating blood

20  pressure and heart rate.

21            And so, conceivably, if you pressed on that you could

22  cause reflex standstill of the heart, or stoppage.  The

23  opposite would be if you pressed below it, you could cause the

24  heart to accelerate and possibly go in a tachycardic or rapid

25  rate rhythm.  That's more of a physiologic event that can only

                                        Olson   D     D7 80

1  really be surmised on the basis of circumstances and witnessed

2  accounts.

3          Most commonly what you see is strangulation takes

4  really not that much pressure.  And strangulation is typically

5  hanging; ligature strangulation — in other words, some object —

6  linear object like a cord, belt, whatever, wrapped around the

7  neck; and then manual, which speaks for itself.  It's using the

8  hands pretty much exclusively.  Implements can be used like a

9  piece of wood or a bar, a flashlight, whatever.

10         And, typically, it takes very little to cut off the

11 blood supply to the brain.  The veins that drain — the main

12 veins that drain from the brain back to the heart through other

13 vessels — larger ramifying with large vessels — can be blocked

14 in about four and a half pounds of pressure, which is easily

15 achievable with most people in this room, if not all.

16         The carotid arteries — the main two arteries that

17 supply the brain — can be blocked in about eleven pounds of

18 pressure.  The other two arteries are the vertebral arteries

19 that run up the back and side of the spinal column and are

20 partially protected by arches of bone.  But, they take the

21 greatest degree of pressure, and typically would only be

22 occluded in a hanging.  And then they take about 66 pounds.

23         To actually block the airway, the trachea, takes

24 about 33 pounds of pressure to compress it to the point that

25 air won't pass through.

```
     D7 81                              Olson   D
```

1      Q.   And if you're examining a body for evidence of

2    strangulation, what do you look for?

3      A.   Well, typically, you would look for marks on the —

4    about the individual, assuming that they were able to put up a

5    struggle, unless they were extremely young or old and incapable

6    of resistance, or unconscious or nearly so for drugs, alcohol,

7    whatever.  But, typically you would expect in a manual

8    strangulation to see marks — fingernail marks, which can either

9    be just, basically, an impression — kind of a curve — a linear

10   mark from the fingernails, themselves.  And that depends upon

11   the — how long they are.  It's conceivable that some people

12   have very short nails and may not even make an impression.

13        You can get scratches, which are just linear

14   abrasions where the skin is scratched.  You can get somewhat —

15   marks that are sometimes called claw marks, where you dig in

16   and pull down and it looks like a claw — sort of a "U" shaped

17   abrasion.

18        You can also get the marks from the decedent, or

19   victim, where they're trying to relieve the pressure and pull

20   the hands off.  And their fingernails may also dig in.

21        You can get bruises from fingertips, the thumbs.  So,

22   it all depends on what's used.  If it's just purely one or both

23   hands, then those are the possibilities.

24      Q.   Now, in examining the remains of Ms. Freeman, were

25   you able to do that type of an examination?

Olson    D    D7 82

1    A.    No.   That was impossible due to the level of

2    decomposition.   I should also add that in a non-decomposed

3    individual, typically in manual strangulation you'll get pin-

4    point hemorrhages in the eyes over the conjunctival (phonetic)

5    and the whites of the eyes and the membranes that surround it,

6    over the eyelids and over the face.   And, again — and that's

7    the vascular phenomenon due to backup and rupture of small

8    vessels — capillary sized vessels.

9         In this case, that's not possible.   We don't have any

10   — any tissue that would be of any use for that left.

11   Q.    Do you look for, when you do these types of

12   examinations — when you do an internal examination of the neck,

13   do you look for what's called the hyoid bone?

14   A.    Well, you look for fractures and they're most

15   commonly seen with manual strangulation.   You have several

16   structures that can fracture and be damaged.   The hyoid bone is

17   an interesting bone.   It's shaped like a horseshoe.   It's

18   positioned above the larynx.   So, if this is your voice box —

19   top of it — it's about here.   It's "U" shaped, so it's about

20   like this and it heads up towards the back.   And it, basically,

21   anchors muscles to the tongue and several muscles that are used

22   in our speech.   It doesn't articulate with any other bones

23   directly.

24        You would also look at the larynx, itself — the

25   thyroid cartilage which, in addition to forming the bulk of the

```
    D7 83                              Olson   D
```

1   voice box and having this sort of wedge or "V" shaped

2   configuration that we can feel on ourselves, in the back has

3   two little projections that stick up called the superior horns.

4   And they are subject to being damaged and fractured, as well.

5          You could, conceivably, fracture directly the larynx,

6   itself, the larger part of it.  And you could also fracture

7   portions of the cricoid cartilage — a wing shaped, or actually

8   shaped like a ring — a signet ring — that is immediately below

9   the thyroid cartilage.  And you might, depending on where you —

10  you might even damage tracheal cartilages.

11         But, that plus-muscle damage — there are multiple

12  muscles that invest the neck.  You've got these two large ones

13  that we can all see and feel on our side — the

14  sternocleidomastoids.  They can show hemorrhage from pressure

15  on them and damage to blood vessels.  It's basically bruising.

16         You can — and then there's an investment of very

17  small muscles that we call the strap muscles that run up and

18  down.  There are several of them.  And you, layer by layer,

19  reflect those, looking for hemorrhages and injuries.

20     Q.   In your examination of Ms. Freeman, did you check the

21  throat area that you've been talking about?

22     A.   Yes.  The only structure left was the hyoid bone.

23  All of the other structures were decomposed and lost.

24     Q.   Now, the hyoid bone — is it actually one bone or is

25  it several bones?

Olson    D    D7 84

1    A.    It depends on the age of the individual.  On a young

2    individual like this — Leah Freeman, at age fifteen, it

3    typically is not fused.  So, it's actually three parts.  You

4    have a front part and then the two horns that project to the

5    back — towards the back or posterior surface of the body.

6         As you age in possibly your late teens, early

7    twenties, those can fuse.  And certainly in older people, it's

8    not uncommon to have the entire bone fused to form one basic

9    horseshoe shaped bone.

10        And in a young individual, it is possible to strangle

11   without damage to any of the bones or structures I've

12   discussed, because they're still largely not calcified.

13   They're rubbery — the consistency of cartilage.  And so,

14   typically, a young person such as this — Leah Freeman — may not

15   show fractures of any of these structures because they are

16   rubbery and resilient and not prone to fracture.

17   Q.    Now, you indicated the hyoid bone was present?

18   A.    I was able to identify it — all three parts of it.

19   It was not fused.  It was in three parts.  And there was no

20   obvious fracture of it.  If there was any hemorrhage around it,

21   that was impossible to tell because of the state of

22   decomposition.

23   Q.    Dr. Olson, we've heard testimony, at least from one

24   witness, that claims the Defendant strangled the female.  Did

25   you find any evidence in the course of your autopsy that would

D7 85                                          Olson   D

1   exclude strangulation as the cause of death?

2        A.   No.  I found nothing that would exclude it.  I didn't

3   find anything that would make it unequivocally possible to say

4   that she was strangled.  But, I could not exclude it.  No.

5        Q.   Now, during the course of your — the autopsy, you are

6   called upon to determine cause and manner of death?

7        A.   Yes.

8        Q.   And what did you determine in this case?

9        A.   Well, based on the total case — the situation and

10  everything that I knew — and bear in mind I'm doing this

11  autopsy almost five and a half weeks after her disappearance,

12  so a lot had been done in the interim, which I assume by now

13  you're all aware of — based on the totality of circumstances, I

14  — basically, I would have two options in a case like this.  One

15  would be just to call it homicidal violence of undetermined

16  type.  Or, the other would just be to say undetermined.

17  However, I chose to call it homicidal violence of undermined

18  type because of the circumstances, notably finding other items

19  of her apparel, one of which had blood on it.

20          You have, basically, a disappearance of a young, as

21  far as all the records suggest healthy young woman, and she's —

22  she's dumped.  There's no question that she's dumped in an area

23  that was probably intended to, hopefully, conceal her remains,

24  perhaps indefinitely.

25          As I've already said, the bloody — the blood on the

Olson  InAid D7 86

1  shoe, while not a lot of blood, certainly points to some sort

2  of injury to this individual, especially since it could be

3  traced as being her blood.  I felt that, while I couldn't come

4  up with a precise type of homicide — i.e. strangulation,

5  gunshot, beating — and blunt force trauma is not excluded in

6  this case, either.  Just because there aren't fractures doesn't

7  exclude significant blunt trauma to the head.

8         So, I chose the option of calling it homicidal

9  violence of undetermined type.

10     Q.  And was the Death Certificate prepared for

11  Ms. Freeman?

12     A.  Yes, it was.

13     Q.  I'll show you what's marked as State's Exhibit 244.

14  Does this appear to be a copy of her Death Certificate?

15     A.  Yes, it is.

16         MR. FRASIER:   Your Honor, we'd offer State's

17  Exhibit 244.

18         MR. McCREA:   Again, Your Honor, may I just

19  inquire briefly?

20         THE COURT:   You may.

21              EXAMINATION IN AID OF OBJECTION

22  BY MR. McCREA:

23     Q.  Dr. Olson, as I understand, you indicated here

24  homicidal violence of undetermined type, not as a medical

25  opinion based upon your observations, but as a combination of

```
     D7 87                                    Olson   D
```

1  what you observed medically, combined with sort of a detective

2  process of the surrounding circumstances.  Is that correct?

3       A.   Yes.

4       Q.   All right.  Thank you.

5            MR. McCREA:   With that understanding, there's

6  no objection. Your Honor.

7            THE COURT:   Received.

8            (Whereupon Plaintiff's Exhibit No. 244 was

9  received into evidence.)

10            DIRECT EXAMINATION (Continued)

11 BY MR. FRASIER:

12      Q.   Dr. Olson, the state of decomposition that you saw in

13 this body — how long does it take a body that's left out in the

14 open to get to this type of condition?

15      A.   Well, this is the worst season of the year you could

16 pick, because I've seen bodies that have been dead a few days

17 to a week, if left out, where they can be accessed by flies.

18 And insects are the biggest factor in removing tissue.  You

19 could conceivably, in a fresh body, have large animals — I've

20 seen bears, dogs, coyotes, smaller things like racoons,

21 whatever, that get involved in the process, as well.

22            You could — you could have — obviously, the case

23 speaks for itself.  This only took five weeks.  But, I've seen

24 less and I've seen — I sort of have my own — you might call it

25 bone farm.  I have a farm in the Applegate Valley and

Olson   D     D7 88

1  periodically I lose a cow or whatever.  And I've seen cows and

2  even sheep, when I used to do that, go down to this level in a

3  matter of a couple weeks.

4      Q.    Now, in regards to the — well, let's say that,

5  hypothetically, Ms. Freeman was stabbed in the chest.  Are you

6  familiar with the concept of blood pooling?

7      A.    Yes.

8      Q.    Could you tell us about that?

9      A.    Well, if she was stabbed in the chest or any other

10  body cavity, it depends on the position that she remains in.

11  If she were down and supine, it's possible that the majority of

12  the blood would pool in the cavity before it would start to

13  exit the body.  So, you may not have a substantial amount of

14  blood actually exiting the body.  I mean, if she'd been upright

15  and trying to evade her — the person assaulting her and been

16  running around, you might have blood — quite a bit more blood

17  on her body, as well as at the scene.

18          But, if — you could conceivably stab somebody in one

19  of the major body cavities, have quite a bit of blood loss, and

20  not have a tremendous amount exiting through the wound, itself,

21  whether it's a gunshot or stab.  A stab is more likely to close

22  on itself because it's a narrow wound without a lot of

23  collateral damage to the soft tissue.  And the edges tend to

24  re-oppose once the weapon is withdrawn.  So, it is conceivable

25  that you could have a minimal loss of blood externally, at

```
      D7 89                                    Olson   X
```

 1  least for awhile.

 2      Q.   Thank you.

 3           MR. FRASIER:    That's all the questions I have,

 4  Your Honor.

 5           THE COURT:    Mr. McCrea?

 6                      CROSS EXAMINATION

 7  BY MR. McCREA:

 8      Q.   Dr. Olson, in this case you were missing an awful lot

 9  of what you need to work with.  Is that the way it was?

10      A.   Yes.  I mean, basically, almost to bone.

11      Q.   I'm sorry?

12      A.   You're basically down almost to skeletonized remains.

13      Q.   And I do appreciate you speaking up.  As you can see

14  - - -

15      A.   (Interposing) Yeah.

16      Q.   And you don't have to be a doctor.

17           I'm kind of old and I don't hear as well as I wish I

18  did.  So, if you would and we can get through this, I'm sure,

19  very quickly.

20           And when you got her shirt off, you were actually

21  looking sort of into the body cavity — into the torso, right?

22      A.   Yes.

23      Q.   There wasn't much of anything there except the bone?

24      A.   Yes.  And what was left of the tissue.

25      Q.   Excuse me?

                                          Olson   X     D7 90

1        A.   And what was left of the tissue — I mean, the dried

2    remnants of tissue.  Not much — I mean, no organs.

3        Q.   No organs?  And in the front, the skin had been

4    consumed away by something?

5        A.   Yes.

6        Q.   Okay.  So, if — let's just go through this as

7    carefully as we can as to what you had there.  In terms of

8    toxicology, you took samplings from what was it, the thigh?

9        A.   No.  The back of the lower leg.

10       Q.   The calf?

11       A.   The calf.

12       Q.   You took muscle tissue?

13       A.   Yes.

14       Q.   And one of the problems with utilizing muscle tissue

15   after a body has been out for awhile is that the insects and

16   other organisms tend to extract the toxic things from the

17   muscle tissue, don't they?

18       A.   Not necessarily.  In this case the muscle, as I

19   described earlier, was surprisingly preserved and actually had

20   kind of a pink-red color.  And it was encased in dried skin and

21   there really was no actually maggot activity, or insect

22   activity in the body of the muscle, itself, that I sampled.

23       Q.   Okay.  So, you felt this muscle tissue was probably

24   pretty good to work with?

25       A.   I felt it was obviously the best chance we had to

```
    D7 91                              Olson   X
```

1  identify anything and, actually, all I'm concerned about at

2  that point is not so much quantitation, although it could be

3  performed, but just a yes/no answer: Are these drugs even

4  present?  Are we dealing with anything that might point to a

5  drug-related death?

6      Q.   But, one of the things you could have used instead of

7  muscle tissue would have been to have hair samples checked for

8  toxic substances?

9      A.   That's possible to do that.  You could possibly test

10  hair samples.

11      Q.   There's a lot of hair samples there?

12      A.   Pardon?

13      Q.   And there was a lot of hair there?

14      A.   We took hair samples, but they weren't tested.  No.

15      Q.   But, they weren't checked for toxic substances?

16      A.   Well, it may not reflect the actual pre-mortem, anti-

17  mortem levels.  They might, by themselves, also suggest yes/no,

18  these drugs have been used.  But, it might also have suggested,

19  depending on where you sampled in the hair, that they would

20  have been used well — well before the death of the individual.

21      Q.   But, is the answer no, you didn't check them for

22  toxic substances?

23      A.   No.  We checked the muscle.

24      Q.   And in terms of the toxic substances, you checked for

25  the amphetamines — methamphetamine, amphetamine — the

Olson   X     D7 92

1   amphetamines, so to speak?

2       A.   That's correct.

3       Q.   You checked for it, right?

4       A.   Yes.

5       Q.   And then you checked the opiates?

6       A.   They were checked.  They would basically be —

7   morphine was checked, as well as several of its metabolites,

8   including one that is a breakdown from heroin to morphine.  And

9   then the alkaloid - - -

10      Q.   (Interposing) I'm not quite hearing you.  Are you

11  saying that the test did include heroin?

12      A.   Well, it included a metabolite.  Heroin is rapidly

13  broken down to morphine.  And the six — the one metabolite that

14  is tested and typically indicates the presence of it is 6-

15  Monoacetylmorphine.  It's the first stage in the breakdown from

16  heroin to morphine.

17      Q.   Down to morphine?

18      A.   Yes.

19      Q.   Okay.  Well, I'm not trying to take issue with you

20  here.  I'm just trying to get it covered what was checked.

21      A.   Right.

22      Q.   I'm looking at the Medical Examiner Toxicology

23  Report.  We dealt with the amphetamines.  And so as a group,

24  the morphine and heroin would be in the opiate group, right?

25      A.   They'd be part of it.  But, there — as we deal with

```
     D7 93                              Olson   X
```

1  quite frequently, there are a lot of other drugs besides

2  morphine and heroin now that we're dealing with.  Like

3  methadone is probably the biggest offender.

4       Q.   Did you check, generally, for opiates?

5       A.   The blood organic base screen should screen for

6  synthetic narcotics, as well as several other common drugs.

7       Q.   And then you checked what's set out in terms as blood

8  cocaine panel?

9       A.   That's correct.

10       Q.   Okay.  And that's it?

11       A.   That's it.  I mean, obviously, there are - - -

12       Q.   (Interposing) So, you didn't check for LSD?

13       A.   No.

14       Q.   And that's, what, lysergic acid diethylamide?

15       A.   Yes, closely.

16       Q.   And nothing was done to check for that?

17       A.   No.

18       Q.   What about — what's — what is the drug that is called

19  Ecstacy?  What is that?

20       A.   That's a spinoff of methamphetamine.

21       Q.   What about the so-called designer drugs?  What are

22  they?

23       A.   Most of those are spinoffs of the amphetamines.

24       Q.   You say most of them.  Are there some that are not?

25       A.   I'm not aware of any.  Cocaine changes.  I don't

Olson   X     D7 94

1  think any of the opiates require any sort of alteration to make

2  them more effective or more desirable.  So, most of the

3  designer drugs seem to be alterations of the general structure

4  of methamphetamine.

5      Q.   And in any event, to the extent testing was done, you

6  didn't find evidence of drugs, right?

7      A.   No.  The testing, as you described, is negative.

8      Q.   Now, Mr. Frasier talked with you at considerable

9  length about strangulation.  And I just set that as a

10  reference.  But, the fact of it is that you didn't find a

11  single bit of evidence that strangulation had occurred,

12  correct?

13     A.   No.  Nothing that would prove it occurred; nothing

14  would disprove it as a possibility.

15     Q.   Well, a possibility, because you — there are a number

16  — we'll get the possibilities.  But, there's no evidence that

17  it occurred, right?

18     A.   No, not - - -

19             MR. FRASIER:    (Interposing) Asked and

20  answered, Your Honor.

21             MR. McCREA:    Well, that's - - -

22             THE COURT:    (Interposing) Overruled.

23             Go ahead.

24             MR. McCREA:    Yeah.

25     Q.   I just want to know, yes or no, was there any

D7 95                                              Olson   X

1    evidence at all that strangulation had occurred?

2         A.   No.  There was no evidence.

3         Q.   Thank you, Doctor.  I don't mean to make an issue.

4              And in this case, did you think that she probably was

5    not shot, correct?

6         A.   It's not impossible to exclude it.  It's possible to

7    get shot in parts of the body that — say the abdomen and

8    through and through — obviously injure vital structures, bleed

9    out, and not — and this body in this condition, where you can't

10   examine for entrance/exit wounds, or any tissue damage, organ

11   damage, it's basically along the lines of the strangulation.  I

12   could not find any evidence that suggested it.  I don't think

13   the autopsy specifically excludes it as a possibility.

14        Q.   If the bullet didn't hit a bone, you might not have

15   any evidence that a bullet went into her or through her?

16        A.   That's correct.

17        Q.   And now let's deal with the stabbing.  And just to

18   make it simple, Doctor, I'm looking at the testimony you gave

19   in the Grand Jury.  And is it correct that she could have been

20   stabbed?

21        A.   Again, it's right up there with the strangulation and

22   the bullet.  If you stabbed her, say, in the abdomen and you

23   didn't strike bone, we're left with nothing to be an indicator

24   that she was stabbed.

25        Q.   All right.  And she could have had her throat cut?

Olson   X    D7 96

1      A.   It's possible, as well.

2      Q.   And you wouldn't be able to see — tell that, either?

3      A.   Not unless it had gone down to and damaged the

4   vertebral column.  And I couldn't see anything in the neck

5   vertebrae that suggested that.

6      Q.   You've already made it clear as far as strangulation

7   that the hyoid bones were normal, so that didn't support

8   strangulation?

9      A.   Well, it doesn't support it.  But, in a young person

10  where, as I think I discussed earlier, everything is pretty

11  elastic still, it is possible to strangle, manually, a younger

12  person and not leave fractures of those bones.

13     Q.   I'm not taking issue with you, Doctor.  I just want

14  to get it clear.

15     A.   Yes.

16     Q.   That didn't — now, if she had been stabbed just under

17  the sternum — you were asked — excuse me.  Let me back up.

18          Mr. Frasier asked you a hypothetical regarding her

19  being stabbed in the chest.  Do you recall that?

20     A.   Yes.

21     Q.   All right.  I want to modify that slightly and move

22  it down to just under the sternum.  And if she were stabbed

23  just under the sternum there would have been nothing that you

24  were observing on her body that would show that this had

25  happened.  Is that correct?

D7 97                                      Olson  X

1    A.    That's correct.

2    Q.    And so there's nothing you could observe on her body

3  that showed this did not happen?

4    A.    That's correct.  I mean, you could conceivably, with

5  an upward thrust of a knife beneath the sternum and chest

6  cavity, strike the heart or another vital structure — large

7  vessels and not have any marks on the bones.

8    Q.    But, I want you to assume in my hypothetical that

9  we're dealing with an instrument, a knife if you will, or

10  dagger, that is about one and a half centimeters in width, and

11  that this stabbing takes place under the sternum.  Are you able

12  to form an opinion, assuming that to be true, as to the

13  internal damage — we're not talking about the bleeding; we'll

14  get to that — but the internal damage that would do to the

15  person?

16    A.    It depends on the length.  I assume that a blade of —

17  you described it as one and a half inches?

18    Q.    I said one and a half centimeters.

19    A.    Oh, centimeters?  That's about a standard blade,

20  maybe a little smaller.  It's three-quarters of an inch at the

21  base of the blade, and then tapering single point — or, point,

22  single edged.

23    Q.    Okay.

24    A.    Whatever.  Yeah, most of those — most of the knives

25  that I see, apart from kitchen knives, steak knives, are

Olson   X     D7 98

1   folding pocket knives, typical of about four inches in length,

2   maybe three-quarters to an inch at the base.  That would easily

3   go up and access the heart, pulmonary vessels, aorta, and may

4   not have any bone trauma, especially with an upward thrust if

5   you were doing that.

6       Q.  So, such a thing could take place and you would not

7   be able to see any evidence of it on the body?

8       A.  There, or elsewhere in the abdomen, where you may

9   have no - - -

10      Q.  (Interposing) Right.

11      A.  - - - possible access to bones, at all.

12      Q.  And so — and this would be — would, or at least

13  could, be fatal?

14      A.  Well, typically, in the center of the chest and an

15  upward thrust of — as you described, it would most likely

16  strike the heart and be fatal within a short time.

17      Q.  I'm sorry, Doctor.  I know that what you're saying is

18  very clear to you.  But, I'm not hearing you.  If you could

19  help me.

20      A.  Okay.  Can you restate the question then?

21      Q.  Oh, my question was, I guess to put it simply, would

22  such a stabbing be fatal?

23      A.  Very likely.

24      Q.  And how quickly would it be fatal?

25      A.  If you strike the heart, it's just a matter of

```
    D7 99                              Olson   X
```

1  minutes, if even that, before you would probably exsanguinate

2  or fill the sack around the heart and compromise the heart's

3  function.  You could strike the aorta.  You could strike — or,

4  in combination of any of these — the long and major pulmonary

5  vessels and bleed out.  And it could go from under a minute to

6  perhaps several minutes, depending on what structures are

7  damaged.

8      Q.   And it's correct, Doctor — and I'm just referring

9  back to what you indicated to Mr. Frasier — that such a wound

10  could be inflicted and it may or may not have substantial, or

11  much of any, external bleeding?

12      A.   It's possible.  A lot of the wounds I see the people

13  walk around for a bit and there is bleeding externally under

14  their clothing and onto their shoes and onto the surface that

15  they're standing on.  If the person went down right away, or

16  were even stabbed in a, say, supine position on their back,

17  it's possible that it would take longer for the blood to exit

18  the body.  It would have to pool and then start flowing out.

19  So, they're not absolute rules.  I mean, every case is a case

20  unto itself.

21      Q.   Just as I said, it may or may not have any external

22  bleeding?

23      A.   There may not be.  There may not be.

24      Q.   Now, with regard to blunt force trauma, is it — is it

25  possible that the death here could have resulted from blunt

```
                                     Olson   X    D7 100
```

1   force trauma?

2        A.   It could have.

3        Q.   And you didn't see any fracture of the skull?

4        A.   No.  But, you could still have substantial internal

5   bleeding in and around the brain without skull fractures.

6        Q.   But, you have had personal experience with instances

7   where there was blunt force trauma to the head that caused

8   death without there being any evidence of the blunt force

9   trauma on the body that you examined, right?

10       A.   That's correct.  I have.

11       Q.   Well, except inside?

12       A.   Except internally — hemorrhage — bleeding in or

13  around the brain.

14       Q.   Yeah.  In that case, you were fortunate enough to be

15  able to see a big blood clot on the brain?

16       A.   A subdural hematoma, typically, yes.

17       Q.   Hematoma?  Is that what you said?

18       A.   A subdural hematoma, typically, would be just over

19  the surface of the brain and beneath the dense lining.

20       Q.   But, it was because you were fortunate enough to see

21  this that you were able to determine that it had come from

22  blunt force trauma to the head?

23       A.   Yes.

24       Q.   Okay.  And in this case, the brain was completely

25  deteriorated and gone?

```
D7 101                                      Olson  X
```

 1    A.    That's correct.

 2    Q.    And you were — I'm trying to — I'm sorry, Doctor.

 3   Just give me a minute.  So, if this person had been struck by a

 4   — well, strike that.  I think we've covered that.

 5              MR. McCREA:    May I have just a moment to

 6   review, Your Honor?

 7              THE COURT:    Yes.

 8              MR. McCREA:    I'm trying to be efficient here.

 9    Q.    Oh.  One thing — you were advised there were blood

10   spots on the sole of the shoe?

11    A.    Yes.  I think also near the top, as well, and perhaps

12   on the lace.  But, yes, I was.

13    Q.    And you opined that that probably would be unlikely

14   unless it came from some wound on the body?

15    A.    There has to be some type of injury that has broken

16   the surface of the body and damaged vessels such that blood can

17   be deposited on that surface in one form or another.

18    Q.    Okay.  And then to wrap this up, Doctor, you did the

19   best you could with what you had, but you just can't tell us

20   what happened to her?

21    A.    I can't tell you precisely what manner of injury she

22   sustained or what caused her death precisely.  But again, as we

23   discussed, the circumstances of this certainly militate against

24   a consideration of a natural death.

25    Q.    Well, I'm not arguing with you.  I'm just — you can

Olson   ReD   D7 102

1   say she's dead, but you don't know how she came to be.  Is that

2   a fair way to put it?

3        A.   Yes.

4        Q.   Pardon?

5        A.   Yes.

6        Q.   All right.  Thank you, Doctor.

7                  MR. McCREA:    That's all.

8                  THE COURT:    Redirect?

9                  MR. FRASIER:    Thank you.

10                  <u>REDIRECT EXAMINATION</u>

11   <u>BY MR. FRASIER:</u>

12        Q.   It is your opinion that she is a homicide victim?

13        A.   Yes, it is.

14        Q.   Now, counsel talked with you about checking the hair

15   for drugs to see if there was any drugs in the hair?

16        A.   Yes.

17        Q.   Given the fact that you had taken the tissue and had

18   that sent and analyzed, would there have been any scientific

19   reason to check the hair?

20        A.   I think — I don't think so, because a lot of the hair

21   analysis that is done — yes, there are drugs that will

22   accumulate in the hair.  But, it's primarily a screening test

23   that, say that you were supervising a drug recovery program for

24   addicts, you would test the hair to see if they were being

25   honest about being abstinent from illicit or prescription

```
     D7 103                                    Olson   ReD
```

1  drugs.

2        And they could show up and you could, you know, say,

3  "Well, this suggests since your last test that was performed

4  that you've used drugs that we've told you not to use, or were

5  trying to get you off being addicted to."  So, it's kind of, in

6  itself, a yes/no thing.

7        Using the muscle, which I think was a better specimen

8  and surprisingly was fairly well preserved, given the

9  circumstances and condition of the body elsewhere, we were able

10  to perform a battery of tests that also — all I expected was

11  yes or no.  It might have altered the course of this.  It may

12  not have at all, had we detected any of these drugs, because

13  it's not likely we could have adequately — I mean, you could

14  probably perform quantitation studies, but how valid they would

15  be would be disputable.

16        So, basically, the whole purpose of this testing was

17  to say, "Yes or no?  Are these drugs present?  Are they a

18  possible contributing factor, or are they even possibly the

19  cause of death?"  And we found no drugs that we could implicate

20  as being suspicious or involved in her death, at least in the

21  categories we tested.

22        We can't test for everything.  I don't know how many

23  of you have seen the Physician Desk Reference.  It's this thick

24  and in print so microscopic that even my old eyes, with

25  glasses, have a hard time reading.  But, so the number and

Exhibit 102  Page 1245 of 1666 to
State Defendants' Motion for Summary Judgment

Olson   ReD   D7 104

1 possibility of drugs across the county is just enormous.  But,

2 we test for what is most likely to be abused, what is most

3 likely on the street and most common.

4     Q.   Now, counsel also asked you about — well, he used the

5 hypothetical of being stabbed underneath the sternum.  In this

6 case, there wasn't any skin left on the body to determine that?

7     A.   Not in that area, and there was no obvious injury to

8 the underlying vertebral column that would suggest a stab wound

9 where the tip might nick or strike the vertebral column or the

10 bone.

11     Q.   But, in this case, she was wearing a shirt?

12     A.   That's correct.

13     Q.   And would that be an indicator?

14     A.   Typically it has.  And I've seen some cases, one of

15 which is in this county, unsolved, of a fellow that went to

16 complete skeletonization with minimal bone injuries that was

17 stabbed multiple times and the best thing we had was his

18 clothing, which was a coat, pants, shirt, and you could still

19 identify obvious sharp force injury to the clothing.  It was

20 better than having — as good as having the skin, itself.

21     Q.   And if the person had been shot in the chest — or if

22 Leah Freeman had been shot in the chest or the abdomen, again,

23 her clothing?

24     A.   Assuming she was clothed at the time, you would

25 expect obvious damage to the clothing.  How much animal

D7 105                                          Olson   ReD

1   activity might alter that, because animals preferentially go to

2   body orifices, whether natural or unnatural, and start working

3   there — notably flies, and subsequently maggots.  But, I didn't

4   see anything in the clothing that struck me as being the result

5   of any type of injury, whether it's ballistic, gunshot wound,

6   or knife.  I saw several holes which I described.  They all

7   appeared to be the result — a lot of times the edges were

8   frayed and the fabric was pulled outwards.  All of that, to me,

9   suggested something I've seen multiple times, that it's just

10  animal depredation.

11      Q.   Well, let me follow up with you there.  When the

12  clothing was removed from Leah Freeman's body, did you examine

13  it?

14      A.   I did.  And I described each item.

15      Q.   And did you see anything in the shirt or bra that

16  caused you to believe she'd been stabbed?

17      A.   No.  The damage that I saw to those garments — I

18  could not specifically implicate a gunshot wound or wounds, or

19  stabbing.

20      Q.   Now, counsel also asked you — there was blood found

21  on the bottom of one of Ms. Freeman's shoes — I believe her

22  left shoe?

23      A.   That's correct.

24      Q.   Now, a person doesn't need to be stabbed to be

25  bleeding, do they?

Olson   ReD   D7 106

1      A.   No.   No.   That type of bleeding could be seen from —

2    as I said, I mean, the basic phenomenon is you've damaged the

3    skin or a mucosal surface, like the inside of the lips, the

4    mouth, elsewhere in the body — the lining of the hollow organs

5    — and damaged blood vessels so the blood has escaped from the

6    vessels themselves, and through the opening in the skin or

7    mucosal surface.

8      Q.   Bloody nose?

9      A.   A bloody nose, bloody lip, blood in the mouth.

10      Q.   Thank you.

11             MR. FRASIER:    That's all the questions I have.

12             MR. McCREA:    Your Honor, may I just have one

13    recross question?

14             THE COURT:    Go ahead.

15             MR. McCREA:    Counsel kind of enlarged a little

16    bit.  I just want to ask - - -

17             THE COURT:    (Interposing) I don't think he

18    enlarged anything.

19             MR. McCREA:    - - - one question.

20             THE COURT:    I'll allow you — so, I'll allow

21    you to ask the question.

22             Mr. Frasier, if you have something, you can ask.

23             But, he didn't enlarge anything.

24                    RECROSS EXAMINATION

25    BY MR. McCREA:

```
D7 107                                    Olson  ReX
```

1    Q.   Doctor - - -

2            MR. McCREA:    Thank you, Your Honor.

3            THE COURT:    Go ahead.

4    Q.   Doctor, did you make a microscopic examination of the

5    shirt that came off of Ms. Freeman?

6    A.   No.  I wouldn't normally do that.

7    Q.   Thank you very much.

8            THE COURT:    Anything, Mr. Frasier?

9                    REDIRECT EXAMINATION

10   BY MR. FRASIER:

11   Q.   Did you see a knife hole that was one and a half

12   centimeters?  Would you have seen that?

13   A.   I didn't see anything that — if it had been a knife

14   hole, initially, it had been distorted.  And it, basically,

15   assumed an oval configuration with frayed edges.  So, it wasn't

16   typical of what I would expect to identify on clothing in the

17   course of a knife wound.

18   Q.   Thank you.

19            MR. FRASIER:    That's all I have.

20            THE COURT:    You may step down.  You are free

21   to leave.

22            WITNESS:    Thank you.

23            THE COURT:    You don't have any of the

24   exhibits?

25            WITNESS:    Where do I throw this?

D7 108

1          THE COURT:   You can just leave it right there.

2          WITNESS:   Okay.

3          THE COURT:   Mr. Frasier?

4          MR. FRASIER:   Your Honor, I'd like a few

5    minutes to go over with the Clerk to make sure our exhibits are

6    — our exhibit lists match up.  And, assuming it does, we will

7    rest our case at that point.

8          THE COURT:   Okay.

9          Ladies and gentlemen, we will take the noon

10   recess at this time.

11          Everybody else remained seated.

12          Leave your notes in the jury room.  Remember the

13   admonition.  And I would say be back this time — let's say

14   1:30, because there may be a couple legal matters.  So, be back

15   by 1:30.

16          (Jury out.)

17          THE COURT:   Cathy, I think that's it, but I'm

18   not sure.  Will you check?

19          JUDICIAL ASSISTANT:   (Inaudible response.)

20          Okay.  Do you want to check now?

21          MR. FRASIER:   Yes.  I could check now, Your

22   Honor.

23          THE COURT:   Okay.

24          Leave it on the record here.

25          This is not a time to talk in the courtroom.

```
   D7 109                              Motion
```

1           You can pause it for awhile, Dixie.  You can

2   pause the FTR right now.

3                           (RECESS)

4           (Jury out.)

5           MS. McCREA:   We've got, yeah, the Exhibit 84.

6   They can't rest yet.

7           THE COURT:   Well, with that exception, you're

8   resting.

9           I'll either rule it in or out, so that's not

10  going to make any difference on your motions.

11          MS. McCREA:   Okay.  That's fine.

12          THE COURT:   So, if I decide to receive it,

13  whether you've rested or not, I'll receive it.

14          MR. FRASIER:   All right.

15          THE COURT:   So, go ahead and make any motions.

16          And you said you had — you might have some

17  argument on 84.  So, I don't care if you make the argument on

18  84 first, or your motions first.

19          MS. McCREA:   Well, I'll go ahead and make my

20  motion first, and then I'll argue on 84.

21          THE COURT:   Okay.

22          MS. McCREA:   All right.  So, pursuant to

23  ORS 136.445, the defense moves for Judgment of Acquittal as to

24  the charge against Mr. McGuffin, because the State's evidence

25  does not support a verdict against Mr. McGuffin.

Motion      D7 110

1           The only direct evidence in this case was the

2      statement of David Breakfield, claiming that Mr. McGuffin had

3      confessed to him that Mr. McGuffin had strangled Leah Freeman.

4      Clearly, we have no other evidence, including a cause or manner

5      of death.  We have an opinion of homicide, but no other proof

6      that, in fact, there had been a crime, or that Mr. McGuffin was

7      involved in it.  And, thus, the state of the evidence is

8      insufficient for any trier of fact to find the elements beyond

9      a reasonable doubt.

10           In addition, under ORS 136.425(2), a confession

11      alone is not sufficient to warrant conviction of a Defendant

12      without some other proof a crime has been committed.

13           So, based on everything that has been put

14      forward, Your Honor, the evidence is simply not sufficient and

15      we ask the Court to grant a Judgment of Acquittal.

16           And, I'm sorry - - -

17           MR. McCREA:    (Interposing) May I?

18           MS. McCREA:    Mr. McCrea is pointing out to me

19      I was generalizing Mr. Breakfield's statement, because

20      Mr. Breakfield's statement was not that Mr. McGuffin testified

21      that he had strangled Leah Freeman.  His statement was, "I

22      strangled that bitch," and then whatever else he said, "And I

23      can kill you, too," or, "I can strangle you, too."  The

24      reference was intended, I submit, to reference Leah Freeman.

25      But, of course, there is the position that that further dilutes

```
    D7 111                          Motion
```

1   the State's evidence.

2              THE COURT:    The Motion is denied.  Even

3   without Mr. Breakfield's statement, I think there is sufficient

4   other circumstances from which the jury could draw a conclusion

5   that not only was the cause of death homicidal, but that

6   Mr. McGuffin was the one who did it.  Whether they do that or

7   not is up to them.  But, I think there's clearly sufficient

8   evidence and inferences — reasonable inferences from the

9   evidence that could be made.

10             So, the Motion is denied.

11             Now, 84?

12             MS. McCREA:    Concerning Exhibit — State's

13  Exhibit 84, which is the written time line prepared by

14  Mr. Brent Bartley, - - -

15             THE COURT:    (Interposing) Which is being

16  offered for impeachment only.

17             MS. McCREA:    Which is being offered for

18  impeachment only.

19             - - - in looking at Oregon Rule of Evidence 613,

20  it is our position, Number One, that we don't have an adequate

21  foundation to impeach Mr. Bartley, because my recollection of

22  the — either the direct examination or the redirect examination

23  by counsel was that the questions asked of him were limited to,

24  "Is your — was your memory then. . ." — meaning back in 2000 —

25  ". . .better than your memory now?"  And that there were no

Motion        D7 112

1  specific incidents or portions of that time line that he was

2  questioned about specifically so that it could then be used to

3  impeach him.

4        And my objection yesterday was additionally that

5  it was hearsay.  And I continue with that objection.

6        And, Number Three, if in fact there is some

7  basis — if there is some adequate foundation for impeaching him

8  on one or more of those incidents in the time line, then it

9  would be our position that the impeachment is limited to those

10  things for which there was a foundation established.  That at

11  most, counsel is entitled to then read those portions of the

12  time line to the jury, but that it doesn't allow the State to

13  submit the whole document into evidence.

14        Let me check with the senior counsel to make

15  sure I didn't miss something.

16        Okay.  All right.

17        So, that's our position, Your Honor.

18        THE COURT:    Anything further?

19        MS. SOUBLET:    No, Your Honor.

20        THE COURT:    Well, I just — I haven't had time

21  to go back over Mr. Bartley's testimony and I may do that.  And

22  I think generally there were a lot of questions about that —

23  the document, as a whole.  And everybody knew — and I think he

24  was showing the document and went over — so, I think there's

25  enough of a foundation there.  Whether I allow it, is a

D7 113                                    Motion

1   different question.  But, I will go over that.

2              One thing that I wanted to specifically mention

3   to you just, as to the jury, it's generally been — I think the

4   agreement is that the last two jurors in Seats 13 and 14 would

5   be the alternates, unless some other — unless it was agreed on

6   by some other party.

7              I merely wanted to point out that what I have

8   noticed, although I don't think there was ever him falling

9   asleep, Mr. Welch in Seat No. 1, at times, has come close to

10  what I would think would be nodding.  He's been really heavy-

11  eyed.  I've watched him a couple times.  I think I kind of

12  coughed once and he's always opened his eyes and I never felt

13  like he was sleeping, or I would have said something.

14             But, all the other jurors, I think, were

15  extremely attentive.  And he's generally been attentive,

16  although there's been maybe three or four occasions when I've

17  noticed that.  But, it's not where I thought he was nodding

18  off.

19             I'm merely telling counsel that now so it's not

20  something that comes up later.  So, I don't care whether you do

21  anything with it or not.  I had one criminal Defendant in a

22  death penalty case told me he was happy with a juror sleeping

23  or not.  So, I'm merely pointing it out.  And if counsel wishes

24  to come up with some other solution, two alternates, that's

25  fine.

```
                                    Motion        D7 114
```

1              Okay.  1:30?

2              I have reserved seats.  The media seating that

3    I've reserved, other than for the camera, I think I'm going to

4    eliminate just because people who are not media sat there.  I

5    think the media sat other places other than there.  So, I just

6    — there was a lot of interest, at first, and I think that goes

7    away.

8              But, the camera I will leave.  The rest of them

9    I'm going to remove.

10             I will probably leave three seats for the

11   defense.  You have two investigators.  You may have somebody

12   else.

13             And three seats for the DA's Office.  You have

14   Ms. Courtright, you have your investigator, and somebody from

15   Victim's Assistance.  So, I'll leave three seats for each side.

16             The rest of it is going to be open seating,

17   other than the one media for KCBY, because I see no need to

18   reserve the seats anymore.

19             MR. FRASIER:    That's fine.

20             THE COURT:    And the two deputies, obviously.

21             MR. FRASIER:    All right.  Okay.

22             THE COURT:    Okay.

23                  (LUNCHEON RECESS)

24             (Jury out.)

25             THE COURT:    Be seated, please.

```
    D7 115                                    Myers  D
```

1          The objection to 84 will be sustained.  I don't

2    find the basis for it to be used for impeachment, because I

3    didn't — I listened to the testimony again and I didn't find

4    any particular thing that was asked about that.  So, I'll

5    sustain the objection.  It will be left not for the jury.

6          Okay.  Now you can bring the jury in.

7          (Jury in.)

8          THE COURT:    The State has rested.

9          And, Ms. McCrea, you may call your first

10   witness.

11         MS. McCREA:    Thank you, Your Honor.  The

12   defense calls Quinn Myers.

13         THE COURT:    Raise your right hand, please.

14                    QUINN LESLIE MARIE MYERS

15   was thereupon produced as a witness on behalf of Defendant and,

16   having first been duly sworn to tell the truth, the whole truth

17   and nothing but the truth, was examined and testified as

18   follows:

19         THE COURT:    Have a seat up here, please.  And

20   if you could scoot forward and move the microphone down so it's

21   about there.  That's fine.  Great.

22         Go ahead, Ms. McCrea.

23                    DIRECT EXAMINATION

24   BY MS. McCREA:

25     Q.   Would you state your full name and spell your last

Myers   D    D7 116

1   for the record, please?

2       A.   My name is Quinn Leslie Marie Myers, maiden name

3   Cannon, C-A-N-N-O-N.  My now last name, M-Y-E-R-S.

4       Q.   And is it — do you prefer Ms. Myers?

5       A.   Sure.

6       Q.   Okay.  Ms. Myers, do you live here in town?

7       A.   I do.

8       Q.   And how long have you lived in the Coquille area?

9       A.   My whole life.  I grew up here.  I moved away to

10  Eugene in 1999 to go to school for a short period of time, and

11  then moved back.

12      Q.   Do you know Nick McGuffin?

13      A.   I do.

14      Q.   And how do you know him?

15      A.   We became friends when he was a freshman in high

16  school and I was a sophomore in high school — became good

17  friends.

18      Q.   So, he's a little bit younger than you?

19      A.   Uh huh.

20      Q.   And - - -

21      A.   (Interposing) A year younger.

22      Q.   I'm sorry?

23      A.   A year younger.

24      Q.   A year younger?  In — when the two of you were in

25  high school, did you go to any kind of social events together?

```
     D7 117                          Myers  D
```

1      A.   I was a princess at my junior prom and I took him

2  with me.  Yeah.

3      Q.   And was that a romantic situation?

4      A.   No.

5      Q.   Just friends?

6      A.   Yes.

7      Q.   Okay.  Did you know Leah Freeman?

8      A.   Um, I knew who she was.  I actually finished high

9  school a year early, so I would have been a senior when she was

10  a freshman.  But, I went to college, instead.  So, I had met

11  her one time at Nick's house during the course of what would

12  have been Nick's senior year when I was home to visit from

13  college.

14      Q.   And did you understand that Nick and Leah were

15  dating?

16      A.   Yes.

17      Q.   And you knew — well, did you know that there was an

18  age difference between them?

19      A.   Yes.

20      Q.   And based on your experience in high school, was it

21  unusual for a freshman to date a senior?

22      A.   No.  I did the same thing.

23      Q.   Okay.  Okay.  And did you have any sort of opinion

24  about that type of relationship?

25      A.   Um, no.  To me, I kind of found it that when I was

Myers   D     D7 118

1   that age, the older boys had my maturity level and it was

2   actually very common in this town — this small town that that

3   happened.

4       Q.   Drawing your attention to June 28, 2000.  Do you

5   remember where you were working that day?

6       A.   I worked at Claire's Boutique in the Pony Village

7   Mall.

8       Q.   Do you remember what shift you were working?

9       A.   I worked the closing shift.  So, the store closed at

10  8:00, but I stayed and did paperwork until 8:30.

11      Q.   And then where did you go?

12      A.   When I got home, I drove to my boyfriend at the time,

13  Daniel Lapine's house, on Ninth Street in Coquille.

14      Q.   I'm sorry?

15      A.   On Ninth Street in Coquille.  Daniel Lapine's house.

16      Q.   Okay.  Ninth Street and what, was the cross street?

17      A.   Um, Dean.  I mean, it was on — it actually wasn't on

18  the corner.  It was on Ninth, but it's between Dean and Elliot.

19      Q.   And is that — where is that in relation to Central?

20      A.   Um, it's about two streets up from Central, I'm

21  thinking.

22      Q.   Pretty close?

23      A.   Um, yeah.  I came on — when I came home, I drove past

24  the high school to the stop light on Tenth and Central Avenue,

25  and turned up Tenth to get to his house.

```
D7 119                                    Myers   D
```

1    Q.   And do you remember about what time you got to your

2   boyfriend's house?

3    A.   Around 9:00.

4    Q.   I'm sorry.  Did you say who your boyfriend was?

5    A.   Daniel Lapine.

6    Q.   Okay.  Daniel Lapine.  And then at some point after

7   you arrived there, did Nick McGuffin show up?

8    A.   He did.  I'm not exactly sure on the time.  I had

9   been there probably at least twenty minutes.  I remember by

10   what — it was dusk out.  It was the time of night where it's

11   very hard to see, even with headlights on.  But, I could see

12   Nick approaching as I was sitting inside.

13    Q.   And when you say "approaching," driving or walking

14   up?

15    A.   Walking.  I didn't see the vehicle.  I saw him

16   walking.  I was sitting where I could see out — I was about ten

17   feet from the door, maybe, where I could see anyone who was

18   walking onto the porch.  And I saw him as he was walking up to

19   the porch.

20    Q.   And did he make contact with you?

21    A.   He did.  As soon as he made eye contact with me as he

22   was walking up the steps — as he continued to walk in the house

23   he said, "Is Leah here?"

24                MS. SOUBLET:    Objection.  Hearsay.

25                THE COURT:    Sustained.

Myers   D    D7 120

1          You can't state what other people said.

2          WITNESS:    Okay.

3      Q.   So, he made contact with you.  Did he — did he stay

4  very long?

5      A.   He didn't stay, at all.  As soon as I said, "No,

6  she's not here," after he had asked, "Is she here," and I said

7  - - -

8          MS. SOUBLET:    (Interposing) Objection.

9  Hearsay.  Move to strike.

10          THE COURT:    Don't say what other people said.

11  You can say what you said, but not what other people said.

12          WITNESS:    Okay.  I'm sorry.

13          MS. SOUBLET:    Your Honor, I'd move to strike

14  and ask that the jury be instructed to disregard.

15          THE COURT:    As to what Mr. McGuffin supposedly

16  said, that's stricken.  You're not to consider it.

17      Q.   Let me ask you this question.  Did Mr. McGuffin ask

18  if Leah Freeman was there?

19      A.   Yes.

20          MS. SOUBLET:    Objection.  Hearsay.

21      Q.   What was his demeanor like?

22      A.   He seemed - - -

23      Q.   (Interposing) Wait just a second.

24          MR. McCREA:    (Not understandable.)

25          MS. McCREA:    Well, Your Honor, our position is

```
   D7 121                                    Myers  D
```

 1  it's not hearsay.  It's an action on the part of Mr. McGuffin.

 2              THE COURT:    Right.  But, you can't offer —

 3  they can offer what he says.  You can't.

 4              MS. McCREA:    Well, - - -

 5              THE COURT:    (Interposing) If you have some

 6  other — unless you have some other basis for it, it is hearsay

 7  when you attempt to offer what your party says.  They can offer

 8  it, because it's an adverse party, but you can't.

 9              VOICE:    It's the state of mind.

10              MS. McCREA:    Yeah.  It's the — but, the

11  problem is, it's not being offered for the truth of it, but

12  going to his state of mind.

13              THE COURT:    Well, that can swallow the entire

14  rule.

15              MS. McCREA:    Well, let's do this.  Let me ask

16  her about his demeanor.

17              THE COURT:    That's fine.

18              MS. McCREA:    And then see if I'm to the point

19  of state of mind.

20      Q.    All right.  So, now — I'm sorry, Ms. Myers.  I didn't

21  mean to put you in this position.  What — did you notice Nick

22  McGuffin's demeanor when he came up to the door?

23      A.    He seemed worried, like he was looking for her.

24      Q.    Okay.  And in terms of your state of mind, it

25  appeared to you he was looking for someone?

Myers   D    D7 122

1      A.   Yes.

2      Q.   And did he say anything to you?  Just yes or no.

3      A.   Yes.

4      Q.   And was it an inquiry about the location of a person?

5  Just yes or no.

6      A.   Yes.

7      Q.   All right.  And the person he was looking for was not

8  at the residence?

9      A.   No.

10      Q.   All right.  And then how long did he stay at the

11  residence?

12      A.   He immediately turned around and left.

13      Q.   And what time — you don't remember the exact time,

14  but what was the approximate time, to the best you know?

15      A.   Um — between about 9:20 and 9:45, I would say.

16      Q.   Okay.  Did you remember telling the defense

17  investigator it was between 9:15 and 9:30?

18      A.   It could have been between that time.  It depends on

19  what time it got dusk out at that time.

20      Q.   Okay.  So, you got off work at 8:30 and then went

21  home, and then went over to Mr. Lapine's house?

22      A.   I didn't go home.

23           MS. SOUBLET:   Objection.  Leading, and asked

24  and answered.

25           THE COURT:   I'm not — that part, I'll

```
    D7 123                                    Myers   D
```

1    overrule.

2            Go ahead.

3        A.   I didn't go home.  I went straight to Mr. Lapine's

4    house.

5        Q.   Okay.  How long did it take you to get from North

6    Bend to Mr. Lapine's house?

7        A.   Approximately a half hour.

8        Q.   So, about what time do you think you arrived?

9        A.   Nine o'clock.

10        Q.   And then — well, I don't mean to keep going over the

11    same thing.  All right.

12            Other than Mr. McGuffin appearing worried or —

13    worried, did you notice anything else about his demeanor?

14        A.   No.

15        Q.   Did you see what car he was driving at that point?

16        A.   I did not.

17            MS. McCREA:    Your Honor, at this point I'd

18    make a request to make an offer of proof concerning what

19    Mr. McGuffin asked Ms. Myers.

20            THE COURT:    You may.

21            If you would step out, please — the jury step

22    out for a moment.  Take your notes.  It's not going to take

23    long.

24            (Jury out.)

25            THE COURT:    Go ahead, please.

Myers   D   D7 124

1    Q.  Ms. Myers, when Mr. McGuffin came to the house, what

2 did he say to you?

3    A.  He said, "Is Leah here?"

4    Q.  And what did you say?

5    A.  I said, "No.  Why would she be here?"

6    Q.  And did — what was his response to you?

7    A.  He said, "She's not?" and turned around and left.

8    Q.  Did he seem surprised or just - - -

9    A.  (Interposing) Yes.

10    Q.  Okay.  And how long did that whole interaction take

11 place?

12    A.  As he was walking towards me, he didn't even make it

13 in the door.  By the time he got to the door, I had said, "Why

14 would she be here?"  And he said, "She's not?" and turned

15 around and left.

16    Q.  Okay.

17    MS. McCREA:  That's the defense offer of

18 proof, Your Honor.

19    THE COURT:  Okay.  Just a minute.

20    Anything else from the State?

21    MS. SOUBLET:  The State would maintain its

22 position that it's hearsay.

23    THE COURT:  I think it probably qualifies

24 coming in for his state of mind at the time.

25    So, bring the jury in.

D7 125                                        Myers   D

1              You may ask the question.

2              MS. McCREA:    I'm sorry?

3              THE COURT:    You may ask the question.

4              MS. McCREA:    Thank you, Your Honor.

5              (Jury in.)

6              THE COURT:    The Court will allow the questions

7    that the Court sustained an objection to.

8              And, Ms. McCrea, you may ask those questions.

9              MS. McCREA:    Thank you, Your Honor.

10       Q.   Ms. Myers — Mrs. Myers, when Mr. McGuffin came to

11   Daniel Lapine's residence on June 28, 2000, what did he say?

12       A.   "Is Leah here?"

13       Q.   And what did you say?

14       A.   "No.  Why would she be here?"

15       Q.   And what did Mr. McGuffin say, if he said anything in

16   response?

17       A.   He said, "She's not?"

18       Q.   Did he say it in those — in that tone?

19       A.   He said, "She's not?"

20       Q.   Okay.  And what did he do?

21       A.   He stopped and turned around and left and didn't say

22   anything further.

23       Q.   Did he even come in the house?

24       A.   No.  He didn't make it through the door.

25       Q.   Any more contact with him that night?

Myers    X    D7 126

1    A.    No.

2    Q.    And did you — well, at some point, did you learn that

3 Leah Freeman was missing?

4    A.    The next day, around 6:00 p.m., when I was at work.

5 Daniel Lapine, my boyfriend, had called and told me that she

6 was missing.

7    Q.    Okay.  Thank you.

8         MS. McCREA:    No further questions, Your Honor.

9         MS. SOUBLET:    Thank you, Your Honor.

10                   CROSS EXAMINATION

11 BY MS. SOUBLET:

12    Q.    Ms. Myers, do you remember talking to Officer McNeely

13 and Officer Webley last June — last January?

14    A.    Yes.

15    Q.    You were asked to describe Ms. Freeman — asked about

16 your observations of Ms. Freeman?

17    A.    Yes.

18    Q.    Do you remember talking about an incident you saw

19 Ms. Freeman and the Defendant interacting at a party?

20         MS. McCREA:    Well, excuse me.  It's outside

21 the scope of direct, Your Honor.

22         THE COURT:    Sustained.

23         MS. SOUBLET:    Nothing further.

24         MS. McCREA:    No further questions.

25         THE COURT:    Do either of you want this witness

```
    D7 127                                    Meneely  D
```

1   to remain available?

2                   MS. SOUBLET:    The State does not.

3                   MS. McCREA:    I'd ask she be excused.

4                   THE COURT:    You may step down.  You are free

5   to leave.

6                   WITNESS:    Thank you.

7                   THE COURT:    Call your next witness.

8                   MS. McCREA:    Defense calls Kenn Meneely.

9                   THE COURT:    Raise your right hand, please.

10                          KENN MENEELY

11  was thereupon produced as a witness on behalf of Defendant and,

12  having first been duly sworn to tell the truth, the whole truth

13  and nothing but the truth, was examined and testified as

14  follows:

15                  THE COURT:    Have a seat here, please.

16                  Go ahead, please.

17                      DIRECT EXAMINATION

18  BY MS. McCREA:

19      Q.   Mr. Meneely, would state your full name for the

20  record, and spell your name?

21      A.   My name is Kenn Meneely, M-E-N-E-E-L-Y.

22      Q.   And what kind of work do you do, Mr. Meneely?

23      A.   I'm a private forensic consultant.

24      Q.   Can you give us a little bit of information about

25  your educational background?

Meneely  D    D7 128

1    A.   I have a Bachelor's Degree in Chemistry.  I studied

2  Organic Biochemistry, Pharmacology and Toxicology in graduate

3  school.  I worked for four years in a medical and research

4  facility prior to entering the State Police Crime Lab about 32

5  years ago.  I attended the Oregon State Police, Police Academy

6  and received both my basic and advanced police officer

7  certification, which I maintained throughout the course of my

8  career.

9        And 32 years ago, I transferred from the Patrol

10  Division to the Crime Lab Division, where I subsequently

11  received additional training through the Laboratory Division,

12  FBI, University of Texas Medical School, and University of Utah

13  Center for Human Toxicology.

14        I have several publications in the area of Forensic

15  Science.  In the last 32 years I've lectured or provided

16  training to judges, prosecutors, defense attorneys and law

17  enforcement in a variety of areas of forensic science to

18  include firearms, gunshot residue analysis, gunshot proximity

19  testing, crime scene investigation, blood spatter

20  interpretation, trauma wounds and toxicology.

21        Over the last 32 years I've been involved with

22  homicide and crime scene investigations, scene reconstructions

23  and blood spatter analysis.  Associated with this was also the

24  collection, preservation and analysis of evidence that was

25  collected at the crime scenes, along with assisting the Medical

```
    D7 129                              Meneely   D
```

1  Examiner during the autopsies, collecting the evidence from the

2  autopsy and subsequent analysis of the post-mortem samples.

3          Over the last 32 years, the various types of death

4  investigations that I've been involved with include firearms or

5  gunshot related situations, bludgeons or beatings, stabbings,

6  strangulations or choking, infant deaths and poisonings.

7  Analysis of these types of investigations varied from firearms

8  comparisons, tool mark comparisons, tissue wound comparisons,

9  analysis of damage onto fabric due to weapons, guns, knives and

10  so on, along with trace evidence analysis, hairs and fibers,

11  footwear comparisons and so on.

12          Up until my retirement from the State Police as a

13  supervisor, I was also called an ASCLAD Inspector.  That's

14  American Society of Crime Lab Directors Inspector.  I was

15  responsible for going to laboratories outside of Oregon and,

16  basically, going through every part of their lab.  And these

17  are both forensic laboratories and medical examiner

18  laboratories.  As inspection — looking at their staff, their

19  training, procedures and protocol — everything that they do for

20  their business — in an effort to accredit their entire

21  laboratory system.

22      Q.  So, Mr. Meneely, you're talking about working 32

23  years for the State Police.  Are you talking about the Oregon

24  State Police?

25      A.  Yes.

Meneely   D    D7 130

1    Q.    And were you working in the — one of the Crime Labs,

2  much like Mr. Pex was?

3    A.    Mr. Pex was working in the Coos Bay Laboratory.  I

4  was working the Springfield Laboratory.

5    Q.    Springfield, Oregon Laboratory?

6    A.    Correct.

7    Q.    Okay.  And have you done training of other police

8  officers?

9    A.    As I testified earlier, that over the last three

10  decades I've trained a variety of police officers, prosecutors

11  and a variety of people in the law enforcement community.

12    Q.    And what about awards?  Have you received awards?

13    A.    I received a variety of commendations from the Oregon

14  State Police, from the Oregon District Attorney's Association,

15  several others to support my research work and work in some

16  different casework.

17    Q.    Have you qualified as an expert witness in Court

18  before here in Oregon?

19    A.    Yes.

20    Q.    Any idea how many times you've testified?

21    A.    Let's see.  One year I counted I had 900 subpoenas in

22  one year, not that I went and testified every time.  But, I was

23  traveling to Court multiple times every week and so I can —

24  many, many times I've testified in Court and qualified in Court

25  for various areas of forensics.

```
   D7 131                              Meneely   D
```

1    Q.   And what are you — what is your current business?

2    A.   As a private forensic consultant.

3    Q.   What does it mean to be a private forensic

4 consultant?

5    A.   It generally means that the position — you might say

6 it's a quality control type analysis, where in most cases I'll

7 review documents that the State Crime Lab or other forensic

8 laboratories have done, review them to ensure they're accurate,

9 they're complete and that there may or not be more that can be

10 done, potentially, in the case.  If there is any errors found,

11 then it's my job to investigate into those errors.  Sometimes

12 it involves a re-examination of evidence, or examination of

13 evidence that's never been looked at.

14    Q.   And you were hired by the defense in this case?

15    A.   Correct.

16    Q.   And part of what you were doing was re-examining

17 evidence in this case?

18    A.   Correct.

19    Q.   And were you also listening to and present for the

20 testimony of Ms. Wilcox — Kathy Wilcox, Jim Pex and Dr. Olson?

21    A.   Correct.

22    Q.   Now, based on what you heard concerning some of that

23 testimony, I want to ask you a few questions about that first.

24 So, there was some discussion concerning Luminol.  Are you

25 familiar with that item?

```
                                      Meneely  D    D7 132
```

 1      A.   Yes.

 2      Q.   All right.  And I want you to tell us just a little

 3  bit about it?

 4      A.   Well, Luminol is a chemical that — utilized by

 5  forensic scientists in a situation where a crime scene that

 6  potentially had blood in it, it's been suspected that the blood

 7  has been attempted to wipe or clean up after the fact — or,

 8  after the incident.

 9           And this chemical is — basically you spray it on a

10  wall and then you turn out all the lights and actually it will

11  fluoresce a certain color in the dark.  For example, if a

12  bloody hand print was on the wall and they had actually cleaned

13  the wall with detergents — when sprayed with Luminol, that hand

14  print will actually show up as a fluorescent palm print, if you

15  will, on the wall.  And it's extremely durable, extremely

16  sensitive.

17      Q.   And is blood easy or difficult to get rid of once

18  it's on a surface?

19      A.   In my experience, I've had individuals clean up the

20  entire place where literally you could not see anything.  And

21  when we started spraying Luminol, you could see drag marks

22  through the hallways, smears on the walls, hand prints on the

23  walls.  And so, once again, people make an effort to clean up.

24  They make a good effort to clean up, but still generally we can

25  find it.

D7 133                                    Meneely   D

1    Q.   Ms. Wilcox, in her testimony, made the statement that

2  it's unusual to solve a crime with trace evidence.  Do you

3  agree with that statement or disagree?

4    A.   Well, partly I disagree in the sense that trace

5  evidence, as you heard Mr. Pex testify, is probably the last on

6  a forensic list that they actually spend a lot of time — mainly

7  because since the development of DNA, DNA tends to be the most

8  priority type of analysis that forensics go after.  If they

9  can't find any DNA, then the next resort is to go to smaller

10  items that may be more time consuming — maybe not as exact, but

11  still, that's what else they turn to — and that's trace

12  evidence.

13        I've had several cases where there wasn't any DNA

14  involved, but has — for example, in one up in Toledo that I was

15  crawling on the floor — that's what scientists do when they go

16  through a crime scene; you get very close to the crime scene,

17  you might say — and I found a small segment of finished wood,

18  looked like it had been broken off.  It was buried in the

19  carpet.  And probably a month or two months later, they found

20  individuals out of state — they found the gun that they had

21  with them, and there was a section of the gun that was missing

22  that was actually a jigsaw match to the piece that I found in

23  the carpet back to their weapon.

24        So, I have had cases where trace evidence was the

25  sole piece of information that you might say made the case.

Meneely  D    D7 134

1    Q.   Okay.  And if it's — if you don't have a sole piece

2    of trace evidence, can it also be helpful in establishing a

3    case?

4    A.   Oh, yes.  Yes.

5    Q.   In what way?

6    A.   Well, in — utilized to virtually exclude

7    circumstances, also.

8    Q.   Okay.  Now, Ms. Wilcox yesterday also made a

9    statement about the clothing that she examined — the tank top

10   and the jeans — and I think she used the adjective "ubiquitous"

11   concerning it being rather common material, and therefore not

12   likely to produce any trace evidence.  What is your reaction to

13   that statement?

14   A.   Well, part of that is true in the sense that white

15   cotton fibers are common.  And fibers from jeans are common.

16   But, it depends on where you find those fibers make it maybe

17   good information for the particular type of investigation.  It

18   just depends on the circumstances.  So, depending on the

19   circumstances, those fibers or combination of fibers in the

20   wrong location, if you will, could be important information.

21   Q.   There has been some testimony about the likelihood or

22   the factors that would play into whether one would find blood

23   on clothing or not.  And in our situation — well, let me back

24   up.

25        You heard the testimony from the three individuals

```
    D7 135                              Meneely   D
```

1  and have you also reviewed all of the forensic reports provided

2  to the defense in discovery?

3      A.   Yes, I have.

4      Q.   And based on that, what are — what are some of the

5  factors that you would consider in whether it would be likely

6  or not to find blood on Ms. Freeman's clothing here?

7      A.   Under normal situations or circumstances, one would

8  expect to find blood.  In other words, you have blood on the

9  shoes, so that means you have an incident that blood is being

10 moved around, if you will.  In that case, one would most likely

11 expect to find blood on one's clothing, also.  In this case,

12 they didn't.

13      But, in this circumstance, the — because of the

14 serious degradation of not only the body, but of the clothing —

15 many times that can have an adverse effect on finding anything,

16 at all, especially blood, because of its degradation in this

17 kind of situation.

18     Q.   Are you talking about — what do you mean when you say

19 "degradation?"

20     A.   Um, the bacteria and start — you might say eating

21 away at the biological materials in the body and by — in

22 essence, you might say just melting away.  And when it does

23 that, then it's pretty difficult to maintain integrity on some

24 biological thing such as blood on material.

25     Q.   Ms. Wilcox also expressed an opinion that, based on

Meneely   D     D7 136

1  the photograph of Leah Freeman in the white tank top taken the

2  day she disappeared, June 28, 2000, that the tank top was too

3  tight for that material to have moved.  Do you remember that

4  testimony?

5      A.   Yes.

6      Q.   All right.  And would you agree with her assessment?

7      A.   I agree with the fact that it appeared to be a snug-

8  fitting tank top, kind of a ribbed, cotton-type of material.

9  But, on the other side, it depends on the circumstances once

10  again.  For example, if you're in a struggle, somebody is

11  grabbing a tank top, you know, it is a stretchy-type material.

12  So, in that situation, it can move.

13      Q.   So, Mr. Meneely, in this case you were retained to

14  re-examine particular evidence in this case?

15      A.   Yes.

16      Q.   And what were you asked to take a look at?

17      A.   I was requested to take a look at the two shoes, the

18  jean pants, the tank top-type shirt, and the sports bra.

19      Q.   Of Ms. Freeman?

20      A.   Correct.

21      Q.   That had been — you didn't look at the sock, right?

22      A.   Correct.

23      Q.   Okay.  And in doing that, were you given any

24  direction or charge?

25      A.   No.  The initial charge, if you will, is to go look

D7 137                                          Meneely   D

1   at the evidence — to start with to verify exactly what the

2   other forensic findings were.

3       Q.   Did you go into it with any pre-conceived idea of

4   what you were going to find?

5       A.   No.  It was just to examine the evidence in a very

6   close, up front nature.

7       Q.   And in this case and other cases, are there times

8   when you do an examination and what you find is actually not

9   helpful to — well, in this case, the defense?

10      A.   Sometimes.

11      Q.   Okay.  And what did you do to obtain this evidence?

12      A.   I — well, through the District Attorney's Office, we

13  made arrangements through the Coquille Police Department for me

14  to pick up the evidence, which I picked up on May 28th.  I spent

15  some time with the evidence and subsequently returned the

16  evidence, which I believe is the blue box now.

17      Q.   So, you picked up the evidence, and where did you

18  take it?

19      A.   Back to my facility where I can spread the evidence

20  out and photograph it and examine it and take some time looking

21  at the - - -

22      Q.   (Interposing) And - - -

23      A.   - - - material.

24      Q.   I'm sorry.  I didn't mean to cut you off.  And when

25  you say your "facility," what are you talking about?  Is it

```
                                    Meneely  D    D7 138
```

1   like in your garage or something?

2       A.   Well, unfortunately I've had to turn part of my house

3   into my laboratory, too.  And so I have several rooms dedicated

4   to a laboratory condition.  And unfortunately, in this

5   situation, I had to turn my garage into a laboratory because of

6   the condition, and you might say the odor of the material I was

7   looking at.

8       Q.   I'm sorry.  The odor?

9       A.   The odor of the material — the fabric I was looking

10  at.

11      Q.   What about the odor?

12      A.   Uh, this material was extremely, extremely degraded

13  with biological material, maggot material and so on.  And so

14  the odors were quite intense, so I certainly couldn't do that

15  inside the other parts of my rooms I've turned into a

16  laboratory.  So, I had to, basically, put down sheets of paper

17  all over the garage floor and every place I was working for my

18  examination.

19      Q.   How long did you spend looking at these various items

20  of clothing and shoes?

21      A.   Three days.

22      Q.   Three full days?

23      A.   Three full days.

24      Q.   All right.  And what techniques did you use?

25      A.   I was not allowed to do any chemical analysis, only

```
     D7 139                                Meneely   D
```

1  examination either by way of microscopy, or visual or high

2  intense.  So, in other words, I couldn't add any chemicals or

3  potentially alter anything that was there chemically.

4          So, three days were spent doing both visual and

5  microscopic examination and photographing the results of my

6  work.

7      Q.   And how did your visual examination differ from the

8  examination that Kathy Wilcox did back in 2000?

9      A.   Do you want to start with the shoes and work through

10  each one?

11      Q.   Well, I do.  But, I wanted to get back to the odor

12  aspect.

13      A.   I guess I don't understand the question.  How does my

14  examination differ from Kathy's?

15      Q.   Did you use a fume hood?

16      A.   Oh, no.  I did not use a fume hood.

17      Q.   What's a fume hood?

18      A.   A fume hood is a box and it allows you to put real —

19  you might say either meth labs inside this fume hood, or

20  contaminated material that have — are real badly degraded — so

21  the odors stay inside the fume hood and go up the vent, you

22  might say.  Of course, the difficulty with a fume hood is that

23  it's only so wide by so tall.  And it's designed for you to

24  work at somewhat of a distance so that you don't have to get

25  your face right into the contaminated material.

Meneely  D    D7 140

1           In this case, I did not have a fume hood.  But, the

2      other side is that it allowed me to get much closer to the

3      evidence than at a distance in looking at the contaminated

4      material.

5           Q.   Now, we'll go through it.  So, you did an

6      examination.  And as part of that, you made a report?

7           A.   Yes, I did.

8           Q.   And that was provided to the prosecution?

9           A.   Yes.

10          Q.   And you did some photographs?

11          A.   Correct.

12          Q.   Let me show you what's been marked for identification

13     as Defendant's Exhibits 135 and 136.  Do you recognize those?

14          A.   Yes.  They are the right and left tennis shoes that

15     were removed from the two different road locations, if you

16     will.

17          Q.   Okay.  And those belonged to Leah Freeman?

18          A.   That's my understanding.

19          Q.   And do those fairly and accurate depict in the

20     photographs what you saw when you were doing the examination?

21          A.   Yes.

22               MS. McCREA:   We'd offer Defendant's 135 and

23     136, Your Honor.

24               MR. FRASIER:   No objection.

25               THE COURT:   Received.

```
     D7 141                                    Meneely  D
```

1          (Whereupon Defendant's Exhibit Nos. 135 and 136

2    were received into evidence.)

3          Q.   Tell us what you found, starting with the — it looks

4    like the right shoe first?

5          A.   The right actually had very little information on it,

6    other than the fact that it was lightly soiled, didn't have

7    much dirt embedded into the rib patterns — or, waffle pattern

8    on the base of it.  And that's about it on the right shoe.

9          Q.   Okay.  How about the left shoe?

10         A.   The left shoe was a little bit different in the

11   sense, first of all, when I opened up the packaging, that — of

12   course, the shoe laces had been removed and were just loose

13   inside the shoes.  But, there was a paper fold — a tape-sealed

14   paper fold that contained two blonde hairs inside this — the

15   shoe, itself.

16         Q.   And is that depicted in what's been marked for

17   identification as Defendant's Exhibit 137?

18         A.   Yes.  This is the paper — tape-sealed paper fold that

19   came out of the shoe itself — inside the shoe.  It was

20   basically stuck in there.  And I took a look at the — there

21   were two hairs — blonde hairs — that were inside of the paper

22   fold.

23         Q.   And is that in what's been marked for identification

24   as Exhibit 138?

25         A.   Right.  Correct.  And these two blonde hairs, because

Meneely  InAidD7 142

1   they're loose in a paper fold, means that they may have been

2   given kind of a gross visual observation — but, they've never

3   been mounted on a glass - - -

4                    MR. FRASIER:     (Interposing) Question in aid of

5   objection.

6                    THE COURT:    Yes.

7                    EXAMINATION IN AID OF OBJECTION

8   BY MR. FRASIER:

9       Q.   How do you know they were never inside of a slide?

10      A.   Well, first of all, the slide hasn't been included.

11  And generally the slides, when they've been microscopically

12  examined, you have to rip the slide off, which can break the

13  slide and so on, which would suggest that they've been - - -

14      Q.   (Interposing) But, you don't know if a section was

15  taken out of that hair and put on a slide and placed elsewhere,

16  do you?

17      A.   A section of the hair?

18      Q.   Yeah.  You don't know if this hair was sectioned —

19  say, a piece cut off the end and then put onto a slide

20  elsewhere, do you?

21      A.   There is nothing in your reports saying that.  And,

22  you're right, the evidence as it stands - - -

23      Q.   (Interposing) My point would be, then, you're just

24  speculating that it wasn't put under a slide?

25      A.   That's also correct.

```
     D7 143                            Meneely  D
```

1              MR. FRASIER:   Then I would object to the

2    question, Your Honor, on that basis.

3              THE COURT:   Oh, I'll overrule it and allow it.

4              Go ahead.

5              DIRECT EXAMINATION (Continued)

6    BY MS. McMREA:

7       Q.   Was there anything else you wanted to say about that,

8    Mr. Meneely?

9       A.   Basically, it does not appear that it's been

10   microscopically examined, perhaps only visually, because it

11   doesn't appear it's been mounted previously on a glass slide

12   for microscopic examination.

13      Q.   And do 137 and 138 accurately depict what you saw

14   when you were doing the examination?

15      A.   Yes.

16             MS. McCREA:   We'd offer 137 and 138.

17             MR. FRASIER:   No objection.

18             THE COURT:   Received.

19             (Whereupon Defendant's Exhibit Nos. 137 and 138

20   were received into evidence.)

21      Q.   And then I'm going to hand you what's been marked for

22   identification as Defense Exhibits 139, 140 and 141, and see if

23   you recognize these photographs?

24      A.   These are - - -

25      Q.   (Interposing) Okay.  Wait.  That's just a yes or a

Meneely   D     D7 144

1  no.

2       A.   Yes, I do.

3       Q.   All right.  And are those photographs of the left

4  shoe?

5       A.   Yes.

6       Q.   And are those fair depictions of what you observed?

7       A.   Yes.

8            MS. McCREA:   We'll offer Exhibits 139, 140 and

9  141, Your Honor.

10            MR. FRASIER:   No objection.

11            THE COURT:   Received.

12            (Whereupon Defendant's Exhibit Nos. 139, 140 and

13  141 were received into evidence.)

14            MS. McCREA:   And we did provide these to

15  Mr. Frasier.  That's — correct?  Well, that's — I'm stating

16  that.

17       Q.   Go ahead, Mr. Meneely.  You can testify about them.

18  Tell us what is in each one of those photographs.

19       A.   Once again, in State's — in Defense 139, this is a

20  photograph of the bottom of the left shoe.  Once again, there's

21  very little debris, a little scuffing on the shoe.  It's a

22  little bit soiled on the side of the shoe.  But, this is a —

23  just a general photograph of the shoe, itself.

24            The — Defense 140 and 141 are actually an example of

25  microscopic photographs I've taken.  In other words, they're

D7 145                                    Meneely  D

1   microscopic down to a tenth of a millimeter.  A millimeter, you

2   can imagine, is probably the size of the tip of your ink pen.

3   A tenth of a millimeter is much, much smaller.  So, the point

4   is, is that I'm looking at very, very small details that

5   Ms. Wilcox looked at to identify these impact spatter that was

6   testified that was found on the left shoe.

7       Q.   Now, when you examined the left shoe, did you find

8   the high velocity, or medium-to-high velocity blood spatter

9   that was documented by her?

10      A.   No, I did not.

11      Q.   And did that cause you concern?

12      A.   Not necessarily.

13      Q.   Was that surprising?

14      A.   Well, keeping in mind this — these shoes have been

15  swabbed for DNA testing.  They've been handled a variety of

16  times by many, many scientists.  And so the end sequence — the

17  end result is that it doesn't surprise me that whatever was

18  there at one time has probably either fallen off or been used

19  in an analysis, because it was small evidence.

20      Q.   Any other observations concerning the right or left

21  shoe?

22      A.   I don't believe so.

23      Q.   Okay.  I wasn't suggesting there was.  I'm now

24  handing you what's been marked for identification as

25  Defendant's Exhibits 142 and 143.  Do you recognize those

Meneely  D    D7 146

1  photographs?

2      A.   Yes.  These are photographs that were taken by

3  Ms. Wilcox at the forensic laboratory when she examined the

4  tank top — tee shirt or tank top shirt.  And these are — these

5  are photographs that are taken from a fairly distant

6  perspective, you might say.

7      Q.   And those were part of the information from the

8  prosecution you were given to enable you to do your

9  examination?

10     A.   Yes.

11     Q.   And so they may be duplicates of what is already in

12 evidence.  But, that — those are two, particularly, that you

13 looked at?

14     A.   Yes.

15     Q.   And those are copies of what you received from me

16 concerning the discovery?

17     A.   Yes.

18     Q.   Okay.  And so they're accurate in that regard?

19     A.   Yes.

20          MS. McCREA:   We'd offer Exhibits 142 and 143,

21 Your Honor.

22          MR. FRASIER:   No objection.

23          THE COURT:   Received.

24          (Whereupon Defendant's Exhibit Nos. 142 and 143

25 were received into evidence.)

D7 147                                    Meneely  D

1    Q.   Now, Mr. Meneely, I'm handing you what's been marked

2    for identification as Defense Exhibits 144 and 145.  Do you

3    recognize those photos?

4    A.   Yes, I do.

5    Q.   And are those photographs — well, what are they?

6    A.   These are extreme closeup photographs, is probably

7    the best way to describe it.  One of the damaged areas in the

8    tank top tee shirt — in other words, there were several damaged

9    areas in this tee shirt.  And my position was to examine each

10   one of these areas very closely under microscopic, you might

11   say, conditions, and to determine or verify what conclusions

12   the Crime Lab came up with.

13        And what this particular area is, is in the upper

14   left-hand quadrant of the tee shirt.  There was a variety of

15   torn and frayed edges, which was consistent with other

16   testimony that's been described as animal damage, you might

17   say.  However, in very close up observation and putting pieces

18   back together and carefully unfolding the parts that have been

19   — you might say uprooted or moved to one side or the other —

20   that I put these pieces back together to see if there was any

21   consistency between, in this case, the two layers of garments

22   that I'm dealing with.

23   Q.   Okay.  So — and do Exhibits 144 and 145 fairly and

24   accurately show what you saw?

25   A.   Yes.

Meneely   D    D7 148

1              MS. McCREA:    We'd offer 144 and 145.

2              MR. FRASIER:    No objection.

3              THE COURT:    Received.

4              (Whereupon Defendant's Exhibit Nos. 144 and 145

5    were received into evidence.)

6         Q.   So, now I want to ask you some additional questions,

7    Mr. Meneely.  So, are you — when you say "damage" are you

8    saying that this is one of the holes in the tank top?

9         A.   Yes.  This is the — this particular item we're

10   discussing is the area in the upper left quadrant of the tank

11   top shirt.

12        Q.   Okay.  And what was notable about it?

13        A.   What's notable is the specific characteristics beyond

14   other damaged holes surrounding it, which had frayed fibers and

15   torn, you might say.  What this does have, contrasted to other

16   frayed and torn fibers, is a very distinct outline, very sharp

17   lines of demarcation.

18        Q.   And why is that significant?

19        A.   It's significant because it's suggestive of a sharp

20   instrument.  It's more than just lines of demarcation, because

21   I look at not only that, but I look at shape and sizes and

22   consistency to other damaged clothing areas, also.

23        Q.   I'm sorry.  I didn't mean to cut you off.

24        A.   That's fine.

25        Q.   Well, what's the significance of shape?

D7 149                                          Meneely   D

1      A.    The significance of shape — can I?

2      Q.    Absolutely.  Yeah.

3      A.    This is a wooden knife.  This is only to describe the

4  characteristics of a knife.  And I believe it was about five

5  portions of a knife that are important.  There is a handle.

6  There is this, you might say "T" going through there.  Some

7  people call it the hilt, but that's not correct.  It's actually

8  the guard.  There is the back of the knife.  There is the

9  blade.  And then as the blade goes back into the handle, the

10 blade actually flattens out.  And it's called the ricasso.

11      And when scientists are looking at different

12 features, they're looking at elements that may be consistent to

13 something of this nature.

14      For example, if you're looking at sharp instrument

15 damage to tissue, that tissue may show a variety of different

16 things, meaning that if you take this knife and stab into a

17 piece of wood — if you go with the grain, it actually splits

18 both ends of the grain.

19      But, if you turn the knife 90 degrees to the grain,

20 it will actually show the outline characteristics of the knife.

21 It will show the flat portion of the knife.  It will show the

22 sharp portion of the blade.  And if you go in too far, it will

23 actually show the blunt ends on the top and bottom, meaning

24 it's showing the actual ricasso part — the blunt end here on

25 the edge of the knife blade, and the top part of the knife

Meneely   D     D7 150

1  blade, itself.

2         Similar, in the way of tissue — tissue actually has

3  wood grain lines, but they're called Langer lines in the

4  pathology part of it.  So, if you go into tissue with the

5  grain, you can actually split the grain so that would be

6  pointed on both ends.  But, if you go against the grain, you

7  can actually show specific characteristics to the knife — the

8  top and bottom.  And also, if it goes in too deep, it would be

9  blunt on both the top and bottom showing that it's gone in

10  extra deep and it's gone clear up to this blunt edge on the

11  back end of the blade.

12         But, that's a little bit different than when you do

13  test marks into fabric.  Fabric doesn't show this ricasso

14  effect.  Fabric just generally shows the top of the blade and

15  the actual sharp point of the blade.

16         So, when I look at features like this, it's not just

17  looking at sharply defined or cut pieces of fabric.  But, I

18  look for the blunt part of the back of the blade.  I look to

19  see if there's actually a sharp portion of the blade.  And then

20  I do measurements.  And these are all done under microscopic

21  conditions.  And I measure this to get potential dimensions.

22  This is aside from the frayed areas that I've already excluded.

23         Q.   So, did you do measurements here?

24         A.   Yes.

25         Q.   And what did you determine?

```
     D7 151                                    Meneely  D
```

1      A.    That the width of this damage not only has a flat

2    portion — the top of the damage of the shirt — and actually has

3    a pointed edge, so it's a little more difficult to see in this

4    photograph.  But, it has a top and a bottom that the dimension

5    of this is one and half centimeters.  One and a half

6    centimeters is just short of about three-quarters of an inch.

7                    MS. McCREA:    Permission to publish, Your

8    Honor?

9                    THE COURT:    (Inaudible response.)

10     Q.    And then, Mr. Meneely, that was the tank top.  Did

11   you also do an examination of the sports bra?

12     A.    Yes, I did.

13     Q.    And I'm handing you what's been marked for

14   identification as Defense Exhibit 146.  Is that a photograph of

15   a close up of the sports bra?

16     A.    This is a very close up picture of the sports bra.

17     Q.    And is — does that also accurately depict how you saw

18   it when you did the examination?

19     A.    Yes.

20                    MS. McCREA:    We'd offer Defendant's

21   Exhibit 146.

22                    MR. FRASIER:    No objection.

23                    THE COURT:    Received.

24                    (Whereupon Defendant's Exhibit No. 146 was

25   received into evidence.)

1      Q.   So, what did you note about the sports bra, if

2   anything?

3      A.   Once again, there was a variety of tears, because of

4   frayed area in the sports bra.  There was two areas of concern.

5   One was in — there is a band at the very bottom of the sports

6   bra that clearly had been cut out.  But, it had only been cut

7   out over the very top layer of the band, leaving the bottom

8   layer.  And it was a three-by-six centimeter removal.  It was

9   like somebody cut out the label of the sports bra.

10          The second area, though, of concern was very closely

11   associated with this, but still near the mid section of the

12   sports bra, just about where the soft part of — or, the sternum

13   ends and the soft part of the tissue begins, you might say, in

14   that general mid section area in the abdominal area.

15          And this area, once again, is about two inches from

16   the other area on the tank top that we're discussing.  In this

17   particular area, once again, I was looking for things of

18   consistent nature to support what I found in the tank top —

19   things like sharp lines of demarcation or cutting, and specific

20   size and dimensions.

21          Once again, the top — blunt part, bottom — sharp

22   point, lines of demarcation or cut fabric and dimensions.  The

23   dimensions — it — clearly you can see in the — there's a top

24   part in this cut part.  There's a pointy part, representing the

25   blade — consistent to the blade.  And the size of this is one

```
     D7 153                              Meneely   D
```

1  and a half centimeters, or just shy of three-quarters of an

2  inch.

3      Q.   So, that was the same size as the hole you found in

4  the tank top?

5      A.   Yes.

6      Q.   Now, you said that the two of them — the hole in the

7  tank top and the hole in the sports bra — were about two inches

8  apart?

9      A.   Yes.

10     Q.   Well, what does that mean?

11     A.   Once again, from a forensic standpoint, if there's a

12  struggle that's happening, because this tank top is a rather —

13  it's a ribbed fabric, stretchy, it's conceivable that this is a

14  single event.  In other words, the — during the struggle, the

15  tank top was grabbed, stretching over the undergarment, lining

16  up with the sports bra damage.

17     Q.   And the fact that the two are the same size, to you,

18  is significant?

19     A.   That's significant to me.

20          MS. McCREA:    Permission to publish, Your

21  Honor?

22          THE COURT:    You may.

23     Q.   And then, Mr. Meneely, did you do a comparison for

24  demonstrative purposes in Defense Exhibits 147 and 148, a test

25  mark with a knife into cotton ribbed fabrics to display the top

Meneely  D    D7 154

1    flat portion of the knife and the blade area, compared to the

2    cuts, if you will, in the tank top and the sports bra?

3        A.   Yes, I did.

4        Q.   And does — do those photographs, 147 and 148,

5    accurately depict what your test cut was?

6        A.   Yes, they do.

7                 MS. McCREA:    Offer 147 and 148, Your Honor.

8                 MR. FRASIER:    I don't remember these

9    photographs.  Might I see them, please?

10                 MS. McCREA:    Of course.

11                 MR. FRASIER:    No objection.

12                 THE COURT:    Received.

13                 (Whereupon Defendant's Exhibit Nos. 147 and 148

14   were received into evidence.)

15       Q.   So, what do those show?  Tell us about those.

16       A.   Um, Exhibit 148 is the — once again, the tank top tee

17   shirt, the same damage that you're currently seeing now being

18   passed around.  But, I've also added in a demonstrative section

19   of fabric that's been — you might say stabbed with another

20   knife, just to demonstrate the top and bottom sections of a

21   knife.

22              And the same way in Defense 147 — the same piece of

23   fabric inserted just for references to show a similarity

24   between the top — the blunt part of the knife, and the bottom —

25   the pointy side of the knife, if you will.

D7 155                                    Meneely  D

1              MS. McCREA:    Permission to publish, Your

2    Honor?

3              THE COURT:    You may.

4       Q.   Mr. Meneely, now I'm going to show you what's been

5    marked for identification as Defendant's Exhibits 149, 150, 151

6    and 152.  Are those photographs of — are they all the tank top

7    where the - - -

8       A.   (Interposing) No.  This is a combination.

9       Q.   Okay.  A combination of the tank top and the sports

10   bra?

11      A.   Correct.

12      Q.   And do those fairly and accurately depict various

13   areas of those garments when you examined them?

14      A.   Yes.

15             MS. McCREA:    We'd offer Defense Exhibits 149

16   through — was it 152, Your Honor.

17             MR. FRASIER:    No objection.

18             THE COURT:    Received.

19             (Whereupon Defendant's Exhibits Nos. 149, 150,

20   151, and 152 were received into evidence.)

21      Q.   So, tell us about each one of those, please?

22      A.   These exhibits are only to demonstrate the various

23   types of other damage that was observed.  In 149 — this is,

24   once again, the tank top near the area that we're currently

25   discussing.  But, it clearly shows the frayed nature as a

Meneely  D    D7 156

1  contrast to the sharply defined cut, you might say, of fibers

2  from the picture you are currently seeing.  This shows the

3  frayed fibers.

4        In 150, these are, once again, on the ribbed tank top

5  shirt showing the frayed fibers in contrast to what you're

6  currently seeing, also — the sharply defined fibers.

7        In 151, this shows, once again, the tank top.  But

8  this is an illustration of sampling done by the Crime Lab.

9  This is actually a cut out section.  You can see the sharply

10  defined cut out area, which the Crime Lab will circle in black

11  Sharpie marker an area so that they know they have actually

12  removed this for their identification.

13        And 152 is a description — an area of the sports bra

14  in that lower mid section where I identify as similar to if

15  somebody cut out the label.  This shows you the lines of

16  demarcation, but it's actually six by three centimeters and it

17  only goes through the top layer and not all of the layers of

18  the garment.

19            MS. McCREA:    Permission to publish, Your

20  Honor?

21            THE COURT:    You may.

22    Q.  So, Mr. Meneely, what were all — well, let me ask you

23  this.

24        Based on your examination of the sports bra and the

25  tank top belonging to Ms. Freeman, did you form any opinion

D7 157                                      Meneely   D

1   concerning the holes in each one that you examined?

2       A.   The holes were consistent to a sharp instrument, for

3   example a knife.  They had specific dimensions and both holes

4   in both garments were, basically, exactly the same.  And

5   because they were in such close proximity, my conclusion that

6   they're one in the same event.

7       Q.   That it happened at the same time?

8       A.   Yes.

9       Q.   Okay.  Now, switching gears for a minute, there was

10  some testimony of Mr. Pex that if there had been gasoline

11  dripped onto the soil of the roadway at the scene where

12  Ms. Freeman's body was found, that that would have dissipated

13  over the period of time between her disappearance and the

14  discovery of her body.  Do you agree with that assessment?

15      A.   Not completely.

16      Q.   Okay.

17      A.   And the reason I disagree is that I used to do arson

18  analysis and even burned debris — house fires.  They can

19  acquire material from burned debris that's in a hot

20  environment.  We can still extract remnants of gasoline.  And

21  in the worst case scenario — because of the way they identify

22  gasoline is not only by the volatile compound, but they also

23  add dyes into gasoline so they can identify gasoline from a

24  particular station or product — like, say, Exxon gasoline —

25  back to the dyes that are in somebody's gas tank.

Meneely   D    D7 158

1              So, there's — dyes are extremely durable, regardless

2     of the heat, you might say.  But, once again, there's even

3     volatile compounds still remaining even under adverse

4     conditions like a house fire.

5         Q.   So.  Are you saying that they might have been able —

6     it was possible?

7         A.    If — if gasoline was dripped on the surface, then

8     because of its durability — whether it be the dyes in the

9     gasoline or the remaining volatile materials that are there —

10    there's still a possibility that remnants could have been, you

11    might say, collected and analyzed.

12        Q.   Now, I'm going to ask for your assistance for just a

13    second, Mr. Meneely, because I neglected to do this yesterday.

14    Although Ms. Karcher timely testified about it for me.  And you

15    have reviewed all of the — all of the reports from the State in

16    this case, right?

17        A.    Correct.

18        Q.   Is that your pen?

19        A.    That's mine.

20        Q.   Okay.  All right.  So, Mr. Meneely, I just want to

21    confirm from you — I confirmed this with Ms. Karcher yesterday

22    — but confirm from you that I've got, on Defense Exhibit 134 —

23    that there were four beer cans seized from the Hudson Ridge

24    area?

25        A.    Correct.

D7 159                                    Meneely   D

1      Q.   And that, based on your review of the lab reports,

2   there was no indication that these were associated with

3   Mr. McGuffin, as well as the plastic bottle?

4      A.   Correct.

5      Q.   Mr. Meneely, regarding the testimony concerning

6   Dr. Olson, and utilizing the calf muscle to do an analysis for

7   drug toxicology, do you — do you have an opinion as to whether

8   it would be more effective to analyze — to have analyzed

9   Ms. Freeman's hair?

10     A.   Actually, the — because of the degradation, even

11  little drug metabolites that are circulating throughout the

12  body have the ability to be destroyed, is the best probable way

13  to describe it, by biological activity.  And so if you obtain

14  some muscle group or some other tissue, and if you get a

15  negative toxicology finding, it doesn't necessarily mean that

16  there was nothing there.  It means that — one of two things.

17  There wasn't anything there; or, because of — bacterial

18  degradation destroyed all of the drug metabolites in that

19  particular tissue sample.

20          However, the hair samples can offer a couple

21  different advantages.  One is that they're relatively immune

22  from bacterial contamination.  They're kind of sealed inside

23  their own — the cuticle of the hair.  Number Two, that you can

24  actually analyze the hair if you segment — if you chop it up in

25  different segments because they know how quickly hair grows in

Meneely   D    D7 160

1   a certain period of time, you can actually analyze each segment

2   and determine when a person has started using a medication or

3   drug, when they have stopped, and when they have restarted

4   based upon the hair growth rate.

5        Q.   So — and what about the ability of a hair analysis to

6   detect drugs other than what was discussed this morning?

7        A.   I guess I don't understand your question.

8        Q.   Okay.  The examination that was done was for some

9   particular controlled substances, or so to speak?

10       A.   Correct.  They tested for a limited group, you might

11  say, of street drugs — typically the cocaine, the

12  methamphetamine and opiates.

13       Q.   All right.  And if a hair analysis had been done,

14  could it have demonstrated whether there were other drugs in

15  the body at one — at some point?

16       A.   Well, two parts to that.  Had they done a more

17  complete analysis, they could have potentially identified more

18  medications.  But, hair analysis — once you do a complete

19  analysis there, you can also do a complete identification of

20  all the drugs.  And what I mean by that is that when they test

21  for a term that — "organic base" drugs, that's a limited

22  variety of drugs.  And the one — they tested for cocaine,

23  methamphetamine, and opiates.  That's extremely limited,

24  because there is — as Dr. Olson mentioned, there is a vast

25  number of medications still yet that aren't — that don't follow

D7 161                                          Meneely   D

1   under those three categories.

2          When another test was performed on the maggots, they

3   tested for organic bases.  There is three categories of drugs.

4   There is acids, bases and there's neutral drugs.  For example,

5   the basic drugs are exampled — opiates, the cocaines,

6   methamphetamines.  The acid drugs are things like

7   phenobarbital, the barbiturates.  Then there's a — what's

8   called the neutral drugs, kind of in the middle.  Those are

9   what's called benzodiazepines, like Valium and Xanax.

10          And so to do a total encompassing examination you

11  have to look at each one of those drug categories.

12          The unfortunate thing is that that may not present

13  the entire the picture, because some of these drugs are

14  extremely sensitive, meaning, for example, LSD.  When we used

15  to do urine toxicology for LSD, we asked the agencies to

16  actually wrap the urine sample in aluminum foil, because any

17  light that was shined down onto the urine cup, itself, would

18  actually — because LSD metabolite is so sensitive, it would

19  degrade it just because of light.

20          So, there's a variety of conditions if you don't get

21  a positive test — for example, LSD may not even show up just

22  because of degradation or other sensitive issues.  GHB is

23  called the date rape drug — gamma hydroxy-butyric.  Once again,

24  that's a specialized test.  You have to test for that.  Just

25  the organic base test will not show that.

Meneely   D    D7 162

1    Q.   Can — okay.  And can you exclude — can you exclude

2  drug use based on the fact that there was deterioration?

3    A.   No.

4    Q.   And what other — what other drugs could possibly — I

5  know you've mentioned some of them — could possibly have been

6  identified?  For example, could a more complete screen have

7  potentially identified — I can't remember what the technical

8  term is — the date rape drug?

9    A.   Yes.

10    Q.   What's it called?

11    A.   Well, the acronym is GHB.

12    Q.   Okay.

13    A.   Or, it's actually gamma hydroxy-butyric, or the date

14  rape drug.

15    Q.   All right.  Thank you.  I wasn't trying to make you —

16  okay.  And those things weren't done here, right?

17    A.   Correct.

18    Q.   So, Mr. Meneely, going back to your examination of

19  the sports bra and the tank top, and the — basically, your

20  opinion is you found a cut?

21    A.   After looking very closely, unfortunately your nose

22  has to get right into it — nose with a mask and mentholatum

23  over the mask to hide the odors — but, yes.

24    Q.   And that's what did you here?

25    A.   Yes.

D7 163                                    Meneely  D

1    Q.   Okay.  All right.  I understand.  And so your opinion

2    is that this was one cut that went through two garments.  Is

3    that correct?

4    A.   Yes.

5    Q.   And is that cut consistent with a stabbing?

6    A.   Yes.

7    Q.   And can you tell, or based on your examination, where

8    that — well, let's assume that there's a sharp instrument — a

9    knife — where it would have entered the body based on where the

10   cut was?

11   A.   Most likely in the soft tissue area just below this

12   breast bone, if you will, the sternum.

13   Q.   Can you express an opinion as to what damage that cut

14   — the stabbing would have done?

15   A.   There's several vital organs, and it depends on the

16   angle of the instrument going in.  You can actually — actually,

17   as Dr. Olson testified that it could hit the heart or there's —

18   like I said, there's a variety of organs there.

19   Q.   Was the cut that you observed consistent with

20   anything else other than a stabbing?

21   A.   A sharp instrument, which I relate to a knife.

22   Q.   Okay.  Could it have been an animal bite?  In other

23   words, you know, an animal gnawing on the material?

24   A.   Once again, I — I excluded those versus the ones that

25   had frayed edges.  Under microscopic examination, you can see

Meneely   D    D7 164

1  frayed edges on a variety of the other components of the shirts

2  and the sports bra.  But, these two areas actually had well-

3  defined lines — not only just the well-defined lines of cut

4  fabric, but you can actually see a top and a bottom, or the

5  blunt part and the sharp part, that are typical of the knife

6  that we discussed.

7      Q.   And, Mr. Meneely, in, for example, a — for lack of a

8  better term — a casual — an observation such as during the

9  autopsy of the sports bra and the tank top, would the cut have

10 been detected the way that you — the way that you saw it?

11     A.   No.  You had to get very, very close under

12 microscopic conditions to examine all of these frayed fibers

13 and sharp defined cut areas.

14     Q.   All right.  And, given these — the circumstances that

15 you described concerning the location of the cut under the

16 sternum and the — and the other matters — would — would it have

17 — would the cut to the body have been detected during an

18 autopsy?

19     A.   It would have gone in through soft tissue, most

20 likely not nicking any bones because of this specific location.

21 Therefore, because of the degradation of the body and hitting

22 soft tissue, it most likely would not have been detected.

23     Q.   Would not have been detected?

24     A.   Correct.

25     Q.   In this case?

D7 165                                    Meneely   X

1    A.   Correct.

2    Q.   Okay.  All right.  Thank you.

3         MS. McCREA:    You may inquire, counsel.

4                   CROSS EXAMINATION

5    BY MR. FRASIER:

6    Q.   Mr. Meneely, we had a telephone conversation, didn't

7    we, the Friday before this trial started?

8    A.   I don't recall the day.  But, yes, we did have a

9    conversation.

10   Q.   And did I not ask you, specifically, "Is it your

11   opinion that this woman was stabbed?"  Didn't I ask you that?

12   A.   I didn't record it.  But, you may have and I think my

13   response was — I read it from my report — that it was from a

14   sharp instrument, if I recall correctly.

15   Q.   Isn't it true you said, "What I'm saying is, is

16   there's a cut made with a sharp instrument in the shirt and the

17   bra?"

18   A.   Right.

19   Q.   You never told me, even when I asked you if she had

20   been stabbed — when I asked your opinion, "Was she stabbed?"

21   you never told me that, did you?

22   A.   I think I basically read from my report that it was

23   consistent to a sharp object.

24   Q.   Well, you still haven't answered my question.  Did

25   you tell me that she was - - -

Meneely   X    D7 166

1       A.    (Interposing) I believe that's right.  I didn't say

2   specifically it was consistent to a knife or a stabbing.

3       Q.    And, in fact, you wrote a two-page report in this

4   case, did you not?

5       A.    Correct.

6       Q.    And there is nothing in your report that says that

7   she was stabbed, is there?

8       A.    No.  It — just a minute.

9       Q.    And when it comes to the — back to your report, in

10  regards to the tank top, the area where you mentioned this cut

11  is basically three lines, is it not?

12      A.    Correct.  Part of it says that in Area No. 1, which

13  we described as the upper left quadrant, that I saw, as we

14  described earlier, frayed and torn areas and then one area that

15  we've been discussing was consistent to a sharp instrument.

16      Q.    Right.  You have two sentences in this report that

17  describes the cut in the tank top, correct?

18      A.    Well, there was only one referencing a sharp

19  instrument in the tank top, one referencing a sharp instrument

20  in the sports bra.

21      Q.    Correct.  And, in fact, you wrote in your report

22  regarding the tank top, "Adjacent to the same grouping of torn

23  fabric is a hole that displays microscopic characteristics

24  consistent to a sharp instrument."  You wrote that?

25      A.    Yes.

D7 167                                    Meneely  X

1   Q.   That's all you wrote about that report — about that

2   hole, other than it was 1.5 centimeters in length?

3   A.   Correct.

4   Q.   You didn't describe it as you did here today, did

5   you?

6   A.   No.

7   Q.   You didn't put out there that, well, it had the

8   characteristics of a knife in this manner and this manner and

9   this manner, did you?

10  A.   No.

11  Q.   Why didn't you go into that detail?

12  A.   That was my report that I published and I just didn't

13  go into that amount of detail.

14  Q.   Didn't want me to know about it?

15  A.   I had documents, photographs — actually, you saw — I

16  believe you saw of my work that supports my conclusions.

17  Q.   You just wrote this - - -

18  A.   (Interposing) It's not that I didn't want you to

19  know.

20  Q.   But, you didn't describe it as you did here today?

21  A.   No.  I didn't describe the top and bottom, but I did

22  describe the size.

23  Q.   And, again, looking at the sports bra, the area that

24  you claim was made with a sharp instrument — again, all you

25  wrote in your report regarding this hole is, basically, two

Meneely   X     D7 168

1  sentences?

2              MS. McCREA:    Well, Your Honor, it's been asked

3  and answered.

4              THE COURT:    Overruled.

5      A.   Um, one, two — well, technically three sentences

6  describing the areas of damage.  But, that's essentially

7  correct — same as before.

8      Q.   And, again, in regards to the bra, you did not

9  describe the — well, you didn't go into as much detail as you

10 did here today?

11     A.   Correct.

12     Q.   Now, looking at your report, where does it say that

13 they're about two inches apart — these two holes?

14     A.   It doesn't say that in the report.

15     Q.   Why doesn't it say that in the report?

16     A.   It's in my notes from my description.

17     Q.   Okay.  But, you didn't put it in the report that was

18 given to me, did you?

19     A.   Correct.

20     Q.   And where is it in your report that these holes match

21 up, or are close nearby?

22     A.   It's not in the report.  It's in my notes.

23     Q.   Why didn't that get in the report?

24     A.   Because I didn't put it in the report.

25     Q.   Why not?

D7 169                                    Meneely  X

1       A.   Because I felt it was sufficient to describe my

2   findings as a sharp instrument.

3       Q.   Okay.  How much are you being paid to testify here

4   today?

5       A.   I get paid through the Oregon Public Defense Services

6   funds.

7       Q.   How much?

8       A.   And what they allow me is $150 an hour, the same as

9   actually Mr. Pex, when he's working for the defense, also.

10      Q.   Okay.  And speaking of Mr. Pex, don't you work for

11  him?

12      A.   I'm not so sure I'd say "work for him".  What we have

13  is a group of several forensic — or, retired forensic

14  scientists that if one will get a case that either they're too

15  busy to work, then they'll essentially pass it off onto another

16  one.  And if I have a case I can't get to, then I'll pass it

17  off onto other scientists.  We, basically, exchange cases in

18  that manner.  So, because he has a formed corporation, he takes

19  a small percentage because he does some of the billing to the

20  other clients, which I don't have to do.  And that's part of, I

21  guess, working for him.

22      Q.   All right.  Now, you're — well, let me ask you these

23  questions.  The two holes that you found in the shirt and the

24  bra — when were they made?

25      A.   I have no idea.

Meneely   X     D7 170

1    Q.   Okay.  You're familiar with Kathy Wilcox, are you

2    not?

3    A.   Yes, I am.

4    Q.   In fact, you work for the laboratory system as the

5    same time as Ms. Wilcox, did you not?

6    A.   Yes.

7    Q.   And you are — when you worked for the Laboratory, you

8    were familiar with her work, - - -

9    A.   (Interposing) Yes.

10   Q.   - - - were you not?

11   A.   Yes.

12   Q.   And you never had any problems with her work, did

13   you?

14   A.   Actually, Mr. Pex dealt directly with her work.  I

15   knew of what she did down in the Coos Bay Laboratory, but not

16   more detail work.  But, I had no indication there was any

17   problems with her work, if that's what you're asking.

18   Q.   Well, you have no reason of your own to doubt the

19   validity of her work, do you?

20   A.   No.

21   Q.   All right.  Now, you've indicated that you found

22   these two holes and they are how long, again?  One and a half

23   centimeters?

24   A.   One and a half centimeters is just about three-

25   quarters of a an inch.

D7 171                                    Meneely  X

1    Q.   And are — is it your testimony that Kathy Wilcox

2    missed these two holes?

3    A.   I believe she may not have looked closely enough,

4    given the photographs that she provided through discovery.

5    That's the best I can tell you.

6    Q.   Okay.  Now, you're familiar — you were aware that the

7    clothing was sent to another laboratory — this particular

8    laboratory in England.  Is that right?

9    A.   Correct.

10   Q.   And they looked at the clothing?

11   A.   Uh huh.

12   Q.   Is that correct?

13   A.   Correct.

14   Q.   And you read the report, did you not?

15   A.   Yes, I did.

16   Q.   And I'm going to show to you — this is the report

17   that's marked as State's Exhibit 211.  And there's this

18   paragraph here, it starts on — oh, what is this?  This is Page

19   — well, this would be the last page of the report.  It's

20   talking about — well, it starts in this paragraph and it

21   starts, "Damage to the back of the upper garments," and so

22   forth?

23   A.   Uh huh.

24   Q.   There's a sentence — the last sentence of that

25   paragraph — would you read that for us, please?

Meneely  X    D7 172

1    A.   "The possibility that Leah, the deceased, was stabbed

2    cannot be eliminated.  However, any stab cuts are no longer

3    recognizable due to the decay in the fabrics."

4    Q.   Would that also indicate to you that that laboratory

5    — if those holes were present from the — from Leah Freeman's

6    dying — wouldn't they have seen them?

7    A.   I can't tell you how closely somebody else — because

8    it's not in their report how closely they looked at anything.

9    Q.   Okay.  Well, you knew that the clothing had been sent

10   there for DNA analysis and - - -

11   A.   (Interposing) This clothing has been sent a variety

12   of different places.  But, yes.

13   Q.   Okay.  Now, in examining the holes did you see any

14   type of blood stain?

15   A.   I did not.

16   Q.   In your career — granted, these are fluids from

17   Ms. Freeman's body.  She had decomposed, extensively, correct?

18   A.   Extensively.  Yes.

19   Q.   But, even with that decomposition, if Ms. Freeman had

20   been stabbed, would you not expect to at least see some

21   staining?

22   A.   Well, as Dr. Olson testified, depending on the

23   position of the body, there may be, No. 1, very little blood.

24   But, No. 2, because there is such extensive degradation of

25   biological tissue that I'm not sure that the stain would

```
     D7 173                              Meneely   X
```

1   actually be visible at this point in time.  So, it's uncertain.

2       Q.   All right.  Well, let's go to the first proposition

3   you put out there.  If she didn't bleed, thus no staining, then

4   there wouldn't be any blood to transfer to a car, would there?

5       A.   If that were the only bleeding area, correct.

6       Q.   Now, have you ever worked out of the Coos Bay Lab

7   when it was operating?

8       A.   I don't believe I've worked in the Coos Bay Lab.

9       Q.   All right.  So, you're not familiar with the size of

10  the fume hood that they had there?

11      A.   Fume hoods are somewhat standard.  But, I haven't

12  worked in there.

13      Q.   Okay.  So, if I were to tell you it was big enough

14  that you could have put a body in there, would that have

15  surprised you?

16      A.   That's fine.  I mean, it's a fume hood and some are

17  large and some are not so large.

18      Q.   Okay.  Let's talk about the hair analysis that you

19  talked about in terms of toxicology.  In a homicide case, when

20  you're trying to determine if a person had drugs in their

21  system, you want to know if they had drugs or alcohol on board

22  at the time of their death.  Isn't that true?

23      A.   Well, that's one of the desirable things that we look

24  at.  Yes.

25      Q.   All right.  Now, for hair analysis to be accepted or

Meneely  X    D7 174

1  to get the results out of it, the person takes the drugs, is

2  that right?

3      A.   Correct.

4      Q.   And then they metabolize it?

5      A.   Correct.

6      Q.   And then it gets passed through the blood system to

7  the hair roots, correct?

8      A.   Correct.

9      Q.   And then it gets passed through the root into the

10  shaft of the hair?

11      A.   Correct.

12      Q.   And then the hair has to grow?

13      A.   Also correct.

14      Q.   All right.  So, in order to — if you want to find out

15  if somebody had drugs in their system at the time they died,

16  would you be able to do that with a hair test?

17      A.   Well, what you're suggesting is blood is probably the

18  best medium, which is correct because blood will tell you the

19  most recent ingestion.  Next down the line is, perhaps, muscle

20  or tissue, which is directly associated with the blood, which

21  would show recent ingestion.  Next down the line of

22  possibilities is hair, not as recent ingestion because, as you

23  indicated, hair actually has to grow to move out from the root

24  area.

25      Q.   So, in this case, if we wanted to know — let's say,

D7 175                                    Meneely   X

1  for example, if Leah Freeman died of a drug overdose, would we

2  be able to tell that from a hair sample?

3       A.    Probably not, if that was the one time she utilized a

4  large amount of drugs and didn't have time to migrate to the

5  shaft of the hair, is a possibility.

6       Q.    Okay.  And in this case, if we wanted to find out

7  what type of drugs she had in her system at the time she died,

8  the best way to do it would have been through the tissue

9  sample, wouldn't it?

10      A.    Well, the very best is the blood, which is not an

11  option in this case.  The next one is the tissue sample, which

12  is in the muscle, as the best case option possible, still has

13  the potential of degradation because of biological activity.

14  But, in essence, that's the next best try.

15      Q.    All right.  And in this case, that's what they did?

16      A.    That's what they attempted to do.

17      Q.    Now, you mentioned that if you talked about — well,

18  some date rape drugs and things like that, like GSB?

19      A.    No.  It's GHB.

20      Q.    GHB, excuse me.  How long does that stay in a

21  person's body?

22      A.    Actually, it only stays in the urine about twelve

23  hours, and much less in the blood system.

24      Q.    In fact, isn't it true that if you have someone who

25  thinks that they've been drugged with GHB and that they were

Meneely  X    D7 176

1  raped, you've got to get them to a hospital or to do a sample

2  as quick as possible because if you don't, within a few hours

3  it's gone?

4      A.   Correct.

5      Q.   And how long has GHB been around?

6      A.   Well, a number of years.  I guess I can't put a

7  specific date to it.

8      Q.   Well, let's put it to you this way, you worked at the

9  State Police Crime Lab until when?

10     A.   I retired about four years ago.

11     Q.   So, that would be 2007?

12     A.   Yes.

13     Q.   And wouldn't it be safe to say, or true to say, that

14  — well, when you worked at the Lab you did a lot of toxicology

15  work?

16     A.   Correct.

17     Q.   And you did a lot of urine tests for drugs?  You did

18  some blood and alcohol things?  And, I believe, when we worked

19  together, we were working on trying to do blood toxicology?

20     A.   Also correct.

21     Q.   All right.  Now, during that time frame that you were

22  working there, isn't it true it's only been within the last

23  five, seven years that GHB has really come on the scene?

24     A.   You know, I guess I'm having trouble with when you

25  say, "Come on the scene," because I wrote up procedures for GHB

D7 177                                    Meneely  X

1   analysis for the Crime Lab Division more than five years.  So,

2   it was on the scene.

3       Q.   Well, I guess my question is this.  GHB, was it a

4   common drug being used in 2000?

5       A.   You know, when you say "common," it's whether or not

6   it was recognized as a drug utilized in date rape situations

7   and were individuals actually given samples to present to the

8   Laboratory for analysis.  It may not have been really well

9   recognized back then as a date rape drug.

10      Q.   Now, when you worked at the Laboratory and, let's say

11  my office would say, "Hey, I'd like you to analyze this urine

12  sample and tell me — give me a tox report," what would you look

13  for?

14      A.   Generally we do an amino acid test, which would cover

15  general classifications of drugs.  Then we would do what's

16  called an acid base extraction to look for a broader range of

17  drugs, hopefully to find basically everything possible in the

18  urine.

19      Q.   Okay.  And you would send back a report and it would

20  say, "Well, we found meth," or, ". . .the metabolites of

21  methamphetamine or amphetamine or marijuana," or stuff like

22  that.  Correct?

23      A.   Correct.

24      Q.   Did you normally test for things like GHB?

25      A.   Only when the circumstances dictated.  In other

                                        Meneely  X    D7 178

1   words, if we had — through the officer's report of the

2   incident, "This is a date rape type scenario," or other

3   circumstances — we would have to specifically test for it.

4        Q.   Now, as Dr. Olson mentioned, there is the Physician

5   Desk Reference book about yay thick that's got thousands, if

6   not millions, of drugs in it.  Correct?

7        A.   It's got a lot of medications.

8        Q.   When you worked at the Crime Lab, would you test for

9   everything that was in the book?

10       A.   Well, I think we made an effort to test for

11  everything in the book.  That's why we did the acid base

12  extractions to basically encompass everything.  But, I guess,

13  can I say we absolutely tested for everything?  Probably not.

14       Q.   Now, in getting back to trace evidence a little bit,

15  how many — well, let's back up.  You worked for the Laboratory

16  for how long again?

17       A.   Twenty-eight years.

18       Q.   And during that time frame you worked on a lot of

19  homicide cases.  Is that right?

20       A.   Yes.

21       Q.   Would you say it to be hundreds, if not thousands?

22       A.   Well, a lot of homicide cases.

23       Q.   And during that time frame, how many — can you give

24  me a percentage of how many were solved by means of trace

25  evidence?

D7 179                                    Meneely  X

1    A.   Actually, two that I can think of specifically.  One

2  I mentioned in Toledo, Oregon and another one where we

3  virtually had no other evidence, aside from the fact that as

4  the little old lady kicked her assailant, a hair stuck in her

5  shoe.  And I found the hair and we did some blood typing off

6  that trace evidence.  I don't recall any others right now.

7    Q.   Well, let's go back again now to trace evidence.  You

8  indicated that the lack of trace evidence can mean something.

9  Is that right?

10   A.   It may, depending on the circumstances.

11   Q.   And, for example, like what?

12   A.   For example, if I have a fuzzy red garment and I sit

13 in this car — expectation I would leave some fuzzy red fibers

14 in that car.  Conversely, if I have a fuzzy red garment and I

15 didn't sit in the car, that would support the fact that I

16 didn't sit in the car.

17   Q.   Okay.  Now, in this case, you went through all the

18 lab reports that were submitted.  Is that correct?

19   A.   Correct.

20   Q.   And you are aware of what Kathy Wilcox had done in

21 terms of analyzing or looking at the Mustang and what have you?

22   A.   Yes.

23   Q.   And you were aware that — or, were you not — that in

24 her examination of the Mustang, she did not find any evidence

25 of Leah Freeman being in the car, correct?

Meneely  X    D7 180

1      A.    Correct.

2      Q.    Now, let's back up a little bit.  You were given some

3  of the police reports, were you not, in this case?

4      A.    Yes.

5      Q.    And were you not aware that Leah Freeman was seen

6  inside that car — that very car — the day she disappeared?

7      A.    I was aware of that.

8      Q.    And yet we didn't find anything putting her in that

9  car?

10      A.    That's what the Laboratory reports say.

11      Q.    As a Criminalist, what does that mean to you?

12      A.    Well, they didn't find anything.  That's all I can

13  - - -

14      Q.    (Interposing) That means she wasn't in the car?

15      A.    Not necessarily.

16      Q.    Well, of course, we have witnesses that put her

17  there.  Would it be safe to say that a reasonable explanation

18  of why nothing was found of her in that car is because it was

19  cleaned out before it was examined by the State Police?

20      A.    One possibility.  Or, the possibility is that it may

21  have been overlooked.  But, once again, the scientists are good

22  scientists, too.  So, all I can say is that nothing was found

23  that was associated with her.

24      Q.    But, something should have been found if she was in

25  there.  If you're saying that this Locard Principle that

D7 181                                        Meneely  X

1   something gets left behind — if she was in that car, there

2   should have been something?

3       A.   Once again, I believe Mr. Pex probably testified that

4   there's no absolutes.  There's a principle, but once again

5   there's no absolutes in this science.

6       Q.   The gasoline you mentioned — you are aware of the

7   area where Ms. Freeman's body was found?

8       A.   Yes.

9       Q.   And you're aware it's a dirt road?

10      A.   Yes.

11      Q.   Would you really, realistically expect to find

12  residue of gasoline there after five weeks on a dirt road in

13  the summertime?

14      A.   Once again, if you look at the photographs of the car

15  processing, the gas tank was dripping gas while they processed

16  the car in the garage.  Once again, depending on how long the

17  car was there, it was leaking gas.  If that was the car, it's

18  leaking gas and it's going to — like I said earlier is that the

19  volatiles are volatile materials.  They can evaporate as

20  Mr. Pex said.  But yet, even in burning conditions, there's

21  still remnants of it.  But still, even more durable is the dye

22  components of gasoline.  They're durable.

23      Q.   Well, okay.  Let's say you have a body in your car

24  and pull up and you dump it over the side.  Are you going to

25  stick around for a half hour, or four or five hours, as that

Meneely   ReD   D7 182

1  car was sitting — like it was sitting in the bay?

2      A.   Once again, under that definition, it may not have

3  magically dripped, if that's what you're suggesting.

4      Q.   Well, I guess what I'm getting at is, it's reasonable

5  to assume that you would be able to find something after five

6  weeks under these types of circumstances, would it?

7      A.   Well, first of all, the definition as how long it

8  stayed at that particular scene and how much it dripped.  If it

9  was only moments, then I would suggest there would be very

10 little evidence.  If it was longer, then it would depend on how

11 much dripped, you might say.

12          MR. FRASIER:   I have nothing further.

13              REDIRECT EXAMINATION

14 BY MS. McCREA:

15     Q.   Mr. Meneely, if Leah Freeman had been injured and

16 were bleeding and had been in Mr. McGuffin's Mustang, based on

17 your experience, would you expect that the forensic scientists

18 would find some trace evidence of blood in that car?

19     A.   Forensic scientists are very good in looking in every

20 crack and every crevice of everything they go after.  And I

21 would expect if that's the case, that they would find it.

22     Q.   And, likewise, if she had been in the trunk?

23     A.   Likewise.

24     Q.   Now, - - -

25          MS. McCREA:   May I have 211, please?

D7 183                                    Meneely  ReD

1    Q.   Mr. Meneely, let's just go back briefly to

2    State's 211, which is the results of the laboratory

3    examinations on — from the English lab.  Can you read to us

4    this first sentence in the second paragraph concerning what

5    their findings were about blood staining?

6    A.   "No specific area of blood stain was found on the

7    garments probably due to the extensive body tissue staining on

8    degradation."

9    Q.   Okay.  And then read us what it says in that first

10   sentence in the bottom paragraph on that page?

11   A.   "Damage to the back of the upper garments, while not

12   overlapping, could be considered as have occurred whilst the

13   garments were worn together, allowing for some movement between

14   the layers of garments."

15   Q.   So, does that report talk about damage to the upper

16   garments?

17   A.   Well, this isn't specific as to what I've read —

18   talks about the blood stain couldn't be found or identified.

19   Q.   Right.

20   A.   And they talked about, in the last paragraph, damage

21   to the back of the upper garments.

22   Q.   Did you find damage to the back or the front of the

23   upper garments?

24   A.   The — there was frayed areas on both front and back.

25   Q.   Okay.  But, what about what you've described — the

Meneely   ReD   D7 184

1 cut that went through two garments?  Was that on the front or

2 the back?

3      A.    Front.

4      Q.    Okay.  And while they talk about a different area —

5 the damage to the back of the upper garments — do they also

6 talk about that as being in different locations?

7      A.    Well, they indicate, ". . .whilst not overlapping."

8      Q.    I know.  I'm sorry to make you read that.  Whilst?

9      A.    Whilst.

10      Q.    Okay.  Not overlapping?  And is that the same

11 situation that we have here of damage that is not overlapping?

12      A.    These are sharply defined areas of damage, that

13 they're not overlapping, but they're in very close proximity.

14      Q.    Okay.  And the conclusion in the English lab report

15 was consistent with your conclusion, that is although the — as

16 they put it, damage — you put it "cut" — was not overlapping,

17 but it could have occurred while they were worn together?

18      A.    Well, they're referencing the upper — the back of the

19 garments, the way I read this.

20      Q.    Well, I understand that.

21      A.    Okay.

22      Q.    But, my question is, in terms of having damage to the

23 two garments in the same location, does the English report say

24 that that would have — that the damage would have happened at

25 the same time or a different time?

```
   D7 185                              Meneely  ReD
```

1      A.   That's what they're suggesting, because the two

2   garments can move between each other.

3      Q.   So, are they saying the same thing that you've said

4   in terms of movement of the garments or something different?

5      A.   Same thing, essentially.

6      Q.   Okay.  Mr. Meneely, in terms of Kathy Wilcox's

7   testimony, you were present for that, right?

8      A.   Yes, I was.

9      Q.   Did she say that she didn't find any evidence of Leah

10  Freeman or Nick McGuffin, or did she say that it wouldn't be

11  significant if she did?  Do you remember?

12     A.   I'm sorry.  I don't remember that.

13     Q.   Okay.  Now, in terms of your testimony here today, is

14  — from what you've told us, is there anything that you have

15  said here today that is inconsistent with the report that you

16  wrote that was provided to the District Attorney?

17     A.   No.

18     Q.   Is there anything inconsistent with the photographs

19  that you took during your examination?

20     A.   No.

21     Q.   Is there anything inconsistent with your testimony

22  today and what you observed when you did the examination of the

23  clothes and the shoes?

24     A.   No.

25     Q.   And the photographs that you took during the

Meneely   ReD   D7 186

1  examination that have been entered into evidence here today,

2  those were provided to the District Attorney?

3      A.   Yes.

4      Q.   And the photographs that were provided to the

5  District Attorney showed the cut that you've testified to here

6  today concerning the tank top and the sports bra?

7      A.   Yes.

8           MS. McCREA:    Nothing further.

9      Q.   Thank you.

10          THE COURT:    You may step down, sir.  You are

11  free to leave.

12          We'll take the afternoon recess at this time.

13          Everybody else remain seated until the jury has

14  a chance to get into the jury room.

15          We'll take about 20 minutes.

16          (Jury out.)

17          THE COURT:    Three thirty.

18                  (RECESS)

19          (Jury in.)

20          THE COURT:    Be seated, please.

21          Call your next witness.

22          MS. McCREA:    Your Honor, the defense does not

23  have any more witnesses available today.  I do have documents

24  to offer into evidence.

25          THE COURT:    Okay.

D7 187

1          MS. McCREA:    So, the defense would offer

2    Exhibits 104 and 105.  And these are from — were seized by

3    Sheriff Zanni at 351 West 5th, and are letters from Ms. Freeman

4    to Mr. McGuffin.

5          Then we have Exhibits 106, 107, 108, 109, 110,

6    111, 112, 113, 113a, because the — these are the originals.

7    The copy I had were on one document — and 114.  And those

8    documents were seized by Officer Wetmore from Mr. McGuffin's

9    bedroom.  And I actually received the originals courtesy of

10   Mr. Frasier.

11         MR. FRASIER:    I have no objection.

12         THE COURT:    They are received.

13         (Whereupon Defendant's Exhibit Nos. 104, 105,

14   106, 107, 108, 109, 110, 111, 112, 113, 113a and 114 were

15   received into evidence.)

16         MS. McCREA:    And I would request permission,

17   Your Honor, to read from some of those documents to the jury at

18   this time.

19         THE COURT:    You may.

20         MS. McCREA:    This is Exhibit 108:

21         "Nick, Hey, sugar, how are you?  I'm so bored.

22             Mr. Crosby's test took me about fifteen minutes to

23             do.  So, right now I have 55 minutes left until I get

24             to see you.  I am so hot.  I'm stupid for wearing a

25             big dark shirt on a bright sunny day.  Oh well, just

D7 188

1    because it's yours, that makes it okay.  I think that

2    makes sense."

3        "Anyways, I'm so happy.  I have 50 minutes left

4    of my freshman year.  Yay.  I wish you were going to

5    be back next year and the year after that and the

6    year after that, and then we would graduate together

7    and then we could walk down the thing together.  But,

8    no, you had to graduate three years before me and

9    walk down the thing with Zack.  Shouldn't you have

10   picked someone you would want to share your high

11   school memories with?  You will probably never see

12   him.  Well, never mind, you will see a lot of those

13   people in your class.  You'll never see a lot of

14   those people in your class except for reunions, which

15   for you is probably a good thing, and for me, too."

16       "I feel like I am actually talking to someone

17   right now because of the way I'm saying things in my

18   head.  How weird.  I am in a weird mood.  I am all

19   happy — giggly for awhile, and then I'm all irritable

20   and mad."

21       "Now I have 44 minutes left.  I think I'm going

22   to have to go and get another piece of paper so I'll

23   have something else to do.  Yeah.  I'm going to write

24   Sherry now.  I love you, Leah Nicole."

25       "P.S.  You'd better be done with your shit

D7 189

1    around the house."

2        Exhibit 109, dated May 25, 2000:

3        "Nick, Hey, how are you?  I hope you feel

4    better.  You probably don't, but I sure hope you do.

5    I walked by your class and I saw you but you didn't

6    see me.  Yeah, you were staring at something, but I

7    didn't know what.  Anyways, I just told Tawna

8    (phonetic) about how you went off on Stacy.  She

9    thought it was funny.  She is bothering Tawna, too."

10        "Well, everybody is wandering around so I think

11   the bell is going to ring, so I'm going to go.  I

12   love you, heart, yeah, Leah, a.k.a., Baby Doll."

13        Exhibit 111:

14        "Nicholas James, a.k.a. Prince Charming, Hey,

15   baby.  How are you?  I'm so sad.  I miss you so much.

16   Right now it's third period and I already cried.  So

17   did Melissa, though.  We miss you guys.  School sucks

18   without you, Baby.  So, how is your day?  I'm sorry I

19   was being a bitch this morning.  I wish you were here

20   to make me feel all better.  Scott is coming to get

21   Melissa at lunch today and I don't get to see you

22   until whenever."

23        "Melissa and Holly want me to stay with them

24   tonight.  I kind of want to, but I want to see you,

25   too, since I haven't seen you all day."

D7 190

1          "Well, I'm going to go.  I'm sure I will write

2          you later today.  I love you.  Love always, Leah

3          Nicole, a.k.a. Baby Doll."

4          Exhibit 112:

5          "Nick, I just talked to you, but I miss you

6          already.  So, I was talking to Stacy about

7          graduation.  She was talking about how cute you and

8          Zack were when you were hugging his back.  I think

9          you looked cute, too.  Actually, I think she was

10         saying Zack was cute, but I'm saying I think you were

11         good.  Anyway, Stacy wanted to take pictures of me,

12         but I didn't want her to because I look like shit, no

13         make up and big, baggy clothes.  That doesn't really

14         make good pictures."

15         "Guess what?  Yesterday Sherry, Cory and J.D.

16         were looking for a movie and Cory left.  I don't know

17         where he went, but somewhere."

18         "Anyway, so J.D. and Sherry are there alone and

19         J.D. kissed Sherry.  Cory and Sherry aren't

20         officially together, but she wants to be.  So, she

21         doesn't want to tell him.  Oh, yeah, I forgot to tell

22         you what happened.  J.D. kissed her and she kissed

23         back.  Poor girl.  I feel really sorry for her.  Cory

24         was telling me awhile ago how he would never stay

25         with a girl who cheats on him."

D7 191

1              "Anyways, I'm so sad.  I have to go to two more

2         days of school without you and I can't wait until

3         Thursday.  Well, I should be listening to

4         Mrs. Lefleur (phonetic), so I'm going to go now.  I

5         love you.  XOXO, Love, Baby Doll."

6              The defense also offers Defense Exhibit 121 —

7    either by Judicial Notice, although I think Mr. Frasier is

8    prepared to stipulate to it — which sets out from the U.S.

9    Naval Observatory Astronomical Applications Department, the

10   time of sunset on June 28, 2000.

11             MR. FRASIER:   No objection to the exhibit.

12             THE COURT:   Received.

13             (Whereupon Defendant's Exhibit No. 121 was

14   received into evidence.)

15             MS. McCREA:   And that is as much as the

16   defense can do this afternoon, Your Honor.

17             THE COURT:   Mr. Frasier?

18             MR. FRASIER:   Your Honor, with the Court's

19   permission, I have — I could recall what would be a rebuttal

20   witness at this time and we could take up some time this

21   afternoon.

22             THE COURT:   Ms. Wilcox?

23             MR. FRASIER:   Yes.

24             THE COURT:   Okay.  I think that's - - -

25             MR. McCREA:   (Interposing) Well, if

D7 192

1   Mr. Frasier had let us know he wanted to do that a little

2   sooner — we've released Mr. Meneely for the day, Your Honor.

3   So, we don't have him here to observe the testimony and to

4   advise us in conjunction with that testimony.  It makes it very

5   awkward from our perspective.  And I regret it, because it

6   would have been a handy way to do it otherwise.  But, I — we

7   didn't know that Mr. Frasier would make this suggestion.

8              So, I am forced to object to following that

9   procedure.  And I apologize to the Court we don't have further

10  witnesses scheduled.

11             THE COURT:   Has Ms. Wilcox got anything — she

12  lives in this area, correct?

13             MR. FRASIER:   Yes, she does.

14             THE COURT:   So - - -

15             And you have how many — how much of a day do you

16  have tomorrow with your witnesses, do you think?

17             MR. McCREA:   There probably would be time

18  enough to have her on tomorrow, based on our witnesses who — we

19  have a number of witnesses, but they all should go fairly

20  quickly.  And I've spent a lot of years making that

21  prognostication and being right on.

22             THE COURT:   I've spent a lot of years

23  listening to lawyers prognosticating.

24             MR. FRASIER:   I would prefer, Your Honor, that

25  we be given a specific time so she doesn't have to sit here all

D7 193

1  day.

2          THE COURT:    How about 1:00?

3          I mean, it sounds like your witnesses are going

4  to be short, generally.  If they're not, 1:00 isn't going to

5  interfere with anything.

6          MS. McCREA:    Not at all, Your Honor.  That's

7  fine.  And we can arrange with Mr. Meneely to be here.

8          THE COURT:    Okay.

9          MR. FRASIER:    All right.  That's fine.

10          THE COURT:    All right.

11          Then we'll be in recess.

12          Everybody else remain seated until the jury has

13  a chance to leave.

14          Be back at 9:00 tomorrow.  Put your pads in the

15  jury room and remember the admonition.  Have a pleasant

16  evening.

17          (Jury out.)

18          THE COURT:    Okay.  We'll be in recess until

19  9:00.

20                  (END OF DAY 7)

21

22  *                    *                    *

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

STATE OF OREGON,                    )
                                    )
            Plaintiff,              )    CASE NO. 10CR0782
                                    )
                                    )       JURY TRIAL
        vs.                         )        DAY 8
                                    )
  NICHOLAS JAMES McGUFFIN,          )
                                    )
            Defendant.              )
_____ )

TRANSCRIPT OF PROCEEDINGS

Volume 12, Pages D8 2-D8 79

        BE IT REMEMBERED That, the above-entitled cause

came on regularly for hearing beginning at 9:00 a.m. on Friday,

July 15, 2011, in the Circuit Courtroom of the Coos County

Courthouse in the City of Coquille, County of Coos, State of

Oregon, before the Honorable Richard L. Barron, and a jury.

APPEARANCES

R. Paul Frasier, District Attorney for Coos County,
representing the Plaintiff.

Erika Soublet, Assistant District Attorney for Coos County,
representing the Plaintiff.


Shaun McCrea, Attorney at Law, representing the Defendant.

Robert McCrea, Attorney at Law, representing the Defendant.


        Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

D8 2

1   *                              *                              *

2            (Jury out.)

3            THE COURT:    Be seated, please.

4            Mr. McGuffin, as I do in these type of cases,

5   your counsel has, I think, indicated that you were going to

6   testify, which is fine.  You have the right to testify if you

7   wish to.  If you do testify, you are subject to cross

8   examination on what you've testified to, or any matters

9   related thereto.

10           You also have the right not to testify.  And if

11  you do not testify, the Court would give an instruction to the

12  jury stating to the jury that you have a Constitutional right

13  not to testify and your counsel has asked for that

14  instruction.  So, I assume that's just in case you do not

15  testify.

16           But, do you understand what I've explained to

17  you?

18           DEFENDANT:    Yes, I do.

19           MS. McCREA:    And, Your Honor, that — just so

20  the Court knows, he has not made a decision at this point.

21           THE COURT:    Oh, I assumed that.

22           MS. McCREA:    All right.

23           THE COURT:    That's why I like to go - - -

24           MS. McCREA:    (Interposing) Yes.  Okay.

25           THE COURT:    - - - over this with them and I

D8 3

1  have prepared that instruction.

2              And I think I've prepared the instructions that

3  I'll have Xeroxed and given to you guys today.  I think

4  they're the instructions that both sides have asked for.  So,

5  I'll give them to you now and if there's any comments or

6  discussion on those, we'll do that some time today.

7              Okay?

8              Cathy, you want to give them each a copy of

9  that, please?

10             Bring the jury in.  Oh, just a minute.

11             MR. FRASIER:   Your Honor, just so the Court

12 is aware, we've decided on Ms. Wilcox — to wait until our

13 rebuttal case, when we get there, to call her.  We won't call

14 her this afternoon.

15             THE COURT:   Okay.  That's fine.

16             (Jury in.)

17             THE COURT:   Good morning.

18             Call your next witness, please.

19             MS. McCREA:   Defense calls David Main, Your

20 Honor.  I need to get him.

21             THE COURT:   I don't believe I excused you,

22 Mr. Main.  So, just have a seat.  I don't have to swear you in

23 again, because I didn't excuse you.

24                          <u>DAVID MAIN</u>

25 was thereupon again produced as a witness on behalf of the

Main  D        D8 4

1    Defendant and, having previously been duly sworn to tell the

2    truth, the whole truth and nothing but the truth, was examined

3    and testified as follows:

4                    THE COURT:   Go ahead.

5                         DIRECT EXAMINATION

6    BY MR. McCREA:

7        Q.   Mr. Main, you've been identified as David Main and

8    you formerly were a Coos Bay Police Officer.  Is that correct?

9        A.   Yes, sir.  It is.

10       Q.   And back in July of 2000 you were involved in the

11   investigation concerning the disappearance of Leah Freeman,

12   correct?

13       A.   Yes, sir.  I was.

14       Q.   All right.  And you're here this morning at our

15   request, correct?

16       A.   Yes, sir.

17       Q.   And in conjunction with that request, were you asked

18   to look for your report concerning your interview with Scott

19   Hamilton occurring on the 10th of July of 2000?

20       A.   Yes, sir.  I was.

21       Q.   And did you find that report?

22       A.   Yes, sir.  I did.

23       Q.   And did you bring it with you?

24       A.   Yes, sir.

25       Q.   And do you have it there at the witness stand with

```
    D8 5                                    Main   D
```

 1   you?

 2        A.   Yes, sir.  I do.

 3             MR. McCREA:    May I approach, Your Honor?

 4             THE COURT:    You may.

 5        Q.   All right.  You have the report there now?

 6        A.   Yes, sir.  I do.

 7        Q.   Would you look at your report, and I want to ask you

 8   a question about the interview with Scott Hamilton on the 10th

 9   of July of 2000.  Did you interview him concerning his

10   whereabouts and those of Mr. McGuffin on the night of the 28th

11   of July of 2000?

12        A.   Yes, sir.  We did.

13        Q.   All right.  And at that time, did he tell you as

14   follows:

15             "Mr. Hamilton stated that he had been at

16             Kristin Steinhoff's house until after midnight.

17             Mr. Hamilton stated that Nick had shown up at

18             Kristin's between 9:00 and 10:00 p.m.  He was in his

19             own car, the Mustang.  Mr. Hamilton stated that Nick

20             was pissed off and acted confused.  Nick told

21             Hamilton and Steinhoff that he had been late to pick

22             up Leah at Sherry's and he was supposed to pick her

23             up at 9:00 p.m. and he got there at 9:05 p.m.  Nick

24             told them he looked for her, but couldn't find her.

25             "Mr. Hamilton said that Nick had told him of

Main  D      D8 6

1              rumors in Port Orford that Leah was seen with an

2              unknown girlfriend going to California.

3                  Mr. Hamilton did mention an argument the two had at

4              Leatherman's lot.  They were fighting, but mostly

5              yelling at each other three weeks ago.  Then this

6              happened about a week before her disappearance, he

7              thought."

8              Is that what he told you?

9     A.    Yes, sir.  It is.

10    Q.    And you put that all in your report?

11    A.    Yes, sir.  I did.

12    Q.    Thank you.

13              MR. McCREA:    That's all the questions I have.

14              THE COURT:    Cross?

15              MR. FRASIER:    Could we have a limiting

16    instruction, Your Honor?

17              THE COURT:    Yes.

18              Ladies and gentlemen, again, as I've told you

19    in the past, this is merely offered for impeachment towards

20    Mr. Hamilton, and you can use it in regards only for the

21    purpose of determining whether Mr. Hamilton is a credible or

22    not-credible witness, not for the substance.  Okay?

23              Go ahead.

24              MR. FRASIER:    We have no questions, Your

25    Honor.

```
   D8 7                                    Oester  D
```

1           MR. McCREA:    May the witness be excused?

2           THE COURT:    He may.

3           You are excused from further attendance.

4           MR. McCREA:    He's got three loads of gravel

5    to haul, Your Honor.

6           THE COURT:    Good.

7           Don't leave it here.

8           MR. McCREA:    Call Dale Oester.

9           WITNESS:    I can deliver it at home.

10          THE COURT:    Don't need it there, either.

11                          DALE OESTER

12   was thereupon produced as a witness on behalf of Defendant

13   and, having first been duly sworn to tell the truth, the whole

14   truth and nothing but the truth, was examined and testified as

15   follows:

16          THE COURT:    Have a seat here, please.

17                       DIRECT EXAMINATION

18   BY MR. McCREA:

19       Q.   State your name, please?

20       A.   Dale Oester.

21       Q.   And you were formerly employed by the Oregon State

22   Police?

23       A.   I was.

24       Q.   Were you so employed back in August of 2000?

25       A.   I was.

Oester  D      D8 8

1    Q.   And at that time, were you called in to assist in

2    the investigation concerning the disappearance of Leah

3    Freeman?

4    A.   I was.

5    Q.   As part of that investigation, did you have occasion

6    to contact and interview a Mr. Scott Hamilton on the 15th of

7    August of 2000?

8    A.   I did.

9    Q.   Now, you're here at the — at our request, right?

10   A.   I was subpoenaed by the defense.  Correct.

11   Q.   Okay.  That's the kind of request lawyers make.  All

12   right.

13        And we asked you to review your report of that

14   interview.  Is that also correct?

15   A.   Correct.

16   Q.   All right.  And you have that report with you?

17   A.   Yes, three pages of it.

18   Q.   Excuse me?

19   A.   Three pages of it.

20   Q.   Oh, all right.  But, specifically, do you have the

21   report of the interview you had with Scott Hamilton on the

22   15th?

23   A.   Yes, I do.

24   Q.   All right.  And looking at your report, I want to

25   ask you if he — if he told you as follows.  During this

```
     D8 9                                   Oester  D
```

 1   contact, the following information was obtained:

 2              "His girlfriend was Kristin Steinhoff.  His ex-

 3          girlfriend is Melissa Smith.  On July — excuse me —

 4          on June 28th he was at Melissa's until about 8:00 and

 5          then he went home.  At 9:00 to 9:30, he went over to

 6          Kristin Steinhoff's house and Nick was there sitting

 7          in his Mustang.  Kristin was on the porch and Nick

 8          asked him if he had seen Leah.  He told him, Nick,

 9          he had not seen Leah; and Nick said that if he saw

10          Leah and she was with another guy, to beat the hell

11          out of the guy and take Leah home.  In his opinion,

12          Nick seemed genuinely concerned."

13              "Nick and Kristin were going to go put gas in a

14          purple Kia, so he waited at Kristin's house.  They

15          left about 10:30 and were gone about fifteen to

16          twenty minutes before they came back.  When they got

17          back, they said they had gone to Sinnott's to see if

18          Leah was there, but she wasn't.  Nick left Kristin's

19          at midnight, possibly a little after."

20              "He, Hamilton, stayed another fifteen to twenty

21          minutes before Kristin left to take the purple Kia

22          back to the guy that owned it near Greenacres.  He

23          left and went home and got home about 1:00 a.m."

24              Is that what he told you?

25       A.   Yes, it is.

```
                                          Oester   D     D8 10
 1    Q.   Now, he said:
 2              "On June 29th he woke up at 11:00 a.m. or so.
 3         He went over to Kristin's, but she was asleep.  He
 4         drove around and stopped at Hunter's to see Brian
 5         and then he went back to Kristin's at 7:00 p.m. and
 6         spent the night there.  He heard that Leah. . ."
 7              MR. FRASIER:   (Interposing) Your Honor, I'm
 8    going to object, because I don't think we went into this line
 9    of questioning with Mr. Hamilton about where he was the next
10    day.  So, this would be improper impeachment.
11              THE COURT:   Sustained.
12              MR. McCREA:   We'll skip this.
13    Q.   Let's go to the next paragraph.
14              "On the night of June 28th, he never saw Nick
15         and Kristin Steinhoff in her bedroom.  When he got
16         to Kristin's that night, he turned down his CD
17         player when he pulled in, and saw that it was 9:00
18         and Nick was there, just getting out of his car and
19         walking up to her door.  It wasn't dark yet, but it
20         was close enough that he had his headlights on.
21         Nick was very calm and didn't act like anything was
22         happening."
23         Is that what he told you?
24    A.   Yes, it was.
25    Q.   All right.  And you've reviewed your report as I
```

D8 11                                        Oester   D

1    read the questions?

2         A.   Yes, I did.  I followed along with you.

3         Q.   Now, did you have another occasion to interview

4    Scott Hamilton on September 19th of 2000?

5         A.   I did.

6         Q.   And have you reviewed your report concerning that

7    interview?

8         A.   I have.

9         Q.   And you have that report in front of you?

10        A.   Yes, sir.

11        Q.   And did he state as follows:

12             "He stated that about a week after Leah's body

13             was found, he was going to Chris Miller's place

14             above Fairview with Nick McGuffin.  It was about

15             8:00 p.m. in the evening and Nick asked him if he

16             wanted to see where Leah's body had been found.

17             Hamilton stated that he told Nick that he didn't,

18             but as they were driving to Fairview, Nick turned

19             onto Lee Valley Road and drove out past the rock

20             pit.  Nick was looking to the left, driving slow,

21             and pointed out where the grass was mashed down and

22             said, 'That's where her body was found.'"

23             "Nick drove about twenty feet past this spot

24             and stopped the car and they got out.  Nick walked

25             back to where the grass was mashed down and he went

Oester   D     D8 12

1          over the bank towards the river.  Hamilton said he

2          was really not comfortable with this and stayed up

3          on the road and watched Nick.  Nick was down at the

4          foot of the bank looking around and touching things.

5          Nick pointed out a spot where he said Leah had been

6          laying.  Hamilton stated he was really uncomfortable

7          at this point, and wanted to leave."

8              "Nick came back up the bank and he had a

9          picture of Leah in his hand.  He was crying and

10          looking at the picture, then walked up to him and

11          hugged him — Hamilton.  Nick was saying that he

12          could picture Leah lying down there with her head on

13          a rock.  Hamilton stated that it really creeped him

14          out and he started walking back toward the car.

15          Nick started walking with him and by the time they

16          got the twenty feet back to the car, Nick had quit

17          crying.  They got back in the car and Nick then

18          drove on up to Chris'."

19          Is that what he told you?

20      A.   Yes, it is.

21      Q.   Thank you, very much.

22              MR. FRASIER:   Again, Your Honor, a limiting

23   instruction?

24              THE COURT:   The same instruction I just gave

25   you in relation to Officer Main applies to the testimony of

D8 13                                        Oester   X

1   Mr. Oester and is only for impeachment purposes only as to the

2   credibility of Mr. Hamilton and no other purpose.

3                    Any cross?

4                    MR. FRASIER:   Yes.  Just a few additional

5   questions.

6                         CROSS EXAMINATION

7   BY MR. FRASIER:

8       Q.   Detective — or, formerly Detective Oester, you were

9   not involved in the initial investigation?

10      A.   I was not.

11      Q.   But came in after the body had been found?

12      A.   I was assigned the day the body was recovered.

13  Yes.

14      Q.   And did you actually go out to the site where the

15  body was found?

16      A.   Not during the recovery.  I did subsequently, after

17  the scene was processed.

18      Q.   Did you ever take Mr. Hamilton out there?

19      A.   I did.

20                   MR. McCREA:   Wait a minute.  That's beyond

21  the scope of the direct examination, Your Honor.

22                   MR. FRASIER:   This goes to the asking

23  questions about Mr. Hamilton going out to the scene.  So - - -

24                   MR. McCREA:   (Interposing) Well, ask him

25  about what Mr. Hamilton said about going out to the scene.

```
                                              Oester   ReD   D8 14
 1              THE COURT:    Right.  I know it's for

 2   impeachment purposes.  The fact that it was for impeachment

 3   purposes, I don't know that allows you to cross examine him on

 4   a substantive matter unless it relates to that impeachment or

 5   you're trying to rehabilitate Mr. Hamilton.

 6              MR. FRASIER:    Well, that's what I'm trying to

 7   do.

 8              THE COURT:    Right.  If you go there, then I

 9   would give the limiting instruction that it's for

10   rehabilitation as to his credibility.  Go ahead.

11      Q.   Now, in your interview with Mr. Hamilton, he

12   indicated he had been out with Mr. McGuffin to the place where

13   the body was recovered?

14      A.   Yes.

15      Q.   And did you ask Mr. Hamilton to take you to that

16   location?

17      A.   Yes, I did.

18      Q.   And did Mr. Hamilton take you to the location where

19   the body had been found?

20      A.   He did.

21              MR. FRASIER:    That's all I have, Your Honor.

22                    REDIRECT EXAMINATION

23   BY MR. McCREA:

24      Q.   Well, in that regards — but he pointed out the wrong

25   spot, didn't he?
```

```
     D8 15                                    Oester  ReD
```

1     A.   He pointed out the location where Nick had indicated

2   the body was located — or her body had been found.

3     Q.   I'm sorry?

4     A.   Mr. Hamilton pointed to the spot — indicated the

5   spot that Nick had told him where the body was found.  And

6   that — my personal knowledge of that was — where Mr. McGuffin

7   indicated the body was found was not where the body was found.

8     Q.   I'm sorry.  I didn't catch the last part.

9     A.   Where he — where Mr. McGuffin pointed out to

10  Mr. Hamilton where the body had been located, it was not the

11  location where the body had actually been located.

12    Q.   Okay.  Thank you.

13              MR. McCREA:    That's all.

14              THE COURT:    And, again, the testimony on

15  cross examination and redirect will only go to — you can only

16  consider all of that testimony as to Mr. Hamilton's

17  credibility one way or the other.  Okay?

18              You may step down.  You are excused.

19              WITNESS:    Thank you, Your Honor.

20              MS. McCREA:    Defense calls Mark Perry.

21              THE COURT:    Step forward please, sir.  Stand

22  at the table.  Raise your right hand.

23                        MARK PERRY

24  was thereupon produced as a witness on behalf of Defendant

25  and, having first been duly sworn to tell the truth, the whole

Perry  D    D8 16

1   truth and nothing but the truth, was examined and testified as

2   follows:

3           THE COURT:    Have a seat here, please.

4           Go ahead.

5                   DIRECT EXAMINATION

6   BY MS. McCREA:

7       Q.   Would you state your full name for the record and

8   spell your last, please?

9       A.   Mark Alan Perry, P-E-R-R-Y.

10      Q.   Mr. Perry, where do you live?

11      A.   Myrtle Point.

12      Q.   And what kind of work do you do?

13      A.   Electrician.

14      Q.   Do you know Nick McGuffin?

15      A.   No, I don't.

16      Q.   And in — at some point in past years did you own a

17  Mustang automobile?

18      A.   Yes, I did.

19      Q.   Do you remember when that was, approximately?

20      A.   I'd say about fifteen years ago.

21      Q.   About fifteen years ago?

22      A.   Yeah.

23           MS. McCREA:    And if I may have Exhibit 16,

24  please?

25      Q.   What color was it?

```
     D8 17                              Perry   D
```

1      A.    Light powder blue.

2      Q.    Do you remember what the license plate was, or part

3  of the license plate?

4      A.    I remember the "PEA" part.

5      Q.    It was - - -

6      A.    (Interposing) And if there was three letters, P-E-A.

7      Q.    Okay.  I'm showing you what's in evidence as

8  Exhibit 16.

9      A.    Yeah.  That looks like it, but they painted it.

10      Q.    So, it's a different paint job?

11      A.    Yeah.

12      Q.    Do you recognize the license plate?

13      A.    I recognize the "PEA."

14      Q.    And when you say "PEA," you mean the P-E-A?

15      A.    Yeah.

16      Q.    Okay.  All right.  And how long did you have the

17  car, Mr. Perry?

18      A.    Oh, probably about a year.

19      Q.    And it was a 1967?

20      A.    Yes.

21      Q.    Okay.  So, you had it for a year and when you owned

22  the car, did it have a liner in the trunk?

23      A.    No, it didn't.

24      Q.    And can you describe the car?  Was it a fancy model,

25  a basic model?

Perry   D     D8 18

1      A.   No.  It was a base model, very plain.

2      Q.   And did it have an automatic transmission?

3      A.   No.

4      Q.   Or a stick?

5      A.   Stick.

6      Q.   Standard transmission?

7      A.   Yeah.

8      Q.   And in terms of the trunk, was there anything else

9   that you remember about the car?

10     A.   Yes, that the gas tank was exposed.  It was kind of

11  strange.

12     Q.   Okay.  Why is that strange?

13     A.   Because I've always had Chevy's and Chevy's — they

14  have a front pan and then the gas tank is under them.

15     Q.   And how was it in this Mustang?

16     A.   The gas tank was the bottom of the trunk.

17     Q.   Okay.  And so anything else unusual about the trunk

18  or the gas tank?

19     A.   No.  It was a very nice car, very clean.

20     Q.   Okay.  And do you remember who you sold it to?

21     A.   No, I don't.

22     Q.   And I'm going to show you what's been marked for

23  identification as Defendant's Exhibit 153.  Does that appear

24  to be a copy of your Registration for the vehicle?

25     A.   Yeah.

```
     D8 19                                    Perry  X
```

1          MS. McCREA:    Did you want me to leave the

2   photo up there?

3          MR. FRASIER:    It's up to you.

4      Q.   Do you remember, Mr. Perry, whether or not the 1967

5   Ford Mustang had power steering?

6      A.   That one didn't have power steering.

7      Q.   It did not have power steering?

8      A.   Manual brakes, manual steering.

9      Q.   Okay.  Like you said, a pretty basic model?

10     A.   Just a base model.  Yeah.

11     Q.   Okay.  Thank you.

12         MS. McCREA:    That's all the questions I have,

13  Your Honor.

14         THE COURT:    Any cross?

15         MR. FRASIER:    Thank you, Your Honor.

16                    CROSS EXAMINATION

17  BY MR. FRASIER:

18     Q.   When you owned the car, what did — was there anything

19  kept in the trunk?

20     A.   No.  The trunk was empty when I had it.

21     Q.   Was there a spare tire?

22     A.   No.

23     Q.   Jack?

24     A.   No.

25     Q.   All right.  And what did you — when did you own this

```
                                          Perry  X     D8 20
```

1   car?

2        A.   I'd say about fifteen years ago.  I can't be

3   positive — fifteen, thirteen, fourteen — somewhere in there.

4        Q.   And was it prior to the disappearance of Leah

5   Freeman?

6        A.   Yes.

7        Q.   All right.  Now, in regards to the car, do you have

8   any idea what condition it was in at the time that Leah

9   Freeman disappeared?

10       A.   I don't know what it looked like then.  When I had

11  it, it was a very clean car.

12       Q.   Right.  But, you don't have any idea what the

13  condition was — you have no personal knowledge of what the

14  condition was?

15       A.   No.  Not at all.

16       Q.   All right.

17       A.   After I sold it, I never seen it again.

18       Q.   Thank you.

19            MR. FRASIER:   That's all the questions I

20  have.

21            THE COURT:   Anything else?

22            MS. McCREA:   No further questions.

23            THE COURT:   You may step down.  You are free

24  to leave.

25            WITNESS:   Okay.  Thank you.

```
    D8 21                              Richardson   D
```

 1                THE COURT:    Call your next witness.

 2                MS. McCREA:    Your Honor, we'd offer

 3    Defendant's 153.

 4                MR. FRASIER:    No objection.

 5                THE COURT:    Received.

 6                (Whereupon Defendant's Exhibit No. 153 was

 7    received into evidence.)

 8                MS. McCREA:    Ms. Bonk is checking on our next

 9    witness, Your Honor.

10                THE COURT:    Okay.

11                MS. McCREA:    Ellen Richardson.

12                THE COURT:    Raise your right hand, please.

13                    ELLEN MARIE RICHARDSON

14    was thereupon produced as a witness on behalf of Defendant

15    and, having first been duly sworn to tell the truth, the whole

16    truth and nothing but the truth, was examined and testified as

17    follows:

18                THE COURT:    Have a seat here, please.

19                Go ahead.

20                    DIRECT EXAMINATION

21    BY MS. McCREA:

22        Q.    State your full name and spell your last for the

23    record, please?

24        A.    Ellen Marie Richardson, R-I-C-H-A-R-D-S-O-N.

25        Q.    Ms. Richardson, where do you work?

Richardson   D    D8 22

1      A.   McKay's Market.

2      Q.   And which McKay's?

3      A.   Coquille.

4      Q.   I'm sorry?

5      A.   Coquille.

6      Q.   Coquille?  The one on North Central Boulevard?

7      A.   Correct.

8      Q.   And how long have you worked there?

9      A.   About twelve years.

10     Q.   Does that McKay's Market employ what are called

11 courtesy clerks?

12     A.   Yes.

13     Q.   And what do courtesy clerks do?

14     A.   Fill the pop and beer, mop the floors, sack

15 groceries, do the garbage, all kinds of the maintenance work.

16     Q.   All right.  And, generally, are they — do they tend

17 to be younger people?

18     A.   Yes.

19     Q.   Okay.  Like what age range?

20     A.   Oh, what?  Sixteen to eighteen.

21     Q.   Okay.  And has it been that way during the time that

22 you've worked at the McKay's Market?

23     A.   Yes.

24     Q.   And, typically, what work shifts do the courtesy

25 clerks work?

    D8 23                              Richardson   D

1        A.    4:00 to 9:00 p.m.

2        Q.    4:00 to 9:00 p.m.?  And that has been consistent

3   during the time that you've worked at McKay's Market?

4        A.    Correct.

5        Q.    And that would have been the shift that you observed

6   courtesy clerks working back in the year 2000?

7        A.    Correct.

8        Q.    Do you know what time — well, you probably do since

9   you've worked there for twelve years.  What time in — does

10  McKay's Market close?

11       A.    10:00.

12       Q.    10:00 p.m.?

13       A.    Correct.

14       Q.    And do you know, was that true back in the year

15  2000?

16       A.    I think so.  When I first started, I don't remember

17  if we closed at 10:00 or 10:30.

18       Q.    And, typically, did — well, I'm interested in the

19  year 2000, as best you know.  But, based on your experience,

20  do courtesy clerks work past the 9:00 p.m. — you know, the

21  4:00 to 9:00 shift?

22       A.    Maybe fifteen, twenty minutes, if they don't get

23  things done, they will stay over just to finish up.

24       Q.    But, they don't - - -

25       A.    (Interposing) But, they're not scheduled.

Richardson   X     D8 24

1     Q.   Not scheduled?

2     A.   Not scheduled.

3     Q.   Okay.  Very good.  Thank you.

4          MS. McCREA:    That's all the questions I have.

5          THE COURT:    Any cross?

6          MS. SOUBLET:    Just briefly.  Thank you, Your

7   Honor.

8                  CROSS EXAMINATION

9   BY MS. SOUBLET:

10    Q.   Ms. Richardson, didn't the McKay's used to be open

11  24 hours?

12    A.   If it had, it was not while I was there.

13    Q.   And you have no specific knowledge of Corey Bryant's

14  work schedule on June 28, 2000?

15    A.   No.

16    Q.   Thank you.

17         MS. SOUBLET:    Nothing further.

18         MS. McCREA:    No further questions, Your

19  Honor.

20         THE COURT:    You may step down.  You are free

21  to leave.

22         WITNESS:    Thank you.

23         THE COURT:    Call your next witness.

24         MS. McCREA:    Lyndee Stidham, Your Honor.

25         THE COURT:    Raise your right hand, please.

```
   D8 25                                      Stidham   D
```

1          <u>LYNDEE STIDHAM</u>

2    was thereupon produced as a witness on behalf of Defendant

3    and, having first been duly sworn to tell the truth, the whole

4    truth and nothing but the truth, was examined and testified as

5    follows:

6              THE COURT:   Have a seat up here, please.

7              <u>DIRECT EXAMINATION</u>

8    <u>BY MS. McCREA:</u>

9        Q.   Would you state your name for the record and spell

10   your last name, please?

11       A.   Lyndee Stidham, S-T-I-D-H-A-M.  It is formerly

12   Lyndee Kindred.

13             THE COURT:   Formerly Lyndee what?

14             WITNESS:   Kindred.

15             THE COURT:   Thank you.

16       Q.   And, Ms. Stidham, where do you live?

17       A.   Medford.

18       Q.   Did you — did you ever live in Coquille?

19       A.   Yes.

20       Q.   Did you graduate from high school here?

21       A.   Yes, in 2001.

22       Q.   2001?

23       A.   Uh huh.

24       Q.   So, in the year 2000 how old were you?

25       A.   Seventeen.

Stidham    D    D8 26

1    Q.    And do you know Nick McGuffin?

2    A.    Yes.

3    Q.    And how do you know him?

4    A.    We were friends.

5    Q.    And you knew him in school?

6    A.    Uh huh.

7    Q.    Did you know Leah Freeman?

8    A.    Yes.

9    Q.    And were you friends with her, as well?

10    A.    Not really.

11    Q.    Okay.

12    A.    I knew who she was, but we never hung out.

13    Q.    So, I want to draw your attention to June 28, 2000.

14   Were you involved in any kind of theater activity that night?

15    A.    Yeah, Sawdusters.  I had practice.

16    Q.    And can you tell us just a little bit about that?

17    A.    It was from 7:00 to 9:00.  I typically left there

18   about 9:00, 9:15-ish.

19    Q.    Okay.  So - - -

20    A.    (Interposing) Or a little later.

21    Q.    So, okay.  So, you had practice from 7:00 to 9:00?

22    A.    Uh huh.

23    Q.    And then once practice was over, you would leave

24   there?

25    A.    Yeah.

```
     D8 27                                    Stidham  D
```

1      Q.   And that would be located downtown here?

2      A.   Yes.

3      Q.   And where did you live at the time?

4      A.   Up in Sanford Heights.

5      Q.   And would that have been on West Ninth?

6      A.   Yes.

7      Q.   And so in order to get home, would you travel on

8   North Central and then up Knott Street?

9      A.   Up Knott Street.  Correct.

10     Q.   Okay.  And so were you at practice that night on

11  June 28th?

12     A.   Yes, I was.

13     Q.   And then when you left practice, did you go home?

14     A.   Yes.

15     Q.   And when you were going home, did you encounter

16  anyone?

17     A.   I talked to Nick between 9:30, 9:45-ish, up by where

18  she was living on Knott Street.

19     Q.   And when you say "she" you mean Leah Freeman?

20     A.   Yeah.

21     Q.   Okay.  And was he with anybody?

22     A.   You know, I don't have a real clear memory of that

23  night.  I remember an encounter with him a couple days later

24  more.

25     Q.   Okay.

Stidham   D    D8 28

1      A.   But, I don't remember him being with anyone.

2      Q.   And do you remember what car — what kind of car he

3  was driving?

4      A.   I don't remember it.  But, according to my statement

5  before, he had his Mustang.

6      Q.   His Mustang?

7      A.   Yeah.

8      Q.   Okay.  And do you remember his demeanor?

9      A.   Not from that night.  I remember saying that he just

10 asked - - -

11          MS. SOUBLET:   (Interposing) Objection.

12     A.   I'm sure it was just a quick encounter.

13          MS. SOUBLET:   Objection.  Hearsay.

14     Q.   Are you remembering - - -

15          MS. McCREA:   I'll go onto another question,

16 Your Honor.

17          THE COURT:   Okay.  It just depends on what

18 she's saying.

19          MS. McCREA:   Well, - - -

20          THE COURT:   (Interposing) It may be state of

21 mind, it may not be.

22     Q.   You saw him the night of June 28th?

23     A.   Yes.

24     Q.   And what was he doing?

25     A.   He had stopped me up by her house — up by Leah's

```
   D8 29                                    Stidham   D
```

 1   house and asked if I had seen her walking home.  And I told

 2   him no.

 3                  MS. SOUBLET:    Objection.  Hearsay.

 4                  MS. McCREA:    Well, - - -

 5                  THE COURT:    (Interposing) No.  That, I think,

 6   goes within the state of mind exception.  It's not really —

 7   it's offered to say what he was thinking, not the substance of

 8   it, itself, other than to say what he was thinking at the

 9   time.

10                  So, go ahead.

11                  MS. McCREA:    Okay.

12        Q.   So, he made an inquiry of you of whether you had

13   seen Leah Freeman?

14        A.   He asked if I had.

15        Q.   Okay.  Had you seen her?

16        A.   No, I did not see her walking home that night.

17        Q.   Did you communicate that to him?

18        A.   I'm sure I did.  Yeah.

19        Q.   Okay.  I know it's been a long time.  And you

20   indicated that you saw him again a day later, or a couple of

21   days later?

22        A.   Yeah.  I'm not sure if it was the day after or a

23   couple days later.  I remember running into him and her — and

24   Leah's sister, Denise, at — it used to be Dairy Queen.  I

25   think it was Hunter's at the time.

Stidham   X    D8 30

1    Q.   And is that when you noticed Nick's demeanor that

2 you remember?

3    A.   That he was concerned.  Yes.

4    Q.   He was — and did he indicate what he was concerned

5 about?

6    A.   He was just asking if I had seen her and was

7 concerned that she was missing.

8    Q.   And, again, we're talking about Leah Freeman?

9    A.   Yes.

10    Q.   Okay.  All right.  Thank you.

11            MS. McCREA:    That's all the questions I have.

12            WITNESS:    Okay.

13            THE COURT:    Cross.

14            MS. SOUBLET:    Just briefly, Your Honor.

15                    <u>CROSS EXAMINATION</u>

16 BY MS. SOUBLET:

17    Q.   Ms. Stidham, do you actually remember this, or are

18 you basing it on reading your statement?

19    A.   No.  I remember talking to him at Hunter's.  I don't

20 have a clear memory of talking to him up on Knott Street.

21    Q.   And, in fact, didn't you tell Ms. Bonk that your

22 memory was foggy?

23    A.   Yes.

24    Q.   Thank you.

25            MS. SOUBLET:    Nothing further.

```
     D8 31                                    Stidham  ReD
```

 1          MS. McCREA:    Well, let me just touch on that.

 2                    <u>REDIRECT EXAMINATION</u>

 3   <u>BY MS. McCREA:</u>

 4     Q.   You — you — you do remember running into Nick the

 5   night — or, do you remember running into Nick the night that

 6   Leah Freeman disappeared?

 7     A.   I don't necessarily remember it.  I remember telling

 8   my parents that I had seen him, but I don't remember the

 9   encounter with him, necessarily.

10     Q.   Okay.

11     A.   But, I know I did have theater and left there and —

12   I mean, I know I had practice that night.

13     Q.   And you made a statement back in 2000, is that

14   right?

15     A.   Yes.

16     Q.   About this?

17     A.   Yeah.  And my statement would have been accurate.

18     Q.   Yeah.  July 7, 2000, to Sheriff Zanni?

19     A.   Okay.

20     Q.   And you've had a chance to look at that statement?

21     A.   Briefly.

22     Q.   Do you want to look at it again to see if it

23   refreshes your recollection?

24     A.   I did see it.  Yeah.

25     Q.   Okay.  So, what you're telling us is your memory

```
                                 Quackenbush  D    D8 32
```

1   then is better than your memory now?

2        A.   Yeah.  It's been eleven years.

3        Q.   Right.  Understandably.  Okay.

4        A.   And I saw him up on Sanford Heights quite a bit.

5   So, seeing him up there again wasn't necessarily a uncommon

6   thing.

7        Q.   Okay.  All right.  Thank you very much.

8                  WITNESS:   Okay.

9                  MS. McCREA:    May she be excused?

10                 THE COURT:   You may step down.  You are free

11  to leave.

12                 MS. McCREA:    Thank you, Your Honor.

13                 Defense calls Steve Quackenbush.

14                 THE COURT:   Raise your right hand, please.

15                       STEVE QUACKENBUSH

16  was thereupon produced as a witness on behalf of Defendant

17  and, having first been duly sworn to tell the truth, the whole

18  truth and nothing but the truth, was examined and testified as

19  follows:

20                 THE COURT:   Have a seat here, please.

21                     DIRECT EXAMINATION

22  BY MS. McCREA:

23       Q.   Would you state your name for the record, please?

24       A.   Steve Quackenbush.

25       Q.   Mr. Quackenbush, where do you live?

```
      D8 33                            Quackenbush   D
```

1     A.   Greenacres.

2     Q.   How long have you lived there?

3     A.   About twelve years.

4     Q.   And what kind of work do you do?

5     A.   I drive a truck for Pepsi.

6     Q.   For Pepsi?

7     A.   Yes.

8     Q.   Do you know someone named Corey Bryant?

9     A.   Yes.  He's my nephew.

10    Q.   He's your nephew?   Was he living with you back in

11 June of 2000?

12    A.   Yes.

13    Q.   And where was he working?

14    A.   McKay's.

15    Q.   And that would be the McKay's Market on Central

16 Boulevard?

17    A.   Yes, in Coquille.

18    Q.   In Coquille?  Thank you.  And what kind of a car did

19 Corey Bryant have back in June of 2000, if he had a car?

20    A.   I believe it was a little Nissan pickup.

21    Q.   A Nissan pickup?  Do you remember what year?

22    A.   I do not.

23    Q.   Do you remember what color it was?

24    A.   I believe it was brown.

25    Q.   Brown?  Okay.  And at the time in June of 2000 Corey

Quackenbush  D     D8 34

1  Bryant was dating Sherry Mitchell?

2      A.   As far as I know, yes.

3      Q.   Okay.  And Corey was working at McKay's as a

4  courtesy clerk?

5      A.   I believe so.

6      Q.   Do you remember what shifts he would work?

7      A.   I'm not sure.

8      Q.   You're not sure?

9      A.   Nuh-uh.

10     Q.   Okay.  All right.  Thank you.

11               MS. McCREA:    That's all the questions I have.

12               THE COURT:    Mr. Frasier, do you have any

13  questions — cross?

14               MS. SOUBLET:   No, Your Honor.  Thank you.

15               THE COURT:    You may step down.  You are free

16  to leave.

17               MS. McCREA:    Call Margaret Downs.

18               MR. FRASIER:   Your Honor, I haven't received

19  any discovery from the defense on this witness.  Do they have

20  a statement?

21               THE COURT:    I don't know.

22               MS. McCREA:    We do have a statement, and I

23  thought that had been provided to Mr. Frasier.

24               THE COURT:    Well, if you have it, give it to

25  him.  He says he doesn't have it.  I don't know whether he

```
   D8 35                                    Buehner   D
```

1  does, or not.

2              MS. McCREA:    And I will have to obtain that

3  from Ms. Bonk, Your Honor.

4              MR. FRASIER:    I was looking high and low for

5  something last night, but I could not find anything.

6              MS. McCREA:    Well, I apologize, Mr. Frasier.

7              THE COURT:    Ms. Bonk, Mr. Frasier says he

8  doesn't have a copy of this report, so if you have one, he

9  needs to have it.

10              (Whispered conversation.)

11              MS. McCREA:    Thank you, counsel.  I thought I

12  had provided a copy.

13              THE COURT:    Does the State have one?

14              MS. McCREA:    The State was given one, but

15  they're not sure where it is.  We're going to provide them

16  another one.

17              THE COURT:    Okay.

18              Raise your right hand please, ma'am.

19                   MARGARET BUEHNER

20  was thereupon produced as a witness on behalf of Defendant

21  and, having first been duly sworn to tell the truth, the whole

22  truth and nothing but the truth, was examined and testified as

23  follows:

24              THE COURT:    Have a seat here, please.

25              Go ahead.

Buehner   D     D8 36

1                    DIRECT EXAMINATION

2    BY MS. McCREA:

3        Q.   Would you state your name for the record, please?

4        A.   Margaret Elizabeth Buehner.

5        Q.   And you used to be known as Margaret Downs?

6        A.   Yes.

7        Q.   And where do you live?

8        A.   Um - - -

9        Q.   (Interposing) Currently?

10       A.   On 58 West Fifth Street, Coquille.

11              THE COURT:   Could you spell your last name?

12              WITNESS:   B — my last name now?

13              THE COURT:   Yes.

14              WITNESS:   B-U-E-H-N-E-R.

15              THE COURT:   Thank you.

16              Go ahead.  I'm sorry.

17       Q.   And so you live in Coquille at the current time.

18   Did you grow up here?

19       A.   Yes.

20       Q.   And what kind of work do you do?

21       A.   Um, I am unemployed right now.  I'm actually

22   disabled.

23       Q.   And what - - -

24       A.   (Interposing) But, previously I worked in the

25   medical field.

```
     D8 37                                    Buehner   D
```

1    Q.   And were you affiliated with the military?

2    A.   Yes.  I was in the Army for five years as a medic.

3    Q.   Now, do you know Nick McGuffin, - - -

4    A.   (Interposing) Yes.

5    Q.   - - - seated here next to me?

6         How do you know him?

7    A.   Um, from high school.

8    Q.   And how long have you known him?

9    A.   Um, at least from high school.

10   Q.   Okay.  Okay.  Is he somebody that you've socialized

11   with over the, you know, the current time, or were you just

12   friends in high school?

13   A.   Um, we were friends in high school and I haven't

14   really talked to him since then.  I left for the Army.

15   Q.   You left for the Army after high school?

16   A.   Yeah, right after high school.

17   Q.   And what year did you graduate?

18   A.   In 2002.

19   Q.   Okay.  So, during the time that you knew Nick

20   McGuffin in high school, did you guys hang out together?

21   A.   Um, not a lot.

22   Q.   Okay.  Now, drawing your attention — well, let me

23   ask you this.  Did you know Leah Freeman?

24   A.   Yes.

25   Q.   And were you friends with her?

Buehner   D     D8 38

1      A.    I was really good friends with her sister.

2      Q.    With Denise?

3      A.    Denise.  Yeah.

4      Q.    Okay.  Now, drawing your attention to June 28, 2000,

5  do you remember if you were working that day?

6      A.    I was.

7      Q.    And where did you work?

8      A.    I worked at the Mexican restaurant in Coquille.  I

9  don't remember the name of it at the time.

10     Q.    Was it near the laundromat?

11     A.    Yes.

12     Q.    Okay.  And do you remember about what time you got

13  off work that night?

14     A.    I believe I got off work at 9:00.

15     Q.    And where did you go?

16     A.    I — well, first I went to my house, which was where

17  the liquor store used to be.

18     Q.    Okay.

19     A.    And my door was locked and so I walked to Fast Mart.

20     Q.    Walked to Fast Mart?

21     A.    Yes.

22     Q.    And when you went to Fast Mart — how long — about

23  how long do you think you spent at Fast Mart, if you remember?

24     A.    Um, probably a couple of hours.

25     Q.    So, you were hanging out there?

```
   D8 39                                    Buehner   D
```

1        A.    Yeah.

2        Q.    Were you hanging out there with anybody?

3        A.    Um, not with anyone in particular.  There was just a

4   group of people there.

5        Q.    It was kind of a local hangout at the time?

6        A.    Yes.

7        Q.    So, during the time that you were at Fast Mart, did

8   you see Nick McGuffin?

9        A.    Yes.

10       Q.    This was on June 28th - - -

11       A.    (Interposing) Yes.

12       Q.    - - - of 2000?  Okay.

13             And tell us about your observations of Mr. McGuffin?

14       A.    Um, I saw him.  He stopped at Fast Mart one time and

15   I didn't speak to him.  He spoke to somebody else.  And I

16   heard through other people that were there - - -

17             MR. FRASIER:    (Interposing) Objection.  Calls

18   for hearsay.

19             THE COURT:    Sustained.

20             You can't testify to what other people told

21   you.  So, don't mention what other people told you.

22             Go ahead.

23       Q.    So, you saw him stop at Fast Mart.  He was talking

24   to other people?

25       A.    Yes.

```
                                    Buehner   D     D8 40
```

 1     Q.   Did you notice his demeanor when he was talking to

 2   the other people?

 3     A.   Um, no.  He was in his car and I wasn't really close

 4   to it.

 5     Q.   Do you remember what car he was driving?

 6     A.   Uh, a blue Mustang.

 7     Q.   Okay.  Did he stay at Fast Mart a long time or a

 8   short time?

 9     A.   A short time.

10     Q.   Did he appear to be on an errand?

11     A.   Yes.

12     Q.   Did he appear that he was looking for someone?

13     A.   Yes.

14     Q.   Did you overhear what he was saying to anyone else?

15     A.   No.

16     Q.   Okay.  Then did you see him some other times that

17   night?

18     A.   Yes.

19     Q.   And tell us about that?

20     A.   I saw him drive by in the same vehicle at least two

21   more times.

22     Q.   Drive by Fast Mart?

23     A.   Yes.

24     Q.   When you saw him the first time, do you remember

25   approximately what time it was?

```
   D8 41                                Buehner   D
```

1        A.   No.

2        Q.   Okay.  And what about the other two times you saw

3   him?

4        A.   I don't remember.

5        Q.   But, it was within this period of two hours that you

6   were at Fast Mart that night?

7        A.   Yes.

8        Q.   Okay.  Now, when he drove by the other two times,

9   you've indicated he was in the same car.  That would be the

10  Mustang?

11       A.   Yes.

12       Q.   Did you ever see anyone with him?

13       A.   No.

14       Q.   Then the next day, were you involved in any contact

15  with Mr. McGuffin?

16       A.   Yes.

17       Q.   And tell us about that?

18       A.   Um, actually Denise called me in the morning and

19  told me that her - - -

20            MR. FRASIER:   (Interposing) Objection.  Calls

21  for hearsay.

22            THE COURT:   You can't testify to what other

23  people told you.

24       Q.   Denise called you and as a result of her call, did

25  you go somewhere?

Buehner   D      D8 42

1       A.   I went to her house.

2       Q.   All right.  And then did you contact — did you

3   encounter Mr. McGuffin there?

4       A.   Yes, I did.

5       Q.   And did the three of you go anywhere to do anything?

6       A.   Uh, yes.  The three of us went to look for Leah.

7       Q.   All right.  And what kinds of places did you go

8   looking for her?

9       A.   Um, we went — we went everywhere.

10      Q.   Okay.

11      A.   We talked to a lot of people, asked a lot of people

12  if they had seen her, heard from her.  I don't really know

13  what else to say.

14      Q.   What was — what was Mr. McGuffin's demeanor like?

15      A.   He was upset.  He was distraught.

16      Q.   And were you in his company — this would have been

17  June 29th.  Were you in his company after June 29th?

18      A.   Yes.

19      Q.   And was that a continuous thing?  In other words,

20  did you stay with him, or did you see him periodically?

21      A.   I was with him every day and, um, sometimes

22  overnight.

23      Q.   And when you say "sometimes overnight," where were

24  you staying?

25      A.   At his parents' house.

```
   D8 43                              Buehner   D
```

1      Q.   And were you staying in the same room with

2   Mr. McGuffin?

3      A.   No.

4      Q.   And did his parents know you were there?

5      A.   Yes.

6      Q.   And why were you staying there?

7      A.   Um, really just for support.

8      Q.   Okay.  Were you concerned about Mr. McGuffin's state

9   of mind?

10      A.   I was.

11      Q.   Was he eating?

12      A.   Not much.

13      Q.   Was he — to what you observed, was he sleeping

14   normally?

15      A.   Um, I'm not sure.

16      Q.   Do you remember how many times or how many nights

17   you stayed at the McGuffin residence?

18      A.   I don't remember.

19      Q.   Were there also nights when you stayed at the

20   Freeman residence?

21      A.   Yes.

22      Q.   With your friend, Denise?

23      A.   Yes.

24      Q.   All right.  And the reason for this contact — was

25   that because of Leah's disappearance?

Buehner    D    D8 44

1        A.    Yes.

2        Q.    And, as you say, for support?

3        A.    Yes.

4        Q.    Did the three of you do anything concerning putting

5    up missing posters?

6        A.    Yes.

7        Q.    And tell us about that?

8        A.    Um, Denise actually went to my mom's office to make

9    flyers and we posted flyers all over — all over Coquille in

10   businesses, anywhere we could.

11       Q.    When you say "we," who are you talking about?

12       A.    Uh, myself and Denise and Nick.

13       Q.    Okay.  Now, as the days went by from June 28th, did

14   you notice any change in Nick McGuffin's demeanor?

15       A.    He was just upset the whole time.  I mean, he seemed

16   concerned about his missing girlfriend.

17       Q.    Did he seem to become more concerned or less

18   concerned?

19       A.    More concerned.

20       Q.    Okay.  Anything else that you noticed?

21       A.    Um, not that I can think of.

22       Q.    I know it's been a long time.  Let me ask you this.

23   Do you have any recollection of Mr. McGuffin going out of town

24   to follow up on a lead of a sighting of Leah Freeman?

25                MR. FRASIER:    Well, Your Honor, I'm going to

```
    D8 45                                      Buehner   X
```

1   object to that.  That's going to call for hearsay and that

2   clearly is not state of mind.

3              THE COURT:    Sustained.

4              MS. McCREA:    That's all the questions I have.

5   Q.   Thank you.

6              THE COURT:    Cross?

7              MR. FRASIER:    Yes, Your Honor.

8                   <u>CROSS EXAMINATION</u>

9   <u>BY MR. FRASIER:</u>

10  Q.   Ma'am, you indicated that you were working at the

11  Mexican restaurant that night, June 28th?

12  A.   Yes.

13  Q.   And then you — after you got off work, you went to

14  Fast Mart?

15  A.   Yes.

16  Q.   And why did you go to Fast Mart?

17  A.   Um, to find someone to buy me a pack of cigarettes.

18  Q.   Okay.  Were you going there to meet anybody?

19  A.   Um, I was just going there to meet up with people.

20  There was a guy that I was dating at the time and he was

21  usually there.

22  Q.   Okay.  And so you wanted to meet up with the guy you

23  were dating?

24  A.   Yes.

25  Q.   And so you were looking for him more than you were

Buehner    X     D8 46

1  looking for Mr. McGuffin, right?

2      A.   Um, after I got there, we were all just hanging out

3  there.

4      Q.   Okay.  But, were you hanging out with your

5  boyfriend, the person you were dating with?

6      A.   Um, there were several people there that we were

7  hanging out with.

8      Q.   Well, were you hanging out with your boyfriend?

9      A.   Yes.

10     Q.   All right.  And were you paying attention to him,

11 weren't you?

12     A.   Um, I'm sure I was.

13     Q.   And would it be fair to say you were concentrating

14 more on your boyfriend than you were on other people?

15     A.   No.

16     Q.   No?

17     A.   No.

18     Q.   Why not?

19     A.   Um, there was a lot going on and I guess that's just

20 not really how I am.

21     Q.   And there was a lot going on?  Well, let me put it

22 to you this way.  Did you go to the Fast Mart with the

23 particular idea in mind you were going to keep track of Nick

24 McGuffin?

25     A.   No.

```
   D8 47                              Buehner   X
```

1      Q.   All right.  And so that wasn't your purpose that

2   night, was it, to keep track of Mr. McGuffin?

3      A.   No.

4      Q.   All right.  No, you indicated that you, the next

5   day, spent some time with Mr. McGuffin.  Is that correct?

6      A.   Yes.

7      Q.   And did you go various places with him?

8      A.   Yes.

9      Q.   Did you go out to like the boat dock by one of the

10  parks here in the Coquille area?

11     A.   Uh, possibly.

12     Q.   Do you recall meeting with Sherry Mitchell and Corey

13  Bryant?

14     A.   Yes.

15     Q.   All right.  Do you recall going up to the Haga

16  place?

17     A.   I don't know where that is.

18     Q.   Okay.  Do you know who Brent Bartley is?

19     A.   Um, yes.

20     Q.   And do you know where his grandparents live?

21     A.   No.

22     Q.   Do you recall going to a party on the evening of

23  June 29th with Mr. McGuffin?

24     A.   No.

25     Q.   Okay.  Do you recall going to — let me look here.

```
                                      Buehner   X    D8 48
```

1   Just a second.

2       Did you go to any type of party where there was

3   about ten people in attendance?

4       A.   No.

5       Q.   All right.  And so you did not stay at a party with

6   Mr. McGuffin for about 30 minutes?

7       A.   No.

8       Q.   Now, during the time frame that you were with

9   Mr. McGuffin, it's your testimony that he was concerned about

10  what was going on in regards to Ms. Freeman?

11      A.   Yes.

12      Q.   You indicated he was not eating well?

13      A.   Yes.

14      Q.   Was he doing any drugs in your presence?

15      A.   No.

16      Q.   Now, when you say Mr. McGuffin was concerned about

17  Leah being missing, isn't it true you are basing that on what

18  the Defendant told you?

19      A.   I'm basing that on his actions and the emotion that

20  I saw from him.

21      Q.   Okay.  You saw him being emotional?

22      A.   Yes.

23      Q.   You saw him being concerned?

24      A.   Yes.

25      Q.   Would not those same emotions be present if he had

D8 49                                    Buehner   ReD

1    killed her?

2        A.   Um, I don't know.

3        Q.   So, would it be safe to say you don't really know

4    what he was concerned about, do you?

5        A.   Um, I don't know what he was concerned about.

6        Q.   Thank you.

7             MR. FRASIER:   That's all I have.

8             THE COURT:   Cross — redirect, excuse me.

9                    REDIRECT EXAMINATION

10   BY MS. McCREA:

11       Q.   Did Mr. McGuffin say words that caused you to form

12   an opinion about what he was feeling?

13       A.   Yes.

14       Q.   Did he take - - -

15            MR. FRASIER:   (Interposing) Well, I'm going

16   to object.  I think that's an improper opinion.

17            MS. McCREA:   Well, - - -

18            THE COURT:   (Interposing) Well, the question

19   was, "Did he say words?" and that wouldn't call for an

20   opinion.  She can say whether he said words.

21            Now, what's your next question?

22       Q.   Did he take actions?  Were his actions consistent

23   with what he was saying to you?

24       A.   Um, I'm not quite sure I understand.

25       Q.   Okay.  Let me ask you a different question.

```
                                    Buehner   ReD   D8 50

 1        A.   Okay.

 2        Q.   So, you're with Mr. McGuffin for — how — how many

 3   days were you with him everyday?

 4        A.   Um, about a week.

 5        Q.   Okay.  About a week.  And during that period of a

 6   week, did he consistently search for Leah Freeman?

 7        A.   Yes.

 8        Q.   Were the things that he said to you during that time

 9   consistent with him searching for Leah Freeman?

10        A.   Yes.

11        Q.   Were the actions that he took during that time

12   consistent with him searching for Leah Freeman?

13        A.   Yes.

14        Q.   Everything — did everything he said appear that he

15   wanted to find her?

16        A.   Yes.

17        Q.   Did everything he said appear that he didn't know

18   where she was?

19        A.   Yes.

20        Q.   Did he give you any indication otherwise?

21        A.   No.

22        Q.   And in terms of the things that he did and the

23   places that he went, did he appear to be genuinely looking for

24   her?

25        A.   Yes.
```

D8 51                                      Buehner  ReX

1    Q.   Did you have any doubt about his sincerity?

2              MR. FRASIER:   Well, I'll object to that.

3    That's improper.  What her impression is, is not relevant.

4              THE COURT:   She's described what he was

5    doing.  I think that's sufficient.

6              Sustained.

7    Q.   And you don't have any recollection of having gone

8    to a party?

9    A.   No.

10   Q.   Okay.  If — that's fine, then.  That's fine.  Thank

11   you very much.

12             MS. McCREA:   Nothing further, Your Honor.

13             THE COURT:   You may step down.

14             MR. FRASIER:   Your Honor, I have one follow-

15   up question.

16             THE COURT:   Okay.  Go ahead.

17                  <u>RECROSS EXAMINATION</u>

18   <u>BY MR. FRASIER:</u>

19   Q.   The actions you saw, would they also be consistent

20   with someone trying to cover up that they murdered someone?

21             MS. McCREA:   Well, I object.  That calls for

22   speculation on the part of the witness.

23             MR. FRASIER:   Well, - - -

24             THE COURT:   (Interposing) Sustained.

25             You can step down.  You are free to leave.

D8 52

1           WITNESS:    Thank you.

2           MS. McCREA:    May we approach, Your Honor?

3           THE COURT:    Yes.

4           (Bench conference, not recorded.)

5           THE COURT:    One witness that they have — I

6    think they're going to call Mr. Meneely and he is not present.

7               He is on his way?  Do you know?

8           MS. McCREA:    I believe he is on his way.

9    Yes, Your Honor.

10          THE COURT:    Okay.

11              Then we'll take a recess until Mr. Meneely gets

12   here.  So, you can step into the jury room.  Remember the

13   admonition.  Take your notes.

14              (Jury out.)

15          THE COURT:    Mr. Meneely will be a witness.

16   And, as I understand, other than two witnesses who are coming

17   from out of state, the only witnesses that would then be left

18   for the defense would be Mr. McGuffin, possibly, and his

19   mother, possibly.

20              And Mr. Frasier has rebuttal of Ms. Wilcox.

21              And we had a conference here and I had

22   indicated that I wasn't going to recess for the entire day for

23   Monday to wait for two witnesses, and then have Mr. McGuffin

24   decide whether he was going to testify.  And I'm not too sure

25   he's not - - -

D8 53

1                    Why are you not prepared today?  This case was

2    set and postponed.

3                    MS. McCREA:    Your Honor, one of the reasons

4    we're not prepared is because we made a request to see

5    Mr. McGuffin on Sunday and the jail would not allow us to see

6    him.  Now, we spent significant time with him last night.

7    We've made arrangements with Corporal Dennis to see him again

8    this weekend.  But, the State only rested - - -

9                    THE COURT:    (Interposing) Wait a minute.  Who

10   denied you access to Mr. McGuffin this weekend?

11                   MS. McCREA:    Whoever was in command at the

12   jail on Sunday.

13                   THE COURT:    Find out who, please.  Can you

14   find out who did that?

15                   Well, we have several hours today, too.  I

16   mean, I understand preparation goes on and I'm concerned about

17   the jail denying you access.  If I would have known that, that

18   would not have happened.  In fact, I'm not too sure I knew

19   they were doing that sort of thing.

20                   MS. McCREA:    Well, Corporal Dennis has been

21   very cooperative in assisting us with access as a result of

22   that.

23                   THE COURT:    Right.

24                   MS. McCREA:    And what I'm indicating to the

25   Court is our intention is not to necessarily delay the

D8 54

1  proceedings.  However, the State just rested yesterday.

2              THE COURT:    Correct.

3              MS. McCREA:    And we have been, I submit,

4  proceeding with all diligence.  And the intention here is not

5  to call extraneous witnesses to fill up the time.

6              THE COURT:    And I appreciate that.

7              MS. McCREA:    And we want to make sure we

8  provide Mr. McGuffin with effective assistance of counsel.

9              THE COURT:    And I think — and I think you've

10 been clearly doing that.  What I'm telling you is that between

11 now and Mr. Meneely coming, and now and some time this

12 afternoon — Mr. Meneely, I assume, isn't going to be very

13 long?

14             MS. McCREA:    I would not anticipate him to be

15 very long.

16             THE COURT:    Okay.  Then I think you have

17 probably plenty of time, and I'll hear you afterwards.  But,

18 in the meantime, I want counsel to be talking to Mr. McGuffin

19 today to see whether or not that can be there.  Because, I

20 don't know, you talked to him for what, two hours yesterday?

21             MS. McCREA:    We talked to him for almost

22 three hours yesterday.

23             THE COURT:    And, as I said, the case — I'm

24 sure you were prepared at the time we postponed it — at the

25 time we had to postpone it.  But, I would still ask you to

D8 55

1  talk to Mr. McGuffin and start preparing him for today.

2              And I do want to find out who did that.  That —

3  counsel should not be denied access, unless there's some

4  emergency over there.

5              VOICE:    Your Honor, I looked into it

6  yesterday and I've been unable to find the time frame that she

7  was there and find out who it was.

8              THE COURT:    Well, find it out and report it

9  to me, because Ms. McCrea is an officer of the Court and I'm

10  sure she was there trying to contact her client.

11             MS. McCREA:    I called from Eugene to make the

12  request and was told that the person I spoke with checked with

13  whoever was in command, and indicated that we could not come

14  over and have access Sunday night.  So, I made arrangements to

15  see Mr. McGuffin at 8:00 Monday morning.

16             THE COURT:    In the meantime, please do what I

17  requested.

18             We'll be in recess until Mr. Meneely comes.

19                      (RECESS)

20         (Jury in.)

21             THE COURT:    Be seated, please.

22             Mr. Meneely, if you'd step forward, please?  I

23  think I excused you, so I'm going to swear you again.

24                      <u>KENN MENEELY</u>

25  was thereupon again produced as a witness on behalf of

Meneely    D    D8 56

1  Defendant and, having first been duly sworn to tell the truth,

2  the whole truth and nothing but the truth, was examined and

3  testified as follows:

4           THE COURT:   Have a seat here, please.

5           Go ahead, please.

6                   <u>DIRECT EXAMINATION</u>

7  <u>BY MS. McCREA:</u>

8      Q.   Mr. Meneely, would you state your name again for the

9  record, please?

10     A.   Kenn Meneely, M-E-N-E-E-L-Y.

11     Q.   You were asked yesterday about a report that you

12  made?

13     A.   Correct.

14     Q.   And you made a report on June 23, 2011 concerning

15  your examination of the clothing and shoes of Leah Freeman for

16  this case?

17     A.   Yes.

18     Q.   Who was that report made for?

19     A.   The defense team, you might say.

20     Q.   That would be me and my father?

21     A.   Correct.

22     Q.   And who was the report provided to?

23     A.   (No response.)

24     Q.   It was provided to us, wasn't it?

25     A.   It was provided to you, basically.

```
   D8 57                              Meneely   D
```

1     Q.   And then you didn't directly provide your report to

2  the District Attorney?

3     A.   No.

4     Q.   That was a decision made by the defense team — the

5  counsel?

6     A.   I believe so.

7     Q.   All right.  And the report was a compilation of your

8  observations of the clothing and the shoes?

9     A.   Correct.

10    Q.   In addition to the report, did you create a compact

11 disk — a CD of the photographs that you took of the clothes

12 and the shoes?

13    A.   Yes.

14    Q.   And how many — approximately how many photographs

15 were on that CD?

16    A.   (No response.)

17    Q.   Well, there were a lot of photographs, weren't

18 there?  Maybe 70 or so?

19    A.   I can only say approximately 50 to 70.  I'm just not

20 certain.  I took a lot of photographs.

21    Q.   You were present when Kathy Wilcox testified?

22    A.   Yes.

23    Q.   And do you remember her saying that she had looked

24 at your report?

25    A.   Yes.

Meneely   D     D8 58

1    Q.   And the only report that you made was this report on

2    June 23, 2011?

3    A.   Yes.

4    Q.   Mr. Meneely, I'm going to show you what's been

5    marked for identification as Defendant's Exhibit 154.  Do you

6    recognize that?

7    A.   This is a copy of my report.

8            MS. McCREA:   We'd offer Defendant's

9    Exhibit 154, Your Honor.

10           MR. FRASIER:   Your Honor, I'm not sure what

11   the relevancy of the report is.  It would also be cumulative

12   of his testimony.

13           THE COURT:   That's correct.

14           Sustained.

15   Q.   Mr. Meneely, in terms of your report, as to

16   Item 213, the tank top shirt, in your discussion about Area 1,

17   was your observation as set out, concerning that matter,

18   complete?

19   A.   As far as my testimony goes?

20   Q.   Yeah.  And as far as your observation goes?

21   A.   I gave a complete description of Area 1, which is

22   the upper left quadrant that we were discussing yesterday.

23   And I described holes in that area and several were frayed.  I

24   believe we discussed that.  And then we also further discussed

25   the microscopic characteristics which, I believe, I included a

```
     D8 59                                Meneely   D
```

1  sharp instrument and the dimensions of that.  So, I believe

2  that was complete.

3       Q.   Okay.  So, what you said was there was a hole that

4  showed microscopic characteristics consistent to a sharp

5  instrument?

6       A.   Correct.

7       Q.   And is sharp instrument a term of art among forensic

8  scientists?

9       A.   I'm not sure what you call a "term of art".  That's

10  a definition that forensic scientists commonly use to equate

11  to such things as knives or perhaps even a scissor.

12       Q.   Okay.  And you gave a size of the hole that you were

13  talking about as 1.5 centimeters?

14       A.   Correct.

15       Q.   And likewise, as to Item 214, the sports bra, did

16  you reference in your report in Area 2 that there was a hole

17  that displayed the microscopic characteristics consistent to a

18  sharp instrument?

19       A.   Yes.

20       Q.   And, again, was that described as being 1.5

21  centimeters?

22       A.   Yes.

23       Q.   And so this was provided through the counsel?  This

24  was the report that Ms. Wilcox must have seen?

25       A.   I - - -

Meneely   D      D8 60

1      Q.    (Interposing) There wasn't any other report that you
2  did?
3      A.    Correct.
4      Q.    Okay.  And — all right.  Now, when you made — well,
5  scratch that.
6            What you testified to yesterday, and your opinion as
7  you stated it, before your testimony and before stating your
8  opinion, did you have an opportunity to review Kathy Wilcox's
9  photographs of the sports bra and the tank top?
10     A.    Yes.
11     Q.    Well, — yeah.  Okay.  Of her examination back in
12 2000?
13     A.    Yes.
14     Q.    And did you, in fact, look at those?
15     A.    Photographs?
16     Q.    Photographs.
17     A.    Yes.
18     Q.    Okay.  And in looking at those photographs, did you
19 see in the same location the same hole — let's start with the
20 sports bra — the same hole in the sports — well, the sports
21 bra that you saw?
22     A.    I didn't — I don't recall seeing a specific
23 photograph in Ms. Wilcox's notes, if you will, of that
24 specific location.  I saw a general photograph of the sports
25 bra from a distance, but not any more close ups of that

```
     D8 61                              Meneely   D
```

1  particular area.

2      Q.   Okay.  Not any more close ups.  But, in terms of

3  location, was there one of the sports bra, or not, as you

4  recall?

5      A.   Yes.

6      Q.   Okay.  And was there a hole consistent with the area

7  that you looked at?

8      A.   Yes.

9      Q.   Okay.  So, did it appear to you that the hole that

10  you now have said is a cut in the sports bra was there when

11  Ms. Wilcox examined the item back in 2000?

12      A.   Yes.

13      Q.   And, likewise, with the tank top?  Did you look at

14  her photographs relative to the tank top?

15      A.   Yes.

16      Q.   And did you see whether or not there was a hole in

17  the tank top in the same area that you examined in 2011?

18      A.   Yes.

19      Q.   And was there?

20      A.   Yes.

21      Q.   And, likewise, did you look at the photographs from

22  the United Kingdom?

23      A.   Yes.

24      Q.   And the same question, Mr. Meneely?

25      A.   Yes.

Meneely  D    D8 62

1    Q.   All right.  What was the difference between the

2  photographs that Ms. Wilcox took and the photographs that you

3  took?

4    A.   Well, first of all, some of those photographs were —

5  most of them were distant photographs.  Some were a little bit

6  out of focus, if you will.  But, the majority were what I

7  would call distant — from a forensic standpoint, distance

8  photographs compared to photographs I took that were probably

9  — how do you coin the phrase? — close up and personal down to

10  the resolution of a tenth of a millimeter.

11    Q.   And, likewise, the photographs from the lab in

12  England — what was the difference between those photographs

13  and the photographs you took?

14    A.   Once again, they're general distance type

15  photographs.

16    Q.   And your photographs were closer?

17    A.   Much closer.

18        MS. McCREA:   Your Honor, the defense again

19  would offer Defendant's Exhibit 154, based on the fact that

20  there was an implication made during cross examination that

21  Mr. Meneely's testimony was inconsistent with his report, and

22  the report is being offered to demonstrate it's a prior

23  consistent statement.

24        MR. FRASIER:   Well, I would disagree with

25  that characterization.

```
     D8 63                                    Meneely   X
```

1          THE COURT:    The objection is sustained.

2          We're going to probably have another recess

3    here in a moment, so I'll probably take it up further.  But, I

4    don't think that's correct.  So, I'll sustain the objection at

5    this point in time.

6          Are you done with your examination?

7          MS. McCREA:    I might have a moment?

8          THE COURT:    Yes.

9          MS. McCREA:    That's all the questions I have,

10   Your Honor.

11         THE COURT:    Mr. Frasier?

12                    CROSS EXAMINATION

13   BY MR. FRASIER:

14      Q.   Mr. Meneely, let's see if I got this straight.  What

15   you're saying is, is the holes that you've identified as cut

16   marks are present in the photographs taken by Kathy Wilcox?

17      A.   Well, that area was present in the photographs I

18   looked at.

19      Q.   Are you saying those particular things that you have

20   called "cut marks" are present in Kathy Wilcox's pictures?

21      A.   The specific detail was not in her photographs.

22   But, the area where those holes were, were in the photographs.

23      Q.   Let's — again, Mr. Meneely, the question is, do you

24   see those cut marks in the photographs?

25         MS. McCREA:    Well, - - -

Meneely  X    D8 64

1          MR. FRASIER:    (Interposing) He hasn't

2    answered the question yet.

3          MS. McCREA:    It's an unfair question, because

4    the whole issue is the cut marks.

5          THE COURT:    Well, I — I'll overrule the

6    objection.

7       A.    The specific cut marks were not displayed in

8    Ms. Wilcox — nor the England photographs.

9       Q.    All right.  Now, you are aware — well, let's assume

10   for the sake of argument that what you call cut marks were

11   present when Ms. Wilcox did her examination.  Okay?

12      A.    That's an assumption.

13      Q.    Is it your testimony then that Ms. Wilcox did not

14   correctly identify the cuts or the marks that you claim are

15   cuts?

16      A.    First of all, I believe her testimony was that she

17   did not see those.  But, all I can tell you is that I

18   microscopically saw those cut marks that apparently she did

19   not.

20      Q.    Are you saying that Ms. Wilcox is wrong?

21      A.    I'm saying that she missed it, if that equates to

22   wrong.

23      Q.    Now, and you're also saying, are you not, that the

24   English laboratory, when they looked at these garments, got it

25   wrong, too?

```
     D8 65                              Meneely  X
```

1     A.   First of all, based upon their documentation with

2   their photographs, once again they did not look very closely

3   at the garments.  But, in essence, if they're saying there was

4   no stab marks in the clothing, then they got it wrong under

5   your definition.

6     Q.   All right.  And when Dr. Olson looked at the

7   clothing to see if he could find a cut mark so that he could

8   see that this woman had been stabbed, are you saying that he

9   got it wrong, too?

10    A.   Once again, being associated with Medical Examiners

11  for three decades, they take the clothing and look at it

12  during the autopsy and give a general observation.

13    Q.   That's not the question, Mr. Meneely.  The question

14  is, did Dr. Olson get it wrong?

15    A.   Apparently he did not see stab marks.  And so that

16  would equate to getting it wrong.

17    Q.   Well, all these people missed it and you're the only

18  one that caught it?

19           MS. McCREA:    Well, I object to the question,

20  Your Honor.

21           THE COURT:    Well, it's somewhat

22  argumentative, Mr. Frasier.  Rephrase it.

23    Q.   Is it your testimony that of all the people that

24  have looked at these two garments, you're the only person that

25  have found these marks?

```
                                      Meneely   ReD   D8 66
```

1    A.   Yes.

2    Q.   Thank you.

3            MR. FRASIER:   That's all I have, Your Honor.

4            THE COURT:   Cross?  I mean, redirect.  Excuse

5    me.  I'm sorry.

6            MS. McCREA:   You're just used to me - - -

7            THE COURT:   (Interposing) I'm just used to

8    certain things.  Sorry.

9                    <u>REDIRECT EXAMINATION</u>

10   <u>BY MS. McCREA:</u>

11   Q.   Mr. Meneely, why is it that you're the only one who

12   found these cut marks?

13   A.   Based on all the photographs that I reviewed in this

14   case, I'm the only one that, as I said earlier, got close up

15   and personal with the evidence.

16           MR. FRASIER:   Well, I'm going to object to

17   the answer.  This witness has no personal knowledge as to what

18   exactly these laboratories did.  And, therefore, I don't think

19   he can make that comment.

20           THE COURT:   I'll overrule the objection.

21   Q.   Go ahead, Mr. Meneely.

22   A.   Based upon the photographs, which is documentation

23   that supports her conclusions, is that they did distant-type

24   examinations of the evidence, which I did not.  I did a much

25   more in-depth examination of the evidence, down to the

D8 67                                    Meneely   ReD

1  microscopic level.

2      Q.   And what was the difference — well, Dr. Olson

3  testified that he just did a visual examination of the

4  garments.  What did you do in terms of a microscopic

5  examination?  How close did you get?

6      A.   Well, generally very close.  But, part of the

7  illustration was when we passed the photographs of the soles

8  of the shoe was to show exactly — or, demonstrate how close I

9  had to get to look at these damaged areas.  And it can

10 differentiate down to a tenth of a millimeter, which is very

11 close.

12     Q.   A tenth of a millimeter is about the size of a pen

13 tip?

14     A.   No.  Actually, a millimeter is the size of a pen's

15 tip.  So, we're looking at much, much closer than that.

16     Q.   Much, much closer?  Okay.  Is there a magnification

17 power on the microscope that you used that you can give us as

18 reference?

19     A.   Probably — I'm just — since I didn't record it, I'm

20 just estimating it's probably 100 power — 100 times the

21 magnification.

22     Q.   100 times the magnification?

23     A.   I'm just estimating it.

24     Q.   Okay.  All right.  Thank you.

25          MS. McCREA:    Nothing further.

D8 68

1          THE COURT:    You may step down.

2          Do you want this witness to remain available?

3          MS. McCREA:    He will remain available.  Yeah.

4          THE COURT:    I'm going to ask you to step out

5    again, ladies and gentlemen.  We have just a couple things to

6    take care of that have to do with scheduling.

7          (Jury out.)

8          THE COURT:    And other than Ms. Greenway and

9    Ms. Carr, who are coming from out of state, you have possibly

10   Mr. McGuffin and possibly his mother, Mrs. McGuffin, as your

11   remaining witnesses?

12         MS. McCREA:    Yes.  And also Mr. Bonk for the

13   purpose of identifying a map, Your Honor.

14         THE COURT:    Do you want - - -

15         MR. FRASIER:    (Interposing) I would stipulate

16   to the map coming in.  I don't have a problem with that.

17         MS. McCREA:    Okay.

18         THE COURT:    So, what you're telling me — and

19   I am concerned about what you're telling me about the jail,

20   because I didn't know that when we were having our sidebar —

21   is that you don't believe you can prepare Mr. McGuffin today?

22         MS. McCREA:    That is correct.  And I would

23   also indicate to the Court that at the recess, I was given new

24   discovery from the State, which consists of a number of jail

25   calls made by Mr. McGuffin.  And apparently there are — one,

D8 69

1  two, three, four, five of those highlighted out of a whole

2  list of jail calls.

3          Each one is at least — well, the shortest one

4  is seven minutes and fifty-nine seconds.  The longest one is

5  fifteen minutes.  And I have been advised that if Mr. McGuffin

6  testifies, the State intends to use this in rebuttal.  And so

7  I've got an obligation to sit down and listen to these

8  matters.

9          THE COURT:   Okay.  I don't have — in light of

10 what you said about the jail — and as I said, when we had the

11 sidebar, I wasn't aware of that.  My concern in — and I

12 realize we scheduled this for three weeks and we're moving

13 quicker than what everybody thought.  That doesn't mean I want

14 to go clear 'til next Friday.

15         But, — so the concern I have is obviously you

16 have to prepare him, and you obviously have to listen to the

17 tapes and are doing that to prepare him.

18         My problem is that what I don't want to happen

19 on Monday is that if there's the decision that he doesn't call

20 (sic), then Mr. Frasier, who has to prepare his — for possible

21 cross examination, then doesn't work on closing arguments.

22 And so we have to call the jury in again for five minutes and

23 excuse them, because then everybody wants to prepare for

24 closing arguments.

25         So, I think the decision whether to call him is

D8 70

1    different than the decision how to prepare him.  So, I would

2    appreciate letting us know, so I don't get here Monday and

3    then I'm told, "Well, now we want to prepare for closing

4    argument," and we go into Tuesday.  Because it sounds like we

5    could probably finish this case Monday.

6              So, can you make a decision, after talking to

7    him — and you have — I'm assuming between now and 1:00 you

8    could probably at least - - -

9              Are those tape recordings available for

10   Ms. - - -

11             MR. FRASIER:    Yes.  We just gave her the CD

12   that — we got it this morning, Your Honor.

13             MS. McCREA:    And I will see if I can play it

14   on my laptop.

15             THE COURT:    Okay.  And make sure that she has

16   something available.

17             At least let us know whether he will or will

18   testify at that point.  So, then if — because I assume he

19   would take awhile if he testifies?

20             MS. McCREA:    Yes.

21             THE COURT:    And rebuttal, and then that would

22   make sense to go into Tuesday for closing arguments.  But, if

23   he's not going to testify, then all of the sudden we've got to

24   prepare for instructions and closing arguments and I think

25   that's a problem.  And I would prefer not hearing, "Well, I

D8 71

1  need more time now to prepare for closing arguments."

2          So, I think that decision can be made whether

3  he's going to testify, because we would then have the weekend

4  to talk to him about what his testimony would be if he's going

5  to testify.  I don't think that's — I think that's reasonable

6  to find that out so we know whether or not we're going to —

7  because calling them in for an hour or two is not productive

8  of their time.

9          I'll give you a recess.  We'll come back at

10 1:00 and then you can let me know what you feel about that at

11 that point in time.  By that point, you'll have time to

12 listen.  And you can — at that time you should have access to

13 the jail to play — because I'm assuming you're going to want

14 Mr. McGuffin — although Mr. McGuffin was apparently a

15 participant in that conversation, you may want to have him

16 hear those, too.

17          MS. McCREA:    Yes.

18          THE COURT:    Okay.  We'll recess until 1:00,

19 and I'll tell the jury to be back — well, there's no need for

20 me to have the jury back that I can see, because there isn't

21 going to be any testimony, as I understand.  So, I can excuse

22 them.  At 1:00 I will want to know whether or not — well, we

23 can discuss this issue further at 1:00.

24          MS. McCREA:    I understand.

25          THE COURT:    Okay.

D8 72

1    Bring the jury back in.  Tell them to leave

2 their notebooks in there.

3     (Jury in.)

4    THE COURT:   What I'm going to do is release

5 you for the day until Monday.  I hope you appreciate the fact

6 that when we started we had a huge number of witnesses and the

7 parties have done a good job of paring down the witnesses so

8 we're not going to be here clear 'til next Friday.

9    But, when you pare down witnesses then you

10 obviously throw off scheduling.  And we've moved much quicker

11 than, I think, anybody anticipated.  So, they don't have any

12 further witnesses today that are available.  There are even a

13 couple coming from out of state.

14    So, what I'll do is release you.  And at least

15 my best information is the case may be to you either Monday or

16 Tuesday.  Now, I don't ever guarantee all that but I think,

17 from what I'm understanding, that Tuesday would be the latest

18 that you would be getting the case.

19    So, I'll just release you now with the same

20 admonition that I've given you all the other times.  And then

21 just be back at 9:00 on Monday.  Have a good weekend.

22    VOICE:   Thank you.

23    THE COURT:   Everybody else remain seated

24 until the jury has a chance to leave.

25     (Jury out.)

D8 73

1            THE COURT:   Okay.  1:00.

2            And I'm sure you will, Corporal, make sure that

3  Mr. McCrea and Ms. McCrea have access to Mr. McGuffin?

4            VOICE:   Yes, sir.

5            THE COURT:   Between now and 1:00.  Thank you.

6            We'll be in recess - - -

7            MR. McCREA:   (Interposing) Your Honor, one

8  last thing.

9            I'd like the record to show that when I

10  represented to you yesterday that our witnesses today would be

11  short, that I was accurate.

12            THE COURT:   I recognize that and I appreciate

13  that.

14            MR. McCREA:   Thank you, Your Honor.

15            THE COURT:   The one — the one exhibit — the —

16  Mr. Meneely's report, I don't think your characterization of

17  what Mr. Frasier was doing is correct, because I do think he

18  was pointing out that he didn't put it in a report.  He wasn't

19  questioning what was in the report.  He was questioning what

20  wasn't in the report about the length of the knife or that it

21  was a knife or even the opinion that she was stabbed.  So, I

22  don't think that characterization - - -

23            The other problem is, it appears to me that it

24  gets close to discovery areas, which is clearly the Court.

25  And, you know, — and then I'm ending up possibly instructing

1  the jury on discovery law, which I don't think is appropriate,

2  which I don't want to do.

3          But, I don't think the exhibits there — you

4  know, you can do that with a lot of reports where somebody

5  doesn't say something.  And we've gone through that with

6  several witnesses.

7          So, I don't think that the exhibit is

8  admissible.  Other than that, it may lead then, "Okay, then,

9  we want to offer our reports."  And I think then we all of the

10  sudden get just reports heavy, or even police reports about

11  what people did or didn't say at particular times.  So, it's a

12  little different, but I don't feel that is admissible.  So,

13  that's the reason.

14          If you want it in the record, you should give

15  it to her so she can put, "Not for the jury."

16          Okay.  1:00.

17                  (RECESS)

18          (Jury out.)

19          THE COURT:    Be seated, please.

20          Ms. McCrea?

21          MS. McCREA:    Your Honor, since Court broke

22  this morning, Mr. McCrea and I immediately went over to the

23  jail and have been conferencing with Mr. McGuffin since that

24  time.

25          I would indicate to the Court that we still do

D8 75

1   not have a decision and our request would be to be allowed to

2   have until 5:00 p.m. today to notify the Court and

3   Mr. Frasier's office of Mr. McGuffin's decision.  And we could

4   do that — we could do that informally with something - - -

5                  THE COURT:    (Interposing) I don't have a

6   problem with that.  I don't think it matters whether it's 1:00

7   or 5:00.

8                  Do you have a - - -

9                  MR. FRASIER:    (Interposing) No.  Just a few

10  minutes before 5:00, because my staff is known to be right out

11  the door at 5:00.

12                 MS. McCREA:    And it is Friday.  I understand

13  that.  Yes.

14                 THE COURT:    That would be fine.  I don't have

15  a - - -

16                 MS. McCREA:    (Interposing) And so we can just

17  — we could provide the Court something signed by Mr. McGuffin

18  indicating his decision if that's - - -

19                 THE COURT:    (Interposing) I don't care

20  whether he signs something.  It's not — I just would like to

21  know.  I think it's helpful both to you and the State to know

22  what's going to happen on Monday.

23                 MS. McCREA:    I understand.

24                 THE COURT:    So, if you inform counsel of

25  that, that he's not going to testify, I will take that.

D8 76

1        And, Mr. McGuffin, I'm not requiring you to

2    sign something, but you're going to be bound by your counsel's

3    statement.  So, if you don't want to do that, and you want the

4    authority, which is your right because you're the client, to

5    either say yes or no, then I would want you to sign something.

6        But, if you're going to be satisfied with

7    Ms. McCrea's statement to the Court that you either will or

8    will not, then I will leave it at that.  But, if she does make

9    that representation to the Court, you will be stuck with the

10   decision, in effect.

11       Do you understand that?

12       DEFENDANT:    Yes, I do.

13       THE COURT:    Do you have any problem with her

14   informing the Court and the DA's Office whether you will or

15   will not testify?

16       DEFENDANT:    No, I do not.

17       THE COURT:    And you will be bound by that

18   decision?

19       DEFENDANT:    Yes, I will.

20       THE COURT:    Okay.

21       MR. FRASIER:    Your Honor, actually when I

22   think about it, could we have 4:30, because if the decision —

23   I need to know so we can schedule potential witnesses for

24   Monday?

25       MS. McCREA:    That's fine.

D8 77                    Proposed Jury Instructions

1          THE COURT:   Okay.  That's fine.

2          Can you — I know you've been spending all the

3   time talking to your client, but can we take maybe up to 30

4   minutes so you have a chance — the jury instructions are

5   pretty simple.  I mean, they're straight forward.  But, maybe

6   you could look at them for a few minutes and determine whether

7   or not — so, we could take care of that just in case we're

8   going to go to argument, because I instruct before arguments.

9          I'll take a recess so it gives you some time to

10  look those over and determine what, if any, problems you have

11  with them.

12          Just let me know when you're generally ready.

13          MS. McCREA:   Okay.

14                       (RECESS)

15       (Jury out.)

16          THE COURT:   Be seated, please.

17          MS. McCREA:   I have had a chance to review

18  the proposed jury instructions, Your Honor.  The only

19  suggestion I would make is on the instruction with the

20  definition of Murder - Intentionally, on Subsection 3, that we

21  add in Leah Freeman's last name.

22          THE COURT:   Oh.  That was probably something

23  that when I was typing I just didn't — I left it out.

24          MS. McCREA:   I figured that.

25          And the other — the other thing is the defense

Proposed Jury Instructions                D8 78

1   would like the opportunity to submit a special instruction on

2   — given the difference in age between Mr. McGuffin and

3   Ms. Freeman — that that is not a legal issue.

4                THE COURT:   Oh.  Okay.  In other words, to

5   make it so the jury doesn't think that somehow there was

6   something illegal?

7                MS. McCREA:   Correct.

8                THE COURT:   Okay.  And I will look at that.

9                Mr. Frasier?

10               MR. FRASIER:   We have no problem with the

11  instructions as presented, Your Honor.

12               THE COURT:   Okay.

13               And I will make that one change.  I just didn't

14  mean — I didn't mean to leave that out.  I probably thought I

15  — because I put it in the Manslaughter one.

16               Okay.  I would request, Ms. McCrea, if you can,

17  it's just that when you make the decision — because I don't

18  know that the Court will come back into session for that.

19  Just maybe put it in writing.  You can sign it.  I don't — he

20  doesn't have to.

21               MS. McCREA:   That's fine.

22               THE COURT:   Just give it to Mr. Frasier and

23  the Court whether he will or will not be - - -

24               MS. McCREA:   (Interposing) I will do so, Your

25  Honor.

D8 79

1                    THE COURT:    Thank you, counsel.

2                    MS. McCREA:     Thank you.

3                    THE COURT:    We'll be in recess.

4

5    *                              *                              *

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS


STATE OF OREGON,                      )
                                      )
            Plaintiff,                )     CASE NO. 10CR0782
                                      )
                                      )       JURY TRIAL
       vs.                            )        DAY 9
                                      )
 NICHOLAS JAMES McGUFFIN,             )
                                      )
            Defendant.                )
_____)


TRANSCRIPT OF PROCEEDINGS

Volume 13, Pages D9 2-D9 165

        BE IT REMEMBERED That, the above-entitled cause

came on regularly for hearing beginning at 9:07 a.m. on Monday,

July 18, 2011, in the Circuit Courtroom of the Coos County

Courthouse in the City of Coquille, County of Coos, State of

Oregon, before the Honorable Richard L. Barron, and a jury.

APPEARANCES

R. Paul Frasier, District Attorney for Coos County,
representing the Plaintiff.

Erika Soublet, Assistant District Attorney for Coos County,
representing the Plaintiff.


Shaun McCrea, Attorney at Law, representing the Defendant.

Robert McCrea, Attorney at Law, representing the Defendant.


        Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

D9 2

1  *                              *                              *

2           (Jury out.)

3           JUDICIAL ASSISTANT:    All rise.

4           THE COURT:    Be seated, please.

5           As I briefly discussed with counsel in

6  chambers, there was a matter with one juror that we're going

7  to have to inquire into.  And so, I will ask you to bring

8  Mr. Welch out.

9           (Juror in.)

10          Mr. Welch, just have a seat over there, please.

11          Sorry to bring you out like this, Mr. Welch,

12  but there was some information that was brought to the Court's

13  attention that over the weekend, some people who said that

14  they know you — and their last name is Phillips — encountered

15  a witness in the case, and started to question that witness

16  about the trial.  And they said that they knew you.  And the

17  implication was that they had talked to you.  And the witness

18  felt that the information that they were given could only have

19  come from the trial itself.

20          So, they then started questioning the witness.

21  And the witness didn't say anything to them.  But then, this

22  witness got concerned, and contacted the police, who contacted

23  the people who said they were your friends, the Phillips.  And

24  the Phillips said they had never — they hadn't talked to you

25  about the trial, and weren't acting on your behalf.  But - - -

D9 3

1              JUROR:    (Interposing) I — Your Honor, I said

2    nothing — I would have (not understandable).

3              THE COURT:    You have not — you have not

4    talked to them about it?

5              JUROR:    No.  He knows I'm on here.

6              THE COURT:    Right.

7              JUROR:    But, you know, as far as that, that's

8    it.

9              THE COURT:    Right.  Well, - - -

10             JUROR:    (Interposing) He wants to go fishing.

11   I won't even take him.

12             THE COURT:    Right.  And that's fine.  I — I

13   just wanted to inquire.  Because, we have to inquire when they

14   used your name, and they started talking to somebody.  They

15   later said they weren't acting on your behalf, and had not

16   talked to you.  That part is correct?

17             JUROR:    That's correct.

18             THE COURT:    Mr. Frasier, do you have any

19   questions?

20             MR. FRASIER:    No, Your Honor.

21             THE COURT:    Ms. McCrea?

22             MS. McCREA:    (No audible response.)

23             THE COURT:    Obviously, you do know those

24   people, Mr. - - -

25             JUROR:    (Interposing) Yeah, I know them.

D9 4

1  Yeah.

2                THE COURT:    Okay.  That's fine.

3                MS. McCREA:    We don't have any questions,

4  Your Honor.

5                THE COURT:    Okay.

6                Mr. Welch, don't discuss this matter with the

7  other jurors.  But I - - -

8                JUROR:    (Interposing) Okay.

9                THE COURT:    You understand why I have to

10  inquire about it.

11                JUROR:    Yeah.

12                THE COURT:    Okay.  If you'd step into the

13  jury room, please.

14                (Juror out.)

15                At least from the Court's standpoint, I don't

16  disbelieve the juror, that he didn't contact the people — or,

17  had no contact with the people.  But, I don't have any reason

18  to doubt him, the way he answered and that sort of thing.  But

19  I will leave it up to counsel.  I mean, we have two

20  alternates.  The appearance of that may look — look bad.

21                So, I will certainly consider what counsel

22  thinks, but - - -

23                MR. FRASIER:    Your Honor, I also believe this

24  is the same juror you were referring to that was having

25  trouble staying awake?

D9 5

1                    THE COURT:    Well, I — I felt that he never

2    fell asleep, but he had heavy eyelids on two or three

3    occasions that I noted.  And that — I thought — I brought that

4    to counsels' attention earlier just because I thought that was

5    a possible concern.  I never felt he fell asleep, but I felt

6    that his eyelids, at times, indicated that he was sleepy, and

7    nearly came to sleep.  So, - - -

8                    MR. FRASIER:    I think the better course of

9    valor here, Your Honor — you know, I do agree with the Court.

10   I — I don't have any reason to disbelieve what the juror is

11   staying.  But given the appearance of everything, I think, in

12   a case like this, that he probably should be excused.

13                    THE COURT:    Well, that's my real concern, is

14   that the community now learns of this, is looking at whatever

15   the verdict is — if something happened, that's not proper.

16                    (Counsel confers with Defendant.)

17                    MS. McCREA:    I'm sorry, Your Honor.  I'm

18   consulting with Mr. McGuffin.

19                    THE COURT:    That's fine.  You have a right to

20   take your time on this.

21                    (Counsel confers with Defendant.)

22                    MR. McCREA:    Your Honor, one of the problems

23   here is, we consulted with Mr. McGuffin last night when we had

24   the email from — from Mr. Frasier, the prosecutor.  And we

25   also had some follow up at that point.  But, the record would

D9 6

1  show that Mr. McGuffin was not present in the chambers when

2  Mr. Frasier spoke at greater length as to what investigation

3  was done in this regard.  And perhaps, so the record is clear,

4  and also since we've not had a chance to confer further with

5  Mr. McGuffin since the time we had the conference in chambers

6  so that he could know what was done beyond the information

7  that was originally imparted, - - -

8         THE COURT:    (Interposing) Sure.  I'll just

9  have Mr. Frasier put on the record what he told us in

10 chambers.

11        MR. McCREA:    Yes, that's what I'm asking,

12 Your Honor.

13        THE COURT:    All right.

14        Mr. Frasier, go ahead.

15        MR. FRASIER:    Well, just so it's clear,

16 yesterday I was contacted by telephone by Officer McNealy of

17 the Coquille Police Department.  He indicated to me that the

18 witness, Polly Parks, had been in contact with the Police

19 Department and indicated that she had been contacted by two

20 individuals named Denver Phillips and Tammer (phonetic)

21 Phillips, and that they had questioned the witness about

22 certain information, in particular regarding Wayne McGuffin

23 and the statement that has previously been testified to here,

24 I believe by Ms. Cagley.

25        Ms. Parks declined to answer their questions.

D9 7

1   Indicated she was a witness, and was not supposed to discuss

2   her testimony.  She did indicate that she felt that the

3   information that was being given to her, or questioned about,

4   had to have come from inside the courtroom.  She did indicate

5   - - -

6           The officers then, at my direction, went to

7   investigate this more, to try to identify who these people

8   were, and talk to them.  Basically, what we were able to learn

9   is, Ms. Parks is at the store.  These two individuals happened

10  to bump into her at the store.  They start asking her

11  questions about the case, including the Wayne McGuffin

12  situation.  They indicated they knew a juror.  They called him

13  "Rob".  That's all they had, or at least this is what

14  Ms. Parks revealed back, is they called the juror "Rob".

15          At no time did Ms. Parks say that Rob had asked

16  them to do anything on their behalf, but she was very

17  uncomfortable with this, and called the police and let them

18  know.  My understanding is the police did talk to Denver and —

19  or, Phillips and they acknowledged that they know the juror.

20  They called him Tom Welch versus Rob Welch.  But they

21  indicated they go fishing with him on occasion.  They denied

22  that they were asking any questions on his behalf, that he had

23  said anything to them about the case.  They just ran into

24  Polly Parks and they started asking her questions about

25  information that they had about the case.

D9 8

1          That's basically the sum and substance of

2     everything that was reported to me.

3                THE COURT:    Okay.

4          Well, and the record should reflect that things

5     about the case have been published in The World.  And — in the

6     newspaper.  So, — not everything, obviously.  And the story

7     has gone out on other media, including TV.

8                (Defendant confers with his attorney.)

9          Oh, I'm sorry.

10               MS. McCREA:    Your Honor, after discussing the

11    matter briefly here at counsel table with Mr. McGuffin, he

12    doesn't have a position.  So, he'll leave it to the Court to

13    decide whether to release the juror, or not.

14               THE COURT:    Well, in that light, and what

15    Mr. Frasier said, the Court — as I said, I don't disbelieve

16    Mr. Welch.  But, I just think the appearance is a problem.

17    So, I'm going to excuse Mr. Welch.

18               And my — at least as I understand the statute,

19    is that we draw as to the two alternates, 13 and 14, and

20    choose one of them randomly.  So, I would just have Ms. Cress

21    put numbers 13 and 14 for the seat assignments in a hat or

22    something, and just draw one of them.  We changed seating

23    because Ms. Tinsley had a problem.  So, actually, the Juror in

24    Seat No. 4, Ms. Londagin, was Seat No. 14.  And she changed

25    with Ms. Tinsley because she had some problem about hearing.

D9 9

1   And Ms. Tinsley didn't have a problem.  So, it's actually — it

2   would be Mr. Watson and Ms. Londagin that we would draw

3   between those two.  Okay?

4              So, it would be Seat — so, put No. 4 and No. 13

5   in a hat — or a box, or something.

6              JUDICIAL ASSISTANT:    (Inaudible response.)

7              THE COURT:    That's fine.  I don't care, the

8   names, or whatever it is, if you've already got it.  Just put

9   them in something and swirl them around, and then pick one.

10             The alternate will be Ms. Londagin.  So, I

11  would just move Ms. Tinsley to Seat No. 1, and I would excuse

12  Mr. Welch, and leave Ms. Londagin in Seat No. 4, if that's

13  acceptable to everybody.

14             MR. FRASIER:    That's fine.

15             THE COURT:    Okay.

16             All right.  Ask Mr. Welch to come out again.

17             (Juror in.)

18             THE COURT:    Mr. Welch, in light of this — and

19  neither I nor the parties — I mean, we all accepted your

20  explanation.  But the appearance of this isn't — isn't good.

21  And this verdict has to be going out in the community.  And

22  the community knows of it.  So, I'm going to excuse you from

23  the case.

24             It's not that I disbelieve you explanation.

25  It's just that your — the people that you know have created a

D9 10

1   problem here, and I don't want the verdict, whichever way it

2   is, to be tainted by something like this where people then

3   say, "Well, something happened with a juror in this matter."

4           So, I'm going to excuse you from this case.  I

5   apologize for doing that, but I just don't want anybody in the

6   community to think that something went wrong - - -

7           JUROR:   (Interposing) Okay.

8           THE COURT:   - - - in the matter.  Okay?

9           So, you will be excused.  And I appreciate your

10  service.  And I'm sorry this happened.

11          Okay.  Then, tell Ms. Tinsley, when she comes

12  out she's to take Seat No. 1.

13          (Inaudible response.)

14          Well, I don't care if she wears them or not,

15  but that's the seat she's going to take.  She can wear the

16  glasses.

17          While we looked at it, I just researched that

18  one instruction (not understandable), and I don't find any

19  problems with it in the case law.

20          (Jury in.)

21          THE COURT:   I just wanted to explain.  There

22  was something that occurred over the weekend that is not

23  Mr. Welch's fault.  It's not anything that he did, but

24  something happened in relation to some — some other people who

25  knew him.  He didn't do anything wrong, but they did.  And the

D9 11

1   appearance of that was such that I didn't think it was

2   appropriate for him to continue.  Okay?  So, that's why he is

3   gone.  But please do not think that he did it.  And I

4   explained that to him.

5                    All right.  The defense rests.  Is that

6   correct?

7                    MS. McCREA:   No, we're not prepared to rest

8   yet, Your Honor.

9                    THE COURT:   Okay.

10                   MS. McCREA:   And as a housekeeping matter,

11  defense would offer Defense Exhibits 128, 129, 130, 131, 132,

12  133 and 134.  And those are the summaries.

13                   MR. FRASIER:   No objection.

14                   THE COURT:   Received.

15                   (Whereupon Defendant's Exhibits Nos. 128, 129,

16  130, 131, 132, 133 and 134 were received into evidence.)

17                   MS. McCLINTOCK:   We would also offer Defense

18  Exhibit 126, which was the reward poster which was identified

19  by Ms. Courtright.  I didn't offer it at that time because our

20  copy had some writing on it.

21                   MR. FRASIER:   No objection.

22                   THE COURT:   Received.

23                   (Whereupon Defendant's Exhibit No. 126 was

24  received into evidence.)

25                   MS. McCLINTOCK:   And then, by stipulation we

Greenway   D     D9 12

1  have Exhibit 155, which was the map that Mr. Frasier was

2  prepared to stipulate to on Friday.

3              MR. FRASIER:   Again, no objection.

4              THE COURT:   Received.

5              (Whereupon Defendant's Exhibit No. 155 was

6  received into evidence.)

7              MS. McCREA:   And at this time, Your Honor,

8  the defense would call Haley Greenway.

9              THE COURT:   Did you say Halley (phonetic) or

10 Calley (phonetic)?

11             MS. McCREA:   Haley, with an H.

12             THE COURT:   Raise your right hand, please.

13                      <u>HALEY GREENWAY</u>

14 was thereupon produced as a witness on behalf of Defendant

15 and, having first been duly sworn to tell the truth, the whole

16 truth and nothing but the truth, was examined and testified as

17 follows:

18             THE COURT:   Have a seat here, please.

19             You'll have to find a place to sit.

20             VOICE:   Right.

21             THE COURT:   If you'd just move the microphone

22 closer to you, please.  Just keep your voice up when you're

23 answering questions.

24             Go ahead, please.

25             MS. McCREA:   Okay.

```
    D9 13                               Greenway   D
```

1                          DIRECT EXAMINATION

2    BY MS. McCREA:

3        Q.   Would you state your full name for the record, and

4    spell both your first and last for us, please?

5        A.   Sure.  It's Haley Nicole Greenway.  Haley,

6    H-A-L-E-Y.  Last name Greenway, G-R-E-E-N-W-A-Y.

7        Q.   And Ms. Greenway, you're going to have to keep your

8    voice up because it's really hard to hear.

9        A.   Oh, I'm sorry.

10       Q.   No, just letting you know.

11       A.   Okay.

12       Q.   And Ms. Greenway, where do you live?

13       A.   I live in Pearland, Texas.

14       Q.   And what's Pearland, Texas near?

15       A.   Uh, it's about ten miles southeast of Houston.

16       Q.   Did you used to live in Coquille?

17       A.   Yes.

18       Q.   Can you tell us when that was?

19       A.   I was born and raised here, and I moved — I want to

20   say in 2003.

21       Q.   Did you graduate from Coquille High School?

22       A.   Yes.

23       Q.   Do you remember what year?

24       A.   2000.

25       Q.   2000.  Did you know, at the time, Nick McGuffin?

Greenway   D     D9 14

1      A.   Yes.

2      Q.   And how did you know him?

3      A.   Just, you know, a classmate.

4      Q.   Did you know Leah Freeman?

5      A.   Yes.

6      Q.   How did you know her?

7      A.   Same thing.

8      Q.   Did you have an occasion or opportunity to observe

9  Leah Freeman and Nick McGuffin together in the year 2000?

10     A.   Yes.

11     Q.   What — where was that?

12     A.   At school.

13     Q.   How often would you see them?

14     A.   Just about every day.

15     Q.   Did they seem to have a romantic type relationship?

16     A.   Yeah, just like normal teenager relationship.

17     Q.   Did you ever notice any — anything that they did

18  together?

19     A.   Um, I mean, go to class together, or, you know,

20  hanging out in the halls.  And that's — that's about all I

21  noticed.

22     Q.   Any public displays of affection?

23     A.   Oh, yeah.

24     Q.   Anything particular you remember?

25     A.   Um, you know, walking — walking her to class.  You

```
     D9 15                              Greenway   D
```

1    know, holding hands, occasional, you know, hug, or you know,

2    just normal stuff.

3         Q.   Did you ever see them get into an argument?

4         A.   Oh, yeah.

5         Q.   Is — when you say "Oh, yeah", it's — was it any big

6    deal?

7         A.   No.

8         Q.   Okay.

9         A.   I mean, just like everyone else, there.

10        Q.   All right.  "Everyone else" meaning other teenage

11   relationships?

12        A.   Yes, ma'am.

13        Q.   Now, during the fall of 2000 — or, I don't know.

14   Maybe it was 1999.  Anyway, the school year — that last senior

15   year, do you remember, did — had Nick been participating in

16   school sports?

17        A.   He had, yes.

18        Q.   And what did he play?

19        A.   Football.

20        Q.   Did he play football that last senior year?

21        A.   Not that I remember.

22        Q.   And do you remember that — anything that had

23   happened to him to prevent him from playing football?

24        A.   I know at one point he had — I believe it was a

25   broken neck.

Greenway   D      D9 16

1      Q.   And did you observe anything that he was wearing or

2   using?

3      A.   He, at one point, had a neck brace on.

4      Q.   Do you remember how long he had the neck brace?

5      A.   I don't.

6      Q.   Now, drawing your attention to June 28, 2000, do you

7   remember if you saw Nick McGuffin that night?

8      A.   I did.

9      Q.   And can you tell us about that?

10     A.   Um, I had a 10:00 curfew, and I was coming back from

11  Fairview.  And when I came from the road from Fairview onto —

12  I believe it's Central, at the stop sign, I saw him go by in

13  his car.  And what kind of car was he driving?

14     A.   It was his Mustang.

15     Q.   A blue Mustang?

16     A.   Yes, ma'am.

17     Q.   Okay.  Did you have any contact with him?

18     A.   No.

19     Q.   (Not understandable.)

20     A.   Yes.

21     Q.   So, can you — you'll have to kind of (not

22  understandable).  If you can point it out from where you are,

23  so we can get you on the microphone, or can you get down here

24  and sort of point to it and then tell us?

25          Can you show us where you were, and where you saw

```
     D9 17                              Greenway   D
```

1   Mr. McGuffin?

2         A.   Let's see, now.

3               THE COURT:    Could you move the microphone in

4   front of you, ma'am?

5               WITNESS:   Oh, I'm sorry.

6               THE COURT:    (Not understandable) turn to the

7   side.  That's all right.  Just get it way over there so when

8   you speak, you're still speaking in it.

9               WITNESS:   Okay.

10        A.   Um, let's see.  This here is the Fairview Road.  And

11   this here — okay, this here is Central.  So, I guess it was

12   right here, at this intersection, here.

13        Q.   It's the intersection of Central and Fairview?

14        A.   Correct.

15        Q.   Okay.  Did you see which way Mr. McGuffin was going?

16        A.   He was going towards the high school.

17        Q.   Okay.  And how — did you stop?  Did you have any

18   conversation with him?

19        A.   Well, he — he was just driving by.  And I had a

20   10:00 curfew.  It was just a few minutes before ten, and I had

21   to go home.  He was, you know, just, you know, leaving.

22        Q.   Okay.  Did you notice if there was anybody with him?

23        A.   There wasn't.

24        Q.   One moment please.

25        A.   Sure.

Greenway   X    D9 18

1      Q.   Thanks.

2           Just to confirm, Mr. McGuffin was on Central going

3   toward the high school when you saw him?

4      A.   Correct.

5      Q.   Okay.  Thank you.

6                MS. McCREA:    That's all the questions I have.

7                THE COURT:    Cross?

8                MS. SOUBLET:    Just briefly, thank you, Your

9   Honor.

10                     CROSS EXAMINATION

11   BY MS. SOUBLET:

12      Q.   Ms. Greenway, was he wearing a neck brace?

13      A.   I don't recall that time.

14      Q.   Did you see him wearing a neck brace in June?

15      A.   I don't know the months.  I don't know the time

16   frame.

17      Q.   Thank you.

18                MS. SOUBLET:    Nothing further.

19                MS. McCREA:    No further questions.

20                THE COURT:    You may step down, ma'am, and you

21   are free to leave.

22                WITNESS:    Thank you.

23                THE COURT:    Call your next witness.

24                MS. McCREA:    The defense calls Barbara Carr.

25                THE COURT:    If you would raise your right

D9 19                                              Carr   D

1    hand, please, ma'am.

2                        BARBARA LADAWN CARR

3    was thereupon produced as a witness on behalf of Defendant

4    and, having first been duly sworn to tell the truth, the whole

5    truth and nothing but the truth, was examined and testified as

6    follows:

7                   THE COURT:    Have a seat here, please.

8                   Make sure the microphone is a little closer to

9    you, please.  And make - - -

10                  WITNESS:    (Interposing) Like that?

11                  THE COURT:    - - - sure you keep your voice

12   up.

13                  Go ahead, please.

14                      DIRECT EXAMINATION

15   BY MS. McCREA:

16       Q.   Would you state your full name, and spell your last

17   for the record, please?

18       A.   Barbara Ladawn Carr, C-A-R-R.

19       Q.   And Ms. Carr, where do you live?

20       A.   In Tucson, Arizona.

21       Q.   Now, I want to show you a photograph we have in

22   evidence as State's Exhibit 16 of a Mustang vehicle.  Do you

23   recognize that car?

24       A.   Yes, I do.

25       Q.   And how do you recognize it?

```
                                    Carr   D     D9 20
```

1    A.   I used to own this car.

2    Q.   Do you remember when you owned it?

3    A.   It was in the summer of '99.

4    Q.   Summer of '99?

5    A.   Uh huh.

6    Q.   And what kind of condition was the car in when you

7    owned it?

8    A.   It was in fair condition.  It was lighter in color.

9    My husband repainted it.

10   Q.   And what's your husband's name?

11   A.   Rocky Carr.

12   Q.   Okay.  Now, were the two of you living in Tucson

13   then?  Or, somewhere else?

14   A.   We lived in North Bend at that time.

15   Q.   North Bend.  Close to Coquille?

16   A.   Yeah.  Well, we lived out by Hauser.

17   Q.   Okay.  All right.  But in this area.

18   A.   Yes.

19   Q.   All right.  So, do you remember who you — and I'm

20   assuming it was you and your husband, sort of a joint venture.

21   A.   Correct.

22   Q.   Yes.  So, do you remember who you bought the car

23   from?

24   A.   It was an older gentleman that lived out in Myrtle

25   Creek.  Not Myrtle Creek.  We were coming back from Myrtle

```
     D9 21                                    Carr   D
```

 1   Creek, and we stopped at a little — a little convenience store
 2   just this side of Coquille.  There's a little convenience
 3   store out there where there's a Christmas tree farm.  And we
 4   saw it at the little store.  And we contacted the gentleman.
 5   I don't remember the gentleman's name.  But, it was an older
 6   gentleman.
 7        Q.   And I'm going to show you what's marked for
 8   identification as Defendant's Exhibit 175, and see if that
 9   refreshes your recollection on the guy's name?
10        A.   Yes, it does.
11        Q.   And what was his name?
12        A.   William — we called him Grand Huff (phonetic).
13        Q.   Okay.  So, you bought the vehicle from Mr. Huff?
14        A.   Yes.
15        Q.   And then did you and your husband register the car,
16   the Mustang, in your name?
17        A.   No, we did not.
18        Q.   And was there any reason for that?
19        A.   Because we bought it as a project.  At that time we
20   were buying old Mustangs.  This was the second vehicle we had
21   done that.  And we restore them, and then sell them.  Kind of
22   a little hobby.
23        Q.   Okay.  So, I'm going to show you what we've got
24   marked for identification as Defense Exhibits 157 through 161,
25   and see if you - - -

Carr    D    D9 22

1    A.    (Interposing) Yes.

2    Q.    - - - recognize those photos.

3    A.    Yes, I do.  This particular one is the first Mustang

4    that we did.

5    Q.    Okay.

6              THE COURT:    What's the number on that one,

7    please?

8              MS. McCREA:    No. 157.

9              THE COURT:    Okay.

10   A.    And this is the same Mustang.

11             MS. McCREA:    That would be 158.

12   A.    This is a Mustang that we bought after the blue

13   Mustang.

14             MS. McCREA:    That's 159.

15   A.    And — that we bought and a kid ran that into a

16   telephone pole.

17             This was the original Mustang that we did — the red

18   one.

19             MS. McCREA:    That's 160.

20   A.    And again, this is the original one that turned out

21   to be red.

22             MS. McCREA:    And that's 161.

23   Q.    Okay.  So, none of those photos are photos of the

24   Mustang that we have in Exhibit 16, but they're examples of

25   the work that you did on other Mustangs?

```
     D9 23                               Carr   D
```

1    A.   Correct.  In one of the — in this one, you can see

2    the - - -

3               MS. SOUBLET:   (Interposing) I'm going to

4    object, Your Honor, - - -

5    A.   - - - Mustang (not understandable).

6               MS. SOUBLET:   - - - to relevancy.  She's just

7    indicated they're not the Mustang in question.  I don't see

8    the relevancy.

9               THE COURT:   I assume you're going to get to a

10   point that you're making, here?

11              MS. McCREA:   Yes.

12              THE COURT:   Okay.  Go ahead.

13   Q.   So, the examples that you showed us — again,

14   Exhibits 157 through 161 — do those indicate the type of work

15   that you and your husband put into restoring various Mustangs?

16   A.   Correct.

17   Q.   And would that include the work you did in

18   refurbishing or restoring the Mustang that we have in

19   Exhibit 16?

20   A.   Yes, it does.

21   Q.   And it was not the first Mustang you did, but the

22   second Mustang.

23   A.   Correct.

24   Q.   Now, I want to show you - - -

25              THE COURT:   (Interposing) Excuse me.

Carr   D     D9 24

1           Which — which was the first, and which — the
2   red was the first one?
3                WITNESS:   Yes.
4                THE COURT:   And the blue was the second one?
5                WITNESS:   Yes.
6                THE COURT:   Okay.
7                MS. McCREA:    Thank you, Your Honor.
8       Q.   And then I'd like to show you what's been marked for
9   identification as Defense Exhibits 162 and 163.  Do you
10  recognize the car in those pictures?
11      A.   Yes.
12      Q.   And is that the same vehicle that is — was depicted
13  in Exhibit 16?
14      A.   Yes.
15      Q.   It's the blue Mustang?
16      A.   Correct.
17      Q.   Okay.  It's a 1967 Ford Mustang.
18      A.   Yes.
19      Q.   All right.  And do those pictures fairly and
20  accurately show what the Mustang looked like at the time you
21  and your husband were working on it?
22      A.   Yes.  This is after we painted it.  Yeah.
23      Q.   Okay.
24      A.   Yes.
25      Q.   So, what — Ms. Carr, what did you and your husband

D9 25                                          Carr   D

1   do to the blue Mustang?

2       A.   We took all the seats out of the inside.  We — my —

3   my father-in-law and I redid all the seats inside.  We coated

4   them with new seat covers.  My husband put a new headliner in

5   it.  We replaced the seal in the back window because it

6   leaked.  And the seal that be bought didn't fit as correctly

7   as it should.  And we repainted the trunk.  And my husband —

8   he clear-coated this one.  And when he did that, it kind of

9   made a swirly thing on the — and it didn't turn out very well.

10      Q.   So, the paint job did not turn out very well?

11      A.   No, it did not.

12      Q.   Okay.  Now, in Exhibit 162, is that your house in

13  North Bend?  Is that where it was taken?

14      A.   Yes, it is.

15      Q.   And there appears to be a piece of plastic over the

16  car.

17      A.   Correct.

18      Q.   And why was that?

19      A.   Because the back window leaked.  We couldn't — we

20  put the window in there twice, and we couldn't get it to quit

21  leaking into the trunk.

22      Q.   Okay.  All right.

23           MS. McCREA:   At this point, Your Honor, we

24  would offer Defense Exhibits 162 and 163.

25           MS. SOUBLET:   And are these of this Mustang?

Carr   D    D9 26

1              MS. McCREA:   Yes.

2              MS. SOUBLET:   Did we get copies of these?

3              MS. McCREA:   Yes, I emailed them to you.

4              MS. SOUBLET:   I have no objection to these

5    two exhibits.

6              THE COURT:   Those exhibits are received.  The

7    numbers again?

8              MS. McCREA:   Nos. 162 and 163.

9              THE COURT:   They are received.

10             (Whereupon Defendant's Exhibits Nos. 162 and

11   163 were received into evidence.)

12       Q.   Now, Ms. Carr, you indicated that the back window

13   leaked.  And — and it leaked into the trunk?

14       A.   Correct.

15       Q.   Now, when you owned this Mustang, the blue Mustang,

16   did it have a trunk liner?

17       A.   No.

18       Q.   And why was that?

19       A.   Because on the coast, when you put something in a

20   trunk right on the metal, it creates rust.  And in any of the

21   vehicles that we did, if there was a trunk liner, we always

22   removed it.  And some of the pictures that we had of the

23   finished Mustangs, you can see that there was never anything

24   in the trunk.  Like this one.

25       Q.   When you say "this", we've got to get those - - -

```
       D9 27                                    Carr   D
```

1      A.   (Interposing) Right.  I'm sorry.

2      Q.   No. 158.  Okay.

3      A.   Yeah, there was - - -

4      Q.   (Interposing) So, you're talking about the red

5   Mustang?

6      A.   Right.

7      Q.   Okay.  Now, I'm going to show you what's been marked

8   for identification as Defendant's Exhibit 171.  Do you

9   recognize that photo?

10     A.   Yes.  That's the trunk of the Mustang in question.

11     Q.   Of the blue Mustang?

12     A.   Yes.

13     Q.   Okay.  And then I'm going to show you what's been

14  marked for identification as Defendant's Exhibit 172.  Do you

15  recognize that?

16     A.   Yes.

17     Q.   And what is it?

18     A.   It's rust damage, probably from the water that was

19  leaking into the trunk.

20     Q.   And is that also from the blue Mustang?

21     A.   Yes.

22     Q.   Now, do both of those pictures fairly and accurately

23  depict at least how the Mustang generally looked when you —

24  you and your husband owned it?

25     A.   Right.  We — when we bought it, it looked like this.

Carr   D    D9 28

1   And then when we sold it, we had removed all the rust and

2   sprayed it.

3        Q.   Okay.  So, when you say "it looked like this,"

4   you're referring to Exhibit 172?

5        A.   Yes.

6        Q.   And you're indicating that there was rust in the

7   trunk?

8        A.   There was when we purchased it.

9        Q.   Uh huh.

10       A.   But, when we sold it, we had removed it all.

11       Q.   Okay.  You removed the rust?

12       A.   Yes.

13       Q.   Okay.

14       A.   But, we did tell the gentleman that bought it that

15   it would probably happen again because as the water leaked in

16   there, it would sit in there and create the rust.

17       Q.   And the water leaked in there because of the back

18   window?

19       A.   Yes.

20       Q.   Now, when you sold the Mustang, what, if anything,

21   had you and Mr. Carr done to the trunk?

22            THE COURT:   You're talking about the blue

23   one?

24            MS. McCREA:   Yes.  I'm sorry.

25       Q.   I'm talking about the blue one.

```
   D9 29                                      Carr  D
```

1      A.   We sandblasted the trunk.  We removed the — the gas

2   tank.  The gas tank comes out in one great big piece.  We

3   sandblasted everything.  And we put the tank back in after we

4   had sandblasted that.  And then we sprayed it with a gray

5   primer paint.

6      Q.   Okay.  And in this exhibit, 172, can you see any of

7   that gray primer paint?

8      A.   Yes.  Right along here.

9      Q.   (Interposing) These - - -

10     A.   (Interposing) Uh, right along here.

11     Q.   Okay.  You're talking about sort of the - - -

12     A.   Yeah, the — the top - - -

13     Q.   - - - not the very bottom?

14     A.   Right.  Because see, here, you can that there not

15   any damage because the water hasn't really rested on that

16   area.

17     Q.   Okay.  All right.

18          MS. McCREA:   We'd offer Defense Exhibits 172,

19   and — well, let me make sure what they are.  Nos. 171 and 172,

20   Your Honor.

21          MS. SOUBLET:   No objection.

22          THE COURT:   Received.

23          (Whereupon Defendant's Exhibits Nos. 171 and

24   172 were received into evidence.)

25     Q.   Who did you and Mr. Carr sell the blue Mustang to?

Carr   D     D9 30

1    A.   I don't remember his name.  Sorry.  I found out

2    recently that it's Nick's grandfather.

3    Q.   Right.  Would it refresh your recollection if you

4    took a look at the check that was written to you and Mr. Carr?

5    A.   Yes, it would.

6    Q.   I'm going to show you what's been marked for

7    identification and Defendant's Exhibit 173.  Does that appear

8    to be a copy of the check that you received for purchase of

9    the Mustang?

10   A.   Yes.

11   Q.   And what's the person's name who paid you?

12   A.   Alvin Jensen?

13   Q.   Okay.

14   A.   Sorry.  I don't have my glasses on.

15   Q.   Well, I didn't mean to put you on the spot, there,

16   either.

17        And then, did you do a — a Bill of Sale - - -

18   A.   (Interposing) Yes, I did.

19   Q.   - - - to someone for that blue Mustang?

20   A.   Yes, I did.

21   Q.   And who was the Bill of Sale made out to?

22   A.   To Bruce McGuff.

23   Q.   Is it McGuff or McGuffin?

24   A.   McGuffin, I'm sorry.

25   Q.   Okay.  And — and does the amount that you sold the

```
     D9 31                                    Carr   D
```

1   vehicle for match the check from Mr. Jensen?

2       A.   Yes, it does.

3       Q.   And on what date did you sell the Mustang to

4   Mr. McGuffin?

5       A.   It would be March 8th.

6       Q.   Of what year?

7       A.   '99.

8               MS. McCREA:    We'd offer Defense Exhibit 173.

9               MS. SOUBLET:    No objection.

10              THE COURT:    Received.

11              (Whereupon Defendant's Exhibit No. 173 was

12   received into evidence.)

13      Q.   Now, Ms. Carr, you indicated that you replaced the

14   seat covers in this Mustang?

15      A.   Yes, I did.

16      Q.   And I'm going to show you — I'll show you what's

17   been marked for identification as Defense Exhibit 164.  Do you

18   recognize whether those are the seat covers that you put on

19   the vehicle?

20      A.   They are.

21      Q.   And how about in 166?

22      A.   Yes.

23      Q.   What was the condition of the seat covers before you

24   bought the Mustang?

25      A.   They were cracked and torn in the seams.

Carr   D     D9 32

1    Q.   And did you replace anything else?  I think, the

2    headliner?

3    A.   The headliner and the back seat.

4    Q.   And the back seat.  Okay.

5            MS. McCREA:   We'd offer 164 and 166, Your

6    Honor.

7            MS. SOUBLET:   I'm sorry.  Are these before or

8    after photos?

9            MS. McCREA:   These are after photos.  This is

10   after it's replaced.

11           MS. SOUBLET:   No objection.

12           THE COURT:   Received.

13           (Whereupon Defendant's Exhibits Nos. 164 and

14   166 were received into evidence.)

15   Q.   Do you remember about how much time you and your

16   husband spent refurbishing the blue Mustang?

17           MS. SOUBLET:   Objection.  Relevance.

18           THE COURT:   I'm not too sure I see the

19   relevance of that, one way or the other.  I'll sustain the

20   objection.

21           MS. McCREA:   That's fine.

22           We would offer Defense Exhibit 175, which is

23   the title to Mr. Huff.

24           MS. SOUBLET:   No Objection.

25           THE COURT:   Received.

```
    D9 33                                    Carr  D
```

1                (Whereupon Defendant's Exhibit No. 175 was

2   received into evidence.)

3                And we would offer Defense Exhibits 157, 158,

4   159, 160 and 161 as demonstrative of the work that the Carrs

5   did, Your Honor.

6                MS. SOUBLET:    I would object on grounds of

7   relevance.

8                THE COURT:    Sustained.

9                If you want those in the record, - - -

10               MS. McCREA:    (Interposing) I'll give those to

11  Ms. Cress, Your Honor.

12               THE COURT:    Thank you.

13               MS. McCREA:    Thank you for reminding me.

14               (Whereupon Defendant's Exhibits Nos. 157, 158,

15  159, 160 and 161 were received into evidence for the record

16  only.)

17      Q.   Bear with me for just a minute, Ms. Carr.

18      A.   No problem.

19               MS. McCREA:    We would also offer Defendant's

20  Exhibit 174 which is the title to the blue Mustang in the name

21  of Kathleen and Bruce McGuffin, Your Honor.  That may already

22  be in evidence through the State, but I'm not sure that they

23  are all the same documents.

24               MS. SOUBLET:    No objection.

25               THE COURT:    Received.

                                            Carr   X    D9 34

1            (Whereupon Defendant's Exhibit No. 174 was

2    received into evidence.)

3        Q.   Thank you, Ms. Carr.

4            MS. McCREA:    That's all the questions I have.

5            WITNESS:    Thank you.

6            THE COURT:    Cross?

7            MS. SOUBLET:    Thank you, Your Honor.

8                    CROSS EXAMINATION

9    BY MS. SOUBLET:

10       Q.   Ms. Carr, once that Mustang — you sold that Mustang

11   to McGuffins, you have no knowledge of what it was used for.

12       A.   I do not.

13       Q.   And you have no knowledge of its condition in June

14   of 2000?

15       A.   I do not.

16       Q.   Thank you.

17           MS. SOUBLET:    Nothing further.

18           THE COURT:    Any redirect?

19           MS. McCREA:    Just briefly.

20                    REDIRECT EXAMINATION

21   BY MS. McCREA:

22       Q.   Ms. Carr, you looked at — no, - - -

23           MS. McCREA:    Actually, that's fine, Your

24   Honor.

25           THE COURT:    Okay.

```
     D9 35                              Wilcox   D
```

 1                You may step - - -

 2                MS. McCREA:    (Interposing) Nothing further

 3                THE COURT:    You may step down.  You're free

 4     to leave.

 5                WITNESS:    Thank you.

 6                THE COURT:    Call your next witness, please.

 7                MS. McCREA:    The defense rests, Your Honor.

 8                THE COURT:    Thank you.

 9                Mr. Frasier, call your first rebuttal witness.

10                MR. FRASIER:    Thank you, Your Honor.

11                We recall Kathy Wilcox.

12                THE COURT:    Ms. Wilcox, you're still under

13     oath.  If you'd retake the stand, please.

14                          KATHY WILCOX

15     was thereupon produced as a rebuttal witness on behalf of

16     Plaintiff and, having previously been duly sworn to tell the

17     truth, the whole truth and nothing but the truth, was examined

18     and testified as follows:

19                       DIRECT EXAMINATION

20     BY MR. FRASIER:

21         Q.   Ms. Wilcox, I'd like to go back to your examination

22     of the shirt and the bra that were given to you by — or, that

23     were worn by — or, that were found on the body of Ms. Freeman.

24     Could you tell the jury, please, how closely did you examine

25     those garments?

Exhibit 102  Page 1449 of 1666 to
State Defendants' Motion for Summary Judgment

```
                                      Wilcox   D      D9 36
 1        A.   Um, well, I got right down on them, and examined
 2   them.  And you can tell from my picture, there was some low-
 3   powered magnification.
 4        Q.   When you say you "got right down on them", what do
 5   you mean?
 6        A.   Um, as you would physically examine anything you
 7   wanted to look at closely.  You know, you look at it closely.
 8        Q.   And there was some sort of magnification used?
 9        A.   Um, there must have been some low-powered
10   magnification.
11             MR. McCREA:    Object to the speculation as to
12   what must have happened.
13             THE COURT:    Sustained.
14        Q.   Well, you looked at your photographs that you took.
15        A.   Yes.
16        Q.   And do you have close-up photographs that were
17   taken?
18        A.   Yes.
19        Q.   And do they have the ruler that you used in there?
20        A.   Yes, they do.
21        Q.   To obtain those photographs, would some sort of
22   magnification have been used?
23        A.   Yes.
24        Q.   Now, again, in your examination, did you see
25   anything that caused you to believe that a sharp instrument,
```

```
    D9 37                                    Wilcox   X
```

1   such as a knife, had cut either document — or, either garmet?

2       A.   No.

3       Q.   Thank you.

4                MR. FRASIER:    That's all I have, Your Honor.

5                THE COURT:    Cross?

6                          CROSS EXAMINATION

7   BY MR. McCREA:

8       Q.   Ms. Wilcox, you testified previously that you had

9   received a copy of Mr. Meneely's report.  Is that correct?

10               MR. FRASIER:    Objection.  Outside the scope.

11               MR. McCREA:    Well, we'll tie it up.

12               THE COURT:    Just a minute.

13               I'm not too sure how you're going to tie it up,

14  but - - -

15               MR. McCREA:    Well, that's — that's fine.

16  Your Honor.

17               MR. McCREA:    I'll withdraw - - -

18               THE COURT:    (Interposing) Sustained.

19               MR. McCREA:    - - - the question for the

20  moment, Your Honor.

21               THE COURT:    Okay.  That's fine.

22               MR. McCREA:    All right.

23      Q.   Now, you didn't see the cuts in the fabric of the —

24  let's take it one at a time.  You didn't see the cut in the

25  fabric of the tank top when you examined it originally?

Wilcox   X    D9 38

1    A.    That is correct.

2    Q.    And the photographs you took were as much

3  magnification — they display as much magnification as you used

4  in the course of that examination.  Is that correct?

5    A.    I cannot recall exactly what magnification I used.

6  I call it — I call it "low-powered magnification".

7    Q.    Excuse me?

8    A.    Low-powered magnification.

9    Q.    Low powered?

10    A.    Right.

11    Q.    Okay.  You have been present at the testimony of

12  Mr. Meneely?

13    A.    Yes.

14    Q.    And it is correct that you never, at any time, used

15  the kind of power magnification that he used a lot?

16    A.    I don't know what he used.

17    Q.    Well, did you hear him testify?

18    A.    Yes.

19    Q.    And you've seen the photographs?

20    A.    Yes.

21    Q.    All right.  And looking at the photographs that he

22  took, and comparing it with the photographs you made, it

23  demonstrates, does it not, that he used extremely greater

24  magnification than you used?

25    A.    For the photographs.  I don't know what he used for

```
     D9 39                              Wilcox  X
```

1   his exam.

2        Q.   All right.

3        A.   Photographs are representative of your work.  At the

4   time, eleven years ago, when I did this, I just used what I

5   had at the lab at the time that seemed reasonable.

6        Q.   Right.

7        A.   I might have looked at them more closely.

8        Q.   Well, understand, none of my questions are intended

9   to be accusatory.  You understand that?

10       A.   Yes.

11       Q.   You did the best you could with what you had at the

12  time.

13       A.   Yes.

14       Q.   Okay.  And now, — and what you're saying is that

15  using the best you had at the time, you weren't able to see

16  the cut.

17       A.   I still do not see the cut.

18       Q.   Well, did you go and make a — you say you still do

19  not see it.

20       A.   That is correct.

21       Q.   Have you made a re-examination of the material?

22       A.   No.

23       Q.   Pardon?

24       A.   No.  I have looked at the photographs.

25       Q.   Well, now, in conjunction with still not seeing the

Wilcox   X    D9 40

1   cut — you got a copy of Meneely's report, did you not?

2        A.   Yes, I did.

3        Q.   And - - -

4             MR. McCREA:    May I have Exhibit 152?

5             MS. McCREA:    Exhibit 154.

6             MR. McCREA:    I'm sorry.  I apologize, 154.

7             MR. McCREA:    May I approach, Your Honor.

8             THE COURT:    You may.

9        Q.   I hand you an item in evidence marked for

10   identification as Defendant's Exhibit 154.  And I ask if you

11   recognize that?

12        A.   Yes, I do.

13        Q.   And that's the report of Mr. Meneely that you

14   received?

15        A.   Yes.

16        Q.   And in conjunction — or, in that report, did you

17   look at the item regarding Area 1 of the tank top shirt?

18        A.   Yes, I did.

19        Q.   And - - -

20             MR. McCREA:    And by the way, Your Honor, we

21   will offer, at this time, Exhibit 154.

22             MR. FRASIER:    Again, we've objected to it.

23   The Court has sustained the objection.  We renew that

24   objection.

25             THE COURT:    I'll keep with the ruling.

```
    D9 41                              Wilcox   X
```

1              MR. McCREA:    Pardon?

2              THE COURT:    The ruling — I previously had

3     sustained the objection of that, and stated the reasons for

4     that.  I think that was out of the presence of the jury.  But

5     I have sustained the objection and explained the reasons for

6     that.  You're re-offering it again, and - - -

7              MR. McCREA:    (Interposing) We're offering it

8     again because she's testified that she still doesn't see the

9     holes.

10             THE COURT:    (Interposing) Okay.  I don't

11    think offering the report would do anything in relation to

12    that.  So, the objection is still sustained.

13             MR. McCREA:    Well, may I be heard just

14    briefly?  I don't - - -

15             THE COURT:    (Interposing) Yes.

16             MR. McCREA:    - - - mean to belabor it.

17             THE COURT:    No, that's fine.  Go ahead.

18             MR. McCREA:    The report directs a person to

19    where the holes are, and what they — what they look like, and

20    the direction, to assist her finding them.

21             THE COURT:    Well, and you can certainly

22    question her about it.  But, it doesn't do anything other than

23    repeat Mr. Meneely's testimony, which the jury already has.

24             So, the objection is sustained.

25             MR. McCREA:    Thank you, Your Honor.

Wilcox   X     D9 42

1      Q.    Excuse my back for a moment.

2            You have a copy of that same report in front of you,

3    do you not?

4      A.    Yes, I do.

5      Q.    In other words, I'm not taking away from you what

6    you examined — the report you examined.  You have the same

7    thing in front of you?

8      A.    Yes, I do.

9      Q.    And referring to the tank top shirt in Area 1, it

10   describes the — "a hole that displays microscopic

11   characteristics consistent to a sharp instrument.  And this

12   area is approximately 1.5 centimeters in length."  Is that

13   correct?

14     A.    That is correct.

15     Q.    And when did you receive the report?  How long

16   before this trial?

17     A.    Uh, the night before I testified, so it was about

18   the 12th.  I — I just received it.

19     Q.    The night before you testified?

20     A.    Yes.

21     Q.    And you had it since that time?

22     A.    Yes.

23     Q.    And based on your training and experience as a — as

24   a Criminalist, you don't have any trouble understanding what

25   this report says, do you?

```
     D9 43                                    Wilcox  X
```

1       A.   No, I do not.

2       Q.   Okay.  Now, have you ever gone to look at the tank

3   top since you got the report to see if, in fact, there is a

4   hole that displays microscopic characteristics consistent to a

5   sharp instrument, and that this area is approximately 1.5

6   centimeters in length?

7       A.   I have not looked at the tank top.  I have looked at

8   my own photographs.

9       Q.   My — my question is just that.

10      A.   Okay.  I've not physically looked at the tank top

11  again.

12      Q.   Now, you — I didn't mean to keep you from

13  explaining.  You've looked at what?  Your photograph?

14      A.   Yes.

15      Q.   All right.  And you've looked at Mr. Meneely's

16  photograph?

17      A.   Yes, briefly.

18      Q.   And the — that cut — or that hole, I guess it's

19  called, is displayed in Mr. Meneely's photograph?

20      A.   Yes, it is.

21      Q.   So, at least you have seen it in Mr. Meneely's

22  photograph?

23      A.   Yes.

24      Q.   Now, dealing with the sports bra and the portion

25  that says Area 2, in that it says, "This hole is located in

1  the front, upper-mid section of the material.  This hole

2  displays microscopic characteristics consistent to a sharp

3  instrument.  This area is approximately 1.5 centimeters in

4  length."  Correct?

5       A.   Correct.

6       Q.   And again, you had no trouble understanding that

7  description?

8       A.   I have no trouble understanding that.

9       Q.   Okay.  And did you ever, up to this moment, re-

10  examine this sports bra to see if, in fact, you could find

11  that hole?

12       A.   No, I have not re-examined - - -

13       Q.   (Interposing) But, you did - - -

14       A.   - - - the clothing.

15       Q.   - - - see it in Mr. Meneely's photograph?

16       A.   Yes.

17       Q.   And in both instances, the photographs of the — of

18  the holes, both in the tank top and the sports bra, are

19  consistent with what his description is in the report.

20       A.   I would not agree that they are cut marks.  I still

21  see the - - -

22       Q.   (Interposing) Wait a minute.

23       A.   - - - frayed edges.

24       Q.   My question is - - -

25       A.   (Interposing) But, I — you — the description

```
   D9 45                                Wilcox  X
```

1  describes them as a cut.  I'm just not seeing it.

2      Q.   All right.  Did you look at the photographs — had

3  you looked at the photographs before you testified?

4      A.   No.

5      Q.   But — and, I guess — I suppose — well, just so it's

6  clear — I make it clear, since you have examined — I mean,

7  since you have not examined either of the items of clothing,

8  you have not subsequently brought high magnification —

9  microscopic examination into your view of what's there.  Is

10 that correct?

11     A.   That is correct.

12     Q.   Okay.  Is it — is it significant that both of these

13 holes are of exactly the same length?

14     A.   Well, I think he uses approximately on both of them.

15 And there were other holes that were approximately those

16 lengths, too.

17     Q.   Take out my "exactly".  Is it significant that they

18 are the same length?

19     A.   It could be.

20     Q.   Thank you.

21             MR. McCREA:    That's all the questions I have.

22             THE COURT:    Redirect?

23             MR. FRASIER:    Thank you, Your Honor.

24                   REDIRECT EXAMINATION

25 BY MR. FRASIER:

Wilcox   ReD   D9 46

1    Q.   Ms. Wilcox, going back to your examination back in —

2    in the year 2000, prior to your examination you were aware

3    that an autopsy had been performed on the body of Ms. Freeman?

4    A.   Yes.

5    Q.   And you were aware that the police and the

6    authorities were trying to determine how she died?

7    A.   Yes.

8    Q.   You were aware that the results, because of the

9    condition of the body were somewhat lacking?

10                MR. McCREA:    Excuse me.   The re-direct is

11   going way outside the scope of cross.

12                MR. FRASIER:    Well, I'm going to tie it up

13   here with my next question.

14                THE COURT:    Okay.  Go ahead.

15   Q.   When you were examining the clothes, were you

16   looking for anything that could help you determine how Leah

17   Freeman died?

18   A.   Yes.

19   Q.   And that would include a close examination to see if

20   you could find a cut mark, a bullet hole, whatever?

21   A.   Yes.

22                MR. McCREA:    I'll object to leading, Your

23   Honor.

24                THE COURT:    Sustained.

25   Q.   What were you looking for?

```
D9 47                              Wilcox  ReD
```

1      A.    I was looking for any sign of a weapon, bullet,

2  trace evidence — because we did not have a cause of death, at

3  that point, and we were — that was a big part of the

4  investigation.

5      Q.    Now, just so we're clear, you had looked at the

6  photographs of these areas that Mr. Meneely is calling cut

7  marks.

8      A.    Yes.

9      Q.    And you've looked at his photographs that have been

10  admitted in evidence here today?

11      A.    Yes, I did, briefly.

12      Q.    And it — what is your opinion regarding those marks

13  that you see in those photographs?

14      A.    Well, when I read his report, I thought it was going

15  to be cut marks from the other lab that looked at them after

16  me and before him — the British lab.  But I think he's taking

17  photographs of the same things I have photographs of.  And I

18  still don't see why he can call them cut marks, because I

19  still see the frayed edges, and the curling of the cloth.

20              I — I was really thinking about it, and I'm

21  thinking, well, it is a knit material, so if the knife wasn't

22  very sharp, you know, that maybe it was a small knife.  But I

23  don't see how you can say that.  I really don't.

24      Q.    Why is that?

25      A.    Um, you're supposed to be really objective as a

Exhibit 102  Page 1461 of 1666 to
State Defendants' Motion for Summary Judgment

```
                                    Wilcox   ReD   D9 48
```

1   Forensic Scientist.  So, I'm — I kind of have to agree with

2   the British lab.  I do not see the cut marks.  And I don't see

3   them in his photographs.  If they could have been made by a

4   knife and then later frayed somehow, or because of the

5   dullness of the knife, that maybe as a remote possibility.

6   But I do not see the cut marks.

7       Q.   But, the marks that you — that have been identified

8   by Mr. Meneely, so we're clear, you do not believe that

9   they're cut marks?

10              MR. McCREA:    Objection to leading his

11   witness, Your Honor.

12              THE COURT:    I'll sustain.

13              You can ask her her opinion.

14      Q.   What is your opinion of those marks that Mr. Meneely

15   claims are cut marks?

16              MR. McCREA:    Well, she's already answered

17   that question, Your Honor.  She testified - - -

18              THE COURT:    (Interposing) Over — overruled.

19              You can answer.

20      A.   I did not identify those as cut marks.  I think they

21   are — since there are similar marks like that, that are

22   clearly animal damage, I would think that these would be

23   animal damage, also.

24      Q.   Thank you.

25              MR. FRASIER:    That's all the questions I

D9 49                                              Zanni   D

1   have, Your Honor.

2                THE COURT:    You may step down.

3                MR. FRASIER:    And may she be excused, please?

4                THE COURT:    Yes.

5                MR. FRASIER:    We'd recall Sheriff Zanni.

6                THE COURT:    And I think I told you you had to

7   be available, so if you'd retake the stand.  You're still

8   under oath.

9                              CRAIG ZANNI

10  was thereupon produced as a rebuttal witness on behalf of

11  Plaintiff and, having previously been duly sworn to tell the

12  truth, the whole truth and nothing but the truth, was examined

13  and testified as follows:

14                           DIRECT EXAMINATION

15  BY MR. FRASIER:

16     Q.   Sheriff Zanni, I believe you previously testified

17  you became involved in this investigation in early July of

18  2000?

19     A.   Yes.

20     Q.   And during the course of your — your work in this

21  case, in the month of July of 2000, did you have the

22  opportunity to observe the Defendant in this case?

23     A.   On multiple occasions, yes.

24     Q.   At any time, did you see him wearing a neck brace?

25     A.   Not that I can recall.

```
                                        Zanni   D     D9 50
```

1     Q.    Did you see anything that caused you to believe he

2    had any physical limitations?

3     A.    No.

4     Q.    Thank you.

5              MR. FRASIER:    That's all I have.

6              THE COURT:    Cross?

7              MS. McCREA:    No questions, Your Honor.

8              THE COURT:    You may step down.

9              WITNESS:    Thank you, Your Honor.

10             THE COURT:    Call your next witness.

11             MR. FRASIER:    We have no further witnesses,

12    Your Honor.

13             THE COURT:    Ms. McCrea, anything?

14             MS. McCREA:    Can I confer with counsel, Your

15    Honor?

16             THE COURT:    Sure.

17             MS. McCREA:    Nothing further, Your Honor.

18             THE COURT:    Okay.

19             MS. McCREA:    It's — I would — I do have a

20    matter for the Court, of course.

21             THE COURT:    Okay.

22             Ladies and gentlemen, if you want to step out,

23    we'll take care of this matter, and then I'll come back and

24    give you instructions, and we'll start the closing arguments.

25             Remember the admonition, please.  Take your

D9 51                                    Motion

1   notes with you.

2                   (Jury out.)

3                   THE COURT:   Go ahead.

4                   MS. McCREA:   Your Honor, the defense renews

5   the Motion for Judgment of Acquittal based on the same grounds

6   as indicated at the close of the State's evidence.

7                   THE COURT:   Okay.  And that's denied.

8                   Anything else?

9                   MS. McCREA:   No, Your Honor.

10                  THE COURT:   Okay.  And I think the

11  instructions we've gone over, including the new one that I

12  gave to counsel this morning — which I understand there was no

13  objection to.  And those will be the instructions.

14                  I had the Verdict form from both the State and

15  the defense.  The one from the defense came by email sometime,

16  I think, this weekend.  I thought this morning, I'm going to

17  use the one from the State because I think it follows the

18  instructions, so we'll use that one.

19                  MS. McCREA:   My — my inquiry would be, does

20  it list Not Guilty first?

21                  THE COURT:   It lists them opposite — not —

22  not in order.  They're parallel to each other.

23                  MS. McCREA:   And is Not Guilty the first

24  option?

25                  THE COURT:   No.  That's — well, there's two

D9 52

1   options — Guilty, Not Guilty.  They're on the same line.  So,

2   I don't know that there's really a first or second option in

3   that regard.  They're not listed on above the other.

4              MS. McCREA:    Right.  In the Uniform Jury

5   Instructions, typically, Not Guilty is usually the first

6   option because of the presumption of innocence.

7              THE COURT:    Uh, I guess — I've used this type

8   of Verdict form for 31 years.  So, I've — and it's never been

9   an issue.  So, I will use it.  I don't — I've never found that

10  to be a factor in any case that I can recall, because the jury

11  has returned Not Guilty verdicts and Guilty verdicts

12  throughout the history of me being on the bench, anyway.

13             Okay.  We'll take about fifteen minutes.

14  Instruct at 10:30, and then the State will give its first

15  argument, and I'll try to take a break between each argument —

16  a brief break.

17             MS. McCREA:    Thank you, Your Honor.

18             THE COURT:    Depending on how long the

19  argument is.

20             And you each are entitled to two hours and —

21  unless you want me — the only thing I would suggest what I

22  might do is that if you're within fifteen minutes of your two

23  hours, and I — most the time I don't think that's going to

24  happen — I can advise you of that.  Or, if you want to keep

25  track of your own time, that's fine.

D9 53

1          Okay.  We'll be in recess until 10:30.

2          Oh, before we go off the record, I do want to

3  let people know that there are three reserve seats for the

4  State, three reserve seats for the Defendant, two reserve

5  seats for the TV camera, and two reserve seats for the Deputy

6  Sheriffs.  There are no other reserve seats, and no one can

7  reserve a seat in this — in these matters.  And neither side

8  can reserve a seat for other people.

9          During the closing arguments, I don't care if

10  you leave, but I'm not going to have people coming in and out.

11  So, if you leave, you're not going to be coming back in,

12  because I don't want the arguments disrupted with that door

13  opening and closing.  So, if you want to be in, come in.

14          That's with the exception of either the defense

15  investigator or a State's investigator going out and doing

16  something and (not understandable).  Other than that, people

17  need to stay in.

18          MR. FRASIER:   Your Honor, and also, in my

19  closing, there will be at least one picture of the deceased at

20  the scene.

21          THE COURT:   All right.  And since

22  Ms. Courtright is entitled to be in here under the law, I

23  guess she would be an exception also.  But, I would ask that

24  that be kept to a minimum of going in and out.  There will be

25  a — there will be a photograph, and it's not a pleasant

Charge        D9 54

1   photograph, of Ms. Freeman.  Okay?

2           We'll be in recess — 10:30.

3                   (RECESS)

4           JUDICIAL ASSISTANT:    All rise.

5           THE COURT:    Be seated, please.

6           Ladies and gentlemen, I will pass out the jury

7   instructions for your use.  Please do not read ahead.

8           JUROR:    (Not understandable.)

9           THE COURT:    No, I'll read them.  Just follow

10  — follow along with what I'm reading.

11          Okay.  Each instruction will have a title.  The

12  titles themselves are not important.  They're just kind of a

13  reference point to you.  If one of you wants to refer to an

14  instruction, you can refer to the title.  But, the titles

15  themselves are not really important.

16          We'll start with Functions of the Court and

17  Jury.  It is your sole responsibility to make all the

18  decisions about the facts in this case.  You must evaluate the

19  evidence to determine how reliable or how believable that

20  evidence is.  When you make your decision about the facts, you

21  must then apply the legal rules to those facts and reach your

22  verdict.

23          Remember, however, that your power to reach a

24  verdict is not arbitrary.  When I tell you what the law is on

25  a particular subject, or tell you how to evaluate certain

D9 55                                    Charge

1   evidence, you must follow these instructions.

2            Do not allow anything I have said or done

3   during the course of this trial to suggest that I have formed

4   any opinion about this case.  Keep in mind that a judge is

5   required by law to give certain instructions in every criminal

6   case.

7            When I have sustained objections to evidence or

8   ordered that evidence be stricken or excluded from your

9   consideration, you must follow these rulings.  Do not consider

10  such matters during your deliberations.  Base your verdict on

11  the evidence and these instructions.

12           The lawyers' statements and arguments are not

13  evidence.  If your recollection of the evidence is different

14  from the lawyer's recollection, you must rely on your own

15  memory.

16           In deciding this case, you are to consider all

17  the evidence you find worthy of belief.  It is your duty to

18  weigh the evidence calmly and dispassionately and decide this

19  case on its merits.  Do not allow bias, sympathy, or prejudice

20  any place in your deliberations.  Do not decide this case on

21  guesswork, conjecture, or speculation.

22           Do not consider what sentence might be imposed

23  by the Court if the Defendant is found guilty.

24           Generally, the testimony of any witness whom

25  you believe is sufficient to prove any fact in dispute.  You

Charge        D9 56

1  are not simply to count the witnesses, but you are to weigh

2  the evidence.

3          Keep in mind that each party is entitled to the

4  considered decision of each juror.  Therefore, you should not

5  give undue weight to another juror's notes or memory if they

6  conflict with your recollection of the evidence.

7          The Court has provided written jury

8  instructions for your use.  When you use these instructions,

9  do not place undue emphasis on any particular instruction, but

10  rather view the instructions as a whole.

11          Direct or Circumstantial Evidence.  There are

12  two types of evidence.  One is direct evidence, such as the

13  testimony of an eyewitness.  The other is circumstantial

14  evidence, the proof of a chain of circumstances pointing to

15  the existence or non-existence of a certain fact.  You may

16  base your verdict on direct evidence or on circumstantial

17  evidence or on both.

18          Inferences.  In deciding this case, you may

19  draw inferences and reach conclusions from the evidence, if

20  your inferences and conclusions are reasonable and are based

21  on your common sense and experience.

22          Evaluating Witness Testimony.  The term

23  "witness" includes every person who has testified under oath

24  in this case.  Every witness has taken an oath to tell the

25  truth.  In evaluating each witness's testimony, however, you

D9 57                                    Charge

1    may consider such things as:

2                   One, the manner in which the witness testifies;

3                   Two, the nature or quality of the witness's

4    testimony;

5                   Three, evidence that contradicts the testimony

6    of the witness;

7                   Four, evidence concerning the bias, motives, or

8    interest of the witness.

9                   Five, evidence that the witness has been

10   convicted of a previous crime.

11                  Witness' Prior Conviction.  If you find that a

12   witness has been convicted of a crime, you may consider this

13   conviction only for its bearing, if any, on the credibility of

14   the witness.

15                  Witness False in Part.  A witness who lies

16   under oath in some part of his or her testimony, is like to

17   lie in other parts of his or her testimony.  Therefore, if you

18   find that a witness has lied in some part of his or her

19   testimony, then you may distrust the rest of that witness'

20   testimony.

21                  Sometimes witness who are not lying may give

22   incorrect testimony.  They may forget matters, or may

23   contradict themselves.  Also, different witnesses may observe

24   or remember an event differently.  You will have the sole

25   responsibility to determine what testimony or portions of

Charge        D9 58

1  testimony you will or will not rely on in reaching your

2  verdict.

3              Defendant Not Testifying.  A Defendant also has

4  an absolute Constitutional right not to testify.  Therefore a

5  Defendant's decision not to testify cannot be considered as an

6  indication of guilt.  It should not be commented on or in any

7  way considered by you in your deliberations.

8              Defendant's Statements.  When a witness

9  testifies about statements made by the Defendant, you should

10 consider such testimony with caution.  In reviewing such

11 testimony, you should consider, among other things, the

12 following:

13             One, did the Defendant make the statement and

14 if so, did the Defendant clearly express what he intended to

15 say?

16             Two, did the witness correctly hear and

17 understand what the Defendant said?

18             Three, did the witness correctly remember and

19 relate what the Defendant said?

20             Four, did the witness intentionally or

21 mistakenly alter some of the words used by the Defendant,

22 thereby changing the meaning of what was actually said?

23             If after weighing such factors, you conclude

24 that the Defendant said what he intended to say, and that the

25 witness to the statement correctly understood, remembered, and

D9 59                                        Charge

1    related to you what the Defendant said, then you are

2    authorized to consider such statements for what you've deemed

3    them to be worth.

4                    Expert Opinion.  An expert witness is a person

5    with special skills or education in a particular field.  Even

6    though expert witnesses may testify about their opinions, you

7    are not required to accept those opinions.

8                    To determine the value, if any, you will give

9    to an expert's opinion you should consider such things as:

10                   The expert's qualifications;

11                   The expert's opportunity and ability to form

12   the opinion;

13                   The expert's believability; and

14                   How the expert reached the opinion or

15   conclusion.

16                   Non-Expert Opinion.  Although a witness may be

17   allowed to state his or her opinion, you are not required to

18   accept that opinion.  To determine what value, if any, you

19   will give to a witness' opinion, you should consider such

20   things as:

21                   The witness' opportunity and ability to form

22   the opinion;

23                   The witness' believability; and

24                   How the witness reached the opinion or

25   conclusion.

Charge        D9 60

1              Age.  It is not unlawful for a person who is

2    eighteen years of age to engage in sexual conduct with a

3    person under eighteen years of age, if the difference in their

4    ages is less than three years.

5              Innocence of Defendant - Proof Beyond a

6    Reasonable Doubt.  The Defendant is innocent unless and until

7    the Defendant is proven guilty beyond a reasonable doubt.  The

8    burden is on the State to prove the guilt of the Defendant

9    beyond a reasonable doubt.

10             Reasonable doubt is doubt based on common sense

11   and reason.  Reasonable doubt means an honest uncertainty as

12   to the guilt of the Defendant.  Reasonable doubt exists when,

13   after careful and impartial consideration of all the evidence

14   in the case, you are not firmly convinced that the Defendant

15   is guilty.

16             The charged crime against Mr. McGuffin is

17   Murder.  Oregon law provides that a person commits the crime

18   of Murder if that person intentionally causes the death of

19   another human being.

20             In this case, to establish the crime of Murder,

21   the State must prove beyond a reasonable doubt the following

22   three elements:

23                  One, the act occurred in Coos County, Oregon;

24                  Two, the act occurred on or about June 28,

25   2000; and

```
D9 61                              Charge
```

1    Three, the Defendant intentionally caused the

2    death of Leah Freeman, another human being.

3    "Human being" means a person who has been born,

4    and is alive at the time of the criminal act.  Criminal

5    homicide includes Murder and Manslaughter in the First Degree.

6    Intentionally.  And you use this definition in

7    relation to Murder.  A person acts intentionally when the

8    person acts with a conscious objective to cause a particular

9    result.  When used in the phrase "intentionally caused the

10   death of Leah Freeman", intentionally means that the Defendant

11   acted with a conscious objective to cause Leah Freeman's

12   death.

13   Lesser-Included Offense.  The charged crime of

14   Murder has, as a lesser-included offense of the crime of

15   Manslaughter in the First Degree.  Oregon law provides that a

16   person commits the crime of Manslaughter in the First Degree

17   if that person recklessly causes the death of another human —

18   of another person, excuse me, under circumstances manifesting

19   extreme indifference to the value human life.

20   In this case, to establish the crime of

21   Manslaughter in the First Degree, the State must prove beyond

22   a reasonable doubt the following material elements:

23   One, the act occurred in Coos County, Oregon;

24   Two, the act occurred on or about June 28,

25   2000; and

1            Three, the Defendant unlawfully and recklessly

2     caused the death of Leah Freeman under circumstances

3     manifesting an extreme indifference to the value of human

4     life.

5            Recklessly.  And you use this in relation to

6     the Manslaughter charge.  A person acts recklessly if that

7     person is aware of and consciously disregards a substantial

8     and unjustifiable risk that a particular result will occur.

9     The risk must be of such nature and degree that disregarding

10    it constitutes a gross deviation from the standard of care

11    that a reasonable person would observe in the situation.

12            When used in the phrase "recklessly caused the

13    death of Leah Freeman under circumstances manifesting an

14    extreme indifference to the value of human life, recklessly

15    means the Defendant was aware of and consciously disregarded —

16    disregards a substantial and unjustifiable risk that he would

17    cause her death, and it was under circumstances manifesting an

18    extreme indifference to the value of human life.

19            The risk must be of such nature and degree that

20    disregard thereof constitutes a gross deviation from the

21    standard of care that a reasonable person would observe in the

22    situation.

23            Recklessness is also established if the person

24    acts intentionally.

25            Lesser-Included Offense - Explanation or

```
    D9 63                              Arguments
```

1  Comparison.  The Court has instructed you about the proof

2  required for the charged offense of Murder, and the lesser-

3  included offense of Manslaughter in the First Degree.  The

4  difference in proof required in the charged offense as

5  compared to the lesser-included offense is as follows:

6          Murder requires the Defendant intentionally

7  caused the death of Leah Freeman, whereas Manslaughter in the

8  First Degree requires Defendant recklessly caused the death of

9  Leah Freeman under circumstances manifesting an extreme

10 indifference to the value of human life.

11         The last two instructions I will give to you

12 when the attorneys finish their arguments.

13         Mr. Frasier, you may give the State's first

14 argument.

15         MR. FRASIER:   Thank you, Your Honor.

16         May it please the Court, counsel, ladies and

17 gentlemen.

18         Today we've reached a point where a decision

19 has to be made.  Eleven years ago, this young woman

20 disappeared off the streets of Coquille.  And today, we are

21 coming to you to ask you to hold the Defendant accountable for

22 what he did to her eleven years ago.

23         We know that on June 28th of 2000, Leah Freeman

24 disappeared.  We know August the 3rd, her body was found,

25 dumped beside a gravel road.

```
                                    Arguments      D9 64

 1            As we think about what you've heard over the

 2   last two weeks, this is probably the question that comes to

 3   mind — what happened?

 4            Now, I want to make something abundantly clear.

 5   The State of Oregon is not saying that Nick McGuffin, for a

 6   week or two months or a year, planned to kill his girlfriend.

 7   We are not saying that on the morning of June 28th when he woke

 8   up that day, he woke up with the idea of, "I am going to kill

 9   Leah Freeman."

10            The evidence, we believe, shows that a tragic

11   set of circumstances came together on June 28th. We know these

12   people were a devoted couple, at times. There's no question

13   that at various points of this relationship, they expressed

14   love and affection for each other. But, they were violent

15   with each other, at times. We've got two people here that are

16   kind of feisty — fiery, if you will. And it was a

17   relationship, frankly, that under the right conditions could

18   erupt — and did erupt — into a violent end.

19            What happened June 28, 2000, was the pressures,

20   the feelings, teenage emotions, whatever you want to call it,

21   erupted into a catastrophe that ended the life of Leah

22   Freeman. And after that incident occurred, there's some

23   panic. "What am I going to do?" And as you've heard, the

24   Defendant goes about town making sure he's seen, and he's

25   concerned about Leah. And as I go through my argument here
```

D9 65                              Arguments

1  today, he's showing emotion and concern about Leah.  But, he's

2  also concerned about the tragic mistake he has made.

3          Now, over time, as the police did what they did

4  back in 2000, the Defendant becomes a little bit arrogant.

5  For eleven years he's gotten away with this.  So, as I

6  indicated when I started, today we're here to ask you to hold

7  him accountable for what happened.

8          Now, in deciding this case, there are basically

9  two questions that need to be answered.  The first is, was

10 Leah Freeman the victim of a homicide?  And the second

11 question, if she was the victim of a homicide, who killed her?

12 If the answer to the first question is no, this case is over.

13 If you decide she wasn't the victim of a homicide, we're done.

14 We go home.  That's it.  But, if you answer that question yes,

15 then we move on to, did the Defendant do it?

16         Now, I want to talk a little bit about the

17 first question, because it needs to be addressed.  I don't — I

18 don't intend to spend a lot of time on it because I think,

19 using your common sense, you'll see that she was, in fact, a

20 homicide victim.  And that perhaps there's not even a dispute

21 about it.  But in any event, was she murdered?

22         Of course, we say that, yes, she was murdered.

23 Why do we say this?  Well, as we go through a process of

24 elimination, if you will, we know she doesn't have any health

25 problems.  She was not diabetic.  She didn't have a heart

1  murmur.  She's passed the physicals that she needed to

2  participate in sports.  So, there's no natural reason for her

3  to be dead.  We know she doesn't have any drugs in her

4  tissues, so there's no indication that this is like an

5  accidental drug overdose, or something along that line.  She

6  doesn't have any broken bones.  There's no evidence, for

7  example, that she fell down that bank and broke her neck.  You

8  know, there's just nothing out there to indicate that this was

9  an accident, even.  She's not suicidal.  And again, like I

10 say, it's not an accident.

11          Well, how do we know this is a homicide?  Well,

12 I think one of the things you have to look at is the

13 circumstances of her disappearance.  Okay?  First off, we know

14 one minute she's walking home down the streets of Coquille.

15 The next minute, she's gone.  One day she looks like this.

16 Five weeks later we find her like this.

17          One day we find her — she's walking through the

18 City of Coquille here.  Five weeks later we find her body —

19 excuse me, I have to get up here a little closer — we find her

20 body right there.  And a few days after her disappearance, one

21 of the shoes she was wearing, we find up here, off of Hudson

22 Ridge.  When you look at these circumstances, this was not an

23 accidental death.

24          Well, we've got a little bit more.  If she had

25 died of natural causes, why is her body dumped out where it

D9 67                              Arguments

1   was found?  If it's an accident, why is her body placed where

2   it is?  If she committed suicide, why is somebody hiding the

3   body.  These don't — this just doesn't make any sense.  If you

4   look at these circumstances, it's clear somebody is trying to

5   cover up the fact she was murdered.

6            Well, now, let's look at the autopsy.  You've

7   heard from Dr. Olson, the Medical Examiner for Coos County, a

8   man who's been doing this for — I think he said almost over 30

9   years, twenty-whatever.  And granted, there wasn't much left

10  of her body for him to work with.  But, he listed the manner

11  of death of homicide, and the cause of death as homicidal

12  violence of undetermined origin.  The Medical Examiner has

13  issued his opinion that she's the victim of a homicide.

14           Well, are there some things that we can also

15  exclude from her cause of death.  Well, we do know some facts.

16  We submit there's no evidence she was shot.  Granted, her body

17  — there wasn't much there for the doctor to work with.  But if

18  she'd been shot, we would have seen a bullet hole in her

19  clothes.  No one has identified that.  If she'd been shot in

20  the head, there would have been a hole in the skull, and there

21  wasn't anything like that.  Her skull wasn't fractured.  She

22  didn't have any drugs in her system.  And, as I'm thinking

23  about it, her body was x-rayed, what was left of it.  There

24  were no fractures in any of the bones.

25           One thing cannot be excluded due to the

1   condition of the body, and that is strangulation.  And I

2   realize the defense will argue that she — that, in their

3   opinion, she was stabbed.  That is, again, something we'll

4   talk about more as the day goes on, I'm sure.  But why should

5   we consider strangulation?  And the reason we should consider

6   it is the statement that the Defendant made to Mr. Breakfield

7   you heard last week, which was, "I strangled that bitch."

8           Now, even the defense, as I've indicated, seems

9   to concede that she's a homicide victim.  It's their theory

10  that she was stabbed.  But again, using your common sense and

11  reason, a reasonable conclusion from the facts of this case is

12  that Leah Freeman was the victim of a homicide.  She died at

13  the hands of another.

14          Now, I began my argument today talking about

15  how this was a tragic set if circumstances that came together

16  — one horrible event on June 28th.  We need to talk about what

17  those circumstances were.  What was going on in this

18  relationship?  What was going on on the night of June 28th.

19          Let's start off with this.  Well, was this

20  relationship headed for disaster?  The evidence would — well,

21  yes, it was.  It was a relationship headed for disaster.

22  Let's look at some things that would indicate that it was.

23          First off, was the Defendant possessive of Leah

24  Freeman to the exclusion of all others?  We have a couple of

25  things I'd like you to consider.  One of the things you'll

D9 69                               Arguments

1   have in evidence when you go back there is what's called

2   State's Exhibit No. 93.  And that is a series of pages that

3   were taken — or, scanned from the annual that was seized from

4   the Defendant's home in July of 2000 — the yearbook for the

5   class — or, for the year of 2000, State's Exhibit 93.

6                    Now, I'm going to show you one page, here — I'm

7   going to show you several pages.  But, as you can see, here's

8   a picture of Leah Freeman there, got a heart around it.

9   That's no big deal.  You know, people — boyfriend/girlfriend

10  do that all the time.  But as we go through this, you're going

11  to see some more things.

12                   This is another page in the yearbook.  There's

13  a picture of the Defendant.  It says, "Don't date freshmen,"

14  and then you have the words "except for Leah Freeman" off to

15  the side, there.

16                   Now, we go on further.  This is a picture of

17  the volleyball teams and what have you.  There's a picture of

18  the volleyball team Ms. Freeman was on.  You can see her

19  picture.  You know, she's right here.  Got the heart around it

20  again.  And then it says, "Forever."  Again, perhaps nothing

21  more to be read from that, perhaps.  The State - - -

22                   We go through this again.  Here's another page

23  again showing Ms. Freeman with her friends, again with the

24  heart drawn around it.  On the same page, another picture of

25  her again with the heart drawn around it.

1          But, here's a page we would like you to look

2     at.  And it's going to be kind of hard to see this.  You're

3     going to really want to look at the scanned copy when you get

4     it back into the jury room.  But what you have here, ladies

5     and gentlemen, is you have this green arrow, here, drawn here.

6     And it's pointing at the head of this individual back here.

7     And you can't really tell who it is.  But, it's written in

8     pencil.  And you can't really see it here on the screen.  But

9     you will be able to look at it — if you look at it closely.

10    And it says there, "My babydoll, no one else's."  "My

11    babydoll, no one else's."

12          Ms. Freeman herself talks about how her time is

13    being monopolized, to some extent, by being with the

14    Defendant.  She wrote in what I read to you, State's

15    Exhibit 85.  I'll just read a quote — a small portion:

16          "I depress all of my friends.  Not that I'm

17          ever really with my friends, but when I am, I

18          depress them because you depress me.  And what I

19          don't understand is how you can smile and be just

20          peachy fuckin' keen when you're with your friends,

21          but when you're just with me, life sucks.  I just

22          don't understand."

23          What else do we have?  Well, you heard from

24    Cory Courtright.  She talked with you about how she was

25    concerned about this relationship.  At first she didn't want

D9 71                                    Arguments

1    it to occur.  Then she relented.  But, one of the things she

2    talked about was having her daughter keep seeing her friends,

3    and things along that line.

4              On June 28, 2000, what was one of the last

5    things that Leah Freeman said to her mother?  It was, "Mom,

6    I'm taking your advice.  I'm going to go see Sherry Mitchell."

7    There were some issues about how much — how tightly controlled

8    this relationship was.

9              Sherry Mitchell.  Remember what Sherry Mitchell

10   told you about, that she and Leah had these tee shirts?  One

11   that Sherry wrote said "Leah's girl".  And the one that Leah

12   wrote said "Sherry's girl", or whatever.  Remember that letter

13   that you'll have in evidence to read that Sherry Mitchell

14   wrote to the Defendant, you know, saying certain things she'd

15   do to him if she (sic) mistreated Sherry — or, Leah?  She

16   wrote at the bottom of that "My Girl".  You go back and you

17   look at the response that the Defendant wrote to Sherry

18   Mitchell.  The bottom of that letter he writes, "My Girl.

19   She's my girl."  Okay?

20             And again, as I've indicated, Leah Freeman in a

21   letter that I just read a portion to you, indicates that

22   there's some issues.

23             Okay.  Let's go on.  Was this relationship very

24   healthy?  Were there issues between the two?  Granted, there

25   were times that they got along famously.  Granted, they

Arguments          D9 72

1  probably both felt that they were in love.  But there were

2  issues.  There were arguments.

3          And of course, every couple argues.  But there

4  was more than arguing going on, here.  We've got some anger

5  involved.  You recall, the Defendant got so mad once about

6  something Leah had done that he poked a couple holes in the

7  sheet rock at the high school.  He went off on her — on Leah,

8  when she accidentally dropped some pictures in the parking

9  lot.  You heard from Ms. Dennis about her being pushed up

10  against, or into, a car.  And you've heard testimony that Leah

11  herself was hitting the Defendant.   These are all things that

12  are indicative of a relationship that's got problems.

13          Let's take it further.  Let's look at Leah

14  Freeman's own words regarding what she had to say about things

15  going on in this relationship.  One of the things you have to

16  look at when you go back there is the diary or journal of Leah

17  Freeman.  And it's twenty, thirty pages long.  And feel free

18  to read the whole thing.  I'm not going to read the whole

19  thing to you.  But, I'm going to give you some excerpts that

20  come out of that journal — things you need to keep in mind.

21          For the entry that is dated December 23, 1999,

22  amongst other things, Leah Freeman wrote:

23          "Well, after four days of not even talking to

24      the bad-ass wannabe, Nick finally called me today."

25          The entry that's dated January 1, 1999 is

D9 73                              Arguments

1   sequentially — or, in the diary after the December 1999

2   entries.  It appears she misdated it.  It should have been

3   2000.  But in any event, in this entry of January 1, she

4   writes about a situation where she had gone to a party.  And

5   that after the party, she went to a movie with an individual

6   named Luke.  And I believe some of the letters I read to you

7   the other day referenced an incident with Luke.

8              Anyway, she had gone to a movie with Luke.  And

9   apparently the Defendant found out about it.  Here's what she

10  wrote in her diary:

11             "I left with Luke to go to a movie.  Big

12             mistake.  I didn't do anything with him, but Nick

13             didn't believe me.  I don't think he even believes

14             me now.  I guess I can't really blame him for

15             thinking that, but he's supposed to be able to trust

16             me."

17             She goes on:

18             "I talked to Nick at 2:00 p.m.  He made it

19             quite clear that he was very pissed off.  When he

20             came over, he didn't look pissed.  He was just

21             really sad — like crying sad."

22             The entry dated for January 2, 2000, again,

23  amongst other things she wrote:

24             "When Nick was here, he fell asleep on my bed.

25             And I took the cutest picture of him.  I really hope

Arguments        D9 74

1        he goes home soon, but obviously what I think

2        doesn't really matter to him."

3              The entry dated January 6, 2000:

4              "I don't understand how I can love someone who

5        treats me this bad.  Sometimes I just want to give

6        him a big, huge smooch.  And sometimes I just want

7        to kick him square in the nuts.  He can be the

8        sweetest, most sensitive guy in the world, and then

9        turn around and be this bad-ass prick.  In other

10       words, his personality split really sucks.  I'm

11       going to spend the whole weekend crying, more than

12       likely."

13             She signs the entry "Leah Nicole McGuffin".

14             There are some entries that follow the January

15 entries, in terms of sequence, but they're undated.  In one of

16 the undated entries, she talks about how the Defendant had

17 gone on some sort of trip, whether it was to Salem, or

18 Seattle, or someplace like that.  At the end of the entry she

19 says:

20             "I don't really care if he's mad at me.  I'm

21       mad at him for going."

22             Again, she signs it "Leah Nicole McGuffin".

23             The next entry, which is undated.  She's

24 waiting for the Defendant to call her.  And then she writes:

25             "I hope he's not mad at me."

```
D9 75                           Arguments
```

1        The next entry, which is undated, amongst other
2   things she writes:

3           "Nick is being such a prick.  He's sleeping.
4           He keeps waking up; and when he does, he's an
5           asshole.  It's so annoying, him coming over to
6           sleep.  Leaving me sitting here, bored to death.
7           It's not that I don't like being with him, but when
8           he's being an ass like this, it's hard to tell if I
9           can stand him, let alone love him."

10          The next entry, again which is undated, amongst
11   other things she wrote:

12          "We got into this deep discussion about how he
13          treats me like shit.  And I don't think he care
14          about me.  I really don't want it to end because I
15          care so much about him.  But when that feeling isn't
16          returned, it really hurts.  And I can't really make
17          any big decisions because I don't know how he feels.
18          All I know is I love him very much.  But not enough
19          to put up with this kind of crap.  I've done it
20          enough.  I'm sick of it."  Signed "Leah Nicole".

21          The next, and actually the last entry in the
22   diary, again which is undated, she talks about there —
23   apparently the Defendant had called for a period of a one-week
24   break-up where they weren't seeing each other for a week.  She
25   wrote, amongst other things:

1          "Yeah, he's calling it time off.  I'm calling

2          it time for him to screw with other girls."

3          She goes on later:

4          "I really resent him for doing that to me.  I

5          mean, how dare him.  I freaked on my mom so I could

6          try to make things better with him about the whole

7          Luke thing, which by the way never happened."

8          And then she goes on and talks about Luke

9   again.

10          "Anyways, I risk mine and my mom's good

11          relationship for him.  Then he breaks up with me for

12          a week.  Now, that hurt."

13          She again talks about the Luke incident.  And

14   then she writes:

15          "There wasn't really any coming on to me, but

16          I'm paying the price for not telling Nick about it.

17          Hard situation, I know.  But I don't think it should

18          have mattered.  If he loved me, he should have

19          trusted me.  Oh well, his loss."

20          And it was signed "Leah".

21          We have other things that she wrote, describing

22   this relationship.  And these are letters that she wrote to

23   the Defendant, but were never delivered.  These are State's

24   Exhibits 237, 238 and 239.  These exhibits were found by

25   Sheriff Zanni when he did the search of her room in the house

D9 77                              Arguments

1   where they lived before they moved to her grandparents' place,

2   the residence of Mr. Murphy over on Fifth Street.

3           Exhibit No. 237 starts off:

4           "Nick, I'm sorry I got mad at you before fourth

5           period.  I couldn't help but think something was

6           going on with that girl.  What am I supposed to

7           think?  You guys were late, alone, practically high.

8           And you had the opportunity.  I'm sorry that I

9           thought you would do that.  Okay?  I'm sorry."

10          "Besides that, you weren't being nice to me,

11          either.  Yeah, you come and see me between classes,

12          but you weren't talking.  I hate it when you lay

13          those guilt trips, too.  I feel bad, but I don't

14          want to let you know they work.  But at the same

15          time, I don't want you to be mad because they don't

16          work.  So, why were you mad, sad, whatever, before

17          our little argument?  Don't tell me you weren't

18          because you were."

19          "I hate arguing with you because I love you a

20          lot and I don't want to lose you.  I hope you're

21          happy.  I said it, and I meant it.  I don't know if

22          my thinking you would do that changed things between

23          us.  I don't know if you care if it means anything

24          to you, but it doesn't change anything for me.  I

25          don't care if you did anything with her or not.  I

1      would like to know if you did, but if you did, it

2      still won't change the fact that I still want to be

3      with you."

4          "This is weird, me pouring my heart out to you

5      for a change.  You're always doing this to me.

6      You're always saying it, but I can't say it.  I

7      freeze up in awkward situations like this.  Believe

8      it or not, I've never been in a relationship where

9      we argue.  Usually my relationships don't last long

10     enough for an argument to occur.  This is the most

11     different relationship I've been in, and the best.

12     Things always get awkward and boring."

13         "With you, that isn't even the situation.  Not

14     at all.  I don't like the arguments because they're

15     always about petty shit, like shoes.  I don't know

16     if we've ever argued about shoes, but that was just

17     an example.  But, I guess in a way they kind of make

18     us closer.  Hopefully, we'll run out of things to

19     argue about, and we'll just agree about everything,

20     and be happy about everything."

21         She then writes a few sentences about:

22         "Well, now that I have that off my chest, I can

23     talk about my chest."

24         And then she talks about some things along that

25 line, but then she goes:

D9 79                              Arguments

1          "Oh, nevermind.  It will take too long.  All

2          right.  I'm done rambling now.  I love you.  Leah

3          Nicole."

4          Exhibit 238:

5          "Nick, I don't know what it is, but you

6          obviously have a problem with me.  You look at me

7          like you're disgusted.  And I can't honestly say I

8          like it too well.  I wish you would treat me like

9          you care, because lately you haven't been, other

10         than the roses, which I did appreciate.  But, when

11         you treat me like shit, it doesn't matter if you

12         give me 5,000 roses.  It doesn't make it okay."

13         "I try to settle arguments, but it just created

14         more.  I can't say anything without you looking at

15         me like I'm an idiot, which you know I hate because

16         I'm sensitive about people calling me stupid and

17         things that relate to that."

18         "There are a lot of things that you are

19         sensitive about, and I respect those things.  But

20         you don't respect my sensitivity, and that bothers

21         me.  And it should bother you, but it doesn't.  It's

22         kind of strange.  You can talk about marriage and

23         having kids with me, when you treat me like you do."

24         "I guess you're not being as serious as I am.

25         In fact, you're probably not serious at all. And I

Arguments        D9 80

1    wish I wasn't.  If I were anybody else, I would have

2    broken up with you by now.  But, I'm not anybody

3    else.  And no matter how hard I try, I can't not

4    love you.  Believe that.  I've tried."

5         "So many people have tried to get me to break

6    up with you.  But I could never do that.  So, I

7    guess you're stuck breaking up with me.  And by the

8    way things are going, it seems it could happen

9    soon."

10         "And if you're wondering, yes, this makes me

11   really upset.  You don't even know how upset I am.

12   I want you to know this, but you don't listen when I

13   talk.  And I know I could never bring myself to

14   giving you this letter.  I guess I'm just screwed

15   either way.'

16         "I don't know why, but I don't want to stop

17   writing.  I have nothing else to write about, but I

18   can't talk to you because if I wake you up, you'll

19   just bite my fucking head off again.  I wish things

20   didn't have to be like this because I'm so unhappy.

21   But I know that without you, I would be even more

22   unhappy.  Love you.  Leah Nicole McGuffin."

23         The last, Exhibit 239:

24         "Nick, I don't know why I'm even trying to talk

25   to you.  You obviously don't even care anymore.  I

```
    D9 81                          Arguments
```

1       guess I figure if I follow you around long enough,

2       you'll like me again.  Well, I just want to say I'm

3       sorry.  I'm not positive as to what got you — what

4       you got mad about.  But if it's what I think it is,

5       I didn't even mean it in a bad way, and I was just

6       joking anyway.  I just want you to know I was up all

7       night crying about it, mostly because you'd rather

8       talk to Jenny than your own girlfriend.  Well, I

9       hope you start talking to me soon.  I love you.

10      Leah."

11              The Defendant himself acknowledges that there's

12  some issues.  There's an exhibit that was again found by

13  Sheriff Zanni.  I'm going to work off a copy — the original,

14  the Court has.  It was found in the tin box with the diary.

15  It's labeled State's Exhibit 91.  It's a several-page document

16  and taped — stapled together, that was given — or, is signed

17  by the Defendant.  He writes:

18              "I wish you could trust me, but if you can't,

19      that's okay.  Although, if you would I want to try

20      to gain your trust back, but you won't let me."

21              Off to the side there's a notation, "Don't have

22  any strawberries.  Sorry."

23              "I do care.  And I always will, no matter what.

24      I'm going to keep trying and trying until I get you

25      back.  I'm going to do whatever it takes because I

1      love my babydoll."

2          And babydoll is underlined several times.

3          "We both care about each other so much, I hope.

4      I wish we could just get past certain things.  Start

5      over, or something.  I just care about you too much

6      to let you go.  I am a fuck-up."  Underlined.  "And

7      I would like to make it up to my babydoll."

8          And then there's some notations, "LOL", (not

9  understandable), "Juice Baby", "Princess", "Prince Charming",

10  "Nick-y-Poo".

11          This is a relationship, ladies and gentlemen,

12  that's got some issues.  It's got problems.  On one hand, they

13  really like each other — love each other.  On the other hand,

14  they've got significant issues.

15          Now, let's go to June 28, 2000.  What was going

16  on that day?  What was happening between the two on June 28,

17  2000?  And you'll recall that the Defendant tells the police

18  that outside the Mitchell argument, there didn't appear to be

19  any other issues that night.  This is an except from his

20  statement that he gave to the police that was recorded on

21  June 30th of 2,000:

22          (Whereupon an excerpt from a recording of

23  Defendant's statement to the police was published for the jury

24  as follows:

25          "Besides that argument with Sherry and her mom,

1    that couple days before Wednesday — it was like

2    Monday — we were (not understandable).  And I was

3    getting a pack of cigarettes and Sherry's mom pulls

4    up.  And Leah's here, and she gets out of the car,

5    and Leah goes over to say hi to her.  And she's all,

6    'So, what are you doing (not understandable), Leah?'

7    And she goes, 'I'm just sitting here reading.

8    Nick's getting a pack of cigarettes.'"

9    "And she all, 'Oh.  So, I'm expecting more of

10    you.  You hang out (not understandable).  You're

11    weird.'  That was like two or three minutes.  They

12    pulled up like a minute after we got there.  And

13    Leah came back to me and like was almost just

14    crying.  She was — kind of hugged me.  Came up and

15    put her head on my shoulder and she was like, 'I

16    can't believe she said that.'  Because Sherry was

17    like her best friend, and (not understandable) was

18    like so nice to her.  And then to go and say that to

19    her like that, that just — that would hurt me, too."

20    "And then they — then she ended up going to

21    Sherry's house at — during — on Wednesday.  And then

22    that happened.  When they got in an argument — and

23    Sherry's mom wouldn't let Sherry go running with

24    Leah.  Leah thought it was because Sherry's mom

25    doesn't like Leah, and she hates her.  And she told

1          Sherry that, and Sherry tried to persuade her

2          differently.  But she ended up leaving anyway.  And

3          when I got there, Sherry was bawling her eyes out.

4          Then she said to Cory, Sherry's mom — or, Leah's

5          mom, that it wasn't that big of an argument.  It

6          wasn't that big of a deal.  But, you don't cry about

7          something that's not that big of a deal."

8               He told the police earlier in the interview

9     that that day Leah was the happiest he had ever seen her.

10               (Whereupon more of the recording was published

11    for the jury as follows:)

12               "About — I was at her house about noon.  We sat

13          there for a couple of hours.  We were cleaning out

14          my car, and having a good time.  Probably that was

15          the happiest I had seen her.  Everybody was getting

16          along.  And we decided we were just going to drive

17          around.  We wanted to do something.  So, we told

18          Leah's mother we were going to leave.  Then we drove

19          around for a while."

20               Okay.  Happiest he had ever seen her.  That

21    wasn't true.  Leah wrote a letter that night.  She left it in

22    the room of Sherry Mitchell.  One of the last things we know

23    she had to say before she disappeared.  It's from State's

24    Exhibit No. 82.  This is what's in there:

25               "Nick and I have been getting along a lot

1          better.  I wasn't really mad at Nick when I got up

2          to come over here.  I just didn't feel like being

3          around him anymore tonight.  I love him to death,

4          but that boy gets an attitude sometimes.  And that

5          was one of them."

6              Something's going on.  Something's going on

7  before she gets out of that car and goes to see Sherry

8  Mitchell.

9              Now, listen what the Defendant had to say when

10  he talked to Scott Hamilton last year, about what was going on

11  between him and Leah on the night in question.

12              (Whereupon a one and a half minute excerpt from

13  the audio of Scott Hamilton was published for the jury, but

14  was not understandable for transcription.)

15              There's something going on.  There's something

16  going on.  Why doesn't the Defendant admit that they're having

17  a dispute that night.  Why doesn't he tell the police about

18  it?  Why does he lie, or admit about it — or, omit it.  Things

19  you need to consider when you're looking at this case.

20              Well, let's go on.  Let's look at some of the

21  things the Defendant did not do on the evening of June 18,

22  2000.  Now, he had that phone call, remember?  He calls Cory

23  Courtright from the Mitchell home about 10:00, and he asks if

24  Leah was home.  And Cory (not understandable), of course, she

25  wasn't here.  "What do you need?"  And he says, "Well, don't

Arguments      D9 86

1   worry.  I'll get her home safely.  I'll get her home."  Does

2   he live up to that promise?

3                Remember, now, he's going around town as the

4   night progressed, and he's telling people, "Do you know where

5   Leah is at?  Have you seen Leah?  I'm concerned.  I don't know

6   where Leah is at."  But does he ever once go up to her house

7   and knock on the door, and say, "Hey, by the way, is Leah

8   here?"  Not once does he do that.  And it's not — well, it

9   even goes further.  Not once after 10:00 p.m. does he even

10  call up to double check.  Why doesn't he call?  Why doesn't he

11  knock on the door?  "Is she here?"  He's so concerned about

12  her — remember, he's telling everybody he's concerned — but he

13  doesn't go to the one place where she should have been.

14                And it's not like he didn't have the

15  opportunity.  He's certainly in the area.  His own witness

16  says — put him in the area of that house.  But he didn't do

17  it.  Why not check?  There's something.  We have multiple

18  sightings of Leah Freeman up on Central Avenue.

19                Now, this next point is kind of obvious, but

20  I'll bring it up.  We know whatever happened to Leah had to

21  have happened from the time she left the Mitchell home until

22  Tony Messerle found that shoe at about 11:35.  I think he said

23  11:33, 11:35, whatever.  Whatever happened to her had already

24  come and gone by the time Messerle found that shoe.

25                Now, during that timeframe, between nine-

D9 87                              Arguments

1   whatever and 11:30, what do we know about Leah Freeman?  Well,

2   we've got people that are seeing her walking by McKays.  We've

3   got people seeing her going by the restaurant.  We've got

4   people seeing her over by Fast Mart, the credit union.  We've

5   got people putting her over by the high school.  We've got

6   people putting her at the gas station.  And the Defendant

7   admits that he's in the same area during the same timeframe.

8   But despite all these other people being able to see Leah

9   Freeman, he can't.  He says he didn't see her after he dropped

10  her off at the Mitchell home.

11          Now, it's his claim he didn't see Leah after he

12  dropped her off at the Mitchell home.  And the question you

13  have to ask yourself is, can we trust his word on that issue?

14  Well, according to the Defendant, Leah is the love of his

15  life.  They're going to get married.  They're going to have

16  kids.  But, what is he doing during that same time frame of

17  that relationship?  Having a relationship, or sex, or

18  whatever, with Margaret (sic) Davidson, or Pinkley, whatever

19  her name.

20          Here's something — Dave Hall.  The officer that

21  was assigned by Chief Reaves to do the initial investigation

22  in this matter.  As you'll recall his testimony, on the day

23  after Leah disappeared, June 29th, he goes over to the home of

24  Cory Courtright, and he is talking with her about getting some

25  information so they can get the teletype out, or whatever, so

Arguments     D9 88

1   that they can try to find Leah.  And while he's there, Nick

2   McGuffin is there.  And he asks the Defendant, "Please give me

3   a rendition of what happened."  And Nick gives him — the

4   Defendant gives him a brief rendition of what had occurred the

5   night before.

6            But, you'll recall what he told the officer

7   was, before he went home — the reason he went home was because

8   she — he thought Leah was spending the night with a friend.

9   Leah wasn't home because she was spending the night with a

10  friend.  "And that's why I went home and went to bed.  I

11  thought everything was okay.  She's off with a friend."

12  That's what he said on June 29th.

13           But, look what happens on June 30th.  The next

14  day, he changes his story.  Remember, "I thought she was home.

15  I was outside.  I'm throwing rocks at the window, trying to

16  get her attention.  I'm looking for the. . ." — you know, "I

17  saw the light in the window."  That's different than what he

18  told Dave Hall.  Why are we changing our story?

19           Here's another thing.  Details about the

20  argument with Sherry Mitchell.  Now, you heard Sherry Mitchell

21  testify, and you heard what she told Leah that night.  The

22  argument started off with, well, they wanted to go jogging,

23  and Peggy Mitchell said no.  And Leah gets upset because she

24  doesn't think Peggy doesn't (sic) like her anymore.

25           So, Leah gets upset and is starting out the

D9 89                                    Arguments

1  door.  Sherry follows her.  "Look, this. . ." — you know, "My

2  mom likes you."  It goes downhill from there, because that's

3  when Sherry says — she finally unloads on Leah and says to

4  her, "You know, this relationship is bad.  You've changed.

5  You're using drugs.  You're not behaving the way you were.

6  This is bad."  Remember all these things?  Then I asked her,

7  "Okay.  When the Defendant came to pick her up, what did you

8  tell her (sic)?"  She said something about, "Well, we argued

9  about whether she (sic) could go jogging with her.

10              Now, if you listen carefully to those two

11  excerpts that I just played for you, there's a lot more than

12  just what Sherry Mitchell testified to.  Listen to what he had

13  to say.  For example, to Scott Hamilton he's saying, "Well,

14  when — Peggy Mitchell was saying I shouldn't be dating her

15  anymore, and they're giving her shit," and this and that and

16  the other.  Okay?  He's got a lot more details about that

17  argument than what Sherry Mitchell gave him.  How does he

18  learn all these details?

19              As I indicated, at the most, Sherry Mitchell

20  told him about, was about an argument about whether they could

21  go jogging (not understandable).  And she gets upset and left,

22  and was crying.  Never told — she never told the Defendant

23  that she had said, in essence, that Nick was bad for her.

24  There were only two persons privy to that conversation, ladies

25  and gentlemen — Sherry Mitchell and Leah Freeman.  Sherry

1  Mitchell didn't tell the Defendant about it.  That leaves Leah

2  Freeman.  Yet the Defendant claims he didn't have any contact

3  with her after that.  To learn what was said, he had to learn

4  it from Leah.  Which means he had to have had some contact.

5  Which means he had to have seen her later than what he

6  claimed.

7          Why can't he tell us about that, ladies and

8  gentlemen?  Because that's when it all blew up, and Leah ends

9  up dead.  The Defendant is telling everybody he's concerned

10  about Leah.  Yet, that same night, he's over at Kristin

11  Steinhoff's house smoking meth and trying to have sex with

12  her.  Look at his actions on the evening of June 28, 2000.  We

13  hear from Kristin Steinhoff that, "Well, the officer said he

14  was headed in the direction of going home."

15          But, let's go a little further, Kristin

16  Steinhoff tells you he switched clothes.  She saw him at the

17  Econo Rooter wearing a set of clothes.  And then, when he came

18  over to her house later, he's in a different set of clothes.

19          He switched cars.  You heard — I don't know how

20  many different witnesses say at sometimes he's driving the

21  Mustang, and sometimes he's driving the — the T-Bird.

22  Whatever — why is all this going on?

23          Buddy Young.  This is interesting.  Buddy Young

24  is interviewing the Defendant and asks him, and says, "What do

25  you think happened to your girlfriend?"  Now, instead of

D9 91                          Arguments

1   saying, "Well, I hope she's alive and well, and maybe she ran

2   away," or what have you, he talks about, "Maybe she's walking

3   down by the river and fell and hit her head on a rock and

4   died."  Well, that's interesting because where do we find Leah

5   Freeman's body.  We find her by the Coquille River.

6              In talking with the police, what does he leave

7   out?  Well, look at State's Exhibit 83.  That's his

8   handwritten statement about the things he did that night.

9   Nowhere in there does he talk about there being a disagreement

10  with Leah.  Nowhere in there does he mention about having —

11  trying to have sex with Kristin Steinhoff.  Nowhere in there

12  does he mention going over there and smoking meth with her.

13             Then we have these things, ladies and

14  gentlemen, for you to consider.  You heard from Kristin

15  Steinhoff that the Defendant — well, you heard from Tina Mims

16  that the Defendant came over and threatened Kristin Steinhoff.

17  And what did he say to her?  It was after it became apparent

18  she had been talking with the police.  The Defendant threatens

19  her.  He says, "Keep your mouth shut, or you'll end up like

20  Leah Freeman."

21             Then we have the incident where — at Polly

22  Parks' house where the Defendant is agreeing with his brother,

23  Wayne McGuffin, who said that the shoe was planted to throw

24  the police off.

25             And then, of course, you have David Breakfield.

1  "I've killed before."  And, "I strangled that bitch."

2             All of these things are evidence that the

3  Defendant in this case killed, murdered, however you want to

4  put it, Leah Freeman.

5             I indicated it's time to hold the Defendant

6  accountable.  It's been eleven years.  (Not understandable)

7  the Defendant thinks he's above the law.  He's gotten away

8  with it for eleven years, and thinks he can still get away

9  with it for eleven years.  What's the evidence to support

10 that?  The statement he made where he said, "It's amazing what

11 you can get away with in Coos County."

12            Ladies and gentlemen, it's time to show the

13 Defendant that he can't get away with this anymore.  On behalf

14 of the State of Oregon, we ask you to consider all of the

15 evidence, and find the Defendant guilty of that for which he

16 is accused — causing the intentional death of Leah Freeman.

17            Thank you.

18            THE COURT:   Ms. McCrea, would you — I'm more

19 than happy to take a recess.  Would you want one at this time?

20            MS. McCREA:   I would, Your Honor.  I'd like

21 the recess.

22            THE COURT:   Ladies and gentlemen, I would ask

23 that you step in the jury room.  Take your notes.  Remember

24 the admonition not to discuss the case.

25            JUROR:   (Not understandable?)

D9 93

1          THE COURT:    I'm going to discuss that.

2          (Jury out.)

3          THE COURT:    Just for your information, I

4    calculate your argument was fifty minutes.  So, - - -

5          I can take a lunch recess now, or I can take

6    just a brief recess, and give you your chance to argue it.

7    Somewhere, I'm going to have to take lunch, here.  So, - - -

8          MS. McCREA:    (Interposing) My preference

9    would be we go ahead and take lunch.  We don't have rumbling

10   tummies thinking about food as opposed to the defense

11   argument, Your Honor.

12         THE COURT:    Okay.

13         I'm going to have the jury go with Ms. Cress

14   and Ms. Bennett, our Trial Court Administrator.  We'll take

15   them to lunch down at Frasiers.  There's kind of a private

16   room there that we've arranged for them to use.  And I think

17   it's better that they be in custody of the Court at that point

18   in time.

19         So, would you step in and just - - -

20         How long would it take you to get ready to take

21   them?  Are you ready to go?

22         JUDICIAL ASSISTANT:    (Inaudible response.)

23         THE COURT:    Okay.

24         We'll take just about five minutes for her —

25   Ms. Cress to get Ms. Bennett together and be ready.  Then I'll

D9 94

1   have them tell the jury to leave their notes and come out.

2   Then tell them that they'll be in the custody of Court

3   personnel.  And we'll probably — by the time they get down

4   there and ordered — I'll have them come back about 1:00.

5   Okay?

6               So, we'll take about five minutes, and then

7   we're just going to - - -

8               When you're ready, just let me know and we'll

9   bring the jury back in.  Okay?

10              Five minutes.

11                        (RECESS)

12              (Jury in.)

13              THE COURT:   Be seated, please.

14              Ladies and gentlemen, we will take a lunch

15  break.  You will be going — the Court will be buying your

16  lunch today.  You'll be going with Ms. Cress and Ms. Bennett,

17  who is our Trial Court Administrator.  And we even made

18  arrangements for — go to Frasiers.  There's a room down there.

19  Please follow their directions.  And please do not talk with

20  them about the case, or among yourselves about the case.  This

21  is just for lunch.

22              And hopefully you can get down and be back at

23  1:00.  So, we'll try to start with the — Ms. McCrea's closing

24  argument at that point in time.

25              So, at this point, - - -

D9 95

1    Cathy, do you just want to go — Teresa, I

2  think, is out in the hall.

3    So, if you just go with Ms. Cress.

4    Everybody else remain seated until the jury has

5  a chance to leave with Ms. Cress.

6    (Not understandable.)

7    Okay.  That's fine.

8    If you want to get — if you want - - -

9    MS. McCREA:    (Interposing) Oh.

10    THE COURT:    - - - to leave things there,

11  that's fine.

12    You need to unlock it for them, for a minute.

13    (Jury out.)

14    THE COURT:    I obviously can't stop people

15  from eating where they want to eat, but I would suggest —

16  strongly recommend that it not be Frasiers.  Or, if it is

17  Frasiers, that you be very careful, everybody in the audience,

18  about what is said or done during — while you're at lunch and

19  around the jury.

20    Okay.  We will be in recess until 1:00.

21    (LUNCHEON RECESS)

22    JUDICIAL ASSISTANT:    All rise.

23    THE COURT:    Be seated, please.

24    Ms. McCrea, you may give Mr. McGuffin's closing

25  argument.

1          MS. McCREA:    May it please the Court,

2    Mr. McGuffin, counsel for the prosecution, members of the

3    jury.

4          This is a story — a tale of love — about two

5    star-crossed lovers.  Prince Charming, aka Pooh, and Babydoll,

6    aka Princess.  Nick McGuffin and Leah Freeman.

7          Now, the prosecution came to you in opening

8    statement and said, "They had a toxic relationship — troubled,

9    at best."  The prosecution is now willing to concede that they

10   had some good times.  That they were devoted to each other.

11   And I suggest to you that they were very young.  They were

12   teenagers.  And just as in the fairy tales and the stories,

13   the course of love does not run smooth.

14          Now, you've heard from Mr. Frasier excerpts

15   from things that Leah Freeman wrote in her diary back at the

16   end of 1999 and the beginning of 2000 — back in January.  And

17   she typically wrote things out to be able to vent her

18   feelings.  And she didn't give those to anybody.

19          What she did give to Mr. McGuffin, and what you

20   heard me read to you in evidence, and you have to read

21   yourselves because I'm not going to make you listen to it

22   again, are the things that Leah Freeman wrote, close in time

23   to when she disappeared.  And that's what we care about.  What

24   was happening at the time she disappeared between these two

25   people.

D9 97                              Arguments

1        So, if you look at Exhibits 109 through 114,

2   and you read those, it's — she's talking about graduation.

3   She's talking about how happy she is, and how things are good

4   between them.  And that's what was going on at the point in

5   time that we care about.

6        No, no question they had tiffs, they had

7   arguments.  But, what you need to consider is the prosecution

8   has brought you the best that they can bring you about the

9   problems in this relationship.  And (not understandable)

10  members of the jury, it wasn't very (not understandable).

11       What we know is, on June 28, 2000, that Nick

12  McGuffin and Leah Freeman went over to Leah's mom's, and they

13  were washing the greasepaint off of Nick's car.  They were

14  having a great time.  And Cory Courtright told you that.  That

15  Leah was really, really happy.  And Denise Bertrand, her

16  sister, told you that, that Leah was really, really happy.

17  And even came up and woke Denise up to see if Denise wanted to

18  come help them wash the car.

19       And when Leah Freeman goes to her friend Sherry

20  Mitchell's house, and leaves a note in her bedroom, she says

21  to Sherry Mitchell, "Nick and I are getting along better."

22  Things are good, in other words.  And things were good.

23       You have the photographs in evidence —

24  Exhibits 7 and 8, of how Leah looked that last afternoon on

25  June 28th.  And she's happy.  She's laughing.  She's vibrant.

1            Now, of course, we have the issue — we have the

2    issue of the phone call.  And I submit that what the evidence

3    shows is that when Nick and Brent Bartley and Leah Freeman

4    went over to the McGuffins' from the Haga's — from the

5    grandparents' place, to get the movies from the McGuffins'

6    house, that Melissa Smith called over there to talk to Leah.

7            Now, at this point in time, Leah has told Nick

8    that she's going to go over to Sherry Mitchell's house for a

9    couple of hours that night.  And it's true.  Nick wasn't happy

10   about it.  But the reason Nick wasn't happy about it was

11   because, as Denise Bertrand told you, Nick saw himself as

12   Leah's guardian.  As Kim Pugmire, the cousin who used to be a

13   Courtright, told you, she — Kim — had told Nick, "You take

14   care of my cousin."

15           And Nick took that responsibility seriously.

16   And that's why he threatened Adam — I'm sorry, it wasn't Adam

17   Shinar, it was Austin Fisher — because Austin Fisher and some

18   other people were teasing Leah after New Year's Eve, accusing

19   her of having had sex with Nick — it's in her diary entry —

20   when she hadn't.  And Nick wasn't okay with that.  He was

21   protective of her, and he was defensive of her, and the reason

22   that he didn't want her to go over to Sherry's.

23           And this is the same excerpt of the tape of

24   Nick's statement made to the authorities on June 30, 2000.

25   You have it in evidence as State's Exhibit 218, that

D9 99                                    Arguments

1   Mr. Frasier played for you.  And what Nick says there is he's

2   saying to Chief Reaves, in response to Chief Reaves' question,

3   "Did she have problems with anybody?" he's saying she had an

4   argument with Sherry and her mom a couple of days before

5   Wednesday.

6          Now, Wednesday was the day that Leah

7   disappeared.  So, Leah and Nick are at Fast Mart, and Peggy

8   Mitchell pulls in and says, "What are you doing?"  And Leah

9   says, "Nick is just getting some cigarettes."

10         And Peggy Mitchell says, "Oh, I expected more

11  of you."  And that really, really upset Leah.

12         So, Nick is concerned about her going over to

13  Sherry Mitchell's because of what happened on Monday.  But

14  more, Nick does not get along with Sherry Mitchell because he

15  knows that Sherry Mitchell has been saying bad things about

16  Leah.  How do we know that?  We know that from Nick's own

17  words spoken to Scott Hamilton during the pretext phone call

18  in January of 2010, which you have in evidence as Exhibit 242.

19         Now, the reason this exhibit is so important is

20  because the things that Nick says were said without knowing he

21  was being recorded.  He had no reason to check his words, and

22  that's pretty obvious because he uses the "F" word over and

23  over, and over again.  But what is important is what he says

24  is honest, it's raw, and it's true.  And at that point, he

25  tells Scott Hamilton that Sherry was giving her a guilt trip

Arguments        D9 100

1   because she — meaning Leah — hadn't been hanging out with her,

2   and "fuckin' Leah" really didn't want to hang out with her

3   because Sherry and her weren't getting along.  And he says,

4   "Sherry has been talking shit about her, and I don't even — me

5   and her got into — really, it wasn't even an argument.  It was

6   just fuckin' me telling her that she needs to realize who her

7   fuckin' true friends were.  I was like, — you know, Sherry

8   just fuckin' was talking shit about her constantly, and I kept

9   on hearing about it.  And you know, Leah didn't even want to

10  believe it."

11          So, Nick is, even now — ten years later — is

12  still concerned about what happened that night.  It wasn't an

13  argument that he had with Leah, but he suggested to her that

14  maybe she didn't want to go over to Sherry Mitchell's because

15  Sherry wasn't a true friend.  Leah insisted that she was going

16  to go.

17          And I submit to you that what happened was,

18  when Melissa Smith called over to the McGuffins' to tell Leah

19  that she wasn't going to be available to do anything that

20  evening because she and Scott had broken up, even though they

21  all had a great time at Powers swimming the day before, that

22  either Nick was talking in the background with Brent Bartley,

23  and was saying loudly to Brent Bartley, "Yeah, she's going to

24  go see that bitch," referring to Sherry Mitchell; or he may

25  have thought that Leah was on the phone with Sherry Mitchell,

D9 101                          Arguments

1   and said the word bitch because he believed it was Sherry

2   Mitchell on the phone.

3            Remember what Melissa Smith said.  She said she

4   could hear him in the background.  He said the word "bitch",

5   but she couldn't tell if it was directed toward Leah or if it

6   was a conversation he was having with someone else.

7            The context of the situation, members of the

8   jury, is yeah, Nick didn't want Leah to go over to Sherry

9   Mitchell's, but she said that's what she wanted to do.  And he

10  took her over there.  And he tells Scott Hamilton again, when

11  he's being recorded and he doesn't know it — he doesn't have

12  any reason to not be forthcoming — and he says, "We were

13  having a barbeque.  She was going to come back.  We got into

14  like a little bit of a tizzy, but it wasn't even really a

15  fight."

16           So, there wasn't anything going on between Nick

17  McGuffin and Leah Freeman that would incite him to want to

18  kill her that night.  The evidence just isn't there.  The

19  evidence is that he was protective of her.  He was defensive

20  of her.  He didn't want her to go to Sherry's.  She insisted

21  she was going to.  And so, he took her over there.  But what

22  you see from the documentation is the relationship was good.

23  That she was happy.  And the photograph shows that, as well.

24           So, we know that Nick McGuffin took Leah

25  Freeman over to Sherry Mitchell's house on Elm Street around

1  7:00.  Then he went to Fast Mart.  He meets up with Aaron West

2  and Josh Emler and Dave Jenkins.  And they go out to Johnson

3  Mill Pond to smoke a few bowls of marijuana.

4            Now, we also know that Nick was supposed to

5  pick Leah up at 9:00.  And Aaron West testified that he,

6  Aaron, persuaded Nick to stay a little bit longer.  I mean,

7  remember, we're dealing with teenagers, folks.  You can just

8  see it — Aaron saying, "Oh, come on, Nick.  Let's just finish

9  this bowl."  Nick does that, and he's a little bit late to go

10  pickup Leah.

11           Now, we all know by the time Nick went to pick

12  up Leah, she was gone.  So, let's talk about the chronology.

13  We know that there was a fight - - -

14           Oh, and the prosecution says, "Well, how did —

15  how did Nick possibly know the details of the fight when he

16  talks to Chief Reaves on the 30th?  And how's he going to know

17  the things that he said about Sherry's mom not liking Leah?"

18  Well, he knew that from what had happened on Wednesday — on

19  Monday.  And the details of that.  But, remember, Leah

20  disappeared on the 28th.  The Missing Person's Report was made

21  on the 29th.  Nick's giving this testimony — this statement to

22  the police on the 30th.  By then, you can infer there's been a

23  lot of discussion between Nick and a lot of people, including

24  Sherry, about what happened.

25           Okay.  So, we know that there was — there was

D9 103                                    Arguments

1   the disagreement that Leah and Sherry wanted to go jogging,

2   and Peg said no.  That the voices became raised.  Peg said no.

3   Leah came down the stairs and went out the door.  At that

4   point, Sherry tries to get her to stop, or come back; to which

5   Leah says, "Your mom doesn't like me," in words or substance.

6   And at that point, Sherry says, "You know, it's not that she

7   doesn't like you.  It's just that you're with Nick, and Nick's

8   not good for you, and you should get rid of him."

9           And this is to a young girl, a fifteen year

10  old, who is having a blossoming relationship.  And it's about

11  the guy she's devoted to.  And that, combined with what had

12  happened at Fast Mart, leads Leah to say, "I'm sorry I'm not

13  good enough for you."  And she leaves.  And she walks up Elm —

14  that little street — to Fourth, that we saw in the jury view.

15  And she walks up Fourth to McKays.  And Sherry stands there

16  crying.

17          And we know from Sherry's testimony that Leah

18  went up (not understandable) about 8:45 to 8:50.  Corey

19  Bryant, Sherry's boyfriend, arrives about 9:00.  He was a

20  courtesy clerk at McKays.  We have the testimony from Ellen

21  Richardson that McKays typically close at 10:00.  The courtesy

22  clerks work until 9:00.  Now, Corey Bryant thought that he was

23  going to work at 9:00, but that doesn't fit because courtesy

24  clerks would typically work from 4:00 to 9:00.  So, we can

25  infer that actually Corey Bryant was coming from McKays to the

Arguments        D9 104

1  Mitchell's house.

2              Now, at the point that Corey Bryant is there in

3  the yard with Sherry Mitchell, that's when John Lindegren came

4  by with his dog.  How do we know that?  We know that because

5  of the timing.  We know that because John Lindegren told us

6  that there was a pickup parked in that little road that he had

7  to walk around.  Corey Bryant had a pickup in June of 2000.

8  Mr. Lindegren didn't say that he saw a blue Mustang.  He just

9  saw the pickup.

10             He also told us that the girl had her hair

11 pulled back.  When you saw Sherry Mitchell testify in Court

12 the other day, she had her hair pulled back.  Leah's hair was

13 so short, it would be very, very difficult for her to have her

14 hair pulled back.

15             Additionally, the prosecution told you in

16 opening statement that Mr. Lindegren would testify he saw a

17 couple arguing.  That wasn't his testimony, ladies and

18 gentlemen.  He just saw a boy and a girl in the yard.  And you

19 have the photographs in evidence as to where he saw them.  He

20 saw them directly in front of the Mitchell's house — the

21 picture with the orange cones.  It was Corey Bryant and it was

22 Sherry Mitchell, that Mr. Lindegren saw.  It was not Nick

23 McGuffin and Leah Freeman.

24             Now, did — when Nick McGuffin arrived, Corey

25 Bryant was there.  There was some discussion.  Nick was late.

D9 105                              Arguments

1  And Sherry told him, "You can catch her if you. . ."  "She

2  just left.  You can catch her."  However, we know from the

3  evidence that Corey Bryant had come from Safeway — I'm sorry,

4  McKays, up Fourth, and he didn't see Leah.  So, you can infer

5  from that, by the time that Corey Bryant gets to the Mitchell

6  residence, Leah is already past McKays.

7              You have in evidence, members of the jury, this

8  map, Exhibit 155, that shows you some of this stuff.  So,

9  we've got the Sherry Mitchell residence here on Elm Street.

10 McKays Market is up here on Central.  So, we know by the time

11 that Corey Bryant comes to Sherry Mitchell's residence, that

12 Leah Freeman is already past this location.  We also know that

13 by the time that McGuffin arrived, she's also past that

14 location.

15             So, Nick comes.  She's not there.  Now, where

16 did she go?  We know, from the testimony of Raymond Lewis,

17 that he was coming south on Central, and saw Leah just before

18 Fast Mart.  We know from the testimony of Mark McAdams — Mike

19 McAdams and Mark Kirn that they saw her in front of Hunters

20 Restaurant between 9:00 and about 9:15.

21             And let me say on the times, nobody was looking

22 at their watch and setting out exact times.  Because, it's

23 only after the fact that time became important.  But, the

24 general outline of this is important for your consideration.

25             So, by 9:15, she's already up here at Hunters.

1  And then Heidi Crook and Heather Reid see her, and she's up

2  toward the credit union, closer to the traffic light.  And on

3  she goes.

4          We next have a sighting of here at the Coquille

5  High School by Alicia Hartwell Hyatt.  Now, Ms. Hyatt —

6  Ms. Hyatt would like to claim that Ms. Freeman — Leah — had

7  contact with a car that looked like Mr. McGuffin's car.  But

8  originally what she said was, she thought she — Alicia — saw

9  Leah at the high school.  Then she says, "Well, I saw a car

10  pull up and the passenger door open.  And she says it was a

11  compact car, like maybe a Nissan.  But then, that changes when

12  she comes to Court, and suddenly it's an older car, and it

13  could be a Mustang.

14          But, there's no indication from the evidence

15  that there was, in fact, any contact between Nick McGuffin and

16  Leah Freeman after he dropped her off at Sherry Mitchell's

17  house at 7:00 on June 28, 2000.  But, we have a sighting of

18  Leah at the high school by Alicia Hartwell.

19          Then, we have Cynthia Jones who tells you that

20  she saw Leah Freeman at the payphone across the street by what

21  is now the Shell Station by the cemetery.  Leah looked at her.

22  No big deal.  Didn't cause Cynthia Jones any concern.

23          Then we have the testimony of Thomas Bounds.

24  He also saw Leah at the high school.  They waved at each

25  other.  And then when he was coming back from visiting his

D9 107                              Arguments

1  family, he saw Leah at the same payphone as Cynthia Jones, and

2  Leah was on the phone.  Who was she calling?  I suggest to you

3  that she was calling up to the Hagas to see when Nick was

4  going to come pick her up.  Because, he (sic) knew Nick was

5  going to come pick her up.  And he was late.  So, she was

6  trying to find out when he was going to come.  Brent Bartley

7  told you, he wasn't answering the phone, because really they

8  weren't supposed to be there.

9            So, I submit when Leah doesn't get an answer to

10 her phone call, she thinks Nick is coming to pick her up, and

11 she starts walking up the road, up — this part of town by the

12 cemetery.  And that is when Thomas Bounds hears the scream,

13 and somebody abducted her.

14           She's never sighted again after about 9:30.

15 The shoe was found at 11:30.  Somebody picked her up.

16 Somebody took her away.  But it wasn't Nick McGuffin.

17           Now, Nick gets to Sherry's.  And again, the

18 times are not totally clear.  But, he gets to Sherry's at,

19 say, 9:05, roughly — 9:10, 9:15.  She's not there, so he goes

20 looking for her.  The first place that he goes is he stops at

21 Fast Mart.  And he sees Aaron West.  And Aaron West testifies

22 that they had followed Nick in from the Johnson Mill Pond.

23 Saw Nick turn on Fourth, like he's going to Sherry Mitchell's

24 house, and Aaron West and the other guys went to Fast Mart.

25 Aaron West didn't see Leah when he got to Fast Mart.  So, we

Arguments    D9 108

1  know from that, Leah is already beyond that location by the

2  time Nick gets into town.

3        Nick says to Aaron, "Hey, I'm looking for Leah.

4  Have you seen her?" Aaron says, "No, haven't seen her."

5  Which is bewildering for Nick, because she should be heading

6  that way, and she should be heading home, but she's not. So,

7  he goes up Central, and then turns to go up a couple blocks to

8  Daniel Lapine's residence — remember, the boyfriend of Quinn

9  Myers, who is a roommate of Brent Bartley — thinking maybe

10  Leah had gone there. He goes up to the door. Quinn Myers

11  sees him. He says, "Is Leah here?" And she says, "No." Kind

12  of why would she be here?

13        And he says, "Oh, she's not? Oh, okay."

14  Surprised. And he just turns and leaves because he's looking

15  for her. That's between about 9:20 and 9:30.

16        Nick then drives around. Goes down Knott, the

17  street where Leah was living at that point with her

18  grandparents. Looks for her there. Runs into Lyndee Stidham.

19  Asks her if she's seen Leah. She hasn't. And that's roughly

20  in the 9:00/9:30 area.

21        And then we have Haley Greenway, who testified

22  this morning, who saw Nick at the intersection of Fairview and

23  Central just before 10:00, when her curfew was. And he's

24  driving in his blue Mustang, going toward the high school.

25        We also know that between about 10:00 and

D9 109                              Arguments

1    10:15, Nick circles back around to Sherry Mitchell's to see if

2    Leah has come back.  She hasn't, but they suggested he call

3    Cory Courtright and see if Leah has gone home.  He does that.

4    She's not there.

5              Now, from there — and there's — there's a lot

6    of driving around.  We had a — a statement by Kristin

7    Steinhoff-Ramsey and Zack Elderkin that they thought they saw

8    Nick at the Econo Rooter, or what used to be the Maytag store,

9    around, um, probably — well, it's going to have to be before

10   the stop by Officer Zavala.  And did they or didn't they?  It

11   doesn't really matter.  Nick was driving around looking for

12   Leah, that's for sure.  What we know is Zack Elderkin saw

13   somebody who was talking on a cell phone, and Nick didn't have

14   a cell phone in those days.  He saw somebody with a Jeep

15   Wagoneer, and Nick wasn't driving a Jeep Wagoneer, didn't have

16   a Jeep Wagoneer.  Kristin Steinhoff didn't see any car at all.

17             But, what is significant for your consideration

18   is, there was some contact between Nick McGuffin and Kristin

19   Steinhoff in which she communicated to her, he was looking for

20   Leah.  And she told him, if he didn't find her, to come by

21   later, and she — Kristin Steinhoff — would help him look for

22   her.

23             So, from there, assuming that he's — he's

24   driving the loop, this is where the Maytag place would be.  He

25   comes back around on 42.  And he gets stopped at 42 — Deputy

Arguments        D9 110

1   Zavala testimony — here on 42 South just before the card lock

2   gas station is.  And what is significant about Officer

3   Zavala's testimony is he confirms that Nick is driving the

4   blue Mustang, not any other car.  Aaron West tells you he was

5   driving the blue Mustang.  Sherry Mitchell tells you he is

6   driving the blue Mustang.  Brent Bartley tells you he's

7   driving the blue Mustang.  Nick is stopped because he's got a

8   headlight out.  Officer Zavala doesn't give him a ticket, but

9   he says, "Graveyard shift is going to be coming on.  You'd

10  better get home.  You'd better not be driving around with one

11  headlight because they're not going to be as forgiving as I

12  am."  And Nick says, "Okay."  And Zavala watches him drive

13  over the bridge.

14          Okay.  He's just barely eighteen.  He's looking

15  for his girlfriend.  He drives over the bridge, and then he

16  turns around and he drives back, because he's looking for

17  Leah.  He goes to the card lock and he buys gas.  And one of

18  the things that's significant about the card lock is, in order

19  to use it, you have to put in a card that logs the account and

20  logs the time.  And that can be checked.  And when Nick was

21  questioned by Officer Perske on July 5, 2000, Nick

22  specifically told Officer Perske about this card lock, and

23  said, "Hey, I bought gas that night.  You can check it, and

24  you can confirm when I bought the gas."

25          And likewise, he told Officer Perske that his

D9 111                          Arguments

1   parents had a 1-800 number, and that he, Nick, had called home

2   to talk to his mom to see if Leah had made contact there, or

3   she had somehow come out there, and told Officer Perske, "You

4   can check that to see.  You can confirm what I'm telling you."

5               And you can bet, members of the jury, the

6   prosecution checked that out as part of their investigation.

7   And you didn't hear anything different.  So, you can infer

8   that, in fact, Nick did buy gas at the card lock, and he did

9   call his mom that night from Fast Mart looking for Leah.

10              So, once Nick leaves from buying the gas, he

11  goes back up to Haga's - - -

12              And let me say, in terms of Nick on Central

13  Boulevard, remember Aaron West testified that he saw Nick go

14  up Central — up and down Central Boulevard at least six to

15  seven times during the time that Aaron West was at Fast Mart

16  until Aaron West went home between eleven and twelve that

17  night.

18              So, Nick goes back up to Haga's, way up here,

19  to get Brent Bartley and Nicki Price.  They're in the car, and

20  the three of them go to Denny's Pizza to make contact with

21  Denise Bertrand, Leah's sister, and ask her if she's seen

22  Leah.  And, of course, she hasn't.  Then, about 11:30 — 11:00,

23  11:30 — Brent and Nick take Nicki home.  And Brent goes with

24  Nick looking for Leah.  They drive back down onto Knott

25  Street.  Nick slows down at Leah's house.  The lights aren't

Arguments       D9 112

1  on, so he doesn't stop.

2          Now, the prosecution says, "If he wanted to

3  know if she was home, why didn't he just stop?" But, remember

4  the background of this relationship. Cory Courtright didn't

5  want them together in the beginning. And Jim Murphy was

6  pretty strict about when Nick could call, and when he could

7  come over. And Leah's granddad was pretty straight-laced,

8  too, and he was pretty particular about when Nick should be

9  having contact. So, when he sees there's not a light on in

10 her room, he goes on.

11         He went up to the end of Knott to where the

12 park was, and went down to check to see if she was in the

13 park. Brent stayed in the car because he had the knee brace.

14 They went over to the high school because Nick knew that

15 sometimes Leah would want to just go think on the stadium

16 seats in the grandstands, and Nick checked there and she

17 wasn't there. Eventually Brent got tired of driving around,

18 and when he saw Richard Bryant, he got out and went to smoke

19 marijuana with Richard Bryant. So, Nick continues to look.

20 We know from Brent Bartley he was in the Mustang.

21         Then, at 12:03, (not understandable) an area of

22 (not understandable), right in here. Nick does get stopped a

23 second time, this time by Officer Danny Lee. Again, it's for

24 his headlight being out. He's in the blue Mustang. And Danny

25 Lee says, "You know, you've got your headlight out." Nick

D9 113                                    Arguments

1   says, "I know.  I'm looking for my girlfriend.  If you see

2   her, you know, send her home."  And Danny Lee says okay.

3                Now, around this point, maybe give or take,

4   Nick goes over to Kristin Steinhoff's house because she said

5   that she would help him look for Leah.  And Scott Hamilton is

6   there, in the area, apparently.

7                And much is made concerning Nick's bad

8   character, if you will.  And if he's so concerned about Leah,

9   how can he be smoking meth and trying to have sex with this

10  woman, Kristin Steinhoff?  But, members of the jury, you've

11  got to remember, we're dealing with a kid who's barely

12  eighteen.

13               They've been having a great time.  They've gone

14  to Powers swimming the day before.  They had a great time that

15  afternoon.  And then it all went to hell in a handbasket when

16  Leah went to see Sherry.  And from Nick's perspective, Leah is

17  really, really upset.  She's upset at Sherry.  She's — and

18  Sherry's mom, Peggy.  She's upset at him because he told her

19  this was going to happen, and he was right.

20               And, he's looking for her — he's looking for

21  her, Leah, not because he wants to confront her, but because

22  he wants to comfort her.  And when he can't find her anywhere,

23  the first thing he thinks is, "She's off with some other guy.

24  She's at a party, and she's off with some other guy."  And

25  Kristin Steinhoff doesn't dispel this idea.  She, in fact,

1  encourages it.

2           Now, in the back of Nick's mind, he's also

3  concerned that maybe something has happened.  And Coos County

4  is a different place, certainly, than it was back in 2000.  In

5  2000, you didn't have fifteen year old girls being abducted.

6  And so, Nick is being convinced that Leah is off having a good

7  time, and she's partying.  And so, his actions, while not very

8  wise, are essentially in response to that.  It's payback.

9  It's like, "If you're out partying, then I'm going to have

10 some fun."

11          So, he smoked some meth.  He and Ms. Steinhoff

12 start getting involved.  But, what is very, very significant,

13 and most important for your consideration is, he didn't have

14 sex.  They didn't.  Instead, they got in the Kia, and they

15 went out to Sinnott's a little ways out Fairview to see if

16 there was a party.  They went out to see if there was a party

17 because Nick was afraid Leah was out there partying with

18 somebody else.

19          And what did he tell Scott Hamilton at Kristin

20 Steinhoff's house?  He told Scott Hamilton, "If you see Leah

21 with another guy, beat him up and take her home."  He didn't

22 make threats about Leah.  He made threats about the guy, and

23 he wanted Leah to get safely home.  So, that was his mind set.

24          They go out to Sinnott's.  There's no party.

25 They come back into town.  Nick takes Kristin to the card

D9 115                              Arguments

1   lock, buys some gas for her car.  And he took — you know why

2   they took the Kia.  Because he had been stopped twice in the

3   Mustang with no headlight, and wasn't going to take a chance

4   on getting stopped a third time.

5              And let's deal, just for a second, with the

6   issue of him changing cars.  Now, we know he did not change

7   cars because he tells you so in Exhibit 242, which was a

8   pretext call to Scott Hamilton.  And again, he's saying how it

9   is, with all the little words and swear words and all.  And

10  what he says is, "I had the fuckin' Mustang the whole fuckin'

11  night, and that's because my dad had the fuckin' keys.  So

12  fuckin' — I was branded from the fuckin' T-Bird, you know,

13  because I know from a fact that I wasn't fuckin' driving that

14  shit."  He didn't have the T-Bird.  He had the Mustang.

15             Now, people say, "Oh, yeah.  Yeah.  (Not

16  understandable) the T-Bird."  Well, remember, on July 5th, Nick

17  signed a written consent for the police to take his Mustang,

18  and to search it as much as they wanted.  So, he didn't have

19  the Mustang to drive.  So, certainly at that point, people

20  were seeing him in the T-Bird.  And he did drive the T-Bird on

21  occasion, but he was grounded from the T-Bird on June 28th.  He

22  was only driving the Mustang.

23             So, they come back into town.  Nick drops off

24  Kristin Steinhoff.  He goes back over to Knott Street one more

25  time.  And when he drives through this last time, he sees what

Arguments        D9 116

1  he thinks is a light on in Leah's window, or the flickering of

2  the television.  So, he goes to the driveway next door, picks

3  up some pebbles, and tosses them at her window.  She doesn't

4  respond.  So, he thinks, "Well, I'm in trouble, but we'll deal

5  with it tomorrow."  Because, as we know from the testimony,

6  people had seen them have tiffs.  One of them would walk off,

7  and then they would make up.  So, he goes home.

8          The next morning Cory Courtright calls him and

9  says, "Leah didn't come home."  And his response is telling —

10  because the prosecution talks about how he supposedly tells

11  Officer Hall, "Well, she was staying overnight with a friend."

12  But what he says to Cory is, "What?  She didn't come home last

13  night?"  Because, he expected her to be home.  And he thought

14  that she was home.

15          In his statement — his handwritten statement to

16  the police on July 5, 2000, indicates, "At 7:30 in the

17  morning, Leah's mom calls and said that she didn't come home,

18  and that her TV was probably the glare in Leah's room."  So,

19  you know that back in July of 2000, Nick told Cory Courtright

20  that he believed Leah had come home because he had seen the

21  flickering — some light on in her room.  It's not something

22  that was made up after the fact.

23          The prosecution also contends that Nick and

24  Leah met up again at some point.  And the argument made to you

25  — or, the suggestion made to you is that Nick told Scott

D9 117                              Arguments

1   Hamilton that he actually dropped Leah off at McKays Market at

2   some point.  But we know, from the pretext call — from

3   Exhibit 242 — that that didn't happen because Nick tells you

4   so.  And remember, this is being recorded by the police, and

5   Scott Hamilton is trying to get Nick McGuffin to make

6   admissions — to make statements.

7          And three times — three times, Scott Hamilton

8   says to Nick — first time: "The night when all that shit

9   happened that you and Leah got in a fight and you dropped her

10  off at McKays or whatnot, you remember?  You remember telling

11  me that, right?"  And Nick says, "No, because I dropped her

12  off at Sherry's."

13         And then Hamilton says, "Well, that's ten years

14  ago, though.  So,. . ."  And Nick says, "Well, yeah.  No.

15  Yeah.  I dropped her off at Sherry's because (not

16  understandable) said she was going to go in there for a couple

17  hours, and then she was going to come back."

18         And then, there's a third time where Scott

19  Hamilton says, "I just could have swore that's what you told

20  me about, is her getting out at McKays."  And Nick says, "Huh

21  uh."  And then he says, "Yeah, say something that fuckin'

22  didn't happen.  No, fuckin' no.  I didn't drop her off at

23  McKays."  So, there was no additional contact.  Nick is flat

24  consistent that he didn't have any contact with her.  He

25  didn't drop her off her off at McKays.  There wasn't a fight

Arguments        D9 118

1   between them.  He talks about there was a little bit of a

2   tizzy, and that's because of the whole situation with Sherry

3   Mitchell, and Leah wanting to go over there.

4           I know it's warm in here.

5           So, what do we have?  We have a chronology that

6   shows you that Nick McGuffin drops Sherry — dropped Leah

7   Freeman off at Sherry Mitchell's at 7:00 on June 28th.  He went

8   back to pick her up sometime after 9:00 and she was gone.

9   Somebody abducted her, I submit, by 9:30 that night, where she

10  was discovered at 11:30.  And it wasn't Nick McGuffin who

11  abducted her.

12          He's seen place after place, time after time.

13  And overall, what you can tell, members of the jury, is there

14  was no time for him to make contact with Leah and to spirit

15  her away anywhere.

16          Now, Mr. Frasier has — or, the prosecution has

17  the burden of proof here.  And I'm sure that in Mr. Frasier's

18  final argument, he's going to come up and say, "Well,

19  Mr. McGuffin can't account all his time.  There was — you

20  know, there could have been time where they could have met up,

21  and he could have taken her somewhere."  If that is true, then

22  there should have been some evidence of that in Nick

23  McGuffin's Mustang.  You know they searched the Thunderbird,

24  and they didn't find anything.

25          But, you also know they searched the Mustang.

D9 119                                    Arguments

1   And they found a lot.  They found a whole lot, members of the
2   jury.  And throughout this whole case, they found a lot of
3   stuff.  And you have summaries of all the stuff they found
4   here in evidence.  You can take a look at that.  Because, it's
5   not that they didn't find anything.  They found a lot of
6   stuff.  But what they found did not connect with Nick
7   McGuffin.
8           And these are trained and experienced people.
9   These are Criminalists.  These are police officers.  They did
10  a lot of searching.  They did a lot of work.  They did a lot
11  of comparison.  There's no DNA that connects Mr. McGuffin.
12  There was no blood in his car.  We know how sensitive Luminal
13  is.  They searched the Mustang back on July 6th of 2000.  They
14  searched it again last year.  Not one trace.  Not one iota.
15  Not one scintilla of blood to indicate that Leah Freeman was
16  ever in that car.
17          If Mr. McGuffin snatched her and took her
18  somewhere and killed her, he's got — he can't do it on foot.
19  It's got to be in the Mustang.  And there's nothing to connect
20  that.  It's simply not there.
21          Well, remember, the burden is on the State in
22  this case.  Mr. McGuffin, as he sits here, is presumed
23  innocent.  He doesn't have to do anything or prove anything.
24  It's all on the State of Oregon to provide you the proof.  And
25  they haven't done that here.  And their burden of proof is a

1  heavy burden.  It's beyond a reasonable doubt.  In civil

2  cases, when we look at the Scales of Justice, and we have the

3  merest feather to tip the scales, that's enough.  More likely

4  than not, probably, 51 percent — in a civil case, that's good

5  enough.

6          But, this is a criminal case, and that's not

7  good enough.  So, it's not good enough for the State to say to

8  you, "Okay.  This guy cheated on his girlfriend."  It's not

9  good enough for the State to say to you, "He did drugs."  It's

10 not good enough for them to bring in a statement that he made

11 to somebody when he was in jail, solely for the purpose of

12 prejudicing you against him."

13          They have an obligation to bring you the best

14 possible evidence — not so you think, "Okay.  He may have.  He

15 might have.  He could have.  He probably did."  It's so you

16 know that they have proven the case — that Mr. McGuffin did,

17 in fact, kill Leah Freeman.  And it's simply not here.

18          And the other thing about our system of justice

19 is it's a binary system.  It's a yes, no — black or white.  Is

20 he guilty or is he not guilty.  And he's not guilty unless and

21 until they prove it to you.  And they haven't done that here.

22          Now, like I said, they found a lot forensic

23 evidence.  And Ms. Wilcox testified that when — and this was

24 on her direct testimony — she testified that when she examined

25 the Mustang on July 6, 2000, it did not appear that it has

D9 121                              Arguments

1   been wiped down.  It did not appear, in other words, members

2   of the jury, that it had been cleaned out.  So, she looks at

3   it, and one of the things she tells you — this was on redirect

4   examination by the prosecution — was that in terms of looking

5   for hair, she wasn't particular concerned if there was hair of

6   McGuffin or hair of Ms. Freeman because she knew that Leah

7   rode in the car maybe every day.

8           So, she, Ms. Wilcox, would only be concerned if

9   she had found wads of hair, or she had found hair in the

10  trunk.  And she didn't.  There is absolutely no evidence that

11  Mr. McGuffin had Leah Freeman in his vehicle for any sinister

12  purpose.

13          And the prosecution talks about, none of this

14  evidence — none of the forensic evidence matches anybody.

15  Well, what that means is, it doesn't match anybody that

16  they've compared it to so far.  There were people in this case

17  to which it is not being compared.  And that's something you

18  should also consider.

19          For example, Raymond Lewis.  Now, Raymond Lewis

20  left a receipt dated May 25, 2000 up on Hudson Ridge, not very

21  far from where Ms. Freeman's shoe with the blood was found.

22  Raymond Lewis had a pickup with a lift kit.  Raymond Lewis was

23  a hunter — a deer hunter, and that was out of season.  We know

24  a deer carcass was found near the body.  Raymond Lewis had a

25  hunting knife that he sometimes kept in his vehicle.  Raymond

Arguments        D9 122

1  Lewis said that he was going to his friend Matt Carney's

2  house.  And yet, that was never brought up to Mr. Carney until

3  after the fact when Raymond Lewis said, "Remember, I was

4  coming to your house the night that Leah Freeman disappeared."

5  And Matt Carney is going, "Well, I — okay.  I don't really

6  remember specifically."

7           Now, I — I can't tell you who killed Leah

8  Freeman.  What I can tell you is, based on the evidence

9  produced here today, it was not Nick McGuffin.  And the

10  prosecution has not checked out Raymond Lewis' truck.  They've

11  never checked out his (not understandable).  And that's also

12  of interest because going back to Danny Lee stopping

13  Mr. McGuffin at 12:03 in town, what we know from that is, it

14  was not Mr. McGuffin who was out on Fairview that Jennifer

15  Storts saw when she was coming home from her 72-hour shift at

16  the hospital.  She said it was a pickup, and all she could

17  tell was it looked unusual.  Maybe to her a lift kit on a

18  pickup looks unusual.

19           What we know, for our purposes is, there's

20  forensic evidence that can still be checked.  And it may match

21  somebody.  But, it does not match Nick McGuffin.

22           And we also heard about how, oh, trace evidence

23  disappears.  It doesn't stay.  It's much better to get it

24  early on.  Probably all true.  But, in this case we know that

25  in 2010, the authorities had the Mustang sampled again for

1   paint samples.  They had Ms. Steinhoff's Kia sampled for paint

2   samples.  And they sent Leah Freeman's clothes to a lab in

3   Chicago called Micro Trace.  And Micro Trace, after all this

4   time, was able to find the tiny particle — a gray paint chip —

5   off of Leah Freeman's shirt.

6           Now, that — that may turn out to match

7   something at some point.  Because, if you remember your

8   history, it was paint particles — paint chips that led to the

9   apprehension of Gary Ridgeway, the Green River Killer.  And we

10  know from Ms. Wilcox that just the smallest thing — a piece of

11  glitter on a little girl's shirt — can be the proof needed in

12  order to put her in a vehicle.

13          And I say to you, members of the jury, the

14  significance here is we have nothing forensically, tying Nick

15  McGuffin to the disappearance and the death of Leah Freeman.

16  He didn't have the time to do it.  The lack of any evidence in

17  his car shows he didn't do it.

18          Now, of course we have the statement of David

19  Breakfield.  David Breakfield, who comes into Court and says,

20  "Nick McGuffin said to me, 'I strangled that bitch, and I'll

21  kill you, too.'"  And the Court has instructed you about how

22  to evaluate witness testimony.  And part of that is the manner

23  in which the witness testifies.

24          Members of the jury, David Breakfield was like

25  a poorly-prepared actor.  He got on the stand, and his first

1  statement was, "Do you want me to tell it now?" So, he pops

2  out with his line, and then prosecution counsel tries to

3  prompt him on his next line, and he can't remember. And she

4  has to try to help him along with that. That's how good a

5  witness he was.

6           You also consider the nature or quality of the

7  witness' testimony. The quality of his testimony was (not

8  understandable). He claims the statement was made to him —

9  essentially a confession — by Nick McGuffin in 2002, and he

10 doesn't tell a living soul until 2010. It strains the

11 imagination to accept that. It simply is not believable.

12          You also look at evidence that contradicts the

13 testimony of the witness, and I'll get to that in just a

14 moment. But you look at evidence concerning the bias,

15 motives, or interests of the witness. And with Mr. Breakfield

16 we have a couple of things for you to consider.

17          The first is that this was over Megan Edgerton.

18 And that Mr. Breakfield wants to get back at Mr. McGuffin

19 concerning Ms. Edgerton.

20          The second aspect is the timing of his

21 statement, because there was a $10,000 reward set up in

22 January of 2010. And then Mr. Breakfield suddenly comes

23 forward. If he can successfully help with the prosecution of

24 Mr. McGuffin, he's got 10,000 bucks in his pocket. The way he

25 testified, what he testified to, the timing of it, it's just

D9 125                                    Arguments

1   not believable.

2           Additionally, we know that despite the best

3   efforts of the Medical Examiner, no one can say how Leah

4   Freeman died.  Dr. Olson told us, yes, it could be

5   strangulation, but there was no damage to the hyphoid bone,

6   which one would expect to see.  It could have been blunt-force

7   trauma.  It could have been stabbing.  If it was below the

8   sternum as Mr. Meneely told you, it would — and it hit a major

9   organ, lungs or heart, it would happen very, very quickly, and

10  there wouldn't be any evidence on it at the autopsy.

11          Now again, the defense doesn't have a burden of

12  proof, here.  But we asked the Criminalist to go back and look

13  at the clothing, and look at the shoes, so we could know if

14  there was something else.  And Mr. Meneely has told you, there

15  is evidence of a stab wound in the area below the sternum.

16  How does he know that?  Because he looked.

17          And this is not to be critical of the State's

18  experts because they did the best they could do at the time.

19  Dr. Olson did a quick visual exam.  Kathy Wilcox, as she told

20  you, did a bright light exam.  She thinks maybe now, she did

21  maybe low-microscope exam.  England did a quick exam, but

22  their job was to look for DNA.  That's what they were hired

23  for.  But even so, their report, which you have in evidence,

24  talks about the movement of the fabric.  Because, remember

25  what Mr. Meneely told you?  If there was a struggle, which one

1  would assume in a stabbing situation — and Ms. Wilcox talked

2  about that, as well — you would not expect that the two pieces

3  of fabric, the tank top and the sports bra, would be lined up

4  identically.  And that is consistent with what Mr. Meneely

5  found.  The two cuts were within two inches of each other.  He

6  found the sharp edge that indicates that it was the slashing

7  of a knife.

8           And it is the size that is very important.  One

9  and a half centimeters on each of those holes.  And that

10  contradicts what Mr. Breakfield claims.  So, that is evidence

11  for you to consider.  And since we don't know how Leah Freeman

12  died, and since we can't say that it was strangulation, and we

13  can't believe Mr. Breakfield, that another reasonable doubt.

14           What about Mr. McGuffin's other statements?

15  What about his other actions?  Well, it's true.  It's true in

16  the sense that he went out to look at where Leah Freeman was

17  found, with Scott Hamilton.  And when he talked to Scott

18  Hamilton in 2010, he told Scott, "Well, you know, the police

19  don't really need to know about that."  He also said, "But

20  tell them whatever you want."  And he told him that more than

21  once.

22           So, why wouldn't Mr. McGuffin want the police

23  to know that he went out there?  I submit to you that there's

24  a couple of reasons.  One is because by the time he talks to

25  Scott Hamilton in 2010, Mr. McGuffin has been harassed, he's

D9 127                              Arguments

1  been targeted, he's been followed, and he's — he's tired of

2  it.  He doesn't want to have to deal with the police anymore.

3  And he says to Scott Hamilton, "I wish they'd do a little more

4  questioning of fuckin' other people instead of just trying to

5  fuck with — fuckin' with me."

6              And I'm sorry about the language, but it's

7  there.

8              And the other reason he didn't really want

9  Scott Hamilton to talk about it was because it was a very

10  private thing.  And you know from testimony, that when Nick

11  and Scott went out there, that Nick went down to where he

12  thought the site was, which Detective — former Detective

13  Oester told us was actually the wrong site — that Nick went

14  down there.  And when he came back up the bank, he was crying.

15  And he had a picture of Leah.  And he (not understandable)

16  Scott.  And if he had killed Leah Freeman, the last thing he's

17  going to do is go back into that area.

18              Let's deal with a couple of the other

19  statements.  You've got to remember that in the beginning,

20  there was hope.  Nick hoped that maybe Leah had run away.  And

21  maybe she would be coming home.  And then the first shoe was

22  found.  And still, he's hoping.  And then the second shoe was

23  found.  And one still hopes against hope that things are going

24  to work out okay.  But, when you find the second shoe, it's

25  pretty clear she didn't run away.

Arguments        D9 128

1           Now, Christy Young Cagley tells you that she

2    was present at a place where Nick was with his brother Wayne.

3    And then when the information about the second shoe being

4    discovered came on the television, that Wayne made a statement

5    to the effect of, "Oh, that was just planted there.  The

6    police aren't going to find anything."  Did Wayne say that?

7    Maybe.  It's been reported to you eleven years later — okay,

8    Ms. Cagley talked to the police back in 2010.  So, it's being

9    reported to you for the first time in 2010.  And the Court

10   - - -

11           And let's assume, for the sake of discussion,

12   that Wayne McGuffin did say something like that.  It wasn't

13   with a sinister motive.  It was as an armchair detective.  It

14   was meant possibly to (not understandable) or comfort his

15   brother, because you've got one shoe in the graveyard — close

16   to the graveyard.  You've got one shoe up on Hudson Ridge.

17   And things look really bad.  So, Wayne's trying to say, "Hey,

18   you know, it's not what it looks like."  There's no indication

19   of any knowledge of how the shoe got up there.

20           But, what's really important for your

21   consideration is Ms. Cagley's claim about Nick McGuffin's

22   reaction.  And she claims that when Wayne McGuffin made this

23   statement, that Nick laughed — that he thought it was funny.

24   And I say to you, members of the jury, based on the evidence

25   you've heard here today, that's not something that Nick

```
    D9 129                        Arguments
```

1  McGuffin would do.  You know from Margaret Downs — Buehner, I

2  think her name is now — you heard her testimony that Nick was

3  looking everywhere for Leah.  That he wasn't eating.  He

4  wasn't sleeping.  He was chain smoking.  He was trying to find

5  her.  He was wearing himself down physically.

6          And we know that to be true because on July 2nd

7  he was taken to the Emergency Room with what was diagnosed as

8  a grief reaction.  And you have the doctor's report in

9  evidence as Exhibit 215.  Nick's not going to laugh about the

10 shoe being found, because he wanted to know what had happened

11 to Leah Freeman.

12          And remember Ms. Cagley's testimony.  This was

13 not something — Nick's reaction that she told you about in

14 Court is not something she told the police about when she told

15 them this story.  Nor was it something she had testified to at

16 Grand Jury.  It's something that just was provided for you in

17 Court.  And therefore, I submit that that statement is

18 suspect, and you should reject it.

19          We had some other statements.  The statement to

20 Melissa Beebe, 2003.  Nick's at the courthouse for some

21 proceeding.  Ms. Beebe says to him — yells at him, "How'd

22 court go?"  And he says, "Good."

23          And so then she's irritated at his reaction and

24 says, "Well, that's better than you deserve."  And it's only

25 because of that that she's goading him.  He shouts across the

Arguments      D9 130

1  street to her, "Yeah, amazing what you can get away with in

2  Coos County."  That doesn't mean anything.  It simply doesn't

3  mean anything.

4           Over the course of all these years, and all

5  this evidence, what we see is, there was never a time when

6  Nick McGuffin could have caught up, or did catch up, with Leah

7  Freeman, and abduct her or spirit her anywhere.  And if he

8  had, it would have had to have been in the Mustang.  And

9  there's no evidence of that.

10           And oh, the other thing about that little gray

11  particle — gray paint particle is — the other thing the

12  prosecution hasn't done is to compare it to somebody else in

13  town who we know had a primer gray car, and that was Scott

14  Hamilton.  That hasn't been done.

15           So, all of these things are reasonable doubts.

16  And they require you to find Mr. McGuffin not guilty.

17           And speaking of McGuffin, it's kind of

18  interesting.  The great film maker, Alfred Hitchcock, had a

19  technique that he called "the McGuffin".  And the McGuffin was

20  where the characters in a movie would chase all over after

21  this certain object when it really didn't have any meaning at

22  all.  So, in the movie Casablanca, it was transit papers.  In

23  spy movies, a lot of times it's paperwork.  In heist movies,

24  it's a necklace.  In Pulp Fiction, it was the suitcase.

25           And really, members of the jury, that's what

D9 131                              Arguments

1    we've got here, is we've got a McGuffin, and it's Nick

2    McGuffin.  Because, you chase him all around.  You look at

3    where he is.  You look at what he does.  You look at what he

4    says.

5            Oh, and I almost forgot.  Richard Bryant.  He

6    says to Richard Bryant, "I didn't have anything to do with

7    it."  And I can — he's still — Nick is still haunted.  He's

8    still haunted.  He can still see Leah laying there, because

9    he's never going to be free of it because he feels guilty that

10   he didn't protect her.  That he, as her guardian, did not save

11   her.  If he'd have been on time, or he had convinced her not

12   to go over to Sherry Mitchell's, this would not have happened.

13           And that brings us back around circle to his

14   character.  And yeah, he and Melissa Smith did have a sexual

15   encounter a couple weeks after the memorial service.  They

16   were both drinking.  They were reminiscing about Leah.  And

17   they sought out some solace between the two of them because

18   they both cared so much about Leah.

19           But when you look at all of the evidence, Nick

20   McGuffin is the (not understandable).

21           And I may have forgotten something, members of

22   the jury, and if I have, I apologize; and I hope you rely on

23   your notes.  Because, Mr. Frasier has the last word.  He has

24   the burden of proof.  But the bottom line here is the State

25   has not proven their case.  And if you, based on this

Arguments        D9 132

1  evidence, find Mr. McGuffin guilty, then the case is closed.

2  But, what they really need to do is use this forensic

3  evidence, and keep comparing it to people until they find out

4  who really killed Leah Freeman.

5          And that's what we all really want, is justice

6  for Leah.  But, Mr. McGuffin, Nick McGuffin, is not guilty.

7  He's not guilty.  He's not guilty.

8          THE COURT:   We'll go ahead and take about a

9  fifteen minute recess, ladies and gentlemen.  Remember the

10  admonition.  Take your notes into the jury room, and come back

11  for final argument.

12          (Jury out.)

13          Two twenty-five.

14          Turn the air conditioning on.

15              (RECESS)

16          JUDICIAL ASSISTANT:   All rise.

17          THE COURT:   Be seated, please.

18          Mr. Frasier, you may give the State's final

19  argument.

20          MR. FRASIER:   Thank you, Your Honor.

21          Ladies and gentlemen, let's start with

22  counsel's assertion that this was a relationship that was, in

23  essence, good.  The evidence that we have produced would

24  indicate that that is not exactly true.  Ms. Freeman clearly

25  had issues with how she was being treated by the Defendant.

D9 133                          Arguments

1   And, in addition to what I read to you earlier today, I would

2   just draw your attentions to State's Exhibit 85 and 87.

3                   For example, in 87, she starts off:

4                   "Nick,. . ."

5                   And these were found in the Defendant's

6   bedroom.  These were actually delivered to him.

7                   ". . .I know you think this is chicken shit of

8              me, but this, for me, is the best way of getting

9              through to you."

10                  She goes on, "Anyway, the reason I'm writing

11             this is because changes have to be made."

12                  State's Exhibit No. 85:

13                  "Nick, okay, I don't understand how you can be

14             such an asshole."

15                  That's a healthy relationship?  Or, is this a

16  relationship that's headed for trouble?  Is this really a good

17  relationship?

18                  Let's talk about the argument that the

19  Defendant talked about in his statement with Sherry Mitchell —

20  or, excuse me, with Chief Reaves.  Now, when he's talking to

21  Chief Reaves, Chief Reaves asked him, "Now, does she have any

22  problems with anybody?"  And the Defendant starts talking

23  about the problem that night that Leah disappeared, at the

24  Mitchell house.  But then he goes on to talk about something

25  that happened a couple days before.  He starts talking about,

Arguments    D9 134

1  "Well, Peggy Mitchell did this," and, "Peggy Mitchell did this

2  at the Fast Mart."  Okay?

3           Now, who's the source, that this occurred at

4  Fast Mart?  It's the Defendant.  Because, you'll remember, I

5  asked Peggy Mitchell, "Did you have a dispute with the

6  Defendant or Leah Mitchell (sic) a couple days before at Fast

7  Mart?"  And she says, "I don't remember that."

8           And again, we're back to how does the Defendant

9  know all of this stuff that happened the night of June 28th?

10  Now, think about it.  Is Sherry Mitchell going to tell the

11  Defendant, "Oh, by the way, I told Leah that you're a bad

12  influence on her because you got her into drugs," and this,

13  that and the other, and, "You shouldn't be around her

14  anymore?"  Is she really going to tell him that?  No.  She's

15  just going to say what she told you.  "We had an argument.

16  She left."  Where is he getting all these details about this

17  argument, unless he talked to Leah later than he's claiming.

18           Now, we do know that there's some sort of

19  argument between the two that night.  But, we're not saying

20  that it happened prior to Leah going over to Sherry Mitchell's

21  is the sum total of what occurred.  We're not saying that.

22  What we're saying is, there was friction.  And as I go through

23  my final argument, here, that friction got worse and, again,

24  exploded into this catastrophe that ended up in Leah being

25  dead.  Things became worse.

D9 135                                    Arguments

1          Now, one of the things that counsel talked

2   about with you, "Well, we know the Defendant was telling the

3   truth because of. . ." this, this and that.  Well, was he

4   really being truthful with the police?  Now, one thing in

5   particular I want to draw your attention to, Chief Reaves is

6   asking the Defendant what happened.  And one of the things he

7   says first, at the beginning of the tape, is, "Hey, listen.

8   This is a missing persons case.  We're trying to figure out

9   what happened to Leah Freeman.  I don't care about any

10  drinking, or anything along that line.  Tell me what's going

11  on."

12         And you'll recall the Defendant said, "Hey, I

13  don't drink and drive."  But, one of the things he leaves out

14  on that statement on June 30th of 2000, is that he's running

15  out to Johnson Mill Pond and smoking bowls of marijuana.

16  Apparently it's okay to drink — to drive after using

17  marijuana, but he doesn't tell the police about that.

18         Nor does he tell them later on about him using

19  methamphetamine that night.  And at the same time, he wants

20  people to believe he's so concerned about where Leah Freeman

21  is at.

22         Now, counsel talked about, "Well, you know,

23  Richard Bryant must have — she must have already been past

24  McKays when he left work."  Well, first of all, you have to

25  accept the premise that Richard Bryant was wrong when he said,

1  "I was going to work," instead of coming from work which they

2  said what he was doing.  He said he was working graveyard

3  shift that night, and had to be there at 9:00.  "But, he must

4  be wrong.  He must have worked four to nine, and had gotten

5  off."

6        But, in any event, you'll recall I asked Sherry

7  Mitchell if she'd ever walked home with Leah Freeman from her

8  house.  And she said yes.  And I said, "Where did you — which

9  route did you take?"  And it wasn't going straight down Fourth

10  and up Central.  What she would do is take one of these cross

11  streets back here, and come out either at Fast Mart or come

12  out up here at Tenth Street.

13        Now, to say — well, first of all, Mr. Bryant

14  had it wrong about when he went to work and when he got off.

15  But think about this.  If Leah walked the way she normally

16  - - -

17        MR. McCREA:   (Interposing) Excuse me, Your

18  Honor.  That's malicious argument if it means he wouldn't have

19  come down Fourth Street, because he testified (not

20  understandable) came down Fourth Street.

21        THE COURT:   Overruled.

22        Go ahead.

23        MR. FRASIER:   If Leah (not understandable),

24  went down part of Fourth Street and then turned onto, say,

25  Cedar or Birch, people going down Fourth Street wouldn't have

D9 137                                        Arguments

1   seen her.

2              Now, here's something that's interesting.

3   Counsel talks about Leah making a phone call to have Nick pick

4   her up.  Counsel said Leah was calling because Nick was late.

5   Okay.  How does Leah know she was — that Nick was late if she

6   had left way before 9:00 from the Mitchell place.  It doesn't

7   add up.

8              Here's another question you need to ask

9   yourself.  When the Defendant goes to the Mitchell house and

10  asks, "Hey, is Leah here?"  And they say, "No, why are you

11  asking?"  "Well, I can't find her."

12             Who's idea was it to call Cory Courtright?  It

13  was the Mitchells'.  In fact, they're the ones pushing the

14  phone into his hand to get him to do that — to make that call.

15  Would he have even made that phone call if he hadn't been

16  pushed into it by the Mitchells?  I submit he wouldn't.

17             Driving over the bridge.  How do we know he

18  turned around, as counsel suggests?  Well, there's no evidence

19  that he did.  But, consider this.  During the course of the

20  trial we heard, I think either in opening statement or through

21  questions put to the witnesses, that defense suggested he went

22  over the bridge to turn around so he could come back into

23  town.  And the reason he did that was because the gate — he

24  couldn't turn around at the park because the gate across the

25  road was — was closed.

1          Well, when we put on the evidence that the gate

2    is only closed when the water is high, "Oops, better change

3    that story.  Better change that theory."

4          "The Defendant didn't want to go to the door of

5    the Courtright home to tell them, 'I can't find Leah,' because

6    he's scared of Cory Courtright — scared of her grandfather."

7    Come on, now.  Think about it.  The Defendant wants you to

8    believe that he's running around town trying to find Leah

9    Freeman.  He's almost in a panic.  And do you think the fear

10   that he might have for Cory Courtright is going to prevent him

11   from going to her and saying, "Hey, Cory.  I'm sorry.  I lost

12   her.  I don't know where she's at.  Is she here?"

13         Not once does he have the common courtesy that

14   any young man who's taken a woman out on a date would do.

15   Remember the testimony that he was her guardian.  A guardian

16   doesn't act like he acted.  A guardian goes to the responsible

17   parent and says, "I can't find her."  The responsible thing

18   would be to go to that door.  He didn't do it.

19         In the instruction that you have, the first

20   instruction you have — it's about the Functions of the Court

21   and Jury, things like that — part of the instructions towards

22   the middle of it, it says, "Do not allow speculation,

23   guesswork,. . ." and something else, ". . .to enter into your

24   deliberations."  If you listened closely to counsel's

25   argument, is there not speculation there — asking you to

D9 139                              Arguments

1    speculate?

2              For example, he tells you that the reason the

3    Defendant was trying to fool around with Kristin Steinhoff was

4    because he thought the — the victim was out partying.  Was

5    that not speculation about what he thought?

6              Or, he told Scott Hamilton not to go to the

7    police and tell them about that incident there.  And she gave

8    you a couple of reasons.  Is that not speculation?  Consider

9    that as you go through the deciding of this case.

10              You noticed that when Scott Hamilton says

11    something that they like, he's telling the truth.  But when he

12    says something they don't like, he's not telling the truth?

13    For example, you know, they say, "Well, you know he told Scott

14    Hamilton that he wasn't driving the Thunderbird.  Therefore,

15    that must be the truth."  But think about this.  If he

16    admitted to Scott Hamilton that he'd been driving the

17    Thunderbird that night, that would be an admission that he

18    switched cars that night.  And why would he want to do that?

19              Let's take it a step further.  If you notice

20    carefully, everybody that has said something that hurts the

21    Defendant in some way, must have got it wrong.  For example,

22    Dave Hall, when he said, "When I interviewed the Defendant, he

23    said, 'I thought she was at a friend's house staying the

24    night,' well, he must have gotten that wrong because what he

25    really meant was that she was at home."

1          Or, "Sherry Mitchell must be wrong about when

2     she said Leah left when she said it was closer to nine, and

3     she must be wrong about what she told the Defendant."

4          Or, "Kathy Wilcox must have been wrong in her

5     analysis (not understandable)."

6          Scott Hamilton I already mentioned when he says

7     something they like, it's great.  But when he says something

8     they don't like, like the Defendant "telling me that he picked

9     up. . ." — the Defendant said he picked up Leah and then

10    dropped her off at McKays."  Well, they don't like that.

11         Well, you know, he's having a grief attack.

12    Well, that's true.  He goes to the hospital and he's showing

13    things of grief.  But what's he grieving about?  Leah Freeman

14    is dead, and he knows it.  We also know he — he did it.  All

15    these emotions he was showing are consistent with someone

16    feeling the guilt, having taken the life of his girlfriend.

17         Let's talk a little bit about Mr. Meneely.  If

18    I understood Mr. Meneely correctly, he claims that he found

19    what he believes to be a stab cut in the bra and then the

20    shirt of Leah Freeman.  They're not in the same locations.

21    And so, he's claiming that in order for these things to match

22    up, that the shirt had to have moved around in the course of a

23    struggle.

24         Well, (not understandable) would say, "How

25    reasonable is that proposition when you look at how well that

```
    D9 141                        Arguments
```

1  shirt fit Leah Freeman?"  If I understood it correctly, he's

2  saying that this cut was somewhere in the left quadrant, and

3  then it got pushed over and down so it also matches up with

4  what he claims to be a hole in the bra that's a cut mark.

5          Well, let's look at this a second.  This is

6  Defense Exhibit No. 145.  If I understood Mr. Meneely's

7  testimony correctly, this edge here is a cut mark.  Now, what

8  did Kathy Wilcox tell you that you look for in terms of a cut

9  mark?  "Look for clean, straight edges.  If you see any

10 unraveling and things along that line, it's indicative, more

11 than likely, of something else."  How can you tell that there

12 is a cut mark?  That's what Mr. Meneely wants you to believe.

13          In addition, this is Defendant's Exhibit

14 No. 146.

15          And this, by the way, 145, I want to just show

16 you, this is in the bra.  This is in the bra.  This is the

17 mark Mr. Meneely claims, which is in the shirt, the stab mark,

18 or whatever, in the shirt.  And Ms. Wilcox has looked at

19 those, and talked about these raveling edges and so forth, not

20 consistent with a stab (not understandable).  But, be that as

21 it may - - -

22          Three labs looked at these clothes.  You've got

23 the State Police looked at it in 2000.  You've got the English

24 lab in 2001.  Micro Trace looking at in 2001/2011.  It's only

25 Mr. Meneely that finds these things.

Arguments      D9 142

1  She examined those clothes in 2000.  And you'll
2  recall her testimony.  And you'll recall the testimony of Jim
3  Pex.  Her work is double checked by him.  She testified, "I
4  did not see any marks in that shirt that were cut marks.
5  Didn't see any holes in the shirt, or that bra, that were
6  caused, in her opinion, by a sharp instrument (not
7  understandable).  Accordingly to Mr. Meneely, she must have
8  missed it.

9  Okay.  Now, the police are investigating what's
10 happening — what happened to this young woman.  We know the
11 autopsy didn't reveal an absolute cause of death.  It's
12 extremely important for the police to find out as much as they
13 can.  Ms. Wilcox knew that.  She's aware of that result.
14 She's looking for whatever she can find to help the police.
15 Is it reasonable to believe that she misinterpreted the marks?
16 (Not understandable)?

17 Dr. Olson.  Now, granted, Dr. Olson didn't take
18 a magnifying glass or a microscope, or whatever.  But he
19 looked at those clothes, too.  And here's a man who's dealt
20 with I don't know how many different type of stabbing.  And he
21 wants to see if there's any extraneous evidence that Leah — of
22 how Leah might have died.  And there's this cut in the shirt.
23 Now, it's one and a half centimeters.  Okay?  Three-quarters
24 of an inch.  You don't need a microscope to see this thing.
25 He didn't see anything in that shirt that caused him to

D9 143                              Arguments

1   believe that she was stabbed.  Of course, Mr. Meneely, would

2   think that Dr. Olson missed it.

3              Now, stabbing or strangulation?  You know, it

4   really doesn't matter.  In the eternal scheme of things, it

5   doesn't matter.  Because the question still remains, who did

6   it?  It doesn't matter.

7              Now, the defense says it does matter, and the

8   reason they say it doesn't matter is because if she's stabbed,

9   she would have bled.  And if she had bled, there should have

10  been trace evidence of that in the car that Nick McGuffin had

11  access to.

12             Now — and I guess apparently the defense

13  believes that where Leah was found, is where her body was

14  dumped.  So, whatever happened to her — she's stabbed, she's

15  strangled, whatever — she's dead, and then she's transported

16  to where she's found off of Lee Valley Road five weeks later.

17             Their theory is, if there's no trace evidence

18  in the cars, then the Defendant didn't do it.

19             Now, the search of the Mustang.  When did that

20  occur?  It occurred — well, if you'll recall, one of the

21  things that Kathy Wilcox testified to, it appeared the seats

22  had been wiped.  But - - -

23             MS. McCREA:    (Interposing) I object.  That

24  was not the testimony.  She specifically - - -

25             THE COURT:    (Interposing) Just a minute.

1            I understand your (not understandable).

2            I'm going to sustain the objection because I

3    don't recall that exact evidence.

4            Ladies and gentlemen, I — I'm sustaining the

5    objection, but it's your recollection of the evidence.  That

6    isn't the Court's.  But, on that point, I'll sustain the

7    objection.

8            MR. FRASIER:    May we be heard outside the

9    presence, because I do remember.

10           THE COURT:    Okay.

11           Step into the jury room, please.

12           (Jury out.)

13           THE COURT:    Just a minute.  Let me get to — I

14   took some notes on her testimony.  I don't know what — what I

15   recall her saying is something to the effect that that was

16   vinyl and you couldn't get anything off of it.

17           MR. FRASIER:    I think she said in response to

18   one of my questions — she was talking about looking at the

19   seats, and that they appeared to have been wiped.

20           THE COURT:    I mean, — let me get to my notes.

21   I don't know whether I took it — I do — I recall — as I say, I

22   recall the part where she said they were vinyl seats, and

23   there's not much use going through those.  But, let me look.

24           MR. FRASIER:    The question I asked her, Your

25   Honor, according to our notes, is we — I asked if she had done

D9 145                          Arguments

1  tape lifts of the seat, and she said, "No, because they were

2  vinyl seats, and because it appeared they had been wiped

3  clean."

4           THE COURT:    I do have the one part that says,

5  "The car did not appear to be recently cleaned, and no blood

6  was found.  And you do not tape lifts because it's a vinyl,

7  and do not do a microscopic examination."  I don't have the

8  part you have.  That doesn't mean it wasn't said.

9           What — do you show — Mr. Frasier has a specific

10 recollection of what was said on that.  My notes have part of

11 that.  And that was the part that I remember.  I don't have

12 the other part.  Which doesn't mean I took notes on

13 everything.

14          MS. McCREA:    What — what I have, Your Honor,

15 is she was reading directly from her report from July 6th.  And

16 she said, "The interior surfaces did not appear to have been

17 recently wiped clean."

18          THE COURT:    That was more my recollection of

19 it.  She said, "It did not appear to have recently cleaned."

20 And I don't know that that referred to the outside, because I

21 have a later note about the outside - - -

22          MS. McCREA:    (Interposing) No, it was the

23 interior — the interior surfaces.

24          MR. FRASIER:    Ms. Soublet notes — she can

25 give you a better — it's her notes I've been working off of.

Arguments        D9 146

1          MS. SOUBLET:   Your Honor, my recollection of

2    her testimony is that she was talking about the outside of the

3    car.  And I know that because she indicates, "There was no

4    recent damage to the outside of car — noted recent damage to

5    the outside of the car.  The left side was primer."  Talking

6    about a small amount of gas leak.  Noted that the outside

7    appeared to have been consistent with having been driven.

8    That there was dust on it.

9          But then, inside the car — Mr. Frasier was

10   asking about tape lifts.  And I noted that she didn't do tape

11   lifts because it was wiped clean, the vinyl seats, nothing

12   there.

13          THE COURT:   Just a minute.

14          What date did she testify?  The 12th?

15          MS. SOUBLET:   The 13th, I believe?

16          THE COURT:   The 13th?

17          VOICE:   Yes.

18          THE COURT:   10:56?

19          I don't see — I don't have her starting at

20   10:56 on the 13th.

21          Let me look one more — there is it.  Okay.  All

22   right.  Thank you.

23          Let me look at something.

24          Do you have that — Ms. Soublet, do you have

25   that early in your notes?

```
    D9 147                              Arguments
```

1              MS. SOUBLET:    Somewhat.  It's on the second

2    page — second full page of notes.  I didn't write down, I

3    believe, everything when she was going over her

4    qualifications.

5              THE COURT:    The only thing I can do,

6    Mr. Frasier, is go back and listen to FTR, and I'll do that,

7    because that's — and although there's notes taken about when a

8    witness testifies, most of it is not that — you know, that

9    detailed.

10             MR. FRASIER:    I — I understand that, Your

11   Honor.  But that's our recollection of the testimony.

12             THE COURT:    Then I'll take a recess to listen

13   to that part of the testimony.  That's the only thing I can

14   do.

15             MS. McCREA:    And, Your Honor, I am also

16   firmly convinced that Ms. Wilcox testified that the interior

17   was — did not appear to be recently wiped clean.

18             THE COURT:    My notes reflect that it wasn't

19   recently cleaned, and they don't do lifts on — on vinyl seats.

20   But, I'll listen to the testimony.  This is a point of

21   contention, and we have the right — we have the ability to go

22   back and listen to it.  So, I'll go back and listen to it.

23             We'll be in recess until I - - -

24                        (RECESS)

25             (Jury out.)

1     JUDICIAL ASSISTANT:     All rise.

2     THE COURT:     Be seated, please.

3     It appears from the testimony that you are both

4  correct.  She did testify that the interior did not appear to

5  be recently wiped clean — did not.  And then when Mr. Frasier

6  asked her if she did a tape lift, she said, "No, it was vinyl,

7  and it was clean.  Appeared to be wiped clean."

8     So, the testimony was both.  So, I'm going to

9  overrule the objection, because it's going to be up to the

10  jury.  But, she said two different things within a short

11  period of time.

12     MS. McCREA:     Then, the problem I have is the

13  prosecution limiting it to the one thing she said, then, as

14  misleading.

15     THE COURT:     Well, the problem I have, of

16  course, is I — you know, whenever it get these objections on

17  what the arguments are, unless I'm positive about that, the

18  general tendency is to overrule those because then I'm — I'm

19  taking over what the jury is supposed to do.

20     And I don't know that I can limit him to say

21  both of those.  I agree what I heard was both of them.  The

22  first one was, "It did not appear to be recently wiped clean —

23  did not."  And then the tape lift was, "It appeared to be

24  clean — wiped clean."

25     So, I will give that — I mean, I have to

```
    D9 149                          Arguments
```

1  overrule the objection because he — there's evidence in the

2  record from which he can argue it.

3          The only other thing I can do is explain to the

4  jury that she said two different things at different times.

5  And then you can make your argument.

6          MS. McCREA:    I would request that, Your

7  Honor.

8          THE COURT:    Mr. Frasier?

9          MR. FRASIER:    Leave it to the Court.

10         THE COURT:    Okay.

11         Bring the jury in.

12         (Jury in.)

13         THE COURT:    As you will recall, Mr. Frasier

14  was making a — in his closing argument saying something about

15  it appeared that the interior was wiped clean.  Ms. McCrea

16  objected and said that wasn't the testimony.  In making my

17  rulings, I can go back and listen to the testimony.  And it

18  appears that Ms. Wilcox, at one time, said it appeared that

19  the interior was not recently wiped clean.  She was then asked

20  a question about lifting a print, and she said, "It was vinyl.

21  I didn't because it appeared to be clean — wiped clean."

22         So, that the testimony that's before you, and

23  I'll allow Mr. Frasier to continue with his argument to you.

24         Go ahead.

25         MR. FRASIER:    The objection is overruled?

Arguments      D9 150

1          THE COURT:    Objection is overruled, with the
2     understanding that I just told you.
3          MR. FRASIER:    Well, let's move on.
4          Brent Bartley gave you testimony that prior to
5     Leah disappearing that there was stuff in that trunk.  Then,
6     unsolicited, he testified that after Leah disappeared, there
7     was nothing in that trunk.  Okay?  The trunk was empty.
8          Now, trace evidence.  Let's talk about that a
9     little bit.  Granted, trace evidence can solve cases.  But, as
10    you heard from the experts, it's not that common event.  It
11    rarely occurs.  And the reason is, trace evidence is fragile,
12    easily disturbed, hard to find to begin with.  And as more
13    time passes from the event that you're concerned about, the
14    harder it gets to find this stuff.
15         Now, in this case, we know the Mustang was
16    examined at least a week after Leah disappeared.  The Mustang
17    — excuse me, the Thunderbird was examined almost a month
18    later.  The chances of finding such evidence as time goes by,
19    goes down.  Okay?
20         Now, does the absence of blood in either car
21    exonerate the Defendant in this case?  And the answer is no.
22    Let's take it a step further.
23         You hear from Dr. Olson that a stab wound may not
24    bleed significantly.  In order for there to be blood
25    transferred into car — into the car, if she was stabbed, there

D9 151                              Arguments

1   has to be blood passing from the body.  And again, if the body

2   is covered, there would be no blood transferred into the car

3   itself.  So, the fact — the lack of trace evidence in this

4   case, does not exonerate the Defendant.

5           Let's go a step further.  There's another

6   problem with the stabbing theory.  And again, even though it

7   doesn't matter, the stabbing theory doesn't explain the blood

8   on the shoe.  Now, you heard from Jim Pex and you heard from

9   Kathy Wilcox, about the concept of blood spatter.  And you

10  heard that blood that falls out of a wound, or pumps out,

11  leaves a splotch, or whatever.  But what was seen on that shoe

12  was what was called impact spatter.  Ms. Wilcox described it

13  between medium to high velocity.

14          Now, what does that mean?  If she was stabbed

15  and the knife is pulled out, that is not going to account for

16  the blood on the shoe because there has to be some force

17  behind it, like a cough, or a sneeze — somewhere along that

18  line.  All right?  So, stabbing does not explain how that

19  blood got on the shoe.

20          Now, as we go through this case, you'll recall

21  that when Mr. Fisher testified, they started asking him

22  questions about, "Well, don't you have relatives up there by

23  Hudson Ridge?  Don't you have a pickup truck?"  The

24  insinuation was that Mr. Fisher had something to do with the

25  death of Leah Freeman, until we pointed out he didn't get his

Arguments        D9 152

1   driver's license until the October after Ms. Freeman

2   disappeared.  There's a problem.

3           Raymond Lewis.  Okay, here's another one.

4   "Gee, Mr. Lewis must have done this because there's a receipt

5   found. . ." not even on the same road.  But it's found on

6   another secondary road about 100 yards away from where that

7   shoe was found.  "Golly, Mr. Lewis must have done it."  But,

8   there's a problem with Mr. Lewis doing it, because Wayne

9   McGuffin says that shoe was planted to throw the police off.

10  Okay?

11          See what's happening here?  "Oh, let's look at

12  Raymond Lewis."  "Oh, let's look at Austin Fisher."  This is

13  what they wanted.  Throw police off.

14          Well, let's talk about what other things are

15  out there that indicates the Defendant did this to Leah

16  Freeman.  Well, Brett Mauro.  What does he tell you?  "I seen

17  Mr. McGuffin that night.  In fact, we both smoked some

18  marijuana together.  And, he keeps telling me multiple times,

19  quote, 'She's gone.'"  Gone?

20          Well, then we have Detective Ranger who talks

21  to him a week later who the Defendant keeps referring — refers

22  to Leah Freeman in the past tense.

23          Now, counsel talked about, "Well, of course

24  he's going to do that because the shoe has been found."  When

25  were the shoes turned over to the Coquille Police Department?

D9 153                              Arguments

1   You heard from Sergeant Smith.  You heard those dates.  When

2   did this become public?  Think about that, ladies and

3   gentlemen, because the dates — there's no way Nick McGuffin

4   knew those shoes were in the possession of the police when he

5   was talking to Mark Ranger.

6              The Defendant knew Leah wasn't coming back.  We

7   have concern for Leah.  Sure, he's showing concern for Leah.

8   But, who is the ultimate source of that information about what

9   he is concerned about?  The ultimate source there is the

10  Defendant himself.  He's concerned about being caught.  He's

11  concerned about being held responsible.  He's sad because his

12  girlfriend is dead.  He couldn't just go home and hide in his

13  room.  He had to go out and be seen in order to divert

14  attention away from him.

15             Now, this is another interesting thing.  Note

16  where he goes and who he goes with.  He never knocks on the

17  door of her house.  When he goes someplace, he never — well,

18  he never went farther out Fairview Road than Dr. Sinnott's

19  place.  And he avoids the places where hard questions would be

20  put to him about where Leah Freeman is at.  He avoids going

21  and talking to Cory Courtright.  And where he goes, he goes to

22  where his friends and his supporters are.  And when he goes

23  someplace to look for her, he takes a supporter with him.

24             You'll recall in voir dire — and that's the

25  questioning part when we talked with you before the trial

Arguments        D9 154

1  started — counsel asked you a question.  And that question is,

2  "What type of evidence would you like to see in this case?"

3  And you all gave a variety of answers.  But, there was one

4  answer that I was waiting to hear, but I didn't hear it.  And

5  I didn't hear anybody say, "Admission," or, "Confession."  I

6  think everybody would agree that an admission or a confess is

7  pretty darned good evidence in a Murder case.

8           So, that brings us to Mr. Breakfield.  "Oh,

9  he's lying.  He didn't tell anybody.  He wants the reward."

10 Well, you heard his testimony, ladies and gentlemen.  He

11 didn't even know there was a reward posted.

12          Now, the other thing we have to remember, when

13 this incident occurred, when he's being threatened by the

14 Defendant, he's sixteen years old.  You looked at

15 Mr. Breakfield.  Did he want to be sitting in that witness

16 chair?  No, he didn't want to be here.  But, he came because

17 he had something important to say.  He came and told you what

18 this Defendant told him, which is, "I've killed before, and I

19 strangled that bitch."

20          Here's another thing to think about.  Officer

21 Smith had contact with the Defendant in 2009 at the home of

22 his parents.  And the Defendant says, "I know who killed Leah

23 Freeman."  But, he won't tell.  Golly, for a guy who has a lot

24 of concern, who wants to see justice brought for his dead

25 girlfriend.  Whoopee.

```
       D9 155                        Arguments
```

1              What happened June 28, 2000?  Here is a

2   reasonable explanation with the evidence you have heard in

3   this case.  We have a relationship that, while at times is

4   good, is in trouble.  And, as was stated in opening statement,

5   toxic.  At times it's good, but it was bad.  And when it went

6   bad, it was bad.

7              Leah is having second thoughts about this

8   relationship.  She's got pressure from her mom.  The Defendant

9   and Leah have a dispute about whether she should go over and

10  see Sherry Mitchell that night.  Leah spends time with Sherry

11  Mitchell.

12             An argument ensues about whether she should go

13  jogging.  And then it ensues into, "My mom doesn't like me —

14  your mom doesn't like me."  And then, it progresses into,

15  "Gee, Leah, you know, you've changed.  You're doing things you

16  shouldn't be doing.  Nick is a bad influence on you.  You

17  ought to break up."  She unloads on her.

18             Leah is very upset at this point.  She leaves.

19  She's upset.  As she's walking away, she's thinking to

20  herself, "Mom is right.  Sherry's right.  Maybe this is not

21  something I should be in."

22             The Defendant finds her.  The argument get

23  worse.  She walks away.  She leaves him.  Starts heading home,

24  which would corroborate the testimony of Mr. Lindegren who saw

25  them together; and also the testimony of Scott Hamilton, that

1  he dropped her off at McKays.

2         He gets really upset.  "This is my Babydoll.

3  This is my girl.  No one else's."  He finds her by the high

4  school.  He tries to get her into the car.  She loses a shoe.

5  She ends up with a bloody lip or a bloody nose.  She screams,

6  which is what was heard by Mr. Bounds.  And in an effort to

7  keep her quiet, or in anger, he strangles her.

8         And then it goes downhill from there.  He

9  panics, changes clothes, switches cars, body gets dumped.  He

10  has to cover for himself.  Has to go around asking questions.

11  "Where is Leah?"  The pressure builds.  He has guilt over what

12  he did.  He had that anxiety attack.

13         And then, as time goes by, we start seeing the

14  arrogance.  And then we get to the point of, "It's amazing

15  what you can get away with in Coos County."

16         To close my argument, I'm going to paraphrase

17  the words used by a prosecutor in a case back in the 1990s — a

18  case in Mississippi.  It was a 30-year old Murder case.  And

19  there had been a couple of attempts to prosecute the

20  Defendant, and they had ended in a mistrial, hung jury.  They

21  tried again after 30 years.  I'm going to paraphrase the words

22  that were used by the prosecutor at the end, to close his

23  argument.

24         On behalf of the State of Oregon, on behalf of

25  the family of Leah Freeman, I am asking you in this case to

D9 157                              Final Charge

1  act boldly.  To hold the Defendant accountable for what he did

2  to Leah Freeman.  Simply because it is right; it is just; and

3  Lord knows, it's about time.  Is it ever too late to do the

4  right thing?

5              The right thing, ladies and gentlemen, is to

6  find him guilty of murdering Leah Freeman.

7              Thank you.

8              THE COURT:   If you'd turn to the last two

9  instructions, the one starting Lesser-Include Offense - Order

10 of Deliberation.

11             When you deliberate, you should first consider

12 the charged offense of Murder.  Only if you find the Defendant

13 not guilty of the charged offense, may you consider the

14 lesser-included offense of Manslaughter in the First Degree.

15             Verdict.  When you return to the jury room,

16 select one of your members to act as Presiding Juror.  The

17 Presiding Juror has no greater voting weight, but is to

18 preside over your deliberations, and be the spokesperson for

19 the jury.  You should then deliberate and find your verdict.

20             On the charge of Murder, each and every juror

21 must agree on the verdict of guilty to return a verdict of

22 guilty of Murder.  Ten or more jurors must agree on a verdict

23 of not guilty to return a verdict of not guilty of Murder.

24             For the charge of Manslaughter in the First

25 Degree, ten or more jurors must agree on a verdict of guilty

Final Charge     D9 158

1  or not guilty to return a verdict as to Manslaughter in the

2  First Degree.

3           When you arrive at a verdict, the Presiding

4  Juror will sign the appropriate Verdict form.  After you've

5  reached the verdict, you will signal the Bailiff, and the

6  Court will be reassembled to reach your verdict — or, receive

7  your verdict.

8           You'll have one form of Verdict, and it has a

9  place as to Count — as to Count 1, Murder, to check either

10 Guilty or Not Guilty.  And it tells you in the Verdict form

11 what I've just explained to you.  It explains the order of

12 deliberation and the number of people that it takes to find

13 either a verdict of guilty or not guilty.  Please remember, in

14 Murder, it has to be a unanimous verdict of guilty.  It would

15 be ten to two to find him not guilty of that.  On

16 Manslaughter, it's ten to two to find him either guilty or not

17 guilty.

18          And there's, of course, a place to check either

19 Guilty or Not Guilty of Manslaughter.  If the Defendant is

20 found guilty of Murder, then you don't go one to the

21 Manslaughter charge.  If he's found not guilty of Murder, then

22 you do go on to the Manslaughter charge.  Then you would find

23 him guilty or not guilty.

24          The Presiding Juror has to sign and date this

25 Verdict form, whether he or she agrees with the verdict or

D9 159                              Final Charge

1   not.

2               The instructions covering this case — the law,

3   that is, are in the instructions I gave you.  If you have a

4   question about the instructions — that is, the law — you can

5   have the Presiding Juror sign — write out a question and send

6   it out.  And after consulting with the attorneys, I will try

7   to provide an answer to that as quickly as I can, because

8   that's within my province, which is the law regarding the

9   case.

10              If you have a question about the facts in the

11  case, please do not send out a question.  The facts are up to

12  the jury.  Not up to me.  I can't tell you what the facts are.

13  And if you send out a question asking me about the facts,

14  that's the answer you would get.  That's within your province,

15  not mine.

16              Please don't ask to see any other evidence that

17  wasn't admitted.  I don't have the ability or the authority to

18  bring you other evidence, because the parties have presented

19  the evidence to you.  That's it.  And we don't play back the

20  tape recording.  You've all be attentive.  You've all taken

21  notes.  And you can all talk — talk about this case and

22  deliberate.  But if we play one part back, we'd have to play

23  the other part back, and basically we'd be playing the whole

24  trial back to you.

25              So, you'll have in the jury room with you, the

Final Charge        D9 160

1   exhibits that were received, and the instructions, and the

2   Verdict form.  And when you've arrived at a verdict, place it

3   in an envelope that's provided to you.  You don't seal the

4   envelope, but place it in there.  And do not announce your

5   verdict when you come out.  I will be doing that by reading it

6   in open Court.

7                    (Bailiff sworn.)

8                    With the exception of Mr. Watson, unless there

9   are other — and he also may have a question — if anybody has

10  any questions about the law, you can ask them now.  If not,

11  you'll go back in the jury room.

12                   And Mr. Watson, you would — you're the

13  alternate in the case.  So, there's only twelve jurors that do

14  that.  And I would ask, if you need to get anything, you need

15  to leave your notes in there — or, give them to Ms. Cress,

16  rather.  And then you would be excused and discharged from

17  this.

18                   I would ask that you not discuss the case with

19  anybody until the jury has returned a verdict.  And if you

20  wish to know the verdict, give Ms. Cress a phone number you

21  could be reached at, and she would call you after the verdict

22  has been returned to let you know.

23                   In the meantime, until the case is finally

24  decided by the jury, please do not discuss the case with

25  anybody.  Okay?

```
     D9 161                          Final Charge
```

 1              Then, hearing no questions, if all of you would

 2     retire to the jury room.  Don't discuss the case while

 3     Mr. Watson is there.  He has to have a chance to leave.

 4              You may go into the jury room.  And I would

 5     wait a couple of minutes so Ms. Cress has an opportunity to

 6     get all the exhibits in to you, and that sort of thing, before

 7     you start deliberations.

 8              JUROR:   (Not understandable.)

 9              THE COURT:   I don't care whether you keep

10     those or not.  Just get your coat, and - - -

11              (Jury out.)

12              Mr. Watson, on behalf of the Court and the

13     parties, I do wish to thank you for your service.  As you see,

14     alternates are needed.  We had to use one alternate

15     substitute.  And that's why we have alternates in these cases.

16              But, your service was very valuable.  And I —

17     and I know I extend the thanks for the parties and myself just

18     for being so attentive in listening to the case.

19              And you are discharged from this case.  Please

20     remember my admonition.  And thank you again.

21              Before you go in, Cathy, I want to take the

22     exceptions.

23              Mr. Frasier, does the State have any

24     exceptions?

25              MR. FRASIER:   No exceptions, Your Honor.

Final Charge        D9 162

1          THE COURT:    Ms. McCrea?

2          MS. McCREA:    The defense takes exception to

3    the Verdict form in that it has the first option as Guilty in

4    contravention of the Defendant's right to the presumption of

5    innocence, Your Honor.

6          THE COURT:    Okay.  You have that exception.

7    As I said, I've — I think — I'm sure there's an exception, but

8    in all the cases, that's generally the Verdict form I've used,

9    and I've had people — even when I've used on similar to yours

10   - - -

11         And I think in a couple cases, that has

12   happened.  Juries have returned verdicts of guilty and not

13   guilty, and the Verdict form has never been a factor on how

14   they've returned verdicts.

15         You have that exception.

16         Okay.  As soon as we get all of the exhibits

17   into the jury room, I'll release people.

18              (Exhibits are in jury room, and jury room door

19   is closed.)

20         Okay.  You'll have to wait outside until the

21   jury reaches a verdict.  We will be in recess at this time.

22                   (RECESS)

23         (Jury out.)

24         THE COURT:    Just — Ms. Cress said the jury

25   asked about time, and she said, "Don't worry.  Just take as

```
   D9 163                           Final Charge
```

1   much time as you need.  Okay?  So, I think that was

2   appropriate.

3                   I might, at some poin this evening, at least by

4   6:00, I might send them home.  I'm not to have them deliberate

5   all night.  I think it's counter-productive to make people

6   who've worked all day, work late.  So, — but I'll let them go

7   for a while.  Okay?

8                           (RECESS)

9                   (Jury in.)

10                  JUDICIAL ASSISTANT:    All rise.

11                  THE COURT:    Be seated, please.

12                  Ladies and gentlemen, I've — excuse me —

13  decided to stop the deliberations today and have you come back

14  tomorrow.  I mean, you've worked all day.  It's like making

15  people work overtime.  And I think it's counter-productive

16  after a while to make people work too late.

17                  So, if you would come back tomorrow at 9:00 and

18  be here — there'll be another — there'll be another — I have a

19  non-jury trial starting tomorrow, but just come in.  In fact,

20  if you - - -

21                  Can you — is 8:45 going to be inconvenient?

22                  (Laughter.)

23                  Somebody said yes?

24                  (Laughter.)

25                  JUROR:    (Not understandable.)

Final Charge        D9 164

1              THE COURT:    Okay.  Be here at 8:45, and then
2     the other people — we can start the trial at 9:00.
3              But, this is really important to remember the
4     admonition not to watch anything, do any research.  Don't talk
5     about anything.
6              When you come back, wait until all twelve of
7     you are present before you start talking about the case.
8     Don't — if two or three of you get in there, don't talk about
9     it.  Wait until all twelve are present before there's any
10    discussion at all.
11             And you make sure you're out there in the
12    hallway — there were people out there, so that the jurors
13    aren't talked to or anything.
14             Drive home.  Be back at 8:45.  And you can
15    continue your deliberations at that time.
16             Do you want to stop people from coming in so
17    the jury can go out?
18             Okay.  You're released for the evening.  Please
19    drive carefully and have a pleasant evening.  Eight forty-
20    five.
21             (Jury out.)
22             Okay, 8:45 tomorrow.
23             The jury has been out, I think, about two hours
24    and fifteen minutes, and we sent them home at this point in
25    time.  So, we'll — they'll begin — they're just going to go

```
  D9 165                        Final Charge
```

1   into the jury room.  When all twelve of them are present,

2   they'll start.  I'm not going to bring them out to do anything

3   specifically, like that.  And then I'll start my other trial.

4   And if we get — when we get a verdict, I will stop that and

5   bring everybody in.  Okay?  Just let Ms. Cress know where you

6   are.

7               MS. McCREA:    Thank you, Your Honor.

8               THE COURT:    Thank you.

9               MR. McCREA:    Thank you, Your Honor.

10                    (END OF DAY NINE)

11

12   *                        *                        *

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

STATE OF OREGON,                    )
                                    )
            Plaintiff,              )     CASE NO. 10CR0782
                                    )
                                    )       JURY TRIAL
        vs.                         )        DAY 10
                                    )
 NICHOLAS JAMES McGUFFIN,           )
                                    )
            Defendant.              )
_____    )


TRANSCRIPT OF PROCEEDINGS

Volume 13, Pages D10 2-D10 7

        BE IT REMEMBERED That, the above-entitled cause

came on regularly for hearing beginning at 11:00 a.m. on

Tuesday, July 19, 2011, in the Circuit Courtroom of the Coos

County Courthouse in the City of Coquille, County of Coos,

State of Oregon, before the Honorable Richard L. Barron, and a

jury.

APPEARANCES

R. Paul Frasier, District Attorney for Coos County,
representing the Plaintiff.

Erika Soublet, Assistant District Attorney for Coos County,
representing the Plaintiff.

Shaun McCrea, Attorney at Law, representing the Defendant.

Robert McCrea, Attorney at Law, representing the Defendant.


        Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Verdict          D10 2

1   *                          *                          *

2              (Jury out.)

3              JUDICIAL ASSISTANT:    All rise.

4              THE COURT:    Be seated, please.

5              I'm informed we have a verdict that will be

6    returned.  I want to make sure everybody in the courtroom

7    knows there is to be absolutely no reaction by anybody at all,

8    no matter what this verdict is.  And I will enforce that rule.

9    So, do not react in any way.

10             When the jury returns the verdict, and I've

11   told you the verdict, the jury will then be allowed to leave.

12   Then the other people can orderly leave.

13             When you get outside the courthouse, if you

14   want to have a reaction, it's fine.  But not in this courtroom

15   and not in this courthouse.

16             Okay.  Bring the jury in.

17             And if you can't do it, leave now.

18             (Jury in.)

19             Ms. Hanks, you're the Presiding Juror?

20             PRESIDING JUROR:    Yes.

21             THE COURT:    Hand the verdict to Ms. Cress,

22   please.

23             The jury's verdict is as follows.  In deciding

24   whether the Defendant is — as to Count 1, Murder, we find the

25   Defendant. . ."

```
   D10 3                              Verdict
```

1           I'm assuming, Ms. Hanks, - - -

2           PRESIDING JUROR:    Did I fill it out wrong?

3           THE COURT:    Yes.

4           PRESIDING JUROR:    I'm sorry.

5           THE COURT:    I'll have the jury go back — I'm

6   not too sure exactly, but as to - - -

7           You're going to have to go back and look at it.

8   You may have put your numbers wrong.  But, you'll have to go

9   back and - - -

10          PRESIDING JUROR:    (Interposing) Okay.  Let me

11  go (not understandable).

12          THE COURT:    All of you need to go back.

13          Cathy?

14          If you'd all go back into the jury room, and

15  just stop, and — I'm going to have a copy of this made, and

16  then I'm going to send it back — send it back with you.  Okay?

17          PRESIDING JUROR:    That's fine.

18          THE COURT:    All right.

19          (Jury out.)

20          We'll just stay on the record for a minute.

21          I just wanted to keep a copy of what we got

22  originally, but I don't know — and I'll share that with you

23  once — once we come back with the verdict, to make sure you

24  have the right to make any exceptions, if you want, or

25  objections.  But, I just wanted to keep a copy of this — the

Verdict          D10  4

1   original.

2              I'll make sure you have copies.  And before I

3   receive the verdict, I'll make sure it's clear.  And I'll,

4   undoubtedly, in this case, poll the jury so you'll have an

5   opportunity, if you have an objection or exception, to make

6   it.  But I'm not going to share it now, because it — it's

7   something that — the jury has not returned a verdict yet.  So,

8   I don't think it can be shared now.  But, you'll have plenty

9   of time to do it.

10             Just let me know when they're ready.

11                       (RECESS)

12             (Jury out.)

13             JUDICIAL ASSISTANT:    All rise.

14             THE COURT:    Be seated, please.

15             Okay.  Same admonition that I've given

16   everybody.

17             (Jury in.)

18             Has the jury reached a verdict, then?

19             PRESIDING JUROR:    Yes.

20             THE COURT:    Okay.

21             "As to Count 1, Murder, we find the Defendant

22        not guilty."  And that says ten to two.

23             "As to the Lesser-Included Offense of

24        Manslaughter in the First Degree, we find the

25        Defendant guilty."  And that is ten to two.

D10 5                                          Verdict

1              Now, ladies and gentlemen, I want to just poll

2    you, just the raising of the right hand.

3              As to Count 1, it says, "Murder.  We find the

4    Defendant not guilty."  And that is ten to two.  Would the ten

5    people who voted not guilty on the charge of Murder, raise

6    their hand?

7              And that is ten to two.

8              As to Manslaughter in the First Degree, would

9    the ten people who voted guilty raise their right hand?

10             And that is ten to two.

11             The original verdict that was returned as to

12   Murder had ten guilty and two not guilty on it.  And as to

13   Manslaughter, it had ten guilty and two not guilty.  So, the

14   mistake was on — obviously they couldn't have found him guilty

15   of Murder ten to two.  That was a mistake.  Those are the

16   verdicts.

17             If counsel wishes to review both of these

18   before I receive them, you may do so.

19             Do you wish to review those?  Look at the two

20   verdicts?

21             MS. McCREA:    Yes.

22             THE COURT:    Okay.

23             Ms. Cress, do you want to give that to

24   Ms. McCrea?

25             Ma'am, you and you need to leave.  Now.

Verdict          D10 6

1              Mr. Frasier?

2              If there are no objections or exceptions to the

3     verdict — or, a request at this point in time, the verdicts

4     will be received — the verdict will be received.

5              (No audible response.)

6              Hearing no objections, exceptions or requests,

7     then the verdict as returned by the jury will be received.

8              Ladies and gentlemen, we thank you very much

9     for your service on this case, and for your service to the

10    community, in handling this case.  You handled your

11    responsibilities very well.  You were very attentive and took

12    notes.  And you took your time on reaching your verdict in

13    this case.  And we all appreciate it.

14             Everybody else remained seated until the jury

15    has a chance to leave the courtroom.  Thank you.

16             And leave your buttons here, on the counter or

17    wherever you are.

18             (Jury out.)

19             THE COURT:   Ms. McCrea, when did you want

20    Sentencing set?  I usually try to do those on a Monday at

21    1:30, but I will accommodate you if that's not working.

22             MS. McCREA:   Would August 22nd work for the

23    Court, Your Honor?  I have a matter in — I have a matter in

24    Jackson County on both August 8th and August 15th.

25             THE COURT:   I normally don't set them out

```
   D10 7                           Verdict
```

1   that far.  Is there a reason?  I usually set it more quick

2   than that — quicker than that.

3                MS. McCREA:    Well, we could set it for

4   August 1st.

5                THE COURT:    That's fine.

6                MR. FRASIER:    That's acceptable, Your Honor.

7                THE COURT:    At 1:30?

8                MS. McCREA:    Yes.

9                THE COURT:    Mr. McGuffin, you're remanded

10  back to the custody of the Sheriff.

11               Everybody else may leave the courtroom in an

12  orderly and quiet manner.

13                       (END OF DAY TEN)

14

15  *                        *                        *

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

| | | |
|---|---|---|
| STATE OF OREGON, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. 10CR0782 |
| | ) | |
| | ) | MOTION FOR NEW TRIAL |
| vs. | ) | |
| | ) | SENTENCING |
| NICHOLAS JAMES McGUFFIN, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

TRANSCRIPT OF PROCEEDINGS

Volume 14, Pages 1713-1743

BE IT REMEMBERED That, the above-entitled cause came on regularly for hearing beginning at 2:00 p.m., Monday, August 1, 2011 in the Circuit Courtroom of the Coos County Courthouse in the City of Coquille, County of Coos, State of Oregon, before the Honorable Richard L. Barron.

APPEARANCES

R. Paul Frasier, District Attorney for Coos County, representing the Plaintiff.

Erika Soublet, Assistant District Attorney for Coos County, representing the Plaintiff.

Robert McCrea, Attorney at Law, representing the Defendant.

Shaun McCrea, Attorney at Law, representing the Defendant.

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

1713

1  *                          *                          *

2           THE COURT:    State vs. McGuffin will be next.

3           I want to make sure, again, that people know

4  that there is to be no reaction — nothing in this courtroom.

5  This time it won't be merely sending somebody out of the

6  courtroom.  You'll be going next door.

7           The record should reflect that I've received,

8  uh, Ms. McCrea's — Defendant's Motion to Allow Contact and

9  further investigation regarding prior matter, um,

10 Mr. McGuffin's character letters in support, the Motion to

11 Continue the Sentencing, the Motions against the Ballot

12 Measures.  I've received the State's Response to both of

13 those.  And I've now received a copy of a Restitution matter.

14 And I've read everything.

15          So, I don't really care — the Motion to

16 Continue — Continue the Sentencing is basically put forth

17 based on the other matters; the Motion to Allow Contact until

18 further investigation.

19          So, Ms. McCrea, anything to add to what you've

20 already submitted?

21          MS. McCREA:    The State's Response, dealing

22 with the — the Motion to Continue for Sentencing — that seems

23 to be the preliminary issue, Your Honor — and the Motion to

24 Allow Contact, which is essentially to provide further

25 investigation - - -

1714                                            Motion

1    THE COURT:    (Interposing) By the way, I
2    should indicate I received your email about you disagreeing
3    with him of what year (phonetic) did what.  I think your
4    recollection is correct.
5    MS. McCREA:    That — that was going to be the
6    first thing I was going to say.
7    The — the second thing I would indicate to the
8    Court, is the defense has ordered the CD's of the voir dire.
9    Those are apparently ready for me downstairs.  And the request
10   is made to have sufficient time to be able to review those, in
11   order to determine whether there is additional information to
12   provide to the Court, and to request a formal Hearing
13   regarding contact with this juror.
14   The second aspect of the defense Motion, which
15   we had (not understandable), in terms of a Motion to Seal, to
16   not embarrass or cause issues for anyone involved in the case,
17   concerns the matter of what occurred in open Court regarding
18   the juror, Robert Welch.  And the issue in that regard is that
19   two requests were made of the prosecution to provide us the
20   police reports, or any notes of the Coquille Police
21   Department, referenced in Mr. Frasier's two emails, concerning
22   the contact with potential prosecution witness, Polly Parks
23   (phonetic), who came forward about this contact — contact; and
24   the investigation concerning the couple — the friends of
25   Mr. Welch, the Phillips'.

1      We have not been provided anything.  The latest

2  Response I had from Mr. Frasier was that he did not believe

3  that the police had prepared formal reports.  At that point, I

4  specifically requested to at least have the names of those

5  police officers so there could be an independent defense

6  contact, in order to try to ascertain the circumstances here.

7      Now, I understand Mr. Frasier's position is the

8  defense is now objecting to this juror having been released.

9  And that's actually a premature conclusion.  I fully accept

10  the representations that Mr. Frasier made in his emails and to

11  the Court during the time of Trial on July 18th, as an Officer

12  of the Court.

13      The difficulty that I have, as the advocate for

14  Mr. McGuffin, is Mr. Frasier's representations are based on

15  what was told to him by someone else.  I don't have what that

16  someone else did in terms of investigation; in other words, in

17  this situation, the Coquille Police Department.  And of the

18  fact that I don't even have names of any officers who took

19  these reports, so that an independent investigation

20  corroboration can be done, is problematic and of a concern

21  regarding Mr. McGuffin's rights.

22      In addition, the defense attempted, through the

23  defense investigator, several times to make contact with Polly

24  Parks to discuss this matter with her.  And it appeared that

25  she was abating having any contact with the defense.

1716                                    Motion

1    All of that raises red flags, which potentially

2    down the line could become an issue in the event that there is

3    an appeal or post-conviction relief.  And the effort is being

4    made now to simply be able to pin this down so there is a

5    complete and adequate record.

6    So, based on those issues and the fact that we

7    are only asking to have this matter go over to the following

8    Monday when — I don't know the Court's schedule, but when I'm

9    available.  It is a very short question of the continuance.

10   And it would allow us to make sure that the record is accurate

11   and complete, Your Honor.

12   THE COURT:    If — if I understand what you're

13   (not understandable) — attempting to do in relation to the

14   Parks matter — as I recall, she didn't testify; she was a

15   potential witness — is that — and this is somewhat conduluted

16   (phonetic) — maybe it's condiluted because of the way I'm

17   going to be stating it.  But if I understand this correctly

18   it's that you — after consultation with Mr. McGuffin — you

19   specifically had time when Mr. McGuffin to talk you about

20   Mr. Welch — indicated that you had — you had no position on

21   whether he was excused or not.  The State had a position.

22   They thought he was excused.  And I specifically stated,

23   "Look.  I think there is a bad appearance problem."

24   And I believe what Mr. Welch told me, that he

25   had nothing to do with any this.  And I then excused him

1  because the State asked that he be excused.  And I had said

2  that — and your — your position, along with Mr. McGuffin's

3  position, was you didn't take a position on whether he was

4  released or not.

5          So, the only basis I would think that you would

6  be wanting to see him is to perhaps then show, "Well, we

7  really would have wanted him because he might have been a not

8  guilty verdict."

9                  MS. McCREA:    Yes.

10                 THE COURT:    Okay.

11                 MS. McCREA:    That — that's all accurate.

12                 And the only time - - -

13                 THE COURT:    (Interposing) I just wanted to

14  make sure that I understand that - - -

15                 MS. McCREA:    (Interposing) No.

16                 THE COURT:    - - - was the point you were

17  - - -

18                 MS. McCREA:    (Interposing) That's - - -

19                 THE COURT:    - - - point you were making.

20                 MS. McCREA:    That is exactly right.  And it

21  is the concern of — and — and that's as nearly as we can tell

22  because we haven't been able to obtain any of the

23  investigation concerning the witnesses underlying Mr. Welch

24  being called before the Court and examined — without even the

25  names of the investigating officers.

1718                                      Motion

1    THE COURT:    Okay.

2              Mr. Frasier, do you have any argument on that

3    point?

4              MR. FRASIER:    Well, first I would state that,

5    uh, counsel has indicated she's asked for this information

6    twice.  I, honestly, cannot say that I — you know, maybe she

7    did ask a time earlier than Friday, but I can't recall one.

8    The first I recall of this being in an email she sent Friday,

9    which I responded to in saying, "I don't think they wrote any

10   reports."

11             The officer involved was Officer Webley from

12   the Coquille Police Department.  He's the one that interviewed

13   Ms. Parks.  And it's my understanding that he interviewed the

14   Phillipses, or at least one of the Phillips.

15             He did not write a report.  He was off this

16   weekend.  So, I — I've had a chance today — even today — to

17   talk to him about it.  So, in any event, that's where we are

18   at on that.  That's all I have on that particular - - -

19             Well, I would add on the — regarding the other

20   juror, in the context with Ms. Middleton — uh, Mr. Middleton —

21   I spoke with Mr. Middleton today.  He indicates to me that

22   he's been retired since the year 2007, and has not been

23   actively employed, outside of basketball referring since 2008.

24             If I understood counsel's Motion, there was an

25   allegation that it was a coworker of Mr. Middleton's that is a

1  husband of the potential juror.  But, at this such time, he's

2  indicating to me that he hasn't work since 2008 — outside the

3  basketball referring.

4              THE COURT:   Uh, do you have anything else,

5  Ms. McCrea?

6              MS. McCREA:   Well, this is news to me.  And

7  that's another reason why I need to investigate this,

8  Your Honor, to — to check this.  Because, of course, there has

9  been disagreement between Mr. Middleton and Mr. McGuffin

10  through the course of the past eleven years.

11             THE COURT:   Okay.  And, basically, this is

12  all tied together.  So, do you have any other specific

13  argument in relation — in relation to the Motion to Allow

14  Contact.  I'm not talking about the Welch matter.  I'm talking

15  about the new matter.

16             Any further argument on that?  Because that is

17  all tied in to — excuse me — Motion to Continue Sentencing.

18             MS. McCREA:   No, Your Honor.

19             THE COURT:   Uh, the Court will deny the

20  Motion to Continue Sentencing.  Because, basically, the first

21  issue related to Mr. Welch — and the Court had brought to the

22  attention of the parties that Mr. Welch, at times, appeared to

23  be close to nodding off, and brought to the attention before

24  anything else came up.  So, that was one matter that I brought

25  to the parties' attention.  And then, this second matter came

1  up.

2          Uh, and the basic premise here is that, "Well, I now

3  want to go back and do an investigation to see whether, in

4  effect, I would have objected at the time I was given the

5  opportunity to object to his dismissal."  And, I gave, I

6  think,the parties the time they want.  There wasn't any

7  request for more time.  I think Ms. McCrea asked for time to

8  consult with Mr. McGuffin.  They did that in Court.  It wasn't

9  a lot of time.  But, there was not a request to do anything.

10         Mr. McGuffin was intimately involved in that

11 conversation and in that decision to take no position of

12 whether Mr. Welch was or was not excused.  And now, in effect,

13 it's not timely.  It wasn't objected to.  And now, in effect,

14 he's asking to come back and say, "Well, now I want to

15 investigate because now I might want to raise an objection

16 that I didn't raise when I had time to raise it."  So, that's

17 no basis to continue his Sentence.

18         As far as the other matter goes, uh, even

19 putting aside what Mr. Frasier just told me, I'm going to deny

20 the Motion to Continue based on that Motion to Allow Contact.

21 Because as I understand what is said, is that the juror may

22 have — may have — knowing somebody who knew somebody — a

23 spouse that had somebody that might have worked with somebody

24 related to this case.

25         Uh, the — by the way, the Court did go back and

1  listened to the entire voir dire that would have involved this

2  juror in question.  And the main problem with that is that

3  it's extremely hard to hear all of — all of the answers that

4  were given.  I went back and listened to, uh, my voir dire of

5  that particular juror, and then the general voir dire of

6  Ms. McCrea, which I think lasted maybe forty minutes.  I'm not

7  quite sure.  And Mr. Frasier's, which last basically one

8  minute.  Because I think this was the third panel that we

9  called.  She was a member of that particular panel.

10             And, I looked at her questionnaire, also, which

11 indicated she didn't know anybody involved.  Hadn't talked to

12 anybody about this case at all.

13             And so, there is really nothing other than pure

14 speculation about what this is.

15             Now, there is — and Ms. McCrea sited the civil

16 case involving this issue.  And in that case, the Supreme

17 Court had reversed the Trial Court — or, the Court of Appeals,

18 for allowing a new trial.  Basically, in that case, that juror

19 in there had — had stated during voir dire that she knew the

20 Defendant, but didn't disclose that she thought the Defendant

21 — that is, it was a Civil case; I think a malpractice case —

22 didn't disclose that this doctor, she felt, had saved the life

23 of one of her relatives.  And in that case, the Court said,

24 "Well, that's not sufficient to allow a Motion for a New Trial

25 based on that."

1722                                              Motion

1  There is a case that I've found that's closer

2  in point, State vs. Miller, which is 167 OR Appeals 72. A 19

3  — a 2000 case in which a prison guard was on the jury and

4  indicated that he did not know the Defendant. And later

5  during deliberations indicated that he recognized the

6  Defendant from prior incarcerations. And he had also said

7  other things during deliberations.

8  And the Court said that wasn't sufficient.

9  They — they — one juror had reported this to — to defense

10  counsel. And defense counsel had asked for a Hearing. And

11  the Court gave a Hearing but didn't allow contact with the

12  juror who might have violated conditions. But, they did allow

13  the contact from the — they did allow a Hearing relating to

14  the juror who was reporting the other juror. And they didn't

15  allow a Motion for New Trial in that.

16  And they — and they — and they sited the

17  Urseguard (phonetic) — Ernsguard Case (phonetic), which is the

18  case sited by defense counsel. That's Ernsguard vs. Beard,

19  310 OR 486, a 1990 case.

20  Anyway, the Miller Report specifically wrote,

21  at Page 78, "Defendant also argues that the Court should have

22  granted a new trial because Herring. . ." — that is the juror

23  in question — ". . .lied by omission during voir dire, when

24  she failed to respond to the Court's question about whether

25  any juror knew Defendant."

Motion          1723

1    "He points out that during jury deliberations,

2  Herring stated that she recognized Defendant from his previous

3  incarceration.  It would probably have been better for Herring

4  to have given that information during voir dire.  However,

5  there is a difference between recognizing a person at a

6  distance and knowing the person.  Herring did not claim any

7  personal acquaintanceship with the Defendant during

8  deliberations and incorrectly assumed that he had gang

9  tattoos, which indicates that she had not had any direct

10  contact with him."

11    "Her failure to speak up during voir dire is

12  not a sufficient basis for the Court to grant the Motion for a

13  New Trial based on juror misconduct."  And I think it's not

14  even a basis for granting a Motion to Allow Contact, because

15  this is even farther removed than that.  It's speculation that

16  something may have happened, with nothing to show, other than

17  the fact that possibly her husband may have known somebody

18  that's involved with the Freeman family.  So, there is not

19  even enough to grant that Motion.  So, those Motions will be

20  denied.

21    And, now you have your arguments on Ballot

22  Measure No. 11.  Do you have any argument on that?

23    MS. McCREA:    I do, Your Honor.

24    THE COURT:    Go ahead.

25    MS. McCREA:    It is our position that the

1724                              Ballot Measure 11

1   Court should apply the framework from the Rodriguez-Buck case

2   to Mr. McGuffin's matter.  The three standards being the

3   comparison of the severity of the penalty and the gravity of

4   the offense, Number One.

5              Number Two, the specific circumstances of the

6   Defendant's conduct that come within the statutory definition

7   of the offense, as well as other case-specific factors, such

8   as the characteristics of the Defendant and the victim, the

9   harm to the victim, the relationship between the Defendant and

10  the victim.

11             And Number Three, the Defendant's criminal

12  history, including lack of criminal history.

13             Putting together Numbers One and Two, the

14  comparison of the penalty and the gravity of the offense, and

15  the specific circumstances of the Defendant's conduct, we

16  noted at the outset — as the Court well knows — that

17  Mr. McGuffin was acquitted of the charged count of Murder in

18  this case.  He was found guilty of Manslaughter in the First

19  Degree.  But, it is our position that there was no evidence to

20  support the element of the physical act.  That is that the

21  death was caused under circumstances manifesting extreme

22  indifference to the value of human life.

23             In this case, based on the evidence, there was

24  no cause of death.  There was no manner of death.  And this

25  element, the element of the physical act, remains unproven.

Ballot Measure 11                1725

1          So, at best, in terms of comparison, the
2   severity of the penalty and the gravity of the offense, and
3   the specific circumstances here, this element is unproven.
4   And the Court should, at best, impose a penalty of the
5   mandatory minimum of 75 months for Manslaughter in the Second
6   Degree, based on the mens rea of recklessly without the
7   additional physical act and element of under circumstances
8   manifesting extreme indifference to the value of human life.
9              Now, it is also the defense position that there
10  was no proof of any mens rea in this case, concerning
11  Mr. McGuffin.  The prosecution theory, which came up finally
12  in rebuttal, was that Mr. McGuffin found Leah Freeman, and
13  that she decided to break up with him.  And despite all of the
14  happy letters she wrote to him around the time of graduation,
15  when everything was going very well — close in time to when
16  she disappeared — that Mr. McGuffin reacted and killed her.
17  And it is our position that that simply does make any sense.
18  There was simply no motive and none stated in the evidence for
19  Mr. McGuffin to do this.
20              The characteristics of Mr. McGuffin and
21  Ms. Freeman indicated that close in time to when she
22  disappeared, their relationship was very good.
23              Now, in terms of the harm to the victim, there
24  is no question that the harm was the most extreme that can be,
25  in that Ms. Freeman was discovered approximately five weeks

```
    1726                        Ballot Measure 11
```

1   later, and that she was dead.

2         The relationship, as I said, had — had become a

3   good relationship.  The characteristics of the two of them

4   were such that while Ms. Freeman, the evidence showed, would

5   express herself physically toward Mr. McGuffin when they had

6   arguments — that Mr. McGuffin never expressed himself

7   physically back.  In other words, he never lifted a hand to

8   her.

9         And what we know, based on the evidence in

10  doing the comparison of both the penalty and the gravity, and

11  the specific characteristics of the Defendant's conduct, is

12  that Mr. McGuffin's actions on June 28th were such that if he

13  had sought to abduct Ms. Freeman or to act violently toward

14  her, that she was not a shrinking violet.  That she had hit

15  Nick McGuffin before.  He had not hit her back.  She was not

16  going to accept any kind of abduction or violation of her

17  person without a fight.  And she would have, and probably did,

18  fight back.  And yet, there were no defensive wounds on

19  Mr. McGuffin.

20        We know from the evidence that Mr. McGuffin was

21  stopped by Officer Zavala around 10:30 the night of June 28th.

22  We know that he also stopped by Officer Danny Lee at 12:03,

23  just after midnight, on June 29th.  So, both of those officers

24  had contact with Mr. McGuffin.  They had an opportunity to

25  observe him.  He was not disheveled.  His clothes were not in

Ballot Measure 11          1727

1  disarray.  There were no scratches or cuts.  There was nothing

2  they observed of him out of the ordinary.

3              And then we look at his actions afterward.

4  Mr. McGuffin immediately went to Cory Courtright's when she

5  called him on June 29th, that morning, to say that Leah had not

6  come home.  He went with her to the police on June 29th to file

7  the Missing Person Report.  He went to the police and made a

8  statement to them on June 30, 2000.  And he also went back to

9  the police on July 5, 2000 and made additional statements.

10             We also know, from the testimony of Officer

11  Perske, that photographs were taken of Mr. McGuffin.  And

12  those photographs were of his face, his hands, and his torso.

13  And there was nothing indicative of him having been in any

14  kind of struggle with Leah Freeman or anyone else.

15             In terms of specific circumstances, the Court

16  should also consider the Mustang.  Mr. McGuffin gave his

17  consent for the police to seize and take his Mustang, and to

18  search it to their heart's desire.

19             The testimony of Mark Perry, who had previously

20  owned the Mustang before Mr. McGuffin, was that it had never

21  had a liner in the trunk.  There was no jack.  There was no

22  spare tire.

23             And Barbara Carr, who also came in to testify,

24  said she and her husband had done renovation and

25  rehabilitation of that car.  That the car had gas tank leaks.

1728                              Ballot Measure 11

1  That the window in the back leaked, and that caused rust.  We

2  had the photographs in evidence of the rust in the back of the

3  car.  And we know from the Jury View that it was a gravel road

4  to Mr. McGuffin's parents' house.  And thus, by fair in —

5  inference, a person would not — meaning Mr. McGuffin — would

6  not keep matters in the trunk because anything in the trunk

7  would smell of gas.  It would become wet because of leaks when

8  it rained.  And dust would come in because of that leak, as

9  well.

10         Additionally, as has been harped on over and

11  over, there was no forensic evidence to corroborate the claim

12  that Mr. McGuffin abducted Leah Freeman.  There wasn't time

13  for him to go to his parents' and change cars.  And if he had,

14  it would have had been at the time that he saw Officer Zavala,

15  and Leah would have had to be in the car at that time.  There

16  would have been some trace evidence.  There wasn't.  It didn't

17  happen.

18         Mr. McGuffin did not change his clothes.  It

19  was stated by the prosecution that he had.  But the witness in

20  question, Kristin Steinhoff, specifically indicated that she

21  did not remember that happening.

22         So, in terms of the comparison of the severity

23  of the penalty and the gravity of the offense, and the

24  specific circumstances, we can't say that this was reckless.

25  We can't say it was with manifest disregard for the value of

1  human life.  And therefore, there is a challenge based on

2  Rodriguez-Buck, in terms of proportionality, under Article 1

3  Section 16, in the US Constitution.

4           Further, in terms of specific circumstance, the

5  prosecution, in its Response to the Defendant's Motion,

6  indicates that Mr. McGuffin lied to the police.  And, yeah,

7  that's true.  He didn't tell them that he had been using drugs

8  earlier that night, or later that night with Kristin

9  Steinhoff.  It was a liable omission.  Why?  Because he knew

10  it would get him in trouble if he told them he had been using

11  drugs.

12           In this case, Your Honor, the prosecution has

13  done a masterful job of character assassination concerning

14  Mr. McGuffin.  The evidence came before the jury that he had

15  used drugs, that he was not faithful to Leah Freeman, and that

16  he had been in jail.  The basis and intent was to make

17  Mr. McGuffin out to be a bad person.  And it was very

18  effective in terms of the accumulative effect.

19           But, in terms of the specific circumstances,

20  again, on June 28, 2000, Mr. McGuffin didn't know where Leah

21  Freeman was.  And he believed, rightly or wrongly, that she

22  might be off with someone else, which is why she told — he

23  told Scott Hamilton, "If you see her with another guy, beat

24  the guy up and bring Leah home."

25           He hung out with Kristin Steinhoff because it

1730                          Ballot Measure 11

1  was a — a payback attempt, which he aborted and then went out

2  looking, again, for Leah.  And at this point in time, nobody

3  knew that anything was amiss.  Her mom didn't go looking for

4  her.  Her sister didn't go looking for her.  Sherry Mitchell

5  went down to the park, and then went home.  She didn't go

6  looking for her.

7              All in all, we have a cumulative effect of

8  setting up propensity evidence, but we don't have the evidence

9  that showed what was found, in terms of the verdict — a

10  reckless act in manifest disregard for the value of human

11  life.

12              The prosecution also says in their Response,

13  that Mr. McGuffin told Lieutenant Pat Smith that he knew who

14  did it — who — who killed Leah.  Which comes back to the

15  efforts that the McGuffin family was making to try to assist

16  law enforcement.  And Mr. McGuffin provided law enforcement

17  with a letter from Alisa Mashad, who believed that she had

18  been in a car with Bill Sero and Tom Stemmerman, and that they

19  had hit Leah Freeman with the car, and that Alisa Mashad had

20  been with them when that happened.  Alisa Mashad is now in the

21  State hospital.  She is not a credible witness for either

22  side, but that was what Mr. McGuffin believed.

23              And then, finally, let's deal with the Hudson

24  Ridge shoe.  Because the testimony was — and the specific

25  circumstances were, that supposedly Wayne McGuffin indicated

Ballot Measure 11          1731

1  that the shoe had been put on Hudson Ridge to mislead the

2  police.  The witness, Christy Young Cagle (phonetic), came and

3  then said — for the first time during her testimony — that

4  Wayne McGuffin had said that, and Mr. Nick McGuffin, in

5  response to that, had laughed or had thought it was funny.

6  Although, she had never said that to police before, nor had

7  she said it to the Grand Jury.

8           And really, why would putting the shoe on

9  Hudson Ridge mislead police anyway, because Ms. Freeman's body

10  was found somewhere else?  And Wayne McGuffin never indicated

11  that he or Mr. McGuffin, Nick — his brother — had ever been

12  involved with anything concerning that shoe.

13           Nick McGuffin, in terms of specific

14  circumstances, has been consistent in the people that he has

15  talked to, in telling them that he is innocent, that he is not

16  guilty of this charge.  He told that to David — he told that

17  to — I'm sorry — Richard Bryant when he was in jail.  Told

18  that to Pat Smith, when Pat Smith and Chief Dannels came out

19  to his house in October of 2009.

20           Now, of course, we are clear that there were

21  two people who were contrary, David Breakfield and Melissa

22  Beebe.  But both of those instances, Mr. Breakfield's

23  credibility was shown to be questionable and Ms. — Ms. Beebe

24  had a — an axe to grind because Ms. Freeman is her cousin.

25           All in all, when we look at those two factors,

1732                          Ballot Measure 11

1   the Rodriguez-Buck factors indicate that the Court should

2   consider this a disproportional sentence — the hundred and

3   twenty months — to what occurred here.

4              And the third factor, Mr. McGuffin's criminal

5   history, it's true.  He's got a couple of misdemeanor

6   convictions for Trespass.  But, they are only misdemeanors.

7   And that's all he's got.  And so, overall, in the context of

8   everything, it is our position the Court should apply

9   Rodriguez-Buck, should find it disproportional under the

10  Oregon and US Constitution to Mr. McGuffin, and should impose

11  a less onerous sentence.

12              THE COURT:    Ms. Soublet?

13              MS. SOUBLET:    Thank you.

14              Your Honor, I will stand on my brief.  I just

15  want to touch on a few things that counsel said.

16              First, I would take exception to the argument

17  that there is no indication as to cause of death — or, manner

18  of death because Dr. Olson testified that the cause of death

19  was homicidal violence of a undetermined type.  That the

20  manner of death was homicide.  What counsel appears to be

21  asking for is for the Court to set aside the jury's verdict of

22  Manslaughter in the First Degree and enter a conviction for

23  Manslaughter in the Second Degree.  And I don't believe

24  anything out of Rodriguez-Buck allows the Court to do that.

25              The points counsel makes are ones she made

1  during the Trial.  The jury chose to disregard that and to

2  accept the State's version of the evidence as being — what

3  they found to be true.  And I believe counsel can prove, uh,

4  any one of the three parts of State vs. Rodriguez v. Buck

5  three-part test.

6          And I would ask the Court to impose the

7  mandatory hundred and twenty months sentence.

8          THE COURT:    Anything else, Ms. McCrea?

9          MS. McCREA:    No, Your Honor.

10         THE COURT:    Uh, the Court has read those

11 matters.  And, of course, the — the jury is the one who is the

12 finder of fact, and makes the decisions in this case, under

13 the instructions.

14         Uh, and before I go on to — on to this Motion,

15 I might indicate when I listened to the voir dire of the

16 particular juror in question, in addition to being very

17 difficult to hear, there was nothing that I heard on it that

18 would have shown — thrown any light on it, on anything that

19 could have been in relation to this Motion.  In fact, I don't

20 recall that juror particularly saying anything.  If she did,

21 it was something that was very hard to hear.  There was

22 nothing in there, particularly.  And her questionnaire, as I

23 said, indicated she knew no one.

24         Uh, as far as this Motion goes, the

25 Constitutional challenge has basically already been ruled on

1734                              Ballot Measure 11

1   by the Oregon Supreme Court and this Court is bound by those

2   decisions, and has no right to overrule what the Oregon

3   Supreme Court says.

4                As far as the specific case that put out this

5   test about whether or not the Court can, uh, determine that in

6   a — in a particular case that a particular sentence is harsh,

7   or would in — in a sense, shock moral conscience of all

8   reasonable persons — I don't think they specifically said that

9   that's what — and they — that it has to do that.  But, they've

10  specifically said here - - -

11               I mean, I'm not too sure that you could ever

12  get there when there is a human being that has been killed.

13  That in and of itself is the ultimate — the ultimate injury to

14  anybody.  They are dead.  They are not here.  Uh, so that in

15  and of itself — and this is not disproportionate in the other

16  types offenses that we are talking about.  It's a Class A

17  Felony.

18               What concerns me a little bit is some of the

19  argument — I realize you are making it in relation to the

20  Rodriguez matter.  But, some of it sounds close to argument to

21  the jury or to a Motion for Judgement of Acquittal.  And I

22  listened to that, also — both that Motion and the renewal of

23  the Motion.  And, basically, those Motions were kind of

24  general.  No evidence of a crime.  No evidence that

25  Mr. McGuffin did it.  And, uh, confession alone is not

Ballot Measure 11        1735

1  sufficient to have a conviction.  And those were the only

2  Motions.

3          There wasn't any specific things said about

4  Manslaughter.  In fact, I don't recall either counsel were

5  really arguing Manslaughter too much the jury when they argued

6  the case.

7          But, uh — you know, there were instructions.

8  The State requested Manslaughter in the First Degree.  That

9  was not accepted to.  There was no other request for any other

10 lesser included crimes.

11         So, part of this would be asking the Court to,

12 in effect, on its own Motion, decide that, "Well, there is no

13 evidence of Manslaughter One.  I can reduce that to

14 Manslaughter Two on my own," which I don't believe that I can.

15 Especially in — in the light of no exceptions, or any — or,

16 when no requests for further lesser included's in this matter.

17         But, in weighing the factors that came out in

18 Rodriguez vs. Buck, uh, there was not only a killing in that

19 matter, but the body was just thrown off the side of the road.

20 And that, in of itself, I don't think most people would think

21 that it would shock the conscious if somebody might get a ten

22 year sentence on somebody that they have been convicted of

23 killing and disposing of a body in that way.

24         I mean, in this case, the family couldn't even

25 recognize the victim.  It had to be done by a stranger with

```
      1736                          Sentencing
```

 1   dental records.  So, I don't think it matches any of the

 2   criteria in Rodriguez vs. Buck.

 3              So, the Motion, uh, against Ballot — on

 4   Measure 11 cases, that Motion would be denied.

 5              Now, I've read the letters on the support of

 6   Mr. McGuffin.

 7              Do you have anything else to say on behalf of —

 8   in the way of Sentencing?

 9              MS. McCREA:   I would — I actually have a

10   number of additional character reference letters, which were

11   just provided to me this afternoon.  I haven't had an

12   opportunity to show them to counsel.  So, I don't have copies.

13              MR. McCREA:   Give them to him.

14              THE COURT:   Uh, counsel, want to see those

15   letters?

16              MR. FRASIER:   No.  They are fine.  We'll let

17   the Court look at them.

18              THE COURT:   These are all additional — in

19   addition to what you put in here?

20              MS. McCREA:   Yes.

21              THE COURT:   Okay.

22              You can put it on pause while I'm looking at

23   these.

24                          (RECESS)

25              MS. McCREA:   Your Honor, Pastor Rick Stevens

Statements                1737

1  is present and would like to address the Court just very, very

2  briefly on Mr. McGuffin's behalf.

3          THE COURT:    Uh, normally, that — I mean, I

4  don't take those type of comments because that opens it up to

5  everybody making comments.  And, I guess, if you want to call

6  him as a witness you can.  Then he's subject to cross

7  examination.  But, you know, I normally don't take that — but,

8  you have a right to present evidence.  I just wouldn't allow

9  him to make a statement at this point in time unless he is

10  subject to cross examination.

11          MS. McCREA:    Well — and I don't want to put

12  him in that position because that — I don't that is fair to

13  him.  So, um, we'll forgo calling him.

14          I would indicate to the Court that, um — that

15  there was a back and forth between the parties on Restitution.

16  The defense had indicated, as parts of its Motion to Continue,

17  that it would be objecting to the Restitution.  That that

18  issue has been worked out between the parties.  And so, the

19  total Restitution amount is $1,738.

20          And our request, under ORS 137.106(4)(a), would

21  be for the Court to make a determination here that

22  Mr. McGuffin does not have an ability to pay the Restitution

23  Judgement at the present time.  He's been in custody since

24  August of last year.  And put in the Restitution Judgment that

25  the — the payment schedule should be established by the

Exhibit 102  Page 1612 of 1666 to
State Defendants' Motion for Summary Judgment

1738                                    Statements

1   supervising authority in this case, as opposed to imposing it

2   on him to pay immediately.

3                    The — the Court is in a situation where this is

4   a Ballot Measure 11 offense.  There is a mandatory minimum

5   sentence of a hundred and twenty months.  The prosecution has

6   not asked for anything additional.  So, I am assuming the

7   Court is going to impose what it must, which is a hundred and

8   twenty months.  And, I would simply ask for leave to respond,

9   if necessary, to anything brought up by the prosecution before

10  sentence is imposed.

11                   THE COURT:   Mr. Frasier, I normally go with

12  the State first, but we were on this.  So, - - -

13                   MR. FRASIER:   Your Honor, we don't have

14  anything further to add.  And the family of Ms. Freeman waives

15  any further — well, they — they do not wish to address the

16  Court at this point.

17                   THE COURT:   Okay.

18                   Mr. McGuffin, would you stand, please?

19                   Do you have anything else to say, on your own

20  behalf?

21                   DEFENDANT:   Yeah.  I'm — I do.

22                   THE COURT:   Go ahead.

23                   DEFENDANT:   I'll say that, um, I've been

24  pretty quiet through the last — past eleven years through this

25  Trial, its proceedings, and, obviously, for a good reason.

Statements                    1739

1           Um, as you can see, anyone and everyone who has

2    claimed to have talked to me has twisted my words around, has

3    used them against me, or has completely lied about what I've

4    said all together.  People also have stated that I've said

5    things that God knows, Leah knows, and I know in my heart and

6    soul, that I would never say.  That's why I've chose to read

7    from this paper, so no one can claim I said any different.

8    I'd be happy to give anybody a copy so I don't get misquoted

9    once again.

10          I will say one thing — or, actually, make that

11   three things.  I'm innocent.  I'm innocent.  I'm innocent.

12   I've always claimed my innocence.  And people who try and say

13   any different are lying, committing perjury, and getting away

14   with it.  I won't say names.  They know who they are.  But, I

15   will tell you this, I'm not going to stop claiming my

16   innocence.  Not now.  Not ever.  And maybe — just maybe, one

17   day people will start to see it, believe it.  But, in the

18   meantime, you are putting an innocent person in jail.  You are

19   tearing me away from my daughter and my family.

20          Not only did our precious Leah get her life so

21   wrongfully take away from her, and now you are taking my life

22   away from me — an innocent man's life.

23          I'd never wish — I'd never wish any mother to

24   lose her daughter, especially the way Leah's mother, Cory, has

25   lost hers.  And it truly saddens me that someone took Leah

1740                                    Statements

1   away from her mother so quickly.  But, on that same note, this

2   someone, whoever they are, they took Leah away from me, as

3   well — my princess, my babydoll.  This is not justice by

4   putting an innocent person in jail while the guilty person, or

5   people, are still out there walking free.

6              And for that, I never wish anyone to have to

7   walk in my shoes.  Not only did I lose someone I truly loved,

8   cared about, and was devoted to, but I've also been betrayed,

9   forgotten, used, judged, despised, hated, and treated like the

10  scum of the earth by so many.  And on top of all that, I've

11  been blamed and wrongfully convicted of a crime I did not

12  commit and never could have committed.

13             It sickens me to think people can think that of

14  me.  And I would never wish anyone to have to deal with that,

15  not even my worst enemy.  As this has been the hardest thing

16  to live through in my life.  And now it has become even harder

17  with the injustice that's being served to me today.

18             I'd like to say just a few more things.  And

19  it's that I've heard — we have heard many lies throughout this

20  whole trial.  And I'd like to comment on them.  Forensic and

21  evidence don't lie.  It speaks for itself.  It's not

22  impartial.  It's not biased.  It's not emotionally involved.

23  What it is, is absolute.  Forensics and evidence are true,

24  hard facts.  They don't lie.  They can't lie.

25             But, I do know something that does lie, and

Statements          1741

1   it's people.  And we have definitely seen that in this Trial.

2   My attorneys have even gotten key State witnesses to admit

3   that they were lying under oath.  So, answer me this, how many

4   more of those State witnesses were lying?  I know more were

5   lying then there was ones telling the truth.

6               So, once again, forensics and evidence don't

7   lie.  People lie.  They will.  They have.  And the big thing

8   in this case is the forensics and evidence points away from

9   me.  And that's why the District Attorney never talked about

10  it at all, not one bit.  That right there should show my

11  innocence and explain for itself.

12              So, follow the forensics.  Follow the evidence

13  that's there.  It won't lie.  That will only lead you to — but

14  the people will, and have.  And that will only lead you down

15  the wrong path, to the wrong person as — as in my case.

16              And as like one of my attorneys, Shaun McCrea,

17  has stated an Alfred Hitchcock film about the McGuffin, it

18  being a signature in his movies, that the McGuffin was the

19  scapegoat that lead to nowhere.  It was innocent.  And that's

20  exactly what you have here.  I'm the McGuffin.  I'm the

21  innocent scapegoat.

22              I'd like to say to all my friends, all my

23  family, my loved ones, all my supporters, and for all of you

24  who believe in me, I thank you so much for your support.  I'm

25  forever grateful.  And my heart goes out to you all.  That's

1742                              Judgment

1   what get's me through each and every day.

2           My innocence will be shown.  It will be proven.

3   The fight's not over, not now, not ever.  Not until this wrong

4   is made right.  I know, my family knows — Leah included — and

5   many who believe in me know, this is wrong.  It's just wrong.

6   It's unjust.  This is far from justice.  And we are still

7   waiting to have this made right and for this decision to be

8   overturned, and for me to be released so we can get the

9   person, or people, responsible for this crime.  And that there

10  would be true justice.  Justice for Leah.

11          Thank you, Your Honor.

12          THE COURT:   It will be the Judgement of the

13  Court that you be sentenced to the legal and physical custody

14  of the Oregon State Corrections Division for a period of 120

15  months.

16          Uh, parole thereafter would be a period of

17  three years.

18          You are ordered to pay the Restitution for the

19  amount of $1738.  That will be payable, as ordered by the

20  Post-Prison Supervision Board.  Although, if there are moneys

21  available to you in any accounts or earned, that money should

22  — would be going to pay Restitution — pay the Restitution

23  beforehand.  That would show some ability to pay.  But,

24  generally, with somebody incarcerated they are not going to be

25  able to pay it until afterwards.  But, money in — that you

1  have available to you, would be used to pay, uh — pay on the

2  Restitution.

3          Uh, the people have enacted Measure 11,

4  Mr. McGuffin.  And that is the sentence that the Court is

5  required to impose, and is imposing on you.

6          It's tragic that a young fifteen year old girl

7  is dead.  It's tragic that she was disposed of the way she

8  was.  It's also tragic that somebody your age gets sentenced

9  to prison, but you've been convicted of her — of causing her

10  death.  In that sense, uh, the sentence is appropriate.

11          You will be remanded to the custody of the

12  Sheriff for transportation to the Oregon State Correction

13  Facility.

14          MS. McCREA:    And credit for time served will

15  be DOC, Your Honor?

16          THE COURT:    Time served is automatic under

17  the law.

18

19  *                    *                    *

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS


STATE OF OREGON,               )
                           )
          Plaintiff,     )    CASE NO. 10CR0782
                           )
                           )    MOTION FOR NEW TRIAL
     vs.                )
                           )
 NICHOLAS JAMES McGUFFIN,    )
                           )
          Defendant.     )
_____)


TRANSCRIPT OF PROCEEDINGS

Volume 14, Pages 1744-1788

BE IT REMEMBERED That, the above-entitled cause came on regularly for hearing beginning at 8:56 a.m., Friday, September 9, 2011 in the Circuit Courtroom of the Coos County Courthouse in the City of Coquille, County of Coos, State of Oregon, before the Honorable Richard L. Barron.

APPEARANCES

R. Paul Frasier, District Attorney for Coos County, representing the Plaintiff.

Erika Soublet, Assistant District Attorney for Coos County, representing the Plaintiff.


Robert McCrea, Attorney at Law, representing the Defendant.

Shaun McCrea, Attorney at Law, representing the Defendant.


Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

Email Received from Donald K. McMichael, Technical Support Specialist for Coos County Courts, 12/13/11:

I listened to that entire day including the initial video appearance earlier in the court session. The initial video (from another location) came across fine as it was in a controlled location with limited background noise. When the McGuffin portion began I was listening live in case a problem were to arise. The location where Mr. McGuffin was being held had a considerable amount of background noise which was translating through the echo cancellation system. This "interference" was further compounded by the increased volume of people in the courtroom, media equipment, cooling system active, etc. The courtroom equipment lacks the capability to analyze and eliminate multiple sources of interference with 100% perfection. I was able to interpret what Judge Barron was saying by increasing the gain on Channel #1 albeit with some difficulty.

One of the solutions that I have found works very well in enhanced interference environments such as what took place in CTRM1 is to have the person on the far end of the video session "mute" their microphone and only activate it if they need to respond to a question or interject testimony. We have similar issues with the local jail as the video conference equipment is located in an area which acts like a giant echo chamber and the sounds of cell doors, inmates moving, etc can create interference within the FTR recording.

In this particular session I was not in a position to instruct the far end of the video conference to reposition or mute the microphone. The court staff is aware of potential interference issues but was unable to cope with the large amounts of media equipment allowed into the courtroom as well as the total amount of people in the gallery.


Signed by:

Kyle McMichael
Oregon Judicial Department
Tech. Support Spec.
541-396-2121 X259

1744

```
1    *                        *                        *

2              (With exception to defense attorney, the

3    following proceeding was mostly not understandable due to

4    background noise.)

5              THE COURT:   You've got to get your client on

6    the - - -

7              (Whereupon video communication was established

8    with the client.)

9              THE COURT:   Can you hear me?

10             DEFENDANT:   Yes, I can.

11             THE COURT:   (Not understandable) is here in

12   the Court.  I just want to let you know.

13             DEFENDANT:   Okay.  Yeah.  I can actually see

14   her.  So, - - -

15             THE COURT:   I don't — I don't know how to —

16   other than turning this on to look at you, I don't know how to

17   see that.  (Not understandable.)

18             (Not understandable.)

19             THE COURT:   Do you want him to see Ms. - - -

20             DEFENDANT:   No.  No.  No, I can see her.  I

21   got — it's — it's a split screen.

22             THE COURT:   (Not understandable.)

23             DEFENDANT:   Okay.

24             THE COURT:   That's fine.  He's fine.

25             Okay.  All right.
```

1745

1    Ms. McCrea, this your Motion.  And I've read
2  the Motion.  (Not understandable.)
3        Go ahead.
4        MS. McCREA:    Your Honor, the defense has
5  subpoenaed Officer Chris Webley concerning the Robert Welch
6  matter, and I propose to call him at this time.
7        He's outside.
8        MS. SOUBLET:    Your Honor, the State would
9  object on the (not understandable.)  (Not understandable)
10 evidentiary (not understandable) Officer Webley's testimony
11 (not understandable).  So, I don't know that (not
12 understandable).
13        THE COURT:    (Not understandable.)
14        Uh, Ms. McCrea, the concern I have is — and I'm
15 just looking at it quickly.  The Motion is for a New Trial.
16 And criminal cases generally fall (not understandable).  Let
17 me make sure.
18        And there is nothing in there — it refers to
19 Affidavits and Declarations but not (not understandable).  I
20 mean, I looked at it real quickly here, but there is nothing
21 that allows — that's done by Affidavits (not understandable)
22 Affidavits for Declaration (not understandable).
23        MS. McCREA:    Does it specifically prohibit
24 testimony, Your Honor?
25        THE COURT:    It doesn't prohibit it, but it

Motion for a New Trial          1746

1  does specifically say that it's done by Affidavit Declaration

2  (not understandable).  (Not understandable.)  (Not

3  understandable.)  (Not understandable).

4          I think specifically, such as, you know,

5  Summary of Judgment Motion (not understandable), but I'm not

6  sure.  So, I think they know how.  But, starting that

7  precedent (not understandable) supposed to be done by an

8  Affidavit (not understandable).

9          Is this merely saying what he did in relation

10 to Mr. (not understandable)?

11         MS. McCREA:    I believe so.  The problem that

12 the defense has — and it's referenced on Page 24 of the

13 defense Motion for New Trial — is that the first time that the

14 defense was told who the officer in question was — regarding

15 this investigation, was at the Hearing on the Defense Motion

16 to Postpone, prior to the Sentencing on August 1st.

17         And at that time, no reports or notes had been

18 provided.  And no reports or notes that Mr. Webley have

19 provided — have been provided since that time.  So, what I did

20 was to subpoena Officer Webley.

21         I just had contact with him out in the hallway,

22 in which he indicated to me that he did prepare a report.  He

23 declined, which I understand — he declined to let me look at

24 it without the District Attorney being present.  So, I have

25 not been in a position to be able to provide any further

1747                      Motion for a New Trial

1 information to the Court or counsel absent bringing him here

2 to Court with a subpoena duces tecum, to bring any reports and

3 notes, so this matter can be further investigated.

4             So, what I would suggest, Your Honor, is

5 either, One, I call him as an offer of proof, and have him

6 testify to what he did in the — in terms of this

7 investigation.

8             Or, Two, if the Court is not amenable to that,

9 that I obtain the report from him and have that marked as an

10 exhibit, and tender it as part of the defense (not

11 understandable).

12            THE COURT:   I — I guess, the concern, of

13 course, is that (not understandable) I don't know what your

14 office did or did not do in relation to contacting the officer

15 between that time and the Motion for a New Trial, which I

16 believe had to be filed within ten days of the Judgment.

17            Uh, (not understandable) Officer Webley to get

18 the Affidavits from him.  Now, it may have been he said,

19 "Well, I won't give you an Affidavit."   But, we don't know

20 that because your office did not contact (not understandable)

21 and say what happened.   (Not understandable.)

22            Uh, (not understandable) I guess we could have

23 been in a position where he would have — he would have said,

24 "I won't give you an Affidavit."   Then it may have been that

25 you would have done something to accommodate that without

Motion for a New Trial          1748

1  having contact with (not understandable).  Uh, there is no

2  Affidavit.

3            As far as your offer of proof goes, the main

4  concern I have here is that as far as Mr. Welch goes, it is

5  somewhat moot.  The State (not understandable) you and — and

6  your client.  (Not understandable.)  So, assuming that you

7  could come up with something, I think that I'll waive (not

8  understandable).

9            So, I don't like to make — I don't (not

10  understandable) offers of proof.  I don't like (not

11  understandable.)  (Not understandable.)  I don't want this to

12  turn into a long hearing.  And if you are satisfied with the

13  report, as opposed to calling him, and marking it as an

14  exhibit, I would prefer that.  And I can — if he comes in, I

15  can order you to — I can order him to give it to the Court.

16            Did you — have you seen the report?

17            MS. SOUBLET:    No, Your Honor.  And I just

18  think the record should be clear that once counsel filed the

19  Motion for a New Trial, she never asked the State for a report

20  from Officer Webley.  (Not understandable.)

21            THE COURT:    Well, I can order him to give

22  you, uh — turn it — turn it over to the Court — (not

23  understandable).

24            MS. McCREA:    Well, that — I — I want to make

25  some kind of offer of proof.  So, if that's the Court's

1749                      Motion for a New Trial

1  preference, I would — I would prefer to do that.  I will

2  indicated no, Number One, we did not make an attempt to

3  contact Officer Webley because our experience, throughout the

4  pendency of the — this case, is that police officers have

5  declined to have any contact with the defense and have

6  referred us back to the District Attorney's office.

7           I did not — Number Two, I did not make an

8  additional request for reports or notes because I had already

9  made a request of the District Attorney's Officer for that.

10 And — so, this was how I approached it, was through the power

11 of subpoena simply because the State was contending the

12 Affidavit submitted was not sufficient.

13           THE COURT:    (Not understandable.)

14           MS. McCREA:    I can do it.  I'm closer,

15 Your Honor.

16           THE COURT:    Officer, it's my understanding

17 that, uh, there is a report in question that Ms. McCrea asked

18 to see and you said not without the District Attorney's

19 Office, which is understandable.

20           And, uh, what I'm going to do is order you to

21 give me a copy of it.

22           Now, I have not read this.  I'm not going to

23 read it.

24           Cathy, would you make a copy for both counsel?

25           Can you wait for one minute, please?

Motion for a New Trial          1750

1            VOICE:    (Not understandable.)

2            OFFICER WEBLEY:    (Not understandable.)

3            THE COURT:    I think that's already in the

4    record.

5            MS. McCREA:    I would ask that we have the

6    copies on the record, as well, Your Honor, please?

7            THE COURT:    (Not understandable.)

8            You don't want a copy of your subpoena?

9            MS. McCREA:    I'm sorry?

10           THE COURT:    You don't want a copy of your

11   subpoena?

12           MS. McCREA:    I don't need a copy of the

13   subpoena, no.

14           THE COURT:    Is that sufficient for your proof

15   — for the offer of proof?

16           MS. McCREA:    Yes, it is, Your Honor.

17           THE COURT:    Okay.

18           You are free to leave.

19           Uh, whatever you (not understandable).  I might

20   say that my reference to Summary Judgment (not understandable)

21   talking about having depositions taken (not understandable)

22   not necessarily (not understandable).  So, (not

23   understandable).  You know how to say whether his testimony

24   allowed Summary of Judgment (not understandable) other than

25   the fact the Court can order depositions in that case.

1751                        Motion for a New Trial

1      Uh, do you want to mark that as 1-0 — I don't

2   what - - -

3                        (Not understandable) - - -

4                        MS. McCREA:    (Interposing) Do you want to

5   start with 101 for this Hearing?  Or, - - -

6                        THE COURT:    (Interposing) Why don't we just

7   make it 301, then we'll know it's (not understandable).

8                        MS. McCREA:    Okay.

9                        No.

10                        THE COURT:    Do you want them just all stapled

11  together?

12                        MS. McCREA:    That's fine.

13                        THE COURT:    That would be the report plus the

14  emails that went between the District Attorney's Office and

15  the (not understandable)?

16                        MS. McCREA:    Yes.

17                        And then, additionally, Your Honor, I have what

18  I would offer to the Court, for the purpose of this Hearing,

19  as — we listed it as Respondent's Exhibit 302.

20                        JUDICIAL ASSISTANT:    (Inaudible response.)

21                        MS. McCREA:    Which — it's fine with me,

22  Ms. Cress, as long as we all know what it is.

23                        But, this is — this the excerpt of the closing

24  argument of the State, Your Honor.  And I have a copy for

25  prosecution.  It's now Defendant's Exhibit.

Motion for a New Trial          1752

1          I will also indicate to the Court that

2     I attempted to obtain the Court record of the — the Hearing we

3     had on July 5th, including the Court's rulings on the defense

4     Motion in Limine.   The CD that I received ended up being a

5     duplicate of testimony of another witness.   So, the person who

6     is doing the transcriptions was unable to transcribe that

7     information for me to provide to the Court and counsel.   But,

8     I do have the prosecution closing argument which would be

9     (not understandable.)

10               THE COURT:    (Not understandable.)   You are

11     putting that in the record mainly in relation to the closing

12     argument (not understandable) one argument concerning

13     Mr. Frasier's statement about (not understandable).

14               MS. McCREA:    It is also in relation to the

15     defense argument concerning the character evidence.   And it is

16     in relation to the issue of the Motion for Judgment of

17     Acquittal.   So, it applies to all three of those - - -

18               THE COURT:    (Interposing) Okay.

19               MS. McCREA:    - - - issues.

20               THE COURT:    I (not understandable) some

21     portions of (not understandable.)   (Not understandable.)

22               MS. McCREA:    And the Court now has the - - -

23               THE COURT:    (Interposing) (Not

24     understandable) - - -

25               MS. McCREA:    - - - transcript of the closing.

1753                    Motion for a New Trial

1  It is only the closing and the rebuttal of the prosecution.

2  It is not the defense closing.

3                    THE COURT:    Okay.

4                    Go ahead.

5                    MS. McCREA:    Your Honor, concerning the issue

6  of what I will characterize, for the ease of discussion, bad

7  character, it is the defense position that it was error for

8  the Court to admit evidence of Mr. McGuffin using drugs.  This

9  included evidence of using marijuana the night of June 28th,

10  2000, at the Johnson Mill Pond, the evidence that he used

11  marijuana the night of June 28, 2000 with Brett Mauro, and the

12  evidence that he was smoking methamphetamine with Kristin

13  Steinhoff the night of June 28, 2000, or the early morning

14  hours of June 29th.

15                    Secondly, it was error to admit evidence that

16  Mr. McGuffin had been in jail.

17                    Third, it was error to admit evidence that he

18  had sex with women other than Leah Freeman, including the

19  testimony that he had sexual intercourse with Megan Davidson

20  after the disappearance of Leah Freeman but before her body

21  was found.  That he had sex with Melissa Smith after the

22  memorial for Leah Freeman, after her body was found.  And that

23  he had attempted to have sex with Ms. Steinhoff the night of

24  June 28, 2000 or the early morning hours of June 29th.

25                    Additionally, it was error to admit the

Motion for a New Trial          1754

1  statements of Wayne McGuffin, via Christy Young Cagley, that

2  the shoe was planted on Hudson Ridge.

3          It was error to admit the statement, I'll

4  characterize it — on the courthouse steps by Melissa Beebe,

5  where she claimed that Mr. McGuffin said, "It's amazing what

6  you can get away with in Coos County."

7          And finally, was an error to admit evidence of

8  what I would characterize as a confrontation and altercation

9  testified to by Donna Dennis, by Adam Shinar, and by another

10  individual, concerning Ms. Freeman dropping photographs and

11  Mr. — Mr. McGuffin reacting to that.

12          It was error because - - -

13          THE COURT:    (Interposing) Well, (not

14  understandable).

15          MS. McCREA:    But, Ms. Freeman had dropped

16  some photographs on the ground and Mr. McGuffin had reacted.

17  And I apologize.  I don't recall which witness mentioned that.

18          It is the defense position that there was the

19  unfair, prejudicial effect of this evidence.  Each one of

20  these items separately, as well as accumulatively, denied

21  Mr. McGuffin substantial rights, such that he could be

22  entitled to a new trial.

23          In this situation, the prosecution had an

24  entirely circumstantial case.  And it is the defense position

25  — although, I recognize the Court disagrees, (not

1755                          Motion for a New Trial

1   understandable) the Motion for Judgment of Acquittal — it is

2   the defense position that but for testimony of Dave Wakefield,

3   and the claim that Mr. McGuffin said to him, in 2002, "I

4   strangled that bitch and I'll kill you too," or words to that

5   effect, that there would not have been enough evidence for

6   this case to go to the jury.

7            We know from the evidence, that Mr. Breakfield

8   testified during the Trial that he believed what

9   Mr. McGuffin allegedly said to him was a confession.  It

10  occurred in 2002.  And Mr. Breakfield never told a living sole

11  about this contention, ever; year after year, after year,

12  until finally, police talked to him very recently and

13  questioned him.  And it is the defense position, that it is —

14  would not be reasonable for a jury to convict Mr. McGuffin

15  solely on the testimony of Mr. Breakfield.

16           And Mr. Breakfield's testimony was significant

17  because the prosecution refers to it twice in closing argument

18  — at Transcript, Page 6, Line 18 and Transcript 29, Lines 22

19  through 23 — and again, twice in rebuttal — at Transcript

20  Page 45, Line 20 through 23, and Page 46, Lines 8 and 9.

21           In this case, the prosecution skillfully

22  designed their presentation to create a dislike of

23  Mr. McGuffin.  But, the evidence that was presented was not

24  relevant and it was more unfairly prejudicial than it was

25  probative.

Motion for a New Trial                1756

1        This essentially amounted to character

2  assassination of Mr. McGuffin and allowed the jury to give

3  more weight to circumstantial evidence then they would

4  otherwise.  Stated simply, it put Mr. McGuffin in a position

5  where the jury would decide he was a, quote, "bad person"

6  unquote.  It was propensity evidence and led them to believe

7  he was someone who would do this — who would kill Leah

8  Freeman.

9        Dealing specifically with the drug use, the

10 defense admits it is irrelevant whether Mr. McGuffin was

11 smoking marijuana on June 28, 2000.  It's irrelevant whether

12 he was smoking at the Johnson Mill Pond, and it's irrelevent

13 whether with Brett Mauro that night.  And Brett Mauro was

14 specifically mentioned, by the prosecution in closing, at

15 Transcript 44 — Page 44, Line 5.

16       The evidence may have been relevant if it had

17 been used for rebuttal if Mr. McGuffin had testified

18 concerning his ability to perceive and remember.  But, it was

19 brought in in the prosecution's case-in-chief, and it was not

20 relevant to show any consciousness of guilt or any kind of

21 knowledge.  It was also — and the — the use of drugs was also

22 brought up, in terms of the marijuana in rebuttal, onranscript

23 Page 33, Lines 8 through 10 and 12 through 15.

24       The sum of this evidence was unfairly

25 prejudicial because it communicated to the jury that

1757                          Motion for a New Trial

1  Mr. McGuffin was the kind of person who uses drugs.  He uses

2  drugs when his girlfriend disappears.  But, there is no claim

3  that this drug use had anything to do with her death.

4  Therefore, it was not relevant, nor — and it was more unfairly

5  prejudicial then it was probative.

6              And likewise, with the evidence of Mr. McGuffin

7  smoking methamphetamine with Kristin Steinhoff.  Both parties

8  agree, the defense and the prosecution, that Leah Freeman

9  disappeared by 11:30, when Tony Messerle found the shoe in the

10  cemetery.

11             The evidence of Mr. McGuffin smoking

12  methamphetamine with Ms. Steinhoff was - - -

13             THE COURT:    (Interposing) (Not

14  understandable.)

15             MS. McCREA:    At the cemetery — by the

16  cemetery.

17             I — I'm sorry, Your Honor.  I'm saying

18  "cemetery," as opposed to Hudson Ridge.  That's the

19  distinction I'm making.

20             THE COURT:    All right.

21             MS. McCREA:    Yeah.  On the road, by the

22  cemetery.

23             THE COURT:    (Not understandable.)

24             MS. McCREA:    The smoking of methamphetamine

25  occurred after that, sometime after 11:30.  And actually,

Motion for a New Trial                    1758

1   after 12:03 when Mr. McGuffin had been stopped by Officer

2   Danny Lee — the second police stop of the evening.

3               Smoking methamphetamine has nothing to do with

4   what happened to Leah Freeman.  It has no relevance.  But, it

5   is especially unfairly prejudicial because using

6   methamphetamine has a much stronger societal stigma than one

7   using marijuana.  And it has a strong bearing, the admission

8   of this evidence, about the how the jury was led to feel about

9   Mr. McGuffin in this case.  The drug evidence should not have

10  been admitted.

11              Likewise, when we get to the evidence of the

12  attempted sex with Kristin Steinhoff.  Given the timing of

13  that, and the circumstances, and the way it was presented, it

14  had no relevance to what happened to Leah Freeman.

15              In fairness, arguably, there may be an argument

16  that could be made that the attempt of sex would show some

17  state of mind of Mr. McGuffin concerning his relationship with

18  Leah Freeman, more than any kind of use of methamphetamine.

19  But here, that evidence — the evidence of attempted sex — was

20  likewise more unfairly prejudicial then it was probative of

21  anything because they didn't have sex.  He left the house and

22  went to look for Leah.  The drugs and the attempted should not

23  have been admitted.

24              Additionally, concerning sexual activity, there

25  was testimony that Mr. McGuffin had sex with Megan Davidson

1759                          Motion for a New Trial

1  after Leah was missing but before her body was found.  Again,

2  in terms of relevance, this did not tend to show anything

3  relevant concerning Mr. McGuffin's relationship with Leah

4  Freeman.  And was too attenuated to be relevant to — to the

5  issues in the case.  And is was, under 403, more unfairly

6  prejudicial to Mr. McGuffin because it was only designed to

7  turn the jury against him.

8           He was not in the community, dressed in black,

9  (not understandable) on his head.  And, essentially, what this

10 evidence did — combined with the other evidence — was to put

11 Mr. McGuffin in a position of moral culpability, which the

12 jury then translated into legal culpability.  It was

13 propensity evidence and they used as a basis improperly to

14 convict (not understandable).

15          Additionally, there was evidence of

16 Mr. McGuffin having sexual contact with Melissa Smith one

17 time.  It was after the memorial was held for Leah Freeman.

18 This, as well, was not relevant because it was too attenuated.

19 It didn't show Mr. McGuffin's relationship with Leah Freeman.

20 It had no other relevance.  But, (not understandable) under

21 403, it was unfairly prejudicial, especially because of the

22 accumulative effect.

23          The jury is being told Mr. McGuffin is a

24 druggie.  He's a very sexual being.  They didn't like that.

25 And especially the nine woman jurors, they held it against

Motion for a New Trial          1760

1  him.  He's a bad person.  And that coupled with

2  Mr. Breakfield's claim.  Made it more believable because the

3  jury believed he was a bad person.

4          THE COURT:    I just want to say for the

5  record, you are saying (not understandable).  (Not

6  understandable.)  (Not understandable.)

7          MS. McCREA:    And I'm saying that there nine

8  woman jurors.  And my inference would be there would be more

9  likelihood that they would react to this evidence.  Yes, the

10  Court - - -

11          THE COURT:    (Interposing) Whether that is

12  true or not, as far as the men and woman who don't like him,

13  that's — that (not understandable) being somewhat old school

14  (not understandable).

15          MS. McCREA:    When we add to that the evidence

16  that Mr. McGuffin had been in jail, which came through two

17  separate witnesses — First, the testimony of Richard Bryant,

18  who is in custody with Mr. McGuffin.  Mr. McGuffin — the

19  testimony of Mr. Bryant was that Mr. McGuffin indicated to him

20  that Mr. McGuffin can picture Leah laying there.

21          And, Secondly, told Mr. Bryant that

22  Mr. McGuffin had nothing to do with it — had nothing do with

23  Leah Freeman's disappearance or her death.  Evidence was

24  actually exculpatory.  And the fact that Mr. McGuffin made

25  statement while he was in jail with Mr. Bryant, had no

Exhibit 102  Page 1637 of 1666 to
State Defendants' Motion for Summary Judgment

1761                          Motion for a New Trial

1   relevance whatsoever.

2             But, in addition, the State then called

3   somebody from the jail, Darius Mede, to confirm that

4   Mr. McGuffin had been in jail on certain, particular dates.

5   Not only was there no relevance, but evidence served only for

6   lack of Mr. McGuffin's character, additionally, to the drug

7   use and his sexual activity.

8             So, now the jury has been told Mr. McGuffin is

9   a drug abuser — and not just pot, but hard drugs like

10  methamphetamine; he's promiscuous and has sex different woman;

11  and he's a law breaker and an outlaw because he's been in

12  jail.  And, thus, the jury can infer from this character

13  evidence that he broke the law once so he must have done it

14  here.

15            This is shear propensity evidence, Your Honor.

16  And it's very powerful, but it was not justified.

17            And then, in addition, we add to this evidence

18  the statements of Melissa Beebe, the so-called courthouse-

19  steps statement.  She had contact with Mr. McGuffin in 2003 in

20  reference to another court case, not this case.  And that is

21  when she reported he said, "It's amazing what you can get away

22  with in Coos County."  Now, the context of that conversation

23  was that she said to him, "How did your court case go?"  And

24  he said, "Very well."  And she said, "It's better than you

25  deserve."  And then he responded with, "It's amazing what you

Motion for a New Trial          1762

1  can get away with in Coos County."  The prosecution then

2  parlayed this into a confession.

3          And the prosecution, during closing, talked

4  about the fact that Mr. McGuffin was a little bit arrogant.

5  That's at Page 3 — sorry — Page 30, Line — beginning at

6  Line 2.

7          "As I indicated, it's time to hold the

8          Defendant accountable.  It's been eleven years.  We

9          submit the Defendant think he's above the law.  He's

10          gotten away with it for eleven years, and thinks he

11          can still get away with it for eleven years. What's

12          the evidence to support that?  The statement he made

13          where he said, 'It's amazing what you can get away

14          with in Coos County.'"

15          So, the State is specifically telling the

16  jurors that this statement is related to the death of Leah

17  Freeman and that Mr. McGuffin is confessing to it in the sense

18  that he is saying, "Yeah.  I killed Leah and I got away with

19  it."  Because otherwise it doesn't have any relevance because

20  it would refer to the current case that Mr. McGuffin was

21  dealing with, not the Leah Freeman matter.

22          But, of course, the defense position is it's —

23  it's unfairly prejudicial and it doesn't have anything to do

24  with the Leah Freeman case whatsoever.  But, the cumulative

25  effect we have is that the jury is being told Mr. McGuffin is

1763                          Motion for a New Trial

1    a drug abuser; he's promiscuous; he's an ex-con; he's been in

2    jail; and he's arrogant; and he's bragging about killing Leah

3    Freeman.

4              And, in fact, in this case — the circumstance

5    evidence case — there was nothing concerning any motive.  Leah

6    Freeman had written to Sherry Mitchell the night that they had

7    the fight and she left, that she and Mr. McGuffin were getting

8    along better.  There were positive notes written by Leah

9    Freeman to Mr. McGuffin, which I read in to the jury at the

10   Trial, near graduation.

11             Mr. McGuffin did testify, and Mr. Frasier did

12   note that in his closing, that Leah was very happy that night.

13   And Leah's mother, Cory Freeman, has learned that she was very

14   happy that night.  We had a lack of any physical evidence.  We

15   had all the people who saw Mr. McGuffin on June 28, 2000, (not

16   understandable) two police officers.

17             But, none of that mattered to the jury because

18   we had so much propensity evidence concerning Mr. McGuffin,

19   that they didn't like him.  And because of that propensity

20   evidence, they believed that he would act consistently with

21   the information they had of him, in terms of drug, sex,

22   committing crimes, and bragging about killing, that they found

23   him guilty on the circumstantial evidence in this case.

24             And then, the icing on the cake was the

25   testimony of Christy Young Cagle, when she said that Wayne

Motion for a New Trial                1764

1  McGuffin said the shoe had been planted on Hudson Ridge, and

2  the Nick McGuffin laughed and thought it was funny.  Now,

3  there is no indication of what was funny.  What there was, was

4  Wayne's, and we had an offer of proof with this before the

5  Court allowed it into evidence.

6          But, this was a situation much like the

7  situation in the movie "My Cousin Vinny", where the Defendant

8  who is accused is being questioned by the officer.  And the

9  Defendant says — the guy says, "We shot — we shot the Clerk."

10  And the Defendant says, "I shot the Clerk?  I shot — I shot

11  the Clerk?"  In the Trial it comes out as "I shot the Clerk,

12  I shot the Clerk."  The Defendant said, "I shot the Clerk".

13          And so, we don't have the flavor of this.  We

14  have simply, what Ms. Cagle is reporting, without anything to

15  indicate that, in fact, it was an adoptive admission on the

16  part of Mr. McGuffin.  But given all else that the jury heard

17  about Mr. McGuffin — about Nick McGuffin, they are going

18  believe it.  They are going find it consistent with his bad

19  character.

20          And this was something that the prosecution

21  argued to the jury.  In the closing argument, at Page 29,

22  Lines 18 to 21, the prosecution indicated that Mr. McGuffin —

23  "Defendant agreed with his brother Wayne that the shoe was

24  planted to throw the police off."  And in rebuttal, at

25  Page 43, Lines 18 to 24, the prosecution specifically

1765                    Motion for a New Trial

1  discounts the issue about Raymond Lewis and the receipt dated

2  in May — the end of May — that had been found up on Hudson

3  Ridge, by naming Raymond Lewis in the receipt, and saying

4  again that Wayne had said the shoe was planted.

5             So, the cumulative effect of all of this

6  character evidence, especially when combined with the

7  Breakfield — the statements of Mr. Breakfield, are that the

8  jury is going to be relying on the propensity evidence to the

9  exclusion of the other evidence.

10             So, - - -

11             THE COURT:    (Interposing) (Not

12  understandable.)  (Not understandable.)

13             In any event, go ahead with your argument.

14             MS. McCREA:    Well, that is — that is what I

15  want to say on that issue.  Does the Court want me to go

16  through everything?  Or, go — this - - -

17             THE COURT:    (Interposing) No.  That — no.

18  Just do — argue what you want to argue.

19             MS. McCREA:    (Interposing) All right.

20             THE COURT:    Go ahead.

21             MS. McCREA:    Then on the second issue, which

22  is the Motion for Judgment of Acquittal, that is laid out in

23  the defense Motion.  And I have little to add to that.  I will

24  say that the prosecution is correct that Lurch (phonetic) does

25  talk about there being some evidence, and not necessarily

Motion for a New Trial                1766

1    connected to the Defendant.  However, - - -

2              THE COURT:    (Interposing) The standard,

3    generally, is that there just has to be some evidence that a

4    crime was committed.

5              MS. McCREA:    That's not what — that's not how

6    the plain language Statute reads.

7              THE COURT:    Well, it's certainly what Lurch

8    says.  (Not understandable) - - -

9              MS. McCREA:    (Interposing) And — and Lurch —

10   I don't mean to interrupt.

11             THE COURT:    I — I think that has generally

12   been consistent, (not understandable), in fact, is that you

13   can't have a confession alone.  There has to be some evidence

14   that a crime was committed.  In other words, somebody can't

15   walk into the police station, "I killed John Doe", and they —

16   there is no evidence that John Doe was ever killed, or ever

17   alive, or whatever.

18             Generally, that's the type of thing (not

19   understandable) it goes to.  It's got to somehow be connected

20   to a particular Defendant.

21             Anyway, go ahead.

22             MS. McCREA:    Well, the difference is that

23   what the Court just said, in terms of Lurch, is that a crime

24   has to be committed.  The Statute specifically talks about the

25   crime, which would indicate that it's more specific and would

1767                        Motion for a New Trial

1  be related to the Defendant.

2              THE COURT:   Well, and even — even that

3  interpretation though, some crime was committed.  (Not

4  understandable) evidence from which (not understandable).

5  That is, the killing of Ms. Freeman was not — there was

6  evidence that the killing of Ms. Freeman was (not

7  understandable).

8              MS. McCREA:   Well — and I disagree with the —

9  with the Court's analysis - - -

10             THE COURT:   (Interposing) Okay.

11             MS. McCREA:   - - - based on the plain

12 language of the Statute.  And the Survey of Cases that

13 indicate, from Dennis on, to Lurch, that Lurch has diluted the

14 standard improperly.

15             THE COURT:   (Not understandable.)

16             MS. McCREA:   Well, I make to you, to start

17 with.

18             THE COURT:   All right.  There is not much I

19 can do with what the Supreme Court does.

20             MS. McCREA:   So — and — so, it is our

21 position, Number One, that the Motion for Judgment of

22 Acquittal should have been granted.

23             Mr. McGuffin has now been acquitted of the

24 charge of Murder.  And it is our position that he should

25 likewise have been acquitted, except this couldn't come up

Motion for a New Trial          1768

1  before the Court because it was not before Court at that point

2  — of the Manslaughter in the First Degree, which is why it's a

3  basis for the Motion for New Trial.  Because, Manslaughter in

4  the First Degree two specific elements — both the culpable

5  mental state of reckless; and then the reckless, physical act

6  of there being a death of a human being under circumstances

7  manifest — manifesting extreme indifference to the value of

8  human life.

9          And the State has to prove both elements.  And

10 it is our position here that there was no evidence — there was

11 nothing from which a rational trier of fact could determine

12 how Ms. Freeman died.  And, therefore, they cannot extrapolate

13 back to the circumstances manifesting extreme indifference to

14 the value of human life.

15         THE COURT:   Well, (not understandable).  (Not

16 understandable.)  That particular charge, Manslaughter, (not

17 understandable) conduct of the Defendant is not (not

18 understandable).  And what conduct surrounding the entire

19 crime, frankly — and I think in that case, (not

20 understandable), if I remember correctly.  And then, he

21 berated the police, berated everybody (not understandable).

22 So, frankly, conduct (not understandable) dump the body (not

23 understandable) over an embankment.  (Not understandable) circ

24 manifesting extreme difference to the value of human life,

25 including, possibly, some of the other conduct he engaged in

1769                      Motion for a New Trial

1   (not understandable).  (Not understandable.)  (Not

2   understandable) would you consider circumstances manifesting

3   extreme indifference - - -

4                   MS. McCREA:   (Interposing) Well, - - -

5                   THE COURT:   Under Boone (phonetic) and the

6   cases — I didn't read all the cases (not understandable).  I'm

7   just familiar with Boone.  (Not understandable.)

8                   MS. McCREA:   Right.

9                   And — and looking at Belcher, it talks about

10  the requisite physical act.  And I submit the requisite

11  physical act has to do with the killing.  It is not anything

12  that happens thereafter.

13                  THE COURT:   (Not understandable) - - -

14                  MS. McCREA:   (Interposing) The act is - - -

15                  THE COURT:   - - - (not understandable).  (Not

16  understandable) any question about the conduct of the

17  Defendant (not understandable) entire circumstance (not

18  understandable) occurred.

19                  So, it's not just the crime itself.  (Not

20  understandable.)  (Not understandable) overall conduct in

21  addition to that the acts had already occurred, and (not

22  understandable) thereafter.  So, it's not (not understandable)

23  the crime itself.  And you could argue that (not

24  understandable).  (Not understandable) and shooting somebody,

25  or even stabbing them, (not understandable) hands-on crime,

Motion for a New Trial          1770

1  and that would be claiming somebody fell and couldn't breathe

2  anymore.  (Not understandable.)

3              I'm not — on that part I'm not sure.  (Not

4  understandable) you say, strangling is much more personal (not

5  understandable).

6              MS. McCREA:    Well, that's our position

7  concerning Manslaughter in the First Degree - - -

8              THE COURT:    (Interposing) Okay.

9              MS. McCREA:    - - - and the, um — the Motion

10  for Judgment of Acquittal.

11              Now, in terms of the charge of murder, there

12  was a very strong - - -

13              Oh.  No, I have — one — one other thing to say

14  about, um — about the Motion for Judgement of Acquittal.

15  There were the two statements that were involved.  One was the

16  statement of Mr. Breakfield.  The other was a statement of

17  Melissa Beebe, "It's amazing what you can get away with in

18  Coos County."

19              THE COURT:    The first one, (not

20  understandable).  The second one, there is a question about

21  whether that would be a (not understandable) — a confession or

22  admission.  That's what — I believe that's what you are going

23  to be arguing.  And you can possibly make an argument of both

24  ways, but as I understand what a confession is, they are just

25  admitting guilt of some crime.  It doesn't have to be the —

```
    1771                    Motion for a New Trial
 1  the crime.
 2              So, there is a question in my mind about the
 3  statement, "It's amazing what you can get away with. . ."
 4  There is no question in my mind that Mr. Breakman (not
 5  understandable).  (Not understandable.)
 6              MS. McCREA:    All right.  Then I was — all I
 7  was going to do was refer to Manzela (phonetic), which is also
 8  sited in the defense Motion of 306 OR 303, from 1988.  And
 9  there the Supreme Court — the Oregon Supreme Court, Pages 315
10  and 316, said that the Defendant's Statement, if it's made for
11  some purpose other than to acknowledge guilt.  And if it is
12  not so closely related to the Defendant's confessions as to
13  become part of it, properly deemed an admission and may,
14  itself, be used to corroborate the Defendant's confessions.
15              And it is our position that either, A, the
16  statement of Ms. Beebe was not relevant and should not have
17  come in.  Or, B, it was a confession under the terms of
18  Manzela because it was for the purpose (not understandable) to
19  acknowledge guilt, and it was not for some other reason.  So,
20  based on Manzela, that would be our position.
21              THE COURT:    And in State vs. (not
22  understandable).  Whether or not — and your argument was that
23  he was (not understandable).  (Not understandable.)  But, in
24  the light most favorable to you, in that argue (not
25  understandable.)  I don't know that I could specifically (not
```

Motion for a New Trial          1772

1   understandable).

2          Go ahead.

3          MS. McCREA:     The other issue is the charge of

4   Murder.  And based on the strong Response of prosecution

5   counsel, I sat down and looked at this.  And I very much

6   wanted to see what was in — specifically, what was in the

7   State's closing argument and rebuttal because I made the

8   allegation on a good faith basis.  And let me say this; it is

9   not my intention to get into character assassination of

10  Mr. Frasier.  I like Mr. Frasier.  He is a worthy adversary.

11  But, based on the statements that were made to the press, I

12  had a legitimate concern over the fact that Mr. McGuffin had

13  been charged with Murder and not Manslaughter from the

14  beginning.

15         What Mr. Frasier said during his closing

16  argument, at Page 2 of your Transcript, is:

17             "Now, I want to make something abundantly

18          clear.  The State of Oregon is not saying that Nick

19          McGuffin for a week, or two months, or a year,

20          planned to kill his girlfriend.  They are not saying

21          that on the morning of June 28th, when he woke up

22          that day, he woke up with the idea of, 'I am going

23          to kill Leah Freeman.'"

24             "The evidence we believe shows that a tragic

25          set of circumstances came together on June 28th.  We

1773                          Motion for a New Trial

1    know these people were a devoted couple at times.

2    There is no question that at various points of this

3    relationship they expressed love and affection for

4    each other.  But they were violent with each other

5    at times.  We've got two people here that are fiery,

6    if you will.  And it was a relation, frankly, that

7    under the right conditions could erupt, and did

8    erupt into a violent end.'

9        "What happened June 28, 2000 was the pressures

10    of dealing with teenage emotions — whatever you want

11    to call it — erupted in what (not understandable)

12    the end of the life Leah Freeman."

13        And then, on Page 3 of the Transcript, at

14    Line 12, he also talks about the tragic mistake that he has

15    made.

16        Now, the question is, is it a matter of a difference

17    in semantics, in that Mr. Frasier in his Affidavit says, "I

18    did not believe Defendant had a premeditated desire or plan to

19    kill Leah Freeman."

20        And, I sat down and looked at the dictionary,

21    Your Honor — and all I had on hand at the moment was an Oxford

22    American Dictionary from the 1980's — and at Page 344 it

23    defines intent.  And it defines it as, "To have in mind as

24    what one wishes to do or see, or Two, to plan that a (not

25    understandable) shall be used or interpreted in a particular

Motion for a New Trial          1774

1    way."

2              And the — the concern here is that, based on

3    the statement of the prosecution, it does not appear that

4    there was a basis for charging Mr. McGuffin with intentional

5    murder, but rather a basis for charging him, as he was

6    eventually convicted under the lesser included offense, which

7    is Manslaughter in the First Degree.

8              And in rebuttal, at Page 32, Line 18,

9    Mr. Frasier also says, "Friction — friction got worse and

10   again exploded into this catastrophe that ended up in Leah

11   being dead."

12             Now, there are some other things that the

13   prosecution could say in response, that they haven't said.

14   And some of those things are that this matter went to the

15   Grand Jury; and it was the Grand Jury's decision, not

16   Mr. Frasier's decision.  Although, as we know from experience,

17   the — the prosecutor is the only one in the Grand Jury with

18   the witnesses and the Grand Juror (sic), so typically, (not

19   understandable) has a certain amount of influence.

20             To get — Mr. Frasier could also point out that

21   based on the results in this case, that it was a 10 to 2

22   verdict on the issue of Murder.  That at least two of the

23   jurors believed that Mr. McGuffin was responsible for that.

24   And that would be an argument, as well.

25             But, I am very bothered by the statements that

1775                          Motion for a New Trial

1   were made, both in terms of the State's closing argument and

2   the statements that were made publicly to the press — those to

3   the — the World newspaper, to the Oregonian, and to the, um,

4   video media.

5                    THE COURT:    (Not understandable.)

6                    MS. McCREA:    And my concern is because I see

7   this as unfairly prejudicial to Mr. McGuffin, and a

8   substantial denial of his rights.  Because being charged with

9   Murder, he was looking at a penalty conviction of life in

10  prison with no possibility of parole for twenty-five years.

11                   The Oregon Constitution has a presumption

12  against release if a person is charged with the crime of

13  Murder, as Mr. McGuffin was.  And, if a Release Hearing is

14  requested, the amount of security which would be required for

15  a charge of Murder is much greater than what would be required

16  for a charge of Manslaughter in the First Degree, which

17  carries a penalty of ten years in prison, as opposed to life,

18  with a mandatory minimum of twenty-five.

19                   Now, in this case, had Mr. McGuffin been

20  charged with Manslaughter in the First Degree, he would have

21  had a much better opportunity to obtain release on conditions.

22  As it was with the charge of Murder, the State filed

23  objections to release before the defense ever filed anything

24  requesting a Release Hearing.

25                   The State, in its Response says, "Well,

Motion for a New Trial          1776

1  Mr. McGuffin could have gotten Court appointed counsel and

2  then sought release on security conditions." Our point is, if

3  he had been charged with Manslaughter in the First Degree, he

4  would have had a better opportunity for release from the

5  getgo.

6          And, the other aspect of it is, I have alleged

7  that Mr. McGuffin was, while in custody, under a state of

8  siege. And I would proffer to the Court that I have received,

9  in Discovery from the State, personal letters that were sent

10 to Mr. McGuffin that he did not receive in custody because the

11 State took custody of them. That his cell was searched, and

12 his personal papers — except for his legal papers — were taken

13 on a routine basis.

14         Number Three, being in custody, he had limited

15 access to counsel by telephone at specified times, and

16 personal at specified times and places. And it — it simply

17 was not same as if he were out of custody.

18         And so, his substantial rights were violated.

19 And on that basis, we submit — additionally, he should be

20 entitled to a new trial.

21         We went through the issues with Ms. Londagin

22 (phonetic) at the Motion to Postpone. The person involved was

23 Terry Middleton not Bill Middleton. The State has now

24 submitted an Affidavit indicating that Ms. Londagin left a

25 voicemail saying she doesn't know the family. I have nothing

```
   1777                    Motion for a New Trial
 1  to counter that with.  So, I'm — I'm not prepared to go
 2  forward with that issue.
 3              It's the concern of Mr. Welch that we now have
 4  the report of Officer Webley in evidence.  I understand the
 5  Court's position about the Waiver on the part of the
 6  Defendant.  However, the defense concern is that at the time
 7  the decision was made, which was in Court at counsel table,
 8  the defense did not know who had taken the report, the
 9  specifics of the report, or the (not understandable) involved.
10              And Mr. — Officer Webley's report indicates
11  more involvement concerning Mr. Welch than Mr. Welch
12  indicates.
13              Now, I understand Mr. Welch denied that he had
14  any contact.  The Court left it up to us and we left it up to
15  the Court.  But, I'm just putting that on the record.
16              THE COURT:    (Not understandable.)
17              Ms. Soublet?
18              MS. SOUBLET:    Thank you, Your Honor.
19              (Not understandable.) (Not understandable.)
20  Other than that, unless the Court has questions for me, (not
21  understandable).
22              THE COURT:    Anything else?
23              MS. McCREA:    No, Your Honor.
24              THE COURT:    I just made some notes, and I
25  want to make sure (not understandable).
```

Exhibit 102  Page 1654 of 1666 to
State Defendants' Motion for Summary Judgment

Motion for a New Trial          1778

1     Uh, first of all, as to the Motion for Judgment

2  of Acquittal — and I didn't specifically question you on this,

3  Ms. McCrea, so perhaps you'll want to address it — and that is

4  the issue of preservation on your Motion for Judgment of

5  Acquittal, (not understandable).  (Not understandable.)

6  (Not understandable.) (Not understandable.)

7          MS. McCREA:   Well, - - -

8          THE COURT:    (Interposing) I meant — I meant

9  to ask you a question when you were doing it and I didn't.

10 Then, I thought well that (not understandable).

11         MS. McCREA:   Logistically, it was — and maybe

12 it was erroneous on my part, which, I suppose, could then be

13 an issue for potential post-conviction relief, and that ends

14 up being a possibility.  But, logistically, it was my

15 understanding that the only thing the defense could move for

16 Judgment of Acquittal on would be the charged offense, which

17 was Murder.  Because the jury would not get to the

18 Manslaughter charge unless and until they found Mr. McGuffin

19 guilty — uh, not guilty — acquitted him of the Murder charge.

20         So, it wasn't actually before the Court at the

21 point that the evidence comes in, either during the, um — when

22 the State rests or when all of the evidence was brought in.

23 So, that was the reason that the Motion was made solely on the

24 charged offense of Murder.  That — that was my thinking,

25 Your Honor.

1779                    Motion for a New Trial

1    THE COURT:    Just on the issue, to make sure
2    that it's clear — and there is a real — there is recent case
3    (not understandable) Brown, B-R-O-W-N, (not understandable)
4    2011, kind of talked about the preservation (not
5    understandable).  Uh, but it was known from very early on that
6    the State would contest the Manslaughter in the First Degree.
7            Ms. McCrea did move for Judgment of Acquittal
8    as to the Murder charge.  The concern that the Court has is
9    that that did not raise the issue of whether there was a
10   manifest indifference — manifest — circumstance manifesting
11   extreme indifference to the value of human life.  The Court
12   didn't get a chance to rule on that.
13           Ms. McCrea may be correct that (not
14   understandable) move against the charge itself because the
15   order of deliberation.  It's not (not understandable).  At
16   least that issue was not raised at the time.
17           And I even think that State vs. Brown is —
18   generally is a case favorable to the preservation on behalf of
19   (not understandable), would — would not apply.  And would say
20   that that issue had to be raised at the time, if the Court
21   wouldn't — was going to give the lesser included.  And just
22   raising it at the time of Motion for Judgment of Acquittal may
23   have — may have at least alerted (not understandable)objection
24   to that lesser included because of this.  And there is no
25   exception to that lesser included (not understandable).

Motion for a New Trial          1780

1    (Not understandable) circumstances manifesting

2  extreme indifference to the value of human life.  In fact,

3  part of the Motion for a New Trial is there was nothing to

4  show that it was reckless.

5          So, that possibly — or, should have been raised

6  through at least an exception at the time, if not for a Motion

7  of Judgment of Acquittal.  And those specific weren't raised.

8  So, I'm not too sure that they really deserve (not

9  understandable).

10         Uh, I might be taking these in somewhat of a

11  reverse order.  And I do want to look at my notes on this, as

12  I go along.

13         (Not understandable) quote (not understandable)

14  in State vs. Dennis, uh, at 77 and 78 — and the only reason

15  I'm concerned about that is that general language, especially

16  on (not understandable) has been disavowed, both in (not

17  understandable), which is cited, and (not understandable.)

18  So, I want to make that clear.  But, that was also, generally,

19  on your argument about the fact that there had to be some

20  other proof — some other proof of the crime — some other

21  evidence of proof of crime and in lieu of the confession.

22  But, I think, clearly, that's been covered.

23         And clearly, there is evidence a crime was

24  committed.  The doctor said this wasn't a natural death.  All

25  the circumstances would indicate this wasn't (not

1781                    Motion for a New Trial

1  understandable).  All of the evidence showed this had to be a

2  homicide.  Obviously, the question was, did he (not

3  understandable) homicide at the time the Trial started?  But,

4  I don't think there was really much argument (not

5  understandable).  (Not understandable.)

6            Uh, (not understandable) briefly what a

7  confession is and what an admission is.  And I've also talked

8  about the fact that I think, clearly, there is evidence (not

9  understandable).  That is, killing (not understandable).

10           As to the character evidence — and I again want

11 to — want to raise somewhat of a preservation issue.  And that

12 is, as I recall — and it's been awhile since I listened to it

13 — but I went back and listened to the Omnibus Hearing, parts

14 of it.  And the part that — when we came to arguing, as I

15 recall — I was going through each one — I recall Ms. McCrea

16 saying, "I want to raise this issue — put — put the State on

17 notice that I'm objecting to these matters, generally."

18           But, I believe you also said, "I may have to

19 object in Trial."  The Court did say — and did point out — and

20 generally, I felt these things were admissible on other issues

21 other than character.  And — but, that I would have to rule at

22 Trial.  So, those matters were not objected to at the Trial,

23 based on the whole colloquy between the State, and the

24 defense, and the Court were having.

25           I think those matters would not be prepared by

Motion for a New Trial                1782

1   that (not understandable) in some matters, but (not

2   understandable) in other matters.  (Not understandable.)

3   Basically, it's a side issue of relevancy.  (Not

4   understandable) to make something relevant.  (Not

5   understandable) very little.  There may be, then, the issue of

6   (not understandable) to the point of (not understandable).

7   Relevance is not a lot (not understandable).  Many of them —

8   (not understandable) preservation issue, based on the Court's

9   ruling, (not understandable).  An perfect example of that is

10  the person — I forgot her name but she was the grandmother to

11  a student who (not understandable).  Her testimony was she saw

12  people arguing, but didn't know who they were.  The Court

13  ruled and said it there wasn't a sufficient connection.  It

14  wasn't coming in.  The State, then, later called the grandson,

15  who then said, "I specifically know it was Leah Freeman and

16  Mr. McGuffin who were arguing."  Therefore, the grandmother

17  was recalled and there was no objection, at that point to her

18  testimony, because of the foundation laid by her grandson, as

19  to who the parties were.  So, at that point, it was allowed

20  again but without objection.  (Not understandable.) (Not

21  understandable.)

22          As far as using drugs on the night, even though

23  Mr. McGuffin didn't testify he did give (not understandable).

24  (Not understandable.)  It also would have to do with his

25  concern about Ms. Freeman, and using drugs (not

1783                    Motion for a New Trial

1   understandable).  (Not understandable.)  The jury can do

2   anything with the evidence, but it doesn't make the evidence

3   admissible (not understandable).

4           The fact that he was attempting to have sex, he

5   testified it could have been Ms. Steinhoff, but also indicates

6   (not understandable).  (Not understandable somebody could

7   argue it's a way of consoling himself.  (Not understandable)

8   also indicate (not understandable) allowed, then it's moving

9   on.

10          Again, those are things that the jury can pick.

11  It's certainly relevant to whether or not he was that

12  concerned on the matter.

13          And with the other, uh, woman, again, it would

14  point that (not understandable) during the timeframe we talked

15  about.  (Not understandable.)

16          The fact — the next fact that whether — when he

17  was in jail, and the Court (not understandable) show he was in

18  jail, not whether it — not what he was in jail for, but to

19  show (not understandable).  (Not understandable) which could

20  be important because here is somebody who was saying he was in

21  jail with Mr. McGuffin.  The jury would certainly want to be

22  able to know the circumstances under which the statement was

23  made, and also what the credibility is of the client.  Excuse

24  me.  The fact that he was in jail wouldn't come as a big shock

25  because I doubt there is anybody — juror or otherwise — who

Motion for a New Trial          1784

1   (not understandable).

2            MS. McCREA:    This wasn't when — this wasn't

3   when — this was back in 2003.

4            THE COURT:    I understand that.

5            MS. McCREA:    Okay.  But, - - -

6            THE COURT:    (Interposing) I understand it's

7   back in 2003.  The fact that he was in jail (not

8   understandable).  (Not understandable.)  The jury has a right

9   to (not understandable) testimony (not understandable) motive

10  to come up nu.

11           The other — the other matter, Ms. McCrea, is

12  (not understandable) about the shoe being planted (not

13  understandable).  Proof on that cited a Federal case that (not

14  understandable) very similar, allowing that type of (not

15  understandable) admission (not understandable) appropriate.

16           Again the Beebe matter, that can be construed

17  possibly in different ways, but I think it's relevant and (not

18  understandable).

19           Uh, the other thing about showing a bad

20  relationship between them, obviously that's important in the

21  (not understandable).  The defense was able to show it was a

22  good relationship (not understandable) ups and down.  (Not

23  understandable.)  So, I don't think — I think the evidence was

24  clearly relevant to show the relationship — what it was — (not

25  understandable).

1785                    Motion for a New Trial

1   Uh, as far as Mr. State — Mr. Frasier's

2   statement, what — what would be clearer to me is that if

3   deliberation — that might raise some issue.  And deliberation

4   is not an issue.  It appears to be the more — argument about,

5   "Well, there wasn't any deliberation."  (Not understandable.)

6   In this case (not understandable) more — there wasn't any

7   finding — in other words, there wasn't any deliberations.  So,

8   I don't  (not understandable) didn't have a basis to charge

9   Murder, as far as to argument.  (Not understandable.)  (Not

10  understandable.)  (Not understandable.)   But, I don't think

11  that they are too strong of statements (not understandable).

12  As far as Mr. Breakfield goes, the fact that he

13  was sitting on this and didn't say anything for a long period

14  of time, clearly his credibility (not understandable) brought

15  up.  (Not understandable) the Court had no choice (not

16  understandable).  (Not understandable.)  The jury can decide

17  whether or not they accept Mr. Breakfield's testimony.

18  The argument about — concerning the argument of

19  Murder instead of Manslaughter about him being — about

20  Mr. McGuffin (not understandable) being released, at that time

21  the Court's schedule sets security for Manslaughter in the

22  First Degree at $1,000,000.  So, it was obviously less than

23  Murder but it wasn't substantially (not understandable).  But,

24  it was (not understandable) — it was at that point.  As I

25  recall, there wasn't — there was a Request for Release (not

Motion for a New Trial          1786

1  understandable) but it was withdrawn (not understandable).

2  So, speculating about the fact that he would have gotten out

3  one way or the other.  The Court never had to rule on that

4  issue, there wasn't (not understandable).

5              So, uh — and in relation to your argument in

6  that record that — that there was limited access, I think the

7  only time you raised access with the Defendant during the

8  Trial — and the Court corrected that matter — they assured

9  that the jail wasn't going to do it again.  But there wasn't

10  any other issue ever raised about access or having limited —

11  obviously, it's always better to have a (not understandable).

12  (Not understandable).  (Not understandable.)

13              We've talked about the juror misconduct and —

14  although, I don't know that you are specifically withdrawing

15  your argument about Ms. Londagin, but — but clearly the

16  Affidavit from Ms. Soublet that said Ms. Londagin left and

17  said, "I have no knowledge of the Freeman family."  (Not

18  understandable) any inference that she did something wrong in

19  this matter.  Whether her husband did or did not happen to

20  know a relative of Ms. Freeman is irrelevant.  Ms. Londagin

21  says, "I have no knowledge of any of of these people.  (Not

22  understandable.)

23              And again, as to the other, Mr. Welch, the

24  Court believed what he said.  He — assuming Mr. Welch wasn't

25  being truthful, he was off the jury and it had no effect on

1787                                    Ruling

1   what the jury did one way or the other.

2                  Just make sure I (not understandable) something

3   else.

4                  So, based on the Court's review of this — the

5   Motions — the Motion filed, the Court will deny the Motion for

6   a New Trial.

7                  And, Ms. Soublet, if you would submit (not

8   understandable)?

9                  MS. SOUBLET:    Thank you, Your Honor.

10                  MS. McCREA:   And, Your Honor, did the Court

11  receive Exhibit 302, for the purpose of this Hearing.

12                  THE COURT:   I — I'll receive it for the — for

13  an offer — for the offer of proof.  And I'm familiar with —

14  (not understandable) - - -

15                  MS. McCREA:    (Interposing) Okay.

16                  THE COURT:    - - - closing argument.  So, I

17  didn't have to reread the closing.  But, for the purpose of

18  this Hearing, the Court will receive it as offer of proof (not

19  understandable).

20                  (Whereupon Defendant's Exhibit No. 302 was

21  received into evidence.)

22                  MS. McCREA:   And, may I impose on Ms. Cress

23  to make me a copy of Exhibit 301 since I gave her the copy she

24  gave me?

25                  THE COURT:    (Inaudible response.)

```
                                          Ruling        1788
 1                  MS. McCREA:    Thank you.
 2                  THE COURT:    I will certainly ask her to do
 3     that.
 4                  MS. McCREA:    Thank you, Your Honor.
 5                  THE COURT:    (Not understandable.)
 6                  All right.
 7                  We'll terminate this call, Mr. McGuffin, unless
 8     you had something else you wanted to bring up.  And,
 9     understand your counsel may or may not want you to do that,
10     but if you had some question or something, I'm happy to answer
11     - - -
12                  DEFENDANT:    (Interposing) No, that's — that's
13     perfectly fine.
14                  THE COURT:    Okay.
15                  We'll terminate the call.
16                  DEFENDANT:    All right.
17                  (Whereupon video communication was terminated
18     with the Defendant.)
19                  THE COURT:    We'll take a brief recess for
20     about ten minutes.
21
22     *                        *                        *
```

Certificate    1789

STATE OF OREGON        )
                       )   ss.
County of Coos         )


### TRANSCRIBER'S CERTIFICATE


I, Diane B. Walberg, Court Transcriber for the State of Oregon, Fifteenth Judicial District, do hereby certify that I received the duly certified true copies of the audio record of the before-entitled cause, before the Honorable Richard L. Barron, Judge of the Circuit Court of the County of Coos, State of Oregon; and that I thereafter caused that record to be reduced to typewritten pages.

I further certify that the foregoing and hereto attached typewritten pages numbered 2 through 1788, inclusive, constitute a full, true and accurate record of the proceedings had upon the hearing of said cause, and of the whole thereof, to the best of my ability.


WITNESS my hand as Court Transcriber this 30th day of

December, 2011.

Diane B. Walberg, Court Transcriber
South Coast Transcribing
PO Box 3414, Sunriver, OR   97707
541-593-1664, bdwalberg@aol.com