001569                          001569                          001569

### Nick McGuffin's Statement

Chief Reaves: Today is June 30 it is 1348 hours. This is a statement of Nick McGuffin in reference to case number 00-1905. A missing person case involving Leah Freeman.

Man: Nick, I want you to state your full name, date of birth and your address please.

Nick: Nicholas James Mcguffin 042582 that was all

Chief: Address

Nick: oh 5624 Baker Rd

Chief: Start at the top (?)

Nick: ok

Chief: Hang on a second…You know what this is about right? A missing person case

Nick: Like oh yeah

Chief: ok you know that and you know the victim in this case is Leah…

Nick: Freeman

Chief: How do you know her?

Nick: She's my girlfriend, I've been seeing her the last nine months

Chief: and you guys are close?

Nick: Very, she's my best friend. I consider her my best friend and my girlfriend. She's like part of the family and it's the same for her and her family.

Chief: She went missing sometime after 9pm on the 28th and you were with her?

Nick: I was with her until 7:00pm that night and I drop her off at Cheri Mitchell's and she told me to come back at nine.

Chief: ok, starting at noon time you need to tell us what you all did and where you went and what happened.

Nick: ok about I was probably at her house about noon and we sat there for a couple of hours and we were cleaning off my car and having good time and it was the happiest I'd seen her and everybody was getting along and we decided we were going to drive around we wanted to do

001569                          001569                          001569

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          CPD021556

001570                                    001570                                    001570

something, so we told Leah's mom that we were going to leave and we drove around for awhile. We went up to Brent Bartley's house cause I wanted to tell to Brent and see what he was doing tonight. He said, he asked me if I wanted to go up to his grandparents house and go watch a movie with Leah and he wanted to go with his girlfriend and I told him sure. So, we picked him up, we drove around, went out to my house, got some movies, sat out there for awhile. I don't know exact time it was but my dad was out there and he would know what time it was cause I remember him saying that I couldn't take the movies from him or I better bring them back tonight or something like that. We ended up leaving and we came back to Brent's house, sat there for awhile, then we went up to Brent's grandma's and sat there from I don't know either from 5:30pm 5-5:30 to about 6:45 maybe 6:55.

Chief: At Brent's grandma's were you in the house or out of the house?

Nick: We were in the house watching well we were in the house for a little bit and we started watching Wild Wild West but Leah didn't want to watch it because she thought it was stupid so we took it out and we rewound it for her and then we ended ok we made Leah wait I remember that, we took out the movie and we were all hungry and we made Leah wait there because she didn't want to go, she was just tired and wanted to lay down for awhile and we went into town and got some steaks got some pop I think it was.

Chief: Hold on a second, were the grandparents there?

Nick: no, they were in Germany but we called Brent's mom and he always asks for permission to go up there and everything and nobody was up there except for us four well us three at that time.

Chief: How did you get in the house?

Nick: He has a key

Chief: He has a key?

Nick: (yes) and when we came back we cooked the steaks, I didn't eat nothing, Leah and Brent ended up eating we sat around, sat on the deck, she was like laying down, she sat in the sun for awhile. We left about 6:45 6:55 we took her to Cheri's and then Brent came with me and we went pick Nikki up which is his girlfriend took them back to that house and sat there for like 10 20 minutes and I decided I wanted to go because I just wanted go and I just didn't want to be there with them and I figure I would let them have their time alone you know. I went to Fast Mart, hung there for awhile, drove around, I talked to a couple of people, I talked to Aaron West and I talked to I think Ricky Crook and a couple of people after that and I don't know I just drove around until I had to go pick her back up because I was just waiting for her and after that I went there back about 9:00 maybe five past nine and Cheri said that they got into and argument, she was balling and that she just left and I could probably catch her if I went and looked for her.

Chief: you dropped her off Brent Bartley was with you?

001570                                    001570                                    001570

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    CPD021557

001571                    001571                    001571

Nick: (yes)

Chief: ok

Nick: He was sitting in the back.

Chief: He was sitting in the back and you got a front seat and all that?

Nick: (yes)

Chief: ok

Nick: and after that I went back I left by to go by Fast Mart I took I went straight there by McKays I can't remember which street I went on but I ended up taking a left to back up Central to see if she was walking home, I didn't see I came back came back through Central didn't see her I think I went by the park I check at the park, I check at the Cruise Inn, I check at the Nazarene Church, I check at West Coquille turn off, I checked at Sturdivant, I drove the loop, I basically drove everywhere for that four hours looking for her and I didn't see her once and everybody else saw her well not everybody Mark was the only one I talked to that night that seen her and that was about all.

Chief: You said Mark was with somebody else?

Nick: No, Mark wasn't with anybody

Chief: Mark was with Mike McAdams (?)

Nick: Oh that was at Hunters when she they saw her walking by. He talked to me later I didn't see them at Hunters. He came and flagged me down to see what I was doing and I asked him if he'd seen Leah and he said yeah, me and Mike McAdams were at Hunters and we saw her walked by and I was like ok and he's all and where could she be I was like I don't know I was like she was just walking around maybe she went home and he was like ok well drive around I'm going to go home I talked to Zavala, talked to Danny and they said they hadn't seen anybody walking around or anything. I went back to Cheri's house at like 10:15 and talked to her, I called Leah's mom and after that I ended up going to Fast Mart I think and called my mom and asking her if Leah called or if Leah was out there or anything and she said no so I said ok I'd be home sometime I didn't know when. And then I ended up going by Leah's house....no...yeah I ended up going by Leah's house I think and then I think I went back up to Brent's grandparent's house and I picked him and Nikki up and I took Nikki home at like 11, 11, 11:30 maybe midnight I think it was and Brent cruised around with me and that's when we saw Richard Bryant walking around town and I had already talked to him earlier and seen if he'd seen her and he said no and Brent ended up getting out with Richard and they started walking around and I left and I told Brent I would stop by his house and I think they ended coming up to Brent's house or something they didn't walk around town or anything. But I went by Leah's a couple of times I threw rocks at her window to see if she was, I thought she was but evidently she wasn't because her mom called me in the morning. And I went back to Brent's right before I went home it was late late

001571                    001571                    001571

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    CPD021558

001572                              001572                              001572

and he was the only one there and he was sleeping and I opened up the door and he asked who it was and I asked I told him it was me and I asked if he'd seen her and he was like no he was like she ain't around I was like no I haven't seen her one bit and he was like well I hadn't heard from her either and I was like alright well I'm going to go home and I probably ended up going home after that and I don't know what time it was but it was probably around 2. And after that I don't know, there was so many things that went on I went everywhere, I basically drove every street I could drive and every place I thought she would stop and think anything. Because I didn't know if she was mad or if she was depressed or what was going on or if someone took her I didn't know what to think. That's just not that's not Leah she doesn't walk off I mean she going to tell someone where she is or what she's doing I mean if not me she would tell her mom or she would of told somebody. I just don't get it she doesn't just walk off I know that.

Chief: How would you characterize her personal life?

Nick: When she's around me I don't know she just seems really bright, happy go lucky, and giggly and I don't know she's fun to be around, I don't know she's an easy person to talk to once you know her I don't know she's just a really good person.

Chief: I'm going to ask you a few questions you have to realize we're trying to find a missing person

Nick: (yes)

Chief: We're not trying to get anybody in trouble or anything else but we do need as much information as possible.

Nick: ok

Chief: Did she use alcohol?

Nick: No, she's drank a couple of times that's about all

Chief: Were you all drinking that day up at Brent's house?

Nick: (No), I don't drink and drive she would of drank because

Chief: What was wearing?

Nick: It's a wife they call well people call it a wife beater that's what the term is but it's a tank top it's a tight tank top it's kind of something you wear underneath a shirt and she had blue jeans on

Chief: What was this tank top could you describe it?

Nick: It was just white it's I don't know don't they have like little thread lines on them that go down that's about all there is nothing to them like

001572                              001572                              001572

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    CPD021559

001573                              001573                              001573

Woman: It's ribby like it's ribbed

Hall: Oh it's ribbed?

Woman: yeah

Hall: ok

Woman: It's like the tank tops that men wear for t-shirts.

Chief: ok, I know what you mean

Nick & Woman: yeah

Chief: Any kind of marks on it, stains?

Nick: not that I know of....well I think on this side or this it was on her left side I think there was a little like a little black like a stain mark I don't know what it was from it could have been from anything it hard to say what it that could have been from it was like a blackish color on there it wasn't very noticeable I mean it was

Chief: It wasn't a new shirt?

Nick: Oh no, she's had that tank top for a long time.  She wore it quite a bit during summer.

Chief: ok.  Drugs?

Nick: No

Chief: Marijuana?

Nick: No, that's what I don't get dude.  She's a very shy person, she doesn't just go out and talk to anybody she doesn't just go out and get in nobody's car if she doesn't know them I mean I don't get it.  She's a very good girl I mean she's like almost pretty much perfect in every way except for she can have a little attitude sometimes that's just cause she's a girl.

Chief: Yeah

Nick: Kids though too, teenagers are like that short fused

Chief: I've never been a teenager so

Nick: yeah you wouldn't know you know you never burned out in your car or nothing

Chief:

001573                              001573                              001573

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          CPD021560

001574    001574    001574

Nick: I bet that's probably what I'll say when I get older too.

Chief: Did you go out to Laverne Park today?

Nick: No, I haven't made it yet I left my house at like 12 12:15 and I didn't have time I wanted to make it here on time.

Chief: Do you know Chris Cranford and

Nick: Josh Courtright?

Chief: yeah

Nick: I know both of them. Josh Courtright is related to Leah.

Chief: Did they talk to you?

Nick: I talked to Chris Cranford, he was walking around last night. I drove right by him and Maggie saw it saw him so I turned around cause I hadn't talk to him yet and he told me that they might of seen her yesterday about noon to one right by the Fairview turn off walking into town on the sidewalk part of the road with another girlfriend that had like a blonde blondish hair but he said that he wasn't sure if it was her or not but

Chief: Did she ever have problems at home?

Nick: Her parents were divorced she uh I her depression maybe has a lot to do with her childhood.

Chief: What depression?

Nick: huh?

Chief: What depression?

Nick: From her dad not caring about her from not...totally excluding her out

Chief: A minute ago you told me she was happy go lucky

Nick: She is, she is but if something like that comes up like if you call her like say something about her father she'll get depressed I mean she can easily be hurt but she is a very happy person. It just depends on what she's doing you know what she's thinking about you just don't you aint going to sit there and dwell on not having a dad your whole life I mean if things come up and you start talking about er

Chief: Did she have any problems with her mom?

001574    001574    001574

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER    CPD021561

001575                                    001575                                    001575

Nick: No, they get along really good.

Chief: Unfortunately, we found out that she may have stayed with the Mitchell's for awhile. She was having problems with her mom.  Do you know anything about that?

Nick: Like what do you mean like

Chief: Stayed with the Mitchell's at their house

Nick: Like because like before any of this had happened like she

Chief: Yeah, before any of this had happened.

Nick: I don't think she stayed I don't think that's happened, not that I know of

Chief:

Nick: About yeah, about that

Chief: She made (?)

Nick: Yeah, cause her and Cheri were best friends there for a long time.

Chief: Can you think of anybody we outta to talk to?

Nick: Just Raymond Lewis and those guys just the guys that seen her that night.

Hall: (something) Raymond Lewis?

Nick: Raymond Lewis, west of what's his name ok Matt Fjeild

Hall: Matt who?

Nick: Fjeld, F G or F J

Hall: Say it again

Nick: Matt Fjeild, F J  I think its

Woman: E L D

Nick: E L D?

Woman #2: E I L D

001575                                    001575                                    001575

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          CPD021562

001576                          001576                          001576

Nick: Yeah, E I L D yeah and Joey Schrader um

Woman: Alex?
Nick: Alex Witcom

Chief: Alex Witcom

Nick: Witcom, yeah

Chief: Do you know where he lives?

Nick: He lives straight down from Leah's house, you just go uh I think it's 2 the 2nd right it's right on that side.

Chief: It's on Knott Street?

Hall: The second right would be West 9th

Woman: Yeah, it's right on that corner.

Nick: It's like on the opposite side of the street of Middleton's house but it's right on that corner

Hall: Oh, wait a minute ok

Nick: Like you go down and take a right but it's over it's right on that corner right here it's right there.

Hall: Oh, ok and there's a trailer there?

Nick: Yeah, there's a little camper trailer thingy and its got a fence around the house and they got a dog in the back yard. They have a big they have a big blue they have a big blue Chevy there. He drives a big Chevy it's like an 84 or 88

Woman: What about the two that saw her, possibly saw her yesterday. I would think that those two would be

Chief: Yeah, we're going to talk to them we just found out that Chris went to Roseburg

Hall: Roseburg, yeah he went to pick up his girlfriend in Roseburg

Nick: Oh, Katie…Courtright

Chief: and Josh

Hall: Yeah

001576                          001576                          001576

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          CPD021563

001577                    001577                    001577

Chief: Ok

Hall: Take a run out there

Nick: But I know she was not under the influence of anything cause like she told me like she's only drank like once and that was like two years ago like at Easter at Nick Prescott's house and she told me she got drunk and that was the only time I know of her doing that. I don't know, that's what I don't get. She would of called somebody by now. I don't know. She would at least contacted me if she would of ran away and she might have been scared to come home she would of called me to ask her what to do you know and what should I do? I would of told her everything's fine, just come home, we're all worried about you but she hasn't even contacted me so that's why I think something is up I just don't know what's going on.

Chief: Did she have any problems with anybody?

Nick: Just besides that argument with Cheri and her mom that a couple days before Wednesday I think it was Monday, we were at Fast Mart and I was getting a pack of cigarettes and Cheri's mom pulls up and Leah sees her. Leah gets out of the car to go and say hi to her and she's all so what are you doing at Fast Mart Leah and she's all I'm just sitting we're getting, Nick's getting a pack of cigarettes and she's all oh so I expected more of you, you're hanging out at Fast Mart and we were there for like two or three minutes. They pulled up a minute after we got there and Leah came back to me and like was almost just crying, she was like kinda hugged me and put her head on my shoulder and she was like I can't believe she said that cause Cheri is like was like her best friend and Peg was like so nice to her and to go and say that to her like that just I don't know that would hurt me too. Then she ended up going to Cheri's house at during on Wednesday and then that happened and then when they got into an argument and Cheri's mom wouldn't let Cheri go running with Leah, Leah thought it was because Cheri's mom doesn't like Leah and she hates her and she told Cheri that and Cheri tried to persuade her differently but she ended up leaving anyway and when I got there Cheri was balling her eyes out. But then she said to Cory Cheri's mom or Leah's mom that it wasn't that big of an argument it wasn't that big of a deal but you don't cry about something that that's not that big of a deal.

Chief: Anything else Dave?

Hall: No Sir

Nick: Is that fine?

Chief: Oh, that's great thank you

Nick: That's as much as I can remember

Chief: This concludes the statement of Nick McGuffin and it is 1410

001577                    001577                    001577

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    CPD021564

Our 800# to our house
1-888-396-4983

2 to 4 o'clock   left Leah's house

4 |   Went to Brent Bartley's House

5 o'clock   Me, Leah, & Brent went out to
my house to get a couple of movies

5:45   Went to Brent's grandparents house
Brent had a couple of drinks, I had
1 mixed drink. I don't know if Leah
had any

6:50   left to take Leah to Cherrie Mitchell's
house, Leah told me to come back
in 2 hrs, which is about 9 o'clock

~~7 to 9 o'clock   hung out at fast Mart nm~~

7 o'clock   Brent & I went & picked up
Nicki Price and I took them both
up to Brent's grandparents house

7:30 to 9:00   I hung out at fast Mart until
about 8:00

8:00   Drove around, went out to Mill
Pond came back into town

9:05   Went up to Cherrie's house, when
I got there Cherrie was crying
and said Leah and Cherrie's mom
got into an argument, also said Leah
had just left

9:15   Drove up Central looking for Leah,
Drove back down Central took a left
at Stamper's, then another left
at the next Stop sign, came back
across from fast Mart by hair
place and drove back up Central,
Went to W. Coquille turn off and

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER            CPD021565

turned around.

9:45 Drove by fast Mart again and I think Brett Marrow yelled at me. but, I just kept driving because I was looking for leah. Bunch of People Hanging out at fast Ma

10:00 I might of seen Tim Woosley walking around.

10:15 Went back to Cherrie's, she said that leah didn't come back and she said maybe she walked out to your house, called leah's mom asked if leah was home & she said no.

10:30 Called my mom from fast Mart to see if leah had called but she didn't

10:40 talked to Mark Kurn he said that him & Mike McAdam's seen her walking by ~~fast Mart~~ Hunter's

In between 10 & 10:40 Went up to Brent's grandparents house but, leah wasn't there

10:50 Zavalla pulled me over for one head light & I told him that I was looking for leah and asked him to help find her

10:55 Went to Denny's Pizza & asked Denise, leah's sister if she stopped by and she said No.

11:05 Seen Richard Bryant ~~at fa~~ Walking & he said he hadn't seen her either

In between 10:40 & 11:00 Went to highschool and seen 2 people walking the track and

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          CPD021566

asked them if they had seen a
girl walking around in a tank top.
They also said No. The couple
were driving a ~~the~~ Marroon Aerostar
Van

11:30 I went Back up to Brent's house
to pick him & Nicki up.

11:40 Dropped Nicki off & me and ~~Brent~~ Brent
went looking for leah for about
another 45 mins.

11:50 Went by leah's house and I didn't
think she was home so we kept
looking, also I talked to 2 girls
at the Sanford Heights playground
and they also didn't see her.

Midnight Seen Danny Lee and asked him
to look for her because I couldn't
find her, he kind've ignored me
and didn't pay attention.

After Midnight Saw Richard Bryant again, Brent
got out of car & him & Richard
went up to Brent's house by
Dean St.

12:30 Went back by Leah's house still didn't
think she was home.

1:00 Talked to Kristen Steinhoff for
about 45 mins. to an hour at her
house to see if she had seen her.

2:00 Went back by leah's and seen a
glare in her window which I thought
was the T.V. in her bedroom so,
I went & threw a couple of rocks

at her window to see if she was
there but she didn't answer so, I
thought she was sleeping.
2:00 to 2:30 looked around town just in
case she wasn't home & I didn't
see her so, I decided to head
home about 2:30 or 3 o'clock in
the morning.
3:00 A.M. Went to bed
4:00 A.M. Got a phone call my mom
answered but, the person hung up
7:30 in the morning leah's mom calls and
said that she didn't come home
and that her T.V. was probably
the dare in leah's room
I don't know who called at 4 in
the morning but, I think it might
of been leah trying to contact
me

Nicholas James McGuffin

7-5-00

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    CPD021568

003833        003833        #5 003833 3

# SUPPLEMENTAL REPORT

Page **1**

| | INCIDENT NO. |
|---|---|
| Agency: **Coquille Police Department** | **00001905** |

| Report Purpose | Reported On | Date | Time | Incident Classification |
|---|---|---|---|---|
| *Follow-up report* | THU | 06/29/2000 | 10:25 | *Missing Person* |

| Primary Charge | UCR/NCIC Code |
|---|---|
| | / |

| Additional Charges | Estimated Total Property Loss |
|---|---|

**Related Case No.'s**
*00001911*

**Officer Involved**
*Hall, Ulmer, Lee, Zavala*

## Victims/Witnesses/Other

| Code | Name: Last, First, Middle | Sex | Race/Ethnicity | Date of Birth/Age |
|---|---|---|---|---|
| *G-1* | **Courtright, Corliss Cay** | | | |
| Confidentiality | Address: Street, City, State, ZIP | | | Home Phone    Ext. |
| | *1173 N Knott, Coquille, OR 97423* | | | **(541) 396-4027** |
| Place of Employment/School/Address | | Occupation | | Business Phone    Ext. |

Alias Names (Monikers)
*Courtright, Cory (AKA)*     Gang Affiliations

| Code | Name: Last, First, Middle | Sex | Race/Ethnicity | Date of Birth/Age |
|---|---|---|---|---|
| *O-7* | **McGuffin, Nicholas James** | M | White/Cauca | 04/25/1982   18 |
| Confidentiality | Address: Street, City, State, ZIP | | | Home Phone    Ext. |
| | *100 Baker RD, Coquille, OR 97423* | | | *396-4983* |
| Place of Employment/School/Address | | Occupation | | Business Phone    Ext. |

Alias Names (Monikers)
*McGuffin, Nick (AKA)*     Gang Affiliations

| Code | Name: Last, First, Middle | Sex | Race/Ethnicity | Date of Birth/Age |
|---|---|---|---|---|
| *O-16* | **Wilson, Carl** | | | |
| Confidentiality | Address: Street, City, State, ZIP | | | Home Phone    Ext. |
| | *499 W Central BLVD, Coquille, OR 97423* | | | **(541) 396-2163** |
| Place of Employment/School/Address | | Occupation | | Business Phone    Ext. |
| *Coquille High School /Coquille, OR 97423* | | *Principal* | | **(541) 396-2163** |

| Height | Weight | Build | Hair | Eyes | Descriptors |
|---|---|---|---|---|---|

| Driver's License | State | Social Security No. | Other I.D. |
|---|---|---|---|

| Code | Name: Last, First, Middle | Sex | Race/Ethnicity | Date of Birth/Age |
|---|---|---|---|---|
| *O-17* | **Pflaum, Tim** | | | |
| Confidentiality | Address: Street, City, State, ZIP | | | Home Phone    Ext. |
| | *499 W Central BLVD, Coquille, OR 97423* | | | **(541) 396-2163** |
| Place of Employment/School/Address | | Occupation | | Business Phone    Ext. |
| *Coquille High School /Coquille, OR 97423* | | *Principal* | | **(541) 396-2163** |

```
┌─────────────────┐
│     EXHIBIT      │
│        2         │
└─────────────────┘
```

| I.D. No./Name of Reporting Officer | Prep Date/Time | Approval | Date/Time | |
|---|---|---|---|---|
| *601 Reaves, Michael W.* | 07/02/2000 13:24 | Reaves, Michael W. | 07/05/200007:14 | File |

RECORD 003833    DISTRIBUTION DATE    BY    003833     Supervisor    003833

003834                          003834                          003834

**SUPPLEMENTAL REPORT CONTINUED**                                    Page  **2**

| AGENCY: **Coquille Police Department** | Incident Classification **Missing Person** | Incident No. **00001905** |
|---|---|---|

| Height | Weight | Build | Hair | Eyes | Descriptors | | |
|---|---|---|---|---|---|---|---|

| Driver's License | | State | Social Security No. | Other I.D. | |
|---|---|---|---|---|---|

| Code **O-18** | Name: Last, First, Middle **Murphy, Jimmie Dale** | | Sex **M** | Race/Ethnicity **White/Cauca** | Date of Birth/Age **01/12/1947  53** |
|---|---|---|---|---|---|
| Confidentiality | Address: Street, City, State, ZIP **351 W 5th ST, Coquille, OR 97423** | | | | Home Phone          Ext. |
| Place of Employment/School/Address | | | Occupation | | Business Phone          Ext. |

**Suspects**

| Code **M-1** | Name: Last, First, Middle **Freeman, Leah** | | Sex **F** | Race/Ethnicity **White/Cauca** | Date of Birth/Age **10/29/1984  15** |
|---|---|---|---|---|---|
| Confidentiality | Address: Street, City, State, ZIP **1173 N Knott, Coquille, OR 97423** | | | | Home Phone          Ext. |
| Place of Employment/School/Address **Coquille High School /Coquille, OR 97423** | | | Occupation | | Business Phone          Ext. **(541) 396-2163** |

| Height **5'02"** | Weight **105** | Build | Hair **Blond** | Eyes **Green** | Descriptors | | |
|---|---|---|---|---|---|---|---|

| Driver's License | | State | Social Security No. | Other I.D. | |
|---|---|---|---|---|---|

| Hair Length **Short** | Hair Type | Hair Style | Facial Hair | Facial Shape | Teeth **Braces** |
|---|---|---|---|---|---|
| Appearance | Complexion | Facial Features | Distinctive Features | Glasses | R/L Handed |
| | | | | Speech | |

| Tattoos |
|---|

| Clothing |
|---|

**Narrative**

On 06/29/00, at approximately 1100 hours, I was in Coquille P.D.'s dispatch center when Cory Courtright arrived with additional information on her missing daughter.  She made a missing person report earlier in the morning.

Ms. Courtright was visibly upset, to the point of tears.  She told me her daughter, Leah Freeman, left a friend's house, walking, and never arrived home.  Leah was last seen at approximately 2100 hours on 06/28/00.  Ms. Courtright and friends have been looking for her since early morning on 06/29/00.

She described Leah as a "good" kid, no problems at home and very stable.  She has never run away and isn't the type to run away.

Dispatcher Barb Thurman took the missing person report.  She said soon after Ms. Courtright made the initial report, Ashley Hutchinson called the police department looking for Ms. Courtright.  Ashley said she saw Leah on 06/28/00, around 2100 hours, walking in front of McKay's Market on N. Central Blvd.

Ms. Courtright provided a picture of Leah and said she and friends were going to continue to search.

At 1430 hours, Officer Dave Hall and I began a cursory search of the area where Leah was last seen.  Officer Hall said he was just on Central and thought he saw a young female, who fit Leah's description, walking with a young man on

003834                          003834                          003834

**CONTINUED NEXT PAGE**

003835                    003835                    003835    5

**SUPPLEMENTAL REPORT CONTINUED**                    Page **3**

| AGENCY: **Coquille Police Department** | Incident Classification **Missing Person** | Incident No. **00001905** |

Central near Hunter's.

We went to the area, but couldn't locate the two people. We went to Ms. Courtright's home, where Officer Hall asked about Leah's shirt. The girl he saw had a tank top with colored stripes across the chest. He was advised Leah owned a shirt like the one he described, and the boy fit the description of a stock boy at McKay's.

We went to McKay's, where Officer Hall interviewed the manager and the stock boy's aunt. I patrolled the area and located two people who fit Hall's description, on Alder St, behind the Oregon Federal Credit Union. The girl was not Leah Freeman.

I brought Officer Hall to the area and he verified the two people were the ones he saw, but now recognized the female was not Leah Freeman.

We returned to Coquille P.D. and contacted Officer Dave Zavala. I asked him to interview Cory Courtright and obtain a list of people who saw Leah on 06/28/00. I also asked him to interview Cherie and Peggy Mitchell at 444 1/2 N. Elm.

Officer Hall and I continued searching areas in Coquille frequented by teenagers until 1730 hours.

Between 1800 and 1900 hours, I walked the area between W. 4th St and Coquille High School on N. Central, checking the area just off the road. There was nothing unusual in the area.

On 06/30/00, at 0700 hours, I noted a report by Officer Zavala on a disturbance between Bill Middleton and Nick McGuffin. (Refer to case 00-1911). I advised Officer Hall of the report and asked him to contact Cory Courtright, to determine further developments, and contact Officer Zavala to obtain the results of his investigation.

At 0800, I received a telephone call from Ms. Courtright. She remembered that Leah and Nick visited Brent Bartley's grandparent's (Neil and Dorothy Haga) home at the very end of Fir Street (Dean Minard Rd). She thought we could check to see if Leah might be there.

Officer Hall followed up on information he received from Ms. Courtright. At approximately 0940 hours, Officer Hall and I went to the Haga residence. We rang the door bell, but received no response. We checked the area around the house and found a man's white tank top t-shirt by a trash compactor near a utility room door. The rear deck of the house had several empty beer cans and a funnel (with hose attached) on it. The house was secure and the curtains were drawn on all window's and doors except the living room sliding door.

From the Haga residence, we went to speak to Cory Courtright to establish a chronology of events for 06/28/00. She related the following:

**Leah and Nick (McGuffin) were at the residence most of the day. They spent a portion of the time washing Nick's car and cleaning the car windows. Leah was happy and laughing. She appeared untroubled.**

**Sometime around 1600 hours, Leah and Nick left. Leah said she was going to Cherie's at 1900 hours for a couple of hours.**

**At 2015 hours, she received a call from Nick, asking if Leah was home. He said he arrived at Cherie's house at 2108 hours, but Leah was gone. He looked for her up and around Central, but couldn't find her. Nick said he would continue to look for her.**

**She (Cory) went to bed, awoke at 0300 hours, and found that Leah wasn't home. She stayed awake, thinking Leah might come in. At 0800 she called Nick's home. At that point, they began looking for Leah.**

**She said Nick told her he came by at 0200 and thought he saw a TV light on in Leah's room. He was unable to get anyone's attention (called to Ms. Courtright, threw rocks at Leah's window), so he went home.**

We left Ms. Courtright and went to Coquille High School, where we contacted Tim Pflaum and Carl Wilson. I asked about yearbook picture proofs. Mr. Pflaum said the High School didn't keep the proofs, but he would contact the photographer to see if he had one.

Officer Hall and I returned to the office to organize our data and plan for the afternoon. Officer Hall called Nick

5

003835                    003835                    003835

CONTINUED NEXT PAGE

003836                              003836                              003836

| SUPPLEMENTAL REPORT CONTINUED | | Page  **4** |
| --- | --- | --- |
| AGENCY: **Coquille Police Department** | Incident Classification<br>*Missing Person* | Incident No.<br>**00001905** |

McGuffin and made an appointment to take his statement at 1330 hours.

At 1330 hours, Nick McGuffin came to the police department with his mother. He asked about development and if we had a recent photo of Leah. Over the lunch hour, a yearbook proof of Leah was brought to the police department. I showed the photo to Nick. He reacted very strongly at seeing the picture - he became choked up, teary eyed and had difficulty catching his breath. (Note: The reaction seemed too strong, given the situation at this point)

Officer Hall and I interviewed Nick, with his mother present. We went over the situation, then taped his statement.

Nick said he was at Leah's house in the afternoon, they were washing his car. He went into detail about how they cleaned the windows. He indicated they were getting along very well and were happy and laughing.

Between 1400 and 1600 hours, they left and went to Brent Bartley's. They picked up Bartley and went riding around. They went to McGuffin's home, picked up some videos, then went to the Haga residence to watch the videos. They started to watch "Wild Wild West", but Leah thought it was stupid, so they rewound it.

At at 1900 hours, McGuffin and Bartley dropped Leah off at 444 1/2 N. Elm, the Mitchell residence. She asked him to come back at 2100 hours to pick her up, said she wouldn't be long.

At 2105 hours (time approximate), he returned to the Mitchell's to find Leah had already left. Cherie was upset and crying as she and Leah had a misunderstanding. McGuffin went to look for her.

He drove up Central, toward her house, but didn't see her. He continued looking, at different places where they would go, but didn't find her.

At 2215 hours, he returned to Cherie Mitchell's house, to see if Leah had returned or called. He used Cherie's phone to call Cory Courtright. He asked if Leah was home, she wasn't. He continued to look for her.

He called his mom at 2230 hours to see if Leah walked to his house. He drove around until 0200 hours, when he drove by Leah's house. He thought he saw a TV light on in her room. He tried to get Leah's or Cory's attention, but couldn't. He drove home and went to bed. Around 0800 on 062900, Cory called asking about Leah. At that point he started searching again.
(Note: During the interview, McGuffin mentioned that Ray Lewis saw Leah at 2130 hours at Fast Mart)

At 1440 hours, Officer Hall and I returned to the Haga residence to retrieve the tank top we saw on our earlier visit. During our interview with McGuffin, his description of Leah's shirt led us to believe the one at Haga's house might be hers. When we arrived, the shirt was gone and the beer cans on the deck were cleaned up. We found the kitchen sliding glass door was unlocked and open. We checked the house, but it was empty.

We went to the Courtright home to speak to Cory, but she was not home. We checked the supposed Bartley address given to us by McGuffin, but it wasn't accurate.

We rechecked the Haga residence, then went to the police department. Cory Courtright was there and we obtained a better description of Leah's shirt. She also mentioned that her family, particularly her brother, think that McGuffin is involved in Leah's disappearance.

Between 1600 and 1730, I made a press release on the disappearance and briefed Officers Dan Lee and Dave Zavala on the investigation to date.

At 1900, I returned to the office to check information supplied by Officer Dan Lee.

Courtright and her daughters, (Leah and Denise), lived with James Murphy at 351 W 5th St for a time. I spoke to Officer Hall and we began to check varying leads.

At 2000 hours, I met with Murphy at his residence. He said Courtright and her daughters moved out over 7 weeks ago. He witnessed no problems with Leah and thought she was a good kid. He hasn't seen Leah, or any of the others, in awhile.

I left at 2015 hours. I stopped at Cedar and 6th to make notes. Murphy drove by me 5 minutes later.

CONTINUED NEXT PAGE

003837                                          003837                                          003837

**SUPPLEMENTAL REPORT CONTINUED**                                                 Page 5

| AGENCY: **Coquille Police Department** | Incident Classification *Missing Person* | Incident No. **00001905** |

At 2028 hours, I checked Ray Lewis' home, but no one was there.

At 2130 hours, I stopped at Fast Mart and spoke to those present in the parking lot. Most knew Leah, but had no information. All said they would contact me if they saw or heard anything.

I drove around, checking different hangouts until 2200 hours, then cleared for the day.

On 07/01/00, I returned to Coquille PD at 0815 hours to continue working this case. I reviewed reports and follow ups from officers on the swing and midnight shifts. Officer Dave Hall arrived and we began organizing the new information. Several leads, generated by the newspaper article, came in. Officer Hall took the information and began the investigation and verification of the reports.

From 1000 to 1300 hours, I examined reports and wrote my report. At 1300 hours, Officer Hall and I created a time line of Leah's movement from 2100 hours through the last time she was seen on 062800.

We received information from dispatch that she might have been seen at Hwy 42 and W Central Blvd. This was a favorite parking spot for Leah and McGuffin. Officer Hall and I went to the area and walked the parking lot and hillside up to 1/2 mile west of the intersection. We didn't locate anything related to this case.

We returned to the P.D. to plan the evening investigation on the case. I briefed Officer Randy Ulmer on contacts and investigation.

I took the photo of Leah and made several copies of it for distribution to other agencies. At 1200 hours, I was contacted by Patty Peak, a relative of Cory Courtright. She said she spoke to Denny Freeman and Cory about offering a reward for information leading to Leah's location. Ms. Peak informed me she was offering a $5000.00 reward. The information was already placed on posters around Coquille.

Between 1900 and 2100 hours, Officer Ulmer contacted me with information he received during the evening. (See his supplement for detailed descriptions).

On 07/02/00 at 0830 hours, I returned to the office to continue on this case. I reviewed and approved officers Lee and Ulmer's reports from the previous evening.

I contacted "The World" newspaper and gave them information on the reward. I updated the time line chart with new information, and instructed dispatch to send pictures and reports to the county law enforcement agencies. I made several more pictures of Leah to distribute to county law enforcement agencies.

Volunteer Jason Barkley hand carried photos and information to the CCSO, Coos Bay PD, North Bend PD and Bandon PD. I contacted Coos Bay PD and asked them to check Cindy Warner's address (1826 Thomas St, Coos Bay) to check for Leah.

At 1445, I was contacted by "The Sentinel" for updated information and the reward information was passed on.

Officer Shelly Grant notified the National Center for Missing Children about this case and gave them pertinent information. She also updated our LEDS/NCIC broadcast from "Attempt to Locate-Missing Juvenile" to "Endangered Missing Juvenile".

At 1450 hours, I received a phone call from Tim Nottingham, loss prevention at Fred Meyers in Coos Bay. Frances Maguire, the Fred Meyer Western Union Clerk, had contact with a man, identified as Phil Jackson, that made her suspicious. The man has been in several times this week for Western Union money orders. He saw the Leah Freeman reward posters and began talking about the situation. I spoke to Ms. Maguire who said the man became "excited" when he heard about the reward amount. Jackson's address is 735 N Knott St, Coquille, but he gave a Coos Bay phone number (266-5860).

At 1515 hours, Sgt. Lounsbury, Coos Bay P.D., called and said he checked the Warner address on Thomas Street. He contacted Cindy Warner, who allowed a search at her apartment. Ms. Warner was aware of Leah's disappearance. She said she and her daughter Elizabeth haven't seen or heard from Leah. She will contact a police agency if she hears from Leah.

~~END OF SUPPLEMENTAL REPORT~~

003837                                          003837                                          003837

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| NICHOLAS JAMES MCGUFFIN, as an individual and as guardian ad litem, on behalf Of S.M., a minor, | ) Civil No. ) 6:20-cv-01163- ) MK ) |
| Plaintiffs, | ) ) |
| vs. | ) ) ) |
| MARK DANNELS, PAT DOWNING, SUSAN HORMANN, MARY KRINGS, KRIS KARCHER, SHELLY MCINNES, RAYMOND MCNEELY, KIP OSWALD, MICHAEL REAVES, JOHN RIDDLE, SEAN SANBORN, ERIC SCHWENNINGER, RICHARD WALTER, CHRIS WEBLEY, ANTHONY WETMORE, KATHY WILCOX, CRAIG ZANNI, DAVID ZAVALA, JOEL D. SHAPIRO AS ADMINISTRATOR OF THE ESTATE OF DAVID E. HALL, VIDOCQ SOCIETY, CITY OF COQUILLE, CITY OF COOS BAY, and COOS COUNTY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |
| _____ | ) |

DEPOSITION OF MICHAEL REAVES

Taken in behalf of Plaintiffs

April 25, 2022

*   *   *

Exhibit 105  Page 1 of 3 to
State Defendants' Motion for Summary Judgment

Page 53

1    Q.  What's the -- during your time as Chief, and I

2    want to kind of switch over to the Freeman

3    investigation now, what were the criteria for

4    classifying an investigation as a homicide

5    investigation?

6    A.  I don't understand what you're talking about

7    now.

8    Q.  Well, at some point when it started, it was a

9    missing person investigation, right?  And then at some

10   point it became a homicide investigation.  So I'm just

11   wondering, what are the criteria?

12   A.  All right.  It went -- it was a missing person

13   investigation that went to an endangered missing

14   person.  We treated it as a major case after a certain

15   period of time, and then it became a homicide

16   investigation when we found out there was a homicide.

17   Q.  Okay.  So when did you find out there was a

18   homicide?

19   A.  When we found the deceased person.

20   Q.  Okay.  So is that the criteria for classifying

21   something as a homicide, once you have a body?

22   A.  Well, if we knew -- if there was something prior

23   to that, if we had known there was an act that caused a

24   homicide before that, it would've been in homicide at

25   the time we knew of the act.  But not having an act at

Exhibit 105  Page 2 of 3 to
State Defendants' Motion for Summary Judgment

Page 209

```
 1              C E R T I F I C A T E

 2    STATE OF OREGON        )

 3                           ) ss.

 4    COUNTY OF MULTNOMAH     )

 5

 6         I, Amanda K. Fisher, a Certified Shorthand

 7    Reporter, do hereby certify that, pursuant to

 8    stipulation of counsel for the respective parties

 9    hereinbefore set forth, MICHAEL REAVES remotely

10    appeared before me at the time and place set forth in

11    the caption hereof; that at said time and place I

12    reported in Stenotype all testimony adduced and other

13    oral proceedings had in the foregoing matter; that

14    thereafter my notes were reduced to typewriting under

15    my direction; and that the foregoing transcript, pages

16    1 to 208, both inclusive, constitutes a full, true and

17    accurate record of all such testimony adduced and oral

18    proceedings had, and of the whole thereof.

19         Witness my hand and stamp at Portland, Oregon,

20    May 03, 2022.

21

22

23    _____
      AMANDA K. FISHER
24    CSR No. 3229

25
```

Verified Correct Copy of Original 4/29/2016.

FILED

2011 JUL -7 PM 12: 52

COOS COUNTY COURT
COQUILLE, OREGON

1  Robert J. McCrea # 56062
2  Shaun S. McCrea #83282
   McCREA, P.C.
3  1147 High Street
   Eugene, OR 97401-3270
4  (541) 485-1182

5
   Of Attorneys for Defendant McGuffin
6

7  IN THE CIRCUIT COURT OF THE STATE OF OREGON FOR COOS COUNTY

8  THE STATE OF OREGON,              )
9                    Plaintiff,      )    Case no.  10-CR-0782
                                     )
10                                   )
                  vs.                )    STIPULATION OF THE PARTIES
11                                   )
   NICHOLAS JAMES MCGUFFIN,          )
12                                   )
                                     )
13                Defendant.         )

14       Defendant McGuffin by and through his attorneys, Robert J. McCrea and

15  Shaun S. McCrea, and R. Paul Frasier, District Attorney for Coos County, Oregon

16  and Erika E. Soublet, Chief Deputy District Attorney for Coos County, Oregon hereby

17  enter into the following stipulation for purposes of trial in this matter:

18
         1. Evidence seized and thought to be associated with the disappearance and
19
20  death of Leah Freeman was processed and sent to the Oregon State Police

21  Forensic Laboratory during various stages of the investigation under Coquille Police

22  Department case no. 00-1905;

23
         2. Items received at the Oregon State Police Forensic Laboratory (hereinafter
24
25  "OSP Crime Lab") in case no. 00-1905 were processed for analysis by the  OSP

26

McCREA, P C
ATTORNEYS AT LAW
1147 HIGH STREET
EUGENE, OREGON
97401-3270
TELEPHONE 485-1182

Stipulations   - Page 1

- 444 -

111

_Verified Correct Copy of Original 4/29/2016._

Crime Lab pursuant to the standards and practices of the OSP Crime Lab, a

nationally accredited forensic laboratory;

3. That Mary Krings, a forensic scientist who was qualified and accredited to

perform DNA analysis, performed DNA analysis on various items seized in case no.

00-1905.  Subject to the State establishing by a qualified witness a foundation for

seizure of each item and establishing by a qualified witness the chain-of-custody of

that item, the parties stipulate to the contents and conclusions of Ms. Krings' reports

dated August 27, 2000, September 6, 2000, December 9, 2001, January 21, 2002

*if otherwise relevant and admissible* Sm.

and April 17, 2002, attached and incorporated herein.

4. On March 29, 2001 the Chorley Laboratory in Euxton England received Ms.

Freeman's right and left Nike shoes, her jeans, sports bra and white top from Kris

Karcher as a representative for Coos County.  The items were to be examined for

the presence of semen "and any other apparent significant scientific evidence which

could assist in establishing the possible identity" of any assailant "and the

circumstance surrounding" Ms. Freeman's death.

Dr. Phillip John Seaman, a forensic Scientist with the Forensic Science

Service at Chorley Laboratory, Euxton, England analyzed the foregoing items and

wrote a report dated October 3, 2001.  The parties stipulate to the contents and

conclusions of Dr. Seaman's written report, pages 001499-001502, attached and

incorporated herein.

5. On July 17 2009 Coos County sent specific items of evidence from Leah

Freeman's clothing, on February 10 2010 Coos County sent various items seized

McCREA, P C
ATTORNEYS AT LAW
1147 HIGH STREET
EUGENE, OREGON
97401-3270
TELEPHONE 485-1182

Stipulations   - Page 2

- 445 -

_Verified Correct Copy of Original 4/29/2016._

1   from Nick McGuffin's mustang and on May 24 2010 Coos County sent the clothing

2   and shoes Leah Freeman's was wearing when she was found, to Microtrace LLC a

3   forensic consulting laboratory located in Elgin, Illinois.

4

5       Microtrace is a private independent laboratory specializing in the

6   characterization and identification of single, small particles and small quantities of

7   unknown materials. Microtrace uses a combination of modern and traditional

8   microscopical and microchemical techniques and its' expertise is in analytical

9   microscopy and microchemistry.

10

11      The parties stipulate to the Microtrace report dated March 15 2011 with the

12  **exception of** the hearsay statement on page 2 of that report (discovery page 7534)

13  "Telephone conversations with Kris Karcher indicated that the foam and the fibrous

14  material in the trunk were deposited after the incident, as the trunk was reported to

15  be spotless when the first search warrant was issued. Because of this…"

16

17      The parties stipulate to the Microtrace report dated April 6 2011 which is

18  attached hereto and incorporated herein, as well as to the photograph of the paint

19  particles (discovery page 7609).

20      ///

21      ///

22      ///

23      ///

24      ///

25      ///

26

McCREA, P C
ATTORNEYS AT LAW
1147 HIGH STREET
EUGENE, OREGON
97401-3270
TELEPHONE 485-1182

Stipulations   - Page 3

_ Verified Correct Copy of Original 4/29/2016._

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

    6. If called to testify, Mary Krings, Dr. Phillip Seaman, Jason Beckert and/or

Skip Palenik would testify consistently with the conclusions contained in their

respective reports.

    DATED this 7th day of ~~June~~ July 2011.

_____
R. Paul Frasier OSB #84223
District Attorney for Coos County

_____
Erika E. Soublet OSB #981057
Chief Deputy District Attorney for Coos County

_____
Robert J. McCrea OSB #560624
Attorney for Nick McGuffin

_____
Shaun S. McCrea OSB #832826
Attorney for Nick McGuffin

McCREA, P C
ATTORNEYS AT LAW
1147 HIGH STREET
EUGENE, OREGON
97401-3270
TELEPHONE 485-1182

Stipulations   - Page 4



003006    003006    003006

**Department of State Police**
**Forensic Laboratory**
1111 S.W. 2nd Avenue, 12th Floor
Portland, OR 97204-3258
(503) 229-5017
FAX (503) 229-6638

John A. Kitzhaber, M.D., Governor

August 27, 2000

*/5*

Coquille Police Department
99 E. 2nd Street
Coquille, Oregon 97423

**Attention: David Hall**

FREEMAN, LEAH (VICTIM)
Agency Case 00-1905
Lab No. 00N-481

Please refer to previous report(s) by Kathy Wilcox.

**SUMMARY:   The tennis shoes and blood on the shoes match Leah Freeman.  Leah Freeman is excluded as the contributor of the major profile in the mixture from Exhibit #11 (white sock). Leah Freeman is excluded as the contributor of the profile from Exhibit #12 (Adidas sock).**

On July 18, 2000, this laboratory received sealed from the Coos Bay Laboratory via UPS the following:

Exhibit 1:      One Nike tennis shoe, right.  Cuttings were taken and labeled 1.1-1.3.
Exhibit 2:      One Nike tennis shoe, left.  Cuttings were taken and labeled 2.2-2.4.
    Exhibit 2.1.1-2.2.6:   Swabs from blood on left shoe sole.   DNA analysis was performed on Exhibits 2.1.2 and 2.1.4.
Exhibit 4:      Toothbrush from Leah Freeman used as secondary standard.

On July 25, 2000, this laboratory received sealed from the Coos Bay Laboratory via UPS the following:

Exhibit 9:      Oral standard from Corliss Courtright.
Exhibit 10:     Oral standard from Dennis Freeman.

On August 3, 2000, this laboratory received sealed from the Coos Bay Laboratory via UPS the following:

Exhibit 11:     One white sock.  Cuttings were taken and labeled 11.1 and 11.2.

On August 16, 2000, this laboratory received sealed via Danny Burgard the following:

Exhibit 12:     One Adidas anklet sock.  Cuttings were taken and labeled 12.1-12.3.   DNA analysis was performed on Exhibit 12.3.   Trace evidence was collected, but not examined at this time.

Verified Correct Copy of Original 4/29/2016.

Exhibit 107  Page 5 of 37 to
State Defendants' Motion for Summary Judgment

003007                               003007                              003007

Agency Case No. 00-1905
Lab No. 00N-481
August 27, 2000
Page 2

DNA from the above items was extracted, amplified and typed at the amelogenin locus and the STR
loci listed below by capillary electrophoresis, using the AmpFISTR Profiler Plus and COfiler PCR
amplification kits:

| Profiler Loci | COfiler Loci |
|---------------|--------------|
| D3S1358 | D3S1358 |
| vWA | D7S820 |
| FGA | D16S539 |
| D8S1179 | TH01 |
| D21S11 | TPOX |
| D18S51 | CSF1PO |
| D5S818 | |
| D13S317 | |
| D7S820 | |

**CONCLUSIONS:**

1.     The DNA profile from Exhibit 1 (right Nike shoe) and Exhibit 2.1.2 (swab from blood on left
sole) matches the DNA profile from Leah Freeman (Exhibit 4).  The frequency of occurrence of an
unrelated individual in a random population exhibiting this STR profile is less than 1 in 10 billion in
Caucasians, Hispanics and African-Americans.

2.     The DNA profile from Leah Freeman's toothbrush is consistent with coming from a child of
Corliss Courtright (Exhibit 9) and Dennis Freeman (Exhibit 10).

3.     The DNA profiles from Exhibit 2.3 (left Nike shoe) indicate the presence of DNA from more
than one person.  The major profile is consistent with coming from Leah Freeman.  The minor profile
is from a male.

4.     The DNA profiles from Exhibit 11 (white sock) indicates the presence of DNA from more than
one person.  Leah Freeman is excluded as the contributor of the major profile in this mixture.  The
minor profile is below the threshold for making a conclusive determination.

5.     Leah Freeman is excluded as the contributor to the DNA profile from Exhibit 12.3 (Adidas
sock).  The profile is from a male.  This profile has been compared to profiles stored in the Oregon
State Police databases.  No matches were found at this time.  This profile will be stored and
periodically compared to said databases, as new samples continue to be received.  Should a future
match be found, you will be notified at that time.

The population frequencies are calculated from the allele frequencies found in the FBI STR databases
published in the Journal of Forensic Sciences (JFSCAS 44(6)(1999)).

003007                               003007                              003007

– 449 –

Verified Correct Copy of Original 4/29/2016.

003008                          003008                          003008

Verified Correct Copy of Original 4/29/2016

Agency Case No. 00-1905
Lab No. 00N-481
August 27, 2000
Page 3

Evidence will be returned at the earliest convenience.

Mary H. Krings, Forensic Scientist
5931-90

MHK:mhk

cc: Coos County District Attorney
    OSP Forensic Laboratory, Coos Bay

This is certified to be a true copy of
the original report prepared by the
undersigned.

By _____
    003008

003008                          003008

– 450 ~



003009                                                              003009  /8

# Oregon

John A. Kitzhaber, M.D., Governor

**Department of State Police**
**Forensic Laboratory**
1111 S.W. 2nd Avenue, 12th Floor
Portland, OR 97204-3258
(503) 229-5017
FAX (503) 229-6638

September 6, 2000

Coquille Police Department
99 E. 2nd Street
Coquille, Oregon 97423

**Attention: David Hall**

FREEMAN, LEAH (VICTIM)
McGuffin, Nick (suspect)
Agency Case 00-1905
Lab No. 00N-481

Please refer to the previous report by the undersigned dated August 27, 2000.

**SUMMARY:   Nick McGuffin is excluded as the source of the DNA profile from Exhibit 12 (white Adidas sock).   McGuffin cannot be excluded as a source of the DNA mixture from Exhibit 11 (white sock).**

On August 23, 2000, this laboratory received sealed via UPS the following:

Exhibit 13:     Oral standards from Nick McGuffin.

DNA from the above items was extracted, amplified and typed at the amelogenin locus and the STR loci listed below by capillary electrophoresis, using the AmpFlSTR Profiler Plus amplification kit:

| Profiler Loci | |
|---|---|
| D3S1358 | D18S51 |
| vWA | D5S818 |
| FGA | D13S317 |
| D8S1179 | D7S820 |
| D21S11 | |

**CONCLUSIONS:**

1.     Nick McGuffin's DNA profile does not match the DNA profile previously obtained from the white Adidas sock (Exhibit 12).

2.     Nick McGuffin could not be eliminated as a source of the mixture previously obtained from Exhibit 11 (white sock).

003009                          003009                          003009

– 451 –

Verified Correct Copy of Original 4/29/2916.

003010                           003010                                003010 19

Agency Case No. Coquille PD
Lab No. 00N-481
September 6, 2000
Page 2

Evidence will be returned at the earliest convenience.

Mary H. Krings, Forensic Scientist
5931-90

MHK:mhk

cc: Coos County District Attorney
    OSP Forensic Laboratory, Coos Bay

Verified Correct Copy of Original 4/29/2016.



This is certified to be a true copy of
the original report prepared by the
undersigned.
By _____
   003010

003010                                003010

-452-

003011                  003011      20



## Oregon

John A. Kitzhaber, M.D., Governor

**Department of State Police**
**Forensic Laboratory**
1111 S.W. 2nd Avenue, 12th Floor
Portland, OR 97204-3258
(503) 229-5017
FAX (503) 229-6638

December 9, 2001

Coquille Police Department
99 E. 2nd Street
Coquille, Oregon 97423

**Attention: David Hall**

Freeman, Leah (victim)
Shamblin, Elzie S. (mentioned)
Agency Case 00-1905
Lab No. 00N-481

Please refer to the previous reports regarding this case.

On November 5, 2001, this laboratory received the following sealed evidence via UPS from the OSP Forensic Laboratory, Coos Bay:

      Exhibit 45:     Oral standard from Elzie Shamblin.
      Exhibit 46:     Oral standard from Elzie Shamblin. Not examined.

DNA from the above items was extracted, amplified and typed at the amelogenin locus and the STR loci listed below by capillary electrophoresis, using the AmpFlSTR Profiler Plus PCR amplification kit:

                  **Profiler Loci**
             D3S1358       D18S51
             vWA           D5S818
             FGA           D13S317
             D8S1179       D7S820
             D21S11

**Conclusion:**

Elzie Shamblin is excluded as the contributor of the DNA profiles detected on previously analyzed Exhibit 2.3 (shoe), Exhibit 11 (white sock), and Exhibit 12.3 (adidas sock).

Evidence will be returned at the earliest convenience.

Mary H Krings, Forensic Scientist
5931-90

MHK:mhk

cc: Coos County District Attorney
     OSP Forensic Laboratory, Coos Bay
     Coos County Sheriff's Office, Craig Zanni (agency case no. 20-10627)



This is certified to be a true copy of
the original report prepared by the
003011 undersigned.          003011              003011
     By _____

Verified Correct Copy of Original 4/29/2016.

-453-

Verified Correct Copy of Original 4/29/2016



003012                                    003012                                    0030___

**Oregon**

John A. Kitzhaber, M.D., Governor

**Department of State Police**
**Forensic Laboratory**
1111 S.W. 2nd Avenue, 12th Floor
Portland, OR 97204-3258
(503) 229-5017
FAX (503) 229-6638

January 21, 2002

Coquille Police Department
99 E. 2nd Street
Coquille, Oregon 97423

**Attention: David Hall**

Freeman, Leah (victim)
Oswald, Kip (mentioned)
Agency Case 00-1905
Lab No. 00N-481

Please refer to the previous reports regarding this case.

On January 8, 2002, this laboratory received the following sealed evidence via UPS from the Coos Bay Laboratory:

Exhibit 47:    Oral standard from Kip Oswald.

DNA from the above item was extracted, amplified and typed at the amelogenin locus and the STR loci listed below by capillary electrophoresis, using the AmpFlSTR Profiler Plus PCR amplification kit:

| Profiler Loci | |
|---------|---------|
| D3S1358 | D18S51 |
| vWA | D5S818 |
| FGA | D13S317 |
| D8S1179 | D7S820 |
| D21S11 | |

**Conclusions:**

The DNA profile of Kip Oswald is consistent with the minor profile in the previously analyzed Exhibit 2.3 (left Nike shoe). Kip Oswald is excluded as a contributor to the previously analyzed Exhibit 11 (white sock) and Exhibit 12 (Adidas sock).

003012                        003012                        003012

-454-

003013                    003013                    003013

22

Agency Case No. 00-1905
Lab No. 00N-481
January 21, 2002
Page 2


Evidence will be returned at the earliest convenience.


Mary H Krings, Forensic Scientist
5931-90

MHK:mhk

cc:  Coos County District Attorney
     OSP Forensic Laboratory, Coos Bay

This is certified to be a true copy of
the original report prepared by the
undersigned.

By _____

003013                    003013                    003013

Verified Correct Copy of Original 4/29/2916



003015                                                003015                                    24
                                                                                            003015

# Oregon

John A. Kitzhaber, M.D., Governor

**Department of State Police**
**Forensic Laboratory**
1111 S.W. 2nd Avenue, 12th Floor
Portland, OR 97204-3258
(503) 229-5017
FAX (503) 229-6638

April 17, 2002

Coquille Police Department
99 E. 2nd Street
Coquille, OR  97423

**Attention:  Ray Nichols**

FREEMAN, LEAH (victim)
Sero, William R. (mentioned)
Agency Case 00-1905
Lab No. 00N-000481

Please refer to the previous reports regarding this case.

On March 8, 2002, this laboratory received the following sealed evidence via UPS from the Coos Bay laboratory:

      Exhibit 48:    Oral standard from William Sero.

On April 4, 2002, this laboratory received the following sealed evidence via UPS from the Coos Bay laboratory:

      Exhibit 51:    One purple nitrile glove.  Swabs were collected from the inside and outside of the glove.

DNA from the above items was extracted, amplified and typed at the amelogenin locus and the STR loci listed below by capillary electrophoresis, using the AmpFISTR Profiler Plus PCR amplification kit:

              **Profiler Loci**
              D3S1358    D18S51
              vWA         D5S818
              FGA         D13S317
              D8S1179    D7S820
              D21S11

**Conclusions:**

1.    William Sero is excluded as a contributor of the DNA profiles detected on the previously examined Exhibit 2.3 (shoe), Exhibit 11 (white sock), and Exhibit 12.3 (adidas sock).

2.    No DNA was detected on Exhibit 51 (purple glove).

003015                                                003015                                    003015

- 456 -

Verified Correct Copy of Original 4/29/2016

003016                          003016                              003016

25

Verified Correct Copy of Original 4/29/2416.

Agency Case No. 00-1905
Lab No. 00N-000481
April 17, 2002
Page 2

Evidence will be returned at the earliest convenience.

Mary H Krings, Forensic Scientist
5931-90

MHK:mhk

cc:  Coos County District Attorney
     OSP Forensic Laboratory, Coos Bay
     Coos County Sheriff's Office - Craig Zanni

This is certified to be a true copy of
the original report prepared by the
undersigned.

By

003016                          003016                              003016

– 457 –



Verified Correct Copy of Original 4/29/2016

001499                    001499                    001499

**CHORLEY LABORATORY**

**LAB REF   L/01/38/B/1/IMB**

## RESULTS OF LABORATORY EXAMINATIONS

**Right Shoe  EX1  OON-481**

No blood staining was found on this shoe. Other than wear and tear type damage to the shoe there were no signs that the shoe had been recently damaged or scuffed whilst being dragged across the ground.

**Left Shoe  EX2  OON-481**

Traces of blood were found on the underside, towards the inner aspect. An area of diffuse blood staining was found on the lace, approximately 40 centimeters from one end. Areas had been cut from the back of the tongue and ankle, presumably for other tests prior to my examination. In the absence of any DNA profiling results I am unable to assess whether or not any of the remaining blood should be tested further.

The left shoe smells of decay and degradation, in a similar manner to the clothing, whereas the right shoe does not.

It was noted that the linings of both shoes bear several pils of red fibres. Such extraneous fibres could be matched with socks worn with the shoes.

**Clothing**

The clothing was found to be in a much worse condition than envisaged

Signature ..............................................
Page No. 4

001499                    001499                    001499

-458-

_Verified Correct Copy of Original 4/29/2016._

001500                          001500                          001500



**CHORLEY
LABORATORY**

LAB REF   L/01/38/B/1/IMB

looking at photographs of the deceased where she was found. The garments had an extensive covering of decayed body tissue and fats on the inner surfaces. Some of this had transferred to outer areas possibly due to their having been packaged.

Loose extraneous surface fibres and debris have been  recovered from those less contaminated areas on the jeans, vest and bra, however the tapings have not been examined further.

No semen has been found on the vest or bra.

The jeans were tested for semen and none found. This was achieved by using our usual chemical screening method to indicate possible semen followed by extraction of selected areas and preparation of a stained microscope slide to identify sperm. Whilst no semen was found, I cannot exclude the possibility that there may be azospermic semen present, ie semen from a vasectomised male, but I am reasonably sure that there are no sperm on the jeans.

On receipt at the laboratory examination of the jeans indicated the presence of two 'holes' in the seat/crotch area. This damage was presumably present when the body was recovered and not created during laboratory examinations.

Signature ....................................

Page No. 5

001500                          001500                          001500

Verified Correct Copy of Original 4/29/2016

001501                    001501                    001501



**CHORLEY LABORATORY**

**LAB REF   L/01/38/B/1/IMB**

Swabs were taken from the button and zip pull of the jeans fastener, however, these areas were not void of other staining found on the garment and hence may not be suitable for Low Copy Number DNA profiling. These swabs have been retained for return with the other case exhibits.

No specific area of blood staining was found on the garments probably due to the extensive body tissue staining on them. Two areas of more concentrated blood staining were found on the lower back of the vest, but there is nothing to indicate that this has resulted from a specific injury other than decomposition of the body.

Damage to the jeans and vest/bra is consistent with chemical effect on fabrics of body tissue/fats and chemicals leaching from the body over a period of time. Other smaller areas of damage may be rodent bite marks. Areas on the straps and upper back of the vest/ bra indicate the presence of broken elastic threads in the shoulder straps. I am unable to assess whether or not this damage has resulted from contact with a sharp edge or a result of from another mechanism such as rodent action.

Damage to the back of the upper garments whilst not overlapping, could be considered to have occurred whilst the garments were worn together, allowing for some movement between the layers of garments. However,

Signature ..............................................

Page No. 6

001501                    001501                    001501

- 460 -

Verified Correct Copy of Original 4/29/2016

001502            001502            001502



**CHORLEY
LABORATORY**

LAB REF   L/01/38/B/1/IMB

with the exception of a cut in the hem of the top, there is nothing to indicate how or when the damage was made. The possibility that Leah was stabbed cannot be eliminated, however, any 'stab' cuts are no longer recognisable due to the decay in the fabrics.

**Summary and Conclusion**

1)  There is nothing to indicate the presence of semen on the items examined.

2)  There is no specific pattern in blood to indicate trauma such as a stabbing assault, although such a possibility cannot be discounted.

3)  Tapings and swabbings will be retained at laboratory in connection with this case.

4)  The overall findings provide no additional scientific evidence to assist in addressing the issue as to the cause of LEAH FREEMAN's death or the identity of her assailant.

Signature ...................................................

Page No. 7

001502            001502            001502

— 461 —

Microtrace llc      microscopy • microchemistry • forensic consulting

Verified Correct Copy of Original 4/29/2016

15 Mar 2011

Lt. Patrick D. Smith
Coquille Police Department
851 North Central Blvd.
Coquille, Oregon 97423

*Re: Status Report - Leah Freeman Homicide Investigation*

Dear Lt. Smith,

This status report describes the analyses we have conducted to date regarding the above referenced case.

**Samples:**

Three waves of evidence were received by our laboratory:

Wave 1 – received 17 July 2009
- Exhibit 26 – tape lift from shirt
- Exhibit 27 – two tape lifts from pants

Wave 2 – received 10 Feb 2010
- Item # 3224 – foam from inside trunk latch
- Item # 3225 – fiber material from trunk
- Item # 3226 – carpet from back window
- Item # 3231 – four tape lifts from trunk
- Item # 3233 – vacuum filters from trunk (two filters) and back seat (one filter)

Wave 3 – received 24 May 2010
- Item # 212 – blue jean pants
- Item # 213 – tank top shirt
- Item # 214 – sports bra
- Item # 160 – Nike shoe (also listed as # 215)
- Item # 170 – Nike shoe (also listed as # 216)

006976
MT09-0075

006976

006976
Page 2

**Analysis:**

As with the arrival of the evidence, our examination can be divided into three waves:

*Wave 1*
The three tapelifts, one from the shirt (Ex. 26) and two from the pants (Ex. 27), were examined for the presence of trace evidence. Various particles of debris, including numerous fibers and hairs, both animal and human, were observed on the tape lifts. Nine human hairs (coded 4A, 17C, 19A, 19C, 20D #1, 20D #2, 23D, 28B #1, and 28B #2) from the shirt tape lift were isolated, placed on individual slides, and returned to Kris Karcher, on 28 January 2010, for DNA analysis.

*Wave 2*
Preliminary examinations were conducted on the foam from the trunk (# 3224), the fibrous material from the trunk (# 3225), and the carpet from the back window (#3226). The carpet from the back window appears to be residential in origin and therefore, did not originate from the vehicle.

our examination primarily focused on the tapelifts (# 3231) and the vacuum samples (# 3233) from the trunk and back seat of the vehicle.

Various particles of debris, including numerous fibers and hairs, both animal and human, were observed on the tape lifts and the material from the vacuum samples. Two human hairs (coded trunk #1 and trunk #2) were isolated from the trunk vacuum samples, placed on individual slides, and returned to Kris Karcher, on 17 March 2010, for DNA analysis. Subsequently, an additional, very short (~4mm) human hair fragment was recovered from the vacuum sample from the trunk.

*Wave 3*
Five items of clothing, a pair of jeans (# 212), a tank top (# 213), a sports bra (# 214), and two shoes (# 160 and # 170) were examined for the presence of trace evidence, particularly any potential paint particles. Most of the fabric from the jeans, the tank top and the sports bra, were infiltrated with decomposition products which hampered the examination of their surfaces for the detection of trace evidence.

A gray/tan paint particle was recovered from the front of the tank top. The analysis of this paint and comparisons to known paint samples (yet to be received by our laboratory) will be the subject of a subsequent report.

Other materials, including hairs and other particles, were recovered from these five items. No additional analyses have been requested at this point in time regarding these materials.

Microtrace

006976

006976

006976
755

Verified Correct Copy of Original 4/29/2016.

MT09-0075

If you have any questions concerning this report or if we may be of further assistance, please do not hesitate to contact either of us directly. Thank you for consulting Microtrace.

Sincerely,

Jason Beckert
Research Microscopist

Skip Palenik
Senior Research Microscopist

Verified Correct Copy of Original 4/29/2016

7535

Microtrace ᴸᴸᶜ

– 464 –

**Microtrace** LLC                                        microscopy • microchemistry • forensic consulting                                      ®

Verified Correct Copy of Original 4/29/2016.

06 April 2011

Lt. Patrick D. Smith
Coquille Police Department
851 North Central Blvd.
Coquille, Oregon 97423

*Re: Paint Analysis - Leah Freeman Homicide Investigation*

Dear Lt. Smith,

This report describes the analyses we have conducted regarding the paint particle that we isolated from the tank top (Item #213) (see status report dated 15 Mar 2011).

**Samples:**

In addition to items already in our possession (see status report dated 15 Mar 2011), we received the following additional evidence on 16 Mar 2011:

        RLM 001 – paint sample from Mustang (top of trunk)
        RLM 002 - paint sample from Mustang (bottom of trunk)
        RLM 003 - paint sample from Mustang (side of trunk)
        RLM 004 - paint sample from Mustang (driver side rear panel)
        RLM 005 - paint sample from Mustang (under hood)
        RLM 006 - paint sample from Mustang (pass. side front end)

        PDS 001 - paint sample from KIA (left front fender)
        PDS 002 - paint sample from KIA (left front fender primer)
        PDS 003 - paint sample from KIA (right front bumper)
        PDS 004 - paint sample from KIA (trunk wall/floor)
        PDS 005 - paint sample from KIA (trunk lid)

**Analysis:**

A questioned gray/tan paint particle was isolated during the examination and recovery of trace evidence from the tank top (Item #213) (Figure 1). The particle consists of a single layer. A small subsample of the particle was isolated for further analysis. A portion of this subsample was mounted in 1.66 index of refraction oil for examination using polarized light microscopy (PLM). A high concentration of discrete particles, likely titanium dioxide, can be observed at high magnifications (Figure 2).

7607

- 465 -

Page 2

MT09-0075

Verified Correct Copy of Original 4/29/2016

Another portion of this subsample was prepared for chemical analysis using Fourier transform infrared microspectroscopy (micro-FTIR). Interpretation of the spectrum (Figure 3) indicates that the paint is an alkyd melamine containing titanium dioxide (used as a pigment and/or as a filler).

The eleven known paint samples (RLM 001-006 and PDS 001-005) were examined for the presence of paint similar in color to the questioned gray/tan particle from Item #213. Samples of any paint that resembled the questioned paint particle were isolated analyzed by micro-FTIR. Numerous off-white, gray or tan colored paints were analyzed but none were chemically consistent with the questioned paint particle from Item #213.

**Conclusions:**

The questioned particle of gray/tan paint recovered from Item #213 was determined to be inconsistent with all of the examined paint from the eleven known samples (RLM 001-006 and PDS 001-005).

It should be noted that while automotive paint is a likely possibility for the origin of the questioned paint particle (based on the presence of the melamine catalyst), others such as maintenance paints (*e.g.*, paint used on tools), are possible as well.

If you have any questions concerning this report or if we may be of further assistance, please do not hesitate to contact either of us directly. Thank you for consulting Microtrace.

Sincerely,

Jason Beckert
Research Microscopist

Skip Palenik
Senior Research Microscopist

Microtrace ʟʟᴄ ®

7608

-466-



003321                                    003321

## Oregon
John A. Kitzhaber, M.D., Governor

**Department of State Police**
**Forensic Laboratory**
1111 S.W. 2nd Avenue, 12th Floor
Portland, OR 97204-3258
(503) 229-5017
FAX (503) 229-6638

August 27, 2000



STATE'S
EXHIBIT

Rec
7/13/15    207   10CR0782

Coquille Police Department
99 E. 2nd Street
Coquille, Oregon 97423

**Attention: David Hall**

FREEMAN, LEAH (VICTIM)
Agency Case 00-1905
Lab No. 00N-481

Please refer to previous report(s) by Kathy Wilcox.

**SUMMARY:** The tennis shoes and blood on the shoes match Leah Freeman. Leah Freeman is excluded as the contributor of the major profile in the mixture from Exhibit #11 (white sock). Leah Freeman is excluded as the contributor of the profile from Exhibit #12 (Adidas sock).

On July 18, 2000, this laboratory received sealed from the Coos Bay Laboratory via UPS the following:

Exhibit 1:      One Nike tennis shoe, right. Cuttings were taken and labeled 1.1-1.3.
Exhibit 2:      One Nike tennis shoe, left. Cuttings were taken and labeled 2.2-2.4.
   Exhibit 2.1.1-2.2.6:   Swabs from blood on left shoe sole. DNA analysis was performed on Exhibits 2.1.2 and 2.1.4.
Exhibit 4:      Toothbrush from Leah Freeman used as secondary standard.

On July 25, 2000, this laboratory received sealed from the Coos Bay Laboratory via UPS the following:

Exhibit 9:      Oral standard from Corliss Courtright.
Exhibit 10:    Oral standard from Dennis Freeman.

On August 3, 2000, this laboratory received sealed from the Coos Bay Laboratory via UPS the following:

Exhibit 11:    One white sock. Cuttings were taken and labeled 11.1 and 11.2.

On August 16, 2000, this laboratory received sealed via Danny Burgard the following:

Exhibit 12:    One Adidas anklet sock. Cuttings were taken and labeled 12.1-12.3. DNA analysis was performed on Exhibit 12.3. Trace evidence was collected, but not examined at this time.

003321                              003321                              003321

003322                          003322                        003322

Agency Case No. 00-1905
Lab No. 00N-481
August 27, 2000
Page 2

DNA from the above items was extracted, amplified and typed at the amelogenin locus and the STR loci listed below by capillary electrophoresis, using the AmpFlSTR Profiler Plus and COfiler PCR amplification kits:

| Profiler Loci | COfiler Loci |
|---|---|
| D3S1358 | D3S1358 |
| vWA | D7S820 |
| FGA | D16S539 |
| D8S1179 | TH01 |
| D21S11 | TPOX |
| D18S51 | CSF1PO |
| D5S818 | |
| D13S317 | |
| D7S820 | |

CONCLUSIONS:

1.      The DNA profile from Exhibit 1 (right Nike shoe) and Exhibit 2.1.2 (swab from blood on left sole) matches the DNA profile from Leah Freeman (Exhibit 4).  The frequency of occurrence of an unrelated individual in a random population exhibiting this STR profile is less than 1 in 10 billion in Caucasians, Hispanics and African-Americans.

2.      The DNA profile from Leah Freeman's toothbrush is consistent with coming from a child of Corliss Courtright (Exhibit 9) and Dennis Freeman (Exhibit 10).

3.      The DNA profiles from Exhibit 2.3 (left Nike shoe) indicate the presence of DNA from more than one person.  The major profile is consistent with coming from Leah Freeman.  The minor profile is from a male.

4.      The DNA profiles from Exhibit 11 (white sock) indicates the presence of DNA from more than one person.  Leah Freeman is excluded as the contributor of the major profile in this mixture.  The minor profile is below the threshold for making a conclusive determination.

5.      Leah Freeman is excluded as the contributor to the DNA profile from Exhibit 12.3 (Adidas sock).  The profile is from a male.  This profile has been compared to profiles stored in the Oregon State Police databases.  No matches were found at this time.  This profile will be stored and periodically compared to said databases, as new samples continue to be received.  Should a future match be found, you will be notified at that time.

The population frequencies are calculated from the allele frequencies found in the FBI STR databases published in the Journal of Forensic Sciences (JFSCAS 44(6)(1999)).

003322                          003322                        003322

003323                          003323                          003323
                                                                     3

Agency Case No. 00-1905
Lab No. 00N-481
August 27, 2000
Page 3


Evidence will be returned at the earliest convenience.

*Mary H. Krings*

Mary H. Krings, Forensic Scientist
5931-90

MHK:mhk

cc:  Coos County District Attorney
     OSP Forensic Laboratory, Coos Bay


This is certified to be a true copy of
the original report prepared by the
undersigned.

By *Mary H. Krings*

003323                          003323                          003323



**Department of State Police**
**Forensic Laboratory**
1111 S.W. 2nd Avenue, 12th Floor
Portland, OR 97204-3258
(503) 229-5017
FAX (503) 229-6638

John A. Kitzhaber, M.D., Governor

September 6, 2000

STATE'S
EXHIBIT

*Rec* 208
7/13/11   10CR0782

Coquille Police Department
99 E. 2nd Street
Coquille, Oregon 97423

**Attention: David Hall**

FREEMAN, LEAH (VICTIM)
McGuffin, Nick (suspect)
Agency Case 00-1905
Lab No. 00N-481

Please refer to the previous report by the undersigned dated August 27, 2000.

**SUMMARY:   Nick McGuffin is excluded as the source of the DNA profile from Exhibit 12 (white Adidas sock).  McGuffin cannot be excluded as a source of the DNA mixture from Exhibit 11 (white sock).**

On August 23, 2000, this laboratory received sealed via UPS the following:

Exhibit 13:    Oral standards from Nick McGuffin.

DNA from the above items was extracted, amplified and typed at the amelogenin locus and the STR loci listed below by capillary electrophoresis, using the AmpFlSTR Profiler Plus amplification kit:

| | Profiler Loci | |
|---|---|---|
| D3S1358 | D18S51 | |
| vWA | D5S818 | |
| FGA | D13S317 | |
| D8S1179 | D7S820 | |
| D21S11 | | |

CONCLUSIONS:

1.    Nick McGuffin's DNA profile does not match the DNA profile previously obtained from the white Adidas sock (Exhibit 12).

2.    Nick McGuffin could not be eliminated as a source of the mixture previously obtained from Exhibit 11 (white sock).

003324                         003324                         003324

003325                         003325                         003325 5

Agency Case No. Coquille PD
Lab No. 00N-481
September 6, 2000
Page 2

Evidence will be returned at the earliest convenience.

Mary H. Krings, Forensic Scientist
5931-90

MHK:mhk

cc:  Coos County District Attorney
     OSP Forensic Laboratory, Coos Bay

This is certified to be a true copy of
the original report prepared by the
undersigned.

By

003325                         003325                         003325

003330                    003330                    JAN 2 5 2002  10



# Oregon

John A. Kitzhaber, M.D., Governor



STATE'S
EXHIBIT

*Rec 7/13/15* **210** *10CR0782*

Department of State Police
Forensic Laboratory
1111 S.W. 2nd Avenue, 12th Floor
Portland, OR 97204-3258
(503) 229-5017
FAX (503) 229-6638

January 21, 2002

Coquille Police Department
99 E. 2nd Street
Coquille, Oregon 97423

**Attention: David Hall**

Freeman, Leah (victim)
Oswald, Kip (mentioned)
Agency Case 00-1905
Lab No. 00N-481

Please refer to the previous reports regarding this case.

On January 8, 2002, this laboratory received the following sealed evidence via UPS from the Coos Bay Laboratory:

Exhibit 47:    Oral standard from Kip Oswald.

DNA from the above item was extracted, amplified and typed at the amelogenin locus and the STR loci listed below by capillary electrophoresis, using the AmpFISTR Profiler Plus PCR amplification kit:

**Profiler Loci**

| | |
|---|---|
| D3S1358 | D18S51 |
| vWA | D5S818 |
| FGA | D13S317 |
| D8S1179 | D7S820 |
| D21S11 | |

**Conclusions:**

The DNA profile of Kip Oswald is consistent with the minor profile in the previously analyzed Exhibit 2.3 (left Nike shoe). Kip Oswald is excluded as a contributor to the previously analyzed Exhibit 11 (white sock) and Exhibit 12 (Adidas sock).

003330                    003330                    003330

003331                              003331                              003331

Agency Case No. 00-1905
Lab No. 00N-481
January 21, 2002
Page 2

Evidence will be returned at the earliest convenience.

Mary H Krings, Forensic Scientist
5931-90

MHK:mhk

cc: ✓Coos County District Attorney
      OSP Forensic Laboratory, Coos Bay

This is certified to be a true copy of
the original report prepared by the
undersigned.

By _____

003331                              003331                              003331



001499    001499    001499

**STATE'S EXHIBIT**

Rec 211 10CR0782
7/13/11

LAB REF   L/01/38/B/1/IMB

**CHORLEY LABORATORY**

## RESULTS OF LABORATORY EXAMINATIONS

**Right Shoe   EX1  OON-481**

No blood staining was found on this shoe. Other than wear and tear type damage to the shoe there were no signs that the shoe had been recently damaged or scuffed whilst being dragged across the ground.

**Left Shoe  EX2  OON-481**

Traces of blood were found on the underside, towards the inner aspect. An area of diffuse blood staining was found on the lace, approximately 40 centimeters from one end. Areas had been cut from the back of the tongue and ankle, presumably for other tests prior to my examination. In the absence of any DNA profiling results I am unable to assess whether or not any of the remaining blood should be tested further.

The left shoe smells of decay and degradation, in a similar manner to the clothing, whereas the right shoe does not.

It was noted that the linings of both shoes bear several pils of red fibres. Such extraneous fibres could be matched with socks worn with the shoes.

**Clothing**

The clothing was found to be in a much worse condition than envisaged

Signature ........................................

Page No. 4

001499    001499    001499

001500                                    001500                              001500



**CHORLEY
LABORATORY**

LAB REF   L/01/38/B/1/IMB

looking at photographs of the deceased where she was found. The garments had an extensive covering of decayed body tissue and fats on the inner surfaces. Some of this had transferred to outer areas possibly due to their having been packaged.

Loose extraneous surface fibres and debris have been  recovered from those less contaminated areas on the jeans, vest and bra, however the tapings have not been examined further.

No semen has been found on the vest or bra.

The jeans were tested for semen and none found. This was achieved by using our usual chemical screening method to indicate possible semen followed by extraction of selected areas and preparation of a stained microscope slide to identify sperm. Whilst no semen was found, I cannot exclude the possibility that there may be azospermic semen present, ie semen from a vasectomised male, but I am reasonably sure that there are no sperm on the jeans.

On receipt at the laboratory examination of the jeans indicated the presence of two 'holes' in the seat/crotch area. This damage was presumably present when the body was recovered and not created during laboratory examinations.

Signature .................................................

Page No. 5

001500                                    001500                              001500

001501                    001501                    001501



**CHORLEY
LABORATORY**

LAB REF   L/01/38/B/1/IMB

Swabs were taken from the button and zip pull of the jeans fastener, however, these areas were not void of other staining found on the garment and hence may not be suitable for Low Copy Number DNA profiling. These swabs have been retained for return with the other case exhibits.

No specific area of blood staining was found on the garments probably due to the extensive body tissue staining on them. Two areas of more concentrated blood staining were found on the lower back of the vest, but there is nothing to indicate that this has resulted from a specific injury other than decomposition of the body.

Damage to the jeans and vest/bra is consistent with chemical effect on fabrics of body tissue/fats and chemicals leaching from the body over a period of time. Other smaller areas of damage may be rodent bite marks. Areas on the straps and upper back of the vest/ bra indicate the presence of broken elastic threads in the shoulder straps. I am unable to assess whether or not this damage has resulted from contact with a sharp edge or a result of from another mechanism such as rodent action.

Damage to the back of the upper garments whilst not overlapping, could be considered to have occurred whilst the garments were worn together, allowing for some movement between the layers of garments, However,

Signature ........................................

Page No. 6

001501                    001501                    001501



001502                    001502                        001502

**CHORLEY
LABORATORY**

LAB REF   L/01/38/B/1/IMB

with the exception of a cut in the hem of the top, there is nothing to indicate how or when the damage was made. The possibility that Leah was stabbed cannot be eliminated, however, any 'stab' cuts are no longer recognisable due to the decay in the fabrics.

**Summary and Conclusion**

1) There is nothing to indicate the presence of semen on the items examined.

2) There is no specific pattern in blood to indicate trauma such as a stabbing assault, although such a possibility cannot be discounted.

3) Tapings and swabbings will be retained at laboratory in connection with this case.

4) The overall findings provide no additional scientific evidence to assist in addressing the issue as to the cause of LEAH FREEMAN's death or the identity of her assailant.

Signature ............................................

Page No. 7

001502                    001502                        001502

006975                              006975                                      006975

**Microtrace** LLC                 microscopy • microchemistry • forensic consulting



STATE'S
EXHIBIT

*Rec*
*7/21/11* 212 *10CR0782*

15 Mar 2011

Lt. Patrick D. Smith
Coquille Police Department
851 North Central Blvd.
Coquille, Oregon 97423

*Re: Status Report – Leah Freeman Homicide Investigation*

Dear Lt. Smith,

This status report describes the analyses we have conducted to date regarding the above
referenced case.

**Samples:**

Three waves of evidence were received by our laboratory:

Wave 1 – received 17 July 2009
- Exhibit 26 – tape lift from shirt
- Exhibit 27 – two tape lifts from pants

Wave 2 – received 10 Feb 2010
- Item # 3224 – foam from inside trunk latch
- Item # 3225 – fiber material from trunk
- Item # 3226 – carpet from back window
- Item # 3231 – four tape lifts from trunk
- Item # 3233 – vacuum filters from trunk (two filters) and back seat (one filter)

Wave 3 – received 24 May 2010
- Item # 212 – blue jean pants
- Item # 213 – tank top shirt
- Item # 214 – sports bra
- Item # 160 – Nike shoe (also listed as # 215)
- Item # 170 – Nike shoe (also listed as # 216)

790 Fletcher Drive, Suite 106 • Elgin, IL 60123-4755 • 847.742.9909 • Fax: 847.742.2160
www.microtracescientific.com

*7533*

006975                              006975                                      006975

006976
MT09-0075

006976

006976
Page 2

**Analysis:**

As with the arrival of the evidence, our examination can be divided into three waves:

*Wave 1*
The three tapelifts, one from the shirt (Ex. 26) and two from the pants (Ex. 27), were examined for the presence of trace evidence. Various particles of debris, including numerous fibers and hairs, both animal and human, were observed on the tape lifts. Nine human hairs (coded 4A, 17C, 19A, 19C, 20D #1, 20D #2, 23D, 28B #1, and 28B #2) from the shirt tape lift were isolated, placed on individual slides, and returned to Kris Karcher, on 28 January 2010, for DNA analysis.

*Wave 2*
Preliminary examinations were conducted on the foam from the trunk (# 3224), the fibrous material from the trunk (# 3225), and the carpet from the back window (#3226). The carpet from the back window appears to be residential in origin and therefore, did not originate from the vehicle.

our examination primarily focused on the tapelifts (# 3231) and the vacuum samples (# 3233) from the trunk and back seat of the vehicle.

Various particles of debris, including numerous fibers and hairs, both animal and human, were observed on the tape lifts and the material from the vacuum samples. Two human hairs (coded trunk #1 and trunk #2) were isolated from the trunk vacuum samples, placed on individual slides, and returned to Kris Karcher, on 17 March 2010, for DNA analysis. Subsequently, an additional, very short (~4mm) human hair fragment was recovered from the vacuum sample from the trunk.

*Wave 3*
Five items of clothing, a pair of jeans (# 212), a tank top (# 213), a sports bra (# 214), and two shoes (# 160 and # 170) were examined for the presence of trace evidence, particularly any potential paint particles. Most of the fabric from the jeans, the tank top and the sports bra, were infiltrated with decomposition products which hampered the examination of their surfaces for the detection of trace evidence.

A gray/tan paint particle was recovered from the front of the tank top. The analysis of this paint and comparisons to known paint samples (yet to be received by our laboratory) will be the subject of a subsequent report.

Other materials, including hairs and other particles, were recovered from these five items. No additional analyses have been requested at this point in time regarding these materials.

Microtrace

7534

Exhibit 107  Page 36 of 37 to
State Defendants' Motion for Summary Judgment

006977
MT09-0075

006977

If you have any questions concerning this report or if we may be of further assistance, please do not hesitate to contact either of us directly. Thank you for consulting Microtrace.

Sincerely,

Jason Beckert
Research Microscopist

Skip Palenik
Senior Research Microscopist

7535

Microtrace LLC