DAN RAYFIELD
Attorney General
JESSE B. DAVIS #052290
Senior Assistant Attorney General
TODD MARSHALL #112685
Senior Assistant Attorney General
KRISTEN E. HOFFMEYER #085338
Senior Assistant Attorney General
Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email: jesse.b.davis@doj.oregon.gov
        Todd.Marshall@doj.oregon.gov
        kristen.hoffmeyer@doj.oregon.gov

Of Attorneys for State Defendants Hormann,
Krings, Riddle, Wilcox and Oregon State Police

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| NICHOLAS JAMES MCGUFFIN, as an individual and as guardian *ad litem*, on behalf of S.M., a minor,<br><br>Plaintiffs,<br><br>v.<br><br>MARK DANNELS, PAT DOWNING, SUSAN HORMANN, MARY KRINGS, KRIS KARCHER, SHELLY MCINNES, RAYMOND MCNEELY, KIP OSWALD, MICHAEL REAVES, JOHN RIDDLE, SEAN SANBORN, ERIC SCHWENNINGER, RICHARD WALTER, CHRIS WEBLEY, ANTHONY WETMORE, KATHY WILCOX, CRAIG ZANNI, DAVID ZAVALA, ESTATE OF DAVID E. HALL, VIDOCQ SOCIETY, CITY OF COQUILLE, CITY OF COOS BAY, and COOS COUNTY,<br><br>Defendants. | Case No.  6:20-cv-1163-MTK (Lead Case)<br>       3:21-cv-1719-MTK (Trailing Case)<br><br><br>EXHIBITS 109-120 TO DECLARATION OF JESSE B. DAVIS IN SUPPORT OF STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

Page 1 -   EXHIBITS 109-120 TO DECLARATION OF JESSE B. DAVIS IN SUPPORT OF STATE
          DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
          JBD/ce1/348818260

VIDOCQ SOCIETY,

        Cross-Claimant.

RICHARD WALTER,

        Cross-Claimant.

NICHOLAS JAMES MCGUFFIN, as an individual and as guardian ad litem, on behalf of S.M., a minor,

        Plaintiff,

    v.

OREGON STATE POLICE,

        Defendant.

DATED January 7, 2025.

Respectfully submitted,

DAN RAYFIELD
Attorney General

_s/ Jesse B. Davis_
JESSE B. DAVIS #052290
Senior Assistant Attorney General
TODD MARSHALL #112685
Senior Assistant Attorney General
KRISTEN E. HOFFMEYER #085338
Senior Assistant Attorney General
Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email: jesse.b.davis@doj.oregon.gov
      Todd. marshall@doj.oregon.gov
      Kristen.hoffmeyer@doj.oregon.gov

Of Attorneys for State Defendants Hormann, Krings, Riddle, Wilcox and Oregon State Police

Page 2 -    EXHIBITS 109-120 TO DECLARATION OF JESSE B. DAVIS IN SUPPORT OF STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
JBD/ce1/348818260

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF MALHEUR

NICHOLAS MCGUFFIN , SID # 14504778,     )
                                        )
                          Petitioner,   )   Case No. 15CV1030
                                        )
             vs.                        )
                                        )   GENERAL JUDGMENT
MARK NOOTH, Superintendent, SRCI,       )   (Post-Conviction)
                                        )
                          Defendant.    )

The above-entitled matter came before the court on August 12, 2019 for a Trial on a Petition for Post -Conviction Relief.

NOW, THEREFORE, IT IS HEREBY ORDERED AND ADJUDGED:

PRELIMINARY MATTERS

At Trial, the Defendant objected to various exhibits by the Petitioner.  The Petitioner filed additional argument and requested clarification on the Courts ruling.  Defendant replied.  The Court, having considered the additional argument, makes the following ruling regarding the Exhibits as listed:

    a.  Exhibits 61 (Backman report) and  64 (Microtrace notes) are admitted for the purpose of showing its effect on trial counsel. During trial Exhibit 61 was admitted in Defense Exhibits 103 and 104 and 64 was admitted in Exhibit 103, as attachments to depositions.  This does not constitute an admission of those documents for any and all purposes.

    b.  The Exhibits22, 24, 26, 27, 28, 31, 32, 36, 40, 58, 61, 64, 68, 29, and Exhibit 1 to the Declaration of Amanda Szarkowski were admitted for their effect on Trial Counsel and the Court's ruling remains unchanged.

Page 1 – GENERAL JUDGMENT (Post-Conviction)

c.  The Court reserved ruling on Exhibit 60.  This Exhibit was not properly admitted at trial as a business record and is excluded.

FINDINGS OF FACT (ALL CLAIMS)

Findings of Facts specific to each claim are included in the legal finding below. The court makes the following Findings of Facts:

1.  Petitioner was charged with Murder of Leah Freeman, and found guilty of Manslaughter I, the lessor included offense, after a jury trial in Coos County Circuit Court case 10CR782. He has exhausted his appeals and brings this action for Post-Conviction Relief.

2.  Leah Freeman was Petitioner's fifteen-year old girlfriend. Both she and Petitioner lived in Coquille, Oregon.  She disappeared on June 28, 2000.  Petitioner was eighteen years old at the time Leah Freeman disappeared.  On the night of June 28, after spending most of the day with Ms.  Freeman, Petitioner dropped her off at the home of her friend, Cherie Mitchell, at about 7:00 p.m.  Petitioner was supposed to pick Ms. Freeman up later.  Ms. Freeman had an argument with Ms. Mitchell and left the Mitchell home at about 9:00 p.m., on foot.  Ms. Freeman was seen at various places in Coquille after leaving the Mitchell residence from around 9 to 9:30 p.m.  At about 11:30 p.m., Tony Messerle found Ms. Freeman's right shoe on North Elm Street in Coquille.  Messerle turned the shoe over to police on July 4.  On July 5, a Coos County Deputy Sheriff, Kim Oswald, found Ms. Freeman's left shoe on a remote dirt road approximately ten miles from where the left shoe was found.

3.  Leah Freeman's body was found on August 2, 2000 on an embankment about eight miles outside of Coquille.  The body was in an advanced state of decomposition. The body was found approximately three miles from where the left shoe was found.

4.  Petitioner arrived at the Mitchell residence shortly after 9 a.m. to pick Ms. Freeman up.  She had already left.  At trial, various persons testified they encountered Petitioner driving around looking for Ms. Freeman and that they had seen Ms. Freeman walking alone.

Page 2 – GENERAL JUDGMENT (Post-Conviction)

5. The initial investigation into Ms. Freeman's disappearance was hampered by failure of local law enforcement to view her disappearance as a criminal matter. Materials were not provided to the District Attorney in 2001 which were later discovered in 2009 and 2010. (Testimony of DA Frasier)

6. A grand jury was convened in July 2000 to investigate the disappearance of Leah Freeman. No charges were brought at that time. In 2008, the case was re-opened and a second grand jury convened in 2010. Petitioner was arrested and charged with Murder on August 24, 2010.

7. Petitioner was represented at trial by Robert and Shaun McCrea. Shaun McCrea was lead counsel at trial. Robert Frasier, who was a deputy district attorney in 2001 and the elected District Attorney in 2011, was lead counsel or the State. Deputy DA Erica Soule was co-counsel for the State. The trial began in July, 2011, and lasted 10 days. Petitioner was acquitted of Murder but found guilty of the lesser included offense of Manslaughter I by a 10-2 verdict.

8. Trial Counsel's theory was that the victim was murdered, but not by defendant. She was able to suggest that some other unknown person was responsible, but lacked evidence that specifically pointed to another suspect. Trial Counsel presented a well defended case, resulting in Petitioner receiving a much less onerous sentence that he faced for a Murder conviction. This is not a case where Trial Counsel was obviously and grossly incompetent, particularly at trial, but rather a failure to investigate which would have uncovered exculpatory information which in had a probability of effecting the outcome of the trial.

9. This Court's decision is based on its conclusion the Jury did not have all the information it should have had to make its decision in this case. Whether the outcome would have been different is always a matter of speculation, but it is this Courts conclusion that the Trial Counsel failed to exercise reasonable professional and judgement in two respects, and that

Page 3 – GENERAL JUDGMENT (Post-Conviction)

Exhibit 109  Page 3 of 18 to
State Defendants' Motion for Summary Judgment

Petitioner suffered prejudice as a result of this failure. *Ogle v. Nooth*, 355 Or 570 (2014) and *Strickland v. Washington*, 104 S. Ct. 2052 (1984).

10. All the witnesses who testified at the PCR trial were credible, and generally consistent in key issues pertinent to the case.

FINDINGS OF FACT AND LEGAL CONCLUSIONS (SPECIFIC CLAIMS)

1. Claim: Actual Innocence (Paragraph 7) is denied based on petitioner's failure to establish the merits of the claim. The legal basis for denial of relief is failure to establish the factual and legal merits of the claim.

   a. Without deciding whether "actual innocence is cognizable at Oregon law in a PCR proceeding, in this case, Petitioner has not shown, based on newly discovered and reliable evidence it is more likely than not that no reasonable juror could have found petitioner guilty beyond a reasonable doubt as articulate in *Reeves v. Nooth*, 294 Or. App. 711 (2018). He can show that had certain evidence been presented at trial, the is a reasonable possibility that the outcome would have been difference, as is therefore entitled to relief on other grounds, as stated below. *Stevens v. State* 322 Or. 101(1995) as quoted in *Ogle* at 355.

   b. The testimony of DA Frasier which summarized his theory of the case, summarizes the evidence from which a jury could find defendant committed the crime. This is a concise summary of evidence from which a jury could find the defendant guilty.

2. Claim: Ineffective Assistance of Trial Counsel, failure to challenge State's Conclusions regarding cause and manner of Death (Paragraph 8 A) is denied based on petitioner's failure to establish the merits of the claim. The legal basis for denial of relief is that Trial Counsel's handling of the medical examiner testimony was a reasonable trial strategy and Petitioner has failed to show prejudice from counsel's handling of the medical examiner evidence.

   a. The medical examiner, Dr. Olson, was not able to determine an exact cause of death in this case due to the advanced state of decomposition of the body. He did determine that the

Page 4 – GENERAL JUDGMENT (Post-Conviction)

cause of death was homicidal violence of some undetermined type.  This is a conclusion the jury would have made from the evidence and that the defense advanced in their case, as the defense expert was of the opinion this was likely a homicide.

    b.  A motion in limine to exclude Dr. Olson's opinion would not have been successful.  *State v . Simmons*, 279 OR App 756 (2016) and *State v. Rogers* 313 OR 356 (1992).

3.  Claim Ineffective Assistance of Trial Counsel, failure to effectively challenge the State's conclusions on bloodstain evidence (Paragraph 8 B)  denied.  The legal basis for denial of relief is failure to show a factual and legal basis for the claim.

    a.  Trial counsel had a reasonable strategy, developed in consultation with its forensic expert, trial counsel brought out, through cross examination of prosecution witness Kathy Wilcox, that blood found on the victim's left show was "high velocity" splatter.  This allowed Trial Counsel to argue the absence of blood droplet on petitioner and, most significantly, in his car.

    b.  Petitioner has not shown that a motion in limine would have successful. Analysis of blood evidence at the crime scene is not applicable in this case, as the crime scene has never been located and there was no blood stain evidence at the location where the body was found that could be recovered and tested.

    c.  Petitioner called Kenn Meneely as a defense expert on blood spatter evidence. Petitioner has failed to prove how calling another expert would have provided evidence that another person killed Leah Freeman, or how Mr. Meneely's expertise and testimony was deficient.

4.  Claim Ineffective Assistance of Trial Counsel, failure to provide photos of Petitioner showing no defensive wounds (Paragraph 8 C) is denied based on petitioner's failure to establish the merits of the claim.  The legal basis for denial of relief is  that Trial Counsel  had strategic reason for not questioning law enforcement witnesses regarding Petitioner's lack of defensive wounds or

Page 5 – GENERAL JUDGMENT (Post-Conviction)

introducing photographs of Petitioner taken by law enforcement through law enforcement witnesses.

    a. Trial Counsel intended to introduce the photos through Petitioner and obtain testimony regarding his physical condition at the time of Ms. Freeman's disappearance when Petitioner testified. Petitioner changed his mind about testifying, so she was unable to do this. Her decision not to question the police officer about this is articulated in Exhibit 104 at 36 and is reasonable.

    b. The photographs were taken on July 28, a month after Ms. Freeman disappeared, diminishing their evidentiary value. The jury heard that a victim of strangulation might leave scratches or bruises on her assailant. There was no evidence that Petitioner had any scratches or bruises presented to the jury. Trial Counsel was not inadequate for not arguing this point in closing.

5. Claim Ineffective Assistance of Trial Counsel, failure to effectively challenge the State's Timeline (Paragraph 8 D) denied based on petitioner's failure to establish the merits of the claim.

    a. Trial Counsel was not inadequate for failing to introduce the phone and gas records. (8 D 1 and 2) Trial Counsel intended to introduce the records through Petitioner, and was unable to do so when he elected not to testify. The records do not provide an alibi for Petitioner. It is unlikely the Trial Court would have allowed a continuance to bring in custodians of the records. Petitioner is unable to show prejudice because these records were not admitted.

    b. The email from Chief Daniels to DA Frasier would not have been admissible as hearsay. Counsel was not inadequate for failing to seek admission of this document. (8 D 3)

    c. Trial Counsel was not inadequate for failing to request "missing reports" in discovery. (8 D 4).

    d. Trial Counsel was not inadequate in her cross examination of Denise Bertrand and has failed to show prejudice as a result of any alleged inadequacy. (8 D 5)

Page 6 – GENERAL JUDGMENT (Post-Conviction)

e.  Trial Counsel was not inadequate for failing to call Nicole Price as a witness.  (8 D 6) There is no evidence that Price would have added anything that was not covered in the testimony of Brent Bartley.  Price was vague about times, had been drinking, and had no additional information that would have affected the outcome of the trial.  It was not unreasonable for trial counsel, as a matter of trial strategy, to elect not to call her as a witness.

f.  Trial Counsel was not inadequate for not calling Kristy Christoferson and Amanda Landmark to testify at trial. (8 D 7)  Other witnesses testified that they had seen Petitioner looking for the victim at various times and places in Coquille the night she disappeared. Christoferson could not be located at the time of trial.   Ms. Landmark has no memory of what happened that night, where other witnesses who did testify were specific and detailed about seeing Petitioner.  Petitioner is unable to show prejudice for failing to call these witnesses.

g.  Trial Counsel was not inadequate for failing to produce a timeline of petitioner's movements on June 28.  Counsel provided a  timeline in the form of testimony and presented a coherent argument regarding events for the jury.  Counsel did not make a chart or specific exhibit for the jury.  This was a strategic decision, as any timeline in this case will have gaps due to the vague nature of the witness testimony as to specific times, and information from Petitioner could not be included as he chose not to testify.  A timeline could emphasize the time gaps to Petitioner's detriment.  Petitioner is unable to show prejudice.

6.  Claim  (8 E) Ineffective Assistance of Trial Counsel, failure to request, and offer into evidence DNA Evidence (Paragraph 8 E)  is  allowed; The legal basis for relief is that there is more than a mere possibility that counsel's acts or omissions effected the outcome of the case.

a.   Trial Counsel retained the services of Kenn Meneely, as an expert.  Mr. Meneely is not a DNA expert, and trial counsel did not retain one.  This decision was based the conclusions

Page 7 – GENERAL JUDGMENT (Post-Conviction)

in the 2001 report from the Oregon State Crime lab of testing on the victim's shoes (Ex 18). That report stated that the victim's DNA was found on both shoes, and that male DNA was found on the left shoe that did not match Petitioner. In 2002, the analyst, Mary Krings, compared the DNA on the left shoe against Deputy Oswald, and reported it was a match to him.

b.  In 2001, the shoes were sent to England for testing at Forensic Science Service (FFS). FSS reported traces of blood on the sole, inside heel and lace end of the left shoe. (Ex 9)

c.  Trial Counsel had these reports, as well as Ms. Krings handwritten allele charts interpreting the electropherograms (the bench notes).

d.  The bench notes show there was DNA of an unknown male in the samples. This was not noted in the report.

e.  Trial Counsel did not retain a DNA expert to review the bench notes or actual laboratory analysis. She relied on the conclusion in the 2001 report without further investigation.

f.  Relying on the conclusions in the report, Trial Counsel stipulated to the introduction of the DNA reports.

g.  At trial, Kathy Wilcox, the prosecution expert on DNA, testified that Ms. Freeman's DNA was the only DNA found on the right shoe. She further testified that the only DNA found on the left shoe was from the victim and Deputy Oswald.

h.  These conclusions were incorrect. Review of the results shoe that unknown male DNA was found on both shoes, not belonging to Petitioner, and those results were known in 2001 and 2002 when the reports were generated.

i.  There is a factual dispute as to whether the OSP lab protocols in 2001 and 2002 required the trace DNA amounts found be reported. This case went to trial in 2011. Significant advances in the detection of trace amounts of DNA occurred in that ten-year period, and by 2011, there is no dispute the results would have been reported at that time, or, that had a defense expert asked, the results would have been disclosed.

Page 8 – GENERAL JUDGMENT (Post-Conviction)

j.  At trial, the State argued that there was no unknown DA on the shoes.  After the PCR case was filed, the Coos County District Attorney took the unusual step of hiring an independent expert, Thomas Fedor, to review the DNA results.  Mr. Fedor is of the opinion that the OSP crime lab made errors and that the reliance on protocols or analyst discretion in 2001 is suspect.  (Ex. 15 and 16).

k.  In preparation of this case, the OSP lab reviewed the DNA evidence and prepared  new reports (Ex 17 and 18).  This report reports in detail the presence of unknown male DNA on both shoes, and that the DNA is not from at various males associated with the case.

l.  Trial Counsel did not object to the testimony at the trial regarding the DNA.  Without the information that other unknown male DNA was found, Trial Counsel made the reasonable strategic decision to downplay the DNA evidence and argue that Petitioner's DNA was not found on the shoes.

m.  Trial Counsel's theory of the case was that the victim was murdered, and that some other unknown person was the perpetrator.  However, without the DNA evidence, Trial Counsel was reduced to showing that Petitioner could not have committed the crime and was not able to produce any evidence of an alternative theory.

n.  Had Counsel retained the services of an expert in DNA analysis, a review of the bench notes, protocols and the FFS reports would have resulted in Counsel learning the conclusion in the 2001 and 2002 reports were incomplete at best.  Counsel would then have been able present evidence that could lead a jury to conclude another unknown male was responsible for the victim's death.  Trial Counsel now acknowledges this. (Ex. 104)

o.  The Court finds the testimony of Patrick Sweeny credible and persuasive on this issue. Sweeny testified of the necessity of consulting with at least one and probably two experts regarding the DNA evidence, in order to understand the science and confront the State's experts.  It was his opinion that Trial Counsel performance fell below the standard of

Page 9 – GENERAL JUDGMENT (Post-Conviction)

competence in this type of case, a Murder where the defense theory was that someone else committed the offense.

    p.  While understandable given the language of the reports, Counsel's failure to retain an expert and investigate further, and question the State's witness on the reports constitutes a failure to engage in a reasonable investigation, and a failure to exercise reasonable professional skill and judgment.

    q.  Petitioner was prejudiced by Trial Counsel's failure to investigate, retain and offer and expert at trial and otherwise correct the DNA evidence offered at trial.

7. Claim Ineffective Assistance of Trial Counsel, failure to effectively challenge the State's "bad guy" evidence (Paragraph 8 F)  is denied based on petitioner's failure to establish the merits of the claim.  The legal basis for denial of relief failure to prove factual and legal basis of claim.

    a.  An objection by Trial Counsel to the letters and diaries of the victim would have not been successful.  The materials were admissible under OEC 801(3).  Trial Counsel relied on letters and materials by the victim in its defense, and objection to the materials would have undermined its use of the victim's letters.

    b.  Petitioner has failed to show prejudice as the evidence would  and did have come in through other witnesses.

8. Claim: Ineffective Assistance of Trial Counsel, failure to effectively challenge the State's admission evidence (Paragraph 8 GI)  is denied based on petitioner's failure to establish the merits of the claim.  The legal basis for denial of relief is failure to prove factual or legal basis of claim

    a.  Counsel's decision not to call Meagan Edgerton, Kathy McGuffin or herself as witness were a reasonable trial strategy.  Counsel handled the statement on the Courthouse steps allegedly made by Petitioner by placing it in context to minimize its relation to this case.  Trial Counsel filed a motion in limine regarding the testimony,  and it was never argued that the witness to the statement Melissa Beebee, made the statement.  It can only be concluded that this assert now is not correct.

Page 10 – GENERAL JUDGMENT (Post-Conviction)

b. Counsel was not inadequate for failing to call Wayne McGuffin to testify.  Counsel made a reasonable strategic decision not to call Wayne McGuffin as his testimony could have been detrimental to Petitioner.

9. Claim:  Ineffective Assistance of Trial Counsel, failure to effectively challenge the State's evidence regarding cleaning the Mustang (Paragraph 8 H)  is denied based on petitioner's failure to establish the merits of the claim.  The legal basis for denial of relief is failure to prove factual and legal basis for claim.  Trial Counsel employed a reasonable strategy in her cross examination of Kathy Wilcox, and Petitioner is unable to show prejudice in any event.

10. Claim Ineffective Assistance of Trial Counsel, failure to effectively challenge the State's investigation (Paragraph 8 I) allowed regarding the Backman report (Ex 61).  The remainder of the claim is denied, based on petitioner's failure to establish the merits of the claim.  The legal basis for denial of relief is failure to show factual or legal basis for claim.

a. The Backman report, for whatever reason, was not known to either the State or defense at the time of trial.  The report has a Bates stamp on it, but does not appear in the discovery logs, and neither the District Attorney or Trial counsel recall seeing it prior to the PRC proceedings.

b. The information provided by Mr. Backman was favorable to the defense, and directly contradicts the State's witness, John Lindegren, that he saw the defendant with the victim at around nine in the evening.  Backman was using an ATM and had the withdrawal slip with a time of 9:04 p.m.  He stated he saw the victim walk by while he was using the ATM.

c. While other witnesses saw the victim in the vicinity of the bank that night, their testimony is vague as to time.  While this testimony would have corroborated Backman's, it was not duplicative, as none of the other witnesses can provide an exact time.

d. Backman's statement makes it more likely that Lindegren confused the victim and defendant with Ms. Mitchell and her boyfriend.  Lindegren is the only witness who

Page 11 – GENERAL JUDGMENT (Post-Conviction)

testified that the victim and defendant were together after he dropped her at the home of Ms. Mitchell and contradicts the defendant's claim that he did not see the victim again that evening. While trial counsel argued Lindegren was mistaken, she had no evidence he was wrong. Disclosure of the report could have led to admissible evidence in the form of Mr. Bachman's testimony and been used to impeach Mr. Lindegren. It would have provided a definite time and location of the victim. It would rebut the argument that the Petitioner was lying to the police when he told them he did not see Leah Freeman again after he dropped her off at the Mitchells earlier in the evening, making all his other statements about what he did that evening suspect.

e.  PCR counsel has not located Mr. Backman to determine what his actual testimony would have been. Whether he could have been located in 2011 for trial is not known as no one attempted to locate him then. Whether he can ever be found is not known. This is not a situation where Trial Counsel decided not to call him for strategic reasons, but rather a failure to investigate critical evidence that in all probability would have had a significant impact at trial, and Mr. Backman is distinctive from all the other witnesses now suggested by Petitioner as possible trial witnesses.

f.  There is a possibility, based on the report of the Backman interview not being in the discovery log, that it was in fact not disclosed. If that were the case, it would be a clear *Brady* violation. As indicated below, this Court does not find sufficient evidence it was not in the discovery. It is also possible, given the volume of discovery in the case, that Counsel missed it and if that is the case this error was critical.

g.  Deputy Oswald existed or that it contained anything admissible or exculpatory.

h.  The OSP log would not have been admissible at trial.

i.  The tip sheet and Microtrace notes were not admissible at trial. The Backman information is discussed above.

Page 12 – GENERAL JUDGMENT (Post-Conviction)

j.  There is no evidence the original death certificate and affidavit, if admitted would have changed the outcome at trial.

k.   Petitioner's spoliation argument regarding a bank video failure for failure to show the video contained any exculpatory or relevant information

11. Claim Ineffective Assistance of Trial Counsel, failure to investigate and present evidence of third-party guilt (Paragraph 8 J) is denied based on petitioner's failure to establish the merits of the claim.  The legal basis for denial of relief is that Trial Counsel's decision not to present evidence regarding suspicious males and grey cars in the Coquille at the time of Ms. Freeman's disappearance was a reasonable strategic decision, based on the information counsel had at the time regarding the DNA analysis.

a.  Her conclusion that this evidence was too attenuated and would make the defense look desperate (Ex 104 at 89-90) is reasonable, particularly considering the Trial Court pretrial ruling that it would not allow rumors and local gossip to be admitted.

b.  Petitioner is not able to show prejudice in that attempts to enter this evidence would not have been successful.

12. Claim Ineffective Assistance of Trial Counsel, failure to effectively investigate or call witnesses (Paragraph 8 K) is denied based on petitioner's failure to establish the merits of the claim.  The legal basis for denial of relief is that counsel made a reasonable strategic decision not to call each of the witnesses now identified by the Petitioner.

a.  The testimony of Mona Hathaway regarding the El Camino would have required speculation or conjecture not likely to have been allowed by the Court, and in any event, Trial Counsel's conclusion that testimony about random grey cars in the area would have been seen as desperation by the jury and detracted from more specific evidence regarding other possible specific suspects.

b.  Trial Counsel's decision not to call Charity Kinsey and Shelley Kinsey was a reasonable strategic decision  in the absence of any evidence connecting the two attacks.

Page 13 – GENERAL JUDGMENT (Post-Conviction)

c. Trial Counsel was not inadequate in her handling of the paint chip evidence. Trial Counsel argued the chip was not connected to Petitioner's car, that it was not compared to Scott Hamilton's car. Petitioner is not able to show the chip is actually connected to some other suspect, and is therefore unable to show prejudice.

d. Trial Counsel was not inadequate regarding failure to seek admission of the poem sent to the victim's funeral. This poem is vague and not a confession of someone else. It was reasonable for Trial Counsel to conclude this evidence was weak and to attenuated and its admission would again signal desperation to the jury.

e. Trial Counsel's decision not to call Kathy McGuffin as a witness was reasonable, based on her analysis of the witnesses based on her training and experience and a balance of the risk to reward.

f. Overall, counsel's selection of lay witnesses was a reasonable strategic decision based on her analysis of the case and the information she had at the time of trial. It is certainly possible that her decisions might have been different had she had the information regarding the unknown DNA but overall her handling of witnesses did not fall below the standard of permissible professional conduct.

13. Claim Ineffective Assistance of Trial Counsel, failure to object to State's closing (Paragraph 8 L) is denied based on petitioner's failure to establish the merits of the claim. The legal basis for denial of relief is that statements made by the prosecution in closing argument when viewed in context were not improper.

a. Specifically, the statements do not constitute improper vouching, an improper comment on Petitioner's right to remain silent or are made outside the scope of the evidence. Petitioner has failed to show prejudice.

b. Trial Counsel made a strategic decision not to continuously interrupt closing with objections was reasonable, particularly in light to the Trial Courts response when she did object. Petitioner has not shown that had Trial Counsel objected the objections would have

Page 14 – GENERAL JUDGMENT (Post-Conviction)

been sustained, or that the failure to object effected the outcome of trial.  The Trial Court correctly instructed the jury regarding argument.  Petitioner has failed to show a legal basis for relief.

14.  Claim Ineffective Assistance of Trial Counsel, failure to object to non-unanimous verdict (Paragraph 8 M)  is denied based on petitioner's failure to establish the merits of the claim.  The legal basis for denial of relief is *State v. Broome*, 276 Or. App.595 (2016) and *Apodaca v. Oregon*, 406 US 404, 92 S. Ct 1628, 32 L Ed 2nd 183 (1972).  At the time of Petitioner's trial, State and Federal courts allow a non-unanimous verdict in all crimes but Murder.  Petitioner is unable to show prejudice as had Trial Counsel objected to a non-unanimous verdict in the Manslaughter charge, the motion would have been denied by the trial court and the appellate court would have sustained the denial on appeal.

15. Claim Ineffective Assistance of Appellate Counsel, failure to effectively challenge the State's "bad guy" evidence (Paragraph 9)  is denied based on petitioner's failure to establish the merits of the claim.  The legal basis for denial of relief is failure to show factual and legal basis for the claim.  The materials, as noted above, were legally admissible and this issue could not have been raised by trial counsel as plain error.

16. Claim Violation of Discovery and *Brady v. Maryland,  373 US 83, 83 St. Ct 1194, 10 L ed 215 (1963).* is allowed.  The legal basis for relief is that had the withheld material been disclosed, there is a reasonable probability that the result at trial would have been different.

1.  Male DNA was detected on the victim's shoes during testing in 2000 that was not the defendants.  This information was not disclosed at trial.  DNA from another male is material and exculpatory.  The basis for this conclusion, the actual forensic analysis (the "bench notes") was disclosed but not interpreted in the report.

2.  In 2000, when the original testing was conducted,  it is contended that existing OSP lab protocols did not require disclosure of the DNA in the report, at the discretion of the examiner.

Page 15 – GENERAL JUDGMENT (Post-Conviction)

3. By 2010, when the case was re-opened, significant advances had been made in DNA testing allowing for more detailed and thorough analysis of trace amounts of DNA. A report prepared at that time with the same information would have disclosed the trace DNA on both shoes from unknown males.

4. In 2010, the only DNA reported on the victim's shoes was that of the victim and Deputy Oswald, a police officer who had handled the shoe. While the allele charts and electropherograms were disclosed, the conclusion that there was unknown male DNA in the sample was not. The OSP report and trial testimony presented to the jury and not challenged by the defense, made it appear to the jury that there was no other DNA on the shoes, which was not true and was known to the State at the time of trial, although the District Attorney, also relying on the conclusions in the 2001 report, also did not know about the other DNA, resulting in his argument at trial that no other DNA was found on the shoes other than the victim and the deputy sheriff who had handled the shoe.

5. As a result of the investigation in the PCR case, the OSP lab re-assessed the data thoroughly and completely, and determined there was additional unknown male DNA in the tested materials. There is a possibility that the same unknown male contributed DNA to both the left and right shoes. The conclusions a reader is likely to draw from the 2000 and the 2017 reports are strikingly different and would have altered the trial strategy employed by Trial Counsel. These conclusions are supported by the conclusions of the expert called in the PCR case, Dr. Nasir

6. While the unknown DNA could have been deposited by innocent transfer, it is also possible it was not. This would be a factual question for the jury.

7. Trial counsel did not investigate this matter further as a matter of trial strategy, which was based on the information she had at the time. Had she been presented with the conclusion that other male DNA was found on the shoes, the trial strategy would have been different, particularly if the other material unlawfully withheld had been disclosed, as discussed below.

Page 16 – GENERAL JUDGMENT (Post-Conviction)

Trial counsel's failure to investigate the DNA evidence and hire a DNA expert, discussed above, was a result in large part due to the State's failure to disclose the conclusion that other male DNA was found on the shoes.

8. The District Attorney was laboring under the same lack of information. This is not a case where the District Attorney, who sincerely and passionately has sought to determine what happened to the victim, deliberately withheld exculpatory information. Rather, the material from the OSP lab provided information in its report and through the testimony of Kathy Wilcox that created a false impression that no other DNA was found on the shoes. This failure is a failure to disclosed exculpatory information.

9. The failure to disclose the Nick Backman interview has not been proven. The District Attorney does not recall the document, but it is Bate stamped and hole punched, so it is reasonable to conclude it was in the discovery matters.

10. If the report was in fact disclosed, but somehow not seen by either the District Attorney or Trial Counsel, it would be a clear failure of defense counsel to investigate and properly present evidence at trial, as the failure to present this information raises the possibility that the result at trial would have been different, as discussed above.

11. The other alleged Brady violations do not rise to the level that had the material been disclosed, it would have been likely to have changed the outcome of the trial or would not have been admissible or led to admissible evidence.

For the claims allowed above, the following relief is granted: Conviction for Manslaughter I is set aside and the case is remanded to the Trial Court for further proceedings consistent with this order.

This matter involves Federal; and/or State Constitutional issues.

The court adopts all oral findings made on the record and incorporates them into this judgment.

Page 17 – GENERAL JUDGMENT (Post-Conviction)

All questions presented were decided. This judgment shall constitute a final General Judgment for the purposes of appellate review and for purposes of res judicata.

DATED this 26th day of November , 2019.          Signed: 11/29/2019 04:51 PM

_____
Sr. Judge Patricia Sullivan, Circuit Judge

Circuit Court Sr. Judge Patricia A. Sullivan

Page 18 – GENERAL JUDGMENT (Post-Conviction)



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION

NICHOLAS JAMES MCGUFFIN, as an
individual and as guardian ad litem,
on behalf of S.M., a minor,

        Plaintiff,

vs.

                                    Case No. 6:20-cv-01163-MK

MARK DANNELS, et al.,

        Defendants.



_____







DEPOSITION OF

MEGAN DAVIDSON

TAKEN ON
THURSDAY, JULY 6, 2023
9:18 A.M.

MALONEY LAUERSDORF AND REINER, PC
1111 EAST BURNSIDE STREET, SUITE 300
PORTLAND, OREGON

Exhibit 110  Page 1 of 5 to
State Defendants' Motion for Summary Judgment

yearbook. I think I might have been in my sophomore, but definitely not the rest.

Q. Okay. Now, did you date Nick McGuffin in high school?

A. I did.

Q. And when?

A. Freshman -- well, it would have been my summer -- I would have been going into my freshman, and he was a -- oh, gosh.

It was either -- I was either going into my freshman year or my sophomore year, but I'm pretty positive I was going into my freshman year. I don't know.

Q. Maybe another way, what age were you when you started dating him?

A. Fourteen, 15? I don't know. I don't know.

Q. Okay. And then how long --

A. Fifteen, I think.

Q. Okay. And how long did you date him?

A. We dated for a few months.

Q. Did you --

A. If that's what you want to call it.

Q. Yeah. Did you have a sexual relationship during that dating period?

A.    No, I don't believe so.

Q.    And by sexual, let me be more specific.  I hate to be blunt.  When you were dating him, did you have sexual intercourse?

A.    While we were technically boyfriend and girlfriend?

Q.    That few months you talked about.

A.    No.

Q.    And do you remember when he started dating Leah?  Let me use names because -- do you remember when Nick McGuffin started dating Leah Freeman?

A.    Yeah.  Not, like, I don't know the date or anything like that, but I recall, yeah.

Q.    The school year, do you remember what year?

A.    No.

Q.    Do you remember if it was Nick McGuffin's senior year?

A.    I -- probably junior.  Probably junior, junior or senior, probably, because I think he was a sophomore when I dated him.  So junior maybe.

Q.    So once he started dating Leah Freeman, up until the date Leah Freeman disappeared, did you have sexual intercourse with Nick McGuffin?

A.    No, not that I recall.

Exhibit 110  Page 3 of 5 to
State Defendants' Motion for Summary Judgment

Q.    When is the last time you saw him?

A.    Years ago, three years ago probably.

Q.    And what's his last name?

A.    Pinkley.

Q.    Is Pinkley your maiden name?

A.    Uh-huh.  It's actually my name again also.
I'm divorced now so.

Q.    So in high school was Pinkley?

A.    Uh-huh.

Q.    Yes?

A.    Yes.

Q.    And what's your mother's name?

A.    Deborah.

Q.    And what's her last name?

A.    Pinkley.

Q.    And where does she live?

A.    In my dad's front yard.

Q.    And where is your dad's front yard?

A.    Coquille.

Q.    What address?

A.    I have no idea.  It's in Sanford Heights,
I can tell you that much.

Q.    And what's your father's name?

A.    Kelly.

Q.    Last name?

Exhibit 110  Page 4 of 5 to
State Defendants' Motion for Summary Judgment

CERTIFICATE

I, Chelsy M. Jackson, do hereby certify that I reported all proceedings adduced in the foregoing matter and that the foregoing transcript pages constitutes a full, true and accurate record of said proceedings to the best of my ability.

I further certify that I am neither related to counsel or any party to the proceedings nor have any interest in the outcome of the proceedings.

IN WITNESS HEREOF, I have hereunto set my hand this 10th day of July, 2023.

_____
Chelsy M. Jackson

Exhibit 110  Page 5 of 5 to
State Defendants' Motion for Summary Judgment

John J. Lindegren

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

NICHOLAS JAMES MCGUFFIN, as   )
an individual and as
guardian ad litem, on         )
behalf of S.M., a minor,
                              )   Case No.

          Plaintiffs,         )   6:20-CV-01163-MK

     vs.                      )

MARK DANNELS, PAT DOWNING,    )
SUSAN HORMANN, MARY KRINGS,
KRIS KARCHER, SHELLY          )
MCINNES, RAYMOND MCNEELY,
KIP OSWALD, MICHAEL REAVES,   )
JOHN RIDDLE, SEAN SANBORN,
ERIC SCHWENNINGER,            )
RICHARD WALTER, CHRIS
WEBLEY, ANTHONY WETMORE,      )
KATHY WILCOX, CRAIG ZANNI,
DAVID ZAVALA, JOEL D.         )
SHAPIRO AS ADMINISTRATOR OF
THE ESTATE OF DAVID E.        )
HALL, VIDOCQ SOCIETY, CITY
OF COQUILLE, CITY OF          )
COOS BAY, and COOS COUNTY,
                              )

          Defendants.         )

DEPOSITION OF JOHN J. LINDEGREN

January 4, 2023

Wednesday

10:38 a.m.

ccreporting.com

Exhibit 111  Page 1 of 3 to
State Defendants' Motion for Summary Judgment

know anything.  I might have moved out of there.
I was living there for -- in 985 for several
years, and then -- with a woman there, and we
split up.

Q.    Okay.

A.    So that might have something to do
with that, I have no idea.

Q.    Okay.

A.    I didn't write this.

Q.    Right.  And I understand that.  I'm
just trying to figure out where this information
came from, and I'm hoping you can help me with
that.

A.    Uh-huh.

Q.    So it has your date of birth there;
right?

A.    Yeah.  7/8/1958.

Q.    We've got to be careful not to speak
over each other.

A.    I'm so sorry.

Q.    There it says, "Says he saw Leah
talking to Nick.  Nick in brown pickup.  About
9:15 p.m. to 9:20 p.m. on Elm."

A.    Yeah.

Q.    Is that something you told the police?

Exhibit 111  Page 2 of 3 to
State Defendants' Motion for Summary Judgment

State of Oregon      )
                     ) ss.
County of Douglas    )


          I, Denise C. Zito Smith, CSR, a Certified Shorthand Reporter for the State of Oregon, hereby certify that the witness was sworn and the transcript is a true record of the testimony given by the witness; that at said time and place I reported by stenotype all testimony and other oral proceedings had in the foregoing matter; that the foregoing transcript consisting of 236 pages contains a full, true, and correct transcript of said proceedings reported by me to the best of my ability on said date.

          If any of the parties or the witness requested review of the transcript at the time of the proceedings, such correction pages are included.

          IN WITNESS WHEREOF, I have set my hand this 18th day of January 2023, in the City of Canyonville, County of Douglas, State of Oregon.


*Denise C. Zito Smith*
_____
Denise C. Zito Smith
Oregon CSR No. 01-0375
Expires 9/30/2024

Exhibit 111  Page 3 of 3 to
State Defendants' Motion for Summary Judgment

City of
**Coquille**
POLICE
People Serving People Since 1885

005098 | 005098 | 005098

Mark J. Dannels
Chief of Police

**COPY**

**Distribution:**
(✓) DA      Juv      SCF      Mental
      P&P      Animal      Med Exam
      other  (          )

**Incident Report:** Q20001905

Current As Of:    Tuesday, June 01, 2010

Approved By:

Signature

6 0 1    Badge

## Single Continuation Report

### Summary

Supplemental Report:  In January of 2010 the Coquille Police Department began actively working this case again.  As part of the team I participated in interviewing Dennis Hamilton, Thomas Bounds, Michael Tulles, and Quinn Cannon-Myers.  This report documents those interviews.

### Mentioned

### Action Taken
DENNIS HAMILTON:

On January 25, 2010 at approximately 1855 hours, Officer McNeely and I met with Dennis Hamilton at the police station for an interview.  Hamilton came in voluntarily and was extremely cooperative ⁀oughout the interview.

Hamilton told me that he had been friends with Nick McGuffin and Leah Freeman in high school. Hamilton said he was dating Melissa Smith and that he and Smith had double dated with McGuffin and Freeman during the senior prom.  Hamilton said that he and McGuffin were pretty good friends and that he has maintained somewhat of a friendship with him.  Hamilton said that last time he actually was around McGuffin was approximately two years ago when he helped McGuffin replace a transmission in McGuffin's Dodge Stratus at Bruce McGuffin's home.

Hamilton told me that he remembered McGuffin driving a blue Mustang as a senior in high school. Hamilton said that he did not ever help McGuffin do any work, interior or otherwise on the Mustang. Hamilton commented that the only people that ever helped him work on that car was his dad or brother, Wayne McGuffin.

While helping with the Stratus, Hamilton said he asked McGuffin about the Mustang.  Hamilton said McGuffin showed him the Mustang stored on a flat spot above Bruce McGuffin's home.  Hamilton said the car was being overgrown with blackberry bushes and he asked McGuffin what he was going to do with it.  McGuffin told Hamilton that they planned to fix it up someday.  Hamilton said he looked over the car and noticed that the passenger side front light area had damage.  Hamilton described the damage as the "front lip around the light being rolled back".  He said he teased McGuffin about the bondo in the fender he could see as a result of the damage.

⁀hen asked about his circle of friends and activities around the time of Freeman's disappearance ₁₋₁amilton shared that while dating Smith, he was "cheating" on her by having sex with Kristin Steinhoff.

005098                                    005098                                    005098

Welley                    1-25-2010      to    1-31-2010

**MCCREA_022389**

Exhibit 112  Page 1 of 7 to
State Defendants' Motion for Summary Judgment

Hamilton said that McGuffin and Steinhoff also knew each other and sometimes spent time together. According to Hamilton both McGuffin and Steinhoff used methamphetamine as well as smoking pot. Hamilton said that he sometimes wonder if they had a "thing" but that he didn't know or care.

Hamilton said that McGuffin would sometimes get "huffy" over "stupid shit" in his relationship with Freeman. He said McGuffin was jealous and would get mad when Freeman talked to other guys.

Hamilton said that on the night of June 28, 2000 he was in town and planning to go over to Steinhoff's house. Hamilton said that she would leave a bedroom window open and he would come in through the window. Hamilton said that as best he could remember it was around 2100 - 2200 hours, when he arrived and noticed McGuffin's blue Mustang parked up the block.

Hamilton said he approached Steinhoff's window quietly and could hear McGuffin's voice talking with her. Hamilton said they were talking in low tones and he could only make out part of the conversations. Hamilton said that he heard McGuffin say, "What am I supposed to do?" Hamilton also said that McGuffin whispered and asked Steinhoff to "help him". Hamilton said that a short time later, Steinhoff and McGuffin came out of the house and left in McGuffin's car.

Hamilton said that he later confronted Steinhoff about the incident. Hamilton said Steinhoff "blew him off" without giving a specific answer telling him she was "just helping him do something".

Hamilton told me that approximately two weeks prior to Freeman's body being found he recalls McGuffin saying that Bill Sero was responsible for her disappearance. Hamilton said that it seemed like he was "throwing it out there because everyone was looking at him". Hamilton did not recall McGuffin giving any details, just mentioning it.

Hamilton also recalled Sero hanging around Ron Slagle and a red headed girl possibly named Shiree at the time.

On another occasion Hamilton recalled Jason Lucas, Aaron West and Richard Bryant at a party in a Dean St. residence where West lived with Bryant. Hamilton said that he remembers "everybody saying Sero did it". Hamilton noted that McGuffin was not present at the party.

Also prior to the discovery of Freeman's body, Hamilton recalled an event with Smith. Hamilton said that he and Smith had broken up because Jesse Harden told Smith he was cheating with Steinhoff. Hamilton said that he and Smith still talked after breaking up and at one point she came over to his sister's house where he was living. Hamilton said Smith was upset and told them that she had been partying with McGuffin at his house. She confided that she had had sex with McGuffin and felt bad about it.

Hamilton said he "chewed her out" because he didn't see how McGuffin could sleep with someone when Freeman had not been found. Hamilton said that he believed that was the last time he had a conversation with Smith.

Hamilton said less than one week after Freeman was found, McGuffin asked him to go for a ride with him. Hamilton said McGuffin was sad and he wanted to help so he agreed to go with him. According to Hamilton, McGuffin took him out Lee Valley Rd. about 40-50 yards past a gravel pitt in a red Thunderbird car. Hamilton said McGuffin pulled over and parked on the left side of the road. According to Hamilton, McGuffin knew right where he was going and got out of the car, walking to a specific spot.

Hamilton said that McGuffin was "talking weird" like he could sense Freeman. Hamilton said that

MCCREA_022392

Exhibit 112  Page 2 of 7 to
State Defendants' Motion for Summary Judgment

McGuffin told him, "It's like I can see her laying right there" as he pointed approximately 15-20 yards off the road and down the hill by a rock. Hamilton said McGuffin kept "talking about weird mumble jumble shit". Hamilton said McGuffin made the statements about "wishing he could have helped her" and "wishing he could find out who did it".

Hamilton said that at one point he began wondering if McGuffin might have had something to do with Freeman's disappearance. Hamilton said he came out and asked McGuffin to his face if he had anything to do with it. According to Hamilton, McGuffin denied anything and offered a brief explanation. Hamilton said McGuffin told him he was supposed to pick up Freeman at Cherie Mitchell's house but had been late and Freeman had already left. Hamilton said McGuffin told him that he found Freeman walking and picked her up in his car, then began arguing with her. According to Hamilton, McGuffin said that Freeman wanted out of the car and he let her out near McKay's Market.

Hamilton said McGuffin told him he then drove around the loop before coming back through town. At this time McGuffin told Hamilton he was unable to find Freeman. Hamilton said McGuffin told him the were fighting because she was supposed to be at Sherie's house and wasn't. Hamilton described McGuffin as a "jealous motherfucker" and said they were probably fighting over jealousy in his opinion.

THOMAS BOUNDS:

On January 29, 2010 at approximately 1440 hours, Officer McNeely and I spoke with Thomas Bounds at the Coquille Community Building. Bounds had informed me by email that he had some information on the Leah Freeman case he wished to share.

Bounds said on the night of June 28, 2000 he was living at 382 W. Central Blvd. According to Bounds, he and his wife, Jill Bounds were going from their home to a relatives off N. Knott St. when he noticed Freeman standing in front of the high school on W. Central Blvd. Bounds said he knows Freeman because they are related by marriage and immediately recognized her. Bounds said Freeman was wearing a white top with "string" straps across the shoulder. Bounds said he remembers specifically noticing this because he did not approve of a young girl wearing a top like that and commented to his wife about it. Bounds said he waved at Freeman who waved back to him as they passed. Bounds said the time of day was evening ust around sunset.

Bounds said they were only at the relatives for a short time he estimated to be 15-20 minutes when they drove back by. Bounds said Freeman was now at the pay phone in the gas station parking lot across from the high school and appeared to be on the phone. Bounds said they went home and inside the house. Bounds said that he remembers it was getting dark at this time.

Upon going inside the house, Bounds said he heard a scream from the general direction of the street. Bounds said he stepped outside and listened so see if he could hear anything further but did not. Bounds said he dismissed the scream and continued about his business.

MICHAEL TULLES:

On January 29, 2010 at approximately 1550 hours, Officer McNeely and I talked with Michael Tulles at 93 S. 13th St. in Bandon. Tulles told me that he worked with Nick McGuffin approximately six ars ago at the Bandon Dunes golf course. Tulles said that he didn't know McGuffin very well and uidn't have much interaction with him. Tulles said he did have some interaction with another co-worker he only remembered as Matt.

005100                          005100                          005100

**MCCREA_022394**

Exhibit 112  Page 3 of 7 to
State Defendants' Motion for Summary Judgment

According to Tulles, he and Matt were drinking one time when Matt broke down and told him a story involving Freeman. Tulles said that Matt was known to lie but at the time of this story, he was very intoxicated and seemed to be genuine. Tulles said that Matt told him the night of Leah Freeman's disappearance he had been at a party with McGuffin and Freeman.

Tulles went on to say Matt told him McGuffin was doing "white drugs" at the party and began to fight with Freeman, who took off walking. According to Tulles, Matt said he got in a blue Mustang with McGuffin to look for Freeman and on the way McGuffin lost control of the car in a corner and hit Freeman.

Tulles said that Matt told him Freeman was not dead and he then stabbed her approximately 30 times before cutting her into pieces with a "sawzall" and burying her remains near Laverne Park. Tulles said that Matt referred to the car saying they reupholstered it and fixed the dents.

Tulles said he told Officer Boggs, Chief Webb and a Coquille officer this story long ago. According to Tulles, Matt and his brother cornered him in a bar and threatened him if he continued to talk about it. Tulles said he told his boss about the threats and never hear from Matt again.

QUINN CANNON-MYERS:

On January 31, 2010 at approximately 1411 hours, Officer McNeely and I spoke with Quinn Cannon-Myers at the police station. Myers had contacted us to provide some information regarding the Freeman case.

According to Myers on June 28, 2000 she was working at Clair's in Coos Bay and got off work at about 2030 hours. Myers said she dating Daniel LaPine who lived on E. 9th St. in Coquille and travelled to his house after work that day. Myers said LaPine also lived with Brent Bartley at the residence. Upon arriving at the home she found a group of five to seven people at the residence. Among the people was LaPine but Bartley was not present. Myers said the people were getting ready to go to a party at "TJ" Greve's house up E. 3rd St.

Part of the group included Mike McKay, who Myers said had arrived from Eugene. Myers said she was sitting inside the house about eight to ten feet from the door waiting for the others to leave so she and LaPine could go to dinner when Nick McGuffin arrived. Myers said she didn't know the exact time but that it was not quite dark out and she estimated 2115 or 2130 hours. Myers said she noticed McGuffin walk up the steps like he was going to come inside the house.

Myers said she has known McGuffin for some time and he looked at her and asked, "Is Leah here?" Myers said McGuffin seemed surprised when he was told Leah was not there stating, "She's not?" Myers said McGuffin then turned around quickly and walked away. Myers described McGuffin's demeanor as "completely coherent".

Myers described Freeman as a "really immature girl, really mouthy". Myers said she had seen Freeman "wail" on McGuffin at parties and "wasn't her biggest fan". Myers said she didn't understand why McGuffin would bring a 15 year old girl to parties when everyone was over 18 years old. Myers said when McGuffin had asked about Freeman that night, her feeling had been "why would she be at this house"?

Myers said she did not see what vehicle McGuffin was driving but assumed it was the red underbird because he often drove it. Myers said she believed that Ron Slagle had been outside at the time and may have also seen McGuffin and his vehicle.

Myers said that she and LaPine ended up going to eat dinner and that Bartley never showed up

005101                                   005101                                   005101

MCCREA_022395

Exhibit 112  Page 4 of 7 to
State Defendants' Motion for Summary Judgment

before they left the home.  Myers said that after eating she went home.                    005102    5

Myers said spoke with McGuffin the next day  and asked why he didn't tell her about Freeman being missing the night before.  Myers said McGuffin mentioned being late to pick Freeman up from Cherie Mitchell's house and driving around the loop looking for her and, when he didn't see her, ing to her mother's house and finding out she wasn't there.  Myers said that her impression was that McGuffin and Freeman were going hang out with Brent Bartley and his girlfriend at Bartley's grandparent's house.  Myers said she understood that McGuffin then came to LaPine and Bartley's house assuming that Freeman must have gone there.

According to Myers, McGuffin mentioned seeing Sero earlier that day in a car with Erica Davidson who Sero had two children with.  Myers said McGuffin told her the car stopped in the middle of the road and Sero got out, approached his car, and offered to help him look for Freeman.  Myers said McGuffin told her he didn't think much of it at the time but later reflected that not many people knew Freeman was missing at the time.

According to Myers, she and McGuffin talked about how it was odd Sero knew Freeman was missing considering he didn't know people from "that crowd of people".

Myers said she didn't even know on the night of the 28th that Freeman was missing but got a call at work from LaPine the next day around 1600-1700 hours, telling her Freeman was missing.  Myers said she asked LaPine if he remembered seeing McGuffin the night before and LaPine said he did not.  Myers said Lapine told her on the phone that rumors about Freeman's disappearance including a sex offender kidnapping her and running away with a boyfriend from Coaledo.

Myers said that on June 29, 2000 after getting off work she rented a movie, Deuce Biggalo Male Jiggalo, and went to LaPine's house to watch the movie.  Myers said she arrived and Bill Sero, sa Michaud (now Lambert) and Lapine were the only ones present.

Myers said they talked about Freeman being missing and Sero brought up that he had helped McGuffin look for her earlier that day.  According to Myers, Sero said that he didn't even know Freeman or what she looked like.  Myers said about 45 minutes into the movie, McGuffin showed up and was crying and upset.  McGuffin told them he had just had a confrontation with Bill Middleton who had accused him of being a "15 year old woman abuser".

I asked Myers why Sero and Michaud were at LaPine's watching movies if they didn't know them.  She replied that she knew Michaud better than Sero and thought they must had just stopped by that night.  Myers said the meeting was not preplanned and that she only knew who Sero was but did not know him personally.

Myers said that Sero questioned McGuffin again about what Freeman looked like.  Myers said McGuffin told Sero she had blonde hair, wearing a "wife beater" and had "big boobs".  Myers said that Sero responded, "What a way to describer her."

According to Myers, at this point Michaud broke into tears, began crying hysterically and ran outside.  Myers said Sero immediately got up and followed her outside, leaving the others inside.  Myers said she thought it was odd because it would upset McGuffin more.  Myers said she talked with McGuffin, questioning him about where he looked and he told her he had looked everywhere and just didn't know what to do.

Myers said Michaud and Sero came back inside and she asked Michaud why she was crying.  Myers said Michaud replied, "I'm sorry.  I just have a really bad feeling about this."

005102                                    005102                                    005102

**MCCREA_022396**

Exhibit 112  Page 5 of 7 to
State Defendants' Motion for Summary Judgment

Myers said that after the movie around 2330 hours, she left and went home. She said that Sero and Michaud were still there and were drinking beer. Myers said that when Sero and Michaud left, Sero got stopped by the police and was arrested and taken to jail for providing alcohol to a minor and a probation violation.

/ers then skipped ahead in time to after Freeman's body was found. Myers said LaPine told her investigators came to his house looking for Sero. Myers said she went to LaPine's house after talking with him and Davidson was there. Myers said Davidson stated, "I don't know why they were looking for Bill. If he did it they'd never find her body."

Myers said she mentioned to Davidson that she had seen McGuffin the night of Freeman's disappearance and didn't think he was even concerned or had time to do anything to cover his tracks. According to Myers, Davidson said, "The only thing I will say is that after he went to jail, Bill called my mom every day upset and wanting to know what she had heard about the Freeman case."

Myers said that after that among her group of friends people began talking and the word was that Sero did it. Myers said that at one point Sero called Brianna Arriola and threatened her if she didn't quit telling people he did it.

Myers said she had a couple other things to share with us. Myers then told us she used to date Dustin Graham and had spoken with him. Myers said Graham told her he was with Jesse Newman, Megan Walker and Katy Clemens a few years ago. Myers said Graham told her they ended up in an apartment in Sanford Heights next to Sero's apartment.

According to Myers, Graham related that early in the morning, Sero had come over to the apartment and invited them to come to his apartment and smoke some marijuana. Myers said Graham told her he and the others accepted and went over to Sero's where he proceeded to ovide them with marijuana. Myers said Graham found it unusual because Sero did not participate or smoke any but was very quiet.

Myers said that upon reflection, she and Graham decided that the date of this occurrence would have been the early hours of June 29, 2000.

Myers additionally advised that we might want to talk to LaPine, Maggie Yoakum and Ann Yoakum stating that they might have information that could be useful.

Myers also recalled a time about a week after Freeman went missing when the police were doing a roadblock and contacting cars. Myers said she was walking down and noticed Kristin Steinhoff had parked her car near what is now City Hall and had got out of her car. Myers said Steinhoff was very intense and aggitated asking "what do you think they are talking about"?

Myers related that she did not know what actually happened but had heard a lot of rumors. Myers said what she believed happened was that Steinhoff and Sero hit Freeman in a car by accident, then took her to Tom Stemmerman's house where she late died.

*Statements*

*Evidence/ Property*

*Action Recommended*

005103                    005103                    005103

**MCCREA_022397**

Exhibit 112  Page 6 of 7 to
State Defendants' Motion for Summary Judgment

005104                          *Date/ Officer:*    2/6/2010    005104 Webley          *Incident:*    Q20001905          005104

**Officer's Signature:** _____    **Date:** _____

005104                                    005104                                    005104

**MCCREA_022398**

Exhibit 112   Page 7 of 7 to
State Defendants' Motion for Summary Judgment

# Oregon State Police
# Portland Forensic Laboratory
# DNA Unit

# Short Tandem Repeat (STR)
# Analysis
# Casework Protocol

Technical Leader — *Cecilia H. von Beroldingen*

Date Approved — 8/1/00

August 1, 2000

*archived* (watermark)



DEPO EXHIBIT

Krings 2022-05-05

6

OSPLab_000001



# STR Analysis for Casework
# Oregon State Police DNA Unit

## Table of Contents

| | |
|---|---|
| Introduction | 4 |
| Amplification Protocol – Profiler Plus and COfiler | 6 |
| Typing Protocol | 8 |
| ABI Prism 310 Set-up | 8 |
| Sample Sheet Set-up | 14 |
| Injection List Set-up | 15 |
| Sample Set-up | 16 |
| Loading and Running the Samples | 17 |
| GeneScan Analysis | 18 |
| Genotyping | 23 |
| Automated | 24 |
| Manual | 28 |
| Double Reader | 29 |
| Interpretation Guidelines | 30 |
| Population Frequencies | 37 |
| Report Writing Guidelines | 40 |
| Reagents and Supplies | 44 |
| References | 51 |

August 1, 2000

2

OSPLab_000002

Exhibit 113  Page 2 of 63 to
State Defendants' Motion for Summary Judgment



# STR Analysis for Casework
# Oregon State Police DNA Unit

## Appendices

| A | Worksheets | 54 |
| B | Analysis Parameters | 55 |
| C | Size Standard | 57 |
| D | Matrix | 59 |

**Modifications/Revisions** — 63

August 1, 2000

3

OSPLab_000003



# STR Analysis for Casework
# Oregon State Police DNA Unit

## Introduction

Short tandem repeat (STR) markers are polymorphic DNA loci that contain a repeated nucleotide sequence. The number of repeat units at an STR locus may differ, so alleles of many different lengths are possible, and are therefore very useful for human identification purposes. STR loci can be amplified using the polymerase chain reaction (PCR) process and the PCR products are then analyzed by electrophoresis to separate the alleles according to size. PCR-amplified STR alleles can be detected using various methods, such as fluorescent dye labeling, silver staining, or fluorescent dye staining.

The Oregon State Police Forensic Lab utilizes the AmpF/STR Profiler Plus PCR Amplification Kit and the AmpF/STR COfiler PCR Amplification Kit. Each of the kits contain AmpF/STR Profiler Plus or COfiler PCR Reaction Mix, fluorescently labeled primer sets, AmpliTaq Gold DNA Polymerase, a control DNA, mineral oil, and allelic ladders. Forensic laboratories in North America recently established the 13 core STR loci. The COfiler kit is designed to be used in conjunction with the Profiler Plus kit to amplify the selected 13 STR loci in two PCR reactions. The Profiler Plus kit amplifies nine of the selected STR loci. The COfiler kit amplifies the four remaining STR loci as well as two loci and the amelogenin locus also found in the Profiler Plus kit. The overlap of the two STR loci and the amelogenin locus provides confidence that both reactions have amplified the same sample. Refer to Table 1 for detailed AmpF/STR Profiler Plus and COfiler allele information.

One primer of each locus-specific primer pair is labeled with either the 5-FAM, JOE, or NED dye, which is detected as blue, green and yellow, respectively, on the ABI Prism 310 Genetic Analyzer. The ABI Prism 310 is a capillary electrophoresis instrument through which amplified DNA samples are separated by size. An internal lane size standard is loaded with each sample to allow for automatic sizing of the PCR products and to normalize differences in electrophoretic mobility between injections. ABI Prism 310 Data Collection Software controls, monitors, and collects. GeneScan Analysis Software is used to automatically analyze the data collected (sizes and quantifies the DNA fragments) which can then be imported into the Genotyper Software for automatic genotyping of alleles.

**Special Note:**  *Procedures for DNA extraction and quantitation are found in the PCR-Based Typing Procedures (Oregon State Police Forensic Laboratory, 1997).*

August 1, 2000

4

OSPLab_000004



# STR Analysis for Casework
# Oregon State Police DNA Unit

Table 1. AmpFISTR Profiler Plus and COfiler allele information

| Dye Label | Profiler Plus STR locus | COfiler STR locus | Ladder Alleles | Size Range (base pair) | Positive Control 9947A |
|---|---|---|---|---|---|
| 5-FAM | D3S1358 | D3S1358 | 12, 13, 14, 15, 16, 17, 18, 19 | 114-142 | 14, 15 |
| 5-FAM | VWA | - | 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21 | 157-197 | 17, 18 |
| 5-FAM | FGA | - | 18, 19, 20, 21, 22, 23, 24, 25, 26, 26.2, 27, 28, 29, 30 | 219-267 | 23, 24 |
| 5-FAM | - | D16S539 | 5, 8, 9, 10, 11, 12, 13, 14, 15 | 234-274 | 11, 12 |
| JOE | Amelogenin | Amelogenin | X, Y | 107, 113 | X, X |
| JOE | D8S1179 | - | 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19 | 128-168 | 13, 13 |
| JOE | D21S11 | - | 24.2, 25, 26, 27, 28, 28.2, 29, 29.2, 30, 30.2, 31, 31.2, 32, 32.2, 33, 33.2, 34, 34.2, 35, 35.2, 36, 38 | 189-243 | 30, 30 |
| JOE | D18S51 | - | 9, 10, 10.2, 11, 12, 13, 13.2, 14, 14.2, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26 | 273-341 | 15, 15 |
| JOE | - | THO1 | 5, 6, 7, 8, 9, 9.3, 10 | 169-189 | 8, 9.3 |
| JOE | - | TPOX | 6, 7, 8, 9, 10, 11, 12, 13 | 218-242 | 8, 8 |
| JOE | - | CSF1PO | 6, 7, 8, 9, 10, 11, 12, 13, 14, 15 | 281-317 | 10, 12 |
| NED | D5S818 | - | 7, 8, 9, 10, 11, 12, 13, 14, 15, 16 | 135-171 | 11, 11 |
| NED | D13S317 | - | 8, 9, 10, 11, 12, 13, 14, 15 | 206-234 | 11, 11 |
| NED | D7S820 | D7S820 | 6, 7, 8, 9, 10, 11, 12, 13, 14, 15 | 258-294 | 10, 11 |

Note: Not all known alleles are present in the allelic ladders.

August 1, 2000

5

OSPLab_000005

Exhibit 113  Page 5 of 63 to
State Defendants' Motion for Summary Judgment



# STR Analysis for Casework
# Oregon State Police DNA Unit

## Amplification Protocol

1. For each sample to be amplified, prepare a DNA/TE dilution. The final fixed volume of TE and/or DNA added to the Master Mix will be 20 μl.
   - Add appropriate quantity of TE $^{-4}$

   - Add appropriate quantity of sample or controls

     - **Extracted DNA samples: ~0.5 to 2.5 ng**
       - Evidentiary stains, standards, etc. (Certain sample types may require a greater or lesser amount of input DNA. Examples: degraded DNA samples, samples with inhibitors, etc.)
       - Substrate samples: unstained areas adjacent to an evidentiary stain that is carried through the DNA extraction process to detect any DNA that may be on the substrate.
       - Reagent blank: sample blank that is carried through the DNA isolation procedure to control for any potential contamination of the extraction reagents (μl used should be the same as the corresponding extracted DNA samples).

     - **Positive Control (9947A) : 2 ng** (can be added at the hood)
       - 20 μl of the 0.1 ng/μl 9947A
       - Amplified each time the Profiler Plus or COfiler kit is used to ensure the amplification and typing process is working properly.

     - **PCR Blank: 20 μl of TE$^{-4}$ buffer**
       A negative PCR control consisting of all reagents used in the amplification process, including TE$^{-4}$; no DNA is added to this control.

2. Prior to amplification, turn on the Thermal Cycler and, if needed, program according to the following table.

| GeneAmp® PCR Instrument System | Tube Type | Times & Temperatures for AmpF/STR Profiler Plus and COfiler | | | | | |
|---|---|---|---|---|---|---|---|
| | | Initial Incubation Step | Each of 28 Cycles | | | Final Extension | Final Step |
| | | | Melt | Anneal | Extend | | |
| DNA Thermal Cycler 480 | GeneAmp Thin-Walled Reaction | STEP CYCLE 95 °C 11 min. 1 cycle | STEP CYCLE 94 °C 1 min. | STEP CYCLE 59 °C 1 min. | 72 °C 1 min. | TIME DELAY 60 °C 45 min. | SOAK 25 °C (forever) |
| GeneAmp PCR System 9600 | MicroAmp® Reaction with Cap | HOLD 95 °C 11 min. | CYCLE 94 °C 1 min. | CYCLE 59 °C 1 min. | 72 °C 1 min. | HOLD 60 °C 45 min. | HOLD 25 °C (forever) |

Note: If the amplified products will be left in the Thermal Cycler for extended time periods, the final step should be a SOAK/HOLD at 10 °C forever.

August 1, 2000

6

OSPLab_000006



# STR Analysis for Casework
# Oregon State Police DNA Unit

## Amplification Protocol (cont.)

*Note: Perform steps 3-8 in the laminar flow hood.*

3.  Obtain the AmpF/STR Profiler Plus and/or COfiler amplification reagents to be used and transfer them to the laminar flow hood.

4.  For each sample to be amplified, label one reaction tube with the appropriate identifying markers.
    - Use MicroAmp Bubble-top tubes with the TC 9600
    - Use GeneAmp Flat-top tubes with the TC 480

5.  Briefly vortex and centrifuge the reagents. Prepare one tube of Master Mix by adding the following volume of reagents to a 1.5 mL tube: (this formulation allows for pipetting variation and variability)

    ➤ number of samples x 21.0 µL of <u>PCR Reaction Mix</u>

    ➤ number of samples x 11.0 µL of <u>Primer Set</u>

    ➤ number of samples x 1.0 µL of <u>AmpliTaq Gold DNA Polymerase</u>

    Mix well.

6.  Dispense 30 µL of Master Mix into each PCR tube.

7.  Add one-drop mineral oil to the PCR reaction tube if using the TC 480. DO NOT add mineral oil if using the TC 9600.

8.  Add 20 µL of sample or diluted sample to the proper PCR tube. After addition of the DNA, cap each tube before proceeding to the next tube. The final reaction volume is 50 µl.

9.  Place the tubes into the TC 480 or the TC 9600, pushing them completely down into the heat block and start the program.

10. After amplification, the amplified samples can be stored in the refrigerator (2 to 6 °C) for short periods of time or in the freezer (−15 °C to − 25 °C) for longer periods or time.

    *Note: Store amplified DNA samples separate from all amplification reagents and extracted DNA samples.*

August 1, 2000

7

OSPLab_000007

Exhibit 113  Page 7 of 63 to
State Defendants' Motion for Summary Judgment



# STR Analysis for Casework
# Oregon State Police DNA Unit

## Typing Protocol

**ABI Prism 310 Set-up** – *Steps in this section do not necessarily need to be completed in sequence, nor does every step need to be performed each time a run is set up.*

1.  Remove POP4 polymer from the refrigerator and allow it to warm to room temperature.

2.  Turn on heat block to warm to 95 °C.

3.  Check the run log with the instrument to determine if:
    *   Computer maintenance needs to be done
    *   Capillary needs to be changed (can be used up to 350 injections).
    *   Polymer needs to be added or changed (minimum weekly).
    *   Pump block and syringe needs to be cleaned.
    *   Buffer needs to be changed (minimum weekly).
    *   Water needs to be changed (minimum each set of runs).

4.  Open ABI Prism 310 Collection Software then open the Manual Control window from the Windows Menu. The Function pop-up menu will be used frequently in the following steps.

*Note:* *The following steps are provided as a quick reference. Perform the steps as needed. For detailed instructions, please refer to Chapter 3 of the ABI Prism 310 Genetic Analyzer User's Manual, 1998.*

5.  Check the capillary:
    *   Select <Change Capillary...> from the instrument menu.
    *   If the number of injections will exceed 350 at the completion of your run, or if there have been any indications of capillary failure, click <OK> and change the capillary. Otherwise, click <CANCEL>.

6.  Remove the syringe:
    *   Open the instrument doors.
    *   Select <Syringe Home> from the Function pop-up menu, click <Execute>.
    *   Move the syringe drive toggle to the left.
    *   Unscrew the syringe from the pump block

August 1, 2000

8

OSPLab_000008

 **STR Analysis for Casework**
**Oregon State Police DNA Unit**

## Typing Protocol - ABI Prism 310 Set-up (cont.)

7. Clean the syringe:
   - Remove the plunger from the body of the syringe (the syringe ferrule may also be removed for easier cleaning if desired).
   - Thoroughly rinse plunger and syringe body with warm water and then with deionized water.
   - Dry the outside of the syringe with a Kimwipe.
   - Remove any excess water from the syringe with compressed air.
   - Place a drop of deionized water or polymer on the teflon seal at the end of the plunger and replace it into the syringe body (excessive wear occurs to the Teflon fitting if it is completely dry).

8. Prime the syringe:
   - Allow the polymer to equilibrate to room temperature.
   - If needed, mix the polymer by inverting bottle several times and then allowing it to settle for several minutes before use.
   - Draw a small amount of polymer up into the syringe.
   - Invert the syringe and pull the plunger up to the 1.0 mL mark.
   - Ensure the syringe walls are coated.
   - Discard this polymer.

9. Fill/Add polymer to the syringe:
   - Allow the polymer to equilibrate to room temperature.
   - If needed, mix the polymer by inverting bottle several times and then allowing it to settle for several minutes before use.
   - Draw up to 0.8 mL of polymer into the syringe [minimum amount needed = (# of injections x 0.004 mL) + 0.2 mL for removing air bubbles in pump block + 0.1 mL for reinjections].
   - Remove air bubbles by inverting, allowing bubbles to rise to surface, and pushing them out of the tip.
   - Wipe the outside of the syringe with a deionized water moistened Kimwipe to remove any excess polymer. Dry.
   - Screw syringe back into the pump block (set syringe aside if pump block needs to be cleaned).
   - Optional: Capillary may be saved for future use by placing each end in a septa-capped tube containing 1X Buffer or water.

August 1, 2000

OSPLab_000009

Exhibit 113  Page 9 of 63 to
State Defendants' Motion for Summary Judgment



# STR Analysis for Casework
# Oregon State Police DNA Unit

## Typing Protocol- ABI Prism 310 Set-up (cont.)

10.  Remove the capillary:
- Open the heat plate door and open the laser detector door.
- Remove the tape.
- Unscrew the capillary ferrule.
- Remove capillary.

11.  **Remove and clean the pump block:**
(A convenient time to clean the pump block is when the capillary is changed. The pump.)
- Ensure the capillary and syringe have been removed.
- Select <Buffer Valve Open> from the Manual control function pop-up menu, click <Execute>.
- Remove the buffer reservoir.
- Grasp the pump block and pull straight out.
- Remove the luer valve, waste valve, and capillary ferrule from the pump block.
- Rinse the pump block and its channels, the reservoir, valves, and ferrule thoroughly with warm water and then with deionized water.
- Remove excess water from all components with compressed air.
- Replace the pump block, buffer reservoir, and valves.
- Partially screw the capillary ferrule back into the pump block but DO NOT tighten it (without a capillary present) or the tip will be crushed.

12.  Clean the electrode:
- Press the tray button on the 310 to move the autosampler. forward/backward to make cleaning easier.
- Wipe the electrode with a deionized water moistened Kimwipe.
- Dry the electrode with a dry Kimwipe.
- Recalibrate the autosampler after cleaning the electrode.

13.  Change the electrode:
- Unscrew and remove the cathode electrode thumbscrew.
- Put the long arm of the cathode electrode in the inner electrode hole (center hole).
- Put the short arm in the outer hole.
- Push the electrode down until it is flush with the top of the thumbscrew.
- Screw the electrode thumbscrew back onto the instrument.
- Trim the electrode if necessary (refer to manual).
- Recalibrate the autosampler after replacing or trimming the electrode.

August 1, 2000

10

OSPLab_000010



# STR Analysis for Casework
# Oregon State Police DNA Unit

## Typing Protocol- ABI Prism 310 Set-up (cont.)

14. Install a capillary:
   - Clean the capillary window using a Kimwipe moistened with 95% ethanol.
   - Partially unscrew the capillary ferrule on the right side of the pump block.
   - Insert the capillary end nearest the capillary window into the capillary ferrule and screw (fingertight) into the pump block adjusting the end of the capillary so that it is positioned at or to the right of the cross below the syringe.
   - Open the laser detector door and position the capillary in the groove with the capillary window in front of the laser detector.
   - Close the laser detector door.
   - Thread the capillary through the capillary hole in the electrode thumbscrew until it protrudes past the tip of the electrode (0.5 mm maximum).
   - Tape the capillary to the heat plate with tape.
   - Close the heat plate door.
   - Check to ensure the capillary is still in place.
   - Open the Instrument window and select Choose Capillary, click OK in the Reset window to set the injection counter to zero.
   - Close the instrument doors.

   *(Special Note:  Once the capillary has been immersed in buffer, it should not be left out of the buffer for more than 30 minutes – refer to step 20.)*

15. Install the Syringe/Lower the Syringe:
   - Screw the syringe (fingertight) into the pump block.
   - Place the syringe drive toggle so that it is positioned over the syringe plunger.
   - Select <Syringe Down> from the Manual Control Function pop-up menu, select interval (1 step to 250 steps) to lower syringe drive toggle, click <Execute>.  Continue until the syringe drive toggle makes contact with the plunger.

August 1, 2000

11

OSPLab_000011



# STR Analysis for Casework
# Oregon State Police DNA Unit

## <u>Typing Protocol</u>- ABI Prism 310 Set-up (cont.)

16. **Fill the Pump Block with Polymer:**
    - Select <Buffer Valve Close> in the Manual Control Function pop-up menu, click <Execute>.
    - Remove the air bubbles from the pump block by alternately opening and closing the two removable valves (luer valve and waste valve), the buffer valve, and the capillary ferrule while pushing polymer through using small intervals (~ 1-5 steps).
       - The removable valves are located on the top and bottom of the pump block.
       - To open or close the buffer valve, select <Buffer Valve Open> or <Buffer Valve Close> from the Manual Control function pop-up menu.
       - Polymer can also be moved through the pump block manually.

17. **Change/Fill the Buffer Reservoirs:**
    - Dilute 10X Genetic Analyzer Buffer to 1X concentration with deionized water.
    - Fill the anodic buffer reservoir to the red line with 1X Buffer and place on the pump block.
    - If needed, press the tray button (on the left side inside the 310) to move the autosampler forward for easier access to the buffers.
    - Clean or replace the cathodic buffer vial (AutoSampler position 1) and the water vial (Autosampler position 2).
    - Fill the cathodic buffer vial to the fill line with 1X Genetic Analyzer Buffer and fill the water vial to the fill line with deionized water.
    - Clean or replace the plastic lids for both vials, insert new septa and return the vials to their proper positions.
    - Discard the waste water tube (Autosampler position 3).
    - Fill a new 1.5 ml tube with deionized water (capless or one with the lid clipped off – do not used a screw-cap tube).
    - Place in position 3 on the Autosampler.
    - Return the tray to the back position and ensure the capillary is immersed in buffer.

    *(Special Note: Once the capillary has been immersed in buffer, it should not be left out of the buffer for more than 30 minutes – refer to step 20.)*

18. **Homing the Autosampler:**
    - Select <Autosampler Home X,Y Axis> in the Manual Control Function pop-up menu, click <Execute>.
    - Select <Autosampler Home Z Axis> in the Manual Control Function pop-up menu, click <Execute>.

August 1, 2000

12

OSPLab_000012



# STR Analysis for Casework
# Oregon State Police DNA Unit

## Typing Protocol - ABI Prism 310 Set-up (cont.)

19. Calibrate the Autosampler:
    - Choose <Autosampler Calibration> from the Instrument menu.
    - Click Start and follow the computer directions.

    *Note: The Autosampler should be calibrated each time a new capillary or electrode is installed or whenever there is a possibility that the capillary has been misaligned.*

20. Move the capillary to position:
    - Select <Autosampler To Position> in the Manual Control Function pop-up menu.
    - Enter the desired position of 1 to take the capillary to the 1X Buffer Reservoir, click <Execute>.
    - Select <Autosampler Up> from the Manual Control Function pop-up menu.
    - Enter a value (~1-200), click <Execute>.
    - Repeat moving the <Autosampler Up> until the capillary is immersed in buffer.

21. Set the Temperature:
    - Close the instrument doors.
    - Choose <Temperature Set> from the Manual Control Function pop-up menu.
    - Enter a value of 60 and click <Execute>.

    *Note: Preheating to 60 °C can take up to 30 minutes. If desired, samples can be prepared during this waiting time.*

Note:    *At any time, the status of the instrument may be checked by selecting <Status> from the Window menu in the Collection software.*

August 1, 2000

13

OSPLab_000013

Exhibit 113  Page 13 of 63 to
State Defendants' Motion for Summary Judgment



# STR Analysis for Casework
# Oregon State Police DNA Unit

## Typing Protocol

### Sample Sheet Set-Up

1. Select New from the File menu (in the Collection Software).

2. Click the <GeneScan Sampl Sheet 48 Tube> icon.

3. Fill in the appropriate information in the Sample Name column and copy to the Sample Info column. Include:

   - Run Blank (optional): A blank, containing only the Formamide/ROX mix used for STR typing. No amplified product is added to this control. This blank is usually the 1st injection. If a run blank is not used, ensure that the 1st sample is injected in duplicate (the first injection data should not be used in data analysis).

   - Include at least one Profiler Plus and/or COfiler Ladder depending on samples being run and preferably the ladders should bracket the corresponding samples. The word "ladder" needs to be included in the sample information column for that ladder to be used for genotyping using the Genotyper Software.

   - Evidentiary samples should be separated from reference standards by ladders or blanks (PCR or reagent) if they are from the same case

   - Each tray should include either a COfiler ladder or a sample containing a THO1 9.3,10 - to be used as an aid in checking resolution of the run

4. Ensure that all dye boxes are checked ON. (Note: If you insert lines, you should verify the appropriate standard box is identified – a diamond appears next to the color used for the size standard.)

5. Select Save As from the File menu and save the Sample Sheet into the default Sample Sheet folder. (Format: SS.date.analyst initials   i.e., SS.020599.ABC)  Click SAVE!

6. Print the sample sheet (a suggested method for printing follows)
   - Under File menu, select Page Set-up.
   - Choose 2-Up layout, 75%, & portrait; click OK.
   - Under File menu, select Print.

August 1, 2000

14

OSPLab_000014



# STR Analysis for Casework
# Oregon State Police DNA Unit

## Typing Protocol (cont.)

### Injection List Set-Up

1. Select New from the File menu and click the <GeneScan Injection List> icon.

2. Choose the desired sample sheet from the pop-up menu (the recently saved sample sheet or any appropriate sample sheet containing the samples you want to run).

3. Insert more injection spaces if needed, i.e., additional injections of the ladder, reagent blank or other samples.
   - If there is no run blank, then inject the 1st injection twice at the beginning of the run.
   - Ensure the appropriate ladders (Profiler Plus or COfiler) are injected approximately every 24 samples, and preferably the ladder injections should bracket the corresponding samples (either Profiler Plus or COfiler).

4. For each sample, verify the defaults selected:
   - module file (GS STR POP4 (1mL) F)
     Inj. Secs = 5; Inj. kV = 15.0; Run kV = 15.0; Run °C = 60; Run Time = 24
   - matrix file (most current)
   - analysis parameters
   - size standard.

   Note: The settings may be edited using the pop-up menus and/or typing over the values with the preferred values. (Refer to appendices B, C, and D for detailed information on these files.)

5. Check the Auto Anlz box if you would like the data automatically analyzed by the GeneScan Analysis Software.

6. Check the Auto Prt box if you would like the data automatically printed after auto analysis.

August 1, 2000

15

OSPLab_000015



# STR Analysis for Casework
# Oregon State Police DNA Unit

## Typing Protocol (cont.)

### Sample Set-Up

1.  In a 1.5 mL tube, combine the deionized formamide and GeneScan-500 [ROX] Internal Lane Size Standard for the master mix as follows:

    > (number of samples + 2) x 25 μL deionized formamide

    > (number of samples + 2) x 0.50 μL GeneScan-500 [ROX] size standard

    (The quantity of GeneScan-500 [ROX] size standard may need to be varied, depending on the lot and the instrument. Range should be 0.25μL-1μL.)

    Vortex and spin briefly.

    **WARNING! CHEMICAL HAZARD!** Formamide is a teratogen and is harmful by inhalation, skin contact, and ingestion. Use in a well-ventilated area. Use chemical-resistant gloves and safety glasses when handling.

2.  Aliquot 25 μL of formamide/ROX master mix into each labeled tube (samples, ladders, blanks, etc.).

3.  Add 1.5 μL of amplified product or 1.0-2.0 μL allelic ladder (amount of ladder may vary by kit) to the corresponding tube. Mix by pipetting up and down and immediately seal tube with a septum.

4.  Denature the samples by placing in the 95 °C heat block for at least 3 minutes.

5.  Snap-cool for at least 3 minutes in a cold block (stored in the freezer).

6.  Place the tubes in a 48-well sample tray. Double-check that the order of the tubes in the tray matches that of the sample sheet.

August 1, 2000

16

OSPLab_000016

Exhibit 113  Page 16 of 63 to
State Defendants' Motion for Summary Judgment



# STR Analysis for Casework
# Oregon State Police DNA Unit

## Typing Protocol (cont.)

### Loading and Running the Samples

1. Open the instrument door. Press the tray button (to the left of the pump block) to present the tray.

2. Place the sample tray on the autosampler and press the tray button to return the tray.

3. Ensure the end of the capillary is immersed in buffer solution. If it is not, from the Manual Control function pop-up menu, select Autosampler to position, enter a value of 1, and click execute. Once the autosampler has moved to position 1, select autosampler up, enter a value of 1 to 200 (will vary depending on how much the autosampler needs to move), click execute. Repeat until the end of the capillary is immersed in buffer solution.

4. If not previously set, select Temperature Set from the Manual Control menu, set the temperature to 60 °C, and click execute. (It will take approximately 30 minutes for the heat block to warm up.)

5. If a new capillary was installed, select Change Capillary under the Instrument menu. Select OK in the reset window to set the injection counter to zero.

6. If a new capillary was not installed, select Change Capillary and record the number of injections on the CE Run Log Sheet, select CANCEL in the window.

7. Click on the Run button in the injection list to begin electrophoresis.

8. Print the Injection List (a suggested method for printing follows)
   - Under File menu, select Page Set-up.
   - Choose 1-Up layout, 65-75%, & landscape; click OK.
   - Under File menu, select Print.

9. Anytime after the start of the run, the injection list may be edited to add additional injections of samples already on the sample sheet, re-inject any poor injections, etc. If the Injection List is edited, it must be saved (Go to the File menu, select Save, and click OK) and it must be printed out again.

August 1, 2000

17

OSPLab_000017



# STR Analysis for Casework
# Oregon State Police DNA Unit

## GeneScan Analysis

*Special Note: This section assumes the user has a basic knowledge of the Macintosh computer and is able to perform basic functions. The sample files can be analyzed on any Macintosh computer containing the GeneScan Analysis and Genotyper software. Also, steps for using the GeneScan Analysis and Genotyper software do not necessarily need to be completed in sequence.*

GeneScan Analysis software is used to determine the size of the sample DNA fragments based on the internal size standard. In addition, the GeneScan analysis includes establishing a baseline, adjusting for spectral overlap of the dyes, and peak detection.

## GeneScan Data Analysis

1. Open the GeneScan Project.

2. If Autoanalyze was checked ON in the injection list, the samples should have been autoanalyzed. Skip to step 5.

3. If Autoanalyze was OFF in the injection list or if the parameters need to be changed, the samples will need to be analyzed. Document any changes if the data is re-analyzed using different parameters.

4. Analyze the samples.
   - Check the analysis parameters and size standard (change them using the pop-up menus)
   - Highlight the desired samples
   - Click <Analyze>

   *Refer to the appendices (B, C, and D) for instructions on analysis parameters, size standards and matrix files.*

5. The GeneScan electropherograms are now ready to view. View the results from the Results Control window.

6. At any time, the analyst may choose to make a new GeneScan Project. Save the new project as: PJ.<date>.AI.misc

7. (Optional): View, and if desired, print out the Analysis Log.

August 1, 2000

18

OSPLab_000018



# STR Analysis for Casework
# Oregon State Police DNA Unit

## GeneScan Analysis (cont.)

8.   Review the data to determine if any of the items listed in the following table have occurred or if any items of interest not listed in the table have occurred. If so, document necessary items and apply the appropriate corrective action(s).

Table 2.  Observations/Corrective Action for GeneScan Data

| Observation | Corrective Action |
| --- | --- |
| Size Calling Failed -- Fewer than 3 peaks found in dye selected as standard | Re-inject the sample (Usually this is an indication of a bad injection and there is no need to Genotype.) |
| Matched Size Range does not include entire range (75-400 bp) | 1)  Consider re-analysis with different parameters to include 75bp peak<br>2)  If Profiler Plus, re-inject if 400 bp peak not sized if the largest sample allele is greater than 350 bp.<br>3)  If COfiler, re-inject if 350 bp peak not sized<br>4)  Re-inject if any of the other peaks 75-400bp were showing signs of an injection problem (reduced peak heights, broad peaks, etc.) |
| In-Lane Standard sizes not defined correctly | 1) Check to ensure matched size range is correct<br>2) If sizes were not defined correctly, define a new size standard, apply it to the samples, and re-analyze. |
| Off-scale Regions (signal too high) | Re-inject the sample for less time (e.g. 2 sec) or  2)  Dilute amplified product (ex. 2µl PCR product in 6 µl 1X TE buffer; depending on the strength of sample, the dilution may be varied or several dilutions made) and re-inject or  3) Re-amplify using less input DNA and re-type |
| Size calling not performed because no dye selected as standard | 1)  Make sure the ROX lane is selected as the standard (there will be a diamond in the red lane)<br>2)  The standard lane can be selected by putting the cursor in the box for the standard and then holding the shift and option key and at the same time, clicking in the ROX lane for that sample<br>3)  A diamond will appear<br>4)  Re-analyze the sample |
| Uncalled alleles (visible peaks not identified by GeneScan software) | Case-by-Case |
| Mixture | 1)  Identify the minimum number of contributors (if you are able)<br>2)  Case-by-Case |
| Spike(s), other anomalies | 1)  Re-inject if spike or other anomaly interferes with interpretation or  2)  Proceed if it does not interfere with interpretation |

August 1, 2000

19

OSPLab_000019



# STR Analysis for Casework
# Oregon State Police DNA Unit

## GeneScan Analysis (cont.)

| Observation | Corrective Action |
|---|---|
| No signal detected (no true peaks) | If ROX internal lane standard is fine, then most likely no or insufficient DNA to provide results |
| Minus-A shoulder | Re-incubate the amplified product and re-run if magnitude of –A makes interpretation ambiguous |
| Excessive Stutter | Usually a result of overloaded sample, or mixture. Case-by-case. |
| Any other comments | Document |

*Note: The above table is not all-inclusive. For a more detailed troubleshooting guide, please refer to the ABI Prism 310 Genetic Analyzer User's Manual (1998).*

9.   Document any sample injection in the GeneScan project that can not be resolved (e.g. bad injections, run blank, etc.), as there would be no need to genotype the sample.

10.  Visually examine the ROX dye lanes. *(Note: If the ROX is not examined in GeneScan, it must be examined in Genotyper.)*

A suggested method to check selected Rox peaks (246bp, 75 bp, or 400 bp) is:

10a.  In the Results Control Window (Quick Tile Off), Display all red dye lanes. Each tile will display up to 16 samples, if viewing more than 16, choose another tile and display more. You can also display each injection individually. *(This display is usually by size (bps); however, if size calling failed on any sample injection, it will be displayed by datapoint or that injection will not be displayed.)*

10b.  Hold <SHIFT> and click on the peaks of interest (75, 400, 246, or other).

10c.  Under View Menu, select <Show only Selected Rows> (or Alt G).

10d.  **246 bp peaks** – Note the sized base pair value for all the usable injections. The acceptable range for the peaks is ~245-247 base pairs. The exact value will vary slightly from injection to injection and run to run; however, all the 246 peaks in a comparison set should be within 1 bp of each

August 1, 2000

20

OSPLab_000020



# STR Analysis for Casework
# Oregon State Police DNA Unit

other. Make this calculation. If there is greater than 1 bp difference, interpretation should be done with caution.

## GeneScan Analysis (cont.)

**75 bp peaks** - Note the earliest 75 bp data point and ensure it is included in the analysis range. If it is not, change the analysis parameters to include all the 75 bp peaks and re-analyze.

**400 bp peaks** – Note the latest 400 bp data point and ensure it is included in the analysis range. If it is not, the sample should be re-injected.

10e.  **Print** at least the electropherogram/tabular information for the 246 bp peaks. It is optional to print for the 75bp or 400bp.

11.  Check that the THO1 9.3 and 10 alleles in the COfiler Ladder (or other sample used) are resolved.

12.  Examine the four dye lanes for each injection.

- Ensure each allele in the allelic ladder has been sized by GeneScan.

- Examine the **9947A** positive control for completeness and ensure that GeneScan has sized each allele. If any alleles fall below 150 RFUs in any of the dye lanes, attempt to ascertain the cause. If it is an injection concern, the positive control may be re-injected. If a sample set-up concern is indicated, a new aliquot may be taken from the amplified product and re-run. If acceptable results are not obtained, it will be necessary to re-amplify the positive control and all associated samples.

- Examine the **PCR** blanks and reagent blanks for peaks, as the appearance of such peaks may indicate contamination. If the peak height is low (less than 150 RFU) relative to the sample peaks, the samples may be genotyped with caution. Peaks greater than 150 RFU indicate a more serious problem and may warrant repetition of sample extraction, amplification and/or typing using new reagents.

- Examine the substrate samples. Any peaks corresponding to the substrate sample (unstained region) should be considered. If the

August 1, 2000

21

OSPLab_000021



# STR Analysis for Casework
# Oregon State Police DNA Unit

## GeneScan Analysis (cont.)

evidentiary stain gives a clear typing result (>150 RFU) and the unstained region shows small peaks (<150 RFU), then the type in the stained region may be interpretable.  Clearly, if the stained region shares no alleles in common with those in the unstained area, the stained region is interpretable.

- Examine each of the samples, documenting any necessary observations.

August 1, 2000

22

OSPLab_000022

Exhibit 113  Page 22 of 63 to
State Defendants' Motion for Summary Judgment



# STR Analysis for Casework
# Oregon State Police DNA Unit

## Genotyping

STR results are interpreted by manual or computer generated allele assignment. Genotypes are assigned by comparing the sizes obtained for the unknown sample alleles with the sizes obtained for the alleles in the allelic ladder. Genotypes, not sizes, are used for comparison of data between runs, instruments, and laboratories.

The allelic ladders, which are contained in the AmpFISTR Profiler Plus and/or COfiler Amplification Kits, contain the most common alleles for each locus. The number of 4-bp repeat units observed is designated by an integer. Variant alleles that contain a partial repeat are designated by an integer and decimal followed by the number of bases in the partial repeat.

The GeneScan-500 ROX is used as the Internal Lane Size Standard. It is important that the 400-bp peak in the GeneScan-500 ROX size standard be defined and used in sizing for Profiler Plus samples. COfiler only requires up to the 350 bp peak. This internal lane size standard is run with every sample (including ladders, positive and negative controls, test samples, etc.) to normalize injection-to-injection migration differences. Size windows based on the allelic ladder are used to assign alleles

## Automated Genotyping

Genotyper software is used to automatically convert allele sizes from GeneScan into allele designations and to build tables containing the genotype information. Genotypes are assigned by comparing the sizes obtained for the unknown sample alleles with the sizes obtained for the alleles in the allelic ladder.

1.  Open the Genotyper software by double clicking on the AmpF/STR Profiler Plus or COfiler template file. *(The template file is a Stationary Pad, which means that a new document is created each time it is opened. The original file is not overwritten.)*

2.  Import the GeneScan sample files by choosing Import GeneScan File(s) from the File menu.

3.  Select all checkboxes (Import raw data, Blue, Green, Yellow, and Red).

4.  Select either the GeneScan project file or individual samples files. Click Import.

August 1, 2000

23

OSPLab_000023

Exhibit 113  Page 23 of 63 to
State Defendants' Motion for Summary Judgment



# STR Analysis for Casework
# Oregon State Police DNA Unit

## Automated Genotyping (cont.)

5.  If each sample did not have Sample Info completed in the sample sheet, this can be accomplished in Genotyper as follows:

    •   Under the Views menu, choose Show Dye/lanes Window.

    •   Select the first sample row by clicking on the row.

    •   Click the mouse cursor in the Sample Info box at the top of the window, and type the sample designation or description.

    •   Repeat the above two steps to enter a sample description for every dye/lane in the list. Enter the same sample description for all dye colors of a single sample. (This information is required for the Genotyper macros to build a table.)

6.  Under the Views menu, select Show Dye/lanes Window

    •   If genotyping Profiler Plus samples, delete all COfiler samples by holding the shift key down and highlighting all the COfiler injections, then under the Edit Menu, select clear. (Do the reverse if genotyping COfiler samples.)

    •   In the same manner, delete any samples that are not going to be genotyped such as bad injections, etc.

    •   Close the dye/lanes window

7.  The Genotyper file may be saved as:
    GTPP.date.AI.case  (for Profiler Plus)
    GTCO.date.AI.case  (for Cofiler)

8.  From the Macro list in the main window, select <Check GS500> for Profiler Plus samples or select <Check GS350> for COfiler samples.

9.  Go to the Macro menu and choose Run Macro.

10. A plot window will come up with electropherograms of the internal lane size standards. Scroll through each sample and verify that each peak was sized correctly during the GeneScan analysis and that it includes the entire range 75-400 bp. If the 246 bp data was not previously printed, print this window.

August 1, 2000

24

OSPLab_000024

Exhibit 113  Page 24 of 63 to
State Defendants' Motion for Summary Judgment



# STR Analysis for Casework
# Oregon State Police DNA Unit

## Automated Genotyping (cont.)

11.  Select Kazam from the Macro list. Go to the Macro menu and select Run Macro. *Note: The first "ladder" encountered by the macro will be used comparison ladder. If desired, a different "ladder" may be chosen.*

12.  When the macro is finished running, a plot window will open with the blue allelic ladder and blue sample peaks labeled.

     Electropherograms may be viewed one color at a time or in multiple colors.
     - To choose a single color, click on one of the four color buttons in the top left of the Main Window

     - To choose multiple colors, hold the shift key and select the desired color buttons

     - Under Views Menu, select Show Plot Window or click on the plot icon

     - Use the scroll bar to scroll through the electropherograms

     - Hint: Make ladder window smaller to view more of the sample electropherograms on screen

     To change the labels displayed on the electropherograms:
     - Under Analysis Menu, select <change labels>
          CAUTION: Do Not select <label peaks>!!!
     - Check the labels you desire to have displayed (e.g. peak height, base pair, etc.) and click OK
     - The selected labels will now be displayed in a box under the allele designations

     To change the colors of the labels displayed on the electropherograms:
     - Under Views Menu, select <plot options>, then select <label options>
     - Click on and highlight button for <Color labels by data type>
     - Using the pop-up menus, choose the desired colors for the labels being used

13.  Save the UNEDITED Genotyper file into the run folder as follows (if file saved previously in step 7, just select File, then Save):
          For Profiler Plus      GTPP.date.AI.misc
          For COfiler            GTCO.date.AI.misc

August 1, 2000

25

OSPLab_000025



# STR Analysis for Casework
# Oregon State Police DNA Unit

## Automated Genotyping (cont.)

14.  Print Genotyper electropherograms for all pertinent samples.

To print samples individually or selectively:
*   Under View Menu, select Show Dye/lanes Window (or click on the Dye/lane icon)

*   Highlight the desired sample(s), holding the shift key for multiples

*   Under View Menu, select Show Plot Window (or click plot icon)

*   Print

15.  Examine and edit the results for the blue, green and yellow data, according to the Interpretational Guidelines (Section 7).

*   The allelic ladder plot used for genotyping will be displayed at the top of the plot window and will not move while scrolling, allowing for a direct comparison of the sample file plots to the allelic ladder. Check that the allelic ladder peaks are clearly visible and that all the peaks (alleles) are labeled correctly.

*   Allele categories are defined to be +/- 0.5bp wide.  Peaks which fit into that window for an allele category will be labeled with that allele designation. (The categories for THO1 9.3 and 10 are +/- 0.4bp wide.)  Peaks that do not fall within an allele category will be labeled as an off-ladder allele (OL Allele).

*   The Kazam macro includes a step that removes labels from peaks that are less than the stutter percentage for each locus.

*   Peaks that are less than the minimum peak height threshold (50 RFUs) will not be labeled.

*   Scroll through the sample electropherograms and examine the peak labels checking for any peaks that have been called.  Identify any

August 1, 2000

OSPLab_000026

Exhibit 113  Page 26 of 63 to
State Defendants' Motion for Summary Judgment



# STR Analysis for Casework
# Oregon State Police DNA Unit

## Automated Genotyping (cont.)

spikes, stutter peaks, minus-A shoulders, off-ladders, mixtures, uncalled alleles, off-scale data, etc.

Edit peaks as necessary on the print-out. No editing will be done in the GT file.



August 1, 2000

27

OSPLab_000027



# STR Analysis for Casework
# Oregon State Police DNA Unit

## Manual Genotyping

1. Select one lane or injection of allelic ladder to use for manual genotyping. *(It does not matter which lane or injection of allelic ladder is selected if the alleles in the allelic ladder samples are within ± 0.5 bp of each other.)*

2. Compare the base pair size obtained for each sample allele peak to the sizes obtained for the allelic ladder peaks.

3. Assign genotypes to those sample allele peaks falling within ± 0.5 bp of the corresponding allelic ladder peak.

4. Any sample with an allele(s) that does not size within a ± 0.5 bp window must be re-run to determine whether it is a true off-ladder allele or a possible measurement error due to sample strength, room temperature fluctuations during the run cycle, etc.

   a. An alleged true off-ladder allele sample should be re-run.

      True off-ladder alleles may be known and just not represented in the allelic ladders or they may be "unknown." Regardless, the allele designation may be assigned based on the base pair value.

   b. If the sample strength is suspected as the cause of the off-ladder call, the sample may be re-injected for less time. Peaks near the upper signal threshold are often attenuated and broad. Decreasing the injection time may allow the entire peak to be analyzed and provide the true size of the peak to be identified. If the sample is still too strong, the amplified product should be diluted and rerun or re-amplified.

   c. If missed ROX peaks or room temperature fluctuations are suspected as the cause of the off-ladder call, the sample should be re-injected for 5 seconds.

August 1, 2000

28

OSPLab_000028



# STR Analysis for Casework
# Oregon State Police DNA Unit

## Double Reader

All GeneScan Analysis and Genotyper data shall be independently reviewed by a second qualified analyst to confirm that the conclusions are scientifically supported by the data and that the interpretations have been made objectively, consistently, and within previously agreed limits.

Any differences between the two readers must be resolved prior to issuing a final interpretation and report. If, after review and discussion of the data, disagreement remains regarding a particular result or conclusion, the case file will be referred to the technical leader for a final decision.

August 1, 2000

29

OSPLab_000029

Exhibit 113  Page 29 of 63 to
State Defendants' Motion for Summary Judgment



# STR Analysis for Casework
# Oregon State Police DNA Unit

## Interpretation Guidelines for Profiler Plus and COfiler

### Introduction

The following are objective criteria used to evaluate STR profiles. They are to be used as general guidelines. Every possible situation is not covered. Analysts may draw upon experience and other case information when making an interpretation.

### Evaluation of STR Data

The goal of the evaluation and interpretation of STR data is to determine the DNA profile(s) of the questioned samples for comparison to reference sample profiles.

1. A peak is defined as a tapering projection above the baseline.

2. The peak height is the point at which the intensity of the peak is highest.

3. Peak heights should be a minimum of 150 relative fluorescent units (RFU). Peak heights less than 150 RFU may be interpreted with caution.

4. Homozygous alleles appear as single peaks and usually have a peak height approximately twice that of the heterozygous alleles within the same sample and color family.

   - Results indicating a homozygous type with low peak heights should be interpreted with caution when obtained from samples suspected to contain degraded DNA.

5. Heterozygous alleles appear as a two-peak pattern and generally have an allelic peak ratio of greater than 70%.

   - Occasionally, non-mixed samples may be outside this range. Ratios less than 70% at more than one locus may indicate a mixture. Analysts should consider results at all loci when interpreting samples exhibiting peak height ratios less than 70%.

August 1, 2000

OSPLab_000030



# STR Analysis for Casework
# Oregon State Police DNA Unit

## Evaluation of STR Data (cont.)

loci in question, the number of loci affected and the percent disparity between alleles, the sample may need to be re-amplified and re-run.

- Other causes of imbalance at a locus include degraded DNA, presence of inhibitors, extremely low amounts of input DNA, or primer mis-match.

6.  Mixtures may be indicated by the following:

    a.  The presence of more than two alleles per locus at more than one locus

    b.  The presence of a peak at a stutter position that is greater in peak height than that typically observed for stutter in a single source sample

    c.  Significantly imbalanced alleles for a heterozygous genotype at more than one locus.

In some cases it may be possible to estimate the approximate number of contributors by considering number of alleles present at a locus, the appearance of the allelic patterns within and between loci, etc.

In some DNA mixtures a minor contributor and/or a major contributor may be distinguishable, especially when there is a significant difference in amounts of input DNA from the different contributors.

When a contributor is known or expected to be present, as in certain sexual assault samples where the victim's epithelial cells have been incompletely separated from the sperm cells, assignment of the known contributor's alleles may allow for determination of the remaining profile.

In other DNA mixtures, the donors of the individual peaks may be unclear. Under these circumstances, it may be reported that a given individual can or cannot be excluded as a contributor to the mixture.

The likelihood that any sample is a mixture must be determined by the analyst by assessing all of the DNA case information including the information provided by the known reference standards.

DNA typing results at other loci (e.g. DQA1, PM, D1S80, RFLP, etc.) may also be considered in interpreting mixtures.

August 1, 2000

31

OSPLab_000031



# STR Analysis for Casework
# Oregon State Police DNA Unit

## Evaluation of STR Data (cont.)

7.  Genotypes can still be interpreted even when some loci amplify poorly. Each locus is independent of the others, allowing for results to be interpreted and a genotype profile obtained at the other loci. Poor amplification at a locus may be due to degraded DNA, presence of inhibitors, extremely low or excessively high amounts of input DNA, primer mis-match, or other factors.

8.  Artifact peaks, within the analysis range of the target alleles, may be detected on the electropherograms. These peaks may be caused by stutter, incomplete 3' A nucleotide addition, "pull-up," or other anomalies.

### *Stutter*

The PCR amplification of STR loci typically produces an artifactual minor stutter peak at four base pair intervals. The most common stutter peaks observed in all loci are four bases shorter than the main allele peak. It is also possible to see stutter peaks four bases longer or eight bases shorter than the main allele peak.

Percent stutter is the ratio of the stutter product relative to the corresponding allele and is measured by dividing the peak height of the stutter peak by the peak height of the appropriate adjacent main allele peak. The height of stutter peaks can vary by locus. The following table values for the thirteen core loci should be used as guidelines for the expected levels of stutter:

| Percent Stutter Category | Loci in Category | Kit |
|---|---|---|
| <16% | D18S51 | Profiler Plus |
| <12% | FGA | Profiler Plus |
| <10% | D3S1358 | Profiler Plus, COfiler |
| | vWA | Profiler Plus |
| | D16S539 | COfiler |
| | CSF1PO | COfiler |
| <8% | D8S1179 | Profiler Plus |
| | D21S11 | Profiler Plus |
| | D5S818 | Profiler Plus |
| | D13S317 | Profiler Plus |
| | D7S820 | Profiler Plus, COfiler |
| | THO1 | COfiler |
| | TPOX | COfiler |

August 1, 2000

OSPLab_000032

Exhibit 113  Page 32 of 63 to
State Defendants' Motion for Summary Judgment

Case 3:21-cv-01719-MTK     Document 184     Filed 01/08/25     Page 68 of 208



# STR Analysis for Casework
# Oregon State Police DNA Unit

## Evaluation of STR Data (cont.)

Stutter peaks may be elevated above the established percent values by the following:

a.   The presence of a minor component (as in a mixture) at the same location as a stutter peak.

b.   Main peaks that are designated "off-scale" by the GeneScan Analysis Software may give unnaturally high percent stutter. The results may be interpreted with caution or the sample may be re-injected with less amplified product to help resolve the issue.

c.   Stutter peaks overlapping an area of elevated baseline may exhibit increased percentages. The analyst may choose to apply a different matrix and re-analyze the sample with GeneScan Analysis Software. Elevated baselines may indicate an improperly functioning matrix, a problem with the capillary, etc. The analyst may also choose to re-inject the sample.

### ADDITION OF 3' A NUCLEOTIDE

AmpliTaq Gold DNA polymerase is used in the amplification to maximize the non-template addition of a 3' terminal nucleotide. Sub-optimal amplification conditions or excessive amounts of input DNA may not allow for full A nucleotide addition resulting in "split peaks", where an allele is represented by two peaks one base pair apart. Samples displaying split peak characteristics may be incubated again at 60°C (to complete the A addition), diluted (if off-scale), and re-run.

*(Microvariants may differ by only one base pair so interpretation should be made with caution. Microvariants will not change base pair value upon re-incubation and re-running.)*

### "PULL-UP"

Small artifactual peaks can appear under true peaks in other colors. Pull-up is a result of spectral overlap between the dyes which is normally corrected for by the matrix.

Pull-up can occur as a result of:

a.   Application of an inaccurate or sub-optimal matrix. A new matrix can be made and applied using new matrix standards. *(A new lot of reagent(s) may be responsible for changing the conditions for which the original matrix was established.)*

August 1, 2000

OSPLab_000033

Exhibit 113  Page 33 of 63 to
State Defendants' Motion for Summary Judgment



# STR Analysis for Casework
# Oregon State Police DNA Unit

## Evaluation of STR Data (cont.)

b.    Too much input DNA can lead to off-scale data.  The matrix is less effective with off-scale data.

### OTHER ANOMOLIES

Transient fluorescent materials in the injection (i.e., precipitated urea, fabric dyes, air bubbles, etc.) can cause artifactual peaks.

- Most artifactual peaks can be shown to be false by re-injection of the sample.

- "Spikes" are one of the most common anomolies and can occur in one, two, three, or all four colors.
    - Artifactual peaks occurring in all four colors are the easiest to diagnose as they will be the same size and of similar height; they do not necessarily need to be re-injected if they do not interfere with the interpretation of the sample.
    - Artifactual peaks occurring in less than four colors should be interpreted with caution.

9.    Off-scale data is delineated by a vertical red line through the peak. Off-scale data is generally a result of too much input DNA in amplification where the fluorescence intensity from the PCR products may exceed the linear dynamic range for detection by the instrument.

- Multicomponent analysis of off-scale data may result in raised baselines, excessive "pull-up" of one or more colors under the off-scale peaks, or unnaturally high stutter peak ratios.

- Off-scale data may still be interpreted with caution.

- The analyst may choose to dilute and re-run the amplified product, inject the sample for less time or re-amplify and run the sample using a smaller quantity of input DNA to achieve optimal results.

August 1, 2000

OSPLab_000034

Exhibit 113  Page 34 of 63 to
State Defendants' Motion for Summary Judgment



# STR Analysis for Casework
# Oregon State Police DNA Unit

## Evaluation of STR Data (cont.)

10.  *Off-Ladder Alleles*

- Peaks not aligning with those in the allelic ladders may be detected both within and outside of the range of the allelic ladders. The Genotyper software will accurately label many of the alleles not present in the allelic ladders; however, manual genotyping may be used to determine a genotype where the Genotyper software does not make an assignment. Manual genotypes are assigned using the base pair calculated by the GeneScan Analysis software.

- Whenever an "off-ladder" allele is considered a true off-ladder allele (a variant allele rather than an off-ladder allele due to off-scale data, -A split peaks, or "pull-up") it should be confirmed by re-running if it conforms to the same overall guidelines described in the above sections.

- Alleles smaller than the lowest molecular weight allele (i.e., allele A) in the allelic ladder for that locus will be designated as "<A". Alleles larger than the largest molecular weight allele (i.e., allele B) in the allelic ladder for that locus will be designated as ">B". In some circumstances, questioned samples can be coelectrophoresed (mixed) with the reference sample and re-typed to verify.

### Positive Control
The positive control should have all the alleles present and they should genotype correctly. If the positive control does not give a typeable result, the entire set of samples amplified with this control should be re-amplified and run.

August 1, 2000

35

OSPLab_000035



# STR Analysis for Casework
# Oregon State Police DNA Unit

## Evaluation of STR Data (cont.)

### *Negative Controls*
Allelic peaks should not be present in the negative controls (reagent blanks and PCR blank).

- The appearance of allelic peaks indicate that the sample preparation reagents may have been contaminated, that cross-contamination between samples is occurring during preparation, or that human DNA or amplified DNA is getting into the samples from some other source.

- The appearance of allelic peaks in the negative control does not necessarily mean that the types obtained for the test samples are incorrect. Even if a reagent used to prepare all the samples was contaminated, the level of contamination might be inconsequential compared to the amount of DNA being amplified and run in the test samples. Further testing may be necessary to support these possibilities.

### *Substrate Samples*
Any allelic peaks corresponding to the substrate sample (unstained region) should be considered. If the evidentiary stain gives a clear typing result and the unstained region shows inconclusive results or results less than 150 RFU, the type in the stained area may be interpretable. Clearly, if the substrate sample shares no alleles in common with the evidentiary stain, the stained region is interpretable.

August 1, 2000

36

OSPLab_000036





# STR Analysis for Casework
# Oregon State Police DNA Unit

## Population Frequencies

Population frequencies will be calculated using the population data found in the publication by Budowle et al. (1999) according to the recommendations of the National Research Council Committee on DNA Forensic Science (1996).

- For single source DNA samples or for the major donor in a DNA mixture, calculations will be made as follows: At a given locus the frequency of a homozygous genotype will be calculated as $p^2 + p(1-p)\theta$. The value of $\theta$ used will be 0.01. The frequency of a heterozygous genotype will be calculated as $2pq$.

- When an individual cannot be excluded as a minor contributor to a mixed stain, the following guidelines should be followed in calculating a frequency:

  - If two peaks from the minor contributor can be detected at a locus, use $2pq$ to calculate the genotype frequency of the minor contributor.

  - If the locus exhibits a pattern in which a peak from the minor contributor could be masked by a peak from the major contributor, use $2p$ for the frequency of the unmasked minor genotype where $p$ is the minor allele frequency.

  - If only one of the heterozygous peaks of the minor contributor falls above the threshold, then $2p$ should be used, where $p$ is the frequency of the callable peak.

  - If the peak(s) from the major contributor would completely mask those of the putative minor contributor, then that locus is inconclusive and no statistical interpretation shall be made.

  - Any locus in which the peaks from the minor contributor fall below the threshold are inconclusive and no statistical interpretation shall be made. (Note: These minor peaks may be used for exclusionary purposes).

(See table below for an illustration of these guidelines)

- Multilocus STR profile frequencies will be calculated by multiplying together the genotype frequencies from each locus.

Note: In some mixtures the relative proportions of the donors is such that individual profiles can be distinguished at all loci typed. In other mixtures, it may be possible to distinguish donor profiles at some loci but not others. The analyst should adopt a conservative approach in making a statistical interpretation at loci in which a donor genotype cannot be completely identified.

August 1, 2000

37

OSPLab_000037



# STR Analysis for Casework
# Oregon State Police DNA Unit

## Population Frequencies (cont.)

- For DNA mixtures in which there are multiple minor contributors, or in which there are no clear major and minor contributors discernible, a $P_E$ (probability of exclusion) may be calculated using the frequencies of the callable alleles in the profile (Melvin, 1988).

- For cases involving reverse paternity and questioned paternity and/or maternity, the formulas described by Schanfield et al. (1995) will be applied:

    RPNE (Random Parents Not Excluded) = $(p^2 + 2p(1-p)) \times (q^2 + 2q(1-q))$

    RMNE (Random Man Not Excluded) = $p^2 + 2p(1-p))$

    RFNE (Random Female Not Excluded) =
    $$p^2 + q^2 + 2pq + 2p(1-p-q) + 2q(1-p-q)$$ when the child is heterozygous

    and

    $$p^2 + 2p(1-p)$$ when the child is homozygous

- If required, the probability of finding the evidence profile in relatives of the suspect or victim will be calculated according to the formulas recommended by the National Research Council Committee on DNA Forensic Science.

August 1, 2000

38


OSPLab_000038

Exhibit 113  Page 38 of 63 to
State Defendants' Motion for Summary Judgment



# STR Analysis for Casework
# Oregon State Police DNA Unit

## Population Frequencies (cont.)

### Two Contributor DNA Mixtures

| Peak Pattern (examples) | Major/Minor | Peaks Observed | Genotype Frequency Major | Minor |
|---|---|---|---|---|
| | Heterozygote/Heterozygote | 4 | $2pq$ | $2pq$ |
| | Heterozygote/Heterozygote | 3 | $2pq$ | $2p$ |
| | Heterozygote/Heterozygote | 2 | $2pq$ | Inc. |
| | Homozygote/Heterozygote | 3 | $p^2 + p(1-p)\theta$ | $2pq$ |
| | Homozygote/Heterozygote | 2 | $p^2 + p(1-p)\theta$ | $2p$ |
| | Heterozygote/Homozygote | 3 | $2pq$ | $2p$ |
| | Heterozygote/Homozygote | 2 | $2pq$ | Inc. |
| | Homozygote/Homozygote | 2 | $p^2 + p(1-p)\theta$ | $2p$ |
| | Homozygote/Homozygote | 1 | $p^2 + p(1-p)\theta$ | Inc. |

August 1, 2000

39

OSPLab_000039

Exhibit 113  Page 39 of 63 to
State Defendants' Motion for Summary Judgment



# STR Analysis for Casework
# Oregon State Police DNA Unit

## Report Writing Guidelines

Written reports must contain the following information:

1.  Date issued

2.  Case Identifier

3.  Description of exhibits examined

4.  Description of methodology

5.  Loci analyzed

6.  Results and/or Conclusions

7.  Statistical interpretation (if appropriate)

8.  Signature and title of analyst

## Sample Wording

*Methodology and Loci Analyzed:*

"DNA from Exhibits X, Y, Z... was amplified and typed at the amelogenin locus and STR loci listed below using the Amp*FlSTR* Profiler Plus and COfiler PCR Amplification Kits by capillary electrophoresis."

| | |
|---|---|
| D3S1358 | D13S317 |
| VWA | D7S820 |
| FGA | D16S539 |
| D8S1179 | THO1 |
| D21S11 | TPOX |
| D18S51 | CSF1PO |
| D5S818 | |

August 1, 2000

40

OSPLab_000040

Exhibit 113  Page 40 of 63 to
State Defendants' Motion for Summary Judgment

 **STR Analysis for Casework**
**Oregon State Police DNA Unit**

## Report Writing Guidelines (cont.)

### Results/Conclusions:

**Inclusions**

1.  Single Source Stains

    If, at a particular locus, each allelic peak above 150 RFU in the evidence sample is observed in the reference standard:

    - "The STR profile from Exhibit X (description) matches that from Individual A at all 13 loci (or a subset thereof). The frequency of occurrence of an unrelated individual in a random population exhibiting the STR profile observed in Exhibit X is 1 in xxxx Caucasians and 1 in xxxx African-Americans.

    If the match was based on a partial profile (i.e. there are allelic peaks consistent with Individual A but they are below 150 RFU at one or more loci), an additional statement may be included:

    - "The results at the remaining loci were inconclusive/below the threshold for making a conclusive determination of the contributor; however, Individual A is not excluded as a possible donor at these loci."

2.  Mixed Stains

    If a DNA mixture is indicated by the presence of three or more allelic peaks and/or peak balance <70% at multiple loci:

    - "The STR typing results from Exhibit X (description) indicate the presence of a DNA mixture, i.e. DNA from more than one contributor."

    If the allelic peaks are consistent with two donors and a major profile matching that of Individual A can be clearly discerned:

    - "The major profile matches that from individual A. This frequency of occurrence..."

August 1, 2000

41

OSPLab_000041



# STR Analysis for Casework
# Oregon State Police DNA Unit

## Report Writing Guidelines (cont.)

If allelic peaks from a minor contributor are present that are consistent with coming from Individual B:

- "The minor profile matches that of Individual B.   This frequency of occurrence...."

If there are multiple minor contributors:

- "Individuals B and C cannot be excluded as minor contributors."

If a mixture is identified, but differences in allelic peak height are not large enough to discern a major and minor type:

- "Neither Individual A nor Individual B can be excluded as a contributor to the mixture" or "The mixture is consistent with a mixture of DNA from individuals A and B."

    *Note:  In general, no frequency will be reported in these situations. On a case-by-case basis, a $P_E$ (probability of exclusion) may be calculated.*

3.    It is not necessary to include a statistical interpretation for results that are non-probative.

Exclusions

If allelic peaks in the profile from a reference standard are not found in the profile derived from the evidence sample, and their absence cannot be attributed to insufficient template, degradation, inhibition, or masking at a stutter position:

- "The STR profile of Exhibit A (description) does not match that of Individual A.  Therefore, Individual A is excluded as a possible donor."

Or for a mixed stain:

- "Individual A can be excluded as a contributor to the mixture."

August 1, 2000

42

OSPLab_000042



# STR Analysis for Casework
# Oregon State Police DNA Unit

## Report Writing Guidelines (cont.)

*Note: Peaks between 50 and 150 RFU will be considered for purposes of exclusion*

**Inconclusive Results**

If no allelic peaks above the threshold are present, yet there are peaks between 50 and 150 RFU:

- "No STR profile of Exhibit X (description) could be conclusively determined due to ...(e.g. insufficient and/or degraded DNA)."

**No Result**

"No result" is reported if no allelic peaks greater than 50 RFU are observed. No result may be obtained at all or some loci, depending upon the quantity and/or quality of the DNA.

*Statistical Interpretation:*

1. Allelic peaks must be greater than 150 RFU to be used to make a statistical interpretation.

2. Include in the report the database used to make the statistical interpretation.

"The population frequencies are calculated from the allele frequencies published by the FBI in the Journal of Forensic Sciences (J. Forensic Sci. (1999) 44(6):1277-1286).

August 1, 2000

43

OSPLab_000043



# STR Analysis for Casework
# Oregon State Police DNA Unit

## Reagents and Supplies

The following general instructions are applicable in the preparation of all reagents:

- Label all reagents with name of reagent, date prepared, initials of preparer, and expiration date.

- Record each preparation in the Reagent Logbook.

**TE-4**    10mM Tris-HCl – 0.1 mM EDTA, 1L

Add 10 ml 1M Tris-HCl, pH 8.0, and 200 µl 0.5 M EDTA to 990 ml filter-purified water. Autoclave. Store at room temperature for up to 1 year.

## AmpF/STR Profiler Plus PCR Amplification Kit
(Perkin-Elmer, 4303326)

The kit contains reagents necessary to co-amplify 100 reactions of nine STR loci (D3S1358, vWA, FGA, D8S1179, D21S11, D18S51, D5S818, D13S317, D7S820) and the sex determination marker, Amelogenin. The kit includes: AmpF/STR PCR Reaction Mix, AmpF/STR Profiler Plus Primer Set, Amplitaq Gold DNA Polymerase, AmpF/STR Control DNA 9947A, mineral oil, and Profiler Plus Allelic Ladder. Store each component as recommended by the manufacturer. (Please refer to each component.) Expiration dates are listed on the kits.

August 1, 2000

44

OSPLab_000044

Exhibit 113  Page 44 of 63 to
State Defendants' Motion for Summary Judgment



# STR Analysis for Casework
# Oregon State Police DNA Unit

## Reagents and Supplies (cont.)

### AmpF/STR COfiler PCR Amplification Kit
(Perkin-Elmer, 4305246)

The kit contains reagents necessary to co-amplify 100 reactions of six STR loci (D3S1358, D16S539, THO1, TPOX, CSF1PO, D7S820) and the sex determination marker, Amelogenin. The kit includes: AmpF/STR PCR Reaction Mix, AmpF/STR COfiler Primer Set, Amplitaq Gold DNA Polymerase, AmpF/STR Control DNA 9947A, mineral oil, and COfiler Allelic Ladder. Store each component as recommended by the manufacturer. (Please refer to each component.) Expiration dates are listed on the kits.

### AmpF/STR PCR Reaction Mix – provided in kit

Two tubes each containing 1.1 ml MgCl2, dNTP's, BSA, NaN$_3$ in buffer and salt. Store in the refrigerator (2° - 8°C).

### AmpF/STR Profiler Plus Primer Set – provided in kit

One tube containing 1.1 ml of locus specific 5-FAM, JOE, NED – labeled and unlabeled primers in buffer that amplify the Profiler Plus loci. Store in the refrigerator (2° - 8°C).

### AmpF/STR COfiler Primer Set – provided in kit

One tube containing 1.1 ml of locus specific 5-FAM, JOE, NED – labeled and unlabeled primers that amplify the COfiler loci. Store in the refrigerator (2° - 8°C).

### AmpliTaq Gold DNA Polymerase – provided in kit

Two tubes each containing 50 µl of enzyme with an activity of 5 U/µl. Store in the Freezer (-20°C).

### AmpF/STR Control DNA 9947A – provided in kit

One tube containing 0.3 µl of 50 pg/µl human cell line DNA in NaN$_3$ and buffer. Store in the Refrigerator (2° - 8°C).

August 1, 2000

45

OSPLab_000045

Exhibit 113  Page 45 of 63 to
State Defendants' Motion for Summary Judgment



# STR Analysis for Casework
# Oregon State Police DNA Unit

## Reagents and Supplies (cont.)

### AmpF/STR Profiler Plus Allelic Ladder – provided in kit

One tube containing 50 µl the AmpF/STR Blue (D3S1358, vWA, FGA), AmpF/STR Green II (Amelogenin, D8S1179, D21S11, D18S51) and AmpF/STR Yellow (D5S818, D13S317, D7S820) Allelic Ladders. Store in the PCR Room Refrigerator (2° - 8°C), protected from the light.

### AmpF/STR COfiler Allelic Ladder – provided in kit

One tube containing 50 µl of the AmpF/STR Blue (D3S1358, D16S539, AmpF/STR Green I (Amelogenin, THO1, TPOX, CSF1PO), and AmpF/STR Yellow (D7S820) Allelic Ladders. Store in the PCR Room Refrigerator (2° - 8° C), protected from the light.

### Anode Buffer Reservoir
(P-E, 005402)

Vial for 1X buffer, attaches to the pump block.

### 10X Genetic Analyzer Buffer with EDTA
(P-E, 402824)

One 25 ml bottle of 10X buffer, diluted for use. Store in the PCR Room Refrigerator (2° - 8° C) for 6 months from date of receipt.

### 1X Genetic Analyzer Buffer
(diluted from 10X)

- Dilute 10X Genetic Analyzer Buffer with deionized water to make 1X Genetic Analyzer Buffer, this can be done in any desired quantity.
- For 50 ml: Combine 5 ml 10X Genetic Analyzer Buffer with 45 ml deionized water.
- 1X Genetic Analyzer Buffer can be stored in the PCR Room Refrigerator (2° - 8° C) for 2 weeks.
- Record lot number of 1X buffer in 310 Run Log.

August 1, 2000

OSPLab_000046



# STR Analysis for Casework
# Oregon State Police DNA Unit

## Reagents and Supplies (cont.)

### Buffer Vials and Buffer Vial Cap Adapters, 50/package
(Perkin-Elmer, 401955)

- 4 ml glass buffer vials, for use with 1X Genetic Analyzer Buffer and deionized water on 310 autosampler.

- Plastic caps to be used with 4 ml glass buffer vials on 310 autosampler.

### Capillary, 47 cm x 50 µm, labeled with a green mark, 5/package
(P-E, 402839)

- Capillaries, for use on 310 instrument.

### Electrode
(P-E, 005914)

- Platinum cathode electrode, for use on 310 instrument.

### Formamide, 500 ml, Deionized, Untra-Pure Grade
(Amresco, 0606)

- Aliquot 1.25 ml into 1.5 ml centrifuge tubes.
- Store in the Freezer (-20°C).
- Aliquots expire after one year.

*Warning: Formamide is a suspected teratogen. Avoid inhalation, skin contact, or ingestion. Use gloves and wash hands thoroughly after handling. Formamide preparation should be performed in a chemical fume hood if available. Dispose of unused portions properly in appropriate hazardous waste containers.*

August 1, 2000

47

OSPLab_000047



# STR Analysis for Casework
# Oregon State Police DNA Unit

## Reagents and Supplies (cont.)

### Formamide/GS-500 [ROX] Master Mix

- A master mix can be prepared by combining GS-500[ROX] sizing standard with Formamide according to the following:

Master Mix =

(number of samples + 2) x 25 µl deionized formamide

plus

(number of samples + 2) x 0.5 µl GS-500[ROX] size standard

- Store in the PCR Room Refrigerator (2° - 8° C) for 2 weeks.
- Record information on 310 Run Log.

### Electrode Trimmer
(P-E, T-6157)

Flush-cutting wire cutters to trim the platinum electrode.

### Dye Primer Matrix Standards Kit
(Perkin-Elmer, 401114)

- Contains the 5-FAM (blue), JOE (green), and ROX (red) matrix standards, used to create the matrix for the 310 instrument.
- Expiration – 6 months from date received.

*Caution: DO NOT use the TAMRA (yellow) matrix standard provided in the kit. Instead use the NED (yellow) matrix standard, provided separately.*

### NED Matrix Standard
(Perkin-Elmer, 402996)

- Contains the NED (yellow) matrix standard, used in conjunction with the Dye Primer Matrix Standards Kit to create the matrix for the 310 instrument.
- Expiration – 6 months from date received.

August 1, 2000

48

OSPLab_000048



# STR Analysis for Casework
# Oregon State Police DNA Unit

## Reagents and Supplies (cont.)

### POP-4 Polymer, 5 ml
(Perkin-Elmer, 402838)

- Performance Optimized Polymer 4 (POP-4) used with the 310 instrument.
- Expiration is listed on each bottle.

### Pump Block
(Perkin-Emer, 604072)

Genetic Analyzer pump block, for use on the 310 instrument.

### Septa, 500/package
(Perkin-Elmer, 401956)

Individual Genetic Analyzer Septa for use with the 0.5 ml Genetic Analyzer Sample Tubes.

### Genetic Analyzer Sample Tubes, 0.5 ml, 500/package
(Perkin-Elmer, 401957)

Capless 0.5 ml Sample Tubes for use in the 48 well autosampler tray.

### ROX Internal Lane Size Standard Kit
(Perkin-Elmer, 401734)

- Two tubes (200 μl each) GeneScan-500 [ROX] Internal Lane Size Standard, for use with each sample injection.
- One tube (1000 μl) loading buffer – NOT USED.
- Store in the PCR Room Refrigerator (2° - 8 ° C).
- Expiration – 6 months from date received.

August 1, 2000

49

OSPLab_000049



# STR Analysis for Casework
# Oregon State Police DNA Unit

## Reagents and Supplies (cont.)

### Syringe, 1.0 ml Glass
(Perkin-Elmer, 430447 or other equivalent)

> 1.0 ml glass syringe to contain unused polymer on the 310 instrument, includes one o-ring, and one syringe ferrule.

### Syringe O-ring
(Perkin-Elmer, 221102)

### Syringe Ferrule
(Perkin-Elmer, 00541)

### Tray
(Perkin-Elmer, 005572)

> 310 Genetic Analyzer 48-well Sample Tray.

### 9600 Amplification Tubes, 1000/package
(Perkin-Elmer, N801-0612)

> MicroAmp Autoclaved Reaction Tubes with attached Caps (bubble-top), 0.2 ml.

### 480 Amplification Tubes, 1000/package
(Perkin-Elmer, N801-0611 (bubble) or N801-0737 (flat))

- GeneAmp Autoclaved Thin-Walled Reaction Tubes with attached Caps (bubble-top).

- GeneAmp Thin-Walled Reaction Tubes with attached Caps (flat-top).

August 1, 2000

50

OSPLab_000050

Exhibit 113  Page 50 of 63 to
State Defendants' Motion for Summary Judgment



# STR Analysis for Casework
# Oregon State Police DNA Unit

## References

### GENERAL

1. AmpF/STR Profiler Plus/COfiler PCR Amplification Kit User's Manual (1997,1998).

2. National Research Council Committee on DNA Forensic Science (1996) The Evaluation of Forensic DNA Evidence. National Academy Press, Washington, D.C.

3. Oregon State Police Forensic Laboratory (1997) PCR-Based DNA Typing Procedures.

## Short Tandem Repeats (STRs)

4. Budowle, B., Moretti, T., Keys, K., Koons, B. and Smerick, J. (1997) "Validation Studies of the CTT Multiplex System" J. For. Sci. 42:701-707.

5. Crouse, C.A. and Schumm, J. (1995) "Investigation of Species Specificity Using Nine PCR-Based Human STR Systems" J. For. Sci. 40:952-956.

6. Edwards, A., Civitello, A., Hammond, H.A., and Caskey, C.T. (1991) "DNA Typing and Genetic Mapping with Trimeric and Tetrameric Nucleotide Repaeats" Am. J. Hum. Genet. 49:746-756.

7. Fregeau, C.J. and Fourney, R,M. (1993) "DNA Typing with Fluorescently Tagged Short Tandem Repeats: A Sensitive and Acccurate Approach to Human Identification"" Biotechniques 15:100-119.

8. Linn, A.M., Micka, K.A., Sprecker, C.J., Taylor, J.A., Bacher, J.W., Rabbach, D.R., Bever, B.A., Creasey, S.D., and Schumm, J.W. (1998) "Development and Population Study of an Eight-Locus Short Tandem Repeat (STR) Multiplex System" J. For. Sci. 43:1168-1180.

9. Micka, K.A., Sprecker, C.J., Linn,A.M., Comey, C.T., Koons, B.W., Crouse, C., Endean, D., Pirelli, K., Lee, S.B., Duda, N., Ma, M., and Schumm, J.W. (1996) "Validation of Multiplex Polymorphic STR Amplification Sets Developed for Personal Identification Applications" J. For. Sci. 41:582-590.

August 1, 2000

51

OSPLab_000051



# STR Analysis for Casework
# Oregon State Police DNA Unit

## References (cont.)

10.   Puers, C., Hammond, H.A., Jin, L., Caseky, C.T., and Schumm (1993) "Identification of Repeat Sequence Heterogeneity at the Polymorphic Short Tandem Repeat HUMTHO1 (AATG) and Reassignment of Alleles in Population Analysis Using a Locus-specific Allelic Ladder:" Am. J. Hum. Genet. 53:953-958.

11.   Walsh, P.S., Fildes, N.j., and Reynolds, R. (1996) "Sequence analysis and characterization of stutter at the tetranucleotide repeat locus vWA" Nuc. Acids Res. 24:2807-2815.

12.   Wallin, J.M., Buoncristiani, M.R., Lazaruk, K.D., Fildes, N., Holt, C.L., and Walsh, P.S. (1998) "TWGDAM Validation of the AmpFlSTR Blue PCR Amplification Kit for Forensic Casework Analysis" J. For. Sci. 43:854-870.

### Amelogenin

13.   Buel et al. (1995) "PCR Amplification of Animal DNA with Human X-Y Amelogenin Primers used in Gender Determination" J. For. Sci. 40:641-644.

14.   Sullivan, K., Mannucci, A., Kimpton, C.P., and Gill, P. (1993) "A Rapid and Quantitative DNA Sex Test: Fluroescence Based PCR Analysis of the X-Y Homologous Gene Amelogenin" Biotechniques 15:636-642.

### Capillary Electrophoresis

15.   ABI Prism GeneScan Analysis Software User's Manual, 1996.

16.   ABI Prism Genotyper User's Manual, 1996.

17.   ABI Prism 310 Genetic Analyzer User's Manual, 1998.

18.   Buel, E., Schwartz, M.B., and LaFountain, M.J. (1998) "Capillary Electrophoresis STR Analysis: Comparison to Gel-Based Systems" J. For. Sci. 43:164-170.

19.   LaFountain, M., Schwartz, M., Cormier, J. and Bueil, E. (1998) "Validation of the X-Y Amelogenin Gene" J. For. Sci. 43:1188-1194.

August 1, 2000

OSPLab_000052

Exhibit 113  Page 52 of 63 to
State Defendants' Motion for Summary Judgment



# STR Analysis for Casework
# Oregon State Police DNA Unit

## References (cont.)

20.   Wallin, J.M., Lazaruk, K.D. Holt, C. J., and Walsh, P.S. (1997) "AmpFlSTR Multicomponent Analysis" PE Applied Biosystems Bulletin.

### Population Genetics

21.   National Research Council Committee on DNA Forensic Science (1996) "Population Genetics" Chapter 4 in The Evaluation of Forensic DNA Evidence.  National Academy Press, Washington, D.C.

22.   National Research Council Committee on DNA Forensic Science (1996) "Statistical Issues" Chapter 5 in The Evaluation of Forensic DNA Evidence.  National Academy Press, Washington, D.C.

23.   Budowle, B., Moretti, T.L, Baumstark, A.L., Diefenbaugh, D.A., and Keys, K.M. (1999) "Population Data on the Thirteen Core CODIS Short Tandem Repeat Loci in African-Americans, U.S. Caucasians, Hispanics, Bahamians, Jamaicans, and Trinidadians". J. For. Sci.44;1277-1286.

24.   Budowle, B., Smerick, J.B., Keys, K.M., and Moretti, T.R. (1997) "United States Population Data on the Multiplex Short Tandem Repeat Loci— HUMTHO1, TPOX, CSF1PO— and the Variable Number of Tandem Repeat Locus D1S80" J. For. Sci. 42:846-849.

25.   Edwards, A., Hammond, H.A., Jin, L. and Caskey, C.T. (1992) "Genetic Variation at Five Trimeric and Tetrameric Tandem Repeat Loci in four Human Population Groups" Genomics 12:241-253.

26.   Melvin, J.R. (1988) "Paternity Testing" in Forensic Science Handbook Volume 2, R. Saferstein, ed.

27.   Schanfield, M.S. and Stern, C.M. (1994) "Application of DNA Technology to Parentage Identification" in International Methods of Forensic DNA Analysis.

August 1, 2000

OSPLab_000053

Exhibit 113  Page 53 of 63 to
State Defendants' Motion for Summary Judgment



# STR Analysis for Casework
# Oregon State Police DNA Unit

## *Appendix A – Worksheets*

Amplification

GeneScan/Genotyper Results Control Sheet

Profiler Plus Genotype Summary

COfiler Genotype Summary

Double Reader Checklist

Matrix Worksheet

310 Run Log

August 1, 2000

54

**OSPLab_000054**

Exhibit 113  Page 54 of 63 to
State Defendants' Motion for Summary Judgment



# STR Analysis for Casework
# Oregon State Police DNA Unit

## *Appendix B – Analysis Parameters*

The analysis parameters are the options that specify certain ranges and methods used during GeneScan analysis. The GeneScan program has default analysis parameters that are stored in the project itself.  The default parameters apply globally, unless you create your own parameter files for specific runs/uses.

## Default settings:
Analysis Range
> Start: ~3100-3400
>> Set the start after the primer peak (usually detected in the 2600-3000 scan number range) and prior to the 75 base pair in-lane size standard peak.

> Stop: 7000

| | |
|---|---|
| Data Processing: | Baseline and MultiComponent ON |
| Smooth Options: | Light |

Peak Detection
> Dye Amplitude Threshold:  50 for B, G, Y ; 150 for R

> Min. Peak Half Width:  3 pts

| | |
|---|---|
| Size Call Range: | Min.  75 base pairs<br>Max.  400 base pairs |
| Size Calling Method: | Local Southern Method |
| Split Peak Correction: | None |

## To Define/Change the Default Analysis Parameters:

1.    Choose Analysis Parameters from the Settings menu.

2.    Change the parameters as necessary.  For the most part, this will only involve changing the analysis range or the dye amplitude thresholds.

August 1, 2000                                                                        55

OSPLab_000055

 **STR Analysis for Casework**
**Oregon State Police DNA Unit**

### *Appendix B – Analysis Parameters (cont.)*

3.   Click OK.

**To Define New/Custom Analysis Parameters Files:**

1.   Choose New from the File menu then click on the Analysis Parameters icon.

2.   The Analysis Parameters dialog box will appear.  Enter/change the parameters as necessary.  The only differences between the custom analysis parameters and the default analysis parameters should be the analysis range and/or the dye amplitude thresholds.

3.   Choose Save As from the file menu.  Name the analysis parameters file and ensure it will be saved into the parameters folder.

|  |  |
|---|---|
| Example: | Param.BGY50.R150.3300 |
| Format: | Param.Dye Colors Followed by Threshold Values.Different Dye Colors Followed by Threshold Values.Analysis Range Start Point |
| Location: | Hard drive/ABI Prism 310 Folder/GeneScan Analysis Folder/Parameters Folder |

4.   Click Save.

August 1, 2000                                                            56

OSPLab_000056

Exhibit 113  Page 56 of 63 to
State Defendants' Motion for Summary Judgment



# STR Analysis for Casework
# Oregon State Police DNA Unit

## *Appendix C – Size Standard*

A size standard is specific DNA fragments of known sizes labeled with ABI Prism dyes. After you define the peaks of a size standard, the GeneScan software matches this definition to the internal size standard in each injection. The software assigns the defined size values to the appropriate peaks of the internal size standard in each injection, and uses this information with the size calling method (Local Southern) to size all unknown fragments.

Running an internal size standard with each injection results in particularly and precise base pair sizing because the internal size standard and the unknown fragments undergo exactly the same electrophoretic forces. The GeneScan software can then compensate for variations that may occur from injection to injection.

You normally define a size standard in the GeneScan program after running the standard with samples on the instrument. The software detects peaks for a selected dye color in a selected sample file and allows you to define the peak sizes. You can save the defined standard in a file and use it to automatically analyze other samples run with the same standard under the same conditions.

The GeneScan-500 [ROX] Internal Lane Size Standard must be used with the AmpFlSTR Profiler Plus PCR Amplification Kit because some the alleles are greater than 340 bp. The sizing method (Local Southern) works optimally when there are two internal lane size standard peaks above and two below each possible allele to be sized. Thus, it is important that the 400 bp peak be defined and used in sizing. The GeneScan-500 [ROX] Internal Lane Size Standard is also used with the AmpFlSTR COfiler PCR Amplification Kit.

To Define a New Size Standard:

1.    While in the GeneScan Analysis Software, choose new from the File Menu.

2.    Click the Size Standard icon.

3.    In the file dialog box that appears, select the sample file that contains the dye standard you want to use as a template, click Open.

4.    Another dialog box appears. Select R as the dye, select the desired Analysis Parameters, and click OK. *Note: It may be necessary to adjust the range of data points analyzed to capture all sized from 75 bp to 400 bp.*

OSPLab_000057



# STR Analysis for Casework
# Oregon State Police DNA Unit

## *Appendix C – Size Standard (cont.)*

5.  A window displaying the electropherogram for the chosen size standard will appear.  The software assigns a number to each peak found in the electropherogram in order, from left to right.

6.  Define the peaks by clicking either in the electropherogram or in the table and entering the value for the selected peak in the Size field in the table.

    For the GS ROX 500, define (enter) the following:

| Peak | Size | |
|------|------|---|
| 1 | 50 | *It is necessary that the range of 75 base pairs to 400 base pairs be defined. Outside of this range, you may define any additional peaks you desire; however, they will not be used in the sizing calculations. |
| 2* | 75 | |
| 3* | 100 | |
| 4* | 139 | |
| 5* | 150 | |
| 6* | 160 | |
| 7* | 200 | |
| 8* | 0** | **A zero (0) must be entered for the 250 base pair peak as it is not used to size samples. |
| 9* | 300 | |
| 10* | 340 | |
| 11* | 350 | |
| 12* | 400 | |
| 13 | 450 | |
| 14 | 490 | |
| 15 | 500 | |

7.  Save the defined size standard by selecting Save As from the File Menu. Save the size standard as GSROX500.date.AI into the Standards Folder located in the GeneScan Folder located on the hard drive.

August 1, 2000                                                                58

OSPLab_000058



# STR Analysis for Casework
# Oregon State Police DNA Unit

## *Appendix D – Matrix*

The matrix file is used to adjust for the spectral overlap between the fluorescent dyes used on the ABI Prism 310 instrument. A mathematical matrix of the spectral overlaps is created and the inverse matrix is used to correct the data during analysis. Please refer to the AmpF/STR Profiler Plus Amplification Kit User's Manual, Chapter 6 for detailed information on the matrix and to the GeneScan Analysis Software User's Manual.

Matrix files should be made every six monthly (or sooner if there is a matrix problem). The matrix standards should be stored in the refrigerator (2° to 8 °C).

## Making a Matrix:

1.     Obtain the matrix standards from the refrigerator.
* From the Dye Primer Matrix Standards Kit - 5-FAM, JOE, and ROX
       *Note: Do not use the TAMRA included in this kit – discard it.*
* From the NED Primer Matrix Standard Kit - NED

2.     Record the kit lot numbers and individual standard lot numbers on the Matrix log sheet. (It is also a good idea to include the information on the sample sheet.)

3.     Sample Set-up

* Combine 1 µl of each matrix standard with 25 µl of deionized formamide.

* Prepare 1 tube for each matrix standard sample.

    *DO NOT include the GeneScan-500 [ROX] size standard in the sample tube.*

4.     Denature the samples at 95 °C for 3 minutes, then quick chill on ice or in an ice block for 3 minutes.

5.     Place the tubes in the sample tray and into the instrument.

6.     Launch the ABI Prism 310 Collection application (if not already done).

August 1, 2000                                                    59

OSPLab_000059



# STR Analysis for Casework
# Oregon State Police DNA Unit

## *Appendix D – Matrix (cont.)*

7.    Set-up a sample sheet or choose a previously saved sample sheet.

- Ensure for the matrix standards that no dye has been selected as the standard.
- Ensure that only the dye color for that standard is "present" (i.e. blue, green, yellow, or red) .

8.    Open an injection list and select the proper sample sheet from the Sample Sheet pop-up menu.

- Ensure the correct module is selected:  GS STR POP4 (1 mL) F.

- Choose None in the Matrix File column for each matrix standard sample.

- Turn <Auto Anlz> Off.

- No Analysis Parameters or Size Standard should be selected.

9.    Click Run.

10.    When the injections are done, follow these steps in the GeneScan Analysis Software:

- Under the File menu, select New.

- Click the Matrix icon.  In the window that appears, indicate the sample files that correspond to each matrix standard dye color.

- Select starting scan numbers of ~3300 for each sample.  This starting scan number is intended to exclude the primer peaks and can be varied slightly.

- Enter a value of ~2500 points.  This value indicates how many data points after the starting scan number will be used to make the matrix and can be varied.

- Click OK.  The computer makes the matrix and the matrix file table appears.

August 1, 2000                                                                                      60

OSPLab_000060



# STR Analysis for Casework
# Oregon State Police DNA Unit

## *Appendix D – Matrix (cont.)*

11.    Save the matrix file to the Matrix folder.  (Hard drive/ABI Prism 310 folder/GeneScan Analysis folder/GS Matrix folder.)

Format:
Mtx.CE#.DataStartPoint/ForHowManyDatapoints.RunDate.AnalystInitials

Example:  Mtx.CE3.3300/2500.030199.KLL

### Verify the accuracy of the matrix file:

1.    Install the new matrix file to the Matrix Standard Sample Files.

2.    Select the proper Analysis Parameters to apply.  (Generally they will be the same as default analysis parameters used for other types of samples.)

3.    Analyze all four colors for each Matrix Standard Sample File.

4.    Examine the results for all four colors for each of the matrix standard sample files.

The 5-FAM matrix standard results should have peaks for Blue.  The other colors for this injection should have relatively flat baselines.  A pattern of pronounced peaks or dips in any of the other three colors indicates that the color separation is not optimal.  If it is not optimal, the matrix may need to be created again from the sample files or the matrix sample tubes may need to be set-up again and injected.

Each matrix standard file should be examined in this way.

5.    If this verification test fails, then it could be due to poor capillary alignment, laser alignment, or sample set-up, etc.

August 1, 2000                                                                                   61

OSPLab_000061



# STR Analysis for Casework
# Oregon State Police DNA Unit

## *Appendix D – Matrix (cont.)*

6. The matrix should be then be applied to some samples. Indications of a matrix problem or "bad" matrix include:

- Unusually high pull-up (or extra peaks due to pulling up)

- Poor Baseline

    If the samples show problems, the matrix should not be used.

7. Once the new matrix is acceptable, place a copy of it in ABI Folder located in the System Folder on the Hard Drive. (This means the matrix file is saved in two places. The first was above in step 11 of the Making a matrix section.)

8. Please set the defaults so the new matrix will be used automatically. While in the Collection software:

- Under the <Preferences> menu, select GeneScan Injection List Defaults.

- Using the pop-up option, select the new matrix file that is located on the Hard drive/System Folder/ABI Folder.

    *Caution: The matrix files in the GeneScan Matrix Folder will most likely appear in your list of options, DO NOT CHOOSE it. The collection software needs the matrix file that is in the system folder.*

9. Finish documentation by ensuring the Matrix log worksheet is filled out completely. Attach the following:

- Sample Sheet
- Injection List
- Matrix Table
- GeneScan Electropherograms of Matrix Standard Sample Files with the new matrix applied (scales should be appropriate to clearly see any problems).
- GeneScan Electropherograms of a couple sample files with new matrix applied (scales should be appropriate to clearly see any problems).

August 1, 2000

OSPLab_000062

Exhibit 113  Page 62 of 63 to
State Defendants' Motion for Summary Judgment



# STR Analysis for Casework
# Oregon State Police DNA Unit

## MODIFICATIONS/REVISIONS

| DATE | AUTHOR | SECTION | COMMENTS |
|---|---|---|---|
| 3/30/99 | Von B/Lawless | | Original |
| 8/16/99 | Von Beroldingen | Appendix D | Memo re: Matrix |
| 10/16/99 | Von Beroldingen | Gentotyping | Memo re: GT editing |
| 12/20/99 | Von Beroldingen | Population Frequencies | Memo re: FBI data |
| 5/15/00 | Von Beroldingen | Genescan | Memo re: TH01 valley |
| 8/1/00 | Von Beroldingen | | Revision |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

August 1, 2000

63

OSPLab_000063

Exhibit 113  Page 63 of 63 to
State Defendants' Motion for Summary Judgment

```
CASE 900640010650        ** COOS COUNTY 000646SHERIFF'S OFFICE **        000646PAGE:   1
                              INCIDENT REPORT
```

```
INCIDENT TYPE: PROPERTY-FOUND               PREMISE TYPE:_____
LOCATION:_____HUDSON RIDGE_____FAI   APT/LOT:_____    AREA A12
BUSINESS:_____  WEAPON TYPE  NON APPLICABLE_____
BEGIN DATE: 7/05/00   BEGIN TIME: 2107   END DATE: 7/05/00   END TIME: 2107
CENSUS TRACT: 06      SUB-DIVISION    :_____
   COMMENTS:   CLV DEPUTY REQ FILE NUMBER FOR FOUND PROPERY REF:
               PROPERTY FOUND NEAR POWER LINES FILE # ISSUED
```

```
*************************** N A R R A T I V E ***************************
```

NARRATIVE BY CPL. KIP OSWALD:
ON 07-05-00, AT 2107 HOURS, I WAS ON PATROL, CHECKING REMOTE PLACED USED
FOR PARTYING.  I WAS ALSO LOOKING FOR POSSIBLE EVIDENCE REGARDING THE
DISAPPEARANCE OF LEAH FREEMAN (A JUVENILE FEMALE REPORTED MISSING TO THE
COQUILLE POLICE DEPARTMENT).

UPON TAKING THE FIRST LEFT HAND TURN ON HUDSON RIDGE ROAD, I TURNED ONTO
THE DIRT ROAD THAT LEADS UP UNDER THE POWER LINES.  WHEN I CAME TO THE
90 DEGREE TURN TO THE RIGHT ON THAT ROAD, I OBSERVED A WHITE NIKE TENNIS
SHOE THAT APPEARED TO BE A WOMAN'S SHOE, LYING ON THE RIGHT SIDE OF THE
ROAD.

THE SHOE HAS DARK BLUE STRIPES AND A YELLOW NIKE LOGO.  THE LACES WERE
UNTIED AND INSIDE A TOY SHOWING THE U.S. SIZE OF 6W.  I ALSO OBSERVED
THAT THERE ARE STRANDS OF HAIR IN THE SHOE AND ALSO ONE ON THE OUTSIDE.

I KNOW THAT THE VICTIM, LEAH FREEMAN, WAS DESCRIBED AS WEARING WHITE
NIKE TENNIS SHOES.  THE SHOE IS IN VERY GOOD CONDITION AND DOES NOT
APPEAR TO BE ONE SOMEONE WOULD THROW AWAY.

I WAS FURTHER ADVISED BY TONY MESSERLE THAT THE SHOE I HAD MATCHED ONE HE
HAD FOUND BY HIS HOUSE.
07-25-00 BKH  > DET/CQPD

```
CASE STATUS: NO REPORT_____        REPORT DATE: 070500

REPORTING OFFICER:  OSWALD,KIP

RECORDS CLERK 8674
```

000646 CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER        000646 Coquille 007236 000646

Exhibit 114  Page 1 of 1 to
State Defendants' Motion for Summary Judgment

#24

G24-00

# SUPPLEMENTAL REPORT

Page 1

**Agency:** Coquille Police Department

INCIDENT NO. **00001905**

| Report Purpose | Reported On | Date | Time | Incident Classification | |
|---|---|---|---|---|---|
| Missing Person Investigation | THU | 06/29/2000 | 10:00 | Missing Person | |

| Primary Charge | | UCR/NCIC Code |
|---|---|---|
| | | / |

| Additional Charges | Estimated Total Property Loss |
|---|---|
| | |

**Officer Involved**

Chief Reaves, Dave Zavala, Randy Ulmer

## Victims/Witnesses/Other

| Code | Name: Last, First, Middle | Sex | Race/Ethnicity | Date of Birth/Age |
|---|---|---|---|---|
| G-1 | Courtright, Cory | | | |

| Confidentiality | Address: Street, City, State, ZIP | Home Phone | Ext. |
|---|---|---|---|
| | 1173 N Knott , Coquille, OR  97423 | 396-4027 | |

| Place of Employment/School/Address | Occupation | Business Phone | Ext. |
|---|---|---|---|
| | | | |

| Code | Name: Last, First, Middle | Sex | Race/Ethnicity | Date of Birth/Age |
|---|---|---|---|---|
| W-1 | Middleton, Bill Gene | M | White/Caucasian | 05/29/1947  53 |

| Confidentiality | Address: Street, City, State, ZIP | Home Phone | Ext. |
|---|---|---|---|
| | 1180 W 10th ST , Coquille, OR  97423 | 396-5463 | |

| Place of Employment/School/Address | Occupation | Business Phone | Ext. |
|---|---|---|---|
| | | | |

| Code | Name: Last, First, Middle | Sex | Race/Ethnicity | Date of Birth/Age |
|---|---|---|---|---|
| Q-1 | McGuffin, Nick J | M | White/Caucasian | 04/25/1982  18 |

| Confidentiality | Address: Street, City, State, ZIP | Home Phone | Ext. |
|---|---|---|---|
| | 100 Baker RD , Coquille, OR  97423 | 396-4983 | |

| Place of Employment/School/Address | Occupation | Business Phone | Ext. |
|---|---|---|---|
| | | | |

| Code | Name: Last, First, Middle | Sex | Race/Ethnicity | Date of Birth/Age |
|---|---|---|---|---|
| W-2 | Bartley, Brent W | M | White/Caucasian | 03/02/1980  20 |

| Confidentiality | Address: Street, City, State, ZIP | Home Phone | Ext. |
|---|---|---|---|
| | 1040 E 13th ST , Coquille, OR  97423 | (541) 396-4602 | |

| Place of Employment/School/Address | Occupation | Business Phone | Ext. |
|---|---|---|---|
| | | | |

| Code | Name: Last, First, Middle | Sex | Race/Ethnicity | Date of Birth/Age |
|---|---|---|---|---|
| W-3 | Lewis, Raymond | | | |

| Confidentiality | Address: Street, City, State, ZIP | Home Phone | Ext. |
|---|---|---|---|
| | | | |

| Place of Employment/School/Address | Occupation | Business Phone | Ext. |
|---|---|---|---|
| | | | |

| I.D. No./Name of Reporting Officer | Prep Date/Time | Approval | Date/Time | Distribution |
|---|---|---|---|---|
| 605 Hall, David E. | 07/05/2000 19:10 | Reaves, Michael W. | 07/15/2000 10:55 | D.A. |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER        Coquille 000789

Exhibit 115  Page 1 of 10 to
State Defendants' Motion for Summary Judgment

SUPPLEMENTAL REPORT CONTINUED

Page 2

| AGENCY: Coquille Police Department | Incident Classification Missing Person | Incident No 00001905 |
|---|---|---|

| Code | Name: Last, First, Middle | Sex | Race/Ethnicity | Date of Birth/Age |
|---|---|---|---|---|
| W-4 | Mitchell, Cheri | | | |

| Confidentiality | Address: Street, City, State, ZIP | | | Home Phone | Ext. |
| | 444 1/2 N Elm , Coquille, OR 97423 | | | | |

| Place of Employment/School/Address | | Occupation | Business Phone | Ext. |

| Code | Name: Last, First, Middle | Sex | Race/Ethnicity | Date of Birth/Age |
|---|---|---|---|---|
| W-5 | Mitchell, Peggy | F | White/Caucasian | 06/19/1967  33 |

| Confidentiality | Address: Street, City, State, ZIP | | | Home Phone | Ext. |
| | 4441/2 N Elm ST , Coquille, OR 97423 | | | (541) 396-3155 | |

| Place of Employment/School/Address | | Occupation | Business Phone | Ext. |

| Code | Name: Last, First, Middle | Sex | Race/Ethnicity | Date of Birth/Age |
|---|---|---|---|---|
| W-6 | Grisham, Georgia | F | White/Caucasian | 07/04/1919  81 |

| Confidentiality | Address: Street, City, State, ZIP | | | Home Phone | Ext. |
| | 3520 Fairview Road , Coquille, OR 97423 | | | 396-2829 | |

| Place of Employment/School/Address | | Occupation | Business Phone | Ext. |

| Code | Name: Last, First, Middle | Sex | Race/Ethnicity | Date of Birth/Age |
|---|---|---|---|---|
| W-7 | Thomason, Cheryl | | | |

| Confidentiality | Address: Street, City, State, ZIP | | | Home Phone | Ext. |
| | 1222 Minnesota , Coos Bay, OR 97420 | | | | |

| Place of Employment/School/Address | | Occupation | Business Phone | Ext. |

| Code | Name: Last, First, Middle | Sex | Race/Ethnicity | Date of Birth/Age |
|---|---|---|---|---|
| W-8 | Johnson, Elton | M | White/Caucasian | 04/27/1959  41 |

| Confidentiality | Address: Street, City, State, ZIP | | | Home Phone | Ext. |
| | 249 S Broadway , Coos Bay, OR 97420 | | | | |

| Place of Employment/School/Address | | Occupation | Business Phone | Ext. |

| Code | Name: Last, First, Middle | Sex | Race/Ethnicity | Date of Birth/Age |
|---|---|---|---|---|
| W-9 | Rudder, Joe | M | | 07/28/1976  23 |

| Confidentiality | Address: Street, City, State, ZIP | | | Home Phone | Ext. |
| | 353 S 5th Street , Coos Bay, OR 97420 | | | | |

| Place of Employment/School/Address | | Occupation | Business Phone | Ext. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER     Coquille 000790

CONTINUED NEXT PAGE

Exhibit 115  Page 2 of 10 to
State Defendants' Motion for Summary Judgment

SUPPLEMENTAL REPORT CONTINUED                                          Page  3

| AGENCY: Coquille Police Department | Incident Classification: Missing Person | Incident No. 00001905 |

| Code O-2 | Name: Last, First, Middle **Oswald, Kip** | Sex | Race/Ethnicity | Date of Birth/Age |
|---|---|---|---|---|
| Confidentiality | Address: Street, City, State, ZIP C.C.S.O., Coquille, OR  97423 | | | Home Phone 396-2106 / Ext |
| Place of Employment/School/Address | | Occupation | | Business Phone / Ext |

| Code O-3 | Name: Last, First, Middle **Kiander, V** | Sex | Race/Ethnicity | Date of Birth/Age |
|---|---|---|---|---|
| Confidentiality | Address: Street, City, State, ZIP County Health Clinic, North Bend, OR  97459 | | | Home Phone / Ext |
| Place of Employment/School/Address | | Occupation | | Business Phone / Ext |

| Code O-4 | Name: Last, First, Middle **Soule, Bill** | Sex | Race/Ethnicity | Date of Birth/Age |
|---|---|---|---|---|
| Confidentiality | Address: Street, City, State, ZIP P.O. Box 687, Eugene, OR  97440 | | | Home Phone (541) 343-5222 / Ext |
| Place of Employment/School/Address | | Occupation | | Business Phone / Ext |

| Code O-5 | Name: Last, First, Middle **Ranger, Mark** | Sex | Race/Ethnicity | Date of Birth/Age |
|---|---|---|---|---|
| Confidentiality | Address: Street, City, State, ZIP OSP Headquarters, Roseburg, OR | | | Home Phone / Ext |
| Place of Employment/School/Address | | Occupation | | Business Phone / Ext |

| Code O-6 | Name: Last, First, Middle **Freeman, Denise** | Sex F | Race/Ethnicity | Date of Birth/Age 09/28/1982  17 |
|---|---|---|---|---|
| Confidentiality | Address: Street, City, State, ZIP 1173 N Knott , Coquille, OR  97423 | | | Home Phone / Ext |
| Place of Employment/School/Address | | Occupation | | Business Phone / Ext |

| Code O-7 | Name: Last, First, Middle **Wilson, Dick** | Sex | Race/Ethnicity | Date of Birth/Age |
|---|---|---|---|---|
| Confidentiality | Address: Street, City, State, ZIP P.O. Box 687, Eugene, OR  97440 | | | Home Phone (541) 343-5222 / Ext |
| Place of Employment/School/Address | | Occupation | | Business Phone / Ext |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER    CONTINUED NEXT PAGE    Coquille 000791

Exhibit 115  Page 3 of 10 to
State Defendants' Motion for Summary Judgment

SUPPLEMENTAL REPORT CONTINUED                                        Page  4

| AGENCY Coquille Police Department | Incident Classification Missing Person | Incident No. 00001905 |
|---|---|---|

| Code O-8 | Name: Last, First, Middle Wilcox, Cathy | Sex | Race/Ethnicity | Date of Birth/Age |
|---|---|---|---|---|
| Confidentiality | Address: Street, City, State, ZIP Oregon State Police, Coos Bay, OR 97420 | | | Home Phone    Ext. |
| Place of Employment/School/Address | | Occupation | | Business Phone    Ext. |

**Suspects**

| Code M-1 | Name: Last, First, Middle Freeman, Leah | Sex F | Race/Ethnicity White/Caucasian | Date of Birth/Age 10/29/1984  15 |
|---|---|---|---|---|
| Confidentiality | Address: Street, City, State, ZIP 1173 N Knott , Coquille, OR  97423 | | | Home Phone    Ext. 396-4027 |
| Place of Employment/School/Address | | Occupation | | Business Phone    Ext. |

**Narrative**

On the afternoon of June 29, 2000, I was requested by Chief Reaves to participate in the investigation in the disappearance of Leah Freeman. It was reported to me that Freeman had failed to come home the night before and this was highly unusual behavior for her. It was also explained to me that the last person to see Freeman was a close friend named Cheri Mitchell.

I went to see Cory Courtright, Leah's mother, to obtain a list of friends and associates who she might have went to stay with. I asked Courtright to make a list with phone numbers and addresses and I would stop by later to retrieve this list. Also, while I was there, I asked Cory if she knew of any personal problems Leah may have been having or if she had any known problems with other kids, enemies etc. I was told by Cory that Leah was a stable child with no known personal problems and no enemies.

While I was at the Courtright home I saw Nick McGuffin, Leah's boyfriend, and asked him to briefly give me a time in which he saw Leah. McGuffin told me he had dropped Leah off at 7 PM the night before at Cheri Mitchell's home located at 444 1/2 N. Elm. McGuffin was supposed to return and pick up Leah at nine o'clock but when he arrived she had already left. Nick drove up and down Central looking for Leah but could never locate her. McGuffin stated he drove around until about 2:30 AM Friday morning and finally went home, thinking Leah went to a friend's home to stay and was possibly mad at him for being late to pick her up.

On Friday morning June 30, 2000 about 8:55 AM, I went to the Myrtle Point Post Office and interviewed Bill Middleton, Leah's uncle. Middleton told me the relationship between McGuffin and Leah could be at times volatile because McGuffin is very domineering and controlling of Leah. Middleton asked me to check with the Coquille High School because it was documented they had several problems in regard to their arguing and fighting. He went on to say that ever since Leah started to date McGuffin her grades went down in school and she quit participating in sports at school. Thursday night after the disappearance of Leah, Bill spoke with McGuffin about the previous night, when McGuffin dropped Leah off at Cheri Mitchell's house. Cheri Mitchell's mother, Peggy, would not let Nick come into their home and Bill asked McGuffin how he felt about this. McGuffin confided to Bill that this upset him and also he was upset that Leah wanted to stay and visit Cheri. Bill, at the conclusion of our interview, stated he felt McGuffin knew more about Leah's disappearance than he was telling everyone, including the police.

Chief Reaves received information the morning of June 30, 2000, from Cory Courtright of a possible

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER    CONTINUED    Coquille 000792

5

SUPPLEMENTAL REPORT CONTINUED

Page 5

| AGENCY Coquille Police Department | Incident Classification Missing Person | Incident No. 00001905 |
|---|---|---|

location of Leah. Cory explained to Chief Reaves she remembered Leah and McGuffin visiting Brent Bartley's grandparent's (Haga) house at the end of Fir street. Cory thought we should check to see if Leah might be staying at this location.

Chief Reaves and I drove to Bartley's grandparent's house. (Haga Residence) We rang the door bell but, received no response. We began to check the area around the house. In the carport area, next to a garbage compactor, found a man's white tank top shirt. Chief Reaves observations were that the shirt was soaked with beer because of the smell. We walked around the back of the house onto the deck area and saw several empty beer cans and on the bench a funnel with a long hose attached (A Beer Bong). The house seemed secure so we left.

We then went to Cory Courtright's home to speak with her and to establish a sequence of events for the day Leah disappeared. Cory told us the following:

Leah and McGuffin and spent most of the day at her home. In the afternoon the both of them worked together cleaning McGuffin's car. Leah appeared to be happy and both Leah and McGuffin were laughing and joking around. Around 4 PM, Leah and McGuffin left. Prior to leaving Leah reminded Cory she was going to visit Cheri Mitchell at 7 PM.

At 10:15 PM, Cory received a call from McGuffin asking her if Leah had come home. McGuffin told Cory he arrived at the Mitchell residence at 9:08 PM but Leah had already left. McGuffin told Cory he had looked up and down North Central, but could not find her. McGuffin said he would continue to look for her.

Cory said she went to bed and woke up around 3:30 AM and checked Leah's room and saw she was not home. She stayed awake thinking Leah would come home sometime soon. Finally around 8:00 AM she called McGuffin's home to see if he had found her and possibly she may have spent the night at his house. McGuffin explained to her he was unable to locate Leah.

On Friday, June 30, 2000, in the afternoon, Chief Reaves and I interviewed Nick McGuffin, Leah's boyfriend of about nine months, downstairs in the Coquille Police Department squad room. We asked McGuffin to give us a detailed description of what he and Leah did on the day she disappeared. (Interview Recorded) McGuffin gave us the following in-substance statement:

McGuffin told us he and Leah spent the afternoon at Leah's house cleaning his car and the both of them had been getting along extremely well the last few days. Around four o'clock in the afternoon they left and went to Brent Bartley's grandparent's home (Haga) and watched video's. About seven o'clock McGuffin and Bartley drove Leah over to Cheri Mitchell's home where they dropped off Leah. Leah told McGuffin to come back and pick her up in about two hours that she would not be long.

After dropping off Leah, McGuffin drove Bartley over to pickup his girlfriend, Nicki Price, and then they all went back over to Bartley's grandparents home. McGuffin stated he did not stay long, maybe twenty or thirty minutes, and left because he thought Bartley and Nicki wanted to be alone. After leaving Bartley and Nicki, McGuffin drove around town, stopping at Fast Mart and generally not doing anything of real importance.

A little after nine o'clock McGuffin said he went to Mitchell's home to pick up Leah, but when he arrived he found out she had already left a few minutes earlier. McGuffin told us he made several trips up and down Central looking for Leah but did not see her. He also stated he drove all over

5

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER          Coquille 000793

CONTINUED NEXT PAGE

SUPPLEMENTAL REPORT CONTINUED                                                    Page 6

| AGENCY: Coquille Police Department | Incident Classification Missing Person | Incident No. 00001905 |

town looking by the Middle School and several different locations she might have walked to, but never found her. Around ten fifteen that night he called Cory Courtright from Cheri Mitchell's home to see if if Leah had arrived home, but was told no. At about ten thirty McGuffin called his home and spoke with his mother asking her if Leah had walked out to his house and once again was told no. Later, around eleven o'clock in the evening, McGuffin went to Bartley's grandparent's home and asked Bartley if he had heard from Leah and explained he could not find her. Bartley agreed to go with McGuffin to help look for Leah and they drove around together until two or two thirty in the morning Thursday morning at which time he dropped off Bartley.

McGuffin then drove to Leah's home and saw what appeared to be a light reflection coming from Leah's room. He attempted to throw rocks at her bedroom window to get her attention but she would not answer. McGuffin felt Leah was possibly mad at him, so he left and went home. Around eight o'clock Thursday morning when Cory Courtright called McGuffin at his home to find out if Leah was there and if she had spent the night. During our interview with McGuffin we showed him a picture of Leah we had obtained. McGuffin became extremely choked up, teary eyed, crying and had difficulty catching his breath. It was my opinion his reaction seemed to strong, given the fact she had only been missing for about a day and an half and we considered Leah as a possible runaway.

At the conclusion of the interview Chief Reaves and I decided to go back to the Haga residence to retrieve the tank top we had seen earlier because of the description given to us by McGuffin. We thought there might be a possibility the tank top we had seen might be Leah's. When we arrived at the Haga residence we saw the tank top was missing and all the beer containers had been cleaned up. We found the kitchen sliding glass door was unlocked and partially open, so we did a check of the residence, but found it was empty.

In the late afternoon I had Brent Bartley come into City Hall to do a quick interview about his activities the night Leah disappeared. Bartley's mother, Leslie, accompanied him to the Department and was present during the interview. Bartley told me that McGuffin and Leah came over to his house sometime after 4 PM on Wednesday, June 28th. They all smoked some marijuana and decided to get some video's from McGuffin house and go to Bartley's grandparent's house (Haga). Around 7 PM McGuffin, Bartley and Leah left to take Leah to Cheri Mitchell's house and dropped her off. McGuffin then picked up Bartley's girlfriend, Nicki Price, and they drove back out to Haga's house. Bartley said McGuffin stayed with Nicki and him until around 9 PM then left to pick up Leah.

McGuffin returned a while later and stated he could not find Leah and was going to continue looking for her. About 11 PM, McGuffin returned and told Bartley and Nicki that he could not find Leah, so Bartley told McGuffin he would go and help him find her. They dropped Nicki off at her house and Bartley said he drove around with McGuffin until around 2 AM Thursday morning before McGuffin dropped him off at his house. At the end of the interview I was just listening to what Bartley had to say when Bartley, looked at me, turned, looked at his mother, then looked back at me and stated " I didn't do anything". I felt this response was some what odd at the time because no one making any accusations at this particular point in the investigation, we were just looking for a missing girl.

During the remainder of the day and evening Chief Reaves and I continued to track down leads and possible spots where Leah might have gone to but, were unsuccessful in locating her.

Over the weekend of July 1st and 2nd, I followed up leads which had been called to our Department but none of them produced any positive results.

In July 3, 2000, Officer Shelly Grant contacted the FBI field office in Eugene. Officer Grant

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER  CONTIN Coquille 000794

SUPPLEMENTAL REPORT CONTINUED                                                    Page 7

| AGENCY: Coquille Police Department | Incident Classification Missing Person | Incident No. 00001905 |
|---|---|---|

explained our situation that was ongoing and asked if they could offer any assistance. She was told by the FBI they were going to send a team of special agents to Coquille immediately and would arrive around noon. During the morning hours while waiting for the FBI to arrive, Chief Reaves, Officer Grant and I continued to track down leads coming into the office and collate data we had obtained so far. Around one o'clock in the afternoon four special agents from the FBI arrived at our Department.

The FBI agents were given a full case review by all of us involved and we discussed what should be done immediately and how best to proceed with the investigation. It was determined that I, along with Special Agent Bill Soule, would go and have an in depth interview with Cory Courtright, concerning Leah and her relationship with McGuffin, and also activities and friends. It was thought a more thorough interview might bring out additional information that could give us a better idea about where or what may have happened to Leah.

At 2:55 pm Special Agent Soule and I sat down with Cory Courtright. We explained what we wanted to do and began the interview. Cory stated that Leah enjoyed sports such as Volleyball, Basketball, and was a fair student in school with grades of B's and C's. We then moved on to Leah's relationship with McGuffin. Cory said the relationship Leah had with McGuffin started back in October of 1999. At first Cory did not approve of the relationship because of the age difference. It was not until around March 2000, did Cory start allowing McGuffin to come over to the house. Her reason for this was simple. Leah and Cory's relationship was suffering because Cory disapproved of Leah dating McGuffin and she wanted to regain that relationship she once had. Cory stated tha Leah and her were very close.

McGuffin and Leah spent alot of time together watching movies and swimming. They would spend time together talking in McGuffin's car at either Highway 42 and West Central or at the Caboose Lady Coffee parking area. The day of Leah's disappearance Cory said Leah was in an exceptionally great mood.

We had received information from Cory Courtright that Leah was scheduled for an appointment at County Health Clinic to try and obtain birth control. Cory stated that she had set up the appointment because she knew Leah and McGuffin were sexually active. We had enlisted the help of the District Attorney's Office in trying to ascertain if she made this appointment, but because of a privacy issue we were not able to obtain information. While I was talking to Cory, I received a call from Lt. King stating if I took Cory to the clinic and she signed a waiver we would receive the information we needed. I stopped the interview and took Cory in my patrol car to North Bend. At the North Bend Clinic after Cory had signed the wavier, we were informed by Mrs. Klander that Leah did not make her appointment scheduled for June 29th.

During a briefing at the end of the day it was decided we would attempt on Wednesday July 5th, to get someone from an outside agency over to Coquille on Wednesday to administer a polygraph to both McGuffin and Bartley so we could eliminate them as possible suspects in Leah's diappearance.

Tuesday July 4, 2000, we received an anonymous call at the Department. The female caller stated we were to relay a message to the mother of Leah, that she was alright and staying with another boy in Coos Bay and then hung up. Dispatch traced the call with the help of GTE Phone Services and it came back to an address located at 1222 Minnesota, Coos Bay.

nief Reaves and I left immediately for Coos Bay to the above mentioned address. We arrived and

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER    CONT Coquille 000795

SUPPLEMENTAL REPORT CONTINUED

| AGENCY: Coquille Police Department | Incident Classification Missing Person | Incident No. 00001905 |
|---|---|---|

Page 8

spoke with an elderly woman who stated her daughter knew someone who had seen Leah. We found out the location where the daughter worked and drove to Cap'n Johns Motel in Charleston. We spoke to Cheryl Thomason in regard to her phone call to our office. She told us she had a friend whose name was Elton that lived upstairs in an apartment above the theatre in Coos Bay. She went on to say this friend had told her Leah was at his apartment on Monday.

After receiving this information we drove to 249 S. Broadway # 122, Coos Bay, in an attempt to contact this subject. At this location we contacted Elton Johnson and asked him to tell us about him seeing Leah. Elton told us a tall skinny guy with a girl that looked like Leah came to his door on Monday morning about 8:30 am. The guy stated he was looking for a person named Richard. Elton said there used to be a man named Richard who lived in his apartment but had moved several months earlier. Elton then pointed out his window toward a patch of trees several blocks away and said Richard had moved into a house located by the trees.

We went to two different homes where Elton pointed and finally at 353 S. 5th Street we located a subject who knew Richard. Joe Rudder told us Richard's last name was Hutchins. He told us Hutchins was in jail and had been evicted several months earlier and was doing time in jail for a probation violation. After exhausting all leads in this particular instance we cleared and went back to Coquille.

Later in the evening I was contacted by dispatch and requested to meet Officer Ulmer of my Department at the cemetery located near my house. I was told he had possibly located some items that could be pertinent to our case involving Leah. I responded and Ulmer showed me a jacket he had found but it was quickly determined that it belonged to a young man who was walking through the cemetery. Ulmer then showed me a shoe that was given to him by a citizen who had found it supposedly the night of Leah's disappearance. I told Ulmer to place it in evidence just in case it was Leah's.

On Wednesday morning July 5th, I contacted OSP Officer Mark Ranger, at his office in Roseburg, Oregon. I explained to him my case and requested his assistance in administering polygraph examination on Bartley and McGuffin. Ranger told me he would arrive later in the morning and to contact McGuffin and Bartley to arrange times for them to take the test. I contacted both the above mentioned subjects and arranged times for them to be interviewed and tested.

Agent Dick Wilson of the FBI and I first took Bartley downstairs and had him give us a written statement of his activities on June 28th. During the time Bartley was writing his statement he broke down and cried for several minutes and said he was very upset over Leah's disappearance. After finishing his statement Bartley was asked if he would consent to taking a polygraph exam and he agreed to do so, and was turned over to Ranger for the test. At the beginning of the test Agent Wilson and I were standing outside the office where Bartley was taking the test and heard Bartley break down and start crying once again. At the conclusion of the test Bartley was told he could go home. Ranger told me after the test that Bartley showed deception on one of the test questions. The question was, "Have you talked to Leah since last Wednesday night after 9 PM". Ranger felt Bartley may not have direct involvement in Leah's disappearance, but felt he might have some knowledge about it.

McGuffin was next brought down to the squad room and we had him give a detailed written statement about June 28th and 29th. I remembered our first interview with McGuffin and how he had problems remembering times, where he had been, who he had been with, but this time McGuffin was able to give precise times and state exactly where and who he had seen on that

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER    CONTINU<span>Coquille 000796</span>

9

SUPPLEMENTAL REPORT CONTINUED                                    Page   9

| AGENCY Coquille Police Department | Incident Classification Missing Person | Incident No. 00001905 |

night. After his written statement McGuffin was asked if he would consent to a polygraph exam and he agreed to take the test. Before the test I asked McGuffin if he would be willing to give us consent to look through his car and McGuffin agreed. I had McGuffin write out in his own hand writing a statement granting us permission to search his car. I then contacted Mast Brothers towing and sent them along with investigator Lt. Buddy Young, to pick up McGuffin's car at his home, then transport it to the OSP crime lab in Coos Bay for processing.

After polygraph exam of McGuffin, I met with Ranger to discuss the results. Ranger told me that McGuffin showed a significant amount of deception on three key questions that I have listed below.

1. Did you physically do something that resulted in Leah's death?

2. Did you have any direct involvement in Leah's disappearance?

3. Have you talked to Leah since last Wednesday night after 9 PM?

It was decided that Ranger and I would interview McGuffin again and try to determine if he was hiding something. It should be noted that during the interview McGuffin was extremely defensive and agitated toward us. At one point during the interview, I told McGuffin that we had a witness that saw Leah in McGuffin's car after 10 PM. McGuffin after hearing this statement from me gasped, began looking up at the ceiling and all around as if searching for an answer. He never once said that it was impossible or called it a lie but only replied that he didn't know how that was possible. When the questioning became more intense McGuffin became more irate and finally McGuffin stated " This polygraph is inadmissable in court, you don't have any evidence, so you don't have hit ". He then stated he wanted to speak to his father and got up and walked out.

Later in the evening on this same date from about 9 PM till 10:15 PM, we conducted a roadblock on N. Central by the Credit Union. The reason for this was simple. Most people are creatures of habit and will travel by vehicle or walk the same route daily. We did this in an effort to possibly find someone who may have seen Leah walking up Central on the night of her disappearance. Anyone who may have seen something or thought they had seen something was interviewed. During the time of the roadblock Deputy Kip Oswald of the Sheriff's Office was on patrol in the Fairview area and found a shoe on Hudson Ridge. Oswald came up to me while I was working the roadblock and showed me the shoe he found. It looked very similar to the shoes that Leah was supposed to be wearing on the night of her disappearance. It also matched the shoe Officer Ulmer had located. Oswald said he would take it to his Department and log it in as found property.

On Thursday July 6th I obtained a search warrant for McGuffin's car and served it to Cathy Wilcox at the OSP Crime Lab. In the early part of the afternoon, we had Leah's sister Denise, come down to the Department. We wanted to see if she could identify the shoes that where found. We had siezed a pair of tennis shoes from Leah's room a couple of days earlier and we placed the two pairs of shoes on a table and asked Denise which pair Leah wore the most. Denise pointed to the shoes that were found and said she wore them all the time because the other pair had a faulty heel.

On July 10, 2000, I took the tennis shoes we had found along with other items to the crime lab and requested to have a DNA Test performed to determine if the shoes were, in fact, Leah's. While in Coos Bay I went to the Courthouse in North Bend and did a return of service for the search warrant I had obtained for McGuffin's car. At 2 PM we had a investigators meeting and collated any information received so far and try to determine what leads needed to be followed up. Various signments were given to detectives for follow-up.

9

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER    CONTINUED NEXT PAGE    Coquille 000797

10

SUPPLEMENTAL REPORT CONTINUED                                          Page  10

| AGENCY: Coquille Police Department | Incident Classification Missing Person | Incident No. 00001905 |
|---|---|---|

On July 12, 2000 Chief Reaves scheduled for OSP Detectives from other parts of the state as well as Chief Gil Zacarro from North Bend P.D. to review our case cold. We wanted someone who had not worked on this case to be able to review, critique, and make recommendations to us on how best to proceed or to look at any area's that we may have missed.

During the early morning of July 14th, I had several Officers from my Department as well as Sheriff's Department Deputies conduct a road block on Fairview Road and Collier. It had been reported to our Department that a young woman was seen the night Leah's disappearance standing on the corner of North Collier and Fairview Road attempting to hitch-hike out to Fairview. The description of the woman given to investigators by witnesses closely resembled that of Leah. During the roadblock one of the Officers was able to get a lead in which, the woman who was seen on this night was a female that had been released from jail earlier in the evening and was trying to get ride to Cherry Creek.

As of the date of this report we are currently still following up leads as they come into the Department and collating and cataloging all in formation.

Investigation Continuing.

END OF SUPPLEMENTAL REPORT

10

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          Coquille 000798

Exhibit 115  Page 10 of 10 to
State Defendants' Motion for Summary Judgment



STATE'S EXHIBIT 2 10CR0782

Exhibit 116  Page 1 of 5 to
State Defendants Motion for Summary Judgment

Bartley Grandparents' Home

Coquille Shoe

Gas Station

High School

Credit Union

Leah's Home

STATE'S EXHIBIT 3

Exhibit 116  Page 2 of 5 to
State Defendants Motion for Summary Judgment



STATE'S EXHIBIT 4

Exhibit 116  Page 3 of 5 to
State Defendants Motion for Summary Judgment



Leah's Body

STATE'S EXHIBIT 5

Exhibit 116  Page 4 of 5 to
State Defendants Motion for Summary Judgment



Image © 2011 Digita

Hudson Ridge Shoe

Leah's Body

STATE'S EXHIBIT

Exhibit 116  Page 5 of 5 to
State Defendants Motion for Summary Judgment

## COOS COUNTY SHERIFF'S OFFICE    7/5/2000

### INCIDENT NARRATIVE / FILE NO: 20-10627

Date/Time Printed: July 13, 2000 / 16:20 Hours    By: CLM

```
INCIDENT REPORT[ X ] RPT'D DATE/TIME [  07-05-00/0800 HOURS        ]
SUPPLEMENTAL    [  ] OCC'D DATE/TIME [  06-28-00/2100 HOURS        ]
CONNECT NUMBERS[ COQUILLE PD CASE #00-1905                         ]
```

```
OFFENSE(S)     [ ASSIST POLICE/MISSING PERSON                     ]
VICTIM'S NAME  [ FREEMAN, LEAH                                     ]
LOCATION       [ CENTRAL AVE COQUILLE, OREGON                      ]
```

```
DISTRIBUTION   [ COQUILLE PD, 7-13-00 cdn                          ]
               [                                                   ]
```

**SUMMARY:**

On 07-05-00 at 0800 hours, I was assigned to assist the Coquille
Police Department with the investigation of a missing person.  This
was the result of a Coos County Homicide Investigation call out to
provide additional investigators to assist in this investigation.

**PERSONS INFORMATION:**

(AO) **OFFICER HALL, Dave**: (605) Coquille Police Department.

(AO) **CHIEF REAVES, Michael**: (601) Coquille Police Department.

(AO) **DETECTIVE DOWNING, Pat**: (510) Coos County Sheriff's Office.

(AO) **SERGEANT OSWALD, Kip**: (511) Coos County Sheriff's Office.
                              (Refer case # 20-10650/Found Prop)

(AO) **DEPUTY MCNEELY, Ray**: (519) Coos County Sheriff's Office
                              (Timber Deputy)

(AO) **DEPUTY NICHOLAUS, Rich**: (518) Coos County Sheriff's Office
                              (Timber Deputy).

(AO) **DEPUTY ANDREWS, Kelley**: (526) Coos County Sheriff's Office.
                              (Patrol Division)

```
REPORTING OFFICER  [ Sgt. C. Zanni(504)        ] DPSST [  8614 ]
SHIFT [    ] DISTRICT [    ] APPROVAL [                         ]
```

PAGE 1

Zanni 2021-12-17
**DEPO EXHIBIT**
**2**
exhibitsticker.com

Exhibit 117  Page 1 of 17 to
State Defendants' Motion for Summary Judgment

# COOS COUNTY SHERIFF'S OFFICE

## INCIDENT NARRATIVE / FILE NO: 20-10627

### Date/Time Printed: July 13, 2000 / 16:20 Hours  By: CLM

(AO) **DEPUTY ZAVADA, Jeff:** (536) Coos County Sheriff's Office.
(Marine Deputy).

(AO) **SGT. MCDANIEL, Dave:** (508) Coos County Sheriff's Office,
(Search and Rescue Coordinator)

(W) **MIDDLETON, Bill:** (Uncle to victim)
1180 West 10th Street Coquille, Oregon.
396-5463.

(W) **BOLKEN, Olif Torfinn:** (Safeway Manager)
Coquille Safeway Store.
155E. 1st Street Coquille, Oregon.

396-2223.

(W) **SHIELDS, Mark Randall:** DOB 08-18-79.
99009 McKinley Lane Myrtle Point, Oregon.
572-2246.

(W) **WILLIAMS, Diane.**
Bay Area Hospital Employee.
2010 Juniper St. Coquille, Oregon.
396-5603.

(W) **KINDRED, Lyndee:** DOB 01-01-83.
1223 West 9th St. Coquille, Oregon.
396-3445.
Employed with City of Coquille (Coquille swimming pool).

(W) **CHRISTOFERSON, Kristy D.:** DOB 07-05-84.
396-5804.

(W) **HAMMERBURG, Jessica:**
396-4391.
Pager: 266-5955.
(Not contacted as of this time).

REPORTING OFFICER  [ Sgt. C. Zanni(504)          ] DPSST [  8614  ]
SHIFT [   ] DISTRICT [   ] APPROVAL [                          ]

PAGE 2

Exhibit 117  Page 2 of 17 to
State Defendants' Motion for Summary Judgment

# COOS COUNTY SHERIFF'S OFFICE

3

## INCIDENT NARRATIVE / FILE NO: 20-10627

### Date/Time Printed: July 13, 2000 / 16:20 Hours   By: CLM

(W)   ELBERT, Kimberly LeAnn: DOB 12-24-84.
Currently in custody at Coos County Juvenile Department.
Home address unknown.


## EVIDENCE/PROPERTY INFORMATION:

(E1) **CZ-001,** One paper bag containing three pillow cases from missing
person, Leah Freeman's bed, and pillows.

Item obtained at 1350 hours on 07-05-00 by consent.  It was
obtained from her bedroom and turned over to Coquille Police
Department Evidence. (One pillowcase was removed and put in a
separate sack and turned over to the custody of Sgt. Dave
McDaniel's for the use of the blood hound/tracking dog.)

Value Unknown.

(E2) **CZ-002,** One paper bag containing one pair of Nike tennis shoes
removed from the victims bedroom shoe stacker.  Shoes contain
hair believed to belong to the victim.

Shoes turned over to Evidence at the Coquille Police Department.
Items were seized along with the pillowcases from the victim's
bedroom, same date, and time as above.

Value: Unknown.

(E3) **CZ-003,** One paper bag containing the hairbrush from the victims
bedroom dresser.

Seized on the same date and time as the pillowcases listed
above.  Items turned over to Evidence at the Coquille Police
Department.

Value: Unknown.


REPORTING OFFICER   [ Sgt. C. Zanni(504)          ] DPSST [  8614  ]
SHIFT [   ] DISTRICT [    ] APPROVAL [                                     ]

PAGE 3

Exhibit 117  Page 3 of 17 to
State Defendants' Motion for Summary Judgment

# COOS COUNTY SHERIFF'S OFFICE

4

## INCIDENT NARRATIVE / FILE NO: 20-10627

### Date/Time Printed: July 13, 2000 / 16:20 Hours   By: CLM

(E4)  One printout of purchase records from the Safeway Store in Coquille for 06-28-00 at approximately 1900-2000 hours. The printout lists the purchase by Bill Middleton at 1934 hours on 06-28-00.

Items attached to this report.

Value: Unknown.

(E5)  One report completed by Sgt. Kip Oswald case #20-10650 regarding the finding of a tennis shoe on Hudson Ridge.

Copy of report attached to this report.

Shoe found was removed from the Evidence at the Coos County Sheriff's Office and turned over to the custody of Coquille Police Department.

Value: Unknown.

(E6)  **CZ-004,** One metal tin with the brand Tommy Hilger marked CZ-004.

This tin contained the diary and other papers belonging to Leah Freeman. These items were found in her former bedroom at the residence of 351 West 5th Street in Coquille. Items were obtained by consent and turned over to the custody of the Coquille Police Department Evidence.

Value: Unknown.

(E7)  **CZ-005,** One shoe box marked CZ-005, containing numerous loose leaf notes notes and book pages belonging to victim Leah Freeman.

Items were seized from her closet area of 351 5th Street Coquille.

Items turned over to the Coquille Police Department.

Value: Unknown.

REPORTING OFFICER  [ Sgt. C. Zanni(504)        ] DPSST [  8614  ]
SHIFT [   ] DISTRICT [   ] APPROVAL [                              ]

PAGE 4

Exhibit 117  Page 4 of 17 to
State Defendants' Motion for Summary Judgment

# COOS COUNTY SHERIFF'S OFFICE

## INCIDENT NARRATIVE / FILE NO: 20-10627

### Date/Time Printed: July 13, 2000 / 16:20 Hours   By: CLM

(E8) CZ-006, One Nike shoebox marked CZ-006, containing miscellaneous notes and papers belonging to the victim.

Item seized from the closet area of her former residence at 351 5th Street, Coquille.

Turned over to the Coquille Police Department Evidence.

Value: Unknown.


**VEHICLE INFORMATION:**

(On Wednesday evening at 2100 hours I assisted with a large road block vehicle check with the Coquille Police Department on Central Avenue near the Credit Union on to East 10th Street.  Numerous vehicles were checked and the drivers were identified along with vehicle descriptions.  For additional information see road block sheets in custody of Coquille Police Department.)


**OBSERVATIONS:**

On 07-05-00 at 0800 hours, I was assigned to assist the Coquille Police Department with an investigation of the missing person Leah Freeman.

I first met with the investigating officers from the Coos Major Crime task force, members of the FBI, Oregon State Police, Coos County District Attorney and Coquille Police Department for a briefing at the city council chambers at approximately 1000 hours.

We were given a briefing by the Coquille Police Department regarding the extent of the information available from their investigation. Subsequent assignments were given to investigative officers.

At 1200 hours, on 07-05-00, I was assigned to interview Bill Middleton who had called in and is the uncle to the victim.

REPORTING OFFICER   [ Sgt. C. Zanni(504)             ] DPSST [   8614   ]
SHIFT [    ] DISTRICT [    ] APPROVAL [                                 ]

PAGE 5

Exhibit 117  Page 5 of 17 to
State Defendants' Motion for Summary Judgment

# COOS COUNTY SHERIFF'S OFFICE

## INCIDENT NARRATIVE / FILE NO: 20-10627

### Date/Time Printed: July 13, 2000 / 16:20 Hours   By: CLM

I did contact Bill Middleton and obtained a statement from him and his additional information in which he wanted to provide regarding his niece, Leah Freeman. (For additional information see statement section of this report.)

After interviewing Bill Middleton, I made contact with Torfinn Bolken, the manager of the Coquille Safeway store in an attempt to identify the time that Mr. Middleton would have been at the Safeway store on 06-28-00. At that time, he indicated he would have to research his records and would recall.

At approximately 1300 hours on 07-05-00 I was assigned along with FBI agent Mike Morrow to respond to the victim's residence on North Knott to pick up scent articles to be used for the tracking dogs and also to see if there was any items available for DNA information.

As a result and with consent, I seized the above listed pillowcases, tennis shoes, and a hairbrush from the victim's room at her address at North Knott. These items were all turned over to the possession of the Coquille Police Department later that afternoon.

Later that afternoon, I was recontacted by Torfinn Bolken of the Coquille Safeway store and provided a copy of their printout, indicating that Bill Middleton, the victim's uncle, had gone to the check out counter at 1934 hours on 06-28-00. I obtained a copy of this information and subsequently had advised Dave Hall, case officer for the Coquille Police Department with this additional information.

At 2030 hours, I met with investigators again at the Coquille Police Department and was assigned to assist with the road block information on 10th and Central Streets in Coquille to identify anyone who might be travelling that roadway on Wednesday evenings at approximately the time the victim disappeared. (For additional details, see road check sheets in the custody of Coquille Police Department.)

During the time of the road block operations, I was also contacted by pager and responded to the Glen Aiken road area with Lt. Buddy Young regarding additional information of a possible assault that may have occurred at that area on the evening in question. After contacting the Henthorne residence on Glen Aiken road and their neighbors next

REPORTING OFFICER  [ Sgt. C. Zanni (504)      ] DPSST [  8614 ]
SHIFT [   ] DISTRICT [    ] APPROVAL [                          ]

PAGE 6

Exhibit 117  Page 6 of 17 to
State Defendants' Motion for Summary Judgment

# COOS COUNTY SHERIFF'S OFFICE

## INCIDENT NARRATIVE / FILE NO: 20-10627

### Date/Time Printed: July 13, 2000 / 16:20 Hours  By: CLM

door, no additional inform was obtained that was of any use to this investigation. On the evening of 07-05-00 I was contacted by telephone by Sgt. Oswald of the Coos County Sheriff's Office.  He had found a shoe on Hudson Ridge similar to the description of the victim's shoes.

On 07-06-00, I returned to the sheriff's office and reviewed the report completed by Sgt. Oswald of the Coos County Sheriff's Office. I obtained the shoe from evidence at that time and responded to Coquille Police Department and turned this over to the custody of the police department for further investigation.

Arrangements were also made with the United States Coast Guard Air Station in North Bend to have Detective Sgt. Dan Looney fly with them down the Coquille river area to attempt to locate or spot any possible evidence that may reside along the river area.  Deputies' McNeely and Nickolaus were also assigned to search the Hudson Ridge area where the shoe had been found by Sgt. Oswald the evening before. Deputy Jeff Zevada, Marine Deputy, was also assigned to patrol the Coquille river area in or about the city of Coquille for any possible evidence by boat and Deputy Kelley Andrews was assigned to do follow up every other day, checking the same area by boat.

At approximately 1000 hours, the victims boyfriends father came in to the Coquille Police Department to advise that Sean McCrae at 541-485-1182, was acting as his attorney on behalf of the family, particularly for Nick McGuffen who was the missing person's boyfriend.

At approximately 1326 hours on 07-06-00, I interviewed Mark Randall Shields at the Coquille Police Department regarding any additional information he might have and a statement attributed to Nick McGuffen as stating something to the effect that he did not like being accused of murder.  During that interview it was determined that that statement was not made and somewhat out of context.  (For additional information see Mark Shields statement.)

I subsequently made numerous telephone contacts and calls to obtain additional information with negative results.  I then responded with

---

REPORTING OFFICER  [ Sgt. C. Zanni(504)          ] DPSST [  8614  ]
SHIFT [   ] DISTRICT [    ] APPROVAL [                            ]

PAGE 7

Exhibit 117  Page 7 of 17 to
State Defendants' Motion for Summary Judgment

# COOS COUNTY SHERIFF'S OFFICE

## INCIDENT NARRATIVE / FILE NO: 20-10627

### Date/Time Printed: July 13, 2000 / 16:20 Hours   By: CLM

Detective Downing to 1026 North Dean Street in attempt to contact a possible witness who was not present at that time. We also checked 587 Collier in Coquille for additional witness with negative results.

I then attempted to contact Diane Williams who we had been advised may have seen the victim on the day in question.  I subsequently located her residence at 2010 Juniper and attempted to contact her with negative results.  Messages were left for those persons at the above listed addresses to recall or page Detective Downing or myself.

On July 7, 2000 I assisted Detective Downing when he responded and contacted Kristen Ramsey, also known as Kristen Steinhoff at her residence at 1026 North Dean.  Detective Downing subsequently obtained a statement from her.

Additional contacts were attempted with negative results.  On the afternoon at approximately 1308 hours, Detective Downing and I contacted Lyndee Kindred at her residence regarding information she may have had regarding the victim or other persons who knew the whereabouts of the victim or her boyfriend, Nick McGuffin.  We did obtain a statement from her. (For additional information see statements).

As a result of the information obtained, we attempted contact with Kristy Christoferson and at her residence on West 17th Street in Coquille, however she was not at home and a message was left.

Detective Downing and I then subsequently contacted Dennis Freeman, father of the victim, at his residence at Route 1 Box 3710 Coquille, off highway 42 south.  We attempted to obtain any additional information.  No new information was obtained. It was also determined that the victim had not been seen or heard from recently at the Freeman residence.

Approximately 1540 hours, I was then assigned to accompany Bill Middleton to the Jimmie Murphy residence at 351 West 5th Street where the victim had formerly resided.  Mr. Middleton unlocked the door and we were given permission to check the bedroom where the victim had resided previously.  I subsequently seized the above listed items,

REPORTING OFFICER  [ Sgt. C. Zanni(504)          ] DPSST [  8614  ]
SHIFT [    ] DISTRICT [    ] APPROVAL [                            ]

PAGE 8

Exhibit 117  Page 8 of 17 to
State Defendants' Motion for Summary Judgment

# COOS COUNTY SHERIFF'S OFFICE

*9*

## INCIDENT NARRATIVE / FILE NO: 20-10627

### Date/Time Printed: July 13, 2000 / 16:20 Hours   By: CLM

(E6 thru E8) including her diary and miscellaneous papers as listed under evidence property information section.  These items were transported over to the Coquille Police Department and turned over to their control.

At approximately 1625 hours, we were able to contact Kristy Christoferson at her residence.  A statement was obtained from her regarding her information about Nick McGuffen's activities on the evening of 06-28-00.

Detective Downing and I then contacted Kim Elbert Juvenile Detention in Coquille and a statement was obtained from her.

At approximately 1805 hours on 08-07-00, I was contacted by Corporal Kip Oswald.  He advised that he had received information that a subject camping in the Lakeside area on or about June 28 had found a yellow rope, gloves and a bloody knife along the roadway in that area and he had subsequently transported those items to his residence in Lebanon, Oregon and had contacted the Lebanon Police Department.

I requested Sgt. Oswald to contact Lebanon Police Department and have those items transported to the Oregon State Crime Lab for testing for human blood and to determine what other useful information maybe available or found.  It was also requested to assign a patrol deputy to check that area for additional information.

Additional telephone calls and contacts were attempted with negative results.

At 2009 hours, I cleared from the Sheriff's office.

On 07-12-00, I received a package from the Lebanon Police Department. These items were immediately repackaged and forwarded to the Oregon State Police Crime Lab in Coos Bay.


**STATEMENTS:**

**BILL MIDDLETON** was interviewed at his residence approximately 1200 hours on 07-05-00 and stated the following in substance:

REPORTING OFFICER   [ Sgt.  C.  Zanni (504)                    ] DPSST [  8614  ]
SHIFT  [    ] DISTRICT [    ] APPROVAL [                                        ]

PAGE 9

# COOS COUNTY SHERIFF'S OFFICE        *10*

### INCIDENT NARRATIVE / FILE NO: 20-10627

Date/Time Printed: July 13, 2000 / 16:20 Hours  By: CLM

Bill Middleton stated that he is the uncle of the victim, Leah Freeman. He stated that he does not believe the goody two shoes information about his niece that has been put out by the paper and media. Mr. Middleton basically stated that since she has had a relationship with Nick McGuffen that she has not been as good a child as she has, her grades had dropped and he believes she may be using or involved in drug activity. He also stated that Nick McGuffen at times was physically abusive to the victim and it can be born out by information from other students and teachers at the school that knew her. He advised that Nick McGuffen was very controlling and dominating and he believed the victim could of possibly ran away, committed suicide or been injured by Nick McGuffen.

Mr. Middleton also stated that he believes that the victims' boyfriend Nick McGuffen, and her mother Corey Freeman were withholding some information from the police and not being forthcoming with all relevant information. As a result of that statement, he stated that the evening of the twenty-ninth, he had to call the Coquille Police because Nick McGuffen came to his residence along with other persons and was very threatening and verbally abusive. (See Coquille Police records). He also stated that at one point, a friend of Nick McGuffen's, Mark Shields, had tried to explain to Mr. Middleton, that Nick was just upset because he didn't like being accused of murder. Mr. Middleton stated he had never indicated he believed Nick had committed a murder and thought that statement was odd.

Mr. Middleton also indicated that he and his wife had seen his niece, Leah, with her boyfriend Nick in their car while they had gone to the store on the evening of June 28 and they believe it to be later that 7 p.m. when she was reportedly dropped off. Mr. Middleton stated that his wife and him had gone to the store to purchase a couple items and left. He stated they had used a check to pay for their purchase and their Safeway club card.

Mr. Middleton basically stated he doesn't think a proper picture is being developed of the victim, Leah Freeman, and she is not as straight as the kid is being indicated in the media. He also believes that currently Corey Freeman, the victim's mother and victim's boyfriend, Nick McGuffen, are withholding some information.

REPORTING OFFICER  [ Sgt. C. Zanni(504)          ] DPSST [  8614 ]
SHIFT [   ] DISTRICT [    ] APPROVAL [                              ]

PAGE 10

Exhibit 117  Page 10 of 17 to
State Defendants' Motion for Summary Judgment

# COOS COUNTY SHERIFF'S OFFICE

## INCIDENT NARRATIVE / FILE NO: 20-10627

### Date/Time Printed: July 13, 2000 / 16:20 Hours   By: CLM

He stated it she may have been pregnant or something to that effect but he did not know for sure.

Mr. Middleton stated that Nick, Leah's boyfriend, does hang around with a tough crowd, including Rick Henthorne, Matt Anglen and he believes they are drug involved, using and abusing drugs.

**OLIF TORFINN BOLKEN**, Coquille Safeway Manager was contacted and interviewed at approximately 1542 hours on 07-05-00 and stated the following in substance:

Mr. Bolken indicated he did not recall the transaction but would check his records and advise if he was able to locate those records.

At 1743 hours, on 07-05-00, Mr. Bolken recalled and indicated he had found the transaction involving Bill Middleton. He stated that Mr. Middleton had gone through the Safeway checkout counter at 1934 hours on 06-28-00. A copy would be available for me to pick up at his office. (Copy attached to report.)

**MARK RANDALL SHIELDS** was interviewed at 1326 hours on 07-06-00 at the Coquille Police Department and stated the following in substance:

Mark Shields stated he was staying with his grandmother in the McKinley area and is a cousin to Leah and a friend of Nick McGuffen. He advised that he is familiar with the statement that what Nick had made about being responsible for her murder. He advised that that was out of context and basically what Nick was saying he was not responsible for her disappearance and did not like being falsely accused. He does not recall or know of the term murder, homicide or killing being used in that. He stated that basically Nick is making reference to the fact that people think it's his responsibility or for some reason, he caused the disappearance of Leah and he is really upset about that.

Mr. Shields indicated he had no other information that he could provide to help regarding finding Leah Freeman. However, if he obtained any information he would notify authorities immediately.

REPORTING OFFICER   [ Sgt. C. Zanni(504)          ] DPSST [   8614  ]
SHIFT [    ] DISTRICT [    ] APPROVAL [                              ]

PAGE 11

Exhibit 117  Page 11 of 17 to
State Defendants' Motion for Summary Judgment

# COOS COUNTY SHERIFF'S OFFICE

|2

## INCIDENT NARRATIVE / FILE NO: 20-10627

### Date/Time Printed: July 13, 2000 / 16:20 Hours   By: CLM

**DIANE WILLIAMS** was interviewed by phone on 07-07-00 and stated the following in substance:

Diane Williams indicated that she had seen the victim, Leah Freeman, who she knows, during the early afternoon hours on 06-28-00 walking near the high school. She stated this was early afternoon and she appeared to be walking towards town. (This was well before the victim's known disappearance time at 2100 hours.)

**LYNDEE KINDRED** was interviewed at her residence at approximately 1330 hours on 07-07-00 and stated the following in substance:

Lyndee Kindred stated that she did in fact see Nick McGuffen on 06-28-00 at approximately 2130 or 2145 hours. She stated she is familiar with the time because this is after she had gotten out of Saw Duster practice. She stated she pulled over on her way home as she saw Nick, approximately two houses away from Leah's grandparent's house on North Knott. She pulled up next to Nick and he asked her if she had seen Leah. She stated she was by herself and Nick was driving his blue mustang at the time. She told Nick she had not seen her and that she then went on home.

Lyndee also indicted she did not see the victim on her way home that she recalled and she didn't believe that her and her boyfriend had any problems that she was aware of.

Lyndee Kindred indicated that she had dated Nick for about and a week and he seemed to be a nice guy, he seemed to be a little hot tempered but he keeps it controlled. She indicated she did not have much contact with Leah Freeman but was familiar with her and that was the only information she could provide other than Kristy Christoferson who she had a phone number and address for may have been one of the persons at Sturdivant Park on the night of 06-28-00.

**KRISTY CHRISTOFERSON** was interviewed at her residence at approximately 1625 hours on 07-07-00 and stated the following in substance:

Kristy Christoferson indicated she had been in the park with Jessica Hammberburg. They were visiting and walking around and both were

---

REPORTING OFFICER  [ Sgt. C. Zanni (504)           ] DPSST [  8614  ]
SHIFT [   ] DISTRICT [   ] APPROVAL [                                  ]

PAGE 12

Exhibit 117  Page 12 of 17 to
State Defendants' Motion for Summary Judgment

# COOS COUNTY SHERIFF'S OFFICE                13

## INCIDENT NARRATIVE / FILE NO: 20-10627

### Date/Time Printed: July 13, 2000 / 16:20 Hours  By: CLM

worried about the time because they didn't want to be late.  As they were in the park, Nick walked into the park area and they asked him what time it was and he told them 11:30 p.m.  He inquired from them if they had seen Leah and they advised them they hadn't, at which time he basically left and they believed they heard him drive away. They then left the park and returned to their homes so they did not get in trouble for being out past their curfew time.

Kristy Christoferson said she was certain about the time because she specifically asked about it because they didn't want to be late.

**DENNIS FREEMAN** (father of the victim) was interviewed at his residence approximately 1500 hours on 07-07-00 and stated the following in substance:

Mr. Freeman indicated he was a detached father ever since he had separated from the victim's mother.  He stated that in the past, before she became a girlfriend to Nick McGuffen, she spent most her time with Melissa Brugnoli and he was aware that when she turned up missing she did not have her ID.  He indicated that his daughter was somewhat impulsive and very picky and basically lived out of the dryer and she wore certain clothes, which she liked constantly.

Mr. Freeman indicated he had not heard from or had any contact with the victim in the recent past.  However, he does keep in contact with her mother as to the circumstance.  Mr. Freeman stated if he obtained any information or heard from the victim he would notify authorities immediately.

**KIM ELBERT** was interviewed at approximately 1740 hours on 07-07-00 at the detention facility at the Coos County Juvenile Department and stated the following in substance:

Kim Elbert stated that she knows the victim but has no knowledge of her current whereabouts or activities.  The information about her having camped or her family having camped with the victim in the past at the Sixes River area was false.  She stated she has never associated with the victim because she is a preppy type and looks down on her (Kim) and her family because they are poor.  She doesn't

---

REPORTING OFFICER  [ Sgt. C. Zanni(504)            ] DPSST [  8614  ]
SHIFT [   ] DISTRICT [   ] APPROVAL [                           ]

PAGE 13

Exhibit 117  Page 13 of 17 to
State Defendants' Motion for Summary Judgment

*14*

# COOS COUNTY SHERIFF'S OFFICE

## INCIDENT NARRATIVE / FILE NO: 20-10627

### Date/Time Printed: July 13, 2000 / 16:20 Hours  By: CLM

believe her family has camped and she has no association with the victim.

Kim Elbert indicated that her family to her knowledge, has never camped up the Sixes River at any time regardless of whether the victim was there or not, that she and her family do not camp.

## ACTION(S) PENDING:

Investigation continuing,   information referred to the Coquille Police Department.

NPC 20 HOURS, HOURS 34.

REPORTING OFFICER  [ Sgt. C. Zanni(504)          ] DPSST [  8614 ]
SHIFT [   ] DISTRICT [    ] APPROVAL [                           ]

PAGE 14

Exhibit 117  Page 14 of 17 to
State Defendants' Motion for Summary Judgment



```
B602  SWEEPSTAKES                        84013
MR      LOTTERY TICKET             1.00 .
B602 SWEEPSTAKES                         84013
 ACCOUNT NUMBER                           2151
    ****  TAX          .00   BAL     43.58
         Misc. Tender             1.00
         CASH                     42.60
         CHANGE                     .02
                                  47.67
  6/28/00  19:25  4262  03  0319  112
         ** NO-SALE OPEN CASH DRAWER **
  6/28/00  19:26  4262  03  0320  112
------------------------------------------
MICHAEL PHILLIPS               45001773154
  3:26 lb @ 1.11 /lb
SC XLOG CLUB BF CTRY RIBS          3.62-F
B602 SWEEPSTAKES                    84013
"602 SWEEPSTAKES                    84013
 R      BOT REFUND                   .60-
    ****  TAX          .00   BAL    11.61
         CASH                       11.61
                                    62.90
  6/28/00  19:27  4262  03  0320  112
------------------------------------------
GENE SALISBURY                45000738486
  1.59 lb @ 1.31 /lb
SC       CLUB GRAPES               2.08-F
  1.76 lb @ .89 /lb
SC       CLUB TOMATOES-LRG         1.57-F
B602 SWEEPSTAKES                    84013
T323274238T        0023555008A0261
 23274238-0023555008-0261
              32327423800023555008000261
AA 200076 $68.94
    ****  TAX          .00   BAL    68.94
VF       PERSONAL CHECK             68.94
         CHANGE                      .00
                                   169.25
  6/28/00  19:31  4262  03  0321  112
------------------------------------------
FRANCIS COOK                  45000158420
  2.18 lb @ 1.31 /lb
SC       CLUB GRAPES               2.86-F
B602 SWEEPSTAKES                    84013
 ACCOUNT NUMBER            4426580020156880
 A 000000 $5.36
    ****  TAX          .00   BAL     5.36
VF       DEBIT CARD                  5.36
         CHANGE                      .00
                                   177.47
  6/28/00  19:32  4262  03  0322  112
------------------------------------------
CL       CLASSIC COKE              2.98-F
CL       SODA DEPOSIT                .60-F
BILL MIDDLETON                45000736470
  1.18 lb @ .51 /lb
SC       CLUB RED PLUMS              .60-F
  1.17 lb @ .40 /lb
         CLUB APPLES                 .47-F
L 02 SWEEPSTAKES                    84013
T123000220T153602896620A 2141
123000220-153602896620-2141
              123000220153602896620002141
AA 196787 $33.10
    ****  TAX          .00   BAL    33.10
```

(E.4)

REC'D FROM Safeway 7/5/00 1810 HRS.

15

6. Zam



```
         CHANGE                      .00 .
                                  222.46 .
  6/28/00 19:34 4262 03 0323 112
-----------------------------------------
 **** TAX        .00  BAL       8.81
      CASH                     20.00
      CHANGE                   11.19
                              231.27
  6/28/00 19:35 4262 03 0324 112
-----------------------------------------
  6/28/00 19:35 4262 03 0325 112
         SIGNED OFF
  ;/28/00 19:40 4262 03 0326 112
                            4,676.74
-----------------------------------------
 **** TAX        .00  BAL       3.29
      CASH                     20.00
      CHANGE                   16.71
                               3.29
 .6/28/00 19:41 4262 03 0326 112
-----------------------------------------
CATHY SCHRADER               450007364377
 3.43 lb @ 1.31 /lb
SC XLOG CLUB GRAPES            4.49-F
 0.66 lb @ .89 /lb
SC      CLUB TOMATOES-LRG       .59-F
B602 SWEEPSTAKES              84013
T123202921T44 29108 7A 3225
123202921-44291087-3225
                 123202921442291087003225
AA 197360 $30.00
    **** TAX        00  BAL      24.27
         PERSONAL CHECK          30.00
         CHANGE                   5.73
                                 41.55
  6/28/00 19:43 4262 03 0327 112
-----------------------------------------
  6/28/00 19:43 4262 03 0328 112
         SIGNED OFF
  6/28/00 19:54 4262 03 0329 112
                            4,718.29
-----------------------------------------
GEORGE FAITHSON              450007379009
B602 SWEEPSTAKES             84013
    **** TAX        .00  BAL      5.06
         CASH                    10.00
         CHANGE                   4.94
                                 6.64
  6/28/00 19:55 4262 03 0329 112
-----------------------------------------
CUSTOMER ID VERIFIED   09/28/73
-----------------------------------------
..ew customer               45000753837
B602 SWEEPSTAKES             84013
B602 SWEEPSTAKES             84013
    **** TAX        .00  BAL      32.67
         CASH                    40.67
         CHANGE                   8.00
                                 45.08
  /28/00 19:58 4262 03 0330 112
-----------------------------------------
MICHAEL PHILLIPS            45001773154
B612 SWEEPSTAKES             84013
    **** TAX        .00  BAL      15.47
         CASH                     5.47
```

·16·

12

Exhibit 117 Page 17 of 17 to
State Defendants' Motion for Summary Judgment

COOS COUNTY SHERIFF'S DEPT. pg 1 of 1

Case Nbr 20-10627   Time 1550   Date 7/7/00

Seized From ( )

Received From (X) 351 W. 5H. St.
(CZ004)
① ONE Tommy Hilfer tid w/ Diary Reportedly belonging to Leah Freeman - Missing person
(CZ005)
② Numerous Loose Leaf Note book Pages with notes from on to Leah Freeman
(CZ006)
③ two NIKE shoe boxes with miscellaneous
Re: NOTES And PAPERS.

Deputy _____   ID# 504

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

NICHOLAS JAMES MCGUFFIN, as an    ) Civil No.
individual and as guardian ad     ) 6:20-cv-01163-
litem, on behalf                  ) MK
Of S.M., a minor,                 )
                                  )
            Plaintiffs,           )
                                  )
      vs.                         )
                                  )
MARK DANNELS, PAT DOWNING, SUSAN  )
HORMANN, MARY KRINGS, KRIS        )
KARCHER, SHELLY MCINNES, RAYMOND  )
MCNEELY, KIP OSWALD, MICHAEL      )
REAVES, JOHN RIDDLE, SEAN         )
SANBORN, ERIC SCHWENNINGER,       )
RICHARD WALTER, CHRIS WEBLEY,     )
ANTHONY WETMORE, KATHY WILCOX,    )
CRAIG ZANNI, DAVID ZAVALA, ESTATE )
OF DAVE HALL, VIDOCQ SOCIETY,     )
CITY OF COQUILLE, CITY OF COOS    )
BAY, and COOS COUNTY,             )
                                  )
            Defendants.           )
_____ )

DEPOSITION OF MARY KRINGS

Taken in behalf of Plaintiffs

May 05, 2022

*   *   *

Exhibit 118  Page 1 of 30 to
State Defendants' Motion for Summary Judgment

Q.  I'm trying to get an understanding of if there was a chain of command or a reporting structure at the lab.

Were you reporting to anyone in particular?

A.  I had a supervisor.

Q.  Who was your supervisor?

A.  Brian.

Q.  Does Brian have a last name?

A.  It starts -- I think it starts with an O. Ordstrom?  Ordem?  I don't remember.

Q.  Was there a Brian Ostrom?

A.  That sounds close.

Q.  Do you remember anybody else that you were reporting to at the lab?

A.  There was a DNA technical leader.  I don't know if I reported to them or not.

Q.  What was that person's name?

A.  Cecelia.

Q.  I'm aware that she has a longer last name.  I believe it starts with Von-something, so I'm trying to get a potential last name to see if that might help you out.  I don't see one.  Can you think of her last name?

Could it be -- and I'm going to mispronounce this -- Cecelia Von Beroldingen?

A.  Yes.  Something like that.

Exhibit 118  Page 2 of 30 to
State Defendants' Motion for Summary Judgment

A.  I'm sorry, the question was?

Q.  The question is, what was your understanding about when you were required to report a statistic?  Is it with all inclusions or only certain inclusions?

MR. DAVIS:  Same objection.

A.  I -- I don't recall.

Q.  Is that something that would've followed a written protocol from the lab?

A.  I believe there would be guidelines in the protocol.

Q.  Where did you document your calculation of the statistical analysis?

A.  I believe it's included in the case file.

Q.  Is that something like handwritten notes?

A.  No.

Q.  What did it look like?

A.  I believe it was a printout.  There was some program, I believe.

Q.  When you say some program, do you mean a computer program?

A.  Yes, I think so.

Q.  And then you would print off some documentation?

A.  That's my memory.

Q.  Where would that documentation go?

A.  I believe it goes in the case file.

Exhibit 118  Page 3 of 30 to
State Defendants' Motion for Summary Judgment

Q.  Does it also get saved to a computer somewhere?

A.  I don't remember.

Q.  When you were at the Oregon State Police lab, was the file hard copy, or was there anything saved to a computer?

A.  I don't remember.

Q.  What's your understanding of when to report a profile as insufficient for comparison?

MR. DAVIS:  Objection, vague and incomplete.

A.  I believe there may be circumstances that something might be insufficient for comparison.  I don't remember specifics.

Q.  Was that something that would also follow a written protocol from the lab?

A.  I believe there are guidelines in the protocol that address some of those things.

Q.  You said that address some of those things.  Is it your understanding that they don't address all of those things?

A.  I don't remember.  I have reviewed the protocol, but I don't remember exactly what -- how it addressed that.  But nothing in the protocol that I can remember is able to cover every possible circumstance.

Q.  So were there things outside the protocol that

would inform how you would report conclusions?

A. Can you rephrase the question?

Q. Sure. I'm trying to get an understanding of how much your reporting was governed by a written protocol versus something else.

A. I believe the protocol provides general guidelines, and then information pertaining to the case and your general experience also would add to that.

Q. Where was the protocol kept?

A. I don't remember.

Q. Did you have a physical hard copy?

A. I believe there was a physical copy at the lab.

Q. Did you have access to that physical copy of the protocol?

A. I think I did.

Q. How were you trained on the protocol?

A. I don't remember the training process, but all of our work was guided by the protocol.

Q. And then it sounds like your personal experience also guided the work. So how did those two things come together in the training so that you understood where to follow the protocol and where to follow your personal experience?

A. Specifically, I don't recall.

Q. You don't recall any training on that subject,

Exhibit 118  Page 5 of 30 to
State Defendants' Motion for Summary Judgment

or you don't recall using your personal experience as part of it?

MR. DAVIS:  Objection, vague and ambiguous.

A.  I don't recall the training process.

Q.  Did the Oregon State Police lab have a protocol about documentation in the file when you were there?

A.  I believe the protocol has the guidelines about what should be included in the case file.

Q.  Was that in the protocol you received in preparation for today's deposition?

A.  Possibly.

Q.  Do you remember what section of the protocol talked about documentation in the case file?

A.  I do not.

Q.  Were you required to document every step that you took in the process?

A.  I don't know if we were required to document every step, but we were required to document some things.

Q.  What things?

A.  I don't recall, but, you know, case notes, whatever paperwork is involved in the processes of extraction and amplification and genotyping.

Q.  Was there any protocol about at what point you could destroy your documentation or get rid of

Exhibit 118  Page 6 of 30 to
State Defendants' Motion for Summary Judgment

documentation?

A. I don't believe so.

Q. Was there any protocol about making corrections to your notes or your reports?

A. I don't remember.

Q. Was there any protocol about deviations?

A. I don't understand what you mean.

Q. Were you permitted to deviate from protocol?

A. As I recall, the protocol were guidelines, because every situation is different.

Q. So what does that mean in terms of deviation?

A. I believe that the guidelines and the protocol would allow for analyst discretion in some ways, so I don't believe that would be deviating.

Q. So it sounds like maybe we should define some terms here. You said that the protocol would allow for an analyst's discretion. What about in terms of if the protocol said one thing, but you believed the situation warranted something different, would that be a deviation from protocol that you would need to do?

A. I don't -- I don't think I'd make a broad statement about that without knowing particularly what -- what you're talking about. There are some things where the protocol is providing guidelines and not hard and fast rules.

Exhibit 118  Page 7 of 30 to
State Defendants' Motion for Summary Judgment

Q.  And when the protocol provides hard and fast rules, did you need to get an approval from a supervisor, or technical lead, or someone else to deviate from those hard and fast rules?

A.  I don't recall that situation.

Q.  Where the protocol allowed for analyst's discretion, would you document how you performed that discretion?

MR. DAVIS:  Objection, vague and ambiguous; incomplete.

You can answer, if you can.

A.  I cannot think of a specific example of that.

Q.  Did the protocol also provide rules or guidance for speaking with the media?

A.  I don't remember.

Q.  Did the protocol provide guidance for testifying in court?

A.  I don't remember.

Q.  What was the protocol for testifying in court?

MR. DAVIS:  Objection, mischaracterizes.

Go ahead.

A.  I don't remember a protocol for testifying.

Q.  Did you have a personal process that you would go through before you would testify in court?

A.  I don't understand a personal process.

Q.  It sounds like you don't remember if there was a protocol for the lab, but did you, as an individual, report to somebody that you would be testifying, or did you look through the file to see what you had done in a case before you testified?  Is there anything in particular you might've reviewed, or anyone you would talk to before you would go testify?

A.  I do belief the general practice would be to review the case file before testimony.

Q.  Anything else?

A.  Not that I recall.

Q.  Would you talk to anybody at the lab before you testified?

A.  I can't remember.

Q.  How would you notify the lab if you were being called to testify in a case?

A.  I don't remember.

Q.  How would you work with the prosecutor to prepare for your testimony?

A.  I don't remember.  Certainly -- well, no, not certainly.  I don't remember.  I think that there would be a wide range of ways.

Q.  What do you mean by a wide range of ways?

A.  Maybe in person.  Maybe on the phone.  Maybe with a subpoena.  I don't remember much about that.

Q. When you were at the Oregon State Police crime lab, did you keep a notebook?

A. I don't remember a notebook.

Q. Do you remember any kind of lab policy or protocol to keep a notebook?

A. I don't remember a policy to keep a notebook.

Q. From your expression, it sounds like you did keep a notebook. Is that accurate?

A. I don't have a memory of it.

Q. Is it possible that you kept a notebook but you don't have a memory of it?

A. That's possible.

MS. PURACAL: Why don't we take a five-minute break. We've been going for an hour and forty minutes. Let's go off the record and come back at 10:51.

(A recess was taken at 10:41 AM.)

BY MS. PURACAL: (Continuing)

Q. I'm going to show you what I have marked as Exhibit 1.

(Exhibit No. 1 marked for identification.)

Q. Can you see my screen right now?

A. Yes, I believe I can.

Q. My understanding of Exhibit 1 is that this is the case jacket or the case folder from the Oregon

Exhibit 118  Page 10 of 30 to
State Defendants' Motion for Summary Judgment

State Police crime lab related the Freeman case.

Does that look familiar to you?

A. In general that looks familiar.

Q. And I see up in the right-hand corner here in this block there's, for example, this particular request worked by, and then there's a set of initials. It looks like MHK.

Is that your handwriting?

A. That looks like my handwriting, yes.

Q. And those are your initials, right MHK?

A. MHK, yes.

Q. Okay. So my understanding is that when requests come in from law enforcement, the lab would work those requests, and that you would document the date of completion on something like this case folder.

Is that your understanding or your recollection?

A. Can you repeat that?

Q. Sure. My understanding was that when requests for testing would come in from a local law enforcement agency that the analyst, such as yourself, would document the date of completion and who worked that request on a case folder like this.

Do you remember that process?

A. I don't remember that.

Q. What was your understanding of what the purpose

Exhibit 118  Page 11 of 30 to
State Defendants' Motion for Summary Judgment

A.  I -- I -- no, I have no memory of that.

Q.  Were you ever asked to testify at trial against Mr. McGuffin in his criminal prosecution case?

A.  No.

Q.  Did anyone reach out to you about the Freeman investigation at any point after you left the Oregon State Police lab --

A.  No.

Q.  Sorry, I was saying before this lawsuit.

A.  No.

Q.  What about during the post-conviction litigation related to the conviction of Mr. McGuffin?

A.  I don't know when that was.

Q.  That would've been sometime between 2015 and 2019.  Did anyone reach out to you about the Freeman case or the McGuffin case?

A.  No.

Q.  I'm going to share my screen with you.  I'm going to show you what I have marked as Exhibit 2.

(Exhibit No. 2 marked for identification.)

Q.  This is a longer document, but I can -- you can feel free to scroll through it.  But let me show you sort of the general setup of this document.

The first and second pages -- sorry, the first through third pages is a report date August 27th, 2000,

A.  Yeah, that's possible.

Q.  Do you remember what direction you were given on the Freeman case when you got this request to test these shoes for DNA?

A.  I remember from reviewing the case file just recently that someone had spoken to Kathy about the details.

Q.  Who spoke with Kathy about the details?

A.  I believe it was my supervisor.

Q.  When you say your supervisor, are we talking about Cecelia?

A.  Brian.

Q.  Brian.  Okay.  And what did Brian speak with Kathy about?

A.  I just know this from reviewing the case file recently.  There was a conversation log about what Kathy looking for, what analysis she was requesting.

Q.  What do you remember about what you reviewed recently and what that indicated?

A.  From what I remember of the note, it was a missing person case.  There were some shoes, and they wanted to know if the shoes belonged to the missing person.

Q.  Was there any further direction?

A.  Possibly.  I don't remember the exact wording.

Exhibit 118  Page 13 of 30 to
State Defendants' Motion for Summary Judgment

A.  It would be helpful.  I don't know if that would be an absolute.  There's no guarantee that you would still parse out how many contributors would be there.  That would depend on what the sample looked like.

Q.  How did you communicate your uncertainty about the number of contributors in that sample?

A.  I'm not really understanding what you're saying.  I reported what I believed I could.  There is a minor component that has male DNA in it.

Q.  Did you tell anyone that you were uncertain of how many contributors were in that sample?

A.  I do not know.

Q.  Did you document that uncertainty anywhere in the case file?

A.  I don't believe I would document the uncertainty, but the data is in there for -- this report.  I was identifying who wore the shoes.  The number of people in that minor profile was not a question at that time.

Q.  The number of people in that minor profile was not a question at that time.  What do you remember about whether the question came up at any point in time?

A.  I don't remember if the question came up at that time.  I do, from looking at the submission form and

Q. At any point in time did you determine the number of contributors for Exhibit 2.3?

A. I don't recall that.

Q. Did you communicate to law enforcement or the prosecution that you had not determined the number of contributors for Exhibit 11?

A. I don't recall that.

Q. Did you communicate to law enforcement or the prosecution that you did not determine the number of contributors for Exhibit 2.3?

A. I don't recall that.

Q. And then going down on page 2 of Exhibit 2 for Exhibit 12.3, the Adidas sock, I see that you reported that Ms. Freeman is excluded as a contributor to the DNA profile on that sock.

Do you see that?

A. I do.

Q. And then you've indicated that the profile is from a male.

Do you see that?

A. Uh-huh.

Q. Sorry, is that a yes?

A. Yes. Sorry.

Q. For Exhibit 12.3, had you determined the number of contributors?

A.  But I only did DNA analysis on Exhibit 12.3 for that, so that would be why that -- from what I recall about the -- the shoe No. 1, the -- the requests -- the requested information was answered, and I had no other information that could be reported with that.

Q.  For Exhibit 1, the right Nike shoe?

A.  For Exhibit 1, the right Nike shoe.  Every item would have had the same -- I believe would have had the same wording.  I don't recall, maybe one of them didn't have a response, so that one might've been different.

Q.  Can you explain that a little bit more to me.

A.  The -- the question was answered.  The DNA profile matched Leah Freeman.  I didn't have other information that would be reportable, as in Exhibit 2.3.

Q.  I guess I'm not understanding how that corresponds to my original question, which is why you referred to Exhibit 1 as Exhibit 1, instead of by individual cutting numbers?

A.  I don't remember why I did that, but I believe that there was no added information, if I had split them up to answer the question of whose shoe that was.

Q.  Was there a written protocol to determine when you would refer to an exhibit as the whole exhibit as

opposed to the individual cutting that you had tested?

A. I don't recall.

Q. Was there any protocol, whether it was written or not, that you followed to make that determination?

A. Could you repeat that.

Q. Sure. Was there any protocol or procedure that you followed, whether it was written down or not, to make that determination as to when you would refer to an exhibit as opposed to the individual cuttings that you tested?

A. I'm not aware of anything that addressed that specifically.

Q. You've talked about this idea of the analytic threshold and stochastic threshold, that range between 50 RFU and 150 RFU. What was your understanding of how to treat information within that range between 50 and 150?

A. I believe that the default position of the lab was that the peak heights should be 150 or above to -- for interpretation.

Q. Where does that come from?

A. That is, I believe, in the protocol under the interpretation guidelines, I believe.

Q. And let me try and understand this a little bit better. So your understanding is that for any kind of

interpretation, the peak heights have to be 150 or above?

A. They should be. That's the default position of the lab.

Q. Okay. You said that's the default position. What do you mean by default?

A. There are -- the interpretation guidelines do allow for peak heights less than 150 to be used in some circumstances.

Q. In what circumstances?

A. Generally, circumstances where you might have more confidence that those peaks are a true representation of the DNA profile that might be there and can be distinguished from anything that might give you less confidence. The problems that may come up are degradation and inhibition.

Q. You kind of blurred some of your words together there a little bit, so I want to make sure that I can understand this.

My understanding of what you communicated is that you can, in some circumstances, interpret the data below the 150 threshold, if you can distinguish, and then it kind of blurred from there.

A. If there's an indication that you have a greater level of confidence.

Exhibit 118  Page 18 of 30 to
State Defendants' Motion for Summary Judgment

Q.   What would give you an indication of a greater level of confidence?

A.   I -- I can't recall something specific.

Q.   What about the data below that 150 range would give you a greater level of confidence?

A.   Huh.  Generally, perhaps if there was not a mixture, and it was very clear; that it was a single source, and they were -- I'm sorry, I can't remember.

Q.   Is it your understanding that that comes from the written protocol at the lab?

A.   That's what comes from the protocol.

Q.   Those indications of when you have greater confidence in that data below 150?

A.   I -- I don't know if that came from the protocol.  I don't know that the protocol specifies what those indications might be.

Q.   Is that something that is based on your personal experience?

A.   An analyst's experience, possibly.

Q.   So would that change from analyst to analyst, what might give that analyst greater confidence?

MR. DAVIS:  Objection, calls for speculation.

A.   Yeah, I don't know if the -- I don't recall seeing a specific example of that in the protocol.

Exhibit 118  Page 19 of 30 to
State Defendants' Motion for Summary Judgment

Q.  So how did you determine, in your work at the Oregon State Police lab, when you would interpret the data below the 150 threshold?

A.  I don't remember ever applying the exception to the rule.  I have no memory of that.

Q.  Are there any factors that you considered in order to determine whether or not you would interpret data below the 150 range?

A.  Repeat that, please.

Q.  Are there any factors that you considered when you were deciding whether you would interpret the data below the 150 range?

A.  I don't recall ever deciding to disregard that, so I don't know what factors I might've used if I chose to interpret below that threshold.

Q.  I'm trying to get a sense of, in your process, when you were looking at the data in front of you, and if you see data below the 150 range, what kinds of things are you thinking about in order to decide whether you were going to look at that data or not look at that data?

A.  Specifically, I don't remember.  Generally I think it -- I would be wondering, is there something in this data that gives me confidence that these peaks, this low-level signal, is accurate and repeatable.

that you've got labeled as 2.4?

A. I can't see that, but I took those samples. I believe I did. Those would be places where the wearer of the shoe might rub against the shoe.

Q. It could also be a place where someone might handle the shoe, correct?

A. It might also be a place where someone might handle the shoe, but what I'm saying is handling the shoe would -- in my memory, would be considered a trace contact.

Q. And how is that information important to you?

A. I don't believe we had the technology to sufficiently identify trace amounts of DNA.

Q. So is there a reason then, going back to the document that we were talking about a moment ago, the comparison to Mr. Shamblin, is that a reason to report that Mr. Shamblin has been excluded from that location 2.3 on the shoe?

A. Is the location a reason to exclude him? I don't understand the question.

Q. I'm trying to understand. We started this conversation talking about the fact you had excluded Mr. Shamblin from Exhibit 2.3, and you reported that conclusion. And then we were talking about the fact that you had not reported Mr. McGuffin's exclusion from

C E R T I F I C A T E

STATE OF OREGON        )

                       ) ss.

COUNTY OF MULTNOMAH  )


        I, Amanda K. Fisher, a Certified Shorthand

Reporter, do hereby certify that, pursuant to

stipulation of counsel for the respective parties

hereinbefore set forth, MARY KRINGS remotely appeared

before me at the time and place set forth in the

caption hereof; that at said time and place I reported

in Stenotype all testimony adduced and other oral

proceedings had in the foregoing matter; that

thereafter my notes were reduced to typewriting under

my direction; and that the foregoing transcript, pages

1 to 141, both inclusive, constitutes a full, true and

accurate record of all such testimony adduced and oral

proceedings had, and of the whole thereof.

        Witness my hand and stamp at Portland, Oregon,

May 16, 2022.


_____

AMANDA K. FISHER
CSR No. 3229

CASE NAME:  McGuffin et al v. Dannels et al
DEPONENT: Mary Krings

| Page: | Line: | Reason: | Correction: |
|---|---|---|---|
| 39 | 20 | transcription error | change "the had" to "that" |
| 60 | 17 | recollection post-deposition | change "No" to "Yes, Todd Sarazin contacted me, but I recall little about the substance of those contacts" |
| 64 | 17 | transcription error | insert "was" between "Kathy" and "looking" |
| 73 | 1 | error or clarification | insert "see" between "Bryan," and "that" |
| 75 | 15 | error or clarification | insert "say" between "wouldn't" and "I" |
| 83 | 15 | clarification | change "The" to "Some" |
| 84 | 11 | transcription error | change "That's" to "That" and "." to "?" |
| 116 | 11 | transcription error | change "show" to "shoe" |
| 133 | 21 | transcription error | change "measure" to "major" |

I hereby certify that I have read the deposition taken on May 05, 2022, and that this deposition, together with any corrections or additions, is a true and accurate record of my testimony.

_Mary Krings_

Mary Krings

Subscribed and sworn to before me under the penalties of perjury, this 14th day of June , 2022

Notary Public for the State of Colorado          .
My commission expires: 05-09-2026          .

MASON MAESTAS
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20224018538
MY COMMISSION EXPIRES 05-09-2026

CONFIDENTIAL

4 8

DEC 1 4 2001

JAN 8 3 2002

MAY 1 6 2002

RUSH

00N-000481   FORENSIC BIOLOGY
REQ# 0001 REQ 07/18/00      DUE 08/17/00

0603 00-1905   Coquille Police Department

00N-000481   FORENSIC BIOLOGY
REQ# 0002 REQ 07/24/00      DUE 08/23/00

0603 00-1905   Coquille Police Department

00N-000481   FORENSIC BIOLOGY
REQ# 0003 REQ 07/28/00      DUE 08/29/00

0603 00-1905   Coquille Police Department

00N-000481   FORENSIC BIOLOGY
REQ# 0004 REQ 08/16/00      DUE 09/15/00

0603 00-1905   Coquille Police Department

00N-000481   FORENSIC BIOLOGY
REQ# 0005 REQ 08/22/00      DUE 09/21/00

0603 00-1905   Coquille Police Department

M)C

00N-000481   PRIMARY EXAMINATIONS
REQ# 0006 REQ 09/25/00      DUE 10/25/00

0603 00-1905   Coquille Police Department

RB

Sa. Fender Made
For PE 9-25-00 MMK

00N-000481   FORENSIC BIOLOGY-PDX
REQ# 0023 REQ 11/05/01      DUE 12/05/01

0600 00-10627   Coos County Sheriff's Office

00N-000481   FORENSIC BIOLOGY-PDX
REQ# 0024 REQ 01/07/02      DUE 02/06/02

0603 00-1905   Coquille Police Department

Worked by MMK        Completed 8-29-00
Tech Review STH          Date 8-30-00
Supvsr Review ____        Date ____
Number of pages 145 150
Tech Leaders Review ____
Tech Leaders Review CvB 9-3-00

Worked by MMK        Completed 9-6-00
Tech Review STH          Date 9-7-00
Supvsr Review ____       Date ____
Number of pages 172
Tech Leaders Review CvB 9-8-00

Req(s) 23
Completed MMK          Date 12-9-01
Tech. Review STH          Date 12-10-01
Supervisor Review ____    Date ____
Pages 180

Req(s) 24 26 +27
Completed MMK          Date 1-21-02
Tech. Review STH          Date 1-23-02
Supervisor Review ____    Date ____
Pages 189-210

DEPO EXHIBIT

Krings 2022-05-05

1

exhibitsticker.com

SWS000001

CONFIDENTIAL

**8 4**

```
00N-000481  FORENSIC BIOLOGY-PDX
REQ# 0026  REQ 03/08/02       DUE 04/09/02
|||||||||||||||||||||||||||||||||||||||||||
        VBZC10MK0NCBTF
0603 00-1905   Coquille Police Department
```

```
00N-000481  FORENSIC BIOLOGY-PDX
REQ# 0027  REQ 04/04/02       DUE 05/06/02
|||||||||||||||||||||||||||||||||||||||||||
        UBHU00N100M0BX
0603 00-1905   Coquille Police Department
```

```
00N-000481  Trace Processing-PDX
REQ# 0028   REQ:02/05/10   DUE: 03/09/10
|||||||||||||||||||||||||||||||||||||||||||
0603 00-1905            VB4BE2UY0WRA7A
Coquille Police Department
```

```
00N-000481  DNA-PDX
REQ# 0034   REQ:03/11/10   DUE: 04/12/10
|||||||||||||||||||||||||||||||||||||||||||
0603 00-1905            VB92F2W40UUPGF
Coquille Police Department
```

```
00N-000481  DNA-PDX
REQ# 0036   REQ:06/24/10   DUE: 07/26/10
|||||||||||||||||||||||||||||||||||||||||||
0603 00-1905            VBZC12YX0W4D51
Coquille Police Department
```

```
00N-000481  DNA-PDX
REQ# 0038   REQ:04/26/17   DUE: 05/26/17
|||||||||||||||||||||||||||||||||||||||||||
0603 00-1905            VBPFH4WJ0QJKNC
Coquille Police Department
```

```
00N-000481  Amended Report-PDX
REQ# 0039   REQ:05/17/17   DUE: 06/16/17
|||||||||||||||||||||||||||||||||||||||||||
        VBPFH4X40H8SNT
0603 00-1905   Coquille Police Department
```

Req(s) 26,27
Completed None        Date 4-17-02
Tech. Review STA      Date 4-27-02  4-30-02  STA
Supervisor Review MC  Date 043002
Pages 1-24, 256  None

Req(s) 34
Completed 5-24-10  STA  Date
Tech. Review DN  Date 5/26/10
Supervisor Review  Date
Pages 257-327
Tech Leaders Review MC 6/1/10

Req(s) 36
Completed BN4  Date 11-8-10  10-22-10
Tech. Review DMJ  Date 11/10/10
Supervisor Review  Date
Pages 328-420
Tech Leaders Review MC 11/15/10

Req(s) 38
Completed MC
Tech. Review JM
Supervisor Review
Pages 421-449

Req(s) 34
Completed MC
Tech. Review JM (Amended) MC 5/17/17
Supervisor Review
Pages

Req(s)
Completed
Tech. Review
Supervisor Review

SWS000002

Exhibit 118  Page 25 of 30 to
State Defendants' Motion for Summary Judgment

CONFIDENTIAL

OON-000481  DNA-PDX
REQ# 0041   REQ:06/15/17   DUE: 07/17/17
0603 00-1905                    VB2IQ4Z0113XCO
Coquille Police Department

OON-000481  DNA-PDX
REQ# 0043   REQ:12/18/17   DUE: 01/17/18
0603 00-1905                    VBZC153QOYWI5U
Coquille Police Department

OON-000481  DNA-PDX
REQ# 0045   REQ:01/31/18   DUE: 02/28/18
0603 00-1905                    VBQEW54FONG3SW
Coquille Police Department

OON-000481  DNA-PDX
REQ# 0044   REQ:10/13/17   DUE: 11/14/17
0603 00-1905                    VB2IQ5400WSOF8
Coquille Police Department

OON-000481  DNA-PDX
REQ# 0047   REQ:05/10/18   DUE: 06/11/18
0201 04-3557                    VBTOJ57POSCYQV
Corvallis Police Department

OON-000481  Amended Report-PDX
REQ# 0048   REQ:07/03/18   DUE: 08/02/18
0603 00-1905                    VB2IQ58MORW9OD
Coquille Police Department

Amends Req 43-45 Report

Req(s) ___41___
Completed ___JM___
Tech. Review ___MF___
Supervisor Review _____
Pages _450-956___
(Including 730A-H, 796A-H, 872A-H)

Req(s) _43-45___
Completed ___JM___
Tech. Review ___MF___
Supervisor Review _____
Pages _957-105960___

Req(s) ___47___
Completed ___JM___
Tech. Review _MF [NC] 7/5/18_
Supervisor Review _____
Pages _1061-1090___

Req(s) ___48___
Completed ___JM___
Tech. Review _MF [NC] 7/5/18_
Supervisor Review _____
Pages ___∅___

SWS003003

Exhibit 118  Page 26 of 90
State Defendants' Motion for Summary Judgment

CONFIDENTIAL

OON-000481 CODIS Confirmation-PDX
REQ# 0049   REQ:11/08/18   DUE: 12/14/18

0603 00-1905              VB2IQ5CCOXGK89
Coquille Police Department

Req(s) __JM__

Completed __49__

Tech. Review __MT__ /NC/ 11/26/18

Supervisor Review _____

Pages __1091 -1094__

## CASE STATUS/CONVERSATION RECORD

Lab Number: OON-481

| Date | Time | Individual/Agency Contacted | By | Summary/Comments/Follow-up |
|------|------|------------------------------|----|-----------------------------|
| 7-17-00 BO | 12:30 | Kathy Wilcox – | | she said she is sending the shoes via ∅ UPS, wants to know if they belong to the victim. They will get her toothbrush and stds from mom and Dad. She also found some small spots of human blood on side of shoes, does this belong? |
| | | | | – Please Rush this case, the Need to know. |
| | | | | – Shoe found on gravel road many miles from victim house. |
| 7/00 | | | | Kathy suggested we do the shoes – depending on results Kathy will get Mothers std & maybe Dad Probably won't use toothbrush |

DEPO EXHIBIT
Krings 2022-05-05
5
exhibitsticker.com

OSP000746

18  Page 28 of 30 to

State De... Summary Judgment

CONFIDENTIAL

## CASE STATUS/CONVERSATION RECORD

Lab Number: 004-481

| Date | Time | Individual/Agency Contacted | By | Summary/Comments/Follow-up |
|---|---|---|---|---|
| 7/31/00 | ~12:00A | LT. PEX COOS BAY LAB | Hm | WANTED RESULTS, TOLD HIM I'D HAVE THEM IN AFTERNOON. |
| 7/31/00 | ~2:00P | LT. PEX | MHK | GAVE RESULTS- MATCHED SHOES TO TOOTHBRUSH |
| 8-9-00 | ~3:15P | COOS CO DA | MHK | LEFT MSG. - RE: PERMISSION TO CONSUME EVIDENCE |
| 8-15-00 | ~12:00P | COOS CO DA | MHK | LEFT MSG. - SAME AS ABOVE |
| 8-15-00 | ~12:55P | COOS CO DA PAUL FRAZIER | Hm | OK TO CONSUME. SENDING UP NEW EVIDENCE. |
| 8-17-00 | 4:30P | KATHY WILCOX | MHK | CALLED TO GET ~~CASE~~ EXHIBIT #. |
| 8-21-00 | 2:15P | PAUL FRAZIER | Hm | WANTED TO KNOW IF SOCK GOT HERE? IF IT WAS WORKED |
| 8-28-00 | 10:00A | PAUL FRAZIER | MHK | LEFT MSG TO CALL FOR RESULTS |
| 8-28-00 | ~11:30A | ? COOS PD ? | Hm | GAVE SOCK RESULTS |
| 8-30-00 | ~12:00P | LT. PEX | Hm | GAVE SOCK RESULTS |
| 9-5-00 | 9:30A | PAUL FRAZIER | Hm | GAVE SOCK RESULTS |
| 9-12-00 | 3:00P | " " | " | McGUFFEN DIDN'T MATCH OTHER MATEROS ON 12.3 (2.3,11) |
| 9-21-00 | ~12P | KATHY WILCOX | CAME BY LAB - ASKED US TO | SOCK TRACE OVER |

OSP000747

Exhibit 118  Page 29 of 30 to
State Defendants' Motion for Summary Judgment

CONFIDENTIAL

TOLD HER THAT #12.3 WAS EXCLUDED FROM MIXTURES
ON EXHIBIT 2, BUT #13 WAS INCONCLUSIVE B/C
OF ALLELES SHARED w/ VIC. ~~ALSO~~

OSP000748

Exhibit 118  Page 30 of 30 to
State Defendants' Motion for Summary Judgment

CONFIDENTIAL

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


| | |
|---|---|
| NICHOLAS JAMES MCGUFFIN, as an individual and as guardian ad litem, on behalf Of S.M., a minor, | ) Civil No.<br>) 6:20-cv-01163-<br>) MK<br>) |
| Plaintiffs, | )<br>)<br>) |
| vs. | )<br>) |
| MARK DANNELS, PAT DOWNING, SUSAN HORMANN, MARY KRINGS, KRIS KARCHER, SHELLY MCINNES, RAYMOND MCNEELY, KIP OSWALD, MICHAEL REAVES, JOHN RIDDLE, SEAN SANBORN, ERIC SCHWENNINGER, RICHARD WALTER, CHRIS WEBLEY, ANTHONY WETMORE, KATHY WILCOX, CRAIG ZANNI, DAVID ZAVALA, ESTATE OF DAVE HALL, VIDOCQ SOCIETY, CITY OF COQUILLE, CITY OF COOS BAY, and COOS COUNTY, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants.<br>_____ | )<br>) |


DEPOSITION OF KATHY WILCOX

Taken in behalf of Plaintiffs

May 03, 2022

*   *   *

Exhibit 119  Page 1 of 30 to
State Defendants' Motion for Summary Judgment

investigation past 2002 while you were a Tribal Gaming Detective?

A. No.

Q. And then you left OSP altogether in 2004, is that right?

A. Yes.

Q. Why did you leave in 2004?

A. I did not need to work anymore.

Q. Why was that?

A. I didn't enjoy tribal gaming, and it was a lot of travel, and my husband had had health issues that had pretty much resolved, so I didn't need the insurance.

Q. So did you retire at that point?

A. From Oregon State Police, yes.

Q. And I'm trying to understand if you went on to any other work, besides the work that we talked about in the beginning of the deposition.

A. I retired from Oregon State Police, and then I went and worked part time at my friend's feed store, Parent Feed in Reedsport, Oregon.

Q. Were you working on the Freeman case up until you left the lab in 2002?

A. As requests came in.  I was working on multiple cases.

Exhibit 119  Page 2 of 30 to
State Defendants' Motion for Summary Judgment

Q. If we go to the third page here with your handwritten notes, I see your initials here at the top as well, KW, and these are dated July 17th, 2000.

Is that when you would've created these notes?

A. Oh, yes.

Q. So does that mean that you started your exam of the shoes on July 17th, 2000?

A. Yes.

Q. When did you finish your exam of the shoes?

A. I don't recall.

Q. Did it take more than one day to examine the shoes?

A. I don't think so.

Q. If we go down to page 5 here, I'm looking at the assault evidence worksheet there. On the first and second lines here, there's a reference to PHTH. Is that Phenolphthalein?

A. Yes.

Q. And that's a test to screen for the presence of hemoglobin, is that correct?

A. Yes.

Q. That's a presumptive test, is that right?

A. Yes.

Q. Meaning it doesn't definitively tell you whether blood was present, you have to do a confirmatory test,

is that right?

A.   Yes.

Q.   It looks like here you did an ABA card test as the confirmatory test, is that right?

A.   Yes.

Q.   So that ABA test confirms the presence of human blood?

A.   Yes.

Q.   Did you also use -- and I might mispronounce this, but did you also use the Ouchterlony test in the Freeman case?

A.   I'm sorry, the what kind of test?

Q.   It's spelled O-U-C-H-T-E --

A.   Oh, it's Ouchterlony.

Q.   Ouchterlony?  Okay.  I want to pronounce it Ouchterlony, and I have to catch myself every time.

A.   Yeah.  I think it's named after somebody.

Q.   I assume it is named after somebody, as well.

A.   It's a horrible name.

Q.   Horrible name.  That's right.

The reason that I asked is because when I -- I'm sharing my screen with you again here, and I see in your notebook here on page 11 of your notebook, and I'll blow it up for you, on the 21st of July it says, "Set up Ouchterlony for Seri case and missing girl

case."

So I just had a question whether you used the Ouchterlony test in the Frasier investigation or if this was something different?

A.   I -- I used it for two different cases, but I didn't use it on the shoe.

Q.   What did you use it for in the Freeman case?

A.   I'd have to check dates, but I think I used it for when they brought in the sweatshirt that had cat blood on it.

Q.   Is that the only time you recall using that test --

A.   Yes.

Q.   -- in the Freeman investigation?

A.   Yes, correct.

Q.   So let's go back to where we were on Exhibit 15. We were on page 5 of that document, the assault evidence worksheet here.  On the right shoe, you tested three spots with Phenolphthalein and they were negative.  The equal sign with a circle around it means negative, right?

A.   Yes.

Q.   And on the left shoe you tested four spots that were positive -- sorry.  Let me start over there.

On the left shoe, there were four spots that

were positive on the Phenolphthalein test, is that right?

A. Okay. On the left shoe, four Phenolphthalein positive areas, yes.

Q. And then the ABA card test on the left shoe was positive to confirm the presence of human blood in those areas, correct?

A. Yes. To be clear, I think I only tested one area for human blood, and then I didn't want to consume a lot of samples so I stopped.

Q. And I think that is correct. If we go up to page 4 in your sketch, it looks like the ABA card test was done on swab 5 here. There's an arrow up to the photograph of the ABA card, is that right?

A. Yes.

Q. I'm looking at this swab 1. It has PHTH with the plus sign and a circle around it. So swab 1 tested positive for Phenolphthalein?

A. Yes.

Q. Swab 1, it looks like, was a trace of small droplet and smear, top of traction squares. We can see that here up on your sketch. There's two little locations with number 1 on it.

Do you see that?

A. Yes.

Exhibit 119  Page 6 of 30 to
State Defendants' Motion for Summary Judgment

Q. And then down here, swab 4 has PHTH with a plus sign and a circle around it, so that tested positive on the Phenolphthalein test as well?

A. Yes.

Q. And we can see that that is a trace of -- there are these little hash marks. I presume that that means repeat from right above that, so it would be trace of two smears on top of traction squares. Is that right?

A. Yes.

Q. And we can see in your sketch that there's two little fours up here on the traction squares.

A. Yes.

Q. And then we talked about swab No. 5, which says "re-swabbed above areas." Does that mean the areas where you swabbed 1 through 4?

A. I'm not sure.

Q. Do you have a recollection of what swab 5 was?

A. "Re-swabbed above areas." Oh, yes, I swabbed the same areas to do the ABA card so I didn't take a new sample.

Q. I'm trying to sort out what that means.

A. I think you're right. I think that's what that means, was -- I remember I was surprised to find it, and then I started testing it and I said wait, I can't -- there's not a lot. I better not -- I better

Exhibit 119  Page 7 of 30 to
State Defendants' Motion for Summary Judgment

be really careful about consuming samples.  So that was -- I just -- I tested places I'd already tested so that I wouldn't take any new sample off of the -- of any remaining sample off the shoe.

Q.  So let's see if we can clean this up for the transcript a little bit.

A.  Okay.

Q.  Did you re-swab the areas that you had taken swabs 1 through 4?

A.  Yes.

Q.  And that re-swab was swab 5?

A.  Yes.

Q.  Okay.  Swab 6 says, "Re-swab of all possible blood areas."  So what's the difference between swab 5 and swab 6?

A.  I don't recall.

Q.  Do you have a recollection of where you took swab 6 from?

A.  It would've been areas I'd already swabbed because I put "re-swab," but I don't remember doing that.

Q.  And then I see this notation here on the right-hand side where it says, "No. 2 high velocity," and then in parenthesis "small."  Then it says "blood droplet on side of traction square."

Exhibit 119  Page 8 of 30 to
State Defendants' Motion for Summary Judgment

Did you determine that the droplet at the area of swab 2 was high velocity, or did someone else determine that?

A.   I did.

Q.   When did you determine that?

A.   When I was doing this examination.

Q.   During your exam of the shoe?

A.   Yes.  And it is in parenthesis because that was just a way to describe it.  I hadn't made a final determination about what I thought about this.  I was just taking notes as I worked.

Q.   You said it's parenthesis.  Do you mean the part that says "small" or the part that says "high" that's in quotation?

A.   Oh, the high.

Q.   The part that says "high" in quotations?

A.   Right.

Q.   That part is in quotations because you were taking notes as you were going?

A.   Yes.

Q.   And you had not made a final determination?

A.   Yes.

Q.   The velocity that were talking about with blood stain pattern analysis, that's the velocity of the initial force that causes the blood to move, not the

speed of the blood itself, is that right?

A.  Yes.

Q.  How did you determine the initial force was moving at a high velocity?

MR. DAVIS:  Objection, mischaracterizes the testimony.

Q.  You can answer, Ms. Wilcox.

A.  Oh, just because it was so small.

Q.  Just because the -- because what was so small?

A.  The blood droplet was so small.

Q.  So based on the size of the blood droplet?

A.  Yes.

Q.  Did you determine the trajectory?

A.  No.

Q.  Did you determine the angle of impact?

A.  No.

Q.  Did you determine the angle of origin?

A.  No.

Q.  Why did you pick that blood droplet and not any of the other stains to determine a blood stain pattern here?

MR. DAVIS:  Objection, mischaracterizes the testimony or document.

You can answer, if you can.

A.  They were all small.  That's just the one I

Exhibit 119  Page 10 of 30 to
State Defendants' Motion for Summary Judgment

Page 142

Q.  That's right, and that's where I'm struggling. I see that it says Phenolphthalein positive on swab 1, swab 4, and swab 5.  So what's your understanding of the Phenolphthalein test on swab 2?

A.  Looking at the workshop [sic], I think I also tested them for Phenolphthalein.  I didn't write it down specifically.  So I guess I can't say for absolute sure that I tested it, but from the worksheet, I would say that I did.

Q.  Okay.  I'm going to show you another document here.  This one I have labeled as Exhibit 18.

(Exhibit No. 18 marked for identification.)

Q.  This is a photograph of the bottom here of the shoe.  I'll blow it up for you.  I see the PHTH with a plus sign with a circle around it for swab 4.  I see that for swab 1 and the second traction square on swab 1.  We know from your sketch there were two traction squares on swab 4 and two traction squares on swab 1. I don't see any notation for a positive Phenolphthalein test for swab 2 or swab 3.

Do you have any documentation of a positive Phenolphthalein test on swab 2?

A.  Only the worksheet, which says I tested four areas.

Q.  Do you have a positive confirmatory test for the

determine that that was blood?

A.  If you go back to the worksheet, I tested four areas for Phenolphthalein, and I did not write down on the diagram that No. 2 was tested for Phenolphthalein, so I can't say -- I -- I don't know how to answer your question.

Q.  What I'm trying to understand, Ms. Wilcox, is what the basis was for writing that it was blood if you -- it sounds like you believe you did a Phenolphthalein test, and we talked about how Phenolphthalein test is a presumptive test, but you have to confirm that it's actually blood.

So I'm trying to understand the basis for why you wrote that this was blood on area No. 2.

A.  Okay.  It looked like blood.  It had the appearance of blood.  It tested positive for Phenolphthalein, or at least some of the blood droplets did.  In my training and experience, it was blood.

Q.  In your training and experience, it was blood. What does that mean?

A.  It means that I'd done many cases and I've worked with a lot of different blood samples.

Q.  And in how many of those cases are you able to visually determine it's blood versus actually doing the confirmatory test for blood?

Exhibit 119  Page 12 of 30 to
State Defendants' Motion for Summary Judgment

A.  Do you want an exact number, or can I say -- I can't ever -- I've tested for blood when I didn't think it was blood.  I have never -- I can't ever remember testing for blood where I thought it was blood and it wasn't blood.

Q.  So, in your training and experience, do you actually do a confirmatory test for blood?

A.  Sometimes.

Q.  Are there times where you don't do a confirmatory test for blood?

A.  When there's a small sample and I'm going to be sending it out.

Q.  Why don't you do a confirmatory test then?

A.  Oh, you do -- it -- the blood that's put on the ABA card is now consumed.  It's gone, so it can't be retested.  It can't be tested by the defense.  You have to be really careful that you don't consume too much evidence.  It can't be sent for DNA.  I have never heard -- maybe since I left the crime lab they can get DNA off of a sample from a card, but I don't -- I've never heard of that happening.

So you just -- it's not to consume evidence. You do not want to consume evidence.

Q.  So, in that situation, would you write down that it's blood, even though you have not done a

Exhibit 119  Page 13 of 30 to
State Defendants' Motion for Summary Judgment

confirmatory test --

A.  Yes.

Q.  -- to determine that it's blood?

A.  If it looks like blood, and it's Phenolphthalein positive, and I have other areas that look like it nearby that are confirmed, it is blood in my report.

Q.  Do you document anywhere that that's your practice?

A.  No.

Q.  Did you talk to Lieutenant Pex about the fact that that is your practice?

A.  I don't specifically remember a conversation like that.

Q.  Did your -- did Lieutenant Pex ever tell you not to say that something is blood if you have not confirmed that it is blood?

A.  I don't recall.

Q.  Did anyone at the Oregon State Police lab tell you not to say that something was blood if you have not confirmed that it is blood?

A.  I don't recall.

Q.  I'm going to share my screen with you again. This is two copies of the same photograph of Ms. Freeman's shoe.  The one on the left is Exhibit 15, page 9 and the one on the right is Exhibit 18, page 10.

Did you ever find any evidence of blood in the cemetery?

A. I -- no, there's nothing in my notes.

(Exhibit No. 19 marked for identification.)

Q. I'm showing you what I have marked as Exhibit 19. This is a memo from you to Mike Reaves, at the time Chief of Coquille Police Department -- sorry, it's dated September 25th, 2000, and it says, "Draft" on the right-hand side. Then it says, "To Mary, how about this? KW."

Is that your handwriting there?

A. Yes.

Q. Did you write this memo?

A. Yes.

Q. Here at the first substantive paragraph of the memo it says, "On September 20, 2000, I talked with Mary Krings, Forensic Scientist, Portland, regarding the DNA work done on this case. These are some of the DNA questions we discussed."

The subject line refers to questions raised at the MCT meeting on September 9th, 2000. Were you at that MCT meeting on September 9th, 2000 where those questions were raised?

A. I think I was.

Q. MCT meeting, I assume that means Major Crimes

Exhibit 119  Page 15 of 30 to
State Defendants' Motion for Summary Judgment

Team meeting.  Is that correct?

A.  Yes.

Q.  Who raised the questions?

A.  I don't remember.

Q.  This draft says, "These are some of the DNA questions we've discussed."

What were the other questions?

A.  I don't remember.

Q.  And the draft says that you talked with Mary Krings about these questions.  Do you remember talking with Ms. Krings about the questions?

A.  Not specifically.

Q.  You say not specifically.  Do you remember generally?

A.  I -- I -- I read my report, and I read my notebook, and I know I talked to her.  I can't picture in my mind talking to her, so I don't remember specifically.

Q.  Were you tasked with getting answers to these questions?

A.  Yes.

Q.  Was that part of your role on the MCT?

A.  It was, and I was directed by Lieutenant Pex to write this memo.

Q.  What do you remember about that directive from

Exhibit 119  Page 16 of 30 to
State Defendants' Motion for Summary Judgment

Q.  And I'm asking about your reporting to the HIT team and your reporting about the DNA on the left shoe and what the meaning of that DNA was, or what the investigation should entail from that, based on that male DNA on the left shoe.

What were you telling the HIT team about that DNA?

A.  I -- I -- I had the report.  I would tell them what was on the report.  I don't know what that means to them.  I don't know -- and I'm not a forensic DNA expert, so if they had further questions, they would have to ask a DNA expert or submit a question that we could send to the Portland lab.

Q.  Did you tell the HIT team anything about trying to develop the identity of someone who could be compared to that DNA?

A.  To the minor profile or the trace DNA?  No, I don't think so.

Q.  Was there a reason that you did not tell them about developing that kind of comparison evidence?

A.  That's not my area of expertise.

MR. DAVIS:  Can we take a break when it's convenient for your, Counsel?

MS. PURACAL:  Sure.

Q.  On Exhibit 25 that we've been looking at,

C E R T I F I C A T E

STATE OF OREGON           )

                         ) ss.

COUNTY OF MULTNOMAH      )


        I, Amanda K. Fisher, a Certified Shorthand

Reporter, do hereby certify that, pursuant to

stipulation of counsel for the respective parties

hereinbefore set forth, KATHY WILCOX remotely appeared

before me at the time and place set forth in the

caption hereof; that at said time and place I reported

in Stenotype all testimony adduced and other oral

proceedings had in the foregoing matter; that

thereafter my notes were reduced to typewriting under

my direction; and that the foregoing transcript, pages

1 to 187, both inclusive, constitutes a full, true and

accurate record of all such testimony adduced and oral

proceedings had, and of the whole thereof.

        Witness my hand and stamp at Portland, Oregon,

May 16, 2022.


_____
AMANDA K. FISHER
CSR No. 3229

CASE NAME:  McGuffin et al v. Dannels et al
DEPONENT: Kathy Wilcox

| Page: | Line: | Reason: | Correction: |
|-------|-------|---------|-------------|
| 145 | 4 | Transcription error | Replace "car" with "card" |

I hereby certify that I have read the deposition taken on May 03, 2022, and that this deposition, together with any corrections or additions, is a true and accurate record of my testimony.

*Kathy Wilcox*
Kathy Wilcox

Subscribed and sworn to before me under the penalties of perjury, this __14__ day of __June__, 20__22__

*Brandi Cassaro*

Notary Public for the State of __Oregon__.
My commission expires: __June 8th 2024__.

OFFICIAL STAMP
BRANDI MARIE CASSARO
NOTARY PUBLIC - OREGON
COMMISSION NO. 1000735
MY COMMISSION EXPIRES JUNE 08, 2024

008350          008350          008350





**Oregon** — Department of State Police

John A. Kitzhaber, M.D., Governor

Forensic Laboratory
333 South 4th Street
Coos Bay, OR 97420
(541) 269-2967
FAX (541) 269-2007

July 17, 2000

Coquille Police Department
99 E. 2nd Street
Coquille, Oregon 97423

**Attention:  Officer Hall**

MISSING PERSON
Freeman, Leah (victim)
McGuffin, Nick (suspect)
Agency Case 00-1905
Lab No. 00N-481

**Supplemental Report**

On July 10, 2000, the Forensic Laboratory Division received sealed via Officer Hall the following:

**Exhibit 1) (160)** – A sealed paper bag labeled in part "00-1905" which contained an "AIR" Nike brand right athletic shoe.  This shoe was white with blue and yellow trim.  No blood was detected on this shoe.

**Exhibit 2) (170)** – A sealed paper bag labeled in part "00-1905" which contained an "AIR" Nike brand left athletic shoe.  This shoe was white with blue and yellow trim.  A small amount of human blood was detected on the bottom of this shoe.

**Exhibit 3) (168)** – A sealed paper bag labeled in part "00-1905" which contained a blue "CONAIR" hairbrush which contained numerous blond hairs.  This brush reportedly belonged to Leah Freeman.

**Exhibit 4) (171)** – A sealed paper bag labeled in part "00-1905" which contained a clear and pink "GUM" toothbrush.  This toothbrush reportedly belonged to Leah Freeman.

Exhibits 1, 2, and 4 will be sent to the Oregon State Police Forensic Laboratory in Portland for DNA analysis.

Evidence will be returned at the earliest convenience.

*Katherine S. Wilcox*
Katherine S. Wilcox, Criminalist
568-90
KSW:gs

cc:  Coos County District Attorney
     Oregon State Police Portland Forensic Lab
     Oregon State Police-GHQ

This is certified to be a true copy of the original report prepared by the undersigned.

by *Katherine S. Wilcox*

DEPO EXHIBIT

Wilcox 2022-05-03

**18**

exhibitsticker.com

008350          008350          008350

Exhibit 119  Page 20 of 30 to
State Defendants' Motion for Summary Judgment

008351                                             008351                                    LABORATORY CASE NO.   008351   p. 1 of 9  KW

OREGON STATE POLICE
**FORENSIC SCIENCES REQUEST**
☒ Crime Laboratory
☐ Latent Prints                **EVIDENCE RECEIPT**     REQ #3
☐ Questioned Documents                                 OON-481 sub#3

(TYPE OR USE BLACK BALL POINT PEN ONLY — INSTRUCTIONS ON BACK)   Page ___ of ___

☐ NEW CASE     ☒ ADDITIONAL EVIDENCE TO THE LAB     ☐ ADDITIONAL SUSPECT(S) INFO.

| (1) Agency Name | (2) County of Venue | (3) Date Occurred | (4) NCIC No. (ORI) | (5) Agency Case No. |
|---|---|---|---|---|
| Coquille P.D. | Coos | 6-28-00 | 0060300 | 00-1905 |

(6) Incident Type(s) (Offense): MISSING PERSON     (7) Breath Test Given  Yes ☐  No ☐

| (8) V/S | DE/ME | (9) NAME | | | RACE | SEX | D.O.B. | SID # |
|---|---|---|---|---|---|---|---|---|
| V, S | DE, ME | Last FREEMAN | First LEAH | Middle | W | F | 10 mo. 29 day 84 yr. | |
| V, (S) | DE, ME | Last McGoffin | First Nick | Middle | W | M | 4 mo. 25 day 82 yr. | |
| V, S | DE, ME | Last | First | Middle | | | mo. day yr. | |
| V, S | DE, ME | Last | First | Middle | | | mo. day yr. | |
| V, S | DE, ME | Last | First | Middle | | | mo. day yr. | |

| (10) Signature of Investigating Officer | (11) Printed Name of Investigating Officer | Comm. # | (12) Phone Number of Investigating Officer |
|---|---|---|---|
| David Hall | DAVID HALL | | 541-396-2114 |

| (13) Lab Exhibit Number | (14) Agency Exhibit Number | (15) Signature of Submitting Officer | (16) Printed Name of Submitting Officer | Comm. # | (17) Date |
|---|---|---|---|---|---|
| | | David Hall | DAVID HALL | | 7-10-00 |

| | | (18) Description of Evidence | (19) Examination Requested |
|---|---|---|---|
| 1 | 160 | 1- RT FOOT NIKE SHOE | DNA TEST |
| 2 | 170 | 1- LT FOOT NIKE SHOE | |
| 3 | 168 | 1- HAIR BRUSH FROM VICTIM | |

FOR LAB USE ONLY

7/10/00   9:50 A
Hall / lab/dw
3  S/BPB

| (20) Lab Exhibit Number(s) | (21) Laboratory Employee | (22) Released to: | (23) Date |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

OFFICER'S REPORT REQUESTED ON ALL PHYSICAL EVIDENCE CASES
IF RUSH CASE INDICATE REASON WHY EXPEDITIOUS HANDLING IS NECESSARY & DATE DUE

Produced by STATE PRINTING
Form 49 1/89

008351                    008351

OREGON STATE POLICE
**FORENSIC SCIENCES REQUEST**
☐ Crime Laboratory
☐ Latent Prints        **EVIDENCE RECEIPT**
☐ Questioned Documents

008352        008352        008352

LABORATORY CASE NO.
*Reg #4*

ꓳꓳN-481 *sub#4*

INCIDENT #

*p. 2*  *7/00  KW*

(TYPE OR USE BLACK BALL POINT PEN ONLY — INSTRUCTIONS ON BACK)    Page _____ of _____

☐ NEW CASE    ☐ ADDITIONAL EVIDENCE TO THE LAB    ☐ ADDITIONAL SUSPECT(S) INFO.

**AGENCY DATA**

| (1) Agency Name | (2) County of Venue | (3) Date Occurred | (4) NCIC No. (OR) | (5) Agency Case No. |
|---|---|---|---|---|
| CoQ PD | Coos | 6/28/00 | 0060360 | 00-1905 |

| (6) Incident Type(s) (Offense) | (7) Breath Test Given |
|---|---|
| MISSING PERSON | Yes ☐    No ☐ |

| (8) V/S | DE/ME | (9) NAME | | | RACE | SEX | D.O.B. | SID # |
|---|---|---|---|---|---|---|---|---|
| V | | Last Freeman | First Leah | Middle | W | F | 10 mo. 21 day 84 yr. | |
| S | | Last McGuffin | First Nick | Middle | W | M | 4 mo. 35 day 82 yr. | |
| V | | Last | First | Middle | | | mo. day yr. | |
| V | | Last | First | Middle | | | mo. day yr. | |
| V | | Last | First | Middle | | | mo. day yr. | |

| (10) Signature of Investigating Officer | (11) Printed Name of Investigating Officer    Comm. # | (12) Phone Number of Investigating Officer |
|---|---|---|
| Dave Hall | DAVE HALL | (541) 396-2114 |

| (13) Lab Exhibit Number | (14) Agency Exhibit Number | (15) Signature of Submitting Officer | (16) Printed Name of Submitting Officer    Comm. # | (17) Date |
|---|---|---|---|---|
| | | Shelly Grant | Shelly Grant | |

**EVIDENCE SUBMITTED**

| | | (18) Description of Evidence | (19) Examination Requested |
|---|---|---|---|
| 4 | 171 | 1 - TOOTHBRUSH (Freeman) | DNA TEST |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

LAB COPY

7/10/00 - 10:40A
Grant ((gbldw)
15/BRB

FOR LAB USE ONLY

**EVIDENCE RELEASED**

| (20) Lab Exhibit Number(s) | (21) Laboratory Employee | (22) Released to: | (23) Date |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

OFFICER'S REPORT REQUESTED ON ALL PHYSICAL EVIDENCE CASES
IF RUSH CASE INDICATE REASON WHY EXPEDITIOUS HANDLING IS NECESSARY & DATE DUE

Form 49 1/89

008352        008352        008352

OON481   7/17/00   KW   Supplemental Report

EX 1) (160) A s/pprbg LIP "00-1905" wh/ctnd an "AIR" Nike brand, right, athletic shoe. This shoe was white w/blue + yellow trim. No blood was detected on this shoe.

EX 2) (170) A s/pprbg LIP "00-1905" wh/ctnd an "AIR" Nike brand, left, athletic shoe. This shoe was white w/blue + yellow trim. A small amt. of human blood was detected on the bottom of this shoe.

EX 3) (168) A s/pprbagLIP "00-1905" wh/ctnd a blue "COWAIR" hairbrush wh/ctnd numerous blond hairs. This brush reportly belonged to Leah Freeman.

EX 4) (171) A s/pprbg LIP "00-1905" wh/ctnd a clear + pink "GUM" toothbrush. This toothbrush reportedly belonged to Leah Freeman.

Exhs 1, 2, + 4 will be sent to the OSPFL in Ptld for DNA analysis.

Exhibit 119  Page 23 of 30 to
State Defendants' Motion for Summary Judgment

008354                    008354                    008354

00N481
7/17/00
EX 2

KW

p.4

Left shoe



#2
"high" velocity (small)
blood droplet
on side of traction
square

swab #1    PHTH ⊕
   trace of small droplet & smear - top of traction squares.
swab #2
   small droplet on side of traction square.
swab #3
   trace of two smears on top of traction squares.
swab #4   PHTH ⊕
   trace of two  "    "    "    "    "    ".
swab #5
   reswabbed above areas ⟹ ABA card & PHTH ⊕.
swab #6
   reswab of all possible blood areas.

EX 2
00N481    KW

C. ⊟
T ⊟
   ⊕
   human
   blood
   KW
S ▭

008354           008354
Exhibit 119  Page 24 of 30 to
State Defendants' Motion for Summary Judgment
008354

# ASSAULT EVIDENCE WORKSHEET

Criminal __KW__                                     CD __OON481__                     Date: __7/17/00__

| EXH | MATERIAL | SPECIAL LIGHT EXAM | SPERM | AP | PHTH | TAKAYAMA | COMMENTS |
|---|---|---|---|---|---|---|---|
| 1 | ®  shoe | bright light | | | neg. | | bright light & low power micro exam  **3** spots phth. ⊜  / size 6½ |
| 2 | L  shoe | "       " | | | pos → | ABA ⊕ | "   "   "   "  "      "    "  4 phth positive area!  ABA card ⊕ |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | NEGATIVE CONTROL | moistened swab | | | neg. | | |
| | POSITIVE CONTROL | trace blood on Kimwipe | | | pos. | | |

(margin markings: 008355, OON481-P.25 KW)

Exhibit 119  Page 25 of 30 to
State Defendants' Motion for Summary Judgment

008356     008356     008356

OON 4
7/17/00
KW

p. 6



008356     008356     008356

008357                                008357                                008357

p. 7

OON48
7/17/00
KW





008359    008359    008359



Right shoe – looking from heel towards front – sole only

Exhibit 119  Page 29 of 30 to
State Defendants' Motion for Summary Judgment

# MEMORANDUM
# OREGON STATE POLICE

DATE:        September 25, 2000

TO:          Mike Reaves, Chief
             Coquille Police Department

FROM:        Katherine S. Wilcox, Criminalist
             Oregon State Police Crime Lab-Coos Bay

SUBJECT:     **Questions raised at the MCT Meeting Sept. 9, 2000**

REFER:       Leah Freeman Homicide Investigation

On September 20, 2000 I talked with Mary Krings, Forensic Scientist-Portland, regarding the DNA work done on this case. These are some of the DNA questions we discussed.

1. On the left Nike shoe (Exhibit 2) DNA from more then one person was indicated. Leah Freeman was the major DNA profile. The minor profile was reportedly from a male. The question was: from where were the samples, that tested positive for the male type, taken?

Two samples showed the male type. One was taken from inside the tongue of the shoe and one from inside the shoe at the heel area-near the ankle.

2. Is the male profile complete enough for comparison?          Only a partial DNA profile was identified. This may be helpful to include or exclude some contributors of the DNA, however the statistical numbers may be low.

3. Would handling (i.e. the officer who recovered the evidence) the shoe be enough to leave the male DNA?          Very unlikely.

4. Was the male DNA on the shoe (Exhibit 2) from Nick McGuffin? The DNA was below the threshold for making a conclusive determination. Leah Freeman and Nick McGuffin have some of the same DNA markers. However, according to Forensic Scientist Krings, the data **suggests** that Nick McGuffin was **probably not** the DNA contributor.

5. Tape lifts were taken from the white Adidas sock (Exhibit 12) for possible trace evidence.          The Forensic lab in Portland will evaluate the tape lifts for significant trace evidence and we will receive a report.

**The DNA section requests that only serious suspect(s)' standards be submitted for DNA typing.**

KW:ksw

cc  Coos County DA
    Detective Dale Oester-OSP
    Detective Craig Zanni-Coos County S.O.



DEPO EXHIBIT

Wilcox 2022-05-03

20

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
003914                            003914                            Exhibit 119     Page 30 of 36     003914
State Defendants' Motion for Summary Judgment

1

```
                IN THE UNITED STATES DISTRICT COURT

                  FOR THE DISTRICT OF OREGON


NICHOLAS JAMES MCGUFFIN, as     ) No. 6:20-cv-1163-MK
an individual and as guardian   ) (Lead Case)
ad litem, on behalf of S.M.,    ) No. 3:21-cv-1719-MK
a minor,                        ) (Trailing Case)
             Plaintiffs,        )
     v.                         )
MARK DANNELS, PAT DOWNING,      ) Deposition of:
SUSAN HORMANN, MARY KRINGS,     ) Shaun McCrea
KRIS KARCHER, SHELLY MCINNES,   )
RAYMOND MCNEELY, KIP OSWALD,    ) December 4, 2023
MICHAEL REAVES, JOHN RIDDLE,    ) December 5, 2023
SEAN SANBORN, ERIC              )
SCHWENNINGER, RICHARD WALTER,   )
CHRIS WEBLEY, ANTHONY WETMORE,  )
KATHY WILCOX, CRAIG ZANNI,      )
DAVID ZAVALA, ESTATE OF DAVID   )
E. HALL, VIDOCQ SOCIETY, CITY   )
OF COQUILLE, CITY OF COOS       )
BAY, and COOS COUNTY,           )
             Defendants.        )
_____
```

Exhibit 120  Page 1 of 17 to
State Defendants' Motion for Summary Judgment

that you're asking for work product in this case.

A.    Aren't you trying to tie this to this case?

BY MR. DAVIS:

Q.    I'm asking you generally whether it's important in your work to figure out the questions that the investigators were asking and -- when doing your work?

A.    Figure out the questions the investigators were asking?  I don't -- it's not -- it's not that simple.  It's getting the discovery.  In other words, getting the information and then applying it in the whole context.

So it might not be the questions the investigators were asking, but it might have been their intent and their bias that was involved, or it might be that they had -- trying to figure out if there was a story under the story, that there was something else going on, that they had decided the case was going to be X when really it was something else.

Bless you.

Q.    All right.

Have you ever had occasion to call or write to an analyst at the OSP crime lab to ask a

Exhibit 120  Page 2 of 17 to
State Defendants' Motion for Summary Judgment

question about work that was done?

A.   Yes, I have.

Q.   And did that happen -- how many times has that happened, generally speaking?  Again, just a general estimate.

A.   Not that often.  I can remember a specific rape case in Benton County where I talked with the lab person and actually required them to appear for the trial.

Q.   Have you ever contacted the OSP crime lab to ask a question about the forensic analysis that you're seeing in your case?

MS. PURACAL:  Objection.  Asked and answered.

A.   Yeah.  I just answered it.  Yes.

BY MR. DAVIS:

Q.   I didn't understand you to be answering my question.

I was asking, did you ever call them to discuss with them what was happening -- what they had done and what they -- the conclusions they had reached.  What I understood you to be saying is you called to tell them to come testify?

A.   No.  I called them to talk -- I wouldn't call them to come testify unless I knew what they

Exhibit 120  Page 3 of 17 to
State Defendants' Motion for Summary Judgment

were going to say.  So, yeah, I talked with them about their analysis and about the work that they did.

Q.    Okay.  Okay.

And you were able to -- I mean, was the analyst forthcoming and descriptive in what they had done?

A.    That one was.

Q.    Have you had different experiences where they were not forthcoming?

A.    I have.

Q.    Can you tell me about those?

A.    I don't have a specific person, a specific case, but I know that there's been times where I've tried to get someone to talk to me and they wouldn't, and -- yeah.

Q.    Did you call any of the OSP lab analysts in the McGuffin case?

MS. PURACAL:  Objection.  Work product privilege.

BY MR. DAVIS:

Q.    Have you ever had occasion to talk to -- to contact a forensic scientist associated with a different police -- you know, a different law enforcement agency about forensic analysis done in

Shaun S. McCrea

69

any other case?

A.   I don't -- I don't know.  I may have.  I just -- I don't know.

Q.   Okay.

So McCrea, PC, represented Mr. McGuffin in the criminal trial for the murder and manslaughter of Leah Freeman.  Right?

A.   The allegations of that, yes.

Q.   Sure.

But I'm just saying your firm represented him in that trial?

A.   Yes.

Q.   And you were lead counsel?

A.   Yes.

Q.   And your father was assisting you?

A.   Correct.

Q.   And did you have, sort of, a full authority to represent him?  Were there any limitations on your ability to -- or authority to represent him?

MS. PURACAL:  Objection.  Privilege.  Work product.

BY MR. DAVIS:

Q.   Are you directing her not to answer entirely?

Exhibit 120  Page 5 of 17 to
State Defendants' Motion for Summary Judgment

Exhibit 2 in your binder.

MR. DAVIS:  And here's -- you surely know what's --

MS. PURACAL:  I've got the electronic copy.

MR. DAVIS:  If you want that . . .

BY MR. DAVIS:

Q.    I've handed you what I have marked as Exhibit 2.  Have you had a chance to look at that briefly?  Take the time you need.

A.    I have.

Q.    I'll note that this document is labeled to have 257 pages.  I don't actually know the source of the additional page.  I think we sort of know there to be 256 handwritten pages of bench notes, but I don't know exactly why there's an included page.

If we need to -- I mean, can we agree we'll figure that out if we need to?

MS. PURACAL:  Yes, we can agree to that.

MR. DAVIS:  Okay.

BY MR. DAVIS:

Q.    So, Ms. McCrea, my question is have you seen these before?

A.    I don't know.  If they were provided in

Exhibit 120  Page 6 of 17 to
State Defendants' Motion for Summary Judgment

Shaun S. McCrea

73

this discovery, then, yes, I saw them.  I just don't have a specific recollection right now because I haven't gone back through all the files.

Q.    Okay.

You will notice that there are some numbers -- Bates numbers printed in six places on many of these documents, kind of three on the top and three on the bottom.

Does that refresh your recollection as to the way discovery was Bates numbered and provided in the McGuffin case?

A.    It was Bates numbered.

Q.    Does that increase your --

A.    So you're referring to the -- on the first page of Exhibit 2, 00758?

Q.    Correct.

A.    Okay.

Q.    Does the presence of those Bates numbers increase your confidence that you had these at the time of trial?

A.    Yes, it does.

Q.    And do you think you reviewed these before trial?

A.    Yes.

Q.    Did you ask anybody else to look at them?

Exhibit 120  Page 7 of 17 to
State Defendants' Motion for Summary Judgment

Shaun S. McCrea

93

MR. FRANZ:  Okay.

BY MR. DAVIS:

Q.    So did -- do you remember any other explanations or any other information provided to you by Ms. Puracal or her team at that time, 2019?

A.    About?

Q.    The right shoe.

A.    No.

Q.    You took no notes or anything of those conversations?

A.    I did not.

Q.    Did Ms. Puracal or her team provide any underlying analysis or expert review material to you about the DNA?

A.    I don't -- I don't remember.  I don't think so.

Q.    Did you consult -- I think you've answered this.  Forgive me if you have.

Did you consult a DNA expert to assist with the DNA evidence in the McGuffin case?

A.    And you're talking about prior to the criminal trial in 2011?

Q.    Correct.

A.    No.

Q.    Is there any specific recollection you

Exhibit 120  Page 8 of 17 to
State Defendants' Motion for Summary Judgment

Ms. Puracal. Did you hear more about that from others other than Ms. Puracal?

A. I may have. I don't have a specific recollection.

Q. When was -- when did you learn that information as the "that" has been referred to?

A. When did I learn about the Brady issue and information?

Q. Yes?

A. Sometime before the -- I was deposed in 2019 and before the trial.

MS. PURACAL: And just to be clear, when you say "the trial," are we talking about the post-conviction trial?

THE WITNESS: Yes, I'm sorry, the PCR trial -- post-conviction relief.

BY MR. DAVIS:

Q. Okay.

So do you have any specific recollection of what Ms. Puracal told you about the Brady material that you have not described to us?

A. I don't think so.

Q. So ultimately you stipulated to have Exhibits 1 and 4 come into the record at trial. Right?

Shaun S. McCrea

106

A.    Yes.

Q.    And that meant that the analyst who prepared those reports did not have to testify for those -- for those reports to come in.  Right?

A.    Correct.

Q.    And how did that stipulation come about?

A.    Do you mean did I call Paul Frasier and --

Q.    Yes.

A.    -- say, Hey, do you want to stipulate to this?

Probably.  I don't have a specific recollection of that discussion.

Q.    Do you have any other -- do you have any other memory about why you stipulated?

A.    I think that would go to work product.

Q.    Do you recall whose idea it was for this stipulation?

A.    No.

Q.    And do you recall that Kathy Wilcox was the person to kind of be on the stand when those stipulated exhibits would come in?

A.    That sounds about right.

Q.    Do you remember who Kathy Wilcox is?

A.    Oh, yeah.

Q.    Tell me.

Exhibit 120  Page 10 of 17 to
State Defendants' Motion for Summary Judgment

Shaun S. McCrea

304

State of Oregon       )
                      )          ss.
County of Lane        )


    I, Sara Fahey Wilson, CSR, a Certified Shorthand Reporter for the State of Oregon, certify that the witness was sworn and the transcript is a true record of the testimony given by the witness; that at said time and place I reported all testimony and other oral proceedings had in the foregoing matter; that the foregoing transcript consisting of 303 pages contains a full, true and correct transcript of said proceedings reported by me to the best of my ability on said date.

    If any of the parties or the witness requested review of the transcript at the time of the proceedings, such correction pages are attached.

    IN WITNESS WHEREOF, I have set my hand this 15th day of December 2023, in the City of Eugene, County of Lane, State of Oregon.


Sara Fahey Wilson, CSR

CSR No. 06-0400

Expiration Date:  March 31st, 2026

Exhibit 120  Page 11 of 17 to
State Defendants' Motion for Summary Judgment

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

NICHOLAS JAMES MCGUFFIN, as     )  Case No. 6:20-cv-1163-MK
an individual and as guardian   )
ad litem, on behalf of S.M.,    )
a minor,                        )
                                )
                Plaintiffs,     )
                                )
        v.                      )
                                )
MARK DANNELS, PAT DOWNING,      )
SUSAN HORMANN, MARY KRINGS,     )
KRIS KARCHER, SHELLY MCINNES,   )
RAYMOND MCNEELY, KIP OSWALD,    )
MICHAEL REAVES, JOHN RIDDLE,    )
SEAN SANBORN, ERIC              )
SCHWENNINGER, RICHARD WALTER,   )
CHRIS WEBLEY, ANTHONY WETMORE,  )
KATHY WILCOX, CRAIG ZANNI,      )
DAVID ZAVALA, ESTATE OF DAVE    )
HALL, VIDOCQ SOCIETY, CITY OF   )
COQUILLE, CITY OF COOS BAY,     )
COOS COUNTY, and OREGON STATE   )
POLICE,                         )
                                )
                Defendants.     )
_____)

--oOo--

EXAMINATION OF SHAUN S. MCCREA

Taken on behalf of the Defendants

June 25, 2024

***TAKEN VIA VIDEOCONFERENCE***

--oOo--

Page 1

Exhibit 120  Page 12 of 17 to
State Defendants' Motion for Summary Judgment

looked at at the first deposition was the same memorandum?

A. I'll -- I'll take your word for it. I -- we looked at a lot of documents.

Q. So -- and I'll just point to this conclusion No. 4 here or this item No. 4, and I will just read it, and you let me know if I've misread it.

"Was the male DNA on the shoe (Exhibit 2) from Nick McGuffin? The DNA was below the threshold for making a conclusive determination. Leah Freeman and Nick McGuffin have some of the same DNA markers. However, according to Forensic Scientist Krings, the data suggests that Nick McGuffin was probably not the DNA contributor."

Did I read that right?

A. You did.

Q. You appear -- there appears to be another sticky on the right margin of this page. Right?

A. Yes.

Q. I'll rotate that so you're able to help us read it.

Would you agree that it appears that a word or something was cut off at the very top?

A. Yes.

Q. But underneath what does it say?

Page 18

Exhibit 120  Page 13 of 17 to
State Defendants' Motion for Summary Judgment

A.   It says, "Not minor DNA contributor."

Q.   Do you believe the portion that's cut off probably says, Nick not --

A.   Yes.

Q.   -- minor DNA contributor?

A.   Yes.

Q.   And given your -- your writing on here, it would be a fair understanding -- or a fair conclusion that you are aware of that fact, that Mr. McGuffin's DN -- that -- strike all of that.

It would be fair to conclude that the minor male profile on the left shoe did not match Mr. McGuffin's DNA profile:  Is that accurate?

A.   Yes.

Q.   And it's accurate that you understood that at the time of the criminal trial.  Correct?

A.   Yes.

Q.   Incidentally I want to point out and ask you -- here on the top of Exhibit 42 is the word "Bob's," B-O-B's, and on the top of Exhibit 41 there is also a Bob's.

What does that indicate?

A.   What that indicates to me is these were probably copies of the reports that the paralegal made for my father, who's known as Bob McCrea, because he's

Page 19

Exhibit 120  Page 14 of 17 to
State Defendants' Motion for Summary Judgment

C E R T I F I C A T E

I, Maureen Kelly, Oregon CSR No. 00-0364, Washington CSR No. 3401, do hereby certify that prior to the commencement of the examination SHAUN S. MCCREA, was duly remotely affirmed by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

Witness my hand at Portland, Oregon, this 16th day of July, 2024.

*Maureen Kelly*

MAUREEN KELLY - RPR
Certified Shorthand Reporter
Oregon CSR No. 00-0364
Washington CCR No. 3401

Page 124

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 120  Page 15 of 17 to
State Defendants' Motion for Summary Judgment



STATE'S EXHIBIT

Right shoe – looking from heel towards front – sole only

Bob's

000678                          000678                          000678

16

# MEMORANDUM
# OREGON STATE POLICE

DATE:        September 25, 2000

TO:          Mike Reaves, Chief
             Coquille Police Department

FROM:        Katherine S. Wilcox, Criminalist
             Oregon State Police Crime Lab-Coos Bay

SUBJECT:     **Questions raised at the MCT Meeting Sept. 9, 2000**

REFER:       Leah Freeman Homicide Investigation

On September 20, 2000 I talked with Mary Krings, Forensic Scientist-Portland, regarding the DNA work done on this case. These are some of the DNA questions we discussed.

1. On the left Nike shoe (Exhibit 2) DNA from more then one person was indicated. Leah Freeman was the major DNA profile. The minor profile was reportedly from a male. The question was: from where were the samples, that tested positive for the male type, taken?

Two samples showed the male type. One was taken from inside the tongue of the shoe and one from inside the shoe at the heel area-near the ankle.

2. Is the male profile complete enough for comparison?        Only a partial DNA profile was identified. This may be helpful to include or exclude some contributors of the DNA, however the statistical numbers may be low.

3. Would handling (i.e. the officer who recovered the evidence) the shoe be enough to leave the male DNA?        Very unlikely.

4. Was the male DNA on the shoe (Exhibit 2) from Nick McGuffin? The DNA was below the threshold for making a conclusive determination. Leah Freeman and Nick McGuffin have some of the same DNA markers. However, according to Forensic Scientist Krings, the data **suggests** that Nick McGuffin was **probably not** the DNA contributor.

5. Tape lifts were taken from the white Adidas sock (Exhibit 12) for possible trace evidence.        The Forensic lab in Portland will evaluate the tape lifts for significant trace evidence and we will receive a report.

**The DNA section requests that only serious suspect(s)' standards be submitted for DNA typing.**

KW:ksw

cc Coos County DA
   Detective Dale Oester-OSP
   Detective Craig Zanni-Coos County S.O.

```
DEPO OF  S. McCrea
STATE DEFENDANTS
EXHIBIT
          42
```

```
EXHIBIT
```