Robert Paul Frasier
August 29, 2023

Robert Paul Frasier
August 29, 2023

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

NICHOLAS JAMES MCGUFFIN, as an )
individual and as guardian ad )
litem, on behalf of S.M., a ) Civil No.
minor, ) 6:20-cv-01163-MK
) (Lead Case)
    Plaintiffs, )
)
  v. )
)
MARK DANNELS, PAT DOWNING, ) DEPOSITION
SUSAN HORMANN, MARY KRINGS, )
KRIS KARCHER, SHELLY MCINNES, )
RAYMOND MCNEELY, KIP OSWALD, )
MICHAEL REAVES, JOHN RIDDLE, )
SEAN SANBORN, ERIC )
SCHWENNINGER, RICHARD WALTER, )
CHRIS WEBLEY, ANTHONY WETMORE, )
KATHY WILCOX, CRAIG ZANNI, )
DAVID ZAVALA, JOEL D. SHAPIRO )
AS ADMINISTRATOR OF THE ESTATE )
OF DAVID E. HALL, VIDOCQ )
SOCIETY, CITY OF COQUILLE, CITY )
OF COOS BAY, and COOS COUNTY, )
)
    Defendants. )
)
VIDOCQ SOCIETY, )
)
    Cross-Claimant, )
)
  v. )
)
MARK DANNELS, PAT DOWNING, )
SUSAN HORMANN, MARY KRINGS, )
KRIS KARCHER, SHELLY MCINNES, )
RAYMOND MCNEELY, KIP OSWALD, )
MICHAEL REAVES, JOHN RIDDLE, )
SEAN SANBORN, ERIC )
SCHWENNINGER, RICHARD WALTER, )
CHRIS WEBLEY, ANTHONY WETMORE, )
KATHY WILCOX, CRAIG ZANNI, )
DAVID ZAVALA, JOEL D. SHAPIRO )

EXHIBIT 1
Page 1 of 154

Robert Paul Frasier
August 29, 2023

AS ADMINISTRATOR OF THE ESTATE )
OF DAVID E. HALL, VIDOCQ )
SOCIETY, CITY OF COQUILLE, CITY )
OF COOS BAY, and COOS COUNTY, )
)
)
                    Cross-Defendants.)
_____ )
)
NICHOLAS JAMES MCGUFFIN, as an ) Civil Case No.
individual and as guardian ad ) 3:21-cv-01719-MK
litem, on behalf of S.M. a ) (Trailing Case)
minor, )
)
                    Plaintiffs, )
)
        v. )
)
OREGON STATE POLICE, )
)
                    Defendant. )
_____ )

DEPOSITION UPON ORAL EXAMINATION

OF ROBERT PAUL FRASIER

    BE IT REMEMBERED THAT, pursuant to the Oregon Rules of Civil Procedure, the deposition of ROBERT PAUL FRASIER was taken on behalf of the Plaintiffs, before JEAN M. KOSTNER, a Certified Court Reporter for Oregon, on Tuesday, the 29th day of August, 2023, at the hour of 9:03 a.m., at the Coquille Community Center, 105 North Birch Street, in the City of Coquille, County of Coos, State of Oregon.

EXHIBIT 1
Page 2 of 154

right?

A.    No.

Q.    Okay.

A.    I -- no.

Q.    Okay.  So in any event, at this point, August 17th, 2000, you are convinced that Mr. McGuffin killed Leah Freeman.  Is that right?

A.    At that point he was the only suspect we had.

Q.    But, I mean, you're telling Mr. Bartley, "Nick did it.  There's no doubt about it"?

A.    In my mind, yes.

Q.    Okay.  And you also -- if you go to page 40, line 17.

A.    Page what?

Q.    40 -- four zero -- line 17.  There you're telling Mr. Bartley that whatever you're looking at, the statement analysis or whatever, says that he's an accomplice to murder.  Is that right?

A.    What line again?

Q.    Page 40, line 17.

A.    Okay.

Q.    See, it says "And that says you're lying.  That says you're an accomplice to murder."  Did I read that correctly?

A.    Yes.

EXHIBIT 1
Page 3 of 154

Robert Paul Frasier
August 29, 2023

you on the interview panel as the person who came and talked to them about the Freeman case the day before.  Right?

A.  Oh, I'm sure they did, along -- everybody else that was on the interview panel was here on that -- for that open house too.

Q.  Okay.  And then as far as I can tell, after Mr. Dannels, Chief Dannels, was hired, the H.I.T. Team was reconvened for the first time after that on October 13th, 2009.  Does that sound right?

A.  The H.I.T. Team, yes.

Q.  Okay.  There may have been other things going on, but as far as --

A.  We did other things before we did the H.I.T. Team callout.

Q.  Okay.  And what were the things that were done before the H.I.T. Team callout in October of 2009?

A.  First thing was where are the reports?  I was certain I did not have everything.  We need to find the reports.  Let's find everything, the reports.  That was the first thing that we did.

Once we found the reports and got them organized, then the second thing we did was what is the physical evidence that we have?  Where is it?  We went through that.

One thing I did before we called out the H.I.T. Team was I brought in retired homicide detectives from the

EXHIBIT 1
Page 4 of 154

Robert Paul Frasier
August 29, 2023

Q.   At the Vidocq Society?

A.   At the Vidocq Society.

Q.   Okay.  And who prepared that --

A.   I did.

Q.   -- Exhibit 3?

A.   I did.

Q.   Okay.  And that's a PowerPoint presentation?

A.   Yes.

Q.   Okay.  So you prepared it, and then who gave it?

A.   I did.

Q.   And how long did that presentation last?

A.   Less than an hour.

Q.   And how long did you meet with members of the Vidocq Society after the presentation?

A.   Not very long.  Less than 15, 20 minutes.

Q.   Okay.  Did you go out to dinner with members of the Vidocq Society afterwards?

A.   We went out to dinner with Mr. Walters.

Q.   Okay.  And Mr. Walter was a member of the -- you understood that he was a member of the Vidocq Society at the time?

A.   That's correct.

Q.   How many different members of the Vidocq Society did you speak to personally?

A.   I only recall speaking to one or two, not counting

EXHIBIT 1
Page 5 of 154

Robert Paul Frasier
August 29, 2023

A.    I was looking for information that would help us move forward, either to tell us we were going the wrong way or that this was -- we were going the right way.  And they didn't -- they didn't give us any suggestions whatsoever that I recall.

Q.    Okay.  Anything else there that's inaccurate as you read it today?

A.    Well, the next-to-the-last paragraph, the boyfriend after the crime impregnated another 14-year-old, I don't know where that came from.  I don't think that's true.

Q.    Okay.  Anything else?

A.    Just from my quick look going over it, nothing jumped -- nothing else jumps out to me.

Q.    Okay.  Let me show you what we will mark as Exhibit 5.

      (Document marked for identification as Deposition Exhibit 5.)

BY MR. LAUERSDORF:

Q.    All right.  So you've been handed what's been marked as Exhibit 5.  Do you recognize that document?

A.    Yes.

Q.    Yes?

A.    Yes.

Q.    What is that document?

A.    This is a document that I prepared regarding

EXHIBIT 1
Page 6 of 154

Robert Paul Frasier
August 29, 2023

discovery in the case.

Q.   Okay.  And explain that.  What do you mean by that?

A.   Well, I had started a process -- well, Coos County, the commissioners, would not give the DA's office money for a discovery clerk.

Q.   Okay.

A.   And so my predecessor had started what we call the open file policy.  If you wanted discovery, you had to come and copy it.  And we would allow defense attorneys to take copies of the files and take them to their office, photocopy them, whatever they needed to do.  However, that's not feasible on a larger case, and so I started individually on my own.  As I would -- and I was -- and I started -- what I would do is I would scan the documents, and then I would Bates-number them through Adobe Acrobat --

Q.   Okay.

A.   -- and then I would develop a list with page numbers.  Now, this was -- you know, this would be one of the first times I ever did this.

Q.   Okay.  And so then --

A.   I was trying to keep track of what I had given to them.

Q.   Okay.  So what was the list that you created, Exhibit 5, intended to represent?

A.   It was intended to represent the materials that I

EXHIBIT 1
Page 7 of 154

Robert Paul Frasier
August 29, 2023

believed that I had sent to the defense.  But I made some mistakes.

Q.    Okay.  So it's -- we'll get to this a little bit more later, but my understanding is that generally what you're attempting to do is you've gathered all of the file materials. You've had everything sent to you by law enforcement; you've gathered that all in one place; you're Bates-labeling it; and you're trying to do the defense a solid by producing all that; and you're creating a list of everything that you have and that you've Bates-labeled and that you're producing.  Is that right?

A.    Yes.

Q.    Okay.  I want to ask you about page 7 of that document, Line Item Number 153.

A.    Mm-hm.

Q.    And that says "Vidocq Society Materials 5551 through 5674."

MR. LAUERSDORF:  So now we'll move on to Exhibit 6. Please mark that.

(Document marked for identification as Deposition Exhibit 6.)

BY MR. LAUERSDORF:

Q.    So you've been handed what's been marked as Exhibit 6.  And what I'm going to ask you is to take a look through that and tell me if you recognize that as -- well, just look through it.  Take your time and let me know when you feel

EXHIBIT 1
Page 8 of 154

Robert Paul Frasier
August 29, 2023

comfortable with it.

A.    (Witness complies.)   This appears to be the material that I sent to the -- to the defense on the Vidocq Society.

Q.    Okay.   So is that the material that was provided to you by Vidocq or by somebody else?

A.    The first pages, 551 through 561, I don't recall how those came into our possession, whether they were sent to me directly or if they were sent to Chief Dannels.   The remainder, which are articles, were given to me directly by Mr. Walter.

Q.    Okay.   And were those given to you while you were in Pennsylvania or some other time?

A.    The first article was given to me when we were in Pennsylvania.   The second article was given to me when 20/20 was in town and they brought Mr. Walters with him.

Q.    Okay.   So the first article is numbered at the bottom 005562.   Is that correct?

A.    Yes.

Q.    And the second article, where does that start?

A.    It looks like 5605.

Q.    Okay.   So the first one is titled, for the record, "Profiling Killers:   A Revised Classification Model for Understanding Sexual Murder, Robert D. Keppel and Richard Walter."

EXHIBIT 1
Page 9 of 154

Robert Paul Frasier
August 29, 2023

Did you -- was it your opinion or your conclusion that Ms. Freeman's murder was a sexual murder?

A.   No.

Q.   And then the next article is called "Non-Sexual Murder and Violent Crimes By Richard D. Walter."

A.   Right.

Q.   In those two articles he talks about the subject profiles, anger retaliatory, power-assertive, that kind of thing.  Right?  Did you read those articles?

A.   I read the first one.  I did not read the second one.

Q.   Okay.  And then 005551, the first page there in Exhibit 6, what do you recognize that to be?

MS. SAWYER:  Can you restate what page you're having him look at?

MR. LAUERSDORF:  005551 in the bottom right corner or the top right corner.

A.   This appears to be an email to somebody with the initials "fborn."

BY MR. LAUERSDORF:

Q.   And then signed down at the bottom by Fred Bornhofen?

A.   Could be.

Q.   Case manager of the Vidocq Society?

A.   That could -- yes, that's what it says.

EXHIBIT 1
Page 10 of 154

Robert Paul Frasier
August 29, 2023

Q.    Do you know who Patrick Kelly is?

A.    No.

Q.    It looks like Patrick Kelly is talking about a statement analysis that he has conducted on materials that Mr. Bornhofen has sent him.  Is that --

A.    That's correct.

Q.    -- your take of the email?  Do you see up in the left-hand corner there where it says "RE: The Murder of Leah Freeman, 2000"?

A.    Yes.

Q.    If you look back at Exhibit 4.

A.    Which one is Exhibit 4?

Q.    That's the "Synopsis of Vidocq Society Cases." It's a two-page document that I just asked you to go through and tell me if you --

A.    Okay.

Q.    Do you see up in the upper left-hand corner there where it say "207. The Murder of Leah Freeman, 2000"?

A.    Yes.

Q.    So would you conclude from that that page 5551 of Exhibit 6 is related to Exhibit 4?

A.    Yes.

MR. DEFREEST:  Objection.  Calls for speculation.

MS. SAWYER:  I join the objection.

COURT REPORTER:  Who objected?

EXHIBIT 1
Page 11 of 154

Robert Paul Frasier
August 29, 2023

MR. DEFREEST:  Mr. DeFreest.

MS. SAWYER:  Then Meredith Sawyer.

BY MR. LAUERSDORF:

Q.  And then go to the next page, 5552.  Do you recognize that document at all?

A.  I recognize it as something that was given to me. Again, I don't recall how I got it.

Q.  Okay.  But your understanding is that that came from Vidocq Society?

A.  That was my understanding, yes.

Q.  And then how about page 5558 through 5561?  Do you recognize those documents?

A.  Again, this was material given to me, and again, I don't remember how I got it.

Q.  Okay.  But your understanding is that came to you from the Vidocq Society one way or --

A.  That's correct.

Q.  Okay.  I'm going to take you back to Exhibit 2.

A.  Which one is that?

Q.  That is the H.I.T. Team notes.

A.  Okay.

Q.  Now, I want to take you to Exhibit 2, page -- in the lower right-hand corner, CPD020571, which would be the H.I.T. Team meeting on January 23rd, 2010, which is the next meeting after the last one we discussed.

EXHIBIT 1
Page 12 of 154

Robert Paul Frasier
August 29, 2023

BY MR. LAUERSDORF:

Q.    I'm handing you a copy of the mini transcript of your deposition in the post-conviction proceedings.  It's testimony of R. Paul Frasier in McGuffin v. Nooth, taken May 31st, 2019.  And I'll refer you to page 161 in the -- do you see where the page numbers are in the upper right-hand corner of each page?

A.    Yeah.  I see it.

Q.    Starting at line 5 and lines 5 through 19.

A.    Yes.

Q.    You say there "The other thing I did was grand jury.  Chief Dannels only wanted me to present stuff that showed Nick's guilt.  He wanted me to go in and do a grand jury basically in one day or one afternoon and get an indictment on Nick.  And I told him no.  That was not a popular decision with him.  In fact, he had people come talk to me, and one of them was an idiot from the Vidocq Society, trying to get me to change my mind."  Is that -- did I read that correctly?

A.    That's correct.

Q.    And so I guess that's -- that's what I mean when I ask at some point Chief Dannels began to lose patience.  Is that right?

A.    I don't know if he was losing patience.  He disagreed on what I wanted to do at the grand jury.

Q.    Okay.

EXHIBIT 1
Page 13 of 154

Robert Paul Frasier
August 29, 2023

A.    He wanted me to concentrate on Nick, and I said, "No, we're not going to do that.  We're going to do it the way I told you before.  We're going to present all angles on this case to the grand jury, and we're going to let the grand jury decide who should get indicted, if someone should get indicted, and who that should be."  He did not agree with my decision to handle the case that way.

Q.    Okay.  And who did he send from Vidocq to talk to you and try to persuade you to --

A.    It was Mr. Walter.

Q.    Mr. Walter?

A.    Yes.

Q.    Okay.  When did that meeting occur?

A.    It was --

MR. DAVIS:  Objection.  Assumes facts.

A.    When did I meet with Mr. Walter?

BY MR. LAUERSDORF:

Q.    Yeah.  You said there in your deposition that he sent somebody from the Vidocq Society to try to convince you to move forward with indicting Mr. McGuffin.

A.    That's correct.

Q.    And so I'm asking when did the meeting with the person from Vidocq take place -- or when did the communication with the person from Vidocq take place?

A.    It took place during the week that 20/20 was in

EXHIBIT 1
Page 14 of 154

Robert Paul Frasier
August 29, 2023

THE WITNESS:  That's correct.

MR. DAVIS:  And then you said "the second person," meaning "the other person"?

THE WITNESS:  Right.  Yeah.  That's right.  Not sequentially, yeah.

BY MR. LAUERSDORF:

Q.  Okay.  And then you said that that was a -- that part of your conversation with Walter was short and to the point.  What was the rest of your conversation with Mr. Walter?

A.  I told him that I had read his article that he gave me when we were in Pennsylvania.  And I told him that I did not believe -- when he gave me that article, he represented it to me that this would show a profile that shows that Mr. McGuffin is the murderer.  I read that article, and I'm going, this doesn't fit at all to what I know about this case, that this article is just -- it doesn't make sense to me.  I don't know how this ties in.  And I told him that.  I said, "Look, your article that you gave me frankly doesn't make sense to me because it -- it doesn't match up with what I know about this case."

And it was at that point he says, "Oh.  Okay."  Then he rummaged around in his briefcase, and he gave me the second article.

Q.  Okay.

A.  He said, "You ought to read this one."

EXHIBIT 1
Page 15 of 154

Robert Paul Frasier
August 29, 2023

I said, "Okay.  I will read it."  But I never did because what we found -- we found out later.  It was literally the next day that we found out about Mr. Walter.

Q.    Okay.

A.    And I said, "That's it.  We're done with this guy."

Q.    Okay.  And so -- but up until that point, the theory that Mr. Walter and Vidocq had shared with you about power assertives, punch for the face, and so there must have been a confrontation at the place where her shoe was found by the cemetery and he must have hit her and she must have bled and then she must have been stuck in the truck, that's the theory that you used at trial.  Isn't that right?

A.    Yes, but --

MS. SAWYER:  Object to the form.  Misstates his testimony.

MR. DEFREEST:  Objection.  Facts not in evidence and misstates.

BY MR. LAUERSDORF:

Q.    Go ahead and answer.  You started with "Yes."

A.    I guess -- one of the things I found out about Mr. Walters was that he would take the facts of the case as we knew them and then he would manufacture, if you will, a profile that would fit the only suspect that the prosecution was looking at.  That's the way I read the opinion from the Second Circuit Court of Appeals.

EXHIBIT 1
Page 16 of 154

Robert Paul Frasier
August 29, 2023

Q.    That's Drake vs. Portuondo?

A.    Right.

Q.    Okay.

A.    In my mind, there had to have been an altercation at that scene because of the lost shoe and the blood on the other shoe and so forth.  There had to have been -- Leah had to have been bleeding for her blood to get on her shoes, so there had to be some altercation.  My argument was based on the facts of the case, not on anything that Mr. Walters told me.

Q.    Okay.  So let's go to Exhibit 2, CPD020533.

A.    Okay.

Q.    And that's the same day.  And I guess that gets back to you being concerned about crossing your t's and dotting your i's.  Do you see where I am at the top of the page there?

A.    Right.

Q.    It's a note about "Paul, make sure that the DNA profiles - Leah, Cory, and Denny samples; shoes from the bedroom belonging to Leah; Leah's clothing is still in England; there's a problem with customs; Nick's DNA sample, question mark; swabs of blood stains from Leah's shoes; need found shoes."

The DNA on the shoes is -- appears to be something that you're focused on at that point.  Is that right?

A.    No.  I think this is -- I'm focusing on the physical evidence that I would probably need to present at

EXHIBIT 1
Page 17 of 154

Robert Paul Frasier
August 29, 2023

A.   Yeah.  That's -- that's true.  We did have a double homicide around that time.

Q.   And you still had things to do on McGuffin before you wanted to take it to grand jury.  Right?

A.   That's correct.

Q.   But so at this point, that -- the grand jury, if I remember correctly, was impaneled July 14th, 2010.  Does that sound right?

A.   Sounds about right.

Q.   Okay.  So then ABC 20/20 was in town for a full five months before you impaneled the grand jury for the second time concerning McGuffin?

A.   I don't know -- I don't know if they were here the full five months.  I know they were here kind of hit and miss.  They would be here a day or two, and then I wouldn't see them, and then they'd be back.

Q.   Okay.  But it was no secret around town that ABC 20/20 was in town following the McGuffin investigation, was it?

A.   I don't know.  I can't answer that question.

MR. LAUERSDORF:  Okay.  We've got 12:00 o'clock.  I know Mr. DeFreest has a call at 12:15.

I would keep going till 12:15 if you're comfortable with that.  I know that you have been sitting here and --

THE WITNESS:  No, that's fine.  If you want to go -- we can go till 12:15.  That's all right.

EXHIBIT 1
Page 18 of 154

Robert Paul Frasier
August 29, 2023

reports or other documents and provided to you, you would have

provided those documents to Mr. McGuffin's defense team during

this prosecution, wouldn't you?

A.    Yes.

Q.    Go to Exhibit 14.

(Document marked for identification as Deposition

Exhibit 14.)

BY MR. LAUERSDORF:

Q.    So, Mr. Frasier, if you will -- you've been handed

what's been marked Exhibit 14.  If you could go ahead and look

that over and let me know when you're comfortable with it.

A.    Yes, I'm familiar with this.

Q.    And we talked a little bit about this earlier, I

think.  This is Deputy Zanni's that -- well, what is this?

What do you recognize this as?

A.    Well, this is a document that Craig Zanni brought

to me the day after I had that meeting with Mr. Walter at

Coquille City Hall in the chief's office.  He brought this to

me the next day.

Q.    Okay.  This document is dated 6/30/2010 at the top.

Is that right?

A.    Yes.

Q.    Okay.  And he says "Paul, thought you might want to

know some of this info.  The Jack the Ripper story piqued my

curiosity."  And then it's signed with his initials CZ.  Right?

EXHIBIT 1
Page 19 of 154

Robert Paul Frasier
August 29, 2023

originally gave me didn't fit.  And that's when he gave me the second article, and I didn't have to time to look at it or read it at that time.  We had gone to dinner that night, the sheriff and I -- that would be Craig Zanni -- the sheriff and I, Chief Dannels, and Mr. Walters.  There was a couple of other people there.  I don't recall who they were.  We went to dinner that night, and during dinner Mr. Walter regaled us with his story about how he had been involved in the investigation of Jack the Ripper with Scotland Yard.

I had ridden over with Craig Zanni to the dinner. We went to Bandon Dunes.  And on my way back, Craig told me -- he said, "Paul, this guy doesn't know what the heck he's talking about about Jack the Ripper."  And it turned out Craig is kind of a Jack the Ripper buff, I guess.  I don't know, but he had some knowledge about the case, and he says, "Some of this stuff he said wasn't true."

And I said to him, "Well, you know, we've been thinking about calling him as a witness, but we have never vetted him.  We need to vet him."  And I asked him that night, "Would you vet him for me?"

Okay.  The next morning, first thing in the morning, he's in my office with this (indicating).

Q.   Okay.

A.   And he hands me this, and I read this case, and I'm going, "Okay.  We can't use this guy, and we need to

EXHIBIT 1
Page 20 of 154

Robert Paul Frasier
August 29, 2023

disassociate ourselves totally and completely from him."

Q.    So if I -- and I might have misheard you, but if I understand you correctly, it was the night that Walter had come into your office, and you had said earlier that Chief Dannels had sent Walter to you to try to persuade you to --

A.    Right.

Q.    -- speed up the grand jury.  And during that meeting he had given you this second article that you didn't have a chance to --

A.    That's right.  Because the conversation about grand jury was very short and to the point.

Q.    Okay.  And then so it was that same night that you went out to dinner with Dannels and Zanni and Walter?

A.    Yes.

Q.    Okay.  So at that point, end of June, somebody is still working with Walter and Vidocq.  Right?  I mean, is it Dannels, or is you, or is it who?

A.    Well, 20/20 flew him out --

Q.    Okay.

A.    -- and he was there because of 20/20.

Q.    Okay.

A.    When he was talking with us in Pennsylvania, you know, he was saying stuff.  You know, he was claiming to be an expert on this and so forth, and we were seriously thinking about is this a potential witness for us in this trial.  But

EXHIBIT 1
Page 21 of 154

Robert Paul Frasier
August 29, 2023

after dinner that night, you know, I said, "We haven't vetted this guy.  We need to vet him."

Q.    Okay.

A.    And that's when this stuff came up.  And he was there in Coquille that week, not because we brought him out; it was because 20/20 brought him out.

Q.    Okay.  So up until this point, though, June 30th, 2010, you were still considering using him as a witness?

A.    Until I got this stuff, yeah.

Q.    Okay.  Let's see.  So let's move on to the last -- getting close to the last issue.  You -- it's 2:00 o'clock.  Are you okay?  Are you good?

A.    I'm doing fine.

MR. LAUERSDORF:  Everybody okay?  Anybody need a break?

(No response.)

BY MR. LAUERSDORF:

Q.    Okay.  We'll keep going.

So the next thing I want to talk about, then, is Brady issues and Brady vs. Maryland.  Do you know what I'm talking about when --

A.    Yes, I do.

Q.    -- I refer to Brady vs. Maryland?

A.    Yes, I do.

Q.    So when a felony case goes up through charging and

EXHIBIT 1
Page 22 of 154

Robert Paul Frasier
August 29, 2023

EXAMINATION

BY MR. DEFREEST:

Q.   Hello, Mr. Frasier.  My name is Eric DeFreest.  I represent Mr. Walter in this matter --

A.   Okay.

Q.   -- and I'll try to be efficient here.

As far as your interaction with Mr. Walter, you had mentioned that there is information that you got from Officer Zanni, is it, that --

A.   Craig Zanni.

Q.   Once you received that information from Zanni, then, you chose not to use Mr. Walter at all in any further action you were taking.  Correct?

A.   That's correct.

Q.   Had you determined to utilize any information that was offered or available from Mr. Walter prior to that time?

A.   As I previously testified, we were considering calling him as a potential expert in the case, but once I saw that opinion from the Second Circuit, it was real clear to me that we had to dissociate ourselves from him.

Q.   So in that consideration of potentially utilizing Mr. Walter as an expert, you had not explored that opportunity or potential as of yet.  Correct?

A.   I know Chief Dannels and Sheriff Zanni and I discussed it, but whether we would want to use him, I think

EXHIBIT 1
Page 23 of 154

Robert Paul Frasier
August 29, 2023

you have any agreement with Mr. Walter to conduct any investigation or project for the DA's office?

A.    I did not ask him to do anything specifically for our office, no.

Q.    Did you have any agreement with Mr. Walter to provide the DA's office with any produceable?

A.    No.  We did not have any agreement with him.

Q.    Did you receive any -- absent the two published articles that were part of the exhibits that were shown to you earlier, were you given any other document from Mr. Walter with regard to the Leah Freeman investigation?

A.    I seem to recall in -- that he -- after I declared him not usable, I seem to recall -- he sent a letter trying to explain himself.  And I basically ignored it.

Q.    Did that letter influence your decision-making with regard to the McGuffin case in any way?

A.    My decision not to -- I decided we couldn't use Mr. Walter or any of his theories at the trial, and so from my point of view, no.  He -- none of his information did I use at trial.

Q.    Did Mr. Walter provide you with any evidence or theory which specifically directed prosecution of Mr. McGuffin?

A.    I think in our discussions with him in Pennsylvania and his discussion about the passive aggressive or PA or whatever it was, he certainly was giving us a rendition that

EXHIBIT 1
Page 24 of 154

Robert Paul Frasier
August 29, 2023

Mr. Walter about the investigation, if anything more than what was presented in Philadelphia?

A.    I personally did not give him anything.  Coquille PD may have.

Q.    But that's outside your knowledge?

A.    That's outside my knowledge.

Q.    Do you have any knowledge as to -- in the matter of protocol for the investigation which you were overseeing in the cold case in 2010, would Mr. Walter have ever had free access to investigation information held by Coquille or your office?

A.    Not from my office.  If he did, it would have been through Coquille PD.

Q.    And that would have been under the control of Chief Dannels at that time?

A.    Correct.

Q.    But once he came out -- once Mr. Walter came out to Oregon for the 20/20 production, then soon after his arrival is when you received Mr. Zanni's report of a concern for Mr. Walter's background?

A.    I don't know how long he was here.  I do know that 20/20 had interviewed him and filmed him with Chief Dannels around the area where the first shoe was found.  And I think it was the same day that the chief arranged for him to come talk to me about grand jury.  And that was in the afternoon, as I recall, in Chief Dannels' office.  And I believe that was the

EXHIBIT 1
Page 25 of 154

Robert Paul Frasier
August 29, 2023

first and only time, other than dinner that evening, that I had any contact with Mr. Walters.

Q. Okay. And then after receiving the information from Mr. Zanni, did you conduct any sort of investigation of Mr. Walter's background or credentials beyond what Mr. Zanni gave you?

A. Well, I'm reading an opinion from the Second Circuit Court of Appeals that kind of listed a bunch of really terrible stuff. And I'm looking at that, I don't need anything further. No, I did not conduct any further investigation, just based on that case alone.

Q. Well, I understand that you had concern, given the report from that court opinion, but neither did you investigate the credibility of those allegations or his credentials. Correct?

A. I didn't.

MR. DEFREEST: Okay. Thank you.

Thank you, sir. I greatly appreciate your time.

MR. FRANZ: Does Meredith have any questions?

MS. SAWYER: Yeah, I have some questions. Do we need to take a break, or is it okay to start right now?

MR. FRANZ: Let's start now because we're being kicked out of here at 4:00.

MS. SAWYER: Okay. Okay. I don't know that I'm going to finish by 4:00, but I will start.

EXHIBIT 1
Page 26 of 154

Robert Paul Frasier
August 29, 2023

follow through with.  Is that fair to say?

A.    I would -- since they invited us there, I expected them to tell us.  I wasn't -- I wasn't going to ask them questions.  I expected them to give me something.

Q.    Did you, in your presentation to the Vidocq Society, advise them of the fact that there was unidentified male DNA on Leah Freeman's shoes?

A.    No.  Because I didn't know about it when we did the presentation.

Q.    And did you advise the Vidocq Society during that initial luncheon about the witness statement from Mr. Backman?

A.    No.

Q.    And why not?

A.    Because I frankly don't recall Mr. Backman being involved in the case.  There's that tip sheet, but I don't recall myself seeing it, or I don't recall a tip sheet in and of itself.

Q.    Do you recall speaking with Richard Walter at all before, during, or immediately after your luncheon presentation?

A.    We arrived early for the luncheon, I think an hour, maybe an hour and a half before its scheduled time because, frankly, I didn't know what the facilities looked like; I didn't know -- you know, was I going to have to use my own computer for the PowerPoint; and so forth.  And so we arrived

EXHIBIT 1
Page 27 of 154

Robert Paul Frasier
August 29, 2023

early.

And it was either as we were walking in the door or shortly thereafter, here's Mr. Walter.  And he immediately walks up to us and starts talking to us, telling us about his credentials, telling us how he had looked at the material that had been sent in.  He started talking about a profile he had developed.  We talked for, you know, a half hour, 45 minutes.  He handed me the first article at that time, and I said, "Okay.  Well, I'll read it sometime.  I can't read it today, obviously."  I shoved that in my briefcase.

Then we did the luncheon, and then afterwards he approached us again, started talking to us again.  And he was saying things, as I said before, that interested us.  And so we actually went to dinner and talked some more that evening.  Then after dinner, he left.  Then we returned the next day to Oregon.

Q.    What do you recall was discussed during dinner about the Leah Freeman case?

A.    Um, he kept reinforcing this control physical aspect thing.  There were also times that he would talk about other cases he worked on.  I don't recall specifics about that.  We had already talked with him for a couple, three hours about his theory about the case, and frankly, I think we were getting talked out, and so the conversation changed to other things.  But that -- that's the gist of it.

EXHIBIT 1
Page 28 of 154

Robert Paul Frasier
August 29, 2023

Q.   And when you said "his theory," were you -- are you referring to his power-assertive theory?

A.   Yes.  His profile.  Yes.

Q.   Did you use that language in your prosecution of the McGuffin --

A.   No.

Q.   -- at the McGuffin trial?

A.   No.

Q.   "Power-assertive"?

A.   No.

Q.   Okay.  And you're saying that very stridently.  Why is that?

A.   Because I didn't want to have anything to do with Mr. Walter's theory when we got to trial.

Q.   And that's because you didn't find him particularly credible.  Is that correct?

A.   It didn't matter whether I found him particularly credible or not.  What mattered was what was in that court opinion.  And to me what was in that court opinion, whether it was true or not, ruined any opportunity for us to use him.

Q.   You testified a moment ago that it appeared he had reviewed material that had been already provided either to him or to the Vidocq Society before you got there.  Do I have that right?

A.   Yes.  Because he started right off the bat telling

EXHIBIT 1
Page 29 of 154

Robert Paul Frasier
August 29, 2023

not use it at trial.  It had no effect on the verdict in this case."  Do you see that?

A.    Yes.

Q.    And is that still your position as we sit here today?

A.    As I've explained before, I didn't learn anything new from the Vidocq Society, and obviously we had issues with Mr. Walter and I felt that we needed to stay clear of that, and that's what we did.

Q.    Okay.  And I believe you testified a moment ago that nothing you learned from Mr. Walter affected the manner in which you investigated or prosecuted the case against Mr. McGuffin.  Is that correct?

A.    Could you repeat that for me, please.

Q.    Nothing that you learned from Mr. Walter affected or changed how you investigated or prosecuted the case against Mr. McGuffin?

A.    No.  I didn't use anything from him.

Q.    Okay.  And is that true with respect to the Vidocq Society entity as well?

A.    Well, I did not bring up the Vidocq Society at trial, and we didn't talk about visiting with them, and like I say, the only thing I learned from them was you're on the right track, you've got a better case than what you thought, good luck.

EXHIBIT 1
Page 30 of 154

Robert Paul Frasier
August 29, 2023

those two articles.

Q.    Did Mr. Walters ever ask to be paid for his services?

A.    We never paid him anything, and I don't recall him asking anything.  I don't know what 20/20's arrangement was with him, but my office certainly didn't pay him anything.

Q.    Do you have an understanding that the Vidocq Society is an entirely volunteer organization?

A.    That was my understanding.  It was a volunteer organization of mostly retired law enforcement professions -- professionals from different specialties.

Q.    And did you have an understanding as to -- let me strike that.

Did you have an understanding that the members were not employees of the Vidocq Society; they were just volunteers?

A.    I knew that it was some type of club or social organization because I think I recall we were given some pamphlets about the Vidocq Society and they talked about an annual ball and things along that line.  But in terms of them having employees or anything along that line, I was never told that they did have employees.

Q.    And in your view, did the Vidocq Society at any time ever (audio garbled) visit an agent or representative of the Coos County DA's office?

A.    You broke up.  We couldn't hear your whole

EXHIBIT 1
Page 31 of 154

Robert Paul Frasier
August 29, 2023

don't think.

MR. DEFREEST:  I guess I have one question, if I may.

THE WITNESS:  Okay.

EXAMINATION

BY MR. DEFREEST:

Q.    You mentioned in your response to the municipal defendants as to you weren't sure on presenting to the grand jury until all evidence was reviewed by you and you were -- had opportunity to reinterview witnesses.  Is it fair to say that Mr. Walter was not involved in any regard with interviewing witnesses as part of your process?

A.    No.  I don't believe he interviewed anybody.  I -- I have not been informed he interviewed anybody.

Q.    And he wasn't acting as an agent or -- well, wasn't acting as an agent of the Coos County DA's office.  Correct?

A.    That's right.

MR. DEFREEST:  Thank you.

MR. LAUERSDORF:  Thank you, Mr. Frasier.

THE VIDEOGRAPHER:  Okay.  This concludes today's deposition of R. Paul Frasier.  We're going off the record.  The time is 4:40.

(Discussion off the record.)

THE VIDEOGRAPHER:  We are back on the record at 4:42.

Robert Paul Frasier
August 29, 2023

STATE OF OREGON        )
                       )        ss.  C E R T I F I C A T E
County of Douglas      )

     I, JEAN M. KOSTNER, Certified Shorthand Reporter for the State of Oregon, do hereby certify that:

     Pursuant to stipulation of counsel for the respective parties, hereinbefore set forth, ROBERT PAUL FRASIER appeared before me at the time and place set forth in the caption hereof;

     That, at said time and place, I reported in stenotype all testimony adduced and oral proceedings had in the foregoing matter, to the best of my ability;

     That, thereafter, my notes were reduced to typewriting, and that the foregoing transcript, pages 1 through 251, both inclusive, constitutes a full, true, and correct transcript of all such testimony adduced and oral proceedings had and of the whole thereof.

     IN WITNESS WHEREOF, I have hereunto set my hand and CSR stamp this 12th day of September, 2023, in the City of Roseburg, County of Douglas, State of Oregon.

_____
JEAN M. KOSTNER
Certified Court Reporter
CSR No. 90-0051

EXHIBIT 1
Page 33 of 154

NATIVE FORMAT DOCUMENT

EXHIBIT  0003

EX 0003 R. Paul Frasier 082923



EXHIBIT 1
Page 34 of 154

# Homicidal Death
# of
# Leah Nicole Freeman

EXHIBIT 1
Page 35 of 154

# Leah Freeman

- ***Information to be discussed is law enforcement sensitive***

- ***It is not to be shared with anyone not directly working on this case***

EXHIBIT 1
Page 36 of 154

**Leah Freeman**



EXHIBIT 1
Page 37 of 154

# Leah Freeman

- Born October 29, 1984

- Age 15 at time of disappearance

- Just completed freshman year at Coquille High School, Coquille Oregon

- Mother is Corliss (Cory) Courtright

- Father was Denny Freeman (passed away October 23, 2009)

EXHIBIT 1
Page 38 of 154

# Leah Freeman

- Parents were divorced

- Mom had custody of Leah

- No child custody or visitation issues

EXHIBIT 1
Page 39 of 154

# Leah Freeman

- June 29, 2000, Cory Courtright reports Leah missing

- Leah did not come home the previous evening

- Did not realize this until Cory got up morning of June 29, 2000

EXHIBIT 1
Page 40 of 154

# Leah Freeman

- Police response: probable runaway or with friends
- Leah does not show up
- Coos County Sheriff's Office offers help
- Help declined

EXHIBIT 1
Page 41 of 154

# Leah Freeman

- Leah still does not show up
- Coquille PD brings in FBI
- Leah still does not show up
- Finally Coquille PD asks for Major Crime Team help
- Does not occur until one week after Leah disappears

EXHIBIT 1
Page 42 of 154

# Leah Freeman

- Investigation begins full force
- Police are aware:
- Leah has a boyfriend who just graduated from Coquille High School
- Nicholas McGuffin
- Leah last seen on June 28, 2000

EXHIBIT 1
Page 43 of 154

# Leah Freeman

- June 28, 2000
- Leah picked up by Nick at 2:00 PM
- Between 2:00 PM and 7:00 PM Leah and Nick are seen at various places
- Brent Bartley Home
- Nick McGuffin's Home
- Bartley's grandparents home
- Leah wearing white top, jeans, tennis shoe

EXHIBIT 1
Page 44 of 154



EXHIBIT 1
Page 45 of 154



EXHIBIT 1
Page 46 of 154

# Leah Freeman

- 7:00 PM Nick drops off Leah at Cherie Mitchell home

- Nick to pick up at 9:00 PM

- Leah leaves on foot (small argument at Mitchell home and she left early)

- 9:01 Leah seen in front of McKay's Market

- 9:05 Leah seen in front of Hunter's Restaurant (now Colleen's)

EXHIBIT 1
Page 47 of 154

# Leah Freeman

- 9:15 PM Leah seen in front of Oregon First Community Credit Union (now Coquille City Hall)

- Last known sighting

- Route Leah is walking would take her home, or to road leading to Bartley grandparents' home

EXHIBIT 1
Page 48 of 154

# Leah Freeman

- 11:40 PM, Tony Messerle finds a shoe in middle of North Elm Street
- Same street to get to Bartley grandparents' home
- Messerle holds on to shoe
- Turns over to investigators July 4, 2000
- DNA – Leah's shoe

EXHIBIT 1
Page 49 of 154



Map of Leahs route on 6-28-00 routed

EXHIBIT 1
Page 50 of 154

# Leah Freeman

- July 4, 2000, Kip Oswald, then with Coos County Sheriff's Office, finds matching shoe on Hudson Ridge

- DNA matches shoe to Leah

- High velocity blood spatter seen on shoe

- Leah's blood

EXHIBIT 1
Page 51 of 154



Map of Leahs route on 6-28-00 routed

EXHIBIT 1
Page 52 of 154

# Leah Freeman

- Investigation continues
- McGuffin and Bartley timelines

EXHIBIT 1
Page 53 of 154

# Leah Freeman

- McGuffin
- After leaving Leah at Mitchell home, picked up Nikki Price (Bartley's girlfriend) and drove to grandparents home
- Leaves Bartley and Price
- Goes to Fast Mart and hangs out for an hour
- Goes to Johnson Mill Pond

EXHIBIT 1
Page 54 of 154

# Leah Freeman

- At pond for about an hour (seen by six different men at the pond)

- 9:05 PM arrives at Mitchell home

- Leah is gone

- He claims he then drives up and down Central looking for Leah

- Does not see her

EXHIBIT 1
Page 55 of 154

# Leah Freeman

- 9:45 Drives by Fast Mart
- 10:15 Back to Mitchell's. Calls Leah's Mom
- Sometime between 10:00 and 10:40 out to Bartley's grandparent's home
- Called his home
- Between 10:40 and 11:00 goes to high school

EXHIBIT 1
Page 56 of 154

# Leah Freeman

- 10:50 Pulled over by Officer Zavala. Asks for help looking for Leah

- 10:55 Went to Denny's Pizza and talks to Leah's sister Denise

- Continues driving around town looking for Leah

- 11:30 Goes to Bartley's home. Picks up Bartley and Price

EXHIBIT 1
Page 57 of 154

# Leah Freeman

- 11:40 Dropped Nikki off at her home
- 11:50 Goes to Leah's home. Doesn't think she is there
- 12:00 Talks with Officer Lee. Again asks for help looking for Leah
- 12:30 Goes back to Leah's home. Doesn't think she is there

EXHIBIT 1
Page 58 of 154

# Leah Freeman

- 1:00 Goes to home of Kristen Steinhoff. Talks to her for about an hour

- 2:00 Goes back to Leah's home. Sees light from bedroom window. Thinks she is home

- 3:00 In bed

- 7:30 Leah's mom calls wanting to know where Leah is

EXHIBIT 1
Page 59 of 154

# Leah Freeman

- Bartley's Timeline
- 7:00 He and McGuffin take Leah to Mitchell home
- Go and pick up Nikki Price and go back to grandparent's home
- McGuffin leaves
- 10:30 McGuffin at grandparent's home. Looking for Leah

EXHIBIT 1
Page 60 of 154

# Leah Freeman

- 11:30 to 12:00 McGuffin picks up Bartley and Price. Drop off Price

- He and Nick drive around until 2:00 looking for Leah

- 2:00 McGuffin drops off Bartley at Bartley's home

EXHIBIT 1
Page 61 of 154

# Leah Freeman

- Discrepancies
- McGuffin says between 1:00 and 2:00 he is with Kristen Steinhoff
- Bartley says he is with McGuffin

EXHIBIT 1
Page 62 of 154

# Leah Freeman

- Other witnesses as to activities of McGuffin and Bartley

- 9:00 West and Emler say McGuffin leaves Johnson Mill Pond. Driving the blue Mustang

- Sometime between 9:00 and 10:00, Hamilton and Steinhoff see McGuffin

- McGuffin is angry and confused

EXHIBIT 1
Page 63 of 154

# Leah Freeman

- 9:30 McGuffin seen at Fast Mart by Jenkins and West. McGuffin is upset and crying

- Jenkins says McGuffin is now driving T-Bird

- 9:30 to 9:45 Heather Reid sees McGuffin at Fast Mart in T-Bird. McGuffin is staring at the steering wheel

EXHIBIT 1
Page 64 of 154

# Leah Freeman

- 10:00 – 11:00 Seen by Zach Elderkin at intersection of north end of Central with Highway 101. No one is with Nick. In the Mustang

- 10:00 – 10:15 seen by Denise Freeman at Denny's Pizza.

- 10:15 McGuffin calls Leah's home

- 10:30 McGuffin calls his home

EXHIBIT 1
Page 65 of 154

# Leah Freeman

- 10:35 Nick pulled over in the Mustang. No one in car with him

- 11:00 to 11:15 At Denny's Pizza and sees Denise. She sees Steinhoff in the back and an unknown male (probably Hamilton) in the front of the Mustang

- 12:03 Contacted by Officer Lee

EXHIBIT 1
Page 66 of 154

# Leah Freeman

- Sometime after midnight McGuffin is seen by Steinhoff at Fast Gas

- McGuffin goes to her home and stays for about 45 minutes

- They then drive around in her car for about 30 minutes looking for Leah

EXHIBIT 1
Page 67 of 154

# Leah Freeman

- Discrepancies

- Switch of Car

- Bartley claims with McGuffin after midnight looking for Leah

- Steinhoff confirms McGuffin's story of him being at her house for about an hour and then riding around together looking for Leah

EXHIBIT 1
Page 68 of 154

# Leah Freeman

- According to written statement he only contact's Denny's Pizza one time
- Witnesses say he is there two times

EXHIBIT 1
Page 69 of 154

# Leah Freeman

- Other problems

- Why never contact Leah's home even though he claims to be there three different times?

- Why switch cars?

- Why is he upset and crying at Fast Mart at around 9:30 PM?

EXHIBIT 1
Page 70 of 154

# Leah Freeman

- There are at least three sightings of Leah on Central during the same time period that McGuffin claims he is driving up and down Central looking for her. Why doesn't he see her?

- If so concerned that Leah is missing, why spend so much time at Steinhoff home?

EXHIBIT 1
Page 71 of 154

# Leah Freeman

- Statement of June 30, 2009



EXHIBIT 1
Page 72 of 154

# Leah Freeman

- Both McGuffin and Bartley do a handwritten statement

- Nick flunks polygraph

- Per FBI behavioral unit, Nick is deceptive

- Bartley passes polygraph on issue of causing harm to Leah

- Flunks polygraph on issue of if he knows what happened to her

EXHIBIT 1

Page 73 of 154

# Leah Freeman

- Bartley refuses offer of immunity
- Bartley claims he has no knowledge what happened to Leah
- Nick refuses to cooperate
- Family hires attorney

EXHIBIT 1
Page 74 of 154

# Leah Freeman

- Investigation continued
- Search warrants executed on the McGuffin residence and the Mustang and T-Bird

EXHIBIT 1
Page 75 of 154



EXHIBIT 1
Page 76 of 154



EXHIBIT 1
Page 77 of 154

# Leah Freeman

- Nothing of interest in the T-Bird

EXHIBIT 1
Page 78 of 154



EXHIBIT 1
Page 79 of 154



EXHIBIT 1
Page 80 of 154



EXHIBIT 1
Page 81 of 154



EXHIBIT 1
Page 82 of 154



EXHIBIT 1
Page 83 of 154

# Leah Freeman

- Nothing found in the trunk (No jack, tire iron, spare tire, nothing)
- Reason nothing in the trunk, repairs to quarter panel and gas tank
- Witness reports that day after Leah disappeared, Bruce McGuffin (father) and Nick are burning trash
- Fire season

EXHIBIT 1
Page 84 of 154

# Leah Freeman

- Search of Nick's bedroom
- Marijuana and paraphernalia
- Methamphetamine and paraphernalia
- Letters from Leah
- High School Yearbook

EXHIBIT 1
Page 85 of 154

# ¡Livin'







Top Left: Amanda Kilmer and Cassie Moore cleaning up in Ms. Leffler's class.
Top Right: Kristy Christopherson and McKenzie Hubbard are having a great time at one of the dances!
Above: What teachers REALLY do on "inservice" days!
Right: Josh Cumberland and Shawna Ferren are cooking for the teachers!

# La Vida Loca!

Left: Leslie Summers, Stacie Lyons, Leah Freeman, and Chelsea Olson giggle about Stacie's pregnancy belt.
Below: Ryan Ferren and Jenny Ramsey are cooking up trouble in foods class.
Far Below: Leslie Summers, Tana Smith, and Leah Freeman go wild in Claire's!







84

85

EXHIBIT 1
Page 86 of 154



Freshmen                    2000

EXHIBIT 1
Page 87 of 154

# Sophomores

# Rock The House!









Top: John Dorland and Tabetha Goble dance the night away. Top Center: Willie Lewis, Amanda Lovell, and Jenny Kunders have got it going on! Mike Bradley and Angela Gregory are dancing so close. Below: Joyce Carver posts for the camera. Left: Showing their affection for each other, Jessie West and Rainie Craig embrace each other. Bottom Left: Trisa Mulford busts a move.

Top Left: Josh Fraley and Morgan Bresko bumpin' booties. Top Right: Mary Bower and Morgan Bresko talk about their next move. Bottom Left: Trevor Hartley and Jamie Sinnott "Senior Twirps." Bottom Middle: A North Bend stranger tries to show the Devils how to dance. Bottom Right: Ashley McMahon and Josh Fraley get caught in the moment.







EXHIBIT 1
Page 88 of 154

# Rock The House!



Top Left: Josh Fraley and Morgan Bresko bumpin' booties.
Top Right: Mary Bower and Morgan Bresko talk about their next move.
Bottom Left: Trevor Hartley and Jamie Sinnott "Senior Twirps."
Bottom Middle: A North Bend stranger tries to show the Devils how to dance.
Bottom Right: Ashley McMahon and Josh Fraley get caught in the moment.

EXHIBIT 1
Page 89 of 154





"Don't date Freshmen." *except for Leah Freeman* Nick McGuffin

"Playerism is a disease, if you don't like it, take your 'butt' down to the clinic" -Chris Guerin

*"Don't date Nick." -Kristen Plew*



"I am not conceited because being conceited is a flaw and I don't have any." -Amanda Landmark

"Reverence for the past is important, but so is regard for the future." - Kristi Starrett

"Therefore do not worry about tomorrow for tomorrow will worry about itself. Each day has enough trouble of its own. -Matthew 6:34 (Emilio)" -Morgan Bresko

*"Use the force!" - Trevor Hartley*



*"FINALLY!!!" - Ryan Davidson*

"Enjoy life, man!" -Trevor Riddle





*"Num num num!" - Chantel Truelove*   "It's about time!" - Jennie Johnson

*"Booyeah!" - David Simmons*

*"Everything I do I rush through so I can do something else. In such a way do the days pass- a blend of stock car racing and the never-ending building of a gothic cathedral. Through the windows of my speeding car I see all that I love falling away: books unread, jokes untold, landscapes unvisited...." - Tony Anderson*

"Grow up to be like Tom Green!" - Chris Cranford

"Bon-us!" - Jennifer Gregory

"Do or do not; there is no track. -Yoda" - Salvador Sanchez

"Milkin's good!" - Andrew Vie

"Milkin's great!" - Brandon Walker

*"A smile is a little curve that can set a lot of things straight." - Marjie Bradley*

"Get off my back!" -Zach Ring

*"6 feet, 5 inches, 200 lb.s of pure white chocolate!" -Josh Wallman*

"I haven't broken or died yet, so we'll see what happens in the next year or two. Seth Enslow" - Ryan Arellano





*Top Left: Erin Daugherty, Morgan Bresko, and Brandon Hallan stop to gossip in the hall during break.*
*Top Right: Chasing the butchery, Trent Fisher and Anna Brewer stand and jabber.*
*Top Right: Molly Williams studies her math in Mr. Smith's class.*
*Middle Left: Leslie Summers and Cindy Hoskins share a day.*
*Bottom Left: Trandes King and Ryan Arellano cuddle as a happy couple in the senior hall.*
*Right: Jamie Sinnett is talking to the student body at an assembly.*

22

23

EXHIBIT 1
Page 90 of 154



"Don't date Freshmen." Nick McGuffin *except for Leah Freeman*

"Pla a di yo like you dov clini

"Don't date Nick." -Kristen Plew

"Therefore

EXHIBIT 1
Page 91 of 154

# Leah Freeman

- Body discovered August 3, 2000
- Death by homicidal violence

EXHIBIT 1
Page 92 of 154

EXHIBIT 1
Page 93 of 154



Map of Leahs route on 6-28-00 routed

EXHIBIT 1
Page 94 of 154



EXHIBIT 1
Page 95 of 154



EXHIBIT 1
Page 96 of 154



EXHIBIT 1
Page 97 of 154



EXHIBIT 1
Page 98 of 154



EXHIBIT 1
Page 99 of 154



EXHIBIT 1
Page 100 of 154



EXHIBIT 1
Page 101 of 154



EXHIBIT 1
Page 102 of 154



EXHIBIT 1
Page 103 of 154

# Leah Freeman

- All clothes except her shoes and one sock were found on her body

- No underpants

- Have not been able to explain the lack of underwear

EXHIBIT 1
Page 104 of 154

# Leah Freeman

- Investigation has taken three different avenues
- Person who lived in apartments on street where shoe was found
- Left town in a hurry
- Tracked him down eventually in Colorado
- Eliminated him as suspect

EXHIBIT 1
Page 105 of 154

# Leah Freeman

- Second Avenue
- Rumor that Leah was hit by car and died
- Various persons driving
- William Sero
- Tom Stemmerman

EXHIBIT 1
Page 106 of 154

# Leah Freeman

- Problems with scenario
- No injuries consistent with having been hit by a car
- No "road rash" seen on clothes

EXHIBIT 1
Page 107 of 154

L/01/38

View of front of vest



EXHIBIT 1
Page 108 of 154



L/01/38

View of damage lower right front in vest

EXHIBIT 1
Page 109 of 154

EXHIBIT 1
Page 110 of 154



L/01/38

View of damage to front left side

L/01/38

View of damage to left side



EXHIBIT 1
Page 111 of 154

L/01/38

View of back of vest



EXHIBIT 1
Page 112 of 154

L/01/38

View of shoulder straps at the top of back of vest



EXHIBIT 1
Page 113 of 154

L/01/38

View of back of the sports bra



EXHIBIT 1
Page 114 of 154

L/01/38

View of holes in fabric between shoulder straps at the back of sports bra



EXHIBIT 1
Page 115 of 154

L/01/38

View of area of damage to left side of sports bra



EXHIBIT 1
Page 116 of 154



L/01/38

View of front of jeans ( NB All holes seen here result of laboratory testing)



EXHIBIT 1
Page 117 of 154

L/01/38

View of seat/back of jeans Note frayed hole to right leg and fraying on left seat area.

( NB large area from crotch and hole in leg result of laboratory tests)



EXHIBIT 1
Page 118 of 154

# Leah Freeman

- All of the car scenarios lead back to Alisha Michaud
- Burned out meth addict
- Likely the result of meth induced paranoia
- Sero et al eliminated by polygraph

EXHIBIT 1
Page 119 of 154

# Leah Freeman

- McGuffin aspect of investigation
- Cannot exclude him as the person who committed this crime

EXHIBIT 1
Page 120 of 154

# Leah Freeman

- Extensive Crime Lab Work
- Clothes examined by Oregon State Police Crime Lab
- Sent clothes to United Kingdom for extensive DNA testing
- Fiber analysis currently being done with lab in Chicago
- No forensic evidence

EXHIBIT 1
Page 121 of 154

# Leah Freeman

- Reality:

- No forensic or direct evidence showing who committed the crime

- Probability:

- Case will be solved through old fashioned "gum shoe" work that will show by circumstantial evidence who did it; or

- Confession

EXHIBIT 1
Page 122 of 154

# Leah Freeman

- Goal:
- Eliminate McGuffin as the suspect and identify the perpetrator of the crime
- Or
- If McGuffin is guilty, develop a prosecutable case

EXHIBIT 1
Page 123 of 154

# Leah Freeman

- Cold Case Team of five retired police officers with homicide experience have been quietly putting the case in order

- Larger team of about 15 current police officers are being brought up to date on the case

- Oregon Department of Justice has supplied analyst support

EXHIBIT 1
Page 124 of 154

# Leah Freeman

- Current idea is to get the team fully briefed
- Get a wiretap in place on McGuffin's phone(s)
- Announce formation of the team and intent to re-interview all witnesses
- Hope the wire gives us something
- Otherwise, hope the case somehow breaks

EXHIBIT 1
Page 125 of 154

6/30/2010                    Richard Walter - Wikipedia, the free en...
005646                              005646                              005646

# Richard Walter

om Wikipedia, the free encyclopedia

**Richard Walter** is an American forensic psychologist for the Michigan prison system, a crime scene analyst and one of the creators of modern criminal profiling.[1][2][3]

## Contents

- 1 Career
- 2 Notable cases
- 3 Notes
- 4 External links

*[Handwritten note: Paul, I thought you might know some of want this INFO. The Jack the Ripper story intrigued my curiosity. See pages 21 thru 3]*

## Career

Walter developed a number of psychological classifications for violent crime, and a co-founder of the Vidocq Society, an exclusive organization of forensic professionals dedicated to solving cold cases. As a psychologist for Michigan's prison system, he has interviewed more than 22,000 convicted felons.[4]

He worked with Robert D. Keppel, then the chief investigator for the Attorney General's Office in the State of Washington, and together they wrote *Profiling Killers: A Revised Classification Model for Understanding Sexual Murder*. Keppel created the Homicide Information Tracking Unit (HITS) database, of which Walter was a olific contributor. Walter was the first to develop a matrix as a tool of investigation using pre-crime, crime and post-crime behaviours to help develop suspects.[5]

Author Michael Capuzzo has been given a sizeable advance to write about the Vidocq Society and its three co-founders.[6] The book is tentatively titled *The Arms of Angels*. Walter is also a member of the American Academy of Forensic Sciences, a Fellow of the Royal Society of Medicine/Clinical Forensic Medicine, A Fellow of the Australasian College of Biomedical Sciences and a 22-year veteran prison psychologist for the state of Michigan.

Walter gives lectures to police organizations throughout the United States, England, Scotland, Turkey, Australia and Hong Kong. He has also been featured on programs for CBS, A&E, TLC and Court TV.

## Notable cases

In 1989, Walter provided the psychological profile for mass murderer John List,[7] who had been in hiding for 18 years. Using Walter's profile, forensic sculptor Frank Bender was able to appropriately age the suspect in a bust displayed on *America's Most Wanted*; List was captured the next day.

In Lubbock, Texas in 1999, City Police solved the murder of Scott Dunn with Walter's aid. This is a rare case where a conviction was garnered in the absence of a body. The case is chronicled in the book *Trail of Blood*" by Wanda Evans and in the television series *Medical Detectives*

In 2005, the Hudson, Wisconsin Police Department consulted with the Vidocq Society on the cold case double homicide of Dan O'Connell and James Ellison. With the help of Walter, the Hudson police solved the case. The rderer was a priest who was trying to keep child molestation allegations from surfacing.

## Notes

en.wikipedia.org/wiki/Richard_Walter
005646



EXHIBIT
0014
R. Paul Frasier
08.29.2023

EXHIBIT 1
Page 126 of 154

005647                    005647                    005647

1. ^ Criminal profiling: an introduction to behavioral evidence analysis (http://books.google.com/books?id=Oge7LFaN5xYC&pg=PA738&dq=%22Richard+Walter%22+forensic+profile&lr=&cd=1) Brent E. Turvey - 2008- Page 738
2. ^ The Casebook of Forensic Detection: How Science Solved 100 of the World's ... (http://books.google.com/books?id=6TQAQ8aLDNsC&q=%22Richard+Walter%22+forensic+profile&dq=%22Richard+Walter%22+forensic+profile&lr=&cd=3) Colin Evans - 1998 - Page 140
3. ^ The Vidocq Society page (http://www.vidocq.org/who.html#Walter) retrieved on March 30, 2007
4. ^ Mansfield University article (http://www.mansfield.edu/news/story/default.cfm?SID=889) retrieved on March 30, 2007
5. ^ Robert D. Keppel *Profiling Killers: A Revised Classification Model for Understanding Sexual Murder*, the Institute for Forensics (http://ijo.sagepub.com/cgi/content/abstract/43/4/417) , retrieved on March 30, 2007
6. ^ Publishers Weekly article (http://www.publishersweekly.com/article/CA256951.html?pubdate=11%2F4%2F2002&display=archive) retrieved on March 30, 2007
7. ^ The Casebook of Forensic Detection: How Science Solved 100 of the World's ... (http://books.google.com/books?id=6TQAQ8aLDNsC&q=%22Richard+Walter%22+forensic+profile+list&dq=%22Richard+Walter%22+forensic+profile+list&lr=&cd=1) Colin Evans - 1998 - Page 140

# External links

- Richard Walter criminal profiler (http://www.richarddwalter.com)
- "Famed Profiler Visits Mansfield" (http://www.mansfield.edu/news/story/default.cfm?SID=889)
- "Expert Discusses Serial Killers" (http://www.stargazettenews.com/apps/pbcs.dll/article?AID=/20070202/NEWS01/702020318/1001/ARCHIVES)
- "Man granted new trial in 1981 slaying of two North Tonawanda students: Appeals court calls testimony by expert in case 'quackery'" (http://www.buffalonews.com/cityregion/story/561414.html)

Retrieved from "http://en.wikipedia.org/wiki/Richard_Walter"

Categories: Living people | Offender profiling | Criminal investigation | Forensic psychologists

---

- This page was last modified on 11 March 2010 at 13:29.
- Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. See Terms of Use for details.
  Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

- Privacy policy
- About Wikipedia
- Disclaimers

005647                    005647                    005647

EXHIBIT 1
Page 127 of 154

005648                                    005648                                    005648

553 F.3d 230

FindLaw   Caselaw   United States   US 2nd Cir.   **DRAKE v. PORTUONDO**

# United States Court of Appeals, Second Circuit.

Print    ShareThis                                    Font size:   A   A   Reset

## DRAKE v. PORTUONDO

### Robie J. DRAKE, Petitioner-Appellant, v. L.A. PORTUONDO, Superintendent, Shawangunk Correctional Facility, Respondent-Appellee.

### Docket No. 06-1365-pr.

### Argued: April 1, 2008. -- January 23, 2009

Before: JACOBS, Chief Judge, KEARSE, and POOLER, Circuit Judges.

Sally Wasserman, New York, NY, for Petitioner-Appellant.Thomas H. Brandt, Assistant District Attorney (Matthew J. Murphy, Niagara County District Attorney, on the brief) Lockport, NY, for Respondent-Appellee.

Robie J. Drake appeals from a judgment of the United States District Court for the Western District of New York (Elfvin, J.), on remand, denying a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Drake is currently incarcerated for his 1982 conviction, after a jury trial, in New York State Supreme Court, Niagara County, on two counts of second degree murder for the shooting of a young couple in a parked car.   At Drake's trial, in order to compensate for the lack of evidence of motive, the prosecution, at the last minute, called an expert, Richard D. Walter.   Walter testified regarding a fictional syndrome of sexual dysfunction, dubbed "picquerism," which is, "medically speaking, nonsense," but appeared to account for the particular, gruesome circumstances of the shooting.   Drake v. Portuondo ("Drake I "), 321 F.3d 338, 346 (2d Cir.2003).   In 2001, the district court rejected Drake's claim on habeas corpus review that his due process rights under the Fourteenth Amendment were violated because the prosecution knew or should have known that Walter was testifying falsely.   On appeal, we vacated the district court's judgment and remanded for discovery and, if necessary, a hearing on whether the prosecution knew that Walter was testifying falsely.   Id. at 347.

005648                                    005648                                    005648

EXHIBIT 1
Page 128 of 154

On remand, the parties deposed Walter and prosecutor Peter L. Broderick, now a Niagara County Court Judge.   See Deposition of Richard D. Walter, July 30, 2003 ("Walter Dep."); Deposition of Judge Peter L. Broderick, Aug. 21, 2003 ("Broderick Dep. I"); Deposition of Judge Peter L. Broderick, Nov. 26, 2003 ("Broderick Dep. II").   After completion of depositions, the district court found that the prosecution was not aware of Walter's false statements, and that Walter's false testimony was not material to the jury's verdict.   Drake v. Portuondo ("Drake II"), No. 99 Civ. 0681 (W.D.N.Y. Mar. 16, 2006).   We now conclude that the district court erred in failing to consider direct evidence that the prosecution was aware that Walter misstated the extent of his preparation for trial and strong circumstantial evidence that the prosecution was aware that Walter testified falsely regarding his credentials.   Walter's false statements likely contributed to the jury's decision to credit Walter's highly prejudicial testimony on the sole issue in the case-Drake's intent to commit murder.   Accordingly, we reverse the judgment of the district court and remand for the entry of a judgment conditionally granting the writ of habeas corpus.

BACKGROUND

I.   The Trial

It was undisputed at trial that around midnight on December 5, 1981, Drake, a high school senior, shot and killed two other high school students, Amy Smith and Stephen Rosenthal. We recounted the pertinent trial testimony in Drake I:

[Smith and Rosenthal] were in Rosenthal's rusty 1969 Chevy Nova in the parking lot of a factory in the Town of North [Tonawanda], New York. The factory parking lot was adjacent to a junkyard with abandoned vehicles.   [Smith and Rosenthal] were using the spot as a lovers' lane.

In a confession, Drake said that he left home at approximately 11:30 p.m., dressed in military fatigues and armed with a loaded Marlin .22 caliber semi-automatic rifle, a loaded Winchester .22 caliber high powered rifle, extra ammunition and two hunting knives, and that he went to the junkyard looking for abandoned vehicles to use in target practice.   He said that the first vehicle he came across was the parked Nova, that he believed the car to be abandoned because the engine was off and no noise came from within, and that he opened fire on the passenger side window of the car with his semi-automatic rifle.

Drake claimed that he did not intend to kill Smith and Rosenthal, and insisted that he learned of their deaths only when he inspected the car, heard Rosenthal groaning, and opened the door to find the two bodies.   According to Drake, he stabbed Rosenthal twice, in a fit of panic, to stop him from groaning, but . he "didn't mean to kill him or anything."

EXHIBIT 1
Page 129 of 154

005650  005650  005650

Trial Transcript at 267.   According to Drake, Rosenthal was fully clothed, Smith not. Unsure of what to do, he drove the Nova car to a secluded spot down the road from the parking lot, and put Rosenthal's body in the trunk.   Surprised by a passing car, Drake got back in the car and drove to the Niagara County dump in the neighboring town of Wheatfield, where he was putting Smith's body into the trunk when he was spotted by two police officers on routine patrol.

321 F.3d at 341.

The only issue at trial was whether Drake had the intent requisite for second degree murder.   Although an announcement was made over the high school's public address system requesting that any student with information about Drake and the victims come forward, only one witness testified as to any such information-that she had overheard Drake and Rosenthal exchange profanity on one occasion in the cafeteria.   Thus, the prosecution advanced the theory that the shooting was a sex-crime, based on the following evidence:

The emergency room physician who pronounced the victims dead testified concerning sexual trauma to Smith, including a bruised rectum, and mud near her private parts.   The medical examiner who performed the autopsies noted a bite-mark on Smith's left breast, with hemorrhaging so minor as to indicate that the bite had been inflicted post-mortem. The prosecution's medical forensic witness found no evidence of semen anywhere except on Drake's underwear.   Forensic experts who performed a second autopsy following the exhumation of Smith's body a month after her death, confirmed that the bite on Smith's [left] breast was inflicted post-mortem, and also found a post-mortem bite mark on the other breast.   Dr. Lowell Levine, a dentist and forensic odontologist with experience in bite marks, confirmed the presence of the two post-mortem marks on each breast.   Over a defense objection, Dr. Levine opined that bite marks are often present in "sexually [sic] or demented type[s] of crimes."   Trial Transcript at 671.

Id. at 341-42.

Notwithstanding this circumstantial evidence in support of the sex crime theory, the prosecution evidently concluded that more evidence of motive was needed.   The Erie County Medical Examiner had initially told Broderick that traces of semen, which were believed to have come from Drake, were found on a slide from Smith's rectal cavity. However, when defense counsel asked to examine the semen evidence, the medical examiner could not find the slide.   The next day, the medical examiner informed Broderick that he had found the slide, but there was no evidence of sperm.   The pathologist who had

005650  005650  005650

EXHIBIT 1
Page 130 of 154

taken the slide had been mistaken about the semen and had been "let go."    Broderick Dep. I at 36.

At that point, Broderick sought another means of convincing the jury of Drake's motive for intentional murder.    The prosecutor explained his thinking as follows:

I had people who caught this defendant in the act of putting a naked girl in the trunk of a car and all I needed was some reasonable explanation for why this thing happened and when I lost the sperm evidence a couple of weeks before trial, I was just looking for somebody to give an explanation to the jury as to why this happened.    Not that I needed to but I think juries are always interested in knowing why.

Broderick Dep. II at 26; see also Trial Tr. at 750 (Broderick explaining, "when I lost that evidence which I thought in my own conventional mind was the evidence I sought or would need to prove the sexual assault.    I had to look elsewhere and I consulted with [Walter].").

Broderick called Dr. Levine, the forensic dentist, and explained that he had lost the semen evidence.    Dr. Levine "said the guy that you've got to talk to is Dr. Walter," a prison psychologist in Michigan.    Broderick Dep. I at 38-39.    Dr. Levine called Walter on October 7, 1982, approximately two weeks before trial.[1]    That same day, Broderick also called Walter, and the two had a telephone conversation lasting 52 minutes.    During that 52 minute conversation, Broderick never "got into [Walter's] real credentials." Id. at 43. Rather, Broderick gave Walter "a thumbnail sketch of the evidence in the case, the type of crime that was involved," and discussed the "bite mark question," "the bandoliers of ammunition," and the facts that Drake was "carrying two guns that night" and "dressed in military garb, camouflage."    Id. at 38; Broderick Dep. II at 37-38.    Walter told Broderick that he needed some time to think about the case before he could give Broderick his opinion.

At some point after that telephone call, Walter called Broderick back and said that he believed "picquerism" was involved.    Broderick responded, "what the hell is picquerism," because he "had never heard of that term before."    Broderick Dep. I at 44.    Picquerism is a purported syndrome or criminal profile in which the perpetrator realizes sexual satisfaction from penetrating a victim by sniper activity or by stab or bite wounds.    As we explained in Drake I, the word picquerism comes from "a derivative misspelling of the French verb 'piquer,' which means, among other things, to stick or poke," 321 F.3d at 342, and is "medically speaking, nonsense," id. at 346.[2]    Walter explained "picquerism" to Broderick and sent him two books that referred to the concept.    Broderick did not independently

EXHIBIT 1
Page 131 of 154

005652                                              005652                                              005652

investigate Walter's credentials or contact any other mental health professional to inquire about picquerism.

Although he had discussed picquerism with Walter approximately two weeks before trial, Broderick did not inform defense counsel of his intention to call Walter until Thursday, October 21, 1982, the day before Walter was to take the stand.   The trial judge had already advised the parties that due to an out-of-town judicial commitment, the trial would have to conclude no later than the following Tuesday, October 26.   Under the announced schedule, defense counsel would have no more than a weekend to find a competing expert and prepare his cross-examination.

Walter testified at trial to the following credentials: (1) he received a Bachelors and a Masters degree in psychology from Michigan State University and had done post-graduate work in criminal justice at California State University; (2) he had been employed by the Los Angeles County Coroner's office, where he "had personal involvement with at least" 5,000 to 7,500 cases, in which he "consulted with the prosecutors, the police agencies and various investigative agencies . and the pathologists related to moding [sic] cause of death and profiling for possible leads . also leads in terms of investigation for the resolution of the case"; (3) he had been a prison psychologist for the Michigan Department of Corrections for four and a half years; (4) he was an "adjunct lecturer" at Northern Michigan University; (5) he had written "papers or articles" in his field; (6) he had testified as an expert witness before in both Los Angeles and Pasadena, California; and (7) he was a member of a number of professional associations and had lectured to various groups.   Trial Tr. at 783-92.

Walter testified at trial that the only person with whom he had ever discussed the case was Broderick.   He also claimed that his testimony was based only upon the information he had received regarding the case between his arrival in New York the night before and the time he testified the very next day, when he reviewed the trial exhibits and grand jury transcript, and spoke with Broderick.   When asked by defense counsel whether he had formulated his opinion based only on his investigation beginning the previous evening, Walter responded in the affirmative, and commented that "it was not [a] difficult" case.   Id. at 814.   On direct examination, after Walter had summarized the documentary evidence he had reviewed, the prosecutor asked whether "this case fits into one of the psychological profiles?" and Walter replied emphatically: "Oh yes it does."   Id. at 793.

To achieve verisimilitude, Walter's testimony on picquerism was laden with technical jargon, see id. at 796-805 (using terms including "erotication," "machoism," "coital continuum" "fetish," and "phallution"), alluded to a spurious body of research, see id. at 793 -94 (describing a typology of "lust murders" and picquerism's place "within that structure"

005652                                              005652                                              005652

EXHIBIT 1
Page 132 of 154

005653                                                    005653                                                    005653

as "a pathological condition"), and gave the impression of familiarity with a large number of case studies, see id. at 795 ("It's not uncommon to see cases where they will ."); id. at 797 ("What generally happens, particularly [in] these types of cases."). Walter began by giving an elaborate analysis of the psychological profile and upbringing of a picquerist, for instance, claiming that in order to fulfill a fantasy of superiority, a piquerist may use "machoism, such as weaponry, such as sniper activity." Id. at 795-96. Walter explained that picquerism involves eroticism, but this is not sexuality "in the conventional sense," rather a picquerist "would use the breast, would use symbolic things of sexuality rather than direct sexuality." Id. at 797.

Walter then testified that Drake's crime was a clear case of picquerism. He suggested that nearly every fact in the case was highly suggestive of picquerism, and that this went directly to intent (the sole issue at trial).

[T]he pattern of the gunshot wounds, the bite mark and its location, and the, having an anal assault, then when you see that whole big picture of what the intent is, then you look in at the secondary characteristics and you look at the bite mark. . In this particular case I found it to be sexual.

Id. at 802-03 (emphasis added). In response to the prosecutor's invitation for Walter to "tell the jury what it is [he] relied on in coming to [the] conclusion," id. at 803, that Drake was a picquerist, Walter gave this summary:

Again the location of the bite marks bilaterally on both breasts. The indication of suckling going on, also . you find the penetration in the gunshot wound to the head, and the whole notion of stealing the honor of the normal . the sort of destruction of the whole power center is the whole sense of sight, the whole sense of learning. You come to the breast and . the relationship and in terms of acting out not sex per se . but kind of a mock form of sexuality in terms of power control, dominance expressed through rage, anger. You find the location again highly, highly significant. Again in terms of timing, it's not uncommon to move from the destruction of the power center . and then start working out your fantasy system.

Id. at 803-04. Walter further testified that it was significant that the bites were post-mortem: "[i]n picquerism it's almost always post-mortem, after the person has been deceased. Because you see the threat . that . they're trying to surmount over, [and] that is in their way so they have to kill first." Id. at 804-05. To explain the evidence of rectal bruising, Walter stated that a picquerist, "incidently, derives the sexual satisfaction through the shooting which is quite common. You can also derive sexual satisfaction through any

005653                                                    005653                                                    005653

EXHIBIT 1
Page 133 of 154

form of physical assault to the person whether it be in the vagina or whether it be in the rectum or any other created orifice." Id. at 800.   To explain the lack of evidence of seminal fluid on the victim, Walter stated that "in these types of cases," one would "[n]ot at all" expect to find sperm, because "what they're really after is the satisfaction that they can control and that they can degrade and that they can annihilate and consume others." Id. at 798-99.   Overcoming the evidentiary gap created by Drake's apparent unfamiliarity with the victims, Walter explained that "[m]any times if the victim is known to the perpetrator it's incidental." Id. at 799.   He then testified that a picquerist carries a psychological "murder kit" at all times, and provided his theory of what Drake did that night: "[H]e carries a murder kit with him . [;] he may not feel as though he was going out to murder a specific person but when the opportunity strikes he can impl[e]ment it all the way through." Id.

On the Monday following Walter's testimony, defense counsel informed the trial judge that despite his attempts over the weekend to retain a rebuttal psychologist, he could not find any expert who had ever heard of "picquerism." Id. at 953.   The defense requested a two-week continuance to find a psychologist with the expertise required.   The prosecution opposed a continuance and the judge ruled in the prosecution's favor.   Drake was found guilty of two counts of second degree murder and sentenced to two consecutive terms of twenty years to life by the state court.

II.   Walter's False Statements

In 1995, many years after he had exhausted his direct appeals, Drake moved to vacate his conviction and sentence pursuant to N.Y.Crim. Proc. Law § 440.10 on the basis of newly discovered evidence that Walter had lied about his credentials.   From his research in prison, Drake discovered that Walter's job at the Los Angeles County Medical Examiner's Office was to clean and maintain the forensic lab, not criminal profiling; Walter was never on the payroll of Northern Michigan University; and there was no record that Walter had testified as an expert witness in any criminal proceedings while he worked at the Los Angeles County Medical Examiner's Office.   Drake I, 321 F.3d at 342-43.

The Supreme Court, Niagara County, summarily denied the motion without a hearing, finding that Drake had made no showing that the prosecution knew or should have known about Walter's perjury.   Drake exhausted his state court appeals and filed a federal habeas petition, which was denied by the district court.

On appeal in Drake I, we held that it was apparent that Walter's testimony contained significant falsehoods in addition to the improbability of his testimony as to the scientific

EXHIBIT 1
Page 134 of 154

With respect to his testimony at Drake's trial that he had previously testified as an "expert witness" in two California jurisdictions, Trial Tr. at 785 (emphasis added), Walter had in fact only testified once before the Drake trial, and not as an expert in psychology or criminal profiling, but rather, as a lab technician on a chain of custody issue related to his handling of evidence at the Los Angeles County Coroner's office, Walter Dep. at 85-88.

Additionally, contrary to his trial testimony that his familiarity with the case came from the documents he reviewed and his discussions with Broderick on the eve and morning of his testimony, Walter acknowledged at his deposition that he had spoken with both Dr. Levine and Broderick nearly two weeks before trial, and that his conversation with Broderick had lasted 52 minutes.

Despite new evidence coming to light in Walter and Broderick's depositions, the district court granted Respondent's motion for summary judgment without conducting a hearing on the grounds that (1) there was no evidence that the prosecutor knew or should have known of Walter's false testimony, and (2) Walter's false statements did not render the trial constitutionally defective.

STANDARD OF REVIEW

I.   State Court Decisions

"When a state court adjudicates a habeas petitioner's claim on the merits, we must afford that decision the deferential standard of review established by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") in 28 U.S.C. § 2254(d)."   Hawkins v. Costello, 460 F.3d 238, 242 (2d Cir.2006).   Applying AEDPA deference, a federal court may grant a writ of habeas corpus if the state court's adjudication on the merits "was contrary to, or involved an unreasonable application of, clearly established, Federal law as determined by the Supreme Court of the United States."   28 U.S.C. § 2254(d)(1).   "Clearly established Federal law . refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."   Williams v. Taylor, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).[4]   A state court's findings of fact are "presumed to be correct" unless rebutted "by clear and convincing evidence."   28 U.S.C. § 2254(e)(1); see also Drake I, 321 F.3d at 345.   In this case, we have already held that no deference to the state courts' conclusions is required because the state courts did not permit the development of the factual record.   Drake I, 321 F.3d at 345-47.

II.   District Court Decision

EXHIBIT 1
Page 135 of 154

005656     005656     005656

We review a district court's legal conclusions in denying a habeas petition de novo and its factual findings for clear error.  Hawkins, 460 F.3d at 242.   Clear error review requires examination of factual findings to determine whether "the district court's account of the evidence is plausible in light of the record viewed in its entirety."   Anderson v. City of Bessemer, 470 U.S. 564, 573-74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).   "The reviewing court may reverse . when, although there is evidence to support the finding, 'on the entire evidence [the court] is left with the definite and firm conviction that a mistake has been committed.'" Doe v. Menefee, 391 F.3d 147, 164 (2d Cir.2004) (quoting Anderson, 470 U.S. at 573, 105 S.Ct. 1504).   A district court's factual findings may be clearly erroneous "where the court . failed to synthesize the evidence in a manner that accounts for conflicting evidence or the gaps in a party's evidentiary presentation[;] . incorrectly assessed the probative value of various pieces of evidence[; or] failed to weigh all of the relevant evidence before making its factual findings." Id. at 164.

DISCUSSION

I.  Clearly Established Federal Law on a Conviction Obtained Through Use of False Evidence

Since at least 1935, it has been the established law of the United States that a conviction obtained through testimony the prosecutor knows to be false is repugnant to the Constitution.   See Mooney v. Holohan, 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1935). This is so because, in order to reduce the danger of false convictions, we rely on the prosecutor not to be simply a party in litigation whose sole object is the conviction of the defendant before him.   The prosecutor is an officer of the court whose duty is to present a forceful and truthful case to the jury, not to win at any cost.   See, e.g., Jenkins v. Artuz, 294 F.3d 284, 296 n. 2 (2d Cir.2002) (noting the duty of prosecutors under New York law "to seek justice, not merely to convict").

Shih Wei Su v. Filion, 335 F.3d 119, 126 (2d Cir.2003).   Supreme Court holdings have long "established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment."   Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) (emphasis added); see also United States v. Agurs, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); Giglio v. United States, 405 U.S. 150, 153, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).   "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." Napue, 360 U.S. at 269, 79 S.Ct. 1173.

005656     005656     005656

EXHIBIT 1
Page 136 of 154

005657                                        005657                                        005657

Agurs identified the test as whether "the prosecution knew, or should have known, of the perjury." 427 U.S. at 103, 96 S.Ct. 2392. In Agurs, however, there was no allegation that the prosecutor should have known of any false statements. 427 U.S. at 104, 96 S.Ct. 2392. Thus, in Drake I, we identified the "should have known" language in Agurs as dicta. We did not rule on the contours of clearly established precedent on the level of culpability, short of actual knowledge, a prosecutor must have for a violation under Napue. 321 F.3d at 345. In Giglio, the Supreme Court held that, even though the specific prosecutor on the case did not have actual knowledge of the facts giving the lie to a prosecution witness's testimony at trial, he was charged with the knowledge of another prosecutor because a prosecutor's office has a duty to "insure communication of all relevant information on each case to every [prosecutor] who deals with it." 405 U.S. at 154, 92 S.Ct. 763. However, neither Giglio nor any other Supreme Court case decided prior to Drake's trial "clearly established," by its holding, that a prosecutor's failure to investigate testimony by a state witness that the prosecutor has reason to believe may be false is an error under Napue.[5]

"[T]he [Supreme] Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." Agurs, 427 U.S. at 103, 96 S.Ct. 2392 (footnote omitted); see also Shih Wei Su, 335 F.3d at 129. In United States v. Wallach, we summarized the materiality standard under Napue, explaining that the "question is whether the jury's verdict 'might' be altered." 935 F.2d 445, 456 (2d Cir.1991) (quoting Sanders v. Sullivan, 863 F.2d 218, 225 (2d Cir.1988)). We have interpreted Supreme Court precedent as holding that "if it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic." Shih Wei Su, 335 F.3d at 127 (quoting Wallach, 935 F.2d at 456)). This "strict standard of materiality" is appropriate "not just because [such cases] . involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process." Agurs, 427 U.S. at 104, 96 S.Ct. 2392.[6]

Thus, the clearly established Supreme Court precedent relevant to this habeas petition is that the conviction must be set aside if (1) the prosecution actually knew of Walter's false testimony, and (2) there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.

II.    Application of Clearly Established Federal Law

Based on the discovery on remand, Drake argues that there is now a factual basis for his claim for relief. We agree.

005657                                        005657                                        005657

EXHIBIT 1
Page 137 of 154

005658                                    005658                                    005658

A.    The Prosecutor's Knowledge of Walter's False Testimony

On remand, the district court concluded that there was "no evidence that the prosecution knew . of Walter's false testimony."   Drake II, slip op. at 34.    Upon review of the evidence assessed by the district court, considered in its entirety, we are left with the firm conviction that this finding is clearly erroneous.

The main falsehood that now requires reversal-uncovered for the first time during the depositions on remand-is Walter's false testimony that he learned about the facts of the case the night before his testimony.    Walter's trial testimony was offered on October 22, 1982.    At trial, during cross-examination, Walter gave the jury, the court, and defense counsel the impression that he had become substantively involved in the case only the night before and that his testimony was based entirely on what he had learned beginning the previous day:

[Defense Counsel]: When did you first get involved with this case timewise?

[Walter]: I arrived in Buffalo last night at about 8.30.

[Defense Counsel]: Oh, I see.    When's the first time you read anything like a Grand Jury transcript or anything having to do with this case?

[Walter]: I read the Grand Jury this morning.

[Defense Counsel]: This morning?

[Walter]: Yes.

.

[Defense Counsel]: Well, who did you talk to before you testified here about this case?

[Walter]: I consulted with the prosecutor.

[Defense Counsel]: You mean Mr. Broderick?

[Walter]: Right.

[Defense Counsel]: Who else?

[Walter]: As far as I know that's all.

005658                                    005658                                    005658

EXHIBIT 1
Page 138 of 154

005659                                        005659                                        005659

[Defense Counsel]: What do you mean, did you come in here and look at the exhibit blackboard?

[Walter]: Last night about 9:30.

.

[Defense Counsel]: Okay. Now just so I understand ., you came in last night.

[Walter]: Yes.

[Defense Counsel]: You looked, you talked to Mr. Broderick.

[Walter]: Uh huh.

[Defense Counsel]: And you looked at some things.

[Walter]: Uh huh.

[Defense Counsel]: And based upon that and that alone you've given your testimony this afternoon.    Is that right?

[Walter]: Yes, it was not difficult.

Trial Tr. at 806-14 (emphases added).

The falsity of this testimony became clear when, at Walter's deposition, he acknowledged that a telephone bill from October 7, 1982-about two weeks before trial-showed a telephone call lasting 52 minutes that "very well" seemed to be between his office and the prosecutor's office.    Walter Dep. at 48-52.    Walter commented that he was "quite convinced that they called me on Thursday and that I testified on Friday . but apparently it was a ten day lag there."    Walter Dep. at 51.[7]

During that 52-minute telephone conversation, Broderick explained all of the details of the crime to Walter.    Upon hearing the facts, Walter did not perceive a clear case of picquerism; rather "he hesitated at that point to render any opinion and said he would like to think about it and he'd call [Broderick] back."    Broderick Dep. II at 4. This is flatly inconsistent with Walter's trial testimony that he first became substantively involved with the case the night before, when he arrived in Buffalo, looked at some exhibits, talked with the prosecutor, and based his testimony "upon that and that alone."    Trial Tr. at 814.    To the contrary, as Broderick now recounts, Walter learned the relevant facts two weeks prior

005659                                        005659                                        005659

EXHIBIT 1
Page 139 of 154

examination of Dr. Levine, Broderick asked not only, "Ever write any articles, Doctor?," but also, "Have you had them published?," and "How many articles have you had published in what type of publication[s]?"   Id. at 668-69.

To be sure, eliciting literally accurate testimony is not a ground for a claim of subornation of perjury.   Carefully phrased questions designed to elicit literally accurate testimony while not revealing weaknesses are grist for cross-examination.   A prosecutor who asks such questions on direct takes a chance of damaging his case if defense counsel follows with a cross that brings out these weaknesses.   In this case, however, defense counsel had only one night to investigate Walter's qualifications or scholarship, and Broderick successfully opposed the request for a continuance that would have allowed the defense to investigate the new witness.



## B.   Materiality

The question in this case is whether the evidence was so overwhelming that there is no "reasonable likelihood" that Walter's false testimony, of which the prosecutor was aware, could have "affected the judgment of the jury."   Napue, 360 U.S. at 271, 79 S.Ct. 1173. Walter explicitly testified that the brevity of his review of the evidence confirmed that this "was not [a] difficult" case.   Trial Tr. at 814.   Walter testified that this case was replete with the tell-tale signs of picquerism-the nature of the bullet wounds, the stabbing, the lack of sperm found on the slides from Smith's rectal cavity, the anal bruising, the breast bite marks, the commando clothing.   Given these overwhelming and obvious indicia of picquerism, Walter suggested, a trained expert could conclude in a short evening's work that this was a textbook case, with sufficient confidence in that conclusion to testify under oath to a jury in a murder trial.   Indeed, Walter explicitly made this point by emphasizing that this case was "not difficult."

As Broderick knew, however, the truth was quite different: Walter learned the facts in significant detail (including the bite marks, the camouflage, the bandolier of ammunition, and the guns) two weeks before he testified.[8]   When Walter learned these facts, he did not come up with an opinion on the "spur of the moment"; rather, he told Broderick he would need time to think about it.   Broderick Dep. I at 44.

Walter then had two weeks to conjure up his quackery.   His direct testimony on picquerism, which spans twelve pages of trial transcript, consisted largely of uninterrupted and prolix exposition, weaving the complicated facts of the case into a seemingly coherent narrative, all pointing to the symptoms of the fictive syndrome called picquerism.   Walter even adapted the symptoms of the syndrome to remedy any potential weaknesses in the

EXHIBIT 1
Page 140 of 154

prosecution's theory of Drake's motive, for example, the lack of semen evidence.   Given that, as Walter admitted during his deposition, the literature on picquerism is obscure, it must have taken Walter some time to concoct his description of the picquerist syndrome in a manner that (1) incorporated all the facts in Drake's case and (2) made picquerism sound as if it were well-known to psychologists.   If picquerism were indeed a well-known diagnosis, it would not be surprising that Walter would have looked at this case the night before, come to the easy conclusion that Drake was a picquerist, and delivered a virtually impromptu lecture on the topic the next day.   The jury, therefore, would have been much more likely to believe that picquerism was a real syndrome if, as Walter testified, he learned the facts of this case only the night before.   Walter had no time to make all this up.   Thus, the supposed brevity of Walter's contact with the facts of the case was perhaps the strongest reason for the jury to conclude that Walter was not fabricating this sophisticated story.

There is a strong likelihood that this falsehood was vitally important to the jury's decision to credit Walter's testimony.   And "[t]he principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness."   Napue, 360 U.S. at 269, 79 S.Ct. 1173.   The jury's estimate of the truthfulness of Walter's testimony may well have been determinative of the single issue at trial-Drake's intent.

The prosecutor virtually conceded the materiality of Walter's testimony in acknowledging that he called Walter to compensate for problems revealed with his theory of the case after it turned out that there was no evidence of semen in Smith's rectal cavity.   Walter's testimony filled the gap in the prosecution's theory of intent with a sensationalistic and pseudo-scientific explanation of motive.   As we observed in Drake I, "the jury was likely to be impressed (if not inflamed) by testimony that the defendant was a 'picquerist' who killed, mutilated, and abused his victims to satisfy a warped sexual urge."   321 F.3d at 346.   In response to defense counsel's objection at trial that Walter was "a breath away" from proclaiming Drake guilty, Broderick pointed out that, in light of Walter's testimony, it was impossible to "avoid the analogy that in fact the defendant is the killer in a one-issue case."   Trial Tr. at 818, 824.

We have held that "at least for purposes of a collateral attack, a defendant is normally required to exercise due diligence in gathering and using information to rebut a lying prosecution witness." Shih Wei Su, 335 F.3d at 127 (citing United States v. Helmsley, 985 F.2d 1202, 1208 (2d Cir.1993)).   But where the prosecutor engages in conduct designed to inhibit the defense in this regard, for example, by objecting to efforts at impeachment, bolstering false testimony in summation, or, as in this case, contriving a scheduling crisis, it

EXHIBIT 1
Page 141 of 154

005662                                    005662                                    005662

"sharpen[s] the prejudice."   See, e.g., Jenkins, 294 F.3d at 294.   As we held in Drake I, the prejudice was compounded by the fact that the trial court "denied the defendant a continuance to afford the defense an opportunity to confirm counsel's grounded suspicion (later confirmed) that the witness was a charlatan, and that his testimony was, medically speaking, nonsense."   321 F.3d at 346.   Had defense counsel been informed that Broderick and Walter spent nearly an hour discussing the case two weeks before trial, and that Walter had raised the idea of "picquerism" with Broderick on that day or the next, defense counsel would have had a much stronger argument for a continuance or exclusion of Walter' testimony.

Respondent now argues that the evidence of Drake's guilt is so overwhelming that there is no reasonable likelihood that Walter's misstatements had any effect on the jury. Respondent points to testimony at trial supporting its argument that Smith's body had been abused after her death.   A physician, Dr. Bich Nguyen, testified that she examined decedent Smith's body for signs of rape, found Smith's anus to be dilated, and observed a bruise on the interior wall of Smith's rectum.   However, Dr. Nguyen was not a pathologist and had never before performed a rape examination on a deceased person.   Dr. Nguyen could not testify as to the cause of the anal dilation, or whether the bruising had occurred pre-or postmortem.   Dr. Nguyen also testified that she found "mud and dirt . between the anus and the vulva."   Trial Tr. at 606.   This evidence does not compel the conclusion that sexual assault occurred; it may have resulted when Drake dropped Smith's body on the ground as he attempted to move her body to the trunk of the car.

Dr. Justin Uku, the pathologist who examined the bite marks testified that it was his opinion that they had been inflicted post-mortem.   But Dr. Uku's examination occurred after the body was exhumed more than one month after the crime.   The basis for his conclusion was the lack of white blood cells or broken blood vessels around the injury.   But he testified on cross examination that it was possible that "a trauma inflicted within an hour of death might also show a lack of white blood cells," id. at 658, and that a lack of broken blood vessels could also indicate a pre-mortem trauma that was not severe, id. at 654-55. Dr. Levine, who also testified that the bite marks were inflicted post-mortem, was not a pathologist and the basis for his opinion was Dr. Uku's examination.

The witness who testified as to the evidence of seminal fluid found on Drake's undergarments could not state "with any reasonable degree of scientific certainty when the seminal fluid was deposited ." Id. at 529 (emphasis added).

Respondent also argues that the following evidence demonstrates that Drake shot at the Nova with the intent to commit murder: (1) contrary to Drake's statement that he was ten

005662                                    005662                                    005662

EXHIBIT 1
Page 142 of 154

005663    005663    005663

to fifteen feet away from the car, experts testified that he may have been closer, possibly within eight feet; (2) Drake described the windows as "fogged," a condition that would have occurred only if the car were occupied;[9] (3) the car had license plates and registration inspection stickers, which would have been visible due to street lights; (4) the location of the shooting was not in the dump where abandoned cars were generally found but rather, one half mile away; and (5) despite Drake's statement that he wanted to destroy the car, the only bullet holes were in the passenger's side window.   This evidence, however, is also consistent with Drake's statement that as he was walking down the road, he made a "turn, approached, went over what appeared to be debris and a pile of leaves, dirt," and "opened fire" upon the car without pausing to check whether the car was occupied.   Id. at 266-67. A prosecution expert testified that Drake could have fired all nineteen rounds of ammunition into the car in 3 to 4.5 seconds, supporting Drake's statement that he had fired in the spur of the moment.   No prosecution witness disputed that the rusted Nova was in poor condition.

Respondent also points to the fact that a jailhouse informant testified at trial that Drake had admitted to stabbing Rosenthal in a panic in order to "wipe him out."   Id. at 723 (testifying that the exact words Drake had used were "I had to wipe him out.   Something in that order.").   However, it was established that the stabbing was not the cause of Rosenthal's death.   Moreover, these statements are consistent with Drake's confession that he stabbed Rosenthal as a result of "panic[ ]."   Id. at 271.

Respondent also argues that a witness, Theresa Weslowski, testified that Drake exchanged profanity with Rosenthal on one occasion in the high school cafeteria.   But the evidence of any prior connection between Drake and Rosenthal was extremely thin.   A police officer testified at trial that an announcement was made over the high school's public address system asking that students come forward with any information about Drake, Smith, or Rosenthal, and out of over 1,500 students at the high school, only Weslowski came forward with testimony.

Because the evidence on Drake's intent was not conclusive, the issue of the validity of Walter's testimony on piquerism was no extraneous matter.   In sum, we conclude that the evidence of Drake's intent was not sufficiently overwhelming that there is no "reasonable likelihood" that Walter's false testimony could have "affected the judgment of the jury." Napue, 360 U.S. at 271, 79 S.Ct. 1173.   The district court clearly erred in finding that Walter's false statements were not material.

III.   Relief

005663    005663    005663

EXHIBIT 1
Page 143 of 154

005664                                          005664                                          005664

Because the main facts requiring a grant of habeas relief were uncovered for the first time on remand to the district court, the state court's factual findings and conclusions of law do not require deference under AEDPA.   See Drake I, 321 F.3d at 345-47.   Respondent argues that the doctrine of exhaustion requires rejection of Drake's arguments on remand regarding Broderick's knowledge of Walter's false statements, because the facts supporting those arguments were not presented to the state courts.   But the Supreme Court has "never held that presentation of additional facts to the district court, pursuant to that court's directions, evades the exhaustion requirement when the prisoner has presented the substance of his claim to the state courts."   Vasquez v. Hillery, 474 U.S. 254, 257-58, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986); see also Pinholster v. Ayers, 525 F.3d 742, 765 (9th Cir.2008).   Respondent does not dispute that Drake presented the substance of his Napue claim to the state courts.   In Drake I, we held that Drake had made a showing of good cause that the state courts failed to provide Drake with the opportunity to develop the record.   321 F.3d at 345-46.   We now conclude that, based on the record developed by Drake, the district court erred in denying habeas relief.[10]

Ordinarily, where an appellant demonstrates that a district court denied habeas relief erroneously without holding a hearing, we would remand to the district court for proceedings on the ultimate merits of the appellant's claim.   In the present matter, however, neither party seeks remand.   We hold, based on the record before us, that the district court committed clear error in reaching its findings with respect to Broderick's knowledge of Walter's false testimony and that the district court erred in its determination with respect to the materiality of the false testimony.   Respondent has had a full opportunity to develop the record and brief the issues in response to Drake's claims. Because there is no basis for requiring additional proceedings, we conclude that reversal, not vacatur, of the district court's judgment is warranted, and direct the district court to enter judgment for Drake conditionally granting the writ of habeas corpus.   See Henry v. Poole, 409 F.3d 48, 72 (2d Cir.2005).

CONCLUSION

For the foregoing reasons, the judgment of the district court is REVERSED and REMANDED for the entry of judgment conditionally granting the writ of habeas corpus and ordering Drake's release unless the State provides him a new trial within 90 days.

FOOTNOTES

1.    Although Broderick referred to Walter as "Dr. Walter" during his deposition, Walter had neither a medical nor any other doctorate degree.

005664                                          005664                                          005664

EXHIBIT 1
Page 144 of 154

005665                                    005665                                    005665

2.    We are troubled that Respondent continues to assert that picquerism "appears in numerous, serious, criminal investigative works," of which Respondent seems to be able to locate only four examples from the past 50 years.    Resp. Br. at 59.    Walter himself admitted it is fair to say that "the canon concerning picquerism is not large."    Walter Dep. at 140.    Picquerism, a concept wildly sensational and pseudo-scientific, was once the subject of an episode of a network television crime drama.    But picquerism is not now and never has been recognized in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders.    Support for the idea is primarily anecdotal, popping up in the literature on "lust murder" and "serial killings," alongside names like Jack the Ripper.

3.    We rejected Drake's argument that his rights to due process under the Fourteenth Amendment and compulsory process under the Sixth Amendment were violated because Walter's surprise testimony, coupled with the trial court's refusal to grant a continuance to allow defense counsel to find a competing expert, deprived Drake of the opportunity to present a meaningful defense.    Drake I, 321 F.3d at 344.

4.    Under Section 2254(d)(2), relief is also available if the state court made "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."    28 U.S.C. § 2254(d)(2).    The terms of Section 2254(d)(2) do not limit a federal court's power to grant a writ to situations in which a state court acted in violation of "clearly established Federal law."    However, Drake has not invoked Section 2254(d)(2).

5.    United States v. Wallach found constitutional error where the government "should have known" that its witness was committing perjury but, given the importance of the witness's testimony to their case, "the prosecutors may have consciously avoided recognizing the obvious."    935 F.2d 445, 457 (2d Cir.1991).    However, Wallach was not a habeas case and therefore did not address the question at issue here-whether this principle was clearly established federal law, defined as a Supreme Court holding in existence at the time of the relevant state-court decision.    Williams, 529 U.S. at 412, 120 S.Ct. 1495.

6.    Respondent argues that relief is warranted only if the alleged constitutional errors had a substantial and injurious effect or influence in determining the jury's verdict.    However, certain types of habeas claims, such as errors under Napue, are analyzed under their own harmless error standard.    See, e.g., Shih Wei Su, 335 F.3d at 129 (analyzing Napue claim for whether there was any reasonable likelihood that the false testimony could have affected the judgment of the jury).

005665                                    005665                                    005665

EXHIBIT 1
Page 145 of 154

005666                                    005666                                    005666

7.    Respondent argues that there is no proof that Walter willfully intended to provide false testimony, and that his false testimony may have been the result of confusion or mistake. Napue held that there was constitutional error where a prosecutor knew of "false evidence." Napue, 360 U.S. at 269, 79 S.Ct. 1173.   The question of whether the witness's "untruthfulness . constituted perjury" makes no "material difference" where the issue is a conviction "on tainted testimony."   Mesarosh v. United States, 352 U.S. 1, 9, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956) (cited in Napue, 360 U.S. at 269, 79 S.Ct. 1173)).

8.    The morning of Walter's testimony, Broderick did acknowledge during a bench conference that he had contacted Walter "within the past two weeks."   Trial Tr. at 750. However, Broderick did not disclose the relevant falsehood in Walter's subsequent testimony: that he had a 52-minute conversation with Walter in which he detailed the factual background of the case.   At the end of that conversation, Walter said that he could not give an immediate opinion.

9.    From the record, it is not clear whether Drake first saw fog on the windows before or after the shooting.

10.    Respondent also argues that Drake waived the specific point regarding Broderick's knowledge of the 52-minute phone conversation by failing to raise it before the district court or in his initial submissions to this Court.   But Drake presented the facts and his argument that the prosecutor was aware that certain portions of Walter's testimony were false.   Even if Drake did not state this issue with precision, that does not amount to waiver. See Claudio v. Scully, 982 F.2d 798, 802 n. 3 (2d Cir.1992) (issue was not "waived" because it was not a "new claim," rather, it was merely "an additional argument relating to a point already under dispute").

005666                                    005666                                    005666

EXHIBIT 1
Page 146 of 154



**EXHIBIT**
31
R. Paul Frasier
08.29.2023

# R. Paul Frasier
**District Attorney for Coos County**

**Office of the District Attorney**
Coos County Courthouse
250 N. Baxter St.
Coquille, OR 97423
Phone: 541-396-7550  Fax: 541-396-1015
TDD: 1-800-735-2900

August 10, 2016

Mr. Paul E. Reim
Oregon Department of Justice
Trial Division
1162 Court St NE
Salem, Oregon  97301

Re: McGuffin v. Nooth 15CV1030

Dear Paul:

Here is my third installment on the McGuffin matter. I am jumping ahead to the allegations of regarding Brady violations and misconduct. I will get back to the alleged shortcomings of trial counsel in future letters.

This may become important in the future but I have been informed that Kristen Steinhoff died last week as a result of a drug overdose.

First of all, I want to make it abundantly clear that I deny for myself and law enforcement any allegation that we engaged in any form of misconduct in this case. We worked very hard to make sure this case was investigated properly and to make sure our conduct was above reproach. We wanted the right person to be held accountable for the death of Leah Freeman and the evidence lead us to the person responsible. We investigated several potential suspects in this case. We eliminated all but one, that being Nick McGuffin.

As to paragraph/count 11, with the substance of the allegation being on page 20, I have the following comments:

As to point 1: All reports in this case were given to the defense. I have an open file policy and allowed the defense to examine all of my trial binders well in advance of trial. If there were reports that were missing in discovery, the defense had access to them prior to trial. In addition, I kept a discovery list of all materials sent to them which were Bates numbered. An example of the list, which was current as of June 30, 2011, (which was just before trial in July of 2011) is

1

attached. The defense claims there were reports of witness interviews of witnesses John Lundgren, David Breakfield and Kristen Steinhoff that were not given in discovery. I do not know what reports they are referring to;

As to point 2: It has been my practice, and my understanding, that I am not under any obligation to supply the bench notes for lab personnel unless the defense requests it. We did obtain all bench notes for the DNA testing;

As to point 3: I gave to the defense all records of lab work done that I had in my possession. We had lab work done by several different entities. The majority of the lab work was done by the Oregon State Police. However, we did seek outside lab work. A couple of years after Leah's body was found, my predecessor as District Attorney, Mr. Paul Burgett, arranged for the additional DNA testing and examination of Leah's clothes be done by a lab in England. My understanding is that the lab had some connection to Scotland Yard. I was not involved in that decision to send the clothes to England, but it is my understating that at the time this lab was the only lab in the world that was doing certain types of DNA testing. No usable results were obtained (one of the problems in this case was that because Leah's body and clothing had been exposed to the elements so long was the fact that most, if not all, of the DNA contained in any bodily fluids found on the clothes on the body had degraded and was simply not usable to obtain DNA). Because of a persistent rumor that Leah had been hit by a car, we also sent her outer clothing to a lab in Chicago to be examined to see if there was any evidence of paint transfer on the clothing. Again, the results were negative. The reports we had from England and Chicago were given to the defense prior to trial;

As to point 4: Generally police officer notes are not discoverable unless they contain material not contained within a police report. As a courtesy we did give the defense copies of the notebooks for Officers Brenden, Nichols and Zavala;

As to point 5: We gave to the defense copies of all recordings of interviews in this case. I do not know what the defense is referring to when they claim we did not do so;

As to point 6: We gave to the defense all of the materials for chain of custody of all of the evidence in the case. For example, we gave the defense the evidence accountability sheets (Discovery pages #6678 – 6710), the evidence log (Discovery pages 6711-6716), the forensic evidence request forms (Discovery pages 6717 – 6725), the Lab Submission Forms (Discovery pages 6726 – 6779) and the records for the shipping of evidence back from England (Discovery pages 6675 – 6677). I do not know what records the defense is referring to when they claim we did not do so;

2

As to point 7: I gave to the defense all records I had pertaining to all examinations of evidence. Again, I do not know what records the defense is referring to when they claim otherwise;

As to point 8: I am not sure what crime scene the defense is referring to. There are multiple locations in this case that could be considered crime scenes. For example, the locations of the shoes, the McGuffin home and vehicles, Leah's home, and where the body was found could be considered crime scenes. Any video we had of the various scenes was given to the defense. Again, I am unaware of any video the defense claims was not disclosed;

As to point 9: Notes from briefings of the major crime team. Our major crime team does not have a person designated to keep "notes" of the meetings of the team. A "to do list" with assignments may be established, but generally it is not kept as record. I am not sure what the defense is referring to in this allegation. Further, I do not see how this would have affected the case eventually developed against Mr. McGuffin;

As to point 10: I gave to the defense the death certificate I had in my possession. No request was made of the "original" or the "affidavit" amending it. If the dense wanted it they could have requested it or obtained it from the Department of Vital Statistics. Again, I do not see how the original would have changed the result in this case.

As follow-up to this point, I will make note of the following. Dr. Olsen from the beginning had classified the manner of death of Leah as homicide. I was present at the autopsy of Leah and Dr. Olsen told me that day after he had completed his work that he believed the manner of death was homicide but that the actual cause of the death was some sort of undetermined homicidal violence. As an investigative tactic we did not want anyone outside of the investigation to know that the exact cause of death had not been determined. That included Leah's mother as early on in the investigation she maintained close ties to Mr. McGuffin and his family and we were concerned if we shared with her information about the case that it would go straight back to the McGuffins. Thus the first death certificate listed the manner and cause of death as "pending investigation". By 2004, we had no compelling reason to keep this secret so the death certificate was amended to read that the immediate cause of death was homicidal violence of undetermined type, that the manner of death was homicide that occurred on June 28, 2000, that the time of injury was unknown, that it was undetermined how the injury occurred, that the place of injury was a road embank and that the location was milepost 1.5 of Lee Valley Road, Coquille, Oregon. The amended death certificate was offered at trial and the jury was able to see all of the listings where is the cause of death and injury was undetermined. Had this become an issue, we would have explained why this occurred. It was not done for any nefarious reason; it was done to maintain as best we could some investigative secrets about the case in the early stages of the investigation. In my opinion, any

ATTACHMENT B, Page 31 of 73
Case No. 15CV1030
AG_000306
EXHIBIT 1
Page 149 of 154

difference between the original and ultimate certificate would have had no impact on the verdict in this case;

As to point 11: Any recordings we had of Kristen Steinhoff were given to the defense. I do not know what recordings the defense is referring to in this allegation;

As to point 12: All materials we had regarding the Vidocq Society were given to the defense. I do not know what other records pertaining to the Society the defense is referring to.

As a follow-up to this point, I need to explain the Vidocq Society involvement in this case. It is my recollection that sometime after we had re-opened the case, Coquille Police were approached by the Society about the case. I do not know how we came to their attention. Chief Dannels brought their request to my attention. I had never heard of them before and asked from some background on who they were. Chief Dannels reported back that he has checked them out and found out that the Society was a group of law enforcement officials, mostly retired, but some who were still active, who were renowned specialists in multiple aspects of homicide investigation. These included forensic scientists, polygraph examiners, investigators, psychologists, profilers and so forth. According to Chief Dannels, this group came highly recommended. The Society's purpose was to help police agencies and prosecutors from across the country in solving particularly difficult cases. Most of the time these cases are sometimes referred to as "cold" cases as a lot of them, like ours, had gone unsolved for years. It was explained to me that the Society met once a month in Philadelphia, Pennsylvania. It was a "lunch" meeting where we would present the case and the society would then critique the case and give us any ideas how to work the case. They assured us that anything we told them would be kept in confidence. At the time we were willing to take any help we could get on the case, so we accepted their offer. The Society had done this for numerous other cases from across the United States as a free service.

The Society paid for me and Chief Dannels to go to the meeting. We thought it best that we also take along Sheriff Zanni, who had spent a lot of time on the case and knew the case just as well as anyone and the analyst from the Oregon Department of Justice who had developed time lines, charts and so forth. The City of Coquille paid for those two to attend.

We did not go to the first date set for the meeting as the night before we left we had an incident where a husband had shot his wife at short distance with .30-06 rifle. It was a miracle she survived. The husband fled the scene in Coos Bay and then drove to his grandparent's home in Myrtle Point. Chief Dannels spotted the defendant as he was driving by Coquille and was the lone officer in pursuit of the suspect. He followed the suspect to the grandparent's home where the defendant exited his vehicle with the rifle. When the defendant refused to put down the gun

4

and pointed the gun at Chief Dannels, the chief fired at the defendant several times. The Chief did hit the defendant with one of his shots. The defendant then went around a corner of the house and committed suicide. We decided we needed to stay and wrap up this investigation rather than travel to Philadelphia. We eventually went a couple of months later.

The four of us arrived at the meeting location about an hour early. We were met almost immediately by an individual who was one of the founding fathers of the Vidocq Society, Mr. Richard Walter. Mr. Walter claimed to be psychologist and explained he had extensive background in interviewing and working with violent criminals. He presented me with an article he had recently written and claimed to have been published where he indicated that the person who had killed Leah fit a particular profile. The article was somewhat lengthy and I did not have time to review that day. However, Mr. Walter explained to us at length his theory/profile of the person who would have killed Leah, which just happened to fit Mr. McGuffin perfectly. Naturally we were very interested in what he had to say.

We made our presentation to the Society at lunch. After our presentation, the critique we received back was interesting. The Society did not have any specifics for us to do. Their input was basically that we were on the right track, that we were doing the right things, and that we really had a better case than we thought we had.

After the presentation, we decided we wanted to hear more what Mr. Walter had to say. We invited him to spend the afternoon with us and to have dinner with us. Again, his theory or profile of the killer of Leah was spot on as to Mr. McGuffin.

Upon our return from Philadelphia, I read the article given to me by Mr. Walter. I was disappointed in reading the article as it dealt with the profile of a serial killer. I had no evidence to suggest that Mr. McGuffin was serial killer (in fact I do not believe he is). I was having trouble in seeing how this article was on point to Leah's death. I was considering using Mr. Walter as a witness in the case, but I was concerned about the article he had given me and how it helped our case.

Several months after the Vidocq Society presentation, the show 20/20 came to Coquille to work on a show for the ABC network. They brought Mr. Walter out to do a segment. I met with Mr. Walter one afternoon at Coquille PD. Mr. Walter asked if I had read the article he had given me. I told him I had read it and was having problems with its relevancy to this case as it dealt with a serial killer. Mr. Walter agreed that could a problem. He then produced another article he claimed to have written. This one he claimed had not yet been published. He assured the article me was directly on point to the case. I did not read it at that time but put it aside to look at later.

That night Sheriff Zanni, myself, Chief Dannels and a couple of other people went to dinner with Mr. Walter. During dinner, Mr. Walter made some comments

5

about other cases he had been involved in and in particular he made comments about his involvement and findings he had made at the behest of Scotland Yard pertaining to Jack the Ripper. I rode with Sheriff Zanni on the way home from dinner. Sheriff Zanni had told me that he thought there were issues with the credibility of Mr. Walter. I asked him to explain. It turned out that Sheriff Zanni was a "history buff" as to the Jack the Ripper case and he told me that some of the things Mr. Walter had to say about the case were not true. I told Sheriff Zanni that we had not "vetted" Mr. Walter and that if we were to use him as a witness we needed to do so. I asked Sheriff Zanni to then check out Mr. Walter. The next morning Sheriff Zanni was in my office with some results. Sheriff Zanni had found a federal appeals court case called Drake v. Portuondo from the federal second circuit. There are several opinions in the case, but what we found was that Mr. Walter had testified in the case and had expressed a profile that fit the defendant perfectly in that case. The Court found that Walter had misled, if not lied, about his background and credentials. He was not a psychologist and did not even have a master's degree. The court found that Mr. Walter learned the facts of that particular case and then had built a profile that fit the defendant. Basically the court found him to be a fraud.

I realized at that point that the profile built by Mr. Walter was simply not reliable. It appeared to me that he had done the same thing he had done in the second circuit case in that once he knew the facts of our case, in that it appeared he had created a profile that fit Nick McGuffin. Given the second circuit findings, I knew there was no way I could or should use Mr. Walter or his information. I notified Chief Dannels of what we had found out and I also told the producer for 20/20 what had been discovered and even gave the producer a copy of the case Sheriff Zanni had found. I warned 20/20 that it appeared that Mr. Walter was a fraud and that in my opinion they should not rely upon him. I also directed as to our case that we would not use anything given to us by Mr. Walter and that were going to distance ourselves as far as we could from him, and if need be, from the Vidocq Society given he was a founding member and still on their Board of Directors.

Long story short: I did not use anything we learned from Mr. Walter or the Vidocq Society and certainly did not use it a trial. It had no effect on the verdict in this case; and

As to Point 13: I gave any material I had in my possession and control about 20/20 to the defense, which frankly wasn't much if anything.

I should also make some follow-up comments about 20/20. I do not know exactly how this case came to the attention of 20/20 and why they were interested in the case. I knew that they had become involved, but I was under the impression, and I frankly admit that impression was wrong, that there was an agreement that anything 20/20 learned would not be broadcast until after a verdict had been reached in the case. I remember I was asked about them being involved in the case and I did give permission for them to do so, but again, it was under my

6

mistaken impression that nothing would be broadcast until after a verdict had been returned. I learned that was not the agreement when 20/20 came to town to tape segments for the show that would air before trial. At that point I refused to personally cooperate with the show to the extent they wanted. For example, Mr. Avila did interview me, but I would not answer questions he put to me about the case that I felt would be in violation of the rules pertaining to pretrial publicity. My interview with Mr. Avila was not used at all in the show that was broadcast prior to trial.

I have to say after the initial broadcast that I was not happy with what 20/20 had done. They had a whole segment on Mr. Walter, even though I had shown to them that he was likely a fraud. (In retrospect, I remember how in the show that Mr. Walter explained his profile and even went as far to explain how the person with this psychological background would actually use his fist to strike someone so as to explain the blood evidence found in the case. When I look at that now, I realize just how ludicrous Mr. Walter's opinion actually was.)

I was also upset that the show broadcast a motive that Mr. McGuffin killed Leah because he was having sex with her and that to do so would be a criminal act. The theory proffered by 20/20 was that Nick killed Leah to prevent him being prosecuted for having sex with her. That was obviously wrong. First off, Nick and Leah were just barely within three years of age, so having consensual sex between the two would not be criminal. Secondly, it seemed everyone knew they were having sex. In fact, Mom had set up an appointment for Leah to get birth control. Sex was not the motive. It was not used at trial.

To make matters worse, at least for me, concerned a photo of Leah's body that was used on the show. 20/20 had asked me for permission to use a photo of Leah's body at the scene. I refused. Somehow they obtained a photo and used that in the show.

The following Monday I took action I had never done before. I issued a directive to all law enforcement that no one was allowed to talk with the press about the case from that day forward except me. I told them I did not care what arrangements may have been made with the press about future participation in the case. I made it clear that if anyone from the day forward talked to the press without my permission I would seek a gag order and I would not hesitate to prosecute anyone who violated that order. 20/20 was not happy I cut them off. I told them I did not care because they used a fraud in the show, used a photo I told them not to use and put forward a false motive. No one was going to have anything to say to them until after a verdict was reached.

I will point out that the show had no bearing on the verdict. The defense had an opinion poll of likely jurors in Coos County that was done after the 20/20 show was aired. The purpose of the poll was to determine if the defendant could get a fair trial in Coos County and had the poll showed that getting a fair trial would be

7

problematic, I am sure the results of the poll would have been used in support of a motion for a change of venue. Based upon representations of defendant counsel in pre-trial hearings, the poll apparently showed that the defendant could get a fair trial. (As an aside I would think you would want to explore what the poll results were. I suspect they had a question about whether the people of the county thought the defendant was guilty and that the results of the poll were favorable to the defense.) Voir dire showed that if any of the jurors had been exposed to pre-trial publicity that they still could be fair and impartial to all sides. 20/20 had no effect on this verdict.

These are my comments as to paragraph/count 11. I will have further comments as to the petition in the near future.

Sincerely,

R. Paul Frasier

8