IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF COOS

STATE OF OREGON,                    )
                                    )
            Plaintiff,              )     CASE NO. 10CR0782
                                    )
                                    )     JURY TRIAL
      vs.                           )
                                    )
 NICHOLAS JAMES McGUFFIN,           )
                                    )
            Defendant.              )
_____)

TRANSCRIPT OF PROCEEDINGS

Volume 2, Day 1, Pages D1 2-D1 32

BE IT REMEMBERED That, the above-entitled cause came on regularly for hearing beginning at 9:19 a.m., Tuesday, July 5, 2011 in the Circuit Courtroom of the Coos County Courthouse in the City of Coquille, County of Coos, State of Oregon, before the Honorable Richard L. Barron.

APPEARANCES

R. Paul Frasier, District Attorney for Coos County, representing the Plaintiff.

Erika Soublet, Assistant District Attorney for Coos County, representing the Plaintiff.


Robert McCrea, Attorney at Law, representing the Defendant.

Shaun McCrea, Attorney at Law, representing the Defendant.


Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

EXHIBIT 2
Page 1 of 16

INDEX (Continued)

Volume 7, Pages D5 2 - D5 137 (Continued)

JURY TRIAL, DAY 5, July 12, 2011 (Continued)

    David Zavala                                              D5 107

        Direct Examination by Mr. Frasier           D5 107

        Cross Examination by Ms. McCrea             D5 114

Defendant's Witness (Out of order):

    David Zavala                                              D5 120

        Direct Examination by Ms. McCrea            D5 120

        Cross Examination by Mr. Frasier            D5 121

        Redirect Examination by Ms. McCrea          D5 122

Plaintiff's Witnesses, Continued:

    Tony Messerle                                            D5 125

        Direct Examination by Mr. Frasier           D5 125

        Cross Examination by Mr. McCrea             D5 132

    Kip Oswald                                               D5 137

Volume 8, Pages D5 138-D5 280

        Direct Examination by Mr. Frasier           D5 138

        Cross Examination by Mr. McCrea             D5 147

        Redirect Examination by Mr. Frasier         D5 157

    Randy Ulmer                                              D5 159

        Direct Examination by Mr. Frasier           D5 159

        Cross Examination by Ms. McCrea             D5 162

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

index    xvi

EXHIBIT 2
Page 2 of 16

INDEX (Continued)

Volume 9, Pages D6 2-D6 112 (Continued)

JURY TRIAL, DAY 6, July 13, 2011 (Continued)

Plaintiff's Witnesses, Continued:

    Christy Diane Young (Cagley)                     D6 53

        Direct Examination by Mr. Frasier           D6 54

        Cross Examination by Ms. McCrea             D6 57

        Redirect Examination by Mr. Frasier         D6 61

    Richard Bryant                                   D6 62

        Direct Examination by Mr. Frasier           D6 62

        Cross Examination by Ms. McCrea             D6 66

    Darius Mede                                      D6 70

        Direct Examination by Mr. Frasier           D6 70

    Kathy Wilcox                                     D6 73

        Direct Examination by Mr. Frasier           D6 73

            Volume 10, Pages D6 113 to D6 253

        Direct Examination by Mr. Frasier, Cont'd   D6 113

        Cross Examination by Ms. McCrea             D6 123

        Redirect Examination by Mr. Frasier         D6 169

    David Breakfield                                 D6 176

        Direct Examination by Ms. Soublet           D6 177

        Cross Examination by Mr. McCrea             D6 182

        Redirect Examination by Ms. Soublet         D6 190

Diane B. Walberg, Court Transcriber, XV Judicial District, 541-593-1664

                                        index    xx

EXHIBIT 2
Page 3 of 16

Messerle  D    D5 128

A.  I had a motorcycle at the time.

Q.  How did you — what route did you take to get home?

A.  I left the shop on Central and came straight up Central and turned on Elm Street at the gas station, went straight to my home which is straight up that street.

Q.  As you're traveling up Elm Street, did you notice something in the road?

A.  I did.

Q.  What did you see?

A.  I saw something glint at me.  And I stopped.  It was a tennis shoe.

Q.  Did you pick this tennis shoe up?

A.  I did.

Q.  Why did you pick this tennis shoe up?

A.  I had just got my kids for the weekend.  And I hadn't seen them yet.  They were deposited at my house.  And the first thing that went through my mind is it could have been one of my kids' shoes.

Q.  So, you picked it up?

A.  Yes.  It was in proximity to where I live.

Q.  What did you do with this shoe?

A.  I took the shoe home and put it on the kitchen floor.

Q.  Now at some point in time — well, did you figure out it wasn't one of your kids' shoes?

EXHIBIT 2
Page 4 of 16

Oswald    D    D5 140

out there a lot?

    A.   Many times.

    Q.   Why is that an area you patrol frequently?

    A.   I did, because I've often found places where there have been parties and stuff at the particular location that I went to where there'd been fires.  And you'd often see a lot of evidence of drinking and drugs going on there.

    Q.   Had you also seen areas where there had been illegal garbage dumping?

    A.   Yes.

    Q.   Now, directing your attention, I believe it's to July the 5th of the year 2000.  Is that the day that you went up Hudson Ridge?

    A.   Yes.

    Q.   And could you describe where you went up the Hudson Ridge Road?

    A.   I turned off Lone Pine Lane and went up.  It's approximately three hundred, four hundred yards up to a road that goes off to the left which is an access road to the power lines.  And it drives up, oh I guess it's probably seventy-five yards, and goes underneath the power lines.

    Q.   As you're driving up this road did you see anything that your attention was drawn to?

    A.   Yes.  I got up to where there's a ninety degree turn in the road.  And it's just prior to the top of that road.

EXHIBIT 2
Page 5 of 16

Oswald   D    D5 141

And there was a shoe lying the road.

Q.   Now, is this before you get to the power lines or after the power lines?

A.   It's just before you go under the power lines, yes.

Q.   I'm going to — can you describe this shoe that you saw, sir?

A.   It was a white Nike tennis shoe, women's.  I believe it was size six.

Q.   Let me just show you what's been marked - - -

A.   (Interposing) Yes.

Q.   - - - as State's Exhibit No. 97.  Does that look like the shoe you found?

A.   All I can see is that little bit in there of the shoe, but it's been awhile.  I think it is, yes.

Q.   Now, let's talk about where you found the shoe. Prior to coming into court today, this CD I have here is marked State's Exhibit No. 227.  Did you watch this particular CD?

A.   Yes, I did.

Q.   And is this a video showing going up Hudson Ridge Road to where you found the shoe?

A.   That's correct.

Q.   And does it accurately portray what you saw that day or the area at least?

A.   Yes.

EXHIBIT 2
Page 6 of 16

Wilcox   D     D6 76

Then we usually take it to a vehicle bay.  You use alternate light sources which give you different wave length of light.  And it improves contrast.  So, if you have, like, black residue on a black sweatshirt, by using different wave lengths sometimes the residue will appear white or pink.  So, you find stains, often body fluids.  Like urine will show up. Sometimes it almost fluoresces, when otherwise you might not be able to see it.  Same with semen and blood which might be dark red, might appear to be black.  And then the fabric might turn out to be gray.  It just depends on the different things.

We use Luminal for finding blood residue that is not visible to the naked eye.  And to do that you have to have a room totally dark.  So we always do that in a vehicle bay. And we usually tarp everything also.  And photography.  And then of course, just going through it with the vacuum sweeping and taping of the seats if they're fabric.  If you just run a big piece of strapping tape over it you can pick up fibers and hairs you might not otherwise see.

Just a thorough examination.

Q.   And over the course of the time you worked with the crime lab, could you estimate how many cars you might process?

A.   Oh, a hundred.

Q.   I'm going to direct your attention now, ma'am, to July the 6th of 2000.  Were you asked to examine a 1967 Mustang with the Oregon license numbers PEA640 — or, excuse me — 840?

EXHIBIT 2
Page 7 of 16

Wilcox   D    D6 82

Q.    When you examined the trunk, did you look like at the trunk lid on the inside of the trunk lid.  Did you look at that, too?

A.    Yes, I did.

Q.    See anything of significance there?

A.    No, I did not.

Q.    How long would you say you worked on this car?

A.    I can say exactly.  These are the notebooks we keep for what we do during the day.  And so I can go to - - -

I worked on it all day.  I put field investigation on the car eight hours.

Q.    Now, I want to go to the tenth of July.  Had you been made aware that a pair of shoes had been found with one shoe found in a different location than another here in Coos County?

A.    Yes, I had.

Q.    And that they were believed to be the shoes of Ms. Freeman?

A.    Yes.

Q.    And did you do an examination of both shoes?

A.    Yes, I did.

Q.    I'm going to show to you what's previously been marked as State's Exhibits Nos. 96 and 97.  Do you recognize the shoes or your markings?

A.    Yes.  This is my Exhibit No. 1, KW.  That's my — and

EXHIBIT 2
Page 8 of 16

Wilcox   D     D6 83

our case number 00N481 — that's the lab's case number.

Q.    And State's Exhibit No. 96, your Exhibit No. 1, that would be the — what shoe would that be?

A.    Right.  Exhibit No. 1 is the right shoe.

Q.    And I believe we've had testimony that Exhibit No. 97, the right shoe — or excuse me — No. 96 - - -

A.    (Interposing)  No. 96 is the right shoe, yes.

Q.    - - - was found on Elm Street?

A.    Okay.

Q.    Exhibit No. 97, do you recognize that?

A.    This is the left shoe that was submitted at the same time.

Q.    I believe we've had testimony that that was found on Hudson Ridge?

A.    Okay.

Q.    Now, did you examine both of these shoes?

A.    Yes, I did.

Q.    What type of — when you examine shoes like this in a forensic setting, what are you doing?

A.    Okay.  Well, on my worksheet I first — of course, first you just examine them using good lighting.  The big secret with the crime lab is we have excellent lighting and we have different kinds of lighting which makes us very popular at crime scenes, because we can bring it with us, too.

        But — so, I examined it with good lighting, bright

EXHIBIT 2
Page 9 of 16

Wilcox    D     D6 84

light examination; special light examination is what it's under.  So, I do regular light examination, bright light examination, a low powered microscopic examination, and I tested three spots on the right shoe with a presumptive test for blood.  And it was negative.

And I tested — I had — I don't remember how many I tested.  I think I tested six.  And I had four presumptive tests for blood on the left shoe.  I further tested one of those and it was human blood.

Q.   Now, in the course of examining the left shoe, the one from Hudson Ridge, did you take photographs of that particular shoe?

A.   Yes, I did.

Q.   I'm going to show you now what's been previously marked as State's Exhibits Nos. 29 through 32 and ask if you can identify those photographs?

A.   Yes.  These are photos that I took in the lab.  I have the same ones in my lab notes.

Q.   And do they accurately portray what you saw?

A.   Yes, they do.

MR. FRASIER:   We would offer State's Exhibits Nos. 29 through 32.

MS. McCREA:   There's no objection, Your Honor.

THE COURT:   Received.

EXHIBIT 2
Page 10 of 16

Wilcox    X    D6 136

on this case.  Right?

A.    No.  There were two forensic scientists at the Coos Bay lab.  My boss was Lieutenant Pex.  He was also a working criminalist.

Q.    And that's Jim Pex?

A.    Yes.

Q.    Yeah, okay.  Now, you were asked about the shoe, the shoes.  And I'm interested right now in the left shoe.  And I wanted to ask you, Ms. Wilcox, when we had Exhibit No. 31 up on the board, which gave us a closeup of the ball of the foot, there was some writing on the photo that labeled it as the right shoe.  Would that have been an error?

A.    Oh, yes.

Q.    Okay.

A.    That is bad.

Q.    I just wanted to make sure I was — that I was tracking with that.  Okay.

And, you've indicated that there were blood droplets on that shoe.  And you've talked about them a little bit.  And isn't it correct that your analysis was that on that shoe, there was a high velocity blood droplet on the side of the traction square?

A.    Yes.

Q.    Okay.  And you talked a little bit about blood spatter.  And blood spatter is essentially blood that's

EXHIBIT 2
Page 11 of 16

JUDICIAL ASSISTANT:    All rise.

THE COURT:    Be seated, please.

It appears from the testimony that you are both correct.  She did testify that the interior did not appear to be recently wiped clean — did not.  And then when Mr. Frasier asked her if she did a tape lift, she said, "No, it was vinyl, and it was clean.  Appeared to be wiped clean."

So, the testimony was both.  So, I'm going to overrule the objection, because it's going to be up to the jury.  But, she said two different things within a short period of time.

MS. McCREA:    Then, the problem I have is the prosecution limiting it to the one thing she said, then, as misleading.

THE COURT:    Well, the problem I have, of course, is I — you know, whenever it get these objections on what the arguments are, unless I'm positive about that, the general tendency is to overrule those because then I'm — I'm taking over what the jury is supposed to do.

And I don't know that I can limit him to say both of those.  I agree what I heard was both of them.  The first one was, "It did not appear to be recently wiped clean — did not."  And then the tape lift was, "It appeared to be clean — wiped clean."

So, I will give that — I mean, I have to

EXHIBIT 2
Page 12 of 16

D9 149                                Arguments

overrule the objection because he — there's evidence in the record from which he can argue it.

The only other thing I can do is explain to the jury that she said two different things at different times. And then you can make your argument.

MS. McCREA:    I would request that, Your Honor.

THE COURT:    Mr. Frasier?

MR. FRASIER:    Leave it to the Court.

THE COURT:    Okay.

Bring the jury in.

(Jury in.)

THE COURT:    As you will recall, Mr. Frasier was making a — in his closing argument saying something about it appeared that the interior was wiped clean. Ms. McCrea objected and said that wasn't the testimony. In making my rulings, I can go back and listen to the testimony. And it appears that Ms. Wilcox, at one time, said it appeared that the interior was not recently wiped clean. She was then asked a question about lifting a print, and she said, "It was vinyl. I didn't because it appeared to be clean — wiped clean."

So, that the testimony that's before you, and I'll allow Mr. Frasier to continue with his argument to you.

Go ahead.

MR. FRASIER:    The objection is overruled?

EXHIBIT 2
Page 13 of 16

D9 155                                Arguments

What happened June 28, 2000?  Here is a reasonable explanation with the evidence you have heard in this case.  We have a relationship that, while at times is good, is in trouble.  And, as was stated in opening statement, toxic.  At times it's good, but it was bad.  And when it went bad, it was bad.

Leah is having second thoughts about this relationship.  She's got pressure from her mom.  The Defendant and Leah have a dispute about whether she should go over and see Sherry Mitchell that night.  Leah spends time with Sherry Mitchell.

An argument ensues about whether she should go jogging.  And then it ensues into, "My mom doesn't like me — your mom doesn't like me."  And then, it progresses into, "Gee, Leah, you know, you've changed.  You're doing things you shouldn't be doing.  Nick is a bad influence on you.  You ought to break up."  She unloads on her.

Leah is very upset at this point.  She leaves.  She's upset.  As she's walking away, she's thinking to herself, "Mom is right.  Sherry's right.  Maybe this is not something I should be in."

The Defendant finds her.  The argument get worse.  She walks away.  She leaves him.  Starts heading home, which would corroborate the testimony of Mr. Lindegren who saw them together; and also the testimony of Scott Hamilton, that

EXHIBIT 2
Page 14 of 16

Arguments       D9 156

he dropped her off at McKays.

He gets really upset.  "This is my Babydoll. This is my girl.  No one else's."  He finds her by the high school.  He tries to get her into the car.  She loses a shoe. She ends up with a bloody lip or a bloody nose.  She screams, which is what was heard by Mr. Bounds.  And in an effort to keep her quiet, or in anger, he strangles her.

And then it goes downhill from there.  He panics, changes clothes, switches cars, body gets dumped.  He has to cover for himself.  Has to go around asking questions. "Where is Leah?"  The pressure builds.  He has guilt over what he did.  He had that anxiety attack.

And then, as time goes by, we start seeing the arrogance.  And then we get to the point of, "It's amazing what you can get away with in Coos County."

To close my argument, I'm going to paraphrase the words used by a prosecutor in a case back in the 1990s — a case in Mississippi.  It was a 30-year old Murder case.  And there had been a couple of attempts to prosecute the Defendant, and they had ended in a mistrial, hung jury.  They tried again after 30 years.  I'm going to paraphrase the words that were used by the prosecutor at the end, to close his argument.

On behalf of the State of Oregon, on behalf of the family of Leah Freeman, I am asking you in this case to

EXHIBIT 2
Page 15 of 16

Certificate    1789

STATE OF OREGON        )
                       )   ss.
County of Coos         )


TRANSCRIBER'S CERTIFICATE


I, Diane B. Walberg, Court Transcriber for the State of Oregon, Fifteenth Judicial District, do hereby certify that I received the duly certified true copies of the audio record of the before-entitled cause, before the Honorable Richard L. Barron, Judge of the Circuit Court of the County of Coos, State of Oregon; and that I thereafter caused that record to be reduced to typewritten pages.

I further certify that the foregoing and hereto attached typewritten pages numbered 2 through 1788, inclusive, constitute a full, true and accurate record of the proceedings had upon the hearing of said cause, and of the whole thereof, to the best of my ability.


WITNESS my hand as Court Transcriber this 30th day of December, 2011.

Diane B. Walberg, Court Transcriber
South Coast Transcribing
PO Box 3414, Sunriver, OR   97707
541-593-1664, bdwalberg@aol.com

EXHIBIT 2
Page 16 of 16