Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


NICHOLAS JAMES MCGUFFIN, as      )
an individual and as guardian    )
ad litem, on behalf of S.M., a   )
minor,                           )
                                 )
            Plaintiffs,           )
                                 )
   v.                            ) No. 6:20-cv-01163-MK
                                 )
MARK DANNELS, PAT DOWNING,       )
SUSAN HORMANN, MARY KRINGS,      )
KRIS KARCHER, SHELLY MCINNES,    )
RAYMOND MCNEELY, KIP OSWALD,     )
MICHAEL REAVES, JOHN RIDDLE,     )
SEAN SANBORN, ERIC               )
SCHWENNINGER, RICHARD WALTER,    )
CHRIS WEBLEY, ANTHONY WETMORE,   )
KATHY WILCOX, CRAIG ZANNI,       )
DAVID ZAVALA, JOEL D. SHAPIRO    )
AS ADMINISTRATOR OF THE ESTATE   )
OF DAVID E. HALL, VIDOCQ         )
SOCIETY, CITY OF COQUILLE,       )
CITY OF COOS BAY, and COOS       )
COUNTY,                          )
                                 )
            Defendants            )
                                 )

REMOTE DEPOSITION OF RICHARD WALTER

Taken on behalf of the Plaintiffs

June 30, 2022

EXHIBIT 6
Page 1 of 23

A.   No.

Q.   Have you ever spoken to anyone who's not an attorney about your deposition in this lawsuit?

A.   No.

Q.   Have you ever spoken to any member of the press about this lawsuit?

A.   No.

Q.   Have you ever spoken to any member of the press about the Leah Freeman investigation or the prosecution of Mr. McGuffin?

A.   Would you ask the question again, please.

Q.   Yeah, let me break it down into two parts.

Have you ever spoken to any member of the press about the Leah Freeman investigation?

A.   Only when they were out there at the time that I was there and they filmed.

Q.   All right.

A.   Then about three months before I received paperwork from -- in this lawsuit, they called me at my home and asked me if I would be willing to participate in the program they wanted to do, and I said "What about?" and they said "About Leah Freeman," and I said "And what's the issue?" and they said "Well, he's been let go and overturned," and I said "Why?" and they said "Because a judge

EXHIBIT 6
Page 2 of 23

found that the DNA found on the shoe that was some distance away or whatever else didn't have the DNA on it, and therefore he was released," and I don't particularly like 20/20 to begin with and I wanted to get some more facts behind what was going on, which I didn't do, and then I received the paperwork on this case, so I realized that -- and I never heard back from 20/20, but that was the first I learned of the shoe and the release.

Q.    Okay.  So I think you kind of answered my next question in there, but let me ask it anyway, when you say they contacted you or you spoke with them, who are they?

A.    A person from 20/20.

Q.    Okay.  ABC's 20/20 news program?

A.    Right.  Right.

Q.    Okay.  And so then I'm assuming you ultimately declined to participate any further?

A.    They never called me back and I probably -- not probably, I would not have participated anyway.

Q.    Okay.  Is that just because you don't care for 20/20 or were there other reasons why you would have declined?

A.    Well, I don't think I would bring anything

EXHIBIT 6
Page 3 of 23

helix, the helix was not used in this case, okay?

Q.   Are the matrix and the helix two different things?

A.   Yes.

Q.   Oh, okay.  All right.

A.   Yeah.

So what was used is a block process and a thought suggestion, ideas exchanged of what they had to tell me, okay?  And what they told me, then, was significant, because I did not interview one person in the case and I relied on Chief Dannels, for the most part.

Q.   Okay.

A.   As to what was said, who said what, all these other sorts of things, and so my idea was to exchange ideas and to look, then, for a pattern development that would explain the case in chief or let them understand where they needed to improve or change or whatever else, and so it was a matter of listening and my only source really was the information that the chief had or that the chief had acquired himself, and I for one, having some experience in these issues, I never accept what the police say as a -- who a suspect is.

Q.   What did you do to verify or corroborate

EXHIBIT 6
Page 4 of 23

the information that Chief Dannels provided to you?

A.   I accepted his word for what was said.

Q.   Okay.

A.   Or what he said, okay?

Q.   So essentially what you did was took the facts that he provided you, or the information that he provided you, whether they were facts or not --

A.   Right.

Q.   -- and crafted that into a narrative that the prosecution could use to prosecute Mr. McGuffin?

MS. SCHAFFER:  Objection; lacks foundation; it's argumentative.

Q.   I'm just trying to understand what he just said.

Can you answer the question?

A.   What I did was I listened to what they had to say and asked questions, but I didn't challenge, because I didn't have anything to challenge with, because I didn't interview the original people, okay?  And so --

Q.   You knew at the time that they were coming to you specifically and the Vidocq Society for guidance on how to wrap this case up, right?

A.   And/or what it meant, okay?  And so that was my job.  I was not here as a professional.  I am

EXHIBIT 6
Page 5 of 23

Page 229

doing my professional work as I normally would in terms of consultation and all that kind of stuff. I was there to listen and to help them understand what they claim to be true, okay?

Q. Okay. I'm trying to think of analogy, and correct me if I'm wrong, but it sounds like the analogy would be you're taking the puzzle pieces that they give you and you're assembling them into the puzzle that reveals the picture to them?

MS. SCHAFFER: I'm going to object; incomplete hypothetical; it's vague and ambiguous.

Q. Does that sound like a correct analogy?

A. Well, I think -- I think if you expose the ideas and various arrangements that could have taken place, which is likely, which is not likely, did they coincide, and did they eventually, then, form a construct of understanding in terms of what they claimed happened, okay?

Q. And is that based on your understanding of the matrix that you to developed?

A. Yep, and they -- I was never suggesting that I was absolutely right. I was presenting ideas so that they could see their own case.

Q. Right, because you understood that they were coming to you because they were out of ideas,

EXHIBIT 6
Page 6 of 23

right?

A.   Yeah, and from that, then, I, for instance, knew nothing about the second shoe until -- I may have been told, okay?  I'm not arguing that I didn't hear it.  I knew nothing about the second shoe and the DNA until 20/20 called me. I was gobsmacked by it.

Q.   I guess my question is:  You knew that they were coming to you for guidance and that they were going to rely on what you told them, and so why didn't you take some steps to verify or corroborate the information that they were providing you?

MS. SCHAFFER:  Objection; asked and answered; calls for speculation; argumentative; lacks foundation.

A.   Because I wasn't there to help them solve the crime per se, whether they thought so or not, okay?  I was there to provide them with ideas and suggestions and whatever else in terms of meaning what they had said and how it linked up or didn't link up, to what would be expected, okay?

Q.   So when Vidocq Society back when you were there, back in 2010 when you taking these cases, did Vidocq provide a disclaimer to the agencies that were coming in, any kind of manual or guidelines,

EXHIBIT 6
Page 7 of 23

Page 231

did you explain to them "Hey, this is what we do and don't do, this is what you can expect and not expect"?

MS. SCHAFFER:  Objection; calls for speculation.

You can answer.

A.    And Frederick -- I don't know when he didn't, Frederick always gave that disclaimer.

Q.    Verbally or was there some kind of a written --

A.    In written, okay?

Q.    Okay.

A.    And so one of the great mistakes of a lot of opinion people is that they jump to conclusions. I choose not to do that.  I want the facts as perceived, and in my case, they were perceived, because I didn't know them first person.  I wanted them, then, to come to their own conclusion based on the facts that they asserted were true and valuable.

From that, then, as I could promote through ideas or whatever else some alternative interpretation peripherals, I would have jumped at it immediately and did probably.

I don't remember necessarily, but when the -- when the bulk of the materials were in and I

EXHIBIT 6
Page 8 of 23

Page 234

the investigator, then, the ability to look --
hopefully look in the right places and challenge and
see if you can develop more scientific evidence,
okay?  But again, I did not opine that absolutely he
did it and whatever else.  What I did was I showed
them, predicated on what they told me, this is how
it fits together, okay?

Q.  So let me stop you there for a second and
see if I understand, because I think what you're
saying, and correct me if I'm wrong, but I think
what you're saying -- or the way I'm -- the way I'm
understanding what you're saying and based on what
I've read in your papers and the papers we've
reviewed in your papers --

A.  Right.

Q.  -- it sounds like what you're saying is
based on what they provided me, I determined from
the crime scene evidence that this homicide was
committed by a power assertive perpetrator?

A.  Right.

Q.  A perpetrator who demonstrated
power-assertive tendencies?

A.  Right.

Q.  And then they put this board together with
the pre-crime behavior and the post-crime behavior

EXHIBIT 6
Page 9 of 23

Page 235

of McGuffin, and based on the information that they provided to me about pre-crime and post-crime, I concluded that Mr. McGuffin met the power-assertive profile?

A.    Exactly.

Q.    Okay.    And you discussed that with them, with the investigators, Dannels and Frasier?

A.    Yeah.    I didn't say he did it.

Q.    Okay.    So you didn't say he did it, but from there, now you've discussed this where you said yes, in your opinion, you have a homicide scene that is consistent with a power-assertive perpetrator and you have a suspect who has a power-assertive profile.

A.    Right.

Q.    So where are they supposed to go with that?    Because it sounds like you matched them up pretty tightly.

MS. SCHAFFER:    I'm going to object; lacks foundation; misstates the witness's testimony; argumentative.

Q.    Okay.    Mr. Walter, have I misstated what you're saying?

A.    I lost my thought.

Oh, actually, if all the facts that they

EXHIBIT 6
Page 10 of 23

Page 236

told me are and were true, okay?

Q.    Okay.

A.    The suspect did himself more damage than anybody in terms of creating the suspicion which was put on his shoulders by them, okay?

I am -- well, first of all, I was acting as a simulant for their thinking process and their understanding.  I wasn't there as a professional in my normal professional work, okay?  It's different.  Different process.

Q.    How do you distinguish between the two and how do you make sure that they are clear that you are acting in one capacity and not the other?

A.    All you have to be is around me for five minutes and you can figure that one out.

Q.    Okay.  You know, that may be true with some folks, maybe not true of others.

A.    It's true of me, okay?

Q.    Okay.

A.    From that, then, I would have loved to have said "Gee, do you have any other PAs, power assertives, that we can look into or you should look into" or whatever else, okay?  But that never came about.

Q.    Why not?

EXHIBIT 6
Page 11 of 23

Page 237

A.    I don't know that there was anybody else.

Q.    Did you ask?

A.    I am not convinced, by the way, that we should be talking about just McGuffin.  I would think you should be talking about they.

Q.    Explain.

A.    Often with PAs, they like to have witnesses and they also like to have people who can delegate the fact that they were successful.  In fact, with PAs, certainly you can get the individual, but often you'll get as many as three to five people involved, and I'm not convinced beyond a shadow of a doubt, and though this was never brought up by them, I'm still not convinced that it wasn't more than one.

Q.    Okay.  Did you tell them that?

A.    I don't remember specifically telling them that, but it was certainly within my lexicon to do that, to make that kind of a statement.

      And what I still don't understand about the case --

      MS. SCHAFFER:  There's no question pending.

Q.    Were you finishing a thought?

A.    No, go ahead.

EXHIBIT 6
Page 12 of 23

Q.   Okay.  So let's get into the investigation a little bit.

When did you first become aware of Ms. Freeman outside of the investigation?

A.   When they presented it at Vidocq.

Q.   Had you spoken to anybody about it before Chief Dannels came out to Vidocq Society to present it?

(Exhibit No. 2 marked.)

A.   No.  I'm going to show you what's been marked as Exhb. 2, this is you an article called "Cold Case Squad:  Modern-Day 'Sherlock Holmes' Team Takes on Oregon Slaying."  The author is Rob Wallace I think of ABC News with a publication date of August 11, 2010, which is an article about you and Vidocq Society and your participation in the Freeman investigation.

I'll take you to, let's see here, it must be page -- whatever this page is, page 3 of 7 of the PDF.

We've got this quote here from Mr. Capuzzo, "People think of them" -- and he's talking about you and Vidocq Society -- "People think of them as wizards to sort of peep and mutter and go into a back room and come out and say 'He did

EXHIBIT 6
Page 13 of 23

Page 257

Q.   Anyone else from Vidocq decide to go with you?

A.   No.

Q.   What was discussed at the dinner?

A.   The case.

Q.   What specifically was discussed about the case?

A.   Well, I think that they were still quite loose, very, very loose in their understanding of the collection of material that they had.  I then -- I think I offered the suggestion that from my understanding that it was a PA case, that I would have some more evidence and to affirm that and I'd like to see more crime scene photos and all that, kind of stuff, okay?

Q.   So at that point, was there a decision made that you would come back to Coquille with them at some point?

A.   They asked me if I would, and I think I said it would depend on whether Vidocq agrees with it.

Q.   And apparently Vidocq agreed with you.

A.   Yes.

Q.   Because you went back.

Do you recall during the presentation, did

EXHIBIT 6
Page 14 of 23

A.   Right.

Q.   Okay.  And when you say the question of payment is a mystery, what do you mean?

A.   We never could figure out who paid for the airfare and all that kind of stuff.

Q.   Okay.  Was it another one of those things where you tried to look at Vidocq's records, talked to the travel agents and that sort of thing?

A.   Yeah.  Yeah.

Q.   And there's no record of Vidocq paying for it?

A.   Well, they didn't -- they changed Frasier and all this kind of stuff, but I talked to the most recent treasurer and he looked and they only have six years back, they don't have ten years back.

Q.   So the decision was made that you would travel to Coquille and that Vidocq would participate.

What was the plan for Vidocq Society's involvement in the pre-investigation?

A.   Me going out and getting ideas and giving them suggestions and giving them a sense of perspective and letting them make up their own mind.  That's how they wanted to proceed.  I did not say "Go get him," okay?  It's their choice.  I was there

EXHIBIT 6
Page 15 of 23

Page 260

only as an interested pro bono person.  It's their case, not mine.  I wasn't the investigator.  I didn't do the cross checking of their facts, that sort of thing.  It was just a -- it was a thought stimulated -- hopefully a thought stimulating exercise for them so they could understand their case.

What they do with that case is their problem or their benefit, not mine.

Q.  Was the involvement with any other Vidocq Society members contemplated?

A.  Not that I know of.

Q.  Who is Mark McClish?

A.  I don't know.

Q.  Do you know what his involvement was?

A.  I don't know who he is.

(Exhibit No. 5 marked.)

Q.  Okay.  Let me show you what's been marked as Exhb. 5.

I'll represent to you that this is a blog post from a blog that's maintained or a website maintained by somebody named Mark McClish, and this was from September 23, 2011, and it's about Leah Freeman, the investigation, and he says down here, "In November of 2009, the Vidocq Society asked me to

EXHIBIT 6
Page 16 of 23

Page 267

Freeman investigation.

Is that right?

MS. SCHAFFER:  Objection; misstates the witness' testimony.  I don't believe he ever testified that he formed an opinion.

Q.   I thought you testified that you thought this was a power assertive.

A.   I didn't testify.  Oh, I testified -- I think it is, was a power-assertive case, but -- I forgot what started the argument.

Q.   I'm sorry, I didn't mean it to be an argument.  I was just asking if -- I was just asking if it was correct that you had developed a theory or an opinion of the typology of the perpetrator and the crime scene in this case.

A.   I developed my own opinion, but I didn't necessarily share that.  I shared with them what their evidence showed.  They can draw the conclusion, then, whether it fits or doesn't fit and whether he's the guy.  He did -- I mean, they did make that judgment and they thought it was then the -- McGuffin, whatever his name is.

Q.   Okay.  And that was based on their understanding of your theory about power assertive versus power reassurance versus anger retaliation

EXHIBIT 6
Page 17 of 23

Page 277

for him, thought he was less than talented.

Q.    Okay.  And what is it that you saw or heard or sensed from him that made you think that he didn't care for you?

A.    I think he felt a little upstaged.

Q.    Down here, it says "The boyfriend after the crime impregnated another 14-years-old that he could control."

Do you know where that information comes from?

A.    I'm not sure.

Q.    It says "ABC is filming the case."  This must -- well, I don't know if that was before or after.  It says he was indicted in August of 2010 and the case was featured on 20/20 on 15 October 2010.

When did you stop communicating with Chief Dannels on the Freeman investigation?

A.    When I left the city.

Q.    Okay.  How long were you in Coquille?

A.    I think three days, three days.

Q.    You said when you went there, you thought it was cold.

A.    Yes.

Q.    Having seen that the according to this

EXHIBIT 6
Page 18 of 23

Page 278

memo writer, the date was January 1st, 2010, does that give you any better recollection of when you were in Coquille?

A.   I just knew it was cold and they put me up in the gambling house.

Q.   So the casino?

A.   Correct.

Q.   And then after you left, after the 20/20 airing and after you left, did you correspond with Dannels after that at all?

A.   No.

Q.   How about DA Frasier?

A.   No.

Q.   Did Frasier ask you to appear for the grand jury at all?

A.   No.

Q.   Did you ever ask about that?

A.   No.

Q.   Did you ever talk to Frasier after leaving Coquille?

A.   No.

Q.   Do you know who at the Vidocq Society was following up on the Freeman investigation after you left Coquille?

A.   No.

EXHIBIT 6
Page 19 of 23

Page 279

Q.    Then why didn't you have any correspondence with anybody on the Freeman investigation after you left Coquille?

A.    Because I did my job of basically giving them options and looking at the -- and ideas and their observations, et cetera, and that was my job. I wasn't there to be a detective, it was there to educate them on what they claimed that they had.

Q.    Well, whose idea of Mr. McGuffin and Ms. Freeman getting in a fight where her bloody shoe was found, was that something that was discussed at dinner?

A.    No, it was discussed when I was there.

Q.    In Coquille?

A.    Yes.

Q.    Oh, okay.

Do you recall it being discussed at all at the dinner or during the presentation in Philadelphia?

A.    No.  No.

Q.    Okay.  So when you did go to Coquille, then -- well, I guess at any time during your involvement, did you review any of the police reports that had been generated on the Freeman investigation?

EXHIBIT 6
Page 20 of 23

A.    Not at all.

Q.    How about did you review any of the lab reports that had been generated?

A.    No.

Q.    Did you ever discuss or hear anything about reports from the Chorley laboratory in England?

A.    About the what?

Q.    The Chorley Laboratory in England, C-H-O-R-L-E-Y.

A.    I don't know anything about it.

Q.    Did you review the autopsy report?

A.    I don't know.  I can't remember.

Q.    What did you do to determine what position the body was in when it was found?

MS. SCHAFFER:  Can you restate that question.

Q.    Yeah, what did you do to determine the position that the body was in when it was found?

A.    I'm not sure that I said anything about it.

Q.    Do you recall talking to anybody about the position that the body was found in or the condition of the body when it was found?

A.    Well, she was thrown away like trash, but

EXHIBIT 6
Page 21 of 23

Page 281

aside from that, if it would have been an anger retaliatory killing, that would have been much more important, but it's not, it's a PA, so body position has much less importance than it would if it were an anger retaliatory.

Q.    Okay.  So when you say she was thrown away like trash, what do you base that on?

A.    Because they took me to the scene, showed me where she went over, described where she was, and I may have looked at the pictures they took before they removed her, but it was -- it's obvious that they were just trying to get rid of the body and get out of there.

Q.    Who took you to the scene?

A.    The chief and a cadre of his people.

Q.    Do you remember anyone else who was there other than Dannels?

A.    No.  I know there were other people there.

Q.    Do you know how many other people were there?

A.    No.

Q.    How long did you spend at the scene?

A.    Probably -- maybe 25 minutes.

Q.    Okay.  And did you look at photos of the scene?

EXHIBIT 6
Page 22 of 23

Page 290

STATE OF OREGON        )

County of Multnomah )

          I, Aaron M. Thomas, Certified Shorthand Reporter, Registered Professional Reporter, and Notary Public for the State of Oregon, do hereby certify that ROBERT WALTER personally appeared before me at the time and place mentioned in the caption herein; that the witness was by me first duly sworn on oath and examined upon oral interrogatories propounded by counsel; that said examination, together with the testimony of said witness, was taken down by me in stenotype and transcribed through computer-aided transcription; and that the foregoing transcript constitutes a full, true and accurate record of said examination of and testimony given by said witness, and of all other oral proceedings had during the taking of said deposition, and of the whole thereof.

          Witness my hand and Notarial Seal at Portland, Oregon, this 9th day of July, 2022.

                              _____
                              Aaron M. Thomas
                              Oregon CSR 04-0388

EXHIBIT 6
Page 23 of 23