Janis C. Puracal, OSB #132288
E-mail: jcp@mlrlegalteam.com
Andrew C. Lauersdorf, OSB #980739
E-mail: acl@mlrlegalteam.com
MALONEY LAUERSDORF REINER, PC
1111 E. Burnside Street, Ste. 300
Portland, OR  97214
Telephone: (503) 245-1518
Facsimile: (503) 245-1417

David B. Owens, WSBA #53856, *pro hac vice*
E-mail: david@loevy.com
LOEVY & LOEVY c/o
Civil Rights and Justice Clinic
University of Washington Law School
William H. Gates Hall, Suite 265
PO Box 85110
Seattle, WA  98145-1110
Telephone: (312) 590-5449

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| NICHOLAS JAMES MCGUFFIN, as an individual and as guardian *ad litem*, on behalf of S.M., a minor,<br><br>        Plaintiffs,<br><br>   v.<br><br>MARK DANNELS, PAT DOWNING, SUSAN HORMANN, MARY KRINGS, KRIS KARCHER, SHELLY MCINNES, RAYMOND MCNEELY, KIP OSWALD, MICHAEL REAVES, JOHN RIDDLE, SEAN SANBORN, ERIC SCHWENNINGER, RICHARD WALTER, CHRIS WEBLEY, ANTHONY WETMORE, KATHY WILCOX, CRAIG ZANNI, DAVID ZAVALA, JOEL D. SHAPIRO AS ADMINISTRATOR OF THE ESTATE OF DAVID E. HALL, VIDOCQ SOCIETY, CITY OF COQUILLE, CITY OF COOS BAY, and COOS COUNTY, | Civil No. 6:20-cv-01163-MTK<br>(Lead Case)<br><br><br><br>PLAINTIFFS' RESPONSE TO STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

Defendants.

VIDOCQ SOCIETY,

Cross-Claimant,

v.

MARK DANNELS, PAT DOWNING,
SUSAN HORMANN, MARY KRINGS,
KRIS KARCHER, SHELLY MCINNES,
RAYMOND MCNEELY, KIP OSWALD,
MICHAEL REAVES, JOHN RIDDLE, SEAN
SANBORN, ERIC SCHWENNINGER,
RICHARD WALTER, CHRIS WEBLEY,
ANTHONY WETMORE, KATHY WILCOX,
CRAIG ZANNI, DAVID ZAVALA, JOEL D.
SHAPIRO AS ADMINISTRATOR OF THE
ESTATE OF DAVID E. HALL, VIDOCQ
SOCIETY, CITY OF COQUILLE, CITY OF
COOS BAY, and COOS COUNTY

Cross-Defendants.

NICHOLAS JAMES MCGUFFIN, as an
individual and as guardian *ad litem*, on behalf
of S.M., a minor,

Plaintiffs,

v.

OREGON STATE POLICE,

Defendant.

Civil Case No. 3:21-cv-01719-MTK
(Trailing Case)

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

## TABLE OF CONTENTS

I. GOVERNING LEGAL STANDARDS ............................................................................ 7

II. MATERIAL FACTS THAT PRECLUDE SUMMARY JUDGMENT ....................... 8

    A. Background .......................................................................................................... 8

    B. Freeman's Abduction and Murder ...................................................................... 8

    C. McGuffin's Innocence and the Search for Freeman .......................................... 11

    D. The Defendants knew McGuffin was Innocent ................................................. 15

    E. The Defendants Fabricated Additional Evidence .............................................. 19

    F. McGuffin was Wrongly Charged and Convicted .............................................. 21

    G. McGuffin was Exonerated ................................................................................. 22

    H. Detailed Descriptions of Fabrications and Suppressions .................................. 23

        1. Krings and Hormann withheld exculpatory DNA evidence on
           Freeman's right shoe and fabricated a report to hide the evidence that
           was suppressed………… ........................................................................... 23

        2. Krings and Hormann withheld exculpatory DNA evidence on
           Freeman's left bloodstained shoe and fabricated a report to hide the
           evidence that was suppressed ................................................................... 25

        3. Hormann and the Municipal Defendants withheld documented
           evidence of the lab's attempt to manipulate testing to avoid developing
           DNA that would undermine the case against McGuffin. .............................. 28

        4. The Municipal Defendants and Walter fabricated blood evidence, a
           profile of the killer to fit McGuffin, and a narrative of the crime. ................ 29

III. POINTS AND AUTHORITIES ............................................................................... 34

    A. The Defendants are not entitled to qualified immunity. ................................... 34

        1. A reasonable jury can find Krings violated McGuffin's rights. ................... 35

        2. The constitutional rights at issue were clearly established in 2000. .............. 39

        3. The lab's "protocol" is not relevant to the question of qualified
           immunity………………. ........................................................................ 40

    B. A reasonable jury can find an absence of probable cause. ............................... 45

        1. The grand jury heard fabricated evidence putting McGuffin and
           Freeman together after 9:00 p.m. .............................................................. 47

        2. The grand jury heard fabricated evidence that McGuffin cleaned the
           trunk of his car to cover up the murder. ..................................................... 50

        3. The grand jury heard fabricated evidence that there was no DNA to
           connect anyone else to the crime. .............................................................. 51

        4. The grand jury heard fabricated evidence that McGuffin made
           incriminating statements after Freeman's disappearance. ............................. 52

        5. The State Defendants have mischaracterized the grand jury testimony. ........ 54

    IV. CONCLUSION ............................................................................................... 56

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Amado v. Gonzalez,*
758 F.3d 1119 (9th Cir. 2014) ...........................................................................42

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ..........................................................................................6

*Awabdy v. City of Adelanto,*
368 F.3d 1062 (9th Cir. 2004) ...........................................................................45

*Carrillo v. Cnty. of Los Angeles,*
798 F.3d 1210 (9th Cir. 2015) ...........................................................................38

*Chiaverini v. City of Napoleon,*
602 U.S. 556 (2024) ..........................................................................................44

*Constanich v. Dept. of Soc. & Health Servs.,*
627 F.3d 1101 (9th Cir. 2009) ...........................................................................38

*Cunningham v. City of Wenatchee,*
345 F.3d 802 (9th Cir. 2003) ...........................................................................38

*Devereaux v. Abbey,*
263 F.3d 1070 (9th Cir. 2001) (en banc) ...........................................................38

*Drake v. Portuondo,*
321 F.3d 338 (2nd Cir. 2003) ...........................................................................31

*Drake v. Portuondo,*
553 F.3d 230 (2nd Cir. 2009) ...........................................................................31

*Fatai v. City & Cnty. of Honolulu,*
No. 19-CV-00603-DKW-WRP, 2022 U.S. Dist. LEXIS 121527 (D. Haw. July 11, 2022) ...........................................................................................................44

*Figueroa v. Kern Cnty.,*
506 F.Supp.3d 1051 (E.D. Cal. Dec. 9, 2020 ...................................................21

*Graham v. Connor,*
490 U.S. 386 (1989) ..........................................................................................45

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

*Grossman v. City of Portland*,
    33 F.3d 1200 (9th Cir. 1994) ..............................................................44

*Inouye v. Kemna*,
    504 F.3d 705 (9th Cir. 2007) ..............................................................39

*Johnson v. Mississippi*,
    486 U.S. 578 (1988).............................................................................21

*Leslie v. Grupo ICA*,
    198 F.3d 1152 (9th Cir. 1999) ...............................................................6

*Liston v. Cnty. of Riverside*,
    120 F.3d 965 (9th Cir. 1997) ..............................................................38

*Manuel v. City of Joliet*,
    580 U.S. 357 (2017).......................................................................44, 45

*Mata-Gonzalez v. Monico*,
    No. 3:11-cv-00260-PK, 2013 U.S. Dist. LEXIS 138960 (D. Or. Sept. 27,
    2013) .....................................................................................................38

*Miller v. Pate*,
    386 U.S. 1 (1967)................................................................................38

*Miller v. United States*,
    945 F.2d 1464 (9th Cir. 1991) ...............................................................6

*Milstein v. Cooley*,
    257 F.3d 1004 (9th Cir. 2001) .............................................................45

*Nelson v. Colorado*,
    581 U.S. 128 (2017) ...........................................................................21

*Pearson v. Callahan*,
    555 U.S. 223 (2009).............................................................................33

*Reed v. Lieurance*,
    863 F.3d 1196 (9th Cir. 2017) .............................................................54

*Richards v. Cnty. of San Bernardino*,
    39 F.4th 562 (9th Cir. 2022) ...............................................................34

*Roberts v. Howton*,
    13 F. Supp. 3d 1077 (D. Or. Apr. 9, 2014) .........................................42

*Sierra Medical Services Alliance v. Kent*,
    883 F.3d 1216 (9th Cir. 2018) ...............................................................6

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

*Spencer v. Peters*,
    857 F.3d 789 (9th Cir. 2017) ............................................................34

*State v. Haynes*,
    1988 Ohio App. LEXIS 3811 (1988) ...............................................31

*State v. Roquemore*,
    620 N.E.2d 110 (Ct. App. Ohio 1993) .............................................31

*Tatum v. Moody*,
    768 F.3d 806 (9th Cir. 2014) ............................................................34

*Tennison v. City & Cnty. of San Francisco*,
    570 F.3d 1078 (9th Cir. 2009) ..........................................................34

*Thompson v. Clark*,
    596 U.S. 36 (2022)....................................................................44, 45

*Tolan v. Cotton*,
    134 S. Ct. 1861 (2014)......................................................................6

*Trulove v. D'Amico*,
    No. 16-cv-050 YGR, 2018 U.S. Dist. LEXIS 31854 (N.D. Cal. Feb. 27, 2018)....................33

*Estate of Tucker ex rel. Tucker v. Interscope Records, In*c.,
    515 F.3d 1019 (9th Cir. 2008) ..........................................................45

*United States v. Lopez*,
    482 F.3d 1067 (9th Cir. 2007) ..........................................................48

*Whren v. United States*,
    517 U.S. 806 (1996).........................................................................45

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Plaintiffs request the Court deny the State Defendants' motion for summary judgment.

## I. GOVERNING LEGAL STANDARDS

Summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[1]  Where "evidence is such that a reasonable jury could return a verdict for the nonmoving party," a genuine issue of material fact exists.[2]  The Court must "look to not a single pleading, but to the entire record to determine whether there are any factual disputes."[3]

In making this determination, the evidence must be construed "'in the light most favorable to the opposing party,'" and the court must also "draw inferences in favor of the nonmovant."[4]  The Supreme Court has emphasized the importance of drawing inferences in favor of the nonmovant and the Ninth Circuit has echoed the rule:  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, when he is ruling on a motion for summary judgment. . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."[5]

---

[1] FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).
[2] *Sierra Medical Services Alliance v. Kent*, 883 F.3d 1216, 1222 (9th Cir. 2018) (quoting *Anderson*, 477 U.S. at 248).
[3] *Miller v. United States*, 945 F.2d 1464, 1466 (9th Cir. 1991) (citations omitted).
[4] *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).
[5] *See*, *e.g.*, *Leslie v. Grupo ICA*, 198 F.3d 1152, 1157 (9th Cir. 1999) (quoting *Anderson*, 477 U.S. at 255).



MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

The State Defendants ignore important facts and fail to address any of the inferences that favor Plaintiffs, instead omitting any discussion of reasonable inferences from their motion. This failure is fatal. Summary judgment must be denied.

## II. MATERIAL FACTS THAT PRECLUDE SUMMARY JUDGMENT

1.    Nicholas McGuffin was not in any way involved in the kidnapping and murder of Leah Freeman and is completely innocent of the crime.[6] Nonetheless, McGuffin has been subjected to more than 20 years of hardships, including nearly a decade of incarceration, for a crime that he did not commit.

### A.    Background

2.    McGuffin grew up in Coquille, Oregon, and attended Coquille High School, where he and Freeman met and began dating.[7] McGuffin graduated in June 2000.

3.    McGuffin and Freeman spent the weeks after his graduation hanging out and swimming with their friends.[8]

### B.    Freeman's Abduction and Murder

4.    On June 28, 2000, McGuffin and Freeman spent part of the day at Freeman's house in Coquille, washing McGuffin's blue Ford Mustang.[9]

5.    Sometime in the afternoon, McGuffin and Freeman met up with McGuffin's friend, Brent Bartley.[10] Around 7:00 p.m., McGuffin and Bartley dropped Freeman off at the

---

[6] *See* Criminal Trial Transcript (Sentencing) at 1738:18–1742:11 [Dkt. No. 284-1 at 1799–1852] (McGuffin proclaiming his innocence at sentencing hearing).
[7] Nicholas McGuffin Deposition at 28:14–29:1 (Exhibit 10 to the Declaration of Janis C. Puracal in Support of Plaintiffs' Responses to Summary Judgment ("Puracal Decl.")).
[8] *Id.* at 26:4–12.
[9] *Id.* at 187:10–15.
[10] *Id.* at 106:10–25.

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

home of her friend, Cherie Mitchell.[11]  McGuffin was driving his blue Mustang.[12]

6.    McGuffin did not see, speak with, or otherwise interact with Freeman ever again after dropping her off at the Mitchell residence.[13]

7.    McGuffin was scheduled to return to the Mitchell residence to pick up Freeman at 9:00 p.m. for a double date with McGuffin, Bartley, and Bartley's girlfriend, Nicole Price.[14]

8.    Sometime before 9:00 p.m., Freeman and Mitchell argued, Freeman grew angry with Mitchell, and Freeman left the Mitchell residence alone on foot.[15]

9.    Mitchell followed Freeman out of the house and down North Elm Street, until Freeman turned the corner onto West 4th Street.[16]  Mitchell watched Freeman walk down West 4th Street in the direction of North Central Boulevard.[17]  (See District Attorney's map of locations at Dkt. No. 293-2 at 19.  Plaintiffs do not accept all aspects of the map, but rely on it for illustrative purposes only.)

10.    Many people saw Freeman walking alone on North Central Boulevard toward Coquille High School between roughly 9:00–9:30 p.m.[18]

11.    People also saw Freeman standing outside the high school.  Freeman's home was

---

[11] *Id.* at 181:22–24; Criminal Trial Transcript D4 65:2–24 (Mitchell) [Dkt. No. 284-1 at 596].

[12] Criminal Trial Transcript D4 17:2–13 (Bartley) [Dkt. No. 284-1 at 548].

[13] Nicholas McGuffin Deposition at 58:25–71:22, 96:23–104:4, 190:19–195:14 (Exhibit 10 to Puracal Decl.).

[14] *Id.* at 58:25–59:4, 106:17–25, 134:19–22.

[15] Criminal Trial Transcript D4 68:9–73:22 (Mitchell) [Dkt. No. 284-1 at 599–604].

[16] *Id.*

[17] *Id.*

[18] *See* Criminal Trial Transcript D4 145:17–146:25 (Ashley Patton); D4 200:7–201:14, 215:9–11, 217:11-218:5 (Ray Lewis); D4 153:5–154:5, 156:2–16 (Mark Kirn); D4 162:2–163:6 (Mike McAdams); D4 171:8–19 (Heidi Crook); D4 243:15–244:16, 245:8–246:18, 247:6–8 (Thomas Bounds); D3 88:22–90:8, 94:17–19 (Cynthia Jones) [Dkt. No. 284-1].  *See also* 2000-09-20 CCSO Zanni Notes re Nick Backman [Dkt. No. 290-17 at 5].

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

located past the high school and around the corner on Knott Street.[19]  Had she intended to go home, she could have just kept walking past the high school and around the corner, but no witnesses ever reported seeing Freeman near her home that night.  Instead, Freeman crossed to the opposite side of the street at the high school.  Freeman was last seen alive standing by herself, across the street from the high school, on the corner of West Central Boulevard and North Elm Street in between the cemetery and the gas station.  Freeman was seen standing there around 9:15 p.m.–9:30 p.m. on June 28, 2000.[20]

12.    At some point that evening, Freeman was abducted, taken miles away from the downtown, and murdered by a perpetrator (or perpetrators) that remain unknown.

13.    Later that evening, around 11:30 p.m., a passerby (Tony Messerle) found Freeman's right Nike tennis shoe on North Elm Street in between the cemetery and the gas station.[21]  The right shoe did not have any bloodstains on it.[22]

14.    As detailed below, a search for Freeman ensued.  On July 5, 2000, Coos County Sheriff's Deputy Kip Oswald presented Freeman's left Nike tennis shoe to the Coquille Police Department, claiming he had found the shoe on Hudson Ridge, a remote forested area approximately ten miles from the location where Freeman was last seen alive.[23]  The left shoe purportedly recovered from Hudson Ridge had bloodstains on the shoelace, the interior heel and ankle area, and the exterior sole.[24]

15.    On August 3, 2000, Freeman's body was found deep in the woods off Lee Valley

---

[19] Criminal Trial Transcript at D3 51:8–52:9 [Dkt. No. 284-1 at 359–60].
[20] *Id.* at D3 88:22–90:8, 94:17–19 (Jones) [Dkt. No. 284-1 at 396].
[21] *Id.* at D5 127:16–132:17 (Messerle) [Dkt. No. 284-1 at 920–25].
[22] 2000-07-17 OSP Lab Wilcox Report at 1 [Dkt. No. 296 at 179].
[23] Criminal Trial Transcript D5 140:11–144:13 (Oswald) [Dkt. No. 284-1 at 934–38].
[24] 2000-07-17 OSP Lab Wilcox Report at 1 [Dkt. No. 296 at 179]; 2001-10-03 FSS Lab Report at 15 (Exhibit 63 to Puracal Decl.).

MALONEY | LAUERSDORF | REINER PC
                        ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Road on an embankment of the Coquille River, approximately eight miles from the location

where she had last been seen alive and approximately three miles from the location where

Oswald claimed the bloodstained shoe was found.[25]  (See District Attorney's map of locations at

Dkt. No. 293-2 at 19.)

16.    Freeman was clothed, but missing her underwear, one sock, and her shoes.[26]

## C.    McGuffin's Innocence and the Search for Freeman

17.    At 9:07 p.m. on the night that Freeman was abducted, McGuffin arrived at the

Mitchell residence in his blue Ford Mustang to pick up Freeman.[27]  There, McGuffin learned

from Mitchell that the girls had argued, and Freeman had left and started walking toward town.[28]

McGuffin began to search for Freeman.

18.    McGuffin spent more than five hours searching for Freeman, and more than 20

people saw and interacted with McGuffin during that time, including Freeman's mother, sister,

and friends, McGuffin's family and friends, and at least two Coquille Police Department officers,

each of whom pulled McGuffin over at different times for a blown headlight on his blue Ford

Mustang.

19.    Witnesses who saw McGuffin between 9:00 p.m. and 10:00 p.m.—the key period

of time when Freeman was abducted—include:

a.    Denise Bertrand, Freeman's older sister, who saw McGuffin between

9:00–9:30 p.m. when he came into her place of employment, Denny's Pizza, to see if she had

---

[25] Criminal Trial Transcript D6 218:21–220:7 (Karcher) [Dkt. No. 284-1 at 1293–95].

[26] Autopsy Report at 2–3 (Exhibit 5 to Puracal Decl.).

[27] Nicholas McGuffin Deposition at 58:25–59:4 (Exhibit 10 to Puracal Decl.); Grand Jury (2000) (Cherie Mitchell) at 9:1 [Dkt. No. 286-13 at 10] (Mitchell testifying McGuffin arrived at 9:08 p.m.).

[28] Criminal Trial Transcript D4 75:4–7 (Mitchell) [Dkt. No. 284-1 at 606].

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

seen Freeman[29];

      b.     Brent Mauro who saw McGuffin between 9:15 and 9:40 p.m. when McGuffin stopped at Fast Mart—the local mini-mart where kids hung out on North Central Boulevard—and asked whether anyone had seen Freeman[30];

      c.     Quinn Cannon who saw McGuffin between 9:15–9:45 p.m. when McGuffin stopped at the home of Cannon's boyfriend, Daniel LaPine, and asked whether Freeman was there[31];

      d.     Amanda Landmark who saw McGuffin at 9:30 p.m. when McGuffin stopped at Fast Mart again and asked whether Landmark had seen Freeman[32];

      e.     Lyndee Kindred who saw McGuffin driving on Knott Street—the street where Freeman lived—between 9:30–9:45 p.m. and asked her if she had seen Freeman walking home[33];

      f.     Mike McAdams who saw McGuffin at 9:45 p.m. when McGuffin stopped at Fast Mart again[34];

      g.     Haley Greenway who saw McGuffin a few minutes before 10:00 p.m. when McGuffin was driving on North Central Boulevard toward the high school[35]; and

      h.     Denise Bertrand who saw McGuffin at 10:00 p.m. when McGuffin again stopped at Denny's Pizza to ask if Bertrand had seen Freeman.[36]

---

[29] Criminal Trial Transcript at D3 124:10–125:8 [Dkt. No. 284-1 at 433–34].
[30] *Id.* at D5 9:17–10:18, 13:11–21 [Dkt. No. 284-1 at 802–03, 806].
[31] *Id.* at D7 119:1–126:1 [Dkt. No. 284-1 at 1447–54].
[32] Grand Jury (2010) (Amanda Landmark) at 11:21–12:7 [Dkt. No. 295-1 at 511]
[33] Criminal Trial Transcript at D8 27:17–29:18 [Dkt. No. 284-1 at 1548–50].
[34] *Id.* at D4 164:4–24, 165:24–166:25 [Dkt. No. 284-1 at 695, 696–97].
[35] *Id.* at D9 16:6–18:4 [Dkt. No. 284-1 at 1616–18].
[36] *Id.* at D3 125:9–25 [Dkt. No. 284-1 at 434].

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

20.　　Between 10:05–10:15 p.m., McGuffin went back to the Mitchell house to see if Freeman had returned.[37]  Not finding her there, McGuffin called Freeman's mom from the Mitchell house and asked whether Freeman had come home.[38]

21.　　Objective evidence confirmed what witnesses reported about McGuffin searching for Freeman that evening.  For example, the Defendants obtained gas station records confirming the time McGuffin stopped at the station in town to fill his gas tank at 10:19 p.m., and also obtained telephone records confirming a phone call to McGuffin's parents from the Fast Mart pay phone at 10:44 p.m.[39]

22.　　The two CPD officers—Defendant David Zavala and Officer Danny Lee—who pulled McGuffin over at separate times (10:30 p.m. and 12:03 a.m., respectively) did not report that McGuffin was disoriented, in a panic, or sweating, appeared to be hiding anything, showed any signs of being in a physical struggle, or displayed any other behavior that officers would expect of a person who had just committed a murder and been pulled over by police.[40]  McGuffin told each of the officers that he was looking for his girlfriend and asked them to look out for her.

---

[37] *Id.* at D4 75:23–76:10, 93:20–94:12 [Dkt. No. 284-1 at 605–06, 624–25].

[38] *Id.*  Additional witnesses who saw McGuffin after 10:00 p.m. by himself, searching for Freeman, include: (1) 10:05 p.m. Cory Courtright (phone call) (Criminal Trial Transcript at D3 56:2–12, 22–25); (2) 10:00–10:45 p.m. Ray Lewis (Criminal Trial Transcript at D4 218:6–219:10); (3) 10:00–11:00 p.m. Brent Bartley (Criminal Trial Transcript at D4 18:10–20:19, 29:16–24, 30:23–25); (4) 10:30–11:00 p.m. Nicole Price (Grand Jury (2000) at 3:24–7:22, 11:17–12:10 [Dkt. No. 286-17 at 4]; and (5) 11:30 p.m. Christy Kristofferson (Grand Jury (2000) at 4:9–6:16) (Exhibit 17 to Puracal Decl.).

[39] Gas Station Record in Coquille PD File (Exhibit 18 to Puracal Decl.); Phone Record in Coquille PD File (Exhibit 19 to Puracal Decl.); HIT Team Note re Phone Call at 1 (Exhibit 20 to Puracal Decl.); McNeely Note re Gas Records (Exhibit 14 to Puracal Decl., Attachment 3). McNeely admitted in an interrogatory that the handwriting on Exhibit 14, Attachment 3 is his. McNeely Response to Interrogatory No. 3 (Exhibit 14 to Puracal Decl.).  *See also* Kathy McGuffin Deposition at 17:20–20:25, 27:22–30:24 (Exhibit 21 to Puracal Decl.).

[40] 2000-06-28 Coquille PD Zavala Report [Dkt. No. 292-6 at 2]; 2000-06-28 Coquille PD Lee Report at 4 (Exhibit 32 to Puracal Decl.); Criminal Trial Transcript at D4 249:24–251:24 and D5 108:2–109:16, 114:25–115:5 [Dkt. No. 284-1 at 781–83, 901–02, 907–08].

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Ave, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

23.     Not a single witness ever reported seeing McGuffin or his car outside the town of Coquille or anywhere near the locations where Freeman's bloodstained shoe or body were found.

24.     It was not physically possible for McGuffin to have abducted and murdered Leah Freeman, and then disposed of her body, and also be in the places he was seen, at the times he was seen, by the many witnesses who interacted with him and corroborate his whereabouts.[41]

25.     At some point in the early morning hours, McGuffin drove past Freeman's house on Knott Street and saw what he believed to be light from Freeman's upstairs bedroom window.[42] Believing that Freeman must have gone home, McGuffin went home. McGuffin arrived home at approximately 2:30 a.m., a time his mother confirmed.[43]

26.     The next morning, Freeman's mother (Cory Courtright) called McGuffin at approximately 7:30 a.m. and reported that Freeman never came home.[44] McGuffin immediately began searching for Freeman again, this time along with Freeman's sister, Denise Bertrand. McGuffin, Bertrand, and Courtright went to Coquille PD together to report Freeman missing.[45]

27.     At the knowledge and direction of then Chief of Police Defendant Reaves, Coquille PD refused to investigate or even search for Freeman.[46] Unable to get assistance from local police, McGuffin enlisted Freeman's sister and his own family and friends, and they continued to search for Freeman throughout Coquille, the surrounding counties, and all the way into California.[47]

---

[41] *See* Statement of Facts ¶¶ 19–23.
[42] Nicholas McGuffin Deposition at 193:1–195:14 (Exhibit 10 to Puracal Decl.).
[43] Kathy McGuffin Deposition at 17:20–18:8, 22:18–23:6 (Exhibit 21 to Puracal Decl.).
[44] *Id.* at 23:17–24:8.
[45] Criminal Trial Transcript at D3 127:8–128:9 (Bertrand) [Dkt. No. 284-1 at 436–37].
[46] 2016-05-31 Letter from Frasier to Reim at 2 (Exhibit 64 to Puracal Decl.).
[47] Kathy McGuffin Deposition at 30:25–31:18, 36:10–25 (Exhibit 21 to Puracal Decl.).

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

**D.    The Defendants knew McGuffin was Innocent**

28.    Freeman's disappearance and death shocked the small community of Coquille, and law enforcement was under intense pressure to solve the crime.  There were no eyewitnesses to Freeman's disappearance or death, and there is not—and never has been—any blood, hair, fibers, fingerprints, DNA, or any other trace or tangible evidence of any kind connecting McGuffin to the abduction and death of Freeman.  Nonetheless, despite a corroborated alibi and no physical evidence to connect him to the crime, McGuffin became Coquille PD's primary suspect within a week after Freeman's disappearance.

29.    Coquille PD Chief Reaves appointed Officer Dave Hall to lead the investigation.[48] By Hall's own admission, he had never investigated a homicide and was ill-equipped to carry out the task.[49]  Hall's inexperience, combined with the pressure of a high-profile case, set in motion a bungled investigation.[50]  Over the next ten years, personnel from Coquille PD, the Coos County Sheriff's Office ("CCSO"), City of Coos Bay PD ("CBPD"), and the Oregon State Police ("OSP"), under intense community pressure, worked as part of the local "HIT Team"—a multi-agency investigative team—to bury exculpatory DNA results, fabricate evidence, and coerce and manipulate witness testimony in a concerted effort to bring about the prosecution and ultimate conviction of McGuffin.

30.    Since 2000, the Defendants have known that McGuffin is innocent.  Coquille PD Chief Reaves admitted that, during his tenure on the case from 2000 through 2008, there was not even "reasonable suspicion" to consider McGuffin a "suspect."[51]  CCSO Sheriff Zanni admitted

---

[48] Michael Reaves Deposition at 54:12–58:18 (Exhibit 54 to Puracal Decl.); 2010-01-23 Schwenninger Case Notes at 3 (Exhibit 48 to Puracal Decl., Attachment 4).
[49] *Id.*
[50] R. Paul Frasier PCR Deposition at 21:12–25:1 (Exhibit 62 to Puracal Decl.).
[51] Michael Reaves Deposition at 70:2–72:24 (Exhibit 54 to Puracal Decl.).

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

that, at least up to 2007, they did not have enough evidence to take the case to the District Attorney for consideration.[52]

31.     Nonetheless, since 2000, the Defendants continuously targeted McGuffin as the sole "suspect" and focus of their investigation.[53]  Starting in 2000, the Defendants also began fabricating evidence in an effort to secure an indictment against McGuffin, despite their knowledge of his innocence.

32.     For example, on July 4, 2000—just one week after Freeman's abduction—McGuffin voluntarily agreed to take a polygraph.  McGuffin passed the polygraph with a score indicating "strong truthful," but the Defendants fabricated a report that said that McGuffin failed the polygraph.[54]  The report was used as a "false evidence ploy" for purposes of interrogating McGuffin.  Defendant Hall then used the fabricated report to obtain a search warrant for McGuffin's vehicles, and the fabricated report of a "failed" polygraph was shared with local residents and broadcast in the media.[55]

33.     The Defendants knew that more than 20 people had seen and interacted with McGuffin while he was looking for Freeman on the night that she disappeared, so the Defendants began to fabricate the notion that McGuffin murdered Freeman and then went home and switched cars so he could drive around town to establish a fake alibi.  For example, on July 12, 2000—two weeks after Freeman disappeared and after the Defendants targeted McGuffin as the lead suspect in Freeman's abduction—Zavala wrote a report of his traffic stop of McGuffin on

---

[52] Craig Zanni Deposition at 213:15–218:21 (Exhibit 65 to Puracal Decl.).
[53] *See*, *e.g.*, 2000-07-10 Evidence Receipt [Dkt. No. 296 at 180] (signed by Defendant Hall, requesting the OSP Lab perform DNA testing on Freeman's shoes; Hall listed McGuffin and circled "S" for "suspect"); 2009 Dannels Operations Plan (Exhibit 66 to Puracal Decl.); Dannels Case Summary for Vidocq (Exhibit 4 to Puracal Decl.).
[54] Expert Report of Dr. Charles Honts at 8 (Exhibit 67 to Puracal Decl.).
[55] Hall Affidavit for Search Warrant [Dkt. No. 288-1 at 9].



MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

June 28, 2000.[56]  In his report, Zavala wrote that, after the traffic stop at about 10:30 p.m.,

Zavala "saw Nick [McGuffin] drive over the bridge, which at the time struck me as odd.  I was

trying to figure out why Nick drove over the bridge if he was looking for Leah, when Nick knew

she was last seen in town."[57]  This was false.  McGuffin did not drive over the bridge out of

town.[58]  In addition, at the time of the traffic stop no one, including McGuffin, knew that

Freeman was missing or where she was "last seen."  The only thing that McGuffin knew at the

time was that Freeman was not at Cherie Mitchell's house or any of the other places he would

expect her to be.  Zavala's report, including the suggestion that McGuffin's behavior was

suspicious, was fabricated two weeks after the fact as part of the effort to undermine McGuffin's

alibi.

34.    Indeed, as another example, the Defendants knew that McGuffin could not have

driven home at 10:30 p.m.  The Defendants' handwritten notes from a 2010 meeting of the HIT

Team confirm that the Defendants knew that, at 10:44 p.m., McGuffin was using the pay phone

at the Fast Mart in town to call his parents.[59]  McGuffin's home was more than five miles, down

winding country roads, in the opposite direction from the Fast Mart.[60]  McGuffin's mother

confirmed that he called home to find out whether Freeman had called looking for him.[61]

Zavala's report was fabricated two weeks after the fact to create the false impression that

McGuffin drove over the bridge toward his house, five miles outside of town on Baker Road, in

---

[56] 2000-06-28 Coquille PD Zavala Report [Dkt. No. 292-6 at 2].
[57] *Id.*
[58] Nicholas McGuffin Deposition at 69:11–71:7 (Exhibit 10 to Puracal Decl.).
[59] 2010-01-28 HIT Team Notes at 4 (Exhibit 42 to Puracal Decl.) ("??How did Nick contact Dad that night??  Previous subpoena records shows only the 2244hrs call from Fast Mart payphone.").
[60] *See* Map [Dkt. No. 293-2 at 19].
[61] Kathy McGuffin Deposition at 17:20–20:25 (Exhibit 21 to Puracal Decl.).

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

order to switch cars.  Coquille PD Chief Reaves approved the report.[62]

35.     By August 2000, the Defendants had DNA evidence that further proved McGuffin's innocence.  In late August 2000, Mary Krings, a DNA analyst from the Oregon State Police Forensic Services Division ("OSP Lab"), tested Freeman's Nike tennis shoes for DNA and discovered the DNA of an unidentified male on both shoes, including in and around bloodstains found on the left shoe Oswald claimed to recover miles from Freeman's body.[63] Nonetheless, Krings falsely wrote a report stating that the only DNA on the shoes was that of Freeman herself and the deputy who found the left shoe.  Susan Hormann, another analyst at the OSP Lab, reviewed the work and signed off.

36.     Further objective evidence confirmed McGuffin's innocence, including forensic examination of a paint chip recovered from Freeman's shirt.  Later testing confirmed that the paint chip did not come from McGuffin's vehicle or that of the friend who helped him look for Freeman that night.[64]

37.     Given McGuffin's innocence, the Defendants still lacked a coherent theory about how it could have been possible for McGuffin to have committed the crime.  The individual Defendants, however, did not stop pursuing McGuffin.[65]  Law enforcement began following McGuffin around and regularly stopping him for minor traffic violations.  Then, in May 2004, the Defendants accused McGuffin of another murder that happened in Corvallis—three hours away from Coquille—and told him that, because he had never been cleared as a suspect in the

---

[62] 2000-06-28 Coquille PD Zavala Report [Dkt. No. 292-6 at 2].
[63] *See* Statement of Facts ¶¶ 56–63.
[64] 2011-04-06 Microtrace Report [Dkt. No. 295-3 at 43].
[65] *See* 2010-01-25 HIT Team Note (Exhibit 68 to Puracal Decl.) ("Interview Mike Reeves – 'case never closed'").

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Freeman case, he would be considered for questioning in other murder investigations.[66]

**E.     The Defendants Fabricated Additional Evidence**

38.     In 2008, Chief Reaves resigned from Coquille PD, and Defendant Mark Dannels replaced him.  Dannels was hired based in part upon his pledge of re-opening the Freeman murder investigation.[67]  Dannels knew that the community was outraged that Freeman's murder had not been solved, and was aware that a group called the "Concerned Citizens of Coquille" had formed to report regularly to the Coquille City Council about problems with the police.[68]

39.     Upon his hiring, Chief Dannels re-convened the HIT Team in order to prepare a bogus case against McGuffin.[69]  Chief Dannels led the team directly, and Coquille PD Officer Defendant McNeely acted as lead case officer.  Some of the individuals from years past also continued their work on the team.[70]  But, given the known and objective evidence of McGuffin's innocence, Chief Dannels, like his predecessor, lacked a coherent narrative that would justify seeking an indictment of McGuffin for the Freeman murder.  The HIT Team's own meeting notes from 2009 and early 2010 demonstrate that they were grasping at straws, including speculating about two people being involved, guessing at who the other person could be (including McGuffin's own father), questioning how McGuffin could have possibly contacted his father, and musing about their inability to shore up the previously fabricated "vehicle switch"

---

[66] 2004-05-27 CCSO Downing Report (Exhibit 69 to Puracal Decl.).

[67] R. Paul Frasier PCR Deposition at 36:16–37:19 (Exhibit 62 to Puracal Decl.).

[68] Mark Dannels Deposition at 76:16–79:12 (Exhibit 51 to Puracal Decl.); Rule 30(b)(6) Deposition of City of Coquille at 40:10–41:19 (Exhibit 53 to Puracal Decl.).

[69] *See* Dannels Operation Plan (Exhibit 66 to Puracal Decl.) (prepared by Sanborn and approved by Dannels).

[70] *See, e.g.*, Craig Zanni Deposition at 219:9–221:1, 232:22–233:6 (Exhibit 65 to Puracal Decl.); Susan Hormann Deposition at 57:2–24 (Exhibit 70 to Puracal Decl.); 2010-01-28 HIT Team Note at 1 (Exhibit 42 to Puracal Decl.) ("Talked to Kathy (Wilcox) last night"); Kris Karcher Deposition at 155:3–10 (Exhibit 45 to Puracal Decl.).

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

theory.[71]  Under Chief Dannels' supervision and approval, Coquille PD Officer Defendant

Sanborn prepared an "Operation Plan" in 2009 that confirms that the team had "followed up on

new leads," but "most of the leads have not yielded any results."[72]

     40.    In 2010, after ten years of intense public pressure on a case that, as McNeely (the

lead case officer) put it, had become the "black sheep" of a small town,[73] Chief Dannels and the

other Defendants reinvigorated their efforts to fabricate a narrative that would accomplish their

goal of indicting McGuffin.

     41.    In January of 2010, Chief Dannels, as part of the reinvigorated effort, enlisted

Defendant Vidocq Society, a group of self-described "expert investigators" and "confidential

consultants," to assist with developing a theory of motive, a fake "profile" of the killer that

would fit McGuffin, and a narrative implicating McGuffin that would pass muster with a jury.

Chief Dannels collaborated with Defendant Richard Walter, a founding member of the Vidocq

Society, and Dannels presented their entirely fabricated "profile," narrative of the crime, and

evidence in support of it, to successfully secure an indictment of McGuffin.[74]  Chief Dannels

falsely told the grand jury that, through the collective efforts of law enforcement and their

"experts," and despite the absence of any tangible evidence implicating him, they were able to

eliminate all potential suspects except one: McGuffin.[75]

---

[71] *See* 2009-10-13 HIT Team Notes at 7 (Exhibit 46 to Puracal Decl.); 2010-01-28 HIT Team Notes at 4–5 (Exhibit 42 to Puracal Decl.).

[72] Dannels Operation Plan at 2 (Exhibit 66 to Puracal Decl.).

[73] 2010-10-15 Transcript of ABC News "20/20" Episode at 7 (Exhibit 1 to Puracal Decl.).

[74] R. Paul Frasier Civil Suit Deposition at 114:11–116:23 (Exhibit 3 to Puracal Decl.); R. Paul Frasier PCR Deposition at 161:4–19 (Exhibit 62 to Puracal Decl.).

[75] Grand Jury (2010) (Mark Dannels) at 134:1–9, 137:2–138:21 [Dkt. No. 295-1 at 1544, 1547–48].

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

### F.    McGuffin was Wrongly Charged and Convicted

42.    In August 2010, McGuffin was indicted and arrested for the murder of Freeman

based upon fabricated evidence, only some of which is discussed above and below.[76]

43.    McGuffin's arrest was filmed by the producers of the ABC News program

"20/20" and broadcast in an episode featuring Chief Dannels, the lead case officer (McNeely),

other investigating officers (Webley, Sanborn, and Riddle), the OSP Lab, the Vidocq Society,

and Richard Walter.[77]  The show aired nationally prior to McGuffin's criminal trial.  The made-

up motive, profile, false narrative, and fabricated evidence concocted by Chief Dannels, Walter,

and other police officers and deputies were featured prominently in the "20/20" episode and then

in the prosecutor's closing argument in McGuffin's criminal trial.[78]

44.    McGuffin was ultimately acquitted of murder, but convicted by nonunanimous

verdict of the lesser included crime of manslaughter and sentenced to 120 months imprisonment

plus three years of post-prison supervision.[79]

---

[76] *See, e.g.,* Grand Jury (2010) (David Zavala) at 102:2–105:10 [Dkt. No. 295-1 at 98] (testifying to fabricated report of McGuffin driving over the bridge toward home); Grand Jury (2010) (Kris Karcher) at 146:1–147:7, 148:3–11 [Dkt. No. 295-1 at 254] (testifying Freeman was dumped, rolled down the hill, and a path like someone had walked to the edge and looked down; testifying that blood on the shoe was high velocity and could have come from a cough (*i.e.*, from the mouth) or sneeze (*i.e.*, from the nose)); Grand Jury (2010) (Dave Hall) at 66:7–11 [Dkt. No. 295-1 at 186] (testifying McGuffin switched cars); Grand Jury (2010) (Kip Oswald) at 78:1–5 [Dkt. No. 295-1 at 294](testifying it was his DNA on Freeman's shoe); Grand Jury (2010) (Craig Zanni) at 93:13–21 [Dkt. No. 295-1 at 349] (testifying eliminate everyone except McGuffin); Grand Jury (2010) (Ray McNeely) at 138:4–141:18 [Dkt. No. 295-1 at 1126] (testifying that he confirmed Lindegren's *Survivor* story with a cable tv guide and falsely testifying he never looked up if Rudy was voted off); Grand Jury (2010) (Mark Dannels) at 131:3–132:2, 132:6–138:21 [Dkt. No. 295-1 at 1541] (testifying that no one has threatened any witnesses and there were no difficult witnesses; testifying no DNA of anyone else; testifying eliminated everyone except McGuffin); Indictment [Dkt. No. 291-15 at 2] (listing witnesses appearing by report, including Krings and Wilcox).

[77] 2010-10-15 ABC News 20/20 Transcript (2010) (Exhibit 1 to Puracal Decl.).

[78] *See* Statement of Facts ¶ 77.

[79] Criminal Case Judgment (Exhibit 71 to Puracal Decl.).

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

45.     McGuffin appealed his conviction to the Oregon Court of Appeals, and the judgment of conviction was affirmed without opinion in December 2013.  McGuffin's petition for review was denied by the Oregon Supreme Court in 2015.

**G.     McGuffin was Exonerated**

46.     In 2015, McGuffin filed for post-conviction relief.

47.     On November 29, 2019, the post-conviction court vacated McGuffin's conviction on the basis of, among other things, exculpatory DNA evidence that had been suppressed by the OSP Lab.[80]  Specifically, OSP Lab analysts discovered the DNA of an unidentified male on Freeman's shoes, including her bloodstained left shoe that was found miles from her body and had clearly been handled by her killer.  The OSP Lab knew about the exculpatory DNA evidence in 2000, but never disclosed it prior to the criminal trial.  McGuffin, his criminal defense counsel, and the District Attorney first learned of the exculpatory DNA while McGuffin was sitting in a prison cell years after his wrongful conviction.

48.     On December 17, 2019—after nineteen years of investigation, criminal, and post-conviction proceedings—the District Attorney unilaterally moved the court to dismiss all charges against McGuffin.[81]  Less than one hour after the District Attorney filed his motion, the criminal court dismissed the criminal case in its entirety,[82] and, as a matter of law, McGuffin's presumption of innocence was restored.[83]  McGuffin was released from custody that same night.

---

[80] PCR Judgment [Dkt. No. 296 at 1].

[81] District Attorney's Motion to Dismiss [Dkt. No. 290-3 at 4].

[82] Order of Dismissal (Exhibit 60 to Puracal Decl.).

[83] *See Nelson v. Colorado*, 581 U.S. 128, 135 (2017) (In a case in which the conviction was reversed and the state elected not to appeal or retry the case, the Supreme Court recognized that "once those convictions were erased, the presumption of [the plaintiffs'] innocence was restored."); *Johnson v. Mississippi*, 486 U.S. 578, 585 (1988) (After a "conviction has been reversed, unless and until [the defendant] should be retried, he must be presumed innocent of that charge."); *Figueroa v. Kern Cnty.*, 506 F.Supp.3d 1051, 1057 (E.D. Cal. Dec. 9, 2020) (In a

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

49.     By the time McGuffin was released from custody, he had been subjected to ten

years of harassment through the investigation and more than nine years in jail and prison for a

crime that he did not commit.[84]

50.     McGuffin and his minor daughter, S.M., timely filed this action on July 20, 2020.

**H.     Detailed Descriptions of Fabrications and Suppressions**

51.     Below is a detailed description of some of the key evidence that was fabricated

and suppressed by the Defendants.

**1.     Krings and Hormann withheld exculpatory DNA evidence on Freeman's right shoe and fabricated a report to hide the evidence that was suppressed.**

52.     Freeman disappeared on June 28, 2000, sometime between 9:15–9:30 p.m.  That

same night, around 11:30 p.m., Freeman's right Nike athletic shoe was discovered by a passerby

next to a cemetery on North Elm Street in Coquille, near the location where she was last seen

alive.  The cemetery is across the street from the local high school.

53.     In July 2000, Defendant Kathy Wilcox, a criminalist from the OSP Lab, examined

the right shoe and reported that "no blood was detected on this shoe."[85]  Defendant Mary Krings,

a DNA analyst from the OSP Lab, collected and analyzed cuttings from inside the shoe and

reported finding only the DNA of Freeman.[86]  Hormann, another DNA analyst from the OSP

Lab, signed off on a "technical review" of Krings' report (the review process used by the OSP

Lab to ensure that published reports are supported by case notes and that analysts' conclusions

---

section 1983 case arising out of a wrongful conviction, defendants moved to strike the allegation
in the complaint that the plaintiff was innocent, and the court denied the motion, recognizing that
"It is sufficient to acknowledge that having been granted state habeas relief, plaintiff is entitled to
the presumption of innocence.") (citing *Nelson*, 581 U.S. at 135).

[84] *See* Criminal Trial Transcript (Sentencing) at 1738:18–1742:11 [Dkt. No. 284-1 at 1799–1852]
(McGuffin proclaiming his innocence at sentencing hearing).

[85] 2000-07-17 OSP Lab Wilcox Report [Dkt. No. 296 at 179].

[86] 2000-08-27 OSP Lab Krings Report [Dkt. No. 295-3 at 45].

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

are supported by underlying data).[87]

54.     In 2010, Krings' written report was submitted to the grand jury, and Dannels testified that law enforcement had taken a fresh look at everything they had and determined that they "didn't have much of anything as far as DNA."[88] At trial in 2011, Krings' written report was entered into evidence, and Wilcox testified that Freeman's DNA was the only DNA found on the right (cemetery) shoe.[89] Krings' written report coupled with the testimony of Dannels and Wilcox was intended to, and did, create the inference that there was no DNA to connect anyone else to the crime, consistent with the Defendants' narrative that they had eliminated all other potential suspects.

55.     McGuffin learned about exculpatory DNA on the right (cemetery) shoe for the first time in post-conviction proceedings when McGuffin's post-conviction DNA expert, Huma Nasir, reviewed the OSP Lab's work. Nasir discovered that, contrary to Krings' written report and the testimony of Dannels and Wilcox, the raw data from the testing reveals that the right (cemetery) shoe includes the DNA of not only Freeman, but also an unidentified male contributor.[90] In addition, the male DNA on the right (cemetery) shoe does not match McGuffin, his family members, or any of his male associates who were also sampled during the 10-year long criminal investigation.[91] In May 2017—six years after McGuffin was convicted—the OSP

---

[87] Rule 30(b)(6) Deposition of Oregon State Police at 20:20–21:16, 23:24–25:15 (Exhibit 72 to Puracal Decl.).

[88] Indictment [Dkt. No. 291-15 at 2] (listing Krings as appearing by report); Grand Jury (2010) (Mark Dannels) at 132:6–19 [Dkt. No. 295-1 at 1542].

[89] Criminal Trial Transcript at D6 90:9–93:17 [Dkt. No. 284-1 at 1164–67].

[90] *See* Expert Report of Huma Nasir at 2 [Dkt. No. 297 at 254].

[91] *See* 2017-05-17 OSP Lab Report [Dkt. No. 297 at 211]. The OSP Lab later fabricated a report suggesting that McGuffin's contribution was "inconclusive." Plaintiffs' expert Kent Harman identified how that report was fabricated. *See* Expert Report of Kent Harman (Exhibit 73 to Puracal Decl.).

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Lab issued a new report agreeing with Nasir that there is, in fact, a mixture of DNA from Freeman and an unidentified male on the right (cemetery) shoe.[92]

> **2.** **Krings and Hormann withheld exculpatory DNA evidence on Freeman's left bloodstained shoe and fabricated a report to hide the evidence that was suppressed.**

56.    One week after Freeman disappeared, her left shoe was allegedly discovered by CCSO Deputy Oswald on Hudson Ridge, approximately 10 miles from the right (cemetery) shoe and the location where Freeman was last seen alive.

57.    In July 2000, Wilcox examined the left (Hudson Ridge) shoe and reported that "a small amount of human blood was detected on the bottom of this shoe."[93]  The Defendants also sent the shoes to a forensic lab in England called the Forensic Science Service (the "FSS Lab"), and the FSS Lab confirmed blood transfer on the sole, as well as on the inside of the heel and the lace[94]:

> There is blood still on the underneath of the left shoe, on the lace and on the inside of the shoe in the heel region. We would not conclude that any of this blood had originated by anything other than direct contact with a wet blood stained surface or object.

58.    Wilcox took swabs from the sole of the shoe, and Krings collected and analyzed cuttings from inside the shoe at the tongue and heel areas in which the bloodstains were identified.  Krings' analysis identified the DNA of Freeman and an unidentified male, which did not match McGuffin.[95]  Krings did not report McGuffin's exclusion, but an internal memorandum reveals that she told Wilcox that McGuffin "was probably not the DNA

---

[92] *See* 2017-05-17 OSP Lab Report [Dkt. No. 297 at 211].
[93] 2000-07-17 OSP Lab Wilcox Report [Dkt. No. 296 at 179].
[94] 2001-10-03 FSS Report at 15 (Exhibit 63 to Puracal Decl.).
[95] 2000-08-27 OSP Lab Report [Dkt. No. 295-3 at 45]; 2000-09-25 Memo from Wilcox and Krings to Reaves [Dkt. No. 296 at 189].

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

contributor" and it was "very unlikely" that the unidentified male DNA came from the officer who found the shoe, Deputy Oswald.[96]  Krings and Wilcox shared that memorandum with the Municipal Defendants during a HIT Team meeting in September 2000.

59.    The Municipal Defendants submitted a DNA sample from Deputy Oswald and asked Krings to reconsider her previous opinion.  Krings' analyzed the DNA sample from Oswald, compared it to the male DNA from the Hudson Ridge Shoe, and reported that the male DNA on the left shoe was "consistent with" Oswald's DNA.[97]  Hormann again signed off on the technical review.[98]

60.    In 2010, Krings' written report was submitted to the grand jury, and Dannels testified, in response to questioning by a grand juror, that law enforcement had taken a fresh look at everything they had and determined that they "didn't have much of anything as far as DNA."[99] At trial in 2011, Krings' reports were entered into evidence, and Wilcox testified that the only DNA found on the left (Hudson Ridge) shoe belonged to Freeman and Deputy Oswald.[100] Again, Krings' written report coupled with the testimony of Dannels and Wilcox was intended to create the inference that there was no DNA to connect anyone else to the crime, consistent with the Defendants' narrative that they had eliminated all potential suspects other than McGuffin.

61.    As with the DNA found on the right (cemetery) shoe, McGuffin learned about the exculpatory DNA on the left (Hudson Ridge) shoe for the first time in post-conviction proceedings.  In reviewing the OSP Lab analysts' work on the left (Hudson Ridge ) shoe,

---

[96] *Id.*
[97] 2002-01-21 OSP Lab Krings Report [Dkt. No. 295-3 at 50].
[98] Rule 30(b)(6) Deposition of Oregon State Police, Designee Marla Kaplan at 25:11–15 (Exhibit 72 to Puracal Decl.).
[99] Indictment [Dkt. No. 291-15 at 2] (listing Krings as appearing by report); Grand Jury (2010) (Mark Dannels) at 132:6–19 [Dkt. No. 295-1 at 1542].
[100] Criminal Trial Transcript at D6 90:9–93:17 [Dkt. No. 284-1 at 1164–67].

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

McGuffin's expert, Nasir, discovered that, contrary to Krings' written report and the testimony of Dannels and Wilcox, the data from the testing shows that the left (Hudson Ridge) shoe includes the DNA of Freeman and an unidentified male contributor who is *not* Deputy Oswald.[101]  There are, in fact, markers that are *inconsistent* with Oswald.  In May 2017—six years after McGuffin was convicted—the OSP Lab issued a new report agreeing with Nasir that there is, in fact, a mixture of DNA from Freeman and an unidentified male on the left (Hudson Ridge) shoe.[102]

62.    The bloodstain patterns on the left (Hudson Ridge) shoe, combined with the mixed DNA of Freeman and an unidentified male, indicate the transfer of blood and DNA to the shoe from the perpetrator handling the shoe with blood on his hands.[103]  Because the DNA is a mixture, it is not possible to know whether the blood is that of Freeman, the unidentified male, or some combination of the two.  Nasir opined that there is a strong possibility that the same unidentified individual contributed DNA to both the right and left shoes, and the current OSP Lab Technical Leader, Marla Kaplan, admitted that the lab could not rule out that possibility.[104]

63.    The unidentified male DNA on the shoes was known to Krings and Hormann in 2000, but never reported at any time prior to or during trial in the criminal case.  The Coos County District Attorney was so taken aback by the revelation of this unidentified male DNA during the post-conviction case that he hired his own independent DNA expert, Thomas Fedor

---

[101]  *See* Expert Report of Huma Nasir at 3 [Dkt. No. 297 at 255].  The data from the OSP Lab's testing may be interpreted in one of two ways.  One possible interpretation is that there are two contributors: Freeman and an unidentified male, not Deputy Oswald.  Another possibility is that there are three contributors: Freeman, Deputy Oswald, and an unidentified individual.  Under either scenario, there exists the DNA of an unidentified individual who was never reported.
[102]  *See* 2017-05-17 OSP Lab Report [Dkt. No. 297 at 211].
[103]  *See* Expert Report of Larry Barksdale at 23–25 (Exhibit 74 to Puracal Decl.).
[104]  Expert Report of Marla Kaplan at 16 [Dkt. No. 297 at 190].

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

from SERI Lab in California, who reviewed the OSP Lab's work and wrote that he was "flabbergasted at the depth of bad judgment" on the part of the OSP Lab analysts.[105]

> **3.**    **Hormann and the Municipal Defendants withheld documented evidence of the lab's attempt to manipulate testing to avoid developing DNA that would undermine the case against McGuffin.**

64.    Handwritten notes confirm that the Municipal Defendants had conversations with the OSP Lab about the DNA on Freeman's shoes. A note from McNeely in 2010 reads: "DNA in fridge – Leah's shoes - ?"[106] There are no reports or other documentation disclosing the content of those conversations.

65.    The OSP Lab analysts also recovered a number of hairs from the clothing that Freeman was wearing when her body was found. In March 2010, the Municipal Defendants sought to test those hairs for DNA, but the testing never happened.

66.    McGuffin learned for the first time during this lawsuit why the hairs were never tested. The OSP Lab disclosed for the first time in this civil suit a copy of an email from Hormann to one of the officers at Coquille PD discouraging testing of the hairs during the criminal case.[107] Hormann explained that finding hairs that came from someone other than the lead suspect (McGuffin) would hurt law enforcement's theory and help the accused. "You are almost guaranteed to find foreign hairs in a trace exam," Horman wrote, which "ends up giving the defense the bushy haired stranger they are looking for."[108] Horman did not disclose that she

---

[105] 2017-05-31 Email from Fedor to Frasier at 21 (Exhibit 75 to Puracal Decl.); R. Paul Frasier Civil Suit Deposition at 171:4–172:15 (Exhibit 3 to Puracal Decl.).

[106] 2010-01-29 McNeely Note re DNA (Exhibit 14 to Puracal Decl., Attachment 5). McNeely confirmed that he authored the handwritten note. *See* McNeely's Response to Plaintiffs' Request for Admission No. 5 (Exhibit 14 to Puracal Decl.).

[107] 2010-03-15 Email from Hormann to Smith at 1 [Dkt. No. 297 at 62]. *See also* R. Paul Frasier Civil Suit Deposition at 190:22–194:15 (Exhibit 3 to Puracal Decl.); Shaun McCrea Deposition at 185:10–187:12 (Exhibit 16 to Puracal Decl.).

[108] 2010-03-15 Email from Hormann to Smith at 1 [Dkt. No. 297 at 62].

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

and the OSP Lab *already knew* that DNA of an unidentified male had been found inside Freeman's shoes, and that adding the presence hairs from a foreign contributor would, most certainly, further undermine the case against McGuffin. Hormann's email was a warning to the Municipal Defendants that testing the hairs could be fatal to their efforts to secure an indictment.

67.     Hormann's email is further evidence of the OSP Lab's deliberate indifference to the truth. It is also evidence of Hormann's knowing participation in the conspiracy to prosecute and convict McGuffin for the murder of Leah Freeman.

**4.     The Municipal Defendants and Walter fabricated blood evidence, a profile of the killer to fit McGuffin, and a narrative of the crime.**

68.     As discussed above, after ten years of investigation, the Municipal Defendants lacked any convincing evidence of motive, and were without a sufficiently coherent narrative to seek or secure an indictment of McGuffin. The Municipal Defendants turned to the Vidocq Society for assistance at that point.

69.     In January 2010, a couple of the Municipal Defendants traveled to Philadelphia to meet with Vidocq, including Walter, and discuss investigating McGuffin for the Freeman murder. Dannels wrote a "case summary" for Vidocq identifying McGuffin as the lead suspect.[109] Vidocq told them they were "on the right track" in honing in on McGuffin, and Walter fabricated a profile of a "Power Assertive" perpetrator that Walter claimed "fits Mr. McGuffin."[110] Walter fabricated evidence that Freeman's murder fell under the category of "Power-Assertive Rape-Murder," a crime that would be committed by an arrogant perpetrator who needs to "maintain[ ] control over a vulnerable victim by an exaggerated machismo

---

[109] Dannels Case Summary for Vidocq at 5 (Exhibit 4 to Puracal Decl.).
[110] R. Paul Frasier Civil Suit Deposition at 226:10–23, 228:2–16, 231:14–20, 238:8–24 (Exhibit 3 to Puracal Decl.).

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

overreaction" and the use of "an assertive image and dominating violence."[111]  In this type of killing, according to Walter, the body is "dumped," and the perpetrator "will demand credit for the killing."[112]  Thus, "due to his need for glory and recognition, he may betray his secret to a bar patron, fellow worker, admirer, cell-mate, and sometimes the police."[113]  This profile was entirely made-up and alleged to fit McGuffin.  Walter shared his "profile" with the Municipal Defendants, who in turn used the "profile" to secure an indictment of McGuffin.

70.     After the meeting in Philadelphia, Walter became more involved in working with the Municipal Defendants, offering his fabricated theory of motive and a false narrative about how the crime occurred, which, again, they claimed conveniently fit only McGuffin.[114]

71.     For example, in late June 2010, Walter met with the Municipal Defendants in Coquille and filmed an episode of the ABC News program "20/20."  Walter admits in his motion for summary judgment that he "only traveled to Oregon to provide commentary on the Freeman Investigation" because "Vidocq agreed to allow it."[115]  The episode aired in 2010 (prior to the criminal trial in 2011) and features Walter working with the Municipal Defendants, explaining the false "profile" he created and the invented motive for Freeman's murder, and further explaining the false narrative that would ultimately convict McGuffin.[116]  Walter also created or emphasized false evidence that would ultimately be used at trial.[117]

---

[111] Robert D. Keppel and Richard Walter, *Profiling Killers: A Revised Classification Model for Understanding Sexual Murder*, 43(4) INT'L J. OF OFFENDER THERAPY AND COMPARATIVE CRIMINOLOGY 417, 420 (1999) (Exhibit 76 to Puracal Decl.).  Walter provided a copy of this article to the District Attorney.  *See* R. Paul Frasier Civil Suit Deposition at 92:7–93:11 (Exhibit 3 to Puracal Decl.).
[112] Keppel and Walter, *supra*, n.111, at 421 and 422.
[113] *Id.*
[114] *See* Vidocq's Synopsis at 1 [Dkt. No. 293-2 at 119].
[115] Walter's Motion for Summary Judgment at 15 [Dkt. No. 314].
[116] 2010-10-15 ABC News 20/20 Transcript (2010) (Exhibit 1 to Puracal Decl.).
[117] *See* Statement of Facts ¶¶ 72–77.

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

72.    Walter and the Municipal Defendants created the false narrative that McGuffin

caught up to Freeman on the night that she disappeared, they argued, and he hit her in the face.

Walter and the Municipal Defendants even fabricated blood evidence on Freeman's right shoe—

the bloodless shoe found next to the cemetery in the vicinity of where Freeman was last seen

alive—as evidence that she was punched in the face and bloodied at that location.  Chief Dannels

and Walters announced on "20/20", while discussing their fabricated narrative together on the

road where the right (cemetery) shoe was found, that the shoe was found there "with blood on

it," and that the blood indicated that Freeman "was forcibly taken from that point" where "[s]he

got probably smashed in the face."[118]

32.    In the internal document that Vidocq suppressed during the criminal case, Vidocq

documented Walter's involvement in simply making up evidence that would point at McGuffin:

> Richard [Walter] advises me that after discussion, they realized
> that the motive for the crime was the BF [boyfriend] wanted to get
> Leah pregnant, not the other way around, and they must have had a
> fight where her bloody shoe was found.  It was a PA [Power
> Assertive] case, and PAs hit for the face, therefore blood, and then
> they surmised that the BF put her in the trunk of the car that he was
> driving and called his father who came over and switched cars,
> allowing the BF to drive around being noticed while the father
> dumped the body.  It explains the sanitation of the car trunk and
> the unauthorized burning and that the BF had an alibi of driving
> around looking for Leah.[119]

There was, in fact, no blood on the right (cemetery) shoe, no evidence of a fight or blood

where the shoe was found, and no evidence that Freeman was hit in the face.[120]  Indeed, there

was no evidence of any traumatic injury to Freeman's face or skull.  There was also no evidence

---

[118] 2010-10-15 Transcript of ABC News "20/20" Episode at 11 (Exhibit 1 to Puracal Decl.).

[119] Vidocq Synopsis at 1 [Dkt. No. 293-2 at 119].

[120] *See* 2000-07-17 Wilcox Report at 1 [Dkt. No. 296 at 179]; Autopsy Report (Exhibit 5 to
Puracal Decl.); Dannels Case Summary for Vidocq at 1 (Exhibit 4 to Puracal Decl.) ("No broken
bones were found.").

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

that the car was sanitized or that McGuffin's father had even left the house that evening.[121]

74.    In that internal document, which Vidocq suppressed during the criminal case, Vidocq also wrote:  "Richard [Walter] says that the DA was very impressed and indicated that they now saw the case in a new light and he may have enough to indict."[122]  The claim was correct—the fabrications, alleged motive, and narrative created by Walter and the Municipal Defendants turned out to be sufficient to secure an indictment, and the State even intended at one point to call Walter as an expert witness in the criminal trial against McGuffin.[123]

75.    Though it was 10 years after the crime, it was just one week after Walter came to Coquille and fabricated the evidence with the Municipal Defendants that the State began issuing subpoenas for grand jury witnesses.[124]  The first witness appeared at grand jury one week later on July 14, 2010.[125]

76.    Ultimately, once it came out that Walter lacked credibility and had fabricated evidence in other cases, Walter was not called as a witness.  Prior to his work pursuing McGuffin, multiple courts admonished Walter for fabricating evidence in criminal cases by finding out who the lead suspect was from law enforcement and then concocting a false psychological profile and narrative of the crime that fit the existing suspect, in turn encouraging law enforcement to continue its pursuit of the lead suspect.[126]

---

[121] 2000-07-06 Wilcox Report of Car [Dkt. No. 310-15 at 231]; Kathy Wilcox Deposition at 109:1–110:13, 113:6–115:13 (Exhibit 6 to Puracal Decl.); Kathy McGuffin Deposition at 14:23–27:21 (Exhibit 21 to Puracal Decl.).
[122] Vidocq Synopsis at 1 [Dkt. No. 293-2 at 119].
[123] 2016-08-10 Letter from Frasier to Reim at 5 [Dkt. No. 293-2 at 105].
[124] *See* Grand Jury Subpoena to Denise Bertrand (née Freeman) (Exhibit 77 to Puracal Decl.).
[125] *See* Grand Jury (2010) Transcripts [Dkt. No. 295-1] (starting with testimony of Denise Bertrand (née Freeman)).
[126] *Drake v. Portuondo*, 553 F.3d 230, 238, 244 (2nd Cir. 2009) ("Walter's deposition on remand confirms that he grossly exaggerated most of his qualifications and outright lied about some of them. . . . Walter then had two weeks to conjure up his quackery.  His direct testimony on

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

77.    Nonetheless, the evidence fabricated by Walter and the Municipal Defendants was featured in the criminal case, including in closing argument punctuated by the fabricated narrative of the crime and hallmarks of the made-up "power assertive" theory and arrogance that leads to inadvertent "confession":

> [McGuffin] gets really upset.  "This is my Babydoll.  This is my girl.  No one else's."  He finds her by the high school.  He tries to get her into the car.  She loses a shoe.  *She ends up with a bloody lip or a bloody nose*.  She screams, which is what was heard by Mr. Bounds.  And in an effort to keep her quiet, or *in anger*, he strangles her.
>
> And then it goes downhill from there.  He panics, *changes clothes, switches cars, body gets dumped*.  He has to cover for himself.  *Has to go around asking questions*.  "Where is Leah?"  The pressure builds.  He has guilt over what he did.  He had that anxiety attack.
>
> And then, as time goes by, we start seeing *the arrogance*.  And then we get to the point of, "It's amazing what you can get away with in Coos County."[127]

///

///

///

///

---

picquerism, which spans twelve pages of trial transcript, consisted largely of uninterrupted and prolix exposition, weaving the complicated facts of the case into a seemingly coherent narrative, all pointing to the symptoms of the fictive syndrome called picquerism.  Walter even adapted the symptoms of the syndrome to remedy any potential weaknesses in the prosecution's theory of Drake's motive, for example, the lack of semen evidence."); *Drake v. Portuondo*, 321 F.3d 338, 342 (2nd Cir. 2003) ("It is now apparent that Walter's testimony concerning his qualifications was perjurious."); *State v. Roquemore*, 620 N.E.2d 110, 114 (Ct. App. Ohio 1993) (finding Walter's opinions inadmissible as "stereotyping the defendant"); *State v. Haynes*, 1988 Ohio App. LEXIS 3811, at *13 (1988) (finding Walter's opinions inadmissible as "stereotyping").
[127] 2011 Criminal Trial Transcript at D9 156:2–15 (emphasis added) [Dkt. No. 284-1 at 1756]. Freeman's cousin—a woman McGuffin barely knew—falsely reported that McGuffin said to her, "It's amazing what you can get away with in Coos County," and the State Defendants, in their motion, portrayed the statement as an admission of guilt.  *But see*, *infra*, Section III(B)(4).

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

### III.  POINTS AND AUTHORITIES

The State Defendants raise two arguments on summary judgment.[128]  First, the State Defendants ask the Court to enter summary judgment on Plaintiffs' claims for malicious prosecution, illegal pre-trial detention, and false imprisonment on the ground that probable cause existed for the indictment.[129]  Second, Defendant Krings asks the Court to enter summary judgment on Plaintiffs' claims under 42 U.S.C. § 1983 on the ground of qualified immunity.[130] Plaintiffs address these arguments in reverse order.

**A.      The Defendants are not entitled to qualified immunity.**

Federal courts analyze the question of qualified immunity using a two-step process.[131] First, the Court "must decide whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right."[132]  Second, the Court "must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."[133]

It is important to remember that "[o]n summary judgment as to qualified immunity, as in other contexts, the evidence is viewed in the light most favorable to the non-moving party."[134] Thus, "[if] a genuine issue of material fact exists that prevents a determination of qualified

---

[128] The State Defendants include in their overlength motion arguments related to Hormann, Wilcox, and Riddle.  *See* State Defendants' Motion at 62–85 [Dkt. No. 294].  The Court, however, denied the State Defendants' motion for overlength brief and instructed the parties that "The Court will not consider content included and issues raised beyond page 50 of State Defendants' Motion for Summary Judgment."  [Dkt. No. 309]  Based on the Court's order, Plaintiffs will not respond to the arguments by Hormann, Wilcox, and Riddle that appear beyond page 50 (ECF page 61) of the State Defendants' motion.

[129] State Defendants' Motion at 26 [Dkt. No. 294].

[130] *Id.* at 50.

[131] *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

[132] *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

[133] *Id.*

[134] *Trulove v. D'Amico*, No. 16-cv-050 YGR, 2018 U.S. Dist. LEXIS 31854, at *11 (N.D. Cal. Feb. 27, 2018) (citing *KRL v. Estate of Moore*, 512 F.3d 1184, 1189 (9th Cir. 2008)).

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

immunity at summary judgment, the case must proceed to trial."[135]

Krings argues that she is entitled to qualified immunity on Plaintiffs' claims under section 1983 related to Krings' fabrication of evidence and suppression of favorable evidence.[136] Krings is mistaken.  The motion must be denied.

### 1.    A reasonable jury can find Krings violated McGuffin's rights.

There is DNA from an unidentified male on Freeman's shoes, which was known to Krings (and Hormann) in 2000, but never disclosed prior to McGuffin's indictment or trial in the criminal case.[137]  McGuffin, his family, and his known male associates at the time, were expressly excluded as potential matches to the DNA found on Freeman's shoes.[138]  And yet, written OSP Lab reports from 2000 and 2002, which were relied upon by the parties in the criminal proceedings and used at grand jury and trial, falsely suggest the absence of DNA connecting anyone to the crime.[139]

From those facts, a reasonable jury can conclude that Krings fabricated evidence in violation of McGuffin's constitutional rights.  The evidence above is sufficient to find liability for direct fabrication.[140]

A jury could further conclude that Krings withheld favorable evidence in violation of *Brady*.  For the *Brady* claim, the jury will need to decide whether Krings acted with "deliberate indifference to or reckless disregard" for McGuffin's rights or for the truth.[141]

---

[135] *Id.* (quoting *Serrano v. Francis*, 345 F.3d 1071, 1077 (9th Cir. 2003)).
[136] State's Motion for Summary Judgment at 51, 57 [Dkt. No. 294].
[137] *See* Statement of Facts ¶¶ 52–63.
[138] *Id.*
[139] *Id.*
[140] *Spencer v. Peters*, 857 F.3d 789, 800 (9th Cir. 2017); *Richards v. Cnty. of San Bernardino*, 39 F.4th 562, 569 (9th Cir. 2022).
[141] *Tennison v. City & Cnty. of San Francisco*, 570 F.3d 1078, 1088 (9th Cir. 2009).

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

The Ninth Circuit defines "'deliberate indifference' as 'a conscious choice to disregard the consequences of one's acts or omissions,' and 'reckless disregard' as 'complete indifference to the plaintiff's rights' or action 'in the face of a perceived risk' that the plaintiff's rights will be violated.'"[142]  A jury could reasonably find deliberate indifference or reckless disregard based on the OSP Lab's own records.

Throughout the criminal case, the Municipal Defendants consistently presented the narrative that they had eliminated all potential suspects other than McGuffin.[143]  The reality, however, is that they could not reasonably eliminate as a suspect the man who left his DNA, mixed in with the victim's, on the victim's bloodstained shoe.  The OSP Lab analysts could not identify the male DNA found on Freeman's shoes, so they buried it and gave the Municipal Defendants what they asked for: a paper-trail of "evidence" eliminating the "bushy-haired stranger" and implicating McGuffin by default.[144]

First, Krings' handwritten notes reveal that she knew about the DNA of an unidentified male on the right (cemetery) shoe going all the way back to 2000, but she never reported it and, instead, fabricated a report to hide it.  For example, on lab exhibit 1.3 (a cutting from the right shoe), Krings wrote in her bench notes:



The handwritten notes read, "mx ♀ major."  The OSP Lab's Rule 30(b)(6) designee, Marla Kaplan, testified in deposition that "mx" stands for "mixture,"[145] and Krings testified that

---

[142] *Tatum v. Moody*, 768 F.3d 806, 821 (9th Cir. 2014).

[143] *See* Statement of Facts ¶¶ 41, 54, 60.

[144] *Id.* ¶¶ 52–63, 66.

[145] Rule 30(b)(6) Deposition of Oregon State Police, Designee Marla Kaplan at 71:19 (Exhibit 72 to Puracal Decl.).

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

"mixture" means "DNA from more than one person."[146]  Krings knew in 2000 that there was DNA from more than one person on the victim's right shoe, but she falsely reported DNA from only one person—the victim, Freeman.  Hormann reviewed the work and signed off on the fabricated report.[147]

Krings and Hormann also knew that the foreign DNA on the right (cemetery) shoe came from a male.  Plaintiffs' expert, Huma Nasir, explained that Krings' handwritten bench notes show where she wrote down the alleles[148] for a low-level male contributor.[149]  In a post-conviction deposition, the OSP Lab's DNA Unit Supervisor, Stephenie Winter-Sermeno, also confirmed that the "Y" peak in the sample from the right shoe as recorded in the bench notes indicates the presence of a male.[150]

Second, Krings' handwritten notes reveal that she also knew about the DNA of the unidentified male on the left (Hudson Ridge) shoe, but she fabricated a report attributing that

---

[146] Deposition of Mary Krings at 87:9–11 (Exhibit 78 to Puracal Decl.).

[147] *See* Statement of Facts ¶¶ 52–63.

[148] For an explanation of the DNA testing process, *see* Expert Report of Huma Nasir (PowerPoint Presentation) [Dkt. No. 297 at 263–278].  In brief, forensic DNA requires an analyst to interpret specific locations on the DNA strand.  Each location is called a locus, or loci for plural (pronounced "lo sigh").  At each locus, there are sub-regions made of short DNA sequences that repeat a certain number of times.  A forensic DNA analyst will examine variations in the number of times the DNA sequences repeat, and those repeats are called "alleles," which are labeled by number.  For example, at the locus labeled THO1, the alleles that have been observed in studies are 5, 6, 7, 8, 9, 9.3, 10, and 11.  Individuals typically inherit two alleles at each locus—one from mom and one from dad.  The alleles appear as peaks on an electropherogram created through the testing process.  The peaks may also represent background "noise" created during the testing process, and the analyst must distinguish peaks representing true DNA from those representing noise.  The height of the peak shows the intensity of the signal of DNA present.  An individual's genetic type, or genotype, consists of the alleles present at a given locus (*e.g.*, "12, 14"), and an individual DNA profile is the compilation of all genotypes obtained for the tested loci.  A DNA sample may consist of an individual profile (if the DNA came from one person) or a mixture (if the DNA came from more than one person).

[149] Expert Report of Huma Nasir ¶ 5 [Dkt. No. 297 at 255].

[150] Stephenie Winter Sermeno PCR Deposition at 42:9–23 (Exhibit 79 to Puracal Decl.).

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

DNA to Deputy Oswald.  In 2000, Krings reported the presence of male DNA on the left (Hudson Ridge) shoe, and she told Wilcox that McGuffin "was probably not the DNA contributor" and it was "very unlikely" that it came from the officer who found the shoe, Deputy Oswald.[151]  The unidentified male DNA on the victim's bloodstained shoe, however, created a problem for the Municipal Defendants who were working to implicate McGuffin.[152]

In early 2002, the Municipal Defendants submitted a reference standard for Deputy Oswald, and Krings immediately returned a report that Oswald's DNA profile was "consistent with" the male DNA profile from the left (Hudson Ridge) shoe.[153]  Krings' report effectively negated the possibility of an unidentified male suspect and allowed the Municipal Defendants to continue focusing on McGuffin.  Krings knew, however, that the DNA was not consistent with Deputy Oswald.

Again, Plaintiffs' expert, Huma Nasir, explained that Krings' handwritten bench notes reveal alleles that *do not* match Deputy Oswald, Freeman, or McGuffin.[154]  Krings knew about the presence of DNA from an unidentified male and said nothing.  Instead, she fabricated a report that led the District Attorney (and ultimately the grand jury, McGuffin's criminal defense counsel, and the trial jury) to believe that there was no DNA evidence that could be connected to the abduction and murder of Leah Freeman.  And again, Hormann reviewed the work and signed off on the fabricated report.[155]

The evidence was suppressed by the OSP Lab and not produced to McGuffin's criminal

---

[151] 2000-09-25 Memo from Wilcox and Krings to Reaves [Dkt. No. 296 at 189].
[152] *Cf.* R. Paul Frasier PCR Deposition at 87:5–11 (Exhibit 62 to Puracal Decl.) (wanted to know whose DNA was on the bottom of Freeman's shoe because it "could be the potential suspect").
[153] 2002-01-21 OSP Lab Krings Report [Dkt. No. 295-3 at 50].
[154] Expert Report of Huma Nasir at ¶ 7 [Dkt. No. 297 at 255].
[155] *See* Statement of Facts ¶¶ 52–63.

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

defense counsel or even the District Attorney.  The District Attorney explained:

> We have to remember that when I tried this case back in 2011 the evidence presented was that the male DNA on that shoe was consistent with Oswald.  Given that the other male DNA profiles were not reported because of low numbers, we created at trial the impression that there was no unknown DNA in the case.  Now we know it is not true.  We do have unknown male DNA in the case and the defendant is excluded.[156]

Based solely on the DNA reporting on the shoes, a reasonable jury could conclude that the OSP Defendants deliberately communicated only the evidence that favored the government, while willingly suppressing that which could exonerate McGuffin.  The evidence that Krings and Hormann knew of the DNA of an unidentified male on Freeman's shoes, and actively hid it from discovery, will be enough for a reasonable jury to find that Krings exhibited deliberate indifference for the truth and reckless disregard of Plaintiffs' constitutional rights.  In addition, the evidence that Krings and Hormann falsely reported that the only DNA on the shoes was that of Freeman and Oswald will be enough for a reasonable jury to find that Krings and Hormann fabricated evidence, a constitutional violation that does not require a separate finding indifference.

### 2.    The constitutional rights at issue were clearly established in 2000.

Krings does not dispute that the right to be free from criminal charges based on fabricated evidence, and the right to favorable evidence in a criminal case, were clearly established at the time of the alleged violations.  That should end the inquiry.  The legal fiction of qualified immunity is premised on a hypothetical question about whether the law was clearly established at the time of the conduct in question, and whether the governing law was sufficient to provide notice to officials that their conduct would violate constitutional rights.  As myriad cases

---

[156] 2017-05-03 Email Frasier to OSP Lab (Exhibit 80 to Puracal Decl.).

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

demonstrate, and Krings does not dispute, by 2000 it was clearly established in the law that state officials could not fabricate or write misleading reports or suppress exculpatory evidence.[157]

    **3.      The lab's "protocol" is not relevant to the question of qualified immunity.**

Nonetheless, Krings attempts to argue that, despite clearly established law, her actions were reasonable based on the lab's protocols in 2000. Krings' subjective intent, however, is not relevant to the question of qualified immunity.[158]

All of Krings' arguments about the OSP Lab "protocol" are directed at the *factual* inquiry of whether Krings acted with deliberate indifference or reckless disregard in suppressing exculpatory evidence, rather than the legal question of whether Krings is entitled to qualified immunity. The *factual* inquiry is for the jury. A reasonable jury can find that Krings acted with deliberate indifference or reckless disregard.

Krings initially argues that the unidentified male DNA on the right (cemetery) shoe was not reported because it was "low level," or below the "interpretation threshold," such that Krings could not be confident that it was in fact DNA and not an artifact (or background "noise") from testing. According to the State Defendants, the OSP Lab had a protocol in 2000 that gave

---

[157] *See, e.g., Miller v. Pate*, 386 U.S. 1, 7 (1967) (citing *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)) (fabrication of evidence); *Carrillo v. Cnty. of Los Angeles*, 798 F.3d 1210, 1219–23 (9th Cir. 2015) (holding that it was clearly established as of 1978 that police officers are subject to *Brady*) (citing *United States v. Butler*, 567 F.2d 885, 891 (9th Cir. 1978)); *Constanich v. Dept. of Soc. & Health Servs.*, 627 F.3d 1101, 1111 (9th Cir. 2009) (fabrication); *Cunningham v. City of Wenatchee*, 345 F.3d 802, 811 (9th Cir. 2003) (finding the right to be free from fabricated evidence clearly established in 1994); *Devereaux v. Abbey*, 263 F.3d 1070, 1074–75 (9th Cir. 2001) (en banc) (same and noting it is "virtually self-evident" that police should know they cannot prosecute someone on the basis of fabricated evidence); *Liston v. Cnty. of Riverside*, 120 F.3d 965, 973 (9th Cir. 1997) (fabrication may occur by "material false statements or material omissions"); *Mata-Gonzalez v. Monico*, No. 3:11-cv-00260-PK, 2013 U.S. Dist. LEXIS 138960, at *34 (D. Or. Sept. 27, 2013) (reasonable police officer "would understand it to be obvious" not to fabricate evidence).

[158] *Inouye v. Kemna*, 504 F.3d 705, 712 (9th Cir. 2007) (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)); *Sorrels v. McKee*, 290 F.3d 965, 970 (9th Cir. 2002)).

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

analysts discretion to choose whether to interpret low level DNA, and, according to the State

Defendants, Krings chose not to interpret the male DNA on Freeman's shoes.  (It should be

noted that whether such a protocol existed, and what it meant, is itself a disputed question of fact.

Hormann and Winter-Sermeno testified that the analysts had discretion to choose whether to

"report" low level DNA.[159]  Kaplan and another analyst, Janelle Moore, testified that analysts

had discretion to choose whether to "interpret" low level DNA.[160]  Kaplan, however, testified

that, if the analyst chose to interpret the DNA, the analyst was then required to report it.[161])

Krings testified in her deposition that she has no memory of her testing, making the State

Defendants' assertions about whether she interpreted "low-level" DNA speculative.[162]

Moreover, Krings' handwritten bench notes from 2000 belie the Defendants' speculation about

whether Krings interpreted the low-level DNA to represent a male contributor.  In 2000, Krings

documented her conclusion that the DNA on the right (cemetery) shoe was, in fact, a

"mixture"—meaning DNA from more than one person.[163]  Because Krings interpreted a mixture,

she was required to report it.  Kaplan confirmed in the OSP Lab's Rule 30(b)(6) deposition that

"if something is interpreted and a conclusion is drawn, then it goes on the report."[164]  Krings

interpreted the alleles and concluded that those alleles represented DNA from a male contributor.

---

[159] Stephenie Winter Sermeno PCR Deposition at 31:8–34:13 (Exhibit 79 to Puracal Decl.);
Susan Hormann Deposition at 107:1–16 (Exhibit 70 to Puracal Decl.).
[160] Marla Kaplan PCR Deposition at 18:9–19:8 (Exhibit 81 to Puracal Decl.); Janelle Moore PCR
Deposition at 52:2–53:12 (Exhibit 82 to Puracal Decl.).
[161] Rule 30(b)(6) Deposition of Oregon State Police at 63:16–22 (Exhibit 72 to Puracal Decl.).
[162] Mary Krings Deposition at 94:5–99:24 (Exhibit 78 to Puracal Decl.).  *See also* 2017-05-03
Email between DA Frasier and OSP Lab (Exhibit 80 to Puracal Decl.) (OSP Lab DNA Unit
Supervisor admitting to the District Attorney during post-conviction proceedings that "[i]t is
difficult to understand the conclusion that was made, as none of our current staff was here at the
time the analysis was conducted.").
[163] *See*, *supra*, Section III(A)(1).
[164] Rule 30(b)(6) Deposition of Oregon State Police, Designee Marla Kaplan at 63:16–22
(Exhibit 72 to Puracal Decl.).

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

She then issued a report omitting any mention of her conclusions regarding that male contributor. And Hormann approved the omission.

The "low-level" and "below the interpretation threshold" argument is further belied by the fact that the OSP Lab changed its protocol, lowered its interpretation threshold, and began requiring the interpretation of low-level DNA samples long before McGuffin was indicted in 2010. Krings had left the OSP Lab by the time that McGuffin was indicted in 2010, but Hormann was still with the OSP Lab, had been promoted to Unit Supervisor, and was directly involved in re-testing evidence for the Municipal Defendants' reinvigorated effort to persuade the District Attorney to indict McGuffin.[165] By that time, the alleles from the samples collected from Freeman's shoes were well above the OSP Lab interpretation threshold, and the presence of DNA from an unidentified male contributor on both shoes was unmistakable.[166] Nonetheless, Hormann chose not to disclose the presence of unidentified male DNA on Freeman's right (cemetery) shoe, and chose not to correct the false report that the only DNA found on Freeman's left (Hudson Ridge) shoe belonged to Freeman and Deputy Oswald.[167] (The State Defendants concede that the interpretation threshold changed, but omit from their motion the fact that the lab's Rule 30(b)(6) designee (Marla Kaplan) testified that the change occurred in June *2004*— more than six *years* before McGuffin was indicted.[168] The lab refused to answer Plaintiffs' questions about whether anyone at the lab was required to report the unidentified male DNA after that change.[169])

---

[165] Susan Hormann Deposition at 31:8–13, 57:2–24 (Exhibit 70 to Puracal Decl.).
[166] *See id.* at 80:5–85:12. *See also* Expert Report of Huma Nasir at ¶ 9 [Dkt. No. 297 at 255].
[167] *See id.*; *cf.* 2008-11-18 Letter Hormann to Frasier (Exhibit 83 to Puracal Decl.) (listing the Krings' reports from 2000 and 2002).
[168] *See* State Defendants' Motion for Summary Judgment at 48 [Dkt. No. 294]. *See also* Rule 30(b)(6) Deposition of OSP Lab at 107:10–113:15 (Exhibit 72 to Puracal Decl.).
[169] *Id.*

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Second, Krings argues that, although the exculpatory DNA evidence was not reported, McGuffin's criminal defense counsel had access to the OSP Lab's bench notes and could have hired an independent expert to interpret the data. This argument is foreclosed by the facts and the law. As to the facts, the District Attorney himself was also not able to make this connection[170]—and a reasonable jury could therefore find that the evidence was suppressed. Krings falsely reported that the only DNA found on Freeman's shoes—or anywhere on Freeman for that matter—belonged to Freeman and Deputy Oswald. It was not unreasonable for McGuffin's criminal defense counsel to rely upon the representations of the OSP Lab, and a jury is not likely to agree that criminal defense attorneys in general must assume that the OSP Lab's presumably science-based reporting is false or fraudulent.

This argument also runs contrary to established precedent. The Ninth Circuit has already confirmed repeatedly that the state's disclosure "obligation under *Brady* is not excused by a defense counsel's failure to exercise diligence with respect to suppressed evidence."[171] Simply put, the government does not get to hide or fabricate evidence and then blame any constitutional violation on criminal defense counsel's failure to find it.

*Roberts v. Howton*, the federal habeas case upon which Krings attempts to rely, is distinguishable.[172] That case also involved DNA testing by Krings. In that case, however, Krings disclosed the presence of foreign DNA and specifically wrote in her report that the DNA was "present at levels too low to make a conclusive determination."[173] Krings did not disclose the fact that she compared that low level DNA to a man (Ed Mills) and told the prosecutor that

---

[170] *See* R. Paul Frasier Civil Suit Deposition at 175:16–176:8 (Exhibit 3 to Puracal Decl.).
[171] *Amado v. Gonzalez*, 758 F.3d 1119, 1135 (9th Cir. 2014).
[172] 13 F. Supp. 3d 1077, 1109–10 (D. Or. Apr. 9, 2014).
[173] *Id.*

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

he was "not excluded."[174]  The federal district court found that the information was "disclosed"
for purposes of *Brady* because Krings reported the existence of the foreign DNA and produced
the raw data from which the petitioner could see the profile of that contributor.[175]

What Krings did here was markedly different.  In *Howton*, Krings had actually reported
the presence of low-level DNA, and disclosed to the prosecutor her comparison of that DNA to
Mills, as well as her exclusion of Mills.  In this case, Krings *did not* report, to the prosecutor *or*
defense counsel, the presence of low-level DNA, her interpretation of that DNA, her exclusion of
McGuffin, or the existence of the foreign contributor.  Instead, she wrote two reports that would
lead any reader to conclude the opposite—that there *was no* foreign contributor.[176]

The information disclosed in the OSP Lab's bench notes is a series of numbers that
correspond to peaks on an electropherogram.[177]  The District Attorney and criminal defense
counsel confirmed in depositions that they do not have any understanding of what those numbers
mean.[178]  Plaintiffs' expert, Huma Nasir, explained:

> To determine that there was additional information obtained from
> testing of the samples in this case requires a review and
> understanding of the technical data, including lab notes,
> worksheets and electropherograms.  A lay person without technical
> expertise in DNA analysis would be led to believe from the OSP

---

[174] *Id.*

[175] *Id.*

[176] *Cf.* R. Paul Frasier Civil Suit Deposition at 175:16–176:8 (Exhibit 3 to Puracal Decl.); Shaun
McCrea Deposition at 41:4–14, 59:16–19, 99:8–20 (Exhibit 16 to Puracal Decl.).

[177] *See* Krings' Bench Notes [Dkt. No. 298 at 24] (showing the peaks on the electropherogram
for testing of cutting 1.3 (from the right shoe) on July 31, 2000); *id.* at 34 (showing the peaks on
the electropherogram for testing of cutting 2.3 (from the left shoe) on July 31, 2000; *id.* at 152
(showing Krings' handwritten notes of the alleles that correspond to the peaks she saw on the
electropherogram for testing of cutting 1.3 (from the right shoe)); *id.* at 153 (showing Krings'
handwritten notes of the alleles that correspond to the peaks she saw on the electropherogram for
testing of cutting 2.3 (from the left shoe)).  *See also* Expert Report of Huma Nasir at ¶¶ 5, 7 [Dkt.
No. 297 at 255] (explaining what the alleles shown in Krings' bench notes mean).

[178] R. Paul Frasier PCR Deposition at 41:19–25 (Exhibit 62 to Puracal Decl.); Shaun McCrea
Deposition at 85:7–86:10 (Exhibit 16 to Puracal Decl.).

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Lab report that only Leah Freeman's profile was obtained [from the right shoe] and there is no additional profile obtained from this sample.[179]

McGuffin's defense counsel agreed she would have needed an expert to decipher the peaks on the electropherograms and the numbers on the allele charts.[180] As this Court has already recognized, "[e]vidence is suppressed when defense counsel is not reasonably aware of it," and "defense counsel is not reasonably aware of facts that require further investigation."[181]

The crux of Krings' arguments is that a reasonable DNA analyst, faced with the lab's protocol from 2000, would believe that she has discretion to withhold exculpatory DNA evidence and falsify the results of her interpretation. Krings' arguments are not consistent with well-established constitutional principles, or supported by any precedent, and must be rejected. An official is not entitled to qualified immunity for conduct that is patently violative of constitutional rights.[182]

## B.  A reasonable jury can find an absence of probable cause.

Separate from Krings' argument on qualified immunity, the State Defendants assert that the Court can find probable cause as a matter of law, precluding Plaintiffs' claims for malicious prosecution and illegal pretrial detention. Regardless of how they were pleaded, or labels previously assigned, Plaintiffs have a single claim arising under the Fourth Amendment for McGuffin's seizure pursuant to legal process. Following the Supreme Court's recent decisions, there is no distinction between a Fourth Amendment claim for detention and so-called malicious

---

[179] Expert Report of Huma Nasir at ¶ 4 [Dkt. No. 297 at 254].
[180] Shaun McCrea Deposition at 85:7–86:10 (Exhibit 16 to Puracal Decl.).
[181] Order re Scope of McCrea Deposition at 3 [Dkt. No. 235] (citing *Milke v. Ryan*, 711 F.3d 998, 1017 (9th Cir. 2013) and *Amado*, 758 F.3d at 1136–37).
[182] *Cf. Grossman v. City of Portland*, 33 F.3d 1200, 1209 (9th Cir. 1994) ("Where a statute authorizes official conduct which is patently violative of fundamental constitutional principles, an officer who enforces that statute is not entitled to qualified immunity.").

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

prosecution under the Constitution.[183]  Instead, "because the gravamen of the Fourth Amendment

claim for malicious prosecution . . . is the wrongful initiation of charges without probable cause"

and "the wrongful initiation of charges without probable cause is likewise the gravamen of the

tort of malicious prosecution," these claims overlap and arise under the same constitutional

framework.[184]

　　　To succeed on such a claim, Plaintiffs must prove that McGuffin was detained in the

absence of probable cause and that the proceedings terminated favorably in McGuffin's favor.[185]

Probable cause cannot be based upon fabricated evidence.[186]  Indeed, "if the proceeding is

tainted—as here, by fabricated evidence—and the result is that probable cause is lacking, then

the ensuing pretrial detention violates the confined person's Fourth Amendment rights."[187]

---

[183] *See Chiaverini v. City of Napoleon*, 602 U.S. 556, 556 (2024) (recognizing Fourth Amendment "claims have been analogized to the common-law tort of malicious prosecution"); *Thompson v. Clark*, 596 U.S. 36, 43 (2022); *Manuel v. City of Joliet,* 580 U.S. 357, 364, (2017); *Fatai v. City & Cnty. of Honolulu*, No. 19-CV-00603-DKW-WRP, 2022 U.S. Dist. LEXIS 121527, at *14 (D. Haw. July 11, 2022) (recognizing that *Thompson* "did resolve the labeling question" by "equating malicious prosecution with "unreasonable seizure pursuant to legal process." (citing *Thompson*, 142 S. Ct. at 1337)).

[184] *Thompson*, 596 U.S. at 43.

[185] While some pre-*Thompson* decisions refer to proving malice, that is inconsistent with the claims arising under the Fourth Amendment.  Malice is inconsistent with the Fourth Amendment's objective reasonableness standard.  *See Wren v. United States*, 517 U.S. 806, 815 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."); *Graham v. Connor*, 490 U.S. 386, 399 (1989) ("The Fourth Amendment inquiry is one of 'objective reasonableness' under the circumstances, and subjective concepts like 'malice' and 'sadism' have no proper place in that inquiry.").  At any rate, "[malice is usually a question of fact for the jury to determine." *Estate of Tucker ex rel. Tucker v. Interscope Records, In*c., 515 F.3d 1019, 1030 (9th Cir. 2008).

[186] *See Manuel*, 137 S. Ct. at 919; *Milstein v. Cooley*, 257 F.3d 1004, 1011 (9th Cir. 2001) (probable cause never existed because the prosecutor and other defendants "concocted the essential facts"; namely, fabricated statements from a witness); *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004) (holding that a court's decision to hold plaintiff after a preliminary hearing does not prevent a fourth amendment claim where plaintiff alleges "the criminal proceedings were initiated on the basis of the defendants' intentional and knowingly false accusations and other malicious conduct").

[187] *Manuel*, 137 S. Ct. at 920 n.8.

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Here, despite what the State Defendants claim about the finding of probable cause from the grand jury, they have ignored the fact that those proceedings were tainted by the fabricated evidence used against McGuffin before, during, and after those events. For example:

### 1. The grand jury heard fabricated evidence putting McGuffin and Freeman together after 9:00 p.m.

McGuffin never saw or spoke with Freeman after he dropped her off at Mitchell's house at 7:00 p.m. on June 28, 2000.[188] The Defendants, however, needed a witness who could put the two together after 9:00 p.m. to make their false narrative work.

The Municipal Defendants fabricated the evidence they needed by manipulating John Lindegren into saying that he saw McGuffin and Freeman standing together outside the Mitchell residence shortly after 9:00 p.m.[189] The grand jury heard from John Lindegren and his sister Hjordis Lindegren. Both witnesses testified that they were watching *Survivor* the night that Freeman disappeared and they could recall the night specifically because it was the episode during which contestant "Rudy" was voted off.[190] McNeely and Webley withheld from the grand jury the Wikipedia page and their handwritten notes confirming that the *Survivor* story was false.[191] McNeely and Webley also withheld from the grand jury Lindegren's statement that he

---

[188] Nicholas McGuffin Deposition at 58:25–71:22, 96:23–104:4, 190:19–195:14 (Exhibit 10 to Puracal Decl.).

[189] *See* 2010-05-18 Coquille PD McNeely Report of Lindegren (Exhibit 26 to Puracal Decl.). *But see* John Lindegren Deposition at 136:20–137:14, 174:6–17, 232:6–233:9 (Exhibit 22 to Puracal Decl.); 2010-05-19 Coquille PD Wikipedia Printout (Exhibit 14 to Puracal Decl., Attachment 2). McNeely admitted that it is his handwriting that appears at page 5 of the Wikipedia printout. *See* McNeely Response to Plaintiffs' Request for Admission No. 2 (Exhibit 14 to Puracal Decl.). 2010-05-19 Handwritten Notes re Hjordis Lindegren (Exhibit 30 to Puracal Decl., Attachment 1). Webley admitted that the handwriting on this document is his. *See* Webley Response to Plaintiffs' Request for Admission No. 1 (Exhibit 30 to Puracal Decl.). *See also* R. Paul Frasier Civil Suit Deposition at 153:24–154:1 (Exhibit 3 to Puracal Decl.).

[190] *See* Grand Jury (2010) (John Lindegren) at 89:1–2 [Dkt. No. 295-1 at 1037]; Grand Jury (2010) (Hjordis Lindegren) at 97:9–15 [Dkt. No. 295-1 at 1028].

[191] 2010-05-19 Coquille PD Wikipedia Printout (Exhibit 14 to Puracal Decl., Attachment 2);

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

was not certain that he saw McGuffin.[192]  The State Defendants rely on Lindegren's grand jury testimony as evidence of probable cause, but omit from their motion any discussion of the evidence that proves its falsity or the Defendants' knowledge of that falsity.

The State Defendants do the same with their description of the grand jury testimony of Alicia Hyatt (formerly Hartwell).  On July 21, 2010, Hyatt testified at grand jury. During her testimony, Hyatt stated that, on the evening of June 28, 2000, she was 11 or 12 years old, and she was riding with some other kids in a van driven by the mother of her friend.  Hyatt testified that, while she was in the van, she saw Freeman walking past the high school.  Hyatt testified that she observed Freeman approach a vehicle, which Hyatt described as a dark colored Honda or Nissan compact car.[193]  *That same day*, after her appearance at the grand jury, Webley and McNeely met with Hyatt at the Myrtle Point Police Department.  Webley reported that he showed Hyatt different photos of vehicles and Hyatt picked out "McGuffin's blue Mustang as a possible identification of the car."[194]  On August 11, 2010, Hyatt was brought back before the grand jury. This time Hyatt testified, "I didn't recognize it [the vehicle] until I saw pictures of it."[195]  Hyatt went on to testify that the vehicle she observed near Freeman on June 28, 2000, was a "blue Mustang."[196]

Hyatt's description of the car changed from a dark colored, compact, Japanese car to an older model, blue Mustang only *after* she met with McNeely and Webley and was shown photos.

---

2010-05-19 Handwritten Notes re Hjordis Lindegren (Exhibit 30 to Puracal Decl., Attachment 1); R. Paul Frasier Civil Suit Deposition at 149:5–154:25 (Exhibit 3 to Puracal Decl.).
[192] *Compare* 2010-05-18 McNeely Report re Lindegren (Exhibit 26 to Puracal Decl.) *with* John Lindegren Deposition at 136:20–137:14, 174:6–17 (Exhibit 22 to Puracal Decl.).
[193] Grand Jury (2010) (Alicia Hyatt) at 37:8–15 [Dkt. No. 295-1 at 202].
[194] 2010-07-24 Coquille PD Webley Report re Hyatt (Exhibit 84 to Puracal Decl.).
[195] Grand Jury (2010) (Alicia Hyatt at 166:22–167:4 [Dkt. No. 295-1 at 1348–49].
[196] *Id.*



MALONEY | LAUERSDORF | REINER, pc
                              ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

McNeely and Webley did not keep any records of the photos they showed Hyatt and did not document whether they showed Hyatt one photo of the Mustang or multiple photos of other vehicles.[197]  The officers did not include in their report any details about how the photos were presented, if they gave Hyatt an admonishment that the vehicle may or may not be present, or whether she explained her dramatic change in description.  According to Plaintiffs' expert, Russ Hicks, "[t]he absence of documentation represents a significant departure from standard police practices. An officer adhering to standards and training, would not have thought it was appropriate to omit that type of documentation, especially when the identification is made ten years after the fact and represents a marked difference from the witness's description just hours earlier."[198]  In addition, handwritten notes from the 2009 HIT team indicate that there was a video camera in the interview room at the Myrtle Point Police Department when Hyatt was interviewed.[199]  However, there is no documentation that the identification process was recorded, and, if it was, the video has never been disclosed.

Police officers "may not disregard facts tending to dissipate probable cause."[200]  Yet the State Defendants omit from their motion any of the myriad evidence that undermines probable cause in this case.

///

///

///

---

[197] 2010-07-24 Coquille PD Webley Report re Hyatt (Exhibit 84 to Puracal Decl.); Chris Webley Deposition at 148:6–149:17 (Exhibit 57 to Puracal Decl.); Raymond McNeely Deposition 173:4–176:15 (Exhibit 85 to Puracal Decl.).
[198] Report of Russ Hicks at 19 (Exhibit 29 to Puracal Decl.).  *See also* Report of Dr. Brian Cutler at 16 (Exhibit 28 to Puracal Decl.).
[199] 2009-10-13 HIT Team Notes at 8 (Exhibit 46 to Puracal Decl.).
[200] *United States v. Lopez*, 482 F.3d 1067, 1073 (9th Cir. 2007).

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417


**2.    The grand jury heard fabricated evidence that McGuffin cleaned the trunk of his car to cover up the murder.**

As discussed in Plaintiffs' response to the Municipal Defendants' motion for summary judgment, the Defendants fabricated evidence that McGuffin cleaned or "sanitized" his car following Freeman's disappearance.  Defendants did so to create the false narrative that McGuffin transported Freeman's body in the trunk and then engaged in a sophisticated cover up to hide the blood evidence.[201]  The State Defendants represent in their motion that the trunk of the car was "unexpectedly empty after Freeman disappeared."[202]  The State Defendants agree that Wilcox reported the trunk was empty, but the Defendants represent that "Wilcox did not testify before the grand jury[.]"[203]  The State Defendants omit from their motion the fact that the grand jury received Wilcox's report about the trunk being empty.[204]

The State Defendants further omit from their motion Wilcox's admission for the first time during this case that she knew at the time that there was a reasonable explanation for the trunk being empty: the gas tank was leaking into the trunk, so it had been emptied before Freeman's disappearance.[205]  Wilcox admitted during her deposition in this case that she never amended her report to disclose the reason why the trunk was empty.  The misleading report, instead, went to the grand jury to create the impression that the trunk had been emptied after Freeman's disappearance in an attempt to conceal guilt.

---

[201] *See* Plaintiffs' Response to Municipal Defendants' Motion for Summary Judgment at Section II(D).
[202] State Defendants' Motion for Summary Judgment at 32 [Dkt. No. 294].
[203] *Id.* at 32 n.130.
[204] Indictment [Dkt. No. 295-15 at 2] (listing witnesses who appeared by report); Grand Jury (2010) (Dave Hall) at 61:25–62:1 [Dkt. No. 295–1 at 181–82].
[205] Kathy Wilcox Deposition at 113:6–115:13 (Exhibit 6 to Puracal Decl.).

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Other witnesses at grand jury tried to explain the empty trunk, but the State Defendants mischaracterize the testimony in their motion for summary judgment. Brent Bartley (McGuffin's friend) did not just say that "McGuffin's trunk was empty, 'no liner, nothing.'"[206] Bartley also testified that McGuffin and Freeman had cleaned the car earlier in the day *before Freeman disappeared*, and Bartley could not say whether they also cleaned out the trunk.[207] Likewise, Bruce McGuffin (Nicholas McGuffin's dad) did not just say that there was a rubber mat in the trunk, which, according to the State, was gone when policed searched the trunk.[208] Bruce McGuffin testified that he had the rubber mat and asked Officer Hall whether he wanted it.[209] Again, the State Defendants omit the facts that undermine probable cause.

### 3. The grand jury heard fabricated evidence that there was no DNA to connect anyone else to the crime.

As discussed in detail above, Krings' fabricated two reports about the DNA on Freeman's shoes, creating the false inference that there was no DNA to connect anyone else to the crime.[210] Krings knew that there was DNA from an unidentified male on both shoes, including Freeman's bloodstained shoe that had been found miles from the body and was clearly handled by the perpetrator. The grand jury received Krings' fabricated reports, and Dannels testified that there was no DNA evidence suggesting an alternate suspect. The grand jury never heard about the DNA of the unidentified male, that it was found on both shoes, or that it was found along with blood on the inside of the left (Hudson Ridge) shoe. The State Defendants omit from their motion any mention of the fabricated DNA reports that went to the grand jury.

---

[206] State Defendants' Motion for Summary Judgment at 32 [Dkt. No. 294].
[207] Grand Jury (2010) (Brent Bartley) at 113:14–17, 118:25–119:5 [Dkt. No. 295-1 at 401 and 407].
[208] State Defendants' Motion for Summary Judgment at 32 [Dkt. No. 294].
[209] Grand Jury (2010) (Bruce McGuffin) at 46:2–5 [Dkt. No. 295-1 at 1050].
[210] *See*, *supra*, Statement of Facts ¶¶ 52–63.

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

4.      **The grand jury heard fabricated evidence that McGuffin made incriminating statements after Freeman's disappearance.**

The State Defendants rely on several statements from witnesses creating the appearance that McGuffin made incriminating statements after Freeman disappeared.  The State Defendants omit from their motion any discussion of the context around those statements and the coercion that led to the testimony.  Plaintiffs' expert, Dr. Brian Cutler, examined some of that coercion in his expert report about the interrogation tactics used in the investigation.[211]  The grand jury never heard about the tactics.

For example, the State Defendants assert that Kristen Steinhoff testified that McGuffin "told me to keep my F-ing mouth shut."[212]  The grand jury, however, never heard that Steinhoff originally told investigators that it was another friend, Ricky Crook, who told her to keep her mouth shut.  Steinhoff and Crook were getting drugs from the same person, and Crook told Steinhoff not to talk to the police.[213]  But, in June 2010, Dannels coerced Steinhoff into changing her story and assigning that statement to McGuffin, instead of Crook.[214]  In that same interrogation, Steinhoff can be seen on the video crying, telling the interrogators that she didn't know anything, and begging the interrogators to leave her and her family alone.  They persist; threatening Steinhoff that she is going to go down for the murder and lose her kids.  Before she agreed to Dannels' suggestion about McGuffin telling her to keep her mouth shut, Steinhoff says, "But what do you want me to say?  You want me to sit here and lie that he told me something he didn't?"[215]  Even after that, the Defendants kept going with their dogged threats, leading

---

[211] Expert Report of Dr. Brian Cutler (Exhibit 28 to Puracal Decl.).
[212] State Defendants' Motion for Summary Judgment at 31 [Dkt. No. 294].
[213] Nicholas McGuffin Deposition at 213:17–215:14 (Exhibit 10 to Puracal Decl.).
[214] *Compare* 2010-06-26 Steinhoff Interrogation (Transcript) 7:7–15 *with id.* at 35:8–10, 72:8–13 [Dkt. No. 290-11].
[215] 2010-06-26 Steinhoff Interrogation (Transcript) 37:25–38:1 [Dkt. No. 290-11].

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Steinhoff to say whatever she could to save herself and her kids.  The grand jury never heard

that, and the videotape of Steinhoff's interrogation was never played for the grand jury.

As another example, the State Defendants assert that witness David Breakfield testified

that he had a confrontation with McGuffin about Maegan Edgerton (S.M.'s mother who briefly

dated Breakfield before she and McGuffin had a child).[216]  Breakfield testified that, in 2002,

McGuffin allegedly threatened Breakfield saying, "I've done this before and I'll do it again.

Don't think I won't kill you.  I strangled that bitch, I'll strangle you too."[217]  The State

Defendants omit from their motion the fact that McGuffin denied making the threat.[218]  They

also omit from their motion the fact that Breakfield first disclosed this alleged threat *eight years*

after it supposedly happened, after he tried to get back together with Edgerton and she rebuffed

him.[219]

Edgerton testified in her deposition in this case that Breakfield was not a reliable person

because of his drug use.[220]  She further testified that she was with McGuffin when Melissa Beebe

(Freeman's cousin) supposedly heard McGuffin say, "It's amazing what you can get away with

in Coos County," and Edgerton testified McGuffin never said that.[221]  Edgerton testified that she

heard one of Freeman's other family members make that comment *to* McGuffin.[222]

///

///

---

[216] State Defendants' Motion for Summary Judgment at 37 [Dkt. No. 294].
[217] *Id.*
[218] Nicholas McGuffin Deposition at 232:18–234:1 (Exhibit 10 to Puracal Decl.).
[219] *See* Criminal Trial Transcript at D6 182:5–190:9 [Dkt. No. 284-1 at 1257].  *See also* Maegan Traglio (née Edgerton) Deposition at 34:18–37:21, 74:18–78:6 (Exhibit 86 to Puracal Decl.).
[220] *Id.*
[221] *Compare* State Defendants' Motion at 37 [Dkt. No. 294] *with* Maegan Traglio (née Edgerton) Deposition at 38:11–39:25 (Exhibit 86 to Puracal Decl.).
[222] *Id.*

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

**5.     The State Defendants have mischaracterized the grand jury testimony.**

As discussed above, much of the testimony upon which the State Defendants rely was

fabricated and offered without the benefit of the exculpatory material that proved its falsity.

What remains is improper character evidence that McGuffin, as an 18-year-old boy, had sex with

other girls and had argued with Freeman from time to time over the course of their nine-month-

long relationship.  The State Defendants ask the Court to construe the inferences in favor of the

Defendants and assume that the drama of a teenage relationship can be equated with a propensity

to kill.

The State Defendants bolster their ask by mischaracterizing some of the testimony before

the grand jury.  For example, the State Defendants selectively quote from the testimony of

Damon Mason, suggesting that Bartley admitted that he and McGuffin were involved in

Freeman's murder.[223]  The State Defendants omit the portion of the transcript where the District

Attorney tells Mason, "In previous conversations that you and the police and I have had, you

indicated that Bartley said that he and Nick had been responsible for Leah's disappearance."[224]

Mason corrected the District Attorney and explained that he said that Bartley was "involved"

because Bartley was with McGuffin on the night that Freeman went missing,[225] not because he

helped cover up a murder.  The State Defendants also omit the fact that Bartley steadfastly

denied any involvement in, or knowledge of, the circumstances surrounding the death of

Freeman, even though he was repeatedly accused of being involved in Freeman's murder,

---

[223] State Defendants' Motion for Summary Judgment at 38 [Dkt. No. 294].
[224] Grand Jury (2010) (Damon Mason) at 83:22–24 [Dkt. No. 295-1 at 532].
[225] *Id.* at 83:25–84:14.

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

subjected to multiple false-evidence ploys, threatened with prosecution for the murder, and harassed by police for years.[226]

As another example, the State Defendants selectively quote from the testimony of witness Scott Hamilton who told police that McGuffin found Freeman walking, picked her up in his car where they argued, and he let her out of the car near the McKay's grocery store.[227]  The State Defendants omit the fact that the grand jury never heard that the police convinced Hamilton to do a pre-text phone call with McGuffin, and McGuffin told Hamilton that never happened.[228]

The grand jury, further, never heard that when McGuffin and Hamilton went out to Lee Valley Road after Freeman's body had been found,[229] it was *after* the District Attorney issued a press release identifying the *exact* location on Lee Valley Road where the body had been found,[230]  Freeman's friends had already been to the location and put up a cross for Freeman.[231] McNeely testified in his deposition in this case that, had he known that information, it would have changed his opinion about the significance of McGuffin going to Lee Valley Road with Hamilton.[232]

The State Defendants consistently ignore the facts and inferences favorable to McGuffin and ask the Court to rely on only the self-serving story that the Defendants fabricated to secure

---

[226] Grand Jury (2010) (Brent Bartley) at 108:17–109:6 [Dkt. No. 295-1 396–97].
[227] State Defendants' Motion for Summary Judgment at 37 [Dkt. No. 294].
[228] Transcript of Pretext Phone Call at 4 (Exhibit 87 to Puracal Decl.).  *See also* Report of Dr. Brian Cutler at 14 (Exhibit 28 to Puracal Decl.).
[229] *See* State Defendants' Motion for Summary Judgment at 30 [Dkt. No. 294].
[230] 2000-08-05 Press Release (Exhibit 88 to Puracal Decl.); Craig Zanni Deposition at 135:20–138:17 (Exhibit 65 to Puracal Decl.).
[231] *Id.*
[232] Raymond McNeely Deposition at 147:8–149:21 (Exhibit 85 to Puracal Decl.).



MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

McGuffin's wrongful indictment and conviction in the first place. This the Court cannot do.[233]

Because a reasonable jury can find that the Defendants fabricated evidence in the initiation of the

criminal proceedings, a reasonable jury can necessarily find that probable cause was lacking.

Summary judgment must be denied.

## IV. CONCLUSION

Based upon the foregoing, Plaintiffs request the Court deny the State Defendants' motion

for summary judgment.

DATED: February 18, 2025

| MALONEY LAUERSDORF REINER PC | LOEVY & LOEVY |
|---|---|
| By /s/Janis C. Puracal<br>Janis C. Puracal, OSB #132288<br>E-Mail: jcp@mlrlegalteam.com<br>Andrew C. Lauersdorf, OSB #980739<br>E-Mail: acl@mlrlegalteam.com | By /s/David B. Owens<br>David B. Owens, WSBA #53856<br>E-Mail: david@loevy.com<br>*Pro hac vice* |

---

[233] *Cf. Reed v. Lieurance*, 863 F.3d 1196, 1205 (9th Cir. 2017) (district court "improperly invaded the province of the jury when, at the summary judgment stage, it resolved factual disputes material to the question of probable cause").

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

**CERTIFICATE OF COMPLIANCE**

This brief complies with the applicable page limitation under Dkt. No. 271 because it contains less than 50 pages, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

**CERTIFICATE OF SERVICE**

I hereby certify that on February 18, 2025, the foregoing PLAINTIFFS' RESPONSE TO STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT was served on the following parties at the following address by sending to them a true copy thereof via the method indicated below:

| | |
|---|---|
| Robert E. Franz, Jr.<br>Sarah R. Henderson<br>Law Office of Robert E. Franz, Jr.<br>PO Box 62<br>Springfield, OR 97477<br>rfranz@franzlaw.comcastbiz.net<br>shenderson@franzlaw.comcastbiz.net<br>   *Attorneys for Defendants*<br>   *City of Coquille, City of Coos Bay, Coos*<br>   *County, Craig Zanni, Chris Webley, Eric*<br>   *Schwenninger, Sean Sanborn, Ray McNeely,*<br>   *Kris Karcher, Pat Downing, Mark Dannels,*<br>   *Kip Oswald, Michael Reaves, David Zavala,*<br>   *Anthony Wetmore, Shelly McInnes* | Jesse B. Davis<br>Todd Marshall<br>Kristen Hoffmeyer<br>Oregon Department of Justice<br>100 SW Market Street<br>Portland, OR 97201<br>todd.marshall@doj.state.or.us<br>jesse.b.davis@doj.state.or.us<br>kristen.hoffmeyer@doj.state.or.us<br>   *Attorneys for Defendants Oregon State*<br>   *Police, John Riddle, Susan Hormann,*<br>   *Mary Krings, Kathy Wilcox* |
| Anthony R. Scisciani III<br>Kelsey L. Shewbert<br>Meredith A. Sawyer<br>Lisa Lear<br>HWS Law Group<br>101 SW Main Street, Suite 1605<br>Portland, OR 97204<br>ascisciani@hwslawgroup.com<br>kshewbert@hwslawgroup.com<br>msawyer@hwslawgroup.com<br>llear@hwslawgroup.com<br>   *Attorneys for Defendant Vidocq Society* | Eric S. DeFreest<br>Luvaas Cobb<br>777 High Street, Ste. 300<br>Eugene, OR 97401<br>edefreest@luvaascobb.com<br><br>Laura E. Coffin<br>Coffin Law<br>541 Willamette Street, Ste. 211<br>Eugene, OR 97401<br>lauracoffin@coffin.law<br>   *Attorneys for Defendant Richard*<br>   *Walter* |

MALONEY | LAUERSDORF | REINER PC<br>ATTORNEYS AT LAW<br>1111 E. Burnside Street, Ste. 300<br>Portland, Oregon 97214<br>Telephone: 503.245.1518<br>Facsimile: 503.245.1417

☒ by electronic means through the Court's ECF System on the date set forth above.

MALONEY LAUERSDORF REINER PC

By  /s/Janis C. Puracal
Janis C. Puracal, OSB #132288
E-Mail: jcp@mlrlegalteam.com

Attorneys for Plaintiffs

Page 2– CERTIFICATE OF COMPLIANCE AND SERVICE

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417