Janis C. Puracal, OSB #132288
E-mail: jcp@mlrlegalteam.com
Andrew C. Lauersdorf, OSB #980739
E-mail: acl@mlrlegalteam.com
MALONEY LAUERSDORF REINER, PC
1111 E. Burnside Street, Ste. 300
Portland, OR 97214
Telephone: (503) 245-1518
Facsimile: (503) 245-1417

David B. Owens, WSBA #53856, *pro hac vice*
E-mail: david@loevy.com
LOEVY & LOEVY c/o
Civil Rights and Justice Clinic
University of Washington Law School
William H. Gates Hall, Suite 265
PO Box 85110
Seattle, WA 98145-1110
Telephone: (312) 590-5449

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| NICHOLAS JAMES MCGUFFIN, as an individual and as guardian *ad litem*, on behalf of S.M., a minor,<br><br>Plaintiffs,<br><br>v.<br><br>MARK DANNELS, PAT DOWNING, SUSAN HORMANN, MARY KRINGS, KRIS KARCHER, SHELLY MCINNES, RAYMOND MCNEELY, KIP OSWALD, MICHAEL REAVES, JOHN RIDDLE, SEAN SANBORN, ERIC SCHWENNINGER, RICHARD WALTER, CHRIS WEBLEY, ANTHONY WETMORE, KATHY WILCOX, CRAIG ZANNI, DAVID ZAVALA, JOEL D. SHAPIRO AS ADMINISTRATOR OF THE ESTATE OF DAVID E. HALL, VIDOCQ SOCIETY, CITY OF COQUILLE, CITY OF COOS BAY, and COOS COUNTY,<br><br>Defendants. | Civil No. 6:20-cv-01163-MTK<br>(Lead Case)<br><br><br>PLAINTIFFS' RESPONSE TO THE MUNICIPAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

VIDOCQ SOCIETY,

        Cross-Claimant,

    v.

MARK DANNELS, PAT DOWNING,
SUSAN HORMANN, MARY KRINGS,
KRIS KARCHER, SHELLY MCINNES,
RAYMOND MCNEELY, KIP OSWALD,
MICHAEL REAVES, JOHN RIDDLE, SEAN
SANBORN, ERIC SCHWENNINGER,
RICHARD WALTER, CHRIS WEBLEY,
ANTHONY WETMORE, KATHY WILCOX,
CRAIG ZANNI, DAVID ZAVALA, JOEL D.
SHAPIRO AS ADMINISTRATOR OF THE
ESTATE OF DAVID E. HALL, VIDOCQ
SOCIETY, CITY OF COQUILLE, CITY OF
COOS BAY, and COOS COUNTY

        Cross-Defendants.

NICHOLAS JAMES MCGUFFIN, as an
individual and as guardian *ad litem*, on behalf
of S.M., a minor,

        Plaintiffs,

    v.

OREGON STATE POLICE,

        Defendant.

Civil Case No. 3:21-cv-01719-MTK
(Trailing Case)

---

Page 2– PLAINTIFFS' RESPONSE TO THE MUNICIPAL DEFENDANTS'
      MOTION FOR SUMMARY JUDGMENT

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

# <u>TABLE OF CONTENTS</u>

I. DEFENDANTS HAVE FAILED TO CARRY THEIR INITIAL BURDEN AT SUMMARY JUDGMENT ...................................................................... 9

II. MATERIAL FACTS THAT PRECLUDE SUMMARY JUDGMENT ................................. 11

    A. Defendants fabricated evidence of blood on the right (cemetery) shoe...................... 12

    B. Defendants suppressed a witness identification of Freeman walking by herself........ 15

    C. Defendants fabricated a report of a witness identification.......................................... 16

    D. Defendants fabricated evidence that the Mustang had been sanitized to cover up a murder. .................................................................................................................. 20

    E. Defendants fabricated witness statements that McGuffin switched cars. .................. 25

    F. Defendants fabricated evidence that McGuffin "dumped" Freeman's body down the embankment. ............................................................................................. 28

III. POINTS AND AUTHORITIES ON PLAINTIFFS' CLAIMS UNDER 42 U.S.C. § 1983 .............................................................................................................................. 31

    A. A reasonable jury can find the Defendants fabricated evidence................................ 31

    B. A reasonable jury can find the Defendants suppressed exculpatory evidence. .......... 35

    C. A reasonable jury can find the Defendants detained McGuffin without probable cause.......................................................................................................................... 40

    D. A reasonable jury can find the Defendants acted as part of a conspiracy.................. 42

    E. A reasonable jury can find the municipalities are liable under *Monell*. .................... 46

    F. A reasonable jury can find the Defendants violated S.M.'s constitutional rights… ...................................................................................................................... 50

    G. The Defendants are not entitled to qualified immunity. ............................................ 51

IV. POINTS AND AUTHORITIES ON PLAINTIFFS' CLAIMS UNDER STATE LAW ....... 54

    A. Plaintiffs are entitled to bring a claim for false imprisonment. ................................. 54

    B. A reasonable jury can find the criminal case terminated in McGuffin's favor. ......... 55

    C. The statute of ultimate response does not apply. ...................................................... 56

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona v. Youngblood,*
   488 U.S. 51 (1988) .................................................................................................52

*Armstrong v. Squadrito,*
   152 F.3d 564 (7th Cir. 1998) ...............................................................................46

*Atkins v. Cty. of Riverside,*
   151 F. App'x 501 (9th Cir. 2005) .........................................................................34

*Awabdy v. City of Adelanto,*
   368 F.3d 1062 (9th Cir. 2004) ..............................................................................40

*Barlow v. Ground,*
   943 F.2d 1132 (9th Cir. 1991) ........................................................................40, 52

*Beck v. State of Ohio,*
   379 U.S. 89 (1964) .................................................................................................52

*Benavidez v. Cnty. of San Diego,*
   993 F.3d 1134 (9th Cir. 2021) ..............................................................................30

*Blankenhorn v. v. City of Orange,*
   485 F.3d 463 (9th Cir. 2007) ................................................................................40

*Brady v. Maryland,*
   373 U.S. 83 (1963) ..............................................................................9, 34, 46, 47

*Brosseau v. Haugen,*
   543 U.S. 194 (2004) (per curiam) ........................................................................50

*Bryan v. Las Vegas Metro. Police Dep't,*
   349 F. App'x 132 (9th Cir. 2009) .........................................................................52

*Caldwell v. City & Cnty. of San Francisco,*
   889 F.3d 1105 (9th Cir. 2018) ........................................................................31, 51

*California v. Trombetta,*
   467 U.S. 479 (1984) ..............................................................................................52

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

*Calvillo v. CVSM, LLC*,
No. 2:18-CV-1580 JCM (EJY), 2020 U.S. Dist. LEXIS 57495 (D. Nev. Mar.
30, 2020) ...................................................................................................................................9

*Carriger v. Stewart*,
132 F.3d 463 (9th Cir. 1997) (en banc) .................................................................................34

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)...........................................................................................................8, 9, 10

*Chiaverini v. City of Napoleon*,
602 U.S. 556 (2024)...............................................................................................................39

*Christian Legal Soc'y Chapter of Univ. of Cal. v. Wu*,
626 F.3d 483 (9th Cir. 2010) ............................................................................................10, 50

*City of St. Louis v. Praprotnik*,
485 U.S. 112 (1988)...............................................................................................................48

*Clarke v. OHSU*,
343 Or. 581, 175 P.3d 418 (2007) .........................................................................................53

*Costanich v. Dep't of Social & Health Servs.*,
627 F.3d 1101 (9th Cir. 2010) ..........................................................................30, 31, 32, 33

*Cunningham v. City of Wenatchee*,
345 F.3d 802 (9th Cir. 2003) .................................................................................................51

*Cunningham v. Gates*,
229 F.3d 1271 (9th Cir. 2000) ...............................................................................................33

*Curnow v. Ridgecrest Police*,
952 F.2d 321 (9th Cir. 1991) ............................................................................................49, 52

*Devereaux v. Abbey*,
263 F.3d 1070 (9th Cir. 2001) (*en banc*) ........................................................30, 32, 51

*Drake v. Portuondo*,
321 F.3d 338 (2nd Cir. 2003)................................................................................................35

*Drake v. Portuondo*,
553 F.3d 230 (2nd Cir. 2009)................................................................................................35

*Dzung Chu v. Oracle Corp.*,
627 F.3d 376 (9th Cir. 2010) .................................................................................................10

*Fairley v. Luman*,
281 F.3d 913 (9th Cir. 2002) (per curiam)............................................................................45

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

*Fatai v. City & Cnty. of Honolulu*,
No. 19-CV-00603-DKW-WRP, 2022 U.S. Dist. LEXIS 121527 (D. Haw. July
11, 2022) ...................................................................................................................39

*Fields v. Wharrie*,
740 F.3d 1107 (7th Cir. 2014) ...............................................................................33, 37

*Franklin v. Fox*,
312 F.3d 423 (9th. Cir. 2002) .......................................................................................41

*Gantt v. Roe*,
389 F.3d 908 (9th Cir. 2004) .......................................................................................34

*Gerstein v. Pugh*,
420 U.S. 103 (1975) ....................................................................................................52

*Giglio v. United States*,
405 U.S. 150 (1972) ...............................................................................................34, 51

*Gilbrook v. City of Westminster*,
177 F.3d 839 (9th Cir. 1999) .......................................................................................42

*Graham v. Connor*,
490 U.S. 386 (1989) ....................................................................................................40

*Gravelet-Blondin v. Shelton*,
728 F.3d 1086 (9th Cir. 2013) .....................................................................................48

*Gregory v. City of Louisville*,
444 F.3d 725 (6th Cir. 2006) .......................................................................................47

*Gumm v. Heider*,
220 Or. 5, 348 P.2d 455 (1960) ...................................................................................54

*Gustafson v. Payless Drug Stores NW, Inc.*,
269 Or. 354, 525 P.2d 118 (1974) ...............................................................................40

*Henry v. Shasta*,
132 F.3d 512 (9th Cir. 1997) .......................................................................................48

*Hope v. Pelzer*,
536 U.S. 730 (2002) ....................................................................................................50

*Jackson v. City of Cleveland*,
925 F.3d 793 (6th Cir. 2019) .......................................................................................47

*Keates v. Koile*,
883 F.3d 1228 (9th Cir. 2018) .....................................................................................48

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

*Kyles v. Whitley*,
    514 U.S. 419 (1995) ......................................................................................34, 35

*Larson v. Napier*,
    700 F. App'x 609 (9th Cir. 2017) ............................................................48

*Lemire v. Cal. Dep't of Corr. & Rehab.*,
    726 F.3d 1062 (9th Cir. 2013) ................................................................49

*Leonetti v. Bray*,
    No. 2018 U.S. Dist. LEXIS 241282 (D. Or. Feb. 16, 2018) ..................40

*Lisker v. City of Los Angeles*,
    780 F.3d 1237 (9th Cir. 2015) ................................................................33

*Liston v. Cnty. of Riverside*,
    120 F.3d 965 (9th Cir. 1997) ......................................................30, 31, 51

*Lobato v. Las Vegas Metro. Police Dep't*,
    No. 22-16440, 2023 U.S. App. LEXIS 26946 (9th Cir. Oct. 11, 2023) ................................32

*Long v. Cnty. of Los Angeles*,
    442 F.3d 1178 (9th Cir. 2006) ................................................................45

*Maldonado v. Morales*,
    556 F.3d 1037 (9th Cir. 2009) ..........................................................10, 50

*Manuel v. City of Joliet*,
    580 U.S. 357 (2017) ................................................................................39

*Marshall v. PricewaterhouseCoopers, LLC*,
    371 Or. 536, 539 P.3d 766 (2023) ..........................................................55

*Mattos v. Agarano*,
    661 F.3d 433 (9th Cir. 2011) (*en banc*) ................................................51

*McDonough v. Smith*,
    139 S. Ct. 2149 (2019) ............................................................................53

*Mellen v. Winn*,
    900 F.3d 1085 (9th Cir. 2018) ..........................................................35, 37

*Mendocino Envtl. Ctr. v. Mendocino Cty.*,
    192 F.3d 1283 (9th Cir. 1999) ......................................................41, 42, 44

*Miller v. Pate*,
    386 U.S. 1 (1967) ....................................................................................51

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

*Miller v. United States*,
    945 F.2d 1464 (9th Cir. 1991) ................................................................8

*Moldowan v. City of Warren*,
    578 F.3d 351 (6th Cir. 2009) ...............................................................47

*Mollica v. Cnty. of Sacramento*,
    No. 2:19-cv-02017-KJM-DB, 2023 U.S. Dist. LEXIS 85698 (E.D. Cal. May
    15, 2023) ................................................................................................9

*Morse v. Fusto*,
    804 F.3d 538 (2d Cir. 2015).................................................................31

*Napue v. Illinois*,
    360 U.S. 264 (1959).............................................................................51

*O'Doan v. Sanford*,
    991 F.3d 1027 (9th Cir. 2021) .............................................................30

*Olivier v. Baca*,
    913 F.3d 852 (9th Cir. 2019) .................................................................8

*Ordonez v. Red Hill Lava Prods., Inc.*,
    No.2:22-cv-03072-SSS-SSCx, 2024 U.S. Dist. LEXIS 127797 (C.D. Cal. June
    4, 2024) ..................................................................................................9

*Oviatt v. Pearce*,
    954 F.2d 1470 (9th Cir. 1992) .............................................................48

*Paine v. City of Lompoc*,
    265 F.3d 975 (9th Cir. 2001) ...............................................................33

*Papachristou v. City of Jacksonville*,
    405 U.S. 156 (1972).............................................................................52

*Pembaur v. City of Cincinnati*,
    475 U.S. 469 (1986).............................................................................45

*Perry v. Rein*,
    215 Or. App. 113, 168 P.3d 1163 (2007)............................................54

*Pyle v. Kansas*,
    317 U.S. 213 (1942).............................................................................51

*Reed v. Lieurance*,
    863 F.3d 1196 (9th Cir. 2017) .............................................................40

*Richards v. Cnty. of San Bernardino*,
    39 F.4th 562 (9th Cir. 2022) ....................................................31, 45, 51

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

*Rogers v. Jarrett*,
    63 F.4th 971 (5th Cir. 2023) (Willett, J., concurring)............................................................52

*Rubalcava v. City of San Jose*,
    No. 20-cv-04191-BLF, 2024 U.S. Dist. LEXIS 55718 (N.D. Cal. Mar. 27,
    2024) ........................................................................................................................................33

*S.R. Nehad v. Browder*,
    929 F.3d 1125 (9th Cir. 2019) ................................................................................................52

*Sanders v. Cullen*,
    873 F.3d 778 (9th Cir. 2017) ..................................................................................................34

*Spencer v. Peters*,
    857 F.3d 789 (9th Cir. 2017) ............................................................................................30, 31

*TCB Remarketing LLC v. Metro Auto Auction LLC*,
    No. CV-20-01826-PHX-MTM, 2022 U.S. Dist. LEXIS 195902 (D. Ariz. Oct.
    26, 2022) ....................................................................................................................................8

*Terry v. Ohio*,
    392 U.S. 1 (1968)....................................................................................................................52

*Thomas v. County of Riverside*,
    763 F.3d 1167 (9th Cir. 2014) ................................................................................................44

*Thompson v. Clark*,
    596 U.S. 36 (2022)..................................................................................................................39

*Tobias v. Arteaga*,
    996 F.3d 571 (9th Cir. 2021) ..................................................................................................44

*Trulove v. D'Amico*,
    2018 WL 1070899 (N.D. Cal. Feb. 27, 2018) ........................................................................52

*Tsao v. Desert Palace, Inc.*,
    698 F.3d 1128 (9th Cir. 2012) ....................................................................................45, 46, 47

*Estate of Tucker ex rel. Tucker v. Interscope Records, Inc.*,
    515 F.3d 1019 (9th Cir. 2008) ................................................................................................40

*United States v. Bagley*,
    473 U.S. 667 (1976)..........................................................................................................34, 37

*United States v. DeLeon*,
    979 F.2d 761 (9th Cir. 1992) ..................................................................................................31

*United States v. Stanert*,
    762 F.2d 775 (9th Cir.), amended, 769 F.2d 1410 (9th Cir. 1985)...........................................31

MALONEY | LAUERSDORF | REINER, PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

*United Steelworkers of Am. v. Phelps Dodge Corp.*,
    865 F.2d 1539 (9th Cir.1989) (en banc) ...........................................................41, 42

*Ward v. EEOC*,
    719 F.2d 311 (9th Cir. 1983) ..........................................................................41

*Whren v. United States*,
    517 U.S. 806 (1996)........................................................................................40

*Wong Sun v. United States*,
    371 U.S. 471 (1963)........................................................................................52

*Youngblood v. West Virginia*,
    547 U.S. 867 (2006) (*per curiam*) .................................................................34

*Ziglar v. Abbasi*,
    137 S. Ct. 1843 (2017)...............................................................................50, 51

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Plaintiffs request the Court deny the Municipal Defendants' motion for summary judgment. Plaintiffs object to the Municipal Defendants' representation that the Municipal Defendants conferred in advance of filing their motion for summary judgment. Counsel for the Municipal Defendants never made any effort to contact Plaintiffs' counsel in advance of filing. Had the Municipal Defendants conferred as required by LR 7-1(a)(2), the parties could have avoided a significant amount of expense litigating the extensive factual questions omitted from the Municipal Defendants' motion and raised in this response below.

## I. DEFENDANTS HAVE FAILED TO CARRY THEIR INITIAL BURDEN AT SUMMARY JUDGMENT

To even have the hypothetical possibility of obtaining judgment *as a matter of law*, the Defendants bear the burden of "identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact."[1] The moving party is required to show "there is an absence of evidence to support the nonmoving party's case."[2] The Court must "look to not a single pleading, but to the entire record to determine whether there are any factual disputes."[3]

The moving party's burden, of course, required the Defendants to accept *Plaintiffs'* version of events and then argue why they believe judgment as a matter of law would be warranted. Defendants have entirely failed in this regard. For example, and perhaps most egregiously, they have refused to accept that Nick McGuffin did not kill Leah Freeman and had absolutely nothing to do with her abduction or murder and, instead, that he actively sought to find her after she had gone missing.[4]

---

[1] *Olivier v. Baca*, 913 F.3d 852, 857 (9th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).
[2] *Celotex*, 477 U.S. at 325.
[3] *Miller v. United States*, 945 F.2d 1464, 1466 (9th Cir. 1991) (citations omitted).
[4] *See* Municipal Defendant's Motion at 17 [Dkt. No. 281] (calling McGuffin's account a "story"

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

The lapses are fatal; the Defendants cannot possibly obtain judgment *as a matter of law* while refusing to follow the operative legal standards. Having failed to even attempt to construe the evidence in the record properly, and by ignoring the central evidence in the criminal case that must be addressed to assess Plaintiffs' claims, the Defendants have not met their initial burden. Summary judgment should be denied.[5]

There is a second fatal problem with the Municipal Defendants' motion: they have failed to make any cogent legal arguments about why they believe they are entitled to relief on any of the legal claims. After abstract legal standards generally, each argument includes unsupported assertions denying liability without reference to any evidence—let alone the evidence that Plaintiffs could use to support their claims.[6] The standard on summary judgment requires a moving party to do more than make the "conclusory assertion that the plaintiff has no evidence to prove his case."[7] Instead, as the Ninth Circuit explained, "the Supreme Court in *Celotex* found the moving party could show an absence of evidence by 'directing the district court's attention to the nonmoving party's answers to interrogatories . . . and to the absence of any other evidence . . . in the materials compiled during discovery."[8] The moving party, however, "cannot

---

and "impossible" and arguing that McGuffin should have seen Freeman that evening); *see also* Criminal Trial Transcript (Sentencing) at 1738:18–1742:11 [Dkt. No. 284-1 at 1799–1852] (McGuffin proclaiming his innocence at sentencing hearing).

[5] *Cf. TCB Remarketing LLC v. Metro Auto Auction LLC,* No. CV-20-01826-PHX-MTM, 2022 U.S. Dist. LEXIS 195902, at *3 (D. Ariz. Oct. 26, 2022) (denying motion for summary judgment and emphasizing that "the initial burden remains on the moving party to establish a 'complete failure of proof concerning an essential element of the nonmoving party's case'" (quoting *Celotex*, 477 at 322–23)); *Calvillo v. CVSM, LLC,* No. 2:18-CV-1580 JCM (EJY), 2020 U.S. Dist. LEXIS 57495, at *5 (D. Nev. Mar. 30, 2020) ("If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence.").

[6] *See* Municipal Defendants' Motion at 31–32 (*Brady*); 35–36 (fabrication); 39 (4th Amendment detention without probable cause); and 39–40 (destruction of evidence) [Dkt. No. 281].

[7] *Mollica v. Cnty. of Sacramento*, No. 2:19-cv-02017-KJM-DB, 2023 U.S. Dist. LEXIS 85698, at *41 (E.D. Cal. May 15, 2023) (quoting *Celotex*, 477 U.S. at 328 (White, J., concurring)).

[8] *Id.* (quoting *Nissan Fire & Marine Ins. Co.*, 210 F.3d 1099, 1105 (9th Cir. 2000)).

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

shift the burden to the nonmoving party 'simply by saying that the nonmoving party has no such evidence.'"[9]  Federal courts recognize that the moving party has "both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment."[10]  To carry its burden of persuasion, the moving party "must persuade the court that there is no genuine issue of material fact."[11]  The Municipal Defendants, here, cannot meet their initial burden with conclusory assertions that there is "zero evidence" and the indiscriminate (and untimely[12]) submission of over 10,000 pages of exhibits.[13]  Such motions are simply a "tool for harassment."[14]  The Municipal Defendants have not met their initial burden and cannot attempt to do so for the first time in reply as "[a]rguments made in passing and inadequately briefed are waived."[15]

## II.  MATERIAL FACTS THAT PRECLUDE SUMMARY JUDGMENT

1.      Nicholas McGuffin was not in any way involved in the kidnapping and murder of Leah Freeman and is completely innocent of the crime.[16]  Nonetheless, McGuffin has been

---

[9] *Id.*

[10] *Ordonez v. Red Hill Lava Prods., Inc.*, No.2:22-cv-03072-SSS-SSCx, 2024 U.S. Dist. LEXIS 127797, at *4 (C.D. Cal. June 4, 2024) (quoting *Nissan Fire*, 210 F.3d at 1102).

[11] *Id.*

[12] The Municipal Defendants submitted five new declarations in support of summary judgment on January 9 and 10, 2025—three days after the motion deadline.  *See* Dkt. Nos. 304, 305, 306, 307, and 311.

[13] *Cf. Dzung Chu v. Oracle Corp.*, 627 F.3d 376, 386 (9th Cir. 2010) ("It behooves litigants, particularly in a case with a record of this magnitude, to resist the temptation to treat judges as if they were pigs sniffing for truffles.") (citations omitted).  *See also* D. Or. Local Rule 56-1(a) ("A party's factual positions must be supported by citations, by page and line as appropriate, to the particular parts of materials in the record.").  Plaintiffs are effectively unable to assert individualized evidentiary objections given the number of pages submitted.

[14] *Celotex*, 477 U.S. at 332 (Brennan, J., dissenting).

[15] *Maldonado v. Morales*, 556 F.3d 1037, 1048 n.4 (9th Cir. 2009); *Christian Legal Soc'y Chapter of Univ. of Cal. v. Wu*, 626 F.3d 483, 487 (9th Cir. 2010) (refusing to consider summarily raised issue that had no supporting argument).

[16] *See* Criminal Trial Transcript (Sentencing) at 1738:18–1742:11 [Dkt. No. 284-1 at 1799–1852] (McGuffin proclaiming his innocence at sentencing hearing).

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

subjected to more than 20 years of hardship, including nearly a decade of incarceration, for a crime that he did not commit.

2.     McGuffin was wrongfully indicted, prosecuted, and convicted for a murder that he did not commit, due to the misconduct of law enforcement agencies and actors that pursued him even though they knew that he was innocent.

3.     As discussed below, the Municipal Defendants, working with the other Defendants, fabricated evidence to support the false narrative that, on the night Freeman disappeared, McGuffin caught up to Freeman, argued with her on the road next to the cemetery across from the high school, and then hit her in the face, causing her to bleed on her shoe.  The Municipal Defendants and Defendant Richard Walter then fabricated evidence to support the false narrative that McGuffin switched cars and drove around Coquille in a sophisticated effort to establish an alibi before dumping Freeman's body miles outside of town on Lee Valley Road.

**A.     Defendants fabricated evidence of blood on the right (cemetery) shoe.**

4.     The Defendants fabricated evidence of blood on Freeman's right shoe, which was found next to the cemetery on the night she went missing.  From that blood, they created a false narrative that McGuffin caught up to Freeman by the high school, got into a fight with her near the cemetery, and hit her in the face causing her to bleed onto her shoe.  The blood does not exist, however, and never did.

5.     Freeman's right Nike athletic shoe was discovered by a passerby next to the cemetery on North Elm Street across the street from the high school.[17]  In July 2000, OSP Criminalist Kathy Wilcox examined the right (cemetery) shoe and reported that "no blood was detected on this shoe."[18]

---

[17] Criminal Trial Transcript D5 127:16–132:17 (Messerle) [Dkt. No. 284-1 at 920–25].
[18] 2000-07-17 Wilcox Report at 1 [Dkt. No. 296 at 179].

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

6.      Despite Wilcox's 2000 report, Dannels falsely announced in a 2010 appearance on "20/20" that the right (cemetery) shoe was found "with blood on it."[19]  In the "20/20" video footage, Dannels and Walter are standing in the road next to the cemetery discussing the false narrative they concocted together, including the conclusion that the (fabricated) blood on the right (cemetery) shoe indicated that Freeman "was forcibly taken from that point" where "[s]he got probably smashed in the face."[20]  This entirely made-up narrative was also documented in Vidocq's "synopsis" of its work on the case.[21]

7.      When Dannels and Walter used national television to announce the fabricated blood on the right (cemetery) shoe, they knew the claim was false (*i.e.*, that there was no blood on the shoe).  Dannels wrote about the shoes in his case summary that was provided to Vidocq, including Walter, prior to their meeting at the cemetery.[22]

8.      The claim that Freeman had been "probably smashed in the face" was also false. Dannels and Walter knew, from the autopsy, that there was no evidence that Freeman had been hit in the face.[23]  In fact, there has never been any evidence of injury to Freeman's face or skull, and Dannels specifically told Vidocq and Walter she had no broken bones.[24]

9.      In addition, the Defendants (including Dannels, Walter, and Wilcox) knew that it was the left shoe found deep in the woods ten miles outside of town on Hudson Ridge that had

---

[19] 2010-10-15 Transcript of ABC News 20/20 Episode at 11 (Exhibit 1 to the Declaration of Janis C. Puracal in Support of Plaintiffs' Responses to Summary Judgment (Puracal Decl.)).
[20] 2010-10-15 Transcript of ABC News 20/20 Episode at 11 (Exhibit 1 to Puracal Decl.); 2010-10-15 Excerpt of Video of ABC News 20/20 Episode at Time Stamp 7:18 (Exhibit 2 to Puracal Decl.).
[21] Vidocq Synopsis at 1 [Dkt. No. 293-2 at 119–20].  District Attorney Frasier confirmed that he had never seen Vidocq's synopsis report.  R. Paul Frasier Civil Suit Deposition at 87:16–19 (Exhibit 3 to Puracal Decl.).
[22] Dannels Case Summary for Vidocq at 3–4 (Exhibit 4 to Puracal Decl.).
[23] Autopsy Report (Exhibit 5 to Puracal Decl.).
[24] Dannels Case Summary for Vidocq at 1 (Exhibit 4 to Puracal Decl.) ("No broken bones were found.").

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

blood on it.  In a claim untrue for *either* shoe, Wilcox falsely reported there was "medium high

velocity impact spatter"—a pattern of blood spatter that results from "quite a bit of force behind

it," even though this was not the case.[25]

10.     Further evidence was fabricated to suggest blood on the right (cemetery) shoe

when Wilcox generated a photograph of the left (Hudson Ridge) shoe and labeled it "right shoe,"

though she knew it was actually the cemetery shoe.[26]  The original copy of the photo from 2000

that Wilcox produced to the District Attorney was produced to defense counsel on the day

McGuffin was arraigned and has no such note.[27]  Instead, consistent with the fabrication by

Dannels and Walter, the note appears only on a second copy of the photograph that was produced

to the District Attorney and then defense counsel just before the criminal trial in 2011.[28]  That

falsely-labeled photo was introduced at trial, was the subject of questioning by the defense on

cross-examination, and even manifested itself in the State's closing argument, before being sent

into the jury room.[29]  In fact, the false suggestion that the right (cemetery) shoe had bloodstains

on it; that Freeman had been "smashed in the face"; and that the blood on the right (cemetery)

---

[25] *Compare* Criminal Trial Transcript at D6 173:18–20 [Dkt. No. 284-1 at 1248] *with* Kathy Wilcox Deposition at 131:24–139:9 (Exhibit 6 to Puracal Decl.).  *See also* 2000-07-17 Wilcox Report at 5 [Dkt. No. 296 at 183]; Grand Jury (2010) (Kris Karcher) at 147:22–148:7 [Dkt. No. 295-1 at 255–56]; Criminal Trial Transcript at D6 87:3–88:21, 136:24–138:13, 172:19–174:4 (Wilcox) [Dkt. No. 284-1 at 1161–62, 1211–13, 1247, 1249].

[26] 2000-07-17 Wilcox Report [Dkt. No. 296 at 188]

[27] *See* 2000-07-17 Wilcox Report (Original Version) (Exhibit 7 to Puracal Decl.) (Bates number "3025").  *See also* DA Frasier's Discovery Log at 4 and 7 (showing Bates numbered document "3025" produced on August 24, 2010) (Exhibit 8 to Puracal Decl.); R. Paul Frasier Civil Suit Deposition at 89:19–90:11 (Exhibit 3 to Puracal Decl.) (explaining that his logged the discovery in the criminal case).

[28] *See* 2000-07-17 Wilcox Report [Dkt. No. 296 at 188] (Bates number "8359").  *See also* DA Frasier's Discovery Log at 9 and 10 (showing Bates numbered document "8359" produced on May 2, 2011) (Exhibit 8 to Puracal Decl.).

[29] Criminal Trial Transcript at D6 86:4–21 [Dkt. No. 284-1 at 1160]; Criminal Trial Exhibit No. 31 (Exhibit 9 to Puracal Decl.); Criminal Trial Transcript D6 136:7–15 [Dkt. No. 284-1 at 1211]; Criminal Trial Transcript at D9 156:2–11 [Dkt. No. 284-1 at 1756] (Prosecution Closing).

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

shoe (or either shoe) was "high velocity" consistent with someone being struck in the face were all key elements of the State's case at trial.[30]

**B.      Defendants suppressed a witness identification of Freeman walking by herself.**

11.      McGuffin never saw or spoke with Freeman after he dropped her off at Mitchell's house at 7:00 p.m. on June 28, 2000.[31]

12.      The Defendants knew that Freeman was walking by herself, nearly 15 minutes away from Mitchell's residence, when McGuffin arrived at Mitchell's residence to pick her up.

13.      CCSO Deputy Zanni interviewed Nick Backman, who saw Freeman while he was using the ATM.[32]  Backman accurately described the clothes that Freeman was wearing that night, and Defendants were able to obtain an ATM receipt confirming Backman's withdrawal from the ATM at 9:04 p.m.  Zanni's handwritten notes documenting his interview with Backman and the ATM receipt appear on a "tip sheet" that was never disclosed to McGuffin before trial.

14.      It was Sanborn who was responsible for reviewing and producing the tip sheets,[33] and a handwritten note from 2010 confirms that McNeely (as lead case officer) knew about Backman.[34]  But the District Attorney testified in his deposition that he was not aware of Backman's information or the ATM receipt, and he did not even know that Backman existed.[35]

---

[30] *See id.*
[31] Nicholas McGuffin Deposition at 58:25–71:22, 96:23–104:4, 190:19–195:14 (Exhibit 10 to Puracal Decl.).
[32] 2000-09-20 CCSO Zanni Note re Backman [Dkt. No. 290-17 at 5].
[33] *See* 2008-09-24 Sanborn re Investigation (Exhibit 11 to Puracal Decl.); 2010-02-05 Email from McNeely to HIT Team (Exhibit 12 to Puracal Decl.).
[34] *See* 2009-06-27 Coquille PD Backman Note (Exhibit 13 to Puracal Decl.); 2010-03-01 McNeely Handwritten Note re Backman (Exhibit 14 to Puracal Decl., Attachment 3).  McNeely admitted that he wrote the March 1, 2010, note.  *See* McNeely Response to Plaintiffs' Request for Admission No. 3 (Exhibit 14 to Puracal Decl.).
[35] R. Paul Frasier Civil Suit Deposition at 181:6–183:13 (Exhibit 3 to Puracal Decl.).

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

15.     Despite having never seen the Backman note or the ATM receipt, the District

Attorney testified in his deposition that he believes the note must have been produced in

discovery in the criminal case because the note has a Bates stamp on it, which is his practice.[36]

The note, however, does not appear in discovery from the criminal case, and McGuffin's

criminal counsel testified that she had never seen it during the criminal case.[37]

16.     To this day, the Defendants have never produced a copy of the ATM receipt.[38]

17.     The timing of when Freeman left Mitchell's house, and whether McGuffin had

time to catch up to her before she disappeared, was a point of emphasis for Defendants.  All other

witnesses provided only rough estimates of time.  Backman was the only witness who could

place Freeman at a specific location at a specific time,[39] and Backman and his ATM receipt

contradicted Defendants' narrative and timeline.

**C.     Defendants fabricated a report of a witness identification.**

18.     The Defendants knew McGuffin spent the evening after 9:00 p.m. searching for

Freeman and had witness statements and objective evidence to prove it.[40]  Consistent with their

_____

[36] _Id._ at 179:10–25, 183:14–185:25.

[37] _Compare_ 2000-09-20 CCSO Zanni Backman Note [Dkt. No. 290-17 at 5] (with Bates number 003247) _with_ Criminal Case Discovery Bates numbered page 003247 (Exhibit 15 to Puracal Decl.).  _See also_ Shaun McCrea Deposition at 187:14–188:13 (Exhibit 16 to Puracal Decl.).

[38] R. Paul Frasier Civil Suit Deposition at 181:14–182:8 (Exhibit 3 to Puracal Decl.).

[39] _Id._ at 182:18–183:13 (Exhibit 3 to Puracal Decl.).

[40] _See_ Criminal Trial Transcript at D3 124:10–125:8 [Dkt. No. 284-1 at 433–34] (Denise Bertrand); _id._ at D5 9:17–10:18, 13:11–21 [Dkt. No. 284-1 at 802–03, 806] (Brent Mauro); _id._ at D7 119:1–126:1 [Dkt. No. 284-1 at 1447–54] (Quinn Cannon); _id._ at D8 27:17–29:18 [Dkt. No. 284-1 at 1548–50] (Lyndee Kindred); _id._ at D4 164:4–24, 165:24–166:25 [Dkt. No. 284-1 at 695, 696–97] (Mike McAdams); _id._ at D9 16:6–18:4 [Dkt. No. 284-1 at 1616–18] (Haley Greenway); _id._ at D3 125:9–25 [Dkt. No. 284-1 at 434] (Denise Bertrand for a second time); _id._ at D4 75:23–76:10, 93:20–94:12 [Dkt. No. 284-1 at 605–06, 624–25] (Cherie and Peggy Mitchell); Grand Jury (2010) (Amanda Landmark) at 11:21–12:7 [Dkt. No. 295-1 at 511]. Additional witnesses who saw McGuffin after 10:00 p.m. by himself, searching for Freeman, include: (1) 10:05 p.m. Cory Courtright (phone call) (Criminal Trial Transcript at D3 56:2–12, 22–25); (2) 10:00–10:45 p.m. Ray Lewis (Criminal Trial Transcript at D4 218:6–219:10); (3) 10:00–11:00 p.m. Brent Bartley (Criminal Trial Transcript at D4 18:10–20:19, 29:16–24, 30:23–

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

fabrications regarding blood on the right (cemetery) shoe and that Freeman was smashed in the face, the Defendants fabricated a false witness "identification" by using obviously manipulative tactics to convince John Lindegren to falsely claim he saw McGuffin and Freeman in front of the Mitchell house shortly after 9:00 p.m.

19.    On August 7, 2000, Coquille PD Chief Reaves interviewed Lindegren, a local carpenter in his 40s who went by the nickname "Big John."[41]  Chief Reaves reported that Lindegren said he was doing concrete work at his sister's house at 590 W. 4th Place and, when he left, he saw a female speaking with a white male at W. 4th Place & Elm.[42]  Coquille PD Officer Randy Ulmer also interviewed Lindegren and reported that Lindegren saw McGuffin and Freeman.[43]  Lindegren does not know who he saw, however, and there was obvious reason to doubt his ability to identify McGuffin or Freeman.  An email from Dannels years later suggests that Lindegren saw the girl who lived at the house on North Elm, Cherie Mitchell, and assumed that she was Freeman.[44]  The email shows that in 2000 Reaves recognized that Lindegren had confused Mitchell and Freeman.

20.    Ten years later, even though the Defendants knew Lindegren did not know who he saw, they misled him into making a false identification.  On May 18, 2010, McNeely interviewed

---

25); (4) 10:30–11:00 p.m. Nicole Price (Grand Jury (2000) at 3:24–7:22, 11:17–12:10 [Dkt. No. 286-17 at 4]; and (5) 11:30 p.m. Christy Kristofferson (Grand Jury (2000) at 4:9–6:16) (Exhibit 17 to Puracal Decl.).  *See also* Gas Station Record in Coquille PD File (Exhibit 18 to Puracal Decl.); Phone Record in Coquille PD File (Exhibit 19 to Puracal Decl.); HIT Team Note re Phone Call at 1 (Exhibit 20 to Puracal Decl.); McNeely Note re Gas Records (Exhibit [ ] to Puracal Decl.).  McNeely admitted that the handwriting on Exhibit 14, Attachment 3 is his. McNeely Response to Request for Admission No. 3 (Exhibit 14 to Puracal Decl.).  *See also* Kathy McGuffin Deposition at 17:20–20:25, 27:22–30:24 (Exhibit 21 to Puracal Decl.).
[41] John Lindegren Deposition at 6:2–19, 7:11–13 (Exhibit 22 to Puracal Decl.).
[42] 2000-08-07 Coquille PD Reaves Report of Lindegren (Exhibit 23 to Puracal Decl.).
[43] 2000-07-16 Coquille PD Ulmer Report of Lindegren (Exhibit 24 to Puracal Decl.).
[44] 2010-05-19 Email from Dannels to Frasier (Exhibit 25 to Puracal Decl.).

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Lindegren for a third time.[45]  On June 1, 2010, McNeely typed his report of the interview of John

Lindegren.  This time Lindegren made no mention of doing concrete work.  McNeely reported

that Lindegren said he was watching "*Survivor*" at his sister's house until 9:00 p.m., left

immediately after the episode ended, and saw McGuffin and Freeman outside Mitchell's house.

McNeely attached a copy of a cable television guide and wrote, "A check did confirm that the

TV show Survivor aired on the night of June 28, 2000 from 2000 hours to 2100 hours."

McNeely told the District Attorney that Lindegren recalled the night because it was the episode

of *Survivor* in which a contestant named "Rudy" was voted off.[46]  The District Attorney found

Lindegren credible based on his detailed recollection about what he was doing that night and

McNeely's report with the cable guide showing that *Survivor* did, in fact, air that night.[47]

21.     McNeely and his partner, Webley, knew Lindegren expressed uncertainty about

who he saw, but they suppressed that information.  Lindegren testified in his deposition in this

case that he told McNeely that he did not know McGuffin all that well, and that he believed the

man he saw was McGuffin but he was not absolutely sure.[48]  McNeely never reported

Lindegren's equivocation.[49]  McNeely, instead, misled Lindegren into making an unequivocal

identification by re-enacting Lindegren's walk past the Mitchell house *ten years* after the fact,

using traffic cones to depict where McNeely wanted Lindegren to say McGuffin and Freeman

were standing, and without conducting any sort of lineup or photo array.[50]  Lindegren testified in

---

[45] 2010-05-18 Coquille PD McNeely Report of Lindegren (Exhibit 26 to Puracal Decl.).

[46] *See* Grand Jury (2010) (John Lindegren) at 89:1–2 [Dkt. No. 295-1 at 1037]; Grand Jury (2010) (Hjordis Lindegren) at 97:9–15 [Dkt. No. 295-1 at 1028].

[47] 2016-09-01 Letter from DA Frasier to DOJ at 5 (Exhibit 27 to Puracal Decl.) (re importance of Rudy statement).

[48] John Lindegren Deposition at 136:20–137:14, 174:6–17 (Exhibit 22 to Puracal Decl.).

[49] 2010-05-18 McNeely Report re Lindegren (Exhibit 26 to Puracal Decl.).

[50] John Lindegren Deposition at 179:7–188:19, 209:23–24 (Exhibit 22 to Puracal Decl.).  *Cf.* Expert Report of Dr. Brian Cutler at ¶ 13 (Exhibit 28 to Puracal Decl.) (re contamination in interviewing); Expert Report of Russ Hicks at 17 (Exhibit 29 to Puracal Decl.) (re standard

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

his deposition in this case that, although no one came right out and said "This is what we want you to say or do," he believes he was "probably" led: "Could I have been led? I probably could have, because I'm just an old hillbilly. I ain't none all that brilliant when it comes to law work. Could I have been led? Yeah, probably."[51]

22.     McNeely and Webley also knew that Lindegren was flat out wrong about what he was doing that night, but McNeely and Webley fabricated a report to suggest Lindegren was accurate and suppressed the evidence that would expose the falsity. The day after McNeely interviewed Lindegren, McNeely and Webley interviewed Lindegren's sister (Hjordis Lindegren) who repeated the "Rudy" story. That same day, McNeely and Webley looked up *Survivor* on Wikipedia and saw that Rudy was not voted off the day Freeman disappeared.[52] Webley wrote in his handwritten notes "Night Rudy got voted off. Upset."[53] The line was later then crossed out and the note "wrong episode" was added. The Wikipedia page in Coquille's file is highlighted by hand and shows that Rudy was voted off one month *after* Freeman disappeared.[54]

23.     By the time McNeely and Webley typed up their reports of the interviews with the Lindegrens, they knew that the witnesses were confused about what they had been doing on the evening that Freeman disappeared, what they may or may not have seen, and/or when they had seen it, but McNeely and Webley never mention that in their reports. They, instead, attempted to bolster the credibility of the *Survivor* story by attaching the cable guide to "confirm" that

---

police practices for proper eyewitness identification procedures).
[51] John Lindegren Deposition at 232:6–233:9 (Exhibit 22 to Puracal Decl.).
[52] 2010-05-19 Coquille PD Wikipedia Printout (Exhibit 14 to Puracal Decl., Attachment 2). McNeely admitted that it is his handwriting that appears at page 5 of the Wikipedia printout. *See* McNeely Response to Plaintiffs' Request for Admission No. 2 (Exhibit 14 to Puracal Decl.).
[53] 2010-05-19 Handwritten Notes re Hjordis Lindegren (Exhibit 30 to Puracal Decl., Attachment 1). Webley admitted that the handwriting on this document is his. *See* Webley Response to Plaintiffs' Request for Admission No. 1 (Exhibit 30 to Puracal Decl.).
[54] 2010-05-19 Coquille PD Wikipedia Printout at 5 (Exhibit 14 to Puracal Decl., Attachment 2).

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

*Survivor* aired on the night that Freeman disappeared.  McNeely and Webley withheld from the District Attorney and McGuffin's defense counsel the Wikipedia page and the handwritten notes confirming the hole in the Lindegrens' story.[55]  McNeely even falsely testified to the grand jury that he never looked up whether the episode was the one where Rudy was voted off.[56]   Frasier testified in his deposition in this case that, had he known about the notes, he would have said "we've got a problem here, and we need to resolve this one way or the other."[57]

24.     John Lindegren was a key witness at trial.  He was the only witness who allegedly saw McGuffin with Freeman after 9:00 p.m.  It was the defense theory that Lindegren was mistaken and actually saw Mitchell and her boyfriend, Corey Bryant, standing outside after Freeman left on foot.[58]

25.     The Defendants knew that their suggestion to Lindegren that he saw McGuffin and Freeman together minutes after 9:00 p.m. on June 28, 2000, was false.  The Defendants fabricated the evidence of Lindegren's purported identification and suppressed evidence that would reveal its falsity, including Backman's sighting of Freeman and the ATM receipt confirming that she was walking by herself nearly 15 minutes away from Mitchell's house at the precise moment that Lindegren saw whatever he saw.[59]

**D.     Defendants fabricated evidence that the Mustang had been sanitized to cover up a murder.**

26.     The Defendants fabricated evidence that McGuffin's car had been "wiped clean" and the trunk had been "sanitized," to create the false impression that McGuffin transported

---

[55] R. Paul Frasier Civil Suit Deposition at 149:5–154:25 (Exhibit 3 to Puracal Decl.).
[56] Grand Jury (2010) (Ray McNeely) at 138:4–141:18 [Dkt. No. 295-1 at 1126].
[57] R. Paul Frasier Civil Suit Deposition at 153:24–154:1 (Exhibit 3 to Puracal Decl.).
[58] *See* Criminal Trial Transcript D4 103:5–106:21 (Bryant) [Dkt. No. 284-1 at 634–37]; Grand Jury (2000) (Cherie Mitchell) at 9:17–20 [Dkt. No. 286-13].
[59] *See* Statement of Facts ¶¶ 11–17.

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Freeman's body in the trunk and then engaged in a sophisticated cover up to hide the blood evidence.

27.     On July 5, 2000, McGuffin consented to the seizure and search of his car.[60] Municipal Defendants took the blue Ford Mustang to Wilcox, who examined it on July 6, 2000—just eight days after Freeman disappeared.[61]  Wilcox photographed the interior and noted in her report that "[t]he interior surfaces did not appear to have been recently wiped clean." Wilcox also photographed the trunk and noted in her report that "[t]he trunk compartment was empty.  There was no spare tire or any type of trunk liner."  Wilcox did not observe any indication that the car had been "sanitized" or "sterilized."[62]  The photographs she took during her examination confirm the presence of dirt, debris, cigarette packages, and loose tools inside the vehicle, and loose dirt, rust, and other debris inside the trunk.[63]

28.     Wilcox's examination of the car further proved that McGuffin could not have committed the murder.  The Defendants claimed Freeman bled onto her right (cemetery) shoe and was bleeding when she was transported from the cemetery, but the investigation proved that McGuffin did not have any blood in his car or on his person.[64]  To remedy the obvious hole in their false narrative, the Defendants fabricated evidence that McGuffin's car had been wiped clean to destroy any evidence that might otherwise be detectable through chemical testing.

29.     During his appearance on "20/20" Dannels falsely reported that McGuffin's Mustang had been "cleaned and wiped,"[65] and later represented that he had been told that the

---

[60] 2000-07-05 McGuffin Consent to Search [Dkt. No. 310-15 at 235].

[61] 2000-07-06 Wilcox Report of Car [Dkt. No. 310-15 at 231].

[62] *Id.* at 237–38.

[63] Wilcox Photographs of Mustang (Exhibit 31 to Puracal Decl.).  *See also* Kathy Wilcox Deposition at 93:9–102:19 (Exhibit 6 to Puracal Decl.).

[64] *See* 2000-06-28 Coquille PD Zavala Report [Dkt. No. 292-6 at 2]; 2000-06-28 Coquille PD Lee Report at 4 (Exhibit 32 to Puracal Decl.).

[65] 2010-10-15 Transcript of ABC News 20/20 Episode at 19 (Exhibit 1 to Puracal Decl.).

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

trunk had been "sterilized."[66]  Vidocq repeated the same lie in an internal memorandum: "[T]he suspect's car was completely sanitized with the removal of everything down to the gas tank."[67] This false narrative was ultimately presented at trial when Wilcox falsely testified that the seats of the Mustang had been "wiped clean."[68]  Handwritten notes from a HIT Team meeting in 2000 involving Wilcox and some of the other Defendants, which were produced to McGuffin for the first time in this civil suit, reveal that Wilcox initially explained to the other Defendants that the vehicle was clean, but had not been "wiped."[69]  The story about the Mustang being "wiped clean" and "sterilized" (or "sanitized") was fabricated sometime after this meeting as part of the renewed effort to secure an indictment of McGuffin in 2010.  In her deposition in this case, Wilcox admitted parts of the fabrication, *i.e.,* that the Mustang's trunk was "empty," but not wiped or sterilized[70]; that, at the time of her examination, she knew that the gas tank was leaking into the trunk, which explained why it would be empty[71]; and that she never amended her written report or informed the detectives because, as Wilcox put it, "That wouldn't have been my job."[72]

30.    OSP Detective John Riddle, who was stationed in Coos County, later fabricated evidence that Freeman's blood was found in another car associated with McGuffin.  On the night Freeman disappeared, McGuffin asked a friend, Kristen Steinhoff, to help him look for Freeman around town because McGuffin's Mustang had a gas leak and he could only put a few gallons in

---

[66] 2020-02-28 Transcript of ABC News 20/20 Episode at 40 (Exhibit 33 to Puracal Decl.).

[67] Vidocq Synopsis at 1 [Dkt. No. 293-2 at 119–20].

[68] Criminal Trial Transcript at D6 81:12–13 [Dkt. No. 284-1 at 1155].

[69] 2000-07-06 Wilcox Handwritten Notes from HIT Meeting (Exhibit 34 to Puracal Decl.); *See also* Kathy Wilcox Deposition at 93:9–102:19 (Exhibit 6 to Puracal Decl.).  District Attorney Frasier confirmed that he did not receive HIT Team notes during the criminal case.  R. Paul Frasier Civil Suit Deposition at 76:20–78:15 (Exhibit 3 to Puracal Decl.).

[70] Kathy Wilcox Deposition at 109:1–110:13 (Exhibit 6 to Puracal Decl.).

[71] *Id.* at 113:6–115:13.

[72] *Id.*

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

the tank at a time.[73]  Steinhoff was borrowing a purple Kia from her mother's boyfriend, and Steinhoff agreed to drive around in the Kia with McGuffin to look for Freeman around town. Steinhoff was interviewed by police in 2000, told them that she had helped McGuffin look for Freeman, and recounted the events of that night for them.[74]  Over the next ten years the Defendants threatened, harassed, and intimidated Steinhoff, coercing her to change her exculpatory statements confirming McGuffin's alibi into inculpatory statements implicating McGuffin.[75]  By the time of trial in 2011, Steinhoff had been interviewed or interrogated by police at least 15 times, including a custodial interrogation,  and subjected to two polygraphs, two grand juries, and countless surprise visits from the Defendants who would show up at her home and threaten her in front of her four young children.[76]  Steinhoff was subjected to many forms of coercive tactics.[77]  In early 2010, Coos County Sheriff's Deputy Looney reported that, in an unrecorded interview, Steinhoff said McGuffin changed clothes on the night of Freeman's disappearance.  The Defendants knew Steinhoff had previously testified at grand jury in 2000 about the clothes that McGuffin was wearing and never said anything about blood on those clothes or him changing clothes.[78]  But the Defendants kept pushing Steinhoff.  In early 2010, the Defendants purchased the purple Kia from a new owner after telling her that it "had been involved in a murder back in 2000."[79]  The Defendants took cuttings from the seats and floorboards, which Hormann tested for blood and DNA.[80]  In March 2010, Riddle and his

---

[73] Nicholas McGuffin Deposition at 100:2–18 (Exhibit 10 to Puracal Decl.).
[74] 2000-07-06 CCSO Zanni Report re Steinhoff (Exhibit 35 to Puracal Decl.).
[75] *See* Report of Dr. Brian Cutler at 5–14 (Exhibit 28 to Puracal Decl.).
[76] *See id.* at 6.  *See also* 2010-03-04 Transcript of Steinhoff Interrogation at 3, 14, 24, 25, 56, 70 [Dkt. No. 297 at 95].
[77] Expert Report of Dr. Brian Cutler at 6 (Exhibit 28 to Puracal Decl.).
[78] Grand Jury (2000) (Kristen Steinhoff) [Dkt. No. 286-6].
[79] 2010-10-15 Transcript of ABC News 20/20 Episode at 17, 20 (Exhibit 1 to Puracal Decl.).
[80] 2010-03-25 OSP Lab Report [Dkt. No. 297 at 170]; 2010-05-24 OSP Lab Report [Dkt. No. 297 at 172].

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

counterpart from the Coos County Sheriff's Office interrogated Steinhoff once again, accused her of being involved in the murder, and asked her to explain why Freeman's blood and DNA had been found in the Kia.[81]  Steinhoff began crying and insisted that she had nothing to do with Freeman's murder.  Riddle then asked Steinhoff to "[t]hink back" and specifically asked her if she remembered "Mr. McGuffin having blood on his clothes at all?"[82]  Riddle's suggestion about blood on the clothes had no basis in fact, but it gave Steinhoff an easy opportunity to deflect attention from herself, and appease her interrogators by implicating McGuffin.  Steinhoff now "remembered" that McGuffin "changed clothes" between the time she first saw him that evening and the time she helped him look for Freeman[83]—a flat out falsehood that was not corroborated by any other evidence or eyewitnesses, and which McGuffin denies.[84]  Riddle's statement in 2010 to Steinhoff was itself a lie—Freeman (and McGuffin) were excluded from all samples tested from the Kia.[85]  But Riddle never corrected himself with Steinhoff, and the false evidence ploy worked.[86]  Steinhoff falsely testified at grand jury that McGuffin had changed clothes within the span of time that Freeman was believed to have disappeared, and, when she tried to distance herself from that statement at trial, the prosecutor used her prior testimony against her to convict McGuffin.[87]

---

[81] 2010-03-04 Transcript of Steinhoff Interrogation at 11:22–23, 14:17–22 [Dkt. No. 297 at 95].
[82] *Id.* at 11:24–12:8.
[83] *Id.*
[84] *See* Nicholas McGuffin Deposition at 188:1–10 (Exhibit 10 to Puracal Decl.).
[85] 2010-05-24 OSP Lab Report [Dkt. No. 297 at 172].
[86] *See* ABC News 20/20 Transcript (2010) at 21 (Exhibit 1 to Puracal Decl.).
[87] *See* Grand Jury (2010) (Kristen Steinhoff) at 105:14–106:2 [Dkt. No. 295-1 at 830–31]; Criminal Trial Transcript at D5 23:11–24, 24:7–11 [Dkt. No. 284-1 at 816–17].

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

**E.**    **Defendants fabricated witness statements that McGuffin switched cars.**

31.    The Defendants fabricated evidence that McGuffin drove home shortly after the murder to switch cars.  The Defendants also coerced and manipulated witnesses into falsely identifying the wrong car.

32.    Early in the investigation, the Municipal Defendants crafted the narrative that McGuffin drove home to switch cars (from his blue Mustang to his parents' red Thunderbird) on the night that Freeman disappeared.  Zavala fabricated evidence to support this narrative in his July 12, 2000, report of a June 28 traffic stop of McGuffin, and Reaves signed off.[88]

33.    The Defendants then fed that false narrative to witnesses through repeated interviews, resulting in multiple witnesses who either claimed to have seen McGuffin driving his parents' Thunderbird that evening or over time changed their stories about what car McGuffin was driving on the night in question.[89]  Aaron West is a good example.  On July 3, 2000, Coquille PD Officer Randy Ulmer interviewed West and reported that West hung out with McGuffin and two others (David Jenkins and John Emler) at Johnson Mill Pond on June 28 before McGuffin left to go pick Freeman up from the Mitchell house.[90]  Ulmer reported that, after McGuffin left, West, Jenkins, and Emler went to Fast Mart, and McGuffin stopped by 15–20 minutes later to see if they had seen Freeman.  Ulmer's report does not mention anything about McGuffin switching cars.  Four days later, on July 7, Zavala interviewed West, and, again, the report does not mention anything about McGuffin switching cars.[91]  That was before Zavala wrote the report to create the suspicion that McGuffin drove home while he was supposed to be looking for Freeman.  Then, after Zavala wrote that false report, West was subjected to two more

---

[88] 2000-07-12 Coquille PD Zavala Report of Traffic Stop [Dkt. No. 292-6 at 2].
[89] *Cf.* Expert Report of Dr. Brian Cutler at ¶ 13 (Exhibit 28 to Puracal Decl.).
[90] 2000-07-03 Coquille PD Ulmer Report re West (Exhibit 36 to Puracal Decl.).
[91] 2000-07-07 Coquille PD Zavala Report re West (Exhibit 37 to Puracal Decl.).

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Road, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

interviews, a polygraph, and grand jury, all within a few weeks. In one of the interviews, West reportedly said McGuffin was in the Mustang; in another interview, West reportedly said McGuffin was in the Thunderbird; and during his polygraph pre-test interview, West reportedly said McGuffin was in the Mustang and then switched to the Thunderbird.[92] None of the interviews were recorded. Hall reported the "switch" in a search warrant affidavit and again at grand jury.[93]

34.     By the time of trial in 2011, the Municipal Defendants had fed into the media the false narrative that McGuffin had switched cars,[94] and by then Defendants had interviewed witnesses so many times that the witnesses could not keep their stories straight. The majority of witnesses who suggested that McGuffin was driving his parents' red Thunderbird, instead of his blue Mustang, were uncertain about which car he was driving.[95] The Municipal Defendants themselves could not keep their own stories straight either.[96] Although the Defendants fabricated the narrative that McGuffin killed Freeman and disposed of her body, and switched vehicles one or more times during the process, witness testimony did not support the timeline of the narrative. If the jury in this civil suit were to credit each of the witnesses on which the Defendants relied to support their false narrative, the jury would have to accept the implausible notion that McGuffin switched cars *up to ten times* in a three-hour period on the night that Freeman disappeared.[97]

---

[92] *See* 2000-07-27 Roach Report re West (Exhibit 38 to Puracal Decl.); 2000-08-07 Young Report re West at 29 (Exhibit 39 to Puracal Decl.); 2000-07-27 Ranger Report re West at 3 (Exhibit 40 to Puracal Decl.).

[93] Hall Search Warrant Affidavit at 8 [Dkt. No. 288-3 at 10]; Grand Jury (2010) (Dave Hall) at 66:7–11 [Dkt. No. 295-1 at 186] (testifying McGuffin switched cars)

[94] *See, e.g.,* ABC News 20/20 Transcript (2010) at 17, 19, 20, 22 (Exhibit 1 to Puracal Decl.).

[95] *See* Timeline of Witness Testimony re Vehicles (Exhibit 41 to Puracal Decl.).

[96] *Compare* Hall Search Warrant Affidavit at 8 [Dkt. No. 288-3 at 10] (falsely stating McGuffin started in the Mustang and switched to the Thunderbird, then back to the Mustang) *with* Dannels Case Summary for Vidocq at 3 (Exhibit 4 to Puracal Decl.) (falsely stating McGuffin started in the Thunderbird and switched to the Mustang).

[97] *See* Timeline of Witness Testimony re Vehicles (Exhibit 41 to Puracal Decl.).

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

35.     The Defendants knew that the witness accounts about McGuffin's vehicle were not credible.  Kathy McGuffin—Nick McGuffin's mother—told the police that, on the night Freeman disappeared, the red Thunderbird was parked in her driveway all night.[98]  She told the police that her husband (Bruce McGuffin) allowed Nick to drive the Thunderbird earlier in the summer because the Mustang had a leak in the gas tank.  Kathy told police that, on the Monday before Freeman disappeared, Bruce took the Thunderbird away from Nick because Bruce told Nick to go out and apply for jobs, and Nick had not done so.  Kathy saw Bruce put the keys to the Thunderbird in the headboard in their bedroom, and those keys never left the headboard (and the Thunderbird never left the driveway) on the night that Freeman disappeared.  Kathy testified in her deposition that she provided all of this information to police, but her information does not appear in any of the police reports given to the District Attorney.  A note from the HIT Team, however, confirms that the Defendants knew about the information.[99]

36.     The Defendants also knew that Zavala's report was not credible.  Notes and emails from the HIT Team confirm that the Defendants knew about records that put McGuffin (1) at the gas station at 10:19 p.m. near where Zavala pulled him over and (2) at the pay phone at Fast Mart in town at 10:44 p.m.—around the same time when Zavala falsely says he was home switching cars five miles away in the opposite direction.[100]

///

///

---

[98] Kathy McGuffin Deposition at 14:23–27:21 (Exhibit 21 to Puracal Decl.).  Plaintiffs refer to Kathy, Bruce, and Nick by their first names here to prevent confusion.

[99] 2010-01-28 HIT Team Note at 5 (Exhibit 42 to Puracal Decl.) ("why are they dissociating themselves from the T-Bird?").

[100] *Compare* 2000-06-28 Coquille PD Zavala Report [Dkt. No. 292-6 at 2] *with* 2000-07-21 Fax to Hall with Gas Records (Exhibit 43 to Puracal Decl.) *and* 2010-01-28 HIT Team Notes at 4 (Exhibit 42 to Puracal Decl.) ("??How did Nick contact Dad that night??  Previous subpoena records shows only the 2244hrs call from Fast Mart payphone.").

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

**F.     Defendants fabricated evidence that McGuffin "dumped" Freeman's body down the embankment.**

37.     The Defendants fabricated evidence that McGuffin dumped Freeman's body down an embankment and then stood at the side of the embankment and looked down at the body where it landed.

38.     On August 3, 2000, the Defendants discovered Freeman's body down an embankment off Lee Valley Road in Coquille, near the Coquille River.[101]

39.     Defendant Kris Karcher (a Deputy Medical Examiner with the Coos County Sheriff's Office) went to the scene and reported that Freeman's body had been "dumped" down the embankment from the road based on the body positioning.[102]  In particular, Karcher created the false narrative that one arm was in front of the body and one arm was in back, as if Freeman had been rolled.[103]  The original report from the criminalist in charge of the scene does not say anything about Freeman's body being rolled down the embankment.[104]  The Defendants used Karcher to create the false impression that McGuffin hastily dumped Freeman's body by rolling her down the embankment from the road.

40.     Karcher destroyed all her notes and reports related to this case, but the case summary Dannels wrote for Vidocq, along with Karcher's grand jury testimony, confirms the fabrication happened sometime between 2000 and 2010.[105]

41.     When Karcher fabricated that evidence, she knew that the body was not positioned in the way she reported.  Karcher (and Dannels) knew that the autopsy report actually

---

[101] 2000-08-08 OSP Pex Report (Exhibit 44 to Puracal Decl.).
[102] Grand Jury (2010) (Kris Karcher) at 146:20–24 [Dkt. No. 295-1 at 254].
[103] *Id.* at 130:14–16, 147:4–5.
[104] 2000-08-08 OSP Pex Report (Exhibit 44 to Puracal Decl.).
[105] Kris Karcher Deposition at 73:7–77:7 (Exhibit 45 to Puracal Decl.); Grand Jury (2010) (Kris Karcher) at 146:20–24 [Dkt. No. 295-1 at 254]; Dannels Case Summary for Vidocq at 1 (Exhibit 4 to Puracal Decl.).

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Road, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

describes the right arm as extending up at the shoulder, bent posteriorly, and coming to rest behind the right shoulder[106]—not around the torso as Karcher reported.

42.    Karcher also fabricated evidence of a "path" starting from the side of the road where, according to Karcher, the vegetation was broken down such that it looked like someone had walked over to the edge and looked down.[107]  The Defendants created the false impression that McGuffin dumped the body from the road, gone to the edge, and looked down at the body.

43.    When Karcher fabricated that evidence, she knew that there was no such path.  In a handwritten note from a HIT Team meeting in 2009, the Defendants wrote: "vegetation not broke down by road."[108]  The Defendants suppressed that note.[109]

44.    Moreover, Karcher destroyed the only copy of the videotape documenting the crime scene.  On August 3, 2000, OSP Lab Criminalist, Lt. James Pex, was called to process the scene after Freeman's body was found.  Pex dictated notes at the scene.[110]  The dictated notes reveal that Pex took video of the scene prior to the extraction of Freeman's body.  The video of the scene was given to CCSO Deputy Zanni and then to Coquille PD's lead detective, Dave Hall.[111]  The video was logged into evidence as item 224.  On March 22, 2001, Karcher checked the videotape out of evidence with Hall's permission.[112]  The videotape has never been seen since.  In addition, Pex issued a typed report of his scene work that does not include any reference to the video tape.[113]  The District Attorney testified in his deposition in this case that he

---

[106] 2000-08-04 Autopsy Report at 2 (Exhibit 5 to Puracal Decl.).
[107] Grand Jury (2010) (Kris Karcher) at 146:1–6 [Dkt. No. 295-1 at 254].
[108] 2009-10-13 HIT Team Notes at 7 (Exhibit 46 to Puracal Decl.).
[109] R. Paul Frasier Civil Suit Deposition at 75:13–78:15 (Exhibit 3 to Puracal Decl.); Shaun McCrea Deposition 185:10–21, 197:18–198:16 (Exhibit 16 to Puracal Decl.).
[110] 2000-08-03 Pex Dictated Notes from Scene at 1 (Exhibit 47 to Puracal Decl.).
[111] 2000-08-07 Evidence Log – scene tape [Dkt. No. 292-11 at 2] (first row, listing item as "video tape of crime scene" and remarks "evidence of crime scene").
[112] 2001-03-21 Property Request [Dkt. No. 292-12 at 2].
[113] 2000-08-08 Pex Report (Exhibit 44 to Puracal Decl.).



MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

was not aware of any videotape from the scene and he had never seen Pex's dictated notes referring to the videotape.[114]

45.    More than 20 years later, in a deposition in this case, Karcher finally admitted that the alleged "path" was more than likely made by an animal, and that she did not have any evidence that someone walked to the edge of the road and looked down.[115]

46.    Before the criminal trial, however, the Defendants worked with a jailhouse snitch to fabricate additional evidence that McGuffin had seen Freeman's body laying on the embankment.  In 2010, Defendants Schwenninger and McNeely worked with former lead case officer Hall to approach Richard Bryant—Hall's stepson—who shared a cell with McGuffin in county jail in 2002 after McGuffin had been charged with trespassing.[116]  In 2010, Bryant testified at Grand Jury that, while they were in county jail together, McGuffin became emotional talking about Freeman and said, "I can just – I can see her laying there and I couldn't do anything to help her, and I can't do anything about it."[117]  When he got to trial in 2011, however, Bryant's statement changed and he testified that McGuffin said "he can picture her laying there and her head sitting on a rock and there was nothing he could do about."[118]  The statement suggested that McGuffin had actually seen Freeman's body and knew how it was positioned. The Defendants withheld from the District Attorney evidence that Bryant had previously learned details of the investigation from his stepdad, Hall, the original lead detective on the case.[119]

---

[114] R. Paul Frasier Civil Suit Deposition at 194:20–197:21, 198:15–25, 202:1–203:6 (Exhibit 3 to Puracal Decl.).

[115] Kris Karcher Deposition at 159:22–161:20, 162:25–163:9 (Exhibit 45 to Puracal Decl.).

[116] Schwenninger Case Notes at 3 (Exhibit 48 to Puracal Decl., Attachment 4).  The City admitted that the typed notes were authored by Schwenninger and the handwritten notes were authored by McNeely.  *See* Coquille's Response to Plaintiffs' Interrogatory No. 15 (Exhibit 48 to Puracal Decl.).

[117] Grand Jury (2010) (Richard Bryant) at 8:15–17 [Dkt. No. 295-1 at 941].

[118] Criminal Trial Transcript at D6 65:21–24 [Dkt. No. 284-1 at 1139].

[119] 2000-09-21 CCSO Zanni Note re Richard Bryant (Exhibit 49 to Puracal Decl.); R. Paul

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Zanni and another deputy wrote in September 2000 that Bryant had "heard a lot of stuff from his dad and was blabbing his mouth."

47.     McGuffin was indicted and convicted on the basis of the Defendants' fabricated evidence, and without the benefit of the exculpatory evidence that was suppressed.[120]

## III.  POINTS AND AUTHORITIES ON PLAINTIFFS' CLAIMS UNDER 42 U.S.C. § 1983

**A.     A reasonable jury can find the Defendants fabricated evidence.**

There is a clearly established due process right not to be subjected to criminal charges on the basis of fabricated evidence; the "proposition is virtually self-evident."[121]  Evidence can be fabricated in myriad ways.[122]  First, *direct fabrication* can occur where reports or documents include things that are simply false; where reports or documents, for example, "contain[] evidence" that does not exist or purport to record statements that were "never made."[123]  Direct fabrication also occurs where officials "deliberately mischaracterize[]" evidence,[124] either by

---

Frasier Civil Suit Deposition at 186:15–189:21 (Exhibit 3 to Puracal Decl.).

[120] *See, e.g.*, Grand Jury (2010) (David Zavala) at 102:2–105:10 [Dkt. No. 295-1 at 98] (testifying to fabricated report of McGuffin driving over the bridge toward home); Grand Jury (2010) (Kris Karcher) at 146:1–147:7, 148:3–11 [Dkt. No. 295-1 at 254] (testifying Freeman was dumped, rolled down the hill, and a path like someone had walked to the edge and looked down; testifying that blood on the shoe was high velocity and could have come from a cough (*i.e.*, from the mouth) or sneeze (*i.e.*, from the nose)); Grand Jury (2010) (Dave Hall) at 66:7–11 [Dkt. No. 295-1 at 186] (testifying McGuffin switched cars); Grand Jury (2010) (Kip Oswald) at 78:1–5 [Dkt. No. 295-1 at 294](testifying it was his DNA on Freeman's shoe); Grand Jury (2010) (Craig Zanni) at 93:13–21 [Dkt. No. 295-1 at 349] (testifying eliminate everyone except McGuffin); Grand Jury (2010) (Ray McNeely) at 138:4–141:18 [Dkt. No. 295-1 at 1126] (testifying that he confirmed Lindegren's *Survivor* story with a cable tv guide and falsely testifying he never looked up if Rudy was voted off); Grand Jury (2010) (Mark Dannels) at 131:3–132:2, 132:6–138:21 [Dkt. No. 295-1 at 1541] (testifying that no one has threatened any witnesses and there were no difficult witnesses; testifying no DNA of anyone else; testifying eliminated everyone except McGuffin); Indictment [Dkt. No. 291-15 at 2] (listing witnesses appearing by report, including Krings and Wilcox).

[121] *Devereaux v. Abbey*, 263 F.3d 1070, 1074–75 (9th Cir. 2001) (*en banc*).

[122] *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017).

[123] *Costanich v. Dep't of Social & Health Servs.*, 627 F.3d 1101, 1112 (9th Cir. 2010).

[124] *Spencer*, 857 F.3d at 798.

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

affirmative misstatements or by "material omissions."[125]  In addition, while it is true that trivial

omissions—*i.e.*, those that are not material—do not state a fabrication claim,[126] clearly

established law provides that *material* omissions that make documents misleading or inaccurate

are absolutely actionable as forms of fabrication.[127]  Under the direct method, the investigator's

knowledge or reason to know of the plaintiff's innocence is irrelevant, because the Constitution

"prohibits the deliberate fabrication of evidence whether or not the officer knows that the person

is innocent."[128]  Put differently, "motive evidence is never *required*."[129]

Second, *under the circumstantial method*, fabrication can be proved by showing that "(1)

[d]efendants continued their investigation . . . despite the fact that they knew or should have

known that [the plaintiff] was innocent; or (2) [d]efendants used investigative techniques that

were so coercive and abusive that they knew or should have known that those techniques would

yield false information."[130]  As to the route involving knowledge of innocence, if "an investigator

knows that a person is innocent, yet continues the investigation nevertheless, then the evidence

suggests circumstantially that the investigator has an unlawful motivation to frame an innocent

---

[125] *Liston v. Cnty. of Riverside*, 120 F.3d 965, 973 (9th Cir. 1997).

[126] *See*, *e.g.*, *O'Doan v. Sanford*, 991 F.3d 1027, 1045 (9th Cir. 2021).

[127] *See, e.g.*, *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1147 (9th Cir. 2021) (claims based upon "'false statements or omissions *material* to the finding of probable cause,'" and emphasizing a prior holding "that an omission of a fact necessary to establish probable cause presented a triable issue of material facts about whether that omission 'amounted to at least reckless disregard for the truth'") (citations omitted)); *Liston v. Cty. of Riverside*, 120 F.3d 965, 973 (9th Cir. 1997) (fabrication can be established either through "material false statements or material omissions"); *United States v. DeLeon*, 979 F.2d 761, 763 (9th Cir. 1992) (discussing the material omissions that result in a warrant being falsified); *cf. United States v. Stanert*, 762 F.2d 775, 781 (9th Cir.), amended, 769 F.2d 1410 (9th Cir. 1985) (by "reporting less than the total story, an affiant can manipulate the inferences a magistrate will draw" and undermine any determination of probable cause); *Morse v. Fusto*, 804 F.3d 538, 548 (2d Cir. 2015) ("[I]nformation may be 'false' if material omissions render an otherwise true statement false.").

[128] *Spencer*, 857 F.3d at 800.

[129] *Richards v. Cnty. of San Bernardino*, 39 F.4th 562, 569 (9th Cir. 2022) (emphasis in original).

[130] *Caldwell v. City & Cnty. of San Francisco*, 889 F.3d 1105, 1112 (9th Cir. 2018) (quoting *Devereaux*, 263 F.3d at 1076); *see Spencer*, 857 F.3d at 799.

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

person, which supports a claim that the investigator deliberately fabricated evidence."[131]  The test "envisions an investigator whose unlawful motivation is illustrated by her state of mind regarding the alleged perpetrator's innocence."[132]

Here, a reasonable jury can find that the Defendants fabricated the evidence discussed above in the Statement of Facts, and did so with the intention of framing McGuffin.[133]

Citing Seventh Circuit law, the Municipal Defendants nonetheless argue that Plaintiffs' claims are limited to mere witness *coercion* and not *fabrication*.[134]  The Defendants are mistaken. Plaintiffs' claims—supported by ample evidence discussed above—constitute fabrication of evidence claims.  Plaintiffs allege that the Defendants knew, or should have known, they were eliciting false information from witnesses, which is part of the reason they engaged in repeated questioning of witnesses, why they suppressed evidence of exculpatory information provided by witnesses, and why they used tactics that were coercive.[135]  In other words, apart from just finding Defendants fabricated statements that were never made, a reasonable jury can find Defendants fabricated evidence in a variety of ways, including by using "investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information."[136]

The Municipal Defendants seem to imply that the fabrications here are not actionable because they are mistakes of tone or "mere" omissions.  But, as shown above, that is *not* Plaintiffs' claim, and the Ninth Circuit has rejected arguments like this that are premised on

---

[131] *Id.*
[132] *Costanich*, 627 F.3d at 1111.
[133] *See* Statement of Facts ¶¶ 4–47.
[134] Municipal Defendants' Motion for Summary Judgment at 34 [Dkt. No. 281] (citing *Fields v. Wharrie*, 740 F.3d 1107, 1110 (7th Cir. 2014)).
[135] *See* Statement of Facts ¶¶ 4–47.
[136] *Devereaux*, 263 F.3d at 1076.



MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

misreading and minimizing the plaintiff's evidence.[137]  In *Costanich*, for example, the Ninth

Circuit looked to statements that were included in the reports at issue, but "never made," as well

as other mischaracterizations and misrepresentations within the reports about the nature and

quality of the investigation that took place.[138]  These misrepresentations included situations

where the reports "twisted the[] words" attributed to witnesses, and where the

mischaracterization included "suggestions" that purportedly "lent credibility" to the report.

While mere mistakes of "tone" or "carelessness" are not actionable, misrepresentations and

mischaracterizations that alter the message conveyed by a police report are.[139]  *Costanich* also

made clear that an argument that errors in reports should be presumed to be mere mistakes of

"tone," or something of that sort, "is untenable in light of the principle that, on summary

judgment, [the court] must draw all factual inferences in favor of the nonmoving party."[140]

  The Municipal Defendants' reference to absolute testimonial immunity is a distraction.  It

is well established that "immunity for pre-testimony conduct does not extend to fabricating

reports, investigative notes, and similar documents."[141]  Indeed, "fabricated police reports do not

fall within the scope of absolute witness immunity, even though the officers who prepared the

reports testified at [the plaintiff's] criminal trial."[142]  Plaintiffs' claims involve pre-trial

fabrications—*e.g.*, in police reports, in witness statements, and other documents—not their

testimony alone.  In fact, the Seventh Circuit case to which the Defendants cite, *Fields*,

---

[137] *See, e.g.*, *Costanich,* 627 F.3d at 1112; *Lobato v. Las Vegas Metro. Police Dep't*, No. 22-16440, 2023 U.S. App. LEXIS 26946, at *3 (9th Cir. Oct. 11, 2023).
[138] 627 F.3d at 1112.
[139] *Costanich*, 627 F.3d at 1112–13.
[140] *Id.*
[141] *Id.* at 1113.
[142] *Rubalcava v. City of San Jose*, No. 20-cv-04191-BLF, 2024 U.S. Dist. LEXIS 55718, at *35 (N.D. Cal. Mar. 27, 2024).

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

understood this rule and rejected the extension of immunity to pretrial fabrications.[143]  *Fields* recognized that law enforcement may not seek to "retroactively immunize" themselves by pointing only to trial testimony covered by absolute immunity, which itself "would create a 'license to lawless conduct.'"[144]  That is the law in this Circuit as well.[145]

## B.    A reasonable jury can find the Defendants suppressed exculpatory evidence.

The Due Process Clause requires police to produce material information—*i.e.*, exculpatory and impeachment information—to the accused.[146]  Under *Brady* and its progeny, the state's suppression of evidence favorable to the defense violates due process where that evidence is material either to guilt or to punishment *regardless* of the good faith or bad faith of the state.[147]

Due Process requires disclosure of information "merely favorable to the accused."[148] This duty includes exculpatory and impeachment evidence so long as it is material; *i.e.*, it would be favorable to the accused and has some probability of altering the result at trial.[149]  Favorable information "includes evidence that would help the defendant impeach a witness."[150]

Suppressed information is material if "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."[151]  Due

---

[143] *Fields*, 740 F.3d at 1114.
[144] *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982)).
[145] *See, e.g.*, *Lisker v. City of Los Angeles*, 780 F.3d 1237, 1242 (9th Cir. 2015); *Paine v. City of Lompoc*, 265 F.3d 975, 981 (9th Cir. 2001) (internal quotations and citation omitted)); *Cunningham v. Gates*, 229 F.3d 1271, 1291 (9th Cir. 2000).
[146] *Brady v. Maryland*, 373 U.S. 83 (1963).
[147] *Id.*; *Youngblood v. West Virginia*, 547 U.S. 867 (2006) (*per curiam*); *Giglio v. United States*, 405 U.S. 150 (1972).
[148] *Gantt v. Roe*, 389 F.3d 908, 912 (9th Cir. 2004).
[149] *Kyles v. Whitley*, 514 U.S. 419, 433 (1995); *United States v. Bagley*, 473 U.S. 667 (1976).
[150] *Sanders v. Cullen*, 873 F.3d 778, 802 (9th Cir. 2017); *see also Carriger v. Stewart*, 132 F.3d 463, 481 (9th Cir. 1997) (en banc) ("Evidence is material if it might have been used to impeach a government witness, because if disclosed and used effectively, it may make the difference between conviction and acquittal.").
[151] *Kyles*, 514 U.S. at 435.

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

process requires disclosure of information that would "cast a shadow across" the investigation by illustrating the existence of police misconduct as impeachment.[152]  As the Supreme Court put it in *Kyles*, due process requires the disclosure of information that would "have raised opportunities to attack . . . the thoroughness and even the good faith of the investigation."[153]  This rule has to do with the nature of police work:  "When, for example, the probative force of evidence depends on the circumstances in which it was obtained and those circumstances raise the possibility of fraud, indications of conscientious police work will enhance probative force and slovenly work will diminish it."[154]

Here, a reasonable jury could find that each of the Municipal Defendants fabricated evidence and then suppressed the evidence that would have revealed the fabrications, indicating deliberate indifference or a reckless disregard for McGuffin's rights and the truth.  For example:

- Dannels, Walter, and Wilcox fabricated evidence of blood on the right (cemetery) shoe from which Dannels and Walter created a false narrative that McGuffin caught up to Freeman, argued with her, and hit her in the face, causing her to bleed on her shoe in that location.[155]  Dannels did not disclose that the phony narrative came from his joint efforts with Walter, a man already known for fabricating evidence in criminal cases.[156]

---

[152] *Atkins v. Cty. of Riverside*, 151 F. App'x 501, 505 (9th Cir. 2005).

[153] *Kyles*, 514 U.S. at 445.

[154] *Id.* at 446 n.15.  *See Mellen v. Winn*, 900 F.3d 1085, 1096 (9th Cir. 2018) (elements of *Brady/Giglio* claim).

[155] *See* Statement of Facts ¶¶ 4–10.

[156] *See Drake v. Portuondo*, 553 F.3d 230, 238, 244 (2nd Cir. 2009) ("Walter's deposition on remand confirms that he grossly exaggerated most of his qualifications and outright lied about some of them. . . . Walter then had two weeks to conjure up his quackery.  His direct testimony on picquerism, which spans twelve pages of trial transcript, consisted largely of uninterrupted and prolix exposition, weaving the complicated facts of the case into a seemingly coherent narrative, all pointing to the symptoms of the fictive syndrome called picquerism.  Walter even adapted the symptoms of the syndrome to remedy any potential weaknesses in the prosecution's

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

- McNeely and Webley fabricated evidence that Lindegren saw McGuffin and Freeman together outside the Mitchell residence shortly after 9:00 p.m.[157] McNeely and Webley did not disclose the Wikipedia page and their handwritten notes confirming the holes in Lindegren's story. Zanni and Sanborn supported the fabrication by suppressing the evidence of Backman's sighting of Freeman, nearly fifteen minutes away from the location where Lindegren said she was.

- McNeely and Webley fabricated evidence that Alicia Hyatt saw Freeman approach McGuffin's blue Mustang after 9:00 p.m. near the high school.[158] McNeely and Webley suppressed (or destroyed) the photos they showed Hyatt to get her to change her story from a dark colored Honda or Nissan, to a blue Ford Mustang.

- Dannels and Wilcox fabricated evidence that McGuffin's car had been wiped clean and the trunk had been sterilized to cover up a murder.[159] Dannels, Sanborn, and Wilcox supported the fabrication by suppressing the HIT Team notes documenting Wilcox telling the HIT Team that the car had not been wiped.

- Zavala, Reaves, and Hall fabricated evidence that McGuffin went home to switch cars.[160] The Municipal Defendants did not disclose the HIT Team notes and emails that show that the HIT Team knew that McGuffin made a phone call from the pay

---

theory of Drake's motive, for example, the lack of semen evidence."); *Drake v. Portuondo*, 321 F.3d 338, 342 (2nd Cir. 2003) ("It is now apparent that Walter's testimony concerning his qualifications was perjurious.").

[157] *See* Statement of Facts ¶¶ 11–25.

[158] *See* Grand Jury (2010) (Alicia Hyatt) at 37:8–15 [Dkt. No. 295-1 at 202]; 2010-07-24 Coquille PD Webley Report re Hyatt (Exhibit 84 to Puracal Decl.); Grand Jury (2010) (Alicia Hyatt at 166:22–167:4 [Dkt. No. 295-1 at 1348–49]; Chris Webley Deposition at 148:6–149:17 (Exhibit 57 to Puracal Decl.); Raymond McNeely Deposition 173:4–176:15 (Exhibit 85 to Puracal Decl.).

[159] *See* Statement of Facts ¶¶ 26–30.

[160] *Id.* ¶¶ 31–36.

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

phone at the Fast Mart in town, five miles in the opposite direction from his home, when he was supposedly at home switching cars.

- Karcher fabricated evidence that Freeman's body had been dumped down the embankment off Lee Valley Road and then someone stood at the side of the road and looked down at the body.[161] Karcher did not disclose that she did not have any evidence to support her speculation, and Karcher, Zanni, and Hall suppressed evidence of the crime scene video that would have impeached Karcher. The Municipal Defendants also did not disclose the HIT Team note that confirms that the vegetation was not broken down by the side of the road.

- Krings and Hormann fabricated reports to create the impression that there was no DNA from anyone other than Freeman and Oswald on Freeman's shoes.[162] Oswald contaminated, destroyed, or withheld key evidence about his finding of the shoe on Hudson Ridge,[163] and McNeely suppressed (or destroyed) his communications about the DNA evidence on the shoes.[164]

- Schwenninger and McNeely fabricated evidence that McGuffin knew the location of Freeman's body before it was found and then suppressed evidence that the jailhouse snitch who reported that was getting information from the lead case officer.[165]

---

[161] *Id.* ¶¶ 37–47.

[162] *See* Expert Report of Huma Nasir at 2 and 3 [Dkt. No. 297 at 254].

[163] *See* Expert Report of Russ Hicks at 33 (Exhibit 29 to Puracal Decl.).

[164] 2010-01-29 McNeely Note re DNA (Exhibit 14 to Puracal Decl., Attachment 5). McNeely confirmed that he authored the handwritten note. *See* McNeely's Response to Plaintiffs' Request for Admission No. 5 (Exhibit 14 to Puracal Decl.).

[165] *See* Statement of Facts ¶ 46.

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

As in *Mellen*, had the Defendants disclosed their own misconduct it "'would have provided the defense with a new and different ground of impeachment.'"[166]  Indeed, it would have provided the defense with evidence supporting a theory of innocence that has become increasingly popular in recent years—that Defendants were simply engaged in a "witch hunt."

The Municipal Defendants argue that they did not suppress evidence, but evidence exists from which a jury could find otherwise.  The Municipal Defendants simply ignore the exculpatory value of the evidence.  For example, the Municipal Defendants assert that McGuffin knew that Nick Backman saw Freeman on the night she disappeared, so the information was not suppressed.  But that note from July 2000 confirms the suppression—the note shows that McGuffin only knew that Backman had seen Freeman, just as many others had, and McGuffin was under the impression that Backman had not spoken to police.[167]  McGuffin never learned that Backman was, in fact, interviewed by police two months later in September 2000 and, more importantly, that police had obtained an ATM receipt from the credit union confirming the *exact* time that Backman saw Freeman.[168]  Ten years later, McNeely confirmed in a handwritten note that the HIT Team knew about Backman.[169]  Again, that note was never disclosed.

Similarly, the Municipal Defendants ignore the exculpatory value of the US Bank tape.  The Municipal Defendants argue the tape was not exculpatory because it could have only shown McGuffin driving the Coquille "loop," which witnesses already confirmed.[170]  But the tape could have confirmed the very point in contention—that McGuffin was driving his Mustang *all night* and

---

[166] 900 F.3d at 1098 (quoting *Benn v. Lambert*, 283 F.3d 1040, 1056 (9th Cir. 2002)); *see also Bagley*, 473 U.S. at 676; *Fields*, 672 F.3d at 517.
[167] *See* Municipal Defendants' Motion for Summary Judgment at 40 [Dkt. No. 281] (referring to Dkt. No. 290-17 at 4).
[168] 2000-09-20 CCSO Zanni Note re Backman [Dkt. No. 290-17 at 5].
[169] *See*, *supra*, n.34.
[170] *See* Municipal Defendants' Motion for Summary Judgment at 41 [Dkt. No. 281].

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

never switched cars.  It also would have confirmed the number of times McGuffin passed the US Bank that night, and provided greater precision on the timing of McGuffin's travel on the "loop."

The Defendants cannot ignore the exculpatory value of evidence and then assert that the evidence is not exculpatory.  The Defendants' argument on the destruction of evidence must similarly fail.  The motion itself illustrates why—the Defendants argue that the Court should find that they had a reasonable explanation for destroying the crime scene tape.  It is the jury's function to determine reasonableness; not the Court's.  A reasonable jury could find that Karcher destroyed the crime scene tape because it conflicted with her story that Freeman's body was dumped and the perpetrator walked to the edge of the road and looked down at the body.[171]  These disputed questions of fact mean that summary judgment must be denied.

## C.    A reasonable jury can find the Defendants detained McGuffin without probable cause.

The Municipal Defendants assert that the existence of probable cause defeats Plaintiffs' claims for malicious prosecution and illegal pretrial detention.  Following the Supreme Court's recent decisions, there is no distinction between a Fourth Amendment claim for detention and so-called malicious prosecution under the Constitution.[172]  Instead, "because the gravamen of the Fourth Amendment claim for malicious prosecution . . . is the wrongful initiation of charges without probable cause" and "the wrongful initiation of charges without probable cause is

---

[171] *See* Statement of Facts ¶¶ 37–47.

[172] *See Chiaverini v. City of Napoleon*, 602 U.S. 556, 556 (2024) (recognizing Fourth Amendment "claims have been analogized to the common-law tort of malicious prosecution"); *Thompson v. Clark*, 596 U.S. 36, 43 (2022); *Manuel v. City of Joliet,* 580 U.S. 357, 364, (2017); *Fatai v. City & Cnty. of Honolulu*, No. 19-CV-00603-DKW-WRP, 2022 u.s. Dist. LEXIS 121527, at *14 (D. Haw. July 11, 2022) (recognizing that *Thompson* "did resolve the labeling question" by "equating malicious prosecution with "unreasonable seizure pursuant to legal process." (citing *Thompson*, 142 S. Ct. at 1337)).

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

likewise the gravamen of the tort of malicious prosecution," these claims overlap and arise under the same constitutional framework.[173]

The Municipal Defendants misunderstand what it means to initiate a prosecution.[174] Here, they created (fabricated) police reports, withheld evidence, manipulated witnesses, and arrested McGuffin for the murder of Leah Freeman. A malicious prosecution claim may lie against government officials who "improperly exerted pressure on the prosecutor, knowingly provided misinformation to him, concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct that was actively instrumental in causing the initiation of legal proceedings."[175] The Defendants are responsible for the obviously foreseeable, and intended, consequence of their wrongful acts—McGuffin's indictment.[176]

The Municipal Defendants also argue that there is no evidence of any improper purpose such that they can be found to have acted with malice. There are several problems with this argument. For one, a malice requirement is inconsistent with the Fourth Amendment. The upshot of the Supreme Court's explicit recognition that the claims at issue arise under the Fourth Amendment demands a conclusion that a plaintiff need not show malice to prevail on this claim—the touchstone of the Fourth Amendment is reasonableness, not subjective intent.[177] In addition, under state law, in the context of a malicious prosecution claim, malice can be inferred

---

[173] *Thompson*, 596 U.S. at 43.

[174] *See* Municipal Defendants' Motion at 36, 39 [Dkt. No. 281].

[175] *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004). *See also Leonetti v. Bray*, No. 2018 U.S. Dist. LEXIS 241282, at **66–67 (D. Or. Feb. 16, 2018) ("It is well established under both Oregon and federal law that malicious prosecution actions are not limited to suits against only prosecutors, but rather may be brough against any person who has wrongfully initiated or caused charges to be filed.") (collecting cases).

[176] *Blankenhorn v. v. City of Orange*, 485 F.3d 463, 482 (9th Cir. 2007); *Barlow v. Ground*, 943 F.2d 1132, 1136 (9th Cir. 1991).

[177] *See Whren v. United States*, 517 U.S. 806, 815 (1996); *Graham v. Connor*, 490 U.S. 386, 398 (1989).

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

from a lack of probable cause.[178]  In this case, the lack of probable cause can give rise to the

inference of an improper purpose.[179]  Finally, in a civil case, both the questions of mental state

(malice) and the existence of probable cause are quintessential fact issues for a jury, not a legal

issue for the court.[180]

**D.      A reasonable jury can find the Defendants acted as part of a conspiracy.**

There is more than enough evidence in the record to permit a reasonable jury to find that

each one of the individual Defendants agreed to participate in the unlawful investigation of

McGuffin for a crime he did not commit both before and after McGuffin was charged with the

crime.

To prove a § 1983 conspiracy, a plaintiff must "show an agreement or 'meeting of the

minds' to violate [her] constitutional rights."[181]  Such an agreement "may be inferred from

conduct and need not be proved by evidence of an express agreement"; a plaintiff need only

point to some "facts probative of a conspiracy."[182]  Put differently, it is well established that an

agreement "may be inferred on the basis of circumstantial evidence such as the actions of the

defendants," meaning, "for example, a showing that the alleged conspirators have committed

acts that 'are unlikely to have been undertaken without an agreement' may allow a jury to infer

the existence of a conspiracy."[183]  In addition, while each participant must "share the common

---

[178] *Gustafson v. Payless Drug Stores NW, Inc.*, 269 Or. 354, 367, 525 P.2d 118 (1974).

[179] *See* Plaintiffs' Response to State Defendants' Motion for Summary Judgment at [ ].

[180] *Estate of Tucker ex rel. Tucker v. Interscope Records, Inc.*, 515 F.3d 1019, 1030 (9th Cir. 2008) ("Malice is usually a question of fact for the jury to determine."); *Reed v. Lieurance*, 863 F.3d 1196, 1205 (9th Cir. 2017) ("Here, we find that the district court improperly invaded the province of the jury when, at the summary judgment stage, it resolved factual disputes material to the question of probable cause.").

[181] *Ward v. EEOC*, 719 F.2d 311, 314 (9th Cir. 1983).

[182] *Id.*; *see also Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1301–02 (9th Cir. 1999).

[183] *Mendocino*, 192 F.3d at 1301–02 (citations omitted); *see also* Ward, 719 F.2d at 314.

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

objective" of the conspiracy, "each participant in the conspiracy need not know the exact details of the plan.[184]

An important principle from these cases is that a defendant need not be physically or directly involved in every aspect of the conspiracy to be liable for their agreement. Defendants have not admitted to their conspiracy; but most never do. Indeed, the Ninth Circuit has cautioned: "'Direct evidence of improper motive or an agreement among the parties to violate a plaintiff's constitutional rights will only rarely be available. Instead, it will almost always be necessary to infer such agreements from circumstantial evidence or the existence of joint action.'"[185]

Here, there is evidence from which a jury could easily conclude that there was an agreement (to fabricate evidence to secure the indictment of McGuffin); which defendants conspired (the Municipal Defendants and the State Defendants through the HIT Team and Vidocq/Walter who were added when the HIT Team could not accomplish the goal); how they conspired (by fabricating evidence of a fight that led to murder, and suppressing evidence of (1) an alternate suspect and perpetrator and (2) McGuffin's innocence); and how the conspiracy led to the deprivation of rights (McGuffin was indicted, prosecuted, and convicted based on the fabricated evidence).

There is specific evidence from which the jury could infer a meeting of the minds.[186] There is evidence of the Defendants' direct involvement in creating false evidence, which suggests an intent to violate Plaintiffs' rights.[187] There is further evidence that the Defendants

---

[184] *Franklin v. Fox*, 312 F.3d 423, 441 (9th. Cir. 2002); *see also United Steelworkers of Am. v. Phelps Dodge Corp.,* 865 F.2d 1539, 1541 (9th Cir.1989) (en banc).

[185] *Mendocino*, 192 F.3d at 102; *see also Gilbrook v. City of Westminster*, 177 F.3d 839, 856–57 (9th Cir. 1999) (citation omitted)).

[186] *See* Statement of Facts ¶¶ 4–47.

[187] *See Mendocino*, 192 F.3d at 1302 ("[S]ome of the misinformation included in, and some of

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

had direct knowledge of exculpatory evidence that was buried or destroyed.  The fact that the

Defendants suppressed that information from the criminal justice system before, during, and after

trial suggests an improper motive.[188]  There is further evidence of a close working relationship

between the Defendants through regular HIT Team meetings, internal memos and emails, the

exchange of confidential materials, and even a joint appearance on national television.  From

these facts, a reasonable jury can easily find an ability and opportunity to conspire.[189]

A reasonable jury can further find, despite the Defendants' view of the evidence

otherwise, that their actions were more than just routine steps in an investigation.  There is

specific evidence from which a jury could conclude that the Defendants collaborated to fabricate

evidence that would serve a particular goal in the progress of the investigation.  For example, in

September 2000, the Municipal Defendants, Wilcox, and Krings discussed (in meetings and

through internal memos) the unidentified male DNA on Freeman's left shoe.[190]  Krings

specifically told the HIT Team that it was "very unlikely" to have come from Oswald, the deputy

who found the shoe, meaning there was foreign DNA on the victim's bloodstained shoe that did

not match McGuffin and could not be explained away as innocent transfer.  After that meeting,

Krings fabricated a report that the DNA came from Oswald.[191]

The same thing happened again and again.  For example, in late 2009, the HIT Team met

and discussed the fact that the "left shoe on Hudson Ridge had blood" and the "Rt shoe no

---

the material omissions from the search warrant affidavits were directly attributable to the
appellants, which permits the inference of an improper motive for such conduct.").
[188] *Id.*
[189] *United Steelworkers*, 865 F.2d at 1546 ("The ability and opportunity to conspire, while
insufficient alone, constitute circumstantial evidence of actual participation in the conspiracy.")
(internal citations omitted).
[190] *See* 2000-09-25 Memo from Wilcox and Krings to Reaves [Dkt. No. 296 at 189].
[191] 2002-01-21 OSP Lab Krings Report [Dkt. No. 295-3 at 50].

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

blood."[192]  Handwritten notes from the meeting show that the group was struggling to figure out how to fit the right (cemetery) shoe into their narrative of McGuffin catching up to Freeman and getting into a fight near the cemetery.  The group mused that the right (cemetery) shoe could have been "planted" or "lost when trying to get out of car."  After that meeting, Dannels, Walter, and Wilcox fabricated blood on that cemetery shoe that could be used to explain everything.[193]  The others sat by silently, even after the fabricated blood was announced on national television.

As another example, in January 2010, the HIT Team discussed the need for evidence to link Bruce McGuffin (Nick McGuffin's dad) to the crime.[194]  On June 1, 2010, Dannels interviewed witness Damon Mason and fabricated a report that said: "Additionally, Mr. Mason advised us that he was 90-percent sure that Bruce McGuffin helped, too."[195]  The recording of Mason's interview confirms that he never said that.  But the fabricated report went to the District Attorney and helped move the Defendants toward their goal.[196]

With all of that, judgment as a matter of law cannot be granted. Indeed, the existence of an "unlawful conspiracy is generally a factual issue and should be resolved by the jury, "so long as there is a possibility that the jury can 'infer from the circumstances (that the alleged conspirators) had a 'meeting of the minds' and thus reached an understanding' to achieve the conspiracy's objectives."[197]  Likewise, to the extent there is an issue of a defendant's intention or

---

[192] 2009-10-13 HIT Team Notes at 7 (Exhibit 46 to Puracal Decl.).
[193] *See* Statement of Facts ¶¶ 4–10.
[194] 2010-01-28 HIT Team Notes at 4–5 (Exhibit 42 to Puracal Decl.); 2010-01-23 HIT Team Notes at 1 (Exhibit 50 to Puracal Decl.).
[195] Mark Dannels Deposition at 376:7–380:19 (Exhibit 51 to Puracal Decl.).
[196] 2010-06-01 Coquille PD Dannels Report re Mason (Exhibit 52 to Puracal Decl.).
[197] *Mendocino*, 192 F.3d at 1301-02 (citations omitted).

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

state of mind, such a question is also a factual issue "'inappropriate for resolution by summary judgment."[198]  On this record, Defendants motion must be denied.[199]

## E.    A reasonable jury can find the municipalities are liable under *Monell*.

Under current law, municipalities cannot be liable under a *respondeat superior* theory but may be liable where employees are "acting pursuant to an expressly adopted official policy," or pursuant to a "longstanding practice or custom."[200]  A "policy" is "'a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.'"[201]

Beyond affirmative acts, an actionable practice or custom can be found in municipal inaction or a refusal to act.  A policy "of inaction or omission may be based on failure to implement procedural safeguards to prevent constitutional violations."[202]  A policy of omission can also involve failing to adequately train police officers, where the municipality has "disregarded the known or obvious consequence that a particular omission in their training program would cause municipal employees to violate citizens' constitutional rights."[203]

In addition, though Plaintiffs' claims must proceed against the individuals, even if they hypothetically were not liable, the municipalities can still be liable for the violations of

---

[198] *Id.*

[199] The motion related to the failure to intervene must be denied for the same reasons.  *See Tobias v. Arteaga*, 996 F.3d 571, 583 (9th Cir. 2021) (quoting *United States v. Koon*, 34 F.3d 1447 n.25 (9th Cir. 1994)) (If "an officer fails to intercede, 'the constitutional right violated by the passive defendant is analytically the same as the right violated by the person who' performed the offending action.").

[200] *Thomas v. County of Riverside*, 763 F.3d 1167, 1170 (9th Cir. 2014).

[201] *Long v. Cnty. of Los Angeles,* 442 F.3d 1178, 1185 (9th Cir. 2006) (quoting *Fairley v. Luman*, 281 F.3d 913, 918 (9th Cir. 2002) (per curiam)).

[202] *Tsao v. Desert Palace, Inc*., 698 F.3d 1128, 1143 (9th Cir. 2012) (citing *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992)).

[203] *Id.*

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

McGuffin's underlying constitutional rights.[204]  Put differently, while McGuffin's *rights* must have been violated, *Monell* theories do not have to be "premised on a theory of liability that first requires a finding of *liability* on the part of the individual officers."[205]  The Municipal Defendants' representation to the contrary is not a correct statement of the law.

First, there is evidence from which the jury may find the City of Coquille liable based on the actions of a policymaker (the Chief of Police).  *Monell* liability can be based solely on a single decision, regardless of whether the entity "had taken similar action in the past or intended to do so in the future," when the decision constitutes official policy by a policymaker,[206] such as Chief Reaves and Chief Dannels.  The City itself testified that the person responsible for making policy decisions for the Coquille Police Department from 2000 through 2011 was the Chief of Police.[207]  Chief Reaves was the lead policymaker from 2000 through 2008, and Chief Dannels was the lead policymaker from 2008 through the end of 2010 (after McGuffin was indicted).  As discussed above, there is evidence from which a jury could find that Chief Reaves and Chief Dannels were involved in committing the misconduct.  The Chiefs' involvement is sufficient to make the agency liable in its own right.

Second, there is evidence from which the jury could find that the City of Coquille and Coos County failed to implement procedural safeguards to prevent constitutional violations, such as by failing to enact a policy or separately by failing to train or supervise its agents.[208]  Liability may lie in "a situation that demands a policy," where the municipality "ignored a plainly obvious

---

[204] *See, e.g., Fairley*, 281 F.3d at 917 ("If a plaintiff establishes he suffered a constitutional injury by the City, the fact that individual officers are exonerated is immaterial to liability under § 1983.").
[205] *Richards*, 39 F.4th 574 (emphasis added).
[206] *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).
[207] Rule 30(b)(6) Deposition of City of Coquille at 15:24–17:7 (Exhibit 53 to Puracal Decl.).
[208] *Tsao*, 698 F.3d at 1143 (citing *Oviatt*, 954 F.2d at 1477).

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

danger."[209]  For the City, Chief Reaves, Chief Dannels, and Officers Sanborn and Zavala testified that there was no training on *Brady*.[210]  Webley testified that he was only "vaguely familiar" with *Brady*, does not recall any training on it, and his understanding was limited to issues related to the *Brady* list of officers who had credibility issues.[211]  The County did not even have a *Brady* policy.[212]  On this record, a reasonable jury can find that the municipalities "disregarded the known or obvious consequence that a particular omission in their training program" would lead to constitutional violations.[213]  It should have been obvious by 2000, and long before, that *Brady* obligations are the sorts of things that require both (1) adequate written policies and (2) training.  Indeed, "[i]n their investigative capacities, police officers regularly uncover exculpatory materials" and the Supreme Court has laid down very specific obligations of police officers on the disclosure of exculpatory materials."[214]  Given those rules: "Widespread officer ignorance on the proper handling of exculpatory materials would have the "highly predictable consequence" of due process violations."[215]  As a result, inadequate *Brady* rules are obviously actionable and raise questions for the jury.[216]

     Third, the jury could reasonably infer that it was obvious that Coquille PD needed

[209] *Armstrong v. Squadrito*, 152 F.3d 564, 577–78 (7th Cir. 1998); *see Tsao*, 698 F.3d at 1143.
[210] Michael Reaves Deposition at 32:16–18 (Exhibit 54 to Puracal Decl.); Mark Dannels Deposition at 118:9–16 (Exhibit 51 to Puracal Decl.); Sean Sanborn Deposition at 49:14–50:20 (Exhibit 55 to Puracal Decl.); David Zavala Deposition 35:22–36:16 (Exhibit 56 to Puracal Decl.).
[211] Chris Webley Deposition at 47:6–23 (Exhibit 57 to Puracal Decl.).
[212] Expert Report of Russ Hicks at 28 (Exhibit 29 to Puracal Decl.).  *See also* Kip Oswald Deposition at 65:4–66:11 (Exhibit 58 to Puracal Decl.).
[213] *Tsao*, 698 F.3d at 1143.
[214] *See also Gregory v. City of Louisville,* 444 F.3d 725, 743 (6th Cir. 2006) (citing *Brady*, 373 U.S. at 87).
[215] *Id.*
[216] *See, e.g.*, *Jackson v. City of Cleveland,* 925 F.3d 793, 823–25 (6th Cir. 2019) (inadequate written *Brady* policy presents *Monell* claim that must go to trial); *Gregory*, 444 F.3d at 742–44 (6th Cir. 2006) (failure to train concerning *Brady* obligations is issue for trial); *Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009) (same).

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

training on eyewitness identification procedures.  The City admitted that it did not have any

procedures to conduct eyewitness identifications.[217]  Eyewitness identifications are a recurring

event for police officers tasked with investigating crime, and Plaintiffs' expert Russ Hicks

described in detail the standard police practices for documenting identification procedures.[218]

During the McGuffin investigation, the officers repeatedly conducted eyewitness identification

procedures without showing the witness multiple photographs, without using filler photographs,

without giving the witness an admonishment that the suspect or vehicle may or may not be in the

photo array, and without documenting the procedure administered.[219]  A reasonable jury could

find that the violation of constitutional rights is a highly predictable consequence of a failure to

equip the officers with specific tools to handle these recurring situations.

Fourth, when a municipality approves "a subordinate's decision and the basis for it, their

ratification would be chargeable to the municipality because their decision is final."[220]  Here, a

reasonable jury can find that the municipalities ratified the actions of their officers.  Indeed, the

City admitted that the officers have not deviated from any policy, practice or custom of the

respective department.[221]  This is sufficient.[222]  Each municipal entities' response—and

continued support of all defendants even after McGuffin was exonerated—is a powerful form of

---

[217] Rule 30(b)(6) Deposition of City of Coquille at 41:20–42:1 (Exhibit 53 to Puracal Decl.).
[218] Expert Report of Russ Hicks at 17 (Exhibit 29 to Puracal Decl.).
[219] *See* Statement of Facts ¶¶ 18–25.  *See also*, *supra*, n.163 (re Hyatt).
[220] *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 123–24, 127 (1988); *see also Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097 (9th Cir. 2013).
[221] Rule 30(b)(6) Deposition of City of Coquille at 42:25–44:7, 50:21–51:6 (Exhibit 53 to Puracal Decl.).  A reasonable jury may also find Dannels and Zanni were involved in the violations, resulting in supervisor liability for the City and County.  *See Keates v. Koile*, 883 F.3d 1228, 1243 (9th Cir. 2018).
[222] *Cf. Larson v. Napier*, 700 F. App'x 609, 611 (9th Cir. 2017) (affirming judgment against municipality where, among other things, there was "an admission by the Sheriff that the deputies complied with the department's policy;" chief testified that "he would expect deputies to do the same thing;" and the deputy's actions were "taught and accepted as the department approach.").

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

approval that would permit a reasonable jury to find ratification.[223]

Summary judgment cannot be granted, particularly given that whether "a local government entity has displayed a policy of deliberate indifference is generally a question for the jury."[224]  To establish causation, "Plaintiff need only demonstrate that 'the identified deficiency ... [is] closely related to the ultimate injury.'"[225]  These standards are sufficiently satisfied to permit a jury to find for McGuffin and disputes of material fact preclude summary judgment.

### F.    A reasonable jury can find the Defendants violated S.M.'s constitutional rights.

The Municipal Defendants assert that there is no Fourteenth Amendment claim for violation of a child's liberty interest with her parent.[226]  The Municipal Defendants are simply wrong.  The Ninth Circuit recognizes a "constitutionally protected liberty interest under the Fourteenth Amendment" in the companionship and society between a parent and child.[227]

The Municipal Defendants further argue that S.M.'s claim cannot survive because the Municipal Defendants' misconduct does not "shock the conscience."[228]  Again, the Municipal Defendants are mistaken about the law.  An officer's deliberately indifferent conduct will generally "shock the conscience" when the officer had time to deliberate before acting or failing

---

[223] *See Henry v. Shasta*, 132 F.3d 512, 519 (9th Cir. 1997), as amended, 137 F.3d 1372 (9th Cir. 1998) (the investigation of this incident is "evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but is highly probative with respect to that inquiry") (citing *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985) (which explained: "If that episode of such dangerous recklessness obtained so little attention and action by the City policymaker, the jury was entitled to conclude that it was accepted as the way things are done and have been done in the City.").

[224] *Oviatt*, 954 F.2d at 1478.

[225] *Id*. (quoting *Canton v. Harris*, 489 U.S. 378, 391(1989)).

[226] Municipal Defendants' Motion for Summary Judgment at 49 [Dkt. No. 281].

[227] *See Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991).  Findings and Recommendations at 28–29 [Dkt. No. 83].  *See also* McGuffin's Response to State Defendants' Motion to Dismiss at 39 [Dkt. No. 62].

[228] Municipal Defendants' Motion for Summary Judgment at 49 [Dkt. No. 281].

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

to act.[229]  As discussed above, there are material questions of fact about whether the Municipal

Defendants acted in a manner that was deliberately indifferent.  There can be no question,

however, that the Municipal Defendants knew that McGuffin had a three-year-old daughter when

they fabricated the evidence that would ultimately lead to McGuffin's wrongful indictment,

prosecution, and conviction, and suppressed favorable evidence.[230]

## G.    The Defendants are not entitled to qualified immunity.

The Municipal Defendants are not entitled to qualified immunity.  Aside from boilerplate

language about the existence of qualified immunity, these Defendants offer no more than a

couple of sentences by way of "argument."  These sentences simply deny any wrongdoing, do

not cite any evidence, and do not even suggest a basis for any of the Municipal Defendants to

believe that the rights at issue were not clearly established at the time of the wrongful conduct.

These threadbare references are too cursory to constitute an argument or warrant a response and

have, therefore, been waived.[231]  Nor may Defendants attempt to cure them for the first time in

reply.

Even assuming, *arguendo*, that the issue has not been waived, the individual Municipal

Defendants are not entitled to qualified immunity.  As a general matter, in reviewing a request

for qualified immunity at summary judgment, this Court asks whether the record—properly

construed in plaintiff's favor—illustrates (1) a constitutional violation, and (2) that the right in

question was "clearly established" at the time of the conduct.[232]  As to the latter, the core issue is

---

[229] *See Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013) (citing
*Tennison v. City and Cnty. of San Francisco*, 570 F.3d 1078, 1809 (9th Cir. 2009) and *Porter v. Osborn*, 546 F.3d 1131, 1138 (9th Cir. 2008)).
[230] Schwenninger Case Notes at 1 (Exhibit 48 to Puracal Decl., Attachment 4) (Schwenninger noting McGuffin "[a]lso has a three year old little girl"; McNeely's handwriting on same page).
[231] *See Christian Legal Soc'y*, 626 F.3d at 487; *Maldonado*, 556 F.3d at 1048 n.4.
[232] *Tolan*, 572 U.S. at 655–56.

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

notice; *i.e.,* the "'salient question … is whether the state of the law' at the time of an incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.'"[233] The Supreme Court has consistently rejected the notion that qualified immunity is confined to determining whether there is a case exactly on point; "officials can still be on notice that their conduct violates established law even in novel factual circumstances."[234]  Accordingly, qualified immunity is unavailable in the "obvious case,"[235] and where the application of pre-existing law is "apparent" even where there is no case "directly on point."[236]  If the law were otherwise, qualified immunity would be near-absolute immunity.[237]

First, as the myriad cases cited above (and in response to the other motions for summary judgment) show, each of the constitutional rights at issue here was clearly established by 2000. The Constitution obviously prohibits the fabrication of evidence.[238]  In reaching this conclusion, *Deveraux* broke no new ground but pointed to Supreme Court cases like *Pyle v. Kansas*,[239]

---

[233] *Id*. at 656 (quoting *Hope v. Pelzer,* 536 U.S. 730 (2002)); *see also Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) ("[T]he focus" of qualified immunity "is on whether the officer had fair notice that her conduct was unlawful.").

[234] *Hope*, 536 U.S. at 741 (citing *United States v. Lanier*, 520 U.S. 259 (1997)) *see Ziglar v. Abbasi,* 137 S. Ct. 1843, 1866–67 (2017) ("It is not necessary, of course, that 'the very action in question has previously been held unlawful.' That is, an officer might lose qualified immunity even if there is no reported case "directly on point." (quoting, respectively, *Anderson*, 483 U.S. at 640, and *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

[235] *Brosseau*, 543 U.S. at 199 (per curiam).

[236] *Ziglar*, 137 S. Ct. at 1866.

[237] *Mattos v. Agarano*, 661 F.3d 433, 442 (9th Cir. 2011) (*en banc*) ("If qualified immunity provided a shield in all novel factual circumstances, officials would rarely, if ever, be held accountable for their unreasonable violations" of the constitution).

[238] *Devereaux*, 263 F.3d at 1074–75.

[239] 317 U.S. 213, 216 (1942).  *Pyle* is in a long line of cases that provided beyond adequate notice here. For example, *Napue v. Illinois*, 360 U.S. 264 (1959), pronounced: "[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Id*. at 269 (collecting cases). *Napue* explained that "[t]he principle that a State may not knowingly use false evidence … to obtain a tainted conviction" is "implicit in any concept of ordered liberty[.]" *Id*. In short, as Supreme Court reiterated in *Miller v. Pate*: that "the Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence" and "[t]here has been no

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

which established that the "wrongfulness of charging someone on the basis of deliberately fabricated evidence" is "obvious."[240]  Separately, the Ninth Circuit has repeatedly reiterated that this right was clearly established in cases decades before the McGuffin investigation started in 2000.[241]  Likewise, the Ninth Circuit has recognized that the law in 1984, and as far back as 1978, clearly established that police officers were bound to disclose material exculpatory information.[242]  As to the destruction of evidence with apparently exculpatory value, these rights were clearly established decades ago.[243]  Plaintiff's Fourth Amendment rights, as well as S.M.'s liberty interest in her relationship with her father, were also clearly established.[244]

Second, a defendant who persists in contesting the plaintiff's version of events and construing the facts in their own favor cannot obtain summary judgment.  The Municipal Defendants do not even attempt to accept or address Plaintiffs' facts, or the reasonable inferences to be drawn in Plaintiffs' favor, as they are required to do.  Having elected to ignore the record and proceed on the basis of disputed facts, there can be no summary judgment.[245]

---

deviation from that established principle." 386 U.S. 1, 7 (1967).

[240] *Devereaux*, 263 F.3d at 1075.

[241] *See, e.g.*, *Richards*, 39 F.4th at 569–71 (1993 fabrication of evidence); *Caldwell*, 889 F.3d at 1112, 1114–15 (1990 attribution of fabricated statement to plaintiff in notes); *Cunningham v. City of Wenatchee*, 345 F.3d 802, 811 (9th Cir. 2003) (finding the right clearly established in 1994); *Liston*, 120 F.3d at 973 (1992 case stating that fabrication may occur by "material false statements or material omissions").

[242] *Carillo*, 798 F.2d at 1219–25 (citing *United States v. Butler*, 567 F.2d 885 (9th Cir. 1978)); *see also Giglio*, 405 U.S. at 154 (decided in 1972).

[243] *Arizona v. Youngblood*, 488 U.S. 51, 57–58 (1988); *California v. Trombetta*, 467 U.S. 479, 488–89 (1984).

[244] *See, e.g.*, *Gerstein v. Pugh*, 420 U.S. 103, 112–13 (1975) (discussing the probable cause requirement and tracing it back to, among other cases, *Terry v. Ohio*, 392 U.S. 1 (1968), *Beck v. State of Ohio*, 379 U.S. 89, 91 (1964), and *Wong Sun v. United States*, 371 U.S. 471, 479–82 (1963); *see also Beck*, 379 U.S. at 91 ("[W]hether that arrest was constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it."); *Papachristou v. City of Jacksonville*, 405 U.S. 156, 169 (1972) ("We allow our police to make arrests only on 'probable cause.'" (citing *Johnson v. United States*, 333 U.S. 10, 13 (1948)).  *See Curnow*, 952 F.2d at 325 (child has a liberty interest in relationship with parent).

[245] *See S.R. Nehad v. Browder*, 929 F.3d 1125, 1140 (9th Cir. 2019) (finding "numerous genuine

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

In the end, the Municipal Defendants' qualified immunity argument—though forfeited and too cursory to warrant response—must fail.[246]

## IV.  POINTS AND AUTHORITIES ON PLAINTIFFS' CLAIMS UNDER STATE LAW

### A.    Plaintiffs are entitled to bring a claim for false imprisonment.

The individual Municipal Defendants assert that they cannot be held liable for the tort of false imprisonment "since Plaintiff's exclusive remedy is limited to an action against their public body employer."[247]  The individual Municipal Defendants go on to quote from an older version of ORS 30.265(1) that required substitution of the public body for the individual officers, employees, and agents of that public body.  The statute, however, was amended in 2011 by Senate Bill 397, which specifically changed the substitution requirement.[248]  The current version

---

disputes of material fact, which preclude a grant of summary judgment on qualified immunity" and noting that when disputed issues of fact are necessary to a qualified immunity determination, such factual issues must be resolved by the jury).  *See also Barlow*, 943 F.2d at 1136; *Bryan v. Las Vegas Metro. Police Dep't*, 349 F. App'x 132, 135 (9th Cir. 2009); *Trulove v. D'Amico*, 2018 WL 1070899, at *7 (N.D. Cal. Feb. 27, 2018).

[246] Qualified immunity also cannot be lawfully applied because the text of the statute forecloses its application. For one, the U.S. Code version of the statute provides that a person who, under color of law, violates causes a rights violation "*shall be liable*" to the party injured, 42 U.S.C. § 1983, foreclosing a massive exception if one were to find the law were not sufficiently "clearly established." In addition, the actual text passed by Congress further eliminates the availability of an exception like immunity because it provides that a rights violator "shall *any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding,* be liable to the party injured." Civil Rights Act of 1871, ch. 22, § 1, 17 Stat. 13 (1871) (emphasis added); *see* Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Cal. L. Rev. 201 (2023). As a result, "modern immunity jurisprudence is not just atextual but *counter*textual." *Rogers v. Jarrett*, 63 F.4th 971, 980 (5th Cir. 2023) (Willett, J., concurring).

[247] Municipal Defendants' Motion at 53 [Dkt. No. 281].

[248] Senate Bill 397 (2011) (Exhibit 59 to Puracal Decl.).  The Staff Measure Summary to the bill explains that the statute was changed in response to *Clarke v. OHSU*, 343 Or. 581, 175 P.3d 418 (2007), where the Oregon Supreme Court found that, by requiring substitution of the public body, "the plaintiff was denied an adequate remedy as required by the Remedies Clause of the Oregon Constitution, *as to the individual who caused the harm*[.]"  Senate Bill 397 (2011), Staff Measure Summary, Senate Committee on Judiciary (Exhibit 59 to Puracal Decl.) (emphasis in original).

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

of the statute provides that, when an action "alleges damages in an amount greater than the damages allowed under [the Oregon Tort Claim Act], the action may be brought and maintained against an officer, employee or agent of a public body, whether or not the public body is also named as a defendant."[249]  There is no basis for the Municipal Defendants' reliance on an out-of-date statute.

## B.    A reasonable jury can find the criminal case terminated in McGuffin's favor.

The Municipal Defendants argue that Plaintiffs cannot sustain a claim for malicious prosecution because the criminal case did not terminate in McGuffin's favor, as a matter of Oregon law.[250]  The Municipal Defendants made the same argument in their second motion to dismiss, and Plaintiffs thoroughly briefed the standard to prove "favorable termination" under Oregon law.[251]

Under Oregon law, "favorable termination" is satisfied when the prosecutor unilaterally dismisses the charges—that is, when the dismissal is at the sole request of the prosecutor and not the product of a settlement agreement between the prosecutor and the accused.[252]  The *Perry* Court emphasized that the inquiry is "fact-specific" and, therefore, not appropriate for summary judgment.[253]  The record, here, reflects a genuine issue of material fact.  After the post-conviction court vacated McGuffin's conviction, the District Attorney unilaterally moved to

---

[249] ORS 30.265(4).

[250] There is no dispute that, to the extent required, favorable termination is satisfied for Plaintiffs' federal claims.  *See McDonough v. Smith*, 139 S. Ct. 2149 (2019).  *See also* Findings and Recommendations at 18 [Dkt. No. 128].

[251] Plaintiffs' Opposition to City/County Defendants' Motion to Dismiss the First Amended Complaint at 5 [Dkt. No. 111].

[252] *Gumm v. Heider*, 220 Or. 5, 23–24, 348 P.2d 455 (1960) (quoting *Halberstadt v. New York Life Ins. Co.*, 194 NY 1, 10, 86 NE 801 (1909)).

[253] *Perry v. Rein*, 215 Or. App. 113, 126, 168 P.3d 1163 (2007) (citations omitted).  *See also* Findings and Recommendations at 28 [Dkt. No. 128].

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

dismiss the charges.[254]  The motion was granted half an hour later.[255]  It was not a joint motion between the State and McGuffin pursuant to any sort of settlement agreement whatsoever.

Although the District Attorney, in his motion to dismiss, pointed to difficulties presented due to the passage of time and the death of two witnesses, the District Attorney earlier told a reporter for local news that "There is unknown male DNA on those shoes.  Does it exonerate McGuffin?  Maybe, but I don't know."[256]  The District Attorney admitted in his deposition in the post-conviction case that, even during the criminal case, he wanted to know whose blood was on the bottom of Freeman's shoe because it "could be the potential suspect."[257]

During the post-conviction case, the District Attorney also first learned about Backman— the witness who saw Freeman walking by the credit union at 9:04 p.m., undermining Lindegren's credibility.[258]  Material questions of fact preclude summary judgment on this issue.

## C.    The statute of ultimate response does not apply.

In October 2020, the Municipal Defendants moved to dismiss based on the statute of ultimate repose in ORS 12.115(1).[259]  Plaintiffs thoroughly briefed the issue in response,[260] and the Municipal Defendants abandoned the argument in reply.[261]  This Court recognized that "[t]he statute, by its terms, applies to actions for negligent injury to 'person or property of another.'"[262]  The Court ruled that the statute of ultimate repose cannot apply because Plaintiffs' claims "allege harm to reputation and rights, not person or property."

---

[254] District Attorney's Motion to Dismiss Criminal Case [Dkt. No. 290-3 at 4].
[255] Order Dismissing Criminal Case (Exhibit 60 to Puracal Decl.).
[256] Jillian Ward, *Nicholas McGuffin's Manslaughter Conviction Overturned in the Death of Leah Freeman*, THE WORLD LINK (December 3, 2019) at 6 (Exhibit 61 to Puracal Decl.).
[257] R. Paul Frasier PCR Deposition at 87:5–11 (Exhibit 62 to Puracal Decl.).
[258] R. Paul Frasier Civil Suit Deposition at 180:6–183:13 (Exhibit 3 to Puracal Decl.).
[259] Municipal Defendants' Motion to Dismiss at 14 [Dkt. No. 49].
[260] Plaintiffs' Opposition to Motion to Dismiss by Municipal Defendants at 16 [Dkt. No. 51].
[261] *See* Reply in Support of Motion to Dismiss by Municipal Defendants [Dkt. No. 53].
[262] Findings and Recommendations at 23 [Dkt. No. 83].

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Despite the Court's ruling on this issue, the Municipal Defendants repeat the same argument in their motion for summary judgment. The Municipal Defendants assert that the Oregon Supreme Court "recently confirmed the applicability of the statute in this context."[263] That is not correct. In *Marshall v. PricewaterhouseCoopers, LLC*—the case cited in the Municipal Defendants' motion—the Oregon Supreme Court addressed the statute of ultimate repose in a legal malpractice case where the attorney's negligent advice about tax implications of a business transaction resulted in a purely economic loss to the client—specifically, millions of dollars in back taxes owed, affecting the client's economic interest.[264] The *Marshall* court addressed the question of whether the word "property" in the statute of ultimate repose was intended to encompass injuries to purely economic interests, as well as physical damage to tangible property.[265]

The *Marshall* decision recognizes that, although "injury" includes "any wrong or damage done to another, either in his person, rights, reputation, or property," the phrase "injury to person or property" narrows the scope.[266] The question, however, was whether the scope was so far narrowed to limit the word "property" to only physical property.[267] The court concluded that injury to economic interests is an "injury to . . . property" under the statute.[268]

The *Marshall* court never addressed application of the statute to the type of injury alleged in this case—specifically, an injury to constitutional rights caused by state action. The statute, by its terms, does not apply to an injury to the rights of another.[269] The *Marshall* court,

---

[263] Municipal Defendants' Motion for Summary Judgment at 55 [Dkt. No. 281].
[264] 371 Or. 536, 539, 539 P.3d 766 (2023).
[265] *Id.* at 543, 556.
[266] *Id.* at 542.
[267] *Id.*
[268] *Id.* at 557. *See also id.* at 542.
[269] Plaintiffs' Opposition to Motion to Dismiss by Municipal Defendants at 19 [Dkt. No. 51].

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

furthermore, did not address, or even mention, the significant constitutional implications that would follow from application of the statute of ultimate repose in a case such as this one—a case in which the plaintiff discovered the injury within repose period (when he was wrongfully indicted, prosecuted, and convicted), but was prevented from filing suit as a result of a judicial rule that creates the legal fiction that the injury does not accrue until the conviction is overturned.[270]  Plaintiffs briefed those issues extensively in response to the Municipal Defendants' motion to dismiss, and the Municipal Defendants do not address them at all on summary judgment.  The motion should be denied.

The Municipal Defendants also reprise their arguments on the timeliness of Plaintiffs' claim for intentional infliction of emotional distress and the lawfulness of claims for civil conspiracy and spoliation.[271]  The Court already ruled on all of these issues as a matter of law,[272] and these issues appear to have been re-raised solely for the purpose of confounding Plaintiffs' efforts to respond within allotted page limits to all of the factual issues raised.  Summary judgment should be denied accordingly.

Based upon the foregoing, Plaintiffs request the Court deny the Municipal Defendants' motion for summary judgment.

DATED:  February 18, 2025

| MALONEY LAUERSDORF REINER PC | LOEVY & LOEVY |
|---|---|
| By /s/Janis C. Puracal<br>    Janis C. Puracal, OSB #132288<br>    E-Mail:  jcp@mlrlegalteam.com<br>    Andrew C. Lauersdorf, OSB #980739<br>    E-Mail:  acl@mlrlegalteam.com | By /s/David B. Owens<br>    David B. Owens, WSBA #53856<br>    E-Mail:  david@loevy.com<br>    *Pro hac vice* |

---

[270] *See id.* at 23 (discussing constitutional implications under the Privileges and Immunities Clause and the Remedy Clause of the Oregon Constitution and under the Equal Protection Clause and Due Process Clause of the United States Constitution).

[271] *See* Municipal Defendants' Motion for Summary Judgment at 55, 57, 58 [Dkt. No. 281].

[272] *See* Findings and Recommendations at 17, 22, 26 [Dkt. No. 83].

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

## CERTIFICATE OF COMPLIANCE

This brief complies with the applicable page limitation under Dkt. No. 271 because it contains less than 50 pages, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

## CERTIFICATE OF SERVICE

I hereby certify that on February 18, 2025, the foregoing PLAINTIFFS' RESPONSE TO THE MUNICIPAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT was served on the following parties at the following address by sending to them a true copy thereof via the method indicated below:

| | |
|---|---|
| Robert E. Franz, Jr.<br>Sarah R. Henderson<br>Law Office of Robert E. Franz, Jr.<br>PO Box 62<br>Springfield, OR 97477<br>rfranz@franzlaw.comcastbiz.net<br>shenderson@franzlaw.comcastbiz.net<br>   *Attorneys for Defendants*<br>   *City of Coquille, City of Coos Bay, Coos*<br>   *County, Craig Zanni, Chris Webley, Eric*<br>   *Schwenninger, Sean Sanborn, Ray McNeely,*<br>   *Kris Karcher, Pat Downing, Mark Dannels,*<br>   *Kip Oswald, Michael Reaves, David Zavala,*<br>   *Anthony Wetmore, Shelly McInnes* | Jesse B. Davis<br>Todd Marshall<br>Kristen Hoffmeyer<br>Oregon Department of Justice<br>100 SW Market Street<br>Portland, OR 97201<br>todd.marshall@doj.state.or.us<br>jesse.b.davis@doj.state.or.us<br>kristen.hoffmeyer@doj.state.or.us<br>   *Attorneys for Defendants Oregon State*<br>   *Police, John Riddle, Susan Hormann,*<br>   *Mary Krings, Kathy Wilcox* |
| Anthony R. Scisciani III<br>Kelsey L. Shewbert<br>Meredith A. Sawyer<br>Lisa Lear<br>HWS Law Group<br>101 SW Main Street, Suite 1605<br>Portland, OR 97204<br>ascisciani@hwslawgroup.com<br>kshewbert@hwslawgroup.com<br>msawyer@hwslawgroup.com<br>llear@hwslawgroup.com<br>   *Attorneys for Defendant Vidocq Society* | Eric S. DeFreest<br>Luvaas Cobb<br>777 High Street, Ste. 300<br>Eugene, OR 97401<br>edefreest@luvaascobb.com<br><br>Laura E. Coffin<br>Coffin Law<br>541 Willamette Street, Ste. 211<br>Eugene, OR 97401<br>lauracoffin@coffin.law<br>   *Attorneys for Defendant Richard*<br>   *Walter* |

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

☒ by electronic means through the Court's ECF System on the date set forth above.

MALONEY LAUERSDORF REINER PC


By  /s/Janis C. Puracal
    Janis C. Puracal, OSB #132288
    E-Mail:  jcp@mlrlegalteam.com

Attorneys for Plaintiffs

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417