

**MARK J. DANNELS**
Chief of Police

## CASE SUMMARY
*Leah Freeman Homicide*

**Geographical and Demographical Information:**

The City of Coquille has an approximate population of 5,000. Coquille is the county seat for Coos County. Coos County population is approximately 63,000. The county is predominately rural and consists of approximately 1800 square miles.

The City of Coquille Police Department consists of 7.5 sworn officers, including the Chief of Police, a Lieutenant and five fulltime patrol officers and one part time patrol officer.

**Victim: Leah Freeman DOB 10/29/1984**

**Facts of the Case:**

Sometime after 9 PM on June 28, 2000, Leah Freeman disappeared. Her body was found in remote area of Coos County on August 3, 2009. Her body was found down a steep embankment next to a dirt road (Lee Valley Road). It appeared that her body had been "dumped" from a vehicle at the top of the embankment and rolled to the bottom of the incline. Her body was badly decomposed. No internal organs were present. All of her clothing that she was last seen in, except for her shoes and a sock were on her person. No broken bones were found. What remained of her skin showed no bullet wounds or stab wounds. Closer examination of her bones showed no defects such as being struck by a knife or bullet. Her clothing showed no evidence of bullet holes or knife holes. The autopsy physician listed the cause of death as "homicidal violence". The hyoid bone was not present, but the pathologist suspects she was either strangled or smothered.

Leah was first reported missing on the morning of June 29, 2000. Her mother, Cory Courtright, reported that she had not returned home the evening before.

The initial investigation was handled by the then Chief of Police and one of his patrol officers. (None of the Coquille Police Department personnel who were on the department at that time are currently with the department.) The Chief made the assumption that she had run away or was off with friends. Candidly, there was no evidence to suggest this. The chief and officer did check out a couple of places where she had been last seen, but did not locate her.

On June 30, 2009, other law enforcement agencies, including the District Attorney's Office, learned that there was a missing girl in Coquille. Those agencies offered assistance to the Coquille Police, but the chief refused the offer of assistance.

On July 3, 2000, the then chief requested assistance from the FBI on the idea that Leah had been kidnapped and taken out of state. Again, there was no evidence to support that assumption. Finally, on July 5, 2000, the chief asked for assistance from the Coos County Major Crime Team (which consists of officers from all police agencies operating in Coos County and the District Attorney's Office).

During the investigation, the following was learned:

1. Leah had a boyfriend, Nicholas James McGuffin, DOB 04/25/1982. Leah and Nick met in high school. Leah was freshman and Nick was a senior. He graduated in early June 2000. Their relationship was tumultuous at best. There were reports of arguments and shouting matches between the two. There were no documented situations where physical abuse between the two had occurred.

2. On the day Leah disappeared, the following timeline was developed:

    a. 2:00 PM Nick picks up Leah from her home;
    b. 4:00 PM Nick and Leah arrive at the home of Brent Bartley. Daniel Lapine is present.
    c. 5:00 PM Nick, Leah and Bartley go to Nick's home to pick up movies;
    d. 5:30 PM Nick, Leah and Bartley drive to home of Bartley's grandparents. Home is in a rural area near Coquille. The grandparents were out of town on vacation.
    e. 6:00 PM Nick and Bartley go into town and buy steaks and orange juice for dinner.
    f. 6:50 PM Nick takes Leah to home of Cherie Mitchell and drops her off. He is to return and pick her up at approximately 9:00 PM.

    g. Between 7 and 9 PM, Nick is seen in several locations about town. Some sightings are inconsistent as to time.
    h. 9:00 PM Leah leaves the Mitchell home on foot.
    i. 9:01 PM Leah is seen walking northbound in front of McKay's Market on Central Avenue.
    j. 9:05 PM Leah is seen walking northbound in front of Hunter's Restaurant on Central Avenue.
    k. 9:15 PM Leah is seen walking northbound in front of Oregon Federal Credit Union. This is the last known sighting of Leah. The route she is taking on Central is consistent with her walking from the Mitchell residence to her own residence.

3. After 9:00, a timeline for Nick is developed:

    a. Shortly after 9:00 PM Nick returned to the Mitchell home and learned Leah had left on foot. He claims he then drove from the Mitchell home and then onto Central to Leah's home. He claims he never saw her.
    b. There is approximately a 45 minute window where he is not accounted for;
    c. He is seen again driving through town. To start the evening he is driving a maroon Thunderbird. Later in the evening he is driving his parent's blue Mustang.
    d. While he called Leah's home at about 10:30 PM to see if she was there, Nick never went to her home to see if she was there. He claims that at about 2:30 AM on June 29 he went by her home, saw what he thought was the light from her television on in her room, and thought she was at home.
    e. During the evening, Nick is stopped twice by police. He tells them he is looking for Leah and asks them to look for her. Nick tells other people that night he is looking for Leah.

4. On July 3, 2000, a citizen comes forward and tells the police that on June 28, 2000 at about 11:00 PM, he found a shoe in the middle of a street which is off of Central Avenue. (The witness was returning home from work and thought it was a shoe belonging to one of his kids. He turned it over to the police when he found it did not belong to his family and that Leah had been reported missing and was last seen nearby.) The shoe was found about one block from Central Avenue. That shoe was tested for DNA and was determined to be Leah's shoe.

5. On July 4, 2000, a Coos County Deputy Sheriff found on a dirt road on Hudson's Ridge, where kids go to have MIP parties, the matching shoe which by DNA was determined to be Leah's. Medium to High Velocity blood spatter was found on

the shoe. The blood was determined to be from Leah. The location of the shoe is approximately 20 miles in a direct line to the east from the last location Leah was seen alive.
6. Leah's clothing was sent to England for contact DNA testing. No DNA foreign to Lea was found.
7. Nick gave a recorded statement the Coquille Police on June 30 where he denied any knowledge of what occurred to Leah.
8. On July 5, 2000, Nick made a handwritten statement again denying any knowledge of what happened to Leah. There were inconsistencies between his statement of June 30 and what was in the handwritten statement. The statement was sent to the FBI for analysis and in the opinion of the examiner, Nick was being deceptive in his handwritten statement.
9. On July 5, 2000 Nick took a polygraph and was asked if he had physically done "something to Leah that resulted in her death?" He answered no and was determined to be deceptive. After he flunked the polygraph, Nick refused to cooperate any more with the investigation. His family hired a well known criminal defense attorney to represent him. On advice of counsel, Nick has refused to speak with police.
10. Brent Bartley gave a handwritten statement to the police on July 5. His handwritten statement also had inconsistencies with his prior statements to police. That also was examined by the FBI and was found to be deceptive.
11. Bartley also took a polygraph exam. While he passed on the question as to whether he caused any harm to Leah, he flunked the question about if he knew what had happened to her.
12. Bartley was offered immunity in return for him revealing what he knew. Bartley refused immunity and stated that the test was wrong and he does not know what happened to Leah.
13. One witness has come forward indicating that the day after Leah disappeared that Nick and/or his father were burning what appeared to be items from the trunk of a car.
14. Prior to the body of Leah being found, search warrants were executed on the McGuffin cars and property. The Bartley grandparent's home was also searched. No evidence related to Leah's disappearance was found. It was noted that the truck of the Thunderbird was immaculately clean. There was not even a spare tire in the truck.
15. The location where Leah's body was found is approximately 10 to 15 miles in a direct line to the east of where she was last seen. One can easily drive from where she was last seen to where her body was dumped and back to Coquille in 45 minutes or less.

4

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          CPD004587

Obviously the investigation has been focused on Nick from all most day one. However, the investigators have tried to keep an open mind on the case. Over the years various "tips" have come in suggesting a variety of different suspects or scenarios leading up to Leah's death. However, every such tip has been thoroughly investigated and found not to be true.

Nick has not been eliminated as a suspect in the case.

No charges have been filed at this point as there has been no direct evidence linking anyone to the death of Leah.

At this point, the most likely scenario is that Nick did find Leah walking toward her home and that he picked her up or met her on the road where her shoe was found. In picking her up, they had an argument that turned physical. During that struggle, Leah lost one of her shoes which ended up on the road. During the struggle, Nick, probably in a fit of anger, either strangled her or smothered her to death. He then drove to the location on Lee Valley Road and dumped her body.

We further believe that the next day Nick found Leah's other shoe in his car. We suspect that Dad and Nick cleaned up the car (hence the burn pile) and that Nick then dumped the shoe on Hudson Ridge.

The case continued to be sporadically investigated over the years, although it became clear it had become a cold case. When the current chief, Mark Dannels, arrived at the Coquille Police Department, he formed a cold case squad comprised of retired law enforcement officers. The cold case squad has been granted investigative privileges to by the Coos County District Attorney and the Coquille Police Department. The Oregon Department of Justice has been brought in to assist in locating more investigative leads. The case has been re-organized, updated and compiled under the direction of Chief Dannels.

To date, we continue to follow up on investigative leads. There is much rumor and innuendo which surround this case and all leads are investigated equally.

We have developed a plan to see if this case can ultimately be resolved. The plan first entails learning the telephone numbers for Nick and his associates. Once we have identified the numbers, we want to then apply for wiretap orders on those particular lines.

Once the taps are in place, we will announce publically the formation of the cold case team and that we will be interviewing all of the witnesses again. We want to see if Nick then makes any incriminating statements about his involvement.

If the court denies our requests for the taps, our secondary plan is to identify who the weak link witnesses are in the case and through a gradual process work to gain their confidence and hopefully have them open up as to what happened to Leah.

6

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER     CPD004589