IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| NICHOLAS JAMES MCGUFFIN, as an individual and as guardian ad litem, on behalf Of S.M., a minor, | ) Civil No.<br>) 6:20-cv-01163-<br>) MK<br>) |
| Plaintiffs, | ) |
| vs. | ) |
| MARK DANNELS, PAT DOWNING, SUSAN HORMANN, MARY KRINGS, KRIS KARCHER, SHELLY MCINNES, RAYMOND MCNEELY, KIP OSWALD, MICHAEL REAVES, JOHN RIDDLE, SEAN SANBORN, ERIC SCHWENNINGER, RICHARD WALTER, CHRIS WEBLEY, ANTHONY WETMORE, KATHY WILCOX, CRAIG ZANNI, DAVID ZAVALA, JOEL D. SHAPIRO AS ADMINISTRATOR OF THE ESTATE OF DAVID E. HALL, VIDOCQ SOCIETY, CITY OF COQUILLE, CITY OF COOS BAY, and COOS COUNTY, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | ) |

DEPOSITION OF KATHY WILCOX

Taken in behalf of Plaintiffs

May 03, 2022

* * *

Page 2

1           BE IT REMEMBERED THAT, pursuant to the Oregon

2    Rules of Civil Procedure, the remote deposition of

3    KATHY WILCOX was taken by Amanda K. Fisher, Certified

4    Shorthand Reporter, on May 03, 2022, in the City of

5    Portland, County of Multnomah, State of Oregon.

6

7

8                        APPEARANCES:

9

10      MALONEY LAUERSDORF REINER, PC
        Counsel for Plaintiffs
11      1111 E. Burnside Street
        Suite 300
12      Portland, Oregon 97214
        acl@mlrlegalteam.com
13      jpuracal@forensicjusticeproject.org
              BY:   ANDREW C. LAUERSDORF
14                  JANIS C. PURACAL

15

16      LAW OFFICE OF ROBERT E. FRANZ, JR.
        Counsel for Defendants: City of Coquille, City of
17      Coos Bay, Coos County, Craig Zanni, Chris Webley,
        Eric Schwenninger, Sean Sanborn, Ray McNeely,
18      Kris Karcher, Pat Downing, Mark Dannels, Kip Oswald,
        Michael Reaves, David Zavala, Anthony Wetmore,
19      Shelly McInnes
        PO Box 62
20      Springfield, Oregon 97477
        shenderson@franzlaw.comcastbiz.net
21            BY:   SARAH R. HENDERSON

22

23      OREGON DEPARTMENT OF JUSTICE
        Counsel for Defendants: Oregon State Police, John
24      Riddle, Susan Hormann, Mary Krings, Kathy Wilcox
        100 SW Market Street
25      Portland, OR 97201

```
 1      todd.marshall@doj.state.or.us
            BY:  JESSE B. DAVIS
 2              TODD MARSHALL

 3

        WOOD SMITH HENNING & BERMAN LLP
 4      Counsel for Defendants: Vidocq Society and Richard
        Walter
 5      12755 Southwest 69th Avenue
        Suite 100
 6      Portland, Oregon 97223
        kschaffer@wshblaw.com
 7          BY:  KARIN L. SCHAFFER

 8

 9      Also present:  Nicholas McGuffin

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 6

1              PORTLAND, OREGON; TUESDAY, MAY 03, 2022

2                          9:00 A.M.

3                          *   *   *

4                        KATHY WILCOX

5          called as a witness in behalf of Plaintiffs,

6            having first been sworn by the Reporter,

7                  testifies as follows:

8

9                        EXAMINATION

10   BY MS. PURACAL:

11      Q.  Good morning, Ms. Wilcox.  My name is Janis

12   Puracal.  I'm an attorney representing the Plaintiffs

13   in this matter, which is a lawsuit filed by Mr.

14   McGuffin and his daughter against a number of

15   defendants, including yourself.

16          Do you understand that?

17      A.  Yes.

18      Q.  And you and I have never met, is that correct?

19      A.  Yes.

20      Q.  Can you introduce yourself for the record by

21   saying and spelling your first and last name.

22      A.  It's Katherine Wilcox.  Katherine is

23   K-A-T-H-E-R-I-N-E.  Wilcox is W-I-L-C-O-X.

24      Q.  Ms. Wilcox, do you have a middle name?

25      A.  Shaw.

Page 93

1      A.   I only go by what I wrote in the report.   I

2   don't remember specifically about that.

3      Q.   On page 7 here you say, "I photographed the

4   exterior," and then below that you say you photographed

5   the interior.

6           I'll show you now what I have marked as

7   Exhibit 8.

8               (Exhibit No. 8 marked for identification.)

9      Q.   This is a series of 22 photographs, and I can

10   scroll through it for you.

11          Do you recognize these as the photographs that

12   you took of the Mustang on July 6th, 2000?

13      A.   I don't think I've seen those photographs since

14   I took them, but I would say those would be the

15   photographs.

16      Q.   Does that look like the Coos Bay lab garage in

17   the background there?

18      A.   Yes.

19      Q.   Were you following a particular methodology when

20   you took these photographs?

21      A.   Yes.

22      Q.   What's the methodology to take these

23   photographs?

24      A.   Kind of section it off and try to cover each

25   area.

Page 94

1    Q.  Section the vehicle off and try to cover each

2    area?

3    A.  Yes.  Yes.  Sorry.

4    Q.  Do you go in any particular order?

5    A.  I don't recall.  You want to be thorough, but I

6    don't know if I always started at the front or anything

7    like that.

8    Q.  Does your methodology start on the exterior

9    before, and then move to the interior?

10   A.  Yes.

11   Q.  Do you photograph everything before you enter

12   the vehicle?

13   A.  I don't recall.

14   Q.  Did you move anything around in the vehicle

15   before you started your photographs?

16   A.  I don't recall.

17   Q.  The reason that I'm asking, if we look at, for

18   example, page 7 here, I see this photograph of the back

19   seat of the Mustang, and it looks like this large

20   speaker has a seatbelt around it with nothing in front

21   of it.

22       Then, if I go down to page 19 here, I see the

23   same speaker, but now the seatbelt is unbelted and it's

24   got duct tape and a couple of packs of cigarettes in

25   front of it.

Page 95

1          Do you know who moved those things around?

2     A.  No.

3     Q.  Did you move those things around?

4     A.  I cannot recall.

5     Q.  And then same thing, if I look at, for example,

6     page 13, I see this photograph of the back seat of the

7     Mustang.  I see these tools there that are sort of

8     lying around sort of haphazardly.  But then if I look

9     at page 20, the tools are lined up.

10          Who lined up the tools?

11    A.  I have no recollection of that.

12    Q.  Did you line up the tools?

13    A.  I don't recall.

14    Q.  Would there be a reason to move things around

15    while you're taking photographs?

16    A.  I must've put the seats up so you could see the

17    back seat.  I don't remember the speaker.  I didn't

18    remember the color of the car.

19    Q.  Did you remove anything from the vehicle while

20    you were taking photographs?

21    A.  I don't recall.

22    Q.  Who else was present with you while you were

23    processing the Mustang?

24    A.  I don't remember.

25    Q.  Was there anyone else present?

Page 96

1    A.  I think people came and went.

2    Q.  What people?

3    A.  Other officers.

4    Q.  Was there a protocol to prevent others from

5    moving things around in the vehicle while you were

6    processing the vehicle?

7    A.  Yes.

8    Q.  What was that protocol?

9    A.  They stay outside of the crime scene.  In this

10   case, the car would be considered the crime scene.

11   Q.  And what do you do to ensure that other officers

12   are staying outside of the vehicle while you are

13   processing it?

14   A.  I'm there.  I would not have left it unattended.

15   Q.  Okay.  Let me go back to what we had marked as

16   Exhibit 7.  On page 8 of that document, under the

17   second paragraph there it says, "Examination does not

18   reveal any signs of cleaning or of spatter on the seats

19   or ceiling or any other area of the car.  The seats are

20   a hard blue vinyl, and I don't think I will take any

21   tape lifts from these, since they appear fairly clean."

22       What areas of the car did you exam for signs of

23   cleaning?

24   A.  First, you keep saying page, but I think you

25   mean paragraph.  This is only a two-page report.

Page 97

1    Q.  So I'll clarify that.  I was talking about the

2  page number of the PDF.  This is an eight-page PDF --

3    A.  Oh, I'm sorry.  I can't see that.  I'm sorry.

4    Q.  That's okay.  Exhibit 7 is an eight-page PDF, so

5  I had scrolled down to the last page, page 8 of that

6  PDF.  If you remember, it started with your --

7    A.  Yes.  Okay.  Thank you.

8    Q.  Then it was going through the six pages of case

9  notes that you had numbered in the upper right-hand

10  corner, right?  So now we're on this last page of the

11  PDF here.  I can blow it up for you a little bit.

12       So does that clarify where we're looking at in

13  the document?

14    A.  Yes.  Thank you.

15    Q.  That portion that I read there about, "The

16  examination does not reveal any signs of cleaning,"

17  what areas of the car did you examine for signs of

18  cleaning?

19    A.  The car.  The whole car.

20    Q.  What signs of cleaning do you look for when your

21  processing a vehicle?

22    A.  Most cars have a little dust, or I call it the

23  flotsam of living, and it did not appear to have been

24  recently wash ed or cleaned in the sense that, you

25  know, somebody had come in and detailed the car.

Page 98

1    Q.  So you mentioned that most cars have a little

2  dust.  What are things that might indicate that a car

3  had been cleaned?

4    A.  Swipe marks and sparkling clean without any

5  dust.  And, you know, signs of vacuuming, vacuum marks,

6  those kinds of things.

7    Q.  So those are visual indications that you're

8  looking for?

9    A.  Yes.

10   Q.  In your report from July 6th, 2000, if you look

11  at the report about four paragraphs down, you say, "The

12  interior surfaces did not appear to have been recently

13  wiped clean."

14      So that's one of those visual indications that

15  you're looking for, if something has been wiped clean?

16          MR. DAVIS:  Objection; vague.

17   A.  Can you -- can you restate the question?

18   Q.  Sure.  We were just talking about visual

19  indications that a car might've been cleaned, and here

20  in your report you say that the interior surfaces did

21  not appear to have been recently wiped clean.  Is that

22  one of those visual indications that you're looking

23  for?

24   A.  Yes.

25   Q.  Are there other ways to determine whether a

Page 99

1    vehicle has been wiped clean, for example, alternative

2    light source or chemical tests that you use?

3        A.   That's not what we used those tests for.  Maybe,

4    I don't know.  I've never used a chemical test to say

5    whether something was cleaned or not.

6        Q.   Have you ever used alternative light sources to

7    say whether something was cleaned?

8        A.   That's not what I usually used that for.

9        Q.   Would an alternative light source help you to

10   determine if something had been cleaned?

11       A.   It might.

12       Q.   It sounds like you're hesitating a little bit.

13   Is there a qualification to that?

14       A.   Your question is ambiguous.

15       Q.   When I say alternative light source, do you know

16   what I mean by that?

17       A.   Yes.

18       Q.   Is there something about using an alternative

19   light source that could help you determine whether a

20   vehicle had been wiped clean?

21       A.   Yes.

22       Q.   What is it about the alternative light source

23   that could help you to determine that?

24       A.   The alternative light source makes different

25   substances appear in different colors, so it can

Page 100

1    improve contrast.  I wouldn't usually have used it to

2    see if something had been cleaned.  I would use it to

3    see if something would show up more clearly on a

4    surface.

5         Like, if you had a tiny speck of blood on a

6    black sweatshirt, or even a red sweatshirt -- let's say

7    a tiny speck of blood on a red sweatshirt.  That would

8    be really hard to see.  But an alternative lighting

9    source, since the blood and red sweatshirt are

10   different things, could make the blood appear black and

11   the sweatshirt gray.

12        But I wouldn't usually have used it to say this

13   has been cleaned or not.  I would use it more to say,

14   you know, is there something there that I can't see.

15   Q.  And the reason that I'm asking is, if we look at

16   the last paragraph on the first page of your report

17   here it says, "The exterior, interior, and trunk area

18   of the car were further examined using special

19   alternative lighting techniques.  These areas were also

20   chemical tested for blood.  No blood was found."

21        So I understand you to be saying that you use

22   these other examination techniques like alternative

23   light ing or chemical tests to look for blood.  My

24   question is whether it could also indicate that

25   something had been wiped clean or not wiped clean?

Page 101

1    A.  Not -- not necessarily.

2    Q.  Why is that?

3    A.  I don't think that's how we used it.  Maybe if a

4  chemical residue had been left there, it might show up

5  with the alternative lighting source.  I never -- I

6  cannot remember ever experiencing that, and that is not

7  how I used the alternative lighting technique.

8    Q.  It looks like from your report that you didn't

9  see any indications that the Mustang been wiped clean,

10  is that right?

11    A.  Yes.

12    Q.  I'll show you again what we have marked as

13  Exhibit 3, which were those meeting notes from the HIT

14  team meeting.  And it looks like there's another set of

15  notes at the bottom of the page from the next day, July

16  7th, 2000, another HIT team meeting.  It looks like

17  this one says "full meeting."

18        What does that mean, "full meeting"?

19    A.  I think that means a lot of the other agencies

20  were there.

21    Q.  And it goes on to say, case history,

22  investigator's reports, timeline of Leah.  I understand

23  that you're taking these notes.  Who is giving the case

24  history, the investigator's reports, the timeline of

25  Leah?

Page 102

1    A.  I don't recall.

2    Q.  Down here, a little bit further, there's an

3  arrow and it says "clean" car, not wiped.  Is that what

4  you reported to the others?

5    A.  I don't remember.

6    Q.  Was there anyone else involved in the

7  examination of the Mustang?

8    A.  I think other officers came and went.  I don't

9  recall anyone specifically.

10    Q.  What I'm trying to understand is whether anyone

11  else would have processed the Mustang and then reported

12  on the results, or whether you would've reported on

13  your own results?

14    A.  No, I should've reported the results of my

15  processing.

16    Q.  Why was "clean" car in quotes?

17    A.  I don't remember.

18    Q.  And you reported that the car was not wiped?

19    A.  Yes.

20    Q.  Below that it says, "Mentioned on TV."  What was

21  mentioned on TV?

22    A.  I don't remember.

23    Q.  And then below that it says, "Would Leah accept

24  ride with stranger."  Who brought up whether Leah would

25  accept a ride with a stranger?

Page 109

1    Q.  I'm going to show you what we have marked as

2    Exhibit 3, which were your notes from that HIT team

3    meeting on July 7th, 2000.

4        At the bottom of the page here it says, "When

5    they did clean car, ESP trunk."

6        Who were you talking about here?  Who is the

7    "they"?

8    A.  I don't recall.

9    Q.  When you're talking about the trunk, are you

10   talking about the trunk having been cleaned?

11   A.  I don't recall.

12   Q.  Did you tell someone that the trunk had been

13   cleaned?

14   A.  I don't recall.

15   Q.  So this -- the meeting -- the 7th is the day

16   after I did the Mustang, correct?

17   A.  That's correct.

18   Q.  And I can show you the date of your report.

19   A.  It's okay.  The 6th was the date of my report

20   so -- okay, so then next day there was a meeting of the

21   HIT team.  I -- I -- what was your question again?

22   Q.  Sure.  I'd asked whether you told someone that

23   the trunk had been cleaned.

24   A.  Yes.

25   Q.  Who did you tell?

Page 110

1    A.   I think I called Dave Hall, because I thought

2    that was important.

3    Q.   When you use the word "cleaned" there, what are

4    you -- what are you trying to convey?

5    A.   That there were no items in the trunk of the

6    car.

7    Q.   So are you saying that that had been wiped

8    clean, like we were talking about before?

9    A.   No.

10   Q.   Are you saying that it had been sterilized?

11   A.   No.

12   Q.   Are you saying that it was empty?

13   A.   Yes.

14   Q.   How many times have you opened the trunk of a

15   vehicle with a confirmed fuel leak from a trunk-mounted

16   fuel tank?

17   A.   I have no idea.

18   Q.   Have you ever encountered that situation before?

19   A.   I've encountered some pretty old cars that were

20   of questionable -- yeah.  They might have had leaky

21   trunks, but no, probably not many, if any.

22   Q.   I'll show you what I have marked as Exhibit 9.

23        (Exhibit No. 9 marked for identification.)

24   Q.   This is after affidavit for a search warrant.

25   If I scroll down, you can see Dave Hall is writing this

Page 113

1    A.  Well, okay.  Please ask the question again,

2   because you -- I don't know if I had an expectation of

3   there -- of those tools being in the trunk.  They

4   were -- the fact that there was nothing in the trunk is

5   what was kind of unusual.

6    Q.  And we talked about the gas leak.  So how did

7   that gas leak factor into your thinking?

8    A.  I called -- I was told later that perhaps things

9   been taken out of the trunk so that they could repair

10   the gas leak.  That's something I heard somewhere along

11   the line later.  I can't even tell you when.

12    Q.  Was that something that you heard -- sorry.  Who

13   did you hear that from?

14    A.  I don't recall.

15    Q.  You said you could not tell me when you heard

16   that.  Was that before the trial or after the trial?

17    A.  It was before the trial.

18    Q.  Did you make a notation of that anywhere?

19    A.  No.

20    Q.  Did you report that information to anyone?

21    A.  No.  It was reported to me.

22    Q.  And I'm asking, did you, I guess, re-report that

23   information to anyone?

24    A.  Not in a written report.  I can't remember if I

25   talked to anybody else about it or not.

Page 114

1    Q.  Do you have a memory of talking to someone else

2  about it?

3    A.  Yes.

4    Q.  What was that memory?

5    A.  I was talking, I think, on the phone to somebody

6  and I said, well, where are the items from the trunk?

7  And they said -- or why, and they said, oh, the

8  trunk -- they knew -- they talked to witnesses or

9  something and they said, oh, well, the trunk was

10  cleaned out because they needed to fix the gas leak.

11  But that was after I did the search.  It was around

12  that time, sometime in the next day or two, maybe at

13  one of the meetings, but I can't recall specifically

14  who I talked to or even when.  But it was within a

15  couple of days of when I did the Mustang, because then

16  it was kind of like, okay, that's resolved.  We're

17  done.

18    Q.  With that new information, did you go back and

19  amend your report?

20    A.  No.

21    Q.  Is that something that the OSP protocol would

22  have required an amendment for?

23    A.  No.

24    Q.  Why is that?

25    A.  It wasn't my information.

Page 115

1    Q.  What do you mean it wasn't your information?

2    A.  I did not do that investigation.  I report what

3    I see, what I hear, not what people tell me.

4    Q.  And in your report, you reported that the trunk

5    compartment was empty and there was no spare tire or

6    trunk liner.  Then we saw the search warrant affidavit

7    where Detective Hall then reports again on that

8    information.

9        Did you consider going back to inform Detective

10   Hall that you had resolved that?

11   A.  No.

12   Q.  Why not?

13   A.  That wouldn't have been my job.

14   Q.  I'm going to show you what I have marked as

15   Exhibit 10.

16       (Exhibit No. 10 marked for identification.)

17   Q.  I'll blow this up because I recognize that the

18   writing is very small.  This a conversation log that we

19   received from the Oregon State Police crime lab.  Here

20   on this first entry, it's dated February 1st, 2010.

21   There was a contact from Paul Frasier to -- I think the

22   name here says Putnam, I believe that's Brad Putnam, by

23   phone.  Brad Putnam writes here in this section --

24   A.  Hang on just a second.  Can we get rid of this

25   tab right there so I can read what she's showing?

Page 131

1    other documentation.

2       A.  No, not that I recall.

3       Q.  Did you do anything to determine the path of the

4    blood?

5       A.  No.

6       Q.  Did you tell anyone about your observation or

7    you opinion on the velocity of this blood?

8              MR. DAVIS:  Objections, assumes facts;

9    mischaracterizes.

10             Go ahead.

11      A.  I have the report, and that is what they get to

12   see, and they can look at the lab notes, so Lieutenant

13   Pex knew about it.

14      Q.  Did you tell Lieutenant Pex about it?

15      A.  Yes.

16      Q.  When did you tell him?

17      A.  I don't recall.  He would've been in the lab and

18   we would've talked about the case.

19      Q.  Do you have a memory of talking about this issue

20   of high-velocity blood?

21      A.  Not specifically.

22      Q.  Did you talk to Ms. Karcher about it?

23      A.  I can't recall.

24      Q.  Who performed the technical review on your

25   conclusion that it was high-velocity blood?

Page 132

1          MR. DAVIS:  Objections, mischaracterized

2     the testimony and document.

3          Q.  You can answer, Ms. Wilcox.

4          A.  I'm not sure what you're saying.  Who did the

5     technical -- my -- Lieutenant Pex would've reviewed my

6     report and my worksheets.  And, at this point, it

7     wasn't a conclusion.  It was a description.

8          Q.  At what point did it become a conclusion?

9          A.  I always used it as a description.  It just is

10    what it is.

11         Q.  Can you explain that further.  What do you mean

12    by it is --

13         A.  It is very small, so you don't get a blood

14    droplet that small if it doesn't have some force behind

15    it.  So that would make it either a high or

16    medium-velocity blood droplet.  It wasn't -- and

17    Lieutenant Pex was an expert in blood spatter patterns.

18    I think he actually had awards for that from the

19    American Academy of Forensic Science.  So he would've

20    looked at that and been interested in that.

21         Q.  Do you recall whether Lieutenant Pex looked at

22    that and was interested in that?

23         A.  He would've looked at my worksheets and we

24    would've talked about it.

25         Q.  Did you actually talk about it?

Page 133

1    A.  I can't recall specifically.

2    Q.  And I see here that it says, "High velocity" on

3    Exhibit 15, page 4 that we're looking at, and you've

4    characterized that as a description.  Then if we go

5    to -- let me bring up another document for you.  If we

6    go back to Exhibit 9, which was Dave Hall's affidavit

7    for the search warrant, and we go to page 5 of that

8    document, we see here Dave Hall is talking about

9    contact from you on July 17th, 2000.

10        About halfway down that paragraph he writes,

11   "She had tested part of the blood and determined that

12   it was, in fact, human blood; that based upon the size

13   and outlines of the droplets, that the blood droplets

14   appeared to be blood spatter, and that it appears to be

15   consistent with what is known as medium to

16   high-velocity blood spatter."

17        And this is on that same day, July 17th, 2000.

18   So in the sketch it was written as high velocity, and

19   then it sounds like you had a conversation with

20   Detective Hall and described as medium to high

21   velocity, is that right?

22             MR. DAVIS:  Objection, calls for

23   speculation.

24   A.  I don't recall.

25   Q.  Why had it changed from high velocity in your

Page 134

1    sketch to medium to high velocity?

2            MR. DAVIS:  Objection, calls for

3    speculation.

4      Q.  You can answer, Ms. Wilcox?

5      A.  Oh, sorry.  I remember that high was in

6    hashtags, so I was describing it, as I initially worked

7    on it, as being very small.  You can get small droplets

8    like that from medium blood spatter.  You usually would

9    have a larger sample, so you would have a variety of

10   brood droplets, a larger sampling giving you a little

11   more idea of, you know, if it was the edge of a gunshot

12   or thing else.

13           So I'm covering my bases.  It was very small.  I

14   don't know, and probably somebody has by now, if

15   they've ever done a -- if they've measured the velocity

16   of each droplet that comes from a blood spatter

17   experiment to know exact size and exact distance from

18   whatever it was.  But in my worksheet, I'm doing a

19   description for myself, and of course for whatever

20   other technician looks as it.  And I did put that in

21   hashtags because I hadn't really made a conclusion

22   about what kind of blood spatter it was.

23     Q.  When you're talking to Dave Hall, at that point

24   did you make a conclusion as to what kind of blood

25   spatter it was?

Page 135

1    A.  I don't recall.

2    Q.  Dave Hall writes down that he understood that it

3  appears to be consistent with what is known as medium

4  to high-velocity blood spatter.

5       Did you tell Dave Hall that that was just your

6  observation and not a conclusion?

7            MR. DAVIS:  Objection; asked and answered.

8    A.  Yeah, I don't recall that conversation.

9    Q.  Here he write, "Ms. Wilcox has explained to me

10  that medium to high-velocity blood spatter occurs when

11  an object such as a club or a bullet moving at a fast

12  speed strikes an object which contains blood, such as a

13  part of a human body, with such force that a wound is

14  opened, thus causing blood to spatter."

15       Did you tell him anything else about the sources

16  of the droplet at the area of swab 2?

17    A.  I don't recall.

18    Q.  Did you talk to any other law enforcement

19  personnel or investigators at any point in time before

20  trial about the idea of medium to high-velocity blood

21  on the shoe?

22    A.  I don't recall any specific conversations like

23  that.

24    Q.  Did you talk to the prosecutors about that idea?

25    A.  I don't remember.

Page 136

1     Q.  When we started this deposition, you mentioned

2  that you had reviewed some areas of your testimony from

3  the trial.  Did you review your testimony about the

4  medium to high -- sorry.

5         Did you review your trial testimony about the

6  medium to high-velocity blood on the bottom of the

7  shoe?

8     A.  Yes.

9     Q.  What was the basis for that testimony?  Was it a

10  conclusion at that point or still an observation?

11     A.  I'm pretty -- I can't remember the testimony

12  word for word.  It was a description of the blood.

13     Q.  And you and I have -- I guess we should define

14  this.  What's the difference, in your mind, between a

15  description of the blood versus a conclusion?

16     A.  A conclusion would be if I could duplicate it

17  and, you know, go out, put a shoe down, that -- a shoe

18  like that and duplicate that, and I wasn't sure I could

19  do that.

20         And, also, there just wasn't a lot of droplets

21  there.  It was hard to reach a really firm conclusion

22  with such a small sample.

23     Q.  So the first thing you said there was you

24  weren't sure how you could duplicate it.

25     A.  Yes.

Page 137

1    Q.  Does that go back to our earlier conversation

2    about the trainings that you did on blood stain pattern

3    analysis where you were doing experimentation to create

4    those blood droplets?

5    A.  Yes.

6    Q.  And you weren't sure how you could do that with

7    respect to the -- what you saw on the shoe?

8    A.  Yes.

9    Q.  Did you document that idea anywhere, that you

10   weren't sure how you would duplicate this?

11   A.  No.

12   Q.  And did you tell anyone about that, that you

13   weren't sure how to duplicate this?

14   A.  I don't recall.

15   Q.  And then that second idea that it's hard to

16   reach a firm conclusion when you have a such a small

17   sample, are we talking about a small amount of blood?

18   A.  So -- yes, and so few droplets.

19   Q.  So does that get to this idea of you need a

20   pattern?

21   A.  Yes.

22   Q.  Did you document that idea, that it was hard to

23   reach a firm conclusion with such a small amount of

24   blood?  Did you document that anywhere?

25   A.  No.

Page 138

1    Q.  Did you tell anyone about that?

2    A.  I don't recall a specific conversation.  I'm

3    sure we talked about it in the lab.

4              MR. DAVIS:  Counsel, I'd like to take a

5    break when it's convenience.

6              MS. PURACAL:  Sure.

7    Q.  I just have a couple more questions about your

8    testimony at trial, Ms. Wilcox.

9         When you testified at trial, you testified that

10   it could also be caused by getting smacked in the nose

11   and then smacked again.

12        How could this small droplet be caused by

13   getting smacked in the nose?

14   A.  It -- I was trying to make the point, I think,

15   that if you're already bleeding and then you put force

16   behind a bloody object, you can get some of these

17   little small cast-off blood droplets.

18   Q.  And you also testified at trial that it could be

19   caused by having a split lip and then coughing or

20   sneezing.  So how could it be caused by that?

21   A.  If something is already bleeding and you have

22   blood, and then put -- once again, put force behind it

23   as opposed to, you know, if you cut you finger and hold

24   it up and just let the blood drop, it's going to be a

25   pretty good-sized droplet.  Depending on you surface,

Page 139

1    it could be dime-sized, and we didn't have that here.

2       Q.  What was the evidence that you had that the

3    droplet at the area of swab 2 came from Ms. Freeman's

4    nose or lip?

5            MR. DAVIS:  Objection; mischaracterizes the

6    testimony.

7       Q.  You can answer, Ms. Wilcox.

8       A.  I had no idea where the blood came from.  I was

9    asked a question.  I didn't make a conclusion.

10      Q.  How do you account for directionality to

11   determine that the blood could come from Ms. Freeman's

12   nose or lip and end up on the bottom of her shoe?

13           MR. DAVIS:  Objection; mischaracterization.

14      A.  I did not.

15      Q.  You did not make that determination?

16      A.  Correct.

17      Q.  Did you talk to any of the investigators prior

18   to trial about the difference between a description of

19   the blood and a conclusion?

20           MR. DAVIS:  Objection; asked and answered.

21      Q.  You can answer, Ms. Wilcox.

22      A.  I don't remember any specific conversations.

23           MS. PURACAL:  I think we can take a break

24   now.  We'll go off the record for ten minutes and come

25   back at 2:30.

Page 188

```
 1                    C E R T I F I C A T E

 2   STATE OF OREGON         )

 3                           ) ss.

 4   COUNTY OF MULTNOMAH      )

 5

 6         I, Amanda K. Fisher, a Certified Shorthand

 7   Reporter, do hereby certify that, pursuant to

 8   stipulation of counsel for the respective parties

 9   hereinbefore set forth, KATHY WILCOX remotely appeared

10   before me at the time and place set forth in the

11   caption hereof; that at said time and place I reported

12   in Stenotype all testimony adduced and other oral

13   proceedings had in the foregoing matter; that

14   thereafter my notes were reduced to typewriting under

15   my direction; and that the foregoing transcript, pages

16   1 to 187, both inclusive, constitutes a full, true and

17   accurate record of all such testimony adduced and oral

18   proceedings had, and of the whole thereof.

19         Witness my hand and stamp at Portland, Oregon,

20   May 16, 2022.

21

22         _____

23         AMANDA K. FISHER
           CSR No. 3229

24

25
```

CASE NAME:  McGuffin et al v. Dannels et al
DEPONENT: Kathy Wilcox

| Page: | Line: | Reason: | Correction: |
|-------|-------|---------|-------------|
| 145 | 4 | Transcription error | Replace "car" with "card" |

I hereby certify that I have read the deposition taken on May 03, 2022, and that this deposition, together with any corrections or additions, is a true and accurate record of my testimony.


_Kathy Wilcox_
Kathy Wilcox

Subscribed and sworn to before me under the penalties of perjury, this __14__ day of __June__, 20__22__

_Brandi Cassaro_

Notary Public for the State of __Oregon__.
My commission expires: __June 8th 2024__.

OFFICIAL STAMP
BRANDI MARIE CASSARO
NOTARY PUBLIC - OREGON
COMMISSION NO. 1000735
MY COMMISSION EXPIRES JUNE 08, 2024