# R. Paul Frasier
### District Attorney for Coos County

**Office of the District Attorney**
Coos County Courthouse
250 N. Baxter St.
Coquille, OR 97423
Phone: 541-396-7550  Fax: 541-396-1015
TDD: 1-800-735-2900





RECEIVED
SEP 06 2016
DEPARTMENT OF JUSTICE
TRIAL DIVISION

September 1, 2016

Mr. Paul E. Reim
Oregon Department of Justice
Trial Division
1162 Court St NE
Salem, Oregon 97301

Re: McGuffin v. Nooth 15CV1030

Dear Paul:

    Here is my fourth installment on the McGuffin matter. I am continuing with the allegations regarding Brady violations and misconduct. I will get back to the alleged shortcomings of trial counsel in future letters.

    As to paragraph/count 12, with the substance of the allegations starting on page 21, I have the following comments:

### As to part A:

1. I deny misleading the jury regarding the medical finding of homicide. One of the issues in this case was what the manner of her death actually was. I understand the medical definition of homicide to mean that the person died through the actions of another human being. The criminal culpability of the person causing the death is not the purview of the medical examiner; indeed, as in this case, the ultimate decision on culpability was made by the jury. You will note in my closing argument that I started with the premise of showing that the first issue the jury had to decide was if Leah Freeman had died as the hands of another. As I pointed out, based upon the evidence presented by the defense, primarily through their expert Ken Meneely and in defense counsel's closing argument, they conceded that fact. That being the case, it cannot be said I mislead the jury on this issue;

2. I did not offer speculative testimony on the manner of death. I am not sure what PCR counsel is referring to, but in a homicide case there are two matters

about the death of the victim that are considered. The first is the manner of death, which would be homicide, natural, accidental, suicide or undetermined (there is a 6th manner of death that being legal intervention which is not relevant for this matter). Once the manner of death is established, you look for the actual cause of death, which could be a variety of things such as gunshot wound, stabbing wound, heart attack, cancer, car crash etc. If counsel is referring to manner of death, the testimony of Dr. Olson clearly established his reasoning for classifying the manner of death in this case as homicide. If counsel is referring to cause of death, Dr. Olsen testified that he could not determine exactly what caused her death. We then approached the problem from the standpoint of what could we exclude as a cause of death. For example, we were able to exclude gunshot as a cause of death as there was no evidence of a gunshot wound found in her remains and no evidence of a bullet hole in her clothing. We did the same for stabbing as there was no evidence of a knife wound to her remains or in her clothing. As to the issue of strangulation, Dr. Olsen could not rule out strangulation as a cause of death from the remains of Ms. Freeman. As we could not rule out strangulation, I felt we made the completely reasonable and circumstantial case, based on the statements of the defendant to Mr. Breakfield that the defendant in fact strangled Leah Freeman to death. This was not speculative and was supported by the evidence presented at trial;

3. PCR counsel is completely wrong when the claim is made that we did not consider that Leah died in some sort of an accident. One of the rumors floating around during the pendency of this case was that Leah had been run over by a car and died of her injuries. We looked long and hard for such evidence supporting such a theory. Again, we were looking for the truth of what happened. If her death was an accident so be it. But we simply could not find any evidence to support it. At grand jury, we could not find any person who had firsthand knowledge that was what occurred. Her body showed no signs of broken bones or other trauma indicative of an accidental death. We sent her clothes to a lab in Chicago to look for paint transfer and nothing of significance was found. We found no evidence that showed Leah died as a result of an accident;

4. I do not know how PCR counsel arrives at the conclusion that the evidence that Leah was rolled down an embankment was false, and if it was, how the prosecution team knew it was false and should have corrected it. The evidence showed that one of Leah's shoes was found a short distance from where she was last seen and was found on the evening she disappeared. That shoe had her blood on the sole, indicative that something violent had happened to her. Her other shoe was found several miles away on a dirt road. Her body was then found several weeks later at the bottom of a steep embankment. The embankment above and directly next to where the body was found was so steep it is unlikely that her body could have been carried to where it was found. The body was also lying in somewhat of a contorted position not indicative of being laid out but rather indicative of being dumped. A reasonable interpretation of the facts showed that Leah was attacked where her first shoe was found and in the

struggle it was left behind. The second shoe was then discarded or planted miles away from Coquille and from where the body was found. Given the location and position of the body as it was found, and the above facts, it was clear to me that where her body was found was a dumping site. Indeed, unless you knew where to look, you could not see the body from the road and unless you went down to the river, her body would never have been located. I would also point out that in examining the scene we found no evidence to support that she had died at that location or that there had been some sort of a struggle; and

5. I did not mischaracterize the evidence to "speculate". This was a circumstantial evidence case. I am allowed, as is the jury, to draw any reasonable inference that the facts support. In this case we presented evidence that the relationship between the defendant and Leah was rocky at best. We presented evidence that Leah was under pressure to end her relationship with the defendant. We presented the evidence of what had occurred that night and so forth. Under the totality of the circumstances presented at trial, a reasonable inference to be drawn from those facts was that the defendant strangled Leah to death. There is nothing wrong in what I argued.

**As to part B:**

1. Jennifer Storts. I am not sure what PCR counsel is referring to in this allegation. As I indicated in earlier, one of the big issues I had in the overall initial handling of this case were the actions of Chief Reaves. Chief Reaves did not forward to me police reports done by his officers or other agencies that were submitted directly to him. What reports I did have were those that were copied to me independently when they were submitted to the Coquille Police Department. As we initially worked on the case, a lot of the time we were dependent on Chief Reaves to give us the information that had been reported back to him. As I later found out, a lot of information and numerous reports were never forwarded to me or the office of the Disrict Attorney. Jennifer Storts is an example.

When we reopened the case, Ms. Storts, who worked at Coquille Valley Hospital, came forward with information about the case. She initially told the wife of Chief Dannels (who also worked at Coquille Valley Hospital) about her knowledge of the case, which no one in the subsequent investigation was aware of. She was interviewed by the police as part of the reopened investigation. We learned: that on the evening that Leah disappeared that she had been called into the hospital to work; that she left the hospital shortly after midnight on her way home; that as she was driving home she came upon two men, one she identified as Brent Bartley and the other who she could not identify but she was able to give a vague description that was consistent the defendant; that the two were holding up between them a teenage girl with blond hair; and that she turned around to see if they needed help and saw a pickup she thought was similar to the truck driven by Kathy McGuffin, the defendant's mother (she also worked at Coquille Valley Hospital). Ms. Storts reported she had told Chief Reaves what she had seen

3

when the case was fist being investigated in 2000, and even supplied to the chief a copy of her time card from work to show the date and time. Chief Reaves in essence blew her off and never said anything to me or other investigators about what she had seen.

PCR counsel claims there was no "objective referent" to the testimony. Counsel is not familiar with the area. The most direct way to Lee Valley Road and where Leah's body was found was to drive from Coquille on the same road going over Fairview Mountain. After you crest the mountain and proceed down the other side you come to the intersection of with Lee Valley Road. If Ms. Stout saw the defendant and Mr. Bartley with Leah, then it was on a direct route to where the body was found.

2 & 3. John Lindgren. PCR counsel claims we knew that John Lindgren was mistaken when he testified as to his sightings of the defendant and Leah Freeman. Once again, counsel is wrong. Counsel is misstating what was referred to in an email which was given to the defense in this case before trial. The confusion centered over **_where_** John Lindgren saw the defendant and Leah Freeman. It was first related that it had occurred at Leah's residence not the Mitchell residence. The confusion was not over if Lindgren saw Leah or Sherrie Mitchell. The confusion was over whose house it was at.

I am not aware of any evidence where John Lindgren has changed his story from that which he testified to at trial. As far as I know, Mr. Lindgren is sticking to his testimony.

John Lindgren is a fixture in the Coquille area and is affectionately known around town, due to his size, as "Big John". How we came to know about him is again an example of how badly Chief Reaves handled things in this case.

It is my recollection that at a meeting we had early on in the case and before the body was found, that Chief Reaves reported to the group that someone had interviewed Big John and had reported that Big John had seen Leah shortly after 9:00 PM outside her home. The Chief indicted he did not think this was valid information as she should have been at or near the Mitchell home or McKay's Market at that time. Nothing was done with what Chief Reaves indicated.

When we reopened the investigation, one of things we found was the report written by the officer who had interviewed Big John in 2000 and which was not shared with me or other investigators until the case was reopened. In that report the officer reported that Big John said he had seen Leah and Nick near the Mitchell home on the evening Leah disappeared. This was different than what Chief Reaves had told me originally and I surmised Chief Reaves incorrectly understood the information and incorrectly passed it on. We then asked for Big John to be interviewed again. (As an aside, I believe we asked the reporting officer what he had told Chief Reaves in 2000 about what Big John had said. It is

4

my recollection that officer indicated he told Chief Reaves exactly what was written in the report.)

Big John repeated what he had told the officer in 2000 and even showed us where Leah and the defendant had been standing which was outside the Mitchell home and not the home of Leah Freeman. Big John also told the officers about how he remembered that night because he had been at his sister's house watching the initial season of the show Survivor and had remembered who had been voted off the show that night.

When this was reported to me, I initially did not believe what Big John was saying. My wife is a big fan of the show Survivor and never misses an episode. I knew that when the case reopened that Survivor was on Thursday nights and not Wednesday. I told the officers I had problems with Big John's rendition as if Survivor is on Thursday night, he could not have seen Leah on the night she disappeared as she disappeared on a Wednesday night. The officers then did some work and were able to find a program guide for the evening Leah disappeared and confirmed that Survivor was on the night Leah disappeared and that the person Big John remembered being voted off actually had been voted off. At that point I became convinced that Big John was telling us the truth.

Mr. Lindgren's testimony was further corroborated by the testimony of Scott Hamilton which is described below.

Further, I did not do anything to influence his testimony.

To be clear, I do not believe John Lindgren ever mixed up his identification of Leah Freeman with that of Sherrie Mitchell. I am unaware of any evidence that Mr. Lindgren was mistaken in his testimony. I did not offer false or misleading testimony and there was nothing to correct when Mr. Lindgren testified;

4. I believe my comments regarding the 10:00 time reference is being taken out of context. One of the things the evidence shows is that the defendant, after promising the mother of Leah that he would find her, never called the mother indicating that he had not been successful. I was trying argue that any reasonable young man who had taken a fifteen year old girl out for the evening and then had lost track of her would have reported back to her parents or guardian that he did not find her. The fact is that after the 10:05 PM phone call, the defendant never called Cory Courtright and told her he had not found Leah as he promised Cory Courtright he would do. I was also trying to argue that any young man would have at least called to see if she had made it home. The defendant never did. Whether the last phone call was at 10:00 or 10:05, the defendant never called Cory Courtright later and told her he had not found Leah nor did he call to see if she had come home. That was the point of the argument I made;

5

5. Georgia Grisham. Georgia Grisham was at the time of the grand jury hearing leading to this indictment was just short of her 91st birthday. I have no doubt she sincerely believes what she related to the grand jury. However, I personally did not believe she was correct.

While Ms. Grisham was listed on some of the initial reports in the case, I could not locate any police report indicating that she had ever been interviewed by the police in 2000. Her name kept popping up as a witness the McGuffin family said we should talk to.

I should point out that when the case was reopened, and before we went public with that fact, Chief Dannels and Officer Smith met with the McGuffin family to inform them of the case being reopened. They were told that if there was any witness or evidence they wanted us to talk to or review to please inform us and we would do so. The McGuffin family indicated they that had pages of materials that showed who killed Leah. They were asked to supply us with that material and they refused. We ended up getting a search warrant to obtain those materials. The name of Georgia Grisham kept coming up in those materials but we could not find out what her knowledge was.

In any event I called her as witness to the grand jury. Her testimony was recorded. For her age she was remarkable and I only hope I can be as energetic as she showed. I have reviewed her testimony and I note the following:

a. She did not know Leah Freeman and had never met her;
b. On the evening she disappeared, Ms. Grisham claimed to have almost run over Leah Freeman with Ms. Grisham's car as Ms. Grisham had returned from playing bingo in Coos Bay;
c. That she could not describe the hair color or clothing worn by Ms. Freeman;
d. That as to the color of the clothing worn by Leah, all she could say as she thought it was something dark; and
e. That she reported the matter to the police at Coquille City Hall and that twice in 2000 she took the police to where she claimed to have almost run over Leah.

Again, while I have no doubt as to her sincere belief, there are problems. First off, she had never seen Leah before that night and her observations were based upon a quick glimpse of the person she claimed was Leah illuminated with the headlights of her car. Secondly, on the night she disappeared, Leah was wearing a white tank top (which she was found in). She did not have dark clothing on from the waist up. Thirdly, Ms. Grisham was unable to describe the color of the hair of the person she almost hit. Finally, while she claimed to have spoken to the police on two occasions and had taken them to where she had seen Leah, I could not find any police report verifying that those interviews took place. I frankly believe that Ms. Grisham was mistaken in her identification as to who she saw.

6

I did not present the evidence of Ms. Grisham because I did not believe it was accurate. I did disclose to the defense what we eventually found out which included her grand jury testimony. The defense chose not to call her as a witness at trial which would indicate to me that the defense also had issues with the credibility of her observations.

If I did not believe Ms. Grisham was accurate, I had an obligation to not present her testimony. At trial, I am only allowed to argue what is in the record, which is what I did.

I committed no misconduct in regards to Ms. Grisham.

**As to Part C:**

Both Points 1 and 2 claim we committed misconduct for not having items tested. I have never heard of a case where the prosecution was alleged to have committed misconduct when it failed to have a DNA test done. During the course of the investigation we had several items tested for DNA, which where the clothes of Leah and her shoes. Swabs were taken from the cars in question. When conventional ways of testing for DNA were exhausted, we sent the clothing to England for additional testing.

It is interesting to note that the defendant has not asked for post conviction DNA testing pursuant to ORS 138.690 et seq.

Counsel claims we should have submitted other evidence for DNA testing or re-testing. What other evidence is not identified. The only items in this case that could have led to DNA of the alleged perpetrator were the clothes of Leah. Those were tested two times.

We did not have mitochondrial DNA testing done in the case. We did not have such testing done for two reasons. First was the cost. It was my belief that in 2000 and again when we reopened the case that such testing was not done by the OSP Crime Lab. We would have either had to hire a private lab to do so, or somehow convince the FBI to do it for us (which could take a year or more to get done). My office simply did not have the resources to pay for private testing. Secondly, mitochondrial DNA testing does not produce a result that is as conclusive as nucleic DNA testing provides. My understanding is that while mitochondrial DNA may help exculpate the donor of the sample, it cannot positively identify the donor of the sample. Given the resource issue we had, I could not justify the expenditure. Had the defense requested it, we would have made the samples available for testing at the defense expense.

I had no nefarious reason to not order the additional testing and I committed no misconduct when we did not do so.

7

**In regards to Part D:**

1. Melissa Beebe. PCR counsel claims we did not "thoroughly" investigate the allegation regarding the defendant's statement about "It's amazing what you can get away with in Coos County, now isn't it?"

To put this into context, on November 19, 2003, Ms. Beebe delivered to my office a hand written statement indicating that she had been present at the Coos County Courthouse on November 3, 20013 and after a court appearance for Mr. McGuffin on a criminal trespass case she had contact with him outside the courthouse where he made the above statement. I sent the statement to Chief Reaves on November 20, 2002. As far as I know Chief Reaves took no action on the statement.

However, I was able to confirm that Mr. McGuffin had been in court on November 3, 2003 as shown by the court records in Coos County Circuit Court Case #03-CR-1566. The only persons who would have heard the statement were Ms. Beebe, the defendant and his then girlfriend, Megan Edgerton. As the defendant was represented we could not talk to him about the incident. Megan Edgerton was not cooperative with the investigation and it would have been an exercise in futility to question her about what occurred.

I am not aware of what else could have been done to thoroughly "investigate" this statement.

2. David Breakfield. How we found out about Mr. Breakfield is an interesting story. As I indicated above, we told the McGuffin family if there was anyone they wanted us to talk to let us know and we would do so. After we had reopened the case and had gone public with that fact, one day I was at the Coquille City Hall and when I had returned to my car to leave, I was approached by Bruce McGuffin, the father of the defendant. He gave me the name of a female witness who he claimed would exonerate his son. I took the name and passed it on to the police with instructions to go and interview this person. The police did go and interview the person suggested by Bruce McGuffin. That person told the police she had no knowledge about the case and was getting tired of the McGuffin family saying she knew something. She did indicate that we should go and talk with David Breakfield. Mr. Breakfield was then interviewed and he told the police about how he had at one time been dating Megan Edgerton, who was the girlfriend of the defendant for several years (they have a daughter together). During that eight year period, the defendant and Ms. Edgerton had occasionally broken up for short periods of time. It was during one of those breakups that Mr. Breakfield and Ms. Edgerton were seeing each other. Mr. Breakfield related that on one occasion he had been driving with Megan and that the defendant saw them and managed to get Mr. Breakfield to stop. There was a confrontation outside of the cars. Mr. Breakfield indicated the defendant was furious that

8

Breakfield was with Megan. It is during that confrontation that the defendant said "I strangled that bitch" etc.

PCR counsel again complains we did not thoroughly investigate the matter. We only found out about Mr. Breakfield because the defendant's family sent us in a particular direction. As far as we knew, only three people were privy to what had occurred, that being Breakfield, the defendant, and Megan Edgerton. As the defendant was represented, we could not talk to him. Megan Edgerton was not cooperative with the police. To illustrate this, even though they were no longer a couple, at trial Ms. Edgerton was very supportive of the defendant and after the verdict had been read she had reacted such that Judge Barron ordered her and the defendant's mother out of the courtroom. See trial transcript D9, page 5. See also trial transcript page 1713 where they are warned that if they disrupt the proceedings they would be going to jail. While names are not used in the transcript, I was present and personally saw that these two were the ones involved.

In any event, I did bring Ms. Edgerton into the grand jury and at grand jury she did admit that she had been seeing David Breakfield as he had told us. However, she denied any knowledge of an incident where she was with Breakfield and the defendant having pulled them over. Again, this material was shared with the defense as part of pre-trial discovery.

I am not aware of what else could have been done to thoroughly "investigate" this statement.

Points 3 and 4. Again, PCR counsel is not correctly stating the record regarding the vehicle being cleaned. Ms. Wilcox did testify that the reason she did not do any tape lifts on the seats for things such as hairs etc. was because "it was clean. I mean wiped clean. There wasn't anything visibly there." Trial Transcript page D6 81. Counsel objected in my closing argument when I mentioned that Ms. Wilcox stated the seats had been wiped clean. The Court then took a recess and listened to the testimony and concluded I was correct and overruled the objection. See trial transcript D9 143-150.

You also need to keep in mind that it was several days after Leah went missing that any forensic evaluation of the car was done. Ms. Wilcox testified about her initial examination of the trunk of the car. There was no spare tire, no jack and no liner. As Ms. Wilcox testified regarding the trunk: "I was going, like 'Wow'. There was just nothing." Trial transcript D6 page 79. Again, this was a circumstantial evidence case where there were indications the seats had been cleaned and that items had been removed from the trunk that normally should have been present. Again, a reasonable interpretation of those facts would be that the car had been cleaned.

There was nothing improper in my argument contrary to counsel's suggestion.

9

Point 5, Kristen Steinhoff. As mentioned in previous correspondence, Ms. Steinhoff died a few weeks ago from an apparent drug overdose. Her death occurred in Eugene. (I have also been informed that Officer Hall, the original investigating officer in the case, died last year.)

Again counsel is taking comments out of context. Tina Mims, who is subject of point 7, had testified at the grand jury that she was present when the defendant and an older gentleman had come to the home of Kristen Steinhoff and had taken her to the bathroom. Ms. Mims testified she heard the defendant say to Kristen Steinhoff that she had better keep her mouth shut or that she would end up like Leah. When Kristen Steinhoff testified at the grand jury I asked her about what Ms. Mims had told the police. At first Ms. Steinhoff tried to deflect he question by saying there were not two men confronting her. I narrowed it down to if there had been an incident with the defendant and she did admit the confrontation had occurred and indicated that the defendant had told her to keep her mouth shut. This occurs about nine minutes into her grand jury testimony in 2010.

At trial, Ms Steinhoff tried again to avoid the question by stating she did not remember. That is when she was reminded of grand jury testimony. There was no misconduct as alleged.

Point 6: Scott Hamilton. The person counsel is referring to is Scott Hamilton. At trial he was asked if he had taken a drive with the defendant about one week after the disappearance of Leah Freeman. Mr. Hamilton acknowledged he had done so and then described what happened. While it is true that the police report reflects it occurred after the body was found, I would point out that Mr. Hamilton had changed his story about what occurred regarding his knowledge of this case. For example, Mr. Hamilton had related to the police that the defendant had confided in Hamilton that he had picked up Leah at the Mitchell home and then dropped her off at McKay's. He later testified at grand jury and did not make the same statement. After it was related to the police what he had said at grand jury, the police went back to him to find out why he had changed his story. Mr. Hamilton appeared to be shocked and claimed he had told the grand jury that the defendant had told him he had picked up Leah at the Mitchell home and had then dropped her off at McKay's. The officers then brought Mr. Hamilton to my office.

I should point out that as Coquille is a small town, and since I personally live in Coquille and have done so since 1993, I am somewhat familiar with Scott Hamilton. He is the same age as my second son and my son and Scott were on the same wrestling team in High School. When Scott came to my office I played for him his grand jury testimony. Scott appeared to be shocked that was he had said. Scott then told me and the officers that the defendant had in fact told him he had picked Leah up at the Mitchell's and then left her at McKay's. I brought out

10

this change from his grand jury testimony in my direct examination of Mr. Hamilton.

While I cannot recall exactly how the question came to be phrased in the way it was, I have always made sure that my questions are based on a good faith belief as to what the evidence supported. I do not believe I misstated any facts in the case. Again, the defense had the police reports in question and the defense did cross examine him on that question as to when the ride occurred. Mr. Hamilton said it could have happened before or after the body was found. See Trial Transcript D5, pages 70-71. I do not see how this could have affected the verdict in this case.

Point 7: Tina Mims. PCR counsel claims I improperly influenced Ms. Mims' testimony by influencing her testimony through a tainted identification procedure. As evidence PCR counsel points to Ms. Mims' grand jury testimony. However, counsel does not indicate what was improper.

A review of Ms. Mims' testimony shows that she testified she had contact with a person named Nick McGuffin at the home of Kristen Steinhoff. Ms. Mims related how she heard Nick McGuffin tell Kristen Steinhoff to keep her mouth shut or what had happened to Leah would happen to her. She described this person as Nick, the boyfriend of Leah Freeman. At trial she testified she was acquainted with the defendant.

I do not know what counsel is referring to when counsel says there was a tainted identification procedure. In any event, I did not improperly or otherwise influence Ms. Mims' testimony.

**As to Part E:**

All six points have to do with my closing argument. I would first point out that I have been a practicing attorney in Oregon since 1984. I have been a prosecutor since November of 1984. I am very much aware of what a prosecutor is allowed to say and not say in closing arguments. I deny all of the allegations made by PCR counsel. I simply would not do anything improper.

Secondly I point out that the presiding judge in this case, The Honorable Richard Barron, is probably one of the best trial judges in the State of Oregon. I have practiced in front of him since 1990. I know from my personal experience in watching other attorneys making arguments in his court that he is not shy about stopping a lawyer when that lawyer crosses the line in argument. If Judge Barron thought I had done something wrong, he would have stopped me sua sponte.

Thirdly, Bob and Shawn McCrea are probably the best defense attorneys I have "crossed swords with" in my career. If they believed I had done something wrong,

11

they would have objected and done so very loudly. Outside of the wiping the seat incident mentioned above, they did not do so.

As part of closing argument, the State through me is allowed to explain our theory of the case based upon the evidence. In point 1 the complaint has to do with what the circumstantial evidence showed. This was a reasonable interpretation of the facts as presented at trial. All of the inferences drawn were reasonable. Looking at the trial as a whole, that argument was a reasonable interpretation of the facts. There was nothing wrong with what was said.

As to point 2, I was not commenting on the defendant's right to remain silent. PCR counsel is again misstating the record. The defendant made several statements to the police prior to his invocation of the right to remain silent. The evidence was clear that all was not well in their relationship between the defendant and Leah. Yet when he spoke with the police, there was nothing wrong with their relationship. The defendant lied when he told the police this. Why would he lie? Because to tell the truth would show he killed her. That is why he omitted telling the police about the true state of their relationship. That was what I was commenting on. There was nothing wrong with that argument.

I did not "vouch" in my argument. I was urging the jury to do the right thing. The right thing was to find the defendant guilty. The job of any prosecutor in closing argument is to convince the jury to find the defendant guilty. There was nothing wrong in those comments urging the jury to bring justice to Leah and her family.

The burden of proof is always upon the State. However, when the defense chooses to put on the defense, I am allowed to comment on its validity. I never said the defense had to prove anything nor did I ever infer they had to. If anything I was commenting on the quality of the defense case, nothing more or less.

The facts in evidence were that Kristen Steinhoff was threatened by the defendant. The evidence showed he had changed clothes during the evening. He even changed cars. All such facts were in evidence.

To sum up the above, there was no misconduct by the prosecution in this case. This was a properly tried case and a just result was obtained.

These are my comments as to paragraph/count 12. I will have further comments as to the petition in the near future.

Sincerely,

*[signature]*

R. Paul Frasier