REPORT IN THE MATTER OF NICHOLAS JAMES MCGUFFIN V.
MARK DANIELS ET AL.

Brian L. Cutler, Ph.D.
January 25, 2024

1. On June 28, 2000, Leah Freeman was abducted and murdered.  Nicholas McGuffin, Freeman's boyfriend at the time of her murder, was convicted of her murder in 2011.  The charges against McGuffin were dismissed in 2019.

2. I have been asked by attorneys from Maloney Lauersdorf Reiner PC to review the materials in Appendix A and to evaluate any police investigative methods that, from a psychological perspective, may have contributed to the wrongful conviction of McGuffin.  My review centers on, but is not limited to, investigators' treatment of three witnesses: Kristen Steinhoff, Scott Hamilton, and Alycia Hyatt.  <u>Ultimately, I conclude that Steinhoff, Hamilton, and Hyatt were subjected to investigation practices that had the potential to coerce and contaminate their testimony.</u>  My opinions are guided by my training, education, and experience in the science of memory, cognition, and eyewitness identification, my review of the relevant psychological and other social science research literature, my knowledge of police practices as it pertains to interviews, interrogations, eyewitness identifications, and the training thereof, and my lengthy experience as a researcher and published author in these fields, as documented in my report narrative.

3. Before reviewing investigative actions involving the aforementioned witnesses, I provide an overview of coercion and contamination and describe their roles in wrongful conviction.  It is important to note that much of the research literature on which I rely examines coercion and contamination in the context of coerced and/or false confessions.  In what follows, I apply this research literature more broadly to the treatment of witnesses.  Applying coercion in false confession to witness testimony cases is appropriate, from a scientific perspective, for a number of reasons.  For example, the psychological factors at play in the coercion of inculpatory statements (or confessions) from suspects are the same factors that determine whether a statement from a witness was the product of coercion. The fundamental social psychological factors do not turn on distinctions based upon the type of statement (e.g., whether it is a "confession" or something else) or the type of person to whom the factors apply (e.g., whether the person is considered by the police to be a suspect, a witness, or something in between). The research on coercion of (non-suspect) witnesses demonstrate similar patterns and findings as research on coercion of suspects (e.g., Kaasa et al., 2013; Loney & Cutler, 2015; Moore, Cutler & Shulman, 2014; Tepfer, Nirider, & Tricarico, 2010).  Likewise, even from an investigation or law enforcement perspective,

the distinction between suspects and witnesses is blurry.  Suspects are witnesses to their own and others' behaviors as well as to events around the time of the crime.  Non-suspect witnesses are sometimes interrogated as suspects (Inbau et al., 2013) and later charged as suspects (or are threatened to be charged as suspects).

## Witness Coercion and Contamination

4.  Coercion results from a combination of individual and situational risk factors that render individuals vulnerable to social influence in their interactions with police investigators.  My use of the term "coercion" in this report refers to psychological coercion and not coercion as defined by law.  Legal definitions of coercion are varied, incorporate concepts such as voluntariness, and focus on tactics such as threats, promises, and physical confrontation. I offer no legal opinions about whether any witnesses were actually coerced, as a matter of law. For scientific purposes, my colleagues and I (Kaplan et al., 2019) have derived the following psychological definition of coercion (p. 7): "Coercion in police interrogation consists of the use of persuasive techniques that limit the suspect's autonomy by manipulating the perceived costs and benefits of possible courses of action and/or depleting the suspect's motivation or ability to resist acceding to the investigator's demands." Our definition is similar to that of Luna (2022, p. 7), who defined coercion as "the use of power to constrain an individual's situation, to impose one's will on that individual via the use of force or conditional proposals (to include both threats and offers)."  Coercion has been identified as the single largest cause of false confessions that have led to wrongful convictions (Kassin et al., 2010; Leo, 2008).

5.  The powerful effect of coercion is illustrated in cases of innocent suspects who are subjected to high pressure interrogations and ultimately falsely confess (Kassin, 2005).  Innocent people are more likely than guilty people to waive their rights to remain silent, to cooperate, and to speak freely with investigators (Kassin, 2005; Kassin & Norwick, 2004).  Rather than remaining silent, the innocent suspect repeatedly denies their involvement in the crime, attempts to tell their side of the story, and at least initially, believes that they can convince the investigators that they are innocent. Appearing uncooperative by maintaining their innocence, the innocent suspect's protestations trigger more aggressive and/or accusatory questioning by the interrogators (Kassin, Goldstein, & Savitsky, 2003).  The use of more aggressive or accusatory tactics by the investigators in turn makes the suspect appear more anxious and suspicious.  The suspect exerts physical and mental effort in their attempts to convince the interrogators of their innocence, but failing, the suspect's resources become depleted over time

2

(Guyll et al., 2013, 2019).  Upon failing to convince the investigator of their innocence, the innocent suspect eventually reaches a state of hopelessness, gets worn out, and, in order to end the ordeal of interrogation, admits to involvement in the crime.  The innocent suspect may continue to believe that despite agreeing to confess to the crime, they will prove their innocence in court.  Or, the innocent suspect may become convinced by the investigators that establishing their innocence is impossible and confessing to a minimized (excusable, justifiable) version of the crime will mitigate punishment.  But often, even without additional evidence linking the suspect to the crime, the suspect's confession becomes the new reality, and the false confession results in a wrongful conviction.

6. Contamination occurs when the investigator provides details of a crime to a witness who is naïve to those details but subsequently adopts them in their reports and/or testimony.  The label "contamination" is used because it is the investigator, not the witness, who is the originating source of the detail.  A significant consequence of contamination is that it makes witness statements appear compelling to others. The existence of non-public facts is taken as proof that the statements should be credited. This is true, sadly, even when the statements are false. For example, in a study of the first two-hundred and fifty (250) post-conviction DNA exonerations of innocent prisoners in the American criminal justice system, Garrett (2010) demonstrated that contamination was present in 95% of the false confession cases in his data set (38 of 40 cases).  In other words, police interrogators in most of these cases fed the suspect unique non-public facts that "only the true perpetrator would know," and the prosecution erroneously alleged that the suspect volunteered these facts and that the suspect thereby corroborated the reliability of the confession statement.  Because the jury in each case believed the prosecution rather than the defense, each of the defendants was convicted, and in each of these cases, the defendant's innocence (and the falsity of the confession) was proven many years later by DNA evidence.  Garrett replicated the contamination finding in another set of false confession/wrongful conviction cases (Garrett, 2015).

7. The combination of coercion and contamination of witness statements is a powerful contributing force to wrongful conviction (Appleby, Hasel, & Kassin, 2013; Garrett, 2010, 2015; Kassin et al., 2010; Leo, 2008; Leo & Drizin,

3

2010).[1]  The National Registry of Exonerations (henceforth, the Registry), a project of the University of California Irvine Center for Science & Society, the University of Michigan Law School, and Michigan State University College of Law, maintains a database of exonerations since 1989.  Their work includes coding case characteristics to better understand factors that contribute to wrongful convictions and ultimately prevent their occurrence.

8.  As of January 9, 2024, the Registry had logged 3,443 exonerations, of which, 27% involved mistaken eyewitness identification, 64% involved perjury or false accusations, 13% involved false confession, 25% involved false or misleading forensic evidence, and 60% involved official misconduct.  Three of these contributing factors, mistaken identification, perjury or false accusations, and false confession, are forms of false witness testimony.  Using the Registry's interactive data display, I selected only cases that contained none of these three forms of witness testimony and found that there were 580

---

[1] Leo and Drizin (2010) illustrate how coercion and contamination errors are preceded by misclassification errors.  The misclassification error is the erroneous conclusion that an innocent suspect is the perpetrator, and that misclassification triggers coercion and contamination errors. As Leo has shown (2008), part of this has to do with the structure of interrogation in America, which is guilt-presumptive and accusatory. So, once a person is deemed a suspect, investigators are more likely to use tactics that involve coercive elements and/or contamination because of the assumption the person is guilty.  Misclassification errors are also facilitated and exacerbated by tunnel vision (Findley & Scott, 2006) during the investigation and are particularly prevalent in the investigation of cold cases (Innes, 2003).  According to Findley and Scott (2006), confirmation bias in investigations is a key contributor to tunnel vision and miscarriages of justice.  Confirmation bias refers to peoples' tendencies to seek out, interpret, remember, and credit information that conforms to their beliefs, expectations and/or values.  Confirmation bias also refers to the tendency to ignore or discount information that does not confirm their beliefs, expectations and/or values.  Peoples' tendencies toward confirmation bias are strongest when the information being evaluated is ambiguous, when the issues evoke extreme emotions, and when beliefs are strongly held.  The quote "I wouldn't have seen it if I hadn't believed it," attributed to philosopher Marshall McLuhan, aptly characterizes confirmation bias.  The term confirmation bias was first introduced in the 1970s (Mynatt, Doherty, & Tweney, 1977), around the time when a great deal of psychological research focused on cognitive heuristics and biases (e.g., the historic work of University of Chicago scholars Amos Tversky and Daniel Kahneman).  Although the label was coined in the 1970s, psychological research preceding the 1970s demonstrated aspects of confirmation bias (e.g., Wason, 1960).  Today, confirmation bias is a well-established, well-accepted phenomenon with 60 years of supporting scientific evidence.  Confirmation bias has been linked to coercion in suspect interrogations (Kassin, Goldstein, & Savitsky, 2003), suggestive eyewitness identification procedures (Wells et al., 2020), and faulty forensic testing (Kassin, Dror, & Kukucka, 2013).  Misclassification errors are also facilitated by deception detection errors at the investigation stage prior to interrogation.  Investigators interview potential suspects to determine their levels of suspiciousness (Inbau et al., 2013).  During these interviews, investigators may incorrectly conclude that the potential suspects or witnesses are lying and perceive them as more suspicious, and on this basis put pressure on them through repeated interviews and coercion, evidence of which appears in this case.  Decades of psychological research, however, have consistently shown that people operate at or only slightly above chance levels when discriminating true from false statements (Bond & DePaulo, 2006).  Experienced police investigators fare no better than lay people at discriminating true from false confessions (Kassin, Meissner, & Norwick, 2005).  While training in deception detection generally does little to improve lie detection accuracy, it does typically boost confidence in lie judgments (DePaulo & Pfeifer, 1986).  Confidence in deception detection decisions does not strongly relate to accuracy (DePaulo et al., 1997), but undue confidence that a suspect is lying can result in coercive and guilt-presumptive interrogations that are liable to produce false confessions (Kassin, Goldstein, & Savitsky, 2003; Leo, 2008) and false witness testimony (Loney & Cutler, 2016; Moore, Cutler, & Shulman, 2014).

remaining exonerations.  This means that 2,863 (83%) of the exoneration cases contained at least one form of false witness testimony.

9. Based on my understanding of psychological issues surrounding coercion and contamination of witness accounts, my experience and training, and my review of the documentation provided to me in Appendix A, I conclude that witnesses Steinhoff, Hamilton, and Hyatt were subjected to investigation practices that had the potential to coerce and contaminate their testimony. In the remainder of this report, I document those investigation practices, organized by witness. In reaching these conclusions, as stated, I do not offer any opinion, as a legal matter, about whether any witness was coerced. In addition, there are disputes about some of the things that transpired with each of these witnesses. I do not offer any credibility determinations or purport to resolve any disputes among the witnesses (where they exist). Ultimately, resolution of any issues of credibility or exactly what happened, will be resolved by the trier of fact.

10. Debates about whether opinions such as those that I am prepared to offer sometimes hinge on whether such opinions exceed the common sense of laypeople.  The question of whether psychological theories and research findings concerning coercion, contamination, and eyewitness memory exceeds common sense has been subjected to numerous research reports using a variety of research methodologies, including surveys of general knowledge, trial simulation experiments, and studies of peoples' abilities to distinguish true from false confessions, as well as research reviews (e.g., Chojnacki et al., 2008; Costanzo, Shaked-Schroer, & Vinson, 2010; Cutler, Loney, & Findley, 2014; Cutler & Penrod, 1995; Desmarais & Read, 2011; Henkel et al., 2008; Kassin et al., 2001; Kassin et al., 2010; Mindthoff et al., 2018; Simons & Chabris, 2011).  Together, these studies reveal gaps in peoples' understanding of the psychological factors underlying the phenomena discussed below.

## Witness Kristen Steinhoff

11. Steinhoff maintained that she was a friend of McGuffin, spent time with McGuffin on the night that Freeman went missing, and helped McGuffin search for Freeman.  According to records of the police and sheriff's departments, Steinhoff was interviewed at least 15 times before her trial testimony: July 5, 2000, February 14, 2002, July 5, 7, and 10, 2000, September 12, 16, and 17, 2000; August 2, 2001; February 14, 2002 January 25, March 4, May 11, June 9, and June 17, 2010.  She testified at McGuffin's trial on July 12, 2011.

12. While it is common for witnesses to be interviewed on several occasions (Fisher & Geiselman, 1992), 15 times (at least) prior to trial testimony is highly unusual and an extreme departure from standard police practices. The repeated interviewing strongly suggests that investigators believed that Steinhoff was withholding information or being deceptive. As explained in a footnote above, detecting deception is fraught with errors, and detection accuracy only marginally exceeds guessing rates, even among experienced investigators.

12. The passage of time between Freeman's disappearance on June 28, 2000 and the later interviews (particularly 2001, 2002, 2010 and later) is highly likely to lead to memory decay. According to more than 100 years of psychological research on the effects of retention interval on human memory (e.g., Deffenbacher et al., 2008; Lampinen et al., 2012), memory decay follows a predictable pattern of decline with time (e.g., Deffenbacher et al., 2008; Lampinen et al., 2012). Some research shows that even in the absence of suggestive interviewing, repeated interviewing of witnesses leads to increased witness confidence without changes in witness accuracy (Shaw, 1996; Shaw & McClure, 1996).

13. Repeated interviewing can have more troubling effects because the process of interviewing someone repeatedly can, itself, impact their memory and subsequent testimony. Decades of research on the influence of misleading post-event information demonstrates that such information impairs memory and can lead to the creation of wholly false memories (Loftus, 2005). Asking a witness to imagine an event that never occurred can inflate confidence that the event in fact occurred, a phenomenon known in the research community as "imagination inflation" (Garry et al., 1996). As people retell false memories, the reconstructive nature of memory can lead to increased detail and nuance as well as increased confidence in one's recall. Further, in cases in which recall is partly true and partly false, people have difficulty distinguishing between the events they actually experienced and those that were added through imagination or learning from other sources (Mazzoni & Memon, 2003). This is one of the reasons why professionally trained investigators are taught to avoid providing non-public information to witnesses (and suspects) (e.g., Inbau et al., 2013).

14. Most of the investigators' interviews with Steinhoff were unrecorded. Investigator notes are a poor substitute for recordings. Research on officers' notes shows substantial gaps in completeness of notes taken from witness interviews. One study of investigators' verbatim notes (Lamb et al., 2000) of their forensic interviews with alleged child abuse victims compared investigators' notes with the audio recordings of the interviews. Lamb and colleagues found that investigators failed to report many details provided by

6

the children and many of the utterances used by the investigators to elicit the details. The investigators' notes tended to misrepresent the structure of the interviews. The notes were typically incomplete, having many errors of omission. There was a tendency to misclassify responses given to directed questions as responses given to open-ended questions. Another study (Warren & Woodall, 1999) compared experienced investigators' recall for their interviews with the actual interview transcripts. In that study, the investigators recalled only about 20% of the questions that they asked to the children and the answers the children gave. Similar results were reported in a study of the completeness and accuracy of experienced officers' notes of adult witness interviews (Gregory, Compo, Vertefeuille, & Zambruski, 2011). Gregory et al. found that the notes focused on witnesses' answers, left out the questions posed to the witnesses, and omitted large amounts of information.

15. Two of the investigators' interviews with Steinhoff were recorded and provide the most direct evidence of their explicit attempts to persuade or coerce testimony from Steinhoff.[2] These interviews took place on March 4, 2010 and June 26, 2010. The March 4 interviews were conducted by Detectives Andrew (DA) and Riddle (DR). The June 26 interview was conducted by Detective Riddle (DR), Chief Dannels (CD), Investigator Tabor (MT), and District attorney Frasier (PF).

16. With the assistance of Dr. Jeffrey Kaplan, a former graduate student under my supervision and collaborator on numerous research projects and cases, we subjected these interviews to evaluation using the Interview and Interrogation Assessment Instrument (henceforth, IIAI).[3] The IIAI includes 36 empirically-derived interrogation tactics divided into five domains associated with coerciveness: (1) Rapport-Building Domain, (2) Evidence-Based Domain, (3) Social and Psychological Manipulation Domain, (4) Consequence-Based Domain, and (5) Minimization Domain. The IIAI also includes assessment of personal risk factors, the interrogation environment, the interviewee's demeanor and behaviors, and the degree of investigator contamination of the interviewee's statement.[4]

17. The audio-recorded portion of the March 4, 2010 interview lasted 1 hour and 16 minutes. In that recording, investigators used 21 Evidenced-Based, Social

---

[2] Whether additional interrogation tactics from the IIAI domains were used before or after the recorded interview is unknown.

[3] In 2016 my colleagues and I received a research grant from the Social Sciences & Humanities Research Council of Canada for research on the assessment of coercion in videorecorded interviews and interrogations. Our research on the development of the Interview and Interrogation Assessment Instrument has been described in several publications (Kaplan et al., 2019; 2023) and the Open Science Framework.

[4] Although we assessed within-interrogation contamination, the results are ambiguous given the numerous interviews that investigators conducted with Steinhoff prior to the recorded interrogation.

and Psychological Manipulation, Consequence-Based, and Minimization Tactics with Steinhoff. The full list of tactics used appears in Appendix B.

18. Using 12 Evidence-Based Tactics,[5] the investigators alluded to information allegedly obtained from other witnesses, Freeman's blood allegedly found in one of the cars, forensic evidence, profiles, the voluminous file, and the impending polygraph. For example:

- "You know people have told us that you've actually told them things that happened?" DR [00:18:40, p. 78]

- "So Kristin, I need to ask you: Is there any reason why Leah's blood would be found in that car?" DR [00:10:25, p. 11]

19. The 2 Social and Psychological Manipulation Tactics[6] used by the interrogators focused on the grief of Freeman's mother and family and Steinhoff's drug involvement. The two tactics were:

- "I want that person held accountable. Not for my own gratification, but for the mom who every night has to go to bed thinking of her dead daughter. Her daughter who was left out in the wood to decompose. You know? That's what I want closure for." DR [00:29:45, p. 29]

---

[5] Evidence-Based Tactics are designed to convince the suspect that they have no chance of convincing anyone of their innocence. In the case of witness interviews, Evidence-Based Tactics convince the witness that they have no chance of convincing anyone that they do not possess the information that the investigators believe they have. Such tactics have several psychological effects, including cognitive reframing and depleting the suspect's ability to self-regulate. Cognitive reframing during the interrogation occurs when a suspect concludes that establishing their innocence is no longer feasible and switches their focus to the next best option, minimizing their chances for harsh treatment (Kaplan et al., 2019; Leo, 2008; Scherr et al., 2020). In the case of a witness, cognitive reframing may take the form of abandoning an attempt to convince the investigator of the witness's beliefs in favor of the perceived investigator's beliefs. Put another way, the use of Evidence-Based Tactics (and other tactics as described below) represents a form of *choice architecture* on the part of the investigators (Thaler & Sunstein, 2008). Although Evidence-Based Tactics have the general effects of putting pressure on suspects to confess (Inbau et al., 2013) or a witness to change their testimony, false evidence ploys and bluffs are particular risk factors for false statements (Kassin et al., 2010). Decades of research in social and cognitive psychology has shown that misleading people renders them vulnerable to manipulation (Kassin et al., 2010). Trainers eschew the use of false evidence tactics with vulnerable populations (Carr, 2015; Inbau et al., 2013), or discourage its use altogether (Centrex, 2004; Wicklander-Zulawski, 2020).

[6] Social and Psychological Manipulation Tactics heighten emotional distress, contribute to self-regulatory decline, interfere with cognitive processing and decision-making and render interviewees more vulnerable to social influence (Davis & Leo, 2012; Kaplan et al., 2019).

- "One of the things I hear, and I've heard in following up on this thing, is that you were a source of a lot of drugs. And be that as it may, whether you were or weren't, that was ten years ago. And that there was a lot of the Mexican drug connection that was hanging around you. I don't know if it was from your house or your mom or whoever, but that that was a connection that was pretty prevalent around you. Is that true?" DR [00:22:35, p. 22]

20. The investigators used Consequence-Based Tactics[7] on 5 occasions. Four of these tactics suggested that Steinhoff was at risk for criminal prosecution and possibly prison. For example:

- "…my biggest fear is, is that somebody goes down for this, and they drag you down with them. . .I'm just telling you what my biggest fear is. And for somebody like you, who's got so much going for them, who may have made a mistake or may have been involved with people you shouldn't have been involved with back then, and then you get drug down with them." DR [00:23:55, p. 23]

- "…the last thing your kids need to do is come visit you in prison. I've seen kids that have had to do that and it is not pretty." DR [00:26:00, p. 25]:

21. On 2 occasions the investigators used the Minimization Tactic of appealing to Steinhoff's best interests (from their own perspectives). The two tactics were:[8]

- "The people who aren't going to go down are the people who, if they know something, say something." DR [00:24:10, p. 23]

- "And if you think there's anybody that can drag you down, it's important that we know about it now and you do something good for yourself now. Because the people who do something good for themselves now are going to save them heartache later. Does that make sense?" DR [00:25:00, p. 24]

---

[7] Like Evidence-Based Tactics, Consequence-Based Tactics in various ways put pressure on suspects to confess, or in this case, witnesses to change their statements. Accusations of guilt and deception, derogating information provided by the interviewee, emphasizing the seriousness of the crime, leveraging expertise, trapping the interviewee, showing nonverbal signs of aggression, such as staring, and asking guilt-presumptive questions reinforce the idea that the interviewee has no chance of maintaining their position and create punishments (both distal and proximal) for continued resistance.

[8] Other forms of Minimization Tactics were used in the subsequent interview. These forms and their psychological effects are explained below.

9

22. Steinhoff denied having additional knowledge of the crime 17 times during this interview.

23. In the recorded portion of the June 26, 2010 interview, the investigators put far more pressure on Steinhoff to reveal details that she had not provided previously and persistently maintained she did not have. This interview lasted 1 hour and 38 minutes, involved four separate authority figures, and was conducted in a small interview room, the likes of which are known to create feelings of isolation and stress (Kassin et al., 2010). Steinhoff complained of being physically ill and showed signs of it as well. Discomfort reduces the ability to self-regulate and renders interviewees more vulnerable to social influence (e.g., Galliott & Baumeister, 2007).

24. During the nearly 100-minutes covered by the recording (and, again, without knowing what preceded it), the investigators used 107 coded interrogation tactics to put pressure on Steinhoff. These tactics included 4 Rapport-Building Tactics, 48 Evidence-Based Tactics, 12 Social and Psychological Manipulation Tactics, 26 Consequence-Based Tactics, and 17 Minimization Tactics, all of which are listed in Appendix C.

25. With respect to Rapport-Building Tactics,[9] most notable is that on 3 occasions the investigators misrepresented themselves as Steinhoff's advocate, for examples:

   - "You know? We don't get many opportunities to show, to advocate for you. And right now you – I mean, it's not looking good. So we're trying to do that for you." CD [00:55:35, p. 63].

---

[9] Trainers of interrogation (and many forms of interviewing) recommend that the interrogator take efforts to establish rapport with the suspect in the service of making the suspect comfortable with disclosing personal information with the interrogator (e.g., Inbau et al., 2013). Psychological research demonstrates that persuasion is more effective when the source of persuasion expresses empathy, commonality, and liking for the target of persuasion (Cialdini, 2001). Thus, engaging in small talk, sympathizing with the defendant, and finding common ground enhance persuasion. Offering a concession enhances compliance (Burger et al., 2006). Thus, some forms of rapport-building have the effects of, on the one hand, making an interrogation seem less oppressive or coercive, but on the other hand, enhancing the interrogator's persuasive influence over the suspect. Research has also demonstrated that rapport-based tactics enhance the suspect's vulnerability to misleading information (e.g., Saurland et al., 2018; Vallano & Schreiber Compo, 2015; Wright et al., 2015). Some (Crough et al., 2021) have argued that the establishment of rapport during the adversarial context of a suspect interview is inherently deceptive and is independent of – and often in opposition to – the suspect's best interests. Perhaps the most notable example of a problematic tactic falls under the tactic of minimizing the interrogator's role. Investigators have been observed at times portraying themselves as suspects' lifelines and portraying their roles in the interrogations as ones meant to facilitate helping suspects (Kaplan & Cutler, 2022). Premising interrogations on seeking to help suspects is discouraged in interrogation training manuals and literature (Carr, 2015; Inbau et al., 2013; Wicklander-Zulawski, 2020).

- "I told you before, I'll say it again. This will be the last time I'll probably say it. The advocate is sitting in a chair in front of you. In fact both of us, to help you, not hurt you." DR [01:32:15, p. 98]

26. The Evidence-Based Tactics included presentation of evidence allegedly obtained from other witnesses. This happened on 12 occasions during the recording, for example:

- "I have an eyewitness that puts you and Nick talking" CD [00:31:20, p. 33]

27. Investigators arranged for Steinhoff to take a polygraph exam and then told her she failed the test, claiming that she was being deceptive in response to critical questions. The use of a polygraph, regardless of its accuracy, is a form of evidence ploy. If she in fact did not fail the test, the investigators' statements about the polygraph results would be considered a false-evidence ploy. False-evidence ploys are particular risks not just for coerced statements but for generating *false* confessions and statements (Kassin et al., 2010). In the recording, false evidence was presented to Steinhoff on 20 occasions (assuming that she did not in fact fail the polygraph test), for example:

- "And, I looked at them -- the results, just to make sure. And I'm not a polygrapher; I'm not an expert in that field. But I looked at what -- you can see where you had problems and when you didn't have problems." CD [00:20:45, p. 23]

28. The investigators used Social and Psychological Manipulation Tactics on 12 occasions reflected in the recording. These questions generally asserted that the knowledge Steinhoff was withholding represented a burden, a burning seed inside her, something on her conscience or her chest and causing her pain. The investigators implored her to obtain release by providing previously unrevealed information to them. For example:

- "…there's a deep burning seed in there, that's been hanging on you for ten years, that's - I mean, until I crack that seed and make it grow and get it out of your system and your con - I - it's going to hurt." DR [01:19:45, p. 86]

29. The investigators used Consequence-Based Tactics on 26 occasions during the audio-recorded portion of the questioning. These tactics included accusing Steinhoff of lying on 9 occasions, emphasizing the seriousness of the consequences she might face on 13 occasions, and staring her down on 4 occasions. For example:

- "We gave you an opportunity to show credibility this morning . . and prove yourself. That didn't happen Kris." CD [00:35:35, p. 38]

- "Kris, once the grand jury starts, and once that goes through the process and they make a decision who gets arrested -" CD [00:49:30, p. 54]

30. The investigators used Minimization Tactics[10] on 17 occasions during the audio-recorded portion of the questioning. These tactics included appealing to Steinhoff's best interests on 5 occasions, downplaying the seriousness of the situation on 2 occasions, degrading others on 1 occasion, and making promises of lenient treatment on 9 occasions. For example:

- "This is an opportunity that I want you to take advantage of." CD [00:50:00, p. 55]

- "...especially when they're, when they're at that point in their life. And then they get worried: 'Man, I didn't say back then, I'm worried I might get in trouble today because I didn't do the right thing way back when.' People make mistakes, Kristin." DR [00:10:40, p. 13]

- "And that's why I'm offering you, again, that immunity, to tell me what he said in detail. Or tell me in general what you remember from those conversations. That's where I'm -- I want to provide you that insurance." CD [01:09:15, p. 76-77]

31. During the audio-recorded portion of the questioning Steinhoff on 67 occasions denied having the additional information the investigators sought.

32. In sum, in the two recorded interviews combined, five separate authority figures used 128 interrogation tactics associated with coerciveness to pressure Steinhoff to bring forth details that she may not have revealed in the many unrecorded interviews or encounters with authorities in 2000, 2001, 2002, and 2010. In the higher-pressure, June 26, 2010 interview, Steinhoff was ill, which likely rendered her more vulnerable to investigator influence. The interrogation tactics used are known in the research to

---

[10] Professionally trained interrogators are trained to not explicitly tell a suspect that they will be treated more leniently if they confess, but interrogators can – and are encouraged to -- say things that will make the suspect reach this conclusion on their own (Inbau et al., 2013). And that's the effect that minimization often has. The suspect is encouraged to infer (without being explicitly told) that if they adopt a morally, psychological, or legally defensible justification (one suggested by the investigator), the suspect will receive more lenient treatment – maybe even immunity – than if they refuse to cooperate (Inbau et al., 2013). The use of minimization techniques that imply leniency increases the risk of eliciting a false confession (Kassin et al., 2010; Scherr et al., 2020). In this case, however, both implicit and explicit promises were used.

enhance feelings of isolation and stress, deplete the interviewee's ability to self-regulate and maintain their position, narrow their choices, succumb to the demands of authority figures, and change their behavior in response to implicit and explicit promises of leniency (e.g., Davis & Leo, 2010; Kassin et al., 2010; Leo, 2008).  These tactics continued despite Steinhoff's continued denials of having the knowledge that investigators pressured her to disclose. In total, she denied having this knowledge 84 times.

33. It is noteworthy that the two recorded interviews with Steinhoff were "non-custodial" interviews and that Steinhoff was told she was free to leave. Merely uttering the words "free to leave" does not necessarily create a perception of freedom to leave.  Coercive tactics led to perceptions of psychological custody in recent research (Alceste & Kassin, 2021; Alceste et al., 2018).  As an example of the mixed-messaging that sometimes occurs in non-custodial interviews, during the latter recorded interview, when Steinhoff attempted to exercise her option to leave the interview, she was met at the interview room door by an investigator who persuaded her to remain in the room.

34. The U.S. Supreme Court, 75 years ago, in its historic *Miranda* decision, specifically cited the Reid Technique – which uses tactics mirroring those used with Steinhoff -- as the reason we need *Miranda* warnings (see Footnotes 15-34 of the *Miranda* decision). The Reid Technique, and its guilt-presumptive questioning methods are part of the misclassification errors described above. (Leo & Drizin, 2010). The recorded interviews did not include *Miranda* warnings to Steinhoff.

35. In the preceding paragraphs I focused substantially on the two recorded interviews with Steinhoff.  Absent recordings of the many other interviews with Steinhoff, there is no way to know with certainty the degree of pressure placed on Steinhoff to offer additional details that the investigators believed she had – and she maintained she did not have.

36. The absence of recordings of the previous interviews also renders it impossible to assess whether, or the extent to which, investigators contaminated Steinhoff's beliefs or statements by suggesting details that Steinhoff did not produce or details that were contrary to the ones she did produce.  In the recorded interviews, the investigators indeed suggested details that were not offered by Steinhoff during those interviews.  For example, in the March 4, 2010 interview, investigators were the first to offer that she was driving around with McGuffin the night Freeman went missing; Freeman's blood was found in the car; McGuffin might have confessed to her; Steinhoff had told people that McGuffin killed Freeman and that she was involved; and Steinhoff saw McGuffin at the Maytag place pacing in circles.

In the June 8, 2010 interview, investigators were the first to suggest that Steinhoff was threatened to stay silent. Some of these details were known well before these interviews – that Steinhoff saw McGuffin at the Maytag place and rode around with him. The other details are contested. My point is that the investigators demonstrated in these recordings that their questioning techniques involved suggesting inculpatory details to Steinhoff and likely others.

37. Investigators have at their disposal several methods of preventing and/or documenting contamination of witness statements, and professionally trained investigators in 2000 and 2010 would have understood the importance of avoiding contamination by using some method to prevent non-public information from being communicated to a witness or suspect. One method of preventing contamination is to not suggest or reveal other evidence in the case. Trainers recommend against incorporating case evidence into interrogations or doing so very sparingly (e.g., Inbau et al., 2013). A second method is to create a "hold-back" list (e.g., Snook, Eastwood & Barron, 2014). A hold-back list is a list of evidence created by the investigators before the interview documenting evidence that will not be shared during the interview. The hold-back list requires pre-planning and intentionality. A third method is to record interviews as a means of both prevention and documentation (e.g., Kassin et al., 2010; Sullivan, 2014). Recording interviews and interrogations is an increasingly popular practice among law enforcement. In the interviews with Steinhoff, the investigators revealed evidence in the recorded interviews. There is no evidence that hold-back lists were used in any interviews. There were many unrecorded interviews.

## Witness Scott Hamilton

38. There was also evidence of coercive practices used with witness Scott Hamilton. In 2000, Hamilton was interviewed at least 3 times (July 5, July 10, August 15) in addition to testifying before a Grand Jury. In 2010, Hamilton was interviewed at least 6 times (January 25, January 27, January 28, April 29, May 12, and May 18) in addition to testifying before the Grand Jury and at McGuffin's trial. On 2 of the 6 occasions in 2010 (May 12 and May 18), Hamilton was subjected to polygraph exams. One of these interviews (April 29) was recorded. The recorded portion of the interview was low in coerciveness (though there may have been contamination -- there is no way to know). There is no way to ascertain the level of pressure put on Hamilton to provide details concerning McGuffin and/or contamination in the unrecorded interviews.

39. In addition to their many interviews with Hamilton, investigators arranged two pretext calls, one in which Hamilton spoke with McGuffin's father

14

(January 23, 2010, recorded) and another in which Hamilton spoke with McGuffin himself (March 23, 2010, recorded and transcribed). Pretext calls are investigative techniques designed to elicit inculpatory statements from suspects that can then be used in the suspect's prosecution. Because the source (i.e., caller) eliciting the inculpatory statements is not a member of law enforcement but rather someone known and perhaps trusted by the suspect, pre-text calls are considered to be a form of "interrogation by proxy" (Davis et al., 2023).

40. When investigators deploy a pretext call, they typically coach the caller on what to say to achieve the investigator's goals of eliciting inculpatory statements from the suspect. Pretext calls have become part of the investigator's toolbox, particularly in sexual assault cases in which consent is contested, and there is scant evidence other than the testimony of the alleged victim and defendant (Davis et al., 2023). As explained by Davis et al. (2023), pretext calls are designed to keep the suspect engaged and unaware of police involvement in the conversation while minimizing suspicion and resistance to providing inculpatory details. According to Davis et al. (2023), pretext calls, like other forms of interrogation by proxy, increase the risk of false confessions and false incriminating statements. Pretext calls lack the fundamental safeguards present in questioning by investigators, such as *Miranda* warnings and prohibition of threats and promises (Inbau et al., 2013).

41. In the January 23, 2010 call with McGuffin's father, Hamilton lied to him about the purpose of the call and invited McGuffin's father to give him advice on what to say or not say to the investigators. In the March 23, 2010 pretext call, Hamilton lied to McGuffin about the purpose of his call and asked McGuffin if Hamilton should keep his "mouth shut." Hamilton thrice suggested that McGuffin told him that [on the night of Freeman's disappearance] McGuffin dropped her off at McKay's – a fact that would be considered inculpatory if McGuffin assented to its accuracy. McGuffin thrice denied this assertion. Hamilton again lied to McGuffin by telling him that he did not want to incriminate McGuffin.

42. Thus, while the pretext calls that investigators arranged did not include threats or promises, they are inherently deceptive and included deceptive assertions about a key detail in the case (in Hamilton's call with Nick McGuffin). Such practices can lead to both coercion and contamination of a witness's or suspect's statement.

15

## Witness Alycia Hyatt (Hartwell)

43. Alycia Hyatt (Hartwell) was reported as a bystander eyewitness in this case. The details that Hyatt provided included allegedly seeing Freeman walking by the high school on the night of her disappearance. At the time of this alleged sighting, Hyatt was riding in a car driven by her friend's mother and while interacting with her friend. Hyatt maintained that she saw an auto stop next to Freeman. She saw a person in the auto interact with Freeman while Freeman and the auto were stopped on the side of the road. Investigators also maintained that Freeman identified McGuffin's Mustang as the auto she viewed on the night of Freeman's disappearance. As I note below, Hyatt's recall of these details was far from straightforward.

44. Some principles and research findings from the psychology of eyewitness memory are instructive for understanding factors that may have influenced Hyatt's experience as an eyewitness. These principles and findings are well accepted with Psychology, law enforcement communities, and in courts (e.g., Technical Working Group, 1999; *Oregon v. Lawson*, 2012; Wells et al., 2020).

45. Human memory does not act like a videorecorder, for it is reconstructive by nature. The videorecorder, which captures, a scene, stores it with little degradation over time, and plays back a faithful rendition of what occurred on demand, is commonly used as an analogy of how memory does not work. When we experience events, we do not encode a complete copy of the event but rather store the gist of the event with varying degrees of detail. When we recall an event, we may recall some details but then reconstruct additional details based on some combination of what actually happened and what we believe would have or should have happened based on our knowledge and experiences. The reconstructions of our memories may be accurate, distorted, or even wholly false, depending on such factors as the level of detail encoded, the passage of time, accurate or misleading information we learned or inferred between encoding and retrieval, and the manner and conditions in which we engage in recall (e.g., Lampinen, Neuschatz, & Cling, 2012; Loftus 1979, 2005).

46. Personal and situational factors systematically influence the accuracy of our memories. At the earlier stages of forming memories, our attention constrains our abilities to perceive details in events, and divided attention further challenges our perceptual abilities. We tend to focus on important details of events at the expense of peripheral details (Easterbrook, 1959; Echterhoff & Wolf, 2012). Our attention tends to be goal-directed. Distracting noise and the distractions of our own thoughts and activities limit our abilities to attend to events in our environment.

16

47. There is data loss in the transfer of details from short-term to long-term memories, such as in the case of forgetting the name of someone with whom we are conversing within a minute of having been introduced (Brown, 1958). Examples of personal and situational influences that can influence the accuracy of eyewitness memory include the opportunity to view the event (e.g., lighting, distance), the level of attention and distraction at the time of the event, and the amount of time that passed between the event and the eyewitness interview or identification test (Lampinen, Neuschatz, & Cling, 2012).

48. People can hold richly detailed, false memories with high levels of confidence. Several sources inform us that memory mistakes are common-place, and some have high-stakes consequences (Loftus, 1997). As discussed above, mistaken eyewitness identification is the most common form of misleading evidence in known cases of wrongful conviction (e.g., Wells et al., 2020). Research on false memories demonstrates that they can be induced by suggestive interviews and photographs. False memories can be richly detailed, believed as much as and hard to distinguish from true memories, and held with high confidence (e.g., Laney & Loftus, 2008; Loftus & Pickrell, 1995; Shaw & Porter, 2015; Wade et al., 2002). Also as noted above, the retelling of false memories can strengthen one's beliefs in the events and the details contained in the false memories, as in the case of imagination inflation (Garry et al., 1996).

49. The pattern of statements by Hyatt suggests some level of contamination by post-event information. Hyatt (then Hartwell) was 12-years-old at the time of Freeman's disappearance. On July 11, 2000, Hartwell was interviewed by Detective Downing. According to Downing's report, "Alycia stated that she was riding with Ms. Fuller and some other kids in Ms. Fuller's car, and does remember seeing a girl that appears to be the same as the girl in the pictures. She advised she remembers seeing this girl walking right near the high school and that the girl was a blond-haired female wearing a white top and blue jeans. Alycia advised that she does not know Leah personally but her parents do, but does remember that the girl she saw was very similar to the girl in the photographs around town."

50. On July 21, 2010, Hyatt testified before the Grand Jury. Her testimony about what she saw on the night of Freeman's disappearance was more detailed, despite a 10-year gap in time from the night of Freeman's disappearance. Hyatt testified that she knew Freeman because her mom babysat her. Hyatt also testified that she remembered seeing a car stop behind them. She was uncertain about her memory, but described the car as a darker-colored compact, maybe a Honda or Nissan, but she did not know

exactly.  The car may have been blue, black, or dark gray.  Someone in the car talked to Freeman.

51. After her July 21, 2010 Grand Jury testimony – on the same day – Hyatt was interviewed by Officers Webley and McNeely at the police department. According to the police report, Hyatt now remembered that the vehicle she was in pulled out in front of the car in question and that the car had one headlight dimmer than the other.  As they passed the high school, she saw Freeman walking along the road.  The car behind them pulled in by Freeman and someone on the passenger side either got out or leaned out the window. When shown photos of different cars, Hyatt chose McGuffin's blue Mustang as a possible identification of the car.  Thus, Hyatt's account now included more incriminating information – that the car was not a compact car (as she had testified) but rather a blue mustang with one dim headlight – and that she had a different view of the car.  There is no recording of the interview or image of the car photos shown to Hyatt.

52. The changes in Hyatt's account between her sworn testimony and the responses she allegedly provided in the police interview immediately following her testimony led to Hyatt testifying before the Grand Jury again on August 11, 2010.  In Hyatt's account before the Grand Jury on August 11, she provided the following : The car in question had pulled up, turned a U-turn or something and ended up behind the van she was in, then stopped; one of the lights was dimmer than the other one; it was an older car because it had big glass bulbs; it was an older Ford Mustang; there were at least two people in the car; the driver never moved; and the passenger either leaned out of the car or got out.  She further testified that she knew Freeman since she was little. Hyatt's account before the August 11 Grand Jury notably grows increasingly more focused on McGuffin, a phenomenon common with inflated witness confidence in identifications. Established science, however, documents how this phenomenon occurs and that it is more likely the result of suggestiveness, contamination and post-event feedback rather than actual memory, which by that point has been irretrievably contaminated (e.g., Wells et al, 2020; National Research Council, 2014; Steblay, Wells, & Douglass, 2014).

53. In her July 11, 2011 trial testimony, Hyatt's account evolved further.  She testified that she knew Freeman very well.  She recalled the car with the dimmed headlight and the glass bulbs.  This time she did not recall whether there was one or two people in the car, but the passenger door opened.  She testified that the front end of car looked like a Mustang.

54. In summary, on the night of – but before – Freeman's disappearance, Hyatt allegedly viewed an innocuous event while riding in a car and while engaged

(bickering, as she described it) with her friend. When interviewed by law enforcement soon after Freeman's disappearance and murder was realized, Hyatt provided sparse detail. A full 10 years later, Hyatt's account grew in detail and continued to grow and change in detail with successive interviews. The changes in her account are consistent with the well-understood psychological phenomena as described above, to wit, repeated interviewing, misleading post-event information, false memories, imagination inflation, and inability to distinguish actual from changed memories (e.g., Garry et al., 1996; Loftus, 2005; Mazzoni & Memon, 2003; Shaw, 1996). There is no way to ascertain the full extent to which the evolution of Hyatt's accounts is directly attributable to coercion and/or contamination by the investigators. The investigators did not record their interviews with Hyatt. The sequence of events that included Hyatt's Grand Jury testimony on July 21, 2010, the interview with investigators immediately following that testimony, and her subsequent Grand Jury testimony on August 11, 2010 strongly implies that post-event suggestion and/or contamination from police investigators contributed to or caused the changes in Hyatt's accounts and her suggestion that the car she saw was similar to McGuffin's Mustang.

55. Hyatt's alleged photo identification of McGuffin's Mustang is also noteworthy in its dearth of documentation. Established practices in eyewitness identification procedures involve at least documenting the details of identification procedures but preferably videorecording them (Wells et al., 2020). Even in 2000 and 2010, a professionally trained police investigator would have been well aware of the need to document any form of identification procedure, and it was a departure from established practices for those not to be recorded in this case. For example, with respect to the identification procedures, the International Association of Chiefs of Police issued a Model Policy on Showups, Lineups and Photograph Identifications (1992, 1993) that emphasized various safeguards to reduce suggestiveness and preserve evidence for later review.

56. Minimally adequate practices require that factfinders know whether the identification procedure was the equivalent of a showup or photoarray and whether, if the latter, the array was suggestive. Put differently, whether the witness was just shown a single picture (a show-up, which is inherently suggestive) or a series of pictures (a photo array, which can vary in suggestiveness depending on how it is constructed and how it is administered). One study of forensic-object identification (specifically identification of an auto involved in a crime) found that forensic-object lineups were superior to forensic-option showups. Lineups led to more accurate identification decisions, particularly those identifications made with high confidence and from fair lineups (see Smith et al., 2020).

57. Minimally adequate practices also require that the factfinder know whether other safeguards designed to reduce the risk of mistaken identification were used, including cautionary instructions, avoidance of suggestive comments or actions, properly-selected fillers, ensuring that the suspected vehicle does not stand out, double-blind administration, and the assessment of witness confidence immediately after the identification and prior to providing any validating information that could contribute to false confidence (Wells et al., 2020).

58. The eyewitness principles and research discussed above can likewise be applied to other witness testimony and their object identifications. Specifically, some eyewitnesses testified that on the night Freeman went missing, McGuffin was seen driving his Mustang and his parent's Thunderbird. McGuffin maintained that he did not have access to and was not driving the Thunderbird. This contested detail was relevant in McGuffin's prosecution. While a Thunderbird may be easily distinguishable from a Mustang when seen together in real-time, memorial accounts of which car was seen (if any) may be influenced by inattention at the time of viewing, forgetting due to unimportance at the time of viewing and the passing of time, and other factors known to influence the accuracy of eyewitness accounts.

## Summary

59. In summary, witnesses Steinhoff, Hamilton, and Hyatt were subjected to investigation practices that had the potential to coerce and contaminate their testimony, as reviewed above. These practices included excessive repeated interviewing, the use of interrogation tactics known to enhance the risk of false statements, polygraphs, pretext calls, and the lack of safeguards designed to prevent and document coercion, contamination, and mistaken identification. Many of the practices used did not adhere to established practices for generating reliable evidence. In many respects contemporaneous documentation of the investigative steps was inadequate and incomplete.

60. I reserve the right the amend my opinions upon learning new information about this case.

References

Alceste, F., & Kassin, S. M. (2021). Perceptions of custody: Similarities and disparities among police, judges, social psychologists, and laypeople. *Law and Human Behavior*, *45*, 197-214.

Alceste, F., Luke, T. J., & Kassin, S. M. (2018). Holding yourself captive: Perceptions of custody during interviews and interrogations. *Journal of Applied Research in Memory & Cognition*, *7*, 387–397.

Appleby, S. C., Hasel, L. E., & Kassin, S. M. (2013). Police-induced confessions: An empirical analysis of their content and impact. *Psychology, Crime & Law*, *19*, 111-128.

Bond Jr, C. F., & DePaulo, B. M. (2006). Accuracy of deception judgments. *Personality and Social Psychology Review*, *10*, 214-234.

Brown, J. (1958). Some tests of the decay theory of immediate memory. Quarterly *Journal of Experimental Psychology*, *10*, 12-21.

Burger, J. M., Ehrlichman, A. M., Raymond, N. C., Ishikawa, J. M., & Sandoval, J. (2006). Reciprocal favor exchange and compliance. *Social Influence*, *1*(3), 169-184.

Carr, D. (2015). *The RCMP Phased Interview Model for Suspects: Generating information through dialogue*. Ottawa, ON: Royal Canadian Mounted Police.

Centrex. (2004). *Practical guide to investigative interviewing*. London, UK: Central Police Training and Development Authority.

Chojnacki, D., Cicchini, M., & White, L. (2008). An empirical basis for the admission of expert testimony on false confessions. *Arizona State Law Journal*, *40*, 1–45.

Cialdini, R. (2001). *Influence: Science and Practice*. Boston, MA: Allyn & Bacon, 4th ed.

Costanzo, M., Shaked-Schroer, N., & Vinson, K. (2010). Juror beliefs about police interrogations, false confessions, and expert testimony. *Journal of Empirical Legal Studies*, *7*, 231-247.

Crough, Q., Dion Larivière, C., Snow, M. D., & Eastwood, J. (2022). Reflections on the nature of rapport within suspect interviews. *Current Issues in Criminal Justice*, *34*(2), 219-228.

Cutler, B. L., Loney, D., & Findley, K. A. (2014). Expert testimony on interrogations and false confessions. *University of Missouri Kansas City Law Review*, *82*, 589-622.

Cutler, B. L., & Penrod, S. D. (1995). *Mistaken identification: Eyewitnesses, psychology and the law*. University Press.

Davis, D., Blandon-Gitlin, I., Cleary, H. M. D., Costanzo, M., Leo, R. A., & Margolis, S. (2023). Interrogation by proxy: The growing role of law and undercover interrogators in eliciting criminal confessions. *Criminal Law Bulletin*, *59*, 395-479.

Davis, D., & Leo, R. A. (2012). Interrogation-related regulatory decline: Ego depletion, failures of self-regulation, and the decision to confess. *Psychology, Public Policy, and Law*, *18*, 673-704.

Deffenbacher, K. A., Bornstein, B. H., McGorty, E. K., & Penrod, S. D. (2008). Forgetting the once-seen face: Estimating the strength of an eyewitness's memory representation. *Journal of Experimental Psychology: Applied*, *14*, 139-150.

DePaulo, B. M., & Pfeifer, R. L. (1986). On-the-job experience and skill at detecting deception. *Journal of Applied and Social Psychology*, *16*, 249-267.

DePaulo, B. M., Charlton, K., Cooper, H., Lindsay, J. L., & Muhlenbruck, L. (1997). The accuracy–confidence correlation in the detection of deception. *Personality and Social Psychology Review*, *1*, 346–357.

Desmarais, S. L., & Read, J. D. (2011). After 30 years, what do we know about what jurors know? A meta-analytic review of lay knowledge regarding eyewitness factors. *Law and Human Behavior*, *35*, 200-210.

Easterbrook, J. A. (1959). The effect of emotion on cue utilization and the organization of behavior. *Psychological Review, 66*, 183-201.

Echterhoff, G. & Wolf, O. T. (2012). The stressed eyewitness: The interaction of thematic arousal and post-event stress in memory for central and peripheral event information. *Frontiers of Integrative Neuroscience, 6*(57), 1-12.

Findley, K. A., & Scott, M. S. (2006). The multiple dimensions of tunnel vision in criminal cases, *Wisconsin Law Review, 2006*, 291-397.

Fisher, R. P., & Geiselman, R.E. (1992). *Memory enhancing techniques for investigative interviewing: The Cognitive Interview*. Springfield III: Charles C. Thomas.

Exhibit 28, Page 22 of 69

Galliot, M. T., & Baumeister, R. F. (2007). The physiology of willpower: Linking blood glucose to self-control. *Personality and Social Psychology Review*, *11*, 303-327.

Garrett, B. L. (2015). Contaminated confessions revisited. *Virginia Law Review*, *101*, 395-454.

Garrett, B. L. (2010). The substance of false confessions. *Stanford Law Review*, *62*, 1051–1119.

Garry, M., Manning, C. G., & Loftus, E. F. (1996). Imagination inflation: Imagining a childhood event inflates confidence that it occurred. *Psychonomic Bulletin & Review*, *3*, 208-214.

Gregory, A. H., Compo, N. S., Vertefeuille, L., & Zambruski, G. (2011). A comparison of U.S. police interview notes with their subsequent reports. *Journal of Investigative Psychology and Offender Profiling*, *8*, 203-215.

Guyll, M., Madon, S., Yang, Y., Lannin, D. G., Scherr, K., & Greathouse, S. (2013). Innocence and resisting confession during interrogation: Effects on physiologic activity. *Law and Human Behavior*, *37*, 366-375.

Guyll, M., Yang, Y., Madon, S., Smalarz, L., & Lannin, D. G. (2019). Mobilization and resistance in response to interrogation threat. *Law and Human Behavior*, *43*, 307–318.

Henkel, L. A. (2008). Jurors' reactions to recanted confessions: Do the defendant's personal and dispositional characteristics play a role? *Psychology, Crime & Law*, *14*, 565-578.

International Association of Police Chiefs (1992, 1993). *Showups, Photographic Identifications and Lineups Model Policy*.

Inbau, F. E., Reid, J. E., Buckley, J. P., & Jayne, B. C. (2013). *Essentials of the Reid technique*. Jones & Bartlett Publishers.

Innes, M. (2003). *Investigating murder: Detective work and the police response to criminal homicide*. Oxford University Press.

Kaasa, S. O., Cauffman, E., Clarke-Stewart, K. A., & Loftus, E. F. (2013). *Behavioral Sciences and the Law*, *31*, 574-592.

Kaplan, J. & Cutler, B. L. (2022). Co-occurrences among interrogation tactics in actual police investigations. *Psychology, Crime, & Law*, *28*, 1-19.

Kaplan, J., Cutler, B. L, Leach, A. M, & Eastwood, J. (2023). Development and validation of the Interview and Interrogation Assessment Instrument. *Psychology, Public Policy, and Law, 29*, 49-61.

Kaplan, J., Cutler, B. L., Leach, A. M., Eastwood, J., & Marion, S. (2019). Evaluating coercion in suspect interviews and interrogations. In B. H. Bornstein & M. K. Miller (Eds)., *Advances in Psychology and Law,* Volume 4 (pp. 1-40). New York: Springer.

Kassin, S. M. (2005). On the psychology of confessions: Does innocence put innocents at risk? *American psychologist, 60*, 215-228.

Kassin, S. M., Drizin, S. A., Grisso, T., Gudjonsson, G. H., Leo, R. A., & Redlich, A. D. (2010). Police-induced confessions: Risk factors and recommendations. *Law and Human Behavior, 34*, 3–38.

Kassin, S. M., Tubb, V. A., Hosch, H. M., & Memon, A. (2001). On the "general acceptance" of eyewitness testimony research. *American Psychologist, 56*, 405–416.

Kassin, S. M., Dror, I. E., & Kukucka, J. (2013). The forensic confirmation bias: Problems, perspectives, and proposed solutions. *Journal of Applied Research in Memory and Cognition, 2*, 42-52.

Kassin, S. M., Goldstein, C. C., & Savitsky, K. (2003). Behavioral confirmation in the interrogation room: On the dangers of presuming guilt. *Law and Human Behavior, 27*, 187-203.

Kassin, S. M., Meissner, C. A., & Norwick, R. J. (2005). "I'd know a false confession if I saw one": A comparative study of college students and police investigators. *Law and Human Behavior, 29*, 211-227.

Kassin, S. M., & Norwick, R. J. (2004). Why people waive their Miranda rights: The power of innocence. *Law and Human Behavior, 28*, 211-221.

Lamb, M. E., Orbach, Y., Sternberg, K. J, Hershkowitz, I., & Horowitz, D. (2000). Accuracy of investigators' verbatim notes of their forensic interviews with alleged child abuse victims. *Law and Human Behavior, 24*, 699-708.

Lampinen, J.M., Neuschatz, J.S., Cling, A. (2012). *The Psychology of Eyewitness Identification*. New York: Psychology Press.

Laney, C. & Loftus, E. F. (2008). Emotional content of true and false memories, *Memory, 16*, 500-516.

24

Leo, R. A. (2008). *Police interrogation and American justice*. Cambridge, MA: Harvard University Press.

Leo, R. A., & Drizin, S. A. (2010). The three errors: Pathways to false confession and wrongful conviction. In G. D. Lassiter and C. Meissner (Eds), *Police Interrogations and False Confessions: Current Research, Practice, and Policy Recommendations* (pp. 9-30). American Psychological Association.

Loftus, E. F. (2005). Planting misinformation in the human mind: A 30-year investigation of the malleability of memory. *Learning & Memory*, *12*, 361–366.

Loftus, E. F. (1997). Repressed memory accusations: Devastated families and devastated patients. *Applied Cognitive Psychology*, *11*, 25–30.

Loftus, E. F. (1979). *Eyewitness testimony*. Cambridge, MA: Harvard University Press.

Loftus, E. F., & Pickrell, J. E. (1995). The formation of false memories. *Psychiatric Annals*, *25*, 720–725.

Loney, D. M., & Cutler, B. L. (2016). Coercive interrogation of eyewitnesses can produce false accusations. *Journal of Police and Criminal Psychology*, *31*, 29-36.

Luna, S. (2022). Defining coercion: An application in interrogation and plea negotiation contexts. Psychology, *Public Policy, and Law*, *28*, 240-254.

Mazzoni, G. & A. Memon, A. (2003). Imagination can create false autobiographical memories, *Psychological Science*, *14*, 186-188.

Mindthoff, A., Evans, J. R., Perez, G., Woestehoff, S. A., Olaguez, A. P., Klemfuss, J. Z., ... & Meissner, C. A. (2018). A survey of potential jurors' perceptions of interrogations and confessions. *Psychology, Public Policy, and Law*, *24*, 430-448.

*Miranda v. Arizona*, 384 U.S. 436 (1966).

Moore, T. E., Cutler, B. L., & Shulman, D. (2014). Shaping eyewitness and alibi testimony with coercive interview practices. *The Champion*, October, p. 34-42.

Mynatt, C. R., Doherty, M. E., & Tweney, R. D. (1977). Confirmation bias in a simulated research environment: An experimental study of scientific inference. *The Quarterly Journal of Experimental Psychology, 29*, 85–95.

National Research Council. (2014). *Identifying the culprit: Assessing eyewitness identification*. Washington, DC: The National Academies Press.

*Oregon v. Lawson*, 352 Or. 724, 291 P.3d 673 (2012).

Sauerland, M., Brackmann, N., & Otgaar, H. (2018). Rapport: Little effect on children's, adolescents', and adults' statement quantity, accuracy, and suggestibility. *Journal of Child Custody*, *15*(4), 268-285.

Scherr, K. C., Redlich, A. D., & Kassin, S. M. (2020). Cumulative disadvantage: A psychological framework for understanding how innocence can lead to confession, wrongful conviction, and beyond. *Perspectives on Psychological Science*, *15*, 353-383.

Shaw, J. S., III. (1996). Increases in eyewitness confidence resulting from post-event questioning. *Journal of Experimental Psychology: Applied*, *2*, 126–146.

Shaw, J. S., III, & McClure, K. A. (1996). Repeated post-event questioning can lead to elevated levels of eyewitness confidence. *Law and Human Behavior*, *20*, 629–653.

Shaw, J. & Porter, S. (2015). Constructing rich memories of committing a crime. *Psychological Science*, *26*, 291-301.

Simons, D. J., & Chabris, C. F. (2011). What people believe about how memory works: A representative survey of the U.S. Population. *PLOS ONE*, 6 (8), e22757.

Smith, A. M., Mackovichova, S., Jalava, S. T., & Pozzulo, J. (2020). Fair forensic-object lineups are superior to forensic-object shows. *Journal of Applied Research in Memory and Cognition*, *9*, 68-82.

Snook, B., Eastwood, J., & Barron, W. (2014). The next stage in the evolution of interrogations. The PEACE Model. *Canadian Criminal Law Review*, *18*, 219-239.

Steblay, N., Wells, G. L., & Douglass, A. B. (2014). The eyewitness post identification feedback effect 15 years later: Theoretical and policy implications. *Psychology, Public Policy, and Law*, *20*, 1–18.

Sullivan, T. P. (2014). Arguing for Statewide Uniformity in Recording Custodial Interrogations. *Criminal Justice*, 29, 21.

Technical Working Group. (1999). *Eyewitness evidence: A guide for law enforcement.* (NCJ Publication No. 178240). Washington, D.C.: U.S. Government Printing Office.

Tepfer, J. A., Nirider, L. H., & Tricarico, L. M. (2009). Arresting development: Convictions of innocent youth. *Rutgers Law Review*, *62*, 887-941.

Exhibit 28, Page 26 of 69

Thaler, R. H., & Sunstein, C. (2008). *Nudge: Improving decisions about health, wealth, and happiness*. New Haven, CT: Yale University Press.

Vallano, J. P., & Schreiber Compo, N. (2015). Rapport-building with cooperative witnesses and criminal suspects: A theoretical and empirical review. *Psychology, Public Policy, and Law, 21*, 85-99.

Wade, K. A., Garry, M., Read, J. D., & Lindsay, D. S. (2002). A picture is worth a thousand lies: Using false photographs to create false childhood memories. *Psychonomic Bulletin & Review, 9*, 597-603.

Warren, A. R., & Woodall, C. E. (1999). The reliability of hearsay testimony: How well do interviewers recall their interviews with children? *Psychology, Public Policy & Law, 5*, 355-371.

Wason, P. C. (1960). On the failure to eliminate hypotheses in a conceptual task. Quarterly *Journal of Experimental Psychology, 12*, 129-140.

Wells, G. L., Kovera, M. B., Douglass, A. B., Brewer, N., Meissner, C., & Wixted, J. T. (2020). Policy and procedure recommendations for the collection and preservation of eyewitness evidence. *Law and Human Behavior, 44*, 3-36.

Wicklander-Zulawski & Associates. (2020). *Interviewing techniques: Practical advanced workshop*. Aurora, IL: Wicklander-Zulawski & Associates.

Wright, D. S., Nash, R. A., & Wade, K. A. (2015). Encouraging eyewitnesses to falsely corroborate allegations: Effects of rapport-building and incriminating evidence. *Psychology, Crime & Law, 21*, 648-660.

Appendix A
Documents Reviewed

1. Second Amended Complaint
2. 2000-06-29 CPD, Traffic Stop of Scott Hamilton
3. 2000-07-05 Roadblock Canvas, Interview of Scott Hamilton
4. 2000-07-10 CBPD, Interview of Scott Hamilton
5. 2000-07-20 Grand Jury Testimony of Scott Hamilton
6. 2000-07-20 OSP, Interview of Scott Hamilton (Officer Perske)
7. 2000-07-21 OSP, Interview of Scott Hamilton (Officer Perske)
8. 2000-08-03 OSP, Interview of Scott Hamilton (Officer Oester)
9. 2000-08-15 OSP, Interview of Scott Hamilton (Officer Oester)
10. 2000-08, Lead Sheet
11. 2000-09-12 CPD, Interview of Scott Hamilton (Officer Lee)
12. 2000-09-19 OSP, Interview of Scott Hamilton (Officer Oester)
13. 2009-10-16, CPD, Fact File of Scott Hamilton
14. 2010-01-23, CBPD, Interview of Scott Hamilton (Officer Schwenninger)
15. 2010-01-23 Pretext call from Scott Hamilton to Bruce McGuffin (recording)
16. 2010-01-25 CPD, Interview of Scott Hamilton (Officer Webley)
17. 2010-02-06 CPD, Interview of Scott Hamilton (Officer Webley)
18. 2010-03-22 CBPD, Interview of Scott Hamilton (Officer Schwenninger)
19. 2010-03-23 Pretext call from Scott Hamilton to Nick McGuffin (Recording)
20. 2010-03-23 Pretext call from Scott Hamilton to Nick McGufffin (Transcript)
21. 2010-08-11 Grand Jury Testimony of Scott Hamilton
22. 2011-04-29 CPD, Interview of Scott Hamilton (Office McNeely) (recording)
23. 2011-05-12 OSP, Polygraph of Dennis Hamilton (Officer Tabor)
24. 2011-05-18 OSP, Polygraph of Scott Hamilton (Officer Tabor)
25. 2011-07-12 Trial Transcript testimony of Scott Hamilton
26. 2011-07-13 Trial Transcript testimony of Scott Hamilton
27. 2020-03-25 Facebook Message from Scott Hamilton to Nick McGuffin
28. 2000-07-11 CCSO, Interview of Alycia Hyatt (Officer Downing)
29. 2010-07-21 Grand Jury Testimony of Alycia Hyatt
30. 2010-07-21 Interview of Alycia Hyatt (Officer Webley)
31. 2010-08-11 Grand Jury Testimony of Alycia Hyatt
32. 2011-07-11 Trial Testimony of Alycia Hyatt
33. 2000-07-05 CCSO, Roadblock Canvas, Kirsten Steinhoff (Ramsey)
34. 2000-07-10-CPT, Interview of Steinhoff (Officer Zavala)
35. 2000-07-20 Grand Jury Testimony of Kirsten Steinhoff
36. 2000-09-07 CCSO, Interview of Kristen Steinhoff (Officer Stone)
37. 2000-09-12 CPD, Interview of Kristen Steinhoff (recording)
38. 2000-09-12 CPD, Interview of Kristen Steinhoff (Officer Lee)
39. 2000-09-16 CPD Interview of Kristen Steinhoff (Officer Grant)

28

40. 2001-08-02 CCSO, Interview of Kristen Steinhoff (Officer Zanni)
41. 2002-02-14 OSP, Interview of Kristen Steinhoff (Officer Davis)
42. 2009-10-16 CBPD Department Fact File of Kristen Steinhoff
43. 2010-01-25 CCSO, Interview of Kristen Steinhoff (Officer Looney)
44. 2010-03-04 OSP, Interview of Kristen Steinhoff (recording)
45. 2010-03-04 OSP, Interview of Kristen Steinhoff (transcript)
46. 2010-06-09 CPD, Interview of Kristen Steinhoff (Officer Dannels)
47. 2010-06-17 Polygraph of Kristen Steinhoff
48. 2010-06-26 Interview of Kristen Steinhoff
49. 2010-06-26 Interview of Kristen Steinhoff (video)
50. 2010-07-30 Grand Jury Testimony of Kristen Steinhoff
51. 2011-04-26 CPD, Interview of Kristen Steinhoff (Officer Webley)
52. 2011-07-12 Trial Testimony of Kristen Steinhoff
53. IACP Training Key #414: Showups, Lineup and Photo Identifications, 1991
54. IACP Training Key #600, Eyewitness Identification
55. IACP Training Key #645, Eyewitness Identification
56. Showups, Photographic Identifications and Lineups: Model Policy. IACP National Law Enforcement Policy Center, February 1992
57. Showups, Lineups and Photographic Identification, Concepts and Issues. Paper of the IACP National Law Enforcement Policy Center, May 1993

Appendix B

| Evaluation of the Interrogation of Kristen Steinhoff, 3/4/2010 | |
|---|---|
| Case Information | Table 1 |
| Suspect Information and Personal Risk Factors | Table 2 |
| Physical Environment and Context | Table 3 |
| Interrogation Tactics Summary | Table 4 |
| Rapport Building Tactics | Table 4A |
| Investigative and Evidence Based Tactics | Table 4B |
| Social and Psychological Manipulation Tactics | Table 4C |
| Consequential Tactics | Table 4D |
| Minimization Tactics | Table 4E |
| Miscellaneous Tactics | Table 5 |
| Suspect Demeanor | Table 6 |
| Suspect's Behaviors | Table 7 |
| Confession and Contamination Analysis | Table 8 |

Exhibit 28, Page 30 of 69

| Table 1: Case Information | |
|---|---|
| **Primary Charges:** | N/A |
| **Duration:** | 1h, 16m, 26s (audio only) |
| **Date of Interview:** | March 4, 2010 |
| **Primary Investigator:** | Detective Andrews (DA) |
| **Secondary Investigator:** | Detective Riddle (DR) |
| **Evaluator(s):** | Jeffrey Kaplan, PhD |
| **Date of Evaluation:** | November 2, 2023 |
| **Retaining Attorney(s):** | Maloney Lauersdorf Reiner PC |
| **Description:**  Interrogation of Kristen Steinhoff as a witness regarding the homicide of Leah Freeman. | |

| Table 2: Suspect Information | |
|---|---|
| **Name:** | Kristen Steinhoff |
| **Race:** | Caucasian |
| **Age:** | 27 |
| **Gender:** | Female |
| **Read Legal Rights:** | N/A |
| **Waived Legal Rights:** | N/A |
| **Personal Risk Factors:** KS is an adult, with no diagnosed intellectual disabilities or history of mental illness. There was no evidence that she was intoxicated, suffering from drug withdrawal, or sleep deprived at the time of her interview. | |

| Table 3A: Physical Environment & Context | |
|---|---|
| **Factor** | **Description** |
| N/A | - |
| | |

33

| Table 4: Interrogation Tactics Summary ||
|---|---|
| **Tactic Type** | **Count** |
| **4A: Rapport Building Tactics** | 2 |
| **4B: Evidence Based Tactics** | 12 |
| **4C: Social and Psychological Manipulation Tactics** | 2 |
| **4D: Consequence Based Tactics** | 5 |
| **4E Minimization Tactics** | 2 |
| **Total Number of Interrogation Tactics Used** | **23** |

| Table 4A: Rapport Building Tactics | | |
|---|---|---|
| **Interrogation Tactic** | **Count** | **Notes** |
| Small Talk | 2 | • KS [approximate timestamp 00:46:45, page 43]: "Yeah, if it means no more cops at my house."<br>DR: "Oh, come on, we're not that bad.  Are we?  Are we?"<br>KS: "No, but -"<br>DA: "Well, it's not in uniform in a marked car or anything, and showing up with our lights and sirens on."<br>KS: "Yeah"<br>DR: "That'd be a heck of a lot worse.  But we look like insurance salesmen, don't we?"<br>KS: "No, but the car gave it away."<br>DR: "What?"<br>KS: "There's a red one just like it, lives just down the road from me."<br>DR: Oh.  And that's a police officer?<br>KS: "Yeah."<br>DR: "Who is it?"<br>KS: "Oh, I can't remember.  He's Coos Bay, though."<br><br>• DA [01:00:30, p. 56-59]: "Mm-hmm. When did you get sober?"<br>KS: "Um, when I was 19."<br>DA: "How long before this were you into drugs?"<br>KS: "Maybe a year."<br>DA: "So you were only in there about three years?"<br>KS: "Yeah."<br>DA: "Do you still drink?"<br>KS: "Once in a great while."<br>DA: "Okay. I know you smoke."<br>KS: "Yeah."<br>DA: "Um. So you started when you were like 16? Using meth?"<br>KS: "Yeah, 16, almost 17."<br>DA: "Okay."<br>KS: "Probably like a month away from my 17th birthday."<br>DA: "Mm-hmm. How did you get started?"<br>KS: "My mom."<br>DA: "Really?"<br>KS: "Mm-hmm."<br>DA: "She gave it to you? That's sad."<br>KS: "Yeah."<br>DA: "Mm. And did she teach you how to smoke it and everything?" |

35

KS: "No, um -- Justin Hunter. I smoked it with him the first time."

DA: "Mm-hmm. And how does -- how -- I mean, what's it do to you?"

KS: "Just makes you feel like you have energy."

DA: "Okay."

KS: "But I started doing so much of it that it -- it wasn't really doing anything to me."

DA: "Mm-hmm. Did you go through some sort of program to get sober? You just quit cold turkey?"

KS: "Yep."

DA: "Good for you."

KS: "I got pregnant, and –"

DA: "Good for you. That's the hard way to do it, probably."

KS: "Yeah. But my -- my son was worth it."

DA: "Mm-hmm. How long have you -- it's John, right? John Farley?"

KS: "Mm-hmm."

DA: "How long have you guys been together?"

KS: "Um, 14 years altogether. I was with him when I 5 was 13. Then we broke up. And I was with him when I was 15, 6 and we broke up, and then when I was 18 or 19."

DA: "How much older is he than you?"

KS: "Two years."

DA: "Mm. But how long have you guys been together now? I mean, this last part with no breaks?"

KS: "Nine years."

DA: "Wow. Long time."

KS: "Yeah. And we have four kids."

DA: "Not -- are you married yet?"

KS: "No."

DA: "Oh. Can't pin him down?"

KS: "No, we don't want to get married."

DA: "Oh. I don't blame you, you know. I mean, I'm married, but, you know, there's times when either financially you're not -- not in our situation, but I just -- I just couldn't imagine being without her."

KS: "Yeah. All our friends who got married ended up getting a divorce."

DA: "Oh, really?"

KS: "Yeah."

DA: "That's too bad. So, that's one way -- why not to get married, I guess."

KS: "Yeah."

36

| | | |
|---|---|---|
| | | DA: "You guys talked after we left? What -- how's he feel about you being down here? He just wants it to end, too?"<br>KS: "Yeah."<br>DA: "Did you guys argue about it?"<br>KS: "No." |
| **Total** | **2** | |

37

| Table 4B: Evidence Based Tactics | | |
|---|---|---|
| **Interrogation Tactic** | **Count** | **Notes** |
| Presenting Evidence | 4 | • DA [00:17:00, p. 17]: "He's talking like Leah's never coming back…"<br><br>• DR [00:18:40, p. 78]: "You know people have told us that you've actually told them things that happened?"<br><br>• DR [00:18:50, p. 18]: "You know people have told us that you've actually told them things that happened?"<br>KS: "Things that happened? Like what?"<br>DR: "Well, they've told us that you've actually broke down and told people that Nick did it, that you helped Nick, things like that."<br><br>• [00:19:10, p. 18]: "And people are saying that you broke down and told your mom, and, uh, what's that guy's name? Danny Horlacher." |
| Challenging Contradictions | 1 | • DR [00:20:50, p. 20]: "Okay. So this is what I don't understand. I don't understand why Nick and Ricky would be so dead set on keeping you quiet, not wanting you talking to the cops if you didn't know anything. If they didn't think you knew anything." |
| Evidence Bait | 2 | • DR [00:10:25, p. 11]: "So Kristin, I need to ask you: Is there any reason why Leah's blood would be found in that car?"<br><br>• DA [00:27:45, p. 26-27]: "Okay. And that's what I want to make sure. I'm trying to get a figure on who all was in that car because, um, we have DNA, you know, stuff from Leah, of course. And then several other people. And we're going to be comparing the -- what they call profiles, against that." |
| Emphasizing Evidence | 2 | • DA [00:02:20, p. 4]: "Okay. As part of this, re-look at -- excuse me -- re-look at the investigation, you know, we pored over -- I mean, the one number that was thrown around was there's 4,000 pieces of paper on this -- on this case that's already in there. So we had guys poring over that stuff."<br><br>• DA [00:03:05, p. 4-5]: "And I don't know if you've read the paper at all about this, or seen the news, but there's some new forensic stuff that's come up in this case that we're having tested. We're doing a lot of stuff." |
| Polygraph Request | 3 | • DR [00:44:45, p. 40]: "Um, if we're not able to find those |

| | | |
|---|---|---|
| | | polygraph results, would that be something you'd be willing to do to clear your name on this thing?" <br><br> • DR [00:46:40, p. 42-43]: "And -- you know, because different questions you could pass. If, you know -- if you were asked if you killed her and you didn't, then of course you're going to pass that question." <br> KS: "I didn't kill anybody." <br> DR: "Right. Then you would pass that question. So is that something that you would consider, and help us out?" <br><br> • DR [00:54:15, p. 51]: "It would most likely be with me here, if he's available as well. And then the polygraph examiner would be here. It would be in this room. It would take roughly, two -- three hours, probably, to do it. Because they -- you remember how it goes. A bunch of stuff ahead of time, then they hook you up to the machine and they do the test, then they talk to you about the test afterwards. So." <br> DA: "You willing to do that?" |
| **Total** | **12** | |

| Table 4C: Social and Psychological Manipulation Tactics | | |
|---|---|---|
| **Interrogation Tactic** | **Count** | **Notes** |
| Increase Guilt | 1 | • DR [00:29:45, p. 29]: "I want that person held accountable. Not for my own gratification, but for the mom who every night has to go to bed thinking of her dead daughter. Her daughter who was left out in the wood to decompose. You know? That's what I want closure for."<br>KS: "Yeah."<br>DR: "That's what I want somebody held accountable for, is her. And her sister, and any of her -- you know, the other relatives that have had to deal with this." |
| Other Accusation | 1 | • DR [00:22:35, p. 22]: "One of the things I hear, and I've heard in following up on this thing, is that you were a source of a lot of drugs. And be that as it may, whether you were or weren't, that was ten years ago. And that there was a lot of the Mexican drug connection that was hanging around you. I don't know if it was from your house or your mom or whoever, but that that was a connection that was pretty prevalent around you. Is that true?" |
| **Total** | **2** | |

| Table 4D: Consequence Based Tactics | | |
|---|---|---|
| **Interrogation Tactic** | **Count** | **Notes** |
| Emphasizing Seriousness | 4 | <ul><li>DR [00:23:55, p. 23]: "…my biggest fear is, is that somebody goes down for this, and they drag you down with them.<br>KS: But I didn't do anything. I --"<br>DR: "I'm just telling you what my biggest fear is. And for somebody like you, who's got so much going for them, who may have made a mistake or may have been involved with people you shouldn't have been involved with back then, and then you get drug down with them."</li><li>DR [00:24:30, p. 24]: "…not to sound cocky or overconfident or anything like that, this case is going to come to a head, soon. And there are going to be -- there are going to be people going down, people held accountable for this. And, like I said, my biggest fear is somebody like you, who's got a family, who's got kids, who's got a good thing going in their life, is going to get drug down for something that happened ten years ago."</li><li>DR [00:25:45, p. 25]: "…the people who we feel are responsible have already said that when they go down, they're taking other people with them."</li><li>DR [00:26:00, p. 25]: "…the last thing your kids need to do is come visit you in prison. I've seen kids that have had to do that and it is not pretty."</li></ul> |
| Emphasizing Expertise/Authority | 1 | <ul><li>DR [00:12:50, p. 14]: "I talk to people all the time. Kelly talks to people all the time. Your reaction to this thing right now isn't consistent with somebody who doesn't know something. It isn't consistent with somebody who hasn't heard something. It isn't consistent with somebody who doesn't know something."</li></ul> |
| **Total** | **5** | |

41

| Table 4E: Minimization Tactics | | |
|---|---|---|
| **Interrogation Tactic** | **Count** | **Notes** |
| Self-Interest | 2 | <ul><li>DR [00:24:10, p. 23]: "The people who aren't going to go down are the people who, if they know something, say something."</li><li>DR [00:25:00, p. 24]: "And if you think there's anybody that can drag you down, it's important that we know about it now and you do something good for yourself now. Because the people who do something good for themselves now are going to save them heartache later. Does that make sense?"</li></ul> |
| **Total** | **2** | |

| Table 5: Miscellaneous Tactics | |
|---|---|
| **Factor** | **Description** |
| N/A | - |

| Table 6: Suspect's Demeanor |
|---|
| <u>N/A</u><br><br>The lack of a video recording precludes the analysis of behavioral cues to anxiety, depression, etc. |

| Table 7: Suspect's Behaviors | | |
|---|---|---|
| **Coding Label** | **Frequency** | **Notes** |
| Denial | 17 | |
| Objection | 6 | |

| Table 8: Confession and Contamination Analysis |
|---|
| Beyond psychological risk factors for false confession, the reliability of a confession may be assessed using several criteria.  The first criterion is the degree of fit between the confession and known evidence, and the internal logical consistency of the confession.  When confessions are logically consistent and consistent with the known evidence, a second consideration is whether the suspect produced these details independently or if they were first revealed to the suspect by the investigator or from some other source.  Finally, confessions may be substantiated by whether or not they revealed new evidence that was not already known to law enforcement.<br><br>*Details Originating with the Investigator*<br>• The investigators were the first to state that she was with Nick driving around the night that Leah went missing [00:03:25]<br><br>• Leah's blood was found in the car [00:10:20]<br><br>• Nick may have confessed to her [00:12:00]<br><br>• She had previously told people that Nick killed Leah and that she was involved [00:18:50]<br><br>• She saw Nick at the "Maytag place" pacing in circles [00:48:50] |
| *Unique Details Offered by the Suspect*<br>• Ms. Steinhoff was the first to state that Nick was behaving "weird" that night, "acting like he was never going to see her again" [00:05:50]<br><br>• Scott Hamilton told her something about Leah's head "being on a rock" [00:07:10]<br><br>• Nick changed clothes that night [00:10:50]<br><br>• She believes now in hindsight that Nick may have killed Leah [00:17:30]<br><br>• Nick told her not to tell the police anything [00:20:25] |

Exhibit 28, Page 46 of 69

Appendix C

| Evaluation of the Interrogation of Kristen Steinhoff, 6/26/2010 | |
|---|---|
| Case Information | Table 1 |
| Suspect Information and Personal Risk Factors | Table 2 |
| Physical Environment and Context | Table 3 |
| Interrogation Tactics Summary | Table 4 |
| Rapport Building Tactics | Table 4A |
| Investigative and Evidence Based Tactics | Table 4B |
| Social and Psychological Manipulation Tactics | Table 4C |
| Consequential Tactics | Table 4D |
| Minimization Tactics | Table 4E |
| Miscellaneous Tactics | Table 5 |
| Suspect Demeanor | Table 6 |
| Suspect's Behaviors | Table 7 |
| Confession and Contamination Analysis | Table 8 |

| Table 1: Case Information ||
|---|---|
| **Primary Charges:** | N/A |
| **Duration:** | 1h, 38m, 19s |
| **Date of Interview:** | June 26, 2010 |
| **Primary Investigator:** | Detective Riddle (DR) |
| **Secondary Investigator:** | Chief Dannels (CD) |
| **Tertiary Investigator** | Mike Tabor [MT] |
| **District Attorney** | Paul Frasier (PF) |
| **Evaluator(s):** | Jeffrey Kaplan, PhD |
| **Date of Evaluation:** | October 30, 2023 |
| **Retaining Attorney(s):** | Maloney Lauersdorf Reiner PC |
| **Description:** Interrogation of Kristen Steinhoff as a witness regarding the homicide of Leah Freeman. ||

| Table 2: Suspect Information | |
|---|---|
| **Name:** | Kristen Steinhoff (KS) |
| **Race:** | Caucasian |
| **Age:** | 28 |
| **Gender:** | Female |
| **Read Legal Rights:** | Yes |
| **Waived Legal Rights:** | Yes |
| **Personal Risk Factors:** KS is an adult, with no diagnosed intellectual disabilities or history of mental illness. There was no evidence that she was intoxicated, suffering from drug withdrawal, or sleep deprived at the time of her interview.  She did, however, complain of physical illness and showed signs of it (coughing, sniffling). | |

49

| Table 3A: Physical Environment & Context | |
|---|---|
| **Factor** | **Description** |
| Small Room | KS was interrogated in a very small and enclosed space by multiple authority figures. This environment may create or contribute to feelings of anxiety and vulnerability, and may have increased the impact of the tactics used during the interrogation.  Although this was a non-custodial interview, the conditions may have created a sense of psychological custody.  KS mentioning wanting to leave several times.  She also went to leave once but was met at the door by another investigator who asked her if she would stay (she concurred). |
| | |

| Table 4: Interrogation Tactics Summary | |
|---|---|
| **Tactic Type** | **Count** |
| **4A: Rapport Building Tactics** | 4 |
| **4B: Evidence Based Tactics** | 48 |
| **4C: Social and Psychological Manipulation Tactics** | 12 |
| **4D: Consequence Based Tactics** | 26 |
| **4E Minimization Tactics** | 17 |
| **Total Number of Interrogation Tactics Used** | **107** |

| Table 4A: Rapport Building Tactics | | |
|---|---|---|
| **Interrogation Tactic** | **Count** | **Notes** |
| Minimizing/ Misrepresenting Role | 3 | • DR [approximate timestamp 00:47:45, page 52]: "I'm your advocate."<br><br>• CD [00:55:35, p. 63]: "You know?  We don't get many opportunities to show, to advocate for you. And right now you – I mean, it's not looking good.  So we're trying to do that for you."<br><br>• DR [01:32:15, p. 98]: "I told you before, I'll say it again. This will be the last time I'll probably say it. The advocate is sitting in a chair in front of you.  In fact both of us, to help you, not hurt you." |
| Concession | 1 | • DR [01:16:10, p. 85]: "You want some water?" |
| **Total** | **4** | |

| Table 4B: Evidence Based Tactics | | |
|---|---|---|
| Interrogation Tactic | Count | Notes |
| Presenting Evidence | 12 | • MT [00:04:25, p. 7]: "Well, because I - talking with Coquille PD, they told me that at one point you told them that Ricky Crook came and told you - told you to keep your mouth shut or that he, for lack of better words, was going to beat you up."<br><br>• MT [00:11:05, p. 13]: "Well, why do – I mean, you saying that, um, that the things that people tell us are all lies, then?"<br><br>• CD [00:22:20, p. 25]: "And based on that, and based on new leads in this case that we've developed and got statements from -"<br><br>• CD [00:26:05, p. 28-29]: "I know Nick talked to you that night, and you know that also. And that's what we're looking for, is what Nick McGuffin told you that night. And if you tell me that, and you weren't directly involved in her death -- directly means you were there, you know, and took part in killing Leah Freeman. What I'm talking about is what you were told by Nick. That is the most important aspect I want from you, which falls back to the truth."<br><br>• CD [00:31:20, p. 33]: "I have an eyewitness that puts you and Nick talking -"<br><br>• CD [00:31:35, p. 34]: "Unfortunately, there's many -- we have so many statements, Kris..."<br><br>• CD [00:45:55, p. 50]: "Well, you were with him at a critical time. The most -- the 24 hours after you have a violent crime like this, a homicide, is the most critical time to be with somebody. Especially, in this case, the boyfriend. And you were with him. There's got to be something sparking in that time. That short time, that two hours. Let's just say two hours, plus or minus, that you were with him. There's something in that two-hour window -"<br>KS: "I don't know."<br>CD: "-- that's causing you to trip yourself, consciously."<br><br>• PF [01:22:25, p. 88-89]: "There's been a couple people that have come forward, and one of them, whose name's Michelle Emery, another is a girl named Amber Pattee or Patteé, I don't know how to pronounce it. But they're both -" |

| | | |
|---|---|---|
| | | KS: "Who the hell are they?"<br>PF: "Well, they both say and claim that they talked to you, and they claim they heard you say that you killed Leah…"<br><br>• PF [01:22:55, p. 88-89]: "Well, they both say and claim that they talked to you, and they claim they heard you say that you killed Leah..."<br><br>• PF [01:23:15, p. 89]: "Well, what I'm trying to tell you is I got people out there telling me that you did it."<br><br>• PF [01:26:55, p. 93]: "Yeah, and it all comes back to you. And also you've got people out there saying you're in the freaking car with these people."<br><br>• CD [01:36:20, p. 101]: "You made a comment about Nick telling you he had an argument with her -- with Leah, correct? What was that argument about?" |
| False Evidence | 20 | • MT [00:00:30, p. 2-3]: "Well, I've had a chance to review the test. I've went through all the checks and balances repetition, ran it through the computer, and you didn't pass the test today, Kristen."<br><br>• MT [00:01:45, p. 4]: "And so, even something as simple as that little number, I can tell. So when I run -- and that's just one test. When I run three different charts, and each of the different ones come up that you are not telling me the truth, then I definitely know you are not being -"<br><br>• MT [00:02:15, p. 4]: "Well, why do you think you failed the test, here today?"<br><br>• MT [00:02:40, p. 5]: "Okay. And I'm not saying that you failed the questions about did Nick tell you. I'm just talking about, um, Are you withholding information here today, okay? That's where we're starting at. We're starting with the easy one, okay?"<br><br>• MT [00:04:00, p. 6]: "Well, because that one is not coming up honest either. And so you are telling me that I get all those right, but the only questions I get wrong are the ones dealing with you and your knowledge about Leah's death."<br><br>• MT [00:05:05, p. 7]: "There is no doubt about the failure here on |

the test today. There is there's no doubt about it. I mean, everything - all the checks and balances come together."

- MT [00:05:20, p. 8]: "All I do is give the polygraph test and say if somebody's telling the truth or not. I know that you were not one hundred percent honest with me here today."

- MT [00:06:15, p. 9]: "When somebody fails it, I know they're not being honest with me, okay? That's why I'm able to tell you that you weren't honest on those questions."

- MT [00:08:50, p. 11]: "Well, I'm just trying to figure out how -- how I'm so far off on three tests, then."

- MT [00:14:35, p. 17]: "...you're saying that it's completely wrong, and I'm trying to figure out how I got it completely, completely wrong. Not just me, not just my manual scoring, but then the computer got it completely wrong also."

- MT [00:15:05, p. 18]: "The ones that you failed on were, um: Did you participate in any way? Are you withholding any information? And then I'd have to look at the other ones, but -- Have you ever lied to get out of trouble? Have -- let me make sure before I say these here, so I don't get them wrong. Have you ever lied to get yourself out of trouble? Have you committed any crimes the police don't know about? And, Have you ever lied about another person? Those questions came up that you're not telling the truth."

- MT [00:16:25, p. 19]: "Well, those are -- you asked me the questions that you failed, and those are the questions. And so at least -- at least two of them I know that you're saying, 'Yes, I did lie to you about them,' because you say there was a misunderstanding."

- MT [00:17:45, p. 20]: "...so I'm just talking to you, trying to figure out why you failed the polygraph test here today."

- MT [00:17:50, p. 20]: "Well, I know. See, that's the difference, Kristin. I know. I know why you failed: Because you weren't honest with me."

- CD [00:20:45, p. 23]: "And, I looked at them -- the results, just to make sure. And I'm not a polygrapher; I'm not an expert in that

<table>
<tr>
<td></td>
<td></td>
<td>

field. But I looked at what -- you can see where you had problems and when you didn't have problems."

- DR [00:42:00, p. 44-45]: "There's four people who failed. There's four people who have failed very similar questions to the questions you were asked. Do you want to take a guess as to who those people would be?"
  KS: "No, I have no idea. Nick?"
  DR: "You're right."
  KS: "Ricky?"
  DR: "You're right."
  KS: "I don't know who else."
  DR: "It's another name you've said -- I -- you've said since you've been in here tonight."
  KS: "Brent?"
  DR: "Mm-hmm. And you."

- CD [00:44:00, p. 47]: "That's where you're not -- you're getting wrapped up into the -- remember the knowledge part. Knowing what you know, from what you've said, and now not being able to prove it with a polygraph."

- CD [00:47:20, p. 51]: "And that's why I wanted to give you the benefit today to prove these people and myself wrong, and you didn't."

- CD [01:11:20, p. 78]: "And those are vital information that I think is tripping you on this, right here [points to laptop with polygraph results]."

- CD [01:30:35, p. 96]: "...you're tripping the heck out of this polygraph machine, and with a confident failure. Not with a, Hey, maybe-maybe. No, it's confident you failed that test."

</td>
</tr>
<tr>
<td>Emphasizing Evidence</td>
<td>4</td>
<td>

- MT [00:01:10, p. 3-4]: "Kristin, when I walked around in front of you and I said, 'Your number is five,' was there any hesitation in my voice? Was there any, like, 'I think it's five?'"
  KS: "No."
  MT: "- it could maybe - I do that every single time. I get it right every single time. I – and that's how well I know the polygraph works. I would not do that. Because if I walked around to you and said, 'Your number's seven,' you would look at me and go, 'No, my number was five, this thing doesn't work.' I mean, if I was in the chair I would get up and walk out. And so I only do that because I

</td>
</tr>
</table>

56

|  |  | know I'm going to get it right every single time. Okay? And so, even something as simple as that little number, I can tell." |
|  |  | • MT [00:02:25, p. 4-5]: "Well, you know, I had good chart readings all the way across there. I mean, you could see. I mean, I got your number right just like that. I mean, there's only one was to do that and it's because the chart readings are coming across." |
|  |  | • CD [00:20:25, p. 23]: "So, we didn't bring you somebody who's brand-new to this and say, 'Hey see what - enhance your skills with Kris.' No. We brought you in with someone we were confident with to do this test." |
|  |  | • DR [00:42:40, p. 46]: "Is there something that you think? Is there - I mean, you can't fail the polygraph unless there's something that you - it's within you. You have to have a reason. There has to be something in it that's eating at you that's -"<br>KS: "No, nothing is -"<br>DR: "I mean - I'm sorry. Eating is a bad word.<br>CD: "That's it"<br>DR: Be comfortable. You can't fail a polygraph if he asks you the question -"<br>KS: "Nothing is eating at me.<br>DR: "- and you're not being -"<br>KS: "I'm sitting here, trying – I've been -"<br>DR: "- you're not being deceptive. That's what I'm saying. You can't fail it if you - if you don't have knowledge. See what I'm saying?" |
| Challenging Contradictions | 10 | • MT [00:07:55, p. 10]: "That doesn't make sense, Kristen."<br><br>• MT [00:13:30, p. 16]: "I mean, I've had friends for a long time that they have done stupid things at some point in their life, but it doesn't scare me for the next ten years. I don't sit there and dwell -- you know, think that, that that's going to scare me for the next ten years. I mean, I've had friends do really, really dumb things, and -- and I don't sit there, ten years later, thinking, man, I'm still scared of that person. You know?"<br><br>• CD [00:32:40, p. 35]: "Why would Ricky Crook threaten you with physical harm, if you don't know anything?"<br><br>• CD [00:39:45, p. 42]: "Did you question him on that?"<br>KS: "No."<br>CD: "That's a huge detail." |

| | | |
|---|---|---|
| | | • DR [00:51:30, p. 57]: "I got a question: Why didn't you go look for her in his car? A car that she would recognize?"<br>KS: "I don't know."<br>DR: "Why did you go look for her in a car that she doesn't know belongs to anybody?"<br><br>• CD [00:54:05, p. 61]: "So -- but you told Dan Lee that?"<br>KS: "Yeah."<br>CD: "Why did you tell him if you knew it wasn't Leah?"<br><br>• CD [00:54:20, p. 61]: "But if you told him that wasn't Leah, because you know Leah, why would he go check into it?"<br><br>• CD [01:09:55, p. 77]: "Five-second statement, five minutes in a car. The other four minutes and 55 seconds you don't remember."<br><br>• CD [01:11:15, p. 78]: "Okay. I'm -- listen to me. You go back, and you can't remember what you did in town, why you drove around. You end up going back to your house. And those are vital information that I think is tripping you on this, right here."<br><br>• CD [01:33:40, p. 99]: "It's almost like the -- the hidden car, here. I mean, I'm going to go look for a person. It's like me driving my personal vehicle instead of a cop car where people can recognize me for help." |
| Transition Statement | 1 | • DR [00:05:55, p. 8]: "When somebody fails the polygraph test with me, Kristen, I always give them a chance to explain." |
| Evidence Bait | 1 | • CD [01:15:30, p. 84]: "You think - you think that we would - you think in the course of this investigation - we would turn over a rock, and and somebody would be able to tell us that, or has told us that?" |
| **Total** | **48** | |

58

| Table 4C: Social and Psychological Manipulation Tactics | | |
|---|---|---|
| **Interrogation Tactic** | **Count** | **Notes** |
| Increase Guilt | 12 | <ul><li>CD [00:26:45, p. 29]: "I want to make sure that we - after ten years we'll finally get this off you, out of your body, where it's not hurting no more, because I'm telling you I know you're hurting. You can't hold this for ten years and not hurt. I mean, you're trying to remove yourself from this, but you can't consciously until - I'm your pain reliever, if you want to call it such, in that aspect."</li><li>CD [00:28:25, p. 30]: "I'm here to give you credit and clear your conscience, and put this right."</li><li>CD [00:30:15, p. 32]: "Come on, Kris. Get it off your chest."</li><li>CD [00:32:10, p. 34]: "Kris, get it off your chest."</li><li>CD [00:34:25, p. 36]: "You're not living with yourself now. You're hurting -"</li><li>DR [00:49:00, p. 54]: "This is about making you feel better. This is getting this off your chest after ten years."</li><li>DR [01:19:45, p. 86]: "...there's a deep burning seed in there, that's been hanging on you for ten years, that's - I mean, until I crack that seed and make it grow and get it out of your system and your con - I - it's going to hurt."</li><li>KS [01:20:40, p. 87]: "I know, but this has been going on for years and years and years -"<br>CD: "Right."<br>KS: "- and I'm just so -"<br>CD: "Internally, it has been. Internally it has been."</li><li>CD [01:24:20, p. 90]: "There's -- there's that conscience seed that's sitting in there eating you."</li><li>DR [01:24:45, p. 90]: "Kris, wouldn't it be nice to walk out of here today, after ten years, and put this behind you instead of carrying the weight of this burden?"</li></ul> |

| | | |
|---|---|---|
| | | • CD [01:25:00, p. 91]: "Kris, for ten years you've carried this burden. Whether you want to accept that in front of me or not, you've carried that burden. That mental anguish, that hurt -"<br><br>• CD [01:27:20, p. 93]: "Kris, I wanted you to leave here today feeling better, not worse. That was the goal of this whole session, in all aspects. And that didn't happen today, and it hasn't happened yet. And I don't -- I don't think it's going to get any better." |
| **Total** | **12** | |

| Table 4D: Consequence Based Tactics | | |
|---|---|---|
| **Interrogation Tactic** | **Count** | **Notes** |
| Information Derogation | 9 | <ul><li>MT [00:06:40, p. 9]: "You're saying, 'No, I told you the truth.' KS: "Well, it is -" MT: "And I know - and I know that you didn't."</li><li>MT [00:14:30, p. 17]: "You're saying that you're telling the truth, and I'm saying that you're not telling the truth, Kristin."</li><li>MT [00:18:25, p. 21]: "I'm saying that you are not telling me the truth there today about everything that you know."</li><li>KS [00:32:45, p. 35]: "I don't know." CD: "No, you do know."</li><li>KS [00:34:35, p. 37]: "- and I don't, and you guys think I'm lying." CD: "We do."</li><li>CD [00:35:35, p. 38]: "We gave you an opportunity to show credibility this morning -" KS: "Yeah." CD: "- and prove yourself. That didn't happen, Kris."</li><li>KS [00:44:20, p. 48]: "But I've told you everything I -" CD: "No, there's something specifically in your head -"</li><li>DR [00:48:25, p. 53]: "...your mouth is saying one thing, but everything else is saying something else."</li><li>DR [00:48:40, p. 53]: "Maybe there's just something there. Just a little piece of information that - maybe you're not lying. Maybe you're lying by omission. You're not saying everything, which is considered a lie."</li></ul> |
| Emphasizing Seriousness | 13 | <ul><li>MT [00:09:50, p. 12]: "I have to write a report. I have to tell them the -- the results. I can not lie about the results. The lie -- the results are the results, okay? And so, at some point people are going to start talking and telling everything that they know, to save their own bacon."</li></ul> |

- MT [00:18:00, p. 21]: "You know, I know why you failed the polygraph test. And other people are going to know, because I'm going to send my report, and I've proven to those people who are going to make decisions about your future."

- CD [00:25:25, p. 28]: "Remember I told you knowledge is power, last week? Knowledge is also criminal when it's not explored and shared with us right now."

- CD [00:31:50, p. 34]: "You understand grand - grand jury is like, now it's next week. We're rocking forward here. The finale is coming, and you're on that list. Do you understand that? And not on the list of the, 'Hey, I'm going to help this case,' but on the list of 'You're in trouble.'"

- CD [00:34:00, p. 36]: "Kris, you're not helping yourself today."

- KS [00:47:30, p. 51]: "So what? Am I going to go to jail now because I failed a polygraph?"
  CD: "That will be up to a grand jury, Kris."

- CD [00:49:30, p. 54]: "Kris, once the grand jury starts, and once that goes through the process and they make a decision who gets arrested -"

- CD [01:15:50, p. 84]: "And that's a question the grand jury's going to want to know too."

- PF [01:23:20, p. 89]: "And I'm going to take -- I'm going to take this to the grand jury, and I'm going to let everybody testify. I'm going to bring in those two people; let them testify in front of the grand jury. I'll bring you in front of the grand jury."

- CD [01:25:45, p. 91]: "It's coming. It's no avoidance no more. This ain't ten years ago. It's coming. The train's coming down the tracks."

- CD [01:31:50, p. 98]: "Because here's the deal, Kris. Once you walk out of here, we won't knock on your door anymore. Well, probably a subpoena for grand jury, you will get that. That's a given. And the next time we will walk on your -- knock on your door, it will be the result of the grand jury. Do you understand that?"

62

| | | |
|---|---|---|
| | | • CD [01:37:15, p. 102]: "This is it. I'm going to walk you to the front door, and you're going to walk away, and I'll see you at grand jury." <br><br> • CD [01:38:00, p. 103]: "Knowledge is power, in most cases. It's also criminal in others. Understand my thoughts on that, okay?" |
| Staring Down | 4 | |
| **Total** | **26** | |

| Table 4E: Minimization Tactics | | |
|---|---|---|
| **Interrogation Tactic** | **Count** | **Notes** |
| Self-Interest | 5 | • CD [00:31:45, p. 34]: "Kris, Kris, Kris. Here's the deal: There's not going to be another opportunity besides today. I'm telling you right now."<br><br>• CD [00:35:05, p. 37]: "Kris, do you understand this is an opportunity for you?"<br><br>• CD [00:50:00, p. 55]: "This is an opportunity that I want you to take advantage of."<br><br>• PF [01:23:40, p. 90]: "So this is why we're giving you this chance. It's important that you tell us everything that you know."<br><br>• DR [01:24:25, p. 90]: "This is an opportunity." |
| Downplaying Seriousness | 2 | • DR [00:10:40, p. 13]: "...especially when they're, when they're at that point in their life. And then they get worried: 'Man, I didn't say back then, I'm worried I might get in trouble today because I didn't do the right thing way back when.' People make mistakes, Kristin."<br><br>• CD [00:23:45, p. 26]: "Now, listen to me. You don't want to get in trouble, and I don't want to see you in trouble. Remember I said that last week?" |
| Degrading Others | 1 | • DR [00:51:00, p. 56]: "Do you feel like he used you?" |
| Promise | 9 | • CD [00:24:45, p. 27]: "...but the possibility is an immunity letter. Okay? It is time that we make some decisions here on that."<br><br>• CD [00:25:35, p. 28]: "You have my word on immunity."<br><br>• CD [00:27:10, p. 29]: "...Mr. Fraser is willing to work with an immunity letter for you on your information, which means you will not get in trouble as long as you weren't directly involved with her death."<br><br>• CD [00:28:30, p. 31]: "I mean, I don't know what other offer you're going to have that's going to make it any better than what you're getting today, okay?" |

64

| | | |
|---|---|---|
| | | • CD [00:49:15, p. 54]: "And I've offered - just like car insurance. I've offered you that insurance, that immunity, to give me the talk, and I'll give you that insurance, and you won't be in trouble."<br><br>• CD [01:09:15, p. 76-77]: "And that's why I'm offering you, again, that immunity, to tell me what he said in detail. Or tell me in general what you remember from those conversations. That's where I'm -- I want to provide you that insurance."<br><br>• CD [01:11:35, p. 79]: "Would it help if Mr. Frasier came in here and offered up an immunity directly from his mouth instead of mine?"<br>• KS: "I've told you everything -"<br>CD: "Kris, listen to me."<br>KS: "There isn't anything -"<br>CD: "Think about what I'm saying before you answer."<br>KS: "- that I'm not telling you."<br>CD: "Would it make a difference if Mr. Frasier, who is the prosecutor in this case, the one that sets charges against people, the one that's going to present this at grand jury. Not one of his folks, his people. Him. Him and I have spent many, many hours on this case. He's the one that makes those final decisions. Him and I have talked, but I'm a third party to you now, with him, okay? Consider it a rumor with me, then. Because I'm not directly telling you that, he needs to directly tell you that. Will that make a difference?"<br><br>• CD [01:12:30, p. 80]: "...if I give you my word, detective Riddle's word, what you tell us today, two, you still go home." |
| **Total** | **17** | |

65

Exhibit 28, Page 65 of 69

| Table 5: Miscellaneous Tactics | |
|---|---|
| **Factor** | **Description** |
| N/A | - |

| Table 6: Suspect's Demeanor |
|---|
| _Anxious/Agitated (68.76% of questioning, only accounting for the period of time before the video cuts out)_<br><br>For the majority of the interrogation KS appeared highly anxious and agitated. Her volume and rate of speech were high, her voice waivered, and on numerous occasions appeared on the verge of tears. |
| _Calm/Neutral (31.24% of questioning, only accounting for the period of time before the video cuts out)_<br><br>For approximately the final third of the interrogation KS was relatively calm and collected. She sat upright, answered questions directly, and was engaged in the conversation. |

| Table 7: Suspect's Behaviors | | |
|---|---|---|
| Coding Label | Frequency | Notes |
| Denial | 67 | |
| Objection | 9 | |

68

| Table 8: Confession and Contamination Analysis |
|---|
| Beyond psychological risk factors for false confession, the reliability of a confession may be assessed using several criteria.  The first criterion is the degree of fit between the confession and known evidence, and the internal logical consistency of the confession.  When confessions are logically consistent and consistent with the known evidence, a second consideration is whether the suspect produced these details independently or if they were first revealed to the suspect by the investigator or from some other source.  Finally, confessions may be substantiated by whether or not they revealed new evidence that was not already known to law enforcement. |
| _Details Originating with the Investigator_<br>• She was threatened to stay silent [00:04:30] |
| _Unique Details Offered by the Suspect_<br>• Nick and Leah were fighting that night [00:29:55]<br><br>• Nick was walking in circles very upset [00:58::45]<br><br>• She was told to say she wasn't with Nick that night [01:05:30]<br><br>• Nick's demeanor made her believe he might have killed Leah [01:26:20] |