Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

NICHOLAS JAMES MCGUFFIN, as )
an individual and as guardian )
ad litem, on behalf of S.M., a )
minor, )
 )
        Plaintiffs, )
 )
  v. ) No. 6:20-cv-01163-MK
 )
MARK DANNELS, PAT DOWNING, )
SUSAN HORMANN, MARY KRINGS, )
KRIS KARCHER, SHELLY MCINNES, )
RAYMOND MCNEELY, KIP OSWALD, )
MICHAEL REAVES, JOHN RIDDLE, )
SEAN SANBORN, ERIC )
SCHWENNINGER, RICHARD WALTER, )
CHRIS WEBLEY, ANTHONY WETMORE, )
KATHY WILCOX, CRAIG ZANNI, )
DAVID ZAVALA, JOEL D. SHAPIRO )
AS ADMINISTRATOR OF THE ESTATE )
OF DAVID E. HALL, VIDOCQ )
SOCIETY, CITY OF COQUILLE, )
CITY OF COOS BAY, and COOS )
COUNTY, )
 )
        Defendants )
 )

REMOTE DEPOSITION OF MARK DANNELS

VOLUME I

(Pages 1 through 150)

Taken on behalf of the Plaintiffs

July 14, 2022

## Page 2

```
 1      BE IT REMEMBERED THAT, pursuant to the
 2   Oregon Rules of Civil Procedure, the deposition of
 3   MARK DANNELS was taken by Aaron M. Thomas, Certified
 4   Shorthand Reporter and Registered Professional
 5   Reporter for Oregon, on July 14, 2022, commencing at
 6   the hour of 9:02 a.m., via Zoom.
 7
 8            APPEARANCES:
 9
10   MALONEY LAUERSDORF REINER PC
     Counsel for Plaintiffs
11   1111 East Burnside Street, Suite 300
     Portland, OR 97214
12   acl@mlrlegalteam.com
     jpuracal@forensicjusticeproject.org
13      By MR. ANDREW C. LAUERSDORF
           MS. JANIS C. PURACAL
14
15   LAW OFFICE OF ROBERT E. FRANZ, JR.
     Counsel for Defendants: City of Coquille, City of
16   Coos Bay, Coos County, Craig Zanni, Chris Webley,
     Eric Schwenninger, Sean Sanborn, Ray McNeely,
17   Kris Karcher, Pat Downing, Mark Dannels, Kip Oswald,
     Michael Reaves, David Zavala, Anthony Wetmore,
18   Shelly McInnes
     PO Box 62
19   Springfield, Oregon 97477
     rfranz@franzlaw.comcastbiz.net
20   BY: MS. SARAH HENDERSON
21   OREGON DEPARTMENT OF JUSTICE
     Counsel for Defendants: Oregon State Police, John
22   Riddle, Susan Hormann, Mary Krings, Kathy Wilcox
     100 SW Market Street
23   Portland, OR 97201
     jesse.b.davis@doj.state.or.us
24   BY: MR. JESSE B. DAVIS
25   /////
```

## Page 3

```
 1              --oOo--
 2   WOOD SMITH HENNING & BERMAN LLP
     Counsel for Defendants: Vidocq Society and Richard
 3   Walter
     12755 Southwest 69th Avenue
 4   Suite 100
     Portland, Oregon 97223
 5   kschaffer@wshblaw.com
     BY: KARIN L. SCHAFFER
 6
 7   ALSO PRESENT:  Mr. Nicholas J. McGuffin
```

## Page 4

```
 1             EXAMINATION INDEX
 2                                               Page
 3   EXAMINATION BY MR. LAUERSDORF                  5
 4              * * *
 5             EXHIBIT INDEX
 6   No.     Item                              Page
 7   1    Coquille Police Department            132
 8        Leah Freeman - Organization
 9        Chart CPO Q20001905
```

## Page 5

```
 1            MARK DANNELS
 2   having first been sworn by the Certified Shorthand Reporter,
 3   testified under oath as follows:
 4
 5   EXAMINATION BY MR. LAUERSDORF:
 6       Q.  Okay.  Mr. Dannels, my name is Andy
 7   Lauersdorf.  You and I have never met before.
 8       Is that correct?
 9       A.  That is correct.
10       Q.  You understand that I'm an attorney
11   representing the plaintiffs in this matter, which is
12   a lawsuit filed by Mr. McGuffin against a number of
13   defendants including yourself, correct?
14       A.  Yes.
15       Q.  For the record, we have -- well, I'll have
16   the other attorneys introduce themselves at this
17   point if they'd like to go ahead.
18           MS. HENDERSON:  Yes, Sarah Henderson.  I'm
19   here on behalf of the witness as well as the
20   remaining municipal -- individual municipal
21   defendants.
22           MS. SCHAFFER:  Good morning, Karin
23   Schaffer on behalf of Richard Walter and Vidocq
24   Society.
25           MR. DAVIS:  Jesse Davis on behalf of the
```

Page 74

1  office, so even though I was up in Oregon as chief,
2  I came back every three months and worked in Arizona
3  for law enforcement here.
4      Q.  And how long did those work assignments
5  last when you went back every three months, how long
6  did you have to be in Arizona to fulfill your
7  certification obligations?
8      A.  Forty eight hours.
9      Q.  So every few months you'd go back and
10 work, what, two days?
11     A.  Two or three days.  I'd work long hours to
12 get them in.
13     Q.  Okay.  And the city manager was okay with
14 that arrangement?
15     A.  He was, yes.
16     Q.  And what did you tell them about when you
17 planned to return to Arizona to run for sheriff?
18     A.  I don't remember our exact conversation,
19 but I think my goal was three years, around three
20 years, and that was a tough decision.  I enjoyed my
21 time up there, I enjoyed the people, I enjoyed the
22 community.  They were good to me along with the city
23 council and the mayor.  It was a nice job.
24     Q.  Okay. So as chief, were you responsible
25 for creating policies and procedures for Coquille

Page 75

1  P.D.?
2      A.  Yes.
3      Q.  And were you responsible for changing,
4  updating, or revising the policies or procedures to
5  be followed by Coquille officers and staff?
6      A.  Yes.
7      Q.  Did you institute any new policies and
8  procedures when you started as chief of police in
9  Coquille?
10     A.  One thing I did as a chief, I reset the
11 culture, which is a community culture to work within
12 the community of those we serve.  One of the big
13 things that -- we used a thing called Lexipol up
14 there which is a very good system for monthly
15 training, Lexipol policies and procedures I think
16 was attached to that.
17         One of the things I changed was that we
18 did not have was performance evaluations for our
19 employees and how we appraise our employees, so I
20 initiated that system up there, so we had annual
21 evaluations that were done throughout the year with
22 an annual cap at the end.
23     Q.  How -- go ahead.
24     A.  Each job description, I say I'd like an
25 expectation for what's an officer's job, what's a

Page 76

1  secretary's job, all the way through.
2      Q.  Okay.  And were those written up into some
3  kind of written policy or procedure?
4      A.  Yes, and given to the city manager for
5  approval.
6      Q.  And where were those stored?  How were
7  they stored?
8      A.  They would have been stored at the
9  Coquille Police Department's records office there
10 with Kim Holderfield, our secretary.
11     Q.  And how were they distributed to
12 employees?
13     A.  During our meetings, I went over it with
14 them.
15     Q.  During the performance evaluation?
16     A.  Well, during -- we had meetings.  We met
17 and we talked -- when I first took over, I did a lot
18 of meetings with them, setting my expectations and
19 standards, accountability, what I expected from them
20 in how we treat the public.
21         One thing that was very obvious was there
22 was not a very good relationship between the City of
23 Coquille Police Department and the citizens and I
24 wanted to mend that.
25     Q.  What was the problem with the relationship

Page 77

1  from your perception?
2      A.  The buy-in, the belief, the trust, the
3  respect between law enforcement and the community.
4  The Freeman case was part of that, I believe, that
5  kind of carried over with a fractured foundation.
6  It was felt that it was not done right, that the
7  police department was not engaged with the
8  community.  As a result, we worked very hard.  We
9  worked in our schools, I coached up there, we set up
10 a community haunted house, we started the program
11 Shop with a Cop, which the first year, we raised
12 over $22,000 and five school buses took kids to
13 Wal-Mart to help our kids during Christmas, kids in
14 need.  Anything in the community that we could get
15 involved with, we were all over it, so just change
16 in how we were perceived and getting my officers to
17 believe what we do and why we do it in law
18 enforcement, but also truly how we treat our people.
19         We had one officer that -- we had two
20 officers that are now felons as a result of -- they
21 failed to fall into the culture.
22     Q.  Who were those officers?
23     A.  Jimmy Bryant was one of them.  He was one
24 that had a -- had a bad reputation in our community,
25 and I hate to be aware of that, but when the local

20 (Pages 74 to 77)

Page 78

1  news editor talked to me about it, people in the
2  community took the members of my own office, or
3  department, department, brought that board, and
4  everybody had a chance to change behavior and he
5  chose not to and got himself in trouble.
6       The other one was Randy -- I can't
7  remember Randy's last name.
8       Q.  Ulmer?
9       A.  Ulmer, there it is.  Yes, thank you.
10      Q.  And his issue was stealing property from
11 the evidence room.
12      Is that right?
13      A.  That is correct.  I can give you some
14 history on that if you want.
15      Q.  Sure.
16      A.  When I first took over, one of the things
17 that I asked for was an audit within our evidence
18 room as a new change as a new leader coming in.  It
19 went on and it kept being ignored, so I started
20 pushing buttons.  I already talked to Chief Bob Webb
21 out of the Bandon Police Department to help us with
22 the audit, and the week before we discovered what
23 happened, I had mentioned to Pat Smith, I said
24 "Listen, we have to get that room done.  This is
25 borrowed time," something to that effect.

Page 79

1       About a week later, I get a call, I was in
2  my office and Pat Smith walked up and said "Hey,
3  we're missing money.  These people are here to pick
4  up their money and it's gone," and the other
5  evidence guy was Randy Ulmer.  Long story short is I
6  had Pat Smith call Randy and Randy admitted it.  He
7  was up in Eugene with his dad saying that he had
8  stole the money.  It was over $10,000, so I told Pat
9  to have him come to my office and I called Paul
10 Frasier, I don't remember what agency crime team or
11 how we did it, but I initiated an investigation on
12 him.
13      Q.  Do you recall Oregon State Police Officer
14 Riddle being involved in that investigation?
15      A.  Possibly.  I saw him a lot during crime
16 scene stuff, so I'm sure he was.
17      Q.  And then you said Officer Webb from Bandon
18 P.D.?
19      A.  Officer Webb from Bandon P.D., the chief
20 was going to -- he had people or he was going to do
21 the audit for me of the evidence room.
22      Q.  Do you recall anyone else involved in the
23 audit?
24      A.  I don't at this time.
25      Q.  They found a number of problems, didn't

Page 80

1  they, in the audit in addition to Mr. Ulmer's theft?
2       A.  I don't recall, Andrew, what the findings
3  were.  It was -- once again, you're trying to build
4  trust and then you have something like this happen
5  and it didn't help us, but we did the right thing, I
6  can tell you that much.
7       Q.  Do you know who Larry Maurer is?
8       A.  I don't recognize that name.
9       Q.  It looks like there was a woman involved
10 as well.
11      So that was one of the things I was
12 noticing, when I went through the history of police
13 reports that started being generated once you became
14 chief, the first thing that came up was the audit.
15      A.  Yeah.
16      Q.  And Randy Ulmer's theft, and in reviewing
17 those reports -- actually, I can pull them up if you
18 want, but it seemed like Pat Smith was pretty
19 heavily criticized in addition to Officer Ulmer, and
20 of course Officer Ulmer ended up being terminated
21 and prosecuted.
22      What's your recollection of what the audit
23 revealed?
24      A.  I don't recall specific to that, and I'll
25 just say this to you, and maybe it will be a better

Page 81

1  understanding, my time in Coquille went very, very
2  fast, between the homicides we addressed, not just
3  the Freeman case, but the many homicides and the two
4  officers that I dealt with while I was up there and
5  just building those community programs within the
6  community, heck, I was covering midnight shifts,
7  working days, I was all over the place, so I don't
8  recall the specifics of that audit.  There's
9  probably a good reason I don't, but my intent, my
10 goal from the day I walked in there was to change --
11 and that's why I asked for the audit.  It made sense
12 why Randy and Pat -- Pat didn't know about it, I'm
13 saying that, but they didn't want to push that audit
14 through.
15      Q.  So was there a written policy or procedure
16 in place at the time that you took over for how
17 evidence was to be handled and stored and checked in
18 and out and all those things?
19      A.  Coquille had a policy procedure, they did,
20 and --
21      Q.  Where was that stored --
22      A.  It was stored -- there was a copy in the
23 patrol area for the officers and there was a copy up
24 in our front office, and I might have one in my
25 office, I'm sure, too.

Page 118

1  A. Andrew, it doesn't.
2  Q. So I'll specifically go through the
3  exhibits and we can talk about that tomorrow.
4     That was the case that Pat Smith was
5  pretty heavily criticized and I thought I had it in
6  front of me. I'll get it for you and have it
7  produced tomorrow.
8  A. Okay. Thank you.
9  Q. During your time as chief of Coquille
10 P.D., did the City of Coquille or the Coquille
11 Police Department provide any in-house training more
12 commonly referred to as Brady obligations.
13    Do you understand what I'm refer to when I
14 use the term Brady obligations?
15 A. Yes. I don't think we did. I don't
16 recall that one. I don't think so.
17 Q. Do you recall if the Coquille P.D. or the
18 City of Coquille has any written policies or
19 procedures with regard to the department or
20 individual officers bringing allegations?
21 A. I don't recall having that. That's not
22 something I see standard in the policy. I don't
23 recall that.
24 Q. What's your understanding of your Brady
25 obligation as a law enforcement officer?

Page 119

1  A. Brady is when a person lies during an
2  investigation or aggravated mistakes during an
3  investigation, they call it the fracture of a
4  prosecution, through the district attorney or county
5  attorney to address that officer under a Brady.
6  Q. Okay. Well, what's your understanding of
7  your obligation as a law enforcement officer to
8  disclose all exculpatory and inculpatory evidence
9  that's gathered during your investigation to the
10 other side, the defense?
11 A. My job as a law enforcement officer is to
12 gather the facts and share those facts, whether
13 through written form, physical form, however, to our
14 prosecution, the county attorney, or -- and then
15 what they share with the defense goes into something
16 beyond the scope of a law enforcement officer, if
17 I'm reading you right, Andrew. My job is the
18 factual documentation and to give that to the
19 prosecutor.
20 Q. Okay. And so what's your understanding of
21 your obligation in that regard? Do you have to
22 give -- what do you have to give the prosecutor?
23 A. I give the prosecutor everything. I mean,
24 listen, what I might think is important or not
25 important is not up to me to decide. That's up to

Page 120

1  the prosecutor. We're two different balances of the
2  criminal justice system and what he wants to take
3  forward within the authority of a prosecutor versus
4  what I think is important, I turn that over, okay?
5     A deputy -- the deputy -- we give them
6  everything. I mean, that's our job. We give them
7  information. That why we write reports. We
8  document it and give it to them.
9  Q. What's your understanding of when that
10 obligation to give over everything is triggered?
11 Does the prosecutor have to ask for things before
12 you have to give them to him or do you have an
13 affirmative obligation to provide everything that
14 you have to the prosecutor?
15 A. You have an obligation to provide. I
16 mean, we'll take a crime, that doesn't mean the
17 prosecutor knows about it, so we have an obligation
18 to holistically put together and give it to him in
19 that fashion. If he chooses or she chooses to ask
20 for more, which happens a lot, then we go from
21 there, but that is our obligation in law
22 enforcement.
23 Q. Okay. Does it matter whether the evidence
24 you're providing is potentially exculpatory or
25 inculpatory?

Page 121

1  A. To me, we give them everything, Andrew.
2  We give it all to them. That's for them to decide,
3  the legality side. I'm the cop, I'm not the
4  attorney in this. We give it all to them.
5  Q. Did the Coquille Police Department have
6  any written policy or procedure on that process?
7  A. I don't recall the specifics, but I'm not
8  saying they don't. I just don't recall.
9  Q. During your time as chief there, was there
10 any in-house training provided by the City of
11 Coquille or Coquille P.D. on that process?
12 A. I don't recall if we had discussions or --
13 I don't remember the training, but this goes back to
14 doing the right thing for the right reasons, and I
15 don't ever recall Paul Frasier ever coming to me and
16 saying "Your people aren't submitting reports, your
17 people aren't submitting the proper investigations."
18 Never was I ever confronted on that by Paul or the
19 prosecutors.
20 Q. Okay. Lets use the Freeman investigation
21 as an example, all right?
22 A. (Witness nods head.)
23 Q. If Mr. Frasier didn't know that there was
24 a report out there or information out there or
25 potentially exculpatory evidence out there, he

```
                                                           Page 150
 1    STATE OF OREGON     )
 2    County of Multnomah )
 3
 4           I, Aaron M. Thomas, Certified Shorthand
 5    Reporter, Registered Professional Reporter, and
 6    Notary Public for the State of Oregon, do hereby
 7    certify that MARK DANNELS personally appeared before
 8    me at the time and place mentioned in the caption
 9    herein; that the witness was by me first duly sworn
10    on oath and examined upon oral interrogatories
11    propounded by counsel; that said examination,
12    together with the testimony of said witness, was
13    taken down by me in stenotype and transcribed
14    through computer-aided transcription; and that the
15    foregoing transcript constitutes a full, true and
16    accurate record of said examination of and testimony
17    given by said witness, and of all other oral
18    proceedings had during the taking of said
19    deposition, and of the whole thereof.
20           Witness my hand and Notarial Seal at
21    Portland, Oregon, this 23rd day of July, 2022.
22
23
24           _____
             Aaron M. Thomas
25           Oregon CSR 04-0388
```

                                                    39 (Page 150)

Page 151

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

```
NICHOLAS JAMES MCGUFFIN, as        )
an individual and as guardian      )
ad litem, on behalf of S.M., a     )
minor,                             )
                                   )
            Plaintiffs,            )
                                   )
  v.                               ) No. 6:20-cv-01163-MK
                                   )
MARK DANNELS, PAT DOWNING,         )
SUSAN HORMANN, MARY KRINGS,        )
KRIS KARCHER, SHELLY MCINNES,      )
RAYMOND MCNEELY, KIP OSWALD,       )
MICHAEL REAVES, JOHN RIDDLE,       )
SEAN SANBORN, ERIC                 )
SCHWENNINGER, RICHARD WALTER,      )
CHRIS WEBLEY, ANTHONY WETMORE,     )
KATHY WILCOX, CRAIG ZANNI,         )
DAVID ZAVALA, JOEL D. SHAPIRO      )
AS ADMINISTRATOR OF THE ESTATE     )
OF DAVID E. HALL, VIDOCQ           )
SOCIETY, CITY OF COQUILLE,         )
CITY OF COOS BAY, and COOS         )
COUNTY,                            )
                                   )
            Defendants             )
                                   )
```

REMOTE DEPOSITION OF MARK DANNELS

VOLUME II

(Pages 151 through 382)

Taken on behalf of the Plaintiffs

July 15, 2022

**Page 152**

1  BE IT REMEMBERED THAT, pursuant to the
2  Oregon Rules of Civil Procedure, the deposition of
3  MARK DANNELS was taken by Aaron M. Thomas, Certified
4  Shorthand Reporter and Registered Professional
5  Reporter for Oregon, on July 15, 2022, commencing at
6  the hour of 1:04 p.m., via Zoom.
7
8  APPEARANCES:
9
10  MALONEY LAUERSDORF REINER PC
    Counsel for Plaintiffs
11  1111 East Burnside Street, Suite 300
    Portland, OR 97214
12  acl@mlrlegalteam.com
    jpuracal@forensicjusticeproject.org
13    By MR. ANDREW C. LAUERSDORF
        MS. JANIS C. PURACAL
14
15  LAW OFFICE OF ROBERT E. FRANZ, JR.
    Counsel for Defendants: City of Coquille, City of
16  Coos Bay, Coos County, Craig Zanni, Chris Webley,
    Eric Schwenninger, Sean Sanborn, Ray McNeely,
17  Kris Karcher, Pat Downing, Mark Dannels, Kip Oswald,
    Michael Reaves, David Zavala, Anthony Wetmore,
18  Shelly McInnes
    PO Box 62
19  Springfield, Oregon 97477
    rfranz@franzlaw.comcastbiz.net
20  BY: MS. SARAH HENDERSON
21  OREGON DEPARTMENT OF JUSTICE
    Counsel for Defendants: Oregon State Police, John
22  Riddle, Susan Hormann, Mary Krings, Kathy Wilcox
    100 SW Market Street
23  Portland, OR 97201
    jesse.b.davis@doj.state.or.us
24  BY: MR. JESSE B. DAVIS
25  /////

**Page 153**

1  --oOo--
2  WOOD SMITH HENNING & BERMAN LLP
   Counsel for Defendants: Vidocq Society and Richard
3  Walter
   12755 Southwest 69th Avenue
4  Suite 100
   Portland, Oregon 97223
5  kschaffer@wshblaw.com
   BY: KARIN L. SCHAFFER
6
7  ALSO PRESENT: Mr. Nicholas J. McGuffin

**Page 154**

1  EXAMINATION INDEX
2                                              Page
3  EXAMINATION BY MR. LAUERSDORF       158
4       ***
5  EXHIBIT INDEX
6  No.    Item                          Page
7  5      City of Coquille Police       314
8         Department Incident Report
9         dated April 20, 2010
10 6      Report of James Pex dated     233
11        August 8, 2000
12 7      Evidence Accountability       234
13        Record, Coquille Police
14        Department
15 8      Coquille Police Department    235
16        Property Request dated
17        3-21-01, Kris Karcher
18 9      Miscellaneous Information,    247
19        H.I.T. Team Meeting Notes
20 10     Vidocq Web Pages, 07-16-2009  308
21 13     Email from Fred Bornhofen to  309
22        Mark Dannels dated July 17,
23        2009
24 14     Letter to Mark Dannels from   312
25        Fred Bornhofen, undated

**Page 155**

1  15     Case Summary                  317
2  16     PowerPoint: Homicidal Death of 323
3         Leah Nicole Freeman
4  17     Synopsis of Vidocq Society    327
5         Cases
6  18     CCSO Zanni Case Credits and   288
7         Discredits, 01-27-2010
8  19     Case Point and Discredits,    289
9         Undated
10 24     Press Conference, Coquille    337
11        Police Department, January 25,
12        2010, Re: Leah Freeman
13        Investigation Coquille Police
14        Department Case Q20001905
15 25     Paul Fraiser "Things To Do"   351
16        Leah Freeman Homicide dated
17        May 12, 2010
18 26     Article from The World,       347
19        "Hunting a Killer"
20 27     Memo to Chief Mark Dannels to 185
21        Sergeant Patrick Smith dated
22        November 21, 2008
23 28     Bandon Police Department      186
24        Incident Report dated November
25        25, 2008

Page 156

| | | | |
|---|---|---|---|
| 1 | 29 | Oregon State Police Incident | 188 |
| 2 | | Report | |
| 3 | 30 | Memorandum, Oregon State | 192 |
| 4 | | Police dated 12-4-08 | |
| 5 | 31 | Memo to Chief Dannels from | 177 |
| 6 | | Sergeant Smith dated September | |
| 7 | | 24, 2008 | |
| 8 | 32 | Letter to Detective Dave Hall | 238 |
| 9 | | from Katherine Wilcox dated | |
| 10 | | September 18, 2000 | |
| 11 | 33 | Oregon State Police Interview | 213 |
| 12 | | of Nick Backman | |
| 13 | 34 | Letter to Officer Hall from | 218 |
| 14 | | Katherine Wilcox dated July 6, | |
| 15 | | 2000 | |
| 16 | 35 | Leah Freeman Homicide | 252 |
| 17 | | Investigation Plan | |
| 18 | 36 | 2010 H.I.T. Team Notes | 260 |
| 19 | 37 | Email from Susan Hormann to | 345 |
| 20 | | Pat Smith dated 3/15/2010 | |
| 21 | 39 | Email from Ray McNeely to Pat | 352 |
| 22 | | Smith and Mark Dannels dated | |
| 23 | | May 17, 2010 | |
| 24 | 40 | Coquille Police Department, | 353 |
| 25 | | Leah Freeman Homicide, | |

Page 157

| | | | |
|---|---|---|---|
| 1 | | CQP-Q20001905 | |
| 2 | 41 | FBI investigation of Cherie | 359 |
| 3 | | Mitchell dated 07/11/2000 | |
| 4 | 42 | Grand Jury Proceedings, | 361 |
| 5 | | Testimony of Cherie Mitchell | |
| 6 | 43 | Oregon State Police - ODOT | 364 |
| 7 | | Investigation dated 7/5/2000 | |

Page 158

1  MARK DANNELS
2  having first been sworn by the Certified Shorthand Reporter,
3  testified under oath as follows:
4
01:04:18  5      MR. LAUERSDORF: Okay. This is Andrew
01:04:20  6  Lauersdorf on behalf of the Plaintiff, Mr. McGuffin
01:04:23  7  et al. We're back on the record with the deposition
01:04:27  8  of Mark Dannels.
01:04:28  9
01:04:28 10  EXAMINATION BY MR. LAUERSDORF:
01:04:29 11      Q. You still understand that I'm the attorney
01:04:31 12  representing the plaintiffs in this matter.
01:04:33 13      Is that correct?
01:04:34 14      A. Yes.
01:04:34 15      Q. And can you please state for the record
01:04:37 16  your name as given at birth.
01:04:39 17      A. Mark Joseph Dannels.
01:04:42 18      MR. LAUERSDORF: And I'll go ahead and
01:04:43 19  have counsel for the other parties introduce
01:04:46 20  themselves at this time.
01:04:47 21      MS. HENDERSON: Yes, Sarah Henderson for
01:04:47 22  the witness, the municipal and individual municipal
01:04:49 23  defendants.
01:04:54 24      MR. DAVIS: Jesse Davis on behalf of the
01:04:56 25  Oregon State Defendants.

Page 159

01:04:58  1      MS. SCHAFFER: And Karin Schaffer on
01:05:00  2  behalf of Vidocq Society and Richard Walter.
01:05:05  3
01:05:05  4  BY MR. LAUERSDORF: (Continuing)
01:05:07  5      Q. Sheriff Dannels, did you speak to anybody
01:05:09  6  other than your attorney about the deposition during
01:05:10  7  the overnight break?
01:05:12  8      A. No.
01:05:13  9      Q. Did you review any documents related to
01:05:15 10  this case over the break?
01:05:16 11      A. This morning, about 20 minutes before we
01:05:19 12  started, I looked over my grand jury.
01:05:22 13      Q. Your grand jury testimony?
01:05:23 14      A. Yes.
01:05:24 15      Q. Okay. Any other documents?
01:05:27 16      A. I reviewed the documents through verbal
01:05:30 17  with my counsel from what you sent on what I believe
01:05:36 18  was Shaw.
01:05:37 19      Q. The documents that I sent overnight last
01:05:40 20  night?
01:05:41 21      A. Yes, sir.
01:05:44 22      Q. Were there any notes on any of the
01:05:46 23  documents that you reviewed over the break?
01:05:48 24      A. No.
01:05:49 25      Q. Okay. I understand you continue to be

3 (Pages 156 to 159)

Page 172

```
01:20:16  1   him to Oregon, yes.
01:20:17  2       Q.  Okay.  Do you remember, did you do any
01:20:18  3   vetting of Mr. Walter?  Did you read any of his
01:20:22  4   prior media interviews, anything like that, anything
01:20:25  5   about cases he'd worked on in the paster?
01:20:28  6       A.  He was part of Vidocq, so I did check into
01:20:34  7   Vidocq when I was contacted, but Richard, I don't
01:20:38  8   know if I ever checked into him.  I might have, but
01:20:42  9   I don't recall.
01:20:43 10       Q.  If you look him up on the Internet and you
01:20:46 11   read newspaper articles in which he's quoted, he
01:20:49 12   frequently used this quote "The investigators are
01:20:52 13   getting close, and if I was the suspect, I wouldn't
01:20:56 14   buy any green bananas."
01:20:59 15           Have you ever heard that phrase or heard
01:21:03 16   Mr. Walter use that phrase before?
01:21:04 17       A.  If he did, it's not in my head.  I don't
01:21:06 18   recall that.
01:21:07 19       Q.  Is that the kind of misinformation that
01:21:10 20   you're talking about when you say that you might put
01:21:13 21   something out there in the public just to influence
01:21:15 22   the investigation or influence suspects at large?
01:21:22 23       A.  I don't know that statement.  That's not
01:21:24 24   something in my vocabulary or thought process.  If I
01:21:28 25   put something out, my thoughts are to get hope, that
```

Page 173

```
01:21:33  1   we put hope back in an investigation, hey, we need
01:21:36  2   to follow this thing where it's going, but that
01:21:39  3   catch phrase there, I don't know how to comment on
01:21:41  4   that.
01:21:42  5       Q.  Okay.  During your time as chief of
01:21:44  6   Coquille Police, did you ever lie to a witness in an
01:21:47  7   effort to obtain information in an investigation?
01:21:54  8       A.  Not that I recall.
01:21:55  9       Q.  Okay.  How about a suspect, do you recall
01:21:58 10   ever lying to a suspect in your effort to obtain
01:22:02 11   information in an investigation during your time at
01:22:04 12   Coquille?
01:22:05 13       A.  Not that I recall.
01:22:07 14       Q.  More specifically, during your work on the
01:22:09 15   Freeman investigation, did you ever lie to a witness
01:22:13 16   in an effort to obtain information?
01:22:15 17       A.  Not that I recall.  I only did a handful
01:22:19 18   of direct interviews, Steinhoff being the main one.
01:22:22 19       Q.  Okay.  How about a suspect, did you ever
01:22:24 20   lie to a suspect in the Freeman investigation to
01:22:27 21   obtain information?
01:22:28 22       A.  Not that I recall.
01:22:31 23       Q.  During your time as chief of Coquille
01:22:34 24   police, did you ever authorize or instruct a
01:22:37 25   Coquille Police Department police officer to lie to
```

Page 174

```
01:22:39  1   a witness in an effort to obtain information in an
01:22:43  2   investigation?
01:22:43  3       A.  No.
01:22:45  4       Q.  Did you ever authorize or instruct a
01:22:47  5   Coquille Police Department officer to lie to a
01:22:49  6   suspect in an effort to obtain information in an
01:22:52  7   investigation?
01:22:52  8       A.  Not that I recall.
01:22:55  9       Q.  During your time as chief of Coquille
01:22:59 10   police, did you ever authorize or instruct a police
01:23:03 11   officer from another agency to lie to a witness to
01:23:06 12   obtain information during the time of an
01:23:08 13   investigation?
01:23:08 14       A.  Not that I recall.  That's not in the
01:23:10 15   scope of how I've practiced in my 38 years, sir.
01:23:13 16       Q.  How about to a suspect?
01:23:18 17       A.  Have I instructed somebody to lie to a
01:23:21 18   suspect?
01:23:22 19       Q.  Yeah, let me go through the whole question
01:23:24 20   again.
01:23:25 21           During your time as chief of Coquille
01:23:30 22   P.D., did you ever authorize an officer from another
01:23:34 23   agency to lie to a suspect in an effort in obtain
01:23:37 24   information in an investigation?
01:23:38 25       A.  No, not that I recall.
```

Page 175

```
01:23:39  1       Q.  And the reason I asked is you have the
01:23:41  2   major crimes team, you have officers from multiple
01:23:45  3   agencies, and along those lines, more specifically,
01:23:48  4   did you authorize or instruct Officer Riddle or
01:23:52  5   Officer Kelley Andrews to tell Kristen Steinhoff
01:23:57  6   that Leah Freeman's blood was found in the Kia
01:24:03  7   automobile that was purchased by Coquille P.D. in
01:24:05  8   2010?
01:24:08  9       A.  I don't recall that.
01:24:08 10       Q.  Did you authorize or instruct Officer
01:24:08 11   Riddle or Officer Kelley Andrews that Leah Freeman's
01:24:08 12   DNA was found in the Kia automobile that was
01:24:17 13   purchased by Coquille P.D. in 2010?
01:24:20 14       A.  I don't recall that.
01:24:21 15       Q.  When did you first become aware that they
01:24:24 16   had said those things to Ms. Steinhoff?
01:24:31 17       A.  I don't --
01:24:32 18           MR. DAVIS:  I'm going to make an objection
01:24:33 19   as assumes facts and -- assumes facts.
01:24:40 20           Go ahead if you can.
01:24:42 21       A.  I don't recall that.  I watched that
01:24:45 22   interview back in April of Ms. Steinhoff and I and I
01:24:50 23   don't recall that.
01:24:54 24       Q.  It was an interview, right, she was
01:24:58 25   interviewed for an hour and 20 minutes by Officer
```

Page 376

```
06:15:13  1   was -- I believe this is your badge number up here
06:15:17  2   in the right-hand corner, 601?
06:15:21  3        A.  It is.
06:15:21  4        Q.  And these are your initials.
06:15:22  5            Is that right?
06:15:24  6        A.  Yes.
06:15:25  7        Q.  And this report, if you go down to the
06:15:27  8   bottom, has you listed as the author dated June 1st,
06:15:31  9   2010, so this again is after Mr. Frasier has issued
06:15:40 10   his to do list, and this is a report of you
06:15:42 11   interviewing Damon John Mason at the Coquille Police
06:15:45 12   Department.
06:15:48 13            Do you remember interviewing Mr. Mason?
06:15:50 14        A.  I don't.
06:15:51 15        Q.  Do you remember who Mr. Mason is?
06:15:55 16        A.  Wasn't he the -- I think I read the
06:15:58 17   report -- he was the ex of a Lisa Machaad.
06:16:03 18            Is that correct?
06:16:04 19        Q.  I don't think so.  I can let you read the
06:16:09 20   report here.  He was someone that was AWOL from the
06:16:13 21   military, he was living in California at the time
06:16:15 22   that Ms. Freeman disappeared.  He was coming back up
06:16:19 23   on weekends to visit family and he came back up on
06:16:22 24   the weekend after June 28 and spent some time with
06:16:25 25   Mr. Bartley and he referred to an incident where
```

Page 377

```
06:16:29  1   they were driving past Fast Mart and Mr. Bartley
06:16:33  2   expressed some apprehension that a police officer
06:16:36  3   was approaching.
06:16:37  4            Does that ring any bells?
06:16:39  5        A.  It doesn't, but I'm reading here.  That
06:16:42  6   helps.
06:16:43  7        Q.  Okay.
06:16:48  8        A.  You can move up a little bit, sir.
06:17:13  9        Q.  Let me know when you're ready.
06:17:18 10        A.  I'm ready.
06:18:20 11        Q.  Are you ready?
06:18:21 12        A.  Yep.
06:18:22 13        Q.  Okay.  It goes on just a little bit
06:18:24 14   further.
06:18:26 15            You say this was a recorded interview,
06:18:30 16   this is a CD recording, and the CD was placed in
06:18:34 17   evidence, so until -- one of the things I wanted to
06:18:37 18   ask you, the reasons I was asking you earlier about
06:18:39 19   what information goes into your report is that I
06:18:44 20   went back and listened to the audio and the CD and
06:18:47 21   one of the things I note is that in the recorded
06:18:50 22   interview, Mr. Mason doesn't say anything about
06:18:59 23   arriving in Coquille on the night that Leah went
06:19:02 24   missing or the day after and he doesn't mention
06:19:07 25   anything about missing his girlfriend's 18th
```

Page 378

```
06:19:11  1   birthday.
06:19:12  2            He says that he was coming up on weekends
06:19:14  3   and he came up on the weekend after the birthday,
06:19:17  4   and then he testified consistently with that in
06:19:21  5   grand jury and he also doesn't say specifically --
06:19:30  6   well, I guess she does say he was driving with
06:19:35  7   Bartley the day after Freeman disappeared, but he
06:19:39  8   doesn't offer that, that's something he responded to
06:19:43  9   a question that you put to him.
06:19:45 10            One of the bigger ones that I was
06:19:47 11   particularly interested in, where it says
06:19:49 12   "Additionally, Mr. Mason advised us that he
06:19:54 13   remembers being told that Bruce McGuffin helped,
06:19:58 14   too.  Mr. Mason advised us that he was 90-percent
06:20:01 15   sure that Bruce McGuffin helped, too."  What he's
06:20:04 16   talking about here, "We asked Mr. Mason what he and
06:20:05 17   Bartley spoke about.  Mr. Mason said that Bartley
06:20:06 18   told him that Nick McGuffin and he drove around last
06:20:09 19   night in Nick's Mustang looking for Leah as she was
06:20:13 20   missing.  Mr. Mason advised us that Bartley told him
06:20:17 21   they searched by the high school, mill pond, and
06:20:20 22   around town," and this is after Mr. Mason says --
06:20:24 23   and he says in his interview that Bartley and
06:20:28 24   McGuffin were involved in Freeman's disappearance,
06:20:32 25   that that's what he learned from Bartley, and then
```

Page 379

```
06:20:35  1   you have this note here, "Mr. Mason advised that he
06:20:40  2   remembers being told that Bruce McGuffin helped,
06:20:40  3   too," and "Mr. Mason advised that he was 90 percent
06:20:41  4   sure that Bruce McGuffin helped, too," and that
06:20:44  5   doesn't appear anywhere in the recorded statement,
06:20:47  6   so I'm wondering why that would have been added to
06:20:50  7   your police report?
06:20:51  8        A.  I don't know if that was recorded during
06:20:53  9   the time when he said that, I don't know.  I don't
06:20:56 10   recall this conversation, I don't know, but I don't
06:21:05 11   know when we started recording it, I don't know.
06:21:07 12   I'd have to listen to the recording.
06:21:12 13        Q.  If you recall in some of the notes that I
06:21:14 14   pointed out from the crime team, there were a number
06:21:17 15   of different statements of how do we link Bruce
06:21:22 16   McGuffin to assisting Nick in Leah's disappearance,
06:21:25 17   and then after those notes and after Ms. Frasier's
06:21:29 18   to do list, you take this interview and this note
06:21:33 19   appears in your police report and I'm just wondering
06:21:36 20   if there was any correlation.
06:21:39 21        A.  Any correlation to?
06:21:44 22        Q.  The notes in the crime team meetings about
06:21:48 23   trying to figure out a way to link Bruce McGuffin
06:21:53 24   and Nick McGuffin in Ms. Freeman's disappearance.
06:21:57 25        A.  Are you asking if I fabricated that?
```

58 (Pages 376 to 379)

Page 380

```
06:21:59  1      Q.  Yeah.
06:22:00  2      A.  The answer is no.
06:22:01  3      Q.  Okay.  So this would have come -- this
06:22:04  4   would have been -- even though it's not reflected in
06:22:06  5   the recording of your interview with Mr. Mason, it's
06:22:09  6   something that you would have said?
06:22:11  7      A.  Yes.  I wouldn't make stuff up.
06:22:13  8      Q.  Okay.  Would there be any handwritten
06:22:15  9   notes of this interview?
06:22:17 10      A.  I don't recall.  I don't recall the
06:22:19 11   report, so it -- obviously I wrote that based on
06:22:23 12   something, whether it be my field notes, whether it
06:22:28 13   be -- I don't know, but I'm telling you that it's
06:22:30 14   not made up.
06:22:31 15      Q.  Well, we weren't able to find any field
06:22:34 16   notes of this interview.
06:22:37 17          Do you know whether or not there are any
06:22:38 18   field notes of this conversation?
06:22:40 19      A.  I don't recall, sir.
06:22:41 20          MR. DAVIS:  Counsel, I'm at the end of my
06:22:43 21   flexibility.  It's now 6:22 on a Friday afternoon
06:22:51 22   and we need to conclude right away.
06:22:54 23          MR. LAUERSDORF:  Okay.  So for the record,
06:22:55 24   I'm going to suspend the deposition and leave it
06:22:59 25   open.  I understand there will be objections and I
```

Page 381

```
06:23:02  1   note your objections for the record.  We'll take the
06:23:04  2   issue up with the court and seek some additional
06:23:07  3   time.
06:23:08  4          I can tell you that the amount of time we
06:23:14  5   need is probably an hour or less, but I understand
06:23:17  6   it's an issue for the court, so we'll --
06:23:20  7          MS. HENDERSON:  Yeah, on that note, this
06:23:22  8   is Sarah, we'll just object to keeping the
06:23:24  9   deposition open, obviously especially given the
06:23:27 10   travel arrangements we've had to make doing this
06:23:32 11   twice.  We could have planned for more time if it
06:23:34 12   was going to take this long, but we understand that
06:23:37 13   you'll go to the judge with that.
06:23:40 14          MR. DAVIS:  And I'll voice an objection as
06:23:42 15   well.
06:23:42 16          MS. SCHAFFER:  And Karin Schaffer, I'll
06:23:44 17   join in that objection as well.
06:23:46 18          MR. LAUERSDORF:  Okay.
06:23:48 19          Mr. Thomas, as far as I know, we're off
06:23:52 20   the record.
06:23:52 21          (Deposition adjourned at 6:23 p.m.)
         22
         23
         24
         25
```

Page 382

```
 1   STATE OF OREGON  )
 2   County of Multnomah )
 3
 4          I, Aaron M. Thomas, Certified Shorthand
 5   Reporter, Registered Professional Reporter, and
 6   Notary Public for the State of Oregon, do hereby
 7   certify that MARK DANNELS personally appeared before
 8   me at the time and place mentioned in the caption
 9   herein; that the witness was by me first duly sworn
10   on oath and examined upon oral interrogatories
11   propounded by counsel; that said examination,
12   together with the testimony of said witness, was
13   taken down by me in stenotype and transcribed
14   through computer-aided transcription; and that the
15   foregoing transcript constitutes a full, true and
16   accurate record of said examination of and testimony
17   given by said witness, and of all other oral
18   proceedings had during the taking of said
19   deposition, and of the whole thereof.
20          Witness my hand and Notarial Seal at
21   Portland, Oregon, this 31st day of July, 2022.
22
23
24                          Aaron M. Thomas
25                          Oregon CSR 04-0388
```

Mark Dannels
September 01, 2023

Mark Dannels
September 01, 2023

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

```
NICHOLAS JAMES MCGUFFIN, as an      )
individual and as guardian ad       )
litem, on behalf of S.M., a         ) Civil No.
minor,                              ) 6:20-cv-01163-MK
                                    ) (Lead Case)
            Plaintiffs,             )
                                    )
      v.                            )
                                    )
MARK DANNELS, PAT DOWNING,          ) VIDEOCONFERENCE
SUSAN HORMANN, MARY KRINGS,         ) DEPOSITION
KRIS KARCHER, SHELLY MCINNES,       )
RAYMOND MCNEELY, KIP OSWALD,        )
MICHAEL REAVES, JOHN RIDDLE,        )
SEAN SANBORN, ERIC                  )
SCHWENNINGER, RICHARD WALTER,       )
CHRIS WEBLEY, ANTHONY WETMORE,      )
KATHY WILCOX, CRAIG ZANNI,          )
DAVID ZAVALA, JOEL D. SHAPIRO       )
AS ADMINISTRATOR OF THE ESTATE      )
OF DAVID E. HALL, VIDOCQ            )
SOCIETY, CITY OF COQUILLE, CITY     )
OF COOS BAY, and COOS COUNTY,       )
                                    )
            Defendants.             )
                                    )
VIDOCQ SOCIETY,                     )
                                    )
            Cross-Claimant,         )
                                    )
      v.                            )
                                    )
MARK DANNELS, PAT DOWNING,          )
SUSAN HORMANN, MARY KRINGS,         )
KRIS KARCHER, SHELLY MCINNES,       )
RAYMOND MCNEELY, KIP OSWALD,        )
MICHAEL REAVES, JOHN RIDDLE,        )
SEAN SANBORN, ERIC                  )
SCHWENNINGER, RICHARD WALTER,       )
CHRIS WEBLEY, ANTHONY WETMORE,      )
KATHY WILCOX, CRAIG ZANNI,          )
DAVID ZAVALA, JOEL D. SHAPIRO       )
```

Mark Dannels
September 01, 2023

### Page 2

```
 1   AS ADMINISTRATOR OF THE ESTATE   )
     OF DAVID E. HALL, VIDOCQ         )
 2   SOCIETY, CITY OF COQUILLE, CITY  )
     OF COOS BAY, and COOS COUNTY,    )
 3                                    )
                                      )
 4   Cross-Defendants.                )
     _____  )
 5                                    )
     NICHOLAS JAMES MCGUFFIN, as an   )
 6   individual and as guardian ad    ) Civil Case No.
     litem, on behalf of S.M. a       ) 3:21-cv-01719-MK
 7   minor,                           ) (Trailing Case)
                                      )
 8              Plaintiffs,           )
                                      )
 9        v.                          )
                                      )
10   OREGON STATE POLICE,             )
                                      )
11              Defendant.            )
     _____  )
12
13
14          DEPOSITION UPON ORAL EXAMINATION
15                 OF MARK J. DANNELS
16
17       BE IT REMEMBERED THAT, pursuant to the Oregon Rules of
18   Civil Procedure, the deposition of MARK J. DANNELS was taken
19   remotely via videoconference on behalf of the Plaintiffs,
20   before JEAN M. KOSTNER, a Certified Court Reporter for Oregon,
21   on Friday, the 1st day of September, 2023, at the hour of
22   9:00 a.m., in the State of Oregon.
23
24
25
```

### Page 3

```
 1              APPEARANCES
 2      (All appearances via videoconference)
 3   ON BEHALF OF THE PLAINTIFFS:
 4       Andrew C. Lauersdorf, OSB #980739
         Janis C. Puracal, OSB #132288
 5       MALONEY LAUERSDORF, REINER, PC
         1111 East Burnside Street, Suite 300
 6       Portland, Oregon  97214
         (503) 245-1518
 7       acl@mlrlegalteam.com
         jcp@mlrlegalteam.com
 8
 9   ON BEHALF OF THE DEFENDANTS:
10       Robert E. Franz, Jr., OSB #730915
         Sarah R. Henderson, OSB #153474
11       LAW OFFICE OF ROBERT E. FRANZ, JR.
         Post Office Box 62
12       Springfield, Oregon  97477
         (541) 741-8220
13       rfranz@franzlaw.comcastbiz.net
         shenderson@franzlaw.comcastbiz.net
14         (Representing City of Coquille, City of Coos Bay,
           Coos County, Craig Zanni, Chris Webley, Eric
15         Schwenninger, Sean Sanborn, Ray McNeely, Kris
           Karcher, Pat Downing, Mark Dannels, Kip Oswald,
16         Michael Reaves, David Zavala, Anthony Wetmore,
           Shelly McInnes)
17
         Jesse B. Davis, OSB #052290
18       OREGON DEPARTMENT OF JUSTICE
         100 Southwest Market Street
19       Portland, Oregon  97201
         (971) 673-1880
20       jesse.b.davis@doj.state.or.us
           (Representing Oregon State Police, John Riddle,
21         Susan Hormann, Mary Krings, Kathy Wilcox)
22       Meredith A. Sawyer, WSB #33793
         HWS LAW GROUP
23       101 Southwest Main Street, Suite 1605
         Portland, Oregon  97204
24       (206) 262-1200
         msawyer@hwslawgroup.com
25         (Representing Vidocq Society)
```

### Page 4

```
 1       Eric S. DeFreest, OSB #730915
         LUVAAS COBB
 2       777 High Street, Suite 300
         Eugene, Oregon  97401
 3       (541) 484-9292
         edefreest@luvaascobb.com
 4          (Representing Richard Walter)
 5   REPORTED BY:
 6       Jean M. Kostner, CSR #90-0051
         Subcontractor for:
 7       US LEGAL SUPPORT
 8
 9
10
...
25
```

### Page 5

```
                  INDEX OF TESTIMONY

 3   WITNESS                                             PAGE
 4   MARK J. DANNELS
 5        Examination by Mr. Lauersdorf . . . . . . .       8
 6        Examination by Mr. DeFreest . . . . . . . .      78
 7        Examination by Ms. Sawyer . . . . . . . . .      86
 8        Examination by Mr. Davis  . . . . . . . . .     102
 9        Examination by Mr. Lauersdorf . . . . . . .     103
```

U.S. Legal Support | www.uslegalsupport.com    2 to 5

Mark Dannels
September 01, 2023

| | | Page 6 |
|---|---|---|
| 1 | INDEX OF EXHIBITS | |
| 2 | DEPOSITION | |
| 3 | EXHIBIT NO.   DESCRIPTION | IDENTIFIED |
| 4 | | |
| 5 | 3   Coos County Sheriff's Office Incident Narrative, Interview of K. Steinhoff and R. Crook  (26 pages) | 16 |
| 6 | | |
| 7 | 4   City of Coquille Police Department Incident Report  (2 pages) | 19 |
| 8 | 5   Confidential - Subject to Protective Order - City of Coquille Police | |
| 9 |     Department Incident Report  (2 pages) | 21 |
| 10 | 51  Confidential - Subject to Protective Order - Supplemental Report (3 pages) | 12 |
| 11 | | |
| 12 | 52  Confidential - Subject to Protective Order - OSP Davis Interview of K. Steinhoff (37 pages) | 14 |
| 13 | | |
| 14 | 53  OSP Riddle Interview of K. Steinhoff - (Audio Recording) | 26 |
| 15 | 54  Confidential - Subject to Protective Order - CPD Incident Report  (2 pages) | 29 |
| 16 | | |
| 17 | 55  CPD Dannels Polygraph-Interview of K. Steinhoff - (Video Recording) | 30 |
| 18 | 56  Confidential - Subject to Protective Order - Handwritten Statement of | |
| 19 |     K. Steinhoff  (2 pages) | 39 |
| 20 | 57  ABC News - What Happened to Leah Freeman, Part 1 (Video) | 46 |
| 21 | | |
| 22 | 58  ABC News - What Happened to Leah Freeman, Part 2 (Video) | 49 |
| 23 | 59  ABC News - What Happened to Leah Freeman, Part 3 (Video) | 58 |
| 24 | | |
| 25 | 63  Confidential - Subject to Protective Order - Email from Frasier to Dannels | 38 |

Page 7

1  64   Coquille Police Department Policy
        Manual  (346 pages)                              66
2
3
4       (Exhibit 53 retained by counsel.)
5
...

Page 8

1                    MARK J. DANNELS,
2  called as a witness on behalf of the Plaintiffs, having been
3  first duly sworn to tell the truth, the whole truth, and
4  nothing but the truth, was examined and testified as follows:
5             THE WITNESS:  Yes, ma'am.
6                      EXAMINATION
7  BY MR. LAUERSDORF:
8       Q.   Okay.  Sheriff Dannels, my name is Andy Lauersdorf.
9  We're back on the record in the deposition of Mark Dannels, in
10 the matter of Nicholas McGuffin and S.M. vs. Mark Dannels and a
11 number of other defendants.  Do you recall that?
12      A.   Yes, I do.
13      Q.   Okay.  Would you please state your name as given at
14 birth.
15      A.   Mark Joseph Dannels.
16      Q.   And your place and date of birth?
17      A.   Clinton, Iowa, December 28th, 1963.
18           MR. LAUERSDORF:  Okay.  And once again, this is
19 Andrew Lauersdorf on behalf of the plaintiffs, and I'll have
20 the other attorneys on the Zoom call introduce themselves at
21 this time, please, starting with Ms. Puracal.
22           MS. PURACAL:  Janis Puracal for plaintiffs.
23           MS. HENDERSON:  This is Sarah Henderson on behalf
24 of the witness and the remaining municipal defendants.
25           MR. DAVIS:  Jesse Davis on behalf of the State

Page 9

1  defendants.
2           MS. SAWYER:  Meredith Sawyer on behalf of Vidocq
3  Society.
4           MR. DEFREEST:  Eric DeFreest on behalf of
5  Mr. Walter.
6  BY MR. LAUERSDORF:
7       Q.   Okay.  Mr. Dannel, I underst- -- or, Dannels, I
8  understand that you're represented by Ms. Henderson and that
9  she is apparently not present in the room with you today.  Is
10 that correct?
11      A.   That is correct.
12      Q.   Where are you located today?
13      A.   I'm at a satellite office at 1728 Paseo San Luis,
14 in Sierra Vista, Arizona.
15           COURT REPORTER:  Could you repeat the city?
16           THE WITNESS:  A satellite office -- can you hear me
17 all right?
18           COURT REPORTER:  Yeah, I didn't hear the city.
19           THE WITNESS:  Oh, Sierra Vista.
20           COURT REPORTER:  Thank you.
21 BY MR. LAUERSDORF:
22      Q.   Okay.  So you're still free to take breaks at any
23 time for any reason, whether to consult with Ms. Henderson or
24 otherwise, and I'm going to trust that we have a way figured
25 out for you guys to get together and take a break off the

Mark Dannels
September 01, 2023

Page 98

1  statute, if you're a deputy, you got full -- the full
2  certification, you just don't get a paycheck. So I came back
3  every three months, worked in Arizona when I was a chief up in
4  Oregon. So I came back to prepare to run for sheriff. That's
5  why I came back a year out.
6       Q.   And then did you run for sheriff?
7       A.   I did.
8       Q.   Looks like you won.
9       A.   Let me rephrase it so it's an accurate record here.
10  I came back to run. The current sheriff was not going to run,
11  and I worked for him for almost 29 years. I was under his
12  command before I retired. He chose -- he changed his mind, was
13  going to run. I backed out from running. And he asked me to
14  come back and work for him. Long story short, he was killed in
15  a car crash much later, and then I was selected to run for
16  sheriff and got elected.
17      Q.   Okay. And so when were you elected sheriff in
18  Arizona?
19      A.   November of 2012.
20      Q.   And what -- is it a county that you're the sheriff
21  of?
22      A.   Yes, ma'am.
23      Q.   What county is that?
24      A.   Cochise, C-O-C-H-I-S-E.
25      Q.   And where is that?

Page 99

1       A.   It's in the southeast corner of Arizona just south
2  of -- south of Tucson, all the way over to New Mexico. Pretty
3  large county.
4       Q.   Was Vidocq Society, as an entity, ever authorized
5  by the Coquille Police Department to conduct any aspect of the
6  investigation with respect to the death of Leah Freeman?
7       A.   No. With the caveat, though, that the question --
8  the thought of doing the handwriting sample -- I think it was
9  handwriting. Either voice or handwriting, I can't remember
10  which, but that -- I know we knew they were doing that, but
11  beyond that, I don't know of anything else.
12      Q.   Was Vidocq Society ever authorized by the Coquille
13  Police Department to interview any witnesses on behalf of the
14  Coquille Police Department with respect to the death of Leah
15  Freeman?
16      A.   No.
17      Q.   And was Vidocq Society ever authorized by the
18  Coquille Police Department to collect any physical evidence
19  with respect to the death of Leah Freeman?
20      A.   No. They were strictly a resource.
21      Q.   And was Vidocq Society ever compensated in any way
22  for any involvement they had with respect to the Leah Freeman
23  case?
24      A.   No.
25      Q.   You mentioned something about a statement analysis.

Page 100

1  Do you have an understanding that the -- there was statement
2  analysis or handwriting analysis done by someone affiliated
3  with Vidocq Society?
4       A.   Yeah, more -- it was -- I don't remember if it was
5  an audio or written or scribed, but there was an analysis done.
6  He gave us a copy of that.
7       Q.   And do you recall what kind of communication,
8  statements, audio, whose -- whose statements --
9       A.   It was an interview.
10      Q.   -- whose statements were analyzed?
11      A.   It was an interview with Nick McGuffin by -- I
12  believe it was by the previous chief.
13      Q.   Meaning the previous chief did an interview of Nick
14  McGuffin?
15      A.   Back in the day, yes.
16      Q.   Like soon after Leah Freeman's disappearance?
17      A.   My recollection, I think that there was only --
18  yeah, I believe that's what it was. Yes.
19      Q.   And do you know who -- how many statement analyses
20  or audio analyses were done?
21      A.   I believe that's the only one, that I know of.
22  Unless Mr. Frasier had something, but I think it was the only
23  one.
24      Q.   Just one analysis was done of one statement?
25      A.   I believe it -- I think we had an audio statement

Page 101

1  on Nick, yeah. But it was on -- I'm pretty -- pretty sure it
2  was on Nick that they did.
3       Q.   And do you know the author of the person who
4  actually performed the analysis? Do you know who that was?
5       A.   It was one of the Vidocq, but I don't remember his
6  name.
7       Q.   Do you know if that person was a Vidocq member?
8       A.   He was. He was there in Philadelphia.
9       Q.   And how do you know that was the person that
10  performed the analysis?
11      A.   That's a good question. I just assumed it was him.
12  But I'm pretty sure he said he was going to do it, so ... But
13  if somebody else did it on his behalf, I don't know that.
14      Q.   So did you talk to someone when you were in
15  Philadelphia who represented to you they would do some kind of
16  an analysis of a statement of Mr. McGuffin?
17      A.   I don't know if I personally talked to them or the
18  presentation brought that out and they said they were going to
19  do it. So I don't know how it came about, but I know it was
20  done.
21      Q.   Okay. And did you review that analysis?
22      A.   At the time I'm pretty sure I did.
23      Q.   And was there anything about that analysis that
24  changed the course of the investigation that the Coquille
25  Police Department did?

Mark Dannels
September 01, 2023

Page 106

1  A.  That is correct.
2  Q.  And so do you recall testifying at grand jury
3  that -- telling the grand jury that you guys had spent a lot of
4  time on this case and you were able to eliminate all other
5  suspects?  The only person you couldn't eliminate was
6  Mr. McGuffin.  Is that right?
7  A.  That is correct.
8  Q.  How did you eliminate Scott Hamilton?
9  A.  I'm sorry, what?
10 Q.  How did you eliminate Scott Hamilton?
11 A.  And, again, I would have to go back and -- again, I
12 don't have a pure recollection and all that, but as a team we
13 went through every name that was listed.  Either we couldn't
14 connect it, we couldn't put the person there -- and, again, I'm
15 just putting common sense back on the table -- so we just
16 never -- it never went anywhere.  A lot of these names we just
17 couldn't put anywhere to put them into the case, if that makes
18 sense.
19 Q.  Okay.  How about Kelly Crowder?  Do you remember a
20 person named Kelly Crowder?
21 A.  I don't even know that name.  I don't remember that
22 name.
23 Q.  Okay.  And how about -- let's see.  There's
24 another -- Billy -- I can't think of Billy's last name.  Bill
25 Richardson.  Do you know that name?

Page 107

1  A.  Bill Richardson.  That one doesn't ring a bell
2  either.  Sorry, Andrew.
3  Q.  No worries.
4  A.  Bill Richardson.  I don't recall that name.
5  Q.  So with regard to the people that you eliminated
6  and where you weren't able to eliminate Mr. McGuffin, that
7  elimination would have come down to essentially who you
8  believed and who you didn't believe.  Isn't that right?
9  A.  Well, it goes back to credibility.  I believe I
10 used those words.  And the credibility to include reasonable --
11 the reasonable man test law:  Who had a motive?  Who was there?
12 Who was -- I mean, some of these people didn't even know Leah,
13 even though their names were being thrown out there.  I
14 remember that.  But, again, this was a consensus of everything
15 we were asked to do, everything we felt the team should have
16 done to prove, disprove, and then that information was given to
17 Mr. Frasier for his choice, if he wants to go to grand jury.
18 But based on what the team felt, that was one person we could
19 not eliminate, was Nick McGuffin.
20 Q.  Okay.  So if it comes down to credibility, then, is
21 it that all of the people that were eliminated were credible,
22 and the one person that couldn't be eliminated, Mr. McGuffin,
23 was not credible in your mind?
24 A.  Well, what I'm saying is it's the totality of the
25 circumstances.  First of all, we had to find intent, a motive.

Page 108

1  Second of all, it goes back to some of the people -- again,
2  some of the people that were accused didn't even know Leah.  We
3  could never connect the two of them.  We could never even find
4  people that they were even together.  So it was just going back
5  to what's reasonable, and then it goes back to credibility too.
6  So I'm not saying that everybody that we feel was connected
7  wasn't credible.  There's a lot of people that have character,
8  but when it comes to this case, this is what we felt -- the
9  team felt a consensus on.
10     MR. LAUERSDORF:  Okay.  That's all of the questions
11 I have.
12     THE WITNESS:  Thank you, Andrew.
13     MS. HENDERSON:  Any other follow-up, or are we good
14 to go?
15     MR. DAVIS:  No more questions for me.  Jesse Davis.
16 Thank you.
17     MS. SAWYER:  No more questions for me.
18     MR. DEFREEST:  No more questions for me.
19
20     (WHEREUPON, the deposition ended at the hour
21     of 4:43 p.m.)
22
23          -o0o-
24
25

Page 109

1  STATE OF OREGON     )
                      )  ss. C E R T I F I C A T E
2  County of Douglas   )
3
4      I, JEAN M. KOSTNER, Certified Shorthand Reporter for the
5  State of Oregon, do hereby certify that:
6      Pursuant to stipulation of counsel for the respective
7  parties, hereinbefore set forth, MARK J. DANNELS appeared
8  remotely before me at the time and place set forth in the
9  caption hereof;
10     That, at said time and place, I reported in stenotype
11 all testimony aduced and oral proceedings had in the foregoing
12 matter, to the best of my ability;
13     That, thereafter, my notes were reduced to typewriting,
14 and that the foregoing transcript, pages 1 through 108, both
15 inclusive, constitutes a full, true, and correct transcript of
16 all such testimony aduced and oral proceedings had and of the
17 whole thereof.
18     IN WITNESS WHEREOF, I have hereunto set my hand and CSR
19 stamp this 13th day of September, 2023, in the City of
20 Roseburg, County of Douglas, State of Oregon.
21
22
23          JEAN M. KOSTNER
             Certified Court Reporter
24           CSR No. 90-0051
25