## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION

NICHOLAS JAMES MCGUFFIN, as an  ) Civil No.
individual and as guardian ad    ) 6:20-cv-01163-
litem, on behalf                 ) MK
Of S.M., a minor,                )
                                 )
          Plaintiffs,            )
                                 )
     vs.                         )
                                 )
MARK DANNELS, PAT DOWNING, SUSAN )
HORMANN, MARY KRINGS, KRIS       )
KARCHER, SHELLY MCINNES, RAYMOND )
MCNEELY, KIP OSWALD, MICHAEL     )
REAVES, JOHN RIDDLE, SEAN        )
SANBORN, ERIC SCHWENNINGER,      )
RICHARD WALTER, CHRIS WEBLEY,    )
ANTHONY WETMORE, KATHY WILCOX,   )
CRAIG ZANNI, DAVID ZAVALA, ESTATE)
OF DAVE HALL, VIDOCQ SOCIETY,    )
CITY OF COQUILLE, CITY OF COOS   )
BAY, and COOS COUNTY,            )
                                 )
          Defendants.            )
_____)

DEPOSITION OF MICHAEL REAVES
Taken in behalf of Plaintiffs
April 25, 2022
* * *

## Page 2

BE IT REMEMBERED THAT, pursuant to the Oregon Rules of Civil Procedure, the remote deposition of MICHAEL REAVES was taken by Amanda K. Fisher, Certified Shorthand Reporter, on April 25, 2022, in the City of Portland, County of Multnomah, State of Oregon.

APPEARANCES:

MALONEY LAUERSDORF REINER, PC
Counsel for Plaintiffs
1111 E. Burnside Street
Suite 300
Portland, Oregon 97214
acl@mlrlegalteam.com
jpuracal@forensicjusticeproject.org
  BY:  ANDREW C. LAUERSDORF
       JANIS C. PURACAL

LAW OFFICE OF ROBERT E. FRANZ, JR.
Counsel for Defendants: City of Coquille, City of Coos Bay, Coos County, Craig Zanni, Chris Webley, Eric Schwenninger, Sean Sanborn, Ray McNeely, Kris Karcher, Pat Downing, Mark Dannels, Kip Oswald, Michael Reaves, David Zavala, Anthony Wetmore, Shelly McInnes
PO Box 62
Springfield, Oregon 97477
rfranz@franzlaw.comcastbiz.net
shenderson@franzlaw.comcastbiz.net
  BY:  ROBERT E. FRANZ, JR.
       SARAH R. HENDERSON

OREGON DEPARTMENT OF JUSTICE
Counsel for Defendants: Oregon State Police, John Riddle, Susan Hormann, Mary Krings, Kathy Wilcox

## Page 3

Portland, OR 97201
jesse.b.davis@doj.state.or.us
  BY:  JESSE B. DAVIS

WOOD SMITH HENNING & BERMAN LLP
Counsel for Defendants: Vidocq Society and Richard Walter
12755 Southwest 69th Avenue
Suite 100
Portland, Oregon 97223
kschaffer@wshblaw.com
  BY:  KARIN L. SCHAFFER

Also present:  Nicholas McGuffin

## Page 4

INDEX

| Examinations | Page |
|---|---|
| BY MR. LAUERSDORF: | 6 |

EXHIBITS

| No. | Description | Page |
|---|---|---|
| 1 | Missing persons report | 73 |
| 2 | Supplemental missing persons report | 78 |
| 5 | Bartley polygraph report | 91 |
| 6 | Bartley polygraph report | 108 |
| 7 | Handwritten notes | 111 |
| 8 | Supplemental report - Request No. 12 | 172 |
| 9 | Evidence log | 180 |
| 10 | Property request | 182 |
| 11 | Press release | 186 |
| 12 | Handwritten poem | 190 |
| 13 | HIT meeting notes | 130 |
| 15 | DA Frasier letter | 161 |
| 16 | Matrix article | 165 |
| 17 | Hocus Pocus article | 167 |
| 18 | Oregonian article | 136 |
| 19 | Coquille PD supplemental report | 193 |
| 20 | Oregon State Police report | 196 |
| 21 | North Bend Police supplemental report | 198 |

1 (Pages 1 to 4)

Page 5

| | | |
|---|---|---|
| 1 | 22  Incident report | 204 |
| 2 | 23  Coquille PD supplemental report | 114 |

Page 6

```
 1                PORTLAND, OREGON; MONDAY, APRIL 25, 2022
 2                         9:30 A.M.
 3                           * * *
 4                       MICHAEL REAVES
 5            called as a witness in behalf of Plaintiffs,
 6              having first been sworn by the Reporter,
 7                     testifies as follows:
 8
 9                         EXAMINATION
10   BY MR. LAUERSDORF:
11       Q.  Mr. Reaves, will you please state your name as
12   given at birth.
13       A.  Michael Wayne Reaves.
14       Q.  And what's your date of birth?
15       A.  November the 28th, 1951.
16       Q.  What's your current address?
17       A.  668 Napoleon Avenue, Sunset, Louisiana.
18       Q.  Are you currently employed?
19       A.  Pardon me?
20       Q.  Are you currently employed?
21       A.  No.
22       Q.  Retired?
23       A.  Yes.
24       Q.  Okay.  What was your DPSST number?
25       A.  I don't know.
```

Page 7

```
 1       Q.  Okay.  You're here today to be deposed.  Do you
 2   understand that?
 3       A.  Pardon me?
 4       Q.  You're here today to be deposed.  Do you
 5   understand that?
 6       A.  Yes.
 7       Q.  Okay.  And this is the time and place previously
 8   agreed upon, kind of.  I'm sorry about the delay this
 9   morning.  I've been a little bit under the weather.
10           It's Monday, April 25th, 2022, and it's
11   approximately 9:32 AM, Pacific Daylight Time.
12           Do you agree with that?
13       A.  Well, it's 11:32 Central Time, but yes.
14       Q.  You're time.  That's right.  Okay.
15           This deposition is being conducted and recorded
16   using the cloud-based peer-to-peer software program
17   Zoom over a URL provided by Amanda Fisher of Stumptown
18   Stenographers.
19           Do you understand that?
20       A.  Yes.
21       Q.  What's your current location, for the record?
22       A.  Mr. Franz's hotel room.
23       Q.  And is that in Louisiana?
24       A.  Lafayette, Louisiana.
25       Q.  And Mr. Franz is in the room with you.  Is there
```

Page 8

```
 1   anyone else in the room with you?
 2       A.  No, just Mr. Franz.
 3       Q.  Okay.  Mr. Franz has probably already explained
 4   to you, you're free to take a break to consult with him
 5   at any time.
 6           Do you understand that?
 7       A.  Yes.
 8       Q.  And, by the same token, you're free to take a
 9   break at any time for any reason, if you want to get up
10   and stretch your legs, use the restroom, just let me
11   know.  The only thing I ask is that you answer whatever
12   question might be pending before you get up and take a
13   break.  Okay?
14       A.  Yes, sir.
15       Q.  The court reporter is recording you answers
16   under an oath administered a few moments ago.
17           Do you understand that?
18       A.  Yes.
19       Q.  Do you understand what it means to be under
20   oath?
21       A.  Yes.
22       Q.  Do you understand it means that you're expected
23   to give the same careful and considered answers today
24   that you would give in a court of law?
25       A.  Yes.
```

Page 53

1  Q. What's the -- during your time as Chief, and I
2  want to kind of switch over to the Freeman
3  investigation now, what were the criteria for
4  classifying an investigation as a homicide
5  investigation?
6  A. I don't understand what you're talking about
7  now.
8  Q. Well, at some point when it started, it was a
9  missing person investigation, right? And then at some
10 point it became a homicide investigation. So I'm just
11 wondering, what are the criteria?
12 A. All right. It went -- it was a missing person
13 investigation that went to an endangered missing
14 person. We treated it as a major case after a certain
15 period of time, and then it became a homicide
16 investigation when we found out there was a homicide.
17 Q. Okay. So when did you find out there was a
18 homicide?
19 A. When we found the deceased person.
20 Q. Okay. So is that the criteria for classifying
21 something as a homicide, once you have a body?
22 A. Well, if we knew -- if there was something prior
23 to that, if we had known there was an act that caused a
24 homicide before that, it would've been in homicide at
25 the time we knew of the act. But not having an act at

Page 54

1  any time, you go by the evidence that you have at the
2  time.
3  Q. Okay. How many homicide investigations had you
4  been involved with prior to the Freeman investigation?
5  A. I don't remember.
6  Q. More than ten?
7  A. Probably.
8  Q. How many had you been the lead investigator on?
9  A. Probably one. I was not a homicide
10 investigator, but I was on homicide investigation teams
11 prior to this.
12 Q. Okay. What was your role in the Freeman
13 investigation?
14 A. What was my role in the Freeman investigation?
15 Q. Yeah.
16 A. I took the initial report. I worked
17 with -- with Dave Hall on the missing person part of
18 this thing. And then I facilitated the gathering of
19 the team together and participated in all the team
20 meetings and such on that.
21 Q. Okay. What was the chain of command for the
22 investigation, or was there a chain of command for the
23 investigation?
24 A. I don't -- I don't know what you mean by chain
25 of command. Who was ultimately responsible for the

Page 55

1  investigation?
2  Q. Yeah.
3  A. I would've been ultimately responsible for the
4  investigation up to a point, and then the District
5  Attorney would've taken over from that point. It was
6  kind of -- he kind of -- the District -- well, Paul
7  Frasier was kind of involved in this right from the
8  beginning, so he was also in a lead role in that.
9  Q. Okay. So at some point did he take over the
10 investigation?
11 A. Yes.
12 Q. And at what point was that?
13 A. It was after the -- after we were -- we had the
14 homicide -- homicide was verified. It wasn't like he
15 took over. I mean, he was -- he became the lead at
16 that point.
17 Q. Okay. So that would've been after the body was
18 found?
19 A. Yes.
20 Q. Okay. And so once he became the lead, what was
21 your role at that point?
22 A. My role?
23 Q. Yeah.
24 A. I was part of the team at that point. Well,
25 I -- actually, I left -- I left most of the work to

Page 56

1  Dave Hall and the major cases team. I went back to my
2  normal duties, and then I just kept familiar with the
3  case all the way through in there.
4  Q. Okay. So was there a -- so the case comes
5  in -- I want to try and understand this. So the case
6  comes in, and it comes into Coquille PD, right? And
7  you take the original missing persons report?
8  A. Right.
9  Q. And then at some point it escalates. Did you
10 appoint a case officer to the case?
11 A. That would've been Dave Hall.
12 Q. That was Dave Hall. Okay.
13    When did you appoint Dave Hall as the case
14 officer?
15 A. The day that it came in.
16 Q. Oh, okay. What are the responsibilities of the
17 case officer?
18 A. He would've been responsible for investigating
19 the case.
20 Q. Okay. And then does he report to you, or does
21 he -- what kind of authority does he have? Does he
22 just -- you appoint him and he gets to go off and do
23 whatever he wants, or what happens?
24 A. I don't understand what you're -- what you want
25 on this. He was the case officer. I worked with him

14 (Pages 53 to 56)

Stumptown Steno
503.888.1416

**Page 57**

1  on the case. Okay?
2     Q. Okay.
3     A. As the case escalated, he was the lead. He was
4  the one who collated all the information that came in
5  on the case. And our -- the -- the team -- the
6  management team that we put together after the first
7  three or four days, we worked together on deciding how
8  the case was going to be investigated. But he was the
9  lead officer, and he helped make the assignments on the
10 investigation, and he worked with myself, he worked
11 with Paul Frasier, he worked with the guys from OSP who
12 came in with us, and everybody else.
13    Q. Okay. So I think the reason I'm a little bit
14 confused, and I just want to clarify, is in one of the
15 other depositions, this was explained to me, and my
16 understanding was that there's a case officer assigned
17 at the agency where the case comes in, and then that
18 case officer is responsible for that case regardless --
19    A. Yes.
20    Q. -- of how many other agencies are brought in.
21 So, in other words, if somebody from Coos County
22 Sheriff's office, if I asked them the question, why
23 didn't you do this, his response was, well, the case
24 officer didn't ask me to. It's the case officer who is
25 running the case. Is that --

**Page 58**

1     A. I gotcha. I see where you're coming from.
2        Dave was the case officer, but we worked
3  together on getting all of this stuff done.
4     Q. Okay. Why did you elect Dave Hall as a case
5  officer?
6     A. Because he was on duty at the time the missing
7  person case came in.
8     Q. Had he ever been involved in a homicide
9  investigation at that point in his career?
10    A. Dave?
11    Q. Yeah.
12    A. I believe he had, yes.
13    Q. Do you recall one specifically?
14    A. No. We didn't have a lot of homicide in
15 Coquille.
16    Q. Okay.
17    A. I can't recall specifically. I think he had,
18 but I don't remember.
19    Q. So if he was assigned as the case officer when
20 it originally came in as a missing person, did you at
21 any time consider replacing him with somebody more
22 experienced as a case officer?
23    A. No. By the time that happened, we had a lot of
24 experienced people involved with it, and we just left
25 him as the -- he was the lead officer at that point,

**Page 59**

1  and we didn't have that many other -- Coquille Police
2  Department had eight people, me and seven other people.
3  He was as experienced as the other three people who
4  were the most experienced in our department. He had
5  just as much time in and just as much investigative
6  experience as they had. So there wasn't anybody who
7  had more experience than him at that point.
8     Q. Just as much time as Lieutenant King?
9     A. No. He -- he didn't have as much time as
10 Lieutenant King, no. But I wasn't talking about
11 Lieutenant King. I was talking about the other people
12 who would've been involved in that.
13    Q. Okay.
14    A. Are you asking me if I should've put Lieutenant
15 King in charge of the case?
16    Q. I guess I'm asking if you considered that, and
17 if you did, why --
18    A. I didn't consider it at the time, no.
19    Q. Okay. Why not?
20    A. Why didn't I consider it at the time?
21    Q. Yeah.
22    A. Because we were working the case, and I was
23 working with Dave.
24    Q. Okay. What about Shelly Grant, what was her
25 role?

**Page 60**

1     A. Shelly Grant had just -- she was our -- she was
2  our -- she was a dispatcher, and she had just become a
3  police officer, and she had all of her certifications
4  as a dispatcher, and we needed someone to take notes,
5  and we needed someone to run our LEDS/NCIC computer
6  stuff. We didn't want to put -- we were working very
7  long hours, and our dispatch center for the Coquille
8  Police Department is only open for eight hours, and we
9  didn't want to put any of that burden on -- on the duty
10 dispatcher, or the 911 center, since we had someone who
11 was available to do those LEDS things, and NCIC things.
12 You know, run names for us and track down phone numbers
13 and investigation stuff. So she was essentially our
14 case secretary and computer person.
15    Q. Okay. So she didn't have any responsibility for
16 witness interviews or actual out in-the-field
17 investigation?
18    A. No. No, she went with a couple of the officers
19 when they went to interview females, but she had
20 no -- she was not assigned any interview stuff on her
21 own, no.
22    Q. Okay. What were the duties of the CPD case
23 officer? Like, was the case officer required to review
24 all of the reports that were generated in the
25 investigation?

Page 69

1  working with the MCIT?
2     A. Not that I recall.
3     Q. Okay. So when did you first become aware of
4  Ms. Freeman's disappearance?
5     A. The day her mother came in.
6     Q. And that was June 29th, 2000, does that sound
7  right?
8     A. That sounds right.
9     Q. Okay. Did you know anyone from the Freeman or
10 McGuffin families prior to Ms. Freeman's disappearance?
11    A. I don't think so. It's a small town, so I may
12 have run into them, but I didn't know socially or
13 professionally at any point that I can recall.
14    Q. Okay. How about by reputation?
15    A. By reputation?
16    Q. Yeah.
17    A. Prior to this, no.
18    Q. Okay. When Ms. Courtright came in to report Ms.
19 Freeman missing, was there anybody with her?
20    A. I don't remember.
21    Q. Okay.
22    A. I thought -- I thought a young lady came with
23 her, but I don't remember. I don't whether she came in
24 or she called afterwards --
25    Q. Okay.

Page 70

1     A. -- with information. But I don't recall.
2     Q. When did Mr. McGuffin become a person of
3  interest in the investigation?
4     A. I -- I don't know. One of the -- one of the
5  things we discussed early on was that Paul Frasier and
6  the -- a lot of the people -- some of the people on the
7  Major Case Team and FBI felt we didn't have enough
8  information to either name him a person of interest or
9  a suspect in the thing, so we didn't.
10       I think that -- that later on in the
11 investigation, that McGuffin was named an person of
12 interest, but I don't remember exactly when it was. It
13 was -- it wasn't right away. It was later on.
14    Q. What is -- it seems like person of interest and
15 suspect are terms of art to some extent.
16       What does person of interest mean?
17    A. A person of interest would be, you don't know
18 what this person's involvement is, but the person was
19 there. I mean, it could've been -- anybody that she
20 saw that night could've been a person of interest.
21       The difference between a person of interest and
22 a suspect is that a suspect you have -- you have
23 reasonable suspicion that this person might've been
24 involved with whatever occurred.
25    Q. So do you recall how many persons of interest

Page 71

1  there were in the Freeman investigation?
2     A. No, I don't recall any. I don't recall
3  any -- anybody even naming any.
4     Q. Was it more than one?
5     A. I don't recall. There may have been. I don't
6  know.
7     Q. Okay.
8     A. You gotta remember, this is 22 years later for
9  me.
10    Q. Yeah. Yeah, I get it.
11       At some point did Mr. McGuffin become a suspect
12 in the investigation?
13    A. Not while I was -- not in our part of it, no.
14    Q. Okay. So by the time you left the Coquille
15 Police Department in 2008, there wasn't sufficient
16 reasonable suspicion to name Mr. McGuffin as a suspect
17 in the investigation, is that right?
18    A. We had -- we had talked it over with Paul
19 Frasier quite a few times, but I don't think that we
20 ever did name him as a suspect. I know we didn't name
21 him as a suspect.
22       We had cold case investigators who came in who
23 said that we should be looking at him, but...
24    Q. When was that?
25    A. When Sean Sullivan was Sergeant, we brought in a

Page 72

1  cold case investigator who went through the case. I
2  don't know if we did another one after that or not.
3     Q. Who was the cold case --
4     A. I don't remember doing another one after that.
5     Q. Who was -- I'm sorry to interrupt.
6     A. I don't remember -- I don't remember the names
7  of those cold case investigators either.
8     Q. Okay. When did Sean Sullivan come in?
9     A. After King retired and left the area, he came in
10 as the Sergeant.
11    Q. So sometime after 2002, you think?
12    A. It was probably -- yeah, it was -- it was 2003,
13 2004, somewhere in there. It might've been 2004. I
14 don't remember.
15    Q. Okay. And then you used the term "reasonable
16 suspicion" there. Is that -- that seems like another
17 term of art.
18    A. Term of art, yeah. Less than probable cause.
19    Q. Less than probable cause, but more than nothing,
20 is that fair?
21    A. More than what?
22    Q. Less than probable cause, but more than no
23 thought at all?
24    A. Right.
25    Q. Okay.

18 (Pages 69 to 72)

```
                                                  Page 209
 1                  C E R T I F I C A T E
 2     STATE OF OREGON    )
 3                        ) ss.
 4     COUNTY OF MULTNOMAH )
 5
 6          I, Amanda K. Fisher, a Certified Shorthand
 7     Reporter, do hereby certify that, pursuant to
 8     stipulation of counsel for the respective parties
 9     hereinbefore set forth, MICHAEL REAVES remotely
10     appeared before me at the time and place set forth in
11     the caption hereof; that at said time and place I
12     reported in Stenotype all testimony adduced and other
13     oral proceedings had in the foregoing matter; that
14     thereafter my notes were reduced to typewriting under
15     my direction; and that the foregoing transcript, pages
16     1 to 208, both inclusive, constitutes a full, true and
17     accurate record of all such testimony adduced and oral
18     proceedings had, and of the whole thereof.
19          Witness my hand and stamp at Portland, Oregon,
20     May 03, 2022.
21
22
23          _____
            AMANDA K. FISHER
            CSR No. 3229
24
25
```



53 (Page 209)

Stumptown Steno
503.888.1416

Electronically signed by Amanda Fisher (001-415-598-0954)     ea4d1e2d-df39-46c6-b1d9-ba3035a4ccce