```
                                                                Page 1
 1                IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF OREGON

 3                          EUGENE DIVISION

 4

 5   NICHOLAS JAMES MCGUFFIN, as an   )
     individual and as guardian ad    )
 6   litem, on behalf of S.M., a      ) Civil No.
     minor,                           ) 6:20-cv-01163-MK
 7                                    )
                   Plaintiffs,        ) VIDEOCONFERENCE
 8                                    ) DEPOSITION
           v.                         )
 9                                    )
     MARK DANNELS, PAT DOWNING,       )
10   SUSAN HORMANN, MARY KRINGS,      )
     KRIS KARCHER, SHELLY MCINNES,    )
11   RAYMOND MCNEELY, KIP OSWALD,     )
     MICHAEL REAVES, JOHN RIDDLE,     )
12   SEAN SANBORN, ERIC               )
     SCHWENNINGER, RICHARD WALTER,    )
13   CHRIS WEBLEY, ANTHONY WETMORE,   )
     KATHY WILCOX, CRAIG ZANNI,       )
14   DAVID ZAVALA, ESTATE OF DAVE     )
     HALL, VIDOCQ SOCIETY, CITY OF    )
15   COQUILLE, CITY OF COOS BAY,      )
     COOS COUNTY, and OREGON STATE    )
16   POLICE,                          )
                                      )
17                 Defendants.        )
     _____)
18

19

20
                 DEPOSITION UPON ORAL EXAMINATION
21
                     OF CHRISTOPHER L. WEBLEY
22

23

24
                      U.S. LEGAL SUPPORT, INC
25                         713-653-7100
```

Christopher L. Webley
December 21, 2021                                                2 to 5

Page 2

1    BE IT REMEMBERED THAT, pursuant to the Oregon Rules of
2  Civil Procedure, the deposition of CHRISTOPHER L. WEBLEY, an
3  adverse-party witness, was taken remotely via videoconference
4  on behalf of the Plaintiffs, before JEAN M. KOSTNER, a
5  Certified Court Reporter for Oregon, on Tuesday, the 21st day
6  of December, 2021, at the hour of 9:00 a.m., in the State of
7  Oregon.

Page 3

1                         APPEARANCES
2
   ON BEHALF OF THE PLAINTIFFS:
3
       Andrew C. Lauersdorf, OSB #980739
4      Janis C. Puracal, OSB #132288
       MALONEY LAUERSDORF, REINER, PC
5      1111 East Burnside Street, Suite 300
       Portland, Oregon  97214
6      (503) 245-1518
       acl@mlrlegalteam.com
7      jcp@mlrlegalteam.com
8
   ON BEHALF OF THE DEFENDANTS:
9
       Sarah R. Henderson
10     LAW OFFICE OF ROBERT E. FRANZ, JR.
       Post Office Box 62
11     Springfield, Oregon  97477
       (541) 741-8220
12     shenderson@franzlaw.comcastbiz.net
         (Representing City of Coquille, City of Coos Bay,
13       Coos County, Craig Zanni, Chris Webley, Eric
         Schwenninger, Sean Sanborn, Ray McNeely, Kris
14       Karcher, Pat Downing, Mark Dannels, Kip Oswald,
         Michael Reaves, David Zavala, Anthony Wetmore,
15       Shelly D. McInnes)
16     Jesse B. Davis
       OREGON DEPARTMENT OF JUSTICE
17     100 Southwest Market Street
       Portland, Oregon  97201
18     (503) 947-4700
       jesse.b.davis@doj.state.or.us
19       (Representing Oregon State Police, John Riddle,
         Susan Hormann, Mary Krings, Kathy Wilcox)
20
       Amanda Rockett
21     WOOD SMITH HENNING & BERMAN LLP
       12755 Southwest 69th Avenue, Suite 100
22     Portland, Oregon  97223
       (971) 256-4023
23     arockett@wshblaw.com
         (Representing Vidocq Society and Richard Walter)

Page 4

1    ALSO PRESENT:
2        Nick McGuffin
3
     REPORTED BY:
4
         Jean M. Kostner, CSR #90-0051
5        Subcontractor for:
           US LEGAL SUPPORT

22                    U.S. LEGAL SUPPORT, INC
23                        713-653-7100

Page 5

1                    INDEX OF TESTIMONY
2
3  WITNESS                                              PAGE
4    CHRISTOPHER L. WEBLEY
5       Examination by Mr. Lauersdorf . . . . . . .    7

15              REQUESTS FOR INFORMATION
16
   Information Requested by Mr. Lauersdorf:       PAGE   LINE
17
18   Officer Webley's police reports
     he reviewed                                   18     16
19
     Timelines over the 15 months prior
20   to January 25th, 2010, what investigation
     occurred into Ms. Freeman's death             92      2

Christopher L. Webley
December 21, 2021                                                6 to 9

## Page 6

```
                  INDEX OF EXHIBITS
DEPOSITION
EXHIBIT NO.      DESCRIPTION
  1    Dannels Press Conference, 01/25/10
       (5 pages)                                          89
  2    Coquille Police Department Incident
       Report, No. Q20001905, 02/06/10
       Webley, Hamilton, et al. (7 pages)                 92
  3    Coquille Police Department Supplemental
       Report, No. Q20001905, 03/02/10
       Webley, March 2010 Interviews (11 pages)          108
  4    Coquille Police Department Supplemental
       Report, No. Q20001905, 07/24/10
       Webley, Bartley, et al. (6 pages)                 133
  5    Coos County Sheriff's Office Incident
       Narrative, No. 20-10627, 07/11/00,
       Downing, Hartwell (17 pages)                      149
  6    Alicia Hartwell Grand Jury Subpoena,
       07/21/10                                          152
  7    Alicia Hyatt Grand Jury Testimony
       07/21/10 (10 pages)                               153
  8    Alicia Hartwell Grand Jury Subpoena,
       08/11/10                                          155
  9    Alicia Hyatt Grand Jury Testimony,
       08/11/10 (7 pages)                                155
 11    Lead Sheet, 08/2000                               126
 12    Coquille Police Department Incident
       Report, No. Q20001905, 06/24/11,
       Webley, Mitchell, et al. (3 pages)                162
 16    Handwritten Note                                  133
```

## Page 7

```
 22    ABC News Video - What Happened to
       Leah Freeman, Part 1                              177
 23    ABC News Video - What Happened to
       Leah Freeman, Part 2                              180
 24    ABC News Video - What Happened to
       Leah Freeman, Part 3                              190
 25    Frasier, Things to Do, 05/12/10
       (8 pages)                                         206
 26    ABC News Video - What Happened to
       Leah Freeman, Part 4                              201
 27    ABC News Video - What Happened to
       Leah Freeman, Part 5                              204
```

## Page 8

1           CHRISTOPHER L. WEBLEY,
2  called as a witness on behalf of the Plaintiffs, having been
3  first duly sworn to tell the truth, the whole truth, and
4  nothing but the truth, was examined and testified as follows:
5           THE WITNESS: I do.
6                   EXAMINATION
7  BY MR. LAUERSDORF:
8       Q. Mr. Webley, my name is Andy Lauersdorf. You and I
9  have never met before. Is that right?
10      A. That's true.
11      Q. And you understand that I am an attorney, and I
12 represent the plaintiff in this matter, Mr. McGuffin?
13      A. Yes, I do.
14      Q. And you understand that this is a lawsuit that
15 Mr. McGuffin filed against a number of defendants, including
16 yourself. Right?
17      A. I do.
18      Q. Could you please state your name as given at birth?
19      A. Full name is Christopher. I go by Chris Lee
20 Webley, W-E-B, as in "boy," -L-E-Y.
21      Q. And what's your place and date of birth?
22      A. Springfield, Oregon. 3/24/67.
23      Q. And what's your current business address?
24      A. 155 North Adams Street, Suite B, as in "boy," and
25 that's in Coquille, Oregon.

## Page 9

1       Q. Is that the courthouse?
2       A. No, sir, it's not. That's the office of Coos
3  County Community Corrections.
4       Q. Oh, okay. Let's see. You're a patrol and
5  probation officer, so Coos County Community Corrections is your
6  current employer?
7       A. Correct.
8       Q. And when did you start with them?
9       A. It was nine years ago this last November.
10      Q. Okay. So about --
11      A. Just a little over nine years.
12      Q. -- 2012?
13      A. Yes, sir.
14      Q. And what's your title?
15      A. Adult parole and probation officer.
16      Q. Do you specialize in any particular type of
17 supervision?
18      A. Not at this time, no.
19      Q. And what's your DPSST number? Or do you have a
20 DPSST number for that?
21      A. 46900.
22      Q. Okay. You are here today to be deposed. Do you
23 understand that?
24      A. Yeah.
25      Q. This is the time and place previously agreed upon.

Page 46

1   A.   I believe -- I believe it was digital.  I don't
2 recall ever turning in film.
3   Q.   Okay.  And how about at some point did they start
4 providing you with video cameras?
5   A.   We had a dash- -- dashcam, so --
6   Q.   Okay.
7   A.   -- the video would take place from the car.  So
8 whatever the car was looking at would be recorded on video.
9   Q.   Okay.  What about if you wanted to videotape a
10 witness interview?  Was that equipment available?
11   A.   If it was, I don't believe I ever used it.  I don't
12 think I ever videotaped an interview.  Not that I recall.
13   Q.   Okay.  Do you know if anyone at Coquille PD ever
14 videotaped witness interviews?
15   A.   I don't know.  Not that I know of.
16   Q.   Okay.  Do you recall if the Coquille Police
17 Department had any written policies or procedures on
18 documenting crime scenes?
19   A.   No.  I -- I don't remember specific policies, no.
20   Q.   Okay.  Well, during the time you were with Coquille
21 PD, did they provide you with any in-house training on
22 collecting and preserving evidence?
23   A.   Again, it's not that I wasn't trained in it, but,
24 no, I don't recall any, like, as you say, in-house.  We
25 established what that means.  No, there was not a formal -- I

Page 47

1 don't recall any.
2   Q.   Did they have written policies or procedures on
3 collecting or preserving evidence?
4   A.   I'm sure that we did.  I wouldn't be able to quote
5 them to you.  I knew the flow of what I would do.
6   Q.   Did they provide you any training on what are
7 commonly referred to as "Brady obligations"?  Do you know what
8 I mean when I use the phrase "Brady obligations"?
9   A.   I've heard the term.  I'm vaguely familiar with
10 what Brady is.  I don't recall any training on it, no.
11   Q.   Okay.  And what is your understanding of what Brady
12 is?
13   A.   I've heard the "Brady list."  I know that if an
14 officer is found to be untruthful that I believe it's the
15 district attorney that makes that determination, and there
16 becomes an issue with their work, and they can't testify
17 because somewhere they were found to be untruthful or -- it
18 could be a career-ender if --
19   Q.   But has anybody ever explained to you why there's a
20 Brady list?
21   A.   Other than what I just told you, I understand why
22 it would be.  If an officer were untruthful, that would be
23 problematic.  That makes sense to me.
24   Q.   How about -- did they provide you with any in-house
25 training on protecting a suspect's constitutional rights?

Page 48

1   A.   In-house training, no.
2   Q.   Okay.  What's your understanding of your
3 obligations as a law enforcement officer to avoid violating an
4 accused's constitutional rights?
5   A.   It's a constitutional right.  You don't want to
6 violate them.
7   Q.   Okay.  And where did you -- have you ever received
8 any training on that?
9   A.   I'm sure I have.  It may not --
10   Q.   Do you recall when?
11   A.   No.  I'm sure at DPSST we went through such things.
12   Q.   Okay.  Do you recall anything specifically about
13 being trained on that?
14   A.   I mean, we -- for instance, Miranda rights, that
15 would be the right to remain silent.  But can I quote to you on
16 this day, this training, we went over constitutional rights?
17 No, sir, I can't.
18   Q.   Okay.  Did Coquille PD have any written policies or
19 procedures on reporting known or suspected violations of
20 constitutional rights by other officers or officials?
21   A.   I'm sure it was in policy somewhere.  I mean, if
22 there were an issue, something that was, as you say,
23 "constitutional rights," if you observed an officer do that,
24 you would have a duty to report that.  Yes, I understand that.
25   Q.   Did Coquille Police Department provide you any

Page 49

1 in-house training on using deception or misinformation as an
2 investigative tool in criminal investigations?
3   A.   Again, no.  None.
4   Q.   What is your understanding of when it's okay for a
5 police officer to lie to a witness?
6   A.   Oh, that gets tricky.  You -- you can.  You
7 absolutely can lie to a witness.  You -- the most common form
8 is to infer that you know more than you do.  That could be --
9 yeah, that's dishonest.  You don't really know it, but you
10 pretend like you do.  You pretend like you've talked to people.
11 It's not my favorite tactic, but it can be used, yes.
12   Q.   What about suggesting -- something like suggesting
13 to a witness that something happened that didn't actually
14 happen or there isn't evidence of?
15   A.   You could.
16   Q.   Would that cause any -- how would you then control
17 for credibility issues or the reliability of the information
18 that you obtained that way?
19   A.   I'm trying to follow you here.  I'm sorry, sir.  So
20 you're suggesting to a suspect or a witness or whoever you're
21 interviewing -- you're suggesting that something happened, but
22 you don't know if it really did or not, so you're acting like
23 this actually happened and presenting it like that.  Am I
24 understanding you correctly?
25   Q.   Yeah.  So let's say you're -- just an example, a

Page 146

1  of different cars?
2      A.   No.
3      Q.   And asking them for ID?
4      A.   (No response.)
5      Q.   So the photo that she picked out, was it actually
6  McGuffin's car, or was it a stock photo of a similar Mustang?
7      A.   I don't know.
8      Q.   Do you know when the photo -- the photo that she
9  picked out, do you know when it was taken?
10     A.   I do not.
11     Q.   Do you know where it was taken?
12     A.   I do not.
13     Q.   Do you know in what lighting it was taken or from
14  what angle or perspective?
15     A.   No.
16     Q.   Okay.  You report there "as a possible
17  identification."  Why did you report it "as a possible
18  identification"?
19          MS. HENDERSON:  I'll object to form as calling for
20  speculation, since the witness has no memory of this.
21          But you can answer.
22     A.   Yeah, it is speculation, but if I wrote "possible,"
23  again, you talked about credibility and addressing that.  If
24  she wasn't absolutely certain, then I'm not -- then I could see
25  me writing it.  If she was, like, "I think that it's this,"

Page 147

1  then I would have wrote "as a possible identification."
2  BY MR. LAUERSDORF:
3      Q.   Okay.  Do you recall anything like that happening?
4      A.   No.
5      Q.   Do you know how you selected the photos that you
6  showed her?
7      A.   No.
8      Q.   Do you know what year, make, model, size, or color
9  the vehicles were in the other photos that you showed to
10  Hartwell?
11     A.   No.
12     Q.   Do you recall if you showed her individual photos
13  or multiple photos in a single sheet?
14     A.   Do not recall.
15     Q.   Do you recall what instructions you gave her before
16  you started showing her the photos?
17     A.   I do not.
18     Q.   So, in other words, did you -- how were you trained
19  to do a photo throw-down by the Coquille Police Department?
20     A.   The times where an official -- that you call a
21  throw-down might be different than a photo lineup.
22     Q.   Okay.  Just in my office we called it a -- we
23  called it a throw-down.  What would you --
24     A.   If we were going to do a lineup of people, then my
25  memory is we would use, like, six.  A lot of times we could get

Page 148

1  those photos from, like -- back then you could get them off,
2  like, jail rosters or something.  Obviously there's not -- or
3  cars, I don't know where I would have got them.  It could have
4  been off of the internet or something.  I just don't know.  I
5  don't remember.
6      Q.   Okay.  But going back to the question, were you
7  ever trained by Coquille Police Department on how to conduct a
8  photo array lineup, a throw-down, a show-up, whatever it was
9  called?
10     A.   I don't recall formal training, no.
11     Q.   Okay.  Did you give any -- do you recall if you
12  gave Ms. Hyatt any admonitions, like telling her that the
13  vehicle might not be among the vehicles you were showing her?
14     A.   I don't recall.  And you said "Ms. Hyatt."  Is that
15  the same as Hartwell?
16     Q.   Oh, yeah.  That was her married name at the time.
17     A.   Okay.  Just making sure that we're not talking
18  about somebody else.  Like -- like I said, I don't remember
19  this.
20     Q.   Do you recall who showed Hartwell the photos?
21     A.   No, I do not.
22     Q.   Do you recall who was in the room when they were
23  shown to her?
24     A.   No, I do not.
25     Q.   Did you keep a copy or an index of the photos that

Page 149

1  you showed to her?
2      A.   I do not know.
3      Q.   Were the photos saved anywhere afterwards?
4      A.   I don't know.
5      Q.   Because there's no photos attached to this report,
6  and there's no photo array in any of the documents that have
7  been produced to us.  So do you know where those documents that
8  you showed her would have gone?
9      A.   I do not.
10     Q.   Do you know whether or not this photo array was
11  produced to Mr. McGuffin for use as evidence at trial?
12     A.   I do not.
13     Q.   Do you know whether or not this photo array was
14  produced to the DA's office?
15     A.   I do not.
16     Q.   Do you know where the photos are now?
17     A.   I do not.
18     Q.   And I was going to ask you the question about the
19  Hartwell/Hyatt thing and ask you if you knew why you referred
20  to her as "Hartwell" in your report, when she had identified
21  herself by her married name "Hyatt" when she was in grand jury
22  just a couple of hours before this interview.
23     A.   No, I don't -- I didn't even know -- I thought they
24  were two different people when you said that, so I don't recall
25  it.

Page 210

1  take a copy, please.
2       MR. DAVIS:  This is Mr. Davis.  No questions here,
3  but we would like a copy also.  Thank you.
4       MR. LAUERSDORF:  Okay.  I think that's everyone, so
5  we'll go ahead and go off the record.
6
7       (WHEREUPON, the deposition ended at the hour
8        of 3:55 p.m.)
9
10                      -o0o-

Page 211

1  STATE OF OREGON    )
                      )    ss. C E R T I F I C A T E
2  County of Douglas  )
3
4       I, JEAN M. KOSTNER, Certified Shorthand Reporter for the
5  state of Oregon, do hereby certify that:
6       Pursuant to stipulation of counsel for the respective
7  parties, hereinbefore set forth, CHRISTOPHER L. WEBLEY,
8  appeared remotely before me via Zoom videoconference at the
9  time and place set forth in the caption hereof;
10      That, at said time and place, I reported in stenotype
11 all testimony adduced and oral proceedings had in the foregoing
12 matter, to the best of my ability;
13      That, thereafter, my notes were reduced to typewriting,
14 and that the foregoing transcript, pages 1 through 210, both
15 inclusive, constitutes a full, true, and correct transcript of
16 all such testimony adduced and oral proceedings had and of the
17 whole thereof.
18      IN WITNESS WHEREOF, I have hereunto set my hand and CSR
19 stamp this 10th day of January, 2022, in the City of Roseburg,
20 County of Douglas, State of Oregon.
21
22      _____
23      JEAN M. KOSTNER
        Certified Court Reporter
24      CSR No. 90-0051
25