**1**

IN THE CIRCUIT COURT OF THE STATE OF OREGON

IN AND FOR THE COUNTY OF MALHUER

NICHOLAS MCGUFFIN,          )
                            )
            Petitioner,     )
                            ) Case No.
        vs.                 ) 15CV1030
                            )
MARK NOOTH, Superintendent, )
SRCI,                       )
                            )
            Respondent.     )
                            )

DEPOSITION OF R. PAUL FRASIER

May 31, 2019

Friday

8:19 a.m.

THE DEPOSITION OF R. PAUL FRASIER was taken at the Coos County Courthouse, 250 North Baxter, in the City of Coquille, County of Coos, State of Oregon, before Denise C. Zito Smith, CSR, Certified Shorthand Reporter in and for the State of Oregon.

**2**

APPEARANCES

For the          FORENSIC JUSTICE PROJECT
Petitioner:      333 SW Taylor Street
                 Suite 403
                 Portland, OR 97204
                 503/664-3641
                 jpuracal@forensicjusticeproject.org
                 BY: JANIS PURACAL

For the          DEPARTMENT OF JUSTICE TRIAL
Respondent:      DIVISION
                 1162 Court Street NE
                 Salem, OR 97301-4095
                 503/947-4700
                 paul.reim@doj.state.or.us
                 BY: PAUL REIM

Also Present:    John Comery, Oregon Innocence
                 Project Research Paralegal

Reported By:     Denise C. Zito Smith, CSR

**3**

INDEX

| WITNESS | | PAGE |
|---|---|---|
| R. PAUL FRASIER | | |
| | BY MS. PURACAL | 5 |
| | BY MR. REIM | 159 |

EXHIBITS:

| | For Identification | Marked |
|---|---|---|
| 1 | Subpoena | 7 |
| 2 | Letter Written By Paul Frasier | 21 |
| 3 | England Lab Report | 89 |
| 4 | Report By Kathy Wilcox | 101 |
| 5 | E-mail Chain | 107 |
| 6 | Microtrace File Document | 107 |
| 7 | Tip Sheet | 109 |
| 8 | Document Bates Numbered 003247 | 112 |
| 9 | Subpoena to Nicole Price Nelson and a Letter from Paul Frasier | 117 |
| 10 | E-mail Chain | 121 |
| 11 | E-mail Chain | 121 |
| 12 | Affidavit to Correct a Death Certificate | 126 |
| 13 | Witness' Statements | 130 |

(continuing)

**4**

(continuing)

| 14 | Document Titled Conversation Log | 135 |
|---|---|---|
| 15 | CCH for Lonnie Baker | 140 |
| 16 | Coquille Police Department Report | 142 |
| 17 | Handwritten Poem | 143 |
| 18 | Tip Sheet | 148 |
| 19 | Tip Sheet | 149 |

REQUEST:

Page 147, Line 6

INSTRUCTIONS: (None.)

**Page 5**

1    R. PAUL FRASIER,
2    having been first duly sworn to testify the truth,
3    the whole truth, and nothing but the truth, was
4    examined and testified as follows:
5
6    MS. PURACAL: We'll do appearances
7    for the record. Janis Puracal for Petitioner
8    Nicholas McGuffin?
9    MR. REIM: Paul Reim, assistant
10   attorney general, representing the superintendent.
11   THE WITNESS: Paul Frasier, the
12   victim, I guess.
13   MS. PURACAL: Hopefully it won't be
14   that way.
15   THE WITNESS: Okay.
16   MS. PURACAL: And then with me today
17   is John Comery, research paralegal at the Oregon
18   Innocence Project.
19
20                    EXAMINATION
21   BY MS. PURACAL:
22   Q.   Good morning, Mr. Frasier.
23   A.   Good morning.
24   Q.   You've already given your name for the
25   record. You are the current district attorney for

**Page 6**

1    Coos County?
2    A.   That's correct.
3    Q.   How long have you been the district
4    attorney?
5    A.   Was appointed in -- took office
6    January 1, 2008. So I've been the DA since that
7    time.
8    Q.   And before 2008, you were?
9    A.   I was a deputy district attorney --
10   well, I came to Coos County in 1990 as the chief
11   deputy district attorney. I was moved to the
12   narcotics team as their narcotics prosecutor and
13   forfeiture counsel. I did that for about seven
14   years and then came back to the office as the
15   chief deputy. And then I got appointed to be the
16   DA.
17        So I've been here in Coos County 29
18   years almost. I started my career in Josephine
19   County in 1984 as a deputy district attorney in
20   Josephine County.
21   Q.   You received from my office a subpoena
22   for your deposition.
23   MS. PURACAL: And I'm going to ask
24   for the court reporter to mark that subpoena as
25   Exhibit 1.

**Page 7**

1    (Deposition Exhibit No. 1
2    marked for identification.)
3    BY MS. PURACAL:
4    Q.   Is this a copy of the subpoena you
5    received from my office?
6    A.   I believe so, yes.
7    Q.   You appeared today pursuant to that
8    subpoena; correct?
9    A.   That's correct.
10   Q.   Have you ever testified at a
11   deposition before?
12   A.   I think I did one time. It was over
13   the telephone several years ago. So I don't
14   remember all the particulars of it, but I believe
15   I have once.
16   Q.   Was that in the context of your work
17   as a district attorney or was that in a separate
18   context?
19   A.   Kind of mixed. It involved -- I also
20   teach criminal justice classes at the community
21   college. And the administrator of the criminal
22   justice program was fired by the college, and I
23   was a witness into those proceedings when she
24   filed a wrongful termination lawsuit.
25   Q.   And you said that was several years

**Page 8**

1    ago. Do you remember what year?
2    A.   2017, maybe, 2016.
3    Q.   Did that case go to trial?
4    A.   No. Well, I don't know. I don't know
5    how it concluded. I was not called as a witness.
6    I don't know the status. Nobody ever got back to
7    me about what happened with the case. As far as I
8    know -- for all I know it's still pending.
9    Q.   Have you ever testified at trial?
10   A.   In a trial, no. I've been called as a
11   witness in -- I can think of two times where that
12   occurred where I was called as a witness. Once
13   was in -- this would have been back in the late
14   '80s. We had an aggravated murder case that
15   involved murders in Yamhill County and in
16   Josephine County. I was called as a witness in
17   Yamhill County by the defense about what our plans
18   were in terms of -- there were two
19   co-defendants -- whether we were going to try them
20   together separately. And there was issues about
21   who was going to seek the death penalty, if both
22   counties were, that type of thing.
23        And for some reason, the defense felt
24   they needed to call me as a witness to establish
25   what Josephine County was going to do for the

21

1  test to do to begin with because I thought of
2  degradation and contamination and so forth, so I
3  just didn't think we'd find anything.  And it
4  turns out I was right, but that's a story for
5  another day, I guess.
6          MS. PURACAL:  I'm going to hand you
7  a copy of a letter.  And I'm going to ask our
8  court reporter to mark the letter as Exhibit 2.
9          (Deposition Exhibit No. 2
10         marked for identification.)
11 BY MS. PURACAL:
12     Q.   Do you recognize that letter?
13     A.   Yes.  It's a letter I wrote.
14     Q.   This is a letter that you wrote to
15 Mr. Reim at the attorney general's office related
16 to the post conviction proceedings; correct?
17     A.   That's correct.  My practice is any
18 time there's a PCR petition filed on any of our
19 cases here in Coos County that we respond to the
20 petition and we respond to the person handling the
21 petition with any comments we may have.  So that's
22 my practice.  In every case I do that.
23     Q.   And I think I have maybe 15
24 installments of letters.  Does that sound about
25 right to you?

22

1      A.   That sounds about right.
2      Q.   If you look on page 2 of that letter
3  and you go down to the fifth paragraph it starts
4  with, "Later that morning."
5      A.   Yes.
6      Q.   The first two sentences are, "Later
7      that morning Leah's mother reported
8      to the police that Leah was missing.
9      This began a series of mistakes by the
10     Coquille Police Department."
11     A.   That's correct.
12     Q.   Can you talk to me about what those
13 mistakes were the police made?
14     A.   Well, there were several mistakes.
15 First off, I felt that the chief was not giving
16 appropriate attention to Cory Courtright's
17 concerns.
18          I personally did not know
19 Leah Freeman.  I live here in Coquille.  My kids
20 went to high school here in Coquille.  If you look
21 at the yearbook that freshman year for Leah, my
22 daughter's picture is right next to hers.  I was
23 on the school board for a period of time here in
24 Coquille, so I'm familiar with Coquille.  And from
25 what people were telling me, Leah was not a person

23

1  that would run away from home; out of character.
2          And the first mistake I thought was
3  made was not treating her disappearance seriously
4  when it was first reported.  Chief Reeves
5  basically blew her off.  Then -- and I can't
6  remember whether it was Thursday or Friday -- the
7  chief had found out that Leah and Nick and
8  Brent Bartley and his then girlfriend and maybe a
9  couple other people had gone up to Brent Bartley's
10 grandparents' place before she disappeared on that
11 Wednesday for some sort of a party -- a barbecue
12 and stuff.
13         My recollection is that the chief and
14 Dave Hall went up to the grandparents' place --
15 they were out of town.  They had gone on a
16 vacation where they were out of state, if not out
17 of country.  And they went up there.
18         And one of the things that people had
19 said that Leah was wearing this white T-shirt.
20 The chief kept referring to it as a wife-beater
21 T-shirt which I thought was inappropriate, but
22 okay.  But they described hanging on a railing
23 around the deck a similar-type shirt, but they
24 left it.  It turns out in the end it didn't mean
25 anything, but, you know, there's a similar-type

24

1  shirt, why didn't you seize it?  Why didn't you
2  take it?  I thought that was a mistake.
3          He assigned to the -- a case officer,
4  Dave Hall.  And the reason he assigned
5  Dave Hall -- and I don't want to sound overly -- I
6  think Dave -- he's now deceased, but I think Dave
7  admitted it, Dave had never had any major case
8  experience.  He'd never worked a murder.  He'd
9  never worked a major crime.  And the chief put him
10 in charge primarily because Dave was on light duty
11 and hurt his knee.  And so it was easier to put
12 him on it than to take somebody else.  And there
13 was -- why are you doing that?  You need somebody
14 more experienced to be the lead officer.
15         Then there was a lady, her name was
16 Shelly, less than a year experience, and the chief
17 threw her into the mix, having her running around
18 doing stuff that she just didn't have the
19 experience or training to be doing.
20     Q.   Is that Shelly Grant?  That's the only
21 Shelly I'm aware of.
22     A.   Yeah, I believe so.  Shelly Grant.  I
23 can't point to any mistakes that Shelly made, but
24 I thought putting two really, really inexperienced
25 people in this type of investigation was not

25

1   proper.
2          And then there were things that
3   happened -- some of the things I didn't really
4   find out until later. For example, the
5   Nicholas McGuffin interview that Chief Reeves did,
6   I believe I knew there was an interview, but I
7   didn't know there was a recording, I didn't know
8   there was a transcript. I didn't find that out
9   until 2009, 2010. I mean, there were things that
10  Chief Reeves did that he didn't communicate to us
11  that he knew about that he didn't share with the
12  rest of the team. And then some of the
13  information he gave to us was flat out incorrect.
14  He misinterpreted.
15     Q.   Do you remember anything specific that
16  was incorrect or that he misinterpreted?
17     A.   Yes. The incident with Big John, and
18  I forget John's last name for the life of me.
19     Q.   Are you talking about John Lindegren?
20     A.   Right. He's kind of a character here
21  around Coquille. I just saw him a couple weeks
22  ago. We call him Big John because he's like 6'8"
23  and 300 pounds all muscle. He's a kind of a
24  character.
25          But the chief had related to us -- we

26

1   had these morning briefings and Chief Reeves would
2   just talk and talk and talk. And at one point two
3   or three weeks into this I said, Chief, we're not
4   accomplishing anything by listening to you talk
5   for two hours before we go out and do stuff. Can
6   we shorten it up a bit? And he did at my
7   suggestion.
8          But one of the things he told us was,
9   he said -- and I remember this in the meeting, he
10  was real clear, he says, Yeah, I talked to
11  Big John or somebody -- one of his officers had
12  talked to Big John. And the officer had reported
13  to him that Big John saw Leah and Nick together
14  outside of Leah's house, and he put it around nine
15  o'clock.
16          And we in the group, including myself,
17  immediately said, Well, he's got it wrong, because
18  we had sighting other where in town around nine
19  o'clock where Leah was supposed to be, whether it
20  was at Sherri Mitchell's house or McKay's or what
21  was then the credit union or the restaurant,
22  whatever. We just immediately discounted it.
23          Well, then in 2010, 2011 we find --
24  that's the other thing Chief did, he never sent me
25  all the reports in this case. When we were going

27

1   through -- when we found what the chief had done,
2   it was basically when a report came in he threw it
3   in a banana box. We found, I think it was five
4   banana boxes of reports stacked someplace at
5   Coquille PD in no order, no sense of organization,
6   whatever.
7          So we're going through this, and we
8   find the officer's report about the contact with
9   Lindegren. And that's where we learn what
10  Lindegren had actually said back in 2000, was that
11  he had seen Leah and Nick outside of
12  Sherri Mitchell's at 9:00; not Leah's house on the
13  other side of town, but Sherri Mitchell's place.
14  And I said, Well, that's not what the chief told
15  us, you know, he told us an entirely different
16  story. So we talked to the officer. You wrote
17  this report. Was it Mitchell's place or Leah's
18  place? Oh, no. He told me Mitchell's place.
19  Okay.
20          So then we go and talk to him, and
21  he's -- Yeah, I saw her outside of Mitchell's
22  place. And he talked about right after 9:00.
23  Well, how do you know it's after 9:00? He had
24  this habit of going over to his sister's house to
25  watch Survivor. And he told the story about,

28

1   Yeah, I watched Survivor and somebody got voted
2   off and I'm on my way home and that's when I see
3   them.
4          And I'm, at that point in time,
5   saying, Okay, guys, I don't think he's giving us a
6   straight story. Because my wife's a Survivor fan
7   and she watches it almost religiously, and at the
8   time it was on Thursday night. I said, Survivor
9   is on Thursday night, it's always been on Thursday
10  nights, as far as I know, so it can't be Wednesday
11  night.
12          And they went back and checked, and
13  sure enough the first season of Survivor which was
14  in 2000 was on Wednesday night. And the episode
15  he was talking about turned out to be the episode
16  that he had told the officer about back in 2000.
17          So that was one thing that clearly
18  Chief Reeves had miscommunicated to us.
19     Q.   Do you remember any others?
20     A.   I don't remember any others about the
21  mistakes he had communicated to us.
22          The thing that over -- as the case
23  went cold, one of the things that bothered me was
24  whenever I would try to talk to him about, Hey,
25  let's get together and compare notes. I've

33

1  Q.  That polygraph report, where did you
2  look for that?
3  A.  Well, I went through the scientific
4  evidence binder, that's where I looked for it.
5  And then I have -- the reports in my binders are
6  categorized by officer, and I looked through
7  Kip Oswald's reports and I didn't see it there.  I
8  don't know if I went back and looked at Ranger's
9  stuff or not, Detective Ranger from the state
10 police.  He was the polygrapher at that time for
11 the state police.
12      I don't recall if I went back and
13 looked through Ranger's materials or not.
14 Q.  Did Kip Oswald have kind of personnel
15 file it might have ended up in?
16 A.  I don't know.  I'm sure he had a
17 personnel file at the sheriff's office.  He
18 retired from the sheriff's office and went to work
19 for North Bend PD.  And then after the Freeman
20 case had been concluded, a couple years after
21 that, you might want to look at Kip's personnel
22 file there at North Bend.  He was terminated by
23 North Bend, and I believe they terminated him over
24 some issues that he had with him telling the truth
25 about whether or not he had been given a doctor's

34

1  release to come back to work type of thing.  So he
2  was terminated.  I know he was terminated or asked
3  to resign, but I don't know all of the specifics.
4      I don't think -- if there is a
5  polygraph report in a file, it wouldn't be at
6  North Bend.  It would be at the sheriff's office.
7  Q.  At Coos County Sheriff's Office?
8  A.  Right.
9  Q.  So going back to the police report we
10 were talking about and that gap in time from 2001
11 and 2002 to 2008, you don't recall any
12 investigation in that period of time?
13 A.  Well, there was a couple things that
14 popped up here and there.  There was something
15 about -- I can't remember.  We got something from
16 Bend OSP about somebody up there spouting off
17 knowing something about Leah Freeman, and we
18 looked into that and it didn't seem to go
19 anywhere.  There were occasionally -- I'm thinking
20 like once every two or three years there would be
21 something that popped up like that, but we would
22 look at it and nothing really came out of it.
23      Again, I'm looking at this stuff kind
24 of from an incomplete standpoint because during
25 that time period I didn't know a lot of stuff that

35

1  was at Coquille PD.  I didn't know about these
2  other reports and there was pieces of evidence
3  they had and so forth.
4  Q.  So am I accurate when I'm thinking
5  that the trail had kind of gone cold --
6  A.  Yes.
7  Q.  -- during that period of time?
8  A.  Yes.
9  Q.  By the time you get to trial in 2010,
10 2011, did you believe that the case had been fully
11 prepared for trial?
12 A.  I did, yes.
13 Q.  Who prepared it for trial?
14 A.  Well, I mean, for what happened in the
15 courtroom, is that what you're asking?
16 Q.  Correct.
17 A.  I did.
18 Q.  Did you have any help with that?
19 A.  My chief deputy at the time,
20 Erica Soublet, assisted me at trial.  She was
21 co-counsel with me at trial.  But the majority of
22 the trial prep, getting it ready for trial, was
23 done by me.
24 Q.  Did you believe that you had done all
25 the investigation you needed to do to prepare it

36

1  for trial?
2  A.  Yes.
3  Q.  Did you believe that the facts had
4  been fully developed for trial?
5  A.  Yes.
6  Q.  Let's talk about what you did to
7  prepare for trial.
8  A.  Okay.
9  Q.  Can you give me an overview of what
10 you did?
11 A.  Well, I think -- well, I think we
12 got -- to overall prepare for trial, I think we
13 probably need to back up to how the case got
14 reactivated, so to speak, because that's probably
15 where it started.
16      After I became DA January 1, 2008, and
17 I stood for election in May and got elected the
18 first time in May.  I want to say it was June,
19 July Chief Reeves announced his retirement, and
20 Coquille PD, the City of Coquille, decided to do a
21 nationwide search for a new police chief.
22      To be candid, the police in Coquille
23 at that time in 2008 had a pretty bad reputation.
24 They were seen by a lot of citizens as being
25 overly aggressive, rude, obnoxious, lots of

37

1  complaints.  And the city manager at the time
2  wanted to change that and so they did this
3  nationwide search.
4       They came up with five candidates.
5  And they had an open house at the community
6  center, which I went to, and I spoke to all five
7  candidates.  I indicated to them my belief that --
8  on the Leah Freeman case that Chief Reeves had
9  been dragging his feet for whatever reason, didn't
10 want to be bothered with the case anymore, and I
11 said, I think we need to take a hard look at it.
12 And I asked each one of the five if they would be
13 willing if they became chief.  And they all seemed
14 to have done their homework and knew about the
15 case before I talked to them.  I said, Would you
16 guys be willing to work with me in reopening it
17 and see what we have?  And they all five agreed.
18 I was on the interview panel for the five
19 finalists, which led to Chief Daniels.
20      So after Chief Daniels had been on
21 board, the first thing we did once he came on
22 board -- and it probably was two or three or four
23 months after he came on board -- was, okay, where
24 are the reports?  That was the first thing, is
25 getting everything organized.

38

1       The second thing would have been,
2  Okay, what's the evidence?  What physical evidence
3  do we have?
4       That's when we found things like the
5  recording of Nicholas McGuffin's interview the
6  Friday after she disappeared.  We didn't know it
7  had been recorded.  There's a tape.  And it's on
8  an old DUII tape that had been recorded over, you
9  know, and it's fragile.  And I said, We got to get
10 that over and get it converted to digital so we
11 don't lose that, and then we found a transcript
12 that we didn't know about.
13      So then we're going through the
14 physical evidence and we found out we had Leah's
15 diaries.  I didn't know we had Leah's diaries.  So
16 part of that was -- I had the diaries copied and I
17 read all the diaries.  Reading all the police
18 reports.  I read them all.
19      We discovered in 2010 or 2009 -- well,
20 one of the things we did once the things were
21 organized, then we did this under wraps, I brought
22 in a bunch of retired homicide investigators, I
23 made them kind of special DA investigators, if you
24 will, and I said, Go through this stuff and tell
25 me where we need to go.  Obviously, Nick is a

39

1  suspect, but who are the other people we need to
2  look at?  Go through it and tell me what you
3  think.  So they went through and looked at it.
4  And I can't recall off the top of my head anything
5  specific that they recommended, but they had some
6  recommendations.  We kept this all quiet.  We
7  didn't tell anybody we were doing this.
8       Then we -- like I said, we're looking
9  at the evidence.  That's when I found out that we
10 didn't have Leah's clothes or the shoes, they were
11 still in England.  Good Lord.  Nobody had
12 requested that they be sent back.  And I'm
13 thinking, Oh, my gosh.  So we got ahold of that
14 lab in England, found out they still had them, and
15 had them sent back.
16      Now, in terms -- the other thing I did
17 was -- is the grand jury that we conducted in
18 2010.  I looked at that as a very important
19 preparation tool because we had -- and
20 Chief Daniels disagreed with me on this approach
21 and actually tried to -- he had people come and
22 try to talk me out of it.
23      But my approach was, Look, we've got
24 people out there saying Leah was hit by a car,
25 we've got people out there saying she was held

40

1  hostage at the scout cabin.  We need to bring in
2  all these people and find out, okay, what do you
3  know about this?  We need to eliminate -- I
4  shouldn't say -- we need to find out what the
5  truth is.  Is there some truth to these rumors?
6  If so, we need to figure it out.
7       That's why the grand jury, they called
8  110 witnesses over several days, spaced out over
9  several weeks -- I'm trying to find out, okay, did
10 she get hit by a car, was she held captive,
11 whatever, what do these people know.  And every
12 time we tried to run down those rumors, it was,
13 Well, that's what I heard on the street.  Well,
14 who told you this?  Then we go to that person,
15 Well, who told you that?  Well, that's what I
16 heard.  You know, we never were able to come to
17 anyone that had any firsthand knowledge about any
18 of these doggone rumors floating around town.  And
19 that was a big preparation, and so I had all of
20 those materials.
21      And so then getting ready for trial it
22 was a matter of, okay, who do I want to testify,
23 what do I want to have them testify to, picking
24 out my witnesses, picking out the exhibits and so
25 forth.  Okay, what are the questions I want to ask

Page 41

1  these people and so forth.
2  Q.  You talked about having reviewed all
3  of the police reports?
4  A.  Right.
5  Q.  When I think of police reports I also
6  think of interview reports.  Are you considering
7  the interview reports as well?
8  A.  Yes.  Transcripts of interviews,
9  reviewed all of those.
10 Q.  What about lab reports?
11 A.  Lab reports also.
12 Q.  From OSP lab?
13 A.  Right.
14 Q.  From the England lab?
15 A.  Right.
16 Q.  I believe you also had Microtrace?
17 A.  Microtrace, yes.
18 Q.  Did you review the entire file?
19 A.  When the McCreas asked for the bench
20 files, I did not review the bench file stuff,
21 especially the DNA stuff because I have no clue
22 what all those graphs and notes -- I'm not an
23 expert at it.  I don't know what those things
24 mean.  They wanted it, I got it for them.  I don't
25 recall going through the lab or the bench notes.

Page 42

1  No, I wouldn't have known.
2  Q.  Any other part of the file that you
3  didn't review?
4  A.  No.  That would be the only part,
5  would be the stuff that I have no expertise in
6  trying to figure out what it means.  I wouldn't
7  know.  But everything else -- I would have
8  included medical records that we got for Leah and
9  so forth.
10 Q.  So when we talk about the bench notes
11 for the DNA, and you say you weren't an expert on
12 that --
13 A.  Right.
14 Q.  -- did you rely on your experts to be
15 your eyes and ears on the DNA?
16 A.  Yes.
17 Q.  And your experts on that was
18 Kathy Wilcox for trial?
19 A.  Well, that was -- what we did was --
20 at trial was -- the question arose, and I put this
21 to the McCreas, Do we want to call the DNA people?
22 Do you want me to call these people, because my
23 plan had been -- was to call the people that had
24 done the DNA testing.
25     And I don't know how it came about, I

Page 43

1  don't remember how it came about, but we reached
2  an agreement that in lieu of having the experts
3  come down and testify, we would rely upon the
4  reports.  And my recollection is is we agreed to
5  stipulate to the reports being entered as
6  evidence.
7      And the purpose of Kathy Wilcox was to
8  explain what the reports said.  I wasn't calling
9  her as an expert in DNA.  I was calling her as --
10 well, she did do work on the case, she had
11 examined Leah's clothes and so forth, so I did
12 have her as a fact witness in terms of what she
13 actually did on the case.  And then the second
14 part was, okay, we've got these reports.  Can you
15 explain to the jury what these reports mean.  And
16 that's why -- I wasn't calling her as an expert in
17 DNA.  I was asking her to explain.
18     And that was an agreement that we had
19 reached with the McCreas because, otherwise,
20 normally you wouldn't be able to do that.  In a
21 trial you would have to call the experts and have
22 them explain everything.  That was an agreement
23 that we had reached as to how the trial would be
24 conducted.
25 Q.  So did you talk with Ms. Wilcox in

Page 44

1  advance of trial about what was in those reports?
2  A.  I gave her copies.  She had access to
3  the reports.  I showed her the reports.  I said,
4  Kathy, I'm going to ask you to explain what the
5  reports mean.  And I don't know -- I had pretrial
6  prep with every -- just about every witness, where
7  I sat down and said, Okay, this is the questions
8  I'm going to go ask you, and so forth.  And I know
9  I sat down with Kathy.  But I said, All I'm going
10 to ask you to do is explain what they mean.  I
11 don't believe they went any further than that.
12 Q.  Did you sit down with any other DNA
13 experts in advance of trial?
14 A.  No.
15 Q.  You said that you had met with almost
16 all of the witnesses pretrial.
17 A.  Yes.
18 Q.  Are there specific witnesses you have
19 in mind that you didn't meet with?
20 A.  Well, I had listed on my witness list
21 Mr. McGuffin's parents and Mr. McGuffin's
22 ex-girlfriend as potential witnesses.
23     I didn't meet with them because, A, my
24 first reaction was they wouldn't meet with me,
25 they wouldn't agree to do it.  I mean, I didn't

85

1  that to include an aider, abettor, or
2  co-conspirator.
3      A.   That's correct.  I did not ask them to
4  consider that at all.
5           Frankly, what I told them to do is,
6  You've heard everything, you have heard about all
7  these rumors, and I want you to tell me what you
8  think, if you think an indictment should be
9  issued.  I left it up to them to decide whether or
10 not an indictment should be issued and against
11 who, because, frankly, what I wanted at that point
12 was -- is if the evidence about all this other
13 stuff going on -- that's why I presented it to
14 them, so that they would know about all these
15 other potential suspects and this and that and the
16 other.  I wanted them to tell me who they thought
17 did it and if that person should be indicted.  So
18 I did not go in there advocating that they should
19 indict Mr. McGuffin.  I let them decide what to
20 do.
21     Q.   Did you tell them your theory about
22 Mr. McGuffin?
23     A.   Did I argue the case?  No, I don't
24 believe I did.  I said, You've heard everything.
25 I need you guys to decide what you think needs to

86

1  be done.
2      Q.   What about at trial, did you argue to
3  the jury or do you believe that you argued to the
4  jury a theory of accomplice liability?
5      A.   No.  I did not.
6      Q.   Earlier you mentioned that you had
7  made the suggestion that the shoes be tested for
8  DNA.  And you said that you wanted them to be
9  tested to determine whether they were
10 Ms. Freeman's shoes.
11     A.   That's correct.
12     Q.   Were you looking for anything else in
13 that testing process?
14     A.   At the time that I made the
15 suggestion, I don't believe I knew that there was
16 blood on the bottom of that shoe.  I don't believe
17 I was aware of the blood on the bottom of the shoe
18 until after Kathy Wilcox told me about it.  My
19 intent at that time was we need to figure out are
20 these in fact Leah Freeman's shoes.  So that's
21 where we went and got the standards from her mom
22 and dad, and then we also got something off her
23 hairbrush and her toothbrush to confirm that those
24 shoes were, in fact, hers.
25          That was my intent at the time, was

87

1  whose shoes are these?  Are these her shoes or
2  not.  That's what we wanted to know.
3      Q.   Did that intent change at any point in
4  time?
5      A.   Once they came back that there was
6  blood on the bottom of the one shoe, I said, Okay,
7  we need to figure out who that blood belongs to,
8  because at the time I didn't know who it belonged
9  to.  It could be the potential suspect, it could
10 be Leah's, I didn't know so we needed to get that
11 test.
12     Q.   Were you looking for any kind of
13 perpetrator DNA on those shoes at the time?
14     A.   I said, We need to find out -- now,
15 see, back in 2000, again, touch DNA was in its
16 infancy, and I can't even recall if I knew about
17 touch DNA in 2000.  I said, We need to make sure
18 these are Leah's shoes, and we need to find out
19 who that blood belongs to.  That was my
20 recollection of what we needed to do with that
21 testing.
22     Q.   And then we talked a little bit about
23 the England lab and that it was your boss
24 Mr. Burgett --
25     A.   Burgett.

88

1      Q.   My apologies -- that it was his
2  decision to involve the lab in England.
3      A.   That's correct.
4      Q.   Did you distrust that lab?
5      A.   No, I didn't distrust the lab.  I
6  didn't know if their procedure was going to be
7  admissible because it was never really fully
8  explained to me by Mr. Burgett or the other people
9  what this new process was.
10          And I said, First of all, are we going
11 to be able -- if it finds something, are we going
12 to be able to use it, because I didn't know --
13 because we would have to go through -- whatever
14 this new process was, we would have to go through
15 Brown/O'Key analysis about whether that would be
16 admissible, and I didn't know if we would be able
17 to do that.  I didn't know enough about the
18 process.
19          Secondly, I didn't think -- because
20 Mr. Burgett was, Well, maybe we'll get
21 Nick McGuffin's DNA on the pants, or on the
22 zipper, I think is one of the things he said.  I
23 said, Well, what's that going to tell us?  They're
24 boyfriend/girlfriend.  They're having sex.  That's
25 not going to tell us anything.  And then I said

161

1  and come back to me and tell me whether they are
2  still on the suspect list or they have been
3  eliminated by some reason.
4       The other thing I did was the grand
5  jury -- Chief Daniels only wanted me to present
6  stuff that showed Nick's guilt. He wanted me to
7  go in and do a grand jury basically in one day or
8  one afternoon and get an indictment on Nick. I
9  told him no.
10      That was not a popular decision with
11 him. In fact, he had people come talk to me, and
12 one of them was an idiot from the Vidocq Society,
13 D-I-V-O-Q [sic], trying to get me to change my
14 mind. And I refused to do that. I said, We have
15 to run down in grand jury every last one of these
16 rumors and potential suspects. And so that's why
17 there's 110, 120 people that were interviewed or
18 questioned in front of the grand jury. I felt we
19 needed to do a complete and total investigation.
20    Q.   Okay. You've seen some exhibits today
21 of various other people. You've heard about the
22 fellow who may be in fact Charity Kinsey.
23    A.   Uh-huh.
24    Q.   Was there a discussion during trial
25 about evidence that the defense was going to be

162

1  able to bring in about other potential suspects?
2  Do you remember having a discussion about that
3  with the Court?
4     A.    I filed a motion pretrial, and I
5  called it a motion in limine, and I forgot which
6  number I called it, motion in limine two or
7  something along that line. And my reasoning
8  was -- and I listed several people in there,
9  Alicia Michaud, there was several people I listed,
10 and I said, Look, there's no credible evidence, no
11 admissible evidence to support that these people
12 are suspects and I want to keep it out. Unless
13 you got something that ties into the crime, we
14 shouldn't be going down that rabbit hole.
15      And so we had a hearing on it.
16 Judge Barron ruled that while he wouldn't keep --
17 while he wouldn't just give a blanket no, if the
18 defense wanted to go down that route they would
19 have to demonstrate admissible evidence that would
20 tie that potentially to Leah's death. That's my
21 understanding of his ruling. He didn't foreclose
22 them from doing it, but they would have to produce
23 more than, This guy's a suspect. They would have
24 to tie something to it.
25    Q.   Okay. When we see in these exhibits

163

1  that are presented today about some fellow driving
2  around in a gray Cadillac or some fellow who
3  attacked Charity Kinsey, would these have been
4  people that you would have objected to being
5  brought up as potential suspects during trial?
6     A.    Yes.
7     Q.    Based on that ruling?
8     A.    Yes.
9     Q.    Okay. There is a claim that -- when I
10 look at this petition, you talked about bench
11 notes, giving bench notes to the McCreas. What
12 bench notes did you give to them?
13    A.    My recollection is they called me --
14 my practice is generally not to get the bench
15 notes unless the defense asks for it, primarily
16 because they're so voluminous and there is a cost
17 associated with the state police in producing
18 them. And they won't charge me for them, but
19 there is a cost to the State in producing these.
20 So unless I'm asked to produce them, I generally
21 don't, unless I have an independent reason myself,
22 and I can't recall a case where I've done that
23 other than there was one case I anticipated they
24 were going to do it so I asked for them, but
25 anyway.

164

1       My recollection was I was asked to get
2  the bench notes for the 2000 through 2001, 2003
3  testing, so I got those bench notes and I gave
4  them to the defense. I don't recall ever being
5  asked to get the bench notes for the testing that
6  was done in 2008, 2009, 2010, and I do not believe
7  I requested those bench notes.
8     Q.    I'm looking at paragraph 10, sub 2 and
9  3, and that's on page 18 of the fourth amended
10 petition. Look at 2 and 3. Do you know if you
11 provided the complete bench notes from lab
12 personnel and the complete records of lab work
13 including communication logs from OSP crime lab
14 and the file of Microtrace?
15    A.    I did not get the complete records of
16 the lab work from the testing that was done after
17 the case was reopened because I do not recall
18 being asked to get those.
19    Q.    Okay.
20    A.    And I did not request the file from
21 Microtrace because I was not requested to do so.
22    Q.    Very good.
23      Had that been requested would you have
24 done it?
25    A.    Yes.

R. Paul Frasier

```
 1   STATE OF OREGON.      )
                           ) ss.
 2   County of Douglas     )
 3
 4        I, Denise C. Zito Smith, CSR, a Certified
 5   Shorthand Reporter for the State of Oregon, hereby
 6   certify that the witness was sworn and the
 7   transcript is a true record of the testimony given
 8   by the witness; that at said time and place I
 9   reported by stenotype all testimony and other oral
10   proceedings had in the foregoing matter; that the
11   foregoing transcript consisting of 204 pages
12   contains a full, true and correct transcript of
13   said proceedings reported by me to the best of my
14   ability on said date.
15        If any of the parties or the witness
16   requested review of the transcript at the time of
17   the proceedings, such correction pages are
18   included.
19        IN WITNESS WHEREOF, I have set my hand this
20   14th day of June 2019, in the City of Canyonville,
21   County of Douglas, State of Oregon.
22
23   [signature: Denise C. Zito Smith]
24   _____
     Denise C. Zito Smith
25   Oregon CSR No. 01-0375
     Expires 9/30/2021
```

ccreporting.com