T 208.867.2027     **CHARLES R. HONTS, PH. D.**     F 208.426.4386

June 26, 2024

Janis C. Puracal, Attorney at Law
Andrew C. Lauersdorf, Attorney at Law
Maloney Lauersdorf Reiner, PC
1111 E. Burnside Street, Suite 300
Portland, Oregon 97214

David B. Owens, Attorney at Law
Loevy & Loevy c/o
Civil Rights and Justice Clinic
University of Washington Law School
William H. Gates Hall, Suite 265
PO Box 85110
Seattle, WA 98145-1110

Re: Polygraph Examination of Nicholas J. McGuffin Conducted by Detective Mark D. Ranger

Counselors,

At your request, I conducted a quality control review of a psychophysiological detection of deception examination conducted on Nicholas J. McGuffin by Detective Mark D. Ranger, a polygraph operator Oregon State Police at the Roseburg Patrol Office. The reviewed polygraph examination (hereinafter referred to as the McGuffin Examination) addressed issues concerning the disappearance and/or death of Leah Freeman. The McGuffin Examination was conducted at the Coquille Police Department facility on July 5, 2000.

**My Employment, Qualifications and Recognitions**

1. A true and current copy of my Curriculum Vitae is provided with this report as Attachment A. My Curriculum Vitae accurately provides a list of my education, training, academic appointments, professional licensure, publications, presentations, and a history of my sworn appearances as an expert witness.

2. **Employment:**

    2.1. I am Professor Emeritus of Psychological Science at Boise State University, 1910 University Drive, Boise, Idaho 83725. I retired from full time active employment at Boise State University in July of 2021. Prior to my retirement, Boise State

3105 SWEETWATER DRIVE, BOISE, ID 83716-5664

JUNE 26, 2024

2.1. University granted me Emeritus status with the University thus continuing my professional association and privileges with the Department of Psychological Science and Boise State University.

2.2. In 1976 I was trained as a polygraph examiner at the Backster School of Lie Detection in San Diego, California. In 2010, I completed an American Polygraph Association approved training course in Post-conviction Sex Offender Polygraph Testing. I practiced full time as a polygraph examiner between 1976 and 1980 when I went to graduate school to study Psychology. During my career I was licensed as a Polygraph examiner in a number of states. I maintained an active polygraph practice through the year 2022.

2.3. Since 1982, I have offered basic instruction and continuing education in a number of venues in the polygraph, law enforcement, psychological and legal professions. Those continuing educational activities include lectures and instruction on polygraphs, child witnesses, memory, interrogation methods and confession phenomena. Those educational activities include lectures and instruction with: the United States Department of Defense Polygraph Institute (now known as the National Center for Credibility Assessment. NCCA), the United States Secret Service, the Federal Bureau of Investigation and the Canadian Police College. On invitation, I have given other continuing education lectures and instruction to professionals in the United States and in a number of other countries. Those other countries include Canada, China, Columbia, Costa Rica, Ecuador, Honduras, Israel, Mexico, Norway, Peru, Panama, Poland, Sweden and the Netherlands. During the last 20 years, the area of interrogations, confessions, and false confessions took on a larger portion of my research, continuing education, and consulting efforts.

2.4. I also have a private consulting practice where I offer services as a consulting and/or testifying expert to the legal profession. I have appeared as an expert witness on the polygraph, interrogation techniques, false confessions, and on my other areas of research expertise in a number of courts of law in the United States and elsewhere. Through my research, practice and teaching I am highly familiar with professional polygraph and interrogation practices and standards in the United States and around the world.[1]

2.5. **Education:** I hold a Ph.D. degree in Psychology with a concentration in human experimental psychology. My central area of study and research is in the sub-

---

[1] Throughout this report I will reference two types of standards. In my usage, the term professional standards refers to professional practices to which the profession agrees. Such professional practice standards in the polygraph profession are promulgated by the schools that train examiners, by polygraph examiner organizations, and by scholarly publications in the field. As such professional standards represent a consensus of some group of examiners about how testing should be done. However, the existence of professional standards nether requires nor necessarily implies that those standards are supported by scientific research. The term evidence-based best practices indicates that there is published peer-reviewed scientific research that has validated the use of certain practices by showing that those practice produce a reproducible level of accuracy.

discipline of Psychology known as Psychology and Law. Polygraph testing in particular was a focus over the length of my academic career. I did research on jury behavior, eyewitness identification, eyewitness memory, assessing the credibility of child witnesses, interrogations and confessions. I published a number of peer-reviewed scientific papers, book chapters, and training materials on the polygraph and on the other areas of my expertise. I gave a large number of papers and invited addresses at scientific and professional meetings around the world.

3. **Recognitions:**

    3.1. I am a Charter Member and Fellow (elected in 2006) of the Association for Psychological Science, the largest professional association of psychological scientists in the world.

    3.2. In 2009, I was awarded The John E. Reid Memorial Award for distinguished achievements in polygraph research, teaching or writing by the American Polygraph Association.

    3.3. In 2014, I was awarded The Harry Detwiler Award for contributions to the polygraph profession in Latin America through advances in practice and research by the Asociación Latinoamericana de Poligrafistas.

**Materials Provided For Review:**

5.  I have reviewed the following:

    5.1. Oregon State Incident Report, Page 1 of 4, showing Incident # (CAD#) SP00-255176. The document was stamped with the date JUL 28 2000.

    5.2. Oregon State Police Polygraph Examination, GHQ Case #00-255176 (3 Pages). This document appears to be Detective Ranger's report of the McGuffin Examination conducted on July 5, 2000.

    5.3. Images of polygraph charts (10 pages) collected with an Axciton polygraph instrument, Bates Numbers 005529 through 005538. The 10 pages displayed two charts with a Peak of Tensions format and four charts in the format of a comparison question test.

    5.4. Chart Question Lists (2 Pages, Bates Numbers 005539 and 005540) apparently generated with the Axciton software.

    5.5. A second copy of Item 5.1, above, this version with Bates Numbers 005541 through 005543.

JUNE 26, 2024

5.6. A copy of three pages (without identification) of handwritten notes with Bates numbers 005544, 005545, and 005546.

5.7. A one-page copy of an Advise of Rights - Statement form, Bates Number 005547

5.8. A one-page copy of a State of Oregon, Department of State Police, Polygraph Examination Form, Detective Mark D. Ranger, Bates Number 005548.

5.9. A one-page copy of an Oregon State Police, Polygraph Quality Control Examination, Numerical Evaluation Worksheet, showing the handwritten name Nick McGuffin.

5.10. One unidentified hand written sheet showing numbers and checkmarks, Bates Number 005550.

5.11. 2000-07-05 CPD Report Bartley Deceptive.pdf This file opened as a 10-page document opening with a cover sheet, Supplemental Report, Coquille Police Department, Incident No. 00001905, Bates Numbers 001882 through 001891.

5.12. 2000-07-05 OSP Ranger, Polygraph - Bartley, Brent.pdf This file opened as a four page document. The first page was identified with Incident# (CAD#) SP00-255176, and was stamped with the date, Jul 28, 2000. The remaining pages were identified as, Oregon State Police Polygraph Examination, GHQ Case #00-255176. Those three pages were a report of a polygraph examination of Brent W. Bartley, conducted by Mark D. Ranger on July 5, 2000.

5.14. 2000-07-27 OSP Ranger, Polygraph - Bartley, Brent.pdf This file opened as a three page document. The first page was identified with Incident# (CAD#) SP00-255176, and was stamped with the date, Aug 9, 2000. The remaining two pages were identified as, Oregon State Police Polygraph Examination, GHQ Case #00-255176. Those two pages were a report of a second polygraph examination of Brent W. Bartley, conducted by Mark D. Ranger on July 27, 2000.

5.15. 2000-07-28 Affidavit for Search Warrant.pdf This file opened as a four page document, Bates Numbers 000056 through 000059. The document was captioned, In the Circuit Court of the State of Oregon for Coos County, State of Oregon vs. Nicholas James McGuffin, DOB 04/25/1982, Supplemental Affidavit for search Warrant. the affidavit was subscribed and sworn on July 28, 2000.

5.16. OSP038338.pdf This file opened to 39 pages of documents listing Mark D. Ranger's law enforcement training. The most recent dating on these documents was 04/21/2006.

JUNE 26, 2024

5.17. OSP038377.pdf  This file opened to a single page document titled, Oregon State Police Personnel Records for Ranger, Mark Dumbeck.  The document shows a handwritten Retirement Date of 03/31/2006.

**My Evaluation Of The Polygraph Examination:**

6. My evaluation of an examination normally consists of three qualitatively different analyses. First, I quantitatively evaluate the physiological data from the examination with numerical scoring system that is scientifically validated and represents a scientific best practice. Then I evaluate the critical elements of the examination including, but not limited to, test structure, semantics of the critical relevant and comparison questions, and the adequacy of the instrumentation, collection of physiological data, and the original examiner's evaluation of the data. Finally, I evaluate the conduct of the examination in light of current scientific best practice.

   6.1. Quantitative Review: It is my standard practice in reviewing examinations conducted by other examiners to evaluate the physiological data before reviewing any of the other materials. Although I prefer to review the physiological data in their original digital form, the original digital data were not available for the McGuffin Examination. I conducted my evaluation of the McGuffin Examination data by reviewing the photocopied images noted above at 5.3. My examination of the physiological recordings revealed that the following physiological measures were recorded: two channels of respiration, electrodermal activity, and relative blood pressure. Notably there were no sensors for vasomotor activity or for detecting physical motion by the subject, although sensors were available for both parameters at test time of the McGuffin Examination. Moreover, motion sensors were generally available from the polygraph instrument manufacturers and widely used at that time. At the time of the McGuffin Examination, most polygraph training programs considered motion sensor as a necessary component and a critical element of standard practice. In my own practice, I began using movement sensors in the mid 1980s. The available physiological data recordings were of adequate quality with minimal artifacts and no indication of overt distortion. In my opinion they were of adequate quality for conducting a numerical scoring analysis and they would have met minimal professional standards in the year 2000.

      6.1.1. The first two charts were in an atypical format for what was used at the time (and for what is used now). Although stimulation tests are commonly conducted as a first chart, it would be very unusual to conduct two stimulation tests.[2]  In order to determine the nature of these two charts I consulted the question lists

---

[2] See, Raskin, D. C., & Honts, C. R. (2002). The comparison question test. In M. Kleiner (Ed.), *Handbook of polygraph testing*. London: Academic (1-49) for a description of the Stimulation Test and its value in conducting forensic comparison question tests. Though this book was published after the McGuffin Examination, the discussion of the Simulation Test and its value was equally applicable to professional standards as they existed in 2000 and in years before.

JUNE 26, 2024

(5.4 above) and the polygraph report (5.1 above). From those documents I determined that the first two charts of the McGuffin Examination appear to be a Peak of Tension Test (POT). However, that placement was extremely unusual as the POT is usually conducted after a failed comparison question test where it is then used to guide the pending interrogation of the deceptive subject. In my 47+ years of experience with polygraph testing I have never seen a polygraph test conducted in this fashion. Moreover, there is no scientifically standardized/validated method for evaluating a POT for a direct assessment of credibility. I did review the two POT charts and did not see anything notable about them. **It is my opinion that the POT charts in the McGuffin Examination are without probative value for any purpose.**

6.1.2. The subsequent four charts took the form of a comparison question test (CQT) with three relevant questions and three comparison questions. The questions were ordered in the format commonly referred to in the polygraph profession as a Zone Comparison Test with the test used in the McGuffin Examination being quite similar to the variant known as the Federal Zone Comparison Test.[3] With minor variations, this CQT test format was, and still is, in common use in the polygraph profession. Moreover, this test format was the subject of a large body of published scientific research and was found to have high validity. However, some of the filler (unscored/unevaluated) questions in the McGuffin Examination are atypical and inconsistent with the US Federal, Utah, and Backster School variations of their Zone Comparison Test. The questions were repeated four times while physiological data were collected. I would note that professional standard practice is to collect data from three repetitions of the questions and then score. Additional data are then collected if the scores after three repetitions are inconclusive. **However, despite these discrepancies it is my opinion that the physiological recordings in the McGuffin Examination met the polygraph profession's standards and were of sufficient quality to submit to a numerical scoring analysis.**

6.1.3. I evaluated the physiological recordings using the numerical scoring system developed and scientifically validated at the University of Utah. Peer-reviewed scientific research shows the Utah scoring system to be one of the most accurate of the numerical scorings systems currently available, and it was the scoring system with the strongest scientific validation at the time of the McGuffin Examination.[4]

---

[3] Department of Defense Polygraph Institute (2006). *Test Data Analysis: DoDPI Numerical Evaluation Scoring System*, p. 41.

[4] Brian G. Bell, David C. Raskin, Charles R. Honts, & John C. Kircher, The Utah Numerical Scoring System, 28 *Polygraph* 1 (1999). Also see the review by David C. Raskin & Charles R. Honts, The Comparison Question Test. In Murray Kleiner (Ed.), *Handbook of Polygraph Testing* (2002). As before, though this review was published after the McGuffin Examination, the discussion of the Simulation Test and its value was equally applicable to professional standards as they existed in 2000 and in years before.

JUNE 26, 2024

6.1.4. The three relevant questions in this examination were:[5]

> R5: DY (Did you) physically do something to Leah that resulted in her death? Indicated Answer "No"
>
> R7: DO YH (Did you have) any direct involvement in Leah's disappearance? Indicated Answered "No"
>
> R9: HY (Have you) talked to Leah since last Wednesday night after 9PM? Indicated Answered "No"

6.1.5. Research has shown that the most accurate way to evaluate a polygraph examination is to consider only the total scores.[6] With the numerical scoring system developed at the University of Utah, a total numerical score of +6 or greater indicates truthfulness. A total numerical score of -6 or less indicates deception. Total numerical scores between -6 and +6 are considered inconclusive outcomes. My evaluation of the three question repetitions in the McGuffin Examination resulted in a total score of +17. That score indicates truthfulness to the relevant questions of the examination. My score sheet is provided as Attachment B to this report.

6.2. **Detective Ranger's Scoring Departs from Professional and Scientific Polygraph Standards:** After scoring the charts from the McGuffin Examination I examined Detective Ranger's scoresheet (5.9 above, Bates Number 005549). Although that score sheet does not specify what scoring system was used, it appears to be the US Federal three position scoring method.[7] Research conducted by the US Government and others shows this test data analysis method to be quite inaccurate with an extreme bias against actually truthful examinees. In a recent analysis, only 17% of the actually truthful subjects scored with this test data analysis produced truthful results.[8] That review concluded "The results reported here indicate that the practice of using the Federal 3-position scoring with Spot decision rules is a pernicious practice that is highly biased against the actually innocent and should be abandoned as having been scientifically demonstrated to be invalid."[9] In contrast, my scoring with an evidence-

---

[5] The relevant questions were obtained from 5.2 above, Bates Number 005539. The printout contained shortcut abbreviations for some words in the critical questions. I have indicated my best approximation for the abbreviated words; a task necessitated because there is no recording of the actual questioning. No answers were indicated on the printed question list. The answers shown above were obtained from the chart markings made by the examiner. (5.3 above, Bates Numbers 005531 and 005532)

[6] See the recent review, Honts, C. R. (2024. The innocent at risk: The dark side of certain polygraph practices. *Polygraph and Forensic Credibility Assessment: A Journal of Science and Field Practice, 53*(1), 1-15.

[7] Supra Note 3 for a detailed description of the criteria used for assigning scores and for decision rules.

[8] Supra Note 6.

[9] Supra Note 6, at p. 6.

JUNE 26, 2024

based best practice scoring system produced a truthful total score of +17 while Detective Ranger reported a deceptive total score of -29.

- 6.2.1. **In my opinion, Detective Ranger's scoring was done with a scoring method that is shown in published research to be highly biased against actually innocent subjects and as such it should not be given any probative weight for any purpose.**

- 6.2.2. **Moreover, it is my opinion that even accounting for the bias in the scoring system used by Detective Ranger, his extreme negative scores cannot be justified and are very inconsistent with professional and scientific based standards.** For example, my own evidence-based best practice scoring produced strong truthful scores with Mr. McGuffin's physiological data. I converted my seven position scores to three position scores and using the Federal test data analysis I still had a truthful outcome where all the relevant questions had positive spot scores and with a total score of +12. In other words, there is no professionally or scientifically accepted standard for polygraph scoring that would have justified the scoring documented by Detective Ranger. Even under a scoring system that is known to be biased, Detective Ranger's scores still lack any professional or scientific basis.

- 6.2.3. **It is my opinion that Detective Ranger's scoring of the McGuffin's physiological data is consistent with gross incompetence as a polygraph examiner, or a deliberate manipulation of the data to falsely reflect some sort of guilt or deception in the McGuffin Examination when a minimally competent or honest reporting of the polygraph data would have reflected innocence and a lack of deception in the McGuffin Examination.**

6.3. **Critical Element Evaluation:** After completing my analysis of the physiological data, I evaluated the other materials from the McGuffin Examination. Since there was no recording of the McGuffin Examination, my analysis here focused on the critical Relevant and Comparison Questions of the Examination. My analysis is limited to commentary on the documentary evidence that was available. As a result of that evaluation, I reached the following conclusions:

- 6.3.1. The Relevant Questions addressed different aspects (sometimes referred to as facets in the polygraph profession) of the disappearance and death of Leah. The use of multiple aspects was, and is, within the limits of accepted professional practice. Research shows that such test can be accurate as long as the decision is based only on the total score.[10]  In my opinion, the wording of the Relevant Question was, and is, within the parameters of standard professional practice.

---

[10] Supra Note 6 and its included references.

JUNE 26, 2024

    6.3.2. The Comparison Questions of the McGuffin Examination took the form of the CQT variant known as the probable-lie comparison question and they were worded as follows.[11]

> C4. BWYTM BYE (Besides what you told me did you ever) lie to anyone to protect yourself? Indicated Answer "No"
>
> C6. BTY DYE (Before this year did you ever) lie to the police? Indicated Answer "No"
>
> C8. BTY DYE (Before this year did you ever) commit a crime the police don't know about? Indicated Answer "No"

    6.3.3. The Handbook of Polygraph Testing[12] gives the following description of nature of probable lie questions. *Probable-lie questions deal with acts that are similar to the issue of the investigation. However, they are more general in nature, deliberately vague, and cover long periods of time in the life history of the subject. Virtually every criminal suspect has difficulty in unequivocally answering them with a simple, truthful "NO." An example of a probable-lie question in an examination regarding a robbery is "Prior to 1987. did you ever take something that did not belong to you?" The PLT includes two or three comparison questions that are reviewed with the subject after the relevant questions have been discussed and reviewed, and they are presented in a manner designed to encourage the subject to answer them with a denial.* (p. 15)

        6.3.3.1. In the McGuffin examination, comparison questions C4 and C6 address issues of lying, while the relevant questions address aspects of a disappearance and death/murder. In my opinion Comparison Questions C4 and C6 fail to meet the basic requirement for comparison questions to address acts that are similar to the issue of the investigation. Moreover, those comparison questions are exceptionally weak as they address a common behavior that often has no negative associations for the person being examined (as a potential lie teller).[13]

        6.3.3.2. **In my opinion C8 is also weak. Although C8 addresses a criminal behavior, it does not meet the face validity requirement for comparison questions that virtually any criminal suspect should have difficulty in unequivocally answering the question with a simple**

---

[11] I used the conventions described in Supra Note 5 to derive the wording and answers to the comparison question

[12] Supra Note 2.

[13] See DePaulo, B. M., Kashy, D. A., Kirkendol, S. E., Wyer, M. M., & Epstein J. A. (1996). Lying in everyday life. Journal of Personality and Social Psychology, 70(5), 979-995. DePaulo, B. M., & Rosenthal, R. (1979). Telling lies. Journal of Personality and Social Psychology, 37(10), 1713-1722.

JUNE 26, 2024

> truthful "No". Depending upon how Detective Ranger presented question C8, it might or might not be likely that the average polygraph subject would have difficulty in answering CE with a simple truthful "No". **In my opinion, especially without a recording, we have no evidence demonstrating that the presentation of C8 was adequate under professional and scientific standards.**

    6.3.3.3. In my opinion the form of the Comparison Questions of the McGuffin Examination does not conform to the current professional practice or the evidence-based best practices. **Moreover, the Comparison Questions of the McGuffin examination did not meet the professional or evidence-base practice standards at the time of the McGuffin Examination.**[14]

6.3.4. **In summary, it is my opinion, although the Relevant Questions of the McGuffin Examination conformed to standard practices in the polygraph profession, the Comparison Questions did not.**

6.3.5. **Moreover, it is my opinion that the deficiencies in the McGuffin Examination comparison questions strongly biased the examination toward a false positive error**[15] **with any truthful subject.**

6.4. **Evaluation of the Conduct of the Examination:** Since no video recording was available, an evaluation of the conduct of the McGuffin Examination by Detective Ranger is not possible. However, at the time of the McGuffin Examination there were professional and evidence-based best practice standards for conducting CQT examinations that were readily available to practicing polygraph examiners through publications[16] and continuing education seminars for polygraph examiners.[17] Moreover, in my opinion, by the year 2000 continuing education was considered necessary to maintain professional competence in the polygraph profession. For purposes of this report, I believe that it will be useful to describe what takes places in

---

[14] Supra note 2. Also see, Raskin, D. C. (1989). Polygraph techniques for the detection of deception. In D. C. Raskin Ed., *Psychological Methods in Criminal Investigation and Evidence,* New York: Springer, 247-296, at 254-255.

[15] With regard to polygraph testing a false positive error occurs when an actually truthful person is reported as deceptive on the test by the polygraph examiner.

[16] See Supra Note 2. A review of the References in the Raskin and Honts chapter reveals that none of them post-dated the year 2000. Thus, the vast majority of the source work for Raskin and Honts was readily available in the published literature well before the McGuffin Examination. Moreover, a review containing a description of the evidence-based best practices methods for conducting a CQT was published by Raskin in 1989, Supra Note 9.

[17] See my CV for references to continuing education courses, lectures and presentations, where evidence-based best practices for conducting a CQT that pre-date the year 2000, In my CV examples can be found: p. 29, No. 111, p. 37-40 with 17 seminars/lectures/workshops attended by polygraph examiners, p. 46, University of Utah Annual Workshop for the continuing education of polygraph examiners which I helped organize and where I lectured 1983 through 1987 inclusive, p. 47, listing Other Professional Instruction for polygraph examiners.

evidence-based best practice CQT examination. The subsequent sections provide a description of the professional and evidence-based practice testing methods that I would have been looking for in the conduct of the McGuffin Examination had a recording been available.[18]

6.4.1. **Pre-Test Interview.** The initial portion of the polygraph is known as the Pre-test Interview. The *Handbook of Polygraph Testing* describes the Pre-test Interview as a low-key approach that is conducted as an interview, not as an interrogation.[19] The Pre-test Interview has a number of phases.

    6.4.1.1. **Discussion of Rights and Examination Parameters.** Usually, the Pre-test Interview begins with a discussion of the roles of the polygraph examiner and the subject. As part of a process of informed consent, the subject is informed of the issues on which the subject's credibility will be assessed and about the general nature of the polygraph examination. The subject will also be informed as to who will have access to the results of the test when it is completed. The subject's rights under the law will also be discussed. The subject will then be asked to read, and then if in agreement, he or she will be asked to sign a release form to allow for start of the polygraph examination. That release that may or may not include a waiver of legal rights and the inplications of the presence or absence of a waiver of the subject's legal rights should be discussed.

    6.4.1.2. **Assessment of Subject Suitability for Testing.** A critical task required of the polygraph examiner is to make an initial assessment and decision about the subject's suitability for taking a polygraph tests.[20] A model policy for the assessment of polygraph subject suitability received final approval by the American Polygraph Association in 2021 (hereinafter, the Model Policy) although various versions of recommend practice had been available for many years.[21] As part of this assessment during the pre-test interview the examiner asks a number of open ended general background questions in order to assess the subject's level of education and ability to communicate and thus provide information and guidance about question wording. Physical

---

[18] Note that the methods described here are essentially the same as those I learned when entered the PhD program at the University of Utah in 1983 and which were being taught at the University of Utah Annual Workshop for polygraph examiners in 1983.

[19] Supra note 2, at 14-15.

[20] Nelson, R., (2012). Introduction to the Model Policy for Examinee Suitability, *Polygraph, 41*(4), 203-204.

[21] The Board of the American Polygraph Association (2012). Model Policy for the Evaluation of Examinee Suitability for Polygraph Testing. *Polygraph & Forensic Credibility Assessment: A Journal of Science and Field Practice, 50*(2) 106–108

JUNE 26, 2024

and mental health are also discussed. The health discussions in combination with the subject's reported educational and work history are all used by the examiner to make a decision about the subject's suitability for testing. Since polygraph examiners are neither medical nor mental health professionals, if any suitability issues are noted or suspected, then the examiner is ethically compelled to immediately stop the examination and require that formal assessments and approval by the appropriate medical or mental health professionals be obtained before proceeding.

6.4.1.3. **Free Narrative.** If the subject is found to be suitable for polygraph testing, the pre-test interview continues with the examiner asking open-ended questions intended to elicit a free narrative about the events under investigation. This conversation is done as an interview, not an interrogation. That is, the interview is neither directive nor confrontational. The subject's statements are not challenged although the examiner is allowed to ask non-confrontation clarifying questions after the free narrative is completed. As is noted in the Handbook of Polygraph Testing[22] the goal of that process is to clarify ambiguities or misunderstandings that might interfere with conducting a valid test. Another goal of the pre-test interview is to reduce the subject's general anxiety and to establish an atmosphere of objectivity, competence and trust. Confrontational challenges or interrogation of any sort are anathema to conducting a valid pre-test interview in a CQT intended to assess credibility.

6.4.1.4. **Question Review and Stimulation Test**. After the pre-test interview phase is completed, the examiner then describes the instrument and the process of testing. Test questions are formulated in cooperation with the subject. The development of the relevant and comparison questions is one of the more critical parts of the pre-test interview as the test will lack validity if the relevant question are not clear and unambiguous and/or if the comparison question are not appropriate in form and then introduced with the proper context and methods. The sensors and the test process are then described in detail and the sensors are placed on the subject's body. Usually a stimulation test is conducted at this point that is used as a demonstration to the subject that the polygraph can distinguish truthful from deceptive responses.[23] Apparently no stimulation test was conducted in the McGuffin Examination.

---

[22] Supra Note 2 at 14.

[23] This is sometimes called an Acquaintance Test, Supra Note 2 at 15.

    6.4.1.5.    **Data Collection.** The test questions will then be presented to the subject and the subject's physiology will be recorded. Professional and evidence-based best practice standards require a minimum of three complete repetitions of the test questions be collected. If there are problems with data collection, data from additional repetitions of the questions can be collected up to a total of five. In scientifically validated CQTs the presentation order of the relevant and comparison questions is rotated in each repetition so that the subject does anticipate which question will be asked next. The examiner then scores the physiological data and relates the outcome to the subject and asks if the subject has any questions or comments. The polygraph test is over at that point.

    6.4.1.6.    **Interrogation.** Sometimes, a polygraph test may then transition into an interrogation with the polygraph examiner becoming an interrogator. **However, interrogation should never be primary reason for conducting a polygraph examination.**

**Summary**

The McGuffin Examination was a specific issue comparison question test that used the Probable-lie Variant of the Zone Comparison Test. That test is a member of the family of polygraph tests known as Comparison Questions tests. The test used in the McGuffin Examination is considered by the American Polygraph Association as validated for evidentiary testing if conducted according to the professional standards of the polygraph profession and in a manner that was representative of the scientific data used to validate the Probable-lie Variant of the Zone Comparison Test.

Because the McGuffin Examination was not recorded, there is no evidence to demonstrate whether the examination was conducted according to professional or evidence-based best practices. However, a set of acceptable quality physiological recordings was produced. My scoring of the McGuffin Examination with the Utah Scoring System produced an outcome of Truthful with regard to the three relevant questions of the examination. My review of the available materials indicated that Detective Ranger scored the McGuffin Examination with a test data analysis method that is known to be highly biased against subjects who are answering the relevant questions truthfully. As noted above, published research shows that only about one in five actually truthfully persons produce a truthful outcome with the scoring methods used by Detective Ranger. Moreover, even when I modeled my numerical scoring to the rules apparently used by Detection Ranger, I still produced a truthful outcome.

JUNE 26, 2024

Based upon the materials I have reviewed and the analysis I conducted, my opinions can be summarized as:

**Detective Rangers' evaluation of this examination is consistent with either gross incompetence or a deliberate manipulation of the results that departed from accepted professional and scientific polygraph standards and falsely indicated Mr. McGuffin was being deceptive when he answered the examination questions.**

**Based upon professional and scientific polygraph standards, Mr. McGuffin provided responses that indicated truthfulness when he answered the relevant questions in the McGuffin Examination and denied any involvement in the disappearance and death of Leah Freeman.**

The opinions stated in this report are held to a reasonable degree of scientific and professional certainty.

Sincerely,

*[signature]*

Charles Robert Honts, Ph. D.
Detection of Deception Examiner
Emeritus Professor of Psychological Science

Attachments: (A) Curriculum Vitae of Charles R. Honts, Ph. D.
                (B) Honts Numerical Score Sheet

Charles R. Honts, Ph. D.
Polygraph Score Sheet
11/19/23

| Subject: Nicholas J. McGuffin | Date of Exam: 07-05-00 | | | | | | |
|---|---|---|---|---|---|---|---|
| Orig. Examiner: Mark D. Ranger | | | | | | | |
| Evaluator: Charles R. Honts, Ph. D. | | | | | | | |
| Date of Evaluation: November 19, 2023 1:24 PM | | | | | | | |

| Chart 1 | | Relevants | | | | | |
|---|---|---|---|---|---|---|---|
| Measure | R5 | R7 | R9 | | Totals | | |
| Res | 1 | 1 | 0 | | 2 | Control Qs at C4, C6 & C8 | |
| EDR | 1 | 0 | 0 | | 1 | Scored to strongest | |
| CDO | 2 | 2 | 2 | | 6 | control on chart | |
| Totals | 4 | 3 | 2 | 0 | 9 | | |

| Chart 2 | | | | | | |
|---|---|---|---|---|---|---|
| Measure | R5 | R7 | R9 | | Totals | |
| Res | 0 | 1 | 2 | | 3 | |
| EDR | 0 | 0 | 0 | | 0 | |
| CDO | 0 | 2 | 0 | | 2 | |
| Totals | 0 | 3 | 2 | 0 | 5 | |

| Chart 3 | | | | | | |
|---|---|---|---|---|---|---|
| Measure | R5 | R7 | R9 | | Totals | |
| Res | 2 | 2 | 2 | | 6 | |
| EDR | 0 | 0 | 0 | | 0 | |
| CDO | 2 | -2 | -2 | | -2 | |
| Totals | 4 | 0 | 0 | 0 | 4 | |

| Chart 4 | | | | | | |
|---|---|---|---|---|---|---|
| Measure | R5 | R7 | R9 | | Totals | |
| Res | 2 | 1 | 1 | | 4 | |
| EDR | 0 | 1 | 0 | | 1 | |
| CDO | -2 | -2 | -2 | | -6 | |
| Totals | 0 | 0 | -1 | 0 | -1 | |

| Chart 5 | | | | | | |
|---|---|---|---|---|---|---|
| Measure | R5 | R7 | R9 | | Totals | |
| Res | | | | | 0 | |
| EDR | | | | | 0 | |
| CDO | | | | | 0 | |
| Totals | 0 | 0 | 0 | 0 | 0 | |

| | | **8** | **6** | **3** | **0** | **17** | **Total Score** |

Page 1