Marla Kaplan
July 25, 2023

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

Marla Kaplan
July 25, 2023

```
NICHOLAS JAMES MCGUFFIN, as an      )
individual and as guardian          )
ad litem, on behalf of S.M.,        )
a minor,                            )
                                    )
                Plaintiffs,         )
                                    )
     vs.                            )Case No.
                                    )6:20-cv-01163-MK
                                    )(Lead Case)
MARK DANNELS, PAT DOWNING, SUSAN    )
HORMANN, MARY KRINGS, KRIS KARCHER, )
SHELLY MCINNES, RAYMOND MCNEELY,    )
KIP OSWALD, MICHAEL REAVES, JOHN    )
RIDDLE, SEAN SANBORN, ERIC          )
SCHWENNINGER, RICHARD WALTER, CHRIS )
WEBLEY, ANTHONY WETMORE, KATHY      )
WILCOX, GRAIG ZANNI, DAVID ZAVALA,  )
JOEL D. SHAPIRO AS ADMINISTRATOR OF )
ESTATE OF DAVID E. HALL, VIDOCQ     )
SOCIETY, CITY OF COQUILLE, CITY OF  )
COOS BAY, AND COOS COUNTY,          )
                                    )
                Defendants.         )
                                    )
VIDOCQ SOCIETY                      )
                                    )
                Cross-Claimant,     )
                                    )
     vs.                            )Case No.
                                    )3:21-cv-01719MK
                                    )(Trailing Case)
MARK DANNELS, PAT DOWNING, SUSAN    )
HORMANN, MARY KRINGS, KRIS KARCHER, )
SHELLY MCINNES, RAYMOND MCNEELY,    )
KIP OSWALD, MICHAEL REAVES, JOHN    )
RIDDLE, SEAN SANBORN, ERIC          )
SCHWENNINGER, RICHARD WALTER, CHRIS )
WEBLEY, ANTHONY WETMORE, KATHY      )
WILCOX, GRAIG ZANNI, DAVID ZAVALA,  )
JOEL D. SHAPIRO AS ADMINISTRATOR OF )
ESTATE OF DAVID E. HALL, VIDOCQ     )
```

Marla Kaplan
July 25, 2023

Page 2

```
 1   SOCIETY, CITY OF COQUILLE, CITY OF )
     COOS BAY, AND COOS COUNTY,        )
 2                                     )
                    Cross-Defendants.  )
 3                                     )
     NICHOLAS JAMES MCGUFFIN, as an    )
 4   individual and as guardian        )
     ad litem, on behalf of S.M.,      )
 5   a minor,                          )
                                       )
 6                    Plaintiffs,      )
            vs.                        )
 7                                     )
     OREGON STATE POLICE,              )
 8                                     )
                    Defendant.         )
 9
10
11
12
13
14              DEPOSITION OF MARLA KAPLAN
15            On Behalf of Oregon State Police
16               Pursuant to Rule 30(b)(6)
17            Taken in behalf of the Plaintiffs
18                        * * *
19              Tuesday, July 25, 2023
20           All Parties Appearing Remotely
21
22
23
24   Reported by:
25       Samantha Muncy, Notary Public
```

Page 3

```
 1       BE IT REMEMBERED THAT, pursuant to the Oregon
 2   Rules of Federal Procedure, the deposition of MARLA KAPLAN
 3   was before Samantha Muncy, a Notary Public, in and for the
 4   state of Oregon, commencing at the hour of 1:08 p.m. on the
 5   25th day of July 2023, all parties appearing remotely.
 6
 7                     APPEARANCES
 8
 9   For the Plaintiffs:
10    ANDREW C. LAUERSDORF & JANIS C. PURACAL
      MALONEY LAUERSDORF REINER, PC
11    1111 East Burnside Street, Suite 300
      Portland, Oregon 97214
12    503.245.1518
      acl@mlrlegalteam.com
13    jcp@mlrlegalteam.com
14
     For the Defendants:
15
      ROBERT FRANZ & SARAH HENDERSON, for City of Coquille, City
16    of Coos Bay, Coos County, Craig Zanni, Chris Webley, Eric
      Schwenninger, Sean Sanbron, Ray McNeely, Kris Karcher, Pat
17    Downing, Mark Dannels, Kip Oswald Michael Reaves, David
      Zavala, Anthony Wetmore, Shelly McInnes
18    LAW OFFICE OF ROBERT FRANZ JR
      730 B Street
19    Springfield, Oregon 97477
      541.741.8220
20    rfranz@franzlaw.comcastbiz.net
      shenderson@franzlaw.comcastbiz.net
21
      LAURA COFFIN, TAYLOR GERSCH, & EREK ANDRUS, for Richard
22    Walter
      LUVAAS COBB
23    777 High Street, Suite 300
      Eugene, Oregon 97440
24    541.484.9292
      lcoffin@luvascobb.com
25    tgersch@luvascobb.com
```

Page 4

```
 1
 2    ANTHONY SCISCIANI, for Vidocq Society
      HWS LAW GROUP
 3    101 Southwest Main Street, Suite 1605
      Portland, Oregon 97204
 4    503.542.1200
      rjones@hwslawgroup.com
 5    ascisciani@hwslawgroup.com
 6
 7    TODD MARSHALL & JESSE B. DAVIS, for Oregon State Police,
      John Riddle, Susan Hormann, Mary Krings, Kathy Wilcox
 8    OREGON DEPARTMENT OF JUSTICE
      100 Southwest Market Street
 9    Portland, Oregon 97201
      541.484.9292
10    todd.marshall@doj.state.or.us
      jesse.b.davis@doj.state.or.us
11
12
13
14
15
16
17
18
19
20
21
22   Also Present:
23    None
24
25
```

Page 5

```
 1                    I N D E X
 2   Examination By:                          Page
 3      MS. PURACAL                             6
 4
 5
 6
 7              E X H I B I T S   I N D E X
 8   Exhibit
     Number         Description                Page
 9
     Exhibit 9    Case Jacket                   23
10
     Exhibit 10   Evidence Receipt              31
11
     Exhibit 11   Case Chain-of-Custody Report  36
12
     Exhibit 12   Casework Protocol             41
13
     Exhibit 13   Casework Protocol             41
14
     Exhibit 14   Document from Department of   50
15                State Police Forensic
                  Laboratory Dated 8-27-2000
16
     Exhibit 8    Oregon State Police Forensic  53
17                Division Court Notebook
18   Exhibit 15   Document from Department of   67
                  tate Police Forensic
19                Laboratory Dated 1-21-2002
20   Exhibit 16   Gene Scan Results             70
21   Exhibit 17   STR Analysis Casework         72
                  Procedures Manual
22
     Exhibit 18   E-mail Dated 2-1-2010 Subject:  77
23                Leah Freeman
24
25
```

Marla Kaplan
July 25, 2023

Page 6

1  MARLA KAPLAN,
2  after having been first duly sworn on oath by the Court
3  Reporter, testified under oath as follows:
4
5  EXAMINATION
6
7
8  BY MS. PURACAL:
9  Q.  Ms. Kaplan, my name is Janis Puracal.  I'm an
10 attorney for the plaintiffs in this matter.  I understand
11 that you are appearing for the deposition today as a
12 designee of the Oregon State Police; is that correct?
13 A.  Yes.
14 Q.  And you understand that you are designated to
15 testify as to certain topics within a deposition subpoena.
16 Is that your understanding?
17 A.  Yes.
18 Q.  And do you understand that you're expected to
19 testify regarding all of the knowledge and information that
20 the Oregon State Police possesses on those particular topics
21 on which you are designated?
22 A.  I do.
23 Q.  Do you understand that your answers will binding
24 on the Oregon State Police?
25 A.  Yes.

Page 7

1  Q.  And do consent to testify on behalf of the Oregon
2  State Police?
3  A.  I do.
4  Q.  I understand that Mr. Davis represents you and
5  that he is typically there at the OSP office, but maybe not
6  in the room with you; is that correct?
7  A.  That's correct.
8  Q.  You're free to take a break at any point in time
9  for any reason at all.  Do you understand that?
10 A.  I do.
11 Q.  And you understand that you're under oath today?
12 A.  Yes.
13 Q.  Do you understand that that means you should give
14 the same careful and considerate answers that you would give
15 at -- if we were in a court -- a courtroom?
16 A.  I do.
17 Q.  And you understand we're making a transcript
18 today?
19 A.  I do.
20 Q.  And I know you've testified before, but I'm just
21 going to give you a couple of reminders on how we can make a
22 clean transcript.  One way is to answer questions out loud.
23 Our court reporter can't take down if you nod your head or
24 shake your head.  Does that make sense?
25 A.  Yes.

Page 8

1  Q.  Another thing that you can do is to express
2  confusion out loud.  So if I ask a poor question, you can
3  let me know and I will try and do better; okay?
4  A.  Okay.
5  Q.  And then another thing that we can do is just
6  avoid speaking over each other.  So I will do my best to
7  wait for you to finish your answer before I start a
8  question.  And if you could do your best to wait for me to
9  finish a question before you give an answer, that will help
10 our court reporter.  Does that make sense?
11 A.  It does.
12 Q.  You understand that the transcript in this case
13 may be used at trial?
14 A.  Yes.
15 Q.  Are you suffering from any mental or physical
16 illnesses that may impact your ability to answer my
17 questions today?
18 A.  No.
19 Q.  And are you on any medication that a medical
20 professional has told you may impact your memory or ability
21 to recall?
22 A.  No.
23 Q.  There were some questions that we asked of
24 Mr. Hilsenteger on behalf of Oregon State Police that he
25 thought you may be in a better position to answer.  And one

Page 9

1  of those was just a really basic question about when the DNA
2  unit was created at OSP.  Do you know the answer to that?
3  A.  I actually do not know the answer to that.
4  Q.  Is there somebody at OSP that would know the
5  answer to that?
6  A.  Certainly there's someone at OSP we could -- we
7  could ask and get you that information later.  When you say
8  "the DNA unit," are you specifically talking about the type
9  of testing that's applied in this case or are you talking
10 about other Legacy technologies?
11 Q.  Other Legacy technologies as well.  I'm just
12 trying to understand when that unit first came in to be?
13 A.  I can -- I can look through document archives to
14 see when the first procedures manual was published, and that
15 would -- would coincide roughly with the -- the -- the
16 creation of the unit.  It certainly may not be date exact,
17 but it could give a timeframe.  And I can look that up.
18 Q.  Okay.  Let's -- can we put that on a list for one
19 of the things that --
20 A.  Sure.
21 Q.  You might need to follow up on?
22 A.  Yeah.  But to clarify, the date the DNA unit was
23 created?
24 Q.  That's correct, yes.
25 A.  And if we can't find the creation date, the -- the

Marla Kaplan
July 25, 2023

## Page 18

1  Q. Are those topics on which the test was focused, is
2  that specific to DNA?
3  A. The tests are -- I -- I wouldn't use the word
4  "topics." They are samples upon which DNA testing is to be
5  performed.
6  Q. And it was specific to DNA as opposed to some
7  other discipline?
8  A. Correct.
9  Q. Is each test unique to the analyst or do all of
10 the analysts get the same test each year?
11 A. Currently or in 2000?
12 Q. In 2000?
13 A. I don't know the answer in 2000. There are only
14 so many test that are distributed by the external test
15 providers every year, so it would not be possible for every
16 analyst in the DNA section to have a bespoke external
17 proficiency test for each of those two proficiency test
18 cycles. So it's possible that they all took the same test
19 in the spring and they all took the same test in the fall.
20 But they may, half of them take one test in the spring, half
21 of them take a different test in the spring, another half of
22 them take a different test in the fall and another half of
23 them take a different test in the fall. Just depends on how
24 that program was run at the time.
25 Q. Did the unit supervisors get copies of the results

## Page 19

1  of those proficiency tests?
2  A. Per the policy, the unit supervisor should have
3  results of the proficiency tests, yes.
4  Q. When did the DNA unit start performing STR
5  testing?
6  A. The exact date?
7  Q. If you don't know the exact date, you can give me
8  a -- a year, if you know that.
9  A. The -- the year would be -- the -- the initial
10 protocols are dated in 1999. Whether those protocols were
11 developed in advance of the very first DNA test being
12 performed, I don't know. But 1999, 2000.
13 Q. In 2000, how long did the process take to get
14 through the steps from extraction through interpretation for
15 one sample?
16 A. For a single sample at a time from extraction
17 through interpretation? I could -- I could only speculate
18 as to -- as to that amount of time. It would depend on many
19 different factors, and so I -- I don't think I could -- I
20 don't think I can answer that question.
21 Q. Is it possible for the analyst to have performed
22 all of the steps within one day or were there set delays
23 between the steps? That's what I'm trying to understand.
24 A. There were set delays between the steps. Some of
25 the steps just take a certain amount of time from start to

## Page 20

1  finish to complete. So even now with modern technology,
2  extraction all the way through report writing in a single
3  eight hour day, I'd say it's almost impossible.
4  Q. So probably can't do it within one day. Is it, on
5  average, looking at weeks or are we looking at days?
6  A. A lot of that is going to depend on the other
7  cases the analyst has in progress. It's going to depend on
8  the other duties the analyst has during that time. There's
9  I would say -- you know -- you know, I didn't work here in
10 2000, and I recognize that I'm a representative of OSP in
11 2000 as well, but the analytical turnaround time in 2000, I
12 think, just varied really widely from analyst to analyst,
13 depending on the case type.
14 Q. And then at some point, the DNA unit started
15 performing probabilistic genotyping. When did they start
16 that?
17 A. 2017. Let me correct. Very late 2016, with --
18 with a smaller number of cases. 2017 was the full unit
19 transition to probabilistic genotyping.
20 Q. Mr. Hilsenteger talked a little bit about the
21 technical review prospects generally for the lab. I'm
22 trying to understand the process for the DNA unit
23 specifically, starting in 2000. When was technical review
24 required?
25 A. Always. Every case.

## Page 21

1  Q. And can you walk us through what that process
2  looked like?
3  A. The technical review process, you actually have to
4  take a step back to the analyst completes their case file.
5  So they -- they finish their supporting documentation, their
6  case notes, they write a draft analytical report. And so
7  when they have completed that case to -- to the -- the point
8  at which they are ready to advance it into the technical
9  review process, they will then pass it off to a technical
10 reviewer. At that point, technical review is a review of
11 all of the case notes and the other supporting documentation
12 and a view of the draft report to ensure that it meets all
13 of the division requirements and the disciplines
14 requirements to ensure that the report is supported by the
15 case notes and to ensure that the reported conclusions are
16 correct based on that supporting and underlying data.
17 Q. Is there a method that the lab had in place in
18 2000 for the technical reviewer to give feedback to the
19 analyst who performed the work?
20 A. Not that was informal. It was sometimes just
21 conversations, it would have been passing paperwork with
22 post-it notes with little comments on it back and forth. So
23 it was -- it was just handing off notes, be they verbal
24 notes, be their -- be their written notes.
25 Q. If there was notes, were those kept in the file?

Marla Kaplan
July 25, 2023

Page 22

1    A.   No.
2    Q.   Did that process of giving feedback change at any
3  point before 2011?
4    A.   No.
5    Q.   And Mr. Hilsenteger mentioned supervisor review.
6  That's reviewed by the unit supervisor; is that correct?
7    A.   Correct.
8    Q.   And then the technical lead may be another level
9  of review; is that correct?
10   A.   Technical lead may not -- if we're talking about
11 levels of review, I don't know that the technical lead
12 review is -- is -- is in some way ranked or ordered in
13 relation to supervisor review.  But the technical leader
14 review is another type of review that is performed.
15   Q.   How is the supervisor review different than the
16 technical review?
17   A.   I don't know how a supervisor review is performed.
18   Q.   Who would know that at OSP?
19   A.   That would be a question for Mr. Hilsenteger.
20   Q.   And that's including within the DNA unit?
21   A.   That should be, yes.
22   Q.   Then what about the technical lead review?  How is
23 that different from the technical review?
24   A.   So technical lead review -- and I'm going to --
25 I'm going to pause real quick and close my e-mail because I

Page 23

1  hear it dinging in the background and I do apologize for
2  that.
3    Q.   That's okay.  Go ahead.
4    A.   Just always open, so apologies.
5         So the technical lead review is -- is done
6  after the technical review, generally.  It is done sometimes
7  for -- for a really targeted reason, perhaps if a new
8  technology or a new tool was brought online, a technical
9  leader might just focus a review very narrowly on that new
10 thing.  Other times, a technical leader review might be a
11 complete tech -- re-technical review of all of the work that
12 was previously done.  Other times, a technical leader review
13 could just consist of a review of the analytical report.
14 And I don't know, specifically, what types of technical
15 leader review were being done in 2000.  That would have to
16 be a question for the specific technical leader at the time.
17   Q.   Okay.  I'm going to show you a document here.  It
18 is what we have marked as Exhibit No. 9 to the deposition.
19            (Exhibit No. 9 was marked.)
20   Q.   And my understanding is that this is the case
21 jacket for this case.  Is -- is that what you would call
22 this?
23   A.   For the DNA work in this case, yes.
24   Q.   Okay.  And I see that up here, for example, in the
25 right-hand corner for this one particular set of requests, I

Marla Kaplan
July 25, 2023

Page 24

1  see that there was a tech review, and there's the
2  initials S.T.H.  I understand that to be Susan Hormann; is
3  that correct?
4    A.   Yes.
5    Q.   And I see that work was done by M.K.  That's Mary
6  Krings, correct?
7    A.   Correct.
8    Q.   Then I see that there's a tech leader review,
9  which I think that says CVD, Cecilia Von Beroldingen; is
10 that it?
11   A.   I think it's Von Beroldingen.  But yes, Cecilia.
12   Q.   And maybe you could spell that last name for the
13 record.  I'm sure I'm going to trip over it.
14   A.   I honestly think I have to look it up.
15   Q.   That's okay.  We can look it up afterwards.
16   A.   Okay.
17   Q.   I -- actually, I have it here in my notes.  So --
18   A.   Okay.
19   Q.   I understand her last name is V-O-N
20 B-E-R-O-L-D-I-N-G-E-N.  Does that sound right?
21   A.   Yes.  That sounds correct.
22   Q.   Okay.  And I don't see any supervisor review on
23 here.  Does that mean that there was no supervisor review
24 for this particular set of work?
25   A.   That is my understanding of the process in place

Page 25

1  at the time.
2    Q.   And is that the same for these other sets of work
3  where there's no supervisor review initials?  That means
4  there was no supervisor review for that?
5    A.   Based on my understanding of the overall process,
6  yes.
7    Q.   And I can see that Ms. Hormann did the tech review
8  for Ms. Krings' work in 2000 and then also in 2001; is that
9  correct?
10   A.   Yes.
11   Q.   And then I can see here -- keep going to this next
12 page.  For that set of work in 2002, I can see that
13 Ms. Hormann did the tech review for Ms. Krings' work there
14 as well?
15   A.   Yes.  Based on this, that looks correct.
16   Q.   And then in 2010, I see that it was Ms. Hormann
17 who completed the work; is that right?
18   A.   Yes.
19   Q.   And I can't tell whose initials these are for tech
20 review.  Can you tell?
21   A.   I recognize those initials as being from Deborah
22 Newville, a DNA analyst.  But our official record of
23 technical review is found within our Laboratory Information
24 Management System or our LIMS system.  So I could look up to
25 confirm that.

Page 62

1  interpretation threshold that we're talking about for 2000?
2      A.  So DNA -- DNA results are reflected in terms of a
3  unit of measurement called "relative fluorescent units."
4  Basically part of our DNA analysis process is to analyze DNA
5  fragments and make them glow.  And how intensely they're
6  glowing is corresponds to their fluorescence or relative
7  fluorescent unit.  And those units are measured by
8  instrumentation that we use.  And so in 2000, the
9  interpretation threshold was a hundred and 50 relative
10 fluorescent units or RFU for short.
11     Q.  And so I'm going to -- I'm going to go back to a
12 question that I asked.  Was there a written protocol that
13 gave analysts discretion to choose whether to interpret the
14 data below that 150 threshold?
15     A.  There was a written protocol that discussed the
16 use of peaks below a hundred and 50 that used the word
17 "may," which implied discretion.
18     Q.  Which protocol are you referring to?
19     A.  That would be both in the 2000 -- let me find it.
20 Sorry.  That language would in the 8/1/2000 and 4/9/2001
21 protocols.  And maybe in others as well, but I specifically
22 know it's in those two protocols.
23     Q.  And I'm going to share my screen with you and go
24 back to Exhibit 12.  And this is the August 1st, 2000
25 protocol.  And I'm looking at PDF page 30 here.  Is this the

Page 63

1  language that you're looking at?  The -- under subs three
2  where it says, "Peak heights less than 150 RFU may be
3  interpreted with caution"?
4      A.  Yes.  That's the language I'm referencing.
5          MR. DAVIS:  What's the exhibit number?
6              (Stenographer asks for
7              clarification.)
8          MS. PURACAL:  I'm sorry, Mr. Davis.  I could
9  not understand that.
10         MS. COFFIN:  I -- I was just asking for the
11 exhibit number.  It's covered by a -- some -- something on
12 my screen covers the exhibit number.
13         MS. PURACAL:  It's Exhibit No. 12.
14         MR. DAVIS:  Thank you.
15 BY MS. PURACAL:  (Continuing)
16     Q.  In 2000, if the analyst chose to interpret data
17 below the 150 threshold, did the lab have a protocol that
18 gave analysts discretion to choose whether to report that
19 interpretation?
20     A.  So -- so we go back to the -- the linear process.
21 If something is interpreted and a conclusion is drawn, then
22 it goes on the report.
23     Q.  Where is that stated in the protocols?
24     A.  That's sort of a combined application of the
25 protocol as a whole.

Page 64

1      Q.  Were there factors that the lab established to
2  guide the analysts' discretion whether to interpret data
3  below the 150 threshold in 2000?
4      A.  I don't know.
5      Q.  Who would know the answer to that?
6      A.  I don't know.
7      Q.  In 2000, how did the lab train its analysts to
8  exercise their discretion whether to interpret data below
9  the 150 threshold?
10     A.  Part of the training program would be to look at
11 data of varying strengths.  And so that would have been
12 covered during the analyst training.
13     Q.  Is that the training pursuant to the training
14 manual that we've talked about?
15     A.  Yes.
16     Q.  In 2000, how did the lab supervise the analysts in
17 their exercise of discretion as to whether to interpret data
18 below the 150 threshold?
19     A.  I don't know that "supervise" is the right term.
20 The lab would monitor the application of this threshold
21 through the technical review, technical leader review,
22 supervisor review process.
23     Q.  How would the technical reviewer make sure that
24 the analyst -- that the analyst exercised her discretion
25 appropriately to interpret data below the 150 threshold?

Page 65

1      A.  Part of the technical reviewer -- part of the
2  technical reviewer's role is to determine whether or not
3  they concur with the data assessment, interpretation,
4  conclusions and reportings, so that would have been built
5  into that technical review process.
6      Q.  One of the -- one of the questions that
7  Mr. Hilsenteger deferred to you on was a question that I
8  asked him about Brady and whether the lab, specifically the
9  DNA unit, put any limits on the analyst's discretion in
10 light of Brady obligations.  Meaning, if the analyst saw
11 data that was below threshold, being aware that the analyst
12 has Brady obligations, how did those two things work
13 together?
14         MS. COFFIN:  I will just object that it's a
15 compound hypothetical.  And is -- is -- is vague and
16 ambiguous.  Go ahead if you can.
17         THE WITNESS:  The analyst is responsible for
18 interpreting the data and drawing conclusions from the data.
19 They then report that.  Not interpreting data is -- was not
20 at the time considered Brady material.  It is considered an
21 interpretation of scientific data.  And so therefore, that
22 distinction -- there -- there's a big distinction between
23 data interpretation and -- and application of scientific
24 expertise and -- and Brady obligations.
25     Q.  Was that written down anywhere for the lab

Marla Kaplan
July 25, 2023

Page 70

1   A.   No.
2   Q.   In 2000, did the lab have a protocol that required
3   the analyst to determine the number of contributors?
4   A.   To exact number of contributors?  I don't know if
5   it was specifically spelled out.  That would also be in that
6   Interpretation section in that manual.
7   Q.   Did the lab require the analyst to report a number
8   of contributors?
9   A.   No.
10  Q.   Is it the lab's position that Ms. Krings
11  documented her work appropriately in 2000 and 2002?
12  A.   By the protocols in place at the time, yes.
13  Q.   Has the lab determined whether there were
14  incorrect results reported to the prosecutor for any of the
15  samples tested in the criminal case against Mr. McGuffin?
16  A.   Any of the samples?  Or are we specifically
17  discussing the DNA results?
18  Q.   The DNA results.
19  A.   The lab has not determined any issues with the DNA
20  results as reported in 2000, under those protocols.
21  Q.   I'm going to share my screen with you again here,
22  I'm going to show you what I have marked as Exhibit 16 to
23  your deposition.
24       (Exhibit No. 16 was marked.)
25  Q.   This is a copy of the gene scan results notes from

Page 71

1   Ms. Krings.  I see her initials here at the top.  Do you see
2   that?
3   A.   Yes.
4   Q.   And this is related to the shoe results; correct?
5   A.   Yes.
6   Q.   And down here at the bottom, there's a key.  Right
7   in the middle, there's a couple of hole punches.  Can you
8   tell what information we're missing here in the second
9   seeing column -- actually, the first, second and third
10  column where there's hole punches?
11  A.   I can -- I can certainly make some educated
12  guesses based on my DNA expertise, but I -- I can sort of
13  reserve the right to not get it quite right, I guess I
14  should say.
15  Q.   Sure.
16  A.   So the "NC," I'm not sure.  The "PU" would be
17  "pull up," which is an artifact of the analytical process
18  that we use.  "Minus A" would equal Minus A shoulder," which
19  is another artifact of our process.  "Mx" equals "mixture."
20  And the "DL," I think, references some sort of deletion of
21  data from an analysis project based on either not needing
22  the particular sample or based on poor quality data.
23  Q.   Does the lab have any copies of this form that
24  don't have the hole punches in them?
25  A.   I'm sure we do.  This may -- this -- this form may

Page 72

1   also be an appendix to the protocol itself, which had
2   several example worksheets in it.
3   Q.   So we -- we talked about the lab's policy for
4   interpreting peaks below the 150 threshold.  At some point,
5   that threshold changed.  It was lowered to 100; is that
6   right?
7   A.   Yes.
8   Q.   When did the lab make that change?
9   A.   I don't know specifically when that change was
10  made.
11  Q.   I'm going to show you what I have marked here as
12  Exhibit 17 to the deposition.
13       (Exhibit No. 17 was marked.)
14  Q.   This is a copy of the lab's casework procedures
15  manual, and it's dated here at the bottom.  You can see
16  revised October 22, 2009.  Do you see that?
17  A.   I do.
18  Q.   If I go all the way to the last page -- or sorry.
19  The second to the last page, PDF page 71, I can see their
20  revision history here.  And I can see -- if we scroll down a
21  little bit here, I can see that it says, the "Interpretation
22  threshold to 100 RFU."  And that happened in the October 15,
23  2007 manual.  Does that help to tell us when the threshold
24  was lowered to 100 RFUs?
25  A.   This is just a summary of the changes and they

Page 73

1   were -- this -- this wasn't applied in the 2000 one, but
2   there were also sort of multiple analytical pathways that --
3   that a -- a sample could go through and then meet the
4   obligation of a threshold.  So it's unclear to me whether --
5   which -- which analytical pathway this refers to.  I -- I --
6   I recall that the 150 to 100 RFU threshold was dropped
7   sometime in 2004 or '05.  So the -- the 2007 would have been
8   the samples that went down a different analytical pathway
9   than the sample in this case.
10  Q.   What about the -- for the samples in this case,
11  when was the threshold lowered to 100 RFUs?
12  A.   So for the samples in this case in 2000, they were
13  interpreted under the threshold that was in place at the
14  time.  Sometime between 2000 and 2016 -- and this
15  information is in our casework manuals.  And I -- I vaguely
16  remember it was sometime in 2004.  The threshold was lowered
17  from a hundred and 50 to 100.  And then -- you know, I want
18  to look that up to make sure that I am correct.  Is that
19  information that I could get you later, the exact date
20  that -- it would be very helpful if I could get you that
21  information at a later date, the exact protocols in which
22  the threshold changes were made.
23  Q.   That's fair to me as well.  So why don't we put
24  that on the list?
25  A.   Okay.

Marla Kaplan
July 25, 2023

```
 1                    CERTIFICATE
 2         I, Samantha Muncy, a Court Reporter and Notary
 3    Public, do hereby certify that, pursuant to the Oregon Rules
 4    of Federal Procedure, MARLA KAPLAN,  personally appeared
 5    before me at the time and place mentioned in the caption
 6    herein; that the witness was by me first duly sworn on oath
 7    and examined upon oral interrogatories propounded by
 8    counsel; that said examination, together with the testimony
 9    of said witness, was taken down by me in stenotype and
10    transcribed through computer-aided transcription; and that
11    the foregoing transcript constitutes a full, true and
12    accurate record of said examination of and testimony given
13    by said witness, and of all other oral proceedings had
14    during the taking of said deposition, and of the whole
15    thereof.
16         Witness my hand at Portland, Oregon, this 9th day
17    of August 2023.
18
19    _____
      Samantha Muncy
20    Notary No. 1015962
      Expires August 23, 2025
21
22
23
24
25
```

Marla Kaplan Volume II 30(b)(6)
December 12, 2023

Marla Kaplan Volume II 30(b)(6)
December 12, 2023

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

```
NICHOLAS JAMES MCGUFFIN, as    )
an individual and as           )
guardian ad litem, on behalf   )
of S.M., a minor,              )
         Plaintiffs,           )
vs.                            )
                               ) Civil No. 6:20-cv-01163-MK
MARK DANNELS, et al.,          ) (Lead Case)
         Defendants.           )
_____)
VIDOCQ SOCIETY,                )
     Cross-Claimant,           )
                               )
vs.                            )
                               )
MARK DANNELS, et al.,          )
     Cross-Defendants.         )
_____)
NICHOLAS JAMES MCGUFFIN, et    )
al.,                           )
         Plaintiffs,           ) Civil Case No.
vs.                            ) 3:21-cv-01719-MK
                               ) (Trailing Case)
OREGON STATE POLICE,           )
         Defendant.            )
                               )
```

30(B)(6) DEPOSITION OF OREGON STATE POLICE

by and through

MARLA KAPLAN

VOLUME II


DATE:  December 12, 2023

REPORTED BY:  Lori L. Thielmann, RPR, CCR #21-0014
         U.S. Legal Support | www.uslegalsupport.com

Marla Kaplan Volume II 30(b)(6)
December 12, 2023

Page 90

 1           A P P E A R A N C E S
 2     (All parties appearing via videoconference.)
 3   FOR PLAINTIFFS:
 4           JANIS C. PURACAL
             ANDREW C. LAUERSDORF
 5           Maloney Lauersdorf Reiner PC
             1111 East Burnside Street, Suite 300
 6           Portland, OR 97214
             503.245.1518
 7           jcp@mlrlegalteam.com
             acl@mlrlegalteam.com
 8
 9   FOR DEFENDANTS OREGON STATE POLICE, JOHN RIDDLE, SUSAN
     HORMANN, MARY KRINGS, AND KATHY WILCOX:
10
             JESSE B. DAVIS
11           Oregon Department of Justice
             100 SW Market Street
12           Portland, OR 97201
             jesse.b.davis@doj.state.or.us
13
14   FOR DEFENDANTS CITY OF COQUILLE, CITY OF COOS BAY, COOS
     COUNTY, CRAIG ZANNI, CHRIS WEBLEY, ERIC SCHWENNINGER,
15   SEAN SANBORN, RAY MCNEELY, KRIS KARCHER, PAT DOWNING,
     MARK DANNELS, KIP OSWALD, MICHAEL REAVES, DAVID ZAVALA,
16   ANTHONY WETMORE, SHELLY MCINNES:
17           SARAH R. HENDERSON
             Law Office of Robert E. Franz, Jr.
18           P.O. Box 62
             Springfield, OR 97477
19           shenderson@franzlaw.comcastbiz.net
20
     FOR DEFENDANT VIDOCQ SOCIETY:
21
             ANTHONY R. SCISCIANI III
22           HWS Law Group
             101 SW Main Street, Suite 1605
23           Portland, OR 97204
             ascisciani@hwslawgroup.com
24
25

Page 91

 1        A P P E A R A N C E S (Contd.)
 2
     FOR DEFENDANT RICHARD WALTER:
 3
             ERIC S. DEFREEST
 4           Luvaas Cobb
             777 High Street, Suite 300
 5           Eugene, OR 97401
             edefreest@luvaascobb.com
 6
 7              * * * * *

Page 92

 1                VIDEOCONFERENCE DEPOSITION OF
 2                        MARLA KAPLAN
 3                         VOLUME II
 4
                       EXAMINATION INDEX
 5
     EXAMINATION BY                                       PAGE
 6
     Ms. Puracal........................................ 93
 7   Mr. Davis.......................................... 116
     Ms. Puracal........................................ 120
 8
 9                        EXHIBIT INDEX
10     EXHIBIT        DESCRIPTION              FOR ID
11   Exhibit 12    Oregon State                  101
                   Police
12                 Portland Forensic
                   Laboratory
13                 DNA Unit, Short
                   Tandem Repeat
14                 (STR) Analysis
                   Casework Protocol
15                 SW001758-1820
16   Exhibit 15    01/21/2002 Letter             105
                   MK000241-242
17
     Exhibit 21    12/21/2023 E-mail              94
18                 from Mr. Davis to
                   Ms. Puracal
19
     Exhibit 22    Department of                 113
20                 State Police Media
                   Relations, Revised
21                 01/08/2010
                   OSP024122-126
22
     Exhibit 23    Brady Training                114
23                 Module OSP030013
24
25

Page 93

 1          CLACKAMUS, OREGON; DECEMBER 12, 2023
 2                       9:02 A.M.
 3
 4   MARLA KAPLAN,          deponent herein, being
 5                          first duly sworn on oath,
 6                          was examined and testified as
 7                          follows:
 8                            -o0o-
 9
10                         EXAMINATION
11   BY MS. PURACAL:
12       Q.  Good morning, Ms. Kaplan.  My name is Janis
13   Puracal.  I represent the plaintiffs in this matter.
14   You and I have met before on deposition.  Can you give
15   us your first and last full name and spelling for the
16   record?
17       A.  My name is Marla Kaplan, M-A-R-L-A; last name
18   K-A-P-L-A-N.
19       Q.  And can you give us your title as well?
20       A.  I'm the DNA technical leader for the Oregon
21   State Police.
22       Q.  You're appearing today for deposition as a
23   designee of the Oregon State Police; is that correct?
24       A.  Yes.
25       Q.  You testified as a designee for the Oregon

Marla Kaplan Volume II 30(b)(6)
December 12, 2023

Page 106

1  THE WITNESS: There was no minimum number of
2  alleles required.
3  BY MS. PURACAL:
4     Q. So, for example, in this case, there were only
5  two alleles above threshold. Under the OSP policies,
6  that was sufficient to call something consistent with?
7        MR. DAVIS: Objection. Assumes facts not in
8  evidence. Mischaracterizes. Vague and ambiguous.
9  BY MS. PURACAL:
10    Q. You can answer.
11    A. I don't know the number of specific alleles at
12 that threshold in this particular item, but I go back to
13 there was no minimum number of alleles required.
14    Q. In 2000, were analysts trained on how many
15 alleles they should be looking for to determine whether
16 there was a match?
17    A. Training consisted of looking at a number of
18 DNA profiles of varying quality to include mixed DNA
19 samples. Because there are no requirements related to
20 the number of matching or non-matching alleles, the
21 numbers wouldn't have been part of the training. The
22 training would have been on the protocol which did not
23 have any number of required matching alleles.
24    Q. In 2000, did the lab have a policy that allowed
25 the analyst to report that the evidentiary profile was

Page 107

1  consistent with a reference standard if there were
2  alleles below thresholds that did not match?
3        MR. DAVIS: Objection. Vague. Incomplete
4  hypothetical.
5  BY MS. PURACAL:
6     Q. You can answer.
7     A. I site the policy from earlier, the analyst was
8  required to consider them but the results of that
9  consideration was not dictated by policy.
10    Q. We looked at the lab's policy for interpreting
11 the peaks between 50 and 150 RFUs and at some point that
12 policy changed and the threshold was lowered to 100
13 RFUs. When did the lab make that --
14    A. That policy was changed in June of 2004.
15    Q. How was that documented?
16    A. The protocol was updated to include the change
17 from 150 to 100.
18    Q. I don't have the 2004 policy yet and I
19 understand that we are still waiting on some documents
20 from OSP but if I share my screen with you and we go
21 back to Exhibit 12 that we looked at before, we're
22 looking at page 30, and we were looking at that item
23 number 3 that says peak heights should be a minimum of
24 150 relative fluorescent units, RFU. Peak heights less
25 than 150 RFU may be interpreted with caution.

Page 108

1  Was it the case that in 2004, that number was
2  dropped in item number 3 to 100?
3     A. That number was dropped in item number 3.
4  There may have been other associated changes to that
5  language, but any sort of 150 RFU as a cap was lowered
6  to 100.
7     Q. When that threshold was lowered to 100, what
8  did the lab do to train analysts on the lowered
9  threshold?
10    A. My understanding -- my understanding from
11 people who were in the unit at the time is that when a
12 protocol update was released, that the group would
13 discuss the protocol update and they would have -- it
14 would be part of a regular DNA meeting.
15       Depending on the scope of the change, sometimes
16 there would be supplemental training. But most often it
17 was just a discussion at a DNA meeting about the changes
18 being made to the protocol. There was no formal
19 training other than something that would have been
20 discussed at a meeting. There are no training records
21 related to this protocol update that I could locate.
22    Q. Susan Hormann was at the lab at that time in
23 2004; is that correct?
24    A. I understand that to be true, yes.
25    Q. So she would have been included in those

Page 109

1  discussions about the lowered threshold?
2     A. Conceivably, if she was --
3        MR. DAVIS: Objection. Calls for
4  speculation. Go ahead if you can answer.
5        THE WITNESS: I can say it would have been
6  practice for her to be there, but if she had court or
7  another obligation or was not in a lab that day, I don't
8  know if she would have attended that meeting. At a
9  minimum, she would have been required to read the
10 updated manual.
11 BY MS. PURACAL:
12    Q. When we talked during the earlier deposition,
13 you said that once the threshold was lowered to 100
14 RFUs, analysts who were performing additional testing in
15 a case could decide to go back and look at data that had
16 been generated before the threshold was lowered.
17       Were the analysts required to go back and look
18 at the historical data if they were still working on
19 samples in that case?
20       MR. DAVIS: I'm going to object to the
21 extent that the question mischaracterizes previous
22 testimony. You may answer if you're able.
23       THE WITNESS: It was not required.
24 BY MS. PURACAL:
25    Q. In 2013, did the lab policy require that Susan

```
                                                            Page 110                                                            Page 112
 1  Hormann review the data that had been generated during     1  case whether Ms. Hormann should have gone back
 2  the testing on Ms. Freeman's shoes that was done in        2  in 2010 to look at the historical data?
 3  2000?                                                      3          MR. DAVIS:  I'm going to object here for all
 4          MR. DAVIS:  Objection.  Vague.  Ambiguous          4  the previous reasons and I'm also going to assert
 5  and incomplete.  Go ahead.                                 5  anything -- any questions -- any issues related to
 6          THE WITNESS:  Can you repeat the question,         6  attorney-client privilege for work product done in
 7  please?                                                    7  preparation for this litigation.  Don't identify any
 8  BY MS. PURACAL:                                            8  such discussions.
 9      Q.  Sure.  In 2010, did the lab's policy require       9          THE WITNESS:  I don't know how to answer
10  that Susan Hormann review the data that had been          10  that.  So I may have -- I may have looked into that at
11  generated during the testing on Ms. Freeman's shoes that  11  some point.  I don't have any -- necessarily any
12  had been completed in 2000?                               12  documentation that I did so that I can think of, so I
13          MR. DAVIS:  Same objections.  Go ahead.           13  just -- someone else may have looked into that, I don't
14          THE WITNESS:  I don't know what the policy       14  know, but I can only speak for myself at the lab and I
15  explicitly said at the time.  Those policies are          15  may have looked into the requirements at the time but
16  available but I don't know what they said.                16  don't have recollection of having done so over the years
17  BY MS. PURACAL:                                           17  this case has progressed.
18      Q.  Which policy would we be referring to?            18  BY MS. PURACAL:
19      A.  We'd need to look at the --                       19      Q.  And I understand that you can only speak for
20          MR. DAVIS:  Same objections since we're           20  yourself.  But today you're speaking on behalf of OSP,
21  asking a question about policy regarding the previous     21  so I'm asking generally about OSP and whether OSP has a
22  question.  I'll just incorporate the previous             22  position on this.  And so my understanding of your
23  objections.  Go ahead.                                    23  answer to that is you're not aware of OSP's position on
24          THE WITNESS:  We'd need to look at the STR        24  this; is that correct?
25  analysis casework procedures manual.  We'd need to look   25      A.  I feel like we're confusing two questions.  I

                                                            Page 111                                                            Page 113
 1  at the DNA quality manual.  We'd need to look at the       1  feel like you asked me what OSP's position on whether
 2  operations manual and we'd need to look at the quality     2  Susan was required to go back and look at that data was
 3  assurance, the Forensic Services Division quality          3  and that would have been dictated by policy or
 4  assurance manual to see if there were any requirements     4  procedure.  My understanding of your supplemental
 5  describing what was expected of an analyst when            5  question was whether anybody ever had looked into this
 6  preparing additional work on a previously analyzed case.   6  and that information I don't know.
 7  BY MS. PURACAL:                                            7      Q.  Well, let me ask this other question.  Has OSP
 8      Q.  Does the OSP lab have a position about whether     8  looked into this question?
 9  Susan Hormann was required to go back and look at that     9          MR. DAVIS:  I'm going to incorporate all the
10  historical data back in 2010?                             10  same objections and direct the witness not to answer to
11          MR. DAVIS:  Objection -- same objections.         11  the extent that it considers any attorney-client
12  Incomplete hypothetical.  Vague.  Ambiguous.  Assumes     12  privilege or work product or litigation related
13  facts.  Go ahead if you're able.                          13  activity.
14          THE WITNESS:  I don't really know what you        14          THE WITNESS:  Yeah, I don't think I can
15  mean by does the OSP lab have a position.  If she was     15  answer.
16  required to do so, then she should have done so.  I'm     16  BY MS. PURACAL:
17  unaware off the top of my head of any such requirements   17      Q.  I'm going to share my screen with you and I'll
18  but would need to do a deep dive into the protocol.  I    18  point you to what we have marked as Exhibit 22 to the
19  don't have instant recall of all of the policies from     19  deposition.
20  all of the years, so I don't -- I don't know what you     20          (Exhibit 22 was marked for identification.)
21  mean by the lab's position.  If it was required, it       21          This is OSP's policy on media relations and I
22  would have been dictated in a protocol; otherwise, it     22  see up in that upper right-hand corner has that it's
23  would not have been required.                             23  revised January 8, 2010.  Do you recognize this to be a
24  BY MS. PURACAL:                                           24  media relations policy that also applies to the lab?
25      Q.  Has anyone at the lab looked at that question     25      A.  I do recognize it as such, but questions on
```

Marla Kaplan Volume II 30(b)(6)
December 12, 2023

```
 1                C E R T I F I C A T E

 2

 3          I, LORI L. THIELMANN, Oregon CSR Number 21-0014,

 4    Washington CSR Number 21002182, do hereby certify that

 5    prior to the commencement of the examination, MARLA

 6    KAPLAN, was duly remotely sworn by me to testify to the

 7    truth, the whole truth, and nothing but the truth.

 8          I DO FURTHER CERTIFY that the foregoing is a

 9    verbatim transcript of the testimony as taken

10    stenographically by me at the time, place, and on the

11    date hereinbefore set forth to the best of my ability.

12          I DO FURTHER CERTIFY that I am neither a

13    relative, nor employee, nor attorney, nor counsel of any

14    of the parties to this action, and that I am neither a

15    relative, nor employee of such attorney or counsel, and

16    that I am not financially interested in the action.

17

18           WITNESS WHEREOF, I have hereunto set my hand and

19    seal this 27th day of December, 2023.

20

21

22
                              LORI L. THIELMANN, RPR, CCR
23                            Oregon License No. 21-0014
                              Washington License No. 21002182
24

25
```

U.S. Legal Support | www.uslegalsupport.com                 123

Exhibit 72, Page 13 of 13