005562

# Profiling Killers: A Revised Classification Model for Understanding Sexual Murder

005562

Robert D. Keppel
Richard Walter

**Abstract:** *Generally, murder classifications have failed to be useful for investigators in identifying perpetrators of murders. Based on the experience of the authors, this article extends the definitions of four previously recognized rape-offender typologies (power-assertive, power-reassurance, anger-retaliatory, and anger-excitation) into classifications for sexually oriented killers. These types of murderers and their crime scenes are described through the dynamics of their behaviors, homicidal patterns, and suspect profiles. Each typology is followed by an actual case example that fits that particular type of killer. By identifying crime scene and behavioral factors of these killers, the homicide investigator will be more equipped to process murder scenes, prioritize leads, and apprehend killers. Unlike earlier efforts at crime scene classification, the present work addresses the behaviors, motivational continuum, and the effects of experiential learning by the perpetrators. The relative frequency of the four types within a population of murderers at the Michigan State Penitentiary is revealed.*

When the motivation for a murder is unknown and the identity of the killer has not been established, it is hard to explain the critical questions of who, what, when, where, why, and how. Without such information, the public is left with the uneasy feeling that the police have not caught the killer and another murder is possibly forthcoming. This lack of knowledge has created a forensic investigative dilemma since the beginning of police inquiries.

Past efforts to address unsolved murders by developing theories of investigations have not been empirically studied (Keppel & Weis, 1994). Researchers and investigative practitioners have attempted to analyze murder and the people who commit it by constructing self-styled categories of killers that were hypothetical inferences developed from some individual case studies of convicted murderers and limited experience at investigating violent crimes. In their *Crime Classification Manual*, Douglas, Burgess, Burgess, and Ressler (1992) discussed a wide range of information focused on concept identification. The killers were categorized into groups in which one expected outcome became the single and significant identifier. For example, a lust killing is described as a sexually oriented killing. Similarly, a murder arising from a business dispute was called a power or greed killing.

International Journal of Offender Therapy and Comparative Criminology, 43(4), 1999   417-437
© 1999 Sage Publications, Inc.

417

005563

Unfortunately, although their typologies of murderers have descriptive value, they have failed to provide investigators with the elements necessary for crime scene assessment. For example, greed may have been the original motivation for killing an elderly woman and classified as such. This type of characteristic does not explain the motivation if the woman was also severely beaten, stabbed, and placed into a sexually degrading and posed position. Although general indicators may apply to a myriad of circumstances, the static descriptors of these types of classification systems only address the obvious. They do not address the hidden and inferred behavior of the killer.

In addition, other authorities, such as Holmes and Holmes (1996), cited typologies of serial murderers that were labeled *visionary, mission, hedonistic,* and *power/control.* These categories have a wide range of function, are of limited service to investigative work, and are unsupported by empirical study.

Very few police investigators use the typologies in the *Crime Classification Manual* (Douglas et al., 1992) or those developed by Holmes and Holmes (1996) to generalize about a population of murderers. In fact, the major homicide tracking systems such as the Federal Bureau of Investigation's (FBI) Violent Criminal Apprehension Program (VICAP); the Homicide Investigation Tracking System (HITS) in Washington, Oregon, and Idaho; and the Royal Canadian Mounted Police's (RCMP) Violent Crime Linkage Analysis System (VICLAS), which are centralized data bases for homicide information, do not use either typology to classify murderers (*HITS Murder Form,* 1995; Johnson, 1994; *VICAP Form,* 1991). The reason is that because the *Classification Manual's* and Holmes and Holmes's characteristics of killers and crime scenes are not rich in detail, their utility in aiding investigators to apprehend killers is limited.

Homicide investigators have noted generally that crime classification systems have provided little assistance in solving a particular murder (Copson, 1995; Copson, Badcock, Boon, & Britton, 1997; Geberth & Turco, 1997; Keppel, 1995; Keppel & Birnes, 1995; Morneau & Rockwell, 1980). This is the problem! That is, despite a general description of incidents of murder, the information from homicide classification systems currently mentioned in the literature does not address the key issues relating to the offender's identity. Also, this information does not affect his apprehension. Accordingly, when the logical flow is broken or incomplete between theories and reality, the direction and function of the classification concepts become defused, limited, and sometimes meaningless. Therefore, despite best intentions, the end result may be that the homicide investigator is left with some abstract notions, a dead body, and an unknown offender.

Given the dynamic and synergetic components of two or more murders committed over time by the same person, a systematic look at a viable murder continuum offers the opportunity to explore elements left at the crime scene by the killer. Here, the investigator can assign meaning to (a) the presence or absence of evidence, (b) methods of operation, (c) signature, (d) the comfort zone of the killer (the place the killer feels at ease), and (e) an inferred motive for the murder. In addition, there may be indicators for emotional intensity, rationale for the murder,

005563    005563    005563

and a constellation of additional factors associated with the known and specific type of killer responsible for a certain murder. If used properly, a dynamic classification system can be applied to the murder. The system can then provide information that could be further analyzed to determine methods of approach in the investigative process of the murder. It also may provide reasons for inaccuracies, additional crime scene analysis, and behavioral indicators of the killer.

The intent of criminal profiling, crime scene assessment, or psychological profiling, as it is sometimes called, is to identify the key crime scene and behavioral factors related to the killer, thereby enabling the homicide investigator to more effectively analyze murder scenes, interview killers, prioritize leads, and apprehend killers (Warren, Hazelwood, & Dietz, 1996). It is the focus of this article to (a) identify and define certain typologies within a rape-murder classification, (b) explain the homicidal pattern of the killer within that typology, (c) offer profile characteristics of the killer within each typology, and (d) give a specific example of a murder case scenario that typifies the killer within each typology. Therefore, the investigator will be informed of specific crime scene indicators that describe clearly each of the categories or typologies of killers. In turn, those very indicators will help homicide detectives perform their own crime scene assessment without the long wait sometimes associated with obtaining a profile from an outside expert.

In 1977, Groth, Burgess, and Holmstrom developed a classification system for rapists based on empirical research, and Hazelwood and Burgess (1987) refined and used those same categories for analyzing rape cases 10 years later. Although only addressing issues within a classification of rapists, not rape-murderers, their dynamic model focused on the purpose and style of attack and the conceptual and emotional factors of the behaviors of rapists.

Hazelwood and Burgess (1987) originally described four categories of rapists with their classification: (a) power-assertive (PA), (b) power-reassurance (PR), (c) anger-retaliatory (AR), and (d) anger-excitation (AE). Although these categories at the time related only to rapists and their behavior, the authors expanded those same categories to the crime of rape-murder.

BACKGROUND

Based on their experience in analyzing and investigating many murder and rape-murder cases and interviewing numerous rape-murderers, the authors undertook a project to add to Hazelwood and Burgess's (1987) preexisting rapist categories that would, in turn, enable homicide detectives to use the descriptions of the homicidal pattern and profile for each type of killer in their murder cases. This was accomplished by taking known examples of murder cases that fell within each category and describing their crime scenes in detail.

The major problem in the project was to develop meaningful characteristics in each category that dealt with the deceased victim. When Hazelwood and Burgess (1987) created their categories, they based them largely on what the offender said

the killer's power and control through the elimination of the threat posed by the victim and the secrecy of the performed acts. Because of the satisfaction that the rape-murder gives the killer, he analyzes, plans, and seeks methods to improve his aggressive and masculine image in his everyday life and in times of murder.

## HOMICIDAL PATTERN

The homicidal pattern in the power-assertive murder is characterized by the sating of power needs through sexual assault and murder. Once the perpetrator has decided to commit either the initial or a repeat rape-murder, the methods for victim selection and acting out will be determined by previous experience, the stress of internal pressures, and opportunity. Accordingly, in selecting the victim, the perpetrator may choose one by opportunity and surprise. Often, the victim is a stranger who is available by surprise on the street or through a breaking and entering into a home. If the rape-assault occurs in a home and the husband is present, he may be required to watch the assault or participate.

When the victim has been assaulted on his/her own territory, the body is left undisturbed. Alternately, when the victim has been abducted from an outside location, the killing and disposal sites vary. That is, when the killing was perpetrated elsewhere, the body was generally dumped.

If the perpetrator has coconspirators, there is often evidence of multiple sexual assaults. That evidence in or around the victim's body can be found in the recovery of ejaculate that is later analyzed and determined to come from several persons.

Consistent with his need to overpower and portray an image of the military warrior, detectives will find that clothing is torn off the victim. In addition, the killer will brandish weapons of symbolic importance to him. Generally, his preferred weapon is part of his normal image. The weapon may be a knife or rope or something else and is easily concealed. He views weapons as an extension of his own power and therefore will bring them to the crime scene and take them with him after the murder.

The victim, male or female, may show evidence of bruises from beating and pummeling at the death scene. When the perpetrator senses a challenge to his control and masculine image—or a revelation of his internal weaknesses—he may become even more violent. Here, extreme forms of violence will occur short of what he, in his own mind, considers to be deviant, perverse, and atypical of his self-image. Although violence inflicted on the victim may have been severe, there is generally no mutilation of the body; that would be perverse in his mind. With this in mind, investigators must be cautious when interviewing the power-assertive killer. If the perpetrator senses that he may be seen as a pervert, he may instantly turn off during the interview process and refuse any further contact with authorities.

After the killing has occurred, the perpetrator does not maintain contact with the victim. On departing from the crime scene, he often will leave an organized crime scene—as defined by the FBI behavioral scientists and Geberth (1996)—in

an effort to cover up and protect his identity. Because the crime scene reflects his image of being in the clear from suspicion, he can emotionally exculpate himself from any responsibility for the murder and repeat it within a short time span. Although he remains intellectually precocious and alert, his desire for power will demand credit for the killing. That is, the murder does not count unless someone knows or suspects him of the killing. Therefore, due to his need for glory and recognition, he may betray his secret to a bar patron, fellow worker, admirer, cellmate, and sometimes the police.

## SUSPECT PROFILE

In the power-assertive type of killer, the offender is usually in his early 20s and somewhat emotionally primitive. He is primarily preoccupied with projecting a macho image and orients his life accordingly. Despite a wide range of physical characteristics and types, the power-assertive offender is sensitive to his characteristics of masculinity. Therefore, he often is a body builder and portrays a muscular image and/or displays tattoos for a show of machismo and power. In addition to displaying a confident body posture, the offender cruises in his well-attended car, carries weapons, and shows an arrogant and condescending attitude to others. Although a heavy use of alcohol and drugs may be used to bolster the offender's courage and power, he does not abuse these substances to the point of blacking out.

Although the offender may associate with people, he is not seen as a team player. Socially, he may not be a hermit but at times because of his level of frustration with social contacts, he lives on the edge of being a loner. Although he may have an active interest in sports, they are generally limited to individual contact events such as wrestling, judo, and karate. For the most part, he seeks to gain power and displays a winner-take-all attitude. Although he may have a history of multiple marriages and relationships, he does not view them as successful.

In demonstrating his potential for power, he has a history of perpetrating crimes such as burglary, theft, and robbery. Unless the criminal history has resulted in a mental health referral, he may have had no contact with mental health workers.

Educationally, he is typically a school dropout. Based on the limits of the masculine image, his sexual preferences will not accommodate the variety of materials contained in hard-core pornographic literature. He is especially conflicted over unconventional sexual interest and may display a strong antihomosexual attitude. For the most part, if he reads magazines, they will likely be *Playboy* and *Penthouse* types of literature.

Although he may have served in the Marines or the Navy, his service record is generally poor, and he may have terminated his service prematurely. He is generally viewed as antisocial.

005567   005567   005567

## CASE EXAMPLE

In 1986, a 40-year-old woman began walking down a Sydney, Australia, street in the early evening. Suddenly, she was grabbed by an unknown male who pulled her head back by the hair and said to an unseen accomplice, "What about this one?" In response, the coconspirator said, "No, she's too old." The aggressor then retorted, "You said long black hair." Again, the unseen voice said, "She's too old." At this point, the woman was set free. She reported this incident to the police.

Later that night, an Australian beauty queen with long black hair was scheduled to return by train from a visit with her sister. She failed to return. The next day, she was discovered in a fenced field on the outskirts of Sydney. Her body was found about 150 yards from a gravel road. The body was face down with its arms crisscrossing the head as though carried and dropped into that position. Her legs were spread open. The body was nude and no clothing was found in the surrounding area. There were three major cuts on the ventral side of the neck. The head was nearly severed from the body. The ventral side of the hands showed severe defense wounds from a knife. The forensic examination of the body revealed anal, oral, and vaginal sexual assaults. There was no evidence of any postmortem mutilation.

In this case, there is evidence of a planned assault on a preselected type of victim. Although long black hair appeared to be a criteria for selection, the age of the victim may have also been an influence. Although the first woman was rejected, the criminals continued to search for a woman who would meet their criteria.

In part, the follow-up investigation may have targeted a specific individual. But because of the evidence of multiple rape assaults, all of which were antemortem, investigators must also consider that the victim was abducted and sexually assaulted by multiple offenders.

Although the victim suffered severe defense wounds, there were no significant signs of beating or pummeling of the body. Based on the report of the first victim, multiple sexual assaults, and pattern style, the investigation indicated that probably three to five persons committed the murder. Although each member of the group has the obligation to surmount the victim in sexual assault, it is likely that the leader of the group would save the ultimate act of cutting the victim's throat for himself. Here, he rises above equals. Of note, he did not remove the head . . . that would have been perverse.

Based on this information regarding the power-assertive type, the New South Wales Police were advised that the leader and his associates would likely brag about the killings at the local bar. Again, a suspect profile was given to the investigators. After 11 days of investigation, a total of five suspects confessed to the killing. The leader of the group had a criminal history of exploitative crimes, confident body posture, use of alcohol, and ill-fated relationships. In addition, he was an educational dropout and needed to be validated by followers. Finally, because his followers also needed to validate their victory, they revealed their crime through bar talk, thus tipping the police onto them.

005567   005567   005567

# POWER-REASSURANCE RAPE-MURDERER

## DYNAMICS

In the power-reassurance rape-homicide, a planned, single rape attack is followed by an unplanned overkill of the victim. Motivated by an idealized seduction and conquest fantasy, the killer focuses on acting out a fantasy and seeks verbal reassurance of his sexual adequacy. When the victim does not yield to the killer's planned seduction scenario, a sense of failure and panic thrust him into a murder/assault. In the murder/assault, he gains control and lessens the threat over the situation in which the victim was not compliant. After killing his unrequited lover, the murderer may act out his sexual fantasies through exploratory postmortem mutilation.

The power-reassurance type tries to express his sexual competence through seduction. When that fails, the subsequent killing permits him to reintroduce the fantasy system for further sexual exploration that he was not allowed to do prior to the killing. The quest for sexual competency and personal adequacy dominates any fantasy drawings he may do.

## HOMICIDAL PATTERN

In planning the rape, the power-reassurance type selects and watches a female victim. He may choose a casual acquaintance, neighbor, or stranger. No matter which type of victim, he applies his fantasies to that victim. In the power-reassurance rape-homicide, the murder occurs after the attempted rape has failed and the perpetrator feels a need for emotional catharsis and victim control. Although the offender has no intent to harm or degrade the victim, the failure of the rape-assault and the rejection from the victim panics him into a homicide overkill. Believing that he can act out sexual fantasy and reality, he prepares a scenario of misbeliefs designed to seduce the victim into validating his sexual competence. When the victim does not follow his plan, he feels threatened and attacks the victim.

Often, the selected victim is 10 or 15 years older or younger than the perpetrator. If the victim is the same age as the killer or outside his preferred age range, she may be considered damaged goods.

The power-reassurance type uses threats and intimidation to gain initial control and sometimes enters the crime scene with a weapon. But, usually the first time he attacks, a weapon is not preselected and brought to the scene. The second time, he may bring a gun and display it but will not fire it due to the noise. The third time, the weapon may be a knife.

After the initial attack on the victim, the offender tries to act out the preprogrammed fantasy. In this respect, he has been called the *polite and gentleman rapist* due to the verbal dialogue that he tries to carry on with the victim. During the assault, he may ask the victim to remove her clothing and be quite polite with other

such requests. While assuring her that he is not going to hurt her, he seeks reassurances of his sexual competency from her. Typically, he may ask, "Is this nice; do you like this; is this pleasing to you; am I better than . . . ?"

When the killer finds his sexual competence threatened through ridicule, challenge, and counterattack, he loses control of the situation and kills the victim through pummeling and manual strangulation. Because he fears the revelation of his failure at sex, he initiates the homicidal attack to control the victim and protect his self-image.

Because the incomplete sexual assault does not validate his sexual competency, he will often explore the mysteries and curiosities of sex on the postmortem body. Consequently, there is sometimes mutilation of the body coupled with evidence of ritualism. Because his fantasies have been shunted by the unsuccessful rape, there often is not any evidence of sperm at the murder crime scene. Nevertheless, the postmortem activities and ritualisms can satisfy and reinforce him. From his point of view, the killing was a success. Therefore, when the need arises, it can be acted out repeatedly until his needs are satisfied.

As a result, the behavior of the power-reassurance murderer may be episodic in nature with one or more killings within a cluster of similar offenses. Notably, when the offender views the murder as successful, he may attempt to extend the relationship with that victim by collecting small souvenirs and newspaper clippings to enhance his imagined relationship. Finally, the reader should be aware that nighttime is the friend of fantasy development. Therefore, the offender acts out in the nighttime hours because that's when he feels most comfortable.

## SUSPECT PROFILE

In considering the age of the power-reassurance murderer, the general acting out age is in the mid-20s range. Of course, the age can be variable and conditional on circumstances such as the incarceration of the offender for other crimes during his mid-20s. Although intellectually equal to other types of offenders, the murderer relies excessively on fantasies that allow opposing ideas to come in close proximity. This often makes the offender appear dull and somewhat emotionally scattered. He prefers to satisfy his needs through certain fantasies rather than risk rejection. As a consequence, he is often plagued by an inadequate sex life and uses sexual fantasies and relationships to overcome the dysfunction and pain of reality.

In developing his extensive repertoire of rape fantasies, he borrows notions from erotic pornography and a long history of substitutions for sexual activity such as window peeping, fondling of clothing, and obsessive daydreaming. Developmentally, the onset of absorbing fantasies may have started in the early juvenile years. Because his fantasies have taken him into a private world, he is generally viewed as socially isolated with no male or female friends. He is viewed as a loner and a weirdo. Generally, he is an unmarried person without a history of normal sexual activities.

005570    005570    005570

Educationally, he may be identified as an underachiever who suffers from a learning disability but who still squeaks through the system. His military service will not be marked with unusual problems. He will simply be viewed as a nonachieving passive soldier who takes orders.

Because he does not have any interest in athletic activities, he will often compensate for his lack of machismo through compulsive behaviors. Mentally, he may have had a professional referral because he does not live up to what he is capable of achieving.

Due to the dominating influences of fantasy activities, his life tends to leave him an immature person who views life as a spectator not a participant. In other words, he lacks the confidence to participate. He feels inferior and cannot tolerate criticism of team members. Again, because his activities are dominated by compressed and edited illusions, he often bypasses the social intermediate steps in developing normal social-sexual interactions.

Given the excessive energies directed toward his own self-stimulation, the offender may live at home and try to subsist on little income. If income is not available, he may perform menial labor to support basic needs. Accordingly, he often lives, works, and plays in a neighborhood familiar to him. A common form of transport would be walking. However, if the subject does have a car, it would likely be an older model in need of repair and care.

The subject's criminal record may reflect his interest in fetish activities, unlawful entry, and larcenies. Basically, the killer is fantasy driven and once the satisfaction is over, he leaves the disorganized crime scene (Geberth, 1996) laden with very valuable evidence.

## CASE EXAMPLE

A 24-year-old subject had a 10-year history of alcoholism and unemployment. During a summer evening, the subject was drinking in a local park and chanced upon a 14-year-old female. After a brief encounter, he wrestled her to the ground and sexually assaulted her. Later, when the victim reported the incident to police, she denied that he sexually penetrated her. When the subject was interviewed by the police, he insisted that penetration had taken place.

Subsequently, the subject was convicted of criminal charges and given a brief prison sentence. Prior to parole, the subject was interviewed about the offense. Amongst many issues discussed, he reported his sexual interest in women who were in their 50s, 60s, or 70s. Against advice, the subject was paroled.

Approximately 1 month after parole, he was jailed for drunk and disorderly. Following his release from jail, he resumed a lifestyle pattern of drinking, minimal employment, and socially floating in a fantasy world.

At age 26, the subject found himself in a bar admiring a 65-year-old woman. During the course of the evening, he watched her and made several unsuccessful attempts to make conversation with her. After the bar closed, the woman said goodbye to her friends and started to walk the eight blocks to her home. En route,

005570    005570    005570

005571

the subject approached the victim and expressed interest in having sex with her. In response, she refused his offer by chiding and laughing at him. He persisted and followed her to her home. Once there, he again reiterated his dream of having sexual relations with her. According to the subject, she reportedly stated, "Fuck off! Go home and grow a penis, little boy!" At that time, he forced his way into the house and beat the victim into unconsciousness. He then searched the premises and found a shovel with which to chop her body. After inflicting wounds to her body and head with the shovel, he put her in the closet and left the scene.

Following the discovery of the body, the police investigation led to the subject. After explaining to the detectives that he only intended to "love her," he confessed and explained the murder. On returning to prison with a life sentence for murder, the subject stated, "It's your fault! You knew my fantasy for older women and should not have released me!" Soon after his return to prison, the subject began experimenting with asphyxial autoeroticism and bloodletting. These behaviors were basically his efforts at self-mutilation.

In this example, the subject sat in the bar and activated an overidealized seduction and conquest of a 65-year-old female. Although he planned a sexual rendezvous that would reassure his sexual competence against a history of inadequacy, the implementation of the plan met with unaccounted-for resistance. Faced with failure and the fractured fantasy scenario, he exploded into a rage. He pummeled the victim with his fist into death or a near-death state. Following the combative stage of the killing, he then mutilated the body with a shovel. He then left the crime scene. As in his first offense, although semen was not at the crime scene, the subject reported feeling sexually sated and satisfied. That is, from his point of view, the killing was an unfortunate necessity on the way to fantasy satisfaction.

## ANGER-RETALIATORY RAPE-MURDERER

### DYNAMICS

In the anger-retaliatory rape-murder, the rape is planned and the initial murder involves overkill. It is an anger-venting act that expresses symbolic revenge on a female victim. Nettled by poor relationships with women, the aggressor distills his anguish and contempt into an explosive revenge on the victim. Although the assault is not predicated on a fantasy system, it is often precipitated by a criticism or scolding from a woman with power over him. In the attempt to express revenge and retaliation for being disciplined, the aggressive killer will either direct his anger at that woman or redirect his anger to a substitute woman. Because the latter type of scapegoating retaliation does not eliminate the direct source of hate, it is likely that it will be episodically repeated to relieve internal stresses. Dynamically, the rape-homicide is committed in a stylized violent burst of attack for the purposes of retaliation, getting even, and revenge on women (Keppel, 1997).

## HOMICIDAL PATTERN

The homicidal pattern is characterized by a violent sexual assault and overkill of a victim. Inasmuch as the actual source of the killer's anger is a woman who belittles, humiliates, and rejects the subject, the fatal hostility may not be directed at a mother, wife, or female supervisor but at an unsuspecting substitute victim whom the killer has sought out. In these instances, it is likely that the victim would come from his own age group or older. Often, the substitute victim comes from areas in which the aggressor may live or work. That is, while conducting routine, everyday living, the aggressor may find a potential victim who reminds him of his mother or girlfriend. A chance meeting could occur at a grocery store or through general cruising of a neighborhood. When a potential victim is selected, he will keep in mind the location and living circumstances of the victim.

Alternatively, the aggressor tends to act out against the actual victim directly rather than through a substitute when that actual (targeted) victim is a younger person. The selection of this type of victim may be a dismissive female clerk who says "no" and/or a child who threatens to expose inappropriate sexual behaviors. Again, the perpetrator tends to choose victims from familiar areas. Once angered by the intended target, the perpetrator may choose a preselected substitute victim as a symbolic vehicle for resolving his internal stresses.

In approaching the crime scene, the killer usually walks. However, if necessary, he may drive to the crime scene area and approach the last 200 feet on foot. The anger-retaliatory killer may have some type of ruse to get inside the victim's door, but once the victim is isolated, he confronts her.

Armed with a barrage of accusations, he responds to the victim's denial of him by hitting her in the mouth and about the face. As the assault becomes more combative, the aggressor may use weapons of opportunity (knives, statuary, etc.) to brutalize the victim.

Depending on the aggressor's age, experience, and internal stresses, the rape-assault may be incomplete because of an inability to get an erection. Therefore, semen may not be found at the crime scene. In either case, the subject is intent on sating his anger through percussive acts of assault with fists, blunt objects, or a knife.

Regardless of whether the victim is alive or dead, the assault continues until the subject is emotionally satisfied. As his anger begins to cool, he places the body into a submissive position by placing it on its side away from the door, face down, putting an artifact or cloth across the eyes, or placement in a closet with the door closed. Generally, following the intense expression of anger, the subject tends to leave a disorganized crime scene, and the improvised murder weapon may be found within 15 feet of the body. Just prior to leaving the crime scene, the perpetrator often takes a small trinket or souvenir.

When the subject views the sexual assault and murder as a success, he often leaves the crime scene with a feeling of having been cleansed and renewed. Because the subject has transferred the blame of the murder onto the victim, he

does not experience any sense of guilt. Accordingly, he does not own any feelings of wrongdoing. In fact, quite the contrary is true. That is, he can develop a sense of sentimentality over the victim and help search for the victim with tears in his eyes.

### SUSPECT PROFILE

In the anger-retaliatory type, the offender is usually in the mid-to-late-20s and somewhat younger than his victims. He is seen as an explosive personality who is impulsive, quick-tempered, and self-centered. In dealing with people, he is not reclusive but a loner in the midst of a crowd. Generally, his social relations are superficial and limited to many drinking buddies. Socially, he is a person whom no one really knows. Although a sportsman, he prefers playing team contact sports.

Conflicted over his relationship with women, he may often feel dependent and aggressively resistant to them. When challenged by women, he may use various forms of aggression to get even and degrade them. If he has been married, his marital relationship may have been ill-fated or may be in some phase of estrangement. In the marriage, there has generally been a history of spousal abuse. Rather than dealing with the problems in the marriage, he will often avoid them by seeking extramarital liaisons. For the most part, these relationships are unsatisfactory.

Sexually, he is frustrated and may be impotent. Often, he links eroticized anger with sexual competence. Although he may use *Playboy* and similar types of magazines for curiosity, he does not use pornographic materials for stimulation.

When his aggressive feelings toward women are linked with impulsive behavior, he may develop a history of committing crimes such as assault and battery, wife beating, felonious assault, and reckless driving. Humiliated by disciplinary violations, he is usually a school dropout who has not lived up to his potential. If he has joined the military services, his unsettled behavior often results in a discharge from service. Consistent with these behaviors, his free-floating anger is the cause of many difficulties with authority. Mentally, his unpredictable behavior may have resulted in his being referred to a mental health worker.

### CASE EXAMPLE

In 1990, a 28-year-old female victim and her three children had lived for 2 years with the 28-year-old male subject. The victim was aware that the subject had a history of felonious assault and several domestic violence charges made by girlfriends that were later dismissed. As for her own relationship, she reported to friends that the subject was becoming more violent and would choke her. For her own protection, she advised her three children that if need be, they should call 911.

On one day, the victim allowed her three children to visit at a friend's home. Later that evening, the victim and subject visited at the home of the victim's husband and girlfriend. While there, they ran out of liquor and the men offered to go to

005574    005574    005574

the store. While away, the victim expressed concerns about her boyfriend to her husband's girlfriend.

When the men returned, the subject suggested that they sneak around and see what the women were talking about. When the victim discovered the men were eavesdropping, she was not amused and began to insult the men. Reportedly, she insinuated that the men had had sex with one another while they were out getting the alcohol. They were not amused. Nevertheless, the evening continued until approximately 2 in the morning, at which time the victim and subject returned to their residence. Later, according to the subject, he and the victim got into bed and began the usual foreplay of ripping off each other's underwear. He claimed that she continued to hit and scratch him. Noting that he only had one arm because of a failed suicide attempt, he claimed that to protect himself, he placed both of her arms on her stomach and laid on top of her. After several minutes, she said, "I'm sorry." Accepting that as an invitation to sexual behavior, he claimed that he entered the vagina for a period of time. This was followed by anal intercourse and a return to the vagina. Following the completion of the sexual act, he claimed that the victim did not appear to be breathing. He then dragged her into the bathtub and splashed water to revive her. She did not revive. He then called an alternative girlfriend and indicated that he may have hurt the victim quite badly. He then asked the alternative girlfriend if he could come over and visit her. She said no. He then expressed a feeling of depression and decided to commit suicide by drowning. He claimed that he drove to a lake 1 1/2 hours away from home and walked into the water up to his neck. He then had second thoughts and thought the victim might still be alive. Therefore, he returned but found her dead. He then called 911 and reported the circumstances to the police.

When police arrived, they asked him what happened. He responded, "I guess I just fucked her to death." When police examined the scene, they found the victim's nude body on its side facing the inner wall. The body had bruise marks, a large vaginal tear, and tunneled rectum. There was dried blood between the body and the drain of the bathtub. Inasmuch as the forensic evidence challenged the subject's description, the police made a search of the scene for a weapon of opportunity. Following much discussion, a baseball bat was ruled out. Ultimately, it was determined that the subject had placed his fist inside her and caused an internal rupture. Eventually, at trial, he admitted anger at the victim and sexually assaulting her. However, the defense counsel insisted that it was an accident due to the size of his phallus rather than a fist. The subject was convicted. He later appealed and received a reduced sentence.

In this case, the victim and subject were the same age. The subject had a record of assaults against women. The instant offense appears to have been sparked by the victim's challenge of his masculinity with her husband. When given the ability to link anger and sexuality, the subject burst into a violent attack and overkill of the victim. Although it is unknown whether he actually got an erection, it is known that he used a weapon of opportunity: his only fist and arm. The placement of the body was consistent with an absolute demand for submission. The subject left a

disorganized crime scene. Following the assault and killing, the subject called a girlfriend for help rather than the police. During the police investigation, the subject expressed sentimental concern for the victim.

## ANGER-EXCITATION RAPE-MURDER

### DYNAMICS

The planned sexual assault and homicide are designed to inflict pain and terror on the victim for gratification by the perpetrator. The prolonged torture of the victim energizes the killer's fantasies and temporarily satisfies a lust for domination and control. Precipitated by highly specialized fantasies, the perpetrator selects the victim, male or female, and escalates violence through various acquired and learned incremental levels of ritualistic carnage. Dynamically, the approach of the victim, exploitation of naivete, torture, and mutilation all serve to appease the perpetrator's insatiable appetite for the process of killing.

For unlike other murderers, the luxury of sadism is found in the art and process of killing, not the death. In some instances, the actual death may be anticlimactic. However, in the execution of crimes, the excitement is heightened by the realization of a rehearsed scenario of eroticized anger and power that has been building in his fantasy life until he steps across the line into the reality of murder. Again, sadistic murder is comprised of a series of recognizable deviancies that coalesced into a ritualistic satisfaction. Inasmuch as the development of the process requires an investment of acquired skills, energy, and time, the intent becomes one of indulgent luxury rather than the end goal of a dead body.

### HOMICIDAL PATTERN

In the anger-excitation rape-homicide, the homicidal pattern is characterized by a prolonged, bizarre, ritualistic assault on the victim. Sponsored by a plan of action, the fantasy of the assault is put into action with an equipped murder kit. Often, the victim may be a stranger who fits his needs for a symbol, such as a nurse, a prostitute, a child, a student, or a matriarch. Also, he may be attracted to victims who meet certain criteria such as long blond hair, specialized shoes, or a tramp image. When preparing to encounter the victim, the organized offender can invoke a disarmingly charming manner and dispel most immediate fears from the victim.

To activate the assault process, the subject will use a con or ruse to dupe the victim from the time of contact until the victim is isolated. At that time, he will begin to display vacillating mood shifts that confuse the victim. He then will drop the mask. He may tell her in a very matter-of-fact, monotone voice "I'm going to kill you" just to watch the look of terror on the victim's face. When he sees the victim becoming terrorized, he goes into a fantasy, and a methodical love for torture is

demonstrated through acts of sexual ritual and experimentation. Here, while showing variant forms of dependency, dread, and degradation, the offender is only limited by imagination. Most commonly, bondage and domination play a significant role in the killing process.

In addition, there may be evidence of antemortem cuttings, bruises, and various forms of incomplete strangulation, body washing, shaving, and burns. Although some offenders may attempt perimortem sex, the evidence of ejaculate in the body is not likely at this stage. After the victim has been bludgeoned and strangled, the likelihood for postmortem experimental sexuality increases. Here, it is most likely that one will find evidence of secondary sexual mechanisms. The evidence of sexual exploration is revealed by localized brutalization, skin tears, and inserted objects into the body. In addition, he may leave the body in a bizarre state of undress after possibly cutting the clothing off. In some cases, the clothing could be fetish items that he would take as souvenirs. In some cases, the perpetrators will leave clothing neatly folded alongside the body. In others, they may harvest the body of parts. These parts and souvenirs taken from the crime scene may provide materials for later extravaganzas of masturbation. (Generally, this type of perpetrator divides the murder into phases in which the first part documents the art of killing and the second phase is a later reverie of masturbation with souvenirs.)

Eventually, when the crime has been completed and the perpetrator has been satisfied, he will carefully repack his ropes, knives, and specialized tools of torture into his murder kit for safekeeping. Alert to not leaving any signs at the crime scene, he may move the body to a second location to conceal it. Again, to distance himself from detection, he may bury the body in a shallow grave or dump it in a location familiar to him where he is comfortable. Again, to avoid detection, the organized offender tends to commit offenses distant from his usual activities. Accordingly, when he needs added stimulation, he may attempt to interject himself into the criminal investigation.

## SUSPECT PROFILE

In the anger-excitation type, the age range of the perpetrator is considered somewhat variable. Although most perpetrators commit their first homicide by the age of 35, it is possible that a late bloomer or an undetected perpetrator could do so earlier. Characteristically, the organized offender is often a well-appearing person who is bright and socially facile with others. Based on the ability to appear conventional and law abiding, he can cunningly deceive others. Because he has the ability to separate a general lifestyle from his criminal interest, he may enjoy a good marriage. In the marriage, he may perform as a dutiful and conventional husband. Financially, he is identified as an adequate provider. His work history may be tumultuous until he finds a position with minimum supervision. Sometimes, he may show a penchant for mechanical interest and working with his hands. If so, he may seek employment in the semiskilled trades such as auto mechanics, carpentry, or a specialty factory position. In his daily habits, he is often compulsive and

structurally organized. Educationally, he may have 2 years of college and/or graduated. On serving in the military services, he will be identified as doing well. Often, his military success may have resulted in his being identified as "good officer material."

Based on his exceptional ability to organize, he can successfully segment his criminal interest into a private world of protected ritualisms. Often, his ritual for paraphernalia and souvenirs are contained in a private chamber of horrors. This specialty place may be a dark closet, room, basement, or hole in the ground. Also, he may use an abandoned barn, cabin, or garage. Inside the specialty area, he will keep the victim's souvenirs, murder kit, and favored pornographic materials. Characteristically, the pornographic materials will depict a look of terror and scantily dressed victims. Most often, the literature shows bondage and sadism. Because the specialty area is designed to help the perpetrator manufacture and refine fantasies, it may contain a wide range of masochistic and sadistic clues. Although alcohol is not indicated, it is possible that the perpetrator will use chemical drugs to fuel his fantasies.

## CASE EXAMPLE

While hiking along a ridge of low mountains above a large city, a surprised witness looked down a cliff and saw a nude body trussed in ropes. When police arrived, they found a 21-year-old female nursing assistant tied in a crouched position. When they turned the body over, they saw a nylon cord tied to the right wrist and both ankles. The head had been cut off cleanly at the base of the neck. The fingers had been cut off both hands in the area of the knuckles. A bone-colored Playtex bra and similarly colored blouse was wound around both arms. A crime scene search of the immediate area could not locate the head or missing fingers. Several months later, they were found approximately 6 miles away. The body parts and jewelry were comingled into several plastic bags.

Meanwhile, after some difficulty in identifying the body, the police traced the victim's known whereabouts. Based on accounts from friends and witnesses, police learned that the victim and a female friend had gone to a bar for an evening's entertainment. While there, a friend noticed a man looking in their direction. Eventually, that man was identified. The subject was a handsome 22-year-old male scheduled to be married in 1 week to a chaste bride-to-be. As he became a focus of police attention, the subject became nervous and withdrew $2,000 from a joint account held with his girlfriend. He also borrowed her car and disappeared for several months. Later, her car was found parked in front of a police station. Eventually, after consulting a lawyer and his family, he appeared at the police station.

Meanwhile, the car revealed a number of forensic specimens linking him to the murder. In addition, police went to his home and found that it had been thoroughly cleaned. Nevertheless, they were able to locate the victim's blood in the bathtub and other samples of her blood throughout the apartment. When confronted with a

number of forensic specimens linking him to the murder, he told police that the victim voluntarily went with him to his home from the bar. While there, drug dealers arrived and killed the victim. He was then forced by drug dealers to behead the victim and dispose of her body. Consequently, after the beheading and draining of the victim's blood down the bathtub drain, he tied her and tossed her over the cliff. He then disposed of her head and fingers away in another location. He reported that this was necessary because the drug dealers had threatened to kill him if he did not cooperate. Needless to say, his story could not be corroborated. Instead, the crushed skull, scratches from a knife in the bathtub, blood stains, pliers, hacksaw tool marks, evidence of a massive cleanup effort, and the attempt to hide other evidence convinced police and the jury that he acted alone in committing the diabolical murder. While in prison, he repeated his prepared story, and a number of people supported him. Consequently, despite many objections, he was recently paroled. (Prior to the instant offense, there is circumstantial evidence that he may be linked to two nurses who have gone missing and have never been discovered.)

In this example, there is evidence of targeting a nurse, use of a con or ruse, and the isolation of the victim before acting out the crime. While in the comforts of his own home and available tools, he acted out a planned attack of terror and pain on the victim. There was also evidence of bondage, domination, submission, and *picquerism*. Picquerism is a secondary sexual mechanism in which satisfaction is gained by penetrating the body through cutting, slicing, and tearing of the body parts. In the postmortem activities, there was evidence of trussing up the body, disposal in a neutral location, and the separation of the head with fingers and jewelry in a separate location. Evident from the description, the satisfaction did not end with the death but extended into postmortem activities and beyond. Certainly the subject derived a great deal of satisfaction at avoiding police, leaving the suspect vehicle with evidence in front of the police station, and the effort at surmounting them by creating a phantom scenario. Finally, this killing not only satisfied internal needs but it also helped protect him from a pending marriage and the expectation to perform conventional sexual practices. For him, sadistic sexual fantasies were an art form and a lifestyle.

## SUMMARY AND DISCUSSION

For many years, the authors have performed crime scene assessments for homicide investigators based on the rape-murderer classifications mentioned earlier. Another important question about the four categories is: How widespread is each of the four categories among a population of murderers? To answer this question, the authors examined the frequency of the four categories within the population of murderers incarcerated in the Michigan state prison system. Having that information would assist law enforcement officers in knowing how common each type of rape-murderer is.

005579

For a point of reference, in October 1995, the Michigan Department of Corrections reported a prison population of 41,584 prisoners. At that time, the number of prisoners serving sentences for homicide was 5,928 (14%). This figure represented only those prisoners serving homicide sentences at that particular time and did not account for the total number who have served throughout history. Of the total number of homicide offenders in prison, 2,476 or 42% had committed sexually related murders.

Within that aggregate number of homicides, a survey was conducted to determine the frequency for each category among convicted murderers. This was accomplished by assessing each inmate on entry or reviewing the intake files of previously committed inmates to determine their most appropriate rape-murderer category. The findings of the research revealed the following results: power-assertive = 38% ($n = 904$), anger-retaliatory = 34% ($n = 807$), power-reassurance = 21% ($n = 599$), and anger-excitation = 7% ($n = 166$).

Based on the assumption that most murderers have the capacity for rational thought in a variety of emotional responses, there exists choice, determination, and a foundation for behavior patterns. Given their ability to learn, interpret, and modify behaviors, their characteristics and details of their crimes are formed into specific patterns. When individual idiosyncrasies and levels of social maturity are factored into their violent behavior, the result may be a complex mixture of knowledge, intentions, and behavioral outcomes. Therefore, when an investigator examines a crime scene, the presence or absence of evidence may reveal recognizable patterns that are indicative to that specific offender.

The rape-murder classification system described here was built on an interactive and dynamic template of conceptual and emotional constructs. Infused with the learning from factually based cases and perpetrator interviews, there existed a wide range of information related to precrime, crime, and postcrime behaviors. These behaviors were recognized within the continuums of the four typologies: power-assertive, power-reassurance, anger-retaliatory, and anger-excitation. Within each one of these rape-murderer types, a number of recognizable factors became evident and interrelated to cause and effect.

In addition, depending on their motivation and internal inhibitions, the perpetrators in each typology may and do regulate the rate of murder. In some instances, the perpetrator may simply kill one person. However, when fueled by power and anger, the use of murder can become a preferred mode of problem resolution for the perpetrator.

In the case of the repeat offender, each typology has a pattern of reoccurrence consistent with its killer's individual fantasies. For instance, the repeat power-assertive may show an increase in violence and/or systematic decrease in time between offenses. As for the power-reassurance, the schedule depends on fantasy preparation time, satisfaction, and feeding off the memory. If any one of these factors has changed, it is likely that the perpetrator will commit repeat offenses to gain satisfaction. Under these conditions, one may find a cluster of activity followed by a long absence before the murders are repeated. Alternately, the anger-

retaliatory is emotionally driven and conditioned to the expression of anger. When a particular victim and/or set of circumstances does not fill the need, the perpetrator may commit cluster killings until his needs are fulfilled. Generally, the timing between clusters lessens with experience. In reference to anger-excitation, the repeat offender is the most fickle and sanguine in killing. It can be said that as a lengthy predatory jackal who refines skills of hunting to eat better, so it is for the anger-excitation rape-murderer. Accordingly, when the satisfaction from the killings become brief and situational, the killing rate increases.

Finally, the earlier described murder classification system offers the investigator an ability for understanding the behavioral parameters of the perpetrator of an unsolved rape-murder. That is, given a set of circumstances, analysis of facts, inferences, and patterns, the details of the classification system can give the detective an informed direction for further investigation. The common rape-murderer is characteristically a repeat offender and this behavior is consistent with his rapist equivalent in sexual assault cases. Both have patterns that can be recognized within the rape continuum. Here, the crime scene itself becomes the initiation point for pattern recognition, evidence collection, decision making for follow-up, and strategy planning for interviews with suspects. If the category for a particular rape-murderer is identified correctly, the perpetrator can be his own accuser.

## REFERENCES

Copson, G. (1995). *Coals to Newcastle? Part 1: A study of offender profiling* (Police Research Group Special Interest Series, Paper 7). London: Home Office Police Department.

Copson, G., Badcock, R., Boon, J., & Britton, P. (1997). Articulating a systematic approach to clinical crime profiling. *Criminal Behaviour and Mental Health, 7,* 13-17.

Douglas, J. E., Burgess, A. W., Burgess, A. C., & Ressler, R. K. (1992). *Crime classification manual.* Lexington, MA: Lexington Books.

Geberth, V. J. (1996). *Practical homicide investigation: Tactics, procedures, and forensic techniques* (3rd ed.). Boca Raton, FL: CRC Publishing.

Geberth, V. J., & Turco, R. N. (1997). Antisocial personality disorder, sexual sadism, malignant narcissism, and serial murder. *Journal of Forensic Sciences, 42*(1), 49-60.

Groth, A. N., Burgess, A. W., & Holmstrom, L. L. (1977). Rape: Power, anger, and sexuality. *American Journal of Psychiatry, 134,* 1239-1243.

Hazelwood, R. R., & Burgess, A. N. (1987). *Practical aspects of rape investigation: A multidisciplinary approach.* New York: Elsevier North-Holland.

*HITS murder form.* (1995). Seattle, WA: Washington State Attorney General's Office.

Holmes, R. M., & Holmes, S. T. (1996). *Profiling violent crimes: An investigative tool.* Thousand Oaks, CA: Sage.

Johnson, G. (1994). VICLAS: Violent crime linkage analysis system. *RCMP Gazette, 56*(10), 5-22.

Keppel, R. D. (1995). Signature murders: A report of several related cases. *Journal of Forensic Sciences, 40,* 658-662.

Keppel, R. D. (1997). *Signature killers.* New York: Pocket Books.

Keppel, R. D., & Birnes, W. J. (1995). *The riverman: Ted Bundy and I hunt the Green River killer.* New York: Pocket Books.

Keppel, R. D., & Weis, J. P. (1994). Time and distance as solvability factors in murder cases. *Journal of Forensic Sciences, 39,* 386-401.