IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


NICHOLAS JAMES MCGUFFIN, as an ) Civil No.
individual and as guardian ad ) 6:20-cv-01163-
litem, on behalf ) MK
Of S.M., a minor, )
                                )
          Plaintiffs, )
                                )
     vs. )
                                )
                                )
MARK DANNELS, PAT DOWNING, SUSAN )
HORMANN, MARY KRINGS, KRIS )
KARCHER, SHELLY MCINNES, RAYMOND )
MCNEELY, KIP OSWALD, MICHAEL )
REAVES, JOHN RIDDLE, SEAN )
SANBORN, ERIC SCHWENNINGER, )
RICHARD WALTER, CHRIS WEBLEY, )
ANTHONY WETMORE, KATHY WILCOX, )
CRAIG ZANNI, DAVID ZAVALA, JOEL )
D. SHAPIRO AS ADMINISTRATOR OF )
THE ESTATE OF DAVID E. HALL, )
VIDOCQ SOCIETY, CITY OF COQUILLE, )
CITY OF COOS BAY, and COOS )
COUNTY, )
                                )
          Defendants. )
_____ )


DEPOSITION OF MARY KRINGS

Taken in behalf of Plaintiffs

May 05, 2022

*  *  *

Page 2

1          BE IT REMEMBERED THAT, pursuant to the Oregon

2    Rules of Civil Procedure, the remote deposition of MARY

3    KRINGS was taken by Amanda K. Fisher, Certified

4    Shorthand Reporter, on May 05, 2022, in the City of

5    Portland, County of Multnomah, State of Oregon.

6

7

8                      APPEARANCES:

9

10     MALONEY LAUERSDORF REINER, PC
       Counsel for Plaintiffs
11     1111 E. Burnside Street
       Suite 300
12     Portland, Oregon 97214
       acl@mlrlegalteam.com
13     jpuracal@forensicjusticeproject.org
            BY:  ANDREW C. LAUERSDORF
14               JANIS C. PURACAL

15

16     LAW OFFICE OF ROBERT E. FRANZ, JR.
       Counsel for Defendants: City of Coquille, City of
17     Coos Bay, Coos County, Craig Zanni, Chris Webley,
       Eric Schwenninger, Sean Sanborn, Ray McNeely,
18     Kris Karcher, Pat Downing, Mark Dannels, Kip Oswald,
       Michael Reaves, David Zavala, Anthony Wetmore,
19     Shelly McInnes
       PO Box 62
20     Springfield, Oregon 97477
       shenderson@franzlaw.comcastbiz.net
21          BY:  SARAH R. HENDERSON

22

23     OREGON DEPARTMENT OF JUSTICE
       Counsel for Defendants: Oregon State Police, John
24     Riddle, Susan Hormann, Mary Krings, Kathy Wilcox
       100 SW Market Street
25     Portland, OR 97201

```
 1      todd.marshall@doj.state.or.us
             BY:  JESSE B. DAVIS
 2                TODD MARSHALL

 3

        WOOD SMITH HENNING & BERMAN LLP
 4      Counsel for Defendants: Vidocq Society and Richard
        Walter
 5      12755 Southwest 69th Avenue
        Suite 100
 6      Portland, Oregon 97223
        kschaffer@wshblaw.com
 7          BY:  KARIN L. SCHAFFER

 8
        Also present:  Nicholas McGuffin, Susan Hormann,
 9                      Marla Kaplan

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

1                         I N D E X

2

3    Examinations                                    Page

4    BY MS. PURACAL:                                  5

5    BY MR. DAVIS:                                   138

6

7                       E X H I B I T S

8    No.        Description                          Page

9      1    Case jacket                           52

10     2    OSP lab letter                        60

11     3    Allele call table                     93

12     4    OSP lab letter                       100

13     5    Conversation log                     104

14     6    Lab protocols                        110

15     7    OSP lab letter                       119

16     8    OSP lab letter                       121

17     9    OSP lab memo                         123

18    11    OSP lab letter                       129

19

20

21

22

23

24

25

1          PORTLAND, OREGON; THURSDAY, MAY 05, 2022

2                      9:00 A.M.

3                      *   *   *

4                     MARY KRINGS

5       called as a witness in behalf of Plaintiffs,

6          having first been sworn by the Reporter,

7                  testifies as follows:

8

9                     EXAMINATION

10

11          MS. PURACAL:  Why don't we do introductions

12   for the record so that we can see everybody.

13          For Plaintiffs, this is Janis Puracal, and

14   I have my co-counsel Andrew Lauersdorf here, as well as

15   the Plaintiff, Nick McGuffin.

16          MS. HENDERSON:  This is Sarah Henderson.

17   I'm attending on behalf of the City and County

18   Defendants.

19          MS. SCHAFFER:  Good morning, this is Karin

20   Schaffer and I'm attending on behalf of the Vidocq

21   Society and Richard Walter, sometimes referred to as

22   the Vidocq Defendants.

23          MR. DAVIS:  Morning, this is Jesse Davis.

24   I'm here on behalf of Mary Krings, as well as the State

25   Defendants and the Oregon State Police.

Page 87

1   to 150 range would not be reproducible in your

2   experience, is that right?

3       A.  Well, no, because there are some circumstances

4   that might give you more confidence.  As I said, I

5   can't recall what those might be exactly, but in my

6   experience, generally not a mixture, that are not very

7   clear.  I don't remember an instance where I would have

8   that level of confidence in a mixture.

9       Q.  When you say mixture, can we define that?  What

10  do you mean when you say mixture?

11      A.  Mixture of DNA from more than one person.

12      Q.  So you define mixture as anything more than one

13  person?

14      A.  Yes.

15      Q.  So any time you have DNA contributed from more

16  than one person, then you would not interpret the data

17  between 50 and 150?

18      A.  I don't remember a specific instance when I did.

19  I'm not saying that as an absolute I wouldn't ever.  I

20  can't recall doing it.

21      Q.  When we were talking a little bit earlier about

22  the conclusion on Exhibit 2.3 from the left shoe, and

23  you said that you could not determine the number of

24  contributors there, is that because you

25  determine -- that you had never seen there would be

Page 94

1    conclusions for Exhibit 1, and I was trying to

2    understand which of these three exhibit numbers you

3    were reporting on -- and maybe we can revisit that

4    conversation.

5         Which of these samples were you reporting the

6    results of in your -- your August 27th, 2000?

7    A.  I don't remember writing that report.  But, from

8    looking at it recently, I believe that 1.1 and 1.3

9    would've have been the same sentence.

10   Q.  Would've been the same sentence?  What does that

11   mean?

12   A.  In the report.

13   Q.  You would've reported it the same way for 1.1 or

14   1.3?

15   A.  I believe I would, yes.

16   Q.  For Exhibit 1.3 here, I see that you've

17   indicated that there's a Y peak in the sample.

18        Do you see that?

19   A.  Yes.

20   Q.  The Y peak at the amelogenin location, that

21   tells us that there's male DNA in the sample?

22   A.  That's the -- the Y peak in general indicates

23   male DNA.

24   Q.  We know in the Freeman case, the victim,

25   Ms. Freeman, was female, right?

Page 95

1    A.  Yes.

2    Q.  So the presence of that Y peak tells us that

3  there a male on the sample, and so we know that that

4  didn't come from the female, Ms. Freeman, right?

5    A.  That's one possible interpretation.  Like I

6  said, the -- I don't know what it -- if it's in

7  parenthesis, that means it's below the threshold, so.

8    Q.  A Y peak below the threshold still would not

9  indicate a female, though.  It would still indicate a

10  male, correct?

11    A.  If it were a true Y allele, it would.  That's

12  the issue of the confidence level.  It may be.  It may

13  not be.  It may be.

14    Q.  And I see on Exhibit 1.3 that we also have at

15  least one location here, the D5S location, where we've

16  got three alleles that are all above the 150 threshold.

17      Do you see that?

18    A.  Yes.

19    Q.  So why didn't you report the presence of a

20  potential second contributor based on this three

21  alleles all above the 150 threshold at this locus?

22    A.  The 12 is in a stutter position for the 13, and

23  it's not unusual to have some elevated stutter.  So

24  it's not -- of itself not definite that it is from

25  another person.

1     Q.  Did you believe that 12 to be stutter?

2     A.  I don't know.  I don't remember at the time, and

3  I don't remember looking at -- I don't remember exactly

4  what the electropherogram looks like.

5     Q.  Let's see if I can find it.

6         I think I found here.  I'm going to share my

7  screen with you again, and this is -- we're going back

8  to Exhibit 2, and I'm on page 27 of that PDF here, and

9  I see the electropherogram.

10        Do you see here it's got Exhibit 1.3 noted on

11 there?

12    A.  Yes.

13    Q.  I see that it's dated July 31st, 2000.

14    A.  Okay.

15    Q.  And see your initials here at the top, is that

16 right?

17    A.  Yes.

18    Q.  If we go down to that locus here where we've got

19 the 11, the 12, and the 13, I don't see any indication

20 that you determined that that 12 is stutter.

21        Do you?

22    A.  I don't remember if I determined that

23 definitively or not.

24    Q.  Well, I noticed that on some of your other

25 electropherogram, for example, the one for 2.4 on page

1    41 of the PDF, I see that you've noted where it's

2    stutter in green, and then you crossed it out.

3         Do you see that?

4    A.  Hmm.  Yes.  Yes.

5    Q.  If we go back here to our allele table for

6    sample -- sorry, for Exhibit 1.3, do you have any

7    reason to believe that you determined that the 12 is

8    stutter?

9    A.  I don't have any reason to believe that it was

10   definitely determined to be stutter.

11   Q.  Do you have any reason to believe that it

12   was -- any reason to suggest that at the time you

13   believed it to be stutter?

14   A.  Other than general knowledge that elevated

15   stutterer is not uncommon.

16   Q.  And we just looked at the electropherograms.  I

17   don't see anything on there where you've indicated that

18   the 12 is stutter.  You agree that there was nothing on

19   the documentation that that was stutter, correct?

20   A.  The -- those -- the other electropherogram, that

21   was -- I don't believe that was the same thing.

22   Q.  Well, I understand we looked at two different

23   electropherogram, right?  We looked at one for 1.3 and

24   we looked at one for 2.4.  And we were looking at the

25   ones for 2.4 where you actually notate on the

Page 98

1    electropherogram when you determined something is

2    stutter.  Right?

3        A.  Yes, and that's not -- that's not what I'm

4    saying.  I don't believe that they're measuring the

5    same thing for the same reasons.

6        Q.  Can you explain that to me.

7        A.  What would you -- I -- I -- I'm not sure that

8    the second electropherogram was calculating elevated

9    stutter or just stutter.  That electropherogram had a

10   lot of problems with it.

11       Q.  Which one?

12       A.  The -- the one with all the markings on it.

13       Q.  The one for 2.4?

14       A.  That sounds right.

15       Q.  That we just looked at?

16       A.  Yes.

17       Q.  My question was about Exhibit 1.3 and whether

18   you had any reason to believe that at the time you

19   determined that 12 allele to be stutter?

20       A.  I do not remember anything from the time, and I

21   don't know that it was ever determined to be stutter.

22       Q.  So why did you not report the information about

23   Exhibit 1.3, given that you knew that there were at

24   least three alleles at this one locus here that were

25   above the 150 range?

Page 99

1    A.  I don't -- I don't know that 12 is a -- another

2    allele or if it's elevated stutter, which is not

3    uncommon.

4    Q.  I don't see on this allele chart where you have

5    ever recorded any of the alleles that you believe to be

6    stutter, or that you note to be stutter in your

7    electropherograms.  It appears that you are reporting

8    those that you determined to be true alleles.

9         Do you disagree with that?

10   A.  No.  I don't understand what you're saying.

11   Q.  Okay.  So if we go back here to the document

12   that we looked at before, Exhibit 2, and we were

13   looking at page 41, and we were looking at, as an

14   example, the electropherogram for Exhibit 2.4.  We can

15   see, for example, here that you've crossed out the 16

16   allele and noted that it's stutter.

17        If we then look at your allele call sheet, and

18   we go down to 2.4, we can see that you don't note that

19   16 because you've determined it's stutter.

20   A.  Yes.  For 2.4, it appears that some of those

21   were determined to be stutter.

22   Q.  And so you did not note them on your allele call

23   sheet?

24   A.  I don't know.

25   Q.  Okay.  I'm going to show you what I have marked

```
 1                C E R T I F I C A T E

 2    STATE OF OREGON      )

 3                         ) ss.

 4    COUNTY OF MULTNOMAH  )

 5

 6         I, Amanda K. Fisher, a Certified Shorthand

 7    Reporter, do hereby certify that, pursuant to

 8    stipulation of counsel for the respective parties

 9    hereinbefore set forth, MARY KRINGS remotely appeared

10    before me at the time and place set forth in the

11    caption hereof; that at said time and place I reported

12    in Stenotype all testimony adduced and other oral

13    proceedings had in the foregoing matter; that

14    thereafter my notes were reduced to typewriting under

15    my direction; and that the foregoing transcript, pages

16    1 to 141, both inclusive, constitutes a full, true and

17    accurate record of all such testimony adduced and oral

18    proceedings had, and of the whole thereof.

19         Witness my hand and stamp at Portland, Oregon,

20    May 16, 2022.

21

22    _____

23    AMANDA K. FISHER
      CSR No. 3229
24

25
```