## Page 1

IN THE CIRCUIT COURT OF THE STATE OF OREGON
FOR THE COUNTY OF MALHEUR

NICHOLAS McGUFFIN,            )
         Plaintiff,           )
    vs.                       ) No. 15CV1030
MARK NOOTH, Superintendent,   )
SRCI,                         )
         Defendant.           )

**DEPOSITION OF STEPHENIE WINTER SERMENO**

Taken in behalf of the Plaintiff

June 24, 2019

## Page 2

BE IT REMEMBERED THAT, pursuant to Oregon Rules of Civil Procedure, the deposition of STEPHENIE WINTER SERMENO was taken before Lisa J. Pace, Court Reporter and Notary Public for Oregon, on Monday, June 24, 2019, commencing at the hour of 8:58, the proceedings being reported in the offices of OSP Forensics, Clackamas, Oregon.

-:-

APPEARANCES:

APPEARING FOR THE PLAINTIFF(S)
Janis C. Puracal
Forensic Justice Project
333 SW Taylor Street, Suite 403
Tigard  OR  97204
503-664-3641
jpuracal@forensicjusticeproject.org
    and
Brittney Plesser
Oregon Innocence Project
PO Box 5248
Portland  OR  97208
503-944-2270
bplesser@oregoninnocence.info

APPEARING FOR THE DEFENDANT(S)

Paul E. Reim
DOJ Trial Corrections Lit
1162 Court Street NE
Salem  OR  97301
503-947-4700
paul.reim@doj.state.or.us

Also Present:  John Comery

## Page 3

I N D E X

| Examinations | Page |
|---|---|
| EXAMINATION BY MS. PURACAL | 6 |
| EXAMINATION BY MR. REIM | 63 |

Exhibits

| No. | Description | Page |
|---|---|---|
| 1 | Sermeno Subpoena | 5 |
| 2 | Kaplan Subpoena | 5 |
| 3 | Moore Subpoena | 5 |
| 4 | 6/6/17 Report | 5 |
| 5 | 5/20/19 Supplemental Report | 5 |
| 6 | 8/9/18 Cybergenics Report | 5 |
| 7 | 8/27/00 Report | 5 |
| 8 | 1/21/02 Report | 5 |
| 9 | STR Analysis for Casework | 5 |
| 10 | Notes/Sample Extraction Report | 5 |
| 11 | Genotype Summary of Results | 5 |
| 12 | Transcript Excerpt | 5 |
| 13 | 5/17/17 Amended Report | 5 |
| 14 | 10/10/17 Analytical Report | 5 |
| 15 | 3/5/18 Analytical Report | 5 |
| 16 | 7/17/00 Supplemental Report | 5 |

## Page 4

| No. | Description | Page |
|---|---|---|
| 17 | Undated Letter | 5 |
| 18 | Email String | 5 |
| 19 | Timeline of Events | 5 |
| 20 | 9/8/17 Allele Calls | 5 |

Information to Produce

|  | Page | Line |
|---|---|---|
| Emails | 12 | 17 |
| von Beroldingen | 15 | 17 |
| contact info |  |  |
| Incident Reports | 59 | 25 |

Instruction by Counsel

Page    Line

## 5

1  P R O C E E D I N G S
2  [Sermeno Subpoena, EXB. 1, marked]
3  [Kaplan Subpoena, EXB. 2, marked]
4  [Moore Subpoena, EXB. 3, marked]
5  [6/6/17 Report, EXB. 4, marked]
6  [5/20/19 Supplemental Report, EXB. 5, marked]
7  [8/9/18 Cybergenics Report, EXB. 6, marked]
8  [8/27/00 Report, EXB. 7, marked]
9  [1/21/02 Report, EXB. 8, marked]
10 [STR Analysis for Casework, EXB. 9, marked]
11 [Notes/Sample Extraction Report, EXB. 10, marked]
12 [Genotype Summary of Results, EXB. 11, marked]
13 [Transcript Excerpt, EXB. 12, marked]
14 [5/17/17 Amended Report, EXB. 13, marked]
15 [10/10/17 Analytical Report, EXB. 14, marked]
16 [3/5/18 Analytical Report, EXB. 15, marked]
17 [7/17/00 Supplemental Report, EXB. 16, marked]
18 [Undated Letter, EXB. 17, marked]
19 [Email String, EXB. 18, marked]
20 [Timeline of Events, EXB. 19, marked]
21 [9/8/17 Allele Calls, EXB. 20, marked]
22
23      STEPHENIE WINTER SERMENO,
24 having first been sworn or affirmed, was examined and
25 testified under penalties of perjury as follows:
STUMPTOWN STENO
503.888.1416

## 6

1       MS. PURACAL:  Janice Puracal from the
2  Forensic Justice Project for Petitioner McGuffin,
3  with me is Brittney Plesser from the Oregon Innocence
4  Project and John Comery from the Oregon Innocence
5  Project.
6       MR. REIM:  Paul Reim for the Department
7  of Justice.
8       THE WITNESS:  Stephanie Winter Sermeno
9  from the Oregon State Police Forensic Services
10 Laboratory.
11
12           EXAMINATION
13 BY MS. PURACAL:
14    Q.  Ms. Winter -- Do you want me to refer to
15 you by Ms. Winter Sermeno or Ms. Winter?
16    A.  Winter Sermeno, please.  Thank you.
17    Q.  Good morning.
18    A.  Good morning.
19    Q.  You are the supervisor of the DNA unit at
20 the Oregon State Police Forensics Division; is that
21 correct?
22    A.  That is correct.
23    Q.  How long have you been the supervisor?
24    A.  Not quite six and a half years.
25    Q.  And what were you before you were the
STUMPTOWN STENO
503.888.1416

## 7

1  supervisor?
2     A.  Prior to working for Oregon State Police I
3  was employed by Washington State Patrol, I worked for
4  them for ten years, both at the Seattle laboratory
5  and the Vancouver laboratory.  Prior to that I worked
6  in the State of California at Oakland Police
7  Department, LA County Coroner, LA County Sheriff and
8  at a private DNA laboratory called Forensic
9  Analytical.
10    Q.  Have you always been a DNA supervisor?
11    A.  No.
12    Q.  What were you when you were at the
13 Washington State lab?
14    A.  For a period of time I was an analyst and
15 for a period of time I was a supervisor.
16    Q.  Always in DNA?
17    A.  Yes.
18    Q.  If you could look in the binder right in
19 front of you, Exhibit No. 1 is the subpoena that I
20 sent to you to appear for this deposition.  Is that
21 correct?
22    A.  Yes.
23    Q.  And you are appearing pursuant to that
24 deposition subpoena, correct?
25    A.  I am, yes.
STUMPTOWN STENO
503.888.1416

## 8

1     Q.  All right.  Have you ever testified at
2  deposition before?
3     A.  Not in the State of Oregon but in
4  California and Washington.
5     Q.  How many times have you testified in
6  deposition?
7     A.  Oh.  Sorry.  I don't know the answer to
8  that.  I know at least once in each state.
9     Q.  And what was the context of that
10 deposition?
11    A.  All related to my work as a forensic
12 scientist.
13    Q.  All related to DNA?
14    A.  Oh, another good question.  I'm sorry, I
15 don't know the answer to that.
16    Q.  Okay.  But it was all related to your work
17 as either an analyst or a supervisor?
18    A.  Correct.
19    Q.  Do you remember when those depositions took
20 place?
21    A.  I don't.  I'm sorry.
22    Q.  Was it more than six years ago?
23    A.  Yes.
24    Q.  More than ten years ago?
25    A.  That I'm not sure of.  I'm sorry.
STUMPTOWN STENO
503.888.1416

### 29

1  **Q.** What's the more to it?
2  **A.** You would look at peak heights, you would
3  look at the number of alleles at each location, you
4  would look for other artifacts besides stutter.
5  **Q.** And you're trying to determine what's a
6  real allele versus what's irrelevant information?
7  **A.** Correct.
8  **Q.** That's the interpretation phase?
9  **A.** Correct.
10 **Q.** From there the analyst would write down the
11 real alleles on their allele chart?
12 **A.** Correct.
13 **Q.** And then they're going to compare those
14 real alleles to standards to figure out the
15 inclusions and the exclusions and the inconclusives?
16 **A.** Yes.
17 **Q.** And from there they're going to then report
18 their conclusions in a typewritten report?
19 **A.** Yes.
20 **Q.** Is that the reporting phase?
21 **A.** Yes.
22 **Q.** Have I missed any part of the basic
23 process?
24 **A.** I don't think so.
25 **Q.** So you understand in Mr. McGuffin's case

### 30

1  back before the criminal trial, the victim, Leah
2  Freeman's shoes were tested for DNA in 2000, right?
3  **A.** Correct.
4  **Q.** And we know now that there was foreign DNA
5  on both of those shoes but that foreign DNA wasn't in
6  the report issued in 2000.
7  **A.** I can't -- I honestly can't remember if it
8  was in both shoes or just one. I know one had
9  alleles below threshold that did not end up in the
10 report.
11 **Q.** Okay. If you flip to Exhibit 7 in that
12 binder in front of you, that's the August 2000
13 report.
14 **A.** Yes.
15 **Q.** And if you flip to Exhibit 8, that's the
16 January 2002 report, comparing the samples from 2000
17 to one other standard, correct?
18 **A.** Yes.
19 **Q.** So it's your understanding that there was
20 foreign DNA on at least one of the samples that was
21 not listed in the August 2000 report?
22 **A.** Correct, the DNA was below the laboratory's
23 threshold and it was not reported.
24 **Q.** So we don't disagree on that, correct, that
25 there was foreign DNA in the sample?

### 31

1  **A.** Correct.
2  **Q.** Okay. Have you ever talked to Mary Krings,
3  the analyst who ran that sample in 2000?
4  **A.** I have not.
5  **Q.** Do you have any personal knowledge about
6  what happened with the testing in 2000?
7  **A.** I don't.
8  **Q.** What is your understanding of why the
9  foreign DNA was not reported in the 2000 or 2002
10 reports?
11 **A.** It's my understanding that at the time the
12 protocols allowed an analyst discretion to either
13 report DNA below the threshold or not report the DNA
14 below threshold.
15 **Q.** Can you tell me more about the discretion
16 piece of it, where that comes from?
17 **A.** I don't know where it comes from. I spoke
18 with Cecilia specifically in regard to it and asked
19 if this in fact did happen and this was allowed, and
20 she confirmed that. Where that rule or that policy
21 came from I don't know.
22 **Q.** So you don't know if it was in a written
23 protocol from the lab?
24 **A.** I don't believe it was in the written
25 protocol. I reviewed the protocol from that period

### 32

1  of time and did not see that in the protocol.
2  **Q.** Was it in one of those guidance documents?
3  **A.** I don't know that guidance documents
4  existed at that point in time. That might be a newer
5  thing.
6  **Q.** So was this considered a best practice at
7  the time?
8  **A.** I don't know that I could say it was best
9  practice. I just could say that it's my
10 understanding that it was possible and it was analyst
11 discretion.
12 **Q.** But you don't know where that discretion
13 comes from?
14 **A.** I don't.
15 **Q.** What does it mean to have discretion to
16 decide whether or not to report those alleles below
17 threshold?
18 **A.** It was my understanding that the analyst
19 could use their training and expertise to determine
20 whether or not they would report below threshold
21 alleles in their written report.
22 **Q.** But as far as that word discretion goes,
23 does that mean that they have a choice to report them
24 or not report them?
25 **A.** That's my understanding, yes.

---

33

1   Q. Are there certain factors that she might,
2   the analyst might consider when deciding whether to
3   report those alleles or not report them?
4   A. I don't know.
5   Q. Who would know that?
6   A. Cecilia would be the best person to ask, as
7   she was the technical leader at the time.
8   Q. If the analyst wants to exercise her
9   discretion to report the alleles, does she have to
10  get authorization from someone?
11  A. The technical leader would -- Sorry, not
12  the technical leader. The technical reviewer would
13  have to agree.
14  Q. If the analyst wanted to choose not to
15  report the alleles below threshold would she also
16  have to get authorization from someone?
17  A. The technical reviewer has to agree with
18  the interpretation that was performed within the
19  case, so if they chose to report it or they chose not
20  to report it, the technical reviewer would have to
21  agree with that.
22  Q. You said two different words there, you
23  said interpret and you said report. Is there a
24  difference between the interpretation and the
25  reporting?

STUMPTOWN STENO
503.888.1416

---

34

1   A. In the interpretation I believe that they
2   would -- they would still document that the alleles
3   existed, and I don't believe that there was any
4   discretion in that regard. It was the reporting in
5   which there was discretion.
6       So it's my understanding that those alleles
7   would be in the case file, documented, and that would
8   be part of the interpretation, but the discretion
9   came in regard to the reporting.
10  Q. And is that piece on the reporting that you
11  don't know that there was a written policy that
12  allowed that discretion?
13  A. Correct.
14  Q. Do analysts now have discretion to choose
15  whether or not to report alleles below threshold?
16  A. No.
17  Q. So at some point did there become a written
18  policy that says you do not have discretion to report
19  those?
20  A. Yes. When that was, I'm not sure.
21  Q. But it's in a written policy somewhere?
22  A. Yes.
23  Q. Is it in the current written policy?
24  A. Yes.
25  Q. Do you know where in the current written

STUMPTOWN STENO
503.888.1416

---

35

1   policy?
2   A. It would be in the data interpretation area
3   of our policy and/or report writing.
4   Q. Would it say specifically, you do not have
5   discretion?
6   A. It wouldn't say that. It would be more
7   based on the number of alleles that you're seeing and
8   the number of loci that you're seeing alleles at and
9   the peak heights, so it would be more data driven
10  versus discretion or no discretion.
11  Q. Those same instructions that are in the
12  current policy did not exist in the old policy?
13  A. No.
14  Q. Under the old protocols in 2000, if the
15  analyst chooses not to report peaks under threshold,
16  does she have to document that she made that choice?
17  A. I don't believe that it was required to
18  document but you would see that within the case file,
19  you would see the alleles below threshold in the
20  allele table and then you would not see that reported
21  in the report, but I don't think I've ever seen it
22  specifically spelled out in a case file, I chose not
23  to report these.
24  Q. So how does someone who doesn't understand
25  an allele chart or an electropherogram, how does that

STUMPTOWN STENO
503.888.1416

---

36

1   person know that there was peaks below threshold that
2   are not being reported?
3   A. They would see them in the allele table and
4   in the electropherogram.
5   Q. And that's the only place that they would
6   see them?
7   A. Yes.
8   Q. Can you turn to Exhibit 11 in that binder.
9   A. Okay.
10  Q. And I'm looking specifically at cutting 1.3
11  which is about four rows down.
12  A. Okay.
13  Q. My understanding is that the analyst in
14  2000 reported the results for cutting 1.3. And if
15  you need to, you can flip back to -- I think that is
16  Exhibit No. 7 that's the final report. On the second
17  page of Exhibit 7 the analyst lists the cutting is
18  just Exhibit 1, but my understanding was she's
19  referring to cutting 1.3. Is that correct?
20  A. Yes. It's my understanding that at that
21  point in time they didn't necessarily report every
22  single sample if it was from the same item of
23  evidence.
24      And it looks like three different cuttings
25  were taken from that shoe, and they reported the

STUMPTOWN STENO
503.888.1416

---

**41**

1  Q. Yes, the electropherograms of cutting 1.3.
2  A. Okay.
3  Q. I don't see that she has noted that 12 as
4  being stutter.
5  A. Correct.
6  Q. Does that indicate that she has not
7  determined that that 12 is stutter?
8  A. Yes. If she had considered it stutter she
9  would have crossed it off and not included it in her
10 allele table.
11 Q. So if we go back to that allele table at
12 Exhibit No. 11 and we look at cutting 1.3, is there
13 any other reason why that allele 12 at the D5 locus
14 being above threshold was not reported?
15 A. More than likely it was because it was only
16 one allele that was above threshold.
17 Q. Is that another written protocol or
18 unwritten practice?
19 A. I don't think it was written, it was
20 probably a practice.
21 Q. To not report if there's only one peak
22 above threshold --
23 A. Correct.
24 Q. -- in the foreign DNA?
25 A. Correct.

STUMPTOWN STENO
503.888.1416

**42**

1  Q. The Y peak at the amelogenin locus --
2  A. Yes.
3  Q. -- that tells us that there's male DNA in
4  the sample, correct?
5  A. Correct.
6  Q. So for any sample that has a Y peak, we
7  know that there's male in the sample?
8  A. At least some male, yes.
9  Q. If we know that the victim is female, then
10 we know that that is foreign DNA in the sample,
11 correct?
12 A. Correct.
13 Q. So here we've got, going back to cutting
14 1.3, we have Y in the sample. So we know that
15 there's some male in that sample?
16 A. Correct.
17 Q. Is there a reason why an analyst wouldn't
18 report that, knowing that the victim was female and
19 so that was always going to be foreign male DNA in
20 that sample?
21 A. Just going back to the -- they had
22 discretion, so I don't know why the discretion was
23 used on this particular sample.
24 Q. Do we agree that the foreign DNA profile
25 seen in 2000 and listed on Ms. Krings' allele chart

STUMPTOWN STENO
503.888.1416

**43**

1  do not match Mr. McGuffin?
2  A. That is correct.
3  Q. And we agree that they don't match the
4  victim, Ms. Freeman?
5  A. Correct.
6  Q. Can you turn to Exhibit 9 in that binder.
7  This is just a couple of pages from the 2000
8  protocol, and if you turn to the third page of that
9  exhibit --
10 A. Okay.
11 Q. -- this is page 43 of the 2000 protocols.
12 And I see it says at the top there, "Note: Peaks
13 between 50 and 150 RFU will be considered for
14 purposes of exclusion."
15 A. Yes.
16 Q. What does that mean?
17 A. That means if you have data between 50 and
18 150 and you have a standard to compare to that
19 sample, you will look at that data between 50 and 150
20 to exclude somebody.
21 Q. So here we know that there was data between
22 50 and 150 and we know that Mr. McGuffin was excluded
23 from that data. Why was that not reported pursuant
24 to this policy? If you're looking for the report --
25 A. Is that 7?

STUMPTOWN STENO
503.888.1416

**44**

1  Q. Exhibit 7, correct.
2  A. I don't think in the first report, the
3  August 27th, 2000, I don't believe that there was a
4  standard other than Corliss Courtwright and Dennis
5  Freeman. I don't know why that comparison was not
6  made.
7      I'm assuming both of those individuals were
8  male -- Oh, no. One of them -- Excuse me. It looks
9  like those were Leah Freeman's parents, and those
10 samples were used to confirm that the toothbrush was
11 an appropriate standard for the victim, but I'm not
12 sure why in this report the -- that Dennis Freeman
13 wasn't compared to that to exclude.
14 Q. Do you know why Mr. McGuffin wasn't
15 compared and noted to exclude?
16 A. Did we -- I'm not sure that we had his
17 standard at that point. I don't see his standard
18 listed but I might be missing it in my cursory
19 review.
20 Q. If you look on the electropherograms which
21 are in Exhibit 10 --
22 A. Yes.
23 Q. -- second to the last page, Exhibit No. 13,
24 it's an electropherogram, Exhibit 13?
25 A. Yes.

STUMPTOWN STENO
503.888.1416

### 69

1 laboratory would have had protocols or guidelines in
2 regard to reporting.
3     **Q.** Okay. And the threshold would have been
4 around 150 at that time?
5     **A.** Or lower.
6     **Q.** Or lower?
7     **A.** Or higher. It depends on the laboratory.
8 It's -- That's common even now.
9     **Q.** How do laboratories justify that when they
10 have theoretically an accreditation out there, how do
11 they justify having different numbers? This is a
12 hard science.
13     **A.** It's actually an applied science. And it
14 is based on experiments that were done in an
15 individual laboratory, we don't all use the same
16 instruments, we don't use all the same amplification
17 kits. Our processes are not identical, therefore,
18 you have -- you can't have an expectation that the
19 thresholds will be identical.
20     **Q.** All right. And do you recall when the
21 threshold changed in this agency from 150 to below
22 that?
23     **A.** I don't.
24     MR. REIM: Very good. I don't have any
25 other questions for you, ma'am. Thank you.

STUMPTOWN STENO
503.888.1416

### 70

1     MS. PURACAL: We're done.
2     Off the record.
3     [Deposition adjourned at 10:34]

STUMPTOWN STENO
503.888.1416

### 71

1 State of Oregon       )
                    ) ss.
2 County of Clackamas   )
3
4     I, Lisa J. Pace, Court Reporter and Notary
5 Public, do hereby certify that STEPHENIE WINTER
6 SERMENO personally appeared before me at the time and
7 place mentioned in the caption herein; that the
8 witness was by me first duly sworn on oath and
9 examined upon oral interrogatories propounded by
10 counsel; that said examination, together with the
11 testimony of said witness, was taken down by me in
12 stenotype and thereafter reduced to typewriting; and
13 that the foregoing transcript, Pages 1 to 70, both
14 inclusive, contains a full, true and accurate record
15 of all such testimony adduced and oral proceedings
16 and of the whole thereof.
17     Witness my hand at Lake Oswego, Oregon, this
18 11th day of July 2019.

22     Lisa J. Pace
    Court Reporter
23     Notary Public for Oregon
    My Commission expires 7/17/20

STUMPTOWN STENO
503.888.1416