```
 1            IN THE CIRCUIT COURT OF THE STATE OF OREGON

 2                    FOR THE COUNTY OF MALHEUR

 3

 4     NICHOLAS McGUFFIN,                   )
                                            )
 5           Plaintiff,                     )
                                            )
 6           vs.                            ) No. 15CV1030
                                            )
 7     MARK NOOTH, Superintendent,          )
       SRCI,                                )
 8                                          )
             Defendant.                     )
 9
```

**DEPOSITION OF MARLA KAPLAN**

Taken in behalf of the Plaintiff

June 24, 2019

```
 1            BE IT REMEMBERED THAT, pursuant to Oregon
 2   Rules of Civil Procedure, the deposition of MARLA
 3   KAPLAN was taken before Lisa J. Pace, Court Reporter
 4   and Notary Public for Oregon, on Monday, June 24,
 5   2019, commencing at the hour of time, the proceedings
 6   being reported in the offices of OSP Forensics,
 7   Clackamas, Oregon.
 8                        -:-
 9                    APPEARANCES:
10   APPEARING FOR THE PLAINTIFF(S)
11   Janis C. Puracal
     Forensic Justice Project
12   333 SW Taylor Street, Suite 403
     Tigard  OR  97204
13   503-664-3641
     jpuracal@forensicjusticeproject.org
14        and
     Brittney Plesser
15   Oregon Innocence Project
     PO Box 5248
16   Portland  OR  97208
     503-944-2270
17   bplesser@oregoninnocence.info
18
     APPEARING FOR THE DEFENDANT(S)
19
     Paul E. Reim
20   DOJ Trial Corrections Lit
     1162 Court Street NE
21   Salem  OR  97301
     503-947-4700
22   paul.reim@doj.state.or.us
23
24   Also Present:  John Comery
25
```

```
                           I N D E X

Examinations                                                    Page


  EXAMINATION BY MS. PURACAL                                       4

  EXAMINATION BY MR. REIM                                         42


Exhibits

No.       Description                                           Page
    21    Power Point data                                        65


Information to Produce
                                        Page      Line
  Articles                                6        18


Instruction by Counsel

Page       Line
```

```
 1                      MARLA KAPLAN,
 2   having first been sworn or affirmed, was examined and
 3   testified under penalties of perjury as follows:
 4
 5                       EXAMINATION
 6   BY MS. PURACAL:
 7       Q.   Ms. Kaplan, thank you for coming this
 8   morning.
 9       A.   Mm-hmm [affirmative response].
10       Q.   Let's just do appearances for this record
11   since we have a different deposition transcript from
12   the deposition before you.
13       A.   Okay.
14            MR. PURACAL:  So Janis Puracal from the
15   Forensic Justice Project representing the petitioner,
16   Nicholas McGuffin.  I have with me Brittney Plesser
17   from the Oregon Innocence Project and John Comery
18   from the Oregon Innocence Project.
19            MR. REIM:  Paul Reim from DOJ
20   representing the superintendent.
21   BY MS. PURACAL:  [Continuing]
22       Q.   Ms. Kaplan, you are a forensic scientist in
23   the DNA unit the Oregon State Police Forensics
24   Division, correct?
25       A.   Correct.  My title is DNA technical leader.
```

1  moved onto a different type of technology, so that
2  original data when we looked at it in 2012, it wasn't
3  really apples to apples, it was apples to oranges, if
4  that makes sense.
5      Q.    So what does that tell us about when that
6  threshold was actually lowered?
7      A.    The threshold lowering on the original data
8  didn't become required until 2012.
9      Q.    So at any point in time before 2012 was the
10 lab looking at data below that 150 threshold?
11     A.    The lab was always looking at the data
12 between 50 and 150, but the rules about what you were
13 expected to do with that data became stricter in
14 2012.  Between 2000 and 2012 there was a fair amount
15 of what we call analyst discretion or
16 analyst-to-analyst variability or subjectivity and
17 what to do with that data, and we took some of that
18 subjectivity away in 2012.
19     Q.    So before 2012 some analysts would look at
20 that data below 150 and choose to interpret that
21 data?
22     A.    They would choose to draw -- choose to use
23 that data in drawing specific conclusions.  And
24 again, this is what I know based on my review of the
25 past protocols, I don't have any firsthand knowledge

```
 1  of that; it's conversations with other analysts, I
 2  wasn't here then, but that was the -- that was the
 3  general approach.
 4          And even in the 2000 protocol it says that
 5  DNA types between 50 and 150 should be interpreted
 6  with caution, and so that was something that an
 7  analyst to analyst could draw different conclusions
 8  and make different decisions.
 9      Q.  I'd like to point you to Exhibit No. 9 in
10  that black binder.
11      A.  Yes.
12      Q.  This is just a couple of pages from the
13  written protocol for the lab in 2000, and the second
14  page of that is an interpretation guideline.  I'm
15  looking at point number 3 on that page.  It says,
16  "Peak heights should be a minimum of 150 relative
17  fluorescent units (RFU).  Peak heights less than 150
18  RFU may be interpreted with caution."
19          Is that what you're referring to?
20      A.  Yes.
21      Q.  Is there a difference between interpreting
22  those peak heights less than 150 versus reporting the
23  peak heights less than 150?
24      A.  So the interpretation and reporting
25  requirements were not always aligned insofar as when
```

1  multiple samplings were taken from a single item.
2  There were times that just one result from those
3  multiple samplings were reported.
4         And so the data interpretation took place
5  in the case file, and so the analyst would document
6  the presence of those peaks on what we call allele
7  call tables, and so they would be interpreted and
8  they would be documented, but the conclusions as they
9  were listed on the report may not be fully
10 representative of all of that data that was
11 generated.
12      Q.   So where in the protocol does it say that
13 the analyst can interpret those peaks but then choose
14 not to report them?
15      A.   That I don't know.
16      Q.   Have you reviewed that entire protocol in
17 2000?
18      A.   I have but not recently.
19      Q.   When you say you don't know, is that you
20 don't know where in the protocol it says that the
21 analyst can choose not to report, or that you don't
22 know if it says that in the protocol?
23      A.   I don't know specifically what it says in
24 the protocol related to interpretation versus
25 reporting.

```
 1   State of Oregon        )
                            ) ss.
 2   County of Clackamas    )

 3

 4           I, Lisa J. Pace, Court Reporter and Notary
 5   Public, do hereby certify that MARLA KAPLAN
 6   personally appeared before me at the time and place
 7   mentioned in the caption herein; that the witness was
 8   by me first duly sworn on oath and examined upon oral
 9   interrogatories propounded by counsel; that said
10   examination, together with the testimony of said
11   witness, was taken down by me in stenotype and
12   thereafter reduced to typewriting; and that the
13   foregoing transcript, Pages 1 to 65, both inclusive,
14   contains a full, true and accurate record of all such
15   testimony adduced and oral proceedings and of the
16   whole thereof.
17           Witness my hand at Lake Oswego, Oregon, this
18   11th day of July 2019.
```

OFFICIAL STAMP
LISA J PACE
NOTARY PUBLIC - OREGON
COMMISSION NO. 952557
MY COMMISSION EXPIRES JULY 17, 2020

_____
Lisa J. Pace
Court Reporter
Notary Public for Oregon
My Commission expires 7/17/20