## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION

NICHOLAS JAMES MCGUFFIN, as an ) Civil No.
individual and as guardian ad   ) 6:20-cv-01163-
litem, on behalf                ) MK
Of S.M., a minor,               )
                                )
         Plaintiffs,            )
                                )
vs.                             )
                                )
                                )
MARK DANNELS, PAT DOWNING, SUSAN )
HORMANN, MARY KRINGS, KRIS      )
KARCHER, SHELLY MCINNES, RAYMOND )
MCNEELY, KIP OSWALD, MICHAEL    )
REAVES, JOHN RIDDLE, SEAN       )
SANBORN, ERIC SCHWENNINGER,     )
RICHARD WALTER, CHRIS Webley,   )
ANTHONY WETMORE, KATHY WILCOX,  )
CRAIG ZANNI, DAVID ZAVALA, JOEL )
D. SHAPIRO AS ADMINISTRATOR OF  )
THE ESTATE OF DAVID E. HALL,    )
VIDOCQ SOCIETY, CITY OF COQUILLE, )
CITY OF COOS BAY, and COOS      )
COUNTY,                         )
                                )
         Defendants.            )
_____ )

DEPOSITION OF RAYMOND MCNEELY
Taken in behalf of Plaintiffs
April 26, 2022
* * *

## Page 2

BE IT REMEMBERED THAT, pursuant to the Oregon Rules of Civil Procedure, the remote deposition of RAYMOND MCNEELY was taken by Amanda K. Fisher, Certified Shorthand Reporter, on April 26, 2022, in the City of Portland, County of Multnomah, State of Oregon.

APPEARANCES:

MALONEY LAUERSDORF REINER, PC
Counsel for Plaintiffs
1111 E. Burnside Street
Suite 300
Portland, Oregon 97214
acl@mlrlegalteam.com
jpuracal@forensicjusticeproject.org
  BY: ANDREW C. LAUERSDORF
      JANIS C. PURACAL

LAW OFFICE OF ROBERT E. FRANZ, JR.
Counsel for Defendants: City of Coquille, City of Coos Bay, Coos County, Craig Zanni, Chris Webley, Eric Schwenninger, Sean Sanborn, Ray McNeely, Kris Karcher, Pat Downing, Mark Dannels, Kip Oswald, Michael Reaves, David Zavala, Anthony Wetmore, Shelly McInnes
PO Box 62
Springfield, Oregon 97477
shenderson@franzlaw.comcastbiz.net
  BY: SARAH R. HENDERSON

OREGON DEPARTMENT OF JUSTICE
Counsel for Defendants: Oregon State Police, John Riddle, Susan Hormann, Mary Krings, Kathy Wilcox
100 SW Market Street
Portland, OR 97201
jesse.b.davis@doj.state.or.us

## Page 3

WOOD SMITH HENNING & BERMAN LLP
Counsel for Defendants: Vidocq Society and Richard Walter
12755 Southwest 69th Avenue
Suite 100
Portland, Oregon 97223
kschaffer@wshblaw.com
  BY: KARIN L. SCHAFFER

Also present: Nicholas McGuffin

## Page 4

I N D E X

| Examinations | Page |
|---|---|
| BY MR. LAUERSDORF: | 5 |
| BY MS. SCHAFFER: | 219 |
| BY MR. LAUERSDORF: | 222 |

E X H I B I T S

| No. | Description | Page |
|---|---|---|
| 1 | Dannels' press conference | 92 |
| 2 | Coquille PD incident report | 131 |
| 3 | Coquille PD incident report | 135 |
| 4 | Coquille PD incident report | 173 |
| 10 | Coquille PD incident report | 176 |
| 12 | Coquille PD incident report | 152 |
| 14 | Coquille PD incident report | 162 |
| 15 | Coquille PD incident report | 154 |
| 16 | Handwritten note | 145 |
| 18 | Notice of potential discipline letter | 53 |
| 19 | Disciplinary interview letter | 56 |
| 23 | ABC News 20/20 video | 190 |
| 24 | ABC News 20/20 video | 192 |
| 25 | Paul Frasier to-do list | 205 |
| 26 | ABC News 20/20 video | 206 |
| 27 | ABC News 20/20 video | 208 |

1 (Pages 1 to 4)

Stumptown Steno
503.888.1416

Electronically signed by Amanda Fisher (001-415-598-0954)
f72b865d-a31f-4067-a4bc-19f77795b5c9
Exhibit 85, Page 1 of 6

## Page 5

1  PORTLAND, OREGON; TUESDAY, April 26, 2022
2       9:00 A.M.
3          * * *
4       RAYMOND MCNEELY
5  called as a witness in behalf of Plaintiffs,
6  having first been sworn by the Reporter,
7       testifies as follows:
8
9       EXAMINATION
10 BY MR. LAUERSDORF:
11   Q. Okay. Is it -- you're in the Sheriff's
12 Department, so it is Deputy McNeely?
13   A. Sergeant McNeely.
14   Q. Sergeant McNeely. Okay. So you've had a
15 promotion since being at Cochise County?
16   A. Yeah. Corporal and then Sergeant.
17   Q. Okay. All right. So I'll refer to you as
18 Sergeant McNeely?
19   A. You can refer to me as Ray. That's fine.
20   Q. Well, for the record, I --
21   A. Okay.
22   Q. -- I'm not supposed to do that.
23   A. Oh, okay. Sorry.
24   Q. So my name is Andy Lauersdorf. You and I have
25 never met before, is that right?

## Page 6

1   A. I don't believe so, sir.
2   Q. Okay. I'm an attorney representing the
3  Plaintiffs in this matter, which is a lawsuit filed by
4  Mr. McGuffin against a number of Defendants, including
5  yourself.
6      Do you understand that?
7   A. I do.
8   Q. Okay. And, just for the record, I'll make some
9  quick introductions.
10     Also on the call this morning are Mr. Jesse
11 Davis, representing the State of Oregon, and Ms. Karin
12 Schaeffer representing Richard Walter and the Vidocq
13 Defendants. If I got any of that incorrect, please
14 speak up. Otherwise, we'll go ahead and move on.
15     I understand that you're represented by Sarah
16 Henderson today and that she's in the room with you.
17     Is that right?
18  A. Correct.
19  Q. Okay. Can you please state your name as given
20 at birth.
21  A. Raymond Lee McNeely.
22  Q. Are you a Junior?
23  A. No. My dad has a different middle name.
24  Q. Okay. And your place and date of birth?
25  A. Say that again, sir. Sorry.

## Page 7

1   Q. What is your date of birth?
2   A. January 07, 1978.
3   Q. Where were you born?
4   A. Moscow, Idaho.
5   Q. What's your current address?
6   A. Business address?
7   Q. Sure, that's fine.
8   A. 205 North Judd Drive, Bisbee, Arizona, 85603.
9   Q. Can you spell Judd for me.
10  A. J-U-D-D.
11  Q. Okay. And Bisbee is B-I-S-B-E-E?
12  A. B-I-S-B-E-E, correct.
13  Q. Okay. And who is your current employer?
14  A. The Cochise County Sheriff's office.
15  Q. When did you start with Cochise County?
16  A. November of 2015.
17  Q. 2015? Okay.
18  A. Yeah.
19  Q. And your current title is Sergeant. Okay.
20     Do you have a different -- I know you already
21 had a DPSST number that was 46177, is that right?
22  A. That sounds correct, sir, yes.
23  Q. Do you have a different number that you're using
24 in Arizona for law enforcement identification?
25  A. Yeah, it's 1523.

## Page 8

1   Q. And so up here we call that a DPSST number.
2  What's it called here?
3   A. It's our county number. It's the year you were
4  hired and the -- like, the first employee hired of that
5  year would the date and then number 1, so I was the
6  23rd employee hired in 2015.
7   Q. Okay. And then that is that just a county
8  number, or is that used for state-wide officer
9  identification?
10  A. We -- usually when we sign our names in the
11 state stuff we put that identifier because signatures
12 are hard to read, but I don't think the State actually
13 uses it, to my knowledge.
14  Q. Okay. Do you know if there's a different number
15 or identifier that the state uses?
16  A. No, I think they just use your name, is my
17 understanding.
18  Q. Okay. You're here today to we deposed.
19     Do you understand that?
20  A. I do.
21  Q. And this is the date previously agreed upon, and
22 not quite the time. But it's Tuesday, April 26th,
23 2022, and it's approximately 9:45 AM.
24     Do you agree with that?
25  A. I do.

2 (Pages 5 to 8)

## Page 145

1  So your job was just to write down what people
2  said, and then everything else was up to somebody other
3  than you to evaluate whether their stories had changed
4  over time or anything like that, is that right?
5  A. Correct. We were just advised to go out and
6  interview these people and write -- document down what
7  they said in today's -- today's time.
8  Q. Okay.
9  A. That was briefed over the -- the Major Crimes
10 Team.
11 Q. Do you recall writing your reports or Webley
12 writing his reports times when he thought that
13 somebody's -- a witness's testimony was suspicious or
14 wasn't adding up something like that?
15 A. Not that I recall, no.
16 Q. Okay. So then let's see. I wanted to ask you
17 about this exhibit that's been marked as Exhibit 16.
18     (Exhibit No. 16 marked for identification.)
19 Q. Do you recognize that handwriting at all?
20 A. I do not.
21 Q. Okay. Have you ever seen this document before?
22 A. No, not that I recall.
23 Q. So you don't recognize the handwriting and you
24 don't know who the author of this document was?
25 A. No. Not that I recall, no.

## Page 146

1  Q. Okay. So you interviewed Scott Hamilton, and
2  here down -- here he says -- he tells you, "Less than
3  one week after Freeman was found, McGuffin asked him to
4  go for a ride with him. Hamilton said McGuffin was sad
5  and he wanted to help, so he agreed to go with him.
6  According to Hamilton, McGuffin took him out Lee Valley
7  Road about 40 to 50 yards past the gravel pit in a red
8  Thunderbird car. Hamilton said McGuffin pulled over
9  and parked on the left side of the road. According to
10 Hamilton, McGuffin knew right where he was going and
11 out of the car, walking to a specific spot."
12    Is that the information that you were talking
13 about earlier when you said you did the pretext call
14 with Hamilton because you wanted McGuffin to confirm
15 that?
16 A. That's -- yeah, that -- from what I recall,
17 that's what we were -- that's what he asked Nick on the
18 pretext, something about if I should -- actually, I'm
19 not going to guess, so -- but, yeah, I believe it had
20 something -- it was something it do with that, correct.
21 Q. And on the pretext call, McGuffin confirmed --
22    MR. DAVIS: Counsel, are we back in Exhibit
23 2 now?
24    MR. LAUERSDORF: Yes.
25    MR. DAVIS: Okay.

## Page 147

1     MR. LAUERSDORF: Can you not see the screen
2  I'm sharing?
3     MR. DAVIS: I can, it's just small on my
4  end, and I didn't hear you mention it. I've got it
5  now. Thanks.
6     MR. LAUERSDORF: Okay.
7  BY MR. LAUERSDORF: (Continuing)
8  Q. So Mr. McGuffin confirmed that he had gone out
9  to Lee Valley Road with Hamilton during the pretext
10 call, is that right?
11 A. That's what I recall, yes.
12 Q. And you said that that was new information, or
13 that was kind of new information derived from an old
14 lead.
15    What's the significance of that information to
16 you? Why was that significant?
17 A. Because Nick confirmed that it actually
18 happened.
19 Q. Okay. Had anybody ever asked Nick McGuffin
20 before if it had ever happened?
21 A. Not that I'm aware of. I don't know.
22 Q. And you know -- well, maybe you didn't know, but
23 were you aware that Coquille PD and the Major Crimes
24 Team knew at the time that this was after the body had
25 already been discovered?

## Page 148

1  A. I'm not aware of that, no.
2  Q. Okay. Were you aware that the Major Crimes Team
3  knew at the time that this was after there had been a
4  press release issued that identified the almost exact
5  point where the body had been discovered?
6     MS. HENDERSON: I'm going to object as
7  lacking foundation. If you have a document that shows
8  that date -- I don't want the witness to assume that.
9  Q. I'll show you what's been marked as Exhibit 11
10 to the deposition of Mr. Reaves. I'm guessing you
11 haven't seen this document before?
12 A. I have not, sir.
13 Q. Okay. So this is a press release that was
14 issued on August 5th, which was two days after the body
15 was recovered on August 3rd. In here, Frasier
16 releases, "The body was located approximately 10 to 15
17 feet from Lee Valley Road down a steep embankment. The
18 area is BLM forest land. The location was
19 approximately 1.5 miles from the junction of Lee Valley
20 Road and Fairview route."
21    So that's a pretty specific description of where
22 that body was located, isn't it?
23 A. Yeah, it is.
24 Q. And the Major Crimes team also knew at the time
25 that somebody had gone out there and placed a cross at

37 (Pages 145 to 148)

Stumptown Steno
503.888.1416

Electronically signed by Amanda Fisher (001-415-598-0954)

f72b865d-a31f-4067-a4bc-19f77795b5c9
Exhibit 85, Page 3 of 6

Page 149

1  that location on the night that the body was found, or
2  the day after.
3      Were you aware of that?
4      A. I was not.
5      Q. And the Major Crimes Team was also aware that
6  people were going out there, non-law enforcement people
7  were going out there as early as the night that the
8  body was found after the police had released the scene.
9      Were you aware of that?
10     A. I was not aware of that.
11     Q. Okay. So knowing all that, what the Major
12 Crimes Team knew, does that affect the significance of
13 this revelation?
14         MS. HENDERSON: I'm going object to the
15 form of the question.
16         You can answer, if you understand.
17     A. I mean, if I knew that, would that change my
18 opinion? Is that what you're asking, sir?
19     Q. Yeah. Would it affect your opinion, the
20 significance of this information?
21     A. Yes, it would.
22     Q. Did you -- do you remember discussing that with
23 Chief Dannels at any time?
24     A. I don't recall, sir.
25     Q. Do you recall discussing it with Mr. Frasier at

Page 150

1  any time?
2      A. I don't recall, sir.
3      Q. Okay. And then the other thing that was
4  reported here was that Hamilton told you that McGuffin
5  told him that he found Freeman walking and picked her
6  up in his car, and then began arguing with her. And,
7  according to Hamilton, McGuffin said that Freeman
8  wanted out of the car and he let her out near McKay's
9  Market.
10         Does that sound familiar?
11     A. I don't -- I don't have an independent memory of
12 that, no, sir.
13     Q. Okay. Do you recall that coming up during the
14 pretext call with McGuffin?
15     A. I remember there was other stuff, like I had
16 told you, but I didn't remember what it was, so I'd be
17 guessing if I assumed it was this.
18     Q. Okay. You mentioned earlier that there was a
19 pretext call attempted with Bruce McGuffin. Do you
20 remember talking about that earlier?
21     A. Yes.
22     Q. When we talked about that earlier, you said that
23 got shut down right away.
24         What does that mean?
25     A. He was very short and quick, from what I

Page 151

1  remember, and later we found out it was because someone
2  else we tried do a pretext phone call with had actually
3  tipped the family off that we were doing pretext phone
4  calls.
5      Q. Okay. And that was a pretext that you attempted
6  with Hamilton?
7      A. From what I recall, I -- I would have to see the
8  report to be 100 percent sure, sit, but I recall it
9  being Hamilton we tried to have call Bruce, from what I
10 recall.
11     Q. Okay. And, yeah, I -- I'd like to see that
12 report, too, I guess. Are you -- is there any chance
13 you're confusing Bruce McGuffin with Megan Edgerton?
14     A. I -- I mean, I -- I almost -- I'm, like, 70
15 percent sure we did one with Bruce McGuffin.
16     Q. Okay. Do you recall doing one with Megan
17 Edgerton?
18     A. I do not recall doing one with Megan Edgerton,
19 no.
20     Q. Okay. Do you know who Megan Edgerton is?
21     A. I want to say that's the ex-girlfriend, right?
22     Q. The ex-girlfriend of Brakefield?
23     A. I thought it was Nick's or both, yes.
24     Q. Both. Yeah. Do you remember trying to do a
25 pretext call with her?

Page 152

1      A. I -- I don't recall doing one with her, no.
2      Q. Okay. So one of the things that you mentioned
3  earlier and we've talked about a little bit is that I
4  noticed in reviewing the file that you wrote very few
5  reports during your work on the Freeman investigation.
6         Is that fair to say?
7      A. That is fair to say, yes, sir.
8      Q. One of them was -- that's not the right one.
9  One of them was this exhibit, Exhibit 12. I'm going to
10 show you what's been marked now as Exhibit 12.
11         (Exhibit No. 12 marked for identification.)
12     Q. This looks like it was actually reviewed and
13 approved by Chief Dannels. Is that right? That's his
14 signature and badge number?
15     A. It appears to be so, sir.
16     Q. Okay. And this is a report about you contacting
17 Richard Crook at his place of employment.
18         Do you recall that contact at all?
19     A. I do, yes.
20     Q. Go ahead.
21     A. It wasn't his place of employment. It was a
22 fuel yard where his employers were filling up the
23 vehicles.
24     Q. Oh, okay. I also noticed in reviewing your
25 reports that they're all limited to one or two pages.

38 (Pages 149 to 152)

Page 173

1  so.
2      Q.  Okay.  All right.  I think maybe we can kind of
3  move past that now.
4          So let's see.  You also interviewed, it sounds
5  like, Alicia Hartwell at some point.
6          Do you recall interviewing Alicia Hartwell?
7      A.  I do not, sir.
8      Q.  I'll show you what's been marked as Exhibit 4.
9          (Exhibit No. 4 marked for identification.)
10     Q.  This a Webley report approved by whoever that
11 officer 626 is.  He talks about you -- he and -- well,
12 "Officer McNeely and I," so that's you and Webley,
13 right?  I'll show you the signature line just so you
14 can confirm that this is a Webley report.
15         That's Webley's signature there, right?
16     A.  Correct, yes.
17     Q.  And the date of the report 07/24/2010?
18     A.  Correct.
19     Q.  Okay.  So it says -- on page 4 of Exhibit 4
20 there's a reference to Alicia Hartwell.  And you
21 don't -- do you remember who Alicia Hartwell was?
22     A.  I didn't until reading Officer Webley's
23 deposition.
24     Q.  Okay.  And so you recall from that deposition
25 that Alicia Hartwell was somebody that you guys

Page 174

1  interviewed at Myrtle Point Police Department?
2      A.  I don't have an independent recollection of it,
3  but I mention that I was -- I was there, so I obviously
4  was.
5      Q.  Okay.  Do you recall what you were doing there
6  or why you were there to interview her?
7      A.  No.  My whole knowledge of this is reading
8  Webley's deposition.
9      Q.  Okay.  So if Webley didn't remember anything
10 about this interaction, is it safe to say that you
11 wouldn't remember anything about this interaction?
12     A.  Correct, sir.
13     Q.  Okay.  Were you ever trained in preparing and
14 presenting photo lineups?
15     A.  Photos for people, yes.
16     Q.  For people.  What about for other things,
17 vehicles, things like that?
18     A.  No, because the way we did people you couldn't
19 do any other type of lineup.
20     Q.  Okay.  Do you remember preparing a photo lineup
21 to show to Alicia Hartwell?
22     A.  I do not, sir.
23     Q.  Do you remember presenting Alicia Hartwell with
24 any photos during your interview of her?
25     A.  I do not, sir.

Page 175

1      Q.  Do you recall that this interview was after she
2  appeared at Grand Jury and before she appeared at Grand
3  Jury a second time?
4      A.  I don't recall, sir.
5      Q.  Okay.  Do you have an independent recollection
6  of this interaction with Alicia Hartwell at all, or
7  would you just rely on the report?
8      A.  No, I have no recollection of it except for
9  reading it in Webley's deposition.
10     Q.  Okay.  And so if there's information that's not
11 in the report, you wouldn't be able to talk about that?
12     A.  No, sir, I would not.
13     Q.  Okay.  The reason I ask, and I'll just tell you,
14 and I'll show you the transcript from her Grand Jury
15 testimony if you'd like, but she refers in the Grand
16 Jury testimony to photos that she was shown during this
17 interview.  I haven't been able to find the photos.  I
18 was just wondering if you knew anything about the
19 photos she was shown, how they were shown to her.
20         Do you know anything about that?
21     A.  I do not, sir.
22     Q.  Okay.  So you don't recall if you took any notes
23 from that interview?
24     A.  If -- I -- I mean, I'd be assuming, but if
25 Officer Webley wrote the report, he's the one that kept

Page 176

1  the notes.  I didn't keep notes.  If I had kept notes,
2  that would've been something for a report for me, so.
3      Q.  Okay.  Do you recall in your time with Officer
4  Webley, while you guys were doing these interviews, do
5  you recall in your interview where Officer Webley did
6  not take notes?
7      A.  No, I don't recall any time that he didn't not
8  take notes.
9      Q.  Okay.  I think you answered there that you don't
10 recall any time that he didn't not take notes.  I want
11 to make sure I clarify the double-negative.
12         Do you remember any interview in which Officer
13 Webley did not take notes?
14     A.  No.  From my recollection, all the interviews we
15 did he took notes on.
16     Q.  Okay.  Thank you.
17         So let me show you now what's been marked as
18 Exhibit 10.
19         (Exhibit No. 10 marked for identification.)
20     Q.  Can you see that on your screen?
21     A.  I can, yes.
22     Q.  Okay.  This one doesn't have any approval on it,
23 either.  And this one is a Webley report, I think.  Let
24 me get to the bottom of it here.  Yeah, a Webley
25 report, June 24th, 2011.

```
                                    Page 225
 1         THE WITNESS:  Okay.
 2         MR. DAVIS:  I don't have any questions.
 3   This is Jesse Davis.  Thank you.
 4         MS. HENDERSON:  While we're still on the
 5   record, if we're all wrapped up, we'd like to read and
 6   sign.
 7         (Deposition concluded at 3:35 PM.)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                    Page 226
 1              C E R T I F I C A T E
 2   STATE OF OREGON    )
 3                      ) ss.
 4   COUNTY OF MULTNOMAH )
 5
 6        I, Amanda K. Fisher, a Certified Shorthand
 7   Reporter, do hereby certify that, pursuant to
 8   stipulation of counsel for the respective parties
 9   hereinbefore set forth, RAYMOND MCNEELY remotely
10   appeared before me at the time and place set forth in
11   the caption hereof; that at said time and place I
12   reported in Stenotype all testimony adduced and other
13   oral proceedings had in the foregoing matter; that
14   thereafter my notes were reduced to typewriting under
15   my direction; and that the foregoing transcript, pages
16   1 to 225, both inclusive, constitutes a full, true and
17   accurate record of all such testimony adduced and oral
18   proceedings had, and of the whole thereof.
19        Witness my hand and stamp at Portland, Oregon,
20   May 10, 2022.
21
22
23   AMANDA K. FISHER
     CSR No. 3229
24
25
```



57 (Pages 225 to 226)

Stumptown Steno
503.888.1416

Electronically signed by Amanda Fisher (001-415-598-0954)

f72b865d-a31f-4067-a4bc-19f77795b5c9
Exhibit 85, Page 6 of 6