William L. Fleisher
June 27, 2024

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


| | |
|---|---|
| NICHOLAS JAMES MCGUFFIN, as an individual and as guardian ad litem, on behalf of S.M., a minor, | )<br>)<br>) Civil No.<br>) 6:20-cv-01163-MK |
| Plaintiffs, | ) (Lead Case)<br>) |
| v. | ) VIDEOCONFERENCE<br>) DEPOSITION |
| MARK DANNELS, PAT DOWNING, SUSAN HORMANN, MARY KRINGS, KRIS KARCHER, SHELLY MCINNES, RAYMOND MCNEELY, KIP OSWALD, MICHAEL REAVES, JOHN RIDDLE, SEAN SANBORN, ERIC SCHWENNINGER, RICHARD WALTER, CHRIS WEBLEY, ANTHONY WETMORE, KATHY WILCOX, CRAIG ZANNI, DAVID ZAVALA, JOEL D. SHAPIRO AS ADMINISTRATOR OF THE ESTATE OF DAVID E. HALL, VIDOCQ SOCIETY, CITY OF COQUILLE, CITY OF COOS BAY, and COOS COUNTY, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |
| VIDOCQ SOCIETY, | )<br>) |
| Cross-Claimant, | )<br>) |
| v. | )<br>) |
| MARK DANNELS, PAT DOWNING, SUSAN HORMANN, MARY KRINGS, KRIS KARCHER, SHELLY MCINNES, RAYMOND MCNEELY, KIP OSWALD, MICHAEL REAVES, JOHN RIDDLE, SEAN SANBORN, ERIC SCHWENNINGER, RICHARD WALTER, CHRIS WEBLEY, ANTHONY WETMORE, KATHY WILCOX, CRAIG ZANNI, DAVID ZAVALA, JOEL D. SHAPIRO AS ADMINISTRATOR OF THE ESTATE OF DAVID E. HALL, VIDOCQ SOCIETY, CITY OF COQUILLE, CITY | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

William L. Fleisher
June 27, 2024

**Page 2**

```
 1   OF COOS BAY, and COOS COUNTY,    )
             Cross-Defendants.        )
 2                                    )
     NICHOLAS JAMES MCGUFFIN, as an   ) Civil Case No.
 3   individual and as guardian ad    ) 3:21-cv-01719-MK
     litem, on behalf of S.M., a      )
 4   minor,                           )
                 Plaintiffs,          )
 5                                    )
         v.                           )
 6                                    )
     OREGON STATE POLICE,             )
 7                 Defendant.         )
     _____)
 8
 9
10           DEPOSITION UPON ORAL EXAMINATION
11              OF WILLIAM L. FLEISHER
12
13       BE IT REMEMBERED THAT, pursuant to the Oregon Rules of
14   Civil Procedure, the deposition of WILLIAM L. FLEISHER was
15   taken remotely via videoconference on behalf of the Plaintiffs,
16   before JEAN M. KOSTNER, a Certified Court Reporter for Oregon,
17   on Thursday, the 27th day of June, 2024, at the hour of
18   12:00 p.m., in the State of Oregon.
19
20
21
22
23
24
25
```

**Page 4**

```
 1          Eric S. DeFreest, OSB #920475
            LUVAAS COBB
 2          777 High Street, Suite 300
            Eugene, Oregon  97401
 3          (541) 484-9292
            edefreest@luvaascobb.com
 4            (Representing Richard Walter)
 5
     ALSO PRESENT:
 6
              D. Jacobs, OSP
 7
 8   REPORTED BY:
 9          Jean M. Kostner, CSR #90-0051
            Subcontractor for:
10          US LEGAL SUPPORT
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1                    APPEARANCES
 2
       ON BEHALF OF THE PLAINTIFFS:
 3
          Andrew C. Lauersdorf, OSB #980739
 4        Janis C. Puracal, OSB #132288
          MALONEY LAUERSDORF REINER, PC
 5        1111 East Burnside Street, Suite 300
          Portland, Oregon  97214
 6        (503) 245-1518
          acl@mlrlegalteam.com
 7        jcp@mlrlegalteam.com
 8
       ON BEHALF OF THE DEFENDANTS:
 9
          Sarah R. Henderson, OSB #153474
10        LAW OFFICE OF ROBERT E. FRANZ, JR.
          Post Office Box 62
11        Springfield, Oregon  97477
          (541) 741-8220
12        shenderson@franzlaw.comcastbiz.net
            (Representing City of Coquille, City of Coos Bay,
13          Coos County, Craig Zanni, Chris Webley, Eric
            Schwenninger, Sean Sanborn, Ray McNeely, Kris
14          Karcher, Pat Downing, Mark Dannels, Kip Oswald,
            Michael Reaves, David Zavala, Anthony Wetmore,
15          Shelly D. McInnes)
16        Kristen Hoffmeyer, OSB #085338
          OREGON DEPARTMENT OF JUSTICE
17        100 Southwest Market Street
          Portland, Oregon  97201
18        (503) 428-3544
          kristen.hoffmeyer@doj.oregon.gov
19          (Representing Oregon State Police, John Riddle,
            Susan Hormann, Mary Krings, Kathy Wilcox)
20
          Anthony R. Scisciani, III, OSB #070013
21        Meredith A. Sawyer
          HWS LAW GROUP
22        101 Southwest Main Street, Suite 1605
          Portland, Oregon  97204
23        (206) 262-1200
          ascisciani@hwslawgroup.com
24        msawyer@hwslawgroup.com
            (Representing Vidocq Society)
25
```

**Page 5**

```
 1               INDEX OF TESTIMONY
 2
 3   WITNESS                                    PAGE
 4     WILLIAM L. FLEISHER
 5        Examination by Mr. Lauersdorf . . . . . .    7
 6        Examination by Mr. DeFreest . . . . . . .  110
 7        Examination by Mr. Lauersdorf . . . . . .  112
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

William L. Fleisher
June 27, 2024

Page 6

INDEX OF EXHIBITS

DEPOSITION
EXHIBIT NO.          DESCRIPTION                IDENTIFIED

(Exhibits 1 through 13 all marked on page 12)

1   Plaintiff's Amended Notice of Deposition
    And Subpoena Duces Tecum  (8 pages)          12
2   "The Vidocq Society" Article by William
    Fleisher  (8 pages)                          25
3   "Solving Cold Cases Over a Hot Lunch -
    The Vidocq Society" Article by William
    Fleisher  (5 pages)                          25
4   Vidocq Journal - 2009  (8 pages)             27
5   Vidocq Society Presentations  (4 pages)      41
6   Vidocq Journal - 2010  (13 pages)            49
7   Vidocq Journal - 2011  (17 pages)            53
8   Vidocq Journal - 2011  (19 pages)            56
9   Vidocq Journal - 2012  (18 pages)            61
10  Drake vs. L.A. Portuondo Memorandum
    and Order  (36 pages)                        85
11  Letter from Bill Fleisher to Margaret
    Olson, Esq., 06/06/13  (2 pages)             88
12  "The Vidocq Society an all volunteer group
    dedicated to solving cold cases" Article
    by William Fleisher  (8 pages)                -
13  Running Synopsis                            111

Page 7

        WILLIAM L. FLEISHER,
called as a witness on behalf of the Plaintiffs, having been
first duly sworn to tell the truth, the whole truth, and
nothing but the truth, was examined and testified as follows:
        THE WITNESS: I do.
        EXAMINATION
BY MR. LAUERSDORF:
    Q.  Good afternoon, Mr. Fleisher. My name is Andy
Lauersdorf. You and I have never met before. Is that right?
    A.  That's correct.
    Q.  Do you understand that I'm an attorney representing
the plaintiffs in this matter, which is a lawsuit filed by
Mr. McGuffin and his daughter against the City of Coquille and
a number of other defendants?
    A.  Yes, I do.
    Q.  And those defendants include the Vidocq Society and
one of its former members, Richard Walter. Do you understand
that?
    A.  Yes, I do.
    Q.  Can you please state your full name as given at
birth.
    A.  William L. Fleisher. And what was the last part?
I didn't catch it.
    Q.  Your full name as given at birth.
    A.  Oh, as given at birth. Okay. William Lynn,

Page 8

L-Y-N-N, Fleisher. That's a state secret, that middle name.
Please don't spread it around.
    Q.  Are you currently employed?
    A.  Yes, I am.
    Q.  Where are you employed?
    A.  Keystone Intelligence Network, Inc., in
Philadelphia.
        MR. SCISCIANI: Counsel, could I interject real
quick? Your -- we had issues this morning with the first
deposition. Your audio is not very good. I don't know if
you're able to get closer to the microphone or -- I don't know
what the problem is, but it doesn't sound very good.
        THE WITNESS: Mine?
        MR. SCISCIANI: Mr. Lauersdorf. Not you, Bill.
You're --
        THE WITNESS: Yeah, he's breaking up a little bit.
But I -- this is a new computer I bought for the occasion
because I didn't trust the old computer.
        MR. SCISCIANI: No, it's the -- Bill, it's the same
issue we had this morning with the first deposition.
        THE WITNESS: Okay. Well, if I don't understand
something, I'll ask him to repeat it. That's all.
        MR. SCISCIANI: Okay.
        MR. LAUERSDORF: I appreciate that. Thank you,
Mr. Fleisher.

Page 9

        THE WITNESS: Call me Bill. You don't have to call
me Mr. Fleisher. Call me Bill. Okay?
        MR. LAUERSDORF: I appreciate that, but for the
purposes of the deposition, I have to call you Mr. Fleisher.
The Court insists on formality.
        THE WITNESS: All right.
        MR. SCISCIANI: Counsel, I'm having a hard time
understanding you. I don't know that I even understood the
words you just said.
        MR. LAUERSDORF: I don't know what to do about
that. Let's go off the record.
        COURT REPORTER: We're off the record.
        (Discussion off the record.)
        MR. LAUERSDORF: All right. Let's give it a try.
BY MR. LAUERSDORF:
    Q.  You said you're at the Keystone Intelligence
Network. Is that correct?
    A.  That's correct, sir.
    Q.  And what do you do for them?
    A.  I'm the director of investigations.
    Q.  Is that a private investigation outfit?
    A.  Private investigations firm. It's been around
since about 1988. I joined it when I retired from the
government in 1996.
    Q.  And are you also an instructor at the Academy for

William L. Fleisher
June 27, 2024

Page 10

1  Scientific Investigative Training?
2      A.   Yes, sir, I am.
3      Q.   How long have you been there?
4      A.   Well, technically I used to teach -- when I was
5  still at the government, I had authorizations from my
6  department that I could teach there different techniques of
7  polygraph.  But I've been there as an assistant director since
8  I retired in January 2nd, 1996.
9      Q.   And your background was in polygraphy.  Is that
10 right?
11     A.   That's part of it.
12     Q.   Okay.  And you spent more than 40 years with
13 federal and local law enforcement agencies.  Is that right?
14     A.   Yeah, from about 1968 to 1996.  So I don't --
15 you'll have to do the math for me.  I can't do it here.
16     Q.   Okay.  How long were you with the U.S. Customs
17 Service?
18     A.   That was from 1975 through the day I retired in
19 1996.
20     Q.   And you were a special agent with the FBI?
21     A.   Yes, I was.
22     Q.   From when to when?
23     A.   From November 1970 to June of 1975.
24     Q.   And then you were also a corporal with the
25 Philadelphia Police Department.  Is that right?

Page 11

1      A.   Yes, sir.
2      Q.   From when to when?
3      A.   I was -- in 19- -- I think I got promoted in August
4  of 1970 till I left for the FBI.
5      Q.   And you were a cofounder of the Vidocq Society.  Is
6  that correct?
7      A.   Yes.
8      Q.   And you were also a commissioner of the Vidocq
9  Society.  Is that correct?
10     A.   Yes.
11     Q.   From when to when?
12     A.   Well, from when we initiated, I guess it would be
13 from maybe March of 1990 till I -- somewhere -- I can't give
14 you an exact answer because I got sick.  I got Guillain-Barre
15 syndrome back in 2000-- about six years ago, and so it's a
16 little foggy.  So I was sort of like semi-paralyzed, shall we
17 say, for about three months, and I just didn't run again, and I
18 don't --
19     Q.   Okay.  Do you still hold a position with the Vidocq
20 Society?
21     A.   No.
22     Q.   Are you still a member?
23     A.   Yes.  I'm a commissioner emeritus, emeritus being
24 Latin for paying no mind.
25     Q.   Other than commissioner and a commission emeritus,

Page 12

1  have you held any other positions with the Vidocq Society?
2      A.   Well, I'm sort of an honorary member of the board.
3  You know, I'm not an official member of the board.  They --
4  it's a courtesy.  According to the bylaws, the last
5  commissioner is a board member, but the new commissioner kept
6  me on when the last -- the most immediately past commissioner
7  joined the board.
8      Q.   Okay.  Okay.  I'm going to show you -- did you
9  receive --
10     A.   Yes.
11     Q.   -- a link to a number of documents?
12     A.   Yes.  Are you going to show it to me?  Okay.
13 Because I don't remember --
14     Q.   Well, there should have been 13 exhibits there.
15     A.   Okay.  Let me --
16     Q.   I'm wondering if you received all 13 documents.
17     A.   Let me -- let me try to pull them up here.
18          Yep.  All 13.
19          (Documents marked for identification as Deposition
20          Exhibits 1 through 13, respectively.)
21 BY MR. LAUERSDORF:
22     Q.   Okay.  Can you open the one that's marked "Ex. 1,"
23 Exhibit 1.
24     A.   Yes.
25     Q.   Down on the bottom right-hand corner of the first

Page 13

1  page there should be a yellow sticker that says "W. Fleisher
2  6/27/2024, Number 1."  Do you see that?
3      A.   All right.  Let's see.  Yeah.  I see that.
4      Q.   Okay.  So we're on the same document.  Do you
5  recognize this document at all?
6      A.   Let me see.  Yeah.  It says the subpoena duces
7  tecum and subpoenaed for a deposition.  I think I was served --
8  I'm looking at -- let me read it.  I have to read it, make sure
9  it's the one.
10          It was a subpoena that was -- I think it was the
11 subpoena that was served on me.
12     Q.   Okay.  And you're appearing for deposition today
13 pursuant to that subpoena.  Is that correct?
14     A.   That's my understanding.
15     Q.   Okay.  And if you go to page 7 of that document --
16     A.   Looks like it.  One second.  Let me -- I'm trying
17 to fix the screen so I can do both here.  All right.  Okay.
18 I'll do that.  Page 7.  Page 7, page 7, page -- the
19 Exhibit A, is that page 7?
20     Q.   Yes, sir.
21     A.   Okay.  I see that.
22     Q.   There's a list of documents there that we requested
23 you produce in response to the subpoena.
24     A.   Yes.
25     Q.   Are you familiar with that?

William L. Fleisher
June 27, 2024

Page 22

1  Q. Okay. How long ago did you review them?
2  A. This morning.
3  Q. Do you know how many pages were sent?
4  A. No.
5  Q. Have you spoken to anyone other than your attorneys
about your deposition?
7  A. No. Other than I'm tied up on a deposition. I
8 didn't say what, where, when, why.
9  Q. Okay. But you didn't speak to anyone else from
10 the --
11  A. No. Not about --
12  Q. -- Vidocq Society or --
13  A. -- what I was going to say, not about what I was
14 going to be asked or what I thought I was going to be -- not
15 anything to do with the case. Just that I'm being in a
16 deposition, can't talk right now.
17      MR. SCISCIANI: I'm going to interject just for a
18 second on behalf of what appears to be a somewhat exasperated
19 court reporter. I think it's happening on both sides. I'm
20 going to kindly ask that counsel and the witness give a little
21 breath between one another. There's a little overlap that
22 continues, and it's going to, I think, drive our court reporter
23 crazy.
24      THE WITNESS: I apologize. I respect court
25 reporters very highly. They have a tough job.

Page 23

1 BY MR. LAUERSDORF:
2  Q. Okay. So, Mr. Fleisher, as I understand it, the
Vidocq Society was formed in 1990. Is that correct?
4  A. 1990 at the -- I guess the embryo was on
5 President's Day 1990. It was a holiday. I remember that.
6  Q. Do you recall when the first official meeting of
7 the Vidocq Society was?
8  A. It was a couple -- a month or two later. Well, no.
9 It was an organizing meeting, so maybe it was a month later
10 at --
11  Q. How many members were in the Vidocq Society for the
12 first meeting?
13  A. I think about 20, 21, something in that area.
14  Q. Was Mr. Walter present for the first meeting?
15  A. I don't remember if he was there or not. No, I
16 wouldn't -- I wouldn't think he was there. This was a
17 formulating meeting, and I had sent out letters to 26 people I
18 knew -- prosecutors, polygraph examiners, detectives, ADAs, a
19 whole slough of people -- and told them I had an idea, like,
20 can they meet me at the Officer's Club at the Navy yard in
21 Philadelphia. And I think about 20 people showed up.
22  Q. Mostly folks in law enforcement?
23  A. Law enforcement, we had prosecutors, we had
24 detectives, homicide investigators.
25  Q. And then it was incorporated as a domestic

Page 24

1 nonprofit corporation in June of 1991. Is that correct?
2  A. I wouldn't be sure of the date, but one of our
3 founding -- one of our members, charter members we called them,
4 Kenneth Freeman, who was -- I was a policeman with and
5 became -- went on to become an attorney, an ADA, and, yeah, he
6 formed it. He was, I think, our first deputy commissioner.
7  Q. How was the organization operating up until that
8 point?
9  A. It wasn't. It was just -- it was, you know, we'd
10 meet, we'd have an old -- like, somebody would bring a case. I
11 think one of our first cases was the Cleveland torso murders
12 that Eliot Ness worked on.
13      And then eventually at some point Frank Friel, may
14 he rest in peace, who was a Philadelphia homicide commander and
15 then went on to be the superintendent of police at a large,
16 Bensalem township, which is right contiguous to Philadelphia,
17 he went to speak at Parents of Murdered Children. And he came
18 back, and he was talking, and he says, "Bill, we have to change
19 the direction."
20      Because when I first discussed why we wanted --
21 wanted to use Vidocq, why we -- what we were going to do, it
22 was more of a bonhomie lunch club idea I had. We would look at
23 old cases. I mean, really old cases. We did the Meriwether
24 Lewis and Natchez Trace case where was it suicide or murder.
25      And he came back from this Parents of Murdered

Page 25

1 Children, and he said, "Bill, if" -- there was a thousand,
2 couple thousand people there or more, and he said afterwards --
3 after he gave his talk or whatever he was talking on, he said,
4 "If one person came up to me, 100 people, each one had a sadder
5 story. We've got to start looking at more recent cold cases."
6 And that's how we sort of evolved to what we are today.
7  Q. When was the board established?
8  A. I think it was established right after the first
9 meeting. That's --
10  Q. And who were the original directors?
11  A. I think it was -- Fred Bornhofen was the the --
12 a -- he was, yeah, I think a deputy commissioner. We had one
13 dep -- the first deputy, second deputy. And Kenneth Freeman
14 was the first deputy. And Frank Friel was the chairman of the
15 board. And I think we had -- Joe O'Kane was a member of the
16 board. Nate Gordon was a member of the board. And I'd have to
17 think back to -- I couldn't tell you. It just doesn't come to
18 my mind right now who else was on the board.
19  Q. Okay. I want to direct your attention to the
20 documents that were labeled Exhibit 2 and Exhibit 3. Could you
21 take a look at those.
22  A. One second, please. Exhibit 2 and Exhibit 3.
23 Okay. Okay. I'm looking at Exhibit 2 now.
24  Q. What do you recognize Exhibit 2 to be?
25  A. A description of how we started the organization.

William L. Fleisher
June 27, 2024

Page 30

1    A.    Well, I was writing -- from the beginning I wrote
2    something, a booklet, I think, to tell the members and new
3    members about the society and what we were about.  All right?
4    This particular Philadelphia Lawyer, I was approached by the
5    former United States attorney, Peter Vaira, who was a U.S.
6    attorney in Philadelphia, who I had known for many years, and
7    he knew about the Vidocq Society.  And he asked me to write an
8    article about it, which I did.
9         Q.    Do you know -- as you sit here today, do you know
10   one of -- if either Exhibit 2 or 3 is a draft of a final
11   article, or are they --
12        A.    I don't know.
13        Q.    -- a final -- okay.
14        A.    No, I don't know if they're a draft or what.  I
15   had -- you know, it was like I'd write one article and then I'd
16   write a little something about why -- I'm comparing Vidocq to
17   Jean Valjean in Les Miserables, that he was a -- and Javert,
18   things like that.  I would do that because I was very
19   interested in Vidocq as a person.
20        Q.    Okay.  And so the article is about the founding of
21   the Vidocq Society.  Right?
22        A.    Let me go up and look at it.
23        Q.    I think they're similar enough that you can look at
24   either Exhibit 2 or Exhibit 3, but please let me know which one
25   you're looking --

Page 31

1         A.    Okay.  I'm looking at --
2         Q.    -- off of so I'm on the same one.
3         A.    I'm looking at 4.  I'm going to go to -- to the
4    other ones.  I'll go to 2.
5              Yeah, that could be the draft for it.  Yeah.  That
6    could be the draft, yeah.
7         Q.    If you go to Exhibit 2, if you go to the first
8    paragraph --
9         A.    Yeah.
10        Q.    -- do you see the last sentence of the first
11   paragraph?  It says "Bender was an old friend of each, but it
12   was the first time Fleisher and Walter met."
13        A.    Yes.  That's true.
14        Q.    Okay.  Now go to the first paragraph of Exhibit 3.
15        A.    Okay.  Exhibit 3.  Hold on.  One second.
16   Exhibit 3.  Yeah.  It looks very similar.
17        Q.    And you'll see that a sentence has been added
18   there, right, to the first paragraph?
19        A.    Yeah.  It could have been added or it could have
20   been taken out of the next thing.  It would have to be -- that
21   was the first one.  It depends which came first, the chicken or
22   the -- well, the sentence.  But ...
23        Q.    So that doesn't necessarily help us determine which
24   one might be a draft and which one might be the final?
25        A.    I don't know.  I would be speculating.  It was so

Page 32

1    long ago, I couldn't tell you.
2         Q.    Okay.  How about -- I've got some questions to ask
3    you about them.  Would it be okay if we just use Exhibit 3 for
4    the questions I'm going to ask?
5         A.    Sure.
6         Q.    On page 1 at paragraph 3 --
7         A.    Yeah.
8         Q.    -- it sounds like the Vidocq Society was your idea.
9    Is that right?
10        A.    Well, I never -- I never found an idea that people
11   didn't like if they thought it was theirs.  It was my idea,
12   but --
13        Q.    Okay.
14        A.    -- I'm a great believer in teamwork, ever since I
15   was in the Army.  You know, nothing is done by one man alone.
16   It's a team.
17              So I got it going.  I thought -- my first
18   impression at the time is -- not Frank but Walter said, "Oh,
19   yeah, let's" -- this is another "Let's do lunch."  Nothing ever
20   happened -- you know, become of it.  So --
21        Q.    Mr. Walter and Mr. Bender, though, they agreed with
22   the idea and --
23        A.    Yes.
24        Q.    -- it evolved from it.  Right?
25        A.    Well, yes.

Page 33

1         Q.    And at that time you were --
2         A.    We had a fascinating lunch --
3         Q.    Okay.
4         A.    -- talking about cases.  It was -- it was
5    fascinating, that they were working on America's Most Wanted.
6    I think they talked about the List case, John List case that
7    they both worked on for America's Most Wanted.  I think they
8    were -- one thing they mentioned, about the wife who shot her
9    businessman husband because she thought it was a burglar.  You
10   know, do you have a husband who was a burglar thing?  Things
11   like that.
12              And it was fun.  We had good time.  And we stayed
13   there almost till dinnertime, when it was just to have lunch.
14   It was a federal Monday.  Because it was President's Day.
15   That's where -- it was a federal Monday, where us guys that
16   work for the government get off and you guys who pay the taxes
17   are still working.  That was -- that was it, a federal Monday.
18   I had a very nice time with them then.
19        Q.    And then at that time you were with the
20   U.S. Customs Service.  Right?
21        A.    Correct.
22        Q.    You were a supervisory special agent at the time?
23        A.    I was the deputy special agent in charge.
24        Q.    Okay.  I'm going to take you back to Exhibit 2, if
25   that's okay, because that's where some of my notes are.

William L. Fleisher
June 27, 2024

Page 34

1   A.   Okay.  It's fine with me, sir.
2   Q.   Let me know when you're there.
3   A.   Okay.  Hold on.  I'll get there.
4        I'm there.
5   Q.   And if you will go to page 5, paragraph 4.
6   A.   Page 5.  I didn't number the pages.  One, two,
7   three, four, five.  Paragraph 4 would be "Society members are
8   from all walks of life ..."  Is that the senten- -- the
9   paragraph?
10  Q.   Yeah.
11  A.   Yeah, okay.  I'm there.
12  Q.   It says "Society members are from all walks of
13  life, residing all over the United States, Europe, and the Far
14  East."
15  A.   Correct.
16  Q.   Would you mind reading that -- the whole paragraph
17  to yourself silently.
18  A.   Okay.  (Witness complies.)
19       Yes.
20  Q.   Is everything in that paragraph accurate?
21  A.   Yes.
22  Q.   And then if you'll go to the next paragraph down,
23  paragraph 5.
24  A.   Yep.
25  Q.   The last sentence there, it starts "In addition,

Page 35

1   Vidocq Society members are authorized by the power of its
2   charter to use the letters 'VSM' after their names; indicating
3   that person is a 'Vidocq Society Member.'"  Did I read --
4   A.   Yes.
5   Q.   -- that accurately?
6   A.   That's accurate.
7   Q.   So when you see "VSM" after a person's name, that
8   indicates membership in the Vidocq Society?
9   A.   For us it does.
10  Q.   And that's considered an honorific?
11  A.   No.  It's -- have you ever heard the expression "a
12  man of letters"?  Well, those were the letters for our members.
13  Q.   I thought I saw it referred to in the constitution
14  and bylaws as an honorific.  Does that make sense?
15  A.   I would have to look at the constitution and bylaws
16  again.  I don't -- I don't know if it's honorific.  I don't
17  know how they assign letters.
18  Q.   Okay.  All right.
19  A.   I don't know if you have to be certified by the
20  letter board somewhere.  I don't know.  So I guess it is an
21  honor, in the sense that it's an honor to be a member.  So ...
22  Q.   Okay.  If you go to page 1, paragraph 4.
23  A.   One, two, three, four.  Yeah.
24  Q.   The second-to-the-last sentence there, it starts
25  "It was decided there that day ..."  Do you see where I'm at?

Page 36

1   A.   Yeah.
2   Q.   "It was decided there that day the purpose of the
3   Society would be to solve unsolved crimes over a good meal and
4   enjoy the bonhomie of each other's company."  Did I read that
5   correctly?
6   A.   Yes, you did.
7        Did you hear me?  Yes.  Yes.
8   Q.   Okay.  Okay.  So then -- let's see.  If you go to
9   paragraph -- page 5, paragraph 3.
10  A.   One, two, three, four, five, paragraph 3.  Okay.
11  "Today, Vidocq's memory is honored ..."?
12  Q.   Yes.
13  A.   Okay.
14  Q.   So it's limited to 82 full members, and then it's
15  "comprised of individuals whose interest in, and dedication to,
16  the search for truth and the solving of mysteries binds them
17  together in the tradition of the great detectives past and
18  present; real or fictionalized."  Did I --
19  A.   Yes.
20  Q.   -- read that correctly?
21  A.   Yes.
22  Q.   Were there any other detectives that you had in
23  mind other than Monsieur Vidocq?
24  A.   Oh, let's see.  Of course Sherlock Holmes, who's
25  fictionalized.  Inspector in "The Murders in the Rue Morgue."

Page 37

1   And we've got our Sam Spades, and we have our Joe Fridays from
2   Dragnet.  There's a lot I could name.  Philo Vance.  There's
3   just a slough of them.
4   Q.   And then page 6, the first full paragraph at the
5   top of the page starts "The Society, on a 'pro bono' basis ..."
6   A.   Yep.
7   Q.   "The Society, on a 'pro bono' basis, offers their
8   advice to any law enforcement agency which has a particularly
9   difficult case on its hands."  Did I read that correctly?
10  A.   Yes, you did.
11  Q.   Is there any particular type of case or any
12  particular level of difficulty that was required?
13  A.   Well, it had to be two years old.  It had to be
14  some- -- a victim had to be someone who didn't -- wasn't a
15  victim-precipitated murder, like a drug dealer or a gangster.
16  And it was a case that was cold, that law enforcement was at
17  a -- was sort of at a pause, the pause button in the case for
18  whatever reason.
19  Q.   And then it says "Because of a demonstrable need,
20  the Society has been providing free 'cold case' homicide
21  seminars for law enforcement investigations around the
22  country."  Is that accurate?
23  A.   Yes.
24  Q.   When did you start providing the cold case homicide
25  seminars?

William L. Fleisher
June 27, 2024

Page 38

1    A.   Oh, I think the first one -- I couldn't give you an
2  exact -- it was back in the -- oh, it would have had to have
3  been -- the first one -- oh, I'm trying to remember.  It was
4  when Joe O'Kane ran it, and it was -- well, it was either Ed
5  Gaughan and Joe -- Joe O'Kane started them.  I couldn't tell
6  you exactly where, but Ed Gaughan was -- became the seminar
7  guy, and we did them at universities.  I couldn't -- I'd have
8  to check with those guys.  I don't recall specifically.
9         But we did -- we did one at the University of
10 Delaware for the -- the medical examiner's office did one.  And
11 police came in from different departments.  They did one out in
12 Bethlehem at the college there, at Lehigh.  They did one in
13 Arizona.  They did one in Florida.  They did -- the one that
14 can answer would be Ed Gaughan.
15    Q.   Okay.  Was Richard Walter involved in those
16 trainings?
17    A.   Yes.
18    Q.   What was his role?
19    A.   He would get up, and he would talk about profiling.
20    Q.   Talk about profiling?
21    A.   Profiling.  Now, you have to understand, I didn't
22 attend all of them.
23    Q.   Okay.
24    A.   And I couldn't tell you which ones he spoke at.
25 But I heard him speak at a couple, and he would talk about the

Page 39

1  different types of murderers, the killers, what would motivate
2  them.
3    Q.   Okay.  Was he kind of -- was that -- was that kind
4  of his specialty with Vidocq, profiling?
5    A.   Yes.  Yes.
6    Q.   It says there on page 6 "Over the years the Society
7  has significantly contributed to the solving of numerous
8  unsolved homicides around the country."  Is that accurate?
9    A.   Yes.
10    Q.   And so as of 2009, the Vidocq Society had made
11 these contributions.  What was considered a significant
12 contributions to solving a --
13    A.   Well, the Scott Dunn case, his girlfriend -- that
14 was an interesting one because Frank -- I got a call from a
15 man, Jim Dunn.  And he starts telling me a very sad case about
16 his son disappeared and that they don't have a body and they --
17 you know, he was really hard on the district attorney down in
18 Texas.  I don't know if it was an Arlington detective or -- I
19 would have to look at the article on it.  Lubbock.  Lubbock.
20 It's right there in front of me.
21         And he sort of pissed off the district attorney
22 because he was pressing for something -- them to do something.
23 And I said, "Well, you usually don't get involved in a case
24 this recent."  But he was -- it was heart wrenching the way he
25 told me.  I said, "Let me see what I can do."

Page 40

1         And I got ahold of Frank Friel.  I went up to
2  Frank's office.  He was the superintendent up at Bensalem.  I
3  think -- we had -- we had a call into Scott Dunn.  He gave the
4  facts.  And Frank Friel, may he rest in peace, said, you know,
5  the carpet was missing when the Lubbock police went in there.
6  How big of carpet was missing?  That could be used, you know,
7  if they could show it was some blood and it was a large enough
8  amount that would -- from that piece of carpet that was taken
9  out of that apartment he shared with Alicia Hamilton.  That
10 much blood may be inconsistent with life, and there's your
11 body.  And then they could do a homicide investigation.
12    Q.   And that was whose theory?
13    A.   That was Frank Friel's theory.
14    Q.   Oh, okay.
15    A.   And I think Richard was in town for something and I
16 was speaking to him, and he got together and was with Scott
17 Dunn, and -- not Scott -- Jim Dunn.  And then he went -- either
18 went down or spoke to the prosecutor down there with the
19 information -- he got somebody I think in Scotland Yard to say
20 something to -- I'm not sure -- Richard.  And they went down
21 and the district attorney there, the ADA, whoever was handling
22 it, said, yeah, you've got a point there, and they started the
23 investigation.  And they were able to get a conviction.
24         Ironically, oh, maybe five years ago, say ten years
25 ago, I can't be sure, they actually found Scott's body buried

Page 41

1  in a berm in that apartment complex where he was living.  So
2  that was the contribution.
3    Q.   Did Frank and Richard Walter meet directly with the
4  prosecutor in that case?
5    A.   I don't think Frank did.  I think Richard may have.
6    Q.   Okay.  Can I turn your attention to what's been
7  marked as Exhibit 5?
8    A.   Yes, you can.
9         Okay.  All right.  I got it.
10    Q.   That's another document that was -- that we
11 received from you in response to our subpoena.  Do you
12 recognize that document?
13    A.   Only that it was shown to me recently with the
14 exhibits sent over.  I didn't prepare that.
15    Q.   Do you recognize that as something that came from
16 one of your files?
17    A.   No.  It did not come from my files.
18    Q.   Okay.  Do you have any idea where it came from?
19    A.   Well, it probably came from the case manager at
20 the -- whoever -- at that period, whoever prepared it.  And it
21 might have been prepared based on the discovery subpoena.
22    Q.   Do you know who the case manager was from 2013 to
23 2015?
24    A.   I think it was Bill Gill -- it was either Fred
25 Bornhofen or Bill Gill.

William L. Fleisher
June 27, 2024

Page 42

1    Q.   Do you know who the secretary --
2    A.   2019 is when Fred died.
3    Q.   Right.  I'm aware of that.
4         Do you know who the secretary of the organization
5  was in 2009?
6    A.   Not offhand.  It could have been Zeff Lazinger.  I
7  don't know.  I couldn't tell you specifically.  I don't have a
8  recollection.
9    Q.   Okay.  Do you have a recollection of who the
10  secretary was in 2010?
11    A.   2000- -- no.  Nobody really wanted that job, so ...
12  I don't know who was the secretary.
13    Q.   And if I understand this document correctly -- do
14  you see the column labeled "Jurisdiction"?
15    A.   Yeah.
16    Q.   Those are all law enforcement agencies.  Is that
17  right?
18    A.   Let me roll down and look.
19         Yes, yes, yes, yes.  Yes, yes, yes, yes.  Yes, yes,
20  yes.  Yeah.  It looks like it, yeah.
21    Q.   And then under the "Presenters" column, those would
22  all be law enforcement officers or agents.  Is that right?
23    A.   Or ADAs.  Well, let's see.  Yeah, it would be
24  either law enforcement or sometimes -- maybe it wasn't -- the
25  ADA would be present at the lunch but it may not be presenting.

Page 43

1  So, yeah, I would say, to the best of my recollection, the
2  presentation was generally done by the police department,
3  detectives, investigators.
4    Q.   Okay.  And when you say "ADA," do you mean
5  assistant district attorney?
6    A.   Yeah.  We call them ADAs up here.  Assistant
7  district attorney.
8    Q.   Okay.  Because from time to time the assistant
9  district attorneys would come to the lunches as part of the
10  presentation group.  Is that right?
11    A.   Yes.
12    Q.   Okay.  How about AUSAs?  Did they participate in
13  Vidocq at all?
14    A.   They come as guests.  Remember, Barb was an AUSA.
15    Q.   That's right.  Okay.  And when we use the acronym
16  AUSA, we're talking about --
17    A.   A United States attorney.
18    Q.   -- an assistant U.S. attorney.  Is that right?
19    A.   Back then.  The district attorney, Judge Lynn
20  Abraham, she was a judge then and became district attorney.
21  She would come to the meetings.
22    Q.   All right.  Let me stop you for a second.
23    A.   Yeah.
24    Q.   I've got to help get the question out.
25    A.   Okay.  I'm sorry.

Page 44

1    Q.   When we use the acronym AUSA, we're talking about
2  an assistant U.S. attorney.  Is that right?
3    A.   Correct.
4         MR. LAUERSDORF:  Did you get that, Ms. Kostner?
5         COURT REPORTER:  Yes.  Thank you.
6  BY MR. LAUERSDORF:
7    Q.   And so this -- do you understand this to be a list
8  of presentations that were made to the Vidocq Society?
9    A.   Yep.
10    Q.   The cold cases?
11    A.   Yep.
12    Q.   And then there's a column there labeled
13  "Volunteer."  Do you see that on the right side?
14    A.   Yeah.
15    Q.   Are those then -- are those all Vidocq Society
16  members?
17    A.   Let me look.  I would have to read it.
18         At the time it looks like I -- yeah, they would
19  have to be members, but -- yep.  I want to be sure.  Yep, yep,
20  yep, and yep.
21    Q.   So then are those the Vidocq Society members that
22  were responsible for volunteering on the case that's listed?
23    A.   Well, I guess so.  I didn't handle that.  I would
24  assume, yes.
25    Q.   Okay.

Page 45

1    A.   I didn't handle those things.  You know, I'm not
2  trying to -- overall I would say I was responsible for
3  everything, but we had delegations.  We had the case -- we had
4  the case manager, we had the secretary, the treasurer.  They
5  had their own -- they kept their own houses so to speak.
6    Q.   Okay.
7    A.   And we had somebody -- like Mark Schroeder would do
8  a -- run these post case things, and now there's another one.
9  Like, for example, where it says Fleisher and Gordon, we
10  probably looked over some polygraph charts at the time, I
11  couldn't remember specifically, and gave our professional
12  opinion about the charts.  A lot of times charts are miscalled.
13  They're inconclusive and they're called deceptive or vice versa
14  or they're inconclusive charts and someone calls them, and we
15  did that on occasion.  So ...
16    Q.   So would you be -- then be provided with the actual
17  data and the charts from the polygraph to review?
18    A.   On occasion.
19    Q.   And then you would offer an opinion on your
20  interpretation of the polygraph data?
21    A.   Yes.
22    Q.   And do you recall -- do you recognize any of these
23  presentations, any of these case names in that first column?
24    A.   Let me look.
25         No.

William L. Fleisher
June 27, 2024

Page 46

1    Q.   Okay.  So you don't recall if these are cases that
2  were actually presented or not?
3    A.   I'm assuming they were.  I was looking at the case
4  name.  So if it had presenters next to it, I assumed it was
5  presented.
6    Q.   Okay.
7    A.   I didn't always make all the meetings.  I was out
8  of the country on occasion, so I -- to the best of my
9  knowledge.
10   Q.   Okay.  Can I take you back to Exhibit 4 for a
11 minute?
12   A.   Yes, you may.
13        Okay.  I'm looking at it.
14   Q.   Okay.  At the bottom of -- at the bottom of page 3
15 there's an article entitled "Vidocq Society Announces Position
16 Open for Publicist."
17   A.   You're at page 3.  Okay.  That's page 5.  That's
18 page 4.  Page 3.  All right.  Yeah.  Okay.
19   Q.   And it looks like an article that was written by
20 Mr. Bornhofen?
21   A.   It looks to be.
22   Q.   And the first paragraph there, it says "The Vidocq
23 Society has matured into a significant entity over the twenty
24 years that we have been in existence.  We have grown into a
25 group which is recognized by the U.S. Department of Justice as

Page 47

1  a significant resource in cold case investigations and have
2  received worldwide publicity."  Is that accurate?
3    A.   Yes.
4    Q.   When -- when was the Vidocq Society recognized by
5  the U.S. Department of Justice?
6    A.   When the U.S. Department of Justice -- I'm
7  forgetting the agency within it -- put out a resource book on
8  cold cases and they listed the Vidocq Society as a cold case
9  resource for law enforcement.
10   Q.   Was the Vidocq Society provided with a copy of that
11 book?
12   A.   I didn't have it.  I'm sure someone had it.  Maybe
13 Fred had it.
14   Q.   Okay.  Did you ever see it?
15   A.   Yeah.  I think at one of the board meetings I think
16 I saw it.  I know that we were a resource.  We thought it
17 was -- you know, that was really something.  And I forget
18 what -- oh, I'm trying to remember the -- oh.  Because I, in
19 the past, have on occasion for the -- for a certain -- oh, I
20 can't remember what they call it.  There was an agency in the
21 Justice Department that worked with local police, and they once
22 had me review a book on polygraph being written by a certain
23 professor before they published it, what I thought of it.
24   Q.   Mm-hm.
25   A.   Okay.  But I can't remember the name of that

Page 48

1  agency.  I should because when I got out of the police academy
2  they had a program where you got OJT stipend every month for 13
3  months for new policemen.  And I collected it.  I just can't --
4  I'm drawing a blank.  At 3:00 o'clock in the morning I'll
5  probably remember it and I'll give you a call.
6    Q.   That's all right.  We can try to come back to it.
7    A.   Yeah.
8    Q.   What was Vidocq Society's role with respect to cold
9  cases and the Department of Justice?
10   A.   Well, we did -- with cold cases and Department of
11 Justice, I wouldn't say we had a role in the Department of
12 Justice.  They just listed us as a resource for police
13 officers -- for police departments in solv- -- for cold cases.
14 And I'm sure somebody in the organization may remember what
15 that publication was.  I just know it was there.  I saw it,
16 and -- you know, but I would have to do research.  I can't
17 remember.  I'm sure one of our board members that has been
18 around for a while would remember.  I just can't remember.
19   Q.   Okay.  When they published that listing Vidocq as a
20 significant resource, was that limited to any specific states,
21 or was that nationwide?
22   A.   Well, it was nationwide.  It was a nationwide
23 publication, a nationwide police -- oh, what is that -- what is
24 that agency within the Justice Department?  I'm drawing a
25 blank, but it's a --

Page 49

1    Q.   That's okay.
2    A.   It's well-known.
3    Q.   We can -- we can try to come back to it.
4    A.   Okay.
5    Q.   You've been going for about an hour and 10 minutes
6  now.  How are you doing?
7    A.   I -- it's like my honeymoon.  I can go for another
8  two minutes.  No, I'm fine.
9    Q.   Do you want to take a bathroom break or anything?
10   A.   No, I'm fine.  If you want to, I can take a break.
11   Q.   No, I'm okay to keep going if you are.
12   A.   I'm okay.  Just ...
13   Q.   Can I direct your attention to the document that's
14 been marked Exhibit 6?
15   A.   Yes, sir.  Let me get it up there.  Let's see.
16 Document 6.  Exhibit 6.
17        Yes.
18   Q.   And do you recognize that document?
19   A.   Yes, I do.
20   Q.   And that's another volume of the Vidocq Journal.
21 Is that correct?
22   A.   Yes, it is.
23   Q.   And if you go to the last page of that document, in
24 that right-hand lower corner where they have the copyright, it
25 says "Copyright 2010."  Do you see where I'm at?

William L. Fleisher
June 27, 2024

Page 50

1    A.    Yeah.
2    Q.    And you were still the commissioner in 2010.
3    A.    Yes, I was.
4    Q.    Is that correct?
5    A.    Yes, I was.
6    Q.    And there on page 1 it says "'The Murder Room' has
7 Arrived." Do you see where I'm at?
8    A.    Yeah. Well, yeah, I see it. I remember -- I see
9 it because I --
10    Q.    And that's the book --
11    A.    -- but, yes, it arrived.
12    Q.    Okay. And that's the book by Author Michael
13 Capuzzo about the founders of the Vidocq Society. Is that
14 right?
15    A.    Yes.
16    Q.    And so that was about you and Richard Walter and
17 Frank Bender. Correct?
18    A.    And the Vidocq Society. It was focused on us, but
19 it was about how the Society was formed, I believe, and, you
20 know, what we did, and it was some of the characters that
21 belonged to the Society. You know, things like that. Yeah.
22    Q.    Did you read the book when it came out?
23    A.    Yes, I did.
24    Q.    Have you read it more than once?
25    A.    Yes, I have.

Page 51

1    Q.    Is there anything in the book that you consider to
2 be false?
3    A.    Well, I don't know if --
4         MR. SCISCIANI: Objection. Vague and ambiguous.
5    Answer if you can.
6    A.    Okay. Not -- no. Just it had a poetic license. I
7 don't know about --
8 BY MR. LAUERSDORF:
9    Q.    Okay. Did you think there was --
10    A.    It had a lot of poetic license.
11    Q.    Did you think there was anything in the book that
12 needed to be or should be corrected?
13    A.    Well, we did. We got to look at the -- Bender got
14 to look at the draft, and I got to look at the draft. And I
15 had an issue about my father, who was sort of portrayed as
16 being mean. And I said my father wasn't mean. He was just a
17 little distant. He was not mean. And he did think I was an
18 idiot. I'll give him that, but he -- he wasn't mean.
19         And then he said -- that was the only thing. Then
20 I think he referred to me, an incident I had where I almost
21 came to a gun battle with a guy that threatened to kill me, and
22 he just said a revolver, and I think I was carrying a pistol.
23 You know, something stupid like that. I don't know if he
24 changed it or didn't change it. I just told him that I
25 carried a Walther PPK at the time.

Page 52

1         And Frank Bender had a little more issue. And I
2 don't remember exactly whether he had it in the draft that
3 Frank punched his father in the nose or -- yeah, I think that
4 might have been it, or that his father punched him in the nose.
5 I think it was more like -- and he said that never happened.
6    Q.    Okay.
7    A.    You know, de minimis things you would expect from
8 a -- you know, they never let the facts get in the way of a
9 good story, the writers.
10    Q.    Did Mr. Capuzzo interview you in --
11    A.    Yes, he did.
12    Q.    -- researching for the book?
13    A.    Yeah. Yeah.
14    Q.    How much time did you spend with Mr. Capuzzo?
15    A.    Not much.
16    Q.    More than an hour?
17    A.    A few hours. Yeah, not much. I think I went to
18 his house once. I think we met at my house once. I think he
19 came to the office once. Yeah, something like that. But it
20 wasn't much time. He spent much more time with the other guys,
21 and I was jealous. I'm only kidding.
22    Q.    So do you know if he interviewed Mr. Walter?
23    A.    Yes, he did. I was there at one of the interviews.
24 That was at -- it was at his house, Mike Capuzzo's house. His
25 wife Teresa was there, and we were there for dinner or eating

Page 53

1 something, and I ...
2    Q.    Did he ever interview the three of you together?
3    A.    I don't recall if he did or not.
4    Q.    Okay. Can I direct you to Exhibit 7?
5    A.    Okay. Just a minute, sir. 7.
6         Yeah. Okay. I got it.
7    Q.    Okay. This is another document that we received
8 from you in response to our subpoena. This is another volume
9 of the Vidocq Society Vidocq Journal. Is that right?
10    A.    Okay. Yeah.
11    Q.    If you go to the last page of that document, the
12 copyright is --
13    A.    Okay.
14    Q.    -- 2011?
15    A.    I'm going down there. Let's lighten the load.
16    2011, yes, sir.
17    Q.    And you're still a commissioner in 2011. Is that
18 correct?
19    A.    I was the "Idi Amin" of the Vidocq Society. Nobody
20 wanted the job.
21    Q.    Okay. And then on page 5 of that document, it
22 looks like the Society is advertising a program at Drexel
23 University called "Jack the Ripper Through a Wider Lens." Do
24 you see where I'm at?
25    A.    Just bear with me for a second. Let me go up.

William L. Fleisher
June 27, 2024

Page 54

1  It's skipping pages when I scroll down, so I'm not sure ...
2  Page 5.  That's 1, that's 2, 3, 4, 5.
3       Yeah.  Now, I got it.  I have it.
4       Q.   So that was an article on a presentation that was
5  going to be done at Drexel University about Jack the Ripper.
6  Is that right?
7       A.   Yes.
8       Q.   And Mr. Walter was going to be a presenter at that
9  symposium?
10      A.   Yes.
11      Q.   And so at that time in 2011 Mr. Walter was
12 recognized as an international expert on crime assessment,
13 profiling, and risk evaluation.  Does that sound right?
14      A.   Give me a minute.  Let me see.  I don't think I was
15 at this trial.
16      Q.   I was just looking at the third paragraph down that
17 starts with "Richard Walter, VSM ..."
18      A.   Yep.
19      Q.   And it indicates there that he's an international
20 expert on crime assessment, profiling, and risk evaluation.  Is
21 that accurate?
22      A.   Yes.  As in accurate, that's what it says, yes.
23      Q.   Well, was that accurate of Mr. Walter at the time?
24      A.   Well, he was known in England.  That's
25 international.  And Scotland Yard.  And he was close with Bob

Page 55

1  Ressler from the FBI, may he rest in peace.  He was a good guy.
2  He was a -- he was the guy, I think, that coined -- wrote the
3  book "Whoever Fights Monsters," Bob Ressler.  And I don't know
4  if he appeared on some of the shows about -- on television
5  about profiling and detection and Jack the Ripper.  I think he
6  did one for the History Channel on Jack the Ripper.  I believe
7  so.  I might have been on that too.  I'm not quite sure.  So
8  that would be international, I would say, yes.  And he was a
9  profiler.
10      Bob Ressler was like the top gun at the FBI
11 behavioral analysis unit, so I guess he was internationally
12 recognized.  They did conferences together.
13      Q.   Mr. Walter was never a member of the FBI's
14 behavioral assessment unit, though.  Right?
15      A.   No, he wasn't.
16      Q.   Okay.  And it says there that he's an international
17 expert in risk evaluation.  What is risk evaluation?
18      A.   Risk assessment, risk evaluation, I guess, when he
19 was in the -- I'm just -- this is my opinion.  This is not -- I
20 don't know, but my understanding what risk evaluation would be
21 is if while you're interviewing intake prisoners at a prison,
22 what's the risk by putting them in general population?  What's
23 the risk of them attacking somebody?  What's the risk of them
24 being a victim?  And that might be exactly what you're talking
25 about.

Page 56

1       Q.   Okay.  And then that's Mister -- that's a photo of
2  Mr. Walter up in the upper right-hand corner there in that
3  article.  Is that right?
4       A.   That or Dracula.  Yes, that's Mister -- that's him.
5       Q.   Okay.  Can I take you to Exhibit 8?
6       A.   Yes, sir.
7            Okay.
8       Q.   And that's another document that we received from
9  your attorneys in response to our subpoena?  That's another
10 volume of the Vidocq Society, Vidocq Journal.  Is that right?
11      A.   Yeah.  Copyrighted 2011.  Yeah.
12      Q.   Do you recall how many times per year the Vidocq
13 Journal was published?
14      A.   No.  It took -- they were different generations.  I
15 think I may have done a newsletter originally.  And then I --
16 the best one is the ones -- these, which were done by Dr. Jolie
17 Bookspan and Paul Plevakas, her husband.  And now I think our
18 secretary -- or not -- presently, puts out a couple.
19           I was hoping -- they should have been quarterly.  I
20 couldn't tell you.  I would hope -- I would hope they were on a
21 regular basis.  I'd have to look at all these and I could tell
22 you when she was doing what it was.
23      Q.   Okay.  If you go to page 2 of Exhibit 8 --
24      A.   Okay.  Let's see.
25      Q.   -- there's an article there by --

Page 57

1            MR. SCISCIANI:  What number, Counsel?
2       A.   I'm sorry.  You broke up.  Page 2, "Vidocq Members
3  Contribute to Cold Case Conference."  Okay.
4            MR. SCISCIANI:  I'm sorry.  What number are we on?
5  I missed that.
6            THE WITNESS:  Exhibit 8, page 2, I believe.
7            MR. SCISCIANI:  8, 2.  Okay.  Thank you.
8       A.   What's the first start of that?
9  BY MR. LAUERSDORF:
10      Q.   It's the "Vidocq Members Contribute to Cold Case
11 Conference."
12      A.   Yeah.
13      Q.   And then it says there "A training team of Vidocq
14 Society Members contributed their expertise to the Cold Case
15 Conference hosted in conjunction with the Vidocq Society and
16 the Unified Police Department of Greater Salt Lake in Salt Lake
17 City, Utah."  Did I read that correctly?
18      A.   That's correct.
19      Q.   And so this was a training that was hosted by the
20 Salt Lake County Sheriff's Office.  Is that right?
21      A.   I thought it was the United -- the United -- the --
22      Q.   Oh, the Unified Police Department?
23      A.   Yeah, something like that.  Yeah, there.  It says
24 right there, Unified Police Department.
25      Q.   Okay.  And it was held at the Salt Lake County

William L. Fleisher
June 27, 2024

Page 58

1 Sheriff's Offices, though?  That's the location?
2      A.   I don't know.  Yeah, it says there.  Yeah, it was.
3 I wasn't there.
4      Q.   Okay.  And you see the column -- the list of names
5 over in the second column?
6      A.   Yeah.
7      Q.   It looks like Richard Walter was one of the
8 trainers at that conference?
9      A.   Yes.
10      Q.   Do you know what he spoke about or presented on?
11      A.   Probably profiling.  I don't know for sure.  You'd
12 have to read the article.  Maybe it says.  But he generally
13 would be talking about profiling.
14      Q.   And then it says there "Feedback from participants
15 in the conference and case reviews was overwhelmingly positive.
16 Park, who screened cases for presentation to the review team
17 and contacted those who presented cases to the team after the
18 conference for feedback, said that the detectives involved in
19 the case reviews came away from the experience with
20 investigative avenues to explore and felt that the case review
21 was helpful in moving the case forward."  Did I read that
22 correctly?
23      A.   Yes.
24      Q.   So was that -- so at this conference were there
25 additional case presentations done, kind of the same way they

Page 59

1 would be done in Philadelphia normally?
2      A.   No.  What they did -- sort of the concept was this.
3 That they would have breakaway groups, and the participants or
4 some of the participants would bring their cold cases there.
5 And then they'd go off in a group with a couple of the experts
6 or they would interchange them.  That was the concept.
7      Now, I wasn't there.  I didn't go to -- I don't go
8 to these ones.  The local ones I go.  I do too much -- did too
9 much traveling.  I didn't like to go to these.
10      Q.   Okay.  But the plan was for actual cases, not --
11      A.   Actual cases.
12      Q.   -- for hypothetical cases?
13      A.   No, not hypothetical cases.
14      Q.   Then if you go to page 6 of Exhibit 8.  We're still
15 on that one.
16      A.   Yeah, I'm on 8, page 6.
17      Q.   Yeah, page 6.
18      A.   Okay.  1, 2, 3, 4, 5.  How does it start?  Like
19 "killer Instinct" or which one?
20      Q.   It starts -- it says "Vidocq Society" up at the
21 top, and it says new "CBS TV Show - The Murder Room."
22      A.   Okay.  Got it.  All right.
23      Q.   And it's got a -- it looks like it's got a picture
24 there of a little bit younger William Fleisher on the left.  Is
25 that right?

Page 60

1      A.   Yeah.  That's proof positive that time and gravity
2 are cruel, if you take a look at it closely.
3      Q.   And then a picture of the three founders of the
4 Vidocq Society in the center and then a picture of Mr. Walter
5 on the right.  Is that correct?
6      A.   Yes, sir.
7      Q.   Did that CBS show ever happen?
8      A.   No.
9      Q.   Is it still in the works?
10      A.   No.  Not that show.  Not -- no.
11      Q.   Why didn't that happen?
12      A.   Well, I've got to learn that to get a green light
13 in Hollywood or any of these agencies is like a crap shoot.  So
14 I guess they went onto a nicer project.  I don't -- they don't
15 tell you why.  They just don't renew an option.
16      Q.   All right.  If you go to page 10.
17      A.   Yeah, going down, going down, going up.  Is that
18 it?
19      Q.   Maybe page 9.  9 and 10.  There it's "Vidocq
20 Society 2011 Awards Dinner Highlights"?
21      A.   Let's see.  Oh, gee.  I just saw the death of my --
22 one of my closest friends.  All right.
23      Yeah.  I see it.
24      Q.   It looks like there's a medal of honor, on page 9,
25 being given to Detective Sergeant Randy Long from the Columbus,

Page 61

1 Georgia, Police Department.  Do you see where I'm at?
2      A.   Yeah.
3      Q.   And then I notice there's a -- the photo on the
4 left there, there's a photo of you and what appears to be
5 Detective Sergeant Long and Mr. Walter on the left.  Right?
6      A.   Yes.
7      Q.   And I notice that Mr. Walter is wearing a medal
8 too.  Did he get an award at that ceremony?
9      A.   I don't know if he got one at that ceremony or
10 previously he received an award, maybe for the Scott Dunn case.
11 I couldn't tell you.
12      Q.   Okay.  Do you recall how many awards Mr. Walter won
13 while he was at Vidocq -- with Vidocq?
14      A.   No, I couldn't tell you.  I don't know.
15      Q.   Do you know if he won more than one award from the
16 Society?
17      A.   I couldn't tell you.  I'd have to do a lot of
18 research, and I couldn't tell you.  I would imagine maybe yes,
19 but I -- I don't know for sure.
20      Q.   Okay.  And it looks like you're wearing a medal in
21 that photo as well.  Do you recall what that award was for?
22      A.   I don't recall what it was for.  Maybe because I'm
23 eye candy and they wanted me to look good.  I don't know.  I --
24 I don't know what it was for.
25      Q.   But those medals indicate some kind of recognition

William L. Fleisher
June 27, 2024

Page 62

1  from the Vidocq Society.  Is that correct?
2       A.   Yes, sir.
3       Q.   I direct you to Exhibit 9.
4       A.   Exhibit 9.
5            I'm there.
6       Q.   And if you go to the last page of that one, the
7  copyright date is 2012, so that would indicate this was
8  published in 2012.  Is that correct?
9       A.   Yes, sir.
10      Q.   And you were still the commissioner at that point.
11 Correct?
12      A.   Every time I tried to get out they pulled me back
13 in.  Nobody wanted the job.
14      Q.   If you go to --
15      A.   Yep.
16      Q.   -- page 8 of that document, there's an article
17 entitled "Digital Forensics with Peter Stephenson."
18      A.   Yeah.  Page 8, page 8.  Let me see.  Okay.  Wait a
19 minute.  Yeah.  Oh, I just skipped by.  Okay.  I'm on it.
20 Right.
21      Q.   And it looks like that is an article about some
22 type of technology or assessment procedure that Dr. Stephenson
23 has developed with Richard Walter.  Is that correct, if you
24 look at the last sentence --
25      A.   I'd have to --

Page 63

1       Q.   -- in paragraph 1?
2       A.   I'd have to read it, sir.  I'd have to read it.  I
3  didn't read this article.
4       Q.   Okay.  Do you want to go ahead and read the first
5  paragraph to yourself?
6       A.   Okay.  Yes.
7            Okay.
8       Q.   So then do you understand this is an article about
9  a collaboration between Peter Stephenson and Richard Walter on
10 some kind of crime assessment technique?
11      A.   Yes.
12      Q.   Is this a technique that Mr. Walter taught to other
13 members of the Vidocq Society at any time?
14      A.   I couldn't be sure, but if he's talking about this
15 holistic idea of integrated -- Richard had a -- a very, very --
16 it looked like a helix of how serial killers would evolve up to
17 a certain level over time.
18           And I'm assuming, and I don't know this in any
19 manner, that they were going to be able to computerize this.
20 And just like VICAP, you know, that's where they could input
21 clues; there was another program that it asked questions and
22 the computer would answer.  It was like the first attempt at
23 AI.  And I'm assuming that's what they're talking about.  I
24 don't know.
25      Q.   Okay.  Do you know if they were ever able to

Page 64

1  accomplish that?
2       A.   No, I don't.
3       Q.   Is that something that would have been supported by
4  the Vidocq Society?
5       A.   Anything that would help solve cold cases or hot
6  cases for that matter that evolved in science and technology
7  was something that we would support.  Now, when I say
8  "support," I don't mean financially.  I mean we'd support in
9  spirit; hey, keep it coming, like genetic genealogy.
10           You know, what I've seen over the years from DNA,
11 when this DNA meant do not ask, because nobody really
12 understood it, to what we got today with touch DNA and being
13 able to extract from very -- very limited samples a profile and
14 be able to do genetic genealogy and solve the crime, like the
15 little "Boy in the Box," the Joey Zarelli case.  Yeah, we
16 support it.
17      Q.   Is that something that the Vidocq Society trains
18 law enforcement agencies on?
19      A.   I don't know if they do that at these seminars,
20 whether we had any for-- computer forensic people there.  I
21 couldn't tell you.
22           Our case -- our training coordinator at the time,
23 he's no longer training, Ed Gaughan, may be able to tell you
24 what they taught at these seminars.  I didn't have any --
25      Q.   Do you know if Mr. Gaughan would have any kind of

Page 65

1  records of the trainings that were --
2       A.   Well, I don't know.  He's -- he's not a record
3  keeper.
4       Q.   Okay.
5       A.   We used to work together, and to get him to put
6  anything on paper as a detective was tough.  I don't know.
7  You'd have to ask him.  But I don't think --
8            MR. LAUERSDORF:  All right.  We've been going for
9  about an hour and a half.  Is it okay if we take about a
10 five-minute break so I can use the restroom and you can stretch
11 your legs?
12           THE WITNESS:  No.  Yeah, of course.
13           MR. LAUERSDORF:  All right.  Let's take five.
14           (Timestamp at 1:35 p.m.  Recess taken.)
15           (Timestamp at 1:44 p.m.  Reconvened.)
16 BY MR. LAUERSDORF:
17      Q.   Okay.  Mr. Fleisher, I'd like to take you back to
18 Exhibit 2, if I could.
19      A.   Yes, sir.
20      Q.   And I'll direct you to page 6 of Exhibit 2.  And
21 that's where you're talking about the Vidocq Society's
22 significant contributions to solving --
23      A.   Mm-hm.
24      Q.   -- a few unsolved homicides across the country.  Do
25 you see where I'm at?

William L. Fleisher
June 27, 2024

Page 66

1    A.   Yeah.  I'm trying to find the right page 6.

2    Q.   Okay.

3    A.   3; that's 4, I guess; that's 5; that's -- is that
4  the one which reads the Terri Brooks case?

5    Q.   Scott Dunn case.

6    A.   Oh, Scott Dunn case.  Let's go up.

7    Q.   The page before.

8    A.   Scott Dunn, yeah.

9    Q.   Okay.  And so I would just like to spend a little
10 bit of time talking about some of these cases.  In the Scott
11 Dunn case, if you go to the third sentence in there, it starts
12 with "Assistance."  Do you see where I'm at?

13   A.   Yep.

14   Q.   It says "Assistance by the Vidocq Society helped
15 focus on Hamilton and her new boyfriend as the prime suspects."
16 Is that true?

17   A.   Yes, it is.

18   Q.   And "One of the problems with the case was that no
19 body had been found; no body, no homicide." Is that right?

20   A.   Correct.

21   Q.   And "Therefore, the prosecutor did not proceed with
22 the case as a homicide.  Expert assistance from the Vidocq was
23 able to establish a corpus delecti by showing the amount of
24 blood which would have covered a missing area of rug in the
25 apartment was 'inconsistent with life.'" Is that right?

Page 67

1    A.   Yes.

2    Q.   "In other words, the amount of blood which it would
3  take to drench the piece removed and hidden by a sofa, 'was the
4  body.'" Did I say that correctly?

5    A.   In quotes, yeah.  "The body" in quotes.  Yeah.

6    Q.   Right.  Okay.  It says "Continuing investigation by
7  Richard Walter and Lubbock, Texas, detective Tal English
8  resulted in a grand jury indictment in November 1996 of Alicia
9  Hamilton and Ken Smith." Is that right?

10   A.   Right.

11   Q.   And then it says "Richard Walter played a major
12 role in the solution."  What did Richard Walter do to
13 investigate in that case?

14   A.   Well, I think he got the scientists who would
15 say -- and I think he's from England, Britain.  I think got him
16 to demonstrate where that would be inconsistent with life, that
17 carpet.  Also, the behavior of Leisha was indicative of her
18 involvement.  And I don't know where the boyfriend came in.  I
19 don't remember the details of what happened there.  But he
20 worked -- he worked with the detective, Tal English, and they
21 were able to bring people in front of the grand jury and
22 establish a probable cause for a true bill.

23   Q.   So he went out and recruited an expert from England
24 on the --

25   A.   That's what --

Page 68

1    Q.   -- Dunn issue?

2    A.   -- I believe.  I'm not sure if -- how that worked,
3  whether he got somebody from England or he talked to somebody
4  or put them together with the prosecutor down there.  But it
5  all revolved around the behavior, focusing in on the
6  inconsistencies.  All she wanted when Jim Dunn was trying to
7  find her -- find his son, she wanted his car.  I mean, things
8  that were just inconsistent with an innocent person.

9         And like I said, it was a few years ago that they
10 actually literally -- some utility people were digging out
11 behind the complex, and they found Scott's body.  That was well
12 after she went to jail.

13   Q.   That work that Richard Walter did in the
14 investigation of that case, was that after that case was
15 presented to Vidocq Society?

16   A.   That case I don't think was presented to the Vidocq
17 Society per se.  That was the case where Jim Dunn called me up
18 in the office, and I tried to, you know, tell him we don't
19 handle these type cases.  And things he said like her behavior
20 made him suspicious.  And I said, "All right.  Let's" -- I went
21 up to -- "we'll call you later."

22        I went up to Frank Friel's office, and we got him
23 on the phone, and that's where Frank came up with -- you know,
24 when he described that pieces of carpet are missing and things
25 like that and they found some blood in that.  And the amount of

Page 69

1  blood, if you can get an expert to say, by looking at the size
2  of the carpet that was removed, that that was full of blood,
3  that would be inconsistent with life, and that would be -- the
4  body would be the blood in there, in quotes, enough to say it
5  wasn't just a missing person; they may have a homicide case
6  here.

7    Q.   Okay.

8    A.   And that's -- how Richard did it, interacted
9  directly with him, I couldn't tell you.

10   Q.   Okay.  But he was a member of the Vidocq Society at
11 that point?

12   A.   Yes.

13   Q.   And you were the commissioner of the Vidocq Society
14 during that investigation.  Is that right?

15   A.   Yes.

16   Q.   And then do you see there where it says that the
17 "investigation by Richard Walter and Lubbock, Texas, detective
18 Tal English resulted in a grand jury indictment in November
19 1996 of Alicia Hamilton and Ken Smith"?

20   A.   Yes.

21   Q.   And then the next line down from that it mentions
22 Leisha Hamilton.  Is that -- is that the same person as Alicia
23 Hamilton?

24   A.   Yes.

25   Q.   And then -- and then a line down from that it

William L. Fleisher
June 27, 2024

Page 70

1  mentions Timothy James Smith. Is that the same person as Ken
2  Smith?
3      A.   I don't know. I don't -- I'm assuming it is. I
4  don't know.
5           I think there were two men involved. I'm not sure.
6  I'm not sure. I don't want to say one way or the other, but it
7  could be the same person. I am not sure.
8      Q.   Okay. And then the next one there is the "Deborah
9  Wilson Case." Do you see where I'm at?
10     A.   Yeah. That, I know a little bit better. I
11 remember a little bit better. Go ahead.
12     Q.   The second sentence there, it says "In April of
13 1992, Philadelphia Police Homicide Division Sergeant Robert
14 Snyder along with retired FBI agent Andrew Sloane presented the
15 case at a Vidocq Society luncheon." So this one actually was
16 presented to Vidocq Society. Is that right?
17     A.   Yes, and I remember it very well. That one I
18 remember because Andy Sloane was a friend of mine, Bob Snyder
19 was a friend of mine, and the case was very, very
20 prominently -- the publicity about it, a college student found
21 in the stairwell of Drexel University near the computer lab, it
22 was all over the papers, and it was a very well-known
23 Philadelphia case. And I'm a Philadelphia boy at heart, so I
24 was very interested in this case.
25     Q.   And it says there "Sergeant Snyder advised the

Page 71

1  department had a suspect at the time, a Drexel University
2  security guard, but no evidence was developed and he was no
3  longer a suspect. Richard Walter provided a psychological
4  profile of the suspect that pointed to the security guard ..."
5  Is that true?
6      A.   Yes.
7      Q.   So it says that --
8      A.   A critical -- let me interject this.
9      Q.   Okay.
10     A.   Her shoes were missing. That was -- that was the
11 big -- you know, that was the key --
12     Q.   Okay.
13     A.   -- that her shoes were missing.
14     Q.   Well, that was my question because it says there
15 "no evidence was developed and he was no longer a suspect," but
16 then "Richard Walter provided a psychological profile of the
17 suspect that pointed to the security guard." And I was just
18 wondering how Mr. Walter was able to develop a profile if there
19 was no evidence.
20     A.   The circumstances. He was -- there were a lot of
21 people at that meeting. And Doc Fillinger was at -- the
22 medical examiner, he offered a suggestion. And the late Albert
23 Laurilliard, former Philadelphia detective and federal agent,
24 he suggested that you reach out to the military because he went
25 into the military right afterwards.

Page 72

1           They interviewed the girlfriend, the ex-security
2  guard's girlfriend, and she said he had a fetish with shoes.
3  And then -- that was one of the suggestions. And then they
4  went to the military, and the guy had complaints against him
5  about the sneakers that were missing. You know, not those
6  sneakers, but that was the clue, sneakers were missing from
7  Deborah's body. And then --
8           Am I going too fast, Ms. Kostner? I'll slow down.
9           COURT REPORTER: Sir, yes, please slow down. And I
10 need a spelling of a name that you just mentioned.
11          THE WITNESS: Okay. You got it. What do you need?
12 Hal Fillinger?
13          COURT REPORTER: Yes, that one.
14          THE WITNESS: Halbert, yeah. Homicide Hal, they
15 called him. He was a dear friend. H-A-L-B-E-R-T was the first
16 name. Last name is Fillinger, F-I-L-L-I-N-G-E-R.
17     A.   So where was I? So anyway, there were a couple of
18 suggestions. So they went to the ex-wife or girlfriend, they
19 went to the military, and there were complaints against him.
20 Then they interviewed him, and they wound up arresting him and
21 convicting him, and he killed himself.
22 BY MR. LAUERSDORF:
23     Q.   So, yeah, at the bottom there, it says "After the
24 meeting, Sergeant Snyder ran with the leads. The police found
25 there had been complaints by women in the suspect's personnel

Page 73

1  file and his ex-wife told the detectives her husband kept a
2  collection of women's sneakers." So then the security guard
3  was charged and convicted. Is that right?
4      A.   That's correct.
5      Q.   And that was based in significant part on Richard
6  Walter's work on the case?
7      A.   Well, a lot of people at that meeting contributed,
8  not just Richard, a lot of them. We said he had fit the
9  profile guy too, the security guard. He was a -- I think he was a
10 karate guy too, the security guard. But they were -- a lot of
11 things were reported. These meetings run around two hours, so
12 it wasn't -- it wasn't just Richard there. Albert Laurilliard.
13 You're to need help spelling that, so I'm not going to mention
14 any more names, but other people made comments. It wasn't just
15 Richard giving his opinion. It was Hal Fillinger making
16 suggestions. It was other attendees that contributed to the
17 case.
18     Q.   Okay. So it was more of a cooperative effort
19 than --
20     A.   Which is -- yes, which is what we try to do.
21     Q.   Okay. On the next page, the "Terri Brooks Case"?
22     A.   Yeah.
23     Q.   If you go to the third sentence down where it
24 starts "The case was presented," do you see where I'm at?
25     A.   Yep.

William L. Fleisher
June 27, 2024

Page 74

1    Q.   It says "The case was presented to the Vidocq
2  Society by Win Cloud" --
3    A.   Correct.
4    Q.   -- "a detective sergeant" --
5    A.   Yep.
6    Q.   -- "with the Fairless Township Police Department.
7  Sergeant Cloud related to the assembled --"
8    A.   It should be Fair- -- it should be Fair- -- excuse
9  me, sir.
10    Q.   Okay.
11    A.   It should be Fairless Hills.
12    Q.   Okay.
13    A.   That's an omission, typo omission.
14    Q.   Okay.  Then it says "Sergeant Cloud related to the
15  assembled Vidocquians that the department had many suspects,
16  but no evidence connected anyone to the crime."
17         A couple of sentences later it says "Vidocquian
18  Edward" -- and I always get this name wrong, but "Edward
19  Gaughan" --
20    A.   Correct.  Perfect.
21    Q.   -- "agreed to further assist Sergeant Cloud on the
22  matter.  Richard Walter profiled the perpetrator.
23  Subsequently, they identified and located a previously unknown
24  boyfriend of Brooks."  Is that all true?
25    A.   Yes.

Page 75

1    Q.   So in that one police had a number of suspects or
2  many suspects but no evidence connecting any particular suspect
3  to the crime.  Is that right?
4    A.   That's correct.
5    Q.   But Richard Walter was able to develop a
6  psychological profile?
7    A.   Correct.
8    Q.   How was he able to do that without evidence?  Did
9  you ask him?
10    A.   Well, how they do it, they look at the murder,
11  the -- like Richard used to say, the murder isn't done till the
12  perpetrator says it's done.  It can go on for years in his
13  imagination.  But they look at the crime scene.  And based on
14  the crime scene, they look at the photos of the crime scene.
15  Based on the how the face was covered of Terri.  Based on the
16  type of crime.
17         He was able to say the guy would be living with his
18  mother, he would have some nondescript job -- I'm pulling this
19  from memory -- a nondescript job, and this guy Keith, who was
20  the suspect, who became a sus- -- well, they had a name.  We
21  were able to run it through our databases, my personal private
22  detective database, and came up with the name of the real
23  boyfriend.
24         See, who they thought was the boyfriend wasn't the
25  boyfriend.  He wasn't even around.  So they started looking at

Page 76

1  people that -- they went to the mother's house.  And she said,
2  "Oh, that's not the boyfriend."  Her boyfriend was, like, Keefe
3  or -- yeah, they gave some variations.
4         Well, I was able to pin it down to the correct name
5  and address, and I gave it to the police.  They did some more
6  investigation.  I gave it to Ed, who gave it to Win Cloud, and
7  then they were able to do a trash run, compare the DNA.  Then
8  they picked the boyfriend up and took him up to the police
9  station where he agreed to take a polygraph test, which my
10  partner and I, Nate Gordon, conducted.  And then after the
11  polygraph test, he confessed to the police he did it.  And he
12  was sentenced to life in prison without parole.
13    Q.   Who did the trash run?
14    A.   If they abandon trash off the curtilage -- it's --
15  they put it out for trash.  It's not like up his driveway or
16  something; it's up on the street off the curtilage.  You go out
17  there, you either get the trash people that would pick it up
18  to -- it's like dumpster diving.  They would pick it up, and
19  then they'd go through it, and they'd pick like they're
20  collecting it, and they'd take it to the police.
21         The police, because it was abandoned, would go
22  through it, and they found the cigarette butt that matched the
23  DA profile that was found from the crime scene.  They had a
24  profile.
25         Now, the problem was Keith had a brother.  So now

Page 77

1  they've got a court order to take more DNA from them, and they
2  brought him in.  When they brought him in, Nate and I were
3  there with -- and I think Ed Gaughan was there.  And they asked
4  him if he could take a polygraph test.  And he says yes.
5         So Nate and I did what we call a "joint polygraph
6  test."  That's an Air Force technique.  One guy operates the
7  instrument, which was me; and one guy does the questioning,
8  which was Nate.  And he had the stuff with charts, and based on
9  that, they were able to get a confession, and he was convicted
10  and sentenced to life.
11    Q.   So were Vidocq Society members -- did they
12  participate in the trash run?
13    A.   No.  No.
14    Q.   Okay.  So that was the police that did that?
15    A.   That was the police.  We had nothing to do with
16  that.
17    Q.   And then when they brought him in, were you and
18  Mr. Gordon at the police station to do the polygraph?
19    A.   The police -- the police office, they invited us
20  up.  They didn't have a polygrapher.  So they invited us up to
21  Ed Gaughan, to be there when they brought him in for the DNA
22  sample because they didn't know if it was his or it could have
23  been his brother's DNA.
24    Q.   Okay.  So they brought him in, and then you and
25  Mr. Gordon --

William L. Fleisher
June 27, 2024

Page 78

1    A.  If they're there for the reason to take a polygraph
2 test, we polygraphed them.
3    Q.  At the police station?
4    A.  At the police station.
5    Q.  And then were you involved in interviewing him --
6    A.  No.
7    Q.  -- for purposes of --
8    A.  No.
9    Q.  -- securing a confession?
10    A.  Nate was.  No.  Nate was -- Nate softened him up
11 and left the room and let the police get the confession.
12    Q.  Okay.  So Nate started the interview?
13    A.  No, he didn't start it.  They were interviewing him
14 first.  We were watching it.  It wasn't going very well, but he
15 did agree to take a polygraph test.  We tested him.  We scored
16 the charts immediately, and we saw that they were deceptive.
17 The police had him back in the room, and he was -- you know, he
18 wasn't -- he was denying everything, was in the denying phase.
19    And then Nate said -- because we were running up
20 against the clock.  You know, in Pennsylvania they have the
21 Puch decision, which you have to get him in front of a judge
22 six hours after you -- from the time you picked him up.
23    And we were -- the clock was running down, so they
24 asked -- either they asked Nate or Ed said Nate, why don't you
25 take a crack at him.  Nate went in there and told him this is

Page 79

1 what the evidence is, you know, or something to that effect.
2    And they brought the police detectives in, and he
3 confessed to the police detectives, and they got him in front
4 of the judge before the six hours ran out.  That's what
5 happened there.
6    Q.  Now, you mentioned in there that Nate had softened
7 him up.  What does that mean?
8    A.  That means, hey, look, you know, the charts are the
9 charts, you know, that everything is pointing to you, DNA, this
10 and that.  You know, you're better off telling the truth here.
11    Q.  Okay.  And then --
12    A.  You know, there's only so much time left, you know,
13 before you get a chance to tell your side of the story.  Things
14 like that.  I wasn't in that room.  I didn't see that.
15    Q.  Okay.  And then that person was convicted and
16 sentenced to life in prison.  Is that correct?
17    A.  And his lawyer afterwards came up.  I was at -- I
18 gave a presentation for the Bucks County Bar.  This was in
19 Bucks County Bar.  And the lawyer was, "By the way, tell us
20 something on the polygraph."  And somebody said, "What about
21 the" -- the question was, "Yeah, what about the Rich-" -- I
22 think it was "the Richard Keith case."
23    And I said, "I can't comment on that."
24    He said, "Well, I was his attorney.  You guys did a
25 hell of a job, Vidocq."  And that's -- you know.

Page 80

1    Q.  And did the boyfriend that was convicted match the
2 profile that Mr. Walter developed?
3    A.  Yes, almost to a T.  He worked in a pizza shop.  He
4 lived with his mother.  He was in his thirties.  Yeah,
5 everything was like -- you know, he had women issues.  You
6 know, all those things.
7    Q.  The next one there is the "Dan O'Donnell Case."  Do
8 you see where I'm at?
9    A.  Yeah, I know a little bit about this.  Yeah.
10    Q.  That's the priest up in Hudson, Wisconsin.  Is that
11 right?
12    A.  That's the priest who came and interjected himself
13 into -- after they found the funeral director and an intern
14 dead in the funeral home.  And the police were called, and all
15 of a sudden this priest shows up and starts, you know, sort of
16 interjecting himself into the investigation.  And Richard
17 suggested they interview the priest who showed up at the
18 funeral home.  And when they went -- he was out there and went
19 to interview the priest with them, the priest's demeanor and
20 subsequent interview was, in his view, suspicious.
21    Then the detectives re-interviewed the priest who
22 had been transferred to another parish one hour away from the
23 murders.  Right?  Just what's there.  I'm reading that.
24    And then I don't know how long after that he hung
25 himself in full divestment in a hallway where you enter into

Page 81

1 the church.  And then they had a John Doe hearing, which you're
2 probably familiar with, and they tried it like he was there.
3 And he was -- they determined he was likely the killer.
4    And apparently either the undertaker or his intern
5 were going to expose the priest for child molestation that he
6 was involved in.  That's what I remember about that case.
7    Q.  Okay.  So this one is one that detectives from
8 Hudson came and presented --
9    A.  Yes.
10    Q.  -- at Vidocq Society in Philadelphia.  Is that
11 right?
12    A.  Yes.  I believe yes.  Yes.
13    Q.  And that at the time that they presented, they
14 didn't have any suspects.  Is that correct?
15    A.  I don't -- I think it was -- they thought about the
16 priest, but they -- they mentioned him, as I recall.  And I
17 think the questions from some of our members sort of like
18 focused in on the priest.
19    So here's the issue.  A lot of times you can figure
20 out just being a good detective who probably did it.  The
21 problem is how do you prove it.  Now, you can prove it by
22 collecting -- finding evidence, you know, fingerprints, DNA,
23 you know, and admissions to other co-conspirators or other
24 individuals.  And sometimes you have to put in VICAP.  These
25 are the -- these are the facts of our case, and they go and see

William L. Fleisher
June 27, 2024

Page 82

1  if it shows up in any other case.  And just -- it's pruning it,
2  and how they weren't able to prove it, per se.  They just
3  interviewed him and told him he was implicated, you know, they
4  thought he was involved, which you would do.
5          And apparently he just -- you know, he left, and
6  the next Sunday or something, a few weeks later, I'm not sure
7  when, he died.  He hung himself.
8      Q.  I'm looking at, in that paragraph there, the second
9  sentence where it starts "No suspects."  Do you see where I'm
10  at?
11     A.  Yeah.
12     Q.  It says "No suspects were identified at the
13  meeting, but Richard Walter later traveled to Hudson to review
14  the case file and assist in profiling the killer or killers."
15     A.  Well, I may have to disagree with that.  I think a
16  lot of us in that meeting were thinking about the priest by the
17  questions asked.  So no formal suspect.  That's semantics.
18     Q.  Okay.  So no formal --
19     A.  I mean, he wasn't identified, per se, as the
20  suspect, but we were suspicious of him, I guess, which would
21  make him a suspect.  So that's the -- that probably means --
22     Q.  Okay.  So no formal --
23     A.  He was more a person of interest.
24     Q.  No formal suspect until Richard Walter went up to
25  Hudson and reviewed the case -- until after Richard Walter went

Page 83

1  up to Hudson and reviewed the case file.  Is that --
2          MR. SCISCIANI:  Objection.  Mischaracterizes the
3  witness's testimony.
4          Answer if you can.
5          MR. DEFREEST:  Objection and join in that.
6  BY MR. LAUERSDORF:
7      Q.  Can you answer, Mr. Fleisher?
8      A.  Will you repeat the question, please.  I got lost
9  in the crossfire.
10     Q.  If I understand you correctly, there were
11  suspicions but no formal suspect until after Richard Walter
12  traveled to Hudson and reviewed the case file and assisted in
13  profiling the killer?
14         MR. SCISCIANI:  Objection.  Asked and answered;
15  mischaracterizes the witness's testimony.
16         Answer if you can.
17         MR. DEFREEST:  Objection.  Mischaracterization of
18  it.
19  BY MR. LAUERSDORF:
20     Q.  Do you understand the question, Mr. Fleisher?
21     A.  I understand the question.  I can't answer
22  specifically --
23     Q.  Okay.
24     A.  -- based on that text, but I thought everybody in
25  the room was thinking about the priest.

Page 84

1      Q.  Okay.  So it goes on there, "after reviewing the
2  case file, Walter suggested that the detectives interview a
3  priest who showed up at the home while the police were still at
4  the crime scene.  Walter felt something about the priest's
5  demeanor and subsequent interview was suspicious.  Walter and
6  the detectives re-interviewed the priest, who had been
7  transferred to another parish one hour away after the murders."
8  Is that all true?
9      A.  I don't know.  I don't think I wrote this.  It
10  might have been Bornhofen.  It's his past synopsis.
11     Q.  Do you know who wrote this?
12     A.  Well, you know, they could -- they edited a little
13  at the -- if this is the same thing that was in the lawyer
14  magazine, Peter Vaira edited it and made it -- wrote it -- what
15  I wrote, edited it.  So I don't know.  I don't recall -- I know
16  he went out there.  I know he said to the priest something
17  like, You did it.  The priest went off and hung himself.
18     Q.  Okay.  Yeah, it says "Just a few days after the
19  last interview the priest hung himself."  Is that accurate?
20     A.  I don't know -- I don't know if it's accurate or
21  not.  It should be, but I don't know.  I don't know how many
22  days afterwards.
23     Q.  Okay.
24     A.  I'm assuming it was on a weekend, so Sunday or
25  Saturday mass.  I'm not sure.  I don't know when he

Page 85

1  interviewed.
2      Q.  Okay.  And then you mentioned that this Saint Croix
3  district attorney held a John Doe hearing and the sitting judge
4  ruled that the dead priest was most likely the killer of the
5  two victims.  Do you recall mentioning that?
6      A.  Yes.  And that's my understanding of what happened.
7      Q.  But it says in here that that's -- that was after a
8  deacon had come forward with additional information about the
9  priest.  Is that right?
10     A.  I don't recall what the deacon said or what
11  information he brought forward.
12     Q.  Okay.  Okay.  I'm going to take you to -- direct
13  you to Exhibit 10.
14     A.  Okay.  Give me a minute.  Okay.
15         Yeah.
16     Q.  This is another document that you produced in
17  response to our subpoena.  Do you recognize this document?
18     A.  Yes, I do.
19     Q.  And this is a document that you had in your files?
20     A.  Yes, it was.
21     Q.  When did you -- what do you recognize this to be?
22     A.  I believe this to be when there was a case up in
23  Niagara County, that it was a habeas case by Robie Drake that
24  attacked Richard's testimony in his murder trial, and he was
25  appealing -- he was appealing -- he was asking for a new trial,

William L. Fleisher
June 27, 2024

Page 90

1    Q.   Okay.  And did you send the letter, then, to Hobbs
2  & Olson?
3    A.   I believe I did.  I -- yeah.
4    Q.   Okay.  So let's see.  It says in there, at the
5  second paragraph, "Mr. Walter was very active in the Society
6  for many years until there came a time when he was besmirched
7  by an individual in regards to a double homicide."  Is that
8  Mr. Drake, the individual?
9    A.   That was known as the Drake case, yes.  Just what I
10 said.
11           Apparently what happened, as I recall, there were
12 two teenagers sitting in a car making out, and Drake was
13 accused of coming up with a .22 caliber rifle and shooting both
14 of these kids through the back window or the windshield,
15 killing them both.  That was -- they were in Lover's Lane
16 someplace, I believe, when it happened.
17   Q.   Okay.  It says there "A known professional foe of
18 Mr. Walter posted this on his blog."  Who is the professional
19 foe?
20   A.   He had a couple.  There was one -- I don't remember
21 the name.  There was one from another group, the college --
22 Turvey.  Turvey.  His name was Turvey.
23   Q.   Can you spell that?
24   A.   T-U-R-V-E-Y.  I can't recall his first name.  But
25 he, himself, has been discredited by the same academy or

Page 91

1  whatever it was that he made the allegation to.
2    Q.   And then the next paragraph there, it says "To wit,
3  in his habeas action, Drake alleged that Mr. Walter lied on the
4  stand as to his qualifications and apparently gave a bogus
5  diagnosis of the psychological aspect of the crime for which
6  Drake was on trial."  Did I read that correctly?
7    A.   Yes.
8    Q.   "Specifically, Drake stated, as I recall, that when
9  Mr. Walter testified at his trial, he was not a psychologist;
10 exaggerated his experience of having viewed approximately
11 40,000 homicide cases while employed at the Los Angeles County
12 Medical Examiner's Office, when in fact he was only employed as
13 a lab technician."  Is that true?
14   A.   Yes.  Well, I don't know about the number 40- -- I
15 think it was 40,000.  I don't remember now exactly.  40,000 --
16   Q.   Do you recall how long Mr. Walter was employed by
17 the Los Angeles County Medical Examiner's Office?
18   A.   I -- I don't know.  I think it was a couple of
19 years.  I don't know exactly.
20   Q.   And you say there "Specifically, Drake stated, as I
21 recall ..."  When you were writing this letter, did you
22 actually review anything, or were you just going from memory?
23   A.   I was talking to Richard.  I remember discussions
24 we had at the board about this, and, you know, the adjunct
25 professor -- what's an adjunct -- I give -- regularly give

Page 92

1  courses -- not courses but came in and brought in the lecture
2  at Drexel.  And does that make me an adjunct professor?  I do
3  it for a professor on ethics and corruption.  And I don't know
4  what the -- what "adjunct professor" actually means.
5    Q.   You're referring there to the next sentence, where
6  it says "Further, when stating that he was an 'adjunct'" -- in
7  quotes -- "professor at of Michigan State University and having
8  testified before as an expert in homicide cases, he was
9  exaggerating."  Is that correct?
10   A.   Well, it says "we," but it was "he was
11 exaggerating."
12   Q.   It's a typo.  Right?
13   A.   It's a typo, yeah.
14   Q.   Okay.  And so did I hear you correctly earlier?
15 You said this was a letter that Mr. Walter asked you to write?
16   A.   I don't know specifically, but I imagine it was.
17   Q.   Okay.  And then I also thought I heard you say that
18 there were discussions with the board about this situation.
19   A.   When it first came up, when we put him in the
20 suspended member status till it was sorted out.
21   Q.   What was the discussion at the board level?
22   A.   Generally, I said I don't believe -- you know, when
23 they said this piquerism, I know there's piquerism.  They're
24 saying that's pseudo- -- that it was just made up recently.
25 That's a lie.  It's been around a long time.

Page 93

1         In 1970 I was taught about piquerism and
2  pygmalionism and frottage and all of these other sexual
3  philias, and piquerism was one of them.  When I was at
4  Quantico.
5    Q.   And it says "Mr. Walter" -- next paragraph says
6  "Mr. Walter himself immediately presented these allegations to
7  the Society Board, perhaps, in June of 2003."  Is that correct?
8    A.   Yeah.
9    Q.   So Mr. Drake's accusations would have come to the
10 attention of the Vidocq Society Board in June of 2003.  Does
11 that sound right?
12   A.   Yes.
13   Q.   How did -- it says there "Needless to say, the
14 Board took these allegations seriously and there was much
15 discussion how to deal with them and Mr. Walter's status in the
16 Society.  The Board decided Mr. Walter's membership status
17 would be temporarily being placed in a suspended status, until
18 the case was resolved in federal court and we could review the
19 allegations."  Is that what happened?
20   A.   Yes.
21   Q.   And then on the next paragraph, it says "In
22 addition, we asked Mr. Walter to address each allegation, which
23 he did to our satisfaction."  Is that correct?
24   A.   Yes.
25   Q.   What -- how did Mr. Walter address each of the

William L. Fleisher
June 27, 2024

Page 94

1  allegations? For example, the allegation that he had
2  exaggerated his experience of having viewed approximately
3  40,000 homicide cases while in the Los Angeles County Medical
4  Examiner's Office.
5      A.   He told me his supervis- -- told us, the board,
6  that his supervisor -- and I think somebody spoke to the
7  supervisor when he was there -- said, yeah, he used to look at
8  the cases that came in. He talked to Yaguchi (phonetic) there,
9  whoever the ME was out there, and he had an interest in it.
10         See, I had interest in things when I was in the
11 police department. It wasn't my exact duties, but I asked the
12 other guys what about this, how do you handle this. So he had
13 an interest in these cases. That's reasonable. And he was
14 reviewing it, just like I'm reviewing this document. I'm
15 reading it, going over it with you, asking myself questions,
16 what I remember, what I don't remember. So that was one thing.
17 The piquerism was another thing.
18     Q.   How about the --
19     A.   And the -- go ahead.
20     Q.   What?
21     A.   Please repeat the question again.
22     Q.   How about the allegation that he had misrepresented
23 his status as an adjunct professor at Michigan State
24 University? How did Mr. Walter address that?
25     A.   I don't think he addressed it. I think the board

Page 95

1  said, you know, adjunct professor.
2          You know, a lot of the -- a lot of our members are
3  professors and adjunct professors at some time. For example,
4  one of our board members, Jack Maxwell, who at the time was
5  chief of detectives for Philadelphia, he was -- he was a
6  professor at Drexel when he retired. Before that he would
7  teach classes there. Does that -- you know, periodically, if I
8  did the talk. Does that make him adjunct? You know, what is
9  adjunct? Maybe in his mind he was adjunct. I don't know. Am
10 I an adjunct professor because I've been asked to talk at
11 Drexel almost every semester in the businesses class? I don't
12 know. We believe -- we felt it was frivolous.
13     Q.   Did Mr. Walter present you with any evidence that
14 he had ever lectured at Michigan State University?
15     A.   I think he's made statements that, yeah, he used to
16 be called in a lot of places to give talks.
17     Q.   Okay. And then did he address these allegations in
18 writing?
19     A.   I don't recall if they were in writing or if he
20 appeared in front of the board. I don't recall that.
21     Q.   Was there any -- did the Vidocq Society hold any
22 kind of hearing or disciplinary proceeding?
23     A.   No. Just discussion at the board.
24     Q.   Did you talk to anybody at the Los Angeles County
25 Medical Examiner's Office?

Page 96

1      A.   No.
2      Q.   Did you talk to anybody at Michigan State
3  University?
4      A.   No.
5      Q.   What about the allegation that he had testified
6  before as an expert in homicide cases? How did Mr. Walter
7  address that allegation?
8      A.   Well, I believe we knew he testified in -- had him
9  over in London, the Scotland Yard, I believe, he testified. I
10 don't know for a fact. I think he went down to -- in the --
11 oh, the Dunn case he may have testified at a hearing before a
12 judge. I don't -- I don't know. I don't -- this is 40 years
13 ago, so -- not 40 years ago. 25 years ago.
14     Q.   Did Mr. Walter provide you with a list of cases in
15 which he had testified as an expert?
16     A.   No.
17     Q.   Did he provide you a list of the jurisdictions or
18 tell you which jurisdictions he had testified in?
19     A.   No.
20     Q.   Did he provide you with any case names or the names
21 of prosecutors who had hired him?
22     A.   No.
23     Q.   Okay. On the second page there, it says, starting
24 back up on the second sentence of the first full paragraph,
25 "After the judge ruled in the Drake case ..." Do you see where

Page 97

1  I'm at?
2      A.   Okay. This is the last page, you said?
3      Q.   Yeah. The second sentence of the first full
4  paragraph.
5      A.   Okay. "After the judge ruled in the Drake case,"
6  yes.
7      Q.   Yeah. "After the judge ruled in the Drake case,
8  the Board revisited this matter, and it was clear,
9  notwithstanding the judge's decision, it was the consensus of
10 the Board that the allegations against Mr. Walter were
11 unfounded and he was immediately reinstated as a full member of
12 the Society." Is that correct?
13     A.   Yes.
14     Q.   When you say "after the judge ruled in the Drake
15 case," which ruling are you referring to there?
16     A.   When they granted the habeas corpus motion.
17     Q.   Okay. Do you know or do you remember how many
18 times the Drake case went up to the Second Circuit Court of
19 Appeals and back down and back up and all that?
20     A.   No. No.
21     Q.   Okay. But in here you're referring to after the
22 Second Circuit Court of Appeals granted Mr. Drake habeas
23 relief. Is that correct?
24     A.   I'm not sure when. I think it was the first time
25 after we -- the first issue that came up that we were made

William L. Fleisher
June 27, 2024

Page 98

1 aware of.
2     Q.    Okay.
3     A.    The piquerism one.  That's the one that sort of
4 piques me, pun intended, that that's when someone would profess
5 to be a judge and not know -- and out of hand say it's baloney
6 when it's not.  It is --
7     Q.    Do you recall when the Second Circuit granted
8 Mr. Drake this habeas relief?
9     A.    No.
10     Q.    And then it says there in the next paragraph, "In
11 my personal and professional assessment of Richard Walter is
12 that he did not lie when he testified in the initial Drake
13 homicide trial."  What was your assessment based on?
14     A.    Knowing Richard, Richard has always been
15 straightforward, too much.  You know, he grates people because
16 he says what he thinks.  I don't think he would lie.  I think
17 he's a professional.  He can judge a person by the people they
18 hang out with, and he was close to Bob Ressler and some other
19 people at the assessment unit down at behavioral analysis unit.
20          Don't come in here, please.
21          My grandson.  Sorry about that.  And strike that
22 from the record.  Anyway.
23          And my dealings with him.  I thought he was a
24 person who gave his honest opinion.  Sometimes I didn't agree
25 with it.  But I didn't see him as the type of person that would

Page 99

1 get dumb enough to get up and perjure himself in court.
2     Q.    Okay.  And you held that assessment despite the
3 conclusions of the Court of Appeals and the conclusions of the
4 trial judge in the opinion that is reflected in Exhibit 10.  Is
5 that correct?
6     A.    I still hold that opinion.
7     Q.    Now, when you said the -- I think you said the
8 board of the Vidocq Society -- it was the consensus of the
9 board -- the entire board held that opinion.  Is that right?
10     A.    I don't know if the entire board held that opinion.
11     Q.    Okay.  In that preceding paragraph there, it says
12 "... notwithstanding the Judge's decision, it was the consensus
13 of the Board that the allegations against Mr. Walter were
14 unfounded ..."
15     A.    Yes.
16     Q.    So by "consensus" you mean unanimity?
17     A.    The majority of the board.  I don't mean unanimous.
18     Q.    Oh, okay.
19     A.    And a board that is -- if someone makes a motion
20 and someone seconds it, they have the discussion, and then they
21 have the ayes or nays, and then whatever the outcome would be
22 the consensus in my view.
23     Q.    Okay.  So is that what happened?  Somebody on the
24 board said "I move to" --
25     A.    I don't have a specific recollection, but it seems

Page 100

1 to be the practice we had at board meetings.
2     Q.    Okay.  And then, I mean, there would have had to be
3 a vote to immediately reinstate him as a full member of the
4 Society.  Is that --
5     A.    Yes.
6     Q.    -- right?
7     A.    Yes, there would have been a vote.
8          And at the time Fred Bornhofen was the chairman of
9 the board.  He would have handled these things.  The way we
10 operate, most of the business is conducted by the chairman of
11 the board.  At the board meeting and other -- any other issues
12 that come up that have to be dealt with, even to the -- where
13 we're going to have our banquet, if there's problems with that
14 or -- you know, but it's the chairman of the board who sort of,
15 like, leads the discussions.
16     Q.    Okay.  So is it your position, then, that Richard
17 Walter did not commit any wrongdoing in the Drake case?
18     A.    Well, I haven't read the testimony, but based on my
19 personal knowledge of Richard, sometimes he may misspeak, like
20 in an interview or something, or he might have an opinion on a
21 case that I don't particularly agree with, but I think all his
22 pronouncements are believed by him and are truthful in that --
23 in that regard.  So I would -- do I trust him?  Yes.  Do I
24 think he's professional?  Yes.  Does he sometimes get it wrong?
25 Yes.  We all do.  There's always outliers, you know, in

Page 101

1 investigations.
2     Q.    Okay.  As a member of the board of the Vidocq
3 Society, did you take any steps to train Richard Walter after
4 the allegations were made in the Drake case?
5     A.    No.
6     Q.    Do you know if -- did the board?
7     A.    No.  We didn't.
8     Q.    As a member of the board of the Vidocq Society, did
9 you take any steps to supervise Richard Walter's work with your
10 law enforcement partners after the allegations were made in the
11 Drake case?
12          MR. SCISCIANI:  Object to form.  Vague, ambiguous.
13          Answer if you can.
14          MR. DEFREEST:  Join.
15 BY MR. LAUERSDORF:
16     Q.    Do you understand the question?
17     A.    Yeah, I understood the question.
18     Q.    Did you --
19     A.    No.  The answer is no.
20     Q.    Okay.
21     A.    You know, I wouldn't deal with Richard on any of
22 these case matters.  That was all handled by Fred Bornhofen
23 and, you know, whoever was the case manager at the time.  So
24 what he -- what Fred might have said to him, I'm not sure.  I
25 don't think he would have told him to don't do this, don't do

William L. Fleisher
June 27, 2024

Page 102

1  that because I don't think we did anything wrong.
2      Q.  Okay.  Are you aware of Fred or any other member of
3  the board of the Vidocq Society putting any kind of procedures
4  or restrictions in place with regard to Mr. Walter after the
5  Drake allegations were made?
6      A.  No.  I'm not aware of any.
7      Q.  And as a member of the board of the Vidocq Society,
8  did you take any steps to notify any of the law enforcement --
9  any of your law enforcement partners about the Drake
10  allegations?
11      A.  No.  I didn't.
12      Q.  As far as, like, law enforcement agencies who were
13  coming to present to Vidocq Society and were being introduced
14  to Mr. Walter, was there any -- did you do anything as a member
15  of the board to disclose the Drake allegations to those folks?
16      A.  No.
17          MR. LAUERSDORF:  If you can give me a couple of
18  minutes, I just want to go over my notes, and then I think I'm
19  pretty much done.  Can we take five?
20          THE WITNESS:  Whatever you want, sir.  I'm here at
21  your subpoena, your will.
22          MR. LAUERSDORF:  Well, it's getting into your
23  evening, though.  I don't want to keep you too late.
24          (Timestamp at 2:40 p.m.  Recess taken.)
25          (Timestamp at 2:47 p.m.  Reconvened.)

Page 103

1          MR. LAUERSDORF:  I've got a few more questions.
2  BY MR. LAUERSDORF:
3      Q.  Mr. Fleisher, were you present when the folks from
4  Coquille, Oregon, presented the Leah Freeman murder at the
5  Vidocq Society in January of 2010?
6      A.  I'm not sure if I was.  I travel overseas with my
7  job, you know, at Keystone and the academy I teach.  I don't
8  remember specifically that case.  I could have been in South
9  Africa or Saudi Arabia.  I don't know.  I could have been in
10  Egypt.
11      Q.  All right.  Do you remember any of the details of
12  the Leah Freeman murder?
13      A.  Only what I've seen or in reviewing here.  And I
14  saw that piece on television and just in general.  I don't have
15  a specific memory of the presentation.
16      Q.  Okay.
17      A.  Now, I could have been out of the country because I
18  was doing a lot of traveling in those days.
19      Q.  Are you familiar with the ABC News program 20/20?
20      A.  Yes.
21      Q.  Do you recall appearing on the ABC News program
22  20/20 on an episode on the Freeman murder?
23      A.  If that's where Richard, myself, and Frank Bender,
24  may he rest in peace, were walking up the street in
25  Philadelphia or at a diner someplace, yeah, I believe that was

Page 104

1  the one I was at.
2      Q.  Okay.  And was that footage shot as part of the
3  special on the Freeman investigation, or did 20/20 have some
4  kind of --
5      A.  That also was B-rolled.  It might have been just
6  B-rolled.  You know, they might have just taken pictures.  It
7  wasn't part of the investigation --
8      Q.  Okay.
9      A.  -- that I know.
10      Q.  How many times did 20/20 shoot film footage of you
11  and Mr. Bender and Richard Walter?
12      A.  There was just one day that they came to town.  I
13  think we met at a diner someplace with the -- with the -- and I
14  don't even remember who the commentator or the interviewer was.
15  And we were walking up the street, and they were taking -- like
16  B-roll.  So I don't recall how formal it was.
17      Q.  Okay.  Do you recall Richard Walter traveling to
18  Coquille to participate in that 20/20 episode and meet with
19  local law enforcement officers?
20      A.  I know that he went.  I don't remember exactly when
21  he went or, you know, how he got there.
22      Q.  Did you know at the time in 2010 that he was going?
23      A.  I don't believe so.
24      Q.  Okay.  Is that something that he would just simply
25  do on his own, or is that something that the board would have

Page 105

1  had to approve of?
2      A.  No.
3          MR. SCISCIANI:  Object to the form; foundation;
4  calls for speculation.
5          Answer if you can.
6          MR. DEFREEST:  Join in the objection.
7      A.  And it would have been coordinated with Fred
8  Bornhofen.  Things like that, except for the training, would be
9  Fred Bornhofen.  The training would be Ed Gaughan.
10  BY MR. LAUERSDORF:
11      Q.  Okay.  So as far as after one of Vidocq's law
12  enforcement partners comes and presents a case to the Vidocq
13  Society, if individual members follow up on that and provide
14  expertise on the case after the presentation, that would be
15  coordinated through Mr. Bornhofen at that time?
16      A.  At the time --
17          MR. SCISCIANI:  Object to form; incomplete
18  hypothetical; vague; ambiguous; foundation.
19          Answer if you can.
20          MR. DEFREEST:  I'm going to join in the objection.
21      A.  I can answer.  Here's what I can answer.  The
22  meeting was -- it takes about two hours.  The presentation
23  starts about dessert time.  After about an hour or 45 minutes,
24  the members would ask questions.  Some of the presenters wait
25  till -- ask to wait till the end, sometimes during the

William L. Fleisher
June 27, 2024

Page 106

1 presentation.  Then I was out of there.  I have a business to
2 take care of and work.  People would go up, and if they had
3 specific questions with the presenters, that's when they would
4 talk to them.
5           Now, any follow-up I had nothing to do with.  I
6 didn't know.  I know they did follow-up.  I didn't coordinate
7 it.  I had nothing to do with it unless I was involved in it
8 like reading polygraph charts.  And then I'd read the polygraph
9 charts.
10 BY MR. LAUERSDORF:
11      Q.   Okay.
12      A.   But those other things that just -- I just didn't
13 have the time.
14      Q.   Okay.  Did you or any other member of the board
15 mention the Drake allegations to anyone from Coquille?
16      A.   I didn't.  I don't know if anybody else did.  Let
17 me just say this.  In our business, that's -- all of these
18 things become generally known.  Yeah, they know.  The people --
19 people from all different disciplines go to that academy that
20 he belongs to, the forensic -- American Academy for Forensic
21 whatever.  These things get around.  I don't know if -- I
22 didn't.
23      Q.   Okay.  Are you familiar with Mr. Walter's work on
24 the Olivia Ward case in Searcy, Arkansas?
25      A.   No.

Page 107

1      Q.   Ring any bells?
2      A.   No.
3      Q.   Now, I wanted to read a passage to you from "The
4 Murder Room."  You had mentioned that you read it a couple of
5 times?
6      A.   Yeah, looking for my name.
7      Q.   I'm looking for your name.  It's the very beginning
8 of his book, and he's talking about the three of you, and he
9 says "William Lynn Fleisher" -- which I thought you said that
10 middle name was a state secret, but it seems to be right there.
11      A.   Is it in the book?  I've got to read it again.
12      Q.   It's on page 3 in the book.  He says "William Lynn
13 Fleisher was the glue that held the three together."
14      A.   I've got the book available.  Page 3, you said?
15      Q.   Yeah.  The fifth paragraph down that starts with
16 your name.
17      A.   Page 3, fifth paragraph -- "William Lynn."  He did.
18 Son of a gun.  He divulged a state secret.
19      Q.   So it says there "William Lynn Fleisher was the
20 glue that held the three together -- the one, friends said,
21 'with a sail attached to the mast.'  The sartorial big man was
22 the number two in charge of the United States Customs law
23 enforcement in three states, a world-class polygraph examiner
24 and interrogator, a former FBI special agent, and an
25 ex-Philadelphia beat cop."  Is that all true?

Page 108

1      A.   Yes, but he left out "not a bad dancer."
2      Q.   Okay.  And then if you go to the next page, the
3 first full paragraph down that starts with "Bender and
4 Walter ..."  Do you see where I'm at?
5      A.   The next page, a third of the way down.  Yes.
6      Q.   It says "Bender and Walter were the most
7 astonishing investigative team Fleisher had ever seen, equal
8 parts reason and revelation, when they turned their combustible
9 gifts on a killer and not on each other, like a man trying to
10 extinguish his own shadow.  The stout federal agent was the
11 administrator who allowed them to take shape and function in
12 the world."
13           Is that an accurate portrayal of your relationship
14 with Mr. Bender and Mr. Walter?
15      A.   I would say a little bit of literary license there,
16 but I like both of them very much.  I miss Frank Bender a lot,
17 and I haven't had much contact with Richard Walter at all.  But
18 he was very sick.  I spent half my time with him telling him to
19 quit smoking, which he never listened to me.  And I think he --
20 I think the author is -- I don't think I'm stout is what I'm
21 saying.
22      Q.   Well, is it accurate to say that you were the
23 administrator who allowed them to take shape and function in
24 the world?
25      A.   No.  I don't think that's his -- they would have

Page 109

1 been functioning -- I think the real key person there was Frank
2 Bender.  Frank Bender was just a fascinating human being, and
3 people gravitated to him.  And I think he would be the real
4 administrator.
5           You know, he -- he was just that one wonderful
6 person.  Naive.  Where Richard was cynical, Bender was naive.
7 They would argue over who picked the style of glasses for John
8 List in the profile that he would be wearing on the bust.
9 Richard would say, "I did it."  Bender would say, "No.  I
10 picked the glasses out."
11           Yeah, they would have that professional tension,
12 which I saw amongst a lot of our members.  It's just -- it's
13 human dynamics.  No, I don't think I held the glue -- I held
14 the glue of the organization together.  I like to think that
15 most of the people that started out were personal friends of
16 mine.  That's who I invited to join.
17           You know, Lynn Abraham, the district attorney for
18 22 years, is a personal friend of mine.  John -- Jack Maxwell,
19 he was a personal friend of mine.  So I love how if I was --
20 I think people like to -- like the idea of getting together,
21 looking at a case, having a good meal, meeting each other with
22 the same interests.  But I wasn't -- you know who holds the
23 organization together?  It was always the chairman of the
24 board.  It was Frank Friel; it was Fred Bornhofen; it was Ben
25 Redmond; and it's our Leboski.  They get -- they do all of the

William L. Fleisher
June 27, 2024

Page 110

1  legwork, all of the administrative work.  They delegate it to
2  the different case managers.
3          It's a nice compliment.  He wrote -- I think he
4  wrote -- he used literary license.
5      Q.  Okay.  And then lastly, when the Freeman case was
6  presented to Vidocq Society in January of 2010, you were the
7  commissioner at that time as well.  Is that correct?
8      A.  Yes.
9          MR. LAUERSDORF:  Okay.  That's all of the questions
10 I have for now.
11         MR. SCISCIANI:  Well, I can ask some questions, if
12 no one else does.
13         THE WITNESS:  Okay.
14         MS. HOFFMEYER:  Yeah, this is Kristen Hoffmeyer
15 with DOJ.  I don't have any questions.  Thank you very much.
16                      EXAMINATION
17 BY MR. DEFREEST:
18     Q.  So, Mr. Fleisher, I'm Eric DeFreest.  I represent
19 Richard Walter.
20         So far as --
21     A.  I didn't know that you did, but nice to meet you.
22     Q.  Nice to meet you.
23         And regardless of your middle name being a state
24 secret, it was also my father's first name, so you should be
25 proud of it.

Page 111

1      A.  I'm very proud now.
2      Q.  But I wondered with regard to -- you mentioned the
3  ABC doing a small vignette where they came to Philadelphia for
4  a day.  Do you remember, was that before or after Mr. Walter
5  visited in Coquille, Oregon?
6      A.  I think it was after, but I'm not sure.
7      Q.  Okay.  And the interaction between Vidocq Society
8  and ABC, was that primarily handled by Fred Bornhofen, then, as
9  the case manager?
10     A.  It would be handled by -- I'm trying to think who
11 was the PR guy then.  Maybe Dick Laventhol.  Maybe -- I
12 couldn't tell you for sure, sir.
13     Q.  Okay.  I just need to know what you might know.
14         So far as Mr. Walter going back to Coquille,
15 Oregon, for the visit, do you have any knowledge or were you in
16 touch with him as to what the law enforcement agencies may have
17 shared with him or what they disclosed to him at all?
18     A.  No.
19         MR. DEFREEST:  Okay.  Thank you very much.  I
20 appreciate your time.
21         THE WITNESS:  You're welcome.
22         MR. LAUERSDORF:  I actually have one more question
23 I want to ask.
24         THE WITNESS:  Okay.
25         MR. LAUERSDORF:  A pretty quick one.

Page 112

1                      EXAMINATION
2  BY MR. LAUERSDORF:
3      Q.  Can I direct you to Exhibit 13.
4      A.  One second, sir.  13.  13.
5          Okay.  Yes, sir.
6      Q.  Do you recognize that document at all?
7      A.  Yes.  I do.
8      Q.  What do you recognize that document to be?
9      A.  That was sort of a running synopsis that Fred would
10 keep and be updated, I guess, by Bill Gill, the case manager.
11 That talks about some of the cases -- or all of the cases that
12 there were presentations at.  And I remember -- you know, I
13 remember some of them very well.
14         Let's see.  The Diegel case, I think we -- that was
15 a case that we -- we pretty sure had an idea who did it, but go
16 prove it.  It was trouble proving it.  The Cleveland torso case
17 was just an exercise.  The Chris O'Connor case was up in New
18 York.  A guy got beat up outside of a bar by some -- the
19 bouncers, and it was a -- his -- Michael Salem, who was a
20 businessman, came and presented the case.  He was close to
21 O'Connor in some manner.  Jim McCloskey, Centurion Ministries.
22 Yeah, I recognize these cases.
23     Q.  Is that a document that Mr. Bornhofen shared with
24 the board?
25     A.  Yeah.  I think the board would have had a copy of

Page 113

1  it.
2          MR. LAUERSDORF:  That's all I have.  Thank you.
3  Thank you for your time this afternoon, Mr. Fleisher.
4          THE WITNESS:  You're quite welcome, and I wish
5  everybody a good day.  It's too late for me to run to the pool,
6  but I will go out -- take my wife out to dinner.  So I wish you
7  all the best.
8          MR. LAUERSDORF:  Enjoy your dinner.
9          THE WITNESS:  Thank you.
10         MR. SCISCIANI:  Does anybody else have any
11 questions?
12         MS. HENDERSON:  This is Sarah.  Nothing from me.
13 Thank you, though.
14
15         (WHEREUPON, the deposition ended at the hour
16         of 3:05 p.m.)
17
18                        -o0o-
19
20
21
22
23
24
25

William L. Fleisher
June 27, 2024

Page 114

1  STATE OF OREGON        )
                          )        ss. C E R T I F I C A T E
2  County of Douglas      )

3

4        I, JEAN M. KOSTNER, Certified Shorthand Reporter for the
5  state of Oregon, do hereby certify that:
6        Pursuant to Notice, WILLIAM L. FLEISHER appeared
7  remotely before me via Zoom videoconference at the time and
8  place set forth in the caption hereof;
9        That, at said time and place, I reported in stenotype
10  all testimony adduced and oral proceedings had in the foregoing
11  matter, to the best of my ability;
12        That, thereafter, my notes were reduced to typewriting,
13  and that the foregoing transcript, pages 1 through 113, both
14  inclusive, constitutes a full, true, and correct transcript of
15  all such testimony adduced and oral proceedings had and of the
16  whole thereof.
17        IN WITNESS WHEREOF, I have hereunto set my hand and CSR
18  stamp this 8th day of July, 2024, in the City of Roseburg,
19  County of Douglas, State of Oregon.
20
21
                    _____
22                  JEAN M. KOSTNER
                    Certified Court Reporter
23                  CSR No. 90-0051
24
25

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

The Vidocq Society

By William L. Fleisher, VSM

On a brisk winter day in 1990, internationally renowned forensic sculptor, Frank Bender, forensic psychologist Richard Walter and the local deputy special agent in charge of the erstwhile U.S. Customs Service, Bill Fleisher, met for lunch in a trendy Philadelphia restaurant. It was one of those federal Mondays (the dozen or so holidays off for the federal worker, which are so generously paid for by the taxpayer). Bender was an old friend of each, but it was the first time Fleisher and Walter met.

It did not take long before the three of them were discussing new and old cases. Bender and Walter just came off consulting with America's Most Wanted (AMW) regarding longtime fugitive family killer John List. Bender sculpted an uncanny likeness of how List presently looked and Walter provided a psychological profile of where and what List was likely to be and doing. Both were incredibly on the mark as evidenced by the fact that after AMW's John List segment was aired, that villain was quickly captured.

Fleisher felt so intellectually stimulated by the lunch conversation; he did not realize the "quick" lunch he expected had now run into hours. It was this intellectual stimulation that prompted Fleisher said to his colleagues, "Guys, this has been great. We ought to get together on a regular basis and see if we can't solve some old crimes over a good lunch." Bender and Walter agreed and Fleisher left with a mind to move this idea into being a reality.

A few weeks later, by written invitation from Fleisher, a couple of dozen area forensic experts came together for lunch at the Officer's Club in the Philadelphia Navy Yard. The attendees organized the Vidocq Society, which was named by Fleisher in honor of convict turned cop, Eugéne François Vidocq[1] (1775-1857). It was decided there that day the purpose of the Society would be to solve unsolved crimes over a good meal and enjoy the bonhomie of each other's company. Nineteen years later, the Society is thriving.

Exactly who was this fellow Vidocq and why would any righteous group of criminalists name their organization after a convict? The following is a sketch of Vidocq, which is offered for your judgment as to whether or not "redemption" is not one of the most beautiful phenomenon of human qualities and worthy of a man known as the "word's first great detective."

Eugéne François Vidocq was born July 23, 1775, in the northern French town of Arras, in a house adjoining the one where Robespierre was born 16 years before. It was a stormy night and the mid-wife who delivered baby Vidocq, augured a stormy life for him. How right she was! The son of a successful baker, Vidocq was a large and strong child, who appeared much older than his age. He was a precocious child, looking much older than his years. At age five, he started his schooling with the Franciscan Fathers; two years before most other children. Under their strong hand, Vidocq received an excellent education for the times, learning mathematics

---

[1] Vidocq has also been referred to by some sources as "François Eugéne Vidocq". His friends called him, "François". But his appointment document to the Sûreté refers to him as "Eugéne François Vidocq"; and on his own private detective agency advertisement flyer his name appears as "E.F. Vidocq".



William L. Fleisher

EX 2

6/27/24

FLEISHER 000001

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

and languages.    He had a mischievous nature and he was often in trouble with his parents and neighbors.  Young Vidocq regularly stole fresh baked bread from his father's prosperous bakery and sold it around town for the small sum of spending money it provided him.

In time, and not unexpectedly, Vidocq fell in with a group of local young thugs, whom today we would call "delinquents."  On one occasion, at the urging of these toughs, Vidocq helped them steal a sum of money from his father's bakery.  Because of this theft, Vidocq ran away from home.  Ever a "ladies man," he ran off in the company of a young woman.  The two traveled to various French seaports seeking passage to the "New World."  Interestingly, Vidocq was actually trying to get to Philadelphia in order to find his "fortune."  Instead, he  got himself drugged, beaten and robbed by the lass with whom he ran away.

Left penniless, young Vidocq soon took up with a group of travelling charlatans (petty thieves and con men much like the Thenardiers in Les Misérables[2]), and soon found himself their virtual "slave."  These rogues beat him often; and, all in all, his life during this time was not an easy one.  Finally, young Vidocq was able to escape these villains.  Soon afterwards, he was befriended by a travelling puppeteer and his young wife.  Unfortunately for Vidocq, the puppeteer's wife became enamored with the handsome lad and tried to seduce him.  The puppeteer discovered this "budding romance" and again Vidocq had to literally beat a hasty retreat.

Shortly after his adventure with the puppeteers, Vidocq returned home to Arras to try to patch up relations with his father.  As you might suspect, Vidocq's father was less than happy to see him. His mother however, as mothers are, intervened with her husband. Father and son reconciled somewhat.  To appease his father and avoid his further wrath, Vidocq enlisted in the army.

In the army, Vidocq, already an excellent "swordsman," in every sense of the word, rose quickly through the military ranks and was highly decorated for bravery in battle.  He spent many years in the service of the Crown before deserting, a pattern of behavior he was quick to adopt.  In those times, when record keeping was lax, it was not difficult for a soldier to desert one battalion and enlist in another just to collect the small enlistment bonuses offered at the time. While serving in the army, Vidocq took to dueling as a past-time. And, according to his Memoirs, he was soon engaging in one or two duels a day.  Predictably, it did not take him long to be seriously wounded.

During the the French Revolution and "Reign of Terror," eventually Vidocq, himself, became caught up in lunacy of the times.  Falsely denounced as a traitor to the Revolution, by a jealous girlfriend, he found himself imprisoned awaiting trial with various members of the French Aristocracy.  It seemed for time, that he would be receiving the swift and fatal kiss of "Madame Guillotine."  Fortunately, through the intervention of his family and the evidence they uncovered of his accuser's deceit, Vidocq was released from prison to continue his reckless ways.

---

[2]   Victor M. Hugo, Les Misérables (English version, edited and annotated by D. L. Buffum, PhD); Henry Holt & Company; New York, NY; July 1924.

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

In this dangerous revolutionary atmosphere, Vidocq was now compelled to enlist in the Revolutionary Army to prove his loyalty to the Revolution. Because of his previous military experience, he was made an officer. True to form, he deserted, travelled the country and got himself involved in numerous adventures and affairs of the heart. In order to survive these many escapades, Vidocq became a master of disguise and the use of false identities, even to the point of once dressing as a nun to escape the authorities.

During this period in his life, he took up with many unusual and strange characters including Bohemians (Gypsies) and, on one occasion, even a group of "coast smugglers." At this point in his life, Vidocq's insolent and fearless nature landed him in jail. This time it was for a misdemeanor assault offense, which was the result of an argument over a woman. While in prison, Vidocq was accused by another convict of helping a fellow inmate, a poor farmer who had stolen some grain, escape with forged release documents. Vidocq was convicted for this crime and his original 30-day sentence was extended to 3 years. Confinement, did not agree with him and, after several escapes and recaptures (sometimes under false identity), he was imprisoned into the Galleys – prison ships, where only the most dangerous convicts were kept. Determined to live free, he escaped. While a fugitive from justice, Vidocq had many more exciting adventures also chronicled in his memoires.

In 1809, while still a fugitive, Vidocq was hiding out in Paris with his mother and his mistress, Annette. They ran a successful second-hand clothing shop there. After several comfortable years as a fugitive, Vidocq was recognized by some former convicts who knew him from old days. These scoundrels started blackmailing him. Unless he paid them money on a regular basis, they threatened to reveal his identity.

Unable to endure their blackmail demands any longer, Vidocq sent Annette to contact M. Henrí head of the Criminal Division of the Prefect of the Paris Police. He was offering his services as an informant. He was risked spending the rest of his life in prison, and proposed a deal that in return for his services, he wanted the authorities to reduce his sentence and remove the threat of spending the rest of his life in prison.

M. Henrí was interested in Vidocq's proposal, and seeing the opportunity to solve a particularly dastardly robbery murder, agreed to the bargain. He immediately utilized Vidocq by placing him in the notorious La Force prison in Paris. His assignment was winning the confidence of the suspect in that horrible crime who was imprisoned for an unrelated offense.

Vidocq, whose reputation for being a master criminal and escape artist was known throughout the French prison system, quickly gained the unsuspecting convict's complete confidence. It was not long before the man confided to Vidocq about the murder and told him about a witness, a street porter, who the police failed to question. Vidocq smuggled this information out of prison via Annette, who visited him there regularly.

Because of Vidocq's information, the street porter was interviewed and subsequently identified the convict in question. A confession was easily obtained from the suspect by the authorities. Fortunately for Vidocq, he went unsuspected by his fellow inmates as being the

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

source of the information.  It is interesting to note, that Vidocq at the time was famous in France as a master criminal and escape artist that he was known everywhere simply as "Vidocq"; with many impostors trading on his name and fame.

At the request of M. Henrí, Vidocq was released from prison to establish an investigative unit for the Paris Police.  Although, his police colleagues were jealous of his many achievements and resented the trust M. Henrí placed in him, Vidocq was eventually and made an official member of the department.  He possessed an amazing memory and could remember criminals whose faces he had not seen in twenty years.  Vidocq's use of disguises and undercover identities was legendary.  He routinely wore loudly colored scarves, which he changed frequently when conducting surveillance in order to fool the person he was following.  He could change his appearance almost at will, often fooling criminals who personally knew him.  One day Vidocq would appear as a very old man, the next a laborer or beggar.

In 1812, based on his own idea for a special criminal investigation department, Vidocq established the French Brigade de la Sûreté, commonly known as the "Sûreté".  He ran this new organization in an efficient and faithful manner; serving as its Chief until his retirement in 1827.  Unfortunately, because of the intense jealously they felt about his achievements, his police colleagues still considered him a "convict".  In 1817, in order to remove this stigma against him and legitimize his position, Vidocq was "rearrested" so he could then be officially pardoned.

Although its name has been changed subsequently to the Police Judicaíre, the Sûreté with its extensive record keeping system and innovative investigative techniques, initiated by Vidocq, remains one of the most prestigious law enforcement agencies in the world.  It is important to point out that prior to Vidocq, the French Police, as well as most other European police organizations, functioned primarily as secret police agencies looking for subversives and other perceived enemies of the state; not as criminal investigators.  Vidocq made criminal investigation the "business" of the police.  In fact, when Scotland Yard was established Sir Robert Peel, its founder, sent a delegation of British police officials to Paris to consult with Vidocq and study his organization.  Sir Robert then modeled the "Yard" after Vidocq's Sûreté.

After his retirement, Vidocq built a paper box manufactory near Paris, at St. Mande.  There he employed approximately 40-50 ex-convicts and others who had been destined for the Galleys if not for his interest in reforming them.  Vidocq had always spoken out against social injustice and the inhumane treatment of prisoners, which was another view, which had not endeared him to his police colleagues.

Vidocq was a remarkable and extremely innovative man; he held the patents for indelible ink and unalterable paper, which were used for banknotes and bonds.  He had also developed a pickproof lock.  He was the first detective to dabble in the use of fingerprints and ballistics in criminal investigation.  After leaving the Sûreté, Vidocq started the world's first international private detective agency and credit reporting service, which he called the "Information Bureau".  This enterprise was a great success and made him a small fortune.  In 1836, a two volume book, The Thieves, was purportedly written by Vidocq, was published in Paris and immediately became a bestseller.  This was a comprehensive work about crime in France and gave publicity to Vidocq's private detective agency, the Information Bureau.

FLEISHER 000004

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

Vidocq was an exceptionally impressive man.  His corpulent good looks, sharp wit and eye for fashion in his dress, made him one of the most popular figures of his time.  He counted among his friends, high government officials, writers, artists and the socially elite.  However, he never forgot the common person.  He often helped the unfortunate, including those falsely accused of crimes they did not commit.  He loved the good life, enjoying fine dining, the theater and the company of young actresses.  While head of the Sûreté, he had a small money lending business on the side, which in those times was not considered a conflict of interest and was quite legitimate.

Vidocq's investigative successes were myriad, solving crimes and mysteries worthy of Holmes, Poirot, Spade, Fillinger and all the other great detectives, real or created.  Vidocq was a longtime friend of the authors Victor Hugo and Honore de Balzac.  In fact, Hugo often ate dinner with him, and once wrote that Vidocq's "stories so fascinated [him] that he sometimes forgot to eat or drink."[3]  Balzac used him as the model for his detective Vautrin in his Comedie Humaine.  Dickens used him as a model for the convict in Great Expectations.  Gaboriau used Vidocq for Monsieur Lecoq, himself; and Poe and Conan Doyle were both interested in Vidocq as a model in their creations.  In fact, when pressed Edgar Allen Poe admitted that he used Vidocq as the model for the Inspector in his story Murders of Rue Morgue.

Today, Vidocq's memory is honored by the Vidocq Society, which was founded at Philadelphia, Pennsylvania, in 1990 by Frank Bender, a forensic artist; William Fleisher, a U.S. Customs Service Supervisory Special Agent and Richard Walter, a forensic psychologist.  Society membership, which is limited to 82 members (82 being symbolic of the number of years Vidocq lived), is comprised of individuals whose interest in, and dedication to, the search for truth and the solving of mysteries binds them together in the tradition of the great detectives past and present; real or fictionalized.

Society members are from all walks of life, residing all over the United States, Europe and the Far East.  The Society counts among its members many prominent investigators from various law enforcement agencies and the private sector; internationally renown forensic experts in the fields of pathology, criminology, dactylography, forensic dentistry, psychology, polygraphy and anthropological facial reconstruction; the District Attorney of Philadelphia, several practicing attorneys, including a Temple University law professor and several former and present federal and local prosecutors.  The Society as well, includes as members other individuals who have demonstrated an interest in solving crimes and mysteries.

Vidocq Society Members meet monthly (except for December, July and August), to discuss and ponder solutions to various unsolved crimes, almost always homicides, which are presented to them as they dine.  Attending Vidocq Society Members can be recognized by the red, white and blue rosette worn in their lapels.  This rosette is unique to the Society; the colors symbolizing the American flag and the French Tri-colors.  The rosette itself has its origin in Napoleonic France.  In addition, Vidocq Society members are authorized by the power of its

---

[3]  Samuel Edwards; The Vidocq Dossier; Houghton Mifflin Company, Cambridge, MA,; 1976; p. 11.

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

charter to use the letters "VSM" after their names; indicating that person is a "Vidocq Society Member."

The Society, on a "pro bono" basis, offers their advice to any law enforcement agency, which has a particularly difficult case on its hands. Because of a demonstrable need the Society has been providing free "cold case" homicide seminars for law enforcement investigations around the country. Every year at its annual black tie dinner, the Society has present medals to individuals who have achieved something remarkable in the art of investigation.

Over the years the Society has significantly contributed to the solving of numerous unsolved homicides around the country. Let me tell you about just a few of them.

Scott Dunn Case

The Scott Dunn case was brought to the Vidocq Society in 1992, by his father James Dunn. Scott Dunn is missing and is last seen alive on May 16, 1991 in Lubbock, Texas. Evidence at the scene suggests that he was murdered and possibly dismembered in the apartment he shared with Leisha Hamilton, his girlfriend. Assistance by the Vidocq Society helped focus on Hamilton and her new boy friend as the prime suspects. One of the problems with the case was that no body had been found; no body, no homicide. Therefore, the prosecutor did not proceed with the case as a homicide. Expert assistance from the Vidocq was able to establish a corpus delecti by showing the amount of blood which would have covered a missing area of rug in the apartment was "inconsistent with life." In other words, the amount of blood which it would take to drench the piece remove and hidden by a sofa, "was the body." Continuing investigation by Richard Walter and Lubbock Texas detective Tal English resulted in a grand jury indictment in November 1996 of Alicia Hamilton and Ken Smith. Richard Walter played a major role in the solution. On May 15, 1997, Leisha Hamilton was convicted of murder and sentenced to 20 years in prison. In June 1998, co-defendant Timothy James Smith was tried and convicted of a lesser charge and sentenced to 5 to 10 years probation.

Deborah Wilson Case

On November 30, 1984, Deborah Wilson, a student at Drexel University, Philadelphia, was found strangled in a stair well outside a computer lab at the University. In April of 1992, Philadelphia Police Homicide Division Sergeant Robert Snyder along with retired FBI agent Andrew Sloane presented the case at a Vidocq Society luncheon. Sgt. Snyder advised the department had a suspect at the time, a Drexel University security guard, but no evidence was developed and he was no longer a suspect. Richard Walter provided a psychological profile of the suspect that pointed to the security guard and Dr. Halbert Fillinger suggested that the ligature might have cells enough for DNA testing. It was also suggested by other Vidocqians that the main suspect, an ex-security guard's, girlfriend/wife should be interviewed and due to the missing victim's shoes, she should be queried about any foot fetishes. As the suspect was now in the military, it was suggested that his military records should be checked with Army CID for any complaints against him by women. After the meeting, Sgt. Snyder ran with the leads. The police found there had been complaints by women in the suspect's personnel file and his ex-wife told the detective her husband kept a collection of women's sneakers.

FLEISHER 000006

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

Terry Brooks Case

In February 1984, Terry Brooks, the assistant manager of the Fairless Hills, Pa., Roy Rogers Restaurant was found brutally murdered, stabbed, strangled, beaten and asphyxiated on in the restaurant on a Saturday morning. Brooks was to have closed the restaurant on Friday night but was not seen until the next morning. The case was presented to the Vidocq Society by Win Cloud, a detective sergeant with the Fairless Township Police Department, Sgt. Cloud related to the assembled Vidocqians that the department had many suspects, but no evidence connecting anyone to the crime. The safe was found open and Brooks still had her coat on when found. There was not much money in the safe. Vidocqian Edward Gaughan agreed to further assist Sgt. Cloud on the matter. Richard Walter profiled the perpetrator. Subsequently, they indentified and located a previously unknown boy friend of Brooks. A trash run on the boyfriend's residence developed DNA from a cigarette butt. The boyfriend's DNA matched that of DNA collected from the fingernail scrapings taken from the victim. The boyfriend was picked up by the police and was polygraphed by Vidocq's polygraph experts Nate Gordon and Bill Fleisher. The boyfriend then confessed to the police, was convicted and sentenced to life in prison without parole.

Dan O'Donnell Case

In 2004, Detectives from the Hudson Wisconsin Police Department came to Philadelphia to present before the assembled Vidocqians the puzzling 2002 double homicide of funeral director, Dan O'Donnell and his 22-year-old young intern in the funeral home. No suspects were identified at the meeting, but Richard Walter later travelled to Hudson to review the case file and assist in profiling the killer or killers. After reviewing the case file, Walter suggested that the detectives interview a priest who showed up at the home while the police were still at the crime scene. Walter felt something about the priest's demeanor and subsequent interview was suspicious. Walter and the detectives re-interviewed he priest, who had been transferred to another parish one-hour away after the murders. They came away after the interview believing the priest knew more about the crime than he should. The Hudson detectives now focused on the priest and developed significant information that implicated him in the murders. Just a few days after the last interview, the priest hung himself and it was learned that he had previously told a church deacon that he committed the crime. The deacon at the time did not come forward with the information until after the priest died. The St. Croix District Attorney later had a "John Doe Hearing" on the matter and the sitting judge ruled that the dead priest was most likely the killer of the two victims and the homicide case was exceptionally cleared.

Vidocq Society members pride themselves in the fact that they are much more than a group of individuals who enjoy discussing murder and mayhem; they are a society of professionals dedicated to serving their fellow man by discovering the truth about unsolved crimes. The Society is not in competition with law enforcement agencies; but shares a common goal – justice and the search for the truth. In fact, the Society motto is "Veritas Veritatum"; "Truth begets Truth." All of this, the Vidocq Society does in the tradition of the world's first great detective, Eugéne François Vidocq.

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

Footnotes:

     The major sources for this article are Memoirs of Vidocq, translated from the original French, reprint of 1828-29 version, Arno Press, New York, NY., 1976;  The Police of France, by Philip John Snead, MacMillan Publishing Company,, New York, NY.; The Vidocq Dossier, by Samuel Edwards, Houghton Mifflin Company, Boston, MA., 1977; and Vidocq, the Personal Memoirs of the First Great Detective, by Edwin Giles Rich, Houghton Mifflin Company, Cambridge, MA., 1935.

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

## V I D O C Q    S O C I E T Y



# Vidocq Journal

William L. Fleisher

EX 4

6/27/24

*The Vidocq Society – Solving Unsolved Murders and Cold Cases*

A Quarterly Newsletter                                    Volume Twenty - Numbers One and Two

**Vidocq Members help** *America's Most Wanted* **find Baby Bones**



Pages 1, 4, and 5

**The Vidocq Society: Famous French Detective Inspires American Forensic Inquiries**

There's often blood on the menu when William Fleisher, former Philadelphia Police Officer and FBI Special Agent, meets with pals for lunch.

Pages 1, 5, 6, 7

**Bookspan's Bullets**



*Bookspan's Bullets* brings you summarized forensic news on the cutting edge. Enjoy.

Page 2

**Grave Justice**



M. Fredric Rieders, Ph.D., appeared on the pilot episode of *Grave Justice* on October 31, 2008.

Page 3

**Why Do They Do It? Motives, Mores, and Character of White Collar Criminals**

Based upon extensive interviews with seasoned prosecutors and accomplished defense counsel, article explores views and perceptions about white collar criminals.

Page 3

**Publicist Sought for Vidocq Society**

The Vidocq Society is recognized by the U.S. Department of Justice as a significant resource in cold case investigations, and has received world wide publicity. Position now open for official publicist.

Page 3

---

## Vidocq Members Featured on *America's Most Wanted* Episode: "Baby Bones"

By Paul Plevakas

Donna A. Fontana, M.S., VSM, and Frank Bender, VSM, were featured on an episode of *America's Most Wanted* that aired on March 14, 2009. The case was cold. The victim was dubbed "Baby Bones." Police  believe the child died between 2001 and 2004, and may have been between 5 and 9 years old.

On March 18, 2005, a man hunting in Upper Freehold Township, N.J. not far from the Six Flags Great Adventure amusement park, discovered a small human skull in the wooded undergrowth and reported it to the police.

New Jersey State Trooper Crime Scene Investigators were called to the location. They cordoned the area and began their investigation.

During their search of the wooded area, investigators recovered a lower jawbone, bone fragments and teeth.

*Continued on page 4*

## The Vidocq Society: Famous French Detective Inspires American Forensic Inquiries

By William L. Fleisher

When William Fleisher, former Philadelphia Police Officer and FBI Special Agent, meets with his pals for lunch there's often blood on the menu and a Frenchman to blame: Eugené François Vidocq (1775-1857), legendary French criminal-turned-police chief. Fleisher, having read and reread Vidocq's memoirs, was the prime mover behind the  creation in 1990 of the Vidocq Society, a non-profit, fraternal organization set up to discuss unsolved crimes and assist law enforcement officials in solving "cold" cases. In this article, first printed in The Philadelphia Lawyer, Winter 2009 issue, Fleisher shares some of the crimes that have been solved in the name of the famous Frenchman.

*Continued on page 5*

FLEISHER 000058

Exhibit 89, Page 35 of 86

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

# V I D O C Q   S O C I E T Y

## Bookspan's Bullets

By Dr. Jolie Bookspan, VSM

**Welcome to "Bookspan's Bullets" Each issue brings you a column of summarized forensic education. Enjoy.**

### Forensic Field Called "Badly Fragmented," Overhaul Called For

A congressional report from the National Research Council finds "serious deficiencies in the U.S. forensic science system" and calls for "major reforms and new research." The report shows how certain key forensic methods are unreliable and that "strong standards and protocols for analyzing and reporting on evidence" are deficient. Unlike nuclear DNA analysis, which has been subjected to extensive validation, many forensic science methods have never been strongly supported by scientific research, and others are based on subjective interpretation by experts, such as fingerprint and toolmark analysis.

The report through The *National Academies Press* was written by the Committee on Identifying the Needs of the Forensic Sciences Community, National Research Council. The full report is "Strengthening Forensic Science in the United States: A Path Forward." It can be purchased in hard copy, downloaded, or read online, at no charge: at this website:

http://www.nap.edu/catalog.php?record_id=12589

— ScienceDaily (February 19, 2009)

### "Magic Torch" Detects Drug Use

A new device uses UV light to detect minute traces of cocaine or amphetamine. Officers shine the torch at customers' hands and faces. Traces of the drug show up in bright green. The device has been used in East Lancashire England to stop drug users from entering nightclubs. Police hope the device will lead to a reduction in town violence and drug dealing.

Sergeant Alan Clayton stated, "This simple piece of equipment will have a big impact on drug use in pubs and clubs. It is even easy to see the minute cocaine crystals secreted within the nasal hair. Small traces of cocaine are also left on the cheeks and chin that are not visible to the naked eye and these show up bright green too. It really is amazing."

Two other functions of the device are an ultraviolet option to identify forged notes, identification cards and UV marked property, and the ability to highlight traces of 'smart water' painted onto property for theft deterrence, by turning marked areas bright yellow. The device cost £40.

— Lancashire Evening Telegraph Website (April 13, 2009) www.lancashiretelegraph.co.uk

### Teen Cries After Failed Attempt To Rob Liquor Store

Trenton New Jersey police say a 19-year-old tried to rob a Sykes Liquor Store in Trenton sat down and cried after 76-year-old owner locked him in the store. According to police, the owner triggered the door lock after the teen tried to leave the store with a stolen bottle of cognac. The teen pulled a handgun, demanding release, but the owner saw it was not a real gun and called police. The teen was sitting on the floor crying when officers arrived to arrest him.

— Associated Press

### Forensic Photoshop Website

*Forensic Photoshop* is an on-going discussion of the forensic uses of Adobe's Photoshop. The site's description says, "Questioned Document Examiners, Forensic Video Analysts, Latent Print Examiners, and Image Analysts can all find something here." Here is the link:

http://forensicphotoshop.blogspot.com/

### Forensic Definition

Flip Wilson, American comedian and actor was asked about his religion. He answered, "I am a Jehovah's Bystander." "A Jehovah's Bystander?" remarked his friend. "I never heard of a Jehovah's Bystander." Wilson said, "Well, they asked me to be a witness, but I didn't want to get involved."

FLEISHER 000059

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

## V I D O C Q     S O C I E T Y

## Grave Justice
### Episode Featuring Dr. M. Fredric Rieders
From Michael Reider, VSM

M. Fredric Rieders, Ph.D., a forensic toxicologist, licensed lab director, and Chairman of the Board of Directors at NMS Labs, a private forensic science laboratory in Willow Grove, PA, appeared on the pilot episode of *Grave Justice* on October 31, 2008.



*Grave Justice* is a new series on *truTV*. The show investigates crime and justice stories. It uniquely tells haunting narratives from the victims' perspective, especially in cases where the victim's own body provides crucial evidence in solving the crime.

Dr. M. Fredric Rieders
Forensic Toxicologist and Lab Director
at NMS Labs, Willow Grove, PA

Dr. Rieders was approached by the producers of the new series because of his expertise in forensic toxicology, and asked to participate in the show highlighting the *Robert Curley Thallium Death Case*. This was an exciting opportunity for Dr. Rieders, since he, and his late father, Dr. Fredric Rieders, had assisted in the hair analysis investigation part of the case in the early 1990's. The overwhelming evidence of the hair analysis eventually led to solving the case, and the confession of Mrs. Curley, the victim's wife.

## Why Do They Do It? The Motives, Mores, and Character of White Collar Criminals
By Marc S. Raspanti, VSM

Marc S. Raspanti, VSM and name partner in the law firm of Pietragallo Gordon Alfano Bosick & Raspanti, LLP, co-authored an article published in *St. John's Law Review* entitled "**Why Do They Do It?: The Motives, Mores, and Character of White Collar Criminals,**" **82 St. John's L. Rev. 401 (2008).** The article was based upon extensive interviews with seasoned prosecutors and accomplished defense counsel that explored the views and perceptions traditionally held about white collar criminals. Lengthy interviews were conducted from January through April 2007 with forty-five nationally recognized experts in the area of white collar crime. The interviewees included federal prosecutors, the qui tam relator's counsel, and private defense counsel who specialize in defending those accused of white collar crime.

The hypotheses tested were: (1) most white collar criminals fall into two categories:"leader" or "follower," (2) those falling into each category display distinct personality profiles; and (3) the methods for deterring crime differ for each category. The study results provide useful guidance, not reflected in current scholarship, for how to effectively deter white collar crime. The full article can be downloaded at http://www.stjohns.edu/academics/graduate/law/journals/lawreview/issues/82_2/issue.stj

Mr. Raspanti's co-authors were Bainbridge Professor of Law Pamela H. Bucy from the University of Alabama School of Law, Elizabeth P. Formby, and Kathryn E. Rooney.

---

## Vidocq Society Announces Position Open for Publicist
By Fred Bornhofen

The Vidocq Society has matured into a significant entity over the twenty years that we have been in existence. We have grown into a group which is recognized by the U.S. Department of Justice as a significant resource in cold case investigations, and have received world wide publicity.

Proper and responsible publicity is now an issue and since most of our talent is in the criminal justice and forensics fields, we are seeking someone who could serve as a publicist for the Society. This position, like all of the rest of us in the Society, is on a pro bono basis.

Therefore, we are asking the membership if they know of anyone who might want to help in our mission by serving as our publicist. Experience in the field is essential and it should be known that we get numerous calls for interviews and TV coverage. We need someone to vet those who call and provide guidance for the Board of Directors in cooperating with those in the media.

If you are that person or know someone who might want to help the Society, please email us and we will take it from there.

FLEISHER 000060

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

# V I D O C Q   S O C I E T Y

Continued from Page 1

## Vidocq Members Featured on *America's Most Wanted* Episode: "Baby Bones"

During subsequent searches more bones were recovered. Forensic anthropologist Donna A. Fontana, M.S., VSM working for the New Jersey State Police was able to determine that the bones were those of one human being and that the skull has some African/American features but race cannot be determined.

Mitochondrial DNA taken from a femur and rib bone and submitted to the University of Texas DNA Laboratory confirmed the child was a girl.

According to the medical examiner, there was a broken rib that was in an active state of repair. There was no indication of malnourishment -- there was no dental decay. In fact, a forensic dentist charted and x-rayed the teeth that showed no signs of fillings and no evidence any dental work.

But dental evidence did reveal the child probably lived within a community that offered fluoridated water, which indicated the child came from an urban rather than a rural area.

Investigators believe that although the body was found in 2005 they estimate that the child's remains could have been at the site for a year or more and because the body was burned vital DNA evidence was lost.

Investigators also recovered a zipper and what looked like a hand bag or book bag with a picture of Sylvester the Cat, a Warner Brothers cartoon character, on it. Police were unable to learn much about what they believe was a handbag or book bag, except that it was probably a knock-off made overseas.

Investigators also found a charred child's sneaker, that was later identified as a black, Nike Air Force One. FBI agents contacted Nike, and the company confirmed the sneaker had been manufactured in November 2000, and distributed and sold in early 2001 worldwide to large chain stores.

Officials describe the crime scene as rural and agricultural, with open fields and large, fenced-in horse farms. Police say the location is about three miles from a Six Flags Great Adventure Theme Park, located just off Interstate I-195.

The body was left about 50 feet from the road. Police theorize that someone may have been traveling along the interstate, looking for a desolate spot in which to discard the child's body. The actions of the person and/or persons lend the police to theorize that they were unfamiliar with the area. If they had traveled another 50 feet they would have come upon a swampy, marshy area that would have been a better place for destroying any remaining evidence by immersing it in water, something that a stranger would do, not a local who is familiar with the area.

Investigators believe that since the area was agricultural, a local would have had access to a shovel and would have buried the body whereas a stranger may be caught in a situation where they needed to act quickly to dispose of a body. Examination of the child's teeth shows they were singed. Evidence at the crime scene shows that the bushes were burned, indicating that the fire had been intense and burned high, and could have been aided by an accelerant, lending to the theory of a hasty decision to destroy the body.

In an effort to identify the child, detectives have contacted area schools to track down any children who have disappeared from the area, but all the children were accounted for.

Police contacted the Division of Youth and Family Services regarding complaints in Mercer, Monmouth and Ocean counties -- all with negative results.

Police pulled reports involving fire, suspicious vehicles, suspicious people, motorists, hunter complaints in Monmouth, Ocean and Mercer counties dating back to 2003 -- but nothing stood out.



Investigators publicized the case and set up a tip line. Police received many leads, but none that helped identify Baby Bones.

To assist with the identification, *America's Most Wanted* contacted Frank Bender, VSM, world-renowned forensic sculptor and founding member of the Vidocq Society to create a bust of what Baby Bones may have looked like. Frank Bender's sculpture was unveiled during the airing of the March 14th show. Investigators hope that the sculpture and help from the public will lead to the identification of this young girl.

*Continued on page 5*

FLEISHER 000061

Exhibit 89, Page 38 of 86

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

# V I D O C Q     S O C I E T Y

Continued from Page 4

## Vidocq Members Featured on *America's Most Wanted* Episode: "Baby Bones"

Officials are asking teachers, friends and grandparents to get active and start asking questions. They want people to think back three to seven years, and ask themselves if they know of any child in their immediate area that seemed to just vanish overnight; to question families about the whereabouts of children supposedly shipped off to other states or who are "visiting" relatives, but have yet to show up back to school or their communities.



Frank Bender's Sculpture of "Baby Bones"



NJ State Police Composite Drawing of "Baby Bones"

Continued from Page 1

## The Vidocq Society: A Famous French Detective Inspires American Forensic Inquiries

Eugené François Vidocq was a police detective who practiced his craft in early 19th-century France. His earlier life as a reformed criminal was Victor Hugo's inspiration for both Jean Valjean and Inspector Javert in Les Misérables. Vidocq founded and was first director of the Sûreté, forerunner of France's national investigative service, the Police Jucidiare. The Sûreté was so far ahead of it time that Sir Robert Peel modeled Scotland Yard after it. Vidocq's use of innovative investigative methods and his successes made him among the most famous personalities of his day.

Lunch on President's Day 1990, attended by three forensic experts, spawned a Philadelphia organization named the Vidocq Society. As often happens when forensic experts meet, the conversation on that day quickly turned to crimes, solved and unsolved. The extended, academic discussion prompted the diners to formalize their meetings and invite crime professionals, active and retired, to try to solve "cold" cases over lunch.

The Vidocq Society has been convening every month at the Downtown Club for 18 years. Today it boasts more than 160 members in the U.S., Europe, and the Far East, including prominent investigators, government and private, as well as internationally renowned forensic experts in the fields of pathology, criminology, dactylography (fingerprints), forensic dentistry, psychology, polygraphy, and anthropological facial reconstruction. The District Attorney of Philadelphia, several past and current federal prosecutors, and luminaries at the bar are members, along with persons having no formal credentials save an interest in mysteries.

The Society offers pro bono advice to any law enforcement agency with an especially difficult unsolved case. In response to a demonstrable need over the years, members of the Society have presented free "cold case" homicide seminars for investigators around the country. At a black tie dinner each fall, the Society presents medals to recognize remarkable achievements in the art of investigation. Past honorees include a number of Philadelphia

Continued on page 6

FLEISHER 000062

Exhibit 89, Page 39 of 86

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

# V I D O C Q   S O C I E T Y

Continued from Page 5

## The Vidocq Society: Famous French Detective Inspires American Forensic Inquiries

homicide detectives for a wide range of cases. In connection with new investigation leading to the confession of Marie Noe to smothering eight of her 10 children between 1949 and 1968, the Society recognized Stephen Fried, former editor of *Philadelphia magazine*, the late Dr. Halbert Fillinger, former Montgomery County coroner, and former medical examiner investigator Joseph McGill.

Every month over dessert, a Vidocq Society member or guest presents facts and evidence concerning an unsolved homicide. Society members pose clarifying questions and offer suggestions. Presenters often come away with new avenues of inquiry, even in cases unsolved for more than a decade and where witnesses are missing or known to be dead. Many cases are contributed by small police departments with modest investigative resources.

Homicides unsolved in the "first 48" (hours) are more difficult to crack. Society members offer a fresh look at the case and act as a catalyst among police, prosecutors, and the family, to prompt interest in a renewed inquiry. Typical questions from members to detectives include whether they searched for 'doer's' nucleic skin cells, whether old property has been reclaimed for DNA analysis, and whether old polygraph charts have been preserved for review of "cleared" suspects.

*A few examples follow of the more than 150 cases the Society has considered formally illustrate the range and challenges of cold cases:*

In 1992, James Dunn brought the Society the case of his son, Scott, last seen alive in Lubbock, Texas the previous year. A cursory search by local police of the apartment Scott shared with his girlfriend Leisha Hamilton disclosed no evidence of foul play. Hamilton seemed unconcerned with Scott's disappearance, and because no body was found, the case was relegated to the missing person category. Mr. Dunn was convinced that Scott was murdered in the apartment because of a crudely cut and replaced piece of carpet the police had found there. At his prompting, the police conducted a luminol examination, which is a chemical search of the apartment intended to reveal blood evidence under special lighting. The presence of blood was found but not enough to persuade the local prosecutor

that there was evidence of anything more than a fight. Vidocq Society member and former Philadelphia Homicide Commander Frank Friel suggested that, if the area of carpet removed and replaced were sufficiently large, an expert could testify that the volume of blood on it would be inconsistent with life. With Vidocq Society help, such an expert opinion was obtained. Additional investigation by member and former Michigan Department of Corrections forensic psychologist Richard Walter helped Lubbock detectives obtain indictments of Hamilton and her new boyfriend in November 1996. Hamilton was convicted of murder and sentenced to 20 years in prison. Her boyfriend was tried and convicted of a lesser charge.

On November 30, 1984, Drexel University student Deborah Wilson was found strangled, and without her shoes and socks, in a stairwell outside a computer lab. Eight years later, Philadelphia Police Homicide Division Sgt. Robert Snyder and retired FBI agent Andrew Sloane presented the case at the Vidocq Society. Snyder noted that the police considered a Drexel University security guard to be the prime suspect, but evidence did not develop to charge him. Former forensic psychologist Walter developed a psychological profile that again pointed to the security guard. Dr. Fillinger, a former coroner, suggested that the ligature might have cells enough for DNA testing. Other members suggested new interviews of the suspect's wife or girlfriend about any foot fetishes. As the suspect had enlisted in the U.S. Army after leaving employment at Drexel, Society members suggested a review of military records. They disclosed a number of complaints and, crucially, the suspect's dishonorable discharge after court martial for stealing women's sneakers and socks. The suspect's ex-wife told the detectives her husband kept a collection of women's sneakers. Former security guard David Dickson Jr., who came to be known as "Dr. Smell," was arrested and convicted of murder in 1995.

On a Saturday morning in February 1984, Terry Brooks, the assistant manager of a Roy Rogers restaurant at Fairless Hills, Pa., was found brutally stabbed, beaten, strangled and asphyxiated in the restaurant's kitchen. She was to have closed the restaurant the night before. The

*Continued on page 7*

FLEISHER 000063

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

# V I D O C Q   S O C I E T Y

*Continued from Page 6*

## The Vidocq Society: Famous French Detective Inspires American Forensic Inquiries

safe was found open with little money in it, and Brooks was found with her coat on. After 14 years, no suspect had been identified. Detective Sgt. Win Cloud, of the Falls Township Police Department presented the case to the Vidocq Society. His department had many suspects but the evidence connected no one to the crime. Several significant suggestions were offered by members. Member and retired Philadelphia Police Department Major Crimes Detective Edward Gaughan was assigned to further assist Sgt. Cloud. With the help of profiler Walter, the team identified and located a previously unknown boyfriend of Brooks. A trash run at his residence developed DNA from a cigarette butt. The boyfriend's DNA matched DNA collected from the fingernail scrapings taken from Brooks years before. The boyfriend was picked up by police and polygraphed by Vidocq polygraph experts Nate Gordon and me. After failing the examination, he confessed to the police, was convicted and sentenced to life in prison without parole.

In 2004, Detectives from the Hudson, Wisc., Police Department came to Philadelphia to brief the Society on a puzzling 2002 double homicide of a funeral director and his 22-year-old intern. Vidocq member and former profiler Richard Walter traveled to Wisconsin, reviewed the case file, and profiled the killer. Based on the file, Walter suggested that detectives interview a priest who appeared at the funeral home crime scene while police still were there. Walter felt something about the priest's reported demeanor and subsequent interview was suspicious. Detectives re-interviewed the priest, who had been transferred to another parish after the murders. Concluding from the interview that the suspect knew more about the crime than expected, they developed significant information that implicated him in the murders. Within days of his final interview, the priest hanged himself. It was learned that he had confided in a church deacon who had not come forward. Based on team work with Vidocq Society members, a "John Doe Hearing" convened at which the sitting judge ruled that the dead priest was most likely the killer of both victims.

Much more than a gathering of individuals fascinated by murder and mayhem, the Vidocq Society today is an expert organization devoted to serving the public by discovering the truth, some of it fairly old. Fittingly, the Society's motto is *Veritas Veritatum*—truth begets truth. In support of, rather than in competition with, law enforcement agencies, Philadelphia's Vidocq Society considers its proceedings a practical expression of the tradition started by the world'

This article first appeared in The Philadelphia Lawyer (Winter 2009), the Philadelphia Bar Association Quarterly Magazine. It is published here with permission.

William L. Fleisher is a former Philadelphia Police Officer and FBI Special Agent, who later became the Assistant Special Agent in Charge of the U.S. Customs Service in Philadelphia. Long fascinated by the life of Eugené François Vidocq, Fleisher was the prime mover behind the creation of the Vidocq Society, www.vidocq.org. Fleisher is a principal of Keystone Intelligence Network, a private investigation and polygraph firm.



## Shotokan Karate
### Novice to Black Belt

Train in a gentle,
fun environment
Fitness, Self-defense
Kihon, Katas, Kumite
Monday:
8:00 p.m. – 9:30 p.m.
Thursday:
7:30 p.m. – 9:00 p.m.
2nd Floor
2100 Chestnut Street
Phila.,PA 19103
Entrance on 21st Street
Taught by:
Sensei Paul Plevakas
2nd Degree Black belt
Black Belt Hall of Fame
Telephone: (215) 778–2634
Email: paul@paulplevakas.com
Website: www.paulplevakas.com

FLEISHER 000064

Exhibit 89, Page 41 of 86

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23



## Vidocq Society

*Annual Black Tie Awards Dinner*

*Sunday, October 25, 2009*

*Venue:*

*Pen-Ryn Mansion*

*1601 State Road*

*Bensalem, Pa. 19020*

*Directions to Pen-Ryn Mansion*

*$125.00 per Plate*

*Cocktails at 5:00 p.m.*

*Event Continues until 10:00 p.m.*

*Choice of Filet, Salmon, or Vegetarian*

*Brandy and Cigars*

*Open Bar*



# Intern Wanted for Vidocq Journal

## Position Requires

☑ **Excellent Organization**

☑ **Journalism Experience**

☑ **Excellent Writing**

☑ **Excellent Command of English**

☑ **Excellent Proofreading**

Contact editor Paul Plevakas

editor@vidocq.org

---

## Solve The Mystery

*Last Issue's Solve the Mystery:*

Q. What is Hsi Duan Yu?

A. Hsi Duan Yu is the first documented application of medical knowledge as a legal tool to solve crimes appeared in China in 1248. A book entitled "Hsi Duan Yu" (The Washing Away of Wrongs) depicted various physical differences between the bodies of people who died from natural or unnatural causes.

*NEW Solve the Mystery:*

Q. Who is considered the father of modern toxicology?
Send your answers to editor@vidocq.org

Stay tuned for solutions in the next issue…

## Vidocq Society Journal

*The Vidocq Journal* © Copyright 2009
Published by The Vidocq Society,
a 501 (c) (3) nonprofit organization
Second Floor
1704 Locust Street
Philadelphia, PA 19103
Subscription $100 per year

**Commissioner**
William L. Fleisher

**Deputy Commissioners**
Kenneth D. Freeman
Fred A. Bornhofen

**Communications Office**
Paul D. Plevakas, Editor
Voice: 215-545-1450 — Fax: 215-545-1773
editor@vidocq.org — www.vidocq.org

FLEISHER 000065

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

## Vidocq Society Presentations
### 2013/2014/2015

| Date | Case Name | Presenters | Jurisdiction | Tel. Number | email | Volunteer | Date Resloved |
|---|---|---|---|---|---|---|---|
| 5/16/2013 | Acosta/Berrios | Mike Moreschi | Orlando FL PD | ▉ | ▉ | | |
| 6/20/2013 | Nantais/Hough | Mike Lambert | SanDiego CA PD | ▉ | ▉ | | |
| 9/19/2013 | Parasse/Riddell | Kim Cessna | IL SP (Zone 5) | ▉ | ▉ | Mark Schroeder | |
| 10/17/2013 | Brosso/Bernas | Troy Hillman | Phoenix AZ PD | ▉ | ▉ | Richard Walter | |
| 11/21/2013 | Cox | Darren Barnes | Franklyn TN PD | ▉ | | Bill Weightman Anthony Service Mark Schroeder | |
| 1/16/2014 | DaSilva | Alan Fox | Reno NV PD | ▉ | | | |
| 2/20/2014 | Smith | John Clark | Westmoreland Co. PA Det. Bureau | ▉ | ▉ | Schroeder/Weightman | |
| 3/20/2014 | Vesper | Kevin Spenser | Scottsbluff NE PD | | ▉ | Nate Gordon | |
| 4/17/2014 | Stewart | Jamie Quinn | Mooresville NC PD | | | Mark Schroeder Mark schroeder, Bill Weightman. Jim Fitzgerald | |
| 5/15/2014 | Kempton/Little | Mike Leclair | Portsmouth NH PD | ▉ | ▉ | Carol Sweeny, Mark Schroeder, Bill Weightman, Bill Fleisher, Nate Gordon, Richard Walter | |
| 6/19/2014 | Andes | Geoff Robinson | Oxford OH PD | ▉ | ▉ | | |
| 9/18/2014 | Bergeson | Michele Michaels | Portrland OR PD | ▉ | ▉ | Mark schroeder, Jim Fitzgerald | |
| 10/16/2014 | Higgins | Mitch Messer | Hillsborough Co. SO (FL) | | | Richard Walter, Pat Zirpoli, Mark Schroder,Marcela Fierro, Mike Rieders, Jim Fitzgerald | |
| 11/20/2014 | Zywicki | Tom Vagasky | IL SP (Zone 3) | ▉ | | Maria Durante, Mark Schroder, Jim Fitzgerald, Carol Sweeney | |
| 1/15/2015 | Franke | Mike Moreschi | Orlando PD, FL | ▉ | ▉ | | |
| 2/19/2015 | Leatherbury | Pender/Park | Unified PD, Salt Lake City, UT | ▉ | ▉ | Sweeney, Schroder, Fitzgerald, Weightman refered by Dave Ziegler. Input by Walter, Nemec, Petrucelli, Mike Reiders, Carol Sweeney | |
| 3/19/2015 | Stevenson | Pat Holt | Ewing NJ PD | ▉ | ▉ | Schoder, Weightman, Blum | |
| 4/16/2015 | Matte | Mike Fincher | Lafayette Parish SO, LA | | | from AZ CC Seminar, Jack Maxwell/Maria Durante, Mark Schroder, Bill Weightman | |
| 5/21/2015 | Alexander, et al | Joe Sumner | Coconino County SO | ▉ | ▉ | | |
| 6/18/2015 | Dickus, x2 | john Borges S/As Bobby Proffit & McDonald | Franklin IN PD | ▉ | ▉ | Maria Durante | |
| 9/17/2015 | Coffee | | WY Div. of Criminal Inv. | | | from website Redmond arranged | |

FLEISHER 000101



CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

## Vidocq SocietyPresentations
### 2013/2014/2015

| Date | Name | Presenter | | | Notes |
|---|---|---|---|---|---|
| 10/15/2015 | Davis | Capt. Charles Berry Inv. Jackie Ong Detective | Madison Co. SO., AL | ██████  ████████ | from website they contacted VS thru the website, invite |
| 11/19/2015 | Renken | Jennifer Butler | NCPD, SC | ████████████  ████████ | sent 6/22 |
| 1/21/2016 | Jarosz | Det.Carl Biegacki | GHPD, OH | ██████  ████████████ | he contacted VS thru the website 6/26/15 |

FLEISHER 000102

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

## Vidocq SocietyPresentations
### 2013/2014/2015

| Date | Case Name | Presenters | Jurisdiction | Tel. Number | email | Volunteer | Date Resloved |
|---|---|---|---|---|---|---|---|
| 5/16/2013 | Acosta/Berrios | Mike Moreschi | Orlando FL PD | ▬▬▬ | ▬▬▬ | | |
| 6/20/2013 | Nantais/Hough | Mike Lambert | SanDiego CA PD | ▬▬▬ | ▬▬▬ | Mark Schroeder | |
| 9/19/2013 | Parasse/Riddell | Kim Cessna | IL SP (Zone 5) | ▬▬▬ | ▬▬▬ | Richard Walter | |
| 10/17/2013 | Brosso/Bernas | Troy Hillman | Phoenix AZ PD | | ▬▬▬ | Bill Weightman | |
| 11/21/2013 | Cox | Darren Barnes | Franklyn TN PD | ▬▬▬ | ▬▬▬ | Anthony Service | |
| | | | | | | Mark Schroeder | |
| 1/16/2014 | DaSilva | Alan Fox | Reno NV PD | ▬▬▬ | | | |
| 2/20/2014 | Smith | John Clark | Westmoreland Co. PA Det. Bureau | ▬▬▬ | ▬▬▬ | Schroeder/Weightman | |
| 3/20/2014 | Vesper | Kevin Spenser | Scottsbluff NE PD | ▬▬▬ | ▬▬▬ | Nate Gordon | |
| 4/17/2014 | Stewart | Jamie Quinn | Mooresville NC PD | ▬▬▬ | ▬▬▬ | Mark Schroeder | |
| | | | | | | Mark schroeder, Bill Weightman. Jim | |
| 5/15/2014 | Kempton/Little | Mike Leclair | Portsmouth NH PD | ▬▬▬ | ▬▬▬ | Fitzgerald | |
| | | | | | | Carol Sweeny, Mark Schroeder, Bill Weightman, Bill Fleisher, Nate Gordon, | |
| 6/19/2014 | Andes | Geoff Robinson | Oxford OH PD | ▬▬▬ | ▬▬▬ | Richard Walter | |
| 9/18/2014 | Bergeson | Michele Michaels | Portrland OR PD | ▬▬▬ | ▬▬▬ | | |
| | | | | | | Mark schroeder, Jim Fitzgerald | |
| 10/16/2014 | Higgins | Mitch Messer | Hillsborough Co. SO (FL) | | ▬▬▬ | Richard Walter, Pat Zirpoli, Mark Schroder,Marcela Fierro, Mike Rieders, | |
| 11/20/2014 | Zywicki | Tom Vagasky | IL SP (Zone 3) | ▬▬▬ | | Jim Fitzgerald Maria Durante, Mark Schroder, Jim Fitzgerald, Carol | |
| 1/15/2015 | Franke | Mike Moreschi | Orlando PD, FL | ▬▬▬ | ▬▬▬ | Sweeney | |
| | | | | | | Sweeney, Schroder, Fitzgerald, Weightman refered by Dave Ziegler.  Input by Walter, Nemec, Petrucelli, Mike Reiders, Carol | |
| 2/19/2015 | Leatherbury | Pender/Park | Unified PD, Salt Lake City, UT | ▬▬▬ | ▬▬▬ | Sweeney | |
| 3/19/2015 | Stevenson | Pat Holt | Ewing NJ PD | ▬▬▬ | | | |
| 4/16/2015 | Matte | Mike Fincher | Lafayette Parish SO, LA | ▬▬▬ | ▬▬▬ | from AZ CC Seminar, Jack Maxwell/Maria | |
| 5/21/2015 | Alexander, et al | Joe Sumner | Coconino County SO | ▬▬▬ | ▬▬▬ | Durante | |
| 6/18/2015 | Dickus, x2 | John Borges | Franklin IN PD | ▬▬▬ | ▬▬▬ | | |
| 9/17/2015 | | S/As Bobby Proffit & McDonald | WY Div. of Criminal Inv. | | | Redmond arranged | |
| 10/15/2015 | Gibson | | VT AG's Office | | | fr Walter/Stephenson | |

FLEISHER 000103

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

Vidocq SocietyPresentations
2013/2014/2015

| | | | | | |
|---|---|---|---|---|---|
| 11/19/2015 | Renken | Inv. Jackie Ong | NCPD, SC | ███████ ███████ | they contacted VS, invite sent 6/22 |

FLEISHER 000104

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

# VIDOCQ SOCIETY



# Vidocq Journal

William L. Fleisher
**EX 6**
6/27/24

*The Vidocq Society – Solving Unsolved Murders and Cold Cases*

**Quarterly Journal**                                                                    **Volume Twenty-One. Number Four**

| Vidocq Society Books | Bookspan's Bullets: Fast Forensic Education | New Public Affairs Officer Edward Tenuto | 2010 Vidocq Society Awards | New Column: "Digital Forensics" with Peter Stephenson, PhD | Frank Bender Receives Two Awards |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
| Pages 1, 2, and 3 | Pages 4 and 5 | Page 6 | Page 7 | Page 10 | Page 12 |



" The Murder Room" has Arrived

FLEISHER 000105

Exhibit 89, Page 47 of 86

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

# V I D O C Q   S O C I E T Y

## Vidocq Society in Print: Books By and About Members



**The Murder Room** introduces the founders of the Vidocq Society, talented courageous sculptor Frank Bender, Commissioner William Fleisher, and criminal profiler Richard Walter. Learn what inspired them to help solve cold case murders. Click to order in Print, Kindle Edition and Audio Versions.



**The Girl With The Crooked Nose** by Ted Botha. Frank Bender's work as a forensic artist and founding member of the Vidocq Society, to bring attention and resolution to hundreds of neglected murders of women near Ciudad Juarez, Mexico. From this work, Frank and his daughter Vanessa have donated time and talents to assist the *Ni Una Mas* project (Not One More). Click to order The Girl With The Crooked Nose.



In **Trail of Blood**, The Vidocq Society helps solve the murder of 24 year old Scott Dunn. Scott's parents never gave up when his killers left no body, no weapon, only blood, so much blood. "When Jim Dunn got the heart stopping call every parent dreads: "Your son has disappeared" on a Sunday night, it set into motion a six year nightmarish odyssey of desperate searches. Dunn turned to Dr. Richard Walter of the Vidocq Society, forensic pathologist and criminal profiler, who consulted Scotland Yard, studied DNA evidence and blood spatter patterns, and then pointed out who he deduced killed Scott Dunn, and why." Click to order Trail of Blood.



**Deadly Betrayal: The CBS Murders** is based on an actual major, high-profile investigation, told from the inside by FBI man Don Richards, VSM.

"An undercover agent is killed in a Chinese Tong gang-war and FBI Supervisor Dan Robertson can't prove the operation was authorized. He is set up as the scapegoat, and told to involve himself in a safe white collar fraud case until things get sorted out. But that case is far more sinister, and soon Robertson finds himself partnered with NYPD Detective Richie LeBeau in a complex multiple murder investigation which might connect to the Tong. Overcoming personal clashes, inherent distrust, agency rivalry, and leaks to the media, they use every crime-solving and forensic technique to identify the killer, and build their case. When sharp legal maneuvering threatens to dismantle their work and free the killer, they must find a way to resurrect the case and bring justice to a terrible crime." Click to order Deadly Betrayal.

**Someone's Daughter** tells of a young woman, known only as "Jane Doe," found murdered in 1954 in Colorado. Boulder County Sheriff's Detective Steve Ainsworth and Vidocq members selflessly volunteered resources and time to find the woman's name and killer: Drs. Richard Froede, Walter Birkby, and Robert Goldberg worked on exhumation and autopsy. Dr. Birkby reassem-



bled the skull. Frank Bender did facial reconstructions. Dr. Terry Melton worked on DNA. Fred Bornhofen coordinated. Many others contributed. In October 2009, DNA comparison with a surviving sister confirmed Jane Doe's identity as Dorothy Gay Howard, an 18-year-old missing from Phoenix, Arizona. Click to order Someone's Daughter.

Exhibit 89, Page 48 of 86

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

**V I D O C Q    S O C I E T Y**

## Vidocq Society in Print: Books By and About Members



**Effective Interviewing and Interrogation Techniques, Third Edition,** by Nathan J. Gordon and William L. Fleisher. A practical manual providing the forensic practitioner/ investigator critical insight into human behavior, enabling one to become a better interviewer, interrogator and, most importantly, an expert detector of truthful and deceptive behavior. Gordon and Fleisher have created a one-stop guide to mastering the art of credibility assessment during an interview, with successfully tested techniques for obtaining a confession from guilty suspects. Forensic practitioners, law enforcement, the intelligence community, the private security sector, attorneys, and forensic and criminal justice students will all find this volume a valuable resource.

• Addresses FAINT, IIT, and MITT in one source
• Enables the interviewer to obtain a confession that can stand up in court
• Includes an online workbook with practical exercises to assist the reader

The third edition expands chapters on torture, assessing the interview, statement analysis, MITT, and interrogation. It contains new chapters on passenger screening, and report writing, along with new case studies. Also covered are ways to maximize the collection of information from a prospective employee, and legal considerations. The Forensic Assessment Interview Technique (FAINT) and the Integrated Interrogation Technique (IIT) were developed at the Academy for Scientific Investigative Training and are used by forensic practitioners and investigators to detect truthful or deceptive behavior. FAINT is applicable to all forensic type interviews and incorporates the assessment of nonverbal behavior, projective analysis of unwitting verbal cues, statement analysis and the Morgan Interview Thematic Technique (MITT). This volume teaches how to combine, apply and quantify these techniques to reach a numerical conclusion to the truthfulness of the interviewee. Available in hardcover and Kindle.



**Cold Case Homicides: Practical Investigative Techniques** by Richard H. Walton, VSM, provides effective and accessible information to those responsible for investigating and resolving previously examined, but still unsolved, cold case homicides.

The book merges theory with practice through use of case histories, photographs, illustrations, and checklists that convey essential, fundamental concepts, while providing a strong, practical basis for the investigative process. It combines proven techniques from forensics, psychology, and criminal investigation, and focuses on technologies that may not have been available at the time of the crime.

This guide defines the characteristics of a cold case homicide; details various investigative methods used by law enforcement agencies; explores the actual experiences of detectives in re-opening case files; and presents current technologies such as ViCAP, HITS, and TracKRS used in the identification of cases related to the re-opened case, or its perpetrator. It also highlights technological changes that contribute to law enforcement's abilities to solve cold case homicides, such as computerized print technology, the specificity of DNA, and the expanding data banks that enable the linkage of previously unknown suspects to the crimes they committed. Available for order in hardcover and Kindle.

**Submit Your Books for Listing in the Vidocq Journal**

**Include:**
➡**Graphic of Cover**
➡**Synopsis**
➡**Author's Biography**

Email Dr. Bookspan, Science Editor

FLEISHER 000107

Exhibit 89, Page 49 of 86

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

# V I D O C Q    S O C I E T Y



## Bookspan's Bullets by Jolie Bookspan, MEd, PhD, FAWM, VSM

Welcome to "Bookspan's Bullets" by Dr. Bookspan, Science Officer. Each issue brings you fast forensic news and education. Enjoy.

### Bound Robbery Victim Texts "Get Help" With Toes

Amy Windom was lying in bed when an intruder ransacked her house, tied her wrists to the bedpost, and struck her head with his gun. For at least two hours after the robber left, Ms. Windom screamed for help while trying to free herself. "I had a lot of time to think about MacGyver moments," she said. Ms. Windom said the robber didn't steal her laptop because she told him it had a tracking device. It was left on her bed. She maneuvered the laptop closer with her feet, pried it open and pushed the keys to unlock it, all using her feet since her hands were bound. She said, "The wifi popped right up and it was a wonderful moment when I had the screen and realized my Internet connection was live." Using her big toe as a mouse, she typed a message to her boyfriend asking him to call 911. Officers arrived quickly and freed her. Click here to see an image of her computer screen with the texted messages.

*- Source*: news.com.au

### Wolves Teach German Detectives Leadership Skills

Groups of German policemen, detectives, and businessmen travel to a nature reserve in Brandenburg for seminars that teach leadership training by studying behavior of wolves in packs. Nine resident wolves are role models of how to lead, command respect, and improve efficiency in the workplace. After observing the wolves in the forest reserve, students return to classrooms to review skills and lessons learned. Examples include that the Alpha wolf, the leader, does not use aggression or loud actions to lead or communicate, that the leader or Alpha Wolf is replaced if he is not doing a good job, and that the pack works by mutual respect. Detective Inspector Sabrina Doehlent states, "When you see the respect the wolves have for each other, it is respect that everyone should have on our jobs."

Click the source link to watch a short video news-clip:

*- Source*: BBC News 2010

### Fingerprints Exonerate Man Accused by DNA

Donald Smith claimed innocence, but seemed to appear on surveillance camera footage, matched witness descriptions, and DNA evidence apparently showed he was at the scene of the crime. Investigators followed up and found that fingerprint evidence at the scene did not match Donald, but his identical twin brother Ronald. Identical twins do not share fingerprint patterns.

*- Source*: ABC News

### Company Presses Your Final Ashes Into Vinyl Records

The English company "Rest In Vinyl" offers a novel option for mortal remains after death. They take the ashes of cremation and press them into playable records. Cost of a basic package is £2000 for 30 discs with a standard cover. Original covers and music specially written can be added at additional fees. "Rest In Vinyl" explains: "When the album that is life finally reaches the end wouldn't it be nice to keep that record spinning for eternity? We offer you the chance to press your ashes into a vinyl recording your loved ones will cherish for generations. Record a personal message, your last will and testament, your own soundtrack or simply press your ashes to hear your pops and crackles for the minimal approach." As long as a device is available that plays records, you can "Live On From Beyond The Groove." Click here to read funny reader comments about this item.

*- Source*: Treehugger

### Test Approximates Subjects' Age From Blood

Researchers in the Netherlands have developed a technique to estimate the age group of a suspect from blood left at a crime scene. The technique uses a characteristic of blood cells called T cells. T cells recognize foreign "invaders" such as bacteria, viruses, parasites, and tumor cells, and produce small circular DNA molecules in the process. The number of these DNA molecules, called

*Continued on Page 5*

FLEISHER 000108

Exhibit 89, Page 50 of 86

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

# V I D O C Q   S O C I E T Y



## Bookspan's Bullets

By <u>Dr. Jolie Bookspan</u>, MEd, PhD, FAWM

*Continued from Page 4*

signal joint TCR excision circles (sjTRECs), is thought to decline at a constant rate with age. The approach enables scientists to estimate a person's age, "give or take nine years," the researchers report. In their results, published in the journal *"Current Biology,"* they state that, "this biological phenomenon could be used for estimating age of a human individual accurately and reliably."
- Source: *Current Biology* 2010 Nov 23;20(22):R970-1. Estimating human age from T-cell DNA rearrangements. Zubakov D, Liu F, van Zelm MC, Vermeulen J, Oostra BA, van Duijn CM, Driessen GJ, van Dongen JJ, Kayser M, Langerak AW.

### Fast DNA Test Matches Samples In 4 Hours

A new forensic test matches suspects' DNA with crime samples in four hours. With this test, police could check whether a person's DNA matches that found at crime scenes while suspects are being processed and before a decision is made to release them. To increase speed of forensic DNA testing, scientists built a chip that can copy and analyze DNA samples taken from a cotton swab. The process takes four hours at present, and the developing teams are working to optimize and reduce cycle time to a predicted two hours. With such a short test, DNA evidence could be double-checked before releasing a suspect.

-*Contact*: Andrew Hopwood, Ph.D.
Research and Development, Forensic Science Service,
Trident Court 2960 Solihull Parkway,
Birmingham Business Park,
Birmingham UK B37 7YN
Email: andy.hopwood@fss.pnn.police.uk
and
Frederic Zenhausern, Ph.D., MBA
Center for Applied NanoBioscience and Medicine,
The University of Arizona College of Medicine Phoenix,
425 N. Fifth Street, Phoenix, Arizona 85004
Phone: (602) 827-2051
Email: Frederic.Zenhausern@arizona.edu

- *Source*: Download Full Text Article from ACS Publications, Analytical Chemistry, pubs.acs.org.

### Hand Bacteria Aids Forensics

US researchers have determined that the bacteria on our hands could be used in forensic identification. Communities of bacteria living on skin are different for each person. Each person leaves behind a unique trail of bugs as they go about their day. Even the hands of the cleanest people are home to 150 different species of bacteria which are not significantly affected by regular handwashing, and even identical twins who share the same DNA profile have "substantially" different bacteria living and growing on their hands. Scientists led by Noah Fierer of the University of Colorado in Boulder, were able to match bacteria samples from three computer keyboards to each computer's user. Hand bacteria, they found, can survive at room temperatures for up to two weeks, and could be identified even when fingerprints were smudged, or there was not enough DNA to obtain a profile. The scientists describe their findings in the journal Proceedings of the National Academy of Sciences (PNAS), and wrote, "This suggests that the collective genomes of [these microbes] may be more personally identifying than our own human genomes." The technology is estimated at 70-90% accurate, and expected that accuracy will increase as it is refined over time.

- *Contact*: Address correspondence to:
noah.fierer@colorado.edu.

- *Source*: PNAS. "Forensic identification using skin bacterial communities." Noah Fierer, Christian L. Lauber, Nick Zhou, Daniel McDonald, Elizabeth K. Costello, and Rob Knight. PNAS. DOI:10.1073/pnas.1000162107

Dr. Bookspan loves good science.

Send forensic jokes, quotations, websites and stories for possible inclusion in "Bookspan's Bullets."

Email: Bookspan's Bullets

FLEISHER 000109

Exhibit 89, Page 51 of 86

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

**V I D O C Q     S O C I E T Y**

# Introducing Edward Tenuto, Vidocq Society's New Public Affairs Officer

by Edward Tenuto

Edward Tenuto is the new public affairs officer for The Vidocq Society. Perhaps in future issues of this journal he will tell us more of what a public affairs officer will bring to Vidocq. Here are some words from Ed introducing himself.

Currently, Ed is president of ET-Communications, a news media management consulting firm in the Orlando area, with offices in Windermere, Fl and Philadelphia, PA. Ed was president of Media Relations Consultants, a news crisis management and communications business which advised corporate executives, political candidates and business owners on how to effectively manage press inquiries and how to represent a product, service or idea internally or to the public. He was communications counsel to the board chairman of the Philadelphia Regional Port Authority. He has held positions on many political campaigns from the local to the gubernatorial level. Currently, he specializes in issues and reputation management, news media relations, media training, PR counseling, community relations and employee communications. Ed has a rich and extensive background in the crisis communications area of public relations.

From 1985 to 1993, Ed was the official spokesperson for the Philadelphia Police Department and three police commissioners. As senior press liaison officer, Ed handled myriad press contacts at major police incidents and thousands of routine requests from reporters during his tenure with the police department's public affairs office. He wrote many of the department's press releases and held countless press conferences on matters such as: police shootings; homicides; demonstrations and all major events. He trained and advised police command staff and personnel in all news media matters. He also directed the police department's efforts in promoting community relations programs. From 1997 to 2005 Ed served as assistant regional director for the Bureau of Narcotics Investigation and Drug Control for the Pennsylvania Office of Attorney General.

Ed was the official police department representative with the Philadelphia Film Office, the motion picture industry and the entire film community. He was an editor and assistant producer for Fox television's "COPS" featuring the men and women of the Philadelphia Police



Edward Tenuto

department. As a consultant to the motion picture industry some of his film credits include, Rocky 5 and Rocky Balboa (Rocky6), Philadelphia, Up Close and Personal, Two Bits, Wide Awake, Beloved, Blowout and many others. He worked very closely, providing personal professional services with Sylvester Stallone and John Travolta during their filming in Philadelphia. He provided professional services to Oprah Winfrey, Denzel Washington, Tom Hanks, Burt Young, Talia Shire, Bruce Springsteen, Robert Redford, Michelle Pfeiffer, Richard Burton, Elizabeth Taylor, Peter Falk, John Cassavetes, and other actors during their filming in the Philadelphia area.

Ed graduated from Temple University's School of Communications and Theater with a Bachelor's Degree in Journalism/Public Relations in 1983. Throughout his career he attended numerous training seminars and conferences which included training at the FBI National Academy in Quantico, Virginia. He studied advanced homicide investigation at Hocking Technical College in Columbus, Ohio. He is co-author of a news media management handbook manuscript designed for corporate executives.

Ed is a member of the Public Relations Society of America national and local Orlando chapter and a member of the Fraternal Order of Police. He is an ex officio board member of The Vidocq Society. He is vice president and board member of Lakeside at Lakes of Windermere condominium association and board member of Lake Burden South homeowners association. He lives in Windermere, Florida.

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

# VIDOCQ SOCIETY

## Vidocq Society 2010 Awards

### 2010 Vidocq Society Medal of Honor



Commissioner Bill Fleisher (at podium) presents awards.
L- R: Frank Bender,VSM; Terry Melton, Ph.D., AAFS; Silvia Pettem; Frederick Bornhofen, VSM, CPP, CFE, AAFS

### 2010 Halbert Fillinger Lifetime Achievement Award



Kenneth D. Freeman, VSM, and his wife Dolly, after receiving the Halbert Fillinger Lifetime Achievement Award

### Joe O'Kane, VSM, and Local Doo-wop Group



### Grand Entrance by the Pipers



### String Trio Greets Attendees



### From Left: Silvia Pettem, Dr. Terry Melton, Commissioner William Fleisher, Frank Bender, VSM



FLEISHER 000111

Exhibit 89, Page 53 of 86

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

# V I D O C Q   S O C I E T Y

## Vidocq Society Meetings Move to Union League



**From William Fleisher, Commissioner**:
I wish you all a joyous season, and 2011 promises to be a great year for the Vidocq Society. First of all, we have a **new meeting place**, the historic Union League at 140 S. Broad Street, Philadelphia, Penneylvania.
 http://www.unionleague.org/.

Through the good offices and sponsorship of VSM Frank Mayer, the Union League has given the Vidocq Society a wonderful package. Our meetings will still be held on the **third Thursdays** of the month, except for March 2011, when it will be held on the **third Friday** (due to space availability).

The cost for the lunch, for the time being, will remain at $30.00 per person. The Union League has a dress code. Business attire is required for men and women. It is imperative that you RSVP to Ms. Alvarez at Vidocq, **215-545-1450**, by COB on the Mondays before the scheduled meetings as here as there will be a tight head count.

Case Manager Fred Bornhofen has lined up great cases through 2011, and we expect big turnouts at our classy new venue.

**Union League Directions**

### 2011 Meetings

January 20, 2011

February 17, 2011

March 18, 2011 (Friday)

April 21, 2011

May 19, 2011

June 16, 2011

July 2011 (No Meeting)

August 2011 (No Meeting)

September 15, 2011

October 20, 2011

November 17, 2011

December 2011 (No Meeting)

FLEISHER 000112

Exhibit 89, Page 54 of 86

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

**V I D O C Q   S O C I E T Y**

## Vidocq Society Inspires Serial Killer College Course

By Paul Plevakas, Editor-In-Chief

The University of Western Ontario is offering an elective course titled "The Serial Killer in the Media and Popular Culture" in their undergraduate department of Media Information and Technoculture. Instructor Mike Arntfield is a detective constable for the London Police Criminal Investigation Unit, with 10 years law enforcement experience. According to the website description, "This course will situate the serial killer as a "modernist event" that suggests the press may not only be reporting on these crimes, but actually suborning them."



"There's a tie-in between the celebrity system and violence. Serial killers represent modern incarnations of monsters. They serve an important mythological purpose," Arntfield says

"We look at how the media played in making the serial killers aware of what they were doing and add to the status of their celebrity." That someone capable of serial murder could be working or living next to us

Mike Arntfield

adds to our fascination, he says. "In the industrial culture, we are repositories of strangers. How can we rub shoulders with someone capable of killing? "

The creation of the course was inspired by the work of the Vidocq Society. Students are taught criminal and police procedural theories and then assigned serial killer cold cases to examine with fresh eyes using current technology and proven investigative methods. Students are encouraged to use Google Maps, genealogical websites such as www.ancestry.com, census data and birth and death notices which are available online. Currently there are no unsolved serial killer cases in Canada. All cases assigned the students are from the United States.

Students are put into groups and given the role of case manager, data input person and lead investigator.

Students have contacted the original investigators and reporters but have been told by Arntfield not to contact the victim's families or any witnesses. Research into the crimes has been eye opening for many of them, their only contact with violent crime has been through television crime dramas, they are now digging through arrest reports and looking up information on microfiche and finding it a humbling experience.

Arntfield hopes his students will help solve these cold cases. The most convincing assignment presented in the class will be forwarded to the FBI's Behavioral Sciences Unit.

According to Arntfield, "Students in the course are doing "a public service" by taking a fresh look at old cases."

Mike Arntfield has been asked by undisclosed people to put together a London version of the Vidocq Society.

## Healthy Wishes

Our thoughts to Dr. Haskell Askin, Donna Fontana, Frank Bender, Bill Kelly, Peter Hahn, and others for health in the coming year.
***From, Your Friends and Colleagues at Vidocq Society***



Dr. Haskell Askin and Commissioner William Fleisher

FLEISHER 000113

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

# V I D O C Q    S O C I E T Y

## New Column: "Digital Forensics" with Peter Stephenson, PhD

# What Does Digital Forensics Have to Do With Murder?

By Peter Stephenson, PhD

Some years back a Texas minister was accused of murdering his wife. The wife died of an overdose of sleeping pills and suffocation and much of the evidence against him came from a forensic examination of his computer and the other computers to which he connected. This examination revealed that he had surfed the Internet for information on the effects of an overdose of sleeping pills.

In 2006 a Michigan man was indicted for murder based in part on evidence of 2 year-old emails found on his laptop.

In a murder case police seized a computer and attempted to create a forensic image of the hard disk. During the course of that process the disk failed and the image could not be created. The investigator took the disk drive to a company that specializes in data recovery and, under the watchful eye of the investigator, performed what is called a "head assembly transplant".

Such a transplant consists of rebuilding portions of the hard disk drive assembly that have been damaged. This type of failure often causes what is called a "head crash", an error where the drive head – a small assembly that scans over the disk itself close to but not quite touching the disk for the purpose of reading the data on the disk – hits the disk causing damage to or loss of data on the disk itself.

Once the transplant was complete the technician found that data on the disk had, indeed, been damaged. By using special programs to rebuild the data structure on the disk the forensic image was completed and the investigator had his evidence.

These three cases are examples of digital forensic science, specifically, computer forensics. Today the computer is ubiquitous in our lives. It is not unreasonable to conjecture that it also is ubiquitous in our deaths. Such, it turns out, actually is the case.

For decades law enforcement has recognized the value of computers in analyzing and solving crimes of all types. The earliest use of computers was the cataloging and categorizing of crime data. That continues to be a primary use today. A large computing system can re-member and find more data than football fields full of humans can.

However, today, we keep our lives on digital devices. I have a home computer, a work computer, a laptop, an iPad and a Blackberry smart phone – and these are just my personal digital devices… I interact with dozens more on a daily basis. Every one of these digital devices carries enough information about me, my activities, my interpersonal relationships and behavior to get a very clear picture of who I am, what I do, where I go and with whom I communicate, both physically and virtually. In any type of criminal case this information, by anyone's standards, may be evidence.

However, getting that information with the purity and lack of ambiguity that makes it useful as evidence requires the disciplines of forensic science. Digital forensic science deals with the tools, techniques, and computer science, that are intended to ensure evidential purity and lack of ambiguity.

Digital forensics and murder? More and more they are bedfellows – strange ones, perhaps, but bedfellows, indeed. In future columns we will explore the used of digital forensic science in cold cases and personal cases such as cyber stalking and harassment. Stay tuned.

Peter Stephenson, PhD, CISSP, CISM, FICAF is the director of the Norwich University Center for Advanced Computing and Digital Forensics as well as being the



chief information security officer for the university. He conducts all of the university investigations that have any connection to computers or the Internet and teaches various courses in digital forensics and cyber investigation. His PhD, from Oxford Brookes University in the UK, was one of the first in the world to be awarded based upon research in digital forensic investigation. He has written or contributed to 16 books and hundreds of articles.

Exhibit 89, Page 56 of 86

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

# V I D O C Q   S O C I E T Y

## We Mourn the Passing of Sheriff John P. Durante, VSM



Sheriff John P. Durante, VSM

Shortly after midnight on Wednesday, February 10, 2010, Sheriff John P. Durante, VSM, died peacefully in his sleep at the age of 61.

John is survived by his wife of 15 years, Maria L. Durante, daughters Christina Visco and Deanna Durante, his two grandchildren, and his siblings Michael V. Durante Jr. of Lemont, Colo., Patty, Daniel, Leo, Jane Durante all of Conshohocken.

Sheriff Durante began his public service as a junior firefighter, served in the Harmonville Fire Department and Conshohocken No. 2 Fire Company, and became a life member in the Spring Mill Fire Company. Durante served as a Senior Instructor in the Montgomery County Fire Company and as a local instructor for the Pennsylvania State Fire Academy.

Durante began his law enforcement career as a Deputy Sheriff in Montgomery County in 1971. He then joined the Montgomery County Detectives as a County Investigator in 1974, and he began first as an undercover narcotics and vice investigator and then as a homicide investigator.

He was deeply honored to be inducted into the International Police Hall of Fame and to receive numerous awards from the Vidocq Society.

His forensic career began when he met Dr. Halbert Fillinger, who recognized John's talents and integrity, and took John under his wing, training John to be a forensic expert. Dr. Fillinger paid for John to attend a wide array of forensic science courses in order to shape John into the nationally known forensic expert.

Durante founded the Forensic Science Unit of the Montgomery County District Attorney's Office in 1986, and commanded that unit until 1999, when he won election to the position of Sheriff of Montgomery County. Even though the position of County Sheriff is considered 'part-time' under the salary structure of county government, John treated this as a full-time position and came to work every day to ensure that the Department was always at its best.

Sheriff Durante was proud of his father's contributions to society. Michael Vincent Durante Sr., had served honorably as a Captain in the 101st Airborne Division in WWII, and survived the ordeal of being a prisoner of war in a Nazi camp.

John was inspired by his father's accomplishments, but his defining role model and mentor was his uncle Pasquale DiGuiseppi, who stepped in to guide John at a young age. "Uncle Pat" taught John the values of generosity and compassion for others, values which defined John's entire life.

John used his forensic expertise to help give peace, closure, and justice to the victims of crime, their families and loved ones. John was always motivated by the compassion he felt for those people that he helped thru his forensic work. Sheriff Durante worked tirelessly to help other law enforcement agencies at the local, state and federal level, and he even traveled to international locations to help lend his forensic expertise on a volunteer, unpaid basis.

John's last act as Sheriff was to get the Montgomery County Sheriff's Department certified as an accredited law enforcement agency. An official announcement and certification of that accomplishment is scheduled for March of this year.



Acting Sheriff Alfred J. Ricci, ?, Montgomery County DA Risa Vetri Ferman, Deanna Durante, Chris Durante Visco, and Chief of Detectives Oscar Vance unveil a plaque honoring former Montgomery County Sheriff John Durante at the Montgomery County Courthouse.

FLEISHER 000115

Exhibit 89, Page 57 of 86

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

# V I D O C Q   S O C I E T Y

## Frank Bender Receives Awards from Mayor Nutter and Philadelphia City Council

By Paul Plevakas

Frank Bender, VSM, received two awards on Oct 21, 2010. One award was from Philadelphia Mayor Michael Nutter and the other from Philadelphia City Council. The awards were presented by Margaret Davis whose daughter Jacqueline Gough, age 16, was identified through Frank's sculpture, rendered from the skull of a body found in an abandoned house.



Jacqueline Gough disappeared in 1979 from a Kensington Street Corner. Davis vowed never to move away or change her phone number, in hopes that one day her child would return.

"To be able to know where my daughter is now, after 15 years of not knowing, for him to help me close that door - he'll always have a piece of my heart," Davis said.

Davis now has her daughter's remains at home in Palmyra, where she moved after learning of her daughter's fate.

Frank Bender is presented two awards in tribute to his service
to the people of Philadelphia.

Photo by Dr. Jolie Bookspan

## Silvia Pettem Thanks the Vidocq Society for Their Award and Asks for Help With Her Next Book

"I was humbled and extremely appreciative to have been among the Medal of Honor recipients at the Oct. 24, 2010, Annual Awards Dinner. Without the support of the Vidocq Society, Boulder Jane Doe would not have been identified.

"Currently, I'm under contract with CRC Press to write **"Cold Case Research: Cracking the Historical Record"** and am looking for cold case success stories. If any of you can recommend some cases and would be willing to "introduce" me to the appropriate law-enforcement contacts, I would be most grateful. The book is for law-enforcement, and I would like to recognize some recent (and, perhaps, little-known) detectives and their work through these case stories. Of course, if they tie in with the Vidocq Society, that's an added bonus.

"I can be contacted at pettem@earthlink.net, 303-459-0193, and through my website www.silviapettem.com

"Thank you."

FLEISHER 000116

Exhibit 89, Page 58 of 86

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

# V I D O C Q   S O C I E T Y

## Michael F. Rieders, PhD, Newly Appointed to Board of the National Association of Medical Examiners (The NAME) Foundation

The National Association of Medical Examiners (The NAME) Foundation has appointed Michael F. Rieders, PhD to their board. Rieders is currently Chairman of the Board at NMS Labs and Chief Science Officer at The Forensic Mentors Institute. He is a trustee at Arcadia University, faculty member in its Masters of Forensic Science Program, and Vidocq Society member. Dr. Rieders is an advocate for, and contributor, to The NAME mission. Rieders works to bring systematic understanding of the forensic sciences to the criminal justice community.

"I was proud and honored to learn that The NAME, an organization that I have been involved with for years, has recognized my contributions to the profession and sought to have me on its Foundation Board," explained Dr. Rieders.

He added that toxicology often provides an essential piece to the Medicolegal death investigation, and he looks forward to his continued work with The NAME and The NAME Foundation.



Michael F. Rieders, PhD

John E. Pless, MD, Chairman of the Board of Directors at The NAME remarked, "The members of The NAME Foundation Board are very pleased to have a toxicologist with the stature of Dr. Rieders on our Board. I was personally honored that he was willing to serve."

As a forensic toxicologist and laboratory director, Dr. Rieders brings a new perspective to The NAME Board, as the majority of its members are medical examiners or other professionals with direct affiliations to a medical examiner's office.



---

## Solve The Mystery

*A new mystery each issue.*

Q. Is there always a full moon at Christmas for Santa to drive his sleigh in front of?

*Supersleuths, send your verdicts to Paul Plevakas, editor*

**Solution to January 2010 Solve the Mystery:**

Q. *By what physiologic descriptor do we know that all Santa's Reindeer pulling the sleigh are female?*

A. "Both male and female reindeer have antlers but male reindeer lose their antlers by December, in all apparent descriptions of the reindeer pulling Santa's sleigh the reindeer have antlers, therefore all of Santa's reindeer, including Rudolph, must be female???"
- Correct answer sent in by Bill Donovan, Detective Worcester Police Dept.

## Vidocq Society Journal

*The Vidocq Journal* © Copyright 2010
Published by The Vidocq Society,
a 501 (c) (3) nonprofit organization
Second Floor
1704 Locust Street
Philadelphia, PA 19103
Subscription $100 per year

**Commissioner**
William L. Fleisher - truthfinder@netcarrier.com

**Deputy Commissioners**
Kenneth D. Freeman
Fred A. Bornhofen - pipedriller@verizon.net

**Communications Office**
Paul D. Plevakas and Dr. Jolie Bookspan Plevakas, Editors
**Submissions** to: Vidocq Editors
editor@vidocq.org — www.vidocq.org

FLEISHER 000117

Exhibit 89, Page 59 of 86

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23



# VIDOCQ SOCIETY

# Vidocq Journal

William L. Fleisher

**EX 8**

6/27/24

*The Vidocq Society – Solving Unsolved Murders and Cold Cases*

Quarterly Journal                                    Volume Twenty Two Number Three and Four 2011

| A Moment With Frank Bender | Utah Cold Case Conference | Bookspan's Bullets: Fast Forensic Education | CBS Show Based on Vidocq Society | Vidocq Awards Banquet | Digital Forensics with Peter Stephenson, PhD |
|---|---|---|---|---|---|
| Page 1 | Page 2 | Pages 3 and 4 | Page 6 | Pages 9 and 10 | Page 11-13 |

## A Moment With Frank Bender

By Virginia M. Hill, VSM, Philadelphia Police (retired)



I met Frank in 1995, and it was such a memorable time in my life. The Police department sent me to his studio with several flyers of missing children. The Sighting television show was there taping a show about Frank. I looked on his shelf, and lo and behold, there was a sculpture of a young girl that was missing for fifteen years. I had been looking for her for some time.

After the investigation, she was identified as Jacqueline Gough. From that moment on, Frank and I had become great friends. It seemed as though we were brought together by an almost spiritual force much greater than he or I. We both became good friends with her mother Margaret Davis and her sister Lisa.

He was truly one of the most remarkable people that I have ever met, and the special gift that he possessed brought closure and blessings to many families.

I will truly miss my dear friend, and look forward to seeing him on the other side someday.

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

# V I D O C Q   S O C I E T Y

## Vidocq Members Contribute to Cold Case Conference

By Katherine M. Brown, VSM

A training team of Vidocq Society Members (VSMs) contributed their expertise to the Cold Case Conference hosted in conjunction with the Vidocq Society and the Unified Police Department of Greater Salt Lake in Salt Lake City (UPD), Utah. Det. Todd Park, VSM, UPD, was largely responsible for the conference success and did a fantastic job with local arrangements. Thanks to his careful screening of cold cases before the team's arrival, the team was able to formally review 13 cases. The training was held September 26-30, 2011 in the Salt Lake County Sherriff's Office Building.

Det. Todd Park was ably assisted onsite by Edward Gaughan, VSM, who ensured the team lectures and cold case reviews ran smoothly in his capacity as the Vidocq Training Director. Vidocq Treasurer, Mr. Zeff Lazinger, VSM, also contributed to the conference by ensuring other onsite and offsite logistics ran smoothly. In addition to the Vidocq team members, Vince Meister, Deputy District Attorney for the Salt Lake County District Attorney's Office who contributed valuable legal advice on how to move cases forward from a legal perspective. His contribution to the cases was so valuable; he was inducted into the Vidocq Society at the October meeting.

In addition to case reviews of 13 cold cases, classroom lectures were given by team members on a variety of topics which included: file organization, interviewing and interrogation, equivocal death inves-

tigation subtypes of sexual homicide, forensic entomology, child abduction murder, cold case investigation, and subsurface recovery and decomposition.

Team members contributing their time and expertise were (listed in alphabetical order):

Dr. Katherine M. Brown
Mr. Edward Gaughan
Mr. Nathan J. Gordon
Mr. John H. (Jack) Ingle, D-ABMDI
Dr. Patricia Kauffman, DMORT Commander
Mr. Vince Meister
Dr. Linda-Lou O'Connor
Det. Todd Park
Cpl. Robert S. (Steve) Stoud
Dr. Richard Walton
Mr. Richard Walter
Mr. Zeff Lazinger

Feedback from participants in the conference and case reviews was overwhelmingly positive. Park, who screened cases for presentation to the review team and contacted those who presented cases to the team after the conference for feedback, said that the detectives involved in the case reviews came away from the experience with investigative avenues to explore and felt that the case review was helpful in moving the case forward.



Click for link of Fox News story

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

# V I D O C Q   S O C I E T Y



## Bookspan's Bullets by Jolie Bookspan, MEd, PhD, FAWM, VSM

Bookspan's Bullets—dedicated to Frank Bender VSM, who first requested that I write the column, beginning in 1997. Each issue brings you summarized forensic news and education.

## 🔫 Hairs Inside Nose Help Reveal Time Of Death

The inside of everyone's nose is lined with tiny waving threadlike projections called cilia. They wave constantly while you are awake and asleep throughout your life to move mucous, dust and bacteria out of the nose to the throat.

Biagio Solarino and his colleagues at the University of Bari in Italy suspected that cilia continue to beat after death. They examine the cilia of 100 cadavers and found, "Motility (movement) was observed as long as 20 hours after death" and "seem relatively immune to environmental factors."

Current indicators of time of death, body temperature, and decomposition rate vary with temperature, if the person were involved in a struggle shortly before death, and other factors. Cilia slowing after death is claimed to follow a predictable rate. Considering this rate of slowing, forensic teams could have another tool to estimate time of death, if it were within the previous 24 hours.
- Source: New Scientist Magazine issue 2832.

## 🔫 Forensic Astronomers Solve Walt Whitman Mystery

Donald Olson, a physicist at Texas State University, examines classic art and literature that reference celestial occurrences from Chaucer's Canterbury Tales and Julius Caesar's account of his invasion of Britain, to Ansel Adams's photographs. His latest investigation is of Walt Whitman's poem, *Year of Meteors* (1859-60), published in Whitman's famous collection, *Leaves of Grass*. Whitman wrote of a comet and a procession of meteors in such detail that scholars debated it for decades.

Olsen states, "Figuring out which comet it was wasn't too hard. There were several comets seen in 1859 and 1860. One of them was called "the great comet of 1860" (also known as comet 1860III). It came out of the North without any warning and got very bright, just as Whitman describes it. The meteors were more difficult to figure out. Previous scholars had developed various theories: the 1833 Leonids, the 1858 Leonids, and the 1859 fireball (a fireball is a bright meteor moving across the sky slowly, leaving a glowing wake.) However, there was a problem with each of these guesses."

The answer involved a painting by Frederic Church, an "unusually accurate depicter of the sky." One of Church's paintings showed an "Earth-grazing meteor" - a spectacular meteor traveling horizontally through the Earth's atmosphere, fragmented into a long procession of fireballs. It can come in from space, travel though the Earth's atmosphere, then escape back to space. "As soon as I saw that, I immediately thought that it might be what Whitman was writing about. Meteor processions are rare. We only know of four of them ([one in 1913 being the most recent). Meteor processions happen when an Earth-grazer fragments early in its passage and you see multiple fireballs traveling majestically and slowly across the sky in a nearly horizontal path, from horizon to horizon. While a typical meteor may be visible from a fraction of a second to one or two seconds, a meteor procession can last for up to a minute (for a single observer).

"When I saw the painting I said, good heavens, that looks like a meteor procession! I immediately thought that it might be what Whitman was describing. The painting was called The Meteor of 1860. Well, that's the right year. So we started searching newspapers and journals, and we soon saw that the meteor came on the evening of 20 July 1860. It fit what Whitman described. It was a meteor procession with multiple fireballs, it happened at night, and it occurred at the right time of the right year. Before we were done, we had collected 300 records of observations (of the event). I think this may be the most observed, and most documented, single meteor event in history. From the Great Lakes to New England, every town that had a newspaper wrote about that meteor."

*Continued on Next Page*

FLEISHER 000187

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

# V I D O C Q    S O C I E T Y



## Bookspan's Bullets
By Dr. Jolie Bookspan, VSM

*Continued from Previous Page*

According to Olsen, as far as is known, Walt Whitman was in New York City in July of 1860, and it was likely that Frederic Church was also an eyewitness to the meteor. "So we've got one of America's greatest landscape artists, Frederic Church, watching the meteor from Catskill, and we've got one of America's greatest poets, Walt Whitman, watching the meteor from New York City. I have a big file on Walt Whitman and astronomy. He's a very rich source of descriptions of the sky."

- Source: *Sky & Telescope* magazine, July 2010, findings of Texas State physics professors Donald Olson and Russell Doescher, English professor Marilynn S. Olson and Honors Program student Ava G. Pope, coinciding with the one hundred and fiftieth anniversary of the 1860 meteor procession.

*Note from the Editors: News articles refer to this work as forensic astronomy. We would suggest reserving that term for work searching cultural artifacts to narrow dates and locations of historical crimes.*

## Software Predicts Crime

Santa Cruz California police are field-testing software that flags where crime might occur next. To help develop the software, police submitted eight years of crime reports to George Mohler, applied mathematics professor at Santa Clara University, and his colleagues. Mohler noted that some crimes follow potentially predictable patterns. They developed a statistical model to map time, location, and recurrence of crimes to help police predict crime and tailor patrols to be on scene in time to prevent crime, or at least make arrests. Mohler states that it's an emerging, national movement called predictive policing. Zach Friend, crime analyst for the Santa Cruz Police Department approached Mohler about the project after reading news reports about predictive policing.

The model flags up 10 areas, each 150 meters square, for each of three types of crime: residential burglary, auto burglary and auto theft. Each night the program is updated with new data, and calculates location probabilities for the next day. On average, the program correctly pre-dicted location and time of 25% of actual burglaries occurring on any day in an area of Los Angeles in 2004 and 2005, using only data on burglaries that had occurred before that day.

Mohler and his colleagues plan controlled experiments with the Los Angeles police department, where officers will run the prediction algorithms, but patrol only half of the locations it flags. They will then compare crime levels in the two groups. According to the project website, "A key feature of the experiment is that, because crime is dynamic, hotspot areas can change on a daily basis. Police patrols therefore must adapt to this dynamic risk."

- Sources:
  Project website: Santa Cruz Experimental Predictive Policing Software Project

  Santa Cruz Sentinel

  Journal of the American Statistical Association Self-Exciting Point Process Modeling of Crime, DOI: 10.1198/jasa.2011.ap09546

- Contact:
  George Mohler, Assistant Professor, Department of Mathematics and Computer Science at Santa Clara University.
  Phone: (408) 554-4544
  Email: gmohler@scu.edu
  Website: http://math.scu.edu/~gmohler/homepage.html

**Dr. Bookspan loves good science. Send forensic jokes, quotations, websites and stories for possible inclusion in "Bookspan's Bullets."**

**Email: Bookspan's Bullets**

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

**V I D O C Q     S O C I E T Y**

## Vidocq Member Featured on the Science Channel's "Dark Matters"

By William L. Fleisher, VSM, Commissioner

Our own Anna Dhody, VSM, Curator of the Műtter Museum, has been featured on the Science Channel's *Dark Matters* on cable TV. She is doing an outstanding job discussing things of medical curiosity. Tune in.

Website for *Dark Matters*:
http://science.discovery.com/videos/dark-matters-twisted-but-true-dark-matters-sneak-peek.html

*Dark Matters* Episode Guide:
http://science.discovery.com/tv/dark-matters/episodes/

## Vidocq Member Stars in Movie "Stray Bullet"

By Wayne Hill Sr., VSM

I have been involved as a line producer and starring character over the last year's filming of the feature length movie *Stray Bullet*. It's my second starring role and my first solely dramatic role as Pastor Gerald Richmond. I was also the stunt driver for the 50mph crash scene. We also shot a car to Swiss Cheese in the flight to safety shootout scene. Click to view Trailer: www.sbmovie.com

### Healthy Wishes

**Our thoughts to Vidocq members Bill Kelly, Bob Phillips, Donna Fontana, Joe McGillen, and others preserving privacy during their recovery, for renewed health in the coming year.**

**Your Friends and Colleagues at Vidocq Society**

## "Killer Instinct" - New TV Show by Vidocq Member

By Fred Bornhofen, VSM, Deputy Commissioner, COB

We are pleased to announce that Mark Safarik, VSM has announced his new TV show *Killer Instinct* premiered in September on NBCUniversal's new **Cloo** network. Mark has been an active member for years and is a widely known and respected former member of the FBI Behavioral Science unit. Watch for Mark's show Saturdays at 9PM ET/PT. For details, synopses, videos, discussion boards, and more about *Killer Instinct*, click:
http://www.cloo.com/series/killer_instinct/

Mark Safarik writes,
*Killer Instinct,* **Cloo's** first original programming series, consists of 13-episodes featuring many of the high profile murder cases that I worked on. I'm also the series host for the new *Dateline on Cloo*, which airs immediately after *Killer Instinct*. Many of you may have watched the **Sleuth** network; It's been re-launched with fresh programming as **Cloo**. To find the **Cloo** channel in your area, search using your zip code on the **Cloo** home page:
http://www.cloo.com/

The *Killer Instinct* promotional video is terrific. Check it out at this link:
http://video.cloo.com/cloo_promos/killer-instinct/v1346883.

If you watch the show, I would love your comments:
Mark E. Safarik MS, VSM. (FBI Ret.)
Executive Director
Forensic Behavioral Services Inc.
10908 Courthouse Rd. Suite 102255
Fredericksburg, Virginia 22408
Business 540.898.2807
msafarik@gmail.com

Last year Mr. Safarik appeared on an episode of *Criminal Mindscapes* interviewing one of New York State's most notorious serial killers, Joel Rifkin about his crimes.

FLEISHER 000189

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

# V I D O C Q   S O C I E T Y

## New CBS TV Show  - The Murder Room - Based on The Vidocq Society



William L. Fleisher, VSM, Commissioner

*Richard Walter, VSM*

### CBS is Developing a New Show
### *The Murder Room*

The story features Vidocq's founders: retired homicide detective **William Fleisher**, courageous artist **Frank Bender**, and **Richard Walter**, psychologist known as the living Sherlock Holmes.

From CBS promotional description:
"True story of a world famous profiler, forensic artist, and leading investigator for the FBI who form a team to investigate crimes that have stupefied law enforcement around the world." George Nolfi (*The Bourne Ultimatum*) will write and executive-produce.

http://www.deadline.com/tag/the-murder-room/

More News
To Come

Frank Bender, VSM

FLEISHER 000190

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

# V I D O C Q   S O C I E T Y

## Haskell Askin Farewell
By Virginia Hill, Philadelphia Police, (retired)

Doctor Haskell Askin, forensic odontologist, worked on several of my long term missing children cold cases. Haskell was a very caring man. He was never too busy to help me with a case or listen to me.

Dr. Askin helped with the case of murder victim Jacqueline Gough, missing for fifteen years. He worked on the case of Martin Michael Burkle, missing for twenty five years. We identified Burkle in 2000. We both received an award from the Vidocq Society. In 2001, box car Jane Doe was found murdered on a freight train in Bradenton Florida at the Tropicana orange juice plant. Her hands were bound, a chain wrapped around her, with a pillow case over her head. The train stopped in about sixteen or more states before ending in Bradenton Florida. Thousands of hours were spend trying to identify the female. The description was, black female about twenty four years old. She was buried in grave as Jane Doe for five years. before I identified her with Haskell's help. Dale Hinman FBI profiler was also tying to identify her. It was later determined that Jane Doe was a black female about fifteen years old. I identified her in two days and found to be one of my missing children, Lataya Reese, 15 years old, missing from Philadelphia. Murdered and placed on a train and sent to Florida. In 2002 the case was profiled at the American Academy of Forensic Science. Haskell and I traveled to Atlanta Georgia to be in attendance for Lataya.

Haskell was a good friend to me. He was very kind and giving of himself. He was very passionate about his work and his family. He worked on several cases with me. He will be greatly missed. I like to think of him and Frank on the other side talking about all the cases and smiling down on us.

Farewell my friend.

More on Dr. Askin from Philly.com:
http://articles.philly.com/2011-01-30/news/27091263_1_cold-cases-odontology-forensic-files

## Death of Kenneth D. Freeman, VSM
By William L. Fleisher, VSM, Commissioner

I am saddened to report that my dear friend of 42 years and our beloved colleague, Kenny Freeman, succumbed to his dreaded illness, 20 October, 2011. Kenny was an accomplished attorney, former Philadelphia Police officer, Assistant District Attorney and a kind, warm human being. Husband of Dolly (nee Pertosoff); father of Brett (Mindy) Freeman, Hillary (Matthew) Marcus, Lee (Lisa) Freeman; son of Alice Freeman; brother of Allen Freeman; Poppy of Brooke, Lindsey, Drew, Lyvia, Ava, and Ella. Contributions in his memory may be made to the American Heart or Cancer Assoc. Our prayers go out to his wife, Dolly, and their family. Rest in Peace, Ken. We miss you my friend.

## Death of Judge Rusty Ladd
By William L. Fleisher, VSM, Commissioner

I am saddened to report that I have been informed by Jim Dunn, VSM, of the tragic and sudden death of Judge Rusty Ladd. Judge Ladd died in a motorcycle accident in Lubbock, Texas. Judge Ladd was the prosecutor in the Scott Dunn homicide, which resulted in the conviction of two perpetrators of that heinous crime. Judge Ladd is a past recipient of the Vidocq Society Medal of Honor. He was a great prosecutor and as you will read in the following link, a respected judge and kind human being. Rest in Peace, Rusty.

http://lubbockonline.com/local-news/2011-09-30/court-of-ficials-mourn-loss-judge

## Death of Ken Lee, VSM
By David Quain, VSM

New member, Kenneth Lee, from the Philadelphia Medical Examiner's Office passed away Tuesday, 16 August, 2011. He was only 40 years old. He was a heart transplant recipient seven years ago and again last year, which his body ultimately rejected. Ken had a host of experience as a paramedic and instructor, constable, photographer, and forensic investigator. It seems he was most proud of his job as a forensic investigator and was optimistic at becoming a member of the Vidocq Society. His enthusiasm,

Continued on Next Page

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

## V I D O C Q   S O C I E T Y

## Ken Lee
Continued from Previous Page

knowledge and tenacity would have been a good fit for the organization. His very premature death is a real loss to us all. He really enjoyed the Vidocq meetings and was impressed by the work and camaraderie of the group. Thanks for making him feel so welcome for the short time he was associated with the society



## Dick Compton, VSM
By Steve Churchill, VSM

Dick Compton died at his home on Friday, 22 July, 2011. Dick was an army airborne ranger, a member of BNDD class 13. He served in Philadelphia, Quantico, and New York before he retired. He was head of the local Philadelphia AFFNA chapter. He is survived by his wife, daughter, and son who is a police officer in Pennsylvanua. Dick was an active member of the Vidocq Society.

Dick had been ill throughout the winter, and had been severely  injured by surgery. He had worked at getting better, and it is believed that he had been out in the summer heat wave to run or walk, came in and sat down and died in his favorite chair.

He was interred at George Washington Memorial Park, Stenton Avenue and Butler Pike, Plymouth Meeting, PA. Condolences may be directed to Judith Compton, Marcia Cook, and Robert Compton, 2718 Skyview Ave, Langhorne, PA 19053.

## Joseph B. McKenna, 94, Deputy Fire Commissioner
By William L. Fleisher, VSM, Commissioner

I am sad to relay the news of the death of retired Deputy Fire Commissioner Joe McKenna.  Some of you may remember Commissioner McKenna would accompany retired Philadelphia Police Commissioner Joe O'Neill, VSM, to our meetings. He was a real gentlemen and I miss seeing him.  He was quite an accomplished man.

## Elmer Palmer, First Officer on Scene at Box in the Box Case
By William L. Fleisher, VSM, Commissioner

I am sad to report the death Elmer Palmer. Elmer was a humble and kind man, who had the sad distinction of being the first Philadelphia Police Officer on the scene when the poor soul known for ever as "The Boy in the Box" was found in the Fox Chase area in February 1957. Our prayers go out to Elmer and his family. May he rest in peace!

### DUE NOW
### 2012 Member Dues

Members who have not paid their dues will be – regretfully – dropped from the rolls.

**Send your check for $100 to**
**Vidocq Society**
**1704 Locust Street 2nd Floor**
**Philadelphia, PA 19102**
**Attention: Treasurer**

If you have reached the grand age of 70 years old, and have been a member in good standing for two years, you no longer have to pay dues.

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

# Vidocq Society 2011 Awards Dinner Highlights

## 2011 Vidocq Society Medal of Honor

Detective Sergeant Randy Long, Columbus Georgia Police Department

 

Sergeant Long persevered in the face of overwhelming odds to resolve the infamous Curry Case.
The Vidocq Society is honored to recognize detective Long with the prestigious Vidocq Medal of Honor.

## 2011 Vidocq Service Medals

Joseph M. O'Kane. Charter member and Board member of the Vidocq Society, Chair of the Membership and Banquet committees.

Marcelle D. O'Kane. Co-chair of the Banquet Committee.

Dr. Zeff Lazinger. Treasurer and Board member of the Vidocq Society.

 

Joe O'Kane (r)
introduced by Commissioner Fleisher (l)

Marcella Kane (r) and her granddaughter (c) stand with Paul
Plevakas (l) Journal Editor and previous medal awardee

*Continued on Next Page*
FLEISHER 000193

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

## Vidocq Society 2011 Awards Dinner Highlights

*Continued from Previous Page*



Richard Walter (c) shares discussion with Mr. and Mrs. Nate Gordon



William L. Fleisher, (l) and General Essam Gamal Ei-Bin (r)



Nate Gordon VSM (l) and General Essam Gamal Ei-Bin (r)
Directors of the Academy for Scientific Investigative Training



String trio greets attendees



Doo-wop group Nostalgia 5 sings favorites

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

# V I D O C Q    S O C I E T Y



## Digital Forensics with Peter Stephenson, PhD

## Computer-Aided Crime Assessment



We saw last issue the role that computers can play in stalking. We showed that cyber stalking is somewhat more than simply physical stalking using a computer. This time we will explore the roles that computer analysis can play in crime assessment. There is almost no crime today that does not have a digital component. That component may involve a cell phone, computer or, most recently, a smart phone or tablet such as an iPad.

Before we begin, we should differentiate clearly between crime assessment and profiling. These are terms that often are confused, usually attributing the entire field to offender profiling. To the contrary, the field is crime assessment and profiling is one of its fruits. So, here are the appropriate definitions to get us started on the right track[2]:

> *Crime Scene Assessment:*
> *The analysis of probative evidence (physical, direct, circumstantial) by its presence or absence that meets a recognizable pattern of behavior.*

> *Offender Profile:*
> *Based upon a reflective crime scene assessment. A profile is a projected cluster of attitudinal, behavioral and identity factors of an offender.*

The digital component of a crime may be classed as Direct or Consequential. Direct events are computer-related crimes. These are sub-classed as Personal, Theft, System Attack and Terrorism. In a direct event, a computer is materially involved in the event. Cyber stalking, as we discussed in the last issue, is an example of a Personal event. The computer is material to the completion of the act of cyber stalking. It could not be accomplished without the computer.

Consequential events are those events where a computer is involved peripherally. In other words, the act could be completed without the computer but the computer plays some additional – though perhaps unnecessary – role. There are three kinds of consequential events: Supporting, Coincidental and Prologue.

A Supporting event is exactly what it sounds as if it might be: an event that plays some role in supporting the crime. A couple of examples are a fraudster who keeps a journal of his frauds in an Excel spreadsheet or a collector of child pornography who keeps his collection on his PC.

A Coincidental event is one that expands upon the physical crime. For example, a man who kills his wife may have emails to a lover on his PC. The emails are valuable evidence even though they were not required to complete the homicide.

A Prologue event is one that precedes the physical event and provides material insight into the physical event. An example of this is the man who keeps a list of things that he needs to do leading up to murdering his wife. Another example is the individual who performs Internet searches of ways to commit a particular crime such as bomb-making instructions or what types of poisons are difficult to detect.

**How to Use the Digital Components in Crime Assessment**

There are some fundamental points that are critically important when using crime assessment and profiling in the cyber world.

The first is that they build off of the crime assessment approach developed by Richard Walter, VSM. What we are doing is moving his methodology into the cyber world. It really is very little more complicated than that: a cyber implementation of the physical world discipline. That said, there are, of course, some cyber wrinkles that apply so it is not a direct application of crime assessment but, rather, an extension of the application.

Second, the computer is crime scene and it follows all of the usual rules of a physical crime scene. The victim computer – if there is a victim – is usually the primary crime scene. Other involved computers may be considered secondary. If there is no victim – victims usually only exist in Direct events – the Consequential computer is the crime scene. In both cases our objective is to perform a forensic analysis on the crime scene(s). This seems pretty straightforward. Often, though, it isn't and that's where crime assessment can help a lot.

*Continued on Next Page*

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

# V I D O C Q   S O C I E T Y

## Computer-Aided Crime Assessment

By Peter Stephenson, PhD

*Continued from Previous Page*

Why do we care, especially in Consequential events, about the digital aspects of a crime? In a Direct event the answer is obvious. The computer is integral to the crime and the victim computer actually is the crime scene. Thus, it cannot be ignored. In a Consequential event the answer is not quite so obvious.

In a Consequential event the information that we can get from the computer or cell phone may serve to corroborate our physical evidence, our theory of the crime and/or offer leads that aid the physical investigation. They might help us establish timelines of important events or provide hints – sometimes quite strong – of motive. They can show when the suspect was or was not where he or she claimed to be at a particular time or that he or she was or was not doing actions as and when claimed.

The nature of the computer as a crime scene allows us to apply Keppel/Walter's crime assessment and his notion of subtypes becomes critically important. A computer-as-crime scene can be organized or disorganized. It can show characteristics of power assertive, power reassurance, anger retaliatory or anger excitation just as a physical crime scene can. Because of the inherent ability of computer forensic tools to establish timelines, the pre-crime, crime and post-crime aspects are quite straightforward to establish within the context of the computer evidence.

Perhaps, most important, though, is the fact that it is quite difficult to alter or stage a digital crime scene such that the truth cannot be established. To be clear, it's not that this cannot be done, but for the typical computer user it is quite difficult. If we are dealing with a so-called power user all bets are off but that's a topic for a future column.

Finally, using crime assessment – make that *cyber*crime assessment – does for us exactly what physical crime assessment does with the added advantage of adding to the physical assessment. The problem is that most computer forensic analysts do not – yet – take this approach. The typical state of the practice is a rather mechanical processing of the computer using one or more computer forensic tools and a list of key words and known time lines.

While I am not suggesting that we should not do exactly that, it is very important to go beyond. The typical personal computer – not servers, which are far larger – can easily contain between 300,000 and 500,000 files depending upon the age and size of the hard drive and the use to which the computer is put. That does not include such peripheral devices as USB external drives or thumb drives.

That begs the question of where one goes within this large file system to find useful evidence. Cybercrime assessment can lead us in the right direction and can show us which rocks to look under for obscure but critically important evidence. Cybercrime assessment helps us know where to look. It helps us recognize those computer users who may be clever enough to hide data effectively. Child pornographers are adept at this practice and computer forensic analysts who work heavily on child porn cases are very good at knowing the tricks of the pedophiles.

All of the benefits of Keppel/Walter's approach are transportable to the digital world. Pointing the way in an interview/interrogation, conducting additional evidence searches, gaining a conviction in court, narrowing the list of suspects, all are benefits of the cyber assessment to the physical assessment. The cyber assessment, then, may be used in conjunction with the physical assessment.

Importantly, as Walter has insisted, the investigator must not use the computer as a shortcut to understanding how crime assessment works. There are no convenient checklists, no hard and fast rules for the investigator to memorize and no back doors to understanding. In the cyber world as in the physical world the investigator must think, understand, observe and analyze. The tools we use on the digital side are just tools. They are not substitutes for understanding and thinking through the evidence, the crime scene and characteristics of the suspects.

There is more – so much more – to this approach than we can cover in a single column. For example, what about servers, chains of multiple involved computers, networks, or malware (viruses, etc.) to name a few additional challenges? Over the next several columns we will address all of these and more.

*Continued on Next Page*

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

## V I D O C Q   S O C I E T Y

## Computer-Aided Crime Assessment

*Continued from Previous Page*

**One More Thing**

Currently we are developing active, as well as future, cyber investigative capabilities available to members at no cost on a need basis in the following areas:

- Forensic computer analysis using AccessData Forensic Tool Kit (FTK)
- Forensic mobile phone analysis using AccessData Mobile Phone Examiner + and Oxygen Forensic Suite (mobile phones, smart phones and tablets)
- Cyber investigations/investigation support
- Digital evidence analysis
- Link analysis for complex cases with i2 Analyst's Notebook link analyzer
- Malware analysis with Gargoyle malware forensic tool
- Cyber environment re-creation
- Password recovery
- Email forensic analysis
- Discovering and tracking the cyber trail and performing social network use analysis
- Review of earlier cyber forensic analysis using more current tools
- Second opinions
- Expansion of legacy cyber forensic investigations using most current approaches
- Training

[1] Richard Walter, MA, VSM – quoted directly from various slide presentations by Mr. Walter.

Peter Stephenson, PhD, CISSP, CISM, FICAF is the director of the Norwich University Center for Advanced Computing and Digital Forensics, Associate Professor - digital forensics, and Chief Information Security Officer for Norwich University.  He conducts all university investigations that have any connection to computers or the Internet, and teaches various courses in digital forensics and cyber investigation.  His PhD, from Oxford Brookes University in the UK, was one of the first in the world to be awarded based upon research in digital forensic investigation.  He has written or contributed to 16 books and hundreds of articles.

The Vidocq Society thanks Professor Peter Stephenson for his donation of a new computer projector for our meetings.

## Marcella Fierro, MD, VSM, Urges Professionalization of U.S. Coroners Office

By Fred Bornhofen, VSM, Deputy Commissioner, Chairman of the Board,  Case Manager

Earlier this year in Philadelphia, a program on the coroner's offices in the US was presented by NOVA.  In many jurisdictions, the Coroner is elected, and is a politician, not a trained medical expert.  It was mentioned that one qualification was that the candidate must have is a high school diploma.

Featured in the program was our own Marcella Fierro, MD, VSM who elegantly spoke of the need to professionalize the position.  She made an excellent case to standardize the autopsies in the US and increase the training of the practitioners.  The implication is that thousands of homicides go undetected when the autopsy is preformed by an incompetent person or not at all. Well done, Marcella.

Marcella Fierro, MD, VSM, is the Retired Chief Medical Examiner of the Commonwealth of Virginia.

## How Qualified is Your Coroner?

from PBS:

http://www.pbs.org/wgbh/pages/frontline/post-mortem/things-to-know/how-qualified-is-your-coroner.html

## Why No U.S. National Database for Morgues?

Morgues hold about 40,000 sets of unidentified remains.  Why isn't there a United States national database? A Philadelphia Inquirer article by John Sullivan takes a look at this issue.

The article begins by highlighting Donna Fontana, VSM, New Jersey State Police forensic anthropologist who started a State Police site, advancing and centralizing identification ability.

Read More:
http://www.doenetwork.org/media/news95.html

FLEISHER 000197

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

# V I D O C Q   S O C I E T Y

## Vidocq Society in Print: Books By and About Members - www.Vidocq.org/books



**Effective Interviewing and Interrogation Techniques, Third Edition,** by Nathan J. Gordon and William L. Fleisher. A practical manual providing the forensic practitioner/investigator critical insight into human behavior, enabling one to become a better interviewer, interrogator and, most importantly, an expert detector of truthful and deceptive behavior. Gordon and Fleisher have created a one-stop guide to mastering the art of credibility assessment during an interview, with successfully tested techniques for obtaining a confession from guilty suspects. Forensic practitioners, law enforcement, the intelligence community, the private security sector, attorneys, and forensic and criminal justice students will all find this volume a valuable resource.

• The only book to address FAINT, IIT, and MITT in one source
• Enables the interviewer to obtain a confession that can stand up in court
• Includes an online workbook with practical exercises to assist the reader

The third edition expands chapters on torture, assessing the interview, statement analysis, MITT, and interrogation. It contains new chapters on passenger screening, and report writing, along with new case studies. Also covered are ways to maximize the collection of information from a prospective employee, and legal considerations. The Forensic Assessment Interview Technique (FAINT) and the Integrated Interrogation Technique (IIT) were developed at the Academy for Scientific Investigative Training and are used by forensic practitioners and investigators to detect truthful or deceptive behavior. FAINT is applicable to all forensic type interviews and incorporates the assessment of nonverbal behavior, projective analysis of unwitting verbal cues, statement analysis and the Morgan Interview Thematic Technique (MITT). This volume teaches how to combine, apply and quantify these techniques to reach a numerical conclusion to the truthfulness of the interviewee. Order here in hardcover and Kindle.



**Cold Case Homicides: Practical Investigative Techniques** by Richard H. Walton, EdD, VSM, provides effective and accessible information to those responsible for investigating and resolving previously examined, but still unsolved, cold case homicides.

The book merges theory with practice through use of case histories, photographs, illustrations, and checklists that convey essential, fundamental concepts, while providing a strong, practical basis for the investigative process. It combines proven techniques from forensics, psychology, and criminal investigation, and focuses on technologies that may not have been available at the time of the crime.

This guide defines the characteristics of a cold case homicide; details various investigative methods used by law enforcement agencies; explores the actual experiences of detectives in reopening case files; and presents current technologies such as ViCAP, HITS, and TracKRS used in the identification of cases related to the reopened case, or its perpetrator. It also highlights technological changes that contribute to law enforcement's abilities to solve cold case homicides, such as computerized print technology, the specificity of DNA, and the expanding data banks that enable the linkage of previously unknown suspects to the crimes they committed. Available for order in hardcover and Kindle.

**Submit Your Books for Listing in the Vidocq Journal**

**Include:**

➡**Graphic of Cover**

➡**Synopsis**

➡**Author's Biography**

Email Dr.Bookspan, Science Editor

*Continued on Next Page*

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

# V I D O C Q   S O C I E T Y

## Vidocq Society in Print: Books By and About Members
*Continued from Previous Page*



**The Murder Room.** Michael Capuzzo introduces the founders of the Vidocq Society, talented courageous sculptor Frank Bender, Commissioner William Fleisher, and criminal profiler Richard Walter. Learn what inspired them to help solve cold case murders. Click to order in Print, Kindle Edition and Audio Versions.

**The Girl With The Crooked Nose** by Ted Botha. Tells of Frank Bender's work as a forensic artist and founding member of the Vidocq Society, to bring attention and resolution to hundreds of neglected murders of women near Ciudad Juarez, Mexico. From this work, Frank and his daughter Vanessa have donated time and talents to



assist the *Ni Una Mas* project (Not One More). Click to order The Girl With The Crooked Nose.



In **Trail of Blood**, The Vidocq Society helps solve the murder of 24 year old Scott Dunn. Scott's parents never gave up when his killers left no body, no weapon, only blood, so much blood. "When Jim Dunn got the heart stopping call every parent dreads: "Your son has disappeared" on a Sunday night, it set into motion a six year nightmarish odyssey of desperate searches. Dunn turned to Richard Walter of the Vidocq Society, forensic pathologist and criminal profiler, who consulted Scotland Yard, studied DNA evidence and blood spatter patterns, and then pointed out who he deduced killed Scott Dunn, and why." Click to order Trail of Blood.



**Deadly Betrayal: The CBS Murders** is based on an actual major, high-profile investigation, told from the inside by FBI man Don Richards, VSM.

"An undercover agent is killed in a Chinese Tong gang-war and FBI Supervisor Dan Robertson can't prove the operation was authorized. He is set up as the scapegoat, and told to involve himself in a safe white collar fraud case until things get sorted out. But that case is far more sinister, and soon Robertson finds himself partnered with NYPD Detective Richie LeBeau in a complex multiple murder investigation which might connect to the Tong. Overcoming personal clashes, inherent distrust, agency rivalry, and leaks to the media, they use every crime-solving and forensic technique to identify the killer, and build their case. When sharp legal maneuvering threatens to dismantle their work and free the killer, they must find a way to resurrect the case and bring justice to a terrible crime." Click to order Deadly Betrayal.

In **Someone's Daughter,** historian Silvia Pettem tells of a young woman, known only as "Jane Doe," found murdered in 1954 in Colorado. Pettem spurred the Vidocq Society and Boulder County Sheriff's Detective Steve Ainsworth to find the woman's name and killer. Several Vidocq members selflessly volunteered resources and time: Dr. Richard Froede and Frank Bender did skull and facial reconstructions. Dr. Walter Birkby, Dr. Robert Goldberg, and Dr. Terry Melton worked



on DNA. Fred Bornhofen coordinated. Many others contributed. In October 2009, DNA comparison with a surviving sister confirmed Jane Doe's identity as Dorothy Gay Howard, an 18-year-old missing from Phoenix, Arizona. Click to order Someone's Daughter.

*Continued on Next Page*

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

**V I D O C Q    S O C I E T Y**

## Vidocq Society in Print: Books By and About Members
*Continued from Previous Page*



**Investigating Religious Terrorism and Ritualistic Crimes** by Dawn Perlmutter, VSM, director of Symbol & Ritual Intelligence, is the first complete resource to assist in crime scene identification, criminal investigation, and prosecution of religious terrorism and occult crime. It analyzes occult and religious terrorist practices from each group's theological perspective to help you understand traditional and contemporary occult groups and domestic and international terrorist religions, demarcate legal religious practice from criminal activity, and acquire techniques specific to occult and terrorist religion crime scene investigation. Click here to order in hardcover and Kindle.



**I Have Lived in the Monster: Inside the Minds of the World's Most Notorious Serial Killers** by Robert K. Ressler and Tom Shachtman. Agent Ressler, who coined the term "serial killer" in the 1970s, recounts his years since leaving the FBI, working as an independent criminal profiler on some of the most famous serial murder cases of our day. Piecing clues from crime scenes, along with killing patterns and methods, Ressler explains his role assisting investigations of such perplexing international cases as England's Wimbledon Common killing, the ABC Murders in South Africa, and the deadly gassing of Japan's subway. We're also witness to Ressler's fascinating, in-depth interviews with John Wayne Gacy, plus a shockingly candid discussion with "cannibal killer" Jeffrey Dahmer. Click here to order.



**Investigating Computer-Related Crime, Second Edition** (2004) by Peter Stephenson with NEW Third edition coming soon. Written by an information security specialist, this second edition of Investigating Computer-Related Crime discusses cybercrime, its investigation, and the difficulties encountered by both public law enforcement officials and private corporate investigators. The book offers insights into collecting evidence, interrogating suspects and witnesses, handling crime in progress, as well as issues involving the authorities, and helpful case studies. Updated chapters incorporate new kinds of attacks, current work of the Digital Forensic Research Workshop and their investigative model, new operating systems, the impact of the Patriot Act, and new ways of analyzing computer media. 448 pages.

Order here in hardcover edition and here for Kindle electronic version.



**Sexual Homicide: Patterns and Motives** by John E. Douglas, Ann W. Burgess, & Robert K. Ressler. This authoritative book represents the data, findings, and implications of a long-term F.B.I.-sponsored study of serial sex killers. Specially trained F.B.I. agents examined thirty-six convicted, incarcerated sexual murderers to build a valuable new bank of information which reveals the world of the serial sexual killer. Data was obtained from official psychiatric and criminal records, court transcripts, and prison reports, and from extensive interviews with the offenders. Detailed information is included on the F.B.I.'s Violent Criminal Apprehension Program (VICAP) along with a sample VICAP Crime Analysis Report Form. Attention is given to child/adolescent formative events, societal perceptions & pressures which may be motivational to sexual killers who exhibit aberrant thought patterns, deviant behavior, and aggression linked to sexual expressivity. 234 pages. Click to order in Kindle, paperback and hardcover.

*Continued on Next Page*

FLEISHER 000200

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

# V I D O C Q   S O C I E T Y

## Vidocq Society in Print: Books By and About Members

*Continued from Previous Page*



**The Unknown Darkness: Profiling the Predators Among Us** by Gregg McCrary. McCrary's 25 years in the Bureau have yielded over 1000 cases to draw upon. The 10 he describes in the book reveal the strengths and pitfalls of modern criminal investigation, including the siege of the Branch Davidian compound in Waco, the Buddhist Temple Massacre in Phoenix, Arizona, the search for the Scarborough Rapist (who eventually became a serial murderer), the prosecution of Jack Unterweger (an international serial killer who committed murders in Czechoslavakia, Austria and Los Angeles), the Sam Sheppard murder case and others. McCrary answers what happens at the crime scene, what kind of person does it take to grapple with the serial killers among us, and exactly how do we disarm the enemy. 400 pages. Click here to order in hardcover or paperback.



**Cold Cases: An Evaluation Model with Follow-up Strategies for Investigators (Advances in Police Theory** and Practice) by James M. Adcock and Sarah L. Stein, begins with a historical perspective on how cases get to the point where it appears all investigative leads have been exhausted, and includes a chapter on understanding the process of homicide and those who kill. Next, the authors explain the evaluation model, theories of the crime, evidentiary issues and concerns, informational and behavioral aspects relative to the crime and the participants in the crime, and documents investigative strategies for future efforts on the case. The third section discusses the investigation, questions investigators must ask, choice of interview/interrogation techniques based on the behavioral aspects involved, and how the growth in technology since the date of the incident might provide new opportunities to uncover clues. Finally, the authors suggest how investigators can maximize their efforts and obtain not just an arrest, but a conviction. Appendices include sample standard operating procedures from three different agencies to use as a guide for setting up a cold case unit and a list of additional resources a department may look to for assistance. 264 pages. Click to order.



**Healthy Martial Arts** by Jolie Bookspan, Med, PhD, FAWM is for all in law enforcement, military, athletes, and those who need to be in top shape and prevent injuries for work and life. Covers training techniques for all athletes, strength, abdominal training that transfers to Spec Ops (train like you fight), nutrition, flexibility, performance enhancement drugs and foods, soreness, injuries, breathing, spirit, speed, balance, joint stability, back, neck, and knee pain prevention, handling stress, making training and daily life healthy, brain power & mental exercise, wheelchair athletes, more. Dr. Bookspan is a sports medicine specialist, military scientist, 4th degree Black Belt, 2009 Master Instructor of the Year, and former full contact fighter inducted into the International Black Belt Hall of Fame. *Healthy Martial Arts* won Reader's Choice Award of the International EUSA Martial Arts Association. Approx 200 photos. 228 pages. Click for secure ebook download with color photographs, and 8"x11" print edition with black & white photos.



**Diving Physiology in Plain English** by Dr. Jolie Bookspan, former research physiologist for the U.S. Navy, inducted into the NAUI SCUBA instructor Hall of Honor. For divers, search and rescue teams, training departments. Clear information to understand (not memorize) physiology and medicine, and apply all to safer decompression, thermal, equipment, gas mixing, fitness to dive, rescue, and other protocols. Order from the Hyperbaric Society publisher, retail stores, or the author through website: www.DrBookspan.com/books.

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

# V I D O C Q   S O C I E T Y

## 2012 Meetings at Union League



In 2011, we moved our meetings from the Downtown Club to the historic Union League at 140 S. Broad Street, Philadelphia, PA, http://www.unionleague.org/

Meeting dates are the third Thursday of each month.

The Union League has a dress code; Business attire is required for both men and women—jackets and no jeans.

Cost for the luncheon meeting is $35.00 per person.

It is imperative that you RSVP to Gloria at Vidocq, **215-545-1450**, by close of business on the Mondays before the scheduled meetings, as there will be a tight head count.

Case Manager Fred Bornhofen is lining up great cases for 2012. We expect big turnouts at our new venue.

Parking is available at a reduced rate, courtesy of Ryan Shapiro, VSM, in the garage on Sansom Street opposite the Union League entrance, between Broad and 15th Street. Get your parking validation at the meeting.

### Schedule for 2012
### Please Mark Your Calendars

January 19, 2012

February 16, 2012

March 15, 2012

April 19, 2012

May 17, 2012

June 21, 2012

July and August 2012 (No Meeting)

September 20, 2012

October 18, 2012

Awards Banquet date to be announced

November 15, 2012

December 2012 (No Meeting)

FLEISHER 000202

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

# V I D O C Q   S O C I E T Y

## The Vidocq Society



"The Vidocq Society is a Nonprofit, 501c(3) corporation, which, by the terms of its charter, is a fraternal organization comprising professionals and non-professionals who meet in a social setting to discuss unsolved crimes. Our work is pro bono and we do not consider every case presented to us. Our sole purpose is to act as a catalyst and provide guidance to law enforcement agencies to assist them in solving these crimes. Opinions offered by our members are personal opinions offered in the spirit of cooperation and goodwill, based only upon the facts presented, and should not be considered formal or legally binding opinions of the Vidocq Society."

## Get In Shape
## Shotokan Karate
### Novice to Black Belt

Small class, personal attention. Fitness, katas, skills, injury prevention, self defense.
Mondays:
8:00 pm – 9:30 pm
Thursdays:
7:30 pm – 9:00 pm
2nd Floor
2100 Chestnut Street
Phila., PA 19103
Entrance on 21st Street

Taught by:
Paul Plevakas, Karate Sensei
3rd Degree Black belt
Black Belt Hall of Fame
Telephone: (215) 778-2634
Email: Paul@PaulPlevakas.com
Website: www.PaulPlevakas.com

## Solve The Mystery
*A new mystery each issue*

Q. What was Al Capone's stated occupation on his business card?

*Supersleuths, send your verdicts to*
*Dr. Bookspan, science editor*

**Solution to Last Solve the Mystery:**
Q. What are SanPaku Eyes (*sanpakugan*) and what is the claim how they relate to death and murder?
A. SanPaku literally means three whites (of the eye) — when the white of the eye, not normally seen above the iris (yang sanpaku) or below (yin sanpaku) is visible (to others) when gazing straight forward. Unsubstantiated claims are made of associated mental or physical abnormalities. Celebrity sanpaku: Marilyn Monroe, John F. Kennedy, James Dean, Natalie Wood, Sylvester Stallone, and others.

## Vidocq Society Journal

*The Vidocq Journal* © Copyright 2011
Published by The Vidocq Society,
a 501 (c) (3) nonprofit organization
Second Floor  1704 Locust Street   Philadelphia, PA 19103
Voice: 215-545-1450 — Fax: 215-545-1773 —   www.vidocq.org
Subscription $100 per year

**Commissioner**
William L. Fleisher

**Deputy Commissioner**
Fred A. Bornhofen

**Communications**
Ed Tenuto

**Journal**
Paul D.  and Jolie Plevakas, Editors
Submissions for Journal consideration may be sent via e-mail with web-resized photos to:
Vidocq Editors

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

The Vidocq Society

An all volunteer group dedicated to solving cold cases

By William L. Fleisher

Eugéne François Vidocq (1775-1857) was a real life police detective who practiced his craft in early 19th century France.  He founded and designed the the "Sûreté, forerunner to France's national investigative service, the Police Judicaíre.  An organization so ahead of its time, the when Sir Robert Peel was tasked to create a police force in London at Scotland Yard, he modeled it after Vidocq's Surete.  Vidocq's use of innovative investigative methods and his successes made him one of the world's most famous people.  Recently, a new work of fiction on Vidocq, The Black Tower by Louis Bayard was released.

In early 1990 on a federal holiday, I met with two other forensic experts for a quick lunch. As is often the case when "cops" get together, it did not take long for the conversation to turn crime, solved and unsolved.  That day our discussion became so intellectually stimulating, our "quick" lunch continued for hours.  As we finished up, we decided that we would form a group of "crime" professionals – active and retired - to meet over a fine lunch to try to solve unsolved cases.  The idea sounded like it would turn out to be a lot of fun to try this.  I left there thinking that, who knows, maybe would we will get this off the ground and even solve some old cases.

That meeting was the beginning of the Vidocq Society, which I had suggestd we name after the great French Detective.  Our group has been busily engaged in discussing and sometimes solving cold cases over monthly lunches ever since.

William L. Fleisher

EX 12

6/27/24

FLEISHER 000014

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

The Vidocq Society draws its members are from all walks of life, residing all over the United States, Europe and the Far East.  The Society counts among its members many prominent investigators from various law enforcement agencies and the private sector; internationally renown forensic experts in the fields of pathology, criminology, dactylography, forensic dentistry, psychology, polygraphy and anthropological facial reconstruction; the District Attorney of Philadelphia, several practicing attorneys, including a former Temple University law professor and several former and present federal and local prosecutors.  The Society as well, includes as members other individuals who have demonstrated an interest in solving crimes and mysteries.

The Society offers our "pro bono" advice to any law enforcement agency, which has a particularly difficult unsolved case on its hands.  Because of a demonstrable need, over the years the Society has been providing free "cold case" homicide seminars for law enforcement investigations around the country.  Every year at our annual black tie dinner, the Society has present medals to individuals who have achieved something remarkable in the art of investigation.

At our monthly meetings at the prestigious Downtown Club in Philadelphia, a presenter, not necessarily a Vidocq Society member, serves up to the group facts and evidence concerning a particular unsolved homicide.  This presenter may be an active law enforcement officer or a former one.  (The editor himself once presented an unsolved murder case which took place in Wisconsin.)  The presentation begins just as dessert and coffee is being served, and the attendees have settled down to better absorb the case facts over a calming cup of Java.  During the presentation Society members ask clarifying questions or offer suggestions based on their respective expertise.  Almost always do the presenters come away with new avenues of inquiry

FLEISHER 000015

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

and leads.  It is not uncommon for the case presenters to have just received a fourteen year old murder with crime scene evidence, witnesses gone or deceased.  Many come from small departments with little investigative resources.  We all know that it is crucial to solve a homicide that it be done in the "First 48(hours)."  After that, it becomes exponentially more difficult to solve these crimes.

What we in the Vidocq Society try to do is to offer the investigator a fresh look at the case and to act as a catalyst between the police, prosecutors and the family, to get something going.  Some of the insight we offer to the detectives come in the forms of member's questions.  For example: "Have you checked the ligature for the 'doer's' nucleic skin cells?"  "Do you still have access to the suspect's truck; even if it's in a junk yard it can be re-processed for the victims DNA?"  "Do you still have those polygraph charts, which allegedly cleared the husband?"

Most of our work is conducted in the eloquently appointed Grill Room of the Down Club's wood paneled walls and chandeliered dining tables.  Some of our assistance comes off site.  Through questions such as these, over the years the Society has significantly contributed to the solving of numerous unsolved homicides around the country.   Let me tell you about just a few of them.

The Scott Dunn case was first brought to the Vidocq Society in 1992, by his father, James Dunn.  Scott Dunn had gone missing in Lubbock, Texas, where he was last seen alive on May 16, 1991.  The Lubbock Police Department had been called in and a cursory search of the apartment he shared with his girlfriend Leisha Hamilton, the found no evidence of foul play. nature other Mr. Dunn was convinced that Scott met foul play and was possibly murdered in the apartment.  He based this on Hamilton's cold unconcerned demeanor and that when inspecting

FLEISHER 000016

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

the apartment the police found, hidden by a sofa, a piece of carpet had been cut out and crudely replaced.  He pushed the police, who went back there and conducted a Luminol (a chemical spray which  reveals blood evidence  under special lighting) examination of the apartment.  They found the presence of blood, but the prosecutor insisted that this was only evidence that there may have been a fight there.  Since no body had been found, in his view this was just a missing person case.   Assistance by the Vidocq Society helped focus on Hamilton and her new boy friend as the prime suspects.  One of the problems with the case was that no body had been found; no body, no homicide.  Vidocqian Frank Friel, a former homicide commander, suggested that if the size of the carpet which had been removed was large enough, an expert could testify that much blood would be inconsistent with life and that would establish the corpus delcti.  Expert assistance from the Vidocq was able to establish that the amount of blood on the missing carpet was of such a large amount to be "inconsistent with life."  Continuing investigation by Richard Walter and Lubbock Texas detective Tal English resulted in a grand jury indictment in November 1996 of Alicia Hamilton and Ken Smith.  Richard Walter played a major role in the solution.  On May 15, 1997, Leisha Hamilton was convicted of murder and sentenced to 20 years in prison.  In June 1998, co-defendant Timothy James Smith was tried and convicted of a lesser charge and sentenced to 5 to 10 years probation.

On November 30, 1984, Deborah Wilson, a student at Drexel University, Philadelphia, was found strangled in a stair well outside a computer lab at the University.  In April of 1992, Philadelphia Police Homicide Division Sergeant Robert Snyder along with retired FBI agent Andrew Sloane presented the case at a Vidocq Society luncheon.  Sgt. Snyder advised the department had a suspect at the time, a Drexel University security guard, but no evidence was developed and he was no longer a suspect.  Richard Walter provided a psychological profile of

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

the suspect that pointed to the security guard and Dr. Halbert Fillinger suggested that the ligature might have cells enough for DNA testing. It was also suggested by other Vidocqians that the main suspect, an ex-security guard's, girlfriend/wife should be interviewed and due to the missing victim's shoes, she should be queried about any foot fetishes. As the suspect was now in the military, it was suggested that his military records should be checked with Army CID for any complaints against him by women. After the meeting, Sgt. Snyder ran with the leads. The police found there had been complaints by women in the suspect's personnel file and his ex-wife told the detective her husband kept a collection of women's sneakers.

In February 1984, Terry Brooks, the assistant manager of the Roy Rogers Restaurant at Fairless Hills, Pa., was to have closed the restaurant on a Friday night. The next morning Brooks was found dead in the restaurant's kitchen. She was brutally stabbed, beaten, strangled and asphyxiated. After fourteen years no suspect had been identified. Detective sergeant Win Cloud, of the Falls Township Police Department presented the facts of the case to the Vidocq Society at one of our monthly meetings. Sgt. Cloud related to the assembled Vidocqians that the department had many suspects, but no evidence connecting anyone to the crime. The safe was found open and Brooks still had her coat on when found. There was not much money in the safe. Several significant suggestions were offered by the assembled Vidocians and member Edward Gaughan was assigned to further assist Sgt. Cloud on the matter. Richard Walter profiled the perpetrator. Subsequently, they indentified and located a previously unknown boy friend of Brooks. A trash run on the boyfriend's residence developed DNA from a cigarette butt. The boyfriend's DNA matched that of DNA collected from the fingernail scrapings taken from the victim. The boyfriend was picked up by the police and was polygraphed by Vidocq's polygraph

FLEISHER 000018

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

experts Nate Gordon and Bill Fleisher.  After failing the examination, the boyfriend then confessed to the police, was convicted and sentenced to life in prison without parole.

In 2004, Detectives from the Hudson Wisconsin Police Department came to Philadelphia to present before the assembled Vidocqians the puzzling 2002 double homicide of funeral director, Dan O'Donnell and his 22-year-old young intern in the funeral home.  No suspects were identified at the meeting, but Richard Walter later travelled to Hudson to review the case file and assist in profiling the killer or killers.  After reviewing the case file, Walter suggested that the detectives interview a priest who showed up at the home while the police were still at the crime scene.  Walter felt something about the priest's demeanor and subsequent interview was suspicious.  Walter and the detectives re-interviewed he priest, who had been transferred to another parish one-hour away after the murders.  They came away after the interview believing the priest knew more about the crime than he should.   The Hudson detectives now focused on the priest and developed significant information that implicated him in the murders.  Just a few days after the last interview, the priest hung himself and it was learned that he had previously told a church deacon that he committed the crime.  The deacon at the time did not come forward with the information until after the priest died.  The St. Croix District Attorney later had a "John Doe Hearing" on the matter and the sitting judge ruled that the dead priest was most likely the killer of the two victims and the homicide case was exceptionally cleared.

Vidocq Society members pride ourselves in the fact that we are much more than a group of individuals who enjoy discussing murder and mayhem; we are a society of professionals dedicated to serving ourr fellow man by discovering the truth about unsolved crimes.  The Society is not in competition with law enforcement agencies; but we share a common goal –

FLEISHER 000019

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

justice and the search for the truth.  In fact, the Society motto is "Veritas Veritatum"; "Truth begets Truth."  All of this, the Vidocq Society does in the tradition of the world's first great detective, Eugéne François Vidocq.

Insert:

Eugéne François Vidocq was born in 1775, in the French town of Arras, the son of a successful baker.  He was a precocious child who had a mischievous nature and he was often in trouble with his parents and neighbors.  As a young teenager, he ran off in the company of a young woman.  Young Vidocq took up with a group of petty thieves and con men.  Later, Vidocq enlisted in the French army, where he was highly decorated for bravery in battle.  However, after serving many years he deserted.  During the the French Revolution and "Reign of Terror," eventually Vidocq, enlisted in the Revolutionary Army.  Because of his previous military experience, he was made an officer.  But, disillusioned with the revolution, he deserted.

To survive he became a master of disguises and false identity.  He was arrested for fighting over a woman and sentenced to three months confinement.  Due to other charges, his sentence was extended to three years.  He escaped from jail several times and while a fugitive he offered his services as an informant to M. Henrí head of the Criminal Division of the Prefect of the Paris Police.  M. Henrí was interested in solving and agreed to  the offer.  To solve a murder, he sent Vidocq back inside a notorious prison, where he secured the evidence against a suspect in that horrible crime who was imprisoned for an unrelated offense.  Vidocq obtained the evidence to solve the crime.

CONFIDENTIAL AND SUBJECT TO STIPULATED PROTECTIVE ORDER, ENTERED ON 8/2/23

Vidocq was released from prison, joined the police force and in 1812, established an investigative unit for the Paris Police, French Brigade de la Sûreté, commonly known as the "Sûreté".  He made criminal investigation the business of the police.  He died in 1857.



FLEISHER 000021