IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

NICHOLAS JAMES MCGUFFIN, as          )
an individual and as guardian         )
ad litem, on behalf of S.M., a        )
minor,                                )
                                      )
          Plaintiffs,                 )
                                      )
   v.                                 ) No. 6:20-cv-01163-MK
                                      )
MARK DANNELS, PAT DOWNING,            )
SUSAN HORMANN, MARY KRINGS,           )
KRIS KARCHER, SHELLY MCINNES,         )
RAYMOND MCNEELY, KIP OSWALD,          )
MICHAEL REAVES, JOHN RIDDLE,          )
SEAN SANBORN, ERIC                    )
SCHWENNINGER, RICHARD WALTER,         )
CHRIS WEBLEY, ANTHONY WETMORE,        )
KATHY WILCOX, CRAIG ZANNI,            )
DAVID ZAVALA, JOEL D. SHAPIRO         )
AS ADMINISTRATOR OF THE ESTATE        )
OF DAVID E. HALL, VIDOCQ              )
SOCIETY, CITY OF COQUILLE,            )
CITY OF COOS BAY, and COOS            )
COUNTY,                               )
                                      )
          Defendants                  )
                                      )

REMOTE DEPOSITION OF RICHARD WALTER

Taken on behalf of the Plaintiffs

June 30, 2022

```
 1            BE IT REMEMBERED THAT, pursuant to the

 2   Oregon Rules of Civil Procedure, the deposition of

 3   RICHARD WALTER was taken by Aaron M. Thomas,

 4   Certified Shorthand Reporter and Registered

 5   Professional Reporter for Oregon, on June 30, 2022,

 6   commencing at the hour of 8:03 a.m., via Zoom.

 7

 8                       APPEARANCES:

 9

10   MALONEY LAUERSDORF REINER PC
     Counsel for Plaintiffs
11   1111 East Burnside Street, Suite 300
     Portland, OR 97214
12   acl@mlrlegalteam.com
     jpuracal@forensicjusticeproject.org
13       By MR. ANDREW C. LAUERSDORF
            MS. JANIS C. PURACAL
14

15   LAW OFFICE OF ROBERT E. FRANZ, JR.
     Counsel for Defendants: City of Coquille, City of
16   Coos Bay, Coos County, Craig Zanni, Chris Webley,
     Eric Schwenninger, Sean Sanborn, Ray McNeely,
17   Kris Karcher, Pat Downing, Mark Dannels, Kip Oswald,
     Michael Reaves, David Zavala, Anthony Wetmore,
18   Shelly McInnes
     PO Box 62
19   Springfield, Oregon 97477
     rfranz@franzlaw.comcastbiz.net
20   BY: MR. ROBERT E. FRANZ, JR.

21   OREGON DEPARTMENT OF JUSTICE
     Counsel for Defendants: Oregon State Police, John
22   Riddle, Susan Hormann, Mary Krings, Kathy Wilcox
     100 SW Market Street
23   Portland, OR 97201
     jesse.b.davis@doj.state.or.us
24   BY: MR. JESSE B. DAVIS

25   /////
```

Page 2

```
 1            BE IT REMEMBERED THAT, pursuant to the

 2   Oregon Rules of Civil Procedure, the deposition of

 3   RICHARD WALTER was taken by Aaron M. Thomas,

 4   Certified Shorthand Reporter and Registered

 5   Professional Reporter for Oregon, on June 30, 2022,

 6   commencing at the hour of 8:03 a.m., via Zoom.

 7

 8                       APPEARANCES:

 9

10   MALONEY LAUERSDORF REINER PC
     Counsel for Plaintiffs
11   1111 East Burnside Street, Suite 300
     Portland, OR 97214
12   acl@mlrlegalteam.com
     jpuracal@forensicjusticeproject.org
13       By MR. ANDREW C. LAUERSDORF
            MS. JANIS C. PURACAL
14

15   LAW OFFICE OF ROBERT E. FRANZ, JR.
     Counsel for Defendants: City of Coquille, City of
16   Coos Bay, Coos County, Craig Zanni, Chris Webley,
     Eric Schwenninger, Sean Sanborn, Ray McNeely,
17   Kris Karcher, Pat Downing, Mark Dannels, Kip Oswald,
     Michael Reaves, David Zavala, Anthony Wetmore,
18   Shelly McInnes
     PO Box 62
19   Springfield, Oregon 97477
     rfranz@franzlaw.comcastbiz.net
20   BY: MR. ROBERT E. FRANZ, JR.

21   OREGON DEPARTMENT OF JUSTICE
     Counsel for Defendants: Oregon State Police, John
22   Riddle, Susan Hormann, Mary Krings, Kathy Wilcox
     100 SW Market Street
23   Portland, OR 97201
     jesse.b.davis@doj.state.or.us
24   BY: MR. JESSE B. DAVIS

25   /////
```

```
                                                              Page 3
 1                          --oOo--

 2   WOOD SMITH HENNING & BERMAN LLP
     Counsel for Defendants: Vidocq Society and Richard
 3   Walter
     12755 Southwest 69th Avenue
 4   Suite 100
     Portland, Oregon 97223
 5   kschaffer@wshblaw.com
     BY: KARIN L. SCHAFFER
 6

 7   ALSO PRESENT:  Mr. Nicholas J. McGuffin

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  EXAMINATION INDEX
 2                                                   Page
 3       EXAMINATION BY MR. LAUERSDORF                 6
 4                       * * *
 5                    EXHIBIT INDEX
 6       No.         Item                            Page
 7        1          "About the Vidocq Society"      173
 8                   website printout
 9        2          Article titled "Cold Case       238
10                   Squad:  Modern-Day 'Sherlock
11                   Holmes' Team Takes on Oregon
12                   Slaying," dated August 11,
13                   2010
14        3          Article titled "Murder on the   244
15                   Menu" dated November 19, 2012
16        4          PowerPoint presentation:        250
17                   "Homicidal Death of Leah
18                   Nicole Freeman"
19        5          Statement Analysis, Leah        260
20                   Freeman, An Analysis by Mark
21                   McClish, dated September 23,
22                   2011
23        6          Synopsis of Vidocq Society      270
24                   Cases, 207.  The Murder of
25                   Leah Freeman, 2000
```

```
 1                        --oOo--

 2                        * * *

 3                  REQUEST BY COUNSEL

 4                                                  Page

 5    REQUEST FOR PRODUCTION                        153

 6    REQUEST FOR PRODUCTION                        169

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 6

1                RICHARD WALTER
2    having first been sworn by the Certified Shorthand Reporter,
3    testified under oath as follows:
4
5    EXAMINATION BY MR. LAUERSDORF:
6         Q.   Okay.  So I'll introduce myself first.  My
7    name is Andy Lauersdorf appearing on behalf of the
8    plaintiff, Mr. McGuffin, and the initials that I
9    can't recall off the top of my head right now, but
10   appearing on behalf of plaintiff.
11            Ms. Schaffer, if you want to introduce
12   yourself.
13            MS. SCHAFFER:  Yes, Karin Schaffer,
14   counsel for Defendant Vidocq Society and Richard
15   Walter.
16            MR. LAUERSDORF:  Mr. Franz?
17            MR. FRANZ:  Yeah, I'll just be listening
18   in.  Robert Franz, attorney for the municipal
19   defendants and police officers.
20            MR. LAUERSDORF:  Mr. Davis?
21            MR. DAVIS:  Attorney for the state
22   defendants.
23            MR. LAUERSDORF:  And then Ms. Rockett?
24            MS. ROCKETT:  Yes, I'm with Vidocq Society
25   and Richard Walter as well and just listening in.

1    A.   Yeah, because Bill -- Bill had some health
2  issues and whatever else and felt it was time that
3  he step aside, so he then accepted sort of an
4  emeritus status and Howard -- not Howard, but Ben
5  then took over.
6    Q.   Okay.  What does the deputy commissioner
7  and chairman of the board do?  What's his role?
8    A.   Follow up.  Bill was a strong leader, so
9  generally the deputy commissioner was in league with
10 the commissioner.
11   Q.   Then in 2007, was there a deputy
12 commissioner and case manager?
13   A.   Yes.
14   Q.   Who would that have been?
15   A.   That was Fred Bornhofen, who's now dead.
16   Q.   He was somebody that you mentioned
17 earlier.
18        Is that right?
19   A.   Right.
20   Q.   And what was the role of the case manager
21 at Vidocq in 2010?
22   A.   Departments would contact him to see if
23 they could present at Vidocq and he would then
24 review and then contact them if they were approved
25 and then he'd arrange for them to be at a meeting.

1  Vidocq then would pay for their flight of two
2  detectives to Philadelphia, they would water, house
3  and feed them, and then they would present a
4  presentation to the Vidocq Society, and then, as we
5  discussed before, sometimes I would take them -- not
6  always, but take them with others including Lebofsky
7  would go along at night, take them out to dinner and
8  have a discussion of the case that they had
9  presented and then they would go home.
10      Q.   What were the -- in 2010, what were the
11  annual dues for the Vidocq Society?
12      A.   I don't recall off the top of my head at
13  the moment.
14      Q.   But the annual dues were enough to bring
15  people in, pay for their flights?
16      A.   Well, earlier financial issues, we once
17  had a treasurer who was very efficient at keeping
18  the coffers full and would get donations and raise
19  money to keep the coffers adequate.  Since that
20  time, that policy has dissipated, so I don't know
21  their current financial status.
22           I know that they still pay a lot of money
23  to the -- what's that organization -- anyway, for
24  their meeting spots and all that kind of stuff.
25  I've wondered also about this, but I'm not the best

Page 178

1  person to answer that question.
2      Q.   So as far as the case manager goes, would
3  all of the cases that came into Vidocq for review be
4  routed through that person?
5      A.   Right.
6      Q.   So Fred Bornhofen would have had to sign
7  off on the Freeman investigation?
8      A.   Right.
9      Q.   And he would have been an essential point
10 of contact for the Coquille Police Department or
11 whoever was presenting?
12     A.   Yes.
13     Q.   And how long ago did you say he passed?
14     A.   Three or four years ago, maybe five, but I
15 think probably three.
16     Q.   Are you familiar with Mr. Bornhofen's
17 process for how he brought cases in and evaluated
18 them before signing off on them?
19     A.   In brief, it was that they had to be cold
20 for at least two years, the case had to be, and
21 generally they did not take drug cases and they
22 required to get some kind of a prediscussion of what
23 the case was about and see if it met standards that
24 somehow had been established, and from that, we
25 would then decide yes or no.

Page 187

1  they are today, okay?  I think they find acceptable
2  today what I found unacceptable back then.
3       Q.   So as of 2010, were you aware of a
4  protocol for being -- a written protocol for being a
5  member of Vidocq Society?
6       A.   I believe there was.  I'm not prepared to
7  discuss it.  Others who know more about it are the
8  best evidence.
9       Q.   But you believe there was written protocol
10 for membership in Vidocq Society?
11      A.   I believe there was.
12      Q.   Where would that be kept?
13      A.   I don't know at this point.
14      Q.   Do you recall if -- let's see, I'm just
15 going to go down a list of names.
16           Was Benjamin Redmond a member of the
17 Vidocq Society in 2010?
18      A.   Yes.
19      Q.   Was he present when the Freeman case was
20 presented to Vidocq Society?
21      A.   He was there, yes.
22      Q.   Do you recall whether he was there or not?
23      A.   I don't know.
24      Q.   Were you there when the Freeman case was
25 presented to Vidocq Society?

Page 188

```
 1      A.   Yes.
 2      Q.   But you don't recall if Mr. Redmond was?
 3      A.   Correct.  There was a room full of people.
 4      Q.   How about Mr. Fleisher, was he a member in
 5   2010?
 6      A.   Yes.
 7      Q.   And was he present when the Freeman case
 8   was presented?
 9      A.   I don't know.
10      Q.   How about Mr. Lebofsky, was he a member in
11   2010?
12      A.   Yes.
13      Q.   Do you recall if he was present when the
14   Freeman case was presented?
15      A.   I don't know.
16      Q.   How about Mr. Gill, was he a member in
17   2010?
18      A.   Yes.
19      Q.   Do you recall if he was present when the
20   Freeman case was presented?
21      A.   I do not remember.
22      Q.   All right.  How about Heather Hines, was
23   she a member in 2010?
24      A.   I don't know her.
25      Q.   How about Carey E.G. Galvin, was he or she
```

Page 255

1   the body or offer some kind of explanation for that?
2        A.   I don't recall being asked.
3        Q.   Okay.  So you don't recall specifically
4   whether or not this is the PowerPoint or whether or
5   not a PowerPoint was shown at all, but assuming
6   there was some kind of presentation, what's your
7   recollection of what happened with -- after the
8   presentation was given, what happened next on the
9   Freeman case?
10       A.   I think there was speculation that they
11  didn't have enough to move forward in the room.
12       Q.   Were there small group discussions of any
13  kind?
14       A.   No.  I think there were probably -- you
15  asked me earlier, I did respond.  I think there were
16  probably -- generally you'll find about 50 people
17  there at the case presentation.
18       Q.   Okay.  After the presentation, did half of
19  them get up and leave?  Did all of them get up and
20  leave or stick around and --
21       A.   Yeah, they stuck around and chatted for a
22  while.  They all had their opinions about this, that
23  and whatever else.  I think that even Dannels and
24  the police officer and everybody but the prosecutor
25  thought that they needed more development and that

1  they couldn't move forward with the prosecution.
2          However, then, we went to dinner, and it
3  was at dinner, I believe -- it could have happened
4  at the meeting, but I think it was at dinner, then,
5  that the prosecutor then said that he thought it had
6  legs and that he always wanted to try a
7  circumstantial case and this -- he wanted to move
8  forward on this, and I think Dannels and the other
9  police officer weren't gobsmacked pleased, but
10 gobsmacked by it all, okay?
11     Q.   Did you get the impression that the
12 prosecutor was not convinced before coming to
13 Vidocq?
14     A.   I don't know.
15     Q.   Okay.  I'm just kind of wondering why you
16 got the sense that Dannels and the other police
17 officer were gobsmacked.  It seems to me that if the
18 prosecutor was already convinced that he could go
19 forward, there wouldn't be much reason to come up to
20 present at Vidocq Society.
21     A.   Well, how about this reaction, I'll
22 imitate it, "Really?"
23     Q.   Okay.  So do you recall -- you went out to
24 dinner, who all went to dinner with you?
25     A.   Just them and myself.

Page 257

1    Q.   Anyone else from Vidocq decide to go with
2  you?
3    A.   No.
4    Q.   What was discussed at the dinner?
5    A.   The case.
6    Q.   What specifically was discussed about the
7  case?
8    A.   Well, I think that they were still quite
9  loose, very, very loose in their understanding of
10 the collection of material that they had.  I then --
11 I think I offered the suggestion that from my
12 understanding that it was a PA case, that I would
13 have some more evidence and to affirm that and I'd
14 like to see more crime scene photos and all that,
15 kind of stuff, okay?
16   Q.   So at that point, was there a decision
17 made that you would come back to Coquille with them
18 at some point?
19   A.   They asked me if I would, and I think I
20 said it would depend on whether Vidocq agrees with
21 it.
22   Q.   And apparently Vidocq agreed with you.
23   A.   Yes.
24   Q.   Because you went back.
25        Do you recall during the presentation, did

1  you take any notes?

2      A.   No.

3      Q.   Did you see anyone else at Vidocq taking
4  any notes while they were reviewing the case?

5      A.   I would disapprove.

6      Q.   How about at the dinner, any notes taken
7  at the dinner by anyone that you recall?

8      A.   I can't affirm positively.  I think the
9  investigator did.

10     Q.   Okay.  And then after you had the dinner
11 and talked a little bit, what happened next?  How
12 did the dinner end?

13     A.   I went home.  I went back to my hotel
14 room.  I can't remember -- it had to be Vidocq
15 called me, or Fred, and said that they had contacted
16 and wanted me to come out and I said "What does the
17 Vidocq Society think about that?" and he said "It's
18 your decision," and apparently it was okay and now
19 the whole issue of payment and stuff is a mystery,
20 but anyway, I got there.

21     Q.   And did Mr. Bornhofen say who had
22 contacted him?

23     A.   No.

24     Q.   So we don't know if it was Dannels or
25 Frasier or who?

1    A.    Right.
2    Q.    Okay.  And when you say the question of
3    payment is a mystery, what do you mean?
4    A.    We never could figure out who paid for the
5    airfare and all that kind of stuff.
6    Q.    Okay.  Was it another one of those things
7    where you tried to look at Vidocq's records, talked
8    to the travel agents and that sort of thing?
9    A.    Yeah.  Yeah.
10   Q.    And there's no record of Vidocq paying for
11   it?
12   A.    Well, they didn't -- they changed Frasier
13   and all this kind of stuff, but I talked to the most
14   recent treasurer and he looked and they only have
15   six years back, they don't have ten years back.
16   Q.    So the decision was made that you would
17   travel to Coquille and that Vidocq would
18   participate.
19         What was the plan for Vidocq Society's
20   involvement in the pre-investigation?
21   A.    Me going out and getting ideas and giving
22   them suggestions and giving them a sense of
23   perspective and letting them make up their own mind.
24   That's how they wanted to proceed.  I did not say
25   "Go get him," okay?  It's their choice.  I was there

Page 290

1  STATE OF OREGON     )

2  County of Multnomah )

3

4           I, Aaron M. Thomas, Certified Shorthand

5  Reporter, Registered Professional Reporter, and

6  Notary Public for the State of Oregon, do hereby

7  certify that ROBERT WALTER personally appeared

8  before me at the time and place mentioned in the

9  caption herein; that the witness was by me first

10  duly sworn on oath and examined upon oral

11  interrogatories propounded by counsel; that said

12  examination, together with the testimony of said

13  witness, was taken down by me in stenotype and

14  transcribed through computer-aided transcription;

15  and that the foregoing transcript constitutes a

16  full, true and accurate record of said examination

17  of and testimony given by said witness, and of all

18  other oral proceedings had during the taking of said

19  deposition, and of the whole thereof.

20           Witness my hand and Notarial Seal at

21  Portland, Oregon, this 9th day of July, 2022.

22

23

24                                 _____

                                   Aaron M. Thomas
25                                 Oregon CSR 04-0388