**Robert E. Franz, Jr.**    OSB #730915
E-Mail:  rfranz@franzlaw.comcastbiz.net
**Sarah R. Henderson**    OSB #153474
E-Mail:  shenderson@franzlaw.comcastbiz.net
FRANZ & HENDERSON
P.O. Box 62
Springfield, OR 97477
Telephone:  (541) 741-8220
  Attorneys for Mark Dannels, Pat Downing, Kris Karcher, Shelly McInnes,
  Raymond McNeely, Kip Oswald, Michael Reeves, Sean Sanborn,
  Eric Schwenninger, Chris Webley, Anthony Wetmore, Craig Zanni,
  David Zavala, City of Coquille, City of Coos Bay, Coos County, Oregon,
  and the Estate of David E. Hall

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| Nicholas James McGuffin,<br>as an individual and as guardian<br>*ad litem*, on behalf of S.M., a minor, | Case No. 6:20-cv-01163-MTK<br>(Lead Case) |
| Plaintiffs, | |
| v. | **Reply in Support of<br>FRCP 56 Motion for<br>Summary Judgment** by<br>Municipal Defendants |
| Mark Dannels, Pat Downing, Susan<br>Hormann, Mary Krings, Kris Karcher,<br>Shelly McInnes, Raymond McNeely,<br>Kip Oswald, Michael Reaves, John<br>Riddle, Sean Sanborn, Eric Schwenninger,<br>Richard Walter, Chris Webley, Anthony<br>Wetmore, Kathy Wilcox, Craig Zanni,<br>David Zavala, Joel D. Shapiro as Administrator<br>of the Estate of David E. Hall, Vidocq Society,<br>City of Coquille, City of Coos Bay, and Coos County, | |
| Defendants. | |

Nicholas James McGuffin, as an
Individual and as guardian ad litem,
on behalf of S.M., a minor,

       Plaintiffs,

   v.

Oregon State Police,

       Defendant.

Case No. 3:21-cv-01719-MTK
(Trailing Case)

# TABLE OF CONTENTS

Page

**REPLY** ................................................................................................................2

**LEGAL MEMORANDUM** ...............................................................................3

**I.     Plaintiffs fail to create an issue of material fact**.................................3

    *a. Nick Backman.* .................................................................................3

    *b. John Lindegren.*..............................................................................6

    *c. Karcher Testimony and "Crime Scene Tape."* ............................11

    *d. Richard Bryant.* ...........................................................................15

    *e. Blood evidence on Freeman's shoe.* .............................................18

    *f. Switching cars.* .............................................................................21

    *g. Whether the Mustang was "Wiped Clean."* .................................21

**II.    Each of the Municipal Defendants are Entitled to Dismissal** ...........22

    *a. Reaves.* .........................................................................................23

    *b. Oswald.* ........................................................................................23

    *c. Karcher*.........................................................................................24

    *d. Zanni*............................................................................................25

    *e. Zavala*...........................................................................................25

    *f. The Estate of David Hall* .............................................................25

    *g. The Cold Case Investigators*........................................................26

**III.   The "So What?" Argument** .................................................................31

**IV.    Conclusion** ...........................................................................................31

# TABLE OF AUTHORITIES

**<u>Cases</u>**

Page

*Cannon v. Polk County/Polk County Sheriff, 68 F. Supp. 3d 1267. 1277-78 (D. Or. 2014), aff'd sub nom.* ............................................................................................... 29-30

*Cannon v. Polk Cnty., 702 Fed. Appx. 527 (9th Cir. 2017)* ............................................................ 30

*Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101 (9th Cir. 2009) ................................ 27

*Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001) ............................................................. 26-27

*Gausvik v. Perez*, 345 F.3d 813 (9th Cir. 2003) ........................................................................ 27

**Robert E. Franz, Jr.**    OSB #730915
E-Mail:  rfranz@franzlaw.comcastbiz.net
**Sarah R. Henderson**    OSB #153474
E-Mail:  shenderson@franzlaw.comcastbiz.net
FRANZ & HENDERSON
P.O. Box 62
Springfield, OR 97477
Telephone:  (541) 741-8220
  Attorneys for Mark Dannels, Pat Downing, Kris Karcher, Shelly McInnes,
  Raymond McNeely, Kip Oswald, Michael Reeves, Sean Sanborn,
  Eric Schwenninger, Chris Webley, Anthony Wetmore, Craig Zanni,
  David Zavala, City of Coquille, City of Coos Bay, Coos County, Oregon,
  and the Estate of David E. Hall

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| Nicholas James McGuffin, as an individual and as guardian *ad litem*, on behalf of S.M., a minor, | Case No. 6:20-cv-01163-MTK (Lead Case) |
| Plaintiffs, | **Reply in Support of FRCP 56 Motion for Summary Judgment** by Municipal Defendants |
| v. | |
| Mark Dannels, Pat Downing, Susan Hormann, Mary Krings, Kris Karcher, Shelly McInnes, Raymond McNeely, Kip Oswald, Michael Reaves, John Riddle, Sean Sanborn, Eric Schwenninger, Richard Walter, Chris Webley, Anthony Wetmore, Kathy Wilcox, Craig Zanni, David Zavala, Joel D. Shapiro as Administrator of the Estate of David E. Hall, Vidocq Society, City of Coquille, City of Coos Bay, and Coos County, | |
| Defendants. | |

Page 1 of 32 – Reply

Nicholas James McGuffin, as an
Individual and as guardian ad litem,
on behalf of S.M., a minor,

        Plaintiffs,

    v.

Oregon State Police,

        Defendant.

Case No. 3:21-cv-01719-MTK
(Trailing Case)

    COME NOW Defendants Mark Dannels, Kris Karcher, Raymond McNeely,
Kip Oswald, Michael Reeves, Sean Sanborn, Eric Schwenninger, Chris Webley,
Craig Zanni, David Zavala, City of Coquille, Coos County, Oregon, and the Estate
of David E. Hall (hereinafter, the "Municipal Defendants"), by and through their
attorneys, Franz & Henderson, and hereby offer the following Reply in Support of
their Motion for Summary Judgment on file herein.

    THIS REPLY is made in good faith, not for the purpose of delay, and in the
opinion of counsel is well founded in law; and based upon FRCP 56, the following
Legal Memorandum of Law, the Declaration of Robert  E. Franz Jr., and the
following Exhibits:

| Exhibit | Description |
| --- | --- |
| Exhibit 5072 | Notes of Kathleen McGuffin |
| Exhibit 5073 | Spreadsheet Page from Joyce Bonk Files |
| Exhibit 5074 | Police Report Excerpt of Jim Davis |
| Exhibit 5075 | Spreadsheet Page from Joyce Bonk Files |
| Exhibit 5076 | Report About Lindegren Prepared by Joyce Bonk |
| Exhibit 5077 | Joyce Bond Email to Shaun McCrea |
| Exhibit 5078 | Excerpt Pages from Paul Fraiser Deposition |
| Exhibit 5079 | Report of Randy Ulmer Dated June 29, 2000 |
| Exhibit 5080 | Pages from 2000 Coquille High School Yearbook |
| Exhibit 5081 | Deposition Transcript of John Lindegren |

| Exhibit 5082 | Report of Officer Webley Dated June 24, 2011 |
| Exhibit 5083 | Excerpt from Deposition of Paul Frasier taken May 31, 2019 |
| Exhibit 5084 | Training and Employment Records of David Hall on File with DPSST |

## LEGAL MEMORANDUM

### I. Plaintiffs fail to create an issue of material fact.

Plaintiffs' factual allegations, to the extent they are supported by any evidence at all, fail to create an issue of material fact that would preclude summary judgment. Each allegation is either objectively false, unsupported by any admissible evidence, or irrelevant and immaterial as discussed *infra*.

*a. Nick Backman.*

Plaintiffs allege that information about Nick Backman having seen Freeman was suppressed, and that the information was exculpatory. Neither is true. The initial source of the fact that Nick Backman had information concerning Leah Freeman on the night of her disappearance came from Plaintiff Nick McGuffin. The information appears in the notes of Kathy McGuffin, the mother of Nick McGuffin as follows: "Nick Backman saw Leah that evening and has not spoken to police as far as we know." (Exhibit 5042 at 3) We know that the notes appearing at Bates numbered page 004243 were in the possession of Shaun McCrea because it is in one of the discovery binders used by Shaun McCrea in her defense of McGuffin. See Exhibit 5072 which is the front cover of one of the discovery binders of McCrea that contained 004243, which is attached to the binder cover for purposes of showing McCrea had 004243 in her possession. Also, in looking at Exhibit 5042 at 3, one can see the Bates stamp number of 004243 three times across the bottom of the page and three times across the top of the page, which

indicates that it was Bates stamped by Prosecutor Paul Frasier; and thus, also in his possession. (Exhibit 5078 at 3)

The reference to Nick Backman is also contained in the spread sheet of leads and witnesses that was and is in the possession of Joyce Bonk, the investigator for Shaun McCrea. (Exhibit 5073) We know the spread sheet was in the possession of McCrea and Bonk because of the Bates stamp "Bonk 000007" put on the document to identify it as a document in the possession of Bonk. The information on the spread sheet in the row where Backman's name appears says: "Source: Nick McGuffin. "Backman told McGuffin that he saw Leah on 6/28/00 by Oregon Federal CU."

In addition, both McCrea and Bonk had a copy of the police report of Jim Davis dated October 13, 2000, in which it is documented that Nick McGuffin told Davis: "In addition, McGuffin told us that he had talked with Nick Beckman, who told him that on the night Leah disappeared, he saw her in the parking lot of the Smoke Shop at about 9:00 PM, and again a few minutes later near the credit union, which is just down the street from the Smoke Shop." Exhibit 5042 at 2.

We know Bonk had this report from Davis because her bate stamp of "Bonk 000350" is on the document. We know that Frasier had the report from Davis, because his Bates stamp of 001179 is on the bottom and top of the page, three times. And we know McCrea had a copy of this page of the report from Davis because the report can be found in one of the discovery binders used by Shaun McCrea in her defense of McGuffin. See Exhibit 5074 which is the front cover of the discovery binder of McCrea that contains 001179, which is attached to the binder cover for purposes of showing McCrea had 001179.

And finally, the report of the interview of Backman on September 20, 2000, Exhibit 5042 at 4, has the Bates stamp number of 003247 from Paul Frasier, three times across the top and three times across the bottom, meaning that it was Bates

stamped by Frasier and in the possession of Frasier. (Exhibit 5078 at 4-5) Frasier confirmed in his deposition in the PCR case and the instant case that if a document was Bates stamped in this manner, this was done by him.

None of the Municipal Defendants violated the rights of Nick McGuffin because the information possessed by Backman was not exculpatory and therefore never had to be produced in the first place. Second, the attorneys and investigators for Nick McGuffin, and Nick McGuffin himself, had complete knowledge of information possessed by Backman. Third, all the information about Backman was in the possession of DA Frasier, thus satisfying the constitutional obligation of any other Defendant to produce the information. Fourth, the failure to produce the information about Backman was not prejudicial to McGuffin as a matter of law, since the source of the information about Backman came from Nick McGuffin, who was fully aware of what Backman knew about Leah Freeman. And, fifth, none of the information was prejudicial to McGuffin as numerous other witnesses saw Leah Freeman walking at or near the same location as Backman, and at other locations along Central Boulevard that evening.

Plaintiffs have implicated one other item related to Backman they allege was destroyed, suppressed, or not retained—an ATM receipt purportedly provided to Detective Sergeant Zanni. The first problem with this allegation is that there is no evidence in the record that any such receipt existed. It is undisputed that the report completed by Zanni detailing the statement from Mr. Backman makes no mention of a receipt. Rather, it documents that Zanni "checked with the credit union and confirmed a $10.00 withdrawal on 6/28/2000 at 9:04 p.m." And, of course if the receipt did exist, it would not provide any information beyond what was detailed in Zanni's report of what his investigation revealed.

    *b. John Lindegren.*

The fact that John Lindegren had information concerning Leah Freeman on the night of her disappearance appears in the notes of Kathy McGuffin, the mother of Nick McGuffin as follows: "John Lundgren (sic) saw Leah talking to someone in a brown truck." Exhibit 5042 at 3. We know that the note about Lindegren contained in 004243 was in the possession of Shaun McCrea because it is in one of the discovery binders used by Shaun McCrea in her defense of McGuffin. See Exhibit 5072, which is the front cover of one of the discovery binders of McCrea that contained 004243, which is attached to the binder cover for purposes of showing McCrea had 004243 in her possession. Also, in looking at Exhibit 5042 at 3, one can see the Bates stamp number of 004243 three times across the bottom of the page and three times across the top of the page, which indicates that it was Bates stamped by Prosecutor Paul Frasier; and thus, also in his possession. (Exhibit 5078 at 3)

The reference to John Lindegren is also contained in the spread sheet in the possession of Joyce Bonk, the investigator for Shaun McCrea. (Exhibit 5075). We know the spread sheet was in the possession of McCrea and Bonk because of the bate stamp "Bonk 000013" put on the document to identify it as a document in the possession of Bonk. The information on the spread sheet in the row where Lindegren's name appears provides: "Says he saw Leah talking to Nick about 9:15-9:20 pm on Elm St. Nick was driving a brown pickup. Was at sister's house (590 W 4th Pl) doing concrete work-left at 9:20 PM-Saw female matching description speaking to W/M-6'2", lean, muscular, short hair (near brown pickup-crew of extended cab) W/M was unfriendly, saw @ 4th Pl and Elm."

Joyce Bonk also took a recorded statement from Lindegren and did a report on Lindegren for Shaun McCrea. (Exhibit 5076). At the time of taking the recorded statement, Bonk did "a throw down of photos" of student-teenagers without the

names on the photos, at which time Lindegren identifies Leah Freeman as the female he saw the evening of her disappearance. (Exhibit 5076 at 3).

It must be remembered that it is the position of the Plaintiffs in this case that John Lindegren saw Cheri Mitchell with her hair pulled back on the evening of Leah's disappearance, not Leah Freeman; and that Cheri Mitchell was with Corey Bryant, not Nick McGuffin. Attached hereto as Exhibit 5080 are the yearbook pages used by Bonk in the photo throw down with the names of the students.

Exhibit 5080 at 1 shows the picture of Cheri Mitchell. Exhibit 5080 at 1 is the same page as Exhibit 5076 at 7. John Lindegren did not pick the Mitchell photo in his interview with Bonk, even though the photo was there. Instead, he picked the photo of Freeman which is Exhibit 5080 at 2 and Exhibit 5076 at 6.

Exhibit 5080 at 4 shows the picture of Corey Bryant. Exhibit 5080 at 4 is the same page as Exhibit 5076 at 8. John Lindegren did not pick the Bryant photo in his interview with Bonk, even though the photo was there. Instead, he picked the photo of Nick McGuffin which is Exhibit 5080 at 3 and Exhibit 5076 at 9.

If the Plaintiffs are correct, John Lindegren should have picked Cheri Mitchell's picture from the photo drop down as the female he saw, not Leah Freeman; and Lindegren should have picked Bryant's picture from the photo drop down as the male he saw, not Nick McGuffin. Thus, Bonk's throwdown without any police officers present prove that Lindegren saw Freeman and McGuffin that night. Shaun McCrea thought the report from Bonk about Lindegren with the throw down photo lineup was "very interesting." (Exhibit 5077)

McCrea also had in her possession the police report by Randy Ulmer in which Ulmer talked to John Lindegren on July 16, 2000, at which time Ulmer reported: "I also spoke with John Lindegren, who told me he was walking his dog on North Elm around 2115 hours on June 28, 2000, and walked past Freeman and Nick McGuffin standing outside in front of 444 North Elm.  Lindegren said he

saw a dark orange, late model, Ford Ranger parked near McGuffin and Freeman. Lindegren provided no other information. (Exhibit 5079 at 4-5; Frasier Bates stamps 005026-27)

In addition, Cherie Mitchell reported that although she knows who John Lindegren is, she did not see him the evening Leah disappeared. (Exhibit 5082 at 2) This makes sense. John Lindegren testified he never saw Cherie Mitchell that night, and Cherie Mitchell confirmed that she never saw John Lindegren that night. This just proves that the female Lindegren saw that night was Leah Freeman.

McCrea also had in her possession the grand jury testimony of John Lindegren to use when Lindegren testified at trial and to use when Bonk interviewed Lindegren. (Exhibit 5002 at 969) At trial, McCrea did an uneventful cross-examination of Lindegren. (Exhibit 5001 at 666)

McCrea also had the grand jury testimony of Hjordis Lindegren, the twin sister of John Lindegren, to aid McCrea in her discovery and to use when Bonk interviewed John Lindegren. (Exhibit 5002 at 977)

Further, in the case at bar, the Plaintiffs' attorney, Andrew Lauersdorf, took the deposition of John Lindegren on January 4, 2023. (Exhibit 5081) The night prior to the deposition, Mr. Lauersdorf met with Lindegren. (Exhibit 5081 at 100-01) In his deposition, Lindegren confirmed he did not know Cherie Mitchell. (Exhibit 5081 at 39) Lindegren also confirmed that the female he saw was young, "like a 15, 16" year old and the male was late teens, early 20's: (Exhibit 5081 at 116) and that as to the female he is "relatively absolutely sure it was Leah Freeman." (Exhibit 5081 at 133) "Well, I'll tell you just like I told him, I says, I'm absolutely positive almost that it was Leah Freeman that I saw." (Exhibit 5081 at 136). As to the male being Nick McGuffin, "I said, I think it was. It looked like him. I said, Good chance of it. I don't know absolutely 100 percent." (Exhibit 5081 at 136-37)

Q. You also told police that you knew Nick McGuffin before Ms. Freeman went missing. How did you know Mr. McGuffin?
A. From knowing who he was. You know, it's a little tiny area, everybody knows everybody else." (Exhibit 5081 at 142-43)

At the 2010 Grand Jury, Lindegren testified:

Q. As you're walking, do you -- well, did you --well, did you see a person later identified to you as Nick McGuffin?
A. Yes.

Q. And did you see a person named Leah Freeman?
A. Absolutely.   (Exhibit 5002 at 971-72)

*******
GRAND JUROR: You say it was Nick and Leah?
THE WITNESS: Yes.

GRAND JUROR: And you know -- did you know Nick and Leah?
THE WITNESS: Yeah. Yeah, I knew him. You know, I grew up around here. And I -- you know, I knew of -- Leah, you know, I know her uncles and -- you know. I grew up around here.
(Exhibit 5002 at 975)

At the Criminal Trial Lindegren testified:

Q. Are you familiar with the Defendant in this case, Mr. McGuffin?
A. Yes, I am.

Q. How do you know him?
A. I've met him around. You know, I grew up around here.

Q. And Leah Freeman, were you familiar with who she was?
A. Yes.

Q. How did you know her?
A. I know some of her family and I grew up around here. (Exhibit 5001 at 663)
* * *
Q. Did you see Leah Freeman that night?

A. I did, sir.

Q. Did you see Nicholas McGuffin that night?
A. Yes, I did, sir.

Q. See them together?
A. I did.

Q. Where?
A. At — once you walk down on North Elm — I don't know what the address is. There's a house and then a gravel road and a house behind it. I'm not familiar with the address or anything.

(Exhibit 5001 at 664) Further, in his deposition Lindegren testified:

Q. So when you testified at the jury trial, the criminal jury trial, did you testify truthfully?
A. I believe so.

Q. And when you testified at the grand jury, did you testify truthfully?
A. I believe so. I can't remember much of it until I read it.
        (Exhibit 5081 at 219-20)
* * *
Q. Did you know the grand jury was going to rely upon your testimony?
A. Yeah, probably.  (Exhibit 5081 at 221)
* * *

A. Okay. Yeah. Could I have been led, yeah, probably. I'm just a darn hillbilly, you know. I ain't no law enforcement guru or no attorney guru. You know, you guys are way above my pay grade. But did anybody just come out and say, This is what we want you to say or do or anything? No, they would never say that to me. If they did, I'd whip their ass, I said. (Exhibit 5081 at 233)

Plaintiffs' allegation that police purportedly coerced Lindegren, and relatedly that they knew he was wrong about what he saw, is directly in conflict with the evidence. There is no evidentiary basis to conclude that Lindegren was told or

influenced what to say. The theory that exculpatory evidence was withheld, on the other hand, also fails. Plaintiffs' position is that the John Lindegren's *sister's* testimony about which episode aired the night of June 28, 2000, is exculpatory because that episode did not actually air until almost two months later, and therefore John is wrong about which night he saw what he saw. This is factually impossible. John Lindegren first reported to police on July 16, 2000, that he had seen Freeman and McGuffin. This was only about two and a half weeks after Freeman went missing, and several weeks before the Survivor season finale when Rudy was voted off. This supports the fact that John Lindegren was correct about when he reported to have seen Freeman and McGuffin.

 c. *Karcher Testimony and "Crime Scene Tape."*

 Plaintiffs' allegations regarding Deputy Medical Examiner Kris Karcher's testimony likewise lack merit. Karcher described the position of Leah Freeman's body as it was found to the Grand Jury in 2010 as follows:

> She appeared to have like rolled down the bank. She was laying on her back, but one arm was kind of underneath her, one arm was across the front of her.

(Exhibit 5002 at 354). Karcher also confirmed in response to a grand juror's question that the legs were crossed. (Id. at 370-371) This description is identical to the description Lt. Pex included in his report dated August 8, 2000:

> Her left arm was across her chest and the right arm was folded under her. Her legs were also crossed.

(Doc. No. 330-44 – Plaintiffs' Exhibit 44) In addition, both the Grand Jury and the criminal trial jury were provided photographs of Freeman's body in the position where it was found. During the trial, Karcher's testimony regarding the positioning of the body was given while referencing the photographs of the body where it was found, and while the same photographs were shown to the jury:

 Q. And State's Exhibit No. 42?

A. That's the body from about the neck down. This is a foot that has no sock on it. And it's kind of mummified. And then this is the other leg that — the left leg crosses over the right leg.

Q. And State's Exhibit No. 43?

A. Also of the body. This is the head — Leah's head. Her mouth is open, blonde hair.

Q. And finally, State's Exhibit No. 44?

A. That's just a closer of her head. It also shows her left arm. Her left arm was kind of laying over her chest. Her right arm was kind of underneath her back.

Q. And what does that suggest to you, one arm over the chest and the other arm under the back?

A. That she rolled down this embankment.

(Exhibit 5001 at 1297) Lt. Pex's testimony at the criminal trial also suggested that the position of the body indicated that Freeman had been "dumped" at the site and rolled:

Q. Now, in your career as a forensic scientist, have you ever had cases where the homicide occurred at one location but the body ends up at the second location?
A. Oh, sure.

Q. And what do we — what do they commonly refer to this as?
A. Dumped body.

Q. In examining this scene and the position of the body and so forth, did you come to a conclusion in your opinion as to was this where Leah Freeman died, or something?
A. That isn't always easy to establish. The one thing that I noticed right away is that her legs were crossed. And that is often an indication that someone has been rolled over. Whether rolled over going down the embankment, or rolled over on the site, I don't know.

> But, when you turn someone who is laying on their back, for example, or laying on their stomach and you grab them by the shoulders, the upper body, and roll them over, it causes the legs to cross. That doesn't — that's an indication. That's not absolute, but it's something you notice.
>
> And based upon her position and its relationship to the road, it had the appearance of having been a dead — deposed at that site as a dumped body. But, that's not absolute.

(Exhibit 5001 at 1346-47) This testimony is, once again, consistent with the description given by Karcher, and what is depicted in the photographs. This description is also consistent with the description of the body by Dr. Olson, the medical examiner, during the autopsy:

> The body is essentially in the position in which it was found. The right arm is twisted or bent in an awkward position at the shoulder. It extends posteriorly with the head resting against the shaft of the humerus it then is sharply bent at the elbow and sharply bent at the wrist joint, the hand coming to rest beneath the right shoulder. The left arm is extended to approximately the mid-abdomen level. The forearm bends at approximately 90 degrees and rests on the volar surface across the upper abdomen and lower chest. The hand is acutely flexed.
>
> ...
>
> The right leg is bent at the knee acutely and extends towards the left of the body. It is bent at 90 degrees. The left leg rests, at the knee, over the right foot.

(Doc. No. 330-5 – Plaintiffs' Exhibit 5) This description is simply a more detailed version of that provided by both Karcher and Pex. Dr. Olson testified consistently at the criminal trial:

> Q. Dr. Olson, could you describe for the jury what you did in examining this body?
> A. What I did was, basically, take it as I saw it, layer by layer, and describe the body in the position, roughly, that we received it. The right arm was up and behind the body in kind of an unusual, awkward

> position. The left was resting across the front of the body, about the
> abdomen, lower chest level.

(Exhibit 5001 at 1399) Dr. Olson also testified that there was "no question that
she's dumped in an area that was probably intended to, hopefully, conceal her
remains, perhaps indefinitely." (Id. at 1412)

It is undisputed that when found, Leah Freeman's left arm was in front of
her, bent at the elbow and resting on her chest; her right arm was folded under her;
and her left leg was crossed over her right leg. Of course it bears mentioning that
as part of DME Karcher's responsibilities, she is part of what is referred to as the
"crash team." (Exhibit 5001 at 363) In this role, part of her job is to assess victims
of vehicle-pedestrian crashes and assess the biomechanics of what occurred. (Id.)
She was qualified to testify as to her opinion that the positioning of the body was
indicative that it had rolled down the embankment. If the defense disagreed with
this opinion, they could have rebutted it with their own expert or simply taken
Karcher on during cross-examination. They did neither, because the factual
testimony was accurate, and the opinion testimony was sound. Further, the
Plaintiffs' allegation that evidence was fabricated in order to improperly assert that
the disposal of Leah Freeman's body was done "hastily" is unavailing. Karcher
neither fabricated evidence nor testified to any such thing. Her testimony was
limited to describing the position of the body as shown in a photograph of the
scene and opining as to what the position of the body was indicative of in terms of
biomechanics. Plaintiffs' allegation that Karcher fabricated evidence about the
position Leah Freeman's body was found in is false because the evidence they
allege was fabricated is nothing but objectively truthful evidence.

Plaintiffs also take issue with Karcher's testimony about having observed
what looked like a path where the long grass was down between the road and the
location of Freeman's body:

> The other thing that was noticeable when we came was it looked like
> there was a path that somebody -- the grass was tall along the shoulder
> of the road, but that area it looked like there was a path; that maybe
> somebody had walked over to the edge and looked down. The -- the
> thing -- the -- um, the foliage was kind of down. It could have been an
> animal, you know, coming back and forth through there, but, um, I did
> notice that.

However, this testimony is consistent with that of Officer Wetmore at the criminal

trial, who stated:

> After the scene was cordoned off, we found that there's essentially a
> break in the weeds as if at least one person or several people — that's
> unknown — but somebody or something had traveled through the
> brush there. There was an obvious part and vegetation that was moved
> aside as if somebody had went through that area.

Notably, there is no evidence that either account is false. Both Karcher and

Wetmore acknowledged that they did not know what caused the break in the

foliage they observed, and that it may or may not have been a person.

The details of what became of the "Crime Scene Tape" are addressed in the

Municipal Defendants' original motion and will not be belabored here. There is

simply no evidence that a video taken at the scene would contain anything

exculpatory. The scene where Freeman's body was discovered and the surrounding

area were extensively photographed, and those photographs were produced.

The photographs were presented to the grand jury and the criminal trial jury, and

they are consistent with witness accounts of the scene. Plaintiffs' theory that a

video tape was intentionally destroyed to cover up exculpatory information is just

that—a theory—supported by zero evidence.

*d. Richard Bryant.*

Richard Bryant and Nick McGuffin were in the same grade at Coquille High

School. (Exhibit 5001 at 1136) Richard Bryant was the stepson of Police Officer

David Hall in 2000. At the criminal trial in 2011, Bryant testified that in 2002, he was a cell mate of Nick McGuffin when both of them were in the same jail cell at the Coos County Jail.  Bryant testified that while in the jail cell, Nick McGuffin said:

> A. He was a little emotional at the time, you know, he was crying and telling me that, you know, he can picture her laying there and her head sitting on a rock and there was nothing he could do about. And there was nothing he could do.  (Exhibit 5001 at 1138)

At the Grand Jury in 2010, Richard Bryant testified about this conversation he had with Nick while they were in jail:

> Q. Has anybody told you that they saw what happened to Leah Freeman?
> A. Um, no, not -- not really, other than what kind of Nick was saying to me. Other than, I see -- you know, I can see her laying right there and I couldn't really do anything to help her. You know, stuff like that. Other than anyone else, no. (Exhibit 5002 at 1043-44)

From this testimony, the Plaintiffs are contending that David Hall, as well as Officers Schwenninger and McNeely are liable to them because they worked together to deliberately fabricate evidence by coercing Bryant into giving false testimony. First, there is absolutely no evidence to support this contention. Hall was not even in Coquille in 2010 when Plaintiffs allege this fabrication occurred. He was working as a police officer for Black Butte Ranch, hundreds of miles away from Coquille. (Exhibit 5084)

Second, McGuffin told anyone that would listen that Leah could have fallen on a rock and hit her head. For example, at the criminal trial, North Bend Police Officer Buddy Young testified that on July 5, 2000, he had a conversation with Nick McGuffin as follows:

> Uh, he did start talking about the possible current status of Leah, speculating that she might have been walking near the river and

> stumbled and hit her head, or on a rock or something, or fallen into the
> river. And that seemed like a bazaar, off-the-wall, statement to me at
> the time, especially considering all the other potential possibilities of
> what could have happened to Leah — why he would come up with
> that one.

(Exhibit 5001at 106-107) This testimony by Young was consistent with the police

report Young filed in 2000 about the same conversation he had with McGuffin:

"[s]he may have been walking near the river and stumbled and hit her head on a

rock and fallen into the river." (Exhibit 5027 at 5)

McGuffin also told former Oregon State Trooper Dean Perske and Trooper

Davis about the falling on the rock idea. Dean Perske and Davis talked to

McGuffin on July 28, 2000. (Exhibit 5001 at 121) As Perske testified at the

criminal trial in 2011, McGuffin told Perske:

> A. Yes. He then told us about an incident where — exactly that —
> that they had been walking along the river, and she had fallen on some
> rocks. I wondered how that was relevant, and asked him about it. And
> he thought that maybe if anything would have happened to her, it
> might have been that. That she may have been walking along the
> river, fallen and hit her head, and then fell into the water. And that's
> what could have happened.

(Exhibit 5001 at 125-26) This testimony by Perske was consistent with the police

report of Perske written in 2000 about the same conversation Jim Davis and Perske

had with McGuffin:

> Then we asked McGuffin what he thought could have happened to
> Freeman. McGuffin said that he had no idea. At this point McGuffin
> did recall an instance where Leah was walking along the river on
> some rocks and she fell down and that he had to help her up.
> McGuffin thought if anything maybe she had been mad at him and
> was walking home, possibly along the river and maybe fallen and hit
> her head and fell into the water.

(Exhibit 5026-Binder 4, Perske, Page 25; CPD014563) And of course, about a week after the body was found in August of 2000, McGuffin drove Scott Hamilton to the scene of where the body was found, and they got out of the car at that time. (Exhibit 5001 at 851, 852). As Hamilton testified at the criminal trial:

> Q. What happened when you got out of the car?
> A. Nick kept looking down over the bank and talking about how, it's like he could see her laying down there by some rock or stump.
> Q. Did you see anything?
> A. I seen a rock or a stump down there, but other than bushes and sticks, no.  (Exhibit 5001 at 852)

McGuffin told a lot of people about his idea that Freeman fell and hit her head on a rock while she was walking along the river.  That does not prove anything towards a contention that the Defendants had Richard Bryant fabricate his testimony. It appears that the sole basis for this theory is that Richard Bryant was the stepson of David Hall.

### e. Blood evidence on Freeman's shoe.

Plaintiffs' account of what occurred related to blood evidence on one of Freeman's shoes is a blatant misrepresentation of what the evidence shows occurred. We will start at the beginning for context. Leah Freeman's right shoe was found on N Elm Street, just north of its intersection with W Central. The OSP Lab's testing of this shoe concluded "no blood was detected." (Exhibit 5026: Scientific Binder: CPD012729) Kathy Wilcox testified at the criminal trial as follows:

> Q. And State's Exhibit No. 96, your Exhibit No. 1, that would be the — what shoe would that be?
> A. Right. Exhibit No. 1 is the right shoe.
>
> Q. And I believe we've had testimony that Exhibit No. 97, the right shoe — or excuse me — No. 96 - - -
> A. (Interposing) No. 96 is the right shoe, yes.

> Q. - - - was found on Elm Street?
> A. Okay.
> ...
> So, I do regular light examination, bright light examination, a low
> powered microscopic examination, and tested three spots on the right
> shoe with a presumptive test for blood. And it was negative.

(Exhibit 5001 at 1157) It was, of course, the left shoe that Wilcox tested and

detected "[a] small amount of human blood...on the bottom" of the shoe (Exhibit

5026: Scientific Binder: CPD012729). Wilcox testified at the trial:

> And I tested — I had — I don't remember how many I tested. I think I
> tested six. And I had four presumptive tests for blood on the left shoe.
> I further tested one of those and it was human blood.

(Exhibit 5001 at 1158) Lt. Pex also testified regarding the blood found on the left

shoe at trial:

> Q. And I believe it's the left shoe, which I believe is State's Exhibit
> 97 in this case — did you examine that — the sole of that shoe?
> A. Yes, I did.
> Q. With Ms. Wilcox?
> A. Yes.
> Q. What did you see?
> A. I saw impact spatter on the sole of that shoe —impact blood
> spatter.

(Exhibit 5001 at 1341). There exists no fabricated evidence of blood on the right

shoe. Rather, the notion of there being blood on the right shoe comes from a

photograph of the *left shoe* that was mistakenly labeled as the right shoe by

Wilcox. This error was pointed out and clarified for the jury during trial:

> Q. Yeah, okay. Now, you were asked about the shoe, the shoes. And
> I'm interested right now in the left shoe. And I wanted to ask you, Ms.
> Wilcox, when we had Exhibit No. 31 up on the board, which gave us
> a closeup of the ball of the foot, there was some writing on the photo
> that labeled it as the right shoe. Would that have been an error?

A. Oh, yes.
Q. Okay.
A. That is bad.

(Exhibit 5001 at 1211) Put simply, there was zero evidence of blood on the right shoe fabricated, and zero evidence of blood on the right shoe presented to the jury. There was a photograph of the left shoe mistakenly labelled as the right which obviously led to confusion. Notably, Chief Dannels, who is accused of fabricating this evidence, did not testify at trial and did not testify about Freeman's shoes at all before the grand jury. Rather, Plaintiffs point to a statement Dannels made to an ABC News reporter wherein he repeated what he had been told by DA Frasier, which presumably came from the mistakenly labeled photograph discussed above. The ABC News 20/20 episode is, most importantly, not evidence. It was not presented to the jury, and it was not presented to the grand jury. Put simply, it did not affect in any way the prosecution and conviction of McGuffin. Neither the grand jury that indicted Mr. McGuffin nor the jury that convicted him of manslaughter were presented any evidence of blood on the right shoe, because no such evidence existed, fabricated or not. Finally, the mere idea of there being blood on Freeman's right shoe instead of the left is irrelevant. Plaintiffs argue that it was necessary to support the idea that Freeman was hit in the face near the cemetery where the right shoe was found. But they fail to acknowledge that the only person who ever took that position was Richard Walter. None of the Municipal Defendants ever took that position, and neither did DA Frasier. The notion that Freeman was "smashed in the face" at the location where her right shoe was found was not presented to the grand jury and was not presented to the jury at trial. The Plaintiffs' focus on the idea of blood evidence on the right shoe is unavailing.

/

/

*f. Switching cars.*

Plaintiffs allege that Officer Zavala fabricated evidence that McGuffin switched cars the night of Freeman's disappearance. The record unequivocally shows Zavala did no such thing. Zavala documented a traffic stop he conducted that evening of McGuffin, where he indicated the location where he pulled McGuffin over, the general substance of their conversation, his observations of McGuffin's demeanor, and the direction he observed McGuffin's car heading after the stop. (*See* Exhibit 5001 at 164-168) Officer Zavala did not document in his report, and he did not testify at grand jury or trial, that McGuffin switched cars. That information came from the at least *seven* witnesses who reported that they saw McGuffin driving his parents' Thunderbird that evening in addition to his blue Mustang. (Doc. No. 281 at 23) There is no evidence that any of those witnesses recanted their testimony, and no evidence that anyone was coerced into testifying falsely. The witnesses' statements of what they observed whether or not they vary or conflict, were for the grand jury and the jury to hear and determine their credibility. That is what happened. Finally, Plaintiffs allege that the Municipal Defendants *knew* the witness reports of seeing McGuffin driving the Thunderbird were false. The cited authority for this proposition is that McGuffin and his parents deny he was driving the Thunderbird that night. It should go without saying that McGuffin denying the accounts of several witnesses does not support the proposition that the Defendants knew every one of those witnesses were wrong.

*g. Whether the Mustang was "Wiped Clean."*

It is unclear what this allegation has to do with the Municipal Defendants. The analysis of McGuffin's Mustang was done by Kathy Wilcox of the state crime lab, and the evidence and testimony related to that examination was hers. Potential discrepancies in her testimony was a topic addressed during the trial. (See Exhibit 5001 at 1743-48)

In addition, common sense suggests that the Mustang was cleaned out prior to it being analyzed by the crime lab. If it had not been, one would expect to find evidence of Leah Freeman having been in the car, as well as Brent Bartley and Nicole Price, because we know all three were in the Mustang on June 28, 2000. The defense's expert, Ken Meneely, agreed to as much at the criminal trial:

> Q. And were you not aware that Leah Freeman was seen inside that car — that very car — the day she disappeared?
> A. I was aware of that.
> Q. And yet we didn't find anything putting her in that car?
> A. That's what the Laboratory reports say.
> Q. As a Criminalist, what does that mean to you?
> A. Well, they didn't find anything. That's all I can - - -
> Q. (Interposing) That means she wasn't in the car?
> A. Not necessarily.
> Q. Well, of course, we have witnesses that put her there. Would it be safe to say that a reasonable explanation of why nothing was found of her in that car is because it was cleaned out before it was examined by the State Police?
> A. One possibility. But, once again, the scientists are good scientists, too. So, all I can say is that nothing was found that was associated with her.

(Exhibit 5001 at 1507) Once again, Plaintiffs' position that the Municipal Defendants fabricated evidence or withheld material exculpatory evidence related to the state of McGuffin's Mustang is unsupported by the record.

## II. Each of the Municipal Defendants are entitled to dismissal.

Each of the Municipal Defendants are entitled to dismissal as a matter of law because they did not engage in conduct that violated Plaintiffs' constitutional rights. And, in the alternative, each individual defendant is entitled to qualified immunity on the record before this Court as discussed below.

/

/

*a. Reaves.*

First, Chief Reaves is entitled to be dismissed because nothing he did resulted in the prosecution of McGuffin. When Reaves retired in 2008, no prosecution of anyone had been commenced. Plaintiffs contend that Reaves is liable to them because he (1) interviewed John Lindegren and didn't believe Lindegren's account, (2) approved a police report drafted by Officer Zavala. Neither comes close to supporting any of Plaintiffs' claims against Reaves, and certainly does not support the claim that Reaves violated McGuffin's constitutional rights. And, though there is no basis to reach the issue, for purposes of qualified immunity there is no clearly established constitutional right to be free from the type of conduct Chief Reaves engaged in.

*b. Oswald.*

Plaintiffs' case against Oswald is perhaps even weaker. It is alleged that Oswald is liable to Plaintiffs because he testified before the 2010 grand jury that his DNA was found on Leah Freeman's left shoe. Certainly, there can be no dispute that Oswald did not conduct the DNA testing and has no independent knowledge of this fact; rather, he testified truthfully about what he was told the DNA testing showed. Aside from being absolutely immune from any claim arising out of this testimony, the testimony was true. As stated in Exhibit 5026: Scientific Binder: CPD 13086-Ltr from Mary Krings, forensic scientist, OSP Jan 21, 2002 to David Hall, Coquille Police Department:

> "Conclusions:
> The DNA profile of Kip Oswald is consistent with the minor profile in the previously analyzed Exhibit 2.3 (left Nike shoe). Kip Oswald is excluded as a contributor to the previously analyzed Exhibit 11 (white sock) and Exhibit 12 (Adidas sock)."

The above conclusion was confirmed in trial testimony of Wilcox. (Exhibit 5001 at 1166) It is then alleged that Oswald "contaminated, destroyed, or withheld key evidence about his finding of the shoe on Hudson Ridge." The evidence, however, simply shows that Oswald picked up a shoe that he did not know was Freeman's without gloves. (Exhibit 5002 at 300) He then notified the case officer and the FBI, and once it was determined it was likely related to Freeman investigation, he put the shoe into evidence. (Id. at 301) There is no indication that anything Oswald did bore any causal relationship whatsoever to the prosecution and conviction of McGuffin for Freeman's death. Plaintiffs' evidentiary case against Oswald is limited to the highly speculative and unqualified opinions of one of their many experts, as discussed below. For purposes of the qualified immunity analysis, there is no clearly established constitutional right to what is best described as evidence that may or may not have existed, and if it existed, may or may not have been exculpatory.

c. *Karcher.*

Deputy Medical Examiner Karcher's alleged wrongdoing has been addressed *supra*. Again, aside from her being immune from liability for any grand jury or trial testimony, her testimony was true. It is consistent with testimony of other witnesses and supported by photographic and other evidence. There is no evidence that she fabricated or destroyed anything or engaged in any conduct that violated the constitutional rights of the Plaintiffs. Karcher is likewise entitled to qualified immunity because there is no clearly established constitutional right to evidence which is inadvertently lost (the "Crime Scene Tape"), where there is no indication that it was exculpatory, and where there is abundant photographic evidence depicting the same scene.

/

/

### d. Zanni.

The primary allegation Plaintiffs make against Zanni, the Nick Backman issue, has already been discussed. Fatal to Plaintiffs' claims about the Nick Backman report is the fact that the report was in the possession of DA Frasier. Zanni did not withhold the report. And, McGuffin's defense team was given access to inspect the files of Frasier. (Exhibit 5083 at 4) Any lack of knowledge of Backman's knowledge on the part of both the defense and the prosecutor were not a result of anything Zanni did or did not do. Thus, Zanni did not violate the constitutional rights of the Plaintiffs. Finally, Zanni is entitled to qualified immunity on the second prong of the analysis because a clearly established constitutional right of a criminal defendant is not violated where a police officer obtains a witness statement, documents the contents of the statement in a report, and that report is provided to the prosecutor.

### e. Zavala.

Plaintiffs' allegations against Officer Zavala are addressed *supra.* The evidentiary record does not support a finding of any constitutional violation by Zavala. In the alternative, Zavala is entitled to qualified immunity because the constitutional rights of an individual are not violated where that individual is a person of interest in a missing person case and a police officer documents an encounter he had with that individual on the night in question.

### f. The Estate of Hall.

Plaintiffs' allegation against the estate of the deceased David Hall include (1) that he included in a search warrant affidavit that witnesses reported seeing McGuffin driving two different cars (this was true, as discussed above and in these Defendants' original Motion); (2) that Hall approved Karcher checking out a videotape to deliver to the lab in England on March 22, 2002 (Dave Hall left Coquille Police Department one month after this while the tape was in the

possession of the lab in England, and had no further involvement in the investigation) (Exhibit 5084 at 1); and (3) that he supposedly fabricated the statements made by his step-son, Richard Bryant (there is no evidence to suggest anything was fabricated, and notably, McGuffin's defense attorney at trial took the position that McGuffin had spoken to Bryant about Leah Freeman while they were in jail together in 2002) (Exhibit 2001 at 1139). The evidence does not support the contention that Hall did anything to violate the constitutional rights of the Plaintiffs. Importantly, when Hall left Coquille Police Department, no prosecution of McGuffin had been initiated, and Plaintiff S.M. had not been born. Hall is also entitled to qualified immunity because his conduct did not violate clearly established constitutional rights of the Plaintiffs.

   g. *The Cold Case Investigators.*

   Dannels, Sanborn, Webley, McNeely, and Schwenninger were first involved in the Freeman investigation years after the case had gone cold and no prosecution had been initiated. As detailed previously, there is no evidence that they fabricated anything. These allegations involve statements that are not evidence and were never presented to the grand jury or at trial (i.e., Dannels' comment about blood on one of Leah Freeman's shoes to ABC News, which he believed to be true and the source of that mistaken information easily traced); allegations of coercion of witnesses that either did not happen, were allegedly done by others and not the Municipal Defendants (i.e., Riddle questioning of Steinhoff about McGuffin's clothing); or in any event, even if true, do not support a claim for fabrication of evidence. Plaintiffs argue that they can prove a fabrication of evidence claim just by showing that witnesses were subjected to coercion. This is incorrect. The clearly established constitutional right the Ninth Circuit recognizes is "the right not to be subject to criminal charges <u>on the basis of false evidence</u> that was <u>deliberately fabricated</u> by the government." *See Devereaux v. Abbey*, 263

F.3d.1070 (9th Cir. 2001). In addition to causation, Plaintiffs must prove both that the evidence is false *and* that it was deliberately fabricated. The language from *Devereaux* Plaintiffs rely on, using "investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information," is one of the ways they can attempt to prove the *mens rea* requirement for a fabrication claim using circumstantial evidence; that is, whether a defendant acted deliberately, or intentionally. That does not obviate the threshold requirement to prove that what was produced was false. The cases cited by Plaintiffs confirm as much. *See, e.g., Costanich v. Dept. of Soc. & Health Servs.*, 627 F.3d 1101, 1112 (9th Cir. 2010) (qualified immunity at summary judgment was denied because there was admissible evidence pointing to the falsity of the evidence alleged to have been fabricated). *Devereaux* itself clarifies that aggressive or coercive questioning techniques alone do not support a fabrication of evidence claim ("an allegation that an interviewer disbelieved an initial denial and continued with aggressive questioning of the child cannot, without more, support a deliberate-fabrication-of-evidence claim, even if the allegation is amply supported by the evidence") 263 F.3d. at 1077; *see also Gausvik v. Perez*, 345 F.3d 813, 817 (9th Cir. 2003) (Holding that Plaintiff could not as a matter of law rely upon allegedly coercive interviews to prove his deliberate-fabrication-of-evidence claim). On the record before this Court, as discussed herein, the Plaintiffs have not shown that the witness statements they allege were fabricated were false. In the absence of evidence of actual falsity, they cannot sidestep this requirement and rely only on allegations of coercion. The same is true for the Defendants' alleged knowledge of McGuffin's innocence. The record is clear that far from knowing McGuffin was innocent, the Municipal Defendants believed there was cause to indicate McGuffin was involved in the death of Leah Freeman. And, it must be remembered, DA Frasier was the one leading the investigation and eventually the

prosecution. Without Frasier's instruction and eventual decision to present the case to a grand jury, there would have been no pursuit or prosecution of anyone related to Freeman's death. (See Declaration of Dannels, Doc. No. 283, at 2-3; Declaration of Reaves, Doc. No. 282, at 4)

    With regard to withholding or suppressing evidence, it is important to remember that, even if Plaintiff could prove that something was withheld, it has to have resulted in prejudice; that is, it has to be likely that disclosure of the allegedly withheld evidence would have led to a different verdict. As discussed elsewhere herein, the evidence Plaintiffs allege was destroyed, suppressed, or withheld, either was not in fact any of those things, was not exculpatory, was not material, or was not evidence that was required to be disclosed (for example, unauthenticated meeting notes containing hearsay statements from investigators summarizing the contents of items of evidence and reports that were disclosed). However, to the extent anything was subject to disclosure, there is no evidence that any prejudice ensued. An example is the Survivor: Borneo Wikipedia printout. The evidence in the record is inconsistent with the allegation that this document was withheld from the District Attorney. While Hjordis Lindegren's mistaken assumption about which episode aired on the night of Freeman's disappearance came up during the 2010 Grand Jury, at which point there was no indictment and therefore no discovery obligation under *Brady*; and, by the time of trial there was no mention of who was voted off. Why? Because DA Frasier knew by the time of trial that Hjordis Lindegren was mistaken about Rudy being voted off and that it was factually impossible that John Lindegren reported to police on July 16, 2000, an observation he would not make until weeks later. This is wholly inconsistent with the theory that any information was withheld from Frasier by the investigators. And, finally, all reports of interviews and the entirety of the testimony from the grand jury was produced to the defense, so the defense was on notice of each and every way John

and Hjordis Lindegren's statements conflicted and had the opportunity to utilize these to cross-examine John Lindegren at the trial.

The alleged failure to produce the photos of cars shown to witness Alicia Hartwell (Hyatt) also does not violate *Brady*. This exact situation alleged here occurred in *Cannon v. Polk County/Polk County Sheriff*:

> Plaintiffs argue that Polk County Sheriff's Deputy Hols apple and Sheriff Steele violated Brady, because, under *1278 their supervision, a photo line-up of Thomas McMahon was never produced to defense counsel. McMahon was a known associate in Kinser's drug trade and, at the time of the murder, Kinser's codefendant for drug charges in Marion County. Based on this information, Sergeant Jeff VanLaanen prepared a photo line-up that included a photo of McMahon, The line-up was shown to Boyd in order to determine if she had seen McMahon on the property in the days preceding the murders. Boyd could not identify McMahon. Plaintiffs complain that this photo line-up was not attached to Sergeant VanLaanen's incident report; and therefore not disclosed to plaintiff's criminal defense counsel, resulting in a Brady violation.
>
> The Polk County/City of Dallas defendants argue that the photo line-up was not suppressed. They reason that Sergeant VanLaanen's incident report was provided to defense counsel, and, while it does not contain the photo line-up itself, it contains all of the information necessary for defense counsel to know that a photo line-up existed. Defense counsel's knowledge of the photo line-up is confirmed in his memorandum, dated February 9, 1999, which notes the photo line-up of McMahon. LeGore Decl. Ex. 16. Because defense counsel knew that the lineup existed, Polk County/City of Dallas defendants argue that the suppressed evidence would have been produced if defense counsel exercised reasonable diligence. Therefore, they argue, the lineup was not suppressed, and plaintiffs fail to satisfy the second factor of Brady.
>
> The Ninth Circuit recently opined that a "prosecutor's obligation under Brady is not excused by a defense counsel's failure to exercise diligence with respect to suppressed evidence." *Amado v. Gonzalez*, 758 F.3d 1119, 1135 (9th Cir.2014). The court explained that a

prosecutor cannot avoid a Brady claim "by pointing to that which conceivably could have been discovered had defense counsel ... enlarge[d] his investigations." Id. at 1136–37. On the other hand, "defense counsel cannot lay a trap for prosecutors by failing to use evidence of which defense counsel is reasonably aware for, in such a case, the jury's verdict of guilty may be said to arise from defense counsel's stratagem, not the prosecution's failure to disclose." *Id.* at 1135. Similarly, "defense counsel cannot ignore that which is given to him or of which he otherwise is aware." Id. at 1137.

In this case, obtaining the photo line-up would not have required defense counsel to "enlarge his investigation." Similarly, the photo line-up was not the type of evidence that defense counsel could only conceivably discover. Rather, it is clear that defense counsel was aware of the existence of the photo line-up. LeGore Decl. Ex. 16 (memorandum by defense counsel states "Presented the photo lineup with McMahon to Boyd?"). Defense counsel had an apparent opportunity to obtain the allegedly suppressed evidence, but he made a strategic decision not to pursue that line of defense. Defense counsel's stratagem cannot give rise to a valid Brady claim. Amado, 758 F.3d at 1135. Therefore, the facts alleged do not show that the Polk County/City of Dallas defendants' failure to produce the photo line-up violated plaintiffs' constitutional rights, and plaintiffs cannot satisfy the first prong of the qualified immunity test. Accordingly, defendants are awarded qualified immunity as to this claim.

68 F. Supp. 3d 1267, 1277–78 (D. Or. 2014), *aff'd sub nom. Cannon v. Polk Cnty.*, 702 Fed. Appx. 527 (9th Cir. 2017). We have the same situation here. The report accounting Alicia Hartwell's statement and the fact that she was shown photos of different cars was produced to the defense. It appears at Bates number 005508-09 in the criminal discovery. And, Hartwell (then addressed by her married name Hyatt) was cross examined at length during the criminal trial regarding her statements to police and the alleged discrepancies. We do not know, because Plaintiffs have invoked privilege, why defense counsel did not follow up on the photos that they knew were shown to Hartwell, but the alleged withholding of those photos does not support a *Brady* claim just as the photo lineup in *Cannon* did

not, and as a result the defendant officers are entitled to qualified immunity pursuant to either prong of the analysis.

## III. The "So What?" Argument.

Plaintiffs' allegations that the Defendants' conducted a negligent and flawed investigation can be addressed with what we'll call the "so what?" argument. Plaintiffs have produced no evidence of who would have been arrested absent a what they allege was a negligent, flawed investigation into the death of Leah Freeman. That is, if what Plaintiffs deem a proper investigation had been conducted, who would have been arrested. What would a proper investigation had disclosed that the investigation in this case did not disclose. The answer is there is no one else that would have been arrested because the proper person was arrested.

The grand jury returned the indictment, not any of the Municipal Defendants. If there had been no negligence, what evidence would have been presented to the grand jury that would have changed their mind that McGuffin did not do it. And, the jury convicted McGuffin, not any of the Municipal Defendants. If there had been no negligence or other wrongdoing, what evidence would have been presented to the jury that would have changed their mind that McGuffin did not do it.

Finally, nothing Plaintiffs' many experts say can create an issue of fact. The evidence in the record is what is relevant in determining whether there is an issue of material fact for the jury, not the Plaintiffs' experts' statements. Simply stated, none of the Plaintiffs' experts' testimony is admissible in this case.

## IV. Conclusion.

For all of the foregoing reasons, as well as all of the reasons detailed in the Municipal Defendants' original Motion for Summary Judgment, these moving

Defendants are entitled to judgment as a matter of law and a dismissal of all of the Plaintiffs' claims with prejudice.

DATED:  Tuesday, March 11, 2025.

Respectfully submitted,

By:    /s/ Robert E. Franz, Jr.
FRANZ & HENDERSON
**Robert E. Franz, Jr.**
OSB #730915
(541) 741-8220
 **Of Attorneys for Municipal Defendants**


/s/ Sarah R. Henderson
FRANZ & HENDERSON
**Sarah R. Henderson**
OSB #153474
(541) 741-8220
 **Of Attorneys for Municipal Defendants**