**Robert E. Franz, Jr.**    OSB #730915
E-Mail:  rfranz@franzlaw.comcastbiz.net
**Sarah R. Henderson**    OSB #153474
E-Mail:  shenderson@franzlaw.comcastbiz.net
Franz & Henderson
P.O. Box 62
Springfield, OR 97477
Telephone:  (541) 741-8220
Attorneys for Mark Dannels, Pat Downing, Kris Karcher, Shelly McInnes,
Raymond McNeely, Kip Oswald, Michael Reaves, Sean Sanborn,
Eric Schwenninger, Chris Webley, Anthony Wetmore, Craig Zanni,
David Zavala, Estate of David E. Hall, City of Coquille, City of Coos Bay,
and Coos County, Oregon

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| Nicholas James McGuffin, as an individual and as guardian *ad litem*, on behalf of S.M., a minor, | Case No. 6:20-cv-01163-MTK |
| Plaintiffs, | |
| v. | |
| Mark Dannels, Pat Downing, Susan Hormann, Mary Krings, Kris Karcher, Shelly McInnes, Raymond McNeely, Kip Oswald, Michael Reaves, John Riddle, Sean Sanborn, Eric Schwenninger, Richard Walter, Chris Webley, Anthony Wetmore, Kathy Wilcox, Craig Zanni, David Zavala, Estate of Dave Hall, Vidocq Society, City of Coquille, City of Coos Bay, Coos County, and Oregon State Police, | **EXHIBIT 5082** **Declaration of Robert E. Franz, Jr.** in Support of Municipal Defendants' Reply in Support of their FRCP Motion for Summary Judgment |
| Defendants. | |

008277                                              008277                                    008277

**City of**
**Coquille**
POLICE
*People Serving People Since 1885*

Mark J. Dannels
*Chief of Police*

| Distribution: | | | | | Approved By: |
|---|---|---|---|---|---|
| DA | Juv | SCF | Mental | **Incident Report:**Q20001905 | |
| P&P | Animal | Med Exam | | | Signature |
| other ( ) | | | | *Current As Of:* Friday, June 24, 2011 | Badge |

## Single Continuation Report

### Summary
On June 23, 2011 I spoke with Peggy Mitchell and Cherie Mitchell and conducted a follow up interview.

### Mentioned

### Action Taken
On June 23, 2011 at approximately 1005 hours, I met with Cherie Mitchell and her mother, Peggy Mitchell at Cherie's home at 1115 Windsor Ave. in North Bend. I provided both Cherie and Peggy with copies of reports from Bonk and Bonk Investigations provided to me by the District Attorney. I asked both to read the reports and let me know if there were any inaccuracies or anything they would like to add.

Peggy Mitchell noticed that the report said she stated Nick "probably" came in from the other direction. We were somewhat confused by the run on sentence which did not make it clear if the writer was reporting Nick said he probably came in from the other direction or if Peggy said he probably came in from the other direction. Peggy clarified that she simply could not possibly know or have known which way Nick approached the house and felt it was inaccurate to use the word "probably" in any case.

Cherie, who is studying to be a teacher, said the report was difficult for her to read since the writer used poor sentence and paragraph structure. Cherie said she often found it hard to tell what was being said because she was distracted by wanting to change the writing structure to make sense.

Cherie said she felt the whole interview was awkward and strange to start with. Cherie said she had called Joyce Bonk out of politeness and willingness to honestly assist with the case any way she could. Cherie said when Bonk asked her to talk for a few minutes she agreed. Cherie said she was greatly surprised that the first five minutes were spend with Bonk telling her she had clogged her garage disposal with spaghetti. Cherie said Bonk kept talking to her husband about getting the disposal cleaned out and was distracted.

Cherie said that after about an hour and a half of talking with Bonk on the phone is was "hard not to be offended". Cherie said Bonk talked so much about the case and kept giving her own opinions on what might have happened. Cherie said she did not feel free to be open at all and was surprised at how few questions Bonk had. Cherie said Bonk seemed to have a personal opinion and vested interest and felt Bonk would have been angry or offended if Cherie had disagreed with her.

Cherie said Bonk kept telling her what a "nice young man" Nick McGuffin was now and that he was

008277                                              008277                                    8277

Exhibit 5082 at 1

"not the same as he was in high school".  Cherie said she felt this was irrelevant since the crime occurred ten years ago and also wondered how it was that Bonk knew McGuffin so well on a personal level.  Cherie said at the end of the interview she felt like "calling Nick's lawyers and telling them to hire somebody else".

As Cherie read the report, she made multiple corrections.  At one point she noticed the sentence, "Stating Cheri doesn't remember."  Cherie was unclear from the sentence what it was she supposedly did not remember and told me she also noticed her name was spelled different ways.

Cherie noticed the report said she had stated her mother was was moving near her in Oregon City, Oregon soon.  Cherie said that is simply not true.  Cherie and Peggy both shared detailed plans with me to move to Anchorage Alaska after the trial is over.  Cherie also said that back in 2000 her mother was not moving to Oregon City either.  We were unclear on what the meaning of the sentence was.

Cherie found  Cherie said she felt the report was written in such a way as to make it "sound like I'm backing Nick".  Cherie said, "I'm not backing Nick.  I just want the truth."

Cherie was puzzled by Bonk's mention of "a large guy with a beard that looked like Santa Claus".  When I told Cherie this was referring to John Lindegren, she knew who the man was.  Cherie recalled knowing who Lindegren was and his having a sister living in the area.  Cherie told me Bonk had told her Lindegren had overheard her and Leah arguing before Leah walked away and that he recalled seeing Leah.  Cherie said she was confused because she and Leah had walked down N. Elm St. towards W. 4th St. where she watched Leah walk a block or so down W. 4th St.  Cherie said she did not see Lindegren during this time.

I explained that Lindegren did not claim to have seen her or personally overheard her and Leah arguing.  Rather, Lindegren had reported seeing Leah and Nick McGuffin at what would have been a short time after she and Leah's argument.  Cherie asked me how this could be true.

I asked Cherie specifically how far she watched Leah walk down W. 4th St. and she said it was not very far and only "a minute or so".  Cherie said she kept expecting Leah to turn around and walk back.  Cherie said she knew Leah did not walk as far as N. Cedar St. before Cherie went back down N. Elm St. and returned to her home.  Cherie said she knew Leah would have turned left on N. Cedar St.  because they always walked that way.  Cherie explained that N. Cedar St. crosses W. 6th St. and continues to a trail leading down where the roads continue before intersecting with E. 10th St.  Cherie said this was a shortcut if they were walking to Leah's house in Sanford Heights or anywhere else on that side of town.

I asked Cherie if it seemed possible Leah had turned down N. Cedar St., seen McGuffin drive by and then started walking back to Cherie's house to meet him.  When McGuffin found out from Cherie that Leah had just left he started out her driveway and met up with Leah on N. Elm St. where Lindegren was walking past with his dog and saw them.  Cherie said the time frame would fit perfectly and would also answer her question of many years, why McGuffin had not seen Leah as he drove up W. 4th St. to her house.

Cherie said she knew that if McGuffin did come in contact with Leah after she and Leah's argument, "they would have gotten in a huge fight".  Cherie said, "I know Leah and if she saw him, she would have wanted to take it out on him after our fight."  Cherie said she had gotten the feeling McGuffin and Leah were fighting before Leah arrived but she did not talk with Leah about it.  Cherie said Leah did not talk much about McGuffin to her because she knew Cherie did not approve of him.

Cherie said as far as she knew, McGuffin was the only person Leah had ever slept with and that

008278          008278          008278

Exhibit 5082 at 2

Case 3:21-cv-01719-MTK   Document 226-11   Filed 03/11/25   Page 4 of 4

she actually wasn't real comfortable with the physical relationship. Cherie said Leah did not talk to her a lot about intimacy but did think she would have known if Leah had slept with anyone else. I asked Cherie if Leah liked older men and she said Leah had really not dated much so she didn't know for sure.  Cherie said Leah was "snobby" and would probably never have hung around younger kids though.

Cherie and Peggy both said they noticed Bonk kept bringing up Corey Bryant.  Cherie said Bonk kept making an issue that she was unable to recall Bryant being around that night at any time.  Cherie said to her it made perfect sense that she did not recall Bryant 10 years later.  Cherie said Bryant's visit would have only been a short one and after all the years of thinking about Leah's disappearance, Bryant was not the focus of her memories.

Cherie said Bonk also made an issue of her and Bryant breaking up and asked her if Bryant "just vanished".  Cherie said this was ridiculous as he did no such thing, rather stayed friends with her and continued his job and life much as he had before.  Cherie reminded me that she was only 14 years old at the time and having a boyfriend was a very new experience for her and not that involved.

Peggy said Bonk had also seemed to make an issue out of her not recalling if Bryant was there or not.  Peggy said it was very normal for Bryant to stop by and visit briefly and for her not to even know he had been there.  Peggy said she had told Bonk this but noticed it was missing from the report.  Peggy said Bryant and Cherie often talked in his truck, which he usually parked in the driveway.  Peggy said she recalled getting complaints from neighbors about the truck running while they talked.

Peggy and Cherie described Bryant as a very nice, gentle person to the point of being a "sissy".  Cherie said that when they did have arguments, Bryant never grew angry or showed any signs of violence.  Cherie said all her friends liked Bryant and he was very popular and known for his good personality.

During our conversation about Bryant and his vehicle, Peggy mentioned that a neighbor who would have lived to the south of them had owned a tan truck that was sometimes parked sideways in the yard and might have extended into N. Elm St. partially.

Peggy and Cherie both made corrections to the Bonk and Bonk report and signed them.  I signed the reports as a witness.

*Statements*

*Evidence/ Property*

*Action Recommended*

| | | |
|---|---|---|
| Date/ Officer: | 6/24/2011   WEBLEY | Incident:   Q20001905 |

Officer's Signature:                                      Date:

008279                                        008279                                        008279

Exhibit 5082 at 3