DAN RAYFIELD
Attorney General
JESSE B. DAVIS #052290
Senior Assistant Attorney General
TODD MARSHALL #112685
Senior Assistant Attorney General
KRISTEN E. HOFFMEYER #085338
Senior Assistant Attorney General
Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email: jesse.b.davis@doj.oregon.gov
       Todd.Marshall@doj.oregon.gov
       kristen.hoffmeyer@doj.oregon.gov

Of Attorneys for State Defendants Hormann,
Krings, Riddle, Wilcox and Oregon State Police

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| NICHOLAS JAMES MCGUFFIN, as an individual and as guardian *ad litem*, on behalf of S.M., a minor, <br><br> Plaintiffs, <br><br> v. <br><br> MARK DANNELS, PAT DOWNING, SUSAN HORMANN, MARY KRINGS, KRIS KARCHER, SHELLY MCINNES, RAYMOND MCNEELY, KIP OSWALD, MICHAEL REAVES, JOHN RIDDLE, SEAN SANBORN, ERIC SCHWENNINGER, RICHARD WALTER, CHRIS WEBLEY, ANTHONY WETMORE, KATHY WILCOX, CRAIG ZANNI, DAVID ZAVALA, ESTATE OF DAVID E. HALL, VIDOCQ SOCIETY, CITY OF COQUILLE, CITY OF COOS BAY, and COOS COUNTY, <br><br> Defendants. | Case No.  6:20-cv-1163-MTK (Lead Case) <br>              3:21-cv-1719-MTK (Trailing Case) <br><br><br> STATE DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT |

VIDOCQ SOCIETY,

        Cross-Claimant.

RICHARD WALTER,

        Cross-Claimant.

---

NICHOLAS JAMES MCGUFFIN, as an individual and as guardian ad litem, on behalf of S.M., a minor,

        Plaintiff,

    v.

OREGON STATE POLICE,

        Defendant.

## TABLE OF CONTENTS

I.    PLAINTIFFS TAKE LIBERTIES WITH THE FACTS TO SUPPORT THEIR
      NARRATIVE. ........................................................................................................ 1

II.   PLAINTIFFS FAIL TO DEMONSTRATE A TRIABLE ISSUE OF FACT
      THAT ANY STATE DEFENDANT FABRICATED DNA EVIDENCE OR
      WITHHELD ANY DNA EVIDENCE IN VIOLATION OF *BRADY*. ........................... 4

      A.    Krings and Hormann did not violate *Brady* as a matter of law. ............................ 4

      B.    Krings did not fabricate evidence as a matter of law. ............................................ 8

      C.    Hormann did not fabricate evidence or violate *Brady* as a matter of law ............. 11

III.  PLAINTIFFS FAIL TO DEMONSTRATE ANY TRIABLE ISSUE OF FACT
      PRECLUDING SUMMARY JUDGMENT IN FAVOR OF WILCOX. ......................... 13

      A.    Wilcox is entitled to testimonial immunity for her testimony about the
            DNA analysis and results at trial. .......................................................................... 13

      B.    Wilcox is entitled to summary judgment against Plaintiffs' claims that she
            fabricated evidence of blood on Freeman's shoes. ................................................ 14

            1.    Wilcox did not fabricate evidence of blood on the right (cemetery)
                  shoe or suppress exculpatory evidence about it ......................................... 14

            2.    Wilcox did not fabricate evidence of blood spatter on the left
                  (Hudson Ridge) shoe .................................................................................. 15

      C.    Wilcox is entitled to summary judgment against Plaintiffs *Brady* claims. ............ 16

            1.    The claim that Wilcox suppressed evidence about the Mustang not
                  being "wiped clean" fails ........................................................................... 16

            2.    The claim that Wilcox suppressed evidence about the blood on the
                  left shoe and the "high velocity blood spatter" fails ................................. 17

            3.    The claim that Wilcox suppressed evidence of her conversations
                  with others fails .......................................................................................... 18

IV.   PLAINTIFFS FAIL TO DEMONSTRATE ANY TRIABLE ISSUE OF FACT
      PRECLUDING SUMMARY JUDGMENT IN FAVOR OF RIDDLE. ......................... 19

      A.    Riddle did not fabricate any evidence regarding Bartley, the pretext call
            with Hamilton, that McGuffin was violent, or an informant statement. ................ 19

      B.    Riddle did not fabricate any evidence that McGuffin threatened Steinhoff
            or coerced her into saying that McGuffin had changed cars or clothes. ................ 21

      C.    Riddle is entitled to summary judgment on Plaintiffs' *Brady* claims. ................... 21

Page i

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

V.    PLAINTIFFS FAIL TO REBUT THE PRESUMPTION EVIDENCE THAT THE GRAND JURY'S INDICTMENT WAS SUPPORTED BY PROBABLE CAUSE........ 22

    A.    The DNA evidence. ................................................................................. 25

    B.    The evidence placing McGuffin and Freeman together after 9:00 pm. ................. 25

    C.    The evidence suggesting McGuffin cleaned his trunk to conceal his guilt. ......... 27

    D.    The evidence of McGuffin's incriminating statements. ..................................... 30

        1.    Steinhoff and Crook ............................................................................. 30

        2.    Breakfield, Edgerton, and Beebe ............................................................. 32

    E.    State Defendants have not mischaracterized the grand jury testimony ............... 32

VI.    CONCLUSION................................................................................................. 33

Page ii

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. al-Kidd*,
  563 U.S. 731 (2011)...................................................................................................7

*Awabdy v. City of Adelanto*,
  368 F.3d 1062 (9th Cir. 2004)..................................................................................22

*Briscoe v. LaHue*,
  460 U.S. 325 (1983)..................................................................................................14

*Brown v. Miller*,
  519 F.3d 231 (5th Cir. 2008) .....................................................................................7

*Camm v. Faith*,
  937 F.3d 1096 (7th Cir. 2019)..................................................................................30

*Devereaux v. Abbey*,
  263 F.3d 1070 (9th Cir. 2001) .................................................................................30

*Fields v. Wharrie*,
  740 F.3d 1107 (7th Cir. 2014) .................................................................................30

*Franklin v. Terr*,
  201 F.3d 1098 (9th Cir.2000) ..................................................................................14

*Gregory v. City of Louisville*,
  444 F.3d 725 (6th Cir. 2006) .....................................................................................7

*State v. Harwood*,
  45 Or. App. 938-939 (1980) .....................................................................................27

*Libby v. City of Medford*,
  No. 1:15-CV-00298-CL, 2017 WL 2219995 (D. Or. Mar. 17, 2017) .....................22

*Lisker v. City of Los Angeles*,
  780 F.3d 1237 (9th Cir. 2015) .................................................................................14

*Lobato v. Las Vegas Metro. Police Dep't.*,
  No. 22-16440, 2023 WL 6620306 (9th Cir. Oct. 11, 2023) (unpublished)
  (applying, in reliance on *Ziglar*, the intracorporate-conspiracy doctrine to §
  1983 claims)..............................................................................................................18

*McSherry v. City of Long Beach*,
  584 F.3d 1129 (9th Cir. 2009) ...................................................................1, 22, 26, 31
Page iii

*Merritt v. Arizona*,
  425 F.Supp.3d 1201 (D. Ariz. 2019) .................................................................................22, 29

*Mullenix v. Luna*,
  577 U.S. 7 (2015)...............................................................................................................6, 7

*O'Doan v. Sanford*,
  991 F.3d 1027 (9th Cir. 2021) ..............................................................................................29

*Peterson v. Regina*,
  935 F.Supp.2d 628 (S.D.N.Y. 2013).....................................................................................30

*Pierce v. Gilchrist*,
  359 F.3d 1279 (10th Cir. 2004) .............................................................................................7

*Raley v. Ylst*,
  470 F.3d 792 (9th Cir. 2006) .................................................................................................5

*Roberts v. Howton*,
  13 F.Supp.3d 1077 (D. Or. 2014) ...............................................................................5, 6, 7, 8

*Spencer v. Peters*,
  857 F.3d 789 (9th Cir. 2017)................................................................................................15

*Tekoh v. County of Los Angeles*,
  270 F.Supp.3d 1163 (C.D. Cal. 2017) .............................................................................27, 30

*Tennison v. City & Cnty. of San Francisco*,
  570 F.3d 1078 (9th Cir. 2009) ...............................................................................................8

*Villasana v. Wilhoit*,
  368 F.3d 976 (8th Cir. 2004) .................................................................................................7

*Ziglar v. Abbasi*,
  582 U.S. 120 (2017)..............................................................................................................18

**Statutes**

ORS 132.320(4), 132.390 .........................................................................................................27

**United States Code**

42 U.S.C. § 1985(3) ..................................................................................................................18

**Rules and Regulations**

Fed. R. Civ. P. Rule 30(b)(6).....................................................................................................12

Page iv

Plaintiffs, in their Response to State Defendants' Motion for Summary Judgment, do not address many of the most significant arguments the State Defendants raised.[1]  Instead, Plaintiffs rely on their flawed narrative that investigators, having bungled the investigation and facing intense community pressure, needed the State Defendants to "bury exculpatory DNA results, fabricate evidence, and coerce and manipulate witness testimony in a concerted effort to bring about the prosecution and ultimate conviction of McGuffin."[2]  Plaintiffs leap over factual gaps, blend pre-conviction and post-conviction forensic analysis, compress the various defendant groups into a monolithic actor, and mischaracterize the evidence to advance that narrative. Plaintiffs shape the events of nearly 20 years, including the State Defendants' actions—their testing and analysis, their professional recommendations, their emails, their very thoughts—to fit the outline of that predetermined narrative.  The Court should not be persuaded.  "Surmise, conjecture, theory, speculation and an advocate's suppositions cannot do duty for probative facts and valid inferences."[3]  The State Defendants' Motion for Summary Judgment should be granted and all State Defendants should be dismissed from this action.

## I.    Plaintiffs take liberties with the facts to support their narrative.

Plaintiffs often lump "the Defendants" into a single group, frequently ascribing actions to "the Defendants" that each of the defendants could not have taken.  Plaintiffs attribute to "the Defendants" the singular objective of convicting McGuffin of the murder of Leah Freeman, irrespective of the facts relevant to each individual defendant's involvement.  Plaintiffs ignore the ordinary reality that different law enforcement agencies, especially in small jurisdictions, work with each other.  Ignoring that reality, Plaintiffs do little to explain how a reasonable

---

[1] The State Defendants' Motion for Summary Judgment (ECF 294) will be cited as "State Defendants' Motion."  Plaintiffs' Response to the State Defendants' Motion (ECF 326) will be cited as "Plaintiffs' Response."  Exhibits will be cited by identifying the Declaration to which they were attached, followed by the exhibit number, page number, and line number where appropriate.

[2] Plaintiffs' Resp. at 15.

[3] *McSherry v. City of Long Beach*, 584 F.3d 1129, 1136 (9th Cir. 2009) (quotation omitted).

Page 1 -    STATE DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT

factfinder could conclude that the Defendants' contacts with each other—their meetings, emails, and memoranda—evince a conspiracy rather than ordinary, lawful cooperation.  For example, Plaintiffs assert that in May 2004, "the Defendants accused McGuffin of another murder" because he had not been cleared in the Freeman investigation.[4]  Their support for that assertion is an instance in which Defendant Downing, investigating a 2004 murder in Corvallis, asked McGuffin about his whereabouts when the victim went missing.[5]  McGuffin provided proof of his whereabouts and that concluded the inquiry.[6]  No State Defendant was involved: By 2004, Krings had left OSP, Hormann had done no more than provide technical review of Krings' work, Wilcox retired that year, and Riddle had not yet done any work on the Freeman investigation.  Yet, Plaintiffs offer the 2004 interview as evidence of all Defendants' unlawful objective and dogged pursuit of McGuffin.

As another example, Plaintiffs assert the conspiracy to convict McGuffin continued for years, even though by August 2000, "the Defendants had DNA evidence that further proved McGuffin's innocence," referring to the low level male DNA on Freeman's shoes.[7]  Putting aside the dispute over Krings' analysis of the shoes, this low level male DNA did not then, and does not now, prove McGuffin's innocence.  Plaintiffs' own DNA expert admitted that shoes are dirty objects from a DNA perspective and frequently come into contact with sources of DNA.[8]

As another example, Plaintiffs assert that the "male DNA on the right (cemetery) shoe does not match McGuffin, his family members, or any of his male associates who were also

---

[4] Plaintiffs' Resp. at 18-19.

[5] Puracal Decl. (ECF 330, leading case) Ex. 69 at 2.  State Defendants understand that Plaintiffs intend to dismiss Downing as a defendant.  Third Davis Decl. Ex. 157 at 1 (email from Plaintiffs' counsel).

[6] Puracal Decl. Ex. 69 at 2.

[7] Plaintiffs' Resp. at 18.

[8] Third Davis Decl. Ex. 158 at 5-6 ( 144:16-145:6) (Nasir 2024 deposition); Third Davis Decl. Ex. 159 at 2-4 (32:7-33:9) (Nasir 2019 deposition taken in post-conviction relief case ) (describing the many ways DNA could be deposited on a shoe and admitting there is no way to know how many people came into contact with Freeman's shoes).

Page 2 -    STATE DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR
                    SUMMARY JUDGMENT

sampled during the 10-year long criminal investigation."[9]  This statement is highly misleading.

It suggests that McGuffin and his male "associates" were tested and compared to the shoe during

the 10 years of investigation between Freeman's death in 2000 and McGuffin's indictment in

2010.  But that is simply false.  In that period, DNA from Defendant Kip Oswald, Elzie

Shamblin, and Bill Sero was analyzed and compared to the *left* shoe (not the *right* shoe).[10]  Of

those people, only Sero could be described as an associate of McGuffin.[11]  In October 2017,

several of McGuffin's actual male associates were compared with the both shoes *for the first*

*time*.[12]  But in order to support their narrative, Plaintiffs falsely suggest that these later-obtained

results were known before the criminal trial.  Plaintiffs make this assertion in a more egregiously

misleading way later in their Response.[13]

As another example, Plaintiffs assert that "handwritten notes confirm that the Municipal

Defendants had conversations with the OSP Lab about the DNA on Freeman's shoes," referring

to a note from McNeely in 2010 that reads, "DNA in fridge – Leah's shoes - ?"[14]  Plaintiffs do

---

[9] Plaintiffs' Resp. at 24.

[10] Davis Decl. Ex. 133 at 1-3 (report by Marla Kaplan dated May 17, 2017, reanalyzing the samples that were examined during the investigation up through 2010, describing comparison with profiles from McGuffin, Shamblin, Oswald, Sero and unknown male profiles to item 1.3).

[11] Davis Decl. Ex. 101 at 794 (70:2-4) (Sero grand jury testimony, he vaguely knew McGuffin).

[12] Davis Decl. Ex. 132 at 4 (report by OSP's Janelle Moore, comparing McGuffin, Brent Bartley, Aaron West, Josh Emler, David Jenkins, and Richard Crook, among others, to two samples from the right shoe).  Those individuals, who were McGuffin's associates, were excluded as contributors to one of the samples (item 1.2), but the contribution of McGuffin and those others to another right shoe sample (item 1.3) was inconclusive, meaning that they could neither be included or excluded.  *Id*.  Plaintiffs then allege in a footnote that this report of McGuffin's "inconclusive" contribution is also fabricated, an allegation they do not explain other than to direct the Court to the 35-page report of expert Kent Harman.  Plaintiffs' Resp. at 24 n.91.  The only apparent relevance of that alleged fabrication in 2017—which does not touch any individual defendant—is to support the fabrication narrative.

[13] *See* Plaintiffs' Resp. at 35 ("McGuffin, his family, and his known male associates at the time, were expressly excluded as potential matches to the DNA found on Freeman's shoes.  And yet, written OSP Lab reports from 2000 and 2002, which were relied upon by the parties in the criminal proceedings and used at grand jury and trial, falsely suggest the absence of DNA connecting anyone to the crime.").  This statement strongly suggests that these exclusions had been made at the time of the grand jury and criminal trial, which is patently false.

[14] Plaintiffs' Resp. at 28.  That handwritten note is found at Puracal Decl. Ex. 14 at 34.

Page 3 -    STATE DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR
            SUMMARY JUDGMENT

not show how that note—including its mention of DNA or work done by the OSP lab—indicates that the OSP Lab was involved in that briefing.  Nothing bridges the gap between McNeely taking notes about DNA evidence and the purported presence of OSP Lab officials.

And in one more example, Plaintiffs assert that in 2010, "Hormann was directly involved in re-testing evidence for the Municipal Defendants' reinvigorated effort to persuade the District Attorney to indict McGuffin."[15]  Hormann indeed tested items in 2010, as State Defendants have described.[16]  But Hormann did not "re-test" anything that was tested in 2000-2002.  However, Plaintiffs' "re-testing" assertion, followed by their statement about the OSP Lab's changed interpretation threshold, suggests that Hormann was "re-examining" or "re-analyzing" items under new thresholds in 2010 that were examined or analyzed earlier under different thresholds, such as the shoes, and thus should have changed the conclusions about those items.  That suggestion is flatly false.[17]

These are just some examples of Plaintiffs' adventurous supposition and narrative creativity that lack evidentiary support.  There are others.  Any inference that Plaintiffs ask the Court to make warrants caution and careful verification.

**II.      Plaintiffs fail to demonstrate a triable issue of fact that any State Defendant fabricated DNA evidence or withheld any DNA evidence in violation of *Brady*.**

**A.      Krings and Hormann did not violate *Brady* as a matter of law.**

A simple observation proves that Krings and Hormann did not violate *Brady*:  Plaintiffs complain that the DNA reports did not disclose the presence of male DNA on Freeman's shoes. What source of information were Plaintiffs considering when they first began to believe that the DNA reports were incomplete?  The bench notes.  The bench notes were in the files of

---

[15] Plaintiffs' Resp. at 42.

[16] *See* State Defs.' Motion at 36 (stating that Hormann performed analysis in 2010 on other items collected during the investigations, which "made no notable conclusions").

[17] *See* further discussion, *infra* at 11.

Page 4 -    STATE DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR
             SUMMARY JUDGMENT

McGuffin's counsel before his criminal trial.[18]  In 2017, McGuffin's post-conviction legal team took those bench notes and asked a DNA expert to review them.[19]  That DNA expert noted in her 2017 report that her substantive source of information she relied upon were "OSP bench notes and case file including electropherograms for samples tested" and several OSP Lab reports.[20]  No *Brady* violation occurs when a defendant "possess[es] the salient facts regarding the existence of the records claimed to have been suppressed."[21]  McGuffin possessed not only the salient facts, he possessed the actual records themselves that contained those facts.

Plaintiffs' respond that the "government does not get to hide or fabricate evidence and then blame any constitutional violation on criminal defense counsel's failure to find it."[22] Neither Krings nor Hormann hid or fabricated evidence.  To the contrary, the evidence has been in McGuffin's counsel's possession since before trial.  McGuffin's real grievance is that Krings did not make different conclusions in her reports.  But there is no dispute that McGuffin's counsel had the very information needed to challenge those reports long before trial.

The disclosure of the bench notes was the basis upon which this Court rejected a *Brady* claim in *Roberts v. Howton*.[23]  Plaintiffs' attempt to distinguish *Roberts* fails.[24]  In *Roberts*, the report disclosed mixed DNA profiles on evidentiary items and that an alternative suspect, Mills, was excluded from those mixed profiles.  But two pieces of evidence contrary to the reported conclusions—a Post-it note that stated, "Mills not excluded" and a conversation log that stated

---

[18] Davis Decl. Ex. 108 at 1-257 (bench notes bearing bates numbers beginning with MCCREA); Davis Decl. Ex. 120 at 6-7 (72:8-73:24) (deposition of McCrea, McGuffin's criminal trial counsel, agreeing that she had the bench notes at the time of trial).

[19] Third Davis Decl. Ex. 158 at 3-4 (43:14-44:20) (Nasir 2024 deposition), 8-17 (Ex. 3 to that deposition).  Ms. Nasir confirmed that Ex. 158, pages 9-12, are a copy of her June 6, 2017, report that she prepared in the post-conviction relief litigation.

[20] Third Davis Decl. Ex. 158 at 9.  The bench notes and reports of the 2000-2002 testing were in McCrea's possession.

[21] *Raley v. Ylst*, 470 F.3d 792, 804 (9th Cir. 2006).

[22] Plaintiffs' Resp. at 43.

[23] 13 F.Supp.3d 1077, 1109-11 (D. Or. 2014).

[24] Plaintiffs' Resp. at 43-44.

Page 5 -   STATE DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR
            SUMMARY JUDGMENT

the mixtures contained low-level DNA that "may include Mills"—were not produced to the defense. But this Court concluded that the disclosure of bench notes satisfied *Brady*.[25] That scenario is fully analogous to the circumstances here, where Krings' reports also appeared to exclude an alternative suspect (here, an unidentified male). Plaintiffs' claimed distinction—that the DNA mixture was reported in *Roberts* but was not reported here—is not persuasive, particularly because Krings did report a mixture on the left shoe. The salient fact for *Brady* is that the bench notes, disclosed in both cases, held the critical information needed to question the reports. The Court should follow *Roberts* and reject Plaintiffs' arguments.

Plaintiffs correctly observe that "the information disclosed in the OSP Lab's bench notes is a series of numbers that correspond to peaks on an electropherogram" that would be difficult for a lay person or attorney to interpret.[26] Plaintiffs incorrectly reason that that observation supports a heightened obligation to report possible interpretations or data contrary to the reported conclusions. In fact, that observation weighs *against* their claims. *Brady* does not require longer narrative discussion of alternative conclusions or interpretations that might be drawn from a set of data. It requires disclosure of the data from which alternative conclusions or interpretations might be drawn. That happened here.

And certainly, the publication of *Roberts* in 2014, well after McGuffin's conviction, is evidence that the law was far from clearly established to the degree necessary to put Krings or Hormann on notice that they were violating Plaintiffs' rights. Plaintiffs cite no case law specific to the *Brady* obligations of forensic scientists. They simply rely on a series of cases, some general and some specific to law enforcement scenarios not applicable here, establishing the obligations of *Brady* and the obligation not to fabricate evidence.[27] But the Court must not "define clearly established law at a high level of generality."[28] Clearly established law requires

---

[25] *Roberts*, 13 F.Supp.3d at 1110 n.2.

[26] Plaintiffs' Resp. at 44-45.

[27] Plaintiffs' Resp. at 39-40, n.157.

[28] *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quotation omitted)

Page 6 -  STATE DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR
         SUMMARY JUDGMENT

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

an inquiry into the factual situation the officer confronts,[29] and existing precedent must have placed the constitutional question "beyond debate."[30]

The State Defendants are not arguing that OSP forensic scientists are exempt from *Brady* or that they may knowingly fabricate evidence.[31] But the way *Brady* and evidence-fabrication case law applies to DNA analysts is not clear even today, and at least one other case holds no *Brady* violation occurs where the existence of laboratory notes is known to the defense.[32] None of Plaintiffs' cited cases address *Brady* as applied to DNA analysts or what it means for a forensic DNA report to be false or knowingly false. That is particularly critical in this context because, as Plaintiffs note, a forensic DNA report contains interpretations of the analytical data produced in the analysis. Analysts may make errors in those interpretations, and those interpretations may be subject to reasonable disagreement. But where an analyst keeps notes of their analysis, and those notes include the very numerical data upon which the analyst's conclusions can be challenged, and the criminal defendant has those notes, that analyst surely has satisfied their obligations under *Brady*.

That conclusion is bolstered by the observation that *Roberts* was a federal *habeas corpus* case. In the *habeas* context, suppression of favorable evidence violates due process "irrespective of the good faith or bad faith of the prosecution," whereas in § 1983 *Brady* claims, the plaintiff must prove that the officer withheld evidence with "deliberate indifference or reckless disregard

---

[29] *Id*. (quotation omitted)

[30] *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011).

[31] *See Brown v. Miller,* 519 F.3d 231, 238 (5th Cir. 2008) (applying *Brady* to state crime lab serology analyst); *Gregory v. City of Louisville,* 444 F.3d 725, 744 (6th Cir. 2006) (forensic hair examiner); *Pierce v. Gilchrist,* 359 F.3d 1279, 1293 (10th Cir. 2004) (forensic microscopist).

[32] *See Villasana v. Wilhoit*, 368 F.3d 976, 978 (8th Cir. 2004) (holding that the extension of *Brady* to laboratory technicians was not clearly established). *Villasana* also held that no *Brady* violation occurred because when the laboratory serologist "referred repeatedly to his lab notes in his pretrial deposition, the existence of the allegedly suppressed evidence became known to the defense. *Brady* requires no more." *Id*. at 979. Here, the laboratory analyst's notes were not only known to McGuffin; they were in his counsel's possession.

Page 7 -   STATE DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT

for an accused's rights or for the truth."[33]  If *Roberts* holds that production of bench notes

satisfied *Brady* even in the no-fault *habeas* context, then production of bench notes should

satisfy *Brady* in the "deliberate indifference or reckless disregard" context of § 1983.

Krings did not violate *Brady* as a matter of law.[34]

### B. Krings did not fabricate evidence as a matter of law.

Plaintiffs fail to demonstrate any issue of fact that Krings' reports, as reviewed by

Hormann, were fabricated.

The State Defendants demonstrated in their Motion that Krings' reports were not

knowingly false.[35]  Plaintiffs do not address the conclusion by the State Defendants' expert,

consistent with Krings' report, that the DNA results for item 1.3, Freeman's right (cemetery)

shoe, did not reveal any of the three specific indications of a mixture described in the DNA

analysis protocols in place at the time.[36]  Plaintiffs' do not dispute that their own expert conceded

that the protocols did not require the right shoe's results to be reported as a DNA mixture.[37]  As

to the left (Hudson Ridge) shoe, Plaintiffs do not dispute that all of the alleles observed above the

150 RFU threshold in 2002 were consistent with Oswald, and that Oswald's DNA was later

confirmed to be on the shoe.[38]

Instead, Plaintiffs rely on bald assertions and narrative, attributing to Krings knowledge

and intention to falsify, despite the passage of nearly 25 years and the absence of supporting

---

[33] *Tennison v. City & Cnty. of San Francisco*, 570 F.3d 1078, 1088 (9th Cir. 2009) (quotation omitted)

[34] Plaintiffs, in their Response, appear to abandon a number of their asserted *Brady* violations by Krings, including Krings' alleged suppression of evidence i) of her analysis of the number of contributors to the DNA mixture on the left shoe and suppression of evidence of her conversations with other defendants, police, and prosecutors about her DNA-related conclusions. *See* State Defs.' Motion at 46, 49-50 (discussing).

[35] State Defs.' Motion at 39-45.

[36] Davis Decl. Ex. 131 at 3-4 (expert report of Marla Kaplan).

[37] Davis Decl. Ex. 135 at 5-6 (67:19-68:4) (Nasir Deposition).

[38] Davis Decl. Ex. 132 at 5-7 (October 10, 2017, report by Janelle Moore, reporting results of new testing in 2017); Davis Decl. Ex. 131 at 12-13 (expert report of Marla Kaplan, discussing).

Page 8 -   STATE DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR
              SUMMARY JUDGMENT

evidence about her state of mind. For example, Plaintiffs assert that in early 2002, the Municipal Defendants submitted a reference standard for Deputy Oswald, and Krings "immediately" returned a report that Oswald's DNA profile was consistent with the unidentified male on the left shoe, which allowed the Municipal Defendants to continue focusing on McGuffin.[39] Plaintiffs provide no evidence about the immediateness of Krings' analysis of Oswald's sample, and the evidence shows no actual urgency.[40] McGuffin was not charged for another nine years.

Similarly, Plaintiffs assert "Krings' handwritten notes reveal that she knew about the DNA of an unidentified male on the right (cemetery) shoe going all the way back to 2000, but she never reported it and, instead, fabricated a report to hide it.[41] Plaintiffs rely on the handwritten notation in Krings' bench notes:[42]



State Defendants have already explained that that notation comes from an initial quality control review, a step prescribed by the protocols before completing the interpretation.[43] Plaintiffs ignore that in favor of their unsupported narrative.

Perhaps most significantly, Plaintiffs tell the Court that the protocols are not even relevant to the inquiry, relying on two cases from the inmate First Amendment context that hold

---

[39] Plaintiffs' Resp. at 38.

[40] *See* Davis Decl. Ex. 108 at 190-191 (bench notes from the analysis of the Oswald, showing (slightly difficult to read) that the Oswald sample was sent to the OSP lab on January 8, 2002, and that Krings retrieved the sample from the evidence locker ("RTVD FROM E.L.") on January 15, 2002. Krings did her analysis in the ensuing days and produced her report on January 21, 2002. Davis Decl. Ex. 107 at 11-12 (Jan. 21, 2002, report)

[41] Plaintiffs' Resp. at 36. Plaintiffs make similar assertions about what Krings "knew" about the left shoe. *Id.* at 38 ("knew about the presence of DNA from an unidentified male and said nothing").

[42] Davis Decl. Ex. 108 at 16 (bench notes).

[43] *See* State Defs. Motion at 48-49 (explaining); Davis Decl. Ex. 131 at 4 (Kaplan expert report, explaining quality control review step)); Davis Decl. Ex. 113 at 19-22, 32-36 (2000 STR Analysis Casework Protocol).

Page 9 -    STATE DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR
            SUMMARY JUDGMENT

the subjective beliefs of corrections defendants are not relevant.[44]  Plaintiffs are wrong, at least in the context of forensic DNA analysis, because the protocols set forth policies and procedures to guide analysts in their work.  One of their principal purposes is to guide the analyst in making interpretations and writing reports that are accurate and reliable within the validated procedures of the lab.[45]  In essence, it is by following the procedure manual that the analyst can be confident that she is not reporting incorrect results.  Following the protocols shows that the analyst has a proper regard for the truth.  To call the protocols irrelevant ignores the reality of what the analyst is tasked with doing.

The importance of the protocols—and their direct relevance to qualified immunity—is amply illustrated by this case.  As to the right shoe, Krings reported only the presence of Freeman's DNA in 2000; the low-level traces of DNA did not support reporting a mixture.[46]  But when the same data was reanalyzed in 2017, applying updated interpretation protocols with a lower interpretation threshold to existing data, item 1.3 from the right shoe was reported as a mixture assumed to come from two people, with the major profile matching Freeman and the minor profile being an unidentified male.[47]  The right shoe was then retested later in 2017—meaning existing extracts were tested for the first time—using more sensitive technology and a more sophisticated analytical method, probabilistic genotyping, than was available in 2000-2002.  Unsurprisingly, the results were different, with item 1.3 from the right shoe now showing a

---

[44] Plaintiffs' Resp. at 40, n. 158 (citing *Inouye v. Kemna*, 504 F.3d 705, 712 (9th Cir. 2007) and *Sorrels v. McKee*, 290 F.3d 965, 970 (9th Cir. 2002)).

[45] Third Davis Decl. Ex. 155 at 3 (OSP DNA Unit Quality Manual Aug. 25, 2000) (describing the goals and objectives of the DNA Quality Assurance Program).  The Quality Manual goes on to describe the various analytical protocol manuals that will be used to achieve those goals, including the STR Analysis Casework Protocol (the protocol found in Exhibit 113).  *Id*. at 14

[46] Davis Decl. Ex. 107 at 5-7 (August 27, 2000, report); Davis Decl. Ex. 131 at 4 (Kaplan expert report, explaining).  *See also* State Defs.' Motion at 36-37, 40-42 (discussing)

[47] Davis Decl. Ex. 133 at 2-3 (May, 17, 2017, Amended Report, reinterpreting the 2000-2002 testing data under then-current interpretation protocols); Davis Decl. Ex. 131 at 4 (Kaplan expert report, explaining the items and extracts taken and the 2017 reanalysis).

Page 10 -  STATE DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT

mixture assumed to have come from four contributors, including at least one unidentified male.[48] That Krings did not reach these same conclusions in 2000 does not show she was wrong, and it certainly does not show that she knew she was wrong but reported her results anyway. It merely reflects the evolution of a rapidly developing technology. This case illustrates the continuing need for qualified immunity as a valid and important defense. Plaintiffs fail to raise any triable issue of fact that Krings fabricated any of her DNA conclusions.

### C.     Hormann did not fabricate evidence or violate *Brady* as a matter of law.

The issues pertaining to Hormann are largely the same as Krings, and on those common issues, the State Defendants reiterate their arguments related to Krings.

The differences between the claims against Krings and Hormann largely relate to Hormann's tenure at the OSP Lab at the time of McGuffin's trial. First, Plaintiffs argue that Hormann was "re-testing" evidence in 2010 and thus should be liable for not amending the DNA reports to reflect the changes in the interpretation threshold that occurred between the issuance of the reports and McGuffin's trial.[49] Again, the matter of amending older reports is another matter of policy and procedure, and OSP's protocols did not require the reports in this case to be amended. As Marla Kaplan described, the policy requiring previous DNA results to be revisited was first established in July 2012.[50] And in all events, Hormann was not asked in 2010 to reinterpret any of the 2000-2002 results or retest the shoes. Hormann was not asked to testify at trial. Plaintiffs do not explain how Hormann, after following the interpretation protocols in 2000 and 2002, somehow should have decided those results were no longer reliable and then revisited them before a 2011 trial at which she was not asked to testify. Instead, Plaintiffs simply state,

---

[48] Davis Decl. Ex. 132 at 4.

[49] Plaintiffs' Resp. at 42, n.168 (noting that the change occurred in 2004). As described previously, Hormann did not retest any evidence. *See supra* at 4.

[50] Davis Decl. Ex. 131 at 4 (Kaplan report, referring to DNA Quality Manual, Oregon State Police Forensic Services Division, July 17, 2012).

Page 11 - STATE DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR
SUMMARY JUDGMENT

without evidence, that Hormann just "chose" not to do so.[51]  That conclusion is not a reasonable inference to which Plaintiffs are entitled.

Second, in order to advance their narrative, Plaintiffs postulate that Hormann's "bushy haired stranger" email is evidence of intent to hide exculpatory evidence and evidence of conspiracy.[52]  Plaintiffs again point to an ordinary communication between investigative partners, in which the partners discuss whether to take an investigative step.[53]  That next step entailed persuading the Federal Bureau of Investigation to do mitochondrial DNA analysis, a type of analysis not performed at the OSP lab.  Hormann forwarded to the Coquille PD the questions posed by the FBI before they would be willing to it, and she concluded by saying that once they answered the FBI's questions, they can proceed.  That simply cannot create a question of fact of conspiracy or intent to fabricate or suppress evidence.  And ultimately, although the hairs in question were not tested before trial, they were tested during the post-conviction relief case, returning no probative results.[54]

Finally, Hormann did not, as Plaintiffs assert, "fabricate[] evidence of Freeman's blood and DNA in the Kia."[55]  Plaintiffs do not identify exactly what this allegedly fabricated evidence was or otherwise attempt to defend this assertion.  Six items from the Kia had a positive presumptive test for blood,[56] but Hormann's DNA analysis detected DNA on only one of those

---

[51] Plaintiffs' Resp. at 42.  Plaintiffs also mischaracterize the deposition testimony during the Fed. R. Civ. P. Rule 30(b)(6) deposition of the Oregon State Police, claiming that OSP refused to answer plaintiffs' questions about whether anyone at the lab was required to change its 2000 and 2002 reports when the interpretation threshold was lowered in 2004. *See id*. at 42 n.168 (citing Puracal Decl. Ex. 71 at 107:10-113:15).  The cited deposition transcript shows that the designee was unable to answer that question at that time without more review of the applicable policies.

[52] Plaintiffs' Resp. at 36.

[53] Davis Decl. Ex. 123 at 16 (Hormann email).

[54] Third Davis Decl. Ex. 161 at 1-7, 8 (March 16, 2018, report of mitochondrial DNA testing, and comments by Plaintiffs' counsel, noting that the hairs were founded on Freeman's sock and shoe and that since the hairs turned out to be Freeman's, they were not probative).

[55] Davis Decl. Ex. 124 at 6 (Plaintiffs' Response to Hormann's First Set of Interrogatories).

[56] Davis Decl. Ex. 128 at 1-2 (describing items 52.1 and 52.3 to 52.7 as presumptively positive for blood); Ex. 129 at 1 (describing the origin of those six items).

Page 12 -  STATE DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR
        SUMMARY JUDGMENT
           JBD/ce1/984034582
                                    Department of Justice
                                    100 SW Market Street
                                    Portland, OR 97201
                              (971) 673-1880 / Fax: (971) 673-5000

items, a driver's seat cover, which was determined to be DNA mixture, from which Freeman, McGuffin, Oswald, and Shamblin were excluded.[57] These results were not notable. The grand jury was told that nothing of evidentiary significance was found in the Kia, and at trial, the parties stipulated that nothing in the Kia "implicated anyone in anything in this case."[58] Neither jury was ever told that Freeman's DNA or blood was found in the Kia. Nothing regarding Freeman's blood and the Kia caused any harm to Plaintiffs.

Plaintiffs fail to show any question of fact that Hormann fabricated any evidence, violated *Brady*, or engaged in a conspiracy.

## III.    Plaintiffs fail to demonstrate any triable issue of fact precluding summary judgment in favor of Wilcox.

Plaintiffs allege that Wilcox fabricated evidence about the DNA on Freeman's shoes, fabricated evidence of blood on the right shoe, and fabricated evidence of blood spatter on the left shoe.[59] In their *Brady* claims, Plaintiffs allege that Wilcox withheld her knowledge of the gas leak in McGuffin's car, withheld her knowledge that the interior of McGuffin's car was dusty and had not been wiped clean, withheld information about her testing and conclusions about the blood on Freeman's left shoe, and withheld evidence of her conversations with others.[60] Wilcox is entitled to summary judgment on all claims.

### A.    Wilcox is entitled to testimonial immunity for her testimony about the DNA analysis and results at trial.

Wilcox was the only State Defendant to testify McGuffin's criminal trial. Certain DNA reports were admitted into evidence by stipulation of the parties.[61] Wilcox largely read the

---

[57] Davis Decl. Ex. 130 at 2, 3 (describing DNA results).

[58] Davis Decl. Ex. 101 at 122-23 (Dannels grand jury testimony); Ex. 103 at 1185 (D7 43:8-20) (criminal trial transcript).

[59] Davis Decl. Ex. 121 at 10-11 (Plaintiffs' Suppl. Resp. to Wilcox's First Set of Interrogatories).

[60] Davis Decl. Ex. 121 at 22-23 (Plaintiffs' Suppl. Resp. to Wilcox's First Set of Interrogatories). The allegations regarding the gas leak in McGuffin's Mustang are discussed *infra*, 27-29.

[61] Davis Decl. Ex. 107 at 1-4 (stipulation), 5-14 (DNA reports).

Page 13 -   STATE DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT

reports' conclusions into the record, and she was asked limited questions about the work, again without objection.[62]  Wilcox was not a DNA analyst and had not performed the analysis.

Witnesses, including police officers, are absolutely immune from liability for testimony at trial.[63]  Absolute witness immunity also extends to preparatory activities "inextricably tied" to testimony, such as conspiracies to testify falsely.[64]  Pre-testimonial investigative work, such as evidence gathering and report writing, generally does not enjoy testimonial immunity, and correspondingly, investigators' testimony about their investigative activities does not immunize those activities.[65]  But when Wilcox testified about the DNA analysis—essentially reading analytical reports written by someone else and answering questions about them—she was not an investigator testifying about her own investigative activities, and she did not lose testimony immunity.  She was just an ordinary witness.  To the extent Plaintiffs would hold Wilcox liable for her testimony, she is entitled to immunity.

## B.     Wilcox is entitled to summary judgment against Plaintiffs' claims that she fabricated evidence of blood on Freeman's shoes.

### 1.     Wilcox did not fabricate evidence of blood on the right (cemetery) shoe or suppress exculpatory evidence about it

In asserting that Wilcox fabricated evidence of blood on Freeman's right shoe, Plaintiffs attempt to hold Wilcox liable for an obvious error, not in any report she made, but in her notes. Wilcox's report of her examination of the shoes stated that "[n]o blood was detected" on the right (cemetery) shoe and that a "small amount of human blood was detected on the bottom" of the left (Hudson Ridge) shoe.[66]  That report, and the notes she took during her analysis, were provided to McGuffin attorneys before trial.[67]  Several pages of the notes contain photos,

---

[62] Davis Decl. Ex. 102 at 978-982 (D6 89:10-93:17) (Wilcox trial testimony about DNA).

[63] *Briscoe v. LaHue,* 460 U.S. 325, 345–46 (1983).

[64] *Franklin v. Terr,* 201 F.3d 1098, 1102 (9th Cir. 2000).

[65] *See Lisker v. City of Los Angeles*, 780 F.3d 1237, 1242-43 (9th Cir. 2015) (discussing).

[66] Davis Decl. Ex. 119 at 20 (Ex. 18 to the Wilcox's deposition).

[67] Davis Decl. ¶ 41.

JBD/ce1/984034582
Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

handwritten diagrams, and other notations, all consistent with the report that blood was found on the left shoe and not the right.[68]  However, one page containing a photo of the bottom of the left shoe features a handwritten caption, "Right shoe – looking from heel towards front – sole only," with apparent blood stains circled.[69]  That caption was an obvious error, though an easy one to make: the shoe curves just as a right shoe would curve, but the photo shows the bottom of the shoe—the shoe is upside-down.  This mistake does not subject Wilcox to liability.[70]  That would be true even if, at trial, Wilcox had not readily told the jury that the caption was an error.[71]

### 2. Wilcox did not fabricate evidence of blood spatter on the left (Hudson Ridge) shoe

In their interrogatory responses, Plaintiffs seemed to dispute that there was human blood at all on Freeman's left shoe, but they now seem to concede that there was.[72]  The remaining dispute appears to be about the left shoe blood being described as "high velocity" or "medium velocity" blood spatter.  Wilcox's report did not describe the blood that way.[73]  But in handwritten notes, Wilcox described one blood stain on the left shoe sole as a "'high' velocity (small) blood droplet."[74]  On direct examination at trial, Wilcox did not describe it as "high velocity blood spatter," calling it "blood spatter" or describing it as "little" or "small," consistent with her notes.  On cross, McGuffin's counsel asked about that droplet and about low, medium,

---

[68] Davis Decl. Ex. 119 at 23-25.

[69] Davis Decl. Ex. 119 at 29.

[70] *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017) ("Mere carelessness is insufficient, as are mistakes of tone.  Errors concerning trivial matters cannot establish causation, a necessary element of any § 1983 claim.  And fabricated evidence does not give rise to a claim if the plaintiff cannot show the fabrication actually injured her in some way.") (cleaned up, internal citations and quotations omitted).

[71] Davis Decl. Ex. 102 at 975 (D6, 86:4-21) (criminal trial testimony, receiving trial exhibit 31), 1025 (D6, 136:7-15) (Wilcox trial testimony, correcting her error, "Oh, yes. That is bad.").

[72] Plaintiffs' Resp. at 25 (including citing an English forensic laboratory report describing blood on the "underneath of the left shoe, on the lace and on the inside of the shoe in the heel region), 27 (describing interpretive possibilities for the blood); *see* State Defs.' Motion at 59-61 (describing Wilcox's methodology for testing the blood on the bottom of the left shoe).

[73] Davis Decl. Ex. 119 at 20.

[74] Davis Decl. Ex. 119 at 24.

Page 15 -  STATE DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT

and high velocity blood spatter.  Counsel established through Wilcox that if that one droplet was high velocity blood spatter, then other similar small blood stains would be expected to be found in the area near where the impact occurred, but no other item examined was found to have blood spatter on it, including the Mustang, the Thunderbird, McGuffin's home, and a sock.[75]  Wilcox was explicit that she was not expressing an opinion about what caused the blood droplet or what direction it may have come from or gone.[76]  Wilcox was equally explicit that investigators found no item that linked Freeman to McGuffin.[77]  Whether the blood stains were medium to high velocity impact spatter, or just small, the size of the blood stains on Freeman's left shoe contributed nothing to McGuffin's indictment or conviction.  Wilcox is entitled to summary judgment on fabrication claims.

### C.    Wilcox is entitled to summary judgment against Plaintiffs *Brady* claims.

#### 1.    The claim that Wilcox suppressed evidence about the Mustang not being "wiped clean" fails.

Wilcox's report stated that there was some exterior dust on the Mustang, and the "interior surfaces did not appear to have been recently wiped clean."[78]  Wilcox's transcription of her dictation device while examining the Mustang mentions there are "no signs of cleaning or of spatter on the seats or ceiling," and that the seats are a hard blue vinyl and that "they appear fairly clean."[79]  It is not clear whether that transcription was produced to the defense.  But at trial, Wilcox read into the record her report, including the "did not appear to have been recently wiped clean" passage, so that information was known to the defense and told to the jury.[80]  Just moments later, however, when asked why she did not do tape lifts—a technique used to find for

---

[75] Davis Decl. Ex. 102 at 1025-1029 (D6, 136:18-140:4) (Wilcox trial testimony).

[76] Davis Decl. Ex. 102 at 1058 (D6, 169:5-8), 1061-1063 (D6, 172:19-174:4).

[77] Davis Decl. Ex. 102 at 1063-1064 (D6, 174:20-175:4).

[78] Second Davis Decl. Ex. 153 at 1 (Wilcox July 6, 2000, report, as Ex. 7 to Wilcox's deposition).

[79] Second Davis Decl. Ex. 153 at 14 (Wilcox notes from examination of Mustang, as Ex. 7 to Wilcox's deposition).

[80] Davis Decl. Ex 102 at 968-969 (D6 80:5-81:5).

JBD/ce1/984034582

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

hairs and other trace evidence—Wilcox explained that it was because of the vinyl seating, "And it was clean.  I mean it was wiped clean."[81]  Wilcox's testimony was perhaps confusing, but she was making the dual observations that the seats showed no signs of cleaning—that is, nobody had cleaned them to try to conceal something criminal—but the hard vinyl seats were "clean" in that they did not have apparent loose hairs or other trace evidence on them.[82]  Both observations supported McGuffin's case at trial that the Mustang held neither incriminating evidence nor efforts to conceal incriminating evidence.  Wilcox did not suppress anything exculpatory and did not violate *Brady*.

> **2.  The claim that Wilcox suppressed evidence about the blood on the left shoe and the "high velocity blood spatter" fails.**

Plaintiffs' claims that Wilcox suppressed evidence about blood on the left shoe fail.  Wilcox's notes described what testing she did on each droplet.  At deposition, Wilcox answered that when she wrote "'high' velocity (small) blood droplet" in her notes, "it is in parenthesis because that was just a way to describe it.  I hadn't made a final determination about what I thought about this.  I was just taking notes as I worked."[83]  Plaintiffs appear to contend that Wilcox had withheld what she was doing when she wrote these notes, which was, just as she described, simply taking notes.  The defense had these notes, and indeed introduced them as Exhibit 31 at trial.[84]  Those notes enabled the defense to ask Wilcox at trial (or before) whether the notes mean, as they appear to, that "'high' velocity (small) blood droplet" might mean something different than "high velocity blood spatter," particularly because her report does not make a finding of "high velocity blood spatter."  This is not a *Brady* violation.

---

[81] Davis Decl. Ex 102 at 969 (D6 81:9-25).

[82] Third Davis Decl. Ex. 162 at 2-3 (103:11-104:12) (Wilcox deposition, additional excerpts)

[83] Davis Decl. Ex. 119 at 8-9 (126:22-127:22) (Wilcox deposition).

[84] Davis Decl. Ex. 102 at 975 (D6, 86:4-21) (receiving Defendant's trial Exhibit 31).

Page 17 -  STATE DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT

### 3.     The claim that Wilcox suppressed evidence of her conversations with others fails.

Plaintiffs cite materials in their response to Wilcox's interrogatories that they assert are evidence of Wilcox's conversations with others that Wilcox suppressed.[85]  Those materials are largely irrelevant, such as Wilcox's handwritten notebooks of daily activities from 2000 or various pages of notes of meetings with other investigators.  The only one warranting discussion is the document Plaintiffs cite as OSP000749, a draft memorandum Wilcox sent to Defendant Reaves in September 2000 regarding her conversation with Krings about Krings' DNA analysis.[86]  That draft version—hand-marked "Draft to Mary How about this? KW"—may not have been provided to McCrea before trial.  But the final version is found in McCrea's files.[87]  McCrea admitted that she made handwritten notes on this memorandum and that she understood at the time of trial that McGuffin's DNA profile did not match the minor male DNA profile on the left shoe.[88]  And other than its handwritten notation, there is no apparent textual difference between the draft and the final version.  Plaintiffs identify no exculpatory or impeachment value to the draft, and it cannot support an inference of conspiracy.[89]

Wilcox is entitled to summary judgment on all of Plaintiffs' claims against her.

---

[85] *See* Davis Decl. Ex. 121 at 23 (Plaintiffs' Supplemental Response to Wilcox's First Set of Interrogatories) (describing documents such as: KW000001-41 (notes from Wilcox' daily notebooks with little content), KW0000254 (notes of meetings from July 2000, including a note saying "clean" car, not wiped," which is not inconsistent with Wilcox's report or testimony).

[86] Third Davis Decl. Ex. 160 at 1 (showing document OSP000749, the apparent draft).

[87] *See* State Defs.' Motion at 50-51 (discussing); Davis Decl. Ex. 120 at 17 (the Wilcox memorandum, as Exhibit 42 to the McCrea deposition).

[88] Davis Decl. Ex. 120 at 13-14 (18:5-19:17) (McCrea deposition).

[89] *Ziglar v. Abbasi*, 582 U.S. 120, 153 (2017) (in context of a conspiracy claim under 42 U.S.C. § 1985(3), stating that under the intracorporate-conspiracy doctrine, "an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy"); *Lobato v. Las Vegas Metro. Police Dep't.*, No. 22-16440, 2023 WL 6620306, at *2 (9th Cir. Oct. 11, 2023) (unpublished) (applying, in reliance on *Ziglar*, the intracorporate-conspiracy doctrine to § 1983 claims).

Page 18 -  STATE DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT
JBD/ce1/984034582

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

**IV.    Plaintiffs fail to demonstrate any triable issue of fact precluding summary judgment in favor of Riddle.**

Plaintiffs have alleged that Riddle (i) fabricated evidence that McGuffin's friend, Brent Bartley, failed a polygraph, (ii) fabricated evidence that McGuffin Made incriminating statements during a January 28, 2010, pretext call with Hamilton, (iii) fabricated evidence that McGuffin was violent, and (iv) fabricated an informant statement that McGuffin had made statements that he could see Freeman laying there and her head on a rock.[90]  Plaintiffs also allege that Riddle (v) fabricated Steinhoff's statements that McGuffin threatened her and told her not to talk to police, and (vi) fabricated evidence of Freeman's blood and DNA in the Kia, coercing Steinhoff to state falsely that McGuffin changed his clothes on June 28, 2000.[91]

**A.    Riddle did not fabricate any evidence regarding Bartley, the pretext call with Hamilton, that McGuffin was violent, or an informant statement.**

The first four of these allegations can be readily dismissed.  Riddle did not fabricate evidence that Bartley failed a polygraph because Bartley did fail a polygraph in 2000, years before Riddle became involved.[92]  Similarly, Riddle's email to an uninvolved investigator— stating that Riddle believed Bartley had more information about Freeman's death than he was sharing—is merely a speculation, not "evidence" of anything incriminating.[93]

Riddle did not fabricate evidence about Hamilton's pretext call to McGuffin.  Riddle did not facilitate the pretext call; he and another detective just listened to an audio-recording and reviewed a transcript of the call.  Riddle wrote a report documenting, among many other things, his opinion that "some of the comments made by Mr. McGuffin were not consistent with

---

[90] Third Davis Decl. Ex. 156 at 5-6 (Plaintiffs' Resp. to Defendant John Riddle's First Set of Interrogatories).

[91] *Id*.

[92] Second Davis Decl. Ex. 143 (July 27, 2000, polygraph examination report of Bartley). Further, Riddle's statement on an internal timesheet that Bartley "failed polygraphs," which was not used at any proceeding, is not evidence of anything and caused McGuffin no cognizable harm in any respect. Second Davis Decl. Ex. 141.

[93] Second Davis Decl. Ex. 144 (Riddle email, so stating).

Page 19 -   STATE DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR
              SUMMARY JUDGMENT

comments you'd expect to hear from an innocent person."[94]  Defense counsel had a copy of this report and a transcript of the call.[95]  And although Riddle reasonably explained to best of his recollection how he formed his opinion,[96] that opinion was not presented at grand jury or at trial, and McGuffin was not harmed in any respect.

Riddle did not fabricate evidence that McGuffin was violent by pointing his service weapon at him during the arrest.  Riddle and other officers participated in McGuffin's arrest after her was indicted a warrant was issued for his arrest.  When making a felony arrest, particularly on a murder charge, officers may exercise a higher degree of caution, including drawing their service weapons, staying back, and issuing commands.[97]  Neither grand jury nor trial jury was told about that Riddle drawing his service weapon.

Riddle did not fabricate an informant statement that McGuffin had made comments about how he could see Freeman's head laying on a rock.  Several witnesses told law enforcement that McGuffin made similar statements as early as 2000, including Kristen Steinhoff, Scott Hamilton, and Richard Bryant.[98]  Plaintiffs offer nothing to show how Riddle "fabricated" the informant statement, who the informant was or purported to be, or that Riddle knew or should have known that it was false, particularly given the similar statements by other witnesses.

---

[94] Second Davis Decl. Ex. 145 at 9 (Riddle report).

[95] Second Davis Decl. Ex. 145 (Riddle report, bearing "MCCREA" bates numbers); Puracal Decl. Ex. 87 (transcript of recorded call, bearing District Attorney bates numbers).

[96] Second Davis Decl. Ex. 139 at 22-33 (105:21-116:6) (Riddle deposition).

[97] Riddle Decl. ¶ 1.

[98] *See* Third Davis Decl. Ex. 163 at 16-17 (report by OSP Oester, describing an September 19, 2000, interview in which Hamilton made similar statements); Davis Decl. Ex. 112 at 2-3 (Coquille PD report, Hamilton making similar statements in 2010); Davis Decl. Ex. 101 at 1324-1325 (38:6-39:6) (Hamilton 2010 grand jury testimony, similar); Second Davis Decl. Ex. 146 at 3 (Coquille PD report, Steinhoff reporting in 2000 that Hamilton said that McGuffin had said similar things); Second Davis Decl. Ex. 145 at 6 (Riddle report, Bryant making a similar statement); Davis Decl. Ex. 101 at 941 (8:10-25) (Bryant 2010 grand jury testimony, similar).

Page 20 -  STATE DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT

**B.**    **Riddle did not fabricate any evidence that McGuffin threatened Steinhoff or coerced her into saying that McGuffin had changed cars or clothes.**

Riddle did not fabricate evidence that McGuffin had threatened Steinhoff or told her not to talk to police. This is discussed more fully below, regarding the evidence presented to the grand jury, and the State Defendants incorporate that discussion here by reference.[99]

Plaintiffs contend that during a March 4, 2010, interrogation, Riddle fabricated evidence by coercing Steinhoff to say that McGuffin changed clothes on June 28, 2000.[100] Yet, Steinhoff had already told other investigators on January 25, 2010, that McGuffin had changed cars and clothes the night of June 28.[101] Riddle was not involved with that interview and thus could not have coerced that testimony. Beyond that, other witnesses also reported seeing McGuffin in different vehicles that night.[102] Riddle did fabricate evidence or solicit evidence he knew or should have known was false. He is entitled to summary judgment on Plaintiffs' fabrication claims.

**C.**    **Riddle is entitled to summary judgment on Plaintiffs' *Brady* claims.**

The *Brady* claims against Riddle are that he suppressed evidence of his misconduct, suppressed evidence of portions of the interrogations with Steinhoff prior to the recorded portions, withheld his knowledge of gas and phone records that corroborate McGuffin's alibi, suppressed records from the phone booth where Freeman was seen making a call the night she disappeared, suppressed his field notebooks, and withheld evidence about his conversations with others about his attempts to avoid developing evidence that would exonerate McGuffin.[103]

---

[99] *See infra*, 29-31.

[100] Third Davis Decl. Ex. 156 at 5-6 (interrogatory responses).

[101] Second Davis Decl. Ex. 148 at 2 (Coquille PD report, noting Steinhoff's statements that McGuffin "was in different clothes than she had seen him in earlier and he had a different car").

[102] Davis Decl. Ex. 101 at 217-218, 223 (60:2-61:14, 66:5-15) (David Jenkins), 316, 321, 323-324 (12:12-17, 17:20-24, 19:1-20:22) (Aaron West), 396 (108:5-11) (Brent Bartley). Bruce McGuffin testified to the contrary, that his son had not driven the Thunderbird that night. *Id*. at 1054, 1059, 1060 (50:10-22, 55:7-15, 56:6-14).

[103] Third Davis Decl. Ex. 156 at 11-12 (Plaintiffs' response to Riddle's interrogatories).

Page 21 -  STATE DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT

Plaintiffs cannot sustain these claims.  Plaintiffs have offered no evidence that any of these things contained evidence favorable to McGuffin, and their bare assertions will not suffice. Plaintiffs show no misconduct by Riddle, much less evidence of efforts to hide it.  Records of McGuffin's use of a card-lock gas station the night of June 28 were obtained by investigators, as were records of phone calls made via the McGuffin family's toll-free number.[104]  The core of these records were found in McCrea's files, and McCrea admitted she was aware of their content.[105]  Riddle is entitled to summary judgment on Plaintiffs' *Brady* claims.

## V. Plaintiffs fail to rebut the presumption that the grand jury's indictment was supported by probable cause

A grand jury indictment is *prima facie*, but not conclusive, evidence of probable cause.[106] A plaintiff can rebut that *prima facie* evidence by showing that the indictment was "induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith."[107]  Plaintiffs must show that the "criminal proceedings were initiated on the basis of the defendants' intentional and knowingly false accusations and other malicious conduct."[108] Further, it is not enough for the plaintiff to demonstrate that some of the evidence was fabricated if the remaining unchallenged evidence provides probable cause.  Instead, the plaintiff must show that without the fabricated evidence, the remaining evidence was insufficient to constitute probable cause as a matter of law.[109]

---

[104] Plaintiffs' Resp. at 13, n.39 (citing Puracal Decl. Ex. 18 (gas record), Ex. 19 (phone record)).

[105] Second Davis Decl. Ex. 151 (McCrea deposition) at 10-15 (32:1-37:16), 17-18 (gas and phone records, with MCCREA bates numbers).

[106] *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004) (applying California law); *Libby v. City of Medford*, No. 1:15-CV-00298-CL, 2017 WL 2219995, at *5 (D. Or. Mar. 17, 2017), *report and recommendation adopted*, No. 1:15-CV-00298-CL, 2017 WL 2219980 (D. Or. May 19, 2017) (applying Oregon law).

[107] *Awabdy*, 368 F.3d at 1067.

[108] *McSherry*, 584 F.3d at 1135 (quoting *Awabdy*, 368 F.3d at 1067).

[109] *Merritt v. Arizona*, 425 F.Supp.3d 1201, 1221 (D. Ariz. 2019) (stating that the court "must decide whether Plaintiff's arrest was, as a matter of undisputed fact, supported by probable cause"); Libby, 2017 WL 2219995, at *5 (following same approach).

Page 22 -   STATE DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT

The evidence upon which the grand jury indicted McGuffin was substantial. That evidence included McGuffin's strange and incriminating behavior the night of June 28, 2000,[110] and his threats to Kristen Steinhoff not to talk to the police or the grand jury.[111] That also included the fact that the trunk of McGuffin's Mustang, which contained junk before Freeman disappeared, was empty a week later.[112] It included evidence that McGuffin had changed vehicles[113] and changed clothes that night.[114] It included evidence that contrary to his professed concern about Freeman, McGuffin did drugs with Steinhoff and tried to have sex with her that night,[115] and had sex with other girls before and shortly after Freeman's body was found.[116] It included observations by adults, teachers, and school administrators that Freeman and McGuffin had verbal and physical altercations,[117] and that Freeman was upset with McGuffin the night she disappeared.[118] It included evidence that McGuffin's Mustang was seen in the area of the high school around the time Freeman was last seen there.[119] It included evidence of McGuffin's

---

[110] Davis Decl. Ex. 101 at 69-71 (54:8-56:9) (Cheri Mitchell), 828, 845 (103:6-18, 120:15-22) (Kristen Steinhoff), 1507-1510 (58:10-59:16, 60:22-61:21 ) (Melissa Smith), 939-940, 994, 941 (6:17-7:15, 11:12-14, 8:10-17)) (Richard Bryant), 1320-1321, 1324-1325 (34:24-36:7, 38:2-39:6) (Scott Hamilton), 847-848 (122:22-123:5) (Kristen Steinhoff),

[111] Davis Decl. Ex. 101 at 836-837, 839, 843, 846, 850 (111:2-11, 111:12-112:13, 114:13-24, 118:12-15, 121:3-22) (Kristen Steinhoff), 697-705 (34:18-42:21) (Tina Mimms).

[112] Davis Decl. Ex. 101 at 400-401 (112:13-113:17) (Brent Bartley).

[113] Davis Decl. Ex. 101 at 217-218, 223 (60:2-61:14, 66:5-15) (David Jenkins), 316, 321, 323-324 (12:12-17, 17:20-24, 19:1-20:22) (Aaron West), 396 (108:5-11) (Brent Bartley). Bruce McGuffin testified to the contrary, that his son had not driven the Thunderbird that night. *Id*. at 1054, 1059, 1060 (50:10-22, 55:7-15, 56:6-14).

[114] Davis Decl. Ex. 101 at 830-831, 883 (105:14-106:5) (158:12-14) (Steinhoff).

[115] Davis Decl. Ex. 101 at 831-834 (106:14-20, 107:22-109:12), 882 (157:3-22) (Steinhoff).

[116] Davis Decl. Ex. 101 at 1269-1270 (22:21-23:13) (Megan Davidson), 1511 (62:5-23) (Melissa Smith).

[117] Davis Decl. Ex. 101 at 1280-1283 (93:2-95:1) (Donna Dennis), 1180-1182 (80:7-20, 81:9-82:1) (Adam Shinar), 1426-1427 (89:23-90:12, 91:17) (Mark Nortness), 1412-1422 (78:19-79:24, 81:23-82:2) (Sharon Nelson).

[118] Davis Decl. Ex. 101 at 75-76 (60:22-61:6) (Cheri Mitchell), 316-317 (12:17-13:23) (Aaron West).

[119] Davis Decl. Ex. 101 at 202-203, 1347-49 (37:8-38:7, 165:22-167:8) (Alicia Hyatt fka Hartwell); Ex. 103 at 11.

Page 23 -  STATE DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR
         SUMMARY JUDGMENT

aggression and incriminating statements to David Breakfield,[120] Jesse Smisek's confirmatory statements,[121] and McGuffin's incriminating statements heard by Melissa Beebe.[122] It included evidence that Freeman and McGuffin had been together after 9:00 pm.[123] It also included evidence that although Freeman was seen walking through town on Central,[124] and McGuffin was seen driving back and forth along Central at that same time,[125] McGuffin somehow did not see Freeman.[126] It included evidence of suspicious behavior by McGuffin following Freeman's disappearance.[127] It included forensic DNA reports by Krings and Hormann and the report by Wilcox of her examination of the Mustang.[128]

Plaintiffs attack only some of this evidence, namely the evidence that Freeman and McGuffin were together after 9:00 pm, the evidence suggesting that McGuffin cleaned his trunk to conceal his guilt, the evidence that McGuffin threatened Kristen Steinhoff and David Breakfield, and the forensic DNA reports that were submitted to the jury.[129] Plaintiffs' fail to demonstrate any question of fact that precludes summary judgment.

---

[120] Davis Decl. Ex. 101 at 1213-1214, 1216 (96:15-97:5, 99:11-20) (David Breakfield).

[121] Davis Decl. Ex. 101 at 1494-1498 (172:8-177:25) (Jesse Smisek).

[122] Davis Decl. Ex. 101 at 918-921 (66:21-69:10) (Melissa Beebe).

[123] Davis Decl. Ex. 101 at 1037-1039 (89:17-91:1) (John Lindegren), 1322-1323 (36:12-37:14) and 1325-1326 (39:11-40:9) (Scott Hamilton).

[124] Davis Decl. Ex. 101 at 48, 51 (85:23-25, 88:5-25) (Ashley Patton, fka Hutchinson), 130-132 (78:15-80:12) (Heidi Crook), 263-264 (6:13-7:5) (Mark Kirn), 275-276 (24:14-25:6) (Raymond Lewis), 283-284 (17:9-18:8) (Michael McAdams).

[125] Davis Decl. Ex. 101 at 1382-1383 (132:6-133:25) (Brett Mauro), 199-205 (35:3-40:7), 207-208 (42:12-43:4), 1347-1353 (165:17-171:3) (Alicia Hyatt fka Hartwell).

[126] Davis Decl. Ex. 101 at 180 (60:8-11) (testimony of Dave Hall that McGuffin stated he had been driving back and forth, up and down Central, and he had not seen Freeman at all).

[127] Davis Decl. Ex. 101 at 532-533 (83:1-84:24) (Damon Mason), 1468-1471, (68:9-71:3) (Janet Reab) 1482-1485 (126:3-129:16) (Juliana Curran).

[128] Contrary to Plaintiffs' assertion, the State Defendants did not omit from their motion that the grand jury received these reports. *See* State Defs.' Motion at 28 (stating that the grand jury received forensic reports from Krings, Hormann, and Wilcox).

[129] Plaintiffs' Resp. at 47-55.

Page 24 -  STATE DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT

### A.    The DNA evidence.

Plaintiffs also claim that the grand jury indictment was the product of "fabricated evidence that there was no DNA to connect anyone else to the crime."[130] State Defendants incorporate their previous discussion showing that the DNA reports were not false and they certainly were not knowingly false.[131]

### B.    The evidence placing McGuffin and Freeman together after 9:00 pm.

The evidence placing McGuffin and Freeman together after 9:00 pm came from witnesses Lindegren, Hyatt, and Hamilton.  Plaintiffs assert that Webley and McNeely "manipulated" Lindegren into saying that he saw McGuffin and Freeman together outside the Mitchell residence shortly after 9:00 pm.[132]  Plaintiffs identify no evidence about Lindegren's interactions with Webley and McNeely to support this alleged manipulation.  Lindegren was deposed in this case.  Lindegren affirmed that his statements and testimony to officers and at grand jury and trial were truthful.[133]  When asked whether any law enforcement officer attempted to influence or manipulate what he was going to say or testify, he responded:

> I have no idea. They asked me questions. I don't know the game. Could I have been led? I probably could have, because I'm just an old hillbilly. I ain't none all that brilliant when it comes to law work. Could I have been led? Yeah, probably. But did anybody outwardly try anything with me? No. They would never try that. Anybody try to talk me into testifying some way, I would never have done it, and I would whip their ass.[134]

This is not evidence of intentional fabrication.  Plaintiffs further claim that the Municipal Defendants withheld from the grand jury evidence that Lindegren may have been mistaken about who was voted off the show "Survivor" on June 28, when he saw Freeman and McGuffin outside the Mitchell residence.  But Lindegren's identification of Freeman was unequivocal and his

---

[130] Plaintiffs' Resp. at 51.

[131] *See supra*, 4-13.

[132] Plaintiffs' Resp. at 47-49.

[133] Third Davis Decl. Ex. 154 at 2-3, 6, 8 (Lindegren Depo. 219:23-220:5, 231:9-21, 233:10-14).

[134] Third Davis Decl. Ex. 154 at 7 (Lindegren Depo. 232:11-20).  Plaintiffs' counsel met with Lindegren and bought him dinner the night before the deposition.  *Id* at 4-5 (223:22-224:20).

Page 25 -  STATE DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR
          SUMMARY JUDGMENT

identification of McGuffin was less certain but still somewhat confident.[135]  And although no State Defendant was even involved, officers are entitled to some deference in crediting witness identifications.[136]

Plaintiffs assert that the testimony of Alicia Hyatt (formerly Hartwell) was tainted by an inadequate identification procedure performed by McNeely and Webley.[137]  In support of this argument, Plaintiffs offer no evidence about the identification procedure itself.  Without such evidence, Plaintiffs' argument is essentially conjecture.[138]  Plaintiffs' note the absence of any documentation or description of the identification procedure.  They argue that the identification procedure "should" have been recorded and that "notes from 2009 HIT team indicate that there was a video camera in the interview room at the Myrtle Point Police Department when Hyatt was interviewed." [139]  But Hyatt was interviewed on July 21, 2010, so notes taken in 2009 cannot state that there was a video camera present for that interview.  The notes say only that Myrtle Point has a "nanny cam."[140]  But the report of the interview does not say that there was a camera available at that time or that such a camera was actually in the interview room.  And, just as with Lindegren, there is no indication of intentional fabrication, nor any evidence that any State Defendant was involved.

Plaintiffs assert that the grand jury was never told about a pretext call Hamilton placed to McGuffin, wherein McGuffin denied finding Freeman walking, picking her up in his car, and

---

[135] Puracal Decl. Ex. 22 at 3-5 (Lindegren Depo. at 136:20-137:14, 174:6-17) (stating, in part, "I said I wasn't absolutely positive. I thought it was, but I don't know Mr. McGuffin all that well.").

[136] *McSherry*, 584 F.3d at 1135 (rejecting claim that identification procedures were unreliable and suggestive, and noting that officers are entitled to "latitude in determining when to credit witnesses' denials and when to discount them, and we are not aware of any federal law ... that indicates precisely where the line must be drawn").

[137] Plaintiffs' Resp. at 48-49.

[138] *McSherry*, 584 F.3d at 1136 (in the absence of adequate factual support, plaintiff's claim of improper identification procedure reduced to "[s]urmise, conjecture, theory, and speculation").

[139] Plaintiffs' Resp. at 48-49.

[140] Puracal Decl. Ex. 46 at 8 (handwritten notes from 2009 HIT meeting).

Page 26 -  STATE DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR
           SUMMARY JUDGMENT

letting her out near McKay's.[141]  That kind of argument cannot successfully attack a grand jury indictment.  First, it is irrelevant to intentional fabrication or bad faith by any defendant.  That the grand jury was not told of the pretext call, and McGuffin's denials therein, is not evidence of misconduct.  Under Oregon law, the choice of what evidence to present lies with the prosecutor, and the prosecutor need not present all exculpatory evidence or evidence that "explains or contradicts," only that which objectively refutes the incriminatory facts.[142]  A defendant's denials are not such evidence, either under Oregon law[143] or the law governing § 1983 claims.[144]  In any event, the grand jury was informed of McGuffin's statements that he did not see Freeman again after dropping her off at the Mitchell home, thus putting McGuffin's denial before the grand jury as a practical matter.[145]

None of Plaintiffs' evidence supports a reasonable inference that Lindegren, Hyatt, or Hamilton presented testimony that was intentionally or knowingly fabricated by any Defendant or even that any Defendant knew or should have known that their testimony was incorrect.

**C.    The evidence suggesting McGuffin cleaned his trunk to conceal his guilt.**

Plaintiffs contend that unspecified "Defendants" fabricated evidence that McGuffin cleaned or "sanitized" his Mustang to conceal his guilt.[146]  It is undisputed that nobody testified at grand jury that the car had been "sanitized."

Instead, Plaintiffs suggest that Wilcox misled the grand jury through her report that the Mustang's trunk was empty.[147]  The facts are not with them.  Wilcox's report of her July 6, 2000,

---

[141] Plaintiffs' Resp. at 55.

[142] *State v. Harwood*, 45 Or. App. 938-939 (1980) (construing ORS 132.320(4), 132.390).

[143] *Id*. at 939.

[144] *Tekoh v. County of Los Angeles*, 270 F.Supp.3d 1163, 1180 n.13 (C.D. Cal. 2017) (suspect's denial does not "vitiate the presence of probable cause") (citing *Yousefian v. City of Glendale*, 779 F.3d 1010, 1014 (9th Cir. 2015)).

[145] Davis Decl. Ex 101 at 169, 182 (49:8-16, 62:5-20) (Dave Hall).

[146] Plaintiffs' Resp. at 50.

[147] *Id*.

Page 27 -  STATE DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR
          SUMMARY JUDGMENT

examination of the Mustang stated, "The car had dripped a small amount of gasoline."[148]  It later stated, "The trunk compartment was empty.  There was no spare tire or any type of trunk liner."[149]  Nobody disputes that those statements were correct.  The emptiness of the trunk noted in Wilcox's report was not, by itself, incriminating.  What made the empty trunk incriminating was Bartley's testimony that before Freeman disappeared, McGuffin had a lot of "crap" in the trunk, whereas after Freeman disappeared, he did not.[150]  That created an inference that McGuffin had emptied his trunk to transport Freeman.

Plaintiffs' state incorrectly that Wilcox admitted in deposition that she "knew *at the time* that there was a reasonable explanation for the trunk being empty: the gas tank was leaking into the trunk, so it had been emptied before Freeman's disappearance."[151]  What Wilcox actually said was, "I was told later [shortly after issuing the report of her examination] that perhaps things had been taken out of the trunk so that they could repair the gas leak."[152]  Wilcox could not recall who told her that, but it was clear that it was not first-hand information from McGuffin, his family, or other field witnesses.[153] Further, Bruce McGuffin testified that the trunk had not been emptied in order to fix the gas tank.[154]  In essence, Plaintiffs are claiming that Wilcox fabricated evidence by not amending her report to provide an explanation for the empty trunk that even McGuffin's own father refuted.

In any event, this issue was fully presented to the grand jury.  Bruce McGuffin testified that his son had crashed the Mustang, putting a hole in the gas tank that had not been repaired

---

[148] Second Davis Decl. Ex. 153 at 1.  That report was likely presented to the grand jury—"likely" because although Wilcox is listed as appearing "by report," the specific reports presented to the grand jury is not clear.  *See* ECF 291-15 at 2 (listing witnesses appearing by report).

[149] Second Davis Decl. Ex. 153 at 1.

[150]  Davis Decl. Ex. 101 at 400-401 (112:13-113:17 (Brent Bartley)

[151] Plaintiffs' Resp. at 50 (emphasis added).

[152] Second Davis Decl. Ex. 153 at 3 (113:6-11) (Kathy Wilcox Deposition).

[153] Second Davis Decl. Ex. 153 at 4 (114:4-17) ("they talked to witnesses or something and they said, oh, well, the trunk was cleaned out because they needed to fix the gas leak").

[154] Davis Decl. Ex. 101 at 1049 (45:22-24) (Bruce McGuffin).

Page 28 -   STATE DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR
        SUMMARY JUDGMENT

before Freeman disappeared, and that it was "normal" for the Mustang for the trunk to be empty.[155] Other grand jury witnesses also recounted the gas leak.[156] Bartley testified that the McGuffin and Freeman had cleaned the car earlier on June 28 before Freeman went missing, but could not say that McGuffin had cleaned out the trunk or why.[157] And the testimony of Freeman's sister—that Freeman and McGuffin were washing off the white paint that high school seniors often use to decorate their cars around graduation time—suggested that the trunk was not emptied earlier that day.[158] And ultimately, Dave Hall told the grand jury that nothing of significance was found during Wilcox's examination of the Mustang.[159]

Because this issue was fully presented to the grand jury and Plaintiffs offer no evidence that the indictment was procured by fabrication, Plaintiffs argument reduces to a claim that the grand jury's indictment was erroneous. That is insufficient: the "validity of an indictment is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence."[160] Deliberate fabrication consists of more than omission of exculpatory evidence.[161] In *O'Doan*, the officers were aware of the omitted exculpatory information *before* they wrote their reports, and they were still entitled to qualified immunity.[162] Here, Wilcox learned of the alleged reason for the trunk's emptiness *after* she wrote her report, yet the grand jury was still informed of the explanation for the empty trunk and given enough information to evaluate it, providing an even stronger basis for summary judgment than *O'Doan*.

---

[155] Davis Decl. Ex. 101 at 1048-1050, 1055-1056 (44:8-46:15, 51:6-52:1) (Bruce McGuffin).

[156] Davis Decl. Ex. 101 at 1107 (22:10-22) (Kathy McGuffin); 1278 (31:2-20) (Megan Davidson).

[157] Davis Decl. Ex. 101 at 401 (113:14-17), 406-407 (118:25-119:5) (Brent Bartley).

[158] Davis Decl. Ex. 101 at 7-8 (26:15-27:4) (Denise Bertrand).

[159] Davis Decl. Ex. 101 at 185 (65:13-15) (Dave Hall).)

[160] *Merritt*, 425 F.Supp.3d at 1224-25 (rejecting § 1983 challenge to grand jury indictment where the plaintiff's evidence tended only to diminish the certainty of probable cause but did not suggest fabrication) (quotation omitted).

[161] *O'Doan v. Sanford*, 991 F.3d 1027, 1045 (9th Cir. 2021).

[162] *Id*. 1045-1046.

Page 29 -   STATE DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR
          SUMMARY JUDGMENT

### D. The evidence of McGuffin's incriminating statements.

Plaintiffs attack the grand jury evidence of McGuffin's incriminating statements, specifically mentioning witnesses Steinhoff, Crook, Breakfield, Edgerton, and Beebe.[163]

### 1. Steinhoff and Crook

Plaintiffs note that the grand jury was not made aware of the context around Steinhoff's statements and the allegedly coercive interrogation tactics used in the investigation. The State Defendants dispute that they used coercive tactics and are prepared to rebut Plaintiffs' expert with their own. But "coerced" testimony is not the same as fabricated testimony; evidence extracted through coercion cannot, without more, establish a fabrication claim.[164] Fabricated evidence means that it is "invariably false."[165] The question is whether her testimony was obtained by such coercive or abusive methods that any Defendant knew or should have known that that testimony was false.[166] Plaintiffs argue that "Steinhoff originally told investigators that it was another friend, Ricky Crook, who told her to keep her mouth shut. Steinhoff and Crook were getting drugs from the same person, and Crook told Steinhoff not to talk to the police."[167] Plaintiffs then claim that Dannels, during a June 2010 interview, coerced Steinhoff into changing her story and assigning that statement to McGuffin rather than Crook.[168]

---

[163] Plaintiffs' Resp. at 52-53.

[164] *Camm v. Faith*, 937 F.3d 1096, 1111-12 (7th Cir. 2019).

[165] *Fields v. Wharrie*, 740 F.3d 1107, 1110 (7th Cir. 2014) (distinguishing between coerced, fabricated, and false testimony, and noting that "[m]uch testimony is inaccurate, but not deliberately so and therefore not false or fabricated as we are using these words").

[166] *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).

[167] Plaintiffs' Resp. at 52. There, Plaintiffs refer to the 2023 deposition of Mr. McGuffin (Puracal Decl. Ex. 10 at 213:21-22), in which the following exchange occurred: "Q. And you never threatened her? A. No, Ricky Crook, I think did."). As discussed previously, a plaintiff's denials do little to undermine a grand jury's indictment. *Tekoh*, 270 F.Supp.3d at 1180 n.13; *Peterson v. Regina*, 935 F.Supp.2d 628, 643 (S.D.N.Y. 2013) (stating that where a plaintiff's only evidence to rebut the presumption of probable cause is his version of the events, courts have found such evidence insufficient).

[168] Plaintiffs' Resp. at 52. Plaintiffs do not, in their Response, assert that Riddle coerced Steinhoff. But they do so assert in response to interrogatories. Third Davis Decl. Ex. 156 at 5-6. Thus, State Defendants respond to Plaintiffs' argument as if it were directed at Riddle.

Page 30 - STATE DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT

In fact, less than five minutes into that June 2010 interview, and after very little discussion, Steinhoff stated that she did not recall telling officers that Crook had threatened her.[169]  That statement occurred before Riddle or Dannels even entered the room, vitiating any inference that it was coerced.  And before the June 2010 interview, Steinhoff had already said McGuffin told her not to talk to the police.  She did so on March 4, 2010.[170]  She did so on January 25, 2010.[171]  On several instances before that, she had told police that she felt scared and threatened.[172]  Tina Mims (aka Lehman) also testified that she had heard McGuffin threaten Steinhoff and tell her to keep her mouth shut.[173]  Riddle was not involved in the interviews before the March 2010 interview.  Plaintiffs offer no other evidence that Steinhoff's testimony was false.  Given that history and given the latitude due to officers' assessments of witness credibility,[174] Steinhoff's statements in June 2010 were not so obviously suspect such that Riddle knew or should have known they were false.

---

[169] Second Davis Decl. Ex. 140 at 7:7-15 (transcript of June 2010 interview).  Steinhoff also agreed that she might have said so, but did not recall.  And indeed, she had told officers that.

[170] Davis Decl. Ex. 127 at 19, 61-62 (transcript of interview) (reporting that Crook and McGuffin had told her not to talk to police, and that McGuffin had said, "Quit telling the cops that you seen me that night.  And there was other stuff.  He was mad.").

[171] Second Davis Decl. Ex. 148 at 3 (report of January 25, 2010, interview, describing a country drive with Crook and McGuffin during which they "told her not to talk to the cops about anything," and that they "didn't really threaten her with anything but she felt it was implied").

[172] Second Davis Decl. Ex. 146 at 2-3 (report by Coquille PD Officer Lee of September 12, 2000, interview, reporting Steinhoff did not want to be seen entering the police department, and appeared "very concerned in regard to Nick and Crook"); see Franz Decl. (ECF 290-5) (audio recording of Lee's interview); Second Davis Decl. Ex. 149 at 1-2 (Coos County Sheriff's Office report of September 17, 2000, interview, reporting Steinhoff is scared of what might happen to her and feels her life is in great danger); Franz Decl. Ex. 5033 at 22 (transcript of February 14, 2002, interview of Steinhoff, in which she stated that after she told McGuffin that she had been talking to police, McGuffin "glared at me every time he seen me").

[173] Exhibit 101 at 699.

[174] *McSherry*, 584 F.3d at 1135.

Page 31 -  STATE DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR
         SUMMARY JUDGMENT
         JBD/ce1/984034582

### 2.    Breakfield, Edgerton, and Beebe

Plaintiffs attack the grand jury testimony by David Breakfield of McGuffin's threats and threatening behavior.[175]  Plaintiffs offer McGuffin's denial at deposition, as well as the deposition testimony of Megan Edgerton, who dated both McGuffin and Breakfield, arguing that "Breakfield was not a reliable person because of his drug use."[176]  Plaintiffs also mention that Breakfield first disclosed these threats eight years after they happened.[177]  And Plaintiffs attack the grand jury testimony of Melissa Beebe, Freeman's cousin, that she heard McGuffin say, "It's amazing what you can get away with in Coos County."[178]  Plaintiffs again offer Edgerton's deposition testimony that someone else, not McGuffin, had said that.[179]

Again, these years-later denials are not evidence that any State Defendant submitted knowingly false information to the grand jury.  They are merely insufficient arguments that the grand jury's probable cause finding was wrong, which fails as a matter of law.

### E.    State Defendants have not mischaracterized the grand jury testimony

Plaintiffs claim that State Defendants mischaracterize some of the testimony before the grand jury, pointing the testimony of Mason, Bartley, and Hamilton.  Plaintiffs urge that in their Motion, the State Defendants overemphasized the incriminating portions of Mason's testimony and ignored the exculpatory portions.[180]  As to Bartley, Plaintiffs point to a portion of Bartley's testimony where he was asked about the incident Mason described, and responded:

> And I don't remember it, but I know what this is coming to, about what I said that
> I had something to do with it. And I'm thinking I just was getting harassed by the

---

[175] State Defs.' Motion at 25-26 (describing the threats and threatening behavior).

[176] Plaintiffs' Resp. at 53.

[177] Plaintiffs' Resp. at 53.  The grand jury was told that the threats occurred in 2003, and the District Attorney indicated that the statement, "I strangled that bitch's neck, and it wouldn't be hard for me to do you too," had come to his attention only in the last week.  Exhibit 110 at 1215 98:22-25), 1217-1218 (100:3-101:12).

[178] Plaintiffs' Resp. at 53.

[179] *Id.*

[180] Plaintiffs' Resp. at 54; *see* Exhibit 101 at 525-535 (Mason's testimony).  State Defendants believe the relevant portions of Mason's testimony are at pages 532-534, where he described an incident in which Bartley saw some police officers near Fast Mart and appeared to be scared.

Page 32 -  STATE DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR
         SUMMARY JUDGMENT

cops so much, because I did get harassed by Reaves an awful lot, and I was being questioned, is what I should have said. But I'm no speech major, or nothing like that. It just came out wrong.[181]

Defendants disagree that they have mischaracterized the testimony, but that argument misses the point. Plaintiffs do not argue that Mason's or Bartley's testimony was fabricated. The grand jury's weighing of the evidence is not subject to challenge this way.

Finally, regarding Hamilton's testimony about the occasion where McGuffin drove him out to Lee Valley Road after Freeman's body had been found, during which McGuffin made strange statements, Plaintiffs note that that trip occurred after the District Attorney issued a press release identifying the exact location where the body had been found, which allowed Freeman's friends to go to the location and mark it with a cross.[182] According to Plaintiffs, McNeely said at deposition that if he had known that, it would have changed his opinion about the significance of McGuffin taking Hamilton to the site.[183] McNeely's opinion is irrelevant. What is relevant is the grand jury's opinion. Unless Hamilton's testimony was fabricated, and Plaintiffs do not claim that it was, the grand jury's opinion may not be questioned.

For the reasons discussed above, and in the State Defendants' Motion for Summary Judgment, the evidence at trial also was sufficient to sustain the jury' verdict.[184]

## VI.    Conclusion.

The State Defendants do not ask the Court to resolve disputed facts in their favor. Instead, the State Defendants ask the Court to scrutinize Plaintiffs' arguments with care to discern whether their assertions are supported by the facts and whether those facts reasonably permit the inferences they ask the Court to draw from them. Plaintiffs fail to demonstrate that any State Defendant, under the circumstances with which they were confronted—the scientific methods used and their limitations, the procedures that governed their work, the analytical data

---

[181] Davis Decl. Ex 101 at 396-397 (108:22-109:6) (Bartley testimony).

[182] Plaintiffs' Resp. at 55; *see* Exhibit 101 at 1324-25 (38:1-39:6) (Hamilton's testimony).

[183] *Id*.

[184] See State Defs.' Motion at 29-31 (discussing).

Page 33 -  STATE DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT

JBD/ce1/984034582

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

generated, and the information available to them—fabricated any evidence, solicited evidence that they knew or should have know was false, or suppressed any material, exculpatory evidence.

The State Defendants respectfully request that the Court grant summary judgment in their favor on all claims.

DATED March __11__, 2025.

Respectfully submitted,

DAN RAYFIELD
Attorney General

*s/ Jesse B. Davis*
JESSE B. DAVIS #052290
Senior Assistant Attorney General
TODD MARSHALL #112685
Senior Assistant Attorney General
KRISTEN E. HOFFMEYER #085338
Senior Assistant Attorney General
Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email:  jesse.b.davis@doj.oregon.gov
         Todd. marshall@doj.oregon.gov
         Kristen.hoffmeyer@doj.oregon.gov

Of Attorneys for State Defendants Hormann, Krings, Riddle, Wilcox and Oregon State Police

Page 34 - STATE DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT

JBD/ce1/984034582

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000