IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


| | |
|---|---|
| NICHOLAS JAMES MCGUFFIN, as an individual and as guardian ad litem, on behalf of S.M., a minor, | ) ) ) ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) No. 6:20-cv-01163-MK |
| | ) |
| MARK DANNELS, PAT DOWNING, SUSAN HORMANN, MARY KRINGS, KRIS KARCHER, SHELLY MCINNES, RAYMOND MCNEELY, KIP OSWALD, MICHAEL REAVES, JOHN RIDDLE, SEAN SANBORN, ERIC SCHWENNINGER, RICHARD WALTER, CHRIS WEBLEY, ANTHONY WETMORE, KATHY WILCOX, CRAIG ZANNI, DAVID ZAVALA, JOEL D. SHAPIRO AS ADMINISTRATOR OF THE ESTATE OF DAVID E. HALL, VIDOCQ SOCIETY, CITY OF COQUILLE, CITY OF COOS BAY, and COOS COUNTY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| | ) |
| Defendants | ) |
| | ) |

REMOTE DEPOSITION OF RICHARD WALTER

Taken on behalf of the Plaintiffs

June 30, 2022

EXHIBIT 16
Page 1 of 10

the investigator, then, the ability to look --
hopefully look in the right places and challenge and
see if you can develop more scientific evidence,
okay?  But again, I did not opine that absolutely he
did it and whatever else.  What I did was I showed
them, predicated on what they told me, this is how
it fits together, okay?

Q.    So let me stop you there for a second and
see if I understand, because I think what you're
saying, and correct me if I'm wrong, but I think
what you're saying -- or the way I'm -- the way I'm
understanding what you're saying and based on what
I've read in your papers and the papers we've
reviewed in your papers --

A.    Right.

Q.    -- it sounds like what you're saying is
based on what they provided me, I determined from
the crime scene evidence that this homicide was
committed by a power assertive perpetrator?

A.    Right.

Q.    A perpetrator who demonstrated
power-assertive tendencies?

A.    Right.

Q.    And then they put this board together with
the pre-crime behavior and the post-crime behavior

EXHIBIT 16
Page 2 of 10

of McGuffin, and based on the information that they provided to me about pre-crime and post-crime, I concluded that Mr. McGuffin met the power-assertive profile?

A.    Exactly.

Q.    Okay.  And you discussed that with them, with the investigators, Dannels and Frasier?

A.    Yeah.  I didn't say he did it.

Q.    Okay.  So you didn't say he did it, but from there, now you've discussed this where you said yes, in your opinion, you have a homicide scene that is consistent with a power-assertive perpetrator and you have a suspect who has a power-assertive profile.

A.    Right.

Q.    So where are they supposed to go with that?  Because it sounds like you matched them up pretty tightly.

MS. SCHAFFER:  I'm going to object; lacks foundation; misstates the witness's testimony; argumentative.

Q.    Okay.  Mr. Walter, have I misstated what you're saying?

A.    I lost my thought.

Oh, actually, if all the facts that they

EXHIBIT 16
Page 3 of 10

Page 237

A.   I don't know that there was anybody else.

Q.   Did you ask?

A.   I am not convinced, by the way, that we should be talking about just McGuffin.  I would think you should be talking about they.

Q.   Explain.

A.   Often with PAs, they like to have witnesses and they also like to have people who can delegate the fact that they were successful.  In fact, with PAs, certainly you can get the individual, but often you'll get as many as three to five people involved, and I'm not convinced beyond a shadow of a doubt, and though this was never brought up by them, I'm still not convinced that it wasn't more than one.

Q.   Okay.  Did you tell them that?

A.   I don't remember specifically telling them that, but it was certainly within my lexicon to do that, to make that kind of a statement.

And what I still don't understand about the case --

MS. SCHAFFER:  There's no question pending.

Q.   Were you finishing a thought?

A.   No, go ahead.

EXHIBIT 16
Page 4 of 10

Page 238

Q.   Okay.  So let's get into the investigation a little bit.

When did you first become aware of Ms. Freeman outside of the investigation?

A.   When they presented it at Vidocq.

Q.   Had you spoken to anybody about it before Chief Dannels came out to Vidocq Society to present it?

(Exhibit No. 2 marked.)

A.   No.  I'm going to show you what's been marked as Exhb. 2, this is you an article called "Cold Case Squad:  Modern-Day 'Sherlock Holmes' Team Takes on Oregon Slaying."  The author is Rob Wallace I think of ABC News with a publication date of August 11, 2010, which is an article about you and Vidocq Society and your participation in the Freeman investigation.

I'll take you to, let's see here, it must be page -- whatever this page is, page 3 of 7 of the PDF.

We've got this quote here from Mr. Capuzzo, "People think of them" -- and he's talking about you and Vidocq Society -- "People think of them as wizards to sort of peep and mutter and go into a back room and come out and say 'He did

EXHIBIT 16
Page 5 of 10

A.    Right.

Q.    Okay.  And when you say the question of payment is a mystery, what do you mean?

A.    We never could figure out who paid for the airfare and all that kind of stuff.

Q.    Okay.  Was it another one of those things where you tried to look at Vidocq's records, talked to the travel agents and that sort of thing?

A.    Yeah.  Yeah.

Q.    And there's no record of Vidocq paying for it?

A.    Well, they didn't -- they changed Frasier and all this kind of stuff, but I talked to the most recent treasurer and he looked and they only have six years back, they don't have ten years back.

Q.    So the decision was made that you would travel to Coquille and that Vidocq would participate.

What was the plan for Vidocq Society's involvement in the pre-investigation?

A.    Me going out and getting ideas and giving them suggestions and giving them a sense of perspective and letting them make up their own mind.  That's how they wanted to proceed.  I did not say "Go get him," okay?  It's their choice.  I was there

EXHIBIT 16
Page 6 of 10

Page 260

only as an interested pro bono person.  It's their case, not mine.  I wasn't the investigator.  I didn't do the cross checking of their facts, that sort of thing.  It was just a -- it was a thought stimulated -- hopefully a thought stimulating exercise for them so they could understand their case.

What they do with that case is their problem or their benefit, not mine.

Q.    Was the involvement with any other Vidocq Society members contemplated?

A.    Not that I know of.

Q.    Who is Mark McClish?

A.    I don't know.

Q.    Do you know what his involvement was?

A.    I don't know who he is.

(Exhibit No. 5 marked.)

Q.    Okay.  Let me show you what's been marked as Exhb. 5.

I'll represent to you that this is a blog post from a blog that's maintained or a website maintained by somebody named Mark McClish, and this was from September 23, 2011, and it's about Leah Freeman, the investigation, and he says down here, "In November of 2009, the Vidocq Society asked me to

EXHIBIT 16
Page 7 of 10

Page 270

get through it actually pretty quick.  It looks like a lot more information on my outline than it really is.  I think we can finish up by 4:30.

MS. SCHAFFER:  Okay.  And again, it's 7:30 here.

MR. LAUERSDORF:  I know.

(Pause in deposition:  4:05 - 4:09 p.m.)

(Exhibit No. 6 marked.)

BY MR. LAUERSDORF:  (Continuing)

Q.   All right.  I'm going to show you now what's been marked as Exhb. 6.

I'm wondering if you've ever seen this document before or if you recognize what this document is?

A.   I've not seen it.

Q.   Okay. this is something that we were provided in discovery by Vidocq's counsel and my understanding is that this is a memo that was written reporting kind of a memo with the case and the presentation.

Do you recall seeing this as part of your time with Vidocq, this type of memo?

A.   No.

Q.   Was this part of Vidocq's practice while

EXHIBIT 16
Page 8 of 10

Page 275

other way around?

A.    I think they're speculating and taking liberties with my -- with me.  I don't recall that.

Q.    Okay.  Do you recall having a discussion with anybody at -- having any discussion with anybody at Vidocq Society, that after discussion, Dannels and their crew realized that there must have been a fight where Ms. Freeman's bloody shoe was found?

A.    I think that's speculation.

Q.    Do you recall when this -- when they're referring here to "Richard advises me," do you recall when that conversation took place?

A.    I don't think that conversation did take place.

Q.    Okay.  So you think whoever authored this document is --

A.    Taking liberty.

Q.    And they're referring to a conversation that did not happen?

A.    Right.

Q.    Here it says "It was a PA case and PAs hit for the face, therefore blood, and then they surmised that the BF put her in the trunk of the car that he was driving and called his father who came

EXHIBIT 16
Page 9 of 10

STATE OF OREGON        )

County of Multnomah )

I, Aaron M. Thomas, Certified Shorthand Reporter, Registered Professional Reporter, and Notary Public for the State of Oregon, do hereby certify that ROBERT WALTER personally appeared before me at the time and place mentioned in the caption herein; that the witness was by me first duly sworn on oath and examined upon oral interrogatories propounded by counsel; that said examination, together with the testimony of said witness, was taken down by me in stenotype and transcribed through computer-aided transcription; and that the foregoing transcript constitutes a full, true and accurate record of said examination of and testimony given by said witness, and of all other oral proceedings had during the taking of said deposition, and of the whole thereof.

Witness my hand and Notarial Seal at Portland, Oregon, this 9th day of July, 2022.

_____
Aaron M. Thomas
Oregon CSR 04-0388

EXHIBIT 16
Page 10 of 10